ATTACHMENT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA        *     CRIMINAL NO: 10-204

            v.                 *     SECTION: "N"

KENNETH BOWEN
ROBERT GISEVIUS            *
ROBERT FAULCON
ANTHONY VILLAVASO      *
ARTHUR KAUFMAN
GERARD DUGUE           *

                    *     *     *

## DECLARATION

I, Karla Dobinski, hereby declare under penalty of perjury under the laws of the United States that the following is true and correct, to the best of my information and belief:

INTRODUCTION

1.  I am a trial attorney with the Criminal Section of the Civil Rights Division of the United States Department of Justice and am the attorney who headed the taint team for the federal investigation of the Danziger Bridge shootings.

2.  This declaration is based on my personal knowledge, and on information and belief, and is submitted in support of the United States' Response to Defendant Bowen's Motion to Quash the Indictment against him in the above-captioned matter.

3.  I have been employed at the Criminal Section since April, 1985 and have investigated and prosecuted cases in the areas of police misconduct, racial violence and human trafficking, the three major areas handled by the Criminal Section.

4.  Police misconduct investigations sometimes involve the creation of Garrity- compelled or Kastigar- immunized statements by officers.  In those situations, the Criminal Section frequently establishes a "taint team" to ensure that the officers' rights under Garrity and Kastigar are protected.

5. During my tenure at the Criminal Section, I have participated on several "taint teams" to include United States v. Koon, 34 F. 2d 1416, (9th Cir 1994) (the "Rodney King" federal prosecution).

6. I have also provided advice and consultation to numerous federal and state law enforcement authorities and have provided training on the Garrity/Kastigar best practices.

CRIMINAL SECTION PRACTICES REGARDING IMMUNIZED STATEMENTS

7. It is not unusual that an incident that constitutes a possible federal criminal civil rights violation also is the subject of a state investigation and prosecution.

8. Indeed, in the aftermath of such an incident, the Criminal Section determines whether the federal authorities will pursue the investigation or will defer to the state investigation. This determination usually is made after respective authorities have conferred. If the Criminal Section defers to the state process, the Section will monitor those proceedings to ensure that the federal interest is vindicated.

9. In police misconduct matters in which the state has proceeded while the federal authorities monitor, it is not unusual for the state process to result in the creation of an immunized statement by a subject police officer.

10. The Criminal Section has a long-established standard practice to ensure that no immunized statement of a subject officer is used against that officer in a federal criminal prosecution.

11. According to this standard practice, attorneys, investigators and/or paralegals are assigned to a "taint team" to review all evidence and then segregate the immunized statements and any information derived therefrom.

12. As the investigation progresses, every new document obtained is forwarded immediately to the taint team, which reviews the document for information derived from privileged sources before forwarding the document to the trial team. If the taint team finds any immunized statement, or any direct or indirect reference to the contents of the immunized statement, the taint team redacts the documents before providing them to the trial team.

13. Depending on the circumstances of each case, the standard practice could also warrant that the taint team interview and screen relevant witnesses to preclude any inadvertent use of immunized statements by the government prosecutors. We determine whether the witness has been exposed to the immunized statement, and if so, we follow up to insure that anything the witness would tell the trial team would be based on the witness' own

memory. We also instruct the witness to refrain from telling the trial team any information that might be in the immunized statement.

14. Members of the taint team never participate in any discussions with the prosecution team concerning the contents of the immunized statement, and they never participate in any investigative or trial strategy.

15. The taint team routinely acts "out of an abundance of caution" in its screening process in order to ensure that a person's immunized statement is not used against them in the criminal proceeding.

## FEDERAL JURISDICTION REGARDING DANZIGER SHOOTINGS

16. Regarding the shootings on Danziger Bridge on September 4, 2005, the United States had jurisdiction to investigate the allegations of federal criminal civil rights violation.

17. Thus, in the aftermath of the shootings, the Criminal Section had the responsibility to determine whether to defer to a state investigation and prosecution, or to proceed independently with a full federal investigation.

## FEDERAL PROSECUTORS' INTERACTION WITH THE STATE DISTRICT ATTORNEY

18. As a part of the decision making process, Criminal Section Deputy Chief Bobbi Bernstein and then-Trial Attorney (now-Special Litigation Counsel) Mark Blumberg periodically conferred with then-Assistant District Attorney Dustin Davis of the New Orleans District Attorney's Office, who was the lead state prosecutor. Blumberg and Bernstein spoke to ADA Davis (prior to Davis obtaining immunity for any testimony of any New Orleans police officers) to learn the basic facts of the case and to determine whether the state intended to move forward with a prosecution. Their purpose was to assess whether the Criminal Section would investigate the incident or whether it would monitor the state process.

19. As part of their assessment of the case, they reviewed a 54-page NOPD report, and transcripts of audio-taped statements given by the several officers; and a transcript of Archie Kaufman's testimony at the preliminary hearing for Lance Madison on the charges of attempted murder of a police officer. The 54-page report purported to set out a lengthy recitation of the involved officers' accounts.

20. From reading the NOPD documents, the federal prosecutors became aware that some officers, including defendant Bowen, had given different versions of their actions on the bridge. For example, regarding Bowen's claim that he had kicked guns off of the Danziger Bridge, in one statement he stated he then ran down under the bridge where he

saw the guns lying in the grass, and in a different statement, he stated that after kicking guns off the bridge he immediately followed two men over the bridge.

21. In November, 2006, Attorney Blumberg and Deputy Chief Bernstein traveled to New Orleans to gain firsthand information about the scene, and to view a videotape that was in the possession of the District Attorney's Office. During the meeting, ADAs Dustin Davis and Robert Culpepper showed Blumberg and Bernstein the video and accompanied them to the scene.

22. While Blumberg and Bernstein were with ADAs Davis and Culpepper, they learned that the District Attorney's Office had, just days before, obtained court-ordered immunized grand jury testimony from several NOPD officers, including Ken Bowen. Blumberg and Bernstein immediately instructed ADA Davis not to tell them anything about the immunized statements of any officer, and not to reveal any information that came from those statements. Blumberg and Bernstein explained that they could not become tainted by any of the contents of the statement, because they needed to be able to pursue the federal investigation in the event the state process did not vindicate the federal interest.

23. According to ADAs Davis and Culpepper, and federal prosecutors Blumberg and Bernstein, all of the substantive discussions that the ADAs had with Blumberg and Bernstein, both before and after the immunized statements were taken, related to the crime scene, the video, and the various versions of events on the bridge offered in the 54-page report and transcripts of the officers' audio-taped statements, which Blumberg and Bernstein had previously read. All four attorneys have declared that at no time did either ADA Davis or Culpepper relay to Blumberg or Bernstein any information from the contents of Bowen's immunized testimony.

24. In December, 2006, Attorney Blumberg traveled to New Orleans on one other occasion to meet with victim Lance Madison, and to sit in on a brief meeting with Susan Bartholomew. The purpose of this trip was for Blumberg to meet and personally assess some of the victims, in order to aid in the determination of whether the federal government would continue to monitor the state investigation or would begin to conduct an independent federal investigation. ADA Davis led the questioning of Madison, and audio-taped the questions and answers. Although this interview occurred after Bowen gave his immunized testimony, no part of the interview in any way referred to or involved information derived from, the immunized testimony of defendant Bowen. The interview with Madison and the brief meeting with Bartholomew were the only two interviews in which Blumberg participated. Deputy Chief Bernstein never participated in any witness interview during the state prosecution.

STATE PROCESS RELATED TO IMMUNIZED TESTIMONY

25. According to state records, in September, 2006, the New Orleans Parish District Attorney's Office began a grand jury investigation into the Danziger Bridge shootings. In the course of the state grand jury investigation, the District Attorney's Office put approximately 24 witnesses into the grand jury.

26. Ken Bowen provided court-ordered immunized testimony on November 1, 2006.

27. The State obtained an indictment on December 28, 2006. Among the defendants were Ken Bowen, Mike Hunter and Ignatius Hills, all of whom had provided immunized testimony to the grand jury.

28. During the pendency of pre-trial motions proceedings in February, 2007, ADA Davis sought advice from Attorney Blumberg regarding the legal issues presented by defendant Bowen's immunized statement. Blumberg referred ADA Davis to me for any Kastigar-related discussions because I frequently consult with other law enforcement personnel regarding practices and procedures and because Blumberg did not want to become tainted by the contents of the immunized statement. Both Blumberg and ADA Davis have confirmed that they had no discussions about the substance of the immunized testimony. ADA Davis and I briefly conferred regarding general information about the federal law regarding Kastigar issues and general legal approaches taken by the Criminal Section when confronted with immunized statements. I was familiar only with the general parameters of the Danziger events, and not with the specific facts of the investigation. ADA Davis did not apprise me of any details of the immunized statements.

29. According to state court records, the judge held a hearing on discovery motions on March 9, 2007. During that hearing, Frank DeSalvo, Bowen's attorney, called NOPD Lieut. Michael Lohman as a witness to testify that ADA Davis had shown Bowen's grand jury testimony to Lohman. DeSalvo's questions elicited from Lohman an indirect reference to a specific topic of the testimony The judge then asked a clarification question of Lohman, who replied that he had seen two sentences of Bowen's testimony.

30. On August 13, 2008, the judge issued his decision to quash the indictment. In the written opinion, he cited three bases: the State failed to prove that it did not use the officers' testimony to obtain the indictment against them, the ADA violated the secrecy of the grand jury by showing a portion of Bowen's transcript to Lohman, and the State gave improper jury instructions concerning the state law regarding intent and murder.

FEDERAL INVESTIGATION

31. Active federal involvement in the investigation of the Danziger shootings began in September, 2008, when the District Attorney's Office decided to forego an appeal of the dismissal. Before that time, the only role of the federal prosecutors was to check in

sporadically with ADA Davis; meet with Davis to view the video and see the bridge; and to meet two of the victims. No federal prosecutor participated in any strategy session with the District Attorney's Office; for instance, the federal prosecutors did not know what witnesses ADA Davis interviewed, what witnesses were to be put into the grand jury other than Lance Madison, what charges he planned to present or when he planned to present them. In short, Blumberg, Bernstein, ADA Davis and ADA Culpepper all confirm that the state prosecution operated completely independently of the Department of Justice.

32. Once the federal investigation began, the very first step of the federal investigation was for the Criminal Section to establish a "taint team" to ensure compliance with the federal law regarding Kastigar.

33. The federal investigation in this case incorporated the well-established screening practice of the Criminal Section outlined above. I was assigned to lead the taint team, which was also staffed by Dorothy Manning Taylor, an Assistant United States Attorney from the United States Attorney's Office, and John Wood and Jose Guillen, agents from the Federal Bureau of Investigation. Taint-team paralegals also participated in the screening process.

34. Once the taint team had been established, federal prosecutors issued subpoenas for all NOPD and DA files related to the Danziger Bridge case. When the documents were obtained, they were sent immediately to the Criminal Section where the taint team reviewed all of the evidence and materials from every source, in order to screen out the contents, and any reference to the contents, of the immunized statements. All information subpoenaed by the federal grand jury was screened by the taint team. Only evidence and material that was determined to be from a source independent of the immunized statement was disseminated to the prosecution team.

35. During this process, the taint team segregated the transcripts of, and any direct or indirect references to, the state-immunized testimony of three federal subjects: Bowen, Hills and Hunter. The prosecution team was not provided with any of the segregated information. As the federal investigation progressed, Hunter and Hills agreed to plead guilty and waive any Kastigar rights, after which the taint team retrieved the transcripts of the testimony offered by those two defendants, and provided their transcripts to the prosecution.

36. AUSA Taylor and I have spoken with the current and former members of the trial team, investigative agents from the Federal Bureau of Investigation and also supervisory personnel in the United States Attorney's Office and the Civil Rights Division. No person associated with the federal prosecution team has read, seen, heard, or learned of, the contents of Bowen's immunized statement.

37. We have also spoken with former New Orleans Parish ADAs Dustin Davis and Robert Culpepper, who confirmed that they never discussed the content of Bowen's immunized grand jury with anyone on the federal prosecution or investigative teams.

38. The taint team interviewed all government witnesses who could potentially have become aware of the contents of Bowen's immunized testimony. Only one witness – Michael Lohman -- was directly aware of the content of Bowen's testimony (See paragraph 46 below). Nonetheless, all of these witnesses were told to take special care that the information they provided to the trial team was derived entirely from the witness's own memory. These interviews were memorialized in FBI 302s, which were provided to the defendants in the fall of 2010.

39. No member of the taint team participated in any discussion with members of the prosecution team regarding investigative or trial strategy in this case.

SPECIFIC TOPICS RAISED IN DEFENSE MOTION

**Discussions with FBI ASAC Mark Gant**

40. The defense motion refers to a Danziger-related communication that occurred in September 2005, between an official with the Louisiana Department of Justice and FBI ASAC Mark Gant. This communication occurred more than a year before any testimony was compelled. Accordingly, nothing about that communication could have related to any Kastigar-protected information, and nothing in that communication was redacted by the taint team.

**Discussions Between Federal Prosecutors and ADA Dustin Davis on October 25, 2006**

41. As with the communication to the FBI in 2005, the referenced communication between federal prosecutors and ADA Davis in October 2005 occurred before any testimony had been compelled. Accordingly, nothing about these communications has been redacted.

**Federal Prosecutors Meeting with ADA Davis After Testimony was Compelled**

42. All four participants in any post-immunity conversations -- Blumberg, Bernstein, Davis and Culpepper – have stated, without hesitation, that the contents of Ken Bowen's grand jury testimony were never discussed. Blumberg and Bernstein have confirmed that everything they learned from the ADAs was contained within the reports and transcripts that they had already read.

**State Grand Jury Order of Witnesses**

43. On November 1, 2006, when defendant Bowen testified under a court-ordered grant of use immunity, Bowen was the final NOPD officer who had been present at the shootings

to testify in the grand jury. Afterwards, the state called an additional 10 witnesses. My review of the transcript of their testimony indicates that none of these witnesses was asked any question concerning, or revealing, the substance of defendant Bowen's testimony.

## Federal Grand Jury "Subjected" to File

44. As discussed above, every document obtained by the federal grand jury was sent to the Criminal Section for a taint-review before any prosecutor, or any member of the federal grand jury saw the document or heard any information contained therein.

## FBI Special Agent William Bezak Received DA's Investigative File

45. Special Agent Bezak has confirmed that he has not read nor heard of the contents of Bowen's immunized statement. Consistent with Bezak's statement is the FBI FD-302 (attached as Exhibit H to the defense motion), in which Bezak specifically writes that he submitted the DA's case file to the Civil Rights Division "to review for possible Garrity material."

## Michael Lohman and the Immunized Testimony

46. Mike Lohman is the former NOPD Lieutenant who pled guilty to the conspiracy to cover-up the circumstances of the shootings. Lohman confirmed that he has briefly seen a portion of the immunized testimony. He also confirmed that he has never revealed his knowledge of the contents of the immunized testimony to the federal prosecutors or agents. Lohman stated that everything he has told the federal prosecutors or agents is based on his own first-hand knowledge. He further stated that his brief look at the portion of the immunized testimony did not alter his memory in any way.

## Bigelow Court Opinion

47. When the state judge issued his opinion, he included in the opinion the two-line excerpt of the Lohman testimony referencing a topic within Bowen's testimony. Out of an abundance of caution, we treat the excerpt in the court opinion as *Kastigar*- protected, and, accordingly, redacted it, and every reference to it, from the trial team's case file. See Defense Exhibit I, page 3

## State Defense Attorneys Received Immunized Testimony

48. Three former NOPD officers who were Bowen's co-defendants in the state case have now pled guilty in the federal prosecution: Robert Barrios, Mike Hunter and Ignatius Hills.

49. As described in the FD-302s provided to the defense in September, 2010, each of these former co-defendants has demonstrated that his cooperation with the federal prosecutors has not tainted the federal prosecution, as follows:

    a. Robert Barrios, who is represented in the federal case by Attorney Robert Glass, was interviewed by the taint team. Barrios never read or learned the contents of Bowen's immunized statement, and he confirmed to the taint team that none of the information he provided to federal authorities could have come from Bowen's immunized testimony. Attorney Glass did not represent Barrios in the state case and has never seen the immunized statement.

    b. Ignatius Hills was represented during the state trial by Attorney Bruce Whitaker and is now represented by Attorney Robert Jenkins. Once Hills decided to cooperate with the federal prosecution, he obtained counsel from Jenkins, who advised him through the plea process. The taint team has interviewed both Hills and Jenkins, and has determined that, at the time of Hills' extensive interviews with the FBI and his agreement to plead guilty, he had neither read, nor learned the content of, Bowen's testimony. Likewise, Attorney Jenkins, who advised Hills through the federal process, has never seen or learned the content of that testimony. Hills reported that it was not until after his interviews with federal prosecutors, that he briefly browsed through the state documents but his memory was unaffected by seeing them. Hills has confirmed that he has personal knowledge of the matters he testified about, and that he never relayed to the prosecution team any substance of Bowen grand jury testimony.

    c. Mike Hunter was represented in state court by Attorney Townsend Myers, who continues to represent Hunter in federal court. Both Hunter and Myers have been interviewed by the taint team. Hunter has confirmed that he never read Bowen's immunized statement, and that all of the information he provided to federal authorities came from his personal knowledge unrelated to that testimony.

    d. Townsend Myers confirmed that he did not consider that immunized testimony in any way in advising his client to plead guilty. Although Myers read the immunized statement in 2007, he did not advise his client to plead guilty until 2010, when Hunter admitted to him that he was, in fact, guilty. Myers also confirmed that he has never relayed to the prosecution team any content of Bowen's immunized testimony. Myers said that he was firmly instructed by Ms. Bernstein to not divulge any information derived from Bowen's grand jury testimony. He reported that she said if a question she asked would inadvertently elicit information derived from Bowen's immunized testimony, he was not to answer the question.

**Dylan Utley, who Represents Lohman, was "Exposed" to the Testimony**

50. The taint team interviewed Dylan Utley, who currently represents Mike Lohman. Utley confirmed that he never read the immunized testimony, and that he never learned from any source the content of that testimony. Utley was not involved with the Danziger Bridge case until 2009, when he began representing Mike Lohman. Utley expressed great surprise that defendant Bowen's attorney, Frank DeSalvo, had complained of his involvement in the case, as Utley only became involved in 2009 at the direct and personal request of Attorneys DeSalvo and Hessler. Utley never discussed the testimony with his client. Utley is confident that his client has testified from personal knowledge, and not from information gleaned through the immunized testimony.

## CONCLUSION

51. A supplemental pleading will be filed, under seal and provided to Bowen's counsel, to provide additional information that demonstrates that even if the firewall had been breached and the government's case was tainted, no Kastigar violations have occurred.

52. In sum, due to the practices and circumstances described above, the government's case is not tainted, and all evidence and materials that the prosecution considered in this case and which could be used against defendant Bowen came from sources independent of the defendant's immunized testimony.

Signed this 8th day of April, 2011, in Washington, D.C.

ATTACHMENT B

STATE OF LOUISIANA               ORLEANS PARISH GRAND JURY

                                 POLICE ITEM NO. J-05934-05


        SPECIAL INVESTIGATION INTO SHOOTING OF CIVILIANS ON
     OR AROUND THE DANZINGER BRIDGE ON CHEF HIGHWAY AFTER
        HURRICANE KATRINA ON SEPTEMBER 4, 2005

                    THIS IS FOLDER 1 OF 2

    Transcript of testimony adduced from the following wit-

ness. in the above captioned matter before the Orleans

Parish Grand Jury on Wednesday, November 1, 2006, Mr. Robert

D. Culpepper, Esq. and Mr. Dustin M. Davis, Esq., Assistant

District Attorneys present on behalf of the State of

Louisiana.


11 Jurors were present throughout the proceedings.


WITNESS CALLED:  Sergeant Kenneth Bowen, NOPD      Page 1


(NOTE:  Pages 1 through 78 are contained in Folder 1 of 2

 and Pages 79 through  154 are contained in Folder 2 of 2.

 Also, please see sheet directly behind this sheet in Folder

 1 for a complete listing of the dates and the witnesses who

 testified on said dates.)

MAURICE W. BETTENCOURTT
Certified Court Reporter
1231 St. Ferdinand Street
New Orleans, LA 70117
Phone: (504) 945-7375

MAD-007929



**U.S. Department of Justice**

Civil Rights Division

*Criminal Section - PHB*
*950 Pennsylvania Avenue, NW*
*Washington, DC  20530*

*Garrity Material*

Removed: *Statement of Sergeant Kenneth Bowen.  Dated: November 1, 2006.*

MAD-007930

ATTACHMENT C

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    05/24/2010

ROBERT BARRIOS, black male, date of birth ▮▮▮▮▮▮▮,
▮▮▮▮, was interviewed at the United States Attorney's Office, 500
Poydras Street, New Orleans, Louisiana (LA).  Also present during
the interview was BARRIOS' attorney, ROBERT GLASS, United States
Department of Justice attorney KARLA DOBINSKI, and Assistant United
States Attorney DOROTHY TAYLOR.  After being advised of the
identities of the interviewing agents and the purpose of the
interview, BARRIOS provided the following information:

BARRIOS was at the scene during the Danziger Bridge
incident and was an eye witness to the events that occurred.  He
gave a verbal report to ARCHIE KAUFMAN following the incident.
Some time later, following police procedure, BARRIOS gave a
statement to BARNES and SMALL as a victim of the shooting.

BARRIOS never testified before the state Grand Jury and
was never asked to testify before the Grand Jury.  BARRIOS knew
BOWEN, HUNTER, and HILLS were asked to testify before the Grand
Jury in exchange for immunity, however.  The lawyers of the three
immunized witnesses viewed the Grand Jury testimonies in order to
find Brady material.  None of the witnesses (BOWEN, HUNTER, or
HILLS) shared their Grand Jury testimony with BARRIOS, and BARRIOS
never saw nor heard about the contents of any of their Grand Jury
testimonies.  BARRIOS heard ADA DUSTIN DAVIS met with HUNTER,
HILLS, and GISEVIUS prior to the Grand Jury proceedings.  GISEVIUS
never testified before the Grand Jury.

JOHN DIGIULIO, BARRIOS' lawyer at the time, kept BARRIOS
informed about the Kastigar issues related to BOWEN, HUNTER, and
HILLS' Grand Jury testimonies.  At a police PANO meeting, which
took place after the three men testified before the Grand Jury,
BOWEN told BARRIOS the Federal Government had adopted the case but
they still had to "jump the hurdle" of the Kastigar issue.
DIGIULIO told BARRIOS if a Kastigar hearing had occurred, any Brady
Material found could have been released.

---

Investigation on    05/19/2010    at  New Orleans, Louisiana

File #  282A-NO-71320                                          Date dictated

by    SA Jonathan D Wood: jdw

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# ATTACHMENT D

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    06/08/2010

    MICHAEL HUNTER, white male, date of birth ▊▊▊▊▊,
▊▊▊, was interviewed at the United States Attorney's Office, 500
Poydras Street, New Orleans, Louisiana (LA). Also present during
the interview was HUNTER's attorney, TOWNSEND MYERS, United States
Department of Justice attorney KARLA DOBINSKI, and Assistant United
States Attorney DOROTHY TAYLOR. After being advised of the
identities of the interviewing agents and the purpose of the
interview, HUNTER provided the following information:

    HUNTER was at the scene during the Danziger Bridge
incident and was an eye witness to the events that occurred.
Approximately two hours after the shooting, LOHMAN held a meeting
with all the participants involved to determine which officers
fired their weapons and who were they shooting at. Hunter later
gave a taped statement as a victim of the shooting to two homicide
detectives. HUNTER never read any police reports regarding the
Danziger Bridge incident.

    HUNTER was subpoenaed to testify before the Grand Jury.
HUNTER invoked his 5th amendment right when he took the stand.
Approximately an hour and a half later, HUNTER was given a notice
of immunity. He then testified, with immunity from his statement,
before the Grand Jury. HUNTER never discussed his Grand Jury
testimony with anyone because he had been told he could be charged
with a crime if he talked about his testimony.

    TOWNSEND MYERS, and the other two lawyers, were shown the
entire Grand Jury testimonies of the men that testified in order to
read and review them. MYERS never showed HUNTER his own transcript
or the transcripts of any other officer that testified. HUNTER was
not aware of any conversations other officers had about the Grand
Jury testimonies. HUNTER doesn't know what LOHMAN was shown in the
meeting with ADA DAVIS, and he doesn't know what the other officers
said in their testimonies.

    Before Hurricane Katrina, BOWEN was HUNTER's supervisor.
After the shootings occurred, before giving taped statements to the
detectives, BOWEN and HUNTER discussed the details of the shooting
to align their stories. After Hurricane Katrina, BOWEN took an
administrative position with the district.

---

Investigation on    05/19/2010    at   New Orleans, Louisiana

File #  282A-NO-71320                              Date dictated

by   SA Jonathan D Wood: jdw

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency

FD-302a (Rev. 10-6-95)

282A-NO-71320

Continuation of FD-302 of ___ MICHAEL HUNTER _____ , On 05/19/2010 ___ , Page ___ 2 ___

      HUNTER did not hear about or have any discussions that
have affected HUNTER's memory of the Danziger events.

# ATTACHMENT E

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription _____07/09/2010_____

          IGNATIUS HILLS, black male, date of birth ▆▆▆▆▆▆▆,
▆▆▆▆, was interviewed at the United States Attorney's Office, 500
Poydras Street, New Orleans, Louisiana (LA).  Also present during
the interview was HILLS' attorney, ROBERT JENKINS, JENKINS'
assistant CHARLES CUSIMANO, and Assistant United States Attorney
DOROTHY TAYLOR.  United States Department of Justice attorney KARLA
DOBINSKI and Federal Bureau of Investigation (FBI) Special Agent
(SA) Jonathan Wood were present on a conference call.  After being
advised of the identities of the interviewing agents and the
purpose of the interview, HILLS provided the following information:

          All statements given by HILLS regarding the Danziger
Bridge incident were given as a victim and not as a suspect of the
events that occurred, and HILLS never gave any compelled
statements.  At no point did HILLS discuss his Grand Jury testimony
with the other NOPD officers in the case.  HILLS was not aware of
any of the other NOPD officers reading or having access to BOWENS'
Grand Jury testimony at any point in time.  HILLS never saw BOWENS'
Grand Jury testimony leading up to and during his meetings with the
federal prosecutors.  After his meetings with the federal
prosecutors concluded, HILLS was able to quickly review BOWENS'
Grand Jury testimony, but BOWENS' Grand Jury testimony did not
affect or alter HILLS' recollection of the Danziger Bridge events
in any way.

Investigation on ___06/17/2010___ at _New Orleans, Louisiana_____

File # _282A-NO-71320_____        Date dictated _____

by _SA Jonathan D Wood: jdw_____

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# ATTACHMENT F

FD-302a (Rev. 10-6-95)

282A-NO-71320-302

Continuation of FD-302 of ____IGNATIUS HILLS_____ , On _04/22/2010_ , Page ___5___



    HILLS, BOWEN and HUNTER obtained immunity in the state
case.  HILLS received a copy of his own grand jury testimony from
his previous attorney, BRUCE WHITAKER.  HILLS did not know where
WHITAKER got the transcript from.  HILLS believed each attorney
received a copy.  HILLS stated anything he has said is from his own
memory and he has not read his immunized testimony.  HILLS, without
any solicitation, stated he had no idea what BOWEN did or did not
say in his immunized testimony.

MAD-051648

ATTACHMENT G

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    06/02/2010

MIKE LOHMAN, white male, date of birth ▮▮▮▮▮▮▮,
was interviewed at the United States Attorney's Office, 500 Poydras
Street, New Orleans, Louisiana (LA).  Also present during the
interview was LOHMAN's attorney, DYLAN UTLEY, United States
Department of Justice attorney KARLA DOBINSKI, and Assistant United
States Attorney DOROTHY TAYLOR.  After being advised of the
identities of the interviewing agents and the purpose of the
interview, LOHMAN provided the following information:

LOHMAN was an eye witness to some of the events that
occurred at Danziger Bridge, and was present during the verbal
debrief that occurred after the events happened.

The Orleans Parish District Attorney's office called
LOHMAN in December 2006 to set up a meeting between LOHMAN and
Assistant District Attorney (ADA) DUSTIN DAVIS.  ADA Davis and
another representative at the District Attorney's office met with
LOHMAN.  They asked LOHMAN some generic questions about the events

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

reality, the gun search never occurred.  Following his meeting with
ADA Davis, LOHMAN met with BOWEN.  LOHMAN told BOWEN he had a
meeting with ADA Davis and had been shown BOWEN's Grand Jury
testimony relating ▮▮▮▮▮▮▮▮▮▮▮▮  After his discussion with
LOHMAN, BOWEN told his Attorney, FRANK DISALVO, that LOHMAN had
been allowed to see BOWEN's Grand Jury testimony when LOHMAN met
with ADA Davis.  After BOWEN talked to DISALVO, he met with LOHMAN
again and told LOHMAN that ADA DAVIS should not have shown him
BOWEN's Grand Jury testimony.

LOHMAN met with HESSLER, GISEVIUS' lawyer, about
testifying in a Motion to Quash Indictment hearing.  Before
testifying, LOHMAN met with BOWEN and DISALVO.  When DISALVO was
not present, BOWEN showed LOHMAN a copy of BOWEN's Grand Jury
testimony and asked LOHMAN to point out the section ADA DAVIS had
shown LOHMAN.  LOHMAN testified in the Motion to Quash Indictment
hearing about being shown BOWEN's Grand Jury testimony.

Investigation on   5/19/2010   at  New Orleans, LA

File #  282A-NO-71320                              Date dictated

by   SA Jonathan D Wood: jdw

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___MIKE LOHMAN_____ , On 5/19/2010 , Page __2__

       LOHMAN's reading of BOWEN's Grand Jury testimony did not alter his understanding of the Danziger Bridge events in any way. LOHMAN has not talked to any Federal prosecutor about BOWEN's Grand Jury testimony nor any other individual that testified before the Grand Jury.