## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NUMBER: 10-204** |
| **v.** | * | **SECTION: N** |
| **KENNETH BOWEN;** | * | **VIOLATIONS: 18 U.S.C. § 241** |
| **ROBERT GISEVIUS;** | | **18 U.S.C. § 242** |
| **ROBERT FAULCON;** | * | **18 U.S.C. § 371** |
| **ANTHONY VILLAVASO; and** | | **18 U.S.C. § 924** |
| **ARTHUR KAUFMAN** | * | **18 U.S.C. § 1001** |
| | | **18 U.S.C. § 1512** |
| | * | **18 U.S.C. § 1519** |

\*   \*   \*

## INDICTMENT FOR DEPRIVATION OF RIGHTS UNDER COLOR OF LAW, USE OF A WEAPON DURING COMMISSION OF A CRIME OF VIOLENCE, CONSPIRACY, <u>OBSTRUCTION OF JUSTICE, AND FALSE STATEMENTS</u>

**The Grand Jury charges that:**

## <u>COUNT 1</u>

**A.     At all times relevant to this Indictment:**

1. Defendants **KENNETH BOWEN** and **ROBERT GISEVIUS** were Sergeants with the New Orleans Police Department (NOPD).

2. Defendants **ROBERT FAULCON** and **ANTHONY VILLAVASO** were officers with NOPD.

3. Defendant ARTHUR "ARCHIE" KAUFMAN was a sergeant with NOPD who worked as a homicide investigator.

4. On September 4, 2005, in the wake of Hurricane Katrina, a number of NOPD officers, including defendants **BOWEN, GISEVIUS, FAULCON,** and **VILLAVASO**, rode to the Danziger Bridge (the bridge) in a large Budget rental truck in response to a call that officers nearby had come under fire. On the east side of the Danziger Bridge, the officers encountered six unarmed civilians (five members of the Bartholomew Family and a teenaged family friend; hereinafter sometimes referred to collectively as "the Bartholomew Family"), who were walking westward across the bridge to get food and supplies from a supermarket. Officers drove onto the bridge and opened fire on the civilians, killing family friend James Brissette, 17, and seriously injuring Susan Bartholomew; Leonard Bartholomew, III; the Bartholomews' daughter, Lesha, 17; and the Bartholomews' nephew, Jose Holmes, 19. As the Bartholomews' 14-year-old son ran down the bridge to escape the shooting, an officer fired at him, but missed.

5. Officers then traveled to the west side of the bridge, where they shot at Lance and Ronald Madison, who had crossed the bridge to check on the dentistry office of one of their other brothers. An officer shot Ronald Madison in the back as Madison ran away. Madison, a 40-year-old man with severe disabilities, died at the scene.

6. Officers then arrested 49-year-old Lance Madison for eight counts of Attempted Murder of a Police Officer. Madison was held in custody for approximately three weeks, after which a judge ordered his release. Neither the Orleans Parish District Attorney's Office nor a grand jury ever filed formal charges against Madison.

2

7. On the day of the shooting, officers collected no guns or shell casings from the scene. When the scene was eventually processed, more than a month later, investigators recovered approximately 26 shell casings and four shotgun shells, fired by officers.

8. On September 4, 2005, defendant KAUFMAN became the lead investigator responsible for the initial investigation of the Danziger Bridge shootings. Between September 2005 and May 2006, KAUFMAN drafted numerous reports regarding the shootings.

9. In or about October 2005, defendant KAUFMAN was joined in the investigation by Sergeant Gerard Dugue. In May 2006, Sergeants KAUFMAN and Dugue submitted to the Orleans Parish District Attorney's Office a co-authored incident report. Defendant KAUFMAN and Sgt. Dugue concluded in their report that, with the arrest of Lance Madison and the "imminent" arrest of Jose Holmes, the Danziger Bridge case was "considered solved."

10. In 2006, the Orleans Parish District Attorney's Office and a state grand jury began investigating, among other things, possible wrongdoing by the officers involved in the bridge shootings.

11. In 2008, the state criminal investigation ended, with no finding as to any NOPD officer's guilt or innocence, and the Orleans Parish District Attorney's Office referred the matter to the Federal Bureau of Investigation (FBI), an agency of the United States, which had been monitoring the state investigation.

**B.      Civil Rights Violation (Death of James Brissette):**

On or about September 4, 2005, in the Eastern District of Louisiana, defendants **KENNETH BOWEN, ROBERT GISEVIUS, ROBERT FAULCON,** and **ANTHONY VILLAVASO**, while acting under color of law and while aiding and abetting one another, shot

3

James Brissette, willfully depriving him of the right, secured and protected by the Constitution and laws of the United States, to be free from the use of unreasonable force by a law enforcement officer.  The offense involved the use of dangerous weapons and resulted in bodily injury to, and the death of, James Brissette;

All in violation of Title 18, United States Code, Sections 242 and 2.

## COUNT 2

**A.      The allegations of Count 1, part A are realleged and incorporated herein.**

**B.      Use of Firearms:**

On or about September 4, 2005, in the Eastern District of Louisiana, defendants

**KENNETH BOWEN, ROBERT GISEVIUS, ROBERT FAULCON,** and **ANTHONY**

**VILLAVASO,** aiding and abetting one another, knowingly used and carried firearms during and in relation to, and possessed the firearms in furtherance of, a felony crime of violence prosecutable in a court of the United States; that is, the defendants possessed, carried, used, and discharged several firearms – including an AK-47 assault rifle bearing serial number CA109138; an AK-47 assault rifle bearing serial number SI-73830-2003; a .40 caliber Glock 22 semi-automatic pistol bearing serial number NO1164PD; an M-4-type assault rifle bearing an unknown serial number; and a Mossberg shotgun bearing serial number R244788 – during the commission of the offense charged in Count 1.

In the commission of this offense, the defendants, while aiding and abetting each other, caused the death of James Brissette through the use and discharge of these firearms.  The death involved circumstances constituting murder as defined in Title 18, United States Code, Section 1111;

All in violation of Title 18, United States Code, Sections 924(c),(j) and 2.

## COUNT 3

**A.**     **The allegations of Count 1, part A are realleged and incorporated herein.**

**B.**     **The Civil Rights Violation (Susan Bartholomew):**

On or about September 4, 2005, in the Eastern District of Louisiana, defendants

**KENNETH BOWEN, ROBERT GISEVIUS, ROBERT FAULCON,** and **ANTHONY**

**VILLAVASO,** while acting under color of law and while aiding and abetting one another, shot

Susan Bartholomew, willfully depriving her of the right, secured and protected by the

Constitution and laws of the United States, to be free from the use of unreasonable force by a law

enforcement officer.  The offense involved the use of dangerous weapons and resulted in bodily

injury to Susan Bartholomew;

All in violation of Title 18, United States Code, Sections 242 and 2.

## COUNT 4

**A.**     **The allegations of Count 1, part A are realleged and incorporated herein.**

**B.**     **The Civil Rights Violation (Leonard Bartholomew, III):**

On or about September 4, 2005, in the Eastern District of Louisiana, defendants

**KENNETH BOWEN, ROBERT GISEVIUS, ROBERT FAULCON,** and **ANTHONY**

**VILLAVASO,** while acting under color of law and while aiding and abetting one another, shot

Leonard Bartholomew, III, willfully depriving him of the right, secured and protected by the

Constitution and laws of the United States, to be free from the use of unreasonable force by a law

enforcement officer.  The offense involved the use of dangerous weapons and resulted in bodily

injury to Leonard Bartholomew, III;

5

All in violation of Title 18, United States Code, Sections 242 and 2.

## COUNT 5

**A.**     **The allegations of Count 1, part A are realleged and incorporated herein.**

**B.**     **The Civil Rights Violation (Lesha Bartholomew):**

On or about September 4, 2005, in the Eastern District of Louisiana, defendants

**KENNETH BOWEN, ROBERT GISEVIUS, ROBERT FAULCON,** and **ANTHONY**

**VILLAVASO,** while acting under color of law and while aiding and abetting one another, shot

Lesha Bartholomew, willfully depriving her of the right, secured and protected by the

Constitution and laws of the United States, to be free from the use of unreasonable force by a law

enforcement officer.  The offense involved the use of dangerous weapons and resulted in bodily

injury to Lesha Bartholomew;

All in violation of Title 18, United States Code, Sections 242 and 2.

## COUNT 6

**A.**     **The allegations of Count 1, part A are realleged and incorporated herein.**

**B.**     **The Civil Rights Violation (Jose Holmes):**

On or about September 4, 2005, in the Eastern District of Louisiana, defendants

**KENNETH BOWEN, ROBERT GISEVIUS, ROBERT FAULCON,** and **ANTHONY**

**VILLAVASO,** while acting under color of law and while aiding and abetting one another, shot

Jose Holmes, willfully depriving him of the right, secured and protected by the Constitution and

laws of the United States, to be free from the use of unreasonable force by a law enforcement

officer.  The offense involved the use of dangerous weapons and resulted in bodily injury to Jose

Holmes;

6

All in violation of Title 18, United States Code, Sections 242 and 2.

## COUNT 7

A.   **The allegations of Count 1, part A are realleged and incorporated herein.**

B.   **The Use of a Firearm:**

On or about September 4, 2005, in the Eastern District of Louisiana, defendants

**KENNETH BOWEN, ROBERT GISEVIUS, ROBERT FAULCON,** and **ANTHONY**

**VILLAVASO**, aiding and abetting one another, knowingly used and carried firearms during and

in relation to, and possessed the firearms in furtherance of, a felony crime of violence

prosecutable in a court of the United States; that is, the defendants possessed, carried, used, and

discharged several firearms – including an AK-47 assault rifle bearing serial number CA109138;

an AK-47 assault rifle bearing serial number SI-73830-2003; a .40 caliber Glock 22 semi-

automatic pistol bearing serial number NO1164PD; an M-4-type assault rifle bearing an

unknown serial number; and a Mossberg shotgun bearing serial number R244788 – during the

commission of the offenses charged in Counts 3, 4, 5, and 6;

All in violation of Title 18, United States Code, Sections 924(c) and 2.

## COUNT 8

A.   **The allegations of Count 1, part A are realleged and incorporated herein.**

B.   **The Civil Rights Violation (Death of Ronald Madison):**

On or about September 4, 2005, in the Eastern District of Louisiana, defendant **ROBERT**

**FAULCON**, while acting under color of law, shot Ronald Madison, willfully depriving him of

the right, secured and protected by the Constitution and laws of the United States, to be free from

the use of unreasonable force by a law enforcement officer. The offense involved the use of a dangerous weapon and resulted in bodily injury to, and the death of, Ronald Madison;

All in violation of Title 18, United States Code, Section 242.

## COUNT 9

**A.    The allegations of Count 1, part A are realleged and incorporated herein.**

**B.    The Use of a Firearm:**

On or about September 4, 2005, in the Eastern District of Louisiana, defendant **ROBERT FAULCON** knowingly used and carried a firearm during and in relation to, and possessed the firearm in furtherance of, a felony crime of violence prosecutable in a court of the United States; that is, he possessed, carried, used, and discharged a Mossberg shotgun bearing serial number R244788, during the commission of the offense charged in Count 8.

In the commission of this offense, the defendant caused the death of Ronald Madison through the use and discharge of this firearm. The death involved circumstances constituting murder as defined in Title 18, United States Code, Section 1111;

All in violation of Title 18, United States Code, Sections 924(c) and (j).

## COUNT 10

**A.    The allegations of Count 1, part A are realleged and incorporated herein.**

**B.    The Civil Rights Violation (Use of Unreasonable Force Against Ronald Madison):**

On or about September 4, 2005, in the Eastern District of Louisiana, defendant **KENNETH BOWEN**, while acting under color of law, kicked and stomped Ronald Madison while Madison was on the ground, alive but mortally wounded, willfully depriving Madison of the right, secured and protected by the Constitution and laws of the United States, to be free from

8

the use of unreasonable force by a law enforcement officer. The offense resulted in bodily injury to Ronald Madison;

All in violation of Title 18, United States Code, Section 242.

## COUNT 11

**A.   The allegations of Count 1, part A are realleged and incorporated herein.**

**B.   The Conspiracy to Obstruct Justice and Make False Statements:**

From on or about September 4, 2005, through at least January 23, 2009, in the Eastern District of Louisiana, defendants **KENNETH BOWEN, ROBERT GISEVIUS, ROBERT FAULCON, ANTHONY VILLAVASO, and ARTHUR "ARCHIE" KAUFMAN** wilfully combined, conspired, and agreed with each other and with others known to the grand jury (including, among others, Sgt. Gerard Dugue, Lieutenant Michael Lohman and Detective Jeffrey Lehrmann) to commit the following offenses against the United States, as alleged in Counts 14 - 27 of the Indictment:

a.   to knowingly falsify and make a false entry in a document with intent to impede, obstruct, and influence the investigation and proper administration of a matter within federal jurisdiction, and in relation to and in contemplation of such a matter, in violation of Title 18, United States Code, Section 1519;

b.   to knowingly engage in misleading conduct toward another person with intent to hinder, delay, and prevent the communication to a federal law enforcement officer and judge of truthful information relating to the commission and possible commission of a federal offense, in violation of Title 18, United States Code, Section 1512(b)(3); and

9

c.    to knowingly and willfully make materially false statements and representations in a matter within the jurisdiction of the FBI, an agency of the United States, in violation of Title 18, United States Code, Section 1001.

## C.    Plan and Purpose of the Conspiracy:

It was the plan and purpose of the conspiracy that officers, including defendants **BOWEN, GISEVIUS, FAULCON,** and **VILLAVASO,** would provide false and misleading information about the September 4, 2005, incident on the Danziger Bridge and would cover up other information, as described in the Overt Acts, in order to ensure that the shootings would appear to be legally justified and that the involved officers would therefore be shielded from liability. It was further the plan and purpose of the conspiracy that defendant **KAUFMAN** and Sgt. Dugue would provide false and misleading statements and would refrain from conducting a legitimate investigation of the incident. It was also part of the plan and purpose of the conspiracy that defendant **KAUFMAN** and Sgt. Dugue would submit a report concluding, based on false and misleading information, that the civilians who were shot on the bridge had fired first at officers, and that the officers had been justified in shooting the civilians.

## D.    Overt Acts:

In furtherance of the conspiracy, and to effect the objects thereof, the defendants committed the following overt acts, among others, in the Eastern District of Louisiana:

The Crime Scene

1. On or about September 4, 2005, defendant **KAUFMAN** and Lieutenant Lohman knowingly failed to conduct or direct evidence-collection at the scene.

10

2.  On or about September 4, 2005, defendant **KAUFMAN** dismissed a Louisiana State Police (LSP) sergeant from the shooting scene without taking a statement from him, even though defendant **KAUFMAN** knew that the sergeant had been present for the shooting of Ronald Madison and would be an important witness in a legitimate investigation.

3.  Defendant **KAUFMAN** later omitted from an official supplemental report any mention of the LSP witness's name or of the fact that he had witnessed the shooting.

4.  On or about September 4, 2005, after concluding that the officers from the Budget truck had shot unarmed civilians, Lieutenant Lohman encouraged defendants **GISEVIUS** and **BOWEN** to come up with a story justifying the shooting.

Conversations after the Shooting

5.  On September 4, 2005, and again on numerous occasions between then and January 25, 2006, the officers involved in the Danziger Bridge shooting, led by defendants **KAUFMAN,** **BOWEN,** and **GISEVIUS,** discussed and modified the stories they would tell about what happened on the bridge.

6.  In or about September or October 2005, defendants **KAUFMAN** and **BOWEN** specifically discussed using Hurricane Katrina to excuse failures in the investigation, and thereby to help make any inquiry into the shooting go away.

The Planted Gun

7.  In or about September or October 2005, defendant **KAUFMAN** obtained a gun from his home and told co-conspirators that he would claim to have found the gun at the crime scene on the day after the shooting.

8. On or about September 28, 2005, defendant **KAUFMAN** lied under oath at a Preliminary Hearing for Lance Madison when he provided false testimony about a firearm he claimed had been found near the Danziger Bridge by another officer.

9. In or about October 2005, and again in or about May 2006, defendant **KAUFMAN** signed off on official reports in which he falsely claimed that he had personally returned to the Danziger Bridge on September 5, 2005, and had found a revolver in the grassy area along the east side of the bridge.

Defendant **BOWEN's** False and Changing Story

10. In or about September and October 2005, defendants **KAUFMAN, BOWEN,** and **GISEVIUS,** along with Lieutenant Lohman and Detective Lehrmann, repeatedly discussed the false statement that defendant **BOWEN** would give to justify the shootings on the Danziger Bridge.

11. In or about September and October 2005, defendant **BOWEN** provided various false versions of what had happened on the bridge. For example, defendant **BOWEN** initially stated that he kicked guns off the Danziger Bridge, into a grassy area to which he had just seen a potential suspect flee, and that he then ran below the bridge to look for the suspect who had fled. However, because defendant **BOWEN** had not collected any guns from below the bridge, he and his co-conspirators determined that this story was not believable, and **BOWEN** therefore changed his story to say that he did not run under the bridge after the shooting.

12. On or about January 25, 2006, defendant **BOWEN** lied during a formal, audiotaped statement about the shootings.

12

13.  Defendant **KAUFMAN** and Sgt. Gerard Dugue, who conducted the formal interview with **BOWEN** on or about January 25, 2006, failed to question or challenge statements they knew to be false, and which they knew to be inconsistent with prior claims made by defendant **BOWEN**.

The False Investigative Reports

14.  In or about September and October 2005, defendant **KAUFMAN** drafted various false versions of an incident report, assisted by others, including **BOWEN, GISEVIUS,** Lohman, and Lehrmann.

15.  In or about October 2005, defendant **KAUFMAN** submitted to his supervisor a 32-page version of the false report.

16.  In or about October 2005, Lieutenant Lohman reviewed the 32-page draft of the false report submitted by defendant **KAUFMAN**, and counseled defendant **KAUFMAN** on ways to further falsify the report to make it sound more plausible.

17.  In or about October 2005, Lieutenant Lohman, frustrated that the cover-up story in the Danziger report still was not logical, personally drafted a 17-page report, including numerous false facts that would help justify the police shooting.

18.  In or about October 2005, defendant **KAUFMAN** and Lieutenant Lohman signed off on the 17-page report.

19.  On some date between October 2005 and May 2006, defendant **KAUFMAN** replaced the 17-page report with a seven-page report written to match vague and general audiotaped statements given by the officers.

The Meeting Before the Formal Statements

20.  On or about January 25, 2006, defendant **KAUFMAN** and Sgt. Gerard Dugue held a meeting in the abandoned and gutted-out NOPD Seventh District police station.  Defendants **BOWEN, GISEVIUS,** and **VILLAVASO** attended the meeting, where defendant **KAUFMAN** and Sgt. Gerard Dugue instructed the officers involved in the Danziger Bridge incident to make sure they had their stories straight before they gave formal, audiotaped statements about the incident.

21.  Defendant **BOWEN** then took the lead in explaining the false story that he would tell to justify the shooting, and the other officers discussed the false stories they would tell in order to remain consistent with **BOWEN's** story.

Defendant **GISEVIUS's** Misleading Conduct

22.  In or about September 2005, defendant **GISEVIUS** provided or approved of a false and misleading statement in which he falsely claimed that he saw a civilian (later identified as Lance Madison) shoot at officers as he ran westward over the bridge with another man. Defendant **GISEVIUS** also misleadingly omitted, among other things, the fact that he had repeatedly fired a rifle on the bridge and that he had shot civilians.

23.  On or about January 25, 2006, defendant **GISEVIUS** again gave a false account of events when he provided a formal, audiotaped statement about the incident.  Again, **GISEVIUS** omitted any reference to the fact that he had fired a gun repeatedly on the bridge and that he had shot civilians, even when he was specifically asked whether he had fired his weapon.

24.  During the interview with **GISEVIUS**, defendant **KAUFMAN** and Sgt. Dugue, who

14

were conducting the interview, failed to challenge **GISEVIUS's** misleading statement, even though they knew that **GISEVIUS** had, in fact, fired a gun on the bridge.

### Defendant FAULCON's Misleading Conduct

25.  In or about September 2005, defendant **FAULCON,** after being given advice about how to make his shootings appear justified, provided or approved of a false and misleading statement in which he falsely claimed that the civilians on the bridge, both male and female, were armed and fired at police, and that **FAULCON** shot Ronald Madison because Madison noticed a police presence and quickly turned, reaching for an object in his right waistband.

26.  On or about June 9, 2006, defendant **FAULCON** again gave a false account of events when he provided a formal, audiotaped statement to NOPD investigators.

### Defendant VILLAVASO's Misleading Conduct

27. On or about January 25, 2006, defendant **VILLAVASO** gave a formal, audiotaped statement in which he falsely claimed, among other things, that several civilians on the bridge, including both males and females, pointed guns at and fired at police officers.

### The False May 2006 Supplemental Report

28.  In or about May 2006, defendant **KAUFMAN** and Sgt. Dugue submitted to the Orleans Parish District Attorney's Office a jointly-written, 54-page Supplemental Report (54-page report), in which they included statement summaries which they knew to be false.

### The Unidentified Juvenile

29.  In or about May 2006, defendant **KAUFMAN** and Sgt. Dugue concealed the identity of a key witness/victim when they referred in the 54-page report to a young black male

apprehended at the scene, without further identifying the young black male. In fact, the witness had been identified as "Leonard Bartholomew, Jr.," the son of Susan and Leonard Bartholomew.

30. On or about January 22, 2009, defendant **KAUFMAN** lied to federal agents when he stated, in a voluntary interview, that he had not identified the juvenile apprehended running from the bridge on September 4, 2005, and that he had not learned until much later that the juvenile "might have been" related to the people shot on the bridge.

Fabricated Witnesses

31. In or about May 2006, defendant **KAUFMAN** submitted a 54-page report that included a fabricated interview statement from a fictional witness, "Lakeisha Smith." Defendant **KAUFMAN** wrote in the report that Smith had witnessed part of the incident involving Ronald Madison, when in fact, defendant **KAUFMAN** had made up the witness.

32. In or about May 2006, defendant **KAUFMAN** submitted a 54-page report that included a fabricated interview statement from another fictional witness, James Youngman. Defendant **KAUFMAN** wrote in the report that Youngman had witnessed the shooting incident involving the Bartholomew Family and had offered justification for the police shooting. In fact, defendant **KAUFMAN** had made up the witness.

33. On or about January 22, 2009, defendant **KAUFMAN** lied to federal agents when he stated, in a voluntary interview, that he had interviewed Lakeisha Smith and James Youngman on September 4, 2005.

Fabricated "Admissions" by the Victims

34. In or about May 2006, defendant **KAUFMAN** included in the 54-page report the false claim that Susan and Leonard Bartholomew had admitted to police, on two separate

16

occasions, that their nephew shot a gun on the bridge on September 4, 2005. In fact, as defendant **KAUFMAN** knew, neither Susan nor Leonard Bartholomew had made any such statements.

35. On or about January 22, 2009, defendant **KAUFMAN** lied to federal agents when he stated, during a voluntary interview, that Susan Bartholomew had told him that her nephew shot at police on the bridge.

All in violation of Title 18, United States Code, Section 371.

## COUNT 12

A. **The allegations of Count 1, part A are realleged and incorporated herein.**

B. **Conspiracy to Violate the Civil Rights of Jose Holmes through False Prosecution:**

From on or about September 4, 2005, through at least in or about May 2006, in the Eastern District of Louisiana, defendants **KENNETH BOWEN, ROBERT GISEVIUS, ROBERT FAULCON, ANTHONY VILLAVASO and ARTHUR "ARCHIE" KAUFMAN** combined, conspired and agreed with each other and with others known to the grand jury, to injure, oppress, threaten, and intimidate Jose Holmes in the free exercise and enjoyment of a right secured and protected by the Constitution and laws of the United States; that is, the right, guaranteed by the Due Process Clause, to be free from prosecution based on false evidence, by a person acting under color of law. Specifically, the defendants and their co-conspirators conspired to give false and misleading statements and write false and misleading reports which they expected and intended would lead to the arrest and criminal prosecution of Holmes based on false evidence;

All in violation of Title 18, United States Code, Section 241.

17

## COUNT 13

A.      **The allegations of Count 1, part A are realleged and incorporated herein.**

B.      **Conspiracy to Violate the Civil Rights of Lance Madison through False Prosecution:**

From on or about September 4, 2005, through at least in or about May 2006, in the

Eastern District of Louisiana, defendants **KENNETH BOWEN, ROBERT GISEVIUS, and**

**ARTHUR "ARCHIE" KAUFMAN** combined, conspired and agreed with each other and with

others known to the grand jury, to injure, oppress, threaten, and intimidate Lance Madison in the

free exercise and enjoyment of a right secured and protected by the Constitution and laws of the

United States; that is, the right, guaranteed by the Due Process Clause, to be free from

prosecution based on false evidence, by a person acting under color of law.  Specifically, the

defendants and their co-conspirators conspired to give false and misleading statements and write

false and misleading reports which they expected and intended would lead to the criminal

prosecution of Lance Madison based on false evidence;

All in violation of Title 18, United States Code, Section 241.

## COUNT 14

A.      **The allegations of Count 1, part A are realleged and incorporated herein.**

B.      **The Falsification of Evidence to Obstruct Justice:**

On or about October 11, 2005, in the Eastern District of Louisiana, defendant **ARTHUR**

**"ARCHIE" KAUFMAN** in relation to and in contemplation of a matter within the jurisdiction

of the FBI, an agency of the United States, knowingly falsified and altered a tangible object and

made a false entry in a record and document with intent to impede, obstruct, and influence the

investigation and proper administration of a matter within federal jurisdiction.  That is, defendant

KAUFMAN turned in a firearm to NOPD's Central Evidence and Property and created a record or caused a record to be created, claiming falsely that the firearm had been found on September 5, 2005, in connection with the Danziger Bridge investigation;

All in violation of Title 18, United States Code, Section 1519.

## COUNT 15

A.    **The allegations of Count 1, part A are realleged and incorporated herein.**

B.    **The Obstruction of Justice Concerning the Firearm:**

On or about May 2006, in the Eastern District of Louisiana, defendant **ARTHUR "ARCHIE" KAUFMAN**, in relation to and in contemplation of a matter within the jurisdiction of the FBI, an agency of the United States, was aided and abetted by Sgt. Gerard Dugue, in knowingly falsifying and making false entries in a document with intent to impede, obstruct, and influence the investigation and proper administration of the matter within federal jurisdiction. That is, in or about May 2006, defendant **KAUFMAN** and Sgt. Dugue submitted a 54-page report about the Danziger Bridge shooting, in which they wrote that defendant **KAUFMAN** had found a Colt Trooper Mark III revolver on September 5, 2005, on the side of Danziger Bridge, and in which they included the discussion of the firearm in a section entitled "Perpetrator's Weapons." In fact, as defendant **KAUFMAN** knew, the firearm had not been found on September 5, 2005, on the side of the Danziger Bridge and had not been used in the Danziger Bridge shooting;

All in violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT 16

A.    **The allegations of Count 1, part A are realleged and incorporated herein.**

19

**B.      The False Statement Concerning the Firearm:**

On or about January 22, 2009, in the Eastern District of Louisiana, defendant **ARTHUR**

**"ARCHIE" KAUFMAN** knowingly and willfully made materially false statements and

representations in a matter within the jurisdiction of the FBI, an agency of the United States,

when he told FBI agents investigating the Danziger Bridge incident that he had returned to the

Danziger Bridge on September 5, 2005, the morning after the shootings, and had found and

recovered a revolver (a Colt Trooper Mark III) in the grassy area below where the Bartholomew

Family had been shot.  In truth and in fact, as he then well knew, he had not recovered a firearm

from the grassy area below the bridge on September 5, 2005;

All in violation of Title 18, United States Code, Section 1001.

## COUNT 17

**A.      The allegations of Count 1, part A are realleged and incorporated herein.**

**B.      Falsifications of Victim Statements:**

In or about May 2006, in the Eastern District of Louisiana, defendant **ARTHUR**

**"ARCHIE" KAUFMAN**, in relation to and in contemplation of a matter within the jurisdiction

of the FBI, an agency of the United States, knowingly falsified and made false entries in a

document with intent to impede, obstruct, and influence the investigation and proper

administration of the matter within federal jurisdiction.  That is, defendant **KAUFMAN** (1)

falsely claimed in the 54-page report that Susan and Leonard Bartholomew had, on two

occasions, admitted to police that they had seen their nephew, Jose Holmes, shoot a firearm on

the Danziger Bridge; and (2) omitted the known identity of a juvenile apprehended on or near the

Danziger Bridge on September 4, 2005.  In fact, as defendant **KAUFMAN** knew, (1) neither

20

Susan nor Leonard Bartholomew had admitted that their nephew shot a firearm; and (2) the

juvenile apprehended at the scene had been identified as "Leonard Bartholomew, Jr.," the son of

Susan and Leonard Bartholomew;

> All in violation of Title 18, United States Code, Section 1519.

## COUNT 18

**A.     The allegations of Count 1, part A are realleged and incorporated herein.**

**B.     False Statements regarding Victim Statements:**

> On or about January 22, 2009, in the Eastern District of Louisiana, defendant **ARTHUR**

**"ARCHIE" KAUFMAN** knowingly and willfully made materially false statements and

representations in a matter within the jurisdiction of the FBI, an agency of the United States,

when he told FBI agents investigating the Danziger Bridge incident (1) that Susan Bartholomew

had told him that her nephew had shot at police on the Danziger Bridge; and (2) that he had not

identified the juvenile apprehended on or near the Danziger Bridge on September 4, 2005, and

had only heard a rumor, much later, that the juvenile might have been related to the people who

had been shot.  In truth and in fact, as the defendant then well knew, (1) Susan Bartholomew had

not stated that her nephew shot at police; and (2) before submitting his official supplemental

report, **KAUFMAN** had identified the juvenile as "Leonard Bartholomew Jr.," the son of Susan

and Leonard Bartholomew;

> All in violation of Title 18, United States Code, Section 1001.

## COUNT 19

**A.     The allegations of Count 1, part A are realleged and incorporated herein.**

21

**B.      The September 2005 Misleading Conduct:**

In or about September 2005, in the Eastern District of Louisiana, defendant **KENNETH BOWEN** knowingly engaged in misleading conduct toward another person with intent to hinder, delay, and prevent the communication to a federal law enforcement officer and judge of truthful information relating to the commission and possible commission of a federal offense.  That is, defendant **BOWEN** knowingly and intentionally misled NOPD supervisors, the Orleans Parish District Attorney's Office, FBI agents monitoring the case, and anyone else who would later review the investigative report of the Danziger Bridge incident when he provided a statement, to be used in a report about the Danziger Bridge shooting, in which he made the following false claims, among others:  that civilians on the bridge (later identified as the Bartholomew Family) fired guns at officers; that, after the shooting, he saw two guns on a walkway near the dead and injured civilians; that he kicked the guns off of the bridge; and that he saw Lance Madison throw a gun into the Industrial Canal;

All in violation of Title 18, United States Code, Section 1512(b)(3).

## COUNT 20

**A.      The allegations of Count 1, part A are realleged and incorporated herein.**

**B.      The January 2006 Misleading Conduct:**

On or about January 25, 2006, in the Eastern District of Louisiana, defendant **KENNETH BOWEN** knowingly engaged in misleading conduct toward another person with intent to hinder, delay, and prevent the communication to a federal law enforcement officer and judge of truthful information relating to the commission and possible commission of a federal offense.  That is, defendant **BOWEN** knowingly and intentionally misled NOPD supervisors, the

Orleans Parish District Attorney's Office, FBI agents monitoring the case, and

anyone else who would later review the investigative report of the Danziger Bridge incident

when, during a formal interview about the Danziger Bridge shootings, he falsely claimed, among

other things, that a civilian (later identified as Lance Madison) fired at Officer Mike Hunter; that

Lance Madison threw a gun into the Industrial Canal; that defendant **BOWEN** saw guns on the

pedestrian walkway and kicked them off the bridge; and that **BOWEN** only shot at the civilians

(later identified as the Bartholomew Family) after the civilians jumped over the concrete barrier

and began to fire their handguns at officers;

All in violation of Title 18, United States Code, Section 1512(b)(3).

## COUNT 21

A.      **The allegations of Count 1, part A are realleged and incorporated herein.**

B.      **The January 2006 Misleading Conduct:**

On or about January 25, 2006, in the Eastern District of Louisiana, defendant **ROBERT**

**GISEVIUS** knowingly engaged in misleading conduct toward another person with intent to

hinder, delay, and prevent the communication to a federal law enforcement officer and judge of

truthful information relating to the commission and possible commission of a federal offense.

That is, defendant **GISEVIUS** knowingly and intentionally misled NOPD supervisors, the

Orleans Parish District Attorney's Office, FBI agents monitoring the case, and anyone else who

would later review the investigative report of the Danziger Bridge incident when, during a formal

interview about the Danziger Bridge shootings, he engaged in the following misleading conduct:

(1) he provided a narrative of the incident on the bridge in which he falsely stated that a civilian

(later identified as Lance Madison) had fired a gun at officers; (2) he misleadingly omitted from

his narrative any reference to the fact that he had fired an M-4-type assault rifle multiple times and that he had shot civilians; (3) he misleadingly omitted any reference to the fact that he had ridden down the west side of the bridge with an LSP trooper, that he had been present for the shooting of Ronald Madison, and that he had shot at Lance Madison at the Friendly Inn motel; and (4) when asked specifically if he had fired his gun, he misleadingly responded that he had not fired his "service weapon," without mentioning that he had repeatedly shot an assault rifle and that he had shot civilians;

All in violation of Title 18, United States Code, Section 1512(b)(3).

## COUNT 22

**A.     The allegations of Count 1, part A are realleged and incorporated herein.**

**B.     The June 2006 Misleading Conduct:**

On or about June 9, 2006, in the Eastern District of Louisiana, defendant **ROBERT FAULCON** knowingly engaged in misleading conduct toward another person with intent to hinder, delay, and prevent the communication to a federal law enforcement officer and judge of truthful information relating to the commission and possible commission of a federal offense. That is, defendant **FAULCON** knowingly and intentionally misled NOPD supervisors, the Orleans Parish District Attorney's Office, FBI agents monitoring the case, and anyone else who would later review the investigative report of the Danziger Bridge incident when, during a formal interview about the Danziger Bridge shootings, he falsely claimed that he saw two armed subjects in a group of other subjects (later identified as the Bartholomew Family) on the bridge; that the officers received fire from civilians on the bridge; that defendant **FAULCON** was the only officer who rode down the west side of the bridge with an LSP sergeant; and that Ronald

24

Madison, before being shot, turned three times trying to "get a location" on **FAULCON**;

All in violation of Title 18, United States Code, Section 1512(b)(3).

## COUNT 23

A.     **The allegations of Count 1, part A are realleged and incorporated herein.**

B.     **The January 2006 Misleading Conduct:**

On or about January 25, 2006, in the Eastern District of Louisiana, defendant

**ANTHONY VILLAVASO** knowingly engaged in misleading conduct toward another person

with intent to hinder, delay, and prevent the communication to a federal law enforcement officer

and judge of truthful information relating to the commission and possible commission of a

federal offense.  That is, defendant **VILLAVASO** knowingly and intentionally misled NOPD

supervisors, the Orleans Parish District Attorney's Office, FBI agents monitoring the case, and

anyone else who would later review the investigative report of the Danziger Bridge incident

when, during a formal interview about the Danziger Bridge shootings, he falsely claimed, among

other things, that after the Budget truck came to a complete stop, officers yelled, "Police! Show

us your hands!" and that several subjects on the bridge, including females (later identified as

Susan and Lesha Bartholomew), fired at police officers;

All in violation of Title 18, United States Code, Section 1512(b)(3).

## COUNT 24

A.     **The allegations of Count 1, part A are realleged and incorporated herein.**

B.     **The Fabrication of Witnesses:**

In or about May 2006, in the Eastern District of Louisiana, defendant **ARTHUR**

**"ARCHIE" KAUFMAN**, in relation to and in contemplation of a matter within the jurisdiction

of the FBI, an agency of the United States, knowingly falsified and made a false entry in a document with intent to impede, obstruct, and influence the investigation and proper administration of the matter within federal jurisdiction. That is, defendant **KAUFMAN** made a false entry in the 54-page report about the Danziger Bridge shooting, in which he falsely claimed to have interviewed "Lakeisha Smith" and "James Youngman" on September 4, 2005. In fact, as defendant **KAUFMAN** knew, he had made up the two witnesses and their purported statements in order to help exonerate the officers who had shot civilians on the bridge;

All in violation of Title 18, United States Code, Section 1519.

## COUNT 25

**A.** **The allegations of Count 1, part A are realleged and incorporated herein.**

**B.** **False Statements regarding Fabricated Witnesses:**

On or about January 22, 2009, in the Eastern District of Louisiana, defendant **ARTHUR "ARCHIE" KAUFMAN** knowingly and willfully made materially false statements and representations in a matter within the jurisdiction of the FBI, an agency of the United States, when he told FBI agents investigating the Danziger Bridge incident that he had interviewed "Lakeisha Smith" and "James Youngman" on September 4, 2005. In fact, as the defendant then well knew, he had made up the two witnesses in order to help exonerate the officers who had shot civilians on the bridge;

All in violation of Title 18, United States Code, Section 1001.


**A TRUE BILL:**

_____

**FOREPERSON**

---

**JIM LETTEN**
United States Attorney
Louisiana Bar Roll Number 8517

---

**THOMAS PEREZ**
Assistant Attorney General
Civil Rights Division
United States Department of Justice

---

**JAN MASELLI MANN**
First Assistant United States Attorney
Louisiana Bar Roll Number 9020

---

**BARBARA (BOBBI) BERNSTEIN**
Deputy Chief, Civil Rights Division

---

**JULIA K. EVANS**
Assistant United States Attorney

---

**FORREST CHRISTIAN**
Trial Attorney, Civil Rights Division
United States Department of Justice

New Orleans, Louisiana
July 12, 2010

27