1

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2   ********************************************************************
     UNITED STATES OF AMERICA
 3
                                       Docket No. 10-CR-204
 4   v.                                New Orleans, Louisiana
                                       Monday, July 18, 2011
 5
     KENNETH BOWEN, ROBERT GISEVIUS,
 6   ROBERT FAULCON, ANTHONY VILLAVASO
     and ARTHUR KAUFMAN
 7   ********************************************************************

 8
                      TRANSCRIPT OF TRIAL PROCEEDINGS
 9          HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
                     UNITED STATES DISTRICT JUDGE
10                            VOLUME XV

11

12   APPEARANCES:

13   FOR THE PLAINTIFF:          UNITED STATES DEPARTMENT OF JUSTICE
                                 BY:  BARBARA BERNSTEIN, ESQ.
14                               Civil Rights Division-D Street
                                 601 D Street N.W.
15                               Office PHB 5123
                                 Washington, D.C. 20004
16

17                               UNITED STATES DEPARTMENT OF JUSTICE
                                 BY:  CINDY K. CHUNG, ESQ.
18                               CIVIL RIGHTS, CRIMINAL SECTION
                                 950 Pennsylvania Avenue N.W.
19                               Washington, D.C. 20530

20
                                 UNITED STATES ATTORNEY'S OFFICE
21                               BY:  THEODORE R. CARTER, III, ESQ.
                                 650 Poydras Street, Suite 1600
22                               New Orleans, LA 70130

23
     FOR DEFENDANT KENNETH BOWEN:  FRANK G. DeSALVO, APLC
24                               BY:  FRANK G. DeSALVO, ESQ.
                                 829 Baronne Street
25                               New Orleans, LA 70113
```

```
 1   FOR DEFENDANT ROBERT
     GISEVIUS:                     ERIC J. HESSLER, ESQ.
 2                                 700 Camp Street, Suite 104
                                   New Orleans, LA 70130
 3

 4   FOR DEFENDANT ROBERT
     FAULCON:                      PAUL C. FLEMING, JR., ESQ.
 5                                 2821 Kingman Street, Suite C
                                   Metairie, LA 70006
 6

 7                                 KING, KREBS & JURGENS
                                   BY:  LINDSAY A. LARSON, III, ESQ.
 8                                 201 St. Charles Avenue, 45th Floor
                                   New Orleans, LA 70170
 9

10   FOR DEFENDANT ANTHONY
     VILLAVASO:                    TIMOTHY A. MECHE, ESQ.
11                                 700 Camp Street
                                   New Orleans, LA 70130
12

13                                 DeSALVO, BLACKBURN & KITCHENS
                                   BY:  ROGER W. KITCHENS, ESQ.
14                                 2802 Tulane Avenue
                                   New Orleans, LA 70119
15

16   FOR DEFENDANT ARTHUR
     KAUFMAN:                      STEPHEN D. LONDON, ESQ.
17                                 1100 Poydras Street, Suite 2950
                                   Energy Centre
18                                 New Orleans, LA 70163-2950

19

20   Official Court Reporter:      Karen A. Ibos, CCR, RPR, CRR
                                   500 Poydras Street, Room HB-406
21                                 New Orleans, Louisiana 70130
                                   (504) 589-7776
22

23

24      Proceedings recorded by mechanical stenography, transcript
     produced by computer.
25
```

1                          I N D E X

2

3    WITNESSES FOR THE GOVERNMENT:                    PAGE/LINE:

4    WILLIAM BEZAK

5      Direct Examination by Ms. Bernstein              12/25

6      Cross-Examination by Mr. Hessler                183/18

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                  (MONDAY, JULY 18, 2011)

 3                    (MORNING SESSION)

 4

 5       (OPEN COURT.)

 6       (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

 7            MR. FLEMING:  We've resolved 99 percent of --

 8            THE COURT:  Let's hear the one percent, that's what I'm

 9  here for.

10            MR. FLEMING:  -- the one percent issue, Judge, with Agent

11  Bezak, it's my understanding the government intends to question

12  Agent Bezak regarding some of the CNN reporter's comments, and I

13  don't think that that would be appropriate to have Agent Bezak

14  interpret the comments that were made by the CNN reporter.

15            THE COURT:  The comment that's going to be played on the

16  video?

17            MS. BERNSTEIN:  Yes.  I wasn't going to have him

18  interpret anything, and just so you know, we will not be eliciting

19  hearsay from Bill, either side will not be eliciting hearsay from

20  Bill about what other people said.

21            MR. FLEMING:  Yes.

22            MS. BERNSTEIN:  The one exception that I had was that I

23  did plan to ask about three questions about an interview he just

24  did with Carlos Quintanilla, the reporter on the video.  Because

25  Carlos's hearsay statement has been admitted, Carlos can now be
```

```
 1    impeached as if he testified; and the impeachment is simply that

 2    when he talked to Bill he said he did not, in fact, see anything

 3    that happened, as we suspected, he did not, in fact, see anything

 4    that happened on the Danziger Bridge.  So it was just three

 5    questions, two or three questions that I was going to ask Bill

 6    about have you ever talked to Carlos Quintanilla, did he tell you

 7    he saw what happened on the Danziger Bridge.

 8              THE COURT:  Well, I don't have any problem with that

 9    except that part of my ruling, as I think I said, part of my ruling

10    was that what he said was depicted on the video, such as the

11    caravan stopping the air boats.

12              MS. BERNSTEIN:  Just that one sentence that's still in.

13              THE COURT:  Correct.  I didn't think that the reporter

14    said anything that wasn't already depicted on the videotape.  In

15    other words, there was a visual to go with the reporter said; so I

16    don't know how those two juxtapose together, but I don't have a

17    problem with what you're suggesting.  Is that what the objection is

18    to?

19              MR. FLEMING:  It is, Judge.  I mean, they're kind of

20    catching us off guard and giving us a 302 this morning and

21    informing us they're going to ask Agent Bezak about his

22    conversation with this reporter.

23              THE COURT:  But only in the sense of what Ms. Bernstein

24    has just said, not generally what the reporter saw and heard during

25    the course of Katrina, only on the sense of what she's just said
```

1    here on the record.

2         MR. FLEMING:  Well, I mean, I won't argue since you've

3    ruled, I won't argue, but it is a disadvantage of that.

4         THE COURT:  The 302 is only that?

5         MS. BERNSTEIN:  Yeah, it's only one paragraph.

6         MR. HESSLER:  Well, he does say he heard gunshots and saw

7    activity on a parallel bridge.

8         MS. BERNSTEIN:  I am not going to put the 302 in -- oh,

9    you're saying what I said, I'm sorry, he's right, I was imprecise.

10   You're right, I'm sorry.  He did see, obviously he could see the

11   bridge, what he says is he could hear the gunshots, he could see --

12   and I am not going to get into all of these details, but just so

13   the record is clear, he says he saw people get out of the truck and

14   from the way they moved up the bridge, he surmised that they are

15   police officers.  He didn't see who was shooting whom on the I-10,

16   I mean on the Danziger.

17        So my three questions, did you talk to him, did he tell

18   you whether he saw who shot whom on the Danziger Bridge, and I

19   might have one other question, I can't remember what it is.

20        THE COURT:  Is that really disputed though, I mean, it's

21   what he saw from the bridge.  I don't think it's contesting that he

22   could not see from the bridge other than what the video's

23   depicting.

24        MS. BERNSTEIN:  Well, I think --

25        MR. FLEMING:  She is going to go a little more.

1          MS. BERNSTEIN:  No, I am not.  I think the objection

2     illustrates why it's important to clarify, which is that one

3     sentence, I think you're right, your Honor, that it does just

4     depict what Carlos, the reporter saw.  Arguably it infers the urban

5     warfare comment, arguably it infers that he saw some sort of

6     incident where people were shooting at police.  And I think just to

7     make sure that that inference is not out there is what I want to

8     ask a couple of questions for.  I think that's exactly the reason

9     for the objection is that they like the incorrect inference.

10          MR. FLEMING:  No.  And it's misleading, the question she

11     seeks to elicit is misleading on that tape as a whole, especially

12     including the portions that you kept out.  The comments that the

13     reporter made that it's hard for the police to do their job when

14     they're having to go through that gun fight, and that's kept out,

15     but then she's allowed to ask very pointed questions that Mr. Bezak

16     asks this fella, he didn't really see anybody shooting at police,

17     did you, no; well, no, I didn't really see anybody shoot at police.

18     They're keeping out the stuff they don't want in but they're going

19     to get it and they're trying to get it in with stuff that's more

20     helpful and misleading from that tape as a whole, Judge.  I mean --

21          MS. BERNSTEIN:  I think what's misleading, and the reason

22     that stuff came out, that part of what he was saying on the tape is

23     misleading, the part that came out, because it sounds like he is

24     describing something he sees when, in fact, as he makes clear, he

25     didn't actually see it.

1          MR. FLEMING:  The jury is not hearing that, the jury is

2    not hearing that so you don't need that.  I'll withdraw the

3    objection if we play the whole tape.

4          MS. BERNSTEIN:  It's his impression of what he saw.  He

5    saw people running and shooting, it's --

6          THE COURT:  You can cross-examine with the 302.

7          MR. FLEMING:  See, she's allowed to ask something that

8    would make more sense, Judge, if the tape as a whole were played.

9    Those comments were made -- well --

10         THE COURT:  You can cross-examine him.  Before you go

11   back to your tables, I really want to get this jury in here.

12   Before you go back to the tables, I got the e-mails over the

13   weekend.  I am very sensitive about the comments that were made on

14   the tape by Mr. Gisevius.  I get a lot of that in my position here,

15   a lot of people that are unhappy with things I do in court, so I am

16   very familiar with the idea of be people being hateful.

17         By the same token, I think, for the reasons I think that

18   Jennifer put in the e-mail, I don't think that it's relevant to the

19   crimes that have been charged in this case, I think that they may

20   be relevant if and when there's a sentencing, I think it's

21   certainly a relevant factor for sentencing purposes.  The

22   implication is that he is contemplating or might have arranged for

23   a very, very serious crime to be committed.  But I think it's

24   highly prejudicial to the jury to hear the defendant talking in

25   that fashion when it's not related to any of the allegations.  The

```
 1    furtherance of the conspiracy is furtherance of a conspiracy to
 2    coverup what happened on the bridge.  And look, I hear where you're
 3    coming from, wholeheartedly --
 4         MS. BERNSTEIN:  Taking me out sure would help.
 5         THE COURT:  Well, I deal with it, too.  I deal with it,
 6    too.  The problem is on the case law when you talk about the guilt,
 7    the knowledge of guilt, in this city a lot of people say bad things
 8    about assistant DA's and DA's and federal prosecutors.  Half the
 9    city that would be evidence of guilt of half the city if everyone,
10    particularly recently with these case that have gone to the Supreme
11    Court, prosecutorial misconduct or perceived misconduct is
12    something that's not uncommon in this city.  And for somebody to be
13    critical or to even say something hateful or violent against a
14    prosecutor or an assistant DA all the way up to Jim Letten, I think
15    it's a reach in this case to infer guilt of these crimes, and I
16    don't in any way want to minimize the repulsiveness of what was
17    said.  Like I said, I deal with it, too.  And it's out there but --
18         MS. BERNSTEIN:  I think my biggest concern is that taking
19    those sections out changes the tenner of the conversation, I mean,
20    I hear where you're coming from and we have redacted the lines and
21    pages that Eric sent in his e-mail to you.  We've redacted that out
22    of the audio as well.  But one thing that I did want to front is I
23    have no idea whether Mr. Gisevius plans to testify, but he's
24    certainly --
25         THE COURT:  May be a different story.
```

1          MS. BERNSTEIN:  -- would very easily open the door to

2     that.  And also at some point, we don't have to do it right now,

3     but at some point we wanted to deal with the issue if Mr. Bowen

4     testifies, we have his 404(b) incident that was kept out as 404(b)

5     that I can see in a lot of ways the door would be open for that

6     coming in if he testifies.

7          THE COURT:  That's a different issue.  Insofar as the

8     tape recorded conversation of Gisevius, I am going to sustain the

9     objections that are made that are reflected on the e-mail.  I don't

10    know if it's part of the record, we can make it part of the record.

11         Overrule the objection with regard to the 302 and Bezak

12    interview with the reporter, interview with the interviewer.  I am

13    going to overrule that.

14         MS. BERNSTEIN:  Can you make that e-mail part of the

15    record, his motion and then my e-mail and response?

16         MR. HESSLER:  Your Honor, while we're on that issue.

17    There were some, and I know this all came up kind of late, there

18    were some things that Bobby and I were talking into the evening of

19    redaction of certain nonessential talk for efficiency purposes.  I

20    got an e-mail late at night, I didn't see it until this morning

21    where there's certain portions that were taken out.  Some I didn't

22    get the specific portions, we talked about it generally, and when I

23    was able to look through it there are some things in there that

24    although might be inefficient, I think they should be in there to

25    carry the context of certain conversations.

1          THE COURT:  I thought you all talked about this Friday

2    and over the weekend?

3          MR. HESSLER:  We did but I didn't get the exact stuff

4    until late this morning.

5          THE COURT:  Okay.

6          MS. BERNSTEIN:  Can you tell me what your part is then on

7    cross put in whatever you want.  I think we can work through that.

8          MR. HESSLER:  I wanted to do it.

9          THE COURT:  Let's go ahead and start.

10          MR. DeSALVO:  This brings me to something --

11          THE COURT:  Ten minutes people standing in the hallway.

12          MR. DeSALVO:  I'll bring it up after the recess because I

13    don't think I'll come up until after the recess.

14          MR. LONDON:  I said hello to one of the jurors went

15    through the metal detector this morning, I have a tendency to say

16    hi to people, I just wanted to tell you that.

17          THE COURT:  I appreciate you disclosing that.

18        (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

19          THE COURT:  You may be seated.  First of all, thank you

20    yet again for being on time, I know it's especially difficult on a

21    day like today with the weather and some of these streets flooding

22    for you to be here.

23          And for the record, all of you all were here on time and

24    ready to work.  I apologize about the brief delay, there were a

25    couple of issues I needed to speak to counsel about, and we got

1    through those as quickly as possible so that we could bring you

2    into the courtroom.

3            Speaking of the weather, I think the only person who

4    would normally be here who has gotten flooded in is Mr. Larson, who

5    is one of the attorneys representing Mr. Faulcon.  I spoke to

6    Mr. Larson and he called and indicated his circumstance and with

7    Mr. Fleming here and with Mr. Faulcon's consent, we can go ahead

8    and begin without Mr. Larson.  Is that correct, Mr. Fleming?

9            MR. FLEMING:  That is correct, your Honor.

10           THE COURT:  Let's go ahead and do so, everyone else is

11   here and present.  The government was going to call their next

12   witness, and that is?  Ms. Bernstein?

13           MS. BERNSTEIN:  The United States calls Special Agent

14   Bill Bezak.

15           THE COURT:  Mr. Bezak, if you would come forward, please.

16           THE DEPUTY CLERK:  Raise your right hand.

17      (WHEREUPON, WILLIAM BEZAK, WAS SWORN IN AND TESTIFIED AS

18      FOLLOWS:)

19           THE COURT:  Thank you, you may be seated.  And please

20   state and spell your full name for the record.

21           THE WITNESS:  William Bezak, W-I-L-L-I-A-M B-E-Z-A-K.

22           THE COURT:  You may begin.

23           MS. BERNSTEIN:  Thank you, your Honor.

24                          DIRECT EXAMINATION

25   BY MS. BERNSTEIN:

1  Q.  Agent Bezak, can you please introduce yourself to the jury and

2  tell them what you do for a living?

3  A.  Good morning.  My name is Bill Bezak.  I am a special agent

4  with the Federal Bureau of Investigation, and I am the case agent

5  for the Danziger Bridge case.

6  Q.  How long have you been with the FBI?

7  A.  Approximately five and a half years.

8  Q.  What's your current assignment with the bureau?

9  A.  Currently assigned to the Philadelphia division.

10 Q.  How long have you been assigned up there in Philly?

11 A.  I was transferred to Philadelphia in March of this year.  Spent

12 about six weeks in Philadelphia before I was reassigned temporarily

13 back to New Orleans.

14 Q.  So almost -- since you've been up there, almost the whole time

15 you've been down here working on this trial?

16 A.  Yes, ma'am.

17 Q.  So before you got transferred up to Philly, were you assigned

18 here in New Orleans?

19 A.  Yes, I was.  I was first assigned to New Orleans straight out

20 of Quantico, in early summer of 2006.

21 Q.  What was your assignment here in New Orleans?

22 A.  I was assigned to a force squad.

23 Q.  What does that mean?

24 A.  Force squad is a squad in the New Orleans division that

25 investigates white collar crimes like financial crimes, mortgage

1    fraud, civil rights violations, and healthcare fraud.

2    Q.  You mentioned that one of the areas that your squad looked at

3    is civil rights crimes, does that include allegations of excessive

4    force by police officers?

5    A.  Yes, it does.

6    Q.  Who was your supervisor on -- you call it force squad?

7    A.  Yes, ma'am.

8    Q.  Who was your supervisor on the force squad?

9    A.  During this investigation it was Kelly Bryson.

10   Q.  Is that the agent who testified last week or the week before?

11   A.  Yes, it was.

12   Q.  Agent Bezak, I want to talk to you a little bit about your

13   background.  Where did you grow up?

14   A.  I grew up in New Jersey, on the Jersey shore, a small town on

15   the Jersey shore.  And just a small town that nobody would hear of,

16   nobody would have heard of, a little bit north of Atlantic City.

17   Q.  Do you have any law enforcement in your family?

18   A.  I did.  A lot of law enforcement in my family, actually.

19   Everybody from my grandfather to great uncles, my father, uncles,

20   cousins, and my brother.

21   Q.  Did you always know that you wanted to be in law enforcement?

22   A.  Growing up, I really had two dream jobs, I guess you could say.

23   I always either -- there was one of two things I knew I wanted to

24   do, either design airplanes or be an FBI agent.

25   Q.  So what did you do in school, did you go to college?

1    A.  I did.  I went to Villanova University and studied mechanical

2    engineering.

3    Q.  What did you do with that?

4    A.  I then after school, my first job was with the Boeing Company

5    in their rotorcraft division.

6    Q.  Your mechanical engineering, was that an undergraduate?

7    A.  I received a bachelor's in mechanical engineering and also a

8    master's degree in mechanical engineering.

9    Q.  And then you went to work for Boeing?

10   A.  Yes, ma'am.

11   Q.  What did you do for Boeing?

12   A.  With Boeing I was a stress engineer, so basically a drivetrain

13   stress engineer, so I was basically designing the drive systems,

14   transmissions and rotor shafts for military helicopters.

15   Q.  How did you get from helicopters to the FBI?

16   A.  Well, what it really boils down to is sitting behind a desk

17   eight hours a day working on a computer, wasn't for me, and I

18   really wanted to be, you know, outside more and interacting with

19   people more.  And I had an interest in fighting public corruption.

20   Q.  So you went to the FBI?

21   A.  Yes.

22   Q.  When did you finish -- you mentioned Quantico before, that's

23   the FBI academy?

24   A.  Yes.

25   Q.  When did you graduate the academy?

1    A.  I graduated from the academy in, like I said, early summer,

2    June or July of 2006.

3    Q.  Did you say your first assignment was down here in New Orleans?

4    A.  Yes, it was.

5    Q.  I want to talk to you a little bit about this case in

6    particular, then.  When did you first start working on the Danziger

7    Bridge case?

8    A.  My first involvement with the case was in January of 2009, when

9    I sat in on an interview with Sergeant Kaufman, of Sergeant

10   Kaufman.

11           MR. LONDON:  Objection, your Honor.  May I approach?

12           THE COURT:  Yes.

13     (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

14           MR. LONDON:  Just what she told me she wasn't going to

15   do.  Number one, Bryson spent two hours on the stand talking about

16   the 302, that's number one.  Number two, she is a witness to that

17   interview.  She participated in that interview and now she is going

18   to try to elicit questions about something she already had another

19   agent on to discuss.  That is improper.  And she knows it is, and I

20   asked her if she was going to go into the 302 and she said she

21   wasn't.  And here we go, first question.

22           MS. BERNSTEIN:  I think the objection might be premature.

23   I am going to have him talk about his involvement throughout the

24   case.  I was not going to go through the whole 302 with him again.

25   I was going to have him talk about his involvement in the case,

1    what was his -- some of the, not the hearsay but some of the setup

2    of the interview, what was he there for and what was his reaction

3    to the interview, in terms of what it then made him do next in the

4    investigation, doing exactly what I said I was going to do.

5          MR. LONDON:  She is a witness in that interview, Judge.

6    She participated in that interview.  I don't think it's proper for

7    her to be asking questions about anything that occurred in that

8    interview of my client.  That's why she had Ms. Chung direct Agent

9    Bryson about that 302.

10         MS. BERNSTEIN:  Well, (A) no, it's not; and (B) I don't

11   see anything improper about me asking him about an interview that

12   he participated in, that other people were also present for.

13         MR. LONDON:  But you were present for it, you asked

14   questions during that interview.  You can't be investigator and the

15   prosecutor.

16         THE COURT:  Look, I don't see any problem with the

17   questions that you've just said you're going to ask.  If we get

18   afield of that -- first of all, we've already had Agent Bryson.

19         MR. LONDON:  That's why I am not prepared if she is --

20   was your feeling this, and you know he's going to come back and

21   say, oh, I felt it was a gigantic coverup.  We can hear it coming

22   out.

23         MS. BERNSTEIN:  He is going to talk about how he was

24   curious about some things in that interview, and that based on

25   that, he did these steps to investigate.

 1          MR. LONDON:  And not specifically what he was curious

 2   about?

 3          MS. BERNSTEIN:  Yes, he's going to talk about

 4   specifically what he was curious about, of course.

 5          MR. LONDON:  That gets into the 302, Judge.  That gets

 6   into the same thing we just did with Agent Bryson.  Had no idea

 7   that was coming, totally out of left field.  I specifically asked

 8   if we were going into the 302, the answer was no.  First thing

 9   right out the shoot here we go.

10          MS. BERNSTEIN:  Just so you know, the question was he

11   asked me whether we were going to go through the entire 302, and I

12   said, no, of course not, and I am not.  I plan to talk to him about

13   each step of his investigation as he went through so that the jury

14   can know where he was focused as he was investigating.

15          THE COURT:  Let's see where we go with it.  We had Bryson

16   on the stand, I really don't want to get into it.  These are two

17   FBI agents, one of whom was in a supervisory role who testified as

18   to what was said in the interview, so I really don't see the reason

19   to go through -- to plow through ground we've already plowed.

20          MS. BERNSTEIN:  Wasn't even going to pull out the 302.

21          MR. LONDON:  One thing, too, Judge, he sat there and he

22   listened to my cross-examination of that agent.  He's going to sit

23   up there and she is going to try and smooth everything out, that's

24   patently unfair, especially when you're witness to that.

25          MS. BERNSTEIN:  Case agent is always sitting through.

1          MR. LONDON:  But then to put them up there for the

2    purposes of trying to be a fact witness on something like that when

3    he is called a summary witness.

4          THE COURT:  I don't want to get back into what Bryson

5    covered, she covered it in details, was cross-examined on it.  I

6    just don't see --

7          MS. BERNSTEIN:  Well, the questions I was asking, as long

8    as I ask him to be brief and sort of walk us through it --

9          THE COURT:  To get to what he did.  To get to what he

10   did.  That's the point, keep that in mind.

11     (OPEN COURT.)

12   BY MS. BERNSTEIN:

13   Q.  Agent Bezak, right before the break you mentioned that the

14   first step you took in the Danziger case was to sit in on an

15   interview with Defendant Kaufman; is that right?

16   A.  Yes.

17   Q.  Now, at that point were you assigned to the investigation?

18   A.  No, I wasn't.

19   Q.  Had you heard anything about the shooting on the Danziger

20   Bridge?

21   A.  I had a very vague understanding.  Basically, I knew that there

22   was an officer-involved shooting on the bridge after Katrina and

23   that was about the extent of my knowledge.

24   Q.  Had you made any assumptions one way or the other about what

25   happened out there on the bridge?

1    A.  No, I didn't have enough information to make any type of

2    assumptions.

3    Q.  And at that point when you sat in on that first interview, had

4    you read any reports relating to this case?

5    A.  No, I had not.

6    Q.  And you said that you were not even assigned to the case; is

7    that right?

8    A.  No.

9    Q.  When you walked into the interview that morning, what was your

10   understanding of why you were there?

11   A.  The way I understood it was that Sergeant Kaufman was basically

12   going to present to us the results of his investigation into the

13   incident.  So basically, a debriefing of what he found during his

14   investigation.

15   Q.  What was the tone of that meeting?

16   A.  It was very friendly and cordial.

17   Q.  Could you tell in any way whether or not Defendant Kaufman was

18   anxious to tell his story to you?

19   A.  Yes, I could tell.  In fact, he told us that he was very

20   anxious to tell us his -- to give us his account of his

21   investigation.

22   Q.  And you keep using the pronoun us and we, who all was there for

23   the interview?

24   A.  It was myself, Agent Bryson --

25           MR. LONDON:  Objection, your Honor.  May I approach?

1            THE COURT:  Yes.

2        (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

3            MR. LONDON:  Now she is going to make herself a witness.

4            THE COURT:  She can state who was at the meeting.

5            MR. LONDON:  As soon as he says her, that puts her in

6   perimeter for his testimony and she is vouching for it and the jury

7   is going to look at that.  There's no reason, you don't have to

8   hammer it in.

9            THE COURT:  Well, look, she asked him who was present, I

10  think it's a fair question.  The jury already has heard Agent

11  Bryson say who was there.

12           MR. LONDON:  Did she say you were there?

13           MS. BERNSTEIN:  Uh-huh.

14           MR. LONDON:  I didn't realize that.

15           THE COURT:  Yes, she did.

16       (OPEN COURT.)

17  BY MS. BERNSTEIN:

18  Q.  Agent Bezak, who all was there for that meeting?

19  A.  Myself, Agent Bryson, Agent Gary Henley, Agent Marycruz

20  Martinez, yourself, DOJ attorney Kristy Parker, and DOJ attorney

21  Forrest Christian.

22  Q.  The last three you mentioned, are those all federal

23  prosecutors?

24  A.  Yes, ma'am.

25  Q.  There was testimony last week about the fact that at some point

1   you all went out to the bridge that day; is that right?

2   A.  Yes.

3   Q.  Whose idea was it for Sergeant Kaufman to take the group out to

4   the bridge?

5   A.  It was Sergeant Kaufman's idea.

6   Q.  I want to ask you some reactions, without going through, I

7   don't want to go through the details of what happened in that

8   interview, the jury has already heard about that.  But what was

9   your reaction to the story that Archie Kaufman told you guys that

10  day?

11  A.  There were a number of things that he talked about that I guess

12  you could characterize as that I was curious about or had questions

13  that I thought needed to be answered.

14  Q.  Did you challenge him on any of those things that you were

15  curious about?

16  A.  No, no, I didn't.  At the time, like I said, I had no

17  information about the case and definitely did not know enough to

18  try and challenge him.

19  Q.  Now, again, without going into a whole lot of detail, can you

20  just tell us very briefly what some of those things were that in

21  your own head you were curious about after this interview?

22  A.  Sure.  There were several things, that some of the stuff that

23  comes to the top of my head now are, he told us that he was a

24  witness to the incident and investigated the incident, which I

25  thought was odd because ordinarily that's not the way an

 1   investigation is handled.  If you witnessed an incident, you don't

 2   also then investigate that incident.

 3          He had mentioned that he ordered Lieutenant Mike Lohmann

 4   around, that he told him to conduct a canvas for evidence.

 5          MR. LONDON:  Objection.  We're moving way off of what we

 6   discussed up there.

 7          THE COURT:  Yes, I think we need to stick with what we

 8   talked about here at the bench, that was my understanding.  So

 9   let's move on.  I think we're getting afield of what we discussed

10   in light of the previous objection, two objections.

11   BY MS. BERNSTEIN:

12   Q.  Without getting into the details of what Defendant Kaufman had

13   said during that interview, can you tick off for us the topics of

14   things that you were very curious about, and then I'll ask you

15   where you went from there.

16          So we've got his interactions with Mike Lohmann and the

17   fact that he was a witness to the incident are the two that you've

18   ticked off so far.

19   A.  And investigated the incident, the -- Lakeisha Smith and James

20   Youngman were witnesses, and the fact that Morrell Johnson and

21   Leonard Bartholomew, IV, were not identified and interviewed.

22   Q.  During that interview, again, without giving us the details,

23   during that interview, did Sergeant Kaufman talk about a gun that

24   he had allegedly found at the scene?

25   A.  He did.

1  Q.  Again, without rehashing through what he said about the gun,

2  what was your reaction to what he told you about the gun?

3  A.  Again, I was very curious.  The manner in which he said he

4  found the gun was odd.

5  Q.  Now, you used the word curious about these things.  Can you

6  explain what you mean by curious?

7           MR. LONDON:  Objection, Judge.

8           THE COURT:  I'll overrule.  He can answer this.

9           THE WITNESS:  Again, I didn't know enough at the time to

10  be what I would call suspicious, but there were things that just

11  didn't sound right, didn't add up right, and things that I thought

12  would need further investigation to determine if I should be

13  suspicious about them.

14  BY MS. BERNSTEIN:

15  Q.  What was the next step that you were involved with in this

16  case?

17  A.  I sat in in a similar interview with, of Sergeant Gerard Dugue.

18  Q.  When did that interview happen?

19  A.  The next day, it was in late January.

20  Q.  What was the tone of that interview?

21  A.  Again, very friendly.

22  Q.  And you said it was a similar kind of interview, just to get

23  the background from him?

24  A.  Yes.

25  Q.  Now, you mentioned during the interview with Kaufman that there

```
 1   were these things you were curious about, but you did not confront

 2   him on anything.

 3   A.   Yes.

 4   Q.   In the interview with Dugue, did anybody press him on anything?

 5   A.   Yes, you pressed him on something.

 6   Q.   What was the -- again, without getting into the details of what

 7   happened in the interview, what was the topic that he was pressed

 8   on?

 9   A.   David Ryder, when he learned that David Ryder was not in fact a

10   deputy sheriff, and why he met with David Ryder before David Ryder

11   testified in the state grand jury.

12   Q.   Now, during that interview -- you said up to this point you had

13   not read any reports for the case; is that right?

14   A.   No.

15   Q.   During that interview, did Dugue give you anything?

16   A.   Yes, he gave us the NOPD report on the incident, the 54-page

17   report.

18   Q.   Is that the official 54-page report that's in evidence here?

19   A.   Yes, ma'am.

20   Q.   On that 54-page report, who is the first victim identified of

21   attempted murder of a police officer?

22   A.   Deputy Sheriff David Ryder.

23   Q.   In the course of your investigation, did you learn whether

24   Deputy Sheriff David Ryder was, in fact, a deputy sheriff?

25   A.   Yes, he was not a deputy sheriff, he was a convicted felon.
```

1   Q.  Did your case focus on him at all; you just said he was a

2   convicted felon?

3   A.  It did focus on him, yes.

4   Q.  How was that part of the case resolved?

5   A.  David Ryder pled guilty to lying to the FBI and being a felon

6   in possession of a firearm.

7   Q.  So I want to jump back now to this interview with Sergeant

8   Dugue, and you said this was your second step in the Danziger

9   Bridge investigation, right?

10  A.  Yes, ma'am.

11  Q.  And you said he was pressed on the topic of David Ryder.

12  A.  Yes.

13  Q.  What was his reaction when he was pressed on that?

14  A.  He became very, very nervous, began to stammer with his answers

15  and began to sweat profusely.

16  Q.  Now, during that interview, did Sergeant Dugue, did he mention

17  any particular witnesses he thought you ought to talk to in your

18  federal investigation?

19  A.  Yes, he did.

20  Q.  Let me ask you that sort of background question.  Was it

21  understood in both of these interviews that the reason you all were

22  doing the interviews was because the FBI was about to launch an

23  active investigation in Danziger?

24  A.  Yes.

25  Q.  So who did Dugue tell you you ought to talk to in your federal

1   investigation?

2   A.  He mentioned two witnesses, James Lott and Kenneth Bousegard.

3   Q.  Now, again without telling us what those witnesses said, did

4   Dugue tell you why they were important witnesses?

5   A.  Yes.  He said they had provided information that justified the

6   officers' actions.

7   Q.  Were there other witnesses he suggested you talk to?

8   A.  No, ma'am.

9   Q.  I want to come back to those questions in just a minute, but

10  first I want to talk to you about what you did next.  So you had

11  those first two -- you sat in on those first two interviews, two

12  days back to back, right?

13  A.  Yes.

14  Q.  Now, at some point after that did you actually get assigned to

15  this case?

16  A.  Several weeks after those interviews I was assigned as the case

17  agent.

18  Q.  Once you became the case agent, what did you do?

19  A.  First thing that I did was I tried to get my hand -- I got my

20  hands on the NOPD reports of the incident and the DA reports of

21  their investigation of the incident.

22  Q.  Now, this jury has heard about the fact that the district

23  attorney's office did an investigation.  You got their file, as

24  well as the NOPD file?

25  A.  Yes.

1    Q.   Did you read any official reports about the shooting?

2    A.   Yes.

3    Q.   I know there's probably a lot in your file, if you could just

4    sort of hit the highlights for us, what are the reports that you

5    remember focussing on in the beginning?

6    A.   The three main reports that, initially that I focused on would

7    have been the initial incident report, NOPD incident report --

8    Q.   Let me stop you there.  The initial report, how many pages is

9    that?

10   A.   Approximately seven pages.

11   Q.   Who is that written by?

12   A.   Sergeant Kaufman.

13   Q.   So you had the initial seven-page report?

14   A.   Yes.

15   Q.   What else?

16   A.   The Gist or the probable cause statement for the arrest of

17   Lance Madison.

18   Q.   Is that the one-page statement that's already in evidence?

19   A.   Yes.

20   Q.   And who essentially wrote that?

21   A.   Ignatius Hills.

22   Q.   All right.  What else?

23   A.   And the 54-page supplemental report.

24   Q.   That's the official report that's already in evidence?

25   A.   Yes.

1  Q.  When you were educating yourself about the case, did you also

2  see a transcript from a preliminary hearing for when Lance Madison

3  was arrested for allegedly attempting to murder police officers?

4  A.  Yes, I did.

5  Q.  Who testified at that preliminary hearing?

6  A.  Lance Madison and Sergeant Kaufman.

7  Q.  So you've mentioned some reports you've read and a preliminary

8  hearing transcript.  Again, do you remember what your reaction was

9  when you read those documents?

10 A.  Now a lot of those things that were curious became suspicious

11 to me, and there were more things that I thought were suspicious

12 based on the reports.

13 Q.  So now you're the case agent, you've reviewed the case, and you

14 have these suspicions.  Can you walk us through now what the

15 suspicions are that you want to go investigate?

16 A.  Sure.  One of the suspicions was, in the report it's -- there

17 are five .223 shell casings that were collected from the scene, and

18 none of the officers involved in the incident admitted to firing a

19 weapon that was chambered to fire a .223 round, so I thought that

20 was very, very curious and something that needed to be followed up

21 on.

22      Also, in one of the supplemental reports, not the 54-page

23 report, Robert Faulcon mentions that Sergeant Gisevius had an M4

24 rifle during the incident, which can fire a .223 round.  So that

25 was again very suspicious.

1          The story behind the gun that was collected on the scene,

2     again, very suspicious because, one, it was found the day after the

3     incident, according to Sergeant Kaufman; other evidence that was

4     with the gun was left on the scene, was not collected; in the

5     preliminary hearing that you just mentioned, Sergeant Kaufman says

6     another officer found the weapon.

7     Q.   Why was that particular part suspicious to you?

8     A.   It's impossible to forget that you weren't the one to collect

9     the weapon, so how could you make that mistake and say another

10    officer found it?

11         The Louisiana state trooper who Sergeant Kaufman told me was

12    on the scene was not listed in the report.

13    Q.   You mean his name wasn't in there?

14    A.   No mention of an LSP trooper at all, name or just in general.

15         The witnesses, Lakeisha Smith and James Youngman, they

16    weren't better identified, and basically it was just a date of

17    birth, there was no contact information for them, no phone numbers,

18    and there was just very general one- or two-paragraph interviews,

19    statements from those witnesses.  And I thought that was suspicious

20    because these are witnesses that justify the police shooting and

21    they weren't thoroughly interviewed, they didn't have good contact

22    information for them.

23         And ordinarily you would treat those witnesses like they

24    were gold, like they were -- you know, obviously, they were very,

25    very, very important to the case, and it was suspicious that they

1    weren't thoroughly interviewed, they weren't transported from the

2    scene like other individuals were --

3    Q.  Let me stop you there.  You said they weren't transported from

4    the scene like other individuals were.

5    A.  Yes, ma'am.

6    Q.  Who had been transported to the scene and where had they been

7    transported to?

8    A.  Transported "from" the scene.  Lance Madison, Morrell Johnson,

9    Leonard Bartholomew, IV, and David Ryder.

10   Q.  And why did that particular point make you suspicious?

11   A.  Because, obviously, they had the capability to take people from

12   the scene to take statements from them, and it wasn't done for

13   these two witnesses who supposedly witnessed the incident and

14   justified the officers' actions.

15   Q.  Were there other things at this point that you were now

16   suspicious about and wanted to go investigate further?

17   A.  Yes.

18   Q.  What else?

19   A.  In the report, in the official report, it doesn't say that

20   Sergeant Kaufman was there during the incident.  It says that he

21   arrived, I think shortly before or shortly after Lance Madison was

22   apprehended, I forget which way, but definitely not there when

23   Ronald Madison was shot like he told me.

24   Q.  Now, when you read the -- when you started reading these

25   reports, did those reports contain statements allegedly given by

1  the officers involved in the shooting?

2  A.  Yes, they did.

3  Q.  I want to focus in on Kenny Bowen's statement.  Or let me ask

4  you, did you focus in at all on Ken Bowen's statement?

5  A.  Yes.

6  Q.  What did you focus in on?

7  A.  There were two things that I focused on:  One, in the same

8  report are the -- well, in the 54-page report and the transcript of

9  his NOPD taped interview, Ken Bowen gives two different accounts of

10  his actions on the bridge.

11  Q.  Let me stop you there.  You just mentioned the transcripts of

12  the taped interview.  Did you have transcripts of all of the

13  interviews that the officers gave?

14  A.  Yes.

15  Q.  Was that one of the categories of things that you reviewed?

16  A.  Yes, it was.

17  Q.  Okay.  I'm sorry, so go on.

18  A.  So essentially in the same report he gave two different

19  accounts of his actions on the bridge and it wasn't questioned,

20  neither Sergeant Kaufman nor Sergeant Dugue questioned him about

21  why his story changed.

22  Q.  Is there a particular change in the story that you're thinking

23  of right now?

24  A.  Yes.

25  Q.  Can you walk us through that?

A.  Sure.  In the 54-page report, Ken Bowen claims that after the

shooting he saw guns on the pedestrian walkway, kicked them into

the grass and then ran down into the grass and stood over them.  In

his taped statement, he just says that he saw guns, kicked them

into the grass and then pursued individuals up the bridge, so he

cut out the part about running down into the grass and standing

over the guns.

Q.  Now, according to the 54-page report, whom did Defendant Bowen

give that first statement to about running down into the grass and

seeing the guns?

A.  According to the report, he gave that statement to Sergeant

Kaufman.

Q.  Let me focus you on that particular statement first and then

I'll ask some follow-up questions.  But in that particular

statement, was there anything that you found suspicious that you

thought needed investigation?

A.  In the 54-pager?

Q.  Uh-huh.

A.  Yeah, I mean, the things that we just mentioned that had -- the

story changed and it wasn't questioned, and also he claimed that he

kicked the guns down into an area where he saw an individual flee.

Q.  Did he say he saw the person flee down there to the grass

before or after he kicked the gun?

A.  Before he kicked the guns.

Q.  Why was that curious?

1    A.  Well, I mean, it's -- it could be reasonable to kick guns away

2    from subjects, but you're not going to kick them to an area where

3    you just saw another subject flee.  So it didn't seem reasonable or

4    logical that somebody would do that.

5    Q.  According -- and I am still focused now just on that first

6    statement.  According to that 54-page report, that statement that

7    you just summarized, did anybody question that?

8    A.  No.

9    Q.  Why you would kick a gun to a suspect who just fled?

10   A.  No, it wasn't questioned.

11   Q.  Okay.  Then you mentioned there was a change between that

12   version that's in the 54-page report and the version that Defendant

13   Bowen gave on tape, right?

14   A.  Yes.

15   Q.  And you were explaining why that change -- oh, no, I'm sorry,

16   you explained that that change was suspicious to you.

17          To whom did he give that statement that was audio taped?

18   A.  Sergeant Kaufman and Sergeant Dugue.

19   Q.  So Sergeant Kaufman, who had taken the first statement from

20   him?

21   A.  Yes, ma'am.

22   Q.  On that audiotape, did Sergeant Kaufman question him and say,

23   hey, that's not what you told me before?

24   A.  No, he didn't.

25   Q.  Now, when you started doing your investigation, you said you

1   reviewed a whole bunch of things.  Did you also get your hands on

2   the videotape taken from the I-10?

3   A.  Yes.

4   Q.  Did you watch that?

5   A.  Yes, I did.

6   Q.  What was your reaction when you saw the videotape?

7   A.  Again, very, very suspicious.  The officers' story is that they

8   were basically in a running gun battle, and in the video it's clear

9   that the officers aren't taking cover like they were in gun battle.

10  They're literally standing tall, shooting up the bridge.

11  Q.  Which officers are you picturing in your head when you're

12  talking about them standing tall shooting up the bridge?

13  A.  Mike Hunter, Sergeant Gisevius, and Robert Faulcon, who is

14  standing next to Gisevius when he fires.

15  Q.  Is that two different points on the video that you're talking

16  about?

17  A.  Yes.

18  Q.  Can you explain?

19  A.  Initially in the video, you see Mike Hunter in front of the

20  truck shooting west up the bridge.  After the initial shooting is

21  done on the east side of the bridge, the camera follows Sergeant

22  Gisevius and Robert Faulcon up the bridge, and they stop twice and

23  Sergeant Gisevius fires his weapon.

24  Q.  After you see -- and you said you don't see them take any

25  cover?

1    A.  No.

2    Q.  After you see Faulcon and Gisevius go up the bridge, does the

3    video show anybody else going up the bridge?

4    A.  Yes, it shows Anthony Villavaso walking west up the bridge,

5    looks like he's pumping his rifle in the air, again, not taking

6    cover; doesn't look like he's in a running gun battle.

7    Q.  So once you had all of this information that you took in and

8    you had these suspicions, what did you do to investigate those

9    things?

10   A.  Reviewed all of the reports, tried to make sense of the reports

11   and note any inconsistencies in the reports, and also try to

12   identify everybody that was either on the scene during the

13   incident, after, shortly after the incident, or was somehow

14   involved in the investigation of the incident.

15   Q.  How do you go about identifying people who were there, did you

16   just go by what was in the report?

17   A.  Well, initially I could think that's the way I started was, the

18   people that were identified in the report and people that Sergeant

19   Kaufman had mentioned.  From there it was just, you know, you

20   talked to one person and they would tell you about another officer

21   who was on the scene, that officer would tell you about two more

22   people who were on the scene, and it just kind of rolled like that

23   like a domino effect until I identified as many people as I could.

24   Q.  I want to come back in a minute and start talking to you about

25   your interviews with officers who were on the scene.  But first I

1    want to focus on the alleged civilian eyewitnesses, Lakeisha Smith

2    and James Youngman.

3    A.  Okay.

4    Q.  Did you interview them?

5    A.  No, I couldn't locate them.

6    Q.  Did you try to find them?

7    A.  Yes.

8    Q.  What all did you do?

9    A.  For James Youngman, there wasn't much that I could do other

10   than do a bunch of database checks to try and locate him.  I did

11   DMV searches, Lexis/Nexis searches, social security searches,

12   utility checks, every database check I could think of to try and

13   identify a James Youngman that was in the approximate age range

14   that the witness was in.  I couldn't identify any James Youngman

15   close to that age that was in Louisiana at all.

16        Lakeisha Smith, again, I was just accused -- I didn't focus

17   on her particular date of birth in the report, but just a general

18   age range around that age, and I was able to identify ten or 11

19   Lakeisha Smiths that lived in New Orleans that were of similar age.

20   They were all interviewed and none of them were on the scene during

21   the incident

22   Q.  Let me come back, then, I told you I would come back and ask

23   you about your interviews, trying to identify officers who were on

24   the scene.  Who were some of the first officers you talked to after

25   those first two interviews with Kaufman and Dugue?

1   A.  Jeffrey Lehrmann and Lieutenant Kim Williams.

2   Q.  Why did you start with Jeff Lehrmann and Kim Williams?

3   A.  Sergeant Kaufman mentioned their names.

4   Q.  What did he mention about them?

5   A.  That Jeff Lehrmann had assisted him during his investigation,

6  and that he and Kim Williams had apprehended Morrell Johnson,

7  detained Morrell Johnson.

8   Q.  So let's start with Jeff Lehrmann.  The jury has heard from him

9  already, and I just want to talk to you about sort of the process,

10  how you went about talking to him.  First of all, this first

11  interview, did you talk to him in person or by phone?

12   A.  It was by phone because at the time he lived in Arizona.

13   Q.  What was his demeanor or attitude on the phone?

14   A.  He was surprised to hear from me, nervous.

15   Q.  Without talking to us about what he said to you during that

16  conversation, did you feel like he was being straightforward with

17  you?

18   A.  No, I did not.

19   Q.  Did you later learn whether or not you were right?

20   A.  Yes, I was right.

21   Q.  Let me talk about Kim Williams.  Who is she?

22   A.  She was, at the time of the incident, she was a lieutenant in

23  the 6th District.  When I talked to her, I believe she was in the

24  5th.

25   Q.  She was in the 6th or the 7th?

1    A.  I'm sorry, the 7th District.

2    Q.  So she was in the same district that many of the officers

3    involved were from?

4    A.  Yes, ma'am.

5    Q.  When you talked to her, did you interview her in person or on

6    the phone?

7    A.  It was in person.

8    Q.  What was her demeanor or attitude when she talked to you?

9    A.  Annoyed that I was questioning her.  I guess you could describe

10   her attitude as, how dare I question her about anything that

11   happened during Katrina if I wasn't there.

12   Q.  Did you feel like she was being straightforward with you?

13            MR. LONDON:  Objection to hearsay.

14            THE COURT:  Overruled.

15   BY MS. BERNSTEIN:

16   Q.  Did you feel like she was being straightforward with you?

17   A.  No.

18   Q.  So what did you do after you did these first couple of

19   interviews with people Sergeant Kaufman had identified?

20   A.  Then tried to identify the other people who were on the scene.

21   I found officers who were in the Budget truck that were not

22   identified, and officers who responded to the scene shortly after

23   the shooting that were never identified.

24   Q.  I want to talk to you about how you went about doing these

25   things.  You said that you would ask people who else was there and

1   try to identify other people who were at the scene.  Once you

2   identified other people who were at the scene, what did you do with

3   that information?

4   A.  I interviewed them.

5   Q.  Now, would you -- when you interviewed them, would you call

6   them up and say, hey, I'm with the FBI and I want to talk to you

7   about the Danziger Bridge case?

8   A.  No, no.  Generally, very rarely did I set up an interview

9   initially.  But generally, I tried to pop in on them either at home

10  or while they were at work.

11  Q.  Why did you try to pop in on them instead of calling them and

12  telling them what you were doing?

13  A.  Two reasons, really:  One, officers, in my experience,

14  generally are reluctant to discuss an incident that they have

15  information about, and not because they're trying to hide

16  something, but it's uncomfortable, it's uncomfortable to talk about

17  your co-workers.  And if you give them the opportunity to avoid

18  you, they will, just because it's easier to deal with it that way.

19  So by popping in they can't avoid you, they're forced to talk to

20  you.

21          And also, if they did have something to hide, I thought

22  by popping in it wouldn't give them the chance to talk to anybody

23  else to try and get their stories straight, or they may just slip

24  up if they weren't prepared for me questioning them.

25  Q.  Did you ever find it useful to be able to gauge their reaction

1    when you told them what you were talking to them about?

2    A.  Yes, yes.

3           MR. DeSALVO:  Judge, that's way too general.  It's they

4    and them.

5           THE COURT:  Yes, I think we need to be specific.

6           MS. BERNSTEIN:  All right.

7    BY MS. BERNSTEIN:

8    Q.  Is there any other reason that you wanted to do these

9    interviews in person without first telling them what you wanted to

10   talk to them about?

11   A.  So I could gauge their reaction.  If -- for instance, Kevin

12   Brian, when I approached him, you know, I could tell that he was

13   very nervous and very surprised because up until that point, he had

14   no involvement in the case as far as anybody else was concerned.

15   He was never interviewed in the state case, he was never contacted

16   in the NOPD investigation.  So I was the first person to question

17   him.

18   Q.  And can you remind the jury -- they heard from Kevin Brian, but

19   Kevin Brian, what was his role in the case?

20   A.  He was an officer who was in the back of the Budget truck

21   during the shooting.

22   Q.  So I am going to ask you about some of your specific

23   interviews, but first of all, you said when you were doing this,

24   trying to identify officers and then go interview them,

25   approximately how many NOPD officers did the FBI interview during

1   this investigation?

2   A.  A guess would be at least 75 before they stopped talking to us.

3   Q.  You said they stopped talking to you.  What do you mean by

4   that?

5   A.  At some point in the investigation, officers just refused to

6   talk to us.  And then when that started to occur, we would issue

7   them grand jury subpoenas to have them testify before the grand

8   jury.

9   Q.  Now, those interviews when you go out to talk, when the FBI

10  goes out to talk to people, are those interviews voluntary?

11  A.  Yes.

12  Q.  So they have the right to talk or not talk?

13  A.  Yes.

14  Q.  And you said "they" started refusing to talk, like it was sort

15  of an across-the-board thing.

16          MR. DeSALVO:  Can we be more specific with the they as to

17  the individuals, kind of --

18          THE COURT:  Well, I think he is -- first of all, I also

19  think we need a time frame here.  But I think he's testified that

20  he's talked to some -- he's given us a figure.  So "they" would

21  include, from the testimony as I understand it, everyone he's tried

22  to talk to?

23          MR. DeSALVO:  I think "they" was those who didn't talk to

24  them.

25          MS. BERNSTEIN:  We'll clarify.

1          THE COURT:  Let's clarify that.  That's a good point.

2     BY MS. BERNSTEIN:

3     Q.  You mentioned that the FBI interviewed, you guesstimated, about

4     75 officers before they stopped talking to you.  Is that what you

5     said?

6     A.  Yes, ma'am.

7     Q.  Can you give us a time frame on when you're talking about that

8     y'all did those approximately 75 interviews?  And for the record, I

9     know you're not looking at any documents and I am not asking you to

10    be exact with dates, just give us a guesstimate.

11    A.  I would say between January of 2009 up until the indictment,

12    which was the summer of 2010.

13    Q.  Of those 75 or so interviews that the FBI conducted with NOPD

14    officers, what percentage of those interviews did you do?  Again,

15    just asking you to generalize for us.

16    A.  Seventy-five percent of them.

17    Q.  So most of these, this was you doing this investigation?

18    A.  Yes, ma'am.

19    Q.  But you had some help; is that fair?

20    A.  Yes.

21    Q.  And you mentioned that you did these interviews until people

22    stopped talking.  Did you find out that something had happened to

23    make officers stop talking to you?

24          MR. HESSLER:  Objection, your Honor.  If he is going to

25    speculate on why an individual officer made a choice like that, I

1    think --

2            THE COURT:  Yes, I'll sustain that.  I am going to

3    sustain.  We're attributing a general motive to multiple people.

4    So I'll sustain the objection.

5            MS. BERNSTEIN:  And I'll ask it to get around

6    speculation.

7    BY MS. BERNSTEIN:

8    Q.  During the course of your investigation, did you read an

9    e-mail --

10           MR. HESSLER:  Objection, your Honor, relevance.

11           THE COURT:  Approach.

12       (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

13           MR. HESSLER:  Relevance and hearsay, your Honor.

14           MS. BERNSTEIN:  You want me to tell you what the e-mail

15   says?

16           MR. HESSLER:  I believe the e-mail is going to be an

17   e-mail that was sent out by one of two of the police organizations

18   advising them that they had a right to an attorney if the FBI

19   contacted them, and an attorney would be provided for them if they

20   chose to exercise their rights.

21           So again, whether an officer -- I mean, attributes any

22   improper inference would be a complete constitutional right of why

23   somebody would wait for the grand jury subpoena as opposed to

24   speaking to the investigator.

25           THE COURT:  Okay.

1          MS. BERNSTEIN:  I think what he is going to say is that

2     there was an e-mail telling people first don't talk to them without

3     an attorney, and then another instruction or e-mail that came later

4     saying do not talk to them.

5          MR. HESSLER:  That's an opinion of the writer, that's not

6     an instruction.  They're not bound to follow any instruction.

7          THE COURT:  My only concern is, we're talking about an

8     electronic document that he is going to characterize one that was

9     not directed to him.

10         MR. HESSLER:  I don't know if this witness has even read

11    it.

12         THE COURT:  That's troublesome.

13         MR. FLEMING:  And it's advising them to exercise their

14    constitutional rights.

15         THE COURT:  You can cover that on cross if it doesn't

16    come out on direct.

17         MR. HESSLER:  It's going to come from his mouth

18    indicating that these officers read that.

19         THE COURT:  That's the problem is that he is going to

20    attribute a motive to any number of people based on an e-mail that

21    he doesn't know who received it.  Apparently it came into his hands

22    or his viewing at some point in time, and we don't have the actual

23    e-mail, or maybe you do.

24         MS. BERNSTEIN:  I think we do.

25         THE COURT:  We don't have the actual document to

1   attribute any motive of any particular unnamed individual at this

2   point who is out in the universe of people.  It's very --

3          MS. BERNSTEIN:  We do actually have the document.  I'll

4   try to move on because I don't think it's -- I don't think it's an

5   important point and I wasn't planning -- I wasn't planning on

6   attributing any ill motive to officers who exercised their rights,

7   but so I'll just move on with at some point that officers stopped

8   talking to him.

9          THE COURT:  I think we already established that.  In

10  fact, I think you've also properly established that they were under

11  no obligation to talk to him.  So let's just go ahead and move on.

12  I'll sustain.

13     (OPEN COURT.)

14  BY MS. BERNSTEIN:

15  Q.  Agent Bezak, before the break you were talking about that point

16  in time when you noticed that NOPD officers were declining to do

17  voluntary interviews with you.

18  A.  Yes.

19  Q.  Did you just stop your investigation at that point?

20  A.  No.

21  Q.  What did you do?

22  A.  Officers that refused to speak with me were issued grand jury

23  subpoenas, and they testified in front of the federal grand jury.

24  Q.  Now, you said that witnesses have the right, have every right

25  to refuse to talk to you when you ask them for a statement, right?

1    A.   Yes.

2    Q.   If a witness is given a grand jury subpoena, do they have to go

3    answer questions of the grand jury?

4    A.   Yes.

5    Q.   As the case agent, do you conduct a grand jury investigation?

6    A.   No, I do not.

7    Q.   Who does that?

8    A.   Prosecutors, federal prosecutors.

9    Q.   So during the federal investigation, were a lot more NOPD

10   officers questioned through that process?

11   A.   Yes, they were.

12   Q.   Now I want to talk to you while we're talking about all of

13   these, all of these interviews that you did.  When you conducted

14   these interviews, did you tape record the interviews?

15   A.   No, I did not.

16   Q.   Why not?

17   A.   FBI policy that interviews are not recorded.

18   Q.   Is there ever any exception to that policy?

19   A.   Yes.

20   Q.   During the five -- you said five and a half years you've been

21   an agent?

22   A.   Yes, ma'am.

23   Q.   During the five and a half years you've been an agent, have you

24   ever tape recorded an interview?

25             MR. FLEMING:  I am going to object as to the relevancy as

1    to what this agent may have done in other cases, Judge.

2              MS. BERNSTEIN:  Your Honor, if I might respond.  There's

3    already been a lot of cross-examination about why the interviews --

4              MR. FLEMING:  There's been no cross-examination of this

5    witness, Judge.

6              THE COURT:  I am going to sustain.  Let's get on to his

7    testimony about this case.

8    BY MS. BERNSTEIN:

9    Q.  You started talking about -- I want to go to the next step off

10   of that.  You guys do not tape interviews.  What is the FBI policy

11   for how you keep track of what a witness says to you?

12   A.  During the interview you take notes, and then following the

13   interview you document the interview in a 302.  And the 302 is

14   basically a narrative that fairly summarizes what was said during

15   the interview.

16   Q.  And that's FBI policy?

17   A.  Yes, ma'am.

18   Q.  When you take those notes while you're doing an interview, are

19   you taking verbatim notes?

20   A.  No, they're just bullet points that are used to, you know,

21   refresh your memory when you go back to write your 302.

22   Q.  And then for you, generally, how quickly do you go back and

23   take those notes and turn them into the narrative 302 report?

24   A.  I generally try to do it very quickly, within a day or two.  In

25   this case because of the number of interviews, there was some times

1    where that wasn't possible.  I generally try to do them very, very

2    quickly.

3    Q.  When you then take that step and you go from your notes to

4    writing a narrative, is your narrative a verbatim summary of the

5    conversation?

6    A.  No.  No, again, it's just a narrative of what was said.

7    Q.  Does your 302 necessarily include every single thing that's in

8    your notes?

9    A.  No.

10   Q.  How confident are you in your note taking, how carefully do you

11   take notes?

12   A.  I am extremely confident in my note taking.

13   Q.  There were some questions raised earlier in the trial about

14   your interview with Mike Hunter.  Did you go back and review your

15   notes from those interviews?

16   A.  Yes, I did.

17   Q.  How many pages of notes did you take during your interviews

18   with Mike Hunter?

19   A.  With the three interviews combined, it was 100, 100 pages of

20   notes.

21   Q.  And that's -- you sounded like you had a question mark at the

22   end of that.  Is that a rough estimate?

23   A.  Yeah, because I know that the longest interview was 75 pages

24   and then there were two other interviews.

25   Q.  So 75 pages for one interview?

1    A.  Yes, ma'am.

2    Q.  Now, did you go back and compare -- for that interview, let's

3    focus on that one, did you go back and compare the 75 pages of

4    notes to your 302?

5    A.  Yes.

6    Q.  Now, your 302 wasn't 70 pages long, was it?

7    A.  No, it was 14 pages.

8    Q.  Was every word from the 70-page note in the 302?

9    A.  No.

10   Q.  When you went back and compared, did you find any

11   inconsistencies between the 70 pages and the 302?

12   A.  No.

13   Q.  I want to go back to the interviews you conducted.  You talked

14   about identifying people, going out and interviewing them.  When

15   people did talk to you, did you just take what they said at face

16   value?

17   A.  No, no.  I mean, you do that in every investigation.  The

18   information that people provide to you, you need to compare it to

19   the information that other witnesses have provided to you and other

20   evidence that you have in your case, and you make a determination,

21   you know, as to where they fit in the case.

22   Q.  And you mentioned before, you mentioned that one of the people

23   you talked to was Kevin Brian.

24   A.  Yes.

25   Q.  And you talked about him being surprised when you showed up,

1    right?

2    A.  Yes.

3    Q.  And you said that you learned from him that he was in the

4    Budget truck that day?

5    A.  Yes, ma'am.

6    Q.  Before that interview, did you know that he was in the Budget

7    truck?

8    A.  No.

9    Q.  Was he mentioned in the reports?

10   A.  No, he wasn't.

11   Q.  You said that you had reviewed interviews with the officers who

12   were identified as having been involved in the shooting?

13   A.  Yes.

14   Q.  Had any of them mentioned Kevin Brian being in the Budget

15   truck?

16   A.  They did not mention it.

17   Q.  During that first interview with Kevin Brian, did you feel that

18   he was being forthcoming with you?

19   A.  No, I did not.

20   Q.  Did you later learn whether or not you were right?

21   A.  I was right.

22   Q.  How did you learn that?

23   A.  He admitted that he had lied in that first interview, when he

24   left out the fact that Ignatius Hills fired his weapon and that he

25   had chased the juvenile and struck the juvenile.

1   Q.  This jury has heard from former lieutenant Mike Lohmann.  Did

2   you talk to him early on in your investigation?

3   A.  Yes.  Sometime in the spring of 2009.

4   Q.  Where did you do that interview?

5   A.  At the 6th District station.

6   Q.  Was that where he was working at the time?

7   A.  Yes.

8   Q.  Did you call him, call ahead and tell him, I am with the FBI

9   and I want to talk to you about Danziger?

10  A.  No, I did not, I just showed up at the district station.

11  Q.  Did he talk to you?

12  A.  Reluctantly.

13  Q.  During that meeting, did you feel that he was being

14  forthcoming?

15  A.  No, I did not.

16  Q.  Did you later learn whether you were right?

17  A.  I was right.

18  Q.  How did you learn that?

19  A.  He later pled guilty.

20  Q.  I want to switch gears a little bit away from officers.  Did

21  you talk to any of the victims of this case early on in your

22  investigation?

23  A.  Yes.  Very early on I spoke to Susan Bartholomew, and at some

24  point during the spring of that first year of 2009 I also spoke to

25  José Holmes.

1    Q.  During that interview with -- let me focus on Susan first.

2    During your interview with Susan Bartholomew, did she give you any

3    leads to follow up on?

4    A.  She did.  She, one, flatly denied that she ever said --

5                MR. FLEMING:  I am going to object, your Honor.  Can we

6    approach?

7                THE COURT:  Yes.

8           (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

9                MR. FLEMING:  Judge, this is exactly what we talked about

10   before we started and exactly what Ms. Bernstein said she was not

11   going to do, have him talk about what other people told them and

12   that's all she's doing is what Susan Bartholomew told him.  Susan

13   Bartholomew testified, they could have asked those questions of

14   that witness.  In fact, they did.  I think they did.  But they may

15   not have liked the way she testified and they want it to go a

16   little smoother with Mr. Bezak, but that's all they're doing.

17               MS. BERNSTEIN:  I think he might think I am going

18   somewhere that I am not, and I think I've been rather textbook

19   here, going through what he did not what people told him.  Where I

20   am about to go with this is not through the details of his

21   interview with Susan, but through the fact that she denied friendly

22   conversation with Kaufman and he then checked the medical records.

23               I mean, if there's an objection to him repeating that one

24   little part that is already in evidence, and therefore I thought

25   totally unobjectionable, I can work around that by asking whether

1    it was consistent or inconsistent with what Kaufman had said.

2            THE COURT:  I am going to overrule.  I prefer to do it

3    that way because I don't want to get him recapping testimony.

4            MS. BERNSTEIN:  So you want me to do the consistent,

5    inconsistent and then what he did?

6            THE COURT:  Correct.  Overrule the objection.  So far, so

7    good.  I don't want to have him recap what other people told him or

8    explain away testimony that the jury has heard that's been subject

9    to cross-examination and redirect.

10           MS. BERNSTEIN:  Right.  I have no intention.

11           THE COURT:  Let's get him step by step on what he did.  I

12   think, as I understand it, that's the exercise and that's the

13   appropriate way to handle the agent, the case agent.

14           MS. BERNSTEIN:  I agree.

15           MR. FLEMING:  Judge, I guess I'm thinking preemptively on

16   Ms. Bernstein's comment about the medical records.  I assume she is

17   going to elicit from the agent what the medical records indicated.

18           MS. BERNSTEIN:  Nope.

19           MR. FLEMING:  That's fine.

20           MS. BERNSTEIN:  Not going to get into hearsay.

21           MR. FLEMING:  Okay.

22      (OPEN COURT.)

23   BY MS. BERNSTEIN:

24   Q.  Before that quick break, Agent Bezak, you were talking about

25   your interview with Susan Bartholomew.  Now, again, without going

1  through the details of what people had told you, had Defendant

2  Kaufman in his interview talked about an interview that he

3  allegedly did with Susan Bartholomew?

4  A.  Yes.

5  Q.  Did you talk to Susan Bartholomew about the same topic?

6  A.  Yes, I did.

7  Q.  Was the information she gave you consistent or inconsistent

8  with what Defendant Kaufman had claimed?

9  A.  It was inconsistent.

10  Q.  After you had that interview with Susan Bartholomew, did that

11  lead you to any other evidence to try to determine who was telling

12  the truth on that?

13  A.  Yes, it did.

14  Q.  What evidence did that lead you to?  Again, without detailing

15  what was in the evidence that you went to.

16  A.  I searched the medical records, and I found a note that was

17  consistent with Ms. Bartholomew's account of the interview.

18  Q.  And was that note consistent or inconsistent with what

19  Defendant Kaufman had told you?

20  A.  It was consistent with Ms. Bartholomew, inconsistent with

21  Sergeant Kaufman.

22  Q.  Now, we talked earlier about those two witnesses that Sergeant

23  Duque told you you should go interview.  I think you said their

24  names were James Lott and Kenneth Bousegard?

25  A.  Yes, ma'am.

Q.  Let's start with James Lott.  Did you personally interview James Lott?

A.  No, I did not.

Q.  Why not?

A.  I had a statement from, an NOPD statement, taped statement from the NOPD investigation, and based on that, I didn't think the information he had was relevant or pertinent to the case.

Q.  Now, again, without going into the details of what was in that statement, you said you had an audio-taped statement with him?

A.  The transcript of the statement.

Q.  This was an interview that NOPD had done with James Lott?

A.  Yes, ma'am.

Q.  Did you run James Lott record or did you have his record?

A.  I don't remember if I ran his record, but I definitely had his record.  And he had a criminal history, I believe he was charged with murder.

Q.  Now, without telling us what he said, who or what did he provide information about?

A.  He provided information about Ronald Madison.

Q.  Was the information in that taped statement with James Lott corroborated or contradicted by other evidence in the case?

A.  It was contradicted by the other evidence in the case.

Q.  Did you find James Lott to be a credible source?

A.  No.

Q.  Who participated in the NOPD interview with James Lott?

1   A.  There were two interviews, there was a brief interview that was

2   done with Dugue, Sergeant Dugue, and two FBI agents, Randy Markham

3   and Don Bostick.  The actual taped formal interview, the broad

4   interview, was conducted by Dugue and Don Bostick was present.

5   Q.  Now, Markham and Bostick, those FBI agents, are those the FBI

6   agents whose names came up last week in court?

7   A.  Yes, they are.

8   Q.  Were they assigned to the Danziger case, as was suggested last

9   week?

10   A.  No, they weren't.

11   Q.  Where were they assigned?

12   A.  After -- following Hurricane Katrina, there was, I guess, a

13   task force set up where FBI agents were assigned to the NOPD

14   homicide unit to assist in homicide investigations.

15   Q.  So they actually worked in the homicide unit?

16   A.  Yes.

17   Q.  At whose direction did they participate in that interview with

18   James Lott?

19   A.  Sergeant Dugue's.

20   Q.  That's James Lott.  I want to talk about the other guy now.

21   Kenneth Bousegard.  Did you personally interview him?

22   A.  No.

23   Q.  Why not?

24   A.  Same reason, had previous statements from him.  Reviewed those

25   statements, and I didn't feel they were pertinent or relevant to

1   the case.

2   Q.  Now, was the information he provided corroborated or

3   contradicted by the statements the victims gave?

4   A.  Contradicted.

5   Q.  Was it corroborated or contradicted by the statements the

6   officers had given?

7   A.  It was also contradicting.

8   Q.  Jumping back to that interview with Dugue when he focused you

9   on these two people, did he mention that you might want to talk to

10  the Bartholomews?

11  A.  No.

12  Q.  The Madisons?

13  A.  No.

14  Q.  Did he mention Morrell Johnson's name?

15  A.  No, he did not.

16  Q.  Did he suggest that you talk to any of the people we've seen

17  testify in court here?

18  A.  No, he did not.

19  Q.  What, if anything, did you make of the fact that Dugue had

20  steered you directly to James Lott and Ken Bousegard?

21  A.  I felt like he tried to steer me in the wrong direction.

22  Q.  When you were talking about these interviews that you were

23  doing with NOPD officers; and you said at some point you sort of

24  hit a wall, people stopped talking to you, correct?

25  A.  Yes, ma'am.

1    Q.  When you were identifying people and going to talk to them, did

2    you find any officers who wanted to talk to you?

3    A.  Yes.

4    Q.  You found some who were willing to provide information?

5    A.  Yes, ma'am.

6    Q.  Can you walk us through the first thing that you consider sort

7    of a big break in the case?

8    A.  I don't know if I would consider it the big break, but it

9    was -- the first break in the case was when I was able to identify

10   officers who were in the Budget truck, or responded to the scene

11   and searched the scene for weapons or other evidence and didn't

12   find any.

13   Q.  Why was that important to your investigation?

14   A.  Because Sergeant Kaufman claimed to have found the gun the next

15   day, and if these officers searched the scene and they didn't find

16   the gun, calls that into question; and also Ken Bowen claimed they

17   kicked guns off the bridge, and if these officers searched the area

18   and didn't find the guns, it also calls that statement into

19   question.

20   Q.  At that point what was the focus of your investigation?

21   A.  At that point, the focus of the investigation was to identify

22   all of the officers who were on the scene and try to focus on --

23   basically we split the case into two cases, a coverup case and the

24   shooting incident case.  Initially, generally I focused only on the

25   coverup aspect of the case.

1    Q.  I want to come back to that in just a second.  But you were

2    talking about identifying these officers, and you said you

3    identified other officers who were at the scene or who were in the

4    Budget truck.  Did you learn anything about a minibus or a shuttle

5    bus?

6    A.  Yes.

7    Q.  And the jury has heard from some officers who said that -- or

8    from some officers who arrived in that minibus.  Had the fact that

9    there were officers who arrived in a minibus or a shuttle bus, was

10   that anywhere in the reports?

11   A.  No, it wasn't.

12   Q.  So was this a new source of information, of people for you to

13   talk to?

14   A.  Yes, they were.

15   Q.  And you said that your focus at that point was on the coverup.

16   A.  Yes, ma'am.

17   Q.  Why is that?

18   A.  Well, to -- generally the -- after the state investigation, the

19   officers who were involved in the shooting and charged in that

20   incident, you know, I felt like they were entrenched and galvanized

21   by that investigation.  In order to prove one way or the other what

22   happened during that incident, I thought I would need to have some

23   type of cooperation from one of those officers, one of those

24   Danziger seven officers; otherwise, it would just be a case of the

25   victims' account versus the officers' account.

1           So in order to do that, in order to leverage one of those

2    officers into cooperating, I focused on the coverup in the hopes

3    that the pressure and the weight of that coverup investigation

4    would force one of the Danziger seven officers to cooperate on the

5    shooting part of the case.

6    Q.  Now, at this point in your investigation when you found those

7    officers who were willing to talk to you, who told you that they

8    searched the area and didn't find a weapon, at that point did you

9    focus in on any -- I guess focus more than other things on any

10   particular part of the coverup investigation?

11   A.  Sure.  The weapon that Sergeant Kaufman had allegedly found and

12   the victim statements that were inconsistent with the statements

13   that the officers had given.

14   Q.  Now, once you sort of focused in a little bit more on the gun

15   story, was there anybody else you talked to who you thought might

16   give you information about whether that gun story was true?

17   A.  Yes.

18   Q.  Who was that?

19   A.  Donna Andrew.

20   Q.  Who is Donna Andrew?

21   A.  She was the ADA who handled Lance Madison's preliminary

22   hearing.

23   Q.  Why did you want to talk to her?

24   A.  I thought that she could provide more information about the gun

25   that Sergeant Kaufman claimed to have found the day after the

1    incident.  After reviewing the transcript of that preliminary

2    hearing, I thought it was likely that Sergeant Kaufman invented the

3    gun while he was on the stand during that preliminary hearing.

4    Q.  So what question, without telling the answer, what question did

5    you particularly want to know, want to pose to Andrew?

6    A.  Whether or not she was aware of the gun before that hearing.

7    Q.  Can I have Exhibit 104 up, please, page 13.  Can we zoom in on

8    the highlighted part.

9         This is page 13 of Sergeant Kaufman's testimony at the

10   preliminary hearing, it's already in evidence.

11        There was a question that was raised last week about

12   whether Sergeant Kaufman thought that the gun was related to the

13   incident, and I just wanted to read the beginning here.  I'll read

14   the question and if you can read the answer.  "All right.  Did

15   anybody say they found a --

16        MR. FLEMING:  I am going to object, your Honor.  May we

17   approach?

18        THE COURT:  Yes.

19     (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

20        MR. FLEMING:  I am going to object to the procedure on

21   this.  But I don't know what the purpose of having just question

22   and answer in terms of a transcript that the jury has seen several

23   times and it's already in evidence --

24        MS. BERNSTEIN:  It is already in evidence.  This is about

25   maybe 30 seconds, it's a very short part.  And when it was read to

1    the jury last week, that lead-in question was not read, it's

2    already in evidence.  So I was just going to read the lead-in

3    question.

4         MR. FLEMING:  I am going to ask the questions, you're

5    going to give the answers.  The jury can read it, they can read the

6    whole thing when they go back.

7         MS. BERNSTEIN:  I'll be happy just to read it while he's

8    up there, it will maybe take 20 seconds.

9         THE COURT:  I think we've already asked him about his

10   inquiry being excited by the fact that he's got the grand jury -- I

11   mean, the preliminary hearing testimony, and he also has a person

12   to go talk to, which he did.  So I guess explain to me why we're

13   using the transcript at this point.

14        MS. BERNSTEIN:  Well, this part is separate from what he

15   did.  This is taking an item of evidence that is already in

16   evidence and publishing it to the jury at a relevant point.  And

17   again, my point here is just to read those lead-in questions, the

18   leading question that was not read last week that is in evidence.

19        THE COURT:  But why is that pertinent to his testimony?

20   I guess that's what I am not -- theoretically, if I agree with what

21   you're doing, we could do that with any piece of evidence.

22        MS. BERNSTEIN:  I'll tell you why it was relevant to him.

23   He was saying -- the suspicion that he's about to go investigate is

24   this suspicion that Kaufman made up the gun on the fly there.

25        THE COURT:  Right, he said that.

1      MS. BERNSTEIN:  I know.  But I think for that it's

2  important that it was clear that he was making up a gun that was

3  related to this incident, as opposed to what has been suggested in

4  court, which is that he was making up some random gun that had

5  nothing to do with anything.  So I think the fact that Bezak, after

6  reading this transcript, knew that it was clear to him that this

7  gun, I won't ask him, had they read it, it was clear to him that

8  this was a gun that was allegedly involved in this incident and

9  then he takes the next step to go find out about it.

10      THE COURT:  I think you can ask him, I think we can ask

11  him that without plowing through the transcript.  I am concerned

12  about continuing to put up something that is evidence for another

13  witness to testify about, which has already happened.

14      MS. BERNSTEIN:  I guarantee no plowing, just that 20

15  seconds of highlight.

16      THE COURT:  If we plow a little --

17      MR. FLEMING:  We're going to plow into this --

18      THE COURT:  Anybody that covers stuff on cross that I've

19  already sustained an objection to opens the door for redirect.  So

20  I am just saying, if we're really going to plow this field, then

21  let's plow.

22      MR. FLEMING:  I am pointing out that if the court allows

23  Ms. Bernstein to do this, then it's certainly -- the court should

24  allow the defense to do it as well and be done in much more detail.

25      THE COURT:  I think that he's already testified that he

     1    spoke to her, there was testimony about the gun that he found

     2    suspicious that bore further inquiry.  You can ask him about the

     3    testimony that came up during Kaufman's recitation of facts at the

     4    preliminary hearing.  I don't think that we need to go through the

     5    testimony and put it on the screen for this witness.

     6              MS. BERNSTEIN:  How about -- I am trying to do it without

     7    leading, which is why I wanted to put it up.  But was it clear to

     8    you that the gun was connected -- that according to Kaufman, that

     9    gun was connected to this case?  I mean, I think that's the

    10    important part.

    11              THE COURT:  You may get an objection, Mr. London will

    12    object to that as form.

    13              MS. BERNSTEIN:  That is why I would rather --

    14              MR. FLEMING:  I think it's clear --

    15              THE COURT:  Look, I think you can ask the question, maybe

    16    not in that form, to get that testimony.  But if you rephrase the

    17    question about his understanding of the gun and what he first,

    18    either when he first learned of it or that he learned that it had

    19    come up at the preliminary hearing through Mr. Kaufman's testimony

    20    and --

    21              MS. BERNSTEIN:  Yes, I can do that without leading;

    22    whether it was or was not, yes.

    23              THE COURT:  I think that's where we are.

    24              MR. FLEMING:  And it goes to elicit his opinion as to

    25    whether or not --

1             THE COURT:  That's not his opinion, it's his

2    understanding as the investigating case agent.  He found out that

3    there was testimony at a preliminary hearing that's pivotal to the

4    case that involved a firearm that was recovered.

5             MR. FLEMING:  I think that would be okay.  I think

6    Ms. Bernstein's going a little bit further, but this is more of

7    Mr. London's issue.

8             THE COURT:  I understand, and he is not up here to

9    object.

10            MR. LONDON:  My issue is using the transcript, which is

11   what the purpose of the objection was.

12            MR. FLEMING:  It is.

13            THE COURT:  I think the witness can testify as to the

14   fact that he learned the gun was disclosed and testified to, at the

15   preliminary hearing, that at that time it was his understanding

16   that there was a gun recovered and that it was his understanding

17   that it was related to his investigation, or it could be, and that

18   he looked into it further, and I assume that's going to be the

19   testimony.

20            MS. BERNSTEIN:  Can you ask if it's showing up on the

21   jury screen?

22            THE COURT:  It came up on mine.

23      (OPEN COURT.)

24   BY MS. BERNSTEIN:

25   Q.  Before the break there, we were talking about the transcript of

1    Defendant Kaufman's testimony at that preliminary hearing.  You

2    said that was one of the things you read --

3              THE COURT:  One second, one second.  Okay.

4    BY MS. BERNSTEIN:

5    Q.  You said that that transcript, that testimony was one of the

6    things that you reviewed, right?

7    A.  Yes.

8    Q.  Did you also review it when you went to talk to Donna Andrew?

9    A.  Yes.

10   Q.  Now, based on that transcript that's already in evidence, were

11   you able to conclude whether that gun that Sergeant Kaufman claimed

12   to have found, whether Sergeant Kaufman claimed that the gun was or

13   was not related to the Danziger Bridge shooting?

14             MR. LONDON:  Objection, your Honor, calls for an opinion.

15   Can we approach on it?

16             THE COURT:  Well, come on up.

17      (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

18             THE COURT:  Mr. London, we just discussed this at the

19   bench.  I don't think it's an inappropriate question.  This is

20   based on his understanding, based on his investigation.  But we

21   discussed this at the bench at the last conference.

22             MR. LONDON:  Including his opinion as to what that gun

23   is, it's pure opinions, pure speculation.

24             THE COURT:  He was the investigating agent.  He has to be

25   able to testify as to what he learned.  He's already testified to

1    what his conclusions were, or at least his opinion as to things

2    that he learned as being suspicious, curious, worthy of further

3    investigation.

4              MS. BERNSTEIN:  And you can cross-examine him about

5    whether that was a wrong assumption he made about whether the

6    transcript supported it.

7              THE COURT:  He is the case agent, the investigating case

8    agent.  If he learns of a piece of evidence and it causes him to

9    investigate further, I don't think that's an unfair question.

10             MR. LONDON:  And I didn't understand the question to be

11   that way, I would agree with it that way.  You asked him, what is

12   your opinion of the gun.  If you say after having, after finding

13   the gun or whatever he said about the gun, did that cause you some

14   suspicion, did you continue your investigation, I have no problem

15   with that.

16             MS. BERNSTEIN:  That's where we're going.

17        (OPEN COURT.)

18   BY MS. BERNSTEIN:

19   Q.  Agent Bezak, the question before we broke was whether, when you

20   read that transcript, you concluded whether or not defendant --

21   whether you were able to conclude whether Defendant Kaufman did or

22   did not claim that that gun was related to the Danziger Bridge

23   case?

24   A.  I thought he claimed that it was related to the Danziger Bridge

25   case.

1    Q.   And that was based on the transcript?

2    A.   Yes.

3    Q.   So once you're focused in here on the gun and you said you

4    talked to Donna Andrew, whom the jury has heard from, is there

5    anyone else who you thought might have the real story about what

6    happened with that gun?

7    A.   Jeffrey Lehrmann.

8    Q.   Why did you think Lehrmann might have the story?

9    A.   Because he and Sergeant Kaufman told me that they worked

10   together on the initial investigation.

11   Q.   Now, you said you had already interviewed Lehrmann, right?

12   A.   Yes, ma'am.

13   Q.   And you already said you did not think he was straightforward

14   with you, correct?

15   A.   That's correct.

16   Q.   Did you reach out to him again?

17   A.   Yes.

18   Q.   How did that come about?

19   A.   We, you and I decided that we would issue him a grand jury

20   subpoena to testify in front of the federal grand jury, and we gave

21   him the opportunity to meet with us before the grand jury, if he

22   wanted to.

23   Q.   Now, you talked before about how when somebody gets a grand

24   jury subpoena they have to go to the grand jury and answer

25   questions, right?

1   A.   Yes.

2   Q.   Again, a grand jury subpoena, do they have to talk to you

3   beforehand?

4   A.   No.

5   Q.   But he agreed to?

6   A.   Yes, he did.

7   Q.   Was that interview voluntary?

8   A.   Yes, it was.

9   Q.   How did you make sure it was voluntary?

10  A.   We told him that it was voluntary, and he had his attorney with

11  him.

12  Q.   And again, without telling us what he said -- I am going to ask

13  you about some topics -- did you talk to him specifically about

14  this gun that Kaufman claimed to have found?

15  A.   Yes.

16  Q.   Without telling us what he said, how did he react?

17  A.   He became very, very nervous, became agitated, and literally

18  began to pace.  He got up and started walking around the room in

19  the middle of the investigation -- in the middle of the interview.

20  Q.   Did you think Jeff Lehrmann was being forthcoming that day?

21  A.   No, I did not.

22  Q.   Did you learn whether you were right?

23  A.   I later learned that I was right.

24  Q.   Now, during that interview, did he give you any nuggets of

25  information that you could use in your investigation?

1   A.   He did.

2   Q.   What were those nuggets?

3   A.   He had mentioned that he and Sergeant Kaufman worked on a

4   30-something-page report on the incident.

5   Q.   What did you do with that nugget of information?

6   A.   With that information and some other information that was

7   gathered during the investigation, I applied for a search warrant

8   to search the offices of Sergeant Kaufman and Sergeant Dugue.

9   Q.   Talk to us a little bit about a search warrant.  What is a

10  search warrant and who do you apply to?

11  A.   You apply for a search warrant with a judge, magistrate judge,

12  and --

13  Q.   A magistrate judge, is that a federal judge?

14  A.   Yes, ma'am.

15  Q.   Okay.  Go ahead.

16  A.   And basically the search, a search warrant gives you permission

17  to search an area that otherwise you wouldn't be able to search.

18  There's an expectation of privacy.

19        To get the search warrant, you have to show probable

20  cause, and the judge has to agree that you have probable cause,

21  that a crime was committed and that there's evidence of that crime

22  in the area that you want to search.

23  Q.   So you went out and you applied for a search warrant?

24  A.   Yes, ma'am.

25  Q.   What areas did you want to search?

1   A.   The homicide offices of Gerard Dugue and Sergeant Kaufman.

2   Q.   Did you get that search warrant?

3   A.   Yes, I did.

4   Q.   What were some of the things, without detailing everything,

5   what were some of the things that you were focused on looking for

6   and that you had permission to go in and look for?

7   A.   Two things that really stand out would be the 30-something-page

8   report that Jeff Lehrmann had mentioned, and also I was looking for

9   a 17-page report that I hadn't been able to locate yet.

10   Q.   What made you think there was a 17-page report out there?

11   A.   On the NOPD Gist, the statement of probable cause for Lance

12   Madison's arrest, it says it's page 17 of 17, it was attached to a

13   seven-page report, approximately a seven-page report, and I didn't

14   have a 17-page report.

15   Q.   During your investigation, had you asked people about a 17-page

16   report?

17   A.   Yes.

18   Q.   Had you found any 17-page report?

19   A.   No.

20   Q.   But you suspected there was one out there?

21   A.   Yes.

22   Q.   So you said two of the things in particular that you were

23   looking for when you searched were a 30-something-page report and a

24   17-page report; is that right?

25   A.   Yes, ma'am.

1    Q.  Did you actually do a search of Kaufman and Dugue's office

2    spaces?

3    A.  Yes.  Myself and another agent searched both of their offices.

4    Q.  And did that include -- is that just searching the physical

5    space or did it include searching the computers and electronic

6    media?

7    A.  We searched the physical space, all of their paper files, and

8    seized the electronic media that we thought was pertinent to the

9    case.

10   Q.  Based on that search, did you find anything that you thought

11   was important?

12   A.  Yes.  I found a 30-something-page report on a thumb drive in

13   Sergeant Kaufman's office and portions of that same report on a

14   diskette in Sergeant Dugue's desk.

15   Q.  Did you read that report?

16   A.  Yes, ma'am.

17   Q.  Why did you find that report so important?

18   A.  It contained details that were not in the official 54-page

19   report.

20   Q.  Like what?

21   A.  It had the identity of Leonard Bartholomew, Jr.  It had what

22   we've been calling in court the blame section, where it assigns

23   officers particular blame as to who they shot; and it contained a

24   different description of guns that were used by the perpetrators.

25   Q.  Now, this jury has at this point seen reports from Mike

1    Lohmann.  At this point in your investigation, did you have those

2    other reports that the jury has seen?

3    A.  No, I did not.

4    Q.  When was that search warrant done?

5    A.  August 5th of 2009.

6    Q.  When you all went in and searched the NOPD offices of Kaufman

7    and Dugue, did that get any media attention?

8    A.  Got a lot of media attention, both on the news, on television

9    and in the newspaper.

10   Q.  Up until that point, had your investigation had that kind of

11   media attention?

12   A.  No, no, it had not.

13   Q.  So now this is sort of out there publicly; is that right?

14   A.  Yes, ma'am.

15            MR. HESSLER:  Your Honor, may I ask for a clarification

16   question, whether or not this case had media publicity?

17            MS. BERNSTEIN:  No, no, I didn't say --

18            THE COURT:  No, the issue of the search warrant, that's

19   what I understood the question.

20            MS. BERNSTEIN:  And I think I understand what

21   Mr. Hessler's clarification is.

22   BY MS. BERNSTEIN:

23   Q.  I asked you whether up to that point your investigation had

24   been attended by that kind of media publicity.  When you went out

25   and you did these day-to-day interviews with NOPD officers, was the

1   media covering those steps in your investigation?

2   A.   No.

3   Q.   And I think the clarification is, certainly there had been some

4   media coverage of the fact that FBI was launching this

5   investigation, correct?

6   A.   Yes.

7        MS. BERNSTEIN:   Is that clarification?   Okay.

8   BY MS. BERNSTEIN:

9   Q.   All right.   So I want to focus you back.   Now all of a sudden

10  you have a splash of media when you do this search.   How did you

11  try to deal with that media for purposes of your investigation, or

12  how did you try to deal with that fact?

13  A.   Well, I hoped that it would create more pressure on the

14  subjects of the investigation, that they would know that we're

15  still investigating the case and that we're making progress in the

16  case.

17  Q.   And what do you mean by pressure?   Why is pressure a good

18  thing?

19  A.   Pressure is a good thing because, in my experience, to flip a

20  subject, to get a subject to admit that they've committed a crime,

21  it's not like the movies where you go into a room and three hours

22  later you come out with a confession.   In my experience, the only

23  time I've been able to get somebody to admit what they've done is

24  to back them into a corner; to have, you know, a case that is so

25  strong that they have nowhere to go except to admit the truth.   And

1    that usually occurs, and in this case it did occur, when their

2    attorney is present with them.

3    Q.  So you said that search was, what did you say, August 5th,

4    2009?

5    A.  Yes, ma'am.

6    Q.  Shortly after that did you take another sort of public step in

7    your investigation?

8    A.  Yeah.  We shut down the Danziger Bridge and conducted a

9    physical search of the Danziger Bridge.

10   Q.  What was the purpose of shutting down the Danziger Bridge?

11   A.  The main objective of the operation was to identify the

12   locations of objects of interest from the video.  So basically, for

13   instance, the Budget truck, we wanted to know at this point in time

14   in the video, where was the Budget truck located in real life on

15   the bridge.  So we were out there primarily to try and do that type

16   of analysis.

17   Q.  How did the FBI go about doing that?

18   A.  We have specialists, something that I can't do, we have

19   specialists at Quantico, who -- I think the field is called

20   photogrammetry, and they do some type of analysis based on the

21   video and landmarks that they can, that they see in the video, and

22   then on the scene they compare the location of the truck and adjust

23   the location of the truck, if we're talking about the truck, until

24   it matches what was depicted in the video.

25   Q.  And are they just eyeballing this, or is there some sort of

1    mathematical equations that they're using?

2    A.  Yeah, there's some type of analysis.  I don't know the

3    specifics of how they do it, but...

4    Q.  You said your main purpose was to try to figure this

5    photogrammetry stuff out, to figure out the locations of certain

6    things on the bridge.  What did you need that information for?

7    A.  Wanted to get a better understanding of the incident, and

8    primarily to be able to use on the interviews of witnesses to show

9    their vantage point.

10   Q.  Did you use the information, that information that came from

11   that search, to create any exhibits?

12   A.  Yes.

13   Q.  Can I have Exhibit 52, please.

14            What I am putting up right now is Exhibit 52.  This is a

15   360 photograph that was used with Officer Jennifer Dupree.  Can we

16   scroll to the left, please.  Okay.  Stop.  What, if anything, in

17   this 360 photograph is based on what you all did at the bridge that

18   day?

19   A.  You can barely see it, but the location of the Budget truck is

20   the view location where it stopped in the video.  So using the

21   video, the specialists from Quantico determined where it was in

22   real life and then we took a picture to use in our interviews.

23   Q.  So now you can have a picture that shows Jennifer Dupree's

24   vantage point?

25   A.  Yes, ma'am.

1   Q.  Just so we can see what he's talking about, can we zoom in so

2   that we can see the -- I'm going to circle this right here and then

3   erase it.  Can we zoom in.

4           So if I am understanding right, the location of that

5   Budget truck is a precise location based on whatever mathematical

6   stuff was done that day?

7   A.  Yes.

8   Q.  Now, you said the main point of shutting down the bridge that

9   day was to do this photogrammetry, right?

10  A.  Yes, ma'am.

11  Q.  Was that a big deal to shut down the bridge?

12  A.  Yes, it was a big deal.

13  Q.  And what do you mean by that?

14  A.  It took a lot of coordination because there's obviously created

15  traffic flow issues, and we worked with the Louisiana State Police

16  to direct traffic, basically, for us.

17  Q.  As long as you had the bridge shut down, did you guys do

18  anything else?

19  A.  Yes.  We conducted a search of the bridge and the sewers,

20  drainage system on the bridge, and we also did -- we had a

21  ballistics expert out there who did some work with impact marks.

22  Q.  I am going to ask you about each of those steps.  But first,

23  how many years after the incident was this that you did your

24  search?

25  A.  Four years.

1    Q.  Did you expect to find any evidence related to the shooting?

2    A.  No physical evidence, no.

3    Q.  Why not?

4    A.  Because it was four years later, several hurricanes had come

5    through since the incident.  I just thought it was very unlikely

6    that we would locate anything.

7    Q.  Now, if you did find any evidence, was there any way for you to

8    determine if that evidence came from your case?

9    A.  The only way would be is if a casing matched a particular

10   weapon that I knew was involved in the incident.

11   Q.  So why did you do this search anyway?

12   A.  To be thorough, just in case, you know, I did find a shotgun

13   shell that could be matched to Robert Faulcon's gun, or et cetera.

14   Q.  I've been asking you about the Danziger Bridge case.  Had you

15   heard of any other incidents of guns being fired on or near the

16   Danziger Bridge other than the police-involved shooting in the days

17   after Hurricane Katrina?

18   A.  Yes.  I had information about individuals in mail trucks

19   driving up and down Chef Menteur Highway firing weapons.

20   Q.  Did you know what kind of weapons -- if those people were, in

21   fact, firing weapons, did you know what kind of weapons they were

22   firing?

23   A.  No.

24   Q.  Did you have any way to know whether any other shootings had

25   happened on or near the Danziger Bridge before Hurricane Katrina?

1    A.   No.

2    Q.   Did you know whether there were other shootings that had

3    happened since between Hurricane Katrina and the time you searched?

4    A.   No.

5    Q.   Now, if you do find ballistics evidence on a scene like this,

6    is there any way for you to tell when that casing or whatever or

7    bullet or whatever you find was fired?

8    A.   Specifically, no.  Generally, if it doesn't look like it's been

9    weathered or if it hasn't been deteriorated at all, then you can

10   assume that it's fairly new.  If it's weathered or rusted, there's

11   really no way you can say simply how long it's been there, but

12   obviously it's been there long enough that it's deteriorated.

13   Q.   So if you find something that's weathered, is there any way to

14   tell whether it was, say, one year ago or ten years ago that it was

15   fired?

16   A.   No.

17   Q.   So when you did this search, you said you were doing it in the

18   hopes of finding a casing or something that could be matched to a

19   gun that was turned in, correct?

20   A.   Yes.

21   Q.   Did you expect to find that?

22   A.   No.

23   Q.   Did you find it?

24   A.   No.

25   Q.   Did you all find anything that you thought was related to the

1    Danziger Bridge case?

2    A.  No.

3    Q.  Did you find any items?

4    A.  Yes.

5    Q.  How many items of evidence did you all find when you -- and,

6    I'm sorry, you said you searched the bridge but not just looking at

7    the top of the bridge, right?

8    A.  No.

9    Q.  What did you say about the drains?

10   A.  We also searched the drains.  We pulled the drain covers off

11   and sifted through the debris in the drains and also sifted through

12   all of the debris on the bridge.  So it wasn't just a physical

13   visual inspection, we sifted through all of the debris also.

14   Q.  How many items did you find?

15   A.  Seven.

16   Q.  Now, did you create a visual to show where these items were

17   found?

18   A.  I did not create it, but the FBI did create it.

19   Q.  I was giving you credit for it.

20          MS. BERNSTEIN:  I think we have -- do we have any

21   objection to 307, the one I showed you guys earlier?  Your Honor, I

22   would like to offer 307 into evidence.

23          THE COURT:  Any objection?

24          MR. HESSLER:  Your Honor, we just got this last night,

25   and you have to have like Superman eyes to see it.  I've spoke to

1    Ms. Bernstein about it.  We have no objections at this time,

2    assuming that it is what we believe it to be.  We literally can't

3    read the thing.

4              THE COURT:  Can you see it on the screen at counsel's

5    table?

6              MS. BERNSTEIN:  I'm hoping so.

7              THE COURT:  Before we broadcast it to the jury, though,

8    can you see it on the -- is it up right now?

9              MR. LONDON:  No.

10             THE COURT:  Can we put it on counsel's screen and my

11   screen right now?

12             MR. HESSLER:  That's certainly helpful, your Honor, but

13   we haven't seen it in this format.

14             THE COURT:  Well, let's take a look at it now and then

15   I'll ask you again if there's any objection.

16             MR. HESSLER:  Your Honor, again, subject to our previous

17   discussion, at this point we have no objection.

18             THE COURT:  Well, when you say at this point, though,

19   we're about to broadcast it to the jury, so...

20             MR. HESSLER:  It appears that it is what it should be.

21             THE COURT:  Would you like to question -- let's see if we

22   can't satisfy ourselves.  Ms. Bernstein, if you want to ask

23   questions about this exhibit before we show it to the jury.  And

24   likewise, if counsel would like to voir dire this witness with

25   regard to this exhibit before we broadcast it, then we certainly

 1  can make that process available, if there's any doubt.

 2          MR. DeSALVO:  The only thing I would request, your Honor,

 3  is that we be given a clearer and color indication thing like that

 4  sometime between now and before we have to cross-examine Agent

 5  Bezak.

 6          MS. BERNSTEIN:  I will give you my copy right now.  How

 7  about that?  See if that works.

 8          MR. DeSALVO:  That's wonderful.  Thank you.  I don't need

 9  it yet.

10          THE COURT:  Okay?

11          MR. DeSALVO:  Okay.

12          THE COURT:  Are there any objections to Exhibit 307 at

13  this time?

14          MR. HESSLER:  No objection, your Honor.

15          THE COURT:  Anybody?  Objections to 307?  We're about to

16  go ahead and broadcast it to the jury.

17          MR. DeSALVO:  I have none, your Honor.

18          MR. FLEMING:  No, your Honor.

19          MR. LONDON:  No, your Honor.

20          THE COURT:  So ordered, 307 is admitted.

21  BY MS. BERNSTEIN:

22  Q.  So now the jury can see why this is so hard to make out.  We're

23  going to zoom in on various parts of this, but first tell us, just

24  generally, what we're looking at here.

25  A.  This summarizes the results of the operation on the Danziger

1   Bridge the day that we shut it down.  It marks where evidence was

2   collected or found, impact points that were located, and the

3   location of the truck and individuals pushing the shopping cart

4   that we located using the photogrammetry analysis.

5   Q.  Okay.  To orient people first, let me ask you a couple of

6   questions about specific things on here.  It looks like there are

7   two trucks on this picture.  Why are there two trucks?

8   A.  The two different locations, two different points in time.  At

9   one point in time, somewhere around where you can first see the

10  Budget truck in the video, I forget the precise time, but that's

11  the first location.  The second location is where the truck came to

12  rest.

13  Q.  So I am going to make sure I am doing this right, but I am

14  drawing a little dot here.  Is this particular truck, which is the

15  one on the left in the picture, is that the one where the truck

16  came to rest (INDICATING)?

17  A.  Yes.

18  Q.  And that positioning is based on the photogrammetry you were

19  talking about?

20  A.  Yes.

21  Q.  If we can, can we zoom in on this area right here, just so you

22  can explain to us what we're looking at.

23          All right.  There are some little Xs marked EV with

24  numbers after them, what's that?

25  A.  Those were items of evidence that were found.

1   Q.  So those are -- are those the seven items that we were about to

2   start talking about?

3   A.  Yes.

4   Q.  We'll come back to those.  Then there are also little blue dots

5   on there.  What are the blue dots?

6   A.  The blue dots are impact points on the concrete barrier and the

7   metal railing.

8   Q.  You're also going to talk about those?

9   A.  Yes.

10  Q.  There's a green rectangle that's marked in the legend as being

11  location of body.  Whose body was there?

12  A.  James Brissette.

13  Q.  Is that also based on the photogrammetry?

14  A.  Yes.

15  Q.  And then there's a pink rectangle that says on the legend it's

16  a blood stain.  Is that, in fact, the location of a blood stain?

17  A.  Yes.  Again, based on the photogrammetry, and not using --

18  obviously, you can't see those areas in the video that's been shown

19  in court.  There was a different video that showed the walkway,

20  James Brissette's body and the blood stains.

21  Q.  And the jury here has also seen photographs of James

22  Brissette's body?

23  A.  Yes.

24  Q.  I am going to ask you about the photographs a little bit later.

25  First, let's stick on this.  This is Exhibit 307, and before we

1    zoom out, I want to talk to you about what we see in this zoomed in

2    part.

3              Before we started talking about the exhibit, you said

4    that the FBI that day found seven things, seven items of evidence

5    that day, right?

6    A.  Yes.

7    Q.  And we see EV-1 and EV-2 on this portion that we're zoomed in

8    by.

9    A.  Yes.

10   Q.  I mean, zoomed in on here, right?

11   A.  Yes.

12   Q.  And those are, for the record, those are two marks that are

13   just a bit east of where the victims were; is that right?

14   A.  That's correct.

15   Q.  What were evidence items 1 and 2 that are depicted here?

16   A.  Item 1 was a brown-colored metal fragment.  Item 2 was one

17   brown pellet.

18   Q.  What do you mean by a pellet?

19   A.  A pellet is just a description that the agents who found it

20   gave it.  To my eye, it looks like a small ball bearing.

21   Q.  Was there any point in sending either of these things to the

22   lab?

23   A.  No.

24   Q.  Let's talk about, you said there was one, it was a little

25   fragment of metal, right?

1    A.  Yes.

2    Q.  Why didn't you send that to the lab?

3    A.  It just looked like a piece of metal debris that you would find

4    on any road.  It had no indication that it was ballistics material.

5    Q.  I want to talk to you about the third piece of evidence.  Can

6    we zoom back out.

7          Third piece of evidence, how is it marked on this

8    diagram?

9    A.  On this diagram it's marked EV-14, and that is because it was,

10   when it was photographed, it was photographed with evidence marker

11   No. 14, but it's actually the third item of evidence.

12   Q.  And did you try to find some way to fix it on this diagram?

13   A.  I couldn't fix it.  I asked the person to fix it and they

14   didn't fix it.

15   Q.  So what we have here as EV-14 is, in fact, the third item of

16   evidence?

17   A.  Yes.

18   Q.  What is that and where was it found?

19   A.  That was a .380 bullet casing.  It was found, as you can see in

20   the diagram, on the left side of the road, close to the center

21   barrier, further west of the location where the Bartholomews and

22   Brissettes were.

23   Q.  That casing was actually lying on top of the bridge?

24   A.  It was on the deck of the bridge.

25   Q.  Could you tell whether it was related to the Danziger Bridge

1   shooting?

2   A.  It was not related to the incident because it was too new.  It

3   wasn't weathered, or very little weathering on it.

4   Q.  Let's go to item No. 4.  Can we zoom in on this area

5   (INDICATING).

6           Tell us what item No. 4 was and where it was found.

7   A.  Item No. 4 was an unknown caliber casing, bullet casing.  And

8   it was in really bad shape.  It was very, very weathered and

9   deteriorated and was mangled.

10  Q.  What did you say, what was your last word?

11  A.  It was mangled.

12  Q.  How far away was that casing found from where the victims were?

13  A.  Approximately 500 feet west of where the victims were.

14  Q.  So 500 feet is like, do some math, but that's more than a

15  football field and a half?

16  A.  Yes.  And it was -- also, it was located in the sewer drain.

17  Q.  Now, could you tell from looking at this mangled casing whether

18  it was fired before the storm?

19  A.  No.

20  Q.  Could you tell whether it was fired after the storm?

21  A.  No.

22  Q.  Could you tell whether it was fired from a mail truck?

23  A.  No.

24  Q.  Could you tell anything about it?

25  A.  No.

1   Q.  Did you send it to the lab?

2   A.  No.

3   Q.  Why not?

4   A.  It had no gun to compare it to.

5   Q.  We have evidence -- we have EV-5, also on this blown-up section

6   of the diagram, which looks like it's further to the east, further

7   down the bridge; is that right?

8   A.  Yes.

9   Q.  Tell us about EV-5.

10  A.  It was another unknown caliber bullet casing.  It was found

11  also in a sewer drain, and it was in the same condition as the

12  other casing, it was very weathered and mangled.

13  Q.  Could you tell whether it was fired before the storm?

14  A.  No.

15  Q.  Could you tell whether it was fired after the storm?

16  A.  No.

17  Q.  Could you tell whether it was fired from a mail truck?

18  A.  No.

19  Q.  Can we come way over to the left side and zoom in, please.

20          Can you talk to us about EV-6 and 7?

21  A.  Sure.

22  Q.  Let's do 6 first.

23  A.  Six was a possible 9mm shell casing; again, it was in the same

24  condition as the items 4 and 5, it was very weathered and

25  deteriorated and was mangled.

1    Q.  How far away was that from the victims?

2    A.  That was approximately 630 feet away from the victims.  Also

3    found in a sewer drain.

4    Q.  So that's about two football fields?

5    A.  Yes.

6    Q.  You said it was also found in a drain?

7    A.  Yes, ma'am.

8    Q.  You said it's a possible 9mm.  Did you send it to the lab?

9    A.  No.

10   Q.  So do you know for sure what it was?

11   A.  No.

12   Q.  You said this is also in messed-up condition?

13   A.  Yes.

14   Q.  Can you tell whether it was fired before the storm?

15   A.  No.

16   Q.  Can you tell whether it was fired after the storm?

17   A.  No.

18   Q.  Can you tell whether it was fired from a mail truck?

19   A.  No.

20   Q.  Can you tell us anything about it?

21   A.  No.

22   Q.  Right next to it on the diagram is EV-7, was that found in the

23   same drain?

24   A.  Yes, it was.

25   Q.  What was No. 7?

1   A.  It was a small shell casing, small caliber shell casing.  To my

2   eye, it looked like it could have been a .22, and it was in very

3   good condition compared to the other shell casings, and appeared to

4   be too new to be related to these.  It was on the scene well after

5   the incident.

6   Q.  So can you tell us whether this one was fired before or after

7   the storm?

8   A.  Definitely after the storm.

9   Q.  Now, focussing on those, the items of evidence that were not

10  new but looked older, was there anything to suggest that they were

11  related to the Danziger Bridge case?

12  A.  No.

13  Q.  Could they have been fired by the Bartholomews, Jose Holmes, or

14  James Brissette?

15          MR. HESSLER:  Objection, your Honor; calls for

16  speculation.

17          THE WITNESS:  No.

18          MS. BERNSTEIN:  I'll ask him whether he can answer that

19  without speculating.

20          THE COURT:  We've talked about all of the processes that

21  have been involved and we've had ballistics experts, so I am going

22  to go ahead and allow him to answer.  But I will instruct him not

23  to speculate, only if he knows.

24  BY MS. BERNSTEIN:

25  Q.  So can you answer that question based on the location s that

1    we've just talked about?

2    A.  Yes.

3    Q.  Answer that, please.

4    A.  It could not have been fired from the Bartholomews because they

5    were found further up from the bridge where they were shot and

6    where they laid.

7    Q.  Now, while you had the bridge shut down that day, did you all

8    look into the possibility that shots had been fired from places

9    other than the roadway where the officers drove up?

10   A.  Yes.

11   Q.  Had the FBI interviewed EMTs and paramedics who responded to

12   the scene?

13   A.  Yes, we did.

14   Q.  And based on your investigation, were they there at the time of

15   the shooting?

16   A.  No.

17   Q.  Did the FBI interview a guy named Shawn Gasaway?

18   A.  Yes.

19   Q.  Who is he?

20   A.  He was an EMT who responded to the shooting incident after the

21   incident.

22   Q.  Without telling us what he said, did he give you information

23   about the case?

24   A.  Yes.

25   Q.  Did the FBI talk to the other people who were in the same

1   ambulance with him?

2   A.  Yes.

3   Q.  Did the other -- again, without talking to us about what they

4   said, did the other people provide information that corroborated or

5   contradicted what he had said?

6   A.  Their information contradicted what he said.

7   Q.  Did you still check out what he had said?

8   A.  Yes.

9   Q.  What did you do while you had the bridge shut this day?

10  A.  We had a ballistics expert from the lab and we -- the agents

11  out there located impact points that were suspected impact points

12  on the concrete or the metal railing.

13  Q.  What do you mean by impact points?

14  A.  Strike marks, defects that could have been caused by a bullet

15  striking that object.

16  Q.  Did you find any impact points on the metal railing and/or on

17  the concrete barrier?

18  A.  We found it on both.

19  Q.  Let's start with the railing.  How many impact points did you

20  find on the railings?

21  A.  Seven impact points on the railing.

22  Q.  How about on the concrete barrier?

23  A.  I believe there were eight total, seven on the road side of the

24  concrete barrier and one on the walkway side of the concrete --

25  walkway side of the concrete barrier.

 1   Q.  Let's talk first about the impact points on the --

 2           THE COURT:  Ms. Bernstein, when we get to a good stopping

 3   point we can take a short break.

 4           MS. BERNSTEIN:  This is probably as easy as anywhere.

 5           THE COURT:  Now?  Okay, let's take a 15-minute break, but

 6   if you're ready sooner than that we'll begin.  Let's try for 10:40.

 7   It's about 10:25 right now, and if the jury is prepared before that

 8   time, advise the CSO and we'll begin sooner.

 9           Agent Bezak, if you could be up here, we appreciate it.

10           THE WITNESS:  Yes, sir.

11           THE MARSHAL:  All rise.

12      (WHEREUPON, THE JURY EXITED THE COURTROOM.)

13           THE COURT:  During the break, please don't discuss your

14   testimony with anyone.

15           Counsel, would you approach very quickly.

16      (WHEREUPON, A RECESS WAS TAKEN.)

17      (OPEN COURT.)

18      (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

19           THE COURT:  You may be seated.  We'll pick up where we

20   left off.  Agent Bezak, you're still under oath.  Sir, have you

21   discussed your testimony with anyone during the break?

22           THE WITNESS:  No, sir.

23           THE COURT:  Ms. Bernstein, you may proceed.

24           MS. BERNSTEIN:  Thank you, your Honor.

25   BY MS. BERNSTEIN:

1   Q.  All right.  I think right before the break, Agent Bezak, you

2   were telling us about the impact points that were identified both

3   on the metal railing and on the concrete wall; is that right?

4   A.  Yes.

5   Q.  I want to take those separately, so I want to focus first on

6   the impact points on the metal rails.  First, may I have Exhibit 46

7   up, please.

8           This is a photograph already in evidence of James

9   Brissette's body on the walkway, right?

10  A.  Yes, ma'am.

11  Q.  Stephen, can we zoom in on this area over here by the rail

12  (INDICATING).

13          On this picture taken the day of the incident, do you see

14  any of those impact points that you're talking about on the rail?

15  A.  Yes, I do.

16  Q.  Can you point them out for the jury.

17  A.  (WITNESS MARKS EXHIBIT.)

18  Q.  Now may I have -- actually, let's try this side by side.  May I

19  have Exhibit 290 up next to it -- actually, I'm sorry, I haven't

20  offered it into evidence yet.  Don't put it up quite yet.

21          MS. BERNSTEIN:  Let me show you all a handful of

22  photographs.  Your Honor, I have a number of exhibits that I would

23  like to offer into evidence right now.

24          THE COURT:  Let's get the numbers.

25          MS. BERNSTEIN:  I've got 290, 291, 292, 297, 298, 293,

1  294, 295, 299, 306, 296 and 244.

2          THE COURT:  Counsel, you all have reviewed these

3  exhibits?

4          MR. HESSLER:  We have, your Honor, no objection.

5          THE COURT:  Any objection to -- anybody else choose to

6  object?

7          MR. DeSALVO:  No, your Honor.

8          MR. LONDON:  No, your Honor.

9          THE COURT:  So ordered.  The court will accept into

10  evidence exhibits numbered 290, 291, 292, 293, 294, 295, 297, 298,

11  299, 306, 296 and 244.  Those are admitted.  Okay.

12          MS. BERNSTEIN:  Can we zoom in on the exhibit on the left

13  and have another exhibit come in on the right?  So let's have 290

14  on the right, please.

15  BY MS. BERNSTEIN:

16  Q.  So on the left you identified the impact points in the

17  photograph taken that day.  What is this picture we're looking at

18  on the right, Exhibit 290?

19  A.  It's a photograph of -- I think it's a photograph that I took,

20  actually, of impact points on the metal rail.

21  Q.  And that photograph was taken some years after the incident?

22  A.  It would have been the first few weeks I was assigned as the

23  case agent.

24  Q.  Can I have Exhibit 291, please.  We can take those down.

25          While he is doing that, with these impact points on the

1   railing now that we're talking about, with some of those impact

2   points, could you tell just by eyeballing them what direction the

3   shots came from?

4   A.  Yes.

5   Q.  How could you tell that?

6   A.  Just by the location on the railing where they were, they could

7   have only come from the south or southeast direction.

8   Q.  And I am going to go through a couple of these photographs, but

9   if we can zoom in on the impact point shown on 291, please.  Now

10  can I have Exhibit 292.

11  A.  That's a better example of one of the ones I was talking about.

12  Q.  So the impact point is actually on the roadway side of the

13  railing; is that correct?

14  A.  Yes.

15  Q.  Now, you said that there were seven, I think, you said seven

16  strike marks on the railing?

17  A.  Yes, ma'am.

18  Q.  How high were the strike marks generally?

19  A.  All low on the railing.  I would say the highest was maybe on

20  the bottom third of the railing, the rest were all below that.

21  Q.  May I have Exhibit 297.

22          This is just another exhibit of a strike mark, right?

23  A.  Yes, ma'am.  Again, you can see how it -- it looks like it came

24  from somewhere in that south, southeast quadrant.

25  Q.  Now, there is some writing on the railway there -- on the

1    railing.  It says IP-6, what is that?

2    A.  That was -- this picture was taken -- this photograph was taken

3    the day that we shut the bridge down, and IP-6 is just how it was

4    identified by the ballistics expert who was out there so that he

5    could remember which impact point was which.

6    Q.  So any impact point that has that blue scribbling on it, that

7    was the impact point number it was given that day; is that fair?

8    A.  Yes.

9    Q.  Can we have 298.

10            So this is another example of a very low-down impact

11   point?

12   A.  Yes, several inches off the ground.

13   Q.  And can you tell just from eyeballing which side of the bridge

14   that came from?

15   A.  Again, that's south, southeast quadrant.

16   Q.  Now, even though you said that with some of these impact points

17   like this one, you could tell just by eyeballing which direction it

18   came from, did you still have an expert look at all of the IP

19   points?

20   A.  Yes.

21   Q.  So IP is impact point, right?

22   A.  Yes, ma'am.

23   Q.  So you still had an expert look at them?

24   A.  Yes.

25   Q.  Who was the expert?

1    A.   Eric Smith.

2    Q.   Without telling us about his findings, what did he do on the

3    scene that day?

4    A.   Two things:  He tried to determine the direction of origin for

5    the various impact points, both on the railing and on the concrete

6    barrier; and he tested each one of those impact points for residue

7    that is consistent with residue that's left after a bullet strike.

8    Q.   Let's go back to 46, please.

9         Now, when he looks at an impact point, you said he was

10   trying to determine the direction it came from; what word did you

11   use?

12   A.   The direction of origin, where the bullet originated from.

13   Q.   Now, when he is looking at an impact point, is he trying to

14   determine the exact trajectory, or is he trying to determine a

15   range from where it could have come?

16   A.   It depends.  In certain cases, in certain incidents, you can

17   determine the exact direction that -- or trajectory that a bullet

18   took.  In this case he was not able to because generally you need

19   at least two holes or impact points to draw your line to get the

20   exact location.  He was able to determine --

21   Q.   He was able to determine?

22   A.   He was able to determine a general direction that all of the

23   impact points on the railing came from.

24   Q.   So you said he looked at all of these impact points on the

25   railing, right?

1  A.  Yes.

2  Q.  And he was able to determine the general direction that those

3  shots were fired from?

4  A.  Yes.

5  Q.  Now, based on the information that he gave you about the

6  direction of those shots, did you feel that you needed to do any

7  more investigation into whether somebody had fired, say, from the

8  grass?

9  A.  No.

10 Q.  I want to talk to you about the impact points on the concrete.

11 You said that you all found some of those, right?

12 A.  Yes.

13 Q.  Can I have Exhibit 293, please.

14        Is this a photograph of some of those impact points that

15 we're talking about?

16 A.  Yes.

17 Q.  Can we have 294.

18        Another one of those impact points?

19 A.  Yes, ma'am.

20 Q.  Now, the ones we've looked at so far, in 293 and 294, those are

21 on the roadway side of the concrete barrier, correct?

22 A.  Correct.

23 Q.  Let's have 295, please.

24        295 is a picture of another one of those impact points on

25 the top of the barrier, also on the roadway side; is that right?

1   A.  Yes, ma'am.

2   Q.  Now, at this point in your investigation when you all were out

3   there doing the work on the impact points, had you talked yet to

4   Mike Hunter?

5   A.  No.

6   Q.  Had you heard yet any testimony about anybody leaning over and

7   firing into the walkway?

8   A.  No, I had not.

9   Q.  So did you have any reason that day to focus on skid marks or

10  strike marks on the bottom of the walkway?

11  A.  No.

12  Q.  You were looking at the railway and the concrete barrier?

13  A.  Yes.

14  Q.  I think you already said this, but how many impact points did

15  you notice on the concrete wall, the concrete barrier?

16  A.  I believe there was eight, seven which were on the road side of

17  the barrier and one which was on the walkway side of the barrier.

18  Q.  Did you have a photo taken of one on the grass side of the

19  barrier, the walkway side?

20  A.  Yes.

21  Q.  Can I have Exhibit 299, please.

22          Does this photograph show the one that you're talking

23  about on the inside of the barrier?

24  A.  Yes.

25  Q.  Can you circle it for us.

1    A.   (WITNESS COMPLIES.)

2    Q.   Can I have Exhibit 306, please.

3              And that's marked IP-11.  Is that a close up of that

4    mark?

5    A.   Yes, ma'am.

6    Q.   For the impact points that hit the barrier, was there any way

7    to test for the trajectory of whatever it was that struck the

8    barrier?

9    A.   No.

10   Q.   Did you have the FBI do any -- this expert you were talking

11   about, do any other tests on these?

12   A.   Yes.  On all of the impact points that were located on the

13   railing and on the concrete barrier, they were also tested for, to

14   determine if there was a presence of ballistics material.

15   Q.   What do you mean by ballistics material?

16   A.   The test tests for lead and copper residue, which are major

17   components of bullets.

18   Q.   So even four years later, however long it was, he could test

19   for the presence of lead -- of metals that would be left behind by

20   a bullet?

21   A.   Yes.

22   Q.   And you said he was able to do those on the concrete ones as

23   well?

24   A.   Yes.

25   Q.   Now, focussing on the strike mark that was on the inside of the

1  concrete barrier.  Did you consider the possibility that that

2  strike mark had been made by somebody shooting from off the bridge

3  in that grassy area?

4  A.  Yes, I did.

5  Q.  Is there something in particular that made you look into that

6  possibility?

7  A.  Mr. Gasaway's testimony; and when I did my initial walk-through

8  several weeks after I was assigned the case, I just, I was walking

9  the scene just to get a feel for the scene and I noticed, if you

10  stand in a particular location while looking up at the railing, it

11  looked like you could align one of the strike marks on the railing

12  with the impact point on the barrier.

13  Q.  Did you take a photo in order to try to document that?

14  A.  Yes.

15  Q.  Can we have 296, please.

16        Is this the photo you're talking about?

17  A.  Yes, it is.

18  Q.  Can you show us what you're talking about?

19  A.  In this area here you can see the -- what looks like somebody

20  took a bite out of the metal railing, is lined up behind that

21  impact point 11 on that barrier (INDICATING).

22  Q.  And you purposely got in a position so that you could line it

23  up; is that right?

24  A.  Yes.

25  Q.  And took this picture?

1    A.  Yes, ma'am.

2    Q.  Can we zoom in a little bit, please.

3            So I want to ask you first about this impact point in the

4    metal railing.  Is that one of the impact points that you had the

5    expert look at?

6    A.  Yes.

7    Q.  Was he able to determine what general area that shot was fired

8    from?

9    A.  Yes.

10   Q.  Based on what he found, did you feel that there was any more

11   need to worry about whether or not it was fired from the grass?

12   A.  No.

13   Q.  So let me ask you, then, about, did you also have him look at

14   the mark in the concrete barrier?

15   A.  Yes.

16   Q.  Did he do his test there?

17   A.  For bullet residue, yes, he did.

18   Q.  Did he find any bullet residue in that?

19   A.  No.

20   Q.  So we've talked about these two fairly public steps in the

21   investigation.  You talked about the search warrant and then you

22   talked about shutting down the bridge and doing the search and the

23   photogrammetry.  Once you did those two steps, did you use any new

24   information you had gotten to move your case forward?

25   A.  Yes, I did.

1    Q.  Talk to us about that.

2    A.  In the search warrant, like I stated, I found the 30-page --

3    30-something-page report in Sergeant Kaufman's office.  Knowing

4    that Lehrmann had told me that he had worked on that report and

5    that things in that report were inconsistent with the 54-page

6    official report, you and I decided that we would approach Lehrmann

7    and confront him about those inconsistencies.

8    Q.  Did you invite him back in to talk to you?

9    A.  We did.

10   Q.  Did he come back in?

11   A.  Yes.

12   Q.  You got him back in to talk.  Did anybody have to make any

13   promises to him about what he would get if he told us what

14   happened?

15   A.  No, there were no promises made to him.  In fact, his attorney

16   asked for immunity, we refused to give him immunity --

17   Q.  Immunity would mean a guarantee that he wouldn't be prosecuted?

18   A.  Yes, ma'am.

19   Q.  But he was told no?

20   A.  Yes.

21            MR. FLEMING:  Judge, I am going to object.

22            MR. DeSALVO:  That's a misstatement of the law, your

23   Honor.

24            THE COURT:  Yes, let's strike the question.  I am going

25   to sustain the objection.  Strike the question and the answer and

1    let's go back.

2              MR. FLEMING:  I'm sorry, on a related note, may we

3    approach?

4              THE COURT:  Yes.

5         (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

6              THE COURT:  I am a little bit concerned with regard to

7    the objection to you inadvertently or slipping into a testifying

8    role, when he mentioned that you and I discussed, and then when you

9    mentioned immunity or the type of immunity which, you know, he has

10   a legal background as well, but I think we're getting close to

11   conversations that you actually had with his attorney as opposed to

12   him testifying as to what he knows.

13             MS. BERNSTEIN:  Okay.

14             MR. FLEMING:  You're reading my mind, Judge.  It elicited

15   her actions.

16             THE COURT:  Particularly with regard to the immunity and

17   the nature of the conversation that was held and what was offered

18   and so on.

19             MS. BERNSTEIN:  He was present for many of those

20   conversations.  I understand the objection.  I just want to make

21   sure I don't step on anybody's toes here.  He's asking when he was

22   present was there any conversation about what promises were made,

23   if any, to his client.

24             THE COURT:  I think that's fine.  I think when we get

25   into the area of immunity and the types of immunity, it makes me a

1    little uncomfortable.

2              MR. HESSLER:  Do we need a curative instruction?  Could

3    you consider a curative instruction on the law?

4              THE COURT:  Well, I've already stricken the question and

5    answer.  I can go ahead and tell them that striking it means they

6    are to disregard it.

7         (OPEN COURT.)

8              THE COURT:  Just to be clear, ladies and gentlemen of the

9    jury, I think previously and just now I used the term to strike

10   something from the record, and when I say that, it means that you

11   are to disregard what I have said is stricken, in this case it was

12   the last question and answer, you're to disregard that as part of

13   your consideration of the evidence and the testimony in this case.

14             Okay.  Ms. Bernstein, proceed.

15   BY MS. BERNSTEIN:

16   Q.  Focussing you back on your re-interview with Jeff Lehrmann,

17   were you present for any conversation about what promises, if any,

18   were made to Lehrmann for him coming back and providing more

19   information?

20   A.  Yes.

21   Q.  What promises, if any, were made to him?

22   A.  The only promise we made to him is that if he cooperated and

23   tried to get in front of an indictment, that we would take that

24   into consideration and have some leniency on him.

25   Q.  Did he, during that conversation, provide more information?

1  A.  Yes.

2  Q.  Did he talk to you about the gun that Archie Kaufman claimed to

3  have found?

4  A.  Yes.

5  Q.  What kind of gun is that that he was talking to you about?

6  A.  It was a Colt Trooper Mark III.

7  Q.  Was that gun referenced in an ATF search form that you had in

8  your case file?

9  A.  Yes.

10  Q.  Can I have Exhibit 244 up, please.

11        What is this form that we're looking at?

12  A.  It's the results of an ATF firearm's trace.

13  Q.  What's a firearm's trace?

14  A.  It's a search done by ATF to determine the owner of a weapon or

15  whose possession it's been in.

16  Q.  Did you run this trace --

17  A.  No.

18  Q.  -- or was this run before you got the case?

19  A.  That was run before I got the case.

20  Q.  Can you tell by looking at the form who had this information

21  run?

22  A.  Yes.

23  Q.  Who is that?

24  A.  Sergeant Kaufman.

25  Q.  Can you point to where you're looking at?

1    A.   (WITNESS COMPLIES.)

2    Q.   There's a name above it, Lionel Parker, who is that?

3    A.   He is an NOPD officer, I believe he is an NOPD officer who was

4    assigned to ATF.

5    Q.   Now, according to this trace form, what suspect was this gun

6    associated with?

7    A.   Lance Madison.

8    Q.   Can you point where you're looking at there?

9    A.   (WITNESS COMPLIES.)

10   Q.   Can you zoom in on that part, please, Stephen.

11        That's what you were looking at right there (INDICATING)?

12   A.   Yes, ma'am.

13   Q.   Now, you said the point of this is to do a trace on a gun?

14   A.   Yes.

15   Q.   Was this search able to determine who had bought that Colt

16   Trooper Mark III gun?

17   A.   No.

18   Q.   When was the gun sold?

19   A.   Sometime in 1977, looks like March of 1977.

20   Q.   So that's all the information that came from this trace?

21   A.   Yes.

22   Q.   The information that's on this page?

23   A.   (WITNESS NODS HEAD IN THE AFFIRMATIVE.)

24   Q.   Let me have that down, please.

25        Now, I asked you when he came back in whether he talked

1    to you about the gun.  Did he also talk to you, again, without

2    telling us what he said, but did he also talk to you about Lakeisha

3    Smith and James Youngman?

4    A.  Yes, he did.

5    Q.  Did he offer to cooperate with your investigation?

6    A.  Yes, he did.

7    Q.  What does that mean, when somebody cooperates with the

8    investigation?

9    A.  He agreed to continue to provide information and was willing to

10   perform consensuals, do operational things for the investigation.

11   Q.  Once he agreed to cooperate, did you talk to him about

12   everything that day or did you have a series of conversations with

13   him?

14   A.  It was a series of conversations.

15   Q.  And you mentioned that he agreed to do consensuals.

16   A.  Yes, ma'am.

17   Q.  Can you tell us what you're talking about?

18   A.  Consensual recording between a cooperating person and the

19   subject of an investigation.  So it's a recorded conversation, a

20   secretly-recorded conversation.

21   Q.  Is that a common tool that's used in your investigations?

22   A.  Yes.

23   Q.  Once he agreed to do that, how did you all figure out who he

24   would record?

25   A.  Really, Jeff determined who he would record.  You know, in

1    order to be successful, it needs to be a person who has the

2    information you're looking for and Jeff had to have access to that

3    person.  So it wouldn't be unusual that he approached the person.

4    Q.  What do you mean by access?

5    A.  In contact with that person.

6    Q.  Can you give us an example of, not from this case, but an

7    example of a time when you would not have somebody do a consensual?

8    A.  Sure.  If your cooperator knew the subject but the only time --

9    when they talked, the only thing they talked about was LSU

10   football, you wouldn't send him in to go and try and talk about a

11   drug deal or something like that because it's unusual and the guy

12   would be suspicious.

13   Q.  So did you have a conversation with Lehrmann about whom he

14   might be able to naturally have a conversation with?

15   A.  Yes.

16   Q.  Who did he choose?

17   A.  Robert Gisevius.

18   Q.  So did you just give him a tape recorder and tell him to go off

19   and talk to Rob Gisevius?

20   A.  No, no.  We developed a scenario that we thought would steer

21   the conversation in the direction we wanted and gave -- I gave Jeff

22   specific topics that I wanted him to try and talk about during that

23   conversation.

24   Q.  First if you can just tell us some of the topics and then I

25   want to talk to you more about this scenario that you just

1   mentioned.

2   A.  One of the topics that I wanted him to talk about, or try to

3   talk about, was whether or not Rob Gisevius fired his weapon during

4   the incident.

5   Q.  Let me stop you there.  Why was that important at this point in

6   your investigation?

7   A.  Because at that point I believed that he had, and he didn't

8   admit that he fired a weapon in his statement to NOPD.

9   Q.  And you had statements from him?

10  A.  Yes.

11  Q.  And had he acknowledged in any of those statements that he had

12  fired a gun?

13  A.  No.

14  Q.  So that's one of the --

15          MR. HESSLER:  Your Honor, I object to the form of the

16  question.  It's actually only one statement from Robert Gisevius,

17  he said he had statements from him.

18          THE COURT:  Yes, I think we need to be more specific.

19  I'll sustain.

20          MS. BERNSTEIN:  Let me be more specific, yes.

21          THE COURT:  I'll sustain.

22  BY MS. BERNSTEIN:

23  Q.  You said that you had the official 54-page report, right?

24  A.  Yes.

25  Q.  Did that have a statement in it that was attributed to Robert

1    Gisevius?

2    A.  Yes.

3    Q.  In that statement did he admit to firing a gun?

4    A.  No.

5    Q.  You mentioned that you had gotten that 30-something-page report

6    during your search, right?

7    A.  Yes.

8    Q.  Did that have a statement attributed to Gisevius?

9    A.  Yes.

10   Q.  Did he admit that he had fired his gun?

11   A.  No.

12   Q.  During your interviews with Mike Lohmann, once he cooperated,

13   did he provide you some additional reports?

14   A.  Yes, he did.

15   Q.  Was there a 32-page report that's in evidence here in this

16   case?

17   A.  Yes.

18   Q.  Did that contain a statement attributed to Robert Gisevius?

19   A.  Yes.

20   Q.  In that statement did he admit to having fired his gun?

21   A.  No.

22   Q.  Was there a 46-page report that you got from Mike Lohmann?

23   A.  Yes.

24   Q.  Did that report have a statement attributed to Rob Gisevius?

25   A.  Yes.

1   Q.  In that statement did he admit to having fired his gun?

2   A.  No.

3   Q.  Did you have an audiotape statement of Robert Gisevius?

4   A.  Yes.

5   Q.  In that statement did he admit to having fired his gun?

6   A.  No.

7   Q.  So you focused with Jeff Lehrmann, you were giving him the

8   topics that you wanted him to talk to Rob Gisevius about, and you

9   mentioned one of those topics was whether or not Rob had fired his

10  gun on the bridge, correct?

11  A.  Yes.

12  Q.  Go ahead, and what were the other topics you wanted him to talk

13  about?

14  A.  The different versions of the reports, generally, the various

15  versions of reports; and the witnesses, Lakeisha Smith and James

16  Youngman.

17  Q.  Now, you said that when you met with Lehrmann you came up with

18  a scenario that you thought would get Defendant Gisevius talking.

19  A.  Yes.

20  Q.  Can you explain a little bit more what you mean by a scenario?

21  A.  A story that would be -- that would seem realistic and would

22  steer the conversation where I wanted it to go.  A scenario that I

23  came up with in this case was based on the fact that Lehrmann, when

24  Lehrmann testified in the grand jury earlier in the investigation,

25  he had a conversation with Rob Gisevius.

1            So the scenario that I developed was to pretend like he

2   came back to the grand jury again, was called back to the grand

3   jury again, and during that grand jury testimony the government

4   questioned him about information that we could only have if

5   somebody was cooperating; basically we knew too much, and the only

6   way we can know that information would be if somebody was providing

7   that information to us.

8   Q.  So he was supposed to use that scenario to get Defendant

9   Gisevius talking?

10  A.  Yes.

11  Q.  Was that true, that Jeff Lehrmann had been called back to the

12  grand jury at this point or was that just a made-up story?

13  A.  It was a made-up story.

14  Q.  He was supposed to go along with that made-up story?

15  A.  Yes.

16  Q.  Once you all had that scenario, did Lehrmann just run out and

17  meet with Defendant Gisevius?

18  A.  No.

19  Q.  What happened next?

20  A.  We practiced the scenario, role played the scenario, went over

21  the topics that we wanted him -- that I wanted him to approach.

22  Taught him how to use the recorder.

23  Q.  Did Jeff Lehrmann and Defendant Gisevius talk on the phone at

24  all before they met in person?

25  A.  Yes, they did.

1   Q.  During the first phone call, the first taped phone call once

2   Lehrmann was cooperating, what was Defendant Gisevius's reaction

3   when Lehrmann called?

4           MR. HESSLER:  Your Honor, may we approach?

5           THE COURT:  Yes.

6       (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

7           MR. HESSLER:  I think she is asking for this witness to

8   testify on his -- well, she said a reaction.  I think the tape is

9   the best evidence of that reaction.

10          THE COURT:  I am going to sustain.

11          MS. BERNSTEIN:  Okay.  That's my next thing is to put the

12  tape in.

13          THE COURT:  I think we are at that point.

14      (OPEN COURT.)

15  BY MS. BERNSTEIN:

16  Q.  Did you all tape this conversation when Jeff Lehrmann called

17  Defendant Gisevius?

18  A.  Yes.

19          MS. BERNSTEIN:  Your Honor, I would like to offer into

20  evidence Exhibit 216, which is a transcript of that call, redacted

21  per conversations we've had before.

22          THE COURT:  Counsel, any objection?  216.

23          MR. HESSLER:  No objection, your Honor.

24          THE COURT:  216 is admitted.

25  BY MS. BERNSTEIN:

1   Q.  And have you had a chance to listen to Exhibit 186, have you

2   had a chance to listen to the tape recording of that call?

3   A.  Yes.

4           MS. BERNSTEIN:  I would like to offer into evidence 186,

5   the tape recording, also so redacted.

6           THE COURT:  Any --

7           MR. HESSLER:  No objection, your Honor.

8           THE COURT:  Okay.  186 is admitted also.

9           MS. BERNSTEIN:  Your Honor, may I go stand behind our

10  tech support, just to make sure I am there if anything goes wrong?

11          THE COURT:  Yes.  Yes.

12          MR. HESSLER:  Your Honor, that objection is subject to

13  all previous objections made.

14          THE COURT:  That's correct.

15          MS. BERNSTEIN:  What I would like to do is play the

16  beginning of the tape when Jeff Lehrmann calls Defendant Gisevius.

17          And hang on, before we start, what will appear on the

18  screen, you will hear the audio and what will appear on the screen

19  is the scrolling transcript as the audio plays.

20      (WHEREUPON, THE AUDIO RECORDING WAS PLAYED.)

21      (WHEREUPON, THE AUDIO RECORDING WAS STOPPED.)

22  BY MS. BERNSTEIN:

23  Q.  I know the conversation was actually longer than that part we

24  just listened to, right?

25  A.  Yes.

1          MS. BERNSTEIN:  So I'd offer the entire tape and the

2    transcript into evidence, and I'll move on at this point.

3    BY MS. BERNSTEIN:

4    Q.  So during that, during or after that phone call, did they set

5    up an in-person meeting?

6    A.  Yes, they did.  I think it was after that phone call.

7    Q.  What was that plan, where were they going to meet?

8    A.  At Lucy's Retired Surfers Bar.

9    Q.  Is that downtown here in New Orleans?

10   A.  Yes.

11   Q.  Did you meet with Lehrmann again before he went out and met

12   with Rob Gisevius?

13   A.  Yes, I did.

14   Q.  What did you do during that meeting?

15   A.  Again, we went over the scenario, the topics that I wanted him

16   to try and approach.  I taught him -- instructed him again on how

17   to use the recorder and gave him the recorder.

18   Q.  Did Lehrmann then go out and meet with Defendant Gisevius?

19   A.  Yes, he did.

20   Q.  And while he was meeting with Defendant Gisevius, could the FBI

21   listen in on the conversation they were having?

22   A.  No.  The recorder was just that, a recorder.  There was no

23   transmitter so that we could hear it live.

24   Q.  Do you remember how long that meeting lasted?

25   A.  Three hours approximately.

1   Q.  When the meeting ended, did you meet up with Jeff Lehrmann

2   again?

3   A.  Yes, I did.

4   Q.  Did he give you that recorder?

5   A.  Yes, he did.

6   Q.  At that point could you just plug it in and play it right away?

7   A.  No, no.  It needs to be plugged into a computer with that

8   program particular for that recorder.

9   Q.  Without telling me what he said when you met with him

10  afterwards, did he tell you whether he had succeeded in getting

11  Defendant Gisevius to talk about some of the things you wanted him

12  to talk about?

13  A.  Yes, he told me that he was successful.

14  Q.  So eventually did you get that recorder downloaded so you could

15  listen to the conversation?

16  A.  Yes.

17  Q.  Did the recording work?

18  A.  Yes, it did.

19  Q.  What was the quality of the sound?

20  A.  It was better than I expected it would be.  Being in a bar, I

21  was expecting very poor quality.  But it actually sounds pretty

22  decent.  It doesn't sound like you're in a studio, but you can hear

23  what they're saying.

24  Q.  So you've listened to that conversation?

25  A.  Yes.

```
1    Q.  Have you reviewed a transcript of the conversation?

2    A.  Yes.

3              MS. BERNSTEIN:  May I approach, your Honor?

4              THE COURT:  Yes.

5    BY MS. BERNSTEIN:

6    Q.  I am showing the witness Exhibit 314.  Do you recognize that as

7    a transcript of the Lucy's conversation -- let me point you -- with

8    some redactions per court order (INDICATING)?

9    A.  Yes.

10             MS. BERNSTEIN:  Your Honor, we have an agreement here.

11   If it's okay with you, may I explain to the jury what we've agreed

12   to as far as the redactions, that these are parts that everybody

13   agrees were irrelevant?

14             THE COURT:  Mr. Hessler, have you any objection to that?

15             MR. HESSLER:  One second, your Honor.

16             MS. BERNSTEIN:  I think we have an agreement, your Honor.

17             THE COURT:  Any other counsel have any objection to that

18   procedure?

19             MR. HESSLER:  Your Honor, I would just like to put on the

20   record that the redacted portions are not relevant to any of the

21   topics that he was instructed to talk about.

22             MS. BERNSTEIN:  And the parties have agreed that certain

23   portions -- all of the parties have agreed that certain portions

24   have been taken out.

25             MR. HESSLER:  Correct.
```

 1          THE COURT:  Why don't you go ahead and do that,

 2   Ms. Bernstein.  If Mr. Hessler wants to add to that or feels like

 3   there's need for further clarification of the stipulation, we'll

 4   give him that opportunity before we get into it.

 5          MS. BERNSTEIN:  Okay.  Thank you, your Honor.

 6   BY MS. BERNSTEIN:

 7   Q.  So I want to ask you about -- we talked about some of the

 8   topics that you sent -- that you asked Jeff Lehrmann to talk to

 9   Defendant Gisevius.  Once you got the tape back and you reviewed

10   the transcript, what are some of the topics that you were

11   interested in for your investigation that they were talking about?

12   A.  Whether Gisevius fired his weapon, they talked about who was

13   going to be indicted in the federal investigation, who could

14   possibly be leaking information, and Sergeant Kaufman's reports.

15   Q.  I want to focus you on a couple of parts of that transcript.

16   Can I have Exhibit 185-A, please, which is page 10 of that

17   transcript.

18          MS. BERNSTEIN:  First of all, if I didn't already do it,

19   I would like to offer that transcript into evidence, 314.

20          THE COURT:  314, any objection?

21          MR. HESSLER:  No, your Honor.

22          THE COURT:  314 is admitted, and this is 185-A?

23          MS. BERNSTEIN:  Yes, your Honor.

24   BY MS. BERNSTEIN:

25   Q.  Did they talk at all -- you said one of the things you asked

1   him to talk about, or you asked Jeff Lehrmann to talk about was the

2   reports.  Did that work, did they talk about the reports?

3   A.  Yes.

4   Q.  I would like just for this highlighted part, can you read the

5   part that Rob Gisevius says and I'll read the part Jeff Lehrmann

6   says?

7   A.  Yes.  It says, "Order.  Archie submitted a bullshit report.

8   Now, if he was fucking dumb enough to put the report you and him

9   wrote on that fucking computer a year or so afterwards."

10  Q.  "I don't think he would do that, would he?"

11  A.  "I hope he wouldn't."

12  Q.  "I would think he would have fucking deleted it, to be honest

13  with you."

14        You said that one of the things they talked about was who

15  might be linked in --

16        MR. HESSLER:  Your Honor, if we're going to go through

17  this back and forth script type thing, I mean, certainly a lot of

18  information is relayed through the person's voice, tone and manner,

19  and I think it's improper.

20        THE COURT:  Yes.  I thought we were going to play these?

21        MS. BERNSTEIN:  We're going to play them after.

22        MR. HESSLER:  And I think that's the best way.

23        THE COURT:  Let's do that, let's do that now, yes.

24        MS. BERNSTEIN:  May we approach, your Honor?

25        THE COURT:  Yeah, but if we're going to read them, we're

1    not going to play them.  If we're going to play them, we're not

2    going to read them unless they're on the screen contemporaneously;

3    so let's decide which one we're going to do, and it sounds like the

4    best way to do it is to play them.

5          (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

6          MS. BERNSTEIN:  Let me respond to the objection.  Part of

7    the court's instruction, we're playing a huge, huge chunk of this

8    tape, much of which is, you know, just blabber about what's going

9    on.  There are a few points and I don't have -- I have, I think, a

10   total of maybe four pages to talk about, but playing, I don't know

11   how long it is, an hour-and-a-half tape to the jury where the

12   important parts get lost is I think confusing for the jury, rather

13   than directing their attention to these particular topics, and I

14   can do it very quickly.

15         But to direct their attention to the particular topics so

16   that when they hear it in the context of the hour-long, or however

17   long the tape is, they'll know what Agent Bezak found was

18   important.

19         MR. HESSLER:  I think it's up to the jury to determine

20   what is important, and again, for her to do this role playing type

21   thing, I think inflection, everything, the spirit of the

22   conversation.

23         THE COURT:  I think we need to play, we have to hear

24   their voices recorded.  We need to play their voices as opposed to

25   reading it.  Now whether you want to play it in snippets and ask

1    him about that.

2         MS. BERNSTEIN:  I don't know that technically I can do

3    that.  Can we compromise, your Honor, on how we're going to do it,

4    what Mr. Hessler is referring to as the role play?  I can put up

5    those sections, read it in a totally neutral way, those particular

6    sections, and then if I misread it, and the jury would certainly

7    hold that against me because they're going to hear it.

8         THE COURT:  It's subjective as to whether or not it's a

9    totally neutral way.  I think they need to hear the voices of the

10   speakers.  We have that, let's do it that way.  Get to that

11   snippet, play the snippet, either now or after you play it and go

12   back to those snippets.

13        MS. BERNSTEIN:  I'll play it, then, and I'll stop it and

14   ask some questions and then play it.

15        THE COURT:  I think that would be better.

16        MS. BERNSTEIN:  Might take longer.

17        MR. HESSLER:  I think that's fair.

18        THE COURT:  I understand but that's the objection.

19     (OPEN COURT.)

20   BY MS. BERNSTEIN:

21   Q.  Again, Agent Bezak, you mentioned that this entire conversation

22   was on tape, correct?

23   A.  Yes.

24   Q.  The topics that you said that they did actually talk about that

25   were of interest to your investigation were what?

1   A.  Whether Rob Gisevius fired a gun, the reports written by

2   Sergeant Kaufman, the witnesses alleged to have seen the incident

3   by Sergeant Kaufman in the reports.

4   Q.  You said that one of the things you asked Jeff Lehrmann to talk

5   about was who might be leaking information.  Did they talk about

6   that topic?

7   A.  Yes.

8   Q.  Before we play the tape I want to focus in on one of those

9   things you said that you wanted Jeff Lehrmann to talk about was to

10  try to get Gisevius to talk about whether or not he fired his gun

11  on the bridge.  Was there a specific scenario within your scenario

12  that Lehrmann was going to use to try to spark that conversation?

13  A.  Yes.  Instructed -- I instructed Lehrmann to tell Rob Gisevius

14  that he saw a video of him shooting on the bridge.

15  Q.  And did Lehrmann carry that out?

16  A.  Yes.

17  Q.  What was Defendant Gisevius's reaction to that conversation

18  about the video?

19          MR. HESSLER:  Again, your Honor, same objection.

20          THE COURT:  I'll sustain.

21          MS. BERNSTEIN:  We'll stop it when we go through -- I'll

22  play the tape and I'll stop the tape as we go through and ask you

23  some questions.

24          THE COURT:  But let's not, in light of the objection,

25  though, if we're going to listen to the tape, we'll know the

1    reaction, we don't need this witness to talk about a reaction that

2    he heard on the tape, just like the jury did, the jury can hear the

3    reaction.

4              MS. BERNSTEIN:  Right.  All right.  The tape is number --

5    Exhibit 313.  Did I get that exhibit number right?  All right.  I

6    would like to offer the tape into evidence, please.

7              THE COURT:  Any objection?

8              MR. HESSLER:  No, objection, your Honor.

9              THE COURT:  All right.  So ordered.

10             MS. BERNSTEIN:  Again, we're going to have the tape

11   played with the transcript scrolling.  Can we go ahead and play

12   that, please.

13          (WHEREUPON, THE AUDIO RECORDING WAS PLAYED.)

14          (WHEREUPON, THE AUDIO RECORDING WAS STOPPED.)

15             MS. BERNSTEIN:  Your Honor, may I step back there for a

16   second?

17             THE COURT:  Yes.

18             MS. BERNSTEIN:  May we approach for a second, your Honor?

19             THE COURT:  Yes.

20       (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

21             MS. BERNSTEIN:  I might have to go back to the

22   transcript, at least for this early part.  When they're playing it

23   on the computer they can hear the conversation.  To us, at least to

24   me, it was very hard to hear the actual voices.  Could you guys

25   hear them?

1          MR. HESSLER:  I couldn't discern any voices over the

2     background noise.

3          THE COURT:  It's very faint because of the music, but it

4     seems to me that when I listened to it, at some point you could

5     hear them talking better than this.

6          MS. BERNSTEIN:  Yeah.  And I think, I think it's going to

7     get better.

8          MR. HESSLER:  What if it doesn't?

9          MS. BERNSTEIN:  Well, when they play it, when they hear

10    it on the computer, they can hear it better.  It's not coming

11    through the court system all that well.

12         MR. HESSLER:  So you're saying it's there, you can go

13    back there and hear it.  I mean they're hearing it?

14         MS. BERNSTEIN:  I mean, yes, our guys can hear it.

15         MR. HESSLER:  That's what I'm asking.

16         THE COURT:  If you can turn the volume down just a little

17    bit and see if it improves, because the music is kind of loud.  You

18    can pick up words off of the transcript.

19         MS. BERNSTEIN:  If that doesn't work, turning the volume

20    down a little bit, what I'll propose I'll do, at the beginning part

21    I'll refer to the parts of the transcript and then mention that

22    they'll have the tape to listen to on their own, that we are having

23    issues with the system; and then the later parts where I think it's

24    clearer, I'll jump to that and play.

25         THE COURT:  But that goes back to the objection, though,

1    of reading a transcript.

2            MS. BERNSTEIN:  Well, but I won't be reading and playing,

3    I thought the concern was doing both.

4            MR. HESSLER:  No, my concern was --

5            THE COURT:  Was reading.

6            MR. HESSLER:  -- is reading it anyway because of the

7    inflection.  Like I said, it's subjective, you might think you're

8    being neutral.

9            THE COURT:  I'll just tell the jury that we're going to

10   play it, they can listen to parts of it, they may not hear over the

11   music, parts may be inaudible, but they can follow on the

12   transcript and hear what they can hear.

13           MR. HESSLER:  Your Honor, I have to disagree with that,

14   though.  If that's not on what they're playing, I don't want to

15   give the jury that -- I mean, if they can hear it, I don't want

16   them to take the government's word, and mine now that I've --

17           THE COURT:  I'm assuming that we've already reviewed the

18   transcript.

19           MR. HESSLER:  I have reviewed the transcript and I

20   reviewed the tape, and I don't want -- if the government's going to

21   play a tape and have the jury or just assume that those words are

22   on that tape, I can't agree to that, I thought the tape --

23           THE COURT:  I thought you heard the tape with the

24   transcript such that you can verify that what is being put on the

25   screen matches?

1          MR. HESSLER:  And that's my problem, I can't verify what

2     I can't hear.

3          MS. BERNSTEIN:  But, in fact, that is what we have agreed

4     to and what you have previously verified.

5          MR. HESSLER:  Then just submit the transcript with the

6     tape that they can hear because I am not just going to sit there

7     and let them listen to it.  If you're going to play a tape and you

8     have words transcribed, just logic tells you that they should be

9     able to hear the words to compare them.

10         MS. BERNSTEIN:  Unless the recording system -- and I

11    think the point that you were making, your Honor, is absolutely

12    right, which is, we have all listened to the tape, we have all

13    compared the transcript to the tape, we have agreed that's what's

14    on the tape.  And so...

15         MR. HESSLER:  And that's not --

16         MS. BERNSTEIN:  I am trying to roll with the punches

17    here.

18         MR. HESSLER:  But that's not the tape being played for

19    the jury.  The tape being played for the jury should have audio

20    with the transcribed statement.  I don't think you can have one

21    without the other.

22         THE COURT:  But is there an issue as to the accuracy of

23    the transcript based on the tape recording in whatever, wherever it

24    was played?  Do you contest the accuracy of the transcript?

25         MR. HESSLER:  Well, obviously, your Honor, I know we're

1    talking about a three-hour conversation.  I have listened to the

2    tape numerous times, I've read the transcript.  There are some

3    words that were changed last night by the government, which I would

4    wait to hear on the tape to make sure that those words were

5    changed.

6              THE COURT:  Words that were changed on the transcript as

7    it was previously typed?

8              MR. HESSLER:  That is correct, that was sent to me last,

9    and I'm waiting to hear the words to make sure it was accurate.

10   Not all weren't crucial, but one or two at least crucial.

11             THE COURT:  Do we know what they were?

12             MS. BERNSTEIN:  They were typos.

13             MR. HESSLER:  He did it as opposed to we did it.

14             THE COURT:  We're going to have to take a break and go

15   through this.

16             MS. BERNSTEIN:  I'm sorry, your Honor, I thought we had

17   an agreement.

18             THE COURT:  Maybe we can come back at two o'clock or so.

19   I thought so, too.

20             MS. BERNSTEIN:  I thought we had an agreement this

21   morning on those five or six typos, and this is news to me that we

22   don't.

23             THE COURT:  This could take a long time to go through all

24   of this.

25             MR. HESSLER:  I'm assuming you're right.

```
 1              THE COURT:  Get them back at 2:30 or 3.  This is

 2   incredible.

 3              MS. BERNSTEIN:  I actually don't think it's going to take

 4   that long, your Honor.  We have done all of our preparation.

 5              MR. HESSLER:  Can you play it from the computer and at

 6   the same time let them hear it?

 7              MS. BERNSTEIN:  I'll play it anyway.  I am trying to roll

 8   with the punches here.  The system isn't working, so I wanted to do

 9   it anyway.  I wanted to go off the transcript.  Of course if we go

10   off the transcript, there will have to be reading.  And in response

11   to the reading thing, we certainly have read off of exhibits all

12   throughout trial.

13              THE COURT:  I know, but we don't have an audio.  That's

14   the issue here, is that he's objected because we do have an audio

15   and I've sustained the objection.  My understanding was that the

16   transcripts have been reviewed pretrial, that there was no issue as

17   to the accuracy of any transcript corresponding to a phone

18   conversation.

19              I can hear the conversation, although it's difficult, I

20   can hear the conversation, mostly because of the music, not because

21   of the quality of the recording, because the music was loud.

22              MS. BERNSTEIN:  Let's try that, let's try turning it down

23   a little bit.  I'll ask Agent Bezak to confirm that the music will

24   die down and it will become clearer, we'll see if it plays more

25   clearly that way; and if not, then we'll just deal with the
```

```
 1    transcript issue.

 2              MR. HESSLER:  That's fair.

 3              THE COURT:  The best way to do it is to give them a

 4    transcript that counsel has reviewed that we know is accurate and

 5    play the tape so that the jury can hear it and view it to fill in

 6    any words that are garbled.  But if we don't have the latter then.

 7              MS. BERNSTEIN:  The typos that have been fixed on the

 8    transcript are -- there is one place where clearly they're talking

 9    about Bardy where and it came out as Daughtry on the transcript.

10    There's another place where they were talking about Hardy where

11    it's clearly Bardy.

12              MR. HESSLER:  Right.  There's a "he" and a "yes" and my

13    client says I said "he", they thought it was "we".

14              MS. BERNSTEIN:  It's a "they" versus "we".

15              MR. HESSLER:  There's another one, "he" and "we".

16              MS. BERNSTEIN:  What are you talking about?

17              MR. HESSLER:  We changed the report, he says "he" changed

18    the report.

19              MS. BERNSTEIN:  No, we didn't change that on the

20    transcript.

21              MR. HESSLER:  You just scratched it through and you just

22    handed it to me this morning.

23              MS. BERNSTEIN:  If so, I think it's an error.  Show me

24    that.  I think we can resolve this, your Honor.

25              THE COURT:  Okay.
```

1           MS. BERNSTEIN:  I think we've resolved our issue.

2      (OPEN COURT.)

3           THE COURT:  Is that correct, Mr. Hessler?

4           MR. HESSLER:  Well, your Honor.

5           THE COURT:  Come on up.

6      (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

7           MR. HESSLER:  It's not, the issue is not --

8           THE COURT:  What the heck did y'all do Friday or over the

9      weekend?  We were off on Friday to do this.

10          MR. HESSLER:  The issue is not resolved if the tape is

11     accurate.  And, I mean, we're talking about a word "he" or "we".

12     Maybe I misheard it.  My client tells me the word is "he".

13          MS. BERNSTEIN:  Just to be clear, your Honor, what we're

14     talking about is a word that has been in this transcript the entire

15     time.  This is not something that was a typo that we fixed.

16          MR. HESSLER:  That's correct, I misstated it.

17          MS. BERNSTEIN:  And apparently his client has this

18     morning told him, no, that's not what I said.  I think he can

19     cross-examine, or you can argue, and you can play the tape and you

20     can argue.

21          THE COURT:  But the transcript that comes up, is it a

22     "he" or a "we"?

23          MS. BERNSTEIN:  It's a "we".

24          MR. HESSLER:  In the transcript it's a "we".

25          THE COURT:  Can we not put in the transcript he/we or

1   something to delineate to the jury why it's their job to listen and

2   determine which of the two it is?  Because it is, they will hear

3   what they want to hear, but they are not tethered to a transcript

4   that the government has provided that's disputed by the defendant.

5   If they hear a "we" --

6           MR. HESSLER:  In case it's questionable, then each juror

7   can independently discern.

8           THE COURT:  If they hear a "we" it's a "we".  Half may

9   hear "we" and half of them may hear "he".

10          MS. BERNSTEIN:  And the answer to the question of whether

11  we can do that is that I don't know.  I assume that these guys can

12  go do that on the fly.

13          MR. HESSLER:  Why don't we do it on the submitted

14  transcript?

15          THE COURT:  Well, but it's going to come up on the

16  screen.

17          MS. BERNSTEIN:  If you don't mind it scrolling, we can do

18  it on the submitted transcript.

19          MR. HESSLER:  I don't mind the scrolling, as long as we

20  correct it at that point and put a stipulation in there that we

21  disagree and that's going to be up to the jury.

22          THE COURT:  You want to pause it at that point and we'll

23  explain?

24          MS. BERNSTEIN:  That's fine.

25          MR. HESSLER:  We can put it in on note.

1          THE COURT:  Let's do that.

2      (OPEN COURT.)

3          MS. BERNSTEIN:  Okay.  Before we play this again, we're

4  going to try -- we're having some trouble with the audio.  We're

5  going to play it again a little bit less loud to see if it makes

6  some of the garbling less.

7  BY MS. BERNSTEIN:

8  Q.  Agent Bezak, you've listened to this tape?

9  A.  Yes.

10  Q.  Does that background noise eventually sort of die down a little

11  bit so you can hear the voices better?

12  A.  Yes.

13          MS. BERNSTEIN:  Okay.  I'm sorry, your Honor, about the

14  delay.  Let's try this again.

15      (WHEREUPON, THE AUDIOTAPE WAS STARTED OVER.)

16          MS. BERNSTEIN:  Stop for one moment there.

17      (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

18  BY MS. BERNSTEIN:

19  Q.  Who is the "she" they're talking about?

20  A.  You.

21      (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

22      (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

23  BY MS. BERNSTEIN:

24  Q.  I want to ask you a question about that.  They're talking about

25  a computer.  You said that when you all did a search of Kaufman and

1   Dugue's work space you searched a computer?

2   A.  Yes.

3   Q.  Did you learn whether that was the same computer that was being

4   used back at the time of the storm?

5   A.  No.

6           MS. BERNSTEIN:  Okay.

7       (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

8           MS. BERNSTEIN:  Stop.  Stop.

9       (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

10  BY MS. BERNSTEIN:

11  Q.  They haven't sent target letters out yet.  What's a target

12  letter?

13  A.  A target letter is a letter from the prosecutor that advises a

14  person that they're a subject or a target of an investigation.

15  Q.  So a target of the investigation is just what it sounds like,

16  that somebody is targeted in the investigation as a possible

17  suspect?

18  A.  Yes.

19          MS. BERNSTEIN:  Okay.

20      (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

21      (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

22  BY MS. BERNSTEIN:

23  Q.  Okay.  I want to ask you about those people.  They could link a

24  lot of people, they could be going after Lohmann.  Who is that?

25  A.  Michael Lohmann, who was a lieutenant in the 7th District.

```
1   Q.  Has he pled guilty in this case?

2   A.  Yes.

3   Q.  Bardy, who is that?

4   A.  He was the captain in the 7th District at the time of the

5   incident.

6   Q.  Archie and Dugue?

7   A.  Both defendants in this case.

8   Q.  You, that's Jeff Lehrmann?

9   A.  Yes.

10  Q.  Has he pled guilty?

11  A.  Yes, he has.

12  Q.  And the seven of us, refers to what?

13  A.  The Danziger seven officers, the officers who were initially

14  identified as being in the truck and responding to the incident.

15          (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

16          (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

17          MS. BERNSTEIN:  The section with the beeps is one of

18  those sections that's been taken out by agreement.

19          (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

20          (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

21  BY MS. BERNSTEIN:

22  Q.  They're talking here about whether the investigation will be

23  done in December.  What month was this conversation done?

24  A.  November.

25  Q.  What year?
```

1    A.   2009.

2         (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

3         (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

4    BY MS. BERNSTEIN:

5    Q.   In that point in your investigation, had you ever personally

6    met with Defendant Gisevius?

7    A.   No, I had not.

8    Q.   Do you know whether I had ever met him?

9    A.   You had not.

10        (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

11        (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

12   BY MS. BERNSTEIN:

13   Q.   They just talked about Raymond Young and Marchant Paxton.   Who

14   are they?

15   A.   Two officers who also responded to the incident in the back of

16   the Budget truck.

17   Q.   Oh, and just a few lines ago they talked about FOP and PANO.

18   What is FOP?

19   A.   It's Fraternal Order of Police.

20   Q.   What is PANO?

21   A.   The Police Association of New Orleans.

22        MS. BERNSTEIN:  Thank you.

23        (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

24        (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

25   BY MS. BERNSTEIN:

1   Q.  He just said, you know the federal law a lot better than I do.

2   At this point when Lehrmann was making the tape of Defendant

3   Gisevius, what did Lehrmann do for a living?

4   A.  He was a special agent for ICE.

5   Q.  Is that a federal agency?

6   A.  Yes.

7   Q.  What is ICE?

8   A.  Immigration and Customs Enforcement.

9   Q.  So Lehrmann was a federal agent with ICE?

10  A.  Yes.

11      (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

12      (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

13  BY MS. BERNSTEIN:

14  Q.  Right here they're talking about how many people they got in

15  the other one.  At this point, did the FBI also have another

16  investigation involving a separate incident involving NOPD

17  officers?

18  A.  Yes.

19  Q.  And that other investigation didn't involve any of the

20  defendants in this case, did it?

21  A.  No, it did not.

22  Q.  What was the shorthand name of that other investigation?

23      MR. DeSALVO:  I object as to the relevance of that, your

24  Honor.

25      THE COURT:  I am going to sustain because we had some

1    pretrial practice on this, some motion practice on it, so I think

2    we need to go ahead and skip to the part that pertains to this

3    case.

4            MS. BERNSTEIN:  Skip through it on the tape?

5            THE COURT:  Yeah.  In light of the objection.

6            MS. BERNSTEIN:  My point was just to point out the

7    irrelevance of it.  Does that take care of the objection?

8            THE COURT:  We can point out the irrelevance and then we

9    tell the jury about it -- it's either irrelevant or it's not.  If

10   it's not relevant, then let's not spend time on it.

11           MS. BERNSTEIN:  Let me step back there, your Honor, and

12   see if we can figure out the technology.

13           THE COURT:  Ms. Bernstein, how much longer is the tape?

14   We're about up into the lunch hour.

15           MS. BERNSTEIN:  I'd say we're maybe halfway through the

16   tape.

17           THE COURT:  Okay.  Why don't we do this.  In light of

18   this objection, why don't we go ahead and take our lunch break now.

19   Go ahead and get that fixed up and we will start again, it's about

20   ten after, why don't we plan on starting at 1:20, twenty minutes

21   after one we will pick up right where we left off.

22           THE MARSHAL:  All rise.

23     (WHEREUPON, THE JURY EXITED THE COURTROOM.)

24           THE COURT:  If you all will be seated, please.  Counsel,

25   my understanding was that we had gone through this tape before

```
 1    trial, everyone had seen the transcripts, everyone had heard the

 2    tape.  We've had multiple stoppages during the course of playing

 3    this tape.  Why is this so complicated?  Can somebody please answer

 4    my question, why is this so -- Ms. Bernstein, would you please

 5    answer?

 6            MS. BERNSTEIN:  My understanding was the same as yours,

 7    your Honor.  We had numerous conversations.  When they wanted

 8    something taken out, I've taken that out.  And numerous

 9    conversations where I've said I want this to be smooth in court, so

10    tell me now.  So I am as surprised as the court by the objections

11    as to what's being played.

12            THE COURT:  During the lunch hour, I would expect

13    everyone to, (A) view the transcript, which you should have done

14    multiple times before this morning; and (B) listen to any portions

15    of this tape or any other tape that is at issue so that we can

16    determine if the transcript, if there's any issue with regard to

17    the transcript or if there's any objection to any portion of that

18    tape and/or transcript before we play it for the jury.  It's a

19    waste of time to have objections that have to be dealt with in the

20    middle of this, come on up to the bench, we talk about things that

21    could have been handled a long time ago.  So we need to get this

22    straight.

23            I told you we were going to be respectful of the jury's

24    time.  We need to get this straight and present it to the jury in a

25    streamlined fashion.
```

1              All right.  Anything else to cover on the record?

2              MS. BERNSTEIN:  Not for us, your Honor.

3              MR. HESSLER:  No, sir, your Honor.

4              THE COURT:  All right.  Would you all approach not on the

5    record.

6              You can step down, sir.  Please don't discuss your

7    testimony with anyone during the break.

8              THE WITNESS:  Yes, sir.

9         (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

10

11                    P R O C E E D I N G S

12                    (AFTERNOON PROCEEDINGS)

13

14        (OPEN COURT.)

15        (WHEREUPON, THE JURY ENTERS THE COURTROOM.)

16             THE COURT:  All right.  You may be seated.  Mr. Bezak,

17   you are still under oath.  Have you discussed your testimony with

18   anyone during the break?

19             THE WITNESS:  No, I haven't.

20             THE COURT:  When we broke for lunch, we were, I believe,

21   in the middle, or somewhere thereabouts, in a recording that the

22   jury was listening to.  Ms. Bernstein, if you would like to resume

23   at that point.  I take it we've worked out whatever issues that

24   existed at the time of the break.  So let's go ahead and continue.

25             MS. BERNSTEIN:  Yes, your Honor.  One clarification, if I

```
 1    could put it on the record, is that we have -- by agreement, we
 2    have taken out a couple of other sections.  We did not have the
 3    time to insert the dings, so there will be times when there are
 4    places excerpted that are not -- it's not clear from what we're
 5    listening to that something has been taken out.
 6              THE COURT:  All right.
 7              MS. BERNSTEIN:  And we will get -- at the end of the day
 8    we will get a new transcript for Exhibit No. 314.
 9              THE COURT:  315?
10              MS. BERNSTEIN:  314.
11              THE COURT:  314.
12              MS. BERNSTEIN:  314.  We will get you a new 314.
13              THE COURT:  Okay.  Counsel, is that correct, you all have
14    spoken about any excerpts that have been deleted?
15              MR. HESSLER:  We have, your Honor.
16              THE COURT:  Okay.  Let's go ahead and proceed.
17              MS. BERNSTEIN:  Thank you, your Honor.
18              Stephen, can we just resume where we left off.
19         (WHEREUPON, THE AUDIO RECORDING WAS PLAYED.)
20         (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)
21    BY MS. BERNSTEIN:
22    Q.  They're talking about somebody named Letten, who is that?
23    A.  Jim Letten, the United States Attorney in the Eastern District.
24    Q.  Do you know whether Jim Letten has been involved in this
25    investigation and prosecution?
```

1   A.  He is the lead prosecutor for the district, but he wasn't

2   actively involved in the investigation.

3   Q.  But his office is -- I mean, him as his office?

4   A.  As his office, yes.

5       (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

6       (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

7   BY MS. BERNSTEIN:

8   Q.  They were just talking about a meeting at the station, and I

9   didn't get it stopped quite in time.  Had Lehrmann, in fact, told

10  you about a meeting at the 7th District station?

11  A.  Yes, he had.

12  Q.  Even though he is pretending here that he did not?

13  A.  Yes.

14      (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

15      (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

16  BY MS. BERNSTEIN:

17  Q.  Do you have any idea who Max is?

18  A.  No.

19      (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

20      (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

21  BY MS. BERNSTEIN:

22  Q.  "Do you think they're doing a Title III on my phone?"  What's a

23  Title III?

24  A.  A wiretap.  A court order that would allow a law enforcement

25  agency to listen in on someone's phone calls.

1   Q.  Did you have a Title III on his phone?

2   A.  No.

3       (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

4       (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

5   BY MS. BERNSTEIN:

6   Q.  They were just talking about somebody named Monteverde, do you

7   know who that is?

8   A.  Yes, Brian Monteverde, who at the time was the supervisor over

9   the NOPD central evidence and property.

10  Q.  Did you, in fact, have him in several times in your

11  investigation?

12  A.  Yes.

13  Q.  What for?

14  A.  To return documents he had -- we had issued subpoenas to NOPD

15  for documents related to evidence, and he came several times with

16  those documents.

17      (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

18      (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

19  BY MS. BERNSTEIN:

20  Q.  They just talked about somebody named Heather Koutz, do you

21  know who that is?

22  A.  Yes.

23  Q.  Who is she?

24  A.  She was the supervisor over NOPD's record room.

25  Q.  Did you bring her in in your investigation?

1    A.  Yes.

2    Q.  What for?

3    A.  Same reason, to -- she was -- NOPD was issued some grand jury

4    subpoenas for documents, and she was returning those documents to

5    the grand jury.

6    Q.  Was she cooperative with your investigation?

7    A.  Yes.

8    Q.  Says something there about they actually called to recommend

9    she be fired for holding reports.  As far as you know, did anybody

10   call to recommend that she be fired for anything?

11   A.  No.

12       (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

13       (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

14   BY MS. BERNSTEIN:

15   Q.  At this time had Archie Kaufman been out of work for a while?

16   A.  Yes, he had.

17   Q.  What was that for?

18   A.  Some medical issues.

19       (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

20       (WHEREUPON, THE AUDIO RECORDING WAS STOPPED.)

21   BY MS. BERNSTEIN:

22   Q.  That last part we ended with, talking about the state grand

23   jury, did the state grand jury indict sometime around Christmastime

24   in 2006?

25   A.  Yes.

1    Q.  I want to switch gears a little bit and talk now about your

2    investigation after you had Jeff Lehrmann do this conversation with

3    Defendant Gisevius.

4         Now, I want to talk about Mike Lohmann.  Defendant

5    Gisevius mentioned Lohmann on that tape and you mentioned that he

6    was somebody that you all were focused on in the investigation,

7    right?

8    A.  Yes.

9    Q.  What did you do at this point after getting this tape?

10   A.  After this recorded conversation, you and I approached Michael

11   Lohmann's attorney and invited them to come in and hear our case

12   that we've developed against Mike Lohmann.  Basically, we told him

13   that we were aware of a coverup and we knew he was involved in the

14   coverup.

15   Q.  What happened then?

16   A.  They came in, listened to what we had to say, and then Mike

17   Lohmann decided to cooperate with the investigation.

18   Q.  When Mike Lohmann decided to cooperate with your investigation,

19   did he provide you with anything?

20   A.  Yes, he did.

21   Q.  What did he give you?

22   A.  A 32-page report, a 46-page report, and a 17-page report.

23   Q.  What was your reaction when you got that 17-page report?

24   A.  This is the report that I was looking for from the very

25   beginning, so I was very excited to get it.

1    Q.  Before he gave those to you, you said you suspected that there

2    was a 17-page report.  Had you seen any of those reports before,

3    32, 46 or 17?

4    A.  The 32-page report was found during the search warrant, but the

5    46-page report and the 17-page report, I had not seen them before.

6    Q.  And did those reports back up what Lohmann had told you in his

7    investigation?

8    A.  Yes, they did.

9    Q.  And those three reports you mentioned, the 32, 46, 17, are

10   those the reports that are in evidence here in this trial?

11   A.  Yes, they are.

12   Q.  We talked about Lohmann and Lehrmann.  Did they both eventually

13   plead guilty in the case?

14   A.  They did.

15   Q.  When they pled guilty, were their pleas secret or were they

16   public?

17   A.  When they actually pled guilty it was public.

18   Q.  Before that they had been cooperating with you for a while?

19   A.  Yes, they had.

20   Q.  While they were cooperating but before the pleas went public,

21   was that cooperation private or public?

22   A.  It was kept secret.

23   Q.  Once they pled guilty, did those pleas get any media attention?

24   A.  They got a lot of media attention, both on television and in

25   the newspaper.

1   Q.  First of all, why -- before they pled guilty, why had you kept

2   it secret that you had officers cooperating with you?

3   A.  So we could do things like the consensual recordings with Jeff

4   Lehrmann, things like that.

5   Q.  So was this a big change when all of a sudden people pled

6   guilty and it was public that you had cooperation?

7   A.  Yeah, it was a huge change.  For the first time it was publicly

8   known that we had uncovered a coverup and that officers were

9   cooperating with the federal investigation.

10  Q.  How did you adjust your investigation at that point?

11  A.  At that point, decided that it was a good point in the

12  investigation to approach some of the officers who were involved in

13  the incident, the Danziger seven officers.

14  Q.  Why did you think this was a good time?

15  A.  Because now it was out that we knew about the coverup.  And

16  like I stated earlier, the attack that I took in the investigation

17  was to develop the strong coverup case to try and leverage one of

18  the officers involved in the shooting to cooperate.  And I thought

19  at this time that the case was strong enough to do that.

20  Q.  So what did you do next?

21  A.  I approached three of the Danziger seven officers, Robert

22  Barrios, Anthony Villavaso and Michael Hunter.

23  Q.  Did you approach them all the same day?

24  A.  Yes, I did.

25  Q.  Do you remember what order you did that in?

 1    A.  I know Mike Hunter was the last one I approached.  I forget the

 2    order for Villavaso and Barrios.

 3    Q.  So let's talk about Barrios first.  You said you approached

 4    him, where did you go approach him?

 5    A.  His house.

 6    Q.  Did you ask him if he wanted to talk?

 7    A.  Yes, I did.

 8    Q.  Did he give you a statement?

 9    A.  No, he didn't.

10    Q.  Did he say he wanted to go talk to his lawyer?

11    A.  Yes.

12    Q.  And eventually what did he decide to do?

13    A.  He pled guilty.

14    Q.  I want to go next to Villavaso, you said you approached him the

15    same day?

16    A.  Yes, I did.

17    Q.  How did you approach him?

18    A.  At his house, the same way, and asked him if he wanted to talk.

19    We talked on his porch, the front porch of his house.

20    Q.  Did he actually talk to you?

21    A.  He did.

22    Q.  Do you know the date of this conversation that you had with

23    him?

24    A.  March 4th of 2010.

25    Q.  And by that time Lehrmann and Lohmann had pled guilty?

1   A.  Yes, they had.

2   Q.  Tell us about that conversation with Defendant Villavaso, did

3   he talk to you about what happened on September 4th?

4   A.  Yes.

5   Q.  What did he tell you he did when he got out of the Budget truck

6   on September 4th?

7   A.  He said when he got out of the Budget truck, he saw a subject

8   fleeing across the bridge and he pursued that subject.

9   Q.  Did he tell you whether he caught the person he chased?

10  A.  He did catch that person.

11  Q.  Did he tell you whether that guy was armed or unarmed?

12  A.  He told me that that person was unarmed.

13  Q.  In that conversation, did Defendant Villavaso tell you whether

14  or not he had gone over to the passenger side of the truck where

15  the barrier was?

16  A.  He told me that he did not go to that side of the truck.

17  Q.  How long was this conversation you had with him on his

18  doorstep?

19  A.  Very brief; ten minutes maybe.

20  Q.  During that ten minutes or so, did he mention anything about

21  having seen any civilians with guns?

22  A.  No.

23  Q.  Did he mention anything about men and women firing at him?

24  A.  No.

25  Q.  Did he mention that he had shot at anyone?

```
 1   A.  No.

 2   Q.  Did he say anything about himself firing a gun?

 3   A.  No.

 4   Q.  Did he say anything about anyone shooting at him?

 5   A.  No.

 6   Q.  During that ten-minute conversation, did he say anything about

 7   anyone shooting at officers from the grass?

 8   A.  No.

 9   Q.  Did he say anything about thinking that he saw guns in the

10   hands of civilians?

11   A.  No.

12   Q.  Did he say anything about whether or not he went over to the

13   west side of the bridge that day?

14   A.  I don't believe so.  I would have to look at the 302.

15   Q.  Would it refresh your recollection if you got to look at the

16   302 that you wrote of that interview?

17   A.  Yes.

18           MS. BERNSTEIN:  May I approach, your Honor?

19           THE COURT:  Yes.

20           MR. FLEMING:  Excuse me.

21           THE COURT:  Go ahead and show it to him.  Which one is

22   this?

23           MS. BERNSTEIN:  I am showing him a 302 of the interview

24   on March 4th, 2010.

25   BY MS. BERNSTEIN:
```

1   Q.  I'm going to ask you to read this sentence just to yourself,

2   don't say anything out loud (INDICATING).

3   A.  (WITNESS READS DOCUMENT.)

4   Q.  Does having looked at that refresh your memory as to whether

5   you had any conversation with Defendant Villavaso about whether he

6   went to the west side of the bridge?

7   A.  Yes, it does.

8   Q.  Did you have that conversation with him?

9   A.  Yes, I did.

10  Q.  What did he tell you?

11  A.  That he had not gone to the west side of the bridge.

12  Q.  During that conversation, did he give you the name and number

13  of an attorney who was representing him?

14  A.  He did.

15  Q.  Did you then follow up with that attorney?

16  A.  Yes.

17  Q.  I want to talk to you about your visit with Mike Hunter.  You

18  said you talked to him the same day that you approached Barrios and

19  Villavaso?

20  A.  Yes.

21  Q.  What time of day or night did you -- first of all, where did

22  you approach Hunter?

23  A.  At his home.

24  Q.  What time of day or night did you go to his home?

25  A.  It was at night, maybe around nine o'clock at night.

1  Q.  Tell us about that.  Tell us what happened when you got there.

2  A.  Knocked on the door, saw Mr. Hunter peak out of the window next

3  to the door.  He then exited the garage and came up behind me and

4  the other agent that was with me.  Looked very shaken, worried.

5  And my observation, I sensed that the weight of the investigation

6  had cracked him and that he was ready to cooperate, and that he

7  just needed to be coaxed in, kind of gently coaxed in to cooperate

8  with the investigation.

9  Q.  Did he say anything to you when he came out of the garage?

10 A.  He asked if we were there to arrest him, and I told him that we

11 were not there to arrest him, and he asked if he was a target of

12 the investigation.

13 Q.  What did you say to him?

14 A.  I told him that he absolutely was a target.

15 Q.  Did you ask him whether he wanted to give you a voluntary

16 statement that night?

17 A.  Yes.

18 Q.  Did he give you a statement?

19 A.  No.

20 Q.  What did he do?

21 A.  Gave me the contact information for his attorney, and I later

22 contacted -- you and I contacted his attorney.

23 Q.  What was the next step in the investigation?

24 A.  Michael Hunter's attorney, Townsend Myers, came into the FBI

25 office, met with you and myself.  We laid out the facts that we had

1    that pertained to Mike Hunter.  He then went back to Mike and Mike

2    Hunter decided to cooperate with the investigation.

3    Q.  Did Hunter then at that point come in and give you a statement?

4    A.  Yes, he did.

5    Q.  Did he agree to plead guilty?

6    A.  Yes.

7    Q.  Let me talk to you about the order of that.  When he came in

8    and signed a plea agreement, had Hunter yet at that point given any

9    statement to you in your investigation?

10   A.  No.

11   Q.  So he signed the plea agreement first?

12   A.  Yes, he did.

13   Q.  Then he gave you a statement?

14   A.  Yes.

15   Q.  Did he provide you information in that statement that you had

16   not learned before?

17   A.  Yes.

18   Q.  About what topic?

19   A.  Who fired first in the incident, information about Ken Bowen

20   leaning over the concrete barrier and shooting at civilians laying

21   on the ground, and information about Ken Bowen stomping Ronald

22   Madison on the west side of the bridge.

23   Q.  Let's go through each of those.  Before you talked to Mike

24   Hunter, who did you think had fired the first shots on the bridge?

25   A.  Ken Bowen.

1    Q.  What did you think that based on?

2    A.  Based on the information that Leonard Bartholomew, IV had told

3    me about seeing --

4    Q.  Is that Little Leonard or Big Leonard?

5    A.  Little Leonard.  About seeing a rifle out of the window of the

6    truck, and also in the video you can tell that the shooting started

7    while the truck was still in motion before it stopped.

8    Q.  So when you talked to Hunter he told you that he actually fired

9    first?

10   A.  Yes, he did.

11   Q.  You mentioned the other thing he told you -- another thing he

12   told you about that you had not previously learned, was about

13   Defendant Bowen leaning over the barrier and firing; is that right?

14   A.  Yes, that's right.

15   Q.  What was the other thing you mentioned?

16   A.  Ken Bowen stomping or kicking Ronald Madison on the west side.

17   Q.  Now, when you got this information from Mike Hunter, did you

18   just take it at face value?

19   A.  No.

20   Q.  Why not?

21   A.  Just like we talked about earlier, any information, witness

22   statement in any investigation, you have to compare it to the other

23   evidence that you've already collected, whether it corroborates and

24   fit s with the other interviews that you've conducted and other

25   evidence that you've collected.

1  Q.  After you talked to Mike Hunter, did you go back and watch the

2  video again?

3  A.  Yes.

4  Q.  Did you notice anything that you had not noticed before?

5  A.  Yes.  There was a pause in the shooting right where Mike Hunter

6  said there would be a pause in the shooting.

7  Q.  Before then had you noticed that pause?

8  A.  No.

9  Q.  Now, you said that Hunter also eventually pled guilty; is that

10 right?

11 A.  Yes, he did.

12 Q.  You mentioned Robert Barrios already.  Who is Ignatius Hills?

13 A.  Ignatius Hills was another officer who was in the Budget truck

14 during the shooting incident, and he also pled guilty as a result

15 of the federal case.

16 Q.  All right.  Now, we've talked a little bit about that video and

17 the jury has seen the video.  During the course of your

18 investigation, did you do anything to try to make that video more

19 useful?

20 A.  Yes.  We sent the video to a media expert, I guess, and they

21 were tasked with trying to stabilize the video and improve the

22 clarity if they could.

23 Q.  Were they able to stabilize the image on the video?

24 A.  Yes, they were.

25 Q.  Did they do anything with the video to make it more true to

1    time?

2    A.  Yes.

3    Q.  Can you explain that?

4    A.  Based on the clock that every camera has, they were able to

5    determine when the video camera was shut off.  It was shut off at

6    several times during the incident.  After they identified those

7    times where the camera was shut off and how long it was shut off,

8    they inserted what we call black slugs into the video, so it

9    accounts for the time where the camera was shut off.

10   Q.  For example, I want to talk about the original video in the

11   form that you got it.  What is the frame right before the shooting

12   starts?

13   A.  The Bartholomews pushing a shopping cart.

14   Q.  And were you able to determine whether, in fact, some time

15   passed between the Bartholomews pushing the shopping cart and the

16   first time you hear shots on the video?

17   A.  Yes.  There are, I forget exactly how long it was, but several

18   seconds, 12, 15 seconds between the last shot of the Bartholomews

19   and the first shot of the Budget truck.

20   Q.  So now what does that part of the video look like?

21   A.  Just a black screen.

22   Q.  And was that process done throughout the entire video to give

23   it real time?

24   A.  Yes.

25   Q.  Now, can you tell from the video with the time frames inserted

```
 1    now, can you tell whether the two incidents on the Danziger Bridge
 2    were one running gun battle or not?
 3               MR. FLEMING:  I'm going to object, your Honor.  She is
 4    calling for the witness to interpret what's on the video.  The
 5    video speaks for itself.
 6               THE COURT:  Yes, I'll sustain it.
 7               MS. BERNSTEIN:  Okay.
 8    BY MS. BERNSTEIN:
 9    Q.  At some point on the video, is there a reporter on the film?
10    A.  Yes.
11    Q.  Where is the reporter located?
12    A.  He is on the I-10 high-rise bridge.
13    Q.  Do you know the name of that reporter?
14    A.  Carlos Quintanilla.
15    Q.  On the video does he actually speak?
16    A.  He does.
17    Q.  Have you talked to Mr. Quintanilla?
18    A.  Yes, I have.
19    Q.  Did he tell you whether or not he was able to see from his
20    perspective who was shooting whom on the Danziger Bridge?
21    A.  He said that he could not see, that he could see -- could not
22    see details of that nature.  He could see general people and
23    motion, but could not see enough detail to determine who was
24    shooting or what they were shooting at.
25               MS. BERNSTEIN:  I would like to offer into evidence
```

1    Exhibit 90, which is the Blu-ray version -- do you guys have that

2    up -- which is the Blu-ray version of the video with the time

3    stamps, the time stamp and the black slugs inserted.

4              THE COURT:  Any objection?

5              MR. HESSLER:  No objection, your Honor.

6              THE COURT:  All right.  So ordered, Exhibit 90 is in the

7    record.

8              MR. FLEMING:  Judge, can we reposition?

9              THE COURT:  Yes.

10   BY MS. BERNSTEIN:

11   Q.  While they're setting up, you can frame it for us.  Where does

12   the video start?

13   A.  It starts on the I-10 high-rise.

14   Q.  If, when they have it hooked up, if it doesn't show up on your

15   screen, I'm going to ask you to step down also where you can see it

16   in case I have questions for you.

17   A.  Yes, ma'am.

18             THE COURT:  Sir, back row, out.  Gum, end of back row,

19   right here next to the door, chewing gum, get out.

20             MS. BERNSTEIN:  Is it possible to turn off the jurors'

21   screen since it doesn't appear in Blu-ray on their screens?

22   Stephen, are we ready, Stephen?

23       (WHEREUPON, THE VIDEO WAS PLAYED WHILE THE TESTIMONY

24       CONTINUED.)

25   BY MS. BERNSTEIN:

1    Q.   Now, Agent Bezak, did you also have the video transferred to

2    Blu-ray?

3    A.   Yes.

4    Q.   Did that sharpen the picture, sharpen the image?

5    A.   Yes, it did.

6    Q.   Right now we're looking at the I-10 bridge?

7    A.   Correct.   It is the I-10 looking east.

8    Q.   As a warning to the jurors here, is there going to be quite a

9    bit of this black space on this video?

10   A.   Yes, there is.

11   Q.   Is that still the I-10?

12   A.   Yes, it is.

13   Q.   What's the entrance or exit that we're looking at?

14   A.   That's the Downman Road on ramp.

15   Q.   Did you identify who that is running across the intersection?

16   A.   Yes.

17   Q.   Who is that?

18   A.   Jose Holmes.

19   Q.   Were you able to identify who those people are on screen right

20   now?

21   A.   The Bartholomew family.

22   Q.   Who specifically?

23   A.   Susan, Leonard, Sr., and Lesha.

24   Q.   Who is running up the bridge now?

25   A.   Robert Gisevius and Robert Faulcon.

1   Q.   Who is that walking up the bridge now?

2   A.   Anthony Villavaso.

3   Q.   What are we looking at now, Agent Bezak?

4   A.   Officers on the I-10 high-rise walking west across the

5   high-rise.

6   Q.   Who are those officers?

7   A.   It's Jennifer Dupree on the left and Jennifer Goodenough on the

8   right.

9   Q.   That guy we just saw on the screen, is that the reporter you

10  were talking about?

11  A.   Yes, that's Carlos Quintanilla.

12          THE WITNESS:  I think my screen isn't working.  There's

13  no -- the clock isn't on this screen anymore.

14          MS. BERNSTEIN:  Because I dared to take the remote.  I

15  apologize.  I don't think I touched anything.  Is that the end of

16  the video?

17          COMPUTER OPERATOR:  No.

18  BY MS. BERNSTEIN:

19  Q.   We're looking at two people walking on the bridge, do you know

20  who those two people are?

21  A.   No.

22  Q.   What's the armored vehicle we're looking at there?

23  A.   It's THE Louisiana State Police SWAT vehicle.

24  Q.   We've gotten to the end of that DVD.  Did you also have them

25  make a short Blu-ray clip of a few seconds of Defendant Gisevius?

1    A.  Yes.

2    Q.  Why?

3    A.  To display here in court.  It was a clip where it appears

4    Sergeant Gisevius walks over to the concrete barrier and fires his

5    weapon.

6         MS. BERNSTEIN:  We have Exhibit 90-A that's being loaded

7    right now.  I would like to offer that into evidence.

8         THE COURT:  Exhibit 90-A?

9         MS. BERNSTEIN:  90-A, yes, your Honor.

10         THE COURT:  Any objection?

11         MR. HESSLER:  No, objection, your Honor.

12         THE COURT:  No objection, 90-A is admitted.

13      (WHEREUPON, THE VIDEO WAS PLAYED.)

14   BY MS. BERNSTEIN:

15   Q.  If you can play it one more time, and I want the -- since we've

16   just taken this clip out of context, where does this clip go in the

17   video we just watched?

18   A.  In the shooting on the east side, after Mike Hunter has gone

19   around to the passenger side of the truck.

20   Q.  That's when the video pulls out and then pulls back in?

21   A.  Yes.

22   Q.  And did you notice the time on the video here?

23   A.  No, it was very small on my screen.

24   Q.  Okay.  Let's play that again, please, Stephen.

25      (WHEREUPON, THE VIDEO WAS PLAYED.)

1          MS. BERNSTEIN:  Thank you.

2          THE COURT:  Are we finished with the player?

3          MS. BERNSTEIN:  Yes, your Honor.

4          Do you mind if I ask a few questions while they're doing

5    that, your Honor?

6          THE COURT:  Sure.  Go ahead, as long as the jury can hear

7    you and this isn't too much of a distraction.

8    BY MS. BERNSTEIN:

9    Q.  Agent Bezak, during the course of your investigation, did you

10   talk to Trooper Chris Baron?

11   A.  Yes, I did.

12   Q.  And he's testified here in court, right?

13   A.  Yes, he has.

14   Q.  When you reviewed the video, were you able to locate Trooper

15   Baron's car getting to the bridge?

16   A.  Yes.

17   Q.  Now, that shooting that we just looked at was 9:09 something on

18   the counter, correct?

19   A.  Correct.

20         MS. BERNSTEIN:  What's the exhibit number -- we're going

21   to switch now, your Honor, for ease, we're going to go to the

22   computer version rather than the Blu-ray version.

23         THE COURT:  Sure.

24         MS. BERNSTEIN:  Exhibit 89-J.  So we were just looking at

25   a clip at 9:09 something, I am going to put up Exhibit 91-J -- I'm

```
 1   sorry, 89-J, and we're going to start playing at 9:13:10.

 2        (WHEREUPON, THE VIDEO WAS PLAYED.)

 3           MS. BERNSTEIN:  Let me stop it there.

 4        (WHEREUPON, THE VIDEO WAS STOPPED.)

 5   BY MS. BERNSTEIN:

 6   Q.  Did you see Trooper Baron's car?

 7   A.  Yes.

 8   Q.  Where was it in relation to that police car we just saw?

 9   A.  Behind it.

10   Q.  Did he tell you that he called a police car onto the bridge?

11           THE COURT:  Wait, hold on.

12           MR. LARSON:  Your Honor, can we approach the bench?

13           THE COURT:  Yes.

14        (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

15           MR. LARSON:  Trooper Baron was in a blue car, not a white

16   car.

17           THE COURT:  It's a blue Caprice.

18           MS. BERNSTEIN:  There's a frame or two, and I was going

19   to replay it because you see in one frame or two, you see the white

20   car with the blue car behind it and then you just see the white

21   car, so I am going to replay it.

22           THE COURT:  Okay.

23        (OPEN COURT.)

24   BY MS. BERNSTEIN:

25   Q.  Agent Bezak, did you just see a white police car on that video?
```

```
 1    A.  Yes, I did.

 2    Q.  Did Trooper Baron tell you he drove up on the bridge behind the

 3    white police car?

 4    A.  Yes.

 5    Q.  How many frames can you see the -- Trooper Baron's car in?

 6    A.  A fraction of a second.  So, you know, one or two or three.

 7    Very small number of frames.

 8    Q.  So right at the beginning when we see the white car?

 9    A.  Yes.

10              MS. BERNSTEIN:  Let's go back and play that again from

11    9:13:10.

12         (WHEREUPON, THE VIDEO WAS PLAYED.)

13    BY MS. BERNSTEIN:

14    Q.  Did you just see it?

15    A.  Yes.

16              MS. BERNSTEIN:  And I don't know if we can do this.

17    Let's go back and as soon as it switches over to the Danziger

18    Bridge, I want you to pause the video.

19         (WHEREUPON, THE VIDEO WAS PLAYED.)

20         (WHEREUPON, THE VIDEO WAS PAUSED.)

21    BY MS. BERNSTEIN:

22    Q.  Do you see it there?

23    A.  Yes.

24    Q.  Can you circle it.

25    A.  (WITNESS COMPLIES.)
```

1        MS. BERNSTEIN:  Okay.  Thank you.

2        Let me erase that and you can play it for a few more

3    seconds.

4        (WHEREUPON, THE VIDEO WAS RESUMED.)

5        (WHEREUPON, THE VIDEO WAS STOPPED.)

6    BY MS. BERNSTEIN:

7    Q.  I want to shift gears once again.  You mentioned that during

8    the course of your investigation you listened to audio-taped

9    statements that these defendants gave, correct?

10   A.  Yes, I did.

11   Q.  Did you also review transcripts of those statements?

12   A.  Yes, I did.

13       MS. BERNSTEIN:  Your Honor, I would like to offer into

14   evidence 204, 205, 207 and 206, which are the transcripts

15   respectively of Defendant Bowen, Defendant Gisevius, Defendant

16   Faulcon, and Defendant Villavaso.

17       THE COURT:  Any objection?

18       MR. FLEMING:  No objection to the introduction but

19   subject to all previous objections.

20       THE COURT:  Right.  Okay.  So ordered, we will admit 204,

21   205, 207 and 206.

22   BY MS. BERNSTEIN:

23   Q.  I want to focus you first on the taped statement that Defendant

24   Bowen gave.  Now, in that statement, does he say whether or not he

25   fired a rifle?

1   A.   Yes.

2   Q.   Where does he say he fired it?

3   A.   He says he fired it while he was in the cab of the Budget

4   truck.

5   Q.   What did he shoot at?

6   A.   He said that he saw his rounds strike the concrete barrier.

7   Q.   What did he say he did after firing into the concrete barrier?

8           MR. FLEMING:  Judge, at this point I am going to object.

9   The statements themselves will be the best evidence.  The

10  prosecution is just having the witness comment on the statements

11  themselves.

12          THE COURT:  Why don't you all approach, please.

13      (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

14          MS. BERNSTEIN:  Let me answer your concern first.  This

15  is the last part of my examination of this witness.  I think what I

16  am going to do will actually make it go quicker.  There are

17  obviously certain points that I want to get in the statement.  I'm

18  planning on asking him just very quickly and then playing the

19  statement.  The alternative would be to play the statement and then

20  have to go back and jump around because the things that I am asking

21  about don't necessarily go in order.  So I think this is the most

22  efficient and the quickest way.  And I won't ask him anything that

23  requires him to speculate.

24          THE COURT:  Well, I think the concern, too, is that he

25  opines about, maybe I am wrong, but something that he opines or

1     compares his belief to that which the person states.  I think the

2     jury can draw the conclusion whether what they hear is true or not.

3          MS. BERNSTEIN:  One thing that I planned on doing with

4     them, which I think is legit with him as the investigator, is, did

5     he compare this certain thing to the video, did he see that on the

6     video.  So a couple of questions like that, but I think that's

7     legitimate for him in a way that it would not be for another

8     witness.

9          THE COURT:  Can't the jury view the video and see if

10    there's something on there that doesn't --

11         MS. BERNSTEIN:  Yes.

12         THE COURT:  -- didn't happen or happened differently?

13         MS. BERNSTEIN:  Which, of course, they will.  I think

14    it's my duty in the presentation of my case is simply to draw their

15    attention to certain parts that I think they should focus on.  The

16    defense, of course, will draw their attention to the parts that

17    they think they should -- that they want to focus on.

18         MR. HESSLER:  They weren't questioned on the video, they

19    were questioned on what each individual did.  He didn't have the

20    benefit of seeing that video, and there's portions on there that

21    might have happened, or when the video camera was turned off, which

22    I think is pointless.

23         THE COURT:  Not only that, but we also have the, for what

24    it's worth, we have the reporter saying he couldn't see from up

25    there.  So the video is not an accurate -- I shouldn't say it's not

accurate, it is the video, it is an accurate video from a

perspective.  I am just concerned about him opining about something

that the jury can see on the video, they can hear the taped

statements, if you want to hear him, play taped statements, have

him serve as a juror in this first by saying that that's not right

or that didn't happen or that's not correct.

        MS. BERNSTEIN:  Then to address that concern, my

questions aren't him opining but what did Bowen say on this

particular topic.  And again, I think that, (A) will make it move

quicker; but (B) rather than just playing the entire tape and then

having to come back and point to the significant parts.  These are

fairly lengthy tapes; not lengthy but several minutes.

        MR. FLEMING:  My position would be it's not going to save

time because I think it's improper for the prosecution to elicit

this type of testimony, whether it's done now or it's done at the

end.  It sounds like she wants to build into a closing argument

with this witness, have the witness comment on the evidence, Judge.

This doesn't jive with the system, Judge.  The jury has seen this

tape 1,000 times probably.  Or they will hear the audio-taped

statements, they will have transcripts.  I am assuming they can go

back and look at this in the jury room after listening to

Ms. Bernstein make her argument.

        MS. BERNSTEIN:  I will not ask him to compare.

        MR. FLEMING:  He is going to point out things, that he

said this, it's not in here.

 1          THE COURT:  I am concerned, I think we're getting to the

 2    point where we have him -- in other words, are you going to believe

 3    what you see in the videotape or are you going to believe me?  And

 4    I think the question really is, are you going to believe what the

 5    defendant says or are you going to believe what the video says?

 6          MS. BERNSTEIN:  I think he is objecting to something that

 7    I don't want him to do.

 8          THE COURT:  We don't need him interposed in that

 9    equation.  We need the jury to look at the tape and listen to the

10    statement and say, well, that didn't happen.  But that's the jury's

11    job.

12          MS. BERNSTEIN:  I agree with you, and I don't plan to do

13    anything else other than that.  I think my job is to ask him

14    questions to direct to certain points, not then to say either this

15    did or didn't happen.  For example, how does he say he got out of

16    the truck?  He says he, you know, what's right there.  I won't ask

17    that.  I'll ask him whether he looked at that part of the video and

18    I won't ask him what his conclusion was.

19          MR. LARSON:  This is all closing argument.

20          MS. BERNSTEIN:  It's not argument at all, there's no

21    argument in that at all.  It's simply bringing to the -- it's just

22    like putting in a portion of a statement, which I am going to put

23    the whole statement in just for ease.

24          THE COURT:  Well, so you want -- let me make sure I

25    understand correctly, because my appreciation of your question was

1  that you were going to ask him, did you take -- did you review the

2  statement and is that statement correct based on viewing the

3  videotape.

4          MS. BERNSTEIN:  No, absolutely not.

5          THE COURT:  Well, that's what the objection really was,

6  but I think the goalposts have kind of moved.

7          MS. BERNSTEIN:  I think the objection is to something

8  that I do not plan to do.  What I plan to do is ask him for the

9  next question, how did Ken Bowen say he got out of the truck.

10          THE COURT:  But then he's characterizing something that

11  we have --

12          MS. BERNSTEIN:  I can show him the transcript.  That's

13  what I'm saying, I won't ask him anything that requires a

14  characterization.  He can be straight off the transcript.

15          MR. DeSALVO:  The statement speaks for itself.  The

16  statement speaks for itself, the video speaks for itself.

17          MS. BERNSTEIN:  I thought we had to stop it during

18  videos?

19          THE COURT:  I think that's the way we're going to have to

20  do it in light of the objection.

21          MS. BERNSTEIN:  Okay.

22          MR. FLEMING:  But still, even if she's having the witness

23  comment on the statements themselves, the statements and

24  transcripts --

25          THE COURT:  I think we've talked about that, that he is

1    not going to do that.

2           MS. BERNSTEIN:  So you don't have to object again, I am

3    not going to ask him the questions, I mean that.  I am going to ask

4    him, did you, after hearing that, did you go look at that part of

5    the video, and I am not going to ask him what he concluded.  So

6    don't jump up and object because I am not going to ask him the

7    question I think you're probably going to ask.

8           THE COURT:  We have the taped statements and the video.

9    Those two things.

10          MR. FLEMING:  They're in without objection.

11          THE COURT:  Right.  So that's what we're going to do.

12      (OPEN COURT.)

13          MS. BERNSTEIN:  We had Exhibit 204.  Exhibit 204 was the

14   transcript of Ken Bowen's statement, and I would also like to offer

15   at this time Exhibit 209, which is the audio-taped statement.  I

16   would like to offer 209 into evidence, please.

17          THE COURT:  Any objection?

18          MR. DeSALVO:  No, your Honor.

19          THE COURT:  Admit 209.

20   BY MS. BERNSTEIN:

21   Q.  And again, we have the transcript scrolling with the tape.

22          First, do you know who prepared these transcripts?

23   A.  NOPD.

24   Q.  During the course of their investigation?

25   A.  Yes.

 1          MS. BERNSTEIN:  Can we have Exhibit 209, please.

 2       (WHEREUPON, THE AUDIO RECORDING WAS PLAYED.)

 3       (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

 4  BY MS. BERNSTEIN:

 5  Q.  Who does he say he ran down the west side of the bridge with?

 6  A.  Mike Hunter.

 7       (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

 8       (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

 9  BY MS. BERNSTEIN:

10  Q.  "When I exited back out the driver's side," after hearing this

11  tape, did you look at the videotape?

12  A.  Yes.

13  Q.  Did you look to see if you could see him backing out of the

14  driver's side?

15  A.  Yes, I did.

16  Q.  You did look?

17  A.  I did look.

18       (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

19       (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

20  BY MS. BERNSTEIN:

21  Q.  So when he is shooting his handgun up the bridge, who does he

22  say he is next to?

23          MR. FLEMING:  Judge, I am going to object.  Same

24  objection.  The witness -- she is just asking the witness to

25  comment on the tape.

```
 1              THE COURT:  Let's just play the tape.

 2              MR. DeSALVO:  It's assuming facts not in evidence.

 3              THE COURT:  It stands for what it stands for.  I mean,

 4    we're either going to use the tape, or are we going to get him to

 5    tell us what the tape says.  I think we can just go ahead and use

 6    the tape.

 7              Constantly interrupting it to get his appreciation of it

 8    is just not helpful, and I am going to sustain the objection

 9    because I think that's what it calls for.

10              MS. BERNSTEIN:  Your Honor, I will not and I have not

11    asked him to opine on it.

12              THE COURT:  Well, I'm not talking about opinion.  I don't

13    want him -- he is not -- he is not going to tell us what is being

14    said on the tape because we have the tape and the tape is the best

15    evidence of what it says.  The jury can listen to it without any

16    kind of commentary, whether it's opinion or not.  So let's just do

17    that.

18              (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

19              (WHEREUPON, THE AUDIO RECORDING WAS CONCLUDED.)

20              MS. BERNSTEIN:  That was the entire tape for Ken Bowen.

21              THE COURT:  Ms. Bernstein, if this is a good place to

22    stop, we'll take our afternoon break.  It's 3:30.  We'll start

23    again at 3:45 or as soon as the jury is ready, if it's prior to

24    3:45.

25              THE MARSHAL:  All rise.
```

1        (WHEREUPON, THE JURY EXITED THE COURTROOM.)

2            THE COURT:  Could you please, if y'all would approach,

3    please.

4        (WHEREUPON, A RECESS WAS TAKEN.)

5        (OPEN COURT.)

6        (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

7            THE COURT:  All right.  You may be seated.

8            Mr. Bezak, you're still under oath, sir.  Have you

9    discussed your testimony with anyone during the break?

10           THE WITNESS:  I have not.

11           THE COURT:  Let's go ahead and proceed.

12           MS. BERNSTEIN:  If I can jump right back into it, your

13   Honor, Exhibit 211 is the audio-taped statement of the interview

14   with Defendant Gisevius.  I would like to offer that into evidence.

15   It matches up with Exhibit 205 that's already in evidence.

16           THE COURT:  Any objection?

17           MR. HESSLER:  No objection, your Honor.

18           THE COURT:  All right.  So ordered.

19           MS. BERNSTEIN:  Can we play 211, please.

20       (WHEREUPON, THE AUDIO RECORDING WAS PLAYED.)

21       (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

22   BY MS. BERNSTEIN:

23   Q.  It doesn't specify there who is asking questions.  Do you

24   recognize that voice?

25   A.  Yes, it's Sergeant Kaufman.

1          (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

2          (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

3   BY MS. BERNSTEIN:

4   Q.  I just stopped it a second, a question late, but whose voice

5   was that, that last question?

6   A.  Well, I think several questions it's been Gerard Dugue's asking

7   questions.

8   Q.  So they both ask questions during this interview?

9   A.  Yes.

10          (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

11          (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

12  BY MS. BERNSTEIN:

13  Q.  "And you gave the statement voluntarily and of your own free

14  will, correct?"  Who asked that question?

15  A.  Sergeant Kaufman.

16          (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

17          (WHEREUPON, THE AUDIO RECORDING WAS CONCLUDED.)

18          MS. BERNSTEIN:  That's the end of the taped statement

19  with Defendant Gisevius.

20          I would like to offer into evidence Exhibit 212, which is

21  the taped statement of the interview with Defendant Faulcon.  That

22  matches up with transcript 207.

23          THE COURT:  Any objection?

24          MR. FLEMING:  No objections other than those previously

25  lodged, Judge.

```
 1           THE COURT:  Right, so ordered.

 2   BY MS. BERNSTEIN:

 3   Q.  Now then, before we play it, a couple of questions.  The two

 4   interviews that we just listened to were given on what date?

 5   A.  January 25th of 2006.

 6   Q.  Was Defendant Faulcon's statement given the same date?

 7   A.  No, it was not.

 8   Q.  When was it given?

 9   A.  His was given in June, June 9th of 2006.

10   Q.  On January 25th, 2006, when the other officers came in to give

11   their statements at the 7th District, where did Defendant Faulcon

12   live at the time?

13   A.  He was living in Houston, I believe it was Houston, Texas at

14   the time.

15   Q.  So whatever happened on that day he was not present for and

16   then he was interviewed several months later?

17   A.  Yes.

18           MS. BERNSTEIN:  Okay.  I would like to play Exhibit 212,

19   please.

20       (WHEREUPON, THE AUDIO RECORDING WAS PLAYED.)

21           MS. BERNSTEIN:  Before we start.

22       (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

23   BY MS. BERNSTEIN:

24   Q.  Who conducted this interview with Defendant Faulcon?

25   A.  Sergeant Dugue.
```

1    Q.   Sergeant Dugue alone?

2    A.   Yes.

3         (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

4         (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

5    BY MS. BERNSTEIN:

6    Q.   He just mentioned a Louisiana state trooper.  On that day on

7    January 25th, were there other statements given in addition to the

8    two we've already heard?

9    A.   Yes.

10   Q.   Who all gave statements on that day on January 25th?

11   A.   The six other officers, so the six out of the seven, Danziger

12   seven officers.  The one that was not interviewed that day was

13   Mr. Faulcon.

14   Q.   Did any of the ones interviewed that day mention the Louisiana

15   state trooper?

16   A.   No.

17        MR. FLEMING:  Judge, I'm going to object.  He is

18   commenting on the statements.

19        MS. BERNSTEIN:  Now he is not, your Honor.  He is

20   commenting on what he learned during his investigation with the

21   other interviews as well.

22        THE COURT:  I wish we would just let these recordings

23   speak for themselves and the videos speak for themselves and let

24   the jury see them.  Let's trust the jury.  They don't -- they're

25   not children here.

1          MS. BERNSTEIN:  I understand, your Honor.

2          THE COURT:  They have chosen to sit in this case, they

3     can appreciate evidence, they will follow instructions, they will

4     view videos and listen to things.  So let's do it that way rather

5     than get him to tell them what to think.

6          MS. BERNSTEIN:  I understand that, your Honor.  My only

7     question would be about something that's not on the -- not on the

8     tape.

9          THE COURT:  They know, they will know that.  Really.

10    Trust me.

11         (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

12         (WHEREUPON, THE AUDIO RECORDING WAS CONCLUDED.)

13         MS. BERNSTEIN:  That's the end of the interview with

14    Defendant Faulcon.  I would like to offer into evidence Exhibit

15    210, which is the audiotape of the interview with Defendant

16    Villavaso.

17         THE COURT:  210.  Any objection?

18         MR. MECHE:  No objection.

19         THE COURT:  All right, so ordered.

20    BY MS. BERNSTEIN:

21    Q.  Agent Bezak, this interview with Defendant Villavaso was done

22    on that first date, on January 25th, 2006; is that right?

23    A.  Yes.  Yes, ma'am.

24         MS. BERNSTEIN:  Can we play 210, please.

25         (WHEREUPON, THE AUDIO RECORDING WAS PLAYED.)

1          (WHEREUPON, THE AUDIO RECORDING WAS PAUSED.)

2               MR. MECHE:  I think he's running at a faster speed than

3     normal.  I don't know if there's something we can do about that,

4     but it kind of sounds like a chipmunk.

5               THE COURT:  Is this the proper audio or is it speeded up?

6               MS. BERNSTEIN:  That's the way we've always heard it.

7               THE COURT:  Okay.

8               MS. BERNSTEIN:  Okay.  Should we continue playing, your

9     Honor?

10              THE COURT:  Yes, go ahead.

11              MS. BERNSTEIN:  Please continue, Stephen.

12         (WHEREUPON, THE AUDIO RECORDING WAS RESUMED.)

13         (WHEREUPON, THE AUDIO RECORDING WAS CONCLUDED.)

14    BY MS. BERNSTEIN:

15    Q.  All right.  That's the end of the taped statement with

16    Defendant Villavaso.  I want to focus you back on your

17    investigation.

18              During the course of your investigation, did you

19    determine whether there was, in fact, an older gentleman detained

20    at the bottom of the west side of the Danziger Bridge?

21    A.  Yes, I did.

22    Q.  Who was that?

23    A.  Morrell Johnson.

24    Q.  And was he, in fact, detained and brought back to the Crystal

25    Palace?

1    A.   Yes, he was.

2    Q.   Agent Bezak, did you ask to be assigned to this case?

3    A.   No, I did not.

4    Q.   Were you anxious to investigate police misconduct?

5    A.   No, I wasn't.

6    Q.   Why not?

7    A.   One of the --

8              MR. HESSLER:  Objection; relevance, your Honor.

9              THE COURT:  I am going to sustain.  He's assigned to the

10   case, he investigated it.  I'm going to sustain it.

11   BY MS. BERNSTEIN:

12   Q.   You said you were not anxious to be assigned to this case.  How

13   do you feel now about your work on this case?

14             MR. HESSLER:  Again, your Honor, objection to relevance.

15             THE COURT:  You're going to have to explain to me the

16   relevance of -- he did the work, he was assigned to the case and he

17   did the work.  How he feels about it is beside the point, unless

18   you can explain the relevance to me.

19             MS. BERNSTEIN:  I have just one more question, your

20   Honor.

21   BY MS. BERNSTEIN:

22   Q.   I am going to jump back where we started, Agent Bezak.  During

23   your very first interview in this case, when you were -- when you

24   participated in that interview with Defendant Kaufman, did he take

25   you out to the bridge?

1    A.   Yes, he did.

2    Q.   Did he show you where he claimed to have found that gun?

3    A.   Yes, he did.

4    Q.   May I have Exhibit 58, please.

5           Do you see on this photograph -- for the record, this is

6    Exhibit 58, a photograph showing the side of the Danziger Bridge.

7    Do you see in there the area where he showed you that he claimed to

8    have found a gun?

9    A.   Yes.

10   Q.   Can you show us where that was?

11   A.   (WITNESS MARKS EXHIBIT.)

12   Q.   In the grass, in the area you just circled?

13   A.   Yes, ma'am.

14          MS. BERNSTEIN:   Thank you, Agent Bezak.

15          No further questions, your Honor.

16          THE COURT:   All right.   Cross.

17                      CROSS-EXAMINATION

18   BY MR. HESSLER:

19   Q.   Agent Bezak, are you ready?

20   A.   I just need to get a glass of water.   Hold on one second.

21   Q.   All right.

22   A.   I'm ready, thank you.

23   Q.   Good afternoon.

24   A.   Good afternoon.

25   Q.   Agent Bezak, on August 29th of 2005, you were not even an FBI

1    agent at that time, correct?

2    A.  No, I was not.

3    Q.  You were in training to be an FBI agent?

4    A.  No.  I was still in the application process.  I -- my

5    entry-on-duty date was March of 2006.

6    Q.  And in the course of that training, you received training on

7    how to testify, correct?

8    A.  Yes.

9    Q.  You were taught to look at the jury and make eye contact with

10   them?

11   A.  Yes.

12   Q.  Be personable?

13   A.  Yes.

14   Q.  Comb your hair?

15   A.  Of course.

16   Q.  Smile?

17   A.  Yes.

18   Q.  You were told, I'm sure, don't answer questions that weren't

19   asked by the defense attorney, don't volunteer information?

20   A.  Yes.

21   Q.  You learned well.

22   A.  We'll find out.

23   Q.  Okay.  Well, you also learned about investigations, correct?

24   A.  Yes, I did.

25   Q.  You learned about evidence collection?

1    A.  Yes.

2    Q.  How to preserve a scene, process a scene, utilize all of the

3    assets of the FBI?

4    A.  Yes.  Agents at the academy learn general evidence collection

5    and scene processing, how to preserve evidence, document it and

6    collect it.  The specialized experience, like blood splatter

7    analysis or the ballistic analysis, regular agents, street agents

8    don't learn that, that's a special trade that other individuals

9    handle.

10   Q.  And you learned interview and interrogation techniques?

11   A.  Yes.

12   Q.  Let me ask you this:  Did you ever ask in your training to the

13   FBI why not tape record an interview so we can thoroughly and

14   accurately and concisely report what was said?

15           MS. BERNSTEIN:  Objection; irrelevant.

16           THE COURT:  We covered this on direct, and I believe

17   there was an objection from the other side.  So the ruling is going

18   to be the same.

19           MR. HESSLER:  I don't recall the question or the ruling,

20   your Honor.

21           THE COURT:  Y'all approach.

22      (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

23           MR. HESSLER:  I wasn't being a smart aleck.

24           THE COURT:  I think Ms. Bernstein asked questions about

25   explaining when tape recording could be done.  There was an

1    objection as to it being irrelevant as to -- on previous occasions

2    whether he had tape recorded.  So your question was, did he --

3           MR. HESSLER:  Did he ever ask in regards to this case --

4           THE COURT:  In this case?

5           MR. HESSLER:  No, during his training.

6           MS. BERNSTEIN:  And, your Honor, I think you sustained

7    the objection.

8           THE COURT:  I did.

9           MS. BERNSTEIN:  And if I can add my additional objection

10   to that is whether or not he asked is irrelevant.  I have no

11   objection to questions about the policy, I talked about the policy.

12   So the questions about policy --

13          MR. HESSLER:  But he also asked, I think it's relevant --

14          THE COURT:  Not to interrupt, but are you asking him

15   whether or not he wished to tape record anyone in this case?

16          MR. HESSLER:  That's what I am getting to.

17          MS. BERNSTEIN:  I have no objection with this case, if he

18   asked permission to record somebody, I have no objection to that.

19          MR. HESSLER:  I am simply laying the groundwork that this

20   witness knew what he can and can't do, so he knew when to ask and

21   not ask.

22          THE COURT:  That kind of gets into the area that was

23   objected to in direct, though.

24          MR. HESSLER:  That was in any case, we're talking about

25   in this case, and I think he needs to show his understanding of the

1   rules to understand when it can and cannot be implemented.

2          THE COURT:  Well, when you all plan on asking these type

3   of questions, don't object when they're asked on direct.  I

4   sustained an objection.

5          MR. FLEMING:  I think that was my objection.

6          THE COURT:  I know.

7          MR. FLEMING:  I think he objected to in other cases.

8          THE COURT:  That's the objection.

9          MR. FLEMING:  So Eric is asking something what happened

10  during his training.

11         THE COURT:  But that goes to the question that

12  Ms. Bernstein was asking about occasions when he did tape versus

13  when he didn't, or when he sought to tape and occasions that he

14  didn't.  Why don't we ask him in this case whether he desired to or

15  sought approval to tape any conversations in this case.

16         MR. HESSLER:  I'll do that, I'll move on.

17         MS. BERNSTEIN:  His desire might be relevant, but did you

18  seek permission to, I have an objection to.

19         MR. HESSLER:  I am coming to that, I'll move on.  It's

20  not going to be the next question, but I'll get to that.

21     (OPEN COURT.)

22  BY MR. HESSLER:

23  Q.  Did you take classes in note taking and interviewing and all of

24  that?

25  A.  Not a particular class on note taking, but we had practical or

1    role played the interviews where we had to take notes and generate

2    302s based on those notes.

3    Q.  So the taking of the notes essentially is up to the note taker

4    on what he thinks is relevant or what he thinks is necessary in

5    regards to that particular investigation?

6    A.  Yes.

7    Q.  And if the note taker thinks something is not important and it

8    may be, it just could be lost forever?

9    A.  That's certainly possible.  I would -- I wouldn't expect that

10   that would happen at all or very often.

11   Q.  Why not?

12   A.  Agents are trained to do these interviews, and they're trained,

13   like I said, on taking notes.  And it's a process that is taught to

14   us, where the steps that you go through during the interview, the

15   initial taking of a statement.  And then after the statement you do

16   what is called a brief-back, where you brief back to the

17   interviewee what was just told to you.  And in that process, the

18   interviewee can correct things; or if you've missed something that

19   the interviewee thinks is important, they can reinforce it at that

20   point, and the agent will add that to their notes.

21   Q.  So just as -- let's just use one in particular case, Michael

22   Hunter.  You were in here when Michael Hunter testified, correct?

23   A.  Yes.

24   Q.  You heard the 302s read back to Michael Hunter, and you heard

25   him specifically, for instance, deny that he ever told you that he

```
1    spent two days on the West Bank, the West Bank camp, helping

2    sergeant --

3    A.  Louis Gaydosh.

4    Q.  Helping Sergeant Gaydosh.  You heard him refute that assertion

5    to you, correct?

6    A.  Yes.

7    Q.  Now, I guess the only two possibilities is either:  (A) he

8    swore to tell the truth under oath and didn't; or your notes were

9    wrong and you didn't do the read-back and he wasn't --

10            MS. BERNSTEIN:  Objection to the question and to the

11   clarification.  There are honest mistakes, in addition to --

12            THE COURT:  Well, wait, wait, wait.  I am going to let

13   him answer.  Let's not -- overruled.  He can answer, it's cross.

14            THE WITNESS:  Can you repeat the question?

15   BY MR. HESSLER:

16   Q.  Notwithstanding the answer Ms. Bernstein just gave you, the

17   real allegation, where Hunter said, I did not tell Agent Bezak that

18   I spent two days on the West Bank after my dispute with the

19   sergeants about the truck.  You heard him flat out deny telling you

20   that?

21   A.  Yes.

22   Q.  You would agree that your 302 reflects just that, he told you

23   he did spend two days over there before returning back to the East

24   Bank?

25   A.  Yes.
```

1   Q.  And I guess in regards to what you've just testified to, the

2   only answer to that could be either Hunter flat out lied to this

3   jury when he said that, or --

4          MS. BERNSTEIN:  Objection to asking him to speculate on

5   the veracity of another witness who testified.

6          THE COURT:  I'm going to overrule -- look, this is

7   cross-examination.  He's testified all day on direct.  He's going

8   to answer questions on cross.  That much is for sure.  I overrule

9   it.  He's been asked a question by counsel, he can clarify it, he

10  can testify.

11         Go ahead, Mr. Hessler.

12  BY MR. HESSLER:

13  Q.  Agent Bezak, you heard Hunter, Michael Hunter, government

14  witness, under oath, testify that he did not ever tell you that he

15  spent two days over on the West Bank working for Sergeant Gaydosh

16  before returning to the 7th District, correct?

17  A.  Correct.

18  Q.  Your 302 clearly reflects that he did, in fact, say that he

19  spent two days over there working for Sergeant Louis Gaydosh before

20  returning to the 7th District?

21  A.  Correct.

22  Q.  Right.  So, my question is, did he lie under oath to this jury

23  when he told you that or was your 302 incorrect?

24  A.  I don't think it's either of those answers.

25  Q.  Well, explain it to me.

1    A.  I think it was most likely a misunderstanding, either Mike

2    misspoke or I misunderstood him.  But in my recollection of the

3    interview, he clearly told me that there was a dispute between

4    Sergeant Gisevius, Sergeant Bowen and himself over the truck.

5    Eventually he let them take control of the truck, and at that time

6    he was with Sergeant Gaydosh.  He came back to work in the 7th

7    District and started driving the truck again because Sergeant Bowen

8    and Sergeant Gisevius were having trouble driving the truck, they

9    were crashing it into things and trouble getting around the city.

10   Q.  Okay.  So you're saying that your testimony today is reflective

11   of your memory and your 302, and that is, in fact, correct?

12   A.  Yes.

13   Q.  And that his testimony under oath, while it might not be

14   correct, you wouldn't characterize it as a lie?

15   A.  No, no.  Similar to the other instance that he took issue with

16   the 302 was the Louisiana state trooper.  In that instance, I

17   reviewed my notes, it clearly says in my notes that Mike Hunter

18   said the Louisiana state trooper pulled his gun on him.  And I

19   think that, just like Mike said, I think that was a

20   misinterpretation.  When somebody says pull a gun, I assume pull a

21   gun and point.  He obviously meant just pulled the gun out of his

22   holster; and again, I think that was just an honest

23   misunderstanding.

24   Q.  Now, when you got assigned this case, was this your first case,

25   your first investigation?

1  A.  No, it was not.

2  Q.  Now, in your preparation to work this investigation, did you

3  familiarize yourself with the conditions and the difficulties faced

4  by the New Orleans Police Department during the time of Hurricane

5  Katrina?

6  A.  Not at one point, but throughout the investigation I've learned

7  of those difficulties, absolutely.

8  Q.  Okay.  And you wouldn't, you would not deny that there was

9  certainly a lack of coordination between the NOPD and certain

10  outside elements, outside entities, would you?

11  A.  In the first days after Katrina, no, absolutely not.

12  Q.  Even into the second and third week, don't you think there was

13  still coordination efforts?

14  A.  There was still coordination efforts, but I believe as time

15  went on, the NOPD and the other agencies that were assisting them

16  began to become more organized.  At what point that happened, I

17  don't know.

18  Q.  Did your investigation reveal that there was a lack of chain of

19  command or a disrupted and incoherent chain of command in some

20  periods?

21  A.  I would agree with a disrupted chain of command, yes.

22  Q.  Lack of communication?

23  A.  Yes.

24  Q.  Sometimes nonexistent for a while?

25  A.  Yes.

1    Q.   Communication sometimes existed over the rumor mill, huh?

2    A.   There was a lot of rumor mill, yes, there was.

3    Q.   Not any of it was good, huh?

4    A.   Um...

5    Q.   I'll move on.  Did you learn of the loss of the crime lab?

6    A.   Yes.

7    Q.   The loss of the evidence room?

8    A.   Yes.

9    Q.   Did you ever determine what the presence of the FBI, what level

10   of activity or support that they lent to the Katrina effort?

11   A.   I know initially our SWAT team was stationed at our office.

12   They manned that office until they were relieved, I believe by HRT,

13   and then --

14   Q.   And HRT is Hostage Rescue Team?

15   A.   Hostage Rescue Team, that's correct.  And then I'm also aware

16   that ASAC, who is now ASAC Todd Cox was heavily involved in

17   assisting and coordinating with NOPD.  When that coordination

18   started after the storm I am not sure, but I know he was heavily

19   involved in the emergency operations center, the command center.

20   Q.   And the FBI SWAT team -- in fact, there were ICE units around,

21   Immigration and Customs Enforcement, ATF units; were you aware of

22   that?

23   A.   I wasn't aware of that, but I wouldn't deny that.  That sounds

24   logical.

25   Q.   But the FBI SWAT team and the Hostage Rescue Team are

 1   certainly, certainly tactical units, right?  They are not

 2   investigative units, they are not rescue units, they are tactical

 3   units, correct?

 4   A.  Yes.

 5   Q.  Armed with high-powered weaponry, AR-15, .223s, M4s, .308

 6   rifles?

 7   A.  Yes.

 8   Q.  Handguns, of course?

 9   A.  Sure.

10   Q.  They weren't down here to rescue people, right?

11   A.  I can't say whether FBI agents were detailed to rescue people,

12   I am not sure.

13   Q.  Do you know why the federal government would feel the need to

14   send highly-equipped, highly-trained urban combat-armed personnel

15   to the city of New Orleans during that time?

16          MS. BERNSTEIN:  Objection; relevance and calls for

17   speculation.

18          THE COURT:  I am going to let him answer.

19          THE WITNESS:  This is just my understanding.  The reason

20   the SWAT team was there was to protect and safeguard our files in

21   our building.  There are top secret documents contained in the

22   building, and they were just maintained, they were there to

23   maintain the security of that building.

24   BY MR. HESSLER:

25   Q.  Okay.  Now, I am going to ask you some general things that you

1   learned prior to the investigation.  Did you ever ascertain that at
2   some point the NOPD command staff felt it necessary to distribute
3   AR-15s, M16 .223s, surplus weapons from its armory?
4   A.  Yeah, I don't recall exactly when, when I learned that.  But,
5   no, I do know that weapons were distributed.
6   Q.  And you've stated that you knew that the NOPD crime lab had
7   essentially ceased to exist at that time, ceased to exist at that
8   time, correct?
9   A.  I know the crime lab was under water, yes.
10  Q.  Did you know that, or had you determined that crimes, even
11  violent crimes, simply were not being investigated by the NOPD
12  during the weeks of -- initial two or three weeks of Hurricane
13  Katrina?
14  A.  No, I don't agree with that at all.
15  Q.  You don't agree with that?
16  A.  No.
17  Q.  You're saying that crimes were investigated?
18  A.  Yes.
19  Q.  Such as?
20  A.  The shooting of Officer Thomas, the suicide of Lawrence
21  Celestine, this incident.
22  Q.  Okay.  And are you telling this jury that your belief is that
23  there were three crimes committed from the time Hurricane Katrina
24  struck until two or three weeks afterwards?
25  A.  No, absolutely not.  I am just saying that I know that there

1  were crimes that were investigated.

2  Q.  You know of three?

3  A.  Three that I can think of off the top of my head right now.

4  Q.  Based on what you do know, do you think they were reporting and

5  investigating burglaries, armed robberies, burglaries of stores,

6  looting, things like that?

7  A.  No, no, I don't believe.  I mean, I don't -- I can't say that

8  for sure, but it seems logical that they wouldn't be doing that

9  type of stuff.

10  Q.  Now, did you take it upon yourself to familiarize yourself with

11  the NOPD use of force policy?

12  A.  Yes.

13  Q.  What about state law that guides, that guides the NOPD use of

14  force in regards to self-defense, justification?

15  A.  I wasn't really concerned in the state law because the officers

16  actually would be judged by the federal law.

17  Q.  So if they abided by state law, you still believed that they

18  could have violated federal law?

19          MS. BERNSTEIN:  Objection, your Honor.  May we approach?

20          THE COURT:  Yes.

21      (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

22          MS. BERNSTEIN:  I have numerous objections, and I have

23  them to this question and to the questions following.  Asking him

24  to give legal opinions on whether people could be held accountable

25  is completely out of bounds.  And where I suspect we're going is to

1   get into use of force stuff with this witness, which I think is

2   totally inappropriate, beyond the scope of direct, and were

3   questions that should have been directed to the use of force

4   expert.  I am anticipating, if that's where he plans to go, I

5   object preemptively.

6        MR. HESSLER:  And, your Honor, I think his determinations

7   and investigation, if he didn't do it, he said he's researched the

8   use of force policy.  The use of force policies, not only do they

9   refer in the policy to the state guidelines, but they are designed

10  to correlate with state law.

11       THE COURT:  Look, here is the deal.  I agree insofar as

12  the last concern, to the extent that asks him for a legal opinion.

13  However, he was assigned responsibility for investigating whether a

14  criminal offense occurred under the various statutory authorities

15  that are cited in the indictment.  For him to conduct such an

16  investigation, he would have to know the elements of those crimes.

17       So at some point he is going to be asked, I assume it's

18  about to happen now, questions that relate to the elements of the

19  crimes he's investigating.  He would have to know that.  I don't

20  see any way that he could not know that and do all of the things he

21  said he's done.

22       MS. BERNSTEIN:  I think -- I don't know what his answer

23  will be, but I object to him asking whether he knows the elements

24  of the crimes he is investigating.  I think where he is going to

25  want to go next, which I am objecting to, this witness doesn't make

1    any legal conclusions.  He doesn't decide whether people are going

2    to be charged, he doesn't decide whether the evidence proves a

3    violation.  Obviously, that's for the jury to decide.

4              THE COURT:  Right.

5              MS. BERNSTEIN:  So anything having him speculate on

6    something would or would not violate the law, does or does not meet

7    the requirements of excessive force I think is out of bounds.

8              THE COURT:  I think on the ultimate issues the objection

9    is sustained.  However, his investigation is going to be guided by

10   that which he believes to be relevant to the crimes that he's

11   investigated.  I don't know how we can do it any other way.

12             An agent or a police officer, whoever investigates a

13   crime, would have to know of the crime, what the elements of the

14   crime are in order to determine what facts are critical, what

15   evidence is relevant, what tangible evidence needs to be collected.

16   He can't not know that.

17             MS. BERNSTEIN:  Well, now, one other concern on the

18   elements, your Honor, has been made clear from our own disputes

19   about jury instructions.  There is not necessarily a clear answer

20   that an FBI agent would be able to give about what is or is not a

21   242 violation, so I just throw that out there if the questions

22   get --

23             THE COURT:  He is going to testify to what he knows,

24   that's what he's going to talk about.

25             MR. HESSLER:  And haven't even talked about federal law.

1          THE COURT:  I know, and that's what the objection is, and

2     I agree to the extent that you ask him for legal questions

3     regarding federal law vis-a-vis compliance with state law.

4          MR. HESSLER:  I think he said he doesn't know state law.

5          THE COURT:  It's almost five o'clock, so we're going to

6     break.  If I thought we could finish --

7          MR. HESSLER:  There is no way on earth.

8          THE COURT:  How much longer do you have?

9          MR. HESSLER:  Probably about an hour and a half.  I am

10    taking the bulk of it for everybody.

11         THE COURT:  We'll get to that in second.  Let's go ahead

12    and adjourn for today and pick up where we left off.  But I am

13    sustaining the objection to the last question.

14         MR. HESSLER:  To the state law question?

15         THE COURT:  Yes.  And I think you're going to have to be

16    careful and tailor your questions so as not to ask him to give a

17    legal opinion, rather to ask him how his work and his understanding

18    of what he's investigating, which does call in questions of law

19    that he would know and he would know what he's investigating for.

20         MS. BERNSTEIN:  To be clear, even if it's asking for a

21    legal opinion on federal law, I would state an objection.

22         MR. HESSLER:  I won't, I just want to make sure he knows

23    the parameters.

24    (OPEN COURT.)

25         THE COURT:  We're close up to the five o'clock hour, and

1    we are not, obviously, not going to finish cross of this witness by

2    Mr. Hessler, so we will pick up tomorrow, I would rather go ahead

3    and break for today, we'll pick up tomorrow right at this juncture.

4         Mr. Bezak, in the meantime, you're not to discuss your

5    testimony with anyone between now and 8:30 tomorrow.  Do you

6    understand that, sir?

7         THE WITNESS:  Yes, sir.

8         THE COURT:  Thank you.

9         Again, ladies and gentlemen of the jury, please don't

10   discuss anything about the case, either amongst yourselves or with

11   anyone else.  Please do not view anything or read anything about

12   the case between now and 8:30.  And if you can be here at 8:30, we

13   will start at 8:30 sharp.  Thank you all.

14        THE MARSHAL:  All rise.

15      (WHEREUPON, THE JURY EXITED THE COURTROOM.)

16        THE COURT:  You can step down, sir.

17        THE WITNESS:  Thank you.

18        THE COURT:  If you all would be seated.  We adjourned on

19   Thursday early, I believe by almost three hours earlier than I had

20   planned on Thursday, with the understanding that on Thursday

21   afternoon and on Friday we would work on the videotape presentation

22   and the audiotape presentations today, with the idea that we would

23   finish with this witness and one other prior to the end of today.

24   Obviously, that hasn't happened.  And it's rather disappointing

25   that today we spent, I say spent, wasted time discussing audiotape

1   and videotape excerpts and how they were going to be played.

2          And my comments aren't directed to any one person or side

3   in this case, but I think it bears noting that, unlike previous

4   days, we've spent a lot of time today that was not necessary to

5   spend on matters that could have been taken care of with a simple

6   conference of counsel.  So I will expect henceforth that we will

7   not have days like today when we have a large amount of wasted

8   time.  I think we owe it to the jury, who has been here now for

9   going on four weeks, not counting jury selection, to do a better

10  job than we've done today.

11         Anything else we need to cover on the record?

12         MS. BERNSTEIN:  Nothing for the government, your Honor.

13         MR. HESSLER:  Nothing for the defendants, your Honor.

14         THE COURT:  All right.  Anything we need to cover at the

15  bench today?

16         MR. FLEMING:  No, your Honor.

17         THE COURT:  If you all would approach, then, off the

18  record.

19         MR. FLEMING:  Yes, your Honor.

20      (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

21

22                    *  *  *  *  *  *

23

24

25

1

2

3                         REPORTER'S CERTIFICATE

4

5          I, Karen A. Ibos, CCR, Official Court Reporter, United

6    States District Court, Eastern District of Louisiana, do hereby

7    certify that the foregoing is a true and correct transcript, to the

8    best of my ability and understanding, from the record of the

9    proceedings in the above-entitled and numbered matter.

10

11

12    _____

13                      Karen A. Ibos, CCR, RPR, CRR

14                      Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25