1                   UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF LOUISIANA

3

4

5    UNITED STATES OF AMERICA      *    Docket 10-CR-204
                                   *
6    versus                        *    Section N
                                   *
7    KENNETH BOWEN                  *    New Orleans, Louisiana
     ROBERT GISEVIUS               *
8    ROBERT FAULCON                 *    June 27, 2011
     ANTHONY VILLAVASO            *
9    ARTHUR KAUFMAN                 *    8:30 a.m.
     * * * * * * * * * * * * * * * *

10

11                      VOLUME III of XXVII
                     JURY TRIAL BEFORE THE
12              HONORABLE KURT D. ENGELHARDT
                UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15   For the United States:        U.S. Attorney's Office
                                   BY:  THEODORE CARTER, ESQ.
16                                 500 Poydras Street
                                   New Orleans, Louisiana 70130
17

18
     For the United States:        U.S. Department of Justice
19                                 Civil Rights Division
                                   BY:  BARBARA BERNSTEIN, ESQ.
20                                 601 D Street NW
                                   Office PHB 5123
21                                 Washington, D.C. 20004

22

23   For the United States:        U.S. Department of Justice
                                   Civil Rights Division
24                                 BY:  CINDY K. CHUNG, ESQ.
                                   950 Pennsylvania Avenue NW
25                                 Washington, DC 20530

1    APPEARANCES:

2    For Kenneth Bowen:            FRANK G. DESALVO, APLC
                                   829 Baronne Street
3                                  New Orleans, Louisiana 70113

4

5    For Robert Gisevius:         ERIC J. HESSLER, ESQ.
                                   700 Camp Street
6                                  New Orleans, Louisiana 70130

7

8    For Robert Faulcon:          PAUL C. FLEMING JR., ESQ.
                                   2821 Kingman Street
9                                  Suite C
                                   Metairie, Louisiana 70006
10

11
     For Robert Faulcon:          King Krebs & Jurgens, PLLC
12                                 BY:  LINDSAY A. LARSON III, ESQ.
                                   201 St. Charles Avenue
13                                 45th Floor
                                   New Orleans, Louisiana 70170
14

15
     For Anthony Villavaso:       DeSalvo Blackburn & Kitchens, LLC
16                                 BY:  ROGER W. KITCHENS, ESQ.
                                   2802 Tulane Avenue
17                                 New Orleans, Louisiana 70119

18

19   For Anthony Villavaso:       TIMOTHY A. MECHE, ESQ.
                                   700 Camp Street
20                                 New Orleans, Louisiana 70130

21

22   For Arthur Kaufman:          STEVEN D. LONDON, ESQ.
                                   1100 Poydras Street
23                                 Suite 2950
                                   New Orleans, Louisiana 70163
24

25

1   APPEARANCES:

2

3   Official Court Reporter:        Jodi Simcox, RMR, FCRR
                                    500 Poydras Street
                                    Room HB-406
4                                   New Orleans, Louisiana 70130
                                    (504) 589-7780
5

6

7

8   Proceedings recorded by mechanical stenography; transcript

9   produced by computer.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>I N D E X</u>

2                                                              <u>Page</u>

3

OPENING STATEMENTS

4         Barbara Bernstein, Esq.                          55
          Paul C. Fleming, Jr., Esq.                      106
5         Frank G. DeSalvo, Esq.                          115
          Eric J. Hessler, Esq.                           124
6         Timothy A. Meche, Esq.                          146
          Steven D. London, Esq.                          177
7         Lindsay A. Larson, III, Esq.                    199

8    SUSAN BARTHOLOMEW
          Direct Examination By Ms. Chung:                208
9         Cross-Examination By Mr. Desalvo:               251
          Cross-Examination By Mr. Hessler:               262
10        Cross-Examination By Mr. London:                269
          Cross-Examination By Mr. Meche:                 270
11        Redirect Examination By Ms. Chung:              276

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**PROCEEDINGS**</u>

**(June 27, 2011)**

**(MORNING SESSION)**

**\*\*\*\*\*\***

**(COURT CALLED TO ORDER)**

**THE DEPUTY CLERK:** All rise.

**THE COURT:** All right. You all may be seated.

All right. We can go ahead and bring the jury in. We'll have to stand up again when they enter. But let's see where we are on that.

**THE DEPUTY CLERK:** All rise.

(WHEREUPON, the jury entered the courtroom.)

**THE COURT:** All right. You may be seated.

First of all, ladies and gentlemen of the jury, thank you very much for being here on time and ready to get to work. We're going to, as I indicated last Thursday, we're going to try to be very efficient with your time. We're going to start out this morning, I'm going to read to you the indictment that is involved in this case as well as the elements of the various statutes upon which these allegations in the indictment are based. Then I will read to you the stipulations that the parties have agreed to, and I'll tell you about that in a second.

No, we don't expect you to know all of this today by the time I finish reading it. It's a goodly amount of

material and I want to try to get you familiar with it as soon
as possible.  So it's going to take some time.  The lawyers are
going to talk to you later this morning, and perhaps into the
afternoon, in their opening statements about the allegations as
well as the elements of the crimes that have been charged.

So the process of you getting familiar with
what's alleged in this case and why it's a crime will begin
this morning.  So I'm going to go ahead and start out by
reading the indictment in this case.  I'll ask you to bear with
us here as we go through it.

It's United States District Court, Eastern
District of Louisiana, Criminal No. 10-204, *United States of
America versus Kenneth Bowen, Robert Gisevius, Robert Faulcon,
Anthony Villavaso, and Arthur Kaufman.*

Indictment for deprivation of rights under color
of law, use of a weapon during commission of a crime of
violence, conspiracy, obstruction of justice, and false
statements.

The grand jury charges that:

Count 1.

A.  At all times relevant to this indictment:

1.  Defendants Kenneth Bowen and Robert Gisevius
were sergeants with the New Orleans Police Department, or NOPD.

2.  Defendants Robert Faulcon and Anthony
Villavaso were officers with NOPD.

1          3.   Defendant Arthur "Archie" Kaufman was a

2    sergeant with NOPD who worked as a homicide investigator.

3          4.   On September 4, 2005, in the wake of

4    Hurricane Katrina, a number of NOPD officers, including

5    Defendants Bowen, Gisevius, Faulcon, and Villavaso, rode to the

6    Danziger Bridge in a large Budget rental truck in response to a

7    call that officers nearby had come under fire.

8               On the east side of the Danziger Bridge, the

9    officers encountered six unarmed civilians (five members of the

10   Bartholomew family and a teenaged family friend; hereinafter

11   sometimes referred to collectively as "the Bartholomew family")

12   who were walking westward across the bridge to get food and

13   supplies from a supermarket.  Officers drove onto the bridge

14   and opened fire on the civilians, killing family friend James

15   Brissette, 17, and seriously injuring Susan Bartholomew,

16   Leonard Bartholomew, III, the Bartholomews' daughter, Lesha,

17   17, and the Bartholomews' nephew, Jose Holmes, 19.  As the

18   Bartholomews' 14-year-old son ran down the bridge to escape the

19   shooting, an officer fired at him but missed.

20          5.   Officers then traveled to the west side of

21   the bridge, where they shot at Lance and Ronald Madison, who

22   had crossed the bridge to check on the dentistry office of one

23   of their other brothers.  An officer shot Ronald Madison in the

24   back as Madison ran away.  Madison, a 40-year-old man with

25   severe disabilities, died at the scene.

1          6.   Officers then arrested 49-year-old Lance

2    Madison for eight counts of attempted murder of a police

3    officer.  Madison was held in custody for approximately three

4    weeks, after which a judge ordered his release.  Neither the

5    Orleans Parish District Attorney's Office nor a grand jury ever

6    filed formal charges against Madison.

7          7.   On the day of the shooting, officers

8    collected no guns or shell casings from the scene.  When the

9    scene was eventually processed, more than a month later,

10   investigators recovered approximately 26 shell casings and four

11   shotgun shells fired by officers.

12          8.   On September 4, 2005, Defendant Kaufman

13   became the lead investigator responsible for the initial

14   investigation of the Danziger Bridge shootings.  Between

15   September 2005 and May of 2006, Kaufman drafted numerous

16   reports regarding the shootings.

17          9.   In or about October 2005, Defendant Kaufman

18   was joined in the investigation by Sergeant Gerard Dugue.  In

19   May 2006, Sergeants Kaufman and Dugue submitted to the Orleans

20   Parish District Attorney's Office a co-authored incident

21   report.  Defendant Kaufman and Sergeant Dugue concluded in

22   their report that, with the arrest of Lance Madison and the

23   imminent arrest of Jose Holmes, the Danziger Bridge case was

24   "considered solved."

25          10.   In 2006, the Orleans Parish District

1  Attorney's Office and a state grand jury began investigating,

2  among other things, possible wrongdoing by the officers

3  involved in the bridge shootings.

4          11.  In 2008, the state criminal investigation

5  ended, with no findings as to any NOPD officer's guilt or

6  innocence, and the Orleans Parish District Attorney's Office

7  referred the matter to the Federal Bureau of Investigation, or

8  FBI, an agency of the United States, which had been monitoring

9  the state investigation.

10         B.  Civil Rights Violation (Death of James

11  Brissette):

12         On or about September 4, 2005, in the Eastern

13  District of Louisiana, Defendants Kenneth Bowen, Robert

14  Gisevius, Robert Faulcon, and Anthony Villavaso, while acting

15  under color of law and while aiding and abetting one another,

16  shot, James Brissette, willfully depriving him of the right,

17  secured and protected by the Constitution and laws of the

18  United States, to be free from the use of unreasonable force by

19  a law enforcement officer.  The offense involved the use of

20  dangerous weapons and resulted in body injury to, and the death

21  of, James Brissette;

22         All in violation of Title 18, United States

23  Code, Sections 242 and 2.

24         Count 2.

25         A.  The allegations of Count 1, part A are

1  realleged and incorporated herein.

2           B.   Use of firearms:

3           On or about September 4, 2005, in the Eastern

4  District of Louisiana, Defendants Kenneth Bowen, Robert

5  Gisevius, Robert Faulcon, and Anthony Villavaso, aiding and

6  abetting one another, knowingly used and carried firearms

7  during and in relation to, and possessed the firearms in

8  furtherance of, a felony crime of violence prosecutable in a

9  court of the United States;

10          That is, the defendants possessed, carried,

11 used, and discharged several firearms -- including an AK-47

12 assault rifle bearing serial No. CA109138; and an AK-47 assault

13 rifle bearing serial No. SI-73830-2003; a .40 caliber Glock 22

14 semi-automatic pistol bearing serial No. NO1164PD; an M4-type

15 assault rifle bearing an unknown serial number; and a Mossberg

16 shotgun bearing serial No. R244788 -- during the commission of

17 the offense charged in Count 1.

18          In the commission of this offense, the

19 defendants, while aiding and abetting each other, caused the

20 death of James Brissette through the use and discharge of these

21 firearms.  The death involved circumstances constituting murder

22 as defined under Title 18, United States Code, Section 1111;

23          All in violation Title 18, United States Code,

24 Sections 924(c), (j) and 2.

25          Count 3.

 1              A.   The allegations of Count 1, part A are

 2    realleged and incorporated herein.

 3              B.   The Civil Rights Violation (Susan

 4    Bartholomew):

 5              On or about September 4, 2005, in the Eastern

 6    District of Louisiana, Defendants Kenneth Bowen, Robert

 7    Gisevius, Robert Faulcon, and Anthony Villavaso, while acting

 8    under color of law and while aiding and abetting one another,

 9    shot Susan Bartholomew, willfully depriving her of the right,

10    secured and protected by the Constitution and laws of the

11    United States, to be free from the use of unreasonable force by

12    a law enforcement officer.  The offense involved the use of

13    dangerous weapons and resulted in bodily injury to Susan

14    Bartholomew;

15              All in violation of Title 18, United States

16    Code, Sections 242 and 2.

17              Count 4.

18              A.   The allegations of Count 1, part A are

19    realleged and incorporated herein.

20              B.   The Civil Rights Violation (Leonard

21    Bartholomew, III):

22              On or about September 4, 2005, in the Eastern

23    District of Louisiana, Defendants Kenneth Bowen, Robert

24    Gisevius, Robert Faulcon, and Anthony Villavaso, while acting

25    under color of law and while aiding and abetting one another,

1  shot Leonard Bartholomew, III, willfully depriving him of the
2  right, secured and protected by the Constitution and laws of
3  the United States, to be free from the use of unreasonable
4  force by a law enforcement officer.  The offense involved the
5  use of dangerous weapons and resulted in bodily injury to
6  Leonard Bartholomew, III;
7              All in violation of Title 18, United States
8  Code, Sections 242 and 2.
9              Count 5.
10             A.  The allegations of Count 1, part A are
11 realleged and incorporated herein.
12             B.  Civil Rights Violation (Lesha Bartholomew):
13             On or about September 4, 2005, in the Eastern
14 District of Louisiana, Defendants Kenneth Bowen, Robert
15 Gisevius, Robert Faulcon, and Anthony Villavaso, while acting
16 under color of law and while aiding and abetting one another,
17 shot Lesha Bartholomew, willfully depriving her of the right,
18 secured and protected by the Constitution and laws of the
19 United States, to be free from the use of unreasonable force by
20 a law enforcement officer.  The offense involved the use of
21 dangerous weapons and resulted in bodily injury to Lesha
22 Bartholomew;
23             All in violation of Title 18, United States
24 Code, Sections 242 and 2.
25             Count 6.

1                      A.   The allegations of Count 1, part A are

2    realleged and incorporated herein.

3                      B.   The Civil Rights Violation (Jose Holmes):

4                      On or about September 4, 2005, in the Eastern

5    District of Louisiana, Defendants Kenneth Bowen, Robert

6    Gisevius, Robert Faulcon and Anthony Villavaso, while acting

7    under color of law and while aiding and abetting one another,

8    shot Jose Holmes, willfully depriving him of the right, secured

9    and protected by the Constitution and laws of the United

10   States, to be free from the use of unreasonable force by a law

11   enforcement officer.  The offense involved the use of dangerous

12   weapons and resulted in bodily injury to Jose Holmes;

13                     All in violation of Title 18, United States

14   Code, Sections 242 and 2.

15                     Count 7.

16                     A.   The allegations of Count 1, part A are

17   realleged and incorporated herein.

18                     B.   The Use of a Firearm:

19                     On or about September 4, 2005, in the Eastern

20   District of Louisiana, Defendants Kenneth Bowen, Robert

21   Gisevius, Robert Faulcon, and Anthony Villavaso, aiding and

22   abetting and one another, knowingly used and carried firearms

23   during and in relation to, and possessed the firearms in

24   furtherance of, a felony crime of violence prosecutable in a

25   court of the United States;

1          That is, the defendants possessed, carried,

2    used, and discharged several firearms -- including an AK-47

3    assault rifle bearing serial No. CA109138; and an AK-47 assault

4    rifle bearing serial NO. SI-73830-2003; a .40 caliber Glock 22

5    semi-automatic pistol bearing serial No. NO1164PD; an M4-type

6    assault rifle bearing an unknown serial number; and a Mossberg

7    shotgun bearing serial No. R244788 -- during the commission of

8    the offenses charged in Counts 3, 4, 5 and 6;

9          All in violation of Title 18, United States

10   Code, Sections 924(c), and 2.

11          Count 8.

12          A.  The allegations of Count 1, part A are

13   realleged and incorporated herein.

14          B.  Civil Rights Violation (Death of Ronald

15   Madison):

16          On or about September 4, 2005, in the Eastern

17   District of Louisiana, Defendant Robert Faulcon, while acting

18   under color of law, shot Ronald Madison, willfully depriving

19   him of the right, secured and protected by the Constitution and

20   laws of the United States, to be free from the use of

21   unreasonable force by a law enforcement officer.  The offense

22   involved the use of a dangerous weapon and resulted in bodily

23   injury to, and the death of, Ronald Madison;

24          All in violation of Title 18, United States

25   Code, Section 242.

1              Count 9.

2              A.   The allegations of Count 1, part A are

3    realleged and incorporated herein.

4              B.   The Use of a Firearm:

5              On or about September 4, 2005, in the Eastern

6    District of Louisiana, Defendant Robert Faulcon knowingly used

7    and carried a firearm during and in relation to, and possessed

8    the firearm in furtherance of, a felony crime of violence

9    prosecutable in a court of the United States; that is, he

10   possessed, carried, used, and discharged a Mossberg shotgun

11   bearing serial No. R244788, during the commission of the

12   offense charged Count 8.

13              In the commission of this offense, the defendant

14   caused the death of Ronald Madison through the use and

15   discharge of this firearm.  The death involved circumstances

16   constituting murder as defined in Title 18, United States Code,

17   Section 1111;

18              All in violation of Title 18, United States

19   Code, Sections 924(c) and (j).

20              Count 10.

21              A.   The allegations of Count 1, part A are

22   realleged and incorporated herein.

23              B.   Civil Rights Violation (Use of Unreasonable

24   Force Against Ronald Madison):

25              On or about September 4, 2005, in the Eastern

1  District of Louisiana, Defendant Kenneth Bowen, while acting

2  under color of law, kicked and stomped Ronald Madison while

3  Madison was on the ground, alive but mortally wounded,

4  willfully depriving Madison of the right, secured and protected

5  by the Constitution and laws of the United States, to be free

6  from the use of unreasonable force by a law enforcement

7  officer.  The offense resulted in bodily injury to Ronald

8  Madison;

9                All in violation of Title 18, United States

10  Code, Section 242.

11                Count 11.

12                A.  The allegations of Count 1, part A are

13  realleged and incorporated herein.

14                B.  The Conspiracy to Obstruct Justice and Make

15  False Statements:

16                From on or about September 4, 2005, through at

17  least January 23, 2009, in the Eastern District of Louisiana,

18  Defendants Kenneth Bowen, Robert Gisevius, Robert Faulcon,

19  Anthony Villavaso, and Arthur "Archie" Kaufman willfully

20  combined, conspired, and agreed with each other and with others

21  known to the grand jury (including, among others, Sergeant

22  Gerard Dugue, Lieutenant Michael Lohman, and Detective Jeffrey

23  Lehrmann) to commit the following offenses against the United

24  States, as alleged in Counts 14 through 27 of the indictment:

25                (a.)  To knowingly falsify and make a false

entry in a document with intent to impede, obstruct, and
influence the investigation and proper administration of a
matter within federal jurisdiction, and in relation to and in
contemplation of such a matter, in violation of Title 18,
United States Code, Section 1519;

(b.)  To knowingly engage in misleading conduct
toward another person with the intent to hinder, delay, and
prevent the communication to a federal law enforcement officer
and judge of truthful information relating to the commission
and possible commission of a federal offense, in violation of
Title 18, United States Code, Section 1512(b)(3); and

(c.)  To knowingly and willfully make materially
false statements and representations in a matter within the
jurisdiction of the FBI, an agency of the United States, in
violation of Title 18, United States Code, Section 1001.

C.  Plan and Purpose of the Conspiracy:

It was the plan and purpose of the conspiracy
that officers, including Defendants Bowen, Gisevius, Faulcon,
and Villavaso, would provide false and misleading information
about the September 4, 2005 incident on the Danziger Bridge and
would cover up other information, as described in the Overt
Acts, in order to ensure that the shootings would appear to be
legally justified and that the involved officers would
therefore be shielded from the liability.

It was further the plan and purpose of the

1  conspiracy that Defendant Kaufman and Sergeant Dugue would

2  provide false and misleading statements that would refrain from

3  conducting a legitimate investigation of the incident -- or and

4  would refrain from conducting a legitimate investigation of the

5  incident.

6          It was also part of the plan and purpose of the

7  conspiracy that Defendant Kaufman and Sergeant Dugue would

8  submit a report concluding, based on false and misleading

9  information, that the civilians who were shot on the bridge had

10 fired first at officers, and that the officers had been

11 justified in shooting the civilians.

12          D.  Overt Acts:

13          In furtherance of the conspiracy, and to effect

14 the objects thereof, the defendants committed the following

15 overt acts, among others, in the Eastern District of Louisiana:

16          The Crime Scene.

17          1.  On or about September 4, 2005, Defendant

18 Kaufman and Lieutenant Lohman knowingly failed to conduct or

19 direct evidence collection at the scene.

20          2.  On or about September 4, 2005, Defendant

21 Kaufman dismissed a Louisiana State Police, or LSP, sergeant

22 from the shooting scene without taking a statement from him,

23 even though Defendant Kaufman knew that the sergeant had been

24 present for the shooting of Ronald Madison and would be an

25 important witness in a legitimate investigation.

1        3.  Defendant Kaufman later omitted from an

2   official supplemental report any mention of the LSP witness'

3   name or of the fact that he witnessed the shooting.

4        4.  On or about September 4, 2005, after

5   concluding that the officers from the Budget truck had shot

6   unarmed civilians, Lieutenant Lohman encouraged Defendants

7   Gisevius and Bown to come up with a story justifying the

8   shooting.

9             Conversations after the Shooting.

10        5.  On September 4, 2005, and again on numerous

11   occasions between then and January 25th, 2006, the officers

12   involved in the Danziger Bridge shooting, led by Defendants

13   Kaufman, Bowen, and Gisevius, discussed and modified the

14   stories they would tell about what happened on the bridge.

15        6.  In or about September or October 2005,

16   Defendants Kaufman and Bowen specifically discussed using

17   Hurricane Katrina to excuse failures in the investigation and

18   thereby to help make any inquiry into the shooting go away.

19             The Planted Gun.

20        7.  On or about September or October 2005,

21   Defendant Kaufman obtained a gun from his home and told

22   co-conspirators that he would claim to have found the gun at

23   the crime scene on the day after the shooting.

24        8.  On or about September 28, 2005, Defendant

25   Kaufman lied under oath at a preliminary hearing for Lance

1  Madison when he provided false testimony about a firearm he
2  claimed had been found near the Danziger Bridge by another
3  officer.
4           9.   In or about October 2005, and again in or
5  about May 2006, Defendant Kaufman signed off on official
6  reports in which he falsely claimed that he had personally
7  returned to the Danziger Bridge on September 5, 2005, and had
8  found a revolver in the grassy area along the east side of the
9  bridge.
10          Defendant Bowen's False and Changing Story.
11          10.   In or about September and October 2005,
12  Defendants Kaufman, Bowen, and Gisevius, along with Lieutenant
13  Lohman and Detective Lehrmann, repeatedly discussed the false
14  statement that Defendant Bowen would give to justify the
15  shootings on the Danziger Bridge.
16          11.   In or about September and October 2005,
17  Defendant Bowen provided false versions of what had happened on
18  the bridge.
19          For example, Defendant Bowen initially stated
20  that he had kicked guns off the Danziger Bridge into a grassy
21  area to which he had just seen a potential suspect flee, and
22  that he then ran below the bridge to look for the suspect who
23  had fled.  However, because Defendant Bowen had not collected
24  any guns from below the bridge, he and his co-conspirators
25  determined that this story was not believable and Bowen

therefore changed his story to say that he did not run under the bridge after the shooting.

12.   On or about January 25, 2005, Defendant Bowen lied during a formal, audiotaped statement about the shootings.

13.   Defendant Kaufman and Sergeant Gerard Dugue, who conducted the formal interview with Bowen on or about January 25, 2006, failed to question or challenge statements they knew to be false, and which they knew to be inconsistent with prior claims made by Defendant Bowen.

The False Investigative Reports.

14.   In or about September and October 2005, Defendant Kaufman drafted various false versions of an incident report assisted by others, including Bowen, Gisevius, Lohman and Lehrmann.

15.   In or about October 2005, Defendant Kaufman submitted to his supervisor a 32-page version of the false report.

16.   In or about October 2005, Lieutenant Lohman reviewed the 32-page draft of the false report submitted by Defendant Kaufman and counseled Defendant Kaufman on ways to further falsify the report to make it sound more plausible.

17.   In or about October 2005, Lieutenant Lohman, frustrated that cover-up story in the Danziger report still was not logical, personally drafted a 17-page report,

1   including numerous false facts that would help justify the
2   police shooting.
3                18.   In or about October 2005, Defendant Kaufman
4   and Lieutenant Lohman signed off on the 17-page report.
5                19.   On some date between October 2005 and
6   May 2006, Defendant Kaufman replaced the 17-page report with a
7   7-page report written to match vague and general audiotaped
8   statements given by the officers.
9                The Meeting Before the Formal Statements.
10               20.   On or about January 25, 2006, Defendant
11  Kaufman and Sergeant Gerard Dugue held a meeting in the
12  abandoned and gutted-out NOPD 7th District police station.
13  Defendants Bowen, Gisevius, and Villavaso attended the meeting
14  where Defendant Kaufman and Sergeant Gerard Dugue instructed
15  the officers involved in the Danziger Bridge incident to make
16  sure they had their stories straight before they gave formal,
17  audiotaped statements about the incident.
18               21.   Defendant Bowen then took the lead in
19  explaining the false story that he would tell to justify the
20  shooting, and the other officers discussed the false stories
21  they would tell in order to remain consistent with Bowen's
22  story.
23               Defendant Gisevius' Misleading Conduct.
24               22.   In or about September 2005, Defendant
25  Gisevius provided or approved of a false and misleading

1   statement in which he falsely claimed that he saw a civilian

2   (later identified as Lance Madison) shoot at officers as he ran

3   westward over the bridge with another man.  Defendant Gisevius

4   also misleadingly omitted, among other things, the fact that he

5   had repeatedly fired a rifle on the bridge and that he had shot

6   civilians.

7             23.   On or about January 25, 2006, Defendant

8   Gisevius again gave a false account of the events when he

9   provided a formal, audiotaped statement about the incident.

10  Again, Gisevius omitted any reference to the fact that he had

11  fired a gun repeatedly on the bridge and that he had shot

12  civilians, even when he was specifically asked whether he had

13  fired his weapon.

14            24.   During the interview with Gisevius,

15  Defendant Kaufman and Sergeant Dugue, who were conducting the

16  interview, failed to challenge Gisevius' misleading statement,

17  even though they knew that Gisevius had, in fact, fired a gun

18  on the bridge.

19            Defendant Faulcon's Misleading Conduct.

20            25.   In or about September 2005, Defendant

21  Faulcon, after being given advice about how to make his

22  shooting appear justified, provided or approved of a false and

23  misleading statement in which he falsely claimed that the

24  civilians on the bridge, both male and female, were armed and

25  fired at police, and that Faulcon shot Ronald Madison because

1  Madison noticed a police presence and quickly turned, reaching

2  for an object in his right waistband.

3          26.  On or about June 9, 2006, Defendant Faulcon

4  again gave a false account of events when he provided a formal,

5  audiotaped statement to NOPD investigators.

6          Defendant Villavaso's Misleading Conduct.

7          27.  On or about January 25, 2006,

8  Defendant Villavaso gave a formal, audiotaped statement in

9  which he falsely claimed, among other things, that several

10  civilians on the bridge, including both males and females,

11  pointed guns at and fired at police officers.

12          The False May 2006 Supplemental Report.

13          28.  In or about May 2006, Defendant Kaufman and

14  Sergeant Dugue submitted to the Orleans Parish District

15  Attorney's Office a jointly-written 54-page supplemental report

16  (which will be referred to as the 54-page report) in which they

17  included statement summaries which they knew to be false.

18          The Unidentified Juvenile.

19          29.  In or about May 2006, Defendant Kaufman and

20  Sergeant Dugue concealed the identity of a key witness/victim

21  when they referred in the 54-page report to a young black male

22  apprehended at the scene without further identifying the young

23  black male.  In fact, the witness had been identified as

24  "Leonard Bartholomew, Jr.," the son of Susan and Leonard

25  Bartholomew.

1          30.   On or about January 22, 2009, Defendant

2   Kaufman lied to federal agents when he stated in a voluntary

3   interview, that he had not identified the juvenile apprehended

4   running from the bridge on September 4, 2005, and that he had

5   not learned until much later that the juvenile might have been

6   related to the people shot on the bridge.

7                    Fabricated Witnesses.

8          31.   In or about May 2006, Defendant Kaufman

9   submitted a 54-page report that included a fabricated interview

10  statement from a fictional witness, Lakeisha Smith.  Defendant

11  Kaufman wrote in the report that Smith had witnessed part of

12  the incident involving Ronald Madison when, in fact, Defendant

13  Kaufman had made up the witness.

14         32.   In or about May 2006, Defendant Kaufman

15  submitted a 54-page report that included a fabricated interview

16  statement from another fictional witness, James Youngman.

17  Defendant Kaufman wrote in the report that Youngman had

18  witnessed the shooting incident involving the Bartholomew

19  family and had offered justification for the police shooting.

20  In fact, Defendant Kaufman had made up the witness.

21         33.   On or about January 22, 2009, Defendant

22  Kaufman lied to federal agents when he stated in a voluntary

23  interview that he had interviewed Lakeisha Smith and James

24  Youngman on September 4, 2005.

25                  Fabricated "Admissions" by the Victims.

1           34.   In or about May 2006, Defendant Kaufman

2 included in the 54-page report the false claim that Susan and

3 Leonard Bartholomew had admitted to police, on two separate

4 occasions, that their nephew shot a gun on the bridge on

5 September 4, 2005.  In fact, as Defendant Kaufman knew, neither

6 Susan nor Leonard Bartholomew had made any such statements.

7           35.   On or about January 22, 2009, Defendant

8 Kaufman lied to federal agents when he stated during a

9 voluntary interview that Susan Bartholomew had told him that

10 her nephew shot at police on the bridge.

11           All in violation of Title 18, United States

12 Code, Section 371.

13           Count 12.

14           A.   The allegations of Count 1, part A are

15 realleged and incorporated herein.

16           B.   Conspiracy to Violate the Civil Rights of

17 Jose Holmes through False Prosecution:

18           From on or about September 4, 2005, through at

19 least in or about May of 2006, in the Eastern District of

20 Louisiana, Defendants Kenneth Bowen, Robert Gisevius, Robert

21 Faulcon, Anthony Villavaso, and Arthur "Archie" Kaufman,

22 combined, conspired, and agreed with each other and with others

23 known to the grand jury to injure, oppress, threaten, and

24 intimidate Jose Holmes in the free exercise and enjoyment of a

25 right secured and protected by the Constitution and laws of the

1  United States;

2          That is, the right guaranteed by the due process

3  clause to be free from prosecution based on false evidence, by

4  a person acting under color of law.  Specifically, the

5  defendants and their co-conspirators conspired to give false

6  and misleading statements and write false and misleading

7  reports which they expected and intended would lead to the

8  arrest and criminal prosecution of Holmes based on false

9  evidence;

10         All in violation of Title 18, United States

11  Code, Section 241.

12         Count 13.

13         A.   The allegations of Count 1, part A are

14  realleged and incorporated herein.

15         B.   Conspiracy to Violate the Civil Rights of

16  Lance Madison through False Prosecution:

17         From on or about September 4, 2005, through at

18  least in or about May 2006, in the Eastern District of

19  Louisiana, Defendants Kenneth Bowen, Robert Gisevius, and

20  Arthur "Archie" Kaufman combined, conspired, and agreed with

21  each other and with others known to the grand jury to injure,

22  oppress, threaten, and intimidate Lance Madison in the free

23  exercise and enjoyment of a right secured and protected by the

24  Constitution and laws of the United States;

25         That is, the right guaranteed by the due process

1  clause to be free from prosecution based on false evidence, by

2  a person acting under color of law.  Specifically, the

3  defendants and their co-conspirators conspired to give false

4  and misleading statements and write false and misleading

5  reports which they expected and intended would lead to the

6  criminal prosecution of Lance Madison based on false evidence;

7           All in violation of Title 18, United States

8  Code, Section 241.

9           Count 14.

10          A.   The allegations of Count 1, part A are

11  realleged and incorporated herein.

12          B.   Falsification of Evidence to Obstruct

13  Justice:

14          Or about October 11, 2005, in the Eastern

15  District of Louisiana, Defendant Arthur "Archie" Kaufman, in

16  relation to and in contemplation of a matter within the

17  jurisdiction of the FBI, an agency of the United States,

18  knowingly falsified and altered a tangible object and made a

19  false entry in a record and document with intent to impede,

20  obstruct, and influence the investigation and proper

21  administration of a matter within federal jurisdiction;

22          That is, Defendant Kaufman turned in a firearm

23  to NOPD Central Evidence and Property and created a record or

24  caused a record to be created, claiming falsely that the

25  firearm had been found on September 5, 2005, in connection with

1    the Danziger Bridge investigation;

2              All in violation of Title 18, United States

3    Code, Section 1519.

4              Count 15.

5              A.   The allegations of Count 1, part A are

6    realleged and incorporated herein.

7              B.   The Obstruction of Justice Concerning the

8    Firearm:

9              On or about May 2006, in the Eastern District of

10   Louisiana, Defendant Arthur "Archie" Kaufman, in relation to

11   and in contemplation of a matter within the jurisdiction of the

12   FBI, an agency of the United States, was aided and abetted by

13   Sergeant Gerard Dugue, in knowingly falsifying and making false

14   entries in a document with intent to impede, obstruct, and

15   influence the investigation and proper administration of the

16   matter within federal jurisdiction;

17             That is, in or about May 2006, Defendant Kaufman

18   and Sergeant Dugue submitted a 54-page report about the

19   Danziger Bridge shooting in which they wrote that Defendant

20   Kaufman found a Colt Trooper Mark III revolver on September 5,

21   2005, on the side of the Danziger Bridge, and in which they

22   included the discussion of the firearm in a section entitled

23   "Perpetrator's Weapons."  In fact, as Defendant Kaufman knew,

24   the firearm had not been found on September 5, 2005, on the

25   side of the Danziger Bridge and had not been used in the

 1   Danziger Bridge shooting;

 2                    All in violation of Title 18, United States

 3   Code, Sections 1519 and 2.

 4                    Count 16.

 5                    A.   The allegations of Count 1, part A are

 6   realleged and incorporated herein.

 7                    B.   The False Statement Concerning the Firearm:

 8                    On or about January 22, 2009, in the Eastern

 9   District of Louisiana, Defendant Arthur "Archie" Kaufman,

10   knowingly and willfully made materially false statements and

11   representations in a matter within the jurisdiction of the FBI,

12   an agency of the United States, when he told FBI agents

13   investigating the Danziger Bridge incident that he had returned

14   to the Danziger Bridge on September 5, 2005, the morning after

15   the shootings and had found and recovered a revolver (a Colt

16   Trooper Mark III) in the grassy area below where the

17   Bartholomew family had been shot.  In truth and in fact, as he

18   then well knew, he had not recovered a firearm from the gassy

19   area below the bridge on September 5, 2005;

20                    All in violation of Title 18, United States

21   Code, Section 1001.

22                    Count 17.

23                    A.   The allegations of Count 1, part A are

24   realleged and incorporated herein.

25                    B.   Falsifications of Victim Statements:

1              In or about May 2006, in the Eastern District of

2    Louisiana, Defendant Arthur "Archie" Kaufman, in relation to

3    and in contemplation of a matter within the jurisdiction of the

4    FBI, an agency of the United States, knowingly falsified and

5    made false entries in a document with intent to impede,

6    obstruct, and influence the investigation and proper

7    administration of the matter within federal jurisdiction;

8              That is, Defendant Kaufman (1) falsely claimed

9    in the 54-page report that Susan and Leonard Bartholomew had,

10   on two occasions, admitted to police that they had seen their

11   nephew, Jose Holmes, shoot a firearm on the Danziger Bridge;

12   and (2) omitted the known identity of a juvenile apprehended on

13   or near the Danziger Bridge on September 4, 2005;

14             In fact, as Defendant Kaufman knew (1) neither

15   Susan nor Leonard Bartholomew had admitted that their nephew

16   shot a firearm; and (2) the juvenile apprehended at the scene

17   had been identified as Leonard Bartholomew, Jr., the son of

18   Susan and Leonard Bartholomew;

19             All in violation of Title 18, United States

20   Code, Section 1519.

21             Count 18.

22             A.   The allegations of Count 1, part A are

23   realleged and incorporated herein.

24             B.   False Statements Regarding Victim

25   Statements:

1              On or about January 22, 2009, in the Eastern

2    District of Louisiana, Defendant Arthur "Archie" Kaufman,

3    knowingly and willfully made materially false statements and

4    representations in a matter within the jurisdiction of the FBI,

5    an agency of the United States, when he told FBI agents

6    investigating the Danziger Bridge incident (1) that Susan

7    Bartholomew had told him that her nephew had shot at police on

8    the Danziger Bridge; and (2) that he had not identified the

9    juvenile apprehended on or near the Danziger Bridge on

10   September 4, 2005, and had only heard a rumor much later that

11   the juvenile might have been related to the people who had been

12   shot;

13             In truth and in fact, as the defendant then well

14   knew, (1) Susan Bartholomew had not stated that her nephew shot

15   at police; and (2) before submitting his official supplemental

16   report, Kaufman had identified the juvenile as Leonard

17   Bartholomew, Jr., the son of Susan and Leonard Bartholomew;

18             All in violation of Title 18, United States

19   Code, Section 1001.

20             Count 19.

21             A.   The allegations of Count 1, part A are

22   realleged and incorporated herein.

23             B.   The September 2005 Misleading Conduct:

24             In or about September 2005, in the Eastern

25   District of Louisiana, Defendant Kenneth Bowen knowingly

 1  engaged in misleading conduct toward another person with intent
 2  to hinder, delay, and prevent the communication to a federal
 3  law enforcement officer or judge of truthful information
 4  relating to the commission and possible commission of a federal
 5  offense;
 6              That is, Defendant Bowen knowingly and
 7  intentionally mislead NOPD supervisors, the Orleans Parish
 8  District Attorney's Office, FBI agents monitoring the case, and
 9  anyone else who would later review the investigative report of
10  the Danziger Bridge incident when he provided a statement to be
11  used in a report about the Danziger Bridge shooting in which he
12  made the following false claims, among others:  That civilians
13  on the bridge (later identified as the Bartholomew family)
14  fired guns at officers; that, after the shooting, he saw two
15  guns on a walkway near the dead and injured civilians; that he
16  kicked the guns off the bridge; and that he saw Lance Madison
17  throw a gun into the Industrial Canal;
18              All in violation of Title 18, United States
19  Code, Section 1512(b)(3).
20              Count 20.
21              A.   The allegations of Count 1, part A are
22  realleged and incorporated herein.
23              B.   The January 2006 Misleading Conduct:
24              On or about January 25, 2006, in the Eastern
25  District of Louisiana, Defendant Kenneth Bowen knowingly

1  engaged in misleading conduct toward another person with intent

2  to hinder, delay, and prevent the communication to a federal

3  law enforcement officer and judge of truthful information

4  relating to the commission and possible commission of a federal

5  offense;

6            That is, Defendant Bowen knowingly and

7  intentionally mislead NOPD supervisors, the Orleans Parish

8  District Attorney's Office, FBI agents monitoring the case, and

9  anyone else who would later review the investigative report of

10 the Danziger Bridge incident when, during a formal interview

11 about the Danziger Bridge shootings, he falsely claimed, among

12 other things, that a civilian (later identified as Lance

13 Madison) fired at Officer Mike Hunter; that Lance Madison threw

14 a gun into the Industrial Canal; that Defendant Bowen saw guns

15 on the pedestrian walkway and kicked them off the bridge; and

16 that Bowen only shot at the civilians (later identified as the

17 Bartholomew family) after the civilians jumped over the

18 concrete barrier and began to fire their handguns at officers;

19            All in violation of Title 18, United States

20 Code, Section 1512(b)(3).

21            Count 21.

22            A.   The allegations of Count 1, part A are

23 realleged and incorporated herein.

24            B.   The January 2006 Misleading Conduct:

25            On or about January 25, 2006, in the Eastern

1    District of Louisiana, Defendant Robert Gisevius knowingly

2    engaged in misleading conduct toward another person with intent

3    to hinder, delay, and prevent the communication to a federal

4    law enforcement officer and judge of truthful information

5    relating to the commission and possible commission of a federal

6    offense;

7                That is, Defendant Gisevius knowingly and

8    intentionally mislead NOPD supervisors, the Orleans Parish

9    District Attorney's Office, FBI agents monitoring the case, and

10   anyone else who would later review the investigative report of

11   the Danziger Bridge incident when, during a formal interview

12   about the Danziger Bridge shootings, he engaged in the

13   following misleading conduct:

14                (1) he provided a narrative of the incident on

15   the bridge in which he falsely stated that a civilian (later

16   identified as Lance Madison) had fired a gun at officers;

17                (2) he misleadingly omitted from his narrative

18   any reference to the fact that he had fired an M4-type assault

19   rifle multiple times and that he had shot civilians;

20                (3) he misleadingly omitted any reference to the

21   fact that he had ridden down the west side of the bridge with

22   an LSP trooper, that he had been present for the shooting of

23   Ronald Madison, and that he had shot Lance Madison at the

24   Friendly Inn motel; and

25                (4) when asked specifically if he had fired his

1   gun, he misleadingly responded that he had not fired his

2   "service weapon," without mentioning that he had repeatedly

3   shot an assault rifle and that he had shot civilians;

4           All in violation of Title 18, United States

5   Code, Section 1512(b)(3).

6                   Count 22.

7           A.   The allegations of Count 1, part A are

8   realleged and incorporated herein.

9           B.   The June 2006 Misleading Conduct:

10                  On or about June 9th, 2006, in the Eastern

11  District of Louisiana, Defendant Robert Faulcon knowingly

12  engaged in misleading conduct toward another person with intent

13  to hinder, delay, and prevent the communication to a federal

14  law enforcement officer and judge of truthful information

15  relating to the commission and possible commission of a federal

16  offense;

17                  That is, Defendant Faulcon knowingly and

18  intentionally mislead NOPD supervisors, the Orleans Parish

19  District Attorney's Office, FBI agents monitoring the case, and

20  anyone else who would later review the investigative report of

21  the Danziger Bridge incident when, during a formal interview

22  about the Danziger Bridge shootings, he falsely claimed that he

23  saw two armed subjects in a group of other subjects (later

24  identified as the Bartholomew family) on the bridge; that the

25  officers received fire from civilians on the bridge; that

Defendant Faulcon was the only officer who rode down the west
side of the bridge with an LSP sergeant; and that Ronald
Madison, before being shot, turned three times trying to "get a
location" on Faulcon;

All in violation of Title 18, United States
Code, Section 1512(b)(3).

Count 23.

A.  The allegations of Count 1, part A are
realleged and incorporated herein.

B.  The January 2006 Misleading Conduct:

On or about January 25, 2006, in the Eastern
District of Louisiana, Defendant Anthony Villavaso knowingly
engaged in misleading conduct toward another person with intent
to hinder, delay, and prevent the communication to a federal
law enforcement officer and judge of truthful information
relating to the commission and possible commission of a federal
offense;

That is, Defendant Villavaso knowingly and
intentionally mislead NOPD supervisors, the Orleans Parish
District Attorney's Office, FBI agents monitoring the case, and
anyone else who would later review the investigative report of
the Danziger Bridge incident when, during a formal interview
about the Danziger Bridge shootings, he falsely claimed, among
other things, that after the Budget truck came to a complete
stop officers yelled, "Police.  Show us your hands," and that

1    several subjects on the bridge, including females (later

2    identified as Susan and Lesha Bartholomew), fired at police

3    officers;

4              All in violation of Title 18, United States

5    Code, Section 1512 (b)(3).

6              Count 24.

7              A.   The allegations of Count 1, part A are

8    realleged and incorporated herein.

9              B.   The Fabrication of Witnesses:

10             In or about May 2006, in the Eastern District of

11   Louisiana, Defendant Arthur "Archie" Kaufman in relation to and

12   in contemplation of a matter within the jurisdiction of the

13   FBI, an agency of the United States, knowingly falsified and

14   made a false entry in a document with intent to impede,

15   obstruct, and influence the investigation and proper

16   administration of the matter within federal jurisdiction;

17             That is, Defendant Kaufman made a false entry in

18   the 54-page report about the Danziger Bridge shooting in which

19   he falsely claimed to have interviewed Lakeisha Smith and James

20   Youngman on September 4, 2005.  In fact, as Defendant Kaufman

21   knew, he had made up the two witnesses and their purported

22   statements in order to help exonerate the officers who had shot

23   civilians on the bridge;

24             All in violation of Title 18, United States

25   Code, Section 1519.

1              Count 25.

2              A.  The allegations of Count 1, part A are

3    realleged and incorporated herein.

4              B.  False Statements Regarding Fabricated

5    Witness:

6              On or about January 22, 2009, in the Eastern

7    District of Louisiana, Defendant Arthur "Archie" Kaufman

8    knowingly and willfully made materially false statements and

9    representations in a matter within the jurisdiction of the FBI,

10   an agency of the United States, when he told FBI agents

11   investigating the Danziger Bridge incident that he had

12   interviewed Lakeisha Smith and James Youngman on September 4,

13   2005.  In fact, as the defendant then well knew, he had made up

14   the two witnesses in order to help exonerate the officers who

15   had shot civilians on the bridge;

16             All in violation of Title 18, United States

17   Code, Section 1001.

18             As I told you on Thursday, the indictment, which

19   I've just read to you in its entirety, is not evidence, and it

20   is not to be considered by you to be evidence of anything.  The

21   indictment is a vehicle by which the government brings

22   allegations against defendants.  It puts the defendants on

23   notice of what they are accused of, and it also affords the

24   opportunity to allow them to enter a plea, which in this case

25   as to these five defendants is not guilty.

1              Accordingly, after an entry of a not guilty

2    verdict [sic], it allows the matter to go to trial, which is

3    what we're here for today.

4              Now, I cited some statutory provisions during

5    the course of the indictment.  I'm going to cover the elements

6    of those crimes with you before we get to our opening

7    statements.  I have two more things to do:  I need to cover

8    with you the elements of the crime, and then the facts which

9    are stipulated.

10             At the end of this trial, I will give you

11   detailed instructions on the law to be considered and applied

12   to the evidence during the course of your deliberations.  Those

13   instructions will include a detailed explanation of the crimes

14   with which the defendants are charged and the elements of those

15   crimes; that is, what the government has to prove for the

16   charged defendant, or defendants, to be found guilty of

17   violating that statute.

18             For now, however, I want to give of a general

19   overview of those elements to assist you in understanding the

20   evidence and arguments of counsel that will be presented to you

21   during the course of this trial.

22             Counts 1, 3, 4, 5, 6, 8, and 10 of the

23   indictment charge that one or more defendants deprived one or

24   more persons of a constitutional right by willfully using

25   unreasonable force against that person or persons, in violation

1  of 18, United States Code, Section 242.

2              This offense has the following elements:

3              First, that the defendant deprived the victim of

4  his or her constitutional right to freedom from a police

5  officer's use of unreasonable force;

6              Second, that the defendant acted under color of

7  law.  You are instructed that a police officer acts under color

8  of law if he is performing his official duties, even if he

9  misuses or abuses his official authority by doing something the

10 law forbids;

11             Third, that the defendant acted willfully; and

12             Fourth, that the offense resulted in bodily

13 injury or included the use of a dangerous weapon or both.

14             Counts 1 and 8 additionally charge that a death

15 resulted from the deprivations alleged in those counts.  Thus,

16 with those two counts, the government must also prove that a

17 person died as a result of the charged defendant's conduct, and

18 that death was a foreseeable result of that conduct.

19             With respect to Counts 1, 2, 4, 5, and 6, you

20 are additionally advised that those counts charge violations of

21 18, United States Code, Section 242 and Section 2.

22             Section 2 applies when a person is charged with

23 aiding and abetting another person who directly and personally

24 engaged in criminal conduct; in other words, the guilt of a

25 defendant in a criminal case may be established without proof

1   that the defendant personally did every act constituting the
2   offense alleged.
3           Thus, if another person is acting under the
4   direction of the defendant as his agent, or if the defendant
5   joins another person and performs acts with the intent to
6   commit a crime, then the law holds the defendant responsible
7   for the acts and conduct of such other persons just as though
8   the defendant had personally committed the acts or engaged in
9   such conduct.
10          Counts 2, 7 and 9 of the indictment charge one
11   or more defendants with using a firearm during and in relation
12   to a crime of violence, carrying a firearm during and in
13   relation to a crime of violence, and possessing a firearm in
14   furtherance of a crime of violence, in violation of Section
15   924(c) of Title 18.
16          You are instructed that the pertinent crimes of
17   violence are the civil rights offenses charged in Counts 1, 3,
18   4, 5, 6 and 8 of the indictment.
19          This offense has the following elements:
20          First, that the defendant committed the charged
21   underlying civil rights offense; and
22          Second, that the defendant knowingly used or
23   carried a firearm during and in relation to the commission of
24   the underlying civil rights offense, or knowingly possessed a
25   firearm in furtherance of it.

1          You are instructed that "in relation to" means
2   that the firearm must have some purpose, role, or effect with
3   respect to the crime of violence, and for the charged defendant
4   to possess a firearm in furtherance of, the firearm must
5   further advance or help forward the crime of violence.
6          Additionally, if the jury finds the charged
7   defendant or defendants guilty of the firearm offense charged
8   in Count 2 or Count 9, and that the offense resulted in the
9   death of the named victim, the jury must additionally determine
10  if that death constituted murder.
11         For purposes of this case, "murder" is defined
12  as the unlawful killing of a human being with malice
13  aforethought, which means to kill another person deliberately
14  or intentionally, or to act with callous and wanton disregard
15  for human life.
16         Finally, as I explained with respect to Counts
17  1, 3, 4, 5 and 6, Counts 2 and 7 also allege aiding and
18  abetting pursuant to 18, United States Code, Section 2.
19         As I previously stated, Section 2 of Title 18
20  applies when a person is charged with aiding and abetting
21  another person who directly and personally engaged in criminal
22  conduct.
23         Count 11 of the indictment charges the five
24  defendants with conspiring to (1) obstruct justice by writing
25  false reports; (2) obstruct justice by engaging in misleading

conduct; and (3) making false statements to the FBI, all in violation of Section 371 of Title 18.

A "conspiracy" is an agreement between two or more persons to join together to accomplish some unlawful purpose.  It is a kind of partnership in crime in which each member becomes the agent of every other member.

The conspiracy offense charged in Count 11 has the following elements:

First, that the defendant and at least one other person made an agreement to commit one or more of the three underlying crimes listed in Count 11 of the indictment;

Second, that the charged defendant knew the unlawful purpose of the agreement and joined in it willfully; that is with the intent to further the unlawful purpose; and

Third, that one of the conspirators, during the existence of the conspiracy, knowingly committed at least one of the overt acts described in the indictment in order to accomplish some object or purpose of the conspiracy.

As I previously stated, the alleged purpose of the conspiracy offense charged in Count 11 was to commit one or more of three underlying offenses, which are:

(1) to obstruct justice by writing false reports, in violation of 18, United States Code, Section 1519;

(2) to obstruct justice by engaging in misleading conduct, in violation of Section 1512(b)(3) of

1    Title 18; or

2              (3) to make false statements to the FBI, in

3    violation of Section 1001 of Title 18.

4              I now will explain to you these three underlying

5    offenses.  Please pay close attention to this explanation as

6    these crimes are also separately charged in other counts of the

7    indictment, and for the sake of brevity, I will not repeat

8    their elements at this stage of the proceeding.

9              The first underlying offense, obstructing

10   justice by writing false reports, which is also alleged in

11   Counts 14, 15, 17 and 24, has the following elements:

12             First, that the charged defendant destroyed or

13   altered a tangible object, that he falsified a record or

14   document, or that he made a false entry into a record or

15   document, all as charged in the indictment;

16             Second, that the defendant did so knowingly; and

17             Third, that the defendant acted with the intent

18   to impede, obstruct, or influence the investigation of the

19   matter within the jurisdiction of an agency of the United

20   States, or in relation to, or in contemplation of any such

21   matter or case.

22             With respect to this third element, you are

23   instructed that the Federal Bureau of Investigation is an

24   agency of the United States and that violations of federal

25   civil rights and other federal statutes are within its

1    jurisdiction.

2              Additionally, it is not necessary for an

3    investigation to be ongoing or imminent at the time the

4    defendant acted.  Rather, this element is satisfied if it is

5    found that the defendant acted with the intent to impede,

6    obstruct, or influence an ongoing or potential investigation of

7    the matter and that the matter was, in fact, within the

8    jurisdiction of the FBI.

9              Finally, I must add with respect to Count 15,

10   it, like some of the other counts that I've already explained

11   to you, also alleges aiding and abetting pursuant to Section 2

12   of Title 18.

13             As I've previously stated, Section 2 applies

14   when a person is charged with aiding and abetting another

15   person who directly and personally engaged in criminal conduct.

16             The second underlying offense of the conspiracy

17   charged in Count 11, obstruction of justice by engaging in

18   misleading conduct, is also charged in Counts 19, 20, 21, 22,

19   and 23, and it has the following elements:

20             First, that the defendant knowingly engaged in

21   misleading conduct towards another person;

22             Second, that the defendant acted with the intent

23   to hinder, delay, or prevent the communication of information,

24   and that it is reasonably likely that if the misleading conduct

25   had not occurred, at least one relevant communication would

1    have been made to a federal law enforcement officer or federal

2    judge; and

3                   Third, that the information related to the

4    commission or the possible commission of a federal offense.

5                   You are instructed that FBI agents are federal

6    law enforcement officers.

7                   The third underlying offense of the conspiracy

8    charged in Count 11, making false statements to the FBI, is

9    also charged in Counts 16, 18, and 25, and has the following

10   elements:

11                  One, that the defendant knowingly and willfully

12   made a statement or representation that was false, fictitious,

13   or fraudulent and within the jurisdiction of the executive,

14   legislative, or judicial branch of the United States, which

15   here refers to the FBI;

16                  Two, that the defendant made the statement

17   intentionally, knowing that it was false;

18                  Third, that the statement was material; and

19                  Fourth, that the defendant made the false

20   statement for the purpose of misleading the FBI.

21                  A statement is material if it has a natural

22   tendency to influence or is capable of influencing a decision

23   of the FBI.  The government does not have to show, however,

24   that the FBI was, in fact, mislead.

25                  Finally, Counts 12 and 13 of the indictment

1  charged that five defendants conspired to deprive Jose Holmes

2  and Lance Madison, respectively, of their constitutional right

3  to freedom from criminal prosecution based on false evidence,

4  in violation of Section 241 of Title 18.

5          This conspiracy offense has the following

6  elements:

7          First, that the defendant entered into a

8  conspiracy to injure, oppress, threaten, or intimidate one or

9  more victims; and

10         Second, that the defendant intended by the

11  conspiracy to hinder, prevent, or interfere with Jose Holmes',

12  in Count 12, and Lance Madison's, in Count 13, enjoyment of the

13  constitutional right to be free from a criminal prosecution

14  based on false testimony or manufactured evidence.

15         For purposes of Counts 12 and 13, the term

16  "conspiracy" has the same meaning and elements that I

17  previously explained in connection with Count 11.

18         All right.  Last, I was going to, before I turn

19  it over to the attorneys for opening statements, read to you

20  stipulations which the parties have reached.

21         A stipulation is a fact that all of the parties

22  have agreed is a true fact, and one that requires no further

23  evidence.  You are to accept these facts as true and proven.

24         The parties have agreed on the following factual

25  stipulations.

1                     1.   If called to testify, Larry Robinson of the

2    FBI would state that he forensically copied computers and

3    storage media seized during the execution of a search warrant

4    of the NOPD offices of Sergeants Gerard Dugue and Arthur

5    Kaufman.  A copy was made forensically searchable.

6                     2.   On October 11, 2005, Sergeant Archie Kaufman

7    turned in a gun to Central Evidence and Property.  The gun was

8    a Colt Trooper MK .357 revolver with serial No. 84044J.

9                     3.   If called to testify, George Skaluba of the

10   FBI would state that he obtained video from NBC with date and

11   time stamp markings and that he did not alter the footage in

12   any way.

13                    4.   On January 25, 2006, homicide detectives

14   collected the following weapons related to the Danziger Bridge

15   shooting:

16                     An AK-47 rifle, serial No. CAI/09138, which will

17   be labeled as Exhibit 1;

18                     An AK-47 rifle, serial No. SI-73830-2003, which

19   is now marked as Exhibit 2;

20                     A Glock handgun, serial No. NO1164PD, marked as

21   Exhibit 3;

22                     A Mossberg shotgun, serial No. R244788, marked

23   as Exhibit 4;

24                     A Remington shotgun, serial No. D979303, marked

25   as Exhibit 5;

1            A Glock handgun, serial No. NO1737PD, marked as

2   Exhibit 6;

3            A Glock handgun, serial No. NO1396PD, which is

4   marked as Exhibit 7.

5            The parties have agreed to stipulate to the

6   authenticity, but not the admissibility, of the following

7   items:

8            1.  The NBC video;

9            2.  Audio of NOPD interviews with defendants and

10  cooperators;

11           3.  LSP, September 4, 2005 radio run and

12  transcript;

13           4.  Audio of call and meeting between Lehrmann

14  and Gisevius, November 15, 2009, and November 18, 2009;

15           5.  Medical records, including x-rays, of Lesha

16  Bartholomew, Leonard Bartholomew, III, Susan Bartholomew, and

17  Jose Holmes;

18           6.  Autopsy reports with diagrams of Ronald

19  Madison and Jose Holmes;

20           7 --

21           Is that correct, counsel, No. 6, autopsy reports

22  with diagrams?

23       **MS. BERNSTEIN:**  Yes, Your Honor.

24       **MS. CHUNG:**  Yes, Your Honor, that was my

25  understanding.

1          **THE COURT:**  Okay.  All right.

2               7.  Ballistics report by Patrick Lane, dated

3    11/15/06 and analytical notes and photos;

4               8.  Ballistics report by Patrick Lane, undated,

5    addressing Exhibits 24, 25, and 26;

6               9.  Ballistics report by FBI John Webb, which is

7    marked as MAD 54388, which is a two-page exhibit;

8               10.  The *Times-Picayune* photos;

9               11.  Court reporter transcript of Lance

10   Madison's state preliminary hearing;

11               12.  Autopsy photos and photos from D-Mort;

12               13.  Specific West Jefferson medical records and

13   notes for Susan Bartholomew, which is previously marked as

14   document MAD 275-2770.

15               The parties have agreed to stipulate to the

16   authenticity and admissibility of the following items:

17               1.  The Gist or NOPD report;

18               2.  The 7-page initial report, which is an NOPD

19   report;

20               3.  The 54-page supplemental report, which is an

21   NOPD report;

22               4.  The CEP forms relating to the Trooper Mark

23   III, which is an NOPD report;

24               5.  ATF form for the Trooper Mark III.  The form

25   is to be submitted by NOPD -- or the form was to be submitted

1   by NOPD to ATF;

2                   6.   Specific West Jefferson medical records:

3                        A.   Intake notes for Bartholomews and

4   Holmes;

5                        B.   Surgical reports for Bartholomews and

6   Holmes; and

7                        C.   X-rays for all victims;

8                   7.   D-Mort record excerpt, bears documents

9   No. MAD 25595 through 25599;

10                  8.   LSP Troop B desk log for 9/4/2005;

11                  9.   LSP handwritten station log for September 4,

12  2005.

13                  Counsel, am I correct that these are

14  stipulations of fact?

15              **MS. CHUNG:**  Yes, Your Honor.  Except for No. 6, which

16  you had asked about.  I just double-checked.  It says Jose

17  Holmes instead of James Brissette.  I apologize, Your Honor.

18              **THE COURT:**  I thought so.  That's why I stopped.

19                  I'll read it again.

20                  This document has been stipulated to as to its

21  authenticity, but not it's admissibility.  And No. 6 on that

22  list, which I paused on was:  Autopsy reports with diagrams of

23  Ronald Madison and --

24              **MS. CHUNG:**  James Brissette, Your Honor.

25              **THE COURT:**  -- James Brissette.

1           Okay.  That's what I thought.

2           All right.  Counsel, is there a stipulation?  Is

3   that correct, defense counsel?

4           MR. FLEMING:  Yes, Your Honor.

5           MR. DESALVO:  There is, Your Honor.

6           MR. LARSON:  Yes.

7           THE COURT:  Okay.  We are now at the juncture where

8   we can begin opening statements.  Before we do that, though,

9   since we're allotting the government one hour and 45 minutes

10  for its opening statement, let me ask if this is a time, given

11  that that's going to be the length of the opening statement,

12  would it be preferrable to the jury to take a short pit stop

13  now, come back in about ten minutes to begin the government's

14  opening statement?  Anybody have any feelings about that?  Once

15  we start, it will be hard to take a time-out.  Do you want to a

16  take ten-minute break here?

17          All right.  Let's take a ten-minute break and we

18  will be back at 9:40.  Please be prepared to enter the

19  courtroom.

20          THE DEPUTY CLERK:  All rise.

21          (WHEREUPON, the jury exited the courtroom.)

22          THE DEPUTY CLERK:  All rise.

23          (WHEREUPON, the jury entered the courtroom.)

24          THE COURT:  All right.  You all may be seated.

25          As I indicated, we're at the part of the trial

1   now where the attorneys are allowed to make opening statements

2   to you about what they anticipate you'll see during the course

3   of this trial.  As I said on Thursday also, and I'll remind you

4   again, that what the lawyers say in opening statements, just as

5   what they say in closing statements, are also not evidence.

6               The evidence will come from the witnesses'

7   testimony and from exhibits that are introduced into evidence

8   during the course of the case.  So what the lawyers say to you

9   is argument.  It is their impression of the case, and they're

10  going to tell you about what they think you will see during the

11  course of the trial.

12              We have previously agreed that the government

13  will be given 1 hour and 45 minutes to make an opening

14  statement.  The defendants will be, collectively, given 3 hours

15  and 15 minutes time, which they may divide up amongst

16  themselves in whatever portions they would like.

17              So we're going to go ahead and begin the

18  government's opening statement.  I will tell all counsel that

19  there is no penalty, no one will think less of you, if you use

20  less than your allotted time.

21              All right.  Ms. Bernstein, you may begin.

22              I would, also, ask counsel to please use the

23  podium in opening statements and closing statements.

24              You may begin, Ms. Bernstein.  And I'll be the

25  official timekeeper here with my trustee timer here.  I will

1  give you a one-minute warning.  Likewise, for all defendants, I

2  will give a one-minute warning if, in fact, you go up to that

3  point and then you'll have to stop.  I'll cut you off if you do

4  reach the minute of -- your last minute, if your time expires.

5          **MS. BERNSTEIN:**  Thank you, Your Honor.

6          **THE COURT:**  Go ahead.

7          **MS. BERNSTEIN:**  And I understood we could stay within

8  an arm's length of the podium.

9          **THE COURT:**  Sure, sure.

10          **MS. BERNSTEIN:**  Thank you.

11                    **OPENING STATEMENTS**

12          **MS. BERNSTEIN:**  Shoot first and ask questions later,

13  that's how this whole case got started.  These five defendants

14  sitting here are current and former NOPD officers, four of whom

15  gunned down, not one, not two, not three, but six innocent

16  people on the Danziger Bridge.

17              These defendants, Sergeant Ken Bowen, Sergeant

18  Rob Gisevius, Officer Robert Faulcon, and Officer Anthony

19  Villavaso, drove onto the Danziger Bridge and they opened fire.

20  Without warning, without so much as yelling, "Police," they

21  opened fire with assault rifles and a shotgun, mowing down an

22  unarmed family as that family huddled behind a concrete

23  barrier, wounded and confused, trying desperately to avoid the

24  shots.

25              And then that man, Officer Faulcon, traveled

1   more than half a mile clear to the other side of the bridge,
2   where he raised his shotgun one more time and he shot one more
3   innocent person through the back.  When all was said and done,
4   two innocent people lay dead on the Danziger Bridge, four
5   others seriously wounded.
6           And as soon as the shooting stopped, these four
7   defendants, guided by the fifth defendant back there, Sergeant
8   Archie Kaufman, started lying to cover it up.  They lied
9   because they knew they had committed a crime, because they knew
10  that officers are not allowed to shoot first and ask questions
11  later.
12          It all started on September 4, 2005, about a
13  week after Hurricane Katrina.  The storm had moved out, and on
14  that particular day, the sun was shining bright.  A woman named
15  Susan Bartholomew woke up that morning with hope.  Susan and
16  her extended family had suffered through the storm and its
17  aftermath.  When she saw the sun shining bright, she hoped that
18  that would be the day she'd get her family out of the city.
19          Meanwhile, 75 miles away in Baton Rouge, Andrea
20  Celestine tried every day to hold on to hope.  She had
21  evacuated before the storm, but she had been separated from her
22  mother and her little brother, 17 year old James, J.J.,
23  Brissette.  And every day she hoped that that would be the day
24  she'd get word from her mom and her brother.
25          And you all are going to meet Lance Madison, who

1    will tell you that he had hope that morning.  Lance had stayed
2    behind during the storm with his disabled younger brother,
3    Ronald Madison.  And when Lance saw what a beautiful day it
4    was, he decided that that was going to be the day he would get
5    Ronald out of the city.
6                     But a few minutes past 9:00 a.m. on that sunny
7    Sunday morning, the hopes of these families exploded together
8    on the Danziger Bridge in a seemingly endless barrage of
9    gunshots fired by NOPD officers, including these four
10   defendants.
11                    When that shooting finally stopped, young J.J.
12   Brissette was lying facedown on a pedestrian walkway on the
13   bridge.  He had bullets in his feet, in his knee, in his legs,
14   in his arms, and in the back of his head.  J.J. was dead, and
15   Andrea would never see her brother again.
16                    When that shooting finally stopped, Susan
17   Bartholomew was lying on the same walkway unable to move her
18   right arm, which had been blasted apart by an assault rifle.
19   As Susan laid there wondering what had just happened, she heard
20   the cries of her husband, her daughter, and her nephew, all of
21   whom had been shot around her.
22                    When that shooting finally stopped, Ronald
23   Madison was lying in a pool of blood, blasted through the back
24   with a shotgun.  As Ronald laid there and died in the street,
25   his older brother Lance, his protector, was arrested and taken

1    to jail.  For 25 days, Lance Madison would sit in jail accused

2    of something he didn't do, wondering whether he would ever be

3    free again.

4              And when that shooting finally stopped, these

5    four men had a very big problem; and you're going to hear that

6    they decided to make it go away, and that's where the fifth

7    defendant, Sergeant Kaufman, comes in.  Sergeant Kaufman was a

8    homicide investigator with decades of police experience and he

9    came in and helped these guys cover up what they had done on

10   the Danziger Bridge.

11             During the course of this trial, you're going to

12   hear about a massive cover-up that spans the ranks of NOPD from

13   a one-and-a-half-year rookie officer all way to a well

14   respected veteran lieutenant.  You're going to hear about a

15   cover-up that involves sworn police officers lying, writing

16   false reports, planting evidence, making up witnesses.

17             But I need to back up a little bit.  Because in

18   order to understand this case, first you need to know how all

19   those different people came to be on the Danziger Bridge at the

20   same time at a few minutes past 9:00 a.m. on that sunny Sunday

21   morning, and for that, you also need to know a little bit about

22   the geography out there.

23             For those of you who aren't from New Orleans,

24   the Danziger Bridge is a big bridge, almost three quarters of a

25   mile long, and it runs from east to west over the Industrial

1   Canal from New Orleans East into Old Gentilly.  The Danziger
2   Bridge is part of a major road that runs through New Orleans
3   East called Chef Menteur Highway, and the part of Chef Highway
4   that goes over the Industrial Canal is actually called the
5   Danziger Bridge.
6           The shooting you all are going to hear about
7   happened in two parts.  The first shooting happened at the
8   eastern foot of the Danziger Bridge, and that's where Susan
9   Bartholomew and her family and James Brissette were shot.  The
10  second shooting happened way over on the western foot of the
11  bridge, and that's where Ronald Madison was shot and killed.
12          But the story doesn't start on the Danziger
13  Bridge.  You're going to hear that there's another bridge out
14  there perfectly parallel to Danziger.  That bridge is even
15  bigger, almost a mile long.  It's called the I-10 high rise
16  bridge.
17          The picture you have in front of you on the
18  screen is an aerial photograph you're going to see on and off
19  throughout the trial.  That bridge on the right, the one with
20  the big double span at the top, that's the Danziger Bridge.
21  And those two red dots mark approximately where the two
22  shootings happened.  The dot on the right, that's the east side
23  of the bridge.
24          Can we click on that, please?
25          The picture that just came up, that's a picture

1   of the pedestrian walkway where Susan Bartholomew and her

2   family and James Brissette were shot.  The other dot on the

3   picture, the one on the left side, that's the western foot of

4   the Danziger Bridge, and that's where Ronald Madison was gunned

5   down and killed.  The other bridge in the picture, the one on

6   the left, that's the I-10 high rise bridge, and that's where

7   the story starts.

8           At a few minutes before 9:00, before the

9   shooting ever happened on the Danziger Bridge, there's a group

10  of rescue workers and police officers coming over the I-10 high

11  rise bridge from Old Gentilly into New Orleans East.  As they

12  came down the eastern side of the bridge, they heard what

13  sounded like somebody shooting up at the bottom of the bridge

14  from way down below.  One of the officers in that group,

15  Officer Jennifer Dupree, jumped out of the truck she was in and

16  she ran over to the side of the I-10 bridge and looked down.

17          And when she looked down, she saw a group of

18  African American men, two of whom had guns.  Those guys ran

19  under the I-10 high rise bridge.  And two of them, the ones

20  with guns, ran out the other side, the side facing the Danziger

21  Bridge.

22          You're going to hear that none of the officers

23  on the I-10 fired any shots at those guys, but Officer Jennifer

24  Dupree, she pulled out her radio and she kicked in a call.  She

25  said that they had taken fire on the I-10 bridge and she gave a

description of the bad guys:  One guy in a red T-shirt and one with a black backpack.

And as those guys ran off through a trailer park in the direction of the Danziger Bridge, she continued to call out their location and their description:  Two men running toward the Danziger Bridge, one in a red T-shirt, one in a black backpack.

At that same moment, several miles away at a makeshift police station on Chef Menteur Highway in New Orleans East, a group of police officers, including these defendants, heard that radio call.  About a dozen of the officers, including these four, jumped into a Budget truck and they headed out to the Danziger Bridge.

As they headed out to the Danziger Bridge that day, there were already two groups of civilians walking on the bridge.  Walking up the east side were brothers Lance and Ronald Madison; and behind them, just stepping onto the east side of the bridge, was Susan Bartholomew and her family and James Brissette.

None of those civilians was wearing a red T-shirt, and none of these civilians had on a black backpack. The civilians were minding their own business, totally unaware of that commotion going off to their left at the I-10 high rise, and totally unaware of the band of heavily armed officers barreling up behind them.

1          Walking up the east side of the bridge at that
2    moment were Lance and Ronald Madison.  Lance and Ronald come
3    from a big, loving New Orleans family.  And the Madisons had
4    gotten together before the storm and they decided to evacuate,
5    but they had a problem.  They had two little dogs, Bobby and
6    Sushi, who were like part of the family, and they couldn't find
7    a hotel that would take the dogs.  So Lance Madison, who had
8    worked all night and was tired anyway, he volunteered to stay
9    hand behind and keep the dogs at his two-story apartment.
10          But Lance had a younger brother, Ronald, who was
11   40 years old in biological years, but who had severe
12   developmental disabilities that left him the functioning age of
13   a 7-year-old boy.  And Ronald adored those dogs and couldn't
14   stand the thought of leaving them behind.  So the decision was
15   made that Lance and Ronald would stay behind together and keep
16   the dogs.
17          And you're going to hear that everyone in that
18   family fussed over Ronald and took extra special care of him.
19   But they didn't worry about leaving him behind because they
20   knew that Lance fussed over him and that Lance would keep him
21   safe.
22          The brothers rode out the storm at Lance's
23   place.  But then the levee broke and the floodwaters started to
24   rise and Lance realized he had to get Ronald out of there.  So
25   Lance Madison waded through six- and seven-foot deep water,

1  clutching the hand of the grown man he refers to as "my little
2  brother."
3              The brothers made it to dry land and they ended
4  up on Chef Menteur Highway.  They turned and they walked up and
5  over the Danziger Bridge to the dentistry office of their older
6  brother on the other side.
7              Now, you're going to hear that Lance and Ronald
8  Madison had an older brother, Dr. Romell Madison, who's been a
9  dentist here in New Orleans for -- going on 30 years.  And he
10 has a dentistry office right smack on the western foot of the
11 Danziger Bridge.  The brothers let themselves in.  And then the
12 next day, Lance waded and swam all the way back home and he got
13 Bobby and Sushi and he brought the dogs to the office.
14             Lance and Ronald didn't have a whole lot; but
15 they had each other, they had the dogs, they had a roof over
16 their heads.  They thought they were going to be safe.  But as
17 the days wore on, Lance realized he had to get Ronald out of
18 the city.  And when he woke up on September 4 and saw that sun
19 shining bright, he decided that that would be the day.
20             He and Ronald were going to go to their mom's
21 house, get bicycles and bike out of the city.  But when they
22 tried to get to their mother's house, they realized the
23 flooding was worse than they thought and they gave up and
24 turned around to head back to Dr. Romell's office.  As the
25 brothers headed up the Danziger Bridge that day, neither one

 1    was wearing a red T-shirt, neither one had a black backpack,

 2    and neither one had any idea that their lives were about to

 3    change forever.

 4              At that same moment, behind them on the Danziger

 5    Bridge was another family.  The Bartholomews, like the

 6    Madisons, are a large New Orleans family.  Susan Bartholomew

 7    lived in New Orleans East with her husband, Leonard, and their

 8    three kids:  Their 17-year-old daughter, Lesha Bartholomew;

 9    their 14-year-old son, Leonard, who also goes by "Little

10    Leonard," and the baby, 7-year-old Brandon.

11              The Bartholomews had talked about evacuating

12    before the storm, but they had Susan's extended family with

13    them, her nieces and nephews and her mother, and they only had

14    one vehicle and couldn't fit everybody in it.  So instead of

15    leaving anyone behind, the family decided to hunker down

16    together and ride out the storm.

17              But you all know the story:  The storm was far

18    more violent than anybody had anticipated, and eventually the

19    Bartholomews had to be rescued in a boat and taken away to dry

20    land.  They also ended up on Chef Menteur Highway, where they

21    finally found a hotel that could take them all in.  And they

22    packed into two rooms -- more than a dozen of them -- into two

23    rooms with no electricity, no running water, filth on the

24    floor, but at least they had each other and they had a roof

25    over their heads.

1            When Susan Bartholomew woke up on September 4th,

2    her mother was sick.  Her mom was diabetic, was vomiting and

3    needed food.  Susan knew her mom needed food and she decided

4    she was going to head to a Winn-Dixie over on the other side of

5    the Danziger Bridge, get some food for her mom and some

6    cleaning supplies for the hotel rooms.  But because that day

7    was so beautiful, a bunch of other people decided they'd go

8    along for the walk.

9            And so off they set that morning, Susan

10   Bartholomew, her husband Leonard, their daughter Lesha, their

11   son "Little Leonard," their teenage nephew, a boy named Jose

12   Holmes, and a good friend of Jose's, a boy named James

13   Brissette, who had been separated from his mother and his

14   sister and had been lucky enough to find the Bartholomews.

15           As they headed out that day, nobody in that

16   group had on a red T-shirt, nobody was carrying a black

17   backpack.  As they walked toward the bridge, they were totally

18   unaware of that commotion on the I-10 high rise off to their

19   left, they were totally unaware of the Madison brothers, whom

20   they didn't know, walking up ahead them, and they were

21   definitely unaware of the police officers coming up behind.

22           As the Bartholomews strolled onto the bridge

23   that day, pushing a shopping cart they had found along the way,

24   all of a sudden they heard shots coming from behind them.  They

25   started to scatter as they heard and felt more shots.  They

knew that somebody was shooting them from behind, but they
didn't see anyone back there.

They started to climb over a concrete barrier
that separates the roadway they were walking in from a
pedestrian walkway; and as they climbed, they continue to feel
themselves get shot.  Finally, they all made it to the other
side of that barrier, wounded and confused, and they laid there
on the ground trying to avoid more shots wondering who was
shooting at them and why.

And as they laid there, they continue to feel
more bullets rip through their flesh.  Young Lesha Bartholomew
felt bullets rip through her legs and into her stomach.  Susan
Bartholomew felt an intense pain in her right arm.  Jose Holmes
took a shotgun blast to the face.  Big Leonard got shot in the
back of the head.  And poor James Brissette got riddled with
bullets from head to toe and was lying on that walkway dead.

When the shooting finally stopped, after what
seemed like an eternity, they were all lying there.  And Jose
was lying on the walkway, looking up through blood on his face
from that shotgun blast, and Jose finally saw who was shooting
him.  Jose saw a man walk over to that barrier, lean over and
point a gun at Jose's stomach.  The man fired.  Jose clenched
his stomach and he reminded himself to breathe.  And then Jose
started to pray.

You're going to hear that the only person in

1   that Bartholomew family who saw what happened that day was

2   Little Leonard.  As the family walked toward the bridge, Little

3   Leonard, in typical 14-year-old fashion, had dillydallied and

4   fallen behind.  As his family walked up ahead of him, all of a

5   sudden Leonard heard a vehicle careening up behind him and he

6   turned just in time to see a big rental truck zoom past.

7                But when that truck went past, Little Leonard

8   saw, hanging out of the passenger side window, the barrel of a

9   rifle; the barrel of a rifle pointed ahead at him and his

10  family on the bridge.  Before Little Leonard could make any

11  sense of that, gunfire erupted.  Leonard and his family jumped

12  over that concrete barrier.  And Leonard will tell you that he

13  got down and he covered his head while the shots continued to

14  ring out.

15               And when the shots finally stopped, after what

16  seemed like forever, Little Leonard peeked up and he looked for

17  his family on the bridge.  And he'll tell you he saw his family

18  lying there on the walkway surrounded by police officers

19  pointing guns at them.  Just as Little Leonard was about to

20  jump and say, "No, don't shoot.  They didn't do anything

21  wrong," the gunfire erupted again, and this time Little Leonard

22  turned and ran.  He ran for his life back down the bridge the

23  way they had just come; and as he ran, two bullets whizzed by

24  him but missed.

25               At the bottom of the bridge, Little Leonard was

 1    tackled by a police officer and taken into custody.  Little
 2    Leonard was taken away from the bridge that day not knowing
 3    whether his mother was dead or alive, not knowing whether his
 4    father, his sister, his cousin, and James Brissette were dead
 5    or alive.
 6                When the police started shooting at the
 7    Bartholomews at the bottom of the bridge that day, Lance and
 8    Ronald were walking up the bridge and they also heard the
 9    shots.  And they also turned around to see who was shooting,
10    but the only people behind them were the Bartholomews, a group
11    of six tiny-boned people, all of whom looked to Lance Madison
12    like they could be teenagers.
13                Lance Madison had no way to know that those
14    shots were coming from a Budget truck a block beyond the
15    Bartholomews.  He thought the Bartholomews were shooting at
16    him.  And he yelled to his brother, he yelled, "Run," and Lance
17    and Ronald Madison took off toward the crest of the bridge.
18                As they ran they continued to hear more shots
19    behind them.  And when Lance turned around again, he saw that a
20    big truck had appeared out of nowhere and that men in black had
21    gotten out of the truck and were shooting at those teenagers.
22    "Run," he told Ronald, and the brothers continued to run.
23                But as they ran, Lance suddenly realized that
24    those men in black weren't just shooting at the teenagers, they
25    were also shooting at Lance and Ronald.  And the way Lance

 1   realized that was that he saw Ronald, running in front of him
 2   in a white shirt, all of a sudden had blood on his shoulder,
 3   and the blood started to expand and Lance realized Ronald had
 4   been shot.
 5            He encouraged Ronald, "Keep running," and they
 6   ran up and over the crest of the bridge and started down the
 7   long western side of the Danziger Bridge.  When they finally
 8   made it to the bottom of the bridge, Lance Madison turned into
 9   the open breezeway of a motel that was right next to their
10   brother's office.  Lance ran into that motel to try to get help
11   for his brother; and as Lance ran, he had no idea what was
12   happening behind him.
13            He had no way to know that at that very minute
14   there was a car speeding down the west side of the Danziger
15   Bridge with three NOPD officers with their guns at the ready;
16   he had no way to know that as Ronald turned to run behind him
17   into that motel breezeway, that man, Officer Robert Faulcon,
18   would raise a shotgun, point it at Ronald's back, and boom,
19   fire.  Ronald Madison, who was unarmed, already wounded,
20   disabled, and running away, was blasted through the back and
21   fell to the ground.
22            But Lance Madison, having no idea that his
23   brother had just been shot behind him, continued to run,
24   looking for help.  Lance finally saw a state trooper, whom he
25   thought was National Guard, and he ran up for help.

1          But unknown to Lance, the NOPD officers had

2     already told the state police that they were looking for a man

3     fitting Lance's description who had tried to kill police

4     officers.  So the troopers put Lance under arrest and they

5     turned him over to NOPD.  Lance Madison was taken away that day

6     unsure of what had happened to his little brother, not knowing

7     what had happened to the little brother he adored and had

8     promised to keep safe.

9          You're going to hear about what happened on the

10    bridge that day from the victims, but you're also going to hear

11    from some of those officers who were in the Budget truck.

12         You're going to meet former Officer Mike Hunter

13    who was driving the Budget truck that day.  Mike Hunter will

14    tell you that when Jennifer's Dupree's call initially came out,

15    he and a bunch of other officers were sitting at that makeshift

16    police station, they heard the call, and about a dozen of them

17    grabbed their guns and they went and jumped into the Budget

18    truck and they started to head out to the Danziger Bridge.

19         As they drove out to the bridge, Mike Hunter was

20    driving, and sitting next to him in the big cab of that truck

21    was his supervisor, Sergeant Ken Bowen.  The other officers

22    were all in the back of that panel truck with a collection of

23    high-powered weapons.  As they drove toward the bridge that

24    day, while they were still a ways off, Mike Hunter saw in the

25    distance a group of civilians walking on the bridge.  The

1   civilians were, in his words, "walking casually on the bridge."

2                   Even though none of those civilians had on a red

3   T-shirt and none carried a black backpack, Mike Hunter and

4   Defendant Bown thought that those were the people who had

5   previously shot over at the I-10.

6                   As they approached the bridge, Mike Hunter had

7   his NOPD-issued handgun out the driver's side window, and next

8   to him in the passenger seat, Defendant Bowen was clutching an

9   AK-47, a high-powered assault rifle.

10                  Mike Hunter fired first.  Mike Hunter is going

11  to tell you at that point he made the worst decision of his

12  life.  He's pled guilty to two felonies because of what

13  happened next and he's been sentenced to serve eight years in

14  federal prison.  Mike Hunter has agreed to come talk to you and

15  tell you about what happened on the bridge that day and to tell

16  you about the cover-up that followed.  And he'll tell you that

17  he hopes his judge will take some time off of his sentence for

18  his cooperation.

19                  He's also going to tell you that what he did and

20  saw that day was awful.  Here's what Mike Hunter is going to

21  tell you:  As he fired his gun out the window, those people in

22  the road started to scatter.  As the truck moved closer, they

23  started to climb over a concrete barrier.  Mike Hunter

24  continued to drive, and he drove up and stopped short just

25  behind where those people had disappeared behind the barrier.

1   And when he stopped, he noticed Defendant Bowen standing in the
2   cab of the truck next to him from way on high pointing that
3   assault rifle down toward the walkway and firing.

4            Mike Hunter saw an older man poke his head up on
5   the other side and saw Bowen fire at him and hit the concrete
6   wall.  As Bowen continued to fire into the walkway, Mike Hunter
7   climbed down out of the driver's seat and ran up to the front
8   of the truck.  He focused his attention on people running away
9   toward the top of the bridge.

10           And Mike Hunter will tell you that even though
11  those people were running away, were unarmed, and posed no
12  threat, Mike Hunter used his NOPD-issued handgun and he fired
13  in their direction as they ran.  And as Mike Hunter fired at
14  those people who were running away, he wasn't alone.  There was
15  another officer standing next to him.  Defendant Gisevius, a
16  supervisor like Defendant Bowen, had run out of the back of the
17  truck, had run up to the front and was also shooting at those
18  people as they ran away.

19           But Defendant Gisevius wasn't using his
20  NOPD-issued handgun.  He was standing there with an M-4, a
21  high-powered assault rifle, shooting at the backs of Lance and
22  Ronald Madison as they ran.  As the Madisons ran out of range,
23  Mike Hunter turned his attention to what was happening over on
24  the passenger side of the truck.  He could hear shots coming
25  from over there, but he couldn't see what was happening.

1          He walked around the front of the truck so he

2     could see what was happening on the passenger side and he saw

3     Defendant Bowen and the other officers lined up by that

4     walk- -- line up by the barrier pointing guns over the walkway.

5     Some of them were firing.  Mike Hunter gave a signal and he

6     yelled, "Cease fire, cease fire."  To his surprise, the command

7     worked, the shooting went silent.

8          Mike Hunter walked up to that barrier and he

9     looked over to see what was on the other side and he saw the

10    Bartholomews and Jose Homes and James Brissette lying on the

11    ground, curled up defensively, unarmed, posing no threat.  And

12    then Mike Hunter will tell you what happened next.

13         After a pause in the shooting that lasted almost

14    five seconds, Defendant Bowen, inexplicably, leaned over that

15    concrete barrier, held out his AK-47 and started firing

16    indiscriminately at the people on the ground.

17         And even though Mike Hunter couldn't see what

18    was happening just on the other side of Defendant Bowen, you're

19    going to learn that on the other side of Defendant Bowen, at

20    that very same moment, just as the silence is broken by the

21    sound of Defendant Bowen firing into that walkway, you're going

22    to see Defendant Gisevius standing at that same barrier,

23    lifting his rifle left-handed and firing down into the walkway.

24         A few minutes later, after the shooting finally

25    stopped for good on the east side, the officers heard a radio

1    call.  Remember, Officer Jennifer Dupree is still back over
2    there on the I-10 high rise.  From where she was on the I-10
3    high rise, she could hear the shooting, but she couldn't see
4    who was doing what on the Danziger Bridge.  But even from that
5    distance, she could see two little people running away down the
6    west side, Lance and Ronald Madison.

7              Not knowing what role, if any, they had in the
8    shooting she had just heard, again, she pulled out her radio
9    and she kicked in a call, "Two people are getting away.  One in
10   a black T-shirt, one in a white T-shirt."

11             Mike Hunter and Defendant Bowen jump back in
12   that Budget truck and they headed off up the bridge.  When they
13   got to the top of the bridge, they got out and they joined up
14   with other officers who had by then run up the east side.
15   While they were there on the top of the bridge, all of a sudden
16   a Louisiana State Trooper drove on the bridge responding to
17   those NOPD calls for assistance.

18             When he got to the top of the bridge, three NOPD
19   officers jumped in the car with him, Defendant Gisevius,
20   Defendant Faulcon, and Mike Hunter.  They jumped in the car and
21   the car started speeding down the west side of the bridge,
22   going after Lance and Ronald Madison, who by then were almost
23   to the bottom.  As the car sped down the bridge, Mike Hunter
24   saw Lance Madison run into that motel breezeway, and he got a
25   good look at Ronald Madison, who was already injured, had

1    nothing in his hands, and was running away from the police
2    after his brother.
3              Just as Ronald Madison turned into that motel
4    breezeway, all of a sudden, without warning or provocation,
5    boom, Defendant Faulcon shot Ronald Madison through the back.
6    Ronald Madison crumpled to the ground and Mike Hunter ran over
7    and stood over him and saw that he was still alive, moaning and
8    wheezing and trying to breathe.
9              A few minutes later, Defendant Bowen ran up and
10   he looked down at Ronald Madison on the ground and he said, "Is
11   that one of them?"  And then Defendant Bowen began to stomp on
12   Ronald Madison as hard as he could as Ronald laid there
13   crumpled and dying in the street.
14             A few minutes later, after Mike Hunter had
15   stormed off, Defendant Bowen came up to him and apologized for
16   what he had done to Ronald Madison.  And then he asked Hunter,
17   "Are you okay with what happened on the east side?"  And Mike
18   Hunter will tell you that even though what happened on the east
19   side was not okay -- was not okay at all -- Mike Hunter didn't
20   do anything about it.  Starting at that very minute, Mike
21   Hunter joined Defendant Bowen and all of those other officers
22   in an agreement to cover up the atrocities that he had seen and
23   participated in on the bridge.
24             I want to talk to you in a minute about that
25   cover-up.  But first, I want to talk to you about one more

1   piece of evidence that you're going to see that relates to that

2   shooting on the east side where the Bartholomews and Jose

3   Holmes and James Brissette were shot.

4              You're going to learn that part of that shooting

5   was actually captured on videotape.  It turns out there was an

6   NBC cameraman over there on the I-10 behind those rescue

7   workers and police officers.  And you're going to learn that

8   even though a person standing on the I-10 with a naked eye can

9   barely make out vehicles, let alone people, way over there on

10  the Danziger Bridge, that camera had a zoom lens.

11             And you're going to see at a few minutes to

12  9:00, before that shooting ever happened on the Danziger

13  Bridge, that camera was pointed over to the Danziger Bridge and

14  zoomed all the way in.  And you're going to see that it found

15  three people:  Three of the Bartholomews, doing just what they

16  said, strolling along, pushing a shopping cart, heading to that

17  Winn-Dixie over on the other side.

18             Then the camera shuts off.  And by the time it

19  comes back on, the shooting has already started.  And you'll

20  see the camera sort of go up in the air and around, looking for

21  the sources of those shots.  And by the time the camera finally

22  settles, pointed in the direction of the Danziger Bridge, it's

23  zoomed all the way out.  And all you'll see is a tiny Budget

24  truck still moving along toward the bridge as the shots

25  continue to ring out.

1          The camera zooms in, but by the time it gets

2     there, all you can see is the Budget truck and a couple

3     officers.  By that time the Bartholomews have disappeared over

4     the walkway, and Lance and Ronald Madison have disappeared up

5     the bridge.  So you'll just see the Budget truck and you'll see

6     a couple officers.

7          You'll see Defendant Gisevius in his dark blue

8     battle dress uniform, and you'll see him run out of the back of

9     the truck, run to the front and stand there with his rifle

10    shooting up the bridge.  Next to him you'll see Mike Hunter in

11    his baby blue NOPD shirt.  You'll see him climb out of the

12    truck, run out to the front, and see him standing there

13    shooting his gun up the bridge.

14         Then you'll see Mike Hunter go around to the

15    passenger side, just like he says, and right when he says he

16    gives that "cease fire" command, you'll hear the shooting go

17    silent.  You'll hear a pause that lasts almost five seconds,

18    the five seconds when Mike Hunter says he's looking over that

19    barrier at people who are unarmed, injured, posing no threat;

20    and during that five-second pause, you'll see the camera pull

21    out and then start to zoom back in.

22         And as it starts to zoom back in, you'll see

23    Defendant Gisevius, still out there in front of the truck, and

24    if up watch that part closely -- it's a grainy video -- but if

25    you watch closely, you'll see Defendant Gisevius walk over

1    toward the barrier, toward the side of the road, and you'll

2    know he's right up near the barrier because you'll see his

3    shadow appear on the concrete.

4                 And then just as the silence is broken, as the

5    silence is broken by the sound of Defendant Bowen shooting over

6    that barrier, you're going to see on that grainy videotape as

7    Defendant Gisevius, who is left-handed, lifts his rifle up over

8    the barrier and also shoots down.

9                 Now, even though there's an awful lot that isn't

10   on that videotape, and even though the quality isn't very good,

11   that tape is going to be an important piece of evidence for

12   you.  Because you're going to have a chance to compare what you

13   see on that tape to what you hear these defendants said

14   afterwards.

15                I'm going to talk to you in a minute about some

16   of the specific stories the defendants told afterwards.  But

17   first of all, I want to give you the overview, the official

18   version of what happened on the bridge that day, the false

19   account encapsulated in the official report written by

20   Defendant Kaufman.

21                It goes something like this:  "Police officers

22   responded to the bridge that day and they saw a big group of

23   civilians.  The police drove up and they yelled, 'Stop.

24   Police.  Show us your hands.' But instead of stopping, the

25   civilians broke into two groups:  One group, the Madisons, ran

1    up the bridge, all the while turning and shooting at police
2    officers behind them; the other group, the Bartholomews, jumped
3    over the concrete barrier as they pulled out guns and they used
4    that barrier as a barricade to continue shooting at police.
5              "The police officers, fearing for their lives
6    and the lives of their fellow officers, returned fire and
7    neutralized the threat."
8              That's the false account in Defendant Kaufman's
9    report, and it's the false account that every one of the
10   shooters went along with.  But you're going to see that video.
11   And on that video you're going to see Mike Hunter and
12   Defendant Gisevius standing in the roadway, not taking cover,
13   not ducking and dodging, standing there firing up the bridge.
14             And when you see that, you're going to have to
15   ask yourself, "Does it look like these men are in a gun battle
16   coming under heavy fire," as the cover story says, or, "Does it
17   look like they're shooting at the backs of people running
18   away," like Mike Hunter will tell you?
19             And you're going to learn that that video isn't
20   the only problem with the cover story.  You're going to hear
21   that from the very beginning that cover story had a very big
22   problem, which was that the story was going to be that
23   civilians were shooting at police officers and the police
24   officers fired back, but there were no guns for the civilians
25   to have used.

1            And the officers couldn't just say the civilians

2   ran off with the guns, because the civilians were right there:

3   Susan Bartholomew, Leonard Bartholomew, Lesha Bartholomew, Jose

4   Holmes, and poor dead James Brissette, sprawled out in that

5   walkway with no guns; and Little Leonard, who turned and ran

6   down the bridge and was taken into custody right there, with no

7   gun; and way over on the other side of the bridge, Ronald

8   Madison, lying dead in the street, with no gun; Lance Madison,

9   taken into custody with no gun.

10           You're going to hear that the police collected

11  exactly zero guns that day.  And you're going to hear something

12  else that might seem obvious to you, which is that when a bad

13  guy shoots at the police, the gun that bad guy uses is a

14  critical piece of evidence, a critical piece of evidence that

15  the police are sure to collect right away.  Because that gun

16  proves that the bad guy did wrong and it proves that the

17  officers are in the clear.

18           But that day on the Danziger Bridge, five people

19  lying in the walkway, no gun; Little Leonard, no gun; two

20  people on the west side, no gun.

21           Another thing you're going to hear about the

22  cover-up is that it actually aimed to do more than just keep

23  the police out of trouble.  Because the only way to keep the

24  police out of trouble was to say that they fired in self

25  defense.  But the flip side to that is that they had to say

1   that civilians fired first at the police.  And you're going to

2   hear that when civilians fire at the police, they have very

3   serious legal problems.

4           So part of the cover-up was to make sure that

5   two innocent people, Lance Madison and Jose Holmes, got charged

6   for trying to shoot at police officers.  Charges that, if they

7   stuck, would completely destroy two more lives.

8           You're going to hear about the cover-up from

9   people who were part of it.  And I'm not going to talk about

10  all of them, but I want to flag for you two of the people

11  you're going to hear from.  There were two people who were part

12  of the cover-up who had nothing do with the shooting, but

13  helped cover it up afterwards.  Those two people are former

14  Lieutenant Mike Lohman, who was Defendant Kaufman's supervisor,

15  and former Detective Jeffrey Lehrmann, who was Defendant

16  Kaufman's underling, his good buddy and right-hand man.

17          Lohman and Lehrmann are both going to tell you

18  about this cover-up.  They're going to tell you about how the

19  false stories were created and grew over time, and how they

20  changed over the course of eight months until Defendant Kaufman

21  finally submitted his official report to the District

22  Attorney's Office in May of 2006.

23          Let's start with Mike Lohman.  Lohman was a high

24  ranking officer, a well respected lieutenant in the 7th

25  District at the time of the shooting.  Lohman wasn't there for

1  the shooting, but he responded to the bridge right afterward

2  and he saw five people lying in the walkway shot full of holes.

3  He saw that the people looked like a family, that they were

4  shot, and that there were no guns.

5           Mike Lohman, a man with years of police

6  experience, concluded that that was a bad shoot, an unjustified

7  shooting.  He talked to the two supervisors who had been

8  involved in the shooting, Defendant Bowen and

9  Defendant Gisevius.  When they gave him stories that didn't add

10 up, he said to them, "You know, you all go get your story

11 straight, go decide what happened, and then come back and tell

12 me."

13          And he talked to Defendant Kaufman and assigned

14 him to write a report about the incident.  And he'll tell you

15 that when he assigned Defendant Kaufman to write that report,

16 he fully expected and intended that Defendant Kaufman would

17 help these other guys cover up what had happened.

18          But he'll tell you that he thought that Kaufman

19 and the other guys were going to come up with a cover story on

20 their own and all Lohman would have to do is just look the

21 other way and sign off.  But he'll tell you it turned out not

22 to be that easy.  Because when he finally got a report from

23 Defendant Kaufman, the cover story in that report didn't make

24 any sense.  Mike Lohman will tell you it didn't even pass the

25 laugh test.  And so he eventually had to help Defendant Kaufman

1   write more versions of the report to try to make that cover

2   story hold together.

3            Mike Lohman will tell you that he's pled guilty

4   to a conspiracy and that he fully expects to go to prison for

5   what he did and helped other people do.

6            The other guy you're going to hear from is Jeff

7   Lehrmann.  Because remember, he was Defendant Kaufman's

8   underling.  Jeffrey Lehrmann is going to tell you that he also

9   played a significant role in the cover-up.  He helped

10  Defendant Kaufman, Bowen, Gisevius, and the other officers come

11  up with their false stories.

12           Now, I expect, when the defense attorneys stand

13  up and talk to you, you're going to hear quite a bit about

14  Lohman and Lehrmann being liars; liars who have made deals with

15  the government to save their own skin.  You're going to hear it

16  from them, but you're going to hear it from me first; and

17  you're also going to hear it from the witnesses themselves,

18  because they're going to tell you they lied.

19           They're going to tell you they lied for four

20  years.  They lied to make it look like police officers did

21  nothing wrong; they lied to make it look like innocent people

22  had tried kill police; they lied as part of an agreement to

23  cover up what happened on the Danziger Bridge.  And they're

24  also going to admit to you that when they finally came forward,

25  it was only because they were caught and they wanted to try to

1    help themselves.

2              But they're also going to tell you that once

3    they were caught, they spilled it all.  They talked about their

4    own role in the cover-up, and they talked about the roles of

5    everybody else.  They talked about Defendant Kaufman being the

6    point man, the guy who was responsible for putting it all down

7    on paper.  He was the guy in charge of the story.

8              And they talked about the other supervisors,

9    Defendant Bowen and Defendant Gisevius, who helped come up with

10   that false story, but they were also the leaders among the

11   troops.  Their job was to make sure the other guys knew the

12   story and knew to stick to it.

13             And then there are the guys without rank,

14   including Officers Faulcon and Villavaso.  They also had a very

15   important role.  Their role was to make sure they knew the

16   story and went along with it.  Because you're going to hear

17   that if even one person refused to go along with the story, it

18   would all crumble.  But no worries there, everybody went along

19   with the false story.

20             You're going to hear that all of the shooters

21   gave official statements on audiotape about what happened on

22   the bridge that day; and when they gave their versions of what

23   happened, they all stuck with the false story.

24             You're also going to hear about a meeting that

25   happened the day they gave their official statements on tape.

1    It was a meeting where the leaders of the conspiracy met with
2    the followers of the conspiracy and they got together and they
3    talked about the false statements.

4              Everybody was there for that meeting, everybody
5    except Defendant Faulcon who had by that time quit NOPD and
6    moved to Texas.  He gave his false statement later, and he also
7    went along with the false story.  But that day that everybody
8    else gave their statements, beforehand everybody met.

9              And you're also going to hear the name of
10   somebody else who met with them, a guy who was part of the
11   cover-up, but who isn't on trial here today, and his name is
12   Sergeant Gerard Dugue.  You're going to hear that he eventually
13   signed off on that official false report, along with Defendant
14   Kaufman.

15             And when these people met beforehand to talk
16   about what they were going to say in their false stories, they
17   didn't meet out in the open.  You're going to hear that they
18   met in an abandoned and gutted-out building that used to be
19   used as a police station.  They talked about what they were
20   going to say, they got their stores straight, and then they
21   went their separate ways and they gave their false statements
22   on tape.

23             I want to talk now about some of the specifics
24   of the cover-up.  There are so many details, so many parts, I
25   can't possibly warn you about them all.  So instead I'm going

1    to give you a heads-up about just three things.  I'm going to

2    talk to you about a planted gun, made up phoney eyewitnesses,

3    and fake reports.

4              The planted gun.  Remember, I said none of the

5    civilians had any guns that day and the police officers

6    collected exactly zero weapons.  But when you see

7    Defendant Kaufman's official report, you're going to see that

8    he talks in there about a gun, about a Colt Trooper Mark

9    III revolver that Defendant Kaufman logged into the evidence

10   room six weeks after the shooting.

11             You're going to see the explanation that

12   Defendant Kaufman put in the report, and you're going to hear

13   the explanation he gave the FBI about that gun.

14             Defendant Kaufman said that the day after the

15   shooting when he learned, much to his surprise, that no

16   evidence had been collected, he rushed back out there to the

17   Danziger Bridge and, lo and behold, in the grass right below

18   where the Bartholomews had been shot, he found a gun.  And he

19   took that gun and he put it in the trunk of his car, he said,

20   and he drove around for six weeks until he finally learned

21   where evidence was being collected.

22             And you're going to hear that Defendant Kaufman,

23   the experienced homicide investigator, told the FBI that when

24   he found that gun, he saw a bunch of other evidence there on

25   the ground with it, casings and such, but he just left that

1    evidence there and he picked up the gun and he rode around with

2    it for six weeks.

3              Now, when you hear that story, you might think

4    it sounds made up, and you're going to hear that it is.  You're

5    going to hear that Defendant Kaufman didn't get that gun from

6    anywhere near the Danziger Bridge.  He got that gun from a

7    storage container in his own garage.

8              Jeffrey Lehrmann will tell you he was there with

9    Defendant Kaufman when they drove to Kaufman's house and

10   Kaufman went in and got that gun.  And Mike Lohman is going to

11   tell you that Defendant Kaufman told him he was going to plant

12   a gun.  And you'll hear from officer after officer, who was

13   actually out there on the scene of the Danziger Bridge the day

14   of the shooting, who will tell you on the day of the shooting,

15   there was no gun.  But there it is in the official report, the

16   Colt Trooper Mark III .

17             The second thing I want to flag for you are

18   those made-up, phoney eyewitnesses.  When you see

19   Defendant Kaufman's official report, you're going to see that

20   he claims that there were two civilian eyewitness to the

21   shooting.  Conveniently, there was one on the east side, where

22   the Bartholomews and James Brissette and Jose Holmes were shot,

23   and there was another one over on the west side, where Ronald

24   Madison was killed.

25             According to that report, there is a guy named

1    James Youngman on the east side who supposedly saw the

2    Bartholomews shooting at the police and saw the police fire

3    back in self defense.  And according to that report, there was

4    supposedly a woman on the west side, Lakeisha Smith, who

5    claimed to have seen Ronald Madison reach for his waistband and

6    turn toward the police before the police shot at him.

7              And for good measure, Defendant Kaufman added

8    into that report that Lakeisha Smith also said that she

9    immediately recognized Lance and Ronald Madison as people who

10   had been looting and terrorizing people since the storm.  Lance

11   Madison, who had worked at Federal Express for 20 years, and

12   Ronald Madison, who was like a seven-year-old boy.

13             And even though you'll see in that report that

14   Defendant Kaufman claims that these two civilian eyewitnesses

15   could clear the officers, you're going to see that he never got

16   a detailed statement from either of them, and he never took

17   them back to the police station, and he never gave them a

18   pencil to write down what they saw, and he never even got good

19   contact information so maybe somebody could find them again

20   later.

21             And you're going to hear why Defendant Kaufman

22   never took those obvious investigative steps.  He never took

23   those obvious investigative steps because those witnesses were

24   completely imaginary, made up out of thin air.  And you're

25   going to hear how at least one of them was made up.

1            Jeff Lehrmann is going to tell you that one day

2   a bunch of officers were sitting around in that makeshift

3   police station and Defendant Kaufman was typing on the report

4   and all of a sudden Defendant Kaufman called out, he said,

5   "Hey, somebody give me a name."  Jeff Lehrmann will tell you

6   that he shouted out the first name he thought of, he said,

7   "Lakeisha."  Defendant Kaufman typed, and so was borne Lakeisha

8   Smith, a key police witness in the Danziger Bridge case.

9            The third thing I said I wanted to flag for you

10  was fake reports.  Now, that might be a little bit confusing

11  because you're going to hear that the official report in this

12  case is one big fake.  But when I'm talking now about the fake

13  reports, I'm talking about something different.  I'm talking

14  about three different versions of that report that were never

15  turned in; versions that had input from Defendant Kaufman,

16  Defendant Bowen, Defendant Gisevius, Mike Lohman, Jeff

17  Lehrmann.

18            When you see these fake reports, you're going to

19  see how the false story changed and evolved over time.  And

20  you're going to get a narration of that evolution from Mike

21  Lohman.  When you see those reports, you're going to see how a

22  bunch of stories change.  And, again, I don't have time to flag

23  them all for you, but I'm going to give you one "for instance."

24  I want to talk to you about the story that Defendant Bowen was

25  going to tell about what happened on the bridge.

1            From the moment the gunfire stopped, the

2    officers had a problem, and that was that they had to say that

3    civilians fired at them first, but there were no guns.  So

4    you'll hear the story that Defendant Bowen came up with to

5    explain that.

6            Defendant Bowen was going to say that the

7    civilians fired at them, they fired back, and then

8    Defendant Bowen saw the guns lying on the walkway and he kicked

9    them off the bridge to keep everybody safe.  Then

10   Defendant Bowen said he ran down the bridge to a grassy area

11   under the bridge.  And when he was in the grassy area, he saw

12   the guns there in the grass.

13           Mike Lohman is going to tell you that story

14   didn't make any sense because no guns were collected.  And

15   nobody would believe that a police officer stood over guns that

16   would clear him and his fellow officers and fail to pick them

17   up.  Not even Hurricane Katrina could explain that.  So that

18   story had to change, and Defendant Bowen did change his story.

19           You'll see that in his official report.  When he

20   gave his official version of what happened, he said that the

21   civilians shot at him and he saw the guns lying on the walkway,

22   he kicked the guns off the bridge, and then he saw Lance and

23   Ronald Madison running up the bridge, so he immediately went

24   off after them.  In his official report, he leaves out --

25   completely leaves out that nonsensical part about running down

1    into the grass.

2            And that leads me to another important point I

3    want to make.  You've heard me say a couple times now that this

4    cover-up was extensive, and it was.  But that doesn't mean it

5    was good.  Even Mike Lohman, who played a significant role in

6    the cover-up, is going to tell you it was ridiculously sloppy.

7            He's going to tell you that Defendant Kaufman

8    and Defendant Bowen were so overly confident in their cover-up

9    that they were cavalier.  And so you'll see sometimes when

10   stories change, Defendant Kaufman was either too lazy or too

11   over-confident to go back and make sure he cleaned up behind

12   himself.

13           So sometimes both stories are actually in there.

14   Take, for example, the story that Defendant Bowen was going to

15   tell.  When you see Defendant Kaufman's official report, you're

16   going to see that early on in the report it says that Bowen

17   went down under the bridge and stood in the grass and saw the

18   guns.  And then later in the report, it gives the official

19   version, that he saw the guns and then went straight up over

20   the bridge.  Both versions are actually in the report.

21           And you're going to hear an explanation for

22   that:  Hurricane Katrina.  Not as you might expect, because the

23   hurricane made it impossible to do a good investigation, but

24   rather because these defendants thought that they could just

25   blame Hurricane Katrina.

1      They were cavalier because they thought they

2  didn't have to bother dotting any I's or crossing any T's

3  because they thought nobody was going to question this; nobody

4  was going to question them after the storm; and that as long as

5  they generally stuck together and said civilians fired first

6  and officers fired back, nobody was going to look at this and

7  nobody would ever be the wiser.

8      Now, before I leave off the fake reports,

9  there's one other thing I want to ask you to look for.  When

10  you see those fake reports, I want you to look for a name:

11  Leonard Bartholomew, Jr.  Remember Little Leonard who turned

12  and ran down the bridge and was taken into custody right there

13  at the bottom of the bridge?  When you see Defendant Kaufman's

14  official report, you're going to see that Little Leonard's name

15  isn't in it.

16      An investigator reading Defendant Kaufman's

17  report would have no way to identify that witness, that kid who

18  saw what the police did to his family on the bridge.  And,

19  again, you're going to hear the explanation that

20  Defendant Kaufman gave the FBI.  He told the FBI that, "That

21  kid's name wasn't in my report because, by gosh, I didn't know

22  it."  He told the FBI that he only learned six months later

23  that maybe -- maybe -- that kid was actually related to the

24  people who were shot on the bridge.

25      But those fake reports are going to tell you a

1   different story.  When you see the very first report that
2   Defendant Kaufman wrote and submitted to his supervisor, right
3   there in his very first report, you're going to see a name,
4   Leonard Bartholomew.  And as those reports evolved and made it
5   to that official final report, that witness' name was taken
6   out.
7                   I want to switch gears now and talk about the
8   indictment.  But before I do that, I want to say one other
9   thing, and that's that there are -- there are so many parts to
10  this story, I can't possibly tell you about them all in an
11  opening.  There are a lot of things that you're going to hear
12  from the witnesses when they take the stand.
13                  For example, you're going to hear about a guy
14  who was out there on the bridge pretending to be a police
15  officer that day.  You're going to hear that there were people
16  who went along with the false story and later admitted that
17  they lied.  There are a lot of little pieces like that that
18  you're going to hear from the witnesses once they take the
19  stand.
20                  But right now I want to talk about the
21  indictment.  The indictment has 25 counts against these five
22  defendants, and those counts basically fall into four separate
23  categories.
24                  The first category are charges that relate to
25  the shootings and to Defendant Bowen's stomping on Ronald

1  Madison.

2              The second category are conspiracy charges

3  related to the agreement to cover up what happened on the

4  bridge and to try to see two innocent people prosecuted for

5  something they didn't do.

6              The third category are obstruction of justice

7  counts against the shooters for those false statements that

8  they gave on audiotape.

9              And the fourth category are charges against

10  Defendant Kaufman for obstruction of justice and lying to the

11  FBI.

12              I want to talk about each one of those

13  categories in turn.

14              The first category, these are the charges

15  related to the shootings and to the stomping of Ronald Madison.

16  These are the first ten counts in the indictment.  And the

17  first ten counts charge the defendants with using unreasonable

18  force, and some of the counts charge the defendants with using

19  firearms in the commission of those crimes.

20              Now, I expect when you hear from the defense

21  attorneys today, you're going to hear an awful lot about these

22  defendants not having any criminal intent.  But before you hear

23  that, you need to know what the indictment does and does not

24  accuse them of.  Nobody has ever accused these men of waking up

25  on September 4th and deciding to kill someone.  Nobody has ever

1    accused these men of intentionally shooting the wrong people.
2    That's simply not what they're charged with, and it's not the
3    standard you're going to be asked to apply.
4              What the evidence will prove beyond a reasonable
5    doubt is that these men rolled onto the Danziger Bridge and
6    they cut loose.  They cut loose with assault rifles and a
7    shotgun, without so much as a token effort to identify
8    themselves as police, without so much as a token effort to
9    determine whether those victims posed any threat.  And the
10   evidence will show that they did that even though they knew
11   that police officers are not allowed to shoot first and ask
12   questions later.  That's the crime they're charged with.
13             Another thing you need to know about the
14   indictment is that these men are not charged for a mistake.
15   The evidence will show that they did make a mistake that day.
16   The mistake they made was to assume that anybody walking on the
17   Danziger Bridge was a bad guy; and that mistake led to the
18   crime, which was rolling out there and deciding that everybody
19   on that bridge was fair game.
20             For these counts, pay attention to the testimony
21   of the victims who will tell you they were just minding their
22   own business that day when they got shot up.  And pay attention
23   to the testimony of Mike Hunter, who will tell you, basically,
24   the same thing.  And then watch that video where you'll see
25   three of the Bartholomews doing just that, minding their own

1   business.  And you'll see police officers standing in the
2   street shooting without taking fire.
3                   And if ever for one minute you find yourself
4   wondering why police officers aren't allowed to shoot first and
5   ask questions later, and why that rule isn't suspended for a
6   hurricane, you're going to see in this case six perfect
7   examples of why:  Susan Bartholomew, Leonard Bartholomew, Lesha
8   Bartholomew, Jose Holmes, James Brissette, and Ronald Madison.
9                   I want to talk to you about what the evidence is
10  going to show with respect to each one of these defendants.
11                  Let's start with Defendant Bowen.
12  Defendant Bowen, who was up there in the front in the cab of
13  that truck, in a perfect position to see everything that Mike
14  Hunter saw.  I expect that Defendant Bowen's lawyer might tell
15  you that Bowen only fired because Mike Hunter fired first and
16  he fired automatically.  And when you hear the evidence, I want
17  you to think about that.  Because the evidence is going to show
18  that when Mike Hunter fired first, he was arm's length away
19  from Defendant Bowen and that truck was still about a block
20  from the victims.
21                  And then that truck drove up onto the bridge
22  and, without warning, without yelling any commands,
23  Defendant Bowen fired out to the right and down into the
24  walkway.  And he continued to fire from up there in the truck.
25  And then he got down and he continued to fire.  And then even

1  after that five-second pause, the five-second pause when Mike

2  Hunter is looking at those people, unarmed, curled up on the

3  ground, Defendant Bowen leaned over and he fired again.

4              And, of course, Defendant Bowen still wasn't

5  done.  Because he still had to run almost three-quarters of a

6  mile over to the other side of the bridge where he stomped on

7  Ronald Madison as Ronald lie dying in the street.

8  Defendant Bowen's own words, his own angry words right before

9  he stomped on Ronald Madison, "Is that one of them?"  Those

10 words will tell you why he did what he did.  That's a crime.

11             Defendant Gisevius.  Defendant Gisevius who got

12 out of the back of the truck and ran directly up to the front

13 and started shooting at the backs of Lance and Ronald Madison

14 as they ran away.  You're going to see Defendant Gisevius on

15 that tape.  You're going to see him shooting up at the

16 Madisons.  And then you're going to see him on that grainy tape

17 as he walks over to the barrier and after that five-second

18 pause, the five-second pause when the defendants [sic] are

19 lying there helplessly, you're going to see him lift his gun up

20 left-handed and fire over the walkway.

21             And you're going to hear medical testimony that

22 Defendant Gisevius hit his targets.  One of Defendant Gisevius'

23 bullets ripped into James Brissette's leg, as Brissette lay on

24 his back defenseless on the walkway.  Another one of

25 Defendant Gisevius' bullets ripped into Susan Bartholomew's

1   leg.

2             And that actually brings me to another point I

3   want to make.  When the judge was reading the indictment in the

4   beginning today, you might have heard that these defendants are

5   charged with aiding and abetting each other in the shootings on

6   the east side where the Bartholomews and Jose Holmes and James

7   Brissette were shot.  I'm not going to talk about the law now

8   because there's going to be lots of time for that at the end of

9   the case.

10            But the importance for you of aiding and

11  abetting, as you hear the evidence, is that even though you're

12  going to hear testimony about whose bullets ended up in which

13  victims, those details don't really matter.  Because if you

14  find that these defendants all shared their intent, that they

15  all intended to shoot first and ask questions later, then

16  legally each one of them is responsible for every bullet fired

17  at that family.

18            Coming back to Defendant Gisevius for a minute.

19  You're going to see him on that videotape.  You're also going

20  to hear him on the audiotape of that official statement that he

21  gave.  You're going to hear when Defendant Gisevius is asked to

22  give a narrative of everything that happened on the bridge, and

23  you'll hear him give a narrative where he completely leaves out

24  that he ever fired a gun.

25            Not knowing that he was on videotape shooting on

1    the bridge, Defendant Gisevius gave an account where he left

2    out everything that mattered.  He left out that he fired at the

3    Madisons up the bridge.  He left out that he fired down over

4    the walkway.  He left out that he ever had a rifle.  And he

5    left out that he ever fired one single time any gun on the

6    bridge.

7              And you'll hear him on the tape as he's asked

8    specifically, "Did you fire your weapon," you'll hear him --

9    hear his answer, "No.  I did not fire my service weapon, no."

10   Then he's asked whether he's told everything he knows.  And

11   after giving that statement where he leaves out everything that

12   matters, he says, "Yes."

13             Shoot first, deny it all later, that's a crime.

14             I want to talk about Defendants Faulcon and

15   Villavaso.  They're both charged with aiding and abetting the

16   shooting on the east side.  And Defendant Faulcon, of course,

17   is charged with shooting and killing Ronald Madison over on the

18   west side.

19             Now, with respect to the east side shooting,

20   these two are in a little different situation than Defendants

21   Bowen and Gisevius.  They weren't sitting up front in a perfect

22   place to see everything like Defendant Bowen, and they didn't

23   get out and immediately run up front like Defendant Gisevius.

24             They were in the back of that panel truck.  When

25   the shooting started, they couldn't see what was going on.

1  These two men got out of the back of the truck with their guns
2  at the ready.  That wasn't a crime.  The crime was what they
3  chose to do next.
4                    Defendant Faulcon got out of the truck with his
5  shotgun and he immediately went over to the passenger side over
6  to that barrier.  And instead of assessing the situation,
7  instead of looking at Susan and Leonard and Lesha and Jose and
8  James and deciding whether they posed any threat,
9  Defendant Faulcon got out with his shotgun and he fired, and
10 then he pumped and he fired, and he pumped and he fired, and he
11 pumped and he fired.  He fired that shotgun at least four
12 times.
13                    You're going to hear that six weeks later, when
14 evidence was collected, there were four shotgun shells on the
15 east side and every single one of them matched back to
16 Defendant Faulcon's gun.  And as those seconds ticked by and as
17 he was firing his shotgun, he was looking at the Bartholomews
18 and Jose Holmes and James Brissette lying on that walkway,
19 unarmed, posing no threat.  And you're going to hear that
20 Defendant Faulcon wasn't just shooting wildly, he was hitting
21 his targets.
22                    He fired that shotgun at least four times and it
23 just so happens that those victims were hit by four shotgun
24 blasts.  James Brissette was hit in the back of the head,
25 pellets lodged in his brain and killed him.  James Brissette

1  was hit again in the bottom of the feet as he lay there on the
2  walkway.  Jose Homes was hit by a shotgun blast to the face.
3  And Big Leonard got shotgun pellets in the back of his head.
4                  Defendant Faulcon fired four times, pumping each
5  time in between.  And like Defendant Bowen, Defendant Faulcon
6  wasn't done yet, because he still had to travel more than half
7  a mile over to the other side of the bridge where he would
8  raise that shotgun one more time and blast one more person
9  through the back.
10                  And when that shooting stopped on the bridge,
11  everybody knew that Defendant Faulcon had a problem.  As
12  Defendant Kaufman put it to his then-good buddy, Jeffrey
13  Lehrmann, "Faulcon shot an innocent man."
14                  Shoot first, deal with it later, that's a crime.
15                  Defendant Villavaso.  Defendant Villavaso was in
16  the back of that truck, like Defendant Faulcon, and he jumped
17  out with an assault rifle and went immediately over to the
18  passenger side over to that barrier.  And instead of assessing
19  the situation, instead of looking to see if anybody posed any
20  threat, he raised that assault rifle and he fired, and then
21  fired again, and he fired again.
22                  The evidence is going to show that
23  Defendant Villavaso fired that rifle at least nine times.  Pow,
24  pow, pow, pow, pow, pow, pow, pow, pow.  Nine times at Susan
25  Bartholomew, Leonard Bartholomew, Lesha Bartholomew, Jose

1  Holmes, and James Brissette, at people who were lying there,

2  unarmed, posing no threat.

3          Shoot first, ask questions later, that's a

4  crime.

5          The second category of charges I wanted to talk

6  about are those conspiracy charges for agreeing to cover up

7  what happened on the bridge and for trying to prosecute two

8  innocent people.  I'm not going to talk about these right now

9  because I think the evidence is going to be self-evident when

10  you hear it.

11          The only thing I want to flag on these charges

12  is for the conspiracies to try to see innocent people

13  prosecuted.  It's important for you to know that it doesn't

14  matter whether they succeeded.  The crime that's charged is the

15  agreement to try to see those people prosecuted.  So it won't

16  matter whether Lance Madison and Jose Holmes were actually

17  prosecuted.  What matters is that these defendants agreed to

18  try to see that happen.

19          The third category I mentioned are those

20  obstruction charges against the shooters for those false

21  statements that they gave on tape.  Again, I don't want to talk

22  about all of them now.  The only one I want to flag for right

23  now is the statement given by Defendant Villavaso.

24          You're going to hear Defendant Villavaso in his

25  own voice as he gives his version of what happened on the

 1  bridge that day.  You're going to hear him in his own voice as

 2  he says he got out of that truck and he went over to the

 3  passenger side and he saw men and women with guns.

 4           He announced himself, "Police," and the men and

 5  women turned toward him and fired and he fired back.  "Men and

 6  women," you'll hear him say.  Not even man and woman, but men

 7  and women.  The only civilian women on the bridge that day were

 8  Susan and Lesha Bartholomew, and you're going to meet both of

 9  them.

10           When you meet Susan and Lesha and you hear them

11  softly tell you what happened to them on that horrible day,

12  you're going to decide whether you believe they stood as far

13  away from Defendant Villavaso as I am from my co-counsel right

14  now and pointed a gun at him and fired.  You're going to decide

15  whether Defendant Villavaso obstructed justice.

16           And that brings us to the fourth and final

17  category, those charges for obstruction of justice and lying to

18  the FBI against Defendant Kaufman.  And those charges are for

19  lies, including the ones we've already talked about:  For

20  planting a gun, for making up witnesses, for lying about not

21  knowing who Little Leonard was.

22           Defendant Kaufman responded out to that scene

23  and he immediately took the reins of a cover-up.  From day one,

24  he made sure that evidence wasn't collected, that witnesses

25  weren't identified, that the stage was set for the false

1    prosecution of innocent people.  Instead of conducting an

2    investigation, he headed up a conspiracy.

3              And you're going to hear that Defendant Kaufman

4    was 100 percent positive that he'd get away with it.  Because

5    he knew that even in the best of times, people hesitate to

6    question police; and he knew that after Katrina, nobody would

7    question what they did.

8              He thought he could blame Hurricane Katrina.  He

9    thought he could blame Hurricane Katrina for failing to pick up

10   that evidence that was right there at his feet.  He thought he

11   could blame Hurricane Katrina for not getting statements from

12   those imaginary witnesses he claimed cleared his officers.  He

13   thought he could blame Hurricane Katrina for not getting the

14   name of that kid who saw everything that happened on the

15   bridge.

16             You're going to hear that this man used

17   Hurricane Katrina as a tool to aid in his corruption.

18   Hurricane Katrina, which wreaked havoc on this city and

19   devastated everyone in its path:  The defendants, the

20   Bartholomews, the Madisons, NOPD, the good people of New

21   Orleans.  There were countless casualties of Hurricane Katrina,

22   victims of Mother Nature, but the younger brothers of Andrea

23   Celestine and Lance Madison were not casualties of the storm.

24   J.J. Brissette and Ronald Madison survived Hurricane Katrina.

25   They survived the storm to become casualties of these

1  defendants.

2          And in the six years that have passed since

3  then, this city has fought its way back to its feet:  Displaced

4  people have come home, businesses have reopened, tourism has

5  returned.  There's a new sense of hope in this great city.

6          And Susan Bartholomew, Andrea Celestine and

7  Lance Madison, those people whose hopes were destroyed that

8  sunny day six years ago, they also have a new sense of hope.

9  They hope that finally the truth will come out, that finally

10  justice will be done.

11          At the end of this trial, once you've had a

12  chance to meet all the witnesses and hear all the evidence,

13  we're going to come back and we're going to ask you to render a

14  verdict supported by the overwhelming evidence in this case:

15  We're going to ask you to find these five men guilty as

16  charged.

17          **THE COURT:**  All right.  Thank you, Ms. Bernstein.

18          It is 11:00.  We may have to break up our

19  argument here among the defendants.  So if you all would like

20  to begin, then maybe we can take our break.  It will be in the

21  middle of the defense presentation.  There's just no other way

22  to do that.

23          So why don't we go ahead and get started with --

24  we certainly want to use all our time.  Let's go ahead and get

25  started.  Maybe we can work about a half hour or 40 minutes and

```
 1   then break and come back and finish up with the defendants'
 2   time.
 3              MR. FLEMING:  Believe it or not, I'll be brief,
 4   Judge.
 5              THE COURT:  Okay.  Mr. Fleming.  One second, let me
 6   get you started here.
 7                   You may begin.
 8              MR. FLEMING:  These men are not guilty.  They are not
 9   guilty.
10                   My name is Paul Fleming and I represent Robert
11   Faulcon in this matter, but this morning I'm going to talk to
12   you about all five men and give you a brief overview.
13                   As I said before, if I wasn't clear:  They're
14   not guilty.  The evidence will show that they are not guilty;
15   but more importantly, the evidence will not prove that they are
16   guilty, and that's the standard.  And the evidence certainly
17   will not prove that they are guilty beyond a reasonable doubt,
18   and that's the standard.  And the judge is going to give you
19   that standard when he defines "reasonable doubt" for you.  I
20   won't do it this morning.
21                   The prosecution, likewise, has the burden, and
22   the entire burden, of proving this case.  They bring the
23   charges and thus the burden is on them, and them alone, the
24   people at this table.  As to each count, which the judge will
25   tell you, and he has told you, that you'll consider separately,
```

1    the government has the burden of proving each and every element

2    of that count.  And they have the burden of proving each and

3    every element beyond a reasonable doubt, and reasonable doubt

4    is a high standard.

5              And some of you have sat on civil cases -- sat

6    as jurors on civil cases and there's a different standard on a

7    civil case, a lesser standard.  That's because a civil case is

8    about money.  This is a criminal case, it's much more serious.

9    It's not about money.  It's about people's lives.  It's about

10   people's liberties.  The prosecution wants to deprive these men

11   of their liberties.  The prosecution essentially wants to

12   deprive these men of their lives.

13             This is not a civil case, it's not about money,

14   and that's why the entire burden's on the prosecution, and

15   that's why the burden is as high as it is -- beyond a

16   reasonable doubt -- as to each and every element.  And within

17   this framework, you're going to have to judge the testimony,

18   other evidence, and actions of these men in the context of the

19   worst domestic disaster in the history of this country,

20   Hurricane Katrina.

21             That struck August 29th, 2005.  The levees broke

22   shortly thereafter, flooded the city.  Roughly 90 percent of

23   the City of New Orleans was under water.  Communications with

24   the outside world were almost nonexistent; leadership was

25   almost nonexistent; help from the outside world was

1  nonexistent.

2          The other lawyers are going to tell you the

3  personal stories of these five men, but I want you to remember

4  that these five have one thing in common:  They stayed.  They

5  stayed here and they did their jobs, and they did their jobs

6  the best they could under these horrible, horrible

7  circumstances.  They didn't desert, they didn't go work other

8  jobs.  They stayed, and they did the best they could.

9          They rescued people.  They pulled people off of

10  rooftops, pulled people out of their attics.  In fact, you're

11  going to learn that some of these men were rescued themselves;

12  one off his own rooftop.  And right after that, they jump right

13  in and they get to work.  They do their jobs.  They go out and

14  rescue people.  And they do the best they could.

15          They do the best they could without adequate

16  leadership, without adequate food, without adequate shelter,

17  without adequate clothing, without adequate rest, without

18  adequate supplies, and without adequate support.  These are the

19  guys that stayed.  These are the guys that did their job.

20          As the prosecution said, a lot of this unfolds

21  in the 7th District area of New Orleans, that's roughly the New

22  Orleans East area, particularly devastated by Hurricane

23  Katrina.  The police station out there is out of commission.

24  They kind of sort of set up a little makeshift headquarters at

25  a place called the Crystal Palace.  That's a reception hall

down on Chef Menteur Highway and it's approximately two to four miles from the Danziger Bridge.

Four of these five men worked out in the 7th District.  The fifth worked in the 5th District but lived in the 7th District.  One man was a detective in the 7th District, three worked in the task force in the 7th District. Mr. Villavaso, in the 5th District, was a member of the 5th District task force.

And a task force is a unit, which under normal circumstances, is what's considered a proactive unit.  They go out and get things done.  They go out and look for the bad guys.  They go out and they get guns off the street.  They go out and they get drugs off the street.  They get the bad guys before the bad guys can get someone else.

The task force, they're used to getting things done, and that's what they did after the storm.  They're out there rescuing people.  They're bringing people over to the Convention Center.  They secure a moving van, that Budget truck that Ms. Bernstein referred to.  They use this moving van -- rental van to shuttle people back to the Convention Center that can be bussed out later.

And initially they're doing this day and night. Except you're going to learn they had to stop the night runs. Because during the night, people are taking potshots at them. If you can imagine that, people are shooting at the folks

trying to help.  People are shooting at the folks that are
trying to do some good.

And throughout all this time, there's all kinds
of things going on.  These guys are hearing people call for
help all the time.  They're calling for help on their rooftops;
they're calling for help from their attics.  They're able to
get to some people in time, others not.

They're hearing other officers calling for help.
They know that in at least one instance there's a fellow
officer shot in the head in Algiers.  A member of their own
task force could not take it anymore and committed suicide a
couple of days -- a day or two before this happened.  Despite
this, they kept going.  They didn't desert, they didn't go
AWOL.  They stayed, they rescued people, and they did their
jobs the best that they could do under these circumstances.

And that brings us to September 4th, 2005.  That
morning they're out at the Crystal Palace getting ready to go
do some more rescue runs and a call comes over the radio, and
it's the worst call any police officer can ever hear, a 108.
And what do they hear?  "108, officer needs assistance.  108,
shots fired.  108, two officers down."

And a 108, as I said, is a serious signal, a
serious call to a police officer.  There are other signals with
different numbers, different codes, for less serious
situations; but a 108 is dire, and a 108 is an absolute

emergency.  108 is a call, which under normal circumstances,
every officer in the city of New Orleans will respond to.

If you're working out in Lakeview, if you're
working out in Uptown, if you're working out in New Orleans
East, if you're working out in the Ninth Ward and you get a
call for a 108 from somebody across the river in Algiers,
you're going to stop what you're doing and you're going to rush
out there because that's how serious that is.  And that's the
call they got:  "108, officer needs assistance.  108, shots
fired.  108, two officers down."

Two officers dead is what everyone thought.  Two
officers dead or dying is what these men had in their minds
when they raced out there and all piled into the rental truck.
Michael Hunter's driving; Kenny Bowen's in the passenger seat;
Rob Gisevius, Robert Faulcon, Tony Villavaso and others jump
into the back.  And in the back of the truck, they cannot see
what's going on; in the back of the truck, they don't know
what's going on.

But the truck's speeding down Chef Menteur
Highway towards Danziger Bridge, all the while dodging debris
that's still in the road from the storm, and they're shaking
these guys around.  And they're sitting there back there
nervous, not knowing what's going on, and they're scared.  And
they're hoping that the two guys that they're going -- that are
down are still alive; and they're hoping at the end of all of

1   this, they'll still be alive.  And they're scared, but that's

2   their job, and they're important.

3              And as they pull up, you'll hear, Michael Hunter

4   starts firing.  And the story all along changed a little bit

5   this morning, but what he said when he pled guilty, he said,

6   "I'm driving up and I start firing shots out the window,"

7   Michael Hunter.  He had the audacity to say he fired warning

8   shots.  He had the audacity to say, "I saw a group of unarmed

9   civilians, and I knew that they were unarmed civilians, so I

10  decided to fire some warning shots."

11             That's what he said when he pled guilty.  It

12  changed a little today.  We'll see what he says when he

13  testifies.

14             The guys in the back of the truck don't know

15  who's doing the shooting.  They're responding to a call of

16  shots being fired and there are shots fired as they're pulling

17  up.  But you know what, if they did know it's Michael Hunter

18  shooting, it's certainly reasonable for them to think Michael

19  Hunter is shooting at a threat.

20             So these three guys get out the back of the

21  truck right into the middle of what, in their minds, is a gun

22  battle.  There are other officers in the back of that truck

23  that never got out the back of that truck.  They stayed back

24  there.  But not these guys.  They're there to do their job;

25  they're there to help the officers that are down; they're there

1    to help the officers that are calling in that 108.  So they get
2    out of the trunk.
3            And they get out of that truck slap dead into
4    the middle of a gunfight.  Several people are shot; and some,
5    no doubt, at least some are in the wrong place at the wrong
6    time, and that's unfortunate.  And two people are killed that
7    day, and that's always unfortunate.  No matter what the
8    circumstances, that's unfortunate.
9            The prosecution's own witnesses are going to
10   tell you, or you'll hear, that prior to these officers
11   arriving, there are at least four groups of people firing shots
12   in that area.  Jennifer Dupree, she calls in the 108.  She's on
13   the high rise, the I-10.  There are people shooting at them.
14           Louisiana State Trooper Michael Christopher
15   Baron, he and other troopers are escorting contractors out to
16   St. Bernard Parish, and they're actually going to blow up the
17   levees down in St. Bernard to let the water out.  One of the
18   trucks has a flat tire or something and they stop.
19           And while they stop, they get a call over the
20   state police radio that a helicopter is taking sniper fire from
21   the Holiday Inn, which is nearby.  Trooper Baron assigns some
22   of the other troopers to guard the contractors.  He and others
23   go down to respond to that call of sniper fire.
24           Michael Hunter, "I fired warning shots."
25           And four, Lance Madison.  Lance Madison is

someone else who's story has changed, and you're going to see
how it's changed; but, more importantly, you're going to see
when it changed.

Because Mr. Madison says several times, before
meeting with the folks at this table, including once under
oath, that, "Before" -- before -- "the police got there, there
was a group of teenagers shooting at me and my little brother."
Teenagers, appeared to be between roughly 14 and 19 years of
age; teenagers, boys and girls; teenagers, wearing white
T-shirts and jeans and jean shorts; teenagers, shooting at me
and my brother.

That's a lot of shooting going on, and that's a
whole lot of shooting going on before these guys got out there.

And under all these circumstances, you're going
to have to decide whether the actions that these men took on
that day were reasonable.  And under the totality of the
circumstances -- the totality of the circumstances -- there
really is no reason for these men to have taken any other
action other than that which they took on that day.  Their
actions were reasonable and these men are not guilty.

Thank you.

THE COURT:  All right, Mr. Fleming.

Mr. DeSalvo, you were supposed to go next, I
believe.

MR. DESALVO:  Do you want me to proceed now, Judge,

1   or do you want to wait?

2           **THE COURT:**  Well, it's about 20 after 11:00.  About

3   how long do you anticipate your presentation?

4           **MR. DESALVO:**  I can be done before noon.

5           **THE COURT:**  Before noon.

6                   Let me check with my jury here.  Do you want to

7   go for another half hour, you think, until the lunch hour?

8                   Okay.  Let's do that then, and then we'll take

9   our lunch break.  We'll give you some additional time and come

10  back and finish.

11                  Go ahead, Mr. DeSalvo.

12          **MR. DESALVO:**  You know, as I listened to

13  Ms. Bernstein give her opening statement, I was thinking it

14  should probably be more fitted to a novel.  Because it comes

15  out of the imagination of someone who knows something about the

16  law, knows something about some facts, and then decides to

17  build a story out of it.  And it would have been a very good

18  story, but it came from the government.  It came from a

19  government that's trying to put citizens in jail.

20                  Now, as we proceed in this case, we're going to

21  chip away at every piece of evidence they have.  We're going to

22  start with trying to show what happened in the storm.  We're

23  going to tell you about the 7th District being the largest

24  police district in the city, at least land mass-wise, and the

25  most remote from the city.  You already know it was under

1    water.

2              There was a small strip of land that was not

3    under water, it was the Chef Highway.  When the hurricane hit,

4    and all of New Orleans East went under water, half of the 7th

5    District was in a hotel on the side of the I-10 and they were

6    suddenly stranded and marooned on an island.  The other half

7    wasn't supposed to report to work until the day after the

8    storm -- or after the storm passed.  They were stranded on

9    rooftops, or just couldn't get into the 7th District because of

10   the flooding.

11             You'll learn that Sergeant Gisevius and a Warren

12   Keller swam out of that hotel to look for a boat.  They found a

13   boat and they gradually rescued everybody that was at that

14   hotel, and the 7th District was set up at a place called the

15   Crystal Palace on the side of the Chef Highway, in that little

16   strip of land that didn't get flooded.

17             And they procured more boats and they began

18   doing rescues all over the 7th District.  As they would rescue

19   the people in boats, they would bring them to the Chef Menteur

20   Highway, where they certainly believed that they were going get

21   help from other sources to get into shelters and get the food

22   and water they needed.

23             As time passed and they were bringing people to

24   the Chef Highway and no one was picking them up, they procured

25   two Budget trucks.  Actually, Officer Hunter knew where the

1    keys to the Budget trucks were at the hardware store, or
2    whatever that was renting them, and he got the keys.  And they
3    began driving down the Chef Highway on a regular basis, picking
4    up people and, at first, delivering them to the Superdome; and
5    when the Superdome said, "We can't take anymore," then to the
6    Convention Center, where, of course, they wrongfully believed
7    that those people were going to get help.
8              While this was happening, the boat crews that
9    were being commanded by Sergeant Gisevius and Warren Keller,
10   they were picking up people and bringing them to the Chef.
11   Sergeant Bowen took charge of the truck crews and they were
12   picking people up on the highway and bringing them in.
13             Officer Hunter kept his AK-47, or some kind of
14   fancy rifle, on the seat between them for security purposes
15   because they feared that they were being shot on or could be
16   shot at any time -- trucks were a commodity -- but they
17   continued to do their job of picking up people and bringing
18   them into town.
19             On the morning of the 4th -- I'm not going to go
20   through it a lot.  You already know -- they got the call of a
21   108.  Some of the officers jumped in the back of the truck;
22   some stayed behind, didn't get in that truck, and waited to
23   drive over there after all the hoopla was over.  That's sad.
24             The government wants to tell you that these
25   people didn't have guns, that they just went helter-skelter and

1    began shooting people.  Well, luckily enough, there's a lot of
2    evidence of guns.

3              You're going hear from Lance Madison -- I assume
4    they're going to call him -- and you're going find out that he
5    told multiple stories to a whole host of people, anyone who
6    would listen.  And often his stories would vary, and some of
7    his stories were never consistent with anything, except one
8    thing.  There was one common thread in every statement that
9    Lance Madison made and that was that those two teenage boys had
10   guns and were shooting at him his and brother, and that that
11   was what was happening when the police rolled up.

12             Now, the government has created this illusion,
13   or this story, that would be better suited for a John Grisham,
14   "Well, he only thought that because they were shooting from
15   that Budget truck a block away."

16             But, you know, when you listen to what he
17   said -- I don't know what he's going to say when he gets here,
18   but all the other times he said it -- the two teenage boys,
19   before they were shooting, he heard them running up behind him,
20   getting closer, he turned around, and they fired at him.  And
21   he got his brother and said, "Let's run.  Those boys are
22   shooting at us."  Not the police, not that fairytale story, the
23   facts.

24             They want to tell you that Officer Hunter didn't
25   see any guns, wasn't being shot at, and was just standing out

1  there on the roadway shooting, and didn't seek cover.  Well,

2  obviously, they didn't look at their video.  Because

3  Officer Hunter was shooting.  He emptied two clips.  It's in

4  their video.

5            You will see, as they said, Sergeant Gisevius

6  shooting also.  But when Officer Hunter emptied that first

7  clip, this is the maneuver he made (demonstrating), got behind

8  Sergeant Gisevius, put in another clip, and then came back out

9  shooting again.  Was that a man who didn't think he was being

10 shot at, or was that a man who was not being shot at?  Was that

11 a man who wasn't seeking cover?

12           It gets better.  It gets better.  Because after

13 that, when they decide to get back in the Budget truck to drive

14 up the bridge to go after the Madisons -- Mr. Hunter's driving

15 now -- he gets almost to the crest of the bridge, but doesn't

16 go over it with the Budget truck.  And he'll tell you the

17 reason he didn't go over it with the Budget truck was because

18 it was going to be too big a target.  So they got out of the

19 truck.  Then the state police officer comes by, he had a car,

20 he gets in.

21           You're going to see these things.  They're not

22 coming out of my imagination, you're going to see them.

23           After the incident, others arrive.  Sergeant

24 Kaufman came; Lieutenant Lohman came.  Sergeant Kaufman was one

25 of the members of the DIU unit, that's District Investigative

1   Unit.  That's what they call the guys that do the

2   investigations in the districts.  Lieutenant Lohman was the

3   commander of that DIU unit; and as the senior man in charge,

4   it's his scene, it's his responsibility.

5               I heard one of the silliest things I've ever

6   heard of, "If Sergeant Bowen had gone down there and seen those

7   guns, he would have picked them up.  It was his defense."

8   Well, first of all, he had to know it was defense.  And

9   secondly, more important than anything else, had he picked up

10  anything -- anything -- they would have called that

11  contaminating a crime scene.  If you're involved in the

12  incident, you don't touch evidence.  That's for that DIU

13  person, that person who arrives on the scene after, to do.

14              Lieutenant Lohman sent the people who were

15  involved in the shooting -- and by the way, Sergeant Bowen did

16  fire his weapon, and he fired it more than once -- sent the

17  people who had said, "I fired a weapon," back to the

18  Crystal Palace to give statements so that Sergeant Kaufman

19  could prepare what they call a Gist.

20              Lieutenant Lohman stayed behind; and when he

21  stayed behind, that crime scene was his responsibility.  He was

22  the one that was supposed to diagram it; take pictures;

23  retrieve evidence, but mark it, "This came from this spot,"

24  where he has a little drawing.  It was his job.  He didn't do

25  it.  He didn't do it.

1          What he did was nothing.  He went back, the Gist
2    was written.  This thing was over with.  It was over.  Do you
3    know what they did the next day?  Boats were out doing rescues,
4    the Budget trucks were picking up the people and bringing them
5    into town, just like they had been doing for days.  Just like
6    they had been doing for days.

7          Weeks later, when it was time to really do an
8    investigation, that they said we're going to have to do
9    investigations on all the police shootings that came out of the
10   storm, Lieutenant Lohman, "Well, what am I gonna do?"  Who's
11   butt do you think he was trying to save?

12         You're going to hear from a lot of witnesses in
13   the case.  Most of them will be called by the government.  Now,
14   we don't own witnesses, especially fact witnesses.  Because
15   fact witnesses are people who see and hear, sometimes taste or
16   smell, and they get called.

17         The government usually calls them first because
18   they go first.  But the test to the truth comes when we get to
19   ask questions second.  Some of their witnesses they call are
20   going to tell the truth; some of the witnesses they call will
21   only tell some truths; some of them are just liars.

22         As Ken Bowen sits here, he thanks God for three
23   things.  One, is Lance Madison, to show you the -- there were
24   guns, not just in the hands of the police.  He thanks God that
25   when Officer Hunter gets on that witness stand, he tells a lie

```
 1    that's such a whopper.  And he thanks God that CNN was there
 2    doing the video because there's things on the video that
 3    weren't in that novel.
 4                  Thank you.
 5           THE COURT:  All right.  Thank you, Mr. DeSalvo.
 6                  It's 11:35.  We still have some time if anyone
 7    wants to try to fit in their portion of their statement.
 8                  All right.  We can go ahead and break early for
 9    lunch.  Before we do that, a few instructions here:  First of
10    all, no one on the jury should discuss anything that they have
11    heard so far in this case with anyone, but particularly amongst
12    themselves.  All right.  And no one who hears my voice right
13    now should in any way attempt to discuss anything in the case
14    with anyone that they know to be on this jury.
15                  And there will be a problem if that happens.
16    There will be a problem if anyone attempts to talk to anyone on
17    this jury, either at this lunch break or any other time when
18    they're not in the courtroom.  So please be forewarned.
19                  We are going to come back at 10 minutes to 1:00,
20    which is an hour and 15 minutes from now.  The defendants will
21    have approximately -- well, we're moving at a pretty good clip.
22    There's still approximately 2 hours and 40 minutes left for the
23    defendants.  At the rate we're going, we probably will not need
24    all of that time.
25                  At the conclusion of their opening statements,
```

```
 1    we will then call the first witness and you will begin hearing
 2    testimony in this case and receiving evidence.
 3                   So with those instructions, we will go ahead and
 4    break for lunch.
 5                   Counsel, in the meantime, what are these, new
 6    books up here?  The government?
 7           MS. CHUNG:  Your Honor, they're replacement books for
 8    the ones we've already provided.
 9           THE COURT:  Okay.  Well, I've got to see the witness
10    stand, so you can't build a barrier here between me and the
11    witness stand.  So what I'm going to ask you to do is to take
12    the four books that I've already set up with you and I'll keep
13    these four new books.  Is that correct?
14           MS. CHUNG:  Yes, Your Honor.
15           THE COURT:  Okay.  Thank you all.
16           THE DEPUTY CLERK:  All rise.
17           (WHEREUPON, the jury exited the courtroom.)
18           THE COURT:  All right.  Thank you all.
19                   Counsel, if you could be here a few minutes
20    early to make sure that we start on time.  We'll bring the jury
21    in promptly.
22                          (LUNCHEON RECESS)
23                            *  *  *  *  *
24
25
```

1                    **AFTERNOON SESSION**

2                    **(June 27, 2011)**

3                         * * * * *

4      **THE DEPUTY CLERK:**  All rise.

5      (WHEREUPON, the jury entered the courtroom.)

6      **THE COURT:**  All right.  You may be seated.

7           Thank you all for being on time.  We really

8  appreciate it.  It's going to help us during the course of this

9  case to make progress every time we take a break to come back

10 and be on time, such as you've been.

11          All right.  When we broke we were in the middle

12 of the opening statements by defense counsel and Mr. DeSalvo

13 had just addressed you.

14          I understand, Mr. Hessler, that you're the next

15 one up; is that correct?

16     **MR. HESSLER:**  That's correct, Your Honor.

17     **THE COURT:**  All right.  I'll go ahead and resume the

18 time and you can begin.

19     **MR. HESSLER:**  Good afternoon.  My name is Eric

20 Hessler.  I'm representing Robert Gisevius today.

21          And as we sit here today, and as you all are

22 preparing to judge this case and judge Mr. Gisevius and

23 everybody else involved, we can't judge them by today's

24 standard.  We have to -- to understand this case and to be able

25 to judge this case, you have to go back, and you have to go

1   back to August 29th, 2005, when this storm rolled in.  Because

2   you need to understand what Robert was facing, what he had gone

3   through, and what he would go through during those days.  And

4   I'm going to try and bring you back to that time.

5           And on August 29th, Sergeant Gisevius has

6   reported to duty to serve the City of New Orleans in what was,

7   by all accounts, going to be a major natural disaster.  And

8   that prediction was borne out to be true.  He came to work.  He

9   left behind his wife, a seven-year-old -- I'm sorry, a

10  five-year-old, a seven-month-old boy.  He left his family

11  behind to protect the citizens of this city.

12          That's hard to do.  It's hard do that and live

13  up to your responsibility, and he did it.  He had a

14  responsibility to his family, he had a responsibility to this

15  city, and he left his family, drove into the city, and began to

16  do his job.  He didn't leave at all.  And you'll see he had the

17  opportunity for a legitimate reason to do so; he chose not to.

18          What he did was they holed up in a hotel in New

19  Orleans East, waiting to ride out the winds so they could go

20  patrol, keep down looting, which always occurs in the aftermath

21  of hurricanes.  When a hurricane hits the city, the lights go

22  out, there's looting.  It happens.  They were prepared for

23  that.

24          But what they weren't prepared for, and what

25  nobody prepared them for, was floodwaters that exceeded their

1    chest level, and sometimes over their head in most instances.

2    What they did was Sergeant Gisevius and Sergeant Warren Keller

3    swam out of the hotel they were in from the second floor and

4    procured a boat.

5              As luck would have it, this boat didn't have

6    motors, didn't have oars.  So they broke some fence boards

7    down, used those for paddles, and went and rescued other

8    officers so they, too, could procure more boats, and began

9    rescuing citizens.

10             And that's how this began, with a boat and a

11   piece of wood, and not a whole lot more.  And it grew.  And

12   Sergeant Gisevius was in charge this rescue operation -- for

13   the boat operation in the 7th District, and it grew.  And it

14   grew, and citizens came and helped and brought boats.  But the

15   city didn't do anything for these officers.

16             This went on for some six days, sunup and

17   sundown.  They woke up with the sun and began rescuing people

18   up until the sun went down.  And at that point, it was too

19   dangerous to go out:  Gunshots, obstructions in the water that

20   they couldn't see.  You name it, they faced it.  There was no

21   electricity in the city, no air conditioning, no place to sleep

22   that provided any level of comfort, very little food, very

23   little water.  He stayed through it.  A lot of people couldn't.

24   A lot of people couldn't handle it.

25             During the course of this time, that's bad

1    enough, but you've got to -- you know, we're going to lead up

2    to September 4th, because there's a lot of things that happened

3    and you got to -- and his mind-set is developing.  He's

4    learning things and he's operating on his knowledge, and the

5    things he's learning certainly aren't good.  Certainly aren't

6    good.

7              Some of the things he learned through

8    secondhand, thirdhand information, some of it he learned

9    firsthand.  The things he learned from second- and thirdhand

10   information wasn't good and not always correct:  Rapes in the

11   Superdome, people being murdered in the streets, armed gangs of

12   looters running around.  Some true; some not true.  At that

13   time, was it believable?  Yeah.  Was it believable when the

14   mayor was saying it?  Yeah.  The chief of police?  Yeah.

15   You're seeing some of this firsthand, yeah, it's believe.

16             What he did see firsthand, was present for about

17   that time, was the suicide of a coworker, and that will weigh

18   on your mind.  You're worrying about your family, you're

19   worrying about your job, you're worrying about saving people's

20   lives.  You've got a coworker who shoots himself in the head.

21   That kind of affects you.  Then you've got another officer --

22   now, you didn't work with this officer, but you went to high

23   school with him -- he committed suicide.  He learned of that,

24   all in the days leading to September 4th.

25             And what do you have to do in that time when you

1  have those pressures building on you?  What do you have to do?

2  Who do you have to go to?  Who do you have to lean on?  Nobody.

3  Nobody.  You don't have anything to distract you.  You have

4  other people in the same situation.  You have not a whole lot

5  of anything but yourself, the darkness, and your mind.  And he

6  wakes up the next day and he goes and saves more people.

7              Prior to the storm, he had a little cyst taken

8  out of his back.  During the storm -- of course, it hadn't even

9  fully healed up, but during the storm, it healed over a patch

10 of gauze in his body.  Him and Warren Keller, that other

11 sergeant who had swam for safety, Sergeant Keller developed

12 some type of infection in his legs from the stagnant -- from

13 the waters.

14             Sergeant Keller was allowed to leave the

15 hospital.  Sergeant Gisevius was told to stay, and he left,

16 once again leaving his partner, and he returned; and he

17 returned and he saved more and more people.  He didn't save

18 them to later abuse them; he saved them because that was his

19 job and his responsibility.

20             And all this time the rumors are persisting.

21 The leadership, what there was, had crumbled.  And it had

22 gotten to the point, and you'll hear this in testimony, that

23 NOPD issued AR -- I'm sorry, M16s to the police officers.  And

24 why would they do that unless they believed that they were

25 needed?

1            And they issued them to anybody that had two

2    hands.  You didn't have to be qualified, you didn't have to

3    know what you were doing, you just had to, I guess, be either

4    concerned, scared enough, or ordered to pick it up and patrol

5    the streets.  And these weapons shoot .223 caliber ammunition,

6    which you'll hear about during this trial.

7            Now, in normal days, especially in America in

8    New Orleans, we don't see policemen walking around with

9    automatic weapons.  And these weren't normal days, and you saw

10   plenty of police officers walking around with automatic

11   weapons.  And that was condoned and encouraged by the NOPD.

12           Despite everything I've told you, the

13   life-saving duties go on.  He didn't neglect his duties.  Now,

14   it goes on until September 4th of 2005.  Ms. Bernstein told

15   you, it was a very sunny day.  A beautiful day.

16           Well, September 4th of 2005, very well may have

17   been a sunny day, but anybody here wouldn't describe it as a

18   beautiful day.  I think that would almost be offensive to

19   describe it as a beautiful day.  It was another day of rescuing

20   people, who by this time had been on their roofs for six days.

21   I don't think they even appreciated the sun at that point.

22           Robert Gisevius had just come back from dropping

23   off another load of rescued civilians when he hears a call come

24   out.  And this is a call that no police officer ever wants to

25   hear, no police officer ever wants to have to respond to, no

1   police officer certainly doesn't want to be the guy on the
2   ground that they're calling about, but Gisevius hears this
3   call, "Officer down.  Shots fired.  Two officers down by the
4   bridge."

5            A lot of people kind of looked at the radio,
6   because radios were in short supply.  You could barely --
7   sometimes barely get on the radio to continuously update things
8   because so many things were going on across the city.  People
9   would just walk across the radio -- a call would walk over and
10  it would click out.  You could be saying something and somebody
11  clicks over you and then you can't hear it.

12           He hears the call and he did what he was
13  supposed to do, he picked up an AR-15, gathered some people,
14  told them, "Come on, let's go."  He probably could have got
15  back on the boat and said, "I'm going to go rescue some
16  people."  You know, they got plenty of people sitting around
17  here assigning -- you know, whatever it is they're doing, that
18  hadn't left all day.  But, no, he gets in the truck.  He says,
19  "Come on, let's go."

20           Now, you might say, "Well, that's what he's
21  trained to do."  And, yeah, you know what, I agree, he is.  And
22  he lived up to that training.  Some didn't, but he did.  But it
23  doesn't train you for everything, and it can't.  You can't be
24  trained for everything.  And you rely on certain things.  Even
25  in your training you rely on certain things.  You're relying on

listening to the radio so you'll get updated information,
accurate information, information that you're going to need to
make a proper decision.

And you can sit at this table all you want and
say, "Oh, they had that information and they just disregarded
it," but you can't do that.  You got to get in the back of that
truck and you got to ride over there and you got to figure out
what's going on.  And you got to do it when you can't hear a
damn thing because the rattling of the truck, the bumping of
the truck and all that.

And while you're there, you're thinking about
everything.  And you might hear a little bit, "They're running,
black T-shirt, white T-shirt, black backpack."  God darn it, I
couldn't hear, did they say black shirt, black pack, what did
they say?  So you're not going to have the benefit of
everything.  But he's gone.  And he's gone and he's hampered.
He's handicapped because he can't hear very well because of it,
as is everybody in that truck.  So that's pretty bad.

But let's add another thing:  Take away his
eyesight.  Because he can't see anymore because he's in the
back of a boxed-in truck.  You know what he sees?  Everything
they pass by.  What good does that do you?  It doesn't do you
any good whatsoever.

He's essentially traveling to the worst call he
could ever get, knows very little except the most crucial

1    information, two police officers down under the bridge, and not

2    much more.  Now, maybe they could have stopped the truck and

3    said, "We're not going until we find out some more," but that's

4    just not the way things work.

5              And he's going there, again, with all these

6    things running in their mind:  A policeman shot in the head

7    across the river on day one.  All these rumors.  There's no

8    reason in the world to doubt that there are two police officers

9    down underneath that bridge.  You've got Officer Jennifer

10   Dupree telling you that.

11             There's no reason to doubt that there's two

12   police officers down.  There's no reason to doubt that somebody

13   shot them, because that's what they said, "Shots fired."  That

14   is the logical, the reasonable, and the responsible assumption

15   to make.  And you're going there to either, A, help these two

16   cops out; or B, find the perpetrators.

17             One way or the other, you're going into a hot

18   zone.  You're going into an area where you got people running

19   around with guns who have already shown the propensity not only

20   to shoot at cops, but the ability to hit them.  That weighs on

21   your mind.

22             You're waiting to see:  What am I going to find

23   when I get there?  Hopefully, I'm going to be able to find out

24   some more information.  Hopefully, I'll be able to get some

25   additional information, the truck will slow down, we can get --

somebody in the back can get on the radio and find out more.
Hopefully, I'm going to live through this.  Hopefully, I'll be
able to get home to see my family when all this is over with.
And, hopefully, I won't catch a bullet in the head like other
people have done.

And that hope goes away pretty quickly when all
your questions are answered by a barrage of gunfire.  You're
not going to have time to assess the situation; the situation
has assessed itself for you.  There's gunfire coming,
seemingly, from everywhere.

These guys are in the back of the truck.
Gisevius is in the back of the truck.  He don't know where it's
coming from.  He does know a few things.  He knows police
officers aren't trained to open fire on unarmed, innocent
civilians, nor does he have any earthly reason to believe that
somebody would do that.  He knows that police officers aren't
trained to fire warning shots, because that leads to a whole
lot of bad things.

So he's making some assessments, despite what
the government would have you believe, and his assessments are
reasonable, and it's that, "Oh, my God, you know, maybe this
guy drove the truck a little too fast because they're still
shooting at us."  Maybe he wanted to leave then, but he didn't.
I'll bet he wanted to leave then.  I can assure you he wanted
to leave then.  I'm sure he was scared to death.  I'm sure he

1    was in fear for his life.

2            So what does he have to do?  He's got to get out

3    and he's got to face the music, see what he can see, see what's

4    going on.  But it's not shoot first, ask questions later.  I

5    don't think even Ms. Bernstein would say you should go tap

6    everybody on the shoulder and say, "What are you doing?  Why

7    are you shooting?  What's going on?  What's going on?  What are

8    you doing?"  That ain't gonna happen.

9            What he does is what his training, what his

10   experience, and what human instinct tells you to do.  Because

11   this is not all about -- you know, cops aren't perfect.  And

12   just because you become a cop doesn't mean you're a tactical

13   expert, or you've got some higher sense of danger, or some

14   higher ability to deal with a life-threatening, just

15   scared-to-death situation.  They become scared.  Cops are

16   human.

17           He gets out of the truck, goes to the left side

18   of the truck, comes up with his weapon, trains it on somebody

19   in the distance, because that's what he sees.  He can't see

20   anything to his right because the truck's there.  He don't see

21   all this.  But you know what he hears?  Gunfire.  Gunfire

22   coming from that side.

23           He sees a gentleman, fellow, at the top -- near

24   the top of the bridge in black clothing -- in all black

25   clothing.  Now, this is happening like this, very quickly, and

he's got to make a decision.  And he's moving and he's raising

up and he's coming up and he's looking.  His perception is the

guy's got a rifle and he's firing.  There's gunfire coming from

everywhere.  If you perceive a guy on the top of the bridge

with a rifle, and you perceive him firing, what are you going

to do?  You're going to fire back.

Now, the government's going to say, "Well, we

didn't see anybody with a rifle.  Nobody saw anybody with a

rifle."  That's not necessarily true, but we'll address that

later.  That will be addressed on evidence.

But what Lance Madison says at some point, and

it's kind of interesting.  Now, bear in mind, Lance Madison was

wearing all black clothing, as was at least one other

individual on the bridge who they haven't mentioned yet, but

we'll get to him.  But Lance Madison's going to tell you

something.  I don't know what he's going to tell you today; but

you're going to see in the past, Lance Madison says, "I had a

shovel for protection."

Now -- and he's going to explain that the shovel

that he had for protection was for some dogs.  But he's -- at

one point he says that this group of kids that were chasing

him, he -- he felt in fear -- you know, fearful that they were

going to attack him.  It would make sense that he would pick up

that shovel to defend himself, if they were going to get close

enough for him to swing at them.

1          Regardless, Sergeant Gisevius perceives a

2     threat, sees a guy with a rifle -- and if it was a shovel,

3     well, you know what, good things happen to bad people -- or bad

4     things happen to good people, and vice versa.  But it's a

5     perception.  He fires and the gentleman keeps retreating back

6     to the top of the bridge.

7          What happens also is Michael Hunter gets out of

8     the truck about this same time.  Michael Hunter is the

9     government's witness and we're going to talk about him a little

10    bit.  Michael Hunter begins firing up the bridge also.  What is

11    Michael Hunter firing at?  Who is Michael Hunter firing at?

12    Nobody.  According to him, he's shooting up in the air.  And

13    he's doing a good job of it, by the way.  Because he's having

14    so much fun, apparently, that he takes cover behind Sergeant

15    Gisevius, reloads and fires up the bridge, again, up in the

16    air, probably in excess of 20 times.

17         Sergeant Gisevius is firing at a man in black

18    clothing.  No man in black clothing was ever hit by a gunshot.

19    Ronald Madison was hit by a gunshot at the top of the bridge.

20    Logic, common sense will tell you that he was hit by Michael

21    Hunter.  Michael Hunter won't tell you that because he's going

22    to lie about it.

23         He's not charged with -- he's not even charged

24    with shooting at Ronald Madison.  And neither is Michael

25    Hunter, because that's the benefits of making deals, lying,

1  getting out of it, or not being challenged by the government,

2  "Wait a minute, Mike.  You're shooting at nobody and yet we got

3  this guy that we can't explain being hit."  Well, you know

4  what, they're not going to try and explain it now, I guess.

5  They're just going to maybe, I guess, let you all figure it out

6  at this point who shot him.

7          And if it wasn't Michael Hunter, maybe it was

8  one of the kids that Lance Madison said was shooting at him

9  prior to the arrival of the police.  That doesn't work for

10  them, so they don't investigate it or even tell you about it;

11  but you're going to hear it, and you're going to see the

12  evidence to support it.

13          And I'll tell you this, Michael Hunter is not

14  firing at Ronald Madison to violate his civil rights.  He's

15  just as scared for his life as anybody else out there on the

16  bridge at that time.

17          And another thing the government doesn't tell

18  you, but you'll hear it, and you'll hear it from their own

19  witnesses, there's gunfire coming from the north side of the

20  bridge, the other side of the barrier, where the Bartholomews

21  and Holmes and Brissette had jumped.  Somebody is down in the

22  grass, off of the bridge, shooting back up.  That would lead a

23  police officer certainly to believe that people behind the

24  barrier were firing weapons.

25          And you're going to see that through the

1  physical evidence that's on the scene and the eyewitness

2  testimony.  You're going to see it when you go out there to

3  visit the scene.  You're going to see the strike marks on the

4  other side of the barrier.  You're going to hear Susan

5  Bartholomew saying, "I was crouched down by -- under the --

6  laying on the walkway and bullets were striking the barrier."

7  You'll see that.

8           Now, the government alleges that Rob Gisevius

9  walked up to the railing and fired, striking Mr. Brissette and

10 Ms. Bartholomew.  And you're going to see it on the video, and

11 I'm glad you will.  Because what you're going to see, you're

12 going to see him come up, he's fired -- he's fired up that way.

13 He knows that he's got to go and get this armed subject and

14 his -- that's going toward the bridge.

15          So he's walking to the barrier because he also

16 knows that -- and believes, because if he didn't believe it, he

17 wouldn't do it -- but he knows that he just can't start going

18 that way because he might get shot in the back by one of these

19 people.  He wouldn't go check it if he thought that they

20 weren't armed.

21          And you'll see him, he's coming up like this.

22 He comes up like this, he raises up, peeks, and goes off.  He

23 doesn't fire.  He doesn't even get close enough -- there's just

24 no way he could get -- you'll see the angle.  There's no way he

25 could even get close enough.  And you got -- and if you watch

1  his right forearm holding the -- the weapon, it's always

2  trained in a direction towards the top of the bridge.  You'll

3  never see it turn.  And Mr. Brissette is at this end,

4  Ms. Bartholomew is at this end.  He'd have to turn a full 180

5  to somehow do what the government's accusing him of doing.

6           But they've got that covered because they told

7  you, it don't matter who shot who, but it does.  It does

8  matter.  It certainly matters to him, when you're accused of

9  doing something and they say it doesn't.  It does matter.  And

10  it didn't happen, and you'll see.

11           And what does he do?  He continues up the

12  bridge, over to the other side, and eventually Lance Madison is

13  apprehended.  And he's asked, "Is this him?"

14           "Well, this guy's got all black clothing on.

15  You know, I never got that close.  That looks like him.  He's

16  in the area.  It looks like him," and there you go.  The rest

17  of it is the investigation.  "It looks like him," doesn't mean

18  he did it.  This is -- that's what an investigation is supposed

19  to -- to be completed, to find out exactly what happened.

20           He tells them he fired his weapon.  They said,

21  "Go back to the Crystal Palace.  We'll get with you in a little

22  while."  Everybody that fired their weapon were told to go

23  back, and they did.  They're not supposed to be on the scene

24  because they're nothing more than evidence at that point.

25  They're evidence to be used by the investigators, questioned,

1   et cetera.  They go back and they wait.  They're not going to
2   process the scene.  They're not going to do the things -- in
3   any situation they wouldn't, that's what would happen.  And
4   they do.  They go back -- he goes back and he waits.
5            Now, what Rob expects, and what anybody would
6   expect, is that an investigation would ensue to find out just
7   what happened.  He knows what his perception was, what he saw,
8   what he believed happened, but there's going to be an
9   investigation.  What he doesn't know -- and you know what, let
10  me tell you what, he deserved an investigation.  But what he
11  doesn't know is that the NOPD command staff has decided -- for
12  whatever reason, right, wrong or indifferent -- that that's not
13  the way it's going to be.
14           It doesn't help him, but that's not his job.
15  Because probably about this time, before he even knows that's
16  happening, he's already told that he's fired his weapon.  His
17  weapon's right there.  He's already back -- after that brief
18  interview, he's back rescuing people.  Because the
19  investigation is not his responsibility; it's not his job.  And
20  he's not shirking his responsibility, it's just simply not it.
21           There's a homicide -- there's a whole homicide
22  unit designed and created to investigate homicides.  And
23  somebody in the NOPD decided, we're going to put them in the
24  Superdome and watch evacuees as opposed to go out and
25  investigate crimes.  That's not his problem, but it is now.

1           So he doesn't know the homicide unit's not

2    coming.  He doesn't know crime lab's not coming.  He doesn't

3    know they're not going to photograph the scene.  They don't

4    have even a coroner's office to come pick up Mr. Brissette and

5    Mr. Madison.  They had to put them in the back of a pickup

6    truck hours and hours later.  It wasn't out of disrespect or

7    anything else, just the way it was.

8           What does he do for the next four months?  His

9    job.  Throughout Katrina and the aftermath, he still does his

10   job.  And then sometime in January, I think it was

11   January 25th, he's told he's got to come in and give a

12   statement.  Four months later he's got to give a statement as

13   to what happened.  And this is where the government is going to

14   tell you about the secret meeting.

15          He had to change his hours to accommodate the

16   homicide unit.  He had to change his regular working hours to

17   come in so the entire homicide unit could be present and decide

18   who's taking whose statement and where.

19          So they all meet at the 7th District -- and I

20   can't call it the "station" because it's about two or three

21   trailers -- FEMA trailers -- that probably has 120 people

22   working out of them, and they're meeting in the only area that

23   has enough room for all the investigators, including people

24   from the police academy were at this secret meeting.

25          It's not secret.  It's anything but secret.  And

they're all standing around the driveway and somebody --
somebody steps underneath the -- into the 7th District station,
which has been gutted to the extent that all it has is a roof
and metal studs.  They're not hiding from anybody.  The
government would think there's rats crawling around there,
they're in knee-deep water, and having candles sitting around,
whispering in each other's ears.  It wasn't anything like that.

And they can't even -- you'll find some of these
guys had to give their statements in their car -- in a car
because they had no officers in these -- in these places.  They
went in cars and gave statements.  And you can't -- you know,
sometimes they're inaudible.  That happens.  But they were
given in a car.  Sometimes they're in a -- maybe one or two of
them was given in the office.

Now, bear in mind, he had already -- he's one of
the Danziger Seven.  He's one of the officers that shot on the
bridge.  Everybody knows that.  The homicide unit knows that.
He's never even fired his weapon in the line of duty, so he
don't know what to expect.  They call them in, "What happened?"
He gives them a rundown of what happens, fully expecting that
he's going to be quizzed, queried, asked, "What, why, how,
when, where," and he's not.

Now, again, he's never done this before.  He
knows that they know he fired his weapon or else he wouldn't be
there.  He knows this is a second statement.  Is it an initial

statement, is it a supplemental statement, will a supplemental
statement be taken later, or will they just ask me 101
questions and I'll answer every one of them?  So he gave them a
little brief format of what had happened.  They knew what had
happened because he had already told them.  And there were no
questions.  And he gets up.  Was it odd?  Yeah.  Did he think
it was odd?  Yeah.  But he's not the investigator.

              And the government tells you about these other
meetings that they kind of surreptitiously just say, "Oh, yeah,
he met with this guy and he did this and he did that."  Well,
first of all, he's assigned to the 7th District.  He doesn't
work in a vacuum.  He doesn't run some secret unit where you
don't see guys around.

              But you're going to hear that at these other
meetings, he didn't discuss this incident with them again,
except when he was asked about it.  He didn't participate in
writing a report.  He didn't know anything about the reports
that were being written.  It wasn't his job.

              And you're going to see how little he knows
about it.  Even five -- some four and a half years later,
you're going to see how little he knows about it.  Because the
government gets Lehrmann, the investigator, to -- now, somehow
Lehrmann meets with them and tells them all this stuff; and
they, apparently, either don't believe him or whatever happens,
but Lehrmann decides he's going to tell them what he knows.

1          Now, Lehrmann's a federal agent at this point.

2   He's a federal agent.  He's passed the background check.  He's

3   passed the polygraph.  He is a bona fide, gun-carrying,

4   badge-wearing federal agent.  And the government wires him up

5   and says, "Go out there and get me the information from your

6   co-conspirator, your friend, your buddy, everything he knows

7   about this conspiracy, what you all did, why he did it, when he

8   did it, and all this."

9          And you think Lehrmann, being the federal agent,

10  being his buddy, his coworker and all this, it shouldn't be too

11  darn hard.  And he wires up, goes and meets him at a barroom,

12  where Gisevius had been drinking for a couple hours it seems,

13  and he tape records the conversation.

14         And I want you to listen to all of it.  Because

15  you're going to see quite clearly, Gisevius is pretty much as

16  in the dark as anybody.  Despite four and a half years of

17  publicity, of newspaper articles, of -- of the government doing

18  search warrants on the homicide office, he's quizzing Lehrmann,

19  "Well, what's going on?  What are they saying?  Did we do

20  anything illegal?"

21         And what's Lehrmann saying, "Well, I don't know,

22  you know."  Wait a minute, you're trying to extract a

23  confession, information.  He's your buddy, he's your friend,

24  he's drinking, ask him the direct questions.  He doesn't do

25  that because he knows what the government wants.  He doesn't

1    want to be shown that he can't get it out of Gisevius.  He

2    can't get blood out of a turnip.  And he can't get information

3    from Gisevius that he doesn't have, and he doesn't get that

4    information.

5           And you got to ask yourself, you know, why would

6    somebody flip, give some information on -- you know, plead to

7    something they didn't do?  A lot of reasons.  Why would they,

8    you know, buy their way out of something?  And they do it, and

9    you'll see that some of these things were just completely,

10   completely made up.

11          And when Lehrmann comes back and they've got

12   this tape -- I don't know if they asked him or not.  I don't

13   know if they challenged him or not -- well, where's the

14   confession?  Where's the, you know, the smoking gun?  There is

15   none.

16          You know, during this time Rob is caught within

17   a disaster within a disaster.  He now knows that there was no

18   evidence collected in a timely manner, statements weren't taken

19   in a timely manner.  There probably was reasons for it all, but

20   it's not his fault.  It wasn't his determination not to send

21   anybody out there.  It wasn't his responsibility to order that

22   to ensure that happened.

23          He knows that he responded to a situation and,

24   by all accounts, he had information and a reason to believe

25   that they might encounter a deadly situation, their lives might

1  be put in jeopardy, and he responded.  He gets out of that

2  truck in a barrage of gunfire, knowing full well, rightly or

3  wrongly, that his life is in jeopardy.  And he sees a guy who

4  he believes is armed and he believes fired at him and he fires

5  back.  It's reasonable.  Under those circumstances, it's

6  necessary.  He checks to his right and he goes on.  Why would

7  he check over there if he didn't think they were a threat?

8          You know, anytime somebody -- civilians, police

9  officers, anybody -- is harmed, injured, shot, or killed, it's

10  a tragedy, but not all tragedies are crimes.  They're

11  tragedies.  And this tragedy is not the result of any criminal

12  acts committed by Robert Gisevius.  The aftermath was not the

13  result of any criminal acts conducted or participated in or

14  aided and abetted by Sergeant Gisevius.

15          There's a lot of lives, a lot of families that

16  have been affected by this tragedy.  Make no doubt about that.

17  But it wasn't a criminal act committed by Mr. Gisevius.  And I

18  believe that at the end of this trial, common sense, your human

19  intellect, and the evidence will prove that.

20          Thank you.

21      **THE COURT:**  All right.  Thank you, Mr. Hessler.

22          Mr. Meche, you're next.

23      **MR. MECHE:**  Your Honor, ladies and gentlemen, I'm

24  Timothy Meche.  Again, I'm the attorney for Anthony Villavaso.

25  Stand up, Anthony.  He's my client.  He's the defendant on

1   trial here today.

2           Every case, every trial is different.  In many,

3   if not most, criminal trials we do, the job we give to the jury

4   is for them to decide what happened because frequently the

5   defense differs with the prosecution about what happened, and

6   we present evidence and leave it up to the jury to decide

7   exactly what happened.  In Anthony Villavaso's case, that's

8   really not going to be your job because everybody agrees what

9   happened.

10          And I guess I'm the fifth lawyer to address you

11  about the subject, but it should be clear to you now that, on

12  the date in question, he received a call that an officer was in

13  distress, being shot at under the bridge.  And he jumped in the

14  back of a moving van truck, the truck got to the top of the

15  bridge, the superior ranking officers in the front got out,

16  started shooting.  He's in the back, he hears the gunshots, he

17  gets out, he fires his gun.

18          The government said he fired nine times.  We

19  don't dispute that.  That's what happened.  We all agree to

20  that.

21          The key job for you in his case, maybe more so

22  with him than some of the other defendants, is to decide why

23  this happened, what his intentions were when this happened,

24  what was going through his mind.  Was he acting in a way that

25  he thought was proper and necessary, or was he doing something

with the condemned state of mind that the law makes criminal as opposed to something else?

And I realize what we're going to be asking you to do in his case is to pass judgment on what was in his heart and his mind at that particular time; and that's a very difficult thing to ask a jury to do, although we do it frequently in criminal law. And with that in mind, I realize I have an obligation to give you as much information as possible to help you make that decision and to enable you to be comfortable when you go back in the jury room and make that decision.

I need to give you information about the facts and circumstances of that particular incident, as well as the facts and circumstances leading up to that incident, the days and weeks before that. Also, I think it's incumbent upon me to give you as much information, as I'm allowed to, about Anthony Villavaso himself.

Because you're going to need to decide whether he all of a sudden one day just decided to go out there and become a criminal and do something that the criminal law condemns. And you need to know that there's nothing in his background or his history which would lead him to all of a sudden decide to do that.

Let me give you some information. He was born in New Orleans in 1976. His family was from New Orleans. When

```
 1   he was born, his parents were probably a little bit older than
 2   most couples who have their first child, and ended up being
 3   their only child.  And as a result, most children in that
 4   circumstance, he was doted on a little bit as a child, but he
 5   wasn't spoiled.
 6                He was required go to school, do his chores, he
 7   went to church every week, attended parochial schools, visited
 8   his grandmother every week, came from a loving, good household.
 9   He was very fortunate and very privileged as a result.
10                He ended up getting accepted to a high school in
11   New Orleans that's considered somewhat prestigious,
12   St. Augustine High School.  It's been in the news lately
13   because they impose a form of discipline.  They paddle their
14   students, and he got paddled like everybody else.  He was in
15   the marching band there.  He played the saxophone, marched in
16   Mardi Gras parades.  You may have seen him.  He was a good kid.
17                He graduated from there in 1995.  And like a lot
18   of kids who graduated from high school, he didn't know what he
19   wanted to do at the time, so he went to college.  And he
20   attended Southern University of New Orleans, did okay, never
21   really got focused on a type of major that would lead to a
22   career, but he wasn't a bad student.
23                But something happened which caused him to quit
24   school and go to work.  He learned that he was going to be a
25   father and he had to support his child.  So he went to work and
```

1    he worked for the automotive industry here in New Orleans, the
2    car dealerships.  He wasn't a car salesman, but he did other
3    things for two or three dealerships in the New Orleans area.
4    Originally, he thought maybe he'd make a career out of it, then
5    he realized it wasn't the career for him.
6              At this time in the late '90s, you might recall,
7    there was a push in New Orleans to recruit people for the
8    police department.  And there were ads.  If you'd go to Saints
9    games, you'd see it on the Jumbotron:  "You can make a
10   difference.  You can help.  You can help our community," and he
11   bought into that.
12             It might be kind of corny, but he really thought
13   that he could become a police officer and make a difference.
14   He didn't come from a police family.  He didn't -- in fact, his
15   parents didn't want him to do it.  His grandmother was
16   horrified.  She was afraid he'd get hurt, but it's something he
17   wanted to do.
18             So he went to the police academy.  And in
19   2001 -- the fall of 2001, he graduated from the police academy
20   and became a New Orleans police officer.  This was about a
21   little less than four years before Katrina.  Originally, he
22   started working in the 2nd District.
23             And I need to explain this to you if you're not
24   from New Orleans, and I'm not either, so I had to learn this
25   when I moved here.  New Orleans is kind of subdivided into

 1    certain areas.  If you talk to people who are from here,
 2    they'll tell you they're from the Ninth Ward or the 13th Ward
 3    or something like that.
 4              Within the New Orleans Police Department, at
 5    least in modern times, it's been divided into eight districts.
 6    And you're either from the 1st District or the 2nd District, or
 7    the 8th District, for instance, it's the French Quarter.  And
 8    each little district is kind of it's own little sub-police
 9    force.  They have their own headquarters; they have their own
10    hierarchy; they have their own command staff.  And if you're in
11    a certain district, you pretty much just deal with the people
12    in that district.
13              So when you hear a lot of discussion in this
14    case, and you already have from the other attorneys, about some
15    officers being in one district and some officers being in
16    another, that's because it is significant for purposes of
17    describing the culture of the New Orleans Police Department.
18              So he worked in the 2nd District for about a
19    year.  Then he went over to the canine unit.  He liked animals,
20    so he worked with the dogs for a while.  And then a position
21    came up in the 5th District task force.  And you heard one of
22    the other attorneys talk earlier today about "task force."
23              You know, different people become police for
24    different reasons.  All of them are valid, all of them are
25    necessary.  Some people, frankly, like the paycheck; some

1   people like the insurance or the benefits; some people like to
2   do desk work; some people like to do traffic work.  All of
3   these are equally valued.
4                    But within the New Orleans Police Department and
5   other police departments, they have proactive units, and these
6   are guys who go out there and, essentially, search for crime
7   and search for the criminals.  They go to the hot spots where
8   people are dealing drugs and they try to find the drug dealers
9   engaging in the activity.  It's a little bit more dangerous a
10  job than other positions in the police force, and it's
11  something not everybody wants to do.  That's what he wanted to
12  do.
13                   So he got a job on the 5th District task force.
14  Significantly, I think virtually every defendant in this case
15  were task force officers.  They were the type of people who
16  chose to do something more dangerous, more proactive, what they
17  considered perhaps more valuable.  That's important when you're
18  trying to decide what was in the hearts and minds of all of
19  these defendants.
20                   So in the 5th District he was assigned a partner
21  and it was their job to go out and find the crime.  And his
22  partner was named Robert Barrios.  Remember that name.  You're
23  going to see him during this trial.  His name's going to come
24  up.
25                   And he and Barrios for about a year patrolled

1   the streets in the 5th District in New Orleans, which is near

2   the area of Bywater on the other side of the French Quarter,

3   the Ninth Ward, for instance, and they were successful.  They

4   did their jobs well.  They apprehended their fair share of

5   criminals.  They did their jobs and they liked doing it.

6            When the storm hit, Katrina, August 29th, 2005,

7   the day before that was a Sunday and it was Anthony's day off.

8   And they knew the storm was coming in.  And in most places, I

9   think today, what the New Orleans Police Department would do is

10  they'd tell all the officers to go report to their station if

11  they knew a storm was coming in.

12            The New Orleans Police Department didn't do that

13  for Katrina.  They told the officers, "If you're not scheduled

14  to be on work, just stay at home, come in at your normally

15  assigned time."  And they did that, quite frankly, because they

16  didn't want to spend the money on overtime.  They would have

17  had to pay the officers extra money, overtime, to report, and

18  they were too cheap to do it.

19            They said, "We won't have to -- it's probably

20  not going to be that bad.  The storm always takes a turn to the

21  right and we won't have to worry about it."  So for that

22  reason, Anthony spent the day Sunday securing his house.  He

23  had a house in New Orleans East, a little two-bedroom brick

24  sort of house.

25            And he made sure his parents were going to be

okay.  His father was going to go stay with his
90-something-year-old mother in Harahan, Louisiana.  His mother
was going to go stay Uptown with his aunt.  He made sure his
ex-wife, by this time, and his child were going to be okay.
They were evacuating to Texas.  So he was going to be alone at
his house.  He secured his things and he was going to spend
Sunday at his house.  And he was scheduled to go back into work
that next Monday afternoon.

The storm came through that night, as we all
know, and the next morning he woke up and things weren't that
bad.  I mean, there wasn't -- his house was intact.  There
wasn't really that bad wind damage and he figured he'd just
report in to work that afternoon as usual.  But around
10:00 that morning, water started coming into his neighborhood.
And by noon, it had risen to over his knees, about to his
waist.  And he realized, "Wow, something's going on."

So he had his police radio with him.  He turned
it on and he could -- you know, he didn't know if just his
neighborhood was being flooded or whatever.  But he learned
that it was kind of a citywide thing.  And he learned that some
areas, like where he was to report to his district, was
completely flooded and he couldn't get there, and it was going
to be bad.

So he started scrambling, trying to figure out
what he should do.  He secured his duty belt.  Police have

1    something called a belt that you see them wear and they have

2    all their things, their equipment they use, their radio, their

3    handcuffs, their gun, their ammunition and all that.  So he

4    secured it, put it on a top area of his closet.  And he had

5    guns.  In addition to his police-issued weapon, he had two

6    shotguns and a rifle that he had.  And he put all that up to

7    make sure it was okay with his ammunition and his police

8    uniform and he climbed up in his attic.

9                    And he was up in his attic and the water kept

10   rising.  And then he said, "Wait a minute.  What happens if the

11   water gets all the way up?"  You know, he had one of those

12   roofs, it wasn't the kind of roof where you could punch a hole

13   through it.  It was kind of shell/slate stuff.  So he realized,

14   "Man, I could get stuck up here."

15                   So after a couple hours, he realized he had to

16   get out of there.  So by that time, the water was, you know,

17   six, seven, eight foot high.  So he climbed out of his attic,

18   got in his house in the water, kind of swam out the back door,

19   got a ladder and climbed up on his roof.  And he spent the next

20   few hours on his roof.

21                   And he looked all around and his and whole

22   neighborhood was flooded.  And he realized, "This is going to

23   be a bad situation."  And, you know, who knows what goes

24   through a person's mind when that's going on.  But he realized

25   he didn't want to spend the night there, and for the first time

1    he started hearing things like gunfire that was erupting in the

2    neighborhood.  He couldn't see it, but he could hear gunfire

3    and things like that going on.

4              Right before dusk there was a man who came

5    floating by on some type of mattress sort of thing, but he was,

6    like, using it to paddle out of there.  So Anthony said, you

7    know, "Hey" -- you know, he stopped him and he said, "Can I

8    come with you?"

9              And so he got on the mattress with this guy --

10   and, you know, he don't know the guy's name, never saw him

11   again after that -- and they paddled towards the -- you heard

12   one of the lawyers say there was a sliver of land in that part

13   of the town around Chef Highway, Highway 90, in New Orleans

14   East, and that was the only high ground, which was just a real

15   narrow sliver of land, and they made it out there.

16             As they were going there, though, they

17   encountered an old lady on her roof, who didn't look like she

18   was doing real well at all, and she was obviously in distress.

19   So they got her and they actually put her on the mattress and

20   they pushed her out.  And they got to the road and the guy who

21   was with Anthony, he said, "See you later," and he left.

22             So Anthony's stuck there with this old lady, who

23   obviously needs help.  He doesn't know what to do.  So he said,

24   "Well, I got to get this lady somewhere."  And it turns out

25   there was a nursing home on Chef Highway, and he went to the

1  nursing home and there were people there.  It was dry.  And
2  there were people there kind of taking shelter.
3              And by that time it was nighttime, so he put the
4  old lady in a room and she got to lay down on the bed.  And he
5  spent the night at that nursing home just helping people.
6  There was no real organization.  Everybody was just, you know,
7  pitching in, helping people, people would show up.  He didn't
8  get much sleep, but he spent the night there.
9              And the next day, he woke up, and it was the
10 second day after the storm.  And keep in mind, you know, he's
11 supposed to be on duty, but there's no way he could get to his
12 station where he was supposed to report to work.  That was
13 flooded, that was gone.  That was in the Ninth Ward area.  He
14 couldn't get there.  And if he had wanted to, he could have got
15 out of town, if he could have got out.  He could have just
16 stayed.  He didn't have to go to work as a police officer.
17 There was nobody to tell him, "You have to work."
18             You know, a lot of people recall during those
19 days a lot of New Orleans police officers didn't show up for
20 work or left.  That, in fact, did happen.  But a lot of them
21 just couldn't get to where they were supposed to get to.  And
22 those who chose to be proactive and help people and rescue
23 people, they did that because they wanted to.  They didn't do
24 that because somebody was telling them to.  They were just
25 those type of people.

1          So the second day, Anthony looks around and
2   says, "Well, what should I do," and he decided he would try to
3   get to his partner's house, Robert Barrios, because he lived
4   near there.  And Anthony knew Robert had a boat.  And he said,
5   "Maybe if we could get to him and get in the boat, you know, we
6   can start rescuing people, I can get back to my house and get
7   my things."  So he started walking to Barrios' house, and right
8   before he got there, he saw him, and Robert was in the boat.
9   And he was actually already starting to rescue people.  So
10  Anthony says, "Hey," you know.
11          So Robert picks him up and they spent that
12  second day after the storm just rescuing people.  And they were
13  going -- people were dead, people are on roofs, people were --
14  so they would rescue people and bring them back to Chef
15  Highway.  And there was nobody really taking these people in.
16  There was no real National Guard presence at the time.  We
17  certainly didn't have federal presence at the time.  But they
18  were dropping people off.  And they did that that whole day.
19          And then at night -- and this -- they were at
20  the corner of -- probably the driest part was Chef and
21  Read Boulevard, and that's where many of the officers who were
22  doing this on their own, like you heard about Officer Gisevius,
23  they were just all just doing that on their own.  That's kind
24  of where they were all meeting up and docking, not because
25  somebody said, "Let's all do it there," but it just happened to

1    be the highest point where everybody just ended up.

2               So they did that that whole second day and they

3    spend the night in their boat that second night.  They wanted

4    to keep rescuing people, but they were hearing gunshots and all

5    that and they just didn't think it would be safe.

6               They woke up the third day and Anthony and

7    Barrios decided they should try to make it to Anthony's house,

8    A, to get his weapons and stuff, but also to get food because

9    they had nothing to eat.  So they drove the boat to Anthony's

10   house.  They got in there.  Interestingly, when he got there,

11   he went through the back door, somebody had already gone in

12   there to attempt to loot it.  Somebody had broken in that back

13   door by that third day.

14              And he got in and, you know, he retrieved his

15   weapons and his duty belt, and he also took everything out of

16   his cabinet, canned goods, things that didn't get washed up and

17   weren't flooded, and they loaded up the boat.  And they went

18   out and just spent the day rescuing people that third day.

19              MS. BERNSTEIN:  Objection.  Your Honor, I'm sorry to

20   be disrespectful, but may we approach for a moment?

21              THE COURT:  Sure.

22              MR. MECHE:  Excuse me.

23              (WHEREUPON, the following proceedings were held at

24   the bench.)

25              MS. BERNSTEIN:  I'm sorry, Your Honor.  I let that go

1    for maybe half an hour.  I don't think I've heard anything yet

2    that's appropriate for an opening.  This is argument and

3    nothing has to do with any of the crimes that have been

4    charged.

5            MR. MECHE:  That's completely false, Your Honor.

6    This has everything to do with his state of mind, his personal

7    experiences, whether or not he decided to choose to be a

8    criminal.  He went without sleep for a week.  He's at risk.

9    This is all relevant.  I didn't argue.  This is relevant.

10           THE COURT:  Mr. Meche, go ahead and continue, but I

11   think we need to get to --

12           MR. MECHE:  I'm almost there.

13           THE COURT:  -- the events of September 4th.  I think

14   that's what the jury wants to hear.  And granted, we do have

15   time, but we're not getting there.  This chronology --

16           MR. MECHE:  I only got a couple more minutes.

17           THE COURT:  All right.

18           MS. BERNSTEIN:  At this point --

19           THE COURT:  My ruling with regard to rescuing people

20   pertains to the defendants themselves, not about other events

21   going on in the city.  But that's also not a license to spend

22   time talking about that as opposed to what the evidence in this

23   case is going to be relative to the events on the bridge and

24   the events thereafter that are material to the indictment.

25                   So I'm going to give you a cautionary warning.

```
 1              MR. MECHE:  Sure.
 2              THE COURT:  I'm going to overrule the objection now,
 3    but I think you really do need to get to it.
 4              MR. MECHE:  I'm almost there.
 5              THE COURT:  Okay.  Let's cut to the chase here.
 6              MR. MECHE:  Okay.
 7              MS. BERNSTEIN:  One other thing I'd ask at this point
 8    is whether Mr. Meche has just committed to his client taking
 9    the stand.  I'd ask whether Mr. Meche has just committed his
10    client taking the stand, given half an hour of evidence that
11    can only come in through his client.
12              MR. MECHE:  I've never heard of having to commit to
13    anything.
14              THE COURT:  No.  I'm not going to make him commit to
15    that.  But if there is no explanation of this -- of course,
16    Mr. Barrios is going to testify, whether he can testify to some
17    of this, but let's get to the events that are material to the
18    incident.
19              MR. MECHE:  Sure.
20              THE COURT:  I think they get what you're telling them
21    about the days before.
22              Thank you.
23              (WHEREUPON, the following proceedings were held in
24    open court.)
25              MR. MECHE:  To be clear:  One of the, I think,
```

1   misperceptions is that there was some organized 7th District

2   police group at this place called the Crystal Palace that was

3   directing all of this rescue activity when, in fact, there

4   wasn't.  There was leadership of the 7th District, captains and

5   lieutenants.  They were nowhere to be found.  These people --

6   these officers who were out doing this rescue activity, they

7   were doing it on their own.  They weren't doing it at

8   direction.

9             Anthony and Barrios were not part of this 7th

10   District group.  They were 5th District officers.  So they

11   really didn't answer to any of them.  And they didn't go inside

12   the Crystal Palace.  They kind of operated on their own.  When

13   they slept at night, they slept in their boats on the street on

14   the corner.  The reason they did that was they didn't want to

15   lose -- they knew if they left their boat, somebody would steal

16   it and they wouldn't be doing it.

17             This went on that whole week prior to this

18   incident.  You know, the incident we've been talking about

19   happened on that Sunday.  And when I just left off after

20   Ms. Bernstein interrupted me, we were here on Wednesday.  And

21   this went on Thursday, and Friday, and Saturday, the same type

22   of activity.  That's all they did.  No help, no National Guard,

23   no federal presence, no Massachusetts National Guard.  They

24   were on their own.  And that's what they did.

25             When the incident happened, this Sunday,

1  September 4th, it was the morning.  And Anthony and Barrios

2  were in their boats and they were all meeting up at this corner

3  getting gas.  One of the officers was going around siphoning

4  gas -- they couldn't get gas anywhere's else -- out of cars,

5  and they would fill up their boats.  And they were in their

6  boats trying to get gas and that's when they heard over the

7  radio.

8          Anthony thinks he heard it on his police radio

9  that he had that worked sometimes.  And then they heard that

10  term "108."  And the other attorneys have addressed you guys

11  about what "108" means.  And I'm not a police officer, you

12  know, they all talk in codes.  But 108 is one of the most

13  serious codes, alerts, you can issue.

14          And when you say "108," you're saying there's

15  officers in distress, either being shot at or harmed, and

16  whatever you're doing, you're supposed to drop what you're

17  doing and run to that.  That's what you're trained to do at the

18  police academy.  That's what police do.  If you're writing

19  somebody a speeding ticket, guess what?  It's their lucky day,

20  they get let off.  Because you quit whatever you're doing and

21  you run to go help the officers.  That's what you're trained to

22  do.

23          So once they heard that, somebody got in this

24  Budget truck.  Anthony had never been in that Budget truck

25  before.  He got in the back, along with other officers, and you

1  heard Sergeant Bowen and Officer Hunter was in the front, and

2  the truck took off.  You could imagine what they were thinking

3  as they're riding to this incident.

4          They're hearing -- they heard police -- they

5  heard shots the whole week they were rescuing people.  In fact,

6  they wouldn't work at night because it was too dangerous.

7  People were shooting people.  They heard gunshots all over the

8  city.  That's well documented.  And it seemed quite believable

9  to them that somebody was shooting at officers and two officers

10 were shot under the bridge.  Everything they've seen that whole

11 week would lead them to believe not only is that possible, but

12 that's probable that that's happened.

13         So they're in the back of the truck.

14 Interestingly, all of the officers who were in the back of the

15 truck were interviewed.  A lot of them will testify.  Most of

16 them said, "We didn't talk when we were back there.  Nobody

17 talked.  Everybody was quiet."  And the truck was bouncing

18 around, they're bouncing around.

19         And did the trip take three minutes, two

20 minutes, five minutes?  You ask each one of the officers, they

21 can't tell you.  It was almost a surreal event in their minds.

22 I'm sure their adrenaline was pumping.  I'm sure they're

23 scared.  And they all have their guns.

24         And the truck gets to the top of the bridge and

25 the officers in front, the sergeants, get out, and you've heard

them describe how they started shooting first.  Anthony's in
the back.  He gets out, he has his gun.  Not everybody got out
of that truck.  Some will tell you they didn't get out,
"Because, well, I got tangled up."  Is that possible?  Is it
possible they were scared?  I would have been.  I'm not sure I
would have gotten out.  But Anthony was one of the ones who got
out.  And he got out with his gun and he fired.

Now, you heard Ms. Bernstein say that instead
of, quote, assessing the situation, he got out and fired his
gun.  With all due respect, in a situation like that, you don't
have time to get out of the truck and say, "Oh, let me go
assess the situation first."  Things are happening so fast.
It's not a video game, it's not a slow motion movie.

Things are happening so fast, if you take the
time to go out and assess the situation, you could quite likely
get your head blown off, or somebody else could get their head
blown off.  When he got out of the truck and fired his gun,
it's because he thought people were firing back.  In his mind,
he saw people shooting back at him.  He believes that to this
day.

Now, after this shooting, different people move
certain ways.  You'll see a videotape.  You'll see two of the
officers advance further up the bridge first.  The government's
going to say that's Sergeant Gisevius and Officer Faulcon.  A
little while later, you'll see Anthony Villavaso come from

1  behind the truck and run forward.

2              Sir, can you -- Mr. Tim, can you put up the

3  video?

4              We're at the bridge.  I'll see if I can work

5  this right.  The red dot to my right is where the van or the

6  truck stopped, according to the government, and I believe that,

7  and that's where they got out and started shooting.

8  Eventually, two of the officers ran forward up the bridge, and

9  the government identifies them as Faulcon and Gisevius.  And

10 they ended up where this other red dot is to the left.

11             There may be testimony that at some point they

12 got in the vehicle.  I'm not sure, because Anthony Villavaso

13 didn't go that far.  He stopped right here.  He ran or walked

14 to that point; and at that point, he apprehended a gentleman

15 who was there who was running on the scene.  Anthony didn't

16 know if he was involved or not.

17             He didn't shoot the gentleman.  He didn't hurt

18 the gentleman.  He just detained him.  He put these plastic

19 handcuffs on his back and sat with him.  Sat there 15, 20

20 minutes until some other officer -- he thinks it may have been

21 the state police -- stopped and picked up the guy and put him

22 in the car.  Anthony's understanding is they let that guy go.

23 He doesn't know who that is to this day.

24             Anthony did not go down here where Mr. Madison

25 was shot, had nothing to do with that.  Is not even charged

1  with that.  And that was the extent of his involvement on that
2  day.
3           Now, after this happened, and frequently when,
4  you know, in the normal world, under normal circumstances, when
5  police are involved in shootings, they're, you know, given desk
6  duty.  Many departments automatically send them to counseling,
7  to a psychologist because, obviously, it's a traumatic event.
8  The officers involved in this didn't have that luxury.  They
9  had to go right back to work, within an hour, rescuing people,
10 just like they had done.
11          Now, one thing they did do is they were told,
12 whoever fired their weapons to go back to this station, this
13 7th District station, or Crystal Palace area, and
14 Sergeant Kaufman asked, "If you fired your gun, give me your
15 name and where we can get in touch with you later."
16          And that's all he did.  He said, "I fired my
17 gun.  My name's Anthony Villavaso."  He gave them his contact
18 information, "I'm a 5th District officer," and that was it.
19 There was no further questioning; there was no counseling;
20 there was no discussion.  And he went right back to work
21 rescuing people, and did that pretty much for another week
22 before help arrived.
23          It wasn't until two weeks after the storm that
24 these officers doing this were relieved.  And by that time, a
25 cruise ship came to the Mississippi River and they were allowed

1   to go there and finally get a shower and spend the night, but

2   that was two weeks later.  And that was the extent of his

3   involvement.

4            Now, that's the extent of his involvement in the

5   shooting.  But, again, you're going to be asked to decide what

6   his intentions were and whether his actions were criminal or

7   not.

8            Mr. Villavaso is also charged in the other part

9   of the case, like everybody else, and for lack of a better

10  word, I'll call it the "cover-up case" or the "obstruction of

11  justice case."

12           His role, even as described by the government,

13  is very minimal.  You heard the judge read the indictment out

14  and there's something called "Overt Acts" of the -- of a

15  criminal conspiracy, where the government lays out what they

16  think happened in the course of the conspiracy.

17           The judge read to you 35 paragraphs,

18  constituting 35 overt acts.  Out of those 35 acts, Anthony

19  Villavaso's name is mentioned in two.  And, essentially, it's

20  for the same conduct; and that is, that on January 25th, 2006,

21  he gave a statement about his involvement in the shooting, and

22  they're saying he lied during that statement.

23           The January 25th statement, and you heard

24  Mr. Hessler talk about it, the government describes it as some

25  kind of secret, conspiratorial meeting where they got together

 1   in some gutted-out warehouse.  It's not like that at all.
 2   There were 25 people there.  There were police academy
 3   recruits.  They were officers straight as an arrow.  If
 4   something like that would have been going on, they certainly
 5   wouldn't have done it in front of 25 people.
 6              Anthony's remembrance is he just got there and
 7   one of the officers took his gun.  They were told to take
 8   whatever weapon you used in the incident and turn it in, and he
 9   did.  And the officer he turned it in to said, "You come with
10   me.  I'm going to take your statement."  They didn't use the
11   same detectives to get statements from everybody.  They split
12   it up.  The whole Homicide Division was there and they each
13   kind of took somebody.
14              For instance, Officer Barrios gave his statement
15   in the back seat of a police car.  Anthony gave his statement
16   in a trailer.  They separated them.  If they would have wanted
17   to do some conspiracy, orchestrate your story things, they
18   would have done it all together.  That's not what happened at
19   all.  And the statement he gave, in his mind, was the exact
20   truth.
21              He told them what he said -- he told them what
22   he saw.  He told them what he thinks he saw then.  To this day,
23   he thinks that's what he saw.  He believes, when he got out of
24   that truck, he saw shooting and he thought he saw people
25   shooting back at him.

1          And Ms. Bernstein made a big deal of the fact

2    that he said, "Men and women," and suggested that he tried to

3    say the women had guns too.  That's not what he said.  If you

4    look at his statement real carefully, he said, "I saw men and

5    women.  They had guns."  That's similar to what Lance Madison

6    said.  He said he saw teenagers, men and women, shooting at

7    him.  That's not really what he said.

8          Nevertheless, if he was intentionally trying to

9    lie, he wouldn't have suggested that these women were shooting

10   at him.  He would have suggested the young teenage boys were

11   shooting at him because that was consistent with everybody

12   else.  He's not trying to lie.  He's trying to say exactly what

13   he believes he saw.  And it's up to you to decide, based on all

14   of the evidence, whether or not that seemed reasonable.

15         Very important:  This case is not about whether

16   or not members of the, quote, Bartholomew group, had guns or

17   not.  It's about whether or not these officers reasonably

18   believed those people had guns.

19         And I'm going to tell you, the evidence is

20   such -- and you're going to hear both sides.  You're going to

21   hear people say that members of that group admitted having

22   guns.  You'll hear witnesses say that.  You'll hear people,

23   like Lance Madison, suggest that those people were shooting at

24   him earlier.  You'll hear the people on the high rise bridge

25   who originally put in that call, that 108 call, that there were

1    people shooting at them, and chances are it was these people.

2    There's enough evidence for you to conclude that they did

3    actually have guns.

4              Now, they're going to tell you they did not have

5    guns and absolutely nobody in their group ever had a gun in the

6    history of their whole life.  Now, why would they say that?

7    Well, every single one of them has a lawsuit against the City

8    of New Orleans and they know that their chances of recovering

9    big money are nil if any member of their group had a gun at any

10   time.  So, of course, they're going to stick to that story.

11   But, again, the issue's not whether or not they did have guns,

12   the issue is whether these officers reasonably believed they

13   had guns.

14             Now, there's been some discussion, and you're

15   going to learn, that there were officers in this case who made

16   plea bargains, who have agreed to testify for the government.

17   They pled guilty to reduced charges.  Specifically, five former

18   police officers have done that.  Many, if not most of them,

19   will probably have very little, if anything, to say about

20   Anthony Villavaso.  In fact, I think most of them don't even

21   know who he is.

22             One of the officers who has pled guilty does

23   know him, and that's Robert Barrios, his partner.  You'll learn

24   that Robert Barrios entered a guilty plea to conspiracy to

25   obstruct justice; that is, he admitted giving a false

1    statement.  He admitted that his statement he gave at that

2    January 25th meeting was false; and as a result, he's facing a

3    sentence of zero to five years in prison.

4                    He has been told that if he testifies and,

5    quote, cooperates with the government, and the government is

6    satisfied with his cooperation, they may make a notion to the

7    Court so that he receive a sentence lower than what he should

8    receive.  He could conceivably receive probation.

9                    Now, why would he agree to do that if, in fact,

10   he's really not guilty?  Well, ladies and gentlemen, there's

11   certain things you need to know about him and what he

12   experienced, and there's certain things you need to know about

13   what it's like to be the target in a federal prosecution.  It's

14   an enormously stressful, difficult thing to do.

15                   Here's what we know about Barrios.  Immediately

16   after the shooting, he was overheard by another one of the

17   government cooperating --

18             MR. CARTER:  Your Honor, I object.

19             MS. BERNSTEIN:  Objection.

20             THE COURT:  Why don't you all come forward.

21             (WHEREUPON, the following proceedings were held at

22   the bench.)

23             MS. BERNSTEIN:  Pure hearsay.  Pure hearsay.

24             MR. MECHE:  If he denies it, I'm going to impeach him

25   with Hunter.

1          MS. BERNSTEIN:  Tim, does he talk about --

2          MR. MECHE:  Hopefully, he'll tell the truth and he'll

3      admit to saying that.

4          MS. BERNSTEIN:  And if it comes out on the stand,

5      then people can talk about it.  It's pure hearsay.

6          MR. MECHE:  No, that's coming out.  I can say that in

7      my opening, Judge.  That's it.

8          MS. BERNSTEIN:  And I can also place another

9      objection on the record while we're up here so we don't have to

10     come back, if Mr. Meche has any plans on talking about the tape

11     that Barrios made with his client, I will be on my feet.  So we

12     can save that for then.

13         THE COURT:  Well, peremptorily, I agree with you on

14     that one.

15         MS. BERNSTEIN:  Thank you.

16         MR. MECHE:  I'm not planning on doing that.

17         THE COURT:  On this one, I'm going to let him go

18     ahead and talk about it since these people are going to

19     testify.

20         MS. BERNSTEIN:  They might or might not testify.

21         MR. MECHE:  She's talked about what they're going to

22     say, Judge.

23         MS. BERNSTEIN:  No, I didn't.

24         MR. MECHE:  Yeah, you did talk about what Hunter's

25     going to say.  Why can't I?

1          MS. BERNSTEIN:  I talked about --

2          THE COURT:  First of all, not so loud, and I need one

3    person at a time.

4          MS. BERNSTEIN:  I'm sorry.  I can answer that.  I

5    have talked about what Hunter was going to say.  And the reason

6    Mr. Meche can't talk about that is because it's hearsay if

7    offered by the defense.

8          MR. MECHE:  It's not.  He's going to -- they're going

9    to testify, Judge.

10         THE COURT:  I think he can introduce this into

11   evidence --

12         MR. MECHE:  Yes.  Sure.

13         THE COURT:  -- as impeachment.

14         MR. MECHE:  Uh-huh.

15         THE COURT:  I mean, this document itself.

16         MS. BERNSTEIN:  All right.  If it's for

17   impeachment --

18         THE COURT:  I'm going to let him go ahead and talk

19   about that.

20         MR. CARTER:  Your Honor, we may not call him.

21         THE COURT:  You're not calling Mr. Hunter?  He's

22   talking about Hunter.

23             Mr. Meche, it's the Hunter testimony that we're

24   talking about?

25         MR. MECHE:  Sure.  Absolutely.

 1            THE COURT:  That's what I understood.

 2            MS. BERNSTEIN:  Could we be more specific about what

 3  it is that would be admissible as impeachment?  Hunter would be

 4  testifying about hearsay.  So the hearsay, even if Hunter --

 5            MR. MECHE:  Barrios is going to testify, it's not

 6  hearsay.

 7            THE COURT:  Which they're saying that they may not

 8  call Barrios.

 9            MR. MECHE:  If you commit to not calling Barrios --

10  is she going to commit?  Is she going to commit, Judge?

11            MS. BERNSTEIN:  I don't think I have to commit

12  either, Your Honor.

13            MR. MECHE:  Well, then I get to say it.

14            THE COURT:  Well, I'm going to overrule the objection

15  and let him talk about it.

16            MR. MECHE:  Thank you.

17            (WHEREUPON, the following proceedings were held in

18  open court.)

19            MR. MECHE:  Here's what we know about what Barrios

20  said.  Officer Hunter, who will testify for the government,

21  will say that immediately after the shooting, he heard Barrios,

22  essentially, bragging about the shooting.  He heard Barrios

23  referring to hitting someone in the head with a slug.  He

24  referred to the person he hit as a little bitch and he said,

25  "Did you see how he spun around after I hit him with my shotgun

slug?"  Their witness is going to say that they heard Barrios
say that.

Additionally, immediately after the shooting,
when everybody was asked to tell Kaufman who shot their guns,
Barrios raised his hand and said, "I shot my gun."  On the
January 25th statement that he gave, Barrios said, "Yes, I
fired my weapon on the bridge."  He could have been in big
trouble.  What kind of trouble?  He engaged in a taped
conversation with Officer Hunter and at that time he was led to
believe what kind of trouble he'd be looking at.

Officer Hunter told him, "We're looking at a
minimum of 25 years.  If we go to trial and get convicted, we
could do 50 to 60 years in prison."  I believe he was led to
believe the government might even seek the death penalty
against him.  I believe he was told that if he's indicted on
federal charges, he has to be arrested, he doesn't get bail, he
has to sit in jail until his trial date.

He was facing all that, and he got it all washed
away and pled guilty to an offense where he will serve zero to
five years.  The government's saying, "Maybe we'll put in a
motion with the judge to give you a better sentence."  He could
get zero years.  Consider that when you listen to his
testimony.

The government's going to say, "Well, we didn't
find any ballistic evidence showing that he shot his gun on the

1  bridge."  The ballistic evidence in this case is a joke.  They

2  didn't go out there to collect the ballistics until 52 days

3  after the incident.  Fifty-two days, October 22nd.

4          You know what happened between September 4th and

5  October 22nd?  God knows how many cars were going up and down

6  the bridge.  Who knows what the weather was doing.  Hurricane

7  Rita came through here during that period of time.  Is it

8  possible there were shotgun shells that Barrios fired that

9  weren't recovered 52 days later?  Of course.

10          I think it's just not credible for them to

11  suggest to you, considering all that, that Barrios did not

12  shoot his gun and wasn't the one who hit one of those people.

13          Ladies and gentlemen, we have a large trial, and

14  my commitment to you is to bring out all of the evidence, not

15  just some of it, but all of the evidence.  Because I appreciate

16  that when you go back in that jury room and you're rendering a

17  judgment on another human being, you want what went through

18  their mind and their heart.  You should know everything, not

19  just snippets of it that the government will present.

20          Thank you very much.

21          THE COURT:  Mr. Meche.

22          Mr. London.

23      MR. LONDON:  Good afternoon, ladies and gentlemen.

24  My name is Steve London.  I represent Archie Kaufman, who's

25  seated right there.  I believe I'm either the fifth or sixth to

1   talk to you today.  I've kind of lost count.

2              Obviously, I was prepared to discuss with you

3   about some of the background of this case, but I believe that

4   you've probably heard that enough, so I'll just start off with

5   a brief description of what Archie's position was during

6   Katrina.

7              Archie was a sergeant with the New Orleans

8   Police Department and he was assigned to the 7th Police

9   District, District Investigative Unit, DIU.  He was a sergeant

10  in their district detectives and his primary responsibility was

11  to handle homicides that occurred within the 7th Police

12  District.

13             They had -- and it's important to remember that

14  they had two Homicide Divisions at that point in the New

15  Orleans Police Department.  They had a centralized homicide,

16  which is, as it says, out of police headquarters.  Those

17  individuals investigated some major case homicides and police

18  shootings.

19             The homicide detectives that were assigned to

20  the various districts did not investigate police shootings, and

21  they did not investigate certain major crimes.  It was a

22  distinctly different unit.  They did not share the same chain

23  of command other than the Superintendent of Police; and one

24  worked under the Chief of Detectives, the other worked under

25  the Chief of Field Operations, and then their district

1    commander.

2                  Archie worked in the district -- 7th District,

3    never had handled a police shooting before this in his entire

4    30-year career, and never handled one prior to that until this

5    particular case.  Police shootings were investigated by the

6    Cold Case Squad as well as the Public Integrity Division, which

7    is also out of headquarters in New Orleans.

8                  You've heard the lawyers for both sides discuss

9    the condition of the 7th District station immediately following

10   Katrina.  I mean, it was flooded.  I don't know how many feet

11   of water it had, but it was totally destroyed.  And as such,

12   the officers could not operate out of that, so they went to the

13   Crystal Palace.  And I'm going to skip over the Crystal Palace.

14   I think you're acutely aware of what that building was.

15                  Immediately after Katrina, Sergeant Kaufman as

16   well as other members of the New Orleans Police Department,

17   those that remained at work, were charged with search and

18   rescue.  There wasn't a lot -- other than looting and some

19   shots, there wasn't the typical patrol as we think of policemen

20   nowadays.

21                  They weren't writing tickets.  They weren't out

22   there on the streets, if there were any streets that they could

23   be on.  They were rescuing people from rooftops and from

24   wherever they needed it.  And Kaufman, along with the other

25   officers, were involved in that.

1            And as my colleagues told you earlier, that

2 while at the Crystal Palace on September 4th, officers

3 overheard a radio broadcast of the 108, two officers down, and

4 you're aware that "two officers down" in their lingo means two

5 policemen shot.  Some of their officers traveled to -- on the

6 Danziger Bridge -- to the Danziger Bridge in the Budget

7 rent-a-truck, but Sergeant Kaufman did not do that.  He is a

8 sergeant, had a police car that was assigned to him, so he

9 responded somewhat after.

10            And when he arrived at the Danziger Bridge, the

11 shootings had taken place.  They were over.  He got there after

12 the incident was over.  He observed the Budget truck.  He got

13 out of his car.  He walked around, he saw that there were

14 people injured.  There was an EMS unit, I believe from

15 Arkansas, that had -- those people and a lot of people came to

16 New Orleans to assist -- and they had some EMS personnel

17 attending to these individuals.  And then Kaufman got in his

18 car and drove.  That's the east side, and that's east heading

19 west.

20            Kaufman -- Sergeant Kaufman drove to the west

21 side of the Danziger Bridge and about one-quarter of the way

22 down observed an individual -- I'm ahead of myself a little

23 bit.  There was a lot of traffic still on the radio about

24 descriptions of individuals that had supposedly been involved

25 in the shootings, and just a lot of chaos and a lot of activity

1  going on.

2              He crosses the-- goes down the bridge and he

3  sees the guy walking, he stops him to talk to him because he

4  did not know what -- you know, what his dealings would be or

5  wouldn't be.  That person's name was Mr. Johnson, Mr. Morrell

6  Johnson.

7              While talking to Morrell Johnson, Archie hears a

8  gunshot to his right further down the bridge, probably 100

9  yards, maybe a little bit further than that, and to his right

10  is the Family Inn.  And he looks up and he sees under the eave

11  an individual lying on the ground, and that person was later

12  learned to be Ronald Madison.

13              Sergeant Kaufman had Morrell detained there.  He

14  walked over to that area, down the bridge -- the rest of the

15  bridge to the Friendly Inn and was speaking to some -- to

16  people there.  It was still going on.  It was a very chaotic

17  situation.  They were still looking for other individuals.

18  Kaufman is approached by a person who identifies himself as

19  Lakeisha Smith.  He speaks to Lakeisha Smith, who he identified

20  as a black female, attractive, in her 30s.

21              She told Kaufman that -- identified Ronald

22  Madison as one of the looters in the area and had told Kaufman

23  that she was returning to her family's residence -- or her

24  family were going to leave New Orleans to return to Dallas to

25  stay with family members.

1          And I know the government says that the name of

2    Lakeisha Smith is just made up.  Supposedly their witness

3    Lehrmann -- and I'll talk about him a little bit later --

4    Lehrmann gave this name to Sergeant Kaufman as he was typing on

5    notes for his report, that she simply doesn't exist, not that

6    Lakeisha Smith didn't see this.

7          Remember, what the government told you.  They

8    told you she does not exist.  Well, I believe the evidence will

9    show you before this trial is over that she, in fact, does

10   exist; and, in fact, does fit the description of the individual

11   that Sergeant Kaufman claims to have -- to have spoken to.

12         At about that time, Lieutenant Lohman -- Lohman,

13   who is going to be another government witness and at the time

14   was the lieutenant in the 7th Police District, and he was the

15   commander of the District Investigative Unit, the DIU.  He was

16   Sergeant Kaufman's supervisor -- direct supervisor.  Kaufman

17   worked for him.  He was in charge of the district detectives.

18         Lohman meets with Kaufman.  They talk briefly.

19   Kaufman tells -- or Lohman tells Kaufman, "Look, Cold Case

20   Homicide" -- he probably didn't say "Cold Case," just said --

21   "homicide doesn't appear to be available right now.  You're

22   going to have to start handling this."  Kaufman got on the

23   radio, contacted the dispatcher and asked the dispatcher to

24   send crime lab, EMS, the coroner, and then again asked for

25   homicide.  He was advised that none of those were available.

1          It's Lohman, Kaufman, and Lehrmann is also on

2   the scene.  Lehrmann had left right immediately -- well, he

3   doesn't know if it was right after that, but he left, I

4   believe, before Sergeant Kaufman got to the west side of the

5   bridge to go with the Bartholomews to the hospital.  So it's

6   Lohman and Lehrmann -- Lohman and Kaufman, and, at about that

7   time, about 50 other state and local police officers had

8   amassed on the scene.

9          By this time there are at least two scenes.

10  There's one scene that's on the east side, the initial

11  shooting.  Then there's another scene, which is about

12  three-quarters of a mile away across this bridge, by the

13  Friendly Inn, where Ronald Madison had been shot.  That's two

14  scenes, spanning close to a mile over the Industrial Canal and

15  hundreds of acres of ground.

16         Madison was -- then shortly after that, Lance

17  Madison was apprehended by the state police and returned to the

18  area of the Friendly Inn, where he was identified by two

19  individuals as having been involved in this incident.  Sergeant

20  Kaufman instructed he be taken back to the Crystal Palace and

21  await until he could be booked -- properly booked.

22         Lieutenant Lohman then instructed Kaufman to

23  leave the scene, return to the Crystal Palace and initiate

24  taking interviews from the police officers involved in the

25  shooting, and also to finish the paperwork or whatever needed

to be done to have Lance Madison booked.  Sergeant Kaufman then
left the scene, leaving Lieutenant Lohman in charge of the
scene.  He's gone.  He left the scene and returned to the
Crystal Palace.

Upon arriving at the Crystal Palace, Kaufman
observed that the officers had brought Johnson as well as
Leonard Bartholomew, Jr., and you heard the government talk
about Leonard Bartholomew, Jr.  But the government says that
one of the -- and I don't want to get too far ahead of myself,
but I want mention that while I'm on this point.

The government says that Kaufman neglected to
put the name "Leonard Bartholomew, Jr." in his report, and that
was omitted in some sinister way because he was, apparently, in
this cover-up that they allege, trying to keep anybody from
knowing that Leonard Bartholomew, Jr. was on this scene.

But when you get these reports and you get the
32-page notes that Sergeant Kaufman typed, I want you to look
at it, because it's got Leonard Bartholomew, Jr.'s name in it
and it has a complete description of what he was doing.  So I
don't know where that's coming from, but that's, obviously, in
it and you'll be able to see that.

Anyway, those two individuals were not
identified as having participated in this event at this time,
so Kaufman ordered they be released, and they were.  Madison
was then taken to the Greyhound bus station on Loyola Avenue.

1  And that's important that you remember that because that will

2  come up later in the trial.  Central Lockup had been under

3  water, as well as the rest of New Orleans, and they were not

4  able to book anybody in Central Lockup, so they were using the

5  Greyhound station on Loyola Avenue as a temporary holding spot.

6           And these officers -- Officers Hills and Moret

7  transported Lance Madison to the Greyhound bus station.

8  Sergeant Kaufman followed them, filled out the paperwork -- the

9  paperwork was filled out on Lance Madison and Lance Madison was

10  booked.  Then Sergeant Kaufman returned to the Crystal Palace

11  and began interviewing those involved in this incident.

12           The following day, on September 5th, Kaufman

13  returns to the scene.  And as he exits his automobile at the

14  beginning of the bridge, he looks down and he sees 307 feet

15  away -- over a football field away -- from the shootings on the

16  east side of the bridge, he sees a pistol laying in the grass.

17  The pistol is approximately one mile from where Lance Madison

18  was apprehended.

19           Sergeant Kaufman -- it was a .357 caliber

20  revolver, blue steel, and the revolver was empty.  There were

21  no shell casings in it.  There were nothing fired from the gun.

22  The gun had absolutely no evidence that it had been fired any

23  time within -- recently.  There were no .38 or .357 caliber

24  shell casings lying anywhere around.

25           The shell casings that the government's talking

1    about are rifle shell casings, and they know it.  So when they

2    tell you that he looked -- and didn't even look and there were

3    shell casings all over, they neglected to tell you they weren't

4    .38 or .357 caliber shell casings, which would have fit that

5    pistol.  They were nowhere near -- casings were found nowhere

6    near -- anywhere near either of the two scenes, either the one

7    on the west side or the one on the east side.

8              And I want to take a minute to just discuss with

9    you the difference between a revolver and a semi-automatic

10   pistol.

11             A pistol, or a revolver, some of you may know

12   that and others of you may not, a revolver is just like it

13   sounds.  It's a handgun that has a revolving cylinder.  You

14   open the cylinder, you put cartridges in it -- it'll either

15   hold five or six.  It's the old type police gun.  Everybody

16   remembers the police pistol that policemen used to carry.  They

17   don't carry those anymore, for the most part, but that's what

18   they used to carry -- you close the cylinder.

19             And when it's fired, the casing stays in the

20   cylinder.  The bullet, obviously, comes out the front of the

21   gun, but the casing stays in the cylinder.  And it will fire

22   and the cylinder rotates every time you squeeze the trigger

23   until you expend the ammunition contained in the revolver, five

24   or six rounds, however that is.  The point I'm trying to get at

25   is it doesn't fly out.  It doesn't eject the shell casings.

1          Now, a semi-automatic, which policemen carry
2    now, contain a magazine -- it's magazine-fed -- and they may
3    contain 14 or 15 rounds depending on the particular handgun.
4    And when you fire that weapon, the shell casing is ejected.
5    Now, obviously, the bullet comes out the front.  And when
6    you've shot up all the ammunition, there's nothing left in the
7    gun.  There would just be an empty magazine and the slide would
8    generally be open.  So that's the difference.

9          This gun had no -- this is a revolver.  So if I
10   shot -- if there were any rounds in that and if I pulled the
11   trigger on it, there would be shell casings remaining in the
12   cylinder of that, and you can open it up.  There's absolutely
13   none in there.  Wasn't then, isn't now.

14         No one from that day, except for Lehrmann,
15   another government witness -- and we'll discuss that when
16   Mr. Lehrmann takes the stand -- no one has said that that gun
17   is involved in this case.  That wasn't said then; that wasn't
18   said later; that wasn't said at the preliminary hearing, where
19   Lance Madison admits people were out there shooting.  That was
20   never said.

21         As a matter of fact, when Archie met with the
22   FBI at a later point, he even said, "I don't think that gun had
23   anything to do with this incident."  It's never been said.
24   That's a red herring, ladies and gentlemen.  They want to use
25   that gun and they want to talk about that gun as if it's a drop

1    gun.  We all watch TV.  That makes the case sexy.  We've all

2    watched TV and "drop gun" is this gun that policemen are

3    supposed to, when they just shoot innocent people, they just

4    throw a gun on them.

5              Well, they don't throw a gun 307 feet away; they

6    don't throw an empty gun; they don't throw a gun that's never

7    been -- that has not been -- I say it's never been fired -- has

8    not been fired relative to that incident because there were no

9    rounds in it, there were no cartridges in it.  And it's even a

10   mile away from where Lehrmann claims it was taken off of Lance

11   Madison.  That, ladies and gentlemen, is a red herring.

12             As the crime lab was flooded and not available,

13   Kaufman put the gun in the trunk of his car.  There's no crime

14   lab.  Remember, this is Katrina.  They want to criticize

15   Sergeant Kaufman for the way he conducted a scene

16   investigation.

17             Well, you know, he just didn't have any tape

18   with him, he didn't have a camera with him, he didn't have

19   evidence bags with him.  He's not a crime lab technician.

20   Nobody could have known that.  Maybe if he'd known the entire

21   city was going to be washed away like that, he could have been

22   a little better prepared.  And they fault him for putting the

23   gun in the trunk of his car.

24             And they say that he's faulted because he leaves

25   the shell casings on the scene.  Now, if he had picked the

1  shell casings up, what's he going to do, put those in his
2  pocket?  If he had put those in his pocket or stuck them in the
3  trunk of his car, we'd be sitting here hearing about how that's
4  a cover-up because he picked the casings up and stuck the
5  casings in his pocket.
6             I mean, it's just impossible to win with
7  something like that.  There was no crime lab and that's just
8  the way it was.  He picked the gun up, he put it in the truck,
9  and a couple weeks later when it got to Central Evidence and
10  Property, it was put on the books.
11            Within two days or three days, Sergeant Kaufman
12  conducted brief interviews, very brief interviews, with the
13  shooters and incorporated that information into his notes.
14  During the time between September 4th and October 14th, when
15  Sergeant Dugue conducted the informal investigation --
16            Remember, as I said earlier, Cold Case Homicide
17  investigates police shootings, not district homicide.  He's
18  district homicide.  That case would have been handled, under
19  ordinary circumstances, by PIB, Public Integrity Bureau, and
20  Cold Case Homicide.  They were not available.  That doesn't
21  mean they were never ever going to be available.  They weren't
22  available at that particular time.
23            On October 14th, Sergeant Dugue, who was
24  assigned to Cold Case Homicide, Downtown New Orleans at police
25  headquarters, assumed that investigation.  He is not -- has

1  nothing do with Lieutenant Lohman; he has nothing do with
2  Kaufman; he has nothing to do with Captain Barty, who is the
3  commander of the 7th Police District.  Two total different
4  chains of command; two entirely different outfits.
5          Kaufman had once on October 14th and -- between
6  the 4th of September and October 14th, Kaufman would sit down
7  at the typewriter and he would type his notes, what he did for
8  that period of time.  Those notes were typed on a computer at
9  the 7th District station.  When Kaufman downloaded his notes --
10  when Dugue took that case over, Kaufman downloaded his notes to
11  a thumb drive and he gave that to Sergeant Dugue.
12          When that was downloaded, it amounts to 32
13  pages.  That's the 32 pages -- when you hear me talking, you're
14  going to hear a lot of talk about the 32-page -- they're going
15  to call it a draft, I'm going to call it either notes or a
16  draft, but one thing it's not is a report.  It was never --
17  there wasn't a face sheet with that, it wasn't signed, it was
18  never submitted to anybody.
19          This business about Sergeant Kaufman submitting
20  something is absolutely 100 percent wrong.  The only thing he
21  did was give of that thumb drive containing his notes to
22  Sergeant Dugue.  Dugue incorporated portions of that 32-page
23  notes into his final report.  Sergeant Dugue completed the
24  report, the 54-page report, not supplemental report.  That's
25  the report.

1        That's the only -- one and only official police

2   report concerning this incident ever turned in, except for the

3   7-page narrative, which doesn't even contain any account of the

4   incident, names of people, and people arrested.  And that goes

5   to the DA's office.  That's not an investigative report.

6   That's October 14th.  Sergeant Dugue is in homicide downtown;

7   he is in homicide 7th district -- whatever was left of the 7th

8   District then.

9        And then after that period of time things go on.

10  Sergeant Dugue collected some of the evidence that was out

11  there.  It was collected.  That police shooting was handled

12  just like every police shooting that happened during that

13  period of time.

14        On January 25th, 2006, Sergeant Dugue, along

15  with other homicide officers, some people from the academy, and

16  some other policemen -- and you've heard this.  Several of the

17  lawyers have talked about this before, but I'm going to touch

18  on it for the sake of continuity.

19        About 20 of them, or 21, or 22 of them met at

20  the 7th District police station.  As it was January -- I don't

21  remember and I was here.  I don't remember, but I would assume

22  it was cold.  Because we get -- you know, as everybody knows

23  that lives here, it gets pretty cold.

24        The 7th District station is not some secret,

25  mysterious place.  It is a building that was occupied by the

1    7th Police District that was gutted.  It was flooded.  And we

2    all know that -- all of us that were here, that "gutted" means

3    they ripped the sheetrock down, they take the insulation out,

4    the wiring out, they take the window frames out and doorframes

5    out, and it sits there, and they spray it sometimes to keep

6    mold from coming in, which we all had problems with it.

7              That's what happened to the 7th District police

8    station.  That's what it's in, with other FEMA trailers and

9    other trailers that the policemen used.  And I believe

10   Mr. Meche talked about that in great detail, so I'm not going

11   to go into that.

12             To make it simple, that's where the 20 or 25

13   officers gathered in order to -- to render their written-- or

14   their audiotaped statements.  And some -- they were-- they were

15   split up from there and they were taken -- some, I believe,

16   gave statements in the car, some may have given statements in

17   some of the trailers.

18             But there's about as much of a secret to that as

19   the January '09 meeting that Mr. Kaufman had with Agent Bezak,

20   sitting right here, and the prosecutors up at the FBI office.

21   That did not occur in the parking lot, by the way.  That

22   occurred in their conference room on the second floor of the

23   Hale Boggs building.  So I don't guess that's a secret meeting

24   any more than the secret meeting they're talking about

25   involving this Danziger.  Nothing secret to it.

1            The content of those statements, the ones
2    obtained on January 25th, were transcribed and incorporated
3    into Sergeant Dugue's, not Archie's, Sergeant Dugue's report,
4    the 54-page report, the official report, which was submitted.
5    The official report does not differ -- remember, I'm talking
6    about the notes, I'm talking about Archie's 32 pages of notes,
7    the 54-page completed report, they don't differ.
8            Archie took those verbal statements within two
9    or three days of the incident, typed them into his 32-page
10   report.  Those statements are, essentially, the same as they
11   appear in the 54-page report.  There is no difference.  All
12   this evolution of the report, I'm going to tell you about the
13   evolution of the report here shortly.
14           The evolution of Sergeant Kaufman's report and
15   Sergeant Dugue's report is no evolution.  There is no
16   evolution.  It is this way then; and it's that way this way.
17   The one that Kaufman put is the same one that's turned in.  Do
18   you want to know where the evolution comes from?  Their
19   witness, this esteemed Lieutenant Lohman, that they're going to
20   call.  The evolution of the case deals with the 17-page report.
21           Now, we have the 32-page and we have the 54.
22   Let's talk about the 17, which I don't believe the government
23   mentioned to you in their opening argument today.  The 17-page
24   report is a complete fabrication by Lieutenant Lohman.  He's
25   going to admit that.  You don't have to take my word for it.

1    He fabricated that.  He sat down and typed that.  In his own

2    words, he's going to tell you that he did that, that difference

3    from the 32 and the 54.

4                    Then he's going to tell you that, "I took that

5    17-page report and I showed it to Arthur -- Sergeant Kaufman

6    and I told him to go around and show that to everybody.  That's

7    a better cover-up."  You see, we have degrees of cover-up here.

8    Because I guess what they think that all these people do are

9    cover things up.

10                   I'm going to find out when Lieutenant Lohman

11   takes the stand just how often he covers stuff up.  Because he

12   sure talks an awful lot about, "You know, I didn't like the way

13   that looked; and Kaufman's not doing this great cover-up job;

14   and I can do a better cover-up job, so I'm going to do a better

15   cover-up job."  Well, he thinks he does.  He types his own

16   17-page report that he gets caught with.

17                   Now, he gets caught with that.  It's never

18   turned in, never -- and she says, "Signed off by Archie."

19   Well, I tell you what, if you see a signature on that, you let

20   me know.  When you see that evidence, if you see a signature on

21   that 17 [sic] report, I wish you'd show it to me.  Because I've

22   been looking for months trying to figure out what they're

23   talking about.

24                   There's nothing on there.  There's nothing on

25   there, other than Lohman's mouth that's going to try to connect

1    that 17-page bogus report that Lohman did on his own,

2    personally did, with Sergeant Kaufman.  Period.  That doesn't

3    match, ladies and gentlemen.  That's what doesn't match.

4              And there's a 46-page report.  And I'm not going

5    to get that into that too much because I don't -- right now.

6    We're going to get into it.  But I want to hear what they say,

7    because I think I have a little surprise for them when we start

8    talking about that.  That also matches the 17-page report.  The

9    46 is bogus; the 17 is bogus.  They have facts in there that

10   are peculiar to each other.  The 32 and the 54, which is

11   officially turned in, his 32, do not have conflicts.

12             Shortly after February 6th, '06, homicide was

13   re-centralized because the district stations were, basically,

14   destroyed.  They were just -- they didn't have enough

15   detectives and didn't have enough people, and there wasn't a

16   need because we didn't have the population to have individual

17   detectives assigned to individual districts.  So they were

18   re-centralized.

19             Archie was then transferred, as well as other

20   homicide detectives, from the City of New Orleans from their

21   remaining districts were transferred to Central Homicide, and

22   then they then worked out of the Homicide Division downtown.

23             That 54-page report we're talking about, the

24   official report, the one and only official report, the one and

25   only official report that was ever turned in, was turned in

1  by -- submitted -- not turned in, submitted by Sergeant Dugue
2  sometime in either May or June of 2006.  I'm not sure when.
3          Now, on January 22, '09, just, what, two years
4  ago, Sergeant Kaufman voluntarily met with Agent Bezak, the FBI
5  agent sitting right there, and met with -- voluntarily, and met
6  with prosecutors at the FB- -- wherever that was.  I don't know
7  if it was the FBI office or it was the Hale Boggs building.
8  Some federal institution.
9          He met and he sat down with them for a period of
10  eight hours or more and answered every one of their questions.
11  He didn't have a lawyer with him; he didn't ask for a lawyer;
12  he didn't want a lawyer.  He answered their questions.  He even
13  volunteered at the end to take them to the Danziger Bridge and
14  to point out any point of reference they might be interested in
15  seeing.  That's how much he cooperated with them.
16          And I believe -- I believe Agent Bezak will
17  testify during this trial.  And I believe that when he does
18  testify, he will say -- he will confirm that Sergeant Kaufman
19  cooperated, cooperated with him and answered their questions,
20  and took him out to the Danziger Bridge that afternoon just
21  like I said.
22          Of the thousands of deaths which occurred in the
23  aftermath of Hurricane Katrina, the only ones investigated were
24  police shootings.  Every police shooting was handled the same
25  way to my knowledge.  None of them went out and conducted

police shooting investigations like they would today.  None of
them -- there was no crime lab for any of them.

There was an officer that killed himself,
unfortunately, on the West Bank.  And that crime lab that came
was Jefferson Parish.  It was not Orleans Parish.  Their crime
labs did not come out.  Later -- later -- Cold Case Homicide --
just like they did in this case, nothing different here,
they're trying to make it look like this is something strange,
but it's not -- later, Cold Case Homicide came out and
reinvestigated those -- those police shootings.

But at the time, and through the orders of the
chiefs and the deputy chiefs, they were ordered to write a 105.
A form -- NOPD form 105 is an inner office correspondence.
It's a white paper:  "To", "from", "subject", that's it.
That's what they were instructed to write on this at head-on
because you don't have the manpower, you don't have the crime
lab, the city was chaotic.

There was -- there was no leadership.  There was
no -- I mean, the captain, Captain Barty, where's Captain
Barty?  Lieutenant Lohman's out there.  When he comes to the
Danziger, he's the top-ranking officer from the 7th District.
He's in charge of that scene.  He's not in charge of the scene,
Lohman's in charge of that scene.

That's right, Lohman.  You didn't hear that
either, did you?  He's in charge of that scene.  Where's the

1   captain?  I'm still waiting for the captain.  Where's Captain
2   Barty?  Where is the Superintendent of Police?  Where's the
3   Deputy Chief of Police?  Where's the Chief of Field Operations?
4   Where's the field supervisor?  Where's the captain of the 3rd
5   District?

6              You see, since the west side, the Friendly Inn,
7   that's the 3rd District, that's not the 7th District.  Where
8   Ronald Madison was shot is the 3rd.  Where is he?  Still
9   waiting for him.  Yet, it's all on him.

10             Over one linear mile of scene, spanning a major
11  bridge crossing the Industrial Canal, with hundreds of acres of
12  land from the east shootings to the west, the Friendly almost a
13  mile away, and they expect Kaufman, acting on orders, against
14  orders of his commanders, should conduct the same investigation
15  the FBI would have conducted, with their unlimited resources,
16  in the middle of the worst disaster in the history of this
17  country.  One person, when his lieutenant, his supervisor, his
18  esteemed lieutenant, leaves, and leaves him you know what.

19             And for the government to come here six years
20  later and look over his shoulder and criticize him for that is
21  inexcusable.  What those officers -- remember, ladies and
22  gentlemen, what they said two or three days after that incident
23  is what's in the 54-page report turned in.  The only difference
24  is when you read their 17-page report, and that's not his.

25             Ladies and gentlemen, the evidence will show you

1    that Sergeant Kaufman, Archie, followed instructions as he got

2    them and did the best job he could.  Did he make mistakes?  Was

3    it perfect?  It was absolutely anywhere from being close to

4    perfect.  There's a million mistakes.  But you know what?  We

5    all make them.  I don't know if I would have done as well.  I

6    don't know.

7               I'm going to ask you at the end of this

8    evidence, ladies and gentlemen -- and there will be evidence,

9    because you don't have to take my word for it because you're

10   going to see it -- to return a verdict of not guilty because

11   that's exactly what he is.

12               Thank you.

13               THE COURT:  Thank you, Mr. London.

14               Mr. Larson, I understand you're last.

15               MR. LARSON:  Good afternoon, ladies and gentlemen.

16   My name is Lindsay Larson and, along with Paul Fleming, I

17   represent Mr. Robert Faulcon.

18               After almost -- well, really after more than

19   four years of being a police officer, Robert Faulcon fired his

20   weapon for the first time in the line of duty on the Danziger

21   Bridge.  Even though he was a task force officer who dealt with

22   the worst of the worst, who went in high crime areas looking

23   for people with guns and drugs, during the entire -- his entire

24   career up to that date, he never fired his gun in the line of

25   duty.

1               Why did he do it that day?  Well, Robert Faulcon

2    is going to take the stand and he's going to tell you what went

3    on in his mind that day and he's going to justify why he fired

4    that weapon.

5               A little background on Robert.  He was raised in

6    a middle-class family.  His father was a baptist preacher, a

7    pastor of a church.  His mother, a school teacher and a bank

8    teller.  He had one brother.

9               After high school he joined the Army.  He served

10   in the 101st Airborne Division.  That's the guys on the Band of

11   Brothers we saw on the HBO series.  He was honorably

12   discharged.  He joined the Navy and became a paralegal.  He was

13   discharged from the Navy and then he joined the police force.

14   He started in December of 2000 at the police academy and he

15   graduated in May of 2001 and, as I said, was assigned to the

16   7th District task force at that time.

17               Prior to Hurricane Katrina, on October [sic]

18   28th, 2005, he met with his wife -- he is married, has a

19   five-year-old son and two step-daughters -- he met with his

20   wife at the time, who was more than nine months pregnant.  In

21   fact, the doctors were supposed to induce labor on

22   August 29th of 2005.  But, of course, that was the day

23   Hurricane Katrina was scheduled to strike, so they requested

24   that she evacuate.

25               He met with her on the roof of the police

1  department, where his car was parked, and they traded

2  vehicles -- because he had a better car -- and she, their

3  unborn child, and the two daughters left and subsequently wound

4  up in Shreveport, Louisiana.  Robert didn't see or hear

5  anything about them for the next three weeks.  And unbeknownst

6  to him, his son was born on September the 1st of 2005.

7           Yet, even though he had a nine-month pregnant

8  wife, who was due to deliver at any time, Robert stayed in the

9  city to do what he had sworn to do, and that is to protect the

10  citizens of New Orleans.

11           On the evening before the storm, after he said

12  his goodbyes to his wife, he was on patrol.  At some point in

13  time he was told -- he and his partner, Officer Paxton, was

14  told to seek higher ground because the levees had broken.  They

15  wound up in the third floor of a hotel, with very little food

16  and very little water, and they were stranded there for about

17  two days before Sergeant Bowen came and picked them up in a

18  boat.

19           And they went back to the Crystal Palace, where

20  for the next few days, as you all know -- and I'm not going to

21  belabor you with that -- they rescued people off of rooftops,

22  out of attics, recovered dead bodies, took people from the Chef

23  to the Convention Center and back in that Budget rental truck.

24           On the morning of September the 4th, as we all

25  know, the call came in, 108.  And Robert will tell you that in

his mind what he heard that day, what he thought of that day,
"108, two officers down, shots fired, multiple perpetrators,"
when he got into the van, that's what was on his mind.

And as they rode the three or four minutes from
the Crystal Palace to the Danziger Bridge, what was going on in
his mind -- first of all, he was scared.  And he was thinking,
"We're going to a firefight.  We're going to a place where
multiple assailants have already shot two police officers."

With this in his mind, the truck rolls up onto
the bridge, and as it comes to a stop, he hears multiple
gunshots.  And, of course, he thinks, "Oh, my God, these are
the bad guys shooting at us."  And this is very important:  As
he gets out of the van -- out of the back of the van, he can't
see anything except out the back, and the van's pointed towards
the Bartholomew family.  He gets out of the back of the van and
he goes around the right side.

And what is the first thing that he sees?  He
sees his superiors, the sergeants, shooting at what appears to
be people shooting back at the police.  That's what he
perceives:  They're shooting at them -- they're shooting at
them because the bad guys are shooting back at the police and
they're returning fire.

And that's how he assessed the situation in that
split second when you live or you die by what you do.  And his
assessment was, "We're being shot at."  And he perceived people

shooting at the police, because that's what he saw from his
vantage point.  And so he -- in defense of his officers, he
fired.

When those shots were completed, he heard on the
radio, "There are two of them getting away.  They're going over
the west side of the bridge.  One's in dark clothing, one's in
light clothing.  Hurry, hurry, you're going to lose them."  So
he runs up the bridge, Sergeant Gisevius with him, and as he
gets to the top of the bridge, a Louisiana State Police Trooper
runs up in his car and says, "Where are they," and they point,
"Over there."

And at that time -- and you're going to hear
from the state police trooper.  At that time, after all the
gunfire is over with at the bottom of the east side of the
bridge -- there's no more firing by police -- the trooper will
tell you he heard one or two gunshots that made him duck.  He
was scared.

The evidence will show, if you believe the
trooper -- and there's no reason not to.  He's a neutral
witness.  He's not for or against anybody -- there was somebody
else shooting in the vicinity of that bridge after the police
had finished firing at the bottom of the east side of the
bridge.

Robert jumps in the car, along with the other
officers -- and he forgot about the other officers jumping in

1    the car with him later on.  He doesn't even remember how he got
2    back to the Crystal Palace that day because of the fog of that
3    particular incident and the days of rescuing people kind of
4    melded into one.
5              But in any event, they ride down the bridge and
6    the trooper and Robert see Lance Madison has run -- now run off
7    into the motel.  There's another individual who's running and
8    the trooper sees Lance Madison.  And he says Lance Madison had
9    his hand down by his side -- probably because he was shot in
10   the shoulder -- and he was running with a wobble.  That's what
11   he says, "With a wobble."
12             And Robert is looking at him and perceiving him
13   with that wobble and his hand down here, he was trying to get a
14   beat on him.  This trooper will tell you that he yelled,
15   "Police."  So in Robert's own mind, these two fellows knew they
16   were police.  He had on a police uniform, with a white badge --
17   or a white painted on badge on his BDU uniform and a police
18   patch and "Police" across the back in big white letters.
19             His perception is -- his assessment is that
20   these guys know we're the police, I think they were shooting at
21   us before, and now what are they doing, they're running away,
22   and this guy is wobbling, trying to get a beat on me.  And he
23   knows Lance Madison has gone behind where you can't see.
24             And as Ronald Madison gets to that point, he
25   looks at him for the third time.  And Robert, assessing the

1    situation and fearing that if he gets behind there, he's going

2    to shoot him from ambush with the other guy, that's when he

3    fired his gun.  What did the other guy do that the trooper

4    yelled at, he put his hands up and the trooper apprehended him.

5                  Now, there's no question that Ronald Madison was

6    an innocent man.  But his actions, maybe because of his mental

7    disability -- and, of course, Robert Faulcon didn't know he was

8    chasing a mentally disabled man.  He thought he was chasing a

9    gunman -- maybe those mental disabilities caused Ronald Madison

10   to act like a perpetrator as opposed to acting like the

11   innocent person that he was.

12                 After the shooting, Robert was told to take a

13   position on the perimeter with other officers, including state

14   police officers, because Lance Madison had not yet been

15   apprehended.  Later on, he somehow made it back to the

16   Crystal Palace.

17                 And now let's talk about the alleged cover-up.

18   Robert Faulcon played no part in any alleged cover-up, if there

19   even was one, because he gave two statements, both of them

20   truthful.  And thank God the state trooper was on the scene

21   when Ronald Madison was shot because he corroborates what

22   Robert said.

23                 Robert gave a brief statement to Sergeant

24   Kaufman when they got back to the Crystal Palace and he said

25   just what I told you:  He never saw the guy's hand, it was down

1    here, and he was looking back at him, that's when he got shot;

2    he perceived -- when he saw the other officers shooting back,

3    he perceived them taking fire.  That's what he told

4    Sergeant Kaufman.

5              You will hear from Robert Faulcon, not only from

6    the witness stand, but in his own words in his recorded

7    statement, which says exactly what I just told you.

8              Now, the police reports that were written by

9    Lohman or Dugue, they don't say that.  They say, Robert said he

10   saw him, Ronald Madison, reach into his waistband for a shiny

11   object.  Bologna.  Robert's recorded statement doesn't say

12   that; the state trooper doesn't say that; and Robert doesn't

13   say that.  His statements are consistent.  He was not involved

14   in any cover-up.  He didn't lie.

15             In addition, he left the police force about a

16   month after the incident because he learned his wife had given

17   birth to his son and that she was staying with relatives in

18   Shreveport, and they were going to move to Houston where he was

19   going to go to truck driving school because she didn't want to

20   come back.  She was going to stay in Houston and he was going

21   to be with her.  So he left.

22             When this January meeting took place, he was

23   nowhere around.  He didn't come back.  And he was never

24   involved in a cover-up.  He never saw the reports.  He'll tell

25   you that the first time he saw the reports was after he was

1  indicted in this case.  And he was shocked that they said he

2  said he reached into his waistband for -- because that's not

3  what he saw, and that's not what he said.  He didn't talk to

4  anyone else other than Sergeant Kaufman.  And nobody told him

5  what to say.

6            Ladies and gentlemen, this is a tragedy for

7  everyone involved:  Police officers, victims, everyone

8  involved.  It is a horribly regrettable mistake, but it's not a

9  federal crime.

10           Thank you.

11         THE COURT:  All right.  Thank you, Mr. Larson.

12           All right.  It's almost 3:00.  We'll go ahead

13  and take our mid-afternoon break.  If you all can be prepared

14  to enter the courtroom at 3:15, we will have our first witness.

15         THE DEPUTY CLERK:  All rise.

16         (WHEREUPON, the jury exited the courtroom.)

17         (WHEREUPON, the Court took a recess.)

18         THE DEPUTY CLERK:  All rise.

19         (WHEREUPON, the jury entered the courtroom.)

20         THE DEPUTY CLERK:  All rise.

21         THE COURT:  Before we do that, though, if anyone is

22  in the courtroom that is going to be a fact witness at this

23  trial, we are now sequestering witnesses.  There were a few

24  exceptions to that, which I discussed with counsel.  But if

25  anyone in the courtroom is going to be a fact witness, they

SUSAN BARTHOLOMEW - Direct

1   should step outside right now.

2              And I'll ask counsel, during the course of this

3   trial, since many -- most of the people that were on the list

4   are people who are not known to me and I wouldn't recognize,

5   I'll ask counsel to assist in policing that by advising

6   witnesses not to enter the court and also to bring to my

7   attention if any fact witnesses do happen to come into the

8   court during the course of this trial.

9              Okay.  Let's go ahead and call the first

10  witness.  Ms. Chung, go ahead.

11             MS. CHUNG:  Yes, Your Honor.  The government calls

12  Susan Bartholomew.

13             THE COURT:  Okay.  Susan Bartholomew, and that is the

14  witness on the stand right now.

15             Ms. Bartholomew, good afternoon.  If you'd

16  please rise.

17             (WHEREUPON, **SUSAN BARTHOLOMEW**, having been duly

18  sworn, testified as follows.)

19             THE DEPUTY CLERK:  Please state and spell your full

20  name for the record.

21             THE WITNESS:  Susan Bartholomew, S-U-S-A-N,

22  B-A-R-T-H-O-L-O-M-E-W.

23                    **DIRECT EXAMINATION**

24  BY MS. CHUNG:

25  Q.   Good afternoon.

SUSAN BARTHOLOMEW - Direct

1          Mrs. Bartholomew --
2               **MS. CHUNG:**  I'm sorry, Your Honor.  May I inquire?
3               **THE COURT:**  Certainly.  Go ahead.
4    **BY MS. CHUNG:**
5    **Q.**   Ms. Bartholomew, where are you living now?
6    **A.**   Georgia.
7    **Q.**   Did you grow up in Georgia?
8    **A.**   Yes.
9    **Q.**   In Georgia?
10   **A.**   I'm sorry, in New Orleans.
11   **Q.**   How are you feeling today?
12   **A.**   Really nervous.
13   **Q.**   What part of New Orleans did you grow up in?
14   **A.**   New Orleans.  New Orleans East.
15   **Q.**   What high school did you go to?
16   **A.**   Joseph S. Clark.
17   **Q.**   Were you in New Orleans during Hurricane Katrina?
18   **A.**   Yes.
19   **Q.**   What part of New Orleans were you living in at that time?
20   **A.**   New Orleans East.  And I'm sorry, I grew up in the Ninth
21   Ward.  In the Ninth Ward.
22   **Q.**   During Hurricane Katrina, did you have family with you?
23   **A.**   Yes.
24   **Q.**   Who was your immediate family?
25   **A.**   My husband, my children, my nephew.

SUSAN BARTHOLOMEW - Direct

1   Q.   And how many children did you have at that time?
2   A.   Three.
3   Q.   Could you tell us their names and ages at the time of
4   Hurricane Katrina?
5   A.   Yes.  Lesha was 17; Leonard, he was 14; and Brandon was 8.
6   Q.   What school did Lesha go to?
7   A.   She went to Abramson.
8   Q.   What about Leonard, Jr.?
9   A.   He also went to Abramson.
10  Q.   Did you think about -- actually, during that time were you
11  working or did you have any businesses?
12  A.   Yes.  I had an at-home business selling Christian
13  products.
14  Q.   And was that a business where you were operating it out of
15  your home or online or --
16  A.   At home.
17  Q.   Did you think about evacuating during Hurricane Katrina,
18  prior to it?
19  A.   Yes.
20  Q.   What did you decide to do?
21  A.   I decided to stay.
22  Q.   Why did your family decide to stay during the hurricane?
23  A.   Because other family members weren't able to get out
24  because I only had a van, and everyone wouldn't fit in there.
25  Q.   And are we talking about now more than your three children

SUSAN BARTHOLOMEW - Direct

1    and your husband?

2    A.   Yes.

3    Q.   So where did you all ride the storm out, so to speak?

4    A.   We stayed in my apartment in New Orleans East.

5    Q.   And could you describe for the jury where that apartment

6    is?  Is it on the first level, on the second level?

7    A.   It's a second level.  We stayed there because we thought

8    we would be safe there because it's higher ground.

9    Q.   And did some other family members join you in your

10   apartment since it was on higher ground?

11   A.   Yes.

12   Q.   How high was the water after the storm hit around your

13   apartment?

14   A.   It was as high as the fence that surrounded it.  It's

15   gated, and as high as that gate.

16   Q.   Could you describe how high that gate is up to you?

17   A.   Past my head.  Above me.

18   Q.   Above --

19   A.   Past my heighth.  Higher than my height, and I'm about

20   5'1".

21   Q.   What kind of supplies did you have in your home at the

22   time?

23   A.   We had some canned goods, flashlights, just some basic

24   stuff that you would have for a storm.

25   Q.   Do you remember if you had running water or electricity?

SUSAN BARTHOLOMEW - Direct

1  A.    No.  We didn't have electricity at all due to the storm,

2  and I'm -- I don't recall whether or not we had water.  I'm not

3  sure.

4  Q.    And you described you now had your extended family staying

5  in your apartment with you.  How long did your canned goods and

6  drinks last?

7  A.    Not long.  Only a few days, not long at all.

8  Q.    Did there come a point where you tried to leave your

9  apartment?

10 A.    Yes.

11 Q.    Were you able to?

12 A.    Yes.

13 Q.    How did you get out?

14 A.    A police officer came on a boat and rescued us.

15 Q.    Do you remember which police department that was?

16 A.    New Orleans Police Department.

17 Q.    How did you feel when you were rescued from your

18 apartment?

19 A.    I was very grateful.  Relieved.

20 Q.    How did you feel towards those NOPD officers?

21 A.    Grateful.  We thanked them.

22 Q.    Where did the NOPD officers take you once they had rescued

23 you on the boat?

24 A.    On Chef Menteur Highway.

25 Q.    Where did your family go once you had been brought to Chef

SUSAN BARTHOLOMEW - Direct

1    Menteur Highway?

2    A.    We went to a hotel.

3    Q.    Do you remember where that hotel was located?

4    A.    It was on Chef Highway.

5    Q.    Do you know, was that still in New Orleans East --

6    A.    Yes.

7    Q.    -- or was it now in New Orleans West?

8    A.    Still in New Orleans East.

9    Q.    Did you stay at that hotel?

10   A.    Yes.  Temporarily.  The first one we went to we didn't

11   stay in.

12   Q.    Tell us why you didn't stay at that first hotel.

13   A.    We didn't stay there because there was some guys arguing

14   in a different room, and we just was afraid.  We didn't know

15   what they would do or what was going to happen, so we decided

16   to go to a different hotel, which was across the street.

17   Q.    And what about the men arguing made you afraid?

18   A.    Just you could hear them yelling out really loud.  There's

19   no electricity, so the streets are dark, and you don't know

20   what's going to happen next.

21   Q.    You mentioned you and your family moved out of that hotel

22   then?

23   A.    Yes.  We left that hotel and went across the street to a

24   different one.

25   Q.    Do you know the name of the hotel you moved to across the

SUSAN BARTHOLOMEW - Direct

1  street?

2  A.   Yes.  Family Inn.

3  Q.   How many rooms did you all have in the Family Inn?

4  A.   We had two rooms.

5  Q.   What were the conditions like in those two rooms?

6  A.   It was pretty bad.  I mean, it was -- the floors were

7  really wet.  You couldn't flush the toilet.  There was no

8  electricity, there was no running water.  It was pretty bad.

9  Q.   I'd like to turn your attention to September 4, 2005.  Did

10  anything happen to you and your family that day?

11  A.   Yes.

12  Q.   What happened to you and your family that day?

13  A.   We got shot.

14  Q.   Where did that happen?

15  A.   On Chef Highway.

16  Q.   And was that in the vicinity of the Danziger Bridge?

17  A.   Yes.

18  Q.   Now, the hotel you mentioned, the Family Inn, you said

19  that was across the street from the first hotel?

20  A.   Yes.

21  Q.   Now, are we still on the east side of the Danziger Bridge?

22  A.   Yes.

23  Q.   Okay.  I'd like to turn your attention to that morning,

24  the morning of September 4th, 2005.  What was your plan that

25  morning?

SUSAN BARTHOLOMEW - Direct

1  A.   My plan was to go to Winn-Dixie to get some supplies, some

2  cleaning supplies for the hotel rooms, because they were really

3  bad off, and some Glucerna for my mom because she had gotten

4  sick.  She was due for surgery the day of Hurricane Katrina and

5  did not have that surgery.

6         So while we were there at the hotel, she started

7  throwing up.  And she's also diabetic, and she has high blood

8  pressure, and I figured that the Glucerna, which is for

9  diabetics, would be something that she may be able to keep

10 down.

11 Q.   And what were the cleaning supplies for?

12 A.   The rooms.  They were really, really nasty.

13 Q.   Now, you mentioned you were going to the Winn-Dixie.

14 Where is the Winn-Dixie in relation to the Family Inn?

15 A.   On the other side of the bridge -- on the other side of

16 the Danziger Bridge.

17 Q.   When you left that day, who was with you?

18 A.   Myself, my husband, my son, my daughter, my nephew, and

19 his friend James.

20 Q.   Which son was with you?

21 A.   Leonard.

22 Q.   And you mentioned his friend.  Who's friend James?

23 A.   Jose's friend.

24 Q.   And who is Jose?

25 A.   That's my nephew.

SUSAN BARTHOLOMEW - Direct

1  Q.   How old was Jose at that time?

2  A.   He was 19.

3  Q.   What was the day like when you all set out from the hotel

4  that day?

5  A.   It was -- it was sunny.  It was Sunday, and it was sunny,

6  so it was a pretty nice day.

7  Q.   What was your mood when you left the hotel?

8  A.   Optimistic.  I really thought that something good was

9  going to happen, you know.

10  Q.   What about the mood of the group?  How was everyone

11  feeling when you all set out?

12  A.   They were in a pretty good mood.  They were, you know,

13  kind of skipping and hopping and just -- you know, my main

14  concern was my mom.  That was the biggest worry that I had, my

15  mom.

16  Q.   And you mentioned some people were skipping and hopping.

17  Who was skipping and hopping?

18  A.   Jose, Leonard, James.

19  Q.   Could you describe the walk that you all took from the

20  Family Inn towards the Danziger Bridge?

21  A.   We were pushing a basket, just -- and they kind of skipped

22  ahead and...

23  Q.   Again, when you say, "They kind of skipped ahead," who are

24  you talking about?

25  A.   Jose, James and Leonard.

SUSAN BARTHOLOMEW - Direct

1   **Q.**   And you mentioned you were pushing a basket.  What's a
2   basket?
3   **A.**   A grocery cart.
4   **Q.**   A shopping cart?
5   **A.**   Shopping cart, yes.
6   **Q.**   Do you remember what you were wearing that day?
7   **A.**   I had on a T-shirt and some sweatpants, looked like
8   pink/orange color, like sweatpants.
9   **Q.**   Do you know if you had a hat or anything else on that day?
10  **A.**   I'm not sure.  I probably did.
11  **Q.**   Who gave you that shirt?
12  **A.**   James.
13  **Q.**   Why did he give you that shirt?
14  **A.**   Because I didn't have anything else clean to wear.
15  **Q.**   Had you known James before he joined your family at the
16  hotel?
17  **A.**   No.
18  **Q.**   What was your impression of him over those couple days?
19  **A.**   Just a really good-hearted person.  Just a really good
20  person.
21  **Q.**   You mentioned that you were walking with a basket and that
22  James, Jose and Leonard were skipping ahead.
23  **A.**   Yes.
24  **Q.**   Where were Leonard and Lesha, if you remember?
25  **A.**   Which Leonard?

SUSAN BARTHOLOMEW - Direct

1  Q.   Oh, I'm sorry.  Leonard, your husband.

2  A.   Oh, okay.  They were next to me.  They were right with me.

3  Q.   When we talk about Big Leonard, your husband, how big is

4  your husband?

5  A.   Not much taller than me.

6  Q.   How tall are you?

7  A.   I'm 5'1".

8  Q.   About how much does he weigh?

9  A.   Not much.

10 Q.   So Big Leonard is just a way to differentiate between him

11 and your son?

12 A.   Yes.

13 Q.   Could you tell us what happened next as you all started

14 walking towards the bridge?

15 A.   When we got to the foot of the bridge, I just started to

16 hear a lot of gunshots.  And the next thing I know, it was us,

17 you know.  I was hit.  I can feel myself being shot.  And I ran

18 towards the concrete barrier, I hollered out to my -- you know,

19 yelled out to my children and them to just -- to jump over the

20 concrete barrier because I just assumed that we would be safe

21 there.

22 Q.   Did you make it over the concrete barrier?

23 A.   Yes, but I was shot before I could.

24 Q.   What happened once you got over the concrete barrier?

25 A.   They continued to fire.  They just continued to -- they

SUSAN BARTHOLOMEW - Direct

1    just kept shooting and to the point where they were shooting
2    through the concrete barrier.  I can feel myself being hit
3    while I was on the ground.
4    Q.   Now, you said, "They continued to fire."  Did you have any
5    idea who was shooting at you?
6    A.   At that point, no.
7    Q.   Before you heard shots, did you ever hear anyone yell?
8    A.   No.
9    Q.   Did anyone ever identify themselves to you?
10   A.   No.
11   Q.   Did you ever hear anyone give you any commands?
12   A.   No.
13   Q.   What direction, when you first heard the shooting, as
14   you're walking, before you go over the concrete barrier, where
15   was the gunfire coming from?
16   A.   To the left of me.
17   Q.   And at this point were you walking up the bridge?
18   A.   At the point that I could hear the gunshot, yes, I was
19   walking up the bridge.  We were at the foot of the bridge.
20   Q.   And you said to the left of you.  Directly to the left of
21   you?
22   A.   That's where it sounded like it was coming from, the left,
23   when I first heard it.
24   Q.   And what about as the gunfire continued?
25   A.   As the gunfire continued, I ran to the right, which, like

SUSAN BARTHOLOMEW - Direct

1   I said, I jumped over the concrete barrier.

2   Q.   Once you made it over the concrete barrier, what did the

3   gunfire sound like?

4   A.   It just -- it just kept shooting.  It was just -- I don't

5   know.  I just kept hearing it, and they kept shooting, and I

6   kept feeling myself being hit.

7   Q.   How long did that feel like?

8   A.   I don't know.  I don't know.  It seemed like forever.

9   Maybe it was not a long time, but it just...

10  Q.   Were you able to tell how many shots that was fired over

11  that period?

12  A.   Oh, of course not.  It was multiple.  They just -- you

13  just one after -- you just kept hearing -- I just kept hearing

14  it.

15  Q.   Could you describe whether it was rapid or one --

16  A.   Not a single, no.  Rapid.

17  Q.   Did you know where any of your family members were at the

18  time you made it over the concrete barrier?

19  A.   I know my daughter was next to me and my husband next to

20  her.  I'm not sure where Jose was or James or Leonard.

21  Q.   So your daughter was right next to you?

22  A.   Yes, she was next to me.

23  Q.   And what about your husband?

24  A.   He was next to her.

25  Q.   Could you hear them?

SUSAN BARTHOLOMEW - Direct

```
1   A.   Yes, I could hear them crying out.
2   Q.   What could you hear them doing?
3   A.   Crying out, just moaning and crying.  You could tell they
4   were in a lot of pain.
5   Q.   And you mentioned you didn't know where Jose was.  Could
6   you hear Jose at all?
7   A.   I thought that I could hear him, but I'm not sure.
8   Q.   Could you hear your son, Little Leonard?
9   A.   Not at all.
10  Q.   What about Jose's friend James?
11  A.   Not at all.
12  Q.   What were you doing while the shots were ringing out?
13  A.   I'm sorry?
14  Q.   While you were on the ground, what were you doing?
15  A.   Oh, I lied there -- I prayed.  I just called on the Lord
16  because I didn't know what else to do.
17  Q.   And what about your daughter, what was she doing?
18  A.   She tried to cover me.
19  Q.   And when you say she tried to cover you, what do you mean?
20  A.   She tried to prevent me from being -- continued being
21  shot.
22  Q.   And do you remember how she did that?
23  A.   She tried to cover me with herself.
24  Q.   Did the shooting eventually stop?
25  A.   Yes.  It slacked up eventually.  I assume it did.
```

SUSAN BARTHOLOMEW - Direct

1  Q.   What happened when it stopped?
2  A.   I saw a police officer standing over us.
3  Q.   Before you saw the police officer standing over you, did
4  you hear anything?
5  A.   Yeah.  They were threatening to kill us, telling us to
6  hold our hands up.
7  Q.   So before you saw anyone, you heard commands and threats?
8  A.   Yes.
9  Q.   Could you tell the jury about those?
10 A.   They were telling us to hold our hands up, raise both our
11 hands up, and, of course, I couldn't because my arm was shot
12 off, and I just thought they were gonna -- gonna kill me, and
13 they said that they would kill us.  We weren't allowed to look
14 to see who they were, turn our heads the other way.
15 Q.   So one of the commands you were given was to not look?
16 A.   Yes.
17 Q.   Did you know who was giving the commands at this time?
18 A.   No.  At that point, no.
19 Q.   You had mentioned something about you were told to raise
20 your arm but you couldn't.  Why couldn't you raise your arm?
21 A.   Because they had shot it off.
22 Q.   Once you were given these commands, what did you do?
23 A.   I raised the only hand I had.
24 Q.   You mentioned you were afraid of something.  What were you
25 afraid of and why?

SUSAN BARTHOLOMEW - Direct

1   **A.**   That they were gonna kill me.

2   **Q.**   Why?

3   **A.**   Because I only had one arm.  I couldn't raise two.

4   **Q.**   After you raised your arm, what did they do -- or what did

5   you do?

6   **A.**   I tried to see who it was because I wanted to know who had

7   shot us.

8   **Q.**   What did you see when you looked?

9   **A.**   NOPD.  I saw NOPD.  I know their uniform when I see it.

10  **Q.**   So you recognized the uniform?

11  **A.**   Yes.

12  **Q.**   Other than recognizing the uniform, was there any other

13  way you knew that these people were police officers?

14  **A.**   No.

15  **Q.**   Did anyone ever identify themselves to you?

16  **A.**   No.

17  **Q.**   What happened after you raised your arm and you were able

18  to see it was the police?

19  **A.**   I know everything seemed to happen really fast out there.

20  I just recall the ambulance being there and them rushing to

21  take us to the hospital.

22  **Q.**   When you were taken to the hospital, did you know where

23  any of your family members were?

24  **A.**   I knew where Lesha was, of course, because she rode in the

25  ambulance with me.  I assumed that they had put Big Leonard in

SUSAN BARTHOLOMEW - Direct

 1   a different one.  No, I didn't know where everyone was at all.
 2            MS. CHUNG:  I'm sorry.  I just got a note that the
 3   jury can't hear me.
 4            THE COURT:  Can everyone on the jury -- have you been
 5   able to hear the questions?
 6            MR. LONDON:  Judge, we're not able to hear over here
 7   either.
 8            THE COURT:  You may have to just talk a little bit
 9   louder as well.
10            Have you been able to hear the witness'
11   testimony?
12                 (AFFIRMATIVE RESPONSE BY JURY)
13            THE COURT:  Okay.  Because her microphone is closer.
14            MS. CHUNG:  Can everyone hear me now?
15            THE COURT:  Yes.  Much better.
16            MS. CHUNG:  Sorry about that.
17   BY MS. CHUNG:
18   Q.   So you said you knew where your daughter was.  She was in
19   the ambulance with you.  Did you know where any other family
20   members were at this time?
21   A.   I wasn't sure, no.
22   Q.   What happened in the ambulance?
23   A.   I just kept telling the doctors that my daughter had a
24   problem with her heart and just trying to make sure that she
25   was okay.

SUSAN BARTHOLOMEW - Direct

1  **Q.**   Did you arrive at the hospital?

2  **A.**   Yes.

3  **Q.**   Could you tell us what happened at the hospital?

4  **A.**   I just remember them asking me if I could move my arm,

5  and, of course, I can't move -- I couldn't move my arm because

6  it was -- it was off.  It just was a small piece of skin there

7  holding it.  And then I recall a lady coming in there, and I

8  don't know.  She just seemed like an angel, a godsend.  I just

9  kind of clinged onto her, and I asked her and begged her to

10 just to not leave me, and she said that she wouldn't.

11         And then I don't know what happened after that.

12 **Q.**   Do you know if you were treated once you received -- once

13 you arrived at the hospital?

14 **A.**   Yes.  The doctors were there.

15 **Q.**   What treatment did the doctors give you once you got

16 there?

17 **A.**   I had multiple gunshot wounds, so I didn't know what they

18 did until I came out of surgery.

19 **Q.**   Once you came out of surgery, what was your condition?

20 **A.**   I was pretty bad off, and I didn't have my arm.

21 **Q.**   And that was the arm you had mentioned was hanging by two

22 pieces of --

23 **A.**   Yes.

24 **Q.**   -- skin?

25 **A.**   Yes.

SUSAN BARTHOLOMEW - Direct

1   Q.   So that had been amputated?
2   A.   Yes.
3   Q.   And I noticed today, when the deputy asked you to raise
4   your right hand, you didn't raise your right hand.  You had to
5   raise your left hand.
6   A.   Yes.
7   Q.   Why is that?
8   A.   Because I don't have -- I no longer have my right arm.
9   Q.   And I notice that you're wearing a shawl over both your
10  arms today.  Is that something you customarily do?
11  A.   I usually cover my arm.
12  Q.   Once you came out of surgery and were in the recovery
13  room, what happened, if anything?
14  A.   Two police officers showed up in the room.
15  Q.   What did the police officers say to you?
16  A.   They asked me if I knew who had shot me.
17  Q.   What did you say?
18  A.   I told them I wasn't sure.  I think it was the National
19  Guard.
20  Q.   Is that really what you thought?
21  A.   No.
22  Q.   Why did you say that?
23  A.   Because I was afraid.
24  Q.   Why were you afraid?
25  A.   Because I felt threatened.  I felt intimidated, just the

SUSAN BARTHOLOMEW - Direct

1    way they -- their approach.

2    **Q.**   And can you describe what that approach was, what the

3    attitude of the police officers were?

4    **A.**   Just very intimidating.

5    **Q.**   And this is now just after you've been out of surgery?

6    **A.**   Yes.

7    **Q.**   Do you remember anything else about those police officers?

8    **A.**   No.

9    **Q.**   Once you were out of surgery, did you ever see any family

10   members again?

11   **A.**   Yes.

12   **Q.**   Who did you see?

13   **A.**   I seen my husband, and eventually I was able to see my

14   daughter.

15   **Q.**   What was your husband's physical condition at that time?

16   **A.**   He had a bullet in his head.

17   **Q.**   Where was the bullet?

18   **A.**   It kind of set in the -- inside his temple area.

19   **Q.**   You said you eventually got to see your daughter.  Do you

20   remember when you got to see her?

21   **A.**   Some days later.

22   **Q.**   And what was her condition when you saw her?

23   **A.**   She was pretty bad off.

24   **Q.**   Can you describe what injuries, if any, she had?

25   **A.**   She was shot in her stomach area.  They had to cut her

SUSAN BARTHOLOMEW - Direct

1    from the top part to the lower part of her stomach to remove a
2    bullet.  She was shot all up in her legs.  And she -- she was
3    just pretty bad off.
4    Q.   Was she able to walk?
5    A.   No.
6    Q.   Did you know where Jose, James or Little Leonard were at
7    this time?
8    A.   No.
9    Q.   Did you ever find out where Jose was?
10   A.   Eventually.
11   Q.   Where was he?
12   A.   In the same hospital on a different floor.
13   Q.   Did you ever get to see Jose?
14   A.   It took a long time before I was able to see him, but,
15   yes.
16   Q.   And you mentioned you didn't know where your son Leonard
17   or where James was.  How old was Little Leonard at that time?
18   A.   Fourteen.
19   Q.   How big was he back then?
20   A.   Shorter than me.
21   Q.   Shorter than you?
22   A.   Yes.
23   Q.   So shorter than 5'1"?
24   A.   Yes.
25   Q.   And about how much did he weigh?

SUSAN BARTHOLOMEW - Direct

1   A.   Not much.  He was slim.

2   Q.   How did he wear his hair at that time?

3   A.   He used to have braids.

4   Q.   Was he ever mistaken for a little girl?

5   A.   Yes.

6   Q.   And how frequently did that happen?

7   A.   Pretty often.

8   Q.   And did you have any idea what happened to him?

9   A.   No, I didn't know.

10  Q.   Did there come a time when you did get to see Jose in the

11  hospital?

12  A.   Yes.

13  Q.   Could you tell the jury about that first meeting with him?

14       MR. DESALVO:  Your Honor, may we approach the bench?

15       THE COURT:  Yes.

16       (WHEREUPON, the following proceedings were held at

17  the bench.)

18       THE COURT:  Just the two of you.

19       MR. DESALVO:  Oh, I understand.

20       THE COURT:  Okay.  Is there an objection you'd like

21  to make?  Go ahead.

22       MR. DESALVO:  Yes.  The questions are too vague for

23  me to understand what's being sought and whether or not it's

24  objectionable or not.  Like what happened there when she saw

25  her son.  I don't know whether it's relevant or whether it's

SUSAN BARTHOLOMEW - Direct

1    not.

2              I think they're on the edge of relevance with

3    most of this testimony.

4              THE COURT:  Well, I think so far she's done fine in

5    terms of answering.  They're not allowed to lead the witness.

6    So to a certain extent, I have to give them a wide berth on the

7    questions with "what happened next" type of questions.

8              I'm going to overrule the objection.  If you can

9    narrow the questions a bit, it would probably be helpful to not

10   only defense counsel and the Court but also to the witness as

11   well.  Maybe try to be a little more specific as to what you're

12   looking for.

13             But I'm going to overrule the objection because

14   she can't lead the witness.  So...

15             MR. DESALVO:  I understand.  I was just a little

16   concerned and I wanted to bring it to the attention of

17   everybody.

18             Thank you, Judge.

19             THE COURT:  All right.

20             (WHEREUPON, the following proceedings were held in

21   open court.)

22   BY MS. CHUNG:

23   Q.   Mrs. Bartholomew, I had just asked you, what was Jose's

24   condition when you first saw him?

25   A.   He was pretty bad off.

SUSAN BARTHOLOMEW - Direct

1   **Q.**   Could you tell the jury a little more about what his
2   physical condition was?
3   **A.**   He couldn't talk.
4   **Q.**   Why couldn't he talk?
5   **A.**   Because of where he was shot.
6   **Q.**   I'm sorry.  Could you repeat that?
7   **A.**   Because of where he was shot.
8   **Q.**   Because of where he was shot?
9   **A.**   It affected where he could not talk.
10  **Q.**   You were just gesturing to your face.
11  **A.**   To the neck area.
12  **Q.**   And when you're gesturing to your face, are you indicating
13  that that's where he was shot?
14  **A.**   The neck area.
15  **Q.**   I'm sorry, Mrs. Bartholomew.  I'm just going to have to
16  ask you to speak up a little bit.  I know the microphone is
17  near you, but --
18  **A.**   He was shot in the neck area.
19  **Q.**   What about the rest of his condition?
20  **A.**   He was pretty bad off.  He couldn't walk.  He couldn't do
21  anything.  He was intubated.
22  **Q.**   How close are you to your nephew Jose?
23  **A.**   Real close.  I was like a mom.  Like a mom to him.
24  **Q.**   How close was he to your son Leonard?
25  **A.**   They were like brothers.

SUSAN BARTHOLOMEW - Direct

1    Q.    How often would you see Jose?

2    A.    Very often.

3    Q.    And how well did you know Jose?

4    A.    Well.

5    Q.    Did you ever have any worries about letting Jose spend

6    time with Little Leonard?

7    A.    No.

8    Q.    Mrs. Bartholomew, did you have a gun when you set out to

9    the Winn-Dixie that day?

10   A.    No.

11   Q.    Did your son Leonard have a gun that day?

12   A.    No.

13   Q.    Did anyone in your group have a gun that day?

14   A.    No.

15   Q.    Did you keep a gun in your house?

16   A.    No.

17   Q.    Had you ever even held a gun?

18   A.    No.

19   Q.    Did you permit any members of your family to have -- keep

20   a gun in your home?

21   A.    No.

22   Q.    You had said that Jose's condition was very bad, that he

23   couldn't walk and that he couldn't talk.  Did you see any other

24   gunshot wounds on Jose?

25   A.    I know they had to do surgery and cut him by his stomach

SUSAN BARTHOLOMEW - Direct

1   area.  I know he could no longer go to the bathroom.  He had to

2   wear one of those bags.

3   **Q.**   To help him go to the bathroom?

4   **A.**   Yes.

5   **Q.**   And you, yourself, had mentioned your arm had to be

6   amputated.  Did you have any other serious injures?

7   **A.**   Yes.  I was shot in my legs.  My hip was broken.

8   **Q.**   Were you able to walk at first?

9   **A.**   No.

10  **Q.**   How long was it before your husband was discharged from

11  the hospital due to his gunshot wound to the head?

12  **A.**   Not long.

13  **Q.**   Where did he stay once he was discharged?

14  **A.**   At the hospital with me and my daughter.

15  **Q.**   And how much later were you discharged?

16  **A.**   Approximately two months or so.

17  **Q.**   And what about your daughter?

18  **A.**   Approximately around that time.  She was discharged after

19  me.

20  **Q.**   And once you were discharged, where did you and your

21  husband stay?

22  **A.**   We went to Texas.

23  **Q.**   And was there a time when you were staying in your

24  daughter Lesha's room with her?

25  **A.**   Oh, I'm sorry.  I misunderstood the question when you

SUSAN BARTHOLOMEW - Direct

1  asked where were we staying.  I thought you meant after we left

2  the hospital.  While we were in the hospital, I stayed in the

3  room with my daughter.

4  **Q.**   You had mentioned that some police officers came and asked

5  you questions right after your surgery that morning that you

6  were brought to the hospital.  Did NOPD ever come back to the

7  hospital?

8  **A.**   Yes, they did.

9  **Q.**   How many times?

10  **A.**   Two more times.

11  **Q.**   What happened on the second visit?

12  **A.**   It was, basically, the same thing, two police officers,

13  asking the same questions to myself, my daughter, and my

14  husband.

15  **Q.**   So all three of you were together when the police officers

16  came?

17  **A.**   Yes.

18  **Q.**   And when you say the same questions --

19  **A.**   The same question, do we know who shot us.

20  **Q.**   What did you say?

21  **A.**   I think it was the National Guard.

22  **Q.**   Do you know if your husband answered?

23  **A.**   Yes.

24  **Q.**   What did he say?

25  **A.**   He thought it was the National Guard.

SUSAN BARTHOLOMEW - Direct

1   **Q.**   Again, is that what you really thought?

2   **A.**   No.

3   **Q.**   Why did you answer that way?

4   **A.**   Because I was afraid.

5   **Q.**   What was the tone of that interview?

6   **A.**   Basically, the same, just really intimidating.

7   **Q.**   Do you know if these were the same officers who had come

8   after your surgery?

9   **A.**   I don't remember.

10  **Q.**   Do you remember anything about these officers?

11  **A.**   I only remember one introducing himself as having a higher

12  ranking than the other one.

13  **Q.**   And do you remember what any of those ranks were?

14  **A.**   I don't remember.

15  **Q.**   Tell us about the third visit where the NOPD came to your

16  hospital room.

17  **A.**   It was, basically, the same thing, asking the same

18  question, except this time they -- when they came in, they

19  closed the door.  The nurse did not -- of course, she wasn't in

20  there the second time, but she didn't even stand in there, and

21  she allowed them to close the door.  So it was extremely

22  intimidating.

23  **Q.**   And it seems like the door closing was important to you.

24  Why did that have an effect on you?

25  **A.**   I was afraid.  I didn't know what they would do.

SUSAN BARTHOLOMEW - Direct

1  Q.   Now, you had mentioned that a nurse let them in.  After
2  the second visit, did you have any conversations with the
3  nurses?
4  A.   I asked her to not let them come back in the room like
5  that again, and she said that she would not let them come back
6  there.
7  Q.   But there was another visit?
8  A.   Yes.
9  Q.   You mentioned that the door was closed and that
10  intimidated you?
11  A.   Yes.
12  Q.   What was the tone of the interview?
13  A.   Just their attitudes was like, "You better give the right
14  answer."
15  Q.   And what was the wrong answer?
16  A.   The wrong answer was to say it was them, it was NOPD.
17  Q.   What answer did you give?
18  A.   I think it was the National Guard.
19  Q.   I'm going to show you what's in evidence as Exhibit 27.
20  This is a 54 official New Orleans Police Department report on
21  this incident.  I'd like to turn your attention to page 25.
22  Directing your attention to the highlighted area first --
23  actually, if we could go back one second.
24         If I could draw your attention to this area where it
25  indicates:  "On Thursday, September 8th, 2005, Sergeant Arthur

SUSAN BARTHOLOMEW - Direct

1    Kaufman and Detective Jeffrey Lehrmann went to West Jefferson
2    Hospital's intensive care unit and critical care unit, where
3    they spoke with medical staff personnel.  Kaufman related they
4    were advised that all of the wounded subjects were listed in
5    critical condition except Leonard Bartholomew, Sr., who was
6    listed in stable condition."
7              MS. CHUNG:  May I have the cull-out?
8    BY MS. CHUNG:
9    Q.   And now, directing your attention to this highlighted
10   portion, Mrs. Bartholomew.
11             "The investigators were able to speak with Leonard
12   Bartholomew, Sr. who related the following:
13             "Mr. Leonard Bartholomew, Sr. stated he and his
14   family were walking to the Winn-Dixie supermarket located on
15   Chef Menteur Highway on the 3rd Police District side of the
16   Danziger Bridge."
17             Now, is that part true?  Did your --
18             MR. DESALVO:  Your Honor, she's showing what someone
19   else said to this witness --
20             THE COURT:  Yes, you have to --
21             MR. DESALVO:  -- and asking her to comment on it.
22             THE COURT:  You have to lay a foundation on this.
23   BY MS. CHUNG:
24   Q.   Were you present for this visit?
25   A.   I'm sorry?

SUSAN BARTHOLOMEW - Direct

1   Q.   The second time --
2   A.   I'm completely lost here.
3   Q.   -- the police came to your hotel -- to your hopsital --
4              THE COURT:  I'm sorry.  Wait.
5              Ma'am, you can go ahead.  You were about to say
6   something, or not?
7              THE WITNESS:  No.  I wanted her to repeat what she
8   was saying.  I'm kind of lost here.
9              MS. CHUNG:  Okay.
10             THE COURT:  Sure.  Well, I think -- I am too.  So
11  let's go ahead and ask the question and then we'll see.
12  BY MS. CHUNG:
13  Q.   After your surgery, the next two times the police came,
14  was your husband present?
15  A.   Yes.
16  Q.   Were you present for all statements made to the New
17  Orleans Police Department?
18  A.   Yes.
19  Q.   Turning your attention to this report, which reports a
20  statement that your husband made to the New Orleans Police
21  Department, did he ever make a statement to them out of your
22  presence?
23  A.   No.
24             MR. DESALVO:  It's still hearsay, Your Honor.
25             THE COURT:  One second.  One second.

SUSAN BARTHOLOMEW - Direct

1           Yes.  You have to lay a foundation for her
2   familiarity with this report.  She's not the author of it, nor
3   has it been established that it was ever shown to her.
4           If you want to ask her what happened on those
5   occasions, I think you began to do that, that's fine.  But to
6   get her to look at someone else's report when it's not obvious
7   or it's not -- she hasn't testified that she has any
8   familiarity with it, there's no foundation for her to look at
9   this document and then to testify from it.
10          So I'll sustain the objection.  If you want to
11  try to lay a foundation, fine.  If not, then let's just ask her
12  what happened on those occasions, what did Mr. Bartholomew, Sr.
13  say.
14          **MS. CHUNG:**  Yes, Your Honor.
15          **MR. DESALVO:**  Could we also have that removed, Your
16  Honor?
17          **THE COURT:**  Yes.  Let's go ahead and take it off.
18  Let her look at it.  We'll go ahead and -- if you want to show
19  it to her here -- do you want to show her that document so that
20  she can -- if she's never seen it before, it's improper to ask
21  her about the document, but you can ask her the questions about
22  the information contained in it since she was present when,
23  apparently, that was recorded.
24          **MS. CHUNG:**  Yes, Your Honor.
25

SUSAN BARTHOLOMEW - Direct

1  BY MS. CHUNG:

2  Q.   Ms. Bartholomew, have you seen that 54-page report before?

3  The 54-page report that was just put on the exhibit screen,

4  have you seen that before in preparation for your testimony

5  today?

6  A.   I've heard questions.

7  Q.   And have you seen the statements attributed --

8  A.   The statements -- I'm sorry.  I heard the statements.

9  Q.   Have you seen the statements attributed to you and your

10  husband in those reports?

11  A.   Yes.

12  Q.   Did your husband ever tell the New Orleans Police

13  Department that your nephew Jose was shooting --

14  A.   No.

15  Q.   -- at police or military helicopters?

16  A.   No.

17  Q.   Did you see that statement in the exhibit?

18  A.   Yes.

19  Q.   Did that ever happen?

20  A.   No.

21  Q.   Did you also see a statement attributed to yourself in

22  that report?

23  A.   Yes.

24  Q.   Did you ever tell the New Orleans Police Department that

25  you saw Jose shooting?

SUSAN BARTHOLOMEW - Direct

1   **A.**   No.

2   **Q.**   And did you ever tell the New Orleans Police Department

3   that Jose and his friends started shooting?

4   **A.**   No.

5   **Q.**   Did Jose have more than one friend on the bridge that day?

6   **A.**   No.

7           **MS. CHUNG:**  Your Honor, if I may now show the exhibit

8   to the witness?

9           **THE COURT:**  Mr. DeSalvo?

10          **MR. DESALVO:**  Same objection, your Honor.

11          **THE COURT:**  Yes.  She's not the author of it.  She

12  saw it in connection with preparing for her testimony, but I

13  think the questions you've asked her are about what happened

14  and whether statements attributed to her were, in fact, made by

15  her.  But I think this is the wrong witness for that document.

16          **MS. CHUNG:**  Very well, Your Honor.  I'll move on.

17          **MR. CARTER:**  Your Honor, may we approach for a

18  second?

19          **MR. DESALVO:**  I thought that wasn't the rule, Judge.

20          **THE COURT:**  I'm sorry?

21          **MR. DESALVO:**  I thought that wasn't the rule.

22  Well...

23          **THE COURT:**  Come on up.  I'm hoping it's not to

24  revisit something that I just said, because if it is, then it's

25  a waste of time.

SUSAN BARTHOLOMEW - Direct

1          (WHEREUPON, the following proceedings were held at

2     the bench.)

3          **MR. CARTER:**  This is also for future reference.  This

4     is for all of us, Judge.

5               That document is in evidence.  I thought a

6     document in evidence could be used for any purpose.

7          **THE COURT:**  It can be, but you still need to lay a

8     foundation of her familiarity with it.  She reviewed it just to

9     come in and testify.  I think you can ask her questions about

10    each and every representation made in there whether or not she

11    said it, but she's not the author of the report.

12         **MR. CARTER:**  So would it be proper, just so I'll

13    know, to show her the document and ask her, "Did you make that

14    statement?  Did you ever tell the police this statement

15    that's --

16         **THE COURT:**  Just ask her if she ever made that

17    statement.  I think Ms. Chung has done that effectively.

18         **MR. CARTER:**  Can we show it on the screen while we

19    ask that question?

20         **THE COURT:**  But it's not her report, though.

21         **MR. CARTER:**  It's being attributed to her, and she's

22    saying she never said it, and the document's already in

23    evidence.  I'm just trying to get clarification.

24         **THE COURT:**  It's not her report.  She's not authored

25    it.  The only time she saw it was in preparation for this

SUSAN BARTHOLOMEW - Direct

1   trial.  I don't think there's a foundation for her to testify

2   off of this report.  You can ask her about statements

3   attributed to her that she didn't make, and I think Ms. Chung

4   has done that and can continue to do that.

5           **MR. DESALVO:**  May I inquire of the Court as to the

6   Court's rule about the questioner addresses the issue and the

7   objectioner addresses the issue and no one else?

8           **THE COURT:**  Yes.  And it's been violated now once and

9   for the last time.

10          **MR. CARTER:**  I'll just state, Your Honor, I thought

11  this was something that we all needed to know going forward.

12          **THE COURT:**  Well, one thing that we do need to do

13  that we haven't done is put into evidence the uncontested

14  exhibits, of which this is one, and we will do that at the end

15  of the day, but you can go ahead and proceed.

16          **MS. CHUNG:**  Okay.

17          **THE COURT:**  I think she's doing it the right way.

18          (WHEREUPON, the proceedings were concluded.)

19  BY MS. CHUNG:

20  **Q.**   Mrs. Bartholomew, how many friends did Jose have with him

21  that day?

22  **A.**   One.

23  **Q.**   Did he ever have multiple friends out with him on the

24  bridge that day?

25  **A.**   No.

SUSAN BARTHOLOMEW - Direct

1   Q.   Did you ever see Jose or James start firing any weapon?

2   A.   No.

3   Q.   Did you see either of them carrying any weapon?

4   A.   No.

5   Q.   Did you ever tell the police that your nephew Jose and his

6   friend James fired at the police?

7   A.   No.

8   Q.   Now, you mentioned that the police came a second time --

9   A.   Yeah.

10  Q.   -- a third time.  I'm sorry.  Were you present for any

11  statements that your husband made?

12  A.   Yes.

13  Q.   Did your husband ever tell the police --

14         MR. DESALVO:  Your Honor -- never mind.  I'm sorry,

15  Your Honor.

16  BY MS. CHUNG:

17  Q.   Did your husband ever tell the police that he saw the -- a

18  military truck open fire on your family while your nephew was

19  shooting at police officers?

20  A.   No.

21  Q.   Did you ever observe your husband make that statement?

22  A.   No.

23  Q.   Were you ever out of that room after the door had been

24  closed and your husband was alone with the police?

25  A.   No.

SUSAN BARTHOLOMEW - Direct

1  **Q.**  That same day, the third visit, did you ever tell the
2  police that you recalled your nephew was shooting at police
3  officers as police officers approached the Danziger Bridge?
4  **A.**  No.
5  **Q.**  What did you do once -- how did this -- how did the visit
6  from the New Orleans police officers end that day, the third
7  visit?
8  **A.**  I asked for head of security at the hospital because I
9  wanted to know what my rights were, if they had a right to come
10 in there like that because I had previously requested the last
11 time that the nurse not allow them to come, and she said she
12 would not let them in again, and it happened for a third time.
13 Of course, I was afraid.
14 **Q.**  And did you, in fact, speak with the head of security?
15 **A.**  Yes.
16 **Q.**  And what were you told by the head of security?
17 **A.**  I was told that they had to look out for them because they
18 looks out for them.  You know, it's almost like, "Well, there's
19 nothing that we can do.  They look out for us, we have to look
20 out for them."
21 **Q.**  What was your reaction when you learned that that was --
22 there was no way for you to prevent police officers from coming
23 to your daughter's room?
24 **A.**  I wanted to leave.
25          **MR. DESALVO:**  I object as to relevance, Your Honor.

SUSAN BARTHOLOMEW - Direct

```
 1              THE COURT:  I'm going to overrule.
 2              THE WITNESS:  I wanted to leave the hospital.
 3   BY MS. CHUNG:
 4   Q.   Had your daughter been discharged yet?
 5   A.   No.
 6   Q.   Had your nephew been discharged yet?
 7   A.   No.
 8   Q.   How soon did you leave after that?
 9   A.   I don't remember.  It wasn't that long after that.
10   Q.   At the time you left, what was your daughter's condition?
11   A.   She couldn't walk.
12   Q.   What about Jose?
13   A.   He was still pretty bad off.
14   Q.   While you were still in the hospital, did you ever tell
15   anyone in the hospital what had happened to you?
16   A.   Nothing but basic information, no details, because I
17   didn't understand it myself.
18   Q.   And when you say "basic details," what do you mean?
19   A.   I was shot.  I don't know why.
20   Q.   Did you ever tell anyone you were caught in cross-fire?
21   A.   No.
22   Q.   The day you were on the bridge, did you ever see anyone
23   shooting from in front of you?
24   A.   No.
25   Q.   Did you ever notice anyone in front of you?
```

SUSAN BARTHOLOMEW - Direct

1  A.  No.

2  Q.  Did you ever believe that gunfire was coming from the

3  front of you towards you?

4  A.  No.

5      MR. MECHE:  Objection to leading questions.  Your

6  Honor, we've got a string of them.

7      THE COURT:  I'm going to overrule.  I think it's a

8  logical question that's not leading based upon the prior

9  answer.

10 BY MS. CHUNG:

11 Q.  Mrs. Bartholomew, do you currently have a lawsuit pending?

12 A.  Yes.

13 Q.  Who is the lawsuit against?

14 A.  I believe the City of New Orleans.

15 Q.  And what is the lawsuit for; why was it brought?

16 A.  Injuries due to the shooting.

17 Q.  Who wrote the complaint in that case?

18 A.  My lawyer.

19 Q.  Do you know if the complaint asks for a certain amount of

20 money or for monetary damages?

21 A.  I don't know.

22 Q.  Who made the decision if you would ask for money and how

23 much that would be?

24 A.  My lawyer.

25 Q.  Did you have anything to do with that decision?

SUSAN BARTHOLOMEW – Direct

1   A.   No.

2   Q.   When you set out that day on the Danziger Bridge, who was

3   with you?

4   A.   Myself, my husband, my nephew, my son, my daughter and

5   James.

6   Q.   Did you know anyone named Lance or Ronald Madison?

7   A.   No.

8   Q.   Were they with you?  Did any two people who introduced

9   themselves like that join your group?

10  A.   No.

11  Q.   Did you know anyone named Morrell Johnson?

12  A.   No.

13  Q.   Do you know if someone named Morrell Johnson joined your

14  group?

15  A.   No.

16  Q.   Aside from the people you just named, did anyone else ever

17  join the group of you?

18  A.   No.

19  Q.   Mrs. Bartholomew, looking at this side of the room, have

20  you ever pointed a gun at any of these people on this side of

21  the room?

22  A.   No.

23  Q.   Have you ever fired a gun at any of these people?

24  A.   No.

25  Q.   Have you ever pointed a weapon or fired a weapon in your

SUSAN BARTHOLOMEW - Direct

1  life?

2  A.   No.

3  Q.   You mentioned that when you left -- well, actually, let me

4  just ask it.  When you left the hospital with Lesha and your

5  husband, where did you all go?

6  A.   To Texas.

7  Q.   Was Lesha able to walk at the time?

8  A.   No.

9  Q.   Did she have to have follow-up care?

10 A.   Yes.

11 Q.   What kind of follow-up care?

12 A.   She had to have physical therapy.

13 Q.   What about you, did you require any physical therapy?

14 A.   Yes, yes.

15 Q.   Where was Jose when you all left?

16 A.   He stayed at the hospital.

17 Q.   How did you feel about that?

18 A.   Not good.

19 Q.   Were you or your husband ever able to go back to the

20 hospital and visit Jose?

21 A.   No.

22 Q.   You mentioned that once you got to the hospital you knew

23 where Lesha, Jose and Big Leonard were.  Did you ever find out

24 where Little Leonard was?

25 A.   Yes, eventually.

SUSAN BARTHOLOMEW - Direct

1  **Q.**  How long did it take?

2  **A.**  I don't remember.  A little while it did, some days.

3  **Q.**  How did you feel during that time?

4  **A.**  I was worried.  I couldn't sleep.  And I just thought that

5  if no one knew where he was, he must be dead.

6  **Q.**  Did you ever see James Brissette again?

7  **A.**  No.

8  **Q.**  Do you know what happened to James Brissette?

9  **A.**  No, I didn't know.

10  **Q.**  Did you ever learn?

11  **A.**  Eventually, yes.

12  **Q.**  What did you learn?

13  **A.**  That he was dead.

14          **MS. CHUNG:**  I have no further questions, Your Honor.

15          **THE COURT:**  Thank you.

16          Let me just tell the jury that our procedure

17  here is going to be -- some of you already know this, but the

18  procedure is going to be, of course, that the government may

19  call a witness, and then that witness will be subject to direct

20  examination, which Ms. Chung has just done, and then each

21  defendant will have the opportunity to cross-examine and ask

22  leading questions of the witness, and then the government will

23  be allowed to redirect the witness' testimony, which in this

24  case will be Ms. Chung returning to ask questions on redirect.

25          Insofar as the defendants are concerned, I'm not

SUSAN BARTHOLOMEW - Direct

1   particularly concerned about the order in which you ask

2   questions, counsel.  If you all want to vary the order, that's

3   fine.  But two things:  Number one, you'll only have one

4   opportunity each to question the witness on cross; and

5   secondly, please do not be redundant with the questioning.

6              If one lawyer asks a question on cross, there

7   will be no need to ask it yet again, the same question yet

8   again.  You may want to get into something further, but let's

9   not have the same question being asked by multiple lawyers when

10  the witness has already been examined with regard to that.

11             Mr. DeSalvo, from your position at the podium, I

12  understand you're going to take the first attempt --

13         **MR. DESALVO:**  That's correct, Your Honor.

14         **THE COURT:**  -- at cross-examination of

15  Ms. Bartholomew.  So you may proceed.

16                   **CROSS-EXAMINATION**

17  BY MR. DESALVO:

18  **Q.**   Mrs. Bartholomew, my name is Frank DeSalvo and I represent

19  Ken Bowen, and I have to ask you some questions.

20             On that day, when you left the hotel, you said you

21  were traveling west; is that correct?

22  **A.**   Yes.

23  **Q.**   To go over the Danziger Bridge?

24  **A.**   Yes.

25  **Q.**   And you were going to the Winn-Dixie?

SUSAN BARTHOLOMEW - Cross

1    **A.**    Yes.

2    **Q.**    To get food and cleaning supplies?

3    **A.**    Yes.

4    **Q.**    And, obviously, you didn't get to get to the Winn-Dixie?

5    **A.**    Yes.

6    **Q.**    You had your family members, as you've testified to, and

7    James Brissette?

8    **A.**    Yes.

9    **Q.**    James and Jose were friends?

10   **A.**    Of course.

11   **Q.**    And Little Leonard was a little younger than them?

12   **A.**    Yes.

13   **Q.**    Did he help participate in the skipping up the bridge with

14   them?

15   **A.**    Yes.

16   **Q.**    When they were skipping up the bridge, did they get some

17   distance from you and your husband and daughter?

18   **A.**    Yes, just a little distance.

19   **Q.**    And were they racing up the bridge to see who was the

20   fastest?

21   **A.**    Sort of.

22   **Q.**    Sort of?  So it was more than just skipping?

23   **A.**    (WITNESS NODS HEAD.)

24   **Q.**    Okay.  And you didn't see the Madisons --

25              **THE COURT:**  One second.  We didn't get a verbal

SUSAN BARTHOLOMEW - Cross

1  answer so that we can write it down.  You nodded your head yes;
2  is that correct?
3          **THE WITNESS:**  Yes, yes.
4  **BY MR. DESALVO:**
5  **Q.**  I'm sorry.  And you didn't see the Madisons?  That would
6  be the two guys that were further up the bridge?
7  **A.**  No.
8  **Q.**  Had you looked up there?
9  **A.**  Yes.
10  **Q.**  Okay.  And you had indicated at one point, I believe,
11  that -- well, let me backtrack on that.  Were you afraid of
12  people who had guns at that time?
13  **A.**  Was I afraid of people who had guns at the time that I was
14  going up the bridge?
15  **Q.**  At the time that you were a Katrina survivor.
16  **A.**  No.
17  **Q.**  Do you remember speaking to -- well, first of all, do you
18  know who this man is here, Agent Bezak?
19  **A.**  Yes.
20  **Q.**  Do you remember speaking to him on February 18th, 2009 --
21  maybe not the exact date, but you remember speaking to him
22  sometime in 2009?
23  **A.**  Yes.
24  **Q.**  Do you remember telling him that no one -- none of the
25  individuals from -- with the Bartholomews possessed a gun the

SUSAN BARTHOLOMEW - Cross

1  morning of the incident?

2  A.    Yes.

3  Q.    "She recalled the family was afraid of the individuals who

4  did have guns"?

5  A.    That was at the hotel, if they had guns.  That was when we

6  first were there and there was no electricity.  There was no

7  electricity, and we stayed at the first hotel, and those guys

8  were arguing.

9  Q.    Did you -- what made you believe that some of those people

10  had guns?

11  A.    They could have had guns.  We don't know.  Just New

12  Orleans is known for having violence go on there.

13  Q.    Had you heard any gunshots?

14  A.    No, not until after we left that hotel during the night.

15  Q.    At no time after Katrina struck while you were staying in

16  either hotel at night did you hear gunshots?

17  A.    Yes, I did.

18  Q.    You heard gunshots?

19  A.    Uh-huh.

20  Q.    How often?

21  A.    Not often.

22  Q.    When you were stranded on your rooftop, did you hear

23  gunshots?

24  A.    I was not stranded on my rooftop.

25  Q.    I'm sorry.  When you were stranded at your apartment.

SUSAN BARTHOLOMEW - Cross

1  **A.**   No, I did not.

2  **Q.**   Okay.  When you got to the hospital -- and you don't

3  recall doing your intake interview at the hospital, do you?

4  **A.**   I don't recall an intake interview.

5  **Q.**   You don't remember talking --

6  **A.**   I was in a lot of pain.

7  **Q.**   -- to anybody when you got in and them asking you what

8  happened?

9  **A.**   No, I don't recall that.

10  **Q.**   Okay.  And the government asked you did you ever say you

11  got caught in the cross-fire and you said no; is that correct?

12  **A.**   I don't recall anyone asking me that.

13  **Q.**   Have you been shown your hospital interview wherein you

14  said that you got injured when you were shot and caught --

15          **MS. CHUNG:**  Objection, Your Honor.

16  BY MR. DESALVO:

17  **Q.**   -- shot in the cross-fire?

18          **THE COURT:**  Go ahead.

19          **MS. CHUNG:**  Your Honor, there's been no prior

20  inconsistent statement.  There's no basis for this question.

21          **THE COURT:**  You have to lay a foundation for it.  Are

22  you saying that there's a written recitation?  Is that --

23          **MR. DESALVO:**  Well, I'm -- she's got to deny it

24  first, Judge.

25          **MS. CHUNG:**  A report which, again, Mrs. Bartholomew

1  has not written, which is not -- there's no prior

2  inconsistency.

3         THE COURT:  All right.  Let's direct her then to the

4  occasion of when this supposed interview took place and lead

5  her through it.  Let's lay a foundation for that occasion

6  before we get her to answer questions about what she may or may

7  not have said.

8         MR. DESALVO:  Let's see if I can do it a better way.

9  BY MR. DESALVO:

10 Q.  You don't remember when you went into the hospital talking

11 to somebody and telling them what happened?

12 A.  No.

13 Q.  Okay.  So you don't know what you may have told them?

14 A.  I didn't talk to anyone other than the doctors about my

15 injury.

16 Q.  Now, what were your plans for that day?  Was this the day

17 that you woke up and you decided this was the day you were

18 going to be able to get out of town and leave?

19 A.  No.  My plans was to go to Winn-Dixie and get cleaning

20 supplies and Glucerna for my mom.

21 Q.  It had nothing to do with it being a sunny day and you

22 were going to get to get somewhere else and leave town?

23 A.  No.  It just so happened that the day was -- it was a

24 Sunday and it was sunny outside.

25 Q.  In fact, it was sunny every day after the hurricane for a

SUSAN BARTHOLOMEW - Cross

1  few weeks, wasn't it?

2  **A.**   Maybe.  I don't remember.

3  **Q.**   Okay.  When you -- you said that the third time the police

4  officers came to visit you, they closed the door and they were

5  very intimidating; is that right?

6  **A.**   Yes.

7  **Q.**   And it appeared that they wanted you to say that someone

8  else shot you, not New Orleans police?

9  **A.**   Yes.

10 **Q.**   That's how you felt?

11 **A.**   Yes.

12 **Q.**   And how long after the incident was this?

13 **A.**   Which visit?

14 **Q.**   The third one, the time that they were intimidating you?

15 **A.**   I had been in the hospital at this point almost --

16 approximately almost two months.

17 **Q.**   Okay.  So two months after the incident, you believed that

18 the investigators from the NOPD wanted you to say somebody else

19 shot you other than New Orleans police?

20 **A.**   Of course.  They made three visits there.

21 **Q.**   And that each time that's what you believed they wanted

22 you to say?

23 **A.**   Exactly.

24 **Q.**   And that's why on two occasions you told them it was the

25 National Guard?

SUSAN BARTHOLOMEW - Cross

1   **A.**   That's a question?

2   **Q.**   Yes.  Is that correct?

3   **A.**   On three occasions.

4   **Q.**   On three occasions you told them the National Guard?

5   **A.**   Yes.

6   **Q.**   Do you recall when you got in the -- dealt with the EMS

7   person and you told the person from EMS that you were shot by

8   somebody from a helicopter?

9   **A.**   I didn't tell them who I was shot by.  I didn't speak

10  about who shot who or anything about a shooting.

11  **Q.**   Now --

12          **MR. DESALVO:**  Could you put up Exhibit 31, please?

13          **MS. CHUNG:**  Objection, Your Honor.  I don't believe

14  31 -- which one is 31?

15          **MR. DESALVO:**  It's the walkway.

16          **MS. CHUNG:**  Oh, I'm sorry.

17          **THE COURT:**  31.  You can pull those screens -- there

18  you go.  You can pull those screens out gently from the bottom

19  in the jury box to see, if it helps you see better.

20  BY MR. DESALVO:

21  **Q.**   Mrs. Bartholomew, do you recognize that?

22  **A.**   The area?

23  **Q.**   Yes, ma'am.

24  **A.**   Yes.

25  **Q.**   Does that appear to be the Danziger Bridge?

SUSAN BARTHOLOMEW - Cross

1   A.   It appears to be.

2   Q.   And if you're facing in a direction that that truck is

3   driving, there's a walkway on the right side?

4   A.   Uh-huh, yes.

5   Q.   And in between that walkway and where that truck is

6   driving, there's a concrete barrier?

7   A.   Yes.

8   Q.   Now, you indicated that after you -- you were shot before

9   you went over the barrier and that you felt yourself getting

10  shot after you were over the barrier; is that correct?

11  A.   Yes.

12  Q.   Could you tell me in which direction you were laying?

13  A.   My backside was towards the concrete barrier, and I know

14  this because I was being shot in that area through the concrete

15  barrier.

16  Q.   You were shot through the concrete barrier?

17  A.   Yes.

18  Q.   You actually said that you saw the bullets striking the

19  concrete barrier; is that correct?

20  A.   I could see the holes.

21  Q.   You could see the holes?

22  A.   Uh-huh.

23  Q.   How many holes did you see?

24  A.   I don't remember.

25  Q.   It was more than one?

SUSAN BARTHOLOMEW - Cross

1  A.   Possible.

2  Q.   Well, I mean, you were hit multiple times; right?

3  A.   I was shot multiple times, yes.

4  Q.   And when you're saying that you saw the holes in the

5  concrete barrier, that was on the walkway side of the concrete

6  barrier; is that correct?

7  A.   You can repeat the question?

8  Q.   The holes in the barrier that you saw, were they on the

9  walkway side of the barrier or on the street side of the

10  barrier?

11  A.   The holes that I seen was from where I lie on the ground.

12  Q.   Okay.  So it would have been on the walkway side of that

13  cement barrier; is that correct?

14  A.   Yes.

15  Q.   And your back was facing to the concrete barrier?

16  A.   Yes.

17  Q.   And your daughter Lesha was laying right next to you?

18  A.   Yes, she was next to me.

19  Q.   Was she in between you and the barrier or was she in

20  between you and the rail?

21  A.   I just know she was in -- she was to the right of me.

22  Q.   Which side were you laying on, your right or your left

23  side, or you were laying on your stomach or your back?

24  A.   I can assume that I was on my side because I was shot in

25  my backside.

SUSAN BARTHOLOMEW - Cross

1  Q.   Okay.  So you think you were laying on your right side?
2  A.   It's possible.
3  Q.   Well, which way was your head facing?
4  A.   I don't remember.
5  Q.   Now, you say you finally left the hospital when -- was it
6  the nurse at the hospital who said, "We got to take care of
7  them because they take care of us"?
8  A.   No.  It was the head of security.
9  Q.   The head of security.
10        And did he tell you that or you overheard him say it?
11  A.   No, he said it to me.
12  Q.   And he was in Jefferson Parish?
13  A.   Yes.
14  Q.   And these are New Orleans police officers?
15  A.   I'm sorry?
16  Q.   And these were New Orleans police officers?
17  A.   The head of security it was New Orleans police officers;
18  is that the question?
19  Q.   No.  It was New Orleans police officers that came to ask
20  you the questions?
21  A.   What questions?
22  Q.   About what happened that day and who shot you.
23  A.   Yes.
24  Q.   Now -- and nothing made you feel like they wanted you to
25  say it was not the New Orleans police that shot you other than

SUSAN BARTHOLOMEW - Cross

1   what you gleaned from their demeanor; is that correct?

2   A.   Yes.

3   Q.   And you had no idea that the New Orleans police officers

4   who fired their weapons had admitted to doing it two months

5   before?

6   A.   I don't know what they admitted to.  I didn't know what

7   went on.

8            MR. DESALVO:  No further questions.

9            THE COURT:  Okay.  Next?  Mr. Hessler?

10                   CROSS-EXAMINATION

11   BY MR. HESSLER:

12   Q.   Good afternoon, Ms. Bartholomew.  My name is Eric Hessler.

13   I'm representing Robert Gisevius.  I'm sorry for your loss,

14   ma'am.

15            Ma'am, what was Leonard, your 14-year-old son,

16   wearing that day?

17   A.   I don't remember.  I assume a T-shirt.

18   Q.   Do you recall what color?

19   A.   If he had a T-shirt on, it would have been white.

20   Q.   And he's a short young fellow; correct?

21   A.   Yes.  He was always little for his age, yeah.

22   Q.   Now, when you walked onto the bridge, you didn't see --

23   what were you paying attention to when you were walking toward

24   the bridge?  What was -- what had your attention at that time?

25   A.   Just my surroundings and my kids and what we were doing.

SUSAN BARTHOLOMEW - Cross

1  Q.   Okay.  You weren't paying attention to others around the
2  bridge, on the bridge, or --
3  A.   I didn't see anyone on the bridge.
4  Q.   Okay.  Now, you stated that Jose, Leonard and James
5  Brissette had, basically, skipped up the bridge?
6  A.   Yes.  They were skipping.
7  Q.   How far ahead are they -- how far ahead were they from
8  your position?
9  A.   Oh, not that far.
10 Q.   About how far?  You can estimate.
11 A.   Not really far.  All the way from here to where the guy
12 right there is sitting or something.  Not really very far.  I
13 don't know exactly the distance.
14 Q.   Okay.  Did you ever see -- were they all together?
15         THE COURT:  Wait.  For the sake of the record, which
16 guy are you talking about, ma'am?
17         THE WITNESS:  Um -- (indicating).
18         THE COURT:  Mr. Carter?
19         THE WITNESS:  Yes.
20         THE COURT:  Okay.
21 BY MR. HESSLER:
22 Q.   So to the end of the prosecution table?
23 A.   And that's approximate.
24 Q.   Okay.  From the witness stand to the end of the
25 prosecution table?

SUSAN BARTHOLOMEW - Cross

1  A.  It could be about that distance or a little bit further.

2  Q.  Okay.  So if you were walking at a normal pace, you would

3  have been -- you would have caught up to them at the -- within

4  a matter of seconds, would you agree, if they were stopped?

5  A.  No, not if they were skipping ahead of me.  No.

6  Q.  Well, that's what I'm asking you.

7  A.  And I'm walking and they're skipping ahead.  I'm thinking

8  they're moving faster than what I am.

9  Q.  At the time of this incident, how far ahead were they from

10  you, at the time of the shooting?

11  A.  Approximately that or further.

12  Q.  Okay.  And they were ahead of you?

13  A.  Yes.

14  Q.  When they were skipping or racing or whatever it was that

15  they were doing, how far ahead -- how much of a distance had

16  they put between you, your husband and Leonard -- or you and

17  your husband?  How far had they gotten --

18  A.  About what I just said.

19  Q.  That same distance?

20  A.  About what I just said.

21  Q.  So they were always in a close proximity to you?

22  A.  They were where I could see them, yes, ahead of me.

23  Q.  Okay.  Did you ever see Jose maybe sit down and tie his

24  shoe and just wait for y'all or anything like that?

25  A.  I do recall, and I think it was him that did something

SUSAN BARTHOLOMEW - Cross

1  like that.  I'm not sure if it was him.
2  **Q.**  Now, you stated you had been rescued by the NOPD earlier
3  that week?
4  **A.**  Yes.
5  **Q.**  Was there any problems at that point?  Did they treat you
6  fairly?
7  **A.**  No, there was no problems at all.  They were really good.
8  **Q.**  Did you do anything to cause them to feel threatened at
9  that time or anything when they rescued you?
10  **A.**  Did I do anything?
11  **Q.**  Yes.
12  **A.**  No, not at all.
13  **Q.**  And they rescued you and everybody else in your group?
14  **A.**  Yes.
15  **Q.**  Was James Brissette with you then?
16  **A.**  No.
17  **Q.**  How did you come to hook up with -- how did Mr. Brissette
18  come to connect with your family?
19  **A.**  I don't know.  I assumed he was in the area and, you know,
20  we had been there for maybe a couple of days or so.  I don't
21  remember exactly.  But the next thing I know, he was there.
22  **Q.**  All right.  Did -- how well do you know him, or was that
23  the first you had met him?
24  **A.**  Yes.
25  **Q.**  Would it be fair to state that -- how many days prior to

SUSAN BARTHOLOMEW - Cross

1  this was he with you, prior to the shooting?

2  A.   I don't remember.

3  Q.   During that time did you notice him drinking or anything

4  like that, drinking alcohol?

5  A.   No.

6  Q.   Did you notice him drinking alcohol the night before the

7  shooting?

8  A.   No.

9  Q.   Did you notice him drinking alcohol the morning of the

10  shooting?

11  A.   No.

12  Q.   What about Jose?

13  A.   No.

14  Q.   You never drank alcohol during that time?

15  A.   No.

16  Q.   All right.  Were you -- did Jose and James Brissette hang

17  around the hotel room at night, or did they go off, or were

18  they always in your presence?

19  A.   No, we were all at the hotel room at night.

20  Q.   Now, you stated you were lying on the walkway and you got

21  shot in your back; correct?

22  A.   No, I didn't say I got shot in my back.  I said my

23  backside.

24  Q.   Your backside.  Okay.

25        And you believe that the bullets were coming from

SUSAN BARTHOLOMEW - Cross

1  where the -- from through the concrete barrier and striking

2  you?

3  A.   It had to have.  That's the only way I could get shot back

4  there.

5  Q.   Are you completely sure of your position, however?

6  A.   Completely sure of my position?  I'm completely sure of

7  where I was shot.

8  Q.   I understand that.

9        When you were shot, are you -- can you be completely

10 sure of which way your head was facing, which way your feet

11 were facing, whether you were facing the lake?

12 A.   I'm completely sure that my butt area, my back area was by

13 the concrete barrier.

14 Q.   And at some point, ma'am, you stated that the officer --

15 or some officers were yelling for you to -- for everybody, I

16 guess, to put your hands up?

17 A.   Yes.

18 Q.   All right.  What type of tone were they using?

19 A.   A very harsh tone.

20 Q.   Okay.  Did they sound like they were serious about that?

21 A.   Yes.

22 Q.   And you actually believed you might be shot if you

23 didn't --

24 A.   Yes, because they tried to kill us.

25 Q.   -- comply?

SUSAN BARTHOLOMEW - Cross

1          Okay.  Do you know why they were saying that to you?
2   **A.**   No.
3   **Q.**   And at some point they also told you to turn your head
4   away or don't look, or they're telling that to the group?
5   **A.**   Yes.
6   **Q.**   Okay.  And do you know why they were saying that?
7   **A.**   No.
8   **Q.**   While on the bridge, do you recall being attended to by
9   emergency medical technicians?
10  **A.**   Yes, I recall them coming out.
11  **Q.**   Okay.  Do you recall what you may have told any of those
12  persons?
13  **A.**   Nothing other than my daughter's condition, her heart
14  murmur that she has.  I was concerned about her.
15  **Q.**   Do you recall telling them anything about who may have
16  shot you or where those shots may have come from?
17  **A.**   No.
18          **MS. CHUNG:**  I'd object, Your Honor.  This was asked
19  and answered by Mr. DeSalvo, and it's not her report.
20          **THE COURT:**  I'm not sure it's the exact same
21  question, so I'll overrule it.  But let's go ahead.
22          **MR. HESSLER:**  One second, Your Honor.
23              No further questions.
24          **THE COURT:**  Thank you.
25              Anybody else?  Mr. London?

SUSAN BARTHOLOMEW - Cross

1                          **CROSS-EXAMINATION**

2  **BY MR. LONDON:**

3  **Q.**   Hello, Ms. Bartholomew.  My name is Steve London and I

4  represent Archie Kaufman.  I just have just a few questions for

5  you.  Maybe three and that's it.

6            You testified, I believe, to Mr. DeSalvo when he

7  asked you about the third visit that the police made to you at

8  the hospital was some two months after the incident; is that

9  correct?

10 **A.**   Approximate.

11 **Q.**   Approximately.

12           Do you recall when the first time was?

13 **A.**   After surgery, when I came out of surgery.

14 **Q.**   The same day?

15 **A.**   I assume, yes.

16 **Q.**   And then the second would have been?

17 **A.**   Sometime after that.

18 **Q.**   Can you be more specific?

19 **A.**   I don't remember.

20 **Q.**   And how many officers were there each time?

21 **A.**   Two.

22 **Q.**   Two on all three occasions?

23 **A.**   Yes.

24 **Q.**   Okay.

25           **MR. LONDON:**  Thank you.

SUSAN BARTHOLOMEW - Cross

1              I have nothing further, Judge.

2          **THE COURT:**  Thank you.

3              Anybody else?  Mr. Meche?

4                    **CROSS-EXAMINATION**

5  **BY MR. MECHE:**

6  **Q.**  Good afternoon, Ms. Bartholomew.  I'm Tim Meche.  I

7  represent Anthony Villavaso.

8              Just briefly, you had indicated you and Jose Holmes

9  were particularly close?

10  **A.**  Yes.

11  **Q.**  You were like his mother?

12  **A.**  Yes.

13  **Q.**  Did he live with you?

14  **A.**  He was there most of the time.

15  **Q.**  Okay.  And how old was he, approximately?  How old was he

16  at the time of the storm?

17  **A.**  Nineteen.

18  **Q.**  Okay.  Did he have a job?

19  **A.**  He was in -- I'm sorry?

20  **Q.**  Did he work?

21  **A.**  At the time, no.

22  **Q.**  Was he going to school?

23  **A.**  Yes.

24  **Q.**  Where at?

25  **A.**  I don't remember.  School had just started at that time.

SUSAN BARTHOLOMEW - Cross

1  Q.   And he was 19 and he was going to high school still?
2  That's your testimony?
3  A.   I'm not sure.  I don't remember.  School was just starting
4  at that time.
5  Q.   But it's your testimony that he was enrolled in a school?
6  A.   I'm not sure.  School was starting at that time.
7  Q.   Okay.  Now, when he wasn't staying with you, where would
8  he stay?
9  A.   At his mom's.
10 Q.   And she lived in New Orleans as well?
11 A.   Yes.
12 Q.   Did he split his time about half and half between your
13 houses?
14 A.   Maybe about that.  Probably.
15 Q.   Now, when he was staying with you during the storm, was
16 his mom there as well?
17 A.   No.
18 Q.   Where was she?
19 A.   She had stayed -- I don't know.  I guess she was with my
20 dad or something.  I had no idea at the time what she had --
21 what they had done.
22 Q.   And when Jose stayed with you during the storm, did he
23 leave at all from the residence you were at?
24 A.   No.
25 Q.   Okay.  Did he have any friends staying with him at that

SUSAN BARTHOLOMEW - Cross

1   time?

2   A.   No.

3   Q.   Okay.  Do you remember approximately which day -- if the

4   storm came in on a Monday morning, which day would it have been

5   the police got you evacuated from your residence to Chef

6   Highway?

7   A.   I don't remember.

8   Q.   Okay.  After you evacuated, did it take you a while to

9   find a hotel or did you just immediately go to a hotel?

10  A.   No.  We were waiting for a bus or something was supposed

11  to come through taking people to the Superdome.  And then they

12  said it was coming, and it never came back.  So we didn't have

13  a choice but to try to find somewhere to stay.

14  Q.   Did you notice a -- like a Budget moving van sort of truck

15  picking people up taking them places at all?

16  A.   No.

17  Q.   Once you got to the hotel, it's my understanding you said

18  all of you were staying in one room?

19  A.   The first hotel, yes.

20  Q.   Okay.  And the first hotel was not the one you ended up

21  with?

22  A.   No.

23  Q.   It was a different one?

24  A.   Yes.

25  Q.   And how many nights did you stay at the first hotel?

SUSAN BARTHOLOMEW - Cross

1  A.   We didn't stay there any nights.  The same night we had to
2  leave.
3  Q.   Because of the people arguing?
4  A.   Yes.
5  Q.   Okay.  Did anybody have any discussions with those people,
6  like Jose or anybody?
7  A.   No, we didn't talk to them.
8  Q.   Okay.  When you left did you immediately go to the new
9  hotel where you ended up staying?
10 A.   Yes.
11 Q.   And all of you in one room again?
12 A.   No, two rooms.
13 Q.   Okay.  And how many people, approximately, were with you?
14 A.   Approximately -- I have to take count.
15 Q.   Okay.
16 A.   I need a minute.
17 Q.   Sure.
18 A.   I don't know.  Approximately ten people.  That's
19 approximate.
20 Q.   Now, was Jose staying in the room where you were staying?
21 A.   Yes.
22 Q.   Okay.  And did he stay with you all the whole time, or did
23 he leave or go off by himself sometimes?
24 A.   No.  Nobody -- none of the group was allowed to go out
25 alone, no one.

1  Q.   Okay.  Were you with him when he ran into his friend James
2  Brissette?
3  A.   James -- when he ran into -- I think James ran into us,
4  because we were there.
5  Q.   Do you recall specifically running into him?
6  A.   He came to where we were.  We were there.
7  Q.   He came to the hotel?
8  A.   Yeah.
9  Q.   Okay.  How did he know where to go, which room to go to?
10 A.   I don't know.  He probably happened to be outside or
11 something and seen him outside.
12 Q.   Okay.
13 A.   That would be the only way.
14 Q.   So he would have been outside?
15 A.   Yeah.
16 Q.   And you didn't witness that?
17 A.   No, I didn't witness that.
18 Q.   Okay.  Okay.  And it wouldn't have been a situation where
19 Jose was going off maybe by himself --
20 A.   Of course not.  No.
21 Q.   -- doing things where he ran into --
22 A.   No.  None of the group was allowed to go off anywhere.
23 No.
24 Q.   Okay.  And did you issue that order to them?
25 A.   Oh, definitely.  Myself, my mom, the adults, yes.  All of

SUSAN BARTHOLOMEW - Cross

1  the adults were watching over the children, yes.  They were all
2  to stay close and stay there.
3  Q.   And how many nights did James Brissette stay with you all?
4  A.   I don't know.  I don't remember.
5  Q.   And did he stay in the same room with you or was he in the
6  other room?
7  A.   He was in my room, and he was in the other room too.
8  Q.   And it's your testimony he didn't also leave periodically
9  to do things?
10  A.   No, he didn't leave.
11  Q.   Okay.  They never went by themselves to the Winn-Dixie?
12  A.   No.
13  Q.   When you were in the hospital, were you physically
14  released from your care before Lesha was?
15  A.   Yeah, I was released before Lesha.
16  Q.   But you stayed with Lesha's room because she was still
17  there?
18  A.   That's right.  Yes.
19  Q.   Now, was your husband released at that time?
20  A.   He was released before me -- well, before us.
21  Q.   And did he stay in that same room all the time as well?
22  A.   Yes, he stayed with us.
23  Q.   So you all had to stay in one room?
24  A.   Yeah, yeah.
25  Q.   But Jose was in a different room?

SUSAN BARTHOLOMEW - Cross

1  **A.**   Yes.

2  **Q.**   Okay.

3  **A.**   He was on a different floor.

4  **Q.**   Okay.  Okay.

5       **MR. MECHE:**  Thank you.

6       **THE COURT:**  Okay.  Mr. Fleming, any questions on

7  behalf of Mr. Faulcon?

8       **MR. FLEMING:**  No.  We have no questions of

9  Ms. Bartholomew.  I'm sorry for your loss.

10      **THE COURT:**  Ms. Chung, any redirect?

11      **MS. CHUNG:**  Yes, Your Honor.

12      **THE COURT:**  All right.

13                **REDIRECT EXAMINATION**

14 BY MS. CHUNG:

15 **Q.**   Mrs. Bartholomew, you were asked a series of questions

16 about where you were lying on the sidewalk.

17      **MS. CHUNG:**  Actually, Your Honor, I'm sorry, I

18 neglected to -- No. 31 is not in evidence.  I would now offer

19 No. 31 into evidence.

20      **THE COURT:**  Is there any objection?

21      **MR. DESALVO:**  No objection, Your Honor.

22      **MR. MECHE:**  No objection.

23      **THE COURT:**  All right.  31 is admitted.

24 BY MS. CHUNG:

25 **Q.**   Mrs. Bartholomew, you were asked a series of questions

SUSAN BARTHOLOMEW - Redirect

1  about where you were lying on the sidewalk once you made it
2  over the barrier.  Do you recall that series of questions?
3  **A.**   Yes.
4  **Q.**   Do you remember exactly what position you were in as you
5  were lying on the sidewalk with gunfire coming down on you?
6  **A.**   No, not exactly.
7  **Q.**   Were you taking notes on exactly where you were on that
8  sidewalk?
9  **A.**   Of course not.
10 **Q.**   Were other things going through your mind at that time?
11 **A.**   Yes.
12 **Q.**   What was going through your mind at that time?
13 **A.**   Just my concern, you know, for my life, being shot.  I
14 didn't know if we were going to be killed, were going to die
15 here or what, and just praying.  That's all, just calling on
16 the Lord.
17 **Q.**   You were also asked a series of questions about how you
18 assumed what the officers wanted you to say when you went to
19 the -- when they came to the hospital.  Do you recall that?
20 **A.**   Yes.
21 **Q.**   Before this incident, you had mentioned that NOPD had
22 rescued you?
23 **A.**   Yes.
24 **Q.**   How did you feel towards those NOPD officers?
25 **A.**   I was grateful.

SUSAN BARTHOLOMEW - Redirect

1  **Q.**   Had you ever had any problems with NOPD before this?
2  **A.**   No.
3  **Q.**   And you had said that the -- you didn't have any problems
4  with the NOPD officers who rescued you?
5          **MR. DESALVO:**  Your Honor, this is repetitive of
6  direct.
7          **THE COURT:**  Well, it was covered on cross.  I'm going
8  to let her answer it.  Actually, I think you just asked a very
9  similar question already, but I'll let her go ahead and answer
10  this.  Let's go ahead and finish up.
11  **BY MS. CHUNG:**
12  **Q.**   What were the interactions like between you and the NOPD
13  officers who rescued you?
14  **A.**   They were friendly.
15  **Q.**   How did that compare to the NOPD officers who visited your
16  hospital room?
17  **A.**   There's a huge difference there.
18  **Q.**   What's that difference?
19  **A.**   The difference in their attitude.  Those guys were
20  friendly.  They were there to help.  And the other guys were
21  very intimidating.  I felt threatened.
22  **Q.**   Mrs. Bartholomew, you were also asked about when you were
23  on the sidewalk and you were given a command to raise your
24  hands.  Do you recall that?
25  **A.**   I'm sorry?

SUSAN BARTHOLOMEW - Redirect

1  Q.   On cross-examination you were asked some questions about
2  what the officers told you while you were lying on the concrete
3  barrier -- on the concrete sidewalk.
4  A.   Yes.
5  Q.   Did those commands to raise your hands come before or
6  after you were shot?
7  A.   After.
8  Q.   Before or after you were shot in the backside?
9  A.   After.
10 Q.   Before or after you were shot in the arm?
11 A.   After.
12 Q.   If you had been told to raise your hands before you were
13 shot, what would you have done?
14 A.   I would have raised my hands.
15          MS. CHUNG:  No further questions, Your Honor.
16          THE COURT:  All right.  Thank you.
17               Thank you, ma'am.  You can step down.
18               Okay.  It's almost 20 minutes to 5:00.  Is there
19 any chance that we have a very brief witness that could be put
20 on?
21          MR. CARTER:  I believe he's brief, Your Honor, but I
22 believe it will take the better part of an hour.
23          THE COURT:  Okay.
24          MR. CARTER:  We can start --
25          THE COURT:  Well, we need to get the word "brief"

1    defined differently here.

2              Okay.  Let's go ahead and take care of some

3    housekeeping things that we do need the jury for.  Did we want

4    to go ahead and admit exhibits by number that the jury hasn't

5    seen yet, but can we not admit exhibits by number to which

6    there's no objection?  Would somebody like to go ahead and

7    offer that now?

8              MS. CHUNG:  Yes, Your Honor.  I have provided them to

9    the courtroom deputy.  I'll have to check the tabs for the

10   exact numbers that have them.

11             THE COURT:  Okay.

12             MS. CHUNG:  I put them in a binder for the deputy.

13             THE COURT:  Right.  Do you need to look at that

14   binder?  Maybe we can go ahead and get that done.  Would it

15   help if you just looked at what's --

16             MS. CHUNG:  Sure.

17             THE COURT:  Let's go ahead and offer these numbers,

18   and even though you haven't seen the exhibits yet, you will see

19   them.  It will save us some time with having to introduce them.

20   Let's go ahead and offer them up by number, and then we can

21   just go ahead and start using them.

22             MS. CHUNG:  Yes, Your Honor.  27, the 54-page report.

23             THE COURT:  Right.  27.

24             MS. CHUNG:  35, the seven-page initial report with

25   Gist.

1            THE COURT:  Exhibit 35, okay.

2            MS. CHUNG:  Exhibit 36, the Gist.

3            THE COURT:  Okay.

4            MS. CHUNG:  Exhibit 72, D-Mort record excerpts.

5            THE COURT:  All right.

6            MS. CHUNG:  74, LSP trooper log, handwritten.

7            THE COURT:  Okay.

8            MS. CHUNG:  105, Central Evidence and Property

9    receipt for a .357 Colt revolver, as well as the confiscated

10   firearms report that corresponds to it.

11           THE COURT:  Okay.

12           MS. CHUNG:  154, an x-ray; 155, an x-ray; 156, an

13   x-ray; 157, an x-ray.  And for the record, these were all West

14   Jefferson x-rays.  158 also, 159, 160, 161, 162, 163, 164, 165,

15   all x-rays.  166, 167, and 168, also all x-rays from West

16   Jefferson.

17           THE COURT:  Okay.

18           MS. CHUNG:  Those are all of the exhibits --

19           THE COURT:  Any other exhibits that we can admit at

20   this time?

21           MS. CHUNG:  No, Your Honor.

22           THE COURT:  Counsel on the defendants' side, is there

23   think objection to the admission of any of the numbers that

24   Ms. Chung just put into the record to be admitted into

25   evidence?

1          **MR. FLEMING:**  No, Your Honor.  The parties mutually

2    agreed to that ahead of time.

3          **THE COURT:**  It's so ordered that those numbers, and

4    I'm not going to recite them, but I have written them, and I

5    know that Ms. Radosta, the courtroom deputy, has written them

6    down, and they're in the binder.  So those are in evidence.

7    They will be used hereafter, and we will refer you to those

8    numbers when they show those exhibits to you.

9          We're going to adjourn for the day, but I want

10   to, first of all, thank you all for, A, being on time; and B,

11   for your attention and your patience today during the course of

12   the day.  I know it seems like it's been a long day, but thank

13   you again for your patience.

14         And I will always tell you at the end of the

15   day -- you know what I'm going to say already -- please do not

16   discuss this case amongst yourselves or with anyone else, for

17   that matter, including spouse, family, friends, anyone else.

18         Also, please be aware that there may be some

19   accounts of today's trial in some media outlets, and I would

20   ask you to be very, very careful not to view any of that or

21   listen to any of that or read anything about it in the

22   newspaper.  So let's go ahead and adjourn for the day.  We will

23   start at 8:30 again tomorrow.  Thank you.

24         If you want to leave your notebooks on the

25   chair, that will be fine.  We're going to collect those right

1  now.

2          **THE DEPUTY CLERK:**  All rise.

3          (WHEREUPON, the jury exited the courtroom.)

4          **THE COURT:**  All right.  Counsel, if you all would be

5  seated.  Is there anything we need to put on the record at this

6  point?

7          **MR. FLEMING:**  Not from us, Your Honor.

8          **THE COURT:**  Anything at all?

9          Counsel?

10         **MS. BERNSTEIN:**  Nothing for us, Your Honor.

11         **THE COURT:**  Okay.  If you all would -- well, before

12  you approach, I would also make note that I received a summary

13  here dated June 27th under -- or I should say above

14  Mr. Larson's signature regarding some expert testimony.  I also

15  received an e-mail here relative to experts that may be called

16  by the government.

17         Have all parties received these two

18  transmissions?

19         **MR. DESALVO:**  We weren't checking e-mails while we

20  were here, Judge.

21         **THE COURT:**  They were before lunch.

22         **MS. BERNSTEIN:**  I can say that we e-mailed our list

23  to you all.  Did you all e-mail your summary to us?

24         **MR. DESALVO:**  I have no idea.

25         **MS. BERNSTEIN:**  All right.  We're good then, Your

1  Honor.

2          **THE COURT:**  Well, since you need the opportunity to

3  go check your e-mails and make sure you got these two things, I

4  won't question you about them now.  In terms -- let's go ahead

5  off the record.

6                      **(OFF THE RECORD)**

7          (WHEREUPON, the proceedings were adjourned for the

8  day.)

9                           *****

10                      <u>CERTIFICATE</u>

11          I, Jodi Simcox, RMR, FCRR, Official Court Reporter

12  for the United States District Court, Eastern District of

13  Louisiana, do hereby certify that the foregoing is a true and

14  correct transcript, to the best of my ability and

15  understanding, from the record of the proceedings in the

16  above-entitled and numbered matter.

17

18

19                    S/ Jodi Simcox, RMR, FCRR
                     Jodi Simcox, RMR, FCRR
20                   Official Court Reporter

21

22

23

24

25