1              UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF LOUISIANA

3

4

5    UNITED STATES OF AMERICA      *    Docket 10-CR-204
                                   *
6    versus                       *    Section N
                                   *
7    KENNETH BOWEN                 *    New Orleans, Louisiana
     ROBERT GISEVIUS              *
8    ROBERT FAULCON               *    June 28, 2011
     ANTHONY VILLAVASO            *
9    ARTHUR KAUFMAN               *    8:30 a.m.
     * * * * * * * * * * * * * * * *

10

11                  VOLUME IV of XXVII
                 JURY TRIAL BEFORE THE
12            HONORABLE KURT D. ENGELHARDT
               UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15   For the United States:      U.S. Attorney's Office
                                 BY:  THEODORE CARTER, ESQ.
16                               500 Poydras Street
                                 New Orleans, Louisiana 70130
17

18
     For the United States:      U.S. Department of Justice
19                               Civil Rights Division
                                 BY:  BARBARA BERNSTEIN, ESQ.
20                               601 D Street NW
                                 Office PHB 5123
21                               Washington, D.C. 20004

22

23   For the United States:      U.S. Department of Justice
                                 Civil Rights Division
24                               BY:  CINDY K. CHUNG, ESQ.
                                 950 Pennsylvania Avenue NW
25                               Washington, DC 20530

APPEARANCES:

| | |
|---|---|
| For Kenneth Bowen: | FRANK G. DESALVO, APLC<br>829 Baronne Street<br>New Orleans, Louisiana 70113 |
| For Robert Gisevius: | ERIC J. HESSLER, ESQ.<br>700 Camp Street<br>New Orleans, Louisiana 70130 |
| For Robert Faulcon: | PAUL C. FLEMING JR., ESQ.<br>2821 Kingman Street<br>Suite C<br>Metairie, Louisiana 70006 |
| For Robert Faulcon: | King Krebs & Jurgens, PLLC<br>BY:  LINDSAY A. LARSON III, ESQ.<br>201 St. Charles Avenue<br>45th Floor<br>New Orleans, Louisiana 70170 |
| For Anthony Villavaso: | DeSalvo Blackburn & Kitchens, LLC<br>BY:  ROGER W. KITCHENS, ESQ.<br>2802 Tulane Avenue<br>New Orleans, Louisiana 70119 |
| For Anthony Villavaso: | TIMOTHY A. MECHE, ESQ.<br>700 Camp Street<br>New Orleans, Louisiana 70130 |
| For Arthur Kaufman: | STEVEN D. LONDON, ESQ.<br>1100 Poydras Street<br>Suite 2950<br>New Orleans, Louisiana 70163 |

14:13

14:13     1     APPEARANCES:
14:13
14:13     2
14:13           Official Court Reporter:      Jodi Simcox, RMR, FCRR
14:13     3                                    500 Poydras Street
14:13                                          Room HB-406
14:13     4                                    New Orleans, Louisiana 70130
14:13                                          (504) 589-7780
14:13     5
14:13
14:13     6
14:13
14:13     7
14:13
14:13     8     Proceedings recorded by mechanical stenography; transcript

14:13     9     produced by computer.

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1                              I N D E X

2                                                            Page

3

STANTON DOYLE ARNOLD
4        Direct Examination By Mr. Carter:              14
         Cross-Examination By Mr. Larson:               25
5        Cross-Examination By Mr. Meche:                27
         Cross-Examination By Mr. Hessler:              29
6        Redirect Examination By Mr. Carter:            30

7   MICHAEL LOHMAN
         Direct Examination By Ms. Bernstein:           31
8        Cross-Examination By Mr. London:              207
         Cross-Examination By Mr. Hessler:             300
9        Cross-Examination By Mr. Fleming:             319
         Cross-Examination By Mr. Desalvo:             342
10       Cross-Examination By Mr. Meche:               359
         Redirect Examination By Ms. Bernstein:        373

07:57    11

07:57    12

07:57    13

14

15

16

17

18

19

20

21

22

23

24

25

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| 07:57 | 1 |
| 07:57 | 2 |
| 07:57 | 3 |
| 07:57 | 4 |
| 07:57 | 5 |
| 07:57 | 6 |
| 07:57 | 7 |
| 08:22 | 8 |
| 08:22 | 9 |
| 08:23 | 10 |
| 08:23 | 11 |
| 08:23 | 12 |
| 08:23 | 13 |
| 08:23 | 14 |
| 08:23 | 15 |
| 08:23 | 16 |
| 08:23 | 17 |
| 08:23 | 18 |
| 08:23 | 19 |
| 08:23 | 20 |
| 08:23 | 21 |
| 08:23 | 22 |
| 08:23 | 23 |
| 08:23 | 24 |
| 08:23 | 25 |

**PROCEEDINGS**

**(June 28, 2011)**

**(MORNING SESSION)**

**\*\*\*\*\*\***

**(COURT CALLED TO ORDER.)**

**THE DEPUTY CLERK:**  All rise.

(WHEREUPON, the following proceedings were held at the bench.)

**THE COURT:**  I understand we have an issue with regard to Mr. Lohman today.

**MS. BERNSTEIN:**  Well, I assume it's Mr. Lohman.  We got a note from Mr. Meche that --

**MS. CHUNG:**  No, that's Steve's note.

**MS. BERNSTEIN:**  Yeah, I'm sorry.  We got a message that Mr. Meche wants to introduce today, I assume through Lohman, although he wouldn't say, one of the audiotapes of the statements that the defendants gave to NOPD -- actually, I don't know that it's a defendant -- that one of the officers gave to NOPD.

**THE COURT:**  Tim?

**MR. MECHE:**  I have no idea why she's saying that, Judge.  I never ever uttered a statement like that in my life.

**THE COURT:**  Well, then let me ask you:  Is that your intention to --

08:23    1              MR. MECHE:  No, no.  And, my God, Bobbi, approach me
08:23    2    next time something like this comes up --
08:23    3              THE COURT:  Wait, wait, wait, wait.
08:23    4              MR. MECHE:  I'll tell you what happened.  I got here
08:23    5    to court --
08:23    6              THE COURT:  Tim, all right.  First of all --
08:23    7              MR. MECHE:  This is so silly.  This is the most
08:23    8    ridiculous waste of time.  But let me tell you what I -- next
08:24    9    time, talk to me before approaching the judge.  I got to court
08:24   10    and I asked the technology guys if and when during the trial we
08:24   11    decided to play a tape, how would we do it technology-wise, and
08:24   12    that's all we talked about.
08:24   13                   How in the world --
08:24   14              MS. BERNSTEIN:  Tim, I'm sorry.  The way the message
08:24   15    got to me -- I just want to let you know.  The way the message
08:24   16    got to me was that you wanted to play it today, and that they
08:24   17    had asked which tape, and that you didn't want to say.  So I
08:24   18    just wanted to raise it.  So, I'm sorry, I should have come to
08:24   19    you.
08:24   20              MR. MECHE:  You're getting real paranoid, Bobbi.
08:24   21              THE COURT:  Well, wait, wait.
08:24   22              MR. MECHE:  I mean, that's ridiculous.
08:24   23              THE COURT:  Listen, listen.  I'm going to expect you
08:24   24    all to talk to each other beforehand about any evidentiary
08:24   25    concerns, not just this instance, but any other, before you all

| | | |
|---|---|---|
| 08:24 | 1 | come to the Court.  Okay.  And try to work it out.  If there's |
| 08:24 | 2 | a disagreement, you know, try to work it out.  If there's a |
| 08:24 | 3 | problem, let me know and I'll come out here early, or we'll go |
| 08:24 | 4 | in the back, or at the end of the day, we'll talk about it |
| 08:24 | 5 | again. |
| 08:24 | 6 | So I think right now you all are all loaded up |
| 08:24 | 7 | in anticipatory mode of what the other person's going to say, |
| 08:25 | 8 | which is pretty normal at this stage of the trial. |
| 08:25 | 9 | MS. BERNSTEIN:  As long as we're here, Your Honor, |
| 08:25 | 10 | can I flag one issue that we have tried to work out that we |
| 08:25 | 11 | have talked about? |
| 08:25 | 12 | THE COURT:  Okay. |
| 08:25 | 13 | MS. BERNSTEIN:  For the videotape of the incident, we |
| 08:25 | 14 | have several different versions.  We have the original NBC |
| 08:25 | 15 | videotape where 30 minutes of video is all squished into five. |
| 08:25 | 16 | We've agreed on that. |
| 08:25 | 17 | The government has another version where we have |
| 08:25 | 18 | inserted black dead space for the time that the video camera |
| 08:25 | 19 | was turned off.  So now, instead of being five minutes long, |
| 08:25 | 20 | it's the full 30 minutes, or however long it really is. |
| 08:25 | 21 | THE COURT:  That's based on the timer on the screen? |
| 08:25 | 22 | MS. BERNSTEIN:  Yes. |
| 08:25 | 23 | THE COURT:  So, in other words, we can get a real |
| 08:25 | 24 | lapsed time for the events shown? |
| 08:25 | 25 | MS. BERNSTEIN:  Correct. |

08:25   1          THE COURT:  Okay.

08:25   2          MS. BERNSTEIN:  And the issue that we have with that

08:25   3   one -- actually, I guess, the issue might be with the original

08:25   4   as well, at some point right in the middle of that 30 minutes,

08:25   5   there's a reporter, who's on the I-10, who's just talking into

08:26   6   the camera, talking into the microphone.  We muted that out as

08:26   7   pure hearsay.  We have a disagreement over that.  And they have

08:26   8   now opposed, I guess, any video that has that muted out.

08:26   9          Is that correct?

08:26   10          MR. LARSON:  Right.

08:26   11          MS. BERNSTEIN:  We think it needs to be muted out out

08:26   12   of any video.

08:26   13          THE COURT:  I've watched that video and when I got to

08:26   14   that point, I said, "That's going to be an issue."

08:26   15          All right.  Let me give -- are you playing that

08:26   16   today?

08:26   17          MS. BERNSTEIN:  No.

08:26   18          MS. CHUNG:  No.

08:26   19          THE COURT:  Let me give that some thought.

08:26   20          MS. CHUNG:  Not that part.

08:26   21          THE COURT:  I have noticed that, as I said, and I

08:26   22   knew it would an issue, and I've been thinking about it.  Let

08:26   23   me give that further thought.  I understand the issue.

08:26   24          MS. BERNSTEIN:  Okay.

08:26   25          THE COURT:  Let me give that further thought.  Maybe

| | | |
|---|---|---|
| 08:26 | 1 | by the end of today we can come to a conclusion on it. |
| 08:26 | 2 | MS. BERNSTEIN:  Okay.  Thank you, Your Honor. |
| 08:26 | 3 | THE COURT:  All right.  Look, we're making pretty |
| 08:26 | 4 | good time, I think. |
| 08:26 | 5 | MS. BERNSTEIN:  Sorry again. |
| 08:26 | 6 | MR. MECHE:  Just talk to me next time. |
| 08:26 | 7 | THE COURT:  All right.  Look, you all are going to |
| 08:26 | 8 | have to work together.  It's a long, long road, but I think |
| 08:26 | 9 | we're making pretty good progress.  Let's get these people on |
| 08:27 | 10 | and get them off.  Find out what they know and get them off. |
| 08:27 | 11 | MS. BERNSTEIN:  Sure. |
| 08:27 | 12 | MR. FLEMING:  Judge, on issue with the video, we have |
| 08:27 | 13 | a little memo prepared. |
| 08:27 | 14 | THE COURT:  That would be helpful. |
| 08:27 | 15 | MR. FLEMING:  It's on the computer.  I can have it |
| 08:27 | 16 | for you in the morning. |
| 08:27 | 17 | THE COURT:  Go ahead.  That would be helpful.  And if |
| 08:27 | 18 | you have something you'd like to submit, that would be fine |
| 08:27 | 19 | too. |
| 08:27 | 20 | You all have taken a look at the expert issues? |
| 08:27 | 21 | The expert letter that Lindsay sent? |
| 08:27 | 22 | MS. BERNSTEIN:  Yes, Your Honor. |
| 08:27 | 23 | THE COURT:  And I also got the e-mail.  You all got |
| 08:27 | 24 | the e-mail on the use of force people? |
| 08:27 | 25 | MS. BERNSTEIN:  No. |

| | | |
|---|---|---|
| 08:27 | 1 | THE COURT:  Do you intend to call all the use of |
| 08:27 | 2 | force people? |
| 08:27 | 3 | MS. BERNSTEIN:  No, absolutely not. |
| 08:27 | 4 | THE COURT:  I was going to say. |
| 08:27 | 5 | MS. BERNSTEIN:  No, no, no. |
| 08:27 | 6 | THE COURT:  That's a lot of use of force. |
| 08:27 | 7 | MS. BERNSTEIN:  We haven't made our decision yet, so |
| 08:27 | 8 | we wanted to notice all of them. |
| 08:27 | 9 | THE COURT:  That's contingent, of course, on them |
| 08:27 | 10 | calling their witness. |
| 08:27 | 11 | MS. BERNSTEIN:  Not necessarily.  I think the Court's |
| 08:27 | 12 | order was that we could call in our case in chief or in |
| 08:27 | 13 | rebuttal. |
| 08:27 | 14 | THE COURT:  Well, that's right.  That's right.  If |
| 08:27 | 15 | they have a use of force expert, which I'm waiting to hear from |
| 08:27 | 16 | you all on what Lindsay has sent in.  Because you all had -- |
| 08:28 | 17 | MS. BERNSTEIN:  Well, I can tell you right now -- |
| 08:28 | 18 | THE COURT:  -- already said you did not want to call |
| 08:28 | 19 | a use of force person and we sanctioned -- part of the sanction |
| 08:28 | 20 | for me letting them supplement the report was that you all |
| 08:28 | 21 | could call for either case in chief or rebuttal or both. |
| 08:28 | 22 | MS. BERNSTEIN:  Well, our initial position was that |
| 08:28 | 23 | we wanted to call somebody to talk about the training and talk |
| 08:28 | 24 | about hypotheticals that relate to the training. |
| 08:28 | 25 | THE COURT:  Right. |

08:28  1          **MS. BERNSTEIN:**  The Court's order said that you would

08:28  2   consider that part, the hypothetical part, expert testimony.

08:28  3   My understanding of the order, which obviously your

08:28  4   understanding is more important than my understanding, but my

08:28  5   understanding of your order was that as a sanction to them, the

08:28  6   door was reopened for a short time for us to give notice of an

08:28  7   expert.  So I would expect that we do want to call one of

08:28  8   those, regardless of whether they call their expert.

08:28  9          I can say right now, after having looked at the

08:28  10  summary yesterday -- I mean, I just looked at it this morning,

08:28  11  there is no opinion expressed in that letter, in that summary,

08:28  12  and I expect that we will be moving to exclude that expert.

08:28  13         **THE COURT:**  Well, if there's no opinion, then is he

08:29  14  really -- he's not offering an expert opinion.  He's coming

08:29  15  in -- I agree with you, he doesn't offer an opinion about the

08:29  16  facts of this case, he speaks generally.

08:29  17         **MS. BERNSTEIN:**  I would say as a general witness,

08:29  18  he's irrelevant.  Unless he is an expert, he can offer an

08:29  19  opinion related to this case.  So, I mean, like I said, we

08:29  20  haven't had a chance to formulate it fully, but I do think that

08:29  21  the expert notice is completely inadequate as expert notice,

08:29  22  and I expect that we will move to exclude his testimony

08:29  23  altogether as irrelevant.

08:29  24         **MR. FLEMING:**  It's an expert -- expert testimony to

08:29  25  educate the jury.  It would be improper for him to give an

08:29    1    opinion.

08:29    2              THE COURT:  That's what I understood the letter to

08:29    3    summarize.

08:29    4              MR. LARSON:  Right.

08:29    5              THE COURT:  Let me see what you have to say.  But if

08:29    6    he testifies, then it certainly opens the door, and the intent

08:29    7    of my order was to open the door, for you to call on case in

08:29    8    chief and/or rebuttal a use of force expert.

08:29    9              MS. BERNSTEIN:  If he does come in as just a general

08:30   10    expert, I still don't have any sense of what his testimony is

08:30   11    going to be.  I mean, when I read that letter and it says that

08:30   12    people can sometimes do things automatically under stress, is

08:30   13    what I kind of got.

08:30   14                   But as far as what his testimony is going to be,

08:30   15    how it relates to this case, I have no warning, and that defies

08:30   16    the purpose of the expert notice rule.

08:30   17              THE COURT:  The sooner you can file a motion, the

08:30   18    better, and we'll get an opposition, and I'll decide it.

08:30   19              MR. FLEMING:  Judge, I don't think this needs to be

08:30   20    on the record.

08:30   21              THE COURT:  Okay.

08:30   22                        (OFF THE RECORD)

08:31   23              (WHEREUPON, the following proceedings were held in

08:31   24    open court.)

08:31   25              THE COURT:  Let's bring the jury in.

| | | |
|---|---|---|
| 08:31 | 1 | THE DEPUTY CLERK:  All rise. |
| 08:31 | 2 | (WHEREUPON, the jury entered the courtroom.) |
| 08:32 | 3 | THE COURT:  All right.  You may be seated. |
| 08:32 | 4 | Thank you all, again, for being here on time. |
| 08:32 | 5 | We're prepared to start promptly today, and we're going to |
| 08:32 | 6 | cover a lot of ground today.  So let's go ahead and begin. |
| 08:32 | 7 | Let's ask the government to call the next witness. |
| 08:32 | 8 | MR. CARTER:  The government calls Stanton Arnold to |
| 08:32 | 9 | the stand. |
| 08:32 | 10 | THE COURT:  Stanton Arnold. |
| 08:32 | 11 | Counsel, after the breaks, if you want to have |
| 08:32 | 12 | your person in here ready to go, it will save a few minutes. |
| 08:32 | 13 | MR. CARTER:  Definitely, Your Honor. |
| 08:32 | 14 | THE COURT:   Also, counsel, if you would try to speak |
| 08:32 | 15 | a little bit louder.  I understand there was an issue -- it |
| 08:32 | 16 | wasn't so much from the witness stand, but from the podium -- |
| 08:32 | 17 | in terms of hearing.  So if you could try to speak in a loud, |
| 08:33 | 18 | full voice. |
| 08:33 | 19 | Mr. Arnold, if you'd come up here, sir.  Please |
| 08:33 | 20 | remain standing when you get to this chair until you take the |
| 08:33 | 21 | oath and then you may be seated. |
| | 22 | (WHEREUPON, **STANTON DOYLE ARNOLD**, having been duly |
| | 23 | sworn, testified as follows.) |
| 08:33 | 24 | THE DEPUTY CLERK:  Please state your full name and |
| 08:33 | 25 | correct spelling for the record. |

| | | |
|---|---|---|
| 08:33 | 1 | **THE WITNESS:**  Stanton Doyle Arnold. |
| 08:33 | 2 | **MR. CARTER:**  Your Honor, permission to approach the |
| 08:33 | 3 | witness. |
| 08:33 | 4 | **THE COURT:**  Yes, go ahead. |
| 08:33 | 5 | **THE DEPUTY CLERK:**  How do you spell your first name? |
| 08:33 | 6 | **THE WITNESS:**  S-T-A-N-T-O-N. |
| 08:33 | 7 | DIRECT EXAMINATION |
| 08:33 | 8 | BY MR. CARTER: |
| 08:33 | 9 | **Q.**   Mr. Arnold, where do you live? |
| 08:33 | 10 | **A.**   Winnsboro, Louisiana. |
| 08:33 | 11 | **Q.**   Winnsboro, Louisiana. |
| 08:33 | 12 | What do you do there?  How are you employed? |
| 08:33 | 13 | **A.**   I work on an ambulance. |
| 08:33 | 14 | **Q.**   An ambulance. |
| 08:33 | 15 | Do you have a title? |
| 08:33 | 16 | **A.**   EMT Basic. |
| 08:33 | 17 | **Q.**   What's an EMT Basic? |
| 08:33 | 18 | **A.**   We drive the ambulance and help the paramedic. |
| 08:34 | 19 | **Q.**   How long have you been doing that? |
| 08:34 | 20 | **A.**   Ten years plus. |
| 08:34 | 21 | **Q.**   Let me direct your attention to September of 2005, during |
| 08:34 | 22 | the period of Hurricane Katrina.  Where were you employed? |
| 08:34 | 23 | **A.**   Northeast Louisiana Ambulance. |
| 08:34 | 24 | **Q.**   Is that the ambulance service that you work for now? |
| 08:34 | 25 | **A.**   Yes. |

STANTON DOYLE ARNOLD - Direct

| | | |
|---|---|---|
| 08:34 | 1 | **Q.**   Did that ambulance service send any ambulances to New |
| 08:34 | 2 | Orleans? |
| 08:34 | 3 | **A.**   Yes. |
| 08:34 | 4 | **Q.**   Did you come down to New Orleans? |
| 08:34 | 5 | **A.**   Yes. |
| 08:34 | 6 | **Q.**   Were you on pay or volunteer status? |
| 08:34 | 7 | **A.**   I volunteered. |
| 08:34 | 8 | **Q.**   Let me direct your attention to the morning of |
| 08:34 | 9 | September 4, 2005, the morning of the Danziger shooting.  Where |
| 08:34 | 10 | were you that morning? |
| 08:34 | 11 | **A.**   We were at a boat landing. |
| 08:34 | 12 | **Q.**   When you say "we," who's "we"? |
| 08:34 | 13 | **A.**   The ambulance, with a crew. |
| 08:34 | 14 | **Q.**   Who was your crew? |
| 08:35 | 15 | **A.**   Arlandus -- |
| 08:35 | 16 | **Q.**   How many people? |
| 08:35 | 17 | **A.**   Arlandus White, a guy named Koon, another man named |
| 08:35 | 18 | Patrick, and another man named Jeremy. |
| 08:35 | 19 | **Q.**   So that's four plus yourself, making about five? |
| 08:35 | 20 | **A.**   Yes. |
| 08:35 | 21 | **Q.**   Where were you guys that morning? |
| 08:35 | 22 | **A.**   We were sitting at a boat landing waiting for the boats to |
| 08:35 | 23 | go out into the water. |
| 08:35 | 24 | **Q.**   Were there any police at that boat landing? |
| 08:35 | 25 | **A.**   Yes. |

STANTON DOYLE ARNOLD - Direct

08:35  1  **Q.**   Was that boat landing in any way being used, as you know,
08:35  2  as some type of staging area or police station?
08:35  3  **A.**   Yes.
08:35  4  **Q.**   Did you have occasion to talk to any police officers that
08:35  5  morning?
08:35  6  **A.**   We met a police officer that told us, he said, "I've been
08:35  7  doing this for ten plus years, and I've been out in this water
08:35  8  for the last three days.  And the people that we seen out there
08:35  9  are either old people that are -- didn't have the money to
08:36  10  leave or did not want to leave because their stuff would have
08:36  11  been stolen or thieves and people would --
08:36  12            **MR. HESSLER:**  Your Honor, I object to hearsay.
08:36  13            **THE COURT:**  Yes.  I'm going to sustain it.
08:36  14            **MR. CARTER:**  Your Honor, it's not offered for the
08:36  15  truth of the matter asserted.  It's offered to show his frame
08:36  16  of mind that day.
08:36  17            **THE COURT:**  Okay.  Well, rephrase the question.
08:36  18            **MR. HESSLER:**  Your Honor, I --
08:36  19            **MR. CARTER:**  I'll rephrase the question.
08:36  20            **THE COURT:**  Rephrase the question, and I'll ask the
08:36  21  witness to try to respond as directly as you can to the
08:36  22  question as it's asked and refrain, unless otherwise
08:36  23  instructed, refrain from saying what someone else told you.
08:36  24            Go ahead, Mr. Carter.
       25

STANTON DOYLE ARNOLD - Direct

| 08:36 | 1 | BY MR. CARTER: |
| 08:36 | 2 | Q.   That morning before you had this conversation with the |
| 08:36 | 3 | police officer, what were you and your crew doing? |
| 08:36 | 4 | A.   We were standing around joking. |
| 08:36 | 5 | Q.   Joking around? |
| 08:36 | 6 | A.   Yes. |
| 08:36 | 7 | Q.   And while you were joking around, did this officer walk up |
| 08:36 | 8 | to you? |
| 08:36 | 9 | A.   Yes. |
| 08:36 | 10 | Q.   And he said certain things to you? |
| 08:36 | 11 | A.   Yes. |
| 08:36 | 12 | Q.   And after he left, what was your mood?  Were you still |
| 08:36 | 13 | joking around? |
| 08:37 | 14 | A.   No, we were watching our backs. |
| 08:37 | 15 | Q.   So what did this officer say to you that made you watch |
| 08:37 | 16 | your back? |
| 08:37 | 17 | A.   He said, "You need to watch your backs" -- |
| 08:37 | 18 |        MR. HESSLER:  Again, Your Honor, I'm going to object |
| 08:37 | 19 | to hearsay. |
| 08:37 | 20 |        THE COURT:  I think he can go ahead and testify to it |
| 08:37 | 21 | now. |
| 08:37 | 22 | BY MR. CARTER: |
| 08:37 | 23 | Q.   Please answer the question.  What did this officer tell |
| 08:37 | 24 | you? |
| 08:37 | 25 | A.   He said that the people that are coming out may be |

STANTON DOYLE ARNOLD - Direct

08:37  1   thieves, thugs, murderers, or may be very old people that did
08:37  2   not want to leave, or people that just couldn't leave because
08:37  3   they didn't have the money.
08:37  4   Q.   If I understand you correctly, you and your crew stopped
08:37  5   joking around after that?
08:37  6   A.   Yes.
08:37  7   Q.   Did you receive a call that morning for an ambulance?
08:37  8   A.   Yes.
08:38  9   Q.   Okay.  Why -- what did you hear about that call?  What was
08:38  10  that call for?
08:38  11  A.   A shooting.
08:38  12  Q.   Did you know where that shooting was?
08:38  13  A.   No.
08:38  14  Q.   What did you do when you heard that call?
08:38  15  A.   There was another crew there from Arkansas that followed
08:38  16  the cops.
08:38  17  Q.   When you say "another crew," was it another ambulance
08:38  18  crew?
08:38  19  A.   Yes, sir.
08:38  20  Q.   How many ambulance crews were there at the staging area
08:38  21  where you were?
08:38  22  A.   Two.
08:38  23  Q.   And one from Arkansas?
08:38  24  A.   Yes.
08:38  25  Q.   And your crew?

STANTON DOYLE ARNOLD - Direct

| | | |
|---|---|---|
| 08:38 | 1 | **A.**   Yes. |
| 08:38 | 2 | **Q.**   What did the ambulance from Arkansas do? |
| 08:38 | 3 | **A.**   They followed behind the police. |
| 08:38 | 4 | **Q.**   They followed behind the police? |
| 08:38 | 5 | **A.**   Yes. |
| 08:38 | 6 | **Q.**   Did you see the police that morning? |
| 08:38 | 7 | **A.**   Yes. |
| 08:38 | 8 | **Q.**   What did you see? |
| 08:38 | 9 | **A.**   I seen police walking around.  They got a call for a |
| 08:38 | 10 | shooting and got into a U-Haul vehicle of some sort. |
| 08:39 | 11 | **Q.**   What were they wearing? |
| 08:39 | 12 | **A.**   Black. |
| 08:39 | 13 | **Q.**   Black. |
| 08:39 | 14 |          Were they armed? |
| 08:39 | 15 | **A.**   Yes. |
| 08:39 | 16 | **Q.**   How were they armed? |
| 08:39 | 17 | **A.**   With rifles and shotguns. |
| 08:39 | 18 | **Q.**   At some point did your ambulance also leave? |
| 08:39 | 19 | **A.**   Yes. |
| 08:39 | 20 | **Q.**   And where did you go? |
| 08:39 | 21 | **A.**   We went to a bridge. |
| 08:39 | 22 | **Q.**   Did you know the name of that bridge? |
| 08:39 | 23 | **A.**   No. |
| 08:39 | 24 | **Q.**   Did you know it then? |
| 08:39 | 25 | **A.**   No. |

STANTON DOYLE ARNOLD - Direct

| | | |
|---|---|---|
| 08:39 | 1 | **Q.** Do you know it now? |
| 08:39 | 2 | **A.** Yes. |
| 08:39 | 3 | **Q.** What is it?  What's the name of that bridge? |
| 08:39 | 4 | **A.** Danziger Bridge. |
| 08:39 | 5 | **Q.** Set the scene for us, Mr. Arnold.  What did you see when |
| 08:39 | 6 | you arrived at the bridge? |
| 08:39 | 7 | **A.** We seen four people laid out and one person dead. |
| 08:39 | 8 | **Q.** Were there any police officers around when you got on the |
| 08:39 | 9 | scene? |
| 08:39 | 10 | **A.** Yes. |
| 08:39 | 11 | **Q.** How many officers, if you recall? |
| 08:39 | 12 | **A.** More than five. |
| 08:39 | 13 | **Q.** More than five. |
| 08:40 | 14 | How many people, generally, on the bridge when you |
| 08:40 | 15 | got there? |
| 08:40 | 16 | **A.** More than five, less than 15. |
| 08:40 | 17 | **Q.** And you said there were four people laid out? |
| 08:40 | 18 | **A.** Yes. |
| 08:40 | 19 | **Q.** What could you tell about those four people? |
| 08:40 | 20 | **A.** They had been shot. |
| 08:40 | 21 | **Q.** Did they appear to be minor or serious injuries? |
| 08:40 | 22 | **A.** Serious. |
| 08:40 | 23 | **Q.** Did they appear to be nonlife threatening or life |
| 08:40 | 24 | threatening? |
| 08:40 | 25 | **A.** Life threatening. |

STANTON DOYLE ARNOLD - Direct

| | | |
|---|---|---|
| 08:40 | 1 | **Q.** What did you do after seeing these people laid out? |
| 08:40 | 2 | **A.** I went to the first one that wasn't -- that did not have |
| 08:40 | 3 | anybody taking care of them. |
| 08:40 | 4 | **Q.** Did you go by yourself or did you go with someone else? |
| 08:40 | 5 | **A.** I went with Arlandus White. |
| 08:40 | 6 | **Q.** So you and Arlandus White went to this person? |
| 08:40 | 7 | **A.** Yes. |
| 08:40 | 8 | **Q.** And if I understand you correctly, he was unattended at |
| 08:40 | 9 | the time? |
| 08:40 | 10 | **A.** Yes. |
| 08:40 | 11 | **Q.** Was there anybody in control of the EMTs out there that |
| 08:41 | 12 | day? |
| 08:41 | 13 | **A.** Yes. |
| 08:41 | 14 | **Q.** Who was that? |
| 08:41 | 15 | **A.** A paramedic from Arkansas. |
| 08:41 | 16 | **Q.** And when you say he was in control, why do you say he's in |
| 08:41 | 17 | control? |
| 08:41 | 18 | **A.** The paramedic is above the EMT Basic. |
| 08:41 | 19 | **Q.** When you went to this victim, or this wounded person that |
| 08:41 | 20 | you went to, did this paramedic give you any instructions about |
| 08:41 | 21 | what to do with that particular victim? |
| 08:41 | 22 | **A.** Yes. |
| 08:41 | 23 | **Q.** What did he tell you? |
| 08:41 | 24 | **A.** Leave him. |
| 08:41 | 25 | **Q.** Why did he say that? |

STANTON DOYLE ARNOLD - Direct

| | | |
|---|---|---|
| 08:41 | 1 | **A.**   His injuries were very bad and he did not think he was |
| 08:41 | 2 | going to make it. |
| 08:41 | 3 | **Q.**   So what did you do when this paramedic told you to leave |
| 08:41 | 4 | him? |
| 08:41 | 5 | **A.**   We kept working. |
| 08:41 | 6 | **Q.**   Why did you keep working? |
| 08:41 | 7 | **A.**   He was still moving and talking. |
| 08:41 | 8 | **Q.**   Tell us about your interaction with that victim. |
| 08:41 | 9 | **A.**   It shocked me that he was still able to talk because he'd |
| 08:42 | 10 | been shot so many times. |
| 08:42 | 11 | **Q.**   He was talking? |
| 08:42 | 12 | **A.**   Yes. |
| 08:42 | 13 | **Q.**   What was he saying? |
| 08:42 | 14 | **A.**   "Don't give up on me." |
| 08:42 | 15 | **Q.**   What's your understanding of why he said that? |
| 08:42 | 16 | **A.**   Because he heard somebody say, "Leave him." |
| 08:42 | 17 | **Q.**   Did he say anything else to you? |
| 08:42 | 18 | **A.**   Not that I recall. |
| 08:42 | 19 | **Q.**   Did you or Arlandus -- is that the other guy's name? |
| 08:42 | 20 | **A.**   Yes. |
| 08:42 | 21 | **Q.**   -- ever ask the guy his name or anything else? |
| 08:42 | 22 | **A.**   Arlandus did. |
| 08:42 | 23 | **Q.**   And what did the individual say his name was? |
| 08:42 | 24 | **A.**   Jose. |
| 08:42 | 25 | **Q.**   Jose. |

STANTON DOYLE ARNOLD - Direct

08:42  1            How seriously injured was Jose?
08:42  2  A.   Critical.
08:42  3  Q.   Was he shot once or more than once?
08:42  4  A.   He was shot more than once.
08:42  5  Q.   Did you focus on any particular part of his body while you
08:42  6  were there with him?
08:42  7  A.   The upper thoracic cavity.
08:43  8  Q.   Why?
08:43  9  A.   That's one place that he was shot.
08:43  10 Q.   Was he shot anywhere else?
08:43  11 A.   Yes.
08:43  12 Q.   Where else was he shot?
08:43  13 A.   In the abdomen, the leg, the arms.
08:43  14 Q.   How long were you there assisting him?
08:43  15 A.   I don't recall.
08:43  16 Q.   What exactly did you do with him?
08:43  17 A.   We put him on a spine board and got him to the truck.
08:43  18 Q.   And after you got him to the truck, what did you do?
08:43  19 A.   There were so many people, I got up front and rode in the
08:43  20 passenger seat.
08:43  21 Q.   Where did you go?
08:43  22 A.   We went to a hospital.
08:44  23         MR. CARTER:  One moment, Your Honor.
08:44  24 BY MR. CARTER:
08:44  25 Q.   What happened when you got to the hospital?

STANTON DOYLE ARNOLD - Direct

| | | |
|---|---|---|
| 08:44 | 1 | **A.**   The ER staff met us at the door. |
| 08:44 | 2 | **Q.**   And then what happened? |
| 08:44 | 3 | **A.**   We unloaded the patients. |
| 08:44 | 4 | **Q.**   Was this your first time seeing a gunshot victim? |
| 08:44 | 5 | **A.**   No. |
| 08:44 | 6 | **Q.**   You've been an EMT for ten years? |
| 08:44 | 7 | **A.**   Yes. |
| 08:44 | 8 | **Q.**   How many gunshot victims have you seen? |
| 08:44 | 9 | **A.**   More than 50. |
| 08:44 | 10 | **Q.**   Have you seen minor wounds? |
| 08:44 | 11 | **A.**   Yes. |
| 08:44 | 12 | **Q.**   Have you seen major wounds? |
| 08:44 | 13 | **A.**   Yes. |
| 08:44 | 14 | **Q.**   Have you arrived to find an individual dead? |
| 08:44 | 15 | **A.**   Yes. |
| 08:44 | 16 | **Q.**   Have you worked on an individual who died later? |
| 08:44 | 17 | **A.**   Yes. |
| 08:44 | 18 | **Q.**   Have you worked on an individual who died while you were |
| 08:44 | 19 | working on them? |
| 08:44 | 20 | **A.**   Yes. |
| 08:44 | 21 | **Q.**   How did these wounds that you saw on the people out there |
| 08:44 | 22 | compare to other wounds you've seen? |
| 08:44 | 23 | **A.**   They were -- he was critical, that it shocked me that he |
| 08:44 | 24 | was still moving. |
| 08:45 | 25 | **Q.**   Did you expect him to make it? |

STANTON DOYLE ARNOLD - Direct

08:45   1   **A.**   No.

08:45   2   **Q.**   Did you expect the other victims to make it?

08:45   3   **A.**   No.

08:45   4   **Q.**   Why not?

08:45   5   **A.**   The severity of the their wounds.

08:45   6   **Q.**   Did you ever learn whether or not Jose made it?

08:45   7   **A.**   Yes.

08:45   8   **Q.**   What did you learn?

08:45   9   **A.**   I learned that he made it.

08:45   10  **Q.**   Were you surprised?

08:45   11  **A.**   Yes.

08:45   12  **Q.**   Looking back, how do you feel about your decision to keep

08:45   13  working on him out there that day?

08:45   14  **A.**   I'm glad that I did.

08:45   15  **Q.**   So are we.

08:45   16           **MR. CARTER:**  Thank you.

08:45   17           **THE COURT:**  All right.  Thank you, Mr. Carter.

08:45   18               Counsel?

08:45   19           **MR. DESALVO:**  I have no questions, Your Honor.

08:45   20           **THE COURT:**  All right.

08:45   21               Mr. Larson?

08:45   22           **MR. LARSON:**  Yes.

08:45   23                     **CROSS-EXAMINATION**

08:45   24  **BY MR. LARSON:**

08:45   25  **Q.**   Good morning, Mr. Arnold.  My name is Lindsay Larson and I

STANTON DOYLE ARNOLD - Cross

08:45    1    represent Robert Faulcon.

08:45    2          Do you recall in March of 2009, sitting down with

08:45    3    Mr. Forrest Christian of the Justice Department and giving him

08:46    4    a statement in Winnsboro?

08:46    5    **A.**    I recall sitting down with somebody in Winnsboro and

08:46    6    giving a statement.

08:46    7    **Q.**    Okay.  And do you remember telling Mr. Christian that

08:46    8    while you were en route to the bridge in the ambulance, you

08:46    9    were in the back of the ambulance; correct?

08:46   10    **A.**    Yes.

08:46   11    **Q.**    And you didn't know how long it took you to get there

08:46   12    because you were praying; correct?

08:46   13    **A.**    Yes.

08:46   14    **Q.**    Is that right?

08:46   15    **A.**    Yes.

08:46   16    **Q.**    Why were you praying?

08:46   17    **A.**    Because we knew it was a shooting.

08:46   18    **Q.**    You thought that there was -- you thought that you were

08:46   19    going to walk into -- or ride into a place where people were

08:46   20    shooting at police officers, didn't you?

08:46   21    **A.**    I thought that we were going to a shooting.

08:46   22    **Q.**    And you thought you might get shot at and that's why you

08:46   23    were praying?

08:46   24    **A.**    Yes.

08:46   25          **MR. LARSON:**  No further questions, Your Honor.

STANTON DOYLE ARNOLD - Cross

| | | |
|---|---|---|
| 08:46 | 1 | **THE COURT:**  Okay.  Counsel? |
| 08:46 | 2 | **MR. LONDON:**  No questions, Your Honor. |
| 08:46 | 3 | **THE COURT:**  All right. |
| 08:46 | 4 | Mr. Meche? |
| 08:46 | 5 | **MR. MECHE:**  Just a couple, Your Honor. |
| 08:46 | 6 | **CROSS-EXAMINATION** |
| 08:46 | 7 | BY MR. MECHE: |
| 08:46 | 8 | **Q.**   How are you doing, Mr. Arnold? |
| 08:47 | 9 | **A.**   Yes. |
| 08:47 | 10 | **Q.**   You described your activity on that morning, |
| 08:47 | 11 | September 4th.  How long had you been in the city at that time? |
| 08:47 | 12 | **A.**   That was our second day. |
| 08:47 | 13 | **Q.**   And how did you come to be called to New Orleans for this |
| 08:47 | 14 | event? |
| 08:47 | 15 | **A.**   Hurricane Katrina. |
| 08:47 | 16 | **Q.**   Okay.  But, I mean, who sent you? |
| 08:47 | 17 | **A.**   Who sent us? |
| 08:47 | 18 | **Q.**   Uh-huh. |
| 08:47 | 19 | **A.**   We volunteered to come down here. |
| 08:47 | 20 | **Q.**   Okay.  And where did you report when you came down here? |
| 08:47 | 21 | **A.**   We reported in Baton Rouge and then came down to New |
| 08:47 | 22 | Orleans. |
| 08:47 | 23 | **Q.**   Okay.  And who did you report to in New Orleans?  How did |
| 08:47 | 24 | you know where to go? |
| 08:47 | 25 | **A.**   My boss did. |

STANTON DOYLE ARNOLD - Cross

08:47 1  **Q.**   Okay.  And did you meet with, like, a New Orleans police
08:47 2  sort of captain, or leader, or somebody who told you what to
08:47 3  do?
08:48 4  **A.**   We -- I guess my boss did.
08:48 5  **Q.**   Okay.  And when you were in the city, what were the
08:48 6  conditions like?  What did you see?
08:48 7  **A.**   It was no electricity, no water.  Just looked like total
08:48 8  chaos.
08:48 9  **Q.**   Was there any organizational structure that you noticed
08:48 10  amongst the police or anybody?
08:48 11  **A.**   I don't know.
08:48 12  **Q.**   Did you have occasion to see anything that you considered
08:48 13  dangerous?
08:48 14  **A.**   Dead bodies everywhere.
08:48 15  **Q.**   Gunfire?
08:48 16  **A.**   I heard some.
08:48 17  **Q.**   Were you armed yourself?
08:48 18  **A.**   Yes.
08:48 19  **Q.**   Why were you armed?
08:48 20  **A.**   Because they told us not to come down here without one.
08:48 21  **Q.**   What were you carrying?
08:48 22  **A.**   A little .380.
08:48 23  **Q.**   .380 pistol or --
08:48 24  **A.**   Yes.
08:48 25  **Q.**   Okay.  Did you have it with you when you were on the boat

STANTON DOYLE ARNOLD - Cross

08:49  1   ramp area?

08:49  2   A.   Yes.

08:49  3   Q.   And when you went to the bridge?

08:49  4   A.   Yes.

08:49  5   Q.   Were you prepared to use it?

08:49  6   A.   Yes.

08:49  7   Q.   If you perceived somebody was shooting at you, would you

08:49  8   have used it?

08:49  9   A.   Yes.

08:49  10           MR. MECHE:   Thank you, sir.

08:49  11           THE COURT:   Mr. Hessler?

08:49  12                    CROSS-EXAMINATION

08:49  13   BY MR. HESSLER:

08:49  14   Q.   You said this was your second day down here in New

08:49  15   Orleans?

08:49  16   A.   Yes.

08:49  17   Q.   Okay.  And there were plenty of other police officers from

08:49  18   different jurisdictions around the city, weren't there?

08:49  19   A.   I don't know.

08:49  20   Q.   Okay.  This police officer that got onto you about your

08:49  21   joking around, who was that?

08:49  22   A.   A black male.

08:49  23   Q.   A New Orleans police officer, or could you tell?

08:49  24   A.   I don't recall.

08:49  25   Q.   What is -- what exactly is it that you saw out there that

STANTON DOYLE ARNOLD - Cross

| | | |
|---|---|---|
| 08:49 | 1 | was so funny that day? |
| 08:49 | 2 | A.   I don't remember.  We were just joking and picking. |
| 08:49 | 3 | Q.   Okay. |
| 08:50 | 4 | MR. HESSLER:  No further questions.  Thank you. |
| 08:50 | 5 | THE COURT:  All right. |
| 08:50 | 6 | Mr. Carter, any redirect? |
| 08:50 | 7 | MR. CARTER:  Just briefly, Your Honor. |
| 08:50 | 8 | THE COURT:  Sure. |
| 08:50 | 9 | REDIRECT EXAMINATION |
| 08:50 | 10 | BY MR. CARTER: |
| 08:50 | 11 | Q.   You were asked whether you brought a gun with you and you |
| 08:50 | 12 | had a gun? |
| 08:50 | 13 | A.   Yes. |
| 08:50 | 14 | Q.   You did have a gun? |
| 08:50 | 15 | A.   Yes. |
| 08:50 | 16 | Q.   Did you ever fire it while you were in New Orleans? |
| 08:50 | 17 | A.   No. |
| 08:50 | 18 | Q.   Did you ever have to fire it? |
| 08:50 | 19 | A.   No. |
| 08:50 | 20 | Q.   Did you ever feel you had to pull it out and shoot anybody |
| 08:50 | 21 | with it? |
| 08:50 | 22 | A.   No. |
| 08:50 | 23 | Q.   You thought -- you were asked about whether or not you |
| 08:50 | 24 | thought you were going to a gunfight when you went to the |
| 08:50 | 25 | Danziger Bridge.  Do you remember that question? |

STANTON DOYLE ARNOLD - Redirect

| | | |
|---|---|---|
| 08:50 | 1 | **A.**   Yes. |
| 08:50 | 2 | **Q.**   When you got there, was there a gunfight going on? |
| 08:50 | 3 | **A.**   No. |
| 08:50 | 4 | **Q.**   Did you see any guns around these wounded victims? |
| 08:50 | 5 | **A.**   No. |
| 08:50 | 6 | **MR. CARTER:**  I have nothing further. |
| 08:50 | 7 | **THE COURT:**  All right.  Thank you, sir.  You can step |
| 08:50 | 8 | down. |
| 08:50 | 9 | Next witness. |
| 08:51 | 10 | **MS. BERNSTEIN:**  The United States calls Mike Lohman. |
| 08:51 | 11 | **THE COURT:**  All right.  Let's get Mr. Lohman in here. |
| 08:51 | 12 | Mr. Lohman, if you'd come forward, sir.  When |
| 08:51 | 13 | you get to this chair, please remain standing until you take |
| 08:51 | 14 | the oath and then you may be seated. |
| 08:51 | 15 | (WHEREUPON, **MICHAEL LOHMAN**, having been duly sworn, |
| 08:51 | 16 | testified as follows.) |
| 08:51 | 17 | **THE DEPUTY CLERK:**  Please state your full name and |
| 08:51 | 18 | correct spelling for the record. |
| 08:51 | 19 | **THE WITNESS:**  My name's Michael Lohman. |
| 08:51 | 20 | M-I-C-H-A-E-L, last name, Lohman, L-O-H-M-A-N. |
| 08:52 | 21 | **DIRECT EXAMINATION** |
| 08:52 | 22 | BY MS. BERNSTEIN: |
| 08:52 | 23 | **Q.**   Good morning, Mr. Lohman. |
| 08:52 | 24 | **A.**   Good morning. |
| 08:52 | 25 | **Q.**   Could you, please, introduce yourself to the jury and tell |

MICHAEL LOHMAN - Direct

08:52   1   them where you live.

08:52   2   **A.**   My name's Michael Lohman.  I live in Jefferson Parish.

08:52   3   **Q.**   Back at the time of Hurricane Katrina in 2005, what did

08:52   4   you do for a living?

08:52   5   **A.**   I was a New Orleans police officer.

08:52   6   **Q.**   What was your position with NOPD?

08:52   7   **A.**   I was a lieutenant at the time, assigned to the 7th Police

08:52   8   District.

08:52   9   **Q.**   Were you involved in a shooting at the Danziger Bridge on

08:52  10   September 4th?

08:52  11   **A.**   No.  I wasn't involved in the actual shooting.  I was

08:52  12   involved in the subsequent investigation and cover-up.

08:52  13   **Q.**   What's your relation to the officers who were involved?

08:52  14   **A.**   They were just coworkers, and some of them, we were on

08:52  15   more friendly terms I would say.

08:52  16   **Q.**   I want to ask you a bunch of questions about that, but

08:52  17   first, I want to ask you some questions about your background.

08:52  18   Can you tell us a little bit about yourself?  Where did you

08:52  19   grow up?

08:52  20   **A.**   I grew up on the West Bank in Jefferson Parish.  I

08:52  21   attended Archbishop Shaw High School.  After that, I went to

08:53  22   UNO and LSU for several semesters, and Delgado.  And I came on

08:53  23   the police department when I was 20 years old.

08:53  24   **Q.**   You said you went to college for a while.  Do you have a

08:53  25   college degree?

MICHAEL LOHMAN - Direct

08:53   1   **A.**   No, ma'am.  I'm still working on that, and I actually take

08:53   2   my final exam this week and I'll have a college degree.

08:53   3   **Q.**   You finish this week?

08:53   4   **A.**   Yes.

08:53   5   **Q.**   How old were you when you started with NOPD?

08:53   6   **A.**   I was 20 years old.

08:53   7   **Q.**   What year was that?

08:53   8   **A.**   1988.

08:53   9   **Q.**   Why did you become a police officer?

08:53  10   **A.**   I had a lot of police in my family and it was just

08:53  11   something I was always interested in.

08:53  12   **Q.**   Who were the officers in your family?

08:53  13   **A.**   My grandfather --

08:53  14           **MR. FLEMING:**  Object to relevancy, Your Honor.

08:53  15           **THE COURT:**  I'm going to let him answer.  Overruled.

08:53  16           **THE WITNESS:**  Grandfather, uncles, cousins, brother.

08:53  17   BY MS. BERNSTEIN:

08:53  18   **Q.**   Where did they work?

08:53  19   **A.**   They worked in the New Orleans Police Department, and some

08:53  20   of them were also on the state police.

08:53  21   **Q.**   So you said you started with NOPD at age 20?

08:53  22   **A.**   Yes.

08:53  23   **Q.**   What are some of the different ranks you've held over the

08:53  24   years?

08:53  25   **A.**   All of the ranks of patrol officer, patrol officer 1, 2, 3

MICHAEL LOHMAN - Direct

08:54   1   and 4, sergeant, and lieutenant.

08:54   2   **Q.**   So you said that in 2005, at the time of Katrina, you were

08:54   3   a lieutenant?

08:54   4   **A.**   Yes, I was a lieutenant.

08:54   5   **Q.**   Are you still with NOPD?

08:54   6   **A.**   No.

08:54   7   **Q.**   When did you leave?

08:54   8   **A.**   I retired February 2nd, 2010.

08:54   9   **Q.**   Why did you leave the force in 2010?

08:54   10  **A.**   As a result of the Danziger investigation and my

08:54   11  subsequent guilty plea.

08:54   12  **Q.**   So you did, in fact, plead guilty in this case?

08:54   13  **A.**   Yes, I did.

08:54   14  **Q.**   I'd like you to tell us a little bit about the structure

08:54   15  of NOPD.  Who's the person -- the highest person in command of

08:54   16  the police department?

08:54   17  **A.**   The superintendent.

08:54   18  **Q.**   Who is that now?

08:54   19  **A.**   Now it's Ronal Serpas.

08:54   20  **Q.**   Back at the time of Hurricane Katrina, who was the

08:54   21  superintendent?

08:54   22  **A.**   Eddie Compass was the superintendent.

08:54   23  **Q.**   If somebody refers casually to the chief of police, is

08:54   24  that the same as the superintendent?

08:54   25  **A.**   Yes, it is.

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 08:54 | 1 | **Q.**   What's the next rank down under the superintendent? |
| 08:54 | 2 | **A.**   Deputy superintendent or deputy chiefs. |
| 08:55 | 3 | **Q.**   How many deputy chiefs are there? |
| 08:55 | 4 | **A.**   There would be four of them. |
| 08:55 | 5 | **Q.**   Going down from that, what's the next rank? |
| 08:55 | 6 | **A.**   Major. |
| 08:55 | 7 | **Q.**   How many majors are there; do you know? |
| 08:55 | 8 | **A.**   At the time of Katrina, I believe there were only two.  I |
| 08:55 | 9 | still believe there's only two. |
| 08:55 | 10 | **Q.**   And then under major, what do you have? |
| 08:55 | 11 | **A.**   Captains. |
| 08:55 | 12 | **Q.**   What do captains do? |
| 08:55 | 13 | **A.**   Captains are typically in command of districts or |
| 08:55 | 14 | divisions. |
| 08:55 | 15 | **Q.**   All right.  And you mentioned that you were with the 7th |
| 08:55 | 16 | District.  Can you tell us a little bit about what a district |
| 08:55 | 17 | is? |
| 08:55 | 18 | **A.**   Yes.  The City of New Orleans is broken up into eight |
| 08:55 | 19 | police districts, and it's geographical areas, and each |
| 08:55 | 20 | district is responsible for that geographical area.  You have |
| 08:55 | 21 | districts 1 through 8 in the City of New Orleans. |
| 08:55 | 22 | **Q.**   And you just mentioned that each one of those districts is |
| 08:55 | 23 | headed up by a captain? |
| 08:55 | 24 | **A.**   Yes, a captain is in charge of each district. |
| 08:55 | 25 | **Q.**   Okay.  I want to talk to you then about the structure |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 08:55 | 1 | within the 7th District.  That's where you said you worked; |
| 08:55 | 2 | right? |
| 08:55 | 3 | A.    Yes. |
| 08:55 | 4 | Q.    Who was the captain in charge of that district at the time |
| 08:55 | 5 | of Katrina? |
| 08:55 | 6 | A.    Robert Barty. |
| 08:55 | 7 | Q.    What's the next rank down under captain in the district? |
| 08:56 | 8 | A.    Lieutenants. |
| 08:56 | 9 | Q.    How many lieutenants were there? |
| 08:56 | 10 | A.    There would be five. |
| 08:56 | 11 | Q.    Can you tell us how the lieutenants divvied up duties? |
| 08:56 | 12 | A.    Yes.  There was a lieutenant in charge of -- a lieutenant |
| 08:56 | 13 | in the ICO position, which is the Integrity Control Officer. |
| 08:56 | 14 | He is, basically, responsible for all disciplinary action and |
| 08:56 | 15 | administrative paperwork.  Then there was a DIU lieutenant, |
| 08:56 | 16 | which would be the position I held, and that position would be |
| 08:56 | 17 | you're in charge of all the district detectives. |
| 08:56 | 18 | Then there would be a lieutenant in charge of each |
| 08:56 | 19 | uniform platoon.  The first platoon, the second platoon, and |
| 08:56 | 20 | the third platoon. |
| 08:56 | 21 | Q.    A "platoon," can you tell us what that word means? |
| 08:56 | 22 | A.    Those are the uniformed officers who ride around in marked |
| 08:56 | 23 | police units and they, typically, answer calls for service. |
| 08:56 | 24 | Q.    So "platoon" is just an NOPD word for a troop of uniformed |
| 08:56 | 25 | officers? |

MICHAEL LOHMAN - Direct

08:56  1   **A.**    Yes.

08:56  2   **Q.**    Okay.  And each one of those had a lieutenant at the head?

08:56  3   **A.**    Yes.

08:56  4   **Q.**    You mentioned that you were the lieutenant in charge of

08:56  5   something called the DIU; is that right?

08:56  6   **A.**    Yes.

08:57  7   **Q.**    What does "DIU" stand for?

08:57  8   **A.**    District Investigative Unit.

08:57  9   **Q.**    Can you describe that for us?

08:57  10  **A.**    Excuse me.  Each of the eight districts would have a DIU

08:57  11  unit, and that's, basically, your plainclothes detectives, who

08:57  12  wear shirt and ties, and they conduct investigations.  At the

08:57  13  time they handled homicides, shootings, robberies, simple

08:57  14  robberies, and armed robberies, and also property crimes.

08:57  15  **Q.**    And these are crimes that happened within the particular

08:57  16  district and that are investigated by that district's DIU?

08:57  17  **A.**    Yes.  They investigate the crimes that happen in that

08:57  18  district.

08:57  19  **Q.**    As a lieutenant, you were the head of the 7th District

08:57  20  DIU?

08:57  21  **A.**    Yes, I was.

08:57  22  **Q.**    What's the next rank down under you?

08:57  23  **A.**    A sergeant.

08:57  24  **Q.**    How many sergeants did you have working for you?

08:57  25  **A.**    Five.

MICHAEL LOHMAN - Direct

08:57  1   **Q.**   Can you tell us how they divvied up responsibilities?
08:57  2   **A.**   Yes.  There would have been a sergeant in charge of the
08:57  3   homicide section, a sergeant in charge of the robbery section,
08:57  4   a sergeant in charge of property crimes, and a sergeant in
08:57  5   crime charge of two different -- two separate task forces.
08:58  6   **Q.**   Now, did each those sergeants have people working under
08:58  7   them?
08:58  8   **A.**   Yes, they did.
08:58  9   **Q.**   What rank did they have working under them?
08:58  10  **A.**   They would be detectives or task force officers.
08:58  11  **Q.**   Okay.  I'm going to step to the side so you can see the
08:58  12  folks over here.  Do you see anybody in the courtroom who
08:58  13  worked as a sergeant under you at the time?
08:58  14  **A.**   Yes.
08:58  15  **Q.**   Who?
08:58  16  **A.**   Sergeant Rob Gisevius in the tan coat, Sergeant Archie
08:58  17  Kaufman in the gray coat, and Sergeant Ken Bowen in the blue
08:58  18  coat.
08:58  19  **Q.**   Where did they work?  What did they do under you?
08:58  20  **A.**   Sergeant Kaufman was in charge of the homicide section;
08:58  21  Sergeant Gisevius was in the task force at the time; and
08:58  22  Sergeant Bowen was in the task force also.
08:58  23  **Q.**   When you say Sergeant Gisevius and Sergeant Bowen were in
08:58  24  the task force, does that mean that they each headed a task
08:58  25  force?

MICHAEL LOHMAN - Direct

08:58  1  **A.**   Yes.

08:58  2  **Q.**   Can you tell us what a task force is?  How is that

08:58  3  different from a platoon?

08:58  4  **A.**   A task force officer wears the BDU-style uniform and they

08:59  5  work in high crime areas.  They do directed patrols in high

08:59  6  crime areas.  And those patrols are usually based on crime

08:59  7  trends or crime patterns that we identify, and we send those

08:59  8  officers to those areas to address those problems that we're

08:59  9  having.

08:59  10  **Q.**   Can you describe --

08:59  11  **A.**   It's a proactive unit.  They don't typically respond to

08:59  12  police calls for service.

08:59  13  **Q.**   Can you describe what you mean by "BDU uniforms"?

08:59  14  **A.**   The battle dress uniform would be the blue uniform pants

08:59  15  with the cargo pockets on the side.

08:59  16  **Q.**   When you say "blue," is that a very, very dark blue?

08:59  17  **A.**   Navy blue, yes.  And the shirt was the same type of

08:59  18  material and it had the police patches on both sleeves,

08:59  19  "Police" on the back, I believe a badge and the officer's name

08:59  20  on the front.

08:59  21  **Q.**   So you mentioned that Bowen and Gisevius were sergeants

08:59  22  heading up task forces.  You also mentioned Sergeant Kaufman.

08:59  23  What did he?

08:59  24  **A.**   He was in the homicide section.

08:59  25  **Q.**   Can you describe the homicide section?

MICHAEL LOHMAN - Direct

08:59  1  **A.**   The homicide section investigated homicides and shootings,

09:00  2  and I believe he had about six or seven detectives that worked

09:00  3  under him.

09:00  4  **Q.**   Did they respond directly to him, take orders from him?

09:00  5  **A.**   Yes.

09:00  6  **Q.**   You mentioned that the homicide section would work

09:00  7  homicides.  Was there also a separate, centralized Homicide

09:00  8  Division?

09:00  9  **A.**   Yes.

09:00  10 **Q.**   What's that called?

09:00  11 **A.**   It would be called Cold Case, or it's been referred to as

09:00  12 Centralized Homicide or Major Case Homicide.

09:00  13 **Q.**   So all three of those different names refer to the same

09:00  14 unit?

09:00  15 **A.**   Yes.

09:00  16 **Q.**   Can you describe that unit for us?

09:00  17 **A.**   It was responsible for conducting investigations into just

09:00  18 that, cold cases; cases that had been investigated by the

09:00  19 district, all the leads had been followed up, and they weren't

09:00  20 able to clear the case.  Then the case file was transferred to

09:00  21 the Cold Case Homicide Division, and they would review them for

09:00  22 additional leads or witnesses, and conduct follow-up

09:00  23 investigations, and try to clear that homicide down the road.

09:00  24 **Q.**   So, for example, if you all had a homicide in the 7th

09:01  25 District, your homicide section would first work it?

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 09:01 | 1 | **A.**   Yes. |
| 09:01 | 2 | **Q.**   And then if it went cold, where would it go? |
| 09:01 | 3 | **A.**   To the Cold Case Homicide Division. |
| 09:01 | 4 | **Q.**   Were there other types of cases, other than cold cases, |
| 09:01 | 5 | that also went to that centralized homicide unit? |
| 09:01 | 6 | **A.**   Yes, they also investigated all police shootings. |
| 09:01 | 7 | **Q.**   When you say "police shootings," is that any time a police |
| 09:01 | 8 | officer fires a weapon? |
| 09:01 | 9 | **A.**   No.  If you fired a weapon and you actually struck the |
| 09:01 | 10 | suspect, the Cold Case Homicide Division would handle it; if |
| 09:01 | 11 | you discharged your weapon at a suspect, but you missed him, |
| 09:01 | 12 | then the district would handle it. |
| 09:01 | 13 | **Q.**   I want to take you now back to the end of August 2005, as |
| 09:01 | 14 | Hurricane Katrina was coming in toward the city.  Did the |
| 09:01 | 15 | police department make any preparations for the storm? |
| 09:01 | 16 | **A.**   Yes.  Pretty much each district or division was left to |
| 09:01 | 17 | make its own preparations for the storm.  We had meetings with |
| 09:01 | 18 | headquarters and stuff like that and they would give us our |
| 09:01 | 19 | basic instructions or information.  But then it was pretty much |
| 09:01 | 20 | up to each district or division to get their own provisions, |
| 09:02 | 21 | whether it be food, water, shelter, a place for their officers |
| 09:02 | 22 | to stay while the hurricane was going on. |
| 09:02 | 23 | **Q.**   All right.  Now, I want to ask you about the specific |
| 09:02 | 24 | preparations within the 7th District, but first let me ask you |
| 09:02 | 25 | a couple questions about your family.  Who did you live with at |

MICHAEL LOHMAN - Direct

09:02  1   the time?

09:02  2   A.   My wife and two daughters.

09:02  3   Q.   How old were your daughters?

09:02  4   A.   They're 14 and 11 now.

09:02  5   Q.   Did you make preparations for your family before the

09:02  6   storm?

09:02  7   A.   Yes.

09:02  8   Q.   Tell us what you all did.

09:02  9   A.   I had relatives that lived in Prairieville, Louisiana, and

09:02  10  they went to stay with them during the storm.

09:02  11  Q.   So your wife and your kids evacuated?

09:02  12  A.   Yes, they did.

09:02  13  Q.   Why did you stay behind?

09:02  14  A.   Because I had to work.

09:02  15  Q.   So what plans did the 7th District make?  Where did you go

09:02  16  to report to work?

09:02  17  A.   We reported at the 7th District station, but we had made

09:02  18  arrangements for our officers to stay at the hospital,

09:02  19  Methodist Hospital, located on Read Boulevard, and also at a

09:02  20  hotel located near Bullard on the I-10 Service Road.

09:02  21  Q.   So those were two specific places where your officers were

09:02  22  supposed to ride out the storm?

09:02  23  A.   Yes, two certain locations.

09:02  24  Q.   Where did you go?

09:02  25  A.   To the hotel.

MICHAEL LOHMAN - Direct

09:03  1    **Q.**    Tell us what happened.
09:03  2    **A.**    We went to the hotel on early Sunday morning, probably
09:03  3    2:00, 3:00 in the morning after we had people set up at the
09:03  4    hospital, the officers that were going to stay there.  Then we
09:03  5    relocated to the hotel where other officers were going to stay.
09:03  6    I was part of that group.  And we, basically, stayed at the
09:03  7    hotel when the hurricane came ashore and struck the City of New
09:03  8    Orleans.
09:03  9    **Q.**    Did you all expect the 7th District to flood?
09:03  10   **A.**    No.
09:03  11   **Q.**    When did it flood?
09:03  12   **A.**    We were flooded by probably noon or 2:00 that day, Monday.
09:03  13   **Q.**    What happened when the 7th District flooded?
09:03  14   **A.**    The entire district flooded.  Everything between
09:03  15   Hayne Boulevard and Chef Highway flooded and we were under
09:03  16   water.  We had no transportation, no boats, anything of that
09:03  17   nature, and all of our communications were shut off.
09:03  18   **Q.**    What did you all do?
09:03  19   **A.**    We waited it out until Wednesday evening.  Then come
09:03  20   Wednesday evening, two sergeants went out, Sergeant Rob
09:03  21   Gisevius and Warren Keller, went out on the interstate.  They
09:04  22   waded out to the interstate on the median and they were able to
09:04  23   commandeer a boat.  And they came back to the hotel -- a
09:04  24   fireboat.  They came back to the hotel and began -- they
09:04  25   removed all of us from the hotel and took us to the hospital.

MICHAEL LOHMAN - Direct

09:04  1          When we got to the hospital, there were already boats
09:04  2   at the hospital removing the officers that were at the
09:04  3   hospital, relocating them to Read and Chef Menteur Highway.
09:04  4   That's where we relocated to, Read and Chef Menteur Highway, at
09:04  5   that time.  It was dry there.
09:04  6   Q.   So eventually you all made it to dry land?
09:04  7   A.   Yes.
09:04  8   Q.   You said that was at Read and Chef Menteur Highway?
09:04  9   A.   Yes.
09:04 10   Q.   Is that an intersection in New Orleans East?
09:04 11   A.   Yes, it is.
09:04 12   Q.   Tell us about Chef Menteur Highway.  Is that a major road
09:04 13   through New Orleans East?
09:04 14   A.   Yes.  It goes through New Orleans East.  It's also known
09:04 15   as U.S. Highway 90.
09:04 16   Q.   From New Orleans East if you head west on Chef Menteur
09:04 17   Highway, where do you go?
09:04 18   A.   It would take you to the Industrial Canal to the Danziger
09:04 19   Bridge over the Industrial Canal.
09:04 20   Q.   Is the Danziger Bridge actually part of Chef Menteur
09:04 21   Highway?
09:04 22   A.   Yes.
09:04 23   Q.   And then if you go over the Danziger Bridge, where do you
09:04 24   end up?
09:04 25   A.   I believe it turns into Gentilly Boulevard.

MICHAEL LOHMAN - Direct

09:05  1  **Q.**    All right.  And you said that you all ended up at this
09:05  2  intersection at Chef and Read; correct?
09:05  3  **A.**    Yes.
09:05  4  **Q.**    What did you guys do once you were there?
09:05  5  **A.**    There's a reception hall located there called the
09:05  6  Crystal Palace.  And at that time, people had made entry into
09:05  7  the Crystal Palace.  So we went in, had the people come out of
09:05  8  the Crystal Palace, and we, basically, took it over and we set
09:05  9  up a temporary headquarters at that location.
09:05  10  **Q.**    When you say "people," what do you mean?
09:05  11  **A.**    People had broken in --
09:05  12  **Q.**    Officers or civilians?
09:05  13  **A.**    No.  Civilians had broken into it and were beginning to
09:05  14  loot it when we got there.
09:05  15  **Q.**    So you all moved the civilians out and you took that place
09:05  16  over?
09:05  17  **A.**    Yes.
09:05  18  **Q.**    What did you do?
09:05  19  **A.**    That's, basically, where we lived at for the next two or
09:05  20  three days, and it became our headquarters probably until
09:05  21  December or January, when we got temporary trailers to work out
09:05  22  of.
09:05  23  **Q.**    How many officers would you estimate were camped there at
09:05  24  the Crystal Palace?
09:05  25  **A.**    Maybe 50 or so at that time.

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 09:05 | 1 | **Q.**   At first, when you all made it to dry land and took over |
| 09:05 | 2 | the Crystal Palace, did you have anywhere else to sleep? |
| 09:05 | 3 | **A.**   No. |
| 09:05 | 4 | **Q.**   Where were you sleeping? |
| 09:06 | 5 | **A.**   We slept at the Crystal Palace on the ground, on chairs, |
| 09:06 | 6 | wherever you could find a place to lay down, what little sleep |
| 09:06 | 7 | you got. |
| 09:06 | 8 | **Q.**   Did you have anything to eat and drink? |
| 09:06 | 9 | **A.**   There was a Winn-Dixie located across the street.  And |
| 09:06 | 10 | when we took over the Crystal Palace, we also went to the |
| 09:06 | 11 | Winn-Dixie and obtained food to eat for the next couple of |
| 09:06 | 12 | days. |
| 09:06 | 13 | **Q.**   Can you estimate how many miles away is the Danziger |
| 09:06 | 14 | Bridge from the Crystal Palace where you all were set up? |
| 09:06 | 15 | **A.**   It was roughly two to three miles away. |
| 09:06 | 16 | **Q.**   All right.  And there was a Winn-Dixie right there by the |
| 09:06 | 17 | Crystal Palace? |
| 09:06 | 18 | **A.**   Yes. |
| 09:06 | 19 | **Q.**   Do you know if there's another Winn-Dixie over on the |
| 09:06 | 20 | other side of the Danziger Bridge? |
| 09:06 | 21 | **A.**   Yes, I believe there is. |
| 09:06 | 22 | **Q.**   Okay.  And I might ask you some questions about that |
| 09:06 | 23 | Winn-Dixie later, but I just wanted to figure out if you were |
| 09:06 | 24 | talking about a different Winn-Dixie now. |
| 09:06 | 25 | So you said that you all went over to the Winn-Dixie |

MICHAEL LOHMAN - Direct

09:06    1    and what did you do?

09:06    2    A.    We obtained food and provisions and water, stuff like

09:06    3    that, to live on for the next couple of days.

09:06    4    Q.    When you say you obtained it, was there anybody there

09:06    5    selling food and water or did you just go take it?

09:06    6    A.    Civilians had already broken into the Winn-Dixie and began

09:06    7    looting it.  And when we went over there, we took provisions

09:06    8    and food and stuff that we needed to live on for the next

09:07    9    couple of days also.

09:07   10    Q.    Did you take it back to the Crystal Palace?

09:07   11    A.    Yes.

09:07   12    Q.    At some point did you all find another place to sleep?

09:07   13    A.    Yes.

09:07   14    Q.    Where was that?

09:07   15    A.    The old folks home on Woodland Highway in the 4th Police

09:07   16    District located on the West Bank of New Orleans.

09:07   17    Q.    Can you tell us how that came about?

09:07   18    A.    Myself, Captain Barty, Sergeant Gisevius, and Bowen took a

09:07   19    ride over there, I believe it was on Thursday -- we went over

09:07   20    there Wednesday night and also on Thursday night and we made

09:07   21    contact with some officers and firemen that were staying at the

09:07   22    location and they invited us to come sleep there.

09:07   23          They had running water, some limited electricity in

09:07   24    certain parts of the place.  They had bedding and rooms for

09:07   25    people to sleep in.  And they also had food and a functional

MICHAEL LOHMAN - Direct

09:07   1   kitchen where we could cook.  So they invited us to stay over
09:07   2   there if we would agree to provide permanent -- permanent
09:07   3   security around the clock there for them.  So that's what we
09:07   4   did.
09:07   5   Q.   So once you found the old folks home to stay at, did you
09:08   6   keep the Crystal Palace as your police headquarters?
09:08   7   A.   Yes.  We would have went to the old folks home for the
09:08   8   first night on Friday after the storm and we would leave a
09:08   9   skeleton crew at the Crystal Palace to guard anything we had
09:08   10  there, any equipment we had obtained or food or anything like
09:08   11  that.  We would leave a skeleton crew there overnight to watch
09:08   12  to make sure, you know, no one came in and stole anything we
09:08   13  had.
09:08   14  Q.   Can you tell us a little bit about your communications?
09:08   15  You said right after the storm you had no communication; is
09:08   16  that right?
09:08   17  A.   Yes.
09:08   18  Q.   At some point did your radios start working again?
09:08   19  A.   Yes.
09:08   20  Q.   Were they working just like normal?
09:08   21  A.   I believe they probably started working by that weekend.
09:08   22  Q.   Uh-huh.
09:08   23  A.   And we were only working off of two channels, and it was
09:08   24  pretty -- pretty chaotic and overcrowded on that two channels.
09:08   25  Q.   How did it normally work?  How many channels would NOPD be

MICHAEL LOHMAN - Direct

09:08   1   using?

09:08   2   A.   Normally, I believe you would have two districts that

09:08   3   worked off of each channel -- off any one particular channel.

09:08   4   Q.   And when the radios came up after the storm, how many

09:08   5   districts did you have working off one channel?

09:08   6   A.   Everybody worked off of either the one or two channels.

09:08   7   Not only the districts, but all divisions and the units within

09:09   8   the department, including outside agencies, worked off of one

09:09   9   channel -- off of two channels.

09:09   10  Q.   Okay.  And what was the effect that had?  You said it was

09:09   11  overcrowded on the radio.  What does that mean?

09:09   12  A.   It was chaotic, overcrowded.  People are talking on top of

09:09   13  each other.  It was hard to get in and speak with the

09:09   14  dispatcher because there was so much communication going on on

09:09   15  any one channel.

09:09   16  Q.   Now, during that time, I'm focusing now on the week after

09:09   17  the storm when you were set up at the Crystal Palace, did you

09:09   18  all fall into a routine?

09:09   19  A.   Yes, we did.

09:09   20  Q.   Can you tell us the routine you fell into?

09:09   21  A.   The routine was at about 7:00 p.m. in the evening, we

09:09   22  would relocate everyone to the old folks home to take a shower

09:09   23  and get something to eat and sleep.  And then by 7:00 the

09:09   24  following morning, we would come back to the Crystal Palace and

09:09   25  we would give out assignments at that point.

MICHAEL LOHMAN - Direct

09:09  1          While the district was still flooded, what we would
09:09  2   do is we had boats coming in by that time and we had also
09:09  3   acquired boats that had been abandoned along Chef Highway.  So
09:09  4   we would use those boats to do rescue operations.  We would go
09:10  5   out into the waters and bring people back to Chef Highway and
09:10  6   relocate them to the Convention Center.
09:10  7   Q.   Who would give out assignments in the morning?
09:10  8   A.   A lot of times it would be me, but it could be -- it could
09:10  9   have been Captain Barty or Lieutenant Tollefson; and in some
09:10 10   cases, even some of the sergeants could have done it.  But,
09:10 11   typically, I was there.
09:10 12   Q.   Where did that happen?
09:10 13   A.   Usually, at the intersection of Read and Chef Menteur
09:10 14   Highway.
09:10 15   Q.   You said that during this time, when you were in your
09:10 16   routine, you were going back and forth from the Crystal Palace
09:10 17   to the old folks home.  How were you guys getting around?
09:10 18   A.   We were using whatever automobiles we could acquire.
09:10 19   Anything we could put our hands on that was drivable, we would
09:10 20   use.
09:10 21   Q.   How would you acquire vehicles?
09:10 22   A.   Up and down Chef Highway there were a lot of businesses.
09:10 23   We would check the businesses to see if they had left their
09:10 24   keys in them.  If the keys were left in them, we would use
09:10 25   them.  On occasions, we would find vehicles abandoned on the

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 09:10 | 1 | side of the road with their keys in them. |
| 09:10 | 2 | And we would also -- anybody driving a car up and |
| 09:10 | 3 | down Chef Highway, we would stop them and check them out, |
| 09:10 | 4 | because most likely the car didn't belong to them.  Especially |
| 09:11 | 5 | if it was a company car that we saw they were driving or from a |
| 09:11 | 6 | business, we would stop them and see if they were the |
| 09:11 | 7 | legitimate owner of that car.  If they weren't the legitimate |
| 09:11 | 8 | owner, we would take them and use that car. |
| 09:11 | 9 | Q.   Do you remember some of the different vehicles that |
| 09:11 | 10 | officers in the 7th District were using? |
| 09:11 | 11 | A.   Yes.  We had Dash Lumber trucks, U-Haul trucks, Budget |
| 09:11 | 12 | trucks, postal trucks, RTA buses. |
| 09:11 | 13 | Q.   You said postal trucks.  Are those actually the little |
| 09:11 | 14 | mail trucks? |
| 09:11 | 15 | A.   Yes. |
| 09:11 | 16 | Q.   And you guys were riding around in those? |
| 09:11 | 17 | A.   Yes, we were. |
| 09:11 | 18 | Q.   In the days after the storm, did NOPD come up with some |
| 09:11 | 19 | system to get information from the leaders out to the troops? |
| 09:11 | 20 | A.   Yes. |
| 09:11 | 21 | Q.   Can you tell us about that? |
| 09:11 | 22 | A.   We would meet with the chief -- the chief and deputy |
| 09:11 | 23 | chiefs.  In the beginning, we would meet at Harrah's under the |
| 09:11 | 24 | overhang, and then later on the meeting was moved to the Royal |
| 09:11 | 25 | Sonesta.  And all of the commanders of the districts or |

MICHAEL LOHMAN - Direct

09:11  1   divisions would go to these meetings and obtain any information

09:11  2   they had to give us.  And then we would relocate back to our

09:11  3   districts and funnel that information to the other supervisors

09:12  4   and officers working under us.

09:12  5   Q.   You said that the commanders of the district would go to

09:12  6   the meeting and get information; is that right?

09:12  7   A.   Yes.

09:12  8   Q.   Did you sometimes go?

09:12  9   A.   Yes.

09:12  10  Q.   So what do you mean when you say "the commanders"?

09:12  11  A.   The captains and lieutenants would be the ones that

09:12  12  typically went.

09:12  13  Q.   During that first week after the storm, were you all

09:12  14  getting any information about what was happening elsewhere in

09:12  15  the city?

09:12  16  A.   Yes.

09:12  17  Q.   What were the sources of the information you were getting

09:12  18  in?

09:12  19  A.   Just word of mouth, meeting with other people, rescue

09:12  20  workers and officers, you know, around the area.

09:12  21  Q.   Did you ever learn later whether the things you were

09:12  22  hearing were accurate or inaccurate?

09:12  23  A.   Some was accurate and some was inaccurate.

09:12  24  Q.   I want to focus you now on September 4, 2005, which was

09:12  25  the day of the shooting on the Danziger Bridge.  Do you

MICHAEL LOHMAN - Direct

09:12   1   remember what you were doing that morning?
09:12   2   A.   I was at the intersection of Read and Chef Menteur Highway
09:12   3   giving out boat assignments.
09:12   4   Q.   What happened?
09:12   5   A.   I was at that intersection, assigning people to boats to
09:13   6   go out and do rescue operations, when a call of a signal 108
09:13   7   came out, officer needs assistance, life is in danger.
09:13   8          At that time officers began responding to the scene.
09:13   9   I -- we had enough officers responding to the scene and I
09:13   10  actually stayed at the intersection of Chef and Read for
09:13   11  several more minutes giving out the last remaining boat
09:13   12  assignments that I had.  And once that was done, I, myself,
09:13   13  relocated to the scene of the Danziger Bridge.
09:13   14  Q.   When you said the call came in and officers began
09:13   15  relocating to the scene --
09:13   16  A.   Yes.
09:13   17  Q.   -- did you see who any of the officers were who rushed off
09:13   18  to go respond?
09:13   19  A.   It was 7th District officers, all the officers we had
09:13   20  assigned there.  I know Bowen, Gisevius, Hills, Hunter,
09:13   21  Faulcon, all of those officers were present.
09:13   22  Q.   And you saw them leave to go respond?
09:13   23  A.   Yes.
09:13   24  Q.   What did you say you did when they left?
09:13   25  A.   I remained on the scene.  We had enough personnel

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 09:13 | 1 | responding to the signal 108, so I remained on the scene and |
| 09:14 | 2 | finished giving out the boat assignments that I had, and then |
| 09:14 | 3 | I, myself, relocated to the Danziger. |
| 09:14 | 4 | **Q.**   When you got to the bridge, had the shooting already |
| 09:14 | 5 | happened? |
| 09:14 | 6 | **A.**   Yes. |
| 09:14 | 7 | **Q.**   When you arrived at the bridge, which side did you arrive |
| 09:14 | 8 | on? |
| 09:14 | 9 | **A.**   On the east side. |
| 09:14 | 10 | **Q.**   So that's the New Orleans East side? |
| 09:14 | 11 | **A.**   Yes. |
| 09:14 | 12 | **Q.**   Describe the scene for us when you got there.  What did |
| 09:14 | 13 | you see? |
| 09:14 | 14 | **A.**   When I arrived there, I saw that there were people lying |
| 09:14 | 15 | on the pedestrian walkway who had been shot.  They had |
| 09:14 | 16 | sustained multiple gunshot wounds.  There was also emergency |
| 09:14 | 17 | medical personnel present on the scene already rendering aid to |
| 09:14 | 18 | those people.  And there were officers present on the scene. |
| 09:14 | 19 | **Q.**   What did those people on the walkway look like to you? |
| 09:14 | 20 | **A.**   They had received serious gunshot wounds, multiple gunshot |
| 09:14 | 21 | wounds. |
| 09:14 | 22 | **Q.**   What did you expect when you were driving out to that |
| 09:14 | 23 | scene, when you were heading out to the Danziger Bridge that |
| 09:15 | 24 | day?  What did you expect to see when you got there? |
| 09:15 | 25 | **A.**   I wasn't sure.  I mean, en route there, I really didn't |

MICHAEL LOHMAN - Direct

09:15  1   know what I was in for or what I was going to see.
09:15  2   Q.   When you got there, did you drive right up onto the bridge
09:15  3   or did you walk onto the bridge?
09:15  4   A.   I believe I stopped at the bottom and walked up on the
09:15  5   bridge.
09:15  6   Q.   So as you walked onto the bridge, you said you saw people
09:15  7   in the walkway?
09:15  8   A.   Yes.
09:15  9   Q.   You said they had sustained gunshot wounds?
09:15  10  A.   Yes.
09:15  11  Q.   Can you describe those gunshot wounds at all to us?
09:15  12  A.   They appeared serious in nature and they were -- they had
09:15  13  all received multiple gunshot wounds.  It appeared to be from a
09:15  14  large caliber weapon.
09:15  15  Q.   How many people did you see lying in the walkway?
09:15  16  A.   Five.
09:15  17  Q.   Male or female?
09:15  18  A.   Male and female.
09:15  19  Q.   Did you look for anything when you saw this?
09:15  20  A.   I was looking around on the ground canvassing the ground
09:15  21  for guns.
09:15  22  Q.   Why were you canvassing the ground or guns?
09:16  23  A.   Because the officers had responded to the scene of a 108,
09:16  24  which is usually associated with a police shooting.  The signal
09:16  25  stands for an officer needs assistance, his life is in danger.

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 09:16 | 1 | And like I said, it's usually associated with a police |
| 09:16 | 2 | shooting. |
| 09:16 | 3 | When I got there, I see people lying in the |
| 09:16 | 4 | walkway -- in the pedestrian walkway who had sustained gunshot |
| 09:16 | 5 | wounds.  And I don't know if these are the perpetrators or not, |
| 09:16 | 6 | but I'm looking around on the ground to see if there are any |
| 09:16 | 7 | guns. |
| 09:16 | 8 | **Q.**   Did you see any? |
| 09:16 | 9 | **A.**   No. |
| 09:16 | 10 | **Q.**   What was your reaction when you saw those people and saw |
| 09:16 | 11 | no guns? |
| 09:16 | 12 | **A.**   One of concern. |
| 09:16 | 13 | **Q.**   What do you mean by "concern"? |
| 09:16 | 14 | **A.**   I was concerned that if these were the perpetrators, where |
| 09:16 | 15 | were the guns, how come we weren't locating any guns. |
| 09:16 | 16 | **Q.**   Was there anybody else on scene other than the people who |
| 09:16 | 17 | were shot in the walkway? |
| 09:16 | 18 | **A.**   Yes. |
| 09:16 | 19 | **Q.**   Who else did you see there? |
| 09:16 | 20 | **A.**   There were other officers on the scene.  I know Sergeant |
| 09:16 | 21 | Bowen and Sergeant Kaufman were there. |
| 09:16 | 22 | **Q.**   Did you talk to anybody? |
| 09:16 | 23 | **A.**   Yes. |
| 09:16 | 24 | **Q.**   Who did you talk to? |
| 09:16 | 25 | **A.**   I spoke to both Bowen and Kaufman. |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 09:16 | 1 | **Q.**   Tell us about your conversations. |
| 09:16 | 2 | **A.**   It was pretty -- pretty general at that point.  I spoke to |
| 09:17 | 3 | Bowen and he told me that the officers had responded to the |
| 09:17 | 4 | 108.  When they arrived on the scene of the bridge, they had |
| 09:17 | 5 | saw a group of pedestrians on the bridge who were armed with |
| 09:17 | 6 | weapons.  The pedestrians fired at them and they returned fire, |
| 09:17 | 7 | and as a result, the individuals who were lying in the |
| 09:17 | 8 | pedestrian walkway were struck with their gunfire. |
| 09:17 | 9 |         I had pretty much the same -- same conversation with |
| 09:17 | 10 | Kaufman.  It was pretty general, that, you know, the officers |
| 09:17 | 11 | had responded to the scene and encountered gunfire and returned |
| 09:17 | 12 | gunfire. |
| 09:17 | 13 | **Q.**   Did they indicate that those people on the walkway were |
| 09:17 | 14 | the people who had fired at them? |
| 09:17 | 15 | **A.**   Yes. |
| 09:17 | 16 | **Q.**   What was your response? |
| 09:17 | 17 | **A.**   I asked about guns, if we had located any guns.  And what |
| 09:17 | 18 | I was told is that we were still canvassing the area for the |
| 09:17 | 19 | guns. |
| 09:17 | 20 | **Q.**   What were these officers doing when you got to the scene? |
| 09:17 | 21 | **A.**   The officers were standing on the scene.  I mean, they |
| 09:17 | 22 | were there present on the scene in proximity to where the |
| 09:17 | 23 | victims were located at. |
| 09:17 | 24 | **Q.**   Were they conducting a canvas? |
| 09:18 | 25 | **A.**   I didn't see any real canvas going on, no. |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 09:18 | 1 | **Q.** While you were on the east side of the bridge, did you |
| 09:18 | 2 | learn that there was another scene somewhere? |
| 09:18 | 3 | **A.** Yes. |
| 09:18 | 4 | **Q.** Tell us about that. |
| 09:18 | 5 | **A.** Yeah.  I learned there was a second shooting on the west |
| 09:18 | 6 | side of the Danziger Bridge. |
| 09:18 | 7 | **Q.** Do you remember how you learned that? |
| 09:18 | 8 | **A.** Someone on the scene told me.  I don't recall who. |
| 09:18 | 9 | **Q.** What did you do when you learned that there was another |
| 09:18 | 10 | scene on the west side? |
| 09:18 | 11 | **A.** I relocated over to that side of the bridge. |
| 09:18 | 12 | **Q.** Do you remember how you got from the east side over to the |
| 09:18 | 13 | west side? |
| 09:18 | 14 | **A.** No.  I know I didn't walk because it's quite a distance |
| 09:18 | 15 | and I would have remembered a walk across the bridge.  But I |
| 09:18 | 16 | apparently rode over there with someone.  I don't recall who, |
| 09:18 | 17 | though. |
| 09:18 | 18 | **Q.** Can you tell us what you saw when you got over to the west |
| 09:18 | 19 | side? |
| 09:18 | 20 | **A.** When I got over to the west side, I saw that another |
| 09:18 | 21 | individual had been shot in the entrance to the Friendly Inn |
| 09:18 | 22 | motel. |
| 09:18 | 23 | **Q.** Tell us more about that scene. |
| 09:18 | 24 | **A.** The subject was lying in -- there's an overhang to the |
| 09:18 | 25 | entrance of the hotel which goes into the parking lot and this |

MICHAEL LOHMAN - Direct

09:19  1   subject was lying on the ground in between two parked vehicles,
09:19  2   and he had sustained a gunshot wound to his -- to the right
09:19  3   side of his back.
09:19  4   Q.   This guy you saw on the ground was a civilian or police
09:19  5   officer?
09:19  6   A.   A civilian.
09:19  7   Q.   When you got over to the west side of the bridge and you
09:19  8   saw this guy on the ground with the gunshot wound, were there
09:19  9   any officers around there?
09:19  10  A.   Yes.
09:19  11  Q.   Do you remember who?
09:19  12  A.   Bowen and Faulcon were there and there were other officers
09:19  13  from the state police SWAT team and our SWAT team also.
09:19  14  Q.   Did you talk to anybody about what had happened over
09:19  15  there?
09:19  16  A.   Yes.
09:19  17  Q.   Who did you talk to?
09:19  18  A.   I first spoke with Sergeant Bowen.
09:19  19  Q.   What conversation did you have?
09:19  20  A.   It was, basically, that this individual was involved in
09:19  21  the incident on the east side of the bridge and he ran across
09:19  22  the bridge.  As he ran across the bridge, Officer Faulcon,
09:19  23  along with other officers, pursued him over the bridge.  And as
09:19  24  he turned into the driveway of the motel, he reached into his
09:20  25  waistband.  Officer Faulcon thought he was going for a weapon

MICHAEL LOHMAN - Direct

09:20    1    and fired one shot, striking him.

09:20    2    **Q.**   Did you ask any questions?

09:20    3    **A.**   At that point, no.  That information came from Sergeant

09:20    4    Bowen at that point.

09:20    5    **Q.**   When you saw the guy lying on the ground, did you look for

09:20    6    weapons?

09:20    7    **A.**   Yes.

09:20    8    **Q.**   Did you see any?

09:20    9    **A.**   No.  And I did ask if any weapons had been located and I

09:20   10    was told no.

09:20   11    **Q.**   So what was your reaction at that point?

09:20   12    **A.**   One of concern once again.  I was concerned about it.

09:20   13    **Q.**   Now, you mentioned when you left the east side you had

09:20   14    concerns; correct?

09:20   15    **A.**   Yes.

09:20   16    **Q.**   When you got to the west side, did your concerns lessen or

09:20   17    grow?

09:20   18    **A.**   Grow.

09:20   19    **Q.**   How long would you estimate you stayed on the scene that

09:20   20    day, the scene being the entire area around the Danziger

09:20   21    Bridge?

09:20   22    **A.**   Initially, a little over two hours.

09:20   23    **Q.**   All right.  You say "initially."  Did you actually return

09:20   24    later?

09:20   25    **A.**   Later on we returned, yes.

MICHAEL LOHMAN - Direct

09:20   1   **Q.**   So that morning, you'd estimate that you stayed on the
09:20   2   scene for a couple hours?
09:20   3   **A.**   Yes.
09:20   4   **Q.**   During those couple of hours, did your concerns about the
09:21   5   scene lessen or grow?
09:21   6   **A.**   Grow.
09:21   7   **Q.**   Did you have any particular conversations that made your
09:21   8   concerns grow?
09:21   9   **A.**   Yes.
09:21   10   **Q.**   Who did you talk to?
09:21   11   **A.**   I'm sorry.  Excuse me.
09:21   12          **THE COURT:**  There's some water there if you want.
09:21   13          **THE WITNESS:**  I'm fine.  Thank you, Judge.
09:21   14              While on the west side of the bridge, who did I
09:21   15   speak to?
09:21   16   **BY MS. BERNSTEIN:**
09:21   17   **Q.**   While you were on the scene that day.
09:21   18   **A.**   While on the scene that day, I spoke with Sergeant Bowen
09:21   19   and Sergeant Gisevius on the west side of the bridge, and the
09:21   20   conversation about the incident and about them responding to
09:21   21   the scene.
09:21   22   **Q.**   Let me ask you first, tell me who all you talked to while
09:21   23   you were on the scene and then we can go through each
09:21   24   conversation.
09:21   25   **A.**   Bowen, Gisevius, Faulcon and Kaufman.

MICHAEL LOHMAN - Direct

09:21   1   **Q.**   All right.  You started to tell us about a conversation
09:21   2   with Bowen and Gisevius.  Where did that happen?
09:21   3   **A.**   It happened on the west side by the Friendly Inn motel.
09:21   4   **Q.**   This is after you got over there and saw the guy on the
09:21   5   ground?
09:22   6   **A.**   Yes.
09:22   7   **Q.**   Let me go back to that for a second because you said you
09:22   8   saw the guy on the ground and you didn't see any guns and you
09:22   9   had concerns.  Can you explain what the things were that made
09:22   10   you concerned about that scene?
09:22   11   **A.**   Yes.  The fact that they responded to a scene and it was
09:22   12   alleged that these people were the perpetrators who had fired
09:22   13   at them, yet there were no weapons located by the perpetrators
09:22   14   or on the perpetrators.
09:22   15        In addition to that, no one could tell me which one
09:22   16   of the perpetrators was actually armed with the weapon, whether
09:22   17   it was all of them, one or two of them, or just one of them.
09:22   18   No one could say who actually had a gun.  And this is what
09:22   19   caused me concern.
09:22   20   **Q.**   All right.  You said you spoke to Sergeant Bowen and
09:22   21   Sergeant Gisevius?
09:22   22   **A.**   Yes.
09:22   23   **Q.**   Tell us about that conversation.
09:22   24   **A.**   During the course of that conversation, we spoke about not
09:22   25   being able to locate any weapons on the scene; and as we talked

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 09:22 | 1 | about it, it was a concern of mine.  They seemed to be unsure |
| 09:23 | 2 | about what had actually happened and who was actually armed. |
| 09:23 | 3 | And during the course of that conversation, I told |
| 09:23 | 4 | them, "You two guys need to get together and decide what |
| 09:23 | 5 | happened.  You need to calm down, collect your thoughts and |
| 09:23 | 6 | decide what happened, and come back and let me know what |
| 09:23 | 7 | happened because I wasn't here." |
| 09:23 | 8 | Q.   When you said they seemed unsure about what actually |
| 09:23 | 9 | happened, what do you mean by that? |
| 09:23 | 10 | A.   Like I said, they couldn't say who was armed or they |
| 09:23 | 11 | couldn't account for any weapons. |
| 09:23 | 12 | Q.   So what did you say to them? |
| 09:23 | 13 | A.   I told them that they needed to collect their thoughts, |
| 09:23 | 14 | calm down, collect their thoughts, get their story together, |
| 09:23 | 15 | and come back and let me know what happened. |
| 09:23 | 16 | Q.   What did you mean by that? |
| 09:23 | 17 | A.   Just that -- |
| 09:23 | 18 | MR. DESALVO:  I object Your Honor.  The words speak |
| 09:23 | 19 | for themselves. |
| 09:23 | 20 | THE COURT:  I'm going to overrule.  You can go ahead. |
| 09:23 | 21 | THE WITNESS:  Basically, just that, that they needed |
| 09:23 | 22 | to figure out what happened because there was too much |
| 09:23 | 23 | uncertainty and things weren't adding up to me.  They needed to |
| 09:24 | 24 | figure out what happened and come back with a story for me, or |
| 09:24 | 25 | a plausible story, and relate it to me. |

MICHAEL LOHMAN - Direct

09:24   1   BY MS. BERNSTEIN:
09:24   2   Q.   At that moment did you expect them to come back to you
09:24   3   with the truth?
09:24   4   A.   No, I didn't.
09:24   5   Q.   Did you order them to make up a story?
09:24   6   A.   No.
09:24   7   Q.   If they had come back and said, "We shot unarmed people,"
09:24   8   what would you have done?
09:24   9   A.   That's how it would have went.  I mean, they shot unarmed
09:24  10   people.  I didn't -- I didn't order them to make up a story and
09:24  11   come back and present a plausible story to me or present a lie
09:24  12   to me.  Had they came back and said, "Look, we made a mistake,
09:24  13   we screwed up and we shot the wrong people," that's the way the
09:24  14   story would have went.  I mean, that's what it would have been.
09:24  15          In my heart or in my gut, I knew that wasn't what
09:24  16   they were going to come back and tell me, though.  I knew they
09:24  17   were going to come back with a story explaining their actions.
09:24  18   Q.   Did you have any other conversations with folks while you
09:25  19   were on the scene that day?
09:25  20   A.   Yes.  I had another conversation with Officer Faulcon.
09:25  21   Like I said, when I first arrived on the scene, I spoke with
09:25  22   Sergeant Bowen about what had transpired as far as Ronald
09:25  23   Madison being shot by Officer Faulcon.
09:25  24          Then I also had the opportunity to speak to
09:25  25   Officer Faulcon and he kind of relayed the same general

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 09:25 | 1 | information to me, that he had chased a guy over the bridge. |
| 09:25 | 2 | When the guy turned into the entrance of the hotel, he reached |
| 09:25 | 3 | into his waistband.  He believed he was going for a gun and he |
| 09:25 | 4 | fired one round at him. |
| 09:25 | 5 | **Q.**   Before you had this follow-up conversation -- before you |
| 09:25 | 6 | had this conversation you're about to tell us about with Robert |
| 09:25 | 7 | Faulcon, did you have any other conversations with Bowen or |
| 09:25 | 8 | Kaufman? |
| 09:25 | 9 | **A.**   Yeah.  I don't know exactly in what order we had the |
| 09:25 | 10 | conversations, but, yes, I did have other conversations with |
| 09:25 | 11 | Bowen and with Kaufman on the west side of the bridge. |
| 09:25 | 12 | **Q.**   Let me ask you specifically:  You said that one of your |
| 09:25 | 13 | concerns was the lack of a gun on the scene. |
| 09:25 | 14 | **A.**   Yes. |
| 09:25 | 15 | **Q.**   Did you have any conversations about that concern? |
| 09:25 | 16 | **A.**   Yes. |
| 09:25 | 17 | **Q.**   Who did you talk to about that? |
| 09:25 | 18 | **A.**   Bowen, Kaufman, and Officer Gisevius. |
| 09:26 | 19 | **Q.**   Let me ask you first about your conversation with Bowen. |
| 09:26 | 20 | Was anybody else present for that? |
| 09:26 | 21 | **A.**   No, I don't believe so.  No. |
| 09:26 | 22 | **Q.**   Tell us about the conversation you had with Ken Bowen. |
| 09:26 | 23 | **A.**   The conversation with Ken Bowen was about how we couldn't |
| 09:26 | 24 | account for the guns on the scene and how that was problematic |
| 09:26 | 25 | and was a concern of mine.  What he came back to me with -- |

MICHAEL LOHMAN - Direct

09:26  1    with what he said back to me was, "Well, what about this, what
09:26  2    about if I kicked the guns over the side of the bridge?"
09:26  3            At that point I asked him, "Why would you kick the
09:26  4    guns over the side of the bridge?"
09:26  5            His response was, "Well, it was a hot scene.  It was
09:26  6    still hostile and chaotic.  There were people running around.
09:26  7    I didn't know to what degree the pedestrians were injured.
09:26  8    They could possibly re-arm themselves with the guns or someone
09:26  9    else on the scene could pick up a gun and arm themselves and
09:26  10   start shooting at us.  So to secure the weapons, I didn't have
09:26  11   any way to secure them on myself" -- because he had a long gun
09:26  12   and he didn't have anywhere to put it -- he said, "I pushed
09:27  13   them over the side of the bridge with the intention of going
09:27  14   down there and getting them once the scene is under control."
09:27  15           He said, "But someone apparently came by and picked
09:27  16   up the guns and left with them."
09:27  17   Q.   Where were you all when you had this conversation with Ken
09:27  18   Bowen about the gun?
09:27  19   A.   On the west side of the bridge by the motel.
09:27  20   Q.   So on the west side he said, "What about this?"
09:27  21   A.   Yes.
09:27  22   Q.   And then gave that account?
09:27  23   A.   Yes.
09:27  24   Q.   While you were talking you said that one of the things he
09:27  25   said was, "I didn't have any place to put the guns, so I kicked

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 09:27 | 1 | them off the bridge."  Is that right? |
| 09:27 | 2 | **A.**    Yes. |
| 09:27 | 3 | **Q.**    What was he wearing? |
| 09:27 | 4 | **A.**    A BDU uniform. |
| 09:27 | 5 | **Q.**    How many pockets are in a pair of BDU pants? |
| 09:27 | 6 | **A.**    Six. |
| 09:27 | 7 | **Q.**    Did you understand Defendant Bowen to be telling you that |
| 09:27 | 8 | this was really what happened, that he kicked guns off the |
| 09:27 | 9 | bridge and had no place to put them? |
| 09:27 | 10 | **MR. DESALVO:**  I object as to what he understood.  The |
| 09:27 | 11 | words speak for themselves. |
| 09:27 | 12 | **THE COURT:**  Yes.  I think you need to rephrase.  I'm |
| 09:27 | 13 | going to sustain the objection. |
| 09:28 | 14 | **BY MS. BERNSTEIN:** |
| 09:28 | 15 | **Q.**    How did he lead into that explanation that he just gave |
| 09:28 | 16 | you? |
| 09:28 | 17 | **A.**    He said, "What about this, what about if I kicked the guns |
| 09:28 | 18 | over the side of the bridge?" |
| 09:28 | 19 | **Q.**    And that was in response to your expressing concern about, |
| 09:28 | 20 | "Where are the guns?" |
| 09:28 | 21 | **A.**    Yes. |
| 09:28 | 22 | **Q.**    When you got to the scene that day, who was in charge of |
| 09:28 | 23 | that scene? |
| 09:28 | 24 | **A.**    I would have been in charge of it. |
| 09:28 | 25 | **Q.**    Why would you have been in charge of it?  Can I ask you to |

MICHAEL LOHMAN - Direct

09:28  1   lean forward a little bit just so you're speaking into the
09:28  2   microphone.  Why would you have been in charge of that scene?
09:28  3   A.   Because I was the DIU lieutenant and I would have been one
09:28  4   of the highest rank on the scene, and typically that would have
09:28  5   been my responsibility.
09:28  6   Q.   So even if there's another lieutenant on the scene, would
09:28  7   you be the guy in charge of this scene?
09:28  8   A.   In the 7th District I would have been because of my
09:28  9   position.
09:28  10  Q.   Explain what you mean by that, because of your position.
09:29  11  A.   I was in charge of the District Investigative Unit and we
09:29  12  would ordinarily handle shootings -- or we would handle
09:29  13  shootings and homicides.  If it was something that the Cold
09:29  14  Case Squad was going to handle, we would hold down the scene
09:29  15  until they got there and assumed control of it from us.
09:29  16  Q.   Now, a shooting like this where police are involved and
09:29  17  people are injured, who would normally handle that
09:29  18  investigation?
09:29  19  A.   The Cold Case Squad would handle it.
09:29  20  Q.   Did you know that day whether Cold Case Squad was going to
09:29  21  come out and handle this investigation?
09:29  22  A.   I asked for them, but I was told they weren't going to
09:29  23  respond to the scene.
09:29  24  Q.   So while you were out there, you learned that you were not
09:29  25  going to get Cold Case out there?

MICHAEL LOHMAN - Direct

09:29    1    A.    Yes.
09:29    2    Q.    All right.  Who then was responsible for investigating
09:29    3    this scene?
09:29    4    A.    Then it fell back on us.
09:29    5    Q.    So as the ranking person in charge, did you assign the
09:29    6    investigation to someone?
09:29    7    A.    Yes.  I assigned it to Archie Kaufman.
09:29    8    Q.    Now, as a lieutenant, as the head of the DIU, would you
09:29    9    normally work scenes yourself?
09:29   10    A.    No, that wouldn't be my role.
09:30   11    Q.    What was your role?
09:30   12    A.    To supervise the scene, to delegate the investigations to
09:30   13    the sergeants and detectives and they work the case and the
09:30   14    scene.
09:30   15    Q.    Of all the sergeants who worked under you, why did you
09:30   16    assign this case to Sergeant Kaufman?
09:30   17    A.    He was the most logical.  He had homicide experience and
09:30   18    he was, in fact, in charge of the homicide unit which handled
09:30   19    homicides and shootings.
09:30   20    Q.    And you said he was right there on the scene?
09:30   21    A.    Yes, he was.
09:30   22    Q.    Did you have any conversation -- before you assigned the
09:30   23    case to him, did you have any conversation with any other
09:30   24    supervisors out there?
09:30   25    A.    Yes, I did.

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 09:30 | 1 | **Q.**  Tell us about that.  Who did you talk to? |
| 09:30 | 2 | **A.**  I had a conversation with Captain Jeff Winn, who was a |
| 09:30 | 3 | captain on the department at the time in charge of the Special |
| 09:30 | 4 | Operations Division. |
| 09:30 | 5 | **Q.**  Let me stop you there for a second.  Special Operations |
| 09:30 | 6 | Division, is that like NOPD's SWAT team? |
| 09:30 | 7 | **A.**  Yes, it is. |
| 09:30 | 8 | **Q.**  All right.  So the captain of the Special Operations |
| 09:30 | 9 | Division was there.  What conversation did you have with him? |
| 09:30 | 10 | **A.**  I had learned -- I had heard that his unit had been |
| 09:30 | 11 | involved in a shooting earlier in the week and that homicide |
| 09:30 | 12 | also didn't respond to his scene.  When he requested homicide, |
| 09:31 | 13 | he was told they weren't available, they were tied up at the |
| 09:31 | 14 | Superdome. |
| 09:31 | 15 | He was then told to submit a corres- -- an inner |
| 09:31 | 16 | office correspondence documenting the details of the shooting |
| 09:31 | 17 | to the superintendent, and that was basically the extent of the |
| 09:31 | 18 | investigation that was going to be conducted on that scene. |
| 09:31 | 19 | **Q.**  Was anybody present there when you had that conversation |
| 09:31 | 20 | with Jeff Winn? |
| 09:31 | 21 | **A.**  Yes, Kaufman was. |
| 09:31 | 22 | **Q.**  All right.  So sometime after that, did you have a |
| 09:31 | 23 | conversation with Defendant Kaufman about assigning this |
| 09:31 | 24 | investigation to him? |
| 09:31 | 25 | **A.**  Yes.  I -- |

MICHAEL LOHMAN - Direct

09:31  1   **Q.**   What happened when you assigned the investigation to him?
09:31  2   What did he say?
09:31  3   **A.**   I informed him that he was going to be responsible for
09:31  4   conducting the investigation into this matter.  And his
09:31  5   response was, after hearing what Captain Winn had to say about
09:31  6   the inner office correspondence was, that we didn't have to do
09:31  7   anything.  He said, "21 NAT, babe."
09:31  8   **Q.**   "21 NAT, babe"?
09:31  9   **A.**   Yes.
09:31  10  **Q.**   I want to have you break that down for us.  What does
09:31  11  "NAT" stand for?
09:31  12  **A.**   "NAT" means necessary action taken.  It's a disposition
09:32  13  given on a police function or a police event.
09:32  14  **Q.**   What's the significance of the number 21?
09:32  15  **A.**   21 is just a miscellaneous complaint, or a complaint.
09:32  16  **Q.**   Can you give us an example of the type of thing that might
09:32  17  be a 21 complaint?
09:32  18  **A.**   If someone was at their house and there was a garbage can
09:32  19  lying in the street obstructing the roadway, if they called the
09:32  20  police operator and said, "There's a garbage can lying in the
09:32  21  street, it's blocking -- it's obstructing the roadway, blocking
09:32  22  traffic," the dispatcher would send a car out to that location.
09:32  23        When the car arrived on the scene, the officer would
09:32  24  get out of his car, move the garbage can out of the street and
09:32  25  put it on the curb, and the necessary action was taken.  There

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 09:32 | 1 | would be no need for them to take any further action and it |
| 09:32 | 2 | would be marked off a 21 NAT. |
| 09:32 | 3 | Q.   So Kaufman's response to you was, "21 NAT, babe"? |
| 09:32 | 4 | A.   Yes. |
| 09:32 | 5 | Q.   What did you say to that? |
| 09:32 | 6 | A.   That it wasn't -- it couldn't be a 21 NAT, that police -- |
| 09:32 | 7 | people had been shot, the police had shot them, and that an |
| 09:33 | 8 | investigation was going to have to be conducted, and he was |
| 09:33 | 9 | going to be responsible for that investigation and the report. |
| 09:33 | 10 | Q.   Now, by the time you had that conversation with Defendant |
| 09:33 | 11 | Kaufman, had you already formulated an opinion about the |
| 09:33 | 12 | shooting? |
| 09:33 | 13 | A.   Yes, I had. |
| 09:33 | 14 | Q.   What was that? |
| 09:33 | 15 | A.   That it was unjustifiable, that there were problems with |
| 09:33 | 16 | it. |
| 09:33 | 17 | Q.   When you assigned that case to Defendant Kaufman, what did |
| 09:33 | 18 | you expect? |
| 09:33 | 19 | A.   I believed it was going to be justified when it was |
| 09:33 | 20 | completed. |
| 09:33 | 21 | Q.   What do you mean when you say you believed it was going to |
| 09:33 | 22 | be justified? |
| 09:33 | 23 | A.   That the officers were going to be cleared of any |
| 09:33 | 24 | wrongdoings. |
| 09:33 | 25 | Q.   Because they, in fact, did nothing wrong? |

MICHAEL LOHMAN - Direct

09:33  1  **A.**    No.   I felt that things -- things had gone wrong on the
09:33  2  bridge that day and inappropriate action had been taken.
09:33  3            **MR. FLEMING:**  I'm going to object at this point, Your
09:33  4  Honor.
09:33  5            **THE COURT:**  Okay.  Come forward.
09:33  6            (WHEREUPON, the following proceedings were held at
09:33  7  the bench.)
09:33  8            **THE COURT:**  All right.  Mr. Fleming?
09:34  9            **MR. FLEMING:**  Judge, I'm going to object.  I don't
09:34  10  mean to come up, but he's offering an opinion as to the
09:34  11  ultimate conclusion for the jury to reach whether these
09:34  12  shootings were, in fact, justifiable or not.  That's exactly
09:34  13  what he's doing, and that's a decision for the jury to make
09:34  14  after they hear all the testimony.
09:34  15            **THE COURT:**  I understand the point, but I think he's
09:34  16  giving his impressions of what he believed at the time as a
09:34  17  fact witness.  So I don't think he's making an opinion as to
09:34  18  the ultimate issue.
09:34  19            **MS. BERNSTEIN:**  May I add something else on the
09:34  20  record in opposition to that?
09:34  21            He's also explaining what his mind-set was.  He
09:34  22  was part of this cover-up.  And as was made very clear in the
09:34  23  openings yesterday, the defense is going -- the defense plans
09:34  24  to blame him for this cover-up.  So the fact that he thought it
09:34  25  was an unjustified shooting is highly --

MICHAEL LOHMAN - Direct

09:34    1            **MR. FLEMING:**  If I may respond.  Nobody from
09:34    2    Mr. Faulcon's defense team suggested or blamed Mr. Lohman.
09:34    3    That's one of the problems we have with a five-defendant case.
09:35    4    But no one from Mr. Faulcon's defense team said we're blaming
09:35    5    Mr. Lohman for anything.  Those words never came out of my
09:35    6    mouth.
09:35    7            I understand your position and I respectfully
09:35    8    object to the Court's ruling.
09:35    9            **THE COURT:**  I'm going to overrule the objection.
09:35   10    Let's see where we go.
09:35   11            (WHEREUPON, the following proceedings were held in
09:35   12    open court.)
09:35   13    **BY MS. BERNSTEIN:**
09:35   14    **Q.**   I think the last question before we broke was what you
09:35   15    meant when you said that you expected this case to be justified
09:35   16    when you assigned it to Defendant Kaufman.  What did you mean
09:35   17    by that?
09:35   18    **A.**   That the officers were going to be cleared of any
09:35   19    wrongdoings.
09:35   20    **Q.**   Was there anything about your conversation with Kaufman
09:35   21    that made you sure that that was what was going to happen?
09:35   22    **A.**   We had a conversation about a gun.
09:35   23    **Q.**   Tell us about that conversation.
09:35   24    **A.**   We had discussed the fact that no guns had been located on
09:36   25    the scene, that no one was able to locate a gun anywhere on the

MICHAEL LOHMAN - Direct

09:36    1    scene; and during the course of that conversation, he told me

09:36    2    that he had a gun that he could put on the scene.  I asked him

09:36    3    if the gun was clean, meaning could it be traced back to him or

09:36    4    any other crimes.  He assured me that it was clean, it couldn't

09:36    5    be traced back.

09:36    6    **Q.**   Let me ask you about that bit by bit.  You said he said to

09:36    7    you that he had a gun he could put on the scene?

09:36    8    **A.**   Yes.

09:36    9    **Q.**   What does that mean?

09:36   10    **A.**   That he was going to plant a gun on the scene to make it

09:36   11    look as though the people that had been shot were armed.

09:36   12    **Q.**   When he said that to you, what was your response?

09:36   13    **A.**   I asked him if the gun was clean.

09:36   14    **Q.**   What does that mean?

09:36   15    **A.**   Could it be traced back to him or anyone else or any other

09:36   16    crime scene.

09:36   17    **Q.**   Why did you ask him whether the gun was clean?

09:36   18    **A.**   Because it would be problematic if you planted -- had he

09:36   19    planted a gun on the scene that could be linked back to him,

09:36   20    had he run it through any one of the police databases or

09:37   21    anything like that, there would be a record of it and it could

09:37   22    be traced back to him, or anyone else that ran it through the

09:37   23    databases, and it would be problematic and cause problems.

09:37   24    **Q.**   When you were having this conversation with him, did you

09:37   25    actually see him with a gun?

MICHAEL LOHMAN - Direct

09:37  1   **A.**   No.

09:37  2   **Q.**   Did you know whether he had it with him that day?

09:37  3   **A.**   No, I didn't.

09:37  4   **Q.**   So you were just talking about a gun --

09:37  5   **A.**   Yes.

09:37  6   **Q.**   -- that he said he had?

09:37  7   **A.**   Yes.

09:37  8   **Q.**   All right.  You said you asked him whether it was clean

09:37  9   and then what else did you all say in the conversation?

09:37  10  **A.**   He told me it was clean.  It couldn't be traced back to

09:37  11  him or anyone else.  And I told him if he was going to do it,

09:37  12  to do it, that he doesn't need to talk about it with anyone

09:37  13  else or involve anyone else in it.

09:37  14  **Q.**   What does that mean?

09:37  15  **A.**   Just that, that no one else had to have knowledge of this

09:37  16  and no one else had to be involved in it.  Because the more

09:37  17  people you tell about it or the more people you involved, the

09:37  18  more problems you're going to have.

09:37  19  **Q.**   And while we're on the topic of the gun, let me jump back

09:37  20  to that conversation that you had with Defendant Bowen when he

09:38  21  said, "How about this," and talked about kicking the guns.

09:38  22  When he was telling you that story, did anybody go back to see

09:38  23  if there were guns under the bridge to pick up?

09:38  24  **A.**   No, not to my knowledge.

09:38  25  **Q.**   Did you go back to go pick up guns?

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 09:38 | 1 | **A.**   No, I didn't. |
| 09:38 | 2 | **Q.**   Why not? |
| 09:38 | 3 | **A.**   I knew there was no gun under the bridge. |
| 09:38 | 4 | **Q.**   Tell us about the conversation that you started to tell us |
| 09:38 | 5 | about that you had with Defendant Faulcon. |
| 09:38 | 6 | **A.**   When I first got on the west side of the bridge, I had a |
| 09:38 | 7 | conversation with him about what had happened and it was pretty |
| 09:38 | 8 | general, like I said.  It was that he had chased a guy across |
| 09:38 | 9 | the bridge, as the guy turned into the entrance of the hotel, |
| 09:38 | 10 | he reached into his waistband, he believed he had a gun and he |
| 09:38 | 11 | fired one shot at him, striking him. |
| 09:38 | 12 |         He appeared to be uncertain about what had really |
| 09:39 | 13 | happened.  And at that point, I really didn't have any further |
| 09:39 | 14 | conversation with him.  Later on, I came back and I had another |
| 09:39 | 15 | conversation where he reiterated what he had just told me.  And |
| 09:39 | 16 | I asked him some more questions about what had happened. |
| 09:39 | 17 |         I asked him if this was the same guy that he saw |
| 09:39 | 18 | shooting the gun on the east side of the bridge.  He told me |
| 09:39 | 19 | that it was.  I asked him if it was the same guy he chased over |
| 09:39 | 20 | the bridge while the guy was armed with the gun and firing at |
| 09:39 | 21 | him.  He said that he was -- that it was.  I asked him is |
| 09:39 | 22 | this -- is this what led you to believe that he would still |
| 09:39 | 23 | have a gun when he turned into the hotel and reached into his |
| 09:39 | 24 | waistband, and he indicated that it was. |
| 09:39 | 25 | **Q.**   What were you doing in that conversation? |

MICHAEL LOHMAN - Direct

09:39  1   **A.**   I guess I was asking leading questions to ensure that his
09:39  2   actions were going to be justified.
09:39  3   **Q.**   What do you mean by that?
09:39  4   **A.**   That it was going to be a legal shooting, a good shooting.
09:39  5   **Q.**   When you say you were asking him leading questions to make
09:39  6   sure it was going to be justified, what was your intent?  What
09:39  7   were you trying to do there?
09:40  8   **A.**   Make sure that it was justifiable -- justifiable and that
09:40  9   it wasn't going to cause him any problems.
09:40  10  **Q.**   Did you think you were asking him for the truth?
09:40  11  **A.**   No.  I didn't -- no, I didn't.
09:40  12  **Q.**   In a case like this where police shoot people and you have
09:40  13  injured and dead people on the ground, who would normally
09:40  14  process that scene and collect evidence?
09:40  15        **MR. DESALVO:**  I object Your Honor.  I don't know if
09:40  16  he's qualified to answer that question.  She's not laid the
09:40  17  proper foundation.
09:40  18        **MS. BERNSTEIN:**  I can ask a few more questions.
09:40  19        **THE COURT:**  I think she's already asked some
09:40  20  predicate questions, but go ahead.
09:40  21        **MS. BERNSTEIN:**  I can ask a few more questions, Your
09:40  22  Honor.
09:40  23        **THE COURT:**  Go ahead.
09:40  24  **BY MS. BERNSTEIN:**
09:40  25  **Q.**   How long did you work for NOPD?

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 09:40 | 1 | **A.** 21 years.  At that time, 17 years. |
| 09:40 | 2 | **Q.** Were you familiar with crime scenes and in your 17 years |
| 09:40 | 3 | with NOPD? |
| 09:40 | 4 | **A.** Yes, I was. |
| 09:40 | 5 | **Q.** Were you familiar with how crime scenes were generally |
| 09:41 | 6 | processed? |
| 09:41 | 7 | **A.** Yes. |
| 09:41 | 8 | **Q.** In a crime scene like this, who would normally process the |
| 09:41 | 9 | scene and collect evidence? |
| 09:41 | 10 | **A.** The crime lab would process the scene and collect evidence |
| 09:41 | 11 | at the direction of the investigating officer or detective. |
| 09:41 | 12 | **Q.** What's the crime lab? |
| 09:41 | 13 | **A.** The crime lab is a unit set up to collect evidence on |
| 09:41 | 14 | crime scenes.  They do things such as photograph, draw |
| 09:41 | 15 | sketches, collect fingerprints, and anything else that the |
| 09:41 | 16 | investigating officer or detective would direct them to do |
| 09:41 | 17 | pertaining to that scene in the collection of evidence. |
| 09:41 | 18 | **Q.** Is that a unit that's part of a district or is that |
| 09:41 | 19 | another centralized unit? |
| 09:41 | 20 | **A.** It's a separate, centralized unit. |
| 09:41 | 21 | **Q.** Did you learn on September 4th, whether crime scene was |
| 09:41 | 22 | going to come process this scene? |
| 09:41 | 23 | **A.** Yes.  I had also requested crime scene the same time I |
| 09:41 | 24 | requested homicide and I was told they weren't available and |
| 09:41 | 25 | they weren't going to respond to the scene. |

MICHAEL LOHMAN - Direct

09:41  1  Q.   When crime scene can't come to a scene, who's responsible
09:41  2  for processing the evidence?
09:41  3  A.   The investigating officer or detective.
09:41  4  Q.   Who was the investigating officer on the Danziger case?
09:41  5  A.   In this case it would have been Sergeant Kaufman.
09:42  6  Q.   And you said Sergeant Kaufman had detectives who worked
09:42  7  for him?
09:42  8  A.   Yes.
09:42  9  Q.   Tell us what processing this scene would involve, the
09:42  10  Danziger case?
09:42  11  A.   Ordinarily?
09:42  12  Q.   Uh-huh.
09:42  13  A.   Sketches, photographs, positioning and measurements of
09:42  14  evidence on the scene.
09:42  15  Q.   What kind of evidence was on the scene?
09:42  16  A.   Casings.
09:42  17  Q.   What are casings?
09:42  18  A.   Casings -- a casing would house a bullet projectile.  It
09:42  19  houses the gun powder and the primer and the projectile is in
09:42  20  the end of the casing.  And when the firing pin on the gun hits
09:42  21  the primer, it shoots out the projectile, or the bullet.  If
09:42  22  it's in an automatic weapon or a semi-automatic weapon, the
09:42  23  casing would then be ejected from gun onto the ground.
09:43  24  Q.   With an assault rifle is a casing ejected?
09:43  25  A.   Yes, it is.

MICHAEL LOHMAN - Direct

09:43  1    **Q.**   What kind of handguns did NOPD issue?

09:43  2    **A.**   Glocks, semi-automatics.

09:43  3    **Q.**   Does a Glock kick out a casing?

09:43  4    **A.**   Yes, it does.

09:43  5    **Q.**   How about a pump-action shotgun?

09:43  6    **A.**   Yes.  That would have to be manually -- the casing would

09:43  7    have to be manually ejected, but it does kick out the casing.

09:43  8    **Q.**   When you were on the scene that day at the Danziger

09:43  9    Bridge, did you see casings around?

09:43  10   **A.**   Yes, I did.

09:43  11   **Q.**   All right.  So when you were saying what would normally be

09:43  12   done to process a scene, you mentioned evidence.  What would

09:43  13   you do -- what should be done with those casings?

09:43  14   **A.**   They should be collected.

09:43  15   **Q.**   Even if crime scene can't get there?

09:43  16   **A.**   Yes.

09:43  17   **Q.**   How do you -- how big is a casing?

09:43  18   **A.**   Maybe that big.  Different calibers have different size

09:43  19   casings.  I mean, the biggest ones out there were probably that

09:43  20   big.

09:43  21   **Q.**   So for the record, you're showing a few inches?

09:43  22   **A.**   Yeah, a few inches.  Maybe three inches -- two and a half,

09:43  23   three inches.

09:43  24   **Q.**   If you don't have crime scene out there, how do you pick

09:44  25   up casings?

MICHAEL LOHMAN - Direct

09:44  1   A.   The investigating officers or detectives could collect
09:44  2   them up and package them the best that they could with what was
09:44  3   available to us, whether it be a bag, or a container, or
09:44  4   something of that nature.
09:44  5   Q.   Was this crime scene processed at all?
09:44  6   A.   No, it was not.
09:44  7   Q.   And you said the guy who would be in charge was
09:44  8   Defendant Kaufman?
09:44  9   A.   He would be in charge of the -- direction -- directing the
09:44  10  crime scene, evidence collection, and things like that, yes.
09:44  11  Q.   Did you have any conversation with him about picking up
09:44  12  evidence?
09:44  13  A.   Yes.
09:44  14  Q.   What conversation did you have?
09:44  15  A.   During the course of the conversation, he said that, look,
09:44  16  he's just -- "We're just not going to collect anything because
09:44  17  we'll write it off on Katrina since crime lab wasn't
09:44  18  available," and I went along with it.  I agreed to it.
09:44  19  Q.   So he specifically said that they were not going to pick
09:44  20  up any evidence?
09:44  21  A.   Yes.
09:44  22  Q.   Why?
09:44  23  A.   Because of Katrina and crime lab wasn't available.
09:44  24  Q.   And you said he said, "We can write it off on Katrina"?
09:44  25  A.   Yes.

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 09:45 | 1 | **Q.**   While you were out there on the bridge that day, did you |
| 09:45 | 2 | have any civilians who had been taken into police custody? |
| 09:45 | 3 | **A.**   Yes. |
| 09:45 | 4 | **Q.**   Who did you see? |
| 09:45 | 5 | **A.**   I saw a juvenile on the east side of the bridge, Leonard |
| 09:45 | 6 | Bartholomew, Jr.; and on the west side of the bridge, there was |
| 09:45 | 7 | a black male, maybe 40-ish, attired in black clothing. |
| 09:45 | 8 | **Q.**   The black male you saw in black clothing, did you learn |
| 09:45 | 9 | who he was? |
| 09:45 | 10 | **A.**   I think that day I probably knew who his name was, but I |
| 09:45 | 11 | know his identification was lost and it was never documented in |
| 09:45 | 12 | the police report. |
| 09:45 | 13 | **Q.**   Where was this guy that you saw you're talking about? |
| 09:45 | 14 | **A.**   He was located on the west side in front of the Friendly |
| 09:45 | 15 | Inn motel. |
| 09:45 | 16 | **Q.**   Where was he when you saw him? |
| 09:45 | 17 | **A.**   In a prone position, handcuffed on the ground. |
| 09:45 | 18 | **Q.**   I want to come back to him in just a minute.  You |
| 09:45 | 19 | mentioned a juvenile taken into custody on the east side, this |
| 09:46 | 20 | black male who was on the ground in front of the Friendly Inn. |
| 09:46 | 21 | **A.**   Yes. |
| 09:46 | 22 | **Q.**   Was there anybody else you saw in custody? |
| 09:46 | 23 | **A.**   Lance Madison. |
| 09:46 | 24 | **Q.**   Now, at the time did you know his name? |
| 09:46 | 25 | **A.**   I'm pretty -- I became aware of his name that day, yes, |

MICHAEL LOHMAN - Direct

09:46    1    probably while still on the scene.

09:46    2    Q.   Okay.  Where was Lance Madison when you first saw him?

09:46    3    A.   He was also in front of the Friendly Inn motel.  He had

09:46    4    been apprehended in the block by responding units and he was

09:46    5    handcuffed and on his knees in front of the motel.

09:46    6    Q.   Did you hear him make any statements?

09:46    7    A.   No, I did not.

09:46    8    Q.   Whose custody was he in when you saw him?

09:46    9    A.   I believe it was one -- a SWAT team member had custody of

09:46   10    him when I first saw him.  I don't know if it was from New

09:46   11    Orleans or state police.  They were both present.

09:46   12    Q.   All right.  I promised I was going to go back to the older

09:46   13    guy you saw lying in the street.  What did you learn about him?

09:46   14    A.   That no one could link him to the scene or say that he had

09:46   15    any involvement with anything going on and he was later

09:47   16    subsequently -- he was subsequently released.

09:47   17    Q.   And you said you don't know his name?

09:47   18    A.   No, I don't.

09:47   19    Q.   I want to show you a bunch of photographs.

09:48   20         MS. BERNSTEIN:  May I approach, Your Honor?

09:48   21         THE COURT:  Yes.

09:48   22    BY MS. BERNSTEIN:

09:48   23    Q.   I'm going to ask you just to flip through those

09:48   24    photographs and take a look.

09:49   25         MS. BERNSTEIN:  Your Honor, I think we have no

MICHAEL LOHMAN - Direct

09:49   1   objection to any of these photographs, in which case I'd just

09:49   2   like to offer them into evidence.

09:49   3          THE COURT:  One second.  First of all, counsel,

09:49   4   having reviewed them, is that correct, there's no objection to

09:49   5   these?

09:49   6          MR. FLEMING:  That is correct, Your Honor.

09:49   7          THE COURT:  Okay.  Now, Ms. Bernstein, can we get

09:49   8   numbers on these before we start showing them.

09:49   9          MS. BERNSTEIN:  Yes.

09:49   10  BY MS. BERNSTEIN:

09:49   11  Q.   Mr. Lohman, can you do me a favor and flip through and

09:49   12  read the exhibit number on each one of those photographs you

09:49   13  have in front of you?

09:49   14  A.   Exhibit 87, Exhibit 79, Exhibit 45, Exhibit 44,

09:49   15  Exhibit 43, Exhibit 40, Exhibit 96, and Exhibit 34.

09:50   16         THE COURT:  Okay.  We're going to go through these.

09:50   17  We'll go ahead and admit those into the record.

09:50   18         MS. BERNSTEIN:  Thank you, Your Honor.

09:50   19             Could I have up Exhibit 43, please?

09:50   20  BY MS. BERNSTEIN:

09:50   21  Q.   Mr. Lohman, can you tell us what that's a picture of?

09:50   22  A.   That's a photograph of the Crystal Palace, the reception

09:50   23  hall, which we set up our temporary headquarters in.  That's a

09:50   24  photograph from the front of it, from, like -- from the Chef

09:50   25  Menteur Highway street side of it.

MICHAEL LOHMAN - Direct

09:50  1   Q.   Can you just sort of draw on the scene where Chef Menteur
09:50  2   Highway would run?
09:50  3   A.   Chef would be back this way and run -- run in front of it
09:50  4   like this.
09:51  5   Q.   Okay.  And there's a truck in here in the picture.  What's
09:51  6   that?
09:51  7   A.   A postal truck.
09:51  8   Q.   All right.  Is that another one back here?
09:51  9   A.   Yes, it is.
09:51  10  Q.   Are those some of the trucks that you all were using after
09:51  11  the storm?
09:51  12  A.   Yes, they are.
09:51  13        MS. BERNSTEIN:  May I have Exhibit 45, please?
09:51  14  BY MS. BERNSTEIN:
09:51  15  Q.   What's that's a picture of?
09:51  16  A.   A photograph of the interior of the Crystal Palace
09:51  17  Reception Hall.  That's one of the tables that were set up
09:51  18  inside, and that's officers that were working out of the
09:51  19  Crystal Palace at that time.
09:51  20  Q.   So these are 7th District officers?
09:51  21  A.   Most of them appear to be, yes.
09:51  22  Q.   All right.  Let me actually ask you a question about that,
09:51  23  because we talked about how the 7th District set up a temporary
09:51  24  police station at the Crystal Palace.  Were there officers who
09:51  25  were not with the 7th District who were also stationed at the

MICHAEL LOHMAN - Direct

09:51    1    Crystal Palace with you?

09:51    2    A.    Yes.

09:51    3    Q.    How did that happen?

09:51    4    A.    Some of them had been flooded in at their homes.  And when

09:52    5    they were able to get away from their home, when they were able

09:52    6    to get a boat to Chef Menteur Highway, they couldn't get to

09:52    7    their place of assignment, so they came to the Crystal Palace

09:52    8    and worked out of the Seventh District at the time.

09:52    9    Q.    Do you see anybody in the courtroom today who fits that

09:52   10    description?

09:52   11    A.    Yes, Officer Villavaso.

09:52   12    Q.    Where did he normally work?

09:52   13    A.    He was assigned to the 5th District at the time.

09:52   14    Q.    Now, during the time after the storm, he was with you all

09:52   15    at the Crystal Palace?

09:52   16    A.    Yes, he was.

09:52   17          MS. BERNSTEIN:  May I have Exhibit 44, please?

09:52   18    BY MS. BERNSTEIN:

09:52   19    Q.    Where's this picture taken?

09:52   20    A.    It's taken in the parking lot of the Crystal Palace also.

09:52   21    Q.    Are these 7th District officers?

09:52   22    A.    Yes.

09:52   23    Q.    And there are a bunch of trucks -- different vehicles in

09:52   24    the back of that picture.  What are those vehicles?

09:52   25    A.    It appears to be postal trucks, and it looks like there

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 09:52 | 1 | might be an RTA bus in the back over here. |
| 09:52 | 2 | **Q.**   What's an RTA bus? |
| 09:52 | 3 | **A.**   Regional Transit Authority. |
| 09:53 | 4 |        **MS. BERNSTEIN:**  May I have photo 87, please? |
| 09:53 | 5 | **BY MS. BERNSTEIN:** |
| 09:53 | 6 | **Q.**   First of all, do you know who that picture -- that person |
| 09:53 | 7 | is in the picture? |
| 09:53 | 8 | **A.**   No, I'm not sure who it is. |
| 09:53 | 9 | **Q.**   Okay.  So I want to focus on the vehicles in the back. |
| 09:53 | 10 | There's a mail truck and then behind it a Budget truck.  Are |
| 09:53 | 11 | you familiar with those trucks? |
| 09:53 | 12 | **A.**   Yes. |
| 09:53 | 13 | **Q.**   Can you tell us about them? |
| 09:53 | 14 | **A.**   The postal truck was one that we had used, and the Budget |
| 09:53 | 15 | truck was also used during the course of the -- that week at |
| 09:53 | 16 | the Crystal Palace.  It was used to transport people to the |
| 09:53 | 17 | Convention Center. |
| 09:53 | 18 | **Q.**   What vehicle was used on September 4th to transport the |
| 09:53 | 19 | officers out to the bridge? |
| 09:53 | 20 | **A.**   A Budget rental truck. |
| 09:54 | 21 |        **MS. BERNSTEIN:**  May I have photo 40, please? |
| 09:54 | 22 | **BY MS. BERNSTEIN:** |
| 09:54 | 23 | **Q.**   What's that a picture of? |
| 09:54 | 24 | **A.**   Sergeant Kaufman standing over the male subject that I |
| 09:54 | 25 | described to you earlier that I had seen on the scene. |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 09:54 | 1 | **Q.**   That's the guy you said was released? |
| 09:54 | 2 | **A.**   Yes. |
| 09:54 | 3 | **Q.**   And you don't know his name; correct? |
| 09:54 | 4 | **A.**   No, I don't. |
| 09:54 | 5 |         **MS. BERNSTEIN:**  May I have Exhibit 96, please? |
| 09:54 | 6 | **BY MS. BERNSTEIN:** |
| 09:54 | 7 | **Q.**   What's that a photo of? |
| 09:54 | 8 | **A.**   A photo of Lance Madison after he was taken into custody. |
| 09:54 | 9 | **Q.**   Where is he in that picture? |
| 09:54 | 10 | **A.**   He's on his knees in front of the Friendly Inn motel. |
| 09:54 | 11 | **Q.**   Is the Friendly Inn motel the motel where you said the guy |
| 09:54 | 12 | was lying dead? |
| 09:54 | 13 | **A.**   Yes. |
| 09:54 | 14 | **Q.**   Do you recognize any of the officers in that photograph? |
| 09:55 | 15 | **A.**   Yes.  That's Mike Hunter right there; Rob Gisevius right |
| 09:55 | 16 | there; and I'm not positive, but that may be the back of Robert |
| 09:55 | 17 | Faulcon. |
| 09:55 | 18 | **Q.**   Okay.  And for the record, the officer you identified as |
| 09:55 | 19 | Mike Hunter is the one in the baby blue shirt on the right? |
| 09:55 | 20 | **A.**   Yes. |
| 09:55 | 21 | **Q.**   The one you identified as Rob Gisevius is in a black |
| 09:55 | 22 | short-sleeved shirt and it looks like a green hat on the left; |
| 09:55 | 23 | correct? |
| 09:55 | 24 | **A.**   Yes. |
| 09:55 | 25 | **Q.**   And the one you identified as possibly Officer Faulcon; is |

MICHAEL LOHMAN - Direct

09:55  1   that right?

09:55  2   A.   Yes.

09:55  3   Q.   Is the guy with his back to us on the right in an Eagle's

09:55  4   cap?

09:55  5   A.   Yes.

09:55  6        MS. BERNSTEIN:   May I have Exhibit 34, please?

09:55  7   BY MS. BERNSTEIN:

09:55  8   Q.   What's that a picture of?

09:55  9   A.   The entrance of the parking lot to the Friendly Inn motel.

09:56  10  Q.   So when you talk about the entrance to the motel, this is

09:56  11  what you're talking about?

09:56  12  A.   Yes.

09:56  13  Q.   So it's an overhang that goes into what, is that a

09:56  14  courtyard or a parking lot?

09:56  15  A.   Parking lot.

09:56  16  Q.   Can you show us on this photograph approximately where the

09:56  17  guy who was lying on the ground was lying?

09:56  18  A.   It would have been somewhere up in here.

09:56  19  Q.   Do you now know the name of that guy who was lying on the

09:56  20  ground?

09:56  21  A.   Yes.

09:56  22  Q.   What's his name?

09:56  23  A.   Ronald Madison.

09:56  24  Q.   You said that you knew on the scene that day that the man

09:56  25  we just saw a picture of was Lance Madison.  Did you know on

MICHAEL LOHMAN - Direct

09:56  1   the scene that day what their relationship was?

09:56  2   A.   I don't -- later on that day I was probably aware of what

09:56  3   the relationship was.   Right there on the scene, I don't

09:56  4   believe I was aware of it.

09:56  5   Q.   And I think you said when you saw Ronald Madison lying on

09:56  6   the ground, you saw vehicles around him; correct?

09:56  7   A.   Yes.

09:56  8        MS. BERNSTEIN:   May I have Exhibit 79, please?

09:57  9   BY MS. BERNSTEIN:

09:57  10  Q.   What's that a photograph of?

09:57  11  A.   A photograph of Ronald Madison and the vehicles.

09:57  12  Q.   Those vehicles in the photograph are the ones that you saw

09:57  13  there that day?

09:57  14  A.   Yes.

09:57  15       MS. BERNSTEIN:   May I have Exhibit 31, please?

09:57  16  BY MS. BERNSTEIN:

09:57  17  Q.   What's that a photograph of?

09:57  18  A.   It's a photograph of the Danziger Bridge and the

09:58  19  pedestrian walkway that runs along the side of it.

09:58  20  Q.   Is that the east side of the bridge or the west?

09:58  21  A.   This would be the east side.

09:58  22  Q.   So this is the side you first came up to that day?

09:58  23  A.   Yes.

09:58  24  Q.   Do you see in this photograph where those injured

09:58  25  civilians were?

MICHAEL LOHMAN - Direct

09:58  1   **A.**   Yes.

09:58  2   **Q.**   Where were they?

09:58  3   **A.**   I believe they would have been somewhere up in here.

09:58  4   **Q.**   So in the walkway in that photograph?

09:58  5   **A.**   Yes.

09:58  6   **Q.**   You mentioned earlier --

09:58  7        **MS. BERNSTEIN:**  Thank you, Mr. Harrell.

09:58  8   **BY MS. BERNSTEIN:**

09:58  9   **Q.**   You mentioned earlier that you were on the scene that day,

09:58  10  you estimated a couple hours; right?

09:58  11  **A.**   Yes.

09:58  12  **Q.**   When you left, where did you go?

09:58  13  **A.**   Back to the Crystal Palace.

09:58  14  **Q.**   When you were back at the Crystal Palace, did you see any

09:58  15  of the officers who had been involved in the shooting out at

09:58  16  the bridge?

09:58  17  **A.**   Yes.

09:58  18  **Q.**   Where were they when you saw them?

09:59  19  **A.**   Assembled around a table inside of the Crystal Palace.

09:59  20  **Q.**   Do you know who had assembled them there?

09:59  21  **A.**   It was my understanding that Kaufman had.

09:59  22  **Q.**   So you didn't call them all together?

09:59  23  **A.**   No.

09:59  24  **Q.**   What was that table like that they were sitting around?

09:59  25  **A.**   It was a round table, a round table that you would see in

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 09:59 | 1 | a reception hall. |
| 09:59 | 2 | **Q.**   Was it like the table we just saw in that photograph? |
| 09:59 | 3 | **A.**   Yes. |
| 09:59 | 4 | **Q.**   What happened when everybody was gathered around the |
| 09:59 | 5 | table? |
| 09:59 | 6 | **A.**   While they were gathered around the table, it was |
| 09:59 | 7 | determined that we were going to sit down and talk to them, let |
| 09:59 | 8 | them know what was going on with the investigation and who was |
| 09:59 | 9 | going to be handling it.  That's what I did.  I had a seat at |
| 09:59 | 10 | the round table with them.  All of the officers were present, |
| 09:59 | 11 | along with Sergeant Bowen, Gisevius, and Kaufman, and myself. |
| 09:59 | 12 | **Q.**   Let me stop you there.  You said all of the officers were |
| 09:59 | 13 | present.  What was your understanding of what this group of |
| 09:59 | 14 | officers was? |
| 09:59 | 15 | **A.**   It was my understanding that these were the officers who |
| 10:00 | 16 | were involved in the incident and who had fired their |
| 10:00 | 17 | weapons -- or who had been involved in the shooting. |
| 10:00 | 18 | **Q.**   Okay.  And you said these people were all gathered at a |
| 10:00 | 19 | round table and you went over to that table; correct? |
| 10:00 | 20 | **A.**   Yes. |
| 10:00 | 21 | **Q.**   Were there other people invited to this gathering as well |
| 10:00 | 22 | or were you all separated from the rest of the folks there? |
| 10:00 | 23 | **A.**   It was just us.  No one else was there.  There were other |
| 10:00 | 24 | people in the reception hall, but no one else was at the table. |
| 10:00 | 25 | **Q.**   Was there anybody else in the general area right around |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:00 | 1 | the table? |
| 10:00 | 2 | A.  I don't think in close proximity, but there were other |
| 10:00 | 3 | people in the reception hall in the building, yes. |
| 10:00 | 4 | Q.  All right.  So tell us what happened. |
| 10:00 | 5 | A.  After I had a seat at the round table, I instruct- -- I |
| 10:00 | 6 | told everyone that Sergeant Kaufman was going to be handling |
| 10:00 | 7 | the investigation, that homicide wasn't coming out, so it was |
| 10:00 | 8 | going to be handled internally by Kaufman.  And that everything |
| 10:00 | 9 | was going to be okay, that everything was going to be fine. |
| 10:00 | 10 | Q.  What did you mean when you said, "Everything's going to be |
| 10:01 | 11 | okay.  Everything's going to be fine"? |
| 10:01 | 12 | A.  Just that there weren't going to be any problems. |
| 10:01 | 13 | Q.  What do you mean by that? |
| 10:01 | 14 | A.  It was going to be justifiable. |
| 10:01 | 15 | Q.  What happened next? |
| 10:01 | 16 | A.  We started talking and I asked who had fired their -- I |
| 10:01 | 17 | started with Hunter and asked him how many times he had fired |
| 10:01 | 18 | his weapon.  And his response was something like, "Numerous |
| 10:01 | 19 | times."  At this time I stopped the meeting.  I said, "Hold on. |
| 10:01 | 20 | Let's stop for a minute."  And I went outside with Kaufman, |
| 10:01 | 21 | Bowen, and Gisevius and we had a conversation outside. |
| 10:01 | 22 | Q.  Why did you stop the conversation and go outside with the |
| 10:01 | 23 | supervisors? |
| 10:01 | 24 | A.  Because I didn't think it was a good idea to sit there and |
| 10:01 | 25 | talk about what had taken place in front of each other. |

MICHAEL LOHMAN - Direct

10:01    1    Ordinarily, in a legitimate investigation, you wouldn't
10:01    2    interview witnesses in front of each other.  And I didn't want
10:01    3    to be seated at a table speaking to each person about how many
10:01    4    times they had fired their weapon.
10:01    5            We went outside, myself, Bowen, Gisevius, and
10:01    6    Kaufman, and that's where we had a follow-up conversation.  And
10:01    7    the gist of that conversation was is that they needed to speak
10:02    8    to the officers, let them get their story straight, clear their
10:02    9    minds, clam down, and get their story straight, and then
10:02   10    determine what had happened and who had fired their weapons.
10:02   11    Q.   Now, can you explain why you were comfortable having that
10:02   12    conversation with Bowen, Kaufman, and Gisevius about getting
10:02   13    your story straight when you were not comfortable having that
10:02   14    conversation at the round table?
10:02   15    A.   Because they were the sergeants.  They were the
10:02   16    supervisors who I dealt with on a daily basis.  And I was
10:02   17    comfortable with them and trusted them and -- to have that
10:02   18    conversation.  I wasn't comfortable having that conversation in
10:02   19    front of all of the officers present.
10:02   20    Q.   Had you by that time already had expressed conversations
10:02   21    with those supervisors on the bridge?
10:02   22    A.   Those same supervisors, yes.
10:02   23    Q.   So that conversation you had with the supervisors when you
10:02   24    told them make sure they get their stories straight, did you
10:03   25    have any conversation with them at that point about evidence?

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:03 | 1 | **A.**    Yes. |
| 10:03 | 2 | **Q.**    What conversation did you have? |
| 10:03 | 3 | **A.**    We talked about the casings on the bridge and the amount |
| 10:03 | 4 | of casings.  And we even talked about going back and picking -- |
| 10:03 | 5 | about them going back and picking up the casings from the |
| 10:03 | 6 | bridge.  To my knowledge, it was never done. |
| 10:03 | 7 | **Q.**    Do you know whose suggestion it was for somebody maybe to |
| 10:03 | 8 | go back and pick up casings? |
| 10:03 | 9 | **A.**    Mine. |
| 10:03 | 10 | **Q.**    Do you know whether anybody did go back and pick up |
| 10:03 | 11 | casings? |
| 10:03 | 12 | **A.**    To my knowledge, no one went back and picked up casings, |
| 10:03 | 13 | no. |
| 10:03 | 14 | **Q.**    I want to jump ahead a little bit.  Over the next couple |
| 10:03 | 15 | weeks, did you know whether anybody was working on a report? |
| 10:03 | 16 | **A.**    Yes. |
| 10:03 | 17 | **Q.**    Who was working on a report? |
| 10:03 | 18 | **A.**    Kaufman, and he was assisted by Jeffrey Lehrmann. |
| 10:03 | 19 | **Q.**    Let me start with Kaufman.  How did you know that he was |
| 10:03 | 20 | working on a report? |
| 10:03 | 21 | **A.**    The case had been assigned to him and I had had -- I had |
| 10:03 | 22 | conversation -- daily conversations with him about working on |
| 10:04 | 23 | the report and writing the report.  And he had informed me that |
| 10:04 | 24 | he had gone and spoke to the victims at the hospital and stuff |
| 10:04 | 25 | like that. |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:04 | 1 | **Q.**   So he was giving you some updates? |
| 10:04 | 2 | **A.**   Yes. |
| 10:04 | 3 | **Q.**   Did you ever see him working on his report? |
| 10:04 | 4 | **A.**   I seen him at the computer typing, yes. |
| 10:04 | 5 | **Q.**   You mentioned that there was a guy named Lehrmann, I think |
| 10:04 | 6 | you said, who was working with him; is that right? |
| 10:04 | 7 | **A.**   Yes. |
| 10:04 | 8 | **Q.**   What's his first name? |
| 10:04 | 9 | **A.**   Jeff Lehrmann. |
| 10:04 | 10 | **Q.**   Tell us who Jeff Lehrmann is. |
| 10:04 | 11 | **A.**   He was a detective assigned to the homicide section.  He |
| 10:04 | 12 | worked for Archie Kaufman.  He had been in the 7th District a |
| 10:04 | 13 | few months.  He was a transfer from the Jefferson Parish |
| 10:04 | 14 | Sheriff's Department and he had prior police experience.  He |
| 10:04 | 15 | came to the district, did a little time on one of the platoons. |
| 10:04 | 16 | Kaufman had an opening in his unit and asked for him.  And I |
| 10:04 | 17 | allowed him to be transferred into the unit to work for |
| 10:04 | 18 | Kaufman. |
| 10:04 | 19 | **Q.**   What did you know about Kaufman's relationship with this |
| 10:04 | 20 | guy, Lehrmann? |
| 10:04 | 21 | **A.**   At that time I didn't know much about him; but once he got |
| 10:04 | 22 | into the unit, they seemed to hit it off pretty well and be |
| 10:04 | 23 | pretty friendly with each other. |
| 10:05 | 24 | **Q.**   All right.  So this guy Lehrmann was somebody who worked |
| 10:05 | 25 | directly for Kaufman? |

MICHAEL LOHMAN - Direct

| | | |
|--|--|--|
| 10:05 | 1 | **A.**   Yes, he was. |
| 10:05 | 2 | **Q.**   Before you saw them working together on the report, did |
| 10:05 | 3 | you ever have any conversation with Kaufman about Jeff |
| 10:05 | 4 | Lehrmann? |
| 10:05 | 5 | **A.**   Yes. |
| 10:05 | 6 | **Q.**   What conversation did you have with him? |
| 10:05 | 7 | **A.**   I had a conversation with Kaufman where I told him that he |
| 10:05 | 8 | didn't need to involve anyone in this that didn't need to be |
| 10:05 | 9 | involved, and that he needed to do the work himself.  He didn't |
| 10:05 | 10 | need to involve Lehrmann and have him writing a report, and |
| 10:05 | 11 | that Lehrmann didn't need to know what was going on in this |
| 10:05 | 12 | case. |
| 10:05 | 13 | **Q.**   So you specifically mentioned Jeff Lehrmann? |
| 10:05 | 14 | **A.**   Yes. |
| 10:05 | 15 | **Q.**   Did you mention all the other detectives who worked with |
| 10:05 | 16 | Kaufman? |
| 10:05 | 17 | **A.**   No. |
| 10:05 | 18 | **Q.**   What was your purpose in telling Kaufman, "Don't include |
| 10:05 | 19 | Jeff Lehrmann"? |
| 10:05 | 20 | **A.**   Because the case -- I assigned the case to Kaufman to |
| 10:05 | 21 | investigate, and he was supposed to be the investigator, and I |
| 10:05 | 22 | didn't want him to pawn it off on someone else to do his |
| 10:05 | 23 | legwork. |
| 10:05 | 24 |     In addition to that, I didn't want more people |
| 10:05 | 25 | knowing about what was going on in the case.  The more people |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:06 | 1 | that knew about it, the more problems -- the more potential for |
| 10:06 | 2 | problems were going to exist.  So I told him, "Don't involve |
| 10:06 | 3 | Lehrmann or have Lehrmann doing things that he don't need to |
| 10:06 | 4 | do." |
| 10:06 | 5 | Q.   And why Lehrmann?  Did you know that they were tight? |
| 10:06 | 6 | A.   I knew that they were pretty friendly and I knew that |
| 10:06 | 7 | Lehrmann was helping him out on the case. |
| 10:06 | 8 | Q.   What did Defendant Kaufman say when you told him that, |
| 10:06 | 9 | that he didn't need to include other people? |
| 10:06 | 10 | A.   That he wasn't.  I mean, that he was working on the case. |
| 10:06 | 11 | But I knew Lehrmann was assisting him.  He didn't ever go into |
| 10:06 | 12 | a big explanation or a big response to it, but it was -- he |
| 10:06 | 13 | pretty much agreed to it. |
| 10:06 | 14 | Q.   Did you ever see anybody else working on these reports |
| 10:06 | 15 | other than Kaufman -- let me start -- not these reports.  I |
| 10:06 | 16 | asked you whether you saw anybody working on a report. |
| 10:06 | 17 | A.   Yes. |
| 10:06 | 18 | Q.   Did you ever see anybody other than Kaufman and Jeff |
| 10:06 | 19 | Lehrmann working on a report? |
| 10:06 | 20 | A.   Yes.  At times I saw Ken Bowen and Rob Gisevius huddled |
| 10:06 | 21 | with Kaufman speaking to him around the computer, and I saw |
| 10:07 | 22 | them speaking to other officers who were involved. |
| 10:07 | 23 | Q.   At some point did you get a report submitted to you? |
| 10:07 | 24 | A.   Yes, I did. |
| 10:07 | 25 | Q.   From whom? |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:07 | 1 | **A.** Kaufman. |
| 10:07 | 2 | **Q.** How long was that report? |
| 10:07 | 3 | **A.** 32 pages. |
| 10:07 | 4 | **Q.** Did you read it? |
| 10:07 | 5 | **A.** Yes, I did. |
| 10:07 | 6 | **Q.** What was your reaction? |
| 10:07 | 7 | **A.** Frustration.  It was -- it was a horrible report. |
| 10:07 | 8 | **Q.** Why was it a horrible report? |
| 10:07 | 9 | **A.** It justified the police shooting, but it was full of holes |
| 10:07 | 10 | and inconsistencies, and it -- although he cleared the police |
| 10:07 | 11 | officers, it really didn't justify their actions. |
| 10:07 | 12 | **Q.** What do you mean when you say it was full of holes and |
| 10:07 | 13 | inconsistencies? |
| 10:07 | 14 | **A.** It didn't make any sense.  It didn't justify any of their |
| 10:07 | 15 | actions.  It wasn't logical. |
| 10:07 | 16 | **Q.** Do you remember off the top of your head any of the things |
| 10:07 | 17 | that struck you as problematic? |
| 10:07 | 18 | **A.** They couldn't identify who had what weapon or who was |
| 10:07 | 19 | actually armed with a weapon.  It really didn't provide any |
| 10:08 | 20 | details about anything.  Basically, it was a general summary |
| 10:08 | 21 | of:  The police arrived on the scene -- responded to the scene |
| 10:08 | 22 | of a 108.  Upon arrival, they encountered gunfire and they |
| 10:08 | 23 | returned gunfire. |
| 10:08 | 24 | That's basically what it said.  It provided no |
| 10:08 | 25 | details. |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:08 | 1 | **Q.**   What did you do after you reviewed that 32-page report? |
| 10:08 | 2 | **A.**   I read it.  I took notes on it.  I wrote on the report and |
| 10:08 | 3 | I returned it to Kaufman.  We had some conversation about -- |
| 10:08 | 4 | about correcting some things and clarifying some things in the |
| 10:08 | 5 | report.  And it was returned to him for corrections. |
| 10:08 | 6 | **Q.**   What do you mean when you say, "correcting some things and |
| 10:08 | 7 | clarifying some things"? |
| 10:08 | 8 | **A.**   Clarifying things, adding details, and things like that. |
| 10:08 | 9 | **Q.**   Making this report more accurate? |
| 10:08 | 10 | **A.**   Making it more believable. |
| 10:09 | 11 | **Q.**   What happened next? |
| 10:09 | 12 | **A.**   Sometime later, maybe a couple of weeks later, a second |
| 10:09 | 13 | report was submitted, a 46-page report was submitted to me. |
| 10:09 | 14 | **Q.**   Who submitted that report to you? |
| 10:09 | 15 | **A.**   Kaufman. |
| 10:09 | 16 | **Q.**   Okay. |
| 10:09 | 17 | **A.**   It contained -- some changes had been made to the report; |
| 10:09 | 18 | but once I started reading it, once again, it was horrible.  It |
| 10:09 | 19 | didn't provide any details or justify any of the officers' |
| 10:09 | 20 | actions.  Although it cleared them of the shooting -- in the |
| 10:09 | 21 | shooting, it didn't justify their actions or what they did. |
| 10:09 | 22 | **Q.**   So this 46-page report you're talking about, you said |
| 10:09 | 23 | Defendant Kaufman submitted it to you; correct? |
| 10:09 | 24 | **A.**   Yes. |
| 10:09 | 25 | **Q.**   How did he submit it to you? |

MICHAEL LOHMAN - Direct

10:09   1   A.   It was printed and, I mean, he presented it to me.  He
10:09   2   handed it to me.
10:09   3   Q.   So from his hand to your hand, the 46-page report?
10:09   4   A.   Yes.
10:09   5   Q.   All right.  You said you read it and you had issues with
10:09   6   that report too?
10:09   7   A.   Yes, I did.
10:09   8   Q.   What did you do?
10:09   9   A.   I began taking notes on it, writing things on it, and I
10:10  10   became frustrated with it at the -- how poor it was written,
10:10  11   and I authored a 17-page report.
10:10  12   Q.   Tell us about how you went about authoring this report.
10:10  13   Did you just start from scratch?
10:10  14   A.   No.  I typed over what was already written on the
10:10  15   computer.  I typed over a good portion of that and I added and
10:10  16   excluded information in consultation with Kaufman, Gisevius,
10:10  17   and Bowen.  During the course of authoring the report, I spoke
10:10  18   with them about how things happened and what role each officer
10:10  19   or individual played.
10:10  20   Q.   Was that just one conversation you had with them?
10:10  21   A.   No, it was more than one conversation.
10:10  22   Q.   Tell us how that worked.  You said you wrote this report
10:10  23   in consultation with them.  What do you mean?
10:10  24   A.   As I was writing the report, on different expects of the
10:10  25   report or in different areas of the report, they would sit down

MICHAEL LOHMAN - Direct

| 10:10 | 1 | with me and we would consult with each other on how to write |
|---|---|---|

10:10    1    with me and we would consult with each other on how to write

10:10    2    the report.  I would make suggestions or they would make

10:10    3    suggestions and we would go along writing the report that way.

10:11    4    Q.    So you said this one that you worked on was the 17-page

10:11    5    report?

10:11    6    A.    Yes, it was.

10:11    7    Q.    What happened with that?

10:11    8    A.    Once it was completed and they agreed with everything that

10:11    9    was contained in the report, I had another conversation with

10:11   10    Kaufman where I told him that he needed to get with each one of

10:11   11    the officers involved and make sure that they were okay with

10:11   12    everything that had taken place in the report.  He assured me

10:11   13    that he would do so.  Some --

10:11   14    Q.    Let me stop you there for one second.  This 17-page

10:11   15    report, was that a true and accurate report?

10:11   16    A.    No, it wasn't.

10:11   17    Q.    Was it an attempt at a true and accurate report?

10:11   18    A.    No, it wasn't.

10:11   19    Q.    So you said you told them -- well, you gave it to Kaufman

10:11   20    and told him to make sure everybody was okay with it; correct?

10:11   21    A.    Yes.

10:11   22    Q.    Then what happened?

10:11   23    A.    Sometime later, maybe a few days later, he came to me and

10:11   24    he said that he had spoke with everyone involved who was

10:11   25    contained in the report and they were okay with what had

MICHAEL LOHMAN - Direct

10:12   1   happened.  They were all okay with what their role was in the
10:12   2   report.  At that point, I signed off on the report and gave it
10:12   3   to him to submit.
10:12   4   Q.   All right.
10:12   5           MS. BERNSTEIN:  Excuse me one minute.
10:12   6           THE COURT:  Ms. Bernstein, I'm going to ask you:  How
10:12   7   much longer have you got on your direct?  We would like to take
10:12   8   our mid-morning break, but if you're fairly close to finishing,
10:12   9   we could continue.
10:12   10           MS. BERNSTEIN:  I've got a long while left.  This
10:12   11   would be a perfect time to break.
10:12   12           THE COURT:  Okay.  Why don't we go ahead and do that.
10:12   13   If you all can be ready at 10:25, which is about 15 minutes
10:12   14   from now, we'll pick up then.
10:12   15           THE DEPUTY CLERK:  All rise.
10:12   16           (WHEREUPON, the jury exited the courtroom.)
10:26   17           THE DEPUTY CLERK:  All rise.
10:26   18           (WHEREUPON, the jury entered the courtroom.)
10:26   19           THE COURT:  All right.  You may be seated.  We're
10:26   20   going to go ahead and work up to the lunch hour here.
10:26   21           Mr. Lohman, you're still under oath.
10:26   22           Ms. Bernstein, if you'd like to continue your
10:26   23   questioning, you may do so.
10:26   24           MS. BERNSTEIN:  Thank you, Your Honor.
10:27   25           Mr. Harrell, may we have Exhibit 47 up, please?

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:27 | 1 | **BY MS. BERNSTEIN:** |
| 10:27 | 2 | **Q.**   Before we jump back to the discussion about the reports |
| 10:27 | 3 | where we left off, Mr. Lohman, do you recognize this |
| 10:27 | 4 | photograph? |
| 10:27 | 5 | **A.**   Yes.  It's a photograph of the Danziger Bridge on the -- |
| 10:27 | 6 | do you want me to mark it? |
| 10:27 | 7 | **Q.**   Sure.  If that's helpful for you. |
| 10:27 | 8 | **A.**   This is the Danziger Bridge right here. |
| 10:27 | 9 | **Q.**   Okay.  Thanks.  I'm going to take that away now. |
| 10:27 | 10 | What's the bridge -- what's the bridge on the bottom |
| 10:27 | 11 | of this photograph? |
| 10:27 | 12 | **A.**   This would be the I-10 high rise. |
| 10:27 | 13 | **Q.**   And can you just tell us, to make sure we're all oriented, |
| 10:27 | 14 | when you approached the bridge that day, which direction were |
| 10:27 | 15 | you coming from? |
| 10:27 | 16 | **A.**   I approached from this direction here. |
| 10:27 | 17 | **Q.**   So, for the record, you're approaching from the right of |
| 10:27 | 18 | the photograph? |
| 10:27 | 19 | **A.**   Yes. |
| 10:28 | 20 | **Q.**   What's the closest intersection to the east side of the |
| 10:28 | 21 | Danziger Bridge? |
| 10:28 | 22 | **A.**   Downman. |
| 10:28 | 23 | **Q.**   Downman Road and Chef Menteur Highway? |
| 10:28 | 24 | **A.**   Yes. |
| 10:28 | 25 | **Q.**   Can you show us on that photograph?  Is that intersection |

MICHAEL LOHMAN - Direct

10:28    1    in the photograph?

10:28    2    A.    This is it right here.

10:28    3    Q.    Off to the right?

10:28    4    A.    Yes.

10:28    5    Q.    Can you show us on that photograph approximately where the

10:28    6    Friendly Inn is, where Ronald Madison's body was?

10:28    7    A.    It would be -- it's hard to pinpoint it on here, but it

10:28    8    would be -- it would be up in here.

10:28    9    Q.    Okay.  Now, where you just drew is actually on the

10:28   10    Danziger Bridge?

10:28   11    A.    No.  There are buildings on the right-hand side of the

10:28   12    Danziger.  It's -- it's hard to see in this photograph, but I

10:28   13    believe it's going to be one of these buildings in this area

10:28   14    right here.

10:28   15    Q.    So all the way over to the left side of the bridge there?

10:28   16    A.    Yes.

10:29   17         MS. BERNSTEIN:  Thanks, Mr. Harrell.

10:29   18              Actually, can I have that photograph up one more

10:29   19    time?

10:29   20    BY MS. BERNSTEIN:

10:29   21    Q.    You talked about the Crystal Palace --

10:29   22    A.    Yes.

10:29   23    Q.    -- being, I think you said, two to three miles away.

10:29   24    A.    Yes.

10:29   25    Q.    From the Danziger Bridge.

MICHAEL LOHMAN - Direct

10:29  1   **A.**   Yes.

10:29  2   **Q.**   On this photograph which direction is the Crystal Palace?

10:29  3   **A.**   It would be to the east, going in this direction here.

10:29  4   **Q.**   Okay.  So following that arrow you just drew, another

10:29  5   couple few miles?

10:29  6   **A.**   Yes.

10:29  7        **MS. BERNSTEIN:**  Thanks, Mr. Harrell.

10:29  8   **BY MS. BERNSTEIN:**

10:29  9   **Q.**   All right.  I can't remember exactly where we let off

10:29  10  right before the break, but you were talking to us about a

10:29  11  17-page report.

10:29  12  **A.**   Yes.

10:29  13  **Q.**   How did that 17-page report come about?

10:29  14  **A.**   Two reports had been submitted prior to the 17-page report

10:29  15  by Kaufman, a 32-pager and a 46-pager, that were poorly

10:30  16  written, didn't justify anything, didn't justify any of the

10:30  17  police actions.  I became frustrated with him --

10:30  18  **Q.**   Let me stop you there one second.  You said -- when you

10:30  19  say they didn't justify any of the police actions, what do you

10:30  20  mean?  Did they attempt to justify the actions?

10:30  21  **A.**   They attempted to justify the actions, and both reports

10:30  22  clear the police officers of any wrongdoings.  But when you

10:30  23  read the reports, they're poorly written and they aren't

10:30  24  logical, and they don't make any sense as to how the events on

10:30  25  the Danziger Bridge transpired.

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:30 | 1 | **Q.**   So then what happened? |
| 10:30 | 2 | **A.**   As I said, I became frustrated and I authored a 17-page |
| 10:30 | 3 | report. |
| 10:30 | 4 | **Q.**   You mentioned earlier that you wrote that report in |
| 10:30 | 5 | conjunction with other people? |
| 10:30 | 6 | **A.**   Yes. |
| 10:30 | 7 | **Q.**   Who did you write it in conjunction with? |
| 10:30 | 8 | **A.**   Kaufman, Bowen, and Gisevius. |
| 10:30 | 9 | **Q.**   Who actually typed the report? |
| 10:30 | 10 | **A.**   I did. |
| 10:30 | 11 | **Q.**   So what do you mean you said you did it in conjunction |
| 10:31 | 12 | with Kaufman, Bowen, and Gisevius? |
| 10:31 | 13 | **A.**   I typed over some of the report that had already been |
| 10:31 | 14 | written.  But as I did so, I consulted and I spoke with and I |
| 10:31 | 15 | had conversations with Kaufman, Gisevius, and Bowen about how |
| 10:31 | 16 | we were going to address certain things on the report -- in the |
| 10:31 | 17 | report. |
| 10:31 | 18 | **Q.**   And were any of those conversations that you had about |
| 10:31 | 19 | what actually happened on the bridge? |
| 10:31 | 20 | **A.**   No.  It was all about justifying the actions. |
| 10:31 | 21 | **Q.**   Once that 17-page report was done, who did you give it to? |
| 10:31 | 22 | **A.**   Kaufman. |
| 10:31 | 23 | **Q.**   What conversation did you have with Kaufman? |
| 10:31 | 24 | **A.**   That he needed to let everyone involved, the other |
| 10:31 | 25 | officers involved, read over the report, make sure that they |

MICHAEL LOHMAN - Direct

10:31  1   were okay with their role in this incident.
10:31  2   Q.   Tell me -- let me stop you there.  Why?  Why did you tell
10:31  3   Kaufman to go talk to other people?
10:31  4   A.   Because if they weren't okay with what their role was in
10:32  5   the report, it would be a problem.
10:32  6   Q.   What do you mean when you say "their role in the report"?
10:32  7   A.   What their action was, what they did, what role they
10:32  8   played on the Danziger Bridge shooting.
10:32  9   Q.   Was it your understanding that that report, when it talked
10:32  10  about the actions that people played on the bridge, that those
10:32  11  were actually the things that they had done on the bridge?
10:32  12  A.   No.
10:32  13  Q.   Okay.  So you told him to make sure everybody was okay
10:32  14  with their role?
10:32  15           MR. DESALVO:  Leading, Your Honor.
10:32  16           THE COURT:  Well, I think she's recapping his prior
10:32  17  answer, but I'll ask counsel to be mindful not to lead.
10:32  18           MS. BERNSTEIN:  Yes.  Thank you, Your Honor.
10:32  19  BY MS. BERNSTEIN:
10:32  20  Q.   So after you had that conversation with Kaufman, what
10:32  21  happened next?
10:32  22  A.   A couple days later -- sometime later, he came to me and
10:32  23  informed me that he had spoke with everyone involved in the
10:32  24  incident and they were okay with what was written in the
10:32  25  report.

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:32 | 1 | **Q.**   What then happened with that report? |
| 10:32 | 2 | **A.**   I signed off on the report and gave it to Kaufman to |
| 10:32 | 3 | submit. |
| 10:32 | 4 | **Q.**   Can you explain what you mean when you say you signed off |
| 10:33 | 5 | on the report? |
| 10:33 | 6 | **A.**   On the bottom of any incident -- or any police report, |
| 10:33 | 7 | there's a box for the supervisor to print his name in, |
| 10:33 | 8 | approving the report so that it can be submitted to the record |
| 10:33 | 9 | room, or to the Homicide Division, or to whatever other unit it |
| 10:33 | 10 | needs to go to so that it can be filed and submitted to the |
| 10:33 | 11 | appropriate units. |
| 10:33 | 12 | **Q.**   That report that you wrote in conjunction with these other |
| 10:33 | 13 | folks, who was it written -- according to the report itself, |
| 10:33 | 14 | who wrote it? |
| 10:33 | 15 | **A.**   It was written in Kaufman's name.  Kaufman's report -- |
| 10:33 | 16 | Kaufman's name would have been in the lower left-hand corner |
| 10:33 | 17 | where it says "reporting officers." |
| 10:33 | 18 | **Q.**   Let me ask you to take a look at an exhibit that you have |
| 10:33 | 19 | up there by on -- by the seat right now, Exhibit No. 39.  Do |
| 10:33 | 20 | you recognize that exhibit? |
| 10:33 | 21 | **A.**   Yes, I do. |
| 10:33 | 22 | **Q.**   What is that? |
| 10:33 | 23 | **A.**   This is the 17-page report that I authored. |
| 10:33 | 24 | **MS. BERNSTEIN:**  Your Honor, I'd like to offer |
| 10:34 | 25 | Exhibit 39 into evidence. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MICHAEL LOHMAN - Direct

10:34  1          **THE COURT:**  Any objection?

10:34  2          **MR. LONDON:**  No objection, Your Honor.

10:34  3          **THE COURT:**  I'm sorry.  Who was the first no

10:34  4   objection?  Mr. London.

10:34  5          **MR. LONDON:**  No objection.

10:34  6          **THE COURT:**  Does anybody have any objection among

10:34  7   defense counsel?

10:34  8          **MR. DESALVO:**  No, Your Honor.

10:34  9          **THE COURT:**  All right.  Exhibit 39 is so admitted.

10:34  10  So ordered.

10:34  11         **MS. BERNSTEIN:**  Mr. Harrell, may I have Exhibit 39 up

10:34  12  on the screen, please?

10:34  13  **BY MS. BERNSTEIN:**

10:34  14  Q.   Okay.  You were just explaining that the report was

10:34  15  authored in Kaufman's name.  Is that what you said?

10:34  16  A.   Yes.

10:34  17  Q.   First of all, can you tell the jury what we're looking at

10:34  18  right now?

10:34  19  A.   This is the face sheet of an incident report.

10:34  20  Q.   How do you know just looking at this that this is the

10:34  21  17-page report that we've been talking about?

10:34  22  A.   That's my signature at the bottom right here.  My printed

10:34  23  name at the bottom right there.

10:34  24  Q.   Okay.  And how do you know that this is 17 pages?

10:34  25  A.   Up at the top right here it's numbered.  I'm sorry.

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:34 | 1 | **Q.** Let me circle it for you. |
| 10:35 | 2 | **A.** It's numbered 1 of 17. |
| 10:35 | 3 | **Q.** All right. And you pointed down in the lower right-hand |
| 10:35 | 4 | corner. At first you said that's your signature. |
| 10:35 | 5 | **A.** Yes. |
| 10:35 | 6 | **Q.** It's actually block letters; correct? |
| 10:35 | 7 | **A.** Yes. |
| 10:35 | 8 | **Q.** Explain that. |
| 10:35 | 9 | **A.** That's the way that you typically wrote police reports |
| 10:35 | 10 | before we typed and had computers, you would write in |
| 10:35 | 11 | uppercase, block style letters. When you signed the report |
| 10:35 | 12 | also you would print your name in the supervisor's box so that |
| 10:35 | 13 | it was legible and they would know who the supervisor was, |
| 10:35 | 14 | because they couldn't read signatures. |
| 10:35 | 15 | **Q.** All right. So when you all talk about signing off on a |
| 10:35 | 16 | report, it actually means that you put your name on it? |
| 10:35 | 17 | **A.** Yes. |
| 10:35 | 18 | **Q.** So this block on the right side that you circled -- |
| 10:35 | 19 | **MS. BERNSTEIN:** Mr. Harrell, can I have that area |
| 10:35 | 20 | blown up? |
| 10:35 | 21 | **BY MS. BERNSTEIN:** |
| 10:36 | 22 | **Q.** What's the label on the box that you put your name in? |
| 10:36 | 23 | **A.** Supervisor. |
| 10:36 | 24 | **Q.** All right. So you signed off on this as the supervisor? |
| 10:36 | 25 | **A.** Yes, I did. |

MICHAEL LOHMAN - Direct

10:36   1   **Q.**   Where does the person who's actually authored the report
10:36   2   sign their name?
10:36   3        **MS. BERNSTEIN:**  Can we take that away, please?
10:36   4        **THE WITNESS:**  On the left side of the report where it
10:36   5   says "reporting officer," which would be right here.
10:36   6   **BY MS. BERNSTEIN:**
10:36   7   **Q.**   All right.  So on this 17-page report, the reporting
10:36   8   officer was whom?
10:36   9   **A.**   Archie Kaufman.
10:36   10       **MS. BERNSTEIN:**  Thank you, Mr. Harrell.
10:36   11  **BY MS. BERNSTEIN:**
10:36   12  **Q.**   You said that when this came back to you and he said that
10:36   13  he had talked to the other officers, you signed off on it?
10:36   14  **A.**   Yes.
10:36   15  **Q.**   Then what happened?
10:36   16  **A.**   I gave it back to him to be submitted, for him to submit,
10:36   17  to forward, to the administrative office so that it could be
10:36   18  filed and forwarded to the appropriate units, such as the
10:37   19  record room, and homicide, and wherever else it needed to go.
10:37   20  It was officially complete at that point.  This particular
10:37   21  report was officially complete at that point and it was to be
10:37   22  forwarded to the record room.
10:37   23  **Q.**   As far as you knew, did it get submitted at that point?
10:37   24  **A.**   It was my understanding that it was submitted at that
10:37   25  point.

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:37 | 1 | **Q.**   Do you know approximately when the first report was |
| 10:37 | 2 | submitted to you?  When Defendant Kaufman gave you that 32-page |
| 10:37 | 3 | report you talked about? |
| 10:37 | 4 | **A.**   It would have been early -- the end of October or early |
| 10:37 | 5 | November. |
| 10:37 | 6 | **Q.**   How are you estimating that date? |
| 10:37 | 7 | **A.**   Because I know Kaufman was transferred to the Cold Case |
| 10:37 | 8 | Homicide Division before the end of the year, and I believe it |
| 10:37 | 9 | was around -- in November, and he submitted the report to me |
| 10:37 | 10 | before leaving the unit. |
| 10:37 | 11 | **Q.**   After that report, the 17-page report, got submitted, as |
| 10:38 | 12 | far as you knew, what happened with the case? |
| 10:38 | 13 | **A.**   When Kaufman was transfer- -- prior to Kaufman being |
| 10:38 | 14 | transferred to the Cold Case Homicide Division, the case had |
| 10:38 | 15 | been assigned to the Cold Case Homicide Division to Sergeant |
| 10:38 | 16 | Gerard Dugue.  And he had come out and met with us on a couple |
| 10:38 | 17 | of occasions.  I had a general conversation with him, you know, |
| 10:38 | 18 | just that he was going to be doing some follow-up investigation |
| 10:38 | 19 | on the case and that he was going to need a copy of the report, |
| 10:38 | 20 | was basically the extent of my conversation with him. |
| 10:38 | 21 | **Q.**   Let me stop you there.  What month was that, do you know, |
| 10:38 | 22 | when the case got transferred from the 7th District to Cold |
| 10:38 | 23 | Case unit? |
| 10:38 | 24 | **A.**   It would have been around November. |
| 10:38 | 25 | **Q.**   Okay.  And that's a guestimate, I assume, from your face? |

MICHAEL LOHMAN - Direct

| 10:38 | 1 | **A.** Yes, yes.  November/December. |
| 10:38 | 2 | **Q.** All right.  So at that point, this case got transferred |
| 10:38 | 3 | from the 7th District to the centralized unit; right? |
| 10:38 | 4 | **A.** Yes, yes. |
| 10:38 | 5 | **Q.** At that point what was your role in the case? |
| 10:38 | 6 | **A.** At that point I had no role. |
| 10:39 | 7 | **Q.** And then you started to say something else, that Defendant |
| 10:39 | 8 | Kaufman also left the 7th District; is that right? |
| 10:39 | 9 | **A.** Yes. |
| 10:39 | 10 | **Q.** Where did he go? |
| 10:39 | 11 | **A.** He went to the Cold Case Homicide Division. |
| 10:39 | 12 | **Q.** So he went the same place as the case? |
| 10:39 | 13 | **A.** Yes, he did. |
| 10:39 | 14 | **Q.** What was your understanding of who was in charge -- who |
| 10:39 | 15 | was investigating the case once it went over to homicide? |
| 10:39 | 16 | **A.** That it was going to be worked -- it was going to be a |
| 10:39 | 17 | joint investigation between Kaufman and Dugue. |
| 10:39 | 18 | **Q.** So it's not like this case went over to homicide and then |
| 10:39 | 19 | Kaufman had nothing to do with it anymore? |
| 10:39 | 20 | **A.** No. |
| 10:39 | 21 | **Q.** All right.  You mentioned once it went over to homicide, |
| 10:39 | 22 | you didn't have any role in the case anymore; is that right? |
| 10:39 | 23 | **A.** No, I didn't have any role. |
| 10:39 | 24 | **Q.** I want to jump forward to January 25th, 2006.  Did |
| 10:39 | 25 | something happen that day that relates to this case? |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:40 | 1 | **A.**   Yes. |
| 10:40 | 2 | **Q.**   What happened? |
| 10:40 | 3 | **A.**   I was contacted several days prior to that date by |
| 10:40 | 4 | Kaufman, and Dugue may have contacted me also, and it was in |
| 10:40 | 5 | reference to obtaining statements from the officers involved in |
| 10:40 | 6 | the Danziger shooting. |
| 10:40 | 7 | **Q.**   By that time the case was with homicide? |
| 10:40 | 8 | **A.**   Yes. |
| 10:40 | 9 | **Q.**   And Kaufman and Dugue contacted you? |
| 10:40 | 10 | **A.**   Yes. |
| 10:40 | 11 | **Q.**   You said in reference to taking statements.  Can you |
| 10:40 | 12 | explain what you mean? |
| 10:40 | 13 | **A.**   They wanted to set up a date that they could come to the |
| 10:40 | 14 | 7th District and obtain statements from the officers involved, |
| 10:40 | 15 | and it was agreed upon that they would do it on, I believe it |
| 10:40 | 16 | was January 25th. |
| 10:40 | 17 | **Q.**   Where were they going to come take statements? |
| 10:40 | 18 | **A.**   At the 7th District police station.  The 7th -- the |
| 10:40 | 19 | original 7th District police station had flooded and it had |
| 10:40 | 20 | been gutted, and it was just a shell of a building at this |
| 10:40 | 21 | point.  FEMA had supplied us with trailers and we were working |
| 10:40 | 22 | out of trailers at the time.  So they met me and the other |
| 10:40 | 23 | officers at the 7th District station.  I arranged for the |
| 10:40 | 24 | officers to be there to meet with the homicide detectives when |
| 10:41 | 25 | they came over. |

MICHAEL LOHMAN - Direct

10:41   1   **Q.**   Let me ask you a couple follow-up questions about that.
10:41   2   You said you were meeting at the location of the 7th District
10:41   3   station.  Had you by that time left the Crystal Palace and come
10:41   4   back to your original area?
10:41   5   **A.**   Yes.
10:41   6   **Q.**   All right.  But you said you were not in your original
10:41   7   building; is that right?
10:41   8   **A.**   No.  The original building flooded during the storm.  It
10:41   9   had since been gutted and it was just a shell of a building at
10:41   10  this point.  FEMA had supplied us with trailers and they were
10:41   11  set up in the parking lot of the 7th District police station
10:41   12  and we were working out of the trailers.
10:41   13  **Q.**   All right.  So you were still working in the 7th District?
10:41   14  **A.**   Yes, I was.
10:41   15  **Q.**   And you were working out of those trailers?
10:41   16  **A.**   Yes, I was.
10:41   17  **Q.**   How about other officers from the 7th District, were they
10:41   18  also working out of those trailers?
10:41   19  **A.**   Yes.
10:41   20  **Q.**   That's where you all were conducting your business?
10:41   21  **A.**   Yes.
10:41   22  **Q.**   All right.  You mentioned on this day, you think it was
10:41   23  January 25th, officers got together to give statements; is that
10:41   24  right?
10:41   25  **A.**   Yes.

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:41 | 1 | **Q.**   Tell us how that happened. |
| 10:41 | 2 | **A.**   I instructed them to be at the station for whatever time |
| 10:42 | 3 | it was set up for on the 25th of January.  The officers were |
| 10:42 | 4 | there.  And then Dugue, along with Kaufman and other |
| 10:42 | 5 | investigators from the Homicide Division, showed up at the 7th |
| 10:42 | 6 | District to take statements. |
| 10:42 | 7 | **Q.**   Where did you all meet? |
| 10:42 | 8 | **A.**   At the 7th District station in the trailers, or outside of |
| 10:42 | 9 | the trailers, where I initially met with Kaufman and Dugue. |
| 10:42 | 10 | **Q.**   When you say "outside the trailers," is that a parking lot |
| 10:42 | 11 | area? |
| 10:42 | 12 | **A.**   In the parking lot, yes. |
| 10:42 | 13 | **Q.**   And you said you initially met with who? |
| 10:42 | 14 | **A.**   Dugue and Kaufman. |
| 10:42 | 15 | **Q.**   Did you have any conversation with them? |
| 10:42 | 16 | **A.**   With Dugue, no real conversation other than, you know, |
| 10:42 | 17 | they were just here to take statements.  Nothing further than |
| 10:42 | 18 | that. |
| 10:42 | 19 | Kaufman and I had a conversation in which I told him |
| 10:42 | 20 | that they need to look at the statements that they gave in the |
| 10:42 | 21 | original report.  And what I meant by that, I was referring to |
| 10:42 | 22 | the 17-page report, that he needed to let them look at the |
| 10:42 | 23 | statements and read their statements from that 17-page report |
| 10:42 | 24 | so that they knew -- so that the statement they were going to |
| 10:42 | 25 | give that day was consistent with what was contained in the |

MICHAEL LOHMAN - Direct

10:43  1   report.

10:43  2   Q.   When you say the statements that they gave in the 17-page

10:43  3   report, had they actually given any statements in the 17-page

10:43  4   report?

10:43  5   A.   They hadn't given statements to me, but it was -- the

10:43  6   statements that -- that were came up with in the 17-page report

10:43  7   was made by myself, Kaufman, Gisevius, and Bowen, and it was

10:43  8   run by them.  So that's the statements I was referring to.

10:43  9   They hadn't sat down and given me statements in the report, no.

10:43  10  Q.   All right.  So tell us again -- tell us more about this

10:43  11  conversation that you had with Defendant Kaufman.  Was it just

10:43  12  the two of you or were you having this conversation in front of

10:43  13  other people?

10:43  14  A.   Just him and I that I recall.

10:43  15  Q.   And why was it just the two of you?

10:43  16  A.   Because I wouldn't have involved other people in a

10:43  17  conversation like that.

10:43  18  Q.   So what were you telling Kaufman to do?

10:43  19  A.   To make sure that their statements were squared away, that

10:43  20  they were consistent with what was contained in the 17-page

10:43  21  report because that justified their actions.

10:43  22  Q.   And what do you mean by "squared away"?

10:43  23  A.   That they didn't give statements that contradicted what

10:43  24  they said in the report because then it would cause problems.

10:44  25  Q.   What did Kaufman say?

MICHAEL LOHMAN - Direct

10:44  1   A.    I don't remember the exact -- the exact -- his exact
10:44  2   response.  That everything was going to be okay, it was going
10:44  3   to be taken care of, something to that effect.  But I know the
10:44  4   report wasn't shown to them.  He didn't have a copy of the
10:44  5   report to show to them.  It was my understanding, and to my
10:44  6   knowledge, a report was never showed to them.
10:44  7   Q.    So based on that conversation that you had with Kaufman,
10:44  8   did you expect him to get together with the officers who had
10:44  9   been involved?
10:44  10  A.    Yes.
10:44  11  Q.    Did you expect him to have a conversation with them?
10:44  12  A.    Yes.
10:44  13  Q.    What did you expect to be covered in that conversation?
10:44  14  A.    What was written in the 17-page report, that their
10:44  15  statements would be consistent with the statements in the
10:44  16  report.
10:44  17  Q.    And this conversation that you had with Kaufman took place
10:44  18  in the parking lot you said?
10:44  19  A.    It could have been in the trailer or in the parking lot
10:44  20  right there in the 7th District station's parking lot.  I don't
10:44  21  know if we were outside or in the trailer.
10:44  22  Q.    Did you see Kaufman then meet with the other officers?
10:45  23  A.    I don't recall.
10:45  24  Q.    Do you know whether other officers went into the abandoned
10:45  25  building?

MICHAEL LOHMAN - Direct

10:45  1   A.   I don't recall.

10:45  2   Q.   Was there any legitimate reason to be in that abandoned

10:45  3   building?  Was it being used for anything?

10:45  4   A.   No.

10:45  5   Q.   After that day, did the case continue to be worked out of

10:45  6   the centralized homicide?

10:45  7   A.   Yes, it did.

10:45  8   Q.   So did you continue to have no role in it at that point?

10:45  9   A.   Yes.

10:45  10  Q.   At some point after that, did you get a copy of the report

10:45  11  submitted in the Danziger case?

10:45  12  A.   Yes.

10:45  13  Q.   Why?

10:45  14  A.   I asked Kaufman for a copy of it because I wanted to read

10:45  15  it to see what the final version or final report said.

10:45  16  Q.   Let me ask you a couple of questions about different kinds

10:45  17  of reports that you all do for NOPD.  That 17-page report that

10:45  18  you thought had been submitted, what kind of report was that?

10:46  19  What's it called?

10:46  20  A.   An incident report.

10:46  21  Q.   Is there another name for it?

10:46  22  A.   An initial report.  Initial report or incident report,

10:46  23  they're usually referred to as.

10:46  24  Q.   Okay.  What are -- what's another kind of report that NOPD

10:46  25  can do?

MICHAEL LOHMAN - Direct

10:46   1   A.   A supplemental report.

10:46   2   Q.   So that 17-page report was an incident report?

10:46   3   A.   Yes, it was.

10:46   4   Q.   When you say that later you tried to get the report that

10:46   5   had been written, what were you looking for?

10:46   6   A.   The supplemental reports that had been written after the

10:46   7   incident report.

10:46   8   Q.   Can you explain what the difference is?

10:46   9   A.   The incident report would contain information that you had

10:46   10  up to that point.  Any additional information that would have

10:46   11  to be added to this case or investigation would be written in a

10:46   12  supplemental report, and there's actually a box at the top

10:46   13  where you would mark "supplemental report," and that would be

10:46   14  to let you know that that was additional information that was

10:46   15  obtained after the initial report was submitted.

10:46   16  Q.   When is an initial report usually submitted?

10:47   17  A.   Shortly after the incident occurs.

10:47   18  Q.   And then after investigation happens, a supplemental

10:47   19  report gets turned in?

10:47   20  A.   Yes.  If additional work or additional investigative work

10:47   21  is done on a case, it's documented in a supplemental report

10:47   22  which then is, you know, put together with the incident report

10:47   23  at the record room.

10:47   24  Q.   All right.  So you tried to get a copy of the supplemental

10:47   25  report; is that right?

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:47 | 1 | **A.**   Yes. |
| 10:47 | 2 | **Q.**   What happened? |
| 10:47 | 3 | **A.**   A copy was delivered to me at the Sixth District station. |
| 10:47 | 4 | **Q.**   That's where you were working at the time? |
| 10:47 | 5 | **A.**   Yes, yes. |
| 10:47 | 6 | **Q.**   Did you just get one report? |
| 10:47 | 7 | **A.**   No.  I got a copy of a 54-page supplemental report and a |
| 10:47 | 8 | copy of a 7-page incident report. |
| 10:47 | 9 | **Q.**   Let me start with the 54-page supplemental report. |
| 10:47 | 10 | According to the paperwork, who had authored that report? |
| 10:47 | 11 | **A.**   It's okay to refer to that? |
| 10:47 | 12 | **Q.**   What exhibit are you looking at over there? |
| 10:47 | 13 | **A.**   Exhibit 27. |
| 10:48 | 14 | **Q.**   Do you recognize Exhibit 27? |
| 10:48 | 15 | **A.**   Yes.  It's the 54-page supplemental report which was |
| 10:48 | 16 | presented to me by Kaufman. |
| 10:48 | 17 | **Q.**   And according to that report, who authored it? |
| 10:48 | 18 | **A.**   The reporting officers are Gerard Dugue and Arthur |
| 10:48 | 19 | Kaufman. |
| 10:48 | 20 | **Q.**   Dugue and Kaufman both? |
| 10:48 | 21 | **A.**   Yes. |
| 10:48 | 22 | **Q.**   Both of their names are on the report? |
| 10:48 | 23 | **A.**   Yes. |
| 10:48 | 24 | **Q.**   Both as the reporting officer? |
| 10:48 | 25 | **A.**   Yes. |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:48 | 1 | **Q.**   All right.  So you said you got the 54-page report and |
| 10:48 | 2 | there was also an initial report with it? |
| 10:48 | 3 | **A.**   Yes. |
| 10:48 | 4 | **Q.**   How many pages was that? |
| 10:48 | 5 | **A.**   7 pages. |
| 10:48 | 6 | **Q.**   Was there a 17-page initial report? |
| 10:48 | 7 | **A.**   No. |
| 10:48 | 8 | **Q.**   Were you surprised by that? |
| 10:48 | 9 | **A.**   Yes. |
| 10:48 | 10 | **Q.**   Tell us about that 7-page report. |
| 10:48 | 11 | **A.**   The 17-page report -- |
| 10:48 | 12 | **Q.**   I'm sorry, the 7-page report. |
| 10:48 | 13 | **A.**   I'm sorry.  The 7-page report now replaced the 17-page |
| 10:48 | 14 | report.  And I was told by Kaufman that they had to make some |
| 10:48 | 15 | changes because of the audiotaped statements that were taken |
| 10:49 | 16 | from the officers. |
| 10:49 | 17 | **Q.**   Do you have that 7-page report in front of you, |
| 10:49 | 18 | Exhibit 35? |
| 10:49 | 19 | **A.**   No, I don't have the 17-page.  I have every one -- the |
| 10:49 | 20 | 7-page -- I'm sorry.  I don't have the 7-page. |
| 10:49 | 21 | **Q.**   Oh, actually the 7-page, I believe, is already in |
| 10:49 | 22 | evidence, Exhibit 35. |
| 10:49 | 23 |        **MS. BERNSTEIN:**  May I have Exhibit 35 up, please? |
| 10:49 | 24 | **BY MS. BERNSTEIN:** |
| 10:49 | 25 | **Q.**   Do you recognize the exhibit in front of you? |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:49 | 1 | A.   Yes.  That's -- that's the 7-page report that was |
| 10:49 | 2 | submitted to me. |
| 10:49 | 3 | Q.   According to that page we're looking at, who authored this |
| 10:49 | 4 | 7-page report? |
| 10:49 | 5 | A.   Kaufman. |
| 10:49 | 6 | Q.   Down here? |
| 10:49 | 7 | A.   Yes. |
| 10:49 | 8 | Q.   According to this report, who signed off on it as the |
| 10:50 | 9 | supervisor? |
| 10:50 | 10 | A.   Me. |
| 10:50 | 11 | Q.   Before you got this report back, along with the |
| 10:50 | 12 | supplemental report, had you ever seen it before? |
| 10:50 | 13 | A.   No, I had not. |
| 10:50 | 14 | Q.   That's your signature, isn't it? |
| 10:50 | 15 | A.   Yes, it is. |
| 10:50 | 16 | Q.   Or your police signature? |
| 10:50 | 17 | A.   Yes, it is. |
| 10:50 | 18 | Q.   But you'd never seen the report? |
| 10:50 | 19 | A.   No, I had not. |
| 10:50 | 20 | Q.   Did you have a conversation with Kaufman about that? |
| 10:50 | 21 | A.   Yes. |
| 10:50 | 22 | Q.   How did your signature get on a report you'd never seen? |
| 10:50 | 23 | A.   The face sheet from the 17-page report was removed from |
| 10:50 | 24 | the 17-page report and then placed as the cover sheet on the |
| 10:50 | 25 | 7-page report. |

MICHAEL LOHMAN - Direct

| 10:50 | 1 | **Q.** You say it was removed.  Who removed it? |
| 10:50 | 2 | **A.** Kaufman, I assume. |
| 10:50 | 3 | **Q.** So he told you -- and face sheet, I assume, is just this |
| 10:50 | 4 | cover sheet we're looking at? |
| 10:50 | 5 | **A.** Yes. |
| 10:50 | 6 | **Q.** Can you circle on there where you would normally have the |
| 10:50 | 7 | number of pages in the report? |
| 10:50 | 8 | **A.** Up here. |
| 10:50 | 9 | **Q.** And what does it say there? |
| 10:50 | 10 | **A.** 1 of blank. |
| 10:51 | 11 | **MS. BERNSTEIN:**  Mr. Harrell, may I have Exhibits 35 |
| 10:51 | 12 | and 39 side by side, please? |
| 10:51 | 13 | **BY MS. BERNSTEIN:** |
| 10:51 | 14 | **Q.** Now, on the left there we have the cover sheet of the |
| 10:51 | 15 | 7-page report that you saw for the first time when you got the |
| 10:51 | 16 | reports back; correct? |
| 10:51 | 17 | **A.** Yes. |
| 10:51 | 18 | **Q.** On the right we have the cover sheet for the 17-page |
| 10:51 | 19 | report that you worked on with Kaufman, Bowen, and Gisevius; |
| 10:51 | 20 | correct? |
| 10:51 | 21 | **A.** Yes. |
| 10:51 | 22 | **Q.** Now, the black marks on these reports, that's not part -- |
| 10:51 | 23 | those aren't NOPD marks; right? |
| 10:51 | 24 | **A.** No. |
| 10:51 | 25 | **Q.** Your understanding is that those are redactions made for |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:51 | 1 | court here? |
| 10:51 | 2 | A.   Yes. |
| 10:51 | 3 | Q.   So other than those black marks, is that the same cover |
| 10:51 | 4 | sheet? |
| 10:51 | 5 | A.   Yes, it is. |
| 10:51 | 6 | Q.   Is there any difference up in this area? |
| 10:52 | 7 | A.   Yes, there is. |
| 10:52 | 8 | Q.   What's that? |
| 10:52 | 9 | A.   The page numbers.  This one is 1 of blank, and this one is |
| 10:52 | 10 | 1 of 17. |
| 10:52 | 11 | Q.   So somebody as whited out the number 17? |
| 10:52 | 12 | A.   Yes. |
| 10:52 | 13 | MS. BERNSTEIN:  Can I go to page 8 of the 7-page |
| 10:52 | 14 | report, please? |
| 10:52 | 15 | BY MS. BERNSTEIN: |
| 10:52 | 16 | Q.   All right.  We've been calling it the 7-page report.  It's |
| 10:52 | 17 | 7 pages of report with an attachment on the back; right? |
| 10:52 | 18 | A.   Yes. |
| 10:52 | 19 | Q.   What is this eighth page that we're looking at? |
| 10:52 | 20 | A.   That's a copy of the Gist, the Arrest Gist. |
| 10:52 | 21 | Q.   And I'll ask you some questions about a Gist in a little |
| 10:52 | 22 | bit, but was that Gist attached to the 17-page report? |
| 10:52 | 23 | A.   Yes, it was. |
| 10:52 | 24 | Q.   What page was it? |
| 10:52 | 25 | A.   Page 17 of 17. |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:53 | 1 | **Q.**   What does it say here on page 8 of the 7-page report? |
| 10:53 | 2 | **A.**   17 of 17. |
| 10:53 | 3 | **MS. BERNSTEIN:**  Thanks, Mr. Harrell. |
| 10:53 | 4 | **BY MS. BERNSTEIN:** |
| 10:53 | 5 | **Q.**   Do you have a number of exhibits up there next to you? |
| 10:53 | 6 | You should have Exhibit 38, 37 and 39. |
| 10:53 | 7 | **A.**   Yes. |
| 10:53 | 8 | **Q.**   Can you identify those for us?  First, what's Exhibit 37? |
| 10:53 | 9 | **A.**   37 is a copy of the 46-page report, which was the second |
| 10:53 | 10 | report that was submitted to me by Kaufman. |
| 10:53 | 11 | **Q.**   My bad.  I asked you out of order. |
| 10:53 | 12 | Can you tell us first what Exhibit 38 is? |
| 10:53 | 13 | **A.**   38 is a copy of the 32-page report, which was submitted to |
| 10:54 | 14 | me first by Kaufman. |
| 10:54 | 15 | **Q.**   What's Exhibit 37? |
| 10:54 | 16 | **A.**   37 is the 46-page report, which was the second report |
| 10:54 | 17 | submitted to me. |
| 10:54 | 18 | **Q.**   And, again, that was the report that was handed to you by |
| 10:54 | 19 | Defendant Kaufman? |
| 10:54 | 20 | **A.**   Yes, it was. |
| 10:54 | 21 | **Q.**   What is Exhibit 39? |
| 10:54 | 22 | **A.**   39 is the 17-page report, which I authored. |
| 10:54 | 23 | **Q.**   And you also have up there Exhibit 27, which is the |
| 10:54 | 24 | 54-page report now already in evidence; correct? |
| 10:54 | 25 | **A.**   Yes. |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:54 | 1 | **Q.**   And that's the official report that was submitted in this |
| 10:54 | 2 | case? |
| 10:54 | 3 | **A.**   Yes. |
| 10:54 | 4 | **Q.**   Those reports, the 32-pager, the 46-pager, and 17-pager, |
| 10:54 | 5 | right in front of you, where did I get those reports? |
| 10:54 | 6 | **A.**   From me. |
| 10:54 | 7 | **Q.**   The federal government got those reports from you? |
| 10:54 | 8 | **A.**   Yes.  I turned them over to the federal government when I |
| 10:55 | 9 | agreed to plead guilty in this case. |
| 10:55 | 10 | **Q.**   Why had you kept them? |
| 10:55 | 11 | **A.**   I had concerns about this case all along and about what |
| 10:55 | 12 | had taken place and I kept -- I kept copies of all the reports |
| 10:55 | 13 | that were submitted in this case. |
| 10:55 | 14 | **Q.**   And when you decided to plead guilty, you gave those to |
| 10:55 | 15 | us? |
| 10:55 | 16 | **A.**   Yes, I did. |
| 10:55 | 17 | **Q.**   Why? |
| 10:55 | 18 | **A.**   Because they were now evidence. |
| 10:55 | 19 | **Q.**   So if someone said you got caught with those reports; |
| 10:55 | 20 | would you agree with that? |
| 10:55 | 21 | **A.**   No. |
| 10:55 | 22 | **Q.**   You voluntarily gave them to us? |
| 10:55 | 23 | **A.**   Yes.  No one knew I had the reports.  I brought them to my |
| 10:55 | 24 | attorney, explained to him what they were once I agreed to |
| 10:55 | 25 | plead guilty, and then they were turned over to you. |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:55 | 1 | **MS. BERNSTEIN:**  I'd like to offer Exhibits 38, 37 and |
| 10:55 | 2 | 39 into evidence. |
| 10:55 | 3 | **THE COURT:**  Any objection? |
| 10:55 | 4 | **MR. LONDON:**  No objection, Your Honor. |
| 10:55 | 5 | **MR. FLEMING:**  No, Judge. |
| 10:55 | 6 | **THE COURT:**  38, 37 and 39.  So ordered. |
| 10:56 | 7 | **MS. BERNSTEIN:**  May I have Exhibit 38 up, please? |
| 10:56 | 8 | **BY MS. BERNSTEIN:** |
| 10:56 | 9 | **Q.**   I'm going to come back to these reports in a minute, but |
| 10:56 | 10 | what we're looking at here is the top page of Exhibit 38; |
| 10:56 | 11 | correct? |
| 10:56 | 12 | **A.**   Yes. |
| 10:56 | 13 | **Q.**   It says on there that it's page 2 of 32. |
| 10:56 | 14 | **A.**   Yes. |
| 10:56 | 15 | **Q.**   Where is page 1? |
| 10:56 | 16 | **A.**   It didn't -- it wasn't attached to this report when I got |
| 10:56 | 17 | it.  All I got was a copy of the narrative, just as it's |
| 10:56 | 18 | presented right here. |
| 10:56 | 19 | **Q.**   What would page 1 normally be? |
| 10:56 | 20 | **A.**   That would be your face sheet.  Your incident report cover |
| 10:56 | 21 | sheet or face sheet. |
| 10:56 | 22 | **Q.**   So when this report was submitted to you, it looked just |
| 10:56 | 23 | like this? |
| 10:56 | 24 | **A.**   Yes.  This is the manner in which it was given to me. |
| 10:56 | 25 | **Q.**   There's some handwriting on this typed report.  Whose |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:56 | 1 | handwriting is that? |
| 10:56 | 2 | A.   My handwriting. |
| 10:56 | 3 | Q.   And if you flip through that report, is there handwriting |
| 10:56 | 4 | on and off throughout? |
| 10:56 | 5 | A.   Yes, there is. |
| 10:56 | 6 | Q.   Whose handwriting is that? |
| 10:56 | 7 | A.   My handwriting. |
| 10:56 | 8 | Q.   Why is your handwriting on this report? |
| 10:57 | 9 | A.   When the reports were submitted to me, as I stated |
| 10:57 | 10 | earlier, they were poorly written and didn't justify any of the |
| 10:57 | 11 | officers' actions.  They were full of holes.  I read over the |
| 10:57 | 12 | report and I asked questions and made handwritten notes on the |
| 10:57 | 13 | report to discuss with Kaufman and the other sergeants. |
| 10:57 | 14 | Q.   Now, when you wrote on that report, did you write, "This |
| 10:57 | 15 | cover-up didn't make sense"? |
| 10:57 | 16 | A.   No. |
| 10:57 | 17 | Q.   Or, "This doesn't hold together"? |
| 10:57 | 18 | A.   No. |
| 10:57 | 19 | Q.   Why not? |
| 10:57 | 20 | A.   Because I wasn't -- at that point I wasn't admitting to |
| 10:57 | 21 | anyone that this was a cover-up.  The approach that I took was |
| 10:57 | 22 | that this was a legitimate report and I was reading it as a |
| 10:57 | 23 | legitimate investigation, and I was asking the questions that I |
| 10:57 | 24 | would ordinarily ask in a report. |
| 10:57 | 25 | Q.   When you say you weren't admitting to anyone this was a |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:57 | 1 | cover-up, what do you mean? |
| 10:57 | 2 | A.   I wasn't saying that -- I wasn't coming out in those words |
| 10:57 | 3 | as saying that this doesn't fit the cover-up.  I was asking the |
| 10:57 | 4 | questions as though it was a legitimate investigation and a |
| 10:58 | 5 | legitimate report wrote in conjunction with that investigation. |
| 10:58 | 6 | Q.   So if someone outside the cover-up had looked at it, what |
| 10:58 | 7 | did you want them to see? |
| 10:58 | 8 | A.   Just that, that it was questions asked during the course |
| 10:58 | 9 | of a legitimate investigation about a legitimate police report. |
| 10:58 | 10 | **MS. BERNSTEIN:**  Thank you, Mr. Harrell. |
| 10:58 | 11 | **BY MS. BERNSTEIN:** |
| 10:58 | 12 | Q.   After you gave those reports to us, did you, in fact, |
| 10:58 | 13 | plead guilty? |
| 10:58 | 14 | A.   Yes, I did. |
| 10:58 | 15 | Q.   What did you plead guilty to? |
| 10:58 | 16 | A.   Conspiracy to obstruct justice. |
| 10:58 | 17 | Q.   Is that a felony or a misdemeanor? |
| 10:58 | 18 | A.   It's a felony. |
| 10:58 | 19 | Q.   Have you been sentenced on that? |
| 10:58 | 20 | A.   No, I have not. |
| 10:58 | 21 | Q.   What's your understanding of the maximum sentence you're |
| 10:58 | 22 | facing? |
| 10:58 | 23 | A.   Five years. |
| 10:58 | 24 | Q.   Do you know what the Sentencing Guidelines recommend for |
| 10:58 | 25 | you? |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 10:58 | 1 | **A.** More than five years, seven or eight years. |
| 10:58 | 2 | **Q.** But five is the most you can get? |
| 10:58 | 3 | **A.** Yes. |
| 10:58 | 4 | **Q.** Do you know what sentence you're actually going to get? |
| 10:58 | 5 | **A.** No, I don't. |
| 10:58 | 6 | **Q.** Are you hoping to get less than five years? |
| 10:59 | 7 | **A.** Yes. |
| 10:59 | 8 | **Q.** Are you hoping for any leniency because of your |
| 10:59 | 9 | cooperation with this case? |
| 10:59 | 10 | **A.** Yes. |
| 10:59 | 11 | **Q.** Has anyone promised you what sentence you're going to get? |
| 10:59 | 12 | **A.** No. |
| 10:59 | 13 | **Q.** Has anybody promised you that you are, in fact, going to |
| 10:59 | 14 | get less than five years? |
| 10:59 | 15 | **A.** No. |
| 10:59 | 16 | **Q.** What's your understanding of who will make the final |
| 10:59 | 17 | decision about what sentence you get? |
| 10:59 | 18 | **A.** The judge. |
| 10:59 | 19 | **Q.** Is that this judge or a different judge? |
| 10:59 | 20 | **A.** No, it's Ivan Lemelle -- Judge Ivan Lemelle. |
| 10:59 | 21 | **Q.** You're in front of a different judge? |
| 10:59 | 22 | **A.** Yes. |
| 10:59 | 23 | **Q.** Mr. Lohman, do you expect to go to prison? |
| 10:59 | 24 | **A.** Yes, I do. |
| 10:59 | 25 | **Q.** I want to ask you a bunch of questions now about those |

MICHAEL LOHMAN - Direct

10:59   1   various reports.  First, though, let me go back to the bridge
10:59   2   that day.  Were any guns collected from the bridge that day?
10:59   3   A.   No, they weren't.
11:00   4   Q.   But you mentioned that back on that first day Defendant
11:00   5   Kaufman said that he was going to plant a gun?
11:00   6   A.   Yes.
11:00   7   Q.   When you finally -- when you finally got that first
11:00   8   report, the 32-page report, did it mention whether or not a gun
11:00   9   was found?
11:00   10  A.   Yes.
11:00   11  Q.   What did it say?
11:00   12  A.   That a gun had been recovered under the bridge the
11:00   13  following day on the 5th of September by Kaufman.
11:00   14  Q.   When you saw that in the report, did you understand that
11:00   15  to be true or false?
11:00   16  A.   I knew it was false.
11:00   17        MS. BERNSTEIN:  Mr. Harrell, can I have Exhibit 38,
11:00   18  please?
11:00   19            Can I go to page 28 of that exhibit.
11:00   20            Just to make the record clear, when I say 28 of
11:00   21  the exhibit, that's actually page 29 of the 32-page report.
11:00   22  BY MS. BERNSTEIN:
11:00   23  Q.   Can you read the highlighted section there?
11:00   24  A.   Yes.
11:00   25            "Learning that no technical support was available,

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 11:00 | 1 | Sergeant Kaufman and Detective Lehrmann returned to the scene |
| 11:00 | 2 | on Sunday, September 5th, 2005.  Sergeant Kaufman canvassed |
| 11:01 | 3 | under the bridge and located the lone handgun noted in the |
| 11:01 | 4 | evidence section:  A blue steel Colt Trooper Mark III revolver |
| 11:01 | 5 | with a cylinder in the open position and void of any shell |
| 11:01 | 6 | casings." |
| 11:01 | 7 | MS. BERNSTEIN:  Can I have page 7 of that same |
| 11:01 | 8 | exhibit? |
| 11:01 | 9 | For the record this is page 8 of the 32-page |
| 11:01 | 10 | report. |
| 11:01 | 11 | Can we jump out on that part? |
| 11:01 | 12 | BY MS. BERNSTEIN: |
| 11:01 | 13 | Q.   Mr. Lohman, can you tell us what this report says about |
| 11:01 | 14 | evidence that was located at the scene? |
| 11:01 | 15 | A.   It says:  "The following evidence was located by |
| 11:01 | 16 | responding 7th District units:  An unknown make and model black |
| 11:01 | 17 | semi-automatic pistol; No. 2, a blue steel Colt Trooper MK III |
| 11:01 | 18 | .357 magnum revolver, serial number 84044J; 3, an unknown type |
| 11:01 | 19 | handgun; and 4, an unknown type handgun." |
| 11:02 | 20 | Q.   Were any of those weapons out on the scene at the Danziger |
| 11:02 | 21 | Bridge? |
| 11:02 | 22 | A.   No, they weren't. |
| 11:02 | 23 | MS. BERNSTEIN:  Mr. Harrell, may I have page 8, |
| 11:02 | 24 | please? |
| 11:02 | 25 | Again, for the record, this is page 9 of the |

MICHAEL LOHMAN - Direct

11:02   1   32-page report.

11:02   2   BY MS. BERNSTEIN:

11:02   3   Q.   Can you read what that report says under the heading

11:02   4   "Weapon"?

11:02   5   A.   "The weapons used in the attempted murder of several

11:02   6   police officers were identified as a black semi-automatic

11:02   7   pistol, an unknown caliber chrome revolver, and one other

11:02   8   unknown type handgun, and the Colt Trooper Mark III noted in

11:02   9   the evidence section.  Only the aforementioned weapon was

11:02   10  recovered and later logged as evidence."

11:02   11  Q.   All right.  I want to jump now to the next version you got

11:02   12  from Defendant Kaufman, that 46-page report he put in your

11:02   13  hand.

11:02   14          MS. BERNSTEIN:  Mr. Harrell, can I have Exhibit 37,

11:02   15  please?

11:02   16  BY MS. BERNSTEIN:

11:02   17  Q.   And before I move to the page I want to talk about, the

11:03   18  first page of this exhibit says it's page 3 of 46.  Where are

11:03   19  pages 1 and 2?

11:03   20  A.   Once again, this is the form in which it was submitted to

11:03   21  me.  Pages 1 and 2 would have been a copy -- would have been

11:03   22  the front of the incident report and the back of the

11:03   23  incident -- the front of the incident report page and the back

11:03   24  of the incident report page.

11:03   25  Q.   So you gave this report to us the way you got it from

MICHAEL LOHMAN - Direct

| 11:03 | 1 | Defendant Kaufman? |
| 11:03 | 2 | **A.**   Yes.  This is how I obtained it from him. |
| 11:03 | 3 | **MS. BERNSTEIN:**  Mr. Harrell, may I have page 4 of |
| 11:03 | 4 | that exhibit, please? |
| 11:03 | 5 | For the record, this is page 6 of the 46-page |
| 11:03 | 6 | report. |
| 11:03 | 7 | Can you jump out on that please? |
| 11:03 | 8 | **BY MS. BERNSTEIN:** |
| 11:03 | 9 | **Q.**   Mr. Lohman, can you read to us what this report says under |
| 11:03 | 10 | the heading "Evidence"? |
| 11:03 | 11 | **A.**   "The following weapons were recovered by primary Unit |
| 11:03 | 12 | 1730, Sergeant Arthur Kaufman, a blue steel Colt Trooper MK III |
| 11:03 | 13 | .357 magnum revolver, serial number 84044J, recovered on side |
| 11:04 | 14 | of the Danziger Bridge." |
| 11:04 | 15 | **MS. BERNSTEIN:**  May I have page 5 of that exhibit? |
| 11:04 | 16 | For the record, this is page 7 of the 46-page |
| 11:04 | 17 | report. |
| 11:04 | 18 | **BY MS. BERNSTEIN:** |
| 11:04 | 19 | **Q.**   Can you read what this version of the report says under |
| 11:04 | 20 | the heading "Weapons"? |
| 11:04 | 21 | **A.**   "The weapons used in the attempted murder of several |
| 11:04 | 22 | police officers were identified as an unknown make and model |
| 11:04 | 23 | black semi-automatic pistol, discarded over the Danziger Bridge |
| 11:04 | 24 | into the waters of the Industrial Canal by arrested subject |
| 11:04 | 25 | Lance Madison; weapon not recovered. |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 11:04 | 1 | "A blue steel Colt Trooper MK III .357 magnum |
| 11:04 | 2 | revolver, serial number 84044J located -- later recovered on |
| 11:04 | 3 | the side of the Danziger Bridge by Sergeant Kaufman." |
| 11:04 | 4 | **MS. BERNSTEIN:**  Mr. Harrell, can we get this page and |
| 11:04 | 5 | the next page up side by side? |
| 11:05 | 6 | Actually, Mr. Harrell, if we can just have |
| 11:05 | 7 | page -- if we can just have the next page, that will be fine. |
| 11:05 | 8 | Can we zoom in on the top of page 8 of the |
| 11:05 | 9 | 46-page report? |
| 11:05 | 10 | **BY MS. BERNSTEIN:** |
| 11:05 | 11 | **Q.**  All right.  So the "Weapons" section continues.  Can you |
| 11:05 | 12 | continue reading what it says in the 46-page report about |
| 11:05 | 13 | weapons used in this case? |
| 11:05 | 14 | **A.**  "An unknown make and model black pistol, observed on the |
| 11:05 | 15 | side of the Danziger Bridge by Sergeant Bowen; not recovered, |
| 11:05 | 16 | subsequently missing. |
| 11:05 | 17 | "An unknown make chrome revolver, observed on side of |
| 11:05 | 18 | the Danziger Bridge by Sergeant Bowen; not recovered |
| 11:05 | 19 | immediately, subsequently missing. |
| 11:05 | 20 | "An unknown type handgun, observed being fired by |
| 11:06 | 21 | deceased perpetrator John Doe No. 2 as he fled over the top of |
| 11:06 | 22 | the Danziger Bridge; weapon could not be located. |
| 11:06 | 23 | "The following -- |
| 11:06 | 24 | **Q.**  Let me -- no, that's okay. |
| 11:06 | 25 | Let me focus on that last thing you just read:  "An |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 11:06 | 1 | unknown type handgun, observed being fired by deceased |
| 11:06 | 2 | perpetrator John Doe No. 2." |
| 11:06 | 3 | Who is deceased perpetrator John Doe No. 2? |
| 11:06 | 4 | A.  Ronald Madison. |
| 11:06 | 5 | Q.  Did any of those guns exist? |
| 11:06 | 6 | A.  No. |
| 11:06 | 7 | MS. BERNSTEIN:  Thank you, Mr. Harrell. |
| 11:06 | 8 | BY MS. BERNSTEIN: |
| 11:06 | 9 | Q.  While we're on the topic of the gun, do you know whether |
| 11:06 | 10 | Lance Madison, the man arrested on the bridge, ever had to |
| 11:06 | 11 | appear in court? |
| 11:06 | 12 | A.  Yes. |
| 11:06 | 13 | Q.  What kind of hearing did he appear for? |
| 11:06 | 14 | A.  A preliminary hearing. |
| 11:06 | 15 | Q.  What's a preliminary hearing? |
| 11:06 | 16 | A.  It's a hearing held before a judge to determine if there |
| 11:06 | 17 | was, in fact, probable cause to effect the arrest for which |
| 11:06 | 18 | he's being held. |
| 11:07 | 19 | Q.  Had Lance Madison been arrested the day of the shooting? |
| 11:07 | 20 | A.  Yes, he had. |
| 11:07 | 21 | Q.  What was he arrested for? |
| 11:07 | 22 | A.  Eight counts of attempted murder on a police officer. |
| 11:07 | 23 | Q.  How serious a charge is that, attempted murder on a police |
| 11:07 | 24 | officer? |
| 11:07 | 25 | A.  Very serious. |

MICHAEL LOHMAN - Direct

| | | |
|--|--|--|
| 11:07 | 1 | **Q.**   Who were the victims that he allegedly tried to kill? |
| 11:07 | 2 | **A.**   Police officers. |
| 11:07 | 3 | **Q.**   Which police officers? |
| 11:07 | 4 | **A.**   The seven police officers involved with the -- the |
| 11:07 | 5 | Danziger Seven. |
| 11:07 | 6 | **Q.**   What was the eighth count? |
| 11:07 | 7 | **A.**   It was a deputy from St. Landry Parish, I believe it was, |
| 11:07 | 8 | David Ryder. |
| 11:07 | 9 | **Q.**   And you said a deputy from St. Landry Parish.  Did you |
| 11:07 | 10 | learn later whether or not that man was really a deputy? |
| 11:07 | 11 | **A.**   I later learned that he wasn't a deputy. |
| 11:07 | 12 | **Q.**   All right.  So seven of those counts of attempted murder |
| 11:07 | 13 | against Lance Madison were for allegedly attempting to kill |
| 11:07 | 14 | NOPD officers involved in this incident; correct? |
| 11:07 | 15 | **A.**   Yes. |
| 11:07 | 16 | **Q.**   You said that he appeared at a preliminary hearing.  What |
| 11:07 | 17 | normally happens at a preliminary hearing?  Do police usually |
| 11:07 | 18 | testify? |
| 11:07 | 19 | **A.**   Yes.  The arresting officer will testify as to the |
| 11:08 | 20 | probable cause for the arrest. |
| 11:08 | 21 | **Q.**   Do you know whether any officers testified at Lance's |
| 11:08 | 22 | hearing? |
| 11:08 | 23 | **A.**   Yes, Kaufman did. |
| 11:08 | 24 | **Q.**   Were you there for it? |
| 11:08 | 25 | **A.**   No, I wasn't. |

MICHAEL LOHMAN - Direct

11:08   1   **Q.**   How do you know that Kaufman testified at it?
11:08   2   **A.**   We had a conversation about it that day after he
11:08   3   testified.
11:08   4   **Q.**   So he told you he had testified?
11:08   5   **A.**   Yes.
11:08   6   **Q.**   What did he tell you had happened?
11:08   7   **A.**   That he testified and that the judge was going to let
11:08   8   Lance Madison go if it weren't for the part that he added at
11:08   9   the bottom of the Gist about him throwing the gun over the side
11:08  10   into the Industrial Canal.
11:08  11   **Q.**   All right.  I'm going to put the Gist up in a minute and
11:08  12   ask you some questions about that.
11:08  13            Did you have any other conversation with him?
11:08  14   **A.**   Yes.
11:08  15   **Q.**   What?
11:08  16   **A.**   About the gun being recovered by someone else other than
11:08  17   him.
11:08  18   **Q.**   Explain what you mean by that.
11:08  19   **A.**   He testified in the preliminary hearing that someone else
11:08  20   had recovered the gun under the Danziger Bridge.
11:08  21   **Q.**   He told you that that's what he had said?
11:08  22   **A.**   Yeah.  Yes.  We had a conversation about that, yes.
11:08  23   **Q.**   What was your reaction?
11:08  24   **A.**   Anger and frustration, and I asked him how he could be so
11:08  25   foolish.

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 11:08 | 1 | **Q.**   What did you mean by that, "How can you be so foolish"? |
| 11:09 | 2 | **A.**   He was the one that planted the gun, so how could now |
| 11:09 | 3 | someone else recover the gun under the bridge? |
| 11:09 | 4 | **Q.**   Do you remember what he said? |
| 11:09 | 5 | **A.**   I don't really remember.  It was something to the effect |
| 11:09 | 6 | of he just got crossed up on his testimony, something to that |
| 11:09 | 7 | effect.  I don't really remember the exact verbiage or |
| 11:09 | 8 | explanation as to how he came about saying that. |
| 11:09 | 9 | **Q.**   All right.  You mentioned that you had some conversation |
| 11:09 | 10 | with him about the Gist. |
| 11:09 | 11 | **MS. BERNSTEIN:**  Can I have Exhibit 39 up, please? |
| 11:09 | 12 | May I have page 17 of that? |
| 11:09 | 13 | **BY MS. BERNSTEIN:** |
| 11:09 | 14 | **Q.**   All right.  So for the record, we've just put up 39, which |
| 11:09 | 15 | is the 17-page report.  And page 17 of that is the Gist that |
| 11:09 | 16 | you talked about earlier; correct? |
| 11:09 | 17 | **A.**   Yes. |
| 11:09 | 18 | **Q.**   First, can you tell us what "Gist" means in NOPD lingo? |
| 11:09 | 19 | **A.**   This is a Probable Cause Gist.  It's written by the |
| 11:10 | 20 | arresting officers and it contains the probable cause for the |
| 11:10 | 21 | arrest that was effected. |
| 11:10 | 22 | **Q.**   Now, when we look at the reports that were submitted, |
| 11:10 | 23 | sometimes they'll say in there, "Here's a Gist of somebody's |
| 11:10 | 24 | statement."  Is that Gist different than the official Probable |
| 11:10 | 25 | Cause Gist? |

MICHAEL LOHMAN - Direct

11:10   1   A.   Yes, it is.

11:10   2   Q.   All right.  When you write in a report, "Here's the Gist

11:10   3   of someone's statement," what does that mean?

11:10   4   A.   It's a summary of a statement obtained from a witness, or

11:10   5   a suspect, or a victim.

11:10   6   Q.   But when you all talk about "the Gist," that actually has

11:10   7   a particular meaning in NOPD lingo?

11:10   8   A.   Yes, the Probable Cause Gist.

11:10   9   Q.   All right.  What we're looking at here is the Probable

11:10   10  Cause Gist for the arrest of Lance Madison; correct?

11:10   11  A.   Yes, it is.

11:10   12       MS. BERNSTEIN:  Mr. Harrell, can we crop out just the

11:10   13  very top part of that?

11:10   14  BY MS. BERNSTEIN:

11:10   15  Q.   All right.  According to the -- who wrote the Gist for the

11:10   16  arrest of Lance Madison?

11:11   17  A.   It was my understanding Ignatius Hills did -- Officer

11:11   18  Ignatius Hills.

11:11   19  Q.   We haven't talked about him yet.  Who's he?

11:11   20  A.   He was a police officer assigned to the task force.  I

11:11   21  believe he worked for Bowen.

11:11   22  Q.   How long had he been with NOPD?

11:11   23  A.   Not very long, maybe a year, year and a half.  Somewhere

11:11   24  in that range.

11:11   25  Q.   So he was a very junior officer?

MICHAEL LOHMAN - Direct

11:11  1   A.   Yes, he was.

11:11  2   Q.   And it says on here, "I, Hills, Ignatius, employed by the

11:11  3   New Orleans Police Department, after being sworn, state,

11:11  4   Madison, Lance, arrested subject, black male, residing at

11:11  5   unknown, was arrested and charged as stated above.  Sworn and

11:11  6   subscribed before me this 4th day of September, 2005."

11:11  7         So that Gist, the probable cause statement, is a

11:11  8   sworn statement?

11:11  9   A.   Yes, it is.

11:11  10  Q.   And who is this Gist that we're about to look at the

11:11  11  statement of?

11:11  12  A.   It's the Probable Cause Gist for Lance Madison.

11:11  13  Q.   And according to this report, who's sworn statement is it?

11:12  14  A.   Ignatius Hills'.

11:12  15  Q.   There are a couple of signatures down there.  There's one

11:12  16  line that says "affiant"?

11:12  17  A.   Yes.

11:12  18  Q.   Whose name is that above it?

11:12  19  A.   Above it, Ignatius Hills.

11:12  20  Q.   To the right there's a line that says "supervisor."  Is a

11:12  21  Gist always signed off on by a supervisor?

11:12  22  A.   Yes, it has to be approved by a supervisor.

11:12  23  Q.   Who was Ignatius Hills' supervisor; do you know?

11:12  24  A.   At that time I think it was Bowen or Gisevius.

11:12  25  Q.   Who is the supervisor who signed off on this Gist?

MICHAEL LOHMAN - Direct

11:12  1    A.   Archie Kaufman.

11:12  2    Q.   All right.  So this is a sworn statement of Ignatius

11:12  3    Hills, signed off on by Archie Kaufman?

11:12  4    A.   Yes, it is.

11:12  5            MS. BERNSTEIN:  Can we take that blow-up away?

11:12  6            Can we blow up the text of the Gist, please?

11:12  7    BY MS. BERNSTEIN:

11:12  8    Q.   You said a few minutes ago that when you had your

11:12  9    conversation with Defendant Kaufman after he got back from the

11:12  10   preliminary hearing, he said that the judge was going to

11:12  11   release Lance Madison but for what he wrote on the Gist;

11:13  12   correct?

11:13  13   A.   Yes.

11:13  14   Q.   Can you explain what you mean?

11:13  15   A.   This section at the bottom.

11:13  16   Q.   You've just circled a section that looks like it's in a

11:13  17   different handwriting than the rest.

11:13  18   A.   Yes.  I later learned that that was added by Kaufman.

11:13  19   Q.   Onto Ignatius Hills' sworn statement?

11:13  20   A.   Yes.

11:13  21   Q.   All right.  So let me read.  The top part says:  "On

11:13  22   Sunday, September 4, 2005, at 9:00 a.m., the 7th District

11:13  23   officers received a [sic] officer in distress call, signal 108,

11:13  24   at Downman Road and Chef Menteur Highway.  Upon arrival, the

11:13  25   officers of the 7th District apprehended Lance Madison, black

MICHAEL LOHMAN - Direct

11:13  1   male" -- date of birth has been taken out there -- "in which he
11:13  2   was read his rights per Miranda and arrested for R.S. 14:2730,
11:13  3   relative to attempted murder, eight counts.
11:13  4            "The initial victim, David Ryder" -- some stuff is
11:13  5   excised -- "was fired upon, and 7th District officers were shot
11:14  6   at upon arrival at Chef Menteur Highway and Downman Road."
11:14  7            Can you read the part that Defendant Kaufman told you
11:14  8   he added onto that?
11:14  9   A.   "The perpetrator fled and threw his handgun into the
11:14  10  Industrial Canal and was apprehended a short time later."
11:14  11  Q.   All right.  I want to ask you a bunch of questions now
11:14  12  about these various reports that you testified about.
11:14  13           MS. BERNSTEIN:  First, may I have Exhibit 37 up,
11:14  14  please?
11:14  15  BY MS. BERNSTEIN:
11:14  16  Q.   All right.  This is the 46-page report that Defendant
11:14  17  Kaufman handed to you; correct?
11:14  18  A.   Yes.
11:14  19           MS. BERNSTEIN:  May I have pages 6 and 7 side by
11:14  20  side?
11:15  21  BY MS. BERNSTEIN:
11:15  22  Q.   This report contains a section that lists the weapons
11:15  23  supposedly used on the bridge; correct?
11:15  24  A.   Yes.
11:15  25  Q.   According to this report, what kind of gun did Ken Bowen

MICHAEL LOHMAN - Direct

| 11:15 | 1 | use on the bridge? |
| 11:15 | 2 | A.   A Glock 22 .40 caliber semi-automatic. |
| 11:15 | 3 | Q.   That's the handgun that police officers are issued by |
| 11:15 | 4 | NOPD? |
| 11:15 | 5 | A.   Yes. |
| 11:15 | 6 | Q.   Does it list any other gun? |
| 11:15 | 7 | A.   No, it does not. |
| 11:15 | 8 | Q.   According to this report, what kind of gun did Gisevius |
| 11:15 | 9 | use? |
| 11:15 | 10 | A.   Same thing, a Glock 22 .40 caliber semi-automatic. |
| 11:15 | 11 | Q.   According to this report, what kind of gun did Defendant |
| 11:15 | 12 | Faulcon use? |
| 11:15 | 13 | A.   A shotgun. |
| 11:15 | 14 | Q.   Barrios, Officer Barrios? |
| 11:15 | 15 | A.   A shotgun. |
| 11:15 | 16 | Q.   According to this report, did any officer carry a rifle? |
| 11:15 | 17 | A.   Anthony Villavaso. |
| 11:15 | 18 | Q.   According to this report, is he the only officer who |
| 11:15 | 19 | carried a rifle on the bridge that day? |
| 11:15 | 20 | A.   Yes. |
| 11:15 | 21 | Q.   There are a couple question marks there on page 8 of the |
| 11:16 | 22 | 46 report -- 46-page report.  What are those question marks? |
| 11:16 | 23 | A.   Those were questions -- question marks written by me when |
| 11:16 | 24 | I read the report, and I was asking why -- why are we saying |
| 11:16 | 25 | that Bowen and Gisevius were only carrying handguns when I knew |

MICHAEL LOHMAN - Direct

11:16  1  it to be otherwise.
11:16  2  **Q.**   What did you know to be otherwise?
11:16  3  **A.**   That they were carrying long rifles.
11:16  4  **Q.**   Both of them?
11:16  5  **A.**   Yes.
11:16  6  **Q.**   What did you do other than just write question marks
11:16  7  there?
11:16  8  **A.**   The question marks were written and I believe we talked
11:16  9  about it.  I don't remember -- I don't recall what the
11:16 10  explanation was.  And I know that when the 17-page report was
11:16 11  written, it was written the same way.
11:16 12  **Q.**   Okay.  Let's go --
11:16 13  **A.**   But I don't recall what the explanation was.
11:16 14  **Q.**   -- one step at a time.
11:16 15       When you noticed that this report didn't mention
11:16 16  Bowen's rifle or Gisevius' rifle, who did you have a
11:16 17  conversation with?
11:16 18  **A.**   With Kaufman.
11:16 19  **Q.**   And let me ask you to lean forward and talk into the
11:16 20  microphone again, please.
11:16 21       You had a conversation with Kaufman?
11:16 22  **A.**   Yes.
11:16 23  **Q.**   What was the purpose of the conversation that you had with
11:17 24  Kaufman?
11:17 25  **A.**   Why weren't we just saying -- why weren't we just telling

MICHAEL LOHMAN - Direct

11:17    1    the truth about what weapons they were carrying.  Why were we

11:17    2    saying they were only carrying the Glock?

11:17    3    **Q.**   And you said you don't remember what answer you got?

11:17    4    **A.**   I don't remember the explanation.  But I know that when I

11:17    5    wrote the 17-page report, it was -- I typed over this, but it

11:17    6    was left the same in the 17-pager.

11:17    7         **MS. BERNSTEIN:**  Let's look at that one, please,

11:17    8    Exhibit 39.

11:17    9    **BY MS. BERNSTEIN:**

11:17    10    **Q.**   So your report also has that list of guns; correct?

11:17    11    **A.**   Yes.

11:17    12         **MS. BERNSTEIN:**  Can we have page 7, please?

11:17    13    **BY MS. BERNSTEIN:**

11:17    14    **Q.**   Now, this is the 17-page report that you wrote in

11:17    15    conjunction with Kaufman, Bowen, and Gisevius; correct?

11:17    16    **A.**   Yes.

11:17    17    **Q.**   And as we look at that, according to this report, what

11:17    18    kind of gun did Bowen use?

11:17    19    **A.**   A handgun, the .40 caliber Glock.

11:17    20    **Q.**   Gisevius?

11:17    21    **A.**   .40 caliber Glock.

11:17    22    **Q.**   And according to this list, who is the only officer who

11:18    23    fired a rifle?

11:18    24    **A.**   Villavaso.

11:18    25    **Q.**   This is the report that you wrote after talking to them

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 11:18 | 1 | about, "Why are we leaving out the rifles"; correct? |
| 11:18 | 2 | A.   Yes. |
| 11:18 | 3 | Q.   And you said you don't remember what explanation they gave |
| 11:18 | 4 | you; correct? |
| 11:18 | 5 | A.   No, I don't recall an explanation. |
| 11:18 | 6 | Q.   Whose decision was it that it would stay this way? |
| 11:18 | 7 | A.   Apparently, I went along with it and wrote it that way. |
| 11:18 | 8 | Q.   But who made that call? |
| 11:18 | 9 | A.   It would have been me. |
| 11:18 | 10 | Q.   Did you decide that you were going to leave out the |
| 11:18 | 11 | rifles, or was that in conjunction with the conversation with |
| 11:18 | 12 | them? |
| 11:18 | 13 | A.   It was in conjunction with the conversation.  And like I |
| 11:18 | 14 | said, I don't really recall what the explanation was. |
| 11:18 | 15 | Q.   All right. |
| 11:18 | 16 |       MS. BERNSTEIN:  Can I have Exhibit 38 up, please? |
| 11:18 | 17 | BY MS. BERNSTEIN: |
| 11:18 | 18 | Q.   I want to focus now on the version in these reports |
| 11:18 | 19 | attributed to Defendant Bowen, the stories from him in these |
| 11:19 | 20 | accounts, all right?  Let's start with -- we have the 32-page |
| 11:19 | 21 | report up.  That's the first report you got; right? |
| 11:19 | 22 | A.   Yes. |
| 11:19 | 23 |       MS. BERNSTEIN:  May I have page 22, please? |
| 11:19 | 24 | BY MS. BERNSTEIN: |
| 11:19 | 25 | Q.   For the record, that's page 23 of the 32-page report.  And |

MICHAEL LOHMAN - Direct

11:19    1    it says there in the highlighted part:  "Sergeant Arthur

11:19    2    Kaufman then met with Sergeant Kenneth Bowen, who gave the

11:19    3    verbal statement relevant to this incident."

11:19    4         MS. BERNSTEIN:  And if we can blow this up to make it

11:19    5    easier for him.

11:19    6    BY MS. BERNSTEIN:

11:19    7    Q.    I'd like you to read the entire statement here attributed

11:19    8    to Ken Bowen.

11:19    9         I think we have some highlighting there that will

11:19   10    help.

11:19   11    A.    "On the morning of September 4, 2005, Sergeant Ken Bowen

11:19   12    was on proactive patrol in the 7th District in an attempt to

11:19   13    keep peace and prevent looting.  Sergeant Bowen was monitoring

11:19   14    the 7th District police radio channel when he heard a distress

11:19   15    call come out.  A female officer advised that two police

11:20   16    officers were down, shot under the Danziger Bridge near Chef

11:20   17    Menteur Highway and Downman Road and that subjects were firing

11:20   18    additional shots at persons in the area.  Sergeant Bowen

11:20   19    boarded a truck driven by Officer Michael Hunter and occupied

11:20   20    by several other police officers.  Sergeant Bowen was the front

11:20   21    seat passenger of the truck.

11:20   22         "The truck proceeded to the area of the Danziger

11:20   23    Bridge at which time the truck stopped and Sergeant Bowen

11:20   24    shouted for the subjects to raise their hands in the air.  The

11:20   25    subjects immediately went for cover while arming themselves and

MICHAEL LOHMAN - Direct

11:20   1   fired upon the officers.  The subjects then all jumped behind a
11:20   2   cement barrier for cover to ambush the officers exiting the
11:20   3   rear of the truck.
11:20   4           "To protect his own life and the lives of other
11:20   5   officers exiting the truck, Sergeant Bowen fired several shots
11:20   6   into the concrete barrier to deter the subjects from standing
11:21   7   and aiming at the officers.  Sergeant Bowen began to shout to
11:21   8   the subjects to throw their weapons off the side of the bridge.
11:21   9           "Sergeant Bowen observed a young male subject jump
11:21   10  from the bridge onto the grassy area several feet below to
11:21   11  flee.  Sergeant Bowen heard numerous gunfire from the immediate
11:21   12  area.  Officers Faulcon, Villavaso, and Barrios engaged the
11:21   13  armed subject behind the cement barrier and then ceased firing.
11:21   14          "Sergeant Bowen also observed two males running west
11:21   15  over the bridge while gunshots could be heard coming from those
11:21   16  two subjects.  Sergeant Bowen exited the truck and cautiously
11:21   17  peeked over the cement barrier.  He observed two dark colored
11:21   18  handguns lying on the cement next to the stationary subjects.
11:21   19  Sergeant Bowen jumped over the cement barrier and kicked the
11:21   20  weapons over the side of the bridge.
11:21   21          "Sergeant Bowen ran down the bridge and into the tall
11:21   22  grassy area on the side of the bridge to look for the young
11:21   23  male subject.  While walking through the grassy area next to
11:22   24  the bridge, Sergeant Bowen observed several handguns lying in
11:22   25  the grass near the bridge.

MICHAEL LOHMAN - Direct

11:22  1          "Sergeant Bowen looked under the bridge, but did not

11:22  2      see the young male.  Sergeant Bowen then observed that the

11:22  3      young male who had fled off the bridge had been detained and

11:22  4      handcuffed by another NOPD officer without incident.

11:22  5              "Sergeant Bowen could see that the officers were

11:22  6      still chasing the other two male subjects on foot over the

11:22  7      bridge, when he observed one of the subjects being chased,

11:22  8      later identified as Lance Madison, discard his weapon over the

11:22  9      bridge into the Industrial Canal.

11:22 10              "Sergeant Bowen ran back to the truck and began

11:22 11      to drive it over the bridge.  The subjects were observed

11:22 12      running into the motel complex at the opposite side of the

11:22 13      bridge.  Sergeant Bowen assisted in setting up a perimeter on

11:22 14      the east side of the apartment complex.  Sergeant Bowen

11:22 15      observed that the east side was heavily flooded and, therefore,

11:22 16      ran back to the front of the complex.

11:22 17              "Once in front, Sergeant Bowen observed that one

11:22 18      of the two subjects who had fled over the bridge was stationary

11:23 19      just inside of the apartment complex.  The officers lost sight

11:23 20      of the second subject who had run north in the floodwaters.

11:23 21      Shortly thereafter, Louisiana State Police SWAT team located

11:23 22      the second subject attempting to escape outside -- escape

11:23 23      outside -- escape outside the west side of the police

11:23 24      perimeter.  This subject was arrested by state police without

11:23 25      incident."

MICHAEL LOHMAN - Direct

11:23    1          **MS. BERNSTEIN:**  Can we go back one page, Mr. Harrell?
11:23    2    **BY MS. BERNSTEIN:**
11:23    3    **Q.**   At the bottom there, just to be clear:  "Sergeant Bowen
11:23    4    observed that one of the two subjects who had fled over the
11:23    5    bridge was stationary just inside the apartment complex."
11:23    6          That's Ronald Madison?
11:23    7    **A.**   Yes.
11:23    8    **Q.**   Why was he stationary?
11:23    9    **A.**   Because he had been shot.
11:23    10   **Q.**   And he was dead?
11:23    11   **A.**   Yes.
11:23    12   **Q.**   Okay.  I want to ask you a couple questions about that.
11:24    13   According to this account that you just read, how many men did
11:24    14   Defendant Bowen see running over the bridge toward the west
11:24    15   side?
11:24    16   **A.**   Two males.
11:24    17   **Q.**   Let me ask you if you're -- Mr. Lohman, do you need it to
11:24    18   pop out for you to read it or can you do it without the
11:24    19   pop-out?
11:24    20   **A.**   I can do it without.
11:24    21   **Q.**   Okay.  So that first question was:  How many men did he
11:24    22   see running over the bridge to the west side, according to this
11:24    23   version?
11:24    24   **A.**   It was two males.
11:24    25   **Q.**   According to this version, how many times and why did

MICHAEL LOHMAN - Direct

11:24  1    Defendant Bowen fire?

11:24  2    **A.**   To protect his life and the lives of the other officers,

11:24  3    he fired several shots.

11:24  4    **Q.**   Where did they go?

11:24  5    **A.**   Into the concrete barrier.

11:24  6    **Q.**   Can you read the rest of that line?

11:24  7    **A.**   "To protect his own life and the lives of the other

11:24  8    officers exiting the truck, Sergeant Bowen fired several shots

11:24  9    into the concrete barrier to deter the subjects from standing

11:25  10   and aiming at the officers.

11:25  11   **Q.**   According to this report, did he fire those shots before

11:25  12   or after he got out of the truck?

11:25  13   **A.**   While in the truck.

11:25  14   **Q.**   So he fired them while he was still in the truck?

11:25  15   **A.**   Yes.

11:25  16   **Q.**   And then according to this report, what did he do after he

11:25  17   got out of the truck?

11:25  18   **A.**   "He got out of the truck and cautiously peeked over the

11:25  19   cement barrier, he observed two dark colored handguns lying on

11:25  20   the cement next to the stationary subjects.  Sergeant Bowen

11:25  21   jumped over the cement barrier and kicked the weapons over the

11:25  22   side of the bridge.  Sergeant Bowen ran down the bridge and

11:25  23   into the tall grassy area on side of the bridge to look for the

11:25  24   young male subject who fled.

11:25  25          "While walking through the grassy area next to the

MICHAEL LOHMAN - Direct

11:25  1  bridge, Sergeant Bowen observed several handguns lying in the
11:25  2  grass near the bridge.  Sergeant Bowen looked under the bridge,
11:25  3  but did not see the young male.  Sergeant Bowen then observed
11:25  4  that the young male who had fled off the bridge had been
11:25  5  detained and handcuffed by another NOPD officer without
11:25  6  incident."
11:26  7  Q.  According to this account, how many guns did Sergeant
11:26  8  Bowen see when he got out of the truck?
11:26  9  A.  Two.
11:26  10  Q.  So according to this account, he stood in the grass and
11:26  11  saw the guns, but didn't pick them up; is that right?
11:26  12  A.  Yes, yes.
11:26  13  Q.  What was your reaction to that?
11:26  14  A.  That it wasn't logical.  The reason for -- the reason for
11:26  15  pushing the guns over the side of the bridge was to secure them
11:26  16  in a safe place because he wasn't able to secure them on his
11:26  17  person or pick them up.
11:26  18  Q.  Let me stop you there.  When you say "the reason was," do
11:26  19  you mean the reason that was going to be given?
11:26  20  A.  The reason that was going to be given, or the reason that
11:26  21  he gave for kicking the guns over the side of the bridge was to
11:26  22  set them in a secure place so that no one could arm themselves
11:26  23  with the gun.  Well, he says he kicks the gun -- guns over the
11:26  24  bridge, but then he runs down under the bridge to search for a
11:26  25  young subject who had run under the bridge.

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 11:26 | 1 | Well, if there's now a subject under the bridge where |
| 11:27 | 2 | you kicked the guns, it's not logical and that doesn't make |
| 11:27 | 3 | sense about why you kicked them off the bridge in the first |
| 11:27 | 4 | place, and you should have recovered them. |
| 11:27 | 5 | **Q.** So if there's a subject under there, you're not going to |
| 11:27 | 6 | kick it off in the first place? |
| 11:27 | 7 | **A.** Exactly. |
| 11:27 | 8 | **Q.** Okay. And that -- am I understanding right that that's |
| 11:27 | 9 | one of the concerns you had with this story? |
| 11:27 | 10 | **A.** Yes. |
| 11:27 | 11 | **Q.** All right. And you said something else about he said he |
| 11:27 | 12 | was going to run down into the grass. Can you explain that |
| 11:27 | 13 | concern? |
| 11:27 | 14 | **MR. DESALVO:** Excuse me, Your Honor. I think the |
| 11:27 | 15 | government is misstating. This is what the report says he |
| 11:27 | 16 | said. She's saying "he said." |
| 11:27 | 17 | **THE COURT:** Yes, let's rephrase the question. I'll |
| 11:27 | 18 | sustain that. |
| 11:27 | 19 | **BY MS. BERNSTEIN:** |
| 11:27 | 20 | **Q.** Actually, let me ask another series of questions first and |
| 11:27 | 21 | then I'll come back to this. |
| 11:27 | 22 | When you saw this report and you had these issues |
| 11:27 | 23 | with it, what did you do? |
| 11:27 | 24 | **A.** I spoke to Bowen about it. |
| 11:27 | 25 | **Q.** You talked to Ken Bowen about it? |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 11:27 | 1 | A.   Yes. |
| 11:27 | 2 | Q.   Tell us about your conversation with Bowen, what did you |
| 11:27 | 3 | tell him? |
| 11:27 | 4 | A.   That it wasn't logical.  It didn't make sense.  The reason |
| 11:27 | 5 | that -- the reason that he was providing for kicking the guns |
| 11:27 | 6 | over the side of the bridge to account for where the guns went |
| 11:28 | 7 | was safety concerns.  We were pushing them over the side of the |
| 11:28 | 8 | bridge so no one else could arm themselves with the guns. |
| 11:28 | 9 | Well, if you're kicking them over the side of the |
| 11:28 | 10 | bridge and now you're saying that someone was running under the |
| 11:28 | 11 | bridge where the guns were at, that doesn't make sense.  Why |
| 11:28 | 12 | don't you -- why now do you not have to pick up the gun or |
| 11:28 | 13 | recover them if you know that someone is down there that could |
| 11:28 | 14 | arm themselves and do the same thing that the people on the |
| 11:28 | 15 | bridge did?  They could shoot you. |
| 11:28 | 16 | Q.   When you had that conversation with him, did he say, |
| 11:28 | 17 | "Boss, I don't know what you're talking about.  I've never seen |
| 11:28 | 18 | that statement"? |
| 11:28 | 19 | A.   No. |
| 11:28 | 20 | Q.   Did he say, "That's not my statement"? |
| 11:28 | 21 | A.   No. |
| 11:28 | 22 | Q.   Did he say, "But I can't change it because that's the |
| 11:28 | 23 | truth"? |
| 11:28 | 24 | A.   No. |
| 11:28 | 25 | Q.   Did he, in fact, change his statement after that |

MICHAEL LOHMAN - Direct

11:28    1    conversation?

11:28    2    A.    Yes, it was changed.

11:28    3    Q.    All right.  Let me ask you a couple more questions about

11:28    4    that statement, and I started to ask this before the objection.

11:28    5    You started to say earlier that you were also bothered by the

11:28    6    part about him running down into the grass.  Can you explain

11:28    7    that?

11:28    8    A.    He says he ran down into the grassy area.  And my question

11:28    9    was why couldn't he recover -- he ran down there to look for

11:29   10    the subject who fled, but why couldn't he recover the guns

11:29   11    while he was down there.  That was my concern.

11:29   12    Q.    What did he say to that?

11:29   13    A.    He couldn't provide an explanation.  No explanation was

11:29   14    provided.

11:29   15    Q.    Did that part come out of the next version?

11:29   16    A.    Yes, I believe that -- I believe it did.

11:29   17    Q.    All right.  Rather than asking you to remember the whole

11:29   18    next version, let's pull that up.

11:29   19              MS. BERNSTEIN:  Can we have Exhibit 37, please?

11:29   20    BY MS. BERNSTEIN:

11:29   21    Q.    Exhibit 37.  This is the 46-page report that Defendant

11:29   22    Kaufman gave you.

11:29   23              MS. BERNSTEIN:  Can we have page 16, please?  I'm

11:29   24    sorry, page 15, please.

        25

MICHAEL LOHMAN - Direct

11:29     1    BY MS. BERNSTEIN:

11:29     2    Q.    For the record that's page 17 of the 46-page report.  It

11:29     3    says there:  "Bowen, Kenneth, police sergeant, white male, date

11:29     4    of birth, who's address is 10101 Dwyer Road."  What is that the

11:29     5    address of?

11:29     6    A.    The 7th District police station.

11:29     7    Q.    So we'll see that a bunch of times throughout the report;

11:30     8    correct?

11:30     9    A.    Yes.

11:30    10    Q.    All right.  And then under there is the Gist of this

11:30    11    statement attributed to Defendant Bowen?

11:30    12    A.    Yes.

11:30    13    Q.    All right.  Would it be easier for you if I read it?

11:30    14    A.    No.  I'd rather -- I prefer to read it.

11:30    15    Q.    Okay.

11:30    16    A.    "On the morning of September 4, 2005, Sergeant Ken Bowen

11:30    17    was at the 7th District station.  Sergeant Bowen was monitoring

11:30    18    the 7th District police radio channel when he heard a distress

11:30    19    call come out.  A female officer advised that two police

11:30    20    officers were shot under the Danziger Bridge near Chef Menteur

11:30    21    Highway and Downman Road.  The subjects were firing additional

11:30    22    shots at persons in the area.  Sergeant Bowen boarded a truck

11:30    23    driven by Officer Michael Hunter and occupied by several other

11:30    24    police officers.  Sergeant Bowen was the front seat passenger

11:30    25    of the truck.

MICHAEL LOHMAN - Direct

11:30  1          "Sergeant Bowen was wearing the standard approved
11:30  2    NOPD task force attire, which consisted of dark blue BDU-style
11:30  3    shirt and pants.  Sergeant Bowen's blue shirt had a gold
11:30  4    colored NOPD badge chest patch visible on the front left side
11:30  5    of its -- on the front left side of it and the standard NOPD
11:31  6    arm patches on both sleeves, along with a patch on the back of
11:31  7    the shirt reading in gold lettering, 'New Orleans POLICE,' and
11:31  8    on the shoulders of the shirt were two gold colored police
11:31  9    sergeant chevron insignias.
11:31  10         "The truck proceeded to the area of the Danziger
11:31  11   Bridge at which time the truck stopped and Sergeant Bowen
11:31  12   shouted for the subjects to raise their hands in the air.  The
11:31  13   subjects immediately went for cover by jumping over the cement
11:31  14   barricades or reaching for their pockets or waistbands in a
11:31  15   manner which was consistent with someone arming themselves with
11:31  16   a firearm.
11:31  17         "Sergeant Bowen observed a young male subject, later
11:31  18   identified as Leonard Bartholomew, Jr., jump from the bridge
11:31  19   onto the ground several feet below to flee.  Sergeant Bowen
11:31  20   then observed two males, later identified as Holmes and Doe No.
11:31  21   1, began to run back eastbound toward the rear of the truck
11:31  22   while pointing their weapons at Sergeant Bowen."
11:31  23   Q.   I'm going to stop you there for one second.  Who is Doe
11:31  24   No. 1?
11:32  25   A.   James Brissette.

MICHAEL LOHMAN - Direct

11:32   1   **Q.**   Okay.  Go on, please.

11:32   2   **A.**   "To protect his own life and the lives of other officers

11:32   3   exiting the truck, Sergeant Bowen fired several shots at the

11:32   4   subjects which went low and struck the concrete barrier between

11:32   5   the subjects and Sergeant Bowen.

11:32   6            "Sergeant Bowen momentarily ducked down from the

11:32   7   window for cover to avoid being shot and shouted for the

11:32   8   subjects to throw their weapons off the side of the bridge.

11:32   9   Sergeant Bowen then heard several shots coming from the area of

11:32   10  the right rear side of the truck where Holmes and Doe No. 1 had

11:32   11  been.  Unbeknownst to Sergeant Bowen, Officers Faulcon,

11:32   12  Villavaso, and Barrios had exited the truck, observed the armed

11:32   13  subjects point their weapons at them and fired upon Holmes and

11:32   14  Doe No. 1 in self defense of their lives.

11:32   15           "Sergeant Bowen also observed three males running

11:32   16  west over the bridge, while gunshots could be heard coming from

11:32   17  the area of those three subjects, later identified as Lance

11:32   18  Madison and Doe No. 2 and the unknown third subject.

11:32   19           "Sergeant Bowen observed Officers Faulcon and

11:33   20  Villavaso run past his window and to the front of the Budget

11:33   21  truck.  Sergeant Bowen exited the truck and cautiously peeked

11:33   22  over the cement barrier.  He observed two dark colored handguns

11:33   23  lying on the cement next to two stationary subjects, who were

11:33   24  later identified as Jose Holmes and John Doe No. 1.

11:33   25           "Sergeant Bowen jumped over the cement barrier and

MICHAEL LOHMAN - Direct

11:33  1    looked off the side of the bridge for Bartholomew Junior or
11:33  2    other subjects.  Sergeant Bown did not see anyone below him,
11:33  3    but he did observe a chrome revolver on the ground below.  To
11:33  4    prevent the wounded perpetrators from re-arming themselves with
11:33  5    the two handguns still on the bridge, Sergeant Bowen pushed the
11:33  6    two handguns with his foot over the side of the bridge where
11:33  7    they fell onto the ground.  Sergeant Bowen then looked back
11:33  8    toward Chef Highway and Downman Road and observed that
11:33  9    Bartholomew, Jr. had been detained and handcuffed by another
11:33  10   officer without incident.
11:33  11        "Sergeant Bowen could see that officers were still
11:33  12   chasing the other three male subjects on foot over the bridge.
11:33  13   Sergeant Bowen observed one of the subjects being chased, later
11:34  14   identified as Lance Madison, discard his weapon over the bridge
11:34  15   into the Industrial Canal as he ran over the top of the bridge.
11:34  16   Sergeant Bowen ran back to the truck and began to drive it over
11:34  17   the bridge.  The subjects were observed running into the motel
11:34  18   complex on top -- on the opposite side of the bridge.  Sergeant
11:34  19   Bowen assisted in setting up a perimeter on the east side of
11:34  20   the apartment complex.
11:34  21        "Sergeant Bowen observed that the east side was
11:34  22   heavily flooded and therefore ran back to the front of the
11:34  23   complex.  Once in front, Sergeant Bowen observed that the three
11:34  24   subjects, later identified as Joe No -- Joe -- John Doe No. 2,
11:34  25   had been wounded just inside the parking area of the Friendly

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 11:34 | 1 | Inn.  The officers lost sight of Madison who had run north into |
| 11:34 | 2 | the floodwaters, then unknown.  Shortly thereafter, Louisiana |
| 11:34 | 3 | State Police SWAT team located the Madison attempting -- |
| 11:34 | 4 | located Madison attempting to escape outside the west side of |
| 11:34 | 5 | the police perimeter.  Madison was detained by state police |
| 11:35 | 6 | without incident." |
| 11:35 | 7 | Q.   And it actually refers there to "Joe Doe No. 2," but who |
| 11:35 | 8 | is John Doe or Joe Doe No. 2? |
| 11:35 | 9 | A.   John Doe -- Madison -- John Doe No. 2 would be Ronald |
| 11:35 | 10 | Madison. |
| 11:35 | 11 | Q.   So according to this account, the second version, how many |
| 11:35 | 12 | men ran away toward the west side of the bridge? |
| 11:35 | 13 | A.   Three. |
| 11:35 | 14 | Q.   So it was two, now it's three? |
| 11:35 | 15 | A.   Yes. |
| 11:35 | 16 | Q.   "Sergeant Bowen also observed three males running west |
| 11:35 | 17 | over the bridge, while gunshots could be heard coming from the |
| 11:35 | 18 | area of those three subjects, later identified as Lance |
| 11:35 | 19 | Madison, John Doe No. 2 -- you said that's Ronald Madison? |
| 11:35 | 20 | A.   Yes. |
| 11:35 | 21 | Q.   -- and unknown third subject."  Who's that? |
| 11:35 | 22 | A.   I thought it was the guy -- the individual obtained in |
| 11:35 | 23 | front -- detained in front of the Friendly Inn Motel wearing |
| 11:35 | 24 | the black attire that was identified, but the ID was lost. |
| 11:36 | 25 | Q.   That guy who was lying on the ground? |

MICHAEL LOHMAN - Direct

11:36  1    A.   Yes.  That was my understanding about who it was.

11:36  2    Q.   According to this account, were there additional details

11:36  3    about what Defendant Bowen did right after he fired from the

11:36  4    truck and struck the barrier?

11:36  5    A.   Yes.

11:36  6    Q.   Can you read that part to us?

11:36  7    A.   "The subjects immediately went for cover by jumping over

11:36  8    the cement barricade while reaching for their pockets or

11:36  9    waistband in a manner consistent with someone arming themselves

11:36  10   with a firearm.  Sergeant Bowen observed the young male

11:36  11   subject, later identified as Leonard Bartholomew, Jr., jump

11:36  12   from the bridge onto the ground several feet below to flee.

11:36  13          "Sergeant Bowen then observed two males, later

11:36  14   identified as Holmes and Doe No. 1, begin to run back eastbound

11:36  15   toward the rear of the truck while pointing their weapons at

11:36  16   Sergeant Bowen.  To protect his own life and the lives of the

11:36  17   other officers exiting the truck, Sergeant Bowen fired several

11:36  18   shots at the subjects which went low and struck the concrete

11:36  19   barrier between the subjects and Sergeant Bowen.

11:36  20          "Sergeant Bowen momentarily ducked down from the

11:36  21   window for cover to avoid being shot and shouted for the

11:36  22   subjects to throw their weapons off the side of the bridge."

11:37  23   Q.   So now we've actually got Bowen ducking down to avoid

11:37  24   shots; correct?

11:37  25   A.   Yes.

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 11:37 | 1 | **Q.**   Was that in the last version? |
| 11:37 | 2 | **A.**   No. |
| 11:37 | 3 | **Q.**   According to this account, did Bowen run down under the |
| 11:37 | 4 | bridge and see the guns? |
| 11:37 | 5 | **A.**   No. |
| 11:37 | 6 | **Q.**   And according to this account, how many guns did Bowen |
| 11:37 | 7 | see? |
| 11:37 | 8 | **A.**   Two dark colored handguns lying by the stationary subjects |
| 11:37 | 9 | on the bridge; and he observed an additional gun on the ground |
| 11:37 | 10 | below the bridge, a chrome revolver.  Three. |
| 11:37 | 11 | **Q.**   So why did this second version, if you know, not have that |
| 11:37 | 12 | part about going down under the bridge and seeing the guns? |
| 11:37 | 13 | **A.**   I'm -- I'm not sure.  Why didn't the second -- the 46-page |
| 11:38 | 14 | report didn't contain a part about him going down there because |
| 11:38 | 15 | it wasn't logical and it didn't make sense. |
| 11:38 | 16 | **Q.**   And you all had talked about that? |
| 11:38 | 17 | **A.**   Yes. |
| 11:38 | 18 | **Q.**   Now, you didn't write this 46-page report, did you? |
| 11:38 | 19 | **A.**   No. |
| 11:38 | 20 | **Q.**   And this 46-page report was submitted to you before or |
| 11:38 | 21 | after the case went over to Cold Case Homicide? |
| 11:38 | 22 | **A.**   Before. |
| 11:38 | 23 | **Q.**   So Sergeant Dugue didn't write this report? |
| 11:38 | 24 | **A.**   No. |
| 11:38 | 25 | **Q.**   All right.  In both of those accounts that you just read, |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 11:38 | 1 | Defendant Bowen claimed to have seen Lance Madison -- |
| 11:38 | 2 |      **MR. DESALVO:**  I object, Your Honor.  Those reports |
| 11:38 | 3 | say what they say.  They don't actually say that Sergeant Bowen |
| 11:38 | 4 | claimed anything.  That's a misstatement of facts. |
| 11:38 | 5 |      **THE COURT:**  Rephrase the question. |
| 11:38 | 6 | **BY MS. BERNSTEIN:** |
| 11:38 | 7 | **Q.**  I think we've already established for the first one that |
| 11:38 | 8 | you had a conversation with Bowen about this being his |
| 11:38 | 9 | statement; correct? |
| 11:38 | 10 | **A.**  Yes. |
| 11:38 | 11 | **Q.**  And he never said, "No, that's not my statement"? |
| 11:39 | 12 | **A.**  No. |
| 11:39 | 13 | **Q.**  And he never said, "I can't change it because it's true"? |
| 11:39 | 14 | **A.**  No. |
| 11:39 | 15 | **Q.**  Did you have conversations with him about this statement |
| 11:39 | 16 | in this 46-page report? |
| 11:39 | 17 | **A.**  Yes. |
| 11:39 | 18 | **Q.**  Did he ever say, "That's not my statement"? |
| 11:39 | 19 | **A.**  No. |
| 11:39 | 20 | **Q.**  Did he ever say, "We've got to leave it just the way it is |
| 11:39 | 21 | because that's the way it happened"? |
| 11:39 | 22 | **A.**  No. |
| 11:39 | 23 | **Q.**  All right.  So in both of those statements where |
| 11:39 | 24 | Defendant Bowen claims that he saw Lance Madison throw a gun |
| 11:39 | 25 | into the water, what was your reaction to that particular |

MICHAEL LOHMAN - Direct

11:39   1   claim?

11:39   2   A.   It didn't seem logical or that he was at a vantage point

11:39   3   where he could see that happen on top of the bridge.  It didn't

11:39   4   make sense.

11:39   5   Q.   Explain that.

11:39   6   A.   He was claiming to be down at the bottom of the bridge, so

11:39   7   how could he see someone on top of the bridge.  It didn't sound

11:39   8   logical to me or believable that he could see that from his

11:39   9   vantage point.

11:39   10  Q.   Okay.  And then in the second version of the report, it

11:39   11  says that he's up on the bridge when he sees Lance Madison at

11:39   12  the top throw the gun off.  Did you still have a problem with

11:39   13  that?

11:39   14  A.   Yes.

11:39   15  Q.   Why is that?

11:39   16  A.   It still didn't seem believable that he would be in a

11:39   17  vantage -- at a vantage point where he could see him run over

11:40   18  to the side of the bridge and throw it over.

11:40   19  Q.   How big is that bridge?

11:40   20  A.   It's a big bridge.

11:40   21  Q.   Did you talk to Bowen about your concerns about that

11:40   22  story?

11:40   23  A.   Yes.

11:40   24  Q.   What happened?

11:40   25  A.   It was changed once again to --

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 11:40 | 1 | **Q.**  Well, when you had that conversation with Bowen did he |
| 11:40 | 2 | say, "But, Boss, we can't change that because that's what I |
| 11:40 | 3 | saw"? |
| 11:40 | 4 | **A.**  No.  He was in agreement with the change that we were |
| 11:40 | 5 | going to make. |
| 11:40 | 6 | **Q.**  So what change did you make? |
| 11:40 | 7 | **A.**  The change that was made was that the officers pursuing |
| 11:40 | 8 | the Madisons over the bridge would be at a vantage point to see |
| 11:40 | 9 | them -- to see them throw their guns over the bridge, and that |
| 11:40 | 10 | would be Faulcon, Gisevius, and Villavaso, and Hunter. |
| 11:40 | 11 | **Q.**  And so this was your idea that the story would make more |
| 11:40 | 12 | sense if the people actually chasing him saw it; is that |
| 11:40 | 13 | correct? |
| 11:40 | 14 | **A.**  Yes. |
| 11:40 | 15 | **Q.**  Was that version written down anywhere? |
| 11:40 | 16 | **A.**  Yes, it was. |
| 11:40 | 17 | **Q.**  Where? |
| 11:40 | 18 | **A.**  The 17-page report. |
| 11:40 | 19 | **MS. BERNSTEIN:**  Mr. Harrell, can we have Exhibit 39, |
| 11:40 | 20 | please?  That's the 17-page report. |
| 11:40 | 21 | Can we have page 11? |
| 11:40 | 22 | **BY MS. BERNSTEIN:** |
| 11:41 | 23 | **Q.**  Can you read what it says there? |
| 11:41 | 24 | **A.**  "Officers Faulcon and Villavaso, along with Sergeant |
| 11:41 | 25 | Gisevius and Officer Hunter, also observed Madison and Doe |

MICHAEL LOHMAN - Direct

11:41  1   No. 2 firing at them from top of the bridge."

11:41  2   **Q.**   Who is Doe No. 2?

11:41  3   **A.**   Ronald Madison.

11:41  4   **Q.**   Okay.  Go ahead, please.

11:41  5   **A.**   "The officers returned fire and began to pursue the

11:41  6   subjects over the bridge.  As Madison was running over the top

11:41  7   of the bridge, he discarded his handgun off the north side of

11:41  8   the bridge and into the waters of the Industrial Canal.  Doe

11:41  9   No. 2 was also observed running sharply to his right toward the

11:41  10  north side of the bridge before the officers lost sight of him

11:41  11  momentarily."

11:41  12  **Q.**   That was the version written in the 17-page report?

11:41  13  **A.**   Yes.

11:41  14  **Q.**   Who did you talk to about that version?

11:41  15  **A.**   Bowen, and Gisevius, and Kaufman.

11:41  16  **Q.**   Did they all approve it?

11:41  17  **A.**   Yes.

11:41  18  **Q.**   I'm going to ask you a question -- I'm going to ask you a

11:41  19  question about the 32-page report, that first one that was

11:41  20  turned in to you.  Without even looking at that report, can you

11:41  21  tell us what term the narrative used to describe

11:42  22  Defendant Bowen's actions of shooting into that wall?

11:42  23  **A.**   "Suppression fire."

11:42  24  **Q.**   Why do you know that term without even looking at it?

11:42  25  **A.**   Because it stuck out with me.  It was kind of shocking to

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 11:42 | 1 | me. |
| 11:42 | 2 | MS. BERNSTEIN: Can we have Exhibit 38, please? |
| 11:42 | 3 | That's the 32-page report. |
| 11:42 | 4 | Can we have page 18 of that exhibit? |
| 11:42 | 5 | BY MS. BERNSTEIN: |
| 11:42 | 6 | Q. For the record, that's page 19 of the report. It says |
| 11:42 | 7 | there: "As Sergeant Bowen laid down suppression fire and |
| 11:42 | 8 | engaged Holmes and an unidentified black male who also |
| 11:42 | 9 | brandished a handgun." |
| 11:42 | 10 | Who is the unidentified black male who also |
| 11:42 | 11 | brandished a handgun in that report? |
| 11:42 | 12 | A. James Brissette. |
| 11:42 | 13 | Q. All right. So you said that term about laying down |
| 11:42 | 14 | suppression fire jumped out at you; is that right? |
| 11:42 | 15 | A. Yes, yes. |
| 11:42 | 16 | Q. Why. |
| 11:42 | 17 | A. It was shocking to me because police officers don't lay |
| 11:42 | 18 | down suppression fire. They fire their weapon in self defense |
| 11:42 | 19 | if they believe their life or the life of someone else is in |
| 11:43 | 20 | danger. |
| 11:43 | 21 | Q. So what did you do when you saw that term in the report? |
| 11:43 | 22 | A. We spoke about it and it was changed. |
| 11:43 | 23 | Q. Who did you speak to? |
| 11:43 | 24 | A. Bowen. |
| 11:43 | 25 | Q. Did you talk to anybody else? |

MICHAEL LOHMAN - Direct

11:43   1   **A.**   I don't think -- I don't think so, no.

11:43   2   **Q.**   So that particular part you talked to Bowen about?

11:43   3   **A.**   Yes.

11:43   4   **Q.**   And you expressed your concerns?

11:43   5   **A.**   Yes.

11:43   6   **Q.**   And you said -- and it was changed?

11:43   7   **A.**   Yes.

11:43   8   **Q.**   Who changed it?

11:43   9   **A.**   I did in the 17-page report.

11:43   10   **Q.**   And he went along with that?

11:43   11   **A.**   Yes, he did.

11:43   12   **Q.**   So did that term disappear from the reports after that as

11:43   13   far as you know?

11:43   14   **A.**   Yes, it did.

11:43   15   **Q.**   While we're on the 32-page report, in that first report

11:43   16   that was submitted to you, was there any conclusion about who

11:43   17   had actually shot the people on the bridge?

11:43   18   **A.**   Yes.

11:43   19              **MS. BERNSTEIN:**  Can we have page 31, please?

11:43   20              For the record, that's page 32 of the 32-page

11:43   21   report.

11:43   22              Can you jump in on that, please?

11:43   23   **BY MS. BERNSTEIN:**

11:43   24   **Q.**   Can you read the conclusion to us?

11:43   25   **A.**   "As of this writing, it appears that Officer Robert

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 11:44 | 1 | Faulcon, Anthony Villavaso, and Robert Barrios are more than |
| 11:44 | 2 | likely the ones who struck the perpetrators with gunfire.  It |
| 11:44 | 3 | appears that Officer Barrios struck and mortally wounded the |
| 11:44 | 4 | subject on the Danziger Bridge as well as Susan Bartholomew. |
| 11:44 | 5 | Officer Villavaso appears to have struck the others with |
| 11:44 | 6 | gunfire on the Danziger Bridge.  Further, it appears that |
| 11:44 | 7 | Officer Faulcon struck and mortally wounded the subject in the |
| 11:44 | 8 | driveway of the Friendly Inn." |
| 11:44 | 9 | Q.   So according to that report, how many officers actually |
| 11:44 | 10 | struck victims on the bridge? |
| 11:44 | 11 | A.   Three. |
| 11:44 | 12 | Q.   And those officers are Faulcon, Villavaso, and Barrios? |
| 11:44 | 13 | A.   Yes. |
| 11:44 | 14 | Q.   According to that report, who did Ken Bowen shoot? |
| 11:44 | 15 | A.   No one. |
| 11:44 | 16 | Q.   According to that report, who did Robert Gisevius shoot? |
| 11:44 | 17 | A.   No one. |
| 11:44 | 18 | Q.   What was your understanding of who had worked on this |
| 11:44 | 19 | report? |
| 11:44 | 20 | A.   Of who had worked on the report? |
| 11:44 | 21 | Q.   Uh-huh. |
| 11:44 | 22 | A.   Kaufman and Lehrmann. |
| 11:44 | 23 | Q.   And had you seen them working with anybody else? |
| 11:44 | 24 | A.   Bowen and Gisevius. |
| 11:44 | 25 | Q.   Do you know without looking if the summary in the 46-page |

MICHAEL LOHMAN - Direct

11:45   1   report is about the same?
11:45   2   A.   I believe it is, yes.
11:45   3   Q.   Did the 17-page report that you worked on contain that
11:45   4   same blame section?
11:45   5   A.   No, it did not.
11:45   6   Q.   Why not?
11:45   7   A.   Because I wasn't comfortable with it.  And I don't know --
11:45   8   I don't know how they would draw that conclusion or come to
11:45   9   that conclusion based on what I was being told, how we could
11:45   10  link Barrios, Villavaso, or Faulcon to the individuals they're
11:45   11  claiming were shot.  There was no ballistics evidence or
11:45   12  anything of that nature.
11:45   13  Q.   So at that point you didn't have any ballistics?
11:45   14  A.   No.
11:45   15  Q.   All right.  Did you talk to anybody about these concerns
11:45   16  you had about the -- what I'm calling the "blame section"?
11:45   17  A.   Yes.
11:45   18  Q.   Who did you talk to?
11:45   19  A.   Bowen, Gisevius and Kaufman.
11:45   20  Q.   Did they agree with your concerns?
11:45   21  A.   Yes.  It was decided that it was going to be taken out.
11:45   22  Q.   So they went along with your decision to take it out of
11:45   23  the 17-pager?
11:45   24  A.   Yes.
11:45   25  Q.   All right.  While we have the -- well, let me ask you

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 11:45 | 1 | before we look at the report:  Do you know off the top of your |
| 11:46 | 2 | head whether the first two reports, the 32-page report and the |
| 11:46 | 3 | 46-page report, contained information about interviews |
| 11:46 | 4 | allegedly done by Defendant Kaufman with two of the victims on |
| 11:46 | 5 | the bridge? |
| 11:46 | 6 | A.   Yes. |
| 11:46 | 7 | Q.   Who are those victims we're talking about? |
| 11:46 | 8 | A.   Susan Bartholomew and Leonard Bartholomew, Sr. |
| 11:46 | 9 | Q.   Is it your understanding that they're the mother and the |
| 11:46 | 10 | father of the family shot on the bridge? |
| 11:46 | 11 | A.   Yes. |
| 11:46 | 12 | MS. BERNSTEIN:  All right.  Can we have -- we already |
| 11:46 | 13 | have Exhibit 38 up.  May I have page 28, please? |
| 11:46 | 14 | BY MS. BERNSTEIN: |
| 11:46 | 15 | Q.   So for the record, that's page 29 of the 32-page report. |
| 11:46 | 16 | And it says here that certain interviews happened on Thursday, |
| 11:46 | 17 | September 8th, 2005; is that correct? |
| 11:46 | 18 | A.   Yes. |
| 11:46 | 19 | Q.   So that's four days after the shooting? |
| 11:46 | 20 | A.   Yes. |
| 11:46 | 21 | Q.   Can you read to us what Defendant Kaufman wrote in this |
| 11:46 | 22 | report about his interview with Leonard Bartholomew, Sr.? |
| 11:46 | 23 | A.   "The investigators were able to speak with Leonard |
| 11:46 | 24 | Bartholomew, Sr. who stated he and his family were walking to |
| 11:47 | 25 | the Winn-Dixie located on the 3rd Police District side of the |

11:47  1   Danziger Bridge when his nephew started shooting at military

11:47  2   vehicles that pulled up behind them.  He stated that he did not

11:47  3   remember anything after that."

11:47  4          MS. BERNSTEIN:  Can we have the next page, please?

11:47  5   BY MS. BERNSTEIN:

11:47  6   Q.   And does it also contain a summary of an interview that

11:47  7   Defendant Kaufman allegedly conducted with Susan Bartholomew?

11:47  8   A.   Yes.

11:47  9   Q.   Can you read that to us?

11:47  10  A.   "The investigators then were able to speak with Susan

11:47  11  Bartholomew who stated that she was with her family on the

11:47  12  Danziger Bridge when her nephew, whom she identified as Jose

11:47  13  Holmes, and some of his friends started shooting.  She stated

11:47  14  she did not know who they were shooting at.  Susan Bartholomew

11:47  15  stated she was shot from what she thought was a military

11:47  16  helicopter.  She indicated that she remembered nothing beyond

11:47  17  that."

11:47  18  Q.   According to this report, were there additional interviews

11:47  19  that happened on September 22, 2005?

11:47  20  A.   Yes.

11:47  21  Q.   So now we're talking three weeks -- about three weeks -- a

11:48  22  little less than three weeks after the incident; correct?

11:48  23  A.   Yes.

11:48  24  Q.   And according to this report, Defendant Kaufman spoke to

11:48  25  Leonard and Susan again; correct?

MICHAEL LOHMAN - Direct

11:48  1   **A.**   Yes.

11:48  2   **Q.**   Can you tell us what he wrote in the report about the

11:48  3   interview with Susan Bartholomew?

11:48  4   **A.**   "Sergeant Kaufman and Detective Lehrmann proceeded to the

11:48  5   eighth floor of the hospital and met with Susan Bartholomew and

11:48  6   Lesha Bartholomew.  Mrs. Bartholomew stated she and her

11:48  7   daughter expected to be released from the hospital on this day.

11:48  8   Mrs. Bartholomew stated that she recalls her nephew shooting at

11:48  9   police officers as they approached on the Danziger Bridge.

11:48  10  Mrs. Bartholomew stated she doesn't remember what happened

11:48  11  after that and later woke up in the hospital."

11:48  12  **Q.**   And according to this report, what did Leonard Bartholomew

11:48  13  say three weeks after the shooting?

11:48  14  **A.**   "Sergeant Kaufman and Detective Lehrmann interviewed

11:48  15  Leonard Bartholomew, Sr., who was in the hospital room visiting

11:48  16  his family.  Mr. Bartholomew, Sr. stated he recalls a military

11:48  17  truck pulling up on the bridge and opening fire on his family

11:49  18  while his nephew continued to shoot.  Mr. Leonard Bartholomew

11:49  19  was unsure why his nephew was shooting at the military."

11:49  20  **Q.**   Were there any changes made to this story in your -- in

11:49  21  the 17-page report that you wrote in conjunction with Kaufman,

11:49  22  Bowen, and Gisevius?

11:49  23  **A.**   Yes.  I believe there was some additional information

11:49  24  added.

11:49  25  **Q.**   All right.  Let's take a look at that.

MICHAEL LOHMAN - Direct

11:49   1        **MS. BERNSTEIN:**  Can we have Exhibit 39, please?

11:49   2   **BY MS. BERNSTEIN:**

11:49   3   **Q.**   That's the 17-page report?

11:49   4   **A.**   Yes.

11:49   5        **MS. BERNSTEIN:**  May I have pages 14 and 15, side by

11:49   6   side, please?

11:49   7   **BY MS. BERNSTEIN:**

11:49   8   **Q.**   Can you read to us what was written in your report about

11:49   9   those interviews?

11:49   10        **MS. BERNSTEIN:**  And I think it might help if you jump

11:49   11   out on these.

11:49   12        **THE WITNESS:**  "On Thursday, September 8th, 2005,

11:49   13   Sergeant Kaufman and Detective Lehrmann went to West Jefferson

11:49   14   Hospital where they spoke with Leonard Bartholomew, Sr.  He

11:49   15   stated he, Bartholomew, Jr., Susan Bartholomew, Lesha

11:50   16   Bartholomew, Holmes, and two unidentified subjects, presumed by

11:50   17   investigators to be Doe No. 1 and Doe No. 2, were walking east

11:50   18   on Chef Menteur Highway to the Winn-Dixie supermarket.  They

11:50   19   were going to loot the store for food.

11:50   20        "As they proceeded up the Danziger Bridge, his

11:50   21   nephew, Holmes, started shooting at military vehicles that

11:50   22   pulled up behind them.  He stated he did not remember anything

11:50   23   after that and didn't know why Holmes shot at the vehicles.

11:50   24        "The investigators --

25

MICHAEL LOHMAN - Direct

| | | |
|--|--|--|
| 11:50 | 1 | BY MS. BERNSTEIN: |
| 11:50 | 2 | Q.   How about the interview with Susan Bartholomew? |
| 11:50 | 3 | A.   "The investigators spoke to Susan Bartholomew who stated |
| 11:50 | 4 | she was with Bartholomew, Sr., Bartholomew, Jr., her son, Lesha |
| 11:50 | 5 | Bartholomew, her daughter, Madison, Holmes, her nephew, and two |
| 11:50 | 6 | unidentified friends of Holmes, presumed by investigators to be |
| 11:50 | 7 | Doe No. 1 and Doe No. 2, on the Danziger Bridge. |
| 11:50 | 8 |      "As they walked on the bridge, her nephew, Holmes, |
| 11:50 | 9 | and his two friends began shooting at police officers.  She |
| 11:50 | 10 | said she was then shot from what she thought was a military |
| 11:51 | 11 | helicopter.  She indicated she remembered nothing beyond that." |
| 11:51 | 12 | Q.   Let me start with that paragraph about Leonard |
| 11:51 | 13 | Bartholomew, Sr.  Now, all of a sudden in this version, Doe No. |
| 11:51 | 14 | 2 -- which is whom? |
| 11:51 | 15 | A.   Ronald Madison. |
| 11:51 | 16 | Q.   All of a sudden, Ronald Madison is walking with the |
| 11:51 | 17 | Bartholomews; correct? |
| 11:51 | 18 | A.   Yes. |
| 11:51 | 19 | Q.   And in this version, they're going to loot the store for |
| 11:51 | 20 | food; right? |
| 11:51 | 21 | A.   Yes. |
| 11:51 | 22 | Q.   And in the interview with Susan Bartholomew in this |
| 11:51 | 23 | version, Madison is Lance Madison; correct? |
| 11:51 | 24 | A.   Yes. |
| 11:51 | 25 | Q.   And Doe No. 2, Ronald Madison? |

MICHAEL LOHMAN - Direct

| 11:51 | 1 | **A.** Yes. |
| 11:51 | 2 | **Q.** Are both with the Bartholomews; correct? |
| 11:51 | 3 | **A.** Yes, yes. |
| 11:51 | 4 | **Q.** And it says that there are, "Two friends of Holmes, |
| 11:51 | 5 | presumed to be Doe No. 1 and Doe No. 2."  That's James |
| 11:51 | 6 | Brissette and Ronald Madison? |
| 11:51 | 7 | **A.** Yes. |
| 11:51 | 8 | **Q.** And they're all together in this version? |
| 11:51 | 9 | **A.** Yes. |
| 11:51 | 10 | **Q.** And it says here that her nephew -- now it's not only |
| 11:52 | 11 | Holmes shooting, it's, "Her nephew, Holmes, and his two friends |
| 11:52 | 12 | begin shooting"; correct? |
| 11:52 | 13 | **A.** Yes. |
| 11:52 | 14 | **Q.** How did this version end up in the report that you wrote? |
| 11:52 | 15 | **A.** We spoke about it and that was the version that we decided |
| 11:52 | 16 | to put in the 17-page report. |
| 11:52 | 17 | **Q.** Who did you speak to about this story? |
| 11:52 | 18 | **A.** Bowen, Gisevius, and Kaufman. |
| 11:52 | 19 | **Q.** So together you all came up with this version? |
| 11:52 | 20 | **A.** Yes. |
| 11:52 | 21 | **Q.** Now, when you wrote this version -- or actually, let me |
| 11:52 | 22 | ask you:  To this day do you know for a fact whether the |
| 11:52 | 23 | Madisons and the Bartholomews were walking together on the |
| 11:52 | 24 | bridge? |
| 11:52 | 25 | **A.** That's what I was told.  I don't know it to be a fact. |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 11:52 | 1 | **Q.**   Okay.  You are weren't there, you don't know for sure; |
| 11:52 | 2 | right? |
| 11:52 | 3 | **A.**   No, no. |
| 11:52 | 4 | **Q.**   How did it happen that they are together in this version |
| 11:52 | 5 | that you wrote? |
| 11:52 | 6 | **A.**   Because they were claiming that Ronald Madison was shot on |
| 11:52 | 7 | the east -- on the west side of the bridge.  The reason he was |
| 11:52 | 8 | chased to the west side of the bridge in the first place is |
| 11:53 | 9 | because he was part of the initial group that were shooting at |
| 11:53 | 10 | police officers.  That's why they were lumped together in a |
| 11:53 | 11 | group before, and then he broke off and ran to the west side. |
| 11:53 | 12 | **Q.**   In your mind, did you think there was going to be a |
| 11:53 | 13 | problem with having two separate groups of civilians who |
| 11:53 | 14 | allegedly pulled out guns and shot at the police? |
| 11:53 | 15 | **A.**   I think it would have been unbelievable -- more |
| 11:53 | 16 | unbelievable to think that there were two separate groups on |
| 11:53 | 17 | either side of the bridge.  And like I said, as it was |
| 11:53 | 18 | presented to me from the beginning, they were together. |
| 11:53 | 19 | **Q.**   Okay.  I want to jump now to the official 54-page report |
| 11:53 | 20 | that you talked about earlier.  Do you have that in front of |
| 11:53 | 21 | you still? |
| 11:53 | 22 | **A.**   Yes. |
| 11:53 | 23 | **Q.**   What's the exhibit number on that? |
| 11:53 | 24 | **A.**   27. |
| 11:54 | 25 |         **MS. BERNSTEIN:**  May I have Exhibit 27 up, please? |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 11:54 | 1 | BY MS. BERNSTEIN: |
| 11:54 | 2 | Q.   All right.  And this is the report authored and submitted |
| 11:54 | 3 | by Gerard Dugue and Defendant Kaufman; correct? |
| 11:54 | 4 | A.   Yes. |
| 11:54 | 5 | Q.   Now, according to what -- to your firsthand knowledge and |
| 11:54 | 6 | your conversations with these defendants, was there a juvenile |
| 11:54 | 7 | taken into custody that day? |
| 11:54 | 8 | A.   Yes. |
| 11:54 | 9 | Q.   Who was that boy? |
| 11:54 | 10 | A.   Leonard Bartholomew, Jr. |
| 11:54 | 11 | Q.   How do you know that that's Leonard Bartholomew, Jr.? |
| 11:54 | 12 | A.   That's the information that I obtained that day. |
| 11:54 | 13 | Q.   What was his relation to the people who were shot on the |
| 11:54 | 14 | bridge? |
| 11:54 | 15 | A.   He was a son. |
| 11:54 | 16 | Q.   Did you know that that day? |
| 11:54 | 17 | A.   I think at sometime that day I learned that, yes. |
| 11:54 | 18 | Q.   This 54-page report, the official report submitted in this |
| 11:54 | 19 | case, does it identify that boy? |
| 11:55 | 20 | A.   No. |
| 11:55 | 21 |      MS. BERNSTEIN:  Can we have page 20, please? |
| 11:55 | 22 | BY MS. BERNSTEIN: |
| 11:55 | 23 | Q.   How does it identify that boy? |
| 11:55 | 24 | A.   "As a young male who fled" -- "young male subject who |
| 11:55 | 25 | fled." |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 11:55 | 1 | **Q.**   I want to go back for just a second to that very first |
| 11:55 | 2 | report that Defendant Kaufman submitted to you, the 32-pager. |
| 11:55 | 3 | **MS. BERNSTEIN:**  May I have Exhibit 38 up for a |
| 11:55 | 4 | minute, please? |
| 11:55 | 5 | Actually, can I get those two exhibits side by |
| 11:55 | 6 | side, please, Exhibit 27 and Exhibit 38? |
| 11:55 | 7 | On the left, can I have page 20 of the 54-page |
| 11:56 | 8 | exhibit?  On the right, may I have page 19? |
| 11:56 | 9 | **BY MS. BERNSTEIN:** |
| 11:56 | 10 | **Q.**   So on the left, we have the official report that refers to |
| 11:56 | 11 | that boy as a young male subject; correct? |
| 11:56 | 12 | **A.**   Yes. |
| 11:56 | 13 | **Q.**   And it refers to him that way three times right in a row |
| 11:56 | 14 | there; right? |
| 11:56 | 15 | **A.**   Yes. |
| 11:56 | 16 | **Q.**   On the right is the 32-page report, the very first report |
| 11:56 | 17 | that Defendant Kaufman handed to you; correct? |
| 11:56 | 18 | **A.**   Yes. |
| 11:56 | 19 | **Q.**   How is that boy identified there? |
| 11:56 | 20 | **A.**   "A young black male, later identified as Leonard |
| 11:56 | 21 | Bartholomew, Jr." |
| 11:56 | 22 | **Q.**   Did you ever talk to Defendant Kaufman about why he took |
| 11:56 | 23 | that boy's name out of the official report? |
| 11:56 | 24 | **A.**   No. |
| 11:56 | 25 | **Q.**   As an investigator, if you were doing a legitimate |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 11:56 | 1 | investigation and you had the name of that boy who was a |
| 11:57 | 2 | witness on the bridge, what would you do? |
| 11:57 | 3 | A.   He would be documented in the report and a statement would |
| 11:57 | 4 | be taken from him. |
| 11:57 | 5 | Q.   You would take a statement from him? |
| 11:57 | 6 | A.   Yes. |
| 11:57 | 7 | Q.   If you had the report on the left that said, "A young male |
| 11:57 | 8 | subject fled," what would you do? |
| 11:57 | 9 | A.   There isn't much you could do with that. |
| 11:57 | 10 | Q.   There's no follow-up interview you can do? |
| 11:57 | 11 | A.   Not really, not without being able to identify him. |
| 11:57 | 12 | Q.   From the very first report that was ever submitted to you, |
| 11:57 | 13 | what crime did the report deal with? |
| 11:57 | 14 | A.   Attempted murder. |
| 11:57 | 15 | Q.   Of whom? |
| 11:57 | 16 | A.   Of a police officer. |
| 11:57 | 17 | Q.   Who were the victims in the case? |
| 11:57 | 18 | A.   Police officers. |
| 11:57 | 19 | Q.   Who were the witnesses to the fact that civilians tried to |
| 11:57 | 20 | murder police officers? |
| 11:57 | 21 | A.   Police officers. |
| 11:57 | 22 | Q.   Based on your experience, how much trouble is a civilian |
| 11:57 | 23 | in when police officers witness him -- |
| 11:57 | 24 |         MR. DESALVO:   This has been asked and answered, Your |
| 11:57 | 25 | Honor. |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 11:57 | 1 | **THE COURT:**  What's the question again? |
| 11:57 | 2 | **MS. BERNSTEIN:**  I'm sure I haven't asked it yet. |
| 11:57 | 3 | **THE COURT:**  I don't know that's it been, but I don't |
| 11:57 | 4 | know -- your objection is that it's been asked and answered? |
| 11:58 | 5 | **MR. DESALVO:**  Asked and answered.  This whole series |
| 11:58 | 6 | has been asked and answered. |
| 11:58 | 7 | **THE COURT:**  I don't think it's been asked and |
| 11:58 | 8 | answered.  I was expecting you to object on other grounds, but |
| 11:58 | 9 | he could go ahead and answer that. |
| 11:58 | 10 | BY MS. BERNSTEIN: |
| 11:58 | 11 | **Q.**   So what happens to a -- in your experience as a police |
| 11:58 | 12 | officer, what happens to a civilian who is accused by police |
| 11:58 | 13 | officers of shooting at police officers? |
| 11:58 | 14 | **A.**   They're charged with a crime and go to jail. |
| 11:58 | 15 | **Q.**   How serious is that crime? |
| 11:58 | 16 | **A.**   Very serious. |
| 11:58 | 17 | **Q.**   Attempted murder of a police officer? |
| 11:58 | 18 | **A.**   Yes. |
| 11:58 | 19 | **Q.**   Is that a short jail term or a long jail term? |
| 11:58 | 20 | **MR. FLEMING:**  I would object at this point, Your |
| 11:58 | 21 | Honor. |
| 11:58 | 22 | **THE COURT:**  I'm going to sustain it on this question. |
| 11:58 | 23 | **MS. BERNSTEIN:**  Just so I know, what's the grounds |
| 11:58 | 24 | for the objection? |
| 11:58 | 25 | **MR. FLEMING:**  May we approach? |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 11:58 | 1 | (WHEREUPON, the following proceedings were held at |
| 11:58 | 2 | the bench.) |
| 11:58 | 3 | THE COURT:  State the grounds, but I really want to |
| 11:58 | 4 | go back to Frank's objection.  Because I anticipated when he |
| 11:58 | 5 | first made a motion to object, he made a-- like he was going to |
| 11:58 | 6 | stand up, I thought he was going to object on either grounds |
| 11:59 | 7 | that there was no foundation for his knowledge or that he was |
| 11:59 | 8 | asking a -- that you were asking a hypothetical question. |
| 11:59 | 9 | He didn't object on either ground.  I overruled |
| 11:59 | 10 | that objection.  And I'm not -- by anticipating the objection, |
| 11:59 | 11 | I'm not saying that I would have ruled on it the other way. |
| 11:59 | 12 | Mr. Fleming, go ahead. |
| 11:59 | 13 | MR. FLEMING:  Judge, it's two-fold:  It's relevant, |
| 11:59 | 14 | and it's kind of expertise in nature.  She's asking what would |
| 11:59 | 15 | happen to a civilian under these circumstances.  And, you know, |
| 11:59 | 16 | he doesn't -- he's a police officer, Judge.  He not a judge, |
| 11:59 | 17 | not a lawyer.  It's well beyond his scope as a fact witness. |
| 11:59 | 18 | MS. BERNSTEIN:  May I respond to that, Your Honor? |
| 11:59 | 19 | THE COURT:  Go ahead.  I've ruled on it, but go ahead |
| 11:59 | 20 | and respond. |
| 11:59 | 21 | MS. BERNSTEIN:  I can lay a foundation for it, if |
| 11:59 | 22 | you'd like, but this witness was part of a conspiracy to |
| 11:59 | 23 | falsely prosecute innocent people, and as such, it's |
| 11:59 | 24 | significant what he understood the ramifications of that |
| 11:59 | 25 | conspiracy were going to be. |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 11:59 | 1 | But I'm happy to ask additional questions to |
| 11:59 | 2 | decide -- to find out whether in his 17 years he was ever |
| 12:00 | 3 | familiar with attempted murder on police officers. |
| 12:00 | 4 | MR. FLEMING:  With all due respect, it's still not |
| 12:00 | 5 | relevant to this proceeding.  It's still -- and it's still -- |
| 12:00 | 6 | I'm sorry.  It's still a question that is expert in nature to |
| 12:00 | 7 | ask him what would happen to a civilian -- |
| 12:00 | 8 | THE COURT:  I'm going to let you ask a few more |
| 12:00 | 9 | questions about it, but I'm a little uncomfortable with him |
| 12:00 | 10 | testifying as to what prison term a person would receive |
| 12:00 | 11 | because there are a variety of factors -- |
| 12:00 | 12 | MS. BERNSTEIN:  True. |
| 12:00 | 13 | THE COURT:  -- that he may not even be familiar with |
| 12:00 | 14 | to state that. |
| 12:00 | 15 | I think as lay people, the jury knows that that |
| 12:00 | 16 | is a serious offense.  We all know that from the time we're |
| 12:00 | 17 | very young that an attempt to injure or kill a police officer |
| 12:00 | 18 | is a very serious crime.  So I don't think we need to get into |
| 12:00 | 19 | the specifics of asking him about the particular length of |
| 12:00 | 20 | crime in order to convey the gravity of the offense. |
| 12:00 | 21 | How much further do you have?  I'd like to |
| 12:00 | 22 | break. |
| 12:00 | 23 | MS. BERNSTEIN:  To complete, I'd have to go look at |
| 12:01 | 24 | my notes, but I think I'm very close.  I think within 15 |
| 12:01 | 25 | minutes. |

MICHAEL LOHMAN - Direct

12:01  1    **THE COURT:**  Okay.  I'd like to finish up with the
12:01  2  direct and then take our lunch break.
12:01  3    **MS. BERNSTEIN:**  So let me-- just so I understand,
12:01  4  I'll ask a few more questions and I'll make sure I couch them
12:01  5  in terms of his expectation and his experience --
12:01  6    **THE COURT:**  Yes, and --
12:01  7    **MS. BERNSTEIN:**  -- and I won't ask the final
12:01  8  sentence.
12:01  9    **THE COURT:**  I don't think you should ask him about a
12:01  10  length of prison term either relative or specific.
12:01  11    **MS. BERNSTEIN:**  Okay.
12:01  12    (WHEREUPON, the following proceedings were held in
12:01  13  open court.)
12:01  14    **THE COURT:**  We're going to go ahead and finish up
12:01  15  with the direct, but it will probably will take a few more
12:01  16  minutes, and then we'll break for lunch.  We'll give you some
12:01  17  additional time beyond 1:00 for lunch so that you'll have the
12:01  18  full amount of time.
12:01  19    **MS. BERNSTEIN:**  Looking down at my notes, my guess is
12:01  20  another 20 to 30 minutes.
12:01  21    **THE COURT:**  Anybody have a problem with that, 20 to
12:01  22  30 minutes?  Is anybody in desperate need of a restroom break
12:01  23  or sustenance?
12:02  24    Okay.  Let's go ahead and do that as quickly as
12:02  25  we can.  Maybe we can shorten that a bit depending on what the

MICHAEL LOHMAN - Direct

12:02   1   witness has to say and then we can go ahead and take our lunch
12:02   2   break.
12:02   3   BY MS. BERNSTEIN:
12:02   4   Q.   Before the objection I had asked you some questions about
12:02   5   what would happen to somebody who was accused of shooting at
12:02   6   police.  In your experience as a police officer, were you
12:02   7   familiar with those charges, attempted murder of police
12:02   8   officers?
12:02   9   A.   Yes.
12:02   10   Q.   And is that a very serious charge?
12:02   11   A.   Yes, it is.
12:02   12        MS. BERNSTEIN:  Can we have Exhibit 38, please?
12:02   13            May I have page 18?
12:02   14   BY MS. BERNSTEIN:
12:02   15   Q.   For the record, this is the 32-page report, the first
12:02   16   report that was submitted to you; correct?
12:02   17   A.   Yes.
12:02   18   Q.   Can you read that highlighted paragraph, please?
12:02   19   A.   "Two of the subjects, one later identified as Jose Holmes
12:02   20   and the other who remains unidentified, continued to fire in
12:03   21   the direction of the officers from behind the barrier, while
12:03   22   the two remaining subjects continued to run towards the top of
12:03   23   the bridge also firing at the officers.
12:03   24        "At this time, Officers Faulcon, Barrios, Hills, and
12:03   25   Villavaso tactically moved to the concrete barrier, as Sergeant

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 12:03 | 1 | Bowen laid down suppression fire, and engaged Holmes and an |
| 12:03 | 2 | unidentified black male who also brandished a handgun.  The |
| 12:03 | 3 | officers fired several rounds as the two perpetrators returned |
| 12:03 | 4 | fire, striking all five subjects." |
| 12:03 | 5 | Q.   Who are the, "Two remaining subjects who continued to run |
| 12:03 | 6 | toward the top of the bridge also firing at the officers"? |
| 12:03 | 7 | A.   Lance Madison and Ronald Madison. |
| 12:03 | 8 | Q.   And you have, "Holmes and an unidentified black male who |
| 12:03 | 9 | also brandished a handgun."  Who is the unidentified black |
| 12:03 | 10 | male? |
| 12:03 | 11 | A.   James Brissette. |
| 12:03 | 12 | Q.   Based on this report, would you expect anyone to be |
| 12:03 | 13 | arrested? |
| 12:03 | 14 | A.   Yes. |
| 12:03 | 15 | Q.   Who? |
| 12:04 | 16 | A.   Jose Holmes and Lance Madison. |
| 12:04 | 17 | Q.   And why not James Brissette and Ronald Madison? |
| 12:04 | 18 | A.   Because they were deceased. |
| 12:04 | 19 | Q.   I'd like to jump to the official 54-page report submitted |
| 12:04 | 20 | by Defendant Kaufman and Dugue. |
| 12:04 | 21 | MS. BERNSTEIN:  Can we have Exhibit 27, please? |
| 12:04 | 22 | May I have page 53 of that report? |
| 12:04 | 23 | Can you zoom in on that part at the bottom? |
| 12:04 | 24 | BY MS. BERNSTEIN: |
| 12:04 | 25 | Q.   Can you read that us to? |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 12:04 | 1 | **A.** "With the apprehension of Lance Madison, as being one of |
| 12:04 | 2 | the subjects shooting at police officers and rescue workers, |
| 12:04 | 3 | and the arrest of Jose Holmes being imminent, this case is |
| 12:04 | 4 | considered solved." |
| 12:04 | 5 | **Q.** Would you expect anyone to be prosecuted on the basis of |
| 12:04 | 6 | this official report that was submitted? |
| 12:04 | 7 | **A.** Yes. |
| 12:04 | 8 | **Q.** Who? |
| 12:04 | 9 | **A.** Lance Madison and Jose Holmes. |
| 12:04 | 10 | **MS. BERNSTEIN:** Thank you. |
| 12:04 | 11 | **BY MS. BERNSTEIN:** |
| 12:04 | 12 | **Q.** I want to jump ahead now. At some point did you learn -- |
| 12:04 | 13 | well, first, tell us, what's the District Attorney's Office? |
| 12:05 | 14 | **A.** What is the District Attorney's Office? |
| 12:05 | 15 | **Q.** Yes. |
| 12:05 | 16 | **A.** It's the office responsible for prosecuting crimes on a |
| 12:05 | 17 | state level in Orleans Parish. |
| 12:05 | 18 | **Q.** So that's the state Prosecutor's Office? |
| 12:05 | 19 | **A.** Yes. |
| 12:05 | 20 | **Q.** At some point did you learn that the state Prosecutor's |
| 12:05 | 21 | Office, the District Attorney's Office, was investigating the |
| 12:05 | 22 | shooting on the Danziger Bridge? |
| 12:05 | 23 | **A.** Yes. |
| 12:05 | 24 | **Q.** What was your understanding of what they were |
| 12:05 | 25 | investigating? |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 12:05 | 1 | **A.**    Police misconduct. |
| 12:05 | 2 | **Q.**    At some point did you learn that the state had indicted |
| 12:05 | 3 | some people? |
| 12:05 | 4 | **A.**    Yes, I did. |
| 12:05 | 5 | **Q.**    Who did the state indict? |
| 12:05 | 6 | **A.**    Gisevius, Bowen, Faulcon, Villavaso, Barrios, Hunter, and |
| 12:05 | 7 | Hills. |
| 12:05 | 8 | **Q.**    So seven officers? |
| 12:05 | 9 | **A.**    Yes. |
| 12:05 | 10 | **Q.**    Who were involved in the Danziger Bridge incident? |
| 12:05 | 11 | **A.**    Yes. |
| 12:05 | 12 | **Q.**    What happened with that case?  Did it ever go to trial? |
| 12:05 | 13 | **A.**    It was later thrown out for misconduct on the |
| 12:05 | 14 | prosecution's side. |
| 12:05 | 15 | **Q.**    So it was dismissed without a trial? |
| 12:05 | 16 | **A.**    Yes. |
| 12:05 | 17 | **Q.**    Was there ever any finding of guilt or innocence in that |
| 12:05 | 18 | case? |
| 12:05 | 19 | **A.**    No. |
| 12:05 | 20 | **Q.**    At some point after that, after the state case got |
| 12:06 | 21 | dismissed, did you learn that the FBI was looking at this? |
| 12:06 | 22 | **A.**    Yes. |
| 12:06 | 23 | **Q.**    Do you remember how you first learned that? |
| 12:06 | 24 | **A.**    Just through general conversation with other people and |
| 12:06 | 25 | other police officers.  And I knew that the DA's office had |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 12:06 | 1 | requested that they look into the matter. |
| 12:06 | 2 | **Q.**   Were you surprised when you found out that the FBI was |
| 12:06 | 3 | investigating? |
| 12:06 | 4 | **A.**   No. |
| 12:06 | 5 | **Q.**   Why not? |
| 12:06 | 6 | **A.**   Because it was such a shoddy job and poorly written |
| 12:06 | 7 | reports that I didn't -- it wasn't no surprise to me. |
| 12:06 | 8 | **Q.**   Did you know that the FBI could investigate excessive |
| 12:06 | 9 | force claims? |
| 12:06 | 10 | **A.**   Yes, I did. |
| 12:06 | 11 | **Q.**   How did you know that? |
| 12:06 | 12 | **A.**   Through training through the academy and other training I |
| 12:06 | 13 | had throughout my career, and I had seen it done during the |
| 12:06 | 14 | course of my career. |
| 12:06 | 15 | **Q.**   So when you started with NOPD, you went through the |
| 12:06 | 16 | academy? |
| 12:06 | 17 | **A.**   Yes, I did. |
| 12:06 | 18 | **Q.**   When you were at the academy, did you have any training |
| 12:06 | 19 | with the use of force? |
| 12:06 | 20 | **A.**   Yes. |
| 12:06 | 21 | **Q.**   Did you have any training on when an officer can and |
| 12:06 | 22 | cannot -- |
| 12:06 | 23 | **MR. FLEMING:**   I would object at this point, Your |
| 12:06 | 24 | Honor.  Can we approach? |
| 12:06 | 25 | (WHEREUPON, the following proceedings were held at |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 12:06 | 1 | the bench.) |
| 12:06 | 2 | THE COURT:  What's the objection? |
| 12:07 | 3 | MR. FLEMING:  Judge, she's asking this witness -- |
| 12:07 | 4 | she's asking this officer what his training was -- his |
| 12:07 | 5 | training -- to insinuate that these other officers on trial had |
| 12:07 | 6 | experienced similar training.  What he's been trained for is |
| 12:07 | 7 | not relevant to -- |
| 12:07 | 8 | THE COURT:  But you can bring that out on cross.  I |
| 12:07 | 9 | don't have any problem with that.  She's asking him what |
| 12:07 | 10 | training he received.  It's -- I don't think it's an unfair |
| 12:07 | 11 | question.  If you want to bring it out on cross that he was not |
| 12:07 | 12 | in the academy at the same time as them, that he was in |
| 12:07 | 13 | different courses, then that's fine. |
| 12:07 | 14 | MR. MECHE:  But he can't render an expert opinion. |
| 12:07 | 15 | THE COURT:  Well, she's not asking an opinion.  She's |
| 12:07 | 16 | asking what courses he took.  I trust that she's not going to |
| 12:07 | 17 | get him to recite the contents of those courses, because I |
| 12:07 | 18 | think we have some other witnesses for that, as I understand |
| 12:07 | 19 | it. |
| 12:07 | 20 | MS. BERNSTEIN:  My only question for him on the topic |
| 12:07 | 21 | will be if he can boil down in one or two sentences what he |
| 12:07 | 22 | learned about that -- |
| 12:07 | 23 | THE COURT:  Okay.  That's fine. |
| 12:07 | 24 | MR. FLEMING:  Judge, that's -- |
| 12:08 | 25 | THE COURT:  I think we have some expert to testify on |

MICHAEL LOHMAN - Direct

12:08  1   that.  Don't we have the actual instructors?  Don't we have

12:08  2   Badon and people like that who are going to testify to that?

12:08  3          MS. BERNSTEIN:  Yes.  Who are instructors at the

12:08  4   academy, and then we have the issue about proving who exactly

12:08  5   instructed whom because there are no records.

12:08  6          THE COURT:  Right.

12:08  7          MR. FLEMING:  What he is taught for use of force,

12:08  8   again, is not relevant.  He's not one of the people alleged to

12:08  9   have been a gunman on the bridge.  She's trying to back door

12:08  10  him --

12:08  11         THE COURT:  I'm going to sustain that particular

12:08  12  question.  You can ask him about what courses he took while he

12:08  13  was there, but I think you have other witnesses that are more

12:08  14  appropriate for this.  And I don't know that his answer on that

12:08  15  question is going to be relevant to the defendants in this

12:08  16  case.

12:08  17             It doesn't -- it's not apparent to me, so I'm

12:08  18  going to overrule the initial objection.  And to the extent

12:08  19  there would be a question to get him to recite, I'll sustain

12:08  20  that.

12:08  21         MS. BERNSTEIN:  Preemptively sustain it.

12:08  22         THE COURT:  Preemptively sustain an objection as we

12:08  23  have to come know it.

12:08  24         MS. BERNSTEIN:  Thank you, Your Honor.

12:08  25         MR. FLEMING:  Thank you, Judge.

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 12:08 | 1 | (WHEREUPON, the following proceedings were held in |
| 12:08 | 2 | open court.) |
| 12:08 | 3 | **BY MS. BERNSTEIN:** |
| 12:09 | 4 | **Q.**   The question before the break was whether, when you were |
| 12:09 | 5 | in the academy, you had any training on when an officer can and |
| 12:09 | 6 | cannot use force. |
| 12:09 | 7 | **A.**   Yes. |
| 12:09 | 8 | **Q.**   Did you have training in the academy on the consequences |
| 12:09 | 9 | of an excessive or unreasonable use of force? |
| 12:09 | 10 | **A.**   Yes. |
| 12:09 | 11 | **Q.**   All right.  I want to go back to my question about the FBI |
| 12:09 | 12 | investigation.  You said you don't remember exactly how you |
| 12:09 | 13 | first learned the FBI was investigating? |
| 12:09 | 14 | **A.**   Just through talk. |
| 12:09 | 15 | **Q.**   Who was the first person you ever talked to who had been |
| 12:09 | 16 | interviewed by the FBI? |
| 12:09 | 17 | **A.**   Kaufman. |
| 12:09 | 18 | **Q.**   Defendant Kaufman? |
| 12:09 | 19 | **A.**   Yes. |
| 12:09 | 20 | **Q.**   When you talked to him, how close in -- well, first of |
| 12:09 | 21 | all, how did you know that he had been interviewed by the FBI? |
| 12:09 | 22 | **A.**   Once again, through talk, through talk with other people |
| 12:09 | 23 | in the department.  And I saw him on one day and he told me |
| 12:10 | 24 | that he had been interviewed by them. |
| 12:10 | 25 | **Q.**   And what was your understanding of how close in time your |

MICHAEL LOHMAN - Direct

| 12:10 | 1 | conversation was to the conversation he had had with the FBI? |
| 12:10 | 2 | A.    Relatively close. |
| 12:10 | 3 | Q.    What did he tell you about his interview with the FBI? |
| 12:10 | 4 | A.    That he had gone along with the story and that everything |
| 12:10 | 5 | was okay.  He said, "Everything was cool, babe." |
| 12:10 | 6 | Q.    "Everything's cool, babe"? |
| 12:10 | 7 | A.    Yes. |
| 12:10 | 8 | Q.    What did he tell you about the meeting itself with the |
| 12:10 | 9 | FBI? |
| 12:10 | 10 | A.    That he had spent the day with you and he had walked you |
| 12:10 | 11 | through the scene and through the different parts of the case |
| 12:10 | 12 | and explained it to you, and that you were okay with |
| 12:10 | 13 | everything -- that you appeared to be okay with everything. |
| 12:10 | 14 | That you were all right. |
| 12:10 | 15 | Q.    And he told you, "It's all cool, babe"? |
| 12:10 | 16 | A.    Yes. |
| 12:10 | 17 | Q.    Were you confident that "it was all cool, babe"? |
| 12:10 | 18 | A.    No. |
| 12:10 | 19 | Q.    Why not? |
| 12:10 | 20 | A.    Once again, it was a shoddy job.  The police reports were |
| 12:10 | 21 | shoddy and there were too many holes in it. |
| 12:11 | 22 | Q.    Were you worried? |
| 12:11 | 23 | A.    Yes. |
| 12:11 | 24 | Q.    Not too long after that, did the FBI come talk to you? |
| 12:11 | 25 | A.    Yes. |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 12:11 | 1 | Q.   Did you tell the FBI everything you told us here in court |
| 12:11 | 2 | today? |
| 12:11 | 3 | A.   No. |
| 12:11 | 4 | Q.   Why not? |
| 12:11 | 5 | A.   I was untruthful because I was part of the cover-up and I |
| 12:11 | 6 | wasn't looking to go to prison or lose my job or any of the |
| 12:11 | 7 | other consequences that come along with it. |
| 12:11 | 8 | Q.   Did you lie to the FBI? |
| 12:11 | 9 | A.   Yes, I was untruthful. |
| 12:11 | 10 | Q.   Can you tell the jury how you got from there to here? |
| 12:11 | 11 | A.   I met with you first in May of '09.  You came to me, you |
| 12:11 | 12 | interviewed me.  I was untruthful with you.  In August of '09, |
| 12:11 | 13 | you came back to me and you served me with a grand jury |
| 12:11 | 14 | subpoena and you invited me to come to a grand jury -- a |
| 12:11 | 15 | pre-grand jury meeting.  I obtained an attorney at that time |
| 12:11 | 16 | and I attended the meeting with my attorney.  During the course |
| 12:11 | 17 | of that meeting, you told me that I was in trouble, that you |
| 12:11 | 18 | had me, and that I was going to be indicted. |
| 12:11 | 19 | Q.   What was your reaction to that? |
| 12:12 | 20 | A.   I thought you were bluffing.  You also offered -- you also |
| 12:12 | 21 | offered me immunity, told me that I could walk out with any |
| 12:12 | 22 | charges; but in order to get immunity, I had to cooperate with |
| 12:12 | 23 | you.  I refused the deal and I walked out and took the Fifth. |
| 12:12 | 24 | In November, of the same year -- |
| 12:12 | 25 | Q.   Let me stop you.  Did you ever go in the grand jury? |

MICHAEL LOHMAN - Direct

12:12   1   **A.**   No.   I took the Fifth and you excused me from the grand

12:12   2   jury subpoena.

12:12   3        In November of '09, the same year, I received a phone

12:12   4   call shortly before Thanksgiving from my attorney.   He informed

12:12   5   me that you had --

12:12   6        **MR. MECHE:**   Why is this not hearsay, Your Honor?   I

12:12   7   object.

12:12   8        **THE COURT:**   I don't think it's hearsay.   I'm going to

12:12   9   overrule it.

12:12   10        **THE WITNESS:**   I learned from my attorney that he had

12:12   11   had a conversation with you and that I was going to be

12:12   12   indicted, that I was on the indictment list.   You asked if I

12:12   13   would come in and meet with you.   I didn't have to speak or say

12:12   14   anything, you just wanted to talk to me.

12:12   15   **BY MS. BERNSTEIN:**

12:12   16   **Q.**   That was an invitation just for you to listen?

12:12   17   **A.**   For me to come in and listen to what you had to say.

12:12   18   **Q.**   And let me stop you there for a minute because you were

12:13   19   talking about -- you're using the word "you."

12:13   20        During all of these meetings, was the FBI involved?

12:13   21   **A.**   Yes.

12:13   22   **Q.**   All right.   Go ahead.

12:13   23   **A.**   I attended the meeting in early December of '09.   At that

12:13   24   meeting, you laid out a portion of the case to me and explained

12:13   25   some of what you had.   And at that point, I knew that you had

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 12:13 | 1 | the truth.  I went over it for a couple of days with my |
| 12:13 | 2 | attorney, we spoke about options, and I ultimately decided to |
| 12:13 | 3 | plead guilty. |
| 12:13 | 4 | Q.   And is that when you gave us those reports? |
| 12:13 | 5 | A.   Yes. |
| 12:13 | 6 | Q.   As part of your guilty plea, did you sign something called |
| 12:13 | 7 | a factual basis? |
| 12:13 | 8 | A.   Yes, I did. |
| 12:13 | 9 | Q.   What is that? |
| 12:13 | 10 | A.   It's a document that contains what you would be able to |
| 12:13 | 11 | prove in court had I chosen not to prove -- not to plead |
| 12:13 | 12 | guilty. |
| 12:13 | 13 | Q.   Is it a sworn statement? |
| 12:13 | 14 | A.   Yes, it is. |
| 12:14 | 15 | Q.   Whose sworn statement is it? |
| 12:14 | 16 | A.   It's my sworn statement. |
| 12:14 | 17 | MS. BERNSTEIN:  May I approach, Your Honor? |
| 12:14 | 18 | THE COURT:  Yes. |
| 12:14 | 19 | BY MS. BERNSTEIN: |
| 12:14 | 20 | Q.   I'm handing you what's been marked Exhibit No. 42.  Do you |
| 12:14 | 21 | recognize that document? |
| 12:14 | 22 | A.   Yes. |
| 12:14 | 23 | Q.   What is that? |
| 12:14 | 24 | A.   My factual basis. |
| 12:14 | 25 | Q.   Can you turn to the last page? |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 12:14 | 1 | **A.** Yes. |
| 12:14 | 2 | **Q.** Is that your signature? |
| 12:14 | 3 | **A.** Yes, it is. |
| 12:14 | 4 | **Q.** Is your lawyer's signature also on there? |
| 12:14 | 5 | **A.** Yes. |
| 12:14 | 6 | **Q.** Is my signature on there? |
| 12:14 | 7 | **A.** Yes. |
| 12:14 | 8 | **Q.** All right.  You can set that aside for right now. |
| 12:14 | 9 | So that's your sworn statement? |
| 12:14 | 10 | **A.** Yes, it is. |
| 12:14 | 11 | **Q.** Did you actually sit down and type it out? |
| 12:14 | 12 | **A.** No, I did not. |
| 12:14 | 13 | **Q.** Someone from the government typed that out? |
| 12:14 | 14 | **A.** Yes. |
| 12:14 | 15 | **Q.** And handed it to you? |
| 12:14 | 16 | **A.** Yes. |
| 12:14 | 17 | **Q.** When was that document written? |
| 12:14 | 18 | **A.** Early February. |
| 12:14 | 19 | **Q.** Before or after you decided to plead? |
| 12:14 | 20 | **A.** Before I pled. |
| 12:14 | 21 | **Q.** Before or after you decided to plead? |
| 12:14 | 22 | **A.** After I decided to plead, yes. |
| 12:14 | 23 | **Q.** All right.  And when that was handed to you, did you just |
| 12:14 | 24 | sign it? |
| 12:15 | 25 | **A.** No. |

MICHAEL LOHMAN - Direct

12:15   1   **Q.**   What did you do?

12:15   2   **A.**   Read it over.

12:15   3   **Q.**   When you read it over, did you recognize the information

12:15   4   in it?

12:15   5   **A.**   Yes, I did.

12:15   6   **Q.**   Where did that information come from?

12:15   7   **A.**   It came from me.

12:15   8   **Q.**   It was interview -- it came from you to whom?  Who had you

12:15   9   given it to you?

12:15   10   **A.**   During the course of my interviews with you and the FBI.

12:15   11   **Q.**   So when you read that and saw that the information in

12:15   12   there came from you, did you just sign it?

12:15   13   **A.**   No, I didn't.

12:15   14   **Q.**   What did you do?

12:15   15   **A.**   Read over it and there was some information -- it

12:15   16   contained some information that wasn't completely accurate.  So

12:15   17   I made notes on it, talked it over with my attorney, and then

12:15   18   we spoke with you and those changes were made to make the

12:15   19   document more accurate.

12:15   20   **Q.**   How carefully did you read it?

12:15   21   **A.**   Carefully.

12:15   22   **Q.**   And you read it with your attorney?

12:15   23   **A.**   Yes.

12:15   24   **Q.**   You said you made some changes -- you documented some

12:15   25   changes?

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 12:15 | 1 | **A.**   Yes. |
| 12:15 | 2 | **Q.**   Were those changes then made? |
| 12:15 | 3 | **A.**   Yes. |
| 12:15 | 4 | **Q.**   And it was retyped? |
| 12:15 | 5 | **A.**   Yes. |
| 12:15 | 6 | **Q.**   When you got the new version back, did you read it again? |
| 12:15 | 7 | **A.**   Yes, I did. |
| 12:15 | 8 | **Q.**   What did you do with it at that time? |
| 12:15 | 9 | **A.**   At that point I agreed to what was contained in the |
| 12:15 | 10 | factual basis and I signed it. |
| 12:15 | 11 | **Q.**   Does your factual basis contain every single thing you |
| 12:16 | 12 | know about this case? |
| 12:16 | 13 | **A.**   No, it did not. |
| 12:16 | 14 | **Q.**   Does it include a lot of the information you provided |
| 12:16 | 15 | today? |
| 12:16 | 16 | **A.**   Yes. |
| 12:16 | 17 | **Q.**   Mr. Lohman, can you explain to the jury -- can you tell |
| 12:16 | 18 | the jury why you pled guilty? |
| 12:16 | 19 | **A.**   Because I was, in fact, guilty, and because it was the |
| 12:16 | 20 | right thing to do, and because I knew that you had the truth. |
| 12:16 | 21 | **Q.**   Why did you participate in this cover-up? |
| 12:16 | 22 | **A.**   The guys who were involved in this were coworkers, and |
| 12:16 | 23 | some of them were friends of mine; I didn't want anyone to get |
| 12:16 | 24 | in trouble; I didn't want anyone to have to have any problems, |
| 12:16 | 25 | including them and myself, and that's why I participated and |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 12:16 | 1 | went along with the cover-up. |
| 12:16 | 2 | **Q.**   How do you feel now about what you did? |
| 12:16 | 3 | **A.**   Pretty horrible. |
| 12:17 | 4 | **Q.**   Is there any particular part that you feel the most |
| 12:17 | 5 | horrible about? |
| 12:17 | 6 | **A.**   I feel pretty horrible about all of it, but more |
| 12:17 | 7 | particularly about the individuals who were killed or wounded, |
| 12:17 | 8 | and about the individuals who were going to be arrested as a |
| 12:17 | 9 | result of this incident.  They were people who didn't deserve |
| 12:17 | 10 | what they got or what was done. |
| 12:17 | 11 | **Q.**   How do you feel about your decision to plead guilty? |
| 12:17 | 12 | **A.**   I'm comfortable with it. |
| 12:17 | 13 | **Q.**   Even though you expect to go to prison? |
| 12:17 | 14 | **A.**   Yes. |
| 12:17 | 15 | **MS. BERNSTEIN:**  May I have one moment, Your Honor? |
| 12:17 | 16 | **THE COURT:**  Yes. |
| 12:17 | 17 | **MS. BERNSTEIN:**  No further questions, Your Honor. |
| 12:17 | 18 | **THE COURT:**  Okay.  All right.  We're going to go |
| 12:17 | 19 | ahead and break for lunch.  It's almost 12:20.  If you all can |
| 12:17 | 20 | be back at 1:25 in the jury room -- actually, we're going to |
| 12:17 | 21 | report downstairs first -- 102 where you've been reporting, |
| 12:18 | 22 | report there so that you can be up here -- in other words, a |
| 12:18 | 23 | little bit before 1:25 so that you can be up here and we can |
| 12:18 | 24 | start at 1:25 with the cross-examination. |
| 12:18 | 25 | In the meantime, of course, please do not |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 12:18 | 1 | discuss the case with anyone, including amongst yourselves. |
| 12:18 | 2 | And I would ask any others here to please be mindful of the |
| 12:18 | 3 | jurors, not to discuss the case in any place where they might |
| 12:18 | 4 | be in hearing distance. |
| 12:18 | 5 | And, sir, if you could be up here at 1:25, we'll |
| 12:18 | 6 | start promptly. |
| 12:18 | 7 | THE WITNESS:  Yes, sir. |
| 12:18 | 8 | THE DEPUTY CLERK:  All rise. |
| 12:18 | 9 | (WHEREUPON, the jury exited the courtroom.) |
| 12:19 | 10 | THE COURT:  Do you have anything we need to have on |
| 12:19 | 11 | the record outside the jury's presence? |
| 12:19 | 12 | MS. BERNSTEIN:  One little thing, but it doesn't have |
| 12:19 | 13 | to be on the record. |
| 12:19 | 14 | THE COURT:  Okay.  Anything on the record, anybody? |
| 12:19 | 15 | MR. FLEMING:  No, Judge. |
| 12:19 | 16 | THE COURT:  Okay. |
| 12:19 | 17 | (OFF THE RECORD) |
| 12:19 | 18 | (LUNCHEON RECESS) |
| 12:19 | 19 | * * * * * |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

MICHAEL LOHMAN - Direct

| | | |
|---|---|---|
| 12:19 | 1 | **AFTERNOON SESSION** |
| 12:19 | 2 | **(June 28, 2011)** |
| 12:19 | 3 | * * * * * |
| 13:25 | 4 | **THE DEPUTY CLERK:**  All rise. |
| 13:25 | 5 | (WHEREUPON, the jury entered the courtroom.) |
| 13:26 | 6 | **THE COURT:**  You may be seated.  Thank you all again |
| 13:26 | 7 | for being on time.  We're ready to work.  We're going to go |
| 13:26 | 8 | ahead and work through the afternoon.  We'll try take a |
| 13:26 | 9 | mid-afternoon break around 3:15 or 3:30. |
| 13:26 | 10 | Mr. Lohman, you're still under oath and we're |
| 13:26 | 11 | going to commence cross-examination. |
| 13:26 | 12 | Let me ask defense counsel, in what order are we |
| 13:26 | 13 | going to question this witness? |
| 13:26 | 14 | **MR. LONDON:**  I'm number one, Your Honor, but I |
| 13:26 | 15 | believe -- Bobbi, did you want to do something? |
| 13:26 | 16 | **MS. BERNSTEIN:**  Thanks, Steve. |
| 13:26 | 17 | **THE COURT:**  Well, let me get the order first and then |
| 13:26 | 18 | we'll -- go ahead, come on up. |
| 13:26 | 19 | Mr. London, you're going to be first and then |
| 13:26 | 20 | who? |
| 13:26 | 21 | **MR. HESSLER:**  Your Honor, I'll be second. |
| 13:26 | 22 | **THE COURT:**  Mr. Hessler.  All right. |
| 13:26 | 23 | **MR. FLEMING:**  Judge, I'll be after Mr. Hessler. |
| 13:26 | 24 | **THE COURT:**  Okay. |
| 13:26 | 25 | **MR. DESALVO:**  I'll go fourth, Your Honor. |

MICHAEL LOHMAN - Direct

13:26  1          THE COURT:  Okay.
13:26  2          MR. MECHE:  If I ask questions, I'll be fifth.
13:26  3          THE COURT:  Okay.  All right.
13:26  4               Yes, Ms. Bernstein.
13:26  5          MS. BERNSTEIN:  The one matter before
13:26  6  cross-examination starts is we talked about one exhibit that I
13:26  7  neglected to offer into evidence, it's Exhibit 47.
13:27  8          THE COURT:  Okay.  Any objection?
13:27  9          MR. LONDON:  No objection.
13:27 10          MR. FLEMING:  No objection.
13:27 11          THE COURT:  All right.  So ordered.  47 is in.
13:27 12          MS. BERNSTEIN:  Thank you, Your Honor.
13:27 13          THE COURT:  All right.  And for the record, that is a
13:27 14  photograph -- sort of an aerial photograph of the bridge, the
13:27 15  location in question.
13:27 16          MS. BERNSTEIN:  That's correct, Your Honor.
13:27 17          THE COURT:  Okay.  And jury has seen that in
13:27 18  connection with the witness' testimony.
13:27 19               Okay.  Mr. London, you may proceed.
13:27 20          MR. LONDON:  Good afternoon, Your Honor.
13:27 21                    CROSS-EXAMINATION
13:27 22  BY MR. LONDON:
13:27 23  Q.   Good afternoon, Mr. Lohman.  My name is Steve London.  I
13:27 24  represent Archie Kaufman.  I don't believe we've met before,
13:27 25  have we, sir?

MICHAEL LOHMAN - Cross

13:27  1   A.   No.

13:27  2   Q.   I just want to ask you a few background questions.  I know

13:27  3   on direct that Ms. Bernstein asked you quite a few and I don't

13:27  4   see any need to trace all that.

13:27  5        You have been a police officer for 20 years; is that

13:27  6   correct?

13:27  7   A.   I retired with 21 years.  At the time of Katrina, I had 17

13:27  8   years.

13:27  9   Q.   And your 17 years, most of that was on the street?

13:27  10  A.   Yes, sir.

13:27  11  Q.   Most of that making cases?

13:27  12  A.   Yes, sir.

13:27  13  Q.   All right.  So you've had occasion to testify in court on

13:27  14  numerous occasions; is that correct?

13:27  15  A.   Yes.

13:27  16  Q.   And you've been trained to testify?

13:27  17  A.   Yes.

13:27  18  Q.   You were trained in the academy and you probably had

13:28  19  in-service training involving testifying in court; is that

13:28  20  correct?

13:28  21  A.   Yes.

13:28  22  Q.   Now, prior to your testimony today, how many times would

13:28  23  you estimate that you met with Ms. Bernstein or members of her

13:28  24  staff in preparation for your testimony today?

13:28  25  A.   Three times I believe.

MICHAEL LOHMAN - Cross

13:28   1   Q.   Only three?

13:28   2   A.   In preparation, I think three times.

13:28   3   Q.   How many times do you recall meeting with Bernstein to

13:28   4   discuss the information concerning this case from the time you

13:28   5   made your deal until yesterday?

13:28   6   A.   Maybe seven total times, including preparation.

13:28   7   Q.   And how many hours would you say that is?

13:28   8   A.   It varied.  Anywhere from a couple hours to six hours, I

13:28   9   would say.

13:28   10   Q.   So just give me a for instance.  Seven times, how much?

13:28   11   28 hours, 30 hours?

13:28   12   A.   Yes, yes.

13:28   13   Q.   So 28 to 30 hours to prepare for your testimony today?

13:28   14   A.   Yes.

13:28   15   Q.   Now, you've also testified that you have a plea deal with

13:29   16   the government and that your plea deal is that you appear today

13:29   17   and that you testify and you answer questions truthfully; is

13:29   18   that correct?

13:29   19   A.   Yes.

13:29   20   Q.   And you were told that you have to answer questions

13:29   21   truthfully, because if you don't, then you no longer have a

13:29   22   deal; is that correct?

13:29   23   A.   Yes.

13:29   24   Q.   And you've also, I believe on direct, testified that you

13:29   25   completed or you swore to when you pled guilty -- back up.

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 13:29 | 1 | When you pled guilty in front of Judge Lemelle, you |
| 13:29 | 2 | were read -- the government read a factual basis that you |
| 13:29 | 3 | agreed to; is that correct? |
| 13:29 | 4 | A.   Yes. |
| 13:29 | 5 | Q.   Okay.  And prior to the government reading that factual |
| 13:29 | 6 | basis in front of Judge Lemelle, you had an opportunity to read |
| 13:29 | 7 | that? |
| 13:29 | 8 | A.   Yes, I did. |
| 13:29 | 9 | Q.   And I believe you testified that you an opportunity to go |
| 13:29 | 10 | over that with your lawyer? |
| 13:29 | 11 | A.   Yes, I did. |
| 13:29 | 12 | Q.   And I believe you've even said that you've changed some of |
| 13:29 | 13 | the information contained in the first one and then the |
| 13:29 | 14 | subsequent factual basis was issued; is that correct? |
| 13:29 | 15 | A.   Yes. |
| 13:29 | 16 | Q.   And you have read each and every word of it? |
| 13:29 | 17 | A.   Yes. |
| 13:29 | 18 | Q.   And you stand by that today? |
| 13:29 | 19 | A.   Yes. |
| 13:29 | 20 | Q.   Did you review that yesterday in preparation for your |
| 13:29 | 21 | testimony? |
| 13:29 | 22 | A.   Yes, I did. |
| 13:29 | 23 | Q.   Have you reviewed your government 302s in preparation for |
| 13:30 | 24 | your testimony today? |
| 13:30 | 25 | A.   No. |

MICHAEL LOHMAN - Cross

13:30    1    **Q.**    You did not?

13:30    2    **A.**    No.

13:30    3    **Q.**    Nobody -- do you know what a government 302 is?

13:30    4    **A.**    Yes.  I've had the opportunity to look at pieces of them,

13:30    5    but I haven't had the whole 302 to read over, no.

13:30    6    **Q.**    All right.  You've had an opportunity to look at pieces of

13:30    7    your 302 -- of your 302?

13:30    8    **A.**    What I believe to be my 302, or we discussed parts of my

13:30    9    302, yes.

13:30   10    **Q.**    Did they tell you it was your 302?

13:30   11    **A.**    Yes.

13:30   12    **Q.**    Well, then you knew it was your 302?

13:30   13    **A.**    Yes.

13:30   14    **Q.**    And did you have an opportunity to review anybody else's

13:30   15    302s?

13:30   16    **A.**    No, I did not.

13:30   17    **Q.**    Would you explain to the jury what a 302 is, please?

13:30   18    **A.**    A 302 is the FBI report written on the interviews.

13:30   19    **Q.**    Okay.  Now, you know that the FBI, obviously, are federal

13:30   20    agents and that if you tell an FBI agent an untruth that's a

13:30   21    crime; is that correct?

13:30   22    **A.**    Yes.

13:30   23    **Q.**    And you know that?

13:30   24    **A.**    Yes, I do.

13:30   25    **Q.**    And you have known that?

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 13:30 | 1 | **A.**  Yes, I do. |
| 13:30 | 2 | **Q.**  You've known that before you made a deal with the |
| 13:30 | 3 | government? |
| 13:30 | 4 | **A.**  Yes. |
| 13:30 | 5 | **Q.**  Now, you've also said that your deal -- you, obviously, |
| 13:31 | 6 | had a break because you said you think under the Sentencing |
| 13:31 | 7 | Guidelines that you would have been facing maybe eight years or |
| 13:31 | 8 | possibly more had you not made your deal; is that correct? |
| 13:31 | 9 | **A.**  No.  The presentence investigation calls for a seven to |
| 13:31 | 10 | eight year sentence. |
| 13:31 | 11 | **Q.**  I guess that's what I meant.  Maybe I didn't say that |
| 13:31 | 12 | artfully. |
| 13:31 | 13 | But you -- prior to your deal, do you think you were |
| 13:31 | 14 | looking at eight years, or do you think you were looking at 25 |
| 13:31 | 15 | to 30 years? |
| 13:31 | 16 | **A.**  25 to 30. |
| 13:31 | 17 | **Q.**  25 to 30. |
| 13:31 | 18 | Because that's what Ms. Bernstein told you when you |
| 13:31 | 19 | went up there; is that correct? |
| 13:31 | 20 | **A.**  She told me I was looking at a significant amount of time, |
| 13:31 | 21 | yes. |
| 13:31 | 22 | **Q.**  25 to 30 years? |
| 13:31 | 23 | **A.**  In that range, yes. |
| 13:31 | 24 | **Q.**  Okay.  That's a long time. |
| 13:31 | 25 | **A.**  Yes, it is. |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 13:31 | 1 | Q. But if you made a deal, she would sign you up where you |
| 13:31 | 2 | were able to plead that down a lot lower; correct? |
| 13:31 | 3 | A. I was able to plead to one count of conspiracy to obstruct |
| 13:31 | 4 | justice which carried a five-year cap. |
| 13:31 | 5 | Q. Well, then that's a lot lower than 25 to 30; right? |
| 13:31 | 6 | A. Yes. |
| 13:31 | 7 | Q. So that's where -- that's where you stand today.  You've |
| 13:31 | 8 | pled guilty to one count and the statutory maximum that you can |
| 13:31 | 9 | receive is five years? |
| 13:32 | 10 | A. Yes. |
| 13:32 | 11 | Q. All right.  And they -- you have not been sentenced yet? |
| 13:32 | 12 | A. No, I have not. |
| 13:32 | 13 | Q. So that's kind of being held over your head? |
| 13:32 | 14 | A. It's open. |
| 13:32 | 15 | Q. It's open. |
| 13:32 | 16 | It's kind of being held over your head? |
| 13:32 | 17 | A. I say it's open; you say held over my head.  Yes. |
| 13:32 | 18 | Q. So the government also -- you've heard of a Rule 35, |
| 13:32 | 19 | haven't you? |
| 13:32 | 20 | A. A rule what? |
| 13:32 | 21 | Q. 35. |
| 13:32 | 22 | A. I've heard of it.  I couldn't explain to you what it was, |
| 13:32 | 23 | to be honest with you. |
| 13:32 | 24 | Q. Without telling me any conversations you had with your |
| 13:32 | 25 | lawyer, did your lawyer ever just explain what a Rule 35 was to |

MICHAEL LOHMAN - Cross

13:32    1    you?

13:32    2    A.    Not that I recall, no.

13:32    3    Q.    Did the government?

13:32    4    A.    Not that I recall.

13:32    5    Q.    All right.  So it's your understanding, and I guess your

13:32    6    impression, that if you testify well today and things go the

13:32    7    way you'd like, that the government's going to ask the judge to

13:32    8    be -- to even sentence you lower than that five-year cap; is

13:32    9    that correct?

13:32    10   A.    It's my understanding they'll submit a letter on my

13:32    11   behalf.

13:32    12   Q.    Okay.  But if you don't, you don't expect to get that

13:32    13   letter; correct?

13:32    14   A.    If I don't testify, no.

13:33    15   Q.    And only the government can ask for leniency on that; is

13:33    16   that not correct?

13:33    17   A.    That's my understanding, yes.

13:33    18   Q.    All right.  I'm going to skip around a little bit with you

13:33    19   because there were a lot of questions Ms. Bernstein asked you

13:33    20   about that I couldn't even begin to recall all of them, much

13:33    21   less write them down, and I don't want to go point for point

13:33    22   with that.

13:33    23          So with that in mind, I'm going to ask you a couple

13:33    24   of questions about these reports first and then I'm going to go

13:33    25   back to when you were on the scene.  Is that all right with

MICHAEL LOHMAN - Cross

13:33    1    you?

13:33    2    A.    Yes.

13:33    3    Q.    If at any time you don't understand my question, please

13:33    4    just ask me to repeat it.

13:33    5    A.    Yes.

13:33    6    Q.    All right.  Was it your testimony, and did I understand it

13:33    7    correctly, that you -- that Sergeant Dugue assumed this -- back

13:33    8    up.

13:33    9          You testified that the Cold Case Squad or Central

13:33   10    Homicide handles police shootings; is that correct?

13:33   11    A.    Typically, yes, they would handle a police shooting

13:33   12    where -- where the round actually struck the perpetrator.

13:34   13    Q.    As in this case?

13:34   14    A.    Yes.

13:34   15    Q.    Okay.  Now, "typically" would be any time prior to

13:34   16    Katrina; correct?

13:34   17    A.    Yes.

13:34   18    Q.    And any time after Katrina within the period of time it

13:34   19    took to get back into order?

13:34   20    A.    Yes.

13:34   21    Q.    Okay.  So it's your testimony that Central Homicide,

13:34   22    located -- and they're located out of police headquarters;

13:34   23    correct?

13:34   24    A.    Yes, they are.

13:34   25    Q.    All right.  And you had nothing to do with that?

MICHAEL LOHMAN - Cross

13:34  1   **A.**   No, I did not.

13:34  2   **Q.**   You were not in the chain of command?

13:34  3   **A.**   No, I was not.

13:34  4   **Q.**   Let's talk about that chain of command real quick before I

13:34  5   go further.  And you correct me if I'm wrong, the chain of

13:34  6   command for the Homicide Division downtown would come under the

13:34  7   chief of detectives; is that correct?

13:34  8   **A.**   Yes, it would.

13:34  9   **Q.**   That's the deputy chief, deputy superintendent of police?

13:34  10  **A.**   Yes.

13:34  11  **Q.**   We use the term "chief."  I guess it's incorrect because

13:34  12  Ms. Bernstein earlier said that it's the deputy superintendent

13:34  13  as opposed to chief; is that right?

13:34  14  **A.**   Yes.

13:34  15  **Q.**   And that deputy super- -- then there's another deputy

13:34  16  superintendent that's in charge of Field Operations; is that

13:34  17  correct?

13:34  18  **A.**   Yes, there is.

13:34  19  **Q.**   And they hold the same rank?

13:34  20  **A.**   Yes.

13:34  21  **Q.**   So one's in charge of all the -- Field Operations would be

13:34  22  the districts?

13:34  23  **A.**   Yes.

13:34  24  **Q.**   And then chief of detectives would be, obviously, the

13:35  25  central detectives?

MICHAEL LOHMAN - Cross

13:35    1    A.    Yes.

13:35    2    Q.    Now, you had detectives at that time in each district; is

13:35    3    that correct?

13:35    4    A.    Yes, we did.

13:35    5    Q.    All right.  And you testified that the 7th District, I

13:35    6    believe you said you had four or five sergeants that were in

13:35    7    charge of a varying amount of detectives for certain purposes?

13:35    8    A.    Three sergeants in charge --

13:35    9    Q.    Three?

13:35   10    A.    -- of detective work.

13:35   11          Yes.

13:35   12    Q.    Now, those detectives would be under the ultimate command

13:35   13    on the police department under the superintendent -- of the

13:35   14    deputy superintendent of Field Operations; correct?

13:35   15    A.    Yes, they would.

13:35   16    Q.    And so that would be where you would be in the chain of

13:35   17    command?

13:35   18    A.    Yes.

13:35   19    Q.    And you would have absolutely nothing to say whatsoever

13:35   20    over someone that's under the deputy superintendent in charge

13:35   21    of the Detective Bureau; correct?

13:35   22    A.    No.

13:35   23    Q.    All right.  So Sergeant Dugue, you had no supervisory

13:35   24    authority over him whatsoever?

13:35   25    A.    No.

MICHAEL LOHMAN - Cross

13:35    1    **Q.**    Okay.  You're a lieutenant and he's a sergeant.  So one
13:35    2    might think the fact that you're a lieutenant, you would
13:35    3    exercise supervisory authority over a sergeant, but that's
13:35    4    not --
13:35    5    **A.**    Let's back -- if I could explain that a little more.
13:36    6    **Q.**    Sure, please.  Absolutely.
13:36    7    **A.**    He's a sergeant and I was a lieutenant and I did have
13:36    8    supervisory authority over him.  If we were on a scene, I could
13:36    9    tell him what to do and he should listen to what I tell him.
13:36    10    When it came to assume command of a police shooting or a
13:36    11    homicide that the Cold Case Squad was going to investigate,
13:36    12    then it would be under their command or under their umbrella
13:36    13    and under him and his and lieutenant and I wouldn't really have
13:36    14    a role in that.
13:36    15            But if we were on just the scene or on the street or
13:36    16    handling some incident on the scene that wasn't related to a
13:36    17    homicide, he would be under my command.  I did have authority
13:36    18    over him.
13:36    19    **Q.**    You did.
13:36    20            But if he was investigating a police shooting, you
13:36    21    would not have command over him?
13:36    22    **A.**    If -- that's what I said.  If he was investigating a
13:36    23    police shooting, it would fall under him and his lieutenant's
13:36    24    umbrella, not under me.
13:36    25    **Q.**    Not under you.  Okay.

MICHAEL LOHMAN - Cross

13:36   1   **A.**   And I, typically, wouldn't be there to direct him on how

13:36   2   to handle a police shooting or anything else, no.

13:36   3   **Q.**   Now, is it your understanding that -- are you finished

13:36   4   with that?

13:36   5   **A.**   Yes, I'm complete.

13:36   6   **Q.**   Now, is it your understanding that Sergeant Dugue assumed

13:36   7   this investigation through the Cold Case Squad downtown at one

13:37   8   point; is that your understanding?

13:37   9   **A.**   Yes.

13:37   10   **Q.**   When did that happen?

13:37   11   **A.**   Sometime around November, I would say, early November of

13:37   12   2005.

13:37   13   **Q.**   And I believe you testified that, after Sergeant Dugue

13:37   14   assumed responsibility for that investigation, you had nothing

13:37   15   left to do with that; correct?

13:37   16   **A.**   No.

13:37   17   **Q.**   You would not have had any input, would you?

13:37   18   **A.**   No.

13:37   19   **Q.**   It would have been out of your hands?

13:37   20   **A.**   Yes.

13:37   21   **Q.**   And you've also testified that Sergeant Kaufman

13:37   22   transferred to the Homicide Division at the same time the --

13:37   23   the Danziger investigation was transferred to Sergeant Dugue;

13:37   24   is that correct?

13:37   25   **A.**   Yes, shortly after that.

MICHAEL LOHMAN - Cross

| | | |
|--|--|--|
| 13:37 | 1 | **Q.** Shortly -- was it the same time or later? |
| 13:37 | 2 | **A.** It was right around the same time, but I think Dugue had |
| 13:37 | 3 | already been assigned the case in the Cold Case Division.  He |
| 13:37 | 4 | had already made contact with myself and Kaufman while we were |
| 13:37 | 5 | still assigned to the 7th Police District, letting us know that |
| 13:38 | 6 | he was going to be conducting follow-up investigation into the |
| 13:38 | 7 | shooting.  And he had asked for the police reports and stuff |
| 13:38 | 8 | like that, which Kaufman was still working on at that time -- |
| 13:38 | 9 | was still working on at that time. |
| 13:38 | 10 | I know Kaufman submitted to me the police reports |
| 13:38 | 11 | prior to him being transferred to the Cold Case Homicide |
| 13:38 | 12 | section. |
| 13:38 | 13 | **Q.** All right.  And do you know when that transfer was? |
| 13:38 | 14 | **A.** I think it was in November sometime. |
| 13:38 | 15 | **Q.** November.  Okay.  Now, I'm going to get off of this in a |
| 13:38 | 16 | second, but I just wanted to try to set the stage here a little |
| 13:38 | 17 | bit before I ask it. |
| 13:38 | 18 | You have testified that you had fabricated a report |
| 13:38 | 19 | on this incident; is that correct? |
| 13:38 | 20 | **A.** Yes. |
| 13:38 | 21 | **Q.** Okay.  And that's the 17-page report? |
| 13:38 | 22 | **A.** Yes. |
| 13:38 | 23 | **Q.** Now, we've gone into a lot of detail.  You were asked a |
| 13:38 | 24 | lot of questions about that 17-page report as if that was |
| 13:38 | 25 | actually turned in and as if that was actually a genuine |

MICHAEL LOHMAN - Cross

| 13:38 | 1 | investigation, and it wasn't, was it? |
| 13:38 | 2 | **A.** No. |
| 13:38 | 3 | **Q.** No, it was not. |
| 13:39 | 4 | There's nothing genuine about that, is there? |
| 13:39 | 5 | **A.** No. There was nothing genuine about any of the reports |
| 13:39 | 6 | presented today. |
| 13:39 | 7 | **Q.** But I'm asking you about the -- I understand what you want |
| 13:39 | 8 | to say. I understand that. But I would just appreciate it if |
| 13:39 | 9 | you would answer this question: On the 17-page report, was |
| 13:39 | 10 | that -- that was your fictitious account of the incident; |
| 13:39 | 11 | correct? |
| 13:39 | 12 | **A.** That was my fictitious account, Kaufman's fictitious |
| 13:39 | 13 | account, Bowen's fictitious account, and Gisevius' fictitious |
| 13:39 | 14 | account. |
| 13:39 | 15 | **Q.** Okay. Let me get this straight. And that was Kaufman's, |
| 13:39 | 16 | Bowen's. |
| 13:39 | 17 | Who else? |
| 13:39 | 18 | **A.** Gisevius. |
| 13:39 | 19 | **Q.** Gisevius. |
| 13:39 | 20 | And who else? |
| 13:39 | 21 | **A.** Kaufman, Bowen, and Gisevius, and myself. |
| 13:39 | 22 | **Q.** And you -- and last of all you? |
| 13:39 | 23 | **A.** Yes. |
| 13:39 | 24 | **Q.** Okay. And that's on the 17-page report? |
| 13:39 | 25 | **A.** That's on the 17-page report, which was also -- Kaufman |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 13:39 | 1 | also supposedly consulted with the other officers involved as |
| 13:39 | 2 | to their statements in that report and they went along with it. |
| 13:39 | 3 | **Q.**   Okay.  He supposedly. |
| 13:39 | 4 | Do you know whether he did that or not? |
| 13:40 | 5 | **A.**   He told me he did. |
| 13:40 | 6 | **Q.**   He told you he did. |
| 13:40 | 7 | Did you see him do that? |
| 13:40 | 8 | **A.**   No. |
| 13:40 | 9 | **Q.**   But he supposedly did. |
| 13:40 | 10 | So it's everybody? |
| 13:40 | 11 | **A.**   He told me he did. |
| 13:40 | 12 | **Q.**   Okay.  So everybody conspired with the 17-page report.  Is |
| 13:40 | 13 | that a fair assumption? |
| 13:40 | 14 | **A.**   Yes. |
| 13:40 | 15 | **Q.**   We'll just put everybody. |
| 13:40 | 16 | Now, when did you complete that 17-page report -- let |
| 13:40 | 17 | me rephrase that. |
| 13:40 | 18 | You actually completed the 17-page report before the |
| 13:40 | 19 | case was assigned to Dugue? |
| 13:40 | 20 | **A.**   Yes, it was completed prior to -- no.  It was completed |
| 13:40 | 21 | prior to Kaufman being transferred to the Cold Case Division. |
| 13:40 | 22 | **Q.**   Was it completed prior to Sergeant Dugue assuming -- |
| 13:40 | 23 | remember, I believe your testimony was that once Dugue took |
| 13:40 | 24 | over the investigation, you had nothing else to do with it. |
| 13:40 | 25 | Didn't you testify to that? |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 13:40 | 1 | A.   Yes, I did. |
| 13:40 | 2 | Q.   Now, so can you answer -- with that in mind, can you |
| 13:40 | 3 | answer my question? |
| 13:40 | 4 | A.   That it was completed prior to Dugue taking over the case? |
| 13:40 | 5 | Q.   Yes, yes. |
| 13:40 | 6 | A.   Yes. |
| 13:40 | 7 | Q.   Yes, it was? |
| 13:40 | 8 | A.   Yes. |
| 13:40 | 9 | Q.   There is no doubt about that? |
| 13:40 | 10 | A.   No doubt. |
| 13:40 | 11 | Q.   Okay.  Now, was the 46 -- what you're talking about the |
| 13:40 | 12 | 46-page report that you claimed was given to you by my client, |
| 13:41 | 13 | Mr. Kaufman? |
| 13:41 | 14 | A.   Yes. |
| 13:41 | 15 | Q.   And you claim that he gave you that? |
| 13:41 | 16 | A.   Yes. |
| 13:41 | 17 | Q.   Did he give you that prior to Sergeant Dugue assuming the |
| 13:41 | 18 | investigation of this case? |
| 13:41 | 19 | A.   Yes. |
| 13:41 | 20 | Q.   He did. |
| 13:41 | 21 |      And you're sure of that? |
| 13:41 | 22 | A.   Yes. |
| 13:41 | 23 | Q.   Okay.  Because that's in your factual basis and that's in |
| 13:41 | 24 | your testimony, so you're sure of that? |
| 13:41 | 25 | A.   I'm sure of it. |

MICHAEL LOHMAN - Cross

13:41  1  Q.   Okay.  Now, the 46-page report you claim was given to you
13:41  2  by Sergeant Kaufman; is that correct?
13:41  3  A.   Yes.
13:41  4  Q.   Do you have anything other than your word about that?
13:41  5  A.   No.
13:41  6  Q.   No.
13:41  7       Just your word?
13:41  8  A.   He gave me the report.
13:41  9  Q.   Just your word?
13:41  10  A.   Yes.
13:41  11  Q.   And then I want to break for a second and go back to your
13:41  12  word because you did admit to having lied to the FBI when you
13:41  13  initially met with them; right?
13:41  14  A.   Yes.  I was untruthful the first time I met with them.
13:41  15  Q.   And why were you untruthful?
13:41  16  A.   Because I didn't want to be here today.
13:41  17  Q.   You didn't want to be here today?
13:41  18  A.   That's right.
13:41  19  Q.   You wanted to take care of yourself?
13:41  20  A.   Yes.
13:41  21  Q.   And that's understandable.  I mean, you wanted to take
13:41  22  care of yourself.  So when they --
13:41  23  A.   I wanted to take care of myself and them.  I didn't want
13:41  24  any of us to be here today when I initially met with the FBI
13:42  25  and that's why I was untruthful with them.

MICHAEL LOHMAN - Cross

13:42    1    **Q.**    Now, when did you initially meet with the FBI?

13:42    2    **A.**    May of '09.

13:42    3    **Q.**    May of '09.

13:42    4         And it's your testimony that you wanted to protect

13:42    5    everybody else?

13:42    6    **A.**    Yes.

13:42    7    **Q.**    Did you want to protect Sergeant Kaufman?

13:42    8    **A.**    Yes.

13:42    9    **Q.**    You actually hate Sergeant Kaufman, don't you?

13:42    10   **A.**    No.

13:42    11   **Q.**    You all never got along at all, did you?

13:42    12   **A.**    Yes, we did.

13:42    13   **Q.**    You did?

13:42    14        You didn't scream and argue and fight -- now,

13:42    15   remember, you're under oath.  You're under oath here.  You all

13:42    16   didn't argue and fight all the time when you were in the 7th

13:42    17   District?

13:42    18   **A.**    Not all the time.  We had our moments where we did

13:42    19   disagree and we did argue, but it wasn't a hate relationship in

13:42    20   my opinion.

13:42    21   **Q.**    In your opinion.

13:42    22        But it was -- you had heated arguments in the 7th

13:42    23   District with Sergeant Kaufman?

13:42    24   **A.**    Yes, we did.

13:42    25   **Q.**    You're a lieutenant, he's a sergeant, and there were

MICHAEL LOHMAN - Cross

13:42    1    heated arguments between you two?

13:42    2    A.    Yes, there was.

13:42    3    Q.    So there was no love loss, would that be fair to say?

13:42    4    A.    No.  I wouldn't classify it as that.  We had disagreements

13:42    5    and we had discussions that sometimes became heated.

13:42    6    Q.    Did you ever socialize together?

13:42    7    A.    We went -- we ate lunch together and things like that.

13:43    8    Q.    And you got along and it's your --

13:43    9    A.    We worked details together and we always got along as far

13:43   10    as that went.

13:43   11    Q.    And it's your testimony that that was fine?

13:43   12    A.    Yes.

13:43   13    Q.    Okay.  I want to put all that on the side for a minute and

13:43   14    let's go back to the scene.  When you -- do you remember where

13:43   15    you were when you -- when you received notification of the

13:43   16    Danziger-- of the 108?

13:43   17    A.    At the intersection of Chef and Read.

13:43   18    Q.    What were you doing?

13:43   19    A.    Giving out assignments for that day, rescue operations.

13:43   20    Q.    Did you say something about the -- that was the boat

13:43   21    launch?

13:43   22    A.    There were boats at that intersection, people showing up

13:43   23    from other jurisdictions with boats.  And we also had boats

13:43   24    parked at that intersection because it was flooded.  And we

13:43   25    were assigning officers to those boats to go out into the

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 13:43 | 1 | neighborhoods that were flooded and pick people up and bring |
| 13:43 | 2 | them to Chef Highway so that we could load them on a bus or a |
| 13:44 | 3 | truck and transport them to the Convention Center. |
| 13:44 | 4 | Q.   Is that a yes? |
| 13:44 | 5 | A.   Yes. |
| 13:44 | 6 | Q.   There was a boat launch.  Thank you. |
| 13:44 | 7 | A.   It's not a boat launch.  It was an intersection that had |
| 13:44 | 8 | boats from other jurisdictions that we were putting people on |
| 13:44 | 9 | to go do rescues. |
| 13:44 | 10 | Q.   Because it was flooded? |
| 13:44 | 11 | A.   The streets were flooded. |
| 13:44 | 12 | Q.   All right.  Excuse me.  When I said "boat launch," I guess |
| 13:44 | 13 | I said that loosely. |
| 13:44 | 14 |      You were assigning people that got on boats from that |
| 13:44 | 15 | position to go out on search and rescue operations; correct? |
| 13:44 | 16 | A.   Yes, we were. |
| 13:44 | 17 | Q.   Okay.  Great.  Now, you heard the 108 come in.  Do you |
| 13:44 | 18 | have a radio?  Did you hear this yourself? |
| 13:44 | 19 | A.   Yes, I had a radio. |
| 13:44 | 20 | Q.   And you heard, "108, two officers down," or something to |
| 13:44 | 21 | that effect? |
| 13:44 | 22 | A.   I didn't hear the transmission come out.  I saw people |
| 13:44 | 23 | scurrying about going to their cars to respond to the scene and |
| 13:44 | 24 | someone told me that a 108 had come out. |
| 13:44 | 25 | Q.   And they told you that the 108 had come out and that there |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 13:44 | 1 | were possibly officers shot? |
| 13:44 | 2 | **A.**   Yes. |
| 13:44 | 3 | **Q.**   That's probably the biggest call policemen get.  Would you |
| 13:44 | 4 | give me that? |
| 13:44 | 5 | **A.**   Yes. |
| 13:44 | 6 | **Q.**   Okay.  None bigger than that? |
| 13:44 | 7 | **A.**   No. |
| 13:44 | 8 | **Q.**   No.  Okay. |
| 13:44 | 9 |         And you were the lieutenant? |
| 13:44 | 10 | **A.**   Yes, I was. |
| 13:44 | 11 | **Q.**   And you were in charge? |
| 13:44 | 12 | **A.**   Yes. |
| 13:44 | 13 | **Q.**   And you did not leave the boat area to go to the 108? |
| 13:45 | 14 | **A.**   There was an adequate amount of people responding to the |
| 13:45 | 15 | scene. |
| 13:45 | 16 |         **THE COURT:**  Wait, wait.  Let's answer the question |
| 13:45 | 17 | first, and then if you want to explain, you can.  But he's |
| 13:45 | 18 | asking you a question, go ahead and respond to it yes or no. |
| 13:45 | 19 |         **THE WITNESS:**  No. |
| 13:45 | 20 | BY MR. LONDON: |
| 13:45 | 21 | **Q.**   No, you did not? |
| 13:45 | 22 | **A.**   No. |
| 13:45 | 23 | **Q.**   Now, you said -- |
| 13:45 | 24 | **A.**   With an explanation. |
| 13:45 | 25 | **Q.**   Sure.  Go right ahead. |

MICHAEL LOHMAN - Cross

13:45  1   A.    I was still at the intersection giving out assignments --
13:45  2   rescue operation assignments.  There was more than enough
13:45  3   people responding to the scene of the 108, so I finished up
13:45  4   giving out the boat assignments to the people that were still
13:45  5   there.  So within a three- to five-minute time frame, I also
13:45  6   responded to the Danziger.
13:45  7   Q.    How many people were there; do you remember?
13:45  8   A.    I don't recall.
13:45  9   Q.    You don't recall.
13:45  10  A.    There were quite a few people there, but I don't recall.
13:45  11  I couldn't put a number on it.
13:45  12  Q.    How many would you say were responding to the 108?
13:45  13  A.    Quite a few.
13:45  14  Q.    How many?
13:45  15  A.    There was -- I couldn't put a number on it, but there was
13:45  16  more than seven.
13:45  17  Q.    More than seven?
13:45  18  A.    Yes.
13:45  19  Q.    Less than 10?
13:45  20  A.    No, more than 10.  There were quite a few -- I couldn't
13:45  21  put a number on it, but there were quite a few people
13:45  22  responding to the 108.
13:45  23  Q.    But you didn't?
13:46  24  A.    Not -- not right away.
13:46  25  Q.    Not right away.  Okay.

MICHAEL LOHMAN - Cross

13:46    1            But you ultimately did?

13:46    2    A.   Yes, I did.

13:46    3    Q.   Okay.  And that day, by the way, where was Captain Barty?

13:46    4    A.   I'm not sure if he was at a meeting or not.  He wasn't at

13:46    5    that scene that day.

13:46    6    Q.   Was he working detail that day?

13:46    7    A.   Not to my knowledge, no.

13:46    8    Q.   Not to your knowledge?

13:46    9    A.   No.

13:46   10    Q.   But he could have been?

13:46   11    A.   Not that I know of, no.

13:46   12    Q.   So you then proceed to the scene, and where do you go to

13:46   13    first?

13:46   14    A.   To the east side of the bridge.

13:46   15    Q.   To the east side.

13:46   16            And when you get to the east side, you observe -- was

13:46   17    the -- obviously, the rental truck was already there; correct?

13:46   18    A.   Yes.

13:46   19    Q.   All right.  And the unit -- and the emergency unit was

13:46   20    there?

13:46   21    A.   Yes.

13:46   22    Q.   Was Sergeant Kaufman there?

13:46   23    A.   Yes.

13:46   24    Q.   He was there.

13:46   25            Did you speak to him there or did you speak to him on

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 13:46 | 1 | the west side? |
| 13:46 | 2 | **A.** I recall speaking to him on the east side. |
| 13:46 | 3 | **Q.** And did you also speak to him on the west side? |
| 13:46 | 4 | **A.** Yes. |
| 13:46 | 5 | **Q.** Now, when you were on the west side speaking to Sergeant |
| 13:46 | 6 | Kaufman a little bit later during that incident, since I don't |
| 13:46 | 7 | feel like we're going to go through the whole incident again -- |
| 13:47 | 8 | I think you did that adequately on direct -- you saw Sergeant |
| 13:47 | 9 | Kaufman speaking with a black female, didn't you? |
| 13:47 | 10 | **A.** Yes. |
| 13:47 | 11 | **Q.** And you also saw him speaking with a black male? |
| 13:47 | 12 | **A.** Yes. |
| 13:47 | 13 | **Q.** Now, on September 4th, Archie was a sergeant and he was |
| 13:47 | 14 | assigned to the 7th District; correct? |
| 13:47 | 15 | **A.** Yes, he was. |
| 13:47 | 16 | **Q.** 7th District homicide? |
| 13:47 | 17 | **A.** Yes, he was. |
| 13:47 | 18 | **Q.** Now, you knew or you had determined that this was a police |
| 13:47 | 19 | shooting at this time -- |
| 13:47 | 20 | **A.** Yes. |
| 13:47 | 21 | **Q.** -- correct? |
| 13:47 | 22 | But -- and then you -- was it you that contacted |
| 13:47 | 23 | headquarters and requested Cold Case Homicide? |
| 13:47 | 24 | **A.** Yes. |
| 13:47 | 25 | **Q.** And their response to you was? |

232

MICHAEL LOHMAN - Cross

13:47  1   A.   That they weren't available, they weren't going to respond
13:47  2   to the scene.
13:47  3   Q.   Okay.  Not that they were never coming, but just that they
13:47  4   were not respond- -- were not available right then; correct?
13:47  5   A.   I don't know what -- the exact verbiage they used, but
13:47  6   they told me that Cold Case Squad -- the Cold Case Squad was
13:47  7   not coming to the scene, was not responding.
13:47  8   Q.   Let me ask you this:  Did they tell you that Cold Case was
13:48  9   never going to come?
13:48  10  A.   I don't -- they didn't respond, "Cold Case is never
13:48  11  coming."  They responded, "Cold Case is not responding to your
13:48  12  scene.  I don't have a Cold Case Squad available to dispatch to
13:48  13  your scene."
13:48  14  Q.   Now, you had never handled a police shooting before that,
13:48  15  have you?
13:48  16  A.   Discharges, not one where someone was struck.
13:48  17  Q.   All right.  You had never handled a police shooting
13:48  18  before?  When I use the term "police shooting," I'm talking
13:48  19  about where people are shot.
13:48  20  A.   No.
13:48  21  Q.   You never did.
13:48  22        And Sergeant Kaufman, to your knowledge, never did?
13:48  23  A.   Not to my knowledge.  I'm --
13:48  24  Q.   So in your 18-year career, you have never been involved in
13:48  25  an investigation like that before?

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 13:48 | 1 | A.   I was involved in investigations.  I never handled a |
| 13:48 | 2 | shooting because the Cold Case Homicide Division would handle a |
| 13:48 | 3 | police shooting.  It wouldn't be a district sergeant.  It would |
| 13:48 | 4 | be the Cold Case Squad that handled them.  I handled police |
| 13:48 | 5 | discharges where you missed. |
| 13:48 | 6 | Q.   All right.  Well, let me be more specific then because |
| 13:48 | 7 | that's not the question.  The question is: Prior to that time, |
| 13:48 | 8 | did you ever personally investigate an incident where a police |
| 13:48 | 9 | officer shot someone? |
| 13:48 | 10 | A.   No. |
| 13:49 | 11 | Q.   No. |
| 13:49 | 12 |      And how many years had you been a policeman at that |
| 13:49 | 13 | time? |
| 13:49 | 14 | A.   At that time I had been on the job for 17 years. |
| 13:49 | 15 | Q.   17 years. |
| 13:49 | 16 |      So in your 17 years, you had never handled an |
| 13:49 | 17 | incident where a police officer shot someone? |
| 13:49 | 18 | A.   No. |
| 13:49 | 19 | Q.   You had never supervised an investigation where a police |
| 13:49 | 20 | officer shot someone? |
| 13:49 | 21 | A.   No. |
| 13:49 | 22 | Q.   So this was novel to you? |
| 13:49 | 23 | A.   No. |
| 13:49 | 24 | Q.   It wasn't novel to you? |
| 13:49 | 25 | A.   It was an investigation.  It was an investigation which I |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 13:49 | 1 | was capable of handling. I had not handled one up until that |
| 13:49 | 2 | point, but it would be handled the same thing with an ordinary |
| 13:49 | 3 | shooting of which I had handled numerous. |
| 13:49 | 4 | Q. Okay. So you were capable of handling this? |
| 13:49 | 5 | A. Yes. |
| 13:49 | 6 | Q. And you've had experience doing that obviously? |
| 13:49 | 7 | A. Yes. |
| 13:49 | 8 | Q. Because you're the lieutenant and you're in charge? |
| 13:49 | 9 | A. That's not the reason. But I was a lieutenant there and I |
| 13:49 | 10 | was in charge of the scene, yes. |
| 13:49 | 11 | Q. Now, when you talked to Sergeant Kaufman and you |
| 13:49 | 12 | instructed him that it was his responsibility -- that you |
| 13:49 | 13 | wanted him to handle the investigation -- I'm sorry. Let me |
| 13:49 | 14 | rephrase that. |
| 13:49 | 15 | You then spoke to Sergeant Kaufman somewhere either |
| 13:49 | 16 | on the east or west side and you told him Cold Case would not |
| 13:50 | 17 | be coming, so he needs to handle this investigation; correct? |
| 13:50 | 18 | A. That-- he was told that on the west side by the Friendly |
| 13:50 | 19 | Inn motel is where I -- where he was told that information. |
| 13:50 | 20 | Q. And he was told that he would have to initiate this |
| 13:50 | 21 | investigation? |
| 13:50 | 22 | A. That he would have to handle the investigation. |
| 13:50 | 23 | Q. Okay. And you had spoken to Captain Winn, if I'm not |
| 13:50 | 24 | mistaken, just prior to that; correct? |
| 13:50 | 25 | A. Yes, I had. |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 13:50 | 1 | **Q.**   And he was the captain in charge of the tactical unit? |
| 13:50 | 2 | **A.**   Yes, he was. |
| 13:50 | 3 | **Q.**   And you had asked him what has happened in other |
| 13:50 | 4 | situations of this magnitude during Katrina and he responded to |
| 13:50 | 5 | you write a 105 -- that the chief -- |
| 13:50 | 6 | **MS. BERNSTEIN:**  Objection.  It misstates the evidence |
| 13:50 | 7 | on direct. |
| 13:50 | 8 | **MR. LONDON:**  Well, I'm asking for -- for his answer. |
| 13:50 | 9 | **THE COURT:**  I'm going to overrule and see if he can |
| 13:50 | 10 | clarify it. |
| 13:50 | 11 | **BY MR. LONDON:** |
| 13:50 | 12 | **Q.**   Yeah, clarify it for me. |
| 13:50 | 13 | **A.**   Captain Winn was the captain in charge of the Special |
| 13:50 | 14 | Operations Division, and I was already aware that his unit had |
| 13:50 | 15 | been involved in a shooting earlier in the week, and I had |
| 13:50 | 16 | heard that Homicide Division did not respond to his shooting |
| 13:50 | 17 | either. |
| 13:50 | 18 | That's when I asked him, I said, "What did you all do |
| 13:50 | 19 | when you handled your shooting?"  And he said, "They didn't" -- |
| 13:51 | 20 | "homicide didn't respond to our shooting either, that I was |
| 13:51 | 21 | instructed to write an inner office correspondence and forward |
| 13:51 | 22 | that to the chief."  And that was the extent of the |
| 13:51 | 23 | investigation that he was instructed to conduct. |
| 13:51 | 24 | At that point is when I assigned the case to Sergeant |
| 13:51 | 25 | Kaufman and told him that he was going to have to investigate |

MICHAEL LOHMAN - Cross

13:51   1   the incident.

13:51   2   **Q.**   So the answer is that -- that he did tell you that the

13:51   3   last -- what his experience was the superintendent told him,

13:51   4   "Write a 105"?

13:51   5   **A.**   Yes.

13:51   6   **Q.**   Now, would you explain what a 105 is to the jury for me?

13:51   7   **A.**   A 105 is an inner office correspondence.

13:51   8   **Q.**   Not a report?

13:51   9   **A.**   Not a report.

13:51   10   **Q.**   It's white paper?

13:51   11   **A.**   Yes.

13:51   12   **Q.**   Now, when did you -- now, on the scene there, how many

13:51   13   people were shot?

13:51   14   **A.**   Six.

13:51   15   **Q.**   All right.  You would agree it's a fairly chaotic --

13:51   16   chaotic scene at that time?

13:51   17   **A.**   Yes.

13:51   18   **Q.**   And you would agree that Katrina itself was a chaotic

13:51   19   event, would you not?

13:51   20   **A.**   Yes, it was.

13:51   21   **Q.**   Now, when's the -- when did you ever have -- did the

13:51   22   super- --  well, scratch that.

13:51   23   Did the superintendent of police come to that scene?

13:51   24   **A.**   No.

13:52   25   **Q.**   Did the deputy superintendent of police in charge of Field

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 13:52 | 1 | Operations come to that scene? |
| 13:52 | 2 | **A.**   No. |
| 13:52 | 3 | **Q.**   Did the deputy superintendent for the Detective Bureau |
| 13:52 | 4 | come to that scene? |
| 13:52 | 5 | **A.**   No. |
| 13:52 | 6 | **Q.**   Did your own captain come to that scene? |
| 13:52 | 7 | **A.**   I don't believe he came to the scene, no. |
| 13:52 | 8 | **Q.**   Well, you're remembering -- I mean, do you remember |
| 13:52 | 9 | whether he did or he didn't? |
| 13:52 | 10 | **A.**   I don't recall him coming to the scene.  I remember him |
| 13:52 | 11 | being at the Crystal Palace later on, but I don't recall him |
| 13:52 | 12 | being at the scene, no. |
| 13:52 | 13 | **Q.**   Now, the west side of the Danziger Bridge is the 3rd |
| 13:52 | 14 | District; correct? |
| 13:52 | 15 | **A.**   Yes. |
| 13:52 | 16 | **Q.**   Do you recall Captain Plaisance showing up on that scene? |
| 13:52 | 17 | **A.**   Plaisance is -- I'm not -- |
| 13:52 | 18 | **Q.**   Paisance (phonetic) or Plaisance? |
| 13:52 | 19 | **A.**   No. |
| 13:52 | 20 | **Q.**   Okay.  So you were -- were there any other -- was Captain |
| 13:52 | 21 | Winn in charge of that scene or were you? |
| 13:52 | 22 | **A.**   I'd say I was. |
| 13:52 | 23 | **Q.**   You were in charge of that scene.  Okay. |
| 13:52 | 24 | Did you call the dispatcher and ask for the crime |
| 13:52 | 25 | lab? |

MICHAEL LOHMAN - Cross

| 13:52 | 1 | A. | Yes, I did. |

13:52  1   A.   Yes, I did.

13:52  2   Q.   What did they tell you?

13:52  3   A.   That they weren't available and they weren't coming.

13:53  4   Q.   Did you call and ask for the coroner?

13:53  5   A.   Yes, I did.

13:53  6   Q.   And what did they tell you?

13:53  7   A.   The same thing, that they weren't available.

13:53  8   Q.   Did you call for any other EMS units?

13:53  9   A.   No.

13:53  10  Q.   So you all were pretty much on your own?

13:53  11  A.   Yes.

13:53  12  Q.   Would it be fair to say that during Katrina you all were

13:53  13  pretty much on your own as it was?

13:53  14  A.   That would be a fair statement, yes.

13:53  15  Q.   And would it be fair to say that the individuals -- your

13:53  16  policemen, the police that worked for you, did not have crime

13:53  17  lab equipment on them?

13:53  18  A.   That would fair, yes.

13:53  19  Q.   That would be fair to say.

13:53  20       So it would be fair to say that Sergeant Kaufman did

13:53  21  not have crime scene tape on him?

13:53  22  A.   Yes.

13:53  23  Q.   It would be fair to say that Sergeant Kaufman did not have

13:53  24  a camera on him?

13:53  25  A.   Yes.

MICHAEL LOHMAN - Cross

13:53  1   Q.   It would be fair to say that Sergeant Kaufman did not have

13:53  2   evidence bags on him?

13:53  3   A.   Yes.

13:53  4   Q.   It would be fair to say that Sergeant Kaufman had none of

13:53  5   the other accoutrements that go along with a crime scene;

13:53  6   correct?

13:53  7   A.   Yes.

13:54  8   Q.   Now, I want to return to the report.  And I just want to

13:54  9   make sure that I have this clear before I go further.  The

13:54  10  17-page report, which was fabricated by you, was done before

13:54  11  Sergeant Dugue assumed the investigation?

13:54  12  A.   Yes.

13:54  13  Q.   The 46-page report that you claimed was done by Sergeant

13:54  14  Kaufman was done before Sergeant Dugue assumed the

13:54  15  investigation?

13:54  16  A.   Yes.

13:54  17  Q.   Okay.  The 54-page report -- which I believe you called

13:54  18  the supplemental report; is that correct?  Is that how you

13:54  19  referred to that?

13:54  20  A.   Yes.

13:54  21  Q.   -- that was done by Sergeant Dugue; correct?

13:54  22  A.   His name is on the face sheet.  I don't know who actually

13:54  23  wrote it.

13:54  24  Q.   Well, you don't.  Now, his -- okay.  That's an interesting

13:54  25  point.

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 13:54 | 1 | I believe you were asked on direct that to -- that |
| 13:54 | 2 | when you look at a police face sheet, you can identify, because |
| 13:55 | 3 | there's the departmental regulations, on whose name goes to the |
| 13:55 | 4 | left at the bottom, isn't there? |
| 13:55 | 5 | **A.**   Yes. |
| 13:55 | 6 | **Q.**   And that's the person that writes the report; correct? |
| 13:55 | 7 | **A.**   Yes. |
| 13:55 | 8 | **Q.**   So you just don't want to say that Dugue wrote the report, |
| 13:55 | 9 | do you? |
| 13:55 | 10 | **A.**   There were two officers' names on the report.  The first |
| 13:55 | 11 | one was Sergeant Dugue and the second one was Sergeant Kaufman. |
| 13:55 | 12 | **Q.**   And according to department regulations, and tradition -- |
| 13:55 | 13 | **A.**   The first name would be the person -- |
| 13:55 | 14 | **Q.**   -- and history -- |
| 13:55 | 15 | **THE COURT:**  Wait a minute.  Let him finish. |
| 13:55 | 16 | **BY MR. LONDON:** |
| 13:55 | 17 | **Q.**   -- and history, who is the person that wrote the report? |
| 13:55 | 18 | **A.**   The first name. |
| 13:55 | 19 | **Q.**   And whose name was that? |
| 13:55 | 20 | **A.**   Dugue. |
| 13:55 | 21 | **Q.**   Now, we didn't want to say that earlier, did you? |
| 13:55 | 22 | **A.**   I wasn't denying that earlier.  I was saying that's the |
| 13:55 | 23 | first name on the report, that's usually how you identify who |
| 13:55 | 24 | wrote the report.  And you asked me if Dugue wrote the report. |
| 13:55 | 25 | According to the paper, it should be who wrote it.  He should |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 13:55 | 1 | be the one who wrote it. |
| 13:55 | 2 | Q.   Yet, when Ms. Bernstein asked you, "The report written by |
| 13:55 | 3 | Sergeant Dugue and Kaufman," you didn't correct her, did you? |
| 13:56 | 4 | A.   I don't recall correcting her, no. |
| 13:56 | 5 | Q.   No.  You didn't correct her, is what I'm saying, did you? |
| 13:56 | 6 | A.   No. |
| 13:56 | 7 | Q.   No, you didn't. |
| 13:56 | 8 |      Because you want the jury to think that Kaufman's |
| 13:56 | 9 | responsible for that because that helps your deal -- |
| 13:56 | 10 | A.   That's not -- |
| 13:56 | 11 | Q.   -- isn't that correct? |
| 13:56 | 12 | A.   That's not accurate, no. |
| 13:56 | 13 | Q.   That's not accurate? |
| 13:56 | 14 | A.   No. |
| 13:56 | 15 | Q.   We'll see. |
| 13:56 | 16 |      Now, you didn't -- when you showed up to the FBI for |
| 13:56 | 17 | your second, after your lying, interview that you admit was a |
| 13:56 | 18 | lie; correct? |
| 13:56 | 19 | A.   Yes, I was untruthful. |
| 13:56 | 20 | Q.   Untruthful, the same thing as lying? |
| 13:56 | 21 | A.   I say untruthful. |
| 13:56 | 22 | Q.   Okay.  You say untruthful; I say lying. |
| 13:56 | 23 |      You brought a 17-page report, your fictitious report; |
| 13:56 | 24 | correct? |
| 13:56 | 25 | A.   Yes. |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 13:56 | 1 | Q. You brought a copy of the 32 pages of notes? |
| 13:56 | 2 | A. The 32-page report, yes. |
| 13:56 | 3 | Q. It's a report, okay. I was going to ask you about that |
| 13:56 | 4 | term next time, because terms mean a lot. Like when we say we |
| 13:57 | 5 | signed off on things. "Signed off" means a lot to some people. |
| 13:57 | 6 | I understand "signed off" to you doesn't mean signed off, but I |
| 13:57 | 7 | want to ask you about that term "report." |
| 13:57 | 8 | What constitutes a report, in your mind, as far as |
| 13:57 | 9 | the New Orleans Police Department chronicle of official events |
| 13:57 | 10 | is concerned? |
| 13:57 | 11 | A. What constitutes a report -- |
| 13:57 | 12 | Q. Uh-huh. |
| 13:57 | 13 | A. -- is a narrative. A completed report would be a face |
| 13:57 | 14 | sheet, the rear of the face sheet, the narrative, and the Gist |
| 13:57 | 15 | page, and any other attachments that were associated with that |
| 13:57 | 16 | police report. |
| 13:57 | 17 | When the 32 -- the 46-page report is the one you're |
| 13:57 | 18 | referring to right now? |
| 13:57 | 19 | Q. No, I'm referring to the 32. |
| 13:57 | 20 | A. When the 32-page police report was presented to me, it |
| 13:57 | 21 | wasn't completed. A face sheet hadn't been completed and none |
| 13:57 | 22 | of the attachments had been put with the report. All I was |
| 13:57 | 23 | given was the "Narrative" section of the police report at that |
| 13:57 | 24 | time and that's what I read and that's what I took notes on. |
| 13:57 | 25 | Q. Are you finished? |

MICHAEL LOHMAN - Cross

13:57  1   A.   Yes, I'm done now.
13:57  2   Q.   All right.  So is that your explanation?  The question
13:57  3   was:  What constitutes a report in your terminology?  I want to
13:58  4   have the right terminology with you.  What constitutes the term
13:58  5   "report," in your mind, when you say, "It was a report"?
13:58  6   A.   The 32-page report, the 32-page narrative given to me by
13:58  7   Kaufman would constitute a report in my mind.
13:58  8   Q.   And how would it?
13:58  9   A.   It wasn't complete, but it was still a report.  It was
13:58  10  part of the report.
13:58  11  Q.   Did it have a face sheet?
13:58  12  A.   It did not have a face sheet.
13:58  13  Q.   It did not have a face sheet?
13:58  14  A.   No, it did not.
13:58  15  Q.   So what differentiates a collection of notes from a
13:58  16  report, in your mind?
13:58  17  A.   That was the narrative report that was presented to me.
13:58  18  That was what he was presenting as the narrative in his report.
13:58  19  Q.   All right.  We'll move on.
13:58  20       Now, the 46-page, what would you call that, report?
13:58  21  A.   A report.
13:58  22  Q.   Okay.  The 46-page report you also brought into the FBI
13:58  23  when you came; is that correct?
13:58  24  A.   Yes, I did.
13:58  25  Q.   Okay.  Now, you know that the government served a search

MICHAEL LOHMAN - Cross

| 13:58 | 1 | warrant on Sergeant Kaufman's computer at his office? |
| 13:58 | 2 | A.   Yes, I was aware. |
| 13:58 | 3 | Q.   And you know the only thing found on his computer was the |
| 13:59 | 4 | 32-page notes -- |
| 13:59 | 5 | MS. BERNSTEIN:  Objection. |
| 13:59 | 6 | BY MR. LONDON: |
| 13:59 | 7 | Q.   -- I'm going to call them notes, or do you know? |
| 13:59 | 8 | MR. LONDON:  I'm sorry.  I didn't catch that. |
| 13:59 | 9 | THE COURT:  You just rephrased, I think, to cure the |
| 13:59 | 10 | objection, if I'm not mistaken. |
| 13:59 | 11 | MR. LONDON:  Subconscious. |
| 13:59 | 12 | MS. BERNSTEIN:  Correct, Your Honor.  I have no |
| 13:59 | 13 | objection to the second question. |
| 13:59 | 14 | THE COURT:  "Do you know?" |
| 13:59 | 15 | BY MR. LONDON: |
| 13:59 | 16 | Q.   Do you? |
| 13:59 | 17 | A.   What was the question? |
| 13:59 | 18 | Q.   Do you know, or don't you know, that the only thing that |
| 13:59 | 19 | the FBI found on Sergeant Dugue's computer and thumb drive when |
| 13:59 | 20 | they searched his work space was the 32-page, which I'll call, |
| 13:59 | 21 | notes? |
| 13:59 | 22 | A.   No.  I wasn't aware of what was found on the computer.  I |
| 13:59 | 23 | was aware that information or reports were found on his |
| 13:59 | 24 | computer, but I was never aware of exactly what reports or what |
| 13:59 | 25 | information. |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 13:59 | 1 | **Q.**   They didn't tell that you? |
| 13:59 | 2 | **A.**   No. |
| 13:59 | 3 | **Q.**   They didn't tell you that. |
| 13:59 | 4 |        Okay.  Now, how did you -- all right.  Let's back up |
| 13:59 | 5 | to your 17-page report.  Your 17-page report was typed by you? |
| 13:59 | 6 | **A.**   Yes. |
| 13:59 | 7 | **Q.**   Okay.  And only you? |
| 14:00 | 8 | **A.**   I did the typing, but we worked on it together, yes. |
| 14:00 | 9 | **Q.**   You worked on it together.  Okay.  Well, I'll tell you |
| 14:00 | 10 | what, let's just break there for a second and let me ask you -- |
| 14:00 | 11 | let's just go to your factual basis, if I could find it. |
| 14:00 | 12 |        And ask you to go to page 8. |
| 14:00 | 13 |        **MR. LONDON:**  Actually, if I could approach rather |
| 14:00 | 14 | than have them put it up.  It's just one sentence. |
| 14:00 | 15 |            May I approach, Judge? |
| 14:00 | 16 |        **THE COURT:**  Sure. |
| 14:00 | 17 |        **MR. LONDON:**  It's page 8 of the factual basis. |
| 14:00 | 18 |        **THE COURT:**  You don't want to put that on the screen? |
| 14:00 | 19 |        **MR. LONDON:**  Well, yeah, we can -- well, I didn't |
| 14:00 | 20 | want -- |
| 14:00 | 21 |        **MS. BERNSTEIN:**  It's not in evidence or published to |
| 14:00 | 22 | the jury yet. |
| 14:00 | 23 |        **MR. LONDON:**  All right.  May I approach? |
| 14:00 | 24 |        **THE COURT:**  Yes. |
| | 25 | |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 14:00 | 1 | **BY MR. LONDON:** |
| 14:00 | 2 | **Q.**   I'm going to show you what purports to be your factual |
| 14:00 | 3 | basis.  I'd like you to look at it.  Just look at the entire |
| 14:00 | 4 | document, if you would, and tell me if that, in fact, is your |
| 14:01 | 5 | factual basis. |
| 14:01 | 6 | **A.**   (WITNESS COMPLIES.) |
| 14:01 | 7 |        Yes, that appears to be my factual basis. |
| 14:01 | 8 | **Q.**   All right.  And that's the factual basis that you read? |
| 14:01 | 9 | **A.**   Yes. |
| 14:01 | 10 | **Q.**   And that's the factual basis that was read to |
| 14:01 | 11 | Judge Lemelle? |
| 14:01 | 12 | **A.**   Yes. |
| 14:01 | 13 | **Q.**   And you swore it was correct? |
| 14:01 | 14 | **A.**   Yes. |
| 14:01 | 15 | **Q.**   All right.  I'd like to direct your attention -- |
| 14:01 | 16 |        **MR. LONDON:**  May I approach? |
| 14:01 | 17 |        **THE COURT:**  Yes. |
| 14:01 | 18 | **BY MR. LONDON:** |
| 14:01 | 19 | **Q.**   -- direct your attention, if I might, to page 8, the |
| 14:01 | 20 | bottom paragraph, and ask you:  Do you recall swearing that |
| 14:01 | 21 | you, personally, did the 17-page report? |
| 14:01 | 22 | **A.**   Yes. |
| 14:01 | 23 | **Q.**   You did? |
| 14:01 | 24 | **A.**   Yes. |
| 14:01 | 25 | **Q.**   May I have that back? |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 14:01 | 1 | So now you, personally, did the 17-page report? |
| 14:01 | 2 | A.   I typed the report, yes. |
| 14:01 | 3 | Q.   And this says you, personally, prepared, drafted a 17-page |
| 14:02 | 4 | report.  What does that mean to you? |
| 14:02 | 5 | A.   That I, personally, drafted the report.  I, personally, |
| 14:02 | 6 | typed the report. |
| 14:02 | 7 | Q.   Well, you just testified that all these other people did |
| 14:02 | 8 | this report and had this input report with you, but that's not |
| 14:02 | 9 | what it says in your factual basis. |
| 14:02 | 10 | A.   It says I, personally, drafted it.  I'm the one who typed |
| 14:02 | 11 | it.  I authored it. |
| 14:02 | 12 | Q.   What did you expect Judge Lemelle to think when that was |
| 14:02 | 13 | read as what you did? |
| 14:02 | 14 | A.   Is that I'm the one who prepared the report. |
| 14:02 | 15 | Q.   Were you, though?  That's what I just asked you at first, |
| 14:02 | 16 | you're the one that prepared the 17-page report? |
| 14:02 | 17 | A.   Yes. |
| 14:02 | 18 | Q.   Is that correct? |
| 14:02 | 19 | A.   Yes. |
| 14:02 | 20 | Q.   Nobody else prepared it, you did? |
| 14:02 | 21 | A.   I typed it.  I wrote the report in consultation with the |
| 14:02 | 22 | other guys that were involved.  I had conversations with those |
| 14:02 | 23 | guys -- |
| 14:02 | 24 | **MR. LONDON:**  Judge. |
| 14:02 | 25 | **THE WITNESS:**  -- by the computer while the report was |

MICHAEL LOHMAN - Cross

14:02  1  being written.

14:02  2          THE COURT:  You're going to have to answer the

14:02  3  questions directly as you can.

14:03  4              Ask the question again, answer it directly as

14:03  5  you can, all right?

14:03  6          THE WITNESS:  Yes, sir.

14:03  7          THE COURT:  We can't parse words on cross, so let's

14:03  8  listen to the question carefully and answer it.

14:03  9          MS. BERNSTEIN:  Your Honor --

14:03  10  BY MR. LONDON:

14:03  11  Q.  Did you --

14:03  12          MS. BERNSTEIN:  -- I believe the witness is directly

14:03  13  answering his question and has several times now.  But he can

14:03  14  answer one more time.

14:03  15          THE COURT:  Well, we're going to go ahead -- well,

14:03  16  he's going to.  Go ahead.

14:03  17          MR. LONDON:  May I proceed?

14:03  18          THE COURT:  Yes.

14:03  19  BY MR. LONDON:

14:03  20  Q.  Did you or did you not personally prepare the 17-page

14:03  21  report?

14:03  22  A.  I, personally, prepared the report.

14:03  23  Q.  Thank you.

14:03  24          Because that's what's in your factual basis?

14:03  25  A.  That's what it says, yes.

MICHAEL LOHMAN - Cross

14:03    1    Q.    All right.  Now, we'll get back to the first question I
14:03    2    had.  You typed that report; correct?
14:03    3    A.    Yes, I did.
14:03    4    Q.    And you typed it in the 7th District station or did you
14:03    5    not?
14:03    6    A.    Yes, I did.
14:03    7    Q.    And what did you type it on?
14:03    8    A.    On whatever computer -- whatever computer was available at
14:03    9    that time in the 7th District.
14:03   10    Q.    Did you put it on your thumb drive?
14:03   11    A.    No.
14:03   12    Q.    You just left it there?
14:03   13    A.    I think I may have put it on a -- at the time we had a
14:04   14    floppy disk.  I think I may have used it on that.
14:04   15    Q.    You may have, but you don't recall?
14:04   16    A.    I don't recall.
14:04   17    Q.    Are these computers protected -- password protected?
14:04   18    A.    I'm not sure.  I'm not sure if they were or not.
14:04   19    Q.    But you don't know -- it was a computer in your office?
14:04   20    A.    No.
14:04   21    Q.    Was it the same computer that Sergeant Bowen -- Sergeant
14:04   22    Kaufman uses?
14:04   23    A.    Yes.  It would have been whatever computer was available
14:04   24    at that time.  We had them set up in the Crystal Palace around
14:04   25    tables.  And whatever computer was available would have been

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 14:04 | 1 | which one I would have typed it on. |
| 14:04 | 2 | **Q.**   All right.  But there were several different computers? |
| 14:04 | 3 | **A.**   There were a couple, I believe, yes. |
| 14:04 | 4 | **Q.**   So you don't know -- all right.  Are you finished with |
| 14:04 | 5 | that?  I didn't mean to cut you off. |
| 14:04 | 6 | **A.**   Yes, I'm done. |
| 14:04 | 7 | **Q.**   Okay.  So -- but you don't know if it's the exact same |
| 14:04 | 8 | computer that Sergeant Kaufman used for his 32-page of notes, |
| 14:04 | 9 | do you? |
| 14:04 | 10 | **A.**   No. |
| 14:04 | 11 | **Q.**   No, you do not?  That's a no? |
| 14:04 | 12 | **A.**   No. |
| 14:05 | 13 | **Q.**   Now, you also have alleged in your factual basis -- and if |
| 14:05 | 14 | you want to see it, I'll be happy to show it to you, but rather |
| 14:05 | 15 | than walk back and forth, I'll just -- that Archie Kaufman and |
| 14:05 | 16 | the shooters came up with false stories to justify their |
| 14:05 | 17 | shootings.  Do you recall saying that in your factual basis? |
| 14:05 | 18 | **A.**   Yes. |
| 14:05 | 19 | **Q.**   Yes. |
| 14:05 | 20 | Now, of course, that's what the government typed? |
| 14:05 | 21 | **A.**   Yes. |
| 14:05 | 22 | **Q.**   Okay.  Now, which false story did these individuals come |
| 14:05 | 23 | up with that you knew? |
| 14:05 | 24 | **A.**   All of it. |
| 14:05 | 25 | **Q.**   All of it. |

MICHAEL LOHMAN - Cross

14:05  1          So it was all false.  The fact that there was a 108

14:05  2     was false?

14:05  3     A.   There were numerous lies and fabrications in all three of

14:05  4     those reports that were written, the 32-pager, the 46-pager,

14:05  5     and the 17-pager.

14:05  6     Q.   Okay.

14:05  7          THE COURT:  Sir, you have to answer his questions.

14:05  8     He's asking you a specific question.  You have to answer his

14:06  9     question and not say something else.  So listen to the

14:06  10    questions carefully and then answer them as directly as you

14:06  11    can.

14:06  12         THE WITNESS:  Yes, sir.

14:06  13    BY MR. LONDON:

14:06  14    Q.   Can you answer?

14:06  15    A.   Answer the -- ask the question again.

14:06  16    Q.   Ask the question again.

14:06  17         What specific -- you said there are numerous false

14:06  18    accounts in these stories that the officers gave you.

14:06  19    A.   Yes.

14:06  20    Q.   Okay.  Do you specifically remember what each officer told

14:06  21    you?

14:06  22    A.   Not in each version.  I mean, there were several versions

14:06  23    that changed over the time, no.

14:06  24    Q.   No -- period.  On the scene.  Were you on the scene?

14:06  25    A.   Yes, I was.

MICHAEL LOHMAN - Cross

14:06  1   **Q.**   Did you talk to these officers?

14:06  2   **A.**   Yes.

14:06  3   **Q.**   And you asked them what happened?

14:06  4   **A.**   Yes.

14:06  5   **Q.**   And they personally described to you every single thing

14:06  6   they did; correct?

14:06  7   **A.**   No, they did not.

14:06  8   **Q.**   Did you ask them what happened?

14:06  9   **A.**   Yes.

14:06  10  **Q.**   Did they answer you?

14:06  11  **A.**   Yes.

14:06  12  **Q.**   And did they -- by answering you did they tell you what

14:06  13  happened?

14:06  14  **A.**   They didn't explain every single detail that happened.

14:06  15  The statements I obtained on the bridge when I spoke to Bowen,

14:06  16  Gisevius, and Faulcon, which I think were the only ones I spoke

14:07  17  to on the bridge, were pretty general in nature about what had

14:07  18  happened or what had transpired.  The details weren't -- didn't

14:07  19  take place or come up until after when the reports were being

14:07  20  written.

14:07  21  **Q.**   But you eventually asked everybody what they did?

14:07  22  **A.**   No.  I asked Bowen, Gisevius, and Faulcon.  The others, I

14:07  23  state in that factual basis, I had conversations with them or I

14:07  24  asked if they were okay with the reports that they did.

14:07  25  **Q.**   But you asked -- it's your testimony you asked Bowen,

MICHAEL LOHMAN - Cross

14:07  1   Gisevius, and Faulcon what happened?

14:07  2   **A.**   Those were the ones that I had the more detailed

14:07  3   conversations with, yes.

14:07  4   **Q.**   And those detailed conversations consisted of what

14:07  5   happened; is that correct or not?

14:07  6   **A.**   Yes.

14:07  7   **Q.**   Yes.

14:07  8        You asked them what happened?

14:07  9   **A.**   Yes, I did.

14:07  10  **Q.**   And they responded to you?

14:07  11  **A.**   Yes, they did.

14:07  12  **Q.**   And that was their version?

14:07  13  **A.**   Yes.

14:07  14  **Q.**   And do you recall what each one told you?

14:07  15  **A.**   Yes.  Parts of it.  The versions changed throughout the --

14:08  16  throughout the report writing and the discussions.  There was

14:08  17  never one version given to me and said, "That's it.  That's all

14:08  18  I know."  It changed, and there were discussions over the

14:08  19  course of this thing --

14:08  20        **MR. LONDON:**  Judge, that's not the question.

14:08  21        **THE COURT:**  I understand, but I think he's answering

14:08  22  your question.  He's allowed to explain the answer, so go ahead

14:08  23  and finish.

14:08  24        **MR. LONDON:**  All right.  May I just ask him what the

14:08  25  answer is first before he explains?

MICHAEL LOHMAN - Cross

14:08   1        **THE COURT:**  I thought he answered this.

14:08   2        **MR. LONDON:**  Well, maybe I didn't catch it.  Can I

14:08   3   ask him again?

14:08   4        **THE COURT:**  I thought he answered it.  Finish

14:08   5   answering and then if you want to ask it --

14:08   6        **THE WITNESS:**  Ask the question again, what was their

14:08   7   version?  Do I remember what version of the --

14:08   8   **BY MR. LONDON:**

14:08   9   **Q.**   I'm not asking you what they said, no.

14:08   10        I'm asking you that you asked them what happened, or

14:08   11   words to those effect, and they gave you an answer.  Whether it

14:08   12   was true or not true, I'm not asking you.  I'm asking you:  You

14:08   13   asked them what they said and they gave you an answer; is that

14:08   14   correct?

14:08   15   **A.**   I answered that already, yes.

14:08   16   **Q.**   Yes, it is correct?

14:08   17   **A.**   Yes.

14:08   18   **Q.**   Thank you.

14:08   19        Do you recall talking to the FBI on December 9th,

14:09   20   2009, the day you made your deal?

14:09   21   **A.**   Yes.

14:09   22   **Q.**   And do you recall the contents of the conversation that

14:09   23   you had with the FBI?

14:09   24   **A.**   No.

14:09   25   **Q.**   No, you don't.

MICHAEL LOHMAN - Cross

14:09    1          Do you recall telling the FBI:  "Lohman never asked
14:09    2    the responding officers to tell him what actually occurred
14:09    3    during the Danziger shooting incident.  The officers never told
14:09    4    Lohman what occurred on" -- "what occurred.  Lohman theorized
14:09    5    the shooting started when Bowen overreacted and fired his
14:09    6    weapon."
14:09    7          Do you remember telling them that?
14:09    8    A.    Yes.
14:09    9    Q.    Well, now, which one's true?
14:09    10   A.    I had conversations with all of the officers.  On the
14:09    11   Danziger Bridge, I spoke to Ken Bowen, Rob Gisevius, and Robert
14:09    12   Faulcon.  After that, I had conversations with the other
14:09    13   officers involved where I asked them if they were okay with
14:10    14   what was written in the 17-page report.
14:10    15   Q.    Did you tell the FBI:  "Lohman" -- you -- "never asked the
14:10    16   responding officers to tell him what actually occurred during
14:10    17   the Danziger Bridge shooting incident"?  Did you say that?
14:10    18   A.    If that's what they have documented in the 302, that's
14:10    19   what I said, but I clarified it later on in the 302.
14:10    20   Q.    Okay.  Well, let's go on to the next one.  But you did.
14:10    21   The question is:  Did you say that?
14:10    22   A.    Yes.
14:10    23   Q.    You did say that?
14:10    24   A.    Yes.
14:10    25   Q.    "The officers never told Lohman what actually occurred."

MICHAEL LOHMAN - Cross

14:10   1   Did you say that?

14:10   2   A.   Yes.

14:10   3   Q.   Well, then you just testified they did tell you what

14:10   4   occurred?

14:10   5   A.   They did.

14:10   6   Q.   But then here you're saying they didn't?

14:10   7   A.   That's in one 302.

14:10   8   Q.   Yeah.  Well, during that 302 is that what you told them?

14:10   9   A.   Yes.  I can ex --

14:10   10  Q.   And this is the day of your deal?

14:10   11  A.   Yes.

14:10   12  Q.   Well, that doesn't sound like the -- is that an untruth?

14:10   13  A.   No, that's the truth.  I can explain.

14:10   14  Q.   Go ahead.

14:11   15  A.   You're asking me a question about what I told them on

14:11   16  December 18th.  I did tell them that the officers -- I never

14:11   17  asked the officers what happened that day.  What I'm referring

14:11   18  to is the other officers that were involved.  The people that I

14:11   19  spoke with were Sergeant Bowen, Sergeant Gisevius, and Robert

14:11   20  Faulcon on the scene of the incident that day.  The other

14:11   21  officers, I never really had any detailed conversations with

14:11   22  them.

14:11   23       When the 17-page report was written, I asked each and

14:11   24  every one of them at some point, whether crossed -- passing

14:11   25  them in the hallway or meeting with them in the parking lot, if

MICHAEL LOHMAN - Cross

14:11   1   they had a chance to look at the report and if they were okay
14:11   2   with everything.  And I know that's documented somewhere in the
14:11   3   302 also.
14:11   4   Q.   Okay.  But I'm not talking about that 302.
14:11   5   A.   I know.  But I'm explaining what you're asking me here and
14:11   6   I'm trying to explain it accurately because you keep going on
14:11   7   about the one statement, but there was more to it than just
14:11   8   that.
14:11   9   Q.   Well, I happen to be going on about the one statement
14:11   10  because of what it says you said in here, and let me read
14:11   11  further and ask you that.
14:11   12           "The officers never told Lohman what actually
14:11   13  occurred.  Lohman theorized the shooting started when Bowen
14:12   14  overreacted and fired his weapon."  Did you say that?
14:12   15  A.   Yes, with an explanation if I could.
14:12   16  Q.   Go ahead.
14:12   17  A.   That was a question that they asked me where they said,
14:12   18  "What do you think happened that day," and that was my
14:12   19  response.  My theory was, is that I thought they responded to
14:12   20  the bridge, that Bowen overreacted based on the initial
14:12   21  statements he had given me about suppression fire, he started
14:12   22  firing, and everyone else panicked as they came out of the --
14:12   23  out of the Budget truck, is what the statement says.
14:12   24  Q.   So that's your theory?
14:12   25  A.   That's what I was asked, "What is your theory or what do

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 14:12 | 1 | you think happened," and that's what I explained to them I |
| 14:12 | 2 | thought happened. |
| 14:12 | 3 | **Q.**   And that's what you -- is that still what you think |
| 14:12 | 4 | happened? |
| 14:12 | 5 | **A.**   I think -- I think something along those lines happened. |
| 14:12 | 6 | I think something went wrong when they got there.  If you're |
| 14:12 | 7 | asking me for my opinion, that's what I believe or that's what |
| 14:12 | 8 | I think. |
| 14:12 | 9 | **Q.**   That's your theory? |
| 14:12 | 10 | **A.**   That's my opinion. |
| 14:12 | 11 | **Q.**   "The gunfire then" -- okay.  "Gunfire then caused the |
| 14:13 | 12 | officers in the back of the Budget rental truck to fire their |
| 14:13 | 13 | weapons."  Did you say that? |
| 14:13 | 14 | **A.**   Yes, I did. |
| 14:13 | 15 | **Q.**   Now, how do you know that? |
| 14:13 | 16 | **A.**   Once again, I was being asked for my theory or my opinion, |
| 14:13 | 17 | and that's what I thought.  That was my response to that |
| 14:13 | 18 | question. |
| 14:13 | 19 | **Q.**   But the -- in response to your question, when it says you |
| 14:13 | 20 | never asked the responding officers to tell you what happened, |
| 14:13 | 21 | is just not right? |
| 14:13 | 22 | **A.**   No.  On that scene I never had a chance or an opportunity |
| 14:13 | 23 | to speak with the responding officers.  I later spoke with the |
| 14:13 | 24 | responding officers. |
| 14:13 | 25 | **Q.**   "Lohman never" -- "never" means to me that you never -- |

MICHAEL LOHMAN - Cross

14:13   1   "asked the responding officers to tell him what actually
14:13   2   occurred during the Danziger Bridge shooting incident."  Is
14:13   3   that a truthful statement or not a truthful statement?
14:13   4   A.   I never asked them on the scene to tell me what happened.
14:13   5   Now, you're talking about the officers, we're not
14:13   6   speaking about Bowen, Gisevius, or Faulcon.
14:13   7            MR. LONDON:  Judge, if I could just get him to ask
14:13   8   the question -- answer the question.
14:13   9            THE COURT:  Let's narrow the question down a little
14:13  10   bit.
14:13  11            MR. LONDON:  May I rephrase it?
14:13  12            THE COURT:  Rephrase it --
14:13  13   BY MR. LONDON:
14:13  14   Q.   Here's the question --
14:13  15            THE COURT:  -- narrow it down, and let's define who
14:14  16   we mean in "officers," and what time period we're talking
14:14  17   about, because he did use the word "never."  So let's ask him.
14:14  18   BY MR. LONDON:
14:14  19   Q.   I will re-ask this question and I'm going to narrow it to
14:14  20   exactly what's typed here:  "Lohman never asked the responding
14:14  21   officers to tell him what actually occurred during the Danziger
14:14  22   Bridge shooting incident."  Period.  Period meaning the dot.  A
14:14  23   punctuation period.
14:14  24   A.   That's the end of the sentence, yes.
14:14  25   Q.   Yes.

MICHAEL LOHMAN - Cross

14:14   1           Is that a correct statement on the part of what the
14:14   2   FBI put in their 302?
14:14   3   A.   That's what I said on that day, yes.
14:14   4   Q.   All right.
14:14   5   A.   But it's not a simple yes or no answer.  I can't
14:14   6   accurately answer it with a simple yes or no.
14:14   7   Q.   Can you answer whether that is truthful on what you said
14:14   8   that day?
14:14   9   A.   That is truthful.  But once again, Judge, with an
14:14   10   explanation.
14:14   11   Q.   Sure.  Go ahead.  You're entitled to explain.
14:14   12   A.   I said that on that day, I never asked them what happened.
14:14   13   When you're referring to "officers," who I'm referring to are
14:14   14   the police officers involved.  I'm not referring to the
14:14   15   supervisors, meaning, Gisevius, and Bowen, or Faulcon because I
14:15   16   did speak to Faulcon, and it is documented in the 302s that I
14:15   17   spoke to Faulcon on the Danziger Bridge.
14:15   18           I spoke to Gisevius, Kauf- -- Gisevius, Bowen, and
14:15   19   Faulcon on the Danziger Bridge.  The other officers, I did not
14:15   20   speak to on the bridge.  I spoke to them later, but I didn't
14:15   21   take detailed statements from them.  It was just a matter of
14:15   22   passing where I said, "Are you okay with what happened," or,
14:15   23   "Are you okay with what was contained in the 17-page report?"
14:15   24   Q.   You just said --
14:15   25           MR. LONDON:  Excuse me.  May I have one second?

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 14:15 | 1 | **THE COURT:**  Sure. |
| 14:16 | 2 | **MR. LONDON:**  I'm sorry about that, Judge. |
| 14:16 | 3 | **THE COURT:**  Go ahead. |
| 14:16 | 4 | BY MR. LONDON: |

14:16  5  Q.   Now, you made a specific allegation -- oh, let me back up.

14:16  6      This may be putting the cart a little before the

14:16  7  horse, but I'm going to do it anyway.

14:16  8      Ms. Bernstein asked you a lot of questions about the

14:16  9  17-page report and the content of the 17-page report.  And I

14:16 10  believe that we had many slides up there showing various pages

14:16 11  of the 17-page report and the 46-page report.  Is that correct?

14:16 12  A.   Yes.

14:16 13  Q.   Okay.  Now, just to have everything clear, because I'm not

14:16 14  sure that it was clear, because of the way she discussed with

14:16 15  you the content of that 17-page report made it look like that

14:16 16  was something that was supposed to be real.  But it never was,

14:17 17  was it?

14:17 18  A.   The contents of the 17-page report, was that real?

14:17 19  Q.   Yes.

14:17 20  A.   No.

14:17 21  Q.   No, it was not.

14:17 22      But the way this discussion might lend one to think

14:17 23  that it was.  The facts contained in there came from you;

14:17 24  correct?

14:17 25  A.   Not just from me, from me and the other people involved.

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 14:17 | 1 | **Q.**   You don't recall telling the FBI that you did not add or |
| 14:17 | 2 | delete anything, you simply took from Kaufman what he said? |
| 14:17 | 3 | **A.**   No. |
| 14:17 | 4 | **Q.**   You did not say that to the FBI? |
| 14:17 | 5 | **A.**   No. |
| 14:17 | 6 | **Q.**   We'll get to that. |
| 14:17 | 7 | **A.**   I don't know if I said it -- |
| 14:17 | 8 | **MS. BERNSTEIN:**  Objection, Your Honor, because I'm |
| 14:17 | 9 | not sure what the question is, so I'd ask for it to be a little |
| 14:17 | 10 | more clear. |
| 14:17 | 11 | **BY MR. LONDON:** |
| 14:17 | 12 | **Q.**   The question is:  The 17-page report is your fabrication |
| 14:17 | 13 | and does not purport to claim -- or to contain the facts of |
| 14:17 | 14 | what actually occurred on Danziger; is that right? |
| 14:17 | 15 | **A.**   Yes. |
| 14:17 | 16 | **Q.**   And your contention is also that the 46-page report -- and |
| 14:17 | 17 | set on the side for the moment who or who didn't write it, |
| 14:17 | 18 | okay -- just the 46-page report, it's also your contention that |
| 14:18 | 19 | those facts are not the facts of what occurred on Danziger; is |
| 14:18 | 20 | that correct? |
| 14:18 | 21 | **A.**   Yes. |
| 14:18 | 22 | **Q.**   So the 17 pages over here that are not the facts, X that |
| 14:18 | 23 | one out; right? |
| 14:18 | 24 | **A.**   Yes. |
| 14:18 | 25 | **Q.**   The 46 is over here, not the facts, X that out; correct? |

MICHAEL LOHMAN - Cross

14:18    1    A.    Yes.

14:18    2    Q.    Then we have the 32 page, notes I call them, you want to

14:18    3    call them draft report, that was found on Archie's computer;

14:18    4    correct?

14:18    5    A.    That's what you told me.

14:18    6    Q.    Did those facts make it into the 54-page report, official

14:18    7    report?

14:18    8    A.    I don't know exactly what -- I know some of the

14:18    9    information in the previous reports, the 32- or the 46-page,

14:18   10    was contained in the 54-page, but I don't know exactly what.

14:18   11    Q.    The question is, sir:  Do you know whether the facts

14:18   12    contained in Archie's 32-pages of notes made it into the one

14:18   13    and only official 54-page report?

14:18   14    A.    I believe it did, yes.

14:18   15    Q.    If I were to tell you yes, would you have any reason to

14:18   16    disagree with me?

14:18   17    A.    No.

14:18   18    Q.    No.

14:18   19          The facts in your 17-page report did not make it into

14:19   20    the 54-page report, did it?

14:19   21          MS. BERNSTEIN:  Objection, Your Honor.  Which facts?

14:19   22    It's a 17-page report.

14:19   23          MR. LONDON:  Well, you know what, I'll tell you

14:19   24    what --

14:19   25          THE COURT:  Well, I thought he was talking about the

MICHAEL LOHMAN - Cross

14:19  1   17-page report.
14:19  2          **MR. LONDON:**  That's over here, Judge, no.
14:19  3   **BY MR. LONDON:**
14:19  4   **Q.**  The 17-page report -- see, that's why I'm going through
14:19  5   this.  I want to be clear with this.
14:19  6          Your 17-page report is fictitious; correct?
14:19  7   **A.**  Yes.
14:19  8   **Q.**  As far as you know, the 46-page report is fictitious;
14:19  9   correct?
14:19  10  **A.**  Yes.
14:19  11  **Q.**  None of the facts that you put in that 17-page report or
14:19  12  that you can recall in the 46-page report ever showed up in the
14:19  13  official report, did they?
14:19  14  **A.**  I don't believe, no.
14:19  15  **Q.**  No, they didn't.
14:19  16         But the facts in the 32-page notes that Archie gave
14:19  17  to Sergeant Dugue did appear in the 54-page report; correct?
14:19  18  **A.**  Yes.
14:19  19  **Q.**  And there is nothing, to your knowledge, that changes from
14:19  20  the 32-page to the 54-page?  To your knowledge.
14:20  21  **A.**  To my knowledge, no.
14:20  22  **Q.**  No.
14:20  23         So all of the stuff in between is a red herring
14:20  24  because that was never submitted; correct?
14:20  25  **A.**  It was never submitted, no.

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 14:20 | 1 | **Q.**   Never submitted. |
| 14:20 | 2 | Now, you testified that you told Archie to submit |
| 14:20 | 3 | that. |
| 14:20 | 4 | **MR. LONDON:**  Pull -- can you put the 17-page report |
| 14:20 | 5 | up, please? |
| 14:20 | 6 | We're not as good as the government with |
| 14:20 | 7 | these -- I still can't get this stuff to work. |
| 14:20 | 8 | No, that's 46.  I want the 17. |
| 14:20 | 9 | I tell you what, let me get -- can you put the |
| 14:20 | 10 | 17 up for me, please? |
| 14:20 | 11 | **MR. CARTER:**  That's 17 on the right. |
| 14:21 | 12 | **MR. LONDON:**  All right.  Well, I just want the 17. |
| 14:21 | 13 | And I want the face sheet up on the 17.  Please. |
| 14:21 | 14 | **BY MR. LONDON:** |
| 14:21 | 15 | **Q.**   That is the face sheet of the 17-page report; is that |
| 14:21 | 16 | correct? |
| 14:21 | 17 | **A.**   Yes. |
| 14:21 | 18 | **Q.**   You did this? |
| 14:21 | 19 | **A.**   I signed off on it, yes. |
| 14:21 | 20 | **Q.**   Did you physically type this piece of paper? |
| 14:21 | 21 | **A.**   Yes. |
| 14:21 | 22 | **Q.**   Yes, you did? |
| 14:21 | 23 | **A.**   Yes. |
| 14:21 | 24 | **Q.**   You signed off.  That is your "Lieutenant Lohman" at the |
| 14:21 | 25 | bottom; correct? |

MICHAEL LOHMAN - Cross

14:21  1   **A.**   Yes, it is.

14:21  2   **Q.**   And that's a "Sergeant Kaufman" on the left; correct?

14:21  3   **A.**   Yes.

14:21  4   **Q.**   Now, we just discussed according to NOPD policy and past

14:21  5   practices, the person whose name appears at the left of that --

14:21  6   if you touch that, is that how that works -- that in that block

14:21  7   right there would indicate to you the individual that wrote

14:22  8   that report; correct?

14:22  9   **A.**   Yes.

14:22  10  **Q.**   Now, what name do you read there?

14:22  11  **A.**   Kaufman.

14:22  12  **Q.**   That's not you, is it?

14:22  13  **A.**   No.

14:22  14  **Q.**   Yet, you wrote the report?

14:22  15  **A.**   Yes.

14:22  16  **Q.**   So you even at the bottom --

14:22  17         **MR. LONDON:**  On page 2, please.

14:22  18              Any page on that same report.  Can you go to

14:22  19  page -- the next page, please?

14:22  20  **BY MR. LONDON:**

14:22  21  **Q.**   Now, on the bottom -- this is page 2 of 17.  That's still

14:22  22  your report; correct?

14:22  23  **A.**   Yes.

14:22  24  **Q.**   Still the one you typed?

14:22  25  **A.**   Yes.

MICHAEL LOHMAN - Cross

| 14:22 | 1 | Q. You did it? |
| 14:22 | 2 | A. Yes. |
| 14:22 | 3 | Q. At the bottom of that page is a footer. What does that |
| 14:22 | 4 | footer say? |
| 14:22 | 5 | A. "Sergeant Arthur Kaufman." |
| 14:22 | 6 | Q. It doesn't say you, does it? |
| 14:22 | 7 | A. No. |
| 14:22 | 8 | Q. So you wrote this and you put Kaufman's name on it? |
| 14:22 | 9 | A. No. |
| 14:22 | 10 | Q. You didn't put Kaufman's name on it? |
| 14:22 | 11 | A. No. As I stated earlier, I typed over the report that he |
| 14:22 | 12 | had already written. That's not my header and I didn't write |
| 14:23 | 13 | reports in this nature. That would have been his header from |
| 14:23 | 14 | what he wrote, not me. |
| 14:23 | 15 | Q. That would have been his header? |
| 14:23 | 16 | A. That's not my format that I wrote reports in, and I didn't |
| 14:23 | 17 | write his name at the bottom of that report. No, I did not. |
| 14:23 | 18 | Q. Does this say -- |
| 14:23 | 19 | A. I typed over what he had already written. |
| 14:23 | 20 | Q. Does this say -- wait a minute. Does this say "2 of 17" |
| 14:23 | 21 | at the top? |
| 14:23 | 22 | A. Yes, it does. |
| 14:23 | 23 | Q. Is that your 17-page report? |
| 14:23 | 24 | A. Yes, it is. |
| 14:23 | 25 | Q. And now you're saying he wrote it? |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 14:23 | 1 | **A.**   Yes -- no.  I'm not saying he wrote it.  As I explained |
| 14:23 | 2 | earlier, I typed over portions of the report that had been |
| 14:23 | 3 | submitted to me in the 32- and the 46-page report.  That was |
| 14:23 | 4 | his header on the report.  I didn't type my reports in this |
| 14:23 | 5 | style and I didn't write that at the bottom.  I wrote the |
| 14:23 | 6 | narrative portions of it. |
| 14:23 | 7 | **Q.**   So you're saying that you just took this and you just |
| 14:23 | 8 | typed over his -- you're not -- I thought you said that you |
| 14:23 | 9 | drafted the 17-page report. |
| 14:23 | 10 | **A.**   I said earlier that I typed over portions of the report |
| 14:24 | 11 | that he had already submitted to me. |
| 14:24 | 12 | **Q.**   Do you know which portions you typed over? |
| 14:24 | 13 | **A.**   No.  Different portions, much of it. |
| 14:24 | 14 | **Q.**   Well, then did you do the face sheet? |
| 14:24 | 15 | **A.**   Yes.  To my knowledge, I did the face sheet. |
| 14:24 | 16 | **Q.**   Okay.  So let's go back to the face sheet, please. |
| 14:24 | 17 | Now, is Kaufman's name at the lower left? |
| 14:24 | 18 | **A.**   Yes, it is. |
| 14:24 | 19 | **Q.**   Who put that there?  Did Kaufman put that there too? |
| 14:24 | 20 | **A.**   If I typed it, I typed his name. |
| 14:24 | 21 | **Q.**   So you put his name there? |
| 14:24 | 22 | **A.**   Yes. |
| 14:24 | 23 | **Q.**   So you wanted to make it look like Kaufman wrote that? |
| 14:24 | 24 | **A.**   I wasn't trying to make it look like Kaufman wrote that. |
| 14:24 | 25 | We were working on this together.  I didn't go off to the side |

MICHAEL LOHMAN - Cross

14:24     1    and write the report by myself.  I was in consultation and
14:24     2    meetings with him while we wrote the report.  He was part of
14:24     3    it.
14:24     4    Q.    When you put somebody else's name on something, what are
14:24     5    you trying to show?
14:24     6    A.    He was the one that was supposed to write the report and
14:24     7    it was supposed to be in his name.  I was typing over portions
14:24     8    of the report that he had already submitted to me and that's
14:24     9    why it's in his name.
14:24    10    Q.    But you wrote it?
14:25    11    A.    And he was aware of it.
14:25    12    Q.    This is your fabrication.  Are you blaming that on Kaufman
14:25    13    too?
14:25    14    A.    It's my fabrication, but I consulted with him, Bowen, and
14:25    15    Gisevius while writing this report.
14:25    16    Q.    Did he write the report?
14:25    17    A.    I wrote the report in consultation with Kaufman, Gisevius,
14:25    18    and Bowen.
14:25    19    Q.    Did you write the report?
14:25    20    A.    I already answered that, yes, I did.
14:25    21    Q.    Did you type it?
14:25    22    A.    I typed it.
14:25    23    Q.    And you put his name --
14:25    24          MS. BERNSTEIN:  Your Honor.
14:25    25          MR. LONDON:  I'm trying to get a straight answer,

MICHAEL LOHMAN - Cross

| 14:25 | 1 | Judge, is all I'm trying to do. |
|---|---|---|
| 14:25 | 2 | **THE COURT:**  I'm going to let him go ahead and answer. |
| 14:25 | 3 | **THE WITNESS:**  Yes, I wrote the report. |
| 14:25 | 4 | BY MR. LONDON: |
| 14:25 | 5 | Q.  And you put his name in that left-hand box at the bottom? |
| 14:25 | 6 | A.  Yes, I did. |
| 14:25 | 7 | Q.  Yes, you did. |
| 14:25 | 8 | Thank you. |
| 14:25 | 9 | **MR. LONDON:**  You know, I want you -- would you put |
| 14:25 | 10 | that up there one more time for me? |
| 14:25 | 11 | BY MR. LONDON: |
| 14:25 | 12 | Q.  This report was written before Sergeant Dugue took over |
| 14:25 | 13 | the case; correct? |
| 14:25 | 14 | A.  Yes. |
| 14:25 | 15 | Q.  Okay.  And you're absolutely sure of that? |
| 14:25 | 16 | A.  Yes. |
| 14:26 | 17 | Q.  I want you to explain to the jury how item numbers are |
| 14:26 | 18 | generated on the New Orleans Police Department.  Explain to |
| 14:26 | 19 | them what an item number is, if you would. |
| 14:26 | 20 | A.  An item number is a police -- a police item number is |
| 14:26 | 21 | assigned to police incidents and they start over at the |
| 14:26 | 22 | beginning of each month.  In January, you would start with "A," |
| 14:26 | 23 | February would be "B," "C," and on down the line. |
| 14:26 | 24 | So if you had an incident that occurred on |
| 14:26 | 25 | January 1st and it was the first incident of the year, the item |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 14:26 | 1 | number would read A-001 -- since it's the first incident of the |
| 14:26 | 2 | year -- -11, if it was in 2011, that was the year it was in. |
| 14:26 | 3 | And then it would work on -- through the rest of the month, you |
| 14:26 | 4 | would work on that item. |
| 14:26 | 5 | Q.   When was this item generated? |
| 14:26 | 6 | A.   It's an October item number. |
| 14:26 | 7 | Q.   Which means it's after the storm obviously? |
| 14:26 | 8 | A.   Yes. |
| 14:26 | 9 | Q.   And when did Dugue take over the case? |
| 14:27 | 10 | A.   In November, to my knowledge. |
| 14:27 | 11 | Q.   In November? |
| 14:27 | 12 | A.   Yes. |
| 14:27 | 13 | MR. LONDON:  Put, if you would, the face sheet of the |
| 14:27 | 14 | 54-page report up, please? |
| 14:27 | 15 | Or can you do it side by side? |
| 14:27 | 16 | BY MR. LONDON: |
| 14:28 | 17 | Q.   How do you tell when an investigation was initiated by |
| 14:28 | 18 | looking at the face sheet of a report? |
| 14:28 | 19 | A.   The date. |
| 14:28 | 20 | Q.   The date of -- I can't read this. |
| 14:28 | 21 | A.   On the incident report? |
| 14:28 | 22 | Q.   That would be the "Date of Occurrence"; correct? |
| 14:28 | 23 | A.   Yes. |
| 14:28 | 24 | Q.   No, the lower one.  The date of -- |
| 14:28 | 25 | A.   Date and time of occurrence. |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 14:28 | 1 | **Q.**   Date and time of occurrence. |
| 14:28 | 2 | And what date is that? |
| 14:28 | 3 | **A.**   September 4th. |
| 14:28 | 4 | **Q.**   No, the one below it.  The date and time of the report, |
| 14:28 | 5 | right there? |
| 14:28 | 6 | **A.**   September 4th of '05, 9:00 a.m. |
| 14:28 | 7 | **Q.**   No, that's not the date of the report.  That's the date of |
| 14:28 | 8 | occurrence.  Below it. |
| 14:29 | 9 | **A.**   Are you referring to report on the right or the left? |
| 14:29 | 10 | **Q.**   I'm referring right there.  What's that say? |
| 14:29 | 11 | **A.**   I can't read it. |
| 14:29 | 12 | **MR. LONDON:**  Can you make that clearer? |
| 14:29 | 13 | May I approach, Your Honor?  I don't think -- |
| 14:29 | 14 | can we get that straight?  We can't get that. |
| 14:29 | 15 | **BY MR. LONDON:** |
| 14:29 | 16 | **Q.**   Can you read that, Mr. Lohman? |
| 14:30 | 17 | **A.**   No, sir. |
| 14:30 | 18 | **Q.**   All right. |
| 14:30 | 19 | **MR. LONDON:**  May I approach? |
| 14:30 | 20 | **THE COURT:**  Yes. |
| 14:30 | 21 | **BY MR. LONDON:** |
| 14:30 | 22 | **Q.**   I believe this is -- I'm going to show you what's been |
| 14:30 | 23 | marked as Exhibit, I believe it's, 27, the 54-page report, and |
| 14:30 | 24 | ask you if you could look at that and if you could tell me if |
| 14:30 | 25 | you could read the face sheet. |

MICHAEL LOHMAN - Cross

14:30    1    **A.**    You want the date of the report?

14:30    2    **Q.**    Yes.

14:30    3    **A.**    The date of this report is October 14th, 2005, at

14:30    4    10:00 a.m.

14:30    5    **Q.**    All right.  So that's when Sergeant Dugue assumed this

14:30    6    investigation.  Is that signed by Sergeant Dugue?

14:30    7    **A.**    His name's on the report, yes.

14:30    8    **Q.**    His name's at the lower left?

14:30    9    **A.**    Yes.

14:30   10    **Q.**    Which means he wrote the report?

14:30   11    **A.**    Yes.

14:30   12    **Q.**    Thank you.  May I have that back?

14:30   13    **A.**    I don't believe that's the day that it was written,

14:30   14    though.

14:30   15    **Q.**    Are you saying that that's just a phoneyed up date?

14:30   16    **A.**    I don't know how to explain the date because I didn't

14:30   17    write it, but I know that's not the date it was submitted.

14:30   18    **Q.**    You just know that, or could you be wrong?

14:30   19    **A.**    No.  I don't -- that report wasn't submitted on that date.

14:30   20    This was a 54-page report that was submitted later on.  It was

14:31   21    a supplemental report.

14:31   22    **Q.**    The date of submission, if I'm not incorrect, Mr. Lohman,

14:31   23    is the date the officer assumes the investigation.

14:31   24    **A.**    The date he starts working on that report, yes.

14:31   25    **Q.**    Which is the 14th?

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 14:31 | 1 | **A.**   Yes. |
| 14:31 | 2 | **Q.**   Correct? |
| 14:31 | 3 | **A.**   I don't know because I didn't write this report -- |
| 14:31 | 4 | **Q.**   Is it correct that -- |
| 14:31 | 5 | **A.**   -- and I didn't write the face sheet. |
| 14:31 | 6 | **Q.**   Is it correct that's on -- |
| 14:31 | 7 | **A.**   Ordinarily, that would be the day that you start working |
| 14:31 | 8 | on a case, yes. |
| 14:31 | 9 | **Q.**   Ordinarily, that would be the day? |
| 14:31 | 10 | **A.**   Ordinarily -- |
| 14:31 | 11 | **Q.**   Do you have any -- |
| 14:31 | 12 | **A.**   -- that would be the day. |
| 14:31 | 13 | **Q.**   -- reason to believe that that's not correct with this? |
| 14:31 | 14 | **A.**   Yes.  I don't believe it's correct. |
| 14:31 | 15 | **Q.**   You just don't believe that.  Okay. |
| 14:31 | 16 | **A.**   I don't believe it's correct because it wasn't assumed by |
| 14:31 | 17 | the Cold Case Squad until sometime in November. |
| 14:31 | 18 | **Q.**   Even though -- |
| 14:31 | 19 | **A.**   I don't think Kaufman was even transferred yet. |
| 14:31 | 20 | **Q.**   Even though the official report says October 14th? |
| 14:31 | 21 | **A.**   That's correct. |
| 14:31 | 22 | **Q.**   Even though that -- you don't think that it was generated |
| 14:31 | 23 | until November; is that your testimony? |
| 14:31 | 24 | **A.**   No.  The date on that report says October 14th, 2005; |
| 14:32 | 25 | right? |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 14:32 | 1 | **Q.** Correct. |
| 14:32 | 2 | **A.** That report wasn't submitted on 200- -- on October 14th, |
| 14:32 | 3 | 2005. Kaufman was still assigned to the 7th District. |
| 14:32 | 4 | **Q.** The date on this report says the date that Sergeant Dugue |
| 14:32 | 5 | initiated the Cold Case Homicide investigation is all I am |
| 14:32 | 6 | trying to say. Is that correct or not correct? |
| 14:32 | 7 | **A.** I don't believe it to be correct, no. |
| 14:32 | 8 | **Q.** You don't -- but you don't know that? |
| 14:32 | 9 | **A.** I don't know. But I don't believe it to be correct |
| 14:32 | 10 | because it was -- Kaufman was still in the 7th District at that |
| 14:32 | 11 | time. |
| 14:32 | 12 | **Q.** And Kaufman was transferred in November; correct? |
| 14:32 | 13 | **A.** That's what I recall. |
| 14:32 | 14 | **Q.** And you did -- everything was done before Kaufman -- or |
| 14:32 | 15 | Kaufman was transferred with the case; correct? |
| 14:32 | 16 | **A.** He was transferred right around the time that the case |
| 14:32 | 17 | went to Cold Case, yes. |
| 14:32 | 18 | **Q.** Within a week or so? |
| 14:32 | 19 | **A.** I don't know the time frame, but it was right around the |
| 14:32 | 20 | same time. |
| 14:32 | 21 | **Q.** A few days, a week. Can you give me any -- |
| 14:33 | 22 | **A.** I don't know. |
| 14:33 | 23 | **Q.** -- kind of a reference? |
| 14:33 | 24 | **A.** It was around the same -- it was in November. |
| 14:33 | 25 | **Q.** It was in November that Kaufman -- that this case was |

MICHAEL LOHMAN - Cross

14:33   1    transferred to homicide; correct?

14:33   2    A.   Yes.

14:33   3    Q.   And it's the same time Kaufman was transferred with the

14:33   4    case to homicide; correct?

14:33   5    A.   Right around the same time.

14:33   6    Q.   What would you say if I told you Kaufman was transferred

14:33   7    to homicide February 6th of the following year?

14:33   8    A.   I don't believe it.

14:33   9    Q.   You don't believe that either?

14:33   10   A.   No.

14:33   11   Q.   Nothing that doesn't comport with your theory of the case

14:33   12   you believe, do you?

14:33   13   A.   Say that again.

14:33   14   Q.   Nothing that does not comport with your theory of this

14:33   15   case, you don't believe, do you?

14:33   16   A.   No, I have reason not believe it.  I mean, you're asking

14:33   17   me what I remember and I don't remember it that way.  I don't

14:33   18   remember him being transferred in February.

14:33   19   Q.   If I were to tell you that he was, you would disagree with

14:33   20   me?

14:33   21   A.   Yes, I would disagree with you.

14:34   22   Q.   That's fine.

14:34   23          Now, the 32-page report -- have you read the 54-page

14:34   24   report -- yes, you did.  You have.

14:34   25   A.   I read over it.  Not in great detail, but I read over it.

MICHAEL LOHMAN - Cross

14:34   1   Q.   And did you see anything in the 54-page report that
14:34   2   conflicts with Archie's 32 page of notes?
14:34   3   A.   Nothing that stands out right now.  I've read over it, but
14:34   4   I didn't read it in detail and take notes on it.  I couldn't
14:34   5   tell you if anything conflicts with the 32-pager.
14:34   6   Q.   You, in your factual basis, and I believe this is one of
14:34   7   the instances Ms. Bernstein picked out, discuss -- give me a
14:34   8   moment to find it --
14:35   9             MR. LONDON:  Excuse me, Judge.  I have a different
14:35   10  copy and it's paginated differently than the one that's in the
14:35   11  record.
14:35   12            THE COURT:  Let's try to find it so we don't have
14:35   13  some down time.
14:35   14            MR. LONDON:  Bear with me just a second.
14:36   15            Okay.  I'm sorry about that.
14:36   16            THE COURT:  Let's go.
14:36   17  BY MR. LONDON:
14:36   18  Q.   On page 6 and --
14:36   19            MR. LONDON:  May I approach?
14:36   20            THE COURT:  Yes.
14:36   21            MS. BERNSTEIN:  May I see it first?
14:36   22            MR. LONDON:  Sure.  I'm sorry.
14:36   23  BY MR. LONDON:
14:36   24  Q.   Do you recall in your factual basis when you discussed a
14:36   25  for instance of how the story was changed to fit your

MICHAEL LOHMAN - Cross

| | |
|---|---|
| 14:37 | 1 |
| 14:37 | 2 |
| 14:37 | 3 |
| 14:37 | 4 |
| 14:37 | 5 |
| 14:37 | 6 |
| 14:37 | 7 |
| 14:37 | 8 |
| 14:37 | 9 |
| 14:37 | 10 |
| 14:37 | 11 |
| 14:37 | 12 |
| 14:37 | 13 |
| 14:38 | 14 |
| 14:38 | 15 |
| 14:38 | 16 |
| 14:38 | 17 |
| 14:38 | 18 |
| 14:38 | 19 |
| 14:38 | 20 |
| 14:38 | 21 |
| 14:38 | 22 |
| 14:38 | 23 |
| 14:38 | 24 |
| 14:39 | 25 |

circumstances, namely that when Sergeant Bowen allegedly ran under the bridge, you said you didn't think that that was plausible and you told the officers to pull -- or you told Kaufman to pull that out and you wrote -- in your 17-page report, you omitted that?

You with me on that?

A.   Yes.

Q.   Okay.  And so it's your testimony and you testified, if I'm not correct, in your factual basis that that was removed after your suggestion?

A.   After we spoke about it, yes.

Q.   It was removed?

A.   Yes, it was.

Q.   I'm going to now show you what's been marked as Exhibit 37, the 32-page --

     **MR. LONDON:**  May I approach?

     **THE COURT:**  Yes.

BY MR. LONDON:

Q.   -- and I'm going to ask you to read for the jury that sentence starting right there, please.

A.   "Sergeant Bowen ran down the bridge and into the tall grassy area on side of the bridge to look for the young male subject who fled."

Q.   Okay.

     **MS. BERNSTEIN:**  I'm sorry, what's he reading from?

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 14:39 | 1 | **MR. LONDON:**  I'll bring it to you and show it to you. |
| 14:39 | 2 | **MR. CARTER:**  What page? |
| 14:39 | 3 | **MR. LONDON:**  Page 13. |
| 14:39 | 4 | BY MR. LONDON: |

14:39    5   Q.   So it does say in Sergeant Kaufman's notes that he did run
14:39    6   under the bridge, doesn't it?
14:39    7   A.   In that document it does, yes.
14:39    8   Q.   In this document it does.
14:39    9        Now, do you have the 54-page report which has been
14:39   10   marked -- the 54-page report has been marked Exhibit 27 and I'm
14:39   11   going to direct your attention to page 20 of that.  Now, you do
14:39   12   agree that the 54-page report is the official report that was
14:40   13   turned in; correct?
14:40   14   A.   Yes, it was a supplemental report turned in.
14:40   15   Q.   But it was turned in?
14:40   16   A.   To my knowledge, yes.
14:40   17   Q.   To your knowledge, it's the only one turned in, isn't it?
14:40   18   A.   To my knowledge, yes.  And the 7-page report.
14:40   19   Q.   Let me show you.
14:40   20        **MR. LONDON:**  May I approach, Your Honor?
14:40   21        **THE COURT:**  Yes.
14:40   22   BY MR. LONDON:
14:40   23   Q.   I would like you to read for the jury what -- from right
14:40   24   there on.
14:40   25   A.   "Sergeant Bowen ran down the bridge and into the tall

MICHAEL LOHMAN - Cross

14:40    1    grassy area on side of the" -- "on the side of the bridge to

14:40    2    look for the young male subject who fled."

14:40    3    Q.   Now, that's in both of them, isn't it?

14:40    4    A.   Yes, it is.

14:40    5    Q.   The ones that you said in your factual basis was removed

14:41    6    is there, isn't it?

14:41    7    A.   Yes.

14:41    8    Q.   Yes, it is.

14:41    9         But guess where it's not, your 17-page report; and

14:41   10    guess where else it's not, in the 46-page report.

14:41   11         Did you get confused?

14:41   12    A.   No.

14:41   13    Q.   So that portion of your factual basis is incorrect, isn't

14:41   14    it?

14:41   15    A.   No.

14:41   16    Q.   It's not?

14:41   17    A.   The information was removed from the 17-page report and

14:41   18    from the 46-page report.

14:41   19    Q.   What you just read, according to your factual basis, he

14:41   20    removed running down below the bridge and you just read it

14:41   21    twice to the jury.

14:41   22    A.   Yes, but it was removed in the 17-page and the 46-page.

14:41   23    Q.   But that wasn't turned in.  You're blaming this on Kaufman

14:42   24    now.  You wrote the 17.  You're blaming this on Kaufman, but

14:42   25    it's in his notes, isn't it?

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 14:42 | 1 | A.   It's in his notes. |
| 14:42 | 2 | Q.   You just read it. |
| 14:42 | 3 | A.   It's in the 32-page report, yes; and -- |
| 14:42 | 4 | Q.   You just read it. |
| 14:42 | 5 | A.   -- and it's in the 54-page report, yes. |
| 14:42 | 6 | Q.   And the 54-page report is the only one turned in, isn't |
| 14:42 | 7 | it?  Isn't it? |
| 14:42 | 8 | A.   To my knowledge, the 54-page and the 7-page report are the |
| 14:42 | 9 | only ones that were turned in. |
| 14:42 | 10 | Q.   Well, good.  Let's talk about the 7-page report.  Let's go |
| 14:42 | 11 | back to your factual basis. |
| 14:42 | 12 | MR. LONDON:  And I'm sorry, Judge, I have the |
| 14:42 | 13 | pagination wrong.  Give me 10 seconds here. |
| 14:42 | 14 | BY MR. LONDON: |
| 14:42 | 15 | Q.   Let's talk about the 7-page report.  Okay.  Did you say in |
| 14:42 | 16 | your factual basis that you were asking Sergeant Kaufman -- you |
| 14:42 | 17 | had instructed him to turn in your phoney 17-page report; |
| 14:42 | 18 | correct? |
| 14:42 | 19 | A.   Yes. |
| 14:42 | 20 | Q.   You instructed him to do that? |
| 14:42 | 21 | A.   Yes. |
| 14:42 | 22 | Q.   It was not done, was it? |
| 14:43 | 23 | A.   I later learned that he had not turned that report in, no. |
| 14:43 | 24 | Q.   That's what you said? |
| 14:43 | 25 | A.   Yes. |

MICHAEL LOHMAN - Cross

14:43   1   Q.   Then you, according to your testimony, asked him why not;
14:43   2   correct?
14:43   3   A.   This was --
14:43   4       MR. LONDON:  Judge, may he answer the question?
14:43   5       THE WITNESS:  -- much later, yes.
14:43   6       THE COURT:  Is that correct or not?
14:43   7   BY MR. LONDON:
14:43   8   Q.   Is that correct?
14:43   9   A.   Yes.
14:43   10  Q.   And then your testimony was that he turned in the 7-page
14:43   11  report instead; correct?
14:43   12  A.   Yes.
14:43   13  Q.   Labeled "Incident Report"; correct?
14:43   14  A.   Yes.
14:43   15  Q.   And that the reason he did that was because he wrote a new
14:43   16  report to match the shooters' audiotaped statements; is that
14:43   17  correct?
14:43   18  A.   Yes.
14:43   19  Q.   Is that what's in your factual basis?
14:43   20  A.   Yes.
14:43   21      MR. LONDON:  May I see the 7-page, which is
14:43   22  Exhibit 35.
14:43   23          May I approach, Your Honor?
14:43   24      THE COURT:  Yes.
        25

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 14:43 | 1 | BY MR. LONDON: |
| 14:44 | 2 | Q.   Would you, please, take a moment or two and you look that |
| 14:44 | 3 | report over and you tell me anywhere in there where it gives an |
| 14:44 | 4 | account of what the officers did. |
| 14:44 | 5 | A.   (WITNESS COMPLIES.) |
| 14:44 | 6 |     What's the question? |
| 14:44 | 7 | Q.   The question is:  Can you see any account in there where |
| 14:44 | 8 | you claim or where it says what the officers said during their |
| 14:44 | 9 | audiotaped statement as you have in your factual basis? |
| 14:44 | 10 | A.   There's no narrative on the audiotaped statements.  That |
| 14:45 | 11 | would be contained in the supplemental report. |
| 14:45 | 12 | Q.   In your factual basis, did you say that the |
| 14:45 | 13 | investigator -- who, according to you, would be Sergeant |
| 14:45 | 14 | Kaufman; is that correct? |
| 14:45 | 15 | A.   Yes. |
| 14:45 | 16 | Q.   -- explained to you, Lohman, that he had switched out your |
| 14:45 | 17 | 17-page report and wrote a new report -- is that correct? |
| 14:45 | 18 | A.   Yes. |
| 14:45 | 19 | Q.   -- to match the shooters' audiotaped statements?  Is that |
| 14:45 | 20 | correct or would you like to see it? |
| 14:45 | 21 | A.   That's correct. |
| 14:45 | 22 | Q.   And there's no mention of that in there whatsoever, is |
| 14:45 | 23 | there? |
| 14:45 | 24 | A.   No, Judge, but with an explanation.  No.  The audiotaped |
| 14:45 | 25 | statements wouldn't be contained in the incident report, in |

MICHAEL LOHMAN - Cross

14:45  1  this 17-page report.  They would be contained in the 54-page
14:45  2  report.  We already had statements contained in the 17-page
14:45  3  report.  So he had to remove the 17-page report so that they
14:45  4  didn't conflict with the statements that were contained in the
14:45  5  54-page report.
14:46  6          So once you remove the 17-pages and you replace it
14:46  7  with this that has no statements from them, then you're free to
14:46  8  put anything you want in the 54-page report.
14:46  9  Q.   Then why -- can you put anything you want that's not in
14:46  10  the video- -- in the audiotaped statements?
14:46  11  A.   No, you can't.
14:46  12  Q.   Well, then if everybody conspired, as you say, to get this
14:46  13  straight, how come it didn't match your 17-page report?
14:46  14  A.   Because my 17-page report was never turned in.
14:46  15  Q.   Well, it was never -- nobody, according to you, it was --
14:46  16  everybody was supposed to follow that; right?
14:46  17  A.   Everybody was supposed to what?
14:46  18  Q.   Follow what you said in your 17-page report; correct?
14:46  19  A.   That's what I -- that's what the plan was, yes.
14:46  20  Q.   Didn't happen, did it?
14:46  21  A.   No, it did not.
14:46  22  Q.   And this right here says that he rewrote it to match the
14:46  23  shooters' audiotaped statements and there's no account of the
14:46  24  incident in there, is there?  Simple question?
14:46  25  A.   It's not a simple answer, Judge.  I can answer the

MICHAEL LOHMAN - Cross

14:46  1   question with an explanation.

14:46  2          MR. LONDON:  May he answer yes or no first?

14:46  3          THE COURT:  Answer it yes or no and then you can

14:46  4   explain.

14:46  5          THE WITNESS:  Ask the question again.

14:46  6   BY MR. LONDON:

14:46  7   Q.   The question is -- in your factual basis, you say that

14:47  8   that was written to match the audiotaped statements the

14:47  9   officers gave.  My question to you is:  When you've looked at

14:47  10  that report, there is no recitation of what the officers said

14:47  11  in that, is there?

14:47  12  A.   No.

14:47  13  Q.   No.

14:47  14  A.   But what the report -- what it's doing is removing the

14:47  15  17-page report, so then you're free to write whatever

14:47  16  statements you want or the audiotaped statements in the 54-page

14:47  17  report.

14:47  18  Q.   I don't have any idea what that means, but thank you.

14:47  19          Now, did you write that 46-page report?

14:47  20  A.   No, I did not.

14:47  21  Q.   What about you and Lehrmann?

14:47  22  A.   No.

14:47  23  Q.   You didn't?

14:47  24  A.   No.

14:47  25  Q.   All right.

MICHAEL LOHMAN - Cross

14:48  1          **MR. LONDON:**  Are you ready with this?

14:48  2                  I want you to put up the face sheet on the

14:48  3   46-page report and the face sheet on the 17-page report.  Can

14:48  4   you pull up the header?

14:48  5                  I want to see the header of the 47-page report

14:48  6   and I want to see the header of the 17-page, Mr. Lohman's,

14:48  7   report.

14:48  8   **BY MR. LONDON:**

14:49  9   **Q.**   Can you see that, Mr. Lohman?

14:49  10  **A.**   Yes.

14:49  11  **Q.**   I want to direct your attention to the header.  Do you see

14:49  12  the header?

14:49  13  **A.**   At the bottom is what you're referring to?

14:49  14  **Q.**   No, the header.  The footer's at the bottom.  Header, top.

14:49  15  This box.  Let me see.  How do you draw on a line with this?

14:49  16  Just move your finger over it?

14:49  17                  Is that --

14:49  18  **A.**   I see it.

14:49  19  **Q.**   Do you see that?

14:49  20  **A.**   Yes.

14:49  21  **Q.**   That's on the 46-page report?

14:49  22  **A.**   Yes.

14:49  23  **Q.**   Do you see this?

14:49  24  **A.**   Yes.

14:49  25  **Q.**   That's on your report?

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 14:49 | 1 | **A.**   Yes. |
| 14:49 | 2 | **Q.**   Do you see any similarities? |
| 14:49 | 3 | **A.**   Yes. |
| 14:49 | 4 | **Q.**   The header's off, isn't it?  Do you see that area right |
| 14:49 | 5 | there?  See how the header "New", "S" goes down on the slant? |
| 14:49 | 6 | Do you see that? |
| 14:49 | 7 | **A.**   On both of them, yes. |
| 14:49 | 8 | **Q.**   On both of them, that's correct. |
| 14:49 | 9 | **A.**   Yes, yes. |
| 14:49 | 10 | **Q.**   Do you see how the header is not centered -- |
| 14:50 | 11 | **A.**   Yes. |
| 14:50 | 12 | **Q.**   -- so to speak? |
| 14:50 | 13 | You have "New Orleans Police Department."  Then under |
| 14:50 | 14 | the "E," you have "Seventh Police District Homicide."  Then you |
| 14:50 | 15 | have an item number -- |
| 14:50 | 16 | **A.**   Yes. |
| 14:50 | 17 | **Q.**   -- that pesky item number from 10/14. |
| 14:50 | 18 | And then on your 17-page report, it has the same |
| 14:50 | 19 | miscue on the header.  The "N," the "S" under the "E"; correct? |
| 14:50 | 20 | **A.**   Yes. |
| 14:50 | 21 | **MR. LONDON:**  You can take that off.  I want you to |
| 14:50 | 22 | pull up the section on page 14 of the 17-page report.  I want |
| 14:51 | 23 | you to circle that -- |
| 14:51 | 24 | BY MR. LONDON: |
| 14:51 | 25 | **Q.**   Oh, before we go to that.  Didn't you tell the FBI when we |

MICHAEL LOHMAN - Cross

14:51    1    were talking about Sergeant Kaufman putting that gun on the

14:51    2    books, that Central Evidence and Property, you didn't know

14:51    3    whether they were open or not.  You thought they had to go to

14:51    4    the wharf, Nicholls Street.  Do you recall that?

14:51    5    A.    Yeah, at some point that's where the property room was

14:51    6    located.

14:51    7    Q.    And you believe that that was the point it was located

14:51    8    then; correct?

14:51    9    A.    Yes.

14:51   10    Q.    All right.  So that is correct?

14:51   11    A.    Yes.

14:51   12    Q.    All right.

14:51   13          MR. LONDON:  Now, can you pull that up for me?

14:51   14    BY MR. LONDON:

14:51   15    Q.    I want to show you here on your 17-page -- now, this is

14:51   16    yours; correct?

14:51   17    A.    Yes.

14:51   18    Q.    "Returned to the scene on Monday... Sergeant Kaufman...

14:51   19    later... temporary New Orleans Central Evidence and Property

14:51   20    Room, located at the Governor Nicholls Street Warf [sic]."

14:51   21          How is "wharf" spelled?

14:51   22    A.    W-A-R- --

14:51   23    Q.    Now, where else do you think that appears?

14:51   24    A.    I don't know.

14:51   25          MR. LONDON:  Pull up the --

MICHAEL LOHMAN - Cross

14:52  1          THE COURT:  I'm sorry, say it again.  He was spelling
14:52  2  it and you moved on to the next question.
14:52  3          THE WITNESS:  W-A-R-F.
14:52  4  BY MR. LONDON:
14:52  5  Q.   Right.  The correct way is W-H-A-R-F; right?
14:52  6  A.   Yes.
14:52  7          MR. LONDON:  Show the 46-page report, please, the
14:52  8  same section.  Page 45 -- I'm sorry, page -- yeah, whatever.
14:52  9  BY MR. LONDON:
14:52  10  Q.   The bottom sentence:  "The weapon was seized and secured
14:52  11  by Sergeant Kaufman... later processed... New Orleans Central
14:52  12  Evidence and... Governor Nicholls Warf [sic]."  W-A-R-F, in the
14:53  13  46.
14:53  14  A.   Yes, I see it.
14:53  15  Q.   That's a coincidence, isn't it?
14:53  16  A.   I guess it is a coincidence.
       17  Q.   That is a coincidence.
14:53  18  A.   But I can tell you I didn't write that 46-page report.
14:53  19  Q.   You wrote the 17 --
14:53  20  A.   I can guarantee you that.
14:53  21  Q.   -- though, didn't you?
14:53  22  A.   I wrote the 17-page report.  Yes, I did.
14:53  23  Q.   And it just so happens that W-A-R-F shows up --
14:53  24          Would you tell me when you're finished.
14:53  25          THE COURT:  He said he wrote the 17-page report.

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 14:53 | 1 | BY MR. LONDON: |
| 14:53 | 2 | Q.   You wrote the 17-page; correct? |
| 14:53 | 3 | A.   Yes, I did write the 17-page -- |
| 14:53 | 4 | Q.   You presumably you put "warf," W-A-R-F, there; correct? |
| 14:53 | 5 | A.   As I stated earlier, I could have misspelled wharf, but I |
| 14:53 | 6 | was typing over a report that was given to me by Sergeant |
| 14:53 | 7 | Kaufman. |
| 14:53 | 8 | Q.   It's in the same place, isn't that odd, Governor Nicholls. |
| 14:53 | 9 |      Now, let's look and see what the 32-page notes say. |
| 14:53 | 10 |      MR. LONDON:  Pull up 32, please. |
| 14:53 | 11 | BY MR. LONDON: |
| 14:53 | 12 | Q.   While he's doing that, because the Nicholls Street Wharf |
| 14:53 | 13 | didn't open until November or December, did it? |
| 14:54 | 14 | A.   Say that again. |
| 14:54 | 15 | Q.   The Nicholls Street Wharf wasn't open until November or |
| 14:54 | 16 | December? |
| 14:54 | 17 | A.   I'm not sure what date it opened. |
| 14:54 | 18 |      MR. LONDON:  I apologize, our system is not as -- |
| 14:54 | 19 |      THE COURT:  Maybe after we adjourn for today, we |
| 14:54 | 20 | could kind of get it moving a little quicker tomorrow. |
| 14:54 | 21 | BY MR. LONDON: |
| 14:54 | 22 | Q.   On the 32 pages of notes, I'll direct your attention to |
| 14:55 | 23 | the bottom page, this -- it was logged in at the Central |
| 14:55 | 24 | Evidence and Property, no mention of the Nicholls Street Wharf. |
| 14:55 | 25 | And if I were to tell you that the 54-page report is identical |

MICHAEL LOHMAN - Cross

14:55  1   to that, would you have reason to disbelieve me?
14:55  2   A.   Say it again.
14:55  3   Q.   On the 32 pages of notes, there is no mention of the
14:55  4   Nicholls Street Wharf, Central Evidence and Property; would you
14:55  5   agree with that?
14:55  6   A.   Yes.
14:55  7   Q.   And would you agree if I told you that in the 54, only --
14:55  8   one and only official report, has Central Evidence and Property
14:55  9   and no mention of the wharf; would you agree with that?  Or do
14:55  10  I need to show you?
14:55  11  A.   I'll agree with it.
14:55  12  Q.   Okay.  You testified that Sergeant Kaufman came to you on
14:56  13  the scene and said, "I got a gun," or something to that effect?
14:56  14  A.   Yes.
14:56  15  Q.   In your career are you -- how many times have you planted
14:56  16  evidence on the scenes?
14:56  17  A.   None.
14:56  18  Q.   None.
14:56  19       How many times have you been with other officers that
14:56  20  have planted evidence on the scenes?
14:56  21  A.   None.
14:56  22  Q.   None.
14:56  23       Well, your testimony was just as matter of fact about
14:56  24  that, like that was just normal.
14:56  25  A.   That's the way it transpired that day, unfortunately.

MICHAEL LOHMAN - Cross

14:56   1   Q.   And you didn't say a thing?
14:56   2   A.   I told you what I said.  We were having a -- do you want
14:56   3   to hear what I said?
14:56   4   Q.   Sure.  Absolutely.
14:56   5   A.   We were having a conversation about not being able to
14:56   6   locate guns on the scene and how that was problematic.  Kaufman
14:56   7   said that he had a gun he could put on the scene and I asked
14:56   8   him if it was clean.
14:56   9   Q.   Did he tell you that he was going to plant the gun
14:57  10   307 feet away from the east shooting?
14:57  11   A.   No.  He didn't tell me where he was going to plant it.  We
14:57  12   talked about planting it -- we talked about planting it under
14:57  13   the -- putting it under the bridge because there had been too
14:57  14   many people walking around on the bridge for someone not to
14:57  15   have seen a gun or seen someone pick a gun up on the bridge.
14:57  16           MR. LONDON:  Judge, that isn't an explanation of a
14:57  17   yes or no, that's just a continued narrative.
14:57  18           THE COURT:  I think he answered the question, but if
14:57  19   you want to ask it a different way --
14:57  20   BY MR. LONDON:
14:57  21   Q.   All right.  Did he tell you he was going to plant an empty
14:57  22   gun?
14:57  23   A.   No.  It was just a gun at that point.
14:57  24   Q.   Did he tell you he was going to plant one with no shell
14:57  25   casings in it?

MICHAEL LOHMAN - Cross

14:57   1   **A.**   No.

14:57   2   **Q.**   Did he tell you he was going to plant one with no live

14:57   3   casings in it?

14:57   4   **A.**   No.

14:57   5   **Q.**   No, he didn't tell you any of that.

14:57   6        Now, you've also discussed the fact that he went to

14:57   7   testify at Lance Madison's preliminary hearing; is that

14:57   8   correct?

14:57   9   **A.**   Yes.

14:57   10  **Q.**   And it's your testimony that Sergeant Kaufman came back to

14:57   11  you and said, "Man" -- what's it, babes or something?  Is that

14:57   12  where the babes comes in or is that something else? -- "it's

14:58   13  all cool or something with the judge"; is that what he told

14:58   14  you?

14:58   15  **A.**   No, I think you're confused.  That was on a different

14:58   16  part.

14:58   17  **Q.**   That was something different?

14:58   18  **A.**   Yes.

14:58   19  **Q.**   Okay.  During the preliminary hearing, did he say -- it

14:58   20  was your testimony that Sergeant Kaufman came back to you and

14:58   21  said that if he hadn't of put the gun there, or something to

14:58   22  that effect, the judge would not have found probable cause; is

14:58   23  that correct?

14:58   24  **A.**   No, that's not what I said.

14:58   25  **Q.**   What did you say?

MICHAEL LOHMAN - Cross

14:58   1   A.   I said that he told me that had he not added that last
14:58   2   sentence about seeing the guy running over the bridge and
14:58   3   throwing the gun off of the side into the canal, that the judge
14:58   4   was going to release him.
14:58   5   Q.   Well, that's on the Gist; is that correct?
14:58   6   A.   Yes.
14:58   7        MR. LONDON:   May I get a copy of the Gist?  This is
14:59   8   Exhibit 36.
14:59   9             May I approach, Judge?
14:59  10        THE COURT:   Yes.
14:59  11   BY MR. LONDON:
14:59  12   Q.   Okay.  I would like you -- to show you this and ask you if
14:59  13   you can identify that for the jury.
14:59  14   A.   This is a Probable Cause Gist for Lance Madison.
14:59  15        MR. LONDON:   Excuse me.  I want to correct something
14:59  16   technical.  It's part of 39 -- I'm sorry, it's the last page of
14:59  17   39.  It's the -- it's what, I believe, purports to be the Gist.
14:59  18   BY MR. LONDON:
14:59  19   Q.   I'm sorry, Mr. Lohman.  What is that?
14:59  20   A.   It's the Probable Cause Gist for Lance Madison -- for the
14:59  21   arrest of Lance Madison.
14:59  22   Q.   Okay.  Now, it's probable cause.  And you said that Archie
14:59  23   told you that had he not added the last sentence, there would
14:59  24   not be probable cause; correct?
14:59  25   A.   Yes.

MICHAEL LOHMAN - Cross

14:59  1    Q.   Now, you also said that this is a sworn statement?
14:59  2    A.   Yes.
14:59  3    Q.   You testified to that?
14:59  4    A.   Yes.
14:59  5    Q.   Okay.  Now, before we go there, I want you to read, if you
15:00  6    would, from the, "On Sunday," the narrative portion of that, to
15:00  7    the jury, all the way down to, "Downman Road."
15:00  8    A.   "On Sunday, September 4th, 2005, at 9:00 a.m., 7th
15:00  9    District officers received a [sic] officer in distress call,
15:00  10   signal 108, Downman Road."
15:00  11   Q.   Now, you've been a police officer at this time, did you
15:00  12   say, 17 years?
15:00  13   A.   Yes.
15:00  14   Q.   And this is a -- what sheet would this be right here, this
15:00  15   is a probable cause sheet?
15:00  16   A.   Yes.
15:00  17   Q.   Was there anything you just read to the jury that would
15:00  18   constitute probable cause?
15:00  19   A.   No.
15:00  20   Q.   No.
15:00  21        So without that last sentence in there, there would
15:00  22   not be probable cause here, would there?
15:01  23   A.   Yes, it contains some probable cause in addition to the --
15:01  24   the last sentence.
15:01  25   Q.   But I'm saying without the addition of the last sentence,

MICHAEL LOHMAN - Cross

15:01    1    there would not be probable cause; correct?

15:01    2    **A.**   No, there would be probable cause.

15:01    3    **Q.**   We would agree with that.  Okay.

15:01    4         Do you know-- are you familiar with your -- you're,

15:01    5    obviously, familiar your operations manual.  You're a

15:01    6    lieutenant?

15:01    7    **A.**   Yes.

15:01    8    **Q.**   New Orleans Police Operations Manual.

15:01    9         This form was filled out by Officer Hills, I believe;

15:01   10    is that correct?

15:01   11    **A.**   Yes.

15:01   12    **Q.**   To your knowledge?

15:01   13    **A.**   Yes.

15:01   14    **Q.**   And he's a patrolman?

15:01   15    **A.**   Yes.

15:01   16    **Q.**   And according to your own operations manual, doesn't it

15:01   17    say that the sergeant shall ensure that probable cause is

15:01   18    exhibited fully on the arrest -- on the arrest sheet?

15:01   19    **A.**   Yes.

15:01   20    **Q.**   Also, I want to direct your attention to the top of that

15:01   21    sheet there where it says, and I believe you were asked on

15:02   22    direct if you would read that, "Hills, Ignatius."

15:02   23    **A.**   "I, Hills, Ignatius, employed by the New Orleans Police

15:02   24    Department, after being duly sworn, state."

15:02   25    **Q.**   Continue.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MICHAEL LOHMAN - Cross

15:02  1   **A.**   "Madison, Lance, arrested subject, black male" -- a place
15:02  2   for the DOB -- "residing at unknown, was arrested and charged
15:02  3   as stated above."
15:02  4   **Q.**   Stop there.  "Was arrested and charged as stated above."
15:02  5   That's what that says, doesn't it?
15:02  6   **A.**   Yes.
15:02  7   **Q.**   It doesn't say that the material contained below that is
15:02  8   sworn to, does it?
15:02  9   **A.**   It says:  "As charged above."  It doesn't say anything
15:02  10  about being sworn below.
15:02  11  **Q.**   That's right it doesn't, does it?
15:02  12  **A.**   No.
15:02  13  **Q.**   So all that is doing is swearing that his charges -- that
15:02  14  he has been charged with the above offense?
15:03  15  **A.**   Yes.
15:03  16          **MR. LONDON:**  May I have just one minute to confer
15:03  17  with counsel?
15:03  18          **THE COURT:**  Certainly.
15:03  19  **BY MR. LONDON:**
15:03  20  **Q.**   I do have one other question.  Let me see that document.
15:03  21          **MR. LONDON:**  Can I have Exhibit 36?  And these are
15:03  22  different MAD numbers.  Let me show you.
15:04  23          All right.  Let the record reflect that the
15:04  24  exhibit that Mr. Lohman was looking at -- or did you say it was
15:04  25  39 -- it's Gist also -- that's 39.  I now would like to show

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 15:04 | 1 | him what is marked as Exhibit 36. |
| 15:04 | 2 | **THE COURT:**  Okay. |
| 15:04 | 3 | **MR. LONDON:**  Can you put Exhibit 39 and 36 up on |
| 15:04 | 4 | the -- please? |
| 15:04 | 5 | **BY MR. LONDON:** |
| 15:04 | 6 | Q.   The one to the left, it has "17 of 17," that was on your |
| 15:04 | 7 | 17-page report; correct? |
| 15:04 | 8 | A.   Yes. |
| 15:04 | 9 | Q.   The one to the right is different than that one, isn't it? |
| 15:04 | 10 | A.   Yes. |
| 15:04 | 11 | Q.   What's different about it? |
| 15:05 | 12 | A.   It contains no page numbers. |
| 15:05 | 13 | Q.   And what else is different? |
| 15:05 | 14 | A.   The item number. |
| 15:05 | 15 | Q.   The item number. |
| 15:05 | 16 | What's the item number on the one on the right? |
| 15:05 | 17 | A.   0003-I -- it looks like "I." |
| 15:05 | 18 | Q.   Now, that was the one that was turned in to the Greyhound |
| 15:05 | 19 | bus station because there was no Central Lockup; correct? |
| 15:05 | 20 | A.   I'm not sure.  I don't know. |
| 15:05 | 21 | Q.   Well, who changed the number from "I-0003" to "J-5934"? |
| 15:05 | 22 | A.   I don't know. |
| 15:05 | 23 | Q.   You did, didn't you? |
| 15:05 | 24 | A.   No. |
| 15:05 | 25 | Q.   You put this -- |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 15:05 | 1 | **A.**   I don't know where the "003" item number came from. |
| 15:05 | 2 | **Q.**   Did you -- is this part of the Gist that you had attached |
| 15:05 | 3 | to your 17-page report? |
| 15:05 | 4 | **A.**   Yes. |
| 15:05 | 5 | **Q.**   And you put "17 of 17" on it, didn't you? |
| 15:06 | 6 | **A.**   Yes. |
| 15:06 | 7 | **Q.**   And you put that item number "J-5934" on it, didn't you? |
| 15:06 | 8 | **A.**   That's the item number on it, yes. |
| 15:06 | 9 | **Q.**   And you had to erase the item number off the first one |
| 15:06 | 10 | because it's "I-0003."  This is the one that went to the |
| 15:06 | 11 | lockup. |
| 15:06 | 12 | **A.**   I don't recall. |
| 15:06 | 13 | **Q.**   So you altered that form? |
| 15:06 | 14 | **A.**   I didn't alter this form, no. |
| 15:06 | 15 | **Q.**   You altered the form when you took the item number off of |
| 15:06 | 16 | it? |
| 15:06 | 17 | **A.**   I put the item number on it that we were working with, |
| 15:06 | 18 | yes. |
| 15:06 | 19 | **Q.**   Did you alter the form or didn't you? |
| 15:06 | 20 | **A.**   Yes -- |
| 15:06 | 21 | **Q.**   Yes, you did. |
| 15:06 | 22 | **A.**   -- I put the item number on the form. |
| 15:06 | 23 | **Q.**   Thank you.  That's it. |
| 15:06 | 24 | **MR. LONDON:**  Just one minute now, Judge. |
| 15:06 | 25 | You can take that down.  Thank you. |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 15:06 | 1 | No further questions, Your Honor. |
| 15:06 | 2 | **THE COURT:**  Is it Mr.  Fleming next or Mr. Hessler? |
| 15:06 | 3 | Mr. Hessler. |
| 15:06 | 4 | **CROSS-EXAMINATION** |
| 15:07 | 5 | **BY MR. HESSLER:** |
| 15:07 | 6 | Q.   Good afternoon, Mr. Lohman. |
| 15:07 | 7 | A.   Good afternoon. |
| 15:07 | 8 | Q.   Mr. Lohman, you've worked in narcotics prior to your |
| 15:07 | 9 | promotion to lieutenant? |
| 15:07 | 10 | A.   Yes, I did. |
| 15:07 | 11 | Q.   Okay.  In narcotics, isn't it true that a big portion of |
| 15:07 | 12 | working the narcotics -- or investigating narcotics trade is to |
| 15:07 | 13 | develop snitches to give you information or cooperating |
| 15:07 | 14 | individuals to give you information? |
| 15:07 | 15 | A.   Yes. |
| 15:07 | 16 | Q.   And as part of that -- and have you ever worked a |
| 15:07 | 17 | cooperating individual or worked a snitch or something like |
| 15:07 | 18 | that? |
| 15:07 | 19 | A.   Yes, I have. |
| 15:07 | 20 | Q.   And in doing so, you give them something in return for |
| 15:07 | 21 | information? |
| 15:07 | 22 | A.   Yes. |
| 15:07 | 23 | Q.   Whether it be money? |
| 15:07 | 24 | A.   Usually, yes. |
| 15:07 | 25 | Q.   Sometimes it's their freedom, would that be accurate? |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 15:08 | 1 | A.    Yes. |
| 15:08 | 2 | Q.    And how long did you work narcotics? |
| 15:08 | 3 | A.    Altogether, maybe eight years. |
| 15:08 | 4 | Q.    Okay.  And in that time, I mean, I guess you get -- like, |
| 15:08 | 5 | the whole idea sometimes is you get a guy with, or a girl, with |
| 15:08 | 6 | one piece of crack and you might -- obviously, you know they |
| 15:08 | 7 | got it from somewhere, so you want to find out where they got |
| 15:08 | 8 | it from and get somebody bigger or better, in your opinion; |
| 15:08 | 9 | correct? |
| 15:08 | 10 | A.    Yes. |
| 15:08 | 11 | Q.    And if that person says, "I don't know where I got it at," |
| 15:08 | 12 | most assuredly he's going to jail because he can't buy his -- |
| 15:08 | 13 | he can't do anything or won't do anything for you; would you |
| 15:08 | 14 | agree with that? |
| 15:08 | 15 | A.    Yes, that would be accurate. |
| 15:08 | 16 | Q.    Have you ever had the experience or the occasion where a |
| 15:08 | 17 | guy would say, you'd get them, a guy or a person, with crack |
| 15:08 | 18 | cocaine and they'd say, "Oh, somebody around" -- they'd give |
| 15:08 | 19 | you information that would later -- and that would get their |
| 15:08 | 20 | freedom and that information would later turn out to be not |
| 15:09 | 21 | accurate? |
| 15:09 | 22 | A.    Yes. |
| 15:09 | 23 | Q.    That's happened to you? |
| 15:09 | 24 | A.    Yes. |
| 15:09 | 25 | Q.    So in your experience, did you know that or did you |

MICHAEL LOHMAN - Cross

15:09    1   believe that if you had no information to give to the
15:09    2   government that implicated anybody else but yourself, that you
15:09    3   would be of no use to them and wouldn't get your freedom or get
15:09    4   a deal?
15:09    5   A.   Did I believe that --
15:09    6   Q.   Yes.
15:09    7   A.   -- is the question?
15:09    8          No.
15:09    9   Q.   I'm sorry?
15:09   10   A.   You're asking me if I believe that if I didn't have
15:09   11   information to give the government that I would be of no use to
15:09   12   them and wouldn't get a deal?
15:09   13   Q.   Right.
15:09   14   A.   I had information to give them.
15:09   15   Q.   Okay.  But what I'm saying is, is if you told them, "I did
15:09   16   it all on my own and Mr. Kaufman, Mr. Gisevius, all these other
15:09   17   guys aren't involved," do you think that they would have given
15:09   18   you a deal?
15:09   19   A.   I think it depends on the circumstances.  It's not a yes
15:09   20   or no question.  It depends on the circumstances.  Had I -- had
15:09   21   I done this on my own, that's what I would have told them.  I
15:10   22   wouldn't have included someone that didn't participate.
15:10   23   Q.   Well, but you stand to gain more leniency by testifying
15:10   24   against others; correct?
15:10   25   A.   Yes, I think that's accurate.

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 15:10 | 1 | **Q.**   And you wouldn't have the opportunity to gain that |
| 15:10 | 2 | leniency if there was nobody else to testify against? |
| 15:10 | 3 | **A.**   That's accurate, yes. |
| 15:10 | 4 | **Q.**   Now, let's kind of start -- I want to start kind of toward |
| 15:10 | 5 | the beginning.  When you arrived at the bridge, you briefly |
| 15:10 | 6 | spoke to Sergeants Bowen and Gisevius; correct? |
| 15:10 | 7 | **A.**   Yes. |
| 15:10 | 8 | **Q.**   And they told you very vague -- a very vague idea of what |
| 15:10 | 9 | had occurred? |
| 15:10 | 10 | **A.**   Yes. |
| 15:10 | 11 | **Q.**   And you didn't like what you heard? |
| 15:10 | 12 | **A.**   It was a general description, or a brief overview, of what |
| 15:11 | 13 | had taken place on the Danziger. |
| 15:11 | 14 | **Q.**   Could you tell me what Gisevius told you? |
| 15:11 | 15 | **A.**   That they responded to the scene, encountered gunfire, and |
| 15:11 | 16 | they returned gunfire. |
| 15:11 | 17 | **Q.**   Okay.  And do you recall telling the jury that you told |
| 15:11 | 18 | both of them, "You two guys need to calm down"? |
| 15:11 | 19 | **A.**   Yes. |
| 15:11 | 20 | **Q.**   Okay.  Now, why would you -- I mean, obviously, Gisevius |
| 15:11 | 21 | was somewhat excited, or what? |
| 15:11 | 22 | **A.**   The stories -- the story wasn't adding up.  I mean, there |
| 15:11 | 23 | was no evidence on the scene to support what they were telling |
| 15:11 | 24 | me about responding to the scene and being fired at.  They |
| 15:11 | 25 | couldn't provide any real details.  And when I spoke with |

MICHAEL LOHMAN - Cross

15:11  1   Gisevius and Bowen on the west side of the bridge, I told them
15:11  2   that.  I said they needed to calm down, get their -- collect
15:11  3   their thoughts and come back and tell me what happened because
15:12  4   I wasn't there on the scene.
15:12  5   **Q.**   Okay.  Correct.
15:12  6   **A.**   Yes.
15:12  7   **Q.**   And you didn't even know what part Gisevius knew about or
15:12  8   where Gisevius was on the east side or what he did or what he
15:12  9   did on the west side or anything.  Did you know that?
15:12  10  **A.**   No, not at that point, not really.
15:12  11  **Q.**   And your job as investigator was to find out what
15:12  12  occurred; would you agree with that?
15:12  13  **A.**   Yes.
15:12  14  **Q.**   Have you ever been involved in a police-related shooting?
15:12  15  **A.**   Yes.
15:12  16  **Q.**   Have you ever discharged your weapon?
15:12  17  **A.**   Yes.
15:12  18  **Q.**   Did you hit anybody?
15:12  19  **A.**   No.
15:12  20  **Q.**   Okay.  When the investigator got there, did he question
15:12  21  you?
15:12  22  **A.**   Yes.
15:12  23  **Q.**   Did you tell him to the best of your ability what
15:12  24  happened?
15:12  25  **A.**   Yes.

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 15:12 | 1 | **Q.**   Were you a little excited? |
| 15:12 | 2 | **A.**   Yes. |
| 15:12 | 3 | **Q.**   Did he do an investigation afterwards to determine if what |
| 15:12 | 4 | you told him was accurate, or if you missed anything, or if |
| 15:12 | 5 | there were things going on that maybe you didn't see or know |
| 15:12 | 6 | about? |
| 15:12 | 7 | **A.**   Yes. |
| 15:12 | 8 | **Q.**   Would you expect him to do that? |
| 15:12 | 9 | **A.**   Yes. |
| 15:13 | 10 | **Q.**   Now, do you remember telling the FBI that when you told |
| 15:13 | 11 | them they needed to figure out what happened, that, in your |
| 15:13 | 12 | mind, you were really telling them to develop a story to |
| 15:13 | 13 | justify their actions? |
| 15:13 | 14 | **A.**   Yes. |
| 15:13 | 15 | **Q.**   When the guy got there to interview you about you |
| 15:13 | 16 | discharging your firearm at somebody, he told you -- or did he |
| 15:13 | 17 | tell you to figure out what happened and tell me, or tell me |
| 15:13 | 18 | what happened? |
| 15:13 | 19 | **A.**   He asked me what happened.  I don't remember the exact |
| 15:13 | 20 | verbiage that he used, but he asked me what happened. |
| 15:13 | 21 | **Q.**   All right.  And he said -- did he say, "Tell me what |
| 15:13 | 22 | happened," or he said, "What happened?" |
| 15:13 | 23 | **A.**   I don't -- I mean, it's been a while.  I don't remember |
| 15:13 | 24 | the exact verbiage, but he said, you know, "Tell me what |
| 15:13 | 25 | happened." |

MICHAEL LOHMAN - Cross

15:13  1   Q.   In your mind, did you think that he was telling you to
15:13  2   tell me to justify what happened?
15:13  3   A.   No.  He was looking for the truth for what happened in
15:13  4   that story -- in that incident.
15:13  5   Q.   Okay.  And you said to Gisevius in a -- a little while
15:14  6   later, you met them all at the Crystal Palace; correct?
15:14  7   A.   Yes.
15:14  8   Q.   And you stated that, I think it was Officer Hunter stated
15:14  9   he fired his gun numerous times?
15:14  10  A.   Yes.
15:14  11  Q.   And then you stated to the jury that you took them
15:14  12  outside -- no.  You took Gisevius, Bowen, and Archie outside.
15:14  13  Do you remember saying that?
15:14  14  A.   Yes.
15:14  15  Q.   And you said you took them outside because -- why did you
15:14  16  take them outside?
15:14  17  A.   Because I wasn't comfortable sitting around the table
15:14  18  discussing it with all of the officers around there.
15:14  19  Q.   Why weren't you comfortable discussing it with all the
15:14  20  other officers?
15:14  21  A.   Because I wasn't comfortable with the whole incident.
15:14  22  There were -- it was problematic, in my opinion.  No one -- no
15:14  23  guns had been located.  No one was able to tell me who was
15:14  24  actually armed with a weapon.
15:14  25  Q.   All right.  Did you not trust those other officers?

MICHAEL LOHMAN - Cross

15:14   1   A.   I wouldn't say I didn't trust them, but I didn't want to
15:14   2   have that type of conversation in front them, no.
15:14   3   Q.   You didn't want to spread it around what you were doing?
15:15   4   A.   Yes.
15:15   5   Q.   And you also told the FBI that when you took them outside
15:15   6   and talked to them about that, you told them that that
15:15   7   conversation was when you had that -- a conversation outside of
15:15   8   the presence of the other officers, even then you chose your
15:15   9   words carefully to make them sound legitimate.  Do you remember
15:15   10  saying that to the FBI?
15:15   11  A.   No.
15:15   12       MR. HESSLER:  Your Honor, may I approach?
15:15   13       THE COURT:  Yes.  What are we showing him here?
15:15   14       MR. HESSLER:  Oh, I'm sorry.  It's the 302 dated
15:15   15  12/18 of 2009 taken by Special Agent William Bezak.
15:16   16  BY MR. HESSLER:
15:16   17  Q.   Do you see that?
15:16   18  A.   Yes.
15:16   19  Q.   And does it -- did I accurately portray what I told you?
15:16   20  A.   What was the question now?
15:16   21  Q.   Did you tell the FBI that when you had that conversation
15:16   22  outside of the presence of the other officers and in the
15:17   23  presence of Gisevius, Bowen, and Kaufman, that even then you
15:17   24  chose your words carefully to make it sound legitimate?
15:17   25  A.   That's what it says here, yes.

MICHAEL LOHMAN - Cross

15:17  1    Q.    Okay.  Do you -- did you say that?
15:17  2    A.    That's what -- it's documented as me saying that.  But, I
15:17  3    mean, I -- those guys there, I would have used -- I would have
15:17  4    spoken openly with them.  Gisevius, Bowen, and Kaufman, I would
15:17  5    have spoken openly.  I don't know what -- how he perceived that
15:17  6    comment from me, but that's what it says I said, yes.
15:17  7    Q.    So this is the second time you've spoken with Bowen, and
15:17  8    Gisevius, and now Kaufman, and both times you said something
15:18  9    and you chose your words carefully to convey that thought, but,
15:18  10   in your mind, you had a different thought.  Would that be
15:18  11   accurate?
15:18  12   A.    Yes.
15:18  13   Q.    And you've known Gisevius for quite a while?
15:18  14   A.    Yes.
15:18  15   Q.    He was a policeman for how long?
15:18  16   A.    10, 12 years maybe.
15:18  17   Q.    And he's not a mind reader; right?
15:18  18   A.    No.
15:18  19   Q.    Now, you also testified today that this 17-page report --
15:18  20   the 17-page report was done by you and this was -- this 17-page
15:18  21   report, you enlisted the involvement of everybody?
15:18  22   A.    I spoke with Gisevius, Bowen, and Kaufman while authoring
15:19  23   the 17-page report.  I didn't speak with the officers like I
15:19  24   spoke with those guys.  Any conversations I had with the
15:19  25   officers -- I spoke with Faulcon on the scene.  And the other

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 15:19 | 1 | officers, it was just in passing where I said, "Are you okay |
| 15:19 | 2 | about what happened in the report," something of that nature. |
| 15:19 | 3 | I didn't sit down and discuss details with them, no. |
| 15:19 | 4 | **Q.**   Okay.  And did they ask you, "What report?" |
| 15:19 | 5 | **A.**   No. |
| 15:19 | 6 | **Q.**   And these were the same guys that you didn't trust to talk |
| 15:19 | 7 | about -- anything about this before; right? |
| 15:19 | 8 | **A.**   I didn't say I didn't trust them.  I said I didn't care to |
| 15:19 | 9 | have that kind of conversation in front of them. |
| 15:19 | 10 | **Q.**   Okay.  Now, what kind of input did Gisevius, for instance, |
| 15:19 | 11 | have in writing the 17-page report? |
| 15:19 | 12 | **A.**   We spoke, we consulted, myself, Gisevius, and Bowen while |
| 15:19 | 13 | writing the 17-page report.  I didn't sit down and create this |
| 15:19 | 14 | report on my own.  I participated in it and I made suggestions |
| 15:19 | 15 | and I brought things forward in the report, but it was a joint |
| 15:20 | 16 | effort. |
| 15:20 | 17 | **Q.**   But you actually typed it? |
| 15:20 | 18 | **A.**   Yes, I did. |
| 15:20 | 19 | **Q.**   Was Gisevius ever sitting down next to you -- |
| 15:20 | 20 | **A.**   Yes. |
| 15:20 | 21 | **Q.**   -- and said, "No, I don't like the word," or... |
| 15:20 | 22 | **A.**   We sat down together and talked about the report. |
| 15:20 | 23 | **Q.**   And afterwards did you go to Gisevius and say, "Rob, how |
| 15:20 | 24 | do you like the report?  Are you good with that?" |
| 15:20 | 25 | **A.**   We sat down and talked about the report.  And Bowen, |

MICHAEL LOHMAN - Cross

15:20    1    Gisevius, and Kaufman had opportunities to look over the report

15:20    2    and change anything they wanted or speak about anything they

15:20    3    wanted.  Everyone agreed on what was submitted -- or what the

15:20    4    final version is there in the 17-page report.

15:20    5    Q.   Okay.

15:20    6              MR. HESSLER:  Your Honor, may I approach?

15:20    7              THE COURT:  Yes.

15:20    8              MR. HESSLER:  One second.

15:20    9    BY MR. HESSLER:

15:20   10    Q.   Now, in your factual basis, you met with the government a

15:20   11    number of times and told them everything you knew about that

15:21   12    report; correct?  Everything you knew about all these reports?

15:21   13    A.   Yes.

15:21   14    Q.   And the 17-page report was the only time you ever let --

15:21   15    that Gisevius sat down with you and gave you statements or

15:21   16    helped you prepare this false report; would you agree with

15:21   17    that?

15:21   18    A.   Wait.  The 17-page report was the only time that was done?

15:21   19    Q.   Right.  That he sat down with you and actually looked at

15:21   20    these reports -- or this report and made sure things were

15:21   21    changed or whatever?

15:21   22    A.   Yes, while I was writing the 17-page.  I didn't have any

15:21   23    involvement in the other reports.

15:21   24              MR. HESSLER:  May I approach, Your Honor?

15:21   25              THE COURT:  Yes.

MICHAEL LOHMAN - Cross

15:21   1   BY MR. HESSLER:

15:21   2   Q.   I'm going to show you what's Exhibit No. 42, your factual

15:21   3   basis.

15:21   4          MS. BERNSTEIN:  May I see it first?

15:21   5          MR. HESSLER:  Sure.

15:21   6   BY MR. HESSLER:

15:21   7   Q.   And I'm going to direct you to page 8, the last paragraph.

15:22   8   Would you agree that that is the paragraph that begins talking

15:22   9   about -- page 8, that last paragraph, is that the paragraph

15:22   10  that begins, "After reading through several drafts" -- "several

15:22   11  drafts from" -- does that begin like that?

15:22   12  A.   I don't understand the question you're asking.

15:22   13  Q.   The last paragraph of page 8 --

15:22   14  A.   Yes, I see it.  Yes.

15:22   15  Q.   -- does it begin, "After reading through several drafts"?

15:22   16  A.   Yes, yes.

15:22   17  Q.   From who?

15:22   18  A.   "After reading through several drafts from the

15:22   19  investigator."

15:22   20  Q.   Okay.  It says you became frustrated that the cover-up

15:22   21  story and report was not logical; right?

15:22   22  A.   Yes.

15:22   23  Q.   And it says you, personally, drafted a 17-page report?

15:22   24  A.   Yes.

15:22   25  Q.   Okay.  It doesn't say that you, personally, with the

MICHAEL LOHMAN - Cross

15:22   1   assistance of Robert Gisevius, Archie Kaufman, or Kenneth

15:22   2   Bowen; correct?

15:22   3   **A.**   No.

15:22   4   **Q.**   It says you, personally, drafted the reports?

15:23   5   **A.**   Yes.

15:23   6   **Q.**   And it says:  "In the 17-page report, Defendant Lohman

15:23   7   included numerous false facts"; correct?

15:23   8   **A.**   Yes.

15:23   9   **Q.**   And this is what you agreed to.  You even made corrections

15:23   10   to it -- you were able to make corrections to it; right?

15:23   11   **A.**   Yes.

15:23   12   **Q.**   Okay.  It doesn't say, "Lohman, Gisevius, Bowen, and

15:23   13   Kaufman"?

15:23   14   **A.**   No.

15:23   15   **Q.**   And you could have corrected that if you chose to?

15:23   16   **A.**   Yes.

15:23   17   **Q.**   And then the very next sentence, "For example, Defendant

15:23   18   Lohman changed the story."  Nobody else but you?  Correct?

15:23   19   **A.**   Yes.

15:23   20   **Q.**   And then it says -- it changes the story about Lance

15:23   21   Madison threw a gun into the canal and instead wrote that

15:23   22   Robert Faulcon, Villavaso, Gisevius, and Mike Hunter had been

15:23   23   chasing Madison.  You alone added there those individuals into

15:23   24   your report; correct?

15:24   25   **A.**   I added which ones?

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 15:24 | 1 | **Q.**   Robert Faulcon, Anthony Villavaso, Robert Gisevius, and |
| 15:24 | 2 | Michael Hunter? |
| 15:24 | 3 | **A.**   In the 17-page report, yes. |
| 15:24 | 4 | **Q.**   Correct. |
| 15:24 | 5 | **A.**   They were added as we consulted with each other about how |
| 15:24 | 6 | to justify it. |
| 15:24 | 7 | **Q.**   The next sentence:  "Defendant Lohman made this change |
| 15:24 | 8 | because he thought"; right? |
| 15:24 | 9 | **A.**   Yes. |
| 15:24 | 10 | **Q.**   Okay.  Now, you go down to page -- I think it's going to |
| 15:24 | 11 | be page 9 of your report and it says:  "After drafting this |
| 15:24 | 12 | 17-page false report."  Do you see that paragraph? |
| 15:25 | 13 | **A.**   On page 9? |
| 15:25 | 14 | **Q.**   Either page 8 or 9.  I've got your -- the draft that you |
| 15:25 | 15 | made corrections to. |
| 15:25 | 16 | **A.**   "After drafting -- |
| 15:25 | 17 | **Q.**   "The 17-page false report."  Do you see that? |
| 15:25 | 18 | **A.**   No. |
| 15:25 | 19 | **Q.**   "After drafting... |
| 15:25 | 20 | **MR. HESSLER:**  May I approach, Your Honor? |
| 15:25 | 21 | **THE COURT:**  Show it to him. |
| 15:25 | 22 | BY MR. HESSLER: |
| 15:25 | 23 | **Q.**   It says:  "After drafting the 17-page false report, |
| 15:25 | 24 | Defendant Lohman directed Archie Kaufman to speak with each of |
| 15:25 | 25 | the shooters to make sure they were okay with the 17-page |

MICHAEL LOHMAN - Cross

15:25  1   report"; right?
15:25  2   A.   Yes, yes.
15:25  3   Q.   Why would you direct Archie Kaufman to do it if you
15:25  4   weren't comfortable talking with them before, you were trying
15:25  5   to keep yourself out of it?  Why would you also direct him to
15:25  6   do it and then go do it on your own?
15:26  7   A.   Because he was to go over the details of the report with
15:26  8   them and allow them to read their statements in the report and
15:26  9   make sure that they were okay with them.  When I spoke to them,
15:26  10  my only conversation was -- in passing was, "Are you okay with
15:26  11  the report?  Are you okay with what -- your statement in the
15:26  12  report?"  I didn't go over any details with them in the report.
15:26  13  Q.   Okay.  And then it says:  "That Lohman directed Archie
15:26  14  Kaufman to speak with each of the shooters to make sure that
15:26  15  they were okay with the 17-page report and were willing to give
15:26  16  statements consistent with that report.  Archie Kaufman then
15:26  17  got approval for the 17-page report from each of the shooters,
15:26  18  except possibly from Robert Faulcon, who had by that time
15:26  19  resigned from NOPD, and assured Defendant Lohman that everyone
15:26  20  was okay with the report."
15:27  21       That all happened, and despite everything that you're
15:27  22  testifying to the contrary, you're now telling this jury that
15:27  23  you also went to everybody involved and personally spoke to
15:27  24  them about their involvement in this report?
15:27  25  A.   Yes.

MICHAEL LOHMAN - Cross

15:27   1   Q.   Why would you have to do that with Robert Gisevius if he
15:27   2   was sitting right there with you allegedly writing this report?
15:27   3   A.   Because I wasn't referring to Robert Gisevius and Ken
15:27   4   Bowen.  They participated in writing this report.  I typed the
15:27   5   report, I wrote the report, I authored the report, but it was
15:27   6   while consulting with those guys, Gisevius, Bowen, and Kaufman.
15:27   7   I didn't sit down and make up this report on my own.  It simply
15:27   8   didn't happen that way.
15:27   9        The officers that I'm referring to that I'm asking
15:27   10  Kaufman to speak to are the other officers, not the ones that I
15:27   11  already know that are on board what happened, meaning Gisevius
15:27   12  and Bowen.
15:27   13  Q.   Okay.  I guess my question is:  To make the factual basis
15:27   14  more factually correct or accurate, why wouldn't you have also
15:28   15  added that -- that you had -- that these officers were involved
15:28   16  in these-- were involved in writing this 17-page report?  Why
15:28   17  wouldn't you have added that critical piece of information?
15:28   18  A.   It could have been added.  That information was related to
15:28   19  the FBI and the U.S. Attorney's Office.  I told them that
15:28   20  during the course of interviews.  It wasn't written down in the
15:28   21  factual basis like that.  But you're right, I should --
15:28   22  Q.   Okay.  You had a chance to do that if you --
15:28   23  A.   -- it's something that I could have caught and wrote it.
15:28   24  Q.   Did you feel that it should have been in there?
15:28   25  A.   I guess I knew what I was speaking of when I read over

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 15:28 | 1 | this report.  But, yes, it's something that could have been |
| 15:28 | 2 | added. |
| 15:28 | 3 | MR. HESSLER:  Your Honor, may I approach? |
| 15:28 | 4 | THE COURT:  Yes. |
| 15:28 | 5 | BY MR. HESSLER: |
| 15:28 | 6 | Q.  I'm going to show you what appears to be a factual basis |
| 15:29 | 7 | that is corrected by you.  Is this your handwriting? |
| 15:29 | 8 | A.  Yes. |
| 15:29 | 9 | Q.  And that's your initials, "M.L."? |
| 15:29 | 10 | A.  Yes. |
| 15:29 | 11 | Q.  Okay.  Now, in the paragraphs that are talking about the |
| 15:29 | 12 | 17-page report, do you see a handwriting addition where you -- |
| 15:29 | 13 | where you correct the factual basis to indicate who gave you |
| 15:29 | 14 | certain information in that 17-page report or what you did at |
| 15:29 | 15 | their direction? |
| 15:29 | 16 | A.  Yes. |
| 15:29 | 17 | Q.  Okay. |
| 15:29 | 18 | A.  Let me -- this is -- it's not my writing, but it's my |
| 15:29 | 19 | initial.  I had the opportunity to look over this later on. |
| 15:29 | 20 | Yes, I see what you're talking about. |
| 15:29 | 21 | Q.  Okay.  And it says in regards to certain information put |
| 15:29 | 22 | in the 17-page report, you, in fact, put it in at the |
| 15:29 | 23 | direction -- from the direction of Archie Kaufman? |
| 15:29 | 24 | A.  Yes. |
| 15:29 | 25 | Q.  Never once does it say that you added any information at |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 15:30 | 1 | the direction of Sergeant Gisevius, does it? |
| 15:30 | 2 | A.   No. |
| 15:30 | 3 | Q.   And, in fact, today is the first time you ever informed |
| 15:30 | 4 | anybody that Gisevius played a role in formulating the 17-page |
| 15:30 | 5 | report; is that correct? |
| 15:30 | 6 | A.   No. |
| 15:30 | 7 | Q.   Now, there was a -- do you remember being shown page 8 |
| 15:30 | 8 | where it says Gisevius fired his handgun, or, you know, what |
| 15:30 | 9 | guns the officers used? |
| 15:30 | 10 | A.   I'd have to see it again.  I don't recall. |
| 15:30 | 11 | Q.   Okay. |
| 15:30 | 12 | A.   On the 17-page report? |
| 15:30 | 13 | Q.   Yeah, in both of them actually. |
| 15:30 | 14 | A.   On the 17-page report -- |
| 15:30 | 15 | Q.   You had a question mark, like why -- |
| 15:30 | 16 | A.   Yes, yes, yes. |
| 15:30 | 17 | Q.   Because you actually knew that he had fired a long rifle? |
| 15:30 | 18 | A.   Yes. |
| 15:30 | 19 | Q.   And you don't even know why -- why somebody would say or |
| 15:31 | 20 | who said he fired, that was just, obviously, a mistake on |
| 15:31 | 21 | somebody's part? |
| 15:31 | 22 | A.   That's what I was questioning, why wasn't it in the |
| 15:31 | 23 | report. |
| 15:31 | 24 | **THE COURT:**  Mr. Hessler, if you're at a good stopping |
| 15:31 | 25 | point, we can take a short break here. |

MICHAEL LOHMAN - Cross

15:31  1            MR. HESSLER:  That would be fine.  I think I'm almost
15:31  2    done, so that would be fine.
15:31  3            THE COURT:  Well, why don't we go ahead and finish up
15:31  4    with yours and then we'll take a short break.
15:31  5            MR. HESSLER:  One second.
15:32  6            Your Honor, could we break now and then if I
15:32  7    have any questions, it would only be a few minutes, maybe two
15:32  8    questions.
15:32  9            THE COURT:  Okay.  Let's take a ten-minute break.  If
15:32 10    you all could be ready at 3:45, we'll begin again and work for
15:32 11    the rest of the day and then we'll adjourn.
15:32 12            And, sir, if you could be up here at 3:45.
15:32 13            THE DEPUTY CLERK:  All rise.
15:32 14            (WHEREUPON, the jury exited the courtroom.)
15:32 15            THE COURT:  All right.  3:45.
15:33 16            (WHEREUPON, the Court took a recess.)
15:45 17            THE DEPUTY CLERK:  All rise.
15:45 18            (WHEREUPON, the jury entered the courtroom.)
15:46 19            THE COURT:  All right.  You may be seated.
15:46 20            Mr. Lohman, you're still under oath.
15:46 21            Mr. Hessler, anything further?
15:46 22            MR. HESSLER:  Your Honor, I have no further
15:46 23    questions.
15:46 24            THE COURT:  Okay.  Next was Mr. Fleming.
15:46 25            MR. FLEMING:  Yes, sir.

MICHAEL LOHMAN - Cross

15:46    1              **CROSS-EXAMINATION**

15:46    2    **BY MR. FLEMING:**

15:46    3    **Q.**   Mr. Lohman, let me take you back to September 4th, 2005.

15:46    4    You worked in the 7th District then; right?

15:46    5    **A.**   Yes.

15:46    6    **Q.**   And you're a lieutenant out there; right?

15:47    7    **A.**   Yes.

15:47    8    **Q.**   And, correct me if I'm wrong, you're the number two person

15:47    9    in the 7th District at that point; right?  Right under Captain

15:47   10    Barty, it's you?

15:47   11    **A.**   Yes.

15:47   12    **Q.**   Okay.  And you're directing people that go out on rescue

15:47   13    missions, as you told Ms. Bernstein, that morning; right?

15:47   14    **A.**   Yes.

15:47   15    **Q.**   And when you get the call, you let some other guys go run

15:47   16    out to the 108 and you stayed behind and direct some more

15:47   17    people out for some rescue missions; right?

15:47   18    **A.**   Yes.

15:47   19    **Q.**   And then after that, then you go out to the Danziger

15:47   20    Bridge; right?

15:47   21    **A.**   Yes.

15:47   22    **Q.**   Okay.  Where was Captain Barty at this time?

15:47   23    **A.**   I'm not sure where he was at at that time.  He wasn't on

15:47   24    the scene.

15:47   25    **Q.**   He was not?

MICHAEL LOHMAN - Cross

15:47   1   A.   No, he wasn't.

15:47   2   Q.   You get out to the scene and at one point, I believe on

15:47   3   direct examination, you had told Ms. Bernstein that you,

15:48   4   personally, spoke to Robert Faulcon; right?

15:48   5   A.   Yes.

15:48   6   Q.   Okay.  Now, in speaking to the FBI, you had told them, and

15:48   7   I believe Ms. Bernstein was present, that Mr. Faulcon could not

15:48   8   verbalize what happened that day.  Do you remember telling the

15:48   9   FBI that?

15:48   10   A.   I could have said that, yes.  I mean, if you have it

15:48   11   written down, I could read it and jog my memory.

15:48   12   Q.   Okay.  You don't remember saying that initially, though;

15:48   13   right?

15:48   14   A.   I had several conversations with Officer Faulcon while on

15:48   15   the scene.

15:48   16   Q.   That's not my question.  We've moved on from that.  I'm

15:48   17   asking you if you remember telling the FBI that Mr. Faulcon

15:48   18   told you he could not remember -- or he could not verbalize

15:48   19   what happened that day.  Do you remember meeting with the FBI

15:48   20   on December 4th of 2009?

15:49   21   A.   Yes.

15:49   22   Q.   And do you remember meeting with this gentleman right

15:49   23   here, William Bezak?

15:49   24   A.   Yes.

15:49   25   Q.   And Ms. Bernstein was present?

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 15:49 | 1 | **A.**   Yes. |
| 15:49 | 2 | **Q.**   And another prosecutor, Forrest Christian, was present? |
| 15:49 | 3 | **A.**   Yes. |
| 15:49 | 4 | **Q.**   I believe there was another agent -- FBI agent, Robert |
| 15:49 | 5 | Blythe, that was likewise present; right? |
| 15:49 | 6 | **A.**   Yes. |
| 15:49 | 7 | **Q.**   So you got you, you got Mr. Bezak, Ms. Bernstein, |
| 15:49 | 8 | Mr. Christian, and Mr. Blythe; right? |
| 15:49 | 9 | **A.**   Yes. |
| 15:49 | 10 | **Q.**   I'm going to show you -- |
| 15:49 | 11 |         **MR. FLEMING:**   If I can approach the witness, Your |
| 15:49 | 12 | Honor? |
| 15:49 | 13 |         **THE COURT:**   Yes. |
| 15:49 | 14 | **BY MR. FLEMING:** |
| 15:49 | 15 | **Q.**   -- the 302 generated by the FBI and turned over to the |
| 15:49 | 16 | defense during the process of discovery, which I've shown |
| 15:49 | 17 | Ms. Bernstein exactly what I'm looking at.  Let me ask you, |
| 15:49 | 18 | that second sentence, read that.  Read it to yourself first. |
| 15:50 | 19 | **A.**   (WITNESS COMPLIES.) |
| 15:50 | 20 | **Q.**   Now, does that refresh your memory? |
| 15:50 | 21 | **A.**   Yes. |
| 15:50 | 22 | **Q.**   And, in fact, you told Ms. Bernstein and Mr. Bezak that |
| 15:50 | 23 | Mr. Faulcon could not verbalize what happened? |
| 15:50 | 24 | **A.**   Yes. |
| 15:50 | 25 | **Q.**   And what you told them that day is that you told |

MICHAEL LOHMAN - Cross

15:50  1  Mr. Faulcon to decide what happened, think about it and come
15:50  2  back to me; right?
15:50  3  A.   Yes.
15:50  4  Q.   I'm over here.  You don't have to look at Ms. Bernstein.
15:50  5  A.   I wasn't looking at Ms. Bernstein.
15:51  6  Q.   Now, you didn't testify to that on direct examination, did
15:51  7  you?
15:51  8  A.   What did I testify to?  I don't recall what I testified to
15:51  9  on direct.  I did say that in the 302, that's what's documented
15:51  10 right there.  And Faulcon wasn't able to verbalize what had
15:51  11 transpired that day, but he did speak to me and tell me what
15:51  12 happened after some time.  He did have a conversation with me
15:51  13 on the scene.
15:51  14 Q.   Where is that reflected in that 302?
15:51  15 A.   That's not the only 302 they have.
15:51  16 Q.   I'm asking you:  Where is that reflected in that 302?
15:51  17 A.   I haven't had a chance to read that 302.  I only read a
15:51  18 paragraph of what you wrote -- or what you showed me.
15:51  19 Q.   Is that reflected in that paragraph?
15:51  20 A.   It wasn't in that paragraph, no.
15:51  21 Q.   Now, when you get there -- get out to the west side of the
15:52  22 bridge by the Friendly Inn, you indicated before there were
15:52  23 several people around, not sure exactly how many; right?
15:52  24 A.   Yes.
15:52  25 Q.   You had NOPD officers around?

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 15:52 | 1 | A.    Yes. |
| 15:52 | 2 | Q.    You had Louisiana State Troopers around? |
| 15:52 | 3 | A.    Yes. |
| 15:52 | 4 | Q.    You had New Orleans SWAT around? |
| 15:52 | 5 | A.    Yes. |
| 15:52 | 6 | Q.    You had Louisiana State Troopers SWAT around? |
| 15:52 | 7 | A.    Yes. |
| 15:52 | 8 | Q.    And, in fact, the troopers actually had an armored vehicle |
| 15:52 | 9 | out there; right? |
| 15:52 | 10 | A.    Yes, they did. |
| 15:52 | 11 | Q.    Too many law enforcement people around for you to take |
| 15:52 | 12 | count; correct?  Fair statement? |
| 15:52 | 13 | A.    There were quite a few there, yes. |
| 15:52 | 14 | Q.    There were quite a few. |
| 15:52 | 15 |      Do you know how many exactly? |
| 15:52 | 16 | A.    No. |
| 15:53 | 17 | Q.    Mr. Faulcon was in an excited state that day? |
| 15:53 | 18 | A.    At some point he was, yes. |
| 15:53 | 19 | Q.    And that's what you told the FBI in May of last year, |
| 15:53 | 20 | right, that he was in an excited state when you got there? |
| 15:53 | 21 | A.    Yes. |
| 15:53 | 22 | Q.    And you talked to an individual by the name of David Ryder |
| 15:53 | 23 | out there that day? |
| 15:53 | 24 | A.    I don't -- I don't recall having a conversation with |
| 15:53 | 25 | Ryder, no. |

MICHAEL LOHMAN - Cross

| | | |
|--|--|--|
| 15:53 | 1 | **Q.**   Now -- let me come back to that. |
| 15:53 | 2 | Let me ask you:  There's been some talk about that |
| 15:53 | 3 | 17-page report.  I believe that's Exhibit 39. |
| 15:54 | 4 | **MR. FLEMING:**  If I may approach the witness, Judge? |
| 15:54 | 5 | **THE COURT:**  Yes. |
| 15:54 | 6 | **BY MR. FLEMING:** |
| 15:54 | 7 | **Q.**   Let me show you what's marked as State's Exhibit 39.  This |
| 15:54 | 8 | is a copy of the same report everybody else has shown you as |
| 15:54 | 9 | well; right? |
| 15:54 | 10 | **A.**   Yes. |
| 15:54 | 11 | **Q.**   And it's dated -- what time does the date reflect that |
| 15:54 | 12 | that report is generated? |
| 15:55 | 13 | **A.**   September 4th of 2005, 9:00 a.m. |
| 15:55 | 14 | **Q.**   And, obviously, that report's not generated -- this is the |
| 15:55 | 15 | one generated by you; right? |
| 15:55 | 16 | **A.**   Yes. |
| 15:55 | 17 | **Q.**   And that's the one generated by you based on all these |
| 15:55 | 18 | other conversations you supposedly had with everybody else; |
| 15:55 | 19 | right? |
| 15:55 | 20 | **A.**   Yes. |
| 15:55 | 21 | **Q.**   That was not generated on September 4, 2005, was it? |
| 15:55 | 22 | **A.**   No. |
| 15:55 | 23 | **Q.**   Of course not. |
| 15:55 | 24 | When was that written by you? |
| 15:55 | 25 | **A.**   Sometime after that, but prior to November. |

MICHAEL LOHMAN - Cross

15:55   1   Q.   When?

15:55   2   A.   October.

15:55   3   Q.   October?

15:55   4   A.   Yes.

15:55   5   Q.   And -- let's go back.  Second in command of the 7th

15:55   6   District.  You've already testified you're in charge of the

15:55   7   detectives, the task force and whatnot; right?

15:55   8   A.   Yes.

15:55   9   Q.   And as such, you're one of the supervisors for Robert

15:55   10  Faulcon; right?

15:55   11  A.   Yes.

15:55   12  Q.   And as such, you know he left New Orleans Police

15:55   13  Department shortly after Hurricane Katrina; right?

15:55   14  A.   Yes.

15:55   15  Q.   And he went to live with his wife, who had moved to

15:56   16  Houston after the storm?

15:56   17  A.   Yes.

15:56   18  Q.   And so by the time you wrote that 17-page report,

15:56   19  Mr. Faulcon was no longer a member of the New Orleans Police

15:56   20  Department, was he?

15:56   21  A.   That's possible, yes.

15:56   22  Q.   Was it possible or is that what happened?

15:56   23  A.   I don't know exactly what date he left and what date I

15:56   24  wrote the report.  It's possible that he was gone when I wrote

15:56   25  the report, yes.

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 15:56 | 1 | **MR. FLEMING:**  I'm sorry.  One moment, Your Honor. |
| 15:56 | 2 | **BY MR. FLEMING:** |
| 15:56 | 3 | **Q.**   I believe one of the lawyers had asked you on |
| 15:57 | 4 | cross-examination -- let me strike that. |
| 15:57 | 5 | On direct examination by Ms. Bernstein, you told her |
| 15:57 | 6 | that prior to finalizing that 17-page report, you had Sergeant |
| 15:57 | 7 | Kaufman talk to the other officers that were involved in the |
| 15:57 | 8 | shooting; right? |
| 15:57 | 9 | **A.**   Yes. |
| 15:57 | 10 | **Q.**   That's what you told Ms. Bernstein on direct? |
| 15:57 | 11 | **A.**   Yes. |
| 15:57 | 12 | **Q.**   Okay.  Then on cross with Mr. London, you said you, |
| 15:57 | 13 | personally, talked to the individual officers that were |
| 15:57 | 14 | involved in the shooting; right? |
| 15:57 | 15 | **A.**   Yes. |
| 15:57 | 16 | **Q.**   Now, that's a little bit different.  You'd have to admit |
| 15:57 | 17 | that; right? |
| 15:57 | 18 | **A.**   Yes, I did both. |
| 15:57 | 19 | **Q.**   You did both.  Okay. |
| 15:57 | 20 | **A.**   Yes. |
| 15:57 | 21 | **Q.**   Now, in questioning from Ms. Bernstein, you didn't tell |
| 15:57 | 22 | her that you spoke to the individual officers; right? |
| 15:57 | 23 | **A.**   Not today I didn't say that, but she was aware of that and |
| 15:57 | 24 | I had told her in the past. |
| 15:57 | 25 | **Q.**   Well, I'm asking about your testimony on direct |

MICHAEL LOHMAN - Cross

15:57    1    examination today.  You didn't say that, did you?
15:57    2    A.    No.
15:58    3    Q.    And you signed off on a factual basis that, likewise,
15:58    4    several people have shown to you today; right?
15:58    5    A.    Yes.
15:58    6    Q.    Or at least one?
15:58    7    A.    Yes.
15:58    8    Q.    Right?
15:58    9    A.    Yes.
15:58   10    Q.    You signed off on a factual basis as part of your plea
15:58   11    agreement; right?
15:58   12    A.    Yes.
15:58   13           MR. FLEMING:  If I may approach the witness, Your
15:58   14    Honor?
15:58   15           THE COURT:  Yes.
15:58   16    BY MR. FLEMING:
15:58   17    Q.    Let me show you what's been marked as Exhibit 42.  I've
15:58   18    shown Ms. Bernstein specifically where I'm looking at.  Does
15:58   19    that appear to be a copy of your factual basis?
15:58   20    A.    Yes.
15:58   21    Q.    And I'm going to turn your attention to the last page
15:58   22    first.  Does that appear to be your signature -- or, in fact,
15:58   23    is that a copy of your signature on that factual basis?
15:58   24    A.    Yes, it is.
15:58   25    Q.    And that's a copy of the signature of your attorney on

MICHAEL LOHMAN - Cross

15:58  1   that as well; right?
15:58  2   A.   Yes, it is.
15:58  3   Q.   And there's a copy of Ms. Bernstein's signature; right?
15:59  4   A.   Yes.
15:59  5   Q.   And there's a copy of a signature of another U.S.
15:59  6   Attorney, Julia Evans; right?
15:59  7   A.   Yes.
15:59  8   Q.   Okay.  And that's all dated February 24th, 2010; correct?
15:59  9   A.   Yes.
15:59  10  Q.   Okay.  Now, I'm going to direct your attention to page 10.
15:59  11  It's about a 13-page factual basis; right?
15:59  12  A.   Yes.
15:59  13  Q.   Page 10.  And in that factual basis that you've looked at,
15:59  14  you had them revise and edit, submit it back to you, you looked
15:59  15  at it again, and you signed off on, this says:  "After drafting
15:59  16  the 17-page false report, Defendant Lohman" -- all capitals --
15:59  17  "directed the investigator" -- the investigator would be
15:59  18  Mr. Kaufman; right?
15:59  19  A.   Yes.
15:59  20  Q.   -- "directed the investigator to speak to each of the
15:59  21  shooters to make sure they were 'okay with'" -- in quotes --
16:00  22  "the 17-page report"?
16:00  23  A.   Yes.
16:00  24  Q.   That's all in there; right?
16:00  25  A.   Yes.

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 16:00 | 1 | **Q.**   And it goes on to say:  "And were willing to give |
| 16:00 | 2 | statements consistent with that report"; right? |
| 16:00 | 3 | **A.**   Yes. |
| 16:00 | 4 | **Q.**   And it goes on to say:  "The investigator then got |
| 16:00 | 5 | approval" -- "the investigator then got approval for the |
| 16:00 | 6 | 17-page report"; right? |
| 16:00 | 7 | **A.**   Yes. |
| 16:00 | 8 | **Q.**   "From each of the shooters"; right? |
| 16:00 | 9 | **A.**   Yes. |
| 16:00 | 10 | **Q.**   And then you got an open parentheses, "(except possibly |
| 16:00 | 11 | from the one officer who had by that time resigned from NOPD)," |
| 16:00 | 12 | closed parentheses? |
| 16:00 | 13 | **A.**   Yes. |
| 16:00 | 14 | **Q.**   That's what that says? |
| 16:00 | 15 | **A.**   Yes. |
| 16:00 | 16 | **Q.**   All right.  Where does it say in this 13-page factual |
| 16:00 | 17 | basis that you -- you -- talked to each of the people that shot |
| 16:00 | 18 | on the bridge?  You're familiar with that; right? |
| 16:00 | 19 | **A.**   Uh-huh. |
| 16:00 | 20 | **Q.**   Where does it say that? |
| 16:01 | 21 | **A.**   I'm not sure where it says it, but I'll review the whole |
| 16:01 | 22 | thing. |
| 16:01 | 23 |              **THE COURT:**  Do you want him to do that? |
| 16:01 | 24 |              **MR. FLEMING:**  If he can find it, Judge.  I don't mean |
| 16:01 | 25 | to... |

MICHAEL LOHMAN - Cross

16:01  1          **MS. BERNSTEIN:**  I can help direct him, Your Honor.

16:01  2          **THE COURT:**  Well, let's let him -- do you need him

16:01  3  to -- do you want to point him out to a passage, or do you need

16:01  4  him to look through it?

16:01  5          **MR. FLEMING:**  No, I was asking him to look through

16:01  6  it, Judge.

16:01  7          **THE COURT:**  Let's let him look through it.  It's his

16:01  8  factual basis, so let's let him look through it.

16:05  9          **THE WITNESS:**  (WITNESS COMPLIES.)

16:05  10          It's not contained in the factual basis.  It

16:05  11  says that I directed Kaufman to do it.

16:05  12  BY MR. FLEMING:

16:05  13  **Q.**  I apologize.  I can't hear you.

16:05  14  **A.**  I don't see it in the factual basis.  But that information

16:05  15  was relayed to the U.S. Attorney's Office and the FBI.

16:05  16  **Q.**  Answer my question, though:  It's not in the factual

16:05  17  basis, is it?

16:05  18  **A.**  That's what I just said, no, it wasn't contained in the

16:05  19  factual basis.

16:05  20  **Q.**  What's in that 302 -- and in that 302 -- or rather what

16:06  21  you told the FBI is that you directed the investigator,

16:06  22  Mr. Kaufman, to talk to the shooters; right?

16:06  23  **A.**  Yes.

16:06  24  **Q.**  Yes.  Thank you.

16:06  25          And what it also says in that 302, what you told the

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 16:06 | 1 | FBI, is that you think Kaufman talked to everyone except with |
| 16:06 | 2 | the possibility of the one officer who had resigned from the |
| 16:06 | 3 | New Orleans Police Department; right? |
| 16:06 | 4 | A.   Yes. |
| 16:06 | 5 | Q.   And that officer would have been Robert Faulcon; right? |
| 16:06 | 6 | A.   Yes. |
| 16:06 | 7 | Q.   Because Robert Faulcon was living in Houston; right? |
| 16:06 | 8 | A.   Yes. |
| 16:06 | 9 | Q.   After Robert Faulcon resigned from New Orleans Police |
| 16:06 | 10 | Department and moved to Houston, how many times did he drive |
| 16:06 | 11 | from Houston to come talk to you? |
| 16:06 | 12 | A.   To talk to me? |
| 16:06 | 13 | Q.   To talk to you. |
| 16:06 | 14 | A.   Never. |
| 16:06 | 15 | Q.   He came to speak with Detective Dugue; right? |
| 16:06 | 16 | A.   Yes. |
| 16:07 | 17 | Q.   And you said he spoke to -- you said a few moments ago you |
| 16:07 | 18 | said you spoke to Mr. Faulcon; right? |
| 16:07 | 19 | A.   Yes. |
| 16:07 | 20 | Q.   And you're his boss, aren't you? |
| 16:07 | 21 | A.   Yes. |
| 16:07 | 22 | Q.   And as his boss, you would expect him to -- when he's |
| 16:07 | 23 | still a New Orleans policeman, you expect him to listen to you; |
| 16:07 | 24 | right? |
| 16:07 | 25 | A.   Yes. |

MICHAEL LOHMAN - Cross

16:07   1   **Q.**   You'd like most of your men to listen -- men and women to

16:07   2   listen to you; right?

16:07   3   **A.**   Yes.

16:07   4   **Q.**   When you spoke to Mr -- strike that.  Strike that.  I'm

16:07   5   sorry.

16:07   6          Let me go back to the factual basis for a second.  In

16:07   7   that factual basis, you indicate that you put stuff in that

16:08   8   17-page report that Mr. Faulcon did not tell you; right?

16:08   9   Specifically, you came up with a better explanation as to why

16:08   10  Ronald Madison was shot; right?

16:08   11  **A.**   All that information was based on conversations I had with

16:08   12  Faulcon on the bridge the day of the shooting.

16:08   13  **Q.**   Okay.  All right.  So when -- in your factual basis, you

16:08   14  say you came up with the information that Ronald Madison

16:08   15  turned, took a sharp right on the north side of the bridge.  Do

16:08   16  I need to get this out again?

16:08   17         You didn't review this factual basis prior to

16:08   18  testifying today, Mr. Lehrmann -- Mr. Lohman?

16:08   19  **A.**   Yes, I did.  I reviewed it yesterday, and I did say that.

16:09   20  **Q.**   You said:  "Also in the 17-page report, Defendant Lohman

16:09   21  amended the story about Ronald Madison having the gun, shooting

16:09   22  at police by adding that Ronald Madison ran sharply to the

16:09   23  right towards the north side of the bridge where officers who

16:09   24  were chasing him lost sight of him momentarily"; right?

16:09   25  **A.**   Yes.

MICHAEL LOHMAN - Cross

16:09   1   **Q.**   Right.

16:09   2            "Defendant Lohman made this change because it offered

16:09   3   an excuse for how Ronald Madison could have thrown a gun off

16:09   4   the bridge"; right?

16:09   5   **A.**   Yes.

16:09   6   **Q.**   That's what's in here?  Right?

16:09   7   **A.**   Pay attention, yes.

16:09   8   **Q.**   Okay.

16:09   9            **THE COURT:**  Wait one second.

16:09   10           **MR. FLEMING:**  Yes, Judge.

16:09   11           **THE COURT:**  Mr. Lohman --

16:09   12           **THE WITNESS:**  Yes, sir.

16:09   13           **THE COURT:**  -- I'm looking at the record right

16:09   14   here --

16:09   15           **THE WITNESS:**  Yes, sir.  I'm sorry.  I'm sorry.

16:09   16           **THE COURT:**  -- you don't tell a lawyer in here to pay

16:09   17   attention.

16:09   18           **THE WITNESS:**  Yes, sir.

16:09   19           **THE COURT:**  You're here to answer questions, fact

16:10   20   questions for all of the lawyers.

16:10   21           **THE WITNESS:**  Yes, sir.

16:10   22           **THE COURT:**  You don't say, "Pay attention," to a

16:10   23   lawyer in answer to a question.

16:10   24           **THE WITNESS:**  Yes, sir, and I apologize, Your Honor.

16:10   25           **THE COURT:**  Am I clear?

MICHAEL LOHMAN - Cross

16:10   1          THE WITNESS:  Yes, sir, and I apologize.

16:10   2          THE COURT:  Am I crystal clear?

16:10   3          THE WITNESS:  Crystal clear, and I apologize for my

16:10   4   outburst.  I'm sorry.

16:10   5          THE COURT:  All right.  Let's -- I know it's a tense

16:10   6   time, but let's answer the questions and be done.

16:10   7          THE WITNESS:  Yes, sir, and again, I'm sorry.

16:10   8          THE COURT:  Quite honestly, I wasn't quite sure what

16:10   9   I heard.  I had to go back and check the record here to make

16:10  10   sure my ears were hearing correctly.

16:10  11          THE WITNESS:  Yes, sir.  I'm sorry.  I apologize,

16:10  12   Your Honor.

16:10  13          THE COURT:  Because we don't do that here.

16:10  14          THE WITNESS:  I apologize.

16:10  15          THE COURT:  Go ahead, Mr. Fleming.

16:10  16          MR. FLEMING:  Thank you, Your Honor.

16:10  17   BY MR. FLEMING:

16:10  18   Q.   And that's what you signed as part of the factual basis;

16:10  19   correct?

16:10  20   A.   Yes, it is.

16:10  21   Q.   And that does not say in that factual basis that Robert

16:10  22   Faulcon told you that; right?

16:10  23   A.   No.

16:10  24   Q.   It says that Michael Lohman came up with that; right?

16:10  25   A.   Yes, it does.  The part about Ronald Madison running to

MICHAEL LOHMAN - Cross

16:10    1    the side of the bridge.

16:11    2    **Q.**   Because Mr. Faulcon never told you that, did he?

16:11    3    **A.**   No, he didn't.

16:11    4    **Q.**   When you spoke to Mr. Faulcon, and as his boss, you were

16:11    5    asking him leading questions?

16:11    6    **A.**   Yes, I did.

16:11    7    **Q.**   Let me ask you a couple of questions about the scene on

16:11    8    the bridge.  You had said on direct examination that the

16:11    9    evidence should have been collected even if crime lab couldn't

16:11   10    come out; right?

16:11   11    **A.**   Yes.

16:11   12    **Q.**   You remember saying that.  Okay.

16:11   13           And what kind of packaging was available to the

16:12   14    members of the 7th District to put the different things in, to

16:12   15    put the different casings in, to put the different bullets in,

16:12   16    to put the different items of evidence in?  What type of

16:12   17    packaging was available to you?

16:12   18    **A.**   We didn't have anything on our persons to use at that

16:12   19    time, but I'm sure if we had looked around, we could have came

16:12   20    up with bags or packaging or containers to put things in.

16:12   21    **Q.**   If you had done that.

16:12   22    **A.**   If we had --

16:12   23    **Q.**   You directed somebody to pick up evidence.  You didn't

16:12   24    provide anything for them to pick up evidence in; right?

16:12   25    **A.**   No, we didn't.

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 16:12 | 1 | **Q.**   And when you pick up evidence, you pick it up in a secure |
| 16:12 | 2 | manner; right? |
| 16:12 | 3 | **A.**   Yes. |
| 16:12 | 4 | **Q.**   So it has evidentiary value in a court of law; right? |
| 16:12 | 5 | **A.**   Yes. |
| 16:12 | 6 | **Q.**   And usually crime lab would that; correct? |
| 16:12 | 7 | **A.**   Yes. |
| 16:12 | 8 | **Q.**   And crime lab picks that up with their little special |
| 16:12 | 9 | packaging; right? |
| 16:12 | 10 | **A.**   Yes. |
| 16:12 | 11 | **Q.**   And they sit there and take notes, don't they -- |
| 16:12 | 12 | **A.**   Yes. |
| 16:12 | 13 | **Q.**   -- the crime lab? |
| 16:12 | 14 |      And they might take some photographs; right? |
| 16:12 | 15 | **A.**   Yes. |
| 16:12 | 16 | **Q.**   And they might make some drawings; right? |
| 16:12 | 17 | **A.**   Yes. |
| 16:12 | 18 | **Q.**   And they might take some measurements; correct? |
| 16:13 | 19 | **A.**   Yes. |
| 16:13 | 20 | **Q.**   And they're trained.  Crime lab has people that are |
| 16:13 | 21 | actually trained to do all these things; right? |
| 16:13 | 22 | **A.**   Yes. |
| 16:13 | 23 | **Q.**   And crime lab has a secure place to put these items once |
| 16:13 | 24 | they're collected; right? |
| 16:13 | 25 | **A.**   Yes. |

MICHAEL LOHMAN - Cross

16:13    1    Q.    On direct examination I believe you were asked whether you
16:13    2    worked with other individuals in preparing a report; right?
16:13    3    A.    Yes.
16:13    4    Q.    And you said you did; right?
16:13    5    A.    Yes.
16:13    6    Q.    And you mentioned several names, including Mr. Lehrmann;
16:14    7    right?
16:14    8    A.    I never worked with Lehrmann, no.
16:14    9    Q.    In putting together a report?
16:14   10    A.    No.
16:14   11    Q.    No.  Okay.
16:14   12          I noticed you specifically did not mention
16:14   13    Mr. Faulcon.  In drafting that 17-page report, you did not
16:14   14    speak to Mr. Faulcon himself; right?
16:14   15    A.    No.
16:14   16    Q.    Now, you've indicated also on direct examination that
16:14   17    there were certain meetings that were supposedly taking place
16:14   18    out at the 7th District; right?
16:14   19    A.    Yes.
16:14   20    Q.    In the months after the shooting on September 4th; right?
16:14   21    A.    Yes.
16:14   22    Q.    And these meetings took place, actually, after Mr. Faulcon
16:14   23    had resigned from the New Orleans Police Department; right?
16:14   24    A.    Probably.  I don't know the exact date that he resigned,
16:14   25    but probably it was after.

MICHAEL LOHMAN - Cross

16:14  1          **MS. BERNSTEIN:**  Your Honor, I'm sorry.  May I ask for
16:14  2   more specificity about which meetings the questions are
16:14  3   referring to?
16:14  4          **THE COURT:**  Go ahead.  I agree.  Go ahead and
16:14  5   specify.
16:15  6   **BY MR. FLEMING:**
16:15  7   **Q.**   When did these meetings that you testified to on direct
16:15  8   examination take place, Mr. Lohman?  Specifically, when did
16:15  9   they take place?
16:15  10  **A.**   I don't have specific dates, but it would have been
16:15  11  September, October, and November.
16:15  12  **Q.**    October, November, September.  When in September?
16:15  13  **A.**   I don't have specific dates.  I don't know.
16:15  14  **Q.**   Well, I'm asking because the prosecution wants a specific
16:15  15  date.  So you don't know?
16:15  16  **A.**   I don't have a specific date, no.
16:15  17  **Q.**   How many times did Mr. Faulcon drive in from Houston to
16:15  18  attend these meetings?
16:15  19  **A.**   He never attended any meetings with me.
16:15  20  **Q.**   There was testimony on direct examination about what you,
16:15  21  yourself, were taught in the police academy when you went
16:15  22  through it; right?
16:15  23  **A.**   Yes.
16:15  24  **Q.**   You answered that.
16:15  25          Did you attend the police academy with Mr. Faulcon?

MICHAEL LOHMAN - Cross

16:15  1   **A.**   No.

16:15  2   **Q.**   He went through the police academy at a time later than

16:15  3   you; correct?

16:15  4   **A.**   Yes, he did.

16:15  5   **Q.**   Did you -- did you go sit with him in class when he

16:15  6   attended the academy?

16:15  7   **A.**   No.

16:15  8   **Q.**   Of course not.

16:16  9        That would be silly; right?

16:16  10  **A.**   Yes.

16:16  11  **Q.**   Do you know who taught Mr. Faulcon at the academy?

16:16  12  **A.**   No.

16:16  13  **Q.**   Do you know how well he did at the academy?

16:16  14  **A.**   No, I don't.

16:16  15  **Q.**   You were also asked about your plea deal in both direct

16:16  16  and cross-examination.  You pled guilty to something that has a

16:16  17  maximum exposure of five years in prison; right?

16:17  18  **A.**   Yes.

16:17  19  **Q.**   Okay.  Although your Sentencing Guidelines exceed the five

16:17  20  years, you can't get any more than five years; right?

16:17  21  **A.**   Yes.

16:17  22  **Q.**   In fact, as you said before, you're hoping to get less

16:17  23  than five years; right?

16:17  24  **A.**   Yes.

16:17  25  **Q.**   And you're aware that the government can write to the

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 16:17 | 1 | judge that will impose sentence and ask for a lesser sentence; |
| 16:17 | 2 | correct? |
| 16:17 | 3 | **A.**   Yes, I'm aware of that. |
| 16:17 | 4 | **Q.**   And you're aware that whether the government writes that |
| 16:17 | 5 | letter or not is up entirely to the prosecution; right? |
| 16:17 | 6 | **A.**   Yes. |
| 16:17 | 7 | **Q.**   It's not up to your attorney? |
| 16:17 | 8 | **A.**   No. |
| 16:17 | 9 | **Q.**   It's not up to Judge Engelhardt, is it? |
| 16:17 | 10 | **A.**   No. |
| 16:17 | 11 | **Q.**   It's up to Ms. Bernstein; right? |
| 16:17 | 12 | **A.**   Yes. |
| 16:18 | 13 | **Q.**   And also as part of your plea agreement -- let me show you |
| 16:18 | 14 | this.  I'm just going to get you to identify this. |
| 16:18 | 15 |       **THE COURT:**  What is that? |
| 16:18 | 16 |       **MR. FLEMING:**  41. |
| 16:18 | 17 |         If I may approach?  I'm sorry, Judge. |
| 16:18 | 18 |       **THE COURT:**  Yes. |
| 16:18 | 19 | BY MR. FLEMING: |
| 16:18 | 20 | **Q.**   Take a look at that, please.  You don't need to read -- |
| 16:18 | 21 | read the whole thing. |
| 16:18 | 22 |     Does that appear to be a copy of your plea agreement? |
| 16:18 | 23 | **A.**   Yes. |
| 16:18 | 24 | **Q.**   And on that last page that you just had, Mr. Lohman, does |
| 16:18 | 25 | that appear to be your signature? |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 16:18 | 1 | **A.**   Yes. |
| 16:18 | 2 | **Q.**   And it's not -- it is a copy of the plea agreement. |
| 16:18 | 3 | That's a copy of your signature; right? |
| 16:18 | 4 | **A.**   Yes. |
| 16:18 | 5 | **Q.**   And that's the signature of your attorney, Mr. Utley |
| 16:18 | 6 | right? |
| 16:18 | 7 | **A.**   Yes. |
| 16:18 | 8 | **Q.**   And that's a copy from the prosecutor, Ms. Bernstein; |
| 16:18 | 9 | right? |
| 16:18 | 10 | **A.**   Yes. |
| 16:18 | 11 | **Q.**   And, likewise, a copy from one of other prosecutors, Julia |
| 16:18 | 12 | Evans; right? |
| 16:19 | 13 | **A.**   Yes. |
| 16:19 | 14 | **Q.**   And you're aware -- you are aware as part of your plea |
| 16:19 | 15 | agreement, you can still be prosecuted for giving untrue |
| 16:19 | 16 | statements -- or if you give a statement that's untrue, the |
| 16:19 | 17 | whole plea deal is off; right? |
| 16:19 | 18 | **A.**   Yes. |
| 16:19 | 19 | **Q.**   Who makes that determination as to whether you give |
| 16:19 | 20 | another untrue statement? |
| 16:19 | 21 | **A.**   The government. |
| 16:19 | 22 | **MR. FLEMING:**  One moment, please, Judge. |
| 16:19 | 23 | Thank you, Mr. Lohman.  I have no further |
| 16:19 | 24 | questions. |
| 16:19 | 25 | **THE COURT:**  All right.  Mr. DeSalvo. |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 16:19 | 1 | **CROSS-EXAMINATION** |
| 16:19 | 2 | **BY MR. DESALVO:** |
| 16:20 | 3 | Q.   Mr. Lohman, I've got good news for you and the jury.  I'm |
| 16:20 | 4 | going to do my best not to repeat anything that's already been |
| 16:20 | 5 | asked.  So I'm not going to ask you about the policies, or who |
| 16:20 | 6 | writes the report, or who does the police thing.  But I do want |
| 16:20 | 7 | to ask you about who doesn't write a report and do an |
| 16:20 | 8 | investigation. |
| 16:20 | 9 | For example, if a police officer is involved in an |
| 16:20 | 10 | incident, he doesn't do that investigation, does he? |
| 16:20 | 11 | A.   It depends on -- |
| 16:20 | 12 | Q.   Any kind of incident. |
| 16:20 | 13 | A.   If the police officer is involved? |
| 16:20 | 14 | Q.   Yes. |
| 16:20 | 15 | A.   It depends on the incident. |
| 16:20 | 16 | Q.   So say a police officer gets in a traffic accident -- |
| 16:20 | 17 | A.   Yes, sir. |
| 16:20 | 18 | Q.   -- he doesn't write the report, does he? |
| 16:20 | 19 | A.   No. |
| 16:20 | 20 | Q.   Somebody else comes out and writes the report? |
| 16:20 | 21 | A.   A supervisor would. |
| 16:20 | 22 | Q.   If he gets in a fight on the street, he doesn't write the |
| 16:20 | 23 | report, does he?  Somebody else writes the report? |
| 16:20 | 24 | A.   That's the way it's supposed to be, yes. |
| 16:20 | 25 | Q.   I mean, actually, his superior will come out and write a |

MICHAEL LOHMAN - Cross

| 16:20 | 1 | use of force report and somebody else would do the |
| 16:21 | 2 | investigation.  That's how it's done? |
| 16:21 | 3 | A.   Yes. |
| 16:21 | 4 | Q.   And if a police officer is involved in a police shooting, |
| 16:21 | 5 | he certainly doesn't write the report, does he? |
| 16:21 | 6 | A.   No. |
| 16:21 | 7 | Q.   He becomes a witness? |
| 16:21 | 8 | A.   Yes. |
| 16:21 | 9 | Q.   Or a defendant? |
| 16:21 | 10 | A.   Yes. |
| 16:21 | 11 | Q.   And in either case, he doesn't write the report? |
| 16:21 | 12 | A.   No. |
| 16:21 | 13 | Q.   He doesn't preserve the crime scene? |
| 16:21 | 14 | A.   No. |
| 16:21 | 15 | Q.   He doesn't pick up evidence? |
| 16:21 | 16 | A.   No. |
| 16:21 | 17 | Q.   He doesn't diagram the crime scene? |
| 16:21 | 18 | A.   No. |
| 16:21 | 19 | Q.   He doesn't take photographs of the crime scene? |
| 16:21 | 20 | A.   No. |
| 16:21 | 21 | Q.   He's a witness? |
| 16:21 | 22 | A.   Yes. |
| 16:21 | 23 | Q.   And he -- and as a witness, he says what happened? |
| 16:21 | 24 | A.   Yes. |
| 16:21 | 25 | Q.   Okay.  Now, when you -- that 108 came in, you heard it |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 16:21 | 1 | about the same time as everybody else? |
| 16:21 | 2 | **A.**   I don't recall hearing it come across the radio |
| 16:21 | 3 | transmission.  Someone told me that a 108 -- I saw people |
| 16:21 | 4 | scurrying to their cars and I was told there was a 108. |
| 16:21 | 5 | **Q.**   And you were one of three lieutenants that were in the 7th |
| 16:22 | 6 | District at the time? |
| 16:22 | 7 | **A.**   I think there were more than that.  I think we had five. |
| 16:22 | 8 | **Q.**   Five.  Okay. |
| 16:22 | 9 | How many were on duty that morning? |
| 16:22 | 10 | **A.**   I know Lieutenant Brad Tollefson was on duty.  I don't |
| 16:22 | 11 | know about anyone else. |
| 16:22 | 12 | **Q.**   Was he at the Crystal Palace? |
| 16:22 | 13 | **A.**   Yes. |
| 16:22 | 14 | **Q.**   And Lieutenant Kim Williams was there? |
| 16:22 | 15 | **A.**   Yes, yes. |
| 16:22 | 16 | **Q.**   And she was at the Crystal Palace? |
| 16:22 | 17 | **A.**   I remember seeing her on the scene of the Danziger.  I |
| 16:22 | 18 | don't know where she was at prior to that. |
| 16:22 | 19 | **Q.**   Did she get to the scene before you or after you? |
| 16:22 | 20 | **A.**   I don't know. |
| 16:22 | 21 | **Q.**   Could have been the same time, could have been before, |
| 16:22 | 22 | could have been after? |
| 16:22 | 23 | **A.**   Could have been, yes. |
| 16:22 | 24 | **Q.**   But in any event, by the time you got there, it was over? |
| 16:22 | 25 | **A.**   Yes. |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 16:22 | 1 | **Q.** The Budget truck was gone? |
| 16:22 | 2 | **A.** It was still on the scene. |
| 16:22 | 3 | **Q.** It was on the scene, but it was further up the bridge? |
| 16:22 | 4 | **A.** No, at that time I think it was still on the east side. |
| 16:22 | 5 | **Q.** You didn't see it moving, did you? |
| 16:22 | 6 | **A.** No.  I can't -- I don't recall seeing it moving, no. |
| 16:22 | 7 | **Q.** You didn't see Officer Hunter get out of it, did you? |
| 16:22 | 8 | **A.** No. |
| 16:22 | 9 | **Q.** You didn't see Sergeant Bowen get out of it, did you? |
| 16:23 | 10 | **A.** No. |
| 16:23 | 11 | **Q.** But when you got there, you saw that four people were shot |
| 16:23 | 12 | on the side of the -- on the east side of the bridge? |
| 16:23 | 13 | **A.** Yes. |
| 16:23 | 14 | **Q.** And one of whom was deceased? |
| 16:23 | 15 | **A.** Yes. |
| 16:23 | 16 | **Q.** Now, you believe that you had talked to Ken Bowen on the |
| 16:23 | 17 | east side of the bridge; is that correct? |
| 16:23 | 18 | **A.** Yes. |
| 16:23 | 19 | **Q.** It could have been the west side? |
| 16:23 | 20 | **A.** I'm pretty confident I spoke to him on both sides. |
| 16:23 | 21 | **Q.** You believe you spoke to him on both sides? |
| 16:23 | 22 | **A.** I know I spoke to him on the west -- I spoke to him on |
| 16:23 | 23 | both sides.  I spoke to him on the east side and the west side. |
| 16:23 | 24 | **Q.** You're absolutely positive you talked to him on the west |
| 16:23 | 25 | side, though? |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 16:23 | 1 | **A.**   Yes. |
| 16:23 | 2 | **Q.**   And you don't know where the Budget truck was when you got |
| 16:23 | 3 | there? |
| 16:23 | 4 | **A.**   The Budget truck was on the east side. |
| 16:23 | 5 | **Q.**   Was it right where the shooting occurred? |
| 16:23 | 6 | **A.**   No.  It would have -- from what I recall, a little further |
| 16:23 | 7 | up. |
| 16:23 | 8 | **Q.**   Was it close to the crest? |
| 16:23 | 9 | **A.**   No. |
| 16:23 | 10 | **Q.**   You're sure of that too? |
| 16:24 | 11 | **A.**   Yes. |
| 16:24 | 12 | **Q.**   You're sure? |
| 16:24 | 13 | **A.**   To the best of my recollection, yes. |
| 16:24 | 14 | **Q.**   Okay.  And you -- in any event, you talked to Sergeant |
| 16:24 | 15 | Bowen? |
| 16:24 | 16 | **A.**   Yes. |
| 16:24 | 17 | **Q.**   He's on the east side, the west side, or both sides? |
| 16:24 | 18 | **A.**   Yes. |
| 16:24 | 19 | **Q.**   Okay.  And when you talked to Sergeant Bowen he told you |
| 16:24 | 20 | that he drove up in the Budget truck? |
| 16:24 | 21 | **A.**   Yes. |
| 16:24 | 22 | **Q.**   They encountered these people with guns? |
| 16:24 | 23 | **A.**   Yes. |
| 16:24 | 24 | **Q.**   They returned fire? |
| 16:24 | 25 | **A.**   Yes. |

MICHAEL LOHMAN - Cross

| 16:24 | 1 | Q. | They were fired upon and returned fire? |

16:24    1    Q.    They were fired upon and returned fire?

16:24    2    A.    Yes.

16:24    3    Q.    And that never changed, did it?

16:24    4    A.    No.

16:24    5    Q.    Okay.  Now, he also told you that when he returned fire,

16:24    6    he fired into the concrete embankment, didn't he?

16:24    7    A.    Yes.

16:24    8    Q.    And he characterized that as -- what did you call it --

16:24    9    suppression fire?

16:24   10    A.    Suppression fire.

16:25   11    Q.    Yeah.  And so by "suppression fire," he meant for

16:25   12    everybody to keep down so the people in the back of the truck

16:25   13    wouldn't get shot?

16:25   14    A.    I don't know what his intent was, but it was suppression

16:25   15    fire, the way he characterized it.

16:25   16    Q.    Right.  And so -- and you told him, "Well, you can't say

16:25   17    'suppression fire' because police officers don't use

16:25   18    suppression fire"?

16:25   19    A.    Yes.

16:25   20    Q.    So then he said, "Okay.  I shot at them, but all of my

16:25   21    rounds hit the concrete barrier," didn't he?

16:25   22    A.    Yes.

16:25   23    Q.    Okay.  So that was the change?

16:25   24    A.    Yes.

16:25   25    Q.    Now, did you go look at that concrete barrier to see

MICHAEL LOHMAN - Cross

| 16:25 | 1 | whether or not there were strike marks in there where he said |
| 16:25 | 2 | he had fired? |
| 16:25 | 3 | **A.**   No. |
| 16:25 | 4 | **Q.**   Had you gone and looked at it and seen strike marks that |
| 16:25 | 5 | were consistent with where he said he fired his weapon, would |
| 16:25 | 6 | that have caused you maybe to give him more credibility? |
| 16:25 | 7 | **A.**   About firing a weapon, yes. |
| 16:25 | 8 | **Q.**   Okay.  But you chose not to do that? |
| 16:25 | 9 | **A.**   I didn't look at it, no. |
| 16:26 | 10 | **Q.**   Now, you gave -- I don't know how many times you said you |
| 16:26 | 11 | went over to talk to the FBI, but on two times you talked to |
| 16:26 | 12 | them and gave them -- you made statements, right, prior to the |
| 16:26 | 13 | time that you made your plea agreement? |
| 16:26 | 14 | **A.**   Twice I spoke to them before -- three times I spoke to |
| 16:26 | 15 | them before the plea agreement. |
| 16:26 | 16 | **Q.**   Okay.  Well, I only know of two, but maybe you can, if I |
| 16:26 | 17 | leave something out, help me out.  But at least on the first |
| 16:26 | 18 | one -- |
| 16:26 | 19 | **A.**   I can name them if you wish. |
| 16:26 | 20 | **Q.**   Huh? |
| 16:26 | 21 | **A.**   I can name them if you wish. |
| 16:26 | 22 | **Q.**   Okay. |
| 16:26 | 23 | **A.**   I can tell you the dates.  I mean, I spoke to them in May |
| 16:26 | 24 | of '09; August of '09, before the grand jury; and then when |
| 16:26 | 25 | they called me back, I didn't speak, but I came in and listened |

MICHAEL LOHMAN - Cross

16:26   1   to them in November of '09.

16:26   2   **Q.**   Yeah.  But that time you didn't speak, that's why I didn't

16:26   3   mention that one.

16:26   4   **A.**   All right.  Okay.

16:26   5   **Q.**   There's two times that you spoke to them?

16:26   6   **A.**   Yes.

16:26   7   **Q.**   And the first time that you spoke to them, that's when you

16:26   8   weren't telling the truth, the whole truth, and nothing but the

16:26   9   truth?

16:26   10   **A.**   Yes.

16:26   11   **Q.**   Right?

16:26   12   **A.**   Yes.

16:26   13   **Q.**   And -- but some of the things you told them were the

16:27   14   truth?

16:27   15   **A.**   Yes.

16:27   16   **Q.**   And some of the things you told them were not the truth?

16:27   17   **A.**   Yes.

16:27   18   **Q.**   And you told them in that -- and then when you went to the

16:27   19   one, what, December 18th of '09; do you remember that day?

16:27   20   **A.**   Yes.

16:27   21   **Q.**   That was when you had decided that you were going to go in

16:27   22   and tell the truth, the whole truth, and nothing but the truth;

16:27   23   is that right?

16:27   24   **A.**   That was one of the dates, yes.

16:27   25   **Q.**   Well, that's the date when you spoke to them?

MICHAEL LOHMAN - Cross

16:27  1   A.   I spoke to them prior to that also.
16:27  2   Q.   Okay.  But in that interview on December 18th, 2009, you
16:27  3   told them the truth, the whole truth, and nothing but the
16:27  4   truth?
16:27  5   A.   Yes.
16:27  6   Q.   Okay.  Now, when you told them the truth, the whole truth,
16:27  7   and nothing but the truth, you told them that Sergeant Bowen
16:27  8   told you that he kicked two guns off the walkway on the west
16:28  9   side of the bridge?
16:28  10  A.   Yes.
16:28  11  Q.   And you told them that on December 18th, 2009?
16:28  12  A.   Yes.  I probably told them that on that date.  I don't --
16:28  13  Q.   And you actually told them that back in the September
16:28  14  date, too, didn't you, when you were just telling them some of
16:28  15  the truth, some lies, and not the whole truth?  Right?
16:28  16  A.   In May -- May of '09, yes.
16:28  17  Q.   And on neither of those occasions did you tell them,
16:28  18  "Well, I told Sergeant Bowen, there's no guns and we don't" --
16:28  19  and he says, "Well how about this?  How about if I tell them
16:28  20  that I kicked the guns off the bridge?"  You never told them
16:28  21  that in either of those interviews, did you?
16:28  22  A.   Which interview?
16:28  23  Q.   Either one --
16:28  24  A.   Yes, I did.
16:28  25  Q.   -- the first one, where you just told the partial truth;

MICHAEL LOHMAN - Cross

16:28  1   and the second, where you told the truth, the whole truth, and
16:28  2   nothing but the truth.  Is that correct?
16:29  3   A.   I don't know what -- are you talking about the
16:29  4   December 18th interview?
16:29  5   Q.   I'm talking December 18th.  That was the truth, the whole
16:29  6   truth, and nothing but the truth, wasn't it?
16:29  7   A.   Yes.
16:29  8   Q.   And on that occasion, did you tell them that Sergeant
16:29  9   Bowen only told you that after you suggested that nobody's
16:29  10  going to believe it, there weren't any -- they had guns, and he
16:29  11  said, "Well, how about if I tell them I kicked them off?"  You
16:29  12  didn't say that, did you?
16:29  13  A.   On that day?
16:29  14  Q.   You just told them he said he kicked the two guns off; is
16:29  15  that correct?
16:29  16  A.   I don't know which date I told them that on, but that
16:29  17  information was related to them, yes.
16:29  18  Q.   How about if you told it to them on both dates?  Do you
16:29  19  want to look at both of them, or will you accept that as true?
16:29  20  A.   I'm look at them.
16:30  21  Q.   That's not a problem.
16:30  22       I'm going to show you --
16:30  23       MR. DESALVO:  May I approach the bench, Your Honor?
16:30  24       THE COURT:  Yes.
       25

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 16:30 | 1 | **BY MR. DESALVO:** |
| 16:30 | 2 | **Q.**   I'm going to show you what purports to be the 302 that |
| 16:30 | 3 | documented your interview with the government on December 18th, |
| 16:30 | 4 | 2009.  Does that look like it? |
| 16:30 | 5 | **A.**   Yes. |
| 16:30 | 6 | **MS. BERNSTEIN:**  For the record, what page are you on, |
| 16:30 | 7 | Mr. DeSalvo? |
| 16:30 | 8 | **MR. DESALVO:**  I got to look for it.  When I get to my |
| 16:30 | 9 | mark I'll tell you. |
| 16:30 | 10 | **MS. BERNSTEIN:**  All right.  Thank you. |
| 16:30 | 11 | **BY MR. DESALVO:** |
| 16:30 | 12 | **Q.**   Does it say that:  "Later on the west side of the |
| 16:31 | 13 | bridge" -- |
| 16:31 | 14 | **MR. DESALVO:**  This is on page 2 of the that 302, |
| 16:31 | 15 | right in the beginning of the third paragraph. |
| 16:31 | 16 | **BY MR. DESALVO:** |
| 16:31 | 17 | **Q.**   "Later on the west side of the bridge, Bowen told Lohman |
| 16:31 | 18 | he kicked the guns used by the civilians off the bridge to |
| 16:31 | 19 | secure them."  There's nothing in there about him saying, "Well |
| 16:31 | 20 | how about if I say this," is there? |
| 16:31 | 21 | **A.**   No, it doesn't say that. |
| 16:31 | 22 | **Q.**   And you didn't say that, did you? |
| 16:31 | 23 | **A.**   I don't know what I said on that day, but I told them |
| 16:31 | 24 | that -- |
| 16:31 | 25 | **Q.**   Sometime? |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 16:31 | 1 | **A.**   -- in interviews -- |
| 16:31 | 2 | **Q.**   Yeah, maybe later. |
| 16:31 | 3 | **A.**   -- he said, "How about this?" |
| 16:31 | 4 | **Q.**   Yeah.  How about that? |
| 16:31 | 5 |         And then:  "When Lohman asked Bowen where the guns |
| 16:31 | 6 | were, Bowen told Lohman someone must have taken them because he |
| 16:31 | 7 | could not locate them."  He told you that? |
| 16:31 | 8 | **A.**   Yes. |
| 16:31 | 9 | **Q.**   And that was right there on the west side of the bridge |
| 16:31 | 10 | shortly after the incident when you arrived? |
| 16:31 | 11 | **A.**   Yes, that's where the conversation took place at. |
| 16:31 | 12 | **Q.**   "Bowen also told Lohman that Jose Holmes and James |
| 16:31 | 13 | Brissette were armed and fired their weapons at the responding |
| 16:32 | 14 | officers."  Is that true? |
| 16:32 | 15 | **A.**   Yes. |
| 16:32 | 16 | **Q.**   He told you that? |
| 16:32 | 17 | **A.**   Yes. |
| 16:32 | 18 | **Q.**   And it was all right there on September 4th at the scene |
| 16:32 | 19 | on the Danziger Bridge? |
| 16:32 | 20 | **A.**   Yes. |
| 16:32 | 21 | **Q.**   You didn't have to tell him to say that, did you? |
| 16:32 | 22 | **A.**   No. |
| 16:32 | 23 | **Q.**   And that was the day that you swore to tell the truth, the |
| 16:32 | 24 | whole truth, and nothing but the truth, isn't it? |
| 16:32 | 25 | **A.**   Yes. |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 16:32 | 1 | **Q.**   Now, understanding that a person involved in a police |
| 16:33 | 2 | incident, such as a shooting, is not supposed to do his own |
| 16:33 | 3 | investigation, you wouldn't expect that Sergeant Bowen would |
| 16:33 | 4 | have picked up any gun casings, would you? |
| 16:33 | 5 | **A.**   Not typically, no. |
| 16:33 | 6 | **Q.**   And you wouldn't expect that he should move any evidence |
| 16:33 | 7 | from where it is -- from where it lay; is that correct? |
| 16:33 | 8 | **A.**   Not usually, no. |
| 16:33 | 9 | **Q.**   Now, I know you assigned this thing to Sergeant Kaufman, |
| 16:33 | 10 | but you were the senior person under it; right? |
| 16:33 | 11 | **A.**   Yes. |
| 16:33 | 12 | **Q.**   You were actually the No. 2 man in the district? |
| 16:33 | 13 | **A.**   Yes. |
| 16:33 | 14 | **Q.**   The head of the District Investigative Unit; right? |
| 16:33 | 15 | **A.**   Yes. |
| 16:33 | 16 | **Q.**   You said that when you went back to the Crystal Palace, |
| 16:34 | 17 | you saw Sergeant Kaufman sitting around a table talking to the |
| 16:34 | 18 | shooters; is that correct? |
| 16:34 | 19 | **A.**   I don't know if I said that in those words.  They were |
| 16:34 | 20 | assembled around the table and we spoke with them. |
| 16:34 | 21 | **Q.**   So he got back there before you? |
| 16:34 | 22 | **A.**   I don't know if he did or not. |
| 16:34 | 23 | **Q.**   Well, how can he be there sitting around a table when you |
| 16:34 | 24 | got back if he wasn't there before you? |
| 16:34 | 25 | **A.**   I never said I walked in and saw him sitting at the table |

MICHAEL LOHMAN - Cross

16:34    1    with the other officers.  I said we went back to the Crystal
16:34    2    Palace, the officers that were involved were assembled around a
16:34    3    round table in the Crystal Palace, and then that's when we
16:34    4    spoke to them.
16:34    5    Q.    Now, in any event, you knew he had left the scene?
16:34    6    A.    Yes.
16:34    7    Q.    And you, obviously, knew that the scene had not been
16:34    8    processed?
16:34    9    A.    Yes.
16:34   10    Q.    And -- have you ever heard expression, "The buck stops
16:34   11    here"?
16:34   12    A.    Yes.
16:34   13    Q.    What does it mean?
16:34   14    A.    The buck stops here, it stops with -- at that place, at
16:35   15    that moment.
16:35   16    Q.    It stops with the person in the authority, doesn't it?
16:35   17    A.    Yes.
16:35   18    Q.    You know what president said that?
16:35   19    A.    What's that?
16:35   20    Q.    Do you know what president said that?
16:35   21    A.    No, I'm not sure.
16:35   22    Q.    It's not important.  It was President Truman.
16:35   23          At any rate, when Bowen spoke to you in all these
16:35   24    times, did you ever -- well, all these times when you were
16:35   25    concocting stuff, did you ever bother to tape any of that?

MICHAEL LOHMAN - Cross

16:35    1   **A.**   No, there were no tapes.

16:35    2   **Q.**   Did you take copious notes?

16:35    3   **A.**   No.

16:35    4   **Q.**   Did you take any kind of notes?

16:35    5   **A.**   No.

16:35    6   **Q.**   But Sergeant Bowen did go when Sergeant Dugue called him

16:35    7   to go in and give a statement; right?

16:35    8   **A.**   Yes, he did.

16:35    9   **Q.**   And to the best of your knowledge, he gave Sergeant Dugue

16:35   10   a statement?

16:35   11   **A.**   Yes.

16:35   12   **Q.**   Did you ever listen to that statement?

16:35   13   **A.**   No.

16:35   14   **Q.**   Did you ever read a transcript of that statement?

16:36   15   **A.**   I've read the summary that was in the report.  I don't

16:36   16   think I ever read the transcript.

16:36   17   **Q.**   Do you remember when you and Sergeant Bowen got

16:36   18   transferred, close to the same time, to the 6th District?

16:36   19   **A.**   Yes.

16:36   20   **Q.**   Do you remember sitting outside that district one day and

16:36   21   he said, "Thank God for Lance Madison"?

16:36   22   **A.**   No.

16:36   23   **Q.**   Did Ken Bowen ever tell you that he interviewed anybody

16:36   24   with respect to this case?

16:36   25   **A.**   No.

MICHAEL LOHMAN - Cross

16:36  1   **Q.**   Did he ever tell you that he contaminated the scene in any
16:36  2   way with this case?
16:36  3   **A.**   No.
16:37  4   **Q.**   To this date do you know if Ken Bowen ever identified
16:37  5   Lance Madison as the person who was on that bridge firing his
16:37  6   weapon and maybe threw one over the top?  Did he make an
16:37  7   identification of Lance Madison as that person?
16:37  8   **A.**   No, I don't believe so.
16:37  9   **Q.**   Did you interview Lance Madison on the scene?
16:37  10  **A.**   No, I did not.
16:37  11  **Q.**   Did you -- were you aware that he testified at a
16:37  12  preliminary hearing prior to the time that the first report in
16:37  13  this case was written?
16:37  14  **A.**   Yes, I was aware.
16:37  15  **Q.**   Did you know what he had testified to at that preliminary
16:37  16  hearing?
16:37  17  **A.**   I read it at some point, but I don't recall what it was.
16:37  18  **Q.**   Well, did you read it prior to the time --
16:37  19            MR. DESALVO:  I'm not going to do anything bad.  Just
16:37  20  relax.
16:37  21  BY MR. DESALVO:
16:37  22  **Q.**   Did you read it prior to the time that you wrote that
16:38  23  report?
16:38  24  **A.**   I don't know.
16:38  25  **Q.**   You don't know?

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 16:38 | 1 | **A.**   I don't know. |
| 16:38 | 2 | **Q.**   And were you aware of its contents? |
| 16:38 | 3 | **A.**   His what? |
| 16:38 | 4 | **Q.**   Were you aware of the contents of that preliminary |
| 16:38 | 5 | hearing? |
| 16:38 | 6 | **A.**   Some of it. |
| 16:38 | 7 | **Q.**   Did you read an official transcript of the hearing? |
| 16:38 | 8 | **A.**   No. |
| 16:38 | 9 | **Q.**   So you were just told what it said? |
| 16:38 | 10 | **A.**   I read it somewhere -- it was in an article or something |
| 16:38 | 11 | where I read it of -- Lance Madison's statement is what we're |
| 16:38 | 12 | speaking about; right? |
| 16:38 | 13 | **Q.**   Right. |
| 16:38 | 14 | **A.**   I read it in an article somewhere. |
| 16:38 | 15 | **Q.**   Okay.  Did you interview any citizens who told you that |
| 16:38 | 16 | the Madisons had guns? |
| 16:38 | 17 | **A.**   No, I didn't. |
| 16:38 | 18 | **Q.**   Do you know if any such citizens existed? |
| 16:39 | 19 | **A.**   No, I don't. |
| 16:39 | 20 | **Q.**   Did you try to find out? |
| 16:39 | 21 | **A.**   I didn't, no. |
| 16:39 | 22 | **Q.**   And where does the buck stop? |
| 16:39 | 23 | **MR. DESALVO:**  No further questions. |
| 16:39 | 24 | **THE COURT:**  Mr. Meche? |
| | 25 | |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 16:39 | 1 | **CROSS-EXAMINATION** |
| 16:39 | 2 | **BY MR. MECHE:** |
| 16:39 | 3 | **Q.**   Good afternoon, Mr. Lohman. |
| 16:39 | 4 | **A.**   Good afternoon. |
| 16:39 | 5 | **Q.**   I'm Tim Meche.  I represent Anthony Villavaso. |
| 16:39 | 6 | Do you know Anthony Villavaso? |
| 16:39 | 7 | **A.**   Yes. |
| 16:39 | 8 | **Q.**   When did you come to know him? |
| 16:39 | 9 | **A.**   During Hurricane Katrina. |
| 16:39 | 10 | **Q.**   And tell me when you remember -- how did that come about? |
| 16:39 | 11 | **A.**   He showed up at the Crystal Palace with his partner |
| 16:39 | 12 | because they were assigned to the 5th District at the time and |
| 16:39 | 13 | they got flooded in -- I don't know whether it was his house or |
| 16:40 | 14 | his partner's house -- before their reporting time for work. |
| 16:40 | 15 | So they didn't have a district to report to and the first place |
| 16:40 | 16 | that they could get to was the Crystal Palace where the |
| 16:40 | 17 | temporary 7th District station was set up. |
| 16:40 | 18 | **Q.**   And it's your testimony they reported to you? |
| 16:40 | 19 | **A.**   They showed up there, like many officers did who had been |
| 16:40 | 20 | flooded out from their place of assignment. |
| 16:40 | 21 | **Q.**   Okay.  But was there a formal process where those officers |
| 16:40 | 22 | came in and were reporting to you, Mr. Lohman? |
| 16:40 | 23 | **A.**   No.  It wasn't a formal process, but they showed up there |
| 16:40 | 24 | ready and willing to work and they worked with us. |
| 16:40 | 25 | **Q.**   Did you -- were you giving them instructions? |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 16:40 | 1 | **A.**   He was given assignments, yes. |
| 16:40 | 2 | **Q.**   By who? |
| 16:40 | 3 | **A.**   Myself, but he worked with Sergeant Bowen, for the most |
| 16:40 | 4 | part, on his squad. |
| 16:40 | 5 | **Q.**   He worked with Sergeant Bowen.  That's your testimony? |
| 16:40 | 6 | **A.**   Yes. |
| 16:40 | 7 | **Q.**   How do you know that? |
| 16:40 | 8 | **A.**   I seen him. |
| 16:40 | 9 | **Q.**   Okay.  Now, again, he was from a different district, the |
| 16:40 | 10 | 5th District? |
| 16:40 | 11 | **A.**   Yes. |
| 16:40 | 12 | **Q.**   And you all were all in the 7th District? |
| 16:41 | 13 | **A.**   Yes. |
| 16:41 | 14 | **Q.**   Him and his partner. |
| 16:41 | 15 | Now, you indicated that when you did the 17-page |
| 16:41 | 16 | report, you checked with all of the officers to see if they |
| 16:41 | 17 | approved it.  That's your testimony; correct? |
| 16:41 | 18 | **A.**   Yes. |
| 16:41 | 19 | **Q.**   And when you said all of the officers, you checked with |
| 16:41 | 20 | Officer Villavaso to see if he approved that? |
| 16:41 | 21 | **A.**   Yes. |
| 16:41 | 22 | **Q.**   And it's your testimony he approved of it? |
| 16:41 | 23 | **A.**   Yes. |
| 16:41 | 24 | **Q.**   Well, why in the world would he do that? |
| 16:41 | 25 | **A.**   I don't know.  Ask him. |

MICHAEL LOHMAN - Cross

| 16:41 | 1 | Q. | Well, I'm asking you. |

16:41   1   Q.   Well, I'm asking you.

16:41   2   A.   I don't know.  I mean, it wasn't a sit-down conversation

16:41   3   with him.  It was just in passing, "Are you okay with what was

16:41   4   written?  Are you okay with the report," and there was --

16:41   5   Q.   Correct me if I'm wrong --

16:41   6   A.   -- a positive response.

16:41   7   Q.   Excuse me.  I'm sorry.

16:41   8       Correct me if I'm wrong, but your 17-page report

16:41   9   seems to enlarge his role in the incident and it minimizes the

16:41   10  role of the officers under your command.  That's a correct

16:42   11  statement, isn't it?

16:42   12  A.   That's the role that I was informed that he played when we

16:42   13  sat down and talked about it, and that came through Bowen and

16:42   14  Gisevius.

16:42   15  Q.   You just said that's the role you were informed he played

16:42   16  in your 17-page report?

16:42   17  A.   Yes.

16:42   18       MR. MECHE:  Mr. Harrell, can you pull up the 17-page

16:42   19  report, page 7?  It's Exhibit 39, page 7.

16:42   20  BY MR. MECHE:

16:42   21  Q.   Incidentally --

16:42   22       MR. MECHE:  You can stop there.  That's page 1;

16:42   23  that's correct?

16:42   24  BY MR. MECHE:

16:42   25  Q.   Sir, if you look at -- and you authored this report;

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 16:42 | 1 | right? |
| 16:42 | 2 | A.   Yes. |
| 16:42 | 3 | Q.   Okay.  And in the middle section, correct me if I'm wrong, |
| 16:42 | 4 | it says:  "Lance Madison is charged with 8 counts of attempted |
| 16:43 | 5 | murder," and you list the people he was accused of murdering? |
| 16:43 | 6 | A.   Yes. |
| 16:43 | 7 | Q.   Is Anthony Villavaso's name on there? |
| 16:43 | 8 | A.   No. |
| 16:43 | 9 | Q.   Why not? |
| 16:43 | 10 | A.   It must have been a typographical error because Barrios' |
| 16:43 | 11 | name is on there twice. |
| 16:43 | 12 | Q.   So that's an omission and that you should have had |
| 16:43 | 13 | his name on there? |
| 16:43 | 14 | A.   An omission that I should have -- I didn't understand |
| 16:43 | 15 | the -- |
| 16:43 | 16 | Q.   Well, should his name be on there? |
| 16:43 | 17 | A.   Yes, yes. |
| 16:43 | 18 | Q.   And how do you explain why it's not? |
| 16:43 | 19 | A.   It's a typographical error. |
| 16:43 | 20 | Q.   Who would have committed the typographical error? |
| 16:43 | 21 | A.   If I typed it, it would have been me.  Barrios' name is on |
| 16:43 | 22 | there twice.  It's typed two times. |
| 16:43 | 23 | Q.   Well, why is that a typographical error?  I mean, it's -- |
| 16:43 | 24 | A.   It's an error. |
| 16:43 | 25 | Q.   -- either on there or it's not. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 16:43 | 1 | **A.** He's not on there. |
| 16:43 | 2 | **Q.** And your explanation is it's a typographical error? |
| 16:43 | 3 | **A.** It was an error. He was left off of the face sheet. He |
| 16:44 | 4 | should have been included. |
| 16:44 | 5 | **Q.** Okay. |
| 16:44 | 6 | **MR. MECHE:** Go to page 7, please. |
| 16:44 | 7 | BY MR. MECHE: |
| 16:44 | 8 | **Q.** Now, on this page, you list the guns of all of the |
| 16:44 | 9 | officers who were involved in the shooting; correct? |
| 16:44 | 10 | **A.** Yes. |
| 16:44 | 11 | **Q.** Now, how many rifles are listed on this page? |
| 16:44 | 12 | **A.** One. |
| 16:44 | 13 | **Q.** And who do you credit having the rifle? |
| 16:44 | 14 | **A.** Villavaso. |
| 16:44 | 15 | **Q.** Is that an accurate representation of how many rifles were |
| 16:44 | 16 | involved in the shooting? |
| 16:44 | 17 | **A.** No. |
| 16:44 | 18 | **Q.** Who else had rifles? |
| 16:44 | 19 | **A.** Bowen, Gisevius, Hunter. |
| 16:44 | 20 | **Q.** Why didn't you -- |
| 16:44 | 21 | **A.** I believe that was it. |
| 16:44 | 22 | **Q.** Why didn't you list in your report that they had rifles |
| 16:44 | 23 | also? |
| 16:44 | 24 | **A.** As I said, I typed over the report that was already there. |
| 16:45 | 25 | And when I read over the report initially, I questioned that. |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 16:45 | 1 | I don't really recall what the explanation was given, but |
| 16:45 | 2 | apparently when I wrote the report, I left it as is. |
| 16:45 | 3 | Q.   And you were aware that clearly some of the medical |
| 16:45 | 4 | evidence would have shown that some of these wounds were caused |
| 16:45 | 5 | by high-powered rifles? |
| 16:45 | 6 | A.   Yes. |
| 16:45 | 7 | Q.   And you were aware that at some point casings and bullets |
| 16:45 | 8 | and ballistics evidence would have been discovered and |
| 16:45 | 9 | submitted to evidence? |
| 16:45 | 10 | A.   Yes. |
| 16:45 | 11 | Q.   And the only person who would have got tagged with that |
| 16:45 | 12 | was Anthony Villavaso? |
| 16:45 | 13 | A.   Yes, he could have been. |
| 16:45 | 14 | Q.   Why in the world would he have been stupid enough to |
| 16:45 | 15 | approve this when he knew other people had rifles? |
| 16:45 | 16 | A.   I can't answer that question. |
| 16:45 | 17 | MR. MECHE:  Go to page 10. |
| 16:45 | 18 | BY MR. MECHE: |
| 16:46 | 19 | Q.   Sir, in this last paragraph, you suggest that the only |
| 16:46 | 20 | people who fired their weapons at the group were Faulcon, |
| 16:46 | 21 | Villavaso, and Barrios.  Is that a correct statement? |
| 16:46 | 22 | A.   Yes.  In the last paragraph, yes. |
| 16:46 | 23 | Q.   Bowen didn't shoot at that group? |
| 16:46 | 24 | A.   No. |
| 16:46 | 25 | Q.   Did Gisevius shoot at the group? |

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 16:46 | 1 | **A.**   No, not in the last paragraph.  Bowen shot in the previous |
| 16:46 | 2 | paragraph. |
| 16:46 | 3 | **Q.**   Well, you seem to be putting it all on Faulcon, Villavaso, |
| 16:46 | 4 | and Barrios. |
| 16:46 | 5 | **A.**   No, I wasn't putting it on anyone. |
| 16:46 | 6 | **Q.**   Well, that's what it looks like. |
| 16:46 | 7 | **A.**   The version of this -- of what their role was in this, |
| 16:46 | 8 | Faulcon, Villavaso, and Barrios, came through Bowen and |
| 16:47 | 9 | Gisevius, that's who I consulted with when I wrote down what |
| 16:47 | 10 | their role was because I never sat down and interviewed |
| 16:47 | 11 | Faulcon, Villavaso, or Barrios. |
| 16:47 | 12 | The extent of my conversation with them was is, "Are |
| 16:47 | 13 | you okay with what was contained in the report?"  But what |
| 16:47 | 14 | action they took or what role they played on the bridge came |
| 16:47 | 15 | through Bowen, and Gisevius, and Kaufman. |
| 16:47 | 16 | **Q.**   And it's your testimony -- |
| 16:47 | 17 | **A.**   Because I never spoke to them. |
| 16:47 | 18 | **Q.**   It's your testimony that Villavaso said he was okay with |
| 16:47 | 19 | being assigned this level of blame? |
| 16:47 | 20 | **A.**   Yes. |
| 16:47 | 21 | **Q.**   What specifically did he say?  Why would somebody say |
| 16:47 | 22 | something like that? |
| 16:47 | 23 | **A.**   It was as simple as, "Are you okay with what's contained |
| 16:47 | 24 | in the report," and the response was, "Yes." |
| 16:47 | 25 | **Q.**   And when did that conversation take place? |

MICHAEL LOHMAN - Cross

16:47    1    A.    Sometime after the report was written.  It would have been

16:47    2    in October or November.

16:47    3    Q.    Where would that conversation have occurred?

16:47    4    A.    At the station -- at the Crystal Palace.

16:47    5    Q.    Okay.  Now, how could that have been, because by then he

16:47    6    had moved back to his 5th District?

16:47    7    A.    No, he never -- he didn't move back to the 5th District.

16:47    8    He was assigned to me from the 5th District -- from the

16:48    9    Hurricane Katrina on.

16:48   10    Q.    Until how long?

16:48   11    A.    Until he was -- until I retired from -- no, he left -- he

16:48   12    was assigned to the 7th District at the Crystal Palace once he

16:48   13    reported there for Hurricane Katrina; and then when I

16:48   14    transferred to the 6th District, I brought him with me.

16:48   15    Q.    Now, wouldn't there be some documentation showing that he

16:48   16    was assigned formally to a different district?

16:48   17    A.    Yes.  But at the time of Katrina, transfers weren't being

16:48   18    done the way they were normally done, which means on the

16:48   19    paperwork, it wasn't coming out as a transfer.  It was being

16:48   20    done kind of between the commanders.  It was a handshake, "I'll

16:48   21    give you Villavaso and Barrios for Smith and Jones," and the

16:48   22    transfer was made.

16:48   23          And then later on down the line, when headquarters

16:48   24    was up and running, then the information would come out on the

16:48   25    teletype actually making that transfer official, but the

MICHAEL LOHMAN - Cross

16:49   1   officers were already working with the other districts.

16:49   2   **Q.**   Whose hand did you shake to secure the transfer?

16:49   3   **A.**   I didn't make the deal, Captain Barty did with -- Captain

16:49   4   Bryson at the time was in charge of the 5th District.

16:49   5   **Q.**   And what's your specific remembrance of that?

16:49   6   **A.**   That he came to work for us from the 5th District, him and

16:49   7   his partner.

16:49   8   **Q.**   Because Captain Barty shook somebody's hand?

16:49   9   **A.**   Because it was a transfer worked out between the commander

16:49   10   of the 5th District, Capt- -- 7th District, Captain Barty, and

16:49   11   the commander of the 5th District, Captain Bryson, at the time.

16:49   12   **Q.**   And your remembrance is you had a conversation with

16:49   13   Officer Villavaso at the Crystal Palace sometime in October

16:49   14   about this report, which puts more blame on him than anybody

16:49   15   else, and he said he was okay with it?

16:49   16   **A.**   The conversation was really general.  It was, "Are you

16:49   17   okay with what was in the report," and his response was, "Yes."

16:49   18   **Q.**   Since you brought up Captain Barty, and we've talked to

16:49   19   you a little bit about him, you said he was nowhere around this

16:49   20   day.  But subsequently he did start reporting back to the

16:50   21   location, didn't he?

16:50   22   **A.**   That morning he wasn't there --

16:50   23   **Q.**   Sure.

16:50   24   **A.**   -- but he did show up at the Crystal Palace after.  He may

16:50   25   have been at one of the commanders' meetings that morning.  I'm

MICHAEL LOHMAN - Cross

16:50   1   not really sure where he was.

16:50   2   Q.   Okay.  So you think he would have got there later that

16:50   3   day?

16:50   4   A.   Yes.

16:50   5   Q.   And, obviously, this incident would have been something he

16:50   6   would have wanted to know about?

16:50   7   A.   Yes.

16:50   8   Q.   And, obviously, you were the second in command?

16:50   9   A.   Yes.

16:50   10  Q.   And he would have talked to you about it?

16:50   11  A.   Yes.

16:50   12  Q.   And did you, in fact, talk to him?

16:50   13  A.   Yes.

16:50   14  Q.   And did you share your concerns with him about what you

16:50   15  knew?

16:50   16  A.   No.

16:50   17  Q.   Well, why not?

16:50   18  A.   Because I stuck to what we had spoke about earlier.  I

16:50   19  gave him a general rundown on what had happened and that was

16:50   20  that the officers responded to the scene, encountered gunfire,

16:50   21  and they returned gunfire, and as a result, people were shot.

16:50   22  Q.   Did he question you about what happened?

16:50   23  A.   He asked some questions about it, yes.  I don't recall

16:50   24  what, but I didn't give him any of the details or tell him

16:50   25  anything that was --

MICHAEL LOHMAN - Cross

16:50   1   **Q.**   Did you lie to him?
16:50   2   **A.**   I didn't lie -- well, I didn't lie to him, but I didn't
16:51   3   tell him what really happened.  I didn't tell him the details
16:51   4   of what happened about -- I guess you could say I was
16:51   5   untruthful with him, yes.
16:51   6   **Q.**   Well, you know how you were smart enough to figure out
16:51   7   that you didn't think the pieces fit.  He's, obviously, an
16:51   8   experienced police officer.  He's a captain; right?
16:51   9   **A.**   Yes.
16:51   10  **Q.**   And do you think he's pretty bright?
16:51   11  **A.**   Yes.
16:51   12  **Q.**   And he would have, obviously, being the commanding officer
16:51   13  overseeing this event, wanted to know whether or not the pieces
16:51   14  of the puzzle fit, wouldn't he?
16:51   15  **A.**   Yes, he asked questions.  But I didn't tell him anything
16:51   16  that was -- I mean, I stuck to what we had spoke about.  I told
16:51   17  him the story, but I wasn't truthful with him.
16:51   18  **Q.**   And how long after this incident did you continue to work
16:51   19  for him?
16:51   20  **A.**   Until I retired.
16:51   21  **Q.**   So for four years?
16:51   22  **A.**   Yes.
16:51   23  **Q.**   And during the course of those four years, this shooting
16:51   24  incident became the subject of a lot of media attention;
16:51   25  correct?

MICHAEL LOHMAN - Cross

16:51  1  **A.**   Yes.

16:51  2  **Q.**   A lot of law enforcement activity.  In fact, as you

16:52  3  explained to Ms. Bernstein, there were state court indictments?

16:52  4  **A.**   Yes.

16:52  5  **Q.**   And certainly that would have caused him to question you

16:52  6  more about it; right?

16:52  7  **A.**   I never went into detail with him about it.  I never told

16:52  8  him any of the -- the troublesome facts of the case.

16:52  9  **Q.**   Well, certainly, he would have asked you about it, though?

16:52  10  **A.**   We didn't go into detail about it.  I mean, he asked

16:52  11  general questions about it, but he didn't ask detailed

16:52  12  questions.

16:52  13  **Q.**   Well, correct me if I'm wrong, but this was one of the

16:52  14  number one stories going on one year after Katrina when these

16:52  15  officers were indicted in state court; right?

16:52  16  **A.**   Yes.

16:52  17  **Q.**   And it's your testimony that he just didn't want to know

16:52  18  anything about it?

16:52  19        **MS. BERNSTEIN:**  Objection, Your Honor.  I think

16:52  20  that's been asked and answered a couple times now.

16:52  21        **THE COURT:**  I'm going to let him go ahead and answer

16:52  22  this and then let's move on.

16:52  23  **BY MR. MECHE:**

16:52  24  **Q.**   Is your testimony that, even after it got all the

16:52  25  attention it got, he just didn't want to know anything about

MICHAEL LOHMAN - Cross

16:52  1   it?
16:52  2   A.   I mean, that's not what I said.  He asked questions and I
16:52  3   answered his questions, but I didn't tell him that, you know,
16:52  4   we made up a story about kicking guns over the side of the
16:53  5   bridge.  I didn't tell him that a gun was planted on the
16:53  6   bridge.  I didn't tell him any of that information.
16:53  7   Q.   And he continued to have confidence in you for the next
16:53  8   four years?
16:53  9   A.   Yes.
16:53  10  Q.   As his number one in command?
16:53  11  A.   Yes.
16:53  12  Q.   You said, I think it was in response -- I don't know if it
16:53  13  was Ms. Bernstein's questioning or someone else, but you
16:53  14  indicated that you did form an opinion as to what you really
16:53  15  thought happened out there on that bridge.  Do you remember
16:53  16  that?
16:53  17  A.   Yes.
16:53  18  Q.   What's that again?
16:53  19  A.   I was asked what my opinion was, what did I think really
16:53  20  happened on the bridge.
16:53  21  Q.   Right.
16:53  22  A.   And I said I believe that they responded to a legitimate
16:53  23  call for service on the bridge where there was gunfire.  When
16:53  24  they arrived on the bridge, someone overreacted, most likely
16:53  25  Bowen, based on the initial statements that were given to me

MICHAEL LOHMAN - Cross

| | | |
|---|---|---|
| 16:53 | 1 | about suppression fire, and once he started firing, the other |
| 16:53 | 2 | officers came out of the back of the truck firing.  They heard |
| 16:53 | 3 | the gunfire and they came out shooting. |
| 16:54 | 4 | Q.   So, in your opinion, it was an accident as opposed to a |
| 16:54 | 5 | criminal act; right? |
| 16:54 | 6 | MS. BERNSTEIN:  Objection. |
| 16:54 | 7 | MR. MECHE:  Well, wait.  He's formed an opinion. |
| 16:54 | 8 | THE COURT:  I'm going to let him answer it. |
| 16:54 | 9 | BY MR. MECHE: |
| 16:54 | 10 | Q.   In your opinion, it was an accident as opposed to a |
| 16:54 | 11 | criminal act? |
| 16:54 | 12 | A.   No, I wouldn't say an accident.  I mean, you -- as a |
| 16:54 | 13 | police officer, you just don't come out firing a weapon.  I |
| 16:54 | 14 | mean, I wouldn't say it was an accident, no. |
| 16:54 | 15 | Q.   But do you believe they intentionally decided to violate |
| 16:54 | 16 | the law? |
| 16:54 | 17 | MS. BERNSTEIN:  Now, objection, Your Honor. |
| 16:54 | 18 | MR. MECHE:  No, he's -- |
| 16:54 | 19 | THE COURT:  He's asking him a question that wherein |
| 16:54 | 20 | he expressed an opinion that's reflected in a 302.  I'm going |
| 16:54 | 21 | to let him answer it.  That's in a document that reflects his |
| 16:54 | 22 | statement, so I'm going to let him answer it. |
| 16:54 | 23 | BY MR. MECHE: |
| 16:54 | 24 | Q.   I mean, do you believe they intentionally decided, "We |
| 16:54 | 25 | want to violate the law"? |

MICHAEL LOHMAN - Cross

16:54   1   **A.**   No.

16:54   2   **Q.**   Then why didn't you all just tell the truth?

16:54   3   **A.**   I wish I could answer that, but I can't.  I wish I could

16:55   4   change it and go back and redo it, but I can't.

16:55   5              **MR. MECHE:**  Thank you, sir.

16:55   6              **THE COURT:**  All right.  Redirect?

16:55   7              **MS. BERNSTEIN:**  Your Honor, I have quite a bit of

16:55   8   redirect.  May I do just two minutes today and save the rest

16:55   9   for tomorrow?

16:55   10             **THE COURT:**  Let's go ahead and start and then we'll

16:55   11  break shortly.

16:55   12                     **REDIRECT EXAMINATION**

16:55   13  BY MS. BERNSTEIN:

16:55   14  **Q.**   Mr. Lohman, let me start where we just left off.

16:55   15  Mr. Meche asked you a series of questions about why

16:55   16  Defendant Villavaso would agree to that 17-page report.  Do you

16:55   17  remember those questions?

16:55   18  **A.**   Yes.

16:55   19  **Q.**   And you testified earlier that you instructed Defendant

16:55   20  Kaufman to talk to all the guys about that report; right?

16:55   21  **A.**   Yes.

16:55   22  **Q.**   And he came back and told you he had done that?

16:55   23  **A.**   Yes.

16:55   24  **Q.**   Do you know what part of that -- part or parts of the

16:55   25  17-page report he actually showed to the officers?

MICHAEL LOHMAN - Redirect

16:56  1   **A.**   No, I don't.

16:56  2   **Q.**   Do you know whether he ever showed that blame paragraph to

16:56  3   Defendant Villavaso?

16:56  4   **A.**   No, I don't know.

16:56  5   **Q.**   When Mr. DeSalvo was up here, he was asking you about what

16:56  6   he was referring to as a 302.  A 302 is a report that an FBI

16:56  7   agent writes after meeting with a witness; correct?

16:56  8   **A.**   Yes.

16:56  9   **Q.**   And he came up and stood by you and read off of that

16:56  10  report; correct?

16:56  11  **A.**   Yes.

16:56  12  **Q.**   And he was asking you questions about whether you ever

16:56  13  told the FBI that you knew Bowen had made up that story about

16:56  14  kicking off the guns; right?

16:56  15  **A.**   Yes.

16:56  16  **Q.**   And he asked you about the fact that you told the FBI that

16:56  17  Bowen told you that very day on the bridge that he had kicked

16:56  18  guns off; correct?

16:56  19  **A.**   Yes.

16:56  20         **MS. BERNSTEIN:**  May I approach, Your Honor?

16:56  21         **THE COURT:**  Yes.

16:56  22  BY MS. BERNSTEIN:

16:56  23  **Q.**   Mr. Lohman, I'd like you to read to the jury the one

16:56  24  sentence from that paragraph that Mr. DeSalvo did not read.

16:57  25  **A.**   The highlighted line?

MICHAEL LOHMAN - Redirect

16:57   1   **Q.**   No, the last sentence in the paragraph.

16:57   2   **A.**   "I knew this was" -- "I knew this was a bullshit story,

16:57   3   but I went along with it."

16:57   4   **Q.**   So it says in there:  "Lohman told the interviewers, 'I

16:57   5   knew this was a bullshit story, but I went along with it'"?

16:57   6   **A.**   Yes.

16:57   7   **Q.**   Is that consistent with what you told us this morning in

16:57   8   your direct examination?

16:57   9   **A.**   Yes.

16:57   10  **Q.**   Was it consistent with what was in your factual basis?

16:57   11  **A.**   Yes.

16:57   12  **Q.**   All right.  Let me ask you about that factual basis then

16:57   13  because Mr. Fleming asked you, "Where does it say in this

16:57   14  factual basis that you talked to every one of the shooters

16:57   15  involved?"  Do you remember that?

16:57   16  **A.**   Yes.

16:57   17  **Q.**   And he waived it around and he came up and brought it to

16:57   18  you; correct?

16:57   19           **MR. FLEMING:**  Objection to the characterization, Your

16:57   20  Honor.

16:57   21           **THE COURT:**  Let's go ahead and take our break.

16:57   22           **MS. BERNSTEIN:**  I'm sorry?

16:57   23           **THE COURT:**  This is a good time to go ahead and

16:57   24  break.

16:57   25           **MR. CARTER:**  But we're almost finished with this

MICHAEL LOHMAN - Redirect

16:57    1    point.

16:57    2         MS. BERNSTEIN:  May I ask this one question, Your

16:57    3    Honor, and then break?

16:57    4         THE COURT:  Well, we have an objection.  I'm going to

16:58    5    ask you to -- go ahead and rephrase the question.

16:58    6         MS. BERNSTEIN:  Yes.

16:58    7    BY MS. BERNSTEIN:

16:58    8    Q.   Do you remember him showing you the factual basis and

16:58    9    asking you to read it and tell him where in the factual basis

16:58   10    it says that you talked to all of the officers?

16:58   11    A.   Yes.

16:58   12    Q.   And you read it under pressure with an entire courtroom

16:58   13    looking at you; correct?

16:58   14    A.   Yes.

16:58   15         MS. BERNSTEIN:  May I approach, Your Honor?

16:58   16         THE COURT:  Yes.

16:58   17    BY MS. BERNSTEIN:

16:58   18    Q.   Directing your attention to page 11 of the factual basis.

16:58   19    Will you read the first sentence of the last paragraph?

16:58   20         MR. FLEMING:  Judge, I'm going to lodge an objection

16:58   21    to the mischaracterization of my question.  I had a very

16:58   22    specific other question.  That was not the question I asked.

16:58   23         THE COURT:  I think the jury understood the questions

16:58   24    that you asked.  I'll overrule and let him go ahead and refer

16:58   25    to that section.

MICHAEL LOHMAN - Redirect

16:58  1          **THE WITNESS:**  "During the course of the cover-up,

16:58  2   Defendant Lohman spoke to every shooter involved in the

16:58  3   incident and talked to them about their version of what

16:58  4   happened on the bridge."

16:58  5   **BY MS. BERNSTEIN:**

16:58  6   **Q.**   Is that consistent with what you said this morning?

16:58  7   **A.**   Yes.

16:58  8   **Q.**   Is it consistent with what you said this afternoon on

16:58  9   cross?

16:58  10          **MR. FLEMING:**  And I'm going to lodge another

16:59  11   objection as to having the witness state his opinion as to

16:59  12   whether that's consistent.  That's for the jury's

16:59  13   determination.

16:59  14          **THE COURT:**  Well, I'm going to sustain that

16:59  15   objection.  The jury can recall the testimony as it was given

16:59  16   and can recall the questions as given.

16:59  17          **MS. BERNSTEIN:**  And, Your Honor, I have quite a lot

16:59  18   of redirect.  Would you like me to keep going or save it for

16:59  19   tomorrow?

16:59  20          **THE COURT:**  Well, it's 5:00.  We're going to go ahead

16:59  21   and break at 5:00.

16:59  22              How long do you have tomorrow?

16:59  23          **MS. BERNSTEIN:**  My guess would be an hour.

16:59  24          **THE COURT:**  Okay.  All right.

16:59  25              We will start at 8:30.  If you could report to

| | | |
|---|---|---|
| 16:59 | 1 | 102 tomorrow morning.  Please, again, don't discuss anything |
| 16:59 | 2 | about the case or view any type of media reports about the |
| 16:59 | 3 | case. |
| 16:59 | 4 | Wait, wait, wait, wait.  When everybody gets up |
| 16:59 | 5 | at once, there's a lot of noise and the jury is still listening |
| 16:59 | 6 | to me, even though some of you in the courtroom are ready to |
| 16:59 | 7 | go. |
| 16:59 | 8 | So, please, do not listen to any media reports |
| 16:59 | 9 | about the case.  If you can be here ready to start at 8:30, we |
| 16:59 | 10 | will try to put in another full day tomorrow. |
| 16:59 | 11 | All right.  Thank you all very much. |
| 16:59 | 12 | **THE DEPUTY CLERK:**  All rise. |
| 17:00 | 13 | (WHEREUPON, the jury exited the courtroom.) |
| 17:00 | 14 | **THE COURT:**  Sir, if you could be up here at 8:30. |
| 17:00 | 15 | **THE WITNESS:**  Yes, sir. |
| 17:00 | 16 | **THE COURT:**  If you all would be seated. |
| 17:00 | 17 | Mr. Lohman, in the meantime you are not to |
| 17:00 | 18 | discuss your testimony, either today or your anticipated |
| 17:00 | 19 | testimony tomorrow, with anyone, including and especially |
| 17:00 | 20 | counsel for the government.  Is that clear? |
| 17:00 | 21 | **THE WITNESS:**  Yes, sir. |
| 17:00 | 22 | **THE COURT:**  Okay.  You can step down, sir. |
| 17:00 | 23 | All right.  Is there anything we need to cover |
| 17:00 | 24 | on the record? |
| 17:00 | 25 | **MR. FLEMING:**  There is, Your Honor, but I'd like to |

| | | |
|---|---|---|
| 17:00 | 1 | do so outside of the presence of the witness. |
| 17:01 | 2 | **THE COURT:** Okay. We'll do that in a second. |
| 17:01 | 3 | **MR. FLEMING:** Yes, Your Honor. |
| 17:01 | 4 | **THE COURT:** You all are going to submit something to |
| 17:01 | 5 | me -- you all on the defense side -- with regard to the |
| 17:01 | 6 | videotape; is that correct? |
| 17:01 | 7 | **MR. FLEMING:** Yes, Your Honor. |
| 17:01 | 8 | **THE COURT:** And when can I get that? |
| 17:01 | 9 | **MR. FLEMING:** I can e-mail that to Ms. Rogers this |
| 17:01 | 10 | evening, Judge. |
| 17:01 | 11 | **THE COURT:** Okay. When is the first opportunity or |
| 17:01 | 12 | time when you would intend to play that, do you know, on the |
| 17:01 | 13 | government's side? |
| 17:01 | 14 | **MS. BERNSTEIN:** We think the earliest would be after |
| 17:01 | 15 | Thursday. |
| 17:01 | 16 | **THE COURT:** Okay. |
| 17:01 | 17 | **MS. BERNSTEIN:** So I'm not sure whether that's Friday |
| 17:01 | 18 | or Tuesday. |
| 17:01 | 19 | **THE COURT:** That's fine. As long as we know we have |
| 17:01 | 20 | some time tomorrow. I don't want to get the memo from them and |
| 17:01 | 21 | then have you weigh in and then have them ready here to go |
| 17:01 | 22 | ahead and play it. So that's fine. |
| 17:01 | 23 | If you would like to submit something also on |
| 17:01 | 24 | that issue, you may do so either whenever you're ready, or if |
| 17:01 | 25 | you'd like to look at what the defendants have submitted. |

17:02   1              I've gone back and reviewed it again since we
17:02   2    discussed it this morning.  So...
17:02   3              MS. BERNSTEIN:  We would like to see their objection
17:02   4    and have a chance to respond to it.
17:02   5              THE COURT:  All right.  Do so very promptly.
17:02   6              MS. BERNSTEIN:  Yes, Your Honor.
17:02   7              THE COURT:  Anything else on the record?
17:02   8    Mr. Hessler?
17:02   9              MR. HESSLER:  Well, Your Honor, I was wondering if
17:02  10    you would request the government to give us a list of potential
17:02  11    witnesses for tomorrow so we can be efficient and move along.
17:02  12              THE COURT:  Okay.  Well, we have Mr. Lohman, who's
17:02  13    going to return for about an hour on redirect.  And then who
17:02  14    else can we expect in the morning?
17:02  15              MS. BERNSTEIN:  Your Honor, I would ask that we not
17:02  16    announce our witnesses in open court, but we'll provide that
17:02  17    information to the defense attorneys.
17:02  18              THE COURT:  Sure.  That's fine.  We can come up after
17:02  19    we close off the record.
17:02  20              Is there anything else that we need to put on
17:02  21    the record right now?
17:02  22              MR. FLEMING:  Yes, Judge.
17:02  23              THE COURT:  Okay.  Why don't we come on up and we'll
17:02  24    discuss it up here, counsel.  We'll do that on the record and
17:02  25    then we'll go off the record and discuss tomorrow.

17:02   1          (WHEREUPON, the following proceedings were held at

17:02   2    the bench.)

17:03   3          THE COURT:  All right.

17:03   4          MR. FLEMING:  Judge, at this time the defense would

17:03   5    move for a *Brady* -- make a motion for *Brady* material

17:03   6    specific -- I'm sorry -- specifically *Giglio* material in

17:03   7    response to Mr. Lohman's questions on cross-examination.

17:03   8          He had said he provided certain information to

17:03   9    Ms. Bernstein and to Mr -- Special Agent Bezak which were not

17:03   10   reflected in either the factual basis or the 302s.  If that is,

17:03   11   in fact, now true, I think we're entitled to that information.

17:03   12   If he, in fact, perjured himself just now.

17:03   13         MS. BERNSTEIN:  I'm not entirely sure I understand

17:03   14   what Mr. Fleming just said.

17:04   15         THE COURT:  Wait, wait.  Before you answer let me ask

17:04   16   to make sure that I understand.  I understood his testimony to

17:04   17   be that he had orally provided some information in addition to

17:04   18   what -- well, what should be reflected in the 302s.  You have

17:04   19   the 302s.

17:04   20         Is there a belief that there is more -- there

17:04   21   are more 302-type material that the government might possess?

17:04   22         MR. FLEMING:  Well, Mr. Lohman indicated he told the

17:04   23   government and Special Agent Bezak certain things which are not

17:04   24   reflected in any 302s and which are not in the factual bases,

17:04   25   and I would assume it would have been in the 302, but it would

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
| 17:04 | 1  | have been in the factual basis if, in fact, he had not -- if he          |
| 17:04 | 2  | had, in fact, told Ms. Bernstein and Mr. Bezak that                      |
| 17:04 | 3  | information.                                                             |
| 17:04 | 4  | I suspect he testified falsely and I think we're                         |
| 17:04 | 5  | entitled to that information under *Giglio*.                              |
| 17:04 | 6  | THE COURT:  Okay.  I understand.                                          |
| 17:04 | 7  | MS. BERNSTEIN:  We have turned over the 302s.  We                         |
| 17:04 | 8  | don't have any other 302s.  Obviously, I also disagree with the          |
| 17:05 | 9  | characterization that he testified inconsistently with what's            |
| 17:05 | 10 | in those 302s, and I think redirect will show that those are             |
| 17:05 | 11 | not inconsistencies.                                                     |
| 17:05 | 12 | THE COURT:  Well, as I understood his testimony, he                       |
| 17:05 | 13 | indicated that there were things that he said that were over             |
| 17:05 | 14 | and above the 302s that were not reflected in the 302s, putting          |
| 17:05 | 15 | aside the issue of whether his testimony was consistent with             |
| 17:05 | 16 | what is written by the agent.                                            |
| 17:05 | 17 | You know, recently, and I'm not -- I'm certainly                         |
| 17:05 | 18 | not citing this for authority, but recently there was an                 |
| 17:05 | 19 | article about the FBI's use of 302s and whether or not that was          |
| 17:05 | 20 | an outdated procedure, or whether or not those statements                 |
| 17:05 | 21 | should be recorded or not, or transcribed with a court                   |
| 17:05 | 22 | reporter, and I know there's two philosophies on that.                   |
| 17:05 | 23 | But be that as it may, all we have are the 302s.                          |
| 17:05 | 24 | The government is affirmatively representing to me and to                 |
| 17:05 | 25 | counsel that all 302s reflecting Mr. Lohman's statements to the          |

17:05   1   FBI have been produced.

17:05   2          So the record will stand that he has testified

17:05   3   that he has said things to FBI agents that might -- might be,

17:06   4   and I'm using the word "might," because I don't-- I haven't

17:06   5   paged through the 302s like you all have -- but that he has

17:06   6   testified to things that might be in addition to or over and

17:06   7   above that which was reflected in the written word on the 302.

17:06   8          All right.  So to the extent that your motion

17:06   9   has been satisfied by the government, and I an affirmative

17:06   10  representation by the government, I'll deny the motion as moot.

17:06   11         **MR. FLEMING:**  Okay.

17:06   12         **MS. BERNSTEIN:**  Thank you, Your Honor.

17:06   13         **THE COURT:**  Tomorrow.  Off the record.

17:10   14                    **(OFF THE RECORD)**

17:10   15         (WHEREUPON, the proceedings were adjourned for the

17:10   16  day.)

17

18

19

20

21

22

23

24

25

1                              *****

2                            __CERTIFICATE__

3            I, Jodi Simcox, RMR, FCRR, Official Court Reporter

4    for the United States District Court, Eastern District of

5    Louisiana, do hereby certify that the foregoing is a true and

6    correct transcript, to the best of my ability and

7    understanding, from the record of the proceedings in the

8    above-entitled and numbered matter.

9

10

11                            S/ Jodi Simcox, RMR, FCRR
                              Jodi Simcox, RMR, FCRR
12                            Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25