1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF LOUISIANA

3

4

5   UNITED STATES OF AMERICA        *    Docket 10-CR-204
                                    *
6   versus                          *    Section N
                                    *
7   KENNETH BOWEN                   *    New Orleans, Louisiana
    ROBERT GISEVIUS                 *
8   ROBERT FAULCON                  *    June 29, 2011
    ANTHONY VILLAVASO               *
9   ARTHUR KAUFMAN                  *    8:30 a.m.
    * * * * * * * * * * * * * * * *

10

11                        VOLUME V of XXVII
                       JURY TRIAL BEFORE THE
12                 HONORABLE KURT D. ENGELHARDT
                    UNITED STATES DISTRICT JUDGE

13

14  APPEARANCES:

15  For the United States:        U.S. Attorney's Office
                                  BY:  THEODORE CARTER, ESQ.
16                                500 Poydras Street
                                  New Orleans, Louisiana 70130

17

18
    For the United States:        U.S. Department of Justice
19                                Civil Rights Division
                                  BY:  BARBARA BERNSTEIN, ESQ.
20                                601 D Street NW
                                  Office PHB 5123
21                                Washington, D.C. 20004

22

23  For the United States:        U.S. Department of Justice
                                  Civil Rights Division
24                                BY:  CINDY K. CHUNG, ESQ.
                                  950 Pennsylvania Avenue NW
25                                Washington, DC 20530

```
 1    APPEARANCES:

 2    For Kenneth Bowen:          FRANK G. DESALVO, APLC
                                  829 Baronne Street
 3                                New Orleans, Louisiana 70113

 4

 5    For Robert Gisevius:        ERIC J. HESSLER, ESQ.
                                  700 Camp Street
 6                                New Orleans, Louisiana 70130

 7

 8    For Robert Faulcon:         PAUL C. FLEMING JR., ESQ.
                                  2821 Kingman Street
 9                                Suite C
                                  Metairie, Louisiana 70006
10

11

12    For Robert Faulcon:         King Krebs & Jurgens, PLLC
                                  BY:  LINDSAY A. LARSON III, ESQ.
                                  201 St. Charles Avenue
13                                45th Floor
                                  New Orleans, Louisiana 70170
14

15

16    For Anthony Villavaso:      DeSalvo Blackburn & Kitchens, LLC
                                  BY:  ROGER W. KITCHENS, ESQ.
                                  2802 Tulane Avenue
17                                New Orleans, Louisiana 70119

18

19    For Anthony Villavaso:      TIMOTHY A. MECHE, ESQ.
                                  700 Camp Street
20                                New Orleans, Louisiana 70130

21

22    For Arthur Kaufman:         STEVEN D. LONDON, ESQ.
                                  1100 Poydras Street
23                                Suite 2950
                                  New Orleans, Louisiana 70163
24

25
```

APPEARANCES:

Official Court Reporter:        Jodi Simcox, RMR, FCRR
                                500 Poydras Street
                                Room HB-406
                                New Orleans, Louisiana 70130
                                (504) 589-7780

Proceedings recorded by mechanical stenography; transcript

produced by computer.

1                          I N D E X

2                                                    Page

3

MICHAEL LOHMAN
4        Redirect Examination By Ms. Bernstein:          6

5   PATRICK CONAGHAN
         Direct Examination By Mr. Carter:             69
6        Cross-Examination By Mr. Hessler:            80
         Cross-Examination By Mr. Desalvo:            87
7        Cross-Examination By Mr. Meche:              88
         Cross-Examination By Mr. Larson:            113
8        Redirect Examination By Mr. Carter:         114

9   JENNIFER DUPREE
         Direct Examination By Ms. Bernstein:        128
10       Cross-Examination By Mr. Hessler:           207
         Cross-Examination By Mr. Desalvo:           234
11       Cross-Examination By Mr. London:            236
         Cross-Examination By Mr. Larson:            239
12       Redirect Examination By Ms. Bernstein:      246

13  JOSEPH MURRAY COUEY
         Direct Examination By Ms. Chung:            259
14       Cross-Examination By Mr. Meche:             267
         Cross-Examination By Mr. Fleming:           270
15
    JOSE HOLMES, JR.
16       Direct Examination By Ms. Bernstein:        272
         Cross-Examination By Mr. Hessler:           318
17

18

19

20

21

22

23

24

25

1        **<u>PROCEEDINGS</u>**

2        **(June 29, 2011)**

3        **(MORNING SESSION)**

4              **\*\*\*\*\*\***

5        **(COURT CALLED TO ORDER)**

6        **THE DEPUTY CLERK:**  All rise.

7        (WHEREUPON, the jury entered the courtroom.)

8        **THE COURT:**  All right.  You may be seated.

9              Once again, thank you for being on time and

10   ready to work.  You're giving us the opportunity to get out of

11   the gate a little bit earlier, which we greatly appreciate,

12   which will save some time in the end.

13             We left off right after we had commenced the

14   redirect examination by Ms. Bernstein of Mr. Lohman.

15             Mr. Lohman, sir, you're still under oath.

16        **THE WITNESS:**  Yes, sir.

17        **THE COURT:**  Have you discussed anything about your

18   testimony since we broke yesterday up until this moment with

19   anyone?

20        **THE WITNESS:**  No, sir.  No, sir.

21        **THE COURT:**  All right.

22             Ms. Bernstein, let's go ahead and begin the

23   redirect.

24             We had an objection at the end of the day

25   yesterday and I'm going to give a cautionary instruction that

MICHAEL LOHMAN - Redirect

1    really is in response to the objection.

2             But when directing a witness to prior testimony

3    or to a prior question that was asked on cross, I will ask --

4    and this applies to everybody, not just in this instance that

5    we're about to hear -- I'll ask not to try to repeat or

6    paraphrase a question or answer, but rather to direct his

7    testimony to the topic or the specific subject matter that was

8    inquired about on cross.  So that way we can avoid an issue.

9             Because there are going to be multiple times

10   where someone is going to object and say, "That's not exactly

11   what he said," or, "That's not exactly the question that I

12   asked."  So I think it would be much better and fairer if we

13   direct him to passages of testimony or a particular topic that

14   a witness was asked about and then ask your questions as

15   opposed to trying to parrot something that has already been

16   heard by the jury.

17             So if we could proceed in that fashion.

18             Ms. Bernstein.

19         **MS. BERNSTEIN:**  Thank you, Your Honor.

20             (WHEREUPON, **MICHAEL LOHMAN**, having been previously

21   duly sworn, testified as follows.)

22                       **REDIRECT EXAMINATION**

23   BY MS. BERNSTEIN:

24   **Q.**   Good morning, Mr. Lohman.

25   **A.**   Good morning.

MICHAEL LOHMAN - Redirect

1  Q.   You were asked a lot of questions yesterday and I have a
2  lot of follow-up questions today.  And I'm going to try to make
3  it clear, like the judge has just suggested, which part of the
4  testimony from yesterday I'm asking about.
5          Early on yesterday, Mr. London asked you some
6  questions about how many hours you had prepared for your
7  testimony.  Do you remember that?
8  A.   Yes.
9  Q.   And then there were some questions about how many hours
10 you had met with the federal government.  Do you remember that?
11 A.   Yes.
12 Q.   Do you remember what the estimate was that you gave?
13 A.   25 -- 28 to 30 hours, I believe.
14 Q.   When you said 28 to 30 hours, was that in preparation for
15 this trial?
16 A.   No.  Could I say -- he summarized it up by saying roughly
17 28 to 30 hours and I agreed with that.  I said for preparation
18 for the trial, I believe we met on three occasions.
19 Q.   And those hours that he had you summarize, what time span
20 did that cover?
21 A.   The -- well, I told him that we had met a total of, I
22 believe, seven times, and then that's when he summarized it up
23 by saying 28 to 30 hours.  And when I said seven times, I was
24 referring to meetings prior to preparation when I was still
25 giving you statements and also the three meetings that we had

MICHAEL LOHMAN - Redirect

1   in preparation.

2   **Q.**   So from what date to what date did that cover?

3   **A.**   That would have been from May of '09 until last week.

4   **Q.**   So that's --

5   **A.**   This week.

6   **Q.**   -- two years and two months?

7   **A.**   Yes.

8   **Q.**   So 26 months?

9   **A.**   Yes.

10  **Q.**   And that includes -- does that include the meetings when

11  you first lied to us?

12  **A.**   Yes.

13  **Q.**   Does it include the meetings when you gave us those

14  reports?

15  **A.**   Yes.

16  **Q.**   Does that include the time you spent walking through those

17  reports with us?

18  **A.**   Yes.

19  **Q.**   So it wasn't in preparation for this trial?

20  **A.**   No.

21  **Q.**   You were asked a bunch of questions yesterday about dates

22  on NOPD reports.  Do you remember that?

23  **A.**   Yes.

24  **Q.**   I want to see if you can clarify some things.

25          **MS. BERNSTEIN:**  Can we have Exhibit 35, please?

MICHAEL LOHMAN - Redirect

1   BY MS. BERNSTEIN:

2   Q.   Exhibit 35, is that the 7-page report that you talked

3   about yesterday?

4   A.   Yes.

5   Q.   Who wrote this report?

6   A.   Kaufman, is my understanding.

7   Q.   And I'm going to ask you to try to talk into the

8   microphone.

9   A.   I'm sorry.

10  Q.   All right.  And who told you -- did you talk to Kaufman

11  about who wrote this report?

12  A.   Kaufman told me that he wrote that report, yes.

13          MS. BERNSTEIN:  Can we zoom in on the highlighted

14  part?

15  BY MS. BERNSTEIN:

16  Q.   And this page that we're looking at is a typical cover

17  page for an NOPD report; right?

18  A.   Yes, it is.

19          MS. BERNSTEIN:  Actually, I'm sorry.  Can we zoom

20  back out and look at the whole page again?

21  BY MS. BERNSTEIN:

22  Q.   This is the cover page that goes on all NOPD reports?

23  A.   Yes.

24  Q.   Is there any way, looking at an NOPD report, the way NOPD

25  operates, is there any way to look at a report and say when it

MICHAEL LOHMAN - Redirect

1   was actually turned in?

2   **A.**   No.  It's not dated in that manner, no.

3   **Q.**   Okay.  And that's just a thing that NOPD does, is they

4   don't date their reports; right?

5   **A.**   Yes.

6   **Q.**   All right.  So let's look at the "Date" section there.

7   There's a box at the top of this form that says "Date/Time

8   Occurred."  What's supposed to go in that box?

9   **A.**   The date and time that the incident occurred, when it took

10  place.

11  **Q.**   All right.  And right under it there's a box that says,

12  "Date/Time of Report."  Now, somebody might think that that

13  means the date and time the report is submitted; right?

14  **A.**   Yes.

15  **Q.**   Is that what it means?

16  **A.**   No.

17  **Q.**   What does it mean?

18  **A.**   What it typically means is the date and time of report

19  would be when you started writing the report.  And in many

20  cases, such as this one, you would have started putting --

21  taking your notes and putting together the report on the scene

22  at the same time it occurred and when you responded to the

23  scene.

24  **Q.**   And here on this report that Defendant Kaufman wrote, it

25  has the exact same date and time for the time of occurrence and

MICHAEL LOHMAN - Redirect

1   the time of the report; right?

2   A.   Yes, it does.

3   Q.   But everybody agrees it wasn't written at the moment of

4   the incident; correct?

5   A.   Yes.

6   Q.   Okay.

7          MS. BERNSTEIN:   Can we zoom back out, please?

8   BY MS. BERNSTEIN:

9   Q.   Did NOPD at one time have a way that you could actually

10  tell when a report was submitted?

11  A.   There was never -- to my knowledge, in my time on the job,

12  there was never a box on the report or a face sheet where you

13  indicated when the report was submitted.

14         The only thing I was aware of was a report log that

15  many districts kept, and some divisions kept them, some didn't,

16  where when the report was turned in, you logged it into your --

17  into the report log saying it was turned in on this date and

18  you check it off whether it was approved or returned for

19  corrections.

20  Q.   Okay.  So would you agree that box that says "Date of

21  Report" is a somewhat useless box?

22  A.   Yes.

23  Q.   All right.  You were asked a bunch of questions yesterday

24  about whether these various reports you talked about were

25  written before or after the case got assigned to Sergeant

MICHAEL LOHMAN - Redirect

1   Dugue.  Do you remember that?

2   A.   Yes.

3   Q.   Do you know precisely when Dugue was assigned to the case?

4   A.   I believe in November, early or mid-November.

5   Q.   Did you have anything to do with him being assigned?

6   A.   No.

7   Q.   Were you present when he was assigned?

8   A.   No.

9   Q.   Now, in your experience, do people sometimes get assigned

10  to a case before they actually start working on it?

11  A.   Yes, that could happen.

12  Q.   For example --

13          MS. BERNSTEIN:  I'm sorry, can we have that exhibit

14  up again?

15  BY MS. BERNSTEIN:

16  Q.   When did Defendant Kaufman get assigned to this case?

17  A.   The day of the incident on September 4, 2005.

18  Q.   When did he actually submit a report?

19  A.   Sometime in October.

20  Q.   And even though he didn't submit a report until sometime

21  in October, what was the date on that report?

22  A.   September 4, 2005.

23  Q.   Now, when you testified yesterday that, in your belief,

24  all of these reports were written before Dugue took over, what

25  were you using as your reference point for when Dugue took

MICHAEL LOHMAN - Redirect

1  over?

2  A.   I know the 32-page report and the 46-page report and the

3  17-page report were all -- I had possession of those reports

4  prior to Dugue taking over.  And the only real conversation I

5  ever had with Dugue was, when he was assigned the case, he

6  contacted me, actually came to the 7th District, and I spoke to

7  him at the Crystal Palace, and it was in reference to obtaining

8  a copy of the report, which hadn't been completed yet, Kaufman

9  was still working on it.

10 Q.   And let me ask you again about the different types of

11 reports.  What kind of report did Sergeant Dugue want to get

12 from you?

13 A.   The incident report.

14 Q.   When this case was taken out of the 7th District and

15 assigned to homicide, what kind of report was homicide going to

16 do?

17 A.   A supplemental report.

18 Q.   And you mentioned yesterday that that incident report is

19 supposed to come immediately and then the supplemental report

20 contains the investigation?

21 A.   Yes, that's the way it's supposed to work.

22 Q.   Once this case, whatever day it got transferred from the

23 7th District to homicide, could homicide have written an

24 incident report?

25 A.   No.  I mean, if the -- the incident report was already

MICHAEL LOHMAN - Redirect

1  written by that time when it was submitted to the --
2  transferred to the Homicide Division.
3  Q.   Uh-huh.
4  A.   The incident report would have already been completed by
5  that time.
6  Q.   Who has to write the incident report?  Does it have to be
7  written by people who are around at the incident?
8  A.   Yes.
9  Q.   Was anybody from homicide around at the incident?
10  A.   No.
11  Q.   So no matter what, that incident report had to be written
12  by people out of the 7th District; is that fair?
13  A.   Yes, yes.
14  Q.   You were asked some questions yesterday by Mr. DeSalvo
15  about who does and doesn't write a report under NOPD rules.  Do
16  you remember that?
17  A.   Yes, I do.
18  Q.   And I think he asked you if the person involved in an
19  incident writes a report.  Do you remember that?
20  A.   Yes, I do.
21  Q.   Does the lieutenant on a scene traditionally write a
22  report?
23  A.   Not traditionally, no.
24  Q.   What does the lieutenant on the scene do?
25  A.   His job is to supervise the scene, to delegate the

MICHAEL LOHMAN - Redirect

1   investigation to the subordinates and make sure that they
2   conduct the investigation.
3   **Q.**   Who then writes the report?
4   **A.**   In the instance of a police shooting, it would be the
5   sergeant.
6   **Q.**   All right.  I want to talk about these reports.  There
7   were a lot of questions yesterday about a lot of different
8   reports.  So I want to see if you can walk us thru the
9   different reports very carefully, and I think you have three of
10  the reports sitting in front of you; is that right?
11  **A.**   Yes.
12  **Q.**   You have the 32-page, the 46-page, and the 17-page?
13  **A.**   Yes.
14  **Q.**   And for the record, that's Exhibit 38, 37 and 39,
15  respectively.
16           All right.  I'd like you to walk us through the
17  chronology.  What's the first report that you ever saw?
18  **A.**   The first report that was submitted to me was the 32-page
19  report.
20  **Q.**   Who submitted that report to you?
21  **A.**   Kaufman.
22  **Q.**   What did you do with it?
23  **A.**   I read it, I made handwritten notes on it, and I returned
24  it to Kaufman to make changes.  I spoke with Kaufman.  I spoke
25  with Gisevius and Bowen and it was returned to --

MICHAEL LOHMAN - Redirect

1          **MR. LONDON:**  Judge, may I object?  May we approach?

2          **THE COURT:**  Yes.

3          (WHEREUPON, the following proceedings were held at

4  the bench.)

5          **MR. LONDON:**  Judge, this is redirect.  She has gone

6  over her whole case in chief, which is patently unfair when we

7  can't get up to say another word.  And she's dragging him

8  through the whole, "What was your first thought when you" --

9  "first conscious thought."

10          This is redirect, specifically, but not

11  narrative versions about, "Take me through your whole," you

12  know...

13          **THE COURT:**  Well, we covered this in cross in

14  considerable detail -- I know you did, Mr. London -- so I'm

15  going to ask you to --

16          **MS. BERNSTEIN:**  I'll be quick.

17          **THE COURT:**  -- not to get him to give a

18  narrative-type answer.  Let's direct him to the issue that was

19  raised on cross as opposed to getting him to recite A through Z

20  again.

21          **MS. BERNSTEIN:**  I would love to do that.  That would

22  move it faster.

23          **THE COURT:**  But we did spend a lot of time on this,

24  and it's a very important issue that you raised with him.  So

25  I'm going to overrule the objection, but I -- again, I hope

1   we're not going to go through what we did in direct.  We did
2   cover it on direct, so --
3           **MS. BERNSTEIN:**  We did.  And I'd ask the Court, just
4   recognize this is a very important issue that was very much
5   muddled over five hours.  So I just want to walk through,
6   clarify it, and then we'll move on.
7           **MR. LONDON:**  And my only objection was he has a
8   tendency to say, "Yes," and then three paragraphs or 14 minutes
9   later he's done answering the question.
10           **THE COURT:**  Well, I've admonished him yesterday and
11   will do so again if he continues.  So let's try to get him to
12   answer specific questions; and if he doesn't do that, I will
13   ask him to do it again.  But I'm going to overrule the
14   objection.
15           Let's see if we can expedite --
16           **MR. LONDON:**  That's fine.  I'll withdraw the
17   objection.
18           **THE COURT:**  -- chapter 1 all the way through the end.
19           **MR. LONDON:**  Thank you, Judge.
20           **THE COURT:**  Thank you.
21           (WHEREUPON, the following proceedings were held in
22   open court.)
23   **BY MS. BERNSTEIN:**
24   Q.    All right.  Mr. Lohman, I'd like you to walk us through
25   the chronology of the various reports.  You just said the first

MICHAEL LOHMAN - Redirect

1  report you got was the 32-page report; correct?

2  A.    Yes.

3  Q.    Who gave that to you?

4  A.    Kaufman.

5  Q.    What's the second report you got?

6  A.    The second report I got was the 46-page report.

7  Q.    Who gave that to you?

8  A.    Kaufman.

9  Q.    What's the third report that was created?

10  A.    The 17-page report, which I authored.

11  Q.    And did you author that completely on your own?

12  A.    No, with the assistance of Kaufman, Bowen, and Gisevius.

13  Q.    And that's the report -- an initial report or a

14  supplemental report?

15  A.    It's an incident report, initial report.

16  Q.    Incident report, initial report.

17         That's the report that you thought got submitted?

18  A.    Yes.

19  Q.    Was it submitted?

20  A.    No, it was not.

21  Q.    Who was in charge of deciding whether or not that report

22  got submitted?

23  A.    Once I turned it over to Kaufman, it would have been

24  Kaufman.

25  Q.    And what did you find out -- what did you find out

MICHAEL LOHMAN - Redirect

1  happened to that 17-page report?

2  **A.**   Later I found out that the 17-page had not been submitted.

3  It had been replaced with a 7-page report.

4  **Q.**   Who authored the 7-page report?

5  **A.**   Kaufman.

6  **Q.**   Who told you that Kaufman authored the 7-page report?

7  **A.**   He did.

8  **Q.**   So that's the 32, 46, 17, and 7?

9  **A.**   Yes.

10 **Q.**   There were also questions yesterday about an official

11 final 54-page report?

12 **A.**   Yes.

13 **Q.**   Did you have anything to do with writing that report?

14 **A.**   No, I did not.

15 **Q.**   What's your understanding of who wrote that report?

16 **A.**   Kaufman and Dugue.

17 **Q.**   After the case went over to homicide?

18 **A.**   Yes.

19 **Q.**   And that last report, is that an incident or initial

20 report, or is it a supplemental report?

21 **A.**   Supplemental.

22 **Q.**   I want to ask you a couple follow-up questions about your

23 17-page report.  You were asked a bunch of questions yesterday

24 about statements that you've made about whether or not you

25 wrote that report.  Do you remember a bunch of questions

MICHAEL LOHMAN - Redirect

1   yesterday?

2   **A.**   Yes.

3   **Q.**   Who prepared the 17-page report?

4   **A.**   I did.

5   **Q.**   Is that what you said yesterday morning in court?

6   **A.**   Yes.

7   **Q.**   Is that what you said yesterday afternoon in court?

8   **A.**   Yes.

9   **Q.**   Is that what you said in your factual basis?

10  **A.**   Yes.

11  **Q.**   Have you ever said differently?

12  **A.**   No, I haven't.

13  **Q.**   Now, in your testimony you explained that you didn't write

14  that report totally from scratch; right?

15  **A.**   No, no.

16  **Q.**   How did you write it?

17  **A.**   I typed over much of what was there, and what I did was

18  cut and paste and type over information that was already

19  contained in the 32-page or the 46-page report.

20  **Q.**   So when you say "cut and paste," you were actually working

21  on a computer?

22  **A.**   Yes.

23          **MR. FLEMING:**  I'm going to object to the leading

24  nature of the question.

25          **THE COURT:**  Yes, let's not lead the witness.  This is

MICHAEL LOHMAN - Redirect

1  redirect.

2  **BY MS. BERNSTEIN:**

3  **Q.**   Now, you were asked yesterday, I believe it was

4  Mr. London, asked you yesterday specifically whether your

5  testimony in court was the first time you've ever said that

6  you've had input from other people on that report.  Do you

7  remember that?

8  **A.**   Yes, I do.

9  **Q.**   Do you remember him showing you your 302?

10  **A.**   Yes.

11        **MS. BERNSTEIN:**  May I approach, Your Honor?

12        **THE COURT:**  Yes.

13        **MR. FLEMING:**  Judge, may we inquire as to which 302

14  and which page?

15        **THE COURT:**  Yes.  Which one, which page or date?

16  **BY MS. BERNSTEIN:**

17  **Q.**   Do you remember him showing you your 12/18/09 302?

18  **A.**   Yes.

19  **Q.**   And is this -- the 302 is an FBI report of the interview

20  that you did with the FBI; right?

21  **A.**   Yes, it is.

22  **Q.**   And this 12/18/09 interview is the one that Mr. DeSalvo

23  referred to as your "first truth, whole truth, and nothing but

24  the truth" interview; correct?

25  **A.**   Yes.

MICHAEL LOHMAN - Redirect

1   **Q.**   All right.  Do you remember him showing you a paragraph
2   from that report and pointing out that you told the FBI that
3   after reviewing the 46-page report, you wrote the 17-page
4   report?
5   **A.**   Yes.
6   **Q.**   And reading the sentence to you that you admitted to the
7   FBI that your 17-page report was intended to be a better
8   cover-up than Kaufman's 32-page and 46-page report?
9   **A.**   Yes.
10  **Q.**   Can you read the next three sentences from that report
11  that he did not have you read?
12  **A.**   "Lohman did not create anything on his own.  Lohman used
13  the information in Kaufman's reports and information he
14  received from officers involved in the incident to write the
15  report.  Lohman was working off of a floppy disk or a thumb
16  drive when he wrote the 17-page report."
17  **Q.**   So that's something you made clear in your first "truth,
18  whole truth, nothing but the truth" interview with the FBI?
19          **MR. FLEMING:**  Judge, I'm going to object to the
20  leading nature of the question.
21          **THE COURT:**  Yes, let's not lead the witness, please.
22  This is the second time the objection's been made, and it's
23  been sustained a second time.
24          **MS. BERNSTEIN:**  May we approach one second, Your
25  Honor?

MICHAEL LOHMAN - Redirect

1              **THE COURT:**  The more we approach, the longer it's

2    going to take.  If it's to discuss what I just said, no.

3              **MS. BERNSTEIN:**  No, we can -- I can hold it.

4              **THE COURT:**  Let's move on.

5    **BY MS. BERNSTEIN:**

6    **Q.**   You said you have those three reports in front of you;

7    right?

8    **A.**   Yes, I do.

9    **Q.**   You were asked some questions yesterday about the headers

10   and the footers.

11   **A.**   Yes.

12   **Q.**   Are the -- tell me about the headers on those three

13   reports.  Are they the same or are they different?

14   **A.**   The same.

15   **Q.**   Why are the headers on those reports the same?

16   **A.**   It was a format -- a narrative format that was used on the

17   computer that they typed on.

18   **Q.**   Why are the head- -- are the footers also the same?

19   **A.**   The what?

20   **Q.**   The footers, the stuff at the bottom.

21   **A.**   Yes.  Yes, they're the same also.

22   **Q.**   And one of those reports you're looking at is the 17-page

23   report that you said you -- that you wrote; right?

24   **A.**   Yes.

25   **Q.**   Why are the headers and footers on that 17-page report the

MICHAEL LOHMAN - Redirect

1   same?

2   **A.**   Because it's -- I typed over what was there.  I cut and

3   pasted from what was already in the reports.

4   **Q.**   All right.  Now, there were some very pointed questions to

5   you yesterday about whether you wrote the 46-page report.  Do

6   you remember that?

7   **A.**   Yes, I do.

8   **Q.**   And do you remember Mr. London pointing out a similarity

9   between the 46-page report and the 17-page report that you

10  typed?

11  **A.**   Yes.

12  **Q.**   And that similarity was the word, "wharf" misspelled,

13  W-A-R-F; correct?

14  **A.**   Yes.

15  **Q.**   And that first appeared in the 46-page report; right?

16  **A.**   Yes, it did.

17        **MR. MECHE:**  Objection, Your Honor.  I think she's

18  still leading the witness.

19        **MS. BERNSTEIN:**  I'm just trying to direct him to the

20  specific question.

21        **THE COURT:**  Well, this is something that he's already

22  said, so technically, she is.  I don't think it's fair to cite

23  him back to something he's already said that's not disputed.

24  So let's go ahead.

25

MICHAEL LOHMAN - Redirect

1   BY MS. BERNSTEIN:

2   Q.    So on that 46-page report where the word W-A-R-F appears,

3   who wrote that 46-page report?

4   A.    Kaufman.

5   Q.    Who wrote the word W-A-R-F?

6   A.    Kaufman.

7   Q.    When you wrote your 17-page report, what did you use as

8   the foundation?

9   A.    The reports that Kaufman had already submitted to me --

10  Q.    What was the last --

11  A.    -- the 46-page --

12  Q.    What was the last report that had been submitted to you by

13  Kaufman before you wrote the 17?

14  A.    The 46-page report.

15  Q.    How did the word W-A-R-F get in your report?

16  A.    Apparently, when I was typing over or cutting and pasting

17  from the 46-page report, it was also contained in the 17-page

18  report.

19  Q.    Mr. London asked you yesterday about a statement you made

20  saying that you never talked to officers about what actually

21  happened.  Do you remember those questions?

22  A.    Yes.

23  Q.    Did you have conversations with the officers about the

24  shooting?

25  A.    Yes.

MICHAEL LOHMAN - Redirect

1   **Q.**   Did you have conversations with officers about those
2   reports?
3   **A.**   Yes.
4   **Q.**   Can you guesstimate a number for us about how many
5   conversations you had from September 4th to, say,
6   January 1st about what happened on the bridge or about what was
7   going to go in those reports?
8   **A.**   I couldn't accurately give you a number, but I could say
9   numerous conversations.
10  **Q.**   Are we talking tens or hundreds?  Can you give us any sort
11  of estimate?
12  **A.**   Maybe a hundred.
13  **Q.**   Were those maybe-hundred conversations about what actually
14  happened on the bridge?
15  **A.**   No.
16  **Q.**   What were they about?
17  **A.**   About how to justify what happened on the bridge.
18  **Q.**   And when you were covering -- when you were talking to
19  these people, did you ever say, "Now, wait a minute, tell me
20  what actually happened"?
21  **A.**   No.
22  **Q.**   For the purposes of what you all were doing, did it matter
23  what actually happened?
24  **A.**   No, it didn't because it didn't justify the actions.
25  **Q.**   Mr. London also asked you a series of questions comparing

MICHAEL LOHMAN - Redirect

1   the 32-page report that Kaufman wrote to the 54-page report

2   that was officially submitted in this case.  Do you remember

3   that?

4   A.   Yes.

5   Q.   And he asked you whether there were any differences

6   between -- and to be fair, he called it Kaufman's 32 pages of

7   notes -- any differences between that and the 54-page official

8   report.  Do you remember those questions?

9   A.   Yes, I do.

10  Q.   Let's look at those reports.

11            MS. BERNSTEIN:  Can I have the 32-page report,

12  please?  Exhibit 38, for the record.

13            May I have page 32 of that, please, which I

14  think is page 31 of the exhibit?

15            For the record, we're looking at page 32 of the

16  report.

17            Can you zoom in on the highlighted part, please,

18  Mr. Harrell?

19  BY MS. BERNSTEIN:

20  Q.   That's what you talked about yesterday, we refer to it as

21  the "blame paragraph"; right?

22  A.   Yes.

23  Q.   Do you know if that blame paragraph is in the final

24  54-page report?

25  A.   I don't believe it is, no.

MICHAEL LOHMAN - Redirect

1          **MS. BERNSTEIN:**  May I have page 20 of the 32-page
2    report from Mr. Kaufman?
3               And I'm sorry, page 20 of the report.  Thank
4    you.
5    **BY MS. BERNSTEIN:**
6    **Q.**   In the 32-page report -- in the 32-page report, how was
7    that boy who was taken into custody on the bridge referred to?
8    **A.**   "A young black male, later identified as Leonard
9    Bartholomew, Jr."
10   **Q.**   And do you know where that name "Leonard Bartholomew,
11   Jr.," is in the final official 54-page report?
12   **A.**   No, it's not.
13          **MS. BERNSTEIN:**  May I have the 32-page report and the
14   54-page report side by side, please?
15               On the left, we have Exhibit 38, the 32-page
16   report.  And may I have page 29, please, which I think will be
17   page 28 of your exhibit?
18               On the left, the 32-page.  May I have page 28 of
19   the exhibit, please?
20               And on the right, may I have page 8, please?
21               Can we zoom in on those two highlighted
22   sections?
23   **BY MS. BERNSTEIN:**
24   **Q.**   In the 32-page report, who does it say returned to the
25   bridge on Sunday, September 5th, when the gun was found?

MICHAEL LOHMAN - Redirect

1    **A.**   Kaufman and Lehrmann.

2    **Q.**   According to the official 54-page report, who confiscated

3    the weapon?

4    **A.**   Kaufman.

5    **Q.**   That 32-page report that Defendant Kaufman submitted to

6    you, is that a true and accurate report?

7    **A.**   No, it is not.

8    **Q.**   How about the 54-page report?

9    **A.**   No, it is not.

10   **Q.**   How about the 46-page report?

11   **A.**   No.

12   **Q.**   17-page?

13   **A.**   No, it isn't.

14   **Q.**   7?

15   **A.**   No, it isn't.

16   **Q.**   Is there any true and accurate report in this case?

17   **A.**   No, there isn't.

18   **Q.**   Mr. London asked you yesterday whether you saw Defendant

19   Kaufman talking to a black male and a black female on the day

20   of the shooting.  Do you remember that?

21   **A.**   Yes, I do.

22   **Q.**   Which side of the bridge did you see him talking to those

23   people?

24   **A.**   The west side.

25   **Q.**   Both of them were on the west side?

MICHAEL LOHMAN - Redirect

1  A.   Yes.

2  Q.   Did you ever see him talk to a civilian on the east side?

3  A.   No, I did not.

4        MS. BERNSTEIN:   May I have Exhibit 38, please?

5             I'm going to challenge you here, may I have page

6  9 and 10 side by side?

7  BY MS. BERNSTEIN:

8  Q.   You're aware from the reports that Mr. Kaufman claims to

9  have talked to two civilians on the bridge that day or near the

10 scene that day?

11 A.   Yes, I am.

12 Q.   One a black female and one a black male?

13 A.   Yes.

14        MS. BERNSTEIN:   All right.  Can we zoom in on this

15 paragraph in Defendant Kaufman's report about what a person

16 named James Youngman allegedly said?

17 BY MS. BERNSTEIN:

18 Q.   Can you read that?

19 A.   "Youngman stated he observed several black males shooting

20 at the police officers near Downman Road, then fleeing over the

21 bridge.  Youngman advised that he also observed the police

22 officers return fire and chase the two males over the Danziger

23 Bridge to the 3rd Police District side.  This was a brief

24 verbal statement.  Officers were unable to obtain any audio or

25 video statement due to post-storm conditions and the

MICHAEL LOHMAN - Redirect

1    unavailability of technical support."

2    **Q.**    Thank you.

3    **MS. BERNSTEIN:**  Mr. Harrell, can you zoom in on the

4    section at the bottom there?

5    **BY MS. BERNSTEIN:**

6    **Q.**    Can you read, please, Mr. Lohman, what Defendant Kaufman

7    claimed Lakeisha Smith said that day?

8    **A.**    "Ms. Smith stated she evacuated from her residence to the

9    Friendly Inn at 4861 Chef Menteur Highway.  Ms. Smith stated

10   she was on the second floor balcony of the Friendly Inn when

11   she observed police officers pursuing two black male subjects.

12   Ms. Smith stated she immediately recognized the two males as

13   those who had been looting and robbing people after the storm.

14         "Ms. Smith stated she observed the police chase one

15   male, clad in a light colored shirt and blue jeans, into the

16   motel.  Ms. Smith stated she observed the male reach into his

17   waistband and turn towards the street.  Ms. Smith stated she

18   heard gunshots and the male fell to the ground.  Ms. Smith

19   observed the second male, later identified as Lance Madison,

20   clad in all black, flee towards the rear of the motel complex.

21         "Ms. Smith advised Sergeant Kaufman that she was in

22   the process of relocating to Dallas, Texas, to live with her

23   sister at an unknown address.

24         "Further, this was a brief verbal statement.

25   Officers were unable to obtain any audio or videotape

MICHAEL LOHMAN - Redirect

1    statements due to post-storm conditions due to the
2    unavailability of technical support."
3    **Q.**   Mr. Lohman, if two eyewitnesses to the shooting existed,
4    how important would they be?
5    **A.**   They would be very important.
6    **Q.**   They would help the officers?
7    **A.**   Yes, they would.
8    **Q.**   Now, that day on the bridge, on the scene that day, did
9    you talk to Defendant Kaufman about concerns you had about the
10   shooting?
11   **A.**   Yes, we did.
12   **Q.**   What was the biggest concern that you expressed?
13   **A.**   The lack of a gun.
14   **Q.**   When you talked about your concern about the lack of a
15   gun, what was Defendant Kaufman's solution?
16   **A.**   That he had a gun he could put on the scene.
17   **Q.**   What do you mean "put on the scene"?
18   **A.**   Plant on the scene to make it appear as though the wounded
19   individuals were armed.
20   **Q.**   So his suggestion was that he could plant a gun?
21   **A.**   Yes.
22   **Q.**   In response to your concern about guns, did he say, "Don't
23   worry, I want you to come meet this gal named Lakeisha Smith"?
24   **A.**   No.
25   **Q.**   Did he introduce you to a guy named James Youngman?

MICHAEL LOHMAN - Redirect

1   A.   No.

2   Q.   Did he bring those people back to the police station?

3   A.   No.

4   Q.   Were other civilians brought from the scene, from the

5   bridge, back to the makeshift station?

6   A.   Yes, they were.

7   Q.   So you all had the ability to do that?

8   A.   Yes, we did.

9   Q.   Did Defendant Kaufman get a written statement from these

10  people?

11  A.   No.

12  Q.   Did he have paper and pen or pencil; do you know?

13  A.   Yes.

14  Q.   How do you know that?

15  A.   It was available.  Paper and pens were readily available.

16  That was one thing we did have.

17  Q.   And what was his response to your gun concern?

18  A.   Placing one on the scene.

19  Q.   You were asked a series of questions yesterday about

20  whether you had ever investigated a police shooting where

21  somebody was shot.  Do you remember that?

22  A.   Yes, I do.

23  Q.   And you were also asked whether Defendant Kaufman, to your

24  knowledge, had ever investigated a police shooting where

25  someone was shot.  Do you remember that?

MICHAEL LOHMAN - Redirect

1   **A.**   Yes, I do.

2   **Q.**   And I'm going to put a couple questions together because

3   you were also asked a series of questions about your

4   conversation when you reached out to see if homicide unit was

5   going to come to the scene; right?

6   **A.**   Yes.

7   **Q.**   What were you told when you asked for homicide to come to

8   the scene?

9   **A.**   That they weren't available and they were not responding

10  to the scene.

11  **Q.**   And Mr. London asked you if they told you they were never

12  coming.  Do you remember that?

13  **A.**   Yes.

14  **Q.**   If you had asked for them to come and they had said, "No,

15  never," would that have struck you as strange?

16  **A.**   Yes, that would have been odd.

17  **Q.**   Did you think that homicide was coming?

18  **A.**   No, I did not.

19  **Q.**   Did you think they were coming in an hour?

20  **A.**   No.

21  **Q.**   Did you think they were going to come later that night?

22  **A.**   No.

23  **Q.**   Did you think they were going to come tomorrow?

24  **A.**   No.

25  **Q.**   Do you know that crime scene and homicide, in fact, went

MICHAEL LOHMAN - Redirect

1    out there some maybe six weeks later?

2    A.    Yes, I do know.

3    Q.    If they had said on the radio that day --

4            MR. LONDON:  Objection, Judge, to this continuing

5    leading of the witness.

6            MS. BERNSTEIN:  That wasn't leading.

7            THE COURT:  Well, she didn't finish the question.

8    It's kind of hard for me to evaluate whether it was leading or

9    not, but I think we are getting a little afield of -- I think

10   you've covered what was asked with the regard to that point.

11           So if the next question -- we did get far enough

12   into it to realize that it might be a hypothetical.  So I'll

13   caution you not to ask a hypothetical in that regard.

14   BY MS. BERNSTEIN:

15   Q.    Once you found out that homicide was not coming to the

16   scene, what was supposed to happen to that evidence?

17   A.    I assigned the case to Kaufman and the evidence was still

18   supposed to be collected.  We were supposed to collect it.

19   Q.    Is it ever appropriate just to leave it there?

20   A.    No.

21   Q.    Did you leave it there?

22   A.    Yes.

23   Q.    Why?

24   A.    It was all part of the cover-up.

25   Q.    You were asked yesterday whether you and Defendant Kaufman

MICHAEL LOHMAN - Redirect

1   had, quote, crime scene equipment, with you that day.  Do you
2   remember those questions?
3   **A.**   Yes, I do.
4   **Q.**   What equipment does it take to draw a sketch?
5   **A.**   Pencil and paper.
6   **Q.**   Did you all have access to pencil and paper?
7   **A.**   Yes, we did.
8   **Q.**   What equipment does it take to pick a casing up off the
9   ground?
10  **A.**   No equipment to pick it up.  It could have been picked up.
11  **Q.**   What equipment does it take to take photographs?
12  **A.**   A camera.
13  **Q.**   Do you know whether anyone in the 7th District had a
14  camera?
15  **A.**   I couldn't tell you who, but, apparently, so because there
16  are photographs of the Crystal Palace during that time frame.
17  **Q.**   Where was the nearest Winn-Dixie to where you were
18  standing on the west side of the bridge?
19  **A.**   There was one located in the same block.
20  **Q.**   Did anyone go over there to get baggies?
21  **A.**   No.
22  **Q.**   A camera?
23  **A.**   No.
24  **Q.**   A pen?
25  **A.**   No.

MICHAEL LOHMAN - Redirect

1   Q.   Paper?

2   A.   No.

3   Q.   Why not?

4   A.   Because no evidence was collected.  It was determined that

5   the evidence wasn't going to be collected.

6   Q.   Now, let me go back to a question I started to ask a

7   minute ago.  I believe it was Mr. London asked you a series of

8   questions yesterday about whether you and Defendant Kaufman had

9   ever investigated a police shooting where someone was shot

10  before; correct?

11  A.   Yes, I remember.

12  Q.   Had you investigated homicides before?

13  A.   No.

14  Q.   Had Defendant Kaufman investigated homicides before?

15  A.   Yes.

16  Q.   Do you know how many?

17  A.   He was in the Homicide Division.  I don't know how many he

18  investigated, no.  Quite a few I would imagine.

19  Q.   In fact, he was a homicide supervisor; right?

20  A.   Yes.

21  Q.   You were asked a series of questions yesterday about your

22  theory about what happened out there; right?

23  A.   Yes.

24  Q.   You were asked your opinion; right?

25  A.   Yes.

MICHAEL LOHMAN - Redirect

1  Q.   And you weren't there at the time of the shooting; right?

2  A.   No, I wasn't.

3  Q.   Okay.  The theory you expressed yesterday was that Bowen

4  overreacted; is that right?

5  A.   Yes.

6  Q.   What did you mean by "overreacted"?

7  A.   I was asked what was -- what did I believe happened, and

8  my response was:  When he arrived on the scene, I believe that

9  he overreacted and he started firing his weapon; that prompted

10  everyone else -- everyone else heard the rounds and that

11  prompted them to come out of the back of the truck and begin

12  firing also.

13  Q.   Let me ask you to stay very focused on my question,

14  because on redirect you don't want to go through everything

15  that you went through yesterday.  But you said that your theory

16  with respect to Bowen was that he fired and overreacted -- or

17  overreacted and fired?

18  A.   Yes.

19          MR. MECHE:  I object.  I think he said "panicked."

20          THE COURT:  Well, I don't --

21          MR. MECHE:  I think she's misstating his testimony.

22          THE COURT:  Well, you see, here we go.  I think that

23  the testimony yesterday was directed to what was reflected in

24  the 302.  So if we have to, let's show him the 302 and let's

25  not try to recite testimony because the only record of the

MICHAEL LOHMAN - Redirect

1    testimony to the Court is going to be in the transcript.

2              But the jurors heard the testimony.  They may or

3    may not have taken note of it, either mentally or with their

4    notepads, so we're not going to sit here and argue over

5    something that somebody said.

6              He was directed to the 302.  We can ask him

7    about the 302.  There was a line of questioning about that

8    comment.  So let's do that rather than argue about what word he

9    either -- either it's in the 302 or what word was spoken

10   yesterday.

11   BY MS. BERNSTEIN:

12   Q.   Mr. Meche -- Mr. Meche asked you yesterday whether you

13   thought these officers made a mistake.  What did you say to

14   whether you thought the shooting was a mistake?

15   A.   That, yes, it could have been an accident.

16   Q.   He asked you -- Mr. Meche asked you why these officers

17   didn't -- why you thought -- he asked for your opinion -- why

18   you thought these officers didn't just say, "We made a

19   mistake."  Do you remember that question?

20   A.   Yes.

21            MR. MECHE:  Objection.  I didn't ask him that.  I

22   didn't ask him that question.

23            MS. BERNSTEIN:  May we approach one second, Your

24   Honor?

25            THE COURT:  Yes, yes.

MICHAEL LOHMAN - Redirect

1        **MR. LONDON:**  I did not ask that question.

2        (WHEREUPON, the following proceedings were held at

3  the bench.)

4        **THE COURT:**  Tim, I'm not going to go back and look it

5  up, but you asked, if not those exact words, something very

6  similar about why didn't they just say that a mistake was made

7  or an accident.

8        **MR. MECHE:**  No, I said why he didn't --

9        **MS. BERNSTEIN:**  No.

10        **MR. MECHE:**  -- not they, he.

11        **MS. BERNSTEIN:**  No.

12        **MR. MECHE:**  Because I wouldn't have been allowed to

13  ask him why other people did or didn't do what they did.  That

14  would have been objectionable.  All I asked him was --

15        **THE COURT:**  Well, it was directed to him in

16  particular.

17        **MR. MECHE:**  Exactly.

18        **THE COURT:**  Now, I do agree with that.

19        **MS. BERNSTEIN:**  Your Honor, he asked a lot of

20  questions about what other people did and didn't do --

21        **MR. MECHE:**  Let's go back and redirect it.

22        **MS. BERNSTEIN:**  -- because then I think I --

23        **MR. MECHE:**  I didn't ask that.

24        **MS. BERNSTEIN:**  I did object to that.

25        **THE COURT:**  I don't think he asked him, Mr. Lohman,

MICHAEL LOHMAN - Redirect

1  why the defendants --
2          MS. BERNSTEIN:  Yes, he did, Your Honor.
3          THE COURT:  All right.  Then you both go back to your
4  tables and I'm going to look it up, and we're going to sit here
5  until I do --
6          MS. BERNSTEIN:  Excuse me, Your Honor --
7          THE COURT:  We're going to sit here until I do.  Get
8  back over to your tables.
9          (WHEREUPON, the following proceedings were held in
10  open court.)
11          THE COURT:  I appreciate your patience.  We're having
12  to do what I, unfortunately, hoped we would not, which is to go
13  back and look something up that happened yesterday, and I'm
14  going to do it, because that's what it calls for.
15                      (OFF THE RECORD)
16          THE COURT:  All right.  Counsel, would you please
17  approach?
18          (WHEREUPON, the following proceedings were held at
19  the bench.)
20          THE COURT:  He said -- "accident" was the word that
21  was used in the question.  Is that -- that's the part we're
22  referring to, isn't it?
23          MR. MECHE:  Well, I think she's asking him --
24          THE COURT:  "Was it an accident as opposed --
25          MR. MECHE:  -- why did they not say it was a mistake.

MICHAEL LOHMAN - Redirect

1   And I said I didn't ask him -- I said why didn't you do so.

2           THE COURT:  And what was the -- Jodi, do you still

3   have that question up on there?

4           (WHEREUPON, the requested portion of the record was

5   read by the court reporter.)

6           THE COURT:  But then there was a question about why

7   didn't he report it or why didn't they report it.  It should

8   come right after that.  I think it was right after that

9   passage.

10          (WHEREUPON, the requested portion of the record was

11  read by the court reporter.)

12          THE COURT:  Okay.  Now, that's what we were up here

13  before is, "Why didn't you --

14          MS. BERNSTEIN:  No, no, no.  It says "you all".  "Why

15  didn't you all?"

16          THE COURT:  Does it say "you all," or "you"?

17              You all, okay.

18          MS. BERNSTEIN:  And, Your Honor, while we're on the

19  record here, then there was also a series of questions about,

20  "Why would my client agree to this report?  Why would my

21  client" --

22          THE COURT:  Yeah.  There was some -- there were some

23  questions about that.

24          MS. BERNSTEIN:  -- so we're all about getting into

25  other people's heads.

MICHAEL LOHMAN - Redirect

1          **MR. MECHE:**  Well, that's true.  You should ask him

2     why he would agree to have the blame put on him.

3          **THE COURT:**  Okay, okay.  That was covered.  I don't

4     dispute it.

5               Okay.  It was "you all," so I'm going to let her

6     ask it.

7          **MR. MECHE:**  Okay.

8          **THE COURT:**  All right.

9          (WHEREUPON, the following proceedings were held in

10    open court.)

11         **THE COURT:**  I apologize for the delay.  I tried to

12    give an instruction at 8:30 this morning that I thought would

13    overcome disputes over verbiage that was used at various

14    portions of the testimony yesterday.  And we've had to just

15    take some time to verify something on the record.  So I

16    apologize for the delay.

17              I, again, ask counsel to please be careful --

18    all counsel, during the course of this trial, to be careful

19    when you recount something that someone says or a question that

20    a lawyer asked, to either do so very precisely and refrain from

21    characterizing or paraphrasing.  Because we're going to

22    continually have these disputes of what someone said, including

23    whether it was an "a," or a "the," or whether it was a "you,"

24    or a "they," or a "he," or a "they."

25              So let's try to be very careful and direct him

MICHAEL LOHMAN - Redirect

```
 1    to the portion of the testimony and then ask him a specific
 2    question -- your own question.
 3                   So let's go ahead and proceed.
 4                   MS. BERNSTEIN:  Thank you, Your Honor.
 5    BY MS. BERNSTEIN:
 6    Q.   And, Mr. Lohman, I think before the break the question
 7    was -- well, you were asked a question by Mr. Meche yesterday
 8    about why you all didn't just say this was a mistake.  Do you
 9    remember that question?
10    A.   Yes.
11    Q.   Did any officer involved in this shooting ever tell you
12    this was a mistake?
13    A.   No.
14    Q.   Why did they tell you they fired?
15    A.   Because they were fired upon.
16    Q.   They claim that the people who had been shot, shot at
17    them?
18    A.   Yes.
19                   MR. FLEMING:  Judge, I'm going to object just to the
20    ambiguous nature of the question.  Which officers are we
21    referring to?
22                   MS. BERNSTEIN:  I can clarify that.
23                   THE COURT:  Yes, let's clarify it.
24    BY MS. BERNSTEIN:
25    Q.   At some point did you talk to every officer involved out
```

MICHAEL LOHMAN - Redirect

1  there?

2  **A.**   Yes.

3  **Q.**   Did any of them ever tell you this was a mistake?

4  **A.**   No, they did not.

5  **Q.**   I want to go back to that question about whether you

6  authored the 46-page report.  Do you remember that?

7  **A.**   Yes, I do.

8          **MS. BERNSTEIN:**  Mr. Harrell, may I have page -- may I

9  have Exhibit 37 up, please?

10             Let's just pick a page.  Can you go to

11  exhibit -- to page 12 of the exhibit?

12  **BY MS. BERNSTEIN:**

13  **Q.**   All right.  That's page 14 of the 46-page report.  There's

14  some handwriting on that?

15  **A.**   Yes, there is.

16  **Q.**   Whose handwriting is that?

17  **A.**   That's my handwriting.

18  **Q.**   Can you read the question at the bottom?

19  **A.**   "Did Villavaso positively ID Holmes, Madison, Doe No. 1,

20  or Doe No. 2 as perps with guns?"

21  **Q.**   Who wrote that question?

22  **A.**   I did.

23  **Q.**   Do you write questions to yourself on reports that you

24  write?

25  **A.**   No.

MICHAEL LOHMAN - Redirect

1  **Q.**   Mr. Hessler asked you yesterday about what Rob Gisevius
2  told you on the scene.  Do you remember that?
3  **A.**   Yes.
4  **Q.**   What was your answer?  What did Defendant Gisevius tell
5  you on the scene?
6  **A.**   What did he tell me his role was, is what you're --
7  **Q.**   Yes.  Just very, very quickly.
8  **A.**   That he arrived on the scene -- responded to a 108, and he
9  arrived on the scene, and they encountered gunfire and returned
10 gunfire.
11 **Q.**   What did Defendant Gisevius fire at the scene; what kind
12 of gun?
13 **A.**   A rifle.
14         **MS. BERNSTEIN:**  Can I have the 32-page report,
15 please?
16 **BY MS. BERNSTEIN:**
17 **Q.**   Exhibit 38, the 32-page report, that's the report that
18 Defendant Kaufman wrote; correct?
19 **A.**   Yes.
20         **MS. BERNSTEIN:**  Can I have page 13 of the report,
21 which will be page 12 of the exhibit, please?
22 **BY MS. BERNSTEIN:**
23 **Q.**   Okay.  This report contains a summary of Rob Gisevius'
24 statement about what happened on the bridge?
25 **A.**   Yes, it does.

1        **MS. BERNSTEIN:**  Can we zoom in on that so he can read

2    that to us, please?

3        **THE WITNESS:**  Read it?

4    BY MS. BERNSTEIN:

5    **Q.**   Yes, please.

6    **A.**   Okay.

7        "On the morning of September 4, 2005, Sergeant Robert

8    Gisevius was on proactive patrol in the 7th District in an

9    attempt to keep peace and prevent looting.  Sergeant Gisevius

10   was monitoring the 7th District police radio channel when he

11   heard a distress call come out.  A female officer advised that

12   two police were down, shot under the Danziger Bridge near Chef

13   Menteur Highway and Downman Road.

14       "Sergeant Gisevius boarded a truck driven by

15   Officer Michael Hunter and occupied by several other police

16   officers.  The truck proceeded to the area of the Danziger

17   Bridge at which time the officers exited the truck.  As

18   Sergeant Gisevius exited the rear of the truck on the driver's

19   side, he overheard several officers yelling and identifying

20   themselves.

21       "The sergeant then heard several gunshots.  Sergeant

22   Gisevius then observed two black male subjects running west

23   towards the top of the bridge.  The subjects, clad in all

24   black, turned, firing toward the officers.  Sergeant Gisevius

25   then gave chase after the two assailants and heard several

MICHAEL LOHMAN - Redirect

1   additional gunshots come from the top of the bridge.

2          "Sergeant Gisevius then overheard a female officer

3   relaying information as to the further direction of flight of

4   the two black male subjects.  As Sergeant Gisevius neared the

5   top of the bridge, he heard one shot from what he believed to

6   be a high-powered rifle.  The sergeant was unable to

7   distinguish where the shot came from.

8          "The subjects were pursued down the west side of the

9   Danziger Bridge where they were engaged in front of 4861 Chef

10  Menteur Highway.  Assisting officers neutralized one subject in

11  the driveway of the hotel.  Sergeant Gisevius and responding

12  units set up a perimeter around the hotel in an effort to

13  contain the second fleeing subject."

14  Q.   Thank you.

15          MS. BERNSTEIN:  Can we go back one page?

16  BY MS. BERNSTEIN:

17  Q.   According to that statement and Defendant Kaufman's

18  report, what did Defendant Gisevius fire at?

19  A.   The subjects running over the bridge.

20  Q.   Read it again.  Does it say in there whether he fired a

21  gun?

22  A.   "Sergeant Gisevius then observed two black male subjects

23  running west towards the top of the bridge.  The subjects, clad

24  in all black, turned, firing toward the officers.  Sergeant

25  Gisevius then gave chase after the two assailants and heard

MICHAEL LOHMAN - Redirect

1    several additional gunshots come from the top of the bridge.

2                "Sergeant Gisevius overheard a female relaying

3    information as to the further direction of flight of the two

4    black male subjects.  As Gisevius neared the top of the bridge,

5    he heard one shot from what he believed to be a high-powered

6    rifle.  He was unable to distinguish where the shots came

7    from."

8                No, it doesn't.

9    Q.   So according to that report and that statement in Sergeant

10   Kaufman's report, did Sergeant Gisevius ever fire his gun?

11   A.   No.

12   Q.   Do you know whether Defendant Kaufman knew that

13   Defendant Gisevius had fired a gun?

14   A.   I don't know -- I'm not aware of what Kaufman knew, no.

15   Q.   Were you ever present for conversations with the two of

16   them?

17   A.   Yes.  It was later told to me that Gisevius did fire a

18   weapon, and that information was contained in the 17-page

19   report.

20   Q.   Did you ever have conversations with that in front of

21   Defendant Kaufman?

22   A.   Yes.

23        **MS. BERNSTEIN:**  Can we turn to page -- I'm sorry, I'd

24   like to put up the 54-page report, the final official report.

25

MICHAEL LOHMAN - Redirect

1  BY MS. BERNSTEIN:

2  Q.   Now, you understand this to be the official report that

3  was turned in; correct?

4  A.   Yes, I do.

5  Q.   And you were asked some questions yesterday about whether

6  this 54-page report was based on the 32-page, either report or

7  notes --

8  A.   Yes.

9  Q.   -- that Defendant Kaufman wrote?

10  A.   Yes.

11  Q.   And we'll come back to that issue in one second.

12           MS. BERNSTEIN:  May I have page 9, please?

13  BY MS. BERNSTEIN:

14  Q.   Page 9 of that report is a list of the guns used by NOPD

15  officers; correct?

16  A.   Yes, it is.

17           MS. BERNSTEIN:  Can we zoom in on Defendant Gisevius,

18  please?

19  BY MS. BERNSTEIN:

20  Q.   According to this official report, what kind of gun did

21  Defendant Gisevius use?

22  A.   A Glock, model 22 .40 caliber handgun, semi-automatic.

23  Q.   What kind of gun did he really have that day?

24  A.   A rifle.

25  Q.   Is there any mention there of a rifle?

1   **A.**   No, there isn't.

2            **MS. BERNSTEIN:**   Can I have page 21, please?

3   **BY MS. BERNSTEIN:**

4   **Q.**   All right.  I'd like you to do the same thing.  The

5   official 54-page report has a statement there by Defendant

6   Gisevius and I'd like you to read that.

7   **A.**   "On the morning of September 4, 2005, Sergeant Robert

8   Gisevius mentioned he was on proactive patrol in the 7th

9   District in an attempt to keep peace and prevent looting.

10  Sergeant Gisevius was monitoring the 7th District police radio

11  channel when he heard a distress call come out.  A female

12  officer advised that two police were down (believing the

13  officers were shot) under the Danziger Bridge near Chef Menteur

14  Highway and Downman Road.

15           "Sergeant Gisevius stated he boarded a truck driven

16  by Officer Michael Hunter and occupied by several other police

17  officers.  The truck proceeded to the area of the Danziger

18  Bridge at which time the officers exited the trick.  As

19  Sergeant Gisevius exited the rear of the truck on the driver's

20  side, he related he overheard several officers yelling and

21  identifying themselves.

22           "The sergeant then heard several gunshots.  Sergeant

23  Gisevius then observed two black male subjects running west

24  toward the top of the bridge.  He stated the subject clad in

25  all black turned, firing toward the officers.  Sergeant

MICHAEL LOHMAN - Redirect

1   Gisevius then gave chase after two assailants and heard several
2   additional gunshots come from the top of the bridge.
3          "Sergeant Gisevius stated he then overheard a female
4   officer relaying information as to the further direction of
5   flight of the two black male subjects.  As Sergeant Gisevius
6   neared the top of the bridge, he heard one shot from what he
7   believed to be a high-powered rifle.  The sergeant was unable
8   to distinguish where the shot came from.
9          "He related the subjects were pursued down the west
10  side of the Danziger Bridge where they were engaged in front of
11  4861 Chef Menteur Highway.  He stated assisting officers
12  wounded one of the subjects in the driveway of the hotel.
13  Sergeant Gisevius mentioned himself and responding units set up
14  a perimeter around the hotel in an effort to contain the second
15  fleeing subject."
16  Q.   According to that account in the official 54-page report,
17  did Defendant Gisevius fire a gun?
18  A.   No, he did not.
19          MS. BERNSTEIN:  Thank you, Mr. Harrell.
20  BY MS. BERNSTEIN:
21  Q.   All right.  Let's talk now about whether those 32 pages
22  we've been talking about are notes or a report.  Do you
23  remember that issue coming up yesterday?
24  A.   Yes, I do.
25  Q.   Why do you call it a report?

MICHAEL LOHMAN - Redirect

1  A.   It's a report narrative.  It's the narrative from a
2  report.  I mean, it's set up like a report.  It has the header
3  and the footing as a report, and it has a Gist, it has a
4  narrative section.  It's written just like a report would be
5  written, absent the face sheet.
6  Q.   And how did you get it?
7  A.   From Kaufman.
8  Q.   Does a sergeant normally submit reports to his lieutenant?
9  A.   Yes.
10 Q.   Does a sergeant normally submit notes to a lieutenant?
11 A.   No.
12 Q.   Have you ever gone and checked Defendant Kaufman's notes
13 on a case?
14 A.   No, I haven't.
15 Q.   Do you normally edit his notes and give him guidance on
16 them?
17 A.   No, I do not.
18 Q.   You were asked a question yesterday about whether you and
19 Jeff Lehrmann got together and wrote a report.  Do you remember
20 that?
21 A.   Yes.
22 Q.   What was your answer?
23 A.   No.
24 Q.   Jeff Lehrmann is the guy that you testified yesterday that
25 you warned Defendant Kaufman not to get involved; is that

MICHAEL LOHMAN - Redirect

1  right?

2  A.   Yes.

3  Q.   Are you fond of Jeff Lehrmann?

4  A.   I didn't have any problems with Jeff Lehrmann up to this

5  point, but I didn't want him involved in the investigation or

6  knowing things that he didn't need to know.

7  Q.   Was he involved in this shooting?

8  A.   No.

9  Q.   Were you involved in this shooting?

10  A.   No.

11  Q.   So did you and Jeff Lehrmann write a report to cover-up a

12  shooting that neither one of you was involved in?

13  A.   No, we didn't.

14  Q.   You were asked yesterday about a comment you made to the

15  FBI, and I'm going to paraphrase it because I don't have the

16  exact words -- but I don't believe there's anything

17  objectionable about this paraphrase.  Tell me if I'm wrong.

18        You were asked a comment you made to the FBI about

19  whether during these cover-up conversations you chose your

20  words to sound legitimate.  Do you remember those questions?

21  A.   Yes.

22  Q.   All right.  Now, when you were on the bridge and

23  Defendant Bowen said to you, "What about this, I kicked the

24  guns off the bridge," how did you respond to him?

25  A.   Why -- why would you do --

MICHAEL LOHMAN - Redirect

1   **Q.**   Oh, I'm sorry.  Go ahead.

2   **A.**   How did I respond to his comment?

3   **Q.**   Yes.

4   **A.**   Why would you do that and how -- why would you do such a

5   thing and how were you going to explain it?

6   **Q.**   When you responded to him, did you say specifically, "Why

7   would you say that in your cover-up story"?

8   **A.**   No, I did not.

9   **Q.**   Why didn't you use those words?

10   **A.**   At no time during the course of the investigation did we

11   refer to it as a cover-up.  We just handled it as though it was

12   a legitimate investigation or legitimate case.  It was never

13   talked about as a cover-up or anything else of that nature.

14   **Q.**   Now, on a similar note, you were asked a series of

15   questions, I think it was Mr. Meche asked you about two

16   different things that you had testified about.  You testified

17   that after that 17-page report was written, you instructed

18   Defendant Kaufman to go talk to the guys and make sure that

19   they were okay with it; correct?

20   **A.**   Yes.

21   **Q.**   You also testified that at some point you had

22   conversations with each of the officers; is that right?

23   **A.**   Yes.

24   **Q.**   And Mr. Meche asked you a question why if you instructed

25   Defendant Kaufman to go talk to everybody would you also have

MICHAEL LOHMAN - Redirect

1  conversations with them.  Do you remember that?

2  A.   Yes.

3  Q.   The conversations that you, personally, had with people,

4  how detailed were they?

5  A.   With the officers, not very detailed.  My detailed

6  conversations would have been with Gisevius, Bowen, Kaufman;

7  and I had somewhat of a detailed conversation with

8  Officer Faulcon on the bridge that day.

9       But the remaining officers was just real brief.  Like

10 I said, as passing them in the hallway or at the office, "Are

11 you okay with what went on?  Are you okay with your version

12 of -- or your statements in the report?"

13 Q.   Did you expect Defendant Kaufman to have that same

14 conversation with them or a more detailed one?

15 A.   More detailed.

16 Q.   Why did you want Defendant Kaufman to have the more

17 detailed conversation?

18 A.   To make sure that there were no problems, that everyone

19 was in agreement with what happened.

20 Q.   Mr. DeSalvo asked you some questions about Defendant Bowen

21 telling you on the bridge that the civilians had shot at him.

22 Do you remember that?

23 A.   Yes.

24 Q.   And who are the people he said had shot at him?

25 A.   The Bartholomew family, and James Brissette, and Jose

MICHAEL LOHMAN - Redirect

1  Holmes.

2  **Q.**   So the people lying there?

3  **A.**   Yes.

4  **Q.**   Did he ever tell you --

5          **MR. DESALVO:**  I hate to say it, Your Honor, but I

6  read specifically from the 302, that was Jose Holmes and James

7  Brissette, nothing about the Bartholomew family.  Specifically,

8  a paragraph from the 302 was read.

9          **THE COURT:**  Well, let's refer back to the 302.

10  That's what the question was about.

11         **MS. BERNSTEIN:**  Can I ask a follow-up question on it

12  then?

13         **THE COURT:**  Well --

14         **MS. BERNSTEIN:**  As a -- I mean, I'm not -- he

15  testified about the 302.  So I'll ask a follow-up on it.

16         **THE COURT:**  Okay.  Well, let's -- ask him about the

17  statement in the 302, but there's an objection.  So if there's

18  an objection as to what was in the 302 that he was asked about,

19  let's get the 302 and clarify what it is he was asked about.

20  **BY MS. BERNSTEIN:**

21  **Q.**   Well, you were asked yesterday a question about who

22  Defendant Bowen said shot at him?

23  **A.**   Yes.

24  **Q.**   And the question might have -- there might have been a

25  more specific question than that, but the topic was who

MICHAEL LOHMAN - Redirect

1    Defendant Bowen said shot at him.  Do you remember that?
2    A.   Yes.
3    Q.   Who did Defendant Bowen tell you shot at him?
4    A.   Jose Holmes and James Brissette.
5    Q.   Did he ever tell you that somebody else shot at them and
6    got away?
7    A.   No.
8    Q.   Did he ever say that somebody was standing in the grass
9    shooting?
10   A.   No.
11   Q.   You estimated earlier that you've had -- you estimated
12   about a hundred conversations about what happened on the
13   bridge; right?
14   A.   Yes.
15   Q.   In any of those conversations, did anybody ever suggest to
16   you that somebody -- that a civilian fired on the bridge and
17   got away that day?
18   A.   No one ever told that information to me, no.
19   Q.   In those hundred conversations, did anybody ever suggest
20   that somebody was standing in the grass shooting at the bridge?
21   A.   No.
22   Q.   Mr. DeSalvo also asked you specifically about
23   Defendant Bowen's claim that he fired his gun into the concrete
24   wall.  Do you remember that?
25   A.   Yes.

MICHAEL LOHMAN - Redirect

1   Q.   And he asked you specifically whether you would give
2   Defendant Bowen more credibility if you had seen strike marks
3   on the wall where he said he fired.  Do you remember that?
4   A.   Yes.
5   Q.   So he asked you your opinion on that, whether you would
6   give him more credibility.  Do you remember that?
7   A.   Yes.
8   Q.   Would you give him more or less credibility on that point
9   if his bullet were in James Brissette's dead body?
10  A.   Less.
11  Q.   Mr. London asked you about that gun that Defendant Kaufman
12  turned into evidence.  Do you remember that?
13  A.   Yes.
14  Q.   Do you remember him asking you whether Defendant Kaufman
15  told you that he was going to plant the gun 300 feet away from
16  the shooting scene?
17  A.   I remember that, yes.
18  Q.   Do you remember those questions from yesterday?
19  A.   Yes.
20  Q.   Was it ever your understanding that Defendant Kaufman
21  claimed to find the gun 300 feet away from the scene?
22  A.   No, just under the bridge.
23  Q.   That was your understanding, that he claimed to find it
24  just under the bridge?
25  A.   Yes.

MICHAEL LOHMAN - Redirect

1  **Q.**   Was yesterday in court the -- well, let me --
2            Before yesterday in court when Mr. London asked you
3  that question, had you ever heard anything in any of those
4  hundred conversations about the gun being 300 feet away from
5  the scene?
6  **A.**   No, I had not.
7  **Q.**   That 32-page report, the first report you got from
8  Defendant Kaufman, did it mention a gun?
9  **A.**   Yes.
10 **Q.**   Did it say in the report that Defendant Kaufman didn't
11 think the gun had anything to do with the case?
12 **A.**   No, it did not.
13 **Q.**   Let me ask you:  You've been -- you were with NOPD for 17
14 years?
15 **A.**   At that time, yes.
16 **Q.**   Does an investigator generally log evidence into a case
17 that has nothing to do with the case?
18 **A.**   No.
19 **Q.**   Can we look at -- let's look at what Defendant Kaufman did
20 say in the report.
21         **MS. BERNSTEIN:**   Can we have the 32-page report?   Page
22 9, please, which would be page 8 for you.
23            All right.   Can you zoom in on the "Weapon"
24 section, please?
25

MICHAEL LOHMAN - Redirect

1   BY MS. BERNSTEIN:

2   Q.   Can you, please, read that sentence there, the first

3   sentence?

4   A.   "The weapons used in the attempted murder of several

5   police officers were identified as a black semi-automatic

6   pistol, an unknown caliber chrome revolver, and one other

7   unknown type handgun, and the Colt Trooper Mark III noted in

8   the evidence section.  Only --

9   Q.   Thanks.  Oh, I'm sorry.

10  A.   That's good.

11          "Only the aforementioned weapon was recovered and

12  logged as evidence."

13  Q.   That Colt Trooper Mark III, that's the gun that Defendant

14  Kaufman logged into evidence?

15  A.   Yes, it is.

16  Q.   And it's listed here as the weapon used in the attempted

17  murder of several police officers?

18  A.   Yes.

19  Q.   Who wrote this report that we're looking at?

20  A.   Kaufman.

21  Q.   Let's look at the official report that was submitted in

22  this case, the 54-page report.

23          MS. BERNSTEIN:  Can we have page 8 of that report,

24  please?

25

MICHAEL LOHMAN - Redirect

1  BY MS. BERNSTEIN:

2  Q.   Who wrote this report we're looking at?

3  A.   Kaufman and Dugue.

4          MS. BERNSTEIN:  Can we zoom in on that section,

5  please?

6  BY MS. BERNSTEIN:

7  Q.   What's the heading of this section we're about to read?

8  A.   "Perpetrators' Weapons."

9  Q.   And what's the one item listed there?

10 A.   "One blue steel Colt .357 magnum, Model Trooper, MK III,

11 revolver, 5-inch barrel, six shot handgun, bearing serial

12 number 84044J.

13         "The weapon was confiscated by Sergeant Arthur

14 Kaufman on Monday, September 4, 2005, at about 10:00 a.m. from

15 the scene on side of the Danziger Bridge.  It was subsequently

16 submitted to the Central Evidence and Property and -- under

17 [sic] Receipt Number 200519927 was assigned the evidence."

18 Q.   Does it say there that it was confiscated 300 feet away

19 and had nothing to do with the case?

20 A.   No, it does not.

21 Q.   It's called a perpetrators' weapon?

22 A.   Yes.

23 Q.   You were asked some questions yesterday about the Gist

24 that Defendant Kaufman wrote on.  Do you remember that?

25 A.   Yes, I do.

MICHAEL LOHMAN - Redirect

1          **MS. BERNSTEIN:**  Can we have the 17-page report,
2     please, Mr. Harrell?
3               Can we go to page 17?
4     **BY MS. BERNSTEIN:**
5     **Q.**   That's the Gist you were asked about?
6     **A.**   Yes, it is.
7     **Q.**   And you were asked specifically -- I can't remember which
8     attorney asked you -- if you took out that part that
9     Defendant Kaufman handwrote at the end, he asked you whether
10    there would be any probable cause.  Do you remember that?
11    **A.**   Yes, I do.
12    **Q.**   And you said no?
13    **A.**   I believe I said, yes, it would still contain probable
14    cause.
15    **Q.**   Well, read it again.
16    **A.**   The entire Gist?
17    **Q.**   You can read it to yourself.
18    **A.**   (WITNESS COMPLIES.)
19               Okay.
20    **Q.**   If you take out that last sentence, is there any probable
21    cause in that Gist?
22    **A.**    It's weak, but at the bottom it refers to the initial
23    victim, David Ryder, was fired upon and 7th District officers
24    were shot at upon arrival at Chef Menteur Highway and Downman
25    Road.  In my opinion, that would be probable cause.

MICHAEL LOHMAN - Redirect

1   Q.   Does it say who fired at them?
2   A.   No, it doesn't.
3   Q.   Is there probable cause if it doesn't say who fired at
4   them?
5   A.   No.  It doesn't specifically say who fires at him in here,
6   no.
7   Q.   And if there's -- and you were asked those questions
8   yesterday about whether the probable cause was in last
9   sentence; right?
10  A.   Yes.
11  Q.   If there's no probable cause to arrest someone, are you
12  supposed to arrest them?
13  A.   No, you're not.
14  Q.   Are you supposed to make up probable cause and add a
15  sentence at the end?
16  A.   No, you're not.
17  Q.   Mr. DeSalvo asked you some questions yesterday about a
18  saying.  He asked you about the saying, "The buck stops here."
19  Do you remember that?
20  A.   Yes.
21  Q.   And you understand that saying to be about taking
22  responsibility; correct?
23  A.   Yes.
24  Q.   And not pawning it off on people above you?
25  A.   Yes.

MICHAEL LOHMAN - Redirect

1   **Q.**   Do you take responsibility?

2   **A.**   Yes, I do.

3   **Q.**   Have you ever tried to pawn off your responsibility on

4   Captain Barty or deputy superintendents?

5   **A.**   No, I haven't.

6   **Q.**   Right before Mr. DeSalvo sat down, he asked a question and

7   then he sat down before you could answer it.  He said,

8   "Mr. Lohman, where does the buck stop?"

9   **A.**   I remember.

10   **Q.**   Can you answer that:  Where does the buck stop?

11   **A.**   It stopped with me.

12   **Q.**   Who's responsible for what Mike Lohman did?

13   **A.**   I'm responsible for it.

14   **Q.**   Who's responsible for what Defendant Kaufman did?

15   **A.**   Defendant Kaufman, and also as his supervisor, I was

16   responsible for what he did.

17   **Q.**   And who's responsible for what Defendant Gisevius did?

18   **A.**   Same thing:  Gisevius is responsible for himself, but I'm

19   also responsible as his supervisor.

20   **Q.**   And does your understanding of "the buck stops here," does

21   it mean that nobody else is responsible for their own actions?

22   **A.**   No, it doesn't.

23   **Q.**   And who's responsible -- I asked you Kaufman, Bowen,

24   Gisevius.  Who's responsible for Defendant Faulcon's actions?

25   **A.**   He's responsible and so am I.

MICHAEL LOHMAN - Redirect

1  **Q.**   Who's responsible for Defendant Villavaso's actions?

2  **A.**   The same thing:  He's responsible and so am I as his

3  supervisor.

4  **Q.**   Who's responsible for any other officers who went along?

5  **A.**   The same thing:  They were all responsible for themselves,

6  but I was responsible as their supervisor.

7  **Q.**   I believe it was Mr. Hessler asked you yesterday whether

8  you thought you would get a deal -- your plea deal if you came

9  in here and said you had no information on any of the other

10 officers.  Do you remember that?

11 **A.**   Yes, I do.

12 **Q.**   Would you get a plea deal if you said that?

13 **A.**   If it was the truth.

14 **Q.**   Is it the truth?

15 **A.**   Yes -- it's not the truth.  There was other officers

16 involved.

17 **Q.**   So if you came in here and said you had no information

18 about other people, would you get a deal?

19 **A.**   No.

20 **Q.**   Why not?

21 **A.**   Because it's not the truth -- it is the truth.

22         **MR. HESSLER:**  Your Honor, I think he's trying to

23 speculate on what's the truth.  I think that question's

24 improper.

25         **THE WITNESS:**  Could you ask the question again?

MICHAEL LOHMAN - Redirect

1          THE COURT:  Yes, please.

2   BY MS. BERNSTEIN:

3   Q.   If you had come in here and said, "I don't know anything

4   about what these officers did --

5          MR. DESALVO:  It's speculation, Your Honor.  He can't

6   answer that.

7          MS. BERNSTEIN:  He was asked it yesterday.

8          MR. HESSLER:  That's not the question I asked, Your

9   Honor.  I don't want to get into it again, and that's not the

10  question I asked.

11         THE COURT:  Let me hear the rest of the question

12  first.

13  BY MS. BERNSTEIN:

14  Q.   If you came in here and said, "I don't know anything about

15  what these other officers did," would you get a plea deal?

16         MR. HESSLER:  Objection, Your Honor.  It calls for

17  speculation.

18         MS. BERNSTEIN:  That's exactly what was asked

19  yesterday.

20         MR. HESSLER:  That is not the question I asked

21  yesterday.

22         THE COURT:  I'm going to let him go ahead and answer.

23  We did spend time on this yesterday.  I'm going to let him

24  answer.

25         THE WITNESS:  No, I would not get a plea deal because

MICHAEL LOHMAN - Redirect

1   there were other officers involved in this.
2   BY MS. BERNSTEIN:
3   Q.   So if you said that, it would not be the truth?
4   A.   No, it wouldn't.
5            MR. FLEMING:  Objection.  Leading, Judge.
6            THE COURT:  Well, he's already said it once or twice
7   in response to another question.  So, although it's a leading
8   question, a, he's already answered it; and b, he's already said
9   the answer in response to a prior question.
10            So anything further?
11            MS. BERNSTEIN:  And I've got one more question.
12   BY MS. BERNSTEIN:
13   Q.   If you came in here and said that, should you get a deal?
14   A.   No.
15   Q.   Why not?
16   A.   Because it wouldn't be the truth.
17            MS. BERNSTEIN:  Thank you, Mr. Lohman.
18            THE COURT:  All right.  Thank you, sir.  You can step
19   down.
20            THE WITNESS:  Thank you, Judge.
21            THE COURT:  All right.  Can we get another witness
22   in?
23            MR. CARTER:  Yes.
24            THE COURT:  Somebody who's a short witness -- not a
25   short -- somebody who's going to be brief in time.

MICHAEL LOHMAN - Redirect

1          **MR. CARTER:**  I have a short witness who will take a
2   short period of time.
3          **THE COURT:**  Believe it or not, that has happened in
4   this building already where a judge has called for a short
5   witness, and I'll be doggone if the person who walked in was
6   height challenged and didn't know why everyone was laughing
7   when he walked in the courtroom.
8          **MR. CARTER:**  Your Honor, the government calls Patrick
9   Conaghan.  He will be a brief witness, but he is not a short
10  witness.
11         (WHEREUPON, **PATRICK CONAGHAN,** having been duly sworn,
12  testified as follows.)
13         **THE DEPUTY CLERK:**  Please state your full name and
14  correct spelling for the record.
15         **THE WITNESS:**  Patrick Conaghan, C-O-N-A-G-H-A-N.
16                      **DIRECT EXAMINATION**
17  BY MR. CARTER:
18  **Q.**   Mr. Conaghan, where do you work?
19  **A.**   New Orleans Police Department.
20  **Q.**   What do you do there?
21  **A.**   I work in the 2nd District follow-up unit.
22  **Q.**   What is your title?
23  **A.**   Detective.
24  **Q.**   Are you a police officer, sir?
25  **A.**   Yes, sir.

PATRICK CONAGHAN - Direct

1  **Q.**   How long have you been with the New Orleans Police
2  Department?
3  **A.**   Twenty-seven years.
4  **Q.**   Where are you currently assigned?
5  **A.**   2nd District.
6  **Q.**   Were you on duty during Hurricane Katrina in September of
7  2005?
8  **A.**   Yes, sir.
9  **Q.**   Were you on duty on September 4, 2005?
10  **A.**   Yes, sir.
11  **Q.**   Let me direct your attention to the morning of September
12  4, 2005.  Where were you and what were you doing?
13  **A.**   I was working in the 3rd District at the time.  The
14  headquarters we were using was on the Henderson Street Wharf.
15  **Q.**   If you would, speak into the microphone, please.
16  **A.**   Okay.
17        **MR. CARTER:**  Your Honor, may I approach?
18        **THE COURT:**  Yes.
19  BY MR. CARTER:
20  **Q.**   Could you repeat that answer, please?
21  **A.**   I was working in the 3rd District at the time where the
22  headquarters was on the Henderson Street Wharf.
23  **Q.**   What were you doing that morning?
24  **A.**   That morning we were heading out to New Orleans East to do
25  some work.

PATRICK CONAGHAN - Direct

1   Q.   Who's we?
2   A.   Myself, Don Haynes, Jennifer Dupree, Tony Mayfield, Louis
3   Colin, and two guys from Oklahoma that -- in these air boats
4   that we were using.
5   Q.   You said you were heading out to New Orleans East?
6   A.   Yes, sir.
7   Q.   On what roadway were you driving?
8   A.   We were -- we were heading east on westbound I-10.
9   Q.   On I-10?
10  A.   Yes, sir.
11  Q.   Did anything happen as you were driving east on I-10?
12  A.   Right about Downman, the Downman Road off-ramp -- on-ramp,
13  we were flagged down.
14  Q.   Would this have been on the high rise or on a flat level
15  of the I-10?
16  A.   The high rise.
17  Q.   You said you were flagged down?
18  A.   Yes, sir.
19  Q.   Tell the jury how that happened.
20  A.   A guy stepped out in front of us, flagged us down.  He was
21  by himself, and off to the side was a small caravan of boats.
22  Q.   You said you were flagged down.  Were your vehicles moving
23  as you were flagged down?
24  A.   Yes, sir.
25  Q.   How did this individual flag you down?  Did he wave his

PATRICK CONAGHAN - Direct

1   hands or did he wave a flag?

2   **A.**   Stepped out in front of us and waved his hands.

3   **Q.**   Then what happened?

4   **A.**   So we stopped and he said that they were shooting at him.

5   **Q.**   Describe this individual for the jury, the individual who

6   flagged you down.  What was he wearing?

7   **A.**   He was wearing a St. Landry's Parish Sheriff's Office

8   shirt.

9   **Q.**   Did you believe him to be law enforcement?

10  **A.**   Yes, sir.

11  **Q.**   So what did he tell you?

12  **A.**   He said they were being shot at, the guys in the boats and

13  himself were being shot at from someone underneath the high

14  rise.

15  **Q.**   Did you see any other vehicles on the high rise?

16  **A.**   Aside from that caravan?

17  **Q.**   Yes.

18  **A.**   What do you mean?

19  **Q.**   Other than your vehicles, were there other vehicles on the

20  high rise?

21  **A.**   Well, the guys that were pulling the boats were pulling

22  them with trucks, I guess, or whatever, pickups.

23  **Q.**   So you had the vehicles that your group were in?

24  **A.**   Yes.

25  **Q.**   And there were other vehicles from the other caravan?

PATRICK CONAGHAN - Direct

1  A.   Yes, sir.
2  Q.   What happened after this individual told you that shots
3  were being fired?
4  A.   So I jumped out of the truck and we started going down the
5  Downman Road on-ramp, going down under the bridge to find them.
6  Q.   At any time when you were there on the I-10 high rise, did
7  you, yourself, hear any gunshots?
8  A.   I did.
9  Q.   How many gunshots did you hear?
10 A.   A couple.
11 Q.   A couple.
12       Could you tell where they were coming from?
13 A.   From down below.
14 Q.   Down below the high rise?
15 A.   Yes, sir.
16 Q.   And then what did you do after hearing those gunshots?
17 A.   So I headed down that way.
18 Q.   Did you head down by yourself, or did you go with someone
19 else?
20 A.   The guy from St. Landry, he was tagging along, you know.
21 I was mostly by myself, but he was with me.
22 Q.   How did you go down below the bridge?  What route did you
23 take?
24 A.   I took the ramp until I got to a spot where I could just
25 hop over the side, and when I got up on the ground, I headed

1    back towards directly underneath the high rise.

2    **Q.**    This may sound like a silly question, but why were you

3    going down below the bridge?  Why were you going down below the

4    bridge?  Why were you going down there?

5    **A.**    To locate the shooters.

6    **Q.**    To look for the shooters?

7    **A.**    Yes, sir.

8    **Q.**    What did you do in trying to locate the shooters?

9    **A.**    I went under the bridge and under the high rise, and there

10   was -- I started doing a building search.  There was a couple

11   of buildings, you know -- well, there was a lot of buildings,

12   but there was a few almost directly underneath the high rise

13   that I started searching.

14              **MR. CARTER:**  Your Honor, I'm going to show

15   Mr. Conaghan a photograph.  For the record, I will represent

16   that it is the same photograph that has already been used in

17   the opening statement -- the photograph that had the red dots.

18   However, this does not have the red dots.  The photograph with

19   the red dot -- the two red dots was Exhibit 48-A, and this is

20   Exhibit 48.

21   **BY MR. CARTER:**

22   **Q.**    Mr. Conaghan, I hand you what's been marked Exhibit 48.

23   Can you tell us what's depicted in that photograph?

24   **A.**    The high rise, the Downman Road ramps, and the bridge.

25   **Q.**    Is the area where you stopped pictured in that photograph?

PATRICK CONAGHAN - Direct

1    **A.**   Yes, sir.
2            **MR. CARTER:**  I'd like to put up Exhibit 48, please.
3    **BY MR. CARTER:**
4    **Q.**   Can you see it on the screen?  Can you point out to the
5    jury where you were stopped and flagged down by this
6    individual?
7    **A.**   Somewhere around there.  Can you see?
8    **Q.**   Somewhere around there.
9            And you mentioned that you went down the ramp.  Which
10   ramp did you go down?
11   **A.**   This one.
12   **Q.**   And trace for us the route that you took.
13   **A.**   About here, jumped off, and then came back over this way.
14   **Q.**   Now, where is the other guy, the St. Landry Parish guy, at
15   this time?
16   **A.**   He was with me until we got to the buildings, and then he
17   went to search one and I went to search the other one, and that
18   was the last I saw of him.
19   **Q.**   So you were, basically, searching underneath the high
20   rise?
21   **A.**   Correct.
22   **Q.**   Why were you searching underneath the high rise?
23   **A.**   Well, that's where they indicated the shooting was coming
24   from, down there.  So that's where I was going.
25   **Q.**   What did you do when you got to this area?

PATRICK CONAGHAN - Direct

1    A.   I started looking.

2    Q.   How did you go about looking?

3    A.   When I got -- excuse me -- got to here, I did a building

4    search, searching the buildings, things of that sort.

5    Q.   How did you search the buildings?

6    A.   Went in and looked around.

7    Q.   You actually went inside a building?

8    A.   Uh-huh.

9    Q.   Did you go inside more than one building?

10   A.   I don't remember that.  I know I went inside one, maybe

11   two.

12   Q.   Did you see anybody around these buildings?

13   A.   No.

14   Q.   What happened next?

15   A.   Then at some point, they started hollering from on top of

16   the bridge -- on top of the high rise, "They're running to the

17   bridge.  They're running to the bridge."  So at that point, I

18   started heading that way myself.

19   Q.   Heading what way?

20   A.   Towards the bridge, the Danziger Bridge.

21   Q.   Please mark on this exhibit the direction you began to run

22   and from where you began to run.

23   A.   From like under the high rise to -- I went back the same

24   way I came, which is going to be down alongside the --

25   alongside the ramp there.

PATRICK CONAGHAN - Direct

1   Q.   And this is after you heard shooting coming from that
2   direction?
3   A.   Say again?
4   Q.   Was this after you heard shots coming from the direction
5   of the Danziger Bridge?
6   A.   You talking about the shots in the beginning or --
7   Q.   No.  After you -- strike that.
8           If I understand you correctly, you're searching
9   buildings underneath the high rise?
10  A.   Right.
11  Q.   And at some point you stopped searching the buildings
12  underneath the high rise; am I correct?
13  A.   Right.
14  Q.   Why did you stop searching buildings underneath the high
15  rise?
16  A.   Because they were saying that they were heading to the
17  bridge.
18  Q.   Then what did you do?
19  A.   So I started heading that way myself.
20  Q.   And what happened as you headed toward that bridge?
21  A.   At some point I heard a burst of gunfire.
22  Q.   This is as you headed towards the Danziger Bridge?
23  A.   Right.
24  Q.   Do you recall where you were when you heard this gunfire
25  from the Danziger Bridge?

PATRICK CONAGHAN - Direct

1  A.   No, sir.

2  Q.   What did you do after you heard the gunfire from the

3  Danziger Bridge?

4  A.   I kept going that way.

5  Q.   And did you ever get to the Danziger Bridge?

6  A.   Eventually I did, yes.

7  Q.   What did you see when you got there?

8  A.   When I got there, I just saw a Budget truck.

9  Q.   Did you see any officers standing around?

10 A.   No.

11 Q.   Did you see any bodies?

12 A.   No.

13 Q.   What did you do next?

14 A.   I started running across the bridge.

15 Q.   To where?

16 A.   The other side.

17 Q.   Okay.  And what happened on the other side?

18 A.   When I got there, I saw a bunch of state police SWAT guys,

19 and that was it for me.

20 Q.   Please mark on the map where you ran on the Danziger

21 Bridge.  All the way to where you stopped if you can.

22 A.   I don't know exactly where that hotel is.  Somewhere here.

23 Q.   But you ran all the way to the hotel?

24 A.   Right.

25 Q.   As you ran over this bridge -- you already mentioned that

PATRICK CONAGHAN - Direct

1    you saw the Budget truck, but you don't recall seeing any other
2    people around the truck?
3    A.    No, sir.
4    Q.    As you ran across that bridge, do you recall whether or
5    not you heard any gunfire?
6    A.    I didn't.
7    Q.    You did not hear any gunfire?
8    A.    No, sir.
9    Q.    When you got to the other side of the bridge, what did you
10   see?
11   A.    Just saw the state police.
12   Q.    What were they doing?
13   A.    They -- I don't know.
14   Q.    Standing around?
15   A.    Seemed like it, for the most part.
16   Q.    So what did you do?
17   A.    So then I was going to go back because I had to get back
18   to my guys.  And when I walked out to check, they came up
19   behind me.  They had come around like that, and they came up
20   and picked me up.
21   Q.    And who were your guys?
22   A.    Tony Mayfield, Jennifer Dupree, Louis Colin, and, you
23   know...
24              MR. CARTER:  One moment, Your Honor.
25

PATRICK CONAGHAN - Direct

1    **BY MR. CARTER:**
2    **Q.**   At any point when you were in this area searching for the
3    shooter, did you see a shooter?
4    **A.**   No.
5    **Q.**   Do you remember whether anyone made any reference to what
6    the shooter was wearing?
7    **A.**   Yes, sir.
8    **Q.**   And what was that?
9    **A.**   A red shirt.
10   **Q.**   A red shirt?
11   **A.**   Yes, sir.
12            **MR. CARTER:**  Thank you.
13            **THE COURT:**  All right.  Mr. Hessler?
14                     **CROSS-EXAMINATION**
15   **BY MR. HESSLER:**
16   **Q.**   Good morning, Officer Conaghan.  My name is Eric Hessler.
17   I'm representing Robert Gisevius.
18            We know each other; correct?
19   **A.**   Yes, sir.
20   **Q.**   How old are you now, sir?
21   **A.**   Fifty-six.
22   **Q.**   Fifty-six?
23   **A.**   Uh-huh.
24   **Q.**   And you take care of yourself?  You still work out?
25   **A.**   Uh-huh.

PATRICK CONAGHAN - Cross

1  Q.   From the time you left the bridge, bottom of the bridge,
2  until the time you ran over there, about how much time had
3  elapsed?
4  A.   From when to when?
5  Q.   From the time you stopped the truck and got out and began
6  running down the bridge after the persons that were shooting up
7  at you, or at the people on the bridge, how long until you
8  ended up at the -- at the other side of the bridge?
9  A.   I couldn't tell you.  I don't know.
10  Q.   Okay.  Now, I want to take you back to the top of the
11  bridge and we'll start there.  You stated that an individual
12  whom you believed to be a police officer flagged you down and
13  asked you to stop the truck or stop the convoy?
14  A.   Yes, sir.
15  Q.   Did you do so?  Did you stop?
16  A.   We stopped.  Yeah, we stopped for him.
17  Q.   And he told you that people were shooting at them?
18  A.   Yes, sir.
19  Q.   Was there any reason to believe that that was just not
20  true?
21  A.   No, I believed him.
22  Q.   Okay.  This was day six of Katrina or thereabouts?
23  A.   I don't know.
24  Q.   Had you been hearing gunfire throughout?
25  A.   Yes, sir.

PATRICK CONAGHAN - Cross

1   **Q.**   So you didn't find it implausible that people were, in
2   fact, shooting at armed police officers on top of that bridge,
3   did you?
4   **A.**   No, sir.
5   **Q.**   And there were plenty of police officers on top of that
6   bridge, weren't there?
7   **A.**   You mean with us?
8   **Q.**   Yes, sir.
9   **A.**   You mean the guys I was with, the people in the truck?
10  Yeah, yeah.
11  **Q.**   And then there was other state troopers and other
12  volunteer law enforcement persons that had come in the city?
13  **A.**   Yes, sir.
14  **Q.**   And a lot of them were up on top of that bridge?
15  **A.**   I guess so, yes.
16  **Q.**   Let me ask you this:  Have you ever worked or experienced
17  anything like Katrina before in your law enforcement career?
18  **A.**   No, sir.
19  **Q.**   Did you find it to be challenging times?
20  **A.**   Yes, sir.
21         **MR. CARTER:**  Your Honor, I'm going to object to this
22  line of questioning.  It's getting far afield and more
23  generally related to the hurricane than the events and this
24  witness' testimony.
25         **MR. HESSLER:**  It's related to what he did, Your

1  Honor.

2         **THE COURT:**  I'm going to allow him to go ahead and

3  ask about it, but I think we need to move on.

4  BY MR. HESSLER:

5  **Q.**   It must have been pretty scary to go down there alone to

6  look for people that you knew to be shooting guns, huh?

7  **A.**   No.  I mean --

8  **Q.**   Do you know why you went alone and nobody followed you, no

9  other police officers?

10  **A.**   No.

11  **Q.**   Now -- and then you went down there, and when you said you

12  searched under the bridge, did you search literally under the

13  bridge, or are you talking about in the area underneath the

14  bridge?  I mean, was it directly under there or what would have

15  been the buildings up under that area where the circle is?

16  **A.**   No, it was like right there.

17  **Q.**   So you literally searched underneath the bridge?

18  **A.**   Pretty much, yes, sir.

19  **Q.**   And you did, in fact, hear gunshots while you were down

20  there?

21  **A.**   Yes, sir.

22  **Q.**   Or heading down there?

23  **A.**   Right.

24  **Q.**   Did that more or less corroborate that there were, in

25  fact, shooters below the bridge?

PATRICK CONAGHAN - Cross

1   A.   Yes, sir.

2   Q.   Now, by that time had you obtained a description of the

3   shooters?

4   A.   I don't remember when that red shirt was stated.  It was

5   either going to be from -- from Donald Haynes at the top or

6   from the St. Landry guy when we were heading down, so I really

7   don't remember exactly when it came about.

8   Q.   Okay.  And you believe it was somebody actually shouting

9   down from the bridge?

10  A.   Yeah.  Yes.  Haynes was hollering down from the bridge.

11  Q.   And certainly you didn't have -- I guess under normal

12  times you would have had traffic going by and other sounds to

13  suppress somebody yelling from the bridge, wouldn't you agree?

14  A.   Yes, sir.

15  Q.   This was not normal times.  There was none of those

16  sounds, no electrical things running or --

17  A.   No, sir.

18  Q.   You could hear that with a naked ear?

19  A.   Yes.

20  Q.   And at some point, is it true that you were directed or

21  informed that the shooters were running towards the Danziger

22  Bridge?

23  A.   Yes, sir.

24  Q.   And you knew where that was?

25  A.   I don't know.  I mean, I know there was a bridge there.  I

PATRICK CONAGHAN - Cross

1   don't know if I knew the name of it at the time, but, yeah, I
2   knew where it was.
3   Q.   Now, I guess when you heard they were running towards the
4   bridge, the Danziger Bridge or the bridge, what did you do?
5   A.   I started heading that way.
6   Q.   Did you have your gun out?
7   A.   Yes.
8   Q.   Why did you have your gun out?
9   A.   They were shooting at us.  They were shooting at them.
10  Q.   Did you think you might have to use that weapon that day?
11  A.   Possibly.
12  Q.   And you stated under direct that you really don't have any
13  idea the area of where you were when you heard the series or
14  burst of gunshots?
15  A.   No, sir.
16  Q.   How long after you heard that burst of gunshots did you
17  arrive at the foot of the bridge?  And that would be, I guess,
18  around here.
19  A.   See, I couldn't tell you.  I don't know.
20  Q.   All right.  And -- but, nevertheless, at some point you
21  made it across the bridge?
22  A.   Right.
23  Q.   Whereabouts, if you can display on the -- with an X,
24  because I've got all kind of stuff on there and don't know how
25  to get it off -- on this bridge here, the Danziger Bridge,

PATRICK CONAGHAN - Cross

```
1   which you now know to be the Danziger Bridge, can you put a
2   fingerprint or a square where you saw that truck, that
3   unattended truck stop, if you recall?
4   A.   (WITNESS COMPLIES).
5   Q.   That's where?  Okay.
6        And you bypassed it.  Did you see other police
7   officers in the area just milling around or anything else?
8   A.   By the truck?
9   Q.   Yes, sir.
10  A.   No, sir.
11  Q.   Did you ever -- did you have a radio with you?
12  A.   No.
13  Q.   Well, why?  Why not?
14  A.   Didn't carry it.  I don't know why.
15  Q.   Okay.
16  A.   No use for it.  It wasn't really -- you know, I wasn't
17  using it.
18           MR. HESSLER:  No further questions.
19           THE COURT:  Anyone else?  Mr. Meche?  You pass
20  Mr. Meche?
21           MR. MECHE:  No, I would like to ask questions.
22           THE COURT:  Oh, okay.  Well, then, which one of
23  you --
24           MR. DESALVO:  I was going to go.
25           MR. MECHE:  You can go.
```

PATRICK CONAGHAN - Cross

1        **THE COURT:**  Let's hear Mr. DeSalvo, and then we'll
2   get to Mr. Meche, and then we'll check with the other two.
3                      **CROSS-EXAMINATION**
4   BY MR. DESALVO:
5   **Q.**   Officer Conaghan, Frank DeSalvo.  How are you today?
6             Just to be clear:  When you were searching under the
7   high rise, Donald Haynes hollered down to you, "They're heading
8   toward the bridge"?
9   **A.**   Yes, sir.
10  **Q.**   And when he said they were heading toward the bridge, he
11  meant the two people that had the guns who were firing earlier?
12  **A.**   Yes, sir.
13  **Q.**   And that's when you headed toward the Danziger Bridge?
14  **A.**   Yes, sir.
15             **MR. DESALVO:**  Thank you.
16             **THE COURT:**  Mr. Meche?
17             **MR. MECHE:**  Your Honor, we talked about this.  This
18  is the witness I'd like to view the video.
19             **THE COURT:**  Sure.  Go ahead and set that up.
20  Mr. Carter, we did not offer 48.  Is there -- would you like to
21  offer 48, or are we going to do that later?
22             **MR. CARTER:**  I'll offer it at this time, Your Honor.
23  I'll offer it into evidence.
24             **THE COURT:**  Let's go ahead and set up the video
25  snippet, Mr. Meche.  And in the meantime, counsel, is there any

1    objection to 48?

2             **MR. DESALVO:**  No, Your Honor.

3             **MR. FLEMING:**  No, Your Honor.

4             **THE COURT:**  So ordered.  We'll admit 48.

5                      **CROSS-EXAMINATION**

6    BY MR. MECHE:

7    **Q.**   Mr. Conaghan, I'm Tim Meche.  I represent Anthony

8    Villavaso.

9             While Mr. Harrell is setting up the video, I just

10   want to ask you a couple of questions.  Were you aware that

11   there was a videotape made showing the actions of you and your

12   unit on that day?

13   **A.**   I saw it the other day.

14   **Q.**   Who showed it to you?

15   **A.**   Mr. Carter.

16   **Q.**   Were you able to recognize people in that video, such as

17   yourself and people in your unit?

18   **A.**   No, sir.

19   **Q.**   Were you able to recognize the scene?

20   **A.**   Yes.

21            **MR. MECHE:**  Mr. Harrell, can you play it.?

22                      **(VIDEO PLAYED)**

23   BY MR. MECHE:

24   **Q.**   Do you recognize what this shows?

25   **A.**   No.  Okay.  Now I do.

PATRICK CONAGHAN - Cross

1    Q.    Okay.  What does it show?

2    A.    Okay.  That's --

3              MR. MECHE:  Can you pause it, Mr. Harrell?

4                        (VIDEO PAUSED)

5    BY MR. MECHE:

6    Q.    Okay.  What does this show?

7    A.    That's I-10.

8    Q.    Okay.  Who are these people?

9    A.    That's our guys.

10   Q.    Okay.  People in your unit?

11   A.    Yes, sir.

12   Q.    And is this the incident that you described when you

13   testified about getting to the bridge and hearing that there

14   were shots fired?

15   A.    Yes, sir.

16   Q.    And what are you doing now?  Are you reacting to the shots

17   being fired?

18   A.    Right.  Running -- yeah, going down towards the --

19             MR. MECHE:  Okay.  Play it again, please.

20                       (VIDEO PLAYED)

21   BY MR. MECHE:

22   Q.    Now, are you perceiving that shots are being fired from

23   underneath the bridge?

24   A.    Yes, sir.

25   Q.    Where are you at this point?

PATRICK CONAGHAN - Cross

1  A.   I think that's me there.
2          MR. MECHE:  Okay.  Pause it, please.
3                  (VIDEO PAUSED)
4  BY MR. MECHE:
5  Q.   Who is this lady, do you see, on the right of the screen?
6  A.   This one?
7  Q.   Yes, sir.
8  A.   I think that's Jennifer Goodenough, if I'm not mistaken.
9  Q.   And she would have been in your unit?
10  A.   Right.
11  Q.   And there's someone crouching down, bending over.  Do you
12  know who that is?
13  A.   No.
14  Q.   Okay.  But would that have been somebody with you?
15  A.   Right.
16  Q.   And you're perceiving that somebody is shooting at you
17  guys from down under the bridge?
18  A.   Yes, sir.
19  Q.   And you're actually hearing shots being fired?
20  A.   Yes, sir.
21          MR. MECHE:  Can we play it, please?
22                  (VIDEO PLAYED)
23  BY MR. MECHE:
24  Q.   Now, do you actually see individuals down there who's
25  doing the shooting?

PATRICK CONAGHAN - Cross

1   A.   I didn't, no.
2   Q.   Okay.
3          MR. MECHE:  Can you back up, please?  Back.  Okay.
4   BY MR. MECHE:
5   Q.   This individual who seems to be carrying a rifle who's
6   just bending over --
7          MR. MECHE:  Stop, please.
8   BY MR. MECHE:
9   Q.   -- do you know who that is?
10                    (VIDEO PAUSED)
11         THE WITNESS:  No.
12  BY MR. MECHE:
13  Q.   Was he with you, though?
14  A.   I don't know who it was.
15  Q.   Okay.  There were other law enforcement officers with you
16  from other units?
17  A.   No, but --
18  Q.   You described the St. Landry Parish guy.
19  A.   Right.
20  Q.   Is that who that is?
21  A.   I don't think so.
22  Q.   Okay.
23  A.   It could be one of our guys.  I don't recognize the guy,
24  but, I mean, I don't think there was any other police up there
25  before us.  But maybe after us, you know.

PATRICK CONAGHAN - Cross

1    **Q.**   And he appears to be carrying a rifle running to the
2    scene?
3    **A.**   Yes, sir.
4           **MR. MECHE:**  Keep playing it, please.
5                         **(VIDEO PLAYED)**
6    **BY MR. MECHE:**
7    **Q.**   Now, at this point do you think you're running down the
8    bridge?
9    **A.**   Yes, sir.
10   **Q.**   Is that you right here running?
11          **MR. MECHE:**  Pause it.
12                         **(VIDEO PAUSED)**
13          **THE WITNESS:**  I can't tell.
14   **BY MR. MECHE:**
15   **Q.**   Okay.  Well, it would have been you or the St. Landry
16   Parish guy?
17   **A.**   Right.
18   **Q.**   So you were the only two who ran down the bridge?
19   **A.**   Right.
20   **Q.**   Where are you running to?
21   **A.**   Going down towards -- to get underneath the high rise.
22   **Q.**   Now, are you physically chasing somebody who you believe
23   was shooting at you at this point?
24   **A.**   Yeah -- well, I mean -- what do you mean?  Say it again.
25   **Q.**   Well, I mean, are you just running down to the direction

PATRICK CONAGHAN - Cross

1   the shots were fired, or are you running after an individual
2   you actually see?
3   A.   I didn't see anybody, but I know the shots were coming
4   from there.  That's what we were told.
5   Q.   Okay.  And you actually heard it?
6   A.   Yes.
7   Q.   Okay.
8          MR. MECHE:  Keeping playing it, please.
9                    (VIDEO PLAYED)
10  BY MR. MECHE:
11  Q.   Now, did you ever see someone running away who -- and
12  you'll see somebody come up on the screen.  Do you see somebody
13  running down there?
14         MR. MECHE:  Pause it.
15                   (VIDEO PAUSED)
16  BY MR. MECHE:
17  Q.   You saw that individual running?
18  A.   I see him, yeah.
19  Q.   Was that someone you were chasing?
20  A.   I don't know.  I mean, under the bridge, I never did see
21  anybody.
22  Q.   Could that have been someone that was shooting at you?
23         MR. CARTER:  Your Honor, I'm going to object at this
24  point.  I believe his testimony is that he was searching under
25  the bridge and he didn't see anyone, and we're continuing

PATRICK CONAGHAN - Cross

1  asking questions about someone he said he didn't see.

2          MR. MECHE:  I'm asking him --

3          THE COURT:  Let's focus on what he saw.  If he

4  establishes that he hasn't seen it, then let's move on to ask

5  him another question.

6  BY MR. MECHE:

7  Q.   This individual running, is that someone you saw --

8          THE COURT:  I might add that the questions are being

9  asked, although his point of view at this juncture is not the

10 camera's point of view.

11         MR. CARTER:  Yes, that's true.

12         THE COURT:  So he may be looking at something here

13 that is not from his vantage point.

14         MR. CARTER:  That's my very next objection.

15         THE COURT:  If he doesn't see it, then let's move on

16 and ask him something else.

17         MR. MECHE:  Can you play it, please?

18         MR. CARTER:  No, I object to it being played any

19 further.  It is not his vantage point.  He's showing him

20 something he did not see.  He cannot testify to this.  He did

21 not see this.

22         MR. MECHE:  Your Honor, I think the jury should see

23 the video.

24         THE COURT:  I'm going to give you -- let you ask him

25 a few more questions, but again, if he can't see -- he's under

PATRICK CONAGHAN - Cross

1   the bridge now.  His testimony is that he's now come down the

2   ramp, as I understand it, and has made his way back towards

3   under the bridge.  So I don't know how much more of this you

4   can get him to testify that he saw.  So let's find out what he

5   can see.  If he can't see what's shown on camera, then this is

6   of little use to his testimony.  But I'm going to let you ask a

7   few more questions on it.

8             MR. MECHE:  Well, should we just continue playing and

9   let him point out what he did see or didn't see?

10            THE COURT:  Well, let's find out what he saw.

11            MR. MECHE:  Okay.

12            THE COURT:  We don't know yet if he has seen anything

13  that would otherwise be reflected on this, other than what he's

14  already testified to.  If you keep asking him questions about

15  something that's taking place in another area that the camera's

16  catching that he's not present at and cannot see, then the tape

17  is of very little use, and then we'll have to just go ahead and

18  ask him fact questions without the tape.

19            So you can ask him a few more, but it's not

20  appropriate to play the tape, ask him if he saw it, and he says

21  no, and he keeps saying no, no, no, and then all we're doing is

22  watching a videotape that really has not much to do with what

23  he saw.  So let's find out -- we may be at the end of what he

24  saw that's reflected on this tape.

25            MR. MECHE:  Yeah, and if we are, I don't know that

PATRICK CONAGHAN - Cross

1   unless I play the tape and ask him.
2           THE COURT:  Well, but -- ask a couple more, and then
3   let's get on to what he saw.
4   BY MR. MECHE:
5   Q.   Well, what did you see after you got down under the
6   bridge?
7   A.   I searched the buildings.  I never did see anybody.  I
8   never saw any people.
9   Q.   Now, were you able to see the Danziger Bridge at some
10  point while you were down under the bridge?
11  A.   You mean from underneath the high rise?
12  Q.   Well, after you got down there, yes, sir.
13  A.   I couldn't see it from where I was at, no.
14  Q.   Did at any point after this occurred you see the Danziger
15  Bridge?
16  A.   No.
17  Q.   Didn't you, in fact, say at some point you went to the
18  Danziger Bridge?
19  A.   Yeah.  You talking about seeing it from where I was at or
20  getting there?
21  Q.   Getting there.
22  A.   Yeah, eventually I ran across it.
23  Q.   Now, when you got there, was there a Budget truck on the
24  Danziger Bridge?
25  A.   At the base of the bridge, yeah.  Right.  Yes, sir.

PATRICK CONAGHAN - Cross

1          **MR. MECHE:**  Can we continue showing it so he can
2    point that out?
3          **MR. CARTER:**  Your Honor --
4          **MR. MECHE:**  He saw it.  He was there.
5          **MR. CARTER:**  Well, the jury will see this, but this
6    witness -- it's inappropriate with this witness in terms of
7    what he's trying to do, and it's beyond the scope of what he
8    discussed this morning in chambers.
9          **THE COURT:**  Mr. Carter, if he is on this tape -- if
10   there is -- if he can identify himself on there, then he can do
11   so.  I'm going to ask Mr. Meche, since he has already seen it,
12   and the jury hasn't seen it, if the exercise is to get him to
13   identify himself, then he can do that with him.  If he can't,
14   if this is just going to be playing the tape again separate and
15   apart from his recollection, then that would be improper.
16         **MR. MECHE:**  And I don't know, Judge, but the tape
17   goes on for a long time, and at some point he got on the scene,
18   and it is the scene.  He saw it.  I think it's time for us to
19   play the tape for the jury.
20         **MR. CARTER:**  Your Honor, I apologize for the speaking
21   objection.  May we approach, please?
22         **THE COURT:**  First of all, we're going to take our
23   morning break, and then I'm going to give you some instructions
24   that I expect to be followed.
25              Please don't discuss the case amongst yourselves

```
1   during the break.  If you can be ready at 10:30, we will begin
2   again.
3           THE DEPUTY CLERK:  All rise.
4           (WHEREUPON, the jury exited the courtroom.)
5           THE COURT:  You all can be seated.
6               Mr. Meche, this video was produced in discovery.
7   So I take it you have seen it and have chosen to use it with
8   this witness because you have seen it.
9           MR. MECHE:  Yes, sir.
10          THE COURT:  It was previously discussed with me
11  earlier today that we were going to show him a brief snippet
12  wherein he would identify himself and others.  It was never
13  suggested to me, at least with this witness, that we were going
14  to start it and play it.
15          MR. MECHE:  We're not going to play the whole thing.
16          THE COURT:  Well, I know.  I know we're not doing
17  that, but what I'm concerned about is playing portions of it
18  that are not relevant to his testimony.
19          MR. CARTER:  Your Honor, the witness is present.
20  Should he be present for this?
21          THE COURT:  I don't think that I'm saying anything
22  that is going to in any way impact his testimony.  I'm talking
23  about how we're going to use the tape.
24          MR. MECHE:  If I may be heard, Your Honor.  He
25  testified --
```

PATRICK CONAGHAN - Cross

1          **THE COURT:**  Well, wait, wait, wait.

2          **MR. MECHE:**  I'm sorry.

3          **THE COURT:**  Look, if we're going to talk about his

4    testimony, then it's not okay for him to be here.  I'm talking

5    about how we're going to play this tape.

6              My instruction to you is that if we are going to

7    play snippets of the tape, it must be either a circumstance

8    where it is from his vantage point, which we have already seen.

9    There's been no testimony that he went back up on the bridge

10   and was back with the camera crew -- or a portion of a tape

11   where he can identify himself doing something on the tape.

12             If we don't know if there are any more passages

13   or if there are no more passages where he appears, then I think

14   we're done with the tape.  So I'm going to sustain an objection

15   to continuing to play it where it depicts neither him doing

16   something nor a vantage point that he can share as depicted on

17   the tape.

18             So let's get to the part of the tape that's

19   useful rather than just play it and get him to say, "Well, I

20   didn't see that, and I didn't see that, and I didn't see that,"

21   and then the jury sits there and sees the tape.  We may do that

22   with another witness.

23          **MR. MECHE:**  And my answer to that is, I don't know

24   because, unlike the government, I didn't interview him and show

25   him the tape like Mr. Carter did.

PATRICK CONAGHAN - Cross

1          MR. CARTER:  This is disingenuous.  This man does not
2  appear in that tape at any point.
3          MR. MECHE:  Well, that's -- I don't know.  And he did
4  testify that he --
5          THE COURT:  How long is the rest of the tape?
6          MR. MECHE:  The part I would continue to show him
7  would be another minute.
8          MR. CARTER:  Your Honor, can we show it to the
9  witness outside the presence of the jury?
10         THE COURT:  That's what I'm -- Mr. Carter, that's
11 about what I'm going to tell you to do.  While everybody else
12 is taking their bathroom break, Mr. Conaghan, if you would sit
13 here and look at this tape, the one minute that Mr. Meche is
14 talking about.  You can view that, and, Mr. Meche, if he is not
15 on that tape, then I think we're done with the tape.
16         MR. MECHE:  And he may not be.  I don't know.  But
17 it's not just that he's on, but that he saw these things that
18 are occurring on the videotape.  Because like he pointed out,
19 the people he saw in his unit and he couldn't himself, but that
20 didn't exclude him from saying, "Those are my people in my unit
21 moving around."
22         THE COURT:  The one minute -- counsel, would you also
23 -- can we do that just on the screens here?  I think we can do
24 it with just counsel table and the witness stand viewing that
25 minute.  We are going to look at that.  Mr. Meche and counsel,

PATRICK CONAGHAN - Cross

1  go ahead and cover that with him.  We'll take a short break,
2  and then we'll pick up again, and, hopefully, we'll have this
3  all straightened out in terms of what he saw and what other
4  people saw.
5              (WHEREUPON, the Court took a recess.)
6              THE DEPUTY CLERK:  All rise.
7              THE COURT:  Let's be seated here for a second and
8  make sure we're where we need to be.  First of all, what is
9  that noise, and is it going to be a problem?
10             MR. FLEMING:  They're fixing that right now, Judge.
11             MR. HESSLER:  Your Honor, may we approach on an
12 unrelated matter?
13             THE COURT:  I'm on the related matter right now.  Did
14 we show the witness the video?
15             MR. CARTER:  Yes, we did.
16             THE COURT:  And, Mr. Meche, where do we stand on that
17 issue?
18             MR. MECHE:  I think they were going to check on a
19 technical issue and let me know if we could skip a portion of
20 the tape and fast forward to another part where he can identify
21 people walking and things that he can talk about.
22             MR. CARTER:  For the record, that's not something he
23 saw.  They're just people he knows.
24             THE COURT:  That he can identify?
25             MR. CARTER:  Yes.  Actually, the very next witness.

PATRICK CONAGHAN - Cross

1  So if we can't do it with him, we can do it with the very next
2  witness.
3          THE COURT:  And has he seen that portion and we know
4  that he can do that?
5          MR. MECHE:  He can, yes.
6          THE COURT:  And do we need to show the video portion
7  of it, or can we show the still frame where he can point out?
8          MR. MECHE:  We can show the still frame.
9              Can you?
10         THE COURT:  Can you?
11         MR. CARTER:  We can show the still frame if we can
12 freeze it.
13         THE COURT:  All right.  Let's get to that still frame
14 and let him do what Mr. Meche is asking him to do.
15         MR. MECHE:  I think it would be just as easy to show
16 from a certain point where they're trying to find, and it just
17 lasts about 30 seconds.  But if y'all want to still it --
18         THE COURT:  A few seconds.  You can play just a few
19 seconds, but let's not show it on and on and on if another
20 witness is going to do that.
21         MR. MECHE:  Right.
22         THE COURT:  It's kind of like showing him a document
23 that he's not familiar with and then asking him questions about
24 it.
25         MR. MECHE:  No, I understand.

PATRICK CONAGHAN - Cross

1          **THE COURT:**  If he can identify the people, we'll let
2     him do that.
3                    Are we square on our technical issue, or are we
4     going to have noise while we're trying to do this?  Are we
5     good?  Anybody?  Somebody tell me yes or no.
6          **MR. FLEMING:**  The court technical people are looking
7     at the problem, Judge.  I'm not technically savvy enough to do
8     that.
9          **THE COURT:**  I need to have an answer because if we
10    start asking questions and we have noise --
11                   Let's get to the part Mr. Meche was going to ask
12    him about.  Let's see if we can get that.
13                   My question, again, is:  Have we resolved the
14    technical problem so we're not going to have this noise?
15    Anybody?
16         **UNIDENTIFIED SPEAKER:**  Yes.
17         **THE COURT:**  Did I hear a yes?
18         **UNIDENTIFIED SPEAKER:**  Yes.
19         **THE COURT:**  Thank you.  You have to speak louder.  We
20    need to get you a microphone too.
21                   Okay.  Let's go ahead and proceed.  If you can
22    get to the portion that Mr. Meche was going to ask about while
23    the jury's coming in, we'll pick up right there.
24         **THE DEPUTY CLERK:**  All rise.
25                   (WHEREUPON, the jury entered the courtroom.)

PATRICK CONAGHAN - Cross

1          **THE COURT:**  All right.  You may be seated.

2                    Mr. Conaghan, you're still under oath.  Mr.

3    Meche, you were about to ask some more questions.  I think

4    we've resolved the issue that came up right prior to the break.

5    So let's go ahead and proceed.

6    **BY MR. MECHE:**

7    **Q.**   Mr. Conaghan, I'm going to ask you a couple while they're

8    getting the technical issues worked out.  So after the portion

9    of the video that we saw, I think we stopped where there was an

10   individual running, and you indicated you didn't see that

11   particular individual?

12   **A.**   Yes, sir.

13   **Q.**   And at that point in time, you were actually down -- you

14   had finished running down the ramp and you were actually down

15   below the bridge area, and you were searching a building; is

16   that correct?

17   **A.**   Yes, sir.

18   **Q.**   And you were actually going inside buildings; right?

19   **A.**   Yes, sir.

20   **Q.**   Meanwhile, members of your -- you were the only member of

21   your unit that actually went down there; correct?

22   **A.**   Yes, sir.

23   **Q.**   The rest of your unit stayed on the high rise I-10 bridge?

24   **A.**   Right.  Correct.

25   **Q.**   Now, the only other individual down with you was this

PATRICK CONAGHAN - Cross

1  St. Landry Parish guy?
2  A.   Right.
3  Q.   And then you subsequently learned, I don't know if you
4  testified about it earlier, but he actually wasn't a deputy
5  sheriff?
6  A.   Right.
7  Q.   How did you learn that, by the way?
8  A.   I don't remember where I heard it from, but I did.
9  Q.   Did you have much interaction with this guy?
10 A.   No.
11 Q.   Okay.  You never talked to him?
12 A.   Just talked about -- when we were walking down there --
13 no, no, when we were running down -- he flagged us down, said
14 what he said.  I ran down and we talked, and then when we got
15 to one of the buildings, I just told him to go take that one,
16 and I took this one, and that was the last time I saw him.
17 Q.   And you thought he was a police officer?
18 A.   Yes.
19 Q.   Was he armed?
20 A.   I think he was.  I'm not sure on that.  I think he was,
21 though.
22 Q.   Did he have some type of police uniform on?
23 A.   He had that shirt, that St. Landry Parish Sheriff's
24 T-shirt.
25 Q.   Yes, sir.  And did at any point you see him point his gun

PATRICK CONAGHAN - Cross

1  at anyone or shoot anyone?
2  A.   No.
3  Q.   Okay.
4        MR. MECHE:  Mr. Harrell, can you -- you got it
5  figured out?
6  BY MR. MECHE:
7  Q.   Let's show you.  Who is this?
8  A.   That's Goodenough.
9  Q.   Jennifer Goodenough?
10 A.   Jennifer Goodenough and Jennifer Dupree.
11 Q.   And they were both in your unit?
12 A.   Yes, sir.
13 Q.   And Ms. Dupree was the one who had a radio, is that
14 correct, police radio?
15 A.   I --
16 Q.   You don't know?
17 A.   I don't know.  But...
18 Q.   Okay.  That's fine.  Were you hearing radio signals being
19 broadcast at this time?
20 A.   No.
21 Q.   Okay.
22        MR. MECHE:  Keep moving, please.
23 BY MR. MECHE:
24 Q.   Now, this is on the high rise.  Now, you're underneath the
25 bridge, and the rest of your unit --

PATRICK CONAGHAN - Cross

1          MR. MECHE:  Keep going --
2    BY MR. MECHE:
3    Q.   -- they should be following.  If you can just identity the
4    people coming forward.  It appears they're looking to the
5    north.  Who is this?
6    A.   Donald Haynes.
7    Q.   And he's in your unit?
8    A.   Yes, sir.
9    Q.   It appears they're looking north, and that would be
10   towards the direction of the Danziger Bridge, which is that
11   way; correct?
12   A.   Yes, sir.
13          MR. MECHE:  Keep moving.
14   BY MR. MECHE:
15   Q.   I think other members of your unit are going to come
16   forward.  There's a police car.  Did you notice police cars
17   going at this time?
18   A.   No, sir.
19   Q.   Okay.
20          MR. MECHE:  I think other members of his unit come --
21   show up, Judge.
22          THE COURT:  It continues with that?  Do you know the
23   point in the tape where that happens?
24          MR. MECHE:  I think.
25          THE COURT:  I thought we just looked at this during

PATRICK CONAGHAN - Cross

1    the break.  Do we know where that is or do we have to hunt for

2    it?

3            MR. CARTER:  Judge, my only concern is, we've gone

4    from a still to continuing to move, but go ahead.

5            THE COURT:  Can we get to the -- when the next people

6    enter the frame?

7    BY MR. MECHE:

8    Q.   Who's the man in the orange shirt, by the way?

9    A.   You're asking me?

10   Q.   Yes, sir.

11   A.   I don't know.

12   Q.   In addition to you all's unit, were there other civilians

13   or other type people like that walking around?

14           MR. CARTER:  Your Honor, I object and ask to

15   approach.  This has gone beyond what we discussed in the break.

16           THE COURT:  All right.  Come on up.

17           MR. MECHE:  I think we'd be finished by now.

18           MR. CARTER:  I thought we would be finished by now

19   also.

20           THE COURT:  All right.  Come on.

21           (WHEREUPON, the following proceedings were held at

22   the bench.)

23           THE COURT:  First of all, what is it, more -- there

24   are more people on here that you want to show, Tim?

25           MR. MECHE:  The rest of his -- he identified all

PATRICK CONAGHAN - Cross

```
1   these people in his unit that are out on the scene.  I was
2   going to get him to identify everybody who showed up on the
3   high rise.
4            THE COURT:  But do you know where they are?  We took
5   a break --
6            MR. MECHE:  They were right -- they were coming up
7   right after and then they stopped.
8            THE COURT:  First of all, don't interrupt me.  Don't
9   interrupt me.
10               Do we know on the tape, a time designation on
11  elapsed time, when people are on the screen that you want him
12  to identify?
13           MR. MECHE:  I saw them come up right afterwards and
14  then they stopped the tape.  I think they would have come up
15  within the next few seconds, I thought.
16           THE COURT:  I've got the screen up here.  I'm going
17  to look at it when the next person comes up.  We've got the guy
18  in the hat, who he's identified as Mr. Haynes.
19           MR. MECHE:  And then the rest of them show up.
20           MR. CARTER:  Does the jury have that screen also?
21           THE COURT:  No, it's blocked off.
22           MR. CARTER:  I don't think so.
23           THE COURT:  I think it is, Mr. Carter.  But, you know
24  what, double-check.
25           MR. CARTER:  It is.
```

PATRICK CONAGHAN - Cross

1              THE COURT:  I'm right sometimes.
2              MR. CARTER:  You know your courtroom.
3              THE COURT:  Play that -- can you advance that video
4      until I tell you to stop, please?
5                        (VIDEO PLAYED)
6              THE COURT:  All right.  I got the guy in the hat.
7              MR. MECHE:  Here we go.  That's Captain Colin, the
8      captain.
9              THE COURT:  Is this it?
10             MR. MECHE:  No, they keep coming.
11             THE COURT:  That's the only guy I see.
12             MR. MECHE:  They're going to show.  I think there's,
13     like, two more.
14             THE COURT:  Are they going to walking into the screen
15     yet?
16             MR. MECHE:  I think so.
17             THE COURT:  I think the camera maybe stopped.
18             MR. MECHE:  Yeah.
19             THE COURT:  There's only one other guy that I've
20     seen, the guy in the light blue shirt.
21             MR. MECHE:  There they go.
22             THE COURT:  Right there.  Okay.
23                  Is that what you want?  You got a lady with a
24     gun, and a guy in a white shirt.
25                  All right.  Stop it, please.  Pause.

PATRICK CONAGHAN - Cross

1                    **(VIDEO PAUSED)**
2              **THE COURT:**  Thank you.
3                   That's it.  You got two other people.
4              **MR. MECHE:**  Well, I thought Captain Colin and Donald
5    Haynes come up.
6              **THE COURT:**  Haynes, we've already got.
7              **MR. HESSLER:**  That's Colin up front.
8              **MR. CARTER:**  Your Honor, he wants the cameraman,
9    that's what he's waiting for.
10             **THE COURT:**  You've got two other people.
11             **MR. MECHE:**  No, I'm not.  I promise you, I'm you I
12   don't want the cameraman.
13             **THE COURT:**  No, we're not doing that.  I'll tell you
14   that.
15             **MR. MECHE:**  I swear, I'm not doing that.
16             **THE COURT:**  Come on.  Let's ask about these two and
17   let's go.
18             (WHEREUPON, the following proceedings were held in
19   open court.)
20   BY MR. MECHE:
21   Q.   And you had an opportunity to view this with us, and I
22   think -- and it's hard to see, but we saw a better picture of
23   them earlier.  The gentleman in the white shirt who had a hat,
24   I think you identified him as Captain Colin?
25   A.   Right.

PATRICK CONAGHAN - Cross

1    **Q.**   And he was the captain of your group?

2    **A.**   He was a lieutenant at the time, but you're right, he was

3    a commanding officer.  Right.

4    **Q.**   So he was with you, as well, witnessing what was --

5    whatever he saw, he saw?

6    **A.**   Yes, sir.

7    **Q.**   Okay.  And this individual, the last one we see who

8    appears to have some kind of assault rifle, who would that be?

9    **A.**   Looks like Jennifer Dupree.

10   **Q.**   Now, we saw her earlier and she didn't have that type of

11   rifle.  It appears she went somewhere and got it.  Did you all

12   have weapons like that with you all in your unit?

13   **A.**   I don't remember.

14   **Q.**   Okay.  You didn't have one?

15   **A.**   I didn't.

16   **Q.**   Okay.  But she was riding with you all in the same

17   vehicle, the same truck?

18   **A.**   Right.

19   **Q.**   Okay.

20              **MR. MECHE:**  Thank you, sir.

21                 One second.

22              **THE COURT:**  Mr. Larson?

23                 Thank you for the video.

24

25

PATRICK CONAGHAN - Cross

1              **CROSS-EXAMINATION**

2    **BY MR. LARSON:**

3    **Q.**   Mr. Conaghan, I take it that by being -- thinking you're

4    being shot at by a number of individuals gets police officers

5    in sort of an -- they looked like they were in sort of an

6    excited state there.  Fair statement?

7    **A.**   Yes, sir.

8    **Q.**   And how far were you from Officer Haynes, who was yelling

9    to you, directing you where he thought the bad guys were?

10   **A.**   The distance of the high rise to the ground.  I don't know

11   how -- you know...

12   **Q.**   Okay.  And you said he yelled something about a red shirt?

13   **A.**   It was either he said the red shirt, or the St. Landry guy

14   said it from the get-go.  I don't know who said it.  One of

15   them said it.

16   **Q.**   In the excitement of the moment, could he have said red

17   shorts and you heard red shirt?

18   **A.**   It's possible.

19   **Q.**   When you ran up the Danziger Bridge, you got to the top

20   and then you ran down to the west side?

21   **A.**   Yes, sir.

22   **Q.**   All right.  Did you see an unmarked state police car at

23   that point in time?

24   **A.**   No, sir.

25   **Q.**   Was there anybody on the bridge at all except you at that

PATRICK CONAGHAN - Cross

1    point in time?
2    A.   I didn't notice anyone.
3              MR. LARSON:  Thank you, sir.
4              THE COURT:  All right.  Mr. London, do you have any
5    questions for this witness?
6              MR. LONDON:  No questions.
7              THE COURT:  Redirect?
8              MR. CARTER:  Yes, sir.
9                         REDIRECT EXAMINATION
10   BY MR. CARTER:
11   Q.   Briefly, Mr. Conaghan, just to take you back to a couple
12   of things that you testified to.  You were asked, I believe by
13   Mr. Hessler, whether you had any reason to believe that this
14   individual who flagged you down, his statements about hearing
15   gunshots.  Did you hear gunshots yourself after he flagged you
16   down?
17   A.   I don't know when I heard -- yeah, I think they were after
18   he flagged us down.
19   Q.   And where were you when you heard the gunshots?
20   A.   I would have been right about on the high rise.
21             MR. CARTER:  Let's put up Exhibit 48 again, please.
22   BY MR. CARTER:
23   Q.   Can you show us where you were on Exhibit 48 when you
24   heard the gunshots?
25   A.   I don't know exactly.

PATRICK CONAGHAN - Redirect

1   Q.   Just approximate.  You were up on the high rise?
2   A.   Yes, sir.
3   Q.   So it wasn't a question of you believing him, was it?
4   A.   No.
5   Q.   You heard it yourself?
6   A.   Right.
7   Q.   You were asked about the unattended Budget truck.  Now,
8   this was some time ago.  Do you remember all of the details of
9   what happened that day?
10  A.   No.
11  Q.   Is it your testimony that the truck was unattended or that
12  you didn't recall seeing anyone?
13  A.   I didn't see anyone.
14  Q.   You didn't see anyone.
15       Now, how far away was the high rise -- is the high
16  rise from the Danziger Bridge?
17  A.   I don't know.
18  Q.   You don't know?
19  A.   No, sir.
20  Q.   A fair distance?
21  A.   A good piece, yeah.
22  Q.   Where were the people with the camera crew that were
23  taking the video that you were looking at?
24  A.   I never saw them.
25  Q.   You never saw them?

PATRICK CONAGHAN - Redirect

1   **A.**   Never did.

2   **Q.**   Where were the other members of your crew that were

3   pictured on that video?

4   **A.**   On the bridge -- on the high rise.

5   **Q.**   Would you point to where they were approximately?

6   **A.**   (WITNESS COMPLIES).

7   **Q.**   Right up in there?

8   **A.**   Looks like it.

9   **Q.**   And that's where the members -- the people you identified

10  were?  So that was the location of the camera crew, if the

11  camera crew were with them?

12  **A.**   Yes, sir.

13  **Q.**   And you already mentioned that you didn't recall a lot of

14  the details, but you do recall the detail of the red shirt?

15  **A.**   Yes, sir.

16          **MR. CARTER:**  Thank you.

17          **THE COURT:**  Okay.  Thank you, sir.  You can step

18  down.

19              Who's next?

20          **MS. BERNSTEIN:**  United States calls Jennifer Dupree.

21          **THE COURT:**  Jennifer Dupree.

22          **MR. FLEMING:**  Judge, before the witness leaves, may

23  we approach on a matter?  It will be real quick.

24          **THE COURT:**  Come on up.

25              (WHEREUPON, the following proceedings were held at

PATRICK CONAGHAN - Redirect

1    the bench.)

2           **MR. FLEMING:**  Eric had wanted to bring up, Judge,

3    that, I guess, the question would be on the witnesses, once

4    they're finished on redirect, are they released from their

5    subpoenas, or do we need to re-subpoena every single person?

6           **THE COURT:**  Well, now's not a good time to be asking

7    that.

8           **MR. FLEMING:**  You're absolutely right.

9           **THE COURT:**  My understanding is that they will be

10   available.  However, if you need to ensure their attendance,

11   then they should have been subpoenaed.  That's one thing.

12          The other thing is, I have not instructed them

13   to refrain from sitting in the courtroom; and once they sit in

14   the courtroom, they cannot be recalled on rebuttal.

15          So, again, I don't know what your game plan is

16   with witnesses.  Do you need someone who's already testified to

17   return to testify as part of a defendant's case?

18          **MR. FLEMING:**  We may call Mr. Lohman.  We may call

19   Mr. Lohman.

20          **THE COURT:**  Mr. Lohman?

21          **MR. FLEMING:**  Michael Lohman.

22          **THE COURT:**  Okay.  I trust the government will make

23   him available if the defendants choose to recall him.

24          **MS. BERNSTEIN:**  We haven't given him any

25   instructions, and I would normally assume that unless the

PATRICK CONAGHAN - Redirect

1    defense reserves the right to recall somebody, that they're

2    done.  So...

3            THE COURT:  Well, I make the same assumption, and I

4    have not heard this until just now.  I would ask if the

5    government could inquire and make certain that Mr. Lohman is

6    aware that he may be recalled to the stand.

7                    However, I would strongly caution that anything

8    that's been asked about already cannot be asked about again.

9    We are not going to recall people and ask them the same

10   questions and get back into something that was covered on cross

11   or direct or redirect.  If that happens we will be here past

12   Christmas.

13           MR. FLEMING:  No, I understand that, Judge.

14           MR. HESSLER:  I think it's mainly a precautionary

15   measure.  And historically, that's the way -- it's my

16   understanding that's always been done, that they would agree to

17   make their witnesses available to us.

18           THE COURT:  Well, but that's a separate issue.  I'm

19   assuming that they can.  I'm assuming he's not crossed the

20   border at this point and has absconded.  However, we're not

21   going to replow ground that's been plowed.  I can tell you that

22   right now.

23           MS. BERNSTEIN:  Your Honor, just so we're clear going

24   forward, can we assume that every witness is released once

25   they're on the stand unless there is a specific motion to keep

1    them subject to recall.

2              THE COURT:  I think that's the way we should do it.

3    Because we have a lot of witnesses and I'm not going to tell

4    each and every one of them, "Oh, you're not free to go, or you

5    can't sit in the courtroom, or you're subject to being

6    recalled," unless you all tell me that.

7                   Otherwise, I'd have 80 people sitting out there

8    in a couple of weeks.  So let's be careful about who we want to

9    stick around and make certain that that person is, A,

10   available; and B, not violative of the sequestration order.

11                  Okay?

12             MR. HESSLER:  Yes, sir.

13             THE COURT:  The government's going to check with

14   Mr. Lohman and make certain that he can continue to be

15   available at some point in the future.

16             MR. FLEMING:  Judge, I guess I would request, out of

17   an abundance of caution, that we not -- that we not -- I would

18   request, out of an abundance of caution, that we not lift the

19   sequestration order.

20             THE COURT:  I'm not lifting it.

21             MR. FLEMING:  In terms of --

22             THE COURT:  Well, if someone is no longer a witness

23   and wants to sit in the courtroom...

24             MR. FLEMING:  Oh, I understand.  Here's my concern on

25   that, Judge, is that -- I'm just going use an example of the

PATRICK CONAGHAN - Redirect

1   last gentleman who testified, Mr. Conaghan.  He's done, he's
2   free, he's sitting in the courtroom, and Ms. Dupree, for
3   instance, were to say something -- this isn't going to happen,
4   I don't think -- directly contrary, we may want to recall a
5   witness based on what another witness says.
6           **THE COURT:**  You need to so indicate.  Do you need
7   Mr. Conaghan to still be subject to the sequestration order?
8           **MR. FLEMING:**  I don't know that we need Conaghan.  I
9   don't think we need Conaghan.  Do you?  We don't need Conaghan.
10          **MR. MECHE:**  No.
11          **THE COURT:**  You need to so indicate after each person
12  testifies.  Nobody has said a word about these first four
13  people.
14          **MR. FLEMING:**  You're absolutely right, Judge.
15          **MR. HESSLER:**  That will be our responsibility, Judge.
16          **THE COURT:**  I have no idea what your game plan is in
17  terms of calling witnesses.  So you need to so indicate that
18  you reserve the right to recall that person later, and then
19  they will continue to be subject to the sequestration order.
20          **MR. FLEMING:**  Thank you, Judge.
21          **THE COURT:**  All right.
22          **MR. MECHE:**  Your Honor, since we're here, on the
23  video issue, this witness is either in all of the video from
24  the beginning and the end, or witnessed all of the events on
25  the video.  So it's my intention to play the whole video with

PATRICK CONAGHAN - Redirect

 1  her.  She's in it all, she witnessed the shooting, she saw it.
 2  I'm asking her if that's what she --
 3          THE COURT:  It's my understanding that she is in
 4  almost all of it, to my recollection.
 5          MS. BERNSTEIN:  This is related to the issue that we
 6  have, I think, under consideration --
 7          MR. MECHE:  I don't want the NBC guy.  I'll cut that
 8  off.
 9          MS. BERNSTEIN:  -- which is that the video that we're
10  talking about right now, the only one that there's an agreement
11  to, is a video where the camera shuts on and off.  And so it
12  plays in five minutes or something.  What actually happened is
13  over a 30-minute span.
14          THE COURT:  Right.
15          MS. BERNSTEIN:  So...
16          THE COURT:  Can we not tell the jury that they're
17  going to see a realtime exhibition of the video later in the
18  trial?
19          MS. BERNSTEIN:  The defense has not agreed to that.
20          MR. MECHE:  We might.  The person that I have --
21          THE COURT:  I thought we had, subject to the passage
22  with the guy talking.
23          MR. MECHE:  I'll work on the rest of the team.
24          THE COURT:  Yeah, but we're about to do it now,
25  though.

PATRICK CONAGHAN - Redirect

 1          MR. MECHE:  I don't want to play that one.  I just
 2   want to play this short version here.
 3          THE COURT:  Do you all intend to show this video?
 4          MS. BERNSTEIN:  I was going to show -- I expect her
 5   testimony to be that she's so far away that she can just see
 6   tiny little things over there.  So she can't actually see
 7   what's happening, but the video is a zoom.  I was going to show
 8   what she can see, which is the part on the I-10 bridge,
 9   identify herself, the other people, and talk about what she's
10   seeing.
11               She's actually going to describe her
12   perspective, which is very, very different than the video's
13   perspective because of the zoom.
14          THE COURT:  I understand that.  But she's in the
15   video and it depicts her.
16          MS. BERNSTEIN:  On the I-10 --
17          THE COURT:  On the I-10.
18          MS. BERNSTEIN:  -- yes.  But not the part that's on
19   the Danziger Bridge.
20          MR. HESSLER:  But she is describing things that she
21   sees on the Danziger Bridge and actions that she sees people
22   taking.  Whether or not they're small, she's describing their
23   action.
24          THE COURT:  But you see, this is why we should
25   prepare before trial and discuss how this is going to be used.

PATRICK CONAGHAN - Redirect

1            Are we going to show the part with the state

2    police car going over the bridge?  When you tell me that you

3    don't want to show the part of Danziger with this witness,

4    that's interspersed in there.  The camera's moving and you see

5    a police car go over the bridge, and then the camera's back on

6    her walking up the bridge.

7            MS. BERNSTEIN:  Honestly, I don't remember whether

8    that particular police car is in this snippet.  She didn't

9    notice it, and it doesn't have anything to do with her

10   testimony.  But the part that we object to playing is the

11   part -- is the shooting part, which we're going to play later

12   today anyway with a witness who actually has something to say

13   about it.

14           MR. MECHE:  But she did witness that, even though she

15   said it's far away.  But she did witness that.

16           THE COURT:  She's going to talk about it.  The

17   question is:  Are we going to play that part of the video for

18   the jury with this witness?

19           MS. BERNSTEIN:  That part is zoomed in.

20           MR. MECHE:  It's the rule of completeness that you

21   talked about earlier in one of your rulings.  I mean, it's

22   literally cutting and splicing --

23           THE COURT:  Mr. Meche, it's not a 106 question at

24   this point.  It's a question of, "What are we going to do with

25   this witness?"  I agree with you on the rule of completeness,

PATRICK CONAGHAN - Redirect

1    and the rule of completeness will be honored in the sense that

2    it will be played, subject to the issue you all have given me

3    briefs on.

4            The issue is, "With this witness, what are we

5    going to show?"  And, look, I'm tired of talking about the

6    video.  She's on it.  If you want to show it, show it.  I can

7    explain to the jury that there are segments, that are -- this

8    is not a realtime collection of video, that that they are going

9    to see the realtime --

10           MS. BERNSTEIN:  But main part is that the Danziger

11   part is not at all what she saw.  This camera is looking

12   through a zoom at a big truck --

13           THE COURT:  Have you edited those parts out?

14           MS. BERNSTEIN:  No.  Because we didn't plan to offer

15   it.  I think that would be on the defense to do that.

16           MR. MECHE:  You see, the problem is she's

17   interspersed with that --

18           THE COURT:  Right --

19           MR. MECHE:  -- and so --

20           THE COURT:  -- that's the problem.

21           MR. MECHE:  You've got to show it.

22           THE COURT:  That's the problem is that we have no way

23   to edit it now.

24           MS. CHUNG:  She's not interspersed.  She's

25   actually --

PATRICK CONAGHAN - Redirect

1        **THE COURT:**  Wait, wait.  I need one person to talk up
2   here, and that's Ms. Bernstein.
3        **MS. BERNSTEIN:**  She is not interspersed in the part
4   that we object to.  She's in the beginning.  If he wants to
5   show that, he can.  It then goes over to the Danziger Bridge.
6   It shows the victims walking along, and then it shows the
7   shooting on the Danziger Bridge, which is zoomed in, and she
8   didn't see that.  She didn't see the zoomed-in part.  She can
9   testify about what she did see.
10             The next part that she's in is after that, it
11   comes back to the I-10 --
12        **THE COURT:**  Can we skip that part?  Is it easy enough
13   to skip that part on the tape?
14        **MS. BERNSTEIN:**  That's the part that I plan to play
15   anyway, is the part on the I-10.  Absolutely.
16        **MR. MECHE:**  No, Judge, it's -- no.  She's listening,
17   she's hearing, she's watching the video showing what's taking
18   place.  She's seeing it.  The fact that the video had a zoom --
19        **THE COURT:**  She's seen the tape before.  Have you
20   seen the tape before?
21             Because I've got to tell you, this is a
22   tremendous waste of time for us to have bench conferences, and
23   I warned you all about this.  We are not going to spend this
24   trial up here when I've got people sitting in this jury box.
25   It's insulting to them to have to sit and look at you're backs

PATRICK CONAGHAN - Redirect

1  while they're sitting here on jury service.  We are wasting
2  time.
3            All right.  They're going to see the whole tape.
4  How long is the part that you want to play?
5            MR. MECHE:  The whole tape is done in five minutes.
6  I mean, to intersperse it would take 15 minutes just to do all
7  that.  If just put it up there, if we show it, we run it, it's
8  going to be five minutes.  If we start cutting and splicing,
9  it's going to be like last time, that takes 20 minutes.
10           THE COURT:  Let's see what she says.  I'm inclined
11  just to go ahead and play it, and I'll explain to them that
12  it's not in realtime.
13           MS. BERNSTEIN:  We also the reporter in there.
14           THE COURT:  But you're not showing the audio --
15  you're not playing the audio.  You're not playing the audio.
16  My understanding is that we're not playing the audio.
17           MS. BERNSTEIN:  But I think that's not what he has in
18  mind.
19           THE COURT:  We're not playing the audio with this
20  witness.  Is that correct?  Mr. Meche?
21           Poor job -- you know, a really poor job on you
22  alls part.  Very poor.
23           Mr. Meche, are we not playing the audio on this
24  tape?
25           MR. MECHE:  I don't -- you know, what, I don't need

PATRICK CONAGHAN - Redirect

1    it.  If you all don't want it, I mean, I'm fine with that.
2            MS. BERNSTEIN:  I was planning on playing the audio
3    only of the part that has her audio on it.
4            THE COURT:  Okay.  Well, if you don't need it, then
5    she can play the audio for her part, you can question her about
6    that audio for her part, and we're just going to play the tape
7    without the audio when it's on your cross, unless you want to
8    use the part that she's used on the audio.  Okay.
9            MR. MECHE:  I don't have a problem with that.
10           MS. BERNSTEIN:  How do we tell the jury?  Can I just
11   tell the jury that this is a -- that that is a compressed part?
12           THE COURT:  I'll tell them.  If you let me know that
13   you want that part, I'll explain to them, and if you feel like
14   I've left something out, you let me know.
15           MR. MECHE:  And just say you play the audio later, I
16   have no problem with that.
17           THE COURT:  If she's going to play the audio, you can
18   use the portions of her audio that he plays, and play other
19   segments without audio.
20           (WHEREUPON, the following proceedings were held in
21   open court.)
22           (WHEREUPON, **JENNIFER DUPREE**, having been duly sworn,
23   testified as follows.)
24           **THE DEPUTY CLERK:**  Please state your full name and
25   correct spelling for the record.

PATRICK CONAGHAN - Redirect

```
 1            THE WITNESS:  Jennifer Dupree.  J-E-N-N-I-F-E-R,
 2   D-U-P-R-E-E.
 3                      DIRECT EXAMINATION
 4   BY MS. BERNSTEIN:
 5   Q.   Good morning, Ms. Dupree.
 6   A.   Good morning.
 7   Q.   Can you, please, introduce yourself to the jury and tell
 8   them where you work?
 9   A.   My name's Jennifer Dupree.  I work for New Orleans Police
10   Department.
11   Q.   How long have you been with NOPD?
12   A.   About 13 years.
13   Q.   So you worked for NOPD back in 2005 at the time of
14   Hurricane Katrina?
15   A.   Yes.
16   Q.   Where were you on September 4th, 2005, when there was a
17   shooting on the Danziger Bridge?
18   A.   I was on the high rise adjacent to the Danziger.
19   Q.   Is there a bridge out there parallel to Danziger?
20   A.   Yes.
21   Q.   I want to ask about that day in a minute, but first can
22   you give us a little bit of background about yourself.  Where
23   did you grow up?
24   A.   In New Orleans.
25   Q.   Did you go to school here?
```

JENNIFER DUPREE - Direct

1   **A.**   Yes.

2   **Q.**   High school, college?

3   **A.**   High school.

4   **Q.**   When did you join NOPD?

5   **A.**   1999.

6   **Q.**   So in 2005, you had been with the department for about six

7   years?

8   **A.**   Yes.

9   **Q.**   What was your position in 2005 before Hurricane Katrina?

10  **A.**   I was a persons crimes detective in the 3rd District.

11  **Q.**   When the hurricane hit -- well, what were your duties

12  before the hurricane?  What were your duties as a persons crime

13  detective in the 3rd?

14  **A.**   I would investigate anything related to persons crimes:

15  Shootings, robberies, things of that nature.

16  **Q.**   When the storm hit, right afterwards, were you doing your

17  normal duties or were you all assuming different duties?

18  **A.**   No, we took up search and rescue with some airboats.

19  **Q.**   Can you explain what you mean by "airboats, search and

20  rescue"?

21  **A.**   We had met up with two airboat -- two captains of airboats

22  that assisted us in a few days of pulling people that we had

23  received calls from their family members that needed to be

24  pulled out of houses and things in different parts of the city.

25  **Q.**   The folks with the airboats, were they civilians or police

JENNIFER DUPREE - Direct

1  officers?

2  A.   Civilians.

3  Q.   When you say that, "We had hooked up with airboat

4  captains," who do you mean when you refer to as "we"?

5  A.   There was a few of us.  There was myself, Tony Mayfield,

6  Pat Conaghan, Dino Haynes -- Donald Haynes -- Jennifer

7  Goodenough, and that day Lieutenant Louis Colin was with us.

8  Q.   You just mentioned a bunch of people.  The first one you

9  mentioned was -- well, you mentioned Tony Mayfield?

10  A.   Yes.

11  Q.   Patrick Conaghan?

12  A.   Yes.

13  Q.   Dino Haynes?

14  A.   Yes.

15  Q.   Who are they?

16  A.   Three people that I work with.  Well, we all worked

17  together in the 3rd District.

18  Q.   And what's Dino Haynes' real name?

19  A.   Donald Haynes.

20  Q.   You also mentioned a gal named Jennifer Goodenough.  Who's

21  she?

22  A.   She was a police officer at the time and she was also with

23  us.  She's not a police officer anymore.

24  Q.   Was she also 3rd District?

25  A.   Yes.

JENNIFER DUPREE - Direct

1   **Q.**   You mentioned that there was a guy with you that day,

2   Lieutenant Colin?

3   **A.**   Yes.

4   **Q.**   Who's he?

5   **A.**   He was our supervisor that day.  Actually, he was assigned

6   over DIU at the time.

7           **MS. BERNSTEIN:**  Can I have Exhibit 47 up for just a

8   minute, please?

9   **BY MS. BERNSTEIN:**

10  **Q.**   You mentioned that all of those officers you just talked

11  about were in the 3rd District?

12  **A.**   Yes.

13  **Q.**   Where is the 3rd District section of New Orleans?

14  **A.**   It's on the west side of the Danziger Bridge and the high

15  rise approaching the New Orleans East side.

16  **Q.**   Okay.  So I'm going to draw a line on this photograph.  Is

17  there any part on this photograph that's in the 3rd District?

18  **A.**   Yes.

19  **Q.**   Which part?

20  **A.**   Everything -- everything to that side of it.

21  **Q.**   So on the photograph, everything to the left?

22  **A.**   Yes.

23  **Q.**   Is 3rd District?

24  **A.**   Yes.

25  **Q.**   And to the right, what district is that?

JENNIFER DUPREE - Direct

1  A.   7th District.

2       MS. BERNSTEIN:  Okay.  Thanks.  You can put that down

3  for just a minute.

4  BY MS. BERNSTEIN:

5  Q.   So you mentioned that you were with these other officers

6  from the 3rd District on September 4th; is that right?

7  A.   Yes.

8  Q.   The morning of September 4th, what were you all doing?

9  A.   That morning we met up with the airboat guys and we --

10  well, Lieutenant Colin asked us to go out to the 7th District.

11  I think he had a list of some people or some residences we

12  needed to check to see if anybody was in them.

13  Q.   Who were those people you were going to check on?

14  A.   I believe they were either family members of his or family

15  members of people in the 3rd District.

16  Q.   So what happened, you guys got together and you were going

17  to go over to the 7th District?

18  A.   Yes.

19  Q.   How did you get from where you were to the 7th District?

20  A.   The two airboat guys had trucks and trailers, so they

21  trailered the boats.  So we just -- basically, we jumped in the

22  back of the trucks and were heading to the 7th District.

23  Q.   What route did you head out on?

24  A.   The interstate.

25  Q.   Is that the I-10 high rise?

1  A.   Yes.
2  Q.   So to get into the 7th District, you go over that I-10
3  high rise bridge?
4  A.   Yes.
5  Q.   What happened that morning -- well, let me ask you:  As
6  you're going over the I-10 high rise bridge into the 7th
7  District, what side of you is the Danziger Bridge on?
8  A.   It was on the left side.
9  Q.   All right.  Can you tell us what happened that morning?
10 A.   We were coming over the high rise approaching the 7th
11 District side, the downslope, going into the east when at the
12 bottom of the bridge they had several vehicles stopped.  When
13 we got closer to the bottom, one guy in particular, but several
14 people were yelling at us to, "Get down.  They're shooting at
15 us.  They're trying to take our boats."
16         And a guy, who I believed was a police officer at the
17 time, he came running up to us, shouting to get down, that
18 they're shooting at us.
19 Q.   This guy who stopped you and said, "Get down.  They're
20 shooting at us," you said you believed at the time he was a
21 police officer?
22 A.   Yes.
23 Q.   Do you remember what he looked like?
24 A.   He was a white male.  He had black -- he had BDUs on, and
25 I don't remember if it said "Sheriff" or "Police" on his shirt.

JENNIFER DUPREE - Direct

1  **Q.**   Is that what made you think he was a police officer?

2  **A.**   Yeah.

3  **Q.**   All right.  So this guy, was he in a car or was he in the

4  roadway when you saw him?

5  **A.**   He was in the roadway.

6  **Q.**   And he flagged you all down?

7  **A.**   Yes.

8  **Q.**   What happened after he said, "They're shooting at us"?

9  **A.**   At that point we heard several shots.  We jumped -- well,

10 I jumped out of the car -- back of the truck onto the ground,

11 not knowing where it was coming from.  It became kind of

12 chaotic at that point.  I ran to the side of the bridge, not

13 knowing where the shots were coming from, went around to the

14 side of the bridge and looked over, that's when I saw four

15 individuals.

16 **Q.**   When you ran to the side of the bridge and looked over --

17 first of all, you're talking about the I-10 bridge that you

18 were on?

19 **A.**   Yes.

20 **Q.**   Which side did you go to look over, the side facing the

21 Danziger Bridge or the side the other way?

22 **A.**   The side away from the Danziger.

23 **Q.**   And I don't think I asked you this before:  Do you know --

24 can you estimate for us how far away the Danziger Bridge is

25 from the I-10 that you were on?

JENNIFER DUPREE - Direct

1   **A.**   About a mile.

2   **Q.**   Okay.  You -- judging by your face, you're guesstimating

3   on that?

4   **A.**   Yes.

5   **Q.**   But it's a distance?

6   **A.**   Yes.

7   **Q.**   So you said when you heard -- when he yelled, "Shots

8   fired" -- "They're shooting at us" -- I'm sorry -- when he told

9   you, "They're shooting at us," you went over to the right side

10  of the bridge and looked down?

11  **A.**   Yes.

12  **Q.**   What did you see?

13  **A.**   Four individuals at the -- on the ground.

14  **Q.**   White or black?

15  **A.**   Black males.

16  **Q.**   Black males.

17          And what happened next?

18  **A.**   At that time somebody yelled out, "Police," and two of

19  them looked up.  I remember two specifically, one with a red

20  shirt and the other one with a black shirt and a book bag, both

21  having guns.  At that point I ducked.  I heard a few more shots

22  and I was ordered -- well, told by Lieutenant Colin, "Kick it

23  in."

24  **Q.**   First of all, what does "kick it in" mean?

25  **A.**   To put it out over the radio.

JENNIFER DUPREE - Direct

1   **Q.**   Did you have a radio that was working that day?

2   **A.**   Yes.

3   **Q.**   All right.  I'm going to ask you about your radio call in

4   a second.  But first, you said when you looked down there were

5   two guys with guns and you described what they were wearing.

6   **A.**   Yes.

7   **Q.**   You said a book bag for one of them.  Can you describe

8   what you mean by "book bag"?

9   **A.**   It was like a black backpack.

10  **Q.**   So not a book bag that you carry in your hand, but

11  something on your back?

12  **A.**   Yes.

13  **Q.**   What happened next?

14  **A.**   At that point I kicked it in.  I kicked in a 108 because

15  they were shooting.

16  **Q.**   What does a "108" mean?

17  **A.**   Officer needs assistance, officer's life in danger.

18  **Q.**   What happened next?

19  **A.**   They went underneath the bridge and I lost sight of them.

20  I ran to the other side of the bridge along with everybody

21  else.  I don't remember where everybody else was.  When I got

22  to the other side of the bridge, I couldn't see them at first.

23  **Q.**   Now, when you say you went to the other side of the

24  bridge, are you now on the side facing Danziger or away?

25  **A.**   Facing the Danziger.

JENNIFER DUPREE - Direct

1   Q.   All right.  So what happened when you went over to the
2   Danziger side of the I-10 bridge?
3   A.   When I went to that side, I didn't see them right away.
4   It took a little while.  And then there was a guy with a
5   camera.  It's a news crew that I learned now, but at the time
6   he's the one that pointed them out, "There they are."
7   Q.   So at the time, you knew there was a guy there with a
8   camera?
9   A.   Yes.
10  Q.   A little snapshot camera or a video camera?
11  A.   No, it was a big video camera.
12  Q.   What's your understanding at the time, were these
13  civilians or police officers?
14  A.   Civilians.
15  Q.   Did you know where the guy with the camera came from?
16  A.   No.
17  Q.   Were there other people with him?
18  A.   I'm sure there were.  I don't remember them.  I just
19  really remember the camera more than anything.
20  Q.   All right.  When you went over to the Danziger side of the
21  I-10 bridge, you said you were looking down, looking for the
22  people who had run under the bridge?
23  A.   Yes.
24  Q.   On your own, did you see them; did you see anybody come
25  out?

JENNIFER DUPREE - Direct

1    A.   After he pointed them out, where they are, yes, you could

2    see them running.

3    Q.   All right.  Tell us that again.  Who pointed them out to

4    you?

5    A.   The cameraman.

6    Q.   What do you remember the cameraman saying?

7    A.   He just said, "There they are," and he pointed down.

8    Q.   Did you look down?

9    A.   Yes.

10   Q.   What did you see?

11   A.   I saw -- I remember two of them running.  The guy with the

12   red shirt and the black shirt, I specifically kept my eyes on

13   them.

14   Q.   What did you do?  What were you doing as you kept your

15   eyes on them?

16   A.   Giving the description and location of where they were and

17   where they were running.

18   Q.   Who were you giving the description and the location to?

19   A.   To -- over the air to other police officers.

20   Q.   Why were you giving a description and a location of these

21   folks?

22   A.   To apprehend them, to assist us.

23   Q.   When you saw those people after the cameraman pointed them

24   out -- well, first, let me ask you:  Did you have -- were you

25   armed?

JENNIFER DUPREE - Direct

1   **A.**   Yes.

2   **Q.**   What were you armed with?

3   **A.**   I had my Glock .40 and I also had a shotgun.

4   **Q.**   Were the other officers with you armed?

5   **A.**   Yes.

6   **Q.**   When you ran over to the Danziger side of the I-10 and

7   were looking down, where were those other officers that you've

8   been talking about?

9   **A.**   Two of them were running down, I believe it's the on-ramp

10  by Downman, that was Pat Conaghan and the other guy who I

11  believed was a police officer.  I don't know his name.  He

12  was -- they were both running down to the ground after the

13  subjects.

14  **Q.**   Would it help you here to see a photograph when you're

15  describing where they went?

16  **A.**   Yeah.  I mean, I know it's the actual on-ramp by Downman,

17  though.

18          **MS. BERNSTEIN:**  Can I have Exhibit 47 up?  For the

19  record, this is the aerial photograph of the two bridges.

20  **BY MS. BERNSTEIN:**

21  **Q.**   Just to make sure everybody's oriented, can you draw a

22  line on the I-10 bridge where you were?

23  **A.**   (WITNESS COMPLIES.)

24  **Q.**   Okay.  Well, hang on.  Are you showing us where you were

25  or where they went?

JENNIFER DUPREE - Direct

1  **A.**   Well, I was in this area, and where they ran was --

2  **Q.**   Let me erase this.  Okay.  Can you just put an "X" where

3  you were at the time you're talking about now?

4  **A.**   (WITNESS COMPLIES.)

5  **Q.**   Okay.  Yeah.  Sorry, an "X" is hard to do on this machine.

6  I shouldn't have asked you to do that.

7         All right.  You said that two people started to run

8  down a ramp.  Where's the ramp they started to run down?

9  **A.**   (WITNESS COMPLIES.)

10 **Q.**   And those two people were whom?

11 **A.**   Pat Conaghan and the other police officer.

12 **Q.**   When you looked down -- and this was happening as you were

13 looking down and seeing these two people?

14 **A.**   Yes.

15 **Q.**   Can you estimate on this photograph, can you just do a dot

16 at approximately where you think you saw those people when you

17 looked down?

18 **A.**   Some place in this -- I can't -- I mean, it's some

19 place --

20 **Q.**   On the ground under --

21 **A.**   -- in that area.

22        Yes.

23 **Q.**   I'm sorry.  On the ground under where you just did that

24 dot?

25 **A.**   Yes.

JENNIFER DUPREE - Direct

1   Q.   All right.  When you looked down and saw the people, you
2   said this time you saw two?
3   A.   Yes.
4   Q.   What were those two -- and those were the two who were
5   armed?
6   A.   Yes.
7   Q.   What were they doing at that point?
8   A.   They were running towards the Danziger Bridge.
9   Q.   You said you were armed.  You had a shotgun?
10  A.   Yes.
11  Q.   Did you shoot them?
12  A.   No.
13  Q.   Did you shoot at them?
14  A.   No.
15  Q.   Did you fire your weapon?
16  A.   No.
17  Q.   Why not?
18  A.   I was too far away and their backs were turned, they were
19  running towards the Danziger.
20  Q.   Why does that matter that their backs were turned and they
21  were running toward Danziger?
22  A.   They weren't a threat to me.
23  Q.   Did anybody else on the bridge with you fire at them?
24  A.   No.
25  Q.   So you said they started running off in the direction of

JENNIFER DUPREE - Direct

1  Danziger?

2  **A.**   Yes.

3  **Q.**   What was between -- or was there anything between where

4  they were and the Danziger Bridge?

5  **A.**   There was a lot of debris from the storm.  There was also

6  some trailers, cars.  There was a lot of stuff down there.

7  Brush.

8          **MS. BERNSTEIN:**  Can we have Exhibit 47 up again,

9  please?

10 **BY MS. BERNSTEIN:**

11 **Q.**   Looking at that aerial photograph, do you see the trailer

12 park that you're talking about?

13 **A.**   I believe it was all in that area.

14 **Q.**   You're indicating an area in there.  Do you actually see

15 the trailer park there or is that where the trailer park was?

16 **A.**   That's where it was.

17 **Q.**   All right.

18          **MS. BERNSTEIN:**  May I approach, Your Honor?

19          **THE COURT:**  Yes.

20 **BY MS. BERNSTEIN:**

21 **Q.**   I'm approaching with a photograph that's been marked

22 Exhibit 49.  Have you seen that photograph before?

23 **A.**   Yes.

24 **Q.**   Do you recognize it?

25 **A.**   Yes.

JENNIFER DUPREE - Direct

1  **Q.**   What is it?  What's it a picture of?

2  **A.**   It's a photo of the trailer park underneath -- between the

3  two bridges.

4  **Q.**   So this has the trailer park that you were just talking

5  about?

6  **A.**   Yes.

7            **MS. BERNSTEIN:**  Your Honor, I'd like to offer

8  Exhibit 49 into evidence.

9            **THE COURT:**  Any objection?

10            **MR. FLEMING:**  No, Judge.

11            **THE COURT:**  So ordered.  Exhibit 49 is admitted.

12            **MS. BERNSTEIN:**  May we have that up, please?

13  BY MS. BERNSTEIN:

14  **Q.**   I just circled an area on that photograph.  Is that the

15  trailer park that you're talking about?

16  **A.**   Yes.

17  **Q.**   Do you know where this -- or can you tell from looking at

18  it where this photograph was taken from?

19  **A.**   Looks like it was taken up from the bridge down towards --

20  from the high rise down towards the Danziger, the area.

21  **Q.**   Is this approximately the perspective that you had that

22  day?

23  **A.**   Yeah -- yes.

24  **Q.**   Can you draw a line for the jury all the way along the

25  Danziger Bridge along Chef Menteur Highway so they can see what

JENNIFER DUPREE - Direct

1   you're looking at?

2   A.   (WITNESS COMPLIES.)

3   Q.   Thanks.

4          Now, as we're looking at it here -- just to make sure

5   everybody is oriented -- where is the top of the bridge, would

6   it be off to the left of the photograph or off to the right?

7   A.   To the left.

8   Q.   All right.  And what's the intersection off to the right

9   of where this photograph ends?

10  A.   That would be Downman.  Where you don't see it?

11  Q.   Yeah.

12  A.   Downman.

13  Q.   Chef Menteur Highway and Downman Road?

14  A.   Yes.

15         MS. BERNSTEIN:  Thank you, Tim.

16  BY MS. BERNSTEIN:

17  Q.   All right.  So as these people start to run in the

18  direction of the Danziger Bridge, tell us what happens.

19  A.   I lose sight of them because they're running in between

20  the trailers.  So you would catch a glimpse of them, lose

21  sight.  I tried to give the locations where they were.  When I

22  would lose sight of them, I remember Jennifer Goodenough being

23  next to me, she would tell me where they are to broadcast it

24  over the radio.  I remember the two guys passing a pack of

25  dogs, heading towards the bridge, and I think I put that out.

JENNIFER DUPREE - Direct

1   Q.   Were those dogs down in that trailer park area?

2   A.   Yes.

3   Q.   So let me ask you this, because you said as they were

4   running, you continued to put out their description and

5   location?

6   A.   Yes.

7   Q.   And I started to ask this earlier and I think I got

8   sidetracked, but why were you putting out description and

9   location?

10   A.   To apprehend them.

11   Q.   Why is it important to put out on the radio, say, the

12   description of the person?

13   A.   So they know who to look for, who to go after.

14   Q.   What's the description you put out?

15   A.   A red T-shirt and the other one had a black shirt with a

16   black book bag.

17   Q.   That's what you were putting out over the radio?

18   A.   Yes.

19   Q.   Why is it important to put out over the radio the location

20   of the person?

21   A.   To know where to go to, to where to find them.

22   Q.   Did you ever put out on the radio that an officer was

23   down?

24   A.   No.

25   Q.   What does that mean, "officer down"?

JENNIFER DUPREE - Direct

1   **A.**   That he was shot or could have been hurt.

2   **Q.**   Have you had a chance to look at Government's Exhibit

3   No. 52 in preparation for trial, which is a 360 photograph from

4   the I-10 bridge?

5   **A.**   Yes, I think I've seen it.

6   **Q.**   A photograph that sort of moves around?

7   **A.**   Yes.

8   **Q.**   Did that photograph -- is that photograph, does it

9   accurately depict what you saw that day -- or your perspective,

10  I should say, from that day?

11  **A.**   Yes.

12  **Q.**   Would it be helpful for you in explaining your testimony?

13  **A.**   Yes.

14        **MS. BERNSTEIN:**  All right.  I'd like to offer

15  Exhibit 52.

16        **THE COURT:**  Exhibit 52, any objection?

17        **MR. FLEMING:**  No, Judge.

18        **THE COURT:**  All right.  So ordered.

19        **MS. BERNSTEIN:**  Mr. Brickell, may I have Exhibit 52

20  up, please?

21  **BY MS. BERNSTEIN:**

22  **Q.**   Okay.  Can you tell us what the perspective is on this

23  photograph right now?

24  **A.**   This is the high rise looking down towards the Downman

25  exit ramp going towards New Orleans East.

JENNIFER DUPREE - Direct

1  **Q.**   So is this actually looking the direction that you all
2  started out that day?
3  **A.**   Yes.
4  **Q.**   And let me ask you:  We're looking right now down the
5  lanes that would normally be heading the other way; correct?
6  **A.**   Yes.
7  **Q.**   What lane were you all in that day?
8  **A.**   Driving or when we were running?
9  **Q.**   I'm sorry.  When you were driving?
10  **A.**   We were on the opposite side.
11  **Q.**   Okay.  And then you said when you -- you went over to the
12  right side of the bridge first; correct?
13  **A.**   Right.
14  **Q.**   And then when you came back to the left side of the
15  bridge, can you see in this picture where you were?
16  **A.**   We were down towards this area, more towards the entrance
17  ramp.
18  **Q.**   As those people ran towards Danziger and you were kicking
19  in the radio call, what were you doing?
20  **A.**   I was running up the bridge giving locations.
21  **Q.**   So you were running towards us in this picture here?
22  **A.**   Yes.
23          **MS. BERNSTEIN:**  Mr. Brickell, can we pan to the left,
24  please?
25              Can you go back one to the right?

JENNIFER DUPREE - Direct

1  BY MS. BERNSTEIN:

2  Q.   All right.  What are we looking at now, Ms. Dupree?

3  A.   Area headed towards the Danziger Bridge.

4  Q.   You see the big double span over here on the left, is that

5  the top of the Danziger Bridge?

6  A.   Yes.

7  Q.   All right.  So again for us, just to get us oriented, can

8  you draw a line along the entire length of the Danziger Bridge?

9  A.   (WITNESS COMPLIES.)

10  Q.   Now, in this photograph again, that trailer park that you

11  pointed out earlier is missing; right?

12  A.   Yes.

13  Q.   But on the day of the incident, there were trailers there?

14  A.   Yes.

15  Q.   This area that I just had circled, that's the area where

16  you saw the people running through toward the Danziger Bridge;

17  is that right?

18  A.   Yes.

19  Q.   Is this perspective about what you had on the day of the

20  shooting or do we need to do something to make it more

21  accurate?

22  A.   It's pretty accurate.

23  Q.   Do you see a Budget truck in that photograph?

24  A.   Yes.

25  Q.   Can you circle it?  Oh, I'm sorry.

JENNIFER DUPREE - Direct

1    A.    (WITNESS COMPLIES.)

2    Q.    Is that what you were just pointing to?

3    A.    Yes.

4    Q.    All right.  Can you tell us what happened?

5    A.    I watched the two subjects go up the Danziger Bridge,

6    running towards the top of the bridge.  I kept giving their

7    description.

8    Q.    Let me ask you there:  How well can you see people on the

9    Danziger Bridge from where you are on the I-10?

10   A.    You can see them.  It's more of seeing colors of their

11   shirts and -- you can't see too well, but you could see people

12   on the bridge.

13   Q.    Tell us what happened.

14   A.    At that point the two subjects ran up the bridge.  I kept

15   giving the locations of where they were.  I remember them

16   getting to the top of the bridge by the pillars, and at that

17   point I remember the truck pulling up.  When the truck pulls

18   up, I just remember a whole bunch of shots being fired.

19   Q.    All right.  So say that again.  Right before all the shots

20   were fired, you were looking where?

21   A.    At the top of the bridge.

22   Q.    And you said up by the pillars?

23   A.    Yes.

24   Q.    All right.

25            MS. BERNSTEIN:  And I'm sorry, can we have that

JENNIFER DUPREE - Direct

1    exhibit back up again, please?
2    **BY MS. BERNSTEIN:**
3    **Q.**   Can you circle the -- or mark on the area where you were
4    focused?
5    **A.**   (WITNESS COMPLIES.)
6    **Q.**   All right.  So you were looking up there and then what did
7    you say happened?
8    **A.**   I remember a truck pulling up and I remember a whole bunch
9    of shots being fired.  I remember after that being told, "Shut
10   up.  We have them."  So I remember I stopped saying anything.
11   **Q.**   When the truck pulled up, was it up to the top of the
12   bridge where you were looking or was it somewhere else?
13   **A.**   No.  It was more down towards the bottom.
14   **Q.**   So a truck pulled up to the bottom of the bridge.  You
15   said you heard lots of shots?
16   **A.**   Yes.
17   **Q.**   How long did those shots go on; do you know?
18   **A.**   It was quick, in my mind, how everything happened, but
19   maybe five seconds, six seconds.  I don't -- everything
20   happened so quick.
21   **Q.**   When the shooting was going on, where did you move your
22   focus?
23   **A.**   Back down to the truck.
24   **Q.**   So you could tell that the shooting was coming from that
25   truck?

JENNIFER DUPREE - Direct

1   A.   Yes.

2   Q.   Do you know what kind of truck it was?

3   A.   Yeah, it's a Budget truck.

4   Q.   When you saw that truck pull onto the bridge, did you know

5   that there were officers in it?

6   A.   Not at first, no.

7   Q.   But at some point, you realized those were officers

8   shooting?

9   A.   Yes.

10  Q.   Now, from where you were, let me ask you:  Did you have --

11  did you have any binoculars or any zoom, anything to enhance

12  your vision?

13  A.   No.

14  Q.   From where you were, you said you could hear shooting?

15  A.   Yes.

16  Q.   Could you see who was shooting?

17  A.   No.

18  Q.   But you said you could tell it was coming from the area of

19  that Budget truck?

20  A.   Yeah.

21  Q.   As that truck came onto the bridge, did you give any

22  commands on the radio?

23  A.   No, I didn't -- no, I just -- the only thing I remember

24  was giving the locations of where they were at the top of the

25  bridge.

JENNIFER DUPREE - Direct

1  Q.   Did you communicate to the people in the Budget truck at
2  all?
3  A.   I was told to shut up.
4  Q.   When they drove on, did you tell them anything about,
5  "That's them right in front of you"?
6  A.   No.
7  Q.   Are you sure of that?
8  A.   Positive.
9  Q.   How sure are you?
10 A.   Absolutely.  I couldn't see.
11 Q.   Why are you absolutely sure that you didn't give that
12 instruction to people in the Budget truck?
13 A.   Because I didn't know, first of all, who they were pulling
14 up, and I couldn't see that far.  And also my last recollection
15 of the two guys, they were at the top of the bridge.
16 Q.   All right.  When you say you -- first of all, you didn't
17 know who they were in the truck, what do you mean?
18 A.   I didn't know they were police officers in the truck.  I
19 didn't know who was in that truck.
20 Q.   At some point did you see people -- when the truck
21 stopped, did you see people get out of the truck?
22 A.   Yes.
23 Q.   Could you tell what they were wearing?
24 A.   They were in blue.  I couldn't tell what exactly, but --
25 until I saw the video.

JENNIFER DUPREE - Direct

1   **Q.**   So before you saw the video, going back to that day, when

2   you saw people jump out at some point, did you realize they

3   were police?

4   **A.**   No.

5   **Q.**   How did you realize they were police?

6   **A.**   When I pretty much was told, "We got them."

7   **Q.**   Somebody on the radio said, "We got them"?

8   **A.**   Yes.

9   **Q.**   And how did that tell you that these were police?

10  **A.**   Because they had a radio, they could communicate, so I

11  just -- I guess I assumed that they were the police.

12  **Q.**   Did you ever at any point that day see civilians walking

13  up the Danziger Bridge pushing a shopping cart?

14  **A.**   No.

15  **Q.**   Did you ever see civilians in the road approximately where

16  that Budget truck stopped?

17  **A.**   No.

18  **Q.**   Did you ever tell anybody, "Those people in the road there

19  are the people with guns"?

20  **A.**   No.

21  **Q.**   At some point after the shooting on the bridge, did you

22  see people running?

23  **A.**   Yes.

24  **Q.**   Where did you see people -- did you see people running --

25  I'm sorry -- toward the shooting or away from the shooting?

JENNIFER DUPREE - Direct

1  A.   Away from the shooting.

2  Q.   Where did you see them running?

3  A.   Towards the 3rd District side, down towards the Friendly

4  Inn.

5  Q.   So is that area you're describing on this photograph --

6  actually, this is -- I forgot this was a movable photograph.

7         MS. BERNSTEIN:  Can we pan to the left, please,

8  Mr. Brickell?

9              One back to the right.

10             Two back to the right now.

11  BY MS. BERNSTEIN:

12  Q.   Can you see on this photograph now the area you're talking

13  about where you saw people running away?

14  A.   Yes.

15  Q.   Can you show us?

16  A.   (WITNESS COMPLIES.)

17  Q.   Let me describe for the record if I may.  I've had her

18  make a couple marks and I haven't described them for the

19  record.  Ms. Dupree, please make sure I'm accurate on this.

20             Earlier when I asked you to mark where your focus was

21  before the truck came up, you marked just on the right side of

22  the right -- of the double span that's on the right; is that

23  correct?

24  A.   Yes.

25  Q.   And now when I just asked you to describe where you saw

JENNIFER DUPREE - Direct

1   people running away, you've drawn a line from the top of the
2   bridge down the west side, which is off to the left; is that
3   accurate?
4   A.   Yes.
5   Q.   What did those people look like you saw running away?
6   A.   One had a black shirt on, one of them had a white shirt.
7   Q.   What did you do when you saw people running away from the
8   scene of the shooting?
9   A.   I gave the description.
10  Q.   Do you know what role, if any, those people had played in
11  the shooting?
12  A.   No.
13  Q.   Why did you -- when you say you gave a description, was
14  that out on the radio again?
15  A.   Yes.
16  Q.   Why did you give a description on the radio?
17  A.   I still believed those were some of the subjects involved
18  and they were fleeing from the scene still.
19  Q.   What description did you put out?
20  A.   "Black" -- "subject with a black shirt and subject with a
21  white shirt."
22  Q.   Did you give their location as well?
23  A.   Yes.
24  Q.   What did you say?
25  A.   That they're fleeing towards the 3rd District towards

JENNIFER DUPREE - Direct

1    the -- towards the Friendly Inn.

2    **Q.**   What's the Friendly Inn?

3    **A.**   It used to be a motel off of Chef.

4    **Q.**   How are you familiar with the Friendly Inn?

5    **A.**   Well, I worked the 3rd District, so I knew pretty much

6    that whole area from just working -- working in that area.

7    **Q.**   And you said you put out over the radio, "They're running

8    down toward the Friendly Inn"?

9    **A.**   Yes.

10   **Q.**   Could you see the Friendly Inn from where you were?

11   **A.**   No.

12   **Q.**   Why did you put out then, "They're running toward the

13   Friendly Inn"?

14   **A.**   Just a location, a landmark, something to know where

15   they're heading -- which way they're heading.

16   **Q.**   When you put out on the radio that two people were running

17   away, one in a black T-shirt, one in a white T-shirt, what did

18   you expect to happen to them?

19   **A.**   To be apprehended.

20   **Q.**   When you were putting these calls out on the radio, were

21   you hearing any response back?

22   **A.**   Yeah.  I think people were saying, "We're coming."  I

23   don't remember exactly what was said, but I know people were

24   saying, "We're coming."  I heard people saying, "We're there."

25   **Q.**   Let me actually break my question up into a couple parts.

JENNIFER DUPREE - Direct

1    Because first I asked you about the radio call you kicked in in
2    the beginning when you saw people running toward the Danziger
3    Bridge; right?
4    A.   Yes.
5    Q.   As you were kicking in the location and description at
6    that time, do you remember whether you received any response
7    back?
8    A.   Yes.  People said, you know, "We're coming."  So I knew
9    people were coming to help us.
10   Q.   Did you -- and I'm sorry.  When you say "people," you mean
11   officers?
12   A.   Yes, I'm sorry.
13   Q.   Did you know what officers were responding?
14   A.   No.  At that time it could have been whoever's close in
15   the area.
16   Q.   And then I jumped and I had started asking you about the
17   radio call you kicked in when you saw the two guys running down
18   the west side of the bridge.  Do you remember whether you were
19   hearing any response over the radio at that point?
20   A.   Yeah.  Like I said, I remember people saying, "We're
21   coming."  I don't remember exactly what from there, but I do
22   remember people saying, "We're coming," and somebody said, "We
23   see them."
24   Q.   Did you actually learn after the fact that part of this
25   incident was captured on videotape?

JENNIFER DUPREE - Direct

1    **A.**    Yes.

2    **Q.**    You've seen that tape?

3    **A.**    Yes.

4    **Q.**    Is there any audio on that tape?

5    **A.**    Yes.

6    **Q.**    Have you seen yourself on the video?

7    **A.**    Yes.

8    **Q.**    Have you heard yourself on the audio?

9    **A.**    Yes.

10   **Q.**    Let me ask you about the NOPD communications.  In normal

11   times, are your radio communications taped?

12   **A.**    Yes.

13   **Q.**    Do you know whether those -- that backup tape system was

14   working after Katrina?

15   **A.**    I was told it wasn't.  I mean, I had no clue at the time

16   if it was or if it wasn't.

17   **Q.**    So have you ever heard an NOPD audiotape of any of these

18   radio calls that we're talking about?

19   **A.**    No.

20   **Q.**    All right.  But you said that this video does have some

21   audio?

22   **A.**    Yes.

23   **Q.**    And does part of the audio on this video -- or I should

24   say, does the audio on this video capture part of what you've

25   talked about?

JENNIFER DUPREE - Direct

1    A.    Yes.

2    Q.    Do you remember which part -- which one of your radio

3    calls it captures?

4    A.    I believe when the two subjects are at the top fleeing

5    down.

6    Q.    So that second part that you talked about when you're

7    kicking in the call of the two people running?

8    A.    Yes.

9    Q.    I want to go back to what you saw that day.  You said you

10   saw these two people running down the west side of the bridge.

11   Were you still on the east side of the I-10 at that point or

12   were you on the west side of the I-10?

13   A.    We were still running towards the top of the high rise.

14   So we were actually still on the east side running up the

15   bridge to get a better view of -- and trying to keep everybody

16   in sight.

17   Q.    Did those guys you were trying -- were you able to keep

18   them in your sight?

19   A.    On and off.  You'd lose sight of them.  Like I said, I

20   lost sight of them in between the pillars on the bridge, in the

21   brush, in the trailer park down below.

22   Q.    I'm sorry.  Let me focus now on the second part, from the

23   time you see the guys running down the west side of the

24   Danziger Bridge and you're kicking in that second radio call

25   now.  As you're watching them, do you eventually lose sight of

JENNIFER DUPREE - Direct

1  them or are you able to keep your eyes on them?

2  **A.**   No, I lost sight.

3  **Q.**   Do you know where they ultimately ended up?

4  **A.**   No.

5  **Q.**   Did you ever hear a gunshot coming from that side of the

6  bridge, from the west side of the bridge?

7  **A.**   No.

8  **Q.**   So if there was one, you were too far away to hear it?

9  **A.**   Yes.

10  **Q.**   Did you ever hear any shots coming from the I-10 bridge?

11  Other than the ones you described in the very beginning below

12  the bridge.

13  **A.**   No.

14  **Q.**   I think I want to do a couple things here.  I want to --

15  you said you've seen this video before; right?

16  **A.**   Yes.

17  **Q.**   What's your understanding of who took this video?

18  **A.**   It was -- at the time I don't know why I thought it was a

19  CNN reporter, but I just thought it was some kind of reporter

20  or civilian.

21  **Q.**   Was it that guy that you were talking about who was on the

22  I-10 bridge?

23  **A.**   Taking -- yes.  With the camera, yeah.

24  **Q.**   All right.  And you said you had a chance to see it?

25  **A.**   Yes.

1  **Q.**  I want to play the video first without any audio, and then
2  I want to come back and play the audio from the part that you
3  talked about where you recognize your voice.
4        **THE COURT:**  Ms. Bernstein, is this appropriate for me
5  to advise the jury with regard to this?
6        **MS. BERNSTEIN:**  Oh, yes, Your Honor.  Thank you.
7        **THE COURT:**  What we're going to show you now, and
8  part of what we were discussing up here, is that you're going
9  to see the video portion, but segments that have been taken out
10 that do not constitute video have been removed.
11        So in other words, it's not going to be a
12 realtime playing.  It's going to be maybe a couple minutes
13 here, and then there was some dead time that elapsed, and then
14 there's a couple minutes, and then there's some time that was
15 not captured, and then some minutes after that.  And there may
16 be intervals like that.
17        So what we've done, for the purposes of this
18 witness, is to take only the portions that you can view
19 something and show you that.  And, of course, this, as I
20 understand it, Ms. Bernstein is going to have it played without
21 audio.
22        At some point during the trial, you will see the
23 entirety of the video with appropriate audio and also there
24 will be a lapse of time which you'll be able to appreciate
25 between -- in other words, those intervals will be placed back

JENNIFER DUPREE - Direct

1   in, even though the video was not playing during those

2   intervals.  But for right now, we're just going to see the

3   video portion and it's going to be compressed so that you don't

4   have the intervals of time where there is no video.

5                Is that correct?

6           MS. BERNSTEIN:  Yes.  Thank you, Your Honor.

7                For the record, this is Exhibit 29.

8           THE COURT:  Exhibit 29.

9           MS. BERNSTEIN:  The original NBC video.

10          THE COURT:  Are we admitting this at this time?

11          MR. MECHE:  Well, I haven't heard this portion that

12  has been -- stuff's been removed, so I don't know.

13          THE COURT:  Well --

14          MS. BERNSTEIN:  And, Your Honor, I'm not --

15          THE COURT:  -- if you're going to ask me to rule on

16  it's admissibility after we show it to the jury, I think the

17  bell will already be rung.  So --

18          MR. MECHE:  It depends on what they took out.

19          THE COURT:  You don't know what it is?

20          MR. MECHE:  I don't know what they took out.

21          MS. BERNSTEIN:  This is the original video.  Nothing

22  has been taken out, Your Honor, but we're not --

23          THE COURT:  Let me tell you all something:  We have

24  expended -- or you can read into that word "wasted" -- time

25  this morning talking about this videotape and how and in what

JENNIFER DUPREE - Direct

1    form it's going to be played.

2              Now, from now on when a witness is going to

3    testify-- and I asked you all, "Who are we going to see

4    tomorrow?  Who are we going to see in the afternoon?"  If you

5    know you're going to use the videotape, or if you know your

6    opponent's going to use it, you need to confer beforehand to

7    talk about the manner in which it's going to be played so that

8    you can view it or you can satisfy yourself that you have

9    already viewed it so that you don't have any objection.

10             Now, Mr. Meche, the only way -- and anyone else

11   who has an objection -- the only way we can do this is if I ask

12   the jury to step outside, and then we see it, and then I hear

13   an objection, and then they come back and see it or not see it,

14   depending on my ruling on the objection.

15             MR. MECHE:  We assume whatever video the government

16   would play would be the video we were given which has not had

17   segments of the audio removed.  They've never given us this

18   video, which apparently they removed segments of audio to --

19             THE COURT:  But is it not true that what they are

20   playing is all of what you've got minus the things that I've

21   just said; in other words, we're not going to hear the audio

22   this time and we're not going to have the lapses of time?

23             MR. MECHE:  But you see, I don't know what they

24   removed because -- and we can talk more about it, Judge, but

25   this witness --

JENNIFER DUPREE - Direct

 1          **THE COURT:**  I really don't want to talk more about
 2   it.  I want to show it -- I want the jury to be able to
 3   appreciate the evidence and get the trial going.  I don't know.
 4   We talked enough about it up here.
 5          **MS. BERNSTEIN:**  And, Your Honor --
 6          **MR. MECHE:**  When we got here today, we thought they'd
 7   play the full video that we were given.  We didn't think they'd
 8   play a video that they took segments of the audio out
 9   selectively.  Nobody told us that would happen.  We assumed
10   they'd play the video they gave us and the Court.
11          **THE COURT:**  Well, you see, this is the problem.  This
12   is why we need to communicate before we have the jury here and
13   before we are about to play it.
14              Now, is there a desire on the defendant's part
15   to see what they're going to play before we play it here?
16          **MR. MECHE:**  To make sure they didn't remove things
17   that should be in there, yes.
18          **THE COURT:**  Okay.  Let's break for lunch.  It's
19   11:40.  If you can be here at 10 minutes to 1:00, we will
20   resume at 10 minutes to 1:00.
21              Please don't discuss the case amongst yourselves
22   or with anyone else.
23          **THE DEPUTY CLERK:**  All rise.
24          (WHEREUPON, the jury exited the courtroom.)
25          **THE COURT:**  All right.  Let's be seated.

JENNIFER DUPREE - Direct

1          Roll 'em.

2              **MS. BERNSTEIN:**  Your Honor, if I can say, the reason

3     we weren't going to offer it into evidence at this point was

4     because what we discussed at the bench was that it would be

5     played.  This DVD actually has the audio on it, so we were just

6     going to play it, as you instructed, without the audio.

7              **MR. MECHE:**  Your Honor, if I may be heard on that?

8              **THE COURT:**  Wait, wait, wait.  First of all, I've

9     got -- because of the noise of people leaving, I don't think --

10    Mr. London, did you say you couldn't hear what --

11             **MR. LONDON:**  I couldn't hear a word that

12    Ms. Bernstein said.

13             **THE COURT:**  All right.  Ms. Bernstein, would you

14    repeat that --

15             **MS. BERNSTEIN:**  Yes.

16             **THE COURT:**  -- and then I'll hear from Mr. Meche.

17             **MS. BERNSTEIN:**  I said what we planned to play is

18    exactly what we talked about at the bench earlier, which is the

19    original NBC video without any alterations to it, but without

20    the sound, as the Court instructed.  So there's no sound

21    clipped out, the sound will just be off.

22             And the reason the government isn't going to

23    offer it into evidence at this point is because the actual

24    exhibit has the sound on it, and per the Court's instructions,

25    we were going to play the video without the sound.

JENNIFER DUPREE - Direct

1           MR. MECHE:  Judge, do you know why they have to play

2   the sound?  Because this particular witness is all over that

3   video making radio calls, receiving calls.  Ms. Bernstein asked

4   her about what she said on her radio and what she heard coming

5   over her radio.  That's all over the video.  We have to ask her

6   about that.

7               The idea that they take that out because it's

8   not favorable for the government, that's not proper, Judge.  We

9   have to listen to it all.

10          THE COURT:  Let me go back to what we discussed up

11  here.  My understanding was that the government was going to

12  play the compressed audio -- and by compressed, I mean, without

13  the intervals that are missing -- they were going to play the

14  compressed audio -- video and audio, without the segment that

15  we are talking about separately, the other issue, okay?

16              Now, Mr. Meche was up here.  He said, "Well, for

17  my cross, I don't need the audio.  I just want to play the

18  video."

19              When you all went back to your chairs, that's

20  where we were.  Is that not correct?

21          MS. BERNSTEIN:  I'm sorry, Your Honor --

22          MR. MECHE:  And what I thought --

23          MS. BERNSTEIN:  -- should we be having this

24  discussion in front of the witness?

25          THE COURT:  Well, we're talking -- again, we're

JENNIFER DUPREE - Direct

1    talking about how we're using the tape, we're not talking about
2    her fact testimony.  If you would prefer her, or if you're
3    about to talk about her fact testimony, then we should ask her
4    to be excused and let her go to lunch.
5                Do we need her to be part of this discussion?
6          **MR. MECHE:**  I don't care.
7          **MS. BERNSTEIN:**  I don't think so.
8          **THE COURT:**  Okay.  Ma'am, you can step down.  Thank
9    you for your patience.  Please be up here at 10 minutes to
10   1:00 and we'll proceed.
11         **THE WITNESS:**  Okay.
12         **THE COURT:**  Am I not correct that the government was
13   going to show -- when you all were up here at the bench, the
14   government indicated that it was going to show the video and
15   audio, subject to the one exception, but without the intervals?
16         **MS. BERNSTEIN:**  That's not my recollection, Your
17   Honor.  We have the entire video, which we talked about playing
18   the entire video without the audio, and then there's a clip
19   that has the audio of her speaking that we were going to play
20   the video and the audio.
21                I think what you're talking about, Your Honor,
22   will be -- well, I don't know how difficult it would be to just
23   take out that one part that you're talking about.
24         **THE COURT:**  You know what, let me ask you all this:
25   Do we not have a stipulation that without the -- but subject to

JENNIFER DUPREE - Direct

1    the one issue that I'm going to rule on, do we not have a

2    stipulation that the video and audio is to come into evidence

3    during this trial?

4         MR. MECHE:  That's correct, Your Honor.

5         THE COURT:  Again, we've wasted more time trying to

6    segment this out, and it's going to be in this version, but not

7    that version, and it's going to be this, but not that, and

8    maybe this part, and maybe a still picture.  Let's just play

9    the doggone thing and the one part -- during the lunch hour

10   perhaps we can eliminate the one part.

11              Let's play it for them once now and then we can

12   go back into -- with audio, all right, and then we can go back

13   in and highlight sections and have witnesses look at stuff.

14   Can we not just do that?  Is there any problem doing that?

15        MR. MECHE:  We're fine with that, Your Honor.  We

16   think that's necessary actually.

17        MS. BERNSTEIN:  Your Honor, if we're going to play

18   the entire video, can we go ahead and play it on the Blu-ray

19   version, the better, the more --

20        MR. DESALVO:  Yes.  Sure.

21        THE COURT:  That's fine with me.  In fact, has the

22   government filed their opposition with regard to the one issue?

23        MS. BERNSTEIN:  We got it at midnight last night, I

24   think, Your Honor.

25        THE COURT:  Because I'm thinking I could maybe rule

JENNIFER DUPREE - Direct

1    on that during the lunch hour, but...

2         MR. KITCHENS:  Is the sound up on all parts of that

3    in the Blu-ray version?

4         MS. BERNSTEIN:  Except for the part that we're

5    talking about.

6         MR. KITCHENS:  In the beginning it's kind of turned

7    down and then it gets louder as it goes on.

8         MR. MECHE:  And that would be fine with us, Your

9    Honor.

10        MS. BERNSTEIN:  All right.  And, Your Honor, the

11   Blu-ray version we're talking about is there's this original

12   version that, as you said, has everything compressed.

13            The Blu-ray version has black slugs --

14   stabilized with black slugs, meaning that black space has been

15   interspersed during the time that the video was actually turned

16   off, and it's been stabilized, meaning that it's been -- I

17   don't even know --

18        MR. DESALVO:  Stabilized.

19        MS. BERNSTEIN:  Yeah, it's been stabilized.  Thanks.

20            So I think that would be a very good solution,

21   just to play that without the audio that's --

22        THE COURT:  Right, the one issue.

23        MS. BERNSTEIN:  -- that's an issue.

24        MR. MECHE:  Right, that's fine with us, as long as we

25   have all the other audio.

JENNIFER DUPREE - Direct

1    **THE COURT:**  Okay.  Then that's what we'll do.

2          Now, do we want to have them see the elapsed

3    time?  Is there an issue that maybe we can show them all of it,

4    video with audio, but without the elapsed pause, since the

5    point is, with this witness, and correct me if I'm wrong, but

6    the point is that we're not trying to demonstrate with

7    Ms. Dupree the amount of time, or maybe we are?  Is that going

8    to be part of what we're going to do this afternoon?

9    **MR. DESALVO:**  Judge, it's easier just to play the

10   whole thing and get it over it.

11   **THE COURT:**  Well, that's my inclination, but I'm also

12   inclined to save time, which we're not doing a good job of

13   today.

14   **MS. BERNSTEIN:**  Your Honor, let me save even more

15   time.  Because with this witness, I think we go back, if we

16   just -- the compressed version, I think the compressed version

17   with the audio, minus the audio that is in dispute, will save a

18   whole lot of time.  Because once we put in the black slugs,

19   which eventually we'll have to do, but that's -- that makes it

20   a much, much longer video.

21   **MR. DESALVO:**  Like five minutes?

22   **MS. BERNSTEIN:**  No, much longer.

23   **MR. DESALVO:**  More than five minutes longer?

24   **MS. BERNSTEIN:**  Oh, yes.

25   **THE COURT:**  Yeah, it's the entirety.  Why don't we do

JENNIFER DUPREE - Direct

1    this:  We're going to break for lunch.  Sometime between now

2    and 12:50, which is almost an hour from now -- or a little over

3    an hour from now, I would like you all -- "you all" meaning

4    counsel -- to view what Ms. Bernstein just said, okay?

5                    If there's an objection, I want somebody to come

6    knock on this door here, stick your head in there and say,

7    "Judge, there's an objection.  I need to see you about it."

8    Okay?

9                    My appreciation, as we go off the record here,

10   is that there is no objection, okay, subject to the one issue,

11   which I'm going to rule on as soon as I get an opposition from

12   the government.  Let's do that.  Can you all do that now before

13   you go take lunch if it's only going to be -- my understanding,

14   without the intervals, is that it's like a five or six-minute

15   deal.

16              **MR. MECHE:**  I think it's 13 minutes.

17              **THE COURT:**  13, okay.

18              **MR. BRICKELL:**  16.

19              **MR. MECHE:**  16, okay.

20              **THE COURT:**  16, okay.  Well, can we do that, unless

21   you want to talk about it and agree to it without looking at

22   it?  But when I come in here at 12:50 and those people enter

23   that jury box, like I said, roll 'em, it's time to play it.

24              **MS. BERNSTEIN:**  Yes, Your Honor.

25              **THE COURT:**  All right.  Okay.  See you at 12:50,

JENNIFER DUPREE - Direct

1    unless there's an issue.

2              THE DEPUTY CLERK:  All rise.

3                      (LUNCHEON RECESS)

4                     *  *  *  *  *

JENNIFER DUPREE - Direct

1          **AFTERNOON SESSION**

2            **(June 29, 2011)**

3               * * * * *

4      **THE DEPUTY CLERK:**  All rise.

5      (WHEREUPON, the jury entered the courtroom.)

6      **THE COURT:**  All right.  You may be seated.

7           Ms. Dupree, you're still under oath.

8      **THE WITNESS:**  Yes, sir.

9      **THE COURT:**  Counsel, when we broke we were about to

10  see a videotape in the way that I described it.  Then during

11  the lunch hour I think we discussed it and I had given you all

12  some homework to do to try to resolve the issues that had come

13  up.  Are we --

14      **MS. BERNSTEIN:**  We have completed our homework, Your

15  Honor.

16      **THE COURT:**  All right.

17      **MS. BERNSTEIN:**  I have just a couple questions and

18  then...

19      **THE COURT:**  Okay.  Let me ask you this:  Should I now

20  be corrected in terms of what they are going to see on the

21  videotape?  Has that changed, my description of it from before?

22  Because I think there was some variation to that that was

23  discussed.

24      **MS. BERNSTEIN:**  No.  They're going to see a videotape

25  with audio that actually covers more time than what's covered

JENNIFER DUPREE - Direct

1   on the video.  So when the videotape was turned off, it's just
2   ran together.
3           THE COURT:  But it will be with audio, which is
4   different than what I had told them before.  Fine.
5              Counsel, are we clear on that on the defense
6   side?
7           MR. FLEMING:  Yes, sir.
8           THE COURT:  Okay.  I hope that stays the case for the
9   next few minutes.
10             Now, you have some further questions for
11   Ms. Dupree, so let's hear those.
12   BY MS. BERNSTEIN:
13   Q.   Welcome back, Ms. Dupree.
14             I want to just ask a couple questions.  I want to
15   take you back to when you're watching two people run down the
16   west side of the bridge and you're calling that out over your
17   radio.  Those two people, at the time you were watching them, I
18   assume you did not know who they were?
19   A.   No.
20   Q.   Did you later learn who those two people were?
21   A.   No.
22   Q.   All right.  And those people that you were watching, how
23   were they dressed?
24   A.   The two running down the bridge?
25   Q.   Yes.

JENNIFER DUPREE - Direct

1  **A.**   One had a white T-shirt, the other one had a black
2  T-shirt.
3  **Q.**   So that's what you were calling out over the radio?
4  **A.**   Yes.
5  **Q.**   All right.  You said -- I can't remember if I asked this
6  earlier, but did you at some point learn that part of what
7  happened out there that day was captured on videotape?
8  **A.**   Yes.
9  **Q.**   And you said your understanding was that it was that guy
10 on the I-10 bridge who had the camera who was actually taping?
11 **A.**   Yes.
12 **Q.**   Do you know whether he had any sort of zoom lens on his
13 camera?
14 **A.**   I don't know.
15 **Q.**   You didn't know at the time?
16 **A.**   I still don't.
17 **Q.**   Have you seen the video?
18 **A.**   Yes.
19 **Q.**   And does the video show things -- does the video show
20 exactly what you saw that day?
21 **A.**   Like I said, I couldn't see it all, so it shows what was
22 captured on the video.  I couldn't see everything that happened
23 on that bridge.
24 **Q.**   And that video zooms in at some point; correct?
25 **A.**   Yes.

JENNIFER DUPREE - Direct

1  **Q.**   You said you've seen that video through?

2  **A.**   Yes.

3       **MS. BERNSTEIN:**  What I'd like to do now is play

4  Government's Exhibit 300, which will not be offered into

5  evidence at this point, but which will be played to the jury.

6  **BY MS. BERNSTEIN:**

7  **Q.**   What I'd like you to do, I'm going to play the video the

8  whole way through, Ms. Dupree, and then I'm going to come back

9  and ask you to identify some people and some things.

10      But actually, before we get started, because you said

11  you've seen the video before, when it starts, it's a video of

12  the I-10; is that correct?

13 **A.**   Yes.

14 **Q.**   And there are a bunch of people you see in the video?

15 **A.**   Yes.

16 **Q.**   Do you see yourself in the portions that are over on the

17 I-10?

18 **A.**   Yeah.  I am in some clips, yes.

19 **Q.**   And then it pans over to a shooting on the Danziger;

20 correct?

21 **A.**   Yes.

22 **Q.**   And comes back to the I-10?

23 **A.**   Yes.

24 **Q.**   When it comes back to the I-10, do you see yourself?

25 **A.**   Yes.

JENNIFER DUPREE - Direct

1   Q.   Do you hear some radio calls going out on the video?
2   A.   Yes.
3   Q.   Do you hear your voice on those?
4   A.   Yes.
5   Q.   All right.  We'll play it all the way through, then I'll
6   come back and have you explain who is what in the video.
7   A.   Okay.
8                       (VIDEO PLAYED)
9   BY MS. BERNSTEIN:
10  Q.   All right.  What I'd like to do now is go back and play
11  that video again.  I'm going to ask you to pause it a couple of
12  times and I'm going to ask you some questions about it,
13  Ms. Dupree.
14  A.   Okay.
15                      (VIDEO PLAYED)
16  BY MS. BERNSTEIN:
17  Q.   All right.  Here at the beginning of the video, what are
18  we looking at?
19  A.   We're running towards the side of the Danziger because
20  they had crossed underneath going towards the other side.
21  Q.   Do you see yourself in there?
22          MS. BERNSTEIN:  Can we stop for a second,
23  Mr. Brickell?
24                      (VIDEO PAUSED)
25          THE WITNESS:  No.

JENNIFER DUPREE - Direct

1    BY MS. BERNSTEIN:

2    Q.   All right.  Who all do you recognize in that still right

3    there?

4    A.   Dino, Jennifer Goodenough, and Tony Mayfield.

5    Q.   All right.  Dino is Donald Haynes?

6    A.   Yes, I'm sorry.

7    Q.   Can you point him out?

8    A.   He's right there.

9    Q.   Okay.  And you said you recognize Jennifer Goodenough?

10   A.   Yes.

11   Q.   Where is she?

12   A.   She's right there.

13   Q.   Who else do you recognize?

14   A.   Tony Mayfield.

15   Q.   Can you point him out?

16   A.   (WITNESS COMPLIES.)

17   Q.   Was Tony Mayfield your partner?

18   A.   Yes.

19   Q.   Do you know who this guy is front and center?

20   A.   No.  No, I don't.

21            THE COURT:  Pull that microphone up, please.

22   BY MS. BERNSTEIN:

23   Q.   Do you know who the guy is off to the left of the screen

24   right now who appears to be looking down over the edge of the

25   bridge?

JENNIFER DUPREE - Direct

1   A.   No.

2   Q.   And just to get us oriented, this area right here, is that

3   the on-ramp that you were talking about earlier?

4   A.   Yes.

5   Q.   Who all ran down the on-ramp?

6   A.   Pat Conaghan, and I remember the other guy who I -- like I

7   said, I thought he was a police officer.

8   Q.   Have you ever learned his name?

9   A.   Yeah, but I don't remember his name.

10  Q.   Okay.

11          MS. BERNSTEIN:   Let's continue to play then.

12                      (VIDEO PLAYED)

13  BY MS. BERNSTEIN:

14  Q.   As the video plays here, can you tell us what's going on?

15  A.   Yeah.  We're looking for the guy.  Pat is in the curve.

16          MS. BERNSTEIN:   Stop for a second.

17                      (VIDEO PAUSED)

18  BY MS. BERNSTEIN:

19  Q.   Pat is in the curve?

20  A.   Yes, of the bridge going down.

21  Q.   Can you show where you mean?

22  A.   Right here.

23                      (VIDEO PLAYED)

24  BY MS. BERNSTEIN:

25  Q.   The guy who just went off screen -- or most of him just

JENNIFER DUPREE - Direct

1    went off screen there behind the bend?

2    A.    Yes.

3    Q.    That's Patrick Conaghan?

4    A.    Yes.

5    Q.    So now he's starting to run down the on-ramp --

6    A.    Yes.

7    Q.    -- while all this is going on?

8    A.    Yes.

9    Q.    Do you know who that guy is bending over to pick something

10   up?

11   A.    No.

12   Q.    Do you know who that is running down the ramp?

13   A.    No.  I can't tell, no.

14   Q.    All right.  Now, we see somebody coming into the picture.

15   What street are we looking at now?

16   A.    Chef Menteur Highway.

17   Q.    All right.  So now the camera has turned over and is

18   facing Chef Menteur Highway?

19   A.    Yes.

20   Q.    The person who's jogging into the video now, where is that

21   person coming from?

22   A.    He's coming -- I don't know.  I mean -- the way he looks

23   on the -- from the video, he's running towards the Danziger

24   Bridge on Chef, but I couldn't see him at the time.

25   Q.    So you're just describing the video then at this point?

JENNIFER DUPREE - Direct

1   A.   Yes.

2   Q.   All right.

3        And can you tell from looking at this video as we

4   watch, is this clearly zoomed in?

5   A.   Yes.

6   Q.   That's not what you see with the naked eye?

7   A.   No.

8   Q.   All right.  That person we saw jogging is stopping there

9   and has his foot up on the wall.  Did you see that?

10  A.   I can see it on the video, but...

11  Q.   The day of, though, you didn't see it?

12  A.   No.

13  Q.   Now, we're looking back at the Danziger.  Do you see some

14  people on the video?

15  A.   Yes.

16  Q.   Did you see those people that day?

17  A.   No.

18  Q.   I'm sorry.  For the record, if I can describe it.  So for

19  the record, we're looking at three people in white T-shirts?

20  A.   Yes.

21  Q.   The shooting just started on the video; correct?  Did you

22  just hear the shots?

23  A.   Yes.

24  Q.   That day when you were out there, where were you focused

25  right before the shooting started?

JENNIFER DUPREE - Direct

1    A.    I was trying to watch the two subjects that were running.
2    Q.    All right.  I'm going to ask you to focus right now on the
3    video.  Do you see a truck in the square that I just drew on
4    the screen?
5    A.    Yes.
6    Q.    All right.  And we're going to hit "Play."
7          Do you see two people running up the bridge?
8    A.    Yes.
9    Q.    Do you know who those two people are?
10   A.    No.
11   Q.    Did you know who any of those people were shooting in that
12   part we just saw?
13   A.    No.
14   Q.    Those two people -- those two people just stopped and shot
15   some more.  Did you see that that day?
16   A.    No.
17   Q.    The video now shows another guy walking on the bridge.  Do
18   you know who that is?
19   A.    No.
20   Q.    We just see a car going behind the bridge.  Do you know
21   who that was?
22   A.    No.
23   Q.    All right.  Now, we're back on the I-10; right?
24   A.    Yes.
25   Q.    Now, we're looking back up the I-10 bridge back toward the

JENNIFER DUPREE - Direct

1    3rd District?

2    A.    Yes.

3    Q.    Who are the people you see on the video there?  Who's on

4    the left?

5    A.    That's me.

6    Q.    What do you have in your right hand?

7    A.    A shotgun.

8    Q.    Who's the gal to your right?

9    A.    That's Jennifer Goodenough.

10   Q.    Okay.  This guy to the right in the reddish-orange shirt,

11   who's that?

12   A.    I don't know.

13   Q.    Do you know if he was with the cameraman or do you have

14   any idea?

15   A.    I don't know.

16   Q.    Did you just see yourself talk on the radio?

17   A.    Yes.

18   Q.    But we couldn't hear what you were saying?

19   A.    Yes.

20   Q.    When the radio transmissions start, I'm going to stop and

21   I'm going to ask you if you know who these people are talking

22   on the radio, okay?

23   A.    Okay.

24   Q.    Who's this guy who just walked into the camera?

25   A.    That's Dino Haynes, Donald Haynes.

JENNIFER DUPREE - Direct

1   Q.   Donald Haynes?

2   A.   Yes.

3   Q.   And you all call him what?

4   A.   Dino.

5   Q.   Okay.  Who's the guy in the white-and-blue shirt and the

6   baseball cap who just walked into the picture?

7   A.   Lieutenant Colin.

8   Q.   That was your supervisor that day?

9   A.   Yes.

10          MS. BERNSTEIN:  And, Mr. Brickell, I'll give you a

11   signal, if you can wait until the end of that particular

12   announcement and then just cut it off.

13                        (VIDEO PAUSED)

14   BY MS. BERNSTEIN:

15   Q.   Before he starts it again, do you know who that was on the

16   radio?

17   A.   No.

18                        (VIDEO PLAYED)

19   BY MS. BERNSTEIN:

20   Q.   Do you know who that was?

21   A.   No.

22   Q.   Do you know who that was?

23   A.   No.

24   Q.   Do you know who that was?

25   A.   No.

JENNIFER DUPREE - Direct

1   Q.   Do you know who that was?

2   A.   No.

3   Q.   Who was that?

4   A.   That was me.

5   Q.   All right. "3rd District side of the bridge, Friendly

6   Inn," that was your voice?

7   A.   Yes.

8   Q.   Those people we heard back and forth who were answering

9   you on the radio, did you know who any of those people were?

10  A.   No.

11  Q.   Did you know where they were?

12  A.   I just assumed towards the 3rd District side of the

13  bridge.

14  Q.   All right.  You couldn't see them as you were having that

15  communication?

16  A.   No.

17                    **(VIDEO STOPPED)**

18          **MS. BERNSTEIN:**  Thank you, Mr. Brickell.

19  **BY MS. BERNSTEIN:**

20  Q.   All right.  I'd like to pick up where that video leaves

21  off.

22          What did you do after what we see in the video there

23  where you're running up the I-10?

24  A.   We proceeded to the other side.  I -- we went down the

25  exit ramp towards the Winn-Dixie parking lot, past Old

JENNIFER DUPREE - Direct

1  Gentilly.

2  **Q.**   Were you on foot that whole way?

3  **A.**   I believe so, yes.

4  **Q.**   Who were you with?

5  **A.**   Dino Haynes.  Tony had come up from behind and met up with

6  us.  So it was Tony, me, Dino, and Jennifer Goodenough.

7  **Q.**   What did you all do?

8  **A.**   We exited past Old Gentilly and were in the Winn-Dixie

9  parking lot.

10           **MS. BERNSTEIN:**  Can we have the overhead up again,

11  please?  I think it's -- the aerial photograph.  I think it's

12  47.

13  **BY MS. BERNSTEIN:**

14  **Q.**   Can you show us the route you were taking as you all were

15  going back over the I-10?  Just draw an arrow, if you would.

16  **A.**   We were going this way.  You mean, when we get to the ramp

17  to exit?

18  **Q.**   Well, can I make this into an arrow?

19           Is that the direction you were going?

20  **A.**   Yes.

21  **Q.**   All right.  Do you see -- do you see on this overhead the

22  ramp that you eventually took?

23  **A.**   No, I don't see the ramp.

24  **Q.**   Which direction would it be?  Would it be off to the left

25  there?

JENNIFER DUPREE - Direct

1   A.   Yeah.  It would be in this area -- well, off to that area.
2   Q.   All right.  So you all walked over the I-10 and then what
3   did you do?
4   A.   We exited the ramp -- the exit ramp.
5   Q.   Where did you go?
6   A.   From there, we went down, we were going towards the
7   Danziger Bridge.
8   Q.   Where did you end up when you went down that ramp?
9   A.   In the parking lot, like I said, of the Winn-Dixie.
10  Q.   The parking lot of a Winn-Dixie?
11  A.   Yes.
12  Q.   Tell us what happened.
13  A.   The two boats that we were with came by with Lieutenant
14  and picked us up.
15  Q.   Are those the same boats that you started off with --
16  A.   Yeah.
17  Q.   -- over here on the -- where you told us at the beginning?
18  A.   Yes.
19  Q.   So they turned around and came back and got you?
20  A.   Yes.
21  Q.   What happened once you got back in those trucks?
22  A.   We proceeded to the Danziger Bridge and up and over the
23  Danziger.
24  Q.   On your way to get -- again, if you could show us on the
25  overhead, just -- it might be obvious now, but just give us the

JENNIFER DUPREE - Direct

1    route you were taking over the Danziger Bridge?

2    A.    We were coming back that way.

3    Q.    So on the photograph here, coming from the left to the

4    right?

5    A.    Yes.

6    Q.    From the 3rd District into the 7th?

7    A.    To the 7th, yes.

8    Q.    When you got back in the truck and got onto Chef Menteur

9    Highway, did you have to pass by the Friendly Inn in order to

10   get over the Danziger Bridge?

11   A.    Yes.

12   Q.    Did you stop at all at the Friendly Inn?

13   A.    No.

14   Q.    Did you realize that anything had happened over there at

15   the Friendly Inn?

16   A.    No.

17   Q.    Did you see anybody lying on the ground there?

18   A.    No.

19   Q.    All right.  So you guys just kept going over the bridge?

20   A.    Yes.

21   Q.    Did you stop anywhere?

22   A.    We did stop on the bridge.  It was towards the 7th

23   District side.

24   Q.    Back over on the east side?

25   A.    Yes.

JENNIFER DUPREE - Direct

1   Q.   Is that over in the area where the shooting had happened?
2   A.   Yes.
3   Q.   What happened when you stopped over there?  What did you
4   see?
5   A.   I remember a black male police officer -- I don't remember
6   who it is -- and the lieutenant got down to go talk to
7   somebody.  And at that point, I think I told him that, "I was
8   the one that kicked it in.  Do you all need anything?"  And he
9   just said, "No, keep going."  Lieutenant got back in the truck
10  and he told us, "Let's go."
11  Q.   When you stopped over there on the east side of the
12  bridge, did you all see any bodies?
13  A.   I didn't see -- I don't remember seeing any bodies on the
14  ground.  I remember an EMS unit and they were loading somebody
15  in the EMS unit.
16  Q.   Did you get any details about what had gone on over there?
17  A.   No.
18  Q.   When you said you told them that you were the one who
19  kicked it in, what did you mean?
20  A.   That I was the one broadcasting the original broadcast.
21  Q.   Why did you tell that officer that you were the one who
22  kicked it in?
23  A.   Just to let him know who was the one that started the
24  chain of events.
25  Q.   What was the response you got?

JENNIFER DUPREE - Direct

1    A.    Just, "No, keep going."

2    Q.    Did you all just keep going?

3    A.    Once Lieutenant got back and told us, "Let's go," yes.

4    Q.    Let me ask you:  While you were there on the east side

5    stopped for a minute before you went on, did you see any

6    civilians in custody?

7    A.    No.

8    Q.    Do you remember seeing any other women on the scene?

9    A.    No.

10   Q.    When you drove off from the east side of the bridge that

11   day, did you know what had happened there, other than that

12   there had been a shooting?

13   A.    No.

14   Q.    Did anybody interview you that day?

15   A.    No.

16   Q.    At some point did somebody talk to you about what happened

17   on the bridge that day?

18   A.    Yes.

19   Q.    Who eventually interviewed you?

20   A.    Archie Kaufman.

21   Q.    Do you see him in court?

22   A.    Yes.

23   Q.    Sitting at the back table over there?

24   A.    Yes.

25   Q.    Did you know Defendant Kaufman?

JENNIFER DUPREE - Direct

1    **A.**    I didn't know him personally, but I've known him from
2    scenes and being on different scenes and stuff --
3    **Q.**    Did you know him to say hi?
4    **A.**    -- through the job.
5    **Q.**    Did you know him by name?
6    **A.**    I knew him by name and to say hey, that's about it.
7    **Q.**    No personal relationship with him?
8    **A.**    No.
9    **Q.**    Do you know about when it was that he talked to you about
10   what happened on the bridge?
11   **A.**    Maybe a month or so later.  I don't remember exactly when,
12   because everything at that time was still kind of chaos.
13   **Q.**    Did you talk to him in person or over the phone?
14   **A.**    Over the phone.
15   **Q.**    What did you tell him?
16   **A.**    Exactly what I told you.  You know, that we were coming
17   down off the bridge -- do you want me to go through everything?
18   **Q.**    No.
19            But you told him, basically, the same thing that you
20   told us?
21   **A.**    Yes.
22   **Q.**    Have you had a chance since then to see the official
23   report that has a statement in it that you allegedly gave?
24   **A.**    Yes.
25            **MS. BERNSTEIN:**  Can we have up Exhibit 27, please?

JENNIFER DUPREE - Direct

1          May I have pages 26 and 27 side by side, please?

2    BY MS. BERNSTEIN:

3    Q.   All right.  What I'd like you to do --

4          MS. BERNSTEIN:  Can you zoom in on the highlight,

5    please?

6    BY MS. BERNSTEIN:

7    Q.   He's going to highlight a section of this 54-page report.

8    I'd like you to read it through and then I'll ask you some

9    questions about it.

10   A.   Okay.

11          "On Thursday, October 6, 2005, Sergeant Kaufman spoke

12   to Officer Jennifer Dupree who gave the following verbal

13   statement relevant to the shooting incident on the Danziger

14   Bridge, Sunday, September 4, 2005, at approximately 9:00 a.m.

15          "On the morning of September 4th, 2005,

16   Officer Jennifer Dupree, assigned to the New Orleans Police

17   Department, 3rd District, related she was escorting volunteer

18   rescue workers to New Orleans East.  Officer Dupree stated she

19   was traveling on the Interstate I-10 eastbound over the

20   Industrial Canal.

21          "As Officer Dupree traveled over the top of the high

22   rise, she stated she was fired upon by several subjects near

23   the Downman Road exit of the Interstate I-10.  Officer Dupree

24   mentioned she was [sic] immediately advised New Orleans Police

25   Department communications of the incident as it unfolded.

JENNIFER DUPREE - Direct

1    Officer Dupree stated she began to pursue the subjects as they

2    fled down the Downman Road off-ramp towards Chef Menteur

3    Highway.

4         "Simultaneously, she mentioned, 7th District

5    personnel arrived on scene and engaged the subjects as they

6    fired on the officers.  Officer Dupree stated from what she

7    remembered she saw one subject wearing a light in color shirt

8    and blue jean shorts, another subject wearing all black.  She

9    stated both subjects were armed and firing in her direction.

10        "It should be noted that the clothing description

11   given by Officer Dupree matched that of subject Lance Madison

12   and the deceased perpetrator at the Family Inn."

13        MS. BERNSTEIN:  Can we go back to the beginning of

14   that, please?

15        And for the record, this is Exhibit 27, the

16   official 54-page report submitted in this case.

17   BY MS. BERNSTEIN:

18   Q.   At this time, Ms. Dupree, I'm going to ask you some

19   questions about whether or not you made this statement to

20   Defendant Kaufman.

21        It says there that:  "Officer Dupree stated she was

22   traveling on the Interstate 10, I-10, eastbound over the

23   Industrial Canal."

24        Did you tell him that?

25   A.   Yes.

JENNIFER DUPREE - Direct

1  Q.   "As Officer Dupree traveled over the top of the high rise,
2  she stated she was fired upon by several subjects near the
3  Downman Road exit of the Interstate 10, I-10."
4        Did you tell him that?
5  A.   I never said the exit.  I said from below at the bottom of
6  the bridge coming up.
7  Q.   Was there ever anybody firing on the bridge -- on the
8  I-10?
9  A.   Not on the bridge that day, no.
10 Q.   All right.  The next sentence:  "Officer Dupree mentioned
11 she immediately advised New Orleans Police Department
12 communications of the incident as it unfolded."
13       Did you tell him that?
14 A.   Yes.
15 Q.   "Officer Dupree stated she began to pursue the subjects as
16 they fled down the Downman Road off-ramp towards Chef Menteur
17 Highway."
18       Did you tell him that?
19 A.   No.
20 Q.   Did you ever chase anybody down the off-ramp?
21 A.   No.
22 Q.   "Simultaneously, she mentioned, 7th District personnel
23 arrived on the scene and engaged the subjects as they fired on
24 the officers."
25       Did you say that?

JENNIFER DUPREE - Direct

1   A.   No.

2   Q.   Why not?

3   A.   Because I didn't know who they were.

4   Q.   Could you see who was firing on the Danziger?

5   A.   No.

6   Q.   "Officer Dupree stated from what she remembered she saw

7   one subject wearing a light in color shirt and blue jean shorts

8   and another subject wearing all black."

9        Did you say that to Defendant Kaufman?

10  A.   No.

11  Q.   Why not?

12  A.   Because they were wearing -- I couldn't see what -- below

13  what they were wearing, but it was a red T-shirt and a black

14  T-shirt with a book bag.  I never gave a description of a light

15  in color shirt.

16  Q.   "She stated both subjects were armed and firing in her

17  direction."

18       Did you say that?

19  A.   Yes.

20  Q.   At some point after you gave that statement to Defendant

21  Kaufman, did you talk to anybody else who was investigating

22  this case?

23  A.   Yes.

24  Q.   Who was the next person you talked to?

25  A.   Gerard Dugue.

JENNIFER DUPREE - Direct

1    **Q.**    Who's Gerard Dugue?

2    **A.**    He's another homicide detective.

3    **Q.**    Do you remember if you talked to him on the phone or in

4    person?

5    **A.**    I believe he came to the 3rd District.

6    **Q.**    That's where you were working at the time?

7    **A.**    Yes.

8    **Q.**    Do you know the date when you talked to Dugue?

9    **A.**    No.

10   **Q.**    Have you had a chance to read what's in the official

11   54-page report about your interview with Mr. Dugue?

12   **A.**    Yes.

13            **MS. BERNSTEIN:**  Can we have that exhibit back up,

14   please?

15            May I have page 42 at this point?  I'm sorry,

16   may I have page 43?  43, please.

17            Can you jump out that paragraph, please?

18   **BY MS. BERNSTEIN:**

19   **Q.**    Can you read the last sentence there?

20   **A.**    "She mentioned she observed four subjects running from the

21   high rise bridge and two distinctly kept firing their weapons,

22   handguns, in the direction of people [sic] officers on the

23   bridge.  She added she was a distance from the subjects,

24   couldn't identify any of them.

25            "Officer Dupree added she vaguely remembers one of

JENNIFER DUPREE - Direct

1   the subjects had a book bag and one of the subjects had a red
2   shirt, the other one had on a dark colored shirt."
3   Q.   Did you say that to Mr. Dugue?
4   A.   Some of it.
5   Q.   Explain that to us.
6   A.   I did say that one of them had a book bag, one of them had
7   a red shirt, and the other one had a dark colored shirt, but I
8   always remembered it as a black shirt.  I don't remember it as
9   a dark colored shirt.  And "vaguely," I was positive --
10  Q.   So you wouldn't have said --
11  A.   -- of the shirt.
12  Q.   -- you vaguely remember?
13  A.   No.
14  Q.   At some point after all this, did you learn that the
15  District Attorney's Office was investigating the incident on
16  the bridge?
17  A.   Yes.
18  Q.   Did you eventually get a subpoena to testify in a state
19  grand jury?
20  A.   Yes.
21  Q.   Did you go testify in the state grand jury?
22  A.   Yes.
23  Q.   Tell us about your experience in the state grand jury.
24  A.   It was chaotic.  People were asking questions from all
25  over the room.  It wasn't -- there was really no order to it.

JENNIFER DUPREE - Direct

1   You had -- actual juror -- I guess they're jurors, they were

2   asking me questions.  I had Dustin Davis asking me questions.

3   I had the DA at the time asking me questions.  So it was -- it

4   was kind of chaotic.

5   **Q.**   Do you remember what you told the grand jury?

6   **A.**   No.  I told them the exact same thing, but word for word,

7   no.

8   **Q.**   Did you give them a description of the people with guns?

9   **A.**   Yes.

10  **Q.**   What did you tell them?

11  **A.**   A red T-shirt and a black T-shirt with a book bag.

12  **Q.**   What, if anything, do you remember feeling at the end of

13  the grand jury when you were done?

14  **A.**   I was mad.  I was --

15          **MR. DESALVO:**   I object to the relevance, Your Honor,

16  of how she felt after she testified in the state grand jury.

17          **THE COURT:**   I'm going to sustain it.

18  BY MS. BERNSTEIN:

19  **Q.**   I want to go back to that day on the bridge.  I asked you

20  about when you first looked down off the I-10 on the Danziger

21  side and saw those people after the cameraman pointed them out.

22  Do you know the point I'm talking about now?

23  **A.**   Yes.

24  **Q.**   All right.  I asked you earlier if you fired at them and

25  you said no?

JENNIFER DUPREE - Direct

1   A.   Yes.

2   Q.   Had you gone through the academy when you became a police

3   officer?

4   A.   Yes.

5   Q.   Did you learn in the academy about when you can and can't

6   fire your weapon?

7   A.   Yes.

8   Q.   Why didn't you fire your weapon at those people running

9   away?

10  A.   Because they were fleeing.  They weren't a threat.

11  Q.   What was the rule that you learned in the academy about

12  when you can and can't fire your weapon?

13  A.   To use deadly force when deadly force is used against you.

14  Q.   Do you have to wait for somebody to use it against you

15  first before you use it?

16  A.   No.

17  Q.   Okay.

18  A.   I mean, if they were turning to point their weapon at me

19  or -- either myself or somebody else, my life or somebody

20  else's life is in danger.

21  Q.   Then you can shoot?

22  A.   Depending on the circumstances, yes.

23  Q.   When you first saw those two guys with guns who were

24  coming out from under the I-10 bridge, how well could you see

25  what they were wearing?

JENNIFER DUPREE - Direct

1  A.   When they were coming out there, I mean, you could see
2  their shirts very well.
3  Q.   Did you have any buildings or anything in between you and
4  them when you first saw them?
5  A.   There was brush when they came out and all, but you --
6  there was an opening where you could see the subjects, yes.
7  Q.   Were you looking right at them?
8  A.   Yes.
9  Q.   When you picked up your radio and started to make a call,
10  how important was it to you to know what those people were
11  wearing?
12  A.   Very.
13  Q.   Why?
14  A.   To let the people know I was broadcasting to on who to
15  look for.
16  Q.   How sure are you that one was wearing a red shirt?
17  A.   Positive.
18  Q.   How sure are you that one had a black shirt and a backpack
19  or a book bag?
20  A.   Positive.
21  Q.   How sure are you that that's the description you put out
22  on the radio?
23  A.   Positive.
24  Q.   You mentioned that you did a phone interview with
25  Defendant Kaufman about a month after this incident; right?

JENNIFER DUPREE - Direct

1   **A.**   Yes.

2   **Q.**   Did you ever hear back from him?

3   **A.**   Yes.

4   **Q.**   When did you hear from him again?

5   **A.**   It was late one night.  I got a phone call while I was at

6   home.

7   **Q.**   Approximately when was this that you got a phone call from

8   Defendant Kaufman late one night?

9   **A.**   It was around the time of the state grand jury.

10  **Q.**   Do you know whether it was before or after you testified

11  in the state grand jury?

12  **A.**   I really don't remember.

13  **Q.**   But right around that time?

14  **A.**   Yes.

15  **Q.**   Tell us about that call.

16          **MR. LONDON:**  I object to that, Your Honor, on

17  relevance.  May we approach?

18          **THE COURT:**  Come on up.

19          (WHEREUPON, the following proceedings were held at

20  the bench.)

21          **THE COURT:**  Mr. London.

22          **MR. LONDON:**  Judge, I believe that she's going to ask

23  her to comment about an alleged phone call made to her in the

24  middle of the night about, "Do you want to meet and have a

25  drink," or something, and that a lawyer was present.

JENNIFER DUPREE - Direct

1              Is that what you were going to ask?

2         MS. BERNSTEIN:  Well, that's not at all what she's

3    going to testify, but it's the same call we're talking about.

4         MR. LONDON:  But you're not going to get into that,

5    about the, "Do you want to meet me at the Barroom Inn," or

6    something about -- I think that's absolutely totally

7    irrelevant.

8         MS. BERNSTEIN:  I'll tell you what she'll testify.

9         THE COURT:  I'm ignorant here.

10        MS. BERNSTEIN:  Let me say what she'll testify about.

11   She's going to testify that sometime around the state grand

12   jury she got a call at 1:00 in the morning from Sergeant

13   Kaufman, with whom she had no relationship, who said, "Come

14   meet me and my lawyer at a bar."  And she said, "You got to be

15   kidding," and hung up and never talked to him about it again.

16              It's extremely relevant.  I can't even fashion

17   an argument for why it would not be relevant.

18        MR. LONDON:  Why is that relevant?

19        THE COURT:  I'm going to overrule the objection.  I

20   think she can ask it.  I think she can ask it.

21        MS. BERNSTEIN:  Thank you, Your Honor.

22        THE COURT:  I think it's relevant.

23              Do we know that that's -- getting back to the

24   first point that Mr. London made, do we know that that is what

25   she is going to say, or is she going to elaborate, go into

JENNIFER DUPREE - Direct

1   something that might otherwise be inappropriate?
2           MS. BERNSTEIN:  No --
3           MR. LONDON:  Is that it?
4           MS. BERNSTEIN:  -- that's exactly what she's going to
5   say.
6           THE COURT:  But we know that she knows that?  I
7   mean --
8           MS. BERNSTEIN:  Well, she never did meet him, so
9   there was no discussion.
10          THE COURT:  But the words that were spoken is what I
11  think he's talking about, the words that were spoken.
12          MR. LONDON:  Yeah.  In other words, that's the extent
13  of it, "Can you meet me at a bar with my lawyer?"
14          MS. BERNSTEIN:  I think -- I mean, I've prepped her.
15  I don't know the exact words, but what she's going to say is he
16  said, "Come down to some bar" -- he said the name of the bar,
17  she doesn't remember what it was -- he said, "Come down and
18  talk to me and my lawyer."  She said, "No way," and they ended
19  the call.
20          MR. LONDON:  Does she say I'm the lawyer?
21          MS. BERNSTEIN:  Were you there?
22          MR. LONDON:  No.  I can't stay up until 1:00.
23          MS. BERNSTEIN:  Actually, I can ask, if it makes it
24  better, I can ask, "Do you have any idea who the lawyer was he
25  was talking about," and she'll say, "No."

JENNIFER DUPREE - Direct

1          **MR. LONDON:**  And did he tell you what they wanted to
2    say?
3          **MS. BERNSTEIN:**  Okay.
4          **MR. LONDON:**  In other words, just to clear it up,
5    that's just the conversation, "Can you meet me and my lawyer,"
6    and that's it, or you don't -- you know, there's no other
7    conversation about, "Is it Steve or is it," you know --
8          **MS. BERNSTEIN:**  Correct.
9          **THE COURT:**  And you can cross on that, of course.
10          **MR. LONDON:**  Well, but, I mean, I'm going to do that,
11    Judge, if she gets it out.
12          **MS. BERNSTEIN:**  Yeah, no, I can --
13          **THE COURT:**  Let's do that.
14          **MR. LONDON:**  I don't want to open it on redirect
15    where I don't get anything --
16          **THE COURT:**  Let's do that.
17          (WHEREUPON, the following proceedings were held in
18    open court.)
19    **BY MS. BERNSTEIN:**
20    **Q.**   Ms. Dupree, you were about to tell us about a phone call
21    that happened one night around the time of the state grand
22    jury.  Before you tell us about that call, from the time you
23    had talked to Defendant Kaufman on the phone about a month
24    after the incident up until the time you got this call sometime
25    around the state grand jury, had you ever gotten a call from

JENNIFER DUPREE - Direct

1   Defendant Kaufman in that time in between?
2   **A.**    No.
3   **Q.**    Had you socialized with him?
4   **A.**    No.
5   **Q.**    Tell us about that call you got one night.
6   **A.**    I remember at about 1:00 in the morning, maybe a little
7   earlier than that, I was sleeping, he asked me to come meet him
8   at a bar and I told him no.  He said he was with, I believe,
9   his attorney, and I told him no.
10  **Q.**    This was at 1:00 in the morning?
11  **A.**    Yeah.
12  **Q.**    Did you ask what he wanted to talk to you about?
13  **A.**    No.
14  **Q.**    Do you have any idea what he wanted to talk to you about?
15  **A.**    No.
16  **Q.**    Did you ask who the lawyer was he was with?
17  **A.**    He told me, but I don't remember.
18  **Q.**    Did you just go back to sleep?
19  **A.**    Yeah.
20  **Q.**    Did you ever have a follow-up conversation with
21  Defendant Kaufman and ask him, "Hey, why did you call me at
22  1:00 in the morning?"
23  **A.**    No.
24  **Q.**    Did he ever mention it to you again?
25  **A.**    No.

JENNIFER DUPREE - Direct

1  Q.   Has he ever called you at home since then?

2  A.   No.

3       MS. BERNSTEIN:  May I have a moment, Your Honor?

4  BY MS. BERNSTEIN:

5  Q.   Just a couple more questions, Ms. Dupree.

6       I asked you a series of questions about the 54-page

7  report and about the statement in there attributed to you about

8  your conversation with Defendant Kaufman and a couple more

9  questions about the statement in there attributed to you about

10 your conversation with Mr. Dugue.

11      We asked some questions about what descriptions you

12 gave of the people who were running with the guns; right?

13 A.   Yes.

14 Q.   When you answered those questions, which people were you

15 describing as having a red T-shirt, the black backpack?

16 A.   The two that were running underneath the bridge towards

17 the Danziger.

18 Q.   Okay.  And just to be clear:  At some point that day on

19 September 4th, as you saw two people running away down the

20 western side of the bridge, what were those people wearing?

21 A.   A white T-shirt and a black T-shirt.

22      MS. BERNSTEIN:  Your Honor, I'd like to offer into

23 evidence Exhibit No. 49, which we just used with this witness.

24      THE COURT:  Any objection?

25      MR. FLEMING:  No, Your Honor.

JENNIFER DUPREE - Direct

```
1          THE COURT:  All right.  So ordered.  49 is admitted.
2              All right.  Mr. Hessler, you may proceed.
3                      CROSS-EXAMINATION
4   BY MR. HESSLER:
5   Q.   Good evening, Officer Dupree -- or afternoon.
6   A.   Hi.
7   Q.   My name is Eric Hessler.  I'm representing Robert
8   Gisevius.
9              Now, on -- this was the morning of September 4,
10  Sunday morning; correct?
11  A.   Yes.
12  Q.   It was about six days after the levees had been topped or
13  broke?
14  A.   Yes, about that.
15  Q.   And where -- where were you assigned at the time?
16  A.   The 3rd District.
17  Q.   Okay.  That would be the west side of the Industrial
18  Canal?
19  A.   Yes, yes.
20  Q.   And did you work for then-Lieutenant Colin?
21  A.   Yes.
22  Q.   Now, who, if you know, who flagged you down and indicated
23  that there were shots being fired on top -- at the bridge?
24  A.   There were several -- when we got down, there were several
25  people.  I specifically remember the one guy that came up who I
```

1  thought was a police officer, but I remember a lot more people
2  telling us to get down, that they were shooting at us and
3  trying to take our boats.
4  Q.  Okay.  And you actually heard two shots initially when you
5  were on the bridge; correct?
6  A.  Yes.
7  Q.  Did you believe that your life was potentially threatened
8  at that point?
9  A.  Yes.
10 Q.  And when you saw people on the video -- you saw the
11 video -- police officers you don't even know, all crouching
12 down and creeping up to the side of the bridge to look down.
13 Did you see that?
14 A.  Yes.
15 Q.  Now, you were -- I want to make it clear to the jury:  By
16 the time that video turns on, there have already been at least
17 two gunshots fired; would you agree with that?
18 A.  Yes.
19 Q.  And you had already -- is it true you would have already
20 kicked in -- or you call it "kicked in" -- broadcast the 108?
21 A.  Yes.
22 Q.  And when you broadcast the 108, you would have broadcast
23 all of the pertinent information that responding officers would
24 need to know -- officers in the area would need to know?
25 A.  Yes.

JENNIFER DUPREE - Cross

1  Q.   And how long had you been on the job at that time?
2  A.   About six years.
3  Q.   Would part of that information be as in regards for
4  officer safety reasons, would you inform responding officers if
5  other officers were down below the bridge?
6  A.   Yes.
7  Q.   Okay.  And you knew that to be the case because
8  Officer Conaghan ran below the bridge?
9  A.   Yes.
10  Q.   Okay.  So it wouldn't have been farfetched or it wouldn't
11  have been improper, it would actually have been the responsible
12  thing to do, would be to inform other officers there were
13  officers down below the bridge?
14  A.   I did.
15  Q.   Okay.
16  A.   Yes.
17  Q.   So now, we saw Officer Conaghan on the video and he's
18  wearing the light baby blue police shirt; is that accurate?
19  A.   Yes.
20  Q.   And do you remember talking to Agent Bezak, right here, on
21  March 4th of 2009, or thereabouts?
22  A.   Yes.
23  Q.   Being interviewed by the FBI?
24  A.   Yes.
25  Q.   How often were you interviewed by the FBI?

JENNIFER DUPREE - Cross

1    A.   He came to my house once and there could have been a
2    second time.  I don't remember.  But actually interviewed with
3    him, I remember one time.
4    Q.   Okay.
5    A.   Like I said, there could have been another time, but I
6    just specifically remember that one time.
7    Q.   How often have you interviewed with Ms. Bernstein?
8    A.   A few times.
9    Q.   Now, as you're walking to the bridge -- or as you're
10   walking to the railing to look down, what do you see -- or let
11   me ask you this:  Is your attention brought to somebody?
12   A.   On what side?  Because when I originally got there, I went
13   to the right side.
14   Q.   All right.  Let me rephrase the question.
15        Where -- you stated on direct that the cameraman
16   actually brought your attention to the guys that had fired the
17   shots?
18   A.   Yes.
19   Q.   So he saw something that you didn't see?
20   A.   Right.
21   Q.   Did he ever tell you what he saw?
22   A.   No.
23   Q.   But he told you, "That's the shooters there"?
24   A.   He pointed them out to us.  He didn't say, "That's the
25   shooters."  He just pointed the two subjects out, yes.

JENNIFER DUPREE - Cross

1   **Q.**   Okay.  Well, did he point out two or four?
2   **A.**   Two.
3   **Q.**   How did you get four people to be involved?
4   **A.**   Because on the opposite side when I originally looked
5   down, I remember seeing four people.
6   **Q.**   So are we talking -- are these -- you saw four on the left
7   side?
8   **A.**   Correct.
9   **Q.**   Or I guess you'd call it the south side, and then four --
10  or two more on the north side, which would have been between
11  the Danziger Bridge and the I-10 bridge?
12  **A.**   I remember two of them coming out the other side.  My eyes
13  specifically caught the two because I remember specifically the
14  red shirt -- it stood out -- and the black T-shirt with the
15  book bag stood out.
16  **Q.**   And I'm not trying to confuse you, but I want to make this
17  clear:  So on the south side of the bridge you saw four
18  subjects?
19  **A.**   Yes.
20  **Q.**   Two of whom -- at least two of whom you could visually
21  tell were armed?
22  **A.**   Yes.
23  **Q.**   And those two were wearing what?
24  **A.**   Red T-shirt and the other one had the black T-shirt and a
25  book bag.

JENNIFER DUPREE - Cross

1   Q.   Okay.  What color book bag was it?

2   A.   It was a darker black color book bag.

3   Q.   Was it a shoulder pack, was it a fanny pack, was it

4   wrapped around him?  How was he carrying it?

5   A.   It was a book bag.

6   Q.   Full size book bag?

7   A.   Yes.

8   Q.   It didn't appear that he had books in it, I guess.  I

9   mean, was it fully packed, there were -- could you tell?  Was

10  it bulky or was it just --

11  A.   I really couldn't tell.  I just remember he had it on his

12  back.  I don't know what was in it.

13  Q.   Okay.  So the black -- the guy with the black T-shirt had

14  the black bag?

15  A.   Yes.

16  Q.   And he was armed with a handgun?

17  A.   He had a gun.  I couldn't specifically tell what kind or

18  anything like that, but, yes.

19  Q.   And the guy with the red T-shirt had a gun?

20  A.   Yes.

21  Q.   And you don't know if he was wearing white shorts?

22  A.   No.

23  Q.   Okay.  And you don't know what the guy with the black

24  T-shirt, if he was dressed in all black or anything else?

25  A.   No.

JENNIFER DUPREE - Cross

1   Q.   And the other two, you just -- they were wearing anything
2   from all white to all black or pink or neon green, you don't
3   know what they were wearing?
4   A.   That's correct.
5   Q.   And you don't know if they were armed or not?
6   A.   Correct.
7   Q.   All right.  Now, you go to the other side of the bridge
8   for some reason, the north side of the bridge, where you're
9   going toward the Danziger; right?
10  A.   Yes.
11  Q.   And then you see people fitting -- two people fitting the
12  same description of the persons you saw on the south side;
13  right?
14  A.   Yes.
15  Q.   And they're running towards the Danziger Bridge?
16  A.   Yes.
17  Q.   And they're both still armed?
18  A.   I couldn't see at that point.
19  Q.   Okay.  But you believed they were the same two people that
20  you just saw on the south side?
21  A.   Yes.
22  Q.   Now, how -- did you bring this to Officer Conaghan's
23  attention, that these two individuals were running towards the
24  Danziger?
25  A.   I never spoke to Conaghan.  It was chaotic.  We didn't

JENNIFER DUPREE - Cross

1  speak at that point.

2  **Q.**   Okay.  Were people yelling directions to people, "Hey,

3  there they go," or, "The guy in the red T-shirt.  The guy in

4  the black T-shirt"?  Did you hear other people -- other

5  officers yelling information?

6  **A.**   I don't remember.

7  **Q.**   Now, let me ask you something.  Ms. Bernstein asked you

8  about your training in the academy -- it's a little off the

9  subject, but I want to get into it real quick -- and your

10  knowledge of use of force and when you can and can't use force,

11  et cetera.

12         Isn't it a fact that if you believe your life is in

13  danger that you don't have to wait to see a gun, or especially

14  wait to have it pointed at you, before you can protect your

15  life and use deadly force?

16  **A.**   If I believe my life's -- I guess you could take it any

17  way you want.  But if I believe my life's in danger, I would

18  have to know my life is in danger by seeing something or -- I

19  mean, that's all speculative, I guess.

20  **Q.**   Okay.  Well, it is speculative.

21         So the standard is you'd have to -- you, to your

22  level, would have to believe or know that you believe your life

23  is in danger; right?

24  **A.**   Yes.

25  **Q.**   So getting back to this, these two individuals run through

1   the neighborhood, and we've seen the over- -- the aerial view,
2   there's some buildings down there, there's a trailer park, I
3   believe, and some warehouse areas.  It's kind of a mixed
4   residential/industrial type area; would you agree?
5   A.   Yes.
6   Q.   Now, you specifically remember the individual going
7   towards -- the two individuals going towards the Danziger
8   Bridge because they turned by a pack of dogs or something;
9   right?
10  A.   Yeah.  I remember them coming out and I remember the pack
11  of dogs by them.
12  Q.   For whatever --
13  A.   Yeah, right.
14  Q.   -- reason you remember a pack of dogs?
15  A.   Yes.
16  Q.   And they ran by them and turned up the Danziger Bridge?
17  A.   Yes.
18  Q.   Would you be able to recognize these dogs if I showed them
19  to you again?
20  A.   Probably not.
21  Q.   Okay.  Now, the other two fellows, did you see them --
22  those two fellows again, those other two guys?
23  A.   I don't remember seeing them, no.
24  Q.   Okay.  And I know I asked you again, but where had you
25  been assigned?  You were assigned to the 3rd District?

1  A.    Yes.
2  Q.    You were a policewoman for how long then?
3  A.    At that time about six years.
4  Q.    And what unit were you assigned to?
5  A.    DIU.
6  Q.    Had you ever been assigned to a task force unit --
7  A.    Yes.
8  Q.    -- a pre-crimes unit?
9        In your experience have you ever chased perpetrators
10 that, during their course of flight, either threw down weapons,
11 threw down evidence, or even threw down a shirt and was wearing
12 a different color shirt underneath it?
13 A.    Yes.
14 Q.    It's kind of common, isn't it?
15 A.    Yes.
16 Q.    So now you see the shooters and you -- and, admittedly,
17 you lost sight of them at different times.  But the one thing
18 that was consistent was every time you saw those two shooters,
19 they were heading towards the Danziger Bridge?
20 A.    Yes.
21 Q.    And they were attired in the same clothing that you saw
22 them with -- you saw them with when -- you saw them attired in
23 when they were armed?
24 A.    Yes.
25 Q.    All right.  Now -- and these two individuals ran, turned,

JENNIFER DUPREE - Cross

1  went up the Danziger Bridge, and were on the right side of the
2  pillar, I'll call it the downstroke of the Danziger Bridge,
3  walking up and prior to the first stanchions, the first metal
4  supports.  Would that be accurate?
5  A.   You talking about when they went up to the top of the
6  bridge --
7  Q.   When they were walking up to the top of the bridge.
8  A.   Yeah.  I mean, I saw them until they got to -- well, what
9  I remember, until they got to the pillar, the first -- the
10 first one.
11 Q.   Okay.  And about that time -- and this is where things --
12 where you said things started happening very quickly, huh?
13 A.   The whole thing, that I remember, happened real quick.  To
14 me, I mean, at least.
15 Q.   Okay.  You were excited.  There's -- your adrenaline was
16 racing, I guess?
17 A.   Yes.
18 Q.   And your lieutenant, didn't you say your lieutenant was --
19 you know, let me ask you a question.  There was a whole bunch
20 of policemen out there; right?
21 A.   Where?
22 Q.   On top of the bridge?
23 A.   Where I was?
24 Q.   Yes, ma'am.
25 A.   There are -- because I saw the video, there were.  But, I

JENNIFER DUPREE - Cross

1   mean, specifically, I only remembered us five and -- I don't
2   know why, I just -- that's all I really remember.
3   Q.   But you saw some police officers up there that you didn't
4   even know?
5   A.   From the video, yes.
6   Q.   Do you remember the guy carrying the long rifle?
7   A.   From the video, but I don't remember him.
8   Q.   Okay.  Was it uncommon to see officers carrying long
9   rifles at that time?
10  A.   No.
11  Q.   All kind of weapons that they would not even be authorized
12  to carry in other times; would you agree with that?
13  A.   Yes.
14  Q.   Do you know if anybody ever got disciplined for carrying
15  an unauthorized weapon?
16  A.   I don't know.
17  Q.   And you, in fact, had a shotgun?
18  A.   Yes.
19  Q.   You don't normally carry a shotgun, do you?
20  A.   No.
21  Q.   Where was that shotgun obtained from?
22  A.   Where was it obtained from?
23  Q.   Yes.
24  A.   Somebody else had let me use it because I didn't have one.
25  Q.   Okay.  Because NOPD didn't give them to the officers on

JENNIFER DUPREE - Cross

1    everyday patrol?

2    A.   Correct.

3    Q.   Were you still qualified with one at the time?

4    A.   Yes.

5    Q.   Now, also, and I guess at some point -- and you didn't --

6    I'm sure you weren't aware of it, you are now -- but at some

7    point they turned on the cameras and started filming and

8    audio-ing certain things that were going on; correct?

9    A.   Yes.

10   Q.   Now, you listened to the tape today?

11   A.   Yes.

12   Q.   You've probably listened to it with the prosecutors?

13   A.   Yes.

14   Q.   You can hear things other than the police radio, can't

15   you?  Do you recall hearing -- do you remember hearing the dogs

16   barking?  I hate to keep going back to the dogs, but...

17   A.   I don't remember --

18   Q.   You don't recall hearing --

19   A.   -- the -- hearing it; but, yeah, there were different

20   things in there.  Yes.

21   Q.   But it's pretty still out there at that time, wasn't it?

22   I mean, one, you didn't have traffic; you didn't have any

23   indust- -- you know, the indust- -- the noise of the industry

24   or anything else.  It was pretty quiet absent certain things;

25   would you agree?

JENNIFER DUPREE - Cross

1   A.   I mean, I guess.  I don't -- I don't really remember the
2   sounds that day.
3   Q.   But you're giving a running narrative on the radio, best
4   as you can, "I see them again.  There they are.  They're going
5   this way.  They're running there," anything you can do to
6   assist the officers that are responding?
7   A.   Yes.
8   Q.   And we hear a fair portion of that; would you agree?
9   A.   Yes.
10  Q.   Now, in your mind, getting back to where these -- the
11  gentlemen in the white T-shirt and black T-shirt were, they
12  were walking on -- up the Danziger Bridge, approaching the
13  first stanchion, the first support, when the truck pulls up;
14  right?
15  A.   It wasn't a white T-shirt at that point.  I still remember
16  a red T-shirt and a black T-shirt until the pillars, and then I
17  don't remember seeing the red T-shirt again.
18  Q.   So the people that you saw at the top of the bridge
19  actually was the guy with the black T-shirt and the red T-shirt
20  and actually still walking up the bridge?
21  A.   I believed it, yes.  At the time, yes.
22  Q.   Did you ever see a guy wearing a white T-shirt?
23  A.   When they were fleeing down, yes, because I gave the
24  description of it.
25  Q.   And when these four were -- all right.  So you don't know

JENNIFER DUPREE - Cross

1    where the other two went, the guy -- the one that you saw in
2    the white T-shirt.  You don't know if he went towards the
3    Danziger and you didn't follow him.  You kept track of the two
4    guys, the guy in the white -- the guy in the red T-shirt and
5    the guy in the black T-shirt?
6    A.   You're confusing me.  The two that went up the bridge had
7    a red T-shirt on, a black T-shirt, and they were going up the
8    bridge.  I lost sight of them because of the pillars and then
9    the shooting happened.
10          And I remember, after all that, looking back, seeing
11   two subjects fleeing.  I don't -- I couldn't tell you where the
12   shirt went or whatever, but I believed that those were the two
13   subjects that were still fleeing down the other side of the
14   bridge towards the 3rd District.
15   Q.   Okay.  Now, when you first saw this video and heard the
16   audio, I'm sure it refreshed your recollection with things that
17   you just forgot you said, or didn't know you said, or weren't
18   paying attention to what other persons had said?
19   A.   Yes.
20   Q.   Okay.  You -- are you familiar with Officer James Foucha?
21   A.   No.
22   Q.   James Foucha works with you in the dive team?
23   A.   James who?  No, I don't --
24   Q.   Foucha.
25   A.   Foucha?

JENNIFER DUPREE - Cross

1          THE COURT:  Spell it.

2          MR. HESSLER:  I can't spell that, Your Honor.

3   BY MR. HESSLER:

4   Q.   P-H-O-S-U- -- or, no.  Foucha, F-U-C-H- --

5          Well, if you don't know him, you don't know him.

6   A.   Foush (phonetic) or Fou (phonetic) -- yes.

7   Q.   I don't know him, so I can't say his name.

8          Is it anywhere close to somebody with a name --

9   A.   Yes.

10  Q.   -- like that that worked on the --

11  A.   Yes.

12  Q.   Well, please tell me what it is so I don't embarrass

13  myself --

14  A.   I don't know how to pronounce his name either, but I

15  believe I know who you're talking about, yes.

16  Q.   Okay.  Was he working with you that day?

17  A.   No.

18  Q.   I'm going to call him James.  Was James working with you

19  that day?

20  A.   No.

21  Q.   Would he have been assigned to the 3rd District during

22  that time?

23  A.   I don't believe.  I mean, I don't know where he was

24  assigned.  It was -- people were everywhere.  I don't know

25  where people were.

JENNIFER DUPREE - Cross

1    Q.   Okay.  That's fair.

2          MR. HESSLER:  Could you play Exhibit 300, I believe

3    it is, and I'm going stop you at certain points.

4                    (VIDEO PLAYED)

5          MR. HESSLER:  All right.  Stop it, sir.

6                    (VIDEO STOPPED)

7    BY MR. HESSLER:

8    Q.   Can you point out Officer Conaghan?

9    A.   (WITNESS COMPLIES.)

10   Q.   Okay.  And he is -- and others are approaching and

11   actually looking down over the side of the bridge?

12   A.   Yes.

13         MR. HESSLER:  Okay.  Play it again, sir.

14                   (VIDEO PLAYED)

15         MR. HESSLER:  Stop it.

16                   (VIDEO STOPPED)

17   BY MR. HESSLER:

18   Q.   There's a fellow standing by that -- the group of

19   airboats.  Do you see him?

20   A.   Yes.

21   Q.   Who is that fellow?

22   A.   Right here?

23   Q.   Yes, sir -- yes, ma'am.

24   A.   That's Lieutenant Colin.

25   Q.   Okay.  He's not following you, is he?

JENNIFER DUPREE - Cross

1   A.   No.

2   Q.   Do you know why he's not following -- do you have an idea

3   why he's not following you?

4   A.   No, I don't.

5   Q.   Do you remember you told -- do you remember what you told

6   Agent Bezak why he didn't come with you?

7   A.   No, I don't remember what I told him.  I mean, I have an

8   opinion, but...

9   Q.   Well, do you remember the opinion you expressed to Agent

10  Bezak?

11  A.   That he was scared.

12         MR. HESSLER:   Okay.  Play it again, sir.

13                    (VIDEO PLAYED)

14         MR. HESSLER:   Can we stop it again?

15                    (VIDEO STOPPED)

16  BY MR. HESSLER:

17  Q.   Do you see that fellow to the far left, bending over,

18  approaching the ramp -- approaching the railing?

19  A.   Him?

20  Q.   Yes, ma'am.

21  A.   Yes.

22  Q.   All right.  He's crouched down, he's got gun up, gun ready

23  position?

24  A.   Uh-huh.

25  Q.   He's approaching that ramp; right?

JENNIFER DUPREE - Cross

1   A.   He's on the ramp.

2   Q.   Okay.  And you're approaching it?

3   A.   Yes.

4   Q.   You're probably scared too, aren't you?

5   A.   Yes.

6   Q.   But you're going to do your job?

7   A.   Yes.

8          MR. HESSLER:  Play it, please.

9                    (VIDEO PLAYED)

10  BY MR. HESSLER:

11  Q.   Do you hear a helicopter above?

12  A.   Yes.

13         MR. HESSLER:  Stop the tape, please.

14                   (VIDEO STOPPED)

15  BY MR. HESSLER:

16  Q.   You heard that person talking?

17  A.   Yeah.

18  Q.   Okay.  Was that the camera crew talking?  Could you tell?

19  A.   I have no clue who was talking.

20  Q.   Is this prior -- this, obviously, was after they had

21  pointed out persons that were running; would you agree?

22  A.   Yeah.

23  Q.   And after you had broadcast the 108, the descriptions and

24  everything else?

25  A.   Yes.

JENNIFER DUPREE - Cross

```
 1          MR. HESSLER:  Please start it again.
 2                    (VIDEO PLAYED)
 3          MR. HESSLER:  All right.  Stop it right there.
 4                    (VIDEO STOPPED)
 5  BY MR. HESSLER:
 6  Q.   Do you see that individual in the middle of the
 7  intersection?
 8  A.   Yep -- yes.
 9  Q.   Can you tell what he's wearing?
10  A.   Like a white shirt and maybe some red-and-white shorts.
11  Q.   Okay.  And do you see this person right there behind that
12  truck?
13  A.   No.
14  Q.   I'm going to do that, and then I'm going to take that
15  away, if I'm magic -- yep.
16          That right there, can you tell if that's a person
17  right now?
18  A.   I don't know what that is.
19  Q.   Okay.  And I want you to --
20          MR. HESSLER:  Well, you can't go back, can you, sir?
21  BY MR. HESSLER:
22  Q.   Let's do this.  That gentleman right there, does it -- can
23  you tell what he's wearing?
24  A.   A white shirt and I said red shorts with like white on the
25  shorts.
```

JENNIFER DUPREE - Cross

1  Q.   Okay.  Now, you're -- you're just telling me what you can
2  see from here; right?
3  A.   Yeah.
4  Q.   All right.  Is it possible that he had on a red shirt tied
5  around his waist and white shorts?
6  A.   I don't know.  I can't see it.
7  Q.   Okay.  All right.
8          MR. HESSLER:  Can you go forward just a brief second?
9                    (VIDEO PLAYED)
10         MR. HESSLER:  Stop.
11                   (VIDEO STOPPED)
12 BY MR. HESSLER:
13 Q.   Now, look at him again.  Does it appear that that fellow
14 has a red hat on his head and he leaned up a little bit more?
15 A.   I can't even tell it's a person.  I don't know what that
16 is.
17 Q.   Well, it's difficult, because he's -- but you got to keep
18 your eye on him.
19         And now this fellow is still running; right?  This
20 fellow here, he's still running?
21 A.   Yes.
22 Q.   He's moved.
23         You don't see anybody in that direction behind him,
24 do you?
25 A.   No.

JENNIFER DUPREE - Cross

1          MR. HESSLER:  Okay.  Play it again for a second.
2                      **(VIDEO PLAYED)**
3          MR. HESSLER:  Stop.
4                      **(VIDEO STOPPED)**
5          MR. HESSLER:  All right.  Go ahead.
6                      **(VIDEO PLAYED)**
7          MR. HESSLER:  Stop it.
8                      **(VIDEO STOPPED)**
9   BY MR. HESSLER:
10  **Q.**   Now, right here, we can't tell because it looks like a --
11  I don't know what, but is that the area where you saw the dogs
12  standing in the intersection by Downman and Chef?
13  **A.**   Honestly, I --
14          **MS. BERNSTEIN:**  Objection.  I don't think that's the
15  intersection that you're pointing to there.
16          **MR. HESSLER:**  Well, it's near the intersection.  Dogs
17  have legs and they move, so I don't know exactly where.
18          **THE COURT:**  I'm going to overrule it, because I think
19  that the context of this shot, when connected to what we just
20  watched, gives it some proximity.  You're correct that it's not
21  exactly in the intersection, but I think we just saw the
22  intersection.
23          There may be some space here in between, as we
24  said, to time-wise, but I think the jury understands the
25  proximity of this Chef Menteur section in connection with the

JENNIFER DUPREE - Cross

```
 1   intersection that we just saw.
 2             MR. HESSLER:  And, Your Honor, I guess I'm also
 3   making reference more so to the dogs because that's what she
 4   made reference to.
 5             THE COURT:  Okay.
 6   BY MR. HESSLER:
 7   Q.   And, again, I'm going to point you to there.
 8             MR. HESSLER:  All right.  Play the tape, please.
 9                       (VIDEO PLAYED)
10             MR. HESSLER:  All right.  Stop it.
11                       (VIDEO STOPPED)
12   BY MR. HESSLER:
13   Q.   That's a dog; right?
14   A.   Yep.
15   Q.   And that's a dog, and he also made a noise like a dog:  He
16   barked?
17   A.   Yep.
18   Q.   Well, you heard that, didn't you?
19   A.   Yeah.
20   Q.   Okay.  All right.  Now, our guy, this guy, this fellow's
21   right there; correct?  Do you see him there?
22   A.   Yes.
23   Q.   Okay.
24             MR. HESSLER:  All right.  Play the tape, please.
25                       (VIDEO PLAYED)
```

JENNIFER DUPREE - Cross

```
 1              MR. HESSLER:  Stop the tape, please.
 2                       (VIDEO STOPPED)
 3   BY MR. HESSLER:
 4   Q.   Did it look there maybe he had a red T-shirt draped over
 5   himself, could you tell, tied at the waist?
 6   A.   It just looked like red shorts to me.  I can't tell.
 7   Q.   Okay, okay.  Thank you.
 8              MR. HESSLER:  All right.  Continue playing it,
 9   please.
10                       (VIDEO PLAYED)
11              MR. HESSLER:  Stop the tape.
12                       (VIDEO STOPPED)
13   BY MR. HESSLER:
14   Q.   All right.  How many people do you think are walking
15   there -- or you've never even seen these people before; right?
16   A.   No.
17   Q.   Now, somebody you said had a pack; right?
18   A.   Yes.
19   Q.   Okay.  And that person that you said had a pack actually
20   ran up and then went up on the Danziger Bridge?
21   A.   Yes.
22   Q.   And that person that had a pack also had a gun?
23   A.   Yes.
24   Q.   Okay.  Now --
25              MR. HESSLER:  Okay.  Go ahead.
```

JENNIFER DUPREE - Cross

```
 1                         (VIDEO PLAYED)
 2   BY MR. HESSLER:
 3   Q.   Listen to the audio.
 4            MR. HESSLER:  Stop.
 5                         (VIDEO STOPPED)
 6   BY MR. HESSLER:
 7   Q.   Did you hear somebody say, "I'm sure if he has it, it's in
 8   his pack," or, "I'm sure if he has it, it's in his pack," or,
 9   "It's in the pack"?  Did you hear that?
10   A.   No.  I mean, I -- I don't know what he said.
11   Q.   Okay.  You didn't hear that, I guess.  Is that what you're
12   saying, you couldn't hear that?
13   A.   You heard something.  But, I mean, like I said, I don't
14   know what he said.
15   Q.   Okay.
16            MR. HESSLER:  All right.  Go on again.
17                         (VIDEO PLAYED)
18            MR. HESSLER:  Stop the tape.
19                         (VIDEO STOPPED)
20            MR. HESSLER:  Go on a little bit.
21                         (VIDEO PLAYED)
22            MR. HESSLER:  Stop it.
23                         (VIDEO STOPPED)
24   BY MR. HESSLER:
25   Q.   This guy right there, do you see that?  Do you see that
```

JENNIFER DUPREE - Cross

1  tip of that thing right there?

2  A.   Yes.

3  Q.   That little blue arrow?

4  A.   Yes.

5  Q.   That appears to be something, a black object; correct?  A

6  black spot in the middle of the street?

7  A.   Yeah, yeah.

8  Q.   Running towards the Danziger?

9  A.   Yep.

10 Q.   And now we know Conaghan had on a light blue shirt;

11 correct?

12 A.   Correct.

13            MR. HESSLER:  Okay.  Play it again, please.

14                      (VIDEO PLAYED)

15            MR. HESSLER:  Stop.

16                      (VIDEO STOPPED)

17 BY MR. HESSLER:

18 Q.   Do you see that fellow now, right there?

19 A.   Yes.

20 Q.   Okay.  He looks like -- and I'm asking if it appears to

21 you that he's running towards the bridge.

22            MR. HESSLER:  Play it, please.

23                      (VIDEO PLAYED)

24 BY MR. HESSLER:

25 Q.   Could you hear yelling from the bridge at that time --

JENNIFER DUPREE - Cross

1   A.   I don't remember.

2   Q.   -- from somebody yelling?

3        Now, where are you at this time?  Do you know

4   where -- exactly what you're doing or where you're walking?

5   A.   No, I don't.

6        MR. HESSLER:  You can stop it right there.

7                    (VIDEO STOPPED)

8   BY MR. HESSLER:

9   Q.   Officer Dupree, originally in your direct, and I may be

10  wrong, but it seems as if you said that there was the gunfire

11  and before anything else happened somebody said, "Shut up.  We

12  got it," just almost like that -- almost that quick.

13  A.   In my mind, everything happened so quick.  So, yeah,

14  that's what I remember.  Yes.

15  Q.   Okay.  But you've heard the tape.  The government played

16  it?

17  A.   Yes.

18  Q.   And in reality that was minutes -- minutes later and it

19  was said, not about the incident on the right side -- not the

20  incident on the east side of the bridge, it was said about

21  something that occurred on the west side of the bridge, didn't

22  it?

23  A.   According to the tape, yeah.

24  Q.   But you certainly weren't lying to the jury when you said

25  it was right after the gunshots somebody said, "Shut up.  We

JENNIFER DUPREE - Cross

1  got it."  I mean, it was just the way things -- you remembered
2  things because of stress and the conditions you were under?
3  **A.**   Yes.
4  **Q.**   But you wouldn't -- you would certainly suggest that the
5  tape is a more accurate reflection of when somebody finally
6  said, "Shut up.  We got them"?
7  **A.**   Yes.
8          **MR. HESSLER:**  I have no further questions, Your
9  Honor.
10         **THE COURT:**  Thank you, Mr. Hesser.
11             Okay.  Who's next?  Counsel?  Mr. DeSalvo?
12         **MR. DESALVO:**  I just have a couple, Your Honor.
13         **THE COURT:**  Sure.
14                     **CROSS-EXAMINATION**
15  BY MR. DESALVO:
16  **Q.**   Ms. Dupree, Frank DeSalvo.  I should say Officer, I'm
17  sorry.  I just have a couple questions.
18         You indicated in your -- do you recall speaking to
19  Special Agent Bezak of the FBI?
20  **A.**   Yes.
21  **Q.**   Do you recall telling him that you saw -- you watched the
22  Budget truck approach, come to a stop, and you heard gunfire?
23  Do you recall that?
24  **A.**   I don't know exactly, but, yes, I did tell him that.
25  **Q.**   That's what you recall happening too; isn't that correct?

JENNIFER DUPREE - Cross

1  A.   Yes.

2  Q.   And you said that the gunfire came from the Budget

3  truck -- or from the truck, I think you -- is that correct?

4  A.   Yes.

5  Q.   But you couldn't see what was on the other side of the

6  truck?

7  A.   Correct.

8  Q.   And so when you said he came from the truck, you meant the

9  direction of the truck --

10 A.   Yes.

11 Q.   -- when you first heard gunfire?

12 A.   Yes.

13 Q.   And you don't know -- you didn't see anybody fire those

14 rounds, you heard them from that direction?

15 A.   Yes.

16 Q.   And that was after the truck came to a stop?

17 A.   Yes.

18 Q.   One other question.  Do you know Ken Bowen?

19 A.   No.

20 Q.   Did he ever call you?

21 A.   No.

22 Q.   Did he ever ask you what you were going to say?

23 A.   No.

24 Q.   Did he ever try to influence you in what to say?

25 A.   No.

JENNIFER DUPREE - Cross

1          **MR. DESALVO:**  No more questions.

2          **THE COURT:**  All right.  Mr. London?

3          **MR. LONDON:**  Yes, just a couple.

4                    **CROSS-EXAMINATION**

5    BY MR. LONDON:

6    **Q.**   Good afternoon, Officer Dupree.  My name is Steve London.

7    I represent Archie Kaufman.

8          I didn't call you at 1:00 in the morning, did I?

9    **A.**   No.

10   **Q.**   I haven't been up until 1:00 in the morning since I can't

11   tell you.

12         You've testified that -- and I believe that

13   Ms. Bernstein showed you a copy of the report and asked you if

14   that was your statement that was in there and you said that

15   you -- you disputed the part about the shots coming at you,

16   about you being under fire; is that correct?

17   **A.**   What --

18   **Q.**   There's a notation in the report that says you were under

19   fire and that -- she asked you if that part was correct of your

20   statement and you said that it was incorrect.

21         **MS. BERNSTEIN:**  Objection, Your Honor.  I think that

22   misstates the testimony.

23         **MR. LONDON:**  Okay.  Can I --

24         **THE COURT:**  Why don't we show her -- let's show her

25   the part that -- I think she --

JENNIFER DUPREE - Cross

1        **MR. LONDON:**   Judge, I think I can even be faster than
2    that --
3            **THE COURT:**   Okay.
4            **MR. LONDON:**   -- if you let me.
5    BY MR. LONDON:
6    **Q.**   Were you shot -- did you believe that you were shot at
7    during this incident?
8    **A.**   Yes.  I believed that they were shooting at us, yes.
9    **Q.**   You did.
10           So you did believe at a point you were under fire?
11   **A.**   Yes.
12   **Q.**   And when you looked over and you saw the Budget truck, I
13   believe in your statement it said that it was 7th District
14   officers?
15   **A.**   That's what was --
16   **Q.**   Right.  Correct.
17           You would not know that; correct?
18   **A.**   Correct.
19   **Q.**   You would not be able to see -- there was no markings on
20   that Budget truck other than "Budget," but there were no police
21   markings on that truck at all, were there?
22   **A.**   No.
23   **Q.**   And you, during your testimony, had given different
24   descriptions of these individuals from time to time; is that
25   correct?  One white and black shirt, another white and red

JENNIFER DUPREE - Cross

1    shirt?
2    **A.**    Yeah.  The two separate times, but, yes.
3              **MR. LONDON:**  That's all.  Thank you very much.
4              **THE COURT:**  Thank you.  Anybody else?  Mr. Meche or
5    Mr. Larson?  Okay.  Mr. Larson?
6              **MR. LONDON:**  Judge, may I have one more question?
7              **THE COURT:**  Before Mr. Larson gets up here --
8              **MR. LONDON:**  May I?
9              **THE COURT:**  -- go ahead.  Go ahead.
10   **BY MR. LONDON:**
11   **Q.**    My client didn't ask you to do anything improper, did he,
12   in this case?
13   **A.**    No.
14   **Q.**    Did I ever ask you -- we've never met before, have we?
15   **A.**    No.
16   **Q.**    I don't even think we've ever even seen each other; is
17   that correct?
18   **A.**    That's correct.
19   **Q.**    And I certainly have not asked you, nor Mr. Kaufman has
20   asked you, to do anything improper?
21   **A.**    No.
22             **MR. LONDON:**  Okay.  Thank you.
23             **THE COURT:**  All right.  Mr. Larson?
24
25

JENNIFER DUPREE - Cross

1                      CROSS-EXAMINATION
2   BY MR. LARSON:
3   Q.   Good afternoon, Officer Dupree.  My name is Lindsay Larson
4   and my client is Robert Faulcon.
5           In October of 2006, specifically October 11th of
6   2006, you appeared before a state grand jury?
7   A.   Yes.
8   Q.   And you gave testimony under oath at that time; correct?
9   A.   Yes.
10  Q.   Now, you've testified under oath, what, twice more after
11  that time, once in the federal grand jury four years later, and
12  once here today?
13  A.   Yes.
14  Q.   I'm going to ask you about your state grand jury
15  testimony.  Do you remember telling the grand jury that when
16  you kicked in the 108, you also said, "Shots being fired"?
17  A.   I would have to read the testimony.  I don't remember
18  exactly what I said back then.
19           MR. LARSON:  May I approach the witness, Your Honor?
20           THE COURT:  Show it to her.
21           THE WITNESS:  Yes.
22  BY MR. LARSON:
23  Q.   Okay.  Also, I'd like you to read, while I'm up here --
24  A.   Sure.
25  Q.   -- to save some time, pages 13 through 15.

JENNIFER DUPREE - Cross

1          **THE COURT:**  13 through 15.

2          **THE WITNESS:**  Do you want me to read it out loud

3    or...

4    **BY MR. LARSON:**

5    **Q.**   No, just to yourself.  I'm going to ask you some questions

6    about it.

7    **A.**   (WITNESS COMPLIES.)

8    **Q.**   I'm sorry.  Would you also read pages 8 and 9.  I forgot

9    to ask you to do that.  That will save me time.

10   **A.**   (WITNESS COMPLIES.)

11   **Q.**   Thank you.

12          Now, we're talking about what you told the grand

13   jury.  You said when you kicked in the 108, did you say, "Shots

14   being fired"?

15   **A.**   Like I said in there, I don't remember the exact verbiage;

16   but, yes, I did say, "Shots being fired."

17   **Q.**   And did you also -- you also told the grand jury -- I

18   don't know if you told them this or if you told them you said

19   this -- it's unclear, maybe you can remember -- that officers

20   were going down on the ground?

21   **A.**   Yeah.  Well, what I said -- I don't, like I said, I don't

22   remember exactly what I said that day over the radio, but I

23   said there were officers running down towards the ground.

24   **Q.**   Okay.  So you had "officers down" and "ground" in that

25   statement?

JENNIFER DUPREE - Cross

1          **MS. BERNSTEIN:**  Your Honor, I have no objection to

2    this particular question.  I have an objection to the

3    procedure.  May we approach for 20 seconds?

4          (WHEREUPON, the following proceedings were held at

5    the bench.)

6          **MS. BERNSTEIN:**  Is the white noise on?

7          **THE COURT:**  I think so.

8          **MS. BERNSTEIN:**  I'm sorry.  I wanted to have this

9    conversation before we get to an objectionable question, but

10   using the prior statements -- and I had the same objection with

11   the 302 a minute ago -- it's improper just to talk to her about

12   what she said on a different occasion.

13          If there's an inconsistency that she's being

14   impeached with, you need to establish her statement now,

15   establish the inconsistency.  At that point, the stuff becomes

16   non-hearsay.

17          **MR. LARSON:**  Well, I did.  I asked her if she said --

18   "Did you say, 'Shots fired,'" and she said, "Well, I don't

19   remember."  So I said, "Here's something to refresh your

20   recollection.  To save some time, read everything I'm going to

21   ask you, and I'm going to ask you, 'Did you say this?'"

22          **MS. BERNSTEIN:**  It's actually not inconsistent with

23   what's in there, though, because what she just said is --

24          **MR. LARSON:**  I'm not suggesting it's inconsistent.  I

25   was asking her if she said that.

JENNIFER DUPREE - Cross

1          THE COURT:  I hear you.  I agree with you --

2          MS. BERNSTEIN:  Yes, thank you.

3          THE COURT:  -- and I agree with you that you haven't

4    done it yet.  Ask her the question, get the answer, if the

5    answer matches what the statement or the 302 says --

6          MS. BERNSTEIN:  Then we're done.

7          THE COURT:  -- then we move on to the next question.

8          MR. LARSON:  That's why I gave her the thing to look

9    at to begin with, so it would match.

10          THE COURT:  Only to refresh her memory or to impeach

11    her would it be appropriate to reference the prior statement.

12          MS. BERNSTEIN:  And I want to make sure that's clear.

13    So you can't just -- so counsel can't just pick a statement and

14    say to her, "Did you say this," and then impeach her with it if

15    she says, "I don't remember saying it."  It has to be --

16          THE COURT:  You have to ask the question first before

17    a reference can be made to the prior statement.

18          MR. LARSON:  Sure.  I understand.

19          MS. BERNSTEIN:  If what you're doing is refreshing

20    her recollection, the question doesn't start with, "Did you

21    tell the grand jury."  The question starts with, "Did you see a

22    cat?"  "I don't remember if I saw a cat."  "Would it help you

23    remember if you saw your grand jury?"

24          THE COURT:  I think that's --

25          MR. LARSON:  I don't think I'm doing anything wrong

JENNIFER DUPREE - Cross

1   by saying, "Did you tell someone prior to this time this

2   statement?"

3           MS. BERNSTEIN:  Yes, that's improper.

4           THE COURT:  I think -- wait.  I think we're getting

5   ahead of ourselves here.  Ask her the question, regardless of

6   whether she told somebody else that before, ask her the

7   question; and then if you need to go back and ask her, "Do you

8   recall telling anyone, do you recall giving your testimony" --

9           MR. LARSON:  Right.  Okay.

10          THE COURT:  -- and then refer her to that.

11          MS. BERNSTEIN:  Just to be clear, because I think

12  we're about to go ask the question that's going to make me jump

13  up, when Your Honor says, "Ask her the question," the question

14  cannot be, "Did you tell Agent Bezak?  Did you tell the grand

15  jury?"  That's what's improper until you've established --

16          MR. LARSON:  I'm not asking --

17          THE COURT:  After she answers the question -- the

18  predicate question, then he can follow-up with, "Did you tell

19  previously."

20          MR. LARSON:  Right, if she denies it.

21          MS. BERNSTEIN:  If it's something different.

22          MR. LARSON:  Right.

23          (WHEREUPON, the following proceedings were held in

24  open court.)

25

JENNIFER DUPREE - Cross

1   BY MR. LARSON:

2   Q.   Officer Dupree, immediately before you saw the Ryder truck

3   pull up on the bridge, did you see four individuals on the

4   bridge in front of where the truck pulled up?

5   A.   I remember -- from what I remember, I remember two of them

6   at the top.  I don't remember the truck until the shooting

7   started.

8   Q.   Well, my next question is:  Did you ever tell anybody that

9   you saw four individuals -- actually, a group of males, running

10  up the bridge before the truck pulled up?

11  A.   I did state that in my grand jury.

12  Q.   You did?

13  A.   That's what it says, yes.

14  Q.   And did you -- did you see these four individuals, as the

15  truck pulled up, turn towards the truck?

16  A.   Like I said, I don't remember that now; but, yes, I did

17  state that in the state grand jury.

18  Q.   Okay.  And that was one month after the incident happened;

19  correct?

20  A.   The state grand jury?

21  Q.   Yes.

22  A.   No, that was a little while after.

23  Q.   I'm sorry.  It was one year after the incident?

24  A.   Yes.

25  Q.   One year.

JENNIFER DUPREE - Cross

1          Now, did you ever tell anyone that you were positive
2   that the person that you saw running towards the Friendly Inn
3   on the west side of the bridge was one of the persons who were
4   shooting at you?
5   **A.**   I never said that I was positive.  I always believed that
6   those were the same subjects.
7   **Q.**   Do you know why Agent Bezak would say that you told him
8   you were positive about that?
9   **A.**   I don't know why he would say that, but I always believed
10  that they were the same subjects that were shooting at us.
11  **Q.**   And when you were -- when you were on the radio saying,
12  "One's in a white T-shirt, one's in a black T-shirt.  They're
13  running towards the Friendly Inn," these were people that you
14  believed had shot at you and your fellow officers?
15  **A.**   Yes.
16          **MR. LARSON:**  Thank you, Officer Dupree.  I have no
17  further questions.  I tender the witness.
18          **THE COURT:**  All right, Mr. Larson.
19              Mr. Meche?
20          **MR. MECHE:**  Your Honor, we believe Officer Dupree has
21  been sufficiently questioned.  We have nothing else to ask.
22          **THE COURT:**  All right.  Thank you.
23              Redirect?
24          **MS. BERNSTEIN:**  Yes, Your Honor.
25

JENNIFER DUPREE - Cross

1          **REDIRECT EXAMINATION**
2  **BY MS. BERNSTEIN:**
3  Q.   Officer Dupree, Mr. Hessler here asked you some questions
4  about that broadcast that you put out over the radio.  Do you
5  remember him asking you about whether Patrick Conaghan ran down
6  under the bridge?
7  A.   Yes.
8  Q.   And about whether you put that out on the radio?
9  A.   I did, yes.
10 Q.   What bridge did Patrick Conaghan run under?
11 A.   He was running down towards the ground between the
12 Danziger -- well, towards the Danziger off the high rise.
13 Q.   And then did he come back toward the I-10 bridge?
14 A.   No.  I mean, I didn't see where he ran after that, no.  I
15 don't know.
16 Q.   You were asked -- I can't remember which lawyer asked you
17 some questions about how many times you had met with the FBI
18 and with me and you said you had met with me a few times;
19 correct?
20 A.   Yes.
21 Q.   Did you get a subpoena to testify in the federal grand
22 jury?
23 A.   Yes.
24 Q.   Is that the first time we met?
25 A.   Yes, I think so.  Yeah.

JENNIFER DUPREE - Redirect

1   **Q.**   And we've also met to prepare for trial; correct?

2   **A.**   Yes.

3   **Q.**   Now, any time we've met, has an FBI agent also been there?

4   **A.**   Yes.

5   **Q.**   The last lawyer who got up just asked you about whether

6   you thought the people running down the west side of the bridge

7   were the same people who had started off under the I-10 bridge.

8   Do you remember that?

9   **A.**   Yes.

10  **Q.**   And you said that, yes, you always believed those were the

11  same subjects; right?

12  **A.**   Yes.

13  **Q.**   Other than those people that you saw walking up the

14  bridge, the Danziger Bridge now, did you ever see any other

15  civilians out there on the Danziger Bridge?

16  **A.**   No.

17  **Q.**   Did you ever see that kid we saw running through the

18  intersection on the video?

19  **A.**   No.

20  **Q.**   Did you ever see the people pushing a shopping cart?

21  **A.**   No.

22  **Q.**   And one of the attorneys on cross-examination asked you

23  about the fact that it was quiet out there and the road was

24  empty; right?

25  **A.**   That's what he said, yes.

JENNIFER DUPREE - Redirect

1   Q.   Or at least from the distance you were at, the road looked
2   empty; right?
3   A.   Yes.
4   Q.   You know now that there were other people there; right?
5   A.   Yes.
6   Q.   And Mr. Hessler stopped that video at one point and he
7   asked you about something he suggested was a person crouching
8   behind a vehicle.  Do you remember that?
9   A.   Yes.
10  Q.   And you said you weren't sure that it was a person?
11  A.   I didn't know what it was.
12  Q.   That video -- we can put it up if you need to to answer
13  this question -- but at that point on the video, that was even
14  zoomed in; correct?
15  A.   I believe so, yes.
16  Q.   And even zoomed in, you couldn't tell whether you were
17  looking at a person or something else?
18  A.   Correct.
19          MS. BERNSTEIN:  Can we have the video back up,
20  please?
21          I'd like to go to about 2:35, if you can fast
22  forward it.
23                   (VIDEO PLAYED)
24  BY MS. BERNSTEIN:
25  Q.   What we're looking at right now is zoomed in; right?

JENNIFER DUPREE - Redirect

1   A.   Yes.

2   Q.   And those people pushing the shopping cart, that's zoomed

3   in; right?

4   A.   Yes.

5          MS. BERNSTEIN:  All right.  Can we stop there?

6                    (VIDEO STOPPED)

7   BY MS. BERNSTEIN:

8   Q.   That's not zoomed in; right?

9   A.   No.  It doesn't look it, no.

10  Q.   Is that closer to what your view was?

11  A.   Yes.

12  Q.   You've given descriptions today of some people, including

13  the people who were right down below you on the I-10 bridge;

14  right?

15  A.   Yes.

16  Q.   And you gave us the description of the people you saw

17  walking up toward the top of the Danziger Bridge; correct?

18  A.   Yes.

19  Q.   Which description are you more confident of?

20  A.   The red T-shirt, another subject with a black shirt and a

21  book bag.

22  Q.   Did you see people better when they were down under the

23  I-10 or when they were over there on the -- can you show us on

24  the screen where the people were when the truck drove up?  The

25  truck is right here in this photograph; right?  In this still

JENNIFER DUPREE - Redirect

1   video --
2   A.   Yes.
3   Q.   -- is that correct?
4        Where were you looking when that truck drove up?
5   A.   I was looking towards the top of the bridge.
6   Q.   Can you do, like, an arrow or a dot on the screen?
7   A.   I was looking towards that way.
8   Q.   And you had your eye on some people over there; right?
9   A.   Yes.
10  Q.   How big were those people?
11  A.   You could see them running and the colors running, of the
12  shirts.
13  Q.   And so my question is:  Could you see those people better
14  when they were down here under the I-10 bridge or when they
15  were up there on the top of the Danziger?
16  A.   When they were down on the ground.
17  Q.   Which description are you more confident about?
18  A.   Subject with a red shirt, the other subject with a black
19  shirt and a book bag.
20  Q.   And I think Mr. London asked you if you've given different
21  descriptions at different times.
22       MS. BERNSTEIN:  We can take the exhibit down, please.
23  BY MS. BERNSTEIN:
24  Q.   Mr. London asked you if you've given different
25  descriptions at different times.  And then he said, "Sometimes

JENNIFER DUPREE - Redirect

1   red T-shirt and black backpack, sometimes white T-shirt and a

2   black T-shirt."  Do you remember that question?

3   A.   Yes.

4   Q.   Are those different descriptions you gave or are those

5   different people you saw?

6   A.   They were different descriptions, but I believed it was

7   the same people.

8   Q.   All right.  But I guess what I'm asking is:  Have you

9   changed your description of what you saw or are you describing

10  people at different points?

11  A.   I'm describing them at different points running as they

12  continue to run.

13  Q.   All right.  So it's not that you've given -- that you've

14  changed your mind about what those people were wearing?

15  A.   No.  Because like he said earlier, you can change -- you

16  can throw a T-shirt off, you can throw a gun down.  So you can

17  always change.  But I always believed that they were the same

18  people.

19  Q.   All right.  So those people down there at the bottom of

20  the I-10 -- or under the I-10 were wearing what?

21  A.   Red T-shirt --

22          MR. DESALVO:  This has been asked and answered, Your

23  Honor.

24          THE COURT:  Yes.  I think we've asked her that same

25  question numerous times.  More than one lawyer has asked that

JENNIFER DUPREE - Redirect

1   question numerous times.

2   **BY MS. BERNSTEIN:**

3   **Q.**   You were asked some questions about those people under the

4   bridge and whether they shot in your direction, whether you

5   felt yourself under fire.  Do you remember those questions?

6   **A.**   Yes.

7   **Q.**   The guy we saw in the video running across the

8   intersection, did he ever fire at you?

9   **A.**   No.

10  **Q.**   Did you ever tell anybody, "That's him.  That's the guy

11  who fired at me"?

12  **A.**   No, I couldn't even see him.

13  **Q.**   Those three people pushing a shopping cart, did they ever

14  fire at you?

15  **A.**   No.

16  **Q.**   Did you ever tell anybody, "That's them"?

17  **A.**   I couldn't see them either, no.

18  **Q.**   And when that Budget truck drove up, you were asked

19  whether you knew there were 7th District officers in the Budget

20  truck.  Did you have any idea who was in that Budget truck?

21  **A.**   No.

22           **MR. DESALVO:**  That's been asked and answered on

23  direct also, Your Honor.

24           **THE COURT:**  Yes.  I think it has been.

25

JENNIFER DUPREE - Redirect

1   BY MS. BERNSTEIN:

2   Q.   After your initial call on the radio, when you were

3   calling out as the people were running toward the Danziger

4   Bridge, did you ever call out again that anybody else was

5   shooting or that shots were fired?

6   A.   No.

7           MS. BERNSTEIN:  No further questions.  Thank you.

8           THE COURT:  All right.  Thank you.

9               You may step down.

10          THE COURT:  Who's your next witness?

11          MS. CHUNG:  The government calls Murray Couey.

12          THE COURT:  Spell the last name, Ms. Chung.

13          MS. CHUNG:  Couey, C-O-U-E-Y.

14          (WHEREUPON, the following proceedings were held at

15   the bench.)

16          THE COURT:  The witness is not on the list.

17          MS. CHUNG:  I apologize, Your Honor.  I realized at

18   the last minute we left out the chain of custody.

19          THE COURT:  This is a chain of custody witness?

20          MS. CHUNG:  It is.

21          THE COURT:  Is this a local witness?

22          MS. CHUNG:  It is.

23          MR. HESSLER:  Custody on what?

24          MR. FLEMING:  It's on the -- well, he's a nurse --

25   one of the nurses at the West Jeff Hospital.

JENNIFER DUPREE - Redirect

1        **THE COURT:**  Well, first of all, am I correct that I
2    did not announce that name in the jury venire selection?
3    Because this is the list -- I'll show you the list in here.
4    Hold on a second.
5        **MS. CHUNG:**  We did say, Your Honor --
6        **THE COURT:**  That name is not on the list here.
7        **MS. CHUNG:**  Your Honor, we did say with the chain of
8    custody, there might be some additional witnesses.
9        **THE COURT:**  Well, what would you have me do, Ms.
10   Chung, if one of the juror happens to be the next door neighbor
11   of this witness, or happens to be the brother-in-law of this
12   witness?  We wouldn't know that, would we?
13       **MS. CHUNG:**  No, Your Honor.  However, this additional
14   chain of custody witness --
15       **THE COURT:**  I don't care if it's a chain of custody
16   witness or not.  This is a witness at this trial.  Is there an
17   objection to this witness being called -- if the testimony is
18   going to be chain of custody, is there an objection to this
19   witness being called for chain of custody purposes?
20       **MR. MECHE:**  Yeah.
21       **MR. LARSON:**  Because the jury might know her.  That's
22   the only problem.  That's what I'm concerned about.
23       **THE COURT:**  I read almost 200 names.  Why couldn't I
24   have -- well, I read over 200 names.  If we knew that a chain
25   of custody person would be one of several persons, I would

JENNIFER DUPREE - Redirect

1   think they would have been on this list of names.

2           **MS. BERNSTEIN:**  May I respond to that, Your Honor?

3           **THE COURT:**  You can respond to it, but I've got to

4   tell you, if that person's name was not exposed to this jury

5   pool, that person's not testifying.

6           **MS. BERNSTEIN:**  Well, here's the issue, which we

7   tried to identify earlier, which was that we had a very hard

8   time getting answers from the defendants about whether or not

9   there were going to be stipulations.  We didn't know what chain

10  of custody witnesses we were going to need.

11              We tried to flag this by putting on our witness

12  list that we had a number of chain of custody witnesses that we

13  had identified, but that some of them might have to be

14  substituted and we weren't sure.

15          **THE COURT:**  You guys got to be quiet.

16          **MR. HESSLER:**  Your Honor, we could see this coming

17  up.  We'll withdraw the -- it's going to happen.  We'll

18  withdraw the objection.

19          **THE COURT:**  Let me be perfectly clear:  If it turns

20  out that I get a note from the CSO later today that one of

21  these 16 people says, "I know this person because I work with

22  his brother," or, "I live next door to them," or, "I used to

23  play softball with them," that's not going to be grounds for a

24  mistrial.  Am I clear on that?

25          **MR. LARSON:**  Yes.

JENNIFER DUPREE - Redirect

1          **MR. FLEMING:**  Certainly.

2          **THE COURT:**  When you withdraw the objection, you

3   withdraw any issue related to the one that I'm discussing.  Are

4   we clear on that?

5          **MR. DESALVO:**  If somebody comes up and they do have

6   problems, then that's what alternates are for.  But I'm more

7   concerned with the government, if they've got -- we understood

8   that their list that was given was their best effort.

9          **THE COURT:**  Well, let me back up a little bit.

10  Because at one of the conferences -- in fact, the most recent

11  conference that we had, a week or so before trial, in my

12  conference room, not in the courtroom, the issue of chain of

13  custody was brought up and the issue of stipulations was

14  brought up.

15          And, as Ms. Chung just said, or Ms. Bernstein,

16  the attempt was to try to get defense counsel to agree to a

17  stipulation for chain of custody witnesses.  I encouraged such

18  a stipulation, subject to defense counsel's ability to evaluate

19  whether or not they wanted to so stipulate.

20          At that time it was represented to me by

21  Ms. Bernstein that there were some 23 -- and that was not a

22  definite number -- but there was some 23 witnesses that

23  constituted the so-called chain of custody witnesses.  My

24  appreciation of that was that those were all of the witnesses

25  that were going need to be called if there were no such

JENNIFER DUPREE - Redirect

1   stipulations.

2               Furthermore, when I got the list, which I read

3   and which I have here -- this is the actual list I read from

4   during the jury selection process, not any other list.  In

5   fact, it's marked with my red marks here because I did them ten

6   at a time -- that any name of any person who might take this

7   witness stand would be on this list.

8               So I want to be very clear what we're doing

9   here.  Now, if you all withdraw any objection to it, then we

10  don't have an issue, and I don't -- you know me, I don't want

11  to waste any more time on this.

12              This witness is going to testify as to chain of

13  custody and chain of custody only; is that correct?

14          MS. CHUNG:  Correct.

15          THE COURT:  Is there any objection?

16          MR. FLEMING:  No.

17          MS. CHUNG:  Before we move on, I think Ted's witness,

18  which is the next --

19          MR. CARTER:  The next three witnesses are chain of

20  custody witnesses.

21          THE COURT:  Who might they be?

22          MS. CHUNG:  Josh Vicknair.

23          THE COURT:  Josh Vicknair.

24          MR. CARTER:  Registered nurse.

25          THE COURT:  Wait.

JENNIFER DUPREE - Redirect

1              Mr. London and Mr. DeSalvo, this is really
2    important.  It's important to me.
3              **MR. DESALVO:**  Okay.  I'm sorry.
4              **THE COURT:**  There's going to be another witness named
5    Josh Vicknair.
6              **MR. CARTER:**  He's a registered nurse at West Jeff.
7              **THE COURT:**  All right.  And is he on the list?
8              **MS. CHUNG:**  I don't believe so.
9              **THE COURT:**  Well, let's check to see.
10             He's not on the list, the alphabetical list.
11             **MS. CHUNG:**  Karen Alford, but she's next week, and
12   Leslie Goldsmith.  Those two should be on the list.
13             **THE COURT:**  Yeah, Leslie is here.  Leslie Gold- --
14             **MS. CHUNG:**  Goldsmith.  And those two, I believe, are
15   on the list.
16             **THE COURT:**  Goldsmith is on the list.  Who's the
17   other one?
18             **MS. CHUNG:**  Alford, A-L-F-O-R-D.
19             **THE COURT:**  Now, do you think he's on the list -- oh,
20   it's Karen, Karen Alford.  Those two are on.  Okay.
21             Is there any objection to calling Vicknair and
22   Couey?
23             **MR. FLEMING:**  No, Judge.
24             **THE COURT:**  Anybody?
25             All right.  Then for the record, I've got all

JENNIFER DUPREE - Redirect

1    defense counsel here and they all hear me, okay, and there is's

2    no objection.  Let's call the witness.

3              **MS. CHUNG:**  Okay.

4              **THE COURT:**  Thank you all.

5                   And thank you all for so stipulating.

6              (WHEREUPON, the following proceedings were held in

7    open court.)

8              (WHEREUPON, **JOSEPH MURRAY COUEY**, having been duly

9    sworn, testified as follows.)

10             **THE DEPUTY CLERK:**  Please state your full name and

11   correct spelling for the record.

12             **THE WITNESS:**  Joseph Murray Couey.  J-O-S-E-P-H,

13   M-U-R-R-A-Y, C-O-U-E-Y.

14             **MS. CHUNG:**  May I inquire, Your Honor?

15             **THE COURT:**  Yes, please.

16                        **DIRECT EXAMINATION**

17   BY MS. CHUNG:

18   **Q.**   Mr. Couey, where do you work?

19   **A.**   West Jefferson Medical Center.

20   **Q.**   What is your position at West Jefferson Medical Center?

21   **A.**   Nursing supervisor.

22   **Q.**   How long have you been the nursing supervisor?

23   **A.**   I've been the nursing supervisor for two years now.

24   **Q.**   What was your position prior to that?

25   **A.**   I was the senior director of nursing for surgery and

JOSEPH MURRAY COUEY - Direct

1   critical care services.

2   **Q.**   How long were you the senior director of nursing for

3   surgical and critical care?

4   **A.**   About 14 years.

5   **Q.**   And that entire 14 years was at West Jeff?

6   **A.**   Yes.

7   **Q.**   Could you explain what you did in that position as senior

8   director?

9   **A.**   Mainly responsible for the administrative functions of the

10  surgery, ICUs, critical care, hiring, terminations, evaluations

11  of people, policies, procedures, that sort of stuff.

12  **Q.**   As the senior director of nursing, were you familiar with

13  the procedures for securing a bullet that was removed during

14  surgery?

15  **A.**   Yes.

16  **Q.**   What is that procedure?

17  **A.**   When the bullet is removed from the patient during

18  surgery, it's usually placed in a plastic cup, labels are

19  attached to that cup identifying where it was retrieved from,

20  any identifying information from the patient, and then it's

21  locked in a box.

22  **Q.**   Could you explain what that box is?

23  **A.**   It's a -- basically, it's a narcotics box with a double

24  lock on it.  It requires two sets of keys to get in it.  It's

25  kept in a secure location in the department, and there's a

JOSEPH MURRAY COUEY - Direct

1    logbook that goes along with it, and when ballistics items are

2    put in there, it's locked up and the keys are kept in a secure

3    place.

4    Q.   You mentioned there was some documentation for the bullet

5    box.  What is that documentation?

6    A.   It's basically a log, more like a steno pad that they

7    attach the label to, if they have the label, or they handwrite

8    in the information from the patient that they retrieve the

9    bullet from identifying the date and the time, and that's to

10   identify -- to match it up to the cup.

11   Q.   Mr. Couey, were you working during Hurricane Katrina?

12   A.   Yes.

13   Q.   Were you working in the direct aftermath of Hurricane

14   Katrina?

15   A.   Yes.

16   Q.   Do you remember if you all were able to follow the

17   procedures regarding how bullets should be secured after

18   removal from surgery?

19   A.   As far as -- yes, as far as I know, they did.  There was a

20   lot of chaos, so they followed it as closely as they could, I'm

21   sure.

22   Q.   Do you remember a time about two years after Hurricane

23   Katrina when a person named Sandy Gavin came looking for a

24   bullet and contacted you?

25   A.   Yes.

JOSEPH MURRAY COUEY - Direct

1   **Q.**   Could you describe that for the jury?

2   **A.**   He was inquiring if we had the bullet, if I remember

3   correctly, giving me a name.  I could not locate it by that

4   name.  I looked at the book, didn't see the name there, looked

5   through the box and did not see the name that he was asking

6   for.

7   **Q.**   Do you remember the name?

8   **A.**   After looking at it, now I do.  It was Jose -- Jose is the

9   first name.  I think Hamilton is the last name.

10  **Q.**   Were you able eventually to find a bullet that

11  corresponded to the person he was looking for?

12  **A.**   Yes.

13  **Q.**   Could you describe that for the jury?

14  **A.**   I came across a cup in the box that was listed as "Unknown

15  Male 2," and it had a medical record number on it.  I took that

16  medical record number, put it in our computer system, and it

17  came back and showed it was that patient's name.

18  **Q.**   What did you do with the bullet in the specimen cup that

19  you had found under "Unknown Male" and that medical number?

20  **A.**   I let Mr. Gavin know we had identified that that's what he

21  was looking for.

22  **Q.**   What did you do with it then?

23  **A.**   He wanted it, so we signed it out to him, took it out of

24  the -- he came to the hospital, and I signed it out to him.

25           **MS. CHUNG:**  Your Honor, I have in my hand Exhibit

JOSEPH MURRAY COUEY - Direct

 1  146, which is excerpts of medical reports of Jose Holmes which
 2  have been stipulated to as authentic and are bearing the
 3  business certification for records as specified in Rule 803 and
 4  901.  I would now offer those.
 5          THE COURT:  Show them to counsel and then let's show
 6  them to the witness, and then we'll formally offer them.  Go
 7  ahead.  Show them to this gentleman.
 8  BY MS. CHUNG:
 9  Q.   Mr. Couey, do you recognize those two matched West
10  Jefferson medical records formats?
11  A.   Yes.
12  Q.   Did you, in fact, look up medical records of the person
13  Jose when Mr. Gavin came to inquire about the bullet?
14  A.   Yes.
15          MS. CHUNG:  Your Honor, I would now offer those into
16  evidence.
17          THE COURT:  Counsel, any objection?
18          MR. FLEMING:  No objection.
19          THE COURT:  That's Exhibit 146.  It's admitted.
20  BY MS. CHUNG:
21  Q.   Mr. Couey, if you could turn to page 8 of the exhibit.
22          MS. CHUNG:  May I have that on the monitor, please?
23  BY MS. CHUNG:
24  Q.   I guess you could just look at the monitor, Mr. Couey --
25  A.   Okay.  That's fine.

JOSEPH MURRAY COUEY - Direct

1  **Q.**   -- instead of having to flip through the paper.

2          Turning your attention to the middle portion.

3          **MS. CHUNG:**  May I have that culled out?

4  BY MS. CHUNG:

5  **Q.**   The surgical procedures which reflect a removal of a

6  foreign body, a bullet, in the subcutaneous region of the left

7  temple and also one at the base of the tongue.  Do you know

8  which bullet you gave to Mr. Gavin?

9  **A.**   No.

10 **Q.**   Do you know if that information was recorded on the jar or

11 in the logbook?

12 **A.**   No.  If I remember correctly, it just said bullet.  It

13 just said bullet.

14 **Q.**   And you had mentioned that you searched for "Unknown Male"

15 and the unknown male's account number, the medical record

16 number.  What is that?

17 **A.**   The medical record number is a unique identifier for

18 everybody that comes into the hospital.

19 **Q.**   So it's unique to each patient?

20 **A.**   It's unique to each patient, yes.

21 **Q.**   And the account number of this person is?

22 **A.**   I'm sorry?

23 **Q.**   The account number for this person, Jose Holmes, is

24 524780008?

25 **A.**   Correct.

JOSEPH MURRAY COUEY - Direct

1   **Q.**   I'm going to now show you what is marked for
2   identification as 241.  Okay.  I'm going to show you page 3 of
3   the exhibit, Bates No. MAD 51687.  Do you recognize that?
4   **A.**   Yes.
5   **Q.**   What do you recognize it to be?
6   **A.**   A log of the bullet.
7   **Q.**   And is this a photocopy of the bullet book you previously
8   described?
9   **A.**   Yes, it is a photocopy.
10  **Q.**   Turning your attention to the bottom half of the page,
11  whose handwriting is that?
12  **A.**   Mine.  Except for the signature of Sandy Gavin, the date
13  and the time.
14  **Q.**   And is that his signature when he received the bullet?
15  **A.**   Yes.
16  **Q.**   And do you make this record in the normal course of your
17  duties as the senior director of nursing for surgery and
18  critical care?
19  **A.**   If necessary, yes.
20  **Q.**   Are you under a business duty to do so and do so
21  accurately?
22  **A.**   Yes.
23  **Q.**   And do you do it at the time that you release the bullet?
24  **A.**   If it's not already there, yes.
25            **MS. CHUNG:**  Your Honor, I'd now offer page 3 of

JOSEPH MURRAY COUEY - Direct

1   Exhibit 261, MAD No. 51687.

2          **MR. FLEMING:**  No objection.

3          **THE COURT:**  All right.  That's page 3 of Exhibit 261.

4   Did you also -- well, go ahead.  Proceed.

5          **MS. CHUNG:**  I'm being told it's actually 241.

6          **THE COURT:**  Exhibit 241 and not 261?

7          **MS. CHUNG:**  241.  I apologize.

8          **THE COURT:**  All right.  241.

9   BY MS. CHUNG:

10  **Q.**   Mr. Couey, directing your attention to the bottom half of

11  the page, which you said you recognize, could you describe and

12  explain what the bottom half is to the jury?

13  **A.**   It identifies the name, which is "Unknown Male 2," which

14  was related using the account number there to Jose Holmes, who

15  was in ICU 12.  Specimen No. 3, which is a foreign body of the

16  left temple, released to Sandy Gavin on 3/28/07 at 11:13 a.m.,

17  my signature with the date and the time and a copy of his card.

18         **MS. CHUNG:**  Your Honor, may I approach?

19         **THE COURT:**  Yes.

20  BY MS. CHUNG:

21  **Q.**   Showing you what's marked for identification as the

22  contents of the envelopes, Exhibit 239, and ask you to look at

23  that and the label.  Do you recognize that specimen jar?

24  **A.**   Yes.

25  **Q.**   What do you recognize it to be?

JOSEPH MURRAY COUEY - Direct

1  **A.**   The specimen jar that the bullet was put into from our

2  facility.

3  **Q.**   And is that the jar with the bullet that you gave to

4  Mr. Gavin?

5  **A.**   It would appear to be, yes.

6        **MS. CHUNG:**  I would offer that, Your Honor.

7        **THE COURT:**  Any objection?

8        **MR. FLEMING:**  No objection, Judge.

9        **THE COURT:**  So ordered, 239.

10        **MS. CHUNG:**  Nothing further, Your Honor.

11        **THE COURT:**  Does anybody have cross for this witness,

12  counsel?

13        **MR. MECHE:**  Just briefly.

14        **THE COURT:**  Okay.

15                    **CROSS-EXAMINATION**

16  BY MR. MECHE:

17  **Q.**   Mr. Couey, were you working at the West Jeff Hospital when

18  Hurricane Katrina came?

19  **A.**   Yes.

20  **Q.**   You were actually physically on the location there?

21  **A.**   Yes.

22  **Q.**   And my understanding is, it was your job, whenever gun

23  bullets or things like that were recovered from patients, you

24  were in charge of collecting them and securing them; is that

25  correct?

JOSEPH MURRAY COUEY - Cross

1   **A.**   No.  Each individual nurse involved in the case is
2   responsible for getting it and securing it according to policy.
3   **Q.**   Okay.  And how does your role come into play?
4   **A.**   My role is, if they have questions, to answer their
5   questions; but as an administrative role, to ensure that they
6   perform their duties according to the policy, which include
7   them putting these in the box.
8   **Q.**   And you're the person in charge of releasing them?
9   **A.**   Yes.
10  **Q.**   And you all maintain them in the hospital for what period
11  of time?  Is there --
12  **A.**   Indefinitely.
13  **Q.**   Okay.  During Katrina, how many people came in with
14  gunshot wounds?
15          **MS. CHUNG:**  Objection, Your Honor.  This is going
16  beyond the scope of direct.
17          **MR. MECHE:**  That's not the rule, Judge.
18          **THE COURT:**  Well, I'm going to let him answer it, if
19  that's the basis for the objection.
20  BY MR. MECHE:
21  **Q.**   During Katrina, approximately how many people came in with
22  gunshot wounds?
23  **A.**   Six or either seven.
24  **Q.**   And are you familiar with this particular individual whom
25  this bullet fragment was recovered from, Jose Holmes?

JOSEPH MURRAY COUEY - Cross

1  **A.**   No.

2  **Q.**   And you're not aware that he came in with a family called

3  the Bartholomew family?

4  **A.**   Yeah, I was aware of that.  I'm not familiar with him, but

5  I'm aware of the family, absolutely.

6  **Q.**   And there was a total of four of them?

7  **A.**   Four of them.  There were others not related to this.

8  That's where it was either six or seven.

9  **Q.**   So six or seven other gunshot victims other than the

10  Bartholomew/Jose Holmes group?

11  **A.**   Yes.

12  **Q.**   Did you all recover bullet fragments from them as well?

13  **A.**   I'm sure, yes.

14  **Q.**   And they're still maintained?

15  **A.**   Unless they've been released, I would assume so, yes.  I'm

16  no longer in the OR, so I'm assuming they're still there.

17  **Q.**   And you're not aware if any investigative official or

18  agency came knocking asking for those bullets?

19  **A.**   No.

20          **MR. MECHE:**  Thank you, sir.

21          **THE COURT:**  Counsel?  Mr. Fleming?

22          **MR. FLEMING:**  I just have one or two questions,

23  Judge.

24

25

JOSEPH MURRAY COUEY - Cross

1                              **CROSS-EXAMINATION**

2  **BY MR. FLEMING:**

3  **Q.**   Good afternoon, Mr. Couey.  I have just one or two

4  questions for you.

5              You indicated you had to search for this bullet, I

6  believe, before you could turn that over to Mr. Gavin?

7  **A.**   Correct.

8  **Q.**   It was not in the place you expected it to be initially?

9  **A.**   It was there.  I just didn't -- I was looking for it by a

10 name that he had given me.

11 **Q.**   Okay.  It wasn't in a cabinet other than where you

12 expected to find it?

13 **A.**   No.

14 **Q.**   Do you remember giving a statement to the FBI?

15 **A.**   I'm sorry?

16 **Q.**   Do you remember giving a statement to the FBI?

17 **A.**   Yes.

18 **Q.**   Amy Campenero?

19 **A.**   Yes.

20 **Q.**   Do you remember telling Ms. Campenero that the bullet was

21 moved from one cabinet to the other?

22 **A.**   No, I don't recall saying that, but...

23              **MR. MECHE:**  If I may approach the witness, Your

24 Honor.

25

JOSEPH MURRAY COUEY - Cross

1  BY MR. FLEMING:

2  Q.   Those are the notes the FBI agent took from her

3  conversation with you.  I've highlighted the portion right

4  there.

5  A.   Okay.

6  Q.   Does that refresh your memory as to what you told Special

7  Agent Campenero?

8  A.   Not really.  I don't remember saying that to her.

9  Q.   Okay.  And that's what's in the 302, though; right?

10  A.   Yes.

11  Q.   The form I just showed you?

12  A.   Yes.

13  Q.   And you told this agent that someone had moved a bullet

14  from one cabinet to the other?

15  A.   That's what the document says.

16  Q.   And that wasn't you that moved that bullet, was it?

17  A.   No.

18          MR. MECHE:   Thank you, Mr. Couey.  I have no further

19  questions.

20          THE COURT:   Thank you.  Anyone else?  Any redirect?

21          MS. CHUNG:   No redirect, Your Honor.

22          THE COURT:   All right.  Thank you, sir.  You can step

23  down.

24              All right.  We'll go ahead and take our

25  afternoon break.  It's almost 3:10.  Why don't we plan on 3:25.

JOSEPH MURRAY COUEY - Cross

1    We'll come back and we'll finish for the day.

2              THE DEPUTY CLERK:  All rise.

3              (WHEREUPON, the jury exited the courtroom.)

4              THE DEPUTY CLERK:  All rise.

5              (WHEREUPON, the Court took a recess.)

6              THE DEPUTY CLERK:  All rise.

7              (WHEREUPON, the jury entered the courtroom.)

8              THE COURT:  You may be seated.

9                   The government calls its next witness, and he

10   is?

11             MS. BERNSTEIN:  United States calls Jose Holmes.

12             THE COURT:  Mr. Holmes, would you stand up so that

13   you can take the oath and then you may be seated.

14             (WHEREUPON, **JOSE HOLMES, JR.,** having been duly sworn,

15   testified as follows.)

16             THE DEPUTY CLERK:  Please state your full name and

17   correct spelling for the record.

18             THE WITNESS:  My name is Jose Holmes, Jr., J-O-S-E,

19   H-O-L-M-E-S.

20                        **DIRECT EXAMINATION**

21   BY MS. BERNSTEIN:

22   **Q.**   Good afternoon, Mr. Holmes.

23             How old are you?

24   **A.**   I'm 25.

25   **Q.**   How old were you when Hurricane Katrina hit in 2005?

JOSE HOLMES, JR. - Direct

1  A.   I was 19.

2  Q.   Mr. Holmes, were you shot on the Danziger Bridge after

3  Hurricane Katrina?

4  A.   Yes, ma'am.

5  Q.   I want to ask you a bunch of questions about that day, but

6  first let's learn a little bit about you.  Where did you grow

7  up?

8  A.   I grew up in the Lower Ninth Ward with my grandmother.

9  Q.   Is that here in New Orleans?

10 A.   Yes, ma'am.

11 Q.   Did you live there your whole life up until the storm?

12 A.   Well, I stayed in New Orleans East with my parents, but up

13 until the storm, I was with my grandmother.

14 Q.   So you lived in New Orleans your whole live until the

15 storm?

16 A.   Yes, ma'am.

17 Q.   Where do you live now?

18 A.   I stay in Augusta, Georgia.

19 Q.   Who do you live with?

20 A.   Myself, my girlfriend, and my little son.

21 Q.   How old is your son?

22 A.   He's five months.

23 Q.   What's his name?

24 A.   Jose Holmes, III.

25 Q.   What do you do for a living, Jose?

JOSE HOLMES, JR. - Direct

1   **A.**   I work at Kroger.

2   **Q.**   What do you do at Kroger?

3   **A.**   I'm a nutrition clerk, cashier.  Anything they ask me to

4   do.

5   **Q.**   Is that Kroger, the grocery store?

6   **A.**   Yes, ma'am.

7   **Q.**   Have you worked there for a while now?

8   **A.**   Yes, ma'am.

9   **Q.**   How long have you worked for Kroger?

10  **A.**   About five years.

11  **Q.**   Have you been promoted since you started working there?

12  **A.**   Yes, ma'am.  I started off as a bagger, then I moved to a

13  cashier, and then I moved to nutrition clerk.

14  **Q.**   Do you like your job there?

15  **A.**   Yes, ma'am.

16  **Q.**   What do you like about it?

17  **A.**   Everybody loves me.

18  **Q.**   Jose, I want to take you back to the time right before

19  Hurricane Katrina.  You said you lived in New Orleans East at

20  the time?

21  **A.**   No, I was in -- I stayed with my grandmother in the Ninth

22  Ward.

23  **Q.**   The Ninth Ward.  Who's your grandma?  What's her name?

24  **A.**   Augustine Green.

25  **Q.**   And who is Susan Bartholomew?

JOSE HOLMES, JR. - Direct

1   A.   That is my auntie.

2   Q.   That's your auntie?

3   A.   Yes, ma'am.

4   Q.   Where did your auntie live before the storm?

5   A.   She stayed in new Orleans East.

6   Q.   How is your Auntie Susan related to your grandmother who

7   you lived with?

8   A.   That is my grandmother's daughter.

9   Q.   How close are you to your Auntie Susan?

10   A.   Very close.  She is like my second mother.

11   Q.   You said your auntie lived in New Orleans East?

12   A.   Yes, ma'am.

13   Q.   Who did she live with?

14   A.   She stayed with my uncle and my three cousins.

15   Q.   What's your uncle's name?

16   A.   Uncle Leonard.

17   Q.   And they have three kids?

18   A.   Yes, ma'am.

19   Q.   What are their kids' names?

20   A.   Leonard, Jr., Brandon, and Lesha.

21   Q.   Do you know how old they are?

22   A.   No, not off -- right offhand.

23   Q.   How old are they in relation to you then?

24   A.   They're younger than me.

25   Q.   How about Lesha, is she younger than you?

JOSE HOLMES, JR. - Direct

1  A.  Yes, ma'am.

2  Q.  And you said you have a cousin named Leonard?

3  A.  Yes, ma'am.

4  Q.  Does he go by "Little Leonard"?

5  A.  Yes.  I call NiNi (phonetic), his nickname.

6  Q.  NiNi (phonetic)?

7  A.  Yeah.

8  Q.  How much younger than you is Leonard?

9  A.  I'm not sure.

10  Q.  How about Brandon, is he a lot younger?

11  A.  Brandon, he's about to make 14 in July.

12  Q.  You said you were close to your Auntie Susan; right?

13  A.  Yes, ma'am.

14  Q.  What was your relation with your cousins Lesha, Leonard,

15  and Brandon?

16  A.  I was mainly close to Leonard.  He was like my little

17  brother.

18  Q.  What did you and Little Leonard like to do together?

19  A.  Play the PlayStation, video cards and draw.

20  Q.  What was the last thing you said, you like to draw?

21  A.  Draw.

22  Q.  Did both of you draw?

23  A.  Yes, ma'am.

24  Q.  I want to focus on the time right before the storm.  As

25  the storm was coming in, where did you go?

JOSE HOLMES, JR. - Direct

1    A.   We went to my auntie's apartment.

2    Q.   When you say "we," who are you referring to?

3    A.   My grandmother, my two sisters, her son, her boyfriend at

4    the time.  There was a lot of us.

5    Q.   You all went over to Auntie Susan's house?

6    A.   Yes, ma'am.

7    Q.   Why did you go over there?

8    A.   Because we rode out a storm before.

9    Q.   You had ridden out other storms over there?

10   A.   Yes, ma'am.

11   Q.   What kind of place did your aunt have?

12   A.   It was an apartment complex on the second floor.

13   Q.   So she was on high ground?

14   A.   Yes, ma'am.

15   Q.   When you all went over there, was Auntie Susan's whole

16   family there as well?

17   A.   Yes, ma'am.

18   Q.   So quite a bunch of you at her apartment?

19   A.   Yes, ma'am.

20   Q.   You said you had ridden out other storms there before;

21   right?

22   A.   Yes, ma'am.

23   Q.   Did Katrina turn out to be different?

24   A.   Yes, ma'am.

25   Q.   Tell us what happened.

JOSE HOLMES, JR. - Direct

1   A.   Well, the phone went out, the electric, we had no water,
2   and the winds were blowing really hard and the water was rising
3   towards us.
4   Q.   When the levees broke, did your auntie's neighborhood
5   flood?
6   A.   Yes, ma'am.
7   Q.   What did you all do?
8   A.   I knocked a hole in the roof of the apartment complex to
9   signal for help on the roof.
10  Q.   Did you crawl up onto the roof?
11  A.   Yes, ma'am.
12  Q.   What were you trying to do up there?
13  A.   Signal for help.
14  Q.   Who were you trying to signal to?
15  A.   The helicopters.
16  Q.   Did you get anybody's attention?
17  A.   No, ma'am.
18  Q.   Did you all eventually find another way out?
19  A.   Yes, ma'am.
20  Q.   What happened?
21  A.   A rescue boat with some officers came and rescued us.
22  Q.   Police officers?
23  A.   Yes, ma'am.
24  Q.   What department were those officers from?
25  A.   NOPD.

JOSE HOLMES, JR. - Direct

1   Q.   And they got you all in a boat?

2   A.   Yes, ma'am.

3   Q.   What happened?  Where did they take you?

4   A.   They took us to the Chef Menteur Highway.

5   Q.   How did you feel about those guys who rescued you?

6   A.   I was happy that they saved us.

7   Q.   You were happy that they saved you?

8   A.   Yes, ma'am.

9   Q.   Where did you say they dropped you off?

10  A.   Chef Menteur Highway.

11  Q.   What did you guys do once you all ended up at Chef?

12  A.   My auntie decided we needed somewhere to stay.  So we went

13  to a hotel, but we didn't stay at that hotel because it had a

14  lot of people like cussing and it sounded like they would have

15  a lot of violence over there.

16  Q.   Let me ask a question about that.  When you guys got

17  dropped off on Chef, was it that whole group of you with

18  your -- your sisters, and your mother, and your cousins, and

19  your aunt, and your uncle?

20  A.   Yes, ma'am.

21  Q.   Who was in charge of that group?

22  A.   My auntie.

23  Q.   Your Aunt Susan?

24  A.   Yes, ma'am.

25  Q.   So she took charge?

JOSE HOLMES, JR. - Direct

1    A.   Yes, ma'am.

2    Q.   And you said she found you a place to stay?

3    A.   Yes, ma'am.

4    Q.   Tell us about that first place.

5    A.   It was flooded.  I mean, the beds was dry, but just the

6    people that were surrounding it, she didn't like the

7    environment.

8    Q.   She didn't like the environment?

9    A.   No, ma'am.

10   Q.   Why is that?

11   A.   Because they were cussing and arguing and sounded like

12   they going to start fighting and stuff.

13   Q.   All right.  So when there were people cussing and arguing

14   at that hotel, what did your Auntie Susan decide?

15   A.   Said we got to go.

16   Q.   And did you all go?

17   A.   Yeah.

18   Q.   Where did you guys go next?

19   A.   We went to another hotel across the street from it.

20   Q.   Were you still on Chef Menteur Highway there?

21   A.   Yes, ma'am.

22   Q.   Tell us about this next hotel you went to.

23   A.   We got two rooms, but the carpet was muddy, toilets

24   wouldn't flush, no water, no electric.  Just somewhere to

25   sleep.

JOSE HOLMES, JR. - Direct

1   Q.   Did all of you guys fit into those two rooms?
2   A.   Yes, ma'am.
3   Q.   Do you know how long you all stayed at that hotel before
4   the day you got shot?
5   A.   No.
6   Q.   Did you stay there overnight?
7   A.   Yes, ma'am.
8   Q.   Did you stay there more than one night?
9   A.   Yes, ma'am.
10  Q.   So at least a couple few days?
11  A.   A few days.
12  Q.   During that time when you all were -- do you know the name
13  of that motel you were staying in?
14  A.   I do not remember.
15  Q.   Okay.  During the days that you all were staying at that
16  place on Chef Menteur Highway, did you and the other kids ever
17  go off on your own or were you always with a grown-up?
18  A.   No, ma'am.  We was always with a grown-up.
19  Q.   So either your auntie or your uncle?
20  A.   Yes, ma'am.
21  Q.   Why is that?
22  A.   Because my auntie wouldn't let us wander off by ourselves.
23  Q.   Did she keep you guys together?
24  A.   Yeah.  She was real protective of us.
25  Q.   All right.  Jose, I want to talk to you about the day you

JOSE HOLMES, JR. - Direct

1   got shot.  Do you remember that day?
2   A.    Yes, ma'am.
3   Q.    Tell us about that morning.
4   A.    It was a nice, sunny day.  I mean, we all was happy.
5   Q.    What was going on that morning when you guys woke up?
6   A.    My grandmother was sick, so my auntie decided that we
7   should cross the bridge to Winn-Dixie to get some Glucerna.
8   Q.    How did you know your grandma was sick?
9   A.    She was throwing up, her feet were swelling.  She was kind
10  of out of it.
11  Q.    Is this the same grandma that you lived with?
12  A.    Yes, ma'am.
13  Q.    How did you feel when you saw her swelling and throwing up
14  that morning?
15  A.    I felt bad for her.  I just -- I didn't want to see her
16  like that.
17  Q.    Were you worried about her?
18  A.    Yes, ma'am.
19  Q.    You said your Auntie Susan decided to go get some Glucerna
20  for her?
21  A.    Yes, ma'am.
22  Q.    What's Glucerna?
23  A.    Kind of like a diabetic drink.  I want to say like a
24  diabetic boost or something like that.
25  Q.    Your grandma was diabetic?

JOSE HOLMES, JR. - Direct

1    A.   Yes, ma'am.

2    Q.   Where was your Auntie Susan going to go get the Glucerna

3    for your grandma?

4    A.   From Winn-Dixie.

5    Q.   Where was the Winn-Dixie?

6    A.   It was on the other side of the Danziger Bridge.

7    Q.   Do you know how far away from the Danziger Bridge your

8    hotel was?

9    A.   Three to five blocks.

10   Q.   All right.  And then the Winn-Dixie was over on the other

11   side?

12   A.   Yes, ma'am.

13   Q.   Did some of you all decide to go with your aunt to the

14   Winn-Dixie?

15   A.   Yes, ma'am.

16   Q.   Who all decided to go with her?

17   A.   My uncle, my two cousins, me, and James.

18   Q.   Okay.  You said your Auntie Susan?

19   A.   Yes, ma'am.

20   Q.   Your Uncle Leonard?

21   A.   Yes, ma'am.

22   Q.   Who are your cousins who were with you?

23   A.   My cousin Lesha, Leonard, and myself.

24   Q.   And then you said there was somebody named James with you?

25   A.   Yes, and my friend James.

JOSE HOLMES, JR. - Direct

1  Q.   What's James' last name?

2  A.   Brissette.

3  Q.   Where do you know James from?

4  A.   I know James from going to school with him.

5  Q.   Back at the time of the storm, how long had you known

6  James?

7  A.   Two to three years.

8  Q.   You met him in school?

9  A.   Yes, ma'am.

10  Q.   Was he a friend of yours?

11  A.   Yes, ma'am.

12  Q.   Tell me what you and James liked to do together.

13  A.   We played -- played the games.  And we used to play video

14  cards.

15  Q.   Do you like sports?

16  A.   Yes, ma'am.

17  Q.   Did you play sports with James?

18  A.   No, he wasn't really into sports.

19  Q.   What was James like?

20  A.   Kind of like a nerd.

21  Q.   James was a nerd?

22  A.   Yeah.

23  Q.   Now, how did James end up at this motel with you and your

24  family?

25  A.   Well, one day we was crossing the Danziger Bridge and we

JOSE HOLMES, JR. - Direct

1   happened to see him on the other side.

2   **Q.**   So one day after you made it to dry land, but before the

3   day of the shooting?

4   **A.**   Yes, ma'am.

5   **Q.**   Where were you when you ran into James?

6   **A.**   We was on the other side of the Danziger Bridge.

7   **Q.**   Who all were you with?

8   **A.**   Leonard and my uncle.

9   **Q.**   So Little Leonard and Big Leonard?

10  **A.**   Yes, ma'am.

11  **Q.**   For the record how big is your uncle whom we sometimes

12  refer to as "Big Leonard"?

13  **A.**   He is about 5'4" -- shorter that than.  He's really small.

14  **Q.**   He's a little guy?

15  **A.**   Yeah.

16  **Q.**   All right.  So you were over the Danziger Bridge one day

17  with Big Leonard and Little Leonard.  What happened when you

18  ran into James?  How did that come about?

19  **A.**   He was -- I just heard someone shouting my name and I

20  looked towards him and I said, "Oh, there's James."  I didn't

21  recognize him at first.

22  **Q.**   Why didn't you recognize him at first?

23  **A.**   He had a haircut.

24  **Q.**   But he recognized you and called out your name?

25  **A.**   Yes, ma'am.

JOSE HOLMES, JR. - Direct

1   **Q.**   Who all was James with when you saw him?

2   **A.**   He was with some other guys that he said rescued him on a

3   boat.

4   **Q.**   Did he know those guys he was with?

5   **A.**   No, ma'am.

6   **Q.**   So what happened when you all ran into him?

7   **A.**   He tagged along with us.

8   **Q.**   How happy was he to see you?

9   **A.**   He was very happy.

10  **Q.**   How do you know that?

11  **A.**   I saw all his teeth.

12  **Q.**   Because you saw all his teeth?

13  **A.**   Yeah.

14  **Q.**   So you brought James back, he tagged along with you?

15  **A.**   Yes, ma'am.

16  **Q.**   Did you bring him back to the hotel that day?

17  **A.**   Yes, ma'am.

18  **Q.**   Before you brought him back, did the of rest your family

19  know James?

20  **A.**   No, ma'am.

21  **Q.**   How did he get on with them?

22  **A.**   They took a liking to him real quick.

23  **Q.**   Did anybody take a particular liking to him?

24  **A.**   I would say my sister's boyfriend really took a real big

25  liking to him.

JOSE HOLMES, JR. - Direct

1   Q.   How about your Auntie Susan who is kind of strict?

2   A.   Yes, she did too.

3   Q.   That morning, the day of the shooting when you all headed

4   off to the Winn-Dixie, why did James go with you?

5   A.   Well, he was worried about his mother and he wanted to go

6   back and look for the boat that he was rescued on to go and

7   check on her.

8   Q.   As you all set off that day from the hotel, what kind of

9   mood were you all in?

10  A.   We was a happy mood, making the best out of things,

11  laughing and joking.

12  Q.   When you leave your hotel and head for the Danziger Bridge

13  to go to the Winn-Dixie, what's the route you take?

14  A.   We have to cross over the Danziger Bridge.

15  Q.   Is the Danziger Bridge just a straight shot from your

16  hotel?

17  A.   Yes, ma'am.

18  Q.   So tell us about your walk as you headed out towards the

19  Danziger Bridge.  Did you see other people out?

20  A.   No, ma'am.

21  Q.   Did you see cars in the road?

22  A.   No, ma'am.

23  Q.   Where were you all walking?  Were you walking on the

24  sidewalk or right in the road?

25  A.   We was in the middle of the street.

JOSE HOLMES, JR. - Direct

1   Q.   And that was fine because there were no cars?
2   A.   Yes, ma'am.
3   Q.   Tell us about the walk to the bridge.  What happened?
4   A.   Well, we was walking and I challenged James to a race to
5   the bridge.
6   Q.   You challenged James to a race?
7   A.   Yes, ma'am.
8   Q.   Did you all race?
9   A.   Yes, ma'am.
10  Q.   Who won?
11  A.   I did.
12  Q.   You got there first?
13  A.   Yes, ma'am.  He -- he quit because he smokes cigarettes,
14  so...
15  Q.   So you beat him?
16  A.   Yes, ma'am.
17  Q.   And then what happened?
18  A.   I arrived to the bridge and I remember tying my shoe.
19  Q.   Where did you stop and tie your shoe?
20  A.   At the foot of the bridge.
21  Q.   Did you sit on the ground or was there somewhere else to
22  sit?
23  A.   There was like a cement wall to sit on.
24  Q.   And you sat there and tied your shoe?
25  A.   Yes, ma'am.

JOSE HOLMES, JR. - Direct

1  Q.   To wait for other people to catch up?

2  A.   Yes, ma'am.

3  Q.   While you were out there either racing James to the bridge

4  or when you were sitting there tying your shoe, did you notice

5  other -- anybody else on the bridge?

6  A.   No, ma'am.

7  Q.   Did you ever notice anybody out there other than your

8  group, the people you were with?

9  A.   No, ma'am.

10 Q.   All right.  So what happened next after you stopped to tie

11 your shoe?

12 A.   Me and my family, we started walking up the bridge and we

13 heard gunshots hitting the side of the bridge, hitting the wall

14 barrier.

15 Q.   So as you were walking up the bridge with your family you

16 heard shots?

17 A.   Yes, ma'am.

18 Q.   Could you tell which direction they were coming from?

19 A.   Yes, ma'am.  It was coming from behind us.

20 Q.   Did you see anybody shooting at you?

21 A.   No, ma'am.

22 Q.   Tell us what happened.

23 A.   Well, as the shots was coming, we -- my Uncle Leonard, he

24 told us to hop over the barrier to the walk path.  So all of us

25 hopped over and I laid down on my side.

JOSE HOLMES, JR. - Direct

1   Q.   When you said you heard shots, it was just a couple shots
2   you heard?
3   A.   No.  It was several shots.
4   Q.   What do you mean by "several"?
5   A.   Like a rapid fire.
6   Q.   A bunch of rapid-fire shots?
7   A.   Yes, ma'am.
8   Q.   And while they were going on -- while the shots were going
9   on, what did you do?
10  A.   We ran and hopped over the cement barrier.
11  Q.   What happened?
12  A.   We ran and hopped over the cement barrier on the walk
13  path.
14  Q.   And then what happened?
15  A.   Then I laid down on my side and the gunshots paused.
16  Q.   And then what happened?
17  A.   Then they started back again and I got struck in my arm.
18  Q.   When you went over the barrier and you said you laid down
19  on the ground?
20  A.   Yes, ma'am.
21  Q.   Why did you lay down on the ground?
22  A.   So that I wouldn't get hit.  And I kind of figured that if
23  they saw us lying on the ground they wouldn't shoot us.
24  Q.   When you say you figured if they saw you lying on the
25  ground they wouldn't shoot you, at that point did you have any

JOSE HOLMES, JR. - Direct

1   idea who was shooting at you?

2   A.   No, ma'am.

3   Q.   Did you know that you were being shot at?

4   A.   Yes, ma'am.

5   Q.   You had no doubt about that?

6   A.   Yes, ma'am.

7   Q.   And as you went over the barrier and laid down on the

8   ground, you said at some point the shots stopped?

9   A.   Yes, ma'am.

10  Q.   What were you thinking as you were lying there?

11  A.   I was hoping that I wouldn't get hit.  And that I'd be

12  able to survive it.

13  Q.   And then you said you remember getting shot?

14  A.   Yes, ma'am.

15  Q.   Where do you remember getting shot?

16  A.   I remember getting shot in my left arm.

17  Q.   What do you remember about that?

18  A.   Just really bad pain.  The worst pain I ever felt.

19  Q.   Where were you when you got shot in your left arm?

20  A.   I was lying on the ground in the walkway.

21  Q.   As you laid there, did you know where the rest of your

22  family was?

23  A.   No, ma'am.

24  Q.   Had you seen them starting to go over the barrier?

25  A.   Yes, ma'am.

JOSE HOLMES, JR. - Direct

1   **Q.**   Do you know where they ended up?
2   **A.**   No, ma'am.
3   **Q.**   As you were lying there, could you hear anybody in your
4   family?
5   **A.**   Yes, ma'am.
6   **Q.**   Tell us what you heard.
7   **A.**   I heard my auntie and my cousin Lesha, I heard them
8   screaming.  I heard my Uncle Leonard, he was screaming too.
9   **Q.**   When you say "screaming," what were they screaming?
10  **A.**   They were screaming out in pain.
11  **Q.**   They were in pain?
12  **A.**   Yes, ma'am.
13  **Q.**   What were you thinking at that moment?
14  **A.**   I was just hoping that we could make it.
15  **Q.**   Could you see them?  Could you see your aunt and your
16  cousin and your uncle?
17  **A.**   No, ma'am.
18  **Q.**   But you could hear them?
19  **A.**   Yes, ma'am.
20  **Q.**   Tell us what happened next, Jose.
21  **A.**   Well, I remember a guy -- a person running over and leaned
22  over and shot me two times in my stomach with a gun.
23  **Q.**   Where were you when somebody leaned over and shot you in
24  your stomach?
25  **A.**   I was still lying on the ground.

JOSE HOLMES, JR. - Direct

1   Q.   How were you lying?

2   A.   I was lying on my right side.

3   Q.   Were you facing the wall or facing away?

4   A.   I was facing the wall.

5   Q.   And you saw somebody lean over that concrete barrier?

6   A.   Yes, ma'am.

7   Q.   Tell the jury what you saw.

8   A.   Well, I was staring at the wall and I kind of glanced up,

9   I saw like a shadow, a person run over, and I looked up and I

10  saw a barrel of a gun.  And so I looked away and they shot me

11  twice in the stomach.

12  Q.   Where was that gun pointed when you saw it?

13  A.   It was pointed towards my stomach.

14  Q.   Why did you look away, Jose?

15  A.   Well, I tried to brace myself for the shot.

16  Q.   What do you mean when you say you tried to brace yourself?

17  A.   Kind of tightened my stomach up.

18  Q.   And then what?

19  A.   And then they -- he shot me twice.  And after that, it was

20  like the other shots stopped.

21  Q.   What were you thinking when you got shot in the stomach?

22  A.   Like, man, they really want me dead.  You know, I hope I

23  can survive it.

24  Q.   What did you do?

25  A.   Well, I paced my breathing because I knew -- I thought if

JOSE HOLMES, JR. - Direct

1   I panicked really bad that I would die.  So I had enough mind
2   to pace my breathing.
3   **Q.**   What else did you do as you were lying there?
4   **A.**   Just thinking -- wondering if I would survive.  You know,
5   praying to God that he would get me through this.
6   **Q.**   What happened next?
7   **A.**   Well, shortly after the ambulance came and it was like I
8   heard them saying, "This one has a 50/50 chance of living."
9   **Q.**   Were they talking about you?
10  **A.**   Yes, ma'am.
11  **Q.**   Do you remember whether you talked at all to the ambulance
12  crew?
13  **A.**   I'm not sure of that.  I just remember them asking me my
14  name and they kept saying, "Stay with me."  I guess I was going
15  in and out.
16  **Q.**   In and out of consciousness?
17  **A.**   Yes, ma'am.
18  **Q.**   What do you remember next?
19  **A.**   I remember the ambulance driving me to the hospital.  And
20  I woke up when like a gush of wind hit me as they went through
21  the door of the hospital.
22  **Q.**   Say that again.  You woke up?
23  **A.**   Like a fan that's over the door.
24  **Q.**   So a cold whoosh of air hit you?
25  **A.**   Yes, ma'am.

JOSE HOLMES, JR. - Direct

1  Q.   And that woke you up?

2  A.   Yes, ma'am.

3  Q.   What do you remember next?

4  A.   I remember a lot of lights and a lot of doctors standing

5  around me.

6  Q.   Did you know at that point how many times you had been

7  shot?

8  A.   No, ma'am.

9  Q.   Where had you been shot?

10 A.   I was shot in my arm, left side of my jaw, left side of my

11 abdomen, and in my stomach, and my right elbow.

12 Q.   Do you remember on that ambulance ride whether anybody

13 else was in the ambulance with you?

14 A.   Well, it sounded like my Uncle Leonard was with me.  I

15 just heard him talking, "Poor Little Jose.  Is Little Jose

16 going to be all right?"

17 Q.   And that what he calls you, "Little Jose"?

18 A.   Yes, ma'am.  He was more worried about me than hisself

19 [sic].

20 Q.   Had he been shot?

21 A.   Yes, ma'am.

22 Q.   Where had he been shot?

23 A.   He was shot in the head.

24 Q.   But he was worried about you?

25 A.   Yes, ma'am.

JOSE HOLMES, JR. - Direct

1   Q.   So when you got to the hospital and you had that whoosh of
2   cold air and woke up, do you remember what happened next?
3   A.   I remember them moving me to the back and a whole of bunch
4   lights and doctors standing around.  And they was trying to get
5   me to respond to them.
6   Q.   Do you remember whether you were able to respond to them
7   or not?
8   A.   No, ma'am.
9   Q.   No, you don't remember, or no, you couldn't respond?
10  A.   I don't remember.
11  Q.   Okay.  And do you know if you were rushed off to surgery
12  that day?
13  A.   Yeah.  I remember seeing them starting to cut my clothes
14  off and they were like, "Okay, go ahead and put him to sleep,"
15  and they put the anesthesia on me.
16  Q.   So you remember them putting you out?
17  A.   Yes, ma'am.
18  Q.   Jose, did you learn at some point that part of what
19  happened on the Danziger Bridge had been caught on video?
20  A.   Years later.
21  Q.   All right.  But you have seen that video, haven't you?
22  A.   Yes, ma'am.
23        MS. BERNSTEIN:  I think for the sake of ease, I'd
24  like to play Government's Exhibit 54, which is a snippet of
25  what's already in evidence.

JOSE HOLMES, JR. - Direct

1          **THE COURT:**  Any objection, counsel?

2          **MR. MECHE:**  Well, I don't know what it is.  I don't

3     think I've seen it.

4          **THE COURT:**  Ms. Bernstein, this is a portion that we

5     have already seen today?

6          **MR. FLEMING:**  No.

7          **THE COURT:**  It's not a portion of what we've already

8     seen?

9          **MS. BERNSTEIN:**  It's a -- it's labeled as a separate

10    exhibit, but it is footage that we've already seen.  But so we

11    won't have to fast forward through the entire thing like we did

12    earlier, we can just play the snippet.

13         **MR. MECHE:**  No objection.

14         **THE COURT:**  No objection.  All right.  Let's go ahead

15    and do that.  This is labeled what number?

16         **MS. BERNSTEIN:**  54, Your Honor.

17         **THE COURT:**  54, okay.

18         **MS. BERNSTEIN:**  All right.  Can we have Exhibit 54,

19    please?

20    **BY MS. BERNSTEIN:**

21    **Q.**   Jose, I'd like you to look at the screen in front of you.

22    You have a screen right in front of you.

23         **MS. BERNSTEIN:**  Your Honor, may we have one moment?

24         **THE COURT:**  I guess so since we can't see it until

25    you get it set.

JOSE HOLMES, JR. - Direct

1          **MS. BERNSTEIN:**  All right.  Can we start that over,
2     please?
3                            **(VIDEO PLAYED)**
4     BY MS. BERNSTEIN:
5     **Q.**   Do you see a video of someone running across an
6     intersection there?
7     **A.**   Yes.
8     **Q.**   Who is that person?
9     **A.**   That's me.
10    **Q.**   Where are you running from?
11    **A.**   I was running -- I was racing James.
12    **Q.**   What are you doing now?
13    **A.**   I stopped and tied my shoe.
14    **Q.**   Jose, have you also seen the video of the actual shooting
15    part?
16    **A.**   Yes, ma'am.
17    **Q.**   I'd like to play Government's Exhibit --
18          **MS. BERNSTEIN:**  Best laid plans, Your Honor.  We're
19    back to the one that we played earlier.
20          **THE COURT:**  Which --
21          **MS. BERNSTEIN:**  Which was Exhibit 300.
22          **THE COURT:**  Exhibit 300?
23          **MS. BERNSTEIN:**  Yes.  Can we have Exhibit 300 up,
24    please?
25                            **(VIDEO PLAYED)**

JOSE HOLMES, JR. - Direct

1  BY MS. BERNSTEIN:

2  Q.   Is that what the shooting sounded like that day, Jose?

3  A.   Yes, ma'am.

4  Q.   While all those shots were ringing out, what were you

5  doing?

6  A.   Lying on the ground hurt.

7  Q.   Lying on the ground?

8  A.   Yes, ma'am.

9  Q.   On the walkway?

10  A.   Yes, ma'am.

11  Q.   When you were out there that day, how long did it seem to

12  you like that shooting lasted?

13  A.   Forever.

14  Q.   When you watch that video, how long does it seem like it

15  lasted?

16  A.   A really long time.

17  Q.   You said when you got to the hospital they rolled you off

18  into surgery; right?

19  A.   Yes, ma'am.

20  Q.   Do you know what they were operating on that day?

21  A.   No, ma'am.  I just thought that -- I was hoping they would

22  be able to fix my arm.

23  Q.   Do you know how many surgeries you had?

24  A.   Not offhand.

25  Q.   What are some of the different parts you had to have

JOSE HOLMES, JR. - Direct

1  operated on?

2  **A.**   Well, I had -- they to put a metal rod in my left arm.

3  **Q.**   They had to put a metal rod in your left arm?

4  **A.**   Yes, ma'am.

5  **Q.**   Why was that?

6  **A.**   The doctor said my arm was broken in three spots.

7  **Q.**   Is that your upper arm or your lower arm?

8  **A.**   It's my upper arm.

9  **Q.**   Okay.  What else did you have to have operated on?

10 **A.**   I had a jaw fixator on my face.  It's like a round bar

11 with long pikes coming out of it.

12 **Q.**   Is that a contraption on the outside of your face?

13 **A.**   Yes, ma'am.

14 **Q.**   What was that for?

15 **A.**   That was to hold my jaw in place while it healed.

16 **Q.**   I'm sorry, Jose.  I can't hear you.  To hold your what?

17 **A.**   To hold my jaw in place while it healed.

18 **Q.**   Had you also been shot in your jaw there?

19 **A.**   Yes, ma'am.

20 **Q.**   Okay.  What else did you have to have operated on?

21 **A.**   I had a colostomy bag.

22 **Q.**   What's that?

23 **A.**   Like a poop sack.

24 **Q.**   It's like a poop sack?

25 **A.**   Yes, ma'am.

JOSE HOLMES, JR. - Direct

1  Q.   Where was that?

2  A.   That was on my right side.

3  Q.   Why did you have to have that?

4  A.   Because I had injuries to my intestines.

5  Q.   So you had to have this thing on the outside of your body

6  that's connected to you?

7  A.   Yes, ma'am.  My intestines was brought up to the outside

8  of my stomach.

9  Q.   How long did you have to wear that colostomy bag?

10  A.   I had it about a few years.

11  Q.   A few years?

12  A.   Yes, ma'am.

13  Q.   And then how did you get rid of it?

14  A.   I had to have another surgery.

15  Q.   And finally you got it taken off?

16  A.   Yes, ma'am.

17  Q.   During that time when you had to have your colostomy bag,

18  could you still sort of go about your life?

19  A.   Not really.  I couldn't really do -- like play sports that

20  I wanted to.

21  Q.   Did you try to play some sports with it?

22  A.   Yeah.  It didn't really turn out good at times.

23  Q.   What happened?

24  A.   I was at a gym with my friend in Atlanta and I went to go

25  up for the ball and the guy jumped into me and it came off.

JOSE HOLMES, JR. - Direct

1    And it was all on his shirt.  And his brother was just laughing
2    at him.  They didn't know what it was, but he kept saying it
3    smells like poo.
4    Q.   So you finally got rid of it?
5    A.   Yeah.
6    Q.   What other places did you have to have operated on?
7    A.   I know I had surgery on my left thumb because it healed
8    wrong.  I guess it was broke.  So they had to go ahead and put
9    pins in it.
10   Q.   Can you show --
11           MS. BERNSTEIN:  Actually, Your Honor -- let me put up
12   some photographs.  May I have Exhibit 53, please?
13               Actually, I'm sorry.  Is this admitted?
14               May I approach, Your Honor, and show the witness
15   some photographs?
16           THE COURT:  Yes.
17           MS. BERNSTEIN:  May I approach, Your Honor?
18   BY MS. BERNSTEIN:
19   Q.   I'm showing you three photographs labeled Exhibits 53, 55
20   and 57.  Do you do recognize those?
21   A.   Yes, ma'am.
22   Q.   What's Exhibit 55 a picture of?
23   A.   It's a picture of my colostomy bag.
24   Q.   That's a picture taken before you had your surgery to get
25   rid of it?

JOSE HOLMES, JR. - Direct

1   **A.**   Yes, ma'am.

2   **Q.**   What's 53 a picture of?

3   **A.**   Me lying there shot.

4   **Q.**   You lying there shot.  Where are you in that picture?

5   **A.**   I'm in the hospital.

6   **Q.**   How do you know that's you, Jose?

7   **A.**   I can recognize the shorts that I had on and I can

8   recognize my hair.

9   **Q.**   How about your left arm?

10  **A.**   Yes, ma'am.  It's --

11          **MR. FLEMING:**  Judge, I'm going object to the leading

12  nature of that question.

13          **THE COURT:**  Well, he's already testified as to his

14  injuries, so I'm going to overrule the objection.

15          Go ahead.

16  **BY MS. BERNSTEIN:**

17  **Q.**   Do you recognize your arm in that photograph?

18  **A.**   Yes, ma'am.

19  **Q.**   And I'll put it up in a minute.  What's -- Exhibit No. 57,

20  what's that a picture of?

21  **A.**   It's a picture of a lot of doctors doing -- I guess, like,

22  they're doing surgery on me.

23  **Q.**   Okay.

24          **MS. BERNSTEIN:**  Your Honor, I'd like to offer 55, 53,

25  and 57 into evidence.

JOSE HOLMES, JR. - Direct

1          **THE COURT:**  Any objection?

2          **MR. FLEMING:**  Yes.  Can we approach?

3          **THE COURT:**  Yes.

4          (WHEREUPON, the following proceedings were held at

5      the bench.)

6          **MR. FLEMING:**  So I know which ones we're talking

7      about.  I don't have an objection on that one -- I'm sorry.

8          **THE COURT:**  That was 55.

9          **MR. FLEMING:**  55, no objection.  It's 53 and 57.

10     Although he's identified it, Judge, he's identified it because

11     he's been shown these pictures a thousand times by the

12     prosecutor.  He's unconscious in these pictures.  You can

13     barely see who that is.  That's not a real identification.

14         **THE COURT:**  But can't he identify himself from a

15     photograph of a person on the operating table or in a bed?

16     Wouldn't the person be able to identify himself?  I don't know

17     that that's a real hard reach.

18          Do I understand the objection?

19         **MR. FLEMING:**  You do.  You do.

20         **MS. BERNSTEIN:**  And not only can he identify himself,

21     he just did.  So we don't have to speculate as to whether he

22     can.

23         **MR. FLEMING:**  Well, he did because you have shown him

24     those photographs at least a hundred times when you've been

25     preparing him for this testimony.  It's not a real --

JOSE HOLMES, JR. - Direct

1           THE COURT:  He said something about his shorts.
2           MS. BERNSTEIN:  These are his shorts here, Your
3    Honor.
4           THE COURT:  Yes, I see.
5               I'm going to overrule.  You can go ahead and
6    show him.  I think there's enough information for him to
7    identify his own body and the state that it's in.
8           (WHEREUPON, the following proceedings were held in
9    open court.)
10          THE COURT:  All right.  53, 55, and 57 are admitted.
11          MS. BERNSTEIN:  Thank you, Your Honor.
12              May we have Exhibit 55 up, please?
13   BY MS. BERNSTEIN:
14   Q.   Is that one of the photographs you were just looking at,
15   Jose?
16   A.   Yes, ma'am.
17   Q.   What's that a picture of?
18   A.   That's a picture of my colostomy bag.
19   Q.   That's the one that you had taken off?
20   A.   Yes, ma'am.
21          MS. BERNSTEIN:  May I have Exhibit 53, please?
22   BY MS. BERNSTEIN:
23   Q.   What's that a picture of?
24   A.   It's a picture of me lying on the stretcher, hurt.
25          MS. BERNSTEIN:  Can we zoom in on his left arm,

JOSE HOLMES, JR. - Direct

1   please?

2   BY MS. BERNSTEIN:

3   Q.   Is that the arm you said was broken in three places?

4   A.   Yes, ma'am.

5   Q.   Can you see that injury there?

6   A.   Yes, ma'am.

7   Q.   Can you see the injury to your face in that picture?  You

8   said you were shot in the left jaw?

9   A.   Yes, ma'am.

10  Q.   Can you see that in the picture?

11  A.   Yes, ma'am.

12          MS. BERNSTEIN:  May I have Exhibit 57 up, please?

13  BY MS. BERNSTEIN:

14  Q.   Is that another picture of you in the hospital, Jose?

15  A.   Yes, ma'am.

16          MS. BERNSTEIN:  Can we zoom in, please, on his

17  abdomen?

18  BY MS. BERNSTEIN:

19  Q.   You said earlier that you were shot two times in the

20  stomach?

21  A.   Yes, ma'am.

22  Q.   Do you see those injuries there?

23  A.   Yes, ma'am.

24          MS. BERNSTEIN:  Your Honor, may I have the witness

25  step up -- step down for a minute to show the jury the scars he

JOSE HOLMES, JR. - Direct

1    has from this?

2            THE COURT:  Counsel?

3            MR. FLEMING:  I have no objection.  I'd ask that I be

4    permitted to move around so I can see.

5            THE COURT:  Certainly, certainly.  Anybody that needs

6    to see on counsel tables can.  Yes, sir.

7    BY MS. BERNSTEIN:

8    Q.   Jose, while they're moving, can you step down?

9    A.   (WITNESS COMPLIES.)

10   Q.   And I expect that if I ask you to talk, the mic might

11   be --

12           THE COURT:  Well, why don't we show and then we'll

13   come back up to the witness stand.

14   BY MS. BERNSTEIN:

15   Q.   Can you stand in front of the jury?

16   A.   (WITNESS COMPLIES.)

17           THE COURT:  We're not going to question him from

18   here.  He's going to return to the witness stand.

19   BY MS. BERNSTEIN:

20   Q.   Can you show them your scars on your stomach from where

21   you were shot?

22   A.   (WITNESS COMPLIES.)

23           MS. BERNSTEIN:  May I go over there too, Your Honor?

24           THE COURT:  Yes.

25

JOSE HOLMES, JR. - Direct

1    BY MS. BERNSTEIN:

2    Q.   And that scar in the middle of your stomach --

3    A.   That's where they had the --

4              THE COURT:  Wait.

5              MS. BERNSTEIN:  Oh, I'm sorry.  That's right.  I'll

6    question you when you get back.

7    BY MS. BERNSTEIN:

8    Q.   Can you show them your left arm?

9    A.   (WITNESS COMPLIES.)

10   Q.   Can you show them your left thumb that you were talking

11   about?

12   A.   (WITNESS COMPLIES.)

13   Q.   Can you show them your right elbow?

14   A.   (WITNESS COMPLIES.)

15   Q.   How about your jaw, do you have any scars up there?

16   A.   (WITNESS COMPLIES.)

17   Q.   Did I miss any spots that you were shot, Jose?

18   A.   No.

19             THE COURT:  We finished with this exhibit, counsel?

20             MS. BERNSTEIN:  Yes, Your Honor.

21   BY MS. BERNSTEIN:

22   Q.   Joe, you showed the jury that injury to your -- to your

23   hand.  Your thumb doesn't straighten out now?

24   A.   No, ma'am.

25   Q.   Is there anything that you can't do anymore because of

JOSE HOLMES, JR. - Direct

1  that injury?

2  A.   Well, playing basketball real good, do a decent left-hand

3  layup.  And I play the piano, so I can't really hit as many

4  chords as I can with my left hand.

5  Q.   You have trouble hitting the chords now on the piano?

6  A.   Yes, ma'am.

7  Q.   After that first day when they rushed you into surgery,

8  what's the next thing you remember?

9  A.   I remember waking up and the nurses was happy to see that

10  I had woken.  The doctor came in and was going over some of my

11  injuries.

12  Q.   You said the nurses were happy to see that you woke up?

13  A.   Yes, ma'am.

14  Q.   And then the doctors went over your injuries?

15  A.   Yes, ma'am.

16        MR. FLEMING:  Judge, at this point I'm going to

17  object to Ms. Bernstein constantly rehashing the testimony just

18  given by the witness.

19        THE COURT:  Yes.  We don't need to repeat each answer

20  that he gives.  He gives the answer, we ask the next question.

21  BY MS. BERNSTEIN:

22  Q.   Jose, can I ask you to move the microphone a little bit

23  closer to you?

24        When you woke up in the hospital, did you know where

25  your family was?

JOSE HOLMES, JR. - Direct

1  A.   No, ma'am.

2  Q.   When you woke up in the hospital, could you talk?

3  A.   No, ma'am.

4  Q.   Why not?

5  A.   I had a trach tube.

6  Q.   What's a trach tube?

7  A.   It's like another breathing hole because my lungs was

8  bruised from the injuries.

9  Q.   And you talked earlier about a contraption on the outside

10  of your face.  Do you know when you had that put on?

11  A.   It probably was the same day that I had surgery, but I

12  don't know exactly when they put it on.

13  Q.   At some point did you find out -- did you get any news

14  about your family?

15  A.   Yes, ma'am.

16  Q.   What do you remember learning?

17  A.   I remember learning that -- that they got shot on the

18  bridge too.  And the first person that came to see me was my

19  Uncle Leonard.

20  Q.   How happy were you to see him?

21  A.   I was excited.

22  Q.   At some point did you get to see your auntie?

23  A.   Yes, ma'am.

24  Q.   Do you know how long that was?

25  A.   No, ma'am.

JOSE HOLMES, JR. - Direct

1   **Q.**   Where did you see your auntie?

2   **A.**   She was wheelchair-ed to my room by my uncle.

3   **Q.**   At that point were you up and about at all?

4   **A.**   No, ma'am.

5   **Q.**   You were in the bed?

6   **A.**   Yes, ma'am.

7   **Q.**   Do you know how long you were in the bed before you were

8   up and about?

9   **A.**   No, ma'am.

10  **Q.**   At some point did you learn what had happened to Little

11  Leonard?

12  **A.**   Yes, ma'am.

13  **Q.**   How did you learn what had happened to Little Leonard?

14  **A.**   Well, I just remember him coming in my room one day and I

15  was trying to give him like the thumbs-up to let him know I was

16  okay, but he was just crying so bad.

17  **Q.**   I'm sorry.  Who was crying so bad?

18  **A.**   My cousin Leonard.  He was just -- I guess he didn't want

19  to see me like that, I guess.  I must have been --

20          **MR. FLEMING:**  Objection to the speculative nature of

21  the testimony.

22          **THE COURT:**  He can testify as to what he saw.  If he

23  saw the other person weeping or crying, then he can testify to

24  that.  But he can't testify -- except for what's obvious to

25  him, he can't testify how somebody else feels.  But he can

JOSE HOLMES, JR. - Direct

1    testify as to what he saw with his own eyes.
2              Go ahead.
3              **THE WITNESS:**  I just remember seeing him just crying
4    and I was trying to cheer him up.
5    **BY MS. BERNSTEIN:**
6    **Q.**   You were trying to cheer him up?
7    **A.**   Yeah, just kept giving the thumbs-up.
8    **Q.**   Could you talk at that point?
9    **A.**   No, ma'am.
10   **Q.**   Jose, do you know how long you stayed in the hospital?
11   **A.**   About two and a half months, almost three months.
12   **Q.**   What was your mental state during that time?
13   **A.**   I was depressed most of the time I was in there.
14   **Q.**   Do you remember any of the people who took care of you
15   during that time when you were in the hospital?
16   **A.**   Yes, ma'am.
17   **Q.**   Tell us about the people who took care of you.
18   **A.**   Well, a lot of nurses, they spoiled me.  But this one
19   particular nurse, she wanted to take the full job of taking
20   care of me.
21   **Q.**   There was one nurse who wanted to take the full job of
22   taking care of you?
23   **A.**   Yes, ma'am.
24   **Q.**   Do you know her name?
25   **A.**   It was Nurse Robyn.

JOSE HOLMES, JR. - Direct

1   Q.   Did she spoil you?

2   A.   No, she did not.  She made me do everything that I was too

3   lazy to do:  Made me walk, sit up, go wheelchair me outside,

4   set me outside with her, but she --

5   Q.   Are you --

6   A.   But she took really good care of me, though.

7   Q.   I'm sorry.  What did you say?

8   A.   She took really good care of me, though.

9   Q.   Are you glad she didn't spoil you?

10  A.   Yeah.

11  Q.   Did Nurse Robyn ever accuse you of anything?

12  A.   Well, yeah.  I remember her saying that I was shooting at

13  helicopters.  And I just kept shaking my head because I

14  couldn't talk to her, but she kept insinuating I was shooting

15  the helicopters.

16  Q.   Do you know where she got that information from?

17  A.   I guess she must have --

18          MR. MECHE:  Objection.

19          THE WITNESS:  -- got it from the police report.

20          THE COURT:  Yes.

21  BY MS. BERNSTEIN:

22  Q.   Okay.  The question was just do you know, Jose.  So just

23  either yes or no.

24  A.   No.

25  Q.   You don't know where she got that information.

JOSE HOLMES, JR. - Direct

1          When she said that to you, that you had been shooting
2    at helicopters, were you able to talk?
3    A.   No, ma'am.
4    Q.   So what did you do?
5    A.   I was just shaking my head.  And she would just continue
6    on and saying that I was shooting at helicopters.
7    Q.   But she still took really good care of you?
8    A.   Yes, ma'am.
9    Q.   When you finally got out of the hospital, where did you
10   go?
11   A.   I went to stay with my father in Augusta, Georgia.
12   Q.   Did you ever go back to -- what hospital were you in; do
13   you know?
14   A.   West Jefferson Hospital.
15   Q.   After you left and went to Georgia, did you ever go back
16   to West Jefferson?
17   A.   Yes, ma'am.
18   Q.   Do you know about when that was?
19   A.   It was sometime the next year.
20   Q.   Sometime in 2006?
21   A.   Yes, ma'am.
22   Q.   Why did you go back to the hospital?
23   A.   I wanted to thank everybody for helping me get better and
24   to let them see that I was doing better.
25   Q.   Did you find a bunch of them when you went back?

JOSE HOLMES, JR. - Direct

1   A.   Yeah.

2   Q.   How was that?

3   A.   I would say they was very happy to see me.

4   Q.   When you went back that time to thank folks, did you see

5   Nurse Robyn?

6   A.   Yes, ma'am.

7   Q.   Did you talk to her?

8   A.   Yes, ma'am.

9   Q.   What did she say?

10          MR. FLEMING:  Objection.

11          THE COURT:  I'm going to sustain it.

12  BY MS. BERNSTEIN:

13  Q.   Did you thank her?

14  A.   Yes, ma'am.

15  Q.   Before this shooting happened, how did you feel about the

16  police?

17  A.   Well, I know they had some crooked cops, but I had never

18  had a problem with them.

19  Q.   Before all this happened, if you were the victim of a

20  crime, who would you have called?

21  A.   The police.

22          MR. MECHE:  Object to the relevance, Judge.

23          THE COURT:  Yes.  Let's stick with the facts here and

24  not ask him -- you're asking him some hypothetical questions,

25  such as that.  Let's just stick with his factual testimony.

JOSE HOLMES, JR. - Direct

1   BY MS. BERNSTEIN:

2   Q.   Did you have any law enforcement in your family, Jose?

3   A.   Yes, ma'am.

4   Q.   Who's that?

5   A.   My two uncles, Uncle Richard and Uncle Jerome.

6   Q.   Who did they work for?

7   A.   NOPD.

8   Q.   Did you ever have anybody on the sheriff's department?

9   A.   Yes, ma'am, my Uncle Jerome.

10  Q.   So he worked for both?

11  A.   Yes, ma'am.

12  Q.   As you were walking up the bridge that morning, did you

13  know that the police were behind you in a truck?

14  A.   No, ma'am.

15  Q.   Did you ever see a truck on the bridge that day?

16  A.   No, ma'am.

17  Q.   Did you know that people shooting were police?

18  A.   No, ma'am.

19  Q.   Were you mad at the police that morning?

20  A.   No, ma'am.

21  Q.   Did you have any reason to shoot at the police?

22  A.   No, ma'am.

23  Q.   Did you shoot at the police?

24  A.   No, ma'am.

25  Q.   Did anyone else in your group shoot at the police?

JOSE HOLMES, JR. - Direct

1   A.   No, ma'am.

2   Q.   Did you see anyone shoot at the police that day?

3   A.   No, ma'am.

4   Q.   Did you have a gun?

5   A.   No, ma'am.

6   Q.   Did anyone in your group have a gun?

7   A.   No, ma'am.

8   Q.   Have you ever fired a gun in your life?

9   A.   No, ma'am, except for a BB gun.

10  Q.   When did you fire a BB gun?

11  A.   Between the age of 14 and 15.

12  Q.   Did you have a BB gun with you on the bridge?

13  A.   No, ma'am.

14  Q.   Before all that shooting started, right before the

15  shooting started, did you hear any warning?

16  A.   No, ma'am.

17  Q.   Did anyone yell, "Stop"?

18  A.   No, ma'am.

19  Q.   Did anyone yell, "Police"?

20  A.   No, ma'am.

21  Q.   Did anyone yell, "Show us your hands"?

22  A.   No, ma'am.

23  Q.   If somebody yelled, "Stop.  Police.  Show us your hands,"

24  what would you have done?

25  A.   I would have did exactly that.

JOSE HOLMES, JR. - Direct

1      **MS. BERNSTEIN:**  No further questions, Your Honor.

2      **THE COURT:**  Okay.  Cross.

3                        **CROSS-EXAMINATION**

4  BY MR. HESSLER:

5  Q.   Mr. Holmes, my name is Eric Hessler.  I'm representing

6  Robert Gisevius.

7            At the time of this incident, September -- I guess

8  August/September of 2006 [sic], were you enrolled in school?

9  A.   Could you repeat the question?

10  Q.   Were you enrolled in school?

11  A.   No.  What time?

12  Q.   August 2006, September.

13  A.   No, I was not enrolled in school in '06.

14       **THE COURT:**  '06 or '05?

15  BY MR. HESSLER:

16  Q.   '05.

17       **THE COURT:**  Let's back up again.

18  BY MR. HESSLER:

19  Q.   2005.

20  A.   I was enrolled in a GED program.

21  Q.   Okay.  And you completed that program?

22  A.   No, sir.

23  Q.   Okay.  Were you working?

24  A.   Yes, sir.

25  Q.   And where were you working at the time?

JOSE HOLMES, JR. - Cross

1   A.   At McDonald's.

2   Q.   All right.  Now, you said that -- let me ask you:  Where

3   were you when you found out Hurricane Katrina was coming this

4   way?

5   A.   I was -- I spent night at my friend's house.

6   Q.   Okay.  When did you find out that Hurricane Katrina was

7   actually coming -- coming this way?

8   A.   That morning that I woke up.

9   Q.   All right.  And how many days -- was that the day of the

10  storm?

11  A.   I don't remember.

12  Q.   Okay.  Do you remember testifying or learning -- you

13  learned of Hurricane Katrina at the last moment -- at the last

14  minute?

15  A.   I remember knowing about it at the last minute.

16  Q.   Okay.  And what did you do when you learned of it -- of

17  its imminent arrival, that it was coming?

18  A.   Well, me and my friend, we left out of his house and we

19  saw nobody was home or outside.  So he went to this -- this

20  lady he calls granny.  So he went to her and I went to my

21  grandmother's house.

22  Q.   All right.  So you wake up one morning and somebody told

23  you a hurricane was coming.  Who told you that?

24  A.   It was on TV.

25  Q.   And you walk outside -- that same morning you walk outside

JOSE HOLMES, JR. - Cross

1  and you don't see anybody around?
2  A.   Yes, sir.
3  Q.   And it's the first you're hearing of it?
4  A.   Could you repeat that again?
5  Q.   It's the first time you're hearing about Hurricane Katrina
6  coming?
7  A.   Yes, sir.
8  Q.   All right.  And then what -- and what do you do?
9  A.   Well, we walked outside.  My friend went to this lady he
10  calls granny and I went to my grandmother's house.
11 Q.   Okay.  And your grandmother lives where?
12 A.   She stays around the corner from my friend's house.
13 Q.   Was it windy at the time?
14 A.   No.
15 Q.   Was it raining?
16 A.   No.
17 Q.   And it wasn't flooded?
18 A.   No.
19 Q.   Okay.  Were you in New Orleans East or you're in the Ninth
20 Ward?
21 A.   We was in the Ninth Ward.
22 Q.   When you get to your grandmother's house, what do you find
23 out?
24 A.   I found out that all of them was packing their stuff and
25 my auntie was coming to get us.

JOSE HOLMES, JR. - Cross

1  **Q.**  That would be your Auntie Susan?

2  **A.**  Yes, sir.

3  **Q.**  And she was coming to get you why?

4  **A.**  So that we can go to her house and ride out the storm.

5  **Q.**  All right.  And did she pick you up?

6  **A.**  Yes, sir.

7  **Q.**  All right.  Now, where did she bring you to?

8  **A.**  She brought us to her apartment in New Orleans East.

9  **Q.**  Had you ridden out storms there before?

10  **A.**  Yes, sir.

11  **Q.**  Who all was at the house in New Orleans East?

12  **A.**  It was my auntie, my uncle.

13  **Q.**  Give me their names, please.

14  **A.**  Auntie Susan; my Uncle Leonard; my cousin Little Leonard;

15  my cousin Lesha; my cousin Brandon; my sister Jenquia; my

16  sister Jontay; my grandmother, Augustine Green; my sister's

17  son, my nephew, Eugene Green, Jr.; my sister's boyfriend at the

18  time, Eugene Green, Sr.

19  **Q.**  Okay.  And I don't want to put words in your mouth, but

20  did you get there in the afternoon or the evening -- or what

21  time did you get to your Aunt Susan's house?

22  **A.**  I don't remember.

23  **Q.**  All right.  How long did you stay, if you recall?  Was it

24  one night, two nights, or how many nights did you stay until

25  the levees broke?

JOSE HOLMES, JR. - Cross

1   **A.**   I don't remember.

2   **Q.**   Okay.  In what area of New Orleans East was this apartment

3   complex in?

4   **A.**   Right off of Crowder by the service road.

5   **Q.**   Crowder and the service road?

6   **A.**   Right down from the Wal-Mart on the service road.

7   **Q.**   Around Crowder and I-10, for lack of a better area?

8   **A.**   Yeah.

9   **Q.**   How long were you on the roof of that before NOPD officers

10  rescued you and your family?

11  **A.**   I don't remember.

12  **Q.**   Was it one night, two nights, days, hours?

13  **A.**   You said I was out on the roof?

14  **Q.**   Well, yeah.  I thought you all went -- I thought you went

15  up on the roof or kicked out the attic?

16  **A.**   Yeah.  It was just for like -- just to signal for help.

17  **Q.**   Okay.  How long were you stranded by the water until --

18  until the NOPD arrived and got you and your family out of

19  there?

20  **A.**   Could have been a couple of days.  I don't actually

21  remember how many days.

22  **Q.**   Okay.  And you said that they rode you in a boat to

23  somewhere on Chef Menteur Highway?

24  **A.**   Yes, sir.

25  **Q.**   Do you recall exactly where?

JOSE HOLMES, JR. - Cross

1  A.   It was like right -- right next to the hotel we were
2  staying in.
3  Q.   Okay.  Near the Friendly Inn -- the Holiday Inn, Friendly
4  Inn, near Chef and Downman?
5  A.   No, it was not near Chef and Downman.
6  Q.   Okay.  Well, certainly -- like five or six blocks down.
7  It was around -- around the Friendly Inn?
8  A.   Yes.
9  Q.   Now, you first went to a hotel that was across on the
10  other side of the Chef Menteur Highway that was actually
11  somewhat across from the Friendly Inn; correct?
12  A.   Yes, sir.
13  Q.   All right.  And you all did not stay there?
14  A.   Correct.
15  Q.   And what kind of things did you -- were you afraid when
16  you were there?
17  A.   I wasn't really afraid, my auntie was.  She wanted us to
18  be in a safe environment.
19  Q.   Why weren't you afraid of the environment that you were
20  in?
21  A.   I mean, I stay in the Ninth Ward and you hear a lot of
22  gunshots and violence and stuff like that, so it kind of seemed
23  normal to me.
24  Q.   Gunshots and violence didn't affect you in any way, you
25  weren't afraid of it?

JOSE HOLMES, JR. - Cross

1   A.   Not at that time I wasn't.

2   Q.   But, nevertheless, your Auntie Susan moved you all over to

3   the Friendly Inn?

4   A.   Yes, sir.

5   Q.   And that was a hundred yards away maybe?

6   A.   I wasn't counting how many steps I was taking, but it's

7   right like -- it's right across the street.

8   Q.   All right.  And was that environment any different?

9   A.   Yeah.  It was actually quiet and they welcomed us.

10  Q.   Okay.  Now, did the same group of people that were at

11  your -- at your Auntie Susan's house travel to the Friendly Inn

12  or have you all -- did you all separate or anything else?

13  A.   We was always all together.

14  Q.   Okay.  How old is Jenquia?

15  A.   Jenquia is 23.

16  Q.   And Jontay?

17  A.   Jontay is a year younger than her.

18  Q.   Who is Green?

19  A.   Which Green?

20  Q.   I don't know.  You stated there was a Green staying with

21  you; right?

22  A.   Yes.  I had my grandmother and my sister's boyfriend at

23  the time.

24  Q.   Okay.  And give me their first names, please?

25  A.   Augustine Green and Eugene Green.

JOSE HOLMES, JR. - Cross

1   Q.   Okay.  Augustine Green, how old is he?

2   A.   He's knocking on 30.

3   Q.   30?

4   A.   He's about to make 30.

5   Q.   All right.  So back then he was -- well, 28 --

6        MS. BERNSTEIN:  I'm sorry, Your Honor.  Is the

7   question about Augustine Green?

8        MR. HESSLER:  I suppose so, yeah.

9        MS. BERNSTEIN:  Can you ask that question again?

10  BY MR. HESSLER:

11  Q.   Augustine Green, how old is he?

12  A.   That's my grandmother.

13  Q.   Oh, okay.  Well, then she's not knocking on 30.

14  A.   No.

15  Q.   Okay.  Is there a Eugene Green or a Little Eugene?

16  A.   Yeah, Eugene Green, Sr.

17  Q.   How old is he?

18  A.   He's about to turn 30.

19  Q.   Okay.  And is there a Little Eugene?

20  A.   Yes, that's my nephew.

21  Q.   How old is he?

22  A.   He is six, I believe.

23  Q.   Okay.  Six now.

24        So he was one year old back then -- or pretty much an

25  infant?

1   A.   Yes, he was an infant.

2   Q.   And Brandon?

3   A.   Brandon is about to make 14 next month.

4   Q.   So he would have been 10, 11 -- no, about 9.  Gosh.  8 or

5   9 back then?

6   A.   I ain't really good with math, but...

7   Q.   And Leonard Bartholomew --

8          MS. BERNSTEIN:  I'm going to correct his math.  If

9   he's 14 now, that would have made him 8 -- if he's about to

10  turn 14, he was 7 or 8 then.

11         THE WITNESS:  Yeah.

12  BY MR. HESSLER:

13  Q.   And -- okay.  Leonard Bartholomew, III?

14  A.   I don't know how old he was.

15  Q.   Give me just a general --

16  A.   I know he was younger than me, maybe like a few years.

17  Q.   Okay.  And Leonard Bartholomew, IV?

18  A.   He's -- I don't know, 50s, 40s, late 40s.

19  Q.   Which one do you refer to as Leonard Bartholomew, Jr.?

20  A.   Leonard, III.

21  Q.   Leonard, III.  Okay.  All right.

22         Now, you said your auntie said that you all always

23  had to go somewhere in a group for safety reasons; right?

24  A.   Well, my auntie always wanted us to stay together.

25  Q.   Okay.  When you say "stay together," like as a group in

JOSE HOLMES, JR. - Cross

1   total or a group with adults or whatnot?

2   **A.**   As a group in total.

3   **Q.**   Okay.  Did you abide by that?

4   **A.**   Yes, sir.

5   **Q.**   Okay.  And is that like a standing rule day and night,

6   24/7?

7   **A.**   She's the boss.

8           **MS. BERNSTEIN:**  Objection, Your Honor.  Can we

9   clarify the time frame you're talking about?

10  **BY MR. HESSLER:**

11  **Q.**   During the time when you're at the Friendly Inn?

12          **THE COURT:**  Yeah, I think we were just discussing

13  that time frame.  That's what I understood.

14  **BY MR. HESSLER:**

15  **Q.**   During the time you're at the Friendly Inn, was that the

16  standing rule:  We stay together as a group, nobody leaves the

17  group?

18  **A.**   She didn't actually say that, but she would not let us,

19  you know, wander off by ourselves.

20  **Q.**   And did you listen to your auntie all the time?

21  **A.**   Yes, sir.

22  **Q.**   Okay.  But you did wander off, didn't you?

23  **A.**   No, sir, not by myself.

24  **Q.**   Okay.  How old were you at the time?

25  **A.**   I was 19.

JOSE HOLMES, JR. - Cross

1   Q.   All right.  And at some point during that time prior to
2   this incident you and Leonard Bartholomew, Jr., I think he was
3   12 at the time, you all did leave, didn't you?
4   A.   Could you repeat that?
5   Q.   You and Leonard Bartholomew, Jr., did leave together alone
6   without the rest of the group; correct?
7   A.   No, sir.
8   Q.   Do you remember talking to -- do you know Mr. Bezak here?
9   Do you know Mr. Bezak --
10  A.   Yes, sir.
11  Q.   -- William Bezak, the FBI agent?
12       Do you remember speaking with him in March of 2009?
13  A.   I remember talking to him, but I don't remember exactly
14  what I said.
15  Q.   Do you remember telling him, Mr. Bezak, that you walked
16  across the Danziger Bridge to the Foot Locker?
17  A.   Yes, I remember going to the Foot Locker.
18  Q.   And who all went?
19  A.   Whenever we left to go to the bridge, it was always my
20  uncle with me and Little Leonard.
21  Q.   Okay.  Where is this Foot Locker located?
22  A.   It's on the other side of the Danziger Bridge.
23  Q.   How far?
24  A.   I don't know.  It's a long way from the hotel.
25  Q.   So you walked a long way from the hotel to go to the Foot

JOSE HOLMES, JR. - Cross

1  Locker?

2  **A.**   Yes, sir.

3  **Q.**   And why did you do this?

4  **A.**   Well, we needed some clothes and shoes.

5  **Q.**   Okay.  You had packed a bag of clothes at your auntie's

6  house -- you took it to your auntie's house, correct, from your

7  grandmothers?

8  **A.**   Yes, sir.

9  **Q.**   You actually put it in a bag?  You told him you put it a

10  bag; right?

11  **A.**   Yes, sir.

12  **Q.**   What kind of bag was that?

13  **A.**   I don't remember.

14  **Q.**   Did you carry a knapsack or book bag or school bag or --

15  **A.**   I don't remember.

16  **Q.**   Now, so you're saying that -- well, you told Mr. Bezak

17  that just you walked to that Foot Locker; right?

18  **A.**   No, sir.

19  **Q.**   You told him other people walked with you to that Foot

20  Locker?

21  **A.**   No.  Whenever we crossed the bridge, I always was with my

22  uncle and my cousin Leonard.

23  **Q.**   Wait a minute.  I'm sorry?

24  **A.**   Whenever we crossed the bridge, I always was with my uncle

25  and my cousin Leonard.

JOSE HOLMES, JR. - Cross

1  Q.   Okay.

2         MR. HESSLER:   One second, Your Honor.

3  BY MR. HESSLER:

4  Q.   Now, again, do you remember testifying in the grand jury

5  in this matter back on November 15th of 2006?

6  A.   I remember talking to the grand jury.

7  Q.   Do you remember that?

8  A.   Yes, sir.

9  Q.   Okay.  And granted, memories fade with time; would you

10 agree with that?

11 A.   Yes, sir.

12 Q.   But you do remember talking to Agent Bezak in March of

13 2009; correct?

14 A.   I remember talking to Mr. Bezak.

15 Q.   Okay.  And do you remember telling Agent Bezak that just

16 you walked to the Foot Locker?

17         MS. BERNSTEIN:   Objection, Your Honor.  May we

18 approach?

19         (WHEREUPON, the following proceedings were held at

20 the bench.)

21         THE COURT:   What's the objection?

22         MS. BERNSTEIN:   Absolutely no inconsistency.  He's

23 pointing to a line in the FBI report that says, "Jose Holmes

24 went to the Foot Locker."  It has absolutely nothing about who

25 he did or did not go with.  Am I missing something?

JOSE HOLMES, JR. - Cross

1          MR. HESSLER:  The question is:  "Who did you -- did
2   you go to the Foot Locker?"
3                "Yeah, I went to the Foot Locker."
4                And answer is, "You went to the Foot Locker --
5          MS. BERNSTEIN:  There's nothing in there that says
6   what the question was.  It says, "Jose Holmes walked to the
7   Foot Locker."  That is 100 percent consistent with what he said
8   today.
9          THE COURT:  Didn't you ask him who else went?
10         MR. HESSLER:  Yes.
11         THE COURT:  And he said that -- and it's unclear, so
12  you have to clarify it -- but he said that two other people
13  went with him across the bridge.  But it's unclear to me
14  whether they went with him to the Foot Locker.  So I think
15  maybe we need a few more questions before we decide that only
16  he went or whether others went with him.
17         MS. BERNSTEIN:  In the FBI interviews, as far as I
18  can tell, he was never asked whether anybody went with him.  So
19  regardless of what his answer is, there's no inconsistency with
20  which to impeach him.
21         THE COURT:  Right.  I don't know if it's so much
22  impeachment.  As I understand it, it's to refresh his
23  recollection because he seemed to be unclear upon --
24         MR. HESSLER:  Well, I'll tell you what, read right
25  here -- oh, never mind.

JOSE HOLMES, JR. - Cross

1    MS. BERNSTEIN:  His memory is actually -- he's

2  offered more information today than he was asked for in that

3  particular interview.  So there's nothing to refresh his

4  memory.  His memory's fine.  He testified he went with Big

5  Leonard and Little Leonard.

6    MR. HESSLER:  I'll deal with that in a different

7  matter.

8    THE COURT:  I'm going to overrule the objection

9  because I'm not sure you've asked enough questions in order to

10  sustain it.  But let's ask him the question before we use the

11  302 unless he just says he doesn't remember.

12    MR. FLEMING:  Judge, can I make a motion, just to

13  save time at the end of the day?  I want to make the same

14  motion I made yesterday for any *Brady* or *Giglio* material for

15  witnesses who testified to information that's not in the 302.

16    THE COURT:  Everything has been provided with regard

17  to this witness?

18    MS. BERNSTEIN:  You've got all of our *Brady* and

19  *Giglio* and *Jencks*.

20    THE COURT:  It's denied as moot based on the

21  affirmative representation of the government.

22    MR. FLEMING:  I won't belabor the point, but I guess

23  the indication would be whether Agent Bezak is aware of

24  information that perhaps Ms. Bernstein is not.

25    THE COURT:  The affirmative representation is coming

JOSE HOLMES, JR. - Cross

1  from Ms. Bernstein, and clearly by implication that includes

2  Agent Bezak.

3           **MS. BERNSTEIN:**  Yes, Your Honor.

4           **THE COURT:**  Sure.

5           **MR. FLEMING:**  Thank you, Judge.

6           (WHEREUPON, the following proceedings were held in

7  open court.)

8  **BY MR. HESSLER:**

9  **Q.**   Mr. Holmes, you stated that on one occasion yourself

10  walked across the Danziger Bridge and walked to the Foot Locker

11  and you were with -- were you with anybody else?

12  **A.**   I was always with my uncle and my cousin Leonard.

13  **Q.**   Okay.  You were always with your uncle and your cousin

14  Leonard --

15  **A.**   Whenever we --

16  **Q.**   -- when you walked to the Foot Locker?

17  **A.**   Whenever we crossed over the bridge.

18  **Q.**   Okay.  How many times did you walk with your cousin and

19  Uncle Leonard to the Foot Locker during that time?

20  **A.**   I don't remember.

21  **Q.**   More than once certainly, huh?

22  **A.**   Yes, sir.

23  **Q.**   Okay.  And -- and it's a long ways away?

24  **A.**   Yes, sir.

25  **Q.**   But you -- but the three of you all continually walked

JOSE HOLMES, JR. - Cross

1  back and forth to the Foot Locker several times?

2  **A.**   I don't know exactly how many times we went.

3  **Q.**   Did you count how many times you did that?

4  **A.**   No, sir.

5  **Q.**   Did you -- were you pushing anything when you were going

6  up there?

7  **A.**   No, sir.

8  **Q.**   Now -- one second -- on one occasion -- let me ask you

9  this:  Did you meet Mr. Brissette at the hotel while you were

10  just hanging around the hotel?

11 **A.**   No, sir.

12 **Q.**   How is it that you came across meeting Mr. Brissette?

13 **A.**   We was crossing the bridge one day and he was on the other

14 side of the bridge.

15 **Q.**   Okay.  Now, there's a lot of things on the other side of

16 the bridge.  You were crossing the bridge to go back to the

17 Foot Locker; right?

18 **A.**   I don't know.

19 **Q.**   Do you remember in March of 2009, telling Mr. Bezak that

20 you were walking back to the Foot -- walking to the Foot Locker

21 and during this trip you saw your friend James Brissette?

22 **A.**   I don't remember saying we was going to the Foot Locker.

23 I just remember saying that we saw him as we was crossing the

24 bridge.

25 **Q.**   Did you see him -- all right.

JOSE HOLMES, JR. - Cross

1              Now, you saw him crossing the bridge.  Did you see
2    him closer to the Foot Locker or closer to the bridge?
3    A.    We was walking up the bridge.
4    Q.    Walking up the bridge.
5              So did you continue your -- and you were walking down
6    the bridge?
7    A.    Yes, sir.
8    Q.    So you were walking to the Foot Locker again, walking down
9    on the downside of the Danziger Bridge?
10   A.    I don't know if we was headed to the Foot Locker again,
11   but I remember seeing James on the other side.
12   Q.    Did James accompany you back to the Foot Locker?
13   A.    James did go with us one time to the Foot Locker.
14   Q.    Okay.  And the Foot Locker was closed; right?
15   A.    You say was it closed?
16   Q.    Yes, sir.
17   A.    Everything was closed.
18   Q.    And you say Brissette was with two other gentlemen?
19   Brissette was with two other people?
20   A.    I don't remember exactly how many people he was with.
21   Some other guys.
22   Q.    Do you know why -- what happened, why Brissette wasn't
23   home with his family or anything like that?
24   A.    No.  He just said that he was rescued by them.
25   Q.    Did he ever tell you what happened to his family, or did

JOSE HOLMES, JR. - Cross

1   he ever try and leave and find his family or anything else?
2   A.   He just was worried about his mother the whole time.
3   Q.   Okay.  Now, you described Brissette as -- you knew him
4   what, two, two and a half years at that time?
5   A.   About that.
6   Q.   And you describe him as a good guy?
7   A.   Yes, sir.
8   Q.   Did you ever go over to his house?
9   A.   Yes, sir.
10  Q.   You knew his family?
11  A.   Well, his mama was -- she was always lying in the bed.
12  She was sick sometimes I'd go over there.
13  Q.   Okay.  Did he have brothers or sisters?
14  A.   I knew he had a sister, but I never met her.
15  Q.   Okay.  And you say he was worried about his mother?
16  A.   Yes, James was worried about his mother.
17  Q.   And she was a sickly woman?
18  A.   During that time I used go to the house she was sick.
19  Q.   You don't know how -- if she recovered by Katrina?
20  A.   Could you repeat that?
21  Q.   Do you know if she had recovered by the time Hurricane
22  Katrina had come?
23  A.   Neither one of us knew.  He was, you know, worried about
24  her.
25  Q.   I'm sorry?

JOSE HOLMES, JR. - Cross

1   A.   I said neither one of us knew.

2   Q.   All right.  But, nevertheless, he was not going out

3   looking for her, he was with you.  Instead of looking for his

4   mother, he stayed with you?

5   A.   When he -- when we -- when I saw him on the side of that

6   bridge, he tagged along with me, but he was constantly worried

7   about his mother.

8   Q.   Now, did you socialize with James?

9   A.   Could you repeat that?

10  Q.   Did you socialize with James?  Did you hang out with him?

11  A.   Yes, sir.

12  Q.   How often, like on a --

13  A.   I don't know.  I'd -- most of time I used to see him at

14  school when I was going to school with him.

15  Q.   Did you go out to parties with him or anything else?

16  A.   I wasn't into parties.

17  Q.   Did you ever know James to carry a gun?

18  A.   No.

19  Q.   Did you ever see him with a gun?

20  A.   No.

21  Q.   Do you believe he might have had a gun at any time during

22  the storm when he was around you?

23  A.   The James I know, he was a good person, never was into

24  stuff like that.

25  Q.   Okay.  Did you know James to drink alcohol?

JOSE HOLMES, JR. - Cross

1  A.   No, sir.

2  Q.   Did you see -- ever see James drink alcohol when you were

3  hanging around him?

4  A.   No, sir.

5  Q.   Were you around him 24/7 during the storm after you hooked

6  up with him?

7  A.   I don't remember.

8  Q.   Okay.  Did you ever see him drinking during the storm when

9  he was with you?

10 A.   No, sir.

11 Q.   Did you drink?

12 A.   No, sir.

13 Q.   If he was drinking alcohol, would you have known it?

14 A.   Yes, sir.

15 Q.   If he was carrying a gun, you may have known that too?

16 A.   Yes, sir.

17 Q.   And you nor James Brissette drank alcohol the night before

18 this incident?

19 A.   No.

20 Q.   Didn't drink alcohol the night-- the morning of the

21 incident?

22 A.   No, sir.

23 Q.   Now, the morning of the incident, and correct me if I'm

24 wrong, but Leonard Bartholomew -- yourself, Leonard

25 Bartholomew, III, Leonard Bartholomew, IV, Susan -- your Aunt

JOSE HOLMES, JR. - Cross

1   Susan and your niece [sic] Lesha -- or that's your sister?
2   A.   That's my cousin.
3   Q.   Your cousin.
4        -- and James, you all decided to go to the
5   Winn-Dixie?
6   A.   Yes, sir.
7   Q.   And who stayed behind at the house -- at the -- at the
8   Friendly Inn?
9   A.   My sisters, my nephew, my sister's boyfriend, my
10  grandmother.
11  Q.   All right.  And what were you all -- what exactly were you
12  going to get at the Winn-Dixie?
13  A.   We was going to get some Glucerna for my grandmother.
14  Q.   Some what?
15  A.   Glucerna.
16  Q.   Okay.  Were you all talking -- were you all going to leave
17  that day?  Were you going to get out -- get on the bus and get
18  out of there that day?
19  A.   Well, we didn't know exactly when they was going to come
20  back and rescue us.
21  Q.   What?
22  A.   We didn't know exactly when they was going to come back
23  and rescue us.
24  Q.   Well, they had -- did you know that they ever had buses --
25  or Budget trucks and police officers were shuffling people to

JOSE HOLMES, JR. - Cross

1    the Superdome?
2    A.    Didn't know about that.
3    Q.    You heard about the Superdome, didn't you?
4    A.    Yes, sir.
5    Q.    What did you hear about the Superdome?
6    A.    They was sending people over there to be rescued.
7    Q.    Okay.  Do you remember telling anybody that you all didn't
8    want to go to the Superdome because you heard about violence
9    there?
10   A.    No, sir.
11   Q.    Did your Aunt Susan ever tell you that you all were going
12   to be leaving that day, you all were getting out of town, you
13   all had to get out of town?
14   A.    No, sir.  We didn't know when we was going to be leaving.
15   Q.    Do you ever remember stating that -- that, "There was a
16   lot of people on the side of the bridge waiting on trucks to
17   come pick them up and bring them to the Superdome.  They had a
18   lot of violence going on out there.  My auntie said, 'We are
19   not going to go over there.'"  Do you remember saying that?
20   A.    I remember a lot of people waiting underneath the bridge
21   for some trucks to pick them up.
22   Q.    All right.  So after -- this was, like, six days after the
23   levees had broke when you're walking that morning; correct?
24   It's been a while, wouldn't you say so?
25   A.    Could you repeat that?

JOSE HOLMES, JR. - Cross

1   Q.   The morning of the shooting, it had been a good five or

2   six days since the levees had broke and the floodwaters came;

3   would you agree with that?

4   A.   Yes, sir.

5   Q.   And you were on -- on the roof of your -- or at your

6   auntie's house surrounded by water for several of those days

7   before you got rescued?

8   A.   I don't think I'd be able to survive on the roof for that

9   many days, but...

10  Q.   Well, I'm not -- I'm not saying you were on the roof the

11  entire time.  But, nevertheless, you were in a bad situation

12  for a couple of days there before you got rescued by the

13  police; would you agree?

14  A.   Yes, sir.

15  Q.   And you go to the Friendly Inn for a couple more days?

16  A.   Yes, sir.

17  Q.   All right.  Did they have food?

18  A.   Well, the National Guard was bringing, like -- like, army

19  meals, you had to warm them up in the bag.

20  Q.   Okay.  Did you have plenty of water?

21  A.   No, sir.

22  Q.   Did you get a lot of sleep?

23  A.   At night?

24  Q.   At night, yeah.  Did you get a lot of sleep at night?

25  A.   Yes, sir.

JOSE HOLMES, JR. - Cross

1  Q.   All right.  Now, on this Sunday morning, it was around
2  9:00 in the morning, early in the morning, and you had to walk
3  quite a long ways to get to the Winn-Dixie; wouldn't you agree?
4  A.   Yes, sir.
5  Q.   And at some point you and James Brissette decided to go
6  skipping up the bridge; is that correct?
7  A.   No, sir.  I remember us racing towards the bridge.
8  Q.   You didn't skip anywhere, you and James and your cousin?
9  A.   No, sir.  I just remember us walking and I challenged
10 James to a race towards the bridge.
11 Q.   Okay.  Who was present when you decided that you and James
12 were going to run down the street?
13 A.   It was my auntie, my uncle, my two cousins.
14 Q.   And where were you when you decided you all were going to
15 race?
16 A.   I don't remember.
17 Q.   And how far -- well, you decided you were going to race to
18 the foot of the bridge, I guess; right?
19 A.   Yes, sir.
20 Q.   And every race has an ending point?
21 A.   Yes, sir.
22 Q.   And there had to be a starting point.  So where was it?
23 A.   I don't remember.
24 Q.   Okay.  Was it -- I can't imagine you'd want to run a whole
25 long distance.

JOSE HOLMES, JR. - Cross

1   **A.**   I'm a very good runner.

2   **Q.**   I'm sorry?

3   **A.**   I said I'm a very good runner.

4   **Q.**   Okay.  James isn't, is he?

5   **A.**   I didn't find out until he lost the race.

6   **Q.**   So you don't have any clue whether it was 100 yards --

7   you're a good runner, you should be able to judge distance.

8   Was it 100-yard dash, was it --

9   **A.**   When I run, I just run a long ways.

10   **Q.**   Just run like Forrest Gump, run until you stop?

11   **A.**   I run like my daddy taught me.

12   **Q.**   Okay.  So how much distance did you put between you and

13   the rest of the group when you stopped at the base of the

14   bridge?

15   **A.**   I don't remember.

16   **Q.**   Was it from me to you?

17   **A.**   I don't remember.

18   **Q.**   Was it from me to the back of the -- from you to the back

19   of the room?

20   **A.**   I don't remember.

21   **Q.**   Why were you doing the race exactly?

22   **A.**   We was just having fun.

23   **Q.**   Well, you're a very good runner and you beat James

24   Brissette.  How much distance did you beat him by?

25   **A.**   I don't remember.

JOSE HOLMES, JR. - Cross

1          MS. BERNSTEIN:  I'm going to object to the relevance
2  to any additional questions on this topic.
3          THE COURT:  I think he's asked enough, but I do think
4  that it's relevant.  I'll overrule it on relevance, but I don't
5  know how much more you can ask about this.
6          MR. HESSLER:  I think I got one question, Your Honor,
7  and then I'm going to be moving on.
8  BY MR. HESSLER:
9  Q.   Regardless, you sat down, and we see it on video, you sit
10 down to take a breather and tie your shoe or something?
11 A.   Yes, sir.
12 Q.   How long did you wait for everybody to catch up, if you
13 recall?
14 A.   I don't remember.
15 Q.   Did you have anything with you to pack anything from the
16 Winn-Dixie in, a backpack, a knapsack or --
17 A.   I don't remember having any backpack or anything like
18 that.
19 Q.   You don't remember that either?
20 A.   No, sir.
21 Q.   Did anybody in the group, maybe you, or James, or anybody
22 else, have a backpack, a bag or anything else to put stuff in?
23 A.   I don't remember seeing anyone with a backpack.
24 Q.   And you were wearing a white T-shirt and red --
25 A.   Well, I know I had on some work or basketball shorts.

JOSE HOLMES, JR. - Cross

1  Q.   All right.  So when you begin to walk up the bridge,
2  who -- who all is with you?
3  A.   My auntie, my uncle, my two cousins, and James.
4  Q.   Okay.  How far up the bridge had you all walked?
5  A.   I don't remember exactly how far.
6  Q.   Did you see anybody else on the bridge?
7  A.   No, sir.
8  Q.   Did you see anybody in your area?
9  A.   No, sir.
10 Q.   When you were running or waiting, did you hear any
11 gunshots?
12 A.   No, sir.
13 Q.   Did you ever hear any gunshots that day?
14 A.   Yes, sir, when we was being shot at.
15 Q.   I'm sorry?
16 A.   Yes, sir, when we was being shot at on the bridge.
17 Q.   Prior to that, not all morning?
18 A.   No, sir.
19 Q.   Now, it was pretty quiet out there, wasn't it?  You didn't
20 have traffic running up and down the street and...
21 A.   Correct.
22 Q.   So it was pretty quiet?
23 A.   Yes, sir.
24 Q.   You heard a truck coming up behind you?
25 A.   No, sir.

JOSE HOLMES, JR. - Cross

1   Q.   You didn't hear that?
2   A.   No, sir.
3   Q.   You just heard what?
4   A.   Heard gunshots hitting the side of the bridge.
5   Q.   And you -- you knew immediately that was gunshots, didn't
6   you?
7   A.   Yes, sir.
8   Q.   Okay.  So what happened next?
9   A.   I remember my uncle getting us to hop over the walk
10  path -- the cement barrier to the walk path, and I laid down on
11  the ground.
12  Q.   So you all ran toward barrier?
13  A.   Yes, sir.
14  Q.   Somebody tell you to do that?
15  A.   Yes, sir, my uncle.
16  Q.   Okay.  And how far did you run -- did you take an
17  immediate right and then run, or did you run forward and jump?
18  A.   I don't remember.
19  Q.   Do you remember looking back to see what was going on?
20  A.   No, sir.
21  Q.   All right.  So when you ran had you been shot or did you
22  know if you were shot when you were running?
23  A.   Only time I felt when I got shot was when I lied down and
24  got struck in my arm.
25  Q.   When you jumped over the barrier, did you crouch down or

JOSE HOLMES, JR. - Cross

1  did you go into a prone position, a flat-out position?

2  A.   I just remember lying on my right side.

3  Q.   Lying on your right side?

4  A.   Yes, sir.

5  Q.   Do you recall if your head was to the base of the bridge

6  and your feet were to the top of the bridge or vice versa, or

7  do you remember?

8  A.   I just remember facing the barrier.

9  Q.   Facing the cement barrier or the railing and you can see

10 through the hand -- metal handrail?

11 A.   The cement barrier.

12 Q.   About how far was your face from this barrier, if you can

13 recall?

14 A.   I don't remember.

15 Q.   Were you pressed up against it to get some cover or

16 anything, or do you --

17 A.   I was trying to get cover, but I don't remember exactly

18 how close I was to it.

19 Q.   Okay.  And you don't know which way your head was?

20 A.   My head was facing towards the barrier.

21 Q.   Okay.  Now, did you hear anyone yelling commands at all?

22 A.   No, sir.

23 Q.   Did you hear anyone yell, "Don't move"?

24 A.   Yes, sir.

25 Q.   Who yelled, "Don't move" -- let me ask you this:  Was this

JOSE HOLMES, JR. - Cross

1  before somebody shot you in the stomach or after?
2  A.   It was during the shooting.  It was like --
3  Q.   During the shooting you hear commands?
4  A.   Yes, sir.
5  Q.   Let me ask you this:  Where -- in relation to where you
6  were, do you know where Susan was?
7  A.   No, sir.
8  Q.   Do you know where anybody else was in relation to where
9  you were?
10  A.   No, sir.
11  Q.   All right.  So when you're hearing these commands, "Don't
12  move," do you hear anybody say, "Put your hands up," or, "Let
13  me see your hands," or anything like that?
14  A.   No, sir, it sounded like they was referring to my uncle.
15  Q.   I'm sorry?
16  A.   It sounded like they was referring to my uncle.
17  Q.   Why would they be referring to your uncle?
18  A.   I guess he was moving.
19  Q.   Okay.  And he actually said something in response to those
20  commands, didn't he?
21  A.   It sounded like he was saying, "All right, all right, all
22  right."
23  Q.   "All right.  I'm sorry"?
24  A.   I just heard him say, "All right."
25  Q.   Now, tell me what happens next.

1   A.   Well, I remember getting struck in my arm and hearing my
2   family crying, yelling, and I remember getting shot in the
3   stomach twice.  And the gunshots stopped shortly after that.
4   Q.   Okay.  And after you got shot in your arm, you were lying
5   down when you realized you were shot in your arm; correct?
6   A.   Yes, sir.
7   Q.   And you were afraid to look up for some period of time;
8   would that be accurate?
9   A.   I just remember looking at the wall.
10   Q.   Okay.  When you did look up, or when you were able to see
11   something, what did you see?
12   A.   Kind of like a quick movement, like a shadow.
13   Q.   And then what?
14   A.   I saw the barrel of the gun pointed towards my stomach.
15   Q.   Okay.  And then what?
16   A.   And the person shot me twice.
17   Q.   Okay.  Did you see the person?  Were you able to see the
18   person?
19   A.   No.
20   Q.   You just saw a gun barrel stick over the railing and shoot
21   you?
22   A.   Yes, sir.
23   Q.   And he shot you twice?
24   A.   Yes, sir.
25   Q.   And this was at close range; right?

JOSE HOLMES, JR. - Cross

1  A.   Yes, sir.

2  Q.   Now, do you remember talking to Agent Bezak in March of

3  2009?

4  A.   I remember talking to Mr. Bezak.

5  Q.   And do you remember what you told Agent Bezak on that

6  date?

7  A.   No, sir.

8  Q.   Do you recall ever telling Agent Bezak that you, "Looked

9  up and saw a light-skinned male in a dark shirt run towards

10  you" -- "run towards him"?

11  A.   I don't remember.

12  Q.   You don't remember that ever happening?

13  A.   I don't remember saying that.

14  Q.   Do you remember that happening?

15  A.   I remember someone ran over and leaned over the barrier

16  and shoot me in my stomach.

17  Q.   Well, did you see -- well, I don't know.  Did you see a

18  shadow, did you see a barrel, did you see somebody run over

19  there, or did you see a light-skinned male in a dark shirt run

20  toward you?

21  A.   I just remember, like, a shadow came real quick and I saw

22  the barrel of the gun pointing towards my stomach.

23  Q.   Just like real quick, like this and back?

24  A.   I don't remember exactly how fast it was or how fast he

25  was running.

JOSE HOLMES, JR. - Cross

1    Q.    Okay.  So it happened real quick?
2    A.    Yes, sir.
3    Q.    But it was caught on video, wasn't it?
4    A.    Yes, sir.
5    Q.    And did the FBI or did the attorneys ever show you where
6    it happened -- how it happened?  Did they show you what
7    happened?
8    A.    Did I ever see the tape?
9    Q.    Uh-huh.
10   A.    Yes, sir.
11   Q.    Did they point out to you, "This is when you got shot"?
12   Were you able to see it finally?
13   A.    Yes.  I was able to see the video.
14   Q.    They showed you the video?
15   A.    Yes, sir.
16   Q.    And they pointed out to you where you got shot, didn't
17   they?
18   A.    I mean, it's a far distance from it.  It's the day that I
19   got shot, but you can't really tell exactly where I was or
20   anything like that.
21   Q.    Did they show you the guy with the shadow and all that?
22   A.    I just remember seeing somebody run up on the video and
23   shooting twice.
24   Q.    Okay.  But they showed you that video?
25   A.    Yes, sir.

JOSE HOLMES, JR. - Cross

1   Q.   Did they show you the shadow creeping up the wall?
2   A.   I can't really see it in the video.  Kind of hard to tell.
3   Q.   My question to you is:  Whether you saw it or not, did
4   they point out to you the shadow creeping up the barrier?
5   A.   No.  They did not focus on the shadow.
6   Q.   I'm not asking you if they focused on it.  I'm asking:
7   Did they point out to you the shadow creeping up the barrier?
8   A.   No, they did not point out a shadow.
9   Q.   Okay.  So you saw -- you saw this shadow?
10  A.   Yes, sir.
11  Q.   Nobody put that in your mind, you know what you saw?
12  A.   I remember someone running up quick and leaning over,
13  shooting at my stomach.
14  Q.   Do you remember that now?
15  A.   Yes, sir.
16  Q.   Did you remember that on March the 3rd of 2009?
17  A.   What was going on then?
18  Q.   When you were talking to Agent Bezak?
19  A.   Okay.
20  Q.   Do you remember it then?
21  A.   Yes, sir.
22  Q.   Okay.  Well, then certainly, you'd remember it even better
23  in November 15th of 2006, wouldn't you, even closer to the
24  incident?
25  A.   Yes, sir.

JOSE HOLMES, JR. - Cross

1   **Q.**   Okay.  And the way you remembered it then -- how did you

2   remember it then?  I'll ask you:  What did you tell the grand

3   jury under oath what happened to you on that date?

4   **A.**   I don't remember.

5   **Q.**   Let me see if I can refresh your recollection.  Do you

6   remember being asked --

7           **MS. BERNSTEIN:**  Objection to the form if he's

8   refreshing recollection.

9           **THE COURT:**  Show it to him, page and passage.  Show

10  it to him.

11          **MR. HESSLER:**  I will.  May I approach, Your Honor?

12          **THE COURT:**  Yes.  We're going to finish this line of

13  questioning and then we'll break for the day.

14  **BY MR. HESSLER:**

15  **Q.**   I'm going to ask you to read from here to here.

16  **A.**   Question --

17  **Q.**   No, no, no, no.  I'm sorry.  Read it to yourself.

18          **THE COURT:**  Read it to yourself and then he'll ask

19  you a question.

20          **MR. HESSLER:**  That's my fault.

21          **THE WITNESS:**  (WITNESS COMPLIES.)

22  **BY MR. HESSLER:**

23  **Q.**   Are you finished reading?

24          Do you remember being asked by an attorney during

25  your testimony in the grand jury:  "Do you remember seeing

JOSE HOLMES, JR. - Cross

1  anybody with a gun come towards you?"  Do you remember that
2  now?
3  A.   I remember someone ran up really quick and leaning over
4  and shooting me in my stomach.
5  Q.   Okay.  What -- when he ask -- did -- what answer did you
6  give under oath on that date to that question?
7  A.   It says that I said that he jumped over and cut loose.
8        MR. HESSLER:  Your Honor, may I approach?
9        THE COURT:  Yes.
10  BY MR. HESSLER:
11  Q.   Could you read your answer to the grand jury -- I mean, to
12  the jury?
13  A.   "A guy came and he shot me in my stomach and he jumped
14  over the cement thing and he cut loose."
15  Q.   Okay.  He jumped over the cement thing -- jumped over the
16  cement thing and cut loose.
17  A.   You know, I told the truth the best that I can to that
18  grand jury, and I'm telling the truth the best that I can now.
19  And what I remember is a guy running over and leaning over and
20  shooting me in my stomach.
21  Q.   Okay.  So then you remember the guy jumping over the
22  barrier and cutting loose?
23  A.   No, sir.  I remember a guy leaning over and shooting me in
24  my stomach.
25  Q.   Let me ask you a question, in case I misheard you, because

JOSE HOLMES, JR. - Cross

1   the next question, a grand juror says:  "Could you repeat
2   that"; is that correct?  It's right in front of you.
3   A.   Yes, sir.
4   Q.   And when you repeated that, what exactly did you say?
5   A.   "A guy jumped over the cement block and fired at my
6   stomach."
7   Q.   Thank you.
8           Now, did you see a guy crawl or jump over a barrier
9   about this size and shoot you in the stomach?
10  A.   No, sir --
11          MS. BERNSTEIN:  Objection.  The size of the barrier
12  is not in evidence and --
13          THE COURT:  Well, why don't we -- I'll sustain the
14  objection.  Let's establish, if you can, through a question --
15  I knew we'd get to this point when we got into this line of
16  questioning.  So let's talk about the barrier.  And let's
17  finish this line of questioning and then we'll break.
18  BY MR. HESSLER:
19  Q.   Mr. Holmes, approximately how tall was that barrier you
20  were hiding behind?
21  A.   I don't know.  I didn't have a measuring stick.
22  Q.   Okay.  That's why I'm asking approximate.
23  A.   Three feet maybe.  I'm not sure.
24  Q.   Did you ever see an officer, or anybody else armed with a
25  rifle, jump over an approximate 3-foot concrete barrier and

shoot you in the stomach?
**A.** I just remember a guy running over and leaning over and shooting me in my stomach.
**Q.** My answer -- my question, though: Did you ever see a guy jump over a 3-foot -- approximately 3-foot high concrete barrier and cut loose, shooting you in the stomach?
**A.** No, sir. But in that grand jury statement, I told the truth as best I can, and now I'm telling the truth as best I can now. And what I saw was a -- someone ran over, leaned over and shot me in my stomach.
**Q.** All right. But the truth is the truth. It doesn't change, does it?
**A.** No, sir.
**Q.** So I guess the question that they got to answer, and I need to know is: What is the truth? Did he jump over and cut loose and shoot you, did he lean over, was it a shadow? That's what I'm trying to get at.
**A.** What I remember is someone leaning over and shooting me in my stomach?
**Q.** And you remembered that after you -- after the FBI and the attorneys showed you the video; right?
**A.** No, sir.
**Q.** Now, tell me about --
**THE COURT:** Is this a new line of questioning?
**MR. HESSLER:** Not really, but we could stop here.

1        **THE COURT:**  Well --

2        **MR. HESSLER:**  We can stop and I'll --

3        **THE COURT:**  Is this a breaking -- a logical breaking

4    point in your line of questioning?

5        **MR. HESSLER:**  Yes.

6        **THE COURT:**  Okay.  All right.  Let's do that then.  I

7    appreciate your patience.  We went a few minutes over.  In the

8    meantime, please don't discuss the case amongst yourselves,

9    please don't discuss it with anyone else, and please be aware

10   that you are to refrain from viewing or reading anything that

11   discusses this case.  If you all could do that.

12            And then I certainly wish you a good evening.

13   And we will start at 8:30 tomorrow morning on the dot.

14            Thank you.

15       **THE DEPUTY CLERK:**  All rise.

16       (WHEREUPON, the jury exited the courtroom.)

17       **THE COURT:**  Sir, you can step down.  If you could be

18   up here at 8:30 in that chair, Mr. Holmes.

19            A couple of things here.  You all have got to

20   confer, and I'm going to call you up here to talk about it --

21   it's not pertinent to his testimony, but --

22       **MR. DESALVO:**  Could we give him the instruction

23   first?

24       **THE COURT:**  Yes.  Mr. Holmes, please do not discuss

25   your testimony with anyone between now and tomorrow morning.

1    Do you understand that?  Not with the government lawyers, not

2    with Mr. Bezak or anyone with his office, not with anyone else.

3    Do you understand that?

4              **THE WITNESS:**  Yes, sir.

5              **THE COURT:**  Please do not discuss it with anyone

6    until you're up here at 8:30, and then we'll ask you some more

7    questions.  Okay?

8              **THE WITNESS:**  Yes, sir.

9              **THE COURT:**  Thank you, Mr. Holmes.

10             **MR. DESALVO:**  Thank you, Your Honor.

11             **THE COURT:**  Okay.  We had some time today that,

12   again, was expended on this videotape issue, and I think it's

13   pretty apparent that that whole issue could have been avoided

14   such that it could have been handled the way that it ultimately

15   was.  So I'm going to expect you all to communicate with each

16   other a little better with regard to what you have planned for

17   the future witnesses.

18             If you can anticipate an issue, I think by now

19   you all know what the other side might be concerned about or

20   what might be worthwhile discussing, please do it before the

21   person's on the witness stand and before the jury's in the box.

22             I know the idea is, "Well, I don't want to cast

23   my bread upon the water.  I don't want somebody else to know

24   what I'm going to do."  But you know what?  We're at trial now,

25   and the time for that really has come and gone.  It's time to

1  get the case presented to the jury.  So I'm going to expect you

2  to do that so that this can be a lot more efficient than it was

3  this morning.

4          Is there anything else to cover on the record?

5          **MS. BERNSTEIN:**  Nothing for the government, Your

6  Honor.

7          **MR. FLEMING:**  No, Judge.

8          **MR. DESALVO:**  No, Your Honor.

9          **THE COURT:**  All right.  Then let's go ahead -- off

10 the record.

11                    **(OFF THE RECORD)**

12         (WHEREUPON, the proceedings were adjourned for the

13 day.)

14                        *****

15                    <u>**CERTIFICATE**</u>

16         I, Jodi Simcox, RMR, FCRR, Official Court Reporter

17 for the United States District Court, Eastern District of

18 Louisiana, do hereby certify that the foregoing is a true and

19 correct transcript, to the best of my ability and

20 understanding, from the record of the proceedings in the

21 above-entitled and numbered matter.

22

23

                          S/ Jodi Simcox, RMR, FCRR
24                        Jodi Simcox, RMR, FCRR
                          Official Court Reporter

25