UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | Docket 10-CR-204 |
| | * | |
| versus | * | Section N |
| | * | |
| KENNETH BOWEN | * | New Orleans, Louisiana |
| ROBERT GISEVIUS | * | |
| ROBERT FAULCON | * | June 30, 2011 |
| ANTHONY VILLAVASO | * | |
| ARTHUR KAUFMAN | * | 8:30 a.m. |

* * * * * * * * * * * * * * * * *

VOLUME VI of XXVII
JURY TRIAL BEFORE THE
HONORABLE KURT D. ENGELHARDT
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the United States: U.S. Attorney's Office
BY: THEODORE CARTER, ESQ.
500 Poydras Street
New Orleans, Louisiana 70130

For the United States: U.S. Department of Justice
Civil Rights Division
BY: BARBARA BERNSTEIN, ESQ.
601 D Street NW
Office PHB 5123
Washington, D.C. 20004

For the United States: U.S. Department of Justice
Civil Rights Division
BY: CINDY K. CHUNG, ESQ.
950 Pennsylvania Avenue NW
Washington, DC 20530

APPEARANCES:

For Kenneth Bowen: FRANK G. DESALVO, APLC
829 Baronne Street
New Orleans, Louisiana 70113

For Robert Gisevius: ERIC J. HESSLER, ESQ.
700 Camp Street
New Orleans, Louisiana 70130

For Robert Faulcon: PAUL C. FLEMING JR., ESQ.
2821 Kingman Street
Suite C
Metairie, Louisiana 70006

For Robert Faulcon: King Krebs & Jurgens, PLLC
BY: LINDSAY A. LARSON III, ESQ.
201 St. Charles Avenue
45th Floor
New Orleans, Louisiana 70170

For Anthony Villavaso: DeSalvo Blackburn & Kitchens, LLC
BY: ROGER W. KITCHENS, ESQ.
2802 Tulane Avenue
New Orleans, Louisiana 70119

For Anthony Villavaso: TIMOTHY A. MECHE, ESQ.
700 Camp Street
New Orleans, Louisiana 70130

For Arthur Kaufman: STEVEN D. LONDON, ESQ.
1100 Poydras Street
Suite 2950
New Orleans, Louisiana 70163

APPEARANCES:

Official Court Reporter:        Jodi Simcox, RMR, FCRR
                                500 Poydras Street
                                Room HB-406
                                New Orleans, Louisiana 70130
                                (504) 589-7780

Proceedings recorded by mechanical stenography; transcript
produced by computer.

**I N D E X**

| | Page |
|---|---|
| JOSE HOLMES, JR. | |
| Cross-Examination By Mr. Hessler | 9 |
| Cross-Examination By Mr. Meche: | 22 |
| Cross-Examination By Mr. Desalvo: | 36 |
| Redirect Examination By Ms. Bernstein: | 41 |
| JOSH VICKNAIR | |
| Direct Examination By Mr. Carter: | 54 |
| Cross-Examination By Mr. Fleming: | 59 |
| LESLIE GOLDSMITH | |
| Direct Examination By Ms. Chung: | 62 |
| Cross-Examination By Mr. Fleming: | 68 |
| IGNATIUS HILLS | |
| Direct Examination By Mr. Carter: | 79 |
| Cross-Examination By Mr. Hessler: | 138 |
| Cross-Examination By Mr. Desalvo: | 175 |
| Cross-Examination By Mr. London: | 191 |
| Cross-Examination By Mr. Meche: | 198 |
| Redirect Examination By Mr. Carter: | 218 |
| TAJ MAGEE | |
| Direct Examination By Ms. Bernstein: | 230 |
| Cross-Examination By Mr. Hessler: | 271 |
| Cross-Examination By Mr. Desalvo: | 303 |
| Cross-Examination By Mr. Meche: | 317 |
| Cross-Examination By Mr. Fleming: | 332 |
| Redirect Examination By Ms. Bernstein: | 336 |

**PROCEEDINGS**

**(June 30, 2011)**

**(MORNING SESSION)**

******

**(COURT CALLED TO ORDER)**

**THE DEPUTY CLERK:** All rise.

**THE COURT:** Counsel, are we prepared or --

**MS. BERNSTEIN:** We have a real quick question.

(WHEREUPON, the following proceedings were held at the bench.)

**MS. BERNSTEIN:** This should not be in the hearing of the witness.

**THE COURT:** Okay. You all can't wait until 8:30 with questions. It's time to bring the jury in.

**MS. BERNSTEIN:** We have just consulted with Eric about whether he intended to ask certain questions of this witness. There are two issues that have come up. One is Jose testified in the grand jury that he has an older brother who told him one time that the older brother had a gun that Jose never saw. I would object to any questioning along those lines. The brother was not at the hotel. He wasn't there after. He has nothing to do with the case.

The other issue relates to the sister's boyfriend, Jerome Green -- or I forget his first name --

**MR. HESSLER:** Ernest.

**MS. BERNSTEIN:** Ernest -- who was at the hotel. He, I believe, has a criminal record. And, you know, I know that we've talked and I have no objection to Eric asking this witness whether Jerome or Ernest, whatever his name is, whether you saw him with a gun after the storm, whether he had a gun in the hotel, or any of those things.

But I do object -- the one question that we argued about Eric said he planned to ask, "What do you think of him, generally, of this guy Green," and I object to that. I don't think it's relevant, and I don't want to have to stand up and object.

**MR. HESSLER:** Right. And he expressed his opinion on James Brissette being a good guy, in his opinion. This person was with him during the storm, his opinion of this guy, who was also a good guy. I think it goes to explain to the jury a little bit his ability to judge character.

**THE COURT:** Uh-huh.

**MS. BERNSTEIN:** Can I respond to that one?

Because James Brissette's character is an issue. This is a murder case where he has been accused of being of the first aggressor.

**MR. HESSLER:** It's not the character of the individual, it's the ability of the witness.

**MS. BERNSTEIN:** That's simply trying to backdoor inadmissible evidence about somebody who has nothing to do with

the case.

**THE COURT:** I'm inclined to overrule on that one. But let me get back to the first one, because I'm more concerned about that one.

Eric, do you want to respond to the first issue?

**MR. HESSLER:** The first issue, I think I told her I wasn't bringing it up unless he answered that Mr -- that the brother was actually with him at the hotel, which I don't think is the case. I'm not bringing it up if he answers no.

**THE COURT:** I agree. We get far afield if --

**MR. HESSLER:** Your Honor, I'm not going to do it, and I explained that to her.

**MS. BERNSTEIN:** I'm sorry.

The first one, just so I understand so I don't object improperly, what -- is Mr. Hessler allowed to ask about this other guy? He's not going to be allowed to inquire into his criminal record, is he?

**THE COURT:** No, especially if he's not at the hotel. I don't see where it's relevant.

**MS. BERNSTEIN:** The --

**MR. HESSLER:** Second gentleman, Mr. Green.

**MS. BERNSTEIN:** Yes, Mr. Green --

**THE COURT:** He's going to ask his -- I think the point that he was going to ask was what he thought of him, and to the extent that he's expressed opinions about others,

including Brissette, and this is about a person who was at the hotel with them --

**MR. HESSLER:** Correct.

**THE COURT:** -- I'm going to allow him to go ahead and ask that question, but not to recite a criminal record.

**MR. HESSLER:** Well, he knows -- he knows of this gentleman's conviction and he knows he's on active probation at the time he's in that hotel room, and his opinion of that guy is he's a good fellow.

**MS. BERNSTEIN:** Which is fine. His criminal record -- I mean, if they want to call Green to the stand, if he has an impeachable conviction, they can call Green, they can say, "Did you have a gun in the hotel," and they can impeach him with this conviction. But it's totally improper to impeach a witness who isn't here.

**MR. HESSLER:** It's not for impeachment, Your Honor. It's to show his --

**THE COURT:** I'm going to let him ask that. I'm going to let him ask that.

**MS. BERNSTEIN:** About the criminal record?

**THE COURT:** What he knows. Ask him what he knows.

**MR. HESSLER:** Yes, sir.

**THE COURT:** All right.

(WHEREUPON, the following proceedings were held in open court.)

**THE COURT:** Let's bring in the jury.

**THE DEPUTY CLERK:** All rise.

(WHEREUPON, the jury entered the courtroom.)

**THE COURT:** All right. You may be seated. Sorry about the delay for a few minutes.

Mr. Holmes, you are still under oath. Between the time the jury left the room yesterday and this very moment, have you discussed your testimony with anyone?

**THE WITNESS:** No, sir.

**THE COURT:** Okay. You've not met with anyone and discussed anything about what you said yesterday or about what you might be asked today?

**THE WITNESS:** No, sir.

**THE COURT:** Okay. Good.

Mr. Hessler was asking you some questions. We'll pick up where we left off.

(WHEREUPON, **JOSE HOLMES, JR.**, having been previously duly sworn, testified as follows.)

THE DEPUTY CLERK: Please state your full name and correct spelling for the record.

**CROSS-EXAMINATION**

**BY MR. HESSLER:**

**Q.** Good morning, Mr. Holmes.

**A.** Good morning.

**Q.** Mr. Holmes, yesterday when we left off, as I recall, we

were speaking about the manner and way in which you got shot.

**A.** Yes, sir.

**Q.** Okay. And just -- you stated -- you did state to the grand jury in 2006 that a guy jumped over a cement thing and cut loose; correct?

**A.** Yes, sir.

**Q.** That he jumped over a cement thing.

And it was a male; correct?

**A.** Yes, sir. But I remember him leaning over and shooting me in my stomach.

**Q.** We're going to get to that.

You do remember that it was a male back in 2006 that jumped over; correct?

**A.** Yes, sir.

**Q.** Was that male white or black?

**A.** I'm not sure.

**Q.** In 2006, when he jumped over the barrier, was he shooting from -- shooting with his -- with a shoulder -- gun on his right shoulder or left shoulder?

**A.** Sir, I don't remember. All I remember is someone leaning over and shooting me in my stomach.

**Q.** We're talking about in 2006.

**A.** That's what I remember.

**Q.** That's what you remember today?

**A.** Yes, sir.

**Q.** All right. Well, tell me what happened today. Your memory as -- from today, tell me what happened on that day, on September 4th, 2005.

**A.** During that part?

**Q.** Yes. Yes, sir.

**A.** Okay. I remember, like, the shadow of a guy running over and leaning over and shooting me in my stomach.

**Q.** Okay. All you remember is a shadow?

**A.** Yes, sir.

**Q.** All right. How is it that you know this shadow was of a guy?

**A.** I kind of figured it because I heard a guy voice talking.

**Q.** So you don't know if it was a guy or a female; right?

**A.** Correct.

**Q.** Did somebody tell you that it was a guy?

**A.** No, sir.

**Q.** All right. How many times have you met with the FBI in preparation for your testimony today?

**A.** I don't remember.

**Q.** You don't remember?

**A.** No, sir.

**Q.** Was it more than five?

**A.** Don't remember.

**Q.** More than ten?

**A.** Don't remember.

**Q.** More than 20?
**A.** I don't remember.
**Q.** How many times did they show you the video of this event?
**A.** I'm not sure. Maybe once or twice.
**Q.** Was it the same days or of different days, or do you remember?
**A.** I don't remember.
**Q.** Okay. Now, in March of 2009 -- do you remember then, 2009?
**A.** Is that when I was talking to Mr. Bezak?
**Q.** That was one of the times you were talking to Mr. Bezak, yeah. You've talked to him more than that time, haven't you?
**A.** I don't remember.
**Q.** Do you remember talking to Mr. Bezak within the last two weeks?
**A.** Yes, sir.
**Q.** Okay. How many times in the last two weeks did you talk to Mr. Bezak?
**A.** Maybe once. I'm not sure.
**Q.** What about Ms. Bernstein?
**A.** Maybe once.
**Q.** You're not sure?
**A.** I'm not sure.
**Q.** Now, in March of 2009, when you talked to Mr. Bezak, you told him you saw a light-skinned male in a dark shirt.

**A.** I don't remember.

**MR. HESSLER:** Your Honor, may I approach?

**THE COURT:** Yes, sir.

**BY MR. HESSLER:**

**Q.** I'm going to show you what's marked or what's identified as a 302, dated March 27, 2009, taken by William Bezak. Is that your name at the top?

**A.** Yes, sir.

**Q.** And on page 2, the very last paragraph, does it say that you saw a light-skinned male lean over the barrier in a dark shirt and shoot you twice in the stomach?

**A.** Yes, sir.

**Q.** Okay. Did that happen?

**A.** I just remember someone running over and leaning over and shooting me in my stomach.

**Q.** Okay. Now, when you see shadows, you don't see them in color, do you?

**A.** No, sir.

**Q.** So in 2009, when you talked to Mr. Bezak, you saw colors because you saw a light-skinned male and you saw a dark-colored shirt; right?

**A.** I told the truth the best that I can to Mr. Bezak at that time.

**Q.** When the male leaned over the barrier -- well, would you stand up for me?

**A.** (WITNESS COMPLIES.)

**Q.** You've got a barrier in front of you right now, don't you?

**A.** I guess. It's wood.

**Q.** Okay. We'll pretend it's concrete. Would you demonstrate to the jury how that shadow or that light-skinned male leaned over and shot you?

**A.** I just remember seeing a gun leaning over, the barrel of the gun.

**Q.** Now, that's all you remember today is all you saw was a barrel of a gun?

**A.** I saw a shadow come real quick, and I saw a barrel of a gun coming toward me.

**Q.** So you can't demonstrate to the jury how this shadow person --

**A.** I mean, I can get on the ground and look at a wall and actually point to where the gun was pointing at me.

**Q.** Well, I want to know what you saw. I want to see if you can describe looking up, if that's what you were doing, what you saw.

**A.** I was looking towards the barrier, I glanced up, I saw, like, a shadow moving real quick, and I saw a gun approach my stomach.

**MS. BERNSTEIN:** Your Honor, he's asking him to show what he saw, and the witness has just said he was lying on the ground. So if he wants him to show what he saw, he could lie

 on the ground and show what position he was in.

**THE COURT:** Well, I understood the question to ask him to demonstrate what the person that he saw was doing -- or the shadow of the person that he saw was doing. So -- and maybe this isn't the best place to do it because, as the witness said, he's on the witness stand and he's actually not at a barrier. He's in the little three-sided box of the witness stand. So I don't know whether he can demonstrate it from there or not.

**MR. HESSLER:** Your Honor, I think he made it quite clear that he apparently can't demonstrate it.

**THE COURT:** Well -- you can be seated, sir. Thank you, Mr. Holmes.

We can cover that on redirect, unless, Mr. Hessler, you want to ask him -- I just think it's probably not something you can do within the witness stand.

**THE WITNESS:** I'll --

**THE COURT:** I think he answered the question, but I don't think it's something that the witness stand lends itself to, if I understood what you were asking him to do.

**MR. HESSLER:** I'll move on.

**BY MR. HESSLER:**

**Q.** So you definitely saw the barrel of the gun?

**A.** Yes, sir.

**Q.** And you say it was a rifle?

**A.** Yes, sir.

**Q.** How far away was this barrel of the rifle to your stomach when it was fired?

**A.** I'm not sure. I just know that it was really close.

**Q.** I'm sorry?

**A.** I said I'm not sure how far it was. I just know that it was close to my stomach.

**Q.** Was it really close, was it somewhat close, was it three feet? I don't know what close means to you. I'm kind of close to you right now.

**A.** Close enough for me to see it.

**Q.** Okay. Was it a foot away from your stomach?

**A.** I don't remember.

**Q.** Two feet?

**A.** I don't know.

**Q.** Three feet?

**A.** I don't know.

**Q.** Twenty feet?

**A.** I don't know.

**Q.** But you do know there were two shots fired?

**A.** Yes, sir.

**Q.** How do you know that?

**A.** Because I heard it.

**Q.** Okay. Did you see the flash come from the barrel, or you just heard shots?

**A.** I heard shots.

**Q.** Well, you heard a whole bunch of shots too, didn't you?

**A.** Well, during that time when the guy leaned over, I heard two shots.

**Q.** All right. How many times were you struck in the stomach?

**A.** From when he leaned over, twice.

**Q.** You got shot twice in the stomach?

**A.** Yes, sir.

**Q.** Now, you've been in New Orleans all your life, correct, up until you moved to Georgia?

**A.** Yes, sir.

**Q.** Now, to me, when you say a light-skinned guy, are you talking about a person of color, or are you talking about a white guy that's whiter than -- or we got -- just where did the light-skinned individual come from, the description "light-skinned"?

**A.** Is this just pertaining to the bridge incident or just in general?

**Q.** Well, I'd like to talk about the bridge incident first.

**A.** I told you what I remember, what I saw.

**Q.** I understand that. But you told me three different things of what you remembered and what you saw.

**A.** Okay.

**Q.** So I'm talking about when you remembered the time that you saw a light-skinned male in a dark-colored shirt. I'm talking

about that time.

**A.** I just remember a guy -- of a shadow just coming over, leaning over and shooting me in my stomach.

**Q.** You saw the rifle?

**A.** Yes, sir.

**Q.** Do you remember this rifle? Is that something you'd remember?

**A.** Just know it had a long barrel.

**Q.** Do you remember if it had a wooden stock or it was all black or wooden and metal?

**A.** No.

**Q.** And how close were you to the wooden barricade -- I mean, not the wooden -- the concrete barricade? How close to it were you, if you recall?

**A.** I don't know. I was maybe pretty close to it. I'm not sure.

**Q.** Would it be fair to say you were closer to the concrete barrier than you were to the metal handrail?

**A.** I'm not sure.

**Q.** You're sure you know who Eugene Green is; correct?

**A.** Sr. or Jr.?

**Q.** Well, both.

**A.** Yes, sir.

**Q.** Okay. Who is Eugene Green, Sr.?

**A.** That is my sister's baby daddy now.

**Q.** How old is he?
**A.** He's about to turn 30.
**Q.** About to turn 30.
And Eugene Green -- the other Eugene Green, who is that?
**A.** That's my nephew.
**Q.** That's Jr.?
**A.** Yes, sir.
**Q.** So Eugene Green, Jr. And how old is he?
**A.** He is six years old.
**Q.** Okay. What do you know about Eugene Green, Sr.?
**A.** I know he was always very nice to me, very cool to me. He treated me like a brother.
**Q.** And he was with you during the storm; correct?
**A.** Yes, sir.
**Q.** You respected Eugene Green?
**A.** Yes, sir.
**Q.** You looked up to him?
**A.** No, sir.
**Q.** Why not?
**A.** Because I had my own goals in life.
**Q.** Okay. What is it -- but you described him as a very nice guy, or a nice guy?
**A.** Yes, he was very nice towards me.
**Q.** And you looked up to him?

**A.** No, sir.
**Q.** No? Why is that?
**A.** Because I was doing my own things, like I'm -- I want to play in the NBA and go to college.
**Q.** All right. You knew other things about Mr. Green?
**A.** Yes, sir.
**Q.** Like what?
**A.** Well, I knew that he was my sister's boyfriend at the time, and some things he didn't do right.
**Q.** Such as?
**A.** He used to sell drugs on the street.
**Q.** And he was staying with you and your family at the hotel?
**A.** Yes, sir.
**Q.** And you looked up to him? You said that.
**A.** No, sir.
**Q.** You said that a little while ago before this. You said you looked up to him.

**MS. BERNSTEIN:** Objection. Mischaracterizes the testimony three times.

**THE COURT:** Yes. I think you've already asked him this and he's answered it.

**MR. HESSLER:** Yes, sir, Your Honor.

**BY MR. HESSLER:**

**Q.** Did Mr. Green, was he -- where was he the morning you left -- you left the hotel?

**A.** He still was at the hotel.

**Q.** Do you recall what he was wearing that day?

**A.** No, sir.

**Q.** Do you recall what Leonard Bartholomew, Jr., was wearing that day?

**A.** No, sir.

**Q.** The shadow of the person that shot you as you described it today, did you ever see that shadow again?

**A.** I seen lots of shadows.

**Q.** Did you see a person after -- a light-skinned person up there that looked like the person that shot you?

**MS. BERNSTEIN:** Objection. He said a bunch of times that what he remembers seeing is a shadow, and the question about whether he has seen that shadow again is an unfair question.

**MR. HESSLER:** I'll withdraw that question.

**BY MR. HESSLER:**

**Q.** You also said a bunch of times that you saw a light-skinned male shoot you.

**A.** All I remember is seeing a shadow, someone leaning over and shooting me in my stomach.

**MR. HESSLER:** Your Honor, I don't have any further questions.

**THE COURT:** All right. Thank you.

Mr. Meche, you're going next?

**MR. MECHE:** Yes, sir.

**CROSS-EXAMINATION**

**BY MR. MECHE:**

**Q.** Good morning, Mr. Holmes. My name is Tim Meche. I just have to ask you a few questions. If I speak too fast or you don't understand something, feel free to let us know and I'll restate the question.

If I can direct you to the video. It's Exhibit 300. I'll start and show you a little bit, and I'm going to ask you a couple of questions about it. I think you identified this person running as you that day; is that correct?

**A.** Yes, sir.

**Q.** And this was when you were actually in a race with your friend James?

**A.** Yes, sir.

**Q.** And you look like you're kind of beating him pretty bad. He's not anywhere in the picture. Is that correct?

**A.** Yes, sir.

**MR. MECHE:** Can you pause it, please?

**(VIDEO PAUSED)**

**BY MR. MECHE:**

**Q.** And you stopped right here. I think you said you stopped to tie your shoe; is that correct?

**A.** Yes, sir.

**Q.** Okay. Where would James have been, approximately, when

you did this?

**A.** I don't know.

**Q.** Was he within sight of you, or was he so far away that you couldn't even see him?

**A.** I don't remember.

**Q.** You don't remember?

**A.** No, sir.

**Q.** Okay. And the others in your group, I think you said the people who left with you that morning were also your Aunt Susan; is that correct?

**A.** Yes, sir.

**Q.** And who else?

**A.** My Uncle Leonard, my cousin Little Leonard, and my cousin Lesha.

**Q.** And where would they have been when you were right here tying your shoe?

**A.** I don't know.

**Q.** You don't even know?

**A.** No.

**Q.** You couldn't even see them?

**A.** I don't remember.

**Q.** I'm sorry?

**A.** I said I don't remember.

**Q.** Okay. Do you remember ever being with them around that time?

**A.** Well, I know they -- we all caught up eventually on the bridge.

**Q.** Okay.

**THE COURT:** The jury's not seeing the video.

**MR. MECHE:** The jury's not seeing the video?

**THE COURT:** They should be.

**MR. MECHE:** Well, they should be.

**MR. CARTER:** It's on the screen.

**THE COURT:** All right. Now, it's on the juror's screen. Okay.

**MR. MECHE:** Have you all -- I'm sorry, I don't want to talk to the jury.

**THE COURT:** No, no, wait. It's not on the big screen but it's on these screens?

**THE JUROR:** It's on there now.

**MR. MECHE:** But it wasn't earlier?

**THE COURT:** It's not on the big screen.

**MR. MECHE:** Apparently, they didn't see it earlier. I thought they were watching.

**THE COURT:** Let's go back. It's still not on the big screen. We'll try to get it on the big screen, but since they can see it, it's one we've already shown yesterday --

**MR. MECHE:** That's fine.

**THE COURT:** So let's go ahead and ask questions --

**THE JUROR:** Your Honor, this one doesn't have it.

**THE JUROR:** None of us have it.

**THE COURT:** Oops. Is that on your screen in the jury box?

**THE JUROR:** No.

**THE COURT:** Mr. Meche, do you need to show him more of that video as we go?

**MR. MECHE:** The total amount of footage is going to be about 58 seconds I'm going to show him.

**THE COURT:** All right. I don't think we need to go back and show -- the video that he's asking him about is the picture of him running and stopping to tie his shoe. Was that not correct?

**MR. MECHE:** Yes, Your Honor. I'd like the jury to see it as he described it. It's just 58 seconds.

**THE COURT:** Fair enough, if we can get it working. I don't have anything on my screen either here. Here we go. Do you all have that in the jury box? Okay. Good.

**(VIDEO PLAYED)**

**BY MR. MECHE:**

**Q.** Okay, Mr. Holmes, I think you said that's you racing James?

**A.** Yes, sir.

**Q.** But he's not anywhere in the picture?

**A.** Correct.

**Q.** He's not anywhere around?

**A.** He's behind me somewhere.

**Q.** Will you pause it, please?

Okay. That's where you stopped, I think, to tie your shoe. How long did you sit there -- did you sit there and wait for people, or did you, after you tied your shoe, go on by yourself?

**A.** I don't remember.

**Q.** I'm sorry?

**A.** I said I don't remember.

**Q.** Okay. That's fair.

And I think you said you had left with your Aunt Susan and the other members of the group, but once again, they don't appear to be anywhere around; is that correct?

**A.** They were behind me.

**Q.** Okay. But -- could you see them?

**A.** I don't remember.

**Q.** Okay. Can you keep showing it, please?

**(VIDEO PLAYED)**

**BY MR. MECHE:**

**Q.** And you don't remember how long you just sat there?

**A.** No, sir.

**Q.** Okay. Incidentally --

**MR. MECHE:** Can you pause it, please?

**(VIDEO PAUSED)**

**BY MR. MECHE:**

**Q.** While you were out there running, did you hear gunshots in the background or anything?

**A.** No, sir.

**Q.** Okay. Now, I think you said you grew up in the Ninth Ward, so it wasn't unusual for you to hear gunshots. Could it have been a situation where there was gunfire and you just didn't pay any attention to it?

**A.** I mean, you pay attention to gunfire, but it was like normal. You always hear it.

**Q.** So because it was normal for you to hear that, maybe there was gunfire and you just didn't pay any attention to it?

**A.** No, I'm sure I would have paid attention to it.

**Q.** Okay. So you don't think there was gunfire that morning in the area?

**A.** Only when we got on the bridge.

**Q.** I understand.

**MR. MECHE:** Can you keep rolling it, please?

**(VIDEO PLAYED)**

**MR. MECHE:** Pause it, please.

**(VIDEO PAUSED)**

**BY MR. MECHE:**

**Q.** These individuals, it looks like they're pushing a shopping cart. Would that be your Aunt Susan?

**A.** I can't really tell.

**Q.** Okay. Well, I mean, did you encounter other people that morning in the area pushing shopping carts?

**A.** No, sir.

**Q.** Okay. Have you been shown this video before when you met with Ms. Bernstein and Mr. Bezak?

**A.** Yes, sir.

**Q.** Do you remember seeing this part of the video?

**A.** Yes, sir.

**Q.** Do you remember them asking you whether or not that was your Aunt Susan?

**A.** Yes, but I couldn't identify them.

**Q.** And now nobody -- it appears to be two individuals here. It doesn't appear that anybody's around them; is that correct?

**MS. BERNSTEIN:** Objection to him describing what's on the video.

**MR. MECHE:** Your Honor, he's on cross.

**THE COURT:** Yeah, but this isn't his vantage point. The video -- this image speaks for itself in terms of what it depicts. Your question is, "Does he see anyone else in this particular image?" Is that what you're inquiring? Why don't you go ahead and rephrase the question.

**BY MR. MECHE:**

**Q.** Well, I mean -- are you saying today to the jury that this is not your Aunt Susan, because it's obvious no one else is around her?

**MS. BERNSTEIN:** Objection. That's not what he said.

**MR. MECHE:** I'm asking him if he's saying that.

**THE COURT:** I'm going to overrule. He can answer that.

**THE WITNESS:** Could you repeat the question?

**BY MR. MECHE:**

**Q.** Is the reason you're telling the jury now that you don't know that this is your Aunt Susan -- because, obviously, no one else is anywhere around them, including yourself?

**A.** I mean, it's too blurry. You don't have a closeup on them. You cannot tell who actually it is.

**Q.** But you don't recall seeing anyone else that morning pushing a grocery cart.

**A.** I don't remember us having a grocery cart.

**Q.** So you don't believe your Aunt Susan had a grocery cart?

**A.** I don't remember.

**MR. MECHE:** Keep rolling it, please.

**(VIDEO PLAYED)**

**BY MR. MECHE:**

**Q.** So you don't know where you would have been when these people are walking, pushing a grocery cart?

**A.** No, sir.

**Q.** Okay.

**MR. MECHE:** Thank you, sir. Just run it through.

**(VIDEO PLAYED)**

**MR. MECHE:** Okay. That's good. Thanks.

**(VIDEO STOPPED)**

**BY MR. MECHE:**

**Q.** When you got to West Jefferson Hospital, you described how you were operated on. Were you in intensive care unit treatment for a while?

**A.** Yes, sir.

**Q.** For about how long; do you know?

**A.** I'm not sure. It could have been a month.

**Q.** How long were you in the hospital all together?

**A.** Probably two and a half months.

**Q.** Okay. Now, your Aunt Susan and the rest of the Bartholomew family, were they there the whole time you were there?

**A.** No. They wound up leaving before me.

**Q.** Okay. How long were they there about?

**A.** I don't remember.

**Q.** Okay. So there was a time where you were by yourself in the hospital; is that correct?

**A.** Yes, sir.

**Q.** Did anybody come visit you during that time?

**A.** I had NOPD come visit me when I was in rehab.

**Q.** Any relatives or friends?

**A.** I had my uncles and my other cousins come visit me.

**Q.** Okay. The Bartholomews?

**A.** No, sir.
**Q.** Not the Bartholomews?
**A.** No, sir. It was my Uncle Jerome and his sons and his daughter, my Auntie Raquel, my Uncle Richard, and my cousin Kenise?
**Q.** Now, you had a girlfriend at the time?
**A.** Yes, sir.
**Q.** Is that the same girlfriend you have now?
**A.** No.
**Q.** Okay. But your girlfriend at the time, would she come visit you?
**A.** No, sir.
**Q.** Okay. Would you talk to her on the phone?
**A.** Yes, sir. Well, I couldn't talk, but I could listen to her voice.
**Q.** Right. Now, whose phone would you use to talk to her?
**A.** It was the hospital phone.
**Q.** Okay. Now, you indicated you established a relationship with a nurse named -- you said Nurse Robyn; is that correct?
**A.** Yes, sir.
**Q.** Do you know her to be Nurse Robyn Iseman?
**A.** I just remember a first name.
**Q.** I understand.
And you indicated she did special things to help you get better; is that fair to say?

**A.** Yes, sir.

**Q.** She would bring you things, like, you know, books and paper to color and draw and things like that?

**A.** She actually did, brought me some pencil and crayons and stuff to draw with.

**Q.** She wanted you to do that because that would help you get better using your hands and arms and things like that?

**A.** I guess she wanted me to have something to do because I was just so depressed.

**Q.** And she would talk to you a good bit about being depressed and things like that?

**A.** Yes. She assigned me, like, a counselor or something like that to come see me every week, and he would talk to me.

**Q.** And it's fair to say that out of all the people at the hospital, you became closest to her?

**A.** I wouldn't say that.

**Q.** Who would you have been closest to?

**A.** Probably the whole rehab center.

**Q.** Who would that have been?

**A.** I don't remember all their names.

**Q.** Do you remember anybody's name?

**A.** Nathaniel, Shawn, Raven, and Christina.

**Q.** But now Nurse Robyn, she would even get your girlfriend on the phone on her cell phone sometime and let you talk to her?

**A.** I don't remember ever talking to her on the cell phone.

**Q.** Okay. Do you remember a time after your Uncle Leonard was released from the hospital and had moved to Georgia or somewhere one day he came back to see you? Do you remember that day?
**A.** No, sir.
**Q.** Okay. Do you remember being told by someone that you were going to be arrested?
**A.** Yes, sir.
**Q.** Who told you that?
**A.** It was someone in rehab.
**Q.** Okay. You don't remember your Uncle Leonard coming and telling you that?
**A.** No, sir.
**Q.** Do you -- when you learned you were going to be arrested, how did that make you feel?
**A.** Scared.
**Q.** And did you talk to anybody about that?
**A.** No, sir. It -- it just -- I guess because I wasn't talking to them, and they started getting a little upset with me because they thought I -- know I didn't want to be bothered with them, but I was just depressed. And they were like, "We want you to get better because, you know, you'll get arrested when you're released from the hospital." So they wanted me to be strong.
**Q.** Do you remember talking to Nurse Robyn about that?

**A.** No. I just remember her be saying I was shooting at helicopters.

**Q.** Do you remember telling Nurse Robyn that you had a gun on that bridge?

**A.** I could not talk at the time.

**Q.** Not my question, sir. Do you remember telling Nurse Robyn at any point that you had a gun on that bridge?

**A.** I never had a gun on the bridge, sir.

**Q.** That's not my question sir. Do you remember telling Nurse Robyn -- it's okay. You can tell us.

**A.** I mean, I never talked to her about a gun on the bridge.

**Q.** So it's your testimony that you did not tell Nurse Robyn that you had a gun on that bridge?

**A.** I did not tell her that I had a gun on the bridge.

**Q.** Did you tell Nurse Robyn that all of you had guns on that bridge?

**A.** I never talked to Nurse Robyn about a gun.

**Q.** Okay. Now, Ms. Bernstein had you describe in detail your injuries and how it affects you. Did you leave anything out?

**A.** Not that I know of.

**MR. MECHE:** Can you all pull up Exhibit 53, please?

**BY MR. MECHE:**

**Q.** Okay. Now, you had indicated that's you when you got to the hospital?

**A.** Yes, sir.

**Q.** And these people around you, do you know who they were?
**A.** Doctors.
**Q.** The doctors who operated on you?
**A.** I don't know. They just was there to help me.
**Q.** They saved your life?
**A.** Yes, sir.
**Q.** But you sued them afterwards, didn't you?
**A.** We tried to.
**Q.** Why did you do that?
**A.** They left a sponge in my body.
**Q.** Does that affect you at all?
**A.** It affected me when I was in the hospital.
**Q.** And what happened to that lawsuit?
**A.** I believe my lawyer dropped it because it was at a state of emergency or something like that.
**Q.** Thank you.

You've also filed a lawsuit, I think, against the City of New Orleans?
**A.** I don't remember. Did I? I don't remember.
**Q.** Do you not have a lawsuit presently pending as a result of the shooting?
**A.** I'm not sure. I just know that once this is over that I might have a civil lawsuit from me getting shot.
**Q.** Well, you have a lawyer; right?
**A.** Yes, sir.

**Q.** And he was actually here in the courtroom when you testified, wasn't he?
**A.** Yes, sir.
**Q.** And that's the lawyer representing you, but you don't know that he's representing you in a lawsuit?
**A.** He doesn't really tells me everything.
**Q.** Okay.
**MR. MECHE:** Thank you, sir.
**THE COURT:** All right. Any other cross? Mr. DeSalvo?
**MR. DESALVO:** Yes, sir.

**CROSS-EXAMINATION**

**BY MR. DESALVO:**

**Q.** Good morning, Mr. Holmes.
**A.** Hello.
**Q.** How are you?
**A.** Good.
**Q.** Mr. Holmes, I'm Frank DeSalvo, and I represent one of the defendants in this case. I have to ask you some questions.
**A.** Okay.
**Q.** You understand that, huh?
**A.** Yes, sir.
**Q.** One of the things that puzzled me a little bit is that when you were being questioned by Mr. Hessler, you indicated that gunfire and violence don't -- didn't bother you then. Do

you remember saying that?

**A.** Yes, sir. I remember saying that when we was at the other hotel.

**Q.** Is it something that bothers you now?

**A.** I mean, if it's right next to me, then, I mean -- if it's something like what happened on the bridge, then, yes, it would bother me.

**Q.** And life is different. You're no longer living in the hood?

**A.** No, sir.

**Q.** And you no longer have to function like you functioned in the hood; is that correct?

**A.** I function the same that I always functioned.

**Q.** When this happened you were out of school?

**A.** I was in a GED program.

**Q.** You were in a GED program at the time.

And how old were you?

**A.** Nineteen.

**Q.** And how old were you when you dropped out of high school?

**A.** I could have been 18.

**Q.** And what grade were you in?

**A.** Tenth or eleventh grade.

**Q.** You listed all the people who came to visit you when you were in the hospital, and one of them wasn't your mother?

**A.** No, sir.

**Q.** Where was she?

**A.** My mother actually did come visit me when I went to the 18th floor one time. Her, my father, and my little brothers, and my older brother, and my younger sister.

**Q.** Let me ask you: When you dropped out of high school, did you have a job?

**A.** Yes, sir.

**Q.** And where were you working?

**A.** McDonald's.

**Q.** And was there a reason why you dropped out?

**A.** Well, we didn't have a lot of money coming in the household, so I needed clothes, shoes, and to help my grandmother with the bills, so I had to get a job.

**Q.** Now, on the date of this incident when you were walking up the bridge, the first thing you heard was an engine of a vehicle approaching from behind; isn't that correct?

**A.** I don't remember hearing the engine.

**Q.** You don't remember hearing an engine?

**A.** No, sir.

**Q.** Do you ever remember telling Agent Bezak that the first thing you knew you heard was the engine from a vehicle approaching from behind?

**A.** No, sir.

**Q.** You never told him that?

**A.** I don't remember telling him that.

**Q.** You don't remember telling him that or you never told him that?
**A.** I don't remember ever telling Mr. Bezak that.
**Q.** Do you remember telling him that you heard several pops behind you and heard bullets strike the bridge?
**A.** I remember telling him that bullets were striking the bridge.
**Q.** And the barrier, the barrier on the side of the bridge?
**A.** Yes, sir.
**Q.** And the barrier would be that cement barrier that we've been talking about?
**A.** Yes, sir.
**Q.** So you actually heard bullets striking that barrier?
**A.** Yes, sir.
**Q.** But you didn't see who fired them?
**A.** Could you repeat that?
**Q.** You didn't see who fired those bullets into that barrier?
**A.** No, sir.
**Q.** But you knew they were being fired in there because you heard them?
**A.** Yes, sir. It was so close to us.
**Q.** Now, you indicated that you never told Nurse Iseman, Nurse Robyn, that you all had guns?
**A.** Yes, sir.
**Q.** Do you recall that?

And you don't know of any reason why Nurse Isemann would make up a story like that, do you?

**A.** I'm not sure she would make up that, but all I remember is her telling me I was shooting at helicopters.

**Q.** Do you know who William Johnson is?

**A.** No, sir.

**Q.** William Johnson was the person in the back of the ambulance with you from EMS from Winnsboro?

**A.** I remember meeting him a couple of days ago.

**Q.** Do you recall telling him that there were two other people with guns?

**A.** No, sir.

**Q.** And that you got -- you got caught in the cross-fire?

**A.** No, sir.

**Q.** You don't remember telling him that?

**A.** No, sir.

**Q.** Do you know of any reason why he would lie?

**A.** I mean, I don't really know him, but he was very emotional when he saw me.

**Q.** He was?

**A.** Yes, sir.

**Q.** And you weren't?

**A.** Yes, sir, I was.

**Q.** You were too?

Would there be any reason why you would have made up

that story for -- with William Johnson?

**A.** No, sir.

**Q.** Any reason why he would make it up?

**A.** No, sir, but I -- you know, I don't actually know him.

**MR. DESALVO:** No further questions.

**THE COURT:** Okay. Anybody else? Mr. Fleming?

**MR. FLEMING:** I have no questions of Mr. Holmes, Your Honor.

**THE COURT:** And Mr. London, you also have no questions?

**MR. LONDON:** No questions.

**THE COURT:** Redirect?

**MS. BERNSTEIN:** Yes, Your Honor.

**REDIRECT EXAMINATION**

**BY MS. BERNSTEIN:**

**Q.** Good morning, Jose.

**A.** Good morning.

**Q.** I want to start where we just left off. You were just asked some questions about an ambulance driver and you said something about meeting him just the other day; is that right?

**A.** Yes, ma'am.

**Q.** Do you know the name of the guy you're talking about who you met just the other day?

**A.** I don't remember.

**Q.** Can you tell the jury what happened with this guy that

you're talking about?

**A.** We pulled up at the hotel and he was standing there, and he was loading up his stuff. And he asked, "Is that Jose?" And they was like, "Yeah." And he hugged me and he lifted me off the ground. I got kind of scared, but he was -- he was crying and so emotional, and he was saying he never seen anyone able to still function after being shot so many times, and he said God has me here for a reason.

**Q.** Did that happen just here in New Orleans?

**A.** Yes, ma'am.

**Q.** And you said you don't know the guy's name?

**A.** No, ma'am.

**Q.** Was it your understanding that he was somebody who had testified here in this trial?

**A.** Yes, ma'am.

**Q.** And that's who you were just talking about when you were answering Mr. DeSalvo's questions?

**MR. FLEMING:** Objection. Leading.

**THE COURT:** Well, I think --

**BY MS. BERNSTEIN:**

**Q.** Who were you talking about when you were just answering Mr. DeSalvo's questions? What guy did you have in your mind?

**A.** The guy that I met in New Orleans at the hotel.

**Q.** Jose, Mr. Hessler asked you yesterday whether you finished your GED program that you had started before the shooting.

**A.** Yes, ma'am.

**Q.** And you said no; right?

**A.** Yes, ma'am.

**Q.** What interrupted your GED program?

**A.** Hurricane Katrina and me getting shot on the bridge.

**Q.** How seriously do you take your oath here today, Jose?

**A.** Very seriously.

**MR. DESALVO:** Objection, Your Honor. That's not relevant. Self-serving.

**THE COURT:** He's already answered it. I'm going to go ahead and admit the answer. So let's go ahead and proceed.

**BY MS. BERNSTEIN:**

**Q.** If you're not positive of an answer here in court, what has your answer been?

**A.** I'm not sure. I don't remember.

**Q.** All right. I'd like to ask you to estimate a couple of things, and if you're not positive, just tell us if you're not positive. Okay?

**A.** Okay.

**Q.** All right. There are a couple of topics that I want to follow up on. You were asked some questions about how many times you met with Agent Bezak and/or with me. Do you remember those questions?

**A.** Yes, ma'am.

**Q.** When was the first time that you met with Agent Bezak?

**A.** It was sometime in Augusta. I'm not sure. It was probably some years ago.

**Q.** That was in Augusta, Georgia?

**A.** Yes, ma'am.

**Q.** Was I there also?

**A.** I remember meeting up with both of you all.

**Q.** Okay. And you were asked some questions and shown a report about an interview that took place in 2009?

**A.** Yes, ma'am.

**MR. HESSLER:** Object to leading, Your Honor.

**THE COURT:** Yes. Let's not lead the witness. That is a leading question. I'll sustain it.

**BY MS. BERNSTEIN:**

**Q.** Do you remember being shown a report of an interview with the FBI?

**A.** Yes, ma'am.

**Q.** It doesn't matter. You said you met with -- you met with the FBI in Augusta. When -- what year did you say that was?

**A.** They said it was '09.

**Q.** Okay. When was the next time that you met with anybody from the federal government?

**A.** I don't remember.

**Q.** Was it close in time to that, or was it a long time later?

**A.** It was sometime later, but I don't remember.

**Q.** Okay. And did you meet with anybody in preparation for

trial here?

**A.** Yes, ma'am.

**Q.** Where did you have those meetings?

**A.** In New Orleans.

**Q.** And you were asked a question about how many times you met with the FBI in the last two weeks. Do you remember that?

**A.** Yes, ma'am.

**Q.** When was the last time you met with the FBI?

**A.** It was this week.

**Q.** And before that, did you have another meeting?

**A.** Yes, ma'am.

**Q.** When was that?

**A.** I'm not sure.

**Q.** Was it days or weeks or months before that?

**A.** It could have been weeks, maybe a month. I'm not sure.

**Q.** Okay. You were asked some questions about how far away from you the barrel of the gun was. Do you remember those questions?

**A.** Yes, ma'am.

**Q.** And you said -- well, tell us what you do remember. Without trying to estimate the distance in numbers, can you show us how far away you think the gun was?

**A.** I'm not sure. It just was close to me.

**Q.** Okay. You were asked some questions yesterday about what kind of bag you packed to go to your auntie's. Do you remember

those questions?

**A.** Yes, ma'am.

**Q.** On the way to the Winn-Dixie on the day of the shooting, did you have a bag with you?

**A.** No, ma'am.

**Q.** Did you have any bag?

**A.** I don't remember a bag.

**Q.** Did you have a backpack?

**A.** No, ma'am.

**Q.** Did James have a backpack?

**A.** I don't remember anyone having a backpack.

**Q.** No one in the group?

**A.** No, ma'am.

**Q.** Mr. Hessler asked you yesterday if James Brissette ever left the hotel to go look for his family. Do you remember that?

**A.** Yes, ma'am.

**Q.** What was James doing on the day of the shooting?

**A.** James -- I just remember us racing, and he was always worried about his mother. He wanted to go and check on his mother.

**Q.** He was going to check on his mother?

**A.** Yes, ma'am.

**Q.** Did he ever find his mother?

**A.** He never got a chance to.

**Q.** Why not?
**A.** Because we got shot on the bridge.
**Q.** Mr. Hessler asked you yesterday -- this is going to be a long question. Mr. Hessler asked you yesterday whether it was only after the FBI showed you the video that you said a man leaned over the wall and shot you in the stomach. Do you remember that question?
**A.** Yes, ma'am.
**Q.** And you said that I talked to the FBI for the first time in Georgia?
**A.** Yes, ma'am.

**MR. HESSLER:** Your Honor, may we approach?

**THE COURT:** Yes.

(WHEREUPON, the following proceedings were held at the bench.)

**MR. HESSLER:** Can they hear us?

This is a very critical distinction. I asked him was it only after he spoke to the FBI that he saw the shadow, because clearly he said, when he spoke to the FBI, he saw the guy lean over. Only now does he say the shadow. That is a complete inaccurate description of what I said and the question I asked. And it's so contrary that -- that, I mean, it's improper. And that is an improper question, and it is not accurately reflective of what I said.

**THE COURT:** I'll give you a chance to respond, but

here's my concern, and I said this yesterday when we began court.

When you're quoting another lawyer or quoting testimony the jury has heard, the only way for us to determine exactly what somebody said is to go back and look at it in the transcript. Otherwise, we get into, "Well, I heard him say this," and, "I heard him say that."

The jurors remember the testimony and they remember the questions. I really wish you all would not -- if you want to ask him a question about a topic, direct him to that line of questioning and then ask your own question. The problem is characterizing other people's questions that can only be verified on the transcript.

**MS. BERNSTEIN:** Let me explain a couple things on that. First of all, after yesterday's warning, I was trying to be very careful to write down the questions very carefully. This particular instance, I don't think it's -- I don't think it's important enough to go back and look, and I -- I don't really care that much about this particular instance.

But as a general rule, when the questioning on cross is about a very specific allegation that the defense is making, it's necessary to go back and have the witness on the redirect respond to a very specific allegation.

Like I said, in this particular case, I don't know that I'm that concerned about it. But out of respect for

what the Court was saying yesterday, during cross-examination I would actually write down the quotes in order to be sure to come back and ask the question correctly.

**THE COURT:** I don't doubt that you're a good note-taker. The problem is the transcript is the best source of what actually was asked, and there's going to be a dispute over how the question was phrased. You may well have written it precisely as it appears in the transcript.

The problem is that the only way that I can resolve those disputes when it's raised is to go back to the transcript, as we did yesterday morning, which is time consuming.

Look, overall, we're interested in his factual testimony. We want to know what he knows. We don't need to parse words on the questions we're asking. We need to know what he knows.

**MR. HESSLER:** But the question she asked when she's quoting me is important that it's accurate, and that is a complete inaccurate --

**THE COURT:** I'm agreeing with you. I'm agreeing with you, Mr. Hessler. I'm agreeing with you. What I'm suggesting is if we can direct him to the line of questioning, without quoting Mr. Hessler, other than saying Mr. Hessler asked you questions about such and such, here's my question, and then ask him your own question.

But to quote another lawyer at this point begs the question of precisely what appears on the transcript.

**MS. BERNSTEIN:** Do you have any objection then to me asking him, "Did anybody tell you to say that?"

**THE COURT:** That's a fine question. I don't have any problem with that.

**MR. HESSLER:** You better define "that."

**MS. BERNSTEIN:** Of course.

(WHEREUPON, the following proceedings were held in open court.)

**BY MS. BERNSTEIN:**

**Q.** I want to go back to the line of questioning, Jose, about whether anybody told you to say that you saw somebody lean over the barrier.

**A.** No, ma'am.

**Q.** Did anybody ever tell you to say that?

**A.** No, ma'am.

**Q.** Did anybody ever tell you to say you saw a shadow?

**A.** No, ma'am.

**Q.** What instructions were you given from the government?

**A.** To always tell the truth and defend the truth.

**Q.** You were asked some questions today about a lawsuit, and you said you have a lawyer. Is that right?

**A.** Yes, ma'am.

**Q.** Can you explain to the jury what you understand about the

civil suit, about the lawsuit?

**A.** I just know that, you know, after this I might have a civil lawsuit if we win this.

**Q.** What do you expect to -- what do you --

**MR. MECHE:** I'm sorry. I didn't hear the last statement he said. He said, "after this" --

**THE WITNESS:** If -- if we're able to win this, you know, if they get prosecuted, that we might have a civil lawsuit.

**BY MS. BERNSTEIN:**

**Q.** What's your understanding of what a civil lawsuit is?

**A.** I guess defend my rights.

**Q.** Did you file any papers? Did you write any papers for a civil lawsuit?

**A.** I don't remember, no.

**Q.** Who took care of that?

**A.** My lawyers most likely.

**Q.** You were asked some questions today about Eugene Green. That was your sister's boyfriend at the time?

**A.** Yes, ma'am.

**Q.** Why didn't you look up to Eugene?

**A.** Well, he -- we didn't used to do the same stuff. I had my own goals in life.

**Q.** Eugene was in the hotel room with you guys after the storm?

**A.** Yes, ma'am.
**Q.** Did you ever see him with a gun?
**A.** No, ma'am.
**Q.** Did you see anybody in either of those hotel rooms with a gun?
**A.** No, ma'am.
**Q.** Was Eugene with you on the bridge?
**A.** No, ma'am.
**Q.** Did anybody with you on the bridge have a gun?
**A.** No, ma'am.
**Q.** Did anybody with you on the bridge shoot a gun at police?
**A.** No, ma'am.
**Q.** Mr. Hessler asked you yesterday about the police yelling, "Don't move." Do you remember those questions?
**A.** Yes, ma'am.
**Q.** Did you hear that before or after the shots started?
**A.** It was after the shots started.
**Q.** Before or after you ran -- jumped over the wall?
**A.** After I jumped over the wall.
**Q.** I'm sorry?
**A.** After I jumped over the wall.
**Q.** Before or after you laid down on the ground?
**A.** After I laid down on the ground.
**Q.** Before or after you got shot?
**A.** After I got shot.

**Q.** Before or after your family started crying?
**A.** After my family was crying.
**Q.** When you heard, "Don't move," where were you?
**A.** I was still lying on my side on the walk path.
**Q.** Did you hear anyone respond?
**A.** I heard my uncle saying, "All right, all right, all right."
**Q.** Did you hear any more shots after that?
**A.** Yes, ma'am.
**Q.** Which shots?
**A.** I remember getting shot in my stomach.
**Q.** What were you doing when you were shot?
**A.** Just lying there, hoping to survive.

**MS. BERNSTEIN:** Thank you. No further questions.

**THE COURT:** All right. Thank you, sir. You can step down, Mr. Holmes.

**MR. FLEMING:** Judge, we'd ask that the witness remain available subject to the order of sequestration.

**THE COURT:** Mr. Holmes, in the meantime, please do not discuss your testimony with anyone associated with this trial, including attorneys for the government, or anyone else, for that matter, because you may be recalled later in the trial. Okay?

**THE WITNESS:** Yes, sir.

**THE COURT:** Do you understand that?

**THE WITNESS:** Yes, sir.

**THE COURT:** Good. Thank you, Mr. Holmes.

**THE WITNESS:** You're welcome.

**THE COURT:** Who's next?

**MR. CARTER:** The government calls Josh Vicknair to the stand.

**THE COURT:** Mr. Vicknair, Josh Vicknair.

**MS. BERNSTEIN:** Your Honor, may I be excused for one moment?

**THE COURT:** Yes.

Mr. Vicknair, if you'd come forward, please. When you get to this chair, remain standing until you take the oath, and then you may be seated.

(WHEREUPON, **JOSH VICKNAIR**, having been duly sworn, testified as follows.)

**THE DEPUTY CLERK:** Please state your full name and correct spelling for the record.

**THE WITNESS:** Joshua Vicknair, J-O-S-H-U-A, V-I-C-K-N-A-I-R.

**DIRECT EXAMINATION**

**BY MR. CARTER:**

**Q.** Mr. Vicknair, where do you work?

**A.** West Jefferson Medical Center.

**Q.** What do you do there?

**A.** I'm a nurse anesthetist.

**Q.** What's a nurse anesthetist?
**A.** We provide the anesthetic for surgical procedures.
**Q.** How long have you worked there?
**A.** Off and on for about seven years.
**Q.** How long have you been a nurse anesthetist?
**A.** Three years.
**Q.** What were you before that?
**A.** A registered nurse.
**Q.** What's the difference?
**A.** To become a nurse anesthetist, you're a registered nurse first, and then you attend a graduate level anesthesia program for another three years.
**Q.** Let me direct you back to September of 2005. Where were you working then?
**A.** West Jefferson.
**Q.** And were you a registered nurse then?
**A.** Yes, sir.
**Q.** Do you remember treating a patient named Leonard Bartholomew?
**A.** Yes, sir.
**Q.** When was that?
**A.** It was at that time right after Hurricane Katrina.
**Q.** Right after Hurricane Katrina?
**A.** Uh-huh.
**Q.** What are your duties as a registered nurse, generally?

Generally.

**A.** Sure. It was a critical care unit, the CCU, so you do pretty much full care for a patient, vital signs, provide medications, assess their health status.

**Q.** As a registered nurse, do you take any notes of what you do regarding a patient?

**A.** Yes, sir.

**Q.** What are those notes called?

**A.** Just the nurse's notes. It's a chart, write down the daily events, things that happen.

**Q.** Let me show you what we've marked as Government's Exhibit No. 243 and ask if you can identify that document.

**A.** This is the nurse's notes for September 7th through the 8th for Mr. Bartholomew.

**Q.** Who wrote those notes?

**A.** This is my handwriting.

**Q.** You wrote those notes?

**A.** Yes, sir.

**MR. CARTER:** Your Honor, I offer Government's Exhibit 243 into evidence.

**THE COURT:** Any objection?

**MR. FLEMING:** No objection.

**THE COURT:** All right. So ordered. 243 is admitted.

**MR. CARTER:** Let's display Exhibit 243.

**BY MR. CARTER:**

**Q.** Please tell the jury what these notes tell us.

**A.** Let's see, in the beginning of the note there was some instructions that I was giving to the patient about care for his wounds.

**Q.** Again, who's the patient?

**A.** Leonard Bartholomew.

**Q.** Okay.

**A.** Then it also talks about the bullet being removed from his head at the bedside by Dr. Culicchia.

**Q.** Were you present when the bullet was removed?

**A.** I was.

**Q.** What else does this tell us?

**A.** It says that Dr. Culicchia removed the bullet. He passed it on to me. I put it into a specimen cup with the patient's label on it, and then it ended up into -- onto the desk of the unit director, Leslie Goldsmith's desk.

**Q.** You said you put a label on it. Would it have been a label similar to the apparent label at the bottom?

**A.** Yes, sir.

**Q.** What did you do with that specimen cup?

**A.** Put the bullet in the container, put a lid on the container, put a sticker on it. Then the house supervisor contacted the New Orleans Police Department to let them know that we had it, and then it went onto her desk in her office.

**Q.** Is that reflected in your notes?
**A.** Yes.
**Q.** Who is the house supervisor?
**A.** Her name is Roland. I'm not sure of the last name.
**Q.** Okay. There seems to be a reference in your notes to a Leslie Goldsmith.
**A.** Yes, sir.
**Q.** Who is Leslie Goldsmith?
**A.** She was the unit director.
**Q.** Did that -- what did you do with that bullet? After you put it in the specimen cup, what did you do with it?
**A.** I put it on her desk.
**Q.** On whose desk?
**A.** Leslie Goldsmith's desk.
**Q.** From the time that bullet left Mr. Bartholomew's head -- you were present for the procedure?
**A.** Yes, sir.
**Q.** -- to the time it reached Leslie Goldsmith's desk, did it leave your sight?
**A.** No, sir.

**MR. CARTER:** One moment, Your Honor.

**THE COURT:** Sure.

**MR. CARTER:** I have nothing further, Your Honor.

**THE COURT:** Cross? Mr. Fleming?

**CROSS-EXAMINATION**

**BY MR. FLEMING:**

**Q.** Good morning, Mr. Vicknair. Because I would do a worse job than Mr. Carter, I'm not going to try to pronounce the name of your current occupation.

**A.** Okay.

**Q.** You were there when the bullet was removed from Mr. Bartholomew, as you indicated?

**A.** Yes, sir.

**Q.** And they actually removed the bullet during some type of TV interview with Mr. Bartholomew?

**A.** It wasn't during the TV interview. They interviewed Dr. Culicchia afterwards.

**Q.** Your progress notes do reflect that the bullet was put in the specimen cup with patient during interview by Channel 2. Is that still in front of you?

**A.** Yes.

**Q.** Do you not remember that?

**A.** Yeah. No, I was trying to find the spot you were talking about. As far as the TV interview went, it was after the procedure, and Dr. Culicchia had the bullet in the specimen cup in his hand.

**Q.** Okay. You talked to the FBI at some point?

**A.** I think it was about a year ago.

**Q.** Let's back up. You were there when the bullet was removed

from Mr. Bartholomew?
**A.** Yes.
**Q.** You put it in a cup?
**A.** Yes.
**Q.** And then you put the cup on Ms. Goldsmith's desk?
**A.** Well, before it went to Ms. Goldsmith's desk, it went back to Dr. Culicchia's hand until he did the TV interview. It went back to me. Then it went to the house supervisor's possession, Ms. Roland. She contacted the police department. I thought she was going to take it, but since the police department was supposed to come pick it up from our unit, she gave it back to me, and then it went to Leslie Goldsmith's desk.
**Q.** You, personally, put it on Ms. Goldsmith's desk?
**A.** Yes.
**Q.** You didn't give it to Ms. Goldsmith; right?
**A.** No, I put it on her desk.
**Q.** She had left earlier that day?
**A.** I don't know where she was.
**Q.** And you didn't sit at Ms. Goldsmith's desk until the item was picked up, did you?
**A.** No.
**Q.** You said you gave this back to the doctor so he could do the TV interview?
**A.** Yes.
**Q.** You didn't put this bullet in some type of cabinet or

anything like that?

**A.** No, it was on the desk.

**Q.** And you didn't lock it up in a cabinet, though; right?

**A.** No, sir.

**MR. FLEMING:** Thank you. No further questions.

**THE COURT:** Okay. Any other cross?

Redirect?

**MR. CARTER:** No questions.

**THE COURT:** All right. Thank you, sir. You may step down.

**THE WITNESS:** All right.

**THE COURT:** Who's next?

**MS. CHUNG:** The government calls Leslie Goldsmith, Your Honor.

**THE COURT:** Ms. Goldsmith, come forward, please. Ma'am, when you get to this chair, remain standing until you take the oath, and then you may be seated.

(WHEREUPON, **LESLIE GOLDSMITH**, having been duly sworn, testified as follows.)

**THE DEPUTY CLERK:** Please state your full name and correct spelling for the record.

**THE WITNESS:** My name is Leslie Goldsmith, L-E-S-L-I-E, G-O-L-D-S-M-I-T-H.

**DIRECT EXAMINATION**

**BY MS. CHUNG:**

**Q.** Good morning.

**A.** Good morning.

**Q.** Mrs. Goldsmith, where do you work?

**A.** I work at West Jefferson Medical Center.

**Q.** Could you tell us your -- what's your job at West Jefferson?

**A.** I'm currently the clinical manager of the CCU.

**Q.** What is the CCU?

**A.** It was the coronary care unit. It's now the critical care unit.

**Q.** Before you were your current position as the charge nurse, what were you before that?

**A.** I was the clinical director of the CCU.

**Q.** When were you the clinical director of the CCU?

**A.** From about 1989 to 1999.

**Q.** So how long total have you been working --

**A.** I'm sorry. I was the clinical director from 1999 to 2009.

**Q.** Had you worked in the CCU before that?

**A.** Yes. I worked there from 1989 to the present.

**Q.** What was your position from 1989 until 1999, when you became director?

**A.** Well, I was a staff nurse, and then I became the charge nurse.

**Q.** Were you working in the CCU in 2005?

**A.** Yes.

**Q.** Now, does CCU ever have surgeries performed in it? Is that a regular occurrence in the CCU?

**A.** No.

**Q.** Did you, since 1989, ever work in surgery?

**A.** No.

**Q.** Do you know the procedures for securing a bullet when it's recovered in surgery?

**A.** I don't.

**Q.** Does CCU have a protocol for securing bullets?

**A.** No, it doesn't.

**Q.** Are bullets routinely removed in CCU?

**A.** No.

**Q.** Since 1989 until the present, when you've been working in CCU, can you recall a time ever when a bullet was removed while you were working?

**A.** I was told a bullet was removed from a patient in 2005.

**Q.** Any other time?

**A.** No.

**Q.** Now, I'd like to turn your attention to 2005. Were you working during Hurricane Katrina?

**A.** Yes.

**Q.** Do you remember when you got there and how long you stayed?

**A.** I got there the Sunday before Katrina and I stayed ten days.

**Q.** So you were there Sunday to the next Sunday and a couple days after that?

**A.** Yes, until either Tuesday or Wednesday.

**Q.** Did there come a time when some patients with the last name Bartholomew were admitted into the CCU?

**A.** Yes.

**Q.** Who do you remember of that family?

**A.** I remember an older gentleman and a teenager.

**Q.** Do you recall if a bullet removed from the older gentleman ever came into your position?

**A.** Yes.

**Q.** Possession. I said position, but possession. How did that come into your possession?

**A.** After Katrina I stayed there for ten days, and those patients came in the unit, and after they were settled and reasonably okay, I left for a few days. When I got back, the bullet was on my desk.

**Q.** How was it packaged?

**A.** It was in a specimen cup with a label attached to it.

**Q.** What was the label?

**A.** It was -- well, when the computer's down, we have a specimen label at the hospital, and it had -- it was taped to the cup, and it had the name of the patient, a phone number,

and the officer that was to come pick it up.

**Q.** What did you do with the bullet that was on -- in the specimen jar that was left on your desk?

**A.** Well, I waited for the officer to come get it, and one time I did call the number on the label to tell them -- I didn't get in touch with the person.

I left a message that I had it, and nobody came to get it, so I put it on the shelf in the office.

**Q.** How much after that specimen jar first landed on your desk did you call the officer?

**A.** I don't remember exactly. It must have been a few months.

**Q.** During that time, where were you keeping the jar?

**A.** It was on the shelf in the office.

**Q.** And how is your office secured?

**A.** When I leave, generally I lock it for the day. I don't lock it during the day.

**Q.** And as far as you know, did anyone ever access the jar that was on your shelf?

**A.** I don't think --

**MR. FLEMING:** Objection as to what somebody else would have done.

**THE COURT:** I think we're asking about her knowledge, and I assume her answer, obviously, is going to be limited to her knowledge.

**BY MS. CHUNG:**

**Q.** As far as you know.

**A.** As far as I know, nobody knew it was there but me.

**Q.** Did there come a time when someone, not NOPD, came and asked about the bullet?

**A.** Yeah. In 2009, two FBI agents came to pick it up.

**Q.** When they picked it up from you, did they give you a receipt?

**A.** Yes.

**MS. CHUNG:** May I approach, Your Honor?

**THE COURT:** Yes. What number is that, Ms. Chung?

**MS. CHUNG:** 252.

**THE COURT:** 252, okay.

**BY MS. CHUNG:**

**Q.** Mrs. Goldsmith, do you recognize Exhibit 252?

**A.** Yes. This is like a copy of the receipt that I signed.

**Q.** How do you recognize it to be the receipt that you signed?

**A.** My signature is right here at the bottom.

**Q.** Aside from giving a receipt to -- oh, I'm sorry.

**MS. CHUNG:** I now offer that into evidence, Your Honor.

**THE COURT:** Any objection?

**MR. FLEMING:** No objection.

**THE COURT:** All right. Admit Exhibit 262 -- I'm sorry, 252.

**BY MS. CHUNG:**

**Q.** Once you gave the bullet to the FBI agent, did you observe the FBI agent do anything with the specimen cup?

**A.** Yes. They put it in an evidence bag and they sealed it, and they wrote what it was on the outside of the bag.

**Q.** Showing you Exhibit 23, a plastic bag with a jar, I turn your attention to the plastic bag. Do you recognize that?

**A.** Yes. This is the -- what they wrote on the outside of the bag.

**Q.** So that's the actual bag that was completed at the time you gave the bullet to the FBI?

**A.** It looks like it.

**Q.** Do you recognize the jar with the piece of paper attached to the top?

**A.** Yes.

**Q.** What is that?

**A.** This is the specimen that I had in the office.

**Q.** How do you recognize it to be that?

**A.** Well, I recognize the -- the cup and the label that was on it.

**MS. CHUNG:** I would now offer Exhibit 23 into evidence, Your Honor.

**THE COURT:** Any objection?

**MR. FLEMING:** No objection.

**THE COURT:** All right. So ordered.

**MS. CHUNG:** I have no further questions for the witness, Your Honor.

**THE COURT:** All right. Cross? Anybody?

**MR. FLEMING:** Yes. Yes, Judge.

**CROSS-EXAMINATION**

**BY MR. FLEMING:**

**Q.** Good morning, Ms. Goldsmith.

**A.** Good morning.

**Q.** You left that hospital that day, September 4, 2005; correct?

**A.** Yes.

**Q.** Okay. Let me ask you -- let me back up.

On that little evidence bag, that's signed for by one of the FBI agents? The little tag.

**MR. FLEMING:** If I may approach?

**THE COURT:** Yes.

**BY MR. FLEMING:**

**Q.** This bag, they have some names written?

**A.** Yes, sir.

**Q.** One of the names is Special Agent Amy Campenero?

**A.** Yes.

**Q.** And you spoke to Special Agent Amy Campenero in connection with giving her this material?

**A.** Yes.

**Q.** And do you remember telling Special Agent Amy Campenero

that you had left West Jefferson Hospital prior to the Bartholomew family being admitted?

**A.** No.

**Q.** No, you didn't tell her that, or no, that's not true?

**A.** I don't think that's true.

**Q.** Did you tell her that?

**A.** I don't recall.

**MR. FLEMING:** May I approach the witness?

**THE COURT:** Yes.

**BY MR. FLEMING:**

**Q.** As I've shown to the prosecution, I'll direct your attention to what I have marked off. I'm going to ask you to read that to yourself.

**A.** Right here?

**Q.** The first paragraph -- that first sentence.

**A.** (WITNESS COMPLIES.)

**Q.** Does that refresh your memory as to your conversation with the agent?

**A.** Well, I don't recall telling her that. I do recall telling her that I knew of a young lady that was admitted and a gentleman.

**Q.** And what's reflected is that she -- that you told her that they -- you had left the hospital prior to them arriving that day; correct?

**A.** That's what the paper says.

**Q.** All right. When you -- I'm sorry. I lost my train of thought.

You were working the day the hurricane hit; correct?

**A.** Yes.

**Q.** And September 4th was the first day you were able to take off and leave the hospital; correct?

**A.** Yes.

**Q.** You took off for about a week, more or less?

**A.** I was thinking I must have come back for payroll that was due either -- probably around Sunday.

**Q.** Okay. Well, if September 4th was the Sunday you left, you came back the following Sunday?

**A.** I believe I left Tuesday and I came back around Sunday.

**Q.** Okay. Do you think you left the same day the Bartholomews came into the hospital?

**A.** I think so.

**Q.** And you believe you came back the following Sunday?

**A.** Yes.

**Q.** Okay. When you came back, the jar was sitting on your desk?

**A.** Yes.

**Q.** You didn't know -- when you first got there, you didn't know how that got there, did you?

**A.** Well, I believe that people told me --

**Q.** Wait a minute. I'm asking you a very specific question.

When you first got back to your office, you did not know how that jar got on your desk?

**A.** I don't recall if I went to the office first or people told me it was there.

**Q.** Okay. And then after some period of time, you put it on your shelf?

**A.** Yes.

**Q.** And when you turned that over to the FBI, that was in 2009?

**A.** Yes.

**Q.** So it sat on that shelf from 2005 until 2009?

**A.** Yes.

**MR. FLEMING:** Thank you, Ms. Goldsmith. I have no further questions.

**THE COURT:** Thank you, Mr. Fleming.

Anybody else on cross? Redirect?

**MS. CHUNG:** No, Your Honor.

**THE COURT:** Thank you, ma'am. You can step down.

Okay. It's about 10 minutes to 10:00. Counsel, do we have another brief witness we can put on, or are we -- do you have the witness that we discussed yesterday who would be next who would be a little lengthier?

**MR. CARTER:** Yes.

**THE COURT:** Why don't we go ahead and take our morning break. If you all can be ready at ten minutes after

10:00, we will begin with a new witness. Please don't discuss the case amongst yourself during the break.

**THE DEPUTY CLERK:** All rise.

(WHEREUPON, the jury exited the courtroom.)

**THE COURT:** All right. Counsel, if you all would be seated.

Very quickly, I have not received, and maybe you filed it and it hasn't hit me yet, but I've not yet received anything on the video issue. Has that been filed?

**MS. BERNSTEIN:** It has not. We can get it to you right after the lunch break.

**THE COURT:** Okay. As soon as you can. If you can get it to me during the lunch break, I'll be able to read it during the lunch break. If you get it to me after, I won't be able to read it while you all are questioning witnesses.

**MR. DESALVO:** Judge, may we approach the bench? I think there's an evidentiary issue that's going to arise with the next witness, and --

**THE COURT:** Sure, sure. Come on up.

**MR. DESALVO:** -- I'd like to talk to the Court about it ahead of time so we don't disrupt...

(WHEREUPON, the following proceedings were held at the bench.)

**MR. DESALVO:** The next witness is going to be Ignatius Hills. By reading his 302s, a lot of things about how

 he felt when he saw this and about him thinking their story as bullshit, him thinking this was a cover-up. I think those are conclusions for the jury.

And he has to say what he said, what he saw, what he did, and what other s said, and not reach these conclusions that are for the jury.

**MR. CARTER:** Your Honor, his understandings are extremely relevant. Why he did things, what he understood he was doing, the purpose for it are extremely relevant.

**MR. DESALVO:** Why?

**MR. CARTER:** Because he understands his actions and what he did and what he believed he was doing.

**THE COURT:** And that's -- the key word to me is what he believed at the time based on the information that he and what was transpiring around him. I think it's going to depend largely on how you ask the question.

**MR. CARTER:** Generally, I would say --

**THE COURT:** Yes. I think it's going to depend on how you ask the question. But if he believed things at the time they happened based on the information that was available to him, I think he can testify.

**MR. DESALVO:** I just wanted to --

**THE COURT:** That's his belief. It's his and only his.

**MR. DESALVO:** We're trying to object to it now rather

than having to interrupt at trial.

**THE COURT:** I understand.

**MR. DESALVO:** If -- I guess, if I have a need to, I can just voice an objection and sit down and not approach the bench, unless the Court wants us to approach on an issue.

**THE COURT:** Yes. If you want to do that, frankly, we're making a record now, if you want to make it a continuing objection --

**MR. DESALVO:** That's what I would like to do.

**THE COURT:** -- what we need to do is make it contemporaneous to a like of questioning or to --

**MR. DESALVO:** If I can make a continuing objection now, or if something really particularly upset me, then I will come up and --

**THE COURT:** Feel free. Yeah, feel free.

**MR. HESSLER:** Your Honor, I would join in that objection, and also state in a different way -- he says in his 302s, which, you know, we don't have them right now, is he learned -- only later when he learned of something did he think that's what they may have been doing -- there's a lot of information that we don't know where he got that information from.

**THE COURT:** That's why I said the question has to be -- Ted, the question has to be worded -- if you're going to ask him about what he thought at a particular time, it has to

be worded in that fashion, as opposed to, "Now what do you think based on information that either the agent told you, information you read or information you heard on TV?" And he may have a different conclusion that's better or worse.

**MR. CARTER:** And I'll put on the record, I intend to ask him what his understanding was --

**THE COURT:** At that time.

**MR. CARTER:** -- what his thoughts were, at that time, why he did what he did. What he understood.

**MR. LARSON:** His understanding is what somebody said, that's hearsay.

**MR. CARTER:** Right. If his understanding -- what did you say just now?

**MR. LARSON:** His understanding is based on what --

**THE COURT:** Not necessarily. Not necessarily.

**MR. CARTER:** No, no, no.

**THE COURT:** Not necessarily. Because if he took actions, you know, the litany of hearsay exceptions, if he took actions based on an understanding of what somebody told him was a situation, then, you know...

**MR. CARTER:** Perhaps a housekeeping matter. I'm going to ask him about his state grand jury testimony.

**THE COURT:** Wait. We got too many people talking.

**MR. CARTER:** I'm going to ask him about his state grand jury testimony and ask him about his NOPD statement.

I plan to publish those statements. I don't know that I necessarily want to put the document in, but for ease of questioning, I have certain passages from his testimony highlighted. I don't know how you guys feel about putting it into evidence or --

**MR. DESALVO:** Well, I think you have to ask him -- what he has to say, and if he's got a prior consistent statement, you can introduce it. If you just want to introduce his prior logic for the sake of it was his prior logic, you got to lay some kind of foundation for making that admissible.

**THE COURT:** I think that's correct with regard to the state grand jury testimony. But the statement came up on motion practice as being a piece of evidence in furtherance of. So I think the statement you can identify and introduce, and then ask him questions about things that were stated in it.

The grand jury testimony, I'm a little more circumspect about it depending on how it's treated and what he says about it.

**MR. CARTER:** Just so you will guys are clear: I will ask him the foundation questions about his NOPD statement, I will enter into evidence, I will show highlighted portions, and then I will just ask him questions about his grand jury.

**THE COURT:** And you guys know you're going to ask him questions based on his grand jury testimony, aren't you?

**MR. DESALVO:** It depends.

**MR. FLEMING:** But I think the defense is entitled to do that.

**THE COURT:** Oh, sure.

**MR. FLEMING:** I don't think they're entitled to bring out a prior statement just for the sake of doing it.

**MR. DESALVO:** I actually probably won't.

**THE COURT:** That's why I'm saying it depends on what he asks. Before you use the grand jury testimony, I think you need to ask the predicate questions, and depending on what his answers are -- as we would typically use a prior statement. I think the other statement that he gave, the official, whatever you want to call it, I've already ruled on that --

**MR. CARTER:** Yes, sir.

**THE COURT:** -- as an evidentiary matter on a pretrial motion.

**MR. CARTER:** Yes, sir.

**THE COURT:** Okay.

**MR. FLEMING:** Judge, I guess just procedurally, to be correct, when we approached the bench after Mr. DeSalvo lodged his objection, Eric -- Mr. Hessler chimed in. I would assume that when one of the defense lawyers raises an objection, the Court is assuming that that's on behalf of everyone or everyone adopts the same?

**THE COURT:** That has not been a standing order. I think it's been sort of an assumption. But if you want to make

that the rule, and then if there's an exception to it where, "I don't join into that," then --

**MR. DESALVO:** Then opt out.

**THE COURT:** -- let's do it that way. Right. Yes.

**MR. FLEMING:** Just for the sake of brevity, unless you want five lawyers --

**THE COURT:** Why don't we, since it would be rare, or few opportunities, where one would not join in with the others, why don't we make that the standing assumption that an objection made on behalf of one defendant -- because quite honestly, all of the briefing, without fail, except for things, like *Kastegard* (phonetic), that obviously pertain to one person, all of the briefing has been done, all of the oppositions have been done on the basis of all defendants.

So I've been assuming that objections that are made are all defendants.

**MR. FLEMING:** I was too. I just wanted to have the record clear, obviously.

**THE COURT:** Now you do.

**MR. FLEMING:** Thank you, Judge.

**THE COURT:** Now you do.

(WHEREUPON, the following proceedings were held in open court.)

**THE DEPUTY CLERK:** All rise.

(WHEREUPON, the Court took a recess.)

**THE DEPUTY CLERK:** All rise.

(WHEREUPON, the jury entered the courtroom.)

**THE COURT:** All right. You may be seated, except for Mr. Hills.

(WHEREUPON, **IGNATIUS HILLS**, having been duly sworn, testified as follows.)

**THE DEPUTY CLERK:** Please state your full name and correct spelling for the record.

**THE WITNESS:** Ignatius Hills. I-G-N-A-T-I-U-S, H-I-L-L-S.

**DIRECT EXAMINATION**

**BY MR. CARTER:**

**Q.** Mr. Hills, have you adjusted that microphone?

**A.** It was a little too loud?

**Q.** A bit.

**A.** Okay. All right.

**THE COURT:** I think the microphone was fine. I think you were a little too close to it. So keep a good distance so that we can hear you, that would be great.

Go ahead, Mr. Carter.

**BY MR. CARTER:**

**Q.** Mr. Hills, where do you work now?

**A.** Lafarge, truck driver.

**Q.** What do you do for Lafarge?

**A.** I drive trucks.

**Q.** Did you ever work for the New Orleans Police Department?
**A.** Yes.
**Q.** When did you work for the New Orleans Police Department?
**A.** 2003 through 2010.
**Q.** What did you do for the New Orleans Police Department?
**A.** Police officer.
**Q.** Why are you no longer a New Orleans police officer?
**A.** I resigned.
**Q.** Why did you resign?
**A.** Due to the criminal investigation.
**Q.** The criminal investigation of what?
**A.** Danziger Bridge shooting.
**Q.** And your involvement in it?
**A.** Correct.
**Q.** Let's talk about your involvement in that Danziger Bridge investigation. Let me take you back to September 4th of 2005. Where were you working then?
**A.** New Orleans Police Department. 7th District is the district I was assigned to.
**Q.** As a police officer?
**A.** Yes.
**Q.** At that time how long had you been a police officer?
**A.** About a year and a half.
**Q.** About a year and a half.

When did you graduate from the academy; do you

remember?

**A.** May 2004.

**Q.** Were you on duty that morning?

**A.** Yes.

**Q.** How long had you -- well, let's start with what you did that morning when you woke up and you first reported for duty. What did you do?

**A.** We were assigned to the 7th District, New Orleans East area. We reported to duty. The Crystal Palace was the substation -- makeshift police substation at the time, and that's where we reported to every morning.

**Q.** Did you hear any 108 radio call that morning?

**A.** I didn't personally hear it over the radio, but it was understood that there was a 108 that had came across the radio.

**Q.** What is a 108?

**A.** Police life is in danger.

**Q.** What happened when you were told of this 108?

**A.** When I was informed of the 108, me, as well as another group of officers entered a Budget truck and proceeded to the location of the 108.

**Q.** What other officers proceeded to the Budget truck?

**A.** Myself, Kenneth Bowen, Robert Gisevius, Robert Faulcon, Robert Barrios, Anthony Villavaso, Mike Hunter, Raymond Young, Kevin Bryan, and there may have been about two or three other officers. I don't recall specifically. I know there was a

female. I don't know a name right off the bat, but...

**Q.** I'm going to show you a couple of photographs, but first I'd like to show them to defense counsel. It's Government's Exhibits 61 and 66.

Can you identify these documents for me? What's Exhibit 61?

**A.** That's the Budget truck that we entered that day to head to the scene.

**Q.** What's Exhibit 66?

**A.** It's the rear of a cargo truck.

**Q.** Does that appear similar to the rear of the truck you were in that day?

**A.** Yes.

**Q.** Will that assist the jury in understanding your testimony here today?

**A.** Yes.

**MR. CARTER:** Your Honor, I offer Government's Exhibits 61 and 66 into evidence.

**THE COURT:** Any objection?

**MR. HESSLER:** No objection, Your Honor.

**THE COURT:** All right. So ordered. 61 and 66 are admitted.

**MR. CARTER:** Can we have 61, please?

**BY MR. CARTER:**

**Q.** Is this the truck you were in that day?

**A.** Yes.

**Q.** Generally, where in that truck were you at the time you were driving to the scene of the 108?

**A.** Towards the rear.

**MR. CARTER:** May I have Exhibit 66?

**BY MR. CARTER:**

**Q.** When you said you were in the rear, can you tell the jury when you say "rear," are you talking rear closest to the cab of the truck or rear talking closest to the exit of the truck?

**A.** Rear closest to the exit.

**Q.** Closest to the exit of the truck.

Generally, there, were you more -- if you know, were more in the center, more to the left, more to the right?

**A.** Center.

**Q.** Now, you mentioned certain individuals who were in the truck with you. Are any of those individuals present in court today?

**A.** Yes.

**Q.** Would you please identify them?

**A.** Kenneth Bowen.

**Q.** Seated at defense counsel next to Attorney Frank DeSalvo?

**A.** Correct.

**Q.** Who else?

**A.** Anthony Villavaso.

**Q.** Seated next to Attorney Tim Meche?

**A.** Correct.

**Q.** Who else?

**A.** Robert Gisevius.

**Q.** Robert Gisevius?

**A.** Correct.

**Q.** Where is he sitting in the courtroom?

**A.** Right next to the female in a black suit.

**Q.** Anybody else?

**A.** Robert Faulcon.

**Q.** Where is he seated?

**A.** In between a female in a gray top and the male in a suit.

**MR. CARTER:** Your Honor, I'd ask that the record reflect that Mr. Hills has identified the four defendants accurately here in court today.

**THE COURT:** I think that he has. Although, it's not clear to me that other than -- it's not clear to me that he knows the attorneys by name and you said, "Seated next to Mr. Meche." But assuming he knows who those people are, then I think he has.

**MR. CARTER:** Which is why I stopped mentioning their names.

**BY MR. CARTER:**

**Q.** Were you armed on your way to that 108 scene?

**A.** Yes.

**Q.** How were you armed?

**A.** With my duty weapon, .40 caliber Glock.

**Q.** Were the other individuals armed?

**A.** Yes.

**Q.** Do you remember how they were armed?

**A.** Various weapons.

**Q.** What weapons do you recall?

**A.** Shotguns as well as rifles.

**Q.** Do you remember what weapon Defendant Faulcon had?

**A.** He had a shotgun.

**Q.** What about Mr. Bowen?

**A.** His service weapon.

**Q.** What about Mr. Gisevius?

**A.** Some type of rifle.

**Q.** What about Mr. Villavaso?

**A.** I believe it was a rifle.

**Q.** Who was driving the truck that day?

**A.** Mike Hunter.

**Q.** Do you remember how Hunter was armed?

**A.** Rifle.

**Q.** He had a rifle.

Did he also have a revolver, do you know, a service weapon?

**A.** I believe so.

**Q.** What is a service weapon?

**A.** It's a .40 -- .40 caliber Glock, handgun, semi-automatic.

**Q.** You said Mr. Hunter was driving. Was anybody else in the front of the truck with Mr. Hunter?

**A.** Kenneth Bowen.

**Q.** What happened as you drove to the scene of the 108?

**A.** As we drove to the scene, it was pretty much intense. There wasn't much, if any, talking whatso- -- whatever at all. Just kind of intense feeling, just preparing yourself what -- for what you may encounter.

**Q.** Do you remember how long it took you to get to the Danziger Bridge?

**A.** Ten minutes.

**Q.** What happened when you got to the Danziger Bridge?

**A.** Upon approaching the bridge, shots were fired, various shots.

**Q.** When you first heard those shots, do you recall whether the truck had stopped or whether it was still moving?

**A.** Still moving.

**Q.** Where were the shots that you heard coming from, if you could tell?

**A.** From the exterior passenger side of the vehicle.

**MR. CARTER:** Let's put Government's Exhibit 66 back up, please.

**BY MR. CARTER:**

**Q.** Would you touch the screen and point to generally where you were on that truck?

**A.** (WITNESS COMPLIES.)

**Q.** Where did you hear the shots coming from?

**A.** (WITNESS COMPLIES.)

**Q.** Would they have been more to the back of the truck or to the front of the truck?

**A.** To the front.

**Q.** What did they sound like to you?

**A.** High-caliber shots.

**Q.** High-caliber shots?

**A.** Yes.

**Q.** Are you familiar with high-caliber shots?

**A.** Yes.

**Q.** Did it sound like any particular type of weapon -- any particular type of high-caliber weapon?

**A.** AK-47.

**Q.** Are you familiar with an AK-47?

**A.** Yes.

**Q.** Have you ever fired an AK-47?

**A.** Yes.

**Q.** Do you feel you know the sound of an AK-47?

**A.** Yes.

**Q.** Is there another name for an AK-47? Is there a nick name for one that you're familiar with?

**A.** A chopper.

**Q.** A chopper.

And you heard a chopper shooting from the front area of the truck, if I understand you correctly?

**A.** Yes.

**Q.** What did you do when you heard this chopper firing from the front of the truck?

**A.** Pretty much just stood my ground. There wasn't really much room to cover or what have you.

**Q.** Did any of the other officers in the back of the truck do anything when they heard the sound?

**A.** No, no.

**Q.** At some point I take it the truck stopped?

**A.** Correct.

**Q.** What happened when the truck stopped?

**A.** The truck stopped. I observed a male run past the truck in an eastbound direction. I fired my service weapon twice.

**Q.** Before you saw that individual running, did any of the other officers get out of the truck -- had any of the other officers gotten out of the truck before that?

**A.** No.

**Q.** So what happened when you saw this kid running? And I said "kid," could you tell whether it was a kid?

**A.** No, I couldn't.

**Q.** All right. Where was this individual running?

**A.** Alongside the barrier of the bridge, running away from where the initial gunfire had been heard, in an eastbound

direction.

**MR. CARTER:** Let's put Exhibit 61 back on the screen, please.

**BY MR. CARTER:**

**Q.** Would you touch on the truck where you were at the time you saw the individual running?

**A.** I was inside the rear of the cab.

**Q.** Would you touch the general area of the rear of the cab?

**A.** (WITNESS COMPLIES.)

**Q.** That would have been there.

And where did you see the individual running?

**A.** (WITNESS COMPLIES.)

**Q.** And you said he was running. Was he doing anything else?

**A.** No.

**Q.** And you mentioned that you -- what did you do when you saw the kid running?

**A.** Fired my service weapon twice.

**Q.** You raised your service weapon?

**A.** Yes.

**Q.** Pointed it at this individual?

**A.** Yes.

**Q.** And fired twice?

**A.** Yes.

**Q.** Why did you do that?

**A.** Out of fear.

**Q.** Did this individual do anything to threaten you?
**A.** No.
**Q.** Are you allowed to shoot at an individual out of fear as a police officer?
**A.** No.

**MR. MECHE:** I'm going to object to that, Your Honor. That's an opinion I'm not sure he's qualified to give, and I'm not sure everyone would agree with.

**MR. CARTER:** Okay.

**THE COURT:** I'm going to sustain it. But you're going to have to lay a foundation.

**BY MR. CARTER:**

**Q.** Let's talk a little bit about your training as a New Orleans police officer. Are you trained -- were you trained when and when not to use your weapon?
**A.** Yes.
**Q.** Were you trained when and when not to use deadly force?
**A.** Yes.
**Q.** Do you consider, as you sit there, that day firing a weapon at someone the use of deadly force?
**A.** Yes.
**Q.** When you pointed your weapon at that individual, where did you aim?
**A.** At his center mass, back, rear.
**Q.** Center mass, torso?

**A.** He was running away, so the rear of him, his back.

**Q.** When you pulled that trigger, did you intend to hit him?

**A.** Yes.

**Q.** When you pulled it the second time, did you intend to hit him?

**A.** Yes.

**Q.** Do you consider that to be the use of deadly force?

**A.** Yes.

**Q.** What is your training regarding the use of deadly force? When were you trained that you could use deadly force?

**A.** If your life is in danger, someone's an imminent threat to you, or someone else's life is in danger.

**Q.** Did this individual pose an imminent threat to you?

**A.** No.

**Q.** Did he threaten your life in any way?

**A.** No.

**Q.** Was that a justified shoot?

**A.** No.

**Q.** What happened after you fired at that individual?

**A.** After I fired, a few police officers exited the rear of the vehicle and gunfire continued.

**Q.** Who exited the rear of the vehicle; do you remember?

**A.** Robert Barrios, Robert Faulcon, Anthony Villavaso.

**Q.** Could you tell what they did when they exited the vehicle? Were you able to see them and see what they did when they

exited the vehicle?

**A.** No.

**Q.** Was your view blocked by anything?

**A.** Yes. It was blocked by the side of the truck. I was still in the rear of the truck.

**Q.** Why were you still in the truck?

**A.** Just didn't think of it as a safe situation to step out of the rear of the truck at that point.

**Q.** You heard a lot of gunfire?

**A.** Correct.

**Q.** Did you feel it was safer in the truck or out of the truck?

**A.** In the truck.

**Q.** The truck's not bullet-proof, is it?

**A.** No.

**Q.** This happened all pretty quickly?

**A.** Yes.

**Q.** Were you able to tell at that time whether any bullets were striking the truck?

**A.** I hadn't seen any bullets pierce the truck at that point.

**Q.** Did it seem to you from what you could hear that the shots were being fired away from the truck or toward the truck?

**A.** Away from the truck.

**Q.** So if I understand you correctly, you felt safer in the truck than going outside of the truck?

**A.** Yes.

**Q.** What happened next?

**A.** At that point, after the initial officers had exited the vehicle, there was more gunfire that had erupted at that point. There were other officers as well, after the gunfire had ceased, had exited the rear of the vehicle.

**Q.** So at some point, if I understand you correctly, the shooting stopped?

**A.** Yes.

**Q.** What happened when the shooting stop?

**A.** When the shooting stopped, as officers exited the rear of the vehicle, myself as well as another officer, we exited the rear of the vehicle as well.

**Q.** When you exited the rear of that vehicle, which way did you go, to the driver's side or the passenger's side?

**A.** The driver's side.

**Q.** Why did you go to the driver's side?

**A.** Just to, basically, provide some type of safety as opposed to just exposing myself directly to the other side as I exited.

**MR. CARTER:** Exhibit 66, please.

**BY MR. CARTER:**

**Q.** If I understand you correctly, the shooting was coming from this angle?

**A.** Yes.

**Q.** And you exited on this side?

**A.** Yes.

**Q.** If I understand you correctly, it was because you felt it was safer on this side?

**A.** Yes.

**Q.** What did you do after exiting the vehicle?

**A.** I approached the concrete barrier on the bridge.

**MR. CARTER:** Exhibit 61, please.

**BY MR. CARTER:**

**Q.** If I understand you correctly, Mr. Hills, you exited the truck and came up this way?

**A.** Yes.

**Q.** When you got to the front of the truck, do you remember seeing -- do you remember what you saw? Did you see anything?

**A.** Yes. The police officers that were in the rear of the truck just pretty much standing around outside of the truck or in front of the truck at that point near the concrete barrier.

**Q.** And for the record, I've marked a line from the rear of the truck coming up the driver's side to the front of cab.

You said these officers were just doing what?

**A.** Standing around as well as looking back and forth over the concrete barrier.

**Q.** How much time had elapsed from the shooting stopping to your getting out of the truck and walking to the front?

**A.** A few minutes, three minutes, four minutes.

**Q.** Three minutes.

But you weren't timing that, were you?

**A.** No.

**Q.** All right. After seeing these officers standing around, what did you do?

**A.** I leaned over the concrete barrier to observe what -- what had transpired in terms of what the officers were looking at, to look for possible suspects, victims, what have you.

**Q.** So what did you see?

**A.** I saw at least five victims sprawled out across the concrete with severe, severe gunshot wounds.

**Q.** You said "severe." Why do you use the term "severe"? What did you observe about these gunshot wounds?

**A.** There was a female whose arm was somewhat severed. There was just so much blood leaking from these individuals across the concrete. They were somewhat sprawled out.

**Q.** Let me back up a second. When you passed these officers in the front -- when you got out of the truck, were they saying anything?

**A.** No.

**Q.** Were you able to see them, though, as you went to look over the side of the walkway?

**A.** Yes.

**Q.** Were any of them wounded?

**A.** No.

**Q.** Did you look at the truck? Could you tell whether there

were any bullet holes or any damage to the truck?

**A.** No.

**Q.** I'm sorry. That's my -- I phrased that incorrectly.

Were you able to observe the truck?

**A.** Yes.

**Q.** Were there any bullet holes in the truck?

**A.** No.

**Q.** Was there any damage to the truck?

**A.** No.

**Q.** Did these victims, as you were looking over the side of the railing, were they talking or saying anything?

**A.** I did hear one of the female victims make a quote to someone -- another officer that may have asked a question. But she made a statement that they weren't doing anything wrong, is what one of the female victims stated.

**Q.** And what did the officer say in response to that?

**A.** Nothing. I didn't hear any response to it.

**Q.** Did you say anything in response to it?

**A.** No.

**Q.** When you looked at these victims, were you looking for anything else?

**A.** Weapons.

**Q.** Why?

**A.** Because we had responded to a police shooting. This was at the point that I had looked over the steel -- concrete

barrier. It was a pretty horrific scene, five victims with severe gunshot wounds. Obviously, at that point the next thing for me to do would be to assess whether there were any weapons at all.

**Q.** Did you see any weapons?

**A.** None.

**Q.** Did you ask anybody about the weapons or where they were?

**A.** I did respond to another fellow officer after I observed -- after I, personally, observed that there were no weapons on that scene, I questioned, "Where are the weapons?"

**Q.** You said that?

**A.** Yes.

**Q.** Who did you say that to?

**A.** Officer Paxton.

**Q.** Was this in a low tone or a loud tone?

**A.** A medium tone.

**Q.** Medium tone.

Do you know whether anybody else heard you ask that question?

**A.** Kenneth Bowen.

**Q.** All right. Why do you believe he heard you ask that question?

**A.** Because he responded towards us, me and Paxton. At that point after I asked Paxton, he responded towards us that he had kicked the guns off the bridge.

**Q.** Had you seen him kick any guns off the bridge?

**A.** No.

**Q.** Had you seen him on the other of the walkway near the victims?

**A.** No.

**Q.** Did you believe him when he told you this?

**A.** No.

**Q.** Why not?

**MR. DESALVO:** Your Honor, I don't understand why "why not" is a proper question under these circumstances.

**THE COURT:** Yes, I'll sustain it. Go ahead and rephrase the question.

**BY MR. CARTER:**

**Q.** You said you never saw him on the walkway?

**A.** No.

**Q.** You never saw him kick guns off?

**A.** No.

**Q.** Did you ever see him looking over the side of the bridge?

**A.** No.

**Q.** Did you ever see him looking for guns?

**A.** No.

**Q.** Did you ever see him direct anybody to pick up guns?

**A.** No.

**Q.** Who was in charge of that situation at that time? Who was the ranking officer on the spot when you got out of that truck?

**A.** Kenneth Bowen.

**Q.** Did he ever tell you to go look for guns?

**A.** No.

**Q.** Did he ever tell anybody else to go look for guns?

**A.** No.

**Q.** What were you doing as you were standing around there? Were these people a threat at that point in time?

**A.** No.

**Q.** So you were just standing around?

**A.** Yes.

**Q.** How many officers?

**A.** Eight, nine, ten.

**Q.** Any of the eight, nine, ten go down and look for guns?

**A.** No.

**Q.** Anybody look over and say, "Hey, there's a gun"?

**A.** No.

**Q.** Did Officer Bowen say, "Hey, there's a gun right down there"?

**A.** No.

**Q.** "That's the gun I kicked off"?

**A.** No.

**Q.** So did you believe him?

**A.** Absolutely not.

**Q.** Did he tell you to, "Secure the guns that I just kicked off"?

**A.** No.
**Q.** How long were you out there on the bridge that day?
**A.** 35 -- close to an hour.
**Q.** In the same general area where the truck was?
**A.** Yes.
**Q.** Were you there when an ambulance came to pick up these victims?
**A.** Yes.
**Q.** And you were there after the victims were taken away?
**A.** Yes.
**Q.** At any point during that process did anybody say, "Hey, I found a gun"?
**A.** No.
**Q.** When you left the bridge that day, where did you go?
**A.** Back to the Crystal Palace.
**Q.** What happened back at the Crystal Palace?
**A.** They wanted every officer who had fired their weapons on the bridge to, basically, sit at a table.
**Q.** Who is "they"?
**A.** Sergeant Kaufman.
**Q.** You said they wanted every officer who fired -- I'm sorry. I don't want to put words in your mouth -- but fired their weapon that day?
**A.** Yes.
**Q.** How was this expressed, if you recall?

**A.** They asked if -- you know, "Who fired their weapons," was the question asked. And you raised your hand if you had; and if you did, you pretty much sat at the table. And it was various officers, so they wanted to distinguish who had fired their weapons is who they wanted to speak with.

**Q.** And, again, you said "they." Do you remember who said this?

**A.** Kaufman, Sergeant Kaufman.

**Q.** Who raised their hands, if you recall?

**A.** Myself, Anthony Villavaso, Robert Barrios, Robert Faulcon, Kenneth Bowen, and Robert Gisevius.

**Q.** What happened to the people who didn't raise their hands?

**A.** They asked -- they asked them to dismiss themselves.

**Q.** When you say they dismissed themselves, they just left?

**A.** Yes.

**Q.** These are other police officers who were in the truck that day?

**A.** Yes.

**Q.** But if they didn't fire their weapons, they were not allowed to join this meeting? If I'm misstating that, correct me.

**A.** That's correct.

**Q.** So I believe you mentioned Mr. Paxton was out there that day?

**A.** Yes.

**Q.** He didn't raise his hand, he wasn't allowed to join the meeting?

**A.** No.

**Q.** But he was in the back of the truck?

**A.** Yes.

**Q.** And there were other officers in the back of the truck?

**A.** Yes.

**Q.** Tell us what happened at that meeting.

**A.** At that point Sergeant Kaufman, as well as Lieutenant Lohman, with everyone who had fired their weapons, they began to start with the officers --

**Q.** Let me stop you. You said Officer Lohman? Did you just say --

**A.** Lieutenant Lohman was present as well.

**Q.** Lieutenant Lohman.

Who is Lieutenant Lohman?

**A.** He was the lieutenant of the 7th District.

**Q.** And any other ranking officers there in this meeting?

**A.** Sergeant Archie Kaufman.

**Q.** So Sergeant Kaufman, Lieutenant Lohman. Sergeant Bowen?

**A.** Sergeant Bowen, Sergeant Gisevius.

**Q.** Any other sergeants?

**A.** No.

**Q.** Who else?

**A.** Myself, Anthony Villavaso, Robert Barrios, Robert Faulcon,

Michael Hunter.

**Q.** And you guys assembled. Did you -- well, when you began to talk, what happened?

**A.** They started off with Michael Hunter. They questioned how many times he -- they asked Michael Hunter, "How many times did you fire your weapon?"

**Q.** What did he say, if you recall?

**A.** He stated something, "30 plus times."

**Q.** What happened?

**A.** At that point Lieutenant Lohman cut the meeting, gave a signal to just, you know, stop talking, cut the meeting, and everything came to a cease at that point.

**Q.** You say everything came to a cease. Did you guys continue meeting or did you stop?

**A.** No, we dismissed ourselves and that was it.

**Q.** What did you do after you dismissed yourselves?

**A.** Just pretty much exited the table that we were at and went in various locations.

**Q.** That individual that you shot at that day, did you see him again that day?

**A.** Yes.

**Q.** Where?

**A.** He was detained at the Crystal Palace.

**Q.** After leaving this meeting, what did you do?

**A.** Went about just staying at the Crystal Palace, which was

the police station. We just pretty much stayed at the police station after that.

**Q.** For the rest of the evening?

**A.** Yes.

**Q.** The rest of the day?

**A.** Yes.

**Q.** Did you ever have to transport anybody that day?

**A.** Yes.

**Q.** Who?

**A.** Later on that night, it was Lance Madison, as well as another unknown person, male.

**Q.** And how did you transport these people?

**A.** In a Budget truck.

**Q.** Where did you transport them to?

**A.** To the Greyhound station, which at that time was the makeshift police station -- or intake center.

**Q.** When you said you transported him, were you driving the vehicle?

**A.** No.

**Q.** Who was driving the vehicle?

**A.** Paxton, Marchant Paxton.

**Q.** Do you recall what other officers were in the vehicle?

**A.** Yes.

**Q.** Who?

**A.** Myself, Officer Murret, Officer Robert Faulcon, and I

don't recall -- there was another officer. I don't recall exactly who it was.

**Q.** And who did you have in the back -- who were you transporting; do you recall who you were transporting?

**A.** Lance Madison and another unknown male.

**Q.** At this point had you seen Lance Madison before?

**A.** Yes.

**Q.** When did you see Lance Madison?

**A.** He had been detained at the Crystal Palace after the shooting had occurred on the Danziger Bridge.

**Q.** So your first time seeing Lance Madison was as he was being detained at the Crystal Palace?

**A.** Yes.

**Q.** Okay. What happened at the Greyhound station?

**A.** At the Greyhound station, Officer Faulcon and another officer exited the vehicle, the rear of the Budget truck, with Lance Madison and the other unknown male as me, Officer Paxton, and Officer Murret waited in the front cab of the truck for the officers to return.

We had been following Sergeant Kaufman to the lockup and he made it to the lockup in his -- in one of the -- another one of the police vehicles. He wasn't riding in the Budget truck.

**Q.** Now, you were in the front cab of the Budget truck?

**A.** Yes.

**Q.** Were there officers in the back with the detainees?

**A.** Yes.

**Q.** Was Officer Faulcon in the front with you or in the back with the detainees?

**A.** Officer Faulcon was in the rear with the detainees.

**Q.** Okay. So you're at the Greyhound station, you're in the truck?

**A.** Yes.

**Q.** What happens?

**A.** We're in the truck. Officer Faulcon, as well as another officer, exited the rear of the vehicle with the detainees and we're waiting for them to return.

**Q.** How long did you have to wait?

**A.** They were in there maybe ten minutes. Officer Faulcon came out and stated that Sergeant Kaufman needed two officers inside.

**Q.** What happened?

**A.** At that point myself and Geoffrey Murret went inside the Greyhound station, found Sergeant Kaufman, and he explained to us that he needed a face sheet and a Gist written.

**Q.** What's a face sheet?

**A.** A face sheet is the initial sheet of a police report.

**Q.** What's a Gist?

**A.** A Gist is the initial report of a crime.

**Q.** So what happened next?

**A.** Officer Murret was issued the face sheet to fill out. And myself, I was issued a Gist to fill out.

**Q.** How did you go about filling out this Gist?

**A.** Sergeant Kaufman dictated what was to be written in the Gist and I --

**Q.** Why couldn't you just write it yourself?

**A.** Because I had no knowledge of what he wanted written.

**Q.** So he told you what to write?

**A.** Yes.

**Q.** And you wrote it?

**A.** Yes.

**Q.** Let me show you what's been marked as Government's Exhibit 36. I've been told that this is already in evidence. Can you identify this document, sir?

**A.** This is the Gist that I wrote.

**MR. CARTER:** Would you put this on the screen, please?

**BY MR. CARTER:**

**Q.** We have some personal information blacked out. I'm going to ask you to read this for the jury. It may be easier to read it from this document. I'll ask you to stop before we get to the bottom of the page, the area in a different writing.

Let me just do this now. Did you write these last three sentences on here?

**A.** No.

**Q.** Let me ask you to read the portion that you did, in fact, write.

**A.** "On Sunday, September 4, 2005, at 9:00 a.m., 7th District officers received a [sic] officer in distress call, signal 108, at Downman Road and Chef Menteur Highway. Upon arrival, the officers of the 7th District apprehended Lance Madison, black male, date of birth, social security number, and which was read his rights per Miranda and arrested for R.S. 14:2730, relative to attempted murder, eight counts.

"The initial victim, David Ryder, 9/26/64, social security number, was fired upon and 7th District officers were shot at upon arrival at the Chef Menteur Highway and Downman Road."

**Q.** This was dictated to you by Mr. Kaufman?

**A.** Yes.

**Q.** Did this sound right to you, correct, accurate?

**A.** No.

**Q.** Why not?

**A.** I had -- I had never encountered Lance Madison and it was -- it was very confusing as to why Lance Madison would be being booked when the supposed perpetrators were on the bridge, which was at least five of them, and those were the people that were -- to my understanding that were armed that were shooting at the police. So to arrest Lance Madison was -- was very suspicious.

**Q.** It says, "Murder, eight counts." Did you consider yourself to be one of the eight counts?

**A.** Yes.

**Q.** How many people were in that truck, how many officers?

**A.** At the scene of the -- that rode in the --

**Q.** Yes. The Budget truck that you rode up in.

**A.** 10, 11 officers maybe.

**Q.** So it was more than eight?

**A.** Correct.

**Q.** However, only eight are mentioned here?

**A.** Yes.

**Q.** Did you ever see Lance Madison on that bridge?

**A.** No.

**Q.** To your knowledge, had he ever fired at you?

**A.** No.

**Q.** Let's look at this portion underneath, "Perpetrator fled and threw his handgun into the Industrial Canal and was apprehended a short time later." Did you write that?

**A.** No.

**Q.** Was that -- did you see this written on the form that night?

**A.** No.

**Q.** When was the last time you saw this form? Other than seeing it in preparation for trial.

**A.** Months ago.

**Q.** Months ago.

That night when you left this wasn't written on there, to your knowledge?

**A.** No.

**MR. CARTER:** One second, Your Honor.

**BY MR. CARTER:**

**Q.** Getting back to these eight counts of murder, you consider yourself to be one of those counts?

**A.** Yes.

**Q.** Do you know who the other seven were?

**A.** Yes.

**Q.** Who?

**A.** David Ryder, Sergeant Kenneth Bowen, Sergeant Gisevius, Robert Faulcon, Anthony Villavaso, and Robert Barrios. Everyone who had fired their weapon, all the officers that had fired their weapon on the bridge.

**Q.** What happened after you wrote this Gist?

**A.** I presented it to Sergeant Kaufman and pretty much that was it.

**Q.** During the weeks following the shooting and the days, the next day, the next few days, did anybody ever attempt to interview you about what happened that day?

**A.** No.

**Q.** Did Sergeant Kaufman ever attempt to interview you about what happened that day?

**A.** No.

**Q.** Anybody ever ask you for a report about what happened that day?

**A.** No.

**Q.** Did you ever see the supervisors talking about this case?

**A.** It would be hard to say if they were specifically talking about this case, I mean. But I, in fact, saw the supervisors speaking to each other on various occasions.

**Q.** By "supervisors," who are you referring to?

**A.** Kaufman, Bowen, Gisevius.

**Q.** Did you ever see them talking to Lieutenant Lohman?

**A.** Yes.

**Q.** So you saw them talking?

**A.** Yes.

**Q.** And it would be normal for them to talk?

**A.** Yes.

**Q.** They could have been talking about anything?

**A.** Yes.

**Q.** But you saw them talking together many times?

**A.** Yes.

**Q.** Just those individuals or were they with other individuals?

**A.** Just those.

**Q.** Just those.

So you saw numerous conversations --

**A.** Yes.
**Q.** -- with them talking to each other?
**A.** Yes.
**Q.** You mentioned a David Ryder. Do you know who David Ryder is?
**A.** He was someone that was on the bridge that day who gave information about what he had thought or saw or something.
**Q.** Did you know him?
**A.** No.
**Q.** Was he in the back of the truck with you guys?
**A.** No.
**Q.** I want to direct your attention to Government's Exhibit 39, which I believe is already in evidence. I want to ask if you've ever seen this 17-page report before?
**A.** Yes, I have.
**Q.** How did you come to see this report?
**A.** I initially came to see it at the 7th District station.
**Q.** Who showed it to you?
**A.** It was an officer -- I don't remember specifically -- who had possession of it and brought it to my attention, knowing that I had been involved, to take a glimpse at it.
**Q.** Did you take a glimpse at it?
**A.** Yes.
**Q.** Did you read it?
**A.** Yes.

**Q.** When you read it, what was your reaction?

**A.** When I read the report, pretty much I knew that the shooting on the bridge was going -- there was going to be some problems for the officers that were involved.

**Q.** Why do you say that?

**A.** The report was -- the report was just, in my terms, just as far as having so many victims injured on the bridge, it was just not in-depth at all enough to justify any shootings by the officers.

**Q.** Let me --

**MR. CARTER:** Let's put up the report, Government's Exhibit 39, specifically page 6 of 17, if we can.

**BY MR. CARTER:**

**Q.** Let me direct your attention to the bottom --

**MR. CARTER:** Can we blow up that area?

**BY MR. CARTER:**

**Q.** This says, "The weapons used in the attempted murder of several police officers were," and it says, "a model black semi-automatic pistol." Did you see anyone with a model black semi-automatic pistol out there that day?

**A.** No.

**Q.** The next one is, "A blue steel Colt Trooper MK III .357 magnum." How about that, did you see that out there that day?

**A.** No.

**MR. CARTER:** Let's go to the next page, page 7 of 17.

7, forward. Thank you.

Top of the page, please.

**BY MR. CARTER:**

**Q.** "Make and model black pistol observed on the side of the Danziger Bridge by Sergeant Bowen." Did you see that weapon that day?

**A.** No.

**Q.** Then we have, "an unknown make chrome revolver observed on the side of the bridge by Sergeant Bowen," again. Did you see that?

**A.** No.

**Q.** Did you see Sergeant Bowen looking at that?

**A.** No.

**Q.** And the next one is, "An unknown type handgun observed being fired by deceased perpetrator." You didn't see that handgun either, did you?

**A.** No.

**MR. CARTER:** Let's -- well, leave the page up, but let's take the magnified portion down.

**BY MR. CARTER:**

**Q.** Beneath that is a list of weapons used by the officers out there that day.

**MR. CARTER:** Can we blow up that section on the weapons?

Thank you.

**BY MR. CARTER:**

**Q.** It lists Kenneth Bowen having, "a Glock 22 .40 caliber, serial number NO1164PD." Did you see him out there that day with any other type of weapon, Sergeant Bowen?

**A.** There was a rifle at his -- basically in the front cab of that Budget truck between him and Michael Hunter, there was --

**Q.** What type of rifle?

**A.** An AK-47.

**Q.** Now, we have an AK-47 at -- if you look at the bottom for Anthony Villavaso it says, "Egyptian 7.62 caliber rifle." Is that an AK-47?

**A.** Yes.

**Q.** And you said he did have one?

**A.** Yes.

**Q.** But there is no other AK-47 on this list?

**A.** No.

**Q.** Did you observe what type of weapon Sergeant Gisevius had out there that day?

**A.** A rifle as well.

**Q.** Do you remember what type of rifle?

**A.** AR-15. It wasn't an AK-47. It was like AR-15, M-4. They're real similar.

**Q.** Is that listed here under "Weapons," for Sergeant Gisevius?

**A.** No.

**Q.** When you read this document, what did you do?

**A.** When I read the document, I noticed some things in the document that were, basically, just ridiculous as far as being a police report that was written on an incident that was so major.

**Q.** Did you talk to anybody?

**A.** Yes.

**Q.** Who?

**A.** I informed Anthony Villavaso and Robert Barrios at the time that they may want to address what was written in that report because it pretty much had them taking, you know, pretty much the brunt of what was going on with that situation.

**Q.** Let me stop you. How about yourself? How were you referred to in that report?

**A.** I was referred to as not ever firing my weapon at all.

**Q.** Were you okay with that?

**A.** I was.

**Q.** Nothing for to you get mad about?

**A.** Correct.

**Q.** Why did you talk to Villavaso and Barrios?

**A.** Basically, the way that that report was reading, it had them striking these people with gunfire, whereas they had other individuals shooting but, basically, striking the concrete barrier. They hadn't -- they didn't, basically, strike any person, but they had these two guys actually striking people.

**Q.** So you thought this was information that Officer Villavaso and Barrios should have?

**A.** Yes.

**Q.** Did you talk to them?

**A.** Yes.

**Q.** What did they say?

**A.** They said that they would address the situation with Sergeant Bowen.

**Q.** Do you know whether or not they did?

**A.** No.

**Q.** When you look in this 17-page report at the list of weapons that the perpetrators or victims supposedly had, did you ever hear if -- whether anybody found a weapon out there that day?

**A.** It was under -- yes. It was a week later or what have you, supposedly a handgun was found.

**Q.** Did you believe that?

**A.** No.

**Q.** Why not?

**A.** I thought it was ridiculous, again.

**Q.** Why is it ridiculous?

**A.** You have five people who supposedly had weapons on a bridge and a week later you come up with one weapon. Why did it take a week later? Why wasn't there any orders given by the immediate supervisor on that bridge to go secure those weapons,

which would have been pertinent to justify a police shooting?
**Q.** What's it take to secure a weapon?
**A.** Not much, go grab it, stand over it, watch it.
**Q.** Pick it up?
**A.** Correct.
**Q.** Did you secure any bodies that day?
**A.** Yes.
**Q.** How many?
**A.** Two.
**Q.** Were you, personally, involved?
**A.** Yes.
**Q.** What was your involvement in securing the bodies?
**A.** Just standing over them.
**Q.** Just standing over the bodies?
**A.** Yes.
**Q.** Standing guard?
**A.** Yes.
**Q.** To make sure of what?
**A.** Just to make sure that the bodies weren't touched or, basically, to stand over and watch them until they were picked up.
**Q.** Bodies were secured, but these supposed weapons used by the perpetrators were not?
**A.** No.
**Q.** Direct your attention to January of, I guess it would be,

2006, following this. Did you have an occasion to make a statement regarding this shooting?

**A.** Yes.

**Q.** Tell us how that came about.

**A.** Out on regular duty, I was called to come to the 7th District station to give a statement on what had transpired on the Danziger Bridge.

**Q.** Do you remember who called you?

**A.** It was dispatched over the radio.

**Q.** And where were you told to go?

**A.** To the 7th District station.

**Q.** And when you got there, who did you see there?

**A.** There was ranking officers as well as homicide detectives.

**Q.** Give us some names. Who did you see?

**A.** Archie Kaufman, Gerard Dugue, Decynda Barnes, Jeffrey Lehrmann, and the seven officers -- six of the seven officers who had fired their weapons on the Danziger Bridge.

**Q.** Who were the six?

**A.** Anthony Villavaso, Robert Barrios, Michael Hunter, Sergeant Robert Gisevius, Sergeant Kenneth Bowen, and myself.

**Q.** Was Officer Faulcon there that day?

**A.** No.

**Q.** What happened when you got there?

**A.** We got there, it was -- it was, basically, told to us that we would be giving formal statements on the incidents which

transpired on the Danziger Bridge and we would be assigned a specific detective to take that statement. And, basically, we entered the gutted-out 7th District station.

**Q.** When you say "we," who's "we"? The same people you were talking about before?

**A.** Correct.

**Q.** Okay. You entered that station?

**A.** Yes.

**Q.** And what happened there?

**A.** Yes. And Sergeant Kaufman took the lead on explaining what we were here for.

**Q.** What do you remember him saying when he explained what you were here for?

**A.** Basically, to get your story straight.

**Q.** What did you understand that to mean?

**A.** To -- you're about to give a formal police statement, you need to, basically, have your ducks in a row in terms of what you're going to say transpired on that bridge and what your actions were.

**Q.** And you were all there together?

**A.** Yes.

**Q.** What happened next?

**A.** They started off with Sergeant Bowen taking the lead based upon what his actions were on the bridge that day and, basically, went around in a circle.

**Q.** Let me stop you. When you say, "taking the lead," taking the lead in doing what?

**A.** Explaining what his actions were on the bridge.

**Q.** So he explained his actions?

**A.** Yes.

**Q.** In front of all of you?

**A.** Yes.

**Q.** And you listened?

**A.** Yes.

**Q.** And what happened after he finished?

**A.** Went on to the next officer.

**Q.** At some point they got to you?

**A.** Yes.

**Q.** And you gave your statement?

**A.** Yes.

**Q.** What happened when you gave your statement?

**A.** They went on to the next officer.

**Q.** When you gave your statement, did you refer to yourself as having fired at someone or not? If I understand you correctly, the report you saw, the 17-page report, did not reference you as firing at anybody; is that correct?

**A.** Correct.

**Q.** So when you gave your statement that day, did you refer to yourself as having fired at someone or as not having fired?

**A.** I referred to myself as firing my weapon at someone.

**Q.** That's not what was in that 17-page report, is it?

**A.** No.

**Q.** So when you said that what happened?

**A.** When I said that, Sergeant Kaufman advised me to review my statement.

**Q.** What did you understand that to mean?

**A.** To go back, look at the report, what he had my actions being in that particular report, and pretty much to make that be my statement formally.

**Q.** Do you recall whether a copy of that report was available at this meeting?

**A.** Yes.

**Q.** After he said that, did you review the report?

**A.** No.

**Q.** Did you give a statement?

**A.** Yes.

**Q.** A formal recorded statement?

**A.** Yes.

**Q.** Who did you give that statement to?

**A.** Jeffrey Lehrmann.

**Q.** In that statement did you change back to the 17-page report and say you hadn't shot, or did you continue to say in that formal statement that you had shot?

**A.** I continued to state that I had fired my weapon.

**Q.** Why?

**A.** Because it was incorrect as far as the 17-page report. My actions weren't correct. I had never gave any statements on what my actions were on the bridge, but yet they had transcribed something in that report to be my actions.

**Q.** Mr. Hills, there were other incorrect statements in your statement, weren't there?

**A.** Excuse me?

**Q.** There were other incorrect -- or inaccuracies in the statement that you gave?

**A.** Yes.

**Q.** Let me show you that statement. It's Government's Exhibit 62. What is that document?

**A.** This is the formal audiotaped statement that I gave on my actions.

**Q.** That's the transcript of the statement?

**A.** Yes.

**Q.** And you've reviewed that transcript?

**A.** Yes.

**Q.** It's accurate as far as you can tell?

**A.** Yes.

**MR. CARTER:** I offer Government's Exhibit 62 into evidence.

**THE COURT:** Any objection? Counsel?

**MR. HESSLER:** No objection.

**THE COURT:** All right. 62 is admitted.

**MR. FLEMING:** Previous.

**THE COURT:** Sure.

**BY MR. CARTER:**

**Q.** Let's go to page 2 of this document. I have a highlighted portion.

Mr. Hills, it says there: "In the midst of all the gunfire, there was a police-given police commands, 'Put your hands up. Stop. Police.'"

Was that accurate?

**A.** No.

**Q.** Was that what happened?

**A.** No.

**Q.** That's a lie?

**A.** Yes.

**Q.** Why did you say that?

**A.** To protect myself and the other officers, to make it justified in terms of them giving commands, that we were identifying ourselves as police.

**Q.** The next highlighted section: "I exited the Budget truck and also gave the police command to, 'Stop," at which time the subject made an abrupt turn to the right towards the Budget truck and myself.

"And in immediate fear for other officers' life as well as my -- my own life, the subject clutched his waistband, turned towards me and other officers as -- as -- as if he was

grabbing and clutching for a weapon. At which time I observed something shiny around his waistband area. I immediately fired two shots at the subject, unsuccessful in hitting the subject."

Is that true -- is any of that true?

**A.** No.

**Q.** Well, I guess you did fire two shots; right?

**A.** Yes.

**Q.** Did you see something shiny around his waistband area?

**A.** No.

**Q.** Did you get out of the truck and yell, "Stop"?

**A.** No.

**Q.** You weren't in immediate fear of your life or other officers' life because of something this individual was doing, were you?

**A.** Excuse me?

**Q.** You weren't in immediate fear of your life or other officers' life because of something this individual was doing, were you?

**A.** No.

**Q.** Now, it looks like this is part of a statement that was given by you, and then afterwards looking at the transcript -- I believe, this was Officer Lehrmann who was questioning you?

**A.** Yes.

**Q.** He began to ask you questions?

**A.** Yes.

**MR. CARTER:** And let's go to page 4 of 6, please.

**BY MR. CARTER:**

**Q.** And this is, basically, the same story with him asking you and you guys going through it in question-and-answer form?

**A.** Yes.

**Q.** This is, basically, the same recitation about the individual fleeing?

**A.** Yes.

**Q.** And, again, here you also say: "Other officers gave verbal commands to stop"?

**A.** Yes.

**Q.** Is that true?

**A.** No.

**Q.** Did you ever hear any officers give verbal commands to stop?

**A.** No.

**Q.** Did you ever give a verbal command to stop?

**A.** No.

**Q.** So you at least told a partial truth here, that you fired?

**A.** Yes.

**Q.** You later testified before a state grand jury?

**A.** Yes.

**Q.** Why did you come -- how is it that you came to testify before a state grand jury?

**A.** I was subpoenaed to testify regarding the Danziger Bridge

shooting.

**Q.** Is this as part of an investigation of the officers shooting out there that day?

**A.** Yes.

**Q.** You testified at that hearing?

**A.** Yes.

**Q.** And you, again, told these same lies?

**A.** Yes.

**Q.** Were you ever charged as a result of that state investigation?

**A.** Yes.

**Q.** You were indicted?

**A.** Yes.

**Q.** What happened after you were indicted? Were you arrested?

**A.** Yes.

**Q.** Were you arrested at your home or did you self-surrender?

**A.** Self-surrender.

**Q.** Tell us about the day you self-surrendered.

**MR. HESSLER:** Objection, Your Honor. Relevance.

**MR. CARTER:** It was part of the cover-up, Your Honor.

**THE COURT:** Well, that question, in particular, though. Can you be maybe be a little more specific without leading?

**BY MR. CARTER:**

**Q.** Did you leave your house and go directly to jail?

**A.** No. We, as well as other officers, gathered at the PANO building, which is the Police Association Office, and we were transported all together in a vehicle to about two or three blocks to a parking lot, two or three blocks near the lockup, and we proceeded -- we walked together to the lockup.

**Q.** Who's "we"?

**A.** Myself and the other officers that were involved with the shooting that were indicted.

**Q.** Let me show you what's been marked as Government's Exhibit 67.

**MR. HESSLER:** Your Honor, may we approach?

**THE COURT:** Yes.

(WHEREUPON, the following proceedings were held at the bench.)

**THE COURT:** Come on, let's go.

**MR. HESSLER:** Your Honor, I'm going to object to the relevance of this picture. It's a picture of them turning themselves in to lockup. It's not in any way probative of any issue in regards to a cover-up in regards to -- to anything in regards to their actions that is before the jury. To display this is improper.

**THE COURT:** Let me see it. Is it the one I think it is?

**MR. HESSLER:** It's an improper attempt to inflame the jury.

**MR. CARTER:** It may be improper, but it's not to inflame the jury.

**MR. HESSLER:** I'll just go with improper.

**MR. CARTER:** Your Honor, it's part of the whole process to cover-up. They're still working together with concerted efforts. They're still sticking together.

**THE COURT:** But how is this -- I mean, he can testify --

**MR. CARTER:** And why they felt confident they could get away with it.

**MR. HESSLER:** They can't get that out of a picture.

**MR. CARTER:** You can get that out of the picture and his testimony.

**MR. HESSLER:** His testimony, but you're asking them to extrapolate all that from a still photograph. No.

And then, again, the state proceedings and whether they'd get away with that or not is not at issue in this.

**THE COURT:** I think I'm going to let him go ahead and show it. I'll overrule it.

**MR. LARSON:** Can I see it, please?

**MR. MECHE:** Your Honor, there's others like that that are a little bit different. I don't know if Ted intends to introduce --

**THE COURT:** Wait, wait. First of all, there's too

many people talking. If there are others similar to it, I think we need one. Okay?

**MR. CARTER:** I was about to say, Judge, I have five. I will only use this one.

**THE COURT:** One. Pick one that --

**MR. CARTER:** That one. He's in it.

**THE COURT:** Okay. He can only use one. I'm going to overrule.

(WHEREUPON, the following proceedings were held in open court.)

**BY MR. CARTER:**

**Q.** Mr. Hills, I'm going to show you what's been marked as Government's Exhibit 67. Can you identify that?

**A.** Oh, this is the scene outside of lockup on the day that we self-surrendered.

**Q.** Are you in that picture?

**A.** Yes.

**MR. CARTER:** Your Honor, I offer Government's Exhibit 67 into evidence.

**THE COURT:** All right. So ordered.

**MR. CARTER:** Let's have 67.

**BY MR. CARTER:**

**Q.** Do you see yourself in that photograph?

**A.** Yes.

**Q.** Who's the individual in the foreground of that photograph

in front of you?

**A.** Sergeant Robert Gisevius.

**Q.** Who else was there with you? Which other officers from the Budget truck were there with you?

**A.** Anthony Villavaso, Robert Barrios, Robert Faulcon, Sergeant Kenneth Bowen, Michael Hunter.

**Q.** You said you met somewhere. Where did you meet?

**A.** We met at PANO's office.

**Q.** And you walked to the jail?

**A.** We were driven.

**Q.** You were driven?

**A.** We were driven in a vehicle. We parked maybe three -- around the corner, two blocks away from the entrance of lockup.

**Q.** When you say "we", were you all driven in one car or were you in separate cars?

**A.** One car.

**Q.** One car.

And what happened when you got to the parking lot?

**A.** We proceeded to walk towards lockup where there was -- we were greeted by several supporters.

**Q.** You say several. Was it --

**A.** The block was lined on both sides.

**Q.** How many blocks?

**A.** At least a full block.

**Q.** And there's a sign there that says, "Heros." Did you feel

like you were being treated as heros?

**A.** Yes.

**Q.** Were you a hero?

**A.** No.

**Q.** Why not?

**A.** There wasn't anything heroic about what transpired on the bridge that day to be declared a hero.

**Q.** At this point you guys are still working together?

**A.** Yes.

**Q.** Sticking together?

**A.** Yes.

**Q.** Were -- was there a finding of guilt or innocence in that state proceeding?

**A.** No.

**Q.** The case was eventually dismissed?

**A.** Yes.

**Q.** At some point in time or have you heard -- did you hear that someone else was investigating this case?

**A.** Yes.

**Q.** Who?

**MR. HESSLER:** Objection, Your Honor. It's leading.

**THE COURT:** I'll overrule.

**BY MR. CARTER:**

**Q.** Who was investigating this case?

**A.** The Department of Justice.

**Q.** Were you surprised by that?
**A.** No.
**Q.** Why not?
**A.** At that point the case had gained media attention. It was pretty prominent. It had been dismissed to the dislike of quite a few people and it had stepped to the next level of investigation.
**Q.** From your training as a New Orleans police officer -- let me back up. Let me state that differently.

Did you receive any training as a New Orleans police officer as to whether or not uses of force could be investigated by the State of Louisiana?
**A.** Yes.
**Q.** Did you receive any such training on whether a use of force could be investigated by the federal government?
**A.** Yes.
**Q.** And at some point you actually met with the FBI during the course of their investigation?
**A.** Yes.
**Q.** Tell us about those first meetings.
**A.** Met with them one time -- didn't even meet with them, had my attorney speak with them. I chose not to -- to meet with them at that point.
**Q.** Why not?
**A.** Just wasn't ready to -- to -- got the response that they

were pretty much investigating this crime and they were looking to -- to indict all the officers involved.

**Q.** So you weren't willing or ready to cooperate?

**A.** No.

**Q.** Did this change at some point?

**A.** Yes.

**Q.** When?

**A.** This changed once at least three, four officers before me had chosen to cooperate.

**Q.** Who were those officers?

**A.** Lieutenant Michael Lohman, Officer Jeffrey Lehrmann, Officer Michael Hunter, Officer Robert Barrios.

**Q.** So after these officers decided to cooperate -- well, strike that.

How did you know they decided to cooperate?

**A.** Through the information given by the Department of Justice that they had cooperating witnesses that had took pleas.

**Q.** So only after these individuals had agreed to cooperate did you decide to cooperate?

**A.** Correct.

**Q.** Did you think you were going to get indicted?

**A.** Yes.

**Q.** Did the FBI ever invite you to come in and talk, or did you just voluntarily call them once you heard these other individuals had cooperated?

**A.** We actually reached out to the FBI.

**Q.** Who's "we"?

**A.** My attorney and myself.

**Q.** What happened when you reached out to them?

**A.** We went and spoke with them.

**Q.** To tell them what?

**A.** To tell them the truth about what had transpired on the bridge.

**Q.** What were you hoping to get out of this?

**A.** A reduction in jail time.

**Q.** Did you plead guilty to anything?

**A.** Yes.

**Q.** What did you plead guilty to?

**A.** Conspiracy to obstruct justice and misprision of a felony.

**Q.** What type of jail time are you facing?

**A.** Up to eight years.

**Q.** Do you expect to go to prison?

**A.** Yes.

**Q.** Are you hoping for leniency?

**A.** Yes.

**Q.** What do you have to do to get leniency?

**A.** Tell the truth about the events that transpired on the bridge.

**Q.** Were you ever given a document to read and sign, a type of a factual basis?

**A.** Yes.
**Q.** Did you prepare that factual basis?
**A.** No.
**Q.** Who prepared it? Do you know?
**A.** The U.S. Attorney's Office.
**Q.** The government?
**A.** Yes, the government.
**Q.** Did you read it?
**A.** Yes.
**Q.** Did you read it with your attorney?
**A.** Yes.
**Q.** When he handed it to you, did you just sign it?
**A.** No.
**Q.** What did you do?
**A.** Me and my attorney looked over it and I didn't agree with some of the things in the report.
**Q.** So what did you do?
**A.** I didn't sign it.
**Q.** You did what?
**A.** I didn't sign it.
**Q.** What happened?
**A.** We gave it back. We revised it.
**Q.** You revised it?
**A.** Yes.
**Q.** You and your attorney revised it?

**A.** Yes.

**Q.** Do you remember how many times you revised it?

**A.** Maybe twice, at least once.

**Q.** And at some point you signed it?

**A.** Yes.

**Q.** And when you signed it, you were satisfied that it was accurate?

**A.** Yes.

**Q.** Is everything you know about this case contained in that factual basis?

**A.** No.

**Q.** You mentioned misprision of a felony. What's misprision?

**A.** Knowing of a crime.

**Q.** I asked you earlier when you were talking about the immediate aftermath of the shooting on the bridge if you had talked to Arthur Kaufman or Kenneth Bowen. Did you ever talk to Robert Gisevius about the shooting on the bridge?

**A.** No.

**Q.** Did you ever talk to him about shootings in general during Hurricane Katrina?

**A.** Yes.

**Q.** What was that conversation?

**A.** He had, basically, stated that at one point he was driving a truck that he had commandeered in the area and he was approached by another individual that tried to take that

vehicle from him. So I asked him what happened. He said he killed him -- he said he killed that person that tried to approach his vehicle.

**Q.** What did you say in response to this?

**A.** Nothing.

**Q.** Do you recall whether he sounded remorseful or bragging?

**A.** Just normal tone.

**Q.** As a matter of fact?

**A.** Yes.

**Q.** How do you feel about your decision to cooperate with the federal government?

**A.** I feel good about it.

**Q.** How do you feel about your decision to testify here today?

**A.** I feel good about it.

**Q.** Why?

**A.** Because it's the right thing to do.

**Q.** Right for who?

**A.** For myself, as well as the families and the victims of this incident.

**MR. CARTER:** I have nothing further, Your Honor.

**THE COURT:** Okay. Cross?

**CROSS-EXAMINATION**

**BY MR. HESSLER:**

**Q.** Good morning, Mr. Hills.

**A.** Good morning.

**Q.** My name is Eric Hessler.

We know each other; correct?

**A.** Yes.

**Q.** And you know I represent Rob Gisevius?

**A.** Correct.

**Q.** And let me ask you something. On June -- I'm sorry, September 4th, of 2005, at 9:00 in the morning -- about 9:00 in the morning, you tried to shoot and kill an unarmed 14-year-old boy, 5 foot, 90 pounds, who was running away from you?

**A.** Correct.

**Q.** Why on earth would you do that?

**A.** Out of fear. It was an intense situation.

**Q.** You intended to kill him?

**A.** Yes.

**Q.** You wanted him dead?

**A.** I wanted to -- out of fear, I fired my weapon, whether I wanted to kill him -- stop the threat is the use of force. I mean, if he was --

**Q.** Well, he wasn't a threat?

**A.** Kill him is not -- wasn't my intentions. I didn't want to kill him.

**Q.** You wanted to shoot him in the back?

**A.** Yes.

**Q.** Okay. To stop the threat?

**A.** He was not a threat. I fired my weapon, overreacted out

of fear.

**Q.** What were you afraid of?

**A.** Just the events that had took place, the weapons being fired, not knowing if that individual could have been a threat.

**Q.** Okay. Well --

**A.** Essentially, he was not because he was running away from me.

**Q.** You know that now; right?

**A.** Well, I knew it at that point as well.

**Q.** Okay. So you knew it at the point that he wasn't a threat and that he wasn't armed and yet you still decided to try and shoot this 5 foot, 90 pound, 14-year-old boy in the back?

**A.** I didn't know that he -- conclusively that he wasn't armed, but he wasn't a threat because he was running away, and that's correct.

**Q.** So it was -- so you believed he could be a threat?

**A.** Well, he wasn't an imminent threat to me, but he could have been -- could have been armed. But he was not a threat.

**Q.** So you fired -- and I don't want to put words in your mouth -- you fired at him because you were scared?

**A.** Correct.

**Q.** And what is it that you were scared of?

**A.** The fact that he could have been armed and I had heard so much gunfire at that point.

**Q.** Okay. Well, let me ask you this: When you were heading

to that bridge were you scared?

**A.** Yes.

**Q.** Of what?

**A.** What we were -- what potentially we may be approaching.

**Q.** What is it that you may -- or you were potentially approaching?

**A.** Officer's life in danger. The signal was a 108 that there may be some threats out there.

**Q.** Okay. Did you believe two officers were down under the bridge?

**A.** I didn't really get a full understanding of what "down under the bridge," the "two officers being down" was. I didn't know if they was under the bridge, just down under the bridge, or down as far as being shot.

**Q.** Well, when you hear that there are two officers down, normally what do you think?

**A.** You would think that they're injured, they're shot.

**Q.** And that's the only information you had?

**A.** Correct.

**Q.** And if you heard that information normally, in normal times, you'd think that they were shot?

**A.** Yes.

**Q.** And in this time would you be even more likely to believe that that had occurred?

**A.** I would, but the clarity on what that actually meant at

that point, it was -- it wasn't clear enough to me to understand that there were officers that were actually shot. "Down under the bridge" was vague.

**Q.** Now, when did you come to this decision -- well, I guess you're saying to this jury that you came to the decision right before you pulled the trigger that this kid was not a threat to you; is that right?

**A.** It was, basically, understood after I pulled the trigger that, you know, I pulled the trigger at someone that was not a threat.

**Q.** Okay. Do you remember speaking to the government, meeting with Ms. Bernstein -- I'm sorry -- and telling them as recently as April of 2010 that you thought that boy was a threat -- that kid was a threat?

**A.** Yes.

**Q.** Did you believe it then?

**A.** No.

**Q.** Okay. But you told them that -- even though you were cooperating with them, you at that point told them you thought he was a threat, but you didn't believe he was at that time?

**A.** Correct.

**Q.** Now, you met with -- well, let me ask you this. Let's just go back a little bit. You're here testifying -- have you been sentenced yet?

**A.** No.

**Q.** What have you been told is your -- what have you pled to?

**A.** Conspiracy to obstruct justice and misprision of a felony.

**Q.** And what -- what sentence is the maximum sentence you're facing?

**A.** Up to eight years.

**Q.** And you can certainly get less than eight years?

**A.** Yes.

**Q.** And the people that decide whether or not they -- they -- well, the government has told you that they could help you get less than eight years; correct?

**A.** They informed me to tell the truth.

**Q.** You went over a letter with your attorney?

**A.** Yes.

**Q.** And in that letter you were informed that -- that depending upon your testimony, the government could choose, at their sole discretion, whether or not to write a letter on behalf from the government to the judge -- to the judge that you've pled before asking for leniency in your sentence; correct?

**A.** Yes.

**Q.** Do you want that letter written?

**A.** Absolutely.

**Q.** And Ms. Bernstein is the person -- or, basically, the government decides if they write that letter for you or not based on your testimony today?

**A.** To my understanding.

**Q.** Okay. Do you have any pressure to say anything to make sure you get this letter?

**A.** Not at all. It's real easy to tell the truth.

**Q.** Okay. Do you remember giving an interview on March 28th of 2010?

**A.** Yes.

**Q.** To the FBI?

**A.** Yes.

**Q.** Do you remember what the purpose of that interview was?

**A.** No.

**MR. HESSLER:** Your Honor, may I approach?

**THE COURT:** Yes.

**BY MR. HESSLER:**

**Q.** Just read it to yourself.

**A.** (WITNESS COMPLIES.)

**Q.** What was the purpose of that interview now?

**A.** The purpose of that interview was to give my statements on what transpired on the Danziger Bridge.

**Q.** Okay. Let me leave this up by you because -- so you can refer to it.

It says: "After being advised of the purpose of the interview, Hills provided the following information." Is that correct?

**A.** Correct.

**Q.** And then, apparently, you were asked a question, after they tell you what the purpose of that interview is -- they called you back?

**A.** I don't recall.

**Q.** Okay.

**A.** I believe they may have, yeah.

**Q.** It says: "Hills provided the following information." Now, was Agent Bezak asking these questions? Look at the bottom of that paper and see who asked -- does it indicate who was the questioners?

**A.** It says Bezak.

**Q.** Okay. "When asked whether Hills told Robert Barrios that DOJ Attorney Bernstein pressured him to say things he had not done or did not have knowledge of, Hills initially said it was a misunderstanding."

Do you recall that conversation?

**A.** Yes.

**Q.** So the purpose of the interview was, apparently, word got back to Department of Justice that you told Barrios that you were being told to say things that were --

**MR. CARTER:** Your Honor, I object to the mischaracterization.

**THE COURT:** Well, let's go ahead and read it.

**MR. HESSLER:** I'll read it.

**BY MR. HESSLER:**

**Q.** "That you were being pressured to say things that you had not done or did not have knowledge of."

**A.** Yes, that was the misunderstanding.

**Q.** Okay. That's what you said initially, it was a misunderstanding?

**A.** Correct.

**Q.** Okay. They must have asked more questions. Next it says: "Hills said Bernstein was more aggressive than himself as to what happened and what Hills knew." Right?

**A.** Correct.

**Q.** "Hills admitted he talked to Barrios and said that Bernstein asked him to say things he did not do or know about"?

**A.** It was -- it was some misunderstanding as in when she was asking certain questions. I spoke with him about it. It was -- we cleared it up. It was just some things that -- that was just a misunderstanding in terms of what she was -- the questioning -- the manner of the questioning that she was asking.

**Q.** Well, let me ask you this: When you went to Barrios and said, "Bernstein asked him to say things he did not do or know about," you misunderstood what she was asking you?

**A.** No. What -- what it's stating is that Barrios misunderstood what I was telling him in terms of...

**Q.** Well, you also must have understood -- misunderstood what

Barrios told you because it says, "Barrios stated" -- "Barrios felt the same way." Didn't you say that?

**A.** He had expressed that to me.

**Q.** Barrios expressed to you that he felt Bernstein -- Ms. Bernstein was pressuring him to say things he didn't know about or didn't do?

**A.** Yes. He had expressed that to me, that he was -- he had not -- or he had felt pressured from -- from the government.

**Q.** Okay. So you both understood the same thing. You all are both feeling pressured to say -- or say things that you didn't know about or do things that you didn't do. Is that a part -- is that a part to it?

**A.** Well, no. It was a misunderstanding in terms of -- the government just asked me to tell the truth. But they wanted -- they asked certain questions that I really couldn't give answers to.

**Q.** Okay.

**A.** That they may have thought I could have given, but I wasn't in a position to give those answers. So it was a misunderstanding between me and the government in terms of me being able to provide answers to some of the questions that they had, whereas I was just available to give the truth on what had transpired.

**Q.** Okay. Well, let me ask you this: Was the misunderstanding that you misunderstood she was pressuring you,

or was it a misunderstanding that she thought you had information you were holding back?

**A.** Yes, it was a misunderstanding that she thought I had information that I was holding back.

**Q.** Okay. So you certainly felt pressured to say things that you didn't know about and say things that you didn't do. You felt that pressure in reality; correct?

**A.** Well, it wasn't pressure because they was -- I was only there to tell the truth, and I couldn't speak on anything that I didn't have knowledge of.

**Q.** Uh-huh. Now, did you -- now -- and Ms. Bernstein was the one that had, I guess, essentially the keys to the jail, whether or not she -- they write a letter on your behalf or not; right?

**A.** Whether she writes a letter, to my understanding, is, yes, she has the control over it.

**Q.** Okay. And they didn't bring in -- it was Agent Bezak and Blythe and they didn't do this outside the presence of Ms. Bernstein, did they?

**A.** No.

**Q.** She was sitting -- seated right there?

**A.** Yes.

**Q.** Did you feel pressure to give any answers at that point or explain -- explain what had happened?

**A.** No. It was -- it was just -- here again, it was a

misunderstanding. I wasn't able to give them any more information than the truth.

**Q.** Let me ask you this: Why didn't you tell them this? Why did they have to call you in and ask, "Did you tell Barrios this?"

**A.** Excuse me?

**Q.** Why did the government have to call you in and ask you whether you told Barrios that you were feeling pressured to say things you didn't do and do things you didn't do? Why didn't you just tell the Department of Justice that, or did you?

**A.** We had discussed -- I had discussed with the Department of Justice that there were some answers that I didn't have -- some questions I didn't have the answer to --

**Q.** When?

**A.** -- and there was some misunderstandings.

**Q.** When did you have that discussion?

**A.** Prior to this and during this.

**Q.** Okay. Do you know -- all right. I'll withdraw that question.

Now, when you were driving to -- from the Crystal Palace to the scene of the Danziger, was there any talk or banter or anything going on in the back of the truck?

**A.** No.

**Q.** Could you describe to the jury the atmosphere in the truck?

**A.** Pretty quiet. Everybody was on alert, you know, just preparing themselves for what they may encounter.

**Q.** Was it -- would you say it was tense?

**A.** Yes.

**Q.** Would you say your adrenaline was pumping?

**A.** Yes.

**Q.** And it was scary?

**A.** Yes.

**Q.** Could you hear everything going on? Was it silent in the back of the truck or was there rattling and banging around?

**A.** I mean, it was -- you know, you're moving in a truck. You could pretty much hear something if somebody was speaking something or if something was said, but...

**Q.** What could you see?

**A.** Out -- due to my position in the rear of the truck, I could just see the street as we was passing from the rear point of view.

**Q.** Did that give you any advantage in preparing to assess the situation?

**A.** No. Actually, a disadvantage. If there was an advantage, it would be a disadvantage.

**Q.** So you probably -- did you feel you were disadvantaged from a tactical standpoint?

**A.** Yes.

**Q.** Did that concern you?

**A.** It kind of concerned me, but it was just -- the state of mind was just to prepare. I mean, you couldn't control that situation.

**Q.** But that would make your job harder to do, wouldn't it? It would make it harder for you to assess something?

**A.** Yes.

**Q.** When you -- how did you know you were getting near the Danziger Bridge?

**A.** You could tell from the rear viewpoint that you had pretty much crossed Chef Highway and Downman, which is the intersection right before the bridge.

**Q.** Now, in your -- in your training as a New Orleans police officer -- how long have been a police officer at this time?

**A.** A year and a half --

**Q.** A year and a half.

**A.** -- 15 months to a year and a half at that point.

**Q.** Okay. So how long have you actually been working by yourself a New Orleans police officer?

**A.** About a year.

**Q.** But you had to go through a training phase and all that?

**A.** Yes.

**Q.** Were you ever trained for a situation such as this, riding around in the back of a Budget truck during a national disaster, responding to police officers?

**A.** No.

**Q.** Were you ever trained to rid your body of the human emotion of fear?

**A.** No.

**Q.** In fact, you were -- when you arrived on the bridge, what was the first thing you heard?

**A.** Gunfire.

**Q.** Did this concern you?

**A.** Absolutely.

**Q.** Are New Orleans police officers trained to fire warning shots?

**A.** No.

**Q.** Did you believe these were warning shots? Did you have any reason to believe there were warning shots being fired by a police officer?

**A.** No.

**Q.** Is the New Orleans police officers -- department trained to fire on persons they do not believe are a threat to them?

**A.** No.

**Q.** Now, Mr. Carter asked you to describe the sound of the weapons -- or weapon you heard being fired; correct?

**A.** Correct.

**Q.** And what weapons or weapon did you describe?

**A.** A high-caliber weapon, rifles.

**Q.** Okay. Rifles?

**A.** High-caliber weapon.

**Q.** More than one, rifles?

**A.** Yes.

**Q.** Nobody in the back was firing rifles, were they?

**A.** No.

**Q.** There was only one rifle up front, to your knowledge?

**A.** Yes.

**Q.** Did you hear any pistol fire?

**A.** No. Couldn't -- no, I didn't.

**Q.** And the sound is coming from outside of the truck?

**A.** Yes.

**Q.** You can't tell whether you're being fired upon or whether there's -- you don't know who's firing on that bridge, do you?

**A.** No.

**Q.** At that time are you fearful that you were being fired upon?

**A.** Could have been.

**Q.** Well, you've ruled out police firing a warning shot; right?

**A.** Right.

**Q.** And you've ruled out that it's policemen firing on unarmed or --

**MR. CARTER:** I object. That has not been ruled out. That's a mischaracterization of what's been ruled out.

**THE COURT:** Well, I'm going to let him -- I'm going to overrule the objection and let him answer. He can clarify

it, and it was based on the answer he previously gave.

**BY MR. HESSLER:**

**Q.** And you've ruled out that it's police officers firing on persons that are not threatened -- threatening to themselves; correct?

**MR. CARTER:** Same objection.

**THE COURT:** Overruled.

**THE WITNESS:** Rephrase that question again, the second half of "ruled out."

**BY MR. HESSLER:**

**Q.** You have no -- you don't believe it's police officers just shooting willy-nilly at people that aren't a threat to themselves, do you?

**A.** I would have hoped that they weren't at that point.

**Q.** Right.

You wouldn't think that --

**A.** It was -- you didn't know what was going on.

**Q.** Okay. But you knew that you didn't want to get out of the back of that truck, huh?

**A.** Correct.

**Q.** And you had no reason to believe that a policeman was going to shoot you, did you?

**A.** No.

**Q.** So why didn't you get out of the back of the truck?

**A.** Because of just the amount of gunfire, not knowing who was

firing their weapons, not knowing what the situation was, not having that viewpoint of being in the front of the cab to see what you were approaching.

**Q.** All right. Now, how long after this gunfire ceased did you get out of the truck?

**A.** A couple of minutes, three, four minutes.

**Q.** So you waited for some time after the gunfire had stopped to get out?

**A.** Right.

**Q.** Why did you wait so long?

**A.** I mean, it would -- it was a matter of minutes. It was just a matter of officers had exited the vehicle at that point, just for safety precautions.

**Q.** Okay. Now, some officers exited in the midst of all that gunfire, didn't they?

**A.** There was a break in gunfire when the officers exited, then the gunfire transpired again once they exited.

**Q.** So you never saw what happened, for the most part. You heard what happened, you heard gunshots and things of that nature, but you didn't see anything that happened on the east side of the bridge?

**A.** Correct.

**Q.** In regards to that?

**A.** Correct.

**Q.** And did you ever even see Gisevius on the east side of the

bridge after that, immediately after that?

**A.** Immediately, no.

**Q.** And you never saw what happened on the west side of the bridge?

**A.** No.

**Q.** At some point within the -- let me ask you this: How long until you got back to the central -- Crystal Palace?

**A.** We were out there on the bridge maybe about 30 -- close to an hour. Close to an hour, roughly.

**Q.** Did you ever talk to Sergeant Gisevius out there?

**A.** On the bridge, no.

**Q.** All right. So about an hour later you go back to the Crystal Palace you said?

**A.** Yes.

**Q.** How did you get back there?

**A.** It was in a van, some type of van.

**Q.** Did you ride back with Rob Gisevius?

**A.** No.

**Q.** Let me ask you this: When the other officers got -- just to jump back a little -- when the other officers got out of the back of the truck in the midst of the gunfire, what did you think they were going to do?

**A.** I had no idea at that point.

**Q.** Do you recall meeting with the government on March 21 of 2010?

**A.** Yes.

**Q.** Do you recall telling them that you thought their intention was to get out and neutralize the threat and start shooting?

**A.** Excuse me?

**Q.** Do you recall telling the government that, "Hills thought their intention was to get out and neutralize the threat and start shooting"?

**A.** I don't recall. I don't recall. I may have said it, but I don't understand what you're saying.

**MR. HESSLER:** May I approach, Your Honor?

**THE COURT:** Yes.

**MR. HESSLER:** Do you have that?

**MR. CARTER:** I'm sorry.

**MR. HESSLER:** 4/21/2010.

**MR. CARTER:** Which page are you referring to?

**MR. HESSLER:** 3, that paragraph.

**MR. CARTER:** Let me see and make sure I have the right...

May I approach, Your Honor?

**THE COURT:** Yes, sir.

**BY MR. HESSLER:**

**Q.** Do you see that, Mr. Hunter [sic]?

**A.** Yes, yes.

**Q.** Now, does it reflect that you did, in fact, tell them that

you thought the officers' intent was to get out and neutralize the threat by shooting?

**A.** Yes.

**Q.** And right underneath that it says, "You felt safety in the truck," didn't you?

**A.** For what it was worth.

**Q.** Well, it's certainly worth a lot more when some officers are out and you believe they're shooting at people that are shooting at you, that certainly affords you a little more level of protection, don't you think?

**A.** Yes.

**Q.** Thank you.

Now, when you all were driving up there, nobody said, "We're going shoot people," or they wanted shoot people or you didn't -- you didn't get that atmosphere, did you?

**A.** No.

**Q.** You had no reason to believe anybody was going to do that unprovoked?

**A.** No.

**Q.** So you get back to the central -- Crystal Palace and what happens next?

**A.** That's when we were approached by Sergeant Kaufman. He had asked who had fired their weapons on the bridge. The persons that had fired their weapons on the bridge raised their hands.

**Q.** That was seven people?

**A.** Yes.

**Q.** Could you recite to the jury the seven people that raised their hands and informed that they had fired shots on the bridge?

**A.** Robert Gisevius, Kenneth Bowen, myself, Robert Faulcon, Robert Barrios, and Anthony Villavaso. Michael Hunter as well.

**Q.** Were you all -- you all arrived there kind of the same time or do you recall?

**A.** Yes.

**Q.** You were kind of segregated from the others that were not involved in the shooting?

**A.** At the point where everyone who had fired their weapons raised their hands, then the others had dismissed themselves.

**Q.** And you mentioned seven names. And is it true that those seven names eventually in the past five, six years have been somehow labeled by the media as "The Danziger Seven"?

**A.** Yes.

**Q.** And that was the seven officers who shot -- discharged their guns on the bridge?

**A.** Yes.

**Q.** And you all seven sat around a round table, literally -- they say a "round table meeting," but it was literally a round table; right?

**A.** Yes.

**Q.** And what happened?

**A.** At that point --

**Q.** Well, let me ask you this: Was Lieutenant Lohman there?

**A.** Yes.

**Q.** What is your relationship with Lieutenant Lohman?

**A.** He was the lieutenant of the 7th District at that time.

**Q.** Are you close with him?

**A.** No.

**Q.** Were you ever close with him?

**A.** No.

**Q.** Okay. So tell me what happens.

**A.** At that point they started to start with Michael Hunter. They asked Michael Hunter how many times he had fired his weapon. He proceeded to say, "30 plus times," and Lieutenant Lohman, basically, gave a signal and discussed something with Archie Kaufman and they, basically, just cut that -- cut that meeting short.

**Q.** Okay. After Michael Hunter said he fired over 30 times --

**A.** Yes.

**Q.** -- did Kaufman and Lohman get up and walk away and discuss something?

**A.** They didn't -- I didn't observe them walk away. He just kind of leaned over to him, told him something, and that's, basically, when they cut the meeting short.

**Q.** Were all seven of you all dismissed?

**A.** Yes.

**Q.** And, correct me if I'm wrong, but isn't it true that you all almost immediately went back to boat rescues and stuff?

**A.** I just -- we just kind of hung around that station, that's what I did. I mean, we was just kind of at the police station at that point.

**Q.** Did they ever -- were you ever asked what type of weapon you had discharged or did it go any further than that?

**A.** No.

**Q.** You were never asked at that point?

**A.** No.

**Q.** Now --

**THE COURT:** Mr. Hessler, when you get to a good stopping point in your line of questioning, we can go ahead and take our lunch break.

**MR. HESSLER:** Now would be perfect.

**THE COURT:** Now is a good time? Okay. Good.

If you all can be ready at 1:05 -- 1:05 -- we'll go ahead and begin again at 1:05. Please don't discuss anything about the case amongst yourselves or with anyone else during the lunchtime.

And, sir, if you can be on the witness stand here at 1:05. Also, do not discuss anything about your testimony with anyone prior to returning at 1:05.

**THE WITNESS:** Okay.

**THE DEPUTY CLERK:** All rise.

(WHEREUPON, the jury exited the courtroom.)

**THE COURT:** You can be seated.

You can step down, sir.

Counsel, is there anything that we need to discuss on the record before we break for lunch?

**MR. FLEMING:** Just real briefly, Your Honor. Is the record picking me up?

I just want to make clear that when State's Exhibit 62 was admitted there was an indication of no objection, but it was subject to a previous objection.

**THE COURT:** A prior objection that is reflected in the record, correct. That's correct.

**MR. FLEMING:** Thank you.

I want to make sure we're not waiving that.

**THE COURT:** The admission is subject to the objection and the ruling thereon.

**MR. FLEMING:** Thank you, Judge.

**THE COURT:** Okay.

Anything else we need to cover on the record?

**MS. BERNSTEIN:** No, Your Honor.

**MR. FLEMING:** I don't believe so, Your Honor.

**THE COURT:** Counsel, if you all would approach.

**(OFF THE RECORD)**

**(LUNCHEON RECESS)**

**AFTERNOON SESSION**

**(June 30, 2011)**

* * * * *

**THE DEPUTY CLERK:** All rise.

(WHEREUPON, the jury entered the courtroom.)

**THE COURT:** You may be seated.

Again, we appreciate you being back from lunch on time and ready to go at the appointed time.

Mr. Hills was being cross-examined when we took the break.

Mr. Hills, have you discussed anything about your testimony with anyone since we left, took the break and we adjourned here just now?

**THE WITNESS:** No.

**THE COURT:** Okay. Go ahead, Mr. Hessler.

**BY MR. HESSLER:**

**Q.** Good afternoon, Mr. Hills.

Mr. Hills, when we took the break you had testified that the meeting at the Crystal Palace had more or less disintegrated after Michael Hunter stated he --

**THE COURT:** One second.

I'm sorry. Go ahead.

**BY MR. HESSLER:**

**Q.** -- after Michael Hunter stated that he had fired his weapon over 30 times on the bridge; do you recall that?

**A.** Correct.
**Q.** And that was the only discussion that you had at that round table with -- with the seven shooters and the investigators?
**A.** Yes.
**Q.** Is it fair to state that you didn't have any further contact with them regarding the shooting -- when I say "them," I'm talking about the investigators and/or the shooters -- until the 25th of January when you were called off the street to give a statement?
**A.** That's incorrect -- no, that's incorrect. I had -- you know, I had worked with some of the other officers up until that point.
**Q.** And on the 25th, you came to give a statement?
**A.** Yes.
**Q.** And you told the jury that every one of the officers, including yourself, recited a -- I guess, your version of the events?
**A.** Yes.
**Q.** And you hadn't been told what to say?
**A.** No.
**Q.** And there was -- tell the jury who was all present at that pre-interview, that pre-meeting -- that meeting?
**A.** Myself, Anthony Villavaso, Robert Barrios, Sergeant Kenneth Bowen, Robert Gisevius, Sergeant Dugue, Archie Kaufman,

Jeffrey Lehrmann. A couple more homicide detectives, investigators. Decynda Barnes, I remember being there.

**Q.** Decynda Barnes, you remember?

**A.** I remember seeing her, yeah.

**Q.** Did she actually take your statement?

**A.** No.

**Q.** Who took your statement?

**A.** Jeff Lehrmann.

**Q.** So he would have been there also?

**A.** Yes.

**Q.** Do you recall seeing Mike Lohman?

**A.** I don't recall.

**Q.** Are you -- were you and Lohman close?

**A.** No.

**Q.** Did Lohman ever come to you prior to that and show you the 17-page report or even ask you, "Hey, are you okay with the report?"

**A.** No.

**Q.** Are you sure about that?

**A.** Yeah.

**Q.** Did he ever ask you anything about this report or your statement in a report?

**A.** No.

**Q.** "Are you okay with that?"

**A.** Yes.

**Q.** No, did he ever ask you, "Hey, Ignatius Hills, are you okay with this report? Are you okay with the statements you're going to give and all of that?"

**A.** No.

**Q.** Now, the 7th District station was flooded; correct?

**A.** Yes.

**Q.** Now, on January 25th, what was its condition?

**A.** It was still pretty much gutted. I mean, it wasn't flooded, but it was not in operation.

**Q.** Okay. Were the walls -- was it -- is it accurate to describe it as a roof with metal studs?

**A.** Correct.

**Q.** You could see from one side of the building right through the other?

**A.** Not through the building. I mean, the walls of the building were intact.

**Q.** The walls were still there --

**A.** Yes. The outer walls, not the interior walls, yeah, but it...

**Q.** What was -- do you know how it was decided that -- why did you all go in that building; do you know?

**A.** I have no idea.

**Q.** They had -- how many trailers did the 7th District have at the time?

**A.** At least -- at least three.

**Q.** Okay. Some were administrative offices; would you agree with that?

**A.** Yes.

**Q.** Some were roll calls and supervisors worked out of them and everything else?

**A.** Yes.

**Q.** These trailers didn't have a whole lot of room, did they?

**A.** No.

**Q.** Was there also personnel from the police academy there to obtain your weapons and issue you new weapons?

**A.** Yes.

**Q.** And they were all part of this meeting?

**A.** Well, they -- they actually obtained our weapons before we went into the building.

**Q.** Okay. Now, after you gave -- or after the meeting, you were assigned to whom -- or who was assigned to you to take your statement?

**A.** Jeff Lehrmann.

**Q.** Did Jeff tell you what to say?

**A.** No.

**Q.** Did you tell Jeff what you were going to say other than anything?

**A.** No.

**Q.** Now, I want to go back to something we talked about earlier about your -- about when you were called in by the

 federal government in response to some information you passed on to Barrios, okay? And that's -- that's the -- the meeting I'm referring to is when you had told Barrios that you felt pressured to say things that you did not do or know about. Right?

**A.** Correct.

**Q.** And when you told Barrios that, Barrios told you in response, "I feel the same way." Is that actually true?

**A.** Yes.

**Q.** And somehow the government found out about that; right?

**A.** Yes.

**Q.** And called you in the next day; right?

**A.** Correct.

**Q.** And asked you about that?

**A.** Yes.

**Q.** And you said, "Oh, it's -- it's a misunderstanding. You don't understand what I said"?

**A.** Correct. Because -- I mean, I don't know what -- Barrios had provided that information to the government, not myself. I don't know specifically what was his wording or what he had described to the government as being what I had discussed with him.

But, in fact, it was understood between -- at that point, at that meeting between me and the government that, in fact, it was a misunderstanding and I'm here just to tell the

truth.

**Q.** And what I want to know is -- or what I'd like you to tell the jury is tell the jury what you told Barrios.

**A.** He had expressed to me that he felt pressured and I expressed to him at the same time that I had -- that there was some misunderstandings between me and the government as well, and they were actually cleared up. I cleared that up with the government.

**Q.** Okay. And after that did you say that you believed there were assertions made within the questions asked that were not correct?

**A.** Repeat that.

**MR. HESSLER:** Your Honor, may I approach?

**THE COURT:** Yes.

**BY MR. HESSLER:**

**Q.** That's a long, wordy question, but, basically, does it --

**A.** Yeah, that's referring to, you know, some questions or some statements that may have been made by the government that, you know, that I couldn't really, you know, basically, confirm.

**Q.** Okay. But you felt pressure to confirm it?

**A.** No, I didn't.

**Q.** Now, further down in that same paragraph, Ms. Bernstein tells you that you're expected to tell the truth and not -- and not tell them something that's not true, and that if you are lying about anything you've said in the past, you -- you'd be

prosecuted, too, and -- and your deal would be off?

**MR. CARTER:** Well, that's not quite correct. It doesn't say, "During the past." It says, "During the briefing."

**THE COURT:** Is than an objection or...

**MR. CARTER:** Objection.

**THE COURT:** All right. Do you need to rephrase that, Mr. Hessler --

**MR. HESSLER:** May I approach, Your Honor?

**THE COURT:** -- I think you probably should.

**MR. HESSLER:** Can I read it from here?

**THE COURT:** Yes.

**BY MR. HESSLER:**

**Q.** "DOJ Attorney Bernstein further stated that if it is determined Hills lied during negotiations and debriefings with the federal government, that any agreement reached could be nullified and Hills could be prosecuted for those false statements."

Do you recall being told that?

**A.** Yes.

**Q.** You had already engaged in negotiations, hadn't you? Or you were in the process of engaging in negotiations; correct?

**A.** Correct.

**Q.** You had already debriefed a number of times?

**A.** Correct.

**Q.** Did you go back and change anything that you had said in the past and say, "I'm sorry, Ms. Bernstein, I said those because I felt I was under pressure to tell you something"?

**A.** No.

**Q.** Okay. Now, in one of your 302s that I read to you, you stated -- and a 302 is the government notes of an interview -- you stated that you fired because you felt threatened by that individual; right?

**A.** Yes.

**Q.** Today, you told the jury that you knew that individual was not a threat to you?

**A.** Correct.

**Q.** Do you see that those two -- never mind. I'll withdraw that question.

Now, let's go back to the Crystal Palace one more time. You added something that -- that there was something said in front of this group of seven, I suppose, and maybe Lohman and Kaufman, and that was when you walked up to the tail end of a conversation; right?

**A.** Excuse me?

**Q.** Do you ever recall -- you testified today you overheard Gisevius say something?

**A.** Gisevius, I overheard him say something?

**Q.** Well, you overheard Robert Gisevius say something at the Crystal Palace?

**A.** What was that?

**Q.** Well, you stated that he said that he shot somebody during the storm?

**A.** That's correct.

**Q.** What exactly did he say?

**A.** He stated that someone had tried to commandeer his vehicle or threatened to take his vehicle that he had commandeered, a truck, or something to that nature. And, you know, when asked, what happened, he said he shot the guy, he killed him --

**Q.** Okay.

**A.** -- is what the statement was.

**Q.** And this statement was made in front of who?

**A.** Myself and various other officers.

**Q.** Well, who?

**A.** I can't remember exactly who, but I was present.

**Q.** In the midst of a crowd?

**A.** Correct.

**Q.** Was it the crowd of the seven police officers that were being investigated or was it a different crowd?

**A.** No, it was just various officers. It was in front of the 7th District station, so it could have been any officer that was at the station at that time.

**Q.** And what area of town did this supposedly happen?

**A.** To my understanding it was somewhere Uptown.

**Q.** And you all were assigned down in New Orleans East?

**A.** Yes.

**Q.** And people did commandeer boats and trucks and stuff for legitimate law enforcement work, didn't they?

**A.** Yes.

**Q.** He, in fact, commandeered a boat -- were you aware that he commandeered a boat that probably saved you all out of the hotel?

**A.** I'm not aware of that.

**Q.** And the Budget truck for legitimate purposes of transporting evacuees to the Superdome --

**A.** Yes.

**Q.** -- where they could get out of town?

**A.** Yes, yes.

**Q.** And it says that you came into the end of the conversation after overhearing it; right?

**A.** Yes.

**Q.** Who else was around when you questioned him about the conversation -- about what you had overheard?

**A.** That, I don't recall specifically, the officers that were around.

**Q.** So there's nobody that can corroborate that?

**A.** No.

**Q.** Can you give them, the FBI, anybody they can go talk to to say --

**A.** No, I'm not aware. Maybe somebody else has stepped up

and, you know, gave that information as well. But I can't, you know, point out anybody in particular that was there.

**Q.** And, again, you know that the only way you can get -- you're looking at between zero and eight years; correct?

**A.** Correct.

**Q.** And, I guess, the way you get below eight years or anything else is to attempt to get a letter from the government; correct?

**A.** Correct.

**Q.** Asking the judge to deviate or go below the guidelines or otherwise take into consideration your cooperation?

**A.** Correct.

**Q.** And you certainly want that letter, don't you?

**A.** Correct.

**Q.** Now, you got more than that, too, didn't you?

**A.** What would that be?

**Q.** Well, you and your attorney also negotiated that you wouldn't be prosecuted for attempted second degree -- or any state charges for the attempted murder of Leonard Bartholomew, Jr.; correct?

**A.** Yes.

**Q.** Now, you stated in one of your 302s -- or do you recall being questioned about you being charged with attempted second degree murder? Do you recall what your answer was to the DOJ?

**A.** I don't recall.

**Q.** Let me ask you this: Do you think you're actually guilty of attempted second degree murder of Leonard Bartholomew, Jr.?
**A.** No.
**MR. HESSLER:** No further questions.
**THE COURT:** All right. Next. Mr. DeSalvo?
**MR. DESALVO:** Yes, Your Honor.

**CROSS-EXAMINATION**

**BY MR. DESALVO:**
**Q.** Mr. Hills.
**A.** Yes.
**Q.** How are you doing? You know me and I know you.
How have you been?
**A.** I've been fine.
**Q.** Let me see if I can just, by way of beginning this off, I think you testified that the government told you to tell the truth about what happened on the bridge that day?
**A.** Correct.
**Q.** And you also said that you couldn't speak of anything that you didn't have knowledge of?
**A.** Correct.
**Q.** That's fair to say?
**A.** Yeah.
**Q.** Okay. So let's talk about what you had knowledge of. You had knowledge that you were at the Crystal Palace?
**A.** Yes.

**Q.** All right. That you were there and you heard there was a 108?
**A.** Yes.
**Q.** You're not sure whether you heard that 108 or not?
**A.** Correct.
**Q.** But you got in the back of the truck?
**A.** Yes.
**Q.** With other officers?
**A.** Yes.
**Q.** That Sergeant Bowen got in the passenger side of that vehicle?
**A.** Yes.
**Q.** And that Officer Hunter was in the front of it?
**A.** Yes.
**Q.** You knew there was a -- an AK-47 in there between them because that's how they always rode?
**A.** Correct.
**Q.** Okay. And then you proceeded?
**A.** Yes.
**Q.** And when you proceeded, things were tense, your adrenaline was flowing, you were concerned; is that right?
**A.** Yes.
**Q.** There was no conversation between the officers?
**A.** No.
**Q.** It's fair to say everybody was just about as tense as you?

**A.** Yes.
**Q.** And maybe a little bit scared?
**A.** Yes.
**Q.** And you heard a lot of rifle fire?
**A.** Yes.
**Q.** Apparently, from more than one rifle?
**A.** May have been one, may have been -- may not have been more than one --
**Q.** May have been more than one?
**A.** -- at least one.
Correct.
**Q.** And you're not sure whether you heard any pistol fire mixed up in there or not?
**A.** No.
**Q.** But there could have been?
**A.** Could have been.
**Q.** Sure. Okay.
And you're not sure whether or not that Budget truck was still moving or had come to a stop when you heard that fire?
**A.** It was still moving.
**Q.** Okay. Now, you remember when you spoke to the FBI back on that April 21st, 2010, and you told them you weren't sure whether that vehicle was still moving or had come to a stop?
**A.** Correct.

**Q.** And at that time you were not sure?
**A.** Correct.
**Q.** And did you become sure because of some prodding from the government to become sure?
**A.** No. Actually, I saw the tape. Once I reviewed the tape, I was able to distinguish the -- the difference between --
**Q.** You heard -- you heard some gunfire as that truck was still moving?
**A.** Correct.
**Q.** But you couldn't tell whether it was coming from that van or not, could you?
**A.** Excuse me?
**Q.** You couldn't tell whether it was coming from the Budget truck or not, could you --
**A.** No.
**Q.** -- on that videotape?
**A.** No, you can't.
**Q.** So when you say that's what caused you to make a decision, that was because the government suggested that to you?
**A.** No, it was through my own observation of the videotape.
**Q.** But you couldn't tell where that sound came from on the tape?
**A.** No.
**Q.** Because the sound comes from a speaker?
**A.** Correct.

**Q.** All right. And then people got out of the back of the truck?
**A.** Correct.
**Q.** Now, there was a lull between what you heard before they got out of the truck and when they got out of the truck?
**A.** Yes.
**Q.** And when they got out of the truck, then the gunfire broke out completely again?
**A.** Yes.
**Q.** But still that was only what you were hearing --
**A.** Correct.
**Q.** -- right?
**A.** Correct.
**Q.** Because what you were seeing was out of the back of that truck?
**A.** Correct.
**Q.** So you didn't see what any of those officers did when they got out of the back of the truck?
**A.** No.
**Q.** And you didn't see what Officer Hunter did?
**A.** No.
**Q.** And you didn't see what Sergeant Bowen did?
**A.** No.
**Q.** And then after all the gunfire was over -- and you were still taking cover inside the truck; right?

**A.** Correct.
**Q.** And, I guess, you figured that if they can't see you, they won't shoot at you; right?
**A.** Well, I mean, it was just --
**Q.** I mean, you stayed back there because you were scared?
**A.** Right, right.
**Q.** And, actually, you said Officer Paxton was back there scared?
**A.** Yes.
**Q.** I think you actually said he was laying on the floor in a panic or something. I don't remember exactly what you --
**A.** Correct.
**Q.** -- but it was pretty bad how he felt?
And it was a scary situation?
**A.** Yes.
**Q.** So after that gunfire that you heard after the guys got out, that burst of gunfire, and then there was no gunfire; right?
**A.** Yes.
**Q.** But then you waited about three or four minutes to get out of the back of the truck?
**A.** Correct.
**Q.** So still your field of vision is out of the back of the truck?
**A.** Correct.

**Q.** You couldn't see what was going on on the side of the truck, you couldn't see what was going on on the other side of the barrier?

**A.** No.

**Q.** You couldn't see what was going on in the front of the truck?

**A.** No.

**Q.** Or you couldn't see what was going on on the other side of the truck?

**A.** No.

**Q.** You could see your field of vision?

**A.** Correct.

**Q.** And you made the decisions you made when you were in the back of the truck, and we already heard about all those. We don't need to go through those.

When you got out of the truck after about four minutes; is that fair?

**A.** Three -- three, four minutes, that's fair.

**Q.** Okay. Now, you didn't go out to the driver's side -- I mean -- yeah, the driver's side; is that correct?

**A.** Correct.

**Q.** No, you did go out through the driver's side. You didn't go out through the passenger side?

**A.** I went out through the driver's side, not the passenger's side.

**Q.** Because you went around the other side because you still wanted to be cautious as to about what was happening --

**A.** Correct.

**Q.** -- you wanted to get out with as much cover as you could?

**A.** Correct.

**Q.** And you had your gun drawn still?

**A.** Yes.

**Q.** Because you didn't know what you were going to encounter?

**A.** Yes.

**Q.** And you carefully moved from the back of the truck to the front of the truck?

**A.** Yes.

**Q.** I mean, just slowly moving, not trying to make any missteps; is that fair?

**A.** Yes.

**Q.** And when you got to the front of the truck, who did you see?

**A.** I saw Sergeant Bowen, various other officers that were in the rear of the truck, and --

**Q.** And that was it -- oh, I'm sorry.

**A.** Yeah, just a group of officers.

**Q.** And Lieutenant Lohman hadn't arrived yet?

**A.** No.

**Q.** Do you ever remember seeing Lieutenant Lohman?

**A.** No.

**Q.** Okay. And was Officer Hunter still there?

**A.** He had made -- maybe he had probably been there or made his way to the other side of the bridge. I don't recall.

**Q.** You don't recall whether he was there or not.

Did you see the Budget truck leave?

**A.** It did. It did end up leaving eventually.

**Q.** Did it leave while you were there?

**A.** Yes.

**Q.** Okay. And when it left, who drove it?

**A.** I don't recall.

**Q.** Who rode in it?

**A.** When it left the scene after the shooting?

**Q.** Yeah.

**A.** I don't recall.

**Q.** Do you remember how long it was after you got out of the back of the Budget truck that the Budget truck drove away?

**A.** I don't recall.

**Q.** Okay. But you do remember when you talked to Sergeant Bowen that you didn't see any guns?

**A.** Correct.

**Q.** Now, you're talking to him at least about five minutes after the gunfire stops? Probably?

**A.** Probably, roughly.

**Q.** Give or take.

And he said, "I kicked the guns off the side of the

bridge"?

**A.** Yes.

**Q.** Lieutenant Lohman wasn't there yet?

**A.** No.

**Q.** You didn't tell Sergeant Bowen to say that?

**A.** No.

**Q.** He just said that?

**A.** Yes.

**Q.** When you asked, "Where's the guns?"

**A.** Correct.

**Q.** Or did you ask or did Marchant Paxton ask?

**A.** I asked.

**Q.** Again, Marchant Paxton, was he still kind of shaky?

**A.** Pretty much.

**Q.** And you were still a little shaky, too; right?

**A.** Correct.

**Q.** Okay. Now, you ultimately gave a statement of what happened; is that correct?

**A.** Yes.

**Q.** After that day, did you ever talk to Sergeant Bowen about what you were going to say?

**A.** No.

**Q.** Did he ever suggest what you should say?

**A.** No.

**Q.** You, of course, knew what he said happened?

**A.** Yes.

**Q.** And you knew what he said happened and that would be the only way you would know because of what he said?

**A.** Yes.

**Q.** Because you couldn't see it with your field of vision?

**A.** Yes.

**Q.** And he told you that he had fired into the concrete barrier?

**A.** Well, he had not -- he had not specifically told me what his actual actions were other than kicking the guns off the bridge.

**Q.** You eventually learned he --

**A.** Correct.

**Q.** Did you ever go out -- you didn't go check to see whether there were any strike marks in that concrete barrier, did you?

**A.** No.

**Q.** It wasn't your scene?

**A.** Correct.

**Q.** It wasn't your job to investigate that, so you didn't investigate it?

**A.** Right.

**Q.** You just let everybody say what they said they did, and you were going to say what you said you did?

**A.** Right.

**Q.** And you were not influenced by anyone to say what

you've -- to say what you said?

**A.** I was not influenced, although it was understood that through -- based upon his statements of kicking the guns off the bridge that they were going -- they were going to advise that the people that were injured on the bridge at some time had weapons.

**Q.** Okay. Now, you know Officer Hunter; right?

**A.** Yes.

**Q.** And he was one of those guys that decided to plead guilty before you did?

**A.** Yes.

**Q.** And you had conversations with him?

**A.** Yes.

**Q.** And, in fact, you talked to the government on the 21st of April; would that be right? Or the 22nd of April, 2010, and you told them that somewhere within the last three months, Officer Hunter told you that he fired at people who were firing at him. Didn't he tell you that?

**A.** I don't recall if Officer Hunter --

**Q.** Do you recall telling that to the government, that "As recently as three months ago, Hunter said, 'People on the bridge had guns and shot at officers'"?

**MR. CARTER:** Which document are you referring to?

**MR. DESALVO:** That's your 302, April 22nd, 2010, end of page 2, beginning of page 3.

**BY MR. DESALVO:**

**Q.** Do you recall that?

**A.** Yes.

**Q.** You do?

And so it is true, he had told you that?

**A.** He at some point had mentioned that.

**Q.** Somewhere within the last three months?

**A.** Correct.

**MR. CARTER:** It's like a year and three months, not three months. I object to the mischaracterization.

**MR. DESALVO:** Does it? Did I read that wrong?

**THE COURT:** What's the date on it?

**MS. CHUNG:** This is 2011.

**MR. DESALVO:** No, no, three months before 2010.

**MR. CARTER:** Okay. Sorry.

**MR. DESALVO:** Before he said it.

**MR. CARTER:** I'll withdraw that objection, Your Honor.

**BY MR. DESALVO:**

**Q.** We don't have a misunderstanding of what I said, do we?

**A.** No.

**Q.** Okay. All right.

Three months before you made that statement he had told you?

**A.** Correct.

**Q.** Okay. Now, all right. Now, when you were in the back of that truck and you were scared, this was not the first time you were afraid after Hurricane Katrina, was it?

**A.** It was the first situation that was as intense as it was, that I had been --

**Q.** That was the one that was the most intense?

**A.** Correct.

**Q.** But there had been a general fear after Katrina, was there not?

**A.** Yeah, I would agree.

**Q.** With you. I'm not talking about everybody else. With you?

**A.** Not necessarily -- I would think that it was pretty much just -- just not normal circumstances overall after the storm.

**Q.** So you weren't afraid after Katrina?

**A.** No, I mean...

**Q.** Well, let me ask you this: Well, why was it that you were trying to leave town in a stolen Lowe's vehicle and got arrested by the Jefferson Parish Sheriff's Office?

**A.** That was a situation where we were, basically, rendering some type of security to the females that were in the vehicle with us.

**Q.** Did you tell the Jefferson Parish Sheriff's deputy that you were leaving town because you had permission from the commanders of the 7th District to take that vehicle and leave

town?

**A.** I didn't personally tell -- I didn't personally make that statement.

**Q.** So -- and you were also caravaning with a stolen postal truck, were you not?

**A.** That's incorrect.

**Q.** Okay. Were you stopped in conjunction with a stolen postal truck?

**A.** We actually stopped to assist a post- --

**Q.** And that was a friend of yours that was driving that?

**A.** Correct.

**Q.** And what district was he in?

**A.** I'm not sure what district he was assigned to.

**Q.** Okay. And he was leaving in a stolen postal truck?

**A.** I'm not sure what the situation was with the truck or whether it was stolen, commandeered. I don't know what terminology you want to use. He had possession of it.

**Q.** Commandeered. I mean, it was okay to commandeer these vehicles to evacuate people, to save people from the storm and evacuate them to the Superdome or to the Convention Center; right?

**A.** Correct.

**Q.** But it wasn't all right to go pick up those vehicles and say, "Well, I'm going to leave town with my family and friends"?

**A.** It was up to -- to whether your supervisor had gave you permission to do that or not.

**Q.** Did your supervisor give you permission to do that?

**A.** It was understood that he had given that permission.

**Q.** Now, who was that, Captain Barty?

**A.** Yes.

**Q.** So you're going to say that Captain Barty gave you permission to leave town in a stolen Lowe's van and to evacuate the city?

**A.** He didn't give me personal permission. He had -- it was understood that he had given females in that van with us permission.

**Q.** Females. Who were the females in the van?

**A.** It was two female police officers as well as their mother, female -- their mother.

**Q.** And you believed that if Captain Barty came here and sat on that stand and raised his hand to tell the truth, the whole truth, and nothing but the truth, he would say that?

**A.** Yes.

**Q.** Now, let me ask you this: We know you were afraid in the back of that van; right?

**A.** Correct.

**Q.** We know -- at least we kind of believe that maybe you were afraid after Katrina, that's why you were trying to leave town. What were you more afraid of: Being in the back of that van or

them?

**MR. DESALVO:** I have no further questions.

**THE COURT:** All right. Next. Mr. London?

**MR. LONDON:** Yes.

**CROSS-EXAMINATION**

**BY MR. LONDON:**

**Q.** Good afternoon, Mr. Hills. My name is Steve London. I represent Archie Kaufman.

How are you today?

**A.** I'm fine.

**Q.** We've never met, have we?

**A.** No.

**Q.** I just have very few questions for you today. Archie Kaufman never told you what to say in your statement, did he?

**A.** What statement?

**Q.** The statement that you made to the -- concerning your -- the incident -- the incident on the Danziger Bridge?

**A.** No.

**Q.** No, he didn't.

He did not tell you what to say; correct?

**A.** No, he did not.

**Q.** Now, I'd like to show you --

**MR. LONDON:** Is this 39, Ted?

**MR. CARTER:** It's 36.

**MR. LONDON:** 36.

**MR. CARTER:** Wait a minute. I have that as 36.

**MR. LONDON:** 36. Would you, please, put up 36 for me, Mr. Steve?

**BY MR. LONDON:**

**Q.** Now, I'm going to direct your attention to what we've already looked at several times as Exhibit 36. Can you see that on your monitor?

**A.** Yes.

**Q.** I'd like you to read this -- now, I believe you testified on direct, Mr. Carter asked you, that this was dictated to you and that you absolutely did not believe anything that was on this form; is that correct?

**A.** That's correct.

**Q.** That is correct.

So you don't believe this form. This is an absolute hoax; correct?

**A.** Yes.

**Q.** Okay. Let's read it and see which portion of it is a hoax. Are you ready? "On Sunday, September 4th" -- well, I'll tell you what, you read it and then I'll ask you to stop.

**A.** Just read the whole portion that I had written?

**Q.** Maybe it's better if I read it.

**A.** Okay.

**Q.** "On Sunday, September 4, 2005, at 9:00 a.m., 7th District officers received an officer in distress call, signal 108."

Is there something wrong with that statement?

**A.** No.

**Q.** "At Downman Road and Chef Menteur Highway."

Anything wrong with that?

**A.** No.

**Q.** "Upon arrival, the officers of the 7th District" -- not you -- "the officers of the 7th District apprehended Lance Madison, Sr., DOB" -- and it's blacked out here and the social -- whatever, the social security number.

Anything wrong with that? Is that true?

**A.** To my understanding.

**Q.** To your understanding that's true.

"In which he was read his rights and [sic] Miranda and arrested for R.S. 14:2730."

Is that incorrect?

**A.** I wouldn't know if he --

**Q.** He was arrested for that; correct?

**A.** Yes, he was.

**Q.** Well, then it's not incorrect, is it? It's saying that he was --

**A.** Well, as far as the terminology, I wouldn't know if he was read his rights. I don't know what he was read.

**Q.** But you don't know that he was not read his rights?

**A.** Correct.

**Q.** "Relative to attempted murder, eight counts."

Correct?

**A.** Yes.

**Q.** That's what R.S. 14, Article 2730 is, isn't it?

**A.** Yes.

**Q.** "And the initial victim, David Ryder" -- and then they put his identifying information, which I don't have -- "was fired upon and 7th District officers were shot at."

Incorrect?

**A.** Incorrect.

**Q.** You don't know that, do you?

**A.** Correct.

**Q.** Correct, you don't know that?

**A.** I have no knowledge of --

**Q.** Well, then how can you say that's incorrect when you don't know the answer to that?

**A.** Because no officers was injured on the bridge, the truck that we were driving in had no piercings of bullet wounds, but yet you had five victims that were shot by officers.

**Q.** Now, that's not the answer to my question, is it?

The answer to my question is: You don't know whether these policemen were shot at or not, do you?

**A.** Correct.

**Q.** So you don't know if that's an incorrect statement, do you?

**A.** By being included -- by myself being included?

**Q.** Do you see your name on that, sir?

**A.** No.

**Q.** Do you see -- where do you see yourself included in that?

**A.** I was one of the eight officers.

**Q.** Where does it say -- oh, how do you know that?

**A.** It was on the face sheet.

**Q.** Oh, it was on the face sheet.

Did you go to the -- where was Mr. Madison apprehended?

**A.** He was apprehended --

**Q.** Where?

**A.** On the west side of the bridge.

**Q.** Well, you never made it to the west side, did you?

**A.** Correct.

**Q.** So you don't have any idea what happened on the west side, do you?

**A.** No.

**Q.** Now, when we get down -- and that was at Chef Highway and Downman Road; is that correct?

**A.** Correct.

**Q.** Now, you ended it right there; right?

**A.** Yes.

**Q.** So there is nothing that we just read, to your knowledge, is a hoax, is it?

**A.** Yes, there is.

**Q.** What?

**A.** The fact that Lance Madison attempted to murder myself --

**Q.** No, that's not what he's saying. He's saying that he was arrested and charged with that. Is that right?

**A.** He was charged with that.

**Q.** All right. I think we've got the point over. We could argue that all day.

The last part -- then you left, didn't you?

**A.** Yes.

**Q.** And you gave this to?

**A.** Sergeant Kaufman.

**Q.** Sergeant Kaufman.

So this last portion was filled out after you left the scene; correct?

**A.** Correct.

**Q.** Correct.

Do you know Lance Madison?

**A.** No.

**Q.** Who's your dentist?

**A.** I don't really have a dentist right now.

**Q.** Who was your dentist at the time of the storm?

**A.** The last dentist I had been to?

**Q.** Yeah.

**A.** Dr. Washington.

**Q.** What about Romell Madison?

**A.** What about him?

**Q.** Did you ever go to him?

**A.** Yes.

**Q.** Well, he was your -- why don't you want to answer that question? Why don't you want to --

**MR. CARTER:** I object to the characterization, Your Honor.

**MR. LONDON:** Well, yes -- no, Your Honor.

**THE COURT:** Well --

**MR. LONDON:** Excuse me.

**THE COURT:** Look, here's the way we're going to do this: First of all, don't ask questions of the lawyers, sir, okay? Because we're going to have a problem if you're going to ask questions back to the lawyer. You've done it twice already in this testimony. Don't do that.

Second of all, we need to clarify the question. You're asking him a question, we need to clarify the question so that he understands who you're asking about.

So I don't know if there was officially an objection or Mr. Carter stood up, but let's go back, rephrase the question, and he he's going to answer it.

It's cross-examination.

**MR. CARTER:** Your Honor, I would simply point out that the question he asked of Mr. London was for purposes of clarification.

 **THE COURT:** I understand that. I understand that. But it's happened a couple of times already.

Go ahead. Mr. London, ask the question, clarify the question; and then, Mr. Hills, you're going to answer that question directly and concisely.

Go ahead.

**BY MR. LONDON:**

**Q.** Was Mr -- Dr. Romell Madison your dentist?

**A.** At one time he was.

**Q.** Yeah. Yeah, at one time.

**A.** At one time.

**Q.** And that never came out in your testimony, did it?

**A.** No.

**Q.** And this person we're talking about is his brother, isn't it?

**A.** Yes.

**MR. LONDON:** No further questions.

Thank you, Judge.

**THE COURT:** All right. Next. Mr. Meche or Mr. Fleming?

**MR. FLEMING:** Mr. Meche.

**THE COURT:** Okay.

**CROSS-EXAMINATION**

**BY MR. MECHE:**

**Q.** Good afternoon, Mr. Hills. I'm Tim Meche. I'm the lawyer

for Anthony Villavaso.

When Katrina had came in, were you on duty the day of the storm?

**A.** Yes.

**Q.** Okay. And where were you physically stationed at, were you with the 7th District or were you somewhere else?

**A.** 7th District.

**Q.** You were at their headquarters?

**A.** No, we were actually at a hospital.

**Q.** You were one of the ones -- some were -- my understanding from prior testimony, some were at the district and some were at the hospital?

**A.** Yes.

**Q.** And you spent the night at the hospital?

**A.** Yes.

**Q.** Okay. And the day after, what did you start doing?

**A.** The day after, basically, we were somewhat --

**Q.** Rescuing people?

**A.** Correct.

**Q.** So you all got boats and you all started rescuing people?

**A.** Yes.

**Q.** In that area of the hospital, or did you all go somewhere else?

**A.** Throughout the 7th District, New Orleans East area.

**Q.** Okay. When -- did at some point you all move towards the

corner of Read and Chef Highway near that Crystal Palace place?

**A.** Yes.

**Q.** That was when approximately?

**A.** After -- the day after the storm had hit.

**Q.** And that's where you all were continuing to rescue people?

**A.** Yes.

**Q.** Okay. Was there, like, an organizational structure or were you all just kind of acting on your own?

**A.** It was -- it wasn't really organized. Yeah, it wasn't really organized.

**Q.** Who were you working with?

**A.** Kenneth Bowen and Gisevius. Robert Gisevius was pretty much my immediate rank.

**Q.** Okay. And did you -- well, I guess at some point did you come to notice Officer Villavaso out there?

**A.** Yes.

**Q.** Do you remember when?

**A.** No.

**Q.** Okay. And was he with Officer Barrios at the time?

**A.** Yes.

**Q.** Okay. What were they doing?

**A.** Just rescuing people to my understanding.

**Q.** Now, were they working with, you know, you and Sergeant Bowen in you all's group, or were they kind of working on their own?

**A.** On their own.

**Q.** Now, would you all, like, have meetings every morning and come up with a plan for what you all were going to do, or everybody would just kind of --

**A.** Yeah, pretty much.

**Q.** Okay. Would that -- Villavaso --

**A.** Semi-roll call or what have you.

**Q.** Would Villavaso and Barrios go to that?

**A.** I don't recall. I don't know if they were there or not.

**Q.** You don't remember seeing them?

**A.** No.

**Q.** Okay. How long did you all continue operating out of that location rescuing people?

**A.** The Crystal Palace?

**Q.** Yes.

**A.** It's hard to say. I mean, it was a while.

**Q.** Like, this shooting happened, I think, Sunday -- that Sunday after the storm, seven days after the storm. How much longer afterwards did you all stay?

**A.** A couple of weeks, I would think.

**Q.** A couple weeks.

And then where did you all move to?

**A.** Eventually --

**Q.** The cruise ship?

**A.** Excuse me?

**Q.** Did you all go to the cruise ship at some point?

**A.** Yeah, at some point we were.

**Q.** So when you all left the Crystal Palace, you all then moved to the cruise ship?

**A.** Well, the Crystal Palace was somewhat just a makeshift police station for when you were on duty. The cruise ship is where you -- basically, your living quarters. So it was two separate things.

**Q.** Okay. But when you all were living in the cruise ship, where would you all report to work every morning or whenever when you started your shift?

**A.** To the Crystal Palace.

**Q.** And that was the 7th District?

**A.** Correct.

**Q.** Now, Officer Villavaso, though, wasn't in the 7th District. He was in the Fifth District. You understood that?

**A.** Yes.

**Q.** So was he reporting to work to the Crystal Palace after you all had moved over to the cruise ships?

**A.** I really don't recall. I wouldn't know. I didn't keep tabs on him.

**Q.** I understand. But do you remember seeing him then at the Crystal Palace afterwards?

**A.** Yes.

**Q.** When?

**A.** I mean, he had -- to my understanding, him and Officer Barrios had become, you know, part of the district at that point.
**Q.** And you specifically remembered seeing him there?
**A.** Yes.
**Q.** Okay. For how long?
**A.** I don't recall specifically how many days.
**Q.** But was it days, or was it months, or into the new year, 2006?
**A.** They would -- to my understanding they had become part of the district, so they were there at that point.
**Q.** Okay. Okay. Now, there was some discussion of after the shooting at some point you got ahold of this 17-page report. Do you remember when that happened?
**A.** I don't remember the specific date, but it was after the shooting.
**Q.** Okay. And how did you come to be in possession of that?
**A.** Someone had possession of it that brought it to me and some other officers' attention. I would think that they were aware that I was involved and they may have wanted to give me the opportunity to see which direction the investigation was going in.
**Q.** And you remember who that was?
**A.** I don't remember specifically.
**Q.** Okay. Now, were you being made part of the conversations

between the point you got the report and the shooting of what should be said and done, or were you kind of left out of that?

**A.** I was not involved.

**Q.** Okay. So you weren't asked or coached as to what to say until that point?

**A.** No.

**Q.** Okay. Do you recall speaking with Lieutenant Lohman about this subject?

**A.** No.

**Q.** Okay. Did Lieutenant Lohman ever ask you if you were okay with this 17-page report?

**A.** No.

**Q.** Okay. You mentioned that after reading the report, correct me if I'm wrong, but you noticed that, to paraphrase, it looked like they were kind of putting it all on Officer Villavaso and Officer Barrios. Is that what you noticed?

**A.** Correct.

**Q.** And is that what provoked you going to him and discussing this with him?

**A.** Yes.

**Q.** Okay. Do you remember what Officer Villavaso's reaction was to that?

**A.** Just, you know, a state of concern and...

**Q.** Did he say that he was okay being accused of being the

only one out there with an AK-47?

**A.** No.

**Q.** And didn't he, in fact, indicate he wasn't okay with that?

**A.** Right. It was understood that he and Barrios will address it with the rank.

**Q.** Why do you think they were trying to put it all off on Villavaso and Barrios?

**MR. CARTER:** Your Honor, I object to the extent it calls for speculation. If he knows, fine, but it's speculation --

**THE COURT:** If you know, sir.

**THE WITNESS:** Oh, I don't know. I don't know.

**BY MR. MECHE:**

**Q.** But did you all discuss reasons at that meeting why this was happening?

**MR. CARTER:** It's still --

**MR. MECHE:** Well, they discussed it, Your Honor.

**MR. CARTER:** Well, my objection, they would be discussing speculation.

**THE COURT:** Well, he's asking about a specific discussion. I assume the question calls for his testimony about any verbal exchange, i.e., a discussion, of that nature.

**THE WITNESS:** Repeat the question.

**BY MR. MECHE:**

**Q.** Did you and Officer Villavaso and Barrios at this time

discuss why they were putting it on them?

**A.** No, we didn't. We didn't discuss why. I mean, my understanding would be to, you know, avoid the ones that they didn't have striking individuals try to, you know, avoid prosecution for them.

**Q.** Was -- was something you all three had in common that you all were very junior officers?

**A.** Yes.

**Q.** I mean, you, in fact -- I mean, you were only on the job for, what, a year at that time?

**A.** A little bit more, about a year and a half.

**Q.** And Officer Barrios wasn't --

**A.** I really didn't know how long they had been on or...

**Q.** And Officer Villavaso?

**A.** I really didn't know.

**Q.** Okay. Now, after that meeting, did you all continue to have discussions about the subject?

**A.** Me, myself, Officer Barrios and Villavaso would meet for lunch occasionally.

**Q.** Were you all friends?

**A.** We had got to know each other pretty well.

**Q.** Okay. Are you still friends with him?

**A.** No.

**Q.** How about Officer Barrios?

**A.** No.

**Q.** Okay. I mean, are you unfriendly to him or...

**A.** Well, no. I mean, we just -- I don't come in contact with him anymore.

**Q.** That's what I mean.

**A.** Yeah.

**Q.** I mean, you don't have a grudge against him or anything?

**A.** No, no.

**Q.** Now, you pled guilty to obstruction of justice and misprision of a felony; right?

**A.** Yes.

**Q.** You did not plead guilty to the shooting?

**A.** No.

**Q.** In fact, Mr. Hessler asked you if you thought you were guilty of that shooting, attempted second degree murder, and you said no?

**A.** Correct.

**Q.** Now, obstruction of justice -- and I read your factual basis. I think it might have even been introduced into the record.

**MR. CARTER:** No, it was not.

**MR. MECHE:** Okay.

**BY MR. MECHE:**

**Q.** But I think you indicated that the obstriction was, essentially, your participation in the false reports and, essentially, a cover-up; is that correct?

**A.** Correct.

**Q.** And the misprision of a felony, you know that be you knew of a felony being committed and you failed to report it; is that your understanding?

**A.** Yes.

**Q.** And that felony would have been, again, the false reports and the cover-up?

**A.** Correct.

**Q.** Now, the shooting -- and you -- the shooting you were involved in was different from the one Officer Villavaso was involved in?

**A.** Correct.

**Q.** And the shooting that you did was the person running away?

**A.** Correct.

**Q.** Okay. And you indicated you did that out of fear and that's what caused you to do it?

**A.** Correct.

**Q.** When you did it, had you made a decision to intentionally commit a crime?

**A.** No.

**Q.** Okay. And you, as a police officer, know the difference between acts which are perhaps improper or wrong, but acts which are criminal, don't you?

**A.** Yes.

**Q.** And acts which are criminal require you have the type of

mind-set that's condemned by the criminal law?

**MR. CARTER:** Your Honor, I object to the extent we're getting into legalities here.

**MR. MECHE:** Well, he pled guilty.

**THE COURT:** Well, first of all, yes, he pled guilty; but, also, he's already established that this witness has knowledge of this by the predicate questions. So I'm going to overrule the objection. If he can answer it, fine.

**BY MR. MECHE:**

**Q.** Again, I mean, you know to make it criminal would be you have to have that type of mind-set that's condemned by the criminal law?

**A.** To make it --

**Q.** To make it criminal as opposed to something else.

**A.** Well, your actions could be prosecuted whether you have the mind-set already or not. I mean, if it was actions that were not justified, they could still be prosecuted as criminal acts.

**Q.** But anything could be prosecuted. But to prosecute criminal behavior -- and you went to the police academy --

**MR. CARTER:** Judge, they're quibbling now. I think I'm going to object. The witness has answered the question.

**THE COURT:** I'm not sure -- I think you're about to ask the predicate question.

**MR. MECHE:** Right.

 **THE COURT:** I'm going to sustain the objection. But, I think, go ahead and ask him -- you're in the middle of a question, go ahead and ask him.

**MR. CARTER:** Sorry, sorry.

**BY MR. MECHE:**

**Q.** But to constitute a crime, you have to have the type of mind-set that's condemned by the criminal law. You're aware of that?

**MR. CARTER:** I object.

**THE WITNESS:** Yes.

**THE COURT:** That wasn't the question that you were in the middle of when he objected.

**MR. CARTER:** And I do object. It's a legal question.

**THE COURT:** You asked him -- you were in the middle of a question. The last words you said before Mr. Carder objected was, "police academy."

**MR. MECHE:** Yeah. Well, I think he answered it. I can move on.

**THE COURT:** Well, if you want to move on, go ahead and move on, but I sustain the objection. Go ahead and move on, if you want to move on.

**BY MR. MECHE:**

**Q.** Okay. Now, you -- Mr. Hessler asked you a number of questions about the misunderstanding you said you had with Ms. Bernstein concerning your conversations with Officer

Barrios. Do you remember that?

**A.** Yes.

**Q.** Okay. And I think your explanation was that they were asking you questions that you just couldn't answer?

**A.** Correct.

**Q.** What were those questions?

**A.** I don't recall.

**Q.** Well, how would you know to say a misunderstanding because they were asking you questions that you couldn't answer, if you don't recall?

**A.** I don't recall the specific questions that they were asking, but it was in reference to questions that were asked.

**Q.** Okay. Well -- and you were at the meeting when they were asking those questions?

**A.** Yes. I was there and they were asking me.

**Q.** And you don't recall the questions they were asking?

**A.** I don't remember the specific questions that were asked. It was questions that were asked.

**Q.** Well, broadly speaking, don't be specific, what were the basic questions they were asking?

**A.** About -- it was about the incident, different facets of what had took place at different times concerning the shooting or the investigation with the shooting.

**Q.** And questions they thought you would have been in a position to answer because you were there; right?

**A.** Well, not necessarily. Because it could have been a question that was dealing with the investigation that I wasn't privy to. I didn't investigate it personally. It was just various questions and I responded to them accordingly if I wasn't able to answer those. I answered the ones that I was able to answer, and I did not answer the ones that I weren't able to answer.

**Q.** And you got the feeling that they thought you weren't being truthful?

**A.** It wasn't -- I got the feeling that they didn't really understand that I wasn't privy to all the information concerning the investigation. I didn't know as much as dealing with the investigation that they may have thought I had known.

**Q.** In other words, were these questions concerning the investigation, or were these questions concerning the actual incident on the bridge?

**A.** Mixed and matched, both.

**Q.** So some of the questions concerned things they believe you saw on the bridge, but you weren't able to confirm it?

**A.** Correct.

**Q.** Okay. What specifically; do you remember?

**A.** I don't remember. Don't recall.

**Q.** You don't remember at all?

**A.** (WITNESS NODS HEAD.)

**Q.** Okay. Now, this meeting that you talked about on

January 25th, you said you got a call from a dispatcher about it and went there. Were you on duty at the time?

**A.** Yes.

**Q.** Okay. And how did you get there? How did you physically get there?

**A.** In a police vehicle.

**Q.** Okay. By yourself?

**A.** I was riding with a partner at the time.

**Q.** Okay. Who?

**A.** It was, I believe, Marchant Paxton, or it could have been -- we had switched partners after the storm quite a bit.

**Q.** Now, was Mr. Paxton part of the group questioned?

**A.** No. He -- he was not questioned. It was only the shooters, if you had fired your weapon, was who they had wanted, and the initial officers involved in the report.

**Q.** Now, Mr. Paxton was in the truck, though; right?

**A.** Yes.

**Q.** And he was physically present at the scene?

**A.** On the bridge?

**Q.** Yes, sir.

**A.** Yes.

**Q.** And he wasn't questioned?

**A.** Not to my knowledge -- not that day that we were called off duty to give formal statements.

**Q.** Okay. When you got there, who all was there?

**A.** Myself, Officer Robert Barrios, Officer Anthony Villavaso, Officer Michael Hunter, Sergeant Robert Gisevius, Sergeant Bowen, and a slew of detectives -- homicide detectives, including Archie Kaufman, Gerard Dugue, Decynda Barnes, Jeffrey Lehrmann, and some other people that I don't recall their names.

**Q.** And it's your memory that Officer Villavaso was already there when you got there?

**A.** I don't recall whether he was there before I got there. He was there.

**Q.** Okay. And now, a number of -- basically, you said a slew of detectives. Essentially, it was the whole homicide unit that was on duty?

**A.** Correct, correct.

**Q.** And it was their job to kind of get all of you individually, separate, and take your statements?

**A.** Yes.

**Q.** Okay. And where physically did you go to give your statement?

**A.** In the trailer.

**Q.** Because they had trailers there?

**A.** Yes.

**Q.** Okay. And is that where you turned in your gun?

**A.** No.

**Q.** Where did you turn in your gun?

**A.** I mean, it was outside of the gutted portion of the district that personnel from the academy had obtained our weapons before we even went in to discuss what transpired on the bridge.

**Q.** So that was, like, the first thing you did, turn in your gun?

**A.** Yes.

**Q.** And you did it to people who were outside. Did they have, like, a table or something, or how did it work?

**A.** I don't know if it was a table. We handed it over to them.

**Q.** Okay. And after you handed over your gun, did they immediately take you to get your statement or was there some downtime?

**A.** Wasn't much downtime. It was, you know, turned in your weapon and proceeded to the empty building.

**Q.** Well, the building or the trailer?

**A.** No. The way that it happened was you gave your weapons, you went in the empty building with everybody, the other officers and the investigators, that's where they one-by-one gave their --

**Q.** Their account.

**A.** -- account of what transpired, their actions on the bridge. Then you were assigned an immediate investigator and gave your formal statement.

**Q.** Okay. Now, so everybody went into that -- that building and gave their individual account before you gave your formal statement?
**A.** I'm not sure if it was all the detectives. Some of the defendants I remember specifically; some of them I can't recall if they were there. I had seen some on the outside that I can't recall if they were in the inside as well.
**Q.** Did Detective Decynda Barnes go in?
**A.** That's one in particular that I don't recall whether she came in. I saw her there outside. I don't recall actually seeing whether she was inside or not.
**Q.** Detective Hardin, did he go in there?
**A.** I don't even know who that is.
**Q.** Detective Colmenero?
**A.** Don't know who that is.
**Q.** Do you remember him -- well, let me ask you this: Do you remember -- well, did you know all of the detectives there in that meeting?
**A.** No, I did not.
**Q.** So there were some you didn't even known?
**A.** Correct.
**Q.** There was a lot of them?
**A.** Correct.
**Q.** And how long did this meeting last?
**A.** It's hard to say, 10, 15, minutes.

**Q.** Okay. And how long did your statement take?

**A.** Which statement?

**Q.** Your formal statement.

**A.** Your formal statement, ten minutes.

**Q.** Now, after that did you have additional discussions with Officer Villavaso?

**A.** Yeah. Periodically after that we would -- once again, we met for lunch pretty often.

**Q.** Uh-huh. And would you all talk about this incident?

**A.** Yes.

**Q.** Okay. And would you talk about how, the same subject, they were trying to put it on --

**A.** No. It was more or less just the fear of prosecution is what was discussed from that point on.

**Q.** Okay. The fear of who, the federal government prosecution?

**A.** Yes.

**Q.** They were worried about that?

**A.** Correct.

**Q.** And did you all discuss the severity of the type of trouble you could be in?

**A.** Yes.

**Q.** Talk about how much jail time you all could get?

**A.** Could have been. I don't know if specifically jail time was the topic of discussion, but...

**Q.** Like, you could go to prison for a long, long time?

**A.** Correct, correct.

**Q.** Did you discuss the pros and cons of working a deal?

**A.** Excuse me?

**Q.** Did you discuss the pros and cons of possibly working a deal?

**A.** No, no. We never really got into...

**Q.** Okay.

**MR. MECHE:** All right. Thank you, sir.

**THE WITNESS:** Okay.

**THE COURT:** All right. Mr. Larson?

**MR. LARSON:** We have no questions of this witness at this time.

**THE COURT:** Okay. Redirect?

**MR. CARTER:** Yes, sir.

**REDIRECT EXAMINATION**

**BY MR. CARTER:**

**Q.** Mr. Hills, I want to ask you about some of the questions you were asked on cross-examination. Let's start with the 302 about you being pressured by Ms. Bernstein. Now, Mr. Hessler has read the main statement I wanted to have read, but there's one other statement that no one read in this document and I'd like you to read it.

It's right here with the arrow. Would you, please, read that sentence -- or read to the end of the paragraph.

**A.** "DOJ Attorney Bernstein admonished Hills that he needed to be truthful to the best of his recollection and that no one wanted Hills to say anything that was not truthful.

"DOJ Attorney Bernstein further stated that if it is determined that Hills lied during negotiations and debriefings with the federal government, then any agreement reached could be nullified and Hills could be prosecuted for those false statements."

**Q.** Is that consistent with your understanding of what was going on?

**A.** Yes.

**Q.** Did anyone at any time pressure you to say something that wasn't true?

**A.** No.

**Q.** But they did pressure you to say more?

**A.** Yes.

**Q.** And, if I understand what you answered on cross-examination, it is because of the belief that you did know more?

**A.** Yes.

**Q.** But it turns out you did not?

**A.** Yes.

**Q.** You were asked about a stolen van?

**A.** Correct.

**Q.** Did you steal a van?

**A.** No.

**Q.** And in this altercation -- situation with JPSO, did any of your ranking officers ever have to show up to straighten it out?

**A.** Yes.

**Q.** Who was that?

**A.** It was a lieutenant from the 4th District, Italiano and also Michael Lohman.

**Q.** Your lieutenant?

**A.** Yes.

**Q.** And they both came and they straightened the situation out?

**A.** Correct.

**Q.** Were you ever disciplined for this incident, sir?

**A.** No.

**Q.** No PIB investigation?

**A.** No.

**Q.** Tell the jury what PIB is.

**A.** PIB is a division of the New Orleans Police Department that investigates potential wrongdoing by officers of the force.

**Q.** You were asked about a dentist. When was Romell Madison your dentist?

**A.** I was a kid.

**Q.** Had you made the connection between Romell Madison and

Lance Madison on September 4, 2005?

**A.** No.

**Q.** Any time after that?

**A.** Sometime afterwards I made the connection.

**Q.** When, roughly?

**A.** No real time frame.

**Q.** Did that connection in any way influence anything you've said here today?

**A.** No.

**Q.** Did it influence anything you've said in this entire course of events leading up to today?

**A.** No.

**Q.** You were asked a question about the radio call, the 108 call?

**A.** Yes.

**Q.** And about whether you thought two people were down under the bridge. Do you recall that question?

**A.** Yes.

**Q.** Did anyone look for an officer who had been shot when you got out of that truck?

**A.** No.

**Q.** Anybody talk about whether an officer had been shot when you got out of that truck?

**A.** No.

**Q.** When you got out of that truck at some point, was anyone

looking for an officer who had been shot?

**A.** No.

**Q.** When you got out of the truck, nobody was looking for an officer down who had been shot. Did anyone say anything about, "Where is the officer who's down"?

**A.** No.

**Q.** You were asked --

**MR. CARTER:** Let's put Exhibit No. 39 up, that's the 17-page report.

**BY MR. CARTER:**

**Q.** If I recall, you were asked about the 17-page report and about Lieutenant Lohman's questioning you about this report. Were you referenced in this 17-page report?

**A.** Yes.

**Q.** How were you referenced in that 17-page report?

**A.** I was referenced as to --

**Q.** Do you recall how you were referenced in that 17-page report?

**A.** Yes. I was referenced as to not having fired my weapon in the 17-page report.

**Q.** Well, did you give a statement in that report?

**A.** No.

**Q.** So you do not have a statement in that report?

**A.** No.

**Q.** So when you were asked, "Did Lieutenant Lohman ask you

about being okay with your statement," was there a statement for you to be okay with?

**A.** No.

**Q.** And he did not ask you about any statement?

**A.** No.

**Q.** Because there was none?

**A.** No.

**Q.** But someone did at some point in time refer you to read that report, if I recall correctly?

**A.** Excuse me?

**Q.** Someone did point to you -- point out to you that you should read that report?

**A.** Yes.

**Q.** Who was that?

**A.** I don't recall.

**Q.** Mr. DeSalvo made some excellent points. He said you have to -- he wanted to talk to you about what you could see versus what you couldn't see. Do you remember that?

**A.** Yes.

**Q.** What you could hear versus what you couldn't hear. Do you remember that?

**A.** Yes.

**Q.** And you said you couldn't tell if a handgun fire was mixed in with that rifle fire. Do you remember that?

**A.** Yes.

**Q.** And you couldn't tell, could you?
**A.** No.
**Q.** And he asked you how many rifles were being fired. You couldn't tell, could you?
**A.** No.
**Q.** But you could tell at least one was, you said?
**A.** Yes.
**Q.** There may have been more?
**A.** Yes.
**Q.** And you didn't know what was going on outside that truck while you were in it; is that correct?
**A.** Correct.
**Q.** So were you curious because of that?
**A.** Curious as to what transpired?
**Q.** Yes.
**A.** Yes.
**Q.** And when you got out of the truck, what did you do?
**A.** I got out of the truck and I wanted to see what was being shot at, if any officers had been injured.
**Q.** So you did look to see what you could see and not see?
**A.** Correct.
**Q.** What did you see? Did you see any other rifles?

**MR. DESALVO:** That's leading, Your Honor.

**MR. CARTER:** I'll rephrase the question.

**THE COURT:** Rephrase.

**BY MR. CARTER:**

**Q.** When you got out of that truck, were there any other rifles than the rifles in the possession of the police officers?

**A.** Yes, there were police officers who had rifles.

**Q.** Let me rephrase the question. Other than the rifles in the possession of the police officers, did you see any other rifles on that bridge that morning?

**A.** No.

**Q.** He asked you if you could tell if there was handgun fire mixed in there with that rifle fire. Did you see any other handguns on that bridge that morning other than the handguns in possession of the police officers?

**A.** No.

**Q.** Mr. Hessler asked you about your training, were you ever trained for a disaster such as Hurricane Katrina. Do you recall that?

**A.** Excuse me?

**Q.** Do you recall those questions Mr. Hessler asked you about your being trained and were you ever trained for a disaster like Hurricane Katrina. Do you recall being asked those questions?

**A.** Not specifically for a hurricane per se, but we had some type of training for disasters, you know, urgent times.

**Q.** And I believe he asked you if you were ever trained to rid

yourself of emotion -- and you'll correct me if I misstate this question --

**MR. HESSLER:** Well, I'd object to the leading nature of question.

**MR. CARTER:** Well, I haven't asked the question yet.

**THE COURT:** He hasn't asked it yet. Let's hear what question is. Again, I said this a few times starting with yesterday morning, at precisely 8:31 a.m., I specifically said, "Please do not take the words out of another attorney's mouth and then repeat them," because invariably that will be met with an objection that that's not what I said, that's not precisely what I said, in which case we would have to stop and then waste time looking it up.

You need to direct him to the subject matter, which I think is what you're about to do, Mr. Carter -- I sure hope so -- and then ask him your question so that he can answer it as opposed to arguing over what Mr. Hessler precisely said.

So let's do it that way.

**MR. CARTER:** And I'm not -- thank you, sir. I do not intend to argue over what Mr. Hessler said.

**THE COURT:** Sure.

**BY MR. CARTER:**

**Q.** But let's talk about your training. While you may not have been trained for a disaster like Hurricane Katrina, you were trained?

**A.** Yes.
**Q.** You were trained on the use of force?
**A.** Yes.
**Q.** And you were trained on when to use force and when not to use force?
**A.** Yes.
**Q.** In your training -- and you were asked whether you were tense, whether you were scared, whether you had -- whether there was an imminent threat. Were you trained regarding these things as they relate to the use of force?
**A.** Yes.
**Q.** In your training, were you trained that being tense justified the use of force?
**A.** No.
**Q.** In your training, were you trained that being scared justified the use of force?
**A.** No.
**Q.** In terms of a threat, I believe you were asked, "Could this individual have been armed?" Were you trained that you could shoot someone because they could have been armed?
**A.** No.
**Q.** Could you shoot someone --

**MR. MECHE:** Your Honor, I object to the leading questions. I think he can -- this is kind of --

**THE COURT:** We're asking -- I'm going to sustain the

objection. I think you need to rephrase the questions if you're asking them in a leading nature or a rhetorical sense. This is redirect. So let's rephrase questions.

**BY MR. CARTER:**

**Q.** Were you trained that you could shoot someone if you believe they could be armed?

**MR. MECHE:** Your Honor, it's the same --

**THE COURT:** That's the same question.

**MR. MECHE:** It's the same thing.

**THE COURT:** It's the same question.

**BY MR. CARTER:**

**Q.** What is your training regarding shooting someone?

**A.** Either your life has to be in imminent danger or another person's life has to be in imminent danger.

**Q.** And if this person is armed, what's your training? Can you shoot them?

**A.** If the person is armed and they're a threat to you -- an imminent threat to you or someone else, yes.

**Q.** Is their being armed alone enough to justify shooting them?

**A.** No.

**Q.** You have to have more?

**A.** Correct.

**Q.** Is the possibility of them being a threat enough --

**MR. MECHE:** Your Honor, he's still asking leading

questions.

**MR. CARTER:** This is not leading.

**MR. MECHE:** Yeah, he is.

**THE COURT:** No, I'm going to let him go ahead and ask this based on the answers he's just given. I think it clarifies the answers he's just given.

**BY MR. CARTER:**

**Q.** Is the possibility of them being armed enough to justify your using lethal force?

**A.** No.

**MR. CARTER:** One moment, Your Honor.

Your Honor, I have no further questions.

**THE COURT:** All right. Thank you.

**MR. FLEMING:** Judge, we'd ask that the witness remain available and subject to the order of sequestration.

**THE COURT:** So ordered.

All right. Sir, you can step down.

Who's next?

**MS. BERNSTEIN:** United States calls Taj Magee.

**THE COURT:** Taj Magee.

All right. Sir, if you'd come forward. When you get to the chair up here on the witness stand, please remain standing. After you take the oath, you may be seated.

(WHEREUPON, **TAJ MAGEE**, having been duly sworn, testified as follows.)

**THE DEPUTY CLERK:** Please state your full name and correct spelling for the record.

**THE WITNESS:** My name is Taj, common spelling, T-A-J, Magee, M-A-G-E-E.

**THE COURT:** Go ahead.

**DIRECT EXAMINATION**

**BY MS. BERNSTEIN:**

**Q.** Good afternoon, Mr. Magee.

**A.** Good afternoon.

**Q.** Could you, please, introduce yourself to the jurors and tell them what you do for a living?

**A.** My name is Taj Magee. I'm a member of the New Orleans Police Department.

**Q.** Did you grow up here in New Orleans?

**A.** Yes, I did.

**Q.** Have you lived here your whole life?

**A.** Yes, I have.

**Q.** How long have you worked for NOPD?

**A.** Presently 11 years.

**Q.** So you started what, about 2000?

**A.** Yes.

**Q.** What's your rank at NOPD?

**A.** I'm a police officer 4.

**Q.** What does that mean, police officer 4? What does the 4 mean?

**A.** I'm at the highest level that a police officer can be before becoming a sergeant.

**Q.** What's your current position now with the department?

**A.** Presently working in the Central Evidence and Property division.

**Q.** What do you do there?

**A.** Intake property, evidence, processing and security.

**Q.** That Central Evidence and Property, you guys call that CE&P?

**A.** Yes.

**Q.** Before you worked for CE&P, did you work out on patrol?

**A.** Yes, I did.

**Q.** How long did you work as a patrol officer?

**A.** I was personally on the street for, I would say, a little over ten years.

**Q.** Do you guys often call that a platoon officer; is that the same thing?

**A.** Yes.

**Q.** Back in 2005, at the time of Hurricane Katrina, what was your position?

**A.** I was a police officer 2 assigned in the 7th District.

**Q.** At that time how long had you been working in the 7th District?

**A.** A little bit over five years.

**Q.** On September 4, 2005, did you respond to the Danziger

Bridge?

**A.** Yes, ma'am.

**Q.** Were you there when the shooting happened?

**A.** No, ma'am.

**Q.** All right. So you got there afterward?

**A.** Yes.

**Q.** Can you tell us what you were doing that morning before the shooting on the Danziger Bridge?

**A.** That morning myself, along with a number of other officers, were returning into the city after staying the night in St. James Parish.

**Q.** Were you guys staying in an old folks home there?

**A.** We were actually staying in a Catholic Jesuit seminary, Manresa Seminary.

**Q.** Where were you heading back to?

**A.** We were heading back into the city to report for work at the Crystal Palace located at Chef Menteur and Reed where we had our substation.

**Q.** What kind of vehicle were you in when you were heading back to the Crystal Palace?

**A.** I was driving a shuttle bus, somewhat of a commercial type shuttle bus.

**Q.** How had you guys gotten ahold of that shuttle bus; do you know?

**A.** It was a bus that we had commandeered from one of the limo

services that was in the district.

**Q.** Who all did you have with you in the bus that day?

**A.** I would say several officers. As far as an accurate head count, I couldn't really give it to you.

**Q.** Can you give us a rough estimate?

**A.** I would say at least over five, more than five officers in the vehicle with me at the time.

**Q.** You said you were driving?

**A.** Yes, ma'am.

**Q.** Was this a shuttle bus that you all had been driving around in since the storm?

**A.** Yes, ma'am.

**Q.** Where did you say you all were headed?

**A.** We were heading back to the Crystal Palace to report for duty.

**Q.** What happened?

**A.** Once exiting the Chef Menteur Highway exit on I-10, coming over the high rise, we were driving eastbound on Chef, like I said, en route to the Crystal Palace to report for duty.

**Q.** What happened while you were driving eastbound on Chef?

**A.** While driving eastbound on Chef, we observed one of the rental truck vehicles that we had commandeered as well, and officers were driving it around using it to patrol and bring back and forth supplies, traveling westbound against the opposite direction and was traveling at a rapid pace.

**Q.** They were also on Chef?

**A.** Yes, ma'am.

**Q.** Do you remember what kind of rental truck that was?

**A.** Yeah, it was a large Budget rental truck.

**Q.** When you saw it coming at you on Chef going the other way, did you recognize it as a vehicle that police officers had been using?

**A.** Yes.

**Q.** Tell us what happened.

**A.** Well, as the vehicle passed by us at a rapid speed, a couple of people in my vehicle, I could hear from the back, made an inquiry like, "Where are they going? Why they rolling so fast?"

**Q.** Did you see who was driving that truck as it passed by?

**A.** To be totally honest, no. I can just remember maybe one or two guys that were in the cab.

**Q.** Did you know whether or not there was a particular group of officers that had been using that particular truck?

**A.** I'm pretty sure everybody was using the truck. We had more than one. We had more than one, and they all were pretty much identical vehicles.

**Q.** So you saw this truck speed past, and tell us what happened.

**A.** Okay. As the truck speeded past us, like I advised, some of the passengers that were riding with me were curious about

why the guys were heading in such a rapid pace going the opposite direction. So from the back I could hear somebody say, "Hey, who has a radio?"

From that point, a couple of officers pulled out their radios and began to turn them on. And we continued to ride down Chef Menteur Highway for maybe about another five minutes maybe.

**Q.** When you say you continued to ride, are you still heading toward the Crystal Palace?

**A.** We're still continuing toward the Crystal Palace to report for work.

**Q.** All right. So then what happens?

**A.** Okay. Like I advised, once a couple of officers turned their radios on and we continued for a ways, we -- I could hear from the back a large commotion coming over the radio, you know, some shouting, some muffled transmissions. And then shortly after that, we could hear what sounded like gunshots coming over the radio.

**Q.** What did you do when you heard what sounded like gunshots coming over the radio?

**A.** Well, while driving, some of my passengers yelled out to me, "Hey, hey, turn around, turn around. Head back towards the bridge. Something's going on at the bridge, turn around."

So when it was feasible for me to make a left turn, make a U-turn and head back towards the bridge, I did.

**Q.** Did you guys drive back out to the Danziger Bridge then?
**A.** Yes, we did.
**Q.** When you got there, did you drive up onto the bridge, or did you stop?
**A.** We drove up a ways on the bridge, but my -- what I observed was the truck stop midway up, so I didn't know what was going on, so we stopped. We didn't ride up directly onto the truck because I didn't want to release any of my officers out into something that was hot going on.
**Q.** Do you remember how you stopped the truck? And is it fair you were toward the bottom of the bridge?
**A.** Yes.
**Q.** Do you remember how you stopped the truck at the bottom of the bridge?
**A.** Well, I tried to shield my officers that were getting out, so I turned the wheel so that the vehicle was turned kind of diagonal so that when we got out, they wouldn't be jumping directly into anything, just in case there was an active shooting going on.
**Q.** Were you armed that day?
**A.** Yes, ma'am, I was.
**Q.** What were you armed with?
**A.** I was carrying my NOPD issue .40 caliber Glock.
**Q.** How about the other folks in the shuttle bus with you, were they armed?

**A.** Yes.

**Q.** And I'm sorry. Do you remember anybody who was in the shuttle bus with you?

**A.** I remember definitely, because he was sitting next to me, Officer Abreace Daniels.

**Q.** Uh-huh.

**A.** He was in the bus with me. There was an Officer Marsha Thompson. She was in the vehicle with us as well, along with several other officers. These were the officers that were right next to me, so I was talking to them most of the time.

**Q.** Do you know a guy named Everett Fondell?

**A.** Yes.

**Q.** Do you know whether he was with you that day?

**A.** It's a possibility, yes. It's a possibility he could have been in the truck.

**Q.** All right. So when you parked your shuttle van at the bottom the bridge, did you get out?

**A.** Yes.

**Q.** Can you tell us what you did?

**A.** Okay. Once I got out and I opened the door, the shuttle bus door for the rest of the officers to get out, I immediately worked myself to the far right of the bridge and placed myself closer to the rail and began to walk across the bridge, approaching the truck.

**Q.** Were you taking any particular precautions when you got

out of the truck and started --

**A.** Well, knowing that there was active shooting in that location, we were -- or myself, I was at the gun ready position with my gun out in front of me working my way along the bridge.

**Q.** Well, let me back up even a little bit. After you do the U-turn and you start to head back out to the Danziger Bridge, you said you already believed that there had been a shooting?

**A.** Yes.

**Q.** You had heard that over the radio?

**A.** Yes.

**Q.** Tell me what your mind-set was as you were going out there to the bridge.

**A.** We were at a state of alert. We really didn't know what was going on there.

**Q.** Were you nervous?

**A.** Yeah. I would say we were cautious.

**Q.** Were you scared?

**A.** Yes.

**Q.** All right. So you get there to the bridge, and you said you had your gun out at the ready?

**A.** Yes.

**Q.** Because of that nervous state that you were in?

**MR. FLEMING:** Object to the leading nature of the questions, Judge.

**THE COURT:** Well, I think he's testified already to

that, so I think she's repeating something he's already delivered. Otherwise, don't lead the witness.

**MS. BERNSTEIN:** Of course, Your Honor.

**THE COURT:** But I'll overrule.

**MS. BERNSTEIN:** Thank you, Your Honor.

**BY MS. BERNSTEIN:**

**Q.** So was it because of that nervous state that you were talking about that you were at the alert when you were walking up the bridge?

**A.** Yes, ma'am.

**MR. FLEMING:** Judge, the same objection. She's suggesting the answer.

**THE COURT:** My appreciation is that she's attributing to him a statement that he has already made. To suggest an answer would be something that he didn't already recite in his testimony.

So I overrule the objection and, of course, remind counsel that leading questions are not permitted on direct. But I think the question that she asked, although it was in leading form, consisted of something that he already just said, so therefore it's not an answer that she could have suggested to him.

**MS. BERNSTEIN:** Of course. And, Your Honor, the only reason I repeated the question was because you overruled the objection.

**THE COURT:** Go ahead and proceed.

**BY MS. BERNSTEIN:**

**Q.** Do you remember the question, or would you like me to ask it again?

**A.** Yes.

**Q.** I'm sorry. Let me just ask it again. Was it because of that nervous state that you talked about that when you got out of the van you proceed up the bridge in that alert state?

**A.** Yes.

**Q.** All right. So tell us what happened as you proceeded up the bridge.

**A.** Well, as I continued up the bridge, as I advised, I stayed to the right side of the bridge. I'm walking towards the truck. As we were walking, we noticed the truck, the rear hatch of the truck was open and it was empty.

As I continued to walk up, I looked to my right side, and I noticed that there were three individuals lying on the ground on the, I would say pedestrian walk of the bridge, and the individuals were lying down and they weren't moving.

**Q.** When you first saw those individuals, could you tell what kind of condition they were in?

**A.** No, not at that initial distance.

**Q.** Did you know whether they were dead or alive?

**A.** No, not at that initial distance.

**Q.** From that distance, when you first saw them, could you

tell whether they were armed or unarmed?

**A.** No.

**Q.** Did you shoot them?

**A.** No, ma'am.

**Q.** Why not?

**A.** At the moment they weren't posing an immediate threat.

**Q.** Even though you couldn't see if they were armed or unarmed?

**A.** Yes.

**Q.** Okay. So what did you do?

**A.** We continued forward. I advised the guys that were behind me that we had three down on this side, on the right side. And as we approached, I noticed that there was blood on the sidewalk where the subjects were laying down. And as we continued to get closer and closer to them, I noticed that the individuals were, in fact, injured.

**Q.** As you got closer and you saw them, you saw the injuries on them?

**A.** Yes, ma'am.

**Q.** Can you describe what you remember?

**A.** All three subjects apparently appeared to be suffering from numerous gunshot wounds.

**Q.** Could you tell anything about those gunshot wounds, how serious the injuries were?

**A.** They were about the body, torso areas, arms, legs. One of

the individuals was actually having trouble breathing. There was actually blood coming from his mouth. That was the older subject that was lying on the ground first. The second subject was a younger African-American male. At that time I believed that he had expired because there was no movement, no breathing or anything of that nature.

The second subject, who was, in fact, a female probably would be between 30, 40-some-odd years old. She was attempting to crawl, I would think, and she was riddled with bullets.

**Q.** So she was moving?

**A.** She was moving.

**Q.** Did you shoot her?

**A.** No, ma'am.

**Q.** Why not?

**A.** At that time she didn't appear to be a threat.

**Q.** When you got there to the bridge and saw these people, at that point was there anybody tending them, any medical personnel there?

**A.** Not when I got there.

**Q.** What did you do?

**A.** When I had initially noticed the injuries to the subjects, I looked them over, you know, pretty much trying to assess what was going on. I wanted to make sure that neither one of them was possibly with any kind of a weapon within their hand reach

or anything of that nature.

And from there I continued over the bridge to ascertain where the rest of our guys were.

**Q.** Let me ask a follow-up on that. You said that you looked around to make sure that there were no weapons; is that right?

**A.** Yes.

**Q.** Did you see any weapons?

**A.** No, ma'am, not on the catwalk and not in the immediate possession of those individuals.

**Q.** Did you see any guns anywhere, other than in the hands of you and your fellow officers?

**A.** No.

**Q.** All right. So you said you started to head over the bridge to look for your officers. What do you mean by that?

**A.** Well, the guys were not visible, and we knew that there were guys driving the truck. The truck was empty, so my mind-set was to find out where the rest of our guys was and to find out what was going on, and if they needed our assistance.

**Q.** Did you actually continue over the bridge?

**A.** Yes, ma'am, I did.

**Q.** Where did you go?

**A.** Once crossing the bridge itself, I stayed to the right side, and I noticed that a couple of our officers were standing in the motorway entrance near one of the motels. So I continued over to there.

**Q.** When you talk about the motel, is that now all the way down on the other side of the bridge?
**A.** Yes.
**Q.** Do you remember as you were walking over the bridge that day whether you were alone or whether anybody else was with you?
**A.** There were several officers that were behind me, the guys that came with me that were in the truck. I'm pretty sure they continued with me.
**Q.** Do you know who went over there with you?
**A.** I couldn't actually give you a name. I just know that I was in the company of several officers that were with me.
**Q.** You said when you got over to the west side, you saw some people near a motel; is that right?
**A.** Yes.
**Q.** Were you familiar with that motel?
**A.** Not necessarily, no, but I knew where it was. It was not, like, a place I visited.
**Q.** Do you know the name of it?
**A.** No. No, I can't say I do.
**Q.** So what happened when you got over there to the west side of the bridge? What did you see?
**A.** Like I advised, once I got over to the west side of the bridge, I observed a few of our guys standing in the motorway of the motel, so I continued forward to them.

**Q.** When you say "our guys," do you mean people who started off in your shuttle bus, or do you just mean 7th District officers?

**A.** 7th District personnel.

**Q.** Who did you see down there on the west side?

**A.** If I can remember, a few of our guys were wearing fatigues. One of the guys that I remember was Officer Faulcon was over there. He was wearing his fatigues. And Officer Villavaso, I remember seeing him, and I think numerous other guys. Those are the guys who I can remember by name.

**Q.** Do you remember any others by name who you saw standing there?

**A.** Yes. There were several guys there, but as far as, you know, where they were at the time, I couldn't honestly say.

**Q.** When you say you saw some of your guys standing around, where were they?

**A.** They were in the entranceway to the hotel.

**Q.** What were they doing?

**A.** They were pretty much, you know, standing around.

**Q.** What happened next?

**A.** As I approached them and got close enough, I said, "Hey, what we got?" And two of the guys that I mentioned, they turned around, and when they turned around, I observed that there was a subject lying on the ground, like, right amongst them.

**Q.** So where these guys were standing was right by where it turned out there was someone on the ground?
**A.** Yes.
**Q.** The subject you referred to on the ground, was that a civilian or a police officer?
**A.** It was a civilian. It wasn't any of our guys.
**Q.** What condition was that person in?
**A.** The subject that I noticed, he had an injury to the chest, and there was blood on his shirt, and there was pretty much blood on the back of his shirt, and he was on the ground.
**Q.** All right. So you said blood on the chest of his shirt and on the back of his shirt?
**A.** Yes, ma'am.
**Q.** What position was he in on the ground?
**A.** At that moment when I saw him, he was pretty much on his butt leaning forward, slumped over.
**Q.** Could you tell whether he was dead or alive?
**A.** He wasn't moving, wasn't talking. I could pretty much ascertain that he was possibly dead.
**Q.** Did you see any guns or any other weapons near him?
**A.** No.
**Q.** At the time did you know the name of that guy on the ground?
**A.** No, ma'am.
**Q.** Have you learned since the name of that guy?

**A.** Yes, ma'am.

**Q.** Who was that?

**A.** Mr. Madison.

**Q.** Do you know his first name?

**A.** Ronald.

**Q.** So you said you asked these guys, these officers who were gathered around, "What do we got here"?

**A.** Uh-huh.

**Q.** What answer did you get?

**MR. FLEMING:** Objection as to which guy we're talking about here. Is it one of the -- is it one of the people on trial? Is it some other unknown --

**THE COURT:** Well, let's see if we can be more specific with that.

**BY MS. BERNSTEIN:**

**Q.** Tell us who you remember being in that group that you addressed.

**A.** In that group I addressed, like I advised, it was Officer Faulcon that I remember being there, Officer Villavaso, and I'm assuming several of the other defendants.

**Q.** When you addressed your question to them, did somebody respond?

**A.** Somebody in the group responded, and they stated that --

**MR. FLEMING:** Judge, objection. We don't know who it is responded, and there are other people on that scene.

**THE COURT:** Why don't you all approach.

(WHEREUPON, the following proceedings were held at the bench.)

**THE COURT:** Here's my concern on the objection. He just said that he assumes that it was other defendants.

**MS. BERNSTEIN:** Did he say that?

**THE COURT:** That's what he just said, "I assumed it was the other defendants," that's what he just said. Not other officers --

**MS. BERNSTEIN:** Oh, I missed that.

**THE COURT:** -- other defendants. And that kind of concerns me because we're about to attribute a statement to a person which the universe consists of the defendants.

**MS. BERNSTEIN:** I missed that. See, I tried to ask my question very carefully about whether somebody did answer.

**THE COURT:** You did. You did. And he asked it by saying, not other officers. He said other defendants, and that kind of concerns me. I think you need to flesh it out. You need to get him to be more specific, and he may not -- it's going to be kind of tricky to ask the questions.

You had asked the appropriate question. I think he's given an even trickier answer, though. See if you can flesh it out. Otherwise, I'll overrule the objection. But I don't think we're there yet, so I'm going to sustain the objection at this point.

**MS. BERNSTEIN:** Well, I'll ask him to tell us --

**MR. FLEMING:** The witness is listening to the conversation.

**THE COURT:** I don't think he can hear it.

**MS. BERNSTEIN:** I'll ask him to tell us by name everybody he remembers being there, and ask him not to speculate about who the other people are, and ask him if he knows whether or not they were 7th District officers.

**THE COURT:** Do that. And then if we're going to attribute a statement, before he says it, I think we need to make certain was it Mr. Faulcon or was it Mr. Villavaso.

**MS. BERNSTEIN:** I think he'll say he doesn't know who said it -- which one said it.

**MR. FLEMING:** Right. I think you're right there, and that's --

**MS. BERNSTEIN:** Let me tell you what I expect, because I don't think it really matters. I think answer is going to be, "There was a guy missing and we're looking for him." So that's -- so I really don't think it matters.

**THE COURT:** Well, I think it needs to be clear, though, the group consisted of Villavaso, and then Faulcon.

**MS. BERNSTEIN:** Just so you know, he has said Gisevius before, so I don't know whether he'll say that --

**THE COURT:** He didn't say Gisevius just now.

**MS. BERNSTEIN:** No, I know. I'm just saying if he

does come up with it.

**THE COURT:** Right. In fact, he says that there were officers there the first time, and then there was an objection, and then you ask the question, and then he said, "The other defendants."

I think he actually didn't mean these people here.

**MS. BERNSTEIN:** I think he probably meant The Danziger Seven.

**THE COURT:** I don't know what he meant.

**MS. BERNSTEIN:** I'll ask it anyway --

**THE COURT:** But see if you can work through it with him.

**MS. BERNSTEIN:** Is the way I suggested okay?

**THE COURT:** Yes. But I don't know that that completely gets you there, but try that and see.

**MS. BERNSTEIN:** You know what, how about if I then just say, "Did you learn that they were looking for somebody else?" Are you good with that?

**MR. FLEMING:** I won't object to that.

(WHEREUPON, the following proceedings were held in open court.)

**THE COURT:** Okay.

**BY MS. BERNSTEIN:**

**Q.** Officer Magee, you mentioned that you remember a few of

the officers by name who were there; is that right?

**A.** Yes, ma'am.

**Q.** The officers you don't remember by name, do you remember whether they were 7th District officers or whether they were from some other district?

**A.** They were all 7th District personnel. There was nobody but 7th District personnel on the scene at that time.

**Q.** And when you got over there to the west side of the bridge, did you learn that people were looking for someone who was missing?

**A.** When I asked the individual who we got, somebody made the statement of, "We may have one more inside the motel."

**Q.** So you -- "We, being officers, are looking for a civilian"? Is that your understanding?

**A.** Yes. Yes, ma'am.

**Q.** What happened next?

**A.** Well, what I did next was I immediately walked to the far left corner of the motel, staying out on Chef Menteur Highway in kind of a belated manner trying to give us a perimeter, basically, a perimeter of the building.

**Q.** So you just helped set up a perimeter?

**A.** Yes, ma'am.

**Q.** At some point did you leave the west side?

**A.** At some point did I leave the west side?

**Q.** Yes.

**A.** Yes, I did.

**Q.** Where did you go when you left the west side of the bridge?

**A.** Initially, when I left the west side of the bridge, I continued over to -- in an attempt to go pick the vehicle up that I was driving to bring it back across the other side.

**Q.** What was your reaction at that point to the first scene you saw on the east side and then the scene you saw on the west side?

**A.** Things weren't adding up. It didn't make any sense to me at the time, but I hadn't asked any questions.

**Q.** So what did you do when you were on your way back to the east side of the bridge?

**A.** Well, myself, personally, I started to try to contemplate what had happened and what was going on -- what was going on on the scene, based on what I had already seen so far.

And like I said, once I continued over the bridge, I got to a point where I was right next to the truck. So I decided to look at the truck, you know, just to see if there were anything like, you know, any bullet holes or anything like that in the truck, and I didn't find any.

**Q.** Why were you looking for bullet holes in the truck?

**A.** Well, basically, trying to make sense of what was going on in the situation, and if I could assist the guys any way in, you know, finding any kind of evidence as far as the scene.

**Q.** Explain what you mean when you say you were trying to -- I don't remember the exact word you just used -- make sense of the situation. Explain what you mean by that.

**A.** Well, it didn't make any sense to me that the individuals who were, in fact, shot -- you know, I didn't understand why they were shot, you know, and I didn't understand what was going on, what happened in the incident all together.

So my thing was, normally walking a scene, you start to pick up clues and you start to get information from just the physical evidence that will give you a heads-up on what happened.

**Q.** So were you looking for stuff as you were walking back over the bridge?

**A.** Yes.

**Q.** What were you looking for?

**A.** I was looking for any kind of evidence that would give me any insight into what happened.

**Q.** Like what?

**A.** Anything from bullet casings, weapons, contraband, anything that would have not fit on that scene.

**Q.** What were you hoping to find?

**A.** To be honest with you, I was hoping I would find a weapon or something of that nature, or a second area where there were casings so that it would make sense to me why there was a shooting.

**Q.** Can you explain why you were hoping that you would find a gun or a weapon?

**A.** Well, my thing is --

**MR. DESALVO:** He's already answered that, Judge, because it's part of his investigative techniques.

**THE COURT:** I'm going to let him answer.

**BY MS. BERNSTEIN:**

**Q.** You can answer that. Why were you hoping to find a gun? Can you explain that?

**A.** Well, my thing is, I wanted to -- to make sure that my guys acted, you know, accordingly.

**Q.** What do you mean when you talk about "your guys"? Who are you referring to?

**A.** I'm talking about my officers, 7th District personnel, people that I've been working with numerous years.

**Q.** So go on. What were you saying about that? You wanted to make sure that you're guys acted accordingly? What do you mean?

**A.** Well, the individuals that were shot were unarmed, and I ascertained that from the moment that I first came across.

Initially, I thought maybe it was a -- a friendly fire situation, maybe they got caught in a cross-fire, or something of that nature, and I was attempting to find out, you know, if there was any evidence that would support what happened.

**Q.** What kind of evidence might have supported that theory, that maybe they were caught in a cross-fire?

**A.** If there were shells in an opposite area from the initial area where the subjects were laying down, and they were showing that maybe somebody was shooting from another direction.

**Q.** Did you find any of that?

**A.** No, ma'am.

**Q.** What did you do when you got back on the east side of the bridge?

**A.** Well, as I continued to walk past the east side of the bridge, like I advised, I initially looked at the truck to see if there was any kind of bullet holes or anything in the truck. I didn't notice any. And as I continued to walk past the truck, I started to notice that there were numerous casings on the ground.

**Q.** What kind of casings do you remember noticing?

**A.** Most of them appeared to be like rifle casings.

**Q.** What kind of reaction did you have to that?

**A.** When I started looking at some of the casings, by being familiar with certain guns, I noticed that there were several 7.62s and .223 millimeter casings on the ground. And the first thing I said to myself was, those corresponded with some of the weapons that our guys were carrying.

**Q.** "Our guys" being the officers?

**A.** Yes, ma'am.

**Q.** What did you do next?

**A.** Well, at that moment, after looking at the scene, I continued on to the end of the bridge. Once I got to the end of the bridge, I continued to look for any kind of evidence, weapons or any further casings that weren't in that initial area.

I rounded the tail end of the bridge and started to walk into the grassy area under the bridge and alongside the bridge, just looking to see if there were any evidence, any weapons or anything like that, casings that might have fell alongside the bridge.

**Q.** I'm going to ask you some more questions about that, but first I'd like to show you some photographs.

**MS. BERNSTEIN:** May I approach, Your Honor?

**THE COURT:** Yes.

**BY MS. BERNSTEIN:**

**Q.** Before I show you photographs, let me go back to the people you saw injured on the east side of the bridge when you first got there.

**A.** Yes, ma'am.

**Q.** You mentioned that you thought one of them looked expired. Is that what you said?

**A.** Yes.

**Q.** Can you describe the injuries that you remember on the guy who you thought was dead? First of all, did you learn whether

he really was dead?

**A.** Yes, ma'am.

**Q.** Can you describe the injuries that you remember seeing on him?

**A.** He had several gunshot wounds to the torso and one that was -- that I remember vividly was the fact that his elbow had been blown out where it was exposed, where you noticed in the joint, you could see the bone and you could see the flesh. And that kind of stood out to me.

**MS. BERNSTEIN:** May I approach, Your Honor?

**THE COURT:** Yes.

**BY MS. BERNSTEIN:**

**Q.** All right. I'm showing you Exhibits 46, 58, 71, 60, and 59. Do you recognize all of those photographs?

**A.** Yes, ma'am.

**Q.** All right. Let's start with 59. What is that a picture of?

**A.** It appears to be a picture inside one of the shuttle buses of 7th District personnel, 7th District officers.

**Q.** Does that look like the inside of the shuttle bus that you were driving that day?

**A.** It could be similar.

**Q.** Did you have more than one shuttle bus that looked the same?

**A.** We had two actual shuttle buses that were kind of similar.

**Q.** And does this look like one of those two?

**A.** Yes.

**Q.** What's Exhibit 60 a picture of?

**A.** Exhibit 60 appears to be the shuttle bus, in fact, that I was driving. It appears to be the state police unit that arrived on scene in their armored vehicle.

**Q.** Is that actually a picture from that day of the shuttle bus on the bridge?

**A.** Yes, ma'am.

**Q.** What's Exhibit 71 a picture of?

**A.** Exhibit 71 is a picture of the area on the bridge where the incident occurred, as well as the grassy area on the side of the bridge.

**Q.** What's Exhibit 58?

**A.** Exhibit 58 is the same area, just an opposite shot.

**Q.** How about 46?

**A.** Picture 46 is a picture of one our officers over the body of the teenage male.

**MS. BERNSTEIN:** Your Honor, I'd like to offer all of these into evidence at this point.

**THE COURT:** Counsel?

**MR. MECHE:** No objection, Your Honor.

**THE COURT:** The Court will admit Exhibits 46, 58, 71, 60, and 59. So ordered, and you may present those now.

**MS. BERNSTEIN:** Thank you, Your Honor. May I start

with Exhibit 59 up, please?

**BY MS. BERNSTEIN:**

**Q.** Is that the photograph you described as looking like the inside of one of those shuttle buses?

**A.** Yes, ma'am.

**Q.** Those officers in there, do you recognize whether or not they're 7th District officers?

**A.** I would say that two of the officers -- in fact, three -- four are 7th District officers.

**MS. BERNSTEIN:** May I have Exhibit 60, please?

**BY MS. BERNSTEIN:**

**Q.** Do you recognize that as a still photograph taken from a video that was taken the day of the shooting?

**A.** Yes, ma'am.

**Q.** The screen in front of you, you can actually write on the screen by pressing on it with your finger. Can you circle the shuttle bus that you were driving that day?

**A.** (WITNESS COMPLIES.)

**Q.** It looks like there's somebody standing outside of that bus. Do you know whether that's you?

**A.** No, ma'am, I don't. I can't make it out.

**Q.** Can you tell whether that's where you were talking about having parked the bus at the bottom of the bridge?

**A.** Yes, ma'am.

**MS. BERNSTEIN:** May I have Exhibit 71, please?

**BY MS. BERNSTEIN:**

**Q.** All right. When I left off questioning you before I showed you the photograph, you were describing walking back down to the bottom of the east side of the bridge and then going around into a grassy area; is that right?

**A.** Yes, ma'am.

**Q.** Can you tell us what this is a picture of?

**A.** That would be a picture in the opposite direction of the traffic flow of the area where the incident occurred in the grassy area, in fact, where I searched.

**Q.** What are we looking at here? What intersection are we facing in this photograph?

**A.** The intersection you would be facing in that photograph would be the Chef and Downman, right there, the nearest cross street after that.

**Q.** So that's down at the bottom of the east side of the bridge?

**A.** Yes, ma'am, all the way down at the bottom.

**Q.** Can you just draw -- draw on this photograph the route that you were talking about when you said you walked to the bottom of the bridge and then turned around into the grass.

**A.** (WITNESS COMPLIES.)

**Q.** Okay. Now, tell us, if you would, what your purpose was in walking down the bridge and around into the grass. What were you doing?

**A.** My whole purpose was looking for any evidence, any type of bullet casings or weapons or possibly anybody that may have possibly been under the bridge that we might not have came in contact with.

**Q.** Now, at this point what were you hoping to find?

**A.** Hoping to find, like I said, bullet casings, a weapon, anything that would, you know, explain and justify the incident that occurred.

**Q.** Where did you search?

**A.** I searched pretty much the downslope of the bridge, staying to the -- to this wall so that I could look into the crosswalk, as well as the street, looking for any casings, any other area where, you know, maybe somebody had been shooting and showing the type of evidence that they were.

**Q.** And then where did you look?

**A.** Once I got down to the base of the bridge, I started to walk and search up the grassy area from between the street, the rail of the bridge. And then once getting to the open under end of the bridge, we continued to walk up that area and scan that area. And then from there we walked up from the stairwell that was on the bottom side of the bridge back up to the top.

**Q.** You're now using the pronoun "we." Who was with you when you went down into the grass to search?

**A.** I know I was with -- I was in the company with other guys because I remember talking to them, you know. They may have

been on the other side doing the same thing that I was doing, you know. And then as far as exactly who it was, I couldn't really give you a name, but I know I was actually talking to other individuals.

**Q.** All right.

**MS. BERNSTEIN:** May I have Exhibit 58, please?

**BY MS. BERNSTEIN:**

**Q.** What's that a photograph of?

**A.** It's a photograph of the grassy area along the side of the bridge and the areas that I had walked along searching and the under section of the bridge.

**Q.** All right. Now, tell me if I'm right, that this is where you were just saying you were walking on the other picture?

**A.** Uh-huh.

**Q.** And you came around to this area; is that right?

**A.** Yes, ma'am.

**Q.** So this is a different perspective of that same area you were just talking about?

**A.** Yes.

**Q.** All right. Once you were down here in the grass, what did you do?

**A.** Well, I just continued to -- to scan the ground, you know, hoping to find -- find something.

**Q.** Where did you scan?

**A.** Pretty much the area from the rail of the bridge to the

street and back and forth, continuing until I got to the under section of the bridge.

**Q.** When you say the street, is that this street over here that you can see?

**A.** Yes, ma'am.

**Q.** That you can see if I don't draw on it with blue?

**A.** Yes.

**Q.** So you searched this whole grassy area?

**A.** Yes.

**Q.** And how far back along the grass did you go?

**A.** I went all the way to where you see on the under section of the bridge where they have a stairwell. And once I got to that stairwell, I walked back up to the top section of the bridge and came back down.

**Q.** It looks in this picture like there's an area where you could actually go under the bridge there. Do you remember that?

**A.** Yes, ma'am.

**Q.** What did you do there?

**A.** Walked under the bridge and continued to scan.

**Q.** Can you see on this picture, can you tell where that stairwell is that you're talking about?

**A.** I can see the stairwell. Okay. You see that blue box that's on the exterior portion of that? That's where the stairwell comes up to the bridge.

**Q.** Is that right there? Is that the blue box?

**A.** It's right before -- you can see it, but it's right up there right before that box. There's a stairwell that comes out to the bridge.

**Q.** So can you circle for us the grassy area that you searched?

**A.** (WITNESS COMPLIES.)

**Q.** What time of day was this that you were doing your search?

**A.** It was probably before noon.

**Q.** What was the weather like?

**A.** Hot. Clear. Sunny.

**Q.** So the lighting was fine?

**A.** Yes.

**Q.** What was the condition of this area like? Was is flooded?

**A.** No.

**Q.** How tall was the grass?

**A.** It wasn't high enough that it would have been able to impede my vision.

**Q.** So if there were a gun there, would you expect to have seen it?

**A.** I would like to have believed that I would have been able to find it.

**Q.** Did you find any gun?

**A.** No, ma'am.

**Q.** What was your reaction after you did that whole search and

didn't find a gun?

**A.** I was somewhat -- somewhat disappointed in the fact that I didn't find anything that would have supported or assisted in the investigation.

**Q.** Did you tell anybody that you had searched for a gun and that you didn't find any?

**A.** I remember once I got to the top of the bridge walking, and I may have been walking in the company of somebody else or another, and I was saying to myself that, you know, I didn't find a gun, and all of the casings that were on the ground coincide with the weapons that our people were carrying.

**Q.** Did you verbalize that to anybody?

**A.** I believe I did.

**Q.** Who did you verbalize it to?

**A.** An individual I was talking to. I'm not really sure who it was at that time due to the fact that it's been a while. I'm not sure who I was talking to at that time, but I can recall that individual telling me and making a statement that --

**MR. LARSON:** Objection. Hearsay.

**THE COURT:** No, I'm going to overrule.

**THE WITNESS:** I can recall the individual saying, "Good thing you're not working for a lawyer."

**BY MS. BERNSTEIN:**

**Q.** What did the person say? When you say "individual," is

this a civilian or another police officer?

**A.** It was another officer.

**Q.** What did this other officer say to you?

**A.** He told me, "A good thing I wasn't working for a lawyer."

**Q.** What did you take that to mean?

**A.** Well, me, personally, taking that --

**MR. DESALVO:** Objection to the relevance of what some unknown person said, Judge.

**MR. FLEMING:** Judge, further, it's an objection that she's asking the witness to speculate as to what somebody else said.

**THE COURT:** That's an objection that I think is appropriate and that I'll sustain.

**MS. BERNSTEIN:** Well, I'm going to ask him what he did next and whether it was influenced by what he heard.

**THE COURT:** Let's hear that question.

**BY MS. BERNSTEIN:**

**Q.** When you got back up onto the bridge or anytime later that day, did you ask any of those 7th District officers what had happened out there on the east side of the bridge?

**A.** Any of the defendants? No, ma'am, I didn't talk to any of them.

**Q.** Well, and let me just -- not just these defendants but any of the officers who you knew had been in that Budget truck. Did you ever ask them what had happened?

**A.** No.

**Q.** Why not?

**A.** Well, to be honest with you, ma'am, after walking the scene and not finding anything, I kind of didn't want to know after that.

**Q.** Why didn't you want to know?

**A.** Because of the fact that it wasn't -- it wasn't my investigation initially, and I wasn't going to be the one to continue any further investigation, and things weren't adding up to me. So for me to just keep myself out of it, to keep myself out of it, I didn't ask anybody anything. I didn't want to know.

**MS. BERNSTEIN:** May I have Exhibit 106, please?

May I approach?

**THE COURT:** Yes.

**BY MS. BERNSTEIN:**

**Q.** Do you recognize that as another photograph of the same area we've just been talking about?

**A.** Yes, ma'am.

**MS. BERNSTEIN:** Your Honor, I'd offer 106 into evidence.

**THE COURT:** Any objection?

**MR. DESALVO:** No objection, Your Honor.

**THE COURT:** All right. So ordered. 106 is admitted.

**MS. BERNSTEIN:** May I have 106 up, please?

**BY MS. BERNSTEIN:**

**Q.** Is that another photograph taken a different day, clearly, of that same area you were just describing?

**A.** Yes, ma'am, just in the opposite direction.

**Q.** All right. You see -- let me circle an area for you, and then I'm going to ask you a question.

For the record, I've just circled all the way to the bridge and every bit of grass included in that photograph; is that right?

**A.** Yes, ma'am.

**Q.** Is there anything within that blue line that you didn't search that day?

**A.** I don't believe so, ma'am.

**MS. BERNSTEIN:** May I have Exhibit 46, please?

**BY MS. BERNSTEIN:**

**Q.** What's that a picture of, Officer Magee?

**A.** That's a picture of one of our officers, Officer Derrick Williams, and he's standing over the body of the younger male subject that was lying on the catwalk.

**MS. BERNSTEIN:** Can you do me a favor and zoom in, please, Mr. Harrell?

**BY MS. BERNSTEIN:**

**Q.** How do you know that that's the subject that you saw that day on the bridge?

**A.** The one thing that stands out to me is the same thing that

stood out to me at the time -- at the time when I first saw him was the injury to his elbow, the way the bone was protruding and the muscles and tendons were hanging out.

**Q.** At any point while you were on the east side of the bridge that day, did you see a juvenile?

**A.** I recall seeing an individual being spoken to not too far from the vehicle, our shuttle bus.

**Q.** Can you describe this person?

**A.** Light complected, medium complected, possibly African-American. I wasn't sure if it was a boy or girl. I knew they were young, but I really didn't look so much at that individual because I didn't know what they were there for.

**Q.** Why weren't you sure whether it was a boy or a girl?

**A.** The subject had somewhat of a neutral hairstyle.

**Q.** Do you remember what that hairstyle was?

**A.** I can remember seeing, like, braids.

**Q.** Did you talk to that kid at all?

**A.** No, ma'am.

**Q.** Did you see whether there were other officers with him or her?

**A.** I remember the subject standing by the truck next to an officer. Who it was, you know, I'm not really sure.

**Q.** After you did that search of the grassy area and had the conversation with the officer who you don't remember who it was, what did you do?

**A.** Well, that individual instructed me to go to my vehicle and take some of the officers that came with me back to the Crystal Palace.

**Q.** Did you do that?

**A.** Yes.

**Q.** What did you do once you got back to the Crystal Palace?

**A.** Once we got back to the Crystal Palace, we proceeded to continue to go to work. Whatever jobs that were required for us to do, we went out and did them.

**Q.** Were you at the Crystal Palace when the task force officers got back?

**A.** I don't believe I was.

**Q.** All right. You had already headed out?

**A.** Yes, ma'am.

**MS. BERNSTEIN:** No further questions, Your Honor.

**THE COURT:** All right. We're going to take a short -- our afternoon break here. If you can be ready at 3:15, we'll go ahead and finish up for the day.

Sir, if you can be seated in that chair at 3:15. You can step down in between, but please don't discuss your testimony with anyone else during the break. Okay?

**THE DEPUTY CLERK:** All rise.

(WHEREUPON, the jury exited the courtroom.)

**(OFF THE RECORD)**

(WHEREUPON, the Court took a recess.)

**THE DEPUTY CLERK:** All rise.

(WHEREUPON, the jury entered the courtroom.)

**THE COURT:** We're going to go ahead and begin the cross-examination of this witness.

Mr. Magee, you're still under oath, and Mr. Hessler is going to ask you some questions.

**CROSS-EXAMINATION**

**BY MR. HESSLER:**

**Q.** Good afternoon, Officer Magee. My name is Eric Hessler.

How are you doing?

**A.** Pretty good. How are you doing?

**Q.** Fine, sir.

At the time of the Katrina, August 29th of 2005, how long had you been on the job?

**A.** Five years.

**Q.** Five years.

And your position then, your assignment then was 7th District?

**A.** 7th District patrol officer.

**Q.** How long had you been there?

**A.** That was my initial assignment, and that's where I was the whole time, five years.

**Q.** Were you a PO-1, 2, 3, 4?

**A.** PO-1.

**Q.** PO-1 at the time?

**A.** PO-1 or 2. I'm not really sure.

**Q.** Now, you had, obviously, gone through New Orleans Police Department Training Academy; correct?

**A.** Yes.

**Q.** Had you been trained in use of force?

**MS. BERNSTEIN:** Objection. Beyond the scope.

**MR. HESSLER:** I'm asking about his training.

**THE COURT:** I'm sorry. Did you say beyond the scope?

**MS. BERNSTEIN:** Beyond the scope of direct with this witness.

**THE COURT:** I'll overrule. I think he can ask that.

**BY MR. HESSLER:**

**Q.** You had use of force training?

**A.** Yes.

**Q.** Crime scene -- basic crime scene investigation?

**A.** Basic crime scene, yes.

**Q.** Had you had any advanced crime scene investigation?

**A.** No, sir, not at that time.

**Q.** Had you had any -- had you been to any schools to train you how to be a detective?

**A.** No, sir.

**Q.** Now -- and you now work in Central Evidence and Property?

**A.** Yes, sir.

**Q.** Is that a normal assignment, or is that an administrative reassignment?

**A.** No, it's my normal post.
**Q.** Normal assignment?
**A.** Yes.
**Q.** Now, your commander -- who was the commander of the 7th District at the time of this incident?
**A.** The commander would have been Captain Barty.
**Q.** Who was second in charge?
**A.** Second in charge would have been the -- I think the ICO. I think the ICO was, I think, Brad Tollefson at the time.
**Q.** And under him would be?
**A.** Under him would have been Lieutenant Lohman, 1700.
**Q.** Lieutenant Lohman?
**A.** Yes, sir.
**Q.** Did you report to Lieutenant Lohman in kind of way, form, shape, fashion?
**A.** No, sir.
**Q.** What about Tollefson?
**A.** No, sir. My immediate supervisors were -- I believe Lieutenant Kim Williams was my immediate supervisor for my platoon.
**Q.** And there's a chain of command within the police department. If you've got a problem, you go to a sergeant?
**A.** Yes.
**Q.** And that sergeant will bring it to the lieutenant?
**A.** Yes, sir.

**Q.** And so on up until that problem is resolved?
**A.** So on and so forth, yes.
**Q.** Who was your sergeant back then?
**A.** One of my sergeants would have been, that I can remember, would have been Sergeant Davillier.
**Q.** All right. Now, the command staff at the time of Katrina, do you think -- did you find that it had somewhat deteriorated?
**A.** Yes, sir.
**Q.** Could you describe the command -- describe it for me from the top down, the command -- Captain Barty, what type of command and control did he have at the time of Katrina and during Katrina?
**A.** Depending on the time period in which you're talking, sir, because for a long time period when we were dealing with it, Captain Barty wasn't there.
**Q.** Okay. Well, that's what I -- I guess what I need to know is: When wasn't he there?
**A.** For the earlier portion of the storm for us, or at least for me.
**Q.** Like the first week?
**A.** I would say so.
**Q.** And this occurred within the first week?
**A.** Yes, sir.
**Q.** And you never saw Captain Barty?
**A.** No, sir. I didn't see Captain Barty in the first week

until probably after the -- after this incident.

**Q.** But he was supposedly the one in charge of the district?

**A.** Yes, sir.

**Q.** Okay. You were working every day -- or were you working every day?

**A.** Yes, sir.

**Q.** Y'all couldn't work at night because it was too dangerous; right?

**A.** No, sir, we didn't work at night. We just maintained our makeshift station.

**Q.** At night you mean?

**A.** Yes.

**Q.** And that was to keep people from looting the station?

**A.** Keep people from looting the station and also to look out for the individuals that were sleeping in the parking lot out in front.

**Q.** When you say "individuals," would that have been --

**A.** Citizens who were evacuated from their residence.

**Q.** Okay. Who told you all to do that?

**A.** Who told us to do that?

**Q.** Yes.

**A.** Nobody. We were required to do that. It's one of our jobs.

**Q.** Well, I understand that. But didn't they have somebody giving out assignments, saying, "Hey, you do this. We need

this. This is your job"?

**A.** In the initial portion, sir, there weren't many supervisors there, and so the chain of command -- you know, the chain of command was -- was flimsy at most.

**Q.** Did you ever see Lieutenant Lohman out there?

**A.** Did I ever see Lieutenant Lohman? I saw Lieutenant Lohman in our extended session, yes.

**Q.** You saw him where?

**A.** I saw Lieutenant Lohman there, yes.

**Q.** Often, all the time, somewhat frequently?

**A.** Not with me, sir, not directly with me, no. I don't recall seeing him all the time.

**Q.** Okay. I guess what I'm saying -- I guess what I'm asking is, who was giving orders? Who was running things?

**A.** In that situation, everybody -- everybody was doing their job, what they saw they needed to do at the time. There was nobody really giving out commands, nobody give orders, especially not to me.

**Q.** Well, why not especially not to you?

**A.** Because if they were, I would have known who they were.

**Q.** Sergeant Davillier wasn't telling you what --

**A.** Sergeant Davillier was working alongside of us. He wasn't giving us instructions. Everyone who was an officer at that time was working together. So it wasn't so much someone telling you, "You do this. You do that." It was we saw what

needed to be done and we did it.

**Q.** Lieutenant Kim Williams, that was your lieutenant of your platoon at the time?

**A.** Yes, she was.

**Q.** Did she ever direct you as to what to do or not do?

**A.** In what scope?

**Q.** In any -- in your duty as a police officer.

**A.** Well, if she had given me any instructions, yeah, I would follow her instructions.

**Q.** Any idea why Captain Barty never showed up?

**A.** It was possible that maybe he couldn't make it. You know, there was a lot of officers who did live in the parish that weren't able to get into the city due to the fact of the bridges and the traffic situation, but I didn't --

**Q.** Were you hearing any -- I'm sorry.

**A.** But I didn't see him giving any instructions because myself, I was, in fact, stuck on the roof of a hotel for a number of days.

**Q.** Okay. Do you know how you were able to finally get out of that hotel?

**A.** Yes. Finally, some of our officers who were using boats to retrieve other individuals, they saw us on the roof, and they sent somebody over to come and get us.

**Q.** Okay. Now, you -- one second. I lost my train of thought on this.

So were you on a boat rescue squad when you finally --

**A.** When I was finally rescued myself?

**Q.** Right.

**A.** Yes.

**Q.** You went out and started rescuing others?

**A.** Yes.

**Q.** Is that pretty much the role you played throughout Katrina?

**A.** Pretty much that and just transporting people back and forth and in and out of the trucks.

**Q.** Now, at some point you end up out in, I think you said St. John Parish?

**A.** St. James.

**Q.** St. James Parish?

**A.** Yes.

**Q.** And how did that come about?

**A.** We ended up going out into St. James Parish because finally we had enough vehicles, and the female officers that were with us, we were taking them out of town to go see about their families. And the truck that we were -- the van that we were driving, the van actually broke down in St. James Parish.

When it broke down in St. James Parish, we were approached by one of their sheriff deputies, and the sheriff deputy, once we talked to them, he ascertained that we were

police officers, he granted assistance.

**Q.** Were you in a postal truck, by any chance?

**A.** No, we weren't in a postal truck. We were in one of the vehicles that we had commandeered from the limo service.

**Q.** Did you ever run across an Officer Gant on the side of the road?

**A.** Did I ever come across an Officer Gant on the side of the road? No, sir.

**Q.** Okay. But you were stopped by police, you say, at one point?

**A.** No, we weren't stopped by police. We were in St. James Parish. The vehicle we were driving broke down and we couldn't go if I further.

**Q.** Okay.

**A.** And when the vehicle broke down, a St. James Parish sheriff deputy came by and assisted us.

**Q.** Where were you going when you were in St. James Parish?

**A.** We were trying to get to anywhere where we could get these female officers to a place where they could get some transportation either on a Greyhound bus or anything of that nature, or possibly get them to Baton Rouge where they could get some assistance.

**Q.** Female police women?

**A.** Yes.

**Q.** Were they injured?

**A.** No, they weren't injured.

**Q.** Were they sick?

**A.** They were parents, and they had children, and they weren't aware of what was going on. And by an order by one of the supervisors, we took those individuals and brought them where they could go and get some information and get some help as far as their families were concerned.

**Q.** What supervisors were those that gave you permission?

**A.** I wasn't the initial one. I went along. I don't know who, in fact, gave the order to take the ladies out, no.

**Q.** When you saw a picture earlier with a whole bunch of people in the back of that police -- whatever it was called -- chaperone wagon, or whatever you call it, a bus, you saw a bunch of cops in there, male and female?

**A.** I saw a handful of police officers inside a shuttle bus. Yes, sir.

**Q.** Male and female?

**A.** Yes.

**Q.** Do you know if any of those were parents, any of those officers were parents?

**A.** I'm pretty sure they were.

**Q.** Do you know who these two females were, the two female police women?

**A.** Do I know who -- two female police women?

**Q.** I thought that's what you told me.

**A.** I never gave you a number.

**Q.** Okay. Well, how many females?

**A.** There would have been a few, whichever women that were working with us at the time.

**Q.** So you all got permission to let all female police women leave the 7th District?

**A.** I didn't get permission. I got the information that they were taking the ladies out, and they needed a few officers to ride with them, so I went with them. I don't know who gave the order.

**Q.** And how many male officers were in the truck?

**A.** I remember myself and Officer Daniels initially were the two guys because Officer Daniels was driving, and I was in the passenger side.

**Q.** "Initially," you said. How many did it end up being?

**A.** Who knows? I didn't do a head count, so I really don't know.

**Q.** Would it be fair to say the bus was full?

**A.** I would say that it had a reasonable number of people in it, yes.

**Q.** All right. And all of this -- it sounds like *Saving Private Ryan*. All of this was to get these two females out of town?

**A.** You keep saying two females, sir. It wasn't two females.

**Q.** All of this was to get any number of female police women

out of town?

**A.** To get them to get to their family, yes.

**Q.** And other officers eventually got on the bus?

**A.** I would say so, yes.

**Q.** Just to take a ride out of town and drop them off and then come back?

**A.** Yes.

**Q.** Let me ask you a question. What type of communications did the NOPD have during that first week?

**A.** Very minimum, very minimum. We couldn't contact any dispatchers or anything like that, so there weren't any calls being dispatched. But we had what was called an I-CALL system, which is somewhat of a walkie-talkie direct system to anybody who was on that channel.

For certain districts during emergency situations, each district was assigned an I-CALL channel, and you could contact your district personnel back and forth as a walkie-talkie system through that I-CALL channel.

**Q.** How many -- so what was the method of communication -- like, for instance, the New Orleans -- you knew about the New Orleans Superdome being a -- a place of last refuge inside of New Orleans; correct? Did you know about that?

**A.** At the time?

**Q.** Yes, sir.

**A.** Yes.

**Q.** Did you hear any of the information that was allegedly going on at the Superdome, problems at the Superdome?

**A.** No.

**Q.** You weren't aware of any of that?

**A.** No. Actually, due to the fact that my radio was destroyed because it went under water. So I wasn't listening in on anything like that.

**Q.** Did you ever get word of mouth that, "Hey, things aren't going well in New Orleans"?

**A.** There was a lot of things coming through, as far as word of mouth. There was a lot of rumor mills that were coming through, yes.

**Q.** Some of it was pretty horrible things you were probably hearing?

**A.** Yes.

**Q.** Did you know if those were true or not?

**A.** I couldn't verify it. I wasn't there.

**Q.** Did it kind of shape the way you acted, reacted, and thought about certain things?

**A.** Listening to some of the stories, yes. It put a lot of us in a certain mode, yeah.

**Q.** And you had to take account of what was going on around you?

**A.** Yes, sir.

**Q.** And coupled with what you were hearing?

**A.** Yes.

**Q.** Coupled with what you were hearing also, I guess, kind of raised your level of concern?

**A.** Yes.

**Q.** Did you see police officers walking around armed in a -- in a manner that you wouldn't normally see?

**A.** Several of our officers, yes, were carrying long guns, which would be like machine guns and rifles --

**Q.** You wouldn't normally --

**A.** We normally wouldn't carry, not a regular patrol officer.

**Q.** And they carried shotguns?

**A.** Not frequently, sir, no, but we did have the opportunity where we could. Shotguns were locked up, and they had to be assigned.

**Q.** And, typically, a police officer would really only carry one weapon, his side arm?

**A.** He would only have his pistol, yes, sir.

**Q.** .40 caliber?

**A.** .40 caliber.

**Q.** Glock?

**A.** Glock Model 22.

**Q.** Every police officer carries the same so they can exchange ammunition if there's a shootout situation --

**A.** Yes, sir.

**Q.** -- they're all armed?

They're all trained to use the same weapon? Uniformity?

**A.** Yes, sir.

**Q.** Did you ever take it upon yourself to arm yourself with maybe a weapon that -- and I don't want to use the term "unauthorized" because it seems like everything was authorized -- but did you ever take the opportunity to arm yourself with a weapon other than your Glock?

**A.** Anything else other than my Glock? No, sir. The Glock was the only thing I had.

**Q.** And that was a Glock 22?

**A.** Glock Model 22.

**Q.** Model 22 .40 caliber?

**A.** .40 caliber.

**Q.** And every police officer in the city shoots a .40 caliber handgun?

**A.** Yes, sir.

**Q.** And I want to take you back to the morning of Sunday September 4th around 9:00. You stated that you were -- were you driving -- were you driving this bus?

**A.** This shuttle bus? Yes, sir, I was driving.

**Q.** And somehow you made it to Chef Highway heading eastbound on Chef; correct?

**A.** Yes.

**Q.** Where did you get off, or how did you come on --

**A.** I got off at the Chef Menteur exit.

**Q.** Chef and what? I-10?

**A.** No, sir. The Chef Menteur exit that goes down to Chef Menteur as you are traveling on I-10, yes.

**Q.** Okay. Did you go over the high rise?

**A.** Yes.

**Q.** And when you went over the high rise, did you see a line of air boats, buses, police officers, or anybody -- anything else that was --

**A.** At the time we were coming through, sir, no, sir.

**Q.** Nothing unusual?

**A.** No.

**Q.** Did you hear any gunshots?

**A.** Coming across the high rise?

**Q.** Yes, sir.

**A.** No, sir.

**Q.** Did you hear any gunshots down below around Chef and --

**A.** On the ground?

**Q.** -- Chef and Downman?

**A.** No, sir.

**Q.** Was it normal to hear gunshots around that time?

**A.** Was it normal to hear gunshots in the city?

**Q.** Yes, sir.

**A.** Post-Katrina or --

**Q.** During Katrina, during that time.

**A.** I wouldn't say it was normal to hear gunshots in the city.

**Q.** Did you hear them more frequently than you would normally?

**A.** After Katrina?

**Q.** Well, yeah. Yes, that week after Katrina.

**A.** No. There weren't enough people in the area, not where we were assigned, not where we were at.

**Q.** So you never heard gunshots out in New Orleans East in that first week?

**A.** No, I didn't -- like I advised you, in that first week, for three days, I was on top of a motel.

**Q.** Okay. Now, as you're driving eastbound on Chef, approximately how many officers did you have? I think you said --

**A.** I said more than five.

**Q.** Okay. And I believe -- I believe Officer Daniels, and correct me, hopefully I'm wrong, but did he pass away?

**A.** Yes, he did.

**Q.** But it was Abreace Daniels and several other officers?

**A.** Yes.

**Q.** And maybe even more?

**A.** Maybe more.

**Q.** And you see a truck coming down, a Budget truck coming down the opposite way at a fast rate of speed?

**A.** On Chef Menteur, yes, sir.

**Q.** Enough to bring your attention to it?

**A.** Enough to get our attention and wonder why they were going in such a haste.

**Q.** And -- and enough to cause you, in your experience, to say, "Hey, it's" -- "that's our truck, there's police officers in it, they're not going to get doughnuts, they're going somewhere"?

**A.** Yeah.

**Q.** And you turned on your radio? Somebody did?

**A.** Somebody turned on the radio, yes.

**Q.** And you were -- were you able to hear what they heard?

**A.** I didn't hear what they heard because I was in the front of the shuttle bus driving, but I did hear a garbled transmission come over and then hear what we believed were shots coming over the air on the radio. But as far as actually hearing the words and hearing what was said, the only thing I can really recall hearing was the gunshots coming over.

**Q.** And sometimes when you hear transmissions on the radio, some of them are normal?

**A.** Some of them are normal, yes.

**Q.** 704 to headquarters?

**A.** Uh-huh.

**Q.** And sometimes you hear something that makes your ears perk up?

**A.** If you hear an officer who has a sense of urgency, maybe he's screaming in the radio or talking really loudly in the

radio, yeah, he'll get your attention.
**Q.** Did that get your attention, what you heard? Did that radio call that you heard get your attention?
**A.** When I heard the shots coming over the radio? Most certainly.
**Q.** And the garbled transmission?
**A.** The loud, garbled transmission, yes.
**Q.** That got your attention?
**A.** Yes.
**Q.** It wasn't like somebody was --
**A.** Just casually talking or responding to a call? No, sir.
**Q.** And you turned around and you went that way because --
**A.** I was advised that something was going on. I turned around and headed towards the bridge.
**Q.** Did you ever hear anything about an officer down during that ride?
**A.** No, not initially. No, sir.
**Q.** Did you ever hear anything about an officer down at any point --
**A.** Several --
**Q.** -- while you were on that bridge?
**A.** Not while I was on the bridge. I found out about that several, several days later.
**Q.** Okay. So when you get there -- in fact, what was your mind-set when you were getting there? You hear this

transmission. You hear gunshots.

**A.** Uh-huh.

**Q.** And, obviously, you -- were you concerned for your safety?

**A.** Concerned for my safety, as well as with the safety of the other officers in that vehicle that I was driving.

**Q.** Okay. And why theirs? Why not just yours?

**A.** Because I'm a police officer and my responsibility is to look out for other officers just as well as I look out for myself.

**Q.** Even though they have guns?

**A.** They have guns.

**Q.** They're trained to use them just like you?

**A.** Yes, sir.

**Q.** You're going to protect their lives if you're called upon to do it?

**A.** Yes, sir.

**Q.** Now, when you're driving up the bridge, you have the benefit of seeing what you're driving into; correct?

**A.** I had the benefit of seeing what's going on on the bridge, yes, sir.

**Q.** Did you find that helpful to assess the situation?

**A.** Yes.

**Q.** Did you drive up into a hail of gunfire?

**A.** No, sir. No, sir, I didn't.

**Q.** Were you happy about that?

**A.** Happy?

**Q.** Yes, sir.

**A.** Comfortable. I had a sense of relief at that time.

**Q.** Okay. Because there was no gunfire erupting around you?

**A.** There was no gunfire directly coming in our direction. There was no gunfire going on at the time we arrived at the bridge.

**Q.** But you heard it en route?

**A.** We heard it over the radio.

**Q.** And you were looking for something like that to enable you to protect yourself and those officers. If you would have saw something that alerted you to a danger, you might have taken a different position if you were able to see it?

**A.** If I saw a threat, some immediate threat?

**Q.** Yes.

**A.** Yes, sir.

**Q.** You may have taken a different approach?

**A.** Yes, sir.

**Q.** You may have done a lot of different things?

**A.** Yes, sir.

**Q.** If you were able to see it -- if you were able to see it and identify it --

**A.** If I was able to see and identify an immediate threat, yes, sir, I would have.

**Q.** But you didn't, so you kind of drove halfway -- not even

halfway up on the bridge -- a little ways up on the bridge, turned it to kind of give you a tactical advantage of cover? You used the bus longways to cover for your officers?

**A.** Yes.

**Q.** Which was the proper thing to do?

**A.** Yes.

**Q.** And they got out and you got out. Did they use that vehicle for cover until they could determine what was going on?

**A.** I don't believe so. Like I advised, there was nothing immediate at that time, so as we got out, we all began to walk across the bridge to see what was going on.

**Q.** But, nevertheless, you were at the gun ready position? You had your gun out?

**A.** Yes, sir.

**Q.** In case you encountered armed suspects?

**A.** Yes, sir.

**Q.** Or gunfire?

**A.** Yes, sir.

**Q.** And you kept that gun out as you were walking up on some subjects you saw?

**A.** Yes, sir.

**Q.** Did you train your gun on them?

**A.** I kept my gun in the gun ready set -- in the gun ready position. No -- did I point my weapon at those individuals?

**Q.** Correct.

**A.** No, sir.

**Q.** And gun ready would be kind of at waist level --

**A.** Gun ready would be directly in front of me, waist level, where I can see up ahead of me --

**Q.** And you can easily come gun up on them if you --

**A.** Yes, sir.

**Q.** And you never had to do that, did you?

**A.** Never had to do what?

**Q.** Never had to come up with the gun?

**A.** No, sir.

**Q.** They didn't roll over or try to pick something up?

**A.** No, sir.

**Q.** And I'm not going to go through it again, but you described to the jury how you walked from, basically, the foot of the bridge to almost the middle of the bridge, searched for weapons, searched for guns, searched for all kinds of things, trying to piece this together in your head what was going on?

**A.** Yes, sir.

**Q.** Although that wasn't your responsibility, you just tried to do it?

**A.** No, it wasn't my responsibility, but I tried to do it.

**Q.** Were -- was everybody gone by this time? Has everyone left by this time, by that time that you were doing that?

**A.** Was the scene clear?

**Q.** Yes, sir.

**A.** No, sir. There were still officers on the opposing side of the bridge, and there were still officers on the side where I was actually walking.

**Q.** How long were you out there that whole time?

**A.** I couldn't give you an exact time, but we were out there for a good while.

**Q.** All right. And you never talked to any of the officers involved?

**A.** No, sir.

**Q.** You knew most of them, you think?

**A.** The ones that were assigned to the 7th District, and I was -- I was familiar with Officer Barrios due to the fact that Officer Barrios, at one point in time, was a 7th District officer before he was transferred to another.

**Q.** Now, do you remember being told by someone that they were also looking for a subject, or still looking for a subject in a red T-shirt?

**A.** I remember them telling me there was one more subject that had ran -- that they were looking for in the motel area, that ran through the motel.

**Q.** Did they tell you he was wearing a red T-shirt?

**A.** Right now, I wouldn't be able to recall that right now.

**MR. HESSLER:** Your Honor, may I approach?

**THE COURT:** Yes.

**BY MR. HESSLER:**

**Q.** I'm going to show you a 302 dated 6/6 of '09.

You can read it, not aloud, just to yourself.

**A.** (WITNESS COMPLIES).

**Q.** Do you recognize that document I gave you?

**A.** Yes, sir.

**Q.** Does that seem to reflect information you gave in an interview to Mr. Bezak on 6/6 of '09?

**A.** I believe so.

**Q.** Okay. Do you recall now telling Mr. Bezak that you were, in fact, informed that you were looking for another unknown subject on the loose wearing a red T-shirt?

**A.** That's what's in the statement.

**Q.** And certainly your recollection would be fresher on -- or more accurate in 2009 than it would be today; wouldn't you agree?

**A.** Yes, sir.

**Q.** Did you ever find that subject in the red T-shirt, to your knowledge?

**A.** No, myself, I did not. As I advised, I left -- left my location and continued back over the opposite side of the bridge.

**Q.** And the area that you were told to search for the subject in the red T-shirt was, in fact, the area of the Danziger Bridge?

**A.** The area that they made a statement that the individual was still inside of the hotel was at the location of the hotel.

**Q.** It was the west side of the Danziger Bridge?

**A.** West side, in the Fifth District.

**Q.** And you took that serious?

**A.** Yes.

**Q.** And you, in fact, joined other officers to form a perimeter to make sure that this individual in the red T-shirt didn't get away?

**A.** Yes, sir.

**Q.** Are you familiar with the practice of some persons who are fleeing from the officers to change --

**A.** Change clothing? Yes, sir.

**Q.** To what?

**A.** To change clothing, yes.

**Q.** They've done that before?

**A.** Yes.

**Q.** It's rather common?

**A.** Yes.

**Q.** And that's to do what? Do you know why they do that?

**A.** To elude the police.

**Q.** So you described this extensive walk-around looking for evidence; correct?

**A.** Yes.

**Q.** And you, in fact, found some evidence, in fact, saw some

evidence; correct?

**A.** Well, the initial casings that were on the ground, yes.

**Q.** And did you see any strike marks where bullets -- strike marks where bullets had struck concrete or struck -- you looked for strike marks, bullet holes, or bullet marks in the Budget rental truck; correct?

**A.** That's what I looked for in the rental truck, yes, sir.

**Q.** Did you see any?

**A.** I didn't see any bullet holes in the truck.

**Q.** How thoroughly did you look?

**A.** I looked on the side of the truck that was facing the immediate area where I was.

**Q.** And where was that truck parked when you inspected it?

**A.** When I parked it, the truck was on the bridge.

**Q.** Okay. Did you look where the individuals were lying down to see if there were any strike marks along the wall or the barrier?

**A.** No, I didn't look for strike marks, sir.

**Q.** Why not?

**A.** I'm not a ballistics expert.

**Q.** Okay. But you know about guns?

**A.** Yes, sir.

**Q.** And you know about weapons?

**A.** Yes, sir.

**Q.** And you did see some ballistic evidence out there?

**A.** I saw the casings on the ground, and I saw the injuries to the individuals.
**Q.** Okay. And you noted what those casings were because --
**A.** Yes, sir. Because I'm familiar with certain weapons that are commonly used on the street, and AK-47s are not strange weapons to New Orleans police officers.
**Q.** It's not strange to encounter them on the street?
**A.** No, not strange to encounter an AK-47 on the streets of New Orleans.
**Q.** Unfortunately, at this time you also knew New Orleans police had AK-47s, some of them?
**A.** Yes, I knew a couple of our officers were carrying AK-47s.
**Q.** And .223s?
**A.** Yes.
**Q.** And M-16s?
**A.** M-16s or possibly R-15. I wasn't exactly sure.
**Q.** And you said, "Oh, well, we got AK-47 rounds, and we got .223 rounds, and some guys have" -- "police officers carry AK-47s, and some carry" -- so you said, "Oh, the police must have shot them"?
**A.** Well, yes, basically.
**Q.** And you used that and come to certain conclusions because you didn't find any guns anywhere else?
**A.** Yes, sir.
**Q.** And you've expressed your conclusion today, after your

investigation, was, "Wow, nobody else had any guns but the police, so I don't know about this"?

**A.** Yes, sir.

**Q.** Now, sometimes in an investigation, if you don't have all the evidence, you come to the wrong conclusions; would you agree with that?

**A.** Yes, you can.

**Q.** Or if you intentionally ignore evidence, you'll come to the wrong conclusion?

**A.** Intentionally ignore evidence?

**Q.** Yeah.

**A.** Can you explain that?

**Q.** Well, let's just say -- let's just say there was a gun out there, and you either ignored it or you didn't find it, you could come to the wrong conclusion; correct?

**A.** If I didn't find it, yes.

**Q.** Let me ask you this: Did you ever run across, in New Orleans, a criminal throwing down evidence and another person picking it up and running off with it?

**A.** I'm pretty sure, yeah.

**Q.** But in this instance, you came to the conclusion, because you only found AK rounds and .223s, and you knew the police had them, and you didn't find guns, that there were some problems here?

**A.** Yes.

**Q.** And police officers don't carry .9 millimeters, do they?

**A.** No, we're only issued .40 caliber Glocks. The only individuals that may have anything with a .9 millimeter would be possibly SOD, if they're carrying an H&K, one of their tactical weapons.

**Q.** And you didn't see any of those out there?

**A.** None of our SOD units were out there.

**Q.** Now, after you looked at the bullets -- looked for bullets in the truck and you didn't find any --

**A.** Uh-huh.

**Q.** -- you went down and you looked down in the ground not grassy area, and you didn't see any --

**A.** Any guns or any casings, no, sir.

**Q.** Now, typically, when -- you've been on homicide scenes before?

**A.** Yes, sir.

**Q.** Did you ever see it when a homicide detective has to search a grassy area?

**A.** Uh-huh.

**Q.** No matter how short the grass is, they'll use a metal detector?

**A.** Yes, sir.

**Q.** You didn't use a metal detector?

**A.** No, sir, I didn't.

**Q.** But you were diligent enough to note certain calibers of

casings?

**A.** That were on the bridge, yes.

**Q.** And when you came across the .9 millimeter casings, which you know aren't fired by New Orleans police officers and which you know no New Orleans police officers had on the bridge that day, why didn't you mention that to the jury?

**A.** I didn't come across any. I didn't pay attention or state that I came across .9 millimeter casings, sir. I remember .223s and a bunch of rifle casings due to the fact that rifle casings stood out. They were bigger than any other rounds.

**MR. HESSLER:** Your Honor, may I approach?

**THE COURT:** Yes.

**BY MR. HESSLER:**

**Q.** I'm going to refer to your 302, the report you gave to Agent William Bezak on 6/6 of 2009. I refer you to the top paragraph. Just read it to yourself.

**A.** (WITNESS COMPLIES).

**Q.** Okay. Do you see where --

**A.** I see the statement, yes, sir.

**Q.** -- Agent Bezak says you found 12-gauge casings, 7.62 casings, which is an AK, .223s, and .9 millimeters?

**A.** Uh-huh.

**Q.** Okay. Where did the .9 millimeter shells come from that you documented on the scene?

**A.** That I documented on the scene or that this statement

stated that I saw on the scene? I documented no -- no nothing.

**Q.** The .9 millimeter casings that you saw on the scene that you told Agent Bezak about, where were they?

**A.** To be honest with you, sir, I don't recall at this present time. But like you advised earlier, a statement that was given in 2009 may have more information than a statement that I could give right now in 2011.

**Q.** Right. And I'm not saying you made that up.

**A.** Uh-huh.

**Q.** And I certainly don't believe you made that up. I'm just asking you, do you recall where you found those .9 millimeter casings?

**A.** No, sir.

**Q.** But now that you have that important clue or piece of evidence, I guess you've got to -- you can't ignore it?

**A.** No.

**Q.** So the only conclusion you can come to now, I guess, is, somebody out there at some point fired a .9 millimeter handgun?

**A.** From the statement that's written in the paper, yes, sir.

**Q.** Okay.

**MR. HESSLER:** No further questions.

**THE COURT:** All right. Thank you.

Next? Mr. DeSalvo?

**CROSS-EXAMINATION**

**BY MR. DESALVO:**

**Q.** Officer, Frank DeSalvo.

How are you?

**A.** Pretty good, sir. How about you?

**Q.** Old and tired. However, I have to ask you some questions.

You -- I don't want to go through everything. Let me see if I can just start somewhere in the middle. When you got there to the scene, and you keep going and you made your U-turn and all, you drove just a little ways up the bridge, and you said you worked your way up the bridge?

**A.** Yes, sir.

**Q.** I think those were your words.

And you had your gun at the ready?

**A.** Yes, sir.

**Q.** And however many people that were in the vehicle that were with you, they were coming up behind you?

**A.** Yes, sir.

**Q.** Gun at the ready?

**A.** I would imagine so.

**Q.** And maybe you would be looking forward and looking back to see how your people were; right?

**A.** Yes, sir.

**Q.** Now, were you all kind of in the walkway or in the street?

**A.** We're in the street. We're in the street, but not on the

sidewalk.

**Q.** Were you going along the --

**A.** We're going along the rail, the metal rail.

**Q.** Everybody was going along the rail?

**A.** Everybody was walking on the lane of travel, though, closer to the rail, not in the sidewalk.

**Q.** At the gun ready?

**A.** Yes, sir.

**Q.** You all weren't spread out in any kind of formation?

**A.** I wasn't spread in a formation.

**Q.** You all were one behind the another with your guns at the ready?

**A.** That's where I was.

**Q.** You weren't worried about somebody behind you shooting?

**A.** I had officers behind me. I'm pretty sure they would have covered the rear.

**Q.** So as you all were -- you took your time walking up there because you didn't know what you would come across?

**A.** We didn't know what we were walking onto, yes, sir.

**Q.** Even though it was a straight line?

**A.** Yes, sir.

**Q.** I mean, you could see all the way up on the bridge?

**A.** You could see all the way up the bridge, yes, sir.

**Q.** But you still took your time going up?

**A.** Yes, sir.

**Q.** Because you could see the Budget truck up in front of you?
**A.** Yes, sir.
**Q.** And you didn't know what was lurking behind that truck --
**A.** No, sir.
**Q.** -- or may have been lurking on the other side of that cement wall? So it took you a little while to get up there?
**A.** Yes, sir.
**Q.** Now, where was the Budget truck?
**A.** The Budget truck was close to the summit of the bridge.
**Q.** So it was not where those three bodies lay?
**A.** It wasn't diagonally on the side of it, no, sir.
**Q.** It was all the way up --
**A.** It was a ways ahead.
**Q.** It was almost to the crest?
**A.** Yes, sir.
**Q.** When you got to where the three bodies were, did you see any EMS?
**A.** No, sir.
**Q.** Did you ever see any EMS?
**A.** I never saw an EMS, no, sir.
**Q.** Did you pass up any EMS vehicles while you were going east on Chef Highway?
**A.** I don't recall, sir.
**Q.** Did you pass up any EMS vehicles when you were going west on Chef Highway?

**A.** No, sir.

**Q.** You never saw EMS?

**A.** No, I didn't.

**Q.** When you got up to where those three bodies lay -- there were three?

**A.** Yes, sir.

**Q.** I mean, this is something that stands out in your mind?

**A.** Yes, sir.

**Q.** Because this is not something you see in an everyday occurrence?

**A.** No.

**Q.** And you wouldn't forget anything, except maybe a .9 millimeter? At any rate --

**MS. BERNSTEIN:** I'm sorry. Can he answer that question? He asked, "and you wouldn't forget anything," and Mr. Magee --

**MR. DESALVO:** I'm sorry. I did interrupt, Judge. Sorry.

**THE COURT:** Let him go ahead and answer that.

**THE WITNESS:** I wouldn't forget key things that stood out to me, things that I thought were important.

**BY MR. DESALVO:**

**Q.** Okay. Except maybe for the .9 millimeters? You may have forgotten that?

**A.** (WITNESS GESTURES).

**Q.** But at any rate, when you got where those three bodies lay, who was there, other than the three bodies?

**A.** Who was there, other than the three bodies? The police officers. We were.

**Q.** Just you guys?

**A.** Just the guys that came with me.

**Q.** So these three people were left unattended?

**A.** Yes.

**Q.** And they were just laying there on the other side of this concrete barrier with nobody tending to them?

**A.** Nobody attending to them.

**Q.** No EMS?

**A.** No EMS.

**Q.** No 7th District officers?

**A.** No officers that --

**Q.** No officers other than you guys?

**A.** Yeah.

**Q.** Now, you all continued heading up?

**A.** Yes, sir.

**Q.** Did you leave anybody behind with these people?

**A.** I don't know. I didn't leave anybody. Maybe a couple of our guys stopped back to stay with the people, but me, myself, my mind-set, I was focused in on continuing forward, finding the rest of our officers.

**Q.** But you still were gun at the ready?

**A.** Of course.

**Q.** And you're still looking in front?

**A.** Yes, I am.

**Q.** Looking in back to see if your people were with you? I mean, that's normal; right?

**A.** Uh-huh.

**Q.** And as far as you know, everybody was still with you?

**A.** As far as I know, everybody may have been still with me.

**Q.** So then you get up to where the Budget truck is near the crest?

**A.** Uh-huh.

**Q.** And you look around the Budget truck --

**THE COURT:** One second, Mr. DeSalvo. A couple of times you've said "uh-huh." You need to give us a yes or no.

**THE WITNESS:** Yes, sir.

**BY MR. DESALVO:**

**Q.** You looked around the Budget truck to see if there were any injured officers?

**A.** Yes.

**Q.** Or any other injured citizens?

**A.** Yes.

**Q.** And you didn't see anything?

**A.** No, we didn't.

**Q.** And you continued down?

**A.** Yes.

**Q.** Or continued up and down?

**A.** Yes.

**Q.** And when you got down, you saw 7th District police officers?

**A.** When we got down to the edge, we saw 7th District police officers in the doorway, in the vehicle travel-way of the motel.

**Q.** Did you see a dead person?

**A.** Once I got up close enough to him to actually see, yes.

**Q.** You didn't see any state police?

**A.** I didn't see the state police arrive at that moment when I arrived, no. They came later.

**Q.** They came?

**A.** Yes, they came. They came later.

**Q.** And you didn't see any 3rd District officers?

**A.** I don't recall seeing any 3rd District officers.

**Q.** The base of that bridge is the 3rd District; right?

**A.** Yes, it is.

**Q.** So no 3rd District officers that you saw?

**A.** I don't recall seeing any 3rd District.

**Q.** Who from the 7th District was there?

**A.** The officers who initially came with me and the officers that were in the Budget truck.

**Q.** What officers were in the Budget truck? Do you know who was there, or you're just assuming it was the officers from the

Budget truck?
**A.** I know the officers who I named first ahead of time.
**Q.** That was Officer Faulcon and --
**A.** And Officer Villavaso. I remember seeing them.
**Q.** Those are the only two people --
**A.** Those are the guys that I remember looking into the face of and remember them being there. But like I said, I assumed the rest of the individuals were the rest of the defendants.
**Q.** Did you ask any questions?
**A.** Did I ask any questions? I initially asked what we have.
**Q.** Okay. And who did you ask that of?
**A.** I asked it in a general question.
**Q.** You just asked it to the mass?
**A.** Yes.
**Q.** And did the mass answer you, or did someone answer you?
**A.** An individual answered in the mass, in the group of officers.
**Q.** Okay. And that's when you learned --
**A.** That we have one more subject that possibly ran into the motel.
**Q.** And that's all you learned?
**A.** That's all I learned.
**Q.** Nobody told you what happened up on the bridge?
**A.** No, sir.
**Q.** Or why there were three bodies laying there unattended?

**A.** No, sir.

**Q.** You had to think that was strange, huh?

**A.** Yes, sir.

**Q.** You didn't ask anybody, "What are you doing with three bodies up there unattended"?

**A.** Not at that moment. My main focus was, what do we have, if there's still an immediate threat there, and then I set up a perimeter around the hotel.

**Q.** Well, not at that moment, but when did you ask?

**A.** When did I ask?

**Q.** Yes.

**A.** I never asked any of those guys anything.

**Q.** So when you said, "not that the moment," you mean you just didn't ask?

**A.** I just didn't ask.

**Q.** Okay. But then your curiosity got ahold of you, even though you didn't ask any specific questions?

**A.** Yes.

**Q.** And you decided, well, I'm going to go see what happened here. You're going to use your investigative techniques?

**A.** Yes, sir.

**Q.** So that's when you walk down and that's when you saw some casings?

**A.** Yes, sir.

**Q.** Now, you saw some casings at the crest of the bridge, too,

didn't you?

**A.** I didn't say I seen any casings at the crest of the bridge. I didn't give you a location as to the crest of the bridge.

**Q.** Did you take out a pen and paper and write anything down?

**A.** No, sir.

**Q.** When you got back to the Crystal Palace, did you write down anything?

**A.** No, I did not, sir.

**Q.** So eventually when you talked -- well, who was the first person you ever talked to about this?

**A.** Who was the first person that I ever talked to in an official capacity?

**Q.** Yes.

**A.** The FBI.

**Q.** And that was a few years later?

**A.** That was several years later.

**Q.** And then you were relying on your memory?

**A.** Yes, sir.

**Q.** Okay. And as you came here today, you're relying on your memory?

**A.** Yes, sir, from what I remember now.

**Q.** You indicated that you checked for different kinds of casings because you were concerned that maybe these people had been caught in a cross-fire?

**A.** That was -- that was my first mind. That was the first thought that I thought, maybe these people got caught in some kind of a cross-fire, you know, and maybe there was something bigger that happened there. Because, in my mind, I didn't want to believe that my people fired on unarmed individuals.

**Q.** Sure.

And you indicated that you did this search, and it was sometime before noon?

**A.** I would imagine so.

**Q.** But you don't know how much before noon?

**A.** I didn't have a watch.

**Q.** It could have been close to noon?

**A.** It could have been, sir.

**Q.** And when you went under the bridge, you actually saw someone, didn't you?

**A.** When I went under the bridge, there was another officer that was on the opposing side doing pretty much the same thing that I was doing.

**Q.** Well, didn't you say that you saw somebody with "Sheriff" written across his shirt when you went under that bridge?

**A.** No, sir. I don't recall that.

**Q.** Did you see a Lieutenant Kim Williams?

**A.** Yes, I saw Lieutenant Williams.

**Q.** Did she get there before you or after you?

**A.** I'm pretty sure she got there after me.

**Q.** After you?
**A.** I don't really recall, but she wasn't with me.
**Q.** She wasn't with you.
But you didn't see her when you first rode up?
**A.** No.
**Q.** And you certainly didn't see her next to the bodies because nobody was there?
**A.** When we got there, nobody was there, sir.
**Q.** And you didn't see her next to the Budget truck?
**A.** No, sir.
**Q.** Because nobody was there?
**A.** Nobody was by the truck.
**Q.** But when you got down to the other side and saw 7th District officers, was Lieutenant Williams one of them?
**A.** I don't believe so. But I can say I'm not sure.
**Q.** Okay. Well, what about Lieutenant Lohman?
**A.** I'm not sure.
**Q.** You don't know whether he was there or not?
**A.** I'm not sure.
**Q.** Okay. What about Sergeant Kaufman?
**A.** I don't believe I saw Sergeant Kaufman down there, sir, not at the time when I arrived.
**Q.** Would you agree that if you told Agent Bezak in 2009 that you saw .9 millimeter casings that day, that that's more likely correct because your memory was fresher then?

**A.** Yes, sir. Yes, sir.

**Q.** You didn't see any .40 calibers there, .40 caliber casings?

**A.** Um --

**Q.** I mean, you walked that bridge; right?

**A.** Yes, I did.

**Q.** You walked on the roadside of the barrier?

**A.** Yes, sir.

**Q.** And you walked on the -- because you looked over on the concrete barrier side, the walkway side of that barrier?

**A.** Yes, sir.

**Q.** And you didn't see any .40 caliber casings?

**A.** No, sir.

**Q.** And that's the standard weapon that police officers fire and carry?

**A.** Yes, sir.

**Q.** Glock.

And so in your investigative mind, then you would have to say that nobody fired a .40 caliber that day?

**A.** I --

**Q.** I mean, from your investigation.

**A.** From the initial time I was out there, no, I don't believe so.

**Q.** And you were looking carefully?

**A.** I believe I was.

**Q.** And certainly, if there had been .40 calibers there while you were walking down that bridge, you were looking carefully enough to see them?

**A.** Yes, sir.

**Q.** And you would have noted that in your head?

**A.** Yes, sir.

**Q.** Now, you said that you only -- you only had carried your Glock, your issued Glock?

**A.** I only carried my personal -- yes, sir.

**Q.** That's all you carried during the storm?

**A.** That's all I had.

**Q.** That's all you had that day?

**A.** Yes, sir.

**Q.** Did you have anything else any other days?

**A.** No, sir.

**Q.** Okay. Do you recall telling Agent Bezak that you also had a long gun with you that day, but you left it in the shuttle bus?

**A.** You asked me if I was carrying it. No, sir, I wasn't carrying it.

**Q.** Well, that's not what I asked you, though. Didn't I ask you if you ever armed yourself, had anything other than your issued Glock? And didn't you say no?

**A.** Yes, sir, I said no.

**Q.** Right.

But you did have something that you had other than that Glock that was issued to you. You had a long gun.

**A.** That's what the statement says, sir.

**Q.** That's what the statement says?

**A.** Yes, sir.

**Q.** Well, is the statement true or is it false?

**A.** Like you advised, sir, the fact that the statement was in 2009, I may have a better memory in 2009 than I have in 2011.

**Q.** So if, in 2009, you said you had a long gun, but it was in the shuttle bus, then that's probably true?

**A.** Yes, sir.

**Q.** Do you want to look to see if that's what you, in fact, said?

**A.** (WITNESS COMPLIES.)

**Q.** And did you say that?

**A.** Yes, sir. If it's in that statement, I can believe --

**Q.** You had no reason to think that Agent Bezak would write something in here that you didn't say?

**A.** No, sir. No, sir.

**MR. DESALVO:** Thank you, Officer.

**THE COURT:** All right. Mr. Meche is next.

**CROSS-EXAMINATION**

**BY MR. MECHE:**

**Q.** Good afternoon, Officer Magee. I'm Tim Meche. I represent Anthony Villavaso.

Do you know Anthony Villavaso?

**A.** I know Anthony Villavaso from being another officer.

**Q.** I'm sorry?

**A.** I know Anthony Villavaso from being an officer in the department, yes.

**Q.** When did you meet him?

**A.** I met Anthony Villavaso during the time of the storm.

**Q.** Okay. Now, let me get a better understanding of your activities during the storm. Were you on duty the day Katrina came through?

**A.** No, sir, we were actually sequestered. We were staying in the city because I don't live directly in the city. We were staying at a hotel in the district.

**Q.** When you say "we," you mean you and your family?

**A.** No, me along with a number of other officers were staying in the motel off of Read and I-10 Service Road, the Holiday Day Inn Express.

**Q.** So when the storm was coming through, you checked into a hotel?

**A.** Yes, sir.

**Q.** Okay. And you indicated you actually got trapped there and you had to stay a few days?

**A.** Yes, sir.

**Q.** And if Katrina came in Monday, when was it by the time you got out?

**A.** I believe we were in that hotel for at least -- at least three days.

**Q.** Okay. So Monday, Tuesday -- so it would have been Wednesday or Thursday before you got out?

**A.** If that's the -- you know, as far as I was concerned, days of the week was something I wouldn't remember.

**Q.** I understand.

**A.** It wasn't that important to me at the time.

**Q.** And when you got out of the hotel, where did you go?

**A.** When we got out of the hotel, the first place that they brought us was to the location of Chef Menteur Highway and Read, where we got off the boats, and we were advised that we were taking up inside of the Crystal Palace reception hall that was at that location.

**Q.** Okay. What did you do while you were there?

**A.** The first day that I got there, I dropped off my things, sat down for a while and just kind of tried to collect myself and find out what's going on.

**Q.** Okay. Now, this would have been what, Thursday?

**A.** Like I said, the days of the week, I have no exact time.

**Q.** Now, at some point you said you got into a vehicle with some women and physically left the city?

**A.** Yes.

**Q.** Okay. And you got to St. James Parish?

**A.** Yes.

**Q.** And spent the night?

**A.** Yes.

**Q.** Okay. And how many nights did you stay there?

**A.** The first night we only stayed one night.

**Q.** Okay.

**A.** And that's when we returned into the city.

**Q.** And the day of the shooting was that Sunday?

**A.** The day of the shooting would have been the day we came back.

**Q.** Okay. That's when you came back. So you would have been gone from Saturday -- Saturday night probably?

**A.** Yes. I would imagine that that was the day, yeah.

**Q.** And you didn't get there until, like, Thursday?

**A.** I didn't get back to the district until I'd say three days afterward, three or four days after the storm.

**Q.** So during that week, you only really were working for like a day?

**A.** Within the district, yes.

**Q.** Okay. And what did you do that day you were there?

**A.** Got in the boats with the rest of the officers and went out trying to rescue individuals who were trapped in their homes.

**Q.** Now, that one day, was that when you had occasion to meet Officer Villavaso?

**A.** When we got to the Crystal Palace, yeah, that would have

been around the time that I met him because he was with Officer Barrios. He was actually Officer Barrios' partner, and I had actually rode with Officer Barrios when he was assigned to the 7th District.

**Q.** You knew Officer Barrios; right?

**A.** Yes, sir.

**Q.** Sir -- pardon me.

**MR. MECHE:** Mr. Tim, can you show picture 59 -- Exhibit 59?

**BY MR. MECHE:**

**Q.** Now, this is a picture I think the government showed you when you testified earlier.

**A.** Yes, sir.

**Q.** Do you see Officer Barrios in there?

**A.** Yes, sir, I do.

**Q.** Which one is he?

**A.** Officer Barrios would be the subject wearing the black shirt with his hand on his chin.

**Q.** And that is -- is that -- did he go on that trip with you all in this van?

**A.** Did he take the trip with me?

**Q.** Yes, sir.

**A.** No, sir.

**Q.** But this van, and I was confused --

**A.** That van was not the van that I was driving. This van is

one of the vans that we had commandeered. I don't really recall when this picture was taken.

**Q.** Could it have been after the shooting incident?

**A.** Not sure. I can't say after or before, sir.

**Q.** You didn't take the picture?

**A.** No, sir, I didn't.

**Q.** Were you in this particular van at any time?

**A.** No, sir I wasn't in that van.

**Q.** Never?

**A.** I was in another van. That's the van I drove.

**Q.** All right. Okay. So you were in St. James and you slept at the religious retreat?

**A.** Yes, sir.

**Q.** Did they have, like, electricity and stuff working?

**A.** Yes, sir.

**Q.** And hot water and all that?

**A.** Yes, sir.

**Q.** So that must have been nice?

**A.** Yes, sir, it was.

**Q.** And then the next day you came back into the district, and that's when the incident you described in your -- when you parked the van and witnessed the incident?

**A.** Yes, sir.

**Q.** Okay. Now, you got out and then you made a decision to do the -- your investigation; right?

**A.** At what point in time?

**Q.** Well, you know, after -- I mean, you described going to look for objects.

**A.** Yes.

**Q.** Okay. What made you do that?

**A.** Just being an officer, basically doing a murder investigation. Any officer, when you come on a scene, you're going to want to try and help and try and assist whoever is the officer that's going to be the one investigating. So you would canvas the area. That's just something that we would commonly do on most calls.

**Q.** But do you do these type things on your own, or is there a chain of command where people delegate who does what, or do you all individually decide what you all are going to do?

**A.** Well, depending on the investigation. In that particular investigation, I did that on my own.

**Q.** Now, were you a homicide investigator?

**A.** No, sir, I wasn't.

**Q.** Were you a detective?

**A.** No, sir, I was not.

**Q.** What specific duties did you have?

**A.** I was a patrol officer.

**Q.** Okay. What does that mean?

**A.** Pretty much answer calls for service, investigating crimes, writing reports.

**Q.** And would you also do traffic enforcement?

**A.** Yes, sir.

**Q.** Now, you weren't on a task force, though?

**A.** No, sir, I wasn't on a narcotics task force.

**Q.** Task force -- was it just a narcotics task force, or was there a general task force?

**A.** There's a task force. The task force primarily is a narcotics task force.

**Q.** Okay. Okay. So you started doing your investigation. Did you tell anybody what you were doing?

**A.** Not initially, no. I didn't say anything to anybody. I didn't tell anybody, "Look, I'm going to walk the scene," no.

**Q.** Did you see anybody else out there doing it?

**A.** Like I said, once I got up under the bridge, I observed another officer, and I even spoke to him.

**Q.** Who was that?

**A.** It escapes me which officer it was, sir, to be totally honest with you.

**Q.** Was it a ranking officer?

**A.** Like I said, it escapes me.

**Q.** What did you speak to him about?

**A.** What I remember saying was something similar to, "You find anything," you know, and he responded that he didn't see anything.

**Q.** Was he looking for stuff, also?

**A.** I imagine he was.

**Q.** Now, was it one of the officers who was in the van with you?

**A.** To be honest with you, like I said, it escapes me. I'm not really sure what officer. I just recall talking to him like one of the guys. Who exactly it was, I couldn't tell you, and I couldn't tell you back then.

**Q.** But you did, in fact, see some things, though?

**A.** Well, once I was on the bridge, yes, I saw casings.

**Q.** Casings?

**A.** Yes, sir.

**Q.** And you originally said you thought you saw casings from an AK-47 and a Glock, your service-type pistols, but now I think your understanding is, you may have also seen .9 millimeter casings?

**A.** Yes, sir.

**Q.** Why didn't you pick any of these up?

**A.** Because -- the thing is, I'm not a crime lab technician, and the individuals who pick up casings involved in shootings are crime lab technicians. Their job is to collect the evidence to make sure that the evidence is not tainted in any way, shape, or form as they're doing the investigation. That wasn't one of my responsibilities, so I never picked up a casing to physically examine or collect.

**Q.** Did you see any crime scene technicians go out there?

**A.** No, sir, I did not.

**Q.** Now, at some point there was a formal investigation of this incident. Did you become aware of that?

**A.** Many, many years later, yeah.

**Q.** Okay. Well, come on. You became aware of it more than many years later.

**A.** Sir, I didn't investigate it, so it wasn't a part --

**Q.** That wasn't my question.

**A.** -- my responsibility. No --

**Q.** Are you telling me that you were not aware that the Danziger Bridge shooting --

**THE COURT:** Wait. We've got two people talking at one time. He's going to finish the question, and then you can go ahead and answer.

**BY MR. MECHE:**

**Q.** Are you telling me in the fall of '05 and '06, you were not aware there was an investigation of the Danziger Bridge shooting?

**A.** I wasn't aware who investigated it. When you asked me the question, that's what I'm explaining to you, that I didn't know who investigated it.

**Q.** Sir, my question wasn't who. My question was --

**A.** Well, that's what I interpreted your question to be, sir.

**Q.** That's fair. Let me just restate it. Did you become aware there was a state investigation of the Danziger Bridge

shooting?

**A.** Yes, I'm aware that there was a state investigation of the Danziger Bridge shooting. Yes, sir.

**Q.** And you had valuable information which could have contributed to that investigation?

**A.** I didn't consider the fact that I had any valuable information to contribute to that investigation. No one came to me to ask me about anything I did during that investigation.

**Q.** Sir, that wasn't my question. Please answer my question.

**A.** Okay. Then what's your question again, sir?

**Q.** You became -- you had valuable information that could have contributed to the state investigation?

**A.** I don't believe I had any valuable information, sir.

**Q.** Well, sir, you saw four --

**A.** Nobody came to me.

**Q.** Sir, you saw four different types of shell casings on the scene, did you not?

**A.** Yes, sir.

**Q.** And one of those type of shell casings could not have come from a police officer's weapon?

**A.** Yes, sir.

**Q.** The .9 millimeter.

**A.** Yes, sir.

**Q.** And you knew, through certainly media reports at least, that it would have been significant to know that someone else

was shooting a weapon out there?

**A.** Okay.

**Q.** You don't consider that valuable information?

**A.** Not information that I had to give to anyone, sir, no.

**Q.** You don't consider that valuable information?

**A.** What you're saying, I'm going to be totally honest with you, I'm not clear what you're asking me --

**Q.** You're a witness on the scene and you saw .9 millimeter casings out there?

**A.** Okay. Yes, sir.

**Q.** And that could not have come from a police officer's gun?

**A.** No, sir.

**Q.** You don't think the investigators on the scene would have wanted to know that somebody out there saw .9 millimeter casings?

**A.** I'm pretty sure they would have liked to know, but nobody asked me, sir.

**Q.** So nobody asked you?

**A.** Yes, sir.

**Q.** But you're a police officer?

**A.** Yes, sir.

**Q.** Sworn to uphold the law and fight crime?

**A.** Yes, sir.

**Q.** You didn't consider it your duty to seek out the investigators and tell them?

**A.** No, sir. I didn't consider it my duty to seek out the investigators because I didn't know who was investigating.

**Q.** Okay. Could you have found out?

**A.** Possibly.

**Q.** Why didn't you?

**A.** It wasn't my investigation.

**Q.** Well, I know it wasn't your investigation, but why --

**A.** I just answered you why I didn't because --

**Q.** Why didn't you make an effort to let somebody know what you had seen --

**A.** Because it wasn't my investigation, sir.

**THE COURT:** Sir, let him finish the question, and then you can answer.

**THE WITNESS:** Yes, sir.

**BY MR. MECHE:**

**Q.** Let's assume you're a police officer. You witnessed someone committing an armed robbery. Now, you don't investigate armed robberies. Would you not try to find out who's investigating that and let them know what you saw?

**MS. BERNSTEIN:** Objection, Your Honor. The question is hypothetical. We're getting a little far astray here.

**THE COURT:** But given his answers and his suggestion that he's not understanding the question, I don't think it's an unfair way to ask a question. I'm going to allow him to answer.

**BY MR. MECHE:**

**Q.** Say you witness somebody, you know, at Winn-Dixie committing an armed robbery. Now, you're not investigating that incident.

**A.** Uh-huh.

**Q.** Not just as a police officer, but as a citizen, wouldn't you consider it the appropriate thing to do?

**A.** If I witness an armed robbery, yes, sir, I would stay on the scene and tell them what happened at that armed robbery. Yes, sir.

**Q.** Well, why wouldn't you do it in a shooting on the bridge?

**A.** Because you have to understand one thing about that incident, sir. I had no ideas of who was investigating it. I didn't ask who was investigating it, and I didn't know who was investigating it. So I didn't release or give any information to anybody.

**Q.** Okay. Now, at some point, sir, you became -- well, at some point you came to be questioned by a federal government agent about what you knew about the incident?

**A.** Yes, sir.

**Q.** Now, did you know who -- which federal agent was investigating the incident when you came to be questioned by him?

**A.** When the individual reported to my residence, I gave information to the officers who I was talking to.

**Q.** How did they know to come to your residence?
**A.** How would I know, sir?
**Q.** That's what I'm asking. You didn't know? They just came out of the blue?
**A.** Knocked on my door.
**Q.** How did they know to talk to you?
**A.** I don't know, sir.
**Q.** Okay. Now, you had not talked to people about what you saw that day between the incident and the time the federal agent knocked on your door?
**A.** Talked to people, as in who?
**Q.** Who did you talk to?
**A.** I spoke with my family on the incident.
**Q.** Okay. Anybody else?
**A.** Possibly during the time period, I didn't -- I did not let them know I didn't think something was right about it. I've spoken to coworkers, and I've given them my opinions on things, but that was probably about it.
**Q.** Okay. So you did speak to coworkers about what you saw and didn't see out on the scene?
**A.** Yes, sir.
**Q.** And that was before the federal agent came and knocked on your door?
**A.** Yes, sir.
**Q.** But you didn't -- even though you decided to speak to

coworkers, you didn't feel any obligation to speak to any state investigator?

**A.** I didn't know any state investigators to talk to, sir. Nobody ever came to me and inquired about this incident, so I didn't release any information. No, sir, I did not.

**Q.** But you could have found out?

**A.** I imagine I could have.

**Q.** And you just chose not to do so?

**A.** I chose not to get involved with the investigation.

**Q.** Okay.

**MR. MECHE:** Thank you, sir.

**THE WITNESS:** Thank you.

**THE COURT:** All right. Mr. London?

**MR. LONDON:** No questions.

**THE COURT:** Any questions, Mr. London?

**MR. LONDON:** No, Your Honor.

**THE COURT:** Mr. Fleming?

**MR. FLEMING:** Just a few, Judge.

**CROSS-EXAMINATION**

**BY MR. FLEMING:**

**Q.** Good afternoon.

**A.** How are you doing, sir?

**Q.** I just have a few questions for you.

**A.** Okay.

**Q.** You indicated one of the lawyers had asked you about a gun

that you had left back on the shuttle bus. I believe you indicated you a long gun.

**A.** Uh-huh.

**Q.** Do you remember what type of long gun you had? Do you remember what type of gun?

**A.** I remember what weapon I did have. I had a 12-gauge shotgun.

**Q.** It was a 12-gauge shotgun?

**A.** Yes, sir.

**Q.** Was that issued by the department or --

**A.** No, sir. It was my personal weapon.

**Q.** Personal weapon.

Why were you carrying the 12-gauge shotgun, sir?

**A.** For the purpose of having additional firepower.

**Q.** Okay. Were you authorized to do that, sir?

**A.** Was I authorized to carry my 12-gauge? No, sir.

**Q.** Were you carrying the 12-gauge shotgun in front of your superiors?

**A.** No, sir.

**Q.** No.

Just on the shuttle bus?

**A.** Just kept it on the shuttle bus.

**Q.** Was that something that a lot of the officers were doing during this time period? Not on that particular shuttle bus.

**A.** I'm not sure what any of the other officers were doing.

**Q.** And you felt it necessary to get some additional firepower?

**A.** Yes, sir.

**Q.** And I believe you had indicated on direct examination you were driving the shuttle bus, you had other officers with you?

**A.** Yes, sir.

**Q.** One I believe you named was a Marsha Thompson. One I believe you named was Abreace Daniels?

**A.** Yes, sir.

**Q.** And I believe you also indicated there were other officers whose names you do not remember today?

**A.** Yes, sir.

**Q.** It wasn't just the three of you. It was other officers as well?

**A.** Yes, sir.

**Q.** I want to take you over to the west side of the bridge. You went over there by the Friendly Inn, that little motel right there; correct?

**A.** Okay. Yes.

**Q.** That's right; correct?

**A.** Yes.

**Q.** At some point did you and other officers in the area take a perimeter?

**A.** Yes, sir.

**Q.** Before you took the perimeter, did you -- do you remember

seeing any state troopers in the area?

**A.** Not before I took my spot in the perimeter, no, sir.

**Q.** All right. I believe you testified on direct there were only members of the 7th District -- 7th District officers that were there?

**A.** Initially, when I was there? Yes.

**Q.** Initially.

**A.** Yes, sir.

**Q.** But you -- can you say there were no other officers there, no other state troopers there, or you don't remember seeing any?

**A.** There were troopers that arrived in an armored vehicle, and a tac unit arrived at some time. When they arrived, that's when I left.

**Q.** Prior to your leaving --

**A.** Prior to my leaving --

**Q.** I'm sorry. Prior to those officers in the armored vehicle coming, do you remember seeing any state troopers there?

**A.** No, I don't, sir.

**Q.** And I'm sorry. I missed the last part. Is it that you don't remember or you didn't see them?

**A.** I don't remember seeing them. I don't remember.

**Q.** So it's possible that other officers could have been there?

**A.** Yes, sir. Anything is possible.

**MR. FLEMING:** Thank you. I have no further questions.

**THE COURT:** Thank you. Redirect?

**MS. BERNSTEIN:** Yes, Your Honor.

**REDIRECT EXAMINATION**

**BY MS. BERNSTEIN:**

**Q.** Mr. Magee, I want to start with follow-up on the questions that Mr. Villavaso's attorney asked you.

**A.** Okay.

**Q.** He asked you how well you knew Villavaso at the time.

**A.** Uh-huh.

**Q.** Did you know him well enough to recognize him?

**A.** Yes, sir -- yes, ma'am. I'm sorry.

**Q.** Did you see him on the scene that day?

**A.** Yes, ma'am, I did.

**Q.** You said you also saw troopers there in tac gear. What's tack gear?

**A.** It appeared to be one of the state police SWAT units, they were wearing jump-out uniforms, tactical uniforms, as well as body armor and Kevlar helmets.

**MS. BERNSTEIN:** May I approach, Your Honor?

**THE COURT:** Yes, ma'am.

**BY MS. BERNSTEIN:**

**Q.** I'm showing the witness what's been marked Exhibit 255. Do you know where that picture was taken?

**A.** Looking at this picture, this was taken on Chef Menteur Highway in front of the Friendly Inn.

**Q.** That's on the west side of the bridge?

**A.** That's on the west side of the bridge.

**MS. BERNSTEIN:** I'd like to offer 255 into evidence.

**THE COURT:** Any objection?

**MR. FLEMING:** No objection.

**THE COURT:** So ordered. 255 is admitted.

**MS. BERNSTEIN:** Can you, please, zoom in this area right here?

**BY MS. BERNSTEIN:**

**Q.** Do you recognize that officer?

**A.** Yes, sir -- yes, ma'am.

**Q.** Who is that?

**A.** That's Officer Villavaso.

**Q.** And Mr. Villavaso's attorney also asked you whether you ever spoke to coworkers about your opinion. Do you remember that?

**A.** Yes.

**Q.** What opinion did you express to coworkers?

**A.** Well, my main opinion when I was speaking to the other individuals is that a lot of the things just didn't add up. You know, in comparison to some of the stories you were hearing coming over the rumor mill, you know, a lot of things just didn't add up to me.

**Q.** You were asked a bunch of questions about police officer guns. Do you remember those questions?

**A.** Yes, ma'am.

**Q.** What's a police officer gun?

**A.** An officer-issued weapon by New Orleans Police Department is a .40 caliber Glock Model 22.

**Q.** And you mentioned that you had a shotgun; right?

**A.** Yes, ma'am.

**Q.** Was that a police officer gun?

**A.** It wasn't a departmental-issued weapon, no.

**Q.** And after Katrina, were police officers carrying only police officer guns?

**A.** No. Officers -- several officers were carrying several other weapons.

**Q.** They were carrying all types of guns; right?

**A.** Whatever they could arm themselves and protect themselves with.

**Q.** And you mentioned that you saw casings on the east side of the bridge; right?

**A.** Yes, ma'am.

**Q.** You saw a bunch of casings; is that fair?

**A.** Yes, ma'am.

**Q.** Did you have to look closely to find those casings that you're talking about?

**A.** The rifle casings?

**Q.** Uh-huh.

**A.** No, ma'am. They're rather large.

**Q.** Were they right there on the east side of the bridge?

**A.** Yes, ma'am.

**Q.** All right. When you were looking closely for casings and guns, were you looking there or elsewhere?

**A.** I looked there, as well as other places.

**Q.** Why were you looking closely elsewhere?

**A.** My focus was to try and find some evidence to support, you know, whatever the investigation might have been.

**Q.** When you said you -- you were asked a question on cross-examination about whether you thought these people you saw injured on the walkway were caught in cross-fire; right?

**A.** Yes.

**Q.** Why did you think they were caught in cross-fire instead of thinking they were perpetrators?

**A.** Because of just looking at the individuals. I saw no purpose for these individuals to be honestly shooting at the police.

**Q.** What do you mean by that, you saw no purpose?

**A.** Well, basically, as an officer, you would personally expect a certain individual, you know, to be an aggressor towards a police officer, someone who would probably shoot at a police officer. These individuals were, basically, older, except for the individual that was in the middle, you know, and

I saw no reason for a 30-, 40-somewhat-year-old woman to be shooting at the police, you know, 40-year-old man to be shooting at the police in the company of a teenage kid.

**Q.** So you were looking closely elsewhere to see if there was evidence that there had been another shooting?

**A.** That someone else had possibly been there or our officers were shooting at someone else.

**Q.** Let's talk about the area where you did see all the casings.

**A.** Uh-huh.

**Q.** Did you pick them up?

**A.** No, ma'am.

**Q.** Did you have pen and paper? Did you write down what you saw?

**A.** No, ma'am.

**Q.** Did you have the ability to take any photos of them that day?

**A.** No, ma'am, I didn't.

**Q.** All right. So you don't have any record of exactly what you saw that day?

**A.** No, ma'am.

**Q.** And that was six years ago now?

**A.** Yes.

**Q.** Did anybody talk to you that day about what you saw?

**A.** No, ma'am.

**Q.** Did anybody get a statement while it was fresh in your mind?

**A.** No, ma'am.

**Q.** Who was the first person who ever asked you in an official capacity about what you saw that day?

**A.** Agent Bezak.

**Q.** And that was in 2009, four years after the shooting?

**A.** Yes, ma'am.

**Q.** When you talked to him, did you have any notes or any records when you talked to him?

**A.** No, ma'am, I had nothing.

**Q.** So can you be completely sure about all of the casings that you saw on the ground?

**A.** No, ma'am.

**Q.** Are you completely sure about the reaction you had in your head that day when you saw the casings?

**A.** Yes, ma'am.

**Q.** What was that reaction you had in your head?

**A.** That the casings that were on the scene were -- were relevant to the weapons that our guys were carrying.

**Q.** One of the attorneys asked you whether you looked for a strike mark on the barrier on the road. Do you remember that?

**A.** Yes, ma'am.

**Q.** If police officers drove onto the bridge and shot people in the walkway, would you expect to see strike marks in the

barrier there?

**A.** Possibly.

**Q.** One of the attorneys asked you if you've ever heard of a criminal throw down a gun and somebody else pick it up and run off with it. Do you remember that question?

**A.** Yes, ma'am.

**Q.** Have you ever heard of a police officer kick a gun down to where a suspect is?

**A.** No.

**Q.** Have you ever heard of a criminal pick up two guns and leave one gun behind?

**A.** No, ma'am.

**Q.** Was that a no?

**A.** No.

**Q.** You were asked some questions about that 108 radio call, and I think you said you never heard the words "officer down;" is that right?

**A.** Yes, ma'am.

**Q.** Have you heard "officer down" on other occasions?

**A.** Yes, I have.

**Q.** Are there certain things that you regularly hear on the radio right after an "officer down" call?

**A.** Yes, ma'am.

**Q.** What type of things do you hear?

**A.** In situations like that, you would normally hear numerous

officers asking questions, trying to get a location, you know. You would have ranking officers trying to get a location, ascertaining what's going on, and trying to get help to those officers.

**Q.** And do you generally hear people ask the condition of the officer?

**A.** Yes.

**Q.** Did you hear any of that on the radio that day?

**A.** No, ma'am.

**Q.** When you got to the scene, did you see anybody looking for an officer down?

**A.** When we got to the scene, there was nobody there.

**Q.** When you got over to the west side and you saw the task force officers, you said you asked them, "What do we have here;" right?

**A.** Yes.

**Q.** And you had some conversation with them?

**A.** Yes.

**Q.** Did anybody mention an officer down?

**A.** No, ma'am.

**Q.** Mr. DeSalvo asked you why you didn't ask anybody why there were three bodies on the bridge.

**MR. DESALVO:** Your Honor, I never asked why, Your Honor. That's a question lawyers are not supposed to ask.

**BY MS. BERNSTEIN:**

**Q.** Mr. DeSalvo asked you, "You didn't ask anybody why there were three bodies on the bridge?" Do you remember that question?

**MR. DESALVO:** Same objection.

**THE COURT:** Let's rephrase the question, please.

**BY MS. BERNSTEIN:**

**Q.** Mr. DeSalvo asked you about those three bodies on the bridge?

**A.** Yes, ma'am.

**Q.** And he asked you about whether or not you had had any conversations with people about why they were there?

**A.** Yes, ma'am.

**Q.** Why didn't you have any conversations --

**THE COURT:** Well, wait, wait, wait.

**MR. DESALVO:** I don't care, Judge. I mean, I was trained never to ask "why."

**THE COURT:** All you did was add the word "about" in there and then asked the same question.

**BY MS. BERNSTEIN:**

**Q.** Well, my question is: Why? You're right, Mr. DeSalvo did not ask why. Mr. DeSalvo asked you if that is a fact that you didn't talk to anybody about why there were three bodies on the bridge.

**A.** Yes, ma'am.

**Q.** My question to you is: Why didn't you talk to anybody about that?

**A.** Well, ma'am, to be totally honest with you, after looking at the things that I saw and what I came to the conclusion of, my thing was not to ask anything about this because something just didn't -- didn't seem right. So my question was -- my response was, you know, not to ask anybody any questions because I didn't want to be included. It would be similar to saying, "Ask me no questions, and I'll tell you no lies."

**Q.** Now, one of these attorneys asked you some questions about whether you could see what you were heading into as you drove to the Danziger Bridge. Do you remember that?

**A.** Yes, ma'am.

**Q.** If you had seen a threat, would you have driven into it?

**A.** No, ma'am.

**Q.** Or would you have stopped and taken cover like you did?

**A.** I would have probably stopped and taken cover.

**Q.** While you were still in your shuttle van, did you see the people who were in the walkway?

**A.** No, ma'am.

**Q.** So you didn't see them until you got out and you were walking?

**A.** Yes.

**Q.** When you first saw those people, did that surprise you to see them there?

**A.** Yes.

**Q.** And when you first saw them, could you tell whether or not they were armed?

**A.** No, ma'am.

**Q.** Were they a potential threat at that point?

**A.** The individuals weren't pointing in my direction. They had no -- I didn't see anything in their hands, so I didn't interpret them as being an immediate threat.

**Q.** They weren't an immediate threat. Were they a potential threat?

**A.** Yes, ma'am. Anybody can be a potential threat.

**Q.** Did you shoot them?

**A.** No, ma'am.

**Q.** Would you have been allowed to shoot them because they were a potential threat?

**A.** Would I have been allowed to shoot them if they were a potential threat?

**Q.** Uh-huh.

**A.** No, ma'am. If they were an immediate threat, yes.

**Q.** But not a potential threat?

**A.** No, ma'am.

**Q.** And you didn't -- you were asked questions -- you never raised your gun, you never pointed your gun at them?

**A.** No, ma'am, I never pointed my gun deliberately at these individuals.

**Q.** And you never shot at them?

**A.** No, ma'am.

**MS. BERNSTEIN:** No further questions, Your Honor.

**THE COURT:** All right. Thank you, sir. You can step down.

All right. I have about a little after 4:35. We're not going to start another witness today because I understand that the next witness might be a lengthier witness in terms of time, so we would be able to only hear very little of their testimony.

But subject to my instructions that I'm about to give you, I do have some good news for you, and that is that we are a bit -- a slight bit ahead of schedule, which means that we, the attorneys and I, can spend tomorrow perhaps working together to expedite next week's presentation, which would allow you all to not have to come tomorrow. Okay?

I would have told you that earlier except we have been talking about this all the way up until the last break. I told you I would always try to give you the schedule the week before. In this instance, it's something that was determined just in the last break. So we won't have court tomorrow. You won't have court tomorrow. I'll have court tomorrow, and so will the attorneys be working tomorrow, but you won't need to be here.

So what does that mean? Well, the first thing

it means is, obviously, don't come tomorrow for 8:30. The second thing it means -- and this is, very, very important, very, very important -- you can go back to your normal activities, such as your workplace, whatever else you would plan to do on a Friday, or particularly the Friday before the July 4th weekend, you can do.

However, and you know somewhat of what I'm going to say is: Do not discuss this case -- and this is very, very serious. I'm going to tell you why in a minute -- do not discuss this case with anyone, and that includes spouse, next door neighbor, best friend, children, anybody else who seems to be interested in what you have been doing for the past week. Okay?

Do not discuss it with them, do not discuss it -- I don't know if any of you all come across each other during the July 4th weekend, but if you do, obviously, that would be prohibited as well.

The second thing -- and this is just as important -- do not attempt to read anything about this case that's either been written in the past or reported in the past, do not attempt in any way to read anything that is written or broadcast about this case either in the past week or between now and Tuesday morning at 8:30.

Why is that important? It's important because, as I told you at the outset, this case is to be determined only

on the evidence that you hear here in the courtroom. You've already heard four days of testimony from the witness stand, and you've already seen some documents and photographs and some other tangible evidence. You must decide the case only on the evidence that you see here in the courtroom and the testimony that you hear in the courtroom.

What somebody else takes from this trial and memorializes either in writing or in a broadcast report is what they take from the trial, and it's virtually impossible for them to capture everything that you have heard, because you've been here for every piece of testimony, and they may not have been here for every piece of testimony and every exhibit that has been shown to you. So no one's recollection of the evidence can supplant yours, and you should not view it because there's always a temptation or a tendency that it might.

In the end, when you deliberate this case, it will only be the evaluation of the 12 jurors who deliberate as to the meaning of the evidence and the conclusions that can be drawn from it. It's not going to be based on what somebody else thinks. It's not going to be based on someone else's appreciation of the evidence. So it's very important that you insulate yourselves from any type of report about this case.

And, of course, the other reason is that something may be reported that's inaccurate or outright wrong. So you always need to be aware that this case is going to be

decided on your collective appreciation of the evidence and no one else's. So you must abide by that instruction.

And if anyone is to contact you about that case over the weekend up until Tuesday morning, you are to politely, but firmly, tell them that the judge in the case has instructed you, has ordered you not to discuss anything about the case. And you can tell them that that is a direct order from the judge and that there's a serious consequence if you violate that order.

So I'm not -- this isn't something that is just a matter of convenience. It's part of the oath you took when you were sworn in as jurors and the attorneys accepted you as jurors in the case. So it's important that you uphold that. So if you all can abide by those instructions, we would want you here at 8:30 -- in the jury room prepared to come in at 8:30 on Tuesday. We will -- you get to room 102 earlier than that so that you can make your way here and be prepared to enter the courtroom at 8:30.

There were a couple -- oh, next week's schedule, we will work -- since we don't have court on Monday, we will work Tuesday through Friday. We will work Friday next week, and probably on Friday it will be a full day up to the 5:00 hour, or maybe if it's earlier than that, it won't be much earlier than that. So plan on a full four days like we did this week, a full four days.

I'll work with the attorneys. I'm sure they'll work hard over the weekend in an attempt to streamline the case and present it to you over those next four days, and then we'll see where we are then.

Thank you all for your attention and your patience throughout the last four days, and really last week, too, as part of the selection process, and I hope that you have a nice weekend. We will see you on Tuesday.

**THE DEPUTY CLERK:** All rise.

(WHEREUPON, the jury exited the courtroom.)

**THE COURT:** Counsel, I ask you at various intervals if there's anything that we need to cover on the record, so now would be the time to do so. Anybody?

**MR. FLEMING:** I was going to say no.

**MS. CHUNG:** I do have one issue, Your Honor, but I'd approach with it, if that's okay.

**THE COURT:** Sure. On the record?

**MS. CHUNG:** Yes, sir.

All right. Counsel, could you come forward?

(WHEREUPON, the following proceedings were held at the bench.)

**MS. CHUNG:** Your Honor you, I think our next witness is Leonard Bartholomew, Jr. We provided *Giglio* to defense attorneys this morning. He has an arrest from 2010 for simple theft. He pled guilty, he received probation, a fine,

community service, and a class of some kind.

Most of the attorneys said they didn't -- were not inclined -- and it's going to be expunged once he finishes probation in January 2012. I think Lindsay said he would like to ask and Tim was undecided --

**MR. DESALVO:** His probation is finished in January 2012.

**MS. CHUNG:** Right, January 2012.

So I wanted to front it because, obviously, we would object to asking that. But if it's -- if you're going to permit it, I'll probably just bear it out.

**THE COURT:** Let me ask, Lindsay, since Cindy mentioned you, is there an issue here of counsel desiring to ask about that at trial?

**MR. LARSON:** Well, I told her in an abundance of caution that, yeah, I thought we might want to ask about theft. You know, it's -- it deals with dishonesty -- "Did you steal from someone?" And I wouldn't emphasize it, I don't think, but I'm --

**THE COURT:** Let me do --

**MR. LARSON:** I'm afraid, you know, even though being a small arrow in the defense's case --

**THE COURT:** Let's do this: Since the government is moving to exclude that orally here, I would ask if you could, by 10:30 tomorrow, can you do a short memo with authority as to

why that would otherwise be admissible, and you know the statute -- I mean, the code article.

**MR. LARSON:** Sure.

**THE COURT:** Give me some case law.

**MR. LARSON:** If we decide not to, I'll e-mail you all and let you know.

**THE COURT:** Perfect. Then once I get that, if you all would like to respond, I ask that you do it quickly.

**MS. CHUNG:** That is very doable since we don't have court tomorrow.

**THE COURT:** And you know the issue, and you not that you're going to go spend a lot of time on it until you hear from him. But you know the issue and I'm not looking for -- I mean, if you give me a paragraph or two, that's fine.

**MS. CHUNG:** Absolutely.

**THE COURT:** And I'll take a look at it.

**MR. LARSON:** Off the top of my head, I had this come up in a police case a long, long time ago, Judge. Any way --

**THE COURT:** Well, take a look and see, and if there's no dispute --

**MR. LARSON:** It was a fraud conviction, a misdemeanor, and the judge told me that it was within his discretion.

**MS. BERNSTEIN:** Fraud is very different than theft.

**MS. CHUNG:** Yeah. Off the top of my head, I believe

 the case law does support theft is not a crime of dishonor. Fraud, where you're actually making misrepresentations is.

**MR. LARSON:** If I look at it and I see I'm just wasting everybody's time, I will e-mail and you say never mind.

**THE COURT:** Show me some case law on it. It's some years after this, so it's a little bit of a reach. But I'll look at what you have if you feel like you want to get into it. Okay.

Anything else?

**MS. CHUNG:** That was it.

**MR. KITCHENS:** Taj Magee, before he left -- before the Court adjourned, you didn't give him -- we want to keep him under a subpoena for a chance to recall him.

**THE COURT:** Okay.

**MR. KITCHENS:** So I would request --

**THE COURT:** I'm going to ask you all to make -- Hills was here when I said "so ordered," when I think Paul you mentioned about the sequestration.

**MR. FLEMING:** I asked.

**MS. BERNSTEIN:** I'm not sure he understood that.

**THE COURT:** I'm not sure he understood that. If you all could tell him, A, he may be recalled -- same thing with Magee -- a, he may be recalled; and B, he should not discuss his testimony with anyone in the meantime.

**MR. CARTER:** Just for clarification, we can't talk to

him.

**MS. BERNSTEIN:** No, no, we can talk to him.

**MR. FLEMING:** Wait, that's actually what the judge said, that's including the prosecutors.

**THE COURT:** I think it includes -- I mean, you all don't represent him.

**MR. CARTER:** No.

**MS. BERNSTEIN:** We'll talk to his lawyer and have his lawyer relay that message to him.

**THE COURT:** If you would.

**MS. BERNSTEIN:** But Mr. Magee, as far as I know, he don't have a lawyer, so we'll have to contact him to --

**THE COURT:** And tell him just that.

**MS. BERNSTEIN:** Yes.

**THE COURT:** I think he's off limits. He's testified now, so his testimony is before the jury. So he should not be spoken to --

**MS. BERNSTEIN:** By anybody.

**THE COURT:** -- by either side. Absolutely.

**MR. KITCHENS:** That's fine.

**THE COURT:** Who was the other? We had Lohman, I think you mentioned.

**MR. FLEMING:** Well, Mr. Lohman. I believe that's just it, Lohman, Magee, and Hills.

**THE COURT:** Okay.

**MS. BERNSTEIN:** Did you guys --

**MS. CHUNG:** I thought you said Jose.

**MR. FLEMING:** And mr. Holmes, that's right.

**THE COURT:** I was going to say --

**(OFF THE RECORD)**

**THE COURT:** Is there anything else on the record?

**MR. HESSLER:** Yes, sir. I don't know if -- can we be heard still out there?

Your Honor, we have a long weekend coming up. This isn't on the record.

**(OFF THE RECORD)**

(WHEREUPON, the proceedings were adjourned for the day.)

*****

**CERTIFICATE**

I, Jodi Simcox, RMR, FCRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

S/ Jodi Simcox, RMR, FCRR
Jodi Simcox, RMR, FCRR
Official Court Reporter