IN THE UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA,          ) 10-CR-204
                                   )
                Plaintiff,         ) Section N
                                   )
        v.                         ) New Orleans
                                   )
KENNETH BOWEN, ROBERT GISEVIUS     ) July 5, 2011
ROBERT FAULCON, ANTHONY            )
VILLAVASO, ARTHUR KAUFMAN,         )
                                   )
                Defendants.        ) Jury Trial
_____     )  Day Seven


TRANSCRIPT OF PROCEEDINGS

VOL. VII

BEFORE THE HONORABLE KURT D. ENGELHARDT

UNITED STATES DISTRICT JUDGE


SUSAN A. ZIELIE, RPR, FCRR
Official Court Reporter
HB 406
500 Poydras Street
New Orleans, Louisiana 70130
susan_zielie@laed.uscourts.gov
504.589.7781



Proceedings Recorded by Computer-aided Stenography.

```
 1    APPEARANCES:

 2    For the Government:        US Attorney's Office
                                 BY:  THEODORE CARTER, AUSA
 3                               500 Poydras Street, Room B-210
                                 New Orleans, LA 70130
 4                               504.680.3165
                                 usala.ecfcr@usdoj.gov
 5
                                 US Department of Justice
 6                               Civil Rights Division
                                 BY:  BARBARA BERNSTEIN, ESQ.
 7                               601 D Street NW
                                 Office PHB 5123
 8                               Washington, DC 20004
                                 202.353.0032
 9                               bobbi.bernstein@usdoj.gov

10                               US Department of Justice
                                 Civil Rights Division
11                               BY:  CINDY K. CHUNG, ESQ.
                                 950 Pennsylvania Avenue NW
12                               Washington, DC 20530
                                 cindy.chung@usdoj.gov
13                               202.305.4057

14    For Kenneth Bowen:         FRANK G. DESALVO, APLC
                                 829 Baronne Street
15                               New Orleans, LA 70113
                                 504.524.4191
16                               frankd@fdesalvo.com

17    For Robert Gisevius:       ERIC J. HESSLER, ESQ.
                                 700 Camp Street
18                               New Orleans, LA 70130
                                 504.528.9500
19                               hessler.law@gmail.com

20

21

22

23

24

25
```

```
 1    For Robert Faulcon:        PAUL C. FLEMING, JR., ESQ.
                                 2821 Kingman Street, Suite C
 2                               Metairie, LA 70006
                                 504.888.3394
 3                               pfleming@fleminglaw.net

 4                               King Krebs & Jurgens, PPLC
                                 BY: LINDSAY A. LARSON, III, ESQ
 5                               201 St. Charles Avenue
                                 45th Floor
 6                               New Orleans LA 70130
                                 504.582.3800
 7                               llarson@kingkrebs.com

 8    For Anthony Villavaso:     DESALVO Blackburn & Kitchens
                                 BY:  ROGER W. KITCHENS, ESQ.
 9                               2802 Tulane Avenue
                                 New Orleans, LA 70119
10                               504.821.6171
                                 rkitchens@desalvoblackburn.com
11
                                 TIMOTHY A. MECHE, ESQ.
12                               700 Camp Street
                                 New Orleans, LA 70130
13                               504.528.9500
                                 tim_meche@yahoo.com
14
      For Arthur Kaufman:        STEPHEN D. LONDON, ESQ.
15                               1100 Poydras Street
                                 Suite 2950
16                               New Orleans, LA 70163
                                 504.582.2427
17                               ebyte2@aol.com

18

19

20

21

22

23

24

25
```

1

EXAMINATION INDEX

2

3    Testimony of:

4        **LEONARD BARTHOLOMEW**

             Direct by Ms. Chung              6, 56
5            Cross by Mr. DeSalvo             33
             Cross by Mr. Larson             38
6            Cross by Mr. Hessler            43
             Cross by Mr. Meche              49
7            Cross by Mr. London            54

8        **KEVIN BRYAN**

             Direct by Ms. Bernstein         59, 180
9            Cross by Mr. Hessler           106
             Cross by Mr. DeSalvo           135
10           Cross by Mr. London           144
             Cross by Mr. Fleming           150
11           Cross by Mr. Meche             172

12       **MICHAEL CHRISTOPHER BARON**

             Direct by Mr. Carter           198
13           Cross by Mr. Meche             229
             Cross by Mr. Larson            230
14           Cross by Mr. London           244
             Cross by Mr. Hessler           246
15           Cross by Mr. DeSalvo           261

16       **MORRELL JOHNSON**

             Direct by Ms. Chung            276, 335
17           Cross by Mr. DeSalvo           304
             Cross by Mr. Hessler           312
18           Cross by Mr. Fleming           324
             Cross by Mr. Meche             332

19

20

21

22

23

24

25

```
 1            NEW ORLEANS, LOUISIANA; TUESDAY, JULY 5, 2011

 2                        8:30 A.M.

 3            THE COURT:  First of all, again, thank you for being

 4  here on time and ready to work.  We have a full week planned for

 5  you, even though it's a four day week.  Hopefully you've had a

 6  relaxing 4th of July holiday.

 7            We'll get right into it.  Let's get right into it with

 8  the government's next witness.  And that would be --

 9            MS. CHUNG:  Leonard Bartholomew, IV, Your Honor.

10            THE COURT:  Leonard Bartholomew, IV.

11            MS. CHUNG:  Yes.  And I believe there's one outstanding

12  matter.

13            THE COURT:  Do you need to approach on that?

14            MS. CHUNG:  Yes, Your Honor.

15            THE COURT:  Come on up.

16            While we're doing that, if we could get Mr. Bartholomew.

17            (Sidebar conference, jury not present.)

18            MS. CHUNG:  I wanted to check on the ruling with the

19  regard to the simple theft, the shop lifting charge --

20            THE COURT:  I understood from Mr. Larson in an email

21  that this was no longer an issue.  Did I understand correctly?

22            MS. CHUNG:  Remember, I had sent the thing saying he had

23  stole a pack of cards.

24            MR. LARSON:  Right.  And Jennifer asked me if I had any

25  response, and I said no, I did not.  I thought you were going to
```

1    rule on it.

2         THE COURT:  I think it's excluded.  I don't see any

3    reason to get into it.  I didn't know from your response whether

4    you also appreciated that it was not an issue.

5         I think, given the nature of it and the timing of it, I

6    think that it should be excluded.  So I think it's off the table

7    in terms of questioning already.

8         MR. LARSON:  Just note my objection.

9         THE COURT:  Sure.

10        (Sidebar concluded.  Jury now present.)

11        LEONARD BARTHOLOMEW, being first duly sworn, testified

12   as follows:

13        CASE MANAGER:  Please state and spell your full name for

14   the record.

15        THE WITNESS:  Leonard Bartholomew, L-E-O-N-A-R-D

16   B-A-R-T-H-O-M-O-L-E-W.

17        MS. CHUNG:  May I inquire, Your Honor?

18        THE COURT:  Yes.  Please go ahead and proceed.

19                         DIRECT EXAMINATION

20   BY MS. CHUNG:

21   Q   Good morning.

22   A   Good morning.

23   Q   Mr. Bartholomew, where are you currently living?

24   A   In Dalton, Georgia.

25   Q   Where did you grow up?

1    A    In New Orleans East.

2    Q    How long did you live in New Orleans?

3    A    For 14 years.

4    Q    What part of New Orleans did you live in?

5    A    The east.

6    Q    When did you leave New Orleans?

7    A    Hurricane Katrina.

8    Q    Were you here for Hurricane Katrina?

9    A    Yes.

10   Q    How old were you at the time?

11   A    14.

12   Q    What school were you attending?

13   A    Abramson.

14   Q    What grade were you in?

15   A    Just starting 10th.

16   Q    Turning your attention to September 4, 2005, did anything

17   happen to you and your family that day?

18   A    Yes.

19   Q    What happened?

20   A    My family was shot.

21   Q    Was that on the Danziger Bridge?

22   A    Yes.

23   Q    I'd like to start with that morning.  Where were you that

24   morning?

25   A    We were at the motel.

```
 1   Q    Do you remember -- sorry?

 2   A    Nothing.

 3   Q    Do you remember if that's the first motel that you and your

 4   family had decided to stay in after the hurricane hit?

 5   A    No.  That was the second one.

 6   Q    Why didn't you stay in the first place?

 7   A    Because we heard a lot of arguing, and my mom thought that

 8   something might happen.  So we wanted to avoid trouble.

 9   Q    Where was that hotel in relation to the one you ended up at?

10   A    Right across the street.

11   Q    Do you remember what road the hotel is?

12   A    No.

13   Q    Do you remember if it's near the Danziger Bridge?

14   A    Yeah, it is.

15   Q    Do you know if it was on the New Orleans East side of

16   Danziger Bridge, or the other side of the Danziger Bridge?

17   A    I can't be 100 percent sure.

18   Q    Where were you going that morning?

19   A    To Winn-Dixie.

20   Q    Where was the Winn-Dixie?

21   A    On the other side of the bridge.

22   Q    So you actually had to cross the Danziger to go to the

23   Winn-Dixie?

24   A    Yes.

25   Q    Who went to the Winn-Dixie with you all?
```

1    A    My mom, dad, sister, Jose, James and myself.

2    Q    And who is James?

3    A    A friend of Jose's.

4    Q    Who is Jose?

5    A    It's my cousin.

6    Q    What was your relationship with Jose like?

7    A    Jose was like an older brother to me.

8    Q    How close were you all?

9    A    We were really close.

10   Q    What kind of things did you guys do together?

11   A    We did everything.  Played basketball, played cards, games.

12   Anything we could do to pass time.

13   Q    Did you both like to draw?

14   A    Yes.  He was always better than me.

15   Q    Did you ever wish he was your dad?

16   A    Yes.

17   Q    Why is that?

18   A    I don't know, I just really always looked up to him.  I

19   wanted to be just like him.  I still do.

20   Q    Tell us about your walk from the motel towards the Danziger

21   Bridge.

22   A    It was all right.  Everybody was happy that morning.

23   Q    Do you remember how everyone was grouped while you guys

24   walked?

25   A    No.

1    Q    Do you all stay in just one bunch?

2    A    Yeah.

3    Q    Were there times when you and Jose or James were running

4    ahead or falling behind?

5    A    Yeah.   There were times.

6    Q    Tell us about when you were nearing the bridge, what you

7    remember of where you all were.

8    A    I can't remember exactly but -- for everybody else -- but I

9    know that I was a little bit behind the group.

10   Q    Behind everyone else in the group?

11   A    Yes.

12   Q    Tell us about what happened as you approached the bridge.

13   Did something catch your attention?

14   A    Yes.

15   Q    What caught your attention?

16   A    I heard the swerving of a vehicle to my left.

17   Q    Did you turn around to look at the vehicle?

18   A    Yes.

19   Q    What did you see?

20   A    It was coming down the street really fast.  I just stopped,

21   and I kept watching until they turned and made its way up the

22   bridge.  And, when it was coming up, I saw a rifle pointed out

23   the window.

24            THE COURT:  One second.

25            (Pause in proceedings.)

1          THE COURT:   Okay, go ahead.

2          MS. CHUNG:   Thank you, Your Honor.

3     BY MS. CHUNG:

4     Q    What kind of vehicle was approaching the bridge?

5     A    It appeared to be a Budget truck.

6     Q    You just mentioned a rifle.

7     A    Yes.

8     Q    Where did you see the rifle?

9     A    It was pointed out the passenger window.

10    Q    Could you see who was holding the rifle or who was inside the

11    truck?

12    A    No.

13    Q    Now, you said you saw a rifle.  Do you actually know if it

14    was a rifle, or is that a term you use for any long gun?

15    A    Yes.  I don't know exactly what kind of gun it is, but it was

16    long.  So I just say rifle.

17    Q    Now, as you saw that truck swerving and approaching up the

18    bridge, did you ever hear anyone yell anything at you?

19    A    Only my cousin, to jump over the barricade, the pedestrian

20    walkway.

21    Q    Did you hear any yells from the truck?

22    A    No.

23    Q    Anyone tell you who they were or tell you what to do?

24    A    No.

25    Q    So, as the truck is passing you, what happens?

1   A   I see a rifle pointed out, and that's when I hear my cousin

2   tell me, and everybody, to jump over the pedestrian walkway.  We

3   heard shots fired.

4   Q   What did you do when you heard your cousin yell?

5   A   I ran down the bridge a little bit and then I jumped over.

6   Q   Now, at the time your cousin yelled, had the truck passed

7   you?

8   A   Yes.

9   Q   Could you still see the rifle?

10  A   Yes.

11  Q   Was the truck near your cousin at that time?

12  A   Yes.

13  Q   How soon did you hear the shots?

14  A   Immediately.

15  Q   What did the shots sound like?

16  A   Rapid fire shots.

17  Q   Where you able to tell how many there were?

18  A   No.  It was too many.

19  Q   So you described that you ran down the bridge a little bit.

20  Do you mean, back towards the hotel?

21  A   Yes.

22  Q   What did you do next?

23  A   I jumped over the barricade and I ducked down and covered my

24  head.

25  Q   As you jump over the barricade, are you still hearing

1    gunfire?

2    A    Yes.

3    Q    As you jump over the barricade -- and actually let me strike

4    that.

5          Can you describe for the jury what position you were in

6    once you made it over the barricade.

7    A    I was crouched over with my hands over my head.

8          MS. CHUNG:   Let the record reflect the witness held both

9    hands behind his head and bent over in a crouched position.

10   BY MS. CHUNG:

11   Q    Once you were on the sidewalk, what were you hearing?

12   A    Continuous gunfire.

13   Q    Was it still rapid gunfire?

14   A    Yes.

15   Q    How much gunfire?

16   A    It was a lot.

17   Q    How long did it seem to last?

18   A    For about four or five seconds.

19   Q    What were you thinking?

20   A    Why is this happening, what's going on, why are we being shot

21   at, who is doing this.

22   Q    Did there come a time when the shots stopped?

23   A    Yes.

24   Q    What did you do then?

25   A    That's when I looked up the bridge in the direction of the

1    group to see if everybody was all right.

2    Q    And what direction is that?

3    A    Up the bridge.

4    Q    Towards the Winn-Dixie?

5    A    Yes.

6    Q    What did you see when you looked up?

7    A    When I looked up, I saw people jumping over the barricade.

8    Q    What did the people look like?

9    A    On the back of the shirts, I saw NOPD.

10   Q    What did you do when you saw the NOPD around your family?

11   A    I thought this was a big mistake, so I was about to stand up

12   and yell to them, you know:  We didn't do anything, don't shoot,

13   you know.  But, right as I was standing up, that's when I heard

14   more gunfire.

15   Q    And you said you were about to yell:  We didn't do anything,

16   don't shoot.  Why were you going to yell don't shoot?

17   A    Because I could see their arms in a position as if they were

18   holding another gun.

19   Q    What kind of gun, can you describe it?

20   A    No, I didn't see the gun.  But the way that their arms were

21   positioned, it's like a long gun.

22   Q    Did you ever get the chance to yell that out to the police?

23   A    No.

24   Q    Why not?

25   A    Because, when I was about to, that's when I heard the gunfire

1    go off.

2    Q    Where was your family at the time?

3    A    Ahead of me.

4    Q    Was the gunfire going towards them or away from them?

5    A    Towards them.

6    Q    What did you do once the gunfire started again?

7    A    I turned around and I ran back the way I came.

8    Q    So back towards the motel again?

9    A    Yes.

10   Q    What happened then?

11   A    When I got back down the bridge, that's when I saw an officer

12   coming from the other side of the bridge with a handgun.  It was

13   pointed at me, he was telling me to freeze.

14   Q    What happened next?

15   A    That's when I stopped, I raised my hands.  And he told me to

16   get down to my knees, and I did.

17   Q    What happened next?

18   A    That's when he hit me across my eye, and I fell to the

19   ground.  And that's, afterwards, he kicked me and then he

20   handcuffed me.

21   Q    Now, you said this officer ran from the other side of the

22   bridge.  Do you mean all the way from the Winn-Dixie side of the

23   bridge?

24   A    No.  Across the street.

25   Q    So just across the lanes of traffic?

1   A    Yes.

2   Q    Do you remember anything about this police officer?

3   A    He looked like he was average size.  He was white.

4   Q    You said he gave you a command.  What command did he give

5   you?

6   A    Freeze.

7   Q    What did you do when he told you to freeze?

8   A    I froze.  I stopped immediately and I raised my hands.

9   Q    Did anyone ever give you a command from the truck?

10  A    No.

11  Q    Did you ever have any idea that the police were in the truck?

12  A    No.

13  Q    If someone had yelled at you to freeze like this police

14  officer had, what would you have done?

15  A    I would have had stopped.

16  Q    After the police officer had you on the ground, handcuffed,

17  what happened?

18  A    That's when he stood me back up, and another officer came

19  down the bridge.  He was a black officer, he was more built,

20  bald.  And they started asking me where were the guys that shot

21  at the officers, where were the snipers.

22  Q    Did they describe the snipers or the shooters in any way?

23  A    Yes.  They told me that they were wearing red shirts.

24  Q    What did you say?

25  A    I told them we don't know what you're talking about, I don't

1    have on a red shirt.

2    Q    What about shooting?

3    A    We hadn't heard any shooting that morning.  We didn't have

4    any weapons.  So I was confused.

5    Q    Did you see anyone in your group ever have a gun or shoot

6    that morning?

7    A    No.

8    Q    Did you notice anyone on the bridge ahead of you?

9    A    No.

10   Q    Did you ever hear any gunshots before the truck pulled up?

11   A    No.

12            MS. CHUNG:  I'd like to zoom out a little bit.

13   BY MS. CHUNG:

14   Q    You described a white officer and a black officer.  Did you

15   know these officers?

16   A    No.

17   Q    Had you ever seen them before?

18   A    No.

19   Q    Do you have any NOPD in your family?

20   A    Yes.

21   Q    Who is that?

22   A    An uncle.

23   Q    Any other law enforcement?

24   A    No.

25   Q    Did you ever have any bad experiences with NOPD before this?

1    A    No.

2    Q    Before this incident, how did you feel about NOPD?

3    A    I was fine.  I had always heard that, you know, there were

4    crooked cops and things like that.  But I had never had any

5    experience with that so I never really believed it.

6    Q    Did the officers at the station ever ask you if you had a

7    gun?

8    A    At the station?

9    Q    I'm sorry, where did they take you?

10   A    That's when they took me across the street to a spare gas

11   station.

12   Q    I'm sorry, I jumped a little bit ahead.  So, at the gas

13   station, did they ever ask you if you had a gun?

14   A    Yeah.  And I told them no.

15   Q    How old were you at the time?

16   A    14.

17   Q    How tall were you?

18   A    About five feet.

19   Q    Do you remember how much you weighed?

20   A    About 85 pounds.

21   Q    85?

22   A    Yeah.

23   Q    What was your hair like?

24   A    It was really long at the time.  I had it braided that day.

25   Q    Did people ever mistake you for a little girl?

```
1    A    Yes.

2    Q    How often?

3    A    A lot.

4    Q    Did you have a gun that day?

5    A    No.

6    Q    Did Jose?

7    A    No.

8    Q    What was Jose usually like?

9    A    He was a very laid back person.  He likes to joke around and

10   just have fun.

11   Q    That morning, before you guys set out for the Winn-Dixie, was

12   he his usual self?

13   A    No.

14   Q    What was he like that morning?

15   A    Jose was -- he was sitting in a chair outside, and he just

16   seemed like he was spaced out.

17   Q    Was he joking, laughing?

18   A    No.

19   Q    How did that make you feel?

20   A    A little awkward.

21   Q    Did it give you a bad feeling in any way?

22   A    Yes.

23   Q    Were you worried about him?

24   A    Yes.

25   Q    How was your grandma that day?
```

1   A    She was sick.

2   Q    What was wrong with her?

3   A    I don't know exactly, but she was coughing up blood.

4   Q    Is that Jose's grandma, too?

5   A    Yes.

6   Q    Who did Jose live with before Hurricane Katrina hit?

7   A    With my grandma.

8   Q    Now, this morning, you said he wasn't his usual self.  Were

9   you guys in your usual situation?

10  A    No.

11  Q    You mentioned your grandma was sick.  What was the motel

12  like?

13  A    Very dirty.  The floors were muddy.  There was no water and

14  no electricity.  It smelled.

15  Q    Did you guys have a chance to bring your stuff with you?

16  A    Just little things that we would pack.

17  Q    Did you all know what was going to happen to you?

18  A    No.

19  Q    When you say Jose was acting unusual and you had a bad

20  feeling, were you scared in any way of him?

21  A    No.

22  Q    Had you ever seen him in this kind of situation before?

23  A    No.

24  Q    When you guys set out for the Winn-Dixie, did his mood stay

25  weird?

1   A    No.

2   Q    What was his mood like when you all were walking to the

3   Winn-Dixie?

4   A    Back to his usual self.

5   Q    Back to joking?

6   A    Yes.

7   Q    And laughing?

8   A    Yes.

9   Q    So, when you all were walking to the Winn-Dixie, what was the

10  general mood of the group?

11  A    Everybody was fine.  They seemed happy.

12  Q    You had mentioned there was another person with your group

13  named James.  Who was James?

14  A    Jose's friend.

15  Q    Were you with Jose when James ended up with your group?

16  A    Yes.

17  Q    Had you ever met James before?

18  A    No.

19  Q    What was James like?

20  A    My cousin.

21  Q    How long did he stay with you all?

22  A    A few days.

23  Q    How did he act during that few days?

24  A    He seemed like a good friend.

25  Q    How did he treat your family?

A     Nice.

Q     How did he treat your grandma?

A     He was good to her.  He talked to her a lot.

Q     What about your mom?

A     He talked to my mom a lot, too.  He gave her a T-shirt one time.

Q     Do you remember testifying in a state grand jury about this incident?

A     Yes.

Q     Do you remember saying that JJ or James seemed like someone who could get into trouble?

A     Yes.

Q     Did you ever actually see him do anything that made you think he was someone who got into trouble?

A     No.

Q     Did you ever see him drinking, fighting, doing anything like that?

A     No.

Q     So why did you say he seemed like someone who could get into trouble?

A     I meant that his outer appearance fit the stereotype.

Q     And describe that outer appearance.

A     Just baggy clothes, you know.  I can't really -- I can't really describe it that well, but it's like a black stereotype that you see on TV.

1    Q    Did he act in a way that fit that stereotype?

2    A    No.

3    Q    Going back to the gas station, how long were you at the gas

4    station?

5    A    Maybe two minutes.

6    Q    Where did you go after the gas station?

7    A    They sat me on the truck.  Not on it, but on the side of it.

8    Q    And where was that?

9    A    Back on the bridge.

10   Q    Were you still handcuffed?

11   A    Yes.

12   Q    Did you talk to any officers by the truck?

13   A    Yes.

14   Q    What kind of things were you asked?

15   A    What was my name, where was my parents, whether or not I was

16   a boy or girl.

17   Q    What did you say?

18   A    I told them my name, and I told them that they had shot my

19   family, and that I had some other family back down a few blocks

20   at the hotel, and I'm a boy.

21   Q    So you did tell them your name?

22   A    Yes.

23   Q    And you made it clear that you were related to the people who

24   had been shot on the bridge?

25   A    Yes.

1   Q   Did you make it clear they were your parents?

2   A   Yes.

3   Q   What happened after you had been at the truck for awhile?

4   A   A female officer came and she wiped the blood off of my

5   forehead.

6   Q   What happened next?

7   A   And an ambulance came and they picked up everybody.

8   Q   So you saw your family taken away in ambulances?

9   A   Yes.

10   Q   Did you know where they were being taken?

11   A   No.

12   Q   Did you know their condition?

13   A   No.

14   Q   Were you ever taken away?

15   A   Yes.

16   Q   Tell us about that.

17   A   They took me to the other side of the bridge, across the

18   street, to another truck.  And they sat me back there with two

19   other guys.

20   Q   Can you describe the two guys?

21   A   One was tall and skinny, and another one was like shorter and

22   he was chubby.  They were both really dirty.

23   Q   Had you ever seen any of those two people before?

24   A   No.

25   Q   When you set out that morning to go to the Winn-Dixie with

1    your family, did these two guys ever join your family?

2    A    No.

3    Q    Did they ever become part of your group and walk with your

4    family?

5    A    No.

6    Q    Once you got in the truck, where were you taken?

7    A    To a white building, I don't know what the building was

8    called.  But there were a lot of, at the time, there were a lot

9    of police and prisoners out.  The prisoners were picking up trash

10   and stuff.  And they sat me and the other two guys up against the

11   building, on the ground.

12   Q    How long were you at that building?

13   A    About half an hour.

14   Q    While you were there, what happened?

15   A    One officer fed us chicken nuggets, and I asked him did he

16   know anything about what had happened on the bridge or where they

17   had taken my family.  And he didn't know.

18   Q    You mentioned earlier that you had testified in the state

19   grand jury.  Did you review your state grand jury testimony

20   before coming here today?

21   A    Yes.

22   Q    Was there anything in there that you disagreed with?

23   A    Yes.

24   Q    What?

25   A    There's a part that says that I was beaten at that spot by

1   the white building, and I don't recall that happening.

2   Q   So, while you were at this location with a lot of police

3   officers, did anyone ever hit or kick you?

4   A   No.

5   Q   Did anyone ever hit or kick you that day?

6   A   Yes.

7   Q   Where was that?

8   A   That was at the bottom of the bridge when I was initially

9   arrested.

10  Q   But it wasn't at the station?

11  A   No.

12  Q   At the station, did anyone ever ask you your name?

13  A   No.

14  Q   Did anyone ever ask you what happened?

15  A   No.

16  Q   Did anyone ever take a statement so that you could tell them

17  what you witnessed when you were on the bridge?

18  A   No.

19  Q   Did you ever see anyone take a statement from either of the

20  two dirty guys?

21  A   No.

22  Q   After that half hour, where were you taken?

23  A   That's when we were taken to the Greyhound station.

24  Q   What happened at the Greyhound station?

25  A   They took the three of us inside, and then another officer

```
1    came out to talk to the guy that took us in.  And they started
2    calling out numbers, and they said that me and the chubby guy
3    were such and such numbers.  And the other guy was something
4    different.
5    Q   What did you think the numbers were?
6    A   I didn't know.  I assumed it was police code or something.
7    Q   What happened once you and the chubbier guy were given a
8    certain number, a certain police code, and the taller guy was
9    given a different police code?
10   A   The guy who had brought us in, he took us back outside, and
11   he took lose our handcuffs and told us we could go.
12   Q   So you were set free?
13   A   Yes.
14   Q   What about the taller guy who had been in the truck with you?
15   A   He was taken -- kept in the building.
16   Q   Do you remember anything about the person who gave the codes
17   and said that you two could go but the other one had to stay?
18   A   No.
19   Q   Do you remember anything about what that guy looked like or
20   what his position was?
21   A   No.
22   Q   Once you were walked out by that police officer and your
23   handcuffs were removed, where did you go?
24   A   I was walking with the chubby guy, and we were just walking
25   down the street.  Until I saw an Army guy, who gave me a pair of
```

1    shoes.

2    Q    Why did the Army guy give you a pair of shoes?

3    A    Because I didn't have any on my feet at the time.

4    Q    When you left the hotel that morning, did you have shoes?

5    A    Yes.

6    Q    What happened to your shoes?

7    A    I don't know.  When I was running down the bridge, I had my

8    shoes on.  After I was arrested, I did not have my shoes anymore.

9    Q    So the military person gives you a pair of shoes.

10   A    Yes.

11   Q    What did you do next?

12   A    We walked down until we saw a group of -- it was a big group

13   of people, some vans and buses, and they were transporting people

14   out of the city.  And we had asked where this van was going.

15   And, I forgot what state it was going to, but the chubby guy said

16   he knew some people that lived there.  And I didn't have anywhere

17   else to go or anything -- I didn't know what to do, so I decided

18   to follow him.

19   Q    So, when you left the hotel that morning, who were you with?

20   A    My mom, dad, Jose and James, my sister.

21   Q    Who were you with now?

22   A    I was alone.  It was just me and the chubby guy.

23   Q    What did you know about what had happened to your mom, dad,

24   Lesha, Jose and James?

25   A    I didn't know anything.

1    Q    Did you have any money?

2    A    No.

3    Q    Did you have a phone?

4    A    No.

5    Q    Did you know where you were?

6    A    No.

7    Q    Did you know anything about this man that you were with?

8    A    No.

9    Q    How did you feel?

10   A    Really alone and sad.

11   Q    Did you get with the man to go on the bus to the other state?

12   A    Yes.

13   Q    What happened?

14   A    We didn't leave, though.

15   Q    Okay.

16   A    Because another woman came and she took me off the bus.  I

17   mean, that was a van.  And she put me on to her bus.  She was a

18   driver for one of the buses taking people out of the city.

19   Q    Why did she take you off the bus?

20   A    Because she wanted to talk to me and hear what had happened

21   with me.  After I had told her, she decided to take me in.

22   Q    Had you ever seen this woman before?

23   A    No.

24   Q    Did you have any idea what kind of person this woman was?

25   A    No.

1    Q    Did you end up staying with her?

2    A    Yes.

3    Q    Where was that?

4    A    In Baton Rouge.

5    Q    How long did you stay with her?

6    A    About a week and a half.

7    Q    How did she treat you?

8    A    Really good.

9    Q    How were you able to leave -- actually, do you know her name?

10   A    Carla.

11   Q    When did you get to leave Carla's place?

12   A    Her and her boyfriend posted something online telling that

13   they had found me.  And my uncle had found me from reading that

14   online.

15   Q    Which uncle is this?

16   A    My Uncle Jerome.

17   Q    Where does he live at the time?

18   A    At that time, in Plano, Texas.

19   Q    So he came from Plano to come get you?

20   A    Yes.

21   Q    How much later was that?

22   A    What do you mean?

23   Q    From when you got to Carla's?

24   A    About a week and a half.

25   Q    Did you ever see your mom, dad, sister, cousin?

1   A   Yes.  After my uncle picked me up, he took me straight to the

2   hospital where they were at.

3   Q   Was this the first time that you had seen them since you

4   started out for the Winn-Dixie?

5   A   Yes.

6   Q   Tell us what your dad's condition was like at the time.

7   A   At the time, my dad seemed fine.  He didn't seem like

8   anything had happened to him.  He was just walking around,

9   normally.

10  Q   And had anything happened to him?

11  A   Yes.

12  Q   What?

13  A   He was shot in the head and he was shot in his back.  That's

14  all I know of.

15  Q   But, otherwise, he seemed okay?

16  A   Yes.

17  Q   What about your mom?

18  A   My mom was in a wheelchair.  She was shot numerous places,

19  and she was missing her right arm.

20  Q   What about Lesha?

21  A   She was sitting in a bed.  She couldn't walk around.  And she

22  was also shot numerous places.

23  Q   Were you able to talk to her?

24  A   Yes.

25  Q   Did you get a chance to see Jose?

```
 1   A    Yes.

 2   Q    How was he?

 3   A    He was -- he was in a different part of the hospital by

 4   himself.  He was sitting in a bed, and he couldn't talk.  And he

 5   could barely move his arm.

 6   Q    Why couldn't he talk?

 7   A    He had a metal plate in his jaw.

 8   Q    How was the rest of his physical condition?

 9            (Pause in proceedings.)

10   BY MS. CHUNG:

11   A    I'm sorry.

12   Q    Take your time.

13   A    His hand was really messed up.  He couldn't move his fingers.

14   Q    Was he able to get out of the bed and move around?

15   A    No.

16   Q    Did you try to talk to him?

17   A    Yes.

18   Q    How did -- I'm sorry.

19   A    He couldn't really respond back.  He just -- he could only

20   make little low sounds.  Wasn't even words.

21   Q    How did the visit end?

22   A    I told him that I was sorry and that I felt like I should

23   have been shot, too.  I felt it wasn't right that I got off like

24   that but everybody else had to go through all of this pain.  And

25   I'm just walking around, I'm fine.  I don't have to worry about
```

1  injuries.  I felt like it just wasn't right.  But he told me not

2  to worry about it and he gave me a thumbs up before I left.

3  Q   And was he able to actually say the words:  Don't worry about

4  it?

5  A   No.  When I told him I felt like it was my fault, he shook

6  his hand saying no.  So I knew what he meant.

7  Q   You said you felt like you should have been shot up.  Did you

8  do anything wrong that day?

9  A   No.

10  Q   Did anyone in your family do anything wrong that day?

11  A   No.

12          MS. CHUNG:  I have no further questions, Your Honor.

13          THE COURT:  All right.  Cross.

14          MR. DeSALVO:  Yes, Your Honor.

15                      CROSS EXAMINATION

16  BY MR. DeSALVO:

17  Q   Mr. Bartholomew, my name is Frank DeSalvo.  I'm just going to

18  ask you a few questions, whenever you tell me you're ready.

19  A   I'm ready.

20  Q   That morning when you left the Family Inn, how many of you

21  left together?

22  A   Five.  Six if you include me.

23  Q   Six if you include you.

24          Did the six of you stay together the entire time?

25  A   Yes.

1   Q    Did at any time your cousin run away or run any distance from

2   you?

3   A    Not run away.  At points, he was a little bit ahead of the

4   group.

5   Q    This would be Jose; right?

6   A    Yes.

7   Q    By a little bit ahead, you're taking about from me to you or

8   from you to --

9   A    About that.  About me to you.

10  Q    Just distance, that's the most you all were ever separated?

11  A    Yes.

12  Q    And Mr. Brissette was with you, or with him?

13  A    Sometimes he was with Jose and sometimes he was with us.

14  Q    But, in reality, you all never got out of each other's site

15  more than about --

16  A    Yeah.

17  Q    -- just distances, I don't know, 25 feet?

18  A    I guess.

19  Q    And you were -- were you just a little bit behind the rest of

20  the group, or you were just last?

21  A    I was just a little bit behind the group when we were going.

22  Q    But closer than me to you?

23  A    Yes.

24  Q    I mean, just a few feet?

25  A    Yes.

1   Q    You all could easily carry on a conversation if you wanted

2   to?

3   A    Yes.

4   Q    And the first thing you heard was a truck; is that correct?

5   A    Yes.

6   Q    Now, you say it turned -- how did you put it -- it turned --

7   you saw the truck, you heard the truck coming down the street,

8   fast.

9   A    Yes.

10  Q    Right?

11          And then it turned and made its way to the bridge.

12  A    Yes.

13  Q    Is that what you said?

14  A    Yes.

15  Q    Okay.  Where did it turn from?

16  A    It was on my left.

17  Q    Hmm?

18  A    It was on my left-hand side from Downman.

19  Q    It was coming from Downman?

20  A    Yes.

21  Q    So it came from Downman Road and then turned onto the bridge;

22  is that correct?

23  A    Yes.

24  Q    And you saw it make that turn; correct?

25  A    Yes.

1   Q   You didn't hear anything but the sound of the truck?

2   A   Yes.

3   Q   And it went past you; is that correct?

4   A   Yes.

5   Q   And, when it went past you, you saw the butt of a rifle

6   sticking out the window?

7   A   I saw it coming out before it had passed me.

8   Q   You saw it as it came out?

9   A   Yes.

10  Q   How far away was it when that happened?

11  A   It was just about to pass me.

12  Q   Just as it was about to pass you, you saw it come out?

13  A   Yes.

14  Q   Is that about the same time you heard your uncle, I think you

15  said get over the barrier?

16  A   My uncle was not there.

17  Q   I'm sorry?

18  A   My uncle was not there.

19  Q   Who yelled:  Get over the barrier?

20  A   Jose.

21  Q   Jose yelled that out?

22  A   Yes.

23  Q   And then everybody did get over the barrier?

24  A   Yes.

25  Q   And then you heard the gunshots from the rifle?

1   A   No.   I head the gunfire before we had made it over the

2   barricade.

3   Q   Before.

4       Was that as they were going over the barricade, or

5   before they went over the barricade?

6   A   I heard the shots, and then I turned around to run down the

7   bridge.

8   Q   Now, that truck had come to a stop there; right?

9   A   Yes.

10  Q   And that's when you heard the gunfire?

11  A   Yes.

12  Q   You didn't hear any gunfire as it was -- before it got to

13  you?

14  A   No.

15  Q   And you didn't hear it -- you didn't see anybody shooting out

16  of the driver's side window?

17  A   No.

18  Q   Certainly, if you would have, something like that would have

19  happened, you would have heard it because you were right there?

20  A   Yes.

21  Q   Now, could you explain how it was that Jose appeared strange

22  that morning.

23  A   He was just sitting in a chair and he looked spaced out.

24  Q   He looked spaced out?

25  A   Yes.   Staring off.

1   Q    And what else?

2   A    Said he was just staring, like he was lost in his thoughts.

3   Q    Was he with James at the time?

4   A    No.

5   Q    Do you have any idea what -- had you ever seen him like that

6   before?

7   A    No.

8   Q    Did it appear that anyone got shot before they jumped over

9   the barrier?

10  A    I wouldn't know because I turned around.

11  Q    Now --

12          MR. DeSALVO:  Thank you.

13          THE COURT:  Thank you, Mr. DeSalvo.

14                Anybody else?  Mr. Larson?

15                    CROSS EXAMINATION

16  BY MR. LARSON:

17  Q    Good morning, Mr. Bartholomew.  I have just a few questions

18  for you.  I'm Lindsay Larson and I represent Officer Faulcon,

19  former Officer Faulcon.

20          You had a conversation with Ms. Chung a little while ago

21  about your perception of James Brissette.

22  A    Yes.

23  Q    And you told her that when you were in grand jury -- and, by

24  the way, you were testifying under oath, like you're testifying

25  today?

1   A    Yes.

2   Q    You took an oath to tell the truth at that particular time;

3   right?

4   A    Yes.

5   Q    And you were trying to explain to her why you said something

6   to the effect that you thought maybe James might get into a lot

7   of trouble.  Do you remember that?

8   A    Yes.

9   Q    And you told her that he looked like it, and you told her the

10  way he was dressed or the way he looked is what you meant;

11  correct?

12  A    Yes.

13  Q    That's not what you told the grand jury, though; is it?

14  A    No.

15  Q    You told the grand jury like he seemed like he could get in a

16  lot of trouble; correct?

17  A    Seemed.  I'm not exactly sure which word I used.

18          MR. LARSON:  Your Honor, may I approach the witness?

19  BY MR. LARSON:

20  Q    So the word you used at that time was it seemed like he could

21  get in a lot of trouble; correct?

22  A    Yes.

23  Q    Now, you also had a conversation with Ms. Chung concerning

24  another a bit of your testimony before that grand jury in which

25  you told the grand jury under oath that the police tried to beat

1   you and they were kicking at you when you were at the temporary

2   police station or I think you called it the Crystal Palace.  Do

3   you remember telling the jury that?

4   A   I don't remember telling them that.

5         MR. LARSON:  Approach?

6         MR. CHUNG:  I'd just object, Your Honor.  The witness

7   has acknowledged it's in the transcript.  He just says he doesn't

8   remember actually saying it.

9         THE COURT:  It was covered on direct where he indicated

10  he did remember saying that, because you had directed him to it.

11  So Mr. Larson can go ahead and ask him questions about it.  If he

12  now doesn't recall saying it, then I think it's fair to show it

13  to him on the transcript.

14        MS. CHUNG:  I think he's acknowledged it was in the

15  printed transcript, I think he said he doesn't actually remember

16  saying those words.

17        THE COURT:  He can go ahead and show it to him.

18        (Pause in proceedings.)

19  BY MR. LARSON:

20  Q   Now, do you remember telling the grand jury on that day under

21  oath that while you were at the temporary police station the

22  police tried to beat us and they kicked at you?

23  A   No.

24  Q   You don't remember that?

25  A   No.  I do not remember saying that.

1    Q    But you read the transcript just now?

2    A    Yes.

3    Q    And you acknowledge that that's what your words say you said;

4    correct?

5    A    Yes.  I acknowledge that it's in the transcript.

6    Q    Okay.  And that transcript was taken down when you were

7    testifying under oath before that grand jury; correct?

8    A    Yes.

9    Q    And so are you telling us now that what the transcript says

10   you said is not true?

11   A    I'm saying that it may have been misunderstood.  Because I

12   was kicked and beat that day, just not at that time.

13   Q    But that's -- but it references that time, Mr. Bartholomew.

14   A    That's why I said it may have been misunderstood.

15   Q    Who misunderstood?

16   A    Whoever typed it.

17   Q    You think the court reporter didn't get it right?

18   A    Maybe.

19   Q    Are you telling us that you didn't say that the police kicked

20   at you and tried to beat you at the Crystal Palace?

21   A    I may have said that, but not at the Crystal Palace.  Because

22   I was kicked and beat, but not at the Crystal Palace.

23   Q    Do you know why the court reporter would put it in there at

24   that particular point?

25   A    Because it may have been a misunderstanding.

1   Q   You're saying that she misunderstood what you said?

2   A   Maybe.

3   Q   You testified that initially you said a police officer hit

4   you in the head and caused you to bleed?

5   A   Yes.

6   Q   That's not what you said in this particular part of your

7   grand jury testimony, though; is it?

8   A   No.

9   Q   You said they kicked at you and --

10  A   I was kicked.  I said that I was kicked.

11  Q   But you said they tried to beat you.  Not that:  They hit me

12  in the head.  But:  They tried to beat us and they kicked at us.

13  Now, when you say At Us, who were you talking about?

14  A   I don't really remember saying it, so I don't know.

15  Q   Well, do you just remember reading that you said that a few

16  seconds ago?

17  A   Say that again.

18  Q   I showed you the transcript a few seconds, a few minutes -- a

19  minute or so ago.  And you did read:  They tried to beat us,

20  kicking at us?

21  A   Yes.

22  Q   Okay.  All right.

23      So you did say that.  And you said us, not me; correct?

24  A   It's in the transcript.

25  Q   Now, when you claimed you were beat by the police the first

```
 1    time, you were by yourself; were you not?
 2    A    Yes.
 3    Q    There wasn't anyone else with you?
 4    A    No.
 5    Q    So this must be another time when the police tried to beat
 6    you and kick you?
 7    A    No.
 8    Q    Because you used the word Us.
 9    A    No.  I did not use that word.  I don't recall saying that.
10    Q    So you're saying the court reporter made another mistake by
11    saying Us as opposed to Me?
12    A    Maybe.
13          MR. LARSON:  No further questions.  I tender the
14    witness.
15          THE COURT:  Thank you, Mr. Larson.
16          Mr. Hessler.
17                        CROSS EXAMINATION
18    BY MR. HESSLER:
19    Q    Morning, Mr. Bartholomew.
20    A    Morning.
21    Q    My name is Eric Hessler.
22          Mr. Bartholomew, would you describe to the jury what a
23    normal night would have been like for you at the Friendly Inn?
24    Or the Family Inn, you were staying at; correct?
25    A    Yes.
```

1   Q   What did you and your family normally do on the night prior

2   to this?

3   A   Just sat outside and talked.  Wasn't much of anything else to

4   do.

5   Q   All right.  Did you ever hear any gunshots at night?

6   A   Yeah, sometimes.

7   Q   Did that concern you?

8   A   Yes.

9   Q   Did you ever see any people carrying around guns, civilians

10  carrying around guns during the daytime?

11  A   No.  No.  I hasn't actually seen anyone with a gun.

12  Q   Did you hear gunshots during the daytime?

13  A   No, I don't recall.

14  Q   Now, when you would sit around at night, was there anybody

15  drinking alcohol, or did that kind of stuff go on, too?

16  A   At night?  Yeah, some people around.

17  Q   Did James Brissette drink alcohol with you?

18  A   No.

19  Q   Did Jose?

20  A   No.

21  Q   Did your father?

22  A   No.

23  Q   Now, you met Mr. Brissette how?

24  A   Through Jose.

25  Q   And when did you meet Mr. Brissette?

1   A    I can't remember exactly when.  I just remember him kind of

2   showing up.

3   Q    Do you know where he kind of showed up at?

4   A    I believe it was at the hotel.

5   Q    All right.  Did your mother ever instill a rule that you or

6   any other family members couldn't leave the hotel unless you were

7   in a group?

8   A    Yes.

9   Q    Did you ever leave the hotel?

10  A    Yes.

11  Q    To do what?

12  A    Not by myself, though.

13  Q    What did you leave the hotel for?

14  A    I always left with Jose.

15  Q    I'm sorry?

16  A    I say, I always left with Jose.

17  Q    Just you and Jose?

18  A    Sometimes my dad was with us.

19  Q    And what would you and Jose go out to do?

20  A    Whenever we -- sometimes, it was just to take a walk.  But

21  sometimes we went to go and get clothes.

22  Q    And where would you go and get clothes?

23  A    At the Footlocker, which was also across the bridge.

24  Q    About how far a walk was this?

25  A    I don't know, a few blocks probably.

1    Q    A few blocks?

2    A    Yeah.

3    Q    How long -- how many days did you stay at the Family Inn?

4    A    A few.  Not exactly sure.

5    Q    Just a couple or --

6    A    Yeah.

7    Q    And you had brought clothes to the Family Inn; is that

8    correct?

9    A    What do you mean?

10   Q    You had packed bags and stuff like that at your auntie's

11   house?

12   A    Yeah.  But it's not my aunt.  My mom.

13   Q    Your mother, I'm sorry.

14   A    Yeah.  We only could pack just a little bit, though, because

15   there were other things that needed to be brought that weren't

16   clothing.

17   Q    How many times did you make that trip to the Footlocker?  It

18   was a Footlocker; correct?

19   A    Yeah.

20   Q    Any other clothing stores or shoe stores?

21   A    I can't remember.

22   Q    And how many times did you and Jose make that trip?

23   A    I can't remember.

24   Q    More than once?

25   A    Yeah.

1   Q   More than five times?

2   A   No.  I say, I can't remember.

3   Q   When you carried stuff back, did you put it in a shopping

4   cart, a backpack, or bags, or what?

5   A   Carried it in my hand.

6   Q   In your hands?

7   A   Yeah.

8   Q   What about Jose?

9   A   I believe he carried it in his hand, too.

10  Q   Did Jose ever have a knapsack or a backpack or a fanny pack

11  or any other type of thing he carried stuff around in?

12  A   No.

13  Q   Did James Brissette?

14  A   No.

15  Q   Do you recall meeting Brissette on one of the trips to the

16  Footlocker?

17  A   I didn't say that.

18  Q   I'm asking you, do you recall that?

19  A   No.

20  Q   You recall him showing up at the hotel one day?

21  A   Yes.

22  Q   Now, at the time of the shooting, the morning of September

23  4th, approximately how many days had you known James Brissette?

24  A   A few days.

25  Q   And was he constantly at your side, or did him and Jose often

```
 1   go off together or ever go off together without you?

 2   A    No.  I had never seen him leave off without me.

 3   Q    Well, let me ask you this.  Mr. DeSalvo asked you that Jose

 4   was sitting outside, and James was no where to be found.  Where

 5   was James that morning?

 6   A    I don't know where James was at.

 7   Q    And you didn't know James to drink alcohol?

 8   A    Repeat that?

 9   Q    You did know James Brissette to drink alcohol?

10   A    No, I didn't.

11   Q    You didn't see him and Jose drinking the night before the

12   shooting?

13   A    No, I did not.

14   Q    Not the morning of the shooting?

15   A    No.

16   Q    Now, this morning that you all walked away from the hotel,

17   was there a foot race that each of you witnessed?  That there

18   would be a foot race to the base of the bridge?

19   A    That sounds familiar, but I can't recall exactly how it

20   happened.

21   Q    But I'm not asking if you heard that.  Did you see that, with

22   your own eyes?

23   A    I can't remember.

24   Q    Do you know what James Brissette was wearing that morning?

25   A    No.
```

1   Q   And, you described the shooting, I'm not going to go back

2   through that.  But you said the police officer pulled you behind

3   a dumpster at the base of the bridge by the spare gas station.

4   Did you say that?

5   A   No, not behind a dumpster.

6   Q   Did they bring you anywhere in particular behind cover,

7   behind a dumpster, behind a truck or anything like that?

8   A   No.  They just took me to the station, to the front window of

9   it.

10          MR. HESSLER:  No further questions.

11          THE COURT:  Thank you, Mr. Hessler.

12          Mr. Meche.

13                      CROSS EXAMINATION

14   BY MR. MECHE:

15   Q   Good morning.  I'm Tim Meche, I represent Anthony Villavaso.

16   I just want to ask you a couple of questions.

17          Mr. DeSalvo was asking you how you all were walking, and

18   I think you said all six of you were pretty much together at that

19   point.

20   A   Yes.

21   Q   When you said six, I think you mean yourself, your sister,

22   your mom, your dad, James Brissette and Jose Holmes; is that

23   correct?

24   A   Yes.

25   Q   And you also testified about that when you testified with

```
 1   that grand jury, and you said you reviewed that.  And you also

 2   indicated you all never got more than two or three car lengths

 3   separated from each other; is that correct?

 4   A   Yes.

 5   Q   First of all, did you know that there was a video taken of

 6   this incident?  And you watched it when you prepared your

 7   testimony with the prosecutor?

 8   A   Yes.

 9   Q   So you've seen this before?

10   A   Yes.

11           THE COURT:  I'm not sure we're picking up.  If you can

12   speak a little bit louder.

13           THE WITNESS:  Yes.

14   BY MR. MECHE:

15   Q   Does that kind of look like the area where you all were that

16   morning?

17   A   Yes.

18           MR. MECHE:  Mr. Kitchen, can you run that please.

19           (Videotape played.)

20   BY MR. MECHE:

21   Q   There's someone running right here.  Do you know that to be

22   Jose Holmes?

23   A   I don't know.

24   Q   If he testified that that was him, would you dispute that?

25   A   I don't know if it's him.
```

1          MS. CHUNG:  Objection, Your Honor, to having the witness

2   comment on other people's testimony.  If Mr. Mesh wants to ask

3   him about his own statements, obviously that's proper.

4          THE COURT:  Well, typically, I would agree with the

5   objection.  In this case, though, the jury's already heard the

6   testimony, and it's for the sole purpose of identifying someone

7   on a video that the witness has already said that he has viewed.

8   So, under this limited circumstance, I don't think it's an unfair

9   question.

10         But, to be sure, we don't want to go back and revisit

11  other people's testimony with a different witness.  So let's be

12  mindful of that, but let's go ahead and proceed.

13  BY MR. MECHE:

14  Q   In prepare your testimony with Ms. Chung and Ms. Bernstein,

15  did you all discuss whether in fact you all knew this to be Jose

16  Holmes running?

17  A   Yes.  And told him I didn't know.

18  Q   Did they indicate to you that they thought it was him?

19  A   No.

20  Q   Okay.  Now, you don't see anyone around him; do you?

21  A   Where is he?

22         MR. MECHE:  Run it, Mr. Kitchen.

23         (Videotape played.)

24         MR. MECHE:  Stop it.

25  BY MR. MECHE:

1    A    No, I don't see anyone around this person.

2    Q    No one two or three car lengths anywhere around him?

3    A    No.

4         MR. MECHE:  Run it please, Mr. Kitchen.

5    BY MR. MECHE:

6    Q    Now, I think you also indicated in one of your testimonies

7    that your mother was pushing a shopping cart at some point that

8    morning; is that correct?

9         THE COURT:  It's going to be mighty hard to ask him

10   questions while there's audio, unless you turn down the volume or

11   unless you stop it and ask him the questions.  So let's see if we

12   can pick one of those two things.

13   BY MR. MECHE:

14   Q    Incidentally, had you heard gunshots -- stop it please -- had

15   you heard gone shots that morning when you all were walking?

16   A    No.

17   Q    There's someone that appears to be pushing a shopping cart.

18   Do you recognize them?

19   A    No.

20   Q    Do you believe that's your mom and your sister or your

21   father?

22   A    I don't know.

23   Q    Well, do you remember what they were wearing that day?

24   A    No.

25   Q    Now, this video, you've been showed by the prosecutor.

1    You've talked to them about your testimony.  Have you also talked

2    to your other family members about the fact that this video

3    exists?

4    A    No, I didn't talk to them about this.

5    Q    You never talked to any of your family members about this?

6    A    No.

7    Q    Could this be your mom pushing the shopping cart?

8    A    I don't know.

9    Q    Did you see anybody else out there that morning pushing a

10   shopping cart?

11   A    No.

12   Q    And, once again, you don't see anybody around them?

13   A    No.

14   Q    Sir, I realize you went through a lot, and I apologize.  But

15   is it possible you're wrong when you say you remember all six of

16   you being together that morning the whole time?

17   A    I remember all six of us being together.

18   Q    Even after you've seen the video, you still believe that?

19   A    Yes.  Because I can't be 100 percent sure who these people

20   are.

21             MR. MECHE:  Thank you, sir.

22             THE COURT:  All right.  Mr. London.

23             MR. MECHE:  I forgot to ask you.

24             I'm sorry, Your Honor.

25             THE COURT:  Yes.

 1   BY MR. MECHE:

 2   Q    I'd asked you if you remembered what your parents were

 3   wearing that day, but do you remember what you were wearing?

 4   A    No.

 5   Q    Don't remember what color shirt?

 6   A    I remember distinctly there was no red.

 7   Q    I understand.  But you don't remember --

 8   A    But, about any other colors or patterns, no, I don't remember

 9   that.

10          MR. MECHE:  Thank you, sir.

11          THE COURT:  All right.

12                    CROSS EXAMINATION

13   BY MR. LONDON:

14   Q    Good morning, Mr. Bartholomew.  My name is Steve London, I

15   represent Archie Kaufman.  I just have maybe one question for

16   you.

17          When Ms. Chung asked you a couple questions on direct,

18   you said you did not give a statement to the police; is that

19   correct?

20   A    Yes.

21   Q    But the police did come to look for you to get statements

22   from you; didn't they?

23   A    No.

24   Q    Do you recall when you were staying with that lady that you

25   told Ms. Chung about that police and a bunch of other people came

1    looking for you, wanting a statement?

2    A   I don't recall police wanting a statement.  I recall saying

3    that reporters wanted me to talk.

4           MR. LONDON:  May I approach, Your Honor?

5           THE COURT:  Yes.

6    BY MR. LONDON:

7    Q   I'm going to show you the grand jury testimony from November

8    15 of '06 and ask you to read from here to there.

9           (Pause in Proceedings.)

10   BY MR. LONDON:

11   Q   Does that refresh your memory?

12   A   A little.  I don't -- I still don't recall exactly saying

13   that, though.

14   Q   In response to the question:  Did anyone ever try to contact

15   you and take a statement from you, do you recall your answer:

16   Yes, when I was with the lady who took me in, they did say a lot

17   of people wanted to talk to me and some police and other stuff,

18   but she didn't want me to do it, and I didn't want to do it

19   either; until I found my family, I didn't do it.  Do you remember

20   that?

21   A   Again, I don't recall exactly saying that.

22   Q   That's in your grand jury testimony.  Do you dispute saying

23   that?

24   A   I'm not disputing it, I'm just saying I don't exactly recall

25   it.

```
 1              MR. LONDON:  I have nothing further, Your Honor.  Thank

 2   you.

 3              THE COURT:  Thank you.  Redirect?

 4              MS. CHUNG:  Yes, Your Honor.

 5                       REDIRECT EXAMINATION

 6   BY MS. CHUNG:

 7   Q   Mr. Bartholomew, Mr. London here asked about people trying to

 8   contact you at Carla's home.  Did you ever talk to those people?

 9   A   No.

10   Q   Who was telling you that someone was trying to contact you?

11   A   It was Carla and her boyfriend.

12   Q   So the information was coming from Carla?

13   A   Yes.

14   Q   And do you remember exactly what she told you?

15   A   No.

16   Q   So do you know if NOPD actually tried to talk to you at

17   Carla's house?

18   A   No.

19   Q   I believe Mr. Hessler asked you a few questions about James

20   that morning.  Do you remember Mr. Hessler asking you about

21   James?

22   A   Yes.

23   Q   You said you had seen Jose but James wasn't with Jose.  Was

24   James at the hotel when you all when you set out that morning?

25   A   Yes.
```

1    Q    So, when you say he wasn't with Jose, he wasn't right next to

2    Jose; is that correct?

3    A    Yes.

4    Q    But was he at the hotel with your family?

5    A    Yes.

6    Q    You were also asked a few questions about a statement you

7    made in the grand jury about being hit and kicked.  Do you

8    remember that?

9    A    Yes.

10   Q    How old were you at the time of this shooting?

11   A    14.

12   Q    And, in November of 2006, when you testified in front of the

13   state grand jury, how old were you?

14   A    15, 16.

15   Q    Had you ever testified in a grand jury before?

16   A    No.

17   Q    Had you ever testified anywhere before?

18   A    No.

19   Q    Were you always clear that you had been hit and kicked that

20   day?

21   A    Yes.

22   Q    Were you ever uncertain about that fact?

23   A    No.

24   Q    You had mentioned that you were taken from that place to the

25   Greyhound station.

1   A    Yes.

2   Q    Do you remember anything about who was in the vehicle with

3   you that went --

4        MR. LARSON:  Objection, Your Honor.  No one asked him

5   about this on cross examination.

6        THE COURT:  Yeah, I don't recall this being covered on

7   cross, this specific question.  This was covered on direct.  It's

8   already been covered on direct and hasn't been covered on cross,

9   then let's move on.  This is strictly to redirect.

10       MS. CHUNG:  Yes, Your Honor.

11  BY MS. CHUNG:

12  Q    You were asked about what you were wearing that day and what

13  your family was wearing that day.

14  A    Yes.

15  Q    Do you remember that?

16       When the police stopped you and asked you questions near

17  the gas station, what description were they talking about?

18  A    They said that there were guys in a red shirt, wearing red

19  shirts.

20  Q    How did you respond?

21  A    I told them we're not wearing red shirts.  You can look at

22  me, look at my family, none of us are wearing any red shirts at

23  all.

24  Q    And were any of you wearing red shirts that day?

25  A    No.

1        MS. CHUNG:  No further questions, Your Honor.

2        THE COURT:  All right.  Thank you.

3        Thank you, sir.  You can step down.

4        Is this witness released, counsel?

5        MR. LONDON:  Judge, we'd like the witness to remain

6    available and subject to the order.

7        THE COURT:  Mr. Bartholomew, please do not discuss your

8    testimony with anyone until you are so advised by the Court

9    through counsel.  Okay?  All right.

10       Ms. Bernstein, next.

11       MS. BERNSTEIN:  Thank you, Your Honor.  The United

12   States calls Kevin Bryan.

13       KEVIN BRYAN, being first duly sworn, testified as

14   follows:

15       CASE MANAGER:  Please state and spell your full name for

16   the record.

17       THE WITNESS:  Kevin Bryan, K-E-V-I-N B-R-Y-A-N.

18                        DIRECT EXAMINATION

19   BY MS. BERNSTEIN:

20   Q   Good morning, Mr. Bryan.

21   A   Good morning.

22   Q   Can you please introduce yourself to the jury and tell them

23   what you do for a living.

24   A   My name's Kevin Bryan, I am a deputy sheriff with the

25   Plaquemines Parish Sheriff's Office.

```
 1   Q    Mr. Bryan, you speak a little softly, so you might want to
 2   move that microphone closer to your mouth.
 3              What do you do with the Plaquemines Parish Sheriff's
 4   Office?
 5   A    I'm a patrol deputy.
 6   Q    How long have you been there?
 7   A    Going on five years.
 8   Q    Going back to Hurricane Katrina in 2005, where did you work?
 9   A    New Orleans Police Department.
10   Q    What was your assignment with NOPD?
11   A    I was on the task force with the Seventh District.
12   Q    Mr. Bryan, did you respond to the Danziger Bridge on
13   September 4, 2005, the day of the shooting there?
14   A    Yes.
15   Q    What vehicle did you get to the bridge in?
16   A    A Budget rental truck.
17   Q    Was anybody in this courtroom in that Budget truck with you
18   that day?
19   A    Yes.
20   Q    Who?  You if you say the names first, then I'll ask you to
21   point them out.
22   A    Sergeant Sergeant Kaufman.  Sergeant Kenneth Bowen and
23   Villavaso.  Officer Robert Faulcon.
24   Q    Can you do me a favor and point out each one of those people
25   you identified and describe either what they're wearing or where
```

 1   they're sitting for the jury.

 2   A   Robert Faulcon is sitting over there under that white thing,

 3   the projector screen.

 4        Sergeant Gisevius is sitting right there.

 5   Q   Can you describe either what he's wearing or -- the man who

 6   is standing up?

 7   A   Yes, the man who is standing.

 8        Ken Bowen, Villavaso, right there.

 9   Q   For the record the witness has just identified those four

10   defendants.

11        Do you recognize the fifth defendant in here

12   A   Sergeant Archie Kaufman.

13        MS. BERNSTEIN:   For the record, he's just identified

14   Defendant Kaufman.

15   BY MS. BERNSTEIN:

16   Q   Mr. Bryan, I want to ask you a bunch of questions about what

17   happened that day; but, first, can you tell us a little bit about

18   yourself?  Did you grow up in the New Orleans area?

19   A   Yes.

20   Q   Where did you grow up?

21   A   St. Bernard Parish.

22   Q   Did you have any law enforcement in your family?

23   A   Yes.

24   Q   Who is that?

25   A   My father.

1   Q   Where did your dad work?

2   A   New Orleans Police Department.

3   Q   Did your dad still work for NOPD when you started work there?

4   A   No.  He was deceased.

5   Q   I'm sorry.

6       When did your dad die?

7   A   1995.

8   Q   What year did you start working for NOPD?

9   A   2003.

10  Q   How old were you when you started?

11  A   21, 22.

12  Q   All right.  So, at the time of Hurricane Katrina in 2005,

13  you'd been with NOPD for maybe two years?

14  A   Yeah.  Approximately.

15  Q   Had you worked in the Seventh District that whole time?

16  A   Yes.

17  Q   All right.  Can you tell us a little bit more, again focusing

18  at the time of Hurricane Katrina, what was your position within

19  the Seventh District?

20  A   I was on the task force.

21  Q   Who was your supervisor on that task force?

22  A   Sergeant Morel Keller.

23  Q   Were there also other task forces with different sergeants?

24  A   Yes.

25  Q   When Hurricane Katrina hit, did you all keep working on your

1    assigned task forces, or did they sort of blend?

2    A    Everything was blended.

3    Q    I want to talk to you about the day of the shooting out there

4    on the bridge.   Before the shooting ever happened, what were you

5    doing?

6    A    Hanging around the Crystal Palace.

7    Q    That was the headquarters for the Seventh District?

8    A    Yes.

9    Q    What happened while you were hanging around?   Were you inside

10   or outside, do you remember?

11   A    I believe I was outside.

12   Q    What happened?

13   A    Sergeant Gisevius came and got me, told me to get in the back

14   of the Budget truck, saying that officers were being fired at.

15   Q    Did you hear any radio signal about officers being fired at?

16   A    No.

17   Q    So you learned about it through Defendant Gisevius?

18   A    Yes.

19   Q    Can you tell us again, what did he say to you?

20   A    That officers were being fired at on the bridge.

21   Q    What was his attitude when he came to get you?

22   A    Adrenaline pumping.

23   Q    You said he told you to get in the truck.   Did you know what

24   truck he was talking about?

25   A    Yes.

1    Q    What truck was that?

2    A    The Budget rental truck.

3    Q    Is that a truck that you all had been using for

4    transportation?

5    A    Yeah.

6    Q    Did you go get in the truck?

7    A    Yes.

8    Q    Can you tell us who else was in the truck with you?

9    A    Villavaso.

10             In the back of the truck where I was at?

11   Q    That was going to be my next question, was that where you

12   were at, in the cargo area?

13   A    Yes.

14   Q    Who do you remember being back there with you?

15   A    Raymond Young, Villavaso, Paxton -- Paxton, Paxton, I'm not

16   sure of his first name -- Hills, Barrios, Faulcon.

17   Q    Are all of these people that you mentioned police officers?

18   A    Yes.

19   Q    Were there any female police officers in the back of the

20   truck?

21   A    Yes.

22   Q    Who do you remember?

23   A    Heather Gore.

24   Q    Who is Heather Gore?

25   A    She is -- she was in another district, and after the storm

 1   she ended up in ours.

 2   Q    Do you remember how she ended up, or do you know whether she

 3   was friends with anybody in your district?

 4   A    Yes.

 5   Q    Who was she close to?

 6   A    Sergeant Gisevius.

 7   Q    So Heather Gore was in the back of the truck with you?

 8   A    Yes.

 9   Q    What kind of gun did you have that day?

10   A    Department-issued Glock .40 caliber.

11   Q    Is that a handgun?

12   A    Yes.

13   Q    What kind of guns were the other officers in the back of the

14   truck carrying?

15   A    Some of them had like assault rifles and shotguns.

16   Q    Do you remember who had long guns?

17   A    Yeah.  From the ones that was in the back of the truck.

18   Q    Who do you remember having long guns?

19   A    Faulcon --

20   Q    What did he have?

21   A    I'm not 100 percent sure, but it was a long gun.

22   Q    Okay.

23   A    Villavaso.  He had one.

24        Raymond Young had one.

25   Q    Do you know what kinds of long guns they had?

1   A    I believe Villavaso had an assault rifle.  And Raymond Young

2   had had a shotgun.  And I'm not sure what kind of gun Barrios

3   had.

4   Q    Do you know who was driving the Budget truck that day?

5   A    No.

6   Q    Do you know who usually drove the Budget rental truck?

7   A    Yeah.

8   Q    Who was that?

9   A    Mike Hunter.

10  Q    Do you know where Villavaso was?

11  A    In the front of the truck.

12  Q    Do you know what kind of gun he had?

13  A    No.

14  Q    Tell us what happened on the bridge that day.  Is that just a

15  straight shot up Menteur Highway?

16  A    Yes.

17  Q    As you were heading out to the bridge, was the back of the

18  truck open or closed?

19  A    Open.

20  Q    Could you all see where you were going?

21  A    No.

22  Q    Could you see where you had been?

23  A    Yes.

24  Q    All right.  So you're looking out the back at the road behind

25  you?

1  A    Yes.

2  Q    Can you tell us about the -- what was going on on the way to

3  the bridge?

4  A    Nothing.  People just sitting around in the back of the truck

5  waiting to get there.

6  Q    What was your mood?

7  A    Nervous.  Scared.

8  Q    What were you nervous and scared about?

9  A    Because I didn't know what was -- what kind of situation I

10  was getting myself into.  With the way the truck was, if officers

11  were being fired off, there was no place to take cover or

12  anything if somebody did start shooting at the truck.

13  Q    Did you have a radio that day?

14  A    Yes.

15  Q    Was it working?

16  A    Yes.

17  Q    Do you remember whether you were hearing any radio broadcasts

18  as you were riding out to the bridge?

19  A    No.

20  Q    You don't remember any broadcasts?

21  A    No.

22  Q    All right.  So what do you remember next?

23  A    The truck just slammed on its brakes and gunfire erupted.

24  Q    What kind of gunfire?  Just a shot or two?

25  A    No.  It was multiple shots.

1   Q    How many?

2   A    A few.

3   Q    What do you mean by a few?

4   A    A lot.

5   Q    Can you make some noise for us to tell us what you mean.

6   A    Like a couple pops and then like, uh, like an assault rifle.

7   Q    So sounded like assault rifle fire?

8   A    Yes.

9   Q    You say the truck slammed on its brakes all of the sudden; is

10  that right?

11  A    Yes.

12  Q    Could you tell from looking out the back of the truck where

13  you were when it stopped?

14  A    Yes.

15  Q    Where were you?

16  A    On the Danziger Bridge.

17  Q    Could you tell how far up the bridge you were?

18  A    No, I don't know how far.  We was on the bridge but we wasn't

19  by the middle.

20  Q    You said the car -- the truck slammed to a stop and you heard

21  gunfire; correct?

22  A    Yes.

23  Q    Could you tell where the gunfire was coming from?

24  A    From the front of the truck.

25  Q    Could you tell whether it was going out or whether it was

1    coming in?

2    A    No.

3    Q    Did you hear anything hit the truck?

4    A    No.

5    Q    Did you see anything pierce through the truck?

6    A    No.

7    Q    Before that truck slammed to a stop and you heard the

8    gunfire, did you hear anybody give any commands?

9    A    No.

10   Q    Did you hear anybody yell:  Police?

11   A    No.

12   Q    Stop?

13   A    No.

14   Q    Show us your hands?

15   A    No.

16   Q    What did you do when the truck slammed to a stop?

17   A    I was ducked, laying down, when after like when the gunfire

18   erupted.  I like crouched over; and, after the gunfire stopped, I

19   heard a loud bang and the gunshot right over my head, and I

20   looked up and it was Ignatius Hills with his gun down pointing at

21   a black male under the walkway.

22   Q    So you a heard a loud bang over your head?

23   A    Yes.

24   Q    When you heard that, you were still in the back of the truck?

25   A    Yes.

1    Q    You said you looked up and saw Ignatius Hills.  Was he also

2    in the back of the truck?

3    A    Yes.

4    Q    Where was he shooting?

5    A    Towards a black male that he was running down the bridge.

6    Q    Was he running down the bridge in the roadway, or the

7    walkway?

8    A    Walkway.

9    Q    When you saw the black male running -- first tell me a little

10   bit more about him.  How big was he?

11   A    Smaller than me.

12   Q    Fat, skinny?

13   A    Skinny.  Real skinny.

14   Q    So you saw the skinny guy running down the walkway.  Did you

15   ever see him turn toward the officers?

16   A    No.

17   Q    Did you see anything in his hand?

18   A    No.

19   Q    Did you see him threaten anybody in any way?

20   A    No.

21   Q    Tell us what happened next.

22   A    After Hills shot his weapon, I looked up at him and I was

23   like:  What the F are you doing, what are the F are you shooting

24   at?

25   Q    Did you actually use the curse word when you talked to him?

1    A    Yes.

2    Q    What did he say?

3    A    He said:  Oh, I tried to pop that little N word.  Or:  I

4    popped a round off at that little N word.

5    Q    And he actually used the N word?

6    A    Yes.

7    Q    Why did you look up at him and say what the F are you doing?

8    A    Because it hurt my head and my ears.  It was like right above

9    my head.

10   Q    Now let me back up just a second.  When you said initially

11   the truck got to the bridge and slammed to a stop, do you know

12   whether any officers got out at that point when the gunfire

13   started?

14   A    Like right when it started?  No, I don't know if they still

15   had officers in the front of the truck or not.

16   Q    Do you know whether any officers in the back got out?

17   A    Yes.

18   Q    Who got out of the back?

19   A    The ones with the long guns.

20   Q    Do you remember specifically who got out?

21   A    Faulcon, Barrios and Villavaso.

22   Q    When Ignatius Hills shot out of the back of the truck, were

23   there other officers who were still in the back with you?

24   A    Yes.

25   Q    Who do you remember being in the back at that point?

1    A    Hills, Young.

2    Q    That's Raymond Young?

3    A    Yes, Raymond Young.  That's the only two I could positively

4    say that I remember right now.

5    Q    What happened after Hills fired at the skinny guy running

6    down the walkway?

7    A    The guy, he like fell.  Looked like he fell in the walkway.

8    And then he got up and started running again.

9    Q    From where you were, could you tell if he fell all the way to

10   the ground?

11   A    No.

12   Q    Why couldn't you see that?

13   A    Because of the little barrier that separates the walkway from

14   the road.

15   Q    So you just know he disappeared from view for a second?

16   A    Yes.

17   Q    And then he kept running?

18   A    Yes.

19   Q    What did you do?

20   A    I got out and began to chase him down the bridge.

21   Q    How long a head start did he have on you, can you estimate?

22   A    Probably about 30 yards at least I would say.

23   Q    When you got out, did you think you were going to be able to

24   catch him?

25   A    No.

```
 1    Q    Why did you chase him?

 2    A    Because, just the moment, you know.  And that's my job.

 3    Q    When you got out and started chasing him, were you running

 4    down the roadway, or the walkway?

 5    A    The roadway.

 6    Q    Did you have your gun drawn?

 7    A    Yes.

 8    Q    What gun was that?

 9    A    My department-issued handgun.

10    Q    Did you shoot at this guy?

11    A    No.

12    Q    Why not?

13    A    Because he wasn't a threat.

14    Q    So you just chased him?

15    A    Yes.

16    Q    Tell us what happened.

17    A    Chased him and when -- he was running down, and he came out

18    the walkway of the bridge and went towards the right, like at the

19    base of the bridge --

20    Q    So into the roadway?

21    A    Yeah.

22              And then I heard a gunshot go off to my right, and I

23    looked, it was a light skinned black male with a shotgun about

24    waist level.  He shot at least two rounds.

25    Q    What direction was he pointing his gun?
```

1   A   Towards the person running.

2   Q   What kind of gun did he have?

3   A   A shotgun.

4   Q   This light skinned black male whom you saw with a shotgun,

5   what department was he with?

6   A   New Orleans Police Department.

7   Q   How do you know that?

8   A   Because he had on a uniform shirt.

9   Q   What color shirt?

10   A   A light blue.

11   Q   Baby blue NOPD?

12   A   Yeah.

13   Q   Do you know who that officer was?

14   A   No.

15   Q   Did he come from the Budget truck?

16   A   No.

17   Q   Would it help you to describe what you're talking about if

18   you had a picture in front of you?

19   A   Yes.

20         MS. BERNSTEIN:  Can we have Exhibit 71 up, please.

21   BY MS. BERNSTEIN:

22   Q   What's that a picture of, Mr. Bryan?

23   A   Danziger Bridge on the Seventh District side.

24   Q   Are you looking back down the east side of the bridge toward

25   Downman Road and Chef intersection?

1   A    Yes.

2   Q    Can you see on this photograph the direction that this --

3   that the skinny guy was running?

4   A    Yes.

5   Q    Now, that screen in front of you, you can write on it just by

6   touching it?

7        Can you draw an arrow showing the route that the skinny

8   guy took?

9   A    (Witness complies.)

10  Q    Okay.  And I'm going to erase that and then ask you a

11  question.

12       Your line went from the walkway down into the roadway.

13  Did he come over the barrier, or just go to the end of the

14  barrier and then into the roadway?

15  A    He stood on like -- he ran down the whole walkway to the end.

16  Q    And, when it ended, he ended up in the roadway?

17  A    Yes.

18  Q    Can you draw a line for us now showing the route you took

19  when you were chasing him?

20  A    (Witness complies.)

21  Q    And I don't think I put this one on the record; but, for the

22  record, the first line went down the walkway on the left of the

23  road and the second line you just drew went down the roadway.

24       Can you show us on this picture where this light skinned

25  black guy in the baby blue NOPD shirt came from?

1    A    He came from up in that area.

2              (Witness indicates.)

3    BY MS. BERNSTEIN:

4    Q    Did you mean to put that arrow there, or did that just pop

5    up?

6    A    No.  It just popped up.

7    Q    Can you draw an arrow with your finger showing which

8    direction he was traveling?

9    A    Who?

10   Q    The light skinned black guy with the baby blue NOPD shirt.

11   A    He was --

12   Q    So he came from the right as you were running down the

13   bridge?

14   A    Yes.

15   Q    You said this guy in the light blue shirt fires his shotgun

16   two times?

17   A    Yes.

18   Q    What happened?

19   A    There was the guy that was running, laying on the ground,

20   right about there.  Not in two spots.

21   Q    For the record, it's right in the middle of the roadway at

22   the bottom of the bridge; is that right?

23   A    Yeah.

24   Q    The guy laid down on the ground.  What was he doing?

25   A    Just laying there.

1   Q   Fighting with anybody?

2   A   No.

3   Q   Was he resisting in any way?

4   A   No.

5   Q   He just laid down on the ground?

6   A   Yes.

7   Q   Did you see where the guy with the shotgun went?

8   A   No.  He popped out of nowhere.  From the right side of the

9   bridge.

10   Q   Did you see where he went to after he fired?

11   A   No.

12   Q   What did you do?

13   A   I went -- when I caught up with the guy, I slapped him with

14   an open hand, and he was handcuffed.

15   Q   What guy did you slap?

16   A   The guy that was running.

17   Q   Why did you slap him?

18   A   Just heat of the moment, adrenaline pumping.

19   Q   Was he running when you slapped him?

20   A   No.

21   Q   What was he doing?

22   A   Laying down on the ground.

23   Q   Once you got up on the guy, were you able to determine how

24   old he was?

25   A   No.  I was like give an approximate age.

1    Q    Seemed like a grown-up, or a kid?

2    A    A kid.

3    Q    How big was he?

4    A    Skinny.

5    Q    What was his demeanor when you got up to him?

6    A    Scared.

7    Q    How could you tell he was scared?

8    A    Just his body language and --

9    Q    How did you feel about the fact that you hit him?

10   A    Horrible.

11   Q    Why?

12   A    Because that's not the kind of person I am.

13   Q    Did you ever have any justification for hitting the kid?

14   A    No.

15   Q    You said the kid was handcuffed?

16   A    Yes.

17   Q    Who handcuffed him?

18   A    I'm not sure.

19   Q    Who was there other than you?

20   A    Me, Raymond Young --

21   Q    Where did Raymond come from?

22   A    He was behind me when we were running down the bridge.

23   Q    So he also chased the kid?

24   A    Yeah.

25   Q    Who else was there?

1   A   I'm not sure if the guy was with the -- that shot the two

2   shots was there.  But Officer Polite.

3   Q   Who was Officer Polite?

4   A   He was the desk officer in the Seventh District.

5   Q   Did he come with you in the Budget truck?

6   A   No.

7   Q   Where did you see him for the first time that day?

8   A   On the screen?

9   Q   Sure.  All right.

10          So, for the record, you've just put a dot in the middle

11  of the roadway a little further down from where the kid laid down

12  on the ground; correct?

13  A   Yes.

14  Q   When you saw Polite, what was he doing?

15  A   He got out of his car.

16  Q   And what did he do?

17  A   He came by us.

18  Q   Did he have any gun in his hand?

19  A   I don't remember.

20  Q   Do you know whether he gave any commands to the kid?

21  A   No.

22  Q   No -- bad question from me.  No, he didn't; or, no, you don't

23  remember?

24  A   No, I don't remember.

25  Q   So what happened after you all had the kid handcuffed?

```
 1   A    Me and somebody else, and I'm not sure who it was, took the
 2   kid from, and we ran over here, and was either behind a dumpster
 3   or a car, we ducked behind.
 4   Q    And, for the record, you've drawn a line from the roadway off
 5   to the left.
 6            Is there a business over there where you took the kid?
 7   A    Yes.
 8   Q    What kind of business is that?
 9   A    A car wash.
10   Q    And you said you took him behind something?
11   A    Yes.
12   Q    Do you see a dumpster in that photograph?
13   A    Yes.
14   Q    Can you circle it, and then we'll zoom in on it.
15   A    (Witness complies.)
16            MS. BERNSTEIN:  Can we zoom in on that, please?
17   BY MS. BERNSTEIN:
18   Q    Is that where you took the kid?
19   A    Yes, up in that area.
20   Q    Why did you all take the kid over to the car wash behind a
21   dumpster or a car or something?
22   A    For safety reasons.
23   Q    What do you mean by that?
24   A    Because they had all kinds of gunfire going on, and I didn't
25   know which direction they were coming from.  So -- and with him
```

1    being somebody in our custody, you know, we'll be liable if

2    something happened to him.

3    Q   Once you had him over there by the car wash, did you hear any

4    more shots?

5    A   I'm not sure.

6    Q   You don't remember whether you heard any more shots?

7    A   No.

8    Q   I'm going to look at this photograph, Exhibit 71.  From where

9    you were over there by the car wash, in between there and the

10   bridge is a grassy area.  Do you see that?

11   A   Yes.

12   Q   Do you remember that grassy area?

13   A   Yeah.

14   Q   Did you see anybody in that grassy area?

15   A   No.

16   Q   Did you ever hear anybody say anything about shooting coming

17   from the grassy area?

18   A   No.

19   Q   In the six years since the shooting, did you ever hear

20   anybody talk about a shooter being in the grassy area?

21   A   No.

22   Q   In the six years since the shooting, did you ever hear

23   anybody talk about a shooter that day who got away?

24        MR. LONDON:  Judge, I'm going object as to what other

25   people did or did not discuss with this particular witness.

1          THE COURT:  I'm going to sustains the objection.

2          Let's talk about what he heard and what he knows.

3     Rather than suggest things to him that he may have heard, let him

4     testify as to what he knows.

5     BY MS. BERNSTEIN:

6     Q    What were you wearing that day, Mr. Bryan?  Do you remember?

7     A    It was a uniform.

8     Q    What kind of uniform did you wear?

9     A    It was either my Navy blue task force uniform or a light blue

10    shirt, baby blue.

11    Q    What does the task force uniform look like?

12    A    It's Navy blue.

13    Q    What kind of pants, what kind of shirt?

14    A    Navy blue, like a thick material shirt, and Navy blue cargo

15    pants.

16    Q    Are the cargo pants sometimes called BDUs?

17    A    Yes, BDUs.

18    Q    So that's the same thing?

19    A    Similar, yes.

20    Q    Do you remember what the other officer or officers who were

21    with you over there at the car wash with the kid, do you remember

22    what they were wearing?

23    A    No.

24    Q    How long did you stay behind the dumpster or the car over

25    there?

```
 1    A    I'd say a few minutes.

 2    Q    What did you do then?

 3    A    We took -- the limo bus was on the bridge, and we took the

 4    person from the behind the dumpster or the car and brought them

 5    up there by the bus.

 6    Q    All right.  You just mentioned the limo bus for the first

 7    time.  What is that?  What were you talking about?

 8    A    It was a bus that we was using to travel.

 9    Q    It was another vehicle that the Seventh District was using

10    after the storm?

11    A    Yes.

12    Q    Where did it come from on this day?

13    A    From Chef.

14    Q    Did you see it drive up?

15    A    I don't remember.

16    Q    You just remember it being there?

17    A    Yes.

18    Q    Do you remember who all was in the limo bus?

19    A    Taj McGee and I believe Derrick Williams.

20    Q    Are those, both officers, in the Seventh District?

21    A    Yes.

22    Q    You specifically remember them?

23    A    Yes.

24    Q    Do you know whether anybody else was in the limo bus?

25    A    No.  They had other people there but I don't know how they
```

1    got there.

2    Q    Okay.  So, when you're coming back from the car wash with the

3    kid and you see the limo bus, what do you do?

4    A    That's, I went and brought the person over there.  Sat them

5    town.

6    Q    Did you just leave him there on his own, or did you leave him

7    in the custody of someone?

8    A    I left him in the custody of someone.  There were other

9    officers.

10   Q    Do you know who you left him with?

11   A    I know Derrick and Taj, they were over there.

12   Q    Have you had a chance to see Exhibit 56, which is a 360

13   photograph of the area on the bridge?

14   A    Yes.

15   Q    That's a photograph that moves around?

16   A    Yeah.

17   Q    Would that photograph be helpful in you describing what you

18   did that day?

19   A    Yes.

20        MS. BERNSTEIN:  I'd like to offer Exhibit 56.

21        THE COURT:  Any objection?

22        MR. LONDON:  No objection, Judge.

23        THE COURT:  So ordered, 56 is admitted.

24        (Exhibit Admitted.)

25        MS. BERNSTEIN:  May I have 56 on the screen, please?

1          May I question from here for a moment?

2          THE COURT:  Yes.

3          MS. BERNSTEIN:  Thank you, Your Honor.

4   BY MS. BERNSTEIN:

5   Q    Can you tell us what we're looking at right now?

6   A    The Danziger Bridge.

7   Q    From what direction?

8   A    From Downman.

9   Q    So is this the direction you all initially drove up the

10  bridge?

11  A    Yes.

12  Q    I'm going to turn to the right.  Tell us what we're looking

13  off right now to the right.

14  A    The car wash.

15  Q    Is that the green building?

16  A    Yes.

17  Q    Or green awning or whatever you call that?

18  A    Yes.

19  Q    I'm going to go a little bit further to the right now.  What

20  building are we looking at now?

21  A    It's a gas station.

22  Q    And, as I keep going back, what intersection is that?

23  A    Downman and Chef.

24  Q    Now I've turned and I'm facing back up the bridge where I

25  started; right?

1    A    Yes.

2    Q    And.   When you were running down the bridge, you would be

3    running toward us?

4    A    Yes.

5    Q    All right.   I want you to direct me, tell me which way to

6    turn the camera in order for you to show us where the guy with

7    the shotgun in the baby blue shirt came from; all right?

8    A    All right.   To the left.   Keep going.   One more.   I'd say

9    somewhere up in this area.

10   Q    Okay.   And he was running -- can you draw an arrow the

11   direction he was running?

12   A    Who?

13   Q    The guy with the baby blue shirt with the shotgun.

14   A    He came from over here, and he walked that way.

15   Q    And, for the record, on the photograph, that's coming from

16   the left side of the Danziger Bridge as you're looking up the

17   bridge running to the right into the roadway.

18        When you got down there, when you were chasing the kid

19   and you heard that person in the baby blue shirt shoot two times,

20   was that -- let me ask you, was there still shooting going on on

21   the bridge?

22   A    I'm not sure.

23   Q    Have you seen a videotape of the incident?

24   A    Yes.

25   Q    And have you listened the shots on that tape?

```
 1   A    Yes.

 2   Q    Have you listened to see if you hear any shots --

 3              MR. HESSLER:  Your Honor, I'm going to object.  The

 4   videotape she's referring to does not reflect the entire portion

 5   of the shooting incident.  There's things on there that he hasn't

 6   heard, he couldn't have heard, and the government couldn't have

 7   heard.

 8              MS. BERNSTEIN:  I'm going to ask him just on a

 9   particular part whether he's been able to identify shots that he

10   believes are the shots that he did witness fired by the guy in

11   the baby blue.

12              THE COURT:  Well, I'm going to let him view that part of

13   it so that he can answer one way or the other.

14              But I think the objection, if I understand it, is that

15   the tape starts and stops several times -- it doesn't just start

16   at the beginning and go all the way through.  There are starts

17   and stops in the tape.  I don't think that's disputed.

18              And we are going to play for you the entire tape on an

19   elapsed time, realtime.

20              But, if there's a segment of the tape that you want to

21   show him now, let's go ahead and show him that.  If he can

22   identify it.

23              MS. BERNSTEIN:  Actually, the segment that I'm going to

24   show does not have any starts and stops in it.

25              THE COURT:  Okay.
```

 1          MS. BERNSTEIN:  Let me make sure that that's accurate.

 2          THE COURT:  Okay.

 3          MS. BERNSTEIN:  Yes, okay.  So the section that we're

 4    going to show has no stops and starts in it.

 5          May I have video clip 89, please.

 6          (Videotape played.)

 7          MS. BERNSTEIN:  We're going to need to start this over

 8    with the sound, please.

 9          (Videotape played.)

10          THE WITNESS:  Them two shots right there.

11    BY MS. BERNSTEIN:

12    Q    So, right before we stopped this, there were two shots?

13    A    Yes.

14    Q    What did they sound like to you?

15    A    Shotgun.

16    Q    What about them sounded like a shotgun blast?

17    A    It's the way it sounds.

18    Q    Can you describe it?

19    A    Like boo-call, like a big boom.

20    Q    And, those two booms at the end, how do you think fired those

21    shots?

22    A    The guy with the light blue shirt.

23          MS. BERNSTEIN:  For the record, we stopped the video

24    right before 90955 on the counter there.

25    BY MS. BERNSTEIN:

1   Q   Once you brought the kid back and put him by the limo --

2           MR. LONDON:  I would object as there's been no

3   authentication as that was an accurate time specifically on that,

4   Judge.  We're relying on the tape.  There's been nobody to

5   testify to that, no stipulations as to the accuracy of that time

6   stamp.

7           THE COURT:  I'd agree with that.  However, I think, as I

8   understand it, counsel is just giving a marking.  Whether that's

9   a correct time or not, it's a marking on the video such that it

10  could be referenced.

11          MS. BERNSTEIN:  Correct, Your Honor.  It was only

12  offered as a reference point.

13          THE COURT:  Okay.

14  BY MS. BERNSTEIN:

15  Q   Once you brought the kid back to the limo bus and dropped him

16  off, what did you do?

17  A   I went and walked towards the walkway of the bridge, which

18  would be the right.

19  Q   Did you go back up the bridge?

20  A   Yes.

21  Q   What did you see?

22  A   I saw a black male laying in the walkway with blood all over

23  -- like around him.

24  Q   I'm sorry, can you say that again?  Tell us what he looked

25  like.

1   A   He was laying down on the ground, bleeding.

2   Q   Could you tell how badly wounded he was?

3   A   Bad, yes.

4   Q   Can you describe it?

5   A   When the paramedics came, they went to go work on him, and

6   they touched one side of his chest, and blood started squirting

7   out another side of his chest.

8   Q   What was your reaction when you saw that guy?

9   A   Disgusted, like upset.

10  Q   Upset how?

11  A   Mentally and physically, like it just -- nauseous.

12  Q   How focused were you on that guy?

13  A   Focused.

14  Q   And you saw the ambulance crew trying to treat him?

15  A   Yes.

16  Q   How long had you been an officer?

17  A   About two years.

18  Q   Had you ever seen anything like that before?

19  A   No.

20  Q   Did anybody ask you whether you were okay?

21  A   Yes.

22  Q   Who was that?

23  A   Officer Derrick Williams.

24  Q   Can you tell us about that conversation.

25  A   He saw me, I was like kind of like crunched over with like

```
 1   with my hands on my knees, and he came and asked me if I was all
 2   right.  And I said:  Yeah.  And then he asked me what happened.
 3            MR. LONDON:  Judge, I'll withdraw the objection at this
 4   point.  But we're talking about a conversation he's had with
 5   someone else.
 6            THE COURT:  Yeah, okay.
 7   BY MS. BERNSTEIN:
 8   Q   You can go ahead.
 9   A   And he asked me what happened.  I told him:  I don't know.
10   And he asked if they had any guns.
11            MR. LONDON:  Now I'm going to object, Judge, as to what
12   Officer Williams may or may not have said.
13            THE COURT:  I'll sustain it.
14   BY MS. BERNSTEIN:
15   Q   How long did you stay on the bridge that day?
16   A   An hour, two hours.
17   Q   Are you guesstimating?
18   A   Yes.
19   Q   Did you ever go over to the west side of the bridge, or did
20   you stay on the east side?
21   A   Stayed on the east side.
22   Q   While you were there, what were you doing?
23   A   On the east side?
24   Q   Um-hum.
25   A   Staying around.
```

1    Q    Did anybody tell you to collect any evidence?

2    A    No.

3    Q    Were other officers there with you?

4    A    Yes.

5    Q    How many, can you estimate?

6    A    I would say at least eight.

7    Q    Were they also just standing around?

8    A    Yes.

9    Q    When you left the bridge, where did you go?

10   A    Back to the Crystal Palace.

11   Q    Back at the Crystal Palace, did you see the people who had

12   been -- who had originally started out with you in the Budget

13   truck?

14   A    Yes.

15   Q    What did you see, what happened?

16   A    People walked in, people standing around throughout the whole

17   Crystal Palace.  And Sergeant Kaufman like stood up by a table

18   and asked:  Whoever fired their weapon, come over here.

19   Q    Did you go over there?

20   A    No.

21   Q    Why?

22   A    I never fired my weapon.

23   Q    When he said:  If you fired your weapon, come over here,

24   where was over here?

25   A    To the right by the table.

1    Q    Who went with him over to the table?

2    A    Hunter, Gisevius, Bowen, Hills, Faulcon, Barrios, Villavaso.

3    Q    What happened next?

4    A    I know they left.  And didn't return until nighttime.

5    Q    Was that later that they left, or did they go to the table

6    first?

7    A    They was at the table first.

8    Q    Did you go to the table?

9    A    No.

10   Q    What did you do?

11   A    Just stood around the Crystal Palace, called my family.

12   Q    Now, at that point, did you -- who did you understand to be

13   in charge of the investigation?

14   A    Sergeant Kaufman.

15   Q    How did you understand that?

16   A    Because the policy of the police department, anything

17   involves the police officer, rank had to do with the report.  And

18   because that's Sergeant Kaufman's experience as a detective.

19   Q    Did Kaufman ever take a statement from you?

20   A    No.

21   Q    Did you ever track him down and tell him you wanted to give a

22   statement?

23   A    No.

24   Q    Why not?

25   A    Because I wasn't -- when he first called anybody to the

```
 1   table, it was just the people that shot their weapons.
 2   Q    Now, after that first day back at the Crystal Palace when you
 3   saw Kaufman call the shooters together, did you ever see those
 4   Danziger shooters gather together again?
 5   A    Yes.
 6   Q    Where was that?
 7   A    At the Seventh District Police Station.
 8   Q    When you say the Seventh District station, is that the
 9   Crystal Palace, or your real station?
10   A    The real station, but we had temporary trailers.
11   Q    Do you know when it was that you moved back from the Crystal
12   Palace to the trailers at the old station?
13   A    No.
14   Q    So this was some time later?
15   A    Yes.
16   Q    Tell us what you saw at that point.
17   A    They were huddled, just the seven guys I just named.  They
18   were all huddled around Sergeant Bowen with reports in their
19   hand.  And I don't know if somebody walked up, or they just was
20   finished talking.  And, when they broke up, you know, I asked
21   Hills if I could see the report.  And Hills told me:  No.
22   Q    Why did you talk to Hills?  Why did you ask him?
23   A    Because he walked right by me.
24   Q    What was your relationship with Hills?
25   A    It was pretty good.  We graduated from the academy together.
```

1   Q    So you all started at the NOPD together?

2   A    Yes.

3   Q    Going back to the timing of when this happened, you said it

4   was some time after the Seventh District moved back to the

5   original station; right?

6   A    Yes.

7   Q    And you had trailers there?

8   A    Yes.

9   Q    When did you leave NOPD?

10  A    September of '06.

11  Q    So you left just about one year after the storm?

12  A    Yeah.

13  Q    So, whenever this conversation happened, it would be between

14  when the Seventh District moved back and September '06; is that

15  right?

16  A    Yes.

17  Q    All right.  So, your conversation with Hills, you said:  I

18  asked him to see the report.  And what did he say?

19  A    Told me:  No.

20  Q    What did you make of that?

21  A    I was like, stunned.  Why wouldn't he let me see the report?

22  It's a public record.  You know, every police officers, we always

23  read over each other's reports.

24  Q    So what did you make of that?

25            MR. LONDON:  Objection, calls for speculation on the

```
 1   part of the witness, Judge.
 2           MS. BERNSTEIN:  It's going to be relevant to what he
 3   does and doesn't do.
 4           THE COURT:  I think if you rephrase it.  We don't want
 5   him to speculate about what someone else did.  That's the
 6   problem, is the question could possibly elicit that response.
 7           MS. BERNSTEIN:  Okay.
 8   BY MS. BERNSTEIN:
 9   Q   Without asking you what Hills meant, can you tell us how you
10   interpreted what you heard?
11           MR. LONDON:  Judge, that's pure speculation at this
12   point, how he interpreted what Officer Hills' actions were.  She
13   could have asked Officer Hills that question.
14           THE COURT:  I'm going to let him go ahead and answer it.
15   I think that it's been asked in a way that doesn't suggest
16   anything that Hills meant by it, and I'll instruct the witness
17   not to speculate as to what Officer Hills meant.
18           Strictly your appreciation.  He's already testified that
19   -- well, his prior answer I think lays the foundation for the
20   question that's been asked.  So it's limited to your feeling at
21   the time.
22           THE WITNESS:  All right.
23           I felt that something was trying to be hidden.
24   BY MS. BERNSTEIN:
25   Q   Is that something was trying to be hidden?
```

1    A    Yes.

2    Q    At that point did you want to be involved in the

3    investigation?

4    A    No.

5    Q    Did anybody from NOPD ever take a statement from you?

6    A    No.

7    Q    Now, at some point after all this, did you learn that the

8    district attorney here in New Orleans was investigating?

9    A    Yes.

10   Q    Did anybody from the DA's office ever contact you?

11   A    No.

12   Q    As far as you know, did investigators with the DA's office

13   even know you were in the Budget truck?

14         MR. LONDON:  Objection.

15         THE COURT:  I'm going to sustain.  You're asking him to

16   testify as to what they knew.  I don't think he's capable of

17   doing that.

18   BY MS. BERNSTEIN:

19   Q    When nobody contacted you from the DA's Office, did you call

20   anyone up and say:  Hey, I want to give a statement?

21   A    No.

22   Q    Why not?

23   A    Because I thought I had nothing to do with it because of the

24   fact when Sergeant Kaufman asked me, he started the version, he

25   only asked for the people that fired their weapon.

1   Q    During this state investigation, did anyone from the Budget

2   truck contact you?

3   A    Yes.

4   Q    Who was that?

5   A    Heather Gore.

6   Q    Who is she?

7   A    Police officer, white female.

8   Q    The one who was in the truck?

9   A    Yes.

10   Q    And who is it she was close to?

11   A    Sergeant Gisevius.

12   Q    Do you have any independent relationship with Heather Gore?

13   A    No.  Just business.

14   Q    She wasn't a friend?

15   A    A friend, not a hang-out friend when I was off work.

16   Q    Did you ever socialize with her?

17   A    At work.

18   Q    Tell us about that call.

19   A    She called me --

20        MR. LONDON:  Objection, judge.  At this point, may we

21   approach?

22        THE COURT:  Yes.

23        (Sidebar conference.  Jury not present.)

24        MR. LONDON:  Judge, she's asking for pure hearsay at

25   this point, and she's going into speculation, because, this guy's

 1    grand jury testimony, she had him speculate that he thought

 2    Heather Gore was try to get him to lie.  That's pure speculation

 3    and it's hearsay.

 4         MS. BERNSTEIN:  It's not hearsay at all.  It's not being

 5    offer for the truth of the matter asserted.  It's being offered

 6    for the fact that she did call him.  He is a witness here who can

 7    be crossed on whether the call actually happened.  And, again,

 8    I'll be very careful to ask the question not did what Heather

 9    Gore meant but how do you interpret.

10         MR. LONDON:  What Heather Gore said, Judge.

11         MS. BERNSTEIN:  What she is going to say is she called

12    him up --

13         MR. LONDON:  She can call Heather Gore and ask about Ms.

14    Gore's comment, Judge.  And it's --

15         THE COURT:  You've already established that there was a

16    call that was made.  Get him to testify as to what she said, I

17    think we're getting into hearsay here and we're getting into

18    speculation.

19         MS. BERNSTEIN:  Except I'm fairly confident, Your Honor,

20    that he is going to be crossed on the fact that he didn't reach

21    out to the DA's office and that he didn't reach out to the FBI

22    and say that he had relevant information.  That's been crossed on

23    the other witnesses in similar situations.

24         MR. LONDON:  We are doing preemptory redirect now?  I'm

25    sorry.

MS. BERNSTEIN: About what he said about why he didn't want a piece of this investigation I think is highly irrelevant.

MR. MECHE: Relevancy and hearsay are two different objections. She's arguing relevancy, we're talking hearsay.

THE COURT: I'm going to sustain the objection preemptively; all right? If it comes up on cross, then the door is open. Okay? You've established that Ms. Gore made the call to him, which he fielded during the course of the grand jury examination, grand jury session.

MS. BERNSTEIN: So, to wrap it all up, I'll ask whether he normally heard from Gore, but I won't ask the content of it.

THE COURT: That's fine.

(Sidebar conference. Jury now present.)

BY MS. BERNSTEIN:

Q Mr. Bryan, the last question before the break was about a call you got from the Heather Gore. Did you have a relationship with her where she would normally call you on your cellphone?

A No.

MS. BERNSTEIN: May I have on the screen government's Exhibit 60, please.

BY MS. BERNSTEIN:

Q I'm jumping back to something I asked you earlier. Do you see in -- this is a grainy shot, but do you see the limo bus you were talking about earlier?

A Yes.

1    Q   Can you circle it?

2    A   (Witness complies.)

3    Q   Thank you.

4        I asked you about the DA's investigation.  At some point

5    after that, did you learn that the FBI was investigating?

6    A   Yes.

7    Q   Who was the first person to ever question you officially

8    about this incident?

9    A   Agent Bezak.

10   Q   When was that, do you know?

11   A   About two years ago.

12   Q   So that was about four years after the incident?

13   A   Yeah.

14   Q   Where did that interview happen?

15   A   At my police station at Plaquemines.

16   Q   Can you tell us how that interview came about.

17   A   He came to my house first, knocked on the door.  My wife

18   answered.  I wasn't home.  And my wife gave him my cellphone

19   number, and he contacted me.

20   Q   Did he make an appointment, or did he just show up at your

21   house?

22   A   He just showed up.

23   Q   How far away is Plaquemines from New Orleans?

24   A   Far.

25   Q   Can you give us an estimate, how long does it take to drive?

1    A    About 35 minutes.  No.  Probably about 45, depending on where

2    you're going.

3    Q    So what happened after he showed up at your house?

4    A    He called me on the phone, and told him that I'll meet him at

5    the station.

6    Q    Were you surprised that someone had tracked you down?

7    A    Yeah.

8    Q    Why?

9    A    Because I thought the investigation was just pertaining to

10   the ones that fired their weapon.

11   Q    Did you meet with Agent Bezak?

12   A    Yes.

13   Q    Did you talk to him voluntarily?

14   A    Yes.

15   Q    Did you tell hem everything you've told us?

16   A    That day?

17   Q    Yeah.

18   A    No.

19   Q    Did you tell him you were in the Budget truck?

20   A    Yes.

21   Q    What didn't you tell him?

22   A    That Ignatius Hills fired his weapon and struck the person.

23   Q    Did you tell him that you had chased somebody who was running

24   on that first day when you talked to him?

25   A    I don't remember.

1        MS. BERNSTEIN:  May I approach, Your Honor?

2        THE COURT:  Yes.

3    BY MS. BERNSTEIN:

4    Q   I'm going to hand you a report that Agent Bezak wrote of the

5    interview, and I'm going to ask you to read a paragraph to

6    yourself but not say anything out loud.  And, when you're done,

7    just let me know.

8        (Pause in Proceedings.)

9    BY MS. BERNSTEIN:

10   Q   Does reading that help you remember what you told Agent Bezak

11   on that first day when you met with him?

12   A   Yes.

13   Q   Did you tell him that you chased the kid?

14   A   No.

15   Q   Did you tell him anything about the kid running?

16   A   No.

17   Q   And you said you didn't tell him that Hills shot?

18   A   No.

19   Q   Why didn't you tell him those things?

20   A   Because I was scared, nervous and ashamed for what I've done.

21   Q   What were you ashamed of?

22   A   Of my actions of striking the person.

23   Q   How does your shame about striking the kid keep you from

24   telling him that Hills shot?

25   A   Because I thought that if I told about Hills then that would

1    have led to me of the thing I did.

2    Q    And did you actually tell the FBI that you heard a bang which

3    sounded like a door slamming or someone knocking on the truck?

4    A    Yes.

5    Q    What was the bang that you heard?  In fact, what was the bang

6    that you heard?

7    A    He was firing his weapon.

8    Q    You didn't tell the agent that?

9    A    No.

10    Q    Did you eventually tell him the rest?

11    A    Yes.

12    Q    How did that come about, why did you tell him the rest?

13    A    Because I felt ashamed for what I have done, and me telling

14    the truth would be the right thing to do.  It was affecting me

15    mentally.

16    Q    Did you go into the federal grand jury?

17    A    Yes.

18    Q    Did you tell the grand jury, the federal grand jury, about

19    Hills shooting?

20    A    Yes.

21    Q    Did you tell about you hitting the kid?

22    A    Yes.

23    Q    Before the FBI tracked you down two years ago, had anyone

24    tried to get the truth from you about what happened on the

25    bridge?

1    A    No.

2    Q    I want to ask you some overall questions about that day on

3    the bridge.  Did you ever hear the truck get hit by fire?

4    A    No.

5    Q    Did you ever hear anybody announce police?

6    A    No.

7    Q    Did you hear anybody give any other commands?

8    A    No.

9         MR. LONDON:  Judge, objection asked and answered.  She's

10   gone over all of these questions.

11        THE COURT:  I think we asked these questions of this

12   witness.

13   BY MS. BERNSTEIN:

14   Q    Did you see any weapons on the bridge that did not belong to

15   police officers?

16   A    No.

17        MS. BERNSTEIN:  Nothing further, Your Honor.

18        THE COURT:  All right.  Thank you.

19        All right, we're going to take a short break.  It's

20   about 10:30.  At 10:45, we will reenter the courtroom.

21        Sir, if you could be up here seated at that time, we'll

22   begin with cross examination of this witness.

23        (Proceedings in recess.)

24        THE COURT:  Mr. Bryan, you are still under oath.

25        Sir, did you discuss your testimony with anyone during

1    the break?

2              THE WITNESS:  No.

3              THE COURT:  All right, counsel, we're going to begin

4    cross examination.  Mr. Hessler, it looks likes you're going to

5    go first; is that correct?

6              MR. HESSLER:  That's correct, Your Honor.

7              THE COURT:  You may begin.

8                        CROSS EXAMINATION

9    BY MR. HESSLER:

10   Q   Morning, Officer Bryan.  My name is Eric Hessler.  I

11   represent Robert Gisevius.

12   A   Good morning.

13   Q   Officer Bryan, you stated that you were at the Crystal Palace

14   when Sergeant Gisevius came to get you; correct?

15   A   Yes.

16   Q   And what did he tell you?

17   A   That officers were being fired at on the bridge.

18   Q   Did he seem like he meant it?

19   A   Adrenaline pumping, he was pumped up, like.

20   Q   Did you believe that, that officers were being shot at?

21   A   There's a possibility.  A lot going on after the storm.

22   Q   So he certainly thought that was in the realm of possibility

23   at that time?

24   A   Yes.

25   Q   It's actually in the realm of possibility at any time; isn't

1    it?

2    A    Um-hum.

3    Q    Did this cause you any concern?

4    A    Concern?

5    Q    Just in general, did your adrenaline begin pumping also?

6    A    Yeah.

7    Q    Now, you stated that you were armed with your .40 caliber

8    Glock 22; correct?

9    A    Yes.

10   Q    You did have access to other weapons; correct?

11   A    No.

12   Q    You didn't have any access to long weapons?

13   A    No.

14   Q    Why not?

15   A    Because some of them -- like Villavaso brought his own.

16   Q    You didn't have access to a shotgun?

17   A    No.

18   Q    Now, did you make any plans when you were -- did anybody tell

19   you anything other than to get on the truck and let's go?

20   A    No.

21   Q    What were you thinking en route to that scene?

22   A    What's going on up there on the bridge.

23   Q    Okay.  Why would you be thinking what's going on on the

24   bridge?

25   A    Like think of a game plan.

1   Q   Okay.

2   A   It was just all of the sudden.  Usually, when you get

3   dispatched to calls, it's like:  All right, I'm going to do this

4   when I get there.

5   Q   Well, it helps to assess what's going on?  I mean, assess

6   what you're going to do; right?  If you have a game plan or if

7   you know -- if you have information and you can -- it's easy to

8   make a plan; isn't that true?

9   A   Yes.

10  Q   And did you have any information at all other than what

11  Sergeant Gisevius told you?

12  A   No.

13  Q   Did you have a radio with you?

14  A   Yes.

15  Q   Did you have it on?

16  A   Yes.

17  Q   Do you know why you might not have heard the calls for

18  assistance coming from the bridge?

19  A   Because I had it down.  Turned down.

20  Q   Now, en route to -- one of things you get information from is

21  that radio; right?

22  A   Yes.

23  Q   And you know you need information in order to properly assess

24  the scene or more properly assess a situation; right?

25  A   Yes.

1    Q    All right.  So I guess you turned your radio up?

2    A    I don't remember.

3    Q    All right.  Was it noisy in the back of the truck?

4    A    It was a rough ride, loud truck.

5    Q    Did that hamper your ability to hear the radio or gunshots or

6    things hitting the truck or anything else?

7    A    The radio, yeah.  But shots, you know.  The truck was

8    stopped.

9    Q    Okay.  But, prior to that, if you were driving by and

10   somebody was a couple hundred yards a way and shot a weapon,

11   would you be able to hear it, do you think?

12   A    Possibility.

13   Q    Was there much talk amongst the police officers in the back

14   of the truck?

15   A    I don't remember.

16   Q    Did you have a description of the perpetrators?

17   A    I don't know.

18   Q    Did you have a direction that the perpetrators were last

19   seen?

20   A    No.  I don't know.

21   Q    Do you know -- did you ever hear about officers possibly

22   being down?

23   A    No.

24   Q    Do you know how you ended up on the Danziger Bridge?

25   A    How?

1  Q    Yeah.

2  A    With the Budget truck.

3  Q    Okay.  But, I mean, why that whoever was driving chose to go

4  to the Danziger Bridge, as opposed to the I-10 Bridge or any

5  other position or any other place?

6  A    You asking me?

7  Q    Yes, sir, I am.

8  A    Are you asking me why he went to the bridge?

9  Q    If you know.

10  A    No.  As far as I know, I was told by Sergeant Gisevius to get

11  in the back of the truck, officers were being fired at by the

12  bridge.

13  Q    And Ms. Bernstein pointed out that you had no way of seeing

14  in front of you or what was -- your future was or what was coming

15  up the road; correct?

16  A    Correct.

17  Q    And could you see what passed you by?

18  A    Yes.

19  Q    And all that -- would be fair to say that all that told you

20  was a general area that you were in?

21  A    I don't understand.

22  Q    As you passed certain landmarks in the Seventh District, you

23  could tell the general area that you were in; right?

24  A    Yes.

25  Q    But you couldn't see if there were armed subjects ahead of

1    you?

2    A    No.

3    Q    Did that concern you?

4    A    Yes.

5    Q    Now, when you neared the bridge, did anybody say get ready or

6    tell you heads-up or anything like that?

7    A    No.

8    Q    What was your first idea that something was going on, first

9    clue that something was going on?

10   A    Like from when we was at the Crystal Palace?

11   Q    No.  From when you get on the bridge, when do you think that

12   oh, shoot, we might be in trouble?

13   A    When the truck slammed on its brakes and gunfire erupted.

14   Q    And I said:  Oh, shoot, we might be in trouble, would that be

15   some kind of an understatement of your thoughts, or is that

16   accurate?

17   A    Like going through my head?

18   Q    Yeah.

19   A    Like, shoot, yeah, like gunfire, like what the heck's going

20   on.

21   Q    You went through NOPD training and academy; correct?

22   A    Yes.

23   Q    You were trained not to fire warning shots; correct?

24   A    Yes.

25   Q    You were trained not to fire on persons that you didn't

1   believe were a threat to your life; correct?

2   A   Yes.

3   Q   Did you believe somebody had fired -- an NOPD had fired

4   warning shots?

5   A   I didn't know where the shooting was coming from.

6   Q   But you knew that shouldn't be the case?

7   A   Which shouldn't be the case?

8   Q   Firing warning shots.

9   A   No.  That's against policy.

10  Q   Okay.  As is shooting at something that you don't believe to

11  be a threat to your life?

12  A   Yes.

13  Q   Did you feel your life was in danger at the time that that

14  truck slammed on its brakes and gunfire erupted?

15  A   Yes.

16  Q   And what happened then?  Were you scared?

17  A   Yeah.

18  Q   Did you get out of the truck?

19  A   After the gunfire, yes.

20  Q   Why didn't you get out during the gunfire?

21  A   Because it was my first instinct was to duck down.

22  Q   Were you laying on the ground, or were you ducked down?

23  A   I was laying on the ground on my knees at the door.

24  Q   Could you show the jury how you were -- what position were

25  you in, please?

```
 1              THE COURT:  You can step down.

 2              THE WITNESS:  Right here?

 3              THE COURT:  Why don't you do it over here so everyone

 4   can see it.

 5              If you have to stand up in the jury box, you can.

 6              MR. HESSLER:  Let the record reflect that he's on his

 7   hands and knees, elbows on the ground and hands on his head.

 8   BY MR. HESSLER:

 9   Q    You didn't have your gun in your hand; did you, Officer?

10   A    In the back of the truck?

11   Q    Yes, sir.

12   A    No.

13   Q    Why not?

14   A    Because I was crouched down.

15   Q    All right.  Did it happen too quickly for you to draw your

16   gun?

17   A    Yeah.  As soon as the gunfire erupted, my first instinct was

18   to croutch over.

19   Q    To protect your life?

20   A    Yes.

21   Q    And this is despite the fact that you didn't, to your

22   knowledge, you didn't hear bullets hitting the truck?

23   A    No.

24   Q    You didn't see pin holes of light come through where bullets

25   had penetrated the skin of the truck?
```

1    A    No.

2    Q    But, nevertheless, you were scared enough to get down in that

3    position and hope like heck you didn't get struck by a bullet?

4    A    Yes.

5    Q    And you didn't believe that anybody from the NOPD would fire

6    upon you; did you?

7    A    I didn't know who was shooting.

8    Q    But you didn't think that somebody in front of that truck

9    would shoot at you?

10   A    I didn't know where the shots were coming from.

11   Q    But your actions suggest to me that you thought you stood a

12   strong possibility of getting struck by one of those gunshots;

13   would that be accurate?

14   A    Yes.  I was in an enclosed area with no cover whatsoever.

15   Q    Now, how long were you in that position?

16   A    I'm not sure.

17   Q    All right.  So what happened when you finally looked up?

18   A    Well, Hills -- I was still in a position when Officer Hills

19   fired his weapon.  And that's when I looked up and asked him what

20   he was doing.

21   Q    Okay.  And what did Hills say to you?

22   A    I popped a round at the little N word, or I tried to pop the

23   little N word.

24   Q    Now, you've talked to the government at length; correct?

25   A    What you say?

1   Q    You've talked to the government several times?

2   A    Yes.

3   Q    You've given not once but two grand jury appearances where

4   you've testified --

5   A    Yes.

6   Q    -- under oath.

7        Did you ever tell them that, what you just told the jury

8   today?

9   A    What?

10  Q    That Hills said he shot at the N word.

11  A    Yes, I told him.

12  Q    You told them?

13  A    Yeah.

14  Q    In the grand jury, you told them that?

15  A    Yeah.

16  Q    How long have you known Ignatius Hills?

17  A    Since the academy in '03.

18  Q    You went to the academy with him?

19  A    Yes.

20  Q    And Ignatius Hills is in fact an African-American?

21  A    Yes.

22  Q    Did he appear that he was -- Hills was scared?

23  A    No.

24  Q    Just nonchalantly shot at a guy?

25  A    Yeah, he shot him.  He had his hand up, the gun still pointed

1    toward the back of the truck.  And I was like:  What you do?  He

2    was like:  I tried to pop a round in the little N word.  It was

3    not like:  Man, I was scared for my life, or nothing like that.

4    Q    Now, do you recall being asked or do you recall saying:  Why

5    the F you did that?  Do you recall telling -- answering that

6    question in the grand jury?

7    A    Yes.

8    Q    Okay.  Do you recall being asked:  And what did Hills say

9    when you asked that?

10    A    I don't remember.

11           MR. HESSLER:  Your Honor, may I approach?

12           THE COURT:  Yes.

13           (Pause in Proceedings.)

14    BY MR. HESSLER:

15    Q    Have you read that, sir?

16    A    No, not yet.

17           (Pause in Proceedings.)

18           THE WITNESS:  Yes.

19    BY MR. HESSLER:

20    Q    And one of the government attorneys in the grand jury asked

21    you what did Hills say after you said:  Why the F did you do

22    that; correct?

23    A    Yes.

24    Q    All right.  And that's what we're talking about now; right?

25    A    Yes.

1  Q   What did you tell them in the grand jury under oath that

2  Hills said?

3  A   That he was shooting in the air.

4  Q   Well, there's more.

5  A   That he --

6       THE COURT:  I dont' know if he was close to the

7  microphone.

8       Did you say shooting in the air?

9       THE WITNESS:  Yeah.

10      THE COURT:  Okay.

11 BY MR. HESSLER:

12 A   Shooting in the air at the blank.  They had a person running

13 on the side of the bridge and the blank like the little walkway.

14 Q   And the blank is not -- the blank is just a space, a pause?

15 A   A space.

16 Q   It's not --

17      THE COURT:  You might have to pull that, when you're

18 looking at the paper, you might have to pull that microphone a

19 little closer.  Because, when you turn your head, it's not

20 picking it up as clear.

21      THE WITNESS:  All right.

22      THE COURT:  Better.

23 BY MR. HESSLER:

24 Q   You don't see the N word in there, you don't see anything

25 about what you said that you said today; do you?

1    A    No.  No.

2    Q    So you didn't tell the grand jury that; did you?

3    A    According to that, no.

4    Q    It's not a blank, like there's a blank that the word begins.

5    It's a coma mark, like a dash, like a pause; right?

6    A    I understand what you're saying.

7    Q    Now, prior to getting out of the van, did you turn your

8    attention to something else, as opposed to getting out of the

9    van?

10   A    What van?

11   Q    The van you were in.

12   A    I wasn't in a van.

13   Q    The moving truck.  I'm sorry.

14   A    The truck.  When the guy was running down the walkway, you

15   know, Hills shot his weapon, and he started running again, and I

16   chased after him.

17   Q    All right.  Did you ever have to help an officer get --

18   somehow got stuck in the thing?

19   A    Yes.

20   Q    Is that prior to or during or after Hills fired his weapon?

21   A    I don't remember.

22   Q    Did you see the gentleman that Hills fired at?

23   A    Yes.

24   Q    Okay.  Could you describe him to the jury.

25   A    It was an African-American male, skinny.  He was too far away

1    to get like an approximate height.

2    Q    Short hair, long hair?

3    A    I don't remember.

4    Q    Do you recall what he was wearing?

5    A    No.

6    Q    All right.  Person you apprehended and spent some time with

7    behind the dumpster, could you tell me what that person was

8    wearing?

9    A    No.  It's the same person.

10   Q    Now, where were you when you -- you jumped out and you chased

11   this guy.  Eventually, you jump out and you chased this guy;

12   right?

13   A    Yes.

14   Q    Was there any gunfire going on then?

15   A    I don't remember.

16   Q    And approximately how far away was this person you were

17   chasing from the back of the truck when you exited?

18   A    A little ways away.  A couple yards.

19   Q    Did you expect to overcome him and chase him down, or what

20   was your intentions?

21   A    No.  Just give chase.

22   Q    Did you expect somebody else might -- somebody else that was

23   arriving might able to apprehend him?

24   A    Yes.

25   Q    And there were police officers I guess responding to this

1  call from -- almost anybody that could would respond to this type

2  of call; would you agree with that?

3  A    Yeah.

4  Q    Certainly, there were officers that did respond to this call

5  that you learned were responding; correct?

6  A    Yeah.  When we got there, yes.

7  Q    Because you saw other police officers running around?

8  A    Yes.

9  Q    In fact, you saw a police officer take at least two shots out

10  there?

11  A    Yes.

12  Q    Presumably at this kid, this guy you were chasing?

13  A    Yes.

14  Q    And you saw a bunch of people running around with long guns,

15  other than shotguns?

16  A    Yes.

17  Q    And you saw them on both the right-hand side of the bridge

18  and the left-hand side of the bridge; didn't you?

19  A    From, if you're facing from where the truck was, facing down

20  toward them?

21  Q    Um-hum.

22  A    Yeah.  They had the people on the bridge, the ones that got

23  out, they went towards the west side.  And the -- and a guy came

24  with the shotgun on the east side over to the right.

25  Q    Okay.

```
1              MR. HESSLER:  Could you put up Exhibit 71, please.

2    BY MR. HESSLER:

3    Q   Now, I'm going to put a little mark here.  You tell me if I'm

4    wrong.  You say the guy with the shotgun was up around this area;

5    is that correct?  Generally?  And if not correct --

6    A   No.  You got to zoom in more for me to get the area.

7    Q   I don't have that ability.  I don't know if the government

8    does.

9              Does that help you?  That's the general area you saw him

10   when he was firing his weapon?

11   A   Yes.

12   Q   Could you draw a line in the direction that he was firing his

13   weapon.

14   A   That way.

15   Q   Let me do this.  Would it have been in that direction?  Would

16   everybody over this way been firing that way?

17   A   Yeah.  He would be over on the side with that car wash.

18   Q   So he's firing across the bridge?

19   A   Yes.

20   Q   Across the lanes of traffic?

21   A   Yes.

22   Q   In the direction that that arrow is pointing?

23   A   Yes, straight across.

24   Q   All right.  Now, if you reduce that -- keep that stuff there.

25   And he fired at least twice?
```

1    A    Yes.

2    Q    The government asked you if ever saw anybody in this area

3    with a long rifle; correct?

4    A    They asked me if I seen anybody over there.

5    Q    And --

6    A    Had I seen any cop or civilian.  No.

7    Q    All right.  Do you recall seeing -- all right.  Let me ask

8    you this.  The guy on the left-hand side and the left-hand side

9    -- I'll say the guy with the shotgun, what was his description?

10   A    Light skin, black male.

11         MS. BERNSTEIN:  Just for the record, can we make clear

12   left-hand side up the bridge or down the bridge, so the record is

13   clear.

14         THE COURT:  Right.  Mr. Hessler, you're talking about --

15         MR. HESSLER:  On Exhibit 71, we're looking eastbound.

16         THE COURT:  Right.  That's my understanding.

17   BY MR. HESSLER:

18   Q    On the right-hand side of that picture, looking eastbound, is

19   where the police officer with the shotgun had fired from;

20   correct?

21   A    Yes.

22   Q    What was he wearing?

23   A    I don't know what kind of pants, but he did have on a baby

24   blue NOPD uniform.

25   Q    Okay.  Was it a black male?

1    A    Yes.

2    Q    Light skinned, or dark skinned?

3    A    Light skinned.

4    Q    Have glasses on?

5    A    I don't remember.

6    Q    Okay.  Now, you saw an officer on the left-hand side, which

7    would be obviously sitting from the right-hand side --

8         MS. BERNSTEIN:  Objection, that mischaracterizes his

9    testimony.

10        MR. HESSLER:  No, it doesn't.

11        MS. BERNSTEIN:  He said he didn't see an officer.

12   BY MR. HESSLER:

13   Q    Did you ever see an officer on the left-hand side carrying a

14   long rifle?

15   A    On this side?

16   Q    Yes, sir.

17   A    No, I never seen anybody.

18        MR. HESSLER:  Your Honor, may I approach.

19        THE COURT:  Yes.

20        And, for the record, Mr. Hessler, you're going to have

21   to keep pointing out for the record on Exhibit 71, the witness

22   has just marked the grassy area on the left-hand side of that

23   photo.  So you can go ahead and direct him to it --

24        MS. BERNSTEIN:  May we approach a second, Your Honor?

25        MR. HESSLER:  I've got one more question then.

BY MR. HESSLER:

Q   Do you know who the officer on the -- looking at the exhibit, do you know the name of the officer who fired the shotgun?

A   The one that came from this side?

Q   Yes, sir.

A   No, I don't remember.

MS. BERNSTEIN:  I don't think we need to approach, Your Honor.

THE COURT:  Okay.  I'm here if you need me.  But I'll wait if you can work it out.

MR. HESSLER:  I think we're going to be okay.

BY MR. HESSLER:

Q   So your testimony today is there was never an officer on the left-hand side of this picture carrying a long rifle?

A   Talking about this side?

Q   Yes, sir, I am.

A   I don't recall ever seeing anybody.

MR. HESSLER:  Your Honor, may I approach?

THE COURT:  Yes.

(Pause in Proceedings.)

BY MR. HESSLER:

Q   Now, you've read your testimony from prior grand jury testimony?

A   Yes.

Q   That's a federal grand jury; correct?

1  A    Yes.

2  Q    Do you, in that testimony, do you identify an officer on that

3  side of the bridge?

4  A    On this side?

5  Q    Yeah.

6  A    What is this side considered, the left or the right?

7  Q    As we're looking at it, it's considered the left side.

8  A    Yeah.

9         (Pause in Proceedings.)

10  BY MR. HESSLER:

11  Q    Let's do this.  You're talking about an officer on the right

12  side and the left side; correct?

13  A    According to this, yeah.

14  Q    And there are distinctly two different people, because you

15  can identify one of the officers; right?

16  A    Yes.

17  Q    You can't identify the guy in that testimony as described

18  differently, described as the right side, but in that testimony

19  the guy on the right side is the one that shot the shotgun;

20  correct?

21  A    From this picture, it's the right side he came from.

22  Q    That's the guy that shot?

23  A    Yeah.

24  Q    From your testimony, who would have been the officer in that

25  area?

```
 1    A    On the left side?  In the grass?

 2    Q    Yes.

 3    A    I don't recall seeing anybody over there.

 4    Q    And, your grand jury, who do you say is on that side?

 5         MS. BERNSTEIN:  Objection, he has not established that

 6    he's talking about that side.

 7         THE WITNESS:  I don't know which way I was looking at

 8    the bridge.

 9         THE COURT:  Wait.  Let me back up a little bit because

10    we have an objection here.  I think we need to be clear if

11    there's a different configuration that is presented at the time

12    he gave the testimony.  I think we need to make the distinction.

13    Now, you did ask the question about the two individuals.  And

14    he's already talked about one who was on the right side of this

15    Exhibit 71.  So let's -- I'm not sure that, when he's testifying

16    there, he's looking at the picture that we're all looking at.  So

17    you need to make that clear.  Let's make it clear.  If he's

18    talking about two people, then we need to ask him about the

19    second one, with or without the benefit of this picture that

20    we're now looking at in Exhibit 71.  So let's back up a little

21    bit.

22    BY MR. HESSLER:

23    Q    On that same page, going up to -- you're on page 24, sir?

24    A    Yes.

25    Q    They ask you about to describe an officer who came up from
```

```
 1    the left-hand side; correct?  On line 5.

 2    A    Yes.

 3    Q    And you described him as a light skinned black male, bald

 4    headed, maybe with glasses; right?

 5    A    Yes.

 6    Q    Is that the gentleman that fired the gunshot?

 7    A    The light skinned male, yes.

 8    Q    Put a dot on the area where that gentleman is standing.

 9    A    (Witness Complies.)

10    Q    Line 18, page 24.  The question is:  Okay, the officer on the

11    right-hand side, the opposite side of the bridge you saw at the

12    bottom of the bridge what you thought was a long gun; all right,

13    identify him.

14             Do you remember that question?

15    A    No, I don't remember the question.

16    Q    Despite the fact that you don't remember the question now,

17    you must have then, because you gave an answer; didn't you?

18    A    Yes.

19    Q    And what was your answer?

20    A    Dark with a black male officer with glasses, thick framed

21    glasses, an older male.

22    Q    And the next question was:  Who was that person, who was that

23    person you believed it to be?

24    A    Kenny Polite.

25    Q    And he was armed with a long gun?
```

```
 1   A   I don't remember if he was or not.

 2   Q   And, regardless of what side we're going to call that, what

 3   is the opposite side of where the gentleman with the shotgun was?

 4        MS. BERNSTEIN:  Objection, Your Honor it, just says the

 5   opposite side of the bridge, it doesn't say the opposite side of

 6   what.

 7        THE COURT:  Yeah.  We're going to get him to clarify

 8   that right now.

 9   BY MR. HESSLER:

10   Q   Do you remember now, when you're talking about the opposite

11   side of the bridge, where Kenny Polite may have been standing

12   with the long gun?

13   A   Kenny Polite came off a shuttle up in there.

14   Q   Where were you when you saw this guy with the shotgun,

15   firing?

16   A   I was running down -- if you can zoom in.  Can you zoom in?

17   I can show you an approximate area.

18   Q   You were where?

19   A   I was right here.

20        (Witness indicates.)

21   BY MR. HESSLER:

22   Q   And then you also saw Kenny Polite somewhere in that area?

23   A   Kenny Polite was around here.

24   Q   Okay.  Do you know what direction he had come from?

25   A   He pulled up in a police car from Chef.
```

1    Q    And do you know what kind of rifle he had?

2    A    No.

3    Q    At what point --

4         MR. HESSLER:  I approach, Your Honor?

5         THE COURT:  Yes.

6         MR. HESSLER:  Thank you.

7    BY MR. HESSLER:

8    Q    At what point did you take the guy that you caught behind the

9    -- you can remove that -- behind the dumpster?

10   A    After he was handcuffed, we -- I brought him over there.

11   Q    And you went behind the dumpster?

12   A    It was either a dumpster or an abandoned car.

13   Q    Why did you do that?

14   A    For the safety for me and the person.

15   Q    All right.  What did a dumpster or an abandoned car, what

16   kind of safety did that afford you?

17   A    Just cover.

18   Q    From what?

19   A    From gunshots.

20   Q    So you still thought there was a possibility that somebody

21   might being firing at you?

22   A    Yeah.

23   Q    Even though you didn't see anybody?

24   A    Didn't see nobody, no.

25   Q    Now, you got back to the Crystal Palace.  Were you directed

1    to go back there?

2    A    I don't remember.

3    Q    You had been out there for some number of -- you said an hour

4    and a half maybe?

5    A    I said hours, approximate.   I know it was longer than

6    minutes.

7    Q    Were you able to walk around?

8    A    Yeah.

9    Q    So you saw some of the persons that had been shot?

10   A    Yes.

11   Q    You had -- did you hear -- let me ask you this.   When you get

12   back -- after all that, you get back to the Crystal Palace.   And

13   did you have an opinion at that time what had possibly happened?

14   A    All I knew was they were getting fired at.

15   Q    They were getting fired at?

16   A    We, us.

17   Q    So you still believed that at the time, hours later, were you

18   were at the Crystal Palace, you still believed you were being

19   fired at?

20   A    Yes.

21   Q    Some number of months later, you say that you saw the same

22   group, the shooters, gathered around at the Seventh District

23   station?

24   A    Yes.

25   Q    And what were they doing?

1    A    They was huddled up, talking.

2    Q    Where at?

3    A    In the parking lot.

4    Q    Did you see any homicide detectives there and people from the

5    academy there, anybody else?

6    A    I don't recall.

7    Q    And you said you saw them.  They were talking and doing what?

8    A    They were just huddled up, talking.

9    Q    And where did you go or what did you do?

10   A    I was just outside.  I don't know if I was washing my car,

11   what I was doing out there.

12   Q    Were you watching them?

13   A    They caught my attention, that they were all huddled up

14   together.

15   Q    And what happened after they -- did you see anybody else

16   arrive, any other people arrive on this time period during this

17   meeting?

18   A    Like people that went and talked to them?  No.

19   Q    So what happened after that?

20   A    They disbursed, and that's when Hills -- we crossed paths,

21   and I asked him if I could look at the report.  And he told me:

22   No.

23   Q    And you thought -- what did you think about that?

24   A    That it was, you know, like some shady stuff.  Because, like

25   I said, me and him were friends, and I spent that whole period

1    together in the academy and in the Seventh District.  And, for

2    him not to show me a report, I mean, it was just a report, so --

3    it just shocked me.

4    Q    And, earlier, you had talked to Agent Bezak; right?

5    A    Yes.

6    Q    And you did not tell him some things specifically as it

7    pertained to you because you thought it might get you in trouble?

8    A    Yes.

9    Q    And that was specifically that you struck this kid or this

10   guy in the head?

11   A    Yes.

12   Q    And you didn't get in trouble for that; did you?

13   A    No.

14   Q    You didn't get in trouble for hitting him in the head; right?

15   A    No.

16   Q    And you didn't get in trouble for making a false statement to

17   an FBI agent, which is against the law; right?

18   A    No.  Correct.

19   Q    Why did you not get in trouble for that?

20   A    Because Ms. Bernstein and Mr. Bezak told me to tell them the

21   truth.

22   Q    When did they tell you that?

23   A    When we met.

24   Q    Did they come and tell you:  Hey, we think you lied to us,

25   you'd better tell us the truth?

1   A   They said just said:  Just tell us the truth.

2   Q   When did they tell you that?

3   A   I'm not sure.

4   Q   Because you went to them at some point -- or did they come to

5   you, I guess is my question?  After you lied to Agent Bezak, did

6   they approach you, or did you approach them?

7   A   I'm not sure.

8   Q   So, nevertheless, you didn't get prosecuted because of

9   whatever it is you told them or for whatever reason?

10  A   No.

11  Q   Now, when is the first time you've told them about this shady

12  report incident?  Or did you ever tell them that?

13  A   I told them.

14  Q   When?

15  A   First or second time I met with them.  I'm not sure.

16  Q   Told them the first and the second time --

17  A   Or the second.

18  Q   Was he taking notes when this happened, Agent Bezak?

19  A   Don't remember.

20  Q   Did they bring this out in any of your grand jury testimony:

21  Tell the grand jury about this shady report incident?

22  A   I believe I was asked.

23  Q   You were asked about the meeting?

24  A   Yes.

25  Q   And that was in the grand jury; correct?

1    A    I'm not sure if it was in the grand jury or it was with them.

2            MR. HESSLER:  Your Honor, may I approach?

3    BY MR. HESSLER:

4    Q    Let me ask you this.  Do you recall whether or not you told

5    the grand jury that you asked to see this alleged report that

6    Hills had and he allegedly told you:  No, it's not none of your

7    business?

8    A    I don't remember.

9    Q    Would that have been something that you think you should have

10   told the grand jury?

11   A    If I was answering questions.

12           MR. HESSLER:  Your Honor, may I approach?

13           THE COURT:  Yes.

14           (Pause in proceedings.)

15   BY MR. HESSLER:

16   Q    You're asked about that specific question about did you ever

17   see them at the Seventh District again; correct?

18   A    Well, can I go back a page, because it looks like according

19   to this --

20   Q    Go back all 60 pages if you want.

21           (Pause in proceedings.)

22           THE WITNESS:  All right, yeah.

23   BY MR. HESSLER:

24   Q    So you're asked about that specific -- about that specific

25   incident; correct?

1    A    Yes.

2    Q    And never once do you tell or mention this alleged

3    interaction with Officer Hills; do you?

4    A    No.

5              MR. HESSLER:  That's all the questions, Your Honor.

6              THE COURT:  All right.  Thank you.

7              Mr. DeSalvo.

8                        CROSS EXAMINATION

9    BY MR. DeSALVO:

10   Q    It's deputy now; right?

11   A    Yes.

12   Q    Deputy Bryan, Frank DeSalvo.

13   A    How you doing?

14   Q    I could be doing better.

15        Sequence.  When you left the Crystal Palace, you drove

16   straight up Chef Menteur Highway?

17   A    Yes.

18   Q    And the Crystal Palace is on the other side of Downman Road

19   from the Danziger Bridge?

20   A    It's east.

21   Q    Yeah.

22   A    Yeah.

23   Q    It's on the east side?

24   A    Yes.

25   Q    Downman Road is in between?

1   A    Yes.

2   Q    And you came straight down Chef Highway?

3   A    Yes.

4   Q    Right?

5        Straight past Downman Road.

6   A    Yes.

7   Q    On to the Danziger Bridge?

8   A    Yes.

9   Q    Truck came to a -- did you say a screeching halt, screeching

10  stop?

11  A    Yeah.

12  Q    Is that what you said?

13       And then you heard gunfire.

14  A    Yes.

15  Q    Now, you could only see out of the back of the truck?

16  A    Yes.

17  Q    You couldn't see through the front; you couldn't see to

18  either side?

19  A    No.

20  Q    You don't know who fired any weapon at any time other than

21  Ignatius Hills?

22  A    Yes.

23  Q    That's the only person you ever saw fire a round?

24  A    I heard.  I never actually seen him shoot.

25  Q    You heard it, you looked over and he had the gun in his hand?

```
1    A    Yes.

2    Q    You asked him what the F?

3    A    Yes.

4    Q    And he told you what you said?

5    A    Yes.

6    Q    So then you chase this kid down the Danziger Bridge?

7    A    Yes.

8    Q    And you basically get him all the way at the bottom on the

9    east side?

10   A    Yes.

11   Q    And you cuff him?

12   A    I don't remember who cuffed him.

13   Q    Who helped you arrest him?

14   A    I know it was me, Polite and Raymond Young was down there.  I

15   don't know if they had anybody else.

16   Q    One of you cuffed him?

17   A    Yes.

18   Q    And you brought him off the side over by either an abandoned

19   car or that dumpster?

20   A    Yes.

21   Q    How long were you all there before the EMS arrived?

22   A    I'm not sure.

23   Q    How long were you there before the state police arrived?

24   A    I'm not sure.

25   Q    You did see the state police arrive; didn't you?
```

1   A    Yes.

2   Q    Looked like a big tank kind of vehicle with State Trooper all

3   over it?

4   A    Yes?

5   Q    Battle gear on?

6   A    Um-hum.

7   Q    Long rifles?

8   A    Yeah.

9   Q    I noticed in the video that you pointed out -- what did you

10  call that thing -- that van or limo bus that Taj Magee was

11  driving?

12  A    Yes.

13  Q    Do you know Taj Magee?

14  A    Yes.

15  Q    Could you describe him?

16  A    Yes.  Big black male, I would say he wasn't light, he wasn't

17  dark.  More of a chocolate color with a heavy-set weight.

18  Q    Big guy?

19  A    Yeah, big.  Real big.

20  Q    And he was driving that limo bus?

21  A    Yes.

22  Q    You saw it pull up?

23  A    I didn't see him pull it up, but he's the one that drove that

24  bus.

25  Q    When he pulled up, were you still over there on the other

```
 1   side by the dumpster or an abandoned car?

 2   A   I don't remember.

 3   Q   Did you talk to him on the east side of the bridge?

 4   A   I don't remember.

 5   Q   You talk to Derrick Williams?

 6   A   Yes.

 7   Q   Tell me who Derrick Williams is.

 8   A   Another officer that was in the Seventh District.

 9   Q   Was he in the thing with Taj?

10   A   Yes.

11   Q   So, when you talked to Derrick Williams the first time -- you

12   remember the first time you saw him?

13   A   It was on the bridge.

14   Q   Okay.  This was when you walked back up the bridge?

15   A   Yeah.  They were up there.

16   Q   Where was the kid that you arrested?

17   A   When?  After he left from behind the dumpster?

18   Q   Yeah.

19   A   It was -- I put him -- sat down by the limo bus.

20   Q   What you said -- correct me if I'm wrong -- was you turned

21   him over to Taj?

22   A   Yeah.  Well, they was watching him.

23   Q   So you turned him over -- do you remember turning him over to

24   Taj?

25   A   To Taj?
```

1  Q    Taj Magee.

2  A    I don't remember like who was actually standing right there

3  when I sat him down.

4  Q    So somebody from that limo bus, one or more people from there

5  watched the kid?

6  A    The police officers watched him.

7  Q    Yeah.  They were all police officers there at the limo bus;

8  right?

9  A    Yeah.

10  Q    And you and Taj walked up the bridge, or you and Derrick?

11  A    We never walked up the bridge.

12  Q    Okay.  I thought you said you did.

13  A    No.  I said I walked to the side to the walkway.  And Derrick

14  approached me and asked me like:  What's wrong?  And then he

15  asked me what happened and if I saw any guns.

16  Q    So you never walked back up to the bridge?

17  A    No.

18  Q    And you never did see anything?

19  A    No.

20  Q    The government asked you if you picked up any evidence?

21  A    No.

22  Q    Do you have any idea what they're talking about?

23  A    Shell casings, I would say.

24  Q    Nobody was shooting --

25  A    None.

1    Q    Would it be proper for you to pick up evidence?

2    A    No.

3              Secure it.

4    Q    You said that you saw a male on the right side of the bridge

5    in Exhibit 71 going --

6    A    Yeah.  The way that picture looks --

7    Q    You saw that person fire twice?

8    A    Yes.

9    Q    Did you go look to see if there were any shell casings?

10   A    No.

11   Q    Would it have been proper for you to pick those up?

12   A    Not at the time because my focus was the subject that was

13   handcuffed.

14   Q    Did you ever see the occupants of the limo bus go up the

15   bridge?

16   A    No.

17   Q    They all stayed there, that's what you did for the next hour

18   or two?

19   A    Yeah, I don't remember exactly, if they all stayed or -- if

20   they all stayed.

21   Q    Did you see EMS?

22   A    Yes.  I saw an EMS truck pull up.

23   Q    And you saw two EMS vehicles?

24   A    I recall seeing one.

25   Q    Did you see them drive away?

1   A   I don't remember.  I remember them coming.  I don't remember

2   them driving away.

3   Q   Now, one thing that kind of bothers me a little bit, when you

4   talk about this Seventh District meeting --

5           MS. BERNSTEIN:  Objection to what does or what doesn't

6   bother Mr. DeSalvo.

7           THE COURT:  Rephrase.

8           MR. DeSALVO:  I'll rephrase it.

9   BY MR. DeSALVO:

10  Q   The Seventh District meeting, this was at the old station?

11  A   Old but new.

12  Q   Old but it was --

13  A   It was --

14  Q   It was one that was gutted?

15  A   Yeah.  It was our old station but they had trailers there.

16  Q   So this was where the Seventh District was operating out of

17  now?

18  A   Yes.

19  Q   And you saw a meeting where the shooters that were involved

20  in Danziger were in the parking lot?

21  A   Yes.

22  Q   And that parking lot would have been the parking lot for the

23  trailers?

24  A   It's the parking lot for the whole station.

25  Q   And the gutted-out station?

1   A   Yeah.

2   Q   Anybody that was anywhere in the area could see it?

3   A   Yeah.

4   Q   It wasn't a secret; was it?

5   A   What?

6   Q   That they were having this meeting in this parking lot?

7   A   I'm not sure.

8   Q   Now, you used the word huddled up.  There's huddled up like

9   you could see a picture like football players huddled up like

10  this, discussing what the play was going to be?

11  A   No.

12  Q   That's not what they were doing; was it?

13  A   No, it wasn't.

14  Q   So they were standing around in close proximity, talking?

15  A   Yes.

16  Q   They weren't holding hands?

17  A   No.

18  Q   They weren't wrapped up next to each other?

19  A   No.

20  Q   Do you know Ken Bowen?

21  A   Yes.

22  Q   How long had you known him at the time?

23  A   Shoot, at least a year.

24  Q   After this incident, did he ever call you?

25  A   No.

1   Q   Did he ever go visit you?

2   A   No.

3   Q   Did he ever suggest that you go in hiding and say nothing?

4   A   No.

5   Q   Did he ever suggest to you that you should say something?

6   A   No.

7   Q   Did you ever tell him what you saw or didn't see?

8   A   No.

9           MR. DeSALVO:  No further questions.

10          THE COURT:  All right.  Mr. London.

11                      CROSS EXAMINATION

12  BY MR. LONDON:

13  Q   Good morning, Deputy.  My name is Steve London, I represent

14  Archie Kaufman.

15          I believe you testified on direct that you thought

16  Sergeant Gisevius back in the Crystal Palace was in charge of

17  that.

18  A   The investigation?

19  Q   Yes.

20  A   Yes.

21  Q   Did you see Lieutenant Lohman on the scene?

22  A   I don't remember.

23  Q   Do you remember seeing Captain Barrios on the scene?

24  A   I don't remember.

25  Q   Do you remember testifying in front of the federal grand jury

1    on May 27, 2009?

2    A   I remember testifying.  I'm not sure the exact date.

3    Q   May I approach?

4           THE COURT:   Yes.

5    BY MR. LONDON:

6    Q   I'd ask you to start right here.  Don't say anything, just

7    read it if you would.  Read it down to 22.

8           (Pause in proceedings.)

9    BY MR. LONDON:

10   Q   Does that refresh your memory?

11   A   Yeah.

12   Q   And what did that say?

13   A   It said that -- I don't know what timeframe Captain Bardy

14   came on the bridge.

15   Q   But you said that you saw Captain Bardy on the bridge; right?

16   A   Yes.

17   Q   And he outranks Sergeant Kaufman; correct?

18   A   Yes.

19   Q   He's the district commander?

20   A   Yes.

21   Q   You also saw Lieutenant Lohman?

22   A   I never seen him on the bridge.  I don't remember seeing him.

23   Q   But your testimony says he was; correct?

24   A   It said he could have went.  I'm not sure he went.  It

25   doesn't say I seen him there.

1   Q    Did you see Lieutenant Lohman anywhere that day?

2   A    I don't remember.

3   Q    Did you say that Lieutenant Lohman was in charge?

4   A    It was like he ran like the show or of who goes here, who

5   goes where.

6   Q    He ran the show, okay.

7          Now, you also said that you did not give a statement to

8   anyone; is that correct?

9   A    Yes.

10  Q    Do you recall talking to Sergeant Kaufman at the Crystal

11  Palace?

12  A    No.

13         MR. LONDON:  Approach again, Your Honor.

14  BY MR. LONDON:

15  Q    I'd like you to read from line 23 to the next page, line 11.

16         THE WITNESS:  23 to 11.

17         (Pause in proceedings.)

18  BY MR. LONDON:

19  Q    Did that help your recollection?

20  A    Yes.

21  Q    All right.  Did you have a conversation with Sergeant

22  Kaufman?

23  A    A conversation, no.  It was a question that he asked.  And,

24  it wasn't just me, it was multiple people like -- I never fired

25  my weapon.

1    Q    Read from your transcript.  Was this your transcript?

2    A    I guess.

3    Q    Question:  Did you talk to a supervisor back at the Crystal

4    Palace when you got back from the bridge?

5              Answer:  Yes.

6              Do you remember saying that?

7    A    Yes.

8    Q    Question:  Who did you talk to?

9              Answer:  Uh, Sergeant Kaufman.

10             Do you remember answering that?

11   A    Yes.

12   Q    Question:  What was your conversation with Sergeant Kaufman?

13             Answer:  He asked who was involved, who was involved in

14   the shooting.

15             Do you remember answering that?

16   A    Yes.

17   Q    Question:  What did you tell him?

18             Answer:  I said I never wasn't -- I never fired my or

19   discharged my weapon.

20             Do you remember saying that?

21   A    Yes.

22   Q    Question:  Was anybody else there when Sergeant Kaufman asked

23   you this?

24             Answer:  Kenneth Bowen, yes.

25             Correct?

1    A    Yes.

2    Q    So he did ask you what happened out there; right?

3    A    Yes, but --

4    Q    He asked -- go ahead.

5    A    It wasn't directly.  It wasn't like:  Hey, Officer Bryan,

6    were you involved in this?  It was, he stood up, and it was like:

7    Whoever fired their weapon, come over here.  He never went to

8    individual people, for my knowledge.  And I know it wasn't me

9    that asked him directly was you -- were you involved, were you

10   involved, were you involved.  It was like an open flow of

11   questions he asked.

12   Q    So, when you answered the Federal grand jury, who you did you

13   talk to, and you put Sergeant Kaufman, you didn't mean that?

14   A    I spoke to him, but it wasn't a conversation.

15   Q    Then the next question is:  What was your conversation with

16   Sergeant Kaufman?

17           And then you answered and said:  He asked who was

18   involved.

19           Who was involved in the shooting; that's not correct?

20   A    This wasn't -- it was -- them statements in there, it's --

21   see, I was asked about a conversation.  It really wasn't a

22   conversation.  It was a question.  Like he stood up and said who

23   fired their weapon.  And whoever said yeah went over there.

24   Whoever said no -- I wasn't -- I wasn't involved in it.  I didn't

25   fire my weapon.  We didn't have like a sit-down and talk about

1    it.

2    Q    I didn't ask you if you had a sit-down and talk about it.

3         It said here:  What was your conversation with Sergeant

4    Kaufman?  If this is incorrect, just say this is incorrect.

5    A    I don't know if it's correct or not, I don't remember.

6    Q    You don't remember what you said; didn't help your memory?

7    A    It helps a little bit.  But, like I said, the question that

8    was asked of me was a conversation, but to me that's not a

9    conversation.  That was just a question being asked and an

10   answer.  An answer being answered.

11   Q    And your answer was, yes, you spoke to Sergeant Kaufman, but

12   that's -- we'll move on from that.

13        Do you remember telling Sergeant Kaufman that your

14   really good friend Officer Hills fired a shot through somebody's

15   back who was running away from the truck?

16   A    Who said that to Sergeant Kaufman?

17   Q    Do you remember telling Sergeant Kaufman that?

18   A    No.

19   Q    No, you didn't tell him that; did you?

20   A    No.

21   Q    Did you tell him that you slapped the guy who was handcuffed?

22   A    No.

23   Q    You didn't tell them that either; did you?

24   A    I never slapped him when he was handcuffed.

25   Q    Did you slap him?

1    A    Yes, I did.

2    Q    Did you tell him you slapped him?

3    A    No, I never did.

4    Q    You tell him anything you did that was wrong?

5    A    No.

6    Q    Did you tell him anything your buddy did?

7    A    No.

8              MR. LONDON:  I have no further questions.

9              THE COURT:  Thank you, Mr. London.

10             Mr. Fleming?

11             MR. FLEMING:  Yes, Judge.

12                      CROSS EXAMINATION

13   BY MR. FLEMING:

14   Q    Good morning.

15   A    Good morning.

16   Q    I have a few questions for you, Deputy.  Rehash just a little

17   bit of your previous testimony.

18             Back at the time of Katrina, you worked in the Seventh

19   District; correct?

20   A    Yes.

21   Q    At the time you were assigned to the task force; right?

22   A    Yes.

23   Q    There are essentially three task force units at that time,

24   one run by Keller, one run by Bowen and one run by Gisevius?

25   A    I know they at least had two.

1    Q    You worked for Sergeant Keller; right?

2    A    Yes.

3    Q    And Sergeant Keller was out on some type of sick leave right

4    after the storm?

5    A    Yes.

6    Q    Some infected feet due to some storm related issues?

7    A    Yes.

8    Q    You yourself did not hear the radio transmission for a 108;

9    did you?

10   A    No.

11   Q    You heard about that from someone else; right?

12   A    Yes.

13   Q    You heard that officers were getting shot at on the bridge;

14   right?

15   A    Yes.

16   Q    And you believed it; correct?

17   A    Yes.

18   Q    And you believed it, because, after the storm, you heard all

19   kinds of gunshots all the time; right?

20   A    Yes.

21   Q    People shooting at the police often; right?

22   A    Yeah.

23   Q    And you never knew where those shots were coming from; right?

24   A    No.

25   Q    You got in the back of the truck.  I believe you said on

1   several occasions you were in the back of the truck?

2   A    Yes.

3   Q    You could not see in front?

4   A    No.

5   Q    You could not see what was going on?

6   A    Right.

7   Q    Officer Faulcon was in the back of the truck with you?

8   A    Yes.

9   Q    As was Paxton?

10  A    Yes.

11  Q    I believe you already said Heather Gore?

12  A    Yes.

13  Q    Did you say on direct examination that Raymond Young had a

14  long gun?

15  A    Yes.

16  Q    He had a shotgun, or a rifle?

17  A    Shotgun.

18  Q    And the truck was moving pretty fast once you all were

19  inside; right?

20  A    Yes.

21  Q    Headed toward the bridge.

22          It was fast enough for you all to bounce up off the

23  floor.

24  A    Not like come mid-air, but maybe move around.

25  Q    Okay.  Without showing you a transcript, you've testified to

1    the grand jury that you all were bouncing around in the back?

2    A    Yes.

3    Q    The trip took just a couple of minutes; right?

4    A    Yeah.

5    Q    You didn't stop along the way anywhere; right?

6    A    No.

7    Q    During this time, there were no plans that were made; right?

8    A    No, not to my knowledge.

9    Q    Were you part of making any plans?

10   A    No.  No.

11   Q    No tactical plans that were made by you or relayed to you;

12   right?

13   A    No.

14   Q    In fact, I believe you've indicated in the past that no one

15   really talked while you were going across the bridge?

16   A    No.

17   Q    No, no one talked --

18   A    No, that's right.

19   Q    And I believe you've indicated before and today as well,

20   you're kind of nervous, kind of scared going over there; right?

21   A    Correct.

22   Q    As I would be, too.

23        And, as you're pulling up, gunfire erupted; right?

24   A    Yes.

25   Q    I'm sorry?

1    A    After the truck stopped, the gunfire erupted.

2    Q    After the truck stopped?

3    A    Yes.

4    Q    You heard no gunfire prior to the truck stopping?

5    A    No.

6    Q    None at all?

7    A    No.

8    Q    Probably would have heard gunfire; right?

9    A    I'm sorry?

10   Q    You would have heard gunfire; right?

11   A    There's a possibility, yeah.

12   Q    You're trying to listen out for some gunfire because you know

13   you're approaching a scene where people are shooting guns?

14   A    Yeah.

15   Q    So, the truck slams on the brakes, gunfire erupts.  You've

16   described that in the past as gunfire erupting; right?

17   A    Yes.

18   Q    And you didn't get out of the truck until the shooting

19   stopped?

20   A    Yes.

21   Q    You're helping Officer Paxton dislodge himself from the cargo

22   area?

23   A    Yes.

24   Q    His tonnet had gotten lodged in one of the slats?

25   A    Yes.

1   Q   It's at that point in time that you hear the gunfire from

2   Officer Hills?

3   A   No.  It was -- I don't remember exactly when it was.  If it

4   was before or after.

5   Q   Okay.

6           Right around that time.

7   A   I'm not sure.

8   Q   And you asked Hills what happened?

9   A   Yeah.

10  Q   Or something to that effect?

11  A   Yes.

12  Q   And he made some type of disparaging comment; right?

13  A   I don't know what that means.

14  Q   He made a racial slur:  I shot at that little so and so?

15  A   Yes.

16  Q   You saw the person he was shooting at?

17  A   Who, Hills?

18  Q   I'm sorry, yes.  You saw the person Hills was shooting at?

19  A   Yes.

20  Q   And you helped run him down; correct?

21  A   Yes.

22  Q   And I believe you've indicated Raymond Young assisted you in

23  chasing down the subject?

24  A   Yes.

25  Q   As did Officer Kenny Polite; right?

1   A    Yes.

2   Q    And Polite also had a long gun, so called long gun; right?

3   A    Yeah.

4   Q    I'm sorry?

5   A    I don't remember exactly what kind of gun he had.

6   Q    Well, I'm not asking exactly.  Do you know what I'm talking

7   about when I say a long gun, a shotgun, a rifle, as opposed to a

8   pistol.  Do you remember him having a long gun?

9   A    I don't remember.

10  Q    Do you remember telling Agent Bezak that Polite may have had

11  a long gun?

12  A    I don't remember.

13  Q    Well, let me ask you if you remember telling Agent Bezak

14  that, not whether --

15  A    I don't remember telling him if he did or not.

16          MR. FLEMING:  If I may approach the witness?

17  BY MR. FLEMING:

18  Q    I'm going to show you I've just shown Ms. Bernstein and what

19  was provided to us in discovery.  This was Agent Bezak's notes of

20  a conversation reflected on July 6, 2009.  I'm going to ask you

21  to take a look at that last paragraph.  Just read that to

22  yourself.

23          (Pause in proceedings.)

24  BY MR. FLEMING:

25  Q    Does that refresh your memory of a conversation you had with

1    Mr. Bezak?

2    A    Yes.

3    Q    And did you tell Mr. Bezak that Polite may have had a long

4    gun?

5    A    Yes.

6    Q    You testified before that someone came or there was an

7    officer with a baby blue shirt that had a shotgun; right?

8    A    Yes.

9    Q    And that that person fired that shotgun; correct?

10   A    Yes.

11   Q    And I believe -- I don't believe you've testified previously

12   about this, but you've said in the past at least that that

13   officer came from underneath the bridge?

14   A    I don't know where he came from.  But he was on, Exhibit 71,

15   the picture that was shown, he was on the right.  He came from

16   the right side.  I don't know how he got there, where he came

17   from.  I only knew I never even seen him before.

18   Q    Again, you've testified in front of the grand jury in the

19   past --

20            MR. FLEMING:  If I may approach the witness, Judge?

21   BY MR. FLEMING:

22   Q    I'm going to show you what you've previously looked at as

23   your grand jury testimony from May 7, 2009, page 23.  I'm going

24   to ask you to take a look in the middle of the page.  That's your

25   answer right there.  Just read that to yourself.

1        MR. FLEMING:  For the record, I've shown Ms. Bernstein.

2        (Pause in proceedings.)

3   BY MR. FLEMING:

4   Q   Does that fresh your memory as to your previous testimony

5   before the grand jury?

6   A   Yes.

7   Q   And what you had previously told the grand jury is that

8   person came from underneath the bridge; right?

9   A   Yes.  That was based off assumption.  Like I assumed that he

10  came from underneath the bridge.

11  Q   All right.  And that leads to the next question.  In the

12  grand jury testimony, you didn't tell the grand jury that that

13  was based on an assumption.

14  A   No, I never.

15  Q   I'm sorry, never?

16  A   No.

17        MS. BERNSTEIN:  What page did you just show him?

18        MR. FLEMING:  That was 23.

19  BY MR. FLEMING:

20  Q   Back at the Crystal Palace, was that officer -- and you

21  described him as a light skinned African-American?

22  A   Which one?

23  Q   That came from underneath the bridge and fired the shotgun?

24  A   Light skinned African-American, yes.

25  Q   That light skinned African-American with a light blue baby

1  shirt, was he up there raising his hand?

2  A    I don't remember seeing him.  He just popped up, shot the two

3  rounds, and I don't remember seeing him after that.

4  Q    He was not part of the group that when it was asked who fired

5  their weapon he was not one of the people that raised their

6  hands?

7  A    No.

8  Q    Now, Mr. Hessler asked you about another officer with another

9  long gun.  Believe you've indicated on cross examination that may

10  have been Officer Polite; right?

11  A    Polite?

12  Q    Polite.

13  A    Yes.

14  Q    With the long gun.  Older dark skinned African-American.

15  A    Yes.  Thick glasses.

16  Q    And you knew Officer Polite; right?

17  A    Yes.

18  Q    You had worked with him in the past; right?

19  A    Yes.

20  Q    Was Officer Polite part of the group back at the Crystal

21  Palace that raised their hand when asked whether he fired a

22  weapon?

23  A    Not to my knowledge.

24  Q    You got back to the Crystal Palace in that limo bus?

25  A    I'm not sure.  I don't remember how I got back.

1           MR. FLEMING:   Somebody punch up Exhibit 60, please.

2    BY MR. FLEMING:

3    Q   You've seen that picture prior to today; right?

4    A   Yeah.

5    Q   And that's the limo bus we're talking about?

6    A   I can't make that out.   It's too blurry.

7           MR. FLEMING:   I'm sorry, can we go back to regular size?

8    BY MR. FLEMING:

9    Q   Does that appear to be the limo bus that we're talking about?

10   A   It's the description of the limo bus that was there.

11   Q   Do you remember looking at this before, looking at this

12   picture when you met with Mr. Bezak and Ms. Bernstein; right?

13   A   Yes.

14   Q   You remember telling them that that person in there may have

15   been Taj Magee?

16   A   Yes.

17   Q   And that's because you did think that it was Taj Magee;

18   right?

19   A   Yes.   Because he was the one driving the bus.

20   Q   And what is this right here next to the limo bus?

21   A   I think it's the state police.

22   Q   That was their armored vehicle?

23   A   That's what it looks like.

24   Q   You just indicated you do not remember how you got back to

25   the Crystal Palace?

1    A    Yes.

2    Q    Do you remember when you testified before the grand jury in

3    the past you said you did in fact come back on the limo bus;

4    right?

5              MR. FLEMING:   If I may approach the witness again, Your

6    Honor?

7              THE COURT:   Yes.

8    BY MR. FLEMING:

9    Q    I'm going to show you a transcript from the grand jury from

10   May 27, 2009, page 38.   Taking a look at the very last line on

11   that page, just read that to yourself.

12   A    All right.

13   Q    Does that refresh your memory as to how you testified in the

14   past to the grand jury?

15   A    Yes.

16   Q    And you testified in the past that you, quote:   I want to say

17   it was a limo bus?

18   A    Yes.

19   Q    Does that refresh your memory as to how you may have gotten

20   back to the Crystal Palace?

21   A    Yes.

22   Q    Was it the limo bus?

23   A    Could have been.

24   Q    All right.   Never mind.

25        Could have been?

1    A    Could have been.

2    Q    When you went over to the limo bus, Magee was already there?

3    A    I don't remember.

4    Q    Do you remember testifying that the Budget truck remained

5    next to the limo bus the entire time?

6    A    No, I don't remember.

7    Q    On direct examination, you'd indicated that you thought the

8    group of officers that shot had went off with Sergeant Kaufman;

9    right?

10   A    Yes.

11   Q    And, in the past, you'd said you thought they went off with

12   Kaufman because they never went anywhere else to eat or sleep;

13   right?

14   A    I'm sorry, I didn't understand what you said.

15   Q    In the past, you have testified that you thought they must

16   have gone off with Officer Kaufman because the officers never

17   went anywhere else to eat or to sleep.

18   A    Yeah, I don't know if that was about the time where the Manor

19   in Algiers where the fireman was cooking for us, because we did

20   go there a few times to eat and shower.

21   Q    You're thinking ahead, because that was my next question.

22   There was somewhere else you all went to eat and sleep.  You had

23   the old folks home on the west bank; right?

24   A    Yes.

25   Q    Is that the manor where the fireman -- is that the same

1   place?

2   A    Yes.

3   Q    So there were places that people could go from the Seventh

4   District without going AWOL; right?

5   A    Yes.

6   Q    You yourself went over to the manor?

7   A    Yes.

8   Q    On occasion.

9        You were asked about a call you received from Heather

10  Gore.  When Ms. Gore called you, you'd already left the New

11  Orleans Police Department?

12  A    I'm not sure.

13  Q    It was right around that time, though?

14  A    I'm not sure.

15  Q    And you left the New Orleans Police Department roughly almost

16  a year ago -- I'm sorry -- almost five years ago, September 2006?

17  A    Yes.

18  Q    Prior to your departure from the New Orleans Police

19  Department, Robert Faulcon had left the New Orleans Police

20  Department; right?

21  A    Yes.

22  Q    He left about a year ahead of you?

23  A    I'm not sure when he left.

24  Q    He left before you left; right?

25  A    I'm not sure.

1    Q    You worked with him in the Seventh District?

2    A    Yes.

3    Q    And you didn't see him the last year you were there; right?

4    A    Well, I got moved to a different district.

5    Q    And do you know Officer Faulcon -- you know he left the New

6    Orleans Police Department?

7    A    Yeah, I knew he quit.  But, when, I don't know.

8    Q    You knew it was shortly after the storm, though; right?

9    A    I don't remember.

10   Q    Don't remember.

11        You know that he had left the New Orleans Police

12   Department because his wife was living in Houston; right?

13   A    No, I didn't know that.

14   Q    Didn't know that.

15        MR. FLEMING:  Mr. Hessler just saved me about ten

16   questions, Judge.

17   BY MR. FLEMING:

18   Q    On direct examination, you'd indicated that you saw the

19   officers having a series of meetings or a meeting back at the

20   Seventh District; right?

21   A    Yes.

22   Q    And that was back at the real Seventh District on Reed and

23   Dwyer?

24   A    Where the real station was at, yes.

25   Q    And, granted, there were trailers there at the time, but you

1    weren't at the Crystal Palace then; right?

2    A    Right.

3    Q    You're not talking about the Crystal Palace when you're

4    talking about the things back at the trailers; correct?

5    A    Correct.   The trailers were by the station.

6    Q    When did you all move back to the station?

7    A    I don't remember.

8    Q    Later, late 2005, 2006?

9    A    I don't remember.

10   Q    Let me back up a little bit.   Just a few final questions.

11        Back on the bridge, you didn't get out of the truck when

12   it stopped, Raymond Young likewise did not get out of the truck;

13   right?

14   A    I don't remember.

15   Q    But Raymond Young had a long gun; right?

16   A    Yes.

17   Q    You've indicated on direct examination that you did not fire

18   your weapon at the kid running because he did not pose a threat.

19   You could see that that kid did not have a gun in his hands;

20   right?

21   A    Yes.

22   Q    His hands weren't covered; were they?

23   A    No.

24   Q    The kid wasn't turning around trying to get a make on you;

25   was he?

```
1    A    No.

2    Q    And, if he'd be doing those things, you might have shot at

3    him?

4    A    Depending on the situation.

5    Q    That's a maybe; right?

6    A    It depends.  If he turns around and starts firing at me,

7    yeah.  But, for no reason, no.

8    Q    No.  I'm not asking for no reason.  Would you wait for him to

9    fire at you first?

10   A    No.

11   Q    You wouldn't wait for him to actually fire?

12        MS. BERNSTEIN:  Objection, Your Honor, to a series of

13   questions calling for speculation.

14        THE COURT:  Yeah.  Let's move on.

15        MR. FLEMING:  Judge, he was asked a question on direct

16   examination why didn't he fire the weapon.  I'm going into cross

17   examination on that as to fully explore where and what other

18   circumstances.

19        THE COURT:  Well, you can do that, but let's not get

20   into hypothetical circumstances.

21        MR. FLEMING:  Okay.

22   BY MR. FLEMING:

23   Q    Again, the kid was not trying to get a make on you, and you

24   could see his hands; right?

25   A    Yeah.  He was unarmed.
```

1  Q    Could you tell that he was unarmed?

2  A    Yes.

3  Q    And, when you caught him, you said you slapped him?

4  A    Yes.

5  Q    Did you kick him also?

6  A    No.

7  Q    Did Officer Young kick him?

8  A    I don't know.

9  Q    Did Officer Polite kick him?

10 A    I don't know.

11 Q    Is that something that happens so frequently that you

12 wouldn't remember if somebody kicked?

13 A    I don't understand what you're trying to ask me.

14 Q    You said you don't know if Officer Young kicked this kid.

15 You don't know if Officer Polite kicked this kid.  Wouldn't that

16 be something that would stick out in your mind?

17 A    Yeah, but it's six years ago.  I don't -- I know what I did

18 because I did it.

19 Q    You never saw anybody kick this kid; right?

20 A    To my knowledge, no.

21 Q    Well, I'm asking if you saw somebody.

22 A    I don't remember.  Like I know, as to my knowledge, no, I

23 never.

24 Q    On direct examination, you were asked a question to the

25 affect of no one asked you to pick up any evidence.  You weren't

1    working for the crime lab at the time; were you?

2    A    No.

3    Q    You weren't trained in crime lab techniques; were you?

4    A    No.

5    Q    When you got back to the station, the makeshift station at

6    the Crystal Palace, you told -- you testified at some point today

7    that you called your family?

8    A    Yes.

9    Q    You wanted your wife and children to know you were safe?

10   A    Yes.

11   Q    And that was probably a big priority for you, let your wife

12   know you were safe?

13   A    Yes.

14   Q    You weren't concerned with other things going on, you were

15   concerned I've got to call my wife?

16   A    Yes.

17   Q    And, when you said you saw these officers having a meeting at

18   Dwyer and Reed, I'm talking ahead now, Dwyer and Reed, Officer

19   Faulcon was in fact not there?

20   A    I don't remember if he was there or not.

21   Q    Because on direct examination you said all seven.  But it's

22   not your testimony, you don't remember?

23   A    No, I don't remember if Faulcon was there, one of the names.

24   Q    Because you think he'd probably left by that time; right?

25   A    It was a possibility.

1   Q    You left New Orleans Police Department and took a job with

2   Plaquemines Sheriff's Office at some point in 2006; right?

3   A    Yes.

4   Q    And, in part, that was because you had some type of home you

5   could purchase from a family member?

6   A    Well, we was in the process of -- we had a couple of options

7   about buying a lot down there and moving down there because

8   that's where we were staying at after Katrina.  And from -- my

9   family wanted me to come down there, was less crime.  And I'll be

10  closer to home.

11  Q    So you're living down in Plaquemines Parish?

12  A    I was staying there after the storm, yes.

13  Q    And when Agent Bezak over here came to your house, your house

14  was not in New Orleans, it was down in Plaquemines Parish at the

15  time?

16  A    No.  It was -- we bought our house -- I was living in FEMA

17  trailers in Plaquemines.  Then we bought our house, and that's

18  where I was living at when Mr. Bezak came.  In St. Bernard

19  Parish.  I bought my house in St. Bernard Parish.

20  Q    I'm sorry, St. Bernard.

21  A    Yes.

22  Q    And, the first statement you gave Agent Bezak, you'd left

23  stuff out.  You've already said that; right?

24  A    Yes.

25  Q    And, in part, you were fearful that you might be prosecuted

```
 1   for slapping the kid; right?

 2   A   That's a reason.

 3   Q   I'm sorry?

 4   A   That's a reason.

 5   Q   You were also embarrassed by that?

 6   A   Yes.

 7   Q   And you left that out when you talked to Agent Bezak; right?

 8   A   Yes.  The first time.

 9   Q   And you know that, in leaving that out, you could be

10   prosecuted for giving false statements to the FBI; right?

11   A   Yes.

12   Q   And you know that that decision is going to be made, whether

13   to prosecute you or not, by Ms. Bernstein; right?

14   A   Yes.

15           MR. FLEMING:  Thank you.

16           I have nothing further of this witness, Judge.

17           THE COURT:  I was hoping to finish with this witness

18   before we took our lunch break, but it's getting a little bit

19   later.  So I think we ought to break for lunch.

20           Mr. Meche, you have the opportunity to cross, and then

21   we'll have our redirect.

22           We'll go ahead and take our lunch break now.  If you all

23   can be here at 1:20, you'll have the full amount of time, which

24   is a little over an hour.  At 1:20, if you be here, we'll go

25   ahead and pick up with this witness.
```

1        And, in the meantime, Mr. Bryan, you're not to discuss

2   your testimony with anyone.  Understand that, sir?

3        THE WITNESS:  Yes, sir.

4        THE COURT:  Thank you.  If you'll be up here, we'll

5   start right away.  If you can be in that chair at 1:20.

6        (12:12 p.m., proceedings recessed for lunch.)

7        THE COURT:  Anything we need to cover on the record here

8   before the lunch break?

9        MS. BERNSTEIN:  Not from the government.

10        MR. FLEMING:  I don't believe so.

11        THE COURT:  Let me ask counsel to approach, off the

12   record, please.

13        (Sidebar conference, off the record.  Jury not present.)

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                             1:20 P.M.

3          THE COURT:  All right, you may be seated.  Thank you

4    again for being here promptly and all being accounted for at the

5    appropriate time.

6          When we broke, we were about to begin Mr. Meche's cross

7    examination of Mr. Bryan.

8          Mr. Bryan, have you spoken to anyone about your

9    testimony since we broke for lunch?

10         THE WITNESS:  No sir.

11         THE COURT:  You're still under oath.

12         Mr. Meche, you may begin.

13                         CROSS EXAMINATION

14   BY MR. MECHE:

15   Q   Good afternoon, Detective Bryan.  I'm Tim Meche, I represent

16   Anthony Villavaso.

17         I know you identified him earlier in the trial.  Do you

18   know him very well?

19   A   I worked with him.

20   Q   When specifically did you work with him?

21   A   Before I got moved to the Second District.

22   Q   Okay.  Before or after the hurricane?

23   A   I know it was after, I'm not sure about before.

24   Q   Just to back up a little bit, during the hurricane, were you

25   on duty when the hurricane came in?

```
 1    A    Yes.

 2    Q    Where were you stationed at?

 3    A    Before the hurricane landed?

 4    Q    Well, either one.  Yeah, sure.

 5    A    Methodist Hospital.

 6    Q    Okay.  And that's where you spent the night before the

 7    hurricane?

 8    A    Yes.

 9    Q    When did you get out of there?

10    A    I don't remember.

11    Q    Were you stuck there for awhile?

12    A    We were stuck there, but we had a boat.

13    Q    Do you remember somebody physically rescued out of there on

14    the boat?

15    A    Like me?

16    Q    Yes, sir.

17    A    Like did I physically rescue anybody?

18    Q    No.  Did someone rescue you out of the hospital?

19    A    No.

20    Q    How did you get out?

21    A    They had a boat there that I don't know if it drifted or

22    whatever, but the motor was kind of broke, and I know how to

23    drive a boat.  Me and another guy.  So we loaded up some people,

24    and we like putted towards Chef.

25    Q    Okay.  And at some point you meet up with other officers in
```

1    the Seventh District?

2    A    At some point after, yes.

3    Q    And at what point did you meet Anthony Villavaso?

4    A    I'm not sure.

5    Q    Do you remember seeing him out there specifically?

6    A    Right after?  The hurricane?  No.  I don't remember seeing

7    him.

8    Q    Were you working with the group like one of your sergeants

9    after the hurricane?

10    A    We was all together.

11    Q    When you say all, who do you --

12    A    Like everybody was together, the task force, the patrol

13    officers, the desk officers, the detectives.  Everybody was

14    together.

15    Q    But you don't have independent recollection of seeing Officer

16    Villavaso?

17    A    Oh, no.

18    Q    Because he was from another district?

19    A    Yes, sir.

20    Q    Now, were you waking up in the morning, getting instructions

21    from one of your supervising officers as to what you were

22    supposed to do?

23    A    When?

24    Q    Right after the hurricane.

25    A    Like after we had made it on land?

1    Q    Yes, sir.

2    A    And we set up at the Crystal Palace.  We would have like a

3    little meeting, and everything was broken down into zones.  It

4    would be:  All right, Kevin, you and so and so, you all in zone

5    1, zone 2.

6    Q    And you were going out in that boat you commanded and rescued

7    people?

8    A    You talking about in a boat?

9    Q    I'm just asking --

10   A    I'm talking about after the water went down and we was on

11   patrol.

12   Q    I'm talking about the first few days.

13   A    I don't recall me physically rescuing anybody, but I did go

14   out on the boat multiple times.

15   Q    If you weren't part of the rescue operation, what were you

16   doing during those initial days?

17   A    I don't know.  I went out on the boat.

18   Q    I mean, but if you weren't rescuing people, what was the

19   purpose of you going out on the boat?

20   A    To look for people to rescue.

21   Q    Okay.  Okay.  So that's what you did those initial --

22   A    Yes.

23   Q    Okay.  Do you know Officer Barrios?

24   A    Yes.

25   Q    How did you come to know him?

1   A    Worked with him after the storm.

2   Q    Same way with Officer Villavaso?

3   A    Yes.

4   Q    Do you have independent recollection of when you met him?

5   A    No.

6   Q    And he wasn't part of that group that would meet every day

7   either?

8   A    I don't recall.

9   Q    Did you know when you got in that truck that day, did you

10  know Villavaso and Barrios personally at that time?

11  A    Yes, I knew them.

12  Q    You'd met them before?

13  A    Yes.

14  Q    And you knew that they'd actually got in the truck?

15  A    Yes.

16  Q    Now, do you know, because you were in the truck that, they

17  were one of the two first ones to get out of the back of the

18  truck?

19  A    Yes.

20  Q    You saw them?

21  A    They were -- the ones with -- I know Villavaso, Barrios,

22  Faulcon, they were on the end.  Like, what I mean end --

23  Q    Like back of the truck?

24  A    Yeah.  When the door open and shuts, they were like right

25  there on that edge.

1    Q    Were you more towards --

2    A    I was in the back.

3    Q    Okay.

4    A    The front of the car.  You get what I'm saying?  I was up

5    there.

6    Q    And Mr. Hessler had you describe and demonstrate the position

7    you got in.  That was in the truck?

8    A    Yes.

9    Q    Now, being in that position, were you able to see Villavaso

10   and Barrios and what they did?

11   A    I don't remember seeing them jump out of the truck.  I don't

12   know what they did.  I was in the truck.

13   Q    Okay.  But they were just towards the rear, and you're

14   assuming that by the time you got up out of the crouched position

15   you didn't see them?  That they had gotten out?

16   A    Yeah.

17   Q    Did you see after them you got out, did you see what they

18   did?

19   A    No.

20   Q    Did you see them at all after you got out?

21   A    No.

22   Q    Now, the juvenile you described having the encounter with --

23   and you candidly told us what you did to him, you mentioned the

24   reason why you did that, and I don't want to put words in your

25   mouth, but what exactly caused you to do that?

1    A    It was heat of the moment, adrenaline pumping.  Just --

2    Q    Were you intending to commit a crime when you did that?

3    A    No.  It was something that happened.

4    Q    In the heat of the moment?

5    A    In the heat of the moment, might have been.  In law

6    enforcement, eight years in, my record's clear.

7    Q    You've never been through anything like this before?

8    A    Never.

9    Q    Is it fair to say these were extremely crazy days?

10   A    Oh, yeah, it was crazy.  Yes.

11   Q    Under a lot of stress?

12   A    Yes.

13   Q    Getting much sleep?

14   A    No.

15   Q    Getting much food?

16   A    Not really.  Not at first, no.

17   Q    Was that affecting your thought process?

18   A    Could have been.  My family being gone.

19   Q    Sure.

20        Now, you didn't -- as part of your arrangement with the

21   government, you weren't required to enter any kind of guilty plea

22   concerning the incident with the juvenile; were you?

23   A    What arrangement with the government?

24   Q    Well, whatever -- you mentioned that when you met with them,

25   you fessed up to them about lying in your initial statement.

1    A    Yes.

2    Q    And you know that to possibly be a crime.

3    A    Yes.

4    Q    And you explained what you did to the juvenile.

5    A    Yes.

6    Q    And, even though you didn't intend to commit a crime, you

7    recognize it's possible that they could still try to prosecute

8    you?

9    A    Yes.

10   Q    And that's not happening; is it?

11   A    No.

12   Q    And that's because you have some kind of agreement with the

13   government that they won't do that; is that correct?

14   A    No.  They wanted the truth, and I told them the truth.

15   Q    Do you expect to be prosecuted for anything?

16   A    No.

17   Q    Okay.  As a result of lying to the FBI agent and whatever

18   else you did or didn't do, did you receive any repercussions

19   concerning your job?

20   A    No.

21   Q    No disciplinary process?

22   A    No.

23   Q    Any of your prosecutors ever asked you about what you did or

24   didn't do?

25   A    No.

1    Q    Do you expect to encounter any kind of disciplinary process

2    as a result?

3    A    With my job now?

4    Q    Yes, sir.

5    A    I'm not sure.

6    Q    But you haven't heard anything about it?

7    A    No.

8              MR. MECHE:  Thank you, sir.

9              THE COURT:  All right.

10             Redirect?

11             MS. BERNSTEIN:  Yes, Your Honor.

12                          REDIRECT EXAMINATION

13   BY MS. BERNSTEIN:

14   Q    Deputy Bryan, I want to start where we just left off.  You

15   were asked about hitting that kid.  When you hit him, what was he

16   doing?

17   A    Laying down.

18   Q    Did he have anything in his hands?

19   A    No.

20   Q    Did you see any threat?

21   A    No.

22   Q    But you hit him?

23   A    I'm sorry?

24   Q    But you hit him?

25   A    Yes.

1    Q    Did you have any right to hit him?

2    A    No.

3    Q    You were asked if you were tired.  Did that excuse what you

4    did?

5    A    No.

6    Q    How do you feel about what you did to that kid?

7    A    Horrible, and it's -- it's been affecting me ever since, the

8    whole situation.

9              MR. DeSALVO:  This was asked on direct.

10             THE COURT:  It was, but it's been brought up on cross.

11   BY MS. BERNSTEIN:

12   Q    I'm sorry, what was your answer?

13   A    It's been affecting me mentally since the whole incident

14   happened until now.

15   Q    Why has it affected you so much, what you did to that kid?

16   A    Because I knew what I did was wrong and not in my nature, and

17   it wasn't the way I was raised, and I wouldn't want anybody doing

18   that to nobody in my family.

19   Q    Did you shoot the kid?

20   A    No.

21   Q    Mr. Fleming, this man over here, asked you about Officer

22   Polite.  Which direction did Officer Polite come from?

23   A    Chef.

24   Q    From the west, or the east?

25   A    The east side.

1  Q    So he was coming up toward the bridge as you and Ray Young

2  were chasing the kid down the bridge?

3           MR. DeSALVO:  Objection, leading.

4           THE COURT:  Let's not lead the witness.

5           MS. BERNSTEIN:  Can we have 71 up, please?  I think is

6  the picture of the road.

7  BY MS. BERNSTEIN:

8  Q    Which direction, can you just draw an arrow which direction

9  you and Ray Young were running.

10  A    (Witness complies.)

11  Q    And I am going to turn that into an arrow.

12           Is that correct?

13  A    Yes.

14           MS. BERNSTEIN:  For the record, that's running straight

15  down the bridge.

16  BY MS. BERNSTEIN:

17  Q    Can you draw an arrow showing the direction Polite came from.

18  A    (Witness complies.)

19  Q    So coming up the road the other direction?

20  A    Yeah.  Yes.

21  Q    Did Officer Polite ever fire his weapon?

22  A    Not to my knowledge.

23  Q    Did Ray Young fire his weapon?

24  A    Not to my knowledge.

25  Q    Did you fire your weapon?

1   A    No.

2   Q    You were asked some questions about who was on the left and

3   who was on the right.  Do you remember that?

4   A    Yes.

5   Q    And were you shown your grand jury?

6   A    Yes.

7          MS. BERNSTEIN:  May I approach, Your Honor?

8          MR. FLEMING:  I'm going to object to showing him the

9   grand jury or any testimony.  We've shown the testimony to

10  refresh his memory or when he says I can't remember.  She's just

11  showing it to him to show it.

12         THE COURT:  Let's get a question on the table.  Before

13  you show it to him, let's get a question.  This is going to be

14  the mode we operate in, ask the question and then if he needs the

15  testimony he can look at it.

16  BY MS. BERNSTEIN:

17  Q    Do you remember being asked questions about who was on the

18  left and who was on the right?

19  A    Yes.

20  Q    And do you remember being shown your grand jury and having

21  the jury read about who was on of the left and who was on the

22  right?

23  A    Yes.

24         MS. BERNSTEIN:  Judge, may I approach the witness and

25  have him read the prior paragraph?

1        MR. FLEMING:  Objection, she should ask a question.

2        THE COURT:  If we're going to have him read from prior

3   testimony, then there's no reason for him to be here.

4        MS. BERNSTEIN:  I'm not refreshing at this point.

5   BY MS. BERNSTEIN:

6   Q   Were you asked in the grand jury:  So you were facing up the

7   bridge from where you drove up?  Do you remember being asked --

8        MR. FLEMING:  Judge, at this point, I'd object to the

9   prosecutor asking her own witness about his previous testimony.

10       THE COURT:  Let's ask him fact witness questions about

11  what he knows.

12  BY MS. BERNSTEIN:

13  Q   Do you remember as you sit there right now what you were

14  being asked in the grand jury about how you were oriented when

15  you were talking about the left and the right?

16  A   No, I don't remember.

17  Q   Would it help refresh your memory to look at the transcript?

18       MR. FLEMING:  She just asked him to look at his grand

19  jury testimony.  This is her witness.

20       MS. BERNSTEIN:  I'm now refreshing the witness.

21       THE COURT:  He stated that he didn't remember based on a

22  question that I asked her, told her she had to ask the question.

23  So I'm going let her go ahead and show it to him now.

24       MS. BERNSTEIN:  Don't read this out loud, just like you

25  to read it to yourself.

```
 1              MR. FLEMING:  Might I inquire as to which transcript?
 2              THE COURT:  Page and line.
 3              MS. BERNSTEIN:  Judge, page 23, lines 19 through 23.
 4              MR. FLEMING:  Which day?
 5              MS. BERNSTEIN:  May 27, 2009.
 6   BY MS. BERNSTEIN:
 7   Q    Have you finished reading that?
 8   A    Yes.
 9   Q    Does that help you remember how you were oriented when you
10   were talking about left and right?  Do you know what I mean by
11   that question?
12   A    No.
13   Q    Let me ask a couple questions.  If you're looking down the
14   bridge, what's on your left?
15   A    Towards the east?  Like facing towards Downman?
16   Q    Yeah.  If you're looking down the bridge, what's on your
17   left?
18   A    The gas station.  The gas station and car wash.
19   Q    Okay.  And, if you're looking up the bridge, which side is
20   that same car wash on?
21   A    The right.
22   Q    So the same thing is on the left one way and on the right the
23   other way?
24   A    Yes.
25   Q    After looking at your grand jury, do you remember which way
```

1    you were oriented when you were answering questions about left

2    and right?  In other words, whether you were telling them the

3    left as you're facing up the bridge, or whether you were telling

4    them the left as you were looking down the bridge?

5    A    I was telling them the right and left from looking down.

6    Q    Okay.  And may I approach and have you look at your grand

7    jury, just to read to yourself, about which way you were oriented

8    in the grand jury?

9    A    All right.

10           (Pause in proceedings.)

11   BY MS. BERNSTEIN:

12   Q    Now, do you remember what way you were oriented in the grand

13   jury?

14   A    Facing up the bridge.

15   Q    So, when you said to the left, that was facing up the bridge?

16   A    Yes.

17           MR. FLEMING:  Yes, it's been answered, but I'm going to

18   object as to the confusing nature of the question.  Which person

19   are we talking about?  There's been numerous people that have

20   been -- that the witness has testified to in regards to one on

21   the left and one on the right.

22           THE COURT:  I think the jury can appreciate the

23   testimony that he gave.  We've looked at the picture, we've been

24   through some grand jury testimony about which way he was facing,

25   and Ms. Bernstein has just covered it as well as a few of the

1    defense counsel.

2    BY MS. BERNSTEIN:

3    Q   Let's go ahead and ask that next question.  When you're

4    talking about the person who came off from the left as you're

5    looking up the bridge, who is that person?

6    A   The light skinned black male with the long gun.

7    Q   Mr. Hessler here asked you if you ever heard officer down.

8    Did you hear officer down?

9    A   No.

10   Q   When you got out to the bridge, did you look for an officer

11   down?

12   A   No.

13   Q   During the hour or two you were out there, did you ever look

14   for an officer down?

15   A   No.

16   Q   During the hour or two that you were out there, did you ever

17   hear anybody talk about an officer down?

18   A   No.

19   Q   Now, Mr. Hessler asked you some other questions about whether

20   you ever told the FBI what Ignatius Hills said to you after he

21   fired.  Do you remember that?

22   A   Yes.

23        MS. BERNSTEIN:  May I approach, Your Honor?

24        THE COURT:  Yes.  Wait, let's get a question on the

25   table, though.  If we're going to approach, instead of showing

1    him stuff, we need to make certain that counsel has seen it.

2    BY MS. BERNSTEIN:

3    Q   You asked him whether he ever told the FBI about what

4    Ignatius Hills said.  And what was your answer?

5    A   Yes.

6    Q   All right.

7            MS. BERNSTEIN:  And, Your Honor, may I approach with a

8    302 from June 17, 2010?  The implication was made that --

9            THE COURT:  Wait, wait.  Counsel, approach, please.

10           (Sidebar conference.  Jury not present.)

11           THE COURT:  I'm concerned that we're going at him with

12   documents without questions on the table.  He's already answered

13   yes to the last question.

14           MS. BERNSTEIN:  Yes.

15           THE COURT:  So what are we doing with the document?

16           MS. BERNSTEIN:  We're doing redirect because he answered

17   yes.  And the implication on cross was that he never told the

18   FBI.  So I'm, on redirect, I'm going up with the same 302 that

19   you all used on cross, I can't remember which one, to show him

20   that right here on cross he told -- right here when he talked to

21   the FBI he told the FBI exactly what he said here today.  And the

22   implication was clearly made that he never said that.  And they

23   were holding this 302, and I waited, I didn't object to the fact

24   that they weren't showing him the 302 because I thought:  Well,

25   I'm going to get up and have a chance to show it to him on cross.

1          THE COURT:  Let me make sure I understand.  The first --

2    I forget who asked the questions.

3          MS. BERNSTEIN:  I think it was Eric.

4          THE COURT:  That he didn't say the first time he talked

5    to Agent Bezak.

6          MR. HESSLER:  He said the Family Inn, and I showed him

7    the grand jury, and he said he didn't tell the jury that.

8          MS. BERNSTEIN:  The specific question I'm asking was a

9    specific question did you ever tell the FBI that.

10         MR. HESSLER:  And his answer was yes.

11         MS. BERNSTEIN:  And the following implication was that

12   was not true.  So the complete redirect is totally proper to show

13   this to him that in fact he did tell the FBI and the implication

14   was correct.

15         THE COURT:  But he's just said yes.  What would be the

16   point of showing him the 302?

17         MS. BERNSTEIN:  It shows that he's telling the truth.  I

18   didn't object on cross because he asked a question, so I'm going

19   to have a chance to follow-up.

20         MR. HESSLER:  He stated that he did tell the FBI, and I

21   left that alone.  I said that --

22         THE COURT:  He never said that he -- he just said he

23   told the FBI that.  I can't see going and putting paper in front

24   of him to do it.  Why don't you ask Agent Bezak.

25         MS. BERNSTEIN:  What if I ask him exactly what he

1    remembers what he told the FBI and then I can refresh him?

2            THE COURT:  He doesn't need to be refreshed.  He said,

3    yes, he did.  He's definitive, he said yes he has.

4            MS. BERNSTEIN:  And then I will have to jump up and

5    object when they use the 302.

6            THE COURT:  Do what you feel you have to do.  But he's

7    just said yes.

8            To put documents in front of him, he said yes.  He said

9    yes when he was asked on cross, and he's just said yes here.  I

10   can't see refreshing the government's own witness's recollection

11   with the government's own document, when he's already given an

12   answer that matches.

13           MS. BERNSTEIN:  The attorney's implication is that he

14   has lied.  But I understand the ruling.

15   BY MS. BERNSTEIN:

16   Q   What did you tell the FBI about what Ignatius Hills said

17   after he fired that shot?

18   A   I asked him what he was doing.  And he said he was firing a

19   round at that little N word or trying to hit that little N

20   wording something like that.

21   Q   Mr. Hessler also asked you about the gentleman that Ignatius

22   Hills fired at.  Do you remember that question on cross

23   examination?

24   A   No.

25   Q   Who was it that Ignatius Hills fired at?

1    A    The African-American male running in the walkway.

2    Q    And what happened to that person?

3    A    After he was shot?  He fell.

4    Q    And then what happened to him?

5    A    Got up and ran.

6         I ran down there, slapped him.

7    Q    Do you have any doubt about the fact that's the same person?

8    A    No.  It was.

9    Q    All right.  Several of the defense attorneys asked you about

10   two different officers you saw down at the bottom of the bridge.

11   And they asked you if you saw anyone in the grassy area between

12   the bridge and the gas station where you took the kid.  Did you

13   see anybody in that grassy area?

14   A    No.

15   Q    Now, when you went back to the Crystal Palace, and Defendant

16   Kaufman asked his question, what did Defendant Kaufman ask for?

17   Who did he ask to come over to him?

18   A    The people that fired their weapons.

19   Q    And you were there and you saw who responded; right?

20   A    Yes.

21   Q    Was everybody who responded part of the group that was in the

22   Budget truck?

23   A    Yes.

24   Q    Now, you were asked whether Kenny Polite responded.  Did he

25   fire his weapon?

1   A    To my knowledge, no.

2   Q    And you were asked whether Ray Young responded.  Did he fire

3   his weapon?

4   A    Not to my knowledge.

5   Q    And you were right there when the officers who fired did

6   respond; correct?

7   A    Yes.

8   Q    Did anybody ever say there was a shooter in the grass?

9   A    I never heard anybody say that.

10  Q    In the six years since then, did anybody ever say to you that

11  there was a shooter in the grass?

12  A    No.

13  Q    You were asked also about your conversation with Hills the

14  day that you saw people together looking at a report.  Do you

15  remember those questions?

16  A    Yes.

17  Q    And you were asked specifically whether you ever told the

18  grand jury about the conversation that you had with Hills

19  afterwards; is that right?

20  A    Yes.

21  Q    And they showed you your grand jury; right?

22  A    Yes.

23  Q    Now, my question to you is do you remember whether in the

24  grand jury you were asked about any conversation with Hills?

25  A    No, I don't remember.

1          MS. BERNSTEIN:  May I approach, Your Honor?

2          THE COURT:  Yes.

3          MR. FLEMING:  Judge, I'm going to object.  May we

4    approach?

5          THE COURT:  Come on up.

6          (Sidebar conference.  Jury not present.)

7          MR. FLEMING:  I assume she's showing him the transcript

8    to show that the question was not asked, and now she's going to

9    refresh his memory of something that's not there.  Might be able

10   to refresh his memory of something that's there; but, if the

11   question's not asked of him, he's just going to read -- then he's

12   going to say, no, it's not in there.

13         THE COURT:  Well, it may take awhile, but he says he

14   doesn't recall.  She can refresh his recollection.

15         MS. BERNSTEIN:  An alternative way to do it that I

16   actually think is proper, but you can tell me whether you agree

17   at this point, since the implication has been made that he lied

18   to the grand jury, is just to read the question and answer and

19   have him read along with me and tell me if that is in fact what

20   that says.

21         THE COURT:  Are you going to have him look at it?  Is

22   that your intent at this point?

23         MS. BERNSTEIN:  Yes.  And I can either refresh and ask

24   him to do that --

25         MR. FLEMING:  I would object to doing that.

1      THE COURT:  If he says he doesn't recall, then it's fair

2   at this point to ask him if he recalls the transcript.  If you

3   want to get him to flip through it, it may take a little time.

4      MS. BERNSTEIN:  It's about a page that he would have to

5   read.

6      MR. HESSLER:  Is it not the same page that I've already

7   showed him?

8      MS. BERNSTEIN:  And then beyond.

9      MR. FLEMING:  I think Your Honor appreciates my

10  objection, but I want to make sure for the appellate record that

11  the objection is not so much that he said he doesn't remember,

12  it's that she's using an election to show a negative to show that

13  something was not there.  That's my issue.

14     MS. BERNSTEIN:  And the implication was he lied because

15  he didn't give that information.  So I think the fact that he was

16  not asked is responsive to that.

17     THE COURT:  I'm going to overrule and give her the

18  opportunity to demonstrate.

19     MR. FLEMING:  I guess further -- I'm sorry --

20     MS. BERNSTEIN:  May I give it to him to read while we're

21  talking?

22     THE COURT:  Yes.  One second.  Go ahead.

23     (Pause in proceedings.)

24     MR. FLEMING:  I don't think the implication was ever

25  made as to that particular point, that the witness lied to the

```
 1    grand jury.  As to that point, no.  That he withheld information
 2    as to that point -- I understand that's not going to change.
 3             THE COURT:  It's redirect.  I think, if she wants to
 4    make a point, if counsel wants to make a point based upon
 5    something that was either brought out on redirect or the
 6    impression that was left on redirect, and the witness has now
 7    said that he doesn't recall, I don't think it's inappropriate to
 8    show him the transcript at this point in order to clarify
 9    something that counsel believes the government believes was left
10    unclear.
11             MR. FLEMING:  Which transcript, the 527, page 23?
12             MS. BERNSTEIN:  It's the same one you all showed him.
13             MR. FLEMING:  527, page 23?
14             MS. BERNSTEIN:  I think so.
15             (Sidebar concluded.  Jury now present.)
16    BY MS. BERNSTEIN:
17    Q   Are you done reading?
18             Does that help you remember what happened in the grand
19    jury?
20    A   Yes.
21    Q   Did you tell the grand jury about seeing people meeting
22    together at the Seventh District station?
23    A   Yes.
24    Q   Were you ever asked about a conversation?
25    A   Yes.
```

1    Q    With Hills?

2    A    With Hills, no.

3    Q    Now, Mr. DeSalvo asked you some questions about a meeting in

4    the parking lot at the Seventh District station.  Do you know

5    what date that was on?

6    A    No.

7    Q    Do you know whether that's the only time that people got

8    together in the parking lot?

9    A    No.

10   Q    Mr. Kaufman's lawyer, back there, asked you whether you ever

11   told Defendant Kaufman what you did on the bridge.  Do you

12   remember that question?

13   A    Yes.

14   Q    Did Defendant Kaufman ever ask you?

15   A    No.

16   Q    Did he ever take a statement from you?

17   A    No.

18   Q    Now, Mr. Hessler, the first attorney who stood up, asked you

19   about your adrenalin that day.  Do you remember that?

20   A    Yes.

21   Q    Was your adrenaline pumping?

22   A    Yes.

23   Q    Were you scared?

24   A    Yes.

25   Q    On the way to the bridge, what did you think you were heading

1    to?

2    A    A shoot-out.

3    Q    When you got there, what did you hear?

4    A    Shots.

5    Q    Just a couple shots, or a lot?

6    A    A lot.

7    Q    And, with all that adrenaline, did you get out of the truck,

8    shooting?

9    A    No.

10   Q    When you saw that kid running, did you shoot at him?

11   A    No.

12   Q    Why not?

13   A    Because he wasn't a threat.

14   Q    Did you know on September 4th that you can't shoot him if he

15   wasn't a threat?

16   A    I'm sorry, would you repeat it.

17   Q    Did you know on September 4th that you couldn't shoot him if

18   he wasn't a threat?

19   A    Yes.

20   Q    Is that true even if your adrenaline is pumping?

21   A    Yes.

22           MS. BERNSTEIN:  No further questions, Your Honor.

23           THE COURT:  Thank you.  Sir, you can step down.

24           MR. FLEMING:  We'd ask that he remain available and

25   subject to the order of sequestration.

```
 1              THE COURT:  You can step down.  Please don't discuss
 2    your testimony between now and the conclusion of trial.  You're
 3    still under a sequestration order.
 4              MS. BERNSTEIN:  One housekeeping matter.
 5              THE COURT:  Sure.
 6              MS. BERNSTEIN:  I've been told that last week we used
 7    Exhibit 32, which is a photograph of the bridge, and that we
 8    neglected to offer it into evidence.
 9              THE COURT:  Any objection?
10              MR. FLEMING:  No objection.
11              MR. HESSLER:  No objection, Your Honor.
12              THE COURT:  So ordered, 32 is in.
13              (Exhibit Admitted.)
14              THE COURT:  And who do we have next?
15              MR. CARTER:  Officer Christopher Baron.
16              MICHAEL CHRISTOPHER BARON, being first duly sworn,
17    testified as follows:
18              CASE MANAGER:  Please state and spell your full name for
19    the record.
20              THE WITNESS:  My name is Michael Christopher Baron, and
21    M-I-C-H-A-E-L C-H-R-I-S-T-O-P-H-E-R B-A-R-O-N.
22                          DIRECT EXAMINATION
23    BY MR. CARTER:
24    Q   Mr. Baron, where do you work?
25    A   Louisiana State Police.
```

1   Q    What do you do there?

2   A    I'm lieutenant over Fleet Operations, our vehicle

3   maintenance.

4   Q    Fleet Operations, vehicle maintenance?

5   A    Yes, sir.

6   Q    How long have you been with the Louisiana State Police?

7   A    Been there 17 years.

8   Q    Were you on duty on September 4th of 2005?

9   A    Yes, sir, I was.

10  Q    What was your rank at that time?

11  A    Sergeant.

12  Q    Where were you on duty?

13  A    I was on duty in the New Orleans.

14  Q    And what were you doing at that time, the morning of

15  September 4, 2005?

16  A    I was assigned to an escort detail escorting Boh Brothers

17  employees from the 17th Street Canal to their yard in Almonaster.

18  Q    To the yard in Almonaster.

19       What road did you take to get them there?

20  A    I-10.

21  Q    Were there any incidents as you escorted that Boh Brothers

22  unit?

23  A    Yes, sir.  When we got to the down side of the Industrial

24  Canal on I-10, our escort, one of the trucks was pulling a boat

25  trailer, and it got a flat, and we had to stop for the flat.

1    Q    What happened next?

2    A    About that same time, I heard a report over the state police

3    radio that a Coast Guard helicopter was receiving sniper fire

4    from the top of the Holiday Inn at Chef Menteur and I-10.

5    Q    So what did you do?

6    A    At that time, I looked up.  Not being very familiar with New

7    Orleans, exactly where we were, I looked up, and there was the

8    Holiday Inn and the Coast Guard helicopter.  It made a couple

9    passes by around the Holiday Inn and then took off.  At that time

10   I tried to ascertain from the radio operator the reports, because

11   did it happen, did it not happen, and to secure the detail in

12   case there were snipers.

13   Q    What were you told?

14   A    The radio traffic varied.  It worked and didn't work.  You

15   couldn't always get communication through.  And the course of

16   about -- I'm not sure exactly how long it was -- but I never

17   could ascertain whether or not -- get in touch with the Coast

18   Guard to confirm the report was true or not.

19          MR. CARTER:  Can I have Exhibit 47, please.  Which is

20   already in evidence, Your Honor.

21   BY MR. CARTER:

22   Q    Can you show us on this photograph the area where you were?

23   A    Is this I-10, the lower portion of the picture, crossing the

24   canal.

25   Q    Where were you?  Yes.  This is the I-10.

1    A    Right.  We were going eastbound on I-10, and on the down

2    slope.  It might be off of this picture here, but towards the

3    right corner.  Because, where the detail would stop on the

4    down side of I-10, then me and another trooper actually took

5    position --

6    Q    Let me stop you.  You said the area is not on this

7    photograph?

8    A    I'm not sure if it is or isn't, because I don't see the

9    overpass crossing over I-10.

10   Q    Let me show you another photograph.

11         Lieutenant Baron, I'm showing you what has been marked

12   government's Exhibit 257.  Is the area you're referring to

13   depicted in that photograph?

14   A    Yes, sir.  It's going to be at the top of the picture here,

15   close to where this overpass is right here.

16         MR. CARTER:  Your Honor, I would offer government

17   Exhibit 257 into evidence.

18         THE COURT:  Any objection?

19         MR. FLEMING:  No objection, Judge.

20         THE COURT:  257 is admitted.

21         (Exhibit admitted.)

22         MR. CARTER:  Show 257, please.

23   BY MR. CARTER:

24   Q    Would you touch the area on Exhibit 257 that you were

25   referring to earlier.

 1  A   Okay.  Our detail stopped somewhere in this area on the box,

 2  maybe a little bit further.  Because where we stopped the detail

 3  was not a point of cover, per se, and myself and another trooper

 4  drove down to where you see this overpass, right there, to take

 5  cover at the overpass to get eyes on the Holiday Inn to try to

 6  determine if we could see snipers or not.

 7  Q   And where was the Holiday Inn in that photograph?

 8  A   I think that's going to be --

 9         MR. CARTER:  Can we have that area blown up?

10  BY MR. CARTER:

11  A   I believe this would be the Holiday Inn right there.

12  Q   And where were you?

13  A   Underneath this -- I'm sorry -- underneath the overpass.

14  Q   What happened next?

15  A   State police SWAT was called, and they responded.  And I

16  briefed them on the situation.

17         And, in the meantime, Wildlife & Fisheries had driven up

18  and asked about what had happened.  We were still trying to

19  ascertain is it safe, are there snipers, is it not.

20         State police SWAT came and took over the scene.  Secured

21  the area on I-10 for us, keeping eyes on the Holiday Inn so I

22  could get my escort, get me detail to the location.

23  Q   And what did you do after this?

24  A   Then we preceded along I-10, exited right underneath the

25  overpass, and came out on this highway going that direction.  I

 1    think that's going to be east.

 2    Q    You're heading east on I-10?

 3    A    Yes, sir.  We existed I-10 right here.  And I guess this is

 4    Chef.  I'm not sure of the street names.

 5    Q    And then what did you do?

 6    A    Then, once we got of the exit ramp onto the highway here,

 7    then my detail was stopped.  I was on the tail-end.  I drove up

 8    to the front of the detail.

 9    Q    Let me stop you.  Were you heading east, or west?

10    A    The direction away from the city, east.

11    Q    So you were heading away from the city?

12    A    Yes, sir.

13    Q    Okay.  How many cars in your convoy?

14    A    I'm not sure how many was in the convoy, but there was five

15    trooper vehicles.  Four troopers and myself.

16    Q    And who was in control?  Who was in command of this unit,

17    your unit?

18    A    I was the supervisor.

19    Q    What happens as you headed east -- away from the city?

20    A    Yes, sir.

21    Q    What happened?

22    A    Our convoy stopped again on the highway.  And I drove to the

23    front, where I found Trooper Bob Vittitoe, and he was parked.

24    And there was an NOPD officer going the opposite way on that

25    road, going back toward the city.

Q   By the opposite way, you mean he was headed west, toward the city?

A   Yes, sir.

Q   On Chef Menteur?

A   If that's the street name, yes, sir.

Q   On the street.  Whatever the street name is, she was on that street.  What happened next?

A   Trooper Vittitoe advised me that she was advised by the NOPD officers there was an officer down on the bridge and needed assistance.

Q   What did you do next?

A   I asked Trooper Vittitoe and another trooper on detail to secure our detail at that point there, and myself and two other troopers, I believe it was Volante and Pike, went to assist on the bridge.

Q   Which direction did you travel?

A   West towards --

Q   Draw a line in the direction that you traveled.

A   (Witness complies.)

Q   For the record, Officer Baron has drawn the line pointing west coming up what is Chef Menteur Highway.  But you did not know the name of that street?

A   At the time, no, sir.

Q   Do you see the Danziger Bridge in this photograph?

A   Yes, sir, I do.

1   Q   Would you touch it, put a dot on it, where it is.  Is that

2   the direction you were heading?

3   A   Yes, sir.

4   Q   Why were you heading in that direction?

5   A   To assist the officer down on the bridge.

6   Q   Would that have been coming back west?

7   A   Yes, sir.

8   Q   What happened next?  Let me stop you.

9        Did you talk to the officer yourself?

10  A   No, sir, I did not.

11  Q   But you followed the officer, if I understand you correctly?

12  A   Yes, sir, I did.

13  Q   What happened next as you were following the officer?

14  A   I wasn't aware of the layout of the bridge and the area here

15  where we were going.  And so I instructed Volante and Pike, who

16  was in two different vehicles, to take the low road.  Because I

17  didn't know what the scenario and the situation was.  So they

18  went the low road, and I followed the NOPD officer up the bridge.

19        MR. CARTER:  Let's have Exhibit 47 again.

20  BY MR. CARTER:

21  Q   Can you show us where you told the other troopers to go and

22  where you went?

23  A   The other two troopers took that road parallel to the bridge.

24  Q   And where did you go?

25  A   And I followed the NOPD officer up the bridge.

1          MR. CARTER:  And, for the record, Officer Baron has just

2    drawn a line up the Danziger Bridge heading west.  For the other

3    troopers, he's drawn a line parallel to the right, going to the

4    grassy area.

5    BY MR. CARTER:

6    Q    Is that correct?

7    A    Yes, sir.  And this were on the road.

8    Q    They were on the road in that direction.  They were not on

9    the grassy area.

10   A    Correct.

11   Q    What happened as you went up the bridge?  Were you still

12   following the police car?

13   A    Yes, sir.

14   Q    What happened?

15   A    We got to the top of the bridge, which I would call the

16   crest, right about there.

17   Q    And, for the record, you're pointing to the area between the

18   two -- I don't know what you call it --

19   A    Trusses.

20   Q    Trusses.

21          What happened there?

22   A    When I pulled up there --

23   Q    Did you stop there?

24   A    The NOPD officer had stopped, yes, sir.  And I stopped behind

25   her.

1    Q    What happened?

2    A    I rolled my window down.  There were police officers on the

3    bridge on foot.

4    Q    How many?

5    A    I'm not sure how many it was.  There was several.

6    Q    Several.  More than two?

7    A    Yes, sir.

8    Q    More than three?

9    A    Yes, sir.

10   Q    More than four?

11   A    I can't tell you any more past that.

12   Q    You lose count at about four?

13   A    Yes, sir.

14   Q    Probably more than that?

15   A    Yes, sir.

16   Q    Where was this NOPD officer you were following?  Was her car

17   in front of you, or behind you, or to the side of you?

18   A    It was just in front of my car to the left.

19   Q    And what did you do once you stopped up there?

20   A    I rolled my window down, and there was a police officer to my

21   left.  And I asked what's going on.  And at that time gunfire

22   started going off.

23   Q    What did you do when the gunfire went off?

24   A    I ducked in my seat.

25   Q    You ducked in your seat?

1   A   (Witness nods head.)

2   Q   Before you ducked, what were the other officers doing?

3   Standing, sitting, talk, what?

4   A   Yes, sir.  I'm not sure exactly what they were doing at that

5   moment.

6   Q   Before you ducked, what they were they doing?

7   A   They were standing on the bridge, but I'm not sure exactly.

8   Q   After you came up from ducking, what were they doing?

9   A   After I came up from ducking --

10  Q   Were they still standing?

11  A   Yes, sir.

12        The officer to my left said:  Those are guys shooting at

13  us down there.

14  Q   Let me ask you, was he still standing when you came up from

15  your duck?

16  A   Yes, sir.

17  Q   So you don't know if he ducked or not?

18  A   No, sir.

19  Q   You don't know if the other officers ducked or not?

20  A   No, sir.

21  Q   You don't know where those gunshots came from?

22  A   That's correct.

23  Q   Do you know if they knew where the gunfire came from?

24  A   I know what he told me.

25  Q   What did he tell you?

1   A   He told me that those are the guys shooting at us down there,

2   and pointed down the bridge.

3   Q   Down where?

4   A   Down the bridge, this direction.

5   Q   Just put a dot where you -- again, this was six years ago.

6   Where you recall seeing them, in the area you recall seeing these

7   individuals, just put a mark on the screen.

8   A   Like I say, exactly where, I'm not sure.  I'm sorry.

9   Q   Somewhere in that area?

10  A   And it could have been further down, one way or the other.

11  Q   And it could have been further up.  All right.

12        When he said that, did you look down at those

13  individuals?

14  A   Yes, sir, I did.

15  Q   What did you see?

16  A   I saw what looked like a huddle type of black individuals

17  that broke and ran.

18  Q   Can you see these individuals' hands from that distance?

19  A   I just saw a group of individuals and what I would

20  characterize as like a football huddle, and they broke and ran.

21  Q   Were there any other civilians on the bridge other than these

22  people you saw toward the bottom of the bridge, that you saw?

23  A   I didn't observe any.

24  Q   Okay.  Did you see anyone else on the bridge but those two

25  individuals -- or those individuals?  Could you tell how many

1  there were?

2  A   No, sir.  It was more than two, but I'm not sure how many was

3  in it.

4  Q   So it would be those individuals on the bridge and we had law

5  enforcement.

6  A   Yes, sir.

7  Q   At this point in time, when the officer told you that those

8  are the individuals shooting at us, did you see those individuals

9  pointing at you in any way?

10  A   I didn't observe them pointing at me, no, sir.

11  Q   After he said that, did you hear any more gunfire coming from

12  where those individuals were?

13  A   Not at that point.

14  Q   What happened next?

15  A   At that same time, three police officers got in my car, one

16  in my passenger's seat and two in my rear driver's seat and rear

17  passenger's seat.

18  Q   Back up one second.  Those gunshots that you heard when you

19  ducked, did you know where they came from?

20  A   No, sir.  It sounded like it was from a lot of different

21  directions.

22  Q   Do you know whether or not those were police officers who

23  fired those shots?

24  A   No, sir, I do not.

25  Q   You didn't know where it came from?

1    A    No, sir.  No, sir.

2    Q    You said officers got in your car?

3    A    Yes, sir.

4    Q    How many?

5    A    Three.

6    Q    What did they say as they were getting in your car?  Did they

7    say anything?

8    A    I recall:  Get them, let's get them.

9    Q    What can you tell me about these officers who got in your

10   car?  Do you know their names?

11   A    No, sir.  At the time, I didn't.

12   Q    Do you know them now?

13   A    Yes, sir.

14   Q    How do you know them now?

15   A    Within the last six years, through news reports or people

16   talking, television.

17   Q    Describe the individual who got into the front passenger's

18   seat.

19   A    He was a black male officer in blue combat pants and a blue

20   BDU style NOPD shirt.

21   Q    Was he armed?

22   A    Yes, sir.  He had a shotgun.

23   Q    Shotgun?

24        And have you come to learn the name of this individual?

25   A    Yes, sir.

1   Q   And who have you learned this individual to be?

2   A   Mr. Faulcon.

3   Q   Who got in the back passenger's seat?

4   A   Driver -- rear passenger?

5   Q   Rear passenger.

6   A   Rear passenger, it was a white male.

7   Q   What was he wearing, do you remember?

8   A   I don't recall.

9   Q   Who have you learned that that individual is?

10  A   Mr. Gisevius.

11  Q   Gisevius, he got in the rear seat?

12  A   Yes, sir.

13  Q   And who else got in the rear?

14  A   And there was the other white male officer in my driver rear.

15  Q   And who was that?

16  A   A dark-haired guy, think to be --

17  Q   If you don't know --

18  A   I drew a blank on the name.

19  Q   No need to speculate.

20          So we have one known New Orleans police officer in the

21  front with a shotgun next to you in the passenger's seat, and we

22  have two NOPD officers in the rear; have I got that right?

23  A   Yes, sir.

24  Q   What happened next?

25  A   I drove down the bridge in pursuit of the suspects.

1    Q    Did these officers tell you anything about the individuals

2    you were pursuing?

3    A    No, sir.

4    Q    What happened as you drove down the bridge?

5    A    As I was driving down the bridge, the passenger -- there was

6    two individuals running on the road in front of me.

7    Q    Could you tell if these were the same individuals that you

8    saw at the top of the bridge when they pointed -- when the

9    officers pointed and said those are the ones who are shooting at

10   us, could you tell if those were the same individuals?

11   A    No, sir.

12   Q    You continued to follow them, and what happened?

13   A    And there was two individuals, one running in front of

14   another one, in front of my car.

15   Q    Were you focused on these individuals?

16   A    The one that was closest to my car, I was.

17   Q    Why were you focused on that individual?

18   A    He was closest to me.

19   Q    What about the other individual?

20   A    I mean, I saw him, but he was somewhere out in front of the

21   other individual.

22   Q    Okay.  And then what happened?

23   A    Then the police officer in the right rear passenger's seat

24   stated:  There's one right there.

25   Q    So we've got a third individual?

```
1    A    Yes, sir.

2    Q    So there are two that you know are in front of you, if I

3    understand you correctly.  And now someone says something about

4    yet another individual?

5    A    Yes, sir.

6    Q    And where was this third individual?

7    A    As I looked out my passenger window, he was to the right of

8    my car, running on the side of the road.

9    Q    What was he wearing?

10   A    He was wearing a white T-shirt and I believe he had shorts

11   on.

12   Q    Do you recall what part of the bridge you were on at this

13   time when you saw this third individual?

14   A    We were coming down to I guess off the bridge where the

15   bridge meets the road.

16         MR. CARTER:  Your Honor, I'm going to ask the officer to

17   diagram on the board where his car was and the location of the

18   individuals that he saw in front of him.

19         I'll ask that you step down.

20         THE COURT:  You may have to turn that board so that the

21   jury can see it.

22         Counsel, if you need to relocate in order to see it, you

23   may.

24         While he's stepping down, let me ask, those of you in

25   the gallery section, anything beyond where the gates are, between
```

1   the gates and the back door, please do not drink or eat anything

2   in the courtroom, including bottled water.  So please refrain

3   from doing that.

4          All right, sir.

5   BY MR. CARTER:

6   Q   Let me ask, because I don't know how good your art is, to

7   draw a rectangle that would represent your vehicle.

8   A   That triangle would point to the direction I was facing.

9   Q   Where was the individual that you were focused on?

10  A   And he was somewhere in front of my car around this

11  direction.

12  Q   Do you remember at this point how far in front of your car he

13  was at this time?

14  A   He was close enough that I was preparing to come to a stop

15  and foot-pursue him.

16  Q   I'm asking you specifically about the time when you saw the

17  other individual.  The first point where you saw the other

18  individual over to your right.  He was roughly how far that,

19  individual?

20  A   Again, at the time that I noticed the individual to my right,

21  was at about the same time I was getting ready to come to a stop.

22  So --

23  Q   Hard to figure out?

24  A   Yes, sir.  I'm just trying to figure out in feet and how far

25  in front of my car exactly.

1    Q    You said there was another individual that you were already

2    aware of.  Where was that individual, if you know?

3    A    This individual, and then there was a second individual

4    running in front of -- I guess I would call him Suspect 1 at this

5    time.

6            There was another individual running somewhere this

7    direction, too, that I had seen out in front of him.

8    Q    And where was this third, for you, new individual, this new

9    suspect?

10   A    He was somewhere out to the right of my car, running along

11   the edge of the street here.

12   Q    And that's where he was when you first saw him?

13   A    Yes, sir.

14   Q    And, again, who were you focused on?

15   A    This guy here.

16   Q    And someone told you there's another guy right over there?

17   A    Yes, sir.

18   Q    I think you can take the stand now.  We can talk about --

19   we'll leave this diagram.

20           MR. CARTER:  Your Honor, I'd like to offer this as

21   government Exhibit 259.

22           THE COURT:  Counsel?

23           MR. FLEMING:  No objection.  I think that would be the

24   exhibit.

25           THE COURT:  259?

```
 1              MR. CARTER:  259, yes.
 2              THE COURT:  Let's admit 259.
 3              (Exhibit admitted.)
 4    BY MR. CARTER:
 5    Q   I'm going to ask you some questions about this, so I'll move
 6    it back.  Can you see it?
 7    A   Yes, sir.
 8    Q   I want the jury to be able to see it.
 9              Can you see it?
10    A   Yes, sir.  I can see it.
11    Q   Who were you focused on at this time?
12    A   What I would call Suspect 1.
13    Q   As you were driving down this west side of the bridge, were
14    you on high alert?
15    A   Yes.
16    Q   Why?
17    A   The events had all unfolded:  The alleged sniper fire from
18    the Holiday Inn, which was in cross proximity; the report that an
19    officer was down on the bridge, which I perceived to have been
20    shot; responding to the bridge, having gunfire, where I perceived
21    to have been shot at; and then chasing the suspects in a felony
22    situation.
23    Q   Based upon what the NOPD officers had told you, did you have
24    any expectation about whether these individuals were armed?
25    A   Can you ask that one more time?
```

1    Q    Based upon what the officers had told you, the New Orleans

2    police department officers, at the top of the bridge, that those

3    individuals are shooting at us, did you have any expectation at

4    this time about whether or not these suspects were armed?

5    A    Yes, sir.

6    Q    What did you think about whether or not they were armed?

7    What was your concern.

8    A    My concern, it was armed based on what I perceived to have

9    been fired upon.

10   Q    Did you consider them a threat?

11   A    Yes, sir, I did.

12   Q    Did you consider them dangerous?

13   A    Yes, sir, I did.

14   Q    What effect did that have on you?

15   A    It made it a life -- it made a stressful event, I guess.  I'm

16   not sure exactly how to characterize that.

17   Q    But were you alerted, as you said before?

18   A    Yes, sir.

19   Q    What were you looking for as you drove down upon these

20   individuals?  As you looked at these individuals, driving down,

21   what were you looking for?

22   A    I was observing them to determine what the level of threat

23   they were at the time, because they were running away at that

24   point.

25   Q    Was this a casual observance, or a serious very observant

1  observance?

2  A   It was as observant as I could be.

3  Q   Did you ever see any of these three men turn back and look at

4  the car?

5  A   No, sir.

6  Q   You ever see any of these three men point at the car?

7  A   No, sir, I did not.

8  Q   Ever see any of them raise a gun at the car?

9  A   No, sir, I did not.

10 Q   Did you ever see them do anything that was in any way

11 threatening as you followed them down that bridge?

12 A   No, sir, did not.

13 Q   As you were driving upon these individuals, did you perceive

14 an imminent threat?

15 A   Can you define imminent?

16 Q   I want you to define imminent.  What does it mean to you?

17 What is an imminent threat?

18 A   Lethal force situation.

19 Q   Lethal force?  By the word imminent, you would mean lethal

20 force?

21 A   Right.  If you said imminent threat, I would determine that

22 to be at particular moment I felt that my life or other police

23 officers that would be in imminent danger at that point to

24 justify lethal force.

25 Q   At that point in time, did you perceive any eminent threat

1    from these individuals as you followed them down that bridge?

2    A    No, sir, I did not.

3    Q    Let's focus on the guy on your side.  I believe you have him

4    as Suspect No. 1?

5    A    Yes, sir.

6    Q    Okay.  Did you believe he was armed?

7    A    Based on the circumstances, I didn't know if he was or wasn't

8    armed.

9    Q    Did you believe he had fired at police?

10   A    I didn't know if he had fired directly at police.  But I did

11   perceive someone had fired at the police.  I didn't know who.

12   Q    Did you believe Suspect No. 1 was a potential danger?

13   A    Yes, sir, I did believe he was a potential danger.

14   Q    Did you shoot him?

15   A    No, sir, I did not.

16   Q    Why not?

17   A    Because, at that time, he was not an eminent threat.  He was

18   not of a threat to the level to justify me using lethal force.

19   Q    What did you do?

20   A    I exited my vehicle and assisted in arresting him,

21   apprehending him, handcuffing him.

22   Q    And how did you assist in apprehending him?

23   A    I got out of my car, give him loud verbal commands for the

24   suspect to stop, put his hands up.  And at that same time other

25   officers were responding on foot, and we all kind of approached

1    the suspect at the same time where he had complied with the

2    commands.

3    Q    What did Suspect No. 1 do when you said stop?  Do you

4    remember your exact words?

5    A    No, sir, I don't remember the exact words.

6    Q    But, in substance, what did you say?

7    A    Stop, police.

8    Q    And what did this individual do?

9    A    And at that time he stopped running.

10   Q    And you said other officers came up?

11   A    Yes, sir.

12   Q    Were these officers who were in your car?

13   A    I'm not sure if they were coming from my car or on foot or

14   both.

15   Q    All right.  What about suspect No. 2, the one in the front

16   there, what happened to him?  Do you know?

17   A    I'm not sure.

18   Q    You were focused again on Suspect No. 1?

19   A    Yes, sir.

20   Q    Let's talk about the guy in the right, the guy you could see

21   out of your passenger window.  And, again, were you scanning for

22   any threats; do I understand you correctly?

23   A    No, sir.  My attention diverted to him when the police

24   officer said:  There's one right there.  And, instinctively, I

25   looked to my right.

1    Q    I'm backing up a second.  As you're driving down the bridge,

2    you're scanning for threats?

3    A    I pretty much was locked in to the threat in front of me.

4    Q    But at some point someone pointed out this individual on your

5    right?

6    A    Yes, sir.

7    Q    And you looked at him?

8    A    Yes, sir.

9    Q    And you were concerned about whether --

10          MR. LARSON:  Objection, Your Honor.  He's leading.

11          MR. CARTER:  I am.  I'm guilty.  Strike that.

12   BY MR. CARTER:

13   Q    Were you concerned about anything as you looked at this

14   individual off to your right?

15   A    He was a potential threat, along with everyone else, until we

16   could apprehend everyone and determine what the circumstances

17   was.

18   Q    What was that guy off to the right doing?

19   A    He was running.

20   Q    Did you perceive him to be a threat?

21   A    A potential threat, yes, sir.

22   Q    Based on what you saw, did you tell anybody to shoot him?

23   A    No, sir, I did not.

24   Q    Why not?

25   A    I didn't observe anything in his demeanor or actions that

```
 1   would constitute lethal force.

 2   Q   Did he ever raise his hands when you were looking at him?

 3   A   No, sir.

 4   Q   Ever point at the vehicle?

 5   A   No, sir.

 6   Q   And, again, he's right off to the side of the vehicle?

 7   A   Yes, sir.

 8   Q   Did he ever point at the vehicle?

 9   A   I didn't see him point at the vehicle.

10   Q   Ever pull a weapon and point it at the vehicle?

11   A   I didn't observe him.

12   Q   Did you ever see him grab for his waistband?

13   A   When he was running, his right hand was underneath his left

14   arm, and he was running parallel to my vehicle, kind of in a

15   wobbly fashion, running straight.

16   Q   Running straight?

17   A   Yes, sir.

18   Q   When you saw him, was he looking at your vehicle?

19   A   No, sir, he was not.

20   Q   Where was he looking?

21   A   Straight ahead.

22   Q   Where was he running?

23   A   Straight ahead.

24   Q   Trying to get away from you?

25   A   I don't have any idea.
```

1    Q    Did you see any need to shoot that individual?

2    A    At that particular moment, no, sir.

3    Q    As you were getting out of the vehicle to arrest the Subject

4    No. 1, did you hear any noise?

5    A    Yes, sir, I did.

6    Q    What did you hear?

7    A    A gunshot.

8    Q    Where did it come from?

9    A    From my right.

10   Q    And what did you see when you looked over to your right?

11   A    When I looked over to my right, I saw Suspect 3 fall to the

12   ground.  And Mr. Faulcon, who was the passenger, was outside the

13   car with a shotgun raised to his shoulder.

14   Q    Where was Subject No. 3?

15   A    He was kind of out in front of my car a little bit, still

16   running straight ahead.

17   Q    Still running straight ahead?

18   A    Yes, sir.

19   Q    And that's after you heard the boom?

20   A    Yes, sir.

21   Q    And that boom was what now?

22   A    The shotgun from Mr. Faulcon.

23   Q    What did Suspect No. 3 do after that boom, after that shot?

24   A    He fell to the ground.

25   Q    Did you see any weapon on Suspect No. 3?

1    A    I didn't go over there to Suspect No. 3.

2    Q    You didn't go over there?

3    A    No, sir.  My attention was brought back on Suspect No. 1, who

4    we were still trying to apprehend.

5    Q    After seeing this, you went back to your focus on suspect No.

6    1?

7    A    Yes, sir.

8    Q    Did you ever Officer Faulcon make any verbal order like you

9    did, tell this individual to stop?

10   A    I don't recall if did he or if he didn't.

11   Q    Do you recall whether any of the other officers made a verbal

12   command to Suspect No. 3?

13   A    And I don't recall if they did or didn't.

14   Q    What happened next?

15   A    The other NOPD officers had handcuffed Suspect No. 1 in front

16   of my car, and there was some discussion or conversation or

17   comments about there was still a suspect at large that had ran

18   off into the -- and I'm assuming that's a hotel parking lot or an

19   apartment parking lot.

20   Q    What were these individuals wearing?  You've already said

21   that suspect No. 3 had on a white T-shirt, and what color pants?

22   A    I'm not sure at the time I recall, but I think it was shorts.

23   Q    What about Suspect No. 1, what was he wearing?

24   A    Suspect No. 1 had a black shirt, black pants, black combat

25   boots.

1    Q    What about Suspect No. 2, what was he wearing?

2    A    Suspect 2 had a black shirt on and some kind of shorts or

3    knee-length kind of short pats, something along those lines.

4    Q    You said Suspect No. 3 was running with his arm under -- was

5    it his right arm underneath his left arm, or his left arm

6    underneath his right arm?

7    A    His right arm or hand underneath his left arm.

8    Q    And were you able to see anything near where his hand was?

9    A    There was a red spot on his T-shirt.

10   Q    Did it appear to be blood?

11   A    Yes, sir.  When I wrote in my report later that day, that was

12   my observations or my inference.

13   Q    Let me show you what's been marked as government Exhibit 40,

14   and I believe it is already in evidence.  It's already on the

15   screen.

16        What's depicted in this photograph?

17   A    My unit is the black Impala there, and that is Suspect No. 1

18   on the ground.

19   Q    And where are you in this photograph?  Are you in this

20   photograph?

21   A    Yes, sir.

22   Q    Where are you?  Right there?

23   A    Yes, sir.

24   Q    Who are those individuals you're talking to, do you know?

25   A    I'm not sure, no, sir.

1    Q    Who is that standing over Suspect No. 1?

2    A    I'm not 100 percent sure, but I believe it might be Sergeant

3    Kaufman.

4    Q    Did you talk to Sergeant Kaufman that day?

5    A    Yes, sir, I did.

6    Q    Why did you talk to Sergeant Kaufman?

7    A    After the scene was secured and I had to get back to my

8    detail, I was informed by someone, one of the NOPD officers, I'm

9    not sure, that Sergeant Kaufman was the lead detective, and I

10   went to find Sergeant Kaufman to determine what he needed from

11   me, if I needed to make other arrangements for my detail.

12   Q    What did you think he might need from you?

13   A    Maybe a statement.

14   Q    And what did Sergeant Kaufman say?

15   A    He asked me if I had fired a shot.  And I told him:  No, I

16   didn't.  He said:  If you didn't shoot, I don't need you.

17   Q    He said:  If you didn't fire a shot -- what?

18   A    I don't need you.

19   Q    But were you or were you not a witness to what happened out

20   there?

21   A    Yes, sir, I was a witness.

22   Q    Yet, he didn't want a statement from you?

23   A    I'm not sure if he didn't want a statement, but at that time

24   he said he didn't need me.

25   Q    He said he didn't need a statement?

```
 1   A    He said he didn't need me, yes.

 2   Q    Did he contact you later that day?

 3   A    No, sir, he did not.

 4   Q    Did he contact you the next day?

 5   A    No, sir.

 6   Q    Next week?

 7   A    No, sir.

 8   Q    Next month?

 9   A    No, sir.

10   Q    How about several months later?

11   A    It was some time after -- I don't know if it was a year.  I

12   don't know exact time.  But I was contacted through the

13   department to be interviewed by NOPD in terms of the

14   investigation.

15   Q    A year later?

16   A    Approximately, yes, sir.

17   Q    Was it Sergeant Kaufman who interviewed you a year later, or

18   someone else?

19   A    I don't remember at this time.

20             MR. CARTER:  One moment, Your Honor.

21             (Pause in proceedings.)

22   BY MR. CARTER:

23   Q    I'd just ask you, Officer Baron, whether or not you heard

24   Officer Faulcon shout out anything like:  Stop, police?  Prior to

25   getting out of the car, do you remember Officer Faulcon saying
```

1    anything?

2    A    Yes, sir, I do.

3    Q    What did he say?

4    A    After the officer in the right rear passenger seat said:

5    There's one right there, I looked over and saw Suspect 3 running.

6    Was about the same time, I was getting ready to slow -- I was

7    slowing already -- to come to a stop to foot pursue Suspect No.

8    1.  And Mr Faulcon, somewhere -- I'm not exactly sure where --

9    but somewhere in the time of opening the door of the car said:  I

10   got him.

11   Q    Said:  I got him?

12   A    Yes, sir.

13   Q    And then you heard a shotgun blast?

14   A    After that, yes, sir.

15   Q    What about this other suspect, suspect I believe you him as

16   No. 2, what happened to him?

17   A    He later turned himself in to state police squad.

18   Q    Do you know his name?

19   A    No, sir, I do not.

20          MR. CARTER:  I have nothing further, Your Honor.

21          THE COURT:  Okay.  Cross.

22          MR. MECHE:  Yeah.  I'll be brief.

23          THE COURT:  Okay, Mr. Meche, you can go first.

24                    CROSS EXAMINATION

25   BY MR. MECHE:

1   Q    Mr. Trooper, I'm Tim Meche, I represent Officer Tim

2   Villavaso.  Do you know him?

3   A    No, sir, I do not.

4   Q    He wasn't one of the ones that got in your vehicle?

5   A    I'm not sure if he was one of the rear passengers or not.

6   Q    I think you said the two people were white people.

7   A    Yes, sir.

8          MR. MECHE:  Let the record reflect, he's

9   African-American.

10  BY MR. MECHE:

11  Q    So he wasn't the one in the back of your car?

12  A    I identified the passengers as white male.  His complexion is

13  light skinned.

14  Q    Did you recall seeing him at all that day?

15  A    No, sir, I do not.

16  Q    Now, this individual you apprehended who you identified as

17  Unidentified Suspect No. 1, was he ever riding in a shopping

18  cart, that you noticed?

19  A    Not that I know of.

20  Q    Did you notice a shopping cart anywhere near him that day?

21  A    I did not notice a shopping cart, no, sir.

22          MR. MECHE:  Thank you, sir.

23          THE COURT:  All right.  Mr. Larson.

24                         CROSS EXAMINATION

25  BY MR. LARSON:

1    Q    Good afternoon, Lieutenant Baron.  My name is Lindsay Larson,

2    I represent Robert Faulcon.

3            Let's take you back, if we can, through your testimony,

4    and see if I understand what happened on that bridge on that day.

5    As I understand it, you initially were told that there was sniper

6    fire coming from the Holiday Inn who were shooting at a

7    helicopter?

8    A    Yes.

9    Q    And that's when you were on the I-10 bridge?

10   A    Yes, sir.

11   Q    You never did determine whether or not one way or the other

12   whether in fact there was sniper fire coming from the Holiday

13   Inn?

14   A    That is correct.

15   Q    Were you aware of any sniper fire during your time in New

16   Orleans?  Any reports of sniper fire while you were in New

17   Orleans?

18   A    Yes, sir.  There was reports of sniper fire in New Orleans.

19   Q    So you didn't find that call of sniper fire coming from the

20   Holiday Inn incredible?  If fact, you found it credible; didn't

21   you?

22   A    Yes, sir.

23   Q    And then, after you and your troopers continued on the job or

24   continued on your way, going east, you were told by Officer

25   Vittitoe that he was told that there was an officer down on the

1    bridge; correct?

2    A    Yes, sir.

3    Q    Do you recall if the Danziger Bridge was mentioned?

4    A    No, sir.

5    Q    But you specifically recall those words:  Officer down on the

6    bridge?

7    A    Yes, sir.

8    Q    What does that mean when you hear officer down?

9    A    I interpret that it means an officer shot.

10   Q    Now, you said that you followed the -- was it an

11   African-American woman police officer?

12   A    Yes, sir.

13   Q    Was she in a marked vehicle?

14   A    Yes, sir, she was.

15   Q    And you followed her up the bridge?

16   A    Yes, sir.

17   Q    And then you said, when you got to the top of the bridge, you

18   saw three officers or more?

19   A    Yes, sir.

20   Q    Okay.  And did you come to a stop?

21   A    Yes, sir, I did.

22   Q    And at that point in time you heard gunfire?

23   A    Yes, sir.

24   Q    And you thought people were shooting at you?

25   A    Yes, sir.  I perceived I was being shot at.

1   Q    In fact, you thought they were shooting at you so much you

2   put your head on the floorboard?

3   A    Yes, sir.

4   Q    You got down?

5   A    I did.

6   Q    Was it at that point in time that the officers got in the

7   car?

8   A    It was right after the gunfire stopped.

9   Q    And, after the gunfire stopped, they told you -- and they

10  pointed to the guys on the downside of the bridge on the west

11  side of the bridge, running, that those are the guys who were

12  shooting at the police?

13  A    Yes, sir.

14  Q    Do you have any reason to disbelieve them at that time and

15  say:  You got to be kidding me?

16  A    No, sir, I did not.

17  Q    You actually, at that time, in your own mind, you believed

18  these might be guys who were shooting at police officers and who

19  fired a shot at me?

20  A    Yes, sir.

21  Q    Now, as you proceeded down the bridge, you also heard gunfire

22  at that point in time; did you not?

23  A    Yes, sir.

24  Q    So you've got two instances of gunfire when you're on the

25  bridge; one when you stop at the top of the bridge, and then one

1   as you're going down the bridge?

2   A   Yes.

3   Q   And you think people are shooting at you?

4   A   At this time, I don't have any independent recollection of

5   when and where, if it was right when I started going down the

6   bridge, that I heard the gunshots.  But it was in my report.  I

7   wrote it that day.  So I know I heard it.  But I don't have any

8   independent recollection of where exactly I was when I was going

9   down the bridge when I heard that.

10  Q   But you know you were going down the bridge?

11  A   Yes, sir.

12  Q   And that was a different -- that was a different gunfire from

13  the gunfire you had originally heard at the top of the bridge?

14  A   I don't know if there was a break in the gunfire or not at

15  that time.

16  Q   Let me show you, you've testified before the federal grand

17  jury about this matter?

18  A   Yes, sir.

19  Q   I believe it was on October 14, 2009?

20  A   Yes, sir.

21  Q   Let me show you your testimony and see if this refreshes your

22  recollection.

23              MR. LARSON:  May I approach, Your Honor?

24              THE COURT:  Show it to counsel first.

25              MR. LARSON:  If you could read this to yourself.

```
 1              (Pause in proceedings.)
 2   BY MR. LARSON:
 3   Q   Now, having read your grand jury, does that refresh your
 4   recollection as to whether or not you were talking about two
 5   different incidents?  One at the top of the bridge and one as you
 6   were going down the bridge?
 7   A   Yes.  And the reason why I say that is because it all
 8   happened so fast and it was a very short amount of time.  So, the
 9   gunfire, in my recollection, had stopped enough for me to raise
10   my head, you know.  The officers identified those are the guys
11   shooting at us, got in my car, and then going down the bridge I
12   heard gunfire.
13   Q   All right.
14              Now, you indicated that you were focused on -- initially
15   focused on Suspect No. 1; correct?
16   A   Yes, sir.
17   Q   And you perceived him as a threat?
18   A   Yes, sir.
19   Q   And you said he was running down the bridge; correct?
20   A   Yes, sir.
21   Q   Was he running, like this?  Or was he running like this?  Or
22   like this?  Do you recall how -- was it a regular run?
23   A   I would say it was a regular run.
24   Q   Okay.  And you're moving your arms back and forth and you're
25   running?
```

1    A    Yes.

2    Q    And you could see him.

3         When did you notice Suspect No. 2?

4    A    Somewhere in that going down the bridge and seeing Suspect 1,

5    I saw another suspect running in front of him at some point.

6    Q    Now, this was before your attention was drawn to Suspect No.

7    3?

8    A    Yes, sir.

9    Q    And, when your attention was drawn to Suspect No. 3, it was

10   drawn by Officer Faulcon?

11   A    No, sir.  It was drawn by the NOPD officers in the right rear

12   of my vehicle.

13   Q    And what did they tell you?  There's another one?

14   A    There's one right there.

15   Q    Meaning one of the subjects who shot?

16   A    A suspect.

17   Q    A suspect.  And that's what you thought?

18   A    It was a suspect at that time, I'm not sure exactly what his

19   involvement was or wasn't.

20   Q    What was he suspect of?  He was a suspect of shooting police;

21   wasn't he?

22   A    I didn't draw that determination at the time.  In the

23   situation, the speed and the how fast everything was happening,

24   everybody that's not the police and looking like there's any kind

25   of attempt of trying to flee to escape would be a potential

1    suspect until we could figure out what their role was or wasn't,

2    were they a victim, were they a suspect, who knows.

3    Q    They weren't standing around; they were running away from a

4    police vehicle; correct?

5    A    Yes, sir.

6    Q    Now, you indicated also that the Suspect No. 3, he wasn't

7    running, like Suspect No. 1 was running; was he?  In other words,

8    he wasn't running with his hands like this?

9    A    That's correct.

10   Q    He had his hand underneath his armpit where you couldn't see

11   it; is that correct?

12   A    That's correct.

13   Q    You never did see his hands; did you?

14   A    No, sir, I did not.

15   Q    And you couldn't tell whether he had a gun in his hand or

16   whatever?

17   A    I never saw his hand, per se, so I'm not sure what he had

18   under his arm.

19   Q    And he wasn't running like a normal person; he was running

20   like -- you couldn't see his hand?

21   A    Was that a question?

22   Q    Yes, sir.

23   A    Can you please ask the question again?

24   Q    He wasn't running like a normal person.  You said he was

25   running and he was wobbling?

1   A    Yes, sir.

2   Q    Moving his upper body?

3   A    Yes, sir.

4   Q    And you couldn't see his hand.  So he wasn't running like a

5   normal person.  Did you perceive that perhaps he might have a

6   weapon in that hand?  Was that a thought that went through your

7   head?

8   A    At that time, I didn't make that assumption.

9   Q    You didn't know?

10  A    Didn't know.

11  Q    And then you see him out of your -- I believe you said your

12  peripheral view, was a word you used at one time; correct?

13  A    Yes, sir.

14  Q    And then you said you focused on Subject No. 1, and you said

15  you had tunnel vision on that guy.

16  A    The tunnel vision was the whole event, per se.  But, yes, I

17  was fixed on Suspect No. 1.

18  Q    And explain what tunnel vision is.

19  A    Tunnel vision, in a very stressful environment, things you

20  would normally see, hear and do, your brain don't necessarily

21  process all those things.  And at that time, after the fact -- at

22  the time I was experiencing the event, I didn't realize.  Because

23  you hear about it in training.  In the training, they explain to

24  you tunnel vision and your misperceptions or perceptions that you

25  don't gather in, your brain doesn't process.  But, when you're

1   going through it, you don't realize you're experiencing tunnel

2   vision.  After the fact, and you start trying to recreate in your

3   mind what happened, what you did see and what you didn't, and you

4   realize there's bits and pieces you missed.  Things you perceived

5   one way may have not been exactly like that, that would have been

6   a result of tunnel vision.

7   Q    Sure.  And now, when you brought your vehicle to a stop, you

8   were then now really focused on Subject No. 1; correct?

9   A    Yes.

10  Q    Because you were getting out of your vehicle now?

11  A    That's correct.

12  Q    What kind of weapons did you have?  You, personally?

13  A    I had a Sig 45 pistol on my duty belt, and then I had an

14  AR-15 in my car.

15  Q    Where did you get the AR-15 from?

16  A    I got it from a relative.

17  Q    It wasn't department-issued?

18  A    No, sir, it was not.

19  Q    And you felt that you needed more firepower when you were in

20  New Orleans than your sidearm?

21  A    Yes, sir, I did.

22  Q    That's why you got the AR-15?

23  A    Yes, sir.

24  Q    And you kept it in the truck, in the car, with you?

25  A    Yes, sir, I did.

1    Q    In the front seat?

2    A    Yes, sir, I did at that time.

3    Q    You had ready access to it if you needed it?

4    A    Yes, sir.

5    Q    Now, when you got out of the vehicle, did you draw your

6    weapon?

7    A    I drew my pistol.

8    Q    Your pistol, okay.

9         And you yelled:  Stop, police; correct?

10   A    Something to that effect, yes, sir.

11   Q    And were all three subjects within your earshot?

12   A    I don't know if they were or weren't.

13   Q    Well, at the time that you yelled:  Stop, police, you weren't

14   focusing on No. 3; you were focusing on No. 1?

15   A    That's correct.

16   Q    No. 1 was ahead of the vehicle?

17   A    Yes, sir.

18   Q    And No. 3 was closer to the vehicle?

19   A    I don't know that No. 3 was closer to the vehicle than the

20   suspect, no.

21   Q    Would Officer Faulcon have heard you yell:  Stop, police?

22   A    If that instance, I'm not sure if he would have heard me or

23   not heard me.

24   Q    He was right next to you, though, as you got out of the car?

25   A    Yes, sir, he was --

1   Q    Would it be reasonable to assume you didn't go:  Stop,

2   police, like that little lady at the Police Academy goes?  You

3   know that little voice who finally got the big voice at the end

4   of the movie?  You were going:  Stop, police?

5   A    Well, based on my -- and you're asking my opinion based on my

6   interpretation of what happened, I can't recall if at that moment

7   other officers that were in my car or not were given loud verbal

8   commands at the time or not.  I don't recall whether they were or

9   weren't.  So at that time I can't tell you whether he would have

10  heard me or not.

11  Q    Okay.  But you did say:  Stop, police?

12  A    Yes, sir.

13  Q    And you said:  Stop, police, in a loud voice?

14  A    Yes, sir, I did.

15  Q    And Officer Faulcon was sitting in the seat or just getting

16  out of the car as you were getting out of the car, and you all

17  were within what -- five feet of each other?

18  A    Open doors on the car, I would image.

19  Q    And Subject No. 2 -- I'm sorry -- Subject No. 1, when you

20  yelled:  Stop, police, he put his hands up; didn't he?

21  A    At some point in there, I'm not sure exactly if he had

22  started to surrender prior to, at the same time or after the

23  verbal commands were given.  Because it was all right there at

24  the same time.

25  Q    Okay.  So he might have put his arms up and surrendered

1    before you yelled:  Stop, police?

2    A    It was all right there in that same timeframe.  I can't tell

3    you which event happened first.

4    Q    But he certainly, after you yelled:  Stop, police, his hands

5    were either up in the air or went up in the air?

6    A    Yes, sir.

7    Q    He stopped running; correct?

8    A    Yes, sir.

9    Q    Now, Subject No. 2, did he stop running?

10   A    No, sir.

11   Q    Subject No. 3, did he stop running?

12   A    When he was shot.

13   Q    Or you don't know.

14              You weren't really focused on Subject No. 3 for

15   a few seconds after you yelled to Subject No. 1:  Stop, police;

16   is that a fair statement?

17   A    Well, I guess, trying to dissect the events and when it

18   happened, how it happened, it more accurately, to the best I can

19   recall, was that Mr. Faulcon exited the car some time prior to me

20   and stated:  I got him.  As he exited the car, and I stopped the

21   car and exited the car, giving loud verb commands.  At some point

22   in me exiting the car is when I heard the shotgun shot.

23   Q    And you were trying to stop the vehicle.  You weren't focused

24   on Subject No. 3 at that point in time; were you?

25   A    After I looked over and saw Subject 3 run --

1    Q    Right?

2    A    Turned back, focused my attention back on Suspect No. 1, and

3    stopping the car.  I didn't see subject No. 3 again.

4    Q    You didn't see Suspect 3 again until after you heard the

5    gunshot, and then you looked over after the gunshot and you saw

6    him fall?

7    A    That's correct.

8    Q    And he was still running, according to your testimony?

9    A    Yes, sir.

10   Q    So you don't know what he did, if anything, to provoke

11   Officer Faulcon between the time you took your eyes off of him

12   and you stopped your vehicle and yelled to the Subject No. 1 to

13   raise his hands and Subject No. 1 raised his hands, and he heard

14   the gunshot; correct?

15   A    I'm not sure exactly what the suspect's actions were from the

16   time I turned off him and looked back at him and saw him falling.

17   Q    When Officer Faulcon said:  I got him, you took that to mean

18   I'm on this suspect.  You're on the other one?

19   A    Yes, sir.

20   Q    And at that point in time you trusted -- I guess you trusted

21   Officer Faulcon with your life to make sure that Suspect No. 3

22   didn't do any harm to him or to you, or to anybody else in your

23   car; is that a fair statement?

24   A    Very fair statement.

25              MR. LARSON:  May I just have a minute, Your Honor?

```
 1              (Pause in proceedings.)
 2   BY MR. LARSON:
 3   Q    For point of clarification, Lieutenant, the individual in the
 4   right rear of your police vehicle pointed out Subject No. 3
 5   initially; is that correct?
 6   A    Yes, sir.
 7   Q    And finally, Lieutenant, you don't know what Officer Faulcon
 8   perceived at the moment that he squeezed the trigger; do you?
 9   A    No, sir, I do not.
10          MR. LARSON:  Thank you, Lieutenant.
11          THE COURT:  All right, Mr. London.
12                          CROSS EXAMINATION
13   BY MR. LONDON:
14   Q    Good afternoon, Lieutenant.  My name is Steve London.  I
15   represent Archie Kaufman.  How are you today?
16   A    Fine, sir.
17   Q    Mr. Carter asked you about how long it was after this
18   incident that you spoke to the investigator, I believe Sergeant
19   Kaufman and maybe the state.  Do you recall that line of
20   questioning?
21   A    Yes, sir.
22   Q    You did meet with Sergeant Dugue and Sergeant Kaufman and
23   gave a statement; didn't you?
24   A    I'm not sure the two investigators I met with at the time,
25   but I did give a statement to NOPD.
```

1   Q   If I were to tell you it was those two, would you have any

2   reason to dispute that?

3   A   No, sir.

4   Q   You did give a statement; correct?

5   A   Yes, sir.

6   Q   And that was a taped statement?

7   A   Yes, sir.  I think it was.

8   Q   And that was before the FBI or any federal officials met with

9   you; isn't it?

10   A   Yes.

11   Q   So they knew where to find you, obviously?  You were in state

12   police uniform at the time of this incident; weren't you?

13   A   Yes, sir, I was.

14   Q   And there was a lot going on in the city at that time; wasn't

15   there?

16   A   Yes, sir, there was.

17   Q   There was a lot going on in the city for a long time after

18   that; wasn't there?

19   A   Yes, sir.

20   Q   As far as you know, when they got around to taking your

21   statement -- because you weren't a shooter; is that correct?

22   A   That's correct.

23   Q   When they got around to taking your statement, they found you

24   on their own; they came on got you, and you gave voluntarily

25   statement; is that correct?

```
 1   A    Yes, sir.  I was informed by my chain of command that the
 2   NOPD wanted to investigate a shooting and interview me.  So I'm
 3   not sure exactly how that took place.
 4           MR. LONDON:  No further questions.  Thank you.
 5           THE COURT:  Who is next?  Mr. Hessler?
 6           MR. HESSLER:  Yes, sir.
 7                       CROSS EXAMINATION
 8   BY MR. HESSLER:
 9   Q    Good afternoon, Lieutenant.  My name is Eric Hessler, I'm
10   representing Sergeant Gisevius.
11           Trooper, on September 4th, 2005, how long had you been
12   in New Orleans?
13   A    Directly related to Hurricane Katrina?
14   Q    Yes, sir.
15   A    I'm not sure exactly.  I was there the day that -- Katrina
16   was the 30th of August, maybe?  Is that right?
17   Q    Okay.  You had been deployed down here earlier?
18   A    I came down a day or two days after Hurricane Katrina hit.
19   Q    Okay.  That was on orders of the governor; correct?
20   A    I was on orders of my chain of command for a specific
21   assignment.
22   Q    How many troopers came, and where were you originally
23   assigned?
24   A    At the time I was assigned to Narcotics in the Troop L area,
25   which is Northshore, Hammond.
```

1   Q    So where were you staying when you were deployed?  Did you

2   stay in New Orleans, or where did you stay?

3   A    No, sir.  I stayed at my residence.

4   Q    So you commuted back and forth?

5   A    Yes, sir, I did.

6   Q    You worked 12 hour shifts?

7   A    Yes, sir.

8   Q    And that was the way you worked throughout the duration of

9   Katrina, would it be fair to say?

10  A    I'm pretty sure I worked somewhere in the neighborhood of 44

11  days straight.

12  Q    But you returned home to your home and family every night?

13  A    Yes, sir.

14  Q    When you were at home, did you get to watch TV and see what

15  was going on with Hurricane Katrina, catch the news and all that?

16  A    No, sir, I didn't.  With travel time, most of my days were

17  anywhere from 16 to 17 hours days, depending on travel.  So it

18  was pretty much just sleep and get up and go back to work.

19  Q    Right.

20       Did you hear by way of any kind of communications some

21  stories about armed gangs of looters roaming the city?

22  A    I had reports -- when I was assigned to New Orleans, I was

23  ordered to go to our auditorium at our state police training

24  academy where there was a chain of command there who was

25  outlining the problems in the city.  And there was numerous

1   troopers, somewhere around the neighborhood of 20 or so that,

2   were being deployed in New Orleans as a support function for

3   public safety.

4   Q   And for the safety of each other; correct?  Also?

5   A   Yes, sir.

6   Q   I mean, they didn't just send you with your brother-in-law's

7   AR-15; they sent a whole lot of troopers down here?

8   A   Yes.

9   Q   And you actually had more than your sidearm and an AR-15;

10  correct?

11  A   I have other guns that are always in my unit.  But, on my

12  person, I carried my one Sig, and then I had a shotgun.  And, at

13  the time I get back after being in New Orleans, I got the AR-15.

14  Q   Okay.  So at the time you were in New Orleans, you had your

15  sidearm, which is a Sig 45, you had an AR-15, a shotgun and I

16  believe a 38 revolver?

17  A   Yes.  And that's my backup weapon for my regular duty

18  narcotics.

19  Q   And what kind of condition did the state police tell you that

20  you might be facing when you're going to come here?

21          MR. CARTER:  Your Honor, I'm going to object to the

22  relevance of this line of questions.  We're not talking about the

23  incident at hand, we're talking about the general conditions of

24  the city at the time.

25          THE COURT:  Let's be more specific about the timeframe.

1   You're talking about the first two days when he's first sent here

2   and attends the training of command meeting?

3        MR. HESSLER:  I'll move on, Your Honor.

4   BY MR. HESSLER:

5   Q   Nevertheless, on September 4, 2004, when you were advised on

6   the radio that there were possibly snipers on the roof of the

7   Holiday Inn, shooting at helicopters, you did not discount this

8   as some fantasy; did you?

9   A   No, sir, I did not.

10  Q   You actually went so far as to halt or keep the convoy halted

11  and not go any further, as to keep you or any other civilian from

12  being fired upon?

13  A   Keep us safe as we could, yes, sir.

14  Q   Now, at some point, you began, when you couldn't confirm this

15  because of the radio transmissions were so poor, you ordered the

16  convoy to move up?

17  A   No, sir.  At the point LSP SWAT came and took over the scene

18  and they rendered the scene safe, then that allowed our convoy to

19  pass by with the safety of SWAT.

20  Q   Okay.  And at some point you drove your Louisiana State

21  Police car from the back of the convoy to see why I guess it had

22  stopped a second time?

23  A   Yes, sir, I did.

24  Q   And what did you learn then and there?

25  A   As I pulled up to the front of the convoy and Trooper

1    Vittitoe pulled up aside his unit, he advised me that the NOPD

2    officer advised him that there was an officer down on the bridge.

3    Q    Now, this NOPD officer, did you see that officer?

4    A    I saw that it appeared to be a black female officer.

5    Q    Did you speak with that female personally?

6    A    No, sir, I did not.

7    Q    Did you talk to the female who was a lieutenant, a captain or

8    a sergeant or a regular patrolman?

9    A    I do not know.

10   Q    I think I just asked you this.  Did you personally speak with

11   her?

12   A    No, sir, I did not.

13   Q    And do you think that was Trooper Vittitoe that told you

14   this?

15   A    Yes, sir.

16   Q    Did trooper -- and he told you there was an officer down on

17   the bridge?

18   A    She told him that they was responding to an officer down on

19   the bridge.

20   Q    You didn't make this up on your own; right?

21   A    No, sir, I did not.

22   Q    You certainly believed that there was an officer down on the

23   bridge when you heard it?

24   A    Yes, sir, I did.

25   Q    And you had yet to see any of these police officers there to

1    pass on this information?

2    A    No, sir, I did not.

3    Q    And you actually put that in your report, that you heard

4    there was an officer down?

5    A    Yes, sir.

6    Q    Did you ever go look for this officer down?

7    A    In as far as looking particularly, no, sir.  I was following

8    the NOPD officer up the bridge.  And, when I stopped, I was

9    hoping that the officers around could lead me to the right

10   direction of what did they need me to do at that particular point

11   in time.

12   Q    The fact that you personally didn't go off and look for this

13   officer down, do you think that suggests that you don't believe

14   that officer was ever down?

15   A    No, sir.  I don't think that.

16   Q    Thank you.

17        Now, were you all working on the same channel?  When I

18   say you all, were you working on the same channel as NOPD was

19   working?

20   A    No, sir.

21   Q    Now, at some point, you secure the convoy and then take

22   troopers with you to check out the situation on the bridge?

23   A    Yes, sir.

24   Q    Are you following the NOPD lady?

25   A    Yes, sir, I am.

1    Q    When I saw follow, you're behind her.

2         As you approach bridge, you instructed a second

3    Louisiana State Police car to go take what you called the low

4    road.

5    A    Yes, sir.  There was two troopers, Volante and Pike, each in

6    their own units.  And I instructed them to take the low road, and

7    I was going to follow the NOPD officer up on the bridge.  That

8    way, we'd have coverage -- I didn't know the situation of what

9    was going on, and I didn't know suspects, where they would be,

10   where they would not be and I didn't know the configuration of

11   the bridge.  In Baton Rouge, I'm familiar with the overpasses and

12   the interstate.  The overpasses and they interstate are all

13   connected by land.  I wasn't aware of the bridge and that it was

14   free-stranding and it wasn't connected to the ground in any sort

15   of way.

16        MR. CARTER:  Could you put up Exhibit 257, please.  Now,

17   could you blow up this area right here?

18   BY MR. CARTER:

19   Q    When you say you instructed those officers to take the low

20   road, would that have been that road right there?

21   A    Yes, sir.

22   Q    And, in between the low road and the bridge, you see a grassy

23   area there?

24   A    Yes, sir.

25   Q    Did you know what those officers did when they were checking

1    out that area?

2    A    No, sir, I do not.

3    Q    Do you know who those officers were?

4    A    I recall them being Volante and Pike, but I wasn't personally

5    -- I knew of them, but I didn't know them.  And I didn't have any

6    communication with them after.

7    Q    Do you know if they were armed with any AR-15s?

8    A    I do not know.

9    Q    Do you know if they exhibited their vehicle and walked?

10   A    I don't know.  After they split off the low road is the last

11   I saw of them.

12   Q    Do you know if they ever fired their weapons?

13   A    I don't know.

14   Q    Now, and you continued up --

15        MR. HESSLER:  Can you blow up this area, please?  Now,

16   can you make that a little bit wider area from east to west?

17   BY MR. HESSLER:

18   Q    When you're going up the bridge, you're still behind that

19   police car?

20   A    Yes, sir.

21   Q    You're by yourself?

22   A    Yes, sir.

23   Q    Is that black female by herself, the policewoman?

24   A    Best I could see, yes, sir.

25   Q    Can you put a little dot where you see the contingency of

1   officers, NOPD officers, standing in the bridge?

2   A   Somewhere between the trusses here.

3   Q   And that's where the conversations and the shooting and the

4   gunfire you heard occurred?

5   A   Yes, sir.

6   Q   And I'm going to take that out.

7                   Were you in a lane of traffic like that?  You

8   were going -- do you know exactly how that occurred?

9   A   I was in a lane of traffic, but I don't know exactly where I

10  was at.

11  Q   Does it show the area -- could you see the subjects that

12  somebody said:  They are down there shooting at us?  In this

13  picture, can you see that area where those subjects may have

14  been?

15  A   I'm not sure at this point how far downhill they were.

16  Q   Could you tell me if they were in the middle of the roadway,

17  to the left side, right side, or where?  Anything?

18  A   Best of my recollection, they was in the roadway.

19  Q   Okay.  Weren't around the guardrails or anything else?

20  A   In the roadway.

21  Q   They were in the roadway.

22                  Now, you heard gunfire coming from everywhere,

23  is your description of it; was that accurate?

24  A   Yes, sir.  It was more than one -- appeared to be more than

25  one direction.

1  Q   And, actually, you stated that the police officers were in

2  your car when the gunfire continued; right?

3  A   Yes, sir.

4  Q   You'd tell this jury if you believed those officers were

5  leaning out of your car, firing; wouldn't you?

6  A   Yes, sir.

7  Q   You don't have any reason to believe that?

8  A   I don't have any reason to believe they were firing.

9  Q   Leaning out of your car.

10  A   Correct.

11  Q   Also, you said you believed there was incoming gunfire,

12  because you could hear the bullets hitting the metal barrier?

13  A   What appeared to be the metal bullets hitting the metal.

14  Q   Right.

15          Now, what was the condition or the demeanor of these

16  officers that you ran into up on top of the bridge?  Did they

17  appear to be scared?  Concerned?

18  A   I don't have a -- I never processed what I felt their

19  demeanor was at the time.

20  Q   Did you doubt them when they said:  That's them shooting at

21  us?  That's the ones that were shooting at us?

22  A   No, sir, I did not doubt.

23  Q   Do you recall who told you that?

24  A   It was an officer to my left.  And I couldn't say with

25  certainty whether he wasn't or wasn't the one that got in to the

1    left rear of my vehicle, but that was my perception.

2    Q    This was a white male?

3    A    Yes, sir.

4    Q    What about what he was wearing, do you recall if he was

5    wearing a light colored shirt or a dark colored shirt?

6    A    I don't recall.

7    Q    Now, as you're going down the bridge and you hear the

8    additional gunshots, what were the individuals that were huddled

9    the base of the bridge doing now?

10   A    I don't have any independent recollection of hearing the

11   gunshots and what the guys were doing, the suspects that were

12   running.  Whenever I perceived them in the huddle like fashion is

13   about the same time they broke and ran.

14   Q    Could you tell anything more than what they were doing when

15   they broke and ran?  If they were looking over their shoulder,

16   trying to get a fix on your position, or were they just running?

17   A    I can't any more details than that.

18   Q    Did they run in the same direction?

19   A    I don't believe so, but I couldn't tell you with certainty

20   how many were and which direction.  They kind of broke and ran.

21   Q    All right.  But at some point you were able to at least keep

22   track of three individuals, although there may have been more?

23   A    Yes, sir.

24   Q    Do you recall what these individuals were wearing?

25   A    I recall that Suspect No. 1 that I referred to was wearing a

1    black shirt, black pants and the black combat boots.  The Suspect

2    No. 2 that was somewhat in front of him was also in black.  And

3    Suspect No. 3 that was on the side of my car was -- had a white

4    T-shirt on, and I believe shorts.

5    Q   Did you ever see one of the subjects in black holding up or

6    carrying the subject in the white?

7    A   No, sir, I did not.

8    Q   How far did you see them run before the actual -- before you

9    were able to catch up to them?

10   A   Which one we talking about?

11   Q   From the time you left the top of the bridge and drove down

12   to the officer exiting the vehicle, how far had those individuals

13   run, if you could --

14   A   I could tell you that if I knew exactly where they were when

15   they started running.  I know that Suspect No. 1 didn't get any

16   further than where we arrested him in front of my car, and he

17   wasn't a long way in front of my car.  But I'm not sure exactly

18   where they broke and ran from on the downside of the bridge to

19   give you a distance.

20   Q   And I think Mr. Carter asked you, on your drive down there,

21   you stated you were on high alert; right?

22   A   The best I could be.

23   Q   Of course.  Because you didn't want to get shot?

24   A   Yes, sir.

25   Q   And you perceived it as a risk that you could be shot in such

1   a situation?

2   A   Yes, sir.

3   Q   And you also said, I think, that you were concerned that they

4   were armed and that they were also dangerous; right?

5   A   It wasn't like there was a whole lot of thought process at

6   this time with all -- with everything going on, it wasn't a lot

7   of thoughts running through my head, except to catch who I

8   perceived to be the bad guys.

9   Q   And your perception, you said your perception of who you

10  perceived to be the bad guys, perception has a lot of things that

11  go into it; would you agree with that?

12  A   Yes, sir.

13  Q   I mean, it can be based on the information you have at hand,

14  your experience, your knowledge of the incident; would you agree

15  with that?

16  A   My perception of who the bad guys were?

17  Q   Yeah.  Just in a general situation.

18  A   Yes, sir.

19  Q   Would you agree with that your perception can also be

20  affected by your mental condition, your physical condition, your

21  stress level and things of that nature?

22  A   I think stress has a huge factor in your perception.

23  Q   And you told the jury about tunnel vision.  And you

24  experienced it.  Although, you had training in it you experienced

25  it at that time?

1    A    Yes, sir, I did.

2    Q    Sir, have you ever been, prior to this, ever been involved in

3    a shooting incident in 17 years?

4    A    One other incident.

5    Q    Where you fired your weapon?

6    A    No, sir, I didn't fire my weapon.

7    Q    Were you fired at?

8    A    I was -- it was on a drug bust.  And, the bad guys we were

9    attempting to arrest, he was in his car, and he tried to back

10   over me and my partner and run us over.

11   Q    Okay.  Did one of you all fire your weapon?

12   A    No.  There were police officers from the front that fired.

13   Both of us ended up getting out of the way because there wasn't a

14   clear line of sight to shoot towards the threat for the police

15   officers in front of us.

16   Q    So you've encountered a situation where, although your life

17   was threaten and you are perceived it to be a live threatening

18   situation, there was a reason why you didn't use deadly force?

19   A    Yes, sir.

20   Q    Not that it wouldn't have been justified, but there was a

21   reason why you didn't do it?

22   A    That's correct.

23   Q    Now, they had four individuals in your car, four police

24   officers in your car; right?

25   A    Including myself.  Three others and myself.

1   Q   Who you had never seen before in your life before this

2   minute?

3   A   Yeah.  And I can't -- hindsight now.  But I can't recall if I

4   might have met Mr. Gisevius one time before that on a dope deal

5   or not.  I can't remember if it was before or after that.

6   Q   Okay.  But you had to take a certain level of -- you had to

7   put a certain level of trust in these individuals, because they

8   weren't going to let you get hurt; right?

9   A   I did have a huge level of trust in those police officers.

10  Q   And you hoped that, whatever they perceived, they would react

11  accordingly to keep you safe and each other safe?

12  A   Can you rephrase that question one more time?

13  Q   I guess my question is, if there was a threat on that bridge

14  and that individual was a threat to you, and you were focused on

15  another individual, would you expect that officer, if he

16  perceived that individual to be a threat, to deal with it?

17  A   Accordingly.

18  Q   Sure.

19  A   To the threat.

20  Q   And that's according to his perception?

21  A   Yes, sir.

22  Q   Now, did you stay on that scene?  You did stay on that scene

23  for awhile; correct?

24  A   I'm not sure exactly of the time.  But, after Suspect No. 2

25  surrendered to LSP SWAT, and what we could call the Scene Code 4,

1   which means there's no more threats that we know of and the scene

2   is secure, then at some point after that I went and found

3   Sergeant Kaufman to determine my role, and then went back to the

4   detail.

5   Q   Now, the subject that was eventually caught, I think it would

6   be subject No. 2, were you aware or did you realize that he had

7   changed his clothes from when he fled from you initially from

8   when he was caught?

9   A   Yes, sir.  When he came back, he had -- I don't remember

10  exactly what, but he was missing his shorts, had some kind of

11  undergarment on.  I don't remember if it was a spandex or boxers

12  or underwear, but something other than the shorts that he had on

13  before that.

14          MR. HESSLER:  I have no further questions.

15          THE COURT:  All right.  Thank you, Mr. Hessler.

16                  Mr. DeSalvo.

17          MR. DeSALVO:  I'll be very brief, Your Honor.

18                          CROSS EXAMINATION

19  BY MR. DeSALVO:

20  Q   Lieutenant, I'm Frank DeSalvo.  I'll do this pretty quickly?

21          You got up to the crest the bridge between the two

22  trusses.  I don't know what the plural of trusses is, if it's

23  trusses.  But say between those two trusses; is that correct?

24  A   Yes, sir.

25  Q   And you were talking to at least three New Orleans police

1    officers; is that correct?

2    A    Well, I only had conversation with one.  But there was police

3    officers on the right side of my car and on the left side of my

4    car.  But I -- the brief conversation I had was with one.

5    Q    And one of them said those are the people down there shooting

6    at us?

7    A    Yes, sir.

8    Q    They didn't point which one or two of the three or if it was

9    all three, they just said those are the guys down there?

10   A    They just pointed in the general direct down the bridge.

11   Q    In that general direction.

12          And none of them were firing their weapons at that

13   point; were they?

14   A    Not that I could tell at the time.

15   Q    But heard gunfire?

16   A    Yes, sir.

17   Q    And you perceived that gunfire to be at you or in your

18   direction?

19   A    Yes, sir, I did.

20   Q    And you perceived it because you heard the pinging on the

21   bridge?

22   A    That's correct.

23   Q    And the only pinging that could be reasonable would be in

24   those trusses?

25   A    Yes, sir.

1    Q    Is that fair?

2          There's certainly no metal grate on the bottom, it's

3    concrete.

4    A    I couldn't tell you.  Like I say, I don't know if it was

5    concrete or not.

6    Q    And you knew that the police officers certainly weren't

7    shooting at you?

8    A    Not that I perceived.

9    Q    Now, the guy that you stopped, Suspect No. 1, do you know if

10   anybody ever accused him of wrongdoing?

11   A    No, sir, I do not.

12   Q    Do you know if they ever accused him of shooting at anyone?

13   A    No, sir, I do not.

14   Q    Do you know if he was ever arrested?

15   A    No, sir, I do not.

16   Q    Is it normal for a police officer to say:  Show me your

17   hands?

18   A    When you say a normal --

19   Q    In a situation where you approach the person, you want to

20   arrest them, do you want to see their hands?

21   A    Yes, sir, you want to see their hands.

22   Q    And that's taught to you in the academy?

23   A    Yes, sir.  That's fair to say.

24   Q    Now, Suspect No. 2 that you refer to -- that's correct?

25   A    Yes, sir.

1    Q    He's the guy that went into the area of that motel, the

2    Friendly Inn?

3    A    That's correct.

4    Q    And, when he went into that motel, he went through two,

5    three, four feet of water?

6    A    I did not actually see him run in there, there but that's

7    what was told to me by the other officers is that's what

8    direction he ran.

9    Q    And he disappeared for 20 minutes?

10   A    Some length of time, I couldn't tell you.

11   Q    That's what I think you had estimated before.  That's a fair

12   estimate?

13   A    Fair.

14   Q    And, assuming it was 20 minutes later or something close to

15   that, he came out.

16   A    Yes.  When I observed him, he was being escorted by state

17   SWAT.

18   Q    You don't know what he was doing for that 20 minutes other

19   than changing -- taking his pants off; right?

20   A    I don't know what he was doing at that time.

21   Q    You don't know whether he was hiding a weapon?

22   A    I do not know.

23   Q    You have no idea what he was doing for 20 minutes; do you?

24   A    That's correct.

25   Q    Other than taking his pants off.

1  A    His pants weren't on when he came back.  I don't know how he

2  lost them.

3  Q    And you don't know whether he had taken a shirt off earlier

4  in the incident?

5  A    No, sir, I do not.

6  Q    You just know it happened when you were there?

7  A    Yes, sir.

8           MR. DeSALVO:  Thank you.

9           THE COURT:  Thank you, Mr. DeSalvo.

10          Any redirect?

11          MR. CARTER:  Yes, sir, I do.

12                          REDIRECT EXAMINATION

13  BY MR. CARTER:

14  Q    You've been asked a number of questions about whether this

15  gunfire, which, as you were going down the bridge, was near or

16  far or where it was coming from.  Do you know where it was coming

17  from?

18  A    No, sir.  Like I said, I don't have any independent

19  recollection of that gunfire, where I was and when I was going

20  down the bridge.  Other than, I wrote it in my report that day,

21  so it was something I perceived at that time.  But I don't have

22  any independent recollection about it.

23  Q    Do you recall testifying in a federal grand jury about this

24  matter?

25  A    Yes, sir.

1    Q    Do you recall what your answer was regarding that -- what

2    your testimony was regarding that gunfire before the federal

3    grand jury?

4    A    Yes, sir.

5    Q    What do you recall saying before the grand jury?

6    A    Recall what was in my report, that I heard the gunfire as I

7    was going down the bridge.

8    Q    Do you recall whether you testified to whether the gunfire

9    was outgoing or incoming?

10   A    I don't think I recall either way.

11           MR. CARTER:  Your Honor, I would show the witness his

12   grand jury testimony, ask him to read it to himself.

13           THE COURT:  Page?

14           MR. CARTER:  Page 27 of the federal grand jury and see

15   if that refreshes his recollection.

16   BY MR. CARTER:

17   Q    Read that highlighted portion, just read that to yourself.

18           (Pause in proceedings.)

19   BY MR. CARTER:

20   Q    Does that refresh your recollection?

21   A    Yes, sir.

22   Q    What does that refresh your recollection as to where that

23   gunfire was coming from?  Was it close or far?

24   A    It was close.

25   Q    It was close to you.

1            Where were these individuals you were chasing, were they

2    close or far?

3    A    I couldn't say that based on -- at the time I was testifying,

4    I didn't make the connection of the close -- the gunfire next to

5    where the guys were coming from.

6    Q    I understand.

7    A    I didn't perceive the guns running away from me as shooting

8    at me at that time.  The gunshots were close, and it could have

9    been coming from going out or in, either way.

10   Q    But it was close to you?

11   A    Yes, sir.

12   Q    You were asked by Mr. Hessler something about whether you

13   would hope that the officers would deal with the threat

14   appropriately.  You were asked about having a huge level of trust

15   in these officers and whether you trusted them to shoot if there

16   was a threat.  Is it correct, would you also trust them not to

17   shoot if there was not an imminent threat?

18   A    Yes, sir.  My expectation is that the officers or any

19   officers in that given situation would protect myself, them and

20   the public in the manner that the threat is given.

21   Q    You were asked about the troopers who were with you going on

22   the side of the road on the east side of the bridge.  Do you

23   recall those questions?

24   A    Yes, sir.

25   Q    Was the shooting on the east side of the bridge over at that

1    point in time, as far as you know?

2    A    At the time, I didn't know there was even a shooting on the

3    east side of the bridge.

4    Q    You didn't even know there was a shooting as you guys drove

5    by?

6    A    That's correct.

7    Q    You were also asked, I believe by Mr. London, about you not

8    being the shooter.  Were you a witness to the shooting?

9    A    I was a witness to Mr. Faulcon shooting.

10   Q    And you did not give a statement to Mr. Kaufman that day?

11   A    That's correct.

12   Q    When did you give a statement to NOPD?

13   A    At NOPD, some time after a year or so, I'm not sure exactly

14   the timeframe, after the incident.

15   Q    Was that your first statement to NOPD?

16   A    Yes, sir.

17   Q    Any prior statements by you to NOPD?

18   A    No, sir.

19   Q    So, if there are any prior reports, it would contain a

20   statement made by you?

21   A    That's correct.

22   Q    Let's return to these gunshots as you were going down the

23   bridge.  Is anyone shooting from your car?

24   A    I don't recall anyone was or was not shooting from my car.

25   Q    So it could have been happened?

1    A    Could have happened.

2    Q    You just don't recall whether anyone was shooting from your

3    car?

4    A    That's correct.

5    Q    You were asked about Suspect No. 3.  That's the individual

6    off to your Exhibit 259 off to the right; is that correct?

7    A    Yes, sir.

8    Q    You were asked about him running and running and wobbling.

9    Was there anything dangerous about the way he was running?

10   A    I don't know how I would characterize dangerous in the way he

11   was running.  At the time, he was a potential threat.  At the

12   time, I didn't perceive him as a lethal threat.

13   Q    Is wobbling dangerous in and of itself?

14   A    No, sir.

15   Q    And you said you could see his hand?

16   A    No, sir.  I could not see his hand.

17   Q    You could not see his hand.  So you didn't know if he had a

18   gun in his hand?

19   A    I didn't know what was underneath that left arm.

20   Q    Why didn't you shoot him?

21   A    Because at that time when I observed Suspect No. 3, I didn't

22   observe him or perceive him to be a lethal threat.

23   Q    You've testified you were alert.  Was your adrenaline

24   pumping?

25   A    Yes, sir.

1    Q    Were you calm, or scared?

2    A    If I had to narrow it down to both of those -- I mean, I

3    wouldn't characterize either one -- but scared would be more

4    appropriate than calm.

5    Q    Let's stick with alert.

6            You believe someone had shot at police?

7    A    Yes, sir.

8    Q    Did you believe that it might have been the guys you were

9    running after?

10   A    Yes, sir.

11   Q    What did you plan to do with these guys when you got them,

12   when you caught them?

13   A    Arrest them.

14   Q    Arrest them?

15           So, as you drove down the bridge, were you watching

16   them?

17   A    Yes, sir.

18   Q    Alertly watching them?

19   A    To the best of my ability.

20   Q    Did any of them, as you were driving down the bridge, turn

21   and point at you?

22   A    No, sir.

23   Q    Turn and shoot at you?

24   A    Not that I could see, no, sir.

25   Q    So, if there were gunshots, were they coming from those

1  individuals, or from somewhere else?

2  A   I would perceive --

3       MR. HESSLER:  Objection, Your Honor.  Asked and answered

4  numerous times.

5       THE COURT:  I'm going to sustain.  You have asked this.

6  BY MR. CARTER:

7  Q   Did anyone have guns in their hands -- did you see any guns

8  in their hands as you drove down towards them?

9  A   I didn't see any guns.

10  Q   What would you have done if you had seen guns in their hands?

11  A   That's a good question.

12  Q   Would you have proceeded to drive up on them like you did?

13  A   I don't know the answer to that question.  I could only tell

14  you what -- if I would have reacted -- it's hard to armchair

15  quarterback to say what I'd do.  Because, at that time, when the

16  NOPD -- when gunshots started going off, another NOPD put it in

17  reverse and backed out of the situation.  I stayed there.  So I

18  can't really hardly tell you what I would have done if that would

19  have happened.

20  Q   But your windshield on that car, it's not bulletproof; is it?

21  A   No, sir, it's not.

22  Q   You didn't have to deal with that because you didn't see a

23  gun in their hand?

24  A   I'm sorry?

25  Q   You didn't have to deal with that issue because you didn't

```
 1   see a gun?
 2           MR. LARSON:  Objection, it's leading.
 3           THE COURT:  Let's not lead the witness, please.
 4   BY MR. CARTER:
 5   Q   Is that something you were worried about at the time?
 6   A   Again, it was a potential reality.  It was most certainly a
 7   concern.  But I did not see a gun.
 8   Q   So never became your reality?
 9   A   The gun, correct.
10   Q   Did it ever become an issue that you had to deal with with
11   these individuals?
12   A   No, sir, it didn't.
13   Q   You were asked about the timing of your getting out of the
14   car -- and I may have written this down wrong -- but I believe
15   you said somewhere when you were exiting the vehicle you heard
16   the shots that were fired; is that what you testified?
17   A   Yes, sir.
18   Q   As you were getting out of the vehicle, you heard the shot?
19   A   Yes, sir.  I don't know exactly if I was stepping out,
20   already out, running around my door.  But somewhere in that
21   frame.
22   Q   And this all happened pretty quickly?
23   A   Yes, sir.
24   Q   And, again, when you heard him say:  I got him, was it before
25   or after you were getting out of the vehicle?
```

1    A    Before I was getting out of the vehicle.

2    Q    Before were you getting out of the vehicle.

3         And, as you were getting out of the vehicle, you heard

4    what?

5    A    As I was getting out of the vehicle, I heard the shot

6    somewhere in that frame of getting out the vehicle.

7    Q    Was there before or after you yelled:  Stop?

8    A    And that's the part that -- because at the time I was putting

9    in park, opening the door, getting out of the vehicle.  I was

10   giving loud verbal commands, getting out of the vehicle, and then

11   I heard the shot.  I don't exactly know when the shot happened in

12   reference to the loud verbal commands, where exactly I was

13   standing when the shot went off.

14   Q    So, if I understand you correctly, as you sit here today, you

15   don't remember whether you had said stop before the shot or as

16   the shot was going or after the shot?

17   A    That's correct.

18   Q    You were asked about whether or not you could perceive what

19   Officer Faulcon saw, whether you knew what he perceived.  And you

20   don't; do you?

21   A    No, sir, I do not.

22   Q    But you know what you perceived; don't you?

23   A    Yes, sir.

24   Q    Did you perceive this individual Suspect No. 3 to be a

25   threat?

1          MR. HESSLER:  Objection to the form of the question,

2     Your Honor.  He's already asked and answered that he didn't

3     perceive him to be a threat.

4          MR. CARTER:  He doesn't want to hear the answer, but

5     I'll ask it again.

6          MR. HESSLER:  I'll hear the answer if you phrases it

7     correctly.

8          THE COURT:  Ask it again.

9     BY MR. CARTER:

10    Q    You observed Suspect No. 3?

11    A    Yes, sir.

12    Q    What did you observe about Suspect No. 3?

13    A    I observed Suspect No. 3 running parallel to my unit, with

14    his right hand under his left arm, with red on his white T-shirt

15    and running in a wobbly fashion, his upper torso in a straight

16    direction.

17    Q    Did that wobbly fashion present a threat to you?

18    A    The wobbly fashion in and of itself -- I thought the

19    individual being a suspect and then identified by the officer

20    behind me as one, he was a threat at that point to me.

21    Q    Did he ever turn and look at you?

22    A    No, sir.

23    Q    Did he point at you?

24    A    No, sir.

25    Q    Did you perceive him to be an immediate threat worthy of

```
1    shooting at that time?

2    A    Not when I observed him.

3              MR. CARTER:  Thank you.

4              Nothing further, Your Honor.

5              THE COURT:  Is this witness released?

6              MR. FLEMING:  We're going to ask that he remain

7    available, subject to the sequestration order.

8              THE COURT:  Please don't discuss your testimony with

9    anyone between now and the end of trial.  You're still subject to

10   the sequestration order.

11             We're going to go ahead and take our break here.  At

12   3:40 we will begin.  3:40, which is 15 minutes from now.

13             (Proceedings in recess.)

14             THE COURT:  Except for the witness, you may be seated.

15             MORRELL JOHNSON, being first duly sworn, testified as

16   follows:

17             CASE MANAGER:  You may be seated.

18             THE COURT:  This is?

19             MS. CHUNG:  Mr. Morrell Johnson.

20             THE COURT:  Would you please state and spell your full

21   name.

22             THE WITNESS:  Morrell M-O-R-R-E-L-L Johnson

23   J-O-H-N-S-O-N.

24             THE COURT:  You can proceed.

25             MS. CHUNG:  Thank you.
```

DIRECT EXAMINATION

BY MS. CHUNG:

Q   Mr. Johnson, where do you currently live?

A   I live on the Claremont.

Q   How long have you lived in New Orleans?

A   How long?

Q   Yes.

A   Since 1980.

Q   Are you currently working?

A   Yes.

Q   What kind of work do you do?

A   Security.

Q   How long have you been working as a security officer?

A   I've been doing security?

Q   I'm sorry?

A   How long have I been doing security?

Q   Yes.

A   About 18 years.

Q   Who do you currently work for?

A   NOPP.

Q   And what does NOPP stand for?

A   New Orleans Private Patrol.

Q   How long have you been working for them?

A   About a year and five months.

Q   Mr. Johnson, were you here in New Orleans during Hurricane

1    Katrina and directly after Katrina?

2    A    Yes.

3    Q    Where were you living at that time?

4    A    I was staying it the Monte Carlo hotel.

5    Q    Where is the Monte Carlo hotel?

6    A    It's on the Chef Highway.

7    Q    And is that on the Chef Highway near the Danziger Bridge?

8    A    Yes.

9    Q    Which side of the Danziger Bridge is it on?

10   A    On the east side.

11   Q    Were you working at the time?

12   A    Yes.

13   Q    What was your job at that time?

14   A    I was doing security, but I was working for another compay

15   before NOPP.  I was working for Bayou State Security.

16   Q    And were you an unarmed or armed security guard for Bayou

17   State Security?

18   A    Unarmed.

19   Q    After Katrina, were you on the Danziger Bridge when a

20   shooting took place?

21   A    Yes.

22   Q    What were you doing that morning?

23   A    I left to go to where I stayed at, the Monte Carlo.  I left

24   there that morning about 9, 10, 9:15.  And I went to take a walk

25   across the bridge because there was people that wanted to get

 1   food, water or whatever they needed, and I just needed to get

 2   some coals.

 3   Q   Where were you going to get the coals from?

 4   A   From Winn-Dixie.

 5   Q   What side of the Danziger Bridge is the Winn-Dixie on?

 6   A   On the west side.

 7   Q   What did you need coals for?

 8   A   I had a little small grill.  A little baby grill.

 9   Q   So were you going to do a little cook-out?

10   A   Yeah.  I got myself a little cook-out, a little grilling.

11   Q   So did you make it to the Winn-Dixie?

12   A   Yes, I did.

13   Q   Did anything happen on your way to the Winn-Dixie?  Anything

14   unusual?

15   A   When I was going to the Winn-Dixie and I came out the

16   Winn-Dixie --

17   Q   But on your way there from the Monte Carlo to the Winn-Dixie,

18   did anything happen?

19   A   No.

20   Q   Did you ever hear any gunshots?

21   A   No.

22   Q   Notice anything unusual?

23   A   No.

24   Q   Now, you started to say, when you came out of the Winn-Dixie.

25   Tell us what happened once you came out of the Winn-Dixie.

1    A    When I came out Winn-Dixie, I had a little -- I brought a

2    basket.  And I got to the end of the bridge, was about to get on

3    the bridge.  So, when I did get on the bridge, I didn't get half

4    of like a good little distance, not too far, I heard gunshots

5    going off.

6    Q    Now, you said you had a basket.  Is that a shopping cart?

7    A    Winn-Dixie shopping basket.

8    Q    What did you have in it?

9    A    Coals.

10   Q    When you're talking about the Danziger Bridge, are there four

11   lanes of traffic on the Danziger Bridge?

12   A    Yes.

13   Q    Which lane of traffic were you in?

14   A    I was on the -- facing Winn-Dixie, I was on the left side.

15   Q    So, if you're facing left, you're on the west side.

16        What about, when you're going up the bridge, which side

17   were you on?

18   A    Going to Winn-Dixie, or going back?

19   Q    Going back to the Monte Carlo.

20   A    Yeah, I was going back to the Monday Carlo.

21   Q    Which side of the bridge --

22   A    It would be the right side then.

23   Q    Now, you said, as you started going up the Danziger Bridge,

24   you heard gunfire.

25   A    Yes.

1    Q    What did the gunfire sound like?

2    A    Sounded like, it was like fast.  Like fast shooting, you

3    know.  Like you was in Vietnam the way it was going on.  Nothing

4    but just shooting, just noise.

5    Q    When you say Vietnam, what do you mean by that?

6    A    Like a war was going on.  You know.

7    Q    So very fast?

8    A    Yeah.

9    Q    How many?

10   A    It was -- I couldn't really count because it was so many at

11   one time.

12   Q    How far up the bridge had you made it when you heard the

13   gunfire?

14   A    Probably less than -- about less than half way.

15   Q    Could you see over to the Monte Carlo side of the bridge?

16   A    No.

17   Q    Could you see over the crest of the bridge?

18   A    No.

19   Q    What could you tell where the gunfire was coming from?

20   A    It was like coming from every direction.  Like, the sound, it

21   was just -- I couldn't really tell you exactly but it was maybe

22   every direction.

23   Q    And you were gesturing with your arms out in front of you.

24   Do you know if it was in front or behind you?

25   A    It was in front.

1    Q    But you couldn't tell which direction in front you?

2    A    No.

3    Q    What did you do after you heard those shots?

4    A    I just kept walking.  Kept walking up the bridge.  Slow.

5    Looking.

6    Q    How were you feeling at that time?

7    A    I was afraid.  I was really afraid.

8    Q    Did you see anything next?

9    A    When I looked to the left, something told me to look to the

10   left side.  And I saw two guys, one tall guy, one short guy, on

11   that side, coming down, with the tall guy was holding the little

12   short guy up.  Looked like he had been shot.

13   Q    When you say looked like he had been shot, who do you mean?

14   The tall guy, or the short guy?

15   A    The short guy.

16   Q    Why did you think the short guy looked like he had been shot?

17   A    The way he was running.  The way he was like about to -- he

18   was about to fall.  But the other tall guy was holding him up.

19   Q    Can you show the jury how the tall guy was holding the short

20   guy?

21   A    He was like, with his arm around.

22   Q    I'm sorry, I can't really see --

23              THE COURT:  Stand up.

24              THE WITNESS:  He was like holding him, like this.

25   BY MS. CHUNG:

```
 1   Q    Thank you, Mr. Johnson.
 2            MS. CHUNG:  And, for the record, the witness put his arm
 3   out to the side and curled it around --
 4            THE WITNESS:  Around the waist.
 5            MS. CHUNG:  Around the waist area.
 6   BY MS. CHUNG:
 7   Q    You mentioned these two running.  Could you describe, was
 8   this a casual walk, like when you went to the Winn-Dixie, or what
 9   was their run like?
10   A    It wasn't a casual walk.  It was like they was like trying to
11   -- like running, like.  Like running.  He wasn't like the way I
12   was walking.  He was like running, like, you know, like --
13   Q    Hard?
14   A    Yeah.
15   Q    Now, you described you were in the lanes going east.  So, if
16   you're going up the bridge toward the east, you were in the
17   right-hand lanes?
18   A    Yes.
19   Q    Which lanes were these two in?
20   A    They was in the left lane going west.
21   Q    Was there any barrier between the two of you?
22   A    Yeah.  There was.
23   Q    So there's a cement divider between those lanes?
24   A    Yes.
25   Q    Were the two people in the middle of the road, or towards any
```

1    side of those two lanes?

2    A    There was like in the middle.  Like in the middle of the

3    bridge.

4    Q    Did you see anything in any of -- either the short man's or

5    the tall man's hands?

6    A    I saw the tall guy, I saw his arm around the guy, the little

7    short one.  But I couldn't see the little short -- I couldn't see

8    his hand.  But he was swinging.  Walking and swinging.

9    Q    Did you ever see them shooting anything?

10   A    No.

11   Q    Did you ever see them with any guns?

12   A    No.

13   Q    Did you ever see any of them throw anything over the side of

14   the bridge?

15   A    No.

16   Q    Were they near the side of the bridge?

17   A    They was like in the middle.

18   Q    At the time you saw the two of them, could you see over the

19   bridge to the east side?

20   A    No.  Couldn't see.

21   Q    What did you do once you saw these two running in the other

22   direction?

23   A    I just still walking.

24   Q    How are you feeling now?

25   A    I was still afraid.

1    Q    At the time you saw them, were you still hearing gunshots?

2    A    Yes.

3    Q    Could you see them shooting at all?

4    A    No.

5    Q    Do you remember what the tall or short guy was wearing?

6    A    I don't remember what the tall guy was wearing.  But I know

7    the short guy was wearing blue jeans.  Short cut-off blue jeans

8    and a white T-shirt and white tennis.

9    Q    When you say white tennis, you mean tennis shoes?

10   A    Tennis shoes, yeah.

11   Q    So you kept walking.  What happened next?

12   A    And I just kept on walking.  And when I seen a police car

13   come up on this side of the bridge up to the top of the bridge, I

14   just turned around on the basket and I just hopped in the back of

15   the basket and rode down on it.

16   Q    So you're now turned around and went back towards the

17   Winn-Dixie?

18   A    I went back toward the Winn-Dixie.

19   Q    And you mentioned a police car coming over the bridge.  Which

20   roadway was it in?

21   A    It was on this side.  On the west side.

22   Q    What happened once you rode the basket down the bridge?

23   A    Once I rode the basket down the bridge to the end, they

24   caught me.  And they made me get on the ground.  Handcuffed me.

25   And one of the officers had put the their boot -- put their foot

1   in my back.

2   Q   When you say:  They caught me, who do you mean?

3   A   Police.

4   Q   So you're not talking about the short guy or the little guy?

5   A   Pardon me?

6   Q   You're not talking about the short guy and the little guy?

7   A   No. I'm talking about the police officer.

8   Q   How were you told to -- or, if you were -- to get on the

9   ground or stop?

10  A   They stopped me and get on the ground.  They just had their

11  guns on me and telling me to get on the ground, get on the

12  ground.

13  Q   What did you do when they said that?

14  A   I raised my hands up in the air and I just politely got down

15  on the ground.  And I laid down on my stomach as they handcuffed

16  me and one of the police put his foot in my back.

17  Q   Do you remember anything about the police officers who

18  handcuffed you?

19  A   Yeah.  What they did, handcuffed me, and I was there on the

20  ground for maybe about an hour and a half.

21  Q   Do you know, can you describe anyone who cuffed you?

22  A   It was -- they had on blue uniforms, NOPD.

23  Q   Do you remember if there were any men or women?

24  A   It was one black female and one white male.

25  Q   What kind of handcuffs did they use on you?

1   A    The metal type.

2   Q    Did they always keep the metal cuffs on you?

3   A    They kept on on my -- they kept my wrists handcuffed until

4   they took us down to the headquarters down to Chef.

5   Q    Did they always keep the metal cuffs on you, or did they

6   switch them?

7   A    No.  They switched them.

8   Q    To what?

9   A    To the little plastic straps.  Took them off and put the

10  plastic straps around my wrists.

11  Q    You said you were on the ground about an hour?

12  A    About an hour thirty minutes.

13  Q    Were you handcuffed that entire time?

14  A    Yes.

15          MS. CHUNG:  Your Honor, may I approach?

16          THE COURT:  Yes.

17  BY MS. CHUNG:

18  Q    Mr. Johnson, I'm going to hand you Exhibits 188 to 203.

19          THE COURT:  Consecutively numbered?

20          MS. CHUNG:  Yes, Your Honor.

21          THE COURT:  188 to what number?

22          MS. CHUNG:  203.

23          THE COURT:  Okay.

24  BY MS. CHUNG:

25  Q    Do you see yourself in that picture?

1    A    Yes?

2    Q    Are those pictures from the day that we're talking about?

3    A    Yes, it is.

4         MS. CHUNG:  Your Honor, I'd offer those exhibits into

5    evidence.

6         MR. LARSON:  No objection, Judge.

7         THE COURT:  So ordered.  Exhibits 188 through 203 are

8    admitted.

9         (Exhibits admitted.)

10   BY MS. CHUNG:

11   Q    Mr. Johnson, does this depict you having your handcuffs

12   changed there at the scene?

13   A    Yes.

14   Q    And is this where you were stopped?

15   A    Yes.

16   Q    Were you ever moved during that one hour?

17   A    Did I move?

18   Q    Were you ever moved from that location?

19   A    Oh, no.  Not right there.

20   Q    Mr. Johnson, while you were on the ground, what were you

21   thinking?

22   A    I was thinking that I was going to either get killed, get

23   shot.

24        MR. DeSALVO:  Object as to relevance, Your Honor.

25        THE COURT:  I'm going to allow him to answer.

BY MS. CHUNG:

Q   Go ahead, Mr. Johnson.

A   I was thinking I was going to get killed or shot.

Q   Did you hear anything that day that made you -- relating to that fear?

A   No.  I was just laying.  I was just afraid.

Q   Did anyone that day say anything about killing you?

A   No.

Q   Any time that day?

A   When I got down to the little headquarters down on Chef.

        MR. FLEMING:  Judge, I would object.  May we approach?

        THE COURT:  Yes.

        (Sidebar conference.  Jury not present.)

        MR. FLEMING:  This is highly prejudicial.  What they're trying to do is elicit some supposed statement by an unknown person.  Can you identify who made the statement, if the statement was in fact made, apparently not from one of these people on trial, that to the effect of we should kill all the rats.  That's what they are they're trying to elicit.  They can't establish anybody who said it regardless -- I'm sorry -- they can't establish who said the statement, if it was said.  And, if it was, whether it was one of these people.  Someone not on trial may have made a harmful statement may be relevant, but it is unduly prejudice to this trial.

        MS. CHUNG:  I would argue that it is very relevant.  It

```
 1    goes to the state of mind at the scene and at the station.  While
 2    Mr. Johnson --
 3              THE COURT:  State of mind of whom?
 4              MS. CHUNG:  The officers in the Seventh District, both
 5    at Crystal Palace and at the scene.
 6              MR. LARSON:  They're not on trial.
 7              THE COURT:  We've only got four or five, counting
 8    Kaufman, who is in the picture supposedly.  We've got other
 9    officers who are not on trial, including one who has already
10    testified that he shot at a youngster.
11              MS. CHUNG:  Mr. Johnson's statement, while right now he
12    is saying it was said at the Crystal Palace, he made a signed
13    statement in November -- December of 2005, so three months after
14    this, where he actually remembered being on the scene while he
15    was on the ground.  Which makes it much more likely that it was
16    from this group of people that it was made at a time --
17              MR. CARTER:  Judge, let's go to his state of mind.
18              THE COURT:  Number one, Ms. Chung is handling this
19    witness.
20              Second of all, was he going to be able to identify the
21    people around him so that we know the universe of people who may
22    have said it?
23              MS. CHUNG:  He will be able to say that he saw a
24    supervisor in a white shirt at the scene, which is Kaufman.
25    Someone later on identified in that photo was Kaufman.
```

1         And he'll also be able to say that a man in a blue

2    jumpsuit is the one who put me into the trunk and took me to the

3    Crystal Palace and was the one who released him from the ground.

4         THE COURT:  And my question is, is he going to be able

5    to identify the speaker?

6         MS. CHUNG:  He'll not be able to identify the speaker.

7    He was lying face-down, and the statements were above him.  I'll

8    only be able to relate the circumstance.  But it's very similar

9    to the statement that Mr. Arnold told you about when he was at

10   the Crystal Palace as he was told that the only people left in

11   New Orleans were thieves and old people who couldn't afford to

12   get out.

13        MR. FLEMING:  I think we object to that, too.

14        THE COURT:  I think this is -- I don't think there's a

15   similarity between the two.  I'm troubled by this.  If we don't

16   know the universe of people around him and that that universe is

17   limited to the people that are on trial here, I mean, that's a

18   highly prejudicial statement that cannot be attributed with any

19   certainty, any likelihood, to one of the defendants.

20        MS. CHUNG:  It cannot be attributed to one of the

21   defendants but it can be ascertained from the photos that

22   everyone was in the area.  The police officers and other

23   witnesses were saying that no civilians were allowed on-scene.

24        THE COURT:  But only five of them are on trial.

25        MR. FLEMING:  If I may respond --

1          THE COURT:  Yes.

2          MR. FLEMING:  If it was said by another Seventh District

3    police officer, then I think it's way too prejudicial to be

4    attributed to any of these defendants.

5          THE COURT:  I'm going to sustain the objection.  I think

6    that's strongly prejudicial without any certainty as to who said

7    it or the universe OF people who said it such that it was to the

8    exclusion of all the others except for the defendants.  So I'm

9    going to sustain the objection.

10         (Sidebar concluded.  Jury now present.)

11   BY MS. CHUNG:

12   Q   Mr. Johnson, before the objection, I was asking you, while

13   were you laying on the ground, what were you thinking?

14   A   I was afraid, thinking I was going to get killed, get shot.

15   Q   Just before this, you had heard a lot of gunfire that sounded

16   like a war; is that right?

17   A   Yes.

18   Q   When you saw the tall guy and the skinny guy coming over the

19   bridge, did either of those guys ever threaten you?  The tall

20   guy, or the skinny guy?

21   A   No.

22   Q   Did they ever fire any weapons?

23   A   No.

24   Q   Were you scared of them in any way?

25   A   No.  I wasn't.

1    Q    Did you ever fire a gun or threaten anyone?

2    A    Did I ever what?

3    Q    Did you ever fire a gun or threaten anyone?

4    A    Oh, no.

5    Q    Did you see the tall guy or the short guy do anything other

6    than run hard?

7    A    I just saw them running hard.

8    Q    Once you were on the ground, during that hour, did you ever

9    see the short guy again?

10   A    Yes, I did.

11   Q    Describe where and how you saw the short guy.

12   A    Laying on the ground, he was like by over the old van under

13   the cover of the motel.  And, when I saw him, he wasn't moving.

14   Q    Did you ever see him move during the hour that you were on

15   the ground?

16   A    No.

17   Q    And you described that he was by an old van.  Where was the

18   old van parked?

19   A    By the motel up under the cover.  As you enter, the entrance

20   when you first drive in, there was an old van parked right at the

21   front, and he was like by the van, by the back of the van.

22   Q    When you say as you start to go in, there's a cover, as you

23   start to go in where?

24   A    To the motel.

25   Q    And there's a cover over what?

1    A    Over the motel, it's like a -- as you drive in to go in to

2    the motel.   There was another door or I guess where you go in to

3    drive in.

4    Q    So there was a van parked under that covering to go in to the

5    entrance of the motel?

6    A    Yes.

7    Q    Did you ever see the tall man again?

8    A    Yeah.   I seen him when they put me in the back of the van.

9    When they took us down to headquarters down Chef.

10   Q    Tell us about when you got put into the van.

11   A    Oh.   When I got put in the van, one of the policemans picked

12   me up off the ground.   Held me off the ground and he told me to

13   get up.   So I got up.   So he helped me off the ground and he put

14   me in the back of the van.   And then, when I looked around, the

15   tall guy was standing, you know, like he was like behind me.

16   Q    Was the tall man put into the van?

17   A    Yes.

18   Q    Can you describe the officer who put you into the van.

19   A    He had on a uniform.   Blue uniform.   I couldn't remember his

20   face, but he had a NOPD uniform.

21   Q    And, when you say a blue uniform, can you describe what kind

22   of NOPD uniform?

23   A    It was like I guess like a jumpsuit, the jump -- the wallet

24   to warning.

25   Q    So all one piece jumpsuit?

1   A   Yeah.

2   Q   Do you remember what race he was, black male, white male?

3   A   He was white.

4   Q   And that's the officer who put you into the truck, into the

5   van?

6   A   No.  They had -- it was a black officer and a white officer.

7   They both took us down to the headquarters.

8   Q   And the officer who was in the blue jumpsuit, was he black or

9   white?

10   A   He was black.

11   Q   And do you know, can you just give us any other description

12   about the white male?

13   A   He had on the same type of uniform.

14   Q   Did you pick anyone else up?

15   A   Yes.

16   Q   Who?

17   A   We was going down Chef.  And, the motel where I was staying

18   at, they picked up a little young guy, a young boy about 14, 15

19   years old.  And they pulled up on the side where he was at and

20   they was talking to him.  I couldn't hear what they was saying.

21   So one -- the driver got out of van and just put him in the back

22   of the van with the tall guy and I.

23   Q   How was that little 14 year old --

24   A   He was crying.  He was crying a lot.

25   Q   Did he tell you why he was crying?

1   A    Yes.  I asked him why he was crying.  And he said the police

2   had shot his family up and shot his auntie or -- his auntie or

3   his mother, one of them, arm off.

4   Q    Where did the van take you?

5   A    It took us all the way down Chef at a little headquarters.

6   Q    How long were you at the little headquarters?

7   A    We was there for maybe about an hour and a half.

8   Q    While you're at the headquarters, did anyone take your name

9   down?

10  A    No.

11  Q    Did anyone take a statement from you?

12  A    No.

13  Q    Get any contact information from you?

14  A    Nope.

15  Q    Did anyone ask you -- what was the short guy doing when he

16  came across the bridge?

17  A    He didn't -- well, I didn't see him after that.

18  Q    Did anyone ask you at the station what you saw the short guy

19  doing?

20  A    No.  No.

21  Q    Did anyone ask you what you saw the tall guy doing?  Did

22  anyone ask you what you saw at all?

23  A    No.

24  Q    Did the police at the station ever ask you your name?

25  A    No.

1    Q    Did anyone else ever ask you your name?

2    A    No.

3    Q    Did a non-police officer?

4    A    No.

5    Q    What about the tall guy?

6    A    They didn't -- really didn't get none of us.  They just had

7    us stand against the wall in the handcuffs.

8    Q    Did the tall guy ever ask you your name?

9    A    Yeah.  He asked me did I see his brother.

10         And I said:  Your brother?

11         He said:  Yeah, a little short guy you saw me on the

12   bridge running down the bridge with.

13         I said:  That's your brother?

14         He said:  Yes, he's handicapped.

15         I said:  I'm sorry to hear that.

16         So he asked me did I see him.

17         I said:  Yeah, he was laying on the side of the old van

18   over at the motel under cover.

19         He asked me:  Did he move?

20         I said:  No, he never moved.

21         Then he started crying.  Then I tried to talk him in to

22   stop crying.

23   Q    Did he ever ask you your name?

24   A    Yes.

25   Q    Did you tell him your name?

1    A    I told him my name.

2    Q    What happened after that half hour at the headquarters?

3    A    We was standing against the wall and just waiting, and one of

4    the lady cops she gave us a water.  Even though we were still

5    handcuffed, she gave us a water.  And we just stood there.  And I

6    tried to ask one of the cops could they take the plastic straps

7    from off my wrists because it was cutting my wrists.  So they

8    said -- they looked and they just looked, they didn't say

9    nothing.  They just kept them on my wrists.  By the time we got

10   to the bus station, you know, to the main headquarters.

11   Q    What happened at the -- I'm sorry, just to be clear here,

12   were you taken from that headquarters to another place then?

13   A    Yeah.  Took us from the Chef to the bus station.

14   Q    Before you were taken to the bus station, did anyone give any

15   orders about you?

16   A    No.

17   Q    What happened at the bus station?

18   A    They took us in a big Ryder truck.  They put us in the back

19   of the big Ryder truck and took us to the bus station.

20   Q    When you say us, who do you mean?

21   A    Little short guy and the tall guy.

22   Q    Meaning the 14 year old?

23   A    Yeah, the 14 year.

24   Q    But not the one you saw lying and not moving?

25   A    (Witness shakes head.)

1   Q    What happened when you got to the bus station?

2   A    They took us from out of the big truck and they escorted us

3   inside the bus station.  And they let the little 14 year old go

4   and they let me go, but they kept the tall guy.

5   Q    Who let you go?

6   A    Supervisor.

7   Q    Can you describe the supervisor?

8   A    It was kind of stout.  Can't remember his face.  I believe he

9   was kind of stout built.

10  Q    Do you remember if he was white, black?

11  A    He was white.

12  Q    Do you remember what he was wearing?

13  A    A white shirt.

14  Q    Had you seen him before the Greyhound bus station?

15  A    Yes.

16  Q    Where?

17  A    Over at when they was by the motel where I was at on the

18  ground.

19  Q    So at the scene of the shooting?

20  A    Yeah.

21  Q    Once he said that you and the 14 year old could be let go,

22  what happened?

23  A    They let us -- they took us outside and they took the

24  handcuffs off the little 14 year old.  And the lady one of the

25  FBI ladies had to cut the strap.  You know, she had to go up like

1    up under the skin, up under the strap to cut it, and it was like

2    cutting my wrists more.  But she had to cut it anyway.  So, when

3    she did cut it off around my wrists, around both wrists, you

4    could see the blood was coming out the skin.

5    Q   Who took you out from the bus station to the front of the bus

6    station to let you go?

7    A   The police who had us put us in a van.

8    Q   Was it the white one, or the black one in the jumpsuit?

9    A   The one -- the same guys that took us down.

10   Q   The same two?

11   A   Yeah, same two.

12   Q   What happened once the woman cut the handcuffs off of you and

13   you were let go?

14   A   She just she gave us some food and a bottle of water and told

15   us to go catch the buses that was going out of town over on

16   Poydras and Loyola.

17   Q   Did you start to go?

18   A   Yeah.  I did.

19   Q   Who was with you, if anyone?

20   A   The little short guy, the little 14 year old guy.

21   Q   Had you ever met the 14 year old before this day?

22   A   No.

23   Q   When you were setting out to the Winn-Dixie that day, did you

24   ever join him and his family on the bridge?

25   A   (Witness shakes head.)

1    Q    Before you all picked him up in the van, had you ever seen

2    the 14 year old before?

3    A    I never had saw him before.

4    Q    The same question for the tall guy.  Did you ever start

5    walking with the tall guy when you went to the Winn-Dixie?

6    A    No.

7    Q    Did you ever meet him before he was put into the van?

8    A    No.

9    Q    Once you start walking with the little boy, what happened?

10   A    We was just walking, walking down Loyola.  And I asked him, I

11   asked where he was going, what he was going to do, where he was

12   going.  Because he didn't have nobody, no where to go.  So I

13   asked him to go come with me and I was going to watch him.  He

14   could go with me the whole while.

15           So we got down to the Loyola and Poydras where there was

16   a van, the Air Force transport van.  A lady cop, she went from

17   down here, took him.  She came and got him off the van, and he

18   went with her.

19   Q    Before you guys made it to the van, did anybody stop you and

20   give him anything?

21   A    Yes.  National Guard stopped us and asked us where we was

22   going.  We told him we was going to catch the bus.  They asked

23   him where his shoes were, his tennis shoes.  So he told him that

24   the policeman took his tennis shoes from him.

25   Q    Did he have any shoes on him?

1   A   He didn't have any shoes and socks.  You know, he was

2   dressed.

3   Q   Once the little boy was taken away, what happened to you?

4   A   I went -- we went down to the bus station.  I mean, down the

5   Loyola and Poydras, and I stayed on the van.  I stayed on the

6   van.

7   Q   Did the van ever take you any place?

8   A   Yeah.  Took me to the airport.

9   Q   What did you do once you got to the airport?

10   A   Got on a plane with the rest of the little group, people that

11   was leaving out of the town.

12   Q   Had you ever been on a plane before?

13   A   Never.

14   Q   Where were you going?

15   A   Well, we thought we was going to Texas, to Houston.  But they

16   took us to Tennessee.

17   Q   What was that plane ride like for you?  What was that

18   plane --

19   A   Scary.  It was scary because I'd never been on a plane in my

20   life.

21   Q   When you set out that morning, what did you intend to do?

22   A   Go get me some coals and go back across the bridge to the

23   motel.

24   Q   When you went to sleep that night, where were you?

25   A   I was --

1          MR. FLEMING:  Judge, I'm going object at this point to

2    the relevancy.  Lots of people --

3          THE COURT:  I will sustain.  We had some pretrial motion

4    practice on this, so I'll sustain.

5    BY MS. CHUNG:

6    Q   Mr. Johnson, other than the bleeding on your wrists from the

7    handcuffs, did you have any other injuries from that day?

8    A   Yes, I did.  From being on the ground --

9          MR. FLEMING:  Objection.  May we approach?

10         (Side bar conference.  Jury not present.)

11         MR. FLEMING:  This is the same thing, Judge, she's

12   eliciting testimony that some officer who he cannot identify who

13   is likely not somebody on trial stuck his boot in to the guy's

14   face and rubbed his face into the ground.

15         THE COURT:  No.  I think she's asking about the

16   handcuffs.  And I think we had a witness testimony previously

17   that who was putting plastic handcuffs on was Kaufman in the

18   photograph.

19         MR. FLEMING:  She asked other than the handcuffs.

20         MS. CHUNG:  Paul is partially right.  He said that after

21   he was handcuffed someone stepped on his back directly after that

22   and that they rubbed a boot in his face.  And what I was asking

23   him is did he have any injuries.  And he'll say he had abrasions

24   on his face.

25         THE COURT:  I think you can go over that on cross.  I

 1    think you can cover it on cross.

 2          MR. FLEMING:  Judge, it's officers who were not

 3    identified and who are likely not on trial.

 4          MS. CHUNG:  But it happened at the moment when he was

 5    handcuffed.

 6          THE COURT:  We have had a lot of testimony about a lot

 7    of officers doing a lot of things on the bridge.  All right?  I

 8    excluded the one statement that could not be attributed to any of

 9    the officers.  But we've had testimony on cross.  You can bring

10    out the fact that he doesn't know who it is.  You can ask him if

11    it was any of these people.  If he doesn't know, he doesn't know.

12    But I don't think that this is -- this is something that happened

13    to him, according to his testimony, as opposed to the other

14    statement where he's reciting a hearsay statement from someone

15    who we could not even narrow the universe down.  So I'm going to

16    overrule the objection and let him answer this.

17          MR. FLEMING:  Respectfully note our objection.

18          (Sidebar concluded.  Jury now present.)

19    BY MS. CHUNG:

20    Q   Mr. Johnson, other than the cuts on your wrists from the

21    plastic handcuffs, did you have any other injuries?

22    A   Yes, I did.

23    Q   What were they?

24    A   When I was on the ground by the motel, they had police was

25    like walking past me, walking by me, close to my face, and that

1    they'd -- somebody boot was scraped up against my forehead.  Just

2    walking past.

3    Q    So what injuries did you have from that?

4    A    I had, up on my forehead and under my eye, was black from

5    laying on the cement on both my eyes.  It was black up under

6    here.

7              MS. CHUNG:  I have no furthers questions, Your Honor.

8              THE COURT:  All right.

9              Cross.

10             MR. DeSALVO:  I'll proceed, Your Honor.

11                        CROSS EXAMINATION

12   BY MR. DeSALVO:

13   Q    How you doing?  I'm Frank DESALVO.

14             Mr. Johnson, you ever discussed this case with anyone

15   other than the interviews with the DA's office and the Federal

16   Bureau of Investigation and the Department of Justice?

17   A    Oh, no.

18   Q    Because you reviewed here what you remember happening?

19   A    Yes.

20   Q    And you certainly never discussed it with me; did you?

21   A    (Witness nods head.)

22   Q    You may have?  What was that?  You may have discussed it with

23   me?

24   A    No.

25   Q    I forgot to be there.

1    A    I didn't quite understand; but, no.  No.

2    Q    And, when you said when you saw these two for the first time,

3    you were going up the bridge?

4    A    Yes.

5    Q    And they were going down the bridge?

6    A    Yes.

7    Q    And the tall one was holding the short one by the waist?

8    A    Yes.

9    Q    And they were running as fast as they could?

10   A    They was running.  They wasn't real fast fast, but they was

11   like --

12   Q    They were running?

13   A    Yeah.

14   Q    I mean, I run not fast, trust me.

15        And, the next time, you got stopped?

16   A    Yes.

17   Q    And a police officer told you:  Stop, police?

18   A    No --

19   Q    What did they tell you?

20   A    Get on the ground.

21   Q    Get on the ground?

22   A    Get on the ground.

23   Q    Did anybody holler first from behind you in a police car?

24   A    No.

25   Q    In a state trooper car?

1   A   No.

2   Q   Did you see a state trooper?

3   A   No.  Nope.

4   Q   This was all NOPD doing this?

5   A   Yep.

6   Q   You never saw any state troopers around?

7   A   They had, when I was at the motel, they had different

8   policemans there.  There was a state trooper at the motel down at

9   the -- where they had me at on the ground.

10   Q   You mean, after when you all left?

11   A   When they caught me.

12   Q   You drove off on in that van?

13   A   When they caught me and stopped me on the ground.

14   Q   And sat you on the ground?

15   A   Yes.

16   Q   And you could look over towards the motel?

17   A   Yes.

18   Q   And that's when you saw the short guy --

19   A   Yes.

20   Q   -- laying on the ground by the old van?

21   A   Yes.

22   Q   So the policeman hollered at you to get down, and you obeyed;

23   right?

24   A   Yes.

25   Q   Of course, now they've cuffed you.  And you were fearing that

1    they were going to kill you?

2    A    Yes.

3    Q    Turned out not to be true; didn't it?

4    A    No.

5    Q    In fact, an officer -- they took you down?

6    A    Yes.

7    Q    And kind of a stocky officer wearing a white shirt?

8    A    Yes.

9    Q    Blue jeans?

10   A    Yeah.  Blue jeans.  Light blue colored blue jeans.

11   Q    He seemed to be in charge?

12   A    Yes.

13   Q    And, after awhile, said you can go?

14   A    No.  Not right then.

15   Q    After awhile?

16   A    I was just laying on the ground, scared.

17   Q    But, eventually, after awhile, maybe a couple hours while or

18   three hour while, but after awhile they said you could go?

19   A    Yes.

20   Q    And nobody accused you of shooting at them?

21   A    No.

22   Q    Now, after you left -- go back.

23        And you're sure that you saw the tall guy with his arm

24   around the waist of the short guy running down the bridge?

25   A    Yes.

1    Q    Nothing more, nothing less?

2    A    (Witness shakes head.)

3    Q    And that's your memory?

4    A    Yes.

5    Q    Do you recall giving an interview to the district attorney's

6    office?

7    A    Yes.

8    Q    And, in that interview, you said that the tall guy was

9    carrying a short guy over his shoulder and running; is that

10   correct?

11         MS. CHUNG:  Objection, Your Honor.  The witness has

12   stated he gave a statement to the district attorney's office.

13   Mr. DESALVO hasn't established --

14         THE COURT:  Ask him a question.

15   BY MR. DeSALVO:

16   Q   Do you recall the district attorney who was investigating the

17   case --

18         MS. CHUNG:  Objection, Your Honor.  Mr. DESALVO is

19   reading from the statement, hasn't laid a proper foundation for

20   the statement.

21         MR. DeSALVO:  I'm going to.

22         THE COURT:  Ask him if he recalls giving a statement.

23   But you have to show it to him as well, and then go ahead and ask

24   him the question.

25         MR. DeSALVO:  If I could finish the question, you would

1    find out if I was laying a foundation.

2    BY MR. DeSALVO:

3    Q   Do you recall giving a statement to the district attorney's

4    office?

5    A   I have, but I don't remember.

6    Q   Do you recall telling that?

7    A   No, I don't remember.

8    Q   That the tall guy was carrying the short guy over his

9    shoulder?

10   A   No, I don't remember that.

11   Q   Had you watched the news coverage of this after the incident?

12   A   No, I didn't.

13   Q   Did you ever see the tall guy on television saying what

14   happened?

15   A   No, I didn't.

16   Q   And certainly then you never heard anybody on television --

17           MS. BERNSTEIN:  Objection, Your Honor.  Now Mr. DeSalvo

18   is asking the witness about third party statements from a

19   television.

20           THE COURT:  Let's let him finish the question and I'll

21   rule on your objection.

22   BY MR. DeSALVO:

23   Q   You certainly never heard on the television the tall guy

24   saying he carried the short guy on the shoulder?

25           MS. CHUNG:  Objection, Your Honor.

 1          THE COURT:  Let's get to his testimony of what he knows

 2     firsthand.  If he doesn't recall or if you need to refresh his

 3     recollection or use the statement prior given, then go ahead and

 4     use it.  But that's how we're going to do it.  So let's do it.

 5          MR. DeSALVO:  I have Mr. Gamon subpoenaed, Your Honor.

 6          THE COURT:  That's the point.

 7          MR. DeSALVO:  That's the point.  That's I've got to lay

 8     a foundation.

 9          THE COURT:  Okay.

10     BY MR. DeSALVO:

11     Q    When you saw the short guy on the ground, how many people

12     were standing around him?

13     A    Nobody.

14     Q    Nobody?

15     A    No.

16     Q    Okay.

17          When you saw the state troopers over in that area, where

18     were they?

19     A    They was walking around, just --

20     Q    Just walking around in circles?

21     A    Walking around in the streets -- like the street where I was

22     at, it was just a whole like it was a state trooper, police.

23     National Guards.

24     Q    Could you estimate the number of people from law enforcement

25     who were at that location?

1    A    No.

2    Q    Was it a lot?

3    A    It was a few, quite a few.

4    Q    By quite a few, do you mean --

5    A    I couldn't exactly see how many.

6    Q    It was more than 20?

7    A    More than 20.

8    Q    Maybe more than 30?

9    A    More than 20.

10   Q    And they were all over that area?

11   A    Yeah.

12   Q    They were over by you, and they were down by the Friendly

13   Inn?

14   A    (Witness nods head.)

15   Q    Did you see the tall guy get arrested?

16   A    I saw, when he was on the ground, on his knees, and they had

17   police was around him like right in his area like right by him.

18   Q    Now, you're positive of everything you said here today?

19   A    Yes.

20   Q    And you're positive that when you met that 14 year old boy he

21   told you his mother's arm got shot off?

22   A    His auntie.

23   Q    His auntie?

24   A    (Witness nods head.)

25   Q    Or maybe his mother?

1    A    His auntie or maybe his mother, that's what he told me.

2    Q    But he told you unequivocally that she got her arm shot off?

3    A    Yeah.

4    Q    And that's where you learned that that day?

5    A    Yeah.

6    Q    And not from television and you're not confusing that with

7    anything else?

8    A    No.

9         MR. DeSALVO:  That's all the questions.

10        THE COURT:  Mr. Hessler.

11                    CROSS EXAMINATION

12   BY MR. HESSLER:

13   Q    Good afternoon, Mr. Johnson.  My name's Eric Hessler.  How

14   you doing?

15   A    All right.

16   Q    Mr. Johnson, how far is the -- what hotel were you staying

17   in?

18   A    At the Monte Carlo.

19   Q    And how far is that -- is that on the east side of Danziger

20   Bridge?

21   A    It's on the east side, yeah.

22   Q    How far away from the foot of the Danziger Bridge would you

23   say that is?

24   A    From the motel?

25   Q    Well, from the motel that you were staying in to the foot of

1    the east side of the Danziger Bridge --

2    A    Yes.

3    Q    -- Chef and Downman, about how far is that?

4    A    I don't know exactly.  I couldn't say exactly.

5    Q    Is it on the other side of the overpass?

6    A    Yes.

7    Q    Further down east than the Holiday Inn?

8    A    Yes.

9    Q    Now, during your time prior to this Sunday, the 4th, did you

10   hear gunshots at night in the area?

11   A    Where I stayed at the motel?

12   Q    Yes, sir.

13   A    Yes, I did.

14   Q    Plenty?

15   A    Not too much.  Not too much shots when I was at the motel.

16   Q    What about in the daytime, did you hear any?

17   A    When I was going back across the bridge, going back to the

18   east from the Winn-Dixie.

19   Q    Any time prior to Sunday the 4th?

20   A    No.  No.

21   Q    Did you see or did you notice a group or maybe two

22   individuals, young black males, that had been stealing trucks and

23   post office trucks in the area?

24   A    No.

25   Q    You never saw that before?

 1          MS. CHUNG:  Objection to relevance.  This has nothing to

 2     do with what happened on the bridge.

 3          THE COURT:  I'll overrule.

 4          MR. HESSLER:  May I approach, Your Honor?

 5          THE COURT:  Yes.

 6     BY MR. HESSLER:

 7     Q   I'm going to show you a document and ask you if you recognize

 8     the handwriting.

 9     A   Yes.

10     Q   Thumb through it and see if you recognize the handwriting in

11     there.

12          (Pause in proceedings.)

13     BY MR. HESSLER:

14     Q   Do you recognize that handwriting?

15     A   I don't remember the handwriting but I remember me signing my

16     name and my initials.  But the report, the writing.

17          (Witness shakes head.)

18     BY MR. HESSLER:

19     Q   So, when that report was written, it was written by somebody

20     other than you?

21     A   Yes.

22     Q   But obviously -- or I'm assuming that you spoke with

23     somebody, and they wrote down what you told them?

24     A   Yes.

25     Q   And did that person give you the opportunity to read it?

```
 1   A    Yeah.
 2   Q    And then make corrections or initial things, and stuff like
 3   that?
 4   A    Yes.
 5   Q    And, prior to you signing it, did you read that document?
 6   A    I did read it.
 7   Q    Did you sign it?
 8   A    Yes.
 9   Q    Did you agree with the contents that what that person had
10   written was what you in fact told them?
11   A    Yes.
12   Q    And who was that person you talked to?
13   A    I don't remember the person's name.  I can't remember the
14   name.
15   Q    Why were you talking to them?
16   A    They had called me when I was in Texas.  Because at the time
17   I was staying by my daughter.
18   Q    Okay.  And, I mean, you just sat down with people you don't
19   know?
20   A    I didn't know him.
21   Q    Did they told you who they were --
22   A    She told me I think her name was Jennifer.
23   Q    Did she say what -- who she was representing or why she
24   wanted to talk to you?
25   A    She told me she was a -- I can't remember.  But she was -- I
```

1   can't remember, it's been so long.  I can't remember.

2   Q   But you nevertheless you sat down with -- was it one female

3   or two?

4   A   One female.

5   Q   And you told her some things?

6   A   Yes.

7   Q   The things that you told to her, were they true?

8   A   It was true.

9   Q   And I'm going to ask you again, do you remember specifically

10  two male subjects, two young black guys, driving mail trucks and

11  stealing other trucks in the area of Chef Menteur Highway, cement

12  trucks, Ryder trucks, dump trucks?

13  A   Yes.

14  Q   Do you remember that?

15  A   Yes.

16  Q   Do you remember seeing that these two guys were also armed?

17  A   No.

18  Q   You don't remember that?

19  A   No.

20  Q   Do you remember if -- do you know who these two guys were?

21  A   No, I don't know who they was.

22  Q   Do you know if these two young black males were ever in the

23  accompaniment of maybe more subjects?  Or did you always see the

24  same two guys?

25  A   I saw the same two guys.

1    Q    Now -- and this was prior to the day of the shooting?

2    A    Yes.

3    Q    And you saw them going down Chef, up and down Chef Menteur?

4    A    No, they wasn't going down Chef.  I saw him like on the

5    bridge.  When I first saw the guy got shot, I saw them on the

6    bridge.  And that was it.

7    Q    You saw the postal truck?

8    A    I saw the postal truck riding up and down Chef Highway.

9    Q    But you saw that postal truck on the bridge --

10   A    No, they wasn't on the bridge.

11   Q    Where did you see it?

12   A    It was like going down Chef.  I saw mail trucks riding up and

13   down Chef but not on the bridge.

14   Q    Was this mail truck on the east side of the Danziger?

15   A    It was on the east side.

16   Q    Now, you were going up, you were pushing a basket back up the

17   west side --

18   A    Yes.

19   Q    Up-ramp of the Danziger; correct?

20   A    Yes.

21   Q    And this basket was a basket that somebody had pointed out to

22   you --

23   A    Coals, charcoals.

24   Q    Okay.  It had charcoal in it?

25   A    Yes.

1    Q    But did you actually push this basket all the way from your

2    hotel?

3    A    Yes.

4    Q    And at some point you're walking up and you hear a multitude

5    of gunshots?

6    A    Yes.

7    Q    It did that concern you at all?

8    A    It did.  But I just kept on walking.  I was afraid, but I

9    just kept walking.

10   Q    And you certainly couldn't see --

11              MR. HESSLER:  Could you put up Exhibit 252, the long

12   view of the bridge?  257?  256?  256, yeah.

13              THE COURT:  I think it was 257 that we used.

14              MR. HESSLER:  That will be fine.

15              And if you would blow up this area.

16   BY MR. HESSLER:

17   Q    Mr. Morrell, do you recognize that as the Danziger Bridge?

18   A    Yes.

19   Q    Is the area where you would have been, the general area where

20   you would have been pushing the basket in view in that picture?

21   A    I didn't get quite all the way to the top.  Because that

22   bridge was like it went straight down to the bottom like going

23   towards Winn-Dixie.

24   Q    Okay.  Okay.  So nevertheless -- you can take it down.

25              But is it fair to state you couldn't see what was the

1    origin of the gunshots.

2    A    No.

3    Q    You couldn't see over to the crest of the bridge; could you?

4    A    Nope.

5    Q    But what you did see at some point was two males.  Were they

6    running, or were they walking at a fast pace?

7    A    They were like walking fast.

8    Q    And one was holding up the other, or the other one was

9    leaning on --

10   A    The tall guy was holding up the short guy.

11   Q    And there's no way that you could have seen what those two

12   individuals did prior to them coming over the crest?

13   A    No.

14   Q    They could have been walking in the walkway next to the

15   railing?

16   A    They was like in the middle of bridge.

17   Q    But they could have been walking over there because you

18   couldn't see?

19   A    I couldn't see.

20   Q    They could have been zigzagged all across the bridge, you

21   couldn't see?

22   A    (Witness shakes head.)

23   Q    Was your attention drawn to them immediately, or did you see

24   anybody else on the bridge come over?

25   A    No.  I just saw them walk up the bridge, and I heard the

1   gunshots and I was still walking.  And, when I got a little

2   farther then them, something told me to just look to the left.

3   And then that's when I saw the two guys coming down the bridge on

4   the other side.

5   Q   Okay.  When you were -- prior to this point, when you were

6   walking toward the bridge or up the bridge, did you see anybody

7   coming down or hanging around the bottom of the bridge?

8   A   No.

9   Q   Did you see anybody at the Friendly Inn, hanging out at the

10  Friendly Inn?

11  A   No.

12          MS. CHUNG:  Your Honor, if we could ask the witness to

13  answer for a record.  He's shaking his head a lot, but if we

14  could get a verbal answer.

15          THE COURT:  I thought he said:  No.  In fact, I thought

16  he said it twice.  I can hear him; but, if you can't hear him

17  from there -- if you want to pull that microphone a little

18  closer, sir.  There you go.  That's good.

19  BY MR. HESSLER:

20  Q   Were you ever employed as a security guard at the Friendly

21  Inn?

22  A   Yes.

23  Q   When was that?

24  A   During that same -- during the hurricane.  During Katrina.

25  After Katrina.

1   Q    During Katrina, were you a security guard at the Friendly Inn

2   also?

3   A    No, I wasn't there.  No, I never worked there.

4   Q    Prior to the -- prior to?

5   A    I have never worked there.  I never worked at that motel.

6   Q    I'm sorry, I thought you just told me you were at one point

7   employed as a security guard at the Friendly Inn?

8   A    No.  Not the Friendly Inn, no.  I never worked at the

9   Friendly Inn.

10  Q    I'm sorry, that was my mistake.

11          So, anyways, the two gentlemen come across the top of

12  the bridge?

13  A    Yes.

14  Q    And I think you said, prior to that, you didn't see anybody

15  coming down the bridge.  Would you have paid attention to them if

16  they were?

17  A    Yeah, I was looking.  I was looking.  I was looking right at

18  them.

19  Q    All right.  Now, do you remember talking to the FBI, Agent

20  Bezak, sitting right here?

21  A    Yes.

22  Q    In March of 2009?

23  A    Yes.

24  Q    Do you remember telling Agent Bezak that approximately five

25  to eight minutes after seeing the two black males Johnson saw a

1  white police car crest the bridge?

2  A   Yes.  Top of the bridge.

3  Q   So you're saying that there was a five to eight minute span

4  from when the two fellows came over the crest before you ever saw

5  a police car?

6  A   I didn't know exactly what time, but I know I did see a

7  police car come over the bridge.  Over the top of the bridge.

8  Q   And then you stated that you --

9       MS. CHUNG:  Objection, Your Honor, to reading the 302 to

10  the witness.

11       THE COURT:  Let's go ahead and ask the question; and

12  then, if you need to show him the 302, you can.

13  BY MR. HESSLER:

14  Q   After you saw the police car come over the crest of the

15  bridge, what exactly did you do?

16  A   With the basket up the bridge, I just turned the basket

17  around and I got on the back of it and I just rode down the back

18  of the basket.

19  Q   And this was a marked police car, you say?

20  A   Yes.  It was a marked police car.

21  Q   Did you ever see a black unmarked police car?

22  A   (Witness shakes head.)

23       THE COURT:  Let's verbalize.  Is your answer no?  So

24  that we can write it down.  Did you ever see a black unmarked

25  police car?

```
 1              THE WITNESS:  No, no.
 2   BY MR. HESSLER:
 3   Q    I always seem to get a shopping cart with a wobbly wheel.
 4   The shopping cart you had just rode you straight down?
 5   A    Straight down.
 6   Q    No problems whatsoever?
 7   A    I didn't get in the basket, I was on the back of the basket.
 8   Q    But you went straight down?
 9   A    Straight down, yeah.
10   Q    Until a police officer --
11   A    Until they caught me at that end.
12   Q    Okay.  And was at that a male police officer --
13   A    It was a black female and a white mail.
14   Q    Was the white male a New Orleans police officer, or a state
15   trooper?  Could you tell?
16   A    He was an NOPD.
17   Q    Did he give you any oral commands?  Any commands to stop, put
18   your hands up?
19   A    Both of them just told me to get on the ground.  That's when
20   they handcuffed me and one of them put their foot in my back.
21   Q    So you complied, put your hands up, stopped?
22   A    Yes.
23   Q    And that's what you did?
24   A    Yep.
25   Q    And eventually -- and you heard one shot when you were --
```

```
 1    A     When I was stopped?

 2    Q     Yes, sir.

 3    A     No.  I still heard gunshots going on.

 4    Q     Going off behind you, or the other side of the bridge, or

 5    where?

 6    A     On the east side.

 7              MR. HESSLER:  May I approach the witness, Your Honor?

 8              I pass the witness.

 9              THE COURT:  All right.  Cross.

10                        CROSS EXAMINATION

11    BY MR. FLEMING:

12    Q     Good afternoon, Mr. Johnson.

13    A     Hey, how you doing.

14    Q     I'm doing great.  Get my stuff.

15              Prior to today, you've spoken to a lot of people about

16    this matter; correct?  Prior to testifying today, you've spoken

17    to a lot of people about this case; right?

18    A     Yes.

19    Q     Fair to establish, you've spoken to the FBI?

20    A     Yes, sir.

21    Q     This gentleman right here, Mr. Bezak.

22              You've spoken to the prosecutor as well; right?

23    A     Yes.

24    Q     Spoken to someone from the New Orleans District Attorney's

25    Office; right?
```

1   A   Yes.

2   Q   Sandy Gavin, remember that name, Mr. Gavin?  Remember a

3   gentleman who asked -- I'm sorry?

4   A   I may have.

5   Q   Remember a gentleman that asked, from the DA's office, asked

6   if he could audiotape the conversation?

7   A   Yes.

8   Q   Does that ring a bell, that that may have been Mr. Gavin?

9   A   (Witness nods head.)

10  Q   Okay.

11        Remember that, because he asked your permission to do

12  so?

13  A   Yes.

14  Q   You also spoke to a gentleman by the name of Dustin Davis

15  from the District Attorney's Office?

16  A   Yes.

17  Q   The lady you spoke to, Jen Vitrie or Jen Fir Vitrie, she was

18  from the investigator's office; correct?

19  A   Yes.

20  Q   And she was working on behalf of Ms. Madison; right?

21  A   Yes.

22  Q   You knew that when you spoke to her?

23  A   Yeah.

24  Q   The statement that Mr. Hessler showed you, she wrote that

25  out?

1    A   Yes, she did.

2    Q   But you read over it and up initialed each page; correct?

3    And you signed the last page?

4    A   (Witness nods head.)

5    Q   You got stuck at the hotel -- let me back up.  During the

6    storm, you got stuck at the hotel where you were staying at?

7    A   At the Carlo.

8    Q   At the Monte Carlo, water came up, up to the second floor?

9    A   Yes, sir.

10   Q   While you're stuck there, you hear a lot of gunfire?

11   A   Yes.

12   Q   I believe you'd previously answered questions regarding some

13   young men taking some postal trucks and other trucks; right?

14   A   Yes.

15   Q   Driving up and down Chef Highway?

16   A   Yes.

17   Q   I believe you'd previously indicated they had taken cement

18   trucks, dump trucks, so forth?

19   A   Yes.

20   Q   That one of them had burned a building down?

21   A   Yes.

22   Q   Now, the day you went to the Winn-Dixie to get the charcoal,

23   you saw people out by the Friendly Inn on the way to the

24   Winn-Dixie?

25   A   Yes, I saw people.

1    Q    Just for point of reference, the Winn-Dixie is somewhat

2    across the street but further west from the --

3    A    Yes.

4    Q    -- from the Friendly Inn; right?

5              In other words, you would have passed that hotel on your

6    way to the Winn-Dixie?

7    A    Yes.

8    Q    And you would have passed the hotel on your way back?

9    A    Yes.

10   Q    Now, in at least one of your previous statements to Mr.

11   Bezak, you indicated that while you were still on Chef Menteur

12   Highway, that's the first time you heard gunfire; is that right?

13   A    Yeah, first time.

14   Q    And, after hearing the gunfire, you kept walking toward the

15   bridge; right?

16   A    Yeah.

17   Q    And that's the gunfire you described as sounded like from

18   Vietnam; right?

19   A    Yes, sir.

20   Q    You got up to the bridge and you were continuing up east;

21   right?

22   A    Yes.

23   Q    And at some point you saw two black males coming across the

24   bridge?

25   A    Yes.

1   Q    And that's the two gentlemen you've described earlier.  They

2   were headed west?

3   A    Yes.

4   Q    And today you described that as they were running?

5   A    He was running, yeah.

6   Q    And he was running in a westward direction?

7   A    Yes.

8   Q    And that point you continued walking west; right?

9         And, in your statement to Mr. Bezak, you indicated to

10  him that you saw the two men running approximately five to ten

11  minutes after you first heard a gunfire; right?

12  A    Yes.

13  Q    And you told Mr. Bezak that you thought that a man had been

14  shot?

15  A    Yes.

16  Q    Continued walking up the bridge.

17  A    Yes.

18  Q    And at that point you saw what you described as a police car

19  kind of come over the top; right?

20  A    Yes.

21  Q    And that's when you turned and ran the other way?

22  A    Yes.

23  Q    Now, did you run down the bridge, or did you ride your

24  shopping cart down?

25  A    I rode the shopping cart.

1    Q    So be incorrect to say you ran down the bridge?

2    A    On the basket.  On the shopping cart.

3    Q    I'm sorry, it would be wrong to say you ran down the bridge?

4    A    No.  I didn't run, no.

5    Q    Jumped on the shopping cart and rode down?

6    A    Went down, yeah.

7    Q    While you're going down the shopping cart going down the

8    bridge, a black police officer told you to get down on the

9    ground?

10   A    Yes.

11   Q    She was in uniform?

12   A    She was in uniform.

13   Q    And you complied with her?

14   A    Yes.

15   Q    At that point you saw a lot of people around?

16   A    Right.

17   Q    You saw a lot of police officers?

18   A    Yes.

19   Q    Saw a lot of military people; right?

20   A    Yes.

21   Q    And you did not think everybody there was from the New

22   Orleans Police Department; right?

23   A    No.

24   Q    On direct examination, you'd talked about someone running a

25   boot into your head, rubbing your face into the ground.  You

1    don't know who did that; do you?

2    A    No.

3    Q    You can't say it was somebody that's on trial today, as

4    opposed to someone else?

5    A    No.

6    Q    You can't even say that that was a New Orleans police

7    officer; can you?

8    A    It was NOPD.

9    Q    It was NOPD?

10   A    Yes.

11          MR. FLEMING:  One moment, please.

12          (Pause in proceedings.)

13          MR. FLEMING:  Can someone pull up one of the exhibits

14   that was shown earlier, it doesn't matter which one, 108 to 203.

15   BY MR. FLEMING:

16   Q    Mr. Johnson, you can see this picture here?

17   A    Yes.

18          MR. FLEMING:  That's, for the record, Exhibit 188.

19   BY MR. FLEMING:

20   Q    And, in this particular picture, your face is -- you're on

21   the ground; right?

22   A    Yes.

23   Q    And your face is I guess towards the eastern direction;

24   right?

25   A    Yes.

1    Q    Facing towards the Danziger Bridge?

2    A    Yes, yeah.

3    Q    And there's that police car in front of you; correct?

4    A    Yes.

5    Q    That's more or less the spot you're in during that hour, hour

6    and a half period?

7    A    Yes.

8    Q    You're not in custody during that time; right?

9    A    Yes.

10   Q    They didn't let you get up and walk around?

11   A    No.

12   Q    They didn't let you get up and go talk to other people?

13   A    (Witness shakes head.)

14   Q    The FBI tracked you down, or maybe Mr. Gavin tracked you down

15   through your sister?

16   A    My daughter.

17   Q    Your daughter.  That's Sheryl Johnson?

18   A    Yes.

19   Q    Mr. Johnson, did you know the people you later learned now

20   know as the Madisons, the two men coming over the bridge, did you

21   know them before this day?

22   A    No.

23   Q    Did you know any of the Bartholomews before this day?

24   A    No.

25   Q    Did you know Mr. Brissette before this day?

1    A    No.

2    Q    You did not see with your own eyes anyone get shot that day;

3    did you?

4    A    No.

5              MR. FLEMING:  One moment.

6              (Pause in proceedings.)

7              MR. FLEMING:  Thank you, Mr. Johnson.  I have no further

8    questions.

9              THE COURT:  Next.  Mr. Meche.

10                          CROSS EXAMINATION

11   BY MR. MECHE:

12   Q    Good afternoon, Mr. Johnson.  I'm Tim Meche, I represent

13   someone named Anthony Villavaso.

14             MR. MECHE:  Could you stand up, please?

15   BY MR. MECHE:

16   Q    Do you know him?

17   A    No, I can't remember.

18   Q    Do you recall seeing him out there that day?

19   A    I don't remember, no.

20   Q    I want to direct your attention to just before the storm.

21   Were you actually living in this hotel before the hurricane, or

22   did you just check in --

23   A    No.  I just had checked in.  I wasn't living there.  I was

24   over by my daughter.

25   Q    And that was here in Orleans Parish?

1    A    Yeah, Orleans Parish.

2    Q    So you had checked in there, that was kind of like where you

3    evacuated for the storm?

4    A    My daughter asked me -- she had called me that up day and

5    asked me to leave with them, was I going to leave with them to

6    Texas.

7         I say:  No, the storm's going to pass off.

8         They said:  Are you sure?

9         I said:  I'm sure.

10        So I stayed.

11   Q    So when would you have checked in?  Like the night before?

12   A    Maybe about a few nights before.  A couple nights before,

13   yeah.

14   Q    And was that hotel open like after the storm, like the

15   manager and stuff --

16   A    The Monte Carlo?

17   Q    Yes, sir.

18   A    No.  The manager, he was there.  After the storm, they had

19   looked like he was gone.  Before the storm, he was there before

20   the storm.

21   Q    But, the people staying there before the storm, they were

22   allowed to continue staying there?

23   A    Yeah.

24   Q    Now, you had talked a little bit about what you had saw after

25   the storm and before the bridge shooting.  I think you'd

 1  indicated you would hear gunfire at night?

 2  A   Yes.

 3  Q   And you noticed some 20 something year olds committing crimes

 4  around that time; is that correct?

 5  A   Yes.  There was like -- I see like trucks and riding up and

 6  down the highway in the night and in the daytime.

 7  Q   And one of them set a fire?

 8  A   I seen it, but I didn't know who it was.

 9  Q   You said they were 20 years olds.  Are you sure about that,

10  or they just looked about that age?

11  A   Looked about that age.

12  Q   Do you remember kind of what they looked like?

13  A   No.

14  Q   Do you know -- and some of us have more hair than others --

15  do you know how kids wear longer hair with braids, did they wear

16  hair like that?

17  A   I didn't pay attention.  I didn't notice at the time their

18  head.

19  Q   So you don't know if they had short hair or dreadlocks or

20  whatever?

21  A   No.

22  Q   Now, these 20 something year olds, and I think Mr. Hessler

23  showed you that handwritten statement that that investigator lady

24  took when you mentioned it.  You also testified in front of a

25  grand jury, do you remember that?

1    A    Yes.

2    Q    Where you took an oath, and I think Ms. Bernstein was the one

3    asking you questions.

4         And you also mentioned the 20-something-year-olds'

5    activity at that time.  Do you remember that?

6    A    Yes.

7    Q    Now, did they ever follow-up on that and ask you, show you

8    any pictures or anything, see if you could identify them?

9    A    They showed me the pictures where I was laying on the ground,

10   yes.

11   Q    Did they show you any pictures of any 20-something-year-olds?

12   Did they pursue that topic with you further at all?

13   A    No.

14        MR. MECHE:  Thank you, sir.

15        MR. LONDON:  No questions, Your Honor.

16        THE COURT:  Redirect.

17                    REDIRECT EXAMINATION

18   BY MS. CHUNG:

19   Q    Mr. Johnson, Mr. Meche and a lot of these other attorneys

20   asked you a lot about those cement trucks and mail trucks that

21   you saw going around.  Did you see any of those on the bridge

22   that day?

23   A    Not on the bridge, no.

24   Q    Did you see any of those people who had been stealing those

25   trucks on that --

1    A    No.

2    Q    -- bridge that day?

3         Did you see anyone other than those two guys who were

4    coming over the bridge?

5    A    (Witness nods head.)

6    Q    Anyone else besides them?

7    A    That's the only two guys I saw on the bridge.

8         MS. CHUNG:  I have nothing further, Your Honor.

9         THE COURT:  Okay.  Thank you, sir.  You can step down.

10        Is this witness released?

11        MR. FLEMING:  No, Judge, he can be released.

12        THE COURT:  He can be released?

13        You can step down.  You can leave those there, Mr.

14   Johnson.

15        Thank you, sir.

16        It's about five minutes to five, so we're going to go

17   ahead and adjourn for today.  I will again tell you not to

18   discuss anything about the case with anyone including amongst

19   yourselves while you're exiting the building today or when you

20   get here in the morning.  Please don't discuss anything about the

21   case with anyone else when you're not on the premises, and also

22   please be careful not to view anything or read anything about

23   this case if any of it should happen to come within hearing or

24   viewing distance of you.  It's very important that you follow

25   those instructions.

 1            You know, one thing that I meant to tell you on

 2  Thursday, and I'll tell you now, is that you haven't heard all of

 3  the evidence in this case.  And we told you at the outset of the

 4  trial that you really would not be able to get this case for

 5  deliberation until after you have heard all the evidence and the

 6  attorneys have the chance to address you in closing arguments,

 7  which the evidence are not evidence.  But they will be able to

 8  tell you a lot about what you have heard all the way up until

 9  that point in time.  So any consideration or conclusion that you

10  would draw now would be entirely premature.  So that's why we ask

11  you to be very careful about those types of things and those

12  types of instructions I give you.  And I know you're probably

13  already tired of me giving you those instructions, but that's why

14  it's so important.  Because we do have more evidence from the

15  government, more testimony, defendants other than cross examining

16  the government's witnesses haven't even begun to put on their

17  case.  So you'll be having a lot more time to hear other

18  evidence, and then you'll be able to hear the attorneys address

19  you, and then you can go ahead and discuss it and come to some

20  conclusions.  But it's important that you don't engage in that

21  process whatsoever until that time.

22            Okay.  With those instructions, if you all can be ready,

23  we will go ahead and report to the same room on the first floor.

24  We will start here at 8:30.

25            So you all are doing a really good job of being prompt,

 1    and I'd ask you to continue to do so.  Thank you.

 2            (Jury Exits.)

 3            THE COURT:  If you all would be seated.

 4            With regard to the expert issue, I have had my law clerk

 5    check the record.  And, based upon the dates and the subsequent

 6    submission of the letter from Mr. Larson, which discussed the

 7    defendant's expert, the deadlines for filing motions directed to

 8    that report have not been reset.  In other words, one was set,

 9    the report was given, I had heard from -- the government

10    indicated that the report would be rejected because it was not in

11    sufficient form.  I then gave the defendant until the following

12    Monday to go ahead and supplement that report or provide -- I

13    should say provide a report that could be the subject of motion

14    practice.

15            So, Mr. Carter, I think you had indicated at one of the

16    bench conferences here that you could get something filed by the

17    end of today?

18            MR. CARTER:  That was extremely optimistic, Your Honor.

19    I'd like at least one extra day, if the Court would allow it.

20    End of tomorrow.

21            THE COURT:  That's fine, except for that we don't run

22    into a scheduling problem with the government's experts.  Because

23    those issues are linked such that I do have a government expert

24    summary which was provided to me this morning, and I don't want

25    to get crosswise where we're at in this juncture in the trial

```
 1   where we want to hear the expert testimony or where you want the
 2   jury to hear expert testimony but it's still subject to motion
 3   practice.  So please get it in as soon as possible.
 4         Can we get it by some time tomorrow?  Because then they
 5   have to have a chance to read it, and I don't expect them to read
 6   it while they're in here working during the day.
 7         MR. CARTER:  And it would be pretty hard for me to write
 8   it in here tomorrow.
 9         THE COURT:  That's very true.
10         I was given to understand that it was a work in progress
11   when you mentioned that it could possibly be filed today.
12         MR. CARTER:  It has begun.  It's one of the 27 things I
13   will try to do this evening.
14         Just so I'm clear, Your Honor, the timeframe and the
15   urgency that their expert won't testify for some time now, and
16   you said these issues were linked.  I didn't get the linkage.
17         THE COURT:  I believe that they are.  Plus, I need to
18   give the defendants the opportunity to file motion practice with
19   regard to what the government has provided, which they just
20   received today.
21         Either way, I don't want to have an expert witness show
22   up to testify when there's still an outstanding issue as to the
23   adequacy of that report.  So I would like to be able to rule on
24   that as soon as possible.  So can we get that done -- when?  You
25   tell me when.
```

1      MR. CARTER:  What I propose is tomorrow night.  It would

2   be after court up until midnight, 11:59.

3      THE COURT:  That's fine.

4      MR. DeSALVO:  Can we set it at 11:59?  We won't be up

5   waiting for it.

6      THE COURT:  When would the government intend to call an

7   expert?  Would it be this week?  Can we say with confidence --

8      MS. BERNSTEIN:  Possibly Thursday, Your Honor.

9      THE COURT:  This Thursday?

10     MS. BERNSTEIN:  Yes.

11     I mean, possibly not until next week.  But that would be

12  the very earliest, would be this Thursday.

13     THE COURT:  Is there an intent to file a motion on the

14  defendant's side with regard to what I've been provided today, or

15  have you even had a chance to read this?

16     MR. FLEMING:  Personally, I've not been provided a copy.

17  I believe that was given to Mr. Larson on my side.

18     THE COURT:  This is the problem, is that, if a witness

19  is going to show up here on Thursday, I haven't even gotten a

20  motions because I haven't even had a chance to read it, then we

21  have a problem.  So ...

22     MR. FLEMING:  I would anticipate we would file some

23  response, Judge.  I've not seen the report.

24     THE COURT:  Can we not defer the issue of the expert

25  until next week?  The expert would not be called until next week?

1          MS. BERNSTEIN:  I think this might be Mr. Carter's

2    question as well, but I'm not sure how the two are linked.  With

3    the government's expert, it's a use of force expert, they had it

4    this morning.  I would suggest that they be given until tomorrow

5    at midnight to file any objection to that expert notice so the

6    issue can be dealt with by Thursday.

7          I think the defense expert is a separate issue that -- I

8    mean, we will still file it absolutely by tomorrow.  But I'm not

9    sure they're linked.

10         THE COURT:  You both assume that I will be here at my

11   desk at 11:59 waiting with bated breath to receive your filings

12   tomorrow night.  You know what, if I have to do that, I will do

13   that.  Okay?  I can get here at all hours.  I'm here at strange

14   hours.  So I'll do what I have to do to get a ruling on it.

15         It just seems -- well, okay.  Let's do that.  All right.

16   By 11:59 tomorrow evening, I need to get motions with regard to

17   expert reports.  Okay?

18         MR. FLEMING:  I would not assume we'd be here at 11:59,

19   Judge.

20         THE COURT:  I never know.

21         What else do we have to cover on the record?

22         MR. CARTER:  On the record, Your Honor, a housekeeping

23   matter.  I just want to be sure that government Exhibits 259, the

24   chart, are in evidence, and 257, the photographs, are in

25   evidence.

1          THE COURT:  I think they have both been admitted without

2   objection.

3          MR. CARTER:  Yes.

4          MR. FLEMING:  We don't have an objection.  I don't

5   remember the drawing being officially offered.

6          MR. CARTER:  I do remember it, and I think it's in the

7   record.

8          THE COURT:  It was.  259?  Yeah, it was.  Okay.

9          Anything else on the record?

10         Is there anything off the record that we need to discuss

11  other than what we will discuss up here in a minute.

12         Counsel, if you'd approach.

13         (Sidebar conference, off the record.)

14         (5:05 p.m., proceedings concluded.)

15

16                          CERTIFICATE

17

18

           I, Susan A. Zielie, Official Court Reporter, do hereby

19  certify that the foregoing transcript is correct.

20

21

                          /S/ SUSAN A. ZIELIE, FCRR

22         _____

                          Susan A. Zielie, FCRR

23

24

25