```
 1              IN THE UNITED STATES DISTRICT COURT FOR

 2                 THE EASTERN DISTRICT OF LOUISIANA

 3

 4   UNITED STATES OF AMERICA,        ) 10-CR-204
                                      )
 5                    Plaintiff,      ) Section N
                                      )
 6         v.                         ) New Orleans
                                      )
 7   KENNETH BOWEN, ROBERT GISEVIUS   ) July 7, 2011
     ROBERT FAULCON, ANTHONY          )
 8   VILLAVASO, ARTHUR KAUFMAN,       )
                                      )
 9                    Defendants.     ) Jury Trial
     _____)  Day Nine

10

11

12                  TRANSCRIPT OF PROCEEDINGS

13                          VOL. IX

14          BEFORE THE HONORABLE KURT D. ENGELHARDT

15               UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21   SUSAN A. ZIELIE, RPR, FCRR
     Official Court Reporter
22   HB 406
     500 Poydras Street
23   New Orleans, Louisiana 70130
     susan_zielie@laed.uscourts.gov
24   504.589.7781

25   Proceedings Recorded by Computer-aided Stenography.
```

```
 1    APPEARANCES:

 2    For the Government:          US Attorney's Office
                                   BY:  THEODORE CARTER, AUSA
 3                                 500 Poydras Street, Room B-210
                                   New Orleans, LA 70130
 4                                 504.680.3165
                                   usala.ecfcr@usdoj.gov
 5
                                   US Department of Justice
 6                                 Civil Rights Division
                                   BY:  BARBARA BERNSTEIN, ESQ.
 7                                 601 D Street NW
                                   Office PHB 5123
 8                                 Washington, DC 20004
                                   202.353.0032
 9                                 bobbi.bernstein@usdoj.gov

10                                 US Department of Justice
                                   Civil Rights Division
11                                 BY:  CINDY K. CHUNG, ESQ.
                                   950 Pennsylvania Avenue NW
12                                 Washington, DC 20530
                                   cindy.chung@usdoj.gov
13                                 202.305.4057

14    For Kenneth Bowen:          FRANK G. DESALVO, APLC
                                   829 Baronne Street
15                                 New Orleans, LA 70113
                                   504.524.4191
16                                 frankd@fdesalvo.com

17    For Robert Gisevius:        ERIC J. HESSLER, ESQ.
                                   700 Camp Street
18                                 New Orleans, LA 70130
                                   504.528.9500
19                                 hessler.law@gmail.com

20

21

22

23

24

25
```

```
 1   For Robert Faulcon:          PAUL C. FLEMING, JR., ESQ.
                                  2821 Kingman Street, Suite C
 2                                Metairie, LA 70006
                                  504.888.3394
 3                                pfleming@fleminglaw.net

 4                                King Krebs & Jurgens, PPLC
                                  BY: LINDSAY A. LARSON, III, ESQ
 5                                201 St. Charles Avenue
                                  45th Floor
 6                                New Orleans LA 70130
                                  504.582.3800
 7                                llarson@kingkrebs.com

 8   For Anthony Villavaso:       DeSalvo Blackburn & Kitchens
                                  BY:  ROGER W. KITCHENS, ESQ.
 9                                2802 Tulane Avenue
                                  New Orleans, LA 70119
10                                504.821.6171
                                  rkitchens@desalvoblackburn.com
11
                                  TIMOTHY A. MECHE, ESQ.
12                                700 Camp Street
                                  New Orleans, LA 70130
13                                504.528.9500
                                  tim_meche@yahoo.com
14
     For Arthur Kaufman:          STEPHEN D. LONDON, ESQ.
15                                1100 Poydras Street
                                  Suite 2950
16                                New Orleans, LA 70163
                                  504.582.2427
17                                ebyte2@aol.com

18

19

20

21

22

23

24

25
```

```
1                        EXAMINATION INDEX

2

3    Testimony of:

4        MICHAEL HUNTER (Cont.)
             Direct by Mr. London (cont.)    7, 120
5            Cross by Mr. Hessler           15
             Cross by mR. Meche             84
6
         TRACY HAAS
7            Direct by Mr. Carter          169, 212
             Cross by Mr. Larson           193
8            Cross by Mr. DeSalvo          203
             Cross by Mr. Hessler          204
9
         ZINA DARANDA
10           Direct by Ms. Chung           215
             Cross by Mr. London           226
11
         JACQUELYN MADISON BROWN
12           Direct by Ms. Bernstein       227

13       DOUGLAS BLOEDORN
             Direct by Ms. Chung           255, 281
14           Cross by Mr. Larson           271
             Cross by Mr. Hessler          274
15           Cross by Mr. DeSalvo          281

16       MEREDITH ACOSTA
             Direct by Ms. Chung           285
17           Cross by by Mr. Fleming       298

18

19

20

21

22

23

24

25
```

1      NEW ORLEANS, LOUISIANA; THURSDAY, JULY 7, 2011

2                    8:15 A.M.

3      (Following proceedings held in chambers.)

4      MS. BERNSTEIN:  Your Honor, the issue we wanted to put

5  on the record is that the government today provided Mr. Hessler

6  with a letter letting him know -- and provided him with three

7  pages of notes from an interview that his client did with the DAs

8  office back in 2006.  And the letter we provided says we have not

9  been able to determine whether we turned this over during federal

10 discovery but we have reason to believe that it inadvertently got

11 left out of our discovery.

12      Mr. Hessler has said and we have records showing that he

13 received this during state discovery, that he is aware of this

14 interview and had a copy of these notes that we've given him.

15      But I wanted to put on the record that we have provided

16 him this letter, and we've talked to him about it, and we've

17 talked to the Court.

18      Mr. Hessler, do you want to put your position --

19      MR. HESSLER:  As Ms. Bernstein said, I was aware that a

20 document such as this existed years ago.  I did not see it in the

21 federal discovery.

22      I would characterize it as notes of the investigator and

23 in no way would stipulate that they're accurate and would not

24 object to -- would certainly object to any of the introduction of

25 this document, but not any of the information contained therein

```
 1    through a witness that is qualified to do so.

 2         THE COURT:  And I have also been presented with the

 3    letter here that the government has written to Mr. Hessler, along

 4    with the three paged -- it seems to be a bullet-point recounting

 5    of information purportedly sourced from Mr. Gisevius July 17,

 6    2006.  I've been provided with it; and my understanding is that

 7    no one will seek to introduce it into evidence, nor will it be

 8    referred to in front of the jury with regard to the testimony

 9    elicited from any witness.

10         MS. BERNSTEIN:  Yes.

11         Just for the record, since the bullet-point thing

12    doesn't indicate, our understanding is that those bullet points

13    are notes taken during an interview with the DA's Dustin Davis

14    and Robert Culpepper.  The government's plan is to call -- if we

15    do this, the government's potential plan is to call Culpepper as

16    a witness to testify about the contents of the interview without

17    introducing this document.  And Mr. Hessler has not objected to

18    that as long as the document doesn't come in.

19         MR. HESSLER:  I would object to even using it to refresh

20    his recollection.

21         MS. BERNSTEIN:  Okay.

22         THE COURT:  All right.

23         This is my copy; is that right?

24         MS. BERNSTEIN:  Yes.  Thank you.

25         (Chambers conference concluded.)
```

1          (Following proceedings were held in open court.)

2          (Jury Enters.)

3          THE COURT:  Good morning.  You may be seated.

4          Sir, have you discussed your testimony with anyone since

5    we broke yesterday?

6          THE WITNESS:  No, sir.

7          THE COURT:  You can be seated.  You're still under oath.

8          We were in the middle of cross examination.

9          Mr. London, you may approach, and you may begin.

10          Thank you all for being here on time.

11          MR. LONDON:  Begin, Your Honor?

12          THE COURT:  Yes.

13                    CROSS EXAMINATION (CONTINUED)

14    BY MR. LONDON:

15    Q    Good morning, Mr. Hunter.

16    A    Good morning, sir.

17    Q    My name is Steve London, I represent Archie Kaufman.

18          Did you have any opportunity to read any material

19    related to your testimony last night?

20    A    No.

21    Q    I want to just briefly revisit with you, make sure I heard

22    this right.  You were suspended from the New Orleans Police

23    Department for three days for lying; is that correct?

24    A    Yes, sir.

25    Q    You characterize that as a short vacation?

1    A    Yes, sir.

2    Q    That's the way you looked at that?

3    A    Yes, sir.

4    Q    You also lied on your residency requirement; is that correct?

5    A    Yes, I did.

6    Q    And you say you did that because you thought that would

7    better your family?

8    A    Yes, sir.

9    Q    You were supposed to go to court on two different occasions

10   that you just did not do?

11   A    Yes, sir.

12   Q    And you lied to the FBI during this case.  When you first met

13   with the FBI, did you lie to them in your first statement?

14   A    No, sir.

15   Q    Did you go to the state grand jury?

16   A    Yes, sir.

17   Q    And you were under oath there?

18   A    Yes, sir.

19   Q    And you lied there?

20   A    Yes, sir.

21   Q    But you're not lying today?

22   A    No, sir.

23   Q    Or yesterday?

24   A    No, sir.

25   Q    I believe you testified on cross examination of Mr. DeSalvo

1    that no one told you what to say in your statements; is that

2    correct?

3    A    Correct.

4    Q    That's correct, okay.  I would like for --

5         MR. LONDON:  Steve, bring up Exhibit 27, page 22,

6    please.

7    BY MR. LONDON:

8    Q    While they're putting that up, let me ask you a couple of

9    questions.  During this incident, you did not see Sergeant

10   Kaufman on the scene at the time of the shootings occurred;

11   correct?

12   A    I don't have a specific recollection, no.

13   Q    So the answer is no, okay.

14        And you didn't see Sergeant Kaufman involved in

15   physically abusing anybody; is that correct?

16   A    No, I didn't.

17   Q    I'll direct your attention to what is Exhibit 27, previously

18   introduced into evidence page 22.  And I want to direct your

19   attention to where it says Sergeant Kaufman then met with Michael

20   Hunter.  And I believe that Ms. Bernstein discussed this with you

21   at length during her direct; is that correct?

22   A    Yes, sir.

23   Q    And I believe it was your testimony that the content of this

24   statement was basically a lie; is that correct?

25   A    Yes, sir.

1    Q    But that is the content of your statement; isn't it?

2    A    No, sir.

3    Q    That's what you told, that's what you said; correct?

4    A    No.  I didn't give at that statement.

5    Q    Are you saying somebody made this statement up?

6    A    Yes.

7    Q    This just was made up out of hole cloth; you didn't have

8    anything to say with the statement?

9    A    Yes, sir.  There is lots of inconsistencies.  Things I

10   wouldn't have said even if somebody asked me.

11   Q    So this was just totally made up?

12   A    Yes, sir.

13   Q    What about the statement that you gave to homicide personnel

14   in January, I believe specifically January 25, 2006, that taped

15   statement, was that your statement?

16   A    Yes, I gave that statement.

17   Q    You gave that statement.  Were the lies contained in that

18   statement?

19   A    Yes, sir.

20   Q    I believe Mr. Harbin or Detective Harbin or Detective

21   Colmenero --

22   A    Yeah.

23   Q    -- took that statement from you?

24   A    Yes, sir.

25   Q    Did they tell what you to say in that statement?

1   A   No, they didn't.

2   Q   Did Sergeant Kaufman tell you what to say in that statement?

3   A   No, he didn't.

4   Q   Sergeant Kaufman never told you what to say in any statement;

5   did he?

6   A   He wanted us to make sure we had our statements corroborate

7   each other.

8   Q   That's not the answer to the question.  Did he tell you what

9   to put in your statement?

10   A   No, sir.

11   Q   No, he did not.  At not time did he tell you what to put in

12   your statement?

13   A   No, sir.

14   Q   At no time did you hear him tell anybody what to put in their

15   statement.

16   A   No, I did not.

17   Q   Did not.

18              You said you assumed on January 25th when your

19   audiotaped statement was being taken by the Seventh District

20   homicide personnel, that Sergeant Kaufman was still in charge of

21   that case; is that not correct?

22   A   Yeah, I believed that at the time.

23   Q   You believed at the time that he had been transferred to

24   homicide during that period?

25   A   Yes, sir.

1    Q    If I were to tell you that he was not transferred to homicide

2    until February, would you have any reason to doubt that?

3    A    No.  I could be wrong about that.

4    Q    If I told that you they was still assigned to the Seventh

5    District during the time the statements were taken, would you

6    have any reason to doubt that?

7    A    I could be mistaken about that.

8    Q    If I were to tell you that Sergent Dugue was in charge of

9    that investigation and not Kaufman, would you have any reason to

10   doubt that?

11   A    No.  But I wasn't aware of that.

12   Q    Would you have any reason to doubt that?

13   A    No, sir.

14   Q    Now, you never met with Kaufman or enacted with him at any

15   time after the initial meeting at the Crystal Palace; did you?

16   A    No, sir.

17   Q    You were not contacted about the incident again by Sergeant

18   Kaufman or anyone until you gave your statement in January; is

19   that correct?

20   A    That's correct, sir.

21   Q    You also believe, and I believe you told the FBI, that while

22   Kaufman was on vacation for a period of time, you saw Lehrmann --

23   who was then a detective in the Seventh District; is that

24   correct?

25   A    Yes, sir.

1   Q    You saw him typing on what was to later be Kaufman's notes;

2   is that correct?

3   A    I believe he was submitting a narrative of the incident to

4   Lieutenant Lohman.

5   Q    So that was Lehrmann that was typing on the narrative and not

6   Kaufman; correct?

7   A    Correct, sir.

8   Q    And that was because Kaufman was out of town on vacation?

9   A    He was out of town at that time.

10  Q    So Lehrmann had access to those notes and that information

11  that Kaufman was putting down concerning this incident, and

12  utilized that information while he was out of town; correct?

13  A    I believe so.

14  Q    You believe so.  Is it yes or no?

15  A    Yes.

16  Q    Yes.

17       And you also saw Mr. Lehrmann give that information to

18  Lieutenant Lohman; didn't you?

19  A    Yes.

20  Q    And you also heard Detective Lehrmann talking to Lieutenant

21  Lohman about that; didn't you?

22  A    I didn't hear the transaction.  I just saw Lieutenant Lohman

23  getting aggravated saying it wasn't good enough.

24  Q    You heard Lieutenant Lohman say it wasn't good enough?

25  A    Yes, sir.

1  Q   Referring to the information Lehrmann was giving Lohman;

2  correct?

3  A   Yes, sir.

4  Q   Not the information Kaufman was giving him; correct?

5  A   Yes.

6  Q   Because Kaufman was no where around; isn't that correct?

7  A   He wasn't there, no, sir.

8  Q   You didn't meet with anyone else to discuss your statements

9  either before meeting at the Seventh District station on January;

10  did you?

11  A   No, sir.

12  Q   And you did not review any written statements before giving

13  that statement?

14  A   No, sir.

15  Q   And you did not review any draft reports; is that correct?

16  A   No, I don't recall any of that.  No, sir.

17  Q   The answer is to the question, you did not review any draft

18  reports; is that correct?

19         MS. BERNSTEIN:  Your Honor, the answer was:  I don't

20  recall doing that.

21         MR. LONDON:  Then I'll ask again.

22         THE COURT:  I think he said I don't believe as an

23  answer.  So the question is does he not recall it or is the

24  answer no.  So I think that can be clarified.

25         THE WITNESS:  I don't remember reviewing any reports,

1    sir.

2    BY MR. LONDON:

3    Q    So you do not specifically remember reviewing any information

4    as we stand here today, or as I stand here and you sit here

5    today, before giving your statement; correct?

6    A    Correct.

7              MR. LONDON:  No further questions.  Thank you, Judge.

8              THE COURT:  Thank you.

9              Mr. Meche or Mr. Hessler.

10                        CROSS EXAMINATION

11   BY MR. HESSLER:

12   Q    Morning, Mr. Hunter.

13   A    Morning, sir.

14   Q    Mr. Hunter, what year did you attend the police academy?

15   A    Started in December of 1998 and graduated in May of 1999.

16   Q    And then, in police academy, isn't it true that you took

17   classes and training in courtroom testimony?

18   A    That was like a two hour block by Ralph Brant on an

19   afternoon.  It wasn't very long at all.

20   Q    Did you learn anything out of it?

21   A    What Mr. Brant told us was if we don't want to go to court

22   don't put people in jail.  That was the sum of that lesson.

23   Q    That probably took about two seconds to say.

24   A    Yeah.  That was his -- I'm sorry.

25   Q    Consisted of --

A    I'm sorry, it was -- that was his closing advice to us.

Q    All right.  Well, I didn't ask the closing advice.  I asked

what is it that you were -- that you learned in that class, what

was --

A    I don't recall learning anything in that class.

Q    Did you learn that you ought to tell the truth?

A    Oh, of course.

Q    But you didn't take that to heart; did you?

A    I was a recruit back then.

Q    Okay.  But you know how to tell the truth, even before you

became a police officer; didn't you?

A    Yes, sir.

Q    You knew, when you took an oath, that you were supposed to

tell the truth; right?

A    Yes, sir.

Q    And you told this jury already yesterday that you don't much

care for the truth if it doesn't suit your personal need and the

needs of your family; right?

A    It's not that I don't care for the truth, sir.  It's I didn't

have the courage to tell the truth.

Q    You had the courage to raise your hand and swear to God under

oath that you would tell the truth, and you had the courage to

completely disregard that oath and lie; right?

A    Yes, sir.

Q    And you did that because that was in your best interest?

1   A    I was pressured to do it, sir.

2   Q    By who?

3   A    By the people I was involved in this incident with.

4   Q    I thought you said nobody ever told you not one word.

5   A    No, sir.  But it was implied.

6   Q    Just, in your mind, it was implied?

7   A    Yes, sir.

8   Q    Now, let me ask you this.  Back in July of 2003, you were

9   subjected to an investigation by the NOPD, New Orleans Police

10  Department; correct?  Do you remember that?

11  A    In 2003?

12  Q    Yes, sir.

13  A    I don't -- no.

14  Q    With Sergeant Barrios, do you remember that investigation?

15  A    Oh, yeah.

16  Q    And you were accused of lying by Sergeant Barrios, your

17  supervisor?

18  A    Yes.

19  Q    As well as at least two civilians?

20  A    Yes, sir.

21  Q    And you were not only found guilty or sustained of being

22  untruthful in your encounters with the civilian and the -- let me

23  rephrase the question.

24         You admit that you were in fact found to be untruthful

25  in that investigation of making statements to investigators in

1    that investigation; correct?

2    A    The investigation was sustained, as -- I don't know what you

3    would call it.

4    Q    For the jury's knowledge, that means that you were found to

5    have been untruthful in an investigation and statements you made

6    to investigators in regards to that incident?

7    A    Yes.

8    Q    Who was pressuring you to lie then?

9    A    I didn't lie then.

10   Q    Okay.  So Sergeant Barrios lied?

11   A    Yes, sir, he did.

12   Q    And the two civilians that testified that you cursed them and

13   acted unprofessional on the scene lied?

14   A    Yes, they did.

15   Q    Who was pressuring them to lie?

16   A    They were trying to get me in trouble.

17   Q    Why?

18   A    Because I arrested their grandson for hit and run.

19   Q    Did you arrest Sergeant Barrios' grandson?

20   A    No.

21   Q    Why was he trying to get you in trouble?

22   A    Because my cellphone had gotten stolen out of the police car,

23   and I was looking for it.  And he started yelling at me, ordering

24   me to go back to the police station.  And I ignored him.

25   Q    So not only are you a liar but you're insubordinate to your

1   ranking officers; would you agree with that?

2   A   No, sir.

3   Q   But the police department found that; didn't they?

4   A   Yes, they did.

5   Q   But you didn't do anything?

6   A   Just because you're found guilty doesn't mean you are.

7   Q   And just because you're saying you're telling the truth

8   doesn't mean you are either; right?

9   A   But I am today.

10   Q   I know.

11          All right.  So let's go back and revisit that.  Now let

12   me ask you this.  You lied to the homicide; right?

13   A   Yes, I did.

14   Q   And there was some kind of implied reason for you to do that?

15   A   No.  That was pretty straightforward.

16   Q   But nobody told you anything; you just --

17   A   Nobody told me what to say, but we were told to get our

18   stories straight before we gave the statements.

19   Q   Now, getting your stories straight means -- does that mean

20   make sure you tell everything that happened?

21   A   Make sure I justify why I did what I did.

22   Q   Nobody told you that.  They told you, get your story

23   straight.

24   A   The implied message with that was make sure you justify what

25   you did.

1    Q    Okay.  And you did; you lied to two homicide investigators;

2    right?

3    A    Yes, I did.

4    Q    You lied under oath to the state grand jury; right?

5    A    I did.

6    Q    That was to get out of trouble?

7    A    Yes, sir.

8    Q    And you're now testifying under oath in this proceeding;

9    right?

10   A    Yes, sir.

11   Q    And your hope is to get out of trouble?

12   A    I'm in trouble.  I'm not getting out of it.  I just hope to

13   lessen the severity of it.

14   Q    Well, that's getting out of the trouble.

15   A    Getting out of trouble would not be going to prison.

16          THE COURT:  Wait.  First of all, you need to let hem

17   finish the question.

18   BY MR. LONDON:

19   Q    Would you tell Ms. Bernstein right now that you don't want

20   your sentence reduced?

21   A    No.  I wouldn't tell her that, no, sir.

22   Q    Because you do you want your sentence reduced?

23   A    Yes, sir.

24   Q    Because that's certainly in your best interest.

25   A    It's in my family's best interest that I don't go to prison

1   at all, but that's not going to happen.

2   Q   You don't know that.

3   A   I very much know that, sir.

4   Q   How is that?

5   A   I've been sentenced already.

6   Q   But you can get it reduced?

7   A   Not to probation.

8   Q   Do you know that?

9   A   Yes, sir.

10  Q   Now, you testified earlier that you were in the Marine Corps?

11  A   Yes, I was.

12  Q   For six months?

13  A   Yes, sir.  Approximately.

14  Q   All right.  What's reflected on your DD-214?

15  A   Uncharacterized separation, I believe it says.  Something to

16  that effect.

17  Q   Uncharacterized separation.

18  A   Yes.

19  Q   Do you know what that means?

20  A   Just let go.

21  Q   The Marine Corps just let you go?

22  A   Yeah.

23  Q   You signed paperwork swearing --

24  A   Let me clarify.  I had two stress fractures and one of them

25  wasn't healing fast enough.  And I had been there about six

 1   months out of three months.

 2   Q   It actually was unsuitable; correct?

 3   A   I'm sorry?

 4   Q   Would it actually be unsuitable discharge?

 5   A   That's not what my DD-214 says.

 6   Q   Does it say medical?

 7   A   No.

 8   Q   Uncharacterized?

 9   A   That's what it says.

10   Q   Not an honorable discharge?

11   A   No.

12   Q   And how long after did you join the NOPD?

13   A   I left the Marine Corps in '96.  And I was hired by the

14   police department in December of '98.

15   Q   Okay.  All right.  Now, yesterday, you said you met with the

16   government -- prior to you changing your story, you met with the

17   government, you and your attorney; right?

18   A   Yes.

19   Q   And you used a strange choice of words when you were asked

20   why you decided to plea.  You said that you talked to your wife

21   and your attorney and you came to the conclusion that accepting a

22   deal was in your best interest; right?

23   A   Yes, sir.

24   Q   Is that why you decided to take the deal?

25   A   Yes, sir.

1    Q    You did not say that you came to the conclusion that:  I

2    intentionally did wrong by knowingly trying to kill three people

3    on the bridge; right?

4    A    No, I didn't say that.  But that's -- doesn't mean I didn't

5    feel that.

6    Q    Did you intentionally try to kill people up on that bridge?

7    A    No, sir.

8    Q    Now, what were you charged with in state court?

9    A    Two counts of attempted first degree murder.

10   Q    On who?

11   A    Lance and Ronald Madison.

12   Q    The people you fired at as they were running off the bridge?

13   A    Yes, sir.

14   Q    And that's another thing I'm going to get to later, but I

15   said fired at.  You didn't correct me.

16   A    I did fire at them.

17   Q    You didn't fire over their heads, you fired at them?

18   A    Well, I see your point, sir.  I fired in their direction.

19   But I wasn't trying to hit them.

20   Q    Okay.  And that's a crucial point; right?

21   A    Seems like splitting hairs to me, sir, but ...

22   Q    Well, they might have split hairs because they didn't charge

23   you with it.  But the state didn't split those hairs because they

24   did charge you with it; right?

25   A    Yes, sir.

1   Q    Your testimony today, you view it as finally telling the

2   truth?

3   A    Yes, sir.

4   Q    This is not a work in progress where that changes and, you

5   know, where it's best whatever is in your best interest?

6   A    No, sir.

7   Q    When you're in those meetings, did they ever question you

8   about your state charges of attempted first degree murder on

9   Lance Madison or Ronald Madison?

10  A    You're asking about the government?

11  Q    Yeah.

12  A    The meetings I had with the government?

13  Q    Yeah.

14  A    They may have.  I don't specifically recall what we talked

15  about.

16  Q    Okay.  And did the possibility or if they may have -- they

17  knew that; didn't they?

18  A    Yes, they did know that.

19  Q    And did they tell you that, if they decided to charge you

20  with those same charges or something similar, that you'd be

21  facing possible life imprisonment or even the death penalty?

22  A    I don't think they told me that.  Something to the effect of

23  all the counts of perjury and the civil rights violations, it

24  would add up to a considerable amount of time.  I don't remember

25  the exact amount of time, though.

1    Q    Certainly more than you wanted to be accountable for?

2    A    Accountable for?

3    Q    Yeah.

4    A    Well, God's, I guess, going to hold me accountable for my

5    actions.

6    Q    That's later; right?

7    A    Yes, sir.

8    Q    You're not -- you're dealing with the federal government that

9    day, not God.

10   A    Well, you deal with God every day.

11   Q    And this is the same God you swore, put your hand on the

12   Bible --

13   A    I lied to him, too.

14   Q    -- swore to tell the truth?

15   A    I lied to him, too.

16   Q    So there is really nobody you won't lie to?

17   A    There was a time that I would have lied to just about

18   anybody, but --

19   Q    That's apparent.

20        But, now, that's changed?

21   A    Yeah.

22   Q    All right.  Do you remember talking to the government on

23   3/11/2010?

24   A    Yes, sir.

25   Q    And that was what you would characterize as your initial

1   interview?

2   A   Yes, sir.

3   Q   Did you lie to Mr. Bezak on that day?

4   A   No, I didn't.

5   Q   Now, there was a lot of omissions and mistakes and things

6   that might have been left out where you addressed those

7   yesterday; correct?

8   A   Yes, sir.

9   Q   Were those omissions, mistakes and things left out on your

10  part, or on Agent Bezak's part?

11  A   I'm not sure at this point.

12  Q   Now, on -- where is it that you told Agent Bezak that you

13  fired the shots into the air?  The warning shots?

14  A   The first meeting after I signed the Plea Agreement on the

15  11th, March 11th.

16  Q   Let me clarify my question.  You're driving to the bridge;

17  correct?

18  A   Yes.

19  Q   You were speeding actually.  Rightly so.

20  A   Yes, sir.

21  Q   And a state trooper pulls out his gun?

22  A   Yes.

23  Q   Why?

24  A   I guess he didn't know who we were, and we were coming at him

25  at a high rate of speed.

1   Q    State troopers pull over speeders every day of the week;

2   correct?

3   A    Yes, sir.

4   Q    They don't know everybody they pull over.

5   A    Well, this was also the aftermath of Katrina, too.  It's

6   different circumstances.

7   Q    What was different?

8   A    There was a lot of chaos in the city.

9   Q    So is it fair to say that the police officer might have been,

10  even a state trooper, might have been more apt to pull his weapon

11  a little quicker in a circumstance like this?

12  A    Yes.

13  Q    Circumstances were different?

14  A    Yes.

15  Q    Did he point it at you?

16  A    No.

17  Q    All right.  Now, we've talked about yesterday where you said

18  he pointed it at you, but that's a mistake?

19  A    Yeah.  I don't recall -- I don't recall him pointing a gun at

20  us at all.

21  Q    All right.  Do you recall the proximity to any particular

22  location on Chef Highway when you first fired these warning

23  shots?

24  A    It was either as we were exiting the intersection or after we

25  just passed it, going on to the bridge.

1    Q    Where the Banner Chevrolet in relationship to that

2    intersection?

3    A    It's east of the intersection.

4    Q    How far east?

5    A    It's on the corner.  It's on the southeast corner of the

6    Downman and Chef intersection.

7    Q    So would you say that you fired these shots well before you

8    reached the beginning of the bridge?  At the intersection, I

9    guess, is what you're saying?

10   A    I don't recall the exact position when I started doing it.

11   It was either as we were exiting the intersection going to the

12   bridge, west of the intersection, or a little bit after.

13   Q    Okay.  And why did you shoot warning shots up in the air?

14   A    I was concerned that -- well, I wanted to scare the people

15   and make them run off.  Not run off, but scatter, for lack of a

16   better word.  So that the guys in the back of the truck could

17   exit the truck.  And the people we believed to be gunmen would be

18   on the defensive, and give the guys in the back of the truck a

19   couple extra seconds out of the truck.  Because they couldn't see

20   out there.  They could only see out the rear.  It was a boxed

21   truck.

22   Q    And is being able to see what's going on important to a

23   police officer?

24   A    Very.

25   Q    On any given day; right?

1  A    Yes.

2  Q    Would you believe that under those circumstances that you

3  described or that day, that particular call, do you believe that

4  not having the benefit of seeing what's going on puts you even at

5  countless more times more bad position?

6  A    They're in a -- they have a severe disadvantage in the back

7  of that truck.

8  Q    Okay.  And you know they can't see?

9  A    Correct.

10  Q    So you know you also owe these people in the back a

11  responsibility?

12  A    I felt responsible for them.

13  Q    Yeah.

14                    So you shoot without telling them?

15  A    I couldn't tell them.  There was no way to communicate with

16  the people in the back of the truck without a radio.

17  Q    You could have not shot?

18  A    I could have not shot.  And I probably shouldn't have.

19  Q    Well, it would come back up to these rules and regulations

20  again.  There's rules and regulations that you're supposed to

21  follow; right?  Most people are.

22  A    Yes, most people do.

23  Q    Michael Hunter doesn't.

24  A    Well, I do now.  Learned my lesson.

25  Q    All right.  Let's go back and see what you learned.  You

 1   learned not to fire warning shots; didn't you?

 2   A    Yes.

 3   Q    Why?

 4   A    Because it's dangerous.

 5   Q    People in the back might think, oh, my God, it is a

 6   shoot-out.

 7   A    There's all kinds of reasons.  But, yeah, that could be one

 8   of the consequences.

 9   Q    That's a big reason.

10   A    Yes, sir.

11   Q    Nevertheless, you did it?

12   A    Yes, I did.

13   Q    And your intentions were that somehow the gunmen would be

14   separated from innocent civilians?

15   A    I don't know if I put that much thought into it.  I just

16   wanted to crowd to scatter so that, if they did start shooting at

17   us, the guys in the back of the truck would have time to get out

18   of the truck.

19   Q    All right.  And you were concerned that they might get

20   ambushed; right?

21   A    That was a concern at the time.

22   Q    You said that to Agent Bezak?

23   A    Yes.

24   Q    And you were concerned that people in that group might be

25   armed and might shoot at the police?

1    A    Yes.

2    Q    And also you had the benefit of hearing, because you heard on

3    the radio:  That's them right there in front of you?

4    A    Yes.

5    Q    How is it that -- on your way there, did you all get on the

6    radio, you or anybody else get on the radio and say:  All right,

7    we're going to back you up, or anything like that?

8    A    I don't nope.  I didn't have a radio so I didn't do it.  But

9    I'm not sure if anybody else did or not.

10   Q    But somebody was able to direct you either -- or somebody was

11   able to refer to someone in the truck that that's them right in

12   front of you.

13   A    That was the assumption I made.  I ultimately don't know who

14   that person on the radio was talking to.

15   Q    And you make assumptions based on knowledge, experience and

16   what you can see and hear?

17   A    Yes.

18   Q    At the time, you thought that was a reasonable assumption; is

19   that accurate?

20   A    I had a bit of tunnel vision as well.

21   Q    Okay.  But, at the time, you thought it was reasonable.  You

22   say you've learned some lessons since then.

23   A    Yes, sir.

24   Q    But do you think it was reasonable at the time to believe

25   that these are the people, these are people may be armed, they

1    may ambush the guys in the back?

2    A    Yes.

3    Q    So how many people were in that group originally, to your

4    best estimate?

5    A    Seven, eight, nine.  I don't remember.

6    Q    And how many police officers do you know were in the back of

7    the truck?

8    A    I didn't know the total count.  I could tell you ones I know,

9    if you want to know that.

10   Q    Okay.  One of the police officers in the back of the truck

11   was Sergeant Gisevius?

12   A    Yes, sir.

13   Q    All right.  And Sergeant Gisevius was -- were you working for

14   him then?

15   A    No.  I was on the night watch then.

16   Q    Okay.  What was your relationship with Sergeant Gisevius?

17   A    Professional.

18   Q    And I thought earlier you testified that you didn't

19   particularly care for him?

20   A    I didn't care for the way he was running the narcotics unit

21   that they'd recently established.

22   Q    You ever work in narcotics before?

23   A    No.

24   Q    You ever been a supervisor before?

25   A    No, sir.

1  Q   And did you voice your opinion to him and say:  Hey,

2  Sergeant, never worked in narcotics before, but I don't like the

3  way you're running your narcotics unit?

4  A   Well, the way I was invited into the unit, I was told that we

5  were going to be doing investigations, not street level work.

6  And it quickly fell into another plain clothes task force where

7  we were just doing street level work with an occasional search

8  warrant from time to time.

9  Q   So -- he asked you to come there?

10  A   Yeah.  He did approach me.

11  Q   Isn't it a fact that you wanted to go to the narcotics unit,

12  and he didn't want you there because of your prior sustained

13  complaints of untruthfulness?

14  A   No.  He approached me and asked me if I was interested.

15  Q   And how long did you last there?

16  A   Maybe a month, six weeks.  I don't remember.

17  Q   When you're in narcotics, it's primarily your word against

18  the word of a drug dealer oftentimes; right?

19  A   Yeah.  With the New Orleans Police Department, it is.

20  Q   And honesty and truthfulness mean a lot; doesn't it?

21  A   They account for a lot.

22  Q   Especially when you're on the stand and you've got to --

23  you're potentially confronted every single time you testify with

24  your proven inability to tell the truth?

25  A   It's proven now because I've admitted that I lied about this

1   incident.  But I didn't lie about that complaint, that it was

2   sustained against me.

3   Q   Okay.  So you went, despite the fact that you didn't like

4   him, you didn't like the way the thing was running, you went

5   anyways?

6   A   It hadn't started yet.  I was one of the first people

7   involved.  There was four of us that he asked to come in the

8   unit.

9   Q   So you would rather go work on the night watch as opposed to

10   working for Sergeant Gisevius?

11   A   It also benefited my family.  I wrote a 105 to Captain Bardy

12   indicating that my son had just been born, and it helped my

13   family out for me to be working nights so I could be home during

14   the day.  And the narcotics unit had revolving hours, to say the

15   least.  It wasn't convenient for my family.

16   Q   Did you have any other run-ins with Sergeant Gisevius?

17   A   Nothing stands out.

18   Q   If it stood out, you'd certainly tell the government that;

19   wouldn't you?

20   A   Yes, sir.

21   Q   Do you remember telling the government there was a conflict

22   between Hunter, Bowen and Gisevius?

23   A   Yeah.  That was summarized a little bit.  Different people

24   had different agendas with the truck, and I was trying to keep

25   the truck focused on staying in the Seventh District rather than

1    letting people just take it and do whatever they wanted to do.

2    Q    Now, people we're talking about apparently is Hunter -- I'm

3    sorry -- Gisevius and Bowen?

4    A    Among others.

5    Q    Well, that's the only two you named --

6    A    But that's the only two listed on that 302.  I don't know

7    exactly the context of the conversation we had, that was a long

8    time ago.

9    Q    Well --

10            MR. HESSLER:  Your Honor, may I approach?

11            THE COURT:  Yes.

12   BY MR. HESSLER:

13   Q    I'm going to show you a 17 page 302 dated 3/17/10 and ask you

14   to read the lower paragraph going into the second page.  I'm

15   sorry, the second to last paragraph.

16   A    This highlight portion, sir?

17   Q    No.  The second paragraph from the bottom.

18            MS. BERNSTEIN:  For the record, it's a 14 paged 302.

19            MR. HESSLER:  Okay, I'm sorry.

20   BY MR. HESSLER:

21   Q    Does that refresh your memory and possibly help put it into

22   context as to possibly what the conversation revolved around?

23   A    Not any more than I've already testified to.

24   Q    Okay.  Is it accurate when it says, when we're talking about

25   these two Budget trucks you acquired from a lumber yard or a

```
 1    hardware company -- right?

 2    A   Hardware store.

 3    Q   -- is it accurate when it says:  Hunter allowed other

 4    officers to use one the Budget trucks but he tried to control the

 5    use of the other truck?

 6    A   I did try to control the use of the truck I had in my

 7    possession.  The word allow is probably the wrong word to use in

 8    that sentence.  I just turned the keys over to somebody.  If

 9    Donna -- I can't remember her last name -- but I gave her the

10    keys to the truck.  She drove it to the Crystal Palace.  And then

11    I wasn't concerned with it after that.

12    Q   What were you doing?  What was your need for the truck?

13    A   We didn't have any transportation.

14    Q   Where are you going?

15    A   Just anywhere.  We didn't have any transportation to go

16    anywhere.

17    Q   Where would you want to go?  Where would you need to go?

18    A   What I should have done was go to Houston.

19    Q   You should have left?

20    A   Yes.  I should have.

21    Q   I would agree.

22        But what you did do is you stayed.

23    A   Yes, I did.

24    Q   Okay.  Where did you need to go with this truck that you had

25    to keep it?
```

1    A    Just trying to make sure that it was used for the district

2    rather than somebody taking it and going to Houston.

3    Q    You just said that's what you wanted to do.

4    A    No.  That's what I should have done.  At the time that's not

5    what I wanted to do.

6    Q    Let me cut to the chase.  What were you using the truck for?

7    Transportation?

8    A    Trance -- police work.

9    Q    Okay.  Such as?

10   A    Bringing civilians from the Chef Highway to the convention

11   center.  Going to get supplies for the other officers that were

12   at the Crystal Palace.  Getting diesel fuel for Methodist

13   Hospital.

14   Q    Now, somehow a conflict arose between you, Bowen and

15   Gisevius; right?  Over control of the truck?  Right?

16   A    The only conflicts I remember having is like let's go down

17   this way, and they would say no the truck doesn't go that way,

18   let me do this, I know where I'm going and all this other stuff.

19   We didn't have any arguments about give me the keys, no, you're

20   not getting them, nothing like that.  In fact, for the first

21   three or four days, I had to turn the keys over to a supervisor

22   every evening.

23   Q    So the word conflict was something conjured up by the

24   government?

25   A    I wouldn't say conjured up.  I would say misinterpreted.

1    Q    Was it misinterpreted where it says:  Hunter eventually

2    relented to Bowen and Gisevius and gave them control of the

3    truck?

4    A    I'm not sure what that's referring to.

5    Q    I guess, do you follow orders or do you relent to your

6    supervisors?  How is it supposed to work in the regular world?

7    A    You follow orders.

8    Q    In the Michael Hunter world, you relent when you want to?

9    A    I don't know where -- I don't know what context that

10   statement was -- came from.  So I -- I wouldn't say I relented to

11   Bowen and Gisevius because I don't remember being in a position

12   where we had a struggle over something and I had to relent.

13   Q    Did this whatever this -- whatever the words chosen by the

14   government are, did this incident with Gisevius cause you any

15   animosity or disdain for his authority?

16   A    What incident, sir?

17   Q    This incident we've been talking about for the last five

18   minutes, the struggle over the truck.

19   A    You know, Sergeant Gisevius wasn't in the truck every day.

20   Sergeant Bowen was.

21   Q    But, I mean, the report says that you all talked about a

22   conflict between Hunter, Bowen and Gisevius.

23   A    I don't remember the conversation so I don't know what

24   context that came up in.

25   Q    Do you remember saying:  After giving up control of the

```
 1   truck, after giving up control of the truck, Hunter left of the

 2   Seventh District to work at a nursing home on the Westbank with

 3   Sergeant Louie Gaydosh?

 4   A    That's just wrong.

 5   Q    That's just wrong?  Flat out wrong?

 6   A    Yes.

 7   Q    You know you didn't say that?

 8   A    I know.

 9   Q    Okay.  And the very next sentence:  Hunter spent

10   approximately two days working at the nursing home.  He then

11   returned to the Seventh District and started driving the Budget

12   rental truck again.  That's got to be completely made up then?

13   A    I think it's a misinterpretation of a long conversation we

14   had.

15        What happened was that Sergeant Gaydosh offered me a

16   position to work with him at the nursing home.  I declined it.

17   And the only time I left was on my three day break when I went

18   home to Slidell.  And they came back and started driving the

19   truck again.  But that was after the shooting.

20   Q    So you don't know where that came from?

21   A    No.

22   Q    All right.  Now let's get back to -- so it's your testimony

23   today, other than the fact that you don't like how Robert

24   Gisevius ran his narcotics unit, you don't have any issues with

25   him?
```

1   A    No, sir.  We weren't drinking buddies, but I didn't have any

2   problems with him.

3   Q    All right.  So let's get back.  I think I left off and got

4   away from the foot of the bridge where you fired these shots, and

5   let's go back to there.

6          Now, you said that, right prior to that, you heard:

7   That's them right there; correct?

8   A    Correct, sir.

9   Q    And then you fired the warning shots?

10  A    Correct.

11  Q    And we've talked about why we don't fire warning shots;

12  right?

13  A    Yes, we did.

14  Q    How many shots did you fire?

15  A    I don't know.

16  Q    Approximately, how many?

17  A    Ten, 12.

18  Q    Ten or 12 warning shots?

19  A    No.  All together.

20  Q    No.  How many warning shots did you fire?

21  A    I don't know.  Maybe six.

22  Q    Okay.

23  A    Maybe.  I'm guessing.

24  Q    And were these warning shots shot at them?

25  A    No.  I had the gun kind of pointed in the air.

 1   Q    Why didn't you shoot the warning shots at them?

 2   A    Can't aim at them while I'm driving a truck.

 3   Q    You can aim at them when you're out of the truck and standing

 4   in front of the truck; right?

 5   A    Yes.

 6   Q    But you couldn't do it because of your physical position in

 7   your truck at that time?

 8   A    I'm not following you, sir.

 9   Q    You said you couldn't fire the warning shots at them because

10   of your physical position in the truck at the time.

11   A    Well, while I was driving, yes.

12   Q    So would a warning shot be more effective if you were

13   shooting it at somebody, as opposed in the air?

14   A    My intention was just the noise of the gunshot to be enough

15   to make them scatter.  And it worked.

16   Q    And that would hold the same truth on the bridge; right?

17   A    I don't understand.

18   Q    You could have fired up in the air at the bridge to warn

19   these other persons running away?

20   A    Yes, I could have.

21   Q    But you chose to shoot at them?

22   A    In that direction.

23   Q    Now, after hearing the gunshots, the group actually split up?

24   A    Yes.

25   Q    So there was only one group you saw?

1   A    It appeared to be one group to me.

2   Q    When they split up, you saw two distinctive groups at that

3   point?

4   A    Yes, sir.

5   Q    And we'll call group 1 the group -- the larger group at the

6   -- that remained near the east side of the bridge.  And we'll

7   call group 2 the group that fled up the bridge.

8   A    Okay.

9   Q    Approximately, how many people in group 1?

10  A    Five or six.

11  Q    Approximately, how many people in group 2?

12  A    Three.

13  Q    All right.  Which group would you concentrate on most?

14  A    Group 2.

15  Q    What were the races of the people in group 2?

16  A    They all appeared to be black.

17  Q    And in group 1 also?

18  A    Yes, sir.

19  Q    What were the clothing descriptions, if you recall, of the

20  people in group 2?

21  A    Two of the subjects were wearing black shirts and black pants

22  and the third subject had on a white T-shirt, maybe blue jeans,

23  blue jean shorts.

24  Q    And part of the information you had was one of the shooters

25  was wearing a white T-shirt and blue jean shorts; correct?

1    A    Yes, sir.

2    Q    And you had every reason to believe that he was one of the

3    shooters?

4    A    I believed it at the time.

5    Q    When the gunfire erupted, not your gunfire or whatever

6    gunfire, not the warning shots down the base of the bridge, but

7    some shots were fired by somebody up on top of the bridge or on

8    the east side the bridge; correct?

9    A    I'm not following you.

10   Q    You've seen the video where gunfire erupts while the truck is

11   still moving, way past Chef --

12   A    Okay.

13   Q    -- and Downman.

14            How far away was the group of three from the truck at

15   that time?

16   A    I'd say 30 to 40 yards maybe.  I don't know for sure.

17   Q    Did you see one of the individuals pushing -- of the three,

18   pushing a grocery cart with --

19   A    I never noticed a grocery cart, shopping cart.

20   Q    So, at all, you never noticed a grocery cart at all?

21   A    No.  I don't ever remember seeing one.

22   Q    Certainly wouldn't have seen three grocery carts?

23   A    No, sir.

24   Q    Did you ever see an individual in possession of a shovel?

25   A    A shovel?

1   Q    Running with a shovel or having a shovel in a --

2   A    No, sir.

3   Q    -- in a basket or in his hand?

4   A    No, sir.

5   Q    About how old were these individuals you saw running away?

6   A    Adults.  They appeared to be adults.  Maybe in their 30s.  I

7   couldn't get -- at that point, I couldn't really see them clear

8   enough to get a good estimate of their age.

9   Q    So what happens when you all pull out and gunshots rang

10  out -- you said you didn't hear anybody yell Police at all?

11  A    No, I didn't hear that.

12  Q    Certainly part of your training is to identify yourself;

13  right?

14  A    Yes.

15  Q    Especially when you're in a plain clothes situation?

16  A    Most of us were in uniforms.  The chart was unmarked.

17  Q    Even when in uniform, you're trained --

18  A    Oh, yes.

19  Q    -- and continue yelling when you're firing?

20  A    Yes, sir.  I'm thinking about my training.

21  Q    It helps you, helps keep you safe.

22  A    Yes, sir.

23  Q    Give warnings.  But it helps keep you safe.

24  A    Yes, sir.

25  Q    Everybody knows what to do.  Good guys know what to do.  Or,

```
 1    at least, it should.
 2            But you don't remember hearing anybody yelling Police?
 3    A   I don't remember that, sir.
 4    Q   Was it possible that people in the back were jumping out and
 5    yelling Police, Police?
 6    A   It's possible.
 7    Q   And that would have been in accordance with training;
 8    wouldn't it?
 9    A   Yes, sir.
10    Q   And that training, again, is to keep you from getting -- in
11    part, to keep you from getting shot; right?
12    A   It's definitely to identify yourself so if you do have to
13    shoot somebody they can't say they didn't know you were the
14    police.
15    Q   And, also, there's times when police officers mistakenly get
16    shot because people think -- you get a call of a prowler in an
17    alley, you certainly want to let them know, let the people know
18    so they don't shoot the prowler and it's not the prowler but it's
19    you?
20    A   Yes, sir.
21    Q   So it's a good idea to stay alive?
22    A   Yes, sir.
23    Q   Do you think the people in the back of the truck wanted to
24    stay alive that day?
25    A   I'm sure they did.
```

1   Q    So you get out of the truck and do what?

2   A    I got out of truck and then moved to the front and I fired

3   some rounds at the people running away.

4   Q    All right.  Why?

5   A    I wanted to make sure they didn't come back.  That they

6   wouldn't shoot at the police anymore.

7   Q    Anymore?

8   A    Yes, sir.

9   Q    Did they shoot at the police anymore?

10  A    I don't think so, sir.

11  Q    You'd already warned them.  You didn't have to warn them

12  again.

13  A    Well, like I said earlier, sir, I had tunnel vision.

14  Q    And how many times did you shoot?

15  A    Altogether?

16  Q    Yep.  No, no.  At that time.  Yeah, how many times did you

17  fire off the bridge?

18  A    I don't remember, sir.

19       MR. HESSLER:  Would you play -- Your Honor, can we get

20  the Blue Ray out?

21       THE COURT:  It's going to take a little bit.  If you

22  have other questions maybe you can ask.

23  BY MR. HESSLER:

24  Q    So you said you don't recall how many times you fired?

25  A    No, sir.

1   Q    And you didn't want them to shoot again?

2   A    No, sir.  I wanted to make sure that they understood that we

3   weren't to be messed with.

4   Q    Okay.  That's what you wanted to do?

5   A    That was my intention, yes.

6   Q    You can't say what the intentions of any other person that

7   was firing; can you?

8   A    No, sir.

9   Q    How many rounds does your Glock 22 carry?

10  A    We were issued 15 round magazines.

11  Q    That's the policy, you carry 15 round magazines?

12  A    Yes, sir.

13  Q    All right.

14       They have extended magazines; right?

15  A    I've seen some.

16  Q    You didn't have an extended?

17  A    No, sir.

18  Q    You had 15 round?

19  A    Yes.

20  Q    Did you reload after getting out of the truck and prior to

21  firing at the three persons?

22  A    No, sir.

23  Q    You did reload after you emptied your gun?

24  A    I don't think I emptied the gun.  I think there were a couple

25  rounds left in the magazine.  I just took it out and put another

1  magazine in it.

2  Q    Why?

3  A    It's just what I was taught to do.

4  Q    Think you might have to fire that gun again?

5  A    In case.

6  Q    So at that time you're still believing, hey, we're under

7  fire?

8  A    I still believed that there could be threats in the area.  I

9  wasn't -- nobody was -- I wasn't under fire.

10  Q    But you reloaded because it was possible?

11  A    That's what you're just taught to do, sir.

12  Q    Well, you're not taught to shoot at people that pose a

13  threat?

14  A    No, sir.  But there are some of your actions are just

15  instinctive from repetitious training.

16  Q    What's more instinctive, reloading your weapon or projecting

17  your life under any circumstances?

18  A    Self-preservation is a very strong instinct.

19       THE COURT:  Mr. Hessler, would you like the Blue Ray

20  now?  Our folks are here to take care of that.  Why don't we go

21  ahead and take that out.

22       Counsel, if you need to relocate, you certainly can.

23       Do you need him to step down, Mr. Hessler?

24       MR. HESSLER:  I think, if his screen is going to be

25  working and my screen is going to be working, and we can mark on

```
 1    this.
 2            THE COURT:  Marking on that is not going to show up on
 3    that Blue Ray screen.
 4            MR. HESSLER:  Mr. Hunter, would you please step down.
 5            THE WITNESS:  Yes, sir.
 6            (Videotape played.)
 7    BY MR. HESSLER:
 8    Q    Does it appear that this group of individuals is pushing a
 9    shopping cart?
10    A    Yes, sir, it does.
11    Q    And that group of individuals appears to be approximately how
12    many?
13    A    Three maybe.
14    Q    Certainly not nine?
15    A    No, sir.
16    Q    Okay.
17            (Videotape played.)
18            MS. BERNSTEIN:  Objection.  Just for the record, I'm not
19    sure, did you intentionally skip forward or did you mean to be
20    playing that video?
21            MR. HESSLER:  Well, he played it.
22            MS. BERNSTEIN:  I know.  So I want the record to be
23    clear.  Did you mean for it to skip forward or did you intend to
24    play from where you were?
25            MR. HESSLER:  I intended to play from where we were.
```

1          THE COURT:  So the point being that there is some time

2   between the scene we just saw of the people with the shopping

3   cart and what is now on the screen.

4          MR. HESSLER:  Oh, I didn't know that.

5          MS. BERNSTEIN:  That's exactly the point.  Thank you,

6   Your Honor.

7          MR. HESSLER:  I didn't see that we'd skipped a scene.  I

8   can't see what's not shown so I can't know that.

9          (Videotape played.)

10  BY MR. HESSLER:

11  Q   All right, Mr. Hunter, some time had passed from seeing the

12  person pushing the shopping cart and what you see on the screen

13  now at 9:09:01; correct?

14  A   Yes, sir.

15  Q   Some 45 seconds?

16         MS. BERNSTEIN:  Objection to the clarity of the

17  question, whether you're asking what he sees on the screen or if

18  you're asking whether he saw the people with the shopping cart on

19  the day of the incident.  I'd just ask for clarity.

20         THE COURT:  Right.  I think he testified that he did not

21  see the people with the shopping cart.  So, just to be clear, I

22  think that that's correct.

23         MR. HESSLER:  Right.  My question, Your Honor, was only

24  whether or not --

25         THE COURT:  The elapsed time.  You're asking him about

1    the elapsed time, I understand.

2    BY MR. HESSLER:

3    Q    But there was some time that had gone by from when the video

4    showed the people walking and then cuts to the truck arriving;

5    correct?

6    A    Yeah.  The video does show that.

7    Q    And it shows the truck arriving from the east?

8    A    Yes, sir.

9    Q    Do you know where the truck was when you received the call:

10   That's them right there in front of you?

11   A    Somewhere in the area of the Banner Chevrolet.

12        THE COURT:  We'll give you one of these microphones and

13   that might make it easier.

14   BY MR. HESSLER:

15   A    Sir, you were asking where the -- where I heard the call:

16   That's them right there?

17   Q    Yeah.

18   A    Somewhere in the area of the Banner Chevrolet.

19   Q    And you saw a group of people?  Saw a group of people that

20   you believe was the group of people that they said:  That's them

21   right there?

22   A    Yes, sir.  I made that assumption.

23   Q    You made the assumption that that's them right there is also

24   the people that were also shooting at the police?

25   A    Yes, sir.

1   Q   And you also saw in that group at least one person that fit

2   the exact clothing description of the person that shot at the

3   police?

4   A   There was at least one, possibly more.

5   Q   Possibly more.   There was a guy in a black T-shirt they said

6   shot at the police, too; correct?

7   A   I didn't hear that, I don't remember.

8           MR. HESSLER:   Start it up again.

9           (Videotape played.)

10  BY MR. HESSLER:

11  Q   It's 9:09:09.   You just came out of the driver's side door;

12  is that correct?

13  A   Yes, sir.

14  Q   Are you armed at that point?

15  A   Yes, sir.

16  Q   Did you see your movements of your arms as you were moving

17  forward to the front of the truck?

18  A   Looked like I was raising my arms, sir.

19  Q   What are you holding in your hands?

20  A   A Glock.

21  Q   All right.   And that would be you right at the front of the

22  truck?

23  A   Yes, sir.

24  Q   Arms raised with a pistol out in your out-stretched arms;

25  correct?

```
 1   A    Yes, sir.

 2            MR. HESSLER:  Go on.

 3            (Videotape played.)

 4            MR. HESSLER:  Stop.

 5   BY MR. HESSLER:

 6   Q    Are you firing that weapon?

 7   A    I may have fired at that time, sir.

 8            MR. HESSLER:  Can you go back and put it right there at

 9   the truck?

10            (Pause in proceedings.)

11   BY MR. HESSLER:

12   Q    It's hard to see when it's going slow like this, but I want

13   you to watch, and I want you to look at your arms, and I'm going

14   to talk to you about the angle that your arms are raised to and

15   the direction and area that you're aiming to.

16            MR. HESSLER:  You can start it now.

17            (Videotape played.)

18   BY MR. HESSLER:

19   Q    Did you see what I described for you to actually look at, the

20   level where you raised your arms and everything else?

21   A    Yes, sir.

22   Q    Stand up, please.

23            If you could, demonstrate to the jury how you were

24   moving forward and shooting.  Where your arms were held and

25   everything else.
```

1   A    Stretched out like this, sir.

2   Q    And correct me if I'm wrong, but you're pretty much parallel

3   to the ground, dead level to the ground?

4   A    Generally.

5   Q    You're not shooting up?

6   A    No, sir.

7   Q    And, typically, the bullets go where you point?

8   A    Typically.  Depending on --

9   Q    You don't have bullets that come out of your gun and go up;

10  do you?

11  A    No, sir.

12  Q    And these persons are running up; right?

13  A    Yes, sir.

14  Q    So you'd have to go way up to shoot high above their head,

15  potentially?

16  A    Several degrees at my level could be a considerable amount of

17  distance at their position.

18  Q    You were shooting at these individuals to miss them?

19  A    Yes, sir.  I had no intention of shooting anybody.

20  Q    Well then why -- you've answered that question.

21                      How many times did you shoot at them to miss?

22  A    I don't know, sir.

23  Q    And you missed them all but maybe one time?

24  A    I'm sorry, sir?

25  Q    You missed them all but maybe one time?

```
 1   A    I don't think I hit them at all, sir.

 2   Q    Who shot Ronald Madison when he was at the top of the bridge?

 3   A    I don't know.

 4   Q    You got charged with that; didn't you?

 5   A    No.

 6   Q    You didn't get charged with shooting Ronald Madison?

 7   A    No.

 8   Q    Attempted murder on Ronald Madison?

 9   A    I got charged with attempted murder.  They never accused me

10   of actually shooting.

11   Q    By who?

12   A    The state, I believe.

13   Q    They charged you with attempted murder, they didn't charge

14   you with aggravated assault?

15   A    No, sir.  They did.

16   Q    Aggravated assault is if you put somebody in fear of their

17   life; right?

18   A    Yes, sir.

19        MS. BERNSTEIN:  Objection to the definition of the state

20   legal terms.

21        THE COURT:  Unless he understands it.  He was a police

22   officer.  You'd have to lay a foundation.

23        MS. BERNSTEIN:  I'm okay with what Mr. Hunter did or did

24   not understand but not with the discussion of the legal parts.

25   BY MR. HESSLER:
```

1  Q   You understand that aggravated assault is putting someone in

2  fear of losing their life, or fear of death or great bodily harm?

3  A   Yes, sir.

4  Q   Such as by shooting them?

5  A   Yes, sir.

6  Q   Or shooting at them?

7  A   Shooting at them, sir.

8  Q   If you hit them, you'd be charged with attempted murder;

9  right?  Whether you killed them or not?

10  A   Yes, sir.

11  Q   If you killed them, you'd be charged with murder?

12  A   Yes.

13  Q   You were charged were attempted murder?

14  A   Yes, sir.

15  Q   The state must believe you must have hit him?

16  A   I don't think so, sir.

17  Q   Now, just out of an abundance of caution, if you really

18  wanted to make sure you didn't hit them, why didn't you go way

19  above their head?

20  A   I wasn't thinking.

21  Q   Did you think, the closer you came, the more serious they'd

22  take the warning?

23  A   No, sir, I wasn't putting that much thought into it.

24  Q   You talked about the training and the training you received

25  and everything else.

```
 1   A    Yes, sir.

 2   Q    Did you receive any police training other than at NOPD?

 3   A    No, sir.

 4   Q    All right.

 5        And maybe I'm wrong, but my perception is you don't

 6   think much of the NOPD training.

 7   A    There's some aspects of it, when certain people are running

 8   the program, that can be very effective.  But then there's other

 9   aspects that tend to fall to the wayside.

10   Q    Okay.  And how many times did you go through the academy?

11   A    I went throughout the academy one time, sir.

12   Q    What kind of tactical training did you get?

13   A    Captain Wynn and at the time Lieutenant Bardy -- not Bardy.

14   He's commander of the first district, I can't remember his name.

15   They put on an active shooters seminar and a search warrant

16   service training seminar for us.

17   Q    You said earlier that -- did you have any other outside

18   training?  Did you go to any tactical schools on your own or

19   private training?

20   A    No, sir.

21   Q    And you went throughout Marine Corps I guess basic training?

22   A    Yes, sir.

23   Q    How long is basic training?

24   A    It's three months.

25   Q    And they don't teach you -- do they teach you like --
```

1    A    They do basic infantry tactics.  But then the majority of

2    that attention is at a later training date.

3    Q    And the infantry tactics is certainly less compassionate

4    toward humans and innocent civilians than the civilian police

5    officer has to be; right?

6    A    Yes, sir.

7    Q    And you said something yesterday, you said -- I think it was

8    Mr. DeSalvo asked you, did you take cover behind Officer Gisevius

9    to either reload your weapon or to clear a malfunction.  And you

10   said that you didn't.  That you're not trained that way and that

11   would be cowardly; right?

12   A    That's what I said.

13   Q    But he's providing you the only cover that you have; right?

14   A    No, sir.

15   Q    Well, you do move behind him; right?

16   A    I crossed behind him to get to the other side of the truck.

17            MR. HESSLER:  Can you go back?

18   BY MR. HESSLER:

19   Q    You ever heard of moving behind your officer if you have a

20   malfunction so he can cover you with his weapon?

21   A    No.  The technique I was taught is that the officer would

22   move in front of you to cover you.  I know what you're referring

23   to.  Because actually Sergeant Gisevius and I had a conversation

24   about it one time.

25   Q    But for him to move in front of you, he's got to know you

1    have a malfunction?

2    A    Yeah.   The way the technique works is that I would take a

3    knee and announce that I have a malfunction, and he would move up

4    to cover me.

5    Q    Okay.

6    A    That's the way I was taught it.   He might have another way he

7    was taught.   He was on the SWAT team.

8    Q    Right.   And he stood his ground?

9    A    Yes, he did.

10   Q    And you moved behind him?

11   A    I crossed behind him to get to the other side of the truck.

12   Q    So he's the one with the training, and he messed up?

13   A    No, sir.

14        MR. HESSLER:   Can you come back here and play it until

15   he gets back to the front of the truck and takes cover at the

16   front of the truck?

17        (Videotape played.)

18   BY MR. HESSLER:

19   Q    You're changing magazines there?

20   A    Yes, sir.

21        MR. HESSLER:   Stop right there.

22   BY MR. HESSLER:

23   Q    You stopped for something to fiddle with your gun after you

24   fired two rounds; would you agree with that?

25   A    Yeah .   I changed my magazine.

1   Q   And, when you're changing your magazine, you're supposed to

2   keep it up, drop it, keep your eyes on the target; right?

3   A   Supposed to.

4   Q   And you didn't.  You were fiddling with it?

5   A   No.  I dropped it down and --

6   Q   And at that point, one of the guys on the bridge would have

7   turned and shot at you, could have been struck by a bullet?

8   A   Yeah.  I used bad tactics.

9   Q   You what?

10  A   I used a bad tactic.  I should have -- I should have been

11  more disciplined if I truly perceived a threat.

12  Q   Okay.  Well, we know you made some bad decisions.

13          So you are saying you should have moved behind him to

14  use cover to change your magazine.

15  A   At least took a knee.

16  Q   Okay.  Now, you moved back behind here, and you leave

17  Gisevius out front?

18  A   Yes, sir.

19  Q   And you don't perceive a threat?

20  A   No, sir.

21  Q   Why you hiding behind the front of the truck then?

22  A   Because the other officers are shooting.  I didn't know what

23  direction they were shooting in.

24  Q   Did you perceive a threat then?

25  A   I didn't want to get shot by friendly fire.

1   Q    My next question is, if you still believed that these are the

2   people that shot at the police, why didn't you feel there was a

3   threat?  You're the police.

4   A    Because they running away.

5   Q    You never heard of somebody turning and firing as they're

6   running away?

7   A    I didn't see any of them doing that.

8   Q    But you thought they were a threat?

9   A    I thought they were the ones that shot at police officers.

10          MR. HESSLER:  You can go on.

11          (Videotape played.)

12  BY MR. HESSLER:

13  Q    Is there anybody in that truck, in the cab of that truck?

14  A    I don't know.

15  Q    Well, you're on the other side?

16  A    Yes, sir.

17  Q    And you don't know if --

18  A    I don't remember if somebody was in there or not.

19          THE COURT:  Are you finished with the Blue Ray?

20          MR. HESSLER:  I am, Your Honor.

21          THE COURT:  All right.  Thank you.

22  BY MR. HESSLER:

23  Q    Mr. Hunter, at some point shortly after where we just left

24  off, you indicated that you gave a cease fire order to certain

25  police officers.

1    A    Yes, sir.

2    Q    Gisevius would have been further up the bridge by then;

3    right?

4    A    Yes, sir.

5    Q    And your cease fire -- did you actually say cease fire, like

6    in the movies?

7    A    I believe so, sir.

8    Q    And you did something else.  What did you do with your arms?

9    A    I made a hand motion like this.

10        (Witness indicates.)

11   Q    That's the way you were trained?

12   A    That's what I remember -- I'm sorry.

13   Q    That's the way you were trained in the military?

14   A    That's what I remember from the rifle range training.

15   Q    From Marine Corps training?

16   A    Yes, sir.

17   Q    You weren't dealing with Marines today, that day; were you?

18   A    No, sir.

19   Q    Police officers are trained to fire until they believe the

20   threat has been stopped?

21   A    Yes, sir.

22   Q    Doesn't matter if you're doing this or not.  If they see

23   something you don't see, you would assume that they would fire

24   until they thought this threat had been stopped?

25   A    Yes.  That could be -- that's possible, sir.

1  Q    And there were certainly things up on that bridge -- I mean,

2  you said something the other day that stayed in my mind to Mr.

3  DeSalvo.  Mr. DeSalvo asked you, you said that you saw the bullet

4  strike the concrete and the concrete, the impact.

5  A    Yes, sir.

6  Q    Left a mark, but you saw the cement shatter.

7  A    Yes, sir.

8  Q    And he asked you did you see the bullet.  And you actually

9  said -- do you remember what you said?

10 A    Yes, sir.  I remember.

11 Q    What did you say?

12 A    I said I'm not that good, sir.

13 Q    So you're not good enough to see everything up there?

14 A    No, sir.

15 Q    And you're not saying that everything you saw, you perceived

16 correctly; are you?

17 A    I'm pretty confident in what I saw.

18 Q    Do you give that same amount of deference to what other

19 people saw, what they perceived?

20 A    I can't say what they perceived or not.

21 Q    But you perceived that these were the people that had shot at

22 the police?

23 A    That was my assumption.

24 Q    All right.  So somehow you want to go -- I think it was

25 Sergeant Bowen.  I think it was Sergeant Gisevius and Sergeant

1    Bowen, at least -- began running up after the individuals who

2    were getting away.

3    A    No, sir.  Sergeant Gisevius and at least three other officers

4    ran up the bridge.  Sergeant Bowen and I used the truck.

5    Q    Okay.  And that was a bit of a conflict about that darn truck

6    again; wasn't there?

7    A    Not so much a conflict.  There's -- I didn't -- I personally

8    didn't feel it was necessary to go after them.  But my supervisor

9    said let's go.  So I followed his instructions.

10   Q    Okay.  So why, in your personal opinion, didn't you feel

11   necessary to go after the people that you believed shot at the

12   police officers?

13   A    I just didn't think we had the resources to do it properly.

14   And then we didn't -- I wasn't aware of any facilities to bring

15   them to after we apprehended them.

16   Q    Okay.  Well, I don't know what to say.

17         You didn't have the resources to go after them, that was

18   your opinion as a police officer?

19   A    That was my opinion.

20   Q    Sergeant Bowen's opinion as a police sergeant was:  I think

21   we need to go.

22   A    Yes, sir.

23   Q    Did you relent to him and say:  Okay, we'll go?

24   A    Yes, I did.

25   Q    Were you even concerned about resources that might be

 1   available to the three officers that decided to pursue?

 2   A    I guess my assumption was, at the time, was that they'd wear

 3   themselves out running up the bridge.  The people would be too

 4   far away and they would give up.  That was the assumption I made.

 5   Q    And you made a whole lot of assumptions on the bridge?

 6   A    Yes, I did.

 7   Q    Based on the information you had?

 8   A    Yes, I did.

 9   Q    So, after this disagreement with Bowen, you all drive up.

10   Nevertheless, you're driving up there; right?

11   A    Yes, we did.

12   Q    What happens were you near the top, near the crest of the

13   bridge?

14   A    Sergeant Gisevius starts yelling at us to stop, that the

15   subjects were still shooting.

16   Q    Are you driving the truck?

17   A    Yes, I was.

18   Q    All right.  So you zoom by Gisevius and go catch these

19   people; right?

20   A    No.  When he told us to stop, I stopped.

21   Q    Did you believe him?

22   A    I didn't disbelieve him.  I just -- he said it, so I took his

23   word for it.

24   Q    Okay.  But you knew they were unarmed?

25   A    I didn't know they were unarmed.  I just never saw any

```
 1   weapons at that point.

 2   Q    You didn't want to get shot; right?

 3   A    No.  That probably hurts.

 4   Q    So you stopped the truck?

 5   A    Yes, I did.

 6   Q    And when did the state trooper car pull up?

 7   A    Moments afterward.  I don't really know how much time passed.

 8   Q    And they were going to leave you; right?

 9   A    Yeah.

10   Q    They were getting in the car without you?

11   A    (Witness nods head.)

12   Q    You had --

13           THE COURT:  Is that a yes or no?  Make sure to orally

14   answer.

15           THE WITNESS:  I thought I did, sir.  I'm sorry.

16   BY MR. HESSLER:

17   Q    You had to tell or yell to somebody:  Wait for me?

18   A    Yes.

19   Q    Why?  Why did you do that?

20   A    I guess I didn't want to be left behind.

21   Q    Why not?

22   A    I don't know.  I didn't really think about it.  I saw them

23   getting in the car, and my first instinct was to go get in the

24   car with them.

25   Q    Okay.  Prior to getting in the car, you heard some gunshots?
```

1    A    Yeah.  I heard the loud gunshot, sounded like it came from

2    the high-rise.

3    Q    Did you hear a pinging noise, metal hitting metal, while you

4    were out there talking to the state trooper?

5    A    I didn't talk to the state trooper.  I didn't hear anything

6    like that.

7    Q    Was the state trooper car there when you got there?

8    A    No.

9    Q    But you heard another shot, not fired by anybody in your

10   group, police officers?

11   A    Correct.

12   Q    And you don't know who fired that shot?

13   A    No.  I never did figure that out.

14   Q    It sounded like a canon?

15   A    It was very loud.

16   Q    Close proximity?

17   A    No.  It sounded like it was pretty far away.  But it was

18   extremely loud.  Louder than anything we were shooting.

19   Q    All right.  But it sounded loud, yet distant?

20   A    Yes.

21   Q    Now, you said that you had known or seen that Sergeant

22   Gisevius had I think an AR-15?

23   A    Something along that line.  I don't know the exact model that

24   he had.  It resembled an M-4.

25   Q    5.56 NATO round?

1    A    Yes, sir.

2    Q    And I think you told the government he had a scope on it?

3    A    Yes.

4    Q    You know something about weapons; right?

5    A    A little bit.

6    Q    And you know that wasn't a scope on it; right?

7    A    It appeared to be one.

8    Q    Okay.  You know what an aim point --

9    A    Yes, I'm familiar with those.

10   Q    -- target finder is?

11   A    Yes, sir.

12   Q    It's for close quarters combat; right?

13   A    Yes.

14   Q    It's not a scope where it's magnified and you can sit there

15   and take aim at somebody running away?

16   A    No, sir.

17   Q    Not designed for that?

18   A    No, sir.

19        MR. HESSLER:  Would you bring up Exhibit 255, please.

20   BY MR. HESSLER:

21   Q    You see that weapon slung on Sergeant Gisevius's shoulder?

22   A    Yes, sir.

23   Q    That appear to be a close quarter combat aim point, as

24   opposed to a scope magnifying scope?

25   A    If you look at the state trooper directly behind Lance

 1   Madison, I'd recognize that as an aim point.

 2        The one that's attached to the weapon Sergeant Gisevius

 3   is holding could either be an aim point or perhaps a low-powered

 4   scope.  I don't really -- I don't know what it is.

 5   Q   But scopes typically have an eye receptacle and an enlarged

 6   flanges to an allow in more light and a wider view; correct?

 7   A   For the most -- yes.

 8   Q   When you were on top of that bridge, did you notice an

 9   overturned car of some type or an abandoned car?

10   A   I remember something on the high-rise.  I don't remember on

11   the Danziger Bridge.

12   Q   But, anyway, now you're in -- you get in.  I guess they

13   actually heard you, listened.  And they -- the driver, the state

14   trooper, stopped the vehicle; right?

15   A   Yes, sir.

16   Q   And you got in the vehicle?

17   A   Yes, sir.

18   Q   You got in what side?

19   A   The passenger's side.

20   Q   Who got in the front, driver's front side, passenger?

21   A   Wait.  The front passenger's seat?

22   Q   Yeah.  Who got in the front passenger's seat?

23   A   Officer Faulcon.

24   Q   And who got in behind the driver's -- the rear driver

25   passenger's seat?

1   A     Sergeant Gisevius.

2   Q     Okay.  Now, this car apparently is driving still at the three

3   fleeing persons?

4   A     Yes, sir.

5   Q     Two guys dressed in black?

6   A     Yes, sir.

7   Q     One guy dressed in white T-shirt, blue jean shorts?

8   A     Yes, sir.

9   Q     All right.  What's happening as you all are driving up to

10   these individuals?

11   A     I couldn't see the one on the left side of the road.  The two

12   on the right side of the road, one in black, he was ahead of the

13   one in the white shirt.  Started running into the Friendly Inn.

14   And we passed up the one in the white shirt to get closer to the

15   one in the black, but he'd gotten inside the Friendly Inn before

16   we could get to him.

17   Q     When you passed up the fellow in the white shirt on the

18   right-hand side, was anything said to you?

19   A     Yes.

20   Q     What?

21   A     Sergeant Gisevius said:  Don't shoot at him.

22   Q     Why would Sergeant Gisevius have to tell you not to shoot at

23   him?

24   A     I think he was saying it to everyone.  I don't think he was

25   just saying it to me.

1    Q    Did you have your gun out the window?

2    A    The door was open.  I was sitting sideways in the seat of the

3    car.

4    Q    Okay.  And, if you were sitting -- you were sitting sideways

5    with your feet in the car?

6    A    They were either on the -- they were probably on the frame.

7    Q    Okay.  On the step where you step to get in the car?

8    A    Yes.

9    Q    And you have your AK-47 with you?

10   A    Yes, I did.

11   Q    Fully loaded.  Because you loaded it; right?

12   A    I put in a new magazine if it.  It was a smaller magazine.  I

13   don't remember how many rounds were in it.

14   Q    And I don't want to quibble with you, but I want to say

15   loaded and you want to say you put a new magazine in.  Did you

16   put an empty magazine in?

17   A    No.  It was loaded.

18   Q    So you loaded it?

19   A    Yes, sir.

20   Q    And I guess the only way to have that long gun in that car

21   and have it to any use would to have had to been either between

22   your legs and ready to come up with?

23   A    Yeah.  That's accurate.

24   Q    Okay.  So did you come up with it and point it?

25   A    I might have.  I don't remember.

1   Q    And they might have told you:  Don't shoot?

2   A    He said it.  I don't know who he was saying it to.  It seemed

3   to me like he was just saying it generally to me and Faulcon

4   together.

5   Q    All right.  So did you go after Lance Madison?

6   A    No.

7   Q    After --

8   A    Well, Sergeant Gisevius said he thought -- I'm sorry --

9   Sergeant Gisevius said he thought he saw him hide behind

10  something over at the flooded parking lot, and I was looking in

11  that direction to see what he was talking about.

12  Q    And Gisevius is right next to you the whole time telling you:

13  I think he's behind that --

14  A    He was a few feet from me, maybe ten feet.

15  Q    Where were you all?  Where were you all located?

16  A    At the overhang of the Friendly Inn.

17  Q    They had any cover under there, anything to hide or stand

18  behind?

19  A    Yeah.  There were some brick columns there that we can take

20  cover behind.

21  Q    That's what you all were behind?

22  A    I don't particularly remember getting behind it.  At some

23  point, I did see some of the SWAT teams officers use those.

24  Q    You still were under the reasonable belief that this person

25  might be armed, though; right?

1   A    Yes.

2   Q    So it would be reasonable to assume that you might have taken

3   some kind of cover as your training and human instinct would

4   dictate?

5   A    Yeah.  But I was also trying to see what Sergeant Gisevius

6   saw.  And I didn't see what he saw.

7   Q    Because you got to do that, too.  You got to know what you're

8   shooting at, you got to know what it is and you've got to assess,

9   if you can, if the situation allows.

10  A    Yes.

11  Q    And Gisevius thinks he sees something?

12  A    Yes.

13  Q    Was there an argument?  Like, were you all like I don't know

14  --

15  A    I don't remember if we argued about it or not.  I remember

16  not knowing what he was talking about.

17  Q    But Gisevius also thought he was actually hiding.  Thought he

18  could see him kind of hiding or taking cover?

19  A    Like he was hiding something behind something on the

20  right-hand side of the motel on the first level.  In the water,

21  somewhere around there.  It was a good little distance from us.

22  But, the parking lot was flooded, so we didn't try to go in the

23  water to get to it.

24  Q    Gisevius didn't aim his rifle and just starting shooting

25  indiscriminately at what he thought was a threat?

1    A    No, sir.

2    Q    You were right there?

3    A    I didn't see him do that.

4    Q    Did you later learn that it was a garbage bag?

5    A    Yeah.  I heard that the state police SWAT team drove there.

6    They came out there with an armored vehicle, and they drove it

7    into -- this is while I was going getting the truck.  I came back

8    with the Budget truck, and the state police armored vehicle was

9    in the parking lot of the hotel.  And they went to that area and

10   discovered that it was a just a black garbage bag.

11   Q    So he was able to assess it to the point where he wasn't

12   comfortable shooting?

13   A    I guess so.

14   Q    Now, at some point this individual -- an individual dressed

15   in all black is shown to you on the scene; right?

16   A    Yes.

17   Q    And you and Gisevius, actually?

18   A    Yes.

19   Q    And is that the person that was shown to you?

20   A    Yes.

21   Q    Okay.  What was your initial --

22   A    Well, the person kneeling on the ground?

23   Q    Yes, sir?

24   A    Yes.  That was him.

25   Q    And what was your initial reaction when you asked if this was

1   the guy that was fired on or fired at the police or whatever?

2   A   I didn't think that was the right person.

3   Q   You didn't think it was him?

4   A   No.

5   Q   But you knew that the individual you had chased and fired at

6   was a black male, adult, wearing all black?

7   A   Yes.

8   Q   Who else didn't agree -- who else wasn't sure if it was him

9   or not?

10   A   Sergeant Gisevius.

11   Q   And eventually you said:  Yeah, you know, I guess that's him?

12   Based on all kind of different circumstances?

13   A   No.  What happened was Officer Barrios was adamant that that

14   was the right guy.  And Sergeant Gisevius and I didn't agree with

15   him.

16   Q   Let me stop.  Go ahead, I'm sorry.

17   A   Lance Madison then asked us why we were shooting at him.  And

18   that's how we learned that it really was him.

19   Q   Okay.  Now, as a police officer, you know in ideal

20   circumstances identification should be done, not when a guy's

21   been forced to his knees by the state police and handcuffed

22   there; right?

23   A   No.  That's not ideal.

24   Q   That's kind of suggestive?

25   A   Yes.

1   Q   Even as a police officer, you're still human, you could

2   possibly be influenced by certain things that you shouldn't

3   normally be influenced by, but it's just human nature?

4   A   Yes.  Even a police officer could have the wrong perception.

5   Q   And Barrios was positive that's the individual that was

6   shooting at you?

7   A   He was.

8   Q   And that had to effect you to a certain degree of you've got

9   a policeman saying:  That's him, that's him.

10  A   Yeah.  And I wasn't sure.  I just --

11  Q   But you did become fairly sure or surer when he overheard him

12  say:  Why were you shooting at me?

13  A   Yes.

14  Q   Why were you all shooting at me?

15  A   Yes.

16  Q   Okay.  And those are usually called tentative IDs; right?

17  A   I don't know the technical term.  Unseen sure or something.

18  Q   You know what tentatively means, you tentatively do

19  something?

20  A   It's like preliminary.

21  Q   Yeah.  You've identified him based on certain things?

22  A   Yes.

23  Q   Not 100 percent sure but all these things together.

24  A   Yes.  Totality of the circumstances.

25  Q   You don't identify him by face?

```
 1    A    No.  I didn't identify him by face.

 2    Q    And, a lot of times, an investigator such as you, will say

 3    I'm 80 percent sure, 50 percent, 100 percent, and then you'll

 4    combine that with the other evidence and come to your own

 5    conclusion as an investigator?

 6    A    Yeah, that can be done.

 7    Q    You had nothing to do with this investigation; did you?

 8    A    Other than a taped statement I gave to the homicide.

 9    Q    Right.

10    A    But as far as like working the investigation?

11    Q    Yeah.

12    A    No.

13    Q    It would be improper for you to interject yourself into this

14    investigation to collect evidence?

15    A    Yeah.  I think that -- it's against departmental policy, if I

16    remember correctly.

17    Q    So all you were expected to do was give a statement as to

18    what happened?

19    A    Yes.

20    Q    To the best of your ability?

21    A    Yes.

22    Q    Let me ask you this.  During the storm, you talked about all

23    these circumstances and how policies were different or things

24    just couldn't operate by policy.

25                        You can take that picture down, if you want.
```

1              Were you ever instructed by your supervisor

2    that you were not to go off and about the city of New Orleans by

3    yourself?

4    A   I remember it being just a general rule.  I don't remember if

5    I received instructions to that effect.

6    Q   And the general rule was for safety reasons; right?

7    A   Yes.

8    Q   And, despite rules, regulations or whatever, and your ability

9    or willingness to follow them, I think that's probably one you'd

10   want to follow for safety?

11   A   Yeah.

12   Q   That's in your best interest.

13   A   Yes, it is.

14   Q   Did you adhere to that?

15   A   Yes.

16   Q   Did most everybody else that wanted to stay alive adhere to

17   that?

18   A   Best of my knowledge, yes.

19   Q   You told that jury that, at some point prior to the shooting,

20   you heard Sergeant Gisevius or he showed up somewhere driving a

21   truck, he was all crazy looking?

22   A   It wasn't crazy looking.  He was very concerned, almost

23   scared look on his face.

24   Q   Panicked, is what you called it?

25   A   That might be stretching it.  It's close.

1    Q    Now, and he allegedly said something; right?

2    A    Yes.

3    Q    What did he allegedly say?

4         MS. BERNSTEIN:   Objection to the form of the question,

5    Your Honor.

6    BY MR. HESSLER:

7    Q    What did you hear him say?

8    A    I pulled up along side of him, and I saw the look on his

9    face, and I asked him what was wrong with him.  He said that some

10   people just tried to take his truck and he had to empty his

11   magazine to get them away from him.

12   Q    Okay.  Now, who else witnessed this statement?

13   A    There was somebody else in the cab of the truck with me, but

14   I don't remember who they were.

15   Q    You don't have any clue as to who witnessed this?

16   A    It could have been Sergeant Gaydosh, it could have been

17   Sergeant Bowen.  I just don't remember who was riding with me

18   that day.

19   Q    But there's certainly a witness to this?

20   A    Yes.

21   Q    You just don't know who it is?

22   A    No.

23   Q    And there's probably another witness to it.  Who was with

24   Sergeant Gisevius when he made that statement so you can support

25   what you're saying to the grand jury?

1    A    To the best of my knowledge, from what I recall, he was

2    riding by his self.  I don't remember somebody in the truck with

3    him.

4    Q    Now, you disagreed with people riding by themselves.  Did you

5    tell Sergeant Gisevius that:  I don't think you should be riding

6    by yourself, Sergeant?

7    A    I don't remember if I did or not.

8    Q    So there's no witnesses that you can name to this alleged

9    statement?

10   A    No, sir.

11   Q    Did you ever hear it at any time again?

12   A    No.  Never came up again.

13            MR. HESSLER:  One second, Your Honor.

14            (Pause in proceedings.)

15   BY MR. HESSLER:

16   Q    Later on, after the shooting, there was a time when you were

17   called to the Seventh District station in order to give a

18   statement; correct?

19   A    Yes, sir.

20   Q    Who called you to that or made you aware that you had to give

21   a statement?

22   A    Sergeant Gisevius.

23   Q    What did he tell you?

24   A    That we had to be at the Seventh District station the next

25   afternoon and we had to bring the weapons that were involved in

1    the shooting on the bridge.  Whatever weapons we had in our

2    possession, we had to bring.

3    Q    Didn't tell you to do anything wrong; did he?

4    A    No.

5    Q    He didn't tell you to get your stories straight?

6    A    No.

7    Q    You went there and gave a statement?

8    A    Yes.

9    Q    Were reports -- let me ask you, where did you all first meet?

10   A    In the parking lot.

11   Q    Who?

12   A    Everybody that was present to give a statement.  The homicide

13   personnel that were there, some academy staff personnel.  I don't

14   remember, there may have been some crime lab people.  I don't

15   remember.

16   Q    What happened at that meeting?

17   A    That wasn't really a meeting.  That was just turning in the

18   weapons that were involved.  And then, for those that used their

19   duty weapons, they had to get new ones issued.

20   Q    Then what happened?

21   A    Then at some point we were called inside the old station that

22   was flooded out and gutted.

23   Q    Everybody?

24   A    Not everybody.  The persons involved in the shooting.

25   Q    Okay.  And what happened there?

 1    A    At that point, Sergeant Kaufman and I believe Detective

 2    Lehrmann were there, and they said they wanted everybody to say

 3    their statement in front of everybody else so everybody else

 4    would know what the other was going to say.

 5    Q    Nobody told you what to say?

 6    A    Nobody told me.

 7    Q    Do you recall what Sergeant Gisevius said?

 8    A    No, I don't.

 9    Q    Was a report given to you?  Did you review this report?

10    A    I don't remember.  I don't think so.

11    Q    Did you ever see a report?

12    A    No.

13    Q    You never saw a report until after you were indicted; would

14    that be accurate?

15    A    Yes.

16    Q    Lieutenant Lohman never came to you and talked to you about

17    this incident?

18    A    No.  I never spoke to Lieutenant Lohman after September 4th.

19    Q    Never stopped you anywhere and said:  Hey, you all right with

20    this report, you all right with your statement?

21    A    No.

22    Q    Not once?

23    A    The only interaction I had with Lieutenant Lohman was he

24    asked me if I wanted to go to the task force or DIU.  And then

25    when he was hiring people for a detail with the FEMA trailer

1    detail.

2    Q    Did you have any conversations with Gisevius about this?

3    A    None that I can recall.

4    Q    When you said that it was an us against them mentality --

5    actually, you didn't say that.

6    A    No, sir.

7    Q    Us against the savages.

8    A    Yes, sir.

9    Q    Who -- where did you get that from?

10   A    That was just how I felt about the situation with all the

11   chaos in the city after the storm.

12   Q    Let me make this quite clear to these people over here.

13   That's the way you felt about it; right?

14   A    Yes, sir.

15   Q    You didn't here Robert Gisevius say that; did you?

16   A    I don't remember.

17   Q    You heard Sergeant Gisevius say:  Don't shoot that guy;

18   didn't you?

19   A    I remember that.

20          MR. HESSLER:  No further questions, Your Honor.

21          THE COURT:  All right.  Let's go ahead and take a short

22   break.  If you all can be ready at 10:35.

23          Mr. Hunter, you'll still be on the stand at 10:35.

24   Please don't discuss your testimony with anyone on the break.

25          We'll start at 10:35 with the remaining cross

1   examination, I think Mr. Meche.  And then we'll do redirect.

2            (Proceedings in recess.)

3            THE COURT:  You all may be seated.

4            Mr. Hunter, you are still under oath.  Have you

5   discussed your testimony with anybody during the break?

6            THE WITNESS:  No.

7            THE COURT:  You may be seated.

8            My goal is to finish up this witness prior to the lunch

9   break.  So that may take us to the noon hour or shortly after.

10  We'll try to hold off the on the rain today so you can get your

11  lunch and come back.

12           By saying that, I don't intent to mean that counsel

13  should shorten what they intend to do with this witness on cross

14  or redirect.  Let's see what we can get done.

15                        CROSS EXAMINATION

16  BY MR. MECHE:

17  Q   Good morning, Mr. Hunter.  I'm Rick Miche, and I represent

18  Anthony Villavaso.

19  A   Good morning, sir.

20  Q   I think you made clear from your testimony the last couple of

21  days that you know who he is.

22  A   Yes, sir.

23  Q   When did you come to know him?

24  A   Probably around the time of the storm, sir.

25  Q   Was that because he was in a different district from you?

1    A    Yes.  He was -- I believe he was assigned to the fifth

2    district.  He was partners with Officer Barrios, and that's how I

3    became acquainted with him.

4    Q    So you first encountered him when you were working out of the

5    Crystal Palace in those days after the hurricane?

6    A    Yes, sir.

7    Q    Just to clear it up, there was some maybe misunderstanding I

8    think when Mr. DeSalvo was asking you questions about when you

9    were absent a few days from there.  And I think you maybe cleared

10   it up but I'm still not clear on it.  Were you there continually

11   from the time of the storm to --

12   A    I'm sorry.  I was there from the first day we got to the Chef

13   and Reed and dry land from Methodist Hospital up until I was

14   authorized to take my three day break, my leave.

15   Q    Would that have been after the shooting?

16   A    Yes.

17   Q    Like that next week?

18   A    Yeah.  I believe it was like the Tuesday night after -- the

19   shooting happened on the 4th, so the Tuesday night after that.

20   Q    Okay.  And, when you came back to work after your leave,

21   where did you report to?

22   A    Back to the Crystal Palace.

23   Q    Do you remember how long you all were working out of there?

24   A    Maybe a month.  I don't remember for sure.

25   Q    Okay.  Now, during those initial days -- and you testified a

1    lot about the truck and driving it and stuff.

2    A    Yes, sir.

3    Q    Was that mainly your role, to, you know, drive the truck to

4    transport people here and there?

5    A    Yes, sir.

6    Q    Did you do any activity with the boats, going out in the

7    boats, rescuing people?

8    A    No, sir.

9    Q    Okay.  That was some other people?

10   A    Yeah.  Other people participated in that, those operations.

11   Q    Okay.  Now, just to get an idea what the structure was like

12   out of there, would you all like have meetings every morning at

13   the Crystal Palace and be handed out duties?  Or did you all just

14   kind of get up and do whatever you thought was necessary?

15   A    More the latter.  Every once in awhile, the supervisor would

16   get together in the morning and have meetings.  I wasn't a party

17   to that.  But no general role calls or assignments were given

18   out.

19   Q    And, when you say supervisors, you're taking about Lieutenant

20   Lohman?

21   A    Captain Bardy.  The district supervisors.  Captain Bardy,

22   Lieutenant Lohman.  Whatever sergeants were there that

23   participated.

24   Q    And was Captain Bardy there the whole time, or was he absent

25   a good bit during that period of time?

1   A    I didn't see him all that often.

2   Q    What about Lieutenant Lohman?

3   A    He was there most of the time from, what I recall.

4   Q    Who were you mainly taking directions from?  And I say --

5   before you answer, I say I've heard discussions about Sergeant

6   Bowen and Sergeant Gisevius.  Was it one of them?

7   A    Initially, it was Sergeant Gaydosh.  And Sergeant Gaydosh for

8   the most part in the first couple of days.  Then it transitioned

9   in to where Sergeant Bowen took that position.

10  Q    Now, did you notice and you indicated you knew Mr.

11  Villavaso's partner was Barrios?

12  A    Yes, sir.

13  Q    Were they working with like Sergeant Gaydosh, Sergeant Bowen?

14  Or were they kind of doing their own thing?

15  A    I'm not sure what they were doing initially.  They weren't

16  with us on the truck initially.

17  Q    Okay.  You just saw them there but --

18  A    Yeah.  You'd see them passing buy, casual conversation and

19  all that.

20  Q    Okay.  And they were other officers in that category as well?

21  A    Yes, sir.

22  Q    Okay.  I thought you did a real good job with Mr. DeSalvo and

23  Mr. Hessler going over the video, and I'm not going make you do

24  that again.

25  A    Okay, sir.

1    Q    But there were some parts of the video where we couldn't see

2    what was happening simply because it was blocked by things.  So

3    I'm going to go to the white board and ask you to point out some

4    things.

5              MR. MECHE:  May I approach, Your Honor?

6              THE COURT:  Yes.

7              MR. MECHE:  Let the record reflect that I'm drawing on

8    this white tablet in the courtroom.

9    BY MR. MECHE:

10   Q    What I'm going to do, Officer Hunter, is, just for a point of

11   reference, draw like a square object, which I'm going to let us

12   assume would be the truck.  Okay?

13   A    Yes, sir.

14   Q    And, during the video, I think you were able to point out

15   activities such as yourself and Sergeant Gisevius as you all were

16   moving around on the left side of the truck.

17   A    Yes, sir.

18   Q    But we weren't able to see on the other side of the truck

19   because the truck was blocked.

20   A    Correct.

21   Q    So what I'm going to ask you to do, if you can step down, I'm

22   going to give you the pen.  I think there's a point in the truck

23   that we saw on the video repeatedly where, after shooting, you

24   went around the front to the corner area.

25   A    Yes, sir.

1    Q    Can you show us where you went and where you stopped at, and

2    just maybe make an H.

3    A    I'm assuming this is the front?

4    Q    Yes, sir.

5    A    (Witness indicates.)

6    Q    Thank you.

7         So you would have come to the right-hand corner of the

8    truck, but you would have stopped.  You wouldn't have come out to

9    the open area; is that correct?

10   A    Correct, sir.

11   Q    And I think I know why, but I'm going to ask you why wouldn't

12   you have done that.

13   A    I heard some gunfire from that side, and I wasn't sure what

14   direction they were firing.

15   Q    And they could have been firing here, and you would have went

16   right into the line of fire?

17   A    Correct.

18   Q    When you got here, I think you said you saw a number of

19   people?

20   A    Correct, sir.

21   Q    Who specifically did you see?

22   A    It was Sergeant Bowen --

23   Q    Okay.  Can you put, where Sergeant Bowen -- put a B for

24   Sergeant Bowen.

25   A    Now, do we have a reference where the concrete rail is?

1   Q    I guess we should draw one.  Maybe just do a line or

2   something.  I was going to say the end of the page but that's

3   fine.  That's a good idea actually.

4   A    (Witness complies.)

5   Q    And I think you saw other people.

6   A    Yes, sir.  I don't know the order they were in.

7   Q    Can you name all three?

8   A    Officers Faulcon, Barrios and Villavaso.

9   Q    Since you don't know the order they were in, maybe you could

10  just draw Xs about where they were?

11  A    (Witness indicates.)

12  Q    That's good we were doing this, because I had the impression

13  they were stacked this way.

14  A    No, sir.

15  Q    But they were actually stacked one behind the other?

16  A    Yes, sir.

17  Q    Now, I think in your testimony, and they covered it several

18  times and I think somebody actually showed you a report and I

19  think you cleared it up, you didn't actually see them firing but

20  you assumed they were?

21  A    Yes, sir.  Seems like this was more than one weapon being

22  fired at that time.

23  Q    And they all three had weapons?

24  A    Yes.  All four.

25  Q    Right.  All four.

1                    And, out of the three Xs, do you remember what

2   kind of weapons they had?

3   A    Yes.  Officer Faulcon had had a shotgun.  Officer Barrios had

4   had a shotgun.  And Officer Villavaso had an AK-47.

5   Q    Okay.  And, again, you never saw them fire it, but you

6   assumed they were based on their position.

7   A    Yes.

8   Q    And that's why I thought they were this way.  If they're

9   lined up, it seems like they could hit each other if they were

10  firing or they could hit Bowen.

11  A    My impression was they were firing more at an angle.

12  Q    I understand, okay.

13  A    More of an angle outward.

14  Q    Okay.  Now, did you see the people they were firing at?

15  A    No.  I did not see that.

16  Q    At some point, you said you saw Sergeant Bowen -- you did see

17  him fire?

18  A    Yes.

19  Q    Okay.  And were you still positioned here, or had you stepped

20  out a little bit?

21  A    When I first got to the corner, I could see him clearly

22  because he was first.  And then the other officers lined up.

23  Q    Okay.  But was he shooting when you first got there?

24  A    Yes.

25  Q    And then at some point it's my understanding you said he

1   stopped?

2   A    Yes, sir.

3   Q    Okay.  And there was a pause?

4   A    Yes, sir.

5   Q    And then you said you saw him shoot again?

6   A    Yes.  But that was after I'd moved from this position to this

7   position.

8   Q    Okay.  Why don't you draw a dotted line.

9           THE COURT:  Everybody on the jury see that?

10          Mr. Meche, if you'd go ahead and pull that out maybe to

11   the corner here close to where the court reporter is seated.

12          THE WITNESS:  Where the TV was, sir?

13          THE COURT:  Maybe not quite that far.

14          Can everybody see it there at that spot?

15          Counsel, if you need to relocate to see it.

16   BY MR. MECHE:

17   Q    And you moved there.  And what did the three Xs do after you

18   moved there?

19   A    They seemed to back off a little bit from the wall.

20   Q    Okay.  And they weren't firing their weapons?

21   A    No, sir.

22   Q    And that's where you said you saw Sergeant Bowen do the

23   sweeping?

24   A    Yes, sir.

25   Q    Now, all three of these individuals would have been in a

```
 1   position to see the same thing?

 2   A    I believe so, sir.

 3   Q    Okay.  Thank you, sir.

 4        Before I put you up, is there anything else that

 5   happened?  Anybody else you saw that we need to include?

 6   A    No, sir.

 7   Q    Anybody else come out the back here while this was happening?

 8   A    Eventually other people did.  I don't know what point they

 9   did.

10   Q    Because you left and went this way?

11   A    Yes, sir.

12   Q    Did you see these three Xs run around the back?

13   A    I don't remember what direction they were -- I don't know if

14   they went around the back or if they actually ran forward.

15   Q    You don't know?

16   A    I don't know.

17   Q    But you did say you did see Officer Faulcon go up, and then

18   later you saw Officer Villavaso go up as well?

19   A    Yes.

20   Q    And you saw them on the videotape do that as well?

21   A    Yes, sir.

22   Q    Thank you.  Let's move it back a bit.

23        MR. MECHE:  Your Honor, I have an exhibit sticker 302

24   that I'd like to put on this.

25        THE COURT:  Any objection?
```

1          MS. BERNSTEIN:  No, Your Honor.

2          MR. MECHE:  And offer and induce at the time, let the

3    record reflect that it is this white paper that Officer Hunter

4    and I drew.

5          THE COURT:  Exhibit 302 is admitted.

6          (Exhibit admitted.)

7    BY MR. MECHE:

8    Q    Now, without telling me what anybody said, did at some point

9    you ever inquire as to the three individuals you described as to

10   whether they saw what you saw Bowen do?

11   A    There was a point I did ask Officer Barrios.

12   Q    And, without telling me what he said, he answered your

13   question?

14   A    Yes.

15   Q    Now, Officer Barrios, would you consider him your friend?

16   A    Yes.

17   Q    And you know he's been involved in this case since the state

18   court inception?

19   A    Yes, sir.

20   Q    And you know he's actually pled guilty in this federal case?

21   A    Yes, sir.

22   Q    And you understand he could very well be called by the

23   government as a witness just like you are?

24   A    Yes, sir.

25   Q    Have you had any discussions with him about that?

1    A    No, sir.

2    Q    Now, after the incident you described, you did say that you

3    saw Faulcon and Sergeant Gisevius go up and then you saw

4    Villavaso?

5    A    Yes, sir.

6    Q    But they weren't all walking together?

7    A    No, sir.

8    Q    Was Barrios with Villavaso as they went up the bridge?

9    A    Eventually they did end up together.  I don't know what point

10   that it happened.

11   Q    But they weren't together originally?

12   A    I don't think so.

13   Q    And then in the video you could tell they're not together?

14   A    Yeah.  In the video, you can clearly see Officer Villavaso.

15   Q    Maybe we can show it on 300.  Not on the Blue Ray, just on

16   the big screen.

17            (Videotape played.)

18            MR. MECHE:  Pause it, please.

19   BY MR. MECHE:

20   Q    And that is who you know to be Faulcon and Sergeant Gisevius?

21   A    Correct, sir.

22   Q    And I think we just saw somebody in a blue shirt, and I think

23   that was you.  And I think that's where you said you were going

24   to check on the people that had been shot?

25   A    Yes, sir.

1           MR. MECHE:  Please roll it.

2           (Videotape played.)

3   BY MR. MECHE:

4   Q   Do you remember how long you stayed with the people that had

5   been shot?

6   A   Once I determined that they didn't appear to be a threat, I

7   at some point went back to the truck and recovered the AK-47.

8   Q   Okay.  Now, shortly after this, I think we're going to see?

9           (Videotape played.)

10  BY MR. MECHE:

11  Q   -- the screen --

12          What did you do after you got the AK-47, while it's

13  rolling?

14  A   I just maintained my position near the truck.

15  Q   Is that who you know to be Officer Villavaso?

16  A   I believe so, sir.

17  Q   And he's walking by himself.

18          Officer Barrios is not there.

19          But at some point you said you saw them together?

20  A   Yes, sir.

21  Q   And I think, as he's walking -- we can talk about this -- I

22  think you said you saw them together when you got back in the

23  Rider truck and was actually moving forward?

24  A   No, sir.  I believe it was when I was in the state trooper

25  car, as I was exiting the state trooper car.  My next

1   recollection of them is when they were approaching the guy on the

2   left shoulder of the road and taking him into custody.

3   Q   Okay.  I want to talk about that.

4           But this is you at this point in the video leaving going

5   forward.

6           MR. MECHE:  Okay, you can stop it now.

7           Go forward to around towards the end, to around minute 9

8   when the state police armored vehicle shows up.

9   BY MR. MECHE:

10  Q   While he's doing that, I can talk to you a little bit.

11          Do you remember where you stopped the truck on the

12  bridge?

13  A   It was near the crest or on the crest.

14  Q   When you say the crest --

15          MR. MECHE:  Stop it right there.

16  BY MR. MECHE:

17  Q   We saw these girders.  You know, the things --

18  A   For the draw bridge.

19  Q   Yeah.

20          Was it past the last one or --

21  A   I don't think it was past the last one.  It was either --

22  somewhere near the first one.

23  Q   Okay.

24          MR. MECHE:  Roll the video.

25          (Videotape played.)

BY MR. MECHE:

Q   There was some discussion, and I just want to make this clear, I'm not -- I didn't follow it too well.  But there was some discussion about a car that had been overturned on the bridge.

A   Yeah .  I was asked about that.  But I don't recall it.

Q   You don't recall stopping the truck right by that overturned car?

A   I don't remember seeing an overturned car.

Q   I understand.  I understand.

        Let me show you something and see if this will fresh your memory.

A   Yes, sir.

        (Videotape played.)

BY MR. MECHE:

Q   You remember seeing that state police vehicle?

A   Yeah.  When it arrived at the west side of the bridge.

Q   Helicopter, that's the Coast Guard?

A   Yes, sir.

Q   Now, they showed you a picture by someone who was identified as Lance Madison, and they had a lot of state police guys and a lot of armed gear.  Were these guys riding on this vehicle?

A   Yes, sir.

Q   So they got there after you all had apprehended the gentleman?

```
 1    A    No, sir.  I believe they were the ones -- it was either them

 2    or the NOPD SWAT team that actually apprehended.

 3              MR. MECHE:  Stop it.

 4    BY MR. MECHE:

 5    Q    Passing the truck, so you did stop the truck up here.

 6              MR. MECHE:  Roll it, please.

 7              (Videotape played.)

 8    BY MR. MECHE:

 9    Q    How far did you walk down -- is that the abandoned car they

10    were talking about?

11    A    There does appear to be a car on its side.

12    Q    How far did you walk down the bridge before you got in the

13    state police car?

14    A    I believe it was past the second girder.

15              MR. MECHE:  Okay.  Keep rolling.

16    BY MR. MECHE:

17    Q    If you can see the approximate spot, then identify it for us.

18              I think we passed the second girder.  There it is.

19    A    It is somewhere where the thing is now.

20              MR. MECHE:  Stop.  Okay.

21    BY MR. MECHE:

22    A    Where I inadvertently did that, but about where that arrow

23    is.

24    Q    So that's where you would have gotten in the state police

25    car?
```

1    A    Yeah, it's somewhere in that area.

2    Q    If you don't know, it's okay, because I know it's been a long

3    time.  But I'm going to roll it and see if you can show us where

4    you noticed Officer Villavaso and Officer Barrios.

5            (Videotape played.)

6    BY MR. MECHE:

7    Q    So it would have been past there?

8    A    Yes, sir.

9    Q    Would it have been still on the bridge, though?

10   A    It was on the very west side where the guard rail starts

11   then, in that general area.

12   Q    And they were apprehending someone, you could tell?

13   A    Yeah.  The gentleman looked like he was exhausted.  He was

14   down on a knee, maybe both knees.  Appeared to be exhausted.

15   Q    Right.  They showed you a picture, I think it's Exhibit 40.

16           MR. MECHE:  Can you show that?

17   BY MR. MECHE:

18   Q    It was that gentleman?

19   A    Yes, sir.

20   Q    Are you sure that's who they apprehended?  Or could it have

21   been someone else?

22   A    I'm fairly confident that that was the person.

23   Q    Now, were you aware that the state policeman who was driving

24   that unit got out and apprehended someone himself?

25   A    No, I didn't know that.

1    Q    Okay.  So you're not aware of a third person being

2    apprehended; you're just aware of two?

3    A    On the west side of the bridge, this gentleman here in the

4    photograph and Lance Madison.  But the only two that I'm aware

5    of.

6    Q    If you look further up the bridge like right there where I

7    put that blue dot, you didn't notice Villavaso, Barrios

8    apprehending someone up there?

9    A    That's where I believed they did the apprehension at.

10   Q    Okay.  So, in order for -- if it was this gentleman right

11   here, who they apprehended up here, they would have had to

12   transport him down the bridge to here?

13   A    Well, they weren't like on the -- it was where the road

14   starts to slope down and gets to ground level, from best of my

15   memory.  So they only had to walk him from what about -- you

16   can't see the guardrail in this picture.  But they just had to

17   walk him from that point to where they are now.

18   Q    Do you see either of them in this picture?

19   A    I do not.

20   Q    How long approximately after the two -- turn it off, please

21   -- how long after -- how do I do this?  Technology.

22                    All right.  That individual we saw apprehended,

23   I think we saw the other picture of the gentleman apprehended.

24   A    Yes, sir.

25   Q    How long after that did it take for you to get back to the

1    Crystal Palace?

2    A    I don't remember.  Because I don't remember where we went

3    when we left from there.  I don't know if we went straight back

4    to the Crystal Palace or if we went somewhere else first.

5    Q    The next incident I'm going to ask you to talk about is the

6    round table incident.  You described the people who shot being

7    asked to go to a round table.

8    A    Yes.

9    Q    And that was obviously that same day.

10   A    Yes, sir.

11   Q    But you don't know how long a period of time it was between

12   the time the individuals were apprehended and the time you all

13   did that?

14   A    No, sir, I don't know.

15   Q    Okay.  Was it difficult to measure time back in those days?

16   A    Yeah.  I didn't really -- time wasn't really a factor then,

17   you know.  You didn't have any appointments or anything to make.

18   Q    Yeah.  It was just all --

19   A    You worked from daylight to dark.  That was your day.

20   Q    Now, the individuals that went -- and there's been a lot of

21   testimony about it so I'm going to try to get it summarized and

22   cleared up since I'm last -- the individuals who went to the

23   round table, were they asked by either -- and I'm not clear, was

24   it Lieutenant Lohman or Sergeant Kaufman to go there?

25   A    I don't know who initiated that questioning.

1    Q    Okay.  But recall --

2    A    It was one of those two, but I just don't remember who.

3    Q    And the question was, whoever shot their guns come to the

4    table?

5    A    Correct.

6    Q    And seven of you went to the table?

7    A    Correct.

8    Q    Just so the record is clear, since I'm last, let's name the

9    seven.

10   A    Myself, Sergeant Gisevius, Sergeant Bowen, Officer Barrios,

11   Officer Faulcon, Officer Hills and Officer Villavaso.

12   Q    So the record is clear, you said the meeting didn't last very

13   long?

14   A    No, sir.

15   Q    And there wasn't a lot of extensive questioning?

16   A    No, sir.

17   Q    What specific questioning was there?

18   A    What weapon did you fire, how many times did you fire and

19   what direction -- you know, what group were you firing at.

20   Q    And did all seven of the people there answer that -- without

21   telling what they said -- did all seven the individuals there

22   answer that question?

23   A    I believe so.  Best of my knowledge.

24   Q    And did the three individuals on the white board that you

25   marked an X with, who for the record would have been Faulcon,

1    Villavaso and Barrios --

2    A    Correct sir.

3    Q    -- did they all three answer that question?

4    A    Yes, sir.

5    Q    And the person asking the questions, it was either Lohman or

6    Kaufman, you're not sure; is that a fair way to state it?

7    A    Yes, sir.

8    Q    Was anybody else there besides you nine who would have

9    witnessed what was said?

10   A    There were other officers milling about.  We weren't secluded

11   by any stretch of the imagination.  We were right in the middle

12   of the reception hall.

13   Q    It wasn't like a secret gathering?

14   A    No.  We didn't go in a back room or we didn't go meet like

15   behind some abandoned building or anything like that.  We were

16   sitting in a table in a large room with other people around us.

17   Q    And was there also ranking officers there at the time?

18   A    Other than the four supervisors named?

19   Q    Yes, sir.

20   A    Probably.  I don't know.

21   Q    Would Captain Bardy, was he there?

22   A    I don't remember him being there.  Could have been.

23   Q    Lieutenant Kim Williams?

24   A    She disappeared for awhile.  I don't know if she had come

25   back at that point or not.

1    Q    Did a lot people disappear during those days?

2    A    Yes, sir.

3    Q    Bradley Tollefson, was he there?

4    A    Tollefson?

5    Q    Yes, sir.

6    A    He could have been.  He was assigned there.

7    Q    Just to identify him for the record, he was a lieutenant?

8    A    Yes.  If I remember correctly, he was the -- they created a

9    position -- ICO, the integrity control officer for the district.

10   Q    And just to establish the hierarchy of the rank, Captain

11   Bardy was at the top?

12   A    Yes, sir.

13   Q    And underneath him were two or three lieutenants?

14   A    Four.

15   Q    Okay.

16   A    There would be the three platoon commanders.

17   Q    Right.

18   A    There would have been five, I'm sorry.  The DIU commander was

19   Lieutenant Lohman and then Lieutenant Tollefson.

20   Q    And then below them were the sergeants?

21   A    Yes.

22   Q    Okay.

23              All right.  After that meeting and after it

24   broke up -- and this is what I want to make clear for the

25   record -- did anybody else question you about what happened?

1    A    No, sir.

2    Q    Now, there's been a lot of talk about reports and things like

3    that.  Did anybody show you a report of the incident?

4    A    No, sir.

5    Q    Did Lieutenant Lohman ever come up to you and show you a

6    document or a report and ask you if you were okay with it?

7    A    No, sir.  I didn't have any interaction with him concerning

8    the investigation.

9    Q    Did you ever have any discussion at all with Lieutenant

10   Lohman about what happened on the bridge?

11   A    No, sir.  Not after the September 4th meeting at the round

12   table.

13   Q    And, if he said that you did have such a discussion, he'd be

14   lying?

15   A    I don't know if he's lying -- I'm sorry.

16        MS. BERNSTEIN:  Objection.

17        THE COURT:  I'm going to sustain.

18   BY MR. MECHE:

19   Q    Now, you also testified and I wrote down, I've got it in

20   quotes, you said there were many meetings of people about the

21   incident but you weren't part of them, any of them?

22   A    No, sir.

23   Q    Is that a fair characterization?

24   A    Yes, sir.

25   Q    And the people you described as being part of it was I think

1    you said Detective Lehrmann --

2    A    Yes, sir.

3    Q    And I think you indicated Sergeant Kaufman?

4    A    Yes, sir.

5    Q    And others?

6    A    Yes, sir.

7    Q    But you weren't invited to participate at all?

8    A    I never even attempted.  I was trying to stay away from it.

9    Q    Yeah, I understand.

10        And, now, did you also get the feeling that they didn't

11   want to involve you in this?

12   A    That could have been something -- they could have been trying

13   to minimize the amount of people involved.  They could have been

14   doing that.

15   Q    That was your belief?

16   A    I was just happy not to be involved, I guess.  I was just

17   walking around dumb and blind, and happy to be that way.

18   Q    During these days when they're having the meetings, did you

19   ever encounter Officer Villavaso or Officer Barrios?

20   A    There were casual conversations from time to time when we had

21   downtime, sitting around doing nothing.

22   Q    Were they still working with you guys a few weeks after the

23   storm, or had they moved back to their Fifth District?

24   A    At some point, and I remember Officer Barrios being upset

25   about this, the Fifth District called them back to the Fifth

1    District.  And they kind of didn't want to go, but they ended up

2    not having a choice in the matter.

3    Q   So they actually were no longer around the guys who would

4    have been having the meetings?

5    A   Correct.

6    Q   Without telling me what anybody said, did you ever overhear

7    any of the three people who you marked an X describe what their

8    experience was during the shooting?

9    A   Yes.

10   Q   Without telling me what he said, who did you overhear

11   describing what he did?

12   A   Officer Barrios.

13   Q   And did you tell what you learned to Mr. Bezak and Ms.

14   Bernstein?

15   A   Yes.

16   Q   Now, at some point after you decided to cooperate with the

17   government, you agreed to tape; is that correct?

18   A   Yes.

19   Q   And did you actually wear a wire and go meet with people, or

20   did you tape record telephone conversations, or both?

21   A   It was just telephone conversation.

22   Q   And why were you doing that?

23   A   To assist the government with their investigation.

24   Q   Was it your idea, or did they ask you?

25   A   I don't remember how it came up.  It was a mutual decision,

```
 1   though.
 2   Q    And who -- without telling me what they said -- who did you
 3   tape?
 4   A    Officer Barrios.
 5   Q    Now, do you remember the conversations you had with him?
 6   A    Yes.
 7   Q    And do you remember what he said?
 8   A    Yes.
 9   Q    Do you remember what you said?
10   A    Yes.  For the most part.
11   Q    Did at some point you suggest to him or tell him that, quote,
12   they were trying to keep us out of it?
13   A    Yes.
14   Q    And what would you have been referring to?
15   A    Bowen and Gisevius and the attorneys.
16   Q    Okay.  And, when you indicated they were keeping a lot of us
17   out, or others, you're referring to yourself?
18   A    Yes.
19   Q    Officer Barrios?
20   A    Yes.
21   Q    Officer Villavaso?
22   A    Yes.
23   Q    Anybody else?
24   A    Officer Faulcon.  Officer Hills.
25   Q    Why would they have been doing that?  Again, what did you
```

1   believe?

2   A   My impression was just that they just keep us out of the loop

3   so we wouldn't be involved.

4   Q   Okay.

5   A   I don't know the exact motivations.

6   Q   Now, at that meeting where you all gave the statements, okay,

7   there's been a lot of testimony so I just want to summarize and

8   clear it up, you said you were contacted by Sergeant Gisevius and

9   asked to just report what took place.

10  A   Yes.

11  Q   Now, did he give you a lot of notice, or was it just that

12  same day?

13  A   No.  It was the day before.

14  Q   Okay.  Now, between when he let you know that and the next

15  day, did you discuss with anybody what you all were going to do?

16  A   No.

17  Q   Okay.  So nobody called you or contacted you?

18  A   No, sir.

19  Q   Didn't have conversations with Officer Barrios or Villavaso?

20  A   No, sir.

21  Q   You all showed up at the morning, and I think you said there

22  are were a number of people around including police academy

23  people.

24  A   Yes, sir.

25  Q   I wasn't clear on one thing.  You said the purpose of the

```
 1   police academy people -- I'm sorry, you need --
 2   A    No, no.
 3   Q    -- the police academy's people role was, and I wasn't clear,
 4   to collect your guns, or to give you guns?
 5   A    To issue weapons.
 6   Q    Okay.  So you weren't turning your guns in to the police
 7   academy people; you were turning your guns in to the detectives
 8   who were investigating the case?
 9   A    Yes, sir.
10   Q    And you mentioned that, after Katrina, there was a change in
11   the way New Orleans Police Department was structured and it --
12   just correct me if I'm wrong -- I think you said they started a
13   new homicide division?
14   A    Yes, sir.
15   Q    And, previous, it was each district had their own homicide
16   detectives?
17   A    Correct.
18   Q    And then, later, they started a homicide division?
19   A    Yes.
20   Q    So the homicide division detectives were there to take all of
21   you all's statements?
22   A    Yes.
23   Q    So it wasn't just one or two detectives who were going
24   individually take each of your statements; it was a number of
25   them who were going to separate you all and take your statement
```

1    individually?

2    A    Correct.

3    Q    Okay.  Now, when you all got there, were they the ones you

4    turned your guns in to?

5    A    I believe so.  I don't remember -- I know they were writing

6    notes down, writing down information off the weapons.  I don't

7    remember if there was a crime lab personnel there that actually

8    collected the weapons, or if the detectives actually took them.

9    Q    Okay.  And, when you showed up, is that the first thing you

10   did?  Or did you carry your weapons around with you when you went

11   in that building and had that meeting?

12   A    Pretty sure we worked with the weapons first.

13   Q    Right.

14   A    And then went into the building.

15   Q    And that would make sense.

16   A    Yes, sir.

17          MR. MECHE:  Can we show 78?

18   BY MR. MECHE:

19   Q    And I think for the record -- and I think Ms. Bernstein

20   showed you this, or someone -- This is Exhibit 78.  And that's a

21   typewritten -- that's a typewritten your statement that somebody

22   recorded and then later transcribed; is that correct?

23   A    Yes, sir.

24   Q    And it has on there at the top -- and you identified these

25   people.  I appreciate that.  The two detectives who interviewed

1    you.   One of them is Eduardo Colmenero.

2    A    Yes, sir.

3    Q    And Winston Harbin.

4    A    Yes, sir.

5    Q    The second to last line there.

6         And would they have been the ones you turned your guns

7    in to?

8    A    I don't remember.

9    Q    But they were assigned to you to take your statement?

10   A    Correct.

11   Q    And they indicated the time they started taking your

12   statement as being 3:16 p.m.

13   A    Yes, sir.

14   Q    Do you have any of reason to doubt that that's not correct?

15   A    No, sir.

16   Q    Is it common, when they take the statements, they record the

17   time they start and the time they finish?

18   A    Yes, sir.

19        MR. MECHE:   Go to the last page.

20   BY MR. MECHE:

21   Q    And you finished at 3:26?

22   A    Correct, sir.

23   Q    Okay.   And do you remember if you immediately left that

24   meeting where you all were asked to recite what you all were

25   going to say and went to these guys, or if you waited awhile and

1   did something else before you did that?

2   A   We had to wait our turn.  We were sitting inside the white

3   trailer.  There's -- the way the trailer's set up, there's two

4   officers offices at one end and two offices at the other end and

5   a large open area in the middle.  You had to sit in the open area

6   until it was your turn to go into the office.

7   Q   And were you all sitting together at that time, or were you

8   separate?

9   A   We were all sitting together.

10  Q   Were you all continuing to talk?

11  A   There were some discussion that nobody wanted to let Lehrmann

12  take their statement.  They wanted to go with someone else.

13  Q   And why is that?

14  A   Just people had a general distrust of Lehrmann.  Didn't

15  believe he was capable of doing his job.

16  Q   And you remember who would have voiced that?

17  A   It was the officers.  It wasn't rank.  I remember Barrios,

18  but there were several of us sitting there.

19  Q   Do you remember Villavaso sitting there with you?

20  A   I don't have a specific recollection of it.

21  Q   Okay.  There were a lot of discussions about your plea deal.

22  I'm just going to go over it briefly, I don't want to belabor it.

23                  I think you said -- Ms. Bernstein asked you a

24  lot about the reasons for why you shot.  And I think you candidly

25  told us and I think one of the things you said was that you

1    really thought you all were shooting at the bad guys.

2    A    Yes, sir.

3    Q    At least, you did.  You can only speak to yourself.

4    A    Yes, sir.

5    Q    At the time you were doing that, were you intending to commit

6    a crime?

7    A    I guess, in a manner of speaking, yes.

8    Q    What crime is that?

9    A    Aggravated assault, at the very least.

10   Q    As opposed to an attempted murder?

11   A    Correct.

12   Q    When you reach your Plea Agreement with the government, they

13   did not require you to plead guilty to the shooting?

14   A    No, sir.

15   Q    And, if they had, you know that your sentencing exposure

16   would have been a lot greater?

17   A    I can imagine so, sir.

18   Q    And I think there's been talk about how much time you

19   indicated.  Did at some point you tell someone you thought you

20   were looking at 50 to 60 years?

21   A    Yes, sir.

22   Q    In fact, you told Officer Barrios that in one of those taped

23   conversations?

24   A    Yes, sir.

25   Q    So that could have been what you're looking at had you been

```
 1   required to plead guilty to the shooting?
 2   A   When I told him that, I was trying to get him to admit
 3   something, and I was exaggerating a little bit.  But it's fairly
 4   close to what the government told me.
 5   Q   Without telling me what he said, did he ever admit something
 6   you were trying to get him to admit to?
 7   A   No, sir.
 8           MS. BERNSTEIN:  Objection.
 9           THE WITNESS:  I'm sorry.
10           MS. BERNSTEIN:  That doesn't make it any less hearsay.
11           THE MARSHAL:  Just setting the predicate.
12           THE COURT:  I'll overrule.
13   BY MR. MECHE:
14   Q   Without telling me what he said, did he ever admit what you
15   were trying to get him to admit?
16   A   No, sir.
17   Q   What were you trying to get him to admit?
18           MR. DESALVO:  May we approach the bench?
19           (Sidebar conference.  Jury not present.)
20           MR. DESALVO:  Nevertheless, if he answers the
21   question -- I'll back up.
22           I'm concerned that he may have a statement about Mr.
23   Bowen in their statement that would not be admissible.
24           I'm sorry, I can hardly hear, Judge.
25           MS. BERNSTEIN:  But Frank is absolutely correct about
```

1   what is about to be elicited.

2        My objection is that it doesn't cure the hearsay problem

3   to say:  Did he tell you something, no, what is it you were

4   trying to get him to tell you.  That's exactly the same as having

5   the witness say he told me --

6        THE COURT:  I disagree that the previous question was a

7   hearsay question.

8        Now, that doesn't mean that the next one is not going to

9   be a hearsay question.

10       But it's also pregnant with the possibility of the

11  statement that Mr. DeSalvo is concerned about.

12       So, Tim, can you address that, please?  I think you need

13  to be very, very careful.

14       MR. MECHE:  Sure.  And I wasn't actually trying to --

15  I'm not intentionally -- I was just laying a predicate for when I

16  have Barrios on the stand.

17       MS. BERNSTEIN:  Can you explain what you mean by the

18  predicate?

19       MR. MECHE:  I want to play the tape with Barrios; and,

20  in order to do that, I have to establish that he did or didn't

21  say something, and I wanted to find out what he asked.

22       MS. BERNSTEIN:  No you don't.  Once you have Barrios and

23  you play the tape, there's no question about it.  There's no

24  predicate necessary for that.

25       MR. MECHE:  If you waive your objection to me playing,

1    okay.

2            THE COURT:  I think we ought to -- I think we ought to

3    stay away from it with this witness.  We've established that he

4    did have a call, that he recorded a call, and that in it he was

5    trying to obtain an admission of some sort.  Which he did not

6    obtain.  So I think that's pretty much where we are on this.  I

7    don't know how much further you can go in terms of either running

8    into a hearsay problem to the extent that you would elicit a

9    response that Barrios said something and then even worse a

10   response that he said something about Bowen.  So that's my

11   concern.

12           MR. MECHE:  That wasn't my intention.

13           THE COURT:  I know.  But I'm afraid the witness may not

14   understand your question, and in the interest of completing an

15   answer say something that is violative of both of those concerns.

16           MS. BERNSTEIN:  While we're here, though, while we are

17   up here, I would like to ask Mr. Meche to tell me, to show me

18   what part of these interviews, what part of these telephone calls

19   you're referring to when you asked him the question you asked.

20           And, for record, Your Honor, I asked Mr. Meche about

21   eight times beforehand to tell me what he planned to use so we

22   could deal with any issue beforehand.  And I didn't want to call

23   a bench conference; but, since we're here --

24           MR. MECHE:  I didn't have to use any of these.  He's

25   been honest.

1          MS. BERNSTEIN:  It's not his honestly I'm questioning

2     right this minute.  But I want to know what statement it is in

3     here that you asked him about --

4          MR. MECHE:  None.  He admitted everything I asked him

5     about.

6          MS. BERNSTEIN:  You asked him:  Isn't it true that

7     during that conversation.  You said:  They kept us out of it.

8          MR. MECHE:  And he said yes.

9          MS. BERNSTEIN:  And I am asking you to direct me to what

10    part of the conversation --

11         MR. MECHE:  I don't have to because he said yes.

12         THE COURT:  He's already answered the question.

13         MS. BERNSTEIN:  But he answered it incorrectly without

14    the transcript.

15         MR. MECHE:  He answered it.

16         MS. BERNSTEIN:  I didn't want to have this issue because

17    I didn't want to jump up.

18         THE COURT:  That's his testimony.  That's his testimony.

19         MR. MECHE:  He answered honestly.

20         MR. DESALVO:  If he answered, it would create a Bruton

21    problem.

22         MS. BERNSTEIN:  It wouldn't create a Bruton problem

23    because he's on the stand.  We're talking about what he said in

24    the --

25         MR. MECHE:  You know, I thought I'd have to use to

```
 1    impeach.  I didn't have to, he was honest.
 2          THE COURT:  I'm going to sustain the objection of Mr.
 3    DeSalvo and the one that Ms. Bernstein was about to make
 4    regarding hearsay preemptively.  I'm concerned enough to sustain
 5    the objection at this point.
 6          (Sidebar concluded.  Jury now present.)
 7          MR. MECHE:  Thank you, Mr. Hunter.  I don't have
 8    anything else.
 9          THE COURT:  All right.  Redirect.
10          MS. BERNSTEIN:  Yes, Your Honor.
11                       REDIRECT EXAMINATION
12    BY MS. BERNSTEIN:
13    Q   Mr. Hunter, one of these defense attorneys asked you whether
14    you owed any responsibility to the officers in the back of the
15    truck.  Do you remember that?
16    A   Yes, sir.  Yes, ma'am.  I'm sorry.
17    Q   That's the second time I've been sired by a witness.
18          Did you warn the officers in the back of the truck
19    before you fired?
20    A   No, ma'am.
21    Q   Did you owe any responsibility to the civilians on the
22    bridge?
23    A   In hindsight, yes, ma'am.
24    Q   Did you warn them before you fired?
25    A   No, ma'am.
```

1    Q    Did defendant Ken Bowen warn them before he fired?

2    A    No, ma'am.

3    Q    Did defendant Gisevius warn them before he fired?

4    A    No, ma'am.

5    Q    As far as you heard, did any officer on that bridge warn

6    civilians before they fired?

7    A    No, ma'am.  I'm not aware of it.

8    Q    You were also asked about the effect that your shots out the

9    window might have on the officers in the back.  I want to talk to

10   you about where you were when you first fired out the window.

11   A    Either exiting the intersection or a little bit past the

12   intersection going on to the bridge.

13   Q    How fast was the truck moving at that point?

14   A    It was pretty fast.

15   Q    As far as you know, did anyone in the back of the truck jump

16   out while you were moving fast up the bridge?

17   A    No, ma'am.  Actually, I was informed later that day that a

18   bunch of people had fallen down when I slammed on the brakes.

19   Q    And, when you stopped the truck, who was firing?

20   A    Sergeant Bowen at that point.

21   Q    When you had the truck stopped, were you shooting?

22   A    No.

23   Q    Mr. Villavaso's attorney showed that you video of defendant

24   Villavaso walking up the bridge, and he asked you about when you

25   next saw Villavaso; right?

1    A    Correct.

2    Q    Now, when you next saw Villavaso, where was he?

3    A    I believe him and Officer Barrios were apprehending the

4    civilian on the left side of the road.

5    Q    Was that on the east side of bridge or on the west side of

6    the bridge?

7    A    The west side.

8    Q    Down near the bottom?

9    A    Yes, ma'am.

10   Q    How sure are you that defendant Villavaso was down on the

11   west side of bridge that day?

12   A    Very confident.

13   Q    Now, Mr. Villavaso's attorney also asked you whether you were

14   aware of a third person taken into custody on the west side of

15   the bridge.  Do you remember that?

16   A    Yes, ma'am.

17   Q    Now, taking you to January 2006, when you all stood around in

18   that abandoned building and talked about your stories about what

19   happened on the bridge, did anybody say anything about a third

20   person taken into custody on the west side of the bridge?

21   A    I don't remember any information like that.

22   Q    In the six years since all of this happened, have you ever

23   heard anything about a third person taken into custody?

24        MR. MECHE:  Objection, hearsay.

25        MS. BERNSTEIN:  The question was whether he was aware,

1    Your Honor.

2         THE COURT:  I'll overrule.

3    BY MS. BERNSTEIN:

4    Q   In the six years since this incident happened, have you ever

5    heard anybody say anything about a third person taken into

6    custody on the west side of the bridge?

7         MR. MECHE:  Your Honor, that calls for a hearsay answer.

8         THE COURT:  It has to do with his awareness.  I'm going

9    to overrule.

10        You can answer.

11   BY MS. BERNSTEIN:

12   A   No, ma'am.

13   Q   Mr. Villavaso's attorney also asked you some questions about

14   a report.  Now, did you know that a report was being written?

15   A   Yes.

16   Q   What did you think was going in it?

17   A   A justification for the shooting.

18   Q   Were you okay with that?

19   A   At the time, I was.

20   Q   And you were asked some questions about whether you ever said

21   that people kept you out of it.  Were you talking about certain

22   parts of the cover-up in the early stages?

23   A   Yes, ma'am.

24   Q   In January 2006, when you finally had a chance to give a

25   statement, were you being kept out of it at that point?

```
 1   A    No, ma'am.

 2   Q    Were you out, or were you in?

 3   A    I was in.

 4   Q    What were you in?

 5   A    Providing false statements to justify our actions on the

 6   bridge.

 7   Q    So you were in the cover-up?

 8   A    Yes.

 9   Q    Who else was in the cover-up that day?

10   A    Sergeant Bowen, Sergeant Gisevius, Officer Barrios, Officer

11   Hills, myself, Officer Villavaso.

12   Q    Any question about that?

13   A    No, ma'am.

14   Q    Now, you said on cross, cross examination, you explained that

15   you were right at about Banner Chevrolet when you heard the

16   female voice over the radio; is that right?

17   A    Correct.

18   Q    Where you heard:  That's them; is that right?

19   A    Yes, ma'am.

20   Q    When you were at Banner Chevrolet and you heard that, where

21   were the civilians?

22   A    Walking up the bridge.

23   Q    How far would you estimate that was from where you were?

24   A    Hundred-fifty, 200 yards maybe.

25   Q    So maybe two football fields?
```

1    A    Close.

2              MS. BERNSTEIN:  Can we have Exhibit 71 up, please?

3    BY MS. BERNSTEIN:

4    Q    This photograph is already in evidence.  It's a photograph

5    looking down the east side of the bridge.

6              Can you see Banner Chevrolet?

7    A    Yes, ma'am.

8    Q    Can you circle the Banner sign?

9    A    (Witness complies.)

10   Q    Sorry.  I think mine might work a little bit better.  Is that

11   what you were circling?

12   A    Yes, ma'am.

13             MS. BERNSTEIN:  May I have mad pan 88?  Actually, don't

14   put it up yet.

15             Can we work the screens so that only the witness can see

16   what he's putting up?  I'm sorry, the witness and us.

17             THE COURT:  I think it should be just for the witness

18   and here and on the counsel tables.  Should be right now.

19   BY MS. BERNSTEIN:

20   Q    Do you have a picture, Mr. Hunter?

21   A    Yes, ma'am.

22   Q    Do you recognize the perspective in that photograph?

23   A    Yes, ma'am.

24   Q    Is that photograph helpful in you describing your view that

25   day?

 1   A   No, ma'am.  Well, partially.  We're on the wrong side of the

 2   road in this photograph.

 3   Q   Okay.  Will you be able to -- explaining the differences,

 4   will you be able to use this photograph to explain what you saw

 5   that day?

 6   A   Yes, ma'am.

 7   Q   Or what your perspective was?

 8           MS. BERNSTEIN:  I'd like to offer into evidence Mad Pan

 9   88.

10           MR. DESALVO:  No objection.

11           THE COURT:  88, any objection?

12           All right.  Admit Exhibit 88.

13           (Exhibit Admitted.)

14           MS. BERNSTEIN:  Thank you.

15           Can we please publish that to the jury?

16           Your Honor, may I step back there and ask questions for

17   a moment so I can operate this 360 photograph?

18           THE COURT:  Yes.

19   BY MS. BERNSTEIN:

20   Q   Can you tell us, please, Mr. Hunter, what you're looking at

21   here.

22   A   That is a view of the Danziger Bridge from the east side,

23   east of the Chef and Downman intersection.

24   Q   You said that the photograph isn't quite accurate because

25   you're in the wrong lane.  Can you explain what you meant.

1   A   We were --

2   Q   You can draw on the screen, if you need to.

3   A   We were driving over here on the opposite side of the

4   roadway, going against traffic.

5   Q   So, when you all approached the bridge, you were actually

6   going west in the eastbound lane?

7   A   Yes, ma'am.

8   Q   So at some point did you have to swerve and turn to get up in

9   the westbound lanes when you got onto the bridge?

10  A   It wasn't a hard maneuvered intersection.  I did it at the

11  intersection.

12  Q   Okay.  All right.

13          So other than the fact that your perspective was a few

14  lanes over to the left; correct?

15  A   Correct.

16  Q   I want to talk about the distance between you and the people

17  you were looking at.  Can you mark on there on the screen

18  approximately where you think the people were that you were

19  looking at when you were at Banner Chevrolet.

20  A   That's not quite accurate.  I want it maybe a little bit

21  further up.

22          Is there a way to zoom it in?

23  Q   Yes.

24          Actually, first, I'm going to pan to the left.  What are

25  we going to see when I pan to the left?

 1    A    The used car lot.

 2    Q    Banner Chevrolet?

 3    A    Correct.

 4    Q    And I'm going to pan to the right, just to give the

 5    perspective of that intersection that we're looking right at.  Is

 6    that the intersection of Chef and Downman?

 7    A    Yes, ma'am.

 8    Q    Do you want me to keep going?

 9    A    No.  That's good enough, ma'am.

10         Are you ready?

11    Q    Sure.

12    A    About there.

13    Q    So that's about -- you're marking on the photograph about

14    even where the concrete median in the middle of the road starts,

15    but on the other side; is that right?

16    A    Correct.

17    Q    So I'm going to --

18         MS. BERNSTEIN:  Cindy, if you can erase the blue dot.

19    I'm going to zoom back out.  But now we have as a reference point

20    the beginning of that concrete median.

21    BY MS. BERNSTEIN:

22    Q    Now, for the record, that photograph that we're looking at is

23    not a great photograph; correct?  Not particularly clear?

24    A    Yes, ma'am.

25    Q    I just want to make sure that the photograph is not as clear

1    as the naked eye; correct?

2    A    No, ma'am.

3    Q    Now, in that photograph, when I zoomed in, did you see a

4    shopping cart?

5    A    There was something in the left lane of the westbound

6    roadway.  I couldn't make out what it was.

7    Q    When you first saw the people on the bridge, when you were

8    back at Banner Chevrolet, you said it appeared like they were in

9    one group; right?

10   A    Yes, ma'am.

11   Q    Could you tell from that distance who was in front and who

12   was behind?

13   A    The Madisons were in front of the group.

14   Q    Can you tell how much distance was between people?

15   A    Individuals?  They were all together.  They all appeared to

16   go together, like arms's length.

17   Q    Is it depth perception from this distance that we're looking

18   at better or worse than when you're up close?

19   A    I would say worse.

20   Q    Defendant Kaufman's attorney asked you some questions about

21   Jeff Lehrmann.  Who was in charge of the investigation of the

22   Danziger Bridge shooting?

23   A    I believe it was Sergeant Kaufman.

24   Q    How long had Jeff Lehrmann been with NOPD at the time?

25   A    Maybe a year.  A little longer maybe.

1    Q   Was there somebody who Jeff Lehrmann would generally work

2    very closely with?

3    A   Sergeant Kaufman.

4        MR. LONDON:  Objection, Your Honor.  That's way outside

5    of the scope.  I didn't ask any of those questions.

6        THE COURT:  I think it's within the scope of what was

7    asked.

8    BY MS. BERNSTEIN:

9    Q   Mr. Hessler asked you this morning whether you just came up

10   with your testimony for court here today.  Or yesterday,

11   actually.  And I want to focus you now on the first time that you

12   ever sat down and had a full conversation with the FBI.

13       Actually, before I ask you about that, I want to ask you

14   about the chronology of the interviews that you gave with the

15   FBI.  Mr. Hessler, I think it was -- I'm not sure who was who

16   asked, I think it was Mr. Hessler -- asked about omissions from

17   your first interview with the FBI.  Do you remember that?

18   A   Yes.

19   Q   All right.  So much let's go through the chronology again.

20   When the FBI first approached you, at your house, did you give a

21   statement?

22   A   No, ma'am.

23   Q   And, after you talked to your lawyer, what did you do?

24   A   My attorney approached the government.  They called you and

25   approached the government, see what was going on, see what you

```
 1   all were talking about.

 2   Q    And then what happened next?

 3   A    My attorney reported back the information he received and

 4   asked if I'd be willing to sit down with you all to hear you out

 5   in person.

 6   Q    Did you come in and hear us out?

 7   A    Yes.

 8   Q    When you heard us out, did you give any statement?

 9   A    No.

10   Q    You just listened?

11   A    Yes.

12   Q    Was an offer put on the table?

13   A    Yes.

14   Q    What was the next step?

15   A    We considered the offer.  Consulted with my attorney,

16   consulted with my wife.  Then called my attorney and let him know

17   I was going to accept the offer.

18   Q    Did you accept the offer?

19   A    Yes.

20   Q    Did you sign a plea deal?

21   A    Yes.

22   Q    When you signed that plea deal, had you given any statement

23   at all to the FBI?

24   A    No.

25   Q    What time of day or night did you sign that plea deal?
```

1   A    Nighttime.

2   Q    How late was it, do you remember?

3   A    After dinnertime.

4   Q    Did you give a statement that night?

5   A    A brief one.

6   Q    Was that brief statement exhaustive?

7   A    No.

8   Q    Do you know what I mean by exhaustive?

9   A    Yeah.  It wasn't a complete thorough statement as to what I

10  was going to testify to.

11  Q    Were you asked to give a complete and thorough statement that

12  night?

13  A    No.  They specifically asked for a small gist of what my

14  cooperation was going to be.

15  Q    And was it your understanding that you were going to provide

16  a longer statement later?

17  A    Yes.

18  Q    Was that just an assumption that you made, or was that

19  explicitly said?

20  A    No.  That was explicitly said.  That, you know, Mr. Christian

21  and Agent Bezak asked for a basic premise of what the truth was

22  and with the indication that we would come back at a later time

23  and date yet to be determined to do a more extensive interview.

24  Q    And how long was that?  Ask you to estimate how long that

25  statement was that night, that brief gist.

1   A    Maybe 20 minutes.  After I signed the agreement.

2   Q    Do you remember what some of the gist or some of the

3   highlights were that you did give to the FBI that night?

4   A    The first thing is --

5        MR. FLEMING:  Judge, I'm going to object at this point.

6   I don't know the purpose of him going over that statement.

7        MS. BERNSTEIN:  May I respond, Your Honor?

8        MR. FLEMING:  Perhaps a prior consistent statement.

9   But, right now, it's just being offered for the purpose of

10  offering --

11       THE COURT:  I think we need to have a more specific

12  question.  I'll sustain it and we have a more specific question.

13  Other than to get him up here that's an open door for him to

14  recite testimony that's already been covered on direct and cross.

15       MS. BERNSTEIN:  I'll be specific.

16  BY MS. BERNSTEIN:

17  Q    The part about Bowen leaning on the barrier and firing at

18  civilians, did you tell the FBI that the very first time you

19  talked to them?

20  A    Yes.

21  Q    How about seeing Bowen stomp on Ronald Madison, did you tell

22  that the FBI the very first time you talked to them?

23  A    Yes.

24  Q    How about the fact that you were the very first person to

25  fire the gun on the bridge that day?

1          MR. FLEMING:  Judge, I'm going to object to the leading

2   nature of the witness.

3          THE COURT:  The only owe way -- she's asked it as a

4   general question, and we said that she needed to be specific as

5   to what was covered in that interview.  So she's got to do it one

6   way or the other, because it was covered on cross.  So I will

7   overrule the objection.  She can ask about what he did cover with

8   them.

9          If she asks it generally, then he's going to give the

10  narrative answer, which was objected to previously.

11         MS. BERNSTEIN:  Thank you, Your Honor.

12  BY MS. BERNSTEIN:

13  Q   So you can answer that question.  During that very first

14  interview with the FBI, did you tell them about the fact that you

15  were the very first person to fire on the bridge that day?

16  A   Yes.

17  Q   And you said that interview lasted about 20 minutes?

18  A   Approximately.

19         MR. FLEMING:  Objection.  Leading, Judge.

20         THE COURT:  But he just said it took about 20 minutes.

21  She can't suggest an answer in a question.  In this case, he just

22  said about four or five questions ago, that it was about 20

23  minutes.  So, therefore, although technically it's a leading

24  question, it's not an answer that she has suggested to him.  It's

25  rather information that he's already provided, without it being

1    suggested.  So I'm going to overrule the objection.

2    BY MS. BERNSTEIN:

3    Q   So the interview lasted about 20 minutes?

4    A   Approximately.

5    Q   Did you ever come back and give another statement to the FBI?

6    A   Yes.

7    Q   How much later?

8    A   Six, seven days.

9    Q   How long was that interview?

10   A   Long.  That was --

11   Q   Minute, or hours?

12   A   Many hours.

13   Q   When you talked to the FBI for many hours, did you provide

14   any additional details?

15   A   Yes.

16   Q   Other than what you had provided in the Gist?

17   A   Yes.

18   Q   You were asked yesterday -- all right.  So, along those same

19   lines, Mr. Hessler asked you today whether you just came up with

20   your testimony for court.  So I want to focus you now on that

21   longer interview, the first time that sat down for hours with the

22   FBI.  Is it your recollection that was on March 17th?  You've

23   been asked a lot about that interview today.

24   A   Yes.

25   Q   I'm going ask you what you remember about that interview.

1        Do you remember whether you told the FBI that day that

2   you fired first?

3   A    Yes.

4   Q    Do you remember whether you told the FBI that day that Ken

5   Bowen had your AK-47?

6   A    Yes.

7   Q    Do you remember whether you told the FBI that day that you

8   saw an older black guy pop his head up over the barrier?

9   A    Yes.

10  Q    Do you remember whether you told the FBI that day that

11  Kenneth Bowen fired at him?

12  A    Yes.

13  Q    Do you remember if you told the FBI that day that you fired

14  at men who were running away?

15  A    Yes.

16  Q    Do you remember if you told the FBI that day that those men

17  running away posed no threat?

18  A    Yes.

19  Q    Do you remember if you told the FBI that day that you rode

20  down the west side with an LSP trooper?

21  A    Yes.

22  Q    Do you remember whether you told the FBI that day that, as

23  you were going down the west side of the bridge, you saw Ronald

24  Madison?

25  A    Yes.

1  Q   Do you remember whether you told the FBI that day that Ronald

2  Madison, that you didn't see him pose any threat?

3  A   Yes.

4  Q   Do you remember whether you told the FBI that day that

5  Defendant Bowen had stomped on Ronald Madison while he was lying

6  on the ground after being shot?

7  A   Yes.

8  Q   Mr. Hessler asked you today about a shovel.  When you were

9  out on the bridge that day and saw people running up the east

10  side, did anybody have a shovel as they ran?

11  A   I don't remember seeing any shovel.

12  Q   Did any turn and point a shovel at you?

13  A   No.

14  Q   Did anyone shoot a shovel at you?

15  A   No, ma'am.

16  Q   Did anybody shoot anything at you as they ran up the bridge?

17  A   No, ma'am.

18  Q   Did anyone turn and point anything at you as they ran up the

19  bridge?

20  A   No, ma'am.

21  Q   Mr. Hessler asked you a question about whether the state must

22  have thought that you hit Ronald Madison with your shots.  Do you

23  remember that?

24  A   Yes.

25  Q   What did the state charge you with?

1   A    Two counts of attempted first degree murder.

2   Q    Two counts for attempting to kill who?

3   A    Lance and Ronald Madison.

4   Q    Did anyone shoot Lance Madison that day?

5   A    No.

6   Q    Lance Madison wasn't shot at all by one single shot?

7   A    No.

8   Q    So the state could not have thought that you shot Lance

9   Madison?

10          MR. HESSLER:  Objection, Your Honor.

11          THE COURT:  I will sustain.  It's an improper question.

12   BY MS. BERNSTEIN:

13   Q    Several of these attorneys asked you about some trouble that

14   you've gotten into with NOPD.  Let me ask first, you talked about

15   a finding by PIB that you were untruthful.

16   A    It was --

17   Q    Hold on.  Let me get the question out there.

18          First, can you tell us specifically what PIB found that

19   you were untruthful about.

20   A    It wasn't PIB.  It was the district commander.

21   Q    What did the district commander find that you were untruthful

22   about?

23   A    He had two statements in front of him, the sergeant's

24   statement and my statement.

25   Q    Let me stop you there.  First I want you to tell us what was

1    the topic that was at issue, what did they find that you were

2    untruthful about?

3    A    That there was allegations that I was unprofessional and --

4    basically cursed out the supervisor and some civilians.

5    Q    So this finding was about whether or not you were truthful

6    about having cursed?

7    A    Correct.

8    Q    All right.

9         You were also asked about some other trouble that you've

10   gotten into with NOPD.  Did you miss court?

11   A    Yes.

12   Q    Did you live in Slidell against NOPD rules?

13   A    Yes.

14   Q    Mr. Hunter, are you a model police officer?

15   A    No, ma'am.

16   Q    Does a model police officer shoot at people who are running

17   away?

18        MR. FLEMING:  Judge, I'm going to object.

19        THE COURT:  I'm going to sustain.

20        MS. BERNSTEIN:  To that particular question?

21        THE COURT:  Sustained, yes.

22   BY MS. BERNSTEIN:

23   Q    Have you ever claimed that you were a model police officer?

24   A    No, ma'am.

25        MR. FLEMING:  Objection to relevancy.

1        MS. BERNSTEIN:  Your Honor, I think that was invited by

2   the cross.

3        THE COURT:  I'll overrule.  He's already answered.

4   BY MS. BERNSTEIN:

5   Q   Did you admit here that you participated in a cover-up?

6        MR. FLEMING:  Objection.  The witness's testimony speaks

7   for itself, Judge.

8        MR. DESALVO:  Asked and answered.

9        THE COURT:  I think it has been asked and answered.

10  BY MS. BERNSTEIN:

11  Q   Mr. Hessler asked you today about your actions in front of

12  the truck, before you went around to the side.  Do you remember

13  that?

14  A   Yes, ma'am.

15  Q   Now, when you stopped at the corner of the truck, what were

16  you taking cover from?

17  A   I wanted to see what was going on before I crossed the --

18  went around the corner of the truck to make sure -- see what

19  direction the officers were shooting in.

20  Q   You used the expression friendly fire earlier.  What did you

21  mean by that?

22  A   I didn't want to get shot by another police officer.

23  Q   Did you see any threat other than friendly fire?

24  A   No.

25  Q   Mr. Hessler asked you, as you went around to the side of the

1   truck, he asked you whether there was anybody in the passenger's

2   seat.  I want to ask you a different question.  As you went

3   around the side of the truck right there, where was Defendant

4   Bowen?

5   A   By the wall.

6   Q   Any question about that?

7   A   No, ma'am.

8   Q   What he doing?

9   A   Firing his weapon.

10   Q   How do you know he was there firing his weapon?

11   A   I saw him.

12   Q   Did you look in the cab of the truck?

13   A   No, ma'am.

14   Q   Mr. Hessler asked you some questions about an aim point

15   versus a scope.  Am I using the right term, aim point?

16   A   Yes.

17   Q   Does an aim point on a gun affect how far a bullet travels?

18   A   No.

19   Q   Does an aim point keep you from hitting a target far away?

20   A   No.

21   Q   I want to focus now on January 2006 when you gave your

22   statement.  Several of the lawyers here asked you whether anyone

23   told you what to say in your taped statement.  What did defendant

24   Kaufman say at that meeting right before the taped statement?

25   A   He wanted everybody to say their statement in front of the

1    other officers involved so that everybody would know what

2    everybody else was saying.  Our statements could corroborate each

3    other.

4    Q    What was the very next thing that happened?

5    A    People started to give their version of their statement.

6    Q    Without all of the specifics, generally, what version did

7    defendant Bowen give?

8    A    That he'd taken fire from the civilians.  He shouted for them

9    to drop their guns or something to that effect.  And he fired at

10   the wall and suppressed the suspects so that the other officers

11   could get out of the back of the truck.

12   Q    Did you understand the version he gave to be true or false?

13             MR. DESALVO:  I object, Your Honor.  He's already

14   testified as to what he saw Sergeant Bowen do.  And what we just

15   heard was totally consistent with what Sergeant Bowen -- he said

16   Sergeant Bowen did.  Now, for him to make an inference now he

17   knew that was false, is foolhardy.

18             THE COURT:  He needs to testify as to what he knows.

19   Not what somebody else thinks is true or false.  He needs to

20   testify as to what he knows.

21             MS. BERNSTEIN:  So, is that overruled, before I ask the

22   question again?

23             THE COURT:  I think you need to rephrase it, at a

24   minimum.

25   BY MS. BERNSTEIN:

1    Q    When you heard defendant Kaufman give his account, did you

2    know based on what you had seen whether that account was true or

3    false?

4              MR. DESALVO:   There's no way he can answer that other

5    than to say true, Your Honor.   Unless he's just playing a game

6    with the government right now.

7              MS. BERNSTEIN:   Your Honor --

8              MR. DESALVO:   He said -- he said that he saw Sergeant

9    Bowen shoot into that concrete barrier.   He just said that that's

10   what Sergeant Bowen said.   And now he wants to say it's not true?

11             THE COURT:   I'm going to let him --

12             MR. MR. DESALVO:   I object to the question.

13             THE COURT:   I'm going to let him answer.

14             The jury will recall this witness's testimony as

15   compared to all other witness's testimony and be able to make an

16   evaluation.   We're going to ask the jury at the end of the trial

17   to make an evaluation as to credibility.   So they will be able to

18   factor all of this in to determine what they believe to be the

19   truth of the matter.

20             MS. BERNSTEIN:   And where does Mr. DeSalvo's testimony

21   fit in?   Can we have a reminder that that is not testimony?

22             THE COURT:   Let's have him answer the question and

23   finish this.

24   BY MS. BERNSTEIN:

25   Q    The question is when defendant Bowen gave his version during

1    that meeting, did you know based on your own observation whether

2    the statement he gave was true or false?

3    A    False.

4    Q    What was the purpose of that meeting that you all were having

5    in the abandoned building?

6    A    To get our stories straight.

7              MR. HESSLER:  Objection, Your Honor.  Calls for

8    speculation.

9              THE COURT:  He can testify as to what he understood.

10   What he understood.

11   BY MS. BERNSTEIN:

12   Q    What did you understand was the purpose of that meeting that

13   you all had in the abandoned building that day?

14   A    To make sure everybody's statements matched up.

15   Q    And, when you then went to give your statement, what did you

16   think that you were supposed to say?

17   A    I was supposed to come up with a justification for why I

18   fired my weapon at those people.

19   Q    Now, Mr. DeSalvo asked you yesterday about the section of the

20   video that shows you running behind defendant Gisevius and then

21   over to the other side.  And he decided yesterday not to play it,

22   but I'd like to play it.

23             MS. BERNSTEIN:  May have I have Exhibit 89H, please?

24             This is a new exhibit number.

25             Actually, before you put it up, Steven.

1        This is a new exhibit number, because we made a shorter

2  clip so that we don't have to run back and forth.  It's a clip

3  maybe a few seconds long.  Maybe 10 seconds.  Just of that period

4  in front of the truck.

5        THE COURT:  89H, we're going to call it?

6        MS. BERNSTEIN:  Yes, Your Honor.

7        THE COURT:  Any objection to the new exhibit, although

8  it's only a portion?

9        MR. HESSLER:  One second, Your Honor.

10        MR. FLEMING:  I'm going to object, just that we have not

11  had the opportunity to view it.  Based on Ms. Bernstein's word,

12  the jury has viewed the whole thing would moot that out.

13  However, out of courtesy, I would appreciate we be shown new

14  clips ahead of time so we don't have this issue.

15        THE COURT:  All right.  This will be 89H.  And let's try

16  to do that.  If we're going to use segments and re-label them as

17  exhibits, let's always try to show the other side before we take

18  them out here in court.

19        MS. BERNSTEIN:  May I have 89H, please?  What I want to

20  do, before you play it -- it's a very short clip -- I'm going to

21  have him play it once, and then I'm going to ask him a question.

22        MR. HESSLER:  Wait.  I thought we were going to see it

23  before -- whether or not we object.

24        THE COURT:  Let's do that then.  Go ahead and take a

25  look at it.

```
 1              (Pause in Proceedings.)

 2         THE COURT:  All right.  Counsel, any objection?

 3         MR. FLEMING:  No objection, Your Honor.

 4         MR. HESSLER:  We have viewed it, we have no objection.

 5         THE COURT:  All right.

 6         MS. BERNSTEIN:  May I have 89H, please.  Just play it

 7  one time through quickly, and then I'll ask a question.  With

 8  sound, please.

 9              (Videotape played.)

10  BY MS. BERNSTEIN:

11  Q   The second time through, I want you to tell me if at any

12  point in this video you crouch down and take cover behind

13  defendant Gisevius.

14         MR. FLEMING:  Judge, I'm going to object to the purpose

15  of playing the tape -- I'm going to object to playing the tape

16  for the purpose of that question.

17         THE COURT:  Well, it seems awfully redundant and an

18  investment of time that's not needed.  But since it's recross I'm

19  going to go ahead and do it.  But we need to be more conscious

20  and more respectful of our jury's time, please, counsel.

21         MS. BERNSTEIN:  Which is why we made the clip to make it

22  10 seconds.

23         THE COURT:  I think they've seen it quite a bit.  And

24  I'd have to agree that showing it again seems like an investment

25  of time that need not be made.
```

1      MS. BERNSTEIN:  We don't need it, Your Honor .

2      THE COURT:  I didn't think so.

3   BY MS. BERNSTEIN:

4   Q    Mr. DeSalvo asked you questions yesterday about movement over

5   on the passenger's side of the truck, and you said something

6   about a reflection.  I want to ask you follow-up questions on

7   that.  Is there a side view mirror on that Budget truck?

8   A    Yes, there is.

9   Q    On the passenger's side?

10  A    Yes, ma'am.

11  Q    Since you had been driving that truck, had you adjusted that

12  mirror or looked in it?

13  A    Yes, ma'am.

14  Q    What's the purpose of a side-view mirror?

15  A    To see on that side of vehicle.

16  Q    And, when you were driving that truck, what would you see out

17  of the side-view mirror?

18  A    A reflection of what was behind the truck.

19  Q    Would you have it set so you could see a car behind you?

20  A    Yes.

21  Q    How high is that the hood of a car?

22  A    Three feet maybe.

23  Q    So you had it set so you could see something maybe three

24  feet?

25      MR. FLEMING:  Objection, Judge.  Objection, leading.

1          MS. BERNSTEIN:  Again, following up on his answer.

2          THE COURT:  I'm going to overrule.  He can answer.

3   BY MS. BERNSTEIN:

4   Q   Did you have it set so you can see something three feet high?

5   A   Yeah.  There's actually two mirrors attached to the assembly.

6   There's one mirror that allows you to see the blind spot of the

7   truck and then there's a larger mirror that lets you see to the

8   rearview of what's behind the truck.

9   Q   Are you taller or shorter than three feet?

10  A   Taller.

11  Q   Is defendant Bowen taller or shorter than three feet?

12  A   Yes.

13  Q   Did Mr. DeSalvo also ask you whether the passenger side door

14  to the truck would have been between Bowen and the people on the

15  walkway while Bowen was in the truck.  Do you remember that?

16  A   Yes.

17  Q   Did that passenger side door on the truck have a window?

18  A   Yes, ma'am.

19  Q   Was the window open or closed?

20  A   Open.

21  Q   You were asked some questions about when Bowen started

22  shooting.  Now, when you started firing, you were still driving;

23  right?

24  A   Yes.

25  Q   Once you start firing and you were driving, where were you

1    looking?

2    A    Straight ahead.

3    Q    Were you looking at defendant Bowen?

4    A    No.

5    Q    Do you know where his gun was at that moment?

6    A    No, I don't.

7    Q    Do you know whether or not he was firing?

8    A    I don't believe so.

9    Q    Now, do you remember what you told the FBI on that point when

10   you talked to them for the very first time?

11   A    Vaguely.

12   Q    Would it help you remember if could you see the report of

13   that interview?

14   A    It might.

15        MS. BERNSTEIN:  May I approach, Your Honor?

16   BY MS. BERNSTEIN:

17   Q    There's a highlighted section that I'd like you to read just

18   to yourself, the pink highlight.

19        MR. DESALVO:  Your Honor, I think we should approach the

20   bench because the government's going to impeach their own

21   witness.

22        THE COURT:  Come on up.

23        (Sidebar conference.  Jury not present.)

24        MR. DESALVO:  He's said at least three times -- I'm

25   sorry.  Since I can't hear, I'm talking -- he said at least three

1    times in direct that Bowen fired after that truck was at a total

2    stop.  Now, there's a stipulated 302 -- you can read it -- that

3    she wanted to induce a prior consistent statement at this point.

4    But at this point, now to say what this witness said on direct

5    and on cross might be wrong in her redirect is totally improper.

6    She could introduce a prior consistent statement if we had

7    challenged that.  But to now come in and say:  Oh, you said

8    something different to us a long time ago than what you said

9    under oath today, that's impeachment.

10        THE COURT:  I think the jury can recall the testimony

11   that was given.  I mean, many of them are taking notes.  So I

12   think they can perceive -- I mean, he said in here, this said --

13   I'm reading from this exhibit here, the MAD exhibit, Hunter did

14   not know if Sergeant Bowen fired the rifle while the truck was

15   still moving.  Now, how that jives with the testimony he's given

16   on cross is something that I think the jury can --

17        MR. MR. DESALVO:  Also what he said on direct.  He said

18   it on direct with them.

19        THE COURT:  I understand that.

20        MR. DESALVO:  Because I was prepared for him to stay

21   that on direct.  And then, when he said it was stopped, I say

22   good.

23        MS. BERNSTEIN:  And the purpose of asking this is I

24   think he has said that he was not aware of Bowen firing until it

25   stopped, he has also said that he wasn't looking at Bowen.  And

1    so this is simply to clarify or give him a chance to clarify.

2         MR. DESALVO:  He said absolutely he did not fire until

3    they were stopped.

4         MS. BERNSTEIN:  I don't think he said absolutely.

5         THE COURT:  The jury's taking notes.  I think they can

6    recall the testimony and what weight if any to give to it.

7         Frankly, if he's all over the map, I think that he's not

8    going to be given much weight.

9         MR. DESALVO:  I would ask that we be allowed, if she's

10   introducing something new in her direct, that we be allowed to

11   recross.

12        THE COURT:  Once we start that, we'll be here the eight

13   weeks and then some.

14        You're going to introduce in evidence, or are you just

15   going to show him.

16        MS. BERNSTEIN:  No.  I was just going to ask him whether

17   that refreshes his memory as to what he told the FBI.

18        THE COURT:  I think he said he recalled vaguely.  I

19   think you need to ask him, first of all, directly what does he

20   remember.  If he's already said vaguely.  He might remember it a

21   different way.  He's testified on cross once.

22        MR. DESALVO:  Before you show him, you have to ask him

23   did he ever tell the FBI anything different than what he said

24   today.

25        THE COURT:  He did not say he did not remember.  He said

```
1   vaguely, was his word.
2           MS. BERNSTEIN:  I'll move on if I get a silver star for
3   it.
4           (Sidebar concluded.  Jury now present.)
5   BY MS. BERNSTEIN:
6   Q   Several of the attorneys yesterday and today asked about
7   statements you gave to the state grand jury.  Did you tell the
8   truth about the -- in the state grand jury?
9   A   No, ma'am.
10  Q   Were you still part of a cover-up?
11  A   Yes, ma'am.
12  Q   What were you covering up?
13  A   The fact that the shootings were unjustified.
14  Q   What was the false story, just in very general terms, what
15  was the false story that you told the grand jury.
16  A   That when we got there people started shooting at us and
17  we returned fire.
18  Q   Does your state grand jury testimony match what you've seed
19  here in court at this trial?
20  A   No.
21  Q   Why not?
22  A   Because I lied to them.
23  Q   Now, one of the attorneys asked you yesterday if your Factual
24  Basis contained the statement that you fired on the bridge to
25  send a message.  Does your Factual Basis that you signed in this
```

1   case contain every fact about what you know happened on the

2   bridge?

3   A   No, ma'am.

4   Q   Do you remember what if anything the Factual Basis itself

5   says about that topic?

6   A   Something to the effect that I fired -- I don't remember

7   exactly what it says about that.

8   Q   Would it help you remember if you could take a look at it?

9   A   Yes, ma'am.

10          MS. BERNSTEIN:  May I approach, Your Honor?

11      I'm showing the witness Exhibit 81, which has already been

12   identified as the Factual Basis in this case, and I'm directing

13   him to the last paragraph on page 12.

14   BY MS. BERNSTEIN:

15   Q   Read that to yourself.

16          (Pause in Proceedings.)

17   BY MS. BERNSTEIN:

18   Q   Does that help you remember?

19   A   Yes, ma'am.

20   Q   What does it say right in the Factual Basis about that topic?

21   A   That --

22          MR. FLEMING:  I'm going to object as to the improper

23   nature of that.  If the writing is used to refresh his memory, he

24   has to testify as to his memory is refreshed, not what the

25   writing says.

1            THE COURT:  Rephrase.

2            MS. BERNSTEIN:  Mr. Fleming is actually correct on that.

3  BY MS. BERNSTEIN:

4  Q   Reviewing that, what is your recollection as to what you said

5  when you gave your sworn statement about this case?

6  A   That the Factual Basis was a summary of information I

7  provided to the government.

8  Q   And what does it say --

9  A   It's a summary -- it summarizes enough of the facts to bring

10 the charges in front of the court.

11 Q   And does it say whether or not it contains all of the facts

12 that you know?

13 A   It says it does not.

14 Q   Now, you were asked yesterday and today about something

15 called a 302, and people came up and showed documents to you.

16 A   Yes, ma'am.

17 Q   What's your understanding of what a 302 is.

18           MR. FLEMING:  Objection.  As to what his understanding

19 as to what an FBI form is.

20           THE COURT:  We've spent more time talking about it.  I'm

21 going to sustain the objection.  302s are what they are.  You

22 know, he's already looked at them.  He's been asked about them

23 many times.  I'm going to sustain the objection.

24           MS. BERNSTEIN:  All right.

25 BY MS. BERNSTEIN:

1    Q    Those 302s that you were shown, did you write them?

2    A    No, ma'am.

3    Q    Were they transcripts of statements that you gave?

4    A    Yes, ma'am.

5    Q    They were transcripts?

6    A    Well, no.  I take that back.  They're, I guess, a transcript

7    of the notes taken by the agent.

8    Q    When you say transcript, what do you mean?  Do you mean a

9    word-for-word summary, or do you mean like a report?

10   A    Like I guess a report, a gist of what --

11           MR. HESSLER:  Your Honor, I've got to object.  I think

12   that's best left up to the FBI agent to explain how a 302 is

13   developed and the process used.  I think you said it best, it is

14   what it is.

15           THE COURT:  Well, he's been shown them.  It's not his

16   responsibility to draw them up.  I think he's already testified

17   to that.  Getting him to somehow explain an FBI procedure or what

18   an FBI document is supposed to do --

19           MS. BERNSTEIN:  That's not my intent.

20           THE COURT:  -- is improper.  So I'm going sustain the

21   objection.

22   BY MS. BERNSTEIN:

23   Q    Those 302s that you were shown, had you ever read them before

24   court?

25   A    That was one small portion I was showed a few days before my

```
 1    testimony started.

 2    Q    But, other than that small portion, you hadn't read them?

 3    A    No, ma'am.

 4    Q    All right.  Now, Mr. DeSalvo asked you yesterday -- showed

 5    you a video and asked you about some timing.  And I want to play

 6    that section of the video now continuously during the times he

 7    was asking about.

 8              MS. BERNSTEIN:  I think it's about a three minute

 9    section, Your Honor.  Defense counsel just looked at it.  It's

10    Exhibit 89I.  I'd like to offer it into evidence.

11              MR. FLEMING:  No objection from me, Judge.

12              THE COURT:  89-I is admitted.

13              (Exhibit admitted.)

14              MS. BERNSTEIN:  Steven, may I have 89, please.

15              (Videotape played.)

16              MS. BERNSTEIN:  If you could stop it after the last pow,

17    pow.

18              (Videotape played.)

19    BY MS. BERNSTEIN:

20    Q    What did you do right after the shooting?

21    A    I ran up the -- parallel to the concrete barrier.

22    Q    As you ran up to the concrete barrier, did you have the

23    AK-47?

24    A    No, ma'am.

25    Q    Where had you last seen it?
```

1    A    In the hands of Sergeant Bowen.

2    Q    All right.

3             MS. BERNSTEIN:  This is 9:9:59, for the record.  I'd

4    like to go one more second to 9:10 where Mr. DeSalvo stopped the

5    video.

6    BY MS. BERNSTEIN:

7    Q    Did you see yourself in that clip?

8    A    I've seen -- I can see myself where it's paused at now.

9    Q    Do we just miss it by a fraction of a second?

10   A    Yes.

11   Q    Is this approximately on the video where you identified

12   yourself able -- where you identified yourself through this

13   tower?

14   A    Yes.

15   Q    So that's one second after where I just paused it before.

16           At that point, did you have the AK-47?

17   A    No.

18   Q    All right.

19           MS. BERNSTEIN:  Now, I want to play continuously to the

20   next point where Mr. DeSalvo stopped it.

21           And, for the record, that was 9:10 where we just

22   stopped.

23           All right.  Play, please, Steven.

24           (Videotape played.)

25   BY MS. BERNSTEIN:

1    Q    Now, at that point where we just stopped it at 9:10, you said

2    you did not have the AK-47?

3    A    No ma'am.

4    Q    Had you been back to the truck yet at that point?

5    A    No, ma'am.

6              (Videotape played.)

7    BY MS. BERNSTEIN:

8    Q    During all this time when you're not on video, what are you

9    doing?

10   A    At some point during this time, I went back to the cab of the

11   truck and retrieved the AK-47.

12             (Videotape played.)

13             MS. BERNSTEIN:  Steven, I'd like you to stop it at

14   9:12:08 where Mr. DeSalvo stopped it.

15   BY MS. BERNSTEIN:

16   Q    And now that we're back to where you see yourself again;

17   right?

18   A    Yes.

19   Q    Mr. DeSalvo asked you yesterday whether you did all the

20   things you said you did in 23 seconds.  Did you?

21   A    Yes.

22   Q    How long was that break that we just looked at?

23   A    Almost two minutes.

24   Q    And what were you doing -- it was two minutes and eight

25   seconds, for the record.

1          What were you doing during the two minutes and eight

2    seconds?

3    A    During that time, I had retrieved the AK-47 from the cab of

4    the truck and just staying in the area of the truck.

5    Q    Mr. Fleming asked you yesterday about the state charges that

6    you faced and about how much time you were looking at.  How much

7    time were you -- first of all, what were the state charges?

8    A    Two counts of attempted first degree murder.

9    Q    And what did you say you thought you might be facing?

10   A    I don't recall what the statutes is, the statute penalty is

11   for that.

12   Q    A lot or a little?

13   A    It's a lot.

14   Q    What was Lance Madison charged with?

15   A    Seven counts of attempted first degree murder.

16   Q    Who were the victims of that alleged attempted murder?

17   A    The officers.

18   Q    Were you one of them?

19   A    I believe so.

20   Q    Did Lance Madison ever attempt to murder you?

21   A    No.

22          MS. BERNSTEIN:  Your Honor, may we have just one more

23   explanation to the jury about what's going on with the tape with

24   the black space?

25          THE COURT:  My understanding is that at some point the

1    entirety of the tape in real elapsed time is going to be shown to

2    the jury.  Meaning that it won't be just the video portions,

3    there will be some parts of the tape where you see the black

4    portion on the screen that is going to be elapsed time that was

5    not captured on the tape.  So that you can understand from the

6    beginning of the camera being started, with intervals where it's

7    not running, all the way until the very end of that tape.

8            Now, when that happens, what juncture during this trial,

9    remains to be worked out between counsel and the Court.

10           But, at some point, my understanding is that the

11   entirety of the tape with the real elapsed time is going to be

12   presented to the jury.

13           I don't know, Ms. Bernstein, if that's exactly what

14   you're talking about.  But we have thus far seen various portions

15   of the tape with and without elapsed time.  So -- is there a

16   particular issue with regard to this?

17           MS. BERNSTEIN:  No.  I think just that the black screen

18   means that the video was turned off for that amount of time.

19           THE COURT:  Well, I think that's represented by the

20   counter on the bottom, as I understand it.  Unless counsel

21   corrects me, that's my understanding of the counter on the bottom

22   of the screen.

23           MS. BERNSTEIN:  Yes.  Your Honor, the only clarification

24   was that the jury knows that that's not -- it's not that it's

25   something that's been cut out, it's is that it was turned off.

1          THE COURT:  Right.

2          MS. BERNSTEIN:  Okay.

3   BY MS. BERNSTEIN:

4   Q   One of these attorneys asked you about pressure you felt to

5   give your testimony.  I want to take you through some of your

6   statements.  When you gave your very first statement, that taped

7   statement to NOPD, did you feel any pressure?

8   A   Yes.

9   Q   What did you feel pressure to do?

10  A   To justify my actions on the bridge.

11  Q   By whom did you feel pressure?

12  A   All the officers involved.

13  Q   When you gave that statement, did you tell the truth?

14  A   No.

15         MR. FLEMING:  Your Honor, this has been asked and

16  answered ad nauseam.

17         MS. BERNSTEIN:  I'm asking specifically about pressure,

18  following up on cross examination.

19         THE COURT:  I'm going to let you go ahead and ask one

20  more question about it; but I think it has been covered not only

21  on cross but it was covered also on redirect.  I think you've

22  already asked him about this.

23         MS. BERNSTEIN:  About the pressure issue?

24         THE COURT:  Yes.

25  BY MS. BERNSTEIN:

1    Q    Let me ask about the grand jury.  I'm going to leave that

2    NOPD statement.  When you testified -- well, when you testified

3    in the state grand jury, did you feel any pressure on you?

4    A    Yes.

5    Q    What was the pressure you felt then?

6    A    To maintain the statements we gave, the cover-up.

7    Q    And did you tell the truth in the grand jury?

8    A    No.

9    Q    When the FBI came along, did you feel any pressure?

10   A    Yes.

11   Q    What was the pressure you felt at that time?

12   A    I was conflicted between maintaining the cover-up or finally

13   telling the truth.

14   Q    What did you do?

15   A    I came to the conclusion of telling the truth would be the

16   best option for myself and my family.

17   Q    Now, before the FBI came along, did you ever feel pressured

18   to tell the truth?

19   A    No.

20   Q    If it hadn't been for the pressure of the federal

21   investigation, would you ever have come forward?

22   A    Probably not.

23   Q    Now, Mr. DeSalvo asked you a question yesterday, he asked you

24   what you thought would happen if your truth was different from

25   the government's.  When you signed your Plea Agreement, had you

1    given any statement to the federal government yet?

2    A    No.

3    Q    But you had heard us out, you said; right?

4    A    Yes.

5    Q    Who did most of the talking in that meeting when you heard us

6    out?

7    A    You did, ma'am.

8    Q    Did I tell you who I thought had fired first?

9    A    Yes.

10   Q    Who was that?

11   A    You believed Sergeant Bowen fired out the window as the truck

12   was driving down the street.

13   Q    Now, after that, you signed your Plea Agreement; right?

14   A    Correct.

15   Q    And then you gave your very first statement to the FBI?

16   A    Yes.

17   Q    Did you tell the FBI at that point who fired first?

18   A    Yes.

19   Q    Who did you tell us fired first?

20   A    I corrected you, I told you it was me firing as the truck was

21   moving down the street.

22   Q    Did you think that made you look good or bad, to say that you

23   fired first?

24   A    Made me look bad.

25   Q    Then why did you tell us?

```
 1   A   Because it's the truth.

 2   Q   You could have just let us go on thinking it was defendant

 3   Bowen?

 4   A   I could have.

 5   Q   Why didn't you?

 6   A   Because that wasn't the truth.

 7           MS. BERNSTEIN:  Nothing further, Your Honor.

 8           THE COURT:  All right.

 9           MS. BERNSTEIN:  Thank you, Mr. Hunter.

10           THE COURT:  With regard to this witness, counsel --

11           MR. FLEMING:  Yes, Judge, we'd like him to remain

12   available and subject to the sequestration order.

13           THE COURT:  You're subject to the sequestration order.

14   You are not to discuss your testimony with anyone until the trial

15   is complete.  Do you understand that?

16           THE WITNESS:  Yes.

17           THE COURT:  We're going to go ahead and take our lunch

18   break.  It's 12:20.  We'll give you an hour and 10 minutes.  At

19   1:30, if you can be back, ready, we'll work through the

20   afternoon.

21           Please don't discuss the case among yourselves or with

22   anyone else.

23           (Jury Exits.)

24           THE COURT:  If you all would be seated.

25           You can step outside, sir.  Thank you.
```

1          With regard to the expert issue, I'm going to defer

2    ruling on the motion that was filed yesterday evening and which

3    was discussed yesterday afternoon.  I think I made my thoughts on

4    the concerns raised.  I think the motion that was filed pretty

5    much reflects the conversation that we had yesterday afternoon.

6    So I'm going to defer ruling on it.  I trust that counsel will be

7    guided by the comments that I made yesterday afternoon about my

8    concerns regarding the testimony and what I thought was fair game

9    and what is not fair game with regard to the experts.  So that's

10   one issue.

11         The other issue was the motion relative to the

12   handwritten notes of Agent Bezak with regard to this witness.

13         Is there a decision that Agent Bezak is going to testify

14   in this case?

15         MS. BERNSTEIN:  He will, Your Honor.

16         THE COURT:  Okay.  Is there a decision that he will

17   testify with regard to what was and was not written down with

18   regard to Mr. Hunter's interviews?

19         MS. BERNSTEIN:  Well, I think if there was -- for any

20   points where Mr. Hunter was questioned about something that is in

21   the a 302, if Mr. Hunter admitted that he made the statement to

22   the FBI, I think that's done.  If there were any statements that

23   he denied making to the FBI, then yes I agree that it's fair game

24   to question Agent Bezak about whether that statement was made.

25         THE COURT:  The question, though, is not just to ask him

1   about it; is to have the handwritten notes that he took while the

2   questioning took place.  If he is going to testify in support of

3   this witness's testimony about what was and what was not told,

4   and there are notes that are contemporaneous with that interview,

5   I think defense counsel should be provided with those handwritten

6   notes.

7           MS. BERNSTEIN:  Your Honor, since he's not going to be

8   testifying this week, may we have a chance to brief that?

9           THE COURT:  I think defense counsel would be entitled to

10  have those handwritten notes.  That's my answer.

11          MS. BERNSTEIN:  Okay.  Is that a no?

12          THE COURT:  That's precisely the case.

13          MS. BERNSTEIN:  Thank you, Your Honor.

14          THE COURT:  If he is going to testify that something was

15  or was not said, and if there are handwritten notes taken

16  contemporaneously -- and this is important for this witness for

17  all the reasons I think we got into both on cross and on

18  redirect -- then I think those notes become very, very important,

19  and defense counsel should have the opportunity to question Agent

20  Bezak on what he chose to write down or not write down insofar as

21  how it ultimately is reflected in the 302.  Because we did spend

22  a lot of time with the 302s.  In fact, just now on redirect,

23  because it was covered in cross, it was appropriate to cover it

24  on redirect the accuracy of the 302s and their purpose and their

25  usefulness in recounting a prior statement has now become very

1   important.  So the handwritten notes for this witness's 302s, Mr.

2   Hunter's 302s, should be turned over to defense counsel.

3   Assuming, based on the government's representation, that he is

4   going to be asked questions about what is and is not in the 302s

5   of Mr. Hunter.

6           MR. HESSLER:  And, Your Honor, I would ask that those

7   notes be made available to us at the earliest possible time to

8   give us meaningful opportunity to prepare.

9           THE COURT:  Do we have an idea of when Agent Bezak might

10  testify?

11          MS. BERNSTEIN:  Not before Wednesday of next week.

12  Wednesday or Thursday of next week is our best guess.

13          THE COURT:  Okay.  Can we get those to defense counsel

14  -- how voluminous are they?  Are we talking about tablets full of

15  information?

16          (Discussion held off the record.)

17          MS. BERNSTEIN:  Probably a total of one and a half

18  tablets.

19          THE COURT:  Can we get them by the close of business

20  tomorrow to defense counsel?

21          MS. BERNSTEIN:  Of course, Your Honor.

22          THE COURT:  All right.  Thank you.

23          Is there anything else that we need to cover on the

24  record at this time?

25          MS. BERNSTEIN:  Not for the government.

1           MR. FLEMING:  No, Judge.

2           THE COURT:  Counsel, if you all would approach.

3           (12:26 p.m., proceedings recessed for lunch.)

```
 1                        AFTERNOON SESSION

 2                            1:30 P.M.

 3              THE COURT:  You may be seated.

 4              TRACY HAAS, being first duly sworn, testified as

 5      follows:

 6              CASE MANAGER:  Thank you.  You may be seated.

 7              Please state and spell your full name for the record.

 8              THE WITNESS:  Tracy Haas T-R-A-C-Y last name H-A-A-S.

 9              THE COURT:  Mr. Carter, you may begin.

10              MR. CARTER:  Thank you, Your Honor.

11                         DIRECT EXAMINATION

12      BY MR. CARTER:

13      Q    Ms. Haas, were do you currently work?

14      A    Currently work with the Gretna Police Department.

15      Q    What do you do there?

16      A    Administrative assistant to the deputy chief of police.

17      Q    How long have you been there?

18      A    I've been there five years.

19      Q    Did you ever work for the New Orleans Police Department?

20      A    Yes, I have.

21      Q    When was that?

22      A    In late 2004, I started.  And I left in late 2006.

23      Q    What was your position with the New Orleans Police

24      Department?

25      A    Crime scene technician.
```

1   Q    And what is a crime scene technician?

2   A    Processes the scene to collect all the evidence.

3   Q    And how does one -- how does a crime scene technician process

4   a scene?

5   A    By taking photographs, any collection of evidence.

6   Q    Did you ever process the Danziger Bridge for the Danziger

7   Bridge shooting?

8   A    Yes.

9   Q    When was that?

10  A    In October, I was called out.

11  Q    October?

12       Let me hand you what's been marked the government

13  Exhibit 228.

14       MR. CARTER:  Permission to approach?

15       THE COURT:  Yes.

16  BY MR. CARTER:

17  Q    Can you identify that document?

18  A    This is my report from the scene.

19  Q    Did you prepare that?

20  A    Yes, I did.

21  Q    Why do you prepare those types of reports?

22  A    These type of reports are to show what evidence was collected

23  and any photographs that I had taken.

24       MR. CARTER:  Your Honor, I offer government Exhibit 228

25  into evidence.

```
1              THE COURT:  Any objection?

2              MR. LARSEN:  No, Your Honor.

3              THE COURT:  All right.  Admit Exhibit 228.

4              (Exhibit admitted.)

5   BY MR. CARTER:

6   Q    Let's put the first page of 228 up, please.

7              What is reflected on this document, Ms. Haas?

8   A    The date that it was prepared.

9   Q    When was it prepared?

10  A    It was prepared October 26, 2005 at 1:46 p.m.

11  Q    Do you know when the Danziger Bridge shooting occurred in

12  relation to when you prepared this document?

13  A    No, sir.

14  Q    Was it -- did the shooting occur on October 26, 2005?

15  A    No, sir.

16  Q    What's your understanding of when the shooting occurred?

17  A    I really couldn't tell you.  I was called out as a secondary

18  call to the scene.  It was called out as a 108, which is an

19  officer needs assistance.

20  Q    It was some time prior to October of 2005?

21  A    Correct.

22  Q    What happened when you got out to the scene?

23  A    To the scene, I started taking my photographs, overall

24  pictures of bridge, overall pictures of any evidence that I was

25  going to collect.  Laid down photo markers to mark which evidence
```

1    was laying down in the area.  And then collected my evidence.

2    Q   Who did you go to the scene with?

3    A   I met the detective there, which is Duguy.

4    Q   Duguy?

5    A   Yes.

6    Q   Let's just say Dugue.

7    A   Dugue.

8    Q   Anyone else?

9    A   No.  I had one other individual from the scene crime scene

10   that was helping me out.

11   Q   Who was that individual?

12   A   I don't recall.

13   Q   So there were three of you at the crime scene?

14   A   Yes.

15   Q   Was it Sergeant Dugue?

16   A   I don't recall.

17   Q   What did Mr. Dugue tell you to do?

18   A   To photograph the scene, collect any evidence.

19   Q   Did you do that?

20   A   Yes, I did.

21   Q   In what areas?

22   A   The areas of the bridge, I took photographs.  I collected

23   some evidence off of the bridge.  And then, on the side of the

24   bridge, there is a grassy area, to which casings were located.

25   Q   Were there any casings left on the bridge itself?

1    A    No, sir.

2    Q    What about in the walkway?

3    A    No, sir.

4    Q    How about the roadway?

5    A    No, sir.

6    Q    Where did you find casings?

7    A    In the grassy area, which is located the lower part on the

8    side of the bridge.

9    Q    Let me show you what's been marked government Exhibit 106.

10   Can you identify this photograph.

11   A    Yes.  This is an overall picture with the photo markers, the

12   photo markers locating the casings that were collected.

13           MR. CARTER:  Your Honor, I move government Exhibit 106

14   into evidence.

15           THE COURT:  Any objection to 106?

16           CASE MANAGER:  It's already been admitted, Judge.

17           MR. CARTER:  Saves time.

18           Let's put 106 up.

19   BY MR. CARTER:

20   Q    Now, again, Ms. Haas, what is this area?  What does this

21   photograph depict?

22   A    This photograph depicts photo markers of where casings were

23   located that I was about to collect.

24   Q    And all the photo markers and casings that you collected were

25   in this area?

1    A    Correct.

2    Q    What did you do with those casings when you collected them?

3    How did go about collecting them?

4    A    I collected each one of them.  I write down the time, the

5    item number and a description of where they were collected, by

6    which photo marker, and the type of casing that it was.

7    Q    And then what do you do with them?

8    A    Put them in each individually glassine, which is a small

9    little clear envelope, and sealed it.

10        MR. CARTER:  Your Honor, I'm going to show Ms. Haas a

11   bag that is marked government Exhibit No. 9.  Which unfortunately

12   I thought I had opened, and I had not.

13   BY MR. CARTER:

14   Q    Are you skilled in opening these?  I'll let you do it.

15        But, first, do you recognize anything about the outside

16   of that bag?

17   A    No, sir.

18   Q    Can you open that?

19   A    Um-hum.

20        (Pause in proceedings.)

21   BY MR. CARTER:

22   Q    What's inside that bag?

23   A    These are casings that were collected.

24   Q    Who collected them?

25   A    I did.

1    Q    Is there writing on those bags?

2    A    Yes, there is.

3    Q    Do you recognize the writing?

4    A    Yes.  That's my handwriting.

5    Q    You wrote that?

6    A    Yes.

7    Q    Those are casings you collected on October 26, 2005?

8    A    Yes.

9    Q    Did you take photographs of those casings?

10   A    Yes, I did.

11   Q    Let me ask you to generally look at --

12        MR. CARTER:  Your Honor, may I show the witness

13   approximately 27 photographs as a group that the defense has been

14   provided?

15        THE COURT:  They're numbered as what?

16        MR. CARTER:  229A through 229DD.

17        THE COURT:  All right.

18   BY MR. CARTER:

19   Q    And I'll hand you the entire stack and ask you if you could

20   thumb through these and if you can identify what these are

21   photographs of.

22        THE COURT:  Let her flip through those, and then I'll

23   ask you to put the microphone closer after you've flipped through

24   those.

25        (Pause in proceedings.)

 1   BY MR. CARTER:

 2   Q    Do you recognize those photographs?

 3   A    Yes.  These are photographs that I'd taken on the day that I

 4   processed the scene.  Yes.

 5        MR. CARTER:  Your Honor, I move exhibits 229A through

 6   229DD into evidence.

 7        THE COURT:  Any objection?

 8        MR. LARSEN:  No, Your Honor.

 9        THE COURT:  So ordered.

10        (Exhibits admitted.)

11   BY MR. CARTER:

12   Q    Let's go back to Exhibit No. 9, which contains some glassine

13   bags?

14   A    Yes.

15   Q    And, if I understand you correctly, you wrote the information

16   on the outside of those glassine bags?

17   A    Correct.

18   Q    Is there -- are those glassine bags at all referenced to a

19   marker, a photograph marker?

20   A    Yes, they are.

21   Q    Which -- let's look at that.  I believe photo marker 23 is in

22   that bag?

23   A    Yes, it is.

24        MR. CARTER:  Can I have photograph Exhibit 229I, please.

25   BY MR. CARTER:

1    Q    And this is in Exhibit 9?

2    A    Yes, it is.  It's a close-up of a casing collected by photo

3    marker 23.

4    Q    Which again is in that general area that we showed in No. 26?

5    A    Right.

6    Q    No. 26 is 229L.

7         Is this also in that bag, Exhibit 9?

8    A    Yes, it is.

9    Q    What's the next photo marker reference there?

10   A    On here, it's photo marker No. 26, one spent casing, unknown

11   caliber.

12   Q    Okay.  Let me just let you walk through the next glassine

13   bag.

14        What's the next glassine bag?

15   A    I'm trying to put them in order.

16        The next one is photo marker No. 31, one spent casing.

17        MR. CARTER:  Show that 229Q, please.

18   BY MR. CARTER:

19   Q    And what is that again?

20   A    One spent casing.

21   Q    And the next one?

22   A    Is photo marker No. 32.

23   Q    That would be R; Is that correct?

24   A    Yes.

25   Q    And the next one?

1    A    Should be photo marker No. 33.

2    Q    Which would be S; is that correct?

3    A    Yes, it is.

4    Q    Any more glassine bags?

5    A    Yes.  Photo marker No. 34, 37 and 40.

6    Q    Let's start with 34.  What is 34?

7    A    That's a spent casing, 31/94 spent casing.

8    Q    I believe that's 229 T, is photo marker 34.

9         What's the next photo marker you have there?

10   A    No. 37.

11   Q    37 would be W.

12   A    And that should be actually two spent casings because they

13   were both located in the same location so they were both packaged

14   together.

15   Q    So you collected two spent casings by photo marker 37?

16   A    Yes.

17   Q    Do you have any other glassine bags there?

18   A    There's one more.  Photo marker No. 40.  It's another spent

19   casing, unknown caliber.

20   Q    That would be Z.

21        And those are all contained within exhibit, the bag

22   marked Exhibit No. 9?

23   A    Yes.

24   Q    Which you collected?

25   A    Correct.

1  Q    Would you put those back into that bag, please.

2          MR. CARTER:  Your Honor, may I approach?

3          THE COURT:  Yes.

4  BY MR. CARTER:

5  Q    I hand you what's been marked government Exhibit 10.  Can you

6  identify that?

7  A    These are more spent casings that were collected.

8  Q    By whom?

9  A    By myself.

10 Q    Would you please take out the glassine bags.

11         Again, is that your handwriting on those bags?

12 A    Yes, it is.

13 Q    What's the first one you have?  What's the photo marker?

14 A    No. 4.

15 Q    What is No. 4?  That's Exhibit DD.  What is that?

16 A    That's another spent casing, 7.62 by 39.

17 Q    What's in the next glassine?

18 A    Photo marker No. 30.

19 Q    And what's that?

20 A    Spent casing.

21 Q    That would be P.  Another spent casing.

22         The next glassine.

23 A    Photo marker No. 35.

24 Q    And what is that?

25 A    Spent casing.

1   Q   I believe that would be U.  Exhibit U.  229U.  Spent casing.

2            Are there other glassines in there.

3   A   Yes.  There's three more.

4   Q   What's the next one?

5   A   Photo marker No. 36.

6   Q   What number?

7   A   36.

8   Q   And what is that?

9   A   Spent casing.

10  Q   I believe that would be the next one, V.

11           And, in this photo, it's right next to the marker?

12  A   Correct.

13  Q   What's the next bag?

14  A   Photo marker No. 38.

15  Q   229X.  3.

16           Can you point to where the shell casing is in this

17  photo?

18  A   If you look to the smaller 38, it's right below it underneath

19  the two blades.

20  Q   Can you touch the screen where it is.

21  A   (Witness complies.)

22  Q   Right there?

23  A   Um-hum.

24  Q   And that's photo marker No. 38?

25  A   Correct.

1    Q    Is there another glassine bag?

2    A    Yes.  Photo marker No. 39.

3    Q    And where is that?  Would you touch the screen?

4    A    (Witness complies.)

5    Q    Any other glassine bags in that bag marked government

6    exhibit?

7    A    No.  That's all.

8    Q    And you collected each of these?

9    A    Correct.

10   Q    And wrote on the glassine paper there?

11   A    Correct.  I wrote the time, the item number, the signal, the

12   date and the description of the spent casing.

13   Q    Put those back in the bag, please.

14        I'm sorry, I'm falling down on my job.  I didn't open

15   this one.

16        I hand you what's been marked government Exhibit 11.

17   Can you identify that?

18   A    These are spent casings.

19   Q    Do you recognize the markings -- are they glassine bags in

20   there?

21   A    Yes, there are.  There's two.

22   Q    Do you recognize the markings on those bags?

23   A    Yes, my handwriting.

24   Q    Your handwriting?

25        Those are also items you collected on the day you

1    processed the scene?

2    A    Yes.

3    Q    Okay.  Would you put those in order, please.

4         How many glassine bags are in there?

5    A    Two.

6    Q    What's the first one?

7    A    First one is photo marker 19.  It's a .40 Smith & Wesson

8    located by photo marker 19.

9    Q    That would be government Exhibit 229E.

10        Would you point to where the casing is?  I believe I see

11   it.

12   A    (Witness complies.)

13   Q    Thank you.

14        The next one.

15   A    Photo marker No. 27 is also a .40 Smith & Wesson spent

16   casing.

17   Q    I believe we can see that casing.

18        Any other glassine bags in that --

19   A    No.

20   Q    -- evidence bag?

21        Would you put that back in the bag, please.

22        I'll hand you what's been marked --

23        MR. CARTER:  I apologize for forgetting to ask may I

24   approach, but may I approach with these generally?

25        Thank you, Your Honor.

BY MR. CARTER:

Q   I hand you government Exhibit 12, ask you to look inside that bag.  What's in that bag?

A   These are shotgun shells that were collected.

Q   You collected?

A   Yes, I did.

Q   The writing on the bag, is it yours?

A   Yes.

Q   What do we have inside that bag?

A   Shotgun shell.  All of them are Remington.

Q   How many?

A   All of them are Remington shotgun shells.

Q   How many are in that bag?

A   Three.

Q   Three?

A   Um-hum.

Q   Are they by any particular photo marker?

A   Yes.

Q   Which ones?

A   The first one is photo marker No. 16.

Q   The next one?

A   Photo marker No. 17.

Q   And the next one?

A   Photo marker No. 18.

Q   Anything else in that bag?

1    A    No, sir.

2    Q    You can put those back in there.

3         I hand you what's been marked as government Exhibit

4    No. 13.  Ask that you open that bag and identify its contents.

5    A    This is another shotgun located by photo marker No. 15.

6    Q    Photo marker No. 15.

7         Is there anything else in that bag?

8    A    No, sir.

9    Q    And, again, you collected this shell?

10   A    Yes, sir.

11   Q    I'll hand you what's been marked government Exhibit No. 14.

12   Ask you to open that.

13   A    These are spent casings.

14   Q    Photo markers referenced?

15   A    Yes.

16   Q    Which photo markers are referenced?  Put them in order.

17   A    Photo marker No. 2.

18   Q    What is that?

19   A    Spent casing.

20   Q    What's the next one?

21   A    Photo marker No. 21.  Spent casing.

22   Q    The next one?

23   A    Photo marker No. 22.  Spent casing.

24   Q    And the next one?

25   A    Photo marker No. 24.

1   Q   And the next.

2   A   Photo marker No. 25.

3   Q   Anything else in that bag?

4   A   No, sir.

5   Q   I hold in my hand the last envelope.  I hand you what's been

6   marked government Exhibit 15.  What's inside?

7   A   Spent casings.

8   Q   Photo mark reference?

9   A   Yes.  Photo marker No. 1.

10  Q   What else?  Next?

11  A   Photo marker No. 20.

12  Q   Where is the casing?

13  A   The blue dot is hitting the bottom of it.

14  Q   Is it accurate to say that some are more obvious than others?

15  A   Yes.

16  Q   What's the next casing?

17  A   Photo marker No. 28.

18  Q   And where is the casing?

19  A   (Witness indicates.)

20  Q   Is there another one?

21  A   Photo marker No. 29.

22  Q   Any other casings in that bag?

23  A   No, sir.

24  Q   Let's return to government Exhibit 106, please.  And, again,

25  if I understand you correctly, all of these were collected in

 1    this area as shown on government's Exhibit 106?

 2    A    Correct.

 3    Q    What did you do with these items after you collected them?

 4    A    After I collected and finished processing the scene, I went

 5    and submitted them to Central Evidence and Property.

 6    Q    I believe there was -- if I count correctly -- 30 shell

 7    casings?

 8    A    Yes.  30 spent casings.

 9    Q    Would you refer to your report to verify that.

10            (Pause in proceedings.)

11            THE WITNESS:  You want me to count them through the

12    report, or do you have the report --

13            MR. CARTER:  You have my copy.

14            Let's put 228 on the board.

15    BY MR. CARTER:

16    Q    Are these shell casings referenced on your report?

17    A    Yes, they are.  By time which they were collected.

18    Q    Beginning where?  Walk us to where they are on this first

19    page.

20    A    206.

21    Q    Would you point to that on the screen?

22    A    I put a blue dot underneath it.

23    Q    That begins at photo marker No. 15, which you've seen the

24    photo of?

25    A    Correct.

1   Q   And we go through 16, 17, 18.  Next page, please.  All the

2   way through to photo marker 40?

3   A   Yes.  And 40 is on the third page.

4   Q   Next page, please.

5       Did you find any weapon out there that day?

6   A   No, sir.

7   Q   Did you make any reference to any weapons out there that day?

8   A   Yes, sir.

9   Q   What reference was that?

10  A   It was a photo taken with a photo marker of which I was told

11  by Detective Dugue that a possible gun was located.

12  Q   And is that referenced in your report anywhere?

13  A   Yes, it is.

14  Q   Where is it referenced?  Which page of your report?

15  A   It's actually on the photo log, which is photo log page 4,

16  roll frame roll 3, picture 5.

17  Q   And where are you referring to?

18  A   Page 4.

19  Q   Would you touch where you're referring to?

20  A   A little bit before that, 3-5.

21  Q   Start over.

22  A   Sorry.

23  Q   Where is it?

24  A   (Witness indicates.)

25  Q   Close-up of possible gun location located by yellow photo

1    marker?

2    A    Yes, sir.

3    Q    And was that in the area that we looked at in government

4    Exhibit 106?

5    A    Yes.   That was in the overall area of where the casings were

6    located.

7    Q    What did you do with these items once you collected them?

8    A    I collected them and returned them to Central Evidence and

9    Property.

10   Q    What is Central Evidence and Property?

11   A    That is where all evidence is turned in and properly stored.

12   Q    And who stores it there?

13   A    That's the New Orleans Police Department storage area for any

14   property that has to go for further investigation.

15   Q    Let me hand you what's been marked government Exhibit 229CC.

16   I hand you what's been marked government Exhibit 229CC.   What

17   does that depict?

18   A    That's the overall picture of photo marker No. 3.

19          MR. CARTER:   If it's not already moved in evidence, I

20   move it into evidence.   I believe it is already in evidence with

21   the other photographs.

22          THE COURT:   I think A through DD are all in evidence.

23          MR. CARTER:   Yes.

24   BY MR. CARTER:

25   Q    And, again, that's all in the area shown on --

1    A    Correct, with the casings.

2    Q    -- Exhibit 106.

3         I hand you what's been marked as Exhibit 230 and ask you

4    to identify this.

5    A    This is the report from Central Evidence and Property showing

6    that they received the evidence from me.

7         MR. CARTER:  Your Honor, move government Exhibit 230

8    into evidence.

9         THE COURT:  Any objection?

10        MR. LARSON:  No objection, Your Honor.

11        THE COURT:  So ordered.

12        (Exhibit admitted.)

13        MR. CARTER:  Exhibit 230, please.

14   BY MR. CARTER:

15   Q    Did you take any part in preparing this document?

16   A    This is the evidence that was turned in to Central Evidence

17   and Property, and they type out what you have turned in.  As you

18   can see, I had to make a correction where it's scratched out of

19   18 and marked 26.

20   Q    Where is the correction?

21   A    (Witness indicates.)

22   Q    And, that 26, is that your handwriting?

23   A    Yes, it is.

24   Q    And the rest of that at the bottom, the other handwriting, is

25   that yours?

1    A    No.   That's the Central Evidence and Property clerk.

2    Q    Let's go to the top of that form.   It has, next to your name,

3    Officer T. Haas, there's a number.   What is that number?

4    A    That number is my call number.

5    Q    Is that the same as a badge number?

6    A    Yes.

7    Q    So that's your badge number or your call number?

8    A    Correct.

9    Q    6158?

10   A    Yes.

11   Q    And did you collect anything other than casings out there

12   that day?

13   A    I collected one knitted hat, one Louisiana driver's license

14   to Larone Germane Morris, and two possible blood samples.   And

15   one Sprint Sanyo phone.

16   Q    And are those referenced on this CEP report?

17   A    Yes, it is.

18   Q    Where are they referenced?

19   A    The first one is referenced as 322703, one knitted hat.

20            The second one is the Louisiana ID card.

21            The third one references two possible blood samples.

22            No. 4 is the four shotgun shells that were collected.

23            No. 5 is the 26 spent casings.

24   Q    Next page, please.

25   A    And No. 6 is one Sprint Sanyo phone.

1    Q    And, again, these were all related to the Danziger Bridge

2    shooting?

3    A    Yes, sir.

4    Q    What was the purpose of documenting where the gun was

5    located?

6    A    That was given to me by the detective who told me that and

7    wanted a photograph of that area.

8    Q    Would that detective be Mr. Dugue that you referred to

9    earlier?

10   A    Yes, sir, it was.

11   Q    Were you documenting any other crime while you were out there

12   that day?

13   A    No, sir.

14   Q    Only the Danziger shooting?

15   A    Yes, sir.

16            MR. CARTER:  One moment, Your Honor.

17            (Pause in proceedings.)

18   BY MR. CARTER:

19   Q    Did you ever go across the bridge and process the scene at

20   the Friendly Inn?

21   A    No, sir.  I had walked that way.  They had told me that they

22   had an incident in that area but no evidence was found.

23   Q    When you say you walked that way, for what purpose did you

24   walk that way?

25   A    To go over the bridge to photograph the bridge.

1   Q   Did you ever go to the Friendly Inn to photograph the

2   Friendly Inn?

3   A   No, sir.

4   Q   Why not?

5   A   They didn't say that they wanted it photographed or

6   processed.  They just said that this was just an area where it

7   ended.

8   Q   Who told you to process or not process the Friendly Inn?

9   A   Detective Dugue.

10  Q   And what did he tell you about the Friendly Inn?

11  A   He didn't really reference anything about the Friendly Inn.

12  He said that some of it took place here but there was no evidence

13  to collect.

14  Q   At the Friendly Inn?

15  A   Correct.

16  Q   He told you there was no evidence to collect?

17  A   Yes.

18      MR. CARTER:  Your Honor, at this time I offer into

19  evidence government's Exhibits 9, 10, 11, 12 and 15.

20      THE COURT:  Exhibits 9, 10, 11, 12, and 15.  Any

21  objection?

22      MR. LARSON:  No, Your Honor.

23      MR. CARTER:  9, 10, 11, 12, 13, 14, 15.

24      THE COURT:  I thought maybe you were throwing me a curve

25  ball.  So it's 9 through 15.

```
1              MR. CARTER:  9 through 15 consecutive.

2              THE COURT:  Any objection?

3              MR. LARSON:  No, Your Honor.

4              MR. DeSALVO:  No.

5              THE COURT:  So ordered, 9 through 15 are admitted.

6              (Exhibits admitted.)

7              THE COURT:  All right, Mr. Larson.

8                           CROSS EXAMINATION

9   BY MR. LARSON:

10  Q   Good afternoon, Ms. Haas.  My name is Lindsay Larson, I

11  represent Robert Faulcon.

12              Let's talk about your position with the crime lab.  How

13  long had you been a crime lab technician?

14  A   Two years.

15  Q   What kind of training do you have?

16  A   Training, I had 8 years as a ride-along with the Jefferson

17  Parish Coroner's Office.  I was also currently at Loyola

18  University working on my bachelor of Criminal Justice with a

19  minor in Forensic Science, which I had my commencement ceremony

20  this past May.  I have four classes left to finish.

21  Q   So you had worked in the New Orleans crime lab for two years

22  prior to October of 2005?

23  A   Correct.

24  Q   About how many crime scenes have you processed?

25  A   Plenty.  Well over 50.
```

1    Q    And when is a crime lab normally called out?

2    A    Crime lab could be called out from anything minor to someone

3    breaking a window on a car to a possible homicide.

4    Q    And, in relation to the alleged crime, when is the crime lab

5    normally called out?

6    A    When the incident takes place.

7    Q    Now, on August 29th of 2005, the day the Hurricane Katrina

8    hit New Orleans, where were you physically located?

9    A    I was physically located in two separate locations.  First

10   started off at the New Orleans Crime Lab, which water was coming

11   in, so we then moved to the New Orleans Police Department

12   headquarters.

13   Q    And did the police department headquarters take water as

14   well?

15   A    Yes, it did.  I moved to the broad street overpass for three

16   hours.  Then went down to the New Orleans convention center.  And

17   then, after a few hours there, we then moved into the Marriott on

18   the third floor.

19   Q    When did you -- I take it, during this time, you didn't

20   really have a functioning crime lab?

21   A    No.  We lost everything.

22   Q    And when did you first have a functioning crime lab after

23   Hurricane Katrina, if you can recall the date?

24   A    I don't recall the date.  It was awhile.

25   Q    On September 4th of 2005, was there an operating crime lab?

1   A   No, sir.

2   Q   And that's why you didn't go out until October 26th, some

3   seven weeks later, to process the scene; correct?

4   A   Correct.

5   Q   And that's very unusual, isn't it, to go to a crime scene for

6   the first time seven weeks later?

7   A   Correct.

8   Q   And what problems would you encounter in going to a crime

9   scene seven weeks after the alleged commission of a crime?

10   A   They may have some lost evidence.  I wasn't -- like I said, I

11   wasn't called to the original call.  I was called out as a

12   secondary call to it.

13   Q   And I take it that, in that seven week period, it's certainly

14   possible that evidence can be picked up and moved?

15   A   Its possible.

16   Q   Other evidence that wasn't there could somehow be -- I say

17   evidence, I'm talking about objects that you retrieved, could

18   have been placed there at some point in time after the alleged

19   date of the alleged incident; correct?

20   A   Correct.

21   Q   Seven weeks expire.

22        Now, you indicate on your report that the site was not

23   gridded; is that the correct -- am I pronouncing that correctly?

24   If you look in the upper right hand.

25   A   That's just something that's automatically put on to the

1   report in the system.  I didn't put that on there.

2   Q    Do you know what that means?

3   A    That means that like sifting the mud, shifting through the

4   mud for other evidence.

5   Q    Archeological digs where they have the little strings and the

6   squares?

7   A    Right.

8   Q    You all didn't do that there?

9   A    No, sir.

10  Q    Where was the crime lab located on August the -- I'm sorry --

11  October 26, 2005 when you went out there?

12  A    At the Royal Sonesta Hotel.

13  Q    And how long had it been functioning prior to you going out

14  there on that date, if you can remember?

15  A    I am can't really remember, because I processed a few scenes

16  after the hurricane.

17         MR. LARSON:  Can we pull us, please, government's

18  Exhibit 106?

19  BY MR. LARSON:

20  Q    Now, you indicated that you collected the various items from

21  this particular grassy area to the left of the Danziger Bridge?

22  A    Yes, sir.

23  Q    And that's a pretty big area; would you agree?

24  A    Yes, sir.

25  Q    Did you -- do we have a photograph of where you found each

1    and every item?

2    A    Yes.

3    Q    A photograph like this that would have the little cones so we

4    could see in this particular dimension here where these items

5    were found?  I ask you that, because, looking at the other

6    photographs you took, the close-ups of casings or whatever, all

7    you can see is grass and the casings and your little cones.  You

8    really don't know -- you really can't tell where they were found

9    in reference to the Danziger Bridge; can you?

10   A    No, sir.

11   Q    Are you able to tell us today where you found each and every

12   item in referencing this picture?

13   A    No.  Just the grassy area on the side of the bridge.

14   Q    So you don't know if you found the bullet casing here, or

15   where the gun was over there, or a shotgun shell here, or a knit

16   hat over here?  You're not able to tell us exactly where they

17   were found?

18   A    The photo markings reference where the shell casings were

19   found.  The knit hat was actually found on the bridge.

20   Q    I'm sorry, the photo markers?

21   A    Correct.  The numbers with the photo markers.

22   Q    On Exhibit 106?

23   A    Um-hum.  You can see photo marker No. 4 is right there.

24   Q    I see, I see.  I'm sorry.

25             And we have some over here as well?

1   A    Correct.

2   Q    So these are markers where you found various items.  But we

3   don't know exactly which items they were from looking at this

4   photograph?

5   A    From looking at that photograph, no, sir.  The photo marker

6   number is what relates to the item found.

7   Q    Okay.  And we -- and you can make out some photo markers but

8   not all photo markers?

9   A    Correct.  That's why they have the close-ups with the photo

10  marker.

11  Q    Sure.  All right.

12           In looking at the items that you found, you, on the

13  shell casings, you identify them by certain caliber or by -- I'm

14  not sure what some of this means.  But how were you able to

15  identify specific shell casings as specific caliber.

16  A    On the back of the shell casings, it's clearly marked.

17  Q    And do you know --

18  A    If it wasn't, it was put as unknown caliber.

19  Q    And do you know what type of weapons fire these caliber guns?

20  A    No, sir.

21  Q    You don't, okay.

22           Do you know what a Remington Express 9 PEL-OOBK shell

23  is?

24  A    It's a buckshot.  I believe the 9 resembles the beads that

25  are in the buckshot.  I'm not sure, I'm not a ballistics expert.

1    Q    Do you know if 9 is different than 00?

2    A    No, sir.  I don't.

3    Q    You don't know.

4         But these were different types of shotgun shells that

5    you found.  They weren't the some type of shotgun shells;

6    correct?

7    A    Correct.

8    Q    And, on photo marker 20, you indicate one spent casing of

9    unknown caliber.

10   A    Correct.

11   Q    You couldn't match that to the other caliber shells that you

12   retrieved that day?  Like, if you retrieved a 7.62 times or by 39

13   Wolf spent casing, you couldn't compare that --

14   A    No, sir.  If it's not marked on the casing, I don't write

15   that down.  Because, like I said, I'm not a ballistic expert and

16   I'm not going to say that a caliber is the same as this caliber

17   just because they look the same.

18   Q    So as far as you're concerned, this is an unknown caliber,

19   not a caliber that you would put down on your report when you

20   identified it; correct?

21   A    Yes.

22   Q    How many of those unknown calibers were there?

23   A    Two.

24   Q    And do you know, if we look at photo marker No. 23 on page 2,

25   says one 31/94 spent casing.  Do you know what a 31/94 spent

1    casing is?

2    A    No, sir, I do not.

3    Q    You don't know what gun that would go in?

4    A    No, sir.

5    Q    I also wanted to ask you, you have the photo markers -- you

6    have items that you picked up and the times that you picked up;

7    right?

8    A    Correct.

9    Q    So we can tell which items you picked up first and then the

10   next item you pick up and the next item you picked up based on

11   the time you have on your report?

12   A    Correct.

13   Q    But I note that the photo markers are not sequential?

14   A    No, they're not.

15   Q    Like, you picked up the knit hat at 1:45, and that was the

16   second item you picked up, but it's marker No. 11.

17   A    Correct.

18   Q    And, if you go to page 3, the second to last item you picked

19   up was a 223 spent casing, and that's located by photo marker No.

20   2.  Can you tell us why they're not -- why you wouldn't have

21   first thing you picked up No. 1, second thing up picked up --

22   A    I had a mixture of different cones with numbers due to the

23   fact that a fire extinguisher exploded in the trunk of the

24   vehicle.  So I had to call out another crime scene investigator

25   to bring me more photo markers.  So that's why they're not in

1    order, nor the same color.

2    Q    Because you didn't have those number?

3    A    Correct.

4    Q    Because of fire extinguisher?

5    A    Because, if I would have put them out, they would have been

6    covered, the numbers would have been covered by the fire

7    extinguisher.

8    Q    Right.

9         I notice that the report that has items that you picked

10   up dated October 26th of 2005, says administrative worksheet for

11   Site 1 prepared by yourself; correct?

12   A    Correct.

13   Q    You have first person present Detective Dugue.  And then you

14   also referenced a photographing log.

15   A    Yes.

16   Q    Did you take the photographs in that photographic log?

17   A    Yes, sir, I did.

18   Q    Because the one that I'm looking at -- maybe I don't have the

19   right one -- is dated the next day, October 27th.  And it says US

20   Department of Justice, Federal Bureau of Investigation.  Am I

21   looking at a different photo log from yours?

22   A    I don't know what yours looks like.

23        MR. LARSON:  May I approach, Your Honor?

24        THE WITNESS:  At the top, you mean Federal Bureau of

25   Investigation?

 1          THE COURT:  Go ahead and bring it up.

 2    BY MR. LARSON:

 3    Q    Two questions.  Why were these photos taken the next day, as

 4    opposed to the day that you went out initially to the scene?

 5    A    They weren't taken the next day.  They were taken at the

 6    initial scene.  The computer would automatically put the date and

 7    on this it was the Federal Bureau of Investigations' program they

 8    had actually let the New Orleans Police Department use due to the

 9    fact we lost all of our programming, so you couldn't change the

10    date.  It automatically puts in the date, and that's why it has

11    Federal Bureau of Investigation at the top, because it was

12    actually their program that we were utilizing at the time.

13    Q    So the feds weren't out there taking pictures with you?

14    A    No, sir.

15    Q    That was you?

16    A    Correct.

17    Q    And the date was the next day because of the way the program

18    worked?

19    A    Correct.

20    Q    Who was team No. 1?  Says --

21    A    Like I said, the photo taken in that area, that was already

22    in the program and something that we couldn't change because we

23    were just utilizing the program.

24    Q    So team No. 1 would be automatically on that?

25    A    Correct.

1   Q   And, when you were out there and you were taking photographs,

2   I notice you were taking strike marks of photographs on the guard

3   rail.  Did you ever try to line up any of the guardrail strike

4   marks with any strike marks on the inside of the concrete

5   barrier?  By inside, I say, if you are -- you're looking up the

6   Danziger Bridge this way, and to the right is that walkway.  And

7   there's a guardrail and the outside, and then there are --

8   there's that concrete barrier where the walkway is.  Okay?  Did

9   you ever take any pictures or try to line up strike marks on the

10  outside guardrail with bullet marks on the inside of the concrete

11  barrier?

12  A   No, sir.

13  Q   In other words, between the guardrail and the concrete

14  barrier, strike marks there, and then match them up with strike

15  marks from the guard rail?

16  A   No, sir.

17          MR. LARSON:  All right.  Your Honor, I don't have any

18  more questions for Ms. Haas.

19          Thank you very much.

20          Tender the witness.

21          MR. CARTER:  Redirect, Your Honor?

22          THE COURT:  Let's see if there's any further cross.

23                      CROSS EXAMINATION

24  BY MR. DeSALVO:

25  Q   I'm Frank DeSalvo.

1    A    Hi.

2    Q    I've got I'd say a couple of questions, but it's three.

3         There's a drainage section on the bridge.  Did you check

4    the drainage section for any spent casings or any other evidence?

5    A    No, sir.

6    Q    Did you check the top of the bridge, the very top side of the

7    bridge or the east side of the bridge?

8    A    Which side do you mean by east?  I'm not good with north or

9    south.

10   Q    The side going away from the city, going toward Mississippi.

11   A    I had walked up the bridge taking photographs and looking for

12   evidence.

13   Q    And you didn't diagram it?

14   A    No, sir.  It wasn't requested.

15        A diagram is only requested when there is a homicide.

16   And I was not told this was a homicide, I was told this was a

17   single 108, which is an officer needs assistance.  So I did not

18   know that this was a murder.

19        MR. DeSALVO:  Then I have no more questions.  Thank you.

20        THE COURT:  Anybody else?

21        MR. HESSLER:  Yes, Your Honor.

22                    CROSS EXAMINATION

23   BY MR. HESSLER:

24   Q    Afternoon, Ms. Haas.  My name is Eric Hessler.  I'm

25   representing Sergeant Gisevius.  Do you know Sergeant Gisevius?

1   A    No, sir.

2   Q    Was this the first and only time the crime lab had gone out

3   to that location, to your knowledge, to process the scene?

4   A    I'm not really sure.  I was called in as a second call.

5   Q    What does that mean?

6   A    A 1018 is a request to go back out to a scene.  So I don't

7   know if somebody processed the scene before me.

8   Q    Is it fair to state that you can only do what is requested of

9   you?

10   A    Yes, sir.

11   Q    Now, did you stay through Katrina?

12   A    Yes, I did.

13   Q    There was no scenes to process though?  I mean, there might

14   have been scenes, but you all weren't called out to process them?

15   A    No, sir.  Once the winds were a certain speed and the water

16   took on, we weren't allowed to go out.

17   Q    And then, in the subsequent days after Katrina, like on this

18   date, you weren't called out to any scenes; were you?

19   A    On what date?

20   Q    On September 4th.

21   A    No, sir.

22   Q    Were you called to any scenes?

23   A    No, sir.  Crime lab was down, we had no communications, we

24   had no radios.  After they set up an area for the boats to go and

25   rescue people at Harrah's Casino, I was sitting at the Harrah's

1    Casino for awhile.

2    Q    How long after September 4th did the crime lab become

3    operational where you went on scenes?

4    A    I don't remember how long after.

5    Q    Would it be fair to say that this was one of the first scenes

6    that you responded to?

7    A    No, sir, it's not.

8    Q    You had responded to others?

9    A    Yes, sir.

10   Q    And were these scenes, were they cold scenes, were they old

11   scenes?

12   A    They were old scenes with bodies in them.

13   Q    With bodies in them?

14   A    Um-hum.

15   Q    Okay.

16   A    To where someone passed away in the house and they went into

17   the house and found the body to make sure it wasn't a murder.

18        MR. HESSLER:  Could you bring up Exhibit 106, please?

19   BY MR. HESSLER:

20   Q    Now, you know how, if you touch the screen, you can do magic

21   with it?  You can make boxes and stuff like that.

22        Could you outline on this, on this figure this, picture,

23   the area that you searched.

24   A    The area that I searched?

25   Q    Yeah.

1    A    I walked from the start of the bridge to the end of the

2    bridge, to the water.

3    Q    Okay.  So that would be all that way?

4    A    Correct.  And out to the road, this way.

5    Q    Okay.  And you did it with who?

6    A    With one of the other crime scene techs, I don't remember

7    which one it was.

8    Q    How long were you out there?

9    A    Couple hours.

10   Q    This actually depicts the scene as it was that day?

11   A    Correct.

12   Q    Grass debris and everything else.

13        Did you have metal detectors?

14   A    No, sir.

15   Q    Typically, and oftentimes, it's common that the NOPD on a

16   crime scene search would actually use metal detectors to locate

17   evidence; right?

18   A    We didn't have any equipment.

19   Q    That certainly would have made your job a heck of a lot

20   easier?

21   A    It would have.

22   Q    Especially looking for casings?

23   A    Correct.

24   Q    So -- and maybe it's the lighting, but this area here looks

25   like it's more or less, certainly less -- I don't know if that's

1    a word -- less grassy than this area up in here?

2    A    Correct.

3    Q    So this area up in here would have been a lot harder to

4    search for certainly objects such as casings and things like

5    that?

6    A    Yes.

7    Q    Now, under this area, did you notice that there are in fact

8    drain spouts to allow debris and water to be swept off of the

9    bridge?

10    A    Yes, sir.

11    Q    Did you photograph any of those?

12    A    No, sir.

13    Q    Did you come to any conclusion how these casings may have

14    ended up at the bottom the bridge?

15    A    No, sir.

16    Q    And are you the type of crime scene technician that can do

17    reconstructive type things, like stick rods in bullet holes and

18    follow the trajectories and match them up to strike marks and

19    things like that?

20    A    Now I can.

21    Q    At that point obviously --

22    A    No, I couldn't.

23    Q    What about the other person with you?

24    A    No.  We would call out a specialist for that.

25    Q    Were you asked to do that?

```
 1    A    No, sir.

 2    Q    Did you see Sergeant Gisevius out there that day?

 3    A    I don't remember.  I don't recall the face.

 4    Q    Did you see anybody else, any other police officers besides

 5    you, Dugue?

 6    A    That was it.  They had a couple other officers blocking the

 7    bridge for the safety.

 8    Q    But, on a typical crime scene, like on a typical 108 or a

 9    crime scene, you wouldn't have the persons out there walking

10    around, pointing things out?

11    A    No, sir.

12    Q    Now, Mr. Carter referred you to a casing that had 9,

13    something 9 written on it.  Or I think, actually, both Mr. Carter

14    and Mr. Larson did.  Do you have that item in front of you?

15    A    I'm trying to think which one it was.  Was it a casing, or

16    was it shotgun?

17    Q    I believe it was -- I don't know.  I think it's -- I think

18    you referred to it as a shotgun shell.

19              Actually, if you'd go to your log, it should be

20    reflected on the log.  It was a Remington 9, something like that.

21    A    Right.  Remington 9 PEL--OOPK.

22    Q    Can you find that thing for me?  That casing?

23              MR. HESSLER:  Your Honor, may I approach?

24              THE COURT:  Yes.

25    BY MR. HESSLER:
```

1   Q    Is that it?

2   A    Yes, it is.

3   Q    Could you pull that out of there for me?

4        And that is a shotgun shell?

5   A    Correct.

6   Q    And you found how many of those?

7   A    Four.

8        And, as you can see on the grain, it says 9 PEL-OOPK

9   Remington.

10  Q    And you found some unknown type calibers?

11  A    Correct.

12  Q    And none of these -- you have no idea what weapons fired

13  them?

14  A    No, sir.  That would have been to be a ballistics question.

15  Q    You have no idea when they were ejected or left in that area?

16  A    No, sir.

17  Q    Now, we've talked about all this area, the whole entire area.

18  And you put cones by things you didn't find; correct?

19  A    Put cones by things I didn't find, yes.

20  Q    And things you did find?

21  A    Yes, that I did find.

22  Q    Certainly, just because there were no cones out in grassy

23  areas doesn't mean there weren't things to be located?

24  A    Correct.

25  Q    You just did the best with your limited --

1   A   With my eyes, correct.

2   Q   Did you notice -- and I'm going to draw a line on the inside

3   of this upper -- the interior side of the concrete barrier.  Did

4   you notice strike marks?

5   A   No, sir.  It was way higher than me.

6   Q   So, even looking up -- you walked up there; right?

7   A   I walked up there, yes.

8   Q   You actually look photographs of bullet strike marks on

9   various pieces of the metal railing?

10  A   Yes.

11  Q   My question is, did you notice or did you look for strike

12  marks that would have been indicated that not only did that

13  bullet hit that railing but its path continued to where it struck

14  the north side of that barricade?

15  A   On the outside?

16  Q   Yes, ma'am.

17  A   No, sir.

18  Q   What about areas down here, did you check for or photograph

19  or notice any strike marks at the bottom of the lower part of the

20  bridge?

21  A   No, sir, I did not notice any.

22  Q   That doesn't mean they weren't there?

23  A   Correct.

24          MR. HESSLER:  Thank you.

25          THE COURT:  All right.

1          Anybody else?

2          Redirect, Mr. Carter?

3          MR. CARTER:  Yes, Your Honor.

4                    REDIRECT EXAMINATION

5   BY MR. CARTER:

6   Q   You were just asked about strike marks.  You took photographs

7   of every strike mark that you saw; is that correct?

8   A   Correct.

9   Q   So, if you didn't take a photograph of this area, why is

10  that?

11  A   Of what area?

12  Q   Did you take a photograph of this area?

13  A   Just the overall picture.

14  Q   Anything specific?

15  A   The markers where the casings were located.

16  Q   But not of this area itself?

17  A   No.  Not any close-ups.

18  Q   Why not?

19  A   I didn't see anything.

20  Q   Did you look?

21  A   And it was actually kind of high.  And for me to actually see

22  on the opposite side of guardrail, I'd probably have to hang off

23  the side.

24  Q   Did anybody direct you to look for strike marks there?

25  A   No, sir.

1   Q    You mentioned going out to body scenes.

2   A    Yes.

3   Q    When was the first body scene?  When after Hurricane Katrina

4   did you go?

5   A    After the water had receded in Lakeview.

6   Q    Do you remember a date?

7   A    No, I don't.

8   Q    You also mentioned that nobody told you this was a murder

9   scene.  Who would normally tell you that this was a murder scene?

10  A    The detective and the signal reference to the item number.

11  The item number that I was given, which is on my report, J as in

12  John 5938-05.  The signal was a 1018 on a 108.  And a 108 is

13  officer needs assistance.

14  Q    And nobody referenced a murder?

15  A    No, sir.

16  Q    Were you asked about the fact that you processed this scene

17  seven weeks after the shooting.  Did you decide when you would

18  process this scene?

19  A    No, sir.  I was just called.

20  Q    Do you decide when you will process any scene?

21  A    No, sir.

22  Q    Who decides that?

23  A    The detective bureau.

24  Q    And who directed you to process this screen?

25  A    That was actually called over the radio for me to return to

1    that scene to process evidence.

2    Q    If you had been directed to process this scene sooner, would

3    you have done so?

4    A    Yes.

5    Q    If you had been directed to process the Friendly Inn, what

6    would you have done?

7    A    Processed it.

8            MR. CARTER:  I have nothing further.

9            THE COURT:  All right.  Thank you.

10           Thank you, ma'am.  You can step down.

11           THE WITNESS:  Do you want me to leave this evidence up

12    here?

13           THE COURT:  You can leave that.

14           MR. CARTER:  If I understand correctly, you would like

15    us to keep possession of those items?

16           THE COURT:  Why don't you all go ahead and hang on to

17    those in case we need them later during the course of trial.  And

18    of course we will need them when we gather the evidence at the

19    conclusion.

20           MR. CARTER:  And I will hand to the Court its copies of

21    Exhibit 228, 230, the official copies and the photographs.  Yes.

22           THE COURT:  Counsel, this witness is released?

23           MR. FLEMING:  She can be released, Judge.

24           THE COURT:  Thank you.

25           Next.

1          MS. CHUNG:  The government calls Zina Daranda.

2          ZINA Daranda, being first duly sworn, testified as

3    follows:

4          CASE MANAGER:  You may be seated.  Please state and

5    spell your full name for the record.

6          THE WITNESS:  Zina Hammond Daranda Z-I-N-A H-A-M-M-O-N-D

7    D-A-R-A-N-D-A.

8                         DIRECT EXAMINATION

9    BY MS. CHUNG:

10   Q    Good afternoon.

11   A    Good afternoon.

12   Q    Ms. Daranda, where do you currently work?

13   A    Central Evidence Property Division, New Orleans Police

14   Department.

15   Q    Is that often call CEP?

16   A    Yes.

17   Q    What is your position there?

18   A    I'm police tech specialist.

19   Q    Can you tell us what generally goes on at CEP?

20   A    We take in evidence or property.  We release evidence or

21   property.  We store the evidence, and the property also.

22   Q    And what do you do as a specialist?

23   A    I'm a relief person.

24   Q    How long have you worked there?

25   A    13 years.

1    Q   Are you familiar with the way that CEP keeps and stores

2    evidence and makes records of that?

3    A   Yes.

4    Q   And do you regularly keep and make records in the course of

5    your work there?

6    A   Yes.

7    Q   I'm showing you what's marked for identification as

8    Exhibit 260.

9              THE COURT:  260, is it?

10             MS. CHUNG:  Yes, Your Honor.

11   BY MS. CHUNG:

12   Q   Ignoring my handwriting on there, do you recognize

13   Exhibit 260?

14   A   Yes.

15   Q   What is it?

16   A   It's a receipt that's given to the officers when they run in

17   the evidence or property.

18   Q   And that's a receipt issued by CEP?

19   A   Yes.

20   Q   And are all the entries in that receipt made in the regular

21   course of CEP business?

22   A   Yes.

23   Q   And are the entries made by the person who is receiving the

24   evidence at the time they are receiving the evidence?

25   A   Yes.

```
 1   Q    And it's their duty, it's their job, to do that; is that

 2   right?

 3   A    Yes.

 4             MS. BERNSTEIN:  I'd offer that exhibit, Your Honor.

 5             THE COURT:  Any objection?

 6             MR. HESSLER:  No objection.

 7             MR. FLEMING:  Can I see that again?  I'm concerned about

 8   Ms. Chung's comments about her handwritten notes on the exhibit.

 9             MS. CHUNG:  I'm not going to put it up.

10             MR. FLEMING:  You are not offering to publish?

11             THE COURT:  We should not have counsel's notes on an

12   otherwise acceptable exhibit.

13             Is that your only objection.

14             MR. FLEMING:  Yes.  That's my only objection, Judge.

15             THE COURT:  Sure.

16             MR. FLEMING:  It's my understanding we're not seeking to

17   publish this particular copy?

18             MS. CHUNG:  I was just making it clear that I was not

19   asking the witness to talk about my little notes.

20             THE COURT:  If there's no other objection to 260, we'll

21   admit it; but we need to admit a copy that doesn't have counsel's

22   remarks.

23             260 is admitted.

24             (Exhibit admitted.)

25   BY MS. CHUNG:
```

1   Q   Ms. Daranda, what date was this evidence turned in?

2   A   It was turned in on January 25, 2006.

3   Q   Can you show where the record indicates that date?

4   A   (Witness indicates.)

5   Q   I see it says:  Date confiscated.  Is there another place on

6   this receipt that shows when it was turned in?

7   A   Yes.  It's at the top up here.

8   Q   By whom was this evidence turned in?

9   A   E. Colmenero.

10  Q   Where do you see that?

11  A   (Witness indicates.)

12  Q   Does it show which unit Colmenero works for?

13  A   Yes, Homicide Unit.

14  Q   What date was the evidence confiscated?

15  A   It was confiscated on 1/25/2006.

16  Q   From where?

17  A   10101 Dwyer Road.

18  Q   Do you know what 10101 Dwyer Road is?

19  A   Yes.  That's the Seventh District.

20  Q   Looking at the first item provided on the page, what is that?

21  A   That's a Glock handgun, model 22, serial No. N01396PD, black,

22  belonging to police officer Michael Hunter.

23  Q   Showing you what has been marked for identification as

24  Exhibit 7.

25          THE COURT:  Counsel, make sure you all, so that everyone

```
 1   can hear, try to be around the microphone when you say something

 2   so that we can pick it all up and everyone else can hear.

 3              MS. CHUNG:  Yes, Your Honor.

 4              THE COURT:  The witness as well.  Sometimes it drops off

 5   when you move away from the podium.

 6   BY MS. CHUNG:

 7   Q   Ms. Daranda, these guns, when they're taken, they're rendered

 8   safe?

 9   A   Yes.

10   Q   They have --

11   A   Yes.

12   Q   -- everything removed from them that could --

13   A   Yes.

14   Q   -- render them dangerous?

15              Could you check the serial number on that?

16   A   NO1396PD.

17   Q   Does that match item No. 1 on Exhibit 260?

18   A   Yes, ma'am.

19              MS. CHUNG:  I would offer Exhibit 7 into evidence, Your

20   Honor.

21              THE COURT:  Any objection?

22              MR. FLEMING:  No objection, Judge.

23              THE COURT:  So ordered, Exhibit 7 is admitted.

24              (Exhibit admitted.)

25   BY MS. CHUNG:
```

1    Q    I would now direct your attention to item number, ma'am, No.

2    2.  What is item No. 2?

3    A    Item No. 2 is also a Glock handgun, model 22, serial number

4    11 -- NO1164PD.

5    Q    Sorry, I think you're reading three.  If I could have you --

6    A    Okay.  Sorry.

7         It's Glock handgun, model 22, serial number NO1737PD,

8    black in color, belonging to police officer Ignatius Hills.

9    Q    I'm showing you what has been marked for identification as

10   Exhibit 6.  What is the serial number on Exhibit 6?

11   A    NO1737PD.

12   Q    So does it match item 2 in this document?

13   A    Yes, ma'am.

14        MS. CHUNG:  I would offer that.

15        THE COURT:  Any objection?

16        MR. FLEMING:  No objection, Judge.

17        THE COURT:  Exhibit 6 is admitted.

18        (Exhibit admitted.)

19        MS. CHUNG:  May I have a blowup of item 6, please?

20   BY MS. CHUNG:

21   Q    Could you tell us what item 3 is?

22   A    Glock handgun, model 22, serial number NO1164PD, black in

23   color, belonging to Sergeant Kenneth Bowen.

24   Q    Showing you what is marked for identification as Exhibit 3.

25   What is the serial number on Exhibit 3?

 1   A     NO1164PD.

 2           MS. CHUNG:  I would offer Exhibit 3, Your Honor.

 3           MR. FLEMING:  No objection.

 4           THE COURT:  So ordered.

 5           (Exhibit admitted.)

 6           MS. CHUNG:  Could I have a blowup of item 4, please.

 7   BY MS. CHUNG:

 8   Q     Could you tell us what item 4 is?

 9   A     A Mossberg model 500A, 126A, serial No. R244788, black.

10   Q     And I'd like to show you what's been marked for

11   identification as Exhibit 4.  Could you tell us the serial number

12   of Exhibit 4.

13   A     R244788.

14   Q     And does that match item No. 4 for the receipt?

15   A     Yes, ma'am.

16           MS. CHUNG:  I would offer Exhibit No. 4.

17           THE COURT:  Any objection?

18           MR. FLEMING:  No objection.

19           THE COURT:  So ordered.

20           (Exhibit admitted.)

21           MS. CHUNG:  May I have a blowup of No. 5?

22   BY MS. CHUNG:

23   Q     Could you tell us what No. 5 is, please?

24   A     An AK-47 black rifle, 7 by 62 by 39, serial number

25   S173830-2003, made in Romania, Police Officer Michael Hunter.

1    Q    And showing you what is marked for identification as

2    Exhibit 2.  What is the serial number on Exhibit 2?

3    A    S173330-2003.

4    Q    I'd ask you, could you look at that middle number a little

5    more carefully?  I know you're squinting a little bit.

6    A    Yeah.  I can't see.  I can't see it.  7 -- 738.  S1738302003.

7              MS. CHUNG:  And, Your Honor, I would offer -- I'm sorry.

8    BY MS. CHUNG:

9    Q    Does that match the item No. 5?

10   A    Yes.

11             MS. CHUNG:  And I'd offer that, Your Honor.

12             THE COURT:  Any objection?

13             MR. FLEMING:  No objection.

14             THE COURT:  So ordered.

15             (Exhibit admitted.)

16             MS. CHUNG:  May I have the next page, please?  Could I

17   have item 6 blown up, please?

18   BY MS. CHUNG:

19   Q    Could you tell us what item No. 6 is.

20   A    AK-47, 7 by 62 by 39, black, serial number CAI09138, Police

21   Officer Anthony Villavaso.

22   Q    And showing you what's marked for ID as Exhibit 1, could you

23   tell us the serial number on Exhibit 1.

24   A    Yes.  CAI09138.

25   Q    And does it match the item listed in No. 6?

```
 1    A    Yes, ma'am.

 2              MS. CHUNG:  I would offer that, Your Honor.

 3              MR. FLEMING:  No objection.

 4              THE COURT:  So ordered.

 5              (Exhibit admitted.)

 6              MS. CHUNG:  May I have a blow-up of item 7?

 7    BY MS. CHUNG:

 8    Q    Could you tell us what is in item 7?

 9    A    A Remington R, model 870, 12 gauge shotgun, black, serial No.

10    D979303, Police Officer Robert Barrios.

11    Q    And I'm showing you what's marked for identification as

12    Exhibit 5.  Could you tell us the serial number on Exhibit 5?

13    A    D979303M.

14    Q    Does that match the serial number in item 7?

15    A    Yes.

16              MS. CHUNG:  I would offer that, Your Honor.

17              MR. FLEMING:  No objection.

18              THE COURT:  So ordered.

19              (Exhibit admitted.)

20              THE COURT:  That's Exhibit 5?

21              MS. CHUNG:  7.  Sorry.  5.  Sorry, Your Honor.

22              May I have what's in evidence as Exhibit 105?

23              Could you blow up the top portion a little bit?

24    BY MS. CHUNG:

25    Q    Do you recognize Exhibit 105?
```

```
 1   A    Yes.

 2   Q    What is it?

 3   A    It's a receipt that's given to officers.

 4   Q    So it's the same kind of document that 260 was?

 5   A    Yes.

 6   Q    What is the one item listed on Exhibit 105?

 7   A    One blue steel Colt 357 Mk.III revolver.

 8   Q    And what date was this evidence confiscated?

 9   A    It was confiscated on September 05, 2005.

10   Q    Where do you see that information on Exhibit 105?

11   A    (Witness indicates.)

12   Q    And by whom was it confiscated?

13   A    A. Kaufman.

14   Q    And could you tell us where it was confiscated from?

15   A    Chef and Downman.

16   Q    And are there any comments?

17   A    Yes.  They have:  Confiscated from scene, police shooting,

18   Danziger Bridge.

19   Q    What date was the evidence turned in?

20   A    It was turned in on October 11, 2000 -- no -- October 1,

21   2005.

22        MS. CHUNG:  Can we blow up this?

23   BY MS. CHUNG:

24   Q    What date was this item turned in?

25   A    October 11, 2005.
```

```
 1    Q    Could you see it better now that it was --
 2    A    Yes.
 3    Q    -- magnified?
 4    A    Yes.
 5              MS. CHUNG:  Thank you, Tim.
 6    BY MS. CHUNG:
 7    Q    I'd like to show you what's marked for identification as
 8    Exhibit 8.  What serial number is on Exhibit 8?
 9    A    84044J.
10              MS. CHUNG:  I'm sorry, could I have 105 up again?
11    BY MS. CHUNG:
12    Q    Is that the same serial number as the item listed in 105?
13    A    Yes.
14              MS. CHUNG:  I would offer that, Your Honor.
15              MR. FLEMING:  No objection.
16              THE COURT:  So ordered.
17              (Exhibit admitted.)
18    BY MS. CHUNG:
19    Q    Specialist Daranda, could you tell us who was the suspect
20    that this gun is affiliated with?
21    A    Lance Madison.
22              MS. CHUNG:  Thank you, Your Honor.  I have no further
23    questions.
24              THE COURT:  Thank you.
25              Cross?  Anybody?
```

```
 1              MR. FLEMING:  I don't have any questions from that of

 2    Mr. Faulcon, Your Honor.

 3              THE COURT:  Anybody else?

 4              MR. LONDON:  I do.

 5                         CROSS EXAMINATION

 6    BY MR. LONDON:

 7    Q    Good morning, Ms. Daranda.

 8    A    Good afternoon.

 9    Q    My name is Steve London, I represent Archie Kaufman.

10              MR. LONDON:  If we could put 105 back up, please.

11    BY MR. LONDON:

12    Q    Can you see that, ma'am?

13    A    Yes.

14    Q    Now, this form -- I can't point on here -- this indicates

15    right here -- if you could blow up this area, blow the whole

16    thing up -- where it says:  Comments, confiscated from the scene.

17    A    Yes.

18    Q    Do you see that?

19    A    Yes.

20    Q    That would indicate to you that this weapon is taken from the

21    scene?

22    A    Yes.

23    Q    That could be the Danziger Bridge?

24    A    Yes.

25    Q    Because that's the scene of the police shooting?
```

1   A    Yes.

2   Q    It does not tell that you it was taken off of Lance Madison;

3   correct?

4   A    Right.

5            MR. LONDON:  No further questions.  Thank you, Judge.

6            THE COURT:  Anybody else on cross?

7            Any redirect, Ms. Chung?

8            MS. CHUNG:  No, Your Honor.

9            THE COURT:  Thank you, ma'am.  You may step down.

10           This witness is released.  Thank you.

11           Okay.  Let's see if we can get another witness in before

12   we take our afternoon break.

13           MS. BERNSTEIN:  The United States calls Jacque Madison

14   Brown.

15           JACQUELYN MADISON BROWN, being first duly sworn,

16   testified as follows:

17           CASE MANAGER:  You may be seated.

18           Please state and spell your full name for the record.

19           THE WITNESS:  Jacqueline Madison Brown.  Jacquelyn

20   Kasuko Madison Brown, J-A-C-Q-U-E-L-Y-N, my middle is

21   K-A-S-U-K-O, my maiden name was Madison, M-A-D-I-S-O-N, and my

22   last name Brown, B-R-O-W-N.

23                       DIRECT EXAMINATION

24   BY MS. BERNSTEIN:

25   Q    Good afternoon, Ms. Brown.

1    A    Good afternoon.

2    Q    Could you please introduce yourself to the jury.

3    A    My name is Jacquelyn Madison Brown, and I am the sister of

4    Lance Madison and Ronald Madison.

5    Q    Did you grow up here in New Orleans?

6    A    Yes, I did.

7    Q    What part of the city did you grow up in?

8    A    New Orleans East.

9    Q    Can you tell us a little bit about yourself now, what do you

10   do for a living?

11   A    I am a registered nurse.  I am Q coordinator for in-patient

12   dialysis unit with Pacific Medical Center.  We, right now,

13   perform services at Tulane Medical Center and Lakeside Tulane

14   Hospital.

15   Q    You said you're a registered nurse?

16   A    Yes.

17   Q    That job that you mentioned, administration coordinator?

18   A    Q coordinator.

19   Q    Are you functioning as a registered nurse, or administrator,

20   or both?

21   A    As administrator and registered nurse both.

22   Q    How long have you worked at Tulane hospital?

23   A    I started back at Tulane after the hurricane in 2006.  I

24   worked there previously in 2000 -- I'm sorry, in 1984.

25   Q    Do you still live in New Orleans?

1   A   Yes, I do.

2   Q   What part of the city do you live in now?

3   A   Still in New Orleans East area.

4   Q   I want to talk to you about when you were growing up.  When

5   you were growing, how many living brothers and sisters did you

6   have?

7   A   Pretty much eight of us.

8   Q   Did your parents live together?

9   A   Yes, they did.

10  Q   What did your dad do for a living?

11  A   He was a retired Army sergeant.

12  Q   He was with the US Army?

13  A   Yes, he was.

14  Q   How many years did he serve with the Army?

15  A   22 years.

16  Q   Is your dad still living?

17  A   No.  He's deceased.

18  Q   How about your mom, did she work or was she outside of the

19  home, or did she stay home with the kids?

20  A   She was a home-maker.  She stayed home with the kids.

21  Q   Is your mother still alive?

22  A   Yes, she is.

23  Q   Where does she live now?

24  A   On the west bank.

25  Q   I want you to tell us a little bit about your siblings.  If

```
 1   you can start with the oldest of your living siblings from when

 2   you were young.  By that, I mean -- did you also have some

 3   siblings who died at an early age?

 4   A   Yes, I did.

 5   Q   So I want to talk about the siblings that you grew up with.

 6   Who is oldest of that group?

 7   A   Dr. Romell Madison.

 8   Q   How old is Dr. Madison?

 9   A   He's 58.  He should have made 59 just recently.

10   Q   You called him Doctor.  What kind of doctor is he?

11   A   He's dentist.

12   Q   Does he work here in New Orleans?

13   A   Yes, he does.

14   Q   Where is his office?

15   A   He has one in Gentilly, which is on the west side of the

16   Danziger Bridge.  And he has one that's on the west bank on Terry

17   Parkway.

18   Q   You said he has one on the west side of the Danziger Bridge.

19   How close is that office to the bridge?

20   A   Right at the bottom of the bridge.

21   Q   How long has Dr. Madison had that office there?

22   A   Since in the '80s.  In probably the late '80s.

23   Q   So how long has he been a dentist here in New Orleans?

24   A   Since probably the mid-'80s, early '80s.

25   Q   So that's somewhere going on 30 years?
```

1   A   Yes.

2   Q   Who is the next sibling, going down from oldest to youngest?

3   A   Lance Madison.

4   Q   How old is Lance?

5   A   Lance is 55, should be 56 come September.

6   Q   In 2005, at the time of Hurricane Katrina, what did Lance do

7   for a living?

8   A   He worked for the Federal Express.

9   Q   How long had Lance worked for Federal Express, do you know?

10  A   Approximately 25 years.

11  Q   Who is the next sibling?

12  A   Myself.

13  Q   Did you have a sister in between who is dead now?

14  A   Yes, I did.

15  Q   What was her name?

16  A   Barbara Madison Woodfork.

17  Q   How old was Barbara when she died?

18  A   21.

19  Q   Was she working, or in school?

20  A   She was in college at the time.

21  Q   Was she married at the time she died?

22  A   Yes, she was.

23  Q   What was Barbara's husband name?

24  A   Mandrel Woodfork.

25  Q   What did he do for a living?

1    A    He was NOPD.  New Orleans police officer.

2    Q    And you mentioned that you were the next one down under the

3    next oldest after Barbara?

4    A    It was myself.  Then it was my sister, Lauren Humphries.

5    Lauren Madison Humphries.

6    Q    What does Lauren do for a living?

7    A    She's an engineer.

8    Q    Where does she work?

9    A    She works for an engineering firm here in the city.

10   Q    Who is the next sibling in order after Lorna?

11   A    My brother Ronald.  Ronald Madison.

12   Q    Is Ronald still alive?

13   A    Ronald's deceased.

14   Q    Did Ronald die on the Danziger Bridge after Katrina?

15   A    Yes.

16   Q    How old was Ronald when he died?

17   A    40.

18   Q    Was Ronald a typical 40 year old?

19   A    No.  He was not.  He was mentally retarded.

20   Q    Who is the next sibling in line?

21   A    Raymond Madison.

22   Q    How old is Raymond?

23   A    Approximately 43 right now.

24   Q    What's Raymond like?

25   A    Raymond, he also is mentally retarded.

1   Q   And did you have one more sibling?

2   A   Yep.  Theodore Madison.

3   Q   Is he still alive?

4   A   No, he's deceased.

5   Q   What happened to -- did you call him Teddy?

6   A   Yes.

7   Q   What happened to Teddy?

8   A   He died in a car accident.

9   Q   How old was he?

10  A   17.

11  Q   All right.  I want to focus your attention now to the end of

12  August 2005 when Hurricane Katrina was moving in toward the city.

13  At that time, how many of your siblings were still living?

14  A   It was six of us.

15  Q   Would you consider your family close?

16  A   Yes, we were very close.

17  Q   Back in 2005, right before the storm, where did you live,

18  what part of the city?

19  A   In New Orleans East.

20  Q   Where did your mom live?

21  A   In New Orleans East.

22  Q   By that time, was your father already deceased?

23  A   Yes, he was.

24  Q   Who all did your mom live with?

25  A   She lived with my brothers Raymond and Ronald.

Q    And those were the two brothers you mentioned, I think you

referred to them as mentally retarded?

A    Yes.

Q    How did you all in the family refer to Ronald and Raymond?

A    They didn't like the word mentally retarded, so we always

said they had special needs.

Q    Did you refer to them as the boys?

A    Yes, we did.

Q    Did you use that term for them even when they were full grown

men?

A    Yes.

Q    How often, at that time right before Hurricane Katrina, how

often would you go by your mom's place and see your mom and the

boys?

A    Just about every day.

Q    I'm sorry?

A    Every day.

Q    Were you working at the time?

A    Yes, I was.

Q    So you would go either before or after work?

A    Sometimes before, but mainly at the end of the day each day.

Because it was on my way home from work, and I would stop there

just to check on them to make sure she didn't need anything.

Q    And you mentioned earlier, when I asked you how you referred

to Ronald and Raymond, you said you would not use the word retard

1    in front of them?

2    A    Yes.

3    Q    Why was that?

4    A    Because they wanted to feel as though they were normal like

5    everyone else, and they didn't like the word mentally retarded.

6    Q    So you used the term special needs?

7    A    Yes.

8    Q    I want to focus on Ronald.  Can you tell us just a little bit

9    about what you mean when you say he was special needs?

10   A    Ronald would always need someone to care for him.  He would

11   not be able to live on his own.  We would have to take him in for

12   various appointments, doctor's appointments.  Or if they had to

13   take and go for any other type of activity or to go to school.

14   Q    When Ronald was young, did he go to school?

15   A    Yes, he did.

16   Q    Did he go to a regular school?

17   A    He went to public school that had a special education

18   department.

19   Q    Okay.  So it was like a special program within a regular

20   school?

21   A    Yes.

22   Q    Did Ronald finish that program?

23   A    Yes, he did.  He graduated.

24   Q    He graduated from it?

25   A    Yes.

1    Q    How proud was he when he graduated?

2    A    He was very proud.  Because he felt proud of himself for

3    making an accomplishment.  And we were all proud of him as well.

4    Q    Now, you said that Ronald couldn't live on his own.  Did he

5    live with your mom his whole life?

6    A    Yes, he did.

7    Q    Did Ronald ever go out anywhere on his own?

8    A    Never.  Well, he would maybe just ride his bike around the

9    block.  But he would always be monitored.  Like my mom or my dad,

10   when he was living, he would sit outside, or we would just wait

11   for him to come back around because we knew it took about

12   five minutes just to make the block and to come back around.

13   Q    Was that true even when he was an adult?

14   A    Yes.

15   Q    Even when he was a grown man?

16   A    Yes.

17   Q    Would he ever -- would you ever like send him off to the

18   store by himself?

19   A    Never.

20   Q    I want to just get a feel for what Ronald could and couldn't

21   do.  Were there chores around the house, for example, that he

22   might be able to help your mom with?

23   A    Yes, he did.  He would help like fold the clothing and put

24   them away.  He would take and maintain his room.  Help keeping

25   his room straight, his bed made.  And also like maybe help

1    washing my mom's car.

2    Q    Could Ronald talk?

3    A    He could, but not make like full-full complete sentences.

4    But he still could express himself somewhat we could understand

5    him.

6    Q    Could you give us just a very quick example of how Ronald

7    would express himself, how he would talk?

8    A    Like he would say, if I came in the morning and all, you

9    know, he would open the door and all, he would smile and greet me

10   and he would hug me.  Or he'd say, if he wanted a CD or tape, he

11   would say:  Jacque, buy my this, buy my this.  Or he would say --

12   he would say what my mother may have cooked for the day.  Like,

13   on Friday, we would gather together, the family, and like eat

14   maybe gumbo, and he'd said:  She cooked gumbo, she cooked gumbo.

15   Q    How did you the rest of you all treat Ronald?

16   A    We were very protective of him.  Very, very protective and

17   pampered them.

18   Q    Did anybody help your mom take care of him?

19   A    We all did.  We all did, growing up.

20   Q    How about when he was older?

21   A    We all still did.

22   Q    Who are you referring to when you say we all helped?

23   A    Like my brother Lance.  He would like help get him to the

24   doctor's appointments.  Or maybe take them exercising.  When he

25   couldn't go, I would take them, or my sister Lauren.  She would

1   maybe take them to the store if she had to get something for

2   them.  You know, we just all helped out, like getting things that

3   they needed and took care of them.

4   Q   When you're talking about them right now, you're talking

5   about both of the boys, Ronald and Raymond?

6   A   Yes.

7   Q   At the time of Hurricane Katrina, so I want to focus you on

8   2005, who all lived in your mom's house?

9   A   My mom, Raymond and Ronald.

10  Q   Just the three of them?

11  A   Yes.

12  Q   Did they have any pets?

13  A   Yes, they did.

14  Q   What kind of pets did they have?

15  A   They had two small dachshund dogs.

16  Q   What were those dogs names?

17  A   Bobby and Sushi.

18  Q   Who took care of the dogs?

19  A   Primarily Ronald.  They were his dogs.  And my mom's, you

20  know, dogs as well, but he was the primary caretaker of the dogs.

21  Q   What was beyond Ronald's relationship with those dogs?

22  A   He loved them.  He felt like he was being responsible in

23  doing a responsibility as a young adult or as a child.

24          MS. BERNSTEIN:  May I approach, Your Honor?

25          THE COURT:  Yes.

1        MS. BERNSTEIN:  I'm handing Ms. Brown what's been marked

2  as Exhibits 91, 92, 93 and 94.

3  BY MS. BERNSTEIN:

4  Q   Ms. Brown, would you just take a quick look at those and tell

5  me if you recognize the photographs.

6        (Pause in proceedings.)

7  BY MS. BERNSTEIN:

8  A   Yes.

9  Q   Are those all photographs of your brother Ronald?

10  A   Yes.

11        MS. BERNSTEIN:  Your Honor, I'd like to offer into

12  evidence 91, 92, 93, and 94.

13        THE COURT:  Any objection?

14        MR. FLEMING:  No objection, Judge.

15        THE COURT:  So ordered.

16        (Exhibits admitted.)

17        MS. BERNSTEIN:  May I have Exhibit 91 up, please.

18  BY MS. BERNSTEIN:

19  Q   Can you tell us what's that a picture of, Ms. Brown?

20  A   That's a picture of Ronald.

21  Q   Is that his graduation?

22  A   (Witness nods head.)

23        MS. BERNSTEIN:  May I have 92, please?

24  BY MS. BERNSTEIN:

25  A   That's a picture of Ronald.

1    Q    Where is he in that picture?

2    A    That's my mother's house, in her den.

3         MS. BERNSTEIN:   May I have Exhibit 93, please.

4    BY MS. BERNSTEIN:

5    Q    Who is Ronald holding in that picture?

6    A    Bobby.

7         MS. BERNSTEIN:   And may I have Exhibit 94, please.

8    BY MS. BERNSTEIN:

9    Q    Who are the three people in that picture?   Who is in the

10   middle?

11   A    Lance Madison.   And my brother Raymond.

12   Q    So, on Lance's left, as he's standing, his left arm is over

13   Raymond's shoulder?

14   A    Yes.

15   Q    And how about his right arm?

16   A    Ronald.

17   Q    Where is that picture taken?

18   A    At my mom's house during the Christmas holiday.

19   Q    I want to talk to you about Hurricane Katrina.   Where did you

20   live when the storm hit?

21   A    In New Orleans East about -- not too far from my mom.

22   Q    Who did you live with at the time?

23   A    My husband and my children.

24   Q    Now, did you all decide to evacuate before the storm?

25   A    Yes, we did.   We were undecided, but we decided to go ahead

1    and go.

2    Q    Did you talk to your mom about evacuating, too?

3    A    Yes, I did.

4    Q    When you all were planning to evacuate -- did you have a

5    place to stay, or did you have to find a place?

6    A    We had to find a place.

7    Q    So you were looking for a hotel?

8    A    Yes.

9    Q    When you were looking for a hotel, did you have any special

10   need for your family?

11   A    We mainly had to try to find a location that would take in

12   the dogs, our puppies.

13   Q    Were are you able to find a hotel that could take the dogs?

14   A    None.

15   Q    What did you all decide to do?

16   A    We knew we'd have to leave them behind.

17   Q    And who stayed behind with the dogs?

18   A    Ronald wouldn't leave.  He wanted to stay.  And Lance stayed

19   with him.

20   Q    Why wouldn't Ronald leave?

21   A    He didn't want to leave his dogs.

22   Q    Did you have any of concerns about leaving Ronald behind with

23   Lance?

24   A    No.  None at all.

25   Q    Why not?

A    We've all cared for them growing up, my sisters and my

brothers.

Q    So did you evacuate?

A    I did.

Q    Where did you end up?

A    In Lafayette.

Q    When you were in Lafayette, did you stay in touch with Lance

and Ronald by phone at all?

A    Yes, we did.

Q    Do you know when the last time was you spoke to them before

the storm hit or before you lost touch with them?

A    Before -- probably when we lost connection, because we found

out that a phone tower for the Cingular phone service had I guess

had trouble with all the phone lines.

Q    Do you know -- was the last time you talked to them before

the storm or after, do you know?

A    It was before the storm.

Q    And then what's the next word you got about your brothers?

A    That my brother Lance had been arrested.

Q    Where were you when you found out that your brother Lance had

been arrested?

A    In Lafayette.

Q    At the hotel still?

A    Yes.

Q    How did you learn that?

1   A    My brother Romell, Dr. Madison, called me.

2   Q    Did Dr. Madison tell you how he had gotten that news?

3   A    From his daughter.

4   Q    Do you know where she had gotten the news?

5   A    Someone that she knew had called and told her that my brother

6   was arrested.

7   Q    When Dr. Romell -- when Romell called you at the hotel and

8   gave you this news, did he tell you where Ronald was?

9   A    He didn't know for sure at that time.  He didn't know.

10  Q    Did he know what Lance had been arrested for?

11  A    No, he wasn't sure about that as well.

12  Q    What was your reaction when you got that call?

13  A    We were shocked.

14  Q    Did you ask him where Ronald was?

15  A    Yes, I did.

16  Q    Did you at some point get more information?

17  A    Yes, I did.

18  Q    What happened next?  Where did you get that information?

19  A    My brother Romell called and told me Ronald had been killed.

20  Q    Was that the same day, do you remember, that you got the

21  first call?

22  A    Yes.

23  Q    When Romell called, did he have any details about what had

24  happened to Lance or Ronald?

25  A    Not that I know of.  I can't remember if he had anything of

```
 1   specific.  He knew that Ronald was killed, and Lance was
 2   arrested, but he didn't know exactly why at the time.
 3   Q    You were at the hotel with your mom at the time, you said?
 4   A    Yes.
 5   Q    Did you tell your mom what Romell told you?
 6   A    Yes.
 7   Q    What was your mom's reaction?
 8   A    She was devastated.  She couldn't believe it.
 9   Q    You said that you got news that Lance had been arrested.  At
10   some point, did you learn what he had been arrested for?
11   A    We kept watching the news in Lafayette.  And what we were
12   initially hearing on the news and everything was supposedly --
13   well, when we first kept hearing the news about what had taken
14   place, we didn't realize that they were talking about my brother
15   Lance and my brother Ronald, because we would never believe that
16   what they were saying was true because we knew my brother Lance
17   and Ronald.  And then it kept going on, and it started talking a
18   little bit on the news, and we realized that they were talking
19   about my brother, my brother Lance and my brother Ronald.
20   Q    So, when you realized what Lance had been arrested for, were
21   you involved in trying to help find him a lawyer?
22   A    Yes, we were.
23   Q    How did you go about finding a lawyer?
24   A    My sister Lorna Humphries was able to take and get a lawyer.
25   Sister-in-law assisted her with finding a lawyer.
```

1    Q    Where was that lawyer from?

2    A    In Baton Rouge.

3    Q    Why did you all go to Baton Rouge to get a lawyer for Lance?

4    He was arrested here; right?

5    A    Yes, he was.

6    Q    Why did you go to Baton Rouge?

7    A    Because we didn't know who we could trust.  Because --

8    Q    What do you mean by that?

9    A    We knew what we were hearing on TV concerning my brothers

10   Ronald and Lance was not true.  And we didn't know who we could

11   talk to and who we could trust.  So we had want to get an

12   attorney that was outside the area.

13   Q    Where was Lance while you all were trying to find this

14   attorney in Baton Rouge?

15   A    He was in jail.

16   Q    How long was Lance in jail?

17   A    For 25 days.

18   Q    After 25 days, when Lance got out, was he set completely

19   free?

20   A    No, he was not.

21   Q    What conditions were on him?

22   A    He had to wear an ankle bracelet, and he had to stay with the

23   relative.  He stayed with my brother, Romell, and my mother.

24   Q    Now, was that case against your brother eventually presented

25   to a state grand jury?

```
 1    A   Yes, it was.
 2              MR. DESALVO:  That's hearsay, Your Honor.
 3              THE COURT:  It's to lay a foundation for how she knew.
 4    BY MS. BERNSTEIN:
 5    Q   Do you know whether your brother is still charged with
 6    attempted murder of a police officer?
 7    A   No, he is not.  He was cleared by the grand jury.
 8    Q   Now, at some point, did you learn that the district
 9    attorney's office here in New Orleans was investigating that
10    shooting on the Danziger Bridge?
11    A   Yes.
12    Q   Did you learn at some point that NOPD officers had been
13    charged in connection with that shooting?
14    A   Yes.
15    Q   Did you follow that case?
16    A   Yes.
17    Q   How about the rest of your family?
18    A   We all did.
19    Q   How closely did you follow the case?
20    A   We followed it very closely.  We attended all the court
21    hearings and proceedings.  We had gone to speak to the district
22    attorney's office on a number of occasions.
23    Q   How did that state case end?
24    A   It ended where the charges against the police officers were
25    dismissed due to a misstep by the DA's office.
```

1   Q    Was there ever any resolution about guilt or innocence?

2   A    None.

3   Q    It was just dismissed?

4   A    Yes.

5   Q    What was your family's reaction when that case got thrown

6   out?

7   A    We were very upset.  We were angry.  We were outraged.

8   Q    Who were you angry at?

9            MR. FLEMING:  Judge, I'm going to object.  My we

10  approach?

11           THE COURT:  Sure.

12           (Sidebar conference.  Jury not present.)

13           MR. FLEMING:  I'm going to object on two grounds.  One,

14  relevance as to their reactions to the state proceedings being

15  dismissed.

16           Two, it's unduly prejudicial.  These are the same

17  gentlemen on trial, at least four of five are on trial now.  It's

18  to do nothing but inflame the jury that they had a brother that

19  was arrested and a brother that was killed, and she and her whole

20  family were upset when the previous case was dismissed.  This is

21  the same jury that's going to decide whether these men are voted

22  guilty or not guilty.

23           MS. BERNSTEIN:  There were some pretrial motions

24  practice about whether or not the threats against the judge and

25  the officers are going to be admitted, and my understanding is

 1   that they are going to come in.

 2          And I think, A, it's relevant to know that the entire

 3   family was angry, and that they worked within the system.

 4          And, B, I plan to ask this witness whether she ever

 5   heard brother or whether she knew her brother to make any

 6   threats.  It's highly relevant.

 7          MR. FLEMING:  In that case, it's premature and that that

 8   issue has not been raised during the trial.

 9          And I'm assuming Bobbie, Ms. Bernstein, will not raise

10   that issue as to any threats that may or may not have been made.

11   I don't know if any of the other defense lawyers are planning on

12   doing that.  I'm not planning on doing that.  I don't know if any

13   of the other lawyers are.  But, unless that's done, I think it's

14   premature at this point, Judge.

15          THE COURT:  All right.  The first thing I thought of was

16   the pretrial motion.

17          It was contested as to whether or not it could be used

18   -- in other words, the information regarding Lance Madison's

19   alleged threats, that was contested.  There was no statement by

20   defense counsel informally or by any individually that, no, we

21   don't want them to ask that.

22          MS. BERNSTEIN:  Right.

23          THE COURT:  And the Court ruled on it.  It's officially

24   off the table.  Unless there's some change and there's universal

25   feeling among defense counsel that it will not be used.

1        As of right now, I've ruled on it.  So I think it's a

2   fair question.

3        I do think you have to be careful how you ask her.  I

4   don't want her to pass an opinion on the guilt or innocence of

5   these defendants such as well --

6        MS. BERNSTEIN:  We have discussed it.

7        THE COURT:  -- we watched the state court's case so

8   carefully and it's obvious that they were guilty, that's why we

9   were angry and that's why it got dismissed.  That's what I don't

10  think you should ask her or what she said.

11       I do think you can ask about actions that they were

12  upset that the charges were dropped or dismissed by the judge in

13  the state court and specifically what their reaction to it was,

14  without leading.

15       MS. BERNSTEIN:  I might have to lead her a tiny bit to

16  make sure I lead her around that area that you've warned about.

17       THE COURT:  Ask her as specifically as you can.

18       MS. BERNSTEIN:  Yes.

19       THE COURT:  I've already ruled pretrial.  Unless you

20  wish to have a few minutes to talk to defense counsel about Lance

21  Madison's alleged statements, I think she can ask about it, and

22  I'm overruling the objection on those grounds.

23       MS. BERNSTEIN:  I'm happy to give them, if you all want

24  to agree across the board that you won't ask that, then I'm happy

25  to skip these questions.

1          MR. FLEMING:  I don't know whether we'll reach a

2    resolution.  I'll talk to them for a minute.

3          MS. BERNSTEIN:  I'll wait for a minute for them.

4          THE COURT:  Would you like us to visit with them?

5          MR. FLEMING:  Yes.

6          I don't know the procedure, are we coming back up here?

7          THE COURT:  Go ahead and confer with them.

8          (Whereupon, a discussion was held off the record.)

9          MR. FLEMING:  No, Judge.  There's no agreement to that

10   effect.  I still will note my objection.

11         THE COURT:  Sure.

12         MR. FLEMING:  For two reasons, we're not going there in

13   terms of Mr. Faulcon.  Two, it's premature.  This might be

14   appropriate after that issue, if that issue is raised.  But I

15   think at this point it's premature.

16         THE COURT:  I don't think it's premature.  I've ruled on

17   it, and we now expect that -- we know that Lance Madison is going

18   to testify, and we expect that he will be asked about this

19   particular series of events.  So I don't think that it's

20   premature to cover it now, subject to the restrictions that I've

21   indicated.

22         (Sidebar conference concluded.  Jury now present.)

23   BY MS. BERNSTEIN:

24   Q   Ms. Brown, before the break, you mentioned that your family

25   was angry when the state court case was dismissed.

1    A    Yes.

2    Q    Without telling us why you were angry, tell us who you were

3    angry at.

4    A    I was -- we felt as though, initially, that the judicial

5    system had failed us.  We knew that my brother Ronald --

6    Q    Hang on.  I want you to tell us who you were angry at.  You

7    said the judicial system?

8    A    Yes.

9    Q    And did you ever talk to Lance about whether he was angry?

10   A    We all were upset.  We cried.  You know, we had to give each

11   other encouragement to let us know that, you know, this wasn't

12   the end for us.  That we were still determined to seek justice

13   and we would go to the next step.

14   Q    Now, when you were angry when the case got dismissed, did you

15   ever threaten anybody involved in the judicial system?

16   A    No.  Never.

17   Q    Did you ever hear Lance threaten anybody involved in the

18   judicial system?

19   A    Never.

20   Q    I want to ask you a few questions about Ronald.  Did you know

21   if Ronald understood what a police officer was?

22   A    Yes, he did.

23   Q    How do you know that?

24   A    Because I had two brother-in-laws who were police officers.

25        And also, at school, he was introduced to Officer

```
 1   Friendly, who would visit the school.
 2          And then, also, we would always tell Ronald and Raymond
 3   if they ever needed help they could always go to a police
 4   officer.
 5   Q   You mentioned that Ronald actually knew some police officers?
 6   A   Yes.
 7   Q   Who did Ronald know who was a police officer?
 8   A   Roy Humphries.
 9   Q   Who is that?
10   A   That was my sister's husband.
11   Q   Which sister was married to Roy Humphries?
12   A   Lauren.  Lauren Humphries, who is the sister who is beneath
13   me.
14   Q   Who did Roy Humphries work for?
15   A   He worked with NOPD police department, New Orleans Police
16   Department.
17   Q   So this is your sister's husband, was with NOPD?
18   A   Yes.
19   Q   Who was his partner?
20   A   Eddie Compass.
21   Q   Is that the same Eddie Compass who later became
22   superintendent of police?
23   A   Yes.
24   Q   Did Roy and Eddie ever come off to the house where Ronald
25   lived?
```

1   A    Yes.

2   Q    So they knew Ronald, and Ronald knew them?

3   A    Yes.

4   Q    When Roy and Eddie would come over and visit, would they

5   bring their guns into the house?

6   A    No, never.

7   Q    Why not?

8   A    My mom didn't want them to bring any weapons in the home.

9   Q    How would Ronald react when he saw a police officer?

10  A    He would like wave and smile.

11  Q    You knew Ronald his whole life, for 40 years; right?

12  A    Yes.

13  Q    And, in all that time, did you ever see Ronald with a gun?

14  A    Never.

15  Q    Did you ever see him touch a gun?

16  A    Never.

17  Q    Did Ronald watch TV?

18  A    Yes, he did.

19  Q    What kinds of shows did he watch on TV?

20  A    He enjoyed more comedy, and he used to watch the Huxtables,

21  Different Strokes, Little Rascals.

22  Q    Did you ever see Ronald play with toy guns?

23  A    Never.

24  Q    Why not?

25  A    My mom would never buy any gun type toys or any type of

```
 1   weapon toys.

 2   Q   Do you think Ronald would know what to do with a gun?

 3   A   No, he would not.

 4            MR. FLEMING:  Objection.

 5            THE COURT:  I'm going to sustain.

 6            She's already answered.

 7            MS. BERNSTEIN:  But I think it was withdrawn, Your

 8   Honor.

 9            No further questions.  Thank you, Ms. Brown.

10            THE COURT:  Cross?

11            MR. DESALVO:  I have no questions, Your Honor.

12            MR. LONDON:  No questions, Your Honor.

13            THE COURT:  Any cross examination?

14            MR. FLEMING:  I have no questions of Ms. Brown.

15            THE COURT:  Thank you, ma'am.  You can step down.

16            I think you're free to go.

17            Is that correct?

18            Are you asking if you can remain in court?

19            MR. DeSALVO:  We have no objection if she remains in

20   court to watch the trial.

21            THE COURT:  Let's go ahead and take a very short break

22   here.  It's about 3:25.  At 3:40, we'll return, and then we'll

23   finish up for the day.

24            (Jury exits.)

25            THE COURT:  You may be seated.
```

1          Let's go ahead and finish up for the day.  Do we have an

2    agreement on who the next witness will be, as previously

3    discussed?

4          MS. CHUNG:  Douglas Bloedorn.

5          DOUGLAS BLOEDORN, being first duly sworn, testified as

6    follows:

7          CASE MANAGER:  Thank you.  You may be seated.

8          And please state and spell your full name for the

9    record.

10         THE WITNESS:  My name is Douglas Bloedorn

11   B-L-O-E-D-O-R-N.

12         THE COURT:  You may begin.

13         MS. CHUNG:  Thank you, Your Honor.

14                        DIRECT EXAMINATION

15   BY MS. CHUNG:

16   Q    Good afternoon.

17         Mr. Bloedorn, where do you currently live?

18   A    I live in College Station, Texas.

19   Q    Where are you working?

20   A    I work for a grocery chain called HEB.

21   Q    What you do you for HEB?

22   A    I am the market manager.

23   Q    Did you just hit a milestone at work?

24   A    Yes, ma'am.  I just graduated from their retail school of

25   management yesterday.

```
 1   Q    Congratulations.

 2   A    Thank you.

 3   Q    How long have you worked for HEB?

 4   A    I'll make a year in August.

 5   Q    Where did you work before HEB?

 6   A    I worked at Brookshire Brothers in Caldwell, Texas, where I

 7   was assistant market manager for five years.

 8   Q    When did you move to Texas?

 9   A    After Hurricane Katrina.

10   Q    Where did you move from?

11   A    I moved from the Friendly Inn in New Orleans on Chef Menteur

12   Highway.

13   Q    Do you know if that's on the west side of the Chef Menteur

14   Highway, or the east side?

15   A    It's the east side.  I mean, the west side.  I'm sorry.

16   Q    And that's of the Danziger Bridge?

17   A    Yes.

18   Q    The day you moved, was there a shooting?

19   A    Yes, ma'am.

20   Q    What happened?

21   A    It was just a day we were in front of my room.  We had to

22   sleep outside, so I was cleaning up the area a little bit.  We

23   started hearing gunshots, which wasn't too abnormal because we'd

24   been hearing gunshots all week.  Then it started getting to be a

25   few more gunshot in rapid succession, and it sounded to me as
```

1    they were getting closer.

2    Q    You said you were living at the Friendly Inn at that time?

3    A    Yes, ma'am.

4    Q    Where in the Friendly Inn were you living?

5    A    On the top floor in the front part of the complex.  I don't

6    recall the room number.

7              MS. CHUNG:  May I have 97, which is in evidence?

8    BY MS. CHUNG:

9    Q    Mr. Bloedorn, do you recognize what's in Exhibit 97?

10   A    Yes, ma'am.

11   Q    What is that?

12   A    That's the front parking lot of the Friendly Inn.

13   Q    Can you see where you were living on this photo?

14   A    Yes, ma'am.

15   Q    Could you point that out for the jury.

16   A    At the last set of stairs, second door from the top of the

17   stairs.

18   Q    And is that right, the blue --

19             MS. CHUNG:  Can we blow up that area around the blue?

20   BY MS. CHUNG:

21   A    That's the last set of stairs.  I lived one, two doors over.

22   Q    So this staircase right here?

23   A    Yes, ma'am.

24   Q    And your apartment?

25   A    Approximately right there.  That's my apartment.

1    Q     Thank you.

2          Where were you when you first heard shots?

3    A     In front of my room.

4    Q     You said, at first, it wasn't that unusual.

5    A     Right.

6    Q     Did it ever become unusual?

7    A     When the succession of shots, number of shots.  I can't say

8    how many.  But the number of shots and the fact that they seemed

9    to be getting closer.

10   Q     When you first heard shots, what did they sound like?

11   A     Gunshots.

12   Q     Could you tell where they were coming from?

13   A     From over on the -- sounded like the other side of Danziger

14   Bridge or on the Danziger Bridge.

15   Q     And you said it just sounded like gunshots.  Could you

16   describe how many?

17   A     I can't describe how many.  I can't say how many.

18   Q     What's the next thing you heard?

19   A     The next thing I recall, after the gunshots, is -- like I

20   said, they sounded like they were getting closer.  I don't

21   know --

22   Q     I'm sorry, go ahead.

23   A     I don't know if they stopped at some point.  I really can't

24   recollect.  But the next thing I remember is three gentlemen kind

25   of ducking into the front entrance of the Friendly Inn.

1   Q   And I'd like to talk about that second burst of gunfire

2   before I move on.  Can you describe that for the jury.

3   A   Again, just succession of gunfire that sounded close.  Like

4   it was already over the bridge or almost over the bridge.

5   Q   So, when you say close, do you mean closer than the first

6   round of shots that you heard?

7   A   Yes, ma'am.

8   Q   And, aside from the fact that there was a succession, can you

9   tell us anything more about what they sounded like?

10   A   No, ma'am.

11   Q   What do you remember -- you had mentioned three men coming

12   into the parking lot.  Can you describe that for the jury.

13   A   To the best my recollection, all it seems to me is there was

14   a truck that was parked in front, and it seemed like they ducked

15   completely around the corner and were like instantly trying to

16   take cover.

17   Q   And, when you say three, did all three of them come by that

18   truck?

19   A   I'm not sure.  I know at least one or two did.  I'm not sure

20   about all three.

21   Q   When you saw those three people running toward the Friendly

22   Inn, did you see them shooting any guns?

23   A   No, ma'am.

24   Q   Did you see any gunfire coming from those three people?

25   A   No, ma'am.

1    Q    Did you see any guns in their hands?

2    A    No, ma'am.

3    Q    What happened next?

4    A    Almost immediately, a vehicle sort of screeched to a halt at

5    an angle right there, and then just gunshots.

6    Q    When the car screeched to a stop, do you remember anything

7    about what the car look like?

8    A    No, ma'am.

9    Q    Do you remember anything about if anyone got out of the car?

10   A    No, ma'am.  I assume someone got out, but I can't say for

11   sure.

12   Q    Did you, in the past, speak to the FBI about this incident?

13   A    Yes, ma'am.

14   Q    And did you ever testify in the grand jury about this

15   incident?

16   A    Yes, ma'am.

17   Q    When you talked to the FBI and the grand jury, at that time,

18   did you remember someone getting out of the car?

19   A    Yes, ma'am.  And, my memory at that time, it was all -- it's

20   memory that I don't really think of a lot, and I never think of

21   it until I'm interviewed about it.  And it's just some parts are

22   not clear.  Some parts are clear, some parts are not clear.

23   Q    So at this time you really can't recall that?

24   A    Yes, ma'am.

25   Q    But, at a prior time, you did?

1    A    Yes, ma'am.

2    Q    And was that closer in time to the shooting?

3    A    Yes, ma'am.

4    Q    What do you remember about the shots that started after the

5    car screeched to a stop?

6    A    My main memory is the expansion of gas going towards the

7    truck from the Chef Menteur, and I just -- I don't even recall

8    how many shots.  I don't recall if I heard the gunshots.  For

9    some reason, in my mind, the gas coming out and then the shots

10   being fired.

11   Q    So like puffs of gas?

12   A    Yes, ma'am.

13   Q    Which way were they going?

14   A    From the Chef Menteur towards the Friendly Inn.

15   Q    Did you ever perceive gunfire going out of the Friendly Inn?

16   A    No, ma'am.

17   Q    What did you see next?

18   A    The next thing I remember, recall seeing, is a gentleman

19   running down, beginning to run through the water down the parking

20   lot of the Friendly Inn.

21   Q    Was that man one of the three men you saw running into the

22   parking lot?

23   A    Yes, ma'am.

24   Q    Can you describe him at all?

25   A    A black male.  T-shirt.  That's about it.

1    Q    Do you remember anything about his shirt?

2    A    I believe it was either blue or -- dark blue or black.

3    Q    Do you remember anything about what he was wearing on his

4    lower half?

5    A    No.  Because he was in the water already.

6    Q    And that was the water you could see in exhibit --

7    A    Yes, ma'am.

8    Q    -- 97?

9    A    Yes, ma'am.

10        MS. CHUNG:  May I have Exhibit 34, please?

11   BY MS. CHUNG:

12   Q    Do you recognize what's in this picture, 34?

13   A    Yes, ma'am.

14   Q    What is it?

15   A    That is the entrance off of Chef Menteur Highway into the

16   Friend Inn.

17   Q    And can you show us approximately where your apartment is on

18   this photo.

19   A    Straight back, back staircase.

20        MS. CHUNG:  And, for the record, you are indicating the

21   middle left side of the picture towards the staircase depicted on

22   the left side.

23   BY MS. CHUNG:

24   Q    Where did you see the male running?

25   A    Right there, and just straight back.

1    Q    What do you remember seeing next?

2    A    I remember looking towards the right, down by the office

3    side, and seeing a gentleman holding a rifle.

4    Q    What do you remember about the person with the rifle?

5    A    What sticks in my head was that the rifle was being steadily

6    aimed.  And, to the best of my knowledge, I remember seeing a

7    large gentleman, tactical type outfit, black, like they wear.

8    That's what I remember.

9    Q    And, when you say black, what are you referring to?

10   A    The blouse trousers, the -- you know.

11   Q    So, his clothing?

12   A    Yes.  His clothing, yes.

13   Q    So he was wearing black tactical clothing?

14   A    Tactical clothing.

15   Q    And you had mentioned large?

16   A    Large.

17   Q    His build?

18   A    Yes.

19   Q    Do you remember anything else about him?

20   A    Not particularly.

21   Q    Do you remember anything about the rifle?

22   A    It looked like an M-16 or an M-4.

23   Q    How are you familiar with what an M-16 or an M-4 looks like?

24   A    I've been fascinated with military.  My father was full bird

25   colonel.  Fascinated with military and fascinated with firearms

1    all my life.

2    Q    So you have some familiarity with those weapons?

3    A    Oh, yes, ma'am.

4    Q    What did you observe the man in the black tactical gear do?

5    A    Fire a round.

6    Q    Did you see where the round was aimed at?

7    A    It was aimed directly at the gentleman running through the

8    parking lot.

9    Q    Did he hit the man who was running?

10   A    I do not know.

11   Q    What happened next?

12   A    By this time, he was pretty much parallel with me.  And I

13   just -- I yelled:  Dude, stop, they are going to kill you.

14   Q    And, when you say he was parallel to you, who do you mean?

15   A    The gentleman running down the parking lot.

16   Q    How did he respond?

17   A    Just glanced up at me with a terrified look on his face.

18   Q    What happened next?

19   A    Another round was fired.

20   Q    Do you know where that round was fired from?

21   A    That was fired from the officer by the Coke machine by the

22   front office.

23   Q    Then what happened?

24   A    It's my recollection, I remember him falling down,

25   face-first, into the water.  I can't say 100 percent.  That's

1    just something that sticks in my mind.

2    Q    Now, backing up a little, when you first saw the car screech

3    to a halt -- actually, let me back up a little bit.  You just

4    said you yelled something at the man.

5    A    Yes.

6    Q    Did anyone else ever yell at the man?

7    A    No, ma'am.

8    Q    When the car stopped, did you ever hear anyone yell any ID or

9    commands?

10   A    No, ma'am.

11   Q    Did you ever hear the black, the man in the black uniform,

12   yell any commands to the man who was running?

13   A    No, ma'am.

14   Q    Why did you yell at the man who was running through the

15   parking lot?

16   A    I felt that I should tell him to stop, they're going to kill

17   him.

18   Q    How did he respond?

19   A    He looked up at me, glanced as he was running, and just had a

20   terrified look on his face.

21   Q    After he fell, what happened?

22   A    The weapon, I did heard a command to:  Get down, get in your

23   room.  And, I turned at the officer, and the weapon was pointed

24   at me.

25   Q    Did that officer give you any command?

1   A   Yes:  Get down, get down.  Get in your room, get down.

2   Q   What did you do?

3   A   I got in my room.

4   Q   What happened after that?

5   A   Basically, I was in my room.  You could tell that it just got

6   swarmed by police, state troopers.  State troopers entered my

7   room.  They were under the assumption, I believe, that the

8   suspect was down, that the guy that was running was down in one

9   of the rooms.  So the officer was in my doorjamb with his rifle

10   trained into the parking lot.

11   Q   At this time, were you allowed to exit your room --

12   A   No, ma'am.  I was told to sit on the bed.

13   Q   How long did that last?

14   A   It seemed -- seemed, to me, forever.  30, 45 minutes, an hour

15   perhaps.

16   Q   And, at the end of that 30 minutes to an hour, what did you

17   do?

18   A   As soon as you could see everybody was gone, started, you

19   know, getting closer to looking at the door jamb, looking on on

20   the balcony, seeing what was going on.

21   Q   Could you see anything from your balcony?

22   A   Yeah.  I could see the front of the Friendly, there was still

23   police out there.  There weren't any in the parking lot area

24   anymore.  I could see the front of the complex.

25   Q   Did you see anyone who you believed to be one of the three

1    who had run into the parking lot?

2    A    I did.   There was one prone on the ground on Chef Menteur

3    Highway with police around him.

4    Q    Was that -- did that person appear to be alive?

5    A    Yes.

6    Q    Was he detained?

7    A    Detained, handcuffs behind his back, on the ground.

8    Q    And did you ever see someone you believed to be the third

9    person that had run into the parking lot?

10   A    No, ma'am.

11   Q    Did you ever leave the balcony and go down --

12   A    Not until everybody was gone.

13   Q    Okay.   After everyone was gone, what did you see when you

14   went down?

15   A    We went down, everyone started coming out.   And then of

16   course everybody was congregating by a truck, and there was a

17   dead body.

18   Q    So at that time you did see --

19   A    Yes, ma'am.

20   Q    -- a third person?

21   A    Yes, ma'am.

22   Q    Did you believe that to be one of the people who had run into

23   the parking lot?

24   A    Oh, yes, ma'am.

25   Q    Where was that person located?

1    A    In front of the truck, in front of the Friendly.  In between

2    the truck and Chef Menteur Highway.

3              MS. CHUNG:  May I have Exhibit 34 again?

4    BY MS. CHUNG:

5    Q    On Exhibit 34, could you show us where that body was.

6    A    Approximately, this area.  I can't say on this side of the

7    pole or that side of the pole, but that area.

8    Q    When you say this side of the pole or that side, what do you

9    mean?

10   A    I believe it was on this side of the pole, like up more into

11   the -- closer to the restaurant.

12   Q    So, pole, you mean this pole?

13   A    Yes, ma'am.

14   Q    When you say this side, do you mean this side, or that side?

15   A    Yes, ma'am.

16   Q    So, to the best of your recollection, you think it was on

17   this side?

18   A    Yes, ma'am.

19   Q    In the picture to the right side of the pole?

20   A    Yes, ma'am.

21   Q    But you believe it might have been on the left side.

22   A    It might have been.  I barely glanced.  I had no interest in

23   seeing it.

24   Q    Do you know if anyone ever covered that body?

25   A    It was -- I was told that it was covered.  Because, when we

1    did leave later, it was covered when we went out of there.  I

2    don't know who covered it, but it was covered.

3    Q    When you say we --

4    A    Just the people, everybody that was living there.  You know,

5    whoever did it.  I say we.  Wherever I tell the story, I said we.

6    Not necessarily that I covered the body.

7    Q    So at some point some member of the group covered the body?

8    A    Yes, ma'am.

9    Q    Where was the man who was shooting located, if you can see it

10   on this photo?

11   A    It would be on this side, there's a Coke -- there's some Coke

12   machines.  And, you turn the corner, and there's the front door

13   to the office.  Best of my recollection, he was on this side

14   right there, shooting --

15            MS. CHUNG:  And, for the record, the witness has marked

16   the left side of the photo between the two columns depicted on

17   the photo.

18   BY MS. CHUNG:

19   Q    And is it -- am I understanding you correctly, that it's a

20   little more inside?

21   A    Just a little more.  Not much.  Not much more inside.

22   Q    Did you ever observe the man shooting at the running man?

23   Did you ever -- I'm sorry, that's not very clear.

24            Did you ever observe the running man shooting at the

25   man --

1    A    Oh, no, ma'am.

2    Q    Were you able to see his hands when he was running through

3    the parking lot?

4    A    Yes, ma'am.

5              THE COURT:  Wait for her to finish the question.

6              THE WITNESS:  Okay.

7    BY MS. CHUNG:

8    Q    Did you see any weapons or guns in his hand?

9    A    No, ma'am.

10   Q    Did you ever see him do anything aggressive towards the

11   person with the rifle shooting at him?

12   A    No, ma'am.

13   Q    Did you ever see him do anything other than run?

14   A    No, ma'am.

15             MS. CHUNG:  May I have 34 again?

16   BY MS. CHUNG:

17   Q    Using this picture, could you show for the jury what

18   direction the rifle fire was going.

19   A    (Witness indicates.)

20             MS. CHUNG:  And, for the record, the witness has made a

21   diagonal line across the photo from the second column on the left

22   toward the empty space on the right side between the buildings.

23             I have no further questions, Your Honor.

24             THE COURT:  Okay.

25             Cross?  Mr. Larson?

CROSS EXAMINATION

BY MR. LARSON:

Q   Mr. Bloedorn, my name is Lindsay Larson, I'm one of the lawyers in the case.

        You were living at the Friendly Inn for about a year before Hurricane Katrina?

A   At that time, it was about -- I think I'd been doing good for about eight months.

Q   Were you employed at that time?

A   Yes.

Q   What were you doing?

A   I worked at William B. Allen Supply Company on North Rampart.

Q   And you weren't working that day, September 4th?

A   Oh, no, sir.

Q   Do you remember what time of the day it was when all this happened?

A   Morning.

Q   Mr. Bloedorn, isn't it true that you have told two conflicting stories about what you saw that morning?

A   I told two different stories of what my memory served me.

Q   Right.  And those two conflicting stories you told were different from what you told us today; weren't they?

A   Yes, sir.

Q   And those two conflicting stories that you told were told in a time closer to the event than today's testimony?

1  A    Yes, sir.

2  Q    Did you ever tell anyone that you saw a red car pull into the

3  parking lot and two or three police officers exited the vehicle?

4  A    I believe I did, yes, sir.

5  Q    You did say that.

6        And you said that the officers wore identifying

7  clothing, did you stay that?

8  A    I don't recall saying that, but I might have.  And I don't

9  recall seeing any.

10 Q    Including bulletproof vests?

11 A    I don't really recall.

12 Q    Did you say that the officers, plural, start shooting towards

13 the parked truck?

14 A    I did say that.

15 Q    So how many officers did you see?

16 A    As my memory serves me right now, I don't remember seeing any

17 officers.  And that is the honest truth.

18 Q    So no officers were shooting?

19 A    There were officers shooting, but I can't say how many.  I

20 can't say there were shots being fired.

21 Q    Now, that was one statement that you gave.  You gave another

22 statement, I believe -- do you remember giving a statement under

23 oath for the grand jury?

24 A    Yes, sir.

25 Q    Did you tell the grand jury that the officer, singular, had a

1    T-shirt and was in plain clothes?

2    A    I do remember that, sir.

3    Q    And you said that he was a white gentleman?

4    A    I do remember that.

5    Q    You didn't see any black police officers there?

6    A    I don't recall.

7    Q    And I believe you also expressed at one time that either

8    troopers or swat personnel shot at the fleeing guy in the parking

9    lot?

10   A    Yes, sir.

11   Q    By troopers, you mean state troopers?

12   A    Either troopers or SWAT, simply because of remembering the

13   black tactical uniform.

14   Q    And you remember also saying that, because it was chaotic,

15   the details of what you saw were sketchy?

16   A    Yes, sir.  There is certain things stuck in my head, and

17   there is certain things I choose not to remember and I remember

18   differently.

19   Q    And so you don't remember if any black police officers shot

20   at the van?

21   A    I don't remember, sir.

22        MR. LARSON:  Thank you, Mr. Bloedorn.

23        No further questions.  I tender the witness.

24        THE COURT:  All right.

25        Cross?  Anyone else?  Mr. London?

1        MR. LONDON:  No, sir.

2        THE COURT:  Mr. Hessler.

3                    CROSS EXAMINATION

4   BY MR. HESSLER:

5   Q   Good morning, sir.  My name is Eric Hessler.  How you doing?

6   A   Fine.

7   Q   What do you remember today, I guess is my question.

8   A   What I just stated.

9   Q   Okay.  Now, could you describe to the jury what New Orleans

10  East was like up until the days leading to this day?

11  A   I didn't go into New Orleans East.  I didn't cross the

12  Danziger Bridge.  I knew better to.

13  Q   What you do you mean, you knew better to?

14  A   It was a war zone over there.

15  Q   And, when you say a war zone over there, why would you say

16  that?

17  A   Well, you could hear the gunshots, you could see the smoke

18  from the fires.

19  Q   Was that on a daily basis?

20  A   General.

21  Q   Sir?

22  A   General.  I can't say every day.

23  Q   But, every day, you heard gunfire?

24  A   I can't say every day.

25  Q   Often enough that you wouldn't even cross that bridge?

```
 1   A    Often enough, yes, sir.

 2   Q    Some people did cross that bridge; correct?

 3   A    I would imagine so, yes, sir.

 4   Q    Well, you saw them; didn't you?

 5   A    Yeah.  Back and forth.

 6   Q    And, postal trucks, stolen postal trucks?

 7   A    Yes, sir.

 8   Q    What were those persons doing that were driving the stolen

 9   postal trucks?

10   A    Going and looting.

11   Q    Were they armed?

12   A    Yes, sir.

13   Q    You saw them armed?

14   A    I did see one at least armed, yes.

15   Q    And you saw that relatively -- well, frequently?

16   A    That was for a couple of days.  One or two days during the

17   middle of it.

18   Q    And you spokes to a private investigator about this case, did

19   you not, many years ago?

20   A    I don't recall a private investigator.  I remember an

21   attorney coming to talk to me, but I don't recall talking to a

22   private investigator.

23        MS. CHUNG:  I would object.  There's no foundation for

24   that.  And I'd also like to approach if possible.

25        (Side bar conference.  Jury not present.)
```

1          MS. CHUNG:  Your Honor, the interview that Mr. Hessler

2     is referring to, there's a document we turned over which is an

3     email from I believe an investigator of Lance Madison's criminal

4     attorney.  It's not a report of an investigation.  It's not even

5     notes of an interview.  It's an email that a witness was located.

6     It's highly characterized.  It is obviously meant for the

7     preparation of the defense of Lance Madison, and is

8     characterizing the witness's testimony in what I think is a

9     highly prejudicial way.  So I would object to Mr. Hessler reading

10    any of the investigator's characterizations of the testimony.

11         I don't mind if, obviously, he asks:  What did you tell

12    the investigator, did you say there was a shooting, all of that.

13    But they are facts for him to ask.

14         THE COURT:  He's entitled to lead, and he's -- already,

15    the witness has already acknowledged that he had such a

16    conversation with someone that he knew to be I think an

17    investigator.  He didn't say anything about an attorney.  I think

18    he did say --

19         MR. HESSLER:  He thinks it's an attorney.

20         THE COURT:  Attorney or investigator.

21         MR. HESSLER:  An attorney.

22         THE COURT:  I think he's entitled to lead the witness

23    and ask if he ever said such a thing.

24         I don't think you can refer to the document.  Obviously,

25    it's not a prior in inconsistent statement.  But it's a record

1    statement that you can use to ask leading questions.

2         I mean, you don't intend to show him the statement?

3         MR. HESSLER:  Oh, no.  I just want to give him a

4    description that it's contained therein and see if he would agree

5    with those descriptions.

6         MS. CHUNG:  Obviously, I'm not objecting to Mr. Hessler

7    asking about descriptions.  But there are characterizations in

8    the email of the descriptions that I would object to.  For

9    instance, obviously are, just because I saw bullet holes in the

10   car.  I mean, that is a conclusion reached by the investigator,

11   not by the witness.

12        MR. HESSLER:  He said he saw them armed.

13        MS. CHUNG:  No, no.  Not the officers.

14        THE COURT:  If the investigator recorded it in a certain

15   way, I think it's fair game to ask.  If he says that's not what I

16   said or not my words or I never said that, then he can certainly

17   say that.  But I don't think it's unfair to use what someone

18   recorded to ask leading questions from, without referring to the

19   statement itself.  We've directed him to the occasion.  He said

20   he had the conversation.  And now he can either agree or disagree

21   as to what was said during that conversation.

22        So I'll overrule.

23        (Sidebar conference concluded.  Jury now present.)

24   BY MR. HESSLER:

25   Q   Mr. Bloedorn, we were talking about the postal trucks that

1    you saw driving up and down Chef Menteur Highway.

2    A    Yes, sir.

3    Q    Were there postal trucks using Danziger to cross from

4    Gentilly from east to west and west to east?

5    A    Yes.

6    Q    How often did you see those trucks?

7    A    Only for a couple of days.  Once or twice for two days during

8    the middle of the week.  It wasn't an all-week-long thing.

9    Q    And at least on one occasion you saw in fact the occupants of

10   that truck were armed?

11   A    Yes, sir.

12   Q    Could you describe the occupants of the truck to the jury?

13   A    No.

14   Q    Not even race?

15   A    They were African-American, black.

16   Q    Young, old, male, female?

17   A    Couldn't tell that.  Couldn't tell what was in each truck.

18   Just, that's the one that I remember seeing.

19             MR. HESSLER:  Would you bring up Exhibit 34, please.

20   BY MR. HESSLER:

21   Q    In this exhibit, can you point or mark a little X or a dot

22   where you believe the red car pulled up?

23   A    (Witness indicates.)

24   Q    All right.  Actually on the curb in the grassy area?

25   A    It was kind of, as I recall, kind of caddy-cornered in.  Not

1   pulled in the parking lot, not out in the street.  Kind of just

2   stopped in front.

3   Q   I mean, would you say that it kind of pulled up?

4   A   I wouldn't say that far in here, in my recollection.

5   Q   I'm going to do something.  Would it be like if it was --

6   would it be like this where it's kind of --

7   A   Seems like.

8   Q   Like maybe even the front passenger tire might have been up

9   on the curb or something?

10  A   Seems maybe.  I couldn't say.

11  Q   And, when that car came to a stop, where were the three

12  individuals?

13  A   I believe, when I saw them, they were coming around the

14  corner.  I believe I didn't see them come out the back, so they

15  must have been on either in front of the truck or on the side of

16  the truck.

17  Q   Okay.  And, the individual wearing the dark or the blue

18  shirt, which way did he run?

19  A   Well, eventually I saw him -- I don't know exactly when he

20  came around the corner, but he's the one I saw running straight

21  down there.

22  Q   And somebody fired -- or you believed somebody fired from

23  over that way?

24  A   I believe from over there, that direction.  Maybe even a

25  little further out.  I'm not sure if it was this far in, if it

1    was at that from that far out, but it was from inside.

2    Q   When you say it was a police officer in tactical gear, it was

3    a police officer in tactical gear?

4    A   They what's I remember.

5    Q   Did you see him wearing that Kevlar helmet and all that?

6    A   I don't recall that.

7    Q   Is it possible that the officer that fired came around from

8    this way, responding?

9    A   It could definitely be possible.  I wouldn't know.  I -- like

10   I say, it just appeared.

11   Q   But know at some point, you saw the fire and the curb, it was

12   fired from somebody over here?

13   A   Yes, sir.

14   Q   And it very well could have come from that way; right?

15   A   Possibly, yes, sir.

16   Q   And you had -- where were you at?  If you could put an X,

17   because this thing is getting confusing.

18            You were up there?

19   A   Yes, sir.

20   Q   All right.  And you -- would it be -- could you see all this,

21   all this area?

22   A   Yeah, sure.

23   Q   So you didn't see anybody cross over there?

24   A   They could have.  I might have missed it.  But, no, I did not

25   see.

1   Q    Do you recall seeing a state trooper there?

2   A    The first state trooper confirmed I saw was the one I saw in

3   my room.   There was a bunch of state troopers there pretty soon.

4        MR. HESSLER:  I have no further questions.   Thank you.

5   Thank you, sir.

6        MR. DESALVO:  I just have one, Your Honor.

7        THE COURT:  Mr. DeSalvo.

8        MR. DESALVO:  Exhibit 97, please.

9                    CROSS EXAMINATION

10  BY MR. DESALVO:

11  Q    On the day of the indent, was the water deeper than that?

12  A    I wouldn't be able to remember.

13  Q    How deep had it gotten at the Friendly Inn?

14  A    It had gotten up to the zone line air conditioners.

15  Q    Which would be about where?

16  A    About a little bit below doorknob-height, I believe.  I kept

17  saying, if it got to the doorknobs, I was leaving.

18       MR. DESALVO:  Thank you.

19       THE COURT:  Anyone else?

20       All right.  Redirect.

21       MS. CHUNG:  Yes, Your Honor.

22                   REDIRECT EXAMINATION

23  BY MS. CHUNG:

24  Q    Mr. Bloedorn, you said there were some things that are stuck

25  in your memory.

1    A    Yes, ma'am.

2    Q    Are you sure about those things that are stuck in your

3    memory?

4    A    Yes, ma'am.

5    Q    What are the things that are stuck in your memory?

6    A    The things that are stuck in my memory -- and this is my

7    sense -- for some reason, the smoke going towards that car,

8    towards that truck.

9              The man running down the patio, the parking lot.

10             The seeing that rifle being leveled to.  To hear the

11   report.

12             To be yelling at that guy to stop.

13             The look on his face.

14   Q    What was that look on his face?

15   A    I've always said he looked like a scared rabbit, scared to

16   death.

17   Q    What else sticks in your mind?

18   A    Those incidents.

19             The state trooper in my room.

20   Q    And, those things that you just said were stuck in your mind,

21   you've never changed those statements in any of the time you talk

22   not FBI or the grand jury?

23   A    No, ma'am.

24             MR. DESALVO:  Leading, Your Honor.

25             THE COURT:  Let's not lead the witness.

BY MS. CHUNG:

Q   Have you ever changed those things that stuck in your mind?

A   Not my knowledge.  They haven't changed in my head.

Q   And, details like what color the car were, do you remember things like that?

A   No, ma'am.

Q   Or whether the perpetrator was wearing a helmet, don't remember that?

A   No, ma'am.

Q   Mr. Hessler had asked you about the person who was shooting and asked you if that could have been a trooper.  When did you first see Louisiana state troopers arrive at the Friendly Inn?

A   When the armored personnel carrier came in.

Q   Was the armored personnel carrier before or after the car swerved in to the parking lot?

A   Oh, after.

Q   Was it before or after the man in black was shooting at the running man?

A   After.

Q   You were asked a lot of questions about postal trucks and who you saw in postal trucks going back and forth over the bridge. Did you ever see a postal truck swerve into the parking lot of the Friendly Inn this day?

A   No, ma'am.

Q   Did you ever see those three people near a postal truck?

1    A    No, ma'am.

2    Q    Did you ever -- did a postal truck have anything to do with

3    this shooting, in any way?

4    A    No, ma'am.

5    Q    You said certain things were stuck in your mind.  Have you

6    always been clear that the three men, you never saw them shoot?

7    A    Never.

8    Q    Have you always been clear that you never hear any warnings

9    or commands given to them?

10   A    Never.

11           MS. CHUNG:  No further questions, Your Honor.

12           THE COURT:  All right.  Thank you, sir.  You can step

13   down.

14           This witness is released?

15           MR. FLEMING:  He can be released, Judge.

16           THE COURT:  Thank you, sir.

17           Counsel, would you all approach.

18           (Sidebar conference.  Not on the record. )

19           MS. CHUNG:  Meredith Acosta.  Can we call Meredith

20   Acosta in?

21           THE COURT:  All right.  And this is Meredith Acosta?

22           THE WITNESS:  Yes, sir.

23           MEREDITH ACOSTA, being first duly sworn, testified as

24   follows:

25           CASE MANAGER:  You may be seated.

1          Please state and spell your full name for the record.

2          THE WITNESS:  My name is Meredith Acosta M-E-R-E-D-I-T-H

3    A-C-O-S-T-A.

4          THE COURT:  You may begin.

5                    DIRECT EXAMINATION

6    BY MS. CHUNG:

7    Q    Good afternoon.  Where do you currently work?

8    A    I work for the New Orleans Police Department Crime Lab.

9    Q    How long have you worked for the New Orleans Police

10   Department Crime Lab?

11   A    This past time, I've been there since October of 2010.

12   Q    And, prior to that, had you work for the crime lab for

13   another period of time?

14   A    Yes, ma'am.  I worked there from February of 2000 to December

15   of 2006.

16   Q    What's your position at the crime lab?

17   A    I'm a firearms examiner.

18   Q    What do you usually do as a firearm examiner?

19   A    I usually examine firearms and ammunition components such as

20   cartilages and projectiles to determine if they were fired by the

21   same weapon.  Or, if a weapon's turned in, to determine if that

22   weapon was used.

23   Q    Do you occasionally have to pick up the items that you're

24   going to examine or that someone else might examine?

25   A    Not normally.

 1  Q    But, sometimes, out of the norm?

 2  A    Yes.

 3  Q    Were you working in the time after Hurricane Katrina in 2005?

 4  A    Yes, I was.

 5  Q    I'd like to show you what's identified as Exhibit 232.  I'm

 6  going to show you page 46791, Bate stamp of this exhibit.  If you

 7  could look at that, and the next page.

 8        Do you recognize what that type of document this is?

 9  A    This is used by the Central Evidence and Property Division.

10  I think this was on their old system.

11  Q    So you recognize it as a document that they used to use?

12  A    Yes.

13  Q    And that was back in 2006?

14  A    Yes.

15  Q    And do you recognize those items to be records that they keep

16  in the regular course of their business?

17        MR. FLEMING:  Judge, I'm going object.  These are

18  records kept by Central Evidence and Property.  The testimony

19  from Ms. Acosta would reflect that she worked elsewhere in the

20  New Orleans Police Department.

21        THE COURT:  I think we would need to lay a foundation of

22  how she would know this.  If she's not an employee or someone who

23  works in that division or that particular unit, then she's not

24  able to identify as a business record typically held.

25  BY MS. CHUNG:

1    Q    Are you familiar with Central Evidence and Processing?

2    A    Yes, I am.

3    Q    How are you familiar with them?

4    A    All the evidence and property that's collected by the New

5    Orleans Police Department gets submitted to them.

6    Q    And does all of the evidence you examine come from them?

7    A    Yes, it does.

8    Q    Because of that frequency, because all of your -- everything

9    you examine is from criminal CEP, are you familiar with their

10   records and the records they keep?

11   A    Yes.

12   Q    And are you familiar with the procedures they have for

13   checking evidence out?

14   A    Yes.

15   Q    And do you recognize those items to be receipts that they

16   used when they check items out?

17   A    This is the old receipt.

18   Q    So the old version?

19   A    Yes.

20              MS. CHUNG:  Your Honor, I offer just those two pages.

21              THE COURT:  Those are the two pages, this is the two

22   pages are Exhibit 232?

23              MS. BERNSTEIN:  It's two pages of 230.

24              THE COURT:  Are you offering the two pages?

25              THE WITNESS:  I'm only offering the two pages she's

```
 1    talking about.
 2              THE COURT:  And those are Bates numbers which numbers?
 3              MR. FLEMING:  Judge, can we approach?
 4              (Sidebar conference.  Jury not present.)
 5              MS. CHUNG:  I would have a better exhibit, but I was
 6    caught off-guard, and I'm doing it freestyle.  So this is what I
 7    got.  I mean, I have some more in my office.  That's why I'm
 8    offering only these two pages.
 9              THE COURT:  Why don't we call it Exhibit 232, which
10    consists of two pages.  And then it can be supplemented, unless
11    there's an objection to proceeding.  She's already identified the
12    two pages.
13              MR. FLEMING:  I wouldn't object to that.
14              My objection would be the location -- I'm just saying,
15    assuming you are going to offer to publish --
16              MS. CHUNG:  I don't have to publish.
17              MR. FLEMING:  If she's not going to publish, I don't
18    have an objection.
19              THE COURT:  The two pages numbers are?
20              MS. CHUNG:  94761 and 92.
21              THE COURT:  And 947692.
22              And that will be, for the time being, Exhibit 232,
23    subject to being supplemented.
24              MS. CHUNG:  I'm happy to black out whatever he wants
25    before I give it to her.  The only thing I care about is this
```

 1   part.

 2           MR. FLEMING:  No.  My objection would be if you are

 3   seeking to publish, because there's other information.  If you're

 4   not seeking to publish, I don't have an objection.

 5           MS. CHUNG:  I'm not.  But it does go to the jury.  So,

 6   if you don't want the jury so see that --

 7           MR. FLEMING:  If you're not offering to publish, then it

 8   doesn't get sent to the jury.

 9           THE COURT:  Well, let's be clear on what we're doing.

10   First of all, we're going to show her these two pages right now

11   on the stand.

12           MS. CHUNG:  Yes.

13           THE COURT:  Second of all, are we going to show any part

14   of the two pages on the screen?

15           MS. CHUNG:  I won't.

16           THE COURT:  Okay.  And your point is, if we label them

17   and admit them as exhibits, whether we publish them now,

18   regardless of that, they go into evidence and will go into the

19   jury room for deliberation.

20           MS. CHUNG:  That's what I'm afraid of.  If you don't

21   want that part of it, we should cross it out.  I can bring in a

22   redacted copy tomorrow.  I'm only offering it for this purpose.

23           MR. FLEMING:  Yeah.  But I think, if you're not going to

24   establish more of a chain, then you need to redact.

25           MS. CHUNG:  I'm totally happy to do that.  Like I said,

 1   I'm freestyling.

 2        THE COURT:  Let's do this.  We're going admit without

 3   objection Exhibit 232, which will consist of NAT 46791 and 792.

 4   My understanding, there will not be -- although they will be

 5   shown to the witness, they will not be published to the jury

 6   today with this witness.

 7        MS. CHUNG:  Correct.

 8        THE COURT:  Number three, you will discuss with Mr.

 9   Fleming what redactions if any are needed and are agreeable to

10   those two pages in order that they maybe provided to the

11   courtroom deputy for inclusion into the evidence in this case,

12   and by that I mean to be made a part of the record in this case

13   for jury deliberations and appeal.

14        MR. FLEMING:  Okay.

15        (Sidebar conference concluded.  Jury now present.)

16        THE COURT:  We're going to admit Exhibit 232, which

17   subject to any further supplementation, would now consist of the

18   two pages that are Bates number 46791 and 46792.  And the witness

19   has been shown those two pages.

20   BY MS. CHUNG:

21   Q   Ms. Acosta, does that reflect that you picked up some

22   evidence from the coroner's office on July 6th, 2006 and logged

23   it with CEP?

24   A   Yes, it does.

25   Q   Can you tell the jury about when you went to go pick that up.

```
1    A    We were asked to go.  I mean, somebody had to get us to go

2    there to go pick it up.  Which was out the norm, because normally

3    somebody from the coroner's office goes and submits it

4    themselves.  And it's not usually us that goes and gets it from

5    the coroner's office.

6    Q    And you're not usually the person who even picks up evidence;

7    is that right?

8    A    No, I'm not.

9    Q    But, on this occasion, you were asked to go?

10   A    Yeah.  I would have had to have been.

11   Q    When you say we, who do you mean?

12   A    Damian Corney and I went together.

13   Q    Is that someone else who works at the lab?

14   A    Yes, it is.

15   Q    Where did you go that day?

16   A    St. Gabrielle.

17   Q    What was at St. Gabrielle?

18   A    The coroner's office.

19   Q    Is that where the coroner's office was usually located?

20   A    No.

21   Q    Why was it located in St. Gabrielle at that time?

22   A    I guess because of Hurricane Katrina.

23   Q    Did you in fact pick up some evidence that day?

24   A    Yes, I did.

25   Q    What did you pick up?
```

1    A    This says two lead projectiles.  And this says five deformed

2    bullets and one deformed jacket.

3    Q    Do you remember how those were provided to you?

4    A    In envelopes.

5    Q    What kind of envelopes?

6    A    Letter envelopes.

7    Q    So just the white normal --

8    A    Yes.

9    Q    -- mailing envelopes?

10         What did you do with those?

11   A    I have put an evidence tag on them.  And then I submitted

12   them to Central Evidence and Property.

13   Q    Did you mark the envelopes in any way?

14   A    No.  But I attached a tag to them.

15   Q    Showing you what's collectively marked for identification as

16   16, 17, 18, 19, 20, and 21.  Turning your attention to the stack

17   of five with the sheet stapled on top, do you recognize those?

18   A    Yes.

19   Q    What do you recognize them to be?

20   A    Well, this is my evidence tag.

21   Q    When you say this is my evidence tag, what are you talking

22   about?

23   A    Well, I filled it in.  I filled out the information.

24   Q    So the sheet on top that's stapled on top?

25   A    Yes.

1   Q    Okay.  And what's attached?  What's stapled to that sheet?

2   A    It's evidence envelopes.  Well, letter envelopes that have

3   five deformed bullets and one deformed jacket.

4   Q    And do you recognize those envelopes to be the envelopes you

5   created that day?

6   A    Yes.

7   Q    How do you recognize those to be the same envelopes?

8   A    Just from the tag.  And the description on the tag matches

9   the envelopes.  That's it.  I mean --

10  Q    Turning your attention to that evidence tag, do you fill that

11  out in the normal course of your duties when you log evidence?

12  A    Yeah.  If you were logging evidence, yes, you would.

13  Q    And in your duty you do so accurately?

14  A    Yes.

15  Q    And at the time you actually do it, you actually log the

16  evidence, you --

17  A    Right, yes.

18  Q    -- you complete that form?

19  A    You need to have this in order to get the evidence admitted

20  to the CEP.

21  Q    And, the description on that back, does it match what's

22  attached?

23  A    Yes, it matches what's attached.

24  Q    And do those envelopes -- do you recognize those envelopes as

25  the same ones you picked up that day?

1    A    I mean, the description's consistent with the tag.

2    Q    So do you believe them to be the same?

3    A    Yes.

4    Q    Why do you believe them to be the same?

5    A    Well, my tag's on it.  That's my handwriting.  But, normally,

6    when we submit evidence, we don't write on the envelopes.  So

7    that's why I can't technically say, yes, I did.

8         Normally, if I were to deal with the evidence and would

9    have sealed it and things like that, my initials would be on it.

10        But, in this instance, it's not like that.  Because I

11   just submitted it.  So this is what they gave me and that's what

12   I put on the books.

13   Q    So it was already sealed and packaged when you picked it up?

14   A    Yes.

15   Q    And was it labeled with their own coroner's number at the

16   time?

17   A    Yes.

18        MS. CHUNG:  Your Honor, I would offer Exhibit 16, 17, 18

19   and 19 into evidence.

20        THE COURT:  Any objection?

21        MR. FLEMING:  There is, Your Honor.  May we approach?

22        (Sidebar conference.  Jury not present.)

23        MR. FLEMING:  Judge, two things.  One, her testimony was

24   it's not consistent with other ordinary actions that she would

25   ordinarily do.

1    And, two, they really have not established a chain that

2    connects this to this case.  All this witness has testified to is

3    she went to the coroner's office and they gave her -- picked

4    certain items up.  She didn't package them, she didn't retrieve

5    them from anyone.  She went and talked to somebody and got some

6    stuff and left.  There's nothing to establish that to this case

7    through her testimony.

8         MS. CHUNG:  I think that's a separate issue, but it will

9    be connected up with the autopsy protocols at that same number.

10        MR. FLEMING:  And meaning we can draw --

11        MS. BERNSTEIN:  There's a protocol number from that

12   office on the envelopes that's also on the autopsy.  So it will

13   be connected.  But this witness obviously can't testify to what

14   those numbers mean.

15        THE COURT:  But she has recited the number.  This is a

16   link in the chain of evidence, as I understand it.

17        MR. FLEMING:  It's a link in the chain, but they haven't

18   established that chain.  Once they go through the other steps --

19        THE COURT:  It's their burden of proof to establish the

20   other link.  I agree with you, that in and of itself it would

21   seem irrelevant.  However, if it's part of the chain of evidence

22   that the government has to prove by establishing every link in

23   the chain, this is a link in the chain, then it's relevant.  If I

24   understand the objection.  I guess maybe I don't understand the

25   objection.

1        MR. FLEMING:  I am not objecting to relevancy.  I'm

2   objecting that they haven't established a chain to introduce

3   this, they don't have a connection to the case in order to have

4   that evidence admitted at this point.  I would assume they can do

5   it in the future, and they might be able to, but they haven't

6   done it.

7        THE COURT:  So you are saying they're not doing it in

8   the order which is the most logical?  Is that your point?

9        MR. FLEMING:  Well, no.

10       THE COURT:  That we don't have a starting point?

11       MR. FLEMING:  Something to link it to this case, per se.

12   All this witness last testified to is she went to St. Gabrielle,

13   she went to the morgue and picked some stuff up.  That's it.

14       MR. HESSLER:  Nonetheless, she didn't actually know what

15   they contained, except based on descriptions.

16       MS. CHUNG:  Yeah, right.  That doesn't go to the

17   admissibility at this moment.  It goes to their weight.  So, if

18   we can't connect it up, they can punch a hole in the case, They

19   can punch holes in the case that they don't have anything to do

20   with anything.  I've given evidence that they were under

21   circumstances that they are what they purport to be, which is

22   simply evidence picked up from the coroner's office and logged at

23   CEP.  I agree that I will have to connect up later to numbers in

24   this case, but it doesn't mitigate them being entered at this

25   time.

1        THE COURT:  I'm going to go ahead and admit it.  If it's

2   not linked up, you can move to strike.  If they're not linked up,

3   you have an argument that there is a link in the chain missing

4   from the government's offer of proof and move to strike this

5   witness's testimony and these exhibits.

6        MR. HESSLER:  I think that's probably the way we needed

7   it to be done, subject to our option that, if it's later learned

8   that is in fact contained the described evidence, then our

9   objection should be reviewed again.

10        THE COURT:  Correct.  Correct.  That's precisely what I

11   intend to do.  So I think that's correct.  And I will say that

12   it's conditionally admitted.

13        (Sidebar conference concluded.  Jury now present.)

14        THE COURT:  This was this was offered as 16, 17, 18 and

15   19, and the Court will admit those exhibits subject to condition.

16        (Exhibits admitted.)

17   BY MS. CHUNG:

18   Q   20 and 21, there is a similar slip in two envelopes.

19   A   This says two lead projectiles, which coincides with what I

20   wrote on the evidence tag.

21   Q   When you say that -- you're going holding the slip of paper?

22   A   Yeah.  Because it's not stapled.

23   Q   And did you complete that piece of paper?

24   A   Yes, I did.

25   Q   At the time that you lodged this evidence?

1  A    Yes, I did.

2  Q    And are those two envelopes -- do you believe them to be the

3  two envelopes you picked up that day?

4  A    Yes.

5  Q    And why is that?

6  A    Well, because this would be my tag and my description's

7  consistent with what's on the envelopes themselves.

8  Q    And do the envelopes themselves bare numbers that were on

9  them at the time the coroner's office gave them to you?

10  A    Yes.

11        MS. CHUNG:  And, Your Honor, I would offer those with

12  the same discussion we had at the bench.

13        THE COURT:  Subject to the same objection?

14        MR. HESSLER:  Yes.

15        THE COURT:  Likewise, the Court will conditionally admit

16  Exhibits 20 and 21 for the reasons stated.

17        (Exhibits admitted.)

18        MS. CHUNG:  I have no furthers questions, Your Honor.

19        THE COURT:  Okay.

20        Cross?

21                        CROSS EXAMINATION

22  BY MR. FLEMING:

23  Q    Good afternoon, Ms. Acosta.  I have just a few questions.

24        You essentially went out to the St. Gabrielle morgue.

25  A    Yes sir.

1    Q    And picked up a few items?

2    A    Yes.

3    Q    Don't really know where those items came from?

4    A    No, sir.

5              MR. FLEMING:  Thank you.

6              THE COURT:  Any redirect on this?

7              MS. CHUNG:  No, Your Honor.

8              THE COURT:  I have to ask.  Following the procedure

9    here.

10             Thank you, ma'am.  You can step down.

11             I think we're going to go ahead and we'll let you go a

12   few minutes early today since we held you over a few minutes

13   later yesterday and maybe even the day before yesterday.  It's

14   about -- it's almost quarter to five.  So we'll let you go,

15   subject to the same instructions I have given you every day in

16   this case not to discuss the case with anyone and to refrain from

17   viewing or reading anything about the case between now and

18   tomorrow morning.

19             Now, tomorrow, we're going to start at 8:30 again.  I am

20   hoping that perhaps we can finish maybe an hour early tomorrow to

21   get you started on your weekend.  We'll see how the day goes, but

22   we'll try it finish just a pinch early tomorrow.

23             And then, next week, I think I mentioned to you at the

24   outset of the trial the schedule next week will be Monday through

25   Thursday.  We will not have court on Friday the 15 -- well, I'll

1    have court on Friday, the 15th, but you won't.  So you can plan

2    ahead, if you have meetings or appointments or anything like

3    that.  You will be allowed to resume your normal activity for

4    that Friday, if go to your workplace, subject again to the

5    instructions that I'll give you again this coming Thursday.  But

6    that will be the schedule.

7              So we will see you tomorrow at 8:30.  Thank you all.

8              (Jury exits.)

9              THE COURT:  Is there anything that needs to be covered

10   either in open court or at the bench before we conclude for the

11   day?

12             MS. BERNSTEIN:  I don't think we have anything.

13             MR. FLEMING:  We don't have anything.

14             THE COURT:  Then why don't you all approach, we have a

15   couple things to discuss not on the record, and then we'll be

16   done for the day.

17             (4:44 p.m., proceedings concluded.)

18

19                         CERTIFICATE

20

21        I, Susan A. Zielie, Official Court Reporter, do hereby
     certify that the foregoing transcript is correct.

22

23                         /S/ SUSAN A. ZIELIE, FCRR

24             _____
                         Susan A. Zielie, FCRR

25