```
 1              IN THE UNITED STATES DISTRICT COURT FOR

 2                  THE EASTERN DISTRICT OF LOUISIANA

 3

 4    UNITED STATES OF AMERICA,        ) 10-CR-204
                                       )
 5                    Plaintiff,       ) Section N
                                       )
 6          v.                         ) New Orleans
                                       )
 7    KENNETH BOWEN, ROBERT GISEVIUS   ) July 8, 2011
      ROBERT FAULCON, ANTHONY          )
 8    VILLAVASO, ARTHUR KAUFMAN,       )
                                       )
 9                    Defendants.      ) Jury Trial
      _____)  Day Ten

10

11

12                   TRANSCRIPT OF PROCEEDINGS

13                          VOL. X

14        BEFORE THE HONORABLE KURT D. ENGELHARDT

15              UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21    SUSAN A. ZIELIE, RPR, FCRR
      Official Court Reporter
22    HB 406
      500 Poydras Street
23    New Orleans, Louisiana 70130
      susan_zielie@laed.uscourts.gov
24    504.589.7781

25    Proceedings Recorded by Computer-aided Stenography.
```

```
 1    APPEARANCES:

 2    For the Government:          US Attorney's Office
                                   BY:   THEODORE CARTER, AUSA
 3                                 500 Poydras Street, Room B-210
                                   New Orleans, LA 70130
 4                                 504.680.3165
                                   usala.ecfcr@usdoj.gov
 5
                                   US Department of Justice
 6                                 Civil Rights Division
                                   BY:   BARBARA BERNSTEIN, ESQ.
 7                                 601 D Street NW
                                   Office PHB 5123
 8                                 Washington, DC 20004
                                   202.353.0032
 9                                 bobbi.bernstein@usdoj.gov

10                                 US Department of Justice
                                   Civil Rights Division
11                                 BY:   CINDY K. CHUNG, ESQ.
                                   950 Pennsylvania Avenue NW
12                                 Washington, DC 20530
                                   cindy.chung@usdoj.gov
13                                 202.305.4057

14    For Kenneth Bowen:           FRANK G. DESALVO, APLC
                                   829 Baronne Street
15                                 New Orleans, LA 70113
                                   504.524.4191
16                                 frankd@fdesalvo.com

17    For Robert Gisevius:         ERIC J. HESSLER, ESQ.
                                   700 Camp Street
18                                 New Orleans, LA 70130
                                   504.528.9500
19                                 hessler.law@gmail.com

20

21

22

23

24

25
```

```
 1    For Robert Faulcon:        PAUL C. FLEMING, JR., ESQ.
                                 2821 Kingman Street, Suite C
 2                               Metairie, LA 70006
                                 504.888.3394
 3                               pfleming@fleminglaw.net

 4                               King Krebs & Jurgens, PPLC
                                 BY: LINDSAY A. LARSON, III, ESQ
 5                               201 St. Charles Avenue
                                 45th Floor
 6                               New Orleans LA 70130
                                 504.582.3800
 7                               llarson@kingkrebs.com

 8    For Anthony Villavaso:     DeSalvo Blackburn & Kitchens
                                 BY:  ROGER W. KITCHENS, ESQ.
 9                               2802 Tulane Avenue
                                 New Orleans, LA 70119
10                               504.821.6171
                                 rkitchens@desalvoblackburn.com
11
                                 TIMOTHY A. MECHE, ESQ.
12                               700 Camp Street
                                 New Orleans, LA 70130
13                               504.528.9500
                                 tim_meche@yahoo.com
14
      For Arthur Kaufman:        STEPHEN D. LONDON, ESQ.
15                               1100 Poydras Street
                                 Suite 2950
16                               New Orleans, LA 70163
                                 504.582.2427
17                               ebyte2@aol.com

18

19

20

21

22

23

24

25
```

```
 1                        EXAMINATION INDEX

 2

 3    Testimony of:

 4        Lance Madison
              Direct by Mr. Carter            6, 120
 5            Cross by Mr. DeSalvo             64
              Cross by Mr. Larsen             99
 6            Cross by Mr. Hessler            105
              Cross by Mr. London            114
 7            Cross by Mr. Meche             115

 8        Robert Rickman
              Direct by Mr. Carter          128, 173
 9            Cross by Mr. Fleming           152
              Cross by Mr. Hessler           163
10
          Kerry Najolia
11            Direct by Ms. Bernstein       185, 297
              Cross by Mr. Meche             264
12            Cross by Mr. Hessler           274
              Cross by Mr. DeSalvo           294
13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1              NEW ORLEANS, LOUISIANA; FRIDAY, JULY 8, 2011

 2                          8:30 A.M.

 3          THE COURT:  You may be seated.

 4          Except for you, sir.  I'm going to ask you to remain

 5   standing.

 6          Thank you all for being here on time.  Actually, a few

 7   minutes early.  We're making pretty good progress on this, the

 8   attorneys have been pretty efficient up to this point.  So we're

 9   going to go ahead and get going on this.

10          This gentleman is?

11          MR. CARTER:  Mr. Lance Madison.

12          THE COURT:  You may be seated.

13          Please state and spell your full name for the record.

14          THE WITNESS:  My name is Lance Madison.

15                       DIRECT EXAMINATION

16   BY MR. CARTER:

17   Q   Mr. Madison, I'd like you to tell the jury a little bit about

18   yourself, sir.  Where do you work?

19   A   I worked at Federal Express at the New Orleans International

20   Airport.

21   Q   And what do you do there?

22   A   I was a CT driver, which is a commercial transportation

23   driver.

24   Q   You said you were.  Are you not doing that now?

25   A   No, I'm not working now.

1    Q    Why not?

2    A    I'm disabled.

3    Q    Disabled.  How long have you been disabled?

4    A    Since the storm.  Since September the 4th of --

5    Q    2005?

6    A    2005.

7    Q    Hurricane Katrina?

8    A    Yes.

9    Q    Prior to being disabled, how long had you worked at Federal

10   Express?

11   A    Close to 25 years.

12   Q    So 25 years.

13        And what did you do before that?

14   A    Played pro ball for two years.  I was with the Oakland

15   Raiders, Kansas City.  I worked for Hertz Rent-A-Car.

16   Q    Did you play football in college?

17   A    Yes.  I played at Southern University.

18   Q    What position?

19   A    Wide receiver.

20   Q    And, after graduating, you did what?

21   A    I worked for Hertz.  I had got hurt, and started working with

22   Hertz after I graduated.

23   Q    You say you got hurt.  Where did you get hurt?

24   A    At the Southern University, and the leg broke.

25   Q    And what happened next?

1    A    Started working with Federal Express, until I got signed with

2    an Oakland Raider's contract, free agent contract.

3    Q    What year was that?

4    A    1980.

5    Q    How long were you with the Oakland Raider's?

6    A    I was there for a period of duration of three months, until I

7    got released.

8    Q    Get to play in any games?

9    A    No, I didn't play no games with them.

10   Q    Any scrimmages?

11   A    Yes.  I played scrimmage, yes.

12   Q    What position?

13   A    Wide receiver.

14   Q    Then, after that, what happened?

15   A    I got back to Hertz, and I got signed with the Kansas City

16   Chiefs.

17   Q    How long were you with Hertz when you went back with Hertz?

18   A    About two years.

19   Q    What did you do then?

20   A    I was a manager.

21   Q    Manager of what?

22   A    Quality control, manager of the rent-a-car.

23   Q    And then you mentioned another football team contacted you?

24   A    Yes.  Kansas City Chiefs.

25   Q    And what did you do with the Kansas City Chiefs?

1    A    Played wide receiver and kick off, punt return.

2    Q    What year?

3    A    1981.

4    Q    How long were you with them?

5    A    For about six months.  Then I signed a contract in February,

6    and I was released during pre-season.

7             And, after that, I went to work with Federal Express.

8    Q    And why were you released?

9    A    Injuries.

10   Q    What was your injuries?

11   A    Had broken legs, and some screws put in my ankle.

12   Q    Was that related in any way to the college injury?

13   A    Somewhat, yes.

14   Q    Tell me about your family, Mr. Madison.

15   A    I came from a close family.  We all was very close.  We

16   always looked out for one another.  We're a praying family.

17   Q    How many brothers and sisters?

18   A    I had five brothers and four sisters.

19   Q    Mom and dad, of course?

20   A    Yes.  My mother, and my father who was in the service.

21   Q    Live here in New Orleans?

22   A    Yes.

23   Q    You were saying you were very close.

24   A    Yes.  We are very close.  We always looked out for one

25   another.  We prayed together.  We did a lot of things together.

1   Q   Tell me about your family and your family's preparations for

2   Hurricane Katrina back in August of 2005.

3   A   My sister, Jacque Brown, she came to pick up my mother and my

4   brother.  I have two brothers, they're both disabled.  I had one

5   of the brothers with me during the time.  When I got off from

6   work, I went to pick him up, and we stayed at my townhouse.

7   Q   You mentioned two brothers are disable.  Let's go through the

8   brothers and the sisters.  How many brothers do you have?

9   A   I had six brothers and four sisters, but five of them are

10  deceased.

11  Q   Five of them are deceased.

12           At the time of Hurricane Katrina, how many are deceased?

13  A   Two brothers that were deceased and two sisters.

14  Q   And you mentioned two of your brothers lived with your

15  mother?

16  A   Yes.

17  Q   Which two brothers are those?

18  A   Raymond Madison and Ronald Madison.

19  Q   Was there any particular reason they lived with your mother?

20  A   They were mentally challenged.

21  Q   Raymond and Ronald?

22  A   Yes.

23  Q   How long had they lived with your mother?  Since birth?

24  A   Since birth.

25  Q   Were they living with your mother at the time of the

1    Hurricane Katrina?

2    A    Yes.

3    Q    So what preparations did your family take regarding

4    evacuating or staying in town for Hurricane Katrina?

5    A    Well, like I said, my sister, she came and picked up my

6    mother and my brother to evacuate.  And I went to pick up my

7    brother, Ronald, who stayed with me.  And I had a two-story

8    townhouse.

9    Q    Why did Ronald stay with you?

10   A    Because we had two dogs, and he didn't want to leave the

11   dogs.  So I brought them by my place.

12   Q    What were the dogs name?

13   A    Bobby and Sushi.

14   Q    What types of dogs?  Big dogs or small dogs?

15   A    Small dogs.  Dachshunds.

16   Q    Dachshunds.

17   A    Yeah.

18   Q    So you brought the dogs to stay with you?

19   A    Yes.

20   Q    And Ronald stayed with you?

21   A    Yes.

22   Q    This is when, what day?  Saturday before the storm, Sunday

23   before the storm?

24   A    Sunday before the storm.

25   Q    Sunday before the storm.

1              And at some point the storm hit?

2    A    Yes.

3    Q    What happened?

4    A    We was upstairs in my townhouse, and Ronald and I was just

5    trying to get some rest because I had just gotten off from work

6    before I picked him up.  And I had my van parked in the back,

7    ready to go, in case we needed to leave.  And what happened was,

8    I was upstairs, Ronald came and woke me up and told me the water

9    was coming in the house.  And we had about six to eight feet of

10   water coming in.

11   Q    What did you do?

12   A    We went upstairs and stayed upstairs.  We went upstairs, went

13   to the roof, tried to get some help.  Were on top of my roof.

14   Q    Did you have to break through the roof, or did you have a

15   door?

16   A    I had to break through, went through the ventilator.

17   Q    Up to the attic?

18   A    Up to the attic.

19   Q    On the actual rooftop?

20   A    Yes.

21   Q    How long were you on the rooftop?

22   A    We was up there for a total of two days.

23   Q    Two days?

24   A    In and out.

25   Q    What you do you mean, in and out?

1  A    We came back in, tried to get some rest.  And then we came

2  back out and tried to get rescued.  They had helicopters flying

3  around.

4  Q    You say Ronald was mentally disabled?

5  A    Yes.

6  Q    Roughly, what age would you put him at in terms of his mental

7  development?

8  A    Between 6 and 7 years old.

9  Q    How was he handling all of this, the water, the flood?

10  A    He was very frightened, scared.  I tried to calm him down.

11  We prayed.  And I just tried to talk to him and keep him comfort.

12  Q    But, at some point, you were on the roof; and, another point,

13  you weren't on the roof?

14  A    Yes.

15  Q    So you're in and out of the house?

16  A    Yes.

17  Q    How long were you on the roof?

18  A    About two days.  We went up in and out, tried to get rescued.

19  Like I said, they had helicopters flying around.  When we

20  couldn't get no help, we went back in.  Waited until the water

21  receded.  We stayed there a couple days, and then we left the

22  house.  We had about five feet of water outside.

23  Q    Five feet of water outside when you left?

24  A    Yes.

25  Q    So how did you leave?  Did you swim out, did you walk out?

1   A   Both.  We swam and walked.

2   Q   What did you take with you?  Ronald, of course.  Anything

3   else?

4   A   Just Ronald, myself.

5   Q   What about the dogs?

6   A   The dogs were left in there, upstairs.

7   Q   Where did you go?

8   A   We went to my brother's office on Chef Menteur Highway.

9   Q   What's your brother's name?

10  A   Dr. Romell Madison.

11  Q   What type of doctor is he?

12  A   He's a dentist.

13  Q   Did you have to swim all the way there?

14  A   Mostly, we walked through the water.

15  Q   You walked through the water.

16  A   Yeah.

17  Q   And what happened when you got there?

18  A   We went to his office.  And I had a key to his office so we

19  went there and rest up.  Stayed there for awhile.

20  Q   How long did you stay there?

21  A   Until the incident happened on that Sunday.

22  Q   Were there any stores nearby the office?

23  A   Yes.  They had a Winn-Dixie across the street.

24  Q   Any hotels or any other people around that location?

25  A   Yes.  They had a hotel right next door to his office.

1    Q    What was the name of that motel?

2    A    Family -- Friendly Inn.   Friendly Inn.

3    Q    Family Inn, or Friendly Inn, which one, or both?

4    A    I know they had two hotels we crossed.   One was Family Inn,

5    one was Friendly Inn.

6    Q    What was the name of the hotel or motel or inn closest to

7    your brother's office?

8    A    It was Friendly Inn.

9    Q    Did you ever interact with the people there?

10   A    Yes.

11   Q    And in what way?

12   A    We would go over there, tried to get information from them

13   and try to see about getting out of the city.   We went over

14   there, they had food.   We ate with them.

15   Q    With the people at the Friendly Inn?

16   A    Yes.

17   Q    You said they had food, or you had food?

18   A    They had food.

19   Q    So they shared their food with you?

20   A    Yes, they did.

21   Q    What about water, did you have any water?

22   A    Yes.   My brother's office has these five gallon water he kept

23   for his patients.   He had about five or six five gallon waters in

24   there.

25   Q    You used that to drink?

| | | |
|---|---|---|
| 1 | A | We used that to drink and also we used that to bathe. |
| 2 | Q | Did you ever have to go get supplies from anywhere? |
| 3 | A | Yes, we did.  We went to Winn-Dixie across the street. |
| 4 | Q | You said you were there for a couple of days? |
| 5 | A | Yes. |
| 6 | Q | Did you ever leave? |
| 7 | A | Yes, I did. |
| 8 | Q | Why did you leave? |
| 9 | A | I went to go back and get the dogs from my condo. |
| 10 | Q | Do you remember what day that was? |
| 11 | A | That was Thursday, which was my birthday. |
| 12 | Q | Did you go alone, or did you take Ronald? |
| 13 | A | I went alone. |
| 14 | Q | Why did you go alone? |
| 15 | A | Because the water was still high, and Ronald was frightened. |
| 16 | | I locked him up in the office and told him I'd be back with the |
| 17 | | dogs. |
| 18 | Q | And what happened? |
| 19 | A | I went to pick up the dogs and brought them back. |
| 20 | Q | When you went to pick up the dogs, was the water still high? |
| 21 | A | Yes, it was. |
| 22 | Q | So did you have to swim for part of the ways, or were you |
| 23 | | able to walk through it? |
| 24 | A | I walked through most of it. |
| 25 | Q | Did you have any problems getting the dogs? |

1    A    No, I didn't.

2    Q    Any problems getting out with the dogs?

3    A    No.

4    Q    Did you need assistance in any way in returning with those

5    dogs?

6    A    Yes, I did have assistance.  They had some boats with some --

7    I guess people in the boats that was helping, helpful.

8    Q    People with boats?

9    A    Yeah.

10   Q    And how did they help you?

11   A    Once I got to my place, they helped bring the dogs back to

12   the highway.

13   Q    You say when you got to your place.  You're talking about

14   your condo?

15   A    Yes.

16   Q    When you got back to your place, you went in, got your dogs?

17   A    Yes.

18   Q    And you came out?

19   A    Yes.

20   Q    What happened?

21   A    They had two boats over there with law enforcements on it.

22   Q    Law enforcement.  Could you tell what type of law

23   enforcement?

24   A    I think Jefferson Parish, they had out-of-town law

25   enforcement.

1    Q    So law enforcement officers?

2    A    Yes.

3    Q    And they helped you?

4    A    Yes.

5    Q    Were you grateful?

6    A    Very grateful.

7    Q    Did you thank them?

8    A    Yes, I did.

9    Q    When you say they helped you, how far did they then help you

10   in terms of getting back to your brother's office?  How far did

11   they take you?

12   A    They brought me back close to Chef Highway.

13   Q    Was that to an area where you could walk?

14   A    Yes.

15   Q    What happens next?

16   A    I got the dogs and I walked, went back to my brother's

17   office.

18   Q    Was Ronald happy to see the dogs?

19   A    Very happy.

20   Q    What happened next?

21   A    We stayed there Thursday, Friday, Saturday and Sunday.  And

22   we tried to clean up the office and -- the office was messed up.

23   Had a lot of debris.  Had a big hole in the roof.  And I tried to

24   make it as comfortable as we could until we got some help.

25   Q    Did you feel safe in there?

```
 1    A    Yes, I felt safe.

 2    Q    Were you attempting to get out of the New Orleans area in any

 3    way?

 4    A    Yes, I was.

 5    Q    What did you do in an attempt to get out of New Orleans?

 6    A    I walked up and down Chef Highway.  They had buses that was

 7    picking folks up to bring them out of town or to the Superdome.

 8    And I would go back and try to find out when they would have

 9    another bus to come pick up.

10    Q    What did you find out?

11    A    They told me come back another day.  The bus would, you know

12    -- they didn't give me any special time, they just said come

13    back.

14    Q    Who is they?

15    A    People that was out there.

16    Q    Just people standing around?

17    A    Yes.

18    Q    Were these law enforcement officers?

19    A    No.

20    Q    Civilians?

21    A    Civilians.

22    Q    Were they also trying to get rescued?

23    A    Yes.

24    Q    How many days did this go on, your attempts to get rescued?

25    Do you remember at this point?
```

1    A    It was about every day.

2           The people next door to the hotel, I talked to them to

3    try to see about getting help, and they said they may have a bus

4    that come one day to pick up everybody.  So ...

5    Q    Let me direct your attention to September 4th, 2005, the

6    morning of the shooting.  How did that day start out for you?

7    A    That morning, we got up, was in my brother's office that

8    morning.  Around 8 o'clock, I let the dogs out to use the --

9    whatever they need to do.  And then I put them back in the

10   office.  And Ronald and I decided to go down Chef Highway to try

11   to seek help leaving the city.  And also --

12   Q    You walked down the Chef Highway?

13   A    Yes.

14   Q    And you said also?  I'm sorry.

15   A    Then we tried to go to my mother's house, which is about a

16   mile and a half away from the office.

17   Q    Why were you going to your mothers's house?

18   A    To retrieve some bicycles to ride to get as far as we can.

19           MR. CARTER:  Can I have Exhibit 257, please?  I believe

20   that's an aerial view.  It's already in evidence.

21   BY MR. CARTER:

22   Q    Are you familiar with what's shown on this aerial view?

23   A    Yes.

24   Q    Can you point to the Danziger Bridge on the screen?  Just

25   touch it with your finger.

```
 1   A    (Witness complies.)

 2   Q    Point to the center of the bridge, just to make sure we're

 3   properly oriented.

 4        Thank you.

 5        What route did you take to go to your mother's house

 6   that morning?

 7   A    We left westbound going eastbound.

 8   Q    Draw a line on the route you took as far as you can on this

 9   aerial view.

10   A    (Witness complies.)

11   Q    Where is your mother's house located?

12   A    She lives at 4833 Lafon Drive in Academy Park.

13   Q    Can you draw the route you took all the way to your mother's

14   house with this aerial view?

15   A    (Witness complies.)

16   Q    Was it a straight-shot back?

17   A    Yes.

18   Q    What happened when you got to your mother's house?

19   A    We couldn't get back there, the water was real high.  So we

20   turned back around and came back.

21   Q    Why were you going to your mother's house?

22   A    To retrieve bikes.

23   Q    Were you able to retrieve those bikes?

24   A    No.  We wasn't able to get back there.

25   Q    How early in the morning was this, do you remember?
```

1    A    Around 8 o'clock in the morning.  Between 8 and 8:30.

2    Q    What did you do next?

3    A    We turned around, going to my brother's office.

4    Q    Same route you went out, you took it back?

5    A    Yes.

6    Q    On the way out to your mother's house, did you have any items

7    with you?

8    A    No.

9    Q    Did you pick up any items on the way back?

10   A    Yes, I did.

11   Q    What?

12   A    I picked up a shovel.  I had a shovel with me.  And, when we

13   got right under the interstate, they had a cart, pushcart, so I

14   put the shovel in the pushcart and I pushed it from --

15   Q    When you say right under the interstate, can you show on this

16   aerial view where?  If you can see this on this photograph.

17   Right about there?

18   A    Right about there.

19   Q    That's where you the found the shovel, or the cart?

20   A    The cart.

21   Q    Where did you find the shovel?

22   A    The shovel was closer to my mother's -- on the Chef Highway

23   closer to my mother's house.

24   Q    Why did you want the shovel?

25   A    I brought the shovel to clean the debris that my brother had

1    in his office.

2             And I brought the cart back to help the people that was

3    at the hotel.

4    Q   What type of cart are we talking about?  Is this a grocery

5    store pushcart?

6    A   It's a flat cart they usually have at Lowe's or Home Depot.

7    Q   Flat cart?

8    A   Flat cart, yes.

9    Q   Is that the flat cart that's low to the ground?

10   A   Yes.

11   Q   With the handle that comes up?

12   A   Yes.

13   Q   What did you do with that shovel when you found the cart?

14   A   I put the shovel on the cart and I pushed it back towards the

15   bridge.

16   Q   This shovel is laying on the cart?

17   A   Yes.

18   Q   And the cart is low to the ground, if I understand you

19   correctly?

20   A   Yes.

21   Q   And you're walking, pushing it?

22   A   Yes.

23   Q   What happens next?

24   A   When I passed, they had another hotel which is called the

25   Family Inn.

1    Q    Can you, on this aerial view -- I realize we're pretty far

2    out -- can you approximate where the Family Inn is on this

3    photograph?

4    A    It's right by --

5    Q    Somewhere in that area?

6    A    Somewhere in that area.

7    Q    What happened around the Family Inn?

8    A    As we was passing the Family Inn, they had a group of people

9    that was coming from the Family Inn.

10   Q    When you say we, it's you and Ronald?

11   A    Me and Ronald, yes.

12   Q    What you did notice about this group of people?

13   A    They was walking toward the Chef Highway.  And they was

14   walking behind me and Ronald.

15   Q    Walking behind you and Ronald?

16   A    Yes.

17   Q    What were they doing?

18   A    Just walking.  Going towards the same direction.

19   Q    Same direction?

20   A    Yes.

21   Q    How many people in this group, do you recall?

22   A    They had a bunch.  Five, six.  I couldn't tell.  But they had

23   a group of people.

24   Q    You referred to them as a family.  Why did you think they

25   were a family?

```
 1   A    Well, they had kids with them.  I didn't know if they was a

 2   family or not.  I just saw it was a group of people.

 3   Q    You assumed they were a family?

 4   A    I assumed that, yes.

 5   Q    So there were men and women?

 6   A    I didn't notice the men and women.  I noticed they had

 7   teenaged kids.

 8   Q    Kids and adults?

 9   A    Yes.

10   Q    What happened next?

11   A    We walked towards the bridge with the cart, I pushed the

12   cart.  And they had these teenaged kids running up and down Chef

13   Highway.

14   Q    Were these the same teenaged kids you saw with the group you

15   thought was the family, or a different group of kids?

16   A    Same one.

17   Q    What were they doing?

18   A    Running up and down, like playing up there.

19   Q    Were they playing, or were they doing something threatening?

20   A    Nothing threatening.  Running up and down, like they was

21   racing or something.

22   Q    Could you tell if they were angry, laughing, serious?

23   A    No.

24   Q    Did they concern you in any way?

25   A    No.
```

Q    Did they threaten you in any way?

A    No.

Q    Did you ever talk to them?

A    No, no.

Q    No inaction whatsoever?

A    None at all.

Q    And you saw them, if I understand you correctly, running back and forth?  Or just in one direction?

A    Looked like they was running back and forth.

Q    Did you ever get up close to any of these kids?

A    No.

Q    Were they always behind you, or did they ever get in front of you?

A    Well, they had one that got in front of me.  But they had two others that was in the back of me.

Q    This one that got in front of you, did he run in front of you or walk in front of you?

A    He ran in front of me.

Q    Ran by you?

A    Yeah, ran by me.

Q    Say anything to you as he ran by you?

A    No.

Q    Did you say anything to him?

A    No.

Q    What did you see him do?

1    A    I saw him, he got to the bridge, and he was on the side of

2    the bridge, bent over.   I don't know what he was doing.   I know

3    that he was at the end of the bridge right by the side to the

4    right.

5    Q    Was he sitting down, or standing up?

6    A    He was sitting down, bent over.

7    Q    Sitting down, bent over?

8    A    Yeah.

9    Q    And could you tell what he was doing?

10   A    No, I couldn't.

11   Q    Did you talk to him at that point?

12   A    No.

13   Q    Did you walk by him?

14   A    I walked by him.

15   Q    Was Ronald still with you?

16   A    Yes.

17   Q    Where was the pushcart?

18   A    I was pushing the cart up the bridge.

19   Q    And where was the shovel?

20   A    On the pushcart.

21   Q    And you're pushing it up the bridge?

22   A    Yes.

23   Q    What happened next?

24   A    As I was pushing it up the bridge, I heard gunshot.   And,

25   when I looked back, I saw the kids running behind me --

1    Q    Let me stop there.  How many gunshots did you hear, if you

2    recall?  Did it seem like one, or more than one?

3    A    It was more than one.

4    Q    Seemed like more than two?

5    A    Yes.

6    Q    Seemed like many?

7    A    Could have been, yes.

8    Q    Okay.  And what did you do when you heard this gunshot?

9    A    When I heard the gunshots, I looked back and I saw these kids

10   running behind me.  And I'm assuming they had something in their

11   hand.  And I turned around only for a split second, I looked.

12   And I told Ronald, I said:  Run, Ronald, they're shooting at us.

13   Q    When you looked back, did you look back only at the kids, or

14   further than the kids?

15   A    At the kids.

16   Q    You didn't look past the kids?

17   A    No.

18   Q    Did you see anything behind the kids?

19   A    No.

20   Q    Your vision stopped where?

21   A    Right at the kids.

22   Q    What did you do next?

23   A    I turned to run and started running up the bridge.  And told

24   Ronald to run.  I said:  Somebody shooting at us.

25   Q    When you say they're shooting at us, who were you referring

1    to?

2    A    To the kids.

3    Q    Who did you think were shooting at you?

4    A    Kids.

5    Q    What happened next?

6    A    We ran up the bridge.  I pushed the cart out the way and run

7    up the bridge with Ronald.  And, as we was running, I didn't hear

8    no more gunshots until we got half way up the bridge.

9    Q    Let me stop you right there.  When you first hear those

10   gunshots and you say you think it's the kids, if I heard you

11   correctly, you look back and you think they're pointing something

12   at you, you think they're shooting at you?

13   A    Yes.

14   Q    Do you continue to push the shopping cart at that point, or

15   do you do something else with it?

16   A    No.  I just pushed it out of way and started running up the

17   bridge.

18   Q    You pushed it out the way?

19   A    Yes.

20   Q    What did you do with the shovel at that point?

21   A    It was still on the cart.  I don't know what happened to that

22   shovel.

23   Q    So you pushed it out of the way and began to run?

24   A    Yes.

25   Q    Why were you running?

1    A    To get away from the gunshots that I heard.

2    Q    The kids that were shooting?

3    A    Yes.

4    Q    Were you scared?

5    A    Scared.  Yes, very scared.

6    Q    What was Ronald doing?

7    A    He was frightened, and I just told him to run.  And we both

8    running up the bridge.

9    Q    What happened next?

10   A    We was going.  We got about half way up the bridge, and

11   that's when I heard a whole lot of gunshots, lots of gunshots.

12   And I turned back around.  When I turned around, I saw a truck

13   pulled up to the bridge and had people that was coming out the

14   truck and was already out of the truck, shooting at the people

15   that was behind me.  And, next thing I know, they was shooting at

16   us.

17   Q    So what did you think was happening at this point in time?

18   A    I was confused.  I thought it was a game, trying to shoot

19   people that was on the bridge.

20   Q    What could you tell about the people who were shooting the

21   kids?

22   A    They had, looked like rifles or sawed-off shotguns.  They

23   were just constantly firing a lot of shots.

24   Q    Were you running at this point, or did you stop?

25   A    I stopped and turned around to see, trying to assess the

```
 1   situation.  And then, when I saw them trying to shoot at us, we
 2   turned and started running.  When I looked up, I saw Ronald had
 3   blood coming out of his shoulder.
 4   Q   When you said they started shooting at you, how long did it
 5   take for you to realize that you were also being shot at?
 6   A   Not long at all.
 7   Q   Not long at all?
 8        Could you see who was shooting at you?
 9   A   I seen a guy with a dark suit.  They had a bunch of them down
10   there.  I don't know how many there was, but there was a bunch of
11   guys just jumped out the truck.
12   Q   So it appeared to be someone from the group that jumped out
13   of the truck?
14   A   Yes.
15   Q   Someone from the group that was shooting at the kids who you
16   believed was shooting at you?
17   A   Yes.
18   Q   And you began running again?
19   A   Yes.
20   Q   What happened next?
21   A   We started running again, and I was trying to comfort Ronald.
22   He was bleeding very badly.  He told me to stop as we was on the
23   bridge.  He was --
24   Q   Wait.  Let me stop you there.  Are you at the top of the
25   bridge yet?
```

1   A    Close to the top of the bridge.

2   Q    And, when you turned back around to start running again, at

3   that point did you see whether or not Ronald had been shot?

4   A    Yes.

5   Q    Then what did you do?

6   A    We turned around, and I started running again.  And Ronald,

7   seemed like was having problems running, and he stopped.  He told

8   me --

9   Q    Let me stop you there.  You're running up this hill with

10  Ronald?

11  A    Yes.

12  Q    And you've realized he's been shot?

13  A    Yes.

14  Q    Do you still hear gunfire?

15  A    No.

16  Q    Do you remember?

17  A    Not that I remember.

18  Q    Okay.  What happened next?

19  A    Okay.  I grabbed him, put his -- got under his shoulder and

20  grabbed him and tried to run with him.  He stopped me for a

21  second and told me --

22  Q    He stopped you for a second.  At what point did he stop you?

23  A    Was at the top of the bridge.

24  Q    At the top of the bridge?

25  A    Yeah.

1   Q    At this point you guys are trying to run away?

2   A    Yes.

3   Q    Okay.  What happened next?

4   A    And he told me to tell my mother and my brother and sisters

5   that he love us.  And he shook my hand.  And I told him, Ronald,

6   I said:  We got to go, because these guys, you know, are coming

7   after us.  And we started running.

8        I met another guy coming the opposite direction, and I

9   told him turn around.  I said:  These people shooting at us.

10  Q    Were you still near the top, or had you gotten further down

11  the bridge?

12  A    We still near the top.

13  Q    What happened next?

14  A    The guy who was -- he was pushing a cart up the bridge, and

15  he turned around.  And I don't know what he did, but we all ran

16  down the bridge together.

17  Q    At this point, as you're running down the bridge or running

18  -- at some point, you're running up the bridge?

19  A    Yes.

20  Q    And, at some point, you're running down?

21  A    Yes.

22  Q    You mentioned you looked back and you saw the men shooting up

23  the kids.

24  A    Yeah.

25  Q    And they were shooting at you.

1          Did you ever look back again?

2   A    We just kept running.

3   Q    You just kept running?

4   A    Yes.

5   Q    You didn't look back again?

6   A    No.

7   Q    That shovel, before throwing it away, did you ever pick up

8   that shovel?

9   A    No.

10  Q    Did you ever turn and point that shovel at the men who were

11  shooting at you?

12  A    No.

13  Q    Did you ever do anything with that shovel other than push it

14  away?

15  A    Just pushed it away.

16  Q    You're running down the bridge, you've got Ronald.  Where is

17  the other guy?

18  A    The other guy is running down the bridge also.

19  Q    Were you running together, or are you separate?

20  A    We kind of separate.  I didn't notice where he was.  He was

21  just on the left side of us.  I don't know if he jumped in the

22  basket or what, but we all was going down together.

23  Q    So are you and Ronald running apart, or were you running

24  together?

25  A    We was running together when I was holding him, going down

 1    the bridge.  When we got down the bridge, we got separated at the

 2    bottom of the bridge.

 3    Q   Tell me about that, how did you get separated at the bottom

 4    of the bridge?

 5    A   When we got down to the bottom of the bridge, I told Ronald:

 6    Ronald, I'm going to go get some help.  I said:  Just be quiet,

 7    because you're hurt real bad.  And I'm just trying to calm him

 8    down.  So, when I took off to try to get some help, that's where

 9    somebody came behind and started shooting again.

10    Q   What did you notice about the people who came behind you and

11    started shooting again?  Were they walking, or were they in a

12    vehicle?

13    A   Looked like they was running down the bridge.

14    Q   They were running down the bridge?

15    A   Yeah.

16    Q   Did you see a vehicle at all?

17    A   I saw a vehicle, but I didn't pay attention.  I was trying to

18    run, get out of the way from being shot.

19    Q   And where were you running to?

20    A   I was running through the courtyard by the parking lot at the

21    hotel.

22         MR. CARTER:  Let me have Exhibit 34, which is already in

23    evidence.

24    BY MR. CARTER:

25    Q   What does this picture show us?

1   A    That's the parking lot we was going through.

2   Q    You said we.  Who is we?

3   A    Well, Ronald and I.

4   Q    You went through there.  Did Ronald go through there with

5   you?

6   A    No.  He was in the front.  Closer to the front.

7   Q    Where did you run, if you can see the area on this

8   photograph?

9   A    I was close to the right.

10  Q    Close to the right?

11  A    Yes.

12  Q    Let me show you what's been marked as government Exhibit 262.

13          MR. CARTER:  Permission to approach, Your Honor?

14          THE COURT:  Yes.

15          262?

16          MR. CARTER:  262, Your Honor.

17  BY MR. CARTER:

18  Q    I show you government Exhibit 262 and ask if you can identify

19  what's shown in that photograph.

20  A    This looks like the hotel we ran through -- that I ran

21  through.

22  Q    Do you see the area that you ran through on that photograph?

23  A    Yes.

24          MR. CARTER:  Your Honor, I offer government Exhibit 262

25  into evidence.

```
 1            THE COURT:  Any objection?

 2            MR. HESSLER:  No objection.

 3            THE COURT:  All right, so ordered.

 4            (Exhibit admitted.)

 5   BY MR. CARTER:

 6   Q   Did you hear gunshots as you turned in to this courtyard

 7   area?

 8   A   Yes, I did.

 9   Q   Could you tell where they were coming from?

10   A   It was coming from the -- closer to the front on Chef

11   Highway.

12   Q   Were they coming from behind you, or the side of you?

13   A   Behind me.

14   Q   From behind you.

15            Did you look back to see where they were coming from?

16   A   Yes.

17   Q   What did you see?

18   A   I saw a guy with a rifle, shooting at me.

19   Q   How was the guy dressed?

20   A   He had on dark clothes.

21   Q   Could you tell anything else about that individual?

22   A   No.  I was running, trying to get away from him.

23   Q   Can you draw on this screen the direction you were running

24   and where you were running, if you can.

25   A   I was -- at one point, I was getting ready to go inside of a
```

1   room.  And I decided not to go because I said if I went in I

2   would have never came out alive.  I decided to just keep running

3   straight back towards the back of the hotel.

4          MR. CARTER:  For the record, Your Honor, the witness has

5   drawn a line from the front of the Friendly Inn under the little,

6   I guess you'd call it, the entryway toward the rear on the left

7   side of the photograph.

8   BY MR. CARTER:

9   Q   Is that correct?

10  A   Yes.

11  Q   You mentioned that at some point you did something.  What did

12  you do?

13  A   I tried to go -- I went into a room because they were

14  shooting at me.  And I tried to get out of the -- I guess, get

15  out of the way.  So I went, got ready to go through the door.

16  And I decided not to go through.

17  Q   Why did you decide not to go through?

18  A   Because I was afraid if I went in I would have never came out

19  alive.

20  Q   Why would you have never came out alive?

21  A   Because they were shooting.  I think they would have killed

22  me.

23  Q   Did you know who was shooting at you at this point?

24  A   The guy that was dressed up in dark.

25  Q   Did you know who he was?

```
 1   A    No, I did not.

 2   Q    Do you know if he was affiliated with any group or gang?

 3   A    He was --

 4   Q    At that point?

 5   A    It was one of the guys that was at the bridge.

 6   Q    That's your assumption?

 7   A    That's my assumption.

 8   Q    Were there any people in this courtyard?

 9   A    Yes.  It had lots of people there.

10   Q    Generally, where were the people?

11   A    They had people on the balcony.  They were standing around,

12   watching what was going on.

13   Q    Were they doing anything other than watching?

14   A    They was screaming something.  But the only thing on my mind,

15   I was just trying to get out, trying not to get killed out there.

16   Q    Were you scared?

17   A    Very scared.

18   Q    Scared of what?

19   A    That I would get killed, shot.

20   Q    When you ran and you looked back at this individual, did you

21   ever turn and point anything at him?

22   A    No.

23   Q    Ever point a gun at him?

24   A    No.  I didn't have any.

25   Q    Didn't have a gun?
```

```
 1    A    No.

 2    Q    Ever point your finger at him?

 3    A    No.

 4    Q    Ever do anything that you would consider threatening toward

 5    this individual?

 6    A    Nothing whatsoever.

 7    Q    You just ran away?

 8    A    Just ran away.

 9    Q    Was your back to him for most of this run?

10    A    With my back to him, yes.

11    Q    And you heard shots as you ran?

12    A    Yes.

13    Q    Was this courtyard dry like this, like shown in the photo?

14    A    No.  They had water there.

15    Q    How high was the water?

16    A    I guess about three, four feet.  Enough for me to get in that

17    water where they wouldn't see me.

18    Q    How did you get in the water where they couldn't -- so they

19    couldn't see you, what did you do?

20    A    I dove.  I just dove in the water and stayed in the water

21    until I got to the back of the hotel.

22    Q    What happened when you got to the back of the hotel?

23    A    I went -- they had a neighborhood in the back of the hotel.

24    The further I got both back, the higher the water was.

25    Q    So what did you do back there?
```

```
 1   A   I went back there.  And I went there, stayed there until it
 2   got I guess quiet.
 3   Q   At this point do you know where Ronald is?
 4   A   No, I didn't know.
 5   Q   What happened?
 6   A   I went to the back of the hotel and went through the
 7   neighborhood.  And I went all the way around until they had a
 8   street called Louise, Louisa.  And I went there.  Went back to
 9   the Chef Highway where it was dry, and I went back to go try to
10   check on Ronald.
11   Q   Let me stop you.  What was Ronald wearing?
12   A   He had a white T-shirt on and some jean shorts.
13   Q   Blue jeans?
14   A   Blue jeans.
15   Q   What were you wearing?
16   A   Black shirt and black shorts.
17   Q   What type of shorts?
18   A   Like spandex, tights.
19   Q   Was this what you'd put on when you got up that morning to go
20   to your mother's house?
21   A   Yes.
22   Q   Is that what you wore to your mother's house?
23   A   Yes.
24   Q   Is this what you wore when you returned from your mother's
25   house?
```

```
 1   A   Yes.

 2   Q   Is this what you wore when you ran through the courtyard?

 3   A   Yes.

 4   Q   What kind of shirt?

 5   A   Black T-shirt.

 6   Q   What kind of pants?

 7   A   Short spandex, tights.

 8   Q   Spandex?

 9   A   Spandex.

10   Q   Tights?

11   A   Yes.

12   Q   Did they have pockets?

13   A   No.

14   Q   No pockets?

15   A   No.

16   Q   So you don't have pockets on your shirt?

17   A   No.

18   Q   So you didn't have pockets on your person?

19   A   No.

20   Q   What type of shoes were you wearing?

21   A   Tennis shoes.

22   Q   Tennis shoes and socks?

23   A   Yes.

24   Q   All right.  You said you went to Louisa Street?

25   A   Yes.
```

1   Q    What happened next?

2   A    As I approached Louisa Street, I got to Chef Highway.  Once I

3   got to Chef, I was going back toward the hotel where Ronald was

4   at.

5   Q    Why were you going back to the hotel?

6   A    To go check on Ronald.

7   Q    What about the men with the guns?

8   A    Well, when I was going back, I saw the National Guard.

9   People I thought they would be there to help me.

10  Q    To protect you from the men with the guns?

11  A    Exactly.

12  Q    So what did you do when you saw the National Guard?

13  A    I ran up to them.  Next thing I now, they had arrested me.

14  That's when I was found out it was the police shooting at me.

15  Q    How do they come to arrest you when you walked up to them

16  looking for help?

17  A    They just told me that -- I guess the had police or somebody

18  around, say:  Arrest this guy.  And they arrest me, told me to

19  get on my knees.

20  Q    If you recall, you walk up to these National Guard people?

21  A    Yes.

22  Q    What did you say?

23  A    I said they had people shooting at us.  And, next thing I

24  know, some guy's running up to them saying arrest me.

25  Q    The guys running up to the National Guard, who were they?

1    Could you tell?

2    A    This was the police, New Orleans policeman.

3    Q    How could you tell that?

4    A    I saw New Orleans Police shirt.

5    Q    And they were saying what?

6    A    Arrest me.  That I was shooting at them.

7         I tried to explain to them, I said -- I said:  I'm

8    innocent, I was not shooting.  I said:  Can you give me polygraph

9    test or gunpowder test?  And I kept begging them that I was

10   innocent, I'm not the person that was out there shooting.

11   Q    Let me show you what's been marked as government Exhibit 261.

12        MR. CARTER:  Permission to approach, Your Honor?

13        THE COURT:  Yes.

14   BY MR. CARTER:

15   Q    Can you identify what this picture shows us here?

16   A    Yes.  These are the guys I ran up to.

17   Q    Is that you in the photograph?

18   A    Yes, it is.

19   Q    Is that the situation you were referring to just now?

20   A    Yes.

21        MR. CARTER:  I offer government 261 into evidence.

22        THE COURT:  Any objection?

23        MR. LARSEN:  No, Your Honor.

24        MR. HESSLER:  No, Judge.

25        THE COURT:  All right.  So ordered.

```
 1              (Exhibit admitted.)

 2   BY MR. CARTER:

 3   Q   What's happening here, Mr. Madison?

 4   A   I'm being arrested.

 5   Q   Why are you walking backwards?

 6   A   They're bringing me back to the scene where my brother was

 7   shot at.

 8   Q   Why are you walking backwards?

 9   A   I'm walking frontwards, but they got their back towards where

10   I was walking to.

11   Q   So you're walking frontwards, and they're walking backwards?

12   A   Yes.

13   Q   That's the way you recall it, okay.

14            Are you talking to them at all?

15   A   I was trying to explain to them what happened.  And they said

16   -- that's when I guess the police came up and they had put me on

17   my knees and arrested me.

18            MR. CARTER:  I believe government Exhibit 96 is in

19   evidence.

20   BY MR. CARTER:

21   Q   You mentioned you were put on your knees?

22   A   Yes.

23   Q   What does this picture show us, what are you doing here?

24   A   Trying to explain to them.  And they told me shut up, they

25   didn't want to hear it.
```

 1              MR. CARTER:  I don't believe this next photograph is in

 2    evidence yet.  Government's Exhibit 83.  Maybe, I'm not sure.

 3              THE CLERK:  No.

 4    BY MR. CARTER:

 5    Q   Can you identify government Exhibit 83, what does that show

 6    us?

 7    A   I'm trying to explain.  They said they didn't want to hear

 8    it.

 9    Q   Is that you in that photograph?

10    A   Yes, it is.

11              MR. CARTER:  I offer government Exhibit 83 into

12    evidence.

13              THE COURT:  Any objection?

14              MR. LARSEN:  No objection.

15              THE COURT:  So ordered.

16              (Exhibit admitted.)

17    BY MS. BERNSTEIN:

18    Q   You appear to be talking here.  Do you recall generally what

19    you're saying, what's going on?

20    A   Yes.  I was telling them I want to get a polygraph test, a

21    gunpowder test.  I said:  You all got the wrong guy.  I said:  My

22    brother's been shot and he needs some type of medical attention.

23              And they just ignored me.  They started cursing me,

24    telling me to shut the F up.

25    Q   Did you try to determine in talking to them what had

1   happened?  Did you ask them what happened?

2   A    Yeah.  I asked them, I said:  Why were you all shooting at

3   us?  They said:  You were shooting at us.

4   Q    Had you been shooting at them?

5   A    No, I was not.

6   Q    What happened next?

7   A    They put me on the back of a truck.  And they had two other

8   guys that was on that truck.

9   Q    You just mentioned that, if I heard you correctly, something

10  about some test you'd be willing to take.

11  A    Yes.

12  Q    What test were you referring to?

13  A    A polygraph test, a gunpowder test.

14  Q    How were you familiar with these tests?

15  A    I guess these tests would let them know that I didn't -- that

16  I was telling the true, that I wasn't out there shooting.

17  Q    How is it that you even know that these tests exist?  Just

18  something from TV, or do you have personal experience?

19  A    TV.

20  Q    You don't have any personal experience with polygraph tests?

21  A    No.

22  Q    With gunpowder tests?

23  A    No.

24  Q    This is just TV stuff?

25  A    Yeah.

1    Q    What happened next?

2    A    They put me in the back of a truck with two other guys.

3    Q    Did you recognize the two other guys?

4    A    No, I didn't.

5    Q    Describe these two other guys.

6    A    When you say did I recognize, one that was on the bridge who

7    I told to turn around, he was on the back of the truck.

8    Q    He was one of the guys on the back of the truck?

9    A    Yes, he was.

10   Q    What was he wearing?

11   A    Looked like he had black on.

12   Q    Black?

13   A    Yeah.

14   Q    Who was the other guy?

15   A    It was a teenager guy.  A teenaged kid.

16   Q    Had you seen that teenaged kid before?

17   A    No.

18   Q    Were you in handcuffs?

19   A    Yes.

20   Q    Was the guy who ran down the bridge in black in handcuffs?

21   A    Yes.

22   Q    Was the kid in handcuffs?

23   A    Yes.

24   Q    You were all three in handcuffs?

25   A    Yes.

1  Q    And you were in the truck?

2  A    Yes.

3  Q    Who else was in that truck?

4  A    They had two police officers.

5  Q    Do you know their names?

6  A    No.

7  Q    Did you recognize them?

8  A    I recognized one.

9  Q    Which one?

10 A    The one that was shooting at me at the hotel.  Also on that

11 bridge.

12 Q    Did you talk to these individuals at all, the other people in

13 handcuffs on this truck?

14 A    I didn't talk to them on the truck, but I did spoke with them

15 when we got to the police station.

16 Q    Did you talk to any of the law enforcement people while you

17 were on that truck?

18 A    Yes, I did.  I asked them, I said:  Why were you all shooting

19 at us?

20         And one of them said:  I should have shot you and I

21 wouldn't be going through this.

22 Q    I should have shot you and I wouldn't be going through this?

23 A    Yeah.

24 Q    What did you understand that to mean?

25 A    If they would have killed me, they wouldn't have had nothing

1    to explain.

2    Q   Which one of these individuals said that?  Which one of these

3    law enforcement people said that?

4    A   The one that was shooting at us on the bridge.

5    Q   The one you recognized shooting at you?

6    A   Yes.

7    Q   Did he have a name tag or anything on that would identify

8    himself?

9    A   No.  I didn't recall.  I didn't pay attention.

10   Q   But you recognized him as one of the people who was shooting

11   at you?

12   A   Yes.

13   Q   You couldn't see him on the bridge, he was kind of far back?

14   A   Yes.

15   Q   But you were able to get a better look at him as you ran

16   through the courtyard of the Friendly Inn?

17   A   Yes.

18   Q   And he appeared to be the same individual?

19   A   Yes.

20   Q   What did you say when he told you if he'd had shot you we

21   wouldn't have to go through this?  What did you say in response

22   to that?

23   A   He said:  Shut up, I don't want to hear anything no more.

24   Because I was afraid they would shoot me out there.  That's how

25   afraid I was.

1    Q    Was this guy tall, or short?

2    A    I guess about my height, maybe a little taller.

3    Q    A little taller than you?

4    A    (Witness nods head.)

5    Q    Black or white?

6    A    Black.

7    Q    Black guy?

8    A    Yes.

9    Q    What type of weapon did he have?

10   A    He had a rifle.  I couldn't -- he had a rifle.

11   Q    This was a long gun?

12   A    Yes.

13   Q    You couldn't tell what type?

14   A    No.

15   Q    What happened next?

16   A    They brought us to the place called Crystal Palace, and they

17   had us waiting out there for maybe an hour or so, maybe more than

18   an hour.  And when --

19   Q    Waiting out where?

20   A    Excuse me?

21   Q    Waiting out where?  Were you inside, or outside?

22   A    Outside.

23   Q    Outside?

24   A    Yes.

25   Q    Still have handcuffs on?

1  A    Yes.

2  Q    Where were these other two individuals?

3  A    They was right there with me.

4  Q    Handcuffed with you?

5  A    Yes.

6  Q    Did anybody come and talk to you, any law enforcement come

7  and talk to you at this point?

8  A    Well, I had a guy that I knew from football.  He came up, and

9  he knew me from football, and he said --

10 Q    Was this a law enforcement guy?

11 A    Yes.

12 Q    Police officer?

13 A    Police officer.

14 Q    New Orleans police officer?

15 A    Yes.

16 Q    What did he say?

17         MR. LARSON:  Objection, hearsay.

18         MR. CARTER:  This is not hearsay, it's not offered for

19 the truth of the matter asserted.  It's offered to show what

20 happened out there at the Crystal Palace.  This is not hearsay.

21         THE COURT:  Counsel, why don't you all approach.

22         (Sidebar conference.  Jury not present.)

23         THE COURT:  I don't know that until I have an idea of

24 what he's going to say he was told.

25         MR. CARTER:  Just in general interaction, trying to find

 1  out what's going on, what happened out there.  It's not something

 2  that I'm trying to prove that this individual is saying is true.

 3          THE COURT:  He can testify to things he was told by the

 4  officers, such as keep your mouth shut or shut the F up or

 5  something like that.  So I think, if we're going down this path,

 6  if that's going to be the nature of the answer, then I'm going to

 7  go ahead and overrule.

 8          What I'm concerned about -- and, you know, I don't know

 9  because I haven't heard him testify -- I'm concerned about him

10  making a factual assertion by way of hearsay that's not going to

11  be acceptable.  So we need to be careful, based or what your

12  expectation of his answer is.  Okay?

13          MR. CARTER:  Thank you.

14          (Sidebar conference concluded.  Jury now present.)

15  BY MR. CARTER:

16  Q   You mentioned you were talking with the law enforcement

17  officer while you were at the Crystal Palace.

18  A   Yes.

19  Q   Why were you talking to this law enforcement officer?

20  A   I was telling him what happened.  He said:  I know this guy

21  wouldn't do something like that.  So he was trying to talk to one

22  of the officers.

23  Q   So you knew this guy?

24  A   Yes, I did.

25  Q   When you said he said this guy wouldn't do anything like

1   that, was he talking to you, or was he talking to somebody else?

2   A    He went to go talk to somebody else about me.

3   Q    That's what you believed?

4   A    That's what I believed, yes.

5   Q    Did he come back at some point in time?

6   A    He couldn't.  He said he couldn't talk to me.

7           MR. HESSLER:  Your Honor, I'm going to object at this

8   time.  It's double hearsay.

9           MR. CARTER:  It's not hearsay.  He said he couldn't talk

10  to him.

11          THE COURT:  He said he couldn't talk to him.  I take it,

12  that's the end of his answer?

13          MR. CARTER:  That's the end of it.

14  BY MR. CARTER:

15  Q    What happened then?

16  A    I was talking to the other two guys that was on the back of

17  the truck with me.

18  Q    What were you talking to them about?

19  A    I was asking them their name, trying to get information.

20  What they had us there for.  You know, we didn't do anything.

21  Q    Why did you want these individual's names?

22  A    Because I needed somebody for a witness for the crime that

23  these people committed on us.

24  Q    Did you recall their names?

25  A    Yes, I did.

1    Q    What were their names?

2    A    Morrell Johnson and Leonard Bartholomew.

3    Q    And how did you recall these names?  Did you write them down

4    somewhere?

5    A    No.  I memorized it.  I have a cousin named Leonard.  And one

6    of the mayor's name Bartholomew.  I have a cousin named Johnson.

7    And, Morrell, I remember him because of somebody I knew that

8    name, Morrell.  So I just kept on saying it over and over to

9    myself until -- I say I'm going to need these people to be a

10   witness for the crime that was committed against us.

11   Q    Jumping ahead, did you ever try to contact these people down

12   the road?

13   A    No.

14   Q    What happened there at the Crystal Palace?  How long did you

15   stay at the Crystal Palace?

16   A    Hour, maybe more than an hour.  Was staying up.

17   Q    Did you find out anything while you were there about Ronald

18   and where he was?

19   A    Well, I kept asking one of the guys who was on the bridge,

20   because he was closer to Ronald, and I asked him was Ronald still

21   alive.  He said he wouldn't move.  He don't really know if he was

22   dead or not but he was -- he didn't move at all.

23   Q    Which guy was this?

24   A    Morrell.

25   Q    Morrell Johnson?

1    A    Morrell Johnson, yes.

2    Q    What happened next?

3    A    They put us back on the truck and brought us to the train

4    station, to the bus station.

5    Q    Put who on the truck?

6    A    Myself and two guys that was out there that was arrested.

7    Q    What happened at the train station -- was it a Greyhound

8    station?

9    A    Greyhound station.

10   Q    What happened at the Greyhound station?

11   A    We got to the Greyhound station.  They let the two guys go,

12   and they kept me and arrested me.

13          MR. CARTER:  Let me have government Exhibit 36, which is

14   already in evidence.

15   BY MR. CARTER:

16   Q    Mr. Madison, we have a document that's already in evidence,

17   government Exhibit 36.  It's titled Gist Sheet.  And I will just

18   read some of this to you and ask you if it's true.

19          On Sunday, September 4, 2005, at 9 a.m., Seventh

20   District officers received an officer in distress call, Signal

21   108, at Downman and Chef Menteur.  Upon arrival, the officer from

22   the Seventh District apprehended Lance Madison.

23          That's at least true, you were apprehended that day?

24   A    Yes.

25   Q    You were read -- it says:  In which he was read his Miranda

1    Rights and arrested.

2           Were you read your Miranda Rights?

3    A    Yes.

4    Q    So that's true.

5           Relative to attempted murder, eight counts.

6           Did you attempt to murder anyone that day?

7    A    No, I did not.

8    Q    Did you ever attempt to murder anyone?

9    A    No, I did not.

10   Q    Did you have a weapon on you that day?

11   A    No, I did not have no weapon.

12   Q    Did Ronald have a weapon?

13   A    Ronald didn't have no weapon.

14   Q    How do you know Ronald didn't have a weapon?

15   A    Because I was with him the whole time, and he don't know

16   anything about weapons.  He never been raised around no weapons.

17   Q    Ronald ever have a weapon?

18   A    No, he never had.

19   Q    Did ever play with toy guns?

20   A    No.

21   Q    Says:  The initial victim, David Ryder, was fired upon.

22           Did you fire upon David Ryder?

23   A    No, I did not.

24   Q    Did you fire upon anyone?

25   A    No one.  No, I did not.

```
 1   Q   At the very bottom here, it says:  The perpetrator fled and

 2   threw his handgun in the Industrial Canal and was apprehended a

 3   short time later.

 4          Did you throw a handgun in the Industrial Canal?

 5   A   No, I did not.

 6   Q   Do you throw anything into the Industrial Canal?

 7   A   No, I did not.

 8   Q   How long did you stay at the Greyhound station?

 9   A   Several hours, until dark.

10   Q   Were you ever transported to another facility?

11   A   Yes.  I was brought to a correctional center in St. Gabriel

12   called Hunts Correctional Center.

13   Q   How long were you there?

14   A   Twenty-five days.

15   Q   And at some point you were released?

16   A   Yes.

17   Q   How did come to be released?

18   A   My brother, and he had hired a lawyer, and we posted the

19   bond, 400,000.

20   Q   Did you have a bond hearing?

21   A   Yes, I did.

22   Q   Did you testify at that hearing?

23   A   Yes, I did.

24   Q   Did any law enforcement officers testify at that hearing?

25   A   Yes.
```

1    Q    Who?

2    A    Name is Kaufman.   Sergeant Kaufman.

3    Q    Were you present for his testimony?

4    A    Yes, I was.

5    Q    What did he say?

6    A    He said that we was on the bridge, shooting.   He said Ronald

7    had a gun, turned around, facing the officer, and he was shot by

8    one of the officers.

9    Q    Did he say anything about you or what you had done?

10   A    He said that I was on the bridge, shooting.

11   Q    Was this true?

12   A    No, it was not true.

13   Q    At that point what did you think you were facing in terms of

14   punishment for these charged crimes?

15   A    Well, they charged me with eight counts of first degree

16   attempted murder on a law enforcement, which I thought I was

17   going to spend the rest of my life in prison.

18   Q    Did you testify at this hearing?

19   A    Yes, I did.

20   Q    Did you testify, to the best of your knowledge, of what you

21   believed happened?

22   A    Yes, I did.

23   Q    What did you say about who was shooting at that hearing?

24   A    At that hearing, I said they had teenagers that was behind us

25   and I thought that they was shooting at us.

1    Q    Did you say you thought, or were you sure?

2    A    Well, I was sure that they were shooting.

3    Q    And you testified that they were shooting at you.

4    A    Yes.

5    Q    Why were you so sure they were shooting?

6    A    Because, when the shots was fired, I knew who was behind me,

7    that's the only people that was behind me.  And, when I looked

8    back, I saw them running, look like they were pointing an object.

9    And that's the reason why I thought they were shooting at us.

10   Q    Were you released after this hearing, or did you have to stay

11   in jail?

12   A    I was still in jail.

13   Q    At some point, were you released?

14   A    Yes.

15   Q    Did you ever learn of any investigation being conducted into

16   what happened that day?

17   A    No, I did not.

18   Q    Did you ever talk to the district attorney's office?  The New

19   Orleans District Attorney's Office?

20   A    Yes, I did.

21   Q    Did you contact them, or did they contact you?

22   A    They contacted me.

23   Q    And what did they contact you about?

24   A    They wanted to find out what happened.

25   Q    What did you tell them?

1    A    I told them we was on the bridge, and they had these

2    teenagers that I thought was shooting at us; and, next thing I

3    know, they had a truck that came up on the bridge and shot

4    everybody that was on that bridge.   Or tried to shoot everybody

5    that was on the bridge.

6    Q    Again, you just used the word thought.   Did you tell the

7    District Attorney's Office that you thought, or that you knew?

8    A    That I knew.

9    Q    Okay.   Did you ever testify before a state grand jury on

10   this?

11   A    Yes, I did.

12   Q    And what did you tell them?

13   A    I told them the same thing, the kids was running behind us,

14   and they had the object that I thought was a gun.   And I only had

15   a split second to look.   When I heard the shots, I turned around

16   for a split second.   And, when they started running behind us, we

17   turned around and started running up the bridge.

18   Q    Let's talk about the police.   Ever have any problems with

19   police?

20   A    No, I never had no problem.

21   Q    Have any police in your family?

22   A    Yes, I do.

23   Q    Who?

24   A    I had two brother-in-laws.

25   Q    Two brothers-in-law?

1    A    Yes.

2    Q    What are their names?

3    A    Roy Humphrey and Denzel Woodfork.

4              MR. CARTER:  One moment, Your Honor.

5              (Pause in proceedings.)

6    BY MR. CARTER:

7    Q    You mentioned that you testified at a preliminary hear, a

8    bond hearing?

9    A    Yes.

10   Q    Of the kids having guns?

11   A    Yes.

12   Q    Testified at a jury proceeding regarding kids having guns?

13   A    Yes.

14   Q    Did you ever give any interviews to anyone about what

15   happened on the bridge?

16   A    Yes.  I had an interview with CNN.

17   Q    What did you tell CNN?

18   A    I told them the story -- I told them that, when we was on the

19   bridge, I thought that one of the kids was behind me, shooting.

20   And that, we got away, we ran up the bridge.  And next thing I

21   know, they had a truck full of other people that was on the

22   bridge, shooting.

23   Q    You believed that?

24   A    Yes.

25   Q    Why?

1  A   Did I believe --

2  Q   Did you believe the kids had guns?  Did you believe that when

3  you said that?

4  A   At that moment, I did.  I thought they did.

5  Q   Why?

6  A   Because they was the only people behind me at that particular

7  time.

8  Q   How about now?

9  A   No, I don't believe that now.

10  Q   Why not?

11  A   Because there was no guns on the kids, that I know of.

12  Q   When you looked back and saw the kids and you saw something

13  that made you believe they had guns --

14  A   Yes.

15  Q   -- when you looked back at the officers or the people, the

16  gang, as you called it, who were shooting at the kids, did you

17  see guns?

18  A   Yes, I did.

19  Q   Did you see anything different than when you looked back at

20  the kids who had guns?

21  A   Yes, I did.

22  Q   What?

23  A   When I looked back, the people that jumped off the truck,

24  when they were shooting, they had smoke coming from everywhere.

25  When the kids was behind me, I didn't see that.

1    Q    You see that?

2    A    I didn't see that.

3    Q    So, as you sit here today, you don't believe those kids had

4    guns?

5    A    No, I don't.

6              MR. CARTER:  I have nothing nurture, Your Honor.

7              THE COURT:  Okay.  Cross?

8              MR. DeSALVO:  Yes, Your Honor.

9                          CROSS EXAMINATION

10   BY MR. DeSALVO:

11   Q    Mr. Madison, Frank DeSALVO.  We've seen a lot of each other

12   the last five or six years, but I don't believe we've ever spoken

13   to each other; have we?

14   A    No.

15   Q    Other than a cordial hello.

16   A    Hello.

17   Q    Mr. Madison, let me kind of start off where it ended.  You

18   indicated that you had police officers in your family?

19   A    Yes.

20   Q    And you said you had family friends who were law enforcement?

21   A    Yes.

22   Q    A lot?

23   A    Yes.

24   Q    A lot through your own contacts in the world, some through

25   your brothers and the rest of your family?

```
 1   A    Yes.

 2   Q    Such as you knew Trish Lear?

 3   A    Excuse me?

 4   Q    You knew Trish Lear?

 5   A    Trish Lear?

 6   Q    Um-hum.

 7            You knew Clive McCoy?

 8   A    I didn't know him personally.

 9   Q    But you knew them, you knew they were friends of your

10   brother's?

11   A    Yeah.

12   Q    Okay.  And how did you know they were friends of your

13   brother's?

14   A    Well, I just had heard that they spoke to my brother.

15   Q    Through the years?

16   A    Yeah.

17   Q    And you got arrested, you were at the bus station, and the

18   first people who came to see you were Trish Lear and Clive McCoy?

19   A    I didn't know the name at that time.

20   Q    But you remember giving a statement to them?

21   A    Yeah.

22   Q    And you knew they knew your family?

23   A    Yeah.

24   Q    And you knew they were there to help you?

25   A    I assume.  I really --
```

1    Q    You assumed they were there to help you?

2    A    Yeah.

3    Q    And you gave them a statement?

4    A    Yes.

5    Q    And you certainly had no reason to lie to them?

6    A    No.

7    Q    And do you recall what you told them?

8    A    Yes, I do.

9    Q    What did you tell them?

10   A    I told them that they had teenagers that was on that bridge

11   that I thought was shooting at me.  And also that they had a

12   truck with people that jumped off the truck and started shooting

13   at everybody that was on that bridge.

14   Q    You also told them that you thought the teenagers shot at the

15   police?

16   A    Yes.

17   Q    Didn't you?

18   A    Yeah.

19   Q    Before the police shot at them?

20   A    Yeah.

21   Q    So you had to be looking back to be able to tell them that?

22   A    I looked back that one time I did.

23   Q    And that's what you saw?

24   A    Yes.

25   Q    You didn't make that up?

1    A    No.

2    Q    So, in your very first interview with two law enforcement

3    people, who were friends of your brothers, who were there to help

4    you, you told them that these teenagers ran up behind you, were

5    shooting at you; is that correct?

6    A    Yes.

7    Q    And that you turned around after that when -- and you saw the

8    -- I think at that time you thought it was a postal truck; right?

9    A    Yeah.

10   Q    And you saw the teenagers shoot at the people at the postal

11   truck; right?

12   A    I thought so, yeah.

13   Q    And then the people at the postal truck got out and returned

14   the fire?

15   A    It was a Budget truck.

16   Q    But it was a Budget truck, but then you thought it was a

17   postal truck?

18   A    Yeah.

19   Q    At some point in time, somebody told you it was a Budget

20   truck?

21   A    Nobody tell me.  I saw a big old truck that had a big Budget

22   sign on it.

23   Q    Yeah, okay.

24        Now, you said that when you got in the back of that

25   Budget truck to go back to the station to the Crystal Palace,

1    that's when you learned the names of Morrell Johnson and Leonard

2    Bartholomew?

3    A    Yes.

4    Q    And you kept associating those things with people you knew,

5    those names?

6    A    Yes.

7    Q    And you went through it over and over again so you wouldn't

8    forget those names?

9    A    Yes.

10   Q    And that's the same thing you did with the facts; isn't it?

11   A    I tried to, yeah.

12   Q    And you went through those facts in your head over and over

13   and over again so you wouldn't forget them?

14   A    Um-hum.

15   Q    Is that correct?

16   A    Yeah.

17   Q    And --

18        THE COURT:  Sir, you might have to pull that microphone

19   a little closer.

20        THE WITNESS:  Yes, sir.

21   BY MR. DeSALVO:

22   Q    So that, when you started going over and over and over those

23   facts so you wouldn't forget them, you had been doing that for a

24   few days in jail until the friends of your family, Trish Lear and

25   Clive McCoy, came to see you; is that correct?

1    A    Well, like I said, I didn't know who they were at that time.

2    Q    But you knew they were friends of the family and they were

3    there to help you?

4    A    Yes.

5    Q    And, up to that point, you knew that they were going through

6    this over and over and over again?

7    A    Um-hum.

8    Q    And so you had those facts clear in your head?

9    A    Yes.

10   Q    Now, they didn't try to influence you as to what to say?

11   A    No.

12   Q    They listened to what you had to say?

13   A    Yes.

14   Q    And they wrote it down?

15   A    Um-hum.

16   Q    Now, you indicated that -- let's go back to your family for a

17   second.  Your brother, Ronald, looked up to you?

18   A    Yes.

19   Q    He came to you for advice?

20   A    Yes.

21   Q    You counselled him?

22   A    Yes.

23   Q    You were the consummate big brother?

24   A    Yes.

25   Q    In fact, you decided to stay because there weren't any places

```
 1   to bring the dogs when your family evacuated?

 2   A    Yes.

 3   Q    And Ronald actually decided to stay because he wanted to stay

 4   with you because he looked up to you?

 5   A    Yes.

 6   Q    Now, when you first talked to Trish Lear -- you know who he

 7   is now?

 8   A    I only saw him one time.

 9   Q    But you know that he was the number two man at the

10   investigator's attorney general's office?

11   A    No, I didn't know that.

12   Q    You know who Clive McCoy was?

13   A    I didn't know who he was either.

14   Q    You didn't know he was a chief investigator for the DA's

15   office?

16   A    No, I didn't know.

17   Q    Did you know they were brothers-in-law?

18   A    No, I didn't know.

19   Q    But so you told them that, because of the flood, you gained

20   access to the roof and you stayed there for two days until you

21   were rescued?

22   A    No.  I was never rescued.

23   Q    Okay.  And you didn't tell them that?

24   A    No, I never told them that.

25   Q    Now, your testimony today, you said things that you've never
```

```
 1   said before; isn't that correct?
 2   A   I don't remember -- what you talking about?
 3   Q   Well, let's go through some of them.  That, when you all were
 4   running from -- first, you were running from the little boys, and
 5   then you were running from the police; right?
 6   A   Yes.
 7   Q   And, when you all got up to the top of the bridge, these
 8   police were shooting at you; right?
 9   A   Yes.
10   Q   That you and your brother stopped?
11   A   Yes.
12   Q   At the top of the bridge, while the police were shooting at
13   you, and your brother said:  Tell my brothers, my mother and my
14   sister that I love them, or something like that, and shook my
15   hand.
16   A   Yes.
17   Q   You all stopped in the middle of all this --
18   A   No.  We stopped -- there was no shooting when we stopped.
19   That's the reason we stopped.
20   Q   All right.  And did you ever testify or did you ever say in
21   any of these -- back up.
22         After you spoke with Trish Lear, we've heard now that
23   you gave an interview with CNN.
24   A   Yes.
25   Q   You did an interview with the DA's office?
```

1   A    Yes.

2   Q    And you went to the jury, the state jury?

3   A    Yes.

4   Q    And you talked to the FBI?

5   A    I don't the recall, I don't remember talking to the FBI.

6   Q    Do you recall in any of these times that you said that your

7   brother was shot going up the bridge?

8   A    Yes.

9   Q    That you saw blood?

10  A    Yes.

11  Q    You assume he was shot by a policeman?

12  A    Yes.

13  Q    And that you picked him up and carried him over your

14  shoulder --

15  A    I didn't say I carried him over my shoulder.  I say I put his

16  arm under me.  I never said, not one time, I carried him over my

17  shoulder.

18  Q    You never said that in the CNN interview?

19  A    No, I never did.

20  Q    Okay.

21  A    No, not that I recall.

22  Q    But you may have, you just don't recall it?

23  A    Just don't recall it, yeah.

24  Q    Got to find my notes here.

25            In that preliminary hearing when you -- that the

```
 1    government talked to you about where you listened to what

 2    Sergeant Kaufman had to say.

 3    A    Okay.

 4    Q    Remember that?

 5              And you remember you testified also?

 6    A    Yes, I do.

 7    Q    And you remember that you said you had to pick him up and try

 8    to run down the bridge for help?

 9    A    I don't remember saying pick him up.  I grabbed him and put

10    his hand under my shoulder and ran down the bridge with him.

11    Q    Well, did you say you then you put him down?

12    A    Yeah.  When we got to the bottom of the bridge, yeah.

13    Q    You put him down.  And you told him:  I'll be right back?

14    A    Yes.

15    Q    I'm going to go get some help?

16    A    Yes.

17    Q    Now, you didn't maintain your brother within eyesight the

18    whole time that you were running; did you?

19    A    What do you mean by that?

20    Q    What I mean by that is, you didn't pick him up, whether you

21    threw him over your shoulder or not, or held him like this all

22    the way to where you put him down in front of the Friendly Inn?

23    A    No.

24    Q    But you said that?

25    A    I don't recall saying that.
```

1    Q    You never said that at that preliminary hearing?

2    A    I said I ran down the bridge with him and I helped him going

3    to go down the bridge.

4    Q    And when did you separate from him?

5    A    When we got down to the bridge, I put him -- I told him I was

6    going to get some help.

7    Q    Do you remember when you testified to the grand jury?

8    A    Yeah, I remember.

9    Q    Do you remember, in the grand jury, you said at one point you

10   didn't know where your brother was?

11   A    No, I don't remember saying that.

12   Q    Let me see if I can find it for you.

13        You didn't know whether your brother ran behind you into

14   the Friendly Inn or not?

15   A    Yeah, okay.

16   Q    So you did say that.

17   A    No.  When I put him down when I went to go get some help, I

18   didn't know what happened after that, you know.  I didn't know if

19   he got up and ran behind me.  The only thing I knew, I was going,

20   running into the back, and I was being shot at.

21   Q    Do you recall you were asked a question do you know where

22   your brother is --

23        MR. CARTER:  What page are you referring to?

24        MR. DeSALVO:  Page 80 and rolling to 81.

25   BY MR. DeSALVO:

1    Q    The question was:  Do you know where your brother is?  He's

2    talking about this point.  Is he running behind you, is he still

3    kind of with you, or you don't know?  Answer:  I don't know.

4         Do you recall that?

5    A    Yeah.  When I was running through the courtyard -- I mean,

6    through the parking lot, I didn't know.

7    Q    All right.

8         And you don't know whether your brother ran in there

9    behind you?

10   A    No, I didn't know.

11   Q    At any time in this period, did you say you sat your brother

12   down and you said:  Wait, I'm going to get help?

13   A    Yes.

14   Q    You said that in the grand jury?

15   A    Yes.

16   Q    You said that your brother was running at full speed?

17   A    Um-hum.

18   Q    And you were not?

19   A    I never said -- we both running.

20   Q    Well, his full speed is not as fast as your full speed?

21   A    Yeah.

22   Q    So you would have said he was running at full speed and you

23   weren't.  Because you were trying stay with him; right?

24   A    Yes.

25   Q    And the question was:  Is he ahead of you?  And you said:

1   No.   Remember that?

2   A    No.  He was ahead of me when we was going up the bridge.  I

3   was trying run behind him so he wouldn't get shot.

4   Q    So the question was:  Do you know where he went.  Or do you

5   eventually lose sight of him?

6   A    I was with him all the way to the bottom of the bridge.

7           MR. CARTER:  Your Honor --

8   BY MR. DeSALVO:

9   Q    Then do you recall --

10          MR. CARTER:  What page are you on?

11          MR. DeSALVO:  79.

12          THE COURT:  One second, Mr. DeSALVO.

13  BY MR. DeSALVO:

14  Q    Do you recall answering:  Do you know where he went, or do

15  you eventually lose sight of him?  Answer:  I lose sight of him.

16  I was more concentrating on my brother, trying to help him make

17  it on the other side of the water or the bridge.

18  A    Yes.  I had sight of him the whole time, until we got to the

19  bottom of the bridge.  I never said I missed -- don't know where

20  he was at.  He was with me the whole time.

21  Q    Why did you say:  I lose sight of him?

22  A    I never say I lost -- I say, when we went through the parking

23  lot, running through the parking lot, I lost sight.  I don't know

24  where he was after that.

25          MR. CARTER:  Your Honor, I'm going to object.  It's

1    misleading.  The question before that puts it all in context.  It

2    says:  Do you know where he went or did you eventually lose sight

3    of him?  And the witness said:  I lost sight of him.

4          MR. DeSALVO:  I'll go for that.

5    BY MR. DeSALVO:

6    Q    Did you say that you eventually lost sight of him?

7    A    After I ran through the parking lot.

8    Q    And you may have told CNN that you carried him over your

9    shoulder?

10   A    I don't remember saying that.  I just said I grabbed him.  I

11   never told them I carried him over my shoulder.  I said I grabbed

12   him and I had his arm under my shoulder.

13   Q    At some point you pushed the shovel away.  At what point was

14   that?

15   A    The shovel was always on the cart.  When I heard the shots, I

16   pushed the cart away.  I never picked up the shovel at all.

17   Q    How many times did you go back -- after you arrived at your

18   brother's office, you spent time with the people at the Friendly

19   Inn establishing, you know, contact about what was going on and

20   to see what they knew or didn't know, stay up on top of things;

21   right?

22   A    Um-hum.

23   Q    And you did that on a regular basis?

24   A    Yes.

25   Q    How many times did you leave either your brother's office or

```
 1    the Friendly Inn to go back through the waters either to your
 2    house or to your mother's house or --
 3    A    How many times did I do it?
 4    Q    Did you leave to go back into the water?
 5    A    I went there twice.
 6    Q    Twice?
 7    A    Yeah.
 8    Q    And where did you go?
 9    A    To my condo.
10    Q    Twice to your condo?
11    A    Yeah.
12    Q    You never went to your mother's house?
13    A    Yeah.  We went there together, yeah.
14    Q    When you went to your condo twice, you didn't bring your
15    brother?
16    A    No.
17    Q    Now, you said you locked him in.
18    A    Yeah.
19    Q    Now, can you lock him in?  He can't open the door from the
20    inside and leave?
21    A    No.  I had the key to where I locked the door.
22    Q    How many doors are there?
23    A    One in the front and one in the back.
24    Q    And you can't open either door from the inside to go out?
25    A    You can't -- where he had gates on the front door, you can't
```

1    get through the front door.

2    Q    You can in the back, though?

3    A    Yeah.

4    Q    Okay.  So, when you locked him in, as you locked the front

5    door?

6    A    Yeah.  The front door was already locked.

7    Q    But you left your special needs brother for him to decide

8    whether to stay or leave?

9    A    Yeah.

10   Q    When you went back to your house, why did you go?

11   A    I went to go get the dog and the medication.

12   Q    And that's two different occasions?

13   A    Yeah.

14   Q    And of course you went to your mother's house one day?

15   A    Yeah.  He was with me, yeah.

16   Q    You took him to your mother's house through the high water?

17   A    No.  They had no water on Chef Highway.  We got to the back

18   by the neighborhood, we turned around because the water was too

19   high.

20   Q    And that's the day you were going to go get mountain bikes?

21   A    Yes.

22   Q    How many were you going to get?

23   A    Two.

24   Q    One for you and one for your brother?

25   A    Yes.

1    Q    And, even though your brother was a slow learner, a special

2    education student, he certainly was able to ride a bike?

3    A    Yeah.  He ride a bike all the time.

4    Q    I guess you all were going to try to ride a bike into town or

5    into Baton Rouge or something?

6    A    Well, we needed to be safe to get out.

7    Q    Now, today, when you testified, you testified that you

8    thought there were guns, but now you don't know where they were

9    or you don't believe they were; is that the case?

10   A    Yeah.  I saw objects.  I couldn't identify there was guns or

11   not.

12   Q    And let's see if we can develop the transition to how this

13   change came about.

14   A    All right.

15   Q    When you talked to Trish Lear, they had guns?

16   A    Yeah.

17   Q    And you had no reason to lie to Trish Lear?

18   A    No.

19   Q    When you testified at the preliminary hearing, you had no

20   reason to lie then?

21   A    No.

22   Q    And you were under oath?

23   A    Yes.

24   Q    And you told that judge --

25   A    Yes.

1   Q   -- that those guys had guns and were shooting at you?

2   A   Yes.

3   Q   You were represented by a lawyer?

4   A   Yes.

5   Q   A very good lawyer?

6   A   Yes.

7   Q   And, certainly, that lawyer didn't tell you what to say?

8   A   No.

9   Q   You told him what happened?

10  A   Yes.  I told him that's what I thought happened.

11  Q   And he put you on the stand to say it?

12  A   Yes.

13  Q   And he let them put you under oath to say it?

14  A   Yeah.

15  Q   Then you told CNN the same thing?

16  A   Yes.

17  Q   And, of course, CNN, you had no reason to lie to CNN; did

18  you?

19  A   No, I didn't lie.

20  Q   And you told them that those guys had guns and they were

21  shooting at you?

22  A   Yes.

23  Q   Then you went to a meeting at the DA's office?

24  A   Yes.

25  Q   And, at the DA's office, you told them, those guys, they had

1    guns and they were shooting at you?

2    A    Yes.

3    Q    Do you remember who was there asking you the questions?

4    A    I think Dustin Davis, I believe.

5    Q    Dustin Davis?

6    A    Yeah.

7    Q    And a guy named Bloomberg?

8    A    I don't recall.

9    Q    A guy named Bloomberg from the Department of Justice?

10   A    No, I don't remember.

11   Q    Do you remember telling them that you're sure?  When they

12   asked you could you have been mistaken, and you said:  No, those

13   guys had guns.  Do you remember that?

14   A    Yeah, I remember.

15   Q    Do you remember this guy from the Department of Justice named

16   Bloomberg asked you:  Well, are you really sure; I mean, could

17   you really see that far away?

18              And you know what you told him --

19   A    What's that?

20   Q    I'm sure.

21   A    Yes.  He asked me could I identify them.

22   Q    But you told him, after he told you could you be mistaken,

23   you told him:  I'm sure.  Right?

24   A    Yes.

25   Q    And you were there in preparation for your grand jury

```
 1   testimony; weren't you?

 2   A    Yes.  I was there.

 3   Q    And you testified before the grand jury the next day, or a

 4   few days later?

 5   A    Yes.

 6   Q    Now, when you go before the grand jury, swore to tell the

 7   truth, the whole truth, nothing but the truth; right?

 8   A    Yes.

 9   Q    And, when you got in that grand jury, and that's when you

10   told them:  I thought they had guns but I might have been

11   mistaken?

12   A    Yes.

13   Q    How many conversations did you have with that assistant DA

14   and the lawyer from the Department of Justice between when you

15   told them you were positive and when you got to the grand jury

16   and said you weren't?

17   A    One time.  That's all I can recall.

18   Q    One time after that?

19   A    Yes.

20   Q    Where they prepared you and told you the questions they were

21   going to ask you?

22   A    No, they didn't prepare me.  They asked me could I identify

23   what type of gun it was, and I couldn't identify it.  And I said

24   it was a dark object.  And that's the reason why I said I

25   couldn't tell it was a gun or not.  Because I only had one
```

```
 1    second, a split second to decide after I turned around when I
 2    heard the gunshots.
 3    Q   Didn't you originally say that you were walking up the bridge
 4    and you saw this family; right?
 5    A   Yes.  A group.
 6    Q   You referred to them as a group.  Teenagers?
 7    A   Yes.
 8    Q   And then, later, you said:  Well, it was those three that ran
 9    up after me, and there was a mother, a father --
10    A   Yes.
11    Q   -- and a child.
12    A   Yes.
13    Q   That sounds like a family.
14    A   Yes.
15    Q   And you saw them; right?
16    A   Yes, I saw them.
17    Q   And the first thing that drew your attention to them was when
18    these kids came running up behind you?
19    A   They was running back and forth up the street.
20    Q   And that's what drew your attention to them?
21    A   Yes.
22    Q   And that's when you turned around and that's when you said
23    they shot at you?
24    A   No.  Let me tell you --
25    Q   You didn't say that?
```

```
 1   A   I don't recall that.

 2          I said, when I hear guns, that's when I turned around.

 3   Q   You didn't say you turned around when you heard them running

 4   up behind you?

 5   A   No.  I said, when I heard the gunshots, that's when I turned

 6   around.  That's what made me turn around.

 7          THE COURT:  You might want to pull that microphone a

 8   little bit.  A little bit too close.  Sit whichever way you're

 9   comfortable, and you can move as long as you're not too close to

10   the microphone.  That's fine.

11   BY MR. DeSALVO:

12   Q   Do you recall, in that interview with the District Attorney's

13   Office, when someone from the Department of Justice was there --

14   A   Yes.

15   Q   -- that, before that seed got planted, what you said --

16          MR. CARTER:  Object to the seed being planted reference.

17          MR. DeSALVO:  That's proper cross.

18          THE WITNESS:  Nothing was planted in my head.

19          MR. DeSALVO:  That will be for the jury to decide.

20          THE COURT:  Let's just ask him fact questions of what he

21   knows.

22   BY MR. DeSALVO:

23   Q   Do you remember telling him that you walked back to the

24   office and people were coming from the hotel?

25   A   Repeat that.
```

```
1   Q    Do you remember telling them:  As we walked back from the

2   office, people were coming from the hotel?

3   A    People was coming from the hotel?

4   Q    I assume that's the Family Inn; right?

5            MR. CARTER:  What page are you referring to?

6            MR. DeSALVO:  Page 4.

7   BY MR. DeSALVO:

8   A    When I was going back to the office?

9   Q    Yeah.  Back from when you all went to your mother's house to

10  try to get mountain bikes but the water was too high.

11  A    Yes.

12  Q    Do you remember telling them, as you walked back to the

13  office, people were coming from the hotel?

14  A    Yes.  I said a group of people was coming from the hotel.

15  Q    You said young teenagers?

16  A    Yes.

17  Q    About six?

18  A    Six in the group, yes.

19  Q    Coming out of the hotel?

20  A    Yes.

21  Q    And they were about 25 yards behind me and my brother?

22  A    Yes.

23  Q    They were behind us, and I heard something, someone running

24  behind us.

25  A    Yes.
```

1   Q   The six people were still behind us.

2   A   Yes.

3   Q   A group of about three runners came about 10 yards close.

4   A   Yes.

5   Q   And we started walking fast; right?

6   A   Yes.

7   Q   That's what drew your attention to them?

8   A   Yes.

9   Q   Now, you knew it was three because you turned around and

10  looked at them because you heard them running up behind you?

11  A   Yes.

12  Q   And that concerned you?

13  A   Yeah.

14  Q   Said it was six people, more males than females.

15  A   Yes.

16  Q   We stopped at the bottom of the bridge.

17          MR. DeSALVO:   This is on page 5.

18          MR. CARTER:   Thank you.

19  BY MR. DeSALVO:

20  Q   And we then continued up the bridge, and someone shot.

21  A   Yes.

22  Q   And at this point they were approximately 10 yards behind

23  you; right?

24  A   Approximately.  Ten, 20.

25  Q   Well, do you recall saying:  We were on the bridge, westbound

1   lane, and people were close, approximately 10 yards.

2   A    Yes.

3   Q    We were about 40 yards up the bridge when we heard the

4   gunshots.

5   A    Yes.

6   Q    I looked back and saw guys with the gun.

7   A    Yes.

8   Q    You saw guys with the gun?

9   A    Yeah, I saw him with the object.

10  Q    Now, what guys did you see with the gun?

11  A    I saw one of the teenagers.

12  Q    And then you heard pop, pop; right?

13  A    No.  I heard the pop, pop before I turned around.

14  Q    Well, do you recall telling them:  I looked back, saw the

15  guys with the guns?

16       MR. CARTER:  Your Honor, I'm going to object as

17  misleading.  Everything in that paragraph follows after he says

18  someone shot.  It is taken out of context to make it sound like

19  he heard the shots first.

20       THE COURT:  Maybe it would be better if you have a copy

21  to show him as you ask him.  Direct him to pages.

22       MR. CARTER:  It's on page 5 at the top.  I can hand him

23  what I have.

24       THE COURT:  Do you have another copy there?

25       MR. CARTER:  I don't.  I'll just give it to him.

```
 1           THE COURT:  Either that, or we can find another copy

 2    somewhere else, if we have another copy.  But I think we need to

 3    show him what it is, what portion of the testimony we're reading

 4    from.

 5    BY MR. DeSALVO:

 6    Q   Do you see that, Mr. Madison?  At the top paragraph, Mr.

 7    Madison.  If I'm reading this incorrectly, please correct me.

 8    You can start at the first sentence if you want, because I don't

 9    want to mislead you.

10           I started at the second -- the first sentence:  The

11    runners were kind of coming kind of apart from each other.  I did

12    not think anything of the runners.  We stopped at the bottom of

13    the bridge, the Danziger Bridge.

14    A   Yeah.

15    Q   Is that correct?

16    A   Yeah.

17    Q   Do you remember saying that?

18    A   Yeah.

19    Q   And then continued up the bridge, and someone shot.

20    A   Yes.

21    Q   We were on the bridge, westbound lane.  People were close,

22    approximately 10 yards.  We were about 40 yards up the bridge --

23    right?

24    A   Yes.

25    Q   We heard gunshots.
```

1    A    Yes.

2    Q    I looked back, saw the guys with the gun; pop, pop, one of

3    guys with the gun was shooting at us.

4           Is that what you said?

5    A    Yes.

6    Q    Was that correct?

7    A    What's correct is I heard shots before I looked back.  Pop,

8    pop.

9    Q    You heard a shot before you looked back?

10   A    And, when I looked back, that's when I saw these guys.

11   Q    That's when you heard pop, pop.  That's two shots; right?

12   A    It would have been two, could have been three, I don't know.

13   I couldn't count how many shots were being shot.

14   Q    You said one of the guys with the gun was shooting at us?

15   A    Yes.

16   Q    That's what you said?

17   A    Yes.

18   Q    Then Mr. Davis asked you, if you want to go through it, you

19   heard pop, pop.  Could the guys have had something else, did you

20   see something in his hand?

21          I'm certain that he had a gun in his hand.  They had

22   three at the bottom of the bridge:  One at the walkway, one at

23   the bottom.  They were spread out.  Mother, father, teenager with

24   them.

25          And that's when you started running; right?

1   A   I started running when I first heard the shots.

2   Q   Hum?

3   A   I started running when I first heard the shots.

4   Q   Since we already did it -- and then, right after that, when

5   Mr. Bloomberg -- that was the guy from the Department of Justice;

6   right?

7   A   (Witness nods head.)

8   Q   Said:  Could you be mistaken about who in fact had a gun?

9        Your answer:  I saw an object in his hand, it looked

10  like a gun or a pistol.

11        Right?

12  A   Yes.  Yes.

13  Q   Mr. Bloomberg:  40 yards away and you assumed it was a gun?

14        Your answer:  I'm sure they had a gun.

15        And it was the next day when you went to the grand jury

16  when you weren't so sure anymore.

17  A   He also said:  Could you describe the gun?  And I said:  No,

18  I could not describe the gun.

19  Q   Couldn't describe the gun, but you're sure it was a gun?

20  A   I'm assuming it was a gun.

21  Q   Now you assume.

22        Let me ask you, Mr. Madison, I know in several of these

23  different interviews, you said that you didn't own a gun.

24  A   No.

25  Q   You said that you hadn't had a gun since some time in 1989?

```
 1   A    I said I did own a gun.  Never said I didn't own a gun.

 2   Q    You said you hadn't had one since it was stolen from you in

 3   1989?

 4   A    Yes.

 5   Q    And that you said:  I never had a gun after that?

 6             MR. CARTER:  I object, that's a mischaracterization.

 7             THE WITNESS:  No.  I said I never owned a gun after

 8   that.

 9   BY MR. DeSALVO:

10   Q    Never owned a gun after that, okay.

11             And you said you never had the need for a gun?

12   A    Yes.

13   Q    Never had the need to replace the gun that was stolen?

14   A    Yes.

15   Q    But you eventually did come into possession of a gun; didn't

16   you?

17   A    Yes.

18   Q    And you had possession of that gun before Katrina?

19   A    Before Katrina?  Yes.

20   Q    And, actually, that gun was in the glove box of one of the

21   cars that was flooded in Katrina; right?

22   A    Yes.

23   Q    And one of the reasons you went back to your house was to try

24   to get that gun; wasn't it?

25   A    No.  It was flooded.  I couldn't even get back there.
```

1    Q    But tried?

2    A    I tired to go to my place, yes.  I didn't go back to no car

3    or nothing.  Because there was like six, seven feet of water back

4    there.

5    Q    Did any time in any of those interviews when you were saying

6    you didn't have a gun, never had the need to have a gun, never

7    wanted to replace that gun that was stolen, did you ever bother

8    to tell anybody that you did in fact have a gun, you just didn't

9    own it?

10   A    I didn't know if the gun was still there.

11   Q    You didn't know it was still there?

12   A    No.

13   Q    But you did go back and look for it?

14   A    No, I didn't go back and look for no gun.  I went back to

15   look for the dogs.

16   Q    When did you remember that it was still there?

17   A    I didn't really know it was still there or not.

18   Q    When did you remember that you had access to a gun that you

19   had never told anybody about?

20   A    I guess, recently, I thought about it.  It wasn't my gun.  It

21   was my ex.

22   Q    But you had possession of it?

23   A    I didn't have it possession of it on me, no, I did not.

24   Q    It was in your vehicle; right?

25   A    Yes.  I thought it was.  I don't know if it's there or not

1    because that's been 2001.

2    Q    Never retrieved it after the storm?

3    A    No.

4    Q    Discarded it, threw it away?

5    A    No.

6    Q    Now, when you went to that initial interview with Dustin

7    Davis and the guy from the Department of Justice, you told them

8    what you wanted; right?

9    A    I told them what?

10   Q    What you wanted, what you want to accomplish; didn't you?

11   How you wanted to get those police officers; right?

12   A    No.  I wanted to see justice, you know.  They committed a

13   crime.  And I wanted to see them have justice where they never

14   would be able to do this again.

15   Q    You wanted to see them convicted of a murder?

16   A    Yeah.  They killed innocent people out there.

17   Q    That's what you wanted?

18   A    Yeah.

19   Q    And, when that didn't work out, you communicated through

20   other people that you wanted to kill them?

21   A    No.  I never said that, no.

22   Q    Did you communicate any threats to the judge that dismissed

23   the case?

24   A    No.  Never made no threats at all.  I was upset, but I never

25   made no threats.

1    Q    When did you find that gun that you had forgotten about?

2    A    What do you mean, where did I find it?

3    Q    Well, you said several years ago -- Norma Brown, who was she?

4    A    That's a friend of mine.

5    Q    She gave you the gun to hold for her?

6    A    Yes.

7    Q    So you didn't get it from your wife?

8    A    Talking about two different things now.

9    Q    Oh, it's a different gun?

10   A    Yeah.

11   Q    Mr. Madison, isn't it true that your brother, who looked up

12   to you, who had no reason to fear the police, and you, who would

13   normally have to reason to fear the police, you ran; right?

14   A    Yes.

15   Q    And then your brother ran because you ran?

16   A    Yes.

17   Q    It wasn't because it was the police or that he had no reason

18   to fear the police --

19   A    No.  We didn't know it was police.  I thought it was a game.

20   Q    He ran because you ran?

21   A    Yes.

22   Q    And, at some point, when you lost sight of him, and you later

23   found out he was killed?

24   A    Yes.

25   Q    You didn't sit him down in front of the Friendly Inn and get

```
 1    arrested in front of Friendly Inn with him while you were trying

 2    to render assistance?

 3    A    No.  I didn't get arrested until I came back into the scene.

 4    Q    But you did say that; didn't you?

 5    A    I say what?

 6    Q    Didn't you, in one of your interviews, didn't you say that

 7    your brother got shot and he fell in front of the Friendly Inn.

 8    Said you were trying to help him and render assistance when the

 9    police came and arrested you?

10    A    No, I never said that.

11    Q    You never said that?

12    A    No, not that I recall.  He was shot on top of the bridge the

13    first time.

14    Q    What was that?

15    A    I say, he was shot on top of the bridge the first time.  And

16    then, when we got to the bottom of the bridge, he was shot

17    several more times.

18    Q    Do you remember when you talked to the friends of the family

19    Trish Lear and Clive McCoy?

20    A    Yes.

21    Q    And they were there to help you?

22    A    Yes.

23    Q    You certainly didn't want to lie to them; did you?

24    A    I told them what I thought at that time happened.

25    Q    You told them what you thought at that time happened?
```

1    A    Yeah.

2    Q    And you could have been wrong?

3    A    Yeah.

4    Q    But you told them what happened was --

5         MR. CARTER:  What document are you referring to, Mr.

6    DeSALVO?  The document that was prepared by --

7         MR. DeSALVO:  The document that was prepared by Trish

8    Lear, the Deputy Director of the Louisiana Department of Justice.

9         That's a good idea.  I think I'll have one, too.

10   BY MR. DeSALVO:

11   Q    Did you tell your friend of the family, Trish Lear:  Mr.

12   Madison stated that he witnessed his brother grab his chest and

13   scream, then fall to the ground?

14   A    I don't remember.

15   Q    Did you say that?

16   A    I don't remember that.

17   Q    You then said you attempted to render aid to your brother,

18   but the men in the mail truck approached him, identified

19   themselves as police --

20   A    I never say that.

21   Q    You never told them that you continued to stay at this time

22   and you questioned their actions but was placed under arrest?

23   A    Let me make a statement.

24        THE COURT:  First of all, you have to answer.

25   BY MR. DeSALVO:

1    Q    Did you then tell them that:  While the police questioned

2    him, they neglected to render medical treatment to his brother.

3    You learned later that your brother expired on the bridge.  Did

4    you tell them that?

5    A    No.  I don't remember saying that.

6         First of all, I didn't know they was police officers

7    shooting at us.  I didn't find that out until I came back to see

8    about my brother and was arrested.

9         Had I known to that they was police officers on that

10   bridge, shooting at us, I wouldn't be here today because they

11   would have shot and killed me.

12   Q    So you never told that to your friend of the family, Trish

13   Lear?

14   A    No, I don't.

15   Q    And the other friend of the family, Clive McCoy?

16   A    I don't recall.

17   Q    But they would have no reason to lie?

18   A    No.

19   Q    They're your friends?

20   A    No.  They not my friends.  Like I say, that was my first time

21   meeting them.  I didn't know who they were.

22   Q    You knew they were friends of the family?

23   A    No.

24   Q    You used to say that, a half an hour ago; right?

25   A    No.  I think you told me they knew your brother.  I didn't

1    know if these were friends or --

2    Q    They both knew your brother?

3    A    No.   Only one.

4    Q    Told you that your brother had sent them; right?

5    A    Yeah.

6         MR. DeSALVO:   I've got no further questions.

7         THE COURT:   Let's go ahead -- it's almost 10 after 10.

8    If you all could be ready at 10:25.

9         Mr. Madison, if you could be up here at 10:25, we'll

10   continue.   Please don't discuss your testimony with anyone during

11   the break, and we'll start up promptly at 10:25.

12        (Proceedings in recess.)

13        THE COURT:   Mr. Madison, you're still under oath, sir.

14        Have you discussed your testimony during the break?

15        THE WITNESS:   No.   I didn't do nothing but stay here the

16   whole time.

17        THE COURT:   Thank you.

18        Mr. Larson is going to ask you some questions.

19        Again, you might want to pull that microphone just right

20   there so we can hear you.   But not too, too loud.   Fine.

21        Mr. Larson, you may begin.

22                           CROSS EXAMINATION

23   BY MR. LARSON:

24   Q    Good morning, Mr. Madison.

25   A    Good morning.

1    Q   My name is Lindsay Larson, I represent Robert Faulcon.   I

2    have just a few questions for you.   Mr. DeSALVO covered a lot of

3    ground, and I don't want to go back over that.

4           When you were initially taken into custody, initially

5    apprehended, you were actually taken into custody by the state

6    police; weren't you?

7    A   What you mean -- no.   I was taken -- when they first arrest

8    me, I was --

9    Q   As I understand it, you walked up to some National Guard

10   people.

11   A   They were dressed in looked like National Guards.

12   Q   Okay.   Okay.

13   A   That's why I thought they was the National Guards.

14   Q   And they were actually state police?

15   A   Yes.

16          MR. LARSON:  Can we pull up Exhibit No. 261, please?

17   BY MR. LARSON:

18   Q   And are these the guys who took you into custody?

19   A   Yes.

20   Q   You see where it says state police on there?

21   A   Yeah.

22   Q   So it was the state police who initially took you into

23   custody?

24   A   Yeah.

25   Q   And they thought that you were shooting at police officers,

1    evidently, because they took you into custody; correct?

2    A    I don't know what they thought.  But I know, when they took

3    me into custody, that's when the police came running up to them

4    telling them to arrest me.

5    Q    But they had some reason to take you into custody, as opposed

6    to just talking to you and say:  Hi, how you doing, can we help

7    you, or whatever; correct?

8    A    Yes.

9    Q    Now, as I understand it, and I want to be clear about this,

10   your perception that morning was that the young people were

11   shooting at you before what you now know to be police arrived on

12   the scene; right?

13   A    Yes.

14   Q    And also, at some point in time, when you and your brother

15   were running down the bridge, he fell behind you; is that also

16   correct?

17   A    Yes.

18   Q    And so you couldn't see what he was doing when you were in

19   front of him running to try to get away; is that --

20   A    No.  We got down the bridge at the same time.  I was with him

21   the whole time we got to the bridge.

22   Q    But at some time he was behind you, though?

23   A    No.  I don't remember him being behind me.  Just know we got

24   down to the bridge at the same time.

25   Q    Well, let me --

```
 1              MR. LARSON:  Can I show Mr. Madison his grand jury

 2    testimony, Your Honor?

 3              THE COURT:  Yes.  You may approach.

 4              MR. CARTER:  What page are you referring to?

 5              MR. LARSON:  79.

 6    BY MR. LARSON:

 7    Q   Maybe this will refresh your recollection, sir.  If could you

 8    read this question on down to the end.

 9              (Pause in proceedings.)

10    BY MR. LARSON:

11    Q   Now, let me ask my question again.  This refreshed your

12    recollection.

13              At some point in time, you were running ahead of Ronald;

14    is that not correct?

15    A   I don't recall running ahead of him.  I remember him coming

16    down the same time as I did.

17    Q   Well, you --

18    A   If I said that, I guess I don't know what I said --

19    Q   Let me ask you, did you answer this particular question or

20    these couple of questions.

21              Question:  So you're still running with your brother,

22    you're really not at full speed; right?  And you said:  No.

23              Do you remember that?

24    A   Um-hum.

25    Q   What about him, your brother, is he running at full speed?
```

1    And you said:  Yes.

2            Do you remember that?

3    A    Running --

4            MR. CARTER:  Your Honor, let me just --

5            THE COURT:  Wait one second, sir.

6            Go ahead.

7            MR. CARTER:  I think there's an innocent

8    misunderstanding here, and he's taking it out of context.  If you

9    look at the entire page --

10           THE COURT:  Why don't we do this.  Why don't you show

11   Mr. Larsen the portion you're talking about.

12           MR. CARTER:  Line 5.  If you start at line 5 and read

13   down, the context changes.

14           MR. LARSON:  I wanted to ask him about the other fellow.

15   I see that.  But the specific question after that, Your Honor --

16           THE COURT:  Wait.  I mean, you all talk together without

17   all of us hearing it.  Otherwise, there's no objection, and we'll

18   just listen to you guys read it.  I think the point of it was you

19   needed to talk together, and then we were going to listen to the

20   result.

21           MR. CARTER:  We will talk amongst ourselves.

22           (Discussion held off the record.)

23           THE COURT:  Mr. Larson, in light of what you and Mr.

24   Carter discussed, are you prepared to proceed, or would you all

25   like to come up here if there's still a dispute?

```
 1              MR. LARSON:  I'm prepared to proceed.

 2              MR. CARTER:  We'll try it without coming up.

 3   BY MR. LARSON:

 4   Q   At some point in time, Mr. Madison, when you got to the

 5   bottom of the bridge, you ran ahead of your brother into the

 6   parking lot of the motel; correct?

 7   A   Yes, yes.

 8   Q   And at that time he was certainly behind you?

 9   A   Yes, exactly.

10   Q   And he was still alive at that point in time?

11   A   Yes.

12   Q   As far as you know.

13   A   Yes.

14   Q   And you were not present when he was unfortunately killed;

15   were you?

16   A   No.

17   Q   And you don't know what he was doing in the seconds, moments,

18   before he was shot at the bottom of the bridge; is that also

19   correct?

20   A   At the bottom of the bridge, we was together.  But, when we

21   got down to the motel, and I had put him down and left him, I

22   didn't know after that.

23   Q   You didn't know what happened him.  You don't know what he

24   was doing in the moments before he was shot?

25   A   No.
```

```
 1              MR. LARSON:  Thank you very much.

 2              I have no further questions, Your Honor.  I tender the

 3  witness.

 4              THE COURT:  Thank you, Mr. Larson.

 5              Next, Mr. Hessler?

 6              MR. HESSLER:  Yes, sir.

 7                        CROSS EXAMINATION

 8  BY MR. HESSLER:

 9  Q   Morning, Mr. Madison.

10  A   Morning.

11  Q   My name is Eric Hessler, I represent Robert Gisevius.

12              Sir, how many times prior to today in the past, since

13  2005, have you met with FBI agents and/or members of the

14  Department of Justice?

15  A   Several time.  I haven't kept up, I don't know how many

16  times.

17  Q   All right.  How many times in the last two months?

18  A   About three or four times.

19  Q   How long were these meetings that you attended?

20  A   About an hour, no more than two hours.

21  Q   Did they ever call you to testify before the grand jury?

22  A   No.

23  Q   And you've talked to other people about this, the incident

24  and your feelings about the case and what you observed that day

25  and all that; correct?
```

1    A    Yes.

2    Q    And I heard you -- I heard Mr. DeSalvo's examination of you,

3    you referred to a guy named Chris that you spoke to.  Who is

4    that?

5    A    Chris, someone that I met at the bus station who supposedly

6    had known my brother.  That was my first time talking to him.

7    Only met him one time.

8    Q    Have you spoken to him about that incident since then?

9    A    No.  One time.

10   Q    Okay.  In your meetings with DOJ and the FBI, did they ever

11   show you a video?

12   A    No.  I never seen a video.

13   Q    Of the bridge, of the incident, or anything like that?

14   A    I saw -- I saw a picture, but I never saw no video.

15   Q    Now, prior to the storm, you said that you were not going to

16   evacuate, somebody had to take care of the dogs?

17   A    Yes.

18   Q    Two dogs.

19        And your brother, Ronald, was going to stay with you?

20   A    Yes.

21   Q    And he looked up to you?

22   A    Yes.

23   Q    And you tried to take the best care of him that you could?

24   A    Yes.

25   Q    And you've had a gun in the past for protection; correct?

1   A    Yes.

2   Q    And, the morning that the storm hit, that was Monday the

3   29th; correct?  August 29th?

4   A    Yes.

5   Q    And New Orleans East had not yet flooded?

6   A    No.

7   Q    Power was out?

8   A    Yes.

9   Q    You knew that a great majority of the city had evacuated, I

10  would assume?

11  A    Yes.

12  Q    Were you concerned with looters or any criminal acts of

13  violence that could occur?

14  A    No.  No, I never did.

15  Q    Okay.  Well, why did you have a weapon for protection prior

16  to this incident and not one during this time?

17  A    I didn't have no weapon during that time.

18  Q    Well, prior --

19  A    Prior to, before that, I'd been having break-ins.  And people

20  breaking in cars and houses out there.

21  Q    And that's unfortunately true of New Orleans then and now;

22  correct?

23  A    Yes.

24  Q    And things certainly didn't get better from the time you

25  owned a gun back in the '80s; would you agree with that?

1   A    Yes.

2   Q    And so, I guess my question would be, if you felt the need in

3   the '80s to have a gun for protection, and things were

4   continually getting worse, why wouldn't you feel the need to have

5   a weapon, rightfully so, in August 29th of 2005?

6   A    I just didn't have no weapon and at that time I didn't need

7   no weapon.  I didn't have no need for no weapon.  If something

8   was going to happen to me, it was just going to happen.

9   Q    But you actually had one right outside your door?

10  A    I don't know if it's still out there or not.

11  Q    But you told Agent Bezak just a couple of -- I think about a

12  couple weeks before this trial or a week before this trial, that

13  you did in fact have a gun in the -- on the floorboard of the

14  seat of your car; correct?

15  A    Yeah.  Yes.

16  Q    And I guess my question, Mr. Madison, was, with this great

17  responsibility and this particular time with a weapon easily

18  accessible, why wouldn't you feel the responsibility to arm

19  yourself?

20  A    I didn't see no reason for me to arm myself.  After the

21  storm, as a matter of fact, had an RV that was parked there in

22  the back that I was ready to use to leave with.  By the time that

23  happened, the flood came, the water came.

24  Q    At some time during the storm did you feel the need --

25  A    No.

1   Q    -- to arm yourself?

2   A    No.

3   Q    Or to get a weapon or an object for protection?

4   A    No, I didn't need no weapon.

5   Q    Not even at one specific time when you became scared and you

6   said maybe I ought to arm myself?

7   A    No, never did.  And I never thought about it one time.

8   Q    Do you remember speaking to Dustin Davis, this Bloomberg

9   fellow, back in 2005, 2006?

10  A    Yes.

11  Q    Do you remember telling him that you picked up a shovel for

12  cleaning and for protection?

13  A    No.  I told him I picked it up for cleaning.  I never said

14  nothing about protection.

15          MR. HESSLER:  Your Honor, may I approach?

16          THE COURT:  Yes.  Page?

17          MR. CARTER:  Page?

18          MR. HESSLER:  Page 4.

19  BY MR. HESSLER:

20  Q    Mr. Madison, you've had a chance to read the transcript?

21  A    Yes.

22  Q    Does that refresh your recollection of what you told

23  Department of Justice and Dustin Davis that day?

24  A    Yes.

25  Q    What does it say?

1    A    From what they had on there, to say I picked up a shovel to

2    clean up the office and for protection.

3    Q    Okay.  And you did that while you -- when you were walking

4    past the Family Inn; correct?

5    A    Yes.

6    Q    And, in that same paragraph, it actually says:  While passing

7    the Family Inn, a lot of people were out there.  I did not hear

8    any gunshots as we were passing.  On the way back, I picked up a

9    shovel for cleaning and for protection.  Right?

10   A    Yes.

11   Q    Were there anything about these people that were outside of

12   the Family Inn that caused something to go off in your mind and

13   say:  I'd better pick up this shovel, I might need it for

14   protection?

15   A    No.  I picked up the shovel before I passed the Family Inn.

16   Q    But you wouldn't dispute that you also said for protection

17   back then?

18   A    I might have said it, yes.

19   Q    But you're telling us today that you never felt that you

20   needed protection during that time?

21   A    I didn't feel threatened by anybody.

22   Q    Okay.  Did you ever become concerned that these six persons

23   were encroaching upon you and your brother in a fast manner and

24   you decided you'd better distance yourself from them?

25   A    Yes.

1    Q    Well, did these persons in there and the way they were

2    encroaching on you -- why separate yourself?  Why did you want

3    some distance?

4    A    Well, they was running up and down the street.  I didn't know

5    what they was up to.

6    Q    Would it be fair to say you were, at the very least,

7    suspicious of them?

8    A    No, not really.  I was just walking, going toward back to my

9    brother's office.

10   Q    All right.  At that point, when you were going up there and

11   these people were running back and forth, you didn't feel -- and

12   you said at one point they came within -- they were running up on

13   you, these young teenagers, about six people coming out the hotel

14   and they were 25 yards behind me and my brother.

15            Do you remember saying that?

16   A    Yes.

17   Q    They were behind us and I heard someone running behind us.

18   A    Yes.

19   Q    Did that concern you, someone running up behind you at that

20   particular time?

21   A    No.  That didn't concern me at all.

22   Q    It says that:  The six people were still behind us.  A group

23   of about three runners came about 10 yards close and we started

24   walking fast.

25            Do you remember saying that?

1    A    Yes, uh-huh.

2    Q    I know you played football for a long number of years.

3    A    Yes.

4    Q    And 10 yards has got to be a distance engrained in your head.

5    A    Yes.

6    Q    That's the first down, that's where people pass out from

7    pain; correct?

8    A    Yes.

9    Q    From where you are sitting, where would you consider 10 yards

10   to be in this courtroom?  And I'll point to an object out there.

11   A    Probably from here to the guy.

12   Q    This fellow right here?

13   A    Yeah, probably right there.

14        THE COURT:  The person sitting behind Mr. Carter, is

15   that who you're pointing to?

16        THE WITNESS:  Yes.  The one behind him.

17        MR. HESSLER:  Your Honor, I would say I'm at the end of

18   the jury box in the courtroom.

19   BY MR. HESSLER:

20   Q    Now, it goes on, it says:  About 40 yards after the bridge,

21   we heard gunshots.  I looked back, saw guys with a gun, pop, pop.

22   One of the guys with the gun was shooting at us.  I pushed my

23   brother out of the way, stating they're shooting at us.  I pushed

24   my brother out of way and told him they're shooting at us.

25             How far was the person shooting at you?  Was it

1    the person that was 10 yards away?

2    A    When I heard pop, pop, I looked back, the guy about 10 yards.

3    About 10 yards, about.  Ten, 20 maybe.

4    Q    Okay.  So from either to possibly as far as the back of --

5    A    Yeah.

6    Q    -- the room.  The back of the courtroom?

7    A    Yes.

8    Q    When Dustin Davis asked you:  You heard pop, pop, could the

9    guys have heard -- have had something else?  Did you see

10   something in his hands?

11            Answer, Lance Madison:  I am certain he had a gun in his

12   hands.

13            Do you recall saying that?

14   A    Yes.

15   Q    That word certain is not I think, might have.  I'm certain he

16   had a gun in his hand.

17   A    Yes.

18   Q    From here, me to you, my arm out-stretched, with a gun in his

19   hand?

20   A    Yes.

21   Q    And you went on, and I'm going to refer to page 6, you said

22   you heard two gunshots, two gunshots to several shots?

23   A    Yes.

24   Q    And you go on:  Then other people came -- then other people

25   in trucks came and it started sounding like a war.

1   A   Yes.

2   Q   The second set of gunshots were different from the first set;

3   correct?

4   A   Yes.

5   Q   So you were able to differentiate between the guy standing 10

6   yards away with his out-stretched hand from the fellows that came

7   up in a truck and started shooting?

8   A   Yes.

9   Q   Certainly, different people?

10   A   Yes.  Well, the gunshots -- when I heard pop, pop, that's

11   when I looked around.

12   Q   And you looked around and you saw a guy, one of the teenagers

13   standing --

14   A   Running towards me.

15   Q   The ones that had followed you from the Family Inn?

16   A   Yes.

17   Q   And then the police came up -- or what you later learned to

18   be the Budget truck pulled up?

19   A   Yes.

20         MR. HESSLER:  I have no further questions.

21         THE COURT:  Thank you, Mr. Hessler.

22         Anybody else?  Mr. London or Mr. Meche?

23                 CROSS EXAMINATION

24   BY MR. LONDON:

25   Q   Mr. Madison, my name is Steven London, and I represent Archie

1    Kaufman.

2              MR. LONDON:  I'll be very brief, Your Honor.

3    BY MR. LONDON:

4    Q    I believe you testified that, when you were arrested, that

5    the state police had you in custody, and that some New Orleans

6    police officers came up to you and told the state police arrest

7    him, he, meaning you, shot at the police; is that correct?

8    A    Correct.

9    Q    Okay.  When you -- and you also testified about being in a

10   preliminary hearing, and Sergeant Kaufman testified?

11   A    Yes.

12   Q    You heard his testimony?

13   A    Yes.

14   Q    Now, Sergeant Kaufman did not testify that he saw you do

15   anything; correct?

16   A    Yeah.

17   Q    He testified to what others told him; is that correct?

18   A    Yes.

19              MR. LONDON:  Thank you.  That's all I have.

20              THE COURT:  Mr. Meche?

21                        CROSS EXAMINATION

22   BY MR. MECHE:

23   Q    Morning, Mr. Madison.

24   A    Good morning.

25   Q    I'm Tim Meche.  Thank you for your testimony.

1          I am the last lawyer who'll be asking you questions, so

2     I might try to sum some things up briefly.

3          Just to get an understanding of this, after the incident

4     that happened on the bridge, it's my understanding, according to

5     Mr. DeSalvo's questions, you gave at least five statements to

6     various people who were interviewing you about what you recall

7     happened.

8     A    Yes.

9     Q    And that's not counting, you know, private conversations you

10    had with friends or relatives.  But, just to be specific, the

11    five, as I understand them, were like a week or two after the

12    incident, these two police officers came to see you in jail, Ms.

13    Lear and Mr. McCoy; is that correct?

14    A    I wasn't in jail.  It was the same day this happened.

15    Q    Okay.

16    A    Yes.  Same day.  I was at the holding center at the Greyhound

17    station.

18    Q    So really just a few hours after?

19    A    Yes, exactly.

20    Q    And, in that interview, you told them that the teenagers on

21    the bridge had guns and were shooting at you?

22    A    Yes.

23    Q    And then the second interview was actually you went -- you

24    were in court, and this was about 30 days after the incident?

25    A    Somewhere.  Somewhere around there.

1    Q    And that was at that courthouse in the St. Gabriel prison

2    where you were?

3    A    Yes.

4    Q    And it was a hearing.  So, it was just like here, you took

5    the witness stand, took an oath?

6    A    Yes.

7    Q    And you were asked questions by your lawyer.  And, under

8    oath, you again said that the teenagers on the bridge had guns

9    and were shooting at you?

10    A    Yes.

11    Q    The third interview, as I understand it, was the CNN

12    interview?

13    A    Yes.

14    Q    On national television, you said the teenagers on the bridge

15    had guns and were shooting at you?

16    A    Yes.

17    Q    And that was what, about a year after the incident?

18    A    Somewhere.  Somewhere around there.

19    Q    Right around the one year anniversary of Katrina, they were

20    doing a lot of specials, something like that?

21    A    Yes.

22    Q    And then the fourth interview was a few months later, and

23    that was that interview Mr. DeSALVO asked you about at the

24    district attorney's office where they had a district attorney,

25    Mr. Davis and Mr. Bloomberg, and that's where they quizzed you:

1    Are you sure they had guns.  And you said:  I'm sure.

2    A    Yes.

3    Q    And then, the fifth interview was the grand jury, where you

4    again took an oath and again were asked:  Did the teenagers have

5    guns.  And you said:  Yeah.

6    A    Um-hum.

7    Q    So now those are five.  Were there any other interviews like

8    that that we didn't hear about?

9    A    Not that I know of.

10   Q    And all of that happened like within the first 15 months

11   after the incident?

12   A    Yes.

13   Q    Okay.  Now, subsequent to that, a long time passed?

14   A    Um-hum.

15   Q    You had several interviews and meetings with Ms. Bernstein?

16   A    Yes.

17   Q    Mr. Bezak?

18   A    Yes.

19   Q    You also, in addition to that criminal lawyer Mr. DeSALVO

20   spoke about, you got a civil lawyer and filed a lawsuit; right?

21   A    Yes.

22   Q    And you met with that lawyer periodically?

23   A    Who you talking about?

24   Q    Well, I don't know who your lawyer is.  Do you know who your

25   civil lawyer is?

```
 1   A    Yes, I do.

 2   Q    The one who filed the lawsuit?

 3   A    Yes.

 4   Q    And you've met with her or him periodically?

 5   A    Yeah.  A few times, yes.

 6   Q    Discussed the case?

 7   A    Yes.

 8   Q    Okay.  And discussed what you saw or didn't see?

 9   A    Yes.

10   Q    And have you read the lawsuit that was filed?

11   A    No.  I never read it.

12   Q    But you know you're asking for money?

13   A    Well, I never asked for anything.  I know they filed a suit.

14   Q    Sure, okay.  But that's the purpose?

15   A    Yeah.  My purpose seeing justice.

16   Q    I understand.

17   A    That's why I'm here.

18   Q    But, in meeting with all those people, Ms. Bernstein, Mr.

19   Bezak and this lawyer who filed the lawsuit --

20   A    Yes.

21   Q    -- did that help you change your mind about what you saw on

22   the bridge?

23   A    No.  No.  Nothing like that changed my mind.  Like I said,

24   I'm here for justice.  If I don't get a dime, I'm not even

25   worried about that.  I'm worried about justice.
```

1    Q    And you realize that you'd have a hard time getting justice

2    if you really didn't see those teenagers with guns on the bridge;

3    don't you?

4    A    Yes.

5              MR. MECHE:   Thank you, sir.

6              THE COURT:   Thank you.

7              Redirect?

8              MR. CARTER:   Yes, sir.

9                        REDIRECT EXAMINATION

10   BY MR. CARTER:

11   Q    Mr. Madison, you've been asked a lot of questions about Trish

12   Lear coming to meet you.   Where were you when Trish Lear came to

13   talk to you?

14   A    I was at the Greyhound bus station.

15   Q    Were you in a jail cell, or were you outside in the building,

16   inside?   Where were you?

17   A    I was outside the building, for inside like a cage where they

18   keep animals, and they had German shepherds all around me.

19   Q    What type of cage?

20   A    Like a fence, maybe 10 feet high.

21   Q    Ten foot high fence?

22   A    Maybe about eight by eight.

23   Q    And you mentioned a German Shepherd?

24   A    Yeah.   They were dogs that were around the cage.

25   Q    Did you have a bed inside that cage?

```
 1   A   No.

 2   Q   Did you have a toilet inside that cage?

 3   A   Yes.

 4   Q   What did you have?

 5   A   Like a portalet.

 6   Q   A portalet?

 7   A   Yeah.

 8   Q   Was part of this cage open, or was it all open?

 9   A   The cage was closed, all the way.

10   Q   Enclosed from sight?  Could someone see inside?

11   A   Yeah, they could see inside.

12   Q   Otherwise, there was no privacy?

13   A   No.

14   Q   How long were you in that cage?

15   A   From the time I got there until the time I left, maybe about

16   six, eight hours.

17   Q   And this Trish Lear came to talk to you?

18   A   Yes.

19   Q   Did you talk to him?

20   A   No.

21   Q   Did you lie to him?

22   A   No.

23   Q   He wrote a written report, it appears.  Have you ever read

24   that written report?

25   A   No.
```

1    Q    Did he ever come back with you and ask you to look at that

2    written report?

3    A    No.

4    Q    Ask you if that report he wrote was accurate?

5    A    No.

6    Q    You were asked some questions about carrying your brother.

7    Do you know what a fireman's carry is?  Have you ever heard that

8    term before, a fireman's carry?

9    A    No.

10   Q    Not familiar with that?

11   A    No.

12   Q    Did you ever take your brother and pick him up and put him

13   over your shoulder as you ran?

14   A    No.

15   Q    How did you hold your brother, help your brother?

16   A    I grabbed him under the arm.

17   Q    Under his arm?

18   A    Under his arm.

19   Q    Which arm did you use, do you remember?

20   A    It was his left side.

21   Q    Which one of your arms, if you recall?

22   A    It was my right side.

23   Q    And you held him up as you ran?

24   A    Yes.

25   Q    Any doubt in your mind about that, sir?

1    A    Not that I know of, no.

2    Q    You were asked about guns and a gun that your son had.

3    A    Yes.

4    Q    I believe someone referred to as easily accessible.  Was that

5    gun easily accessible to you?

6    A    Yes.

7    Q    And where was it?

8    A    It was in the car.

9    Q    And when did you last see that gun?

10   A    2001.

11   Q    2001?

12   A    Yeah.

13   Q    Under what circumstance did you see that gun?

14   A    Well, I took it to give back to his mom, because that's who

15   the gun is for.

16   Q    Did you give it back to his mom?

17   A    No, I did not.

18   Q    What did you do with it?

19   A    I put it into my car, and that's the last time I saw it.

20   Q    Where was your son at this time?

21   A    My son was killed.

22   Q    What were you going to do with the gun?

23   A    Give it back to his mom.

24   Q    Did you look at the gun?  When you found the gun, did you

25   look at the gun?

1   A   Yes, I did.

2   Q   You inspected it?

3   A   Yes.

4   Q   Was it loaded?

5   A   No.

6   Q   Was there a clip in it?

7   A   It had a clip but it was not loaded.

8   Q   The clip was not -- the gun was not loaded?

9   A   No.

10   Q   No bullets in the clip?

11   A   No.

12   Q   Did you see any bullets there in the house?

13   A   No.

14   Q   Did you ever find any bullets there for that gun?

15   A   No.

16   Q   Ever get any bullets for that gun?

17   A   No.

18   Q   What did you do with that gun?

19   A   I put it in the car to returned it to his mom, and never got

20   a chance to do that.

21   Q   When did you put it in the car?

22   A   Around right after my son got killed.

23   Q   Which was when?

24   A   2001.

25   Q   Did you ever see that gun again?

```
 1    A    No, I didn't.

 2    Q    Ever see it in 2001 again?

 3    A    No.

 4    Q    2002?

 5    A    No.

 6    Q    2003?

 7    A    No.

 8    Q    2004?

 9    A    No.

10    Q    2005?

11    A    No.

12    Q    When you left your house, when it was flooded, were you even

13    aware that that gun was there?

14    A    No.

15    Q    And where was it when you left your house, as far as you

16    recall?

17    A    I thought it was still in the car.  I'm not sure.  I never

18    got a chance --

19    Q    Where was the car?

20    A    In the back of the condo.

21    Q    How high was the water?

22    A    About six to eight feet.

23    Q    So, that gun, if it was there, was flooded?

24    A    Yes.  You couldn't even see the car.  The water was over the

25    car.
```

1   Q    If it was there?

2   A    Yes.

3   Q    What did you use that car for?

4   A    To store stuff in.  I had another car, I had a van, that I

5   would use.  But that car was basically I would store stuff in

6   there.

7   Q    So would you drive that car?

8   A    No, huh-uh.

9   Q    It just sat out there?

10   A    Yes.

11   Q    With other stuff you stored?

12   A    Yes.

13   Q    You were asked about your conversation with the district

14   attorney, and you were asked to describe guns in that

15   conversation.  Do you recall being asked about that?

16   A    Yes.

17   Q    Were you able to describe the guns in that conversation with

18   the district attorney when he asked you to describe the guns?

19   A    No.

20   Q    What effect did that have on you?

21   A    I had doubt if it was really was a gun or not, because I

22   didn't know if it was a gun.  I just saw an object, and I

23   couldn't describe it.  That's what made me have doubts about it.

24   Q    You began to have doubts?

25   A    Yes.

1    Q    You said something in response to a question that I want to

2    follow-up on.  You said, had you known they were police you'd be

3    dead.  What did you mean by that?

4    A    Well, had I known they were police, I would have stopped.  I

5    wouldn't have been running.  But I thought it was a gang at

6    first.  And, after they jumped out the truck, they just started

7    shooting, like it was a war zone.

8    Q    Why would you be dead if you'd have stopped?

9    A    Because they would have shot and killed me, too.

10            MR. CARTER:  I have nothing further, Your Honor.

11            THE COURT:  All right.  Thank you.

12            Counsel, is this witness released?

13            MR. FLEMING:  We're going to ask that Mr. Madison remain

14   available.

15            THE COURT:  Mr. Madison, you can step down, but you're

16   still subject to the sequestration order.  Please don't discuss

17   your testimony with anyone until the trial is completely over.

18   Do you understand that?

19            THE WITNESS:  Yes.

20            THE COURT:  Thank you, sir.  You can step down.

21            All right.  Who is next, counsel?

22            MR. CARTER:  Mr. Robert Rickman.

23            THE COURT:  Robert Rickman.

24            ROBERT RICKMAN, being duly sworn, testified as follows:

25            THE CLERK:  Thank you.  You may be seated.

1          Please state and spell your full name for the record.

2          THE WITNESS:  Robert Rickman R-I-C-K-M-A-N.   Robert

3     R-O-B-E-R-T.

4                          DIRECT EXAMINATION

5     BY MR. CARTER:

6     Q    Mr. Rickman, where do you live?

7     A    Tampa, Florida.

8     Q    What do you do there?

9     A    I'm disabled.

10    Q    How were you disabled, sir?

11    A    I got a bunch of medical problems.

12    Q    Do you take any medicine for those problems?

13    A    Yes, I do.

14    Q    What medicines do you take?

15    A    I don't actually know the name of them.  I can't pronounce

16    them.

17    Q    How many different medicines?

18    A    Seven, I think.

19    Q    Have they affected you here today?

20    A    Yes.

21    Q    How so?

22    A    I have bad dreams about what happened.  I can't -- I have

23    sleep disorders.

24    Q    Has your medicine affected you here today?

25    A    No.

1   Q   Can you hear me?

2   A   Yes, I can hear you.

3   Q   And understand me?

4   A   Yes, sir.

5   Q   If at any point you don't understand me, just tell me to

6   repeat, and I'll rephrase the question.

7   A   Yes, sir.

8   Q   Mr. Rickman, where were you on September 4th, 2005?

9   A   Here in New Orleans, Louisiana.

10  Q   Where were you living?

11  A   4861 Chef Menteur Highway at the Friendly Inn Motel.

12  Q   You lived at the Family Inn?

13  A   Yes, sir.

14  Q   Where did you work at that time?

15  A   At the time, Family Inn.

16  Q   What did you do there?

17  A   All sorts of jobs.  I was a maintenance man, security guard,

18  like a troubleshooter.

19  Q   Are you married, sir?

20  A   Yes, I am.

21  Q   Were you married at that time?

22  A   Yes, sir, I was.

23  Q   Who are you married to?

24  A   Patti Batson.

25  Q   Was Patty also at the Family Inn?

1    A    Yes, sir, she was.

2    Q    Where did she work?

3    A    She worked at the Family Inn.

4    Q    And what did she do at the Family Inn?

5    A    She was somewhat the manager.

6    Q    Somewhat the manager?

7    A    She had manager duties and stuff.  But there was also another

8    manager.

9    Q    I would direct your attention to the morning of

10   September 4th, 2005, what were you doing that morning?

11   A    We was just out on the balconies, hanging out.

12   Q    Anything happen while you were out there hanging out?

13   A    We walked around front that morning to take some pictures of

14   the --

15   Q    Who is we?

16   A    Me and my wife.

17   Q    What were you walking out front to take pictures of?

18   A    We was walking up front to take pictures of the hotel for

19   insurance reasons.

20   Q    Is this related to the storm?

21   A    Yes, sir, it was.

22   Q    How did the storm affect the hotel?

23   A    Today, it's still closed.

24   Q    Was there wind damage?

25   A    Yes, sir.

1    Q    Was there flood damage?

2    A    Yes, sir.

3    Q    Was there water in the courtyard?

4    A    Yes, sir.

5    Q    Roughly, how high, if you know?

6    A    Four to five feet.  Maybe a little bit higher in parts.

7    Q    Where were you going to take pictures of, what particular

8    part of the hotel?

9    A    The front of the motel.

10   Q    And where were you coming from?

11   A    From the 8 and 900 building in the back.

12   Q    In the back?

13   A    Yes, sir.

14   Q    Would this have been more on the one side or the other?  More

15   on the right, or the left?

16   A    It was more in the 2 to 300 buildings had the worse damage, I

17   believe.

18   Q    Let me show you --

19         MR. CARTER:  Let's put Exhibit 34 up.  It's already in

20   evidence.

21   BY MR. CARTER:

22   Q    From what side were you coming from when you came from the

23   back?  Could you point on here?

24   A    To the left side.

25   Q    Just touch the screen, it will make a mark.

1    A    (Witness indicates.)

2    Q    Right around there?

3    A    Yes.  We was coming from the back up to here.

4    Q    From the back up there.  You and who else?

5    A    Me and my wife.

6    Q    Okay.  What happened as you were walking up?

7    A    As we was walking up and turning the corner and got by the

8    steps, we heard some gunshots.

9    Q    How many gunshots?

10   A    I'm not for sure.

11   Q    Now, did they sound loud or far away?

12   A    They seemed to be early close.

13   Q    Seemed to be close.  Let me show you -- I don't believe this

14   is in evidence -- Government Exhibit 98.

15            THE COURT:  Is this 98, Mr. Carter?

16            MR. CARTER:  Yes, sir.

17            May I approach, Your Honor?

18            THE COURT:  Yes.

19   BY MR. CARTER:

20   Q    I show you Exhibit 98, ask if you can identify the area

21   depicted in that photograph.

22   A    This is the Family Inn Motel.

23   Q    Is that the courtyard?

24   A    Yes, sir.

25            MR. CARTER:  Offer Exhibit 98 into evidence.

1           MR. LARSON:  No objection.

2           MR. HESSLER:  No objection.

3           THE COURT:  Admitted.

4           (Exhibit admitted.)

5    BY MR. CARTER:

6    Q   Mr. Rickman, do you see the area where you and your wife wer

7    when you heard gunshots depicted in this photograph?

8    A   Yes, sir.

9    Q   Would you touch the screen in the area where you were?

10   A   We were about right there.

11   Q   Was it dry at that time, like this, or was there water?

12   A   There was water.

13   Q   Was it empty like this, or were there cars?

14   A   There was cars.

15   Q   A lot of cars, or a few cars, if you recall?

16   A   There were a few cars.

17   Q   So what happened when you heard the shots?

18   A   I grabbed my wife and fell into the water.

19   Q   How high was water that you fell into?

20   A   About six, seven inches.

21   Q   And what happened as you fell into the water?

22   A   I just fell into the water and -- I just fell into the water

23   and held on to my wife.

24   Q   Could you tell whether any of the gunfire came close to you

25   or not?

```
1    A    I'm not for sure.

2    Q    Could you see who was shooting?

3    A    No, sir, I couldn't see exactly who was shooting.

4    Q    What happened next?

5    A    I got up and started looking around.

6    Q    What did you see?

7    A    I seen a black male, running.

8    Q    Can you show on this diagram where you saw the black male

9    running?

10   A    He was running through here.

11   Q    And where were you?

12   A    I was over here.

13   Q    And are you still on the ground at this time?

14   A    I'm getting up.

15   Q    You're get up, and you see him running?

16   A    Yes, sir.

17   Q    What direction is he running?

18   A    To the back of the motel.

19   Q    Would it be in this -- well, not working.

20        He's running toward the back of the hotel?

21   A    Yes, sir.

22   Q    Could you tell anything about this gentleman?  Was he white,

23   or black?

24   A    He was a black male.

25   Q    Could you tell if he was short, or tall?
```

1    A    He was kind of tall.

2    Q    Did he have anything in his hands, as far as you could tell?

3    A    No, sir.

4    Q    Was he running slowly, or quickly?

5    A    He was treading through water.

6    Q    Treading through water?

7    A    He was running about average speed, I would guess.

8    Q    And the water was -- was the water where he was as high as

9    the water where you were?

10    A    Yes, sir.

11    Q    Was that level throughout the entire courtyard, or did it get

12    higher at some points?

13    A    At points, it would be higher than others.

14    Q    And he was running toward the back?

15    A    Yes, sir.

16    Q    Do you recall whether the water was higher towards the back,

17    or higher toward the front?

18    A    It was about higher in the middle.

19    Q    So he's running through the water as you see him?

20    A    Sir, repeat.

21    Q    He's running through the water as you see him?

22    A    Yes, sir.

23    Q    Can you see his hand?

24    A    Yes.

25    Q    What do they do?

1   A   He's treading, like this.

2   Q   Did he have anything in his hands?

3   A   No, sir.

4   Q   Did he look back at anything when you saw him running?

5   A   What do you mean?

6   Q   He was running in that direction?

7   A   Yes.

8   Q   Did you ever see him look back in another direction?

9   A   No, sir.  He was just concentrating on going the way he was

10  going.

11  Q   What did you observe next?

12  A   There was some officers chasing him.

13  Q   Where were these officers?

14  A   About a car, car and a half length behind him.

15  Q   What were these officers doing?

16  A   They were chasing after him.

17  Q   Did these officers have any weapons in their hands?

18  A   Yes, they did.

19  Q   What were they doing with those weapons?

20  A   They were holding them.

21  Q   Could you tell whether or not they were pointing them at him?

22  A   I don't think they were pointing at him.  I think they were

23  struggling to through the water, too.

24  Q   What happened next?

25  A   They just disappeared into the back of the motel.

1    Q    Who is they?  Who disappeared in the back?

2    A    The gentleman and the cops.

3    Q    What happened next?

4    A    Me and my wife we got up and started looking around.  And we

5    looked out front and seen somebody laying down on their front

6    under the canopy.

7    Q    Did you know who that individual was?

8    A    Not at the time I didn't.

9    Q    Did you ever learn who that individual was?

10   A    Yes, I did.

11   Q    Who did you learn that individual to be?

12   A    Ronald Madison.

13   Q    You said he was laying down?

14   A    Yes, sir.

15   Q    What did you observe about Mr. Madison?

16   A    He was just laying there.

17   Q    Did you see him?

18   A    Yes, sir.

19   Q    Was he talking, was he breathing, was he saying anything?

20   A    He wasn't saying nothing.  He was laying there, bleeding.

21   Q    Bleeding.  You saw blood?

22   A    Yes, sir.

23   Q    Do you recall where the blood was on his body?

24   A    No, sir, I can't.

25   Q    What did you do next?

1    A    Next, I started taking some photographs.

2    Q    Why did you take photographs?

3    A    Because I figure the hotel needed to document what was going

4    on there.

5    Q    And you had cameras with you?

6    A    Yes, sir.

7    Q    How many?

8    A    Two.

9    Q    What did you take photographs of?

10   A    The body.  Ronald Madison.  The cops.  The military.

11   Q    How many pictures did you take, if you recall?

12   A    I'm not for sure.

13   Q    What happened?

14   A    What do you mean?

15   Q    What happened as you were taking these pictures?

16   A    An officer come up to me and told me -- told us to go back to

17   where we were at.

18   Q    Did he tell you why he wanted you to go back to where you

19   were at?

20   A    No, he didn't.

21   Q    What did you say in response to him?

22   A    I told him that we worked here, we was -- my wife was the

23   manager, we wanted to know what was going on.

24   Q    Did he say anything in response to that?

25   A    He was just telling us to go back to where we were at.

1    Q    And what did you do?

2    A    At one point he -- somehow he got the camera from me and

3    stomped it.

4    Q    You said somehow he got the camera.  Do you know how he got

5    the camera from you?

6    A    I think he pulled it out of my hand.

7    Q    Do you recall?

8    A    I am not for sure.

9    Q    You said he stomped it?

10   A    Yes, sir.  I remember him stomping it.

11   Q    You do recall that?

12   A    Yes.

13   Q    Did he say anything while he was stomping the camera?

14   A    He told us to go back to where we come from.

15   Q    Did you say anything while he was stomping the camera?

16   A    No.  At that point I thought it would be best just to go back

17   to the back.

18   Q    Why would it be best just to go back to the back?

19   A    Well, they're telling us to go back to the back, you know, to

20   get out of their way, you know.  And I just figured it would be

21   best.

22   Q    So what did you do?

23   A    We went back to the back.

24   Q    And what happened when you got back to the back?

25   A    We went back there and just sat down and to catch our breath

1    and to realize what was going on.

2    Q    How long did you stay in the back?

3    A    An hour, hour and a half maybe.

4    Q    Then what did you do?

5    A    We went back out front to see what else was going on.

6    Q    What did you see?

7    A    We seen Ronald Madison laying there and one cop standing by

8    the office door.

9    Q    Did you talk to the police officer?

10   A    No, we didn't.

11   Q    Was it a New Orleans police officer, do you know?

12   A    He had a blue New Orleans Police shirt on.

13   Q    And what did you do next?

14   A    We went upstairs and talked to Henry and told him --

15   actually, we walked over to the vending machine, the Coke

16   machine, and talked to Henry and told him when the sheriff's --

17   when the cops left and everything, to try to let us know.

18   Q    Who is Henry?

19   A    He was one of the maintenance workers that worked there.

20   Q    And did Henry know when the officers had left?

21   A    Yes, sir.

22   Q    What did you do when the officers left?

23   A    I come back up front to see what was going on.

24   Q    What did you see?

25   A    I seen Ronald Madison's body still there.

1    Q    Were there any officers there at that time?

2    A    There was no officers there.

3    Q    That you recall?

4          So what did you do?

5    A    I started taking pictures.

6    Q    What did you take pictures of?

7    A    Ronald Madison.  Some gun shell casings.

8    Q    Gun shell casings?

9    A    Yes, sir.

10    Q    How many casings?

11    A    I'm not for sure, like five or seven.

12    Q    Had you been in the area earlier that day?  The area were you

13 found the casings?

14    A    Yes, sir.  We walked by there.

15    Q    Did you see casings there earlier that day?

16    A    Sir, I didn't.

17    Q    Were those casings there earlier that day?

18    A    No, sir, they weren't.

19    Q    But they were there when you took the pictures?

20    A    Yes, sir.

21    Q    I'm going to show you a series of photographs marked 99A,

22 99C, 99E, 99F, 99G.

23         THE COURT:  Mr. Carter, is that all but letter B?  So

24 it's A through G but not B; is that correct?

25         MR. CARTER:  That's correct.  B was actually redundant.

1              THE COURT:  I wanted to make sure I got the letters

2     correct.

3              MR. CARTER:  One moment, Your Honor, while they're

4     looking at the photographs.

5              THE COURT:  Sure.

6              (Pause in proceedings.)

7              MR. HESSLER:  May we approach, Your Honor?

8              THE COURT:  Yes.

9              (Sidebar conference.  Jury not present.)

10             MR. HESSLER:  I would object to the 99C, E, F and G.

11             THE COURT:  Let's go through here.

12             A, you have no objection to?

13             MR. HESSLER:  No.

14             Well, I would object to A also for some of the same

15     reasons.  Clearly, this is not -- this picture is not reflective

16     of the condition of the body.  It's been manipulated or the scene

17     has been changed.  There's a piece of plywood.  Somebody wrapped

18     him up.  There's no telling what kind manipulation has been done

19     to the scene.

20             MR. CARTER:  May I address that point?  Those are

21     questions he can ask the witness.  But it's a photograph that he

22     took of the scene at this point in time.  Those are all proper

23     questions that he can ask the witness about.

24             MR. HESSLER:  And I think he can describe the scene as

25     he found it.  This picture, I don't believe, properly reflects

 1    the scene as it was.  Obviously, it's been manipulated by --

 2              MR. CARTER:  Excuse me.  Are you saying that the

 3    photograph is doctored?

 4              MR. HESSLER:  No.  No.  The scene itself.

 5              MR. CARTER:  Then he can testify to that.  You can ask

 6    him.

 7              THE COURT:  I think we need to establish the point in

 8    time, and I think he's going to answer that this was not

 9    contemporaneous right after the event happened.  So I think we

10    need to put it on a time line.

11              MR. CARTER:  I'll clarify that.

12              THE COURT:  It is a picture that he personally took.

13    And, if you want to ask him on cross about any changes or things

14    that went on as depicted in this, I think that that would be

15    appropriate for cross.  I'll overrule as to that photo.

16              MR. FLEMING:  Didn't Bloedorn testify yesterday that he

17    put some of that stuff on Mr. Madison's body?

18              THE COURT:  Jury knows that.

19              MR. HESSLER:  Your Honor, I would extend the same

20    objection for those pictures, and then go further that there's --

21    although I understand he can testify as to the general area where

22    these casings were found, the pictures do not have any landmark

23    reflecting the areas.  There would be no way to corroborate --

24              MR. CARTER:  That's why he'll testify as to why he took

25    the photographs.

1    THE COURT:  And he's goings to have the photographs.

2    These were not gunshot shells?

3    MR. CARTER:  Not to my knowledge.

4    THE COURT:  I'll overrule.  I'll let you go ahead and

5  show them and introduce them.

6    I don't know if you're planning on asking him this, but

7  it's his testimony that he doesn't know who shot those shells, he

8  just found the shells.

9    MR. CARTER:  That is correct, sir.

10    THE COURT:  Okay.

11    MR. FLEMING:  Judge, I'm sorry, I assume you're

12  overruling the objection?

13    THE COURT:  I am overruling.

14    MR. FLEMING:  On the assumption that he lays the proper

15  foundation as previously discussed.

16    (Sidebar conference concluded.  Jury now present.)

17  BY MR. CARTER:

18  Q   Mr. Rickman, I'm handing you a series of exhibits, somewhat

19  out of order, all marked government Exhibit 99, we have 99A, 99C,

20  I believe we have 99E, F and G.  I'll ask you just to take a look

21  at these, see if you recognize those photographs.

22    (Pause in proceedings.)

23  BY MR. CARTER:

24  Q   Do you recognize those photographs?

25  A   Yes, sir, I do.

```
 1   Q    How do you recognize those photographs?

 2   A    I took these photographs.

 3        MR. CARTER:  Your Honor, I move into evidence

 4   government's 99A, C -- I can't remember the number.

 5        THE COURT:  A, C through G.

 6        Counsel, other than the objection that we've discussed,

 7   any other objection at this point?

 8        MR. FLEMING:  Judge, I don't think the foundation's been

 9   laid properly as discussed at the bench.

10   BY MR. CARTER:

11   Q    Let me ask you a couple more questions.

12        When did you take these photographs?

13   A    The day of the shooting.

14   Q    Now, you've later mentioned going out, taking pictures,

15   having a camera smashed, going back to the back and then coming

16   out later.  How much longer after you heard the initial gunshots

17   did you take these photographs?

18   A    It had been a fewer hours.

19   Q    A few hours later?

20   A    Two to three hours.

21   Q    So two to three hours had elapsed?

22   A    Yes, sir.

23   Q    And the area you took the photographs --

24        MR. CARTER:  Can I get 98 back on the screen?

25   BY MR. CARTER:
```

1    Q    What area did you take these photographs?

2    A    Up front.

3    Q    Up front.  Could you point to the area where you took the

4    photographs?

5    A    (Witness complies.)

6    Q    Up in the front area.

7    A    Yeah.  Up front under the canopy.

8    Q    How about 34.  Is that better?

9    A    That's better.

10   Q    What area did you take those photographs?

11   A    Under the canopy area.

12   Q    And two to three hours after you heard the original gunshot?

13   A    Yes, sir.

14          MR. CARTER:  Your Honor, I again move into evidence

15   government's Exhibit 99A, C, G, E and F.

16          THE COURT:  Counsel?

17          MR. FLEMING:  Just subject to the previous objections.

18          THE COURT:  So ordered.  We'll admit 99A and then C

19   through G.

20          (Exhibits admitted.)

21          MR. CARTER:  99A, please.

22   BY MR. CARTER:

23   Q    Did you take this photograph?

24   A    Yes, sir, I did.

25   Q    What is this a photograph of?

1   A   Ronald Madison.

2   Q   Did you put the covering over his body?

3   A   No, sir, I didn't.

4   Q   Do you know who did?

5   A   No, sir, I don't.

6   Q   There appears to be some plywood over his shoe or foot.  Do

7   you see that?

8   A   Yes, sir.

9   Q   Did you put that over him?

10   A   No, sir, I didn't.

11   Q   Do you know who did?

12   A   No, sir, I don't.

13          MR. CARTER:  99C, please.

14   BY MR. CARTER:

15   Q   What is this?

16   A   This is a picture of a shell casing.

17   Q   Did you take this picture?

18   A   Yes, sir, I did.

19   Q   And this was again in that general --

20          MR. CARTER:  34, please.

21   BY MR. CARTER:

22   Q   Was that shell casing in this general area?

23   A   Yes, sir.

24   Q   Do you remember specifically where in this area?

25   A   About right around in this area here.

```
 1   Q    That was 99C.

 2              For the record, since we don't have a printing of this,

 3   the dot is somewhat toward the center front of the open way, the

 4   area --

 5   A    Yes, sir.

 6   Q    That's 99C we just discussed.

 7              MR. CARTER:  Let's have 99E.

 8              THE COURT:  Did you say D as in --

 9              MR. CARTER:  E.

10              THE COURT:  E.

11   BY MR. CARTER:

12   Q    And what is this a photo of?

13   A    A photo of a shell casing.

14              MR. CARTER:  99G, please.  Stop.  I'm sorry.

15   BY MR. CARTER:

16   Q    There's a circle around this.  What is that?

17   A    I took a can of paint and sprayed it around the casing so you

18   could see what I was trying to take a picture of.

19              MR. CARTER:  99G, please.

20   BY MR. CARTER:

21   Q    What is this?

22   A    It's a shell casing.

23   Q    And again we have a circle.

24   A    Yes, sir.

25   Q    And 99F.  And we have a circle.
```

1          Now, Mr. Rickman, can you tell if 99F and G are of the

2    same shell casing?

3    A    Yes, sir, I think they are.

4    Q    You think they are?  You think 99F and 99G are the same shell

5    casings?

6    A    Yes, sir.

7    Q    How many shell casings do you recall seeing out there that

8    day?

9    A    Five to seven.

10   Q    And what was your purpose in taking these photos?

11   A    That I thought it needed to be documented for the motel.

12   Q    Why did you feel it needed to be documented for the motel?

13   A    In case something come up, the owner needed to know.

14   Q    Did you see any police officers or anyone out there taking

15   photographs of the scene?

16   A    No, sir.

17   Q    Did you see anyone trying to diagram the area?

18   A    No, sir.

19   Q    Did you see anyone out there talking to individuals, law

20   enforcement officers, about what happened?

21   A    No, sir.

22   Q    Did anyone attempt to interview you about what happened?

23   A    No, sir.

24   Q    How did these photographs come into the possession of law

25   enforcement?

1   A    An FBI agent come to my house in Tampa, Florida.

2   Q    And when was this?

3   A    I'm not for sure on the date.

4   Q    And what did he talk to you about?

5   A    About what happened during Katrina.

6   Q    And what did you tell him?

7   A    I told him what happened, what we seen.

8   Q    And at some point you gave him these photographs?

9   A    Yes, sir.

10  Q    Did you see any police officers on the day of that shooting

11  attempting to pick up evidence?

12  A    No, sir.

13  Q    See anyone photographing at any time out there that day other

14  than yourself?

15  A    Just me.

16  Q    Now, you painted a circle around several of these shell

17  casings?

18  A    Yes, sir.

19  Q    Did you leave the shell casings where they lie?

20  A    Yes, sir.

21  Q    Do you know how long those shell casings remained outside the

22  Family Inn?

23  A    No, sir, I don't.

24  Q    Did anyone come back on the following days or week?  Did you

25  ever see anybody in the following days or weeks, any police

1   officers come back to try to take photos or collect evidence from

2   that scene?

3   A   I don't remember, I don't recall.

4   Q   Now, you mentioned before that someone took a camera from

5   you.

6   A   Yes, sir.

7   Q   Are these the photographs from that camera that the

8   individual, the law enforcement, took from you?

9   A   No.

10  Q   What happened to that camera?

11  A   It got smashed.

12  Q   It got smashed?

13  A   Yes, sir.

14  Q   You say it got smashed?

15  A   Yes, sir, it got smashed.

16  Q   Who smashed it?

17  A   One of the officers smashed it with their foot.

18  Q   Smashed it with his foot?

19  A   Yes, sir.

20  Q   What did you do with that smashed camera?  Did you pick it

21  up, or did you leave it there?

22  A   Just left it laying there.

23  Q   You left it laying there?

24  A   Yes, sir.

25  Q   I believe you said you had two cameras?

 1   A    Yes, sir.

 2   Q    You had the other one in your pocket?

 3   A    Yes, sir.

 4   Q    You didn't pull it out at that time?

 5   A    No.

 6            MR. FLEMING:  Judge, I would object, leading.

 7            THE COURT:  Let's not lead the witness.

 8   BY MR. CARTER:

 9   Q    These pictures that we're looking at today, what camera were

10   they taken with?

11   A    The second camera I had.

12   Q    The second camera.

13            MR. CARTER:  I have nothing further, Your Honor.

14            THE COURT:  All right.  Thank you.

15            Who is crossing?  Mr. Fleming?

16                          CROSS EXAMINATION

17   BY MR. FLEMING:

18   Q    Morning, Mr. Rickman.  I have a few questions for you.

19            Take you back to the day of September 4, 2005.  That

20   day, I believe you indicated you'd seen two men running through

21   the area of the Family Inn.

22   A    Yes sir.

23   Q    And one of the men, you recognized as being Ronald Madison;

24   right?

25   A    Repeat that, sir.

1    Q    One of them, you recognized as being Ronald Madison; right?

2    A    Yes, sir.

3    Q    And you'd seen Mr. Madison around the motel before?

4    A    Yes, sir.

5    Q    And, even before the storm, I believe you'd indicated in the

6    past that he'd come by, he'd asked for change for snacks or give

7    you a note?

8    A    Yes, sir.  Wait.  Let me rephrase that.  He have wouldn't

9    give me the note.  He would give the people at the register a

10   note.

11   Q    And you believed Mr. Madison to be a deaf mute; right?

12   A    Yes, sir.

13   Q    And that was right after the storm you saw him near the

14   motel?

15   A    Yes, sir.

16   Q    Remember now when this chase, I believe you've said in the

17   past, this was about somewhere between noon and 3 o'clock in the

18   afternoon?

19   A    Around that time, yes.

20   Q    And how many officers did you see chasing these two men?

21   A    I've seen two, three, to four chasing the one black male

22   through the motel.

23   Q    How many did you see chasing both men, Mr. Rickman?

24   A    I didn't see them chase both men.

25   Q    In the past, you've told the FBI you saw about seven police

```
 1   officers chasing the two men; right?  Do you remember telling the

 2   FBI that?

 3   A   It could have been.

 4          MR. FLEMING:  May I approach the witness, Your Honor?

 5          THE COURT:  Yes.

 6   BY MR. FLEMING:

 7   Q   You have spoken to the FBI in the past?

 8   A   Yes.

 9   Q   They came out to your house in Tampa, Florida?

10   A   Yes.

11   Q   You remember Chip Lavender?

12   A   Chip Hapler, yes.

13   Q   I'm going to ask you to take a look at this paragraph and see

14   if this refreshes your memory as to the last question.  It's a

15   portion that's highlighted.  Just take a moment, read that to

16   yourself, sir.

17          (Pause in proceedings.)

18          THE WITNESS:  Do you want me to read all of it, or just

19   that part?

20          MR. FLEMING:  Just read that part and see if it

21   refreshes your memory of the questions I asked you.

22   BY MR. FLEMING:

23   A   There were like seven to five officers around, but there was

24   three or four chasing.

25   Q   What you told the FBI agent was you saw approximately seven
```

1    police officers yelling and chasing the two individuals; right?

2    A    Approximately.

3    Q    Chasing; right?  And yelling?

4    A    Yes, sir.

5    Q    And you indicated that the officers, officers, were shooting

6    at the men; right?

7    A    I didn't see that.

8    Q    Is that what you told the FBI agent Chip Lavender?

9    A    Yes, sir, I did.

10   Q    You did.

11        Let me ask you, you told him that you did not see that,

12   or that you told him that the officers were shooting?

13   A    I told him I did not see that.

14        MR. FLEMING:  If I may approach the witness again?

15   BY MR. FLEMING:

16   Q    I'm going to ask you to take a look at the same document.

17   Take a look at the part I just underlined in red and see if that

18   refreshes your memory as to what you discussed with Mr. Lavender.

19   A    I did not say that.

20   Q    So this document is wrong?

21   A    That part is, I guess, yes.

22   Q    That part is wrong, okay.

23        It does say that the officers were shooting at the two

24   individuals; right?

25   A    Yes.

1    Q    And I believe you'd indicated that one officer was carrying

2    an oozie?

3    A    Yes, sir.

4    Q    And one officer was carrying an AK-47?

5    A    Yes, sir.

6    Q    Now, as officers were yelling and chasing these individuals,

7    what were they yelling at the individuals?

8    A    They were yelling at the one to stop.

9    Q    Yelling:  Stop.

10        Now, you saw this as you were coming out to take

11   pictures, right, of the motel for damage?

12   A    Yes, sir.

13   Q    And, before you saw the police at the motel, I believe you

14   did not hear any shooting; right?

15   A    We heard shots, yes.

16   Q    You did hear shots?

17   A    Yes.

18   Q    Before you saw the officers?

19   A    Yes.

20   Q    Now, in addition to speaking to the FBI, you also spoke with

21   members of the New Orleans District Attorney's Office; right?

22   Dustin Davis and Clive McCoy?

23   A    Yes.  But I wasn't the only one that talked to them.

24   Q    You spoke to them; right?

25   A    Me and my wife did, over the speaker phone.

1         MR. FLEMING:  If I may approach the witness?

2         THE COURT:  Yes.

3    BY MR. FLEMING:

4    Q    Show you a transcript of a conversation that indicates

5    questions by Clive McCoy and Dustin Davis and answers by Rick

6    Rickman?

7    A    And Patty Davis.

8    Q    Does it say that on this?

9    A    No, it doesn't.

10   Q    I'm just asking you what it says on this.

11        Page 10, I'm going to ask you to read what I've

12   highlighted in red, see if that refreshes your discussions that

13   you and/or your wife had with Mr. Davis and Mr. McCoy.

14        (Pause in proceedings.)

15   BY MR. FLEMING

16   Q    Does that refresh your memory, Mr. Rickman?

17   A    No, it doesn't.

18   Q    And it does say that, prior to seeing the officers, you did

19   not hear any gunfire; right?

20   A    That's what it says.

21   Q    That's wrong, too?

22   A    Yes, sir.

23   Q    Okay.

24        When you saw Mr. Madison, Ronald Madison, you did not

25   notice that he was bleeding; right?

1    A    When we walked out there to the front, yes, he was bleeding.

2    Q    No, no.  When you saw him running still, you did not notice

3    he was bleeding?

4    A    I never seen Ronald Madison run.

5              MR. FLEMING:  If I may approach the witness?

6              THE COURT:  Yes.

7    BY MR. FLEMING:

8    Q    I'm going to ask you to take a look at this, page 8 of this

9    transcript with Mr. Davis and Mr. McCoy, the portions I've

10   underlined in red.

11             (Pause in proceedings.)

12   BY MR. FLEMING:

13   Q    Does that refresh your memory, Mr. Rickman, as to that

14   portion of the conversation with Mr. Davis and Mr. McCoy?

15   A    No, it doesn't.

16   Q    And that question was asked of you, whether you saw Mr.

17   Madison bleeding; right?

18   A    Right.

19   Q    And your response was you can't say for sure?

20   A    Correct.

21   Q    After hearing these gunshots, I believe you'd indicated you

22   fell in the water -- you fell on your wife, you and your wife

23   jumped into the water for cover?

24   A    I grabbed my wife and fell backwards into the water, yes,

25   sir.

1    Q    And, when you looked up, you noticed that Mr. Madison had

2    been shot?

3    A    No.

4    Q    No?  You didn't notice that?

5    A    No.  I noticed -- when I first got up, I noticed that the

6    cops were chasing a black man through the property.

7    Q    Okay.  I'm not trying to trick you here.

8            It was after you got out of the water at some point that

9    you saw that Ronald Madison had been shot?

10   A    Yes.

11   Q    You did not see Mr. Madison get shot?

12   A    No.

13   Q    And I believe you've indicated on direct examination that

14   there was an officer that stayed with Mr. Madison's body

15   initially?

16   A    Initially, yes, sir.

17   Q    And that was not a black officer; right?

18   A    No, sir.

19   Q    I believe you've described him as being a Mexican, Puerto

20   Rican, or something?

21   A    Yes, sir.

22   Q    And he was carrying an AK-47 or an oozie; right?

23   A    He was carrying a little oozie.

24   Q    Oozie.

25            At some point the guardsman or SWAT team members arrived

1    at the motel; correct?

2    A    You talking about the military?

3    Q    Yes, sir.

4    A    Yes, sir.

5    Q    The picture you took of Mr. Madison, which I believe is

6    described as 99A, that has a tarp and a piece of plywood over it,

7    the first time you went out there, that's not how Mr. Madison's

8    body was at the time; right?

9    A    No, sir, it wasn't.

10   Q    When you got back out, there was a piece of tarp and a piece

11   of plywood covering that?

12   A    Yes, sir.

13   Q    I believe you've testified on direct examination you do not

14   know how that got there; right?

15   A    No, sir, I do not.

16   Q    Do you know a Douglas Bloedorn?

17   A    Yes, sir.

18   Q    He'd lived at the hotel?

19   A    Yes, sir.

20   Q    And these other pictures of the casings, you've indicated

21   that those were 308 casings?

22   A    Yes, I might have said that.

23   Q    And I believe you've indicated that those -- you've indicated

24   in the past that those were 308 casings that you took pictures

25   of; right?

1    A    Yes, sir.

2    Q    When you spoke to the DA, this transcript I've shown you, you

3    knew that they were tape-recording that conversation; right?

4    A    Yes, sir.  They didn't tell me, but I found out later that

5    they did.

6    Q    You found out later they tape-recorded the conversation.

7         And, during that conversation, you were kind of hinting

8    or suggesting that perhaps you could use a little money?

9    A    It could have been, but me and my wife talked to them on the

10   speaker phone.

11   Q    Okay.  You were present during that whole time; right?

12   A    Yes.

13   Q    Did you leave the house during that time?

14   A    No, sir.

15   Q    And either you or your wife were kind of suggesting you could

16   use a little money?

17   A    Not to my reflection, no.

18   Q    You remember telling them that you'd have to miss work for a

19   couple of days, and you might not have power or lights when you

20   get back?

21   A    Don't recall that, sir.

22        MR. FLEMING:  If I may approach?

23        THE COURT:  Yes.

24   BY MR. FLEMING:

25   Q    Show you the same transcript, circle that.  Take a look at

1   what I've just circled in red.

2            (Pause in proceedings.)

3   BY MR. FLEMING:

4   Q   Does that refresh your memory as to that portion of the

5   conversation?

6   A   No, sir.

7   Q   That's what it says, you'd indicated you would have to take

8   time off, you might not have power or lights; right?

9   A   No, sir.

10  Q   That's what it says in here?

11  A   Oh, yes, that's what it says.

12  Q   And they told you that they'd check were their boss and see

13  what assistance they could give you; right?

14  A   I don't recall.

15  Q   Is that what it says here?

16  A   That's what it says.

17  Q   Okay.

18           MR. FLEMING:  One moment, Judge, please.

19           (Pause in proceedings.)

20  BY MR. FLEMING:

21  Q   I'm going to take you back to a point in time you saw the

22  officers chasing the man, or men.  I believe you've indicate in

23  the past you had never saw any officer with a shotgun; right?

24  A   Right.  I never seen an officer with a shotgun.

25           MR. FLEMING:  Thank you, Mr. Rickman.

```
 1              I have no further questions of Mr. Rickman, Your Honor.

 2              THE COURT:  Thank you.

 3              Cross?  Mr. Hessler?

 4                        CROSS EXAMINATION

 5  BY MR. HESSLER:

 6  Q   Goof afternoon, Mr. Rickman.  My name is Eric Hessler.  I

 7  represent Sergeant Gisevius.

 8              Would you stand up, sir?

 9              You stated there were a couple of individual officers

10  chasing -- you can sit down -- chasing Mr. Madison.  You didn't

11  know Mr. Madison at that time; did you?

12  A   We met Lawrence and Ronald Madison -- I knew Ronald Madison

13  before then, but we met Lance or Lawrence just a couple days

14  before this.

15  Q   Did you recognize him at that point as the guy --

16  A   No, sir, I didn't.

17  Q   The individual officers chasing behind the fellow running

18  through the court, what were their races?

19  A   They were black.

20  Q   Both were black?

21  A   Yes.

22  Q   You said there might have been three or four chasing him

23  also.  Were all of them black, or do you know?

24  A   I'm not for sure.

25  Q   Did you ever recognize the gentleman that just stood up in
```

1    the courtroom?

2    A    He don't look familiar, no, sir.

3    Q    Certainly wasn't the fellow that smashed your camera?

4    A    No, sir.

5    Q    Now, you stated you know Doug Bloedorn; right?

6    A    Don't remember his last name; but, yeah, Doug sounds

7    familiar.

8    Q    Worked or stayed at the hotel?

9    A    Yes, sir.

10   Q    Can you describe to the jury the way, the conditions of New

11   Orleans East at that time as you felt they were.

12   A    What do you mean?

13   Q    Well, let me ask you this.  Did you hear gunshots every?

14   A    Yes.

15   Q    Often?

16   A    Yes.

17   Q    Did you hear them on the west side of the Danziger Bridge

18   around the hotel?

19   A    During -- are we talking about the 4th?

20   Q    During the storm, in general.  After the storm.

21   A    During the storm, after the storm, we heard gunshots every

22   night.

23   Q    Did you ever see or hear of an armed person driving around in

24   postal trucks that were stolen from the nearby post office?

25   A    I'm not for sure.

1   Q   Did you ever see any armed persons that were actually firing

2   these weapons?

3   A   No.

4   Q   But you certainly heard them?

5   A   Yes.

6   Q   Did you ever hear them in close proximity to the hotel?

7   A   I can't say for sure.

8   Q   Now, the morning of the 4th, what were you doing prior to

9   this incident you just described?

10   A   What do you mean, sir?

11   Q   Well, you woke up at some point?

12   A   Yeah, we woke up.

13   Q   About what time?

14   A   It's hard to say.  We didn't have no power.  I mean, we went

15   -- we didn't have no clock.  So it's hard to say.  Maybe eight,

16   nine.

17   Q   How long were you awake up until the point where the

18   gentleman ran into the courtyard?

19   A   We was up a little bit because we was trying to pump some of

20   the water out of the parking lot.

21   Q   Had you gone up front by that time?  Had you walked around

22   the front area prior to the -- to them, or did you just walk

23   around in the back?

24   A   Where we was working up, was upfront.  Where the pump was.

25   Q   And that would be by the cover, the awning?

1    A    Yeah.  We had the tube running from the lower part of the --

2    the lowest part of the parking lot and pumping water out into a

3    storm drain off of Chef Menteur Highway.

4           MR. HESSLER:  Could you put up Exhibit 98, please?

5    BY MR. HESSLER:

6    Q    Could you put a little dot in the area where you were

7    working?

8    A    I would say about right in here.

9    Q    And I guess had you gone up in the front of area up in

10   there --

11   A    Yes, we had.

12   Q    -- prior to the incident?

13   A    Yes, sir.

14   Q    For what reason?

15   A    We had a hose -- like I said, we had a hose drug out.  The

16   blue hose that you see in one of those pictures?  We had it

17   strung out, trying to drain it out.

18   Q    You mentioned that you had dreams about this incident on

19   occasion; right?

20   A    I have nightmares about this.

21   Q    Okay.  You didn't see anybody get shot; right?

22   A    Correct.

23   Q    You didn't even see anybody fire their weapons?

24   A    Correct.

25   Q    You did see police officers running behind an individual who

1    was fleeing, yelling:  Stop?

2    A    Yes.

3    Q    And the nightmares that you have, is that your recollection

4    is the nightmares, or is this something different?

5    A    There's something to that, yes.

6    Q    But what brought your attention up front was you heard some

7    gunshots?  At least, one gunshot?

8    A    What we was going up front was to take pictures.  What caused

9    me to throw me and my wife in the water was the gunshots we

10   heard.

11   Q    About how many?

12   A    Five to seven, I would say.  Four to seven.

13   Q    Okay.  And that's -- and you never heard any gunshots after

14   that?

15   A    No, sir.

16   Q    And was it about immediately thereafter --

17           MR. HESSLER:  Put up 98 again, please.

18   BY MR. HESSLER:

19   Q    When you heard the gunshots, where were you?

20   A    Where the steps are at, right about -- right near where it

21   stops at.

22   Q    I'm assuming you looked in the direction of where you heard

23   the gunshots come from?

24   A    No.

25   Q    Why wouldn't you do that?

1   A   I was -- they sounded close to me.  And, in my mind, it told

2   me to grab Patty and fall in the water.

3   Q   Okay.  So, when you do look, do you look towards Chef

4   Highway?

5   A   I don't look.  I just grabbed my wife and I fall in the

6   water.

7   Q   Eventually, you did look.  Eventually, you look.

8   A   Yes, sir.  When I'm getting up.

9   Q   And which way do you look?

10  A   When I first get up, I look -- I'm just looking around.

11  Q   All right.  And, in looking around, did you look toward Chef

12  Highway or the entrance of the motel?

13  A   Yes, sir.

14  Q   Do you see Lance Madison at that point?

15  A   When I'm getting up out of the water, they were running by

16  me.

17  Q   Okay.  And so he's -- would it be fair to say he's up in this

18  general area here, parallel to you?

19  A   Yes.

20  Q   And where about are the police?  How far back are the police?

21  A   A car, a car and a half length behind them.

22  Q   But they're in water up to their waist, at least?

23  A   No.

24  Q   Nobody's in water?

25  A   Yeah, they're in water.  About calf deep, five or six inches.

1   Q    But it get progressively deeper where it goes back to the

2   back?

3   A    Where the aisle is.

4   Q    The owl?

5   A    The aisle in the middle of the parking lot, that's about the

6   deepest part up to the crack, I would say.  That would be about

7   the deepest.

8   Q    And, on an average human being -- I'm a bit shorter than the

9   average person -- but, on the average person, where would it come

10  up to?

11  A    About mid-calf.

12  Q    Even back there?

13  A    Yes.

14  Q    So it wasn't very deep?  It was never anywhere waist-deep in

15  the hotel at that point?

16  A    Not at that point, no.

17          MR. HESSLER:  You can take it down, please.

18          Thank you.

19  BY MR. HESSLER:

20  Q    And it never -- and you were right there and you would have

21  heard if somebody else had shot at him as he was running through

22  there?

23  A    I guess I could have.  I would have heard it.

24  Q    And at some point an officer told you to go inside?

25  A    Yes, sir.

1    Q    And you don't recognize Sergeant Gisevius, so it certainly

2    wasn't him; right?

3    A    No, sir.

4    Q    Did you see officers searching the area for a subject?

5    A    What do you mean?  I seen the military searching the motel

6    for a subject.

7    Q    And how do you know they were military, as opposed to police

8    officers?

9    A    Because they had military uniforms on.  They come up in a

10   military truck.

11   Q    Were they just casually walking around, tapping on doors?

12   A    No.

13   Q    They were searching, guns up?

14   A    Right.

15   Q    Like they were afraid to make a shot?

16   A    I guess, yes.

17   Q    But it wasn't walking around, casually; they were ready for a

18   gun fight or whatever may occur?

19   A    They have ready to see -- they were searching for someone.

20   Q    And at some point later you did come out again?

21   A    Yes, sir.

22   Q    And you saw some, what you thought was important evidence or

23   evidence that was left behind or not collected; right?

24   A    Yes, sir.

25   Q    And you certainly don't know why a police officer would leave

1   behind evidence, or an investigator would; right?

2   A   No, sir, I don't.

3   Q   And so you took it upon yourself to take some photographs?

4   A   Yes, sir.

5   Q   And you apparently know a little bit about ammunition and

6   rifles and stuff, you hunted or something like that?

7   A   I've been hunting a few times, yes, sir.

8   Q   And you know like how to check what a bullet is, what size it

9   is and stuff like that?

10  A   Yes, sir.

11  Q   And you checked these casings and found they were 308 rifle

12  casings?

13  A   I never touched them casings.

14  Q   You did in fact tell the FBI that they were 308?

15  A   They look like a 308.

16  Q   And you can get down and look at the -- I mean, without

17  moving it, you can actually got down and look at it; right?

18  A   I guess you could.

19  Q   Did you do that?

20  A   No, I didn't.

21  Q   So you just did that from your knowledge of weapons?

22  A   Yes, sir.

23          MR. HESSLER:  Now, could you put up 99A, please.

24  BY MR. HESSLER:

25  Q   Did you move any of the evidence that was around?

1   A   No, sir.

2   Q   At any time did you see the police officers use a piece of

3   plywood to cover the body?

4   A   No, sir.

5   Q   All right.  So somebody used a piece of plywood to cover his

6   feet only?

7   A   Yes, sir.  It seems that way.

8   Q   Okay.  But you didn't see anybody manipulate any evidence or

9   move it or whatnot?

10  A   No, sir.

11          MR. HESSLER:  You can take it down.

12          Thank you.

13          No further questions.  Thank you, sir.

14          I'm sorry, sir.

15  BY MR. HESSLER:

16  Q   Do you remember talking with the FBI at one point where you

17  told them that you in fact did pick up the casing and looked at

18  it?

19  A   No, sir, I didn't.

20  Q   You don't remember telling, October of '09, telling Special

21  Agent Johnny Lavender that you picked up the casing and saw some

22  markings on it, indicated it was something about an AK 308?

23  A   No, sir.  I don't remember that.

24          MR. HESSLER:  No further questions, Judge.

25          THE COURT:  Counsel, it's about noontime.  Just, rough

```
 1   estimate, is it possible that we could finish with this witness
 2   including redirect, Mr. Carter, before we take our lunch break?
 3   By that, I mean like within the next 15 or 20 minutes?
 4            MR. MECHE:  I have no questions.
 5            MR. DeSALVO:  I have no questions either, Your Honor.
 6            MR. LONDON:  No questions.
 7            THE COURT:  The pressure's on, Mr. Carter.
 8            MR. CARTER:  Pressure to drag it out a little bit.
 9            THE COURT:  You may go ahead and redirect, and then
10   we'll talk our lunch break, so we can finish with this witness.
11                      REDIRECT EXAMINATION
12   BY MR. CARTER:
13   Q   Mr. Rickman, you were asked some questions about Ronald
14   Madison and Lance Madison.  Had you met the Madisons before?
15   A   Yes, I had.
16   Q   When was that?
17   A   It was a couple days before the shooting.
18   Q   And where did you meet them?
19   A   Out front.
20   Q   Out front where?
21   A   The motel.
22   Q   And what were the circumstances of your meeting them?
23   A   We talked.  The fire truck -- a fire truck rode by, and we
24   was asking them when could we get some water and stuff.
25   Q   Did you have any problems with Ronald Madison?
```

1    A    No, sir.

2    Q    Any problems with Lance Madison?

3    A    No, sir.

4    Q    You were asked some questions about when you saw Lance

5    Madison running through the courtyard.  At that time did you know

6    that this individual was Lance Madison?

7    A    No, sir.

8    Q    When did you learn that this individual was indeed Lance

9    Madison?

10   A    When they had him out front on the Chef Menteur Highway on

11   his knees, handcuffed.

12   Q    What was he doing?

13   A    He was just telling them:  You all got the wrong guy, I

14   didn't do it.

15   Q    And were they saying anything in response?  Did you hear them

16   say anything in response?

17   A    Yeah.  They kept telling him to shut up.

18            MR. LARSON:  Objection, it would be hearsay.

19            MR. CARTER:  It's not hearsay.

20            THE COURT:  I'm going to overrule it.

21   BY MR. CARTER:

22   Q    You mentioned in response to a question that you didn't

23   recognize Mr. Gisevius.  Are you saying he wasn't there, or you

24   just don't recognize him?

25   A    I just don't recognize him.

```
 1   Q   You're taking photographs with the camera.  This officer who

 2   took your camera from you, what did he do with the camera when he

 3   first took it from you?

 4            MR. HESSLER:  Objection, Your Honor, this is asked and

 5   answered.

 6            THE COURT:  It has been asked and answered, and I don't

 7   believe that that's been cover on cross.  I could be wrong, but I

 8   don't believe it's been covered on cross.

 9            MR. LARSON:  It was not.

10            THE COURT:  I don't think it was asked about on cross,

11   and so therefore it would not be permissible on redirect.

12            MR. CARTER:  Stricken.

13   BY MR. CARTER:

14   Q   Were you asked on redirect --

15            THE COURT:  Cross.

16   BY MR. CARTER:

17   Q   On cross about --

18            MR. CARTER:  I get easily confused, Your Honor.

19   BY MR. CARTER:

20   Q   You were asked about hearing the shots.  Do you recall being

21   asked about hearing the shots out front?

22   A   Yes, sir.

23   Q   Did you hear one shot, two shots, three shots?  How many

24   shots?

25   A   I'm not for sure.
```

1    Q    Was it more than one?

2    A    Yes, sir.

3    Q    Was it more than two?

4    A    I'm not -- yes.

5    Q    I believe you said in answer to a question on cross it was

6    four to seven.  Does that sound correction?

7              MR. FLEMING:  Objection.  That's a mischaracterization

8    of the testimony, Judge.

9              THE COURT:  I'm going to let him go ahead and answer.

10   The jury can certainly recall -- perhaps have even taken notes --

11   as to what he said on cross.  So I'm going to overrule.

12   BY MR. CARTER:

13   Q    Are you familiar with a shotgun?

14   A    Yes, sir, I am.

15   Q    Did that sound you heard when you first fell to the ground,

16   did that sound like a shotgun?

17   A    No, sir.

18   Q    Those shells that you took photographs of, did they appear to

19   you to be shotgun shells?

20   A    No, sir.

21   Q    Prior to hearing those shots that you heard, did you hear

22   anyone yelling anything?

23   A    No, sir.

24   Q    Did you hear anyone yell:  Stop?

25   A    No, sir.

1        MR. CARTER:  I have nothing further, Your Honor.

2        THE COURT:  Okay.  This witness is released?

3        MR. FLEMING:  He can be released, Judge.

4        THE COURT:  Thank you, sir.  You can step down.

5        Okay.  We're going to go ahead and take our lunch break

6    right now.  It's a little bit after noon.  Why don't we plan on

7    starting at 1:15.  Let's wait until Mr. Rickman passes.  We will

8    start at 1:15.

9        I indicated that we would like to try to conclude maybe

10   an hour or so early today, so that will be our goal.  And I will

11   discuss that with counsel now.

12       In the meantime, please don't discuss anything about the

13   case amongst yourselves or with anyone else during the lunch

14   break.  Thank you all.

15       (Jury exits.)

16       THE COURT:  Counsel, you all be may be seated.

17       Anything we need to cover now, either at the bench or in

18   open court?

19       MS. BERNSTEIN:  Not from the government, Your Honor.

20       MR. DeSALVO:  Not from Mr. Bowen.

21       MR. FLEMING:  There is one thing we can do at the bench,

22   Judge.

23       THE COURT:  On the record?

24       MR. FLEMING:  On the record.

25       THE COURT:  Come on up.

```
 1              (Sidebar conference.  Jury not present.)

 2              MR. FLEMING:  I might make the afternoon a little

 3    smoother.

 4              THE COURT:  I'm all in favor of that.  Let's hear.

 5              MR. FLEMING:  Maybe not.

 6              Yesterday, we were given notice that the government was

 7    going to call a witness by the name of Troxclair.  I'm assuming

 8    that could be Dana Troxclair, the coroner, whose testimony is

 9    expert in nature.

10              Dr. Troxclair is not listed on the government's notice

11    of expert witnesses, nor have we have been provided a CV or

12    summary or anything.  We've gotten the coroner's report.  We

13    don't have her name on the list or a CV from her.  We assumed Dr.

14    Trailer would be the one testifying instead of Dr. Troxclair, and

15    we would object to Dr. Troxclair testifying.

16              MR. CARTER:  Her name is on the list of witnesses.

17              MR. FLEMING:  It's on the list of witnesses and persons

18    who would be significant.  Given that she and Dr. Trailer

19    performed the autopsy, it would be certainly reasonable for her

20    name to be mentioned during Dr. Trailer's testimony.

21              THE COURT:  Is she going to or are you going to attempt

22    to qualify her as an expert?

23              MR. CARTER:  No.  She's testifying as to a fact witness

24    for the autopsy and what the results of that autopsy show.

25              MR. FLEMING:  That's expert testimony.  Dr. Trailer and
```

1  all the other -- wait -- Dr. Trailer and all the other coroners

2  are listed.  Dr. Trailer and all the other coroners are listed in

3  their expert notice.

4      MR. CARTER:  And, to the extent that it varies over into

5  expert testimony, it's the same as Dr. Trailer's.  She and

6  Trailer did that together.

7      THE COURT:  Well, but do we have a CV for Troxclair

8  that's been provided?

9      MR. FLEMING:  No.

10     MS. BERNSTEIN:  We can get that during lunch.

11     MR. CARTER:  We can get that during lunch.

12     THE COURT:  But she's testifying this afternoon.  Is

13 there someone else she can call, and you can get it to them?

14 And, that way, she can testify next week?

15     MS. BERNSTEIN:  Yes.  We can do that, Your Honor.

16     THE COURT:  If the report is the coroner's report, then

17 they have that.

18     MS. BERNSTEIN:  It's exactly the same testimony.

19     MR. CARTER:  It's exactly the same testimony.

20     THE COURT:  But the CV is important for cross

21 examination purposes, maybe, depending upon what it says and what

22 they think of it.

23     MR. FLEMING:  My objection would be for this doctor to

24 testify, period, as an expert.  We've not been given prior notice

25 prior to the commencement of trial.

1          THE COURT:  She's a signatory for the report?

2          MR. CARTER:  Yes.  And she performed the autopsy.  I

3    suppose -- I don't mean to quibble -- I guess she's an expert.

4    She's testifying to the autopsy she did.  She's testifying to the

5    autopsy she performed and what is shows.  I understand that

6    lapses over into expert testimony.

7          MR. FLEMING:  It's much more than a fact witness.  Every

8    time I've had a homicide case, I've had the coroner offers as an

9    expert.

10         THE COURT:  It's specialized knowledge that the jury

11   does not possess that she's going to give conclusions based on

12   her employment of a specialized conclusion.  I'm less concerned

13   about the report and her ability to use that report as her own if

14   she is a signatory to it and it has been disclosed all along that

15   she was involved in this.

16         MR. CARTER:  Yes.

17         THE COURT:  And is qualified to render the report, just

18   as any signatory to it.

19         The CV, I think, needs to be provided with sufficient

20   time for them to examine it for whichever reasons they choose and

21   be familiar with it.

22         MS. BERNSTEIN:  Sure.

23         THE COURT:  Particularly since that's an essential part

24   of qualifying the expert.  They may look at it and say we'll

25   stipulate.

1           MR. CARTER:  We'll get that right away.

2           THE COURT:  Can we agree that she is not going to

3    testify this afternoon in light of that?

4           MR. CARTER:  It's totally up to the defense.

5           MR. FLEMING:  It's your witness.

6           MR. CARTER:  If we were to get you the CV right now, is

7    that enough time for her to testify this afternoon?  It's up to

8    you guys.  We'll put her on next week.

9           THE COURT:  I don't think they can decide that until

10   they see the CV.  It's probably fine.  But they need the

11   opportunity to look for it.

12          MR. FLEMING:  Just for the record, Judge, I'm not

13   withdrawing my objection for her testifying at all.

14          THE COURT:  I understand that.  But, to the extent that

15   the CV can be provided, though, I'm included to overrule that

16   objection.

17          MR. FLEMING:  Okay.

18          THE COURT:  But I do think that you need to provide the

19   CV with sufficient time to satisfy yourself that either, A, she

20   is an expert; B, she is not an expert; or, C, you need to

21   question her about her expertise before the Court decides.

22   That's the one issue.  Okay?  And that's where we are.

23          Now, the next we is, are we in agreement that she would

24   not testify today?  Is that your preference?  Or do you want to

25   see the CV first?

1      I'm in favor of testifying as soon as possible and as

2   quick as possible.

3      MR. FLEMING:  If they provide a CV today, we have no

4   issue with her testifying this afternoon.  It's your witness,

5   it's your call.  You okay with that?

6      MS. BERNSTEIN:  Just to be clear, we are not entirely

7   sure that we're going to get to her today anyway because we need

8   to decide at lunch based on the time who we should call next.

9      MR. HESSLER:  You all haven't done that?

10      MS. CHUNG:  No.

11      THE COURT:  Let's finish up on the record here.  Get the

12   CV to them as soon as possible.  Then you all can decide whether

13   this would be fair enough to take that witness today or whether

14   you would defer an examination of her until next week.  In which

15   case, we can call other witnesses.

16      Now, in light of what Ms. Bernstein is saying, we do

17   have other witnesses that may last us up into the 4 o'clock hour;

18   is that not correct?

19      MS. BERNSTEIN:  Well, I'm not sure who is and isn't out

20   there right now, so I can't promise that.  But we have three

21   witnesses whom we've given notice of, and we will have one of

22   them in that witness seat.

23      MR. FLEMING:  One could potentially take the bulk of the

24   afternoon.

25      MS. BERNSTEIN:  I don't know which one that is.

1           THE COURT:  Let's go ahead off the record.

2           (Discussion held off the record.)

3           (12:11 p.m., proceedings recessed for lunch.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                    AFTERNOON SESSION

 2                       1:15 P.M.

 3          THE COURT:  You may be seated.  We're going to go ahead

 4   and put in our time this afternoon and conclude the week.  I'll

 5   check with you to see if we need an afternoon break, since it's

 6   our hope to end a little bit early today.  But, if we need to

 7   take a break, we certainly will.

 8          This gentleman, Ms. Bernstein, is?

 9          MS. BERNSTEIN:  The United States calls Kerry Najolia.

10          KERRY NAJOLIA, being first duly sworn, testified as

11   follows:

12          THE CLERK:  You may be seated.  And please state and

13   spell your full name for the record.

14          THE WITNESS:  It's Kerry K-E-R-R-Y Najolia

15   N-A-J-O-L-I-A.

16          THE COURT:  Ms. Bernstein, am I given to understand that

17   this gentleman would be qualified as an expert witness?  Is it

18   the government's intent to qualify him as an expert?

19          MS. BERNSTEIN:  Yes, Your Honor, we are planning to

20   qualify him as an expert in the use of force.

21          THE COURT:  In the use of force.

22          Now, counsel, is there any stipulation, or would you

23   like to ask this witness questions about that area of expertise

24   before we get his testimony?

25          MR. HESSLER:  Your Honor, we would stipulate to Major

1   Najolia expertise in use of force.

2         THE COURT:  Let me explain to the jury that the typical

3   process, we're going to have people in cases and in this case

4   that are called expert witnesses and they possess some type of

5   specialized knowledge that they can use to address certain issues

6   in the case one way or the other in response to counsel's

7   questions.

8         The first step of that is to determine whether or not in

9   fact they are an expert.  That is normally the first process

10  whereby the lawyers from both sides question them; and then, if

11  there is not an agreement, the Court would have to determine

12  whether or not to accept the witness as an expert.  And then we

13  would get on to what the attorneys wanted to question the witness

14  about what might be pertinent to this case.  And, with regard to

15  this witness, we have a stipulation.  So we've now satisfied the

16  first step.  In light of the stipulation, the Court will accept

17  Kerry Najolia as an expert in use of force.

18        Ms. Bernstein, if you'd like to begin, you may do so.

19        MS. BERNSTEIN:  Thank you.

20                        DIRECT EXAMINATION

21  BY MS. BERNSTEIN:

22  Q   Major Najolia, can you please introduce yourself for the jury

23  and tell them what you do for a living.

24  A   I'm employed at the Jefferson Parish Sheriff's Office

25  assigned to their training division.

1   Q   How long have you been with Jefferson Parish?

2   A   Since 1984.

3   Q   Do you guys also call yourselves JPSO?

4   A   Yes, ma'am.

5   Q   So you've been with JPSO for, what's that, 17 years now?   27

6   years now?

7   A   Yes, ma'am.

8   Q   What's your position?

9   A   I am the director of training.

10  Q   Are you also a sworn law enforcement officer, or an

11  administrative position?

12  A   No, ma'am.  I'm also a certified peace officer.

13  Q   What's your rank with JPSO?

14  A   I'm a major.

15  Q   For anyone who is not from the New Orleans area, can you tell

16  us where Jefferson Parish is.

17  A   Jefferson Parish borders the city of New Orleans on the east

18  and west side of the river.

19  Q   And you said that you've been with JPSO for 27 years.  How

20  long have you been in law enforcement?

21  A   Since 1980.

22  Q   So that's --

23  A   Thirty-one.

24  Q   -- thirty-one years?

25  A   Yes, ma'am.

1    Q    Where did you work before JPSO?

2    A    The St. Charles Parish Sheriff's Office.

3    Q    Can you tell us how you initially got interested in law

4    enforcement.

5    A    In 1975, I opened up a karate school where I taught civilians

6    self-defense classes.

7    Q    How old were you in 1975?

8    A    I was 15, going to make 16 years old.

9    Q    15 years old operating a karate school?

10   A    Yes, ma'am.

11   Q    How did that segue into a career in law enforcement?

12   A    Some of the students who were taking the civilian

13   self-defense classes from me were police officers in St. Charles

14   Parish.  They worked for the sheriff's office.

15   Q    And so you met them through the karate school?

16   A    Yes, ma'am.

17   Q    How old were you when started to work for St. Charles?

18   A    It was -- I first became a reserve officer, and I was

19   approximately 19, I think.

20   Q    And then did you become a full-time deputy with them?

21   A    Yes.

22   Q    When was that?

23   A    In 1980, after I completed the Jefferson Parish Sheriff's

24   Office basic recruit class.

25   Q    How come you went to the Jefferson Parish Sheriff's Office

1  academy if you were working for St. Charles?

2  A   At that time, I was a guest.  St. Charles Parish did not have

3  their certificated training sent by POST.

4  Q   So, once you go through that academy, were you a full-time

5  sworn officer?

6  A   Yes, ma'am.

7  Q   Working for St. Charles?

8  A   Yes, ma'am.

9  Q   During your time with St. Charles, did you develop any sort

10 of specialty in law enforcement?

11 A   Yes, ma'am.

12 Q   Can you tell us about that.

13 A   Basically, I conducted defensive tactic classes for police

14 officers in St. Charles Parish.

15 Q   What are defensive tactics?

16 A   It's tactics that the police officers learn in order to

17 control resistant or aggressive behavior.

18 Q   You were teaching defensive tactics?

19 A   Yes, ma'am.

20 Q   Is that something that you have continued to teach throughout

21 your career?

22 A   Yes, ma'am.

23 Q   Now, at some point, did you also start teaching officers the

24 rules regarding when they can and cannot use those tactics that

25 you've been teaching them?

1   A   Yes, ma'am.

2   Q   What's that area of specialty called?

3   A   POST refers to it as the use of force.

4   Q   You just said POST refers to it as use of force.  What is

5   POST?

6   A   POST is an acronym that stands for Peace Officers' Standards

7   of Training Council.  And what it is it's a council that's under

8   the auspices of the Louisiana Commission on Law Enforcement, and

9   that's appointed by the governor of the state of Louisiana.  And

10   basically what POST does is they establish all of the rules,

11   guidelines, regulations and mandates for police training in the

12   state of Louisiana.

13   Q   All right.  I'm going to ask you some questions about POST in

14   a minute, but you said that POST refers to that area as the use

15   of force.  And explain again what is that area called the use of

16   force.

17   A   Use of force is basically the guidelines or it teaches the

18   officer the rules of when they can use and what options of force

19   they can use during any given situation.

20   Q   How long have you been teaching officers what the rules are

21   regarding when they can and can't use force?

22   A   I began teaching in the mid-'80s.  Once I joined the

23   Jefferson Parish Sheriff's Office, after a couple of years of

24   working in the district as a patrol officer, I was actually

25   assigned as a staff instructor.  When I became a staff instructor

1    is when I specifically started teaching the rules and regulations

2    of using the force, the guidelines of using force.

3    Q    When did you move from St. Charles to JPSO?

4    A    July of 1984.

5    Q    And you said a couple years after that you started teaching

6    for JPSO?

7    A    Yes, ma'am.  Started teaching use of force.  I constantly

8    taught the defensive tactics portion to the basic recruits that

9    were attending the Jefferson Parish Sheriff's Office from the

10   time that I went through the course in 1980 through throughout.

11   Q    So since the mid-80s when you started teaching use of force,

12   have you continued teaching use of force?

13   A    Yes, ma'am.

14   Q    Have you done anything to continue to develop your expertise

15   in that area?

16   A    Yes, ma'am.

17   Q    Can you tell us about a little bit about that.

18   A    I've attended classes throughout the United States with local

19   state and federal police agencies.  And I've also attended

20   training classes internationally.

21   Q    What kind of international classes?

22   A    I have attended the classes with Austria, trained with their

23   what's called a Vega unit, which is basically their police SWAT

24   team.  They have a national police SWAT team.  Their COBRA unit,

25   which is similar to our delta force unit.

1           I've trained with the Germany's SEK, which is their

2    police version of SWAT.  And I've also trained with Germany's

3    GSG-9, which is their hostage rescue team.

4           I've trained with various other countries.

5    Q    Have you ever taught any international police courses?

6    A    Yes, ma'am.

7    Q    Can you tell us a little bit about that.

8    A    Most recent was in 2006, I was invited to Budapest, Hungary

9    to teach a class on use of force SWAT tactics and techniques to

10   -- it was several hundred police officers from Hungary and

11   Romania.

12   Q    Focusing now on your domestic stuff in the United States, can

13   you just give us a couple of the highlights of the trainings that

14   you've either taught or attended.

15   A    Highlights of my career in training, in 1989, I was fortunate

16   to go to Israel, and I trained for three weeks with their

17   anti-terrorist unit.

18              In 1990, I attended a class with the Dutch

19   hostage rescue team.

20           In 1994, I was able to attend a week-long session in

21   Fort Bragg with the Delta Force at their special operation

22   training facility.

23           In '99, I attended a class of the hostage rescue team.

24           In 2000, 2001, 2002, 2004 is when I went to Europe and I

25   was able to train with the Germany and Austria.

1    Q    Did you ever attend something called the National Academy?

2    A    Yes, ma'am.

3    Q    What's that?

4    A    The FBI allows local law enforcement officers, once they

5    reach a certain -- basically, mid and upper management, to attend

6    an eleven-week advanced training session.  And I was able to

7    attend and complete that session in Quantico, Virginia in 1995.

8    Q    You mentioned that now you're the director of training at

9    JPSO academy; is that right?

10   A    Yes, ma'am.

11   Q    Is that just an administrative position, or are you still

12   working as an officer?

13   A    I'm still working as a police officer.

14   Q    In what role?

15   A    Since 1987, I started out as a SWAT operator.  And I worked

16   my way through being an assistant team leader, team leader, the

17   deputy commander and now I'm the commander since 2006 of the

18   Jefferson Parish Sheriff's SWAT unit.

19   Q    What's a SWAT unit?

20   A    Basically, the acronym stands form special weapons and

21   tactics.  It's a team of highly trained individuals who respond

22   basically when the police, the district police officers can't

23   handle a certain, you know, crisis situation.  When you guys need

24   -- have an emergency, you all call 9-1-1 and the police come.

25   When the police have an emergency, they call for SWAT.

1    Q    So it's basically a very elite unit within the police

2    department?

3    A    Yes, ma'am.

4    Q    Now, you said you're the commander of the SWAT team now?

5    A    Yes, ma'am.

6    Q    Is that an administrative position, or are you still boots on

7    the ground?

8    A    No, ma'am.  I respond to all the SWAT incidences within

9    Jefferson Parish or sometimes we're required to go outside of the

10   parish.

11   Q    So have you been hunting coyotes lately?

12   A    Yes, ma'am.

13   Q    Now, even though you're the SWAT commander at this point, do

14   you still have your duties at the academy?

15   A    Yes, ma'am.

16   Q    You're still teaching there?

17   A    Yes, ma'am.

18   Q    Now, you mentioned POST before.  Is the academy that you

19   teach at POST-certified?

20   A    Yes, ma'am.

21   Q    What does mean for an academy to be POST-certified?

22   A    In order for police officers to attend a curriculum that is

23   accepted by the state, the POST council, the training centers,

24   there's 27 right now in the state, they have to follow certain

25   rules, regulations, guidelines and they must be inspected.  And

1   ultimately what happens is, once a police officer, police

2   recruit, attends that basic training center and completes that

3   curriculum, then POST comes down and they actually give a state

4   test.  If that police officer passes successfully that written

5   test, then that individual officer would then be considered to be

6   POST-certified as a police officer in the state of Louisiana.

7   Q   What officers in the state of Louisiana have to be

8   POST-certified?

9   A   All police officers.

10  Q   Now, that process you just described is the process that the

11  individual officer goes through to get POST-certified?

12  A   I'm sorry?

13  Q   The process you just described to the jury, that's the

14  process that an individual officer goes through to become

15  POST-certified?

16  A   Yes, ma'am.

17  Q   And you mentioned earlier that POST is that state-wide

18  organization that sets the standards for all training for police

19  officers; correct?

20  A   Yes, ma'am.

21  Q   Now, how does POST, once they decide on a curriculum, how do

22  they get that across and make sure that every officer in the

23  state is trained the same way?

24  A   Basically, there is a manual that all of the 27 training

25  academies are required to have.  And, based on that manual, the

1    curriculum, the minimum curriculum has got to include everything

2    in that manual.

3    Q    All right.  I'm holding up Exhibit 101.  Do you recognize

4    this book that I have in my hand?

5    A    Yes, ma'am.

6    Q    What is this?

7    A    It's the POST manual.

8    Q    Where did I get this book?

9    A    From me.

10   Q    This particular book that you gave me, what year or years was

11   that particular book in effect?

12   A    Approximately '95 through 2007.  And they have had some

13   updates in probably 2002, 2003.

14   Q    You said some updates, your face said some little updates.

15   Are the updates you're talking about, do they affect the rules

16   regarding use of force and defensive tactics their you're about

17   to talk to us about?

18   A    No, ma'am.

19   Q    So this book that I have right here was the one in effect

20   from you said the mid-'90s to 2007?

21   A    Yes, ma'am.

22   Q    So is it fair to say that everything in this book had to be

23   taught at every POST-certified academy?

24   A    Yes, ma'am.

25   Q    Did every POST-certified officer have to learn what's in this

1    book?

2    A    Yes, ma'am.

3    Q    Now, can a POST-certified academy teach its recruits more

4    than what's in this book?

5    A    Yes, ma'am.

6    Q    Can the POST-certified academy teach less than what's in this

7    book?

8    A    No, ma'am.

9    Q    Can anyone at the POST-certified academy teach rules that are

10   different than the rules that are in this book?

11   A    No, ma'am.

12   Q    Talk to me about how you're so familiar with POST.  Have you,

13   during your career, had any involvement in that organization

14   we're talking about?

15   A    Yes, ma'am.  In the early '80s, I attended the instructor

16   certification course.  And ultimately some of the tactics, the

17   defensive tactics that I'd been teaching, was actually put into

18   the first manual.  And then, in the second revisions and all

19   subsequent revisions of the manual, I actually wrote the use of

20   force and the defensive tactics outlines.

21   Q    All right.  So the material in here dealing with use of force

22   and defensive tactics, you actually wrote that?

23   A    Yes, ma'am.

24   Q    So you're familiar with it.

25   A    Yes, ma'am.

1   Q    Now, have you stayed involved with POST over the years?

2   A    Yes, ma'am.

3   Q    What's your involvement right now?

4   A    For all of the 27 academy directors, actually there's an

5   association where the directors come together and we meet on

6   occasion.   And basically the directors -- it's called the Academy

7   Director's Association, and they basically are a vehicle to

8   review the outlines or make suggestions and do things that are

9   necessary in order to keep the POST manual updated.   The Academy

10  Director's Association members would then make the

11  recommendations to the POST council, and then the POST council

12  would then, based on their position by law mandate whatever the

13  rules, changes, revisions have to be.

14  Q    So you continue to be involved in deciding what this

15  curriculum is that is going to be taught to every recruit in the

16  state?

17  A    Yes, ma'am.

18  Q    Do you know whether the NOPD is POST accredited,

19  POST-certified?

20  A    Yes, ma'am, it is POST.

21  Q    Do NOPD officers have to be POST-certified?

22  A    Yes, ma'am.

23  Q    How about the Orleans Parish Sheriff's Office, do you know

24  whether that's POST accredited?

25  A    Yes, ma'am.

1    Q    Do officers there have to be POST-certified?

2    A    Yes, ma'am.

3              MS. BERNSTEIN:  May I approach and show some documents

4    to the witness, Your Honor?

5              THE COURT:  Yes.

6              What are these marked as, Ms. Bernstein?

7              MS. BERNSTEIN:  I'm showing the witness Government's

8    Exhibit 264, 265, 266, 267 and 268.

9              THE COURT:  Okay.

10   BY MS. BERNSTEIN:

11   Q    Do you recognize what those documents are?

12   A    Yes, ma'am.

13   Q    Are those certificates given out by POST?

14   A    Yes, ma'am.  For successfully completing the municipal

15   training academy of the Orleans Parish Criminal Sheriff's Office.

16   Q    And do you recognize those as certificates that POST

17   regularly gives out once an officer completes that training and

18   passing the test?

19   A    I believe those are copies of the certificates.

20   Q    Thank you.

21             MS. BERNSTEIN:  Your Honor, I would like to offer those

22   exhibits into evidence.

23             THE COURT:  Any objection?

24             MR. LARSON:  No objection.

25             MR. DeSALVO:  No, Your Honor.

```
 1            THE COURT:  All right.  So ordered.
 2            (Exhibits admitted.)
 3            MS. BERNSTEIN:  May I have document 264 up, please.
 4   BY MS. BERNSTEIN:
 5   Q   Who is that a POST certificate for?
 6   A   I'm sorry if I mispronounce your name, but it's Anthony
 7   Villavaso, II.
 8   Q   And, according to this certificate, what year did he get POST
 9   certified after passing through that training?
10   A   That's 2001.
11            MS. BERNSTEIN:  May I have 265, please.
12   BY MS. BERNSTEIN:
13   Q   Is this the same thing for an Officer Robert Faulcon?
14   A   Yes, ma'am.
15   Q   Was year was he POST-certified?
16   A   1998.
17            MS. BERNSTEIN:  May I have 266, please.
18   BY MS. BERNSTEIN:
19   Q   Who that is for?
20   A   Robert Gisevius.
21   Q   What year was he POST-certified?
22   A   1997.
23            MS. BERNSTEIN:  May I have the next one, please, 267.
24   BY MS. BERNSTEIN:
25   Q   Is that the same certificate for Kenneth Bowen?
```

1  A   Yes, ma'am.  1997.

2        MS. BERNSTEIN:  And may I have 268.

3  BY MS. BERNSTEIN:

4  Q   Who is that one for?

5  A   Arthur Kaufman.

6  Q   What year was he POST-certified?

7  A   1991.

8  Q   Now, you mentioned that this manual, the POST manual we were

9  talking about, had rules in there regarding defensive tactics and

10 uses of force; right?

11 A   Yes, ma'am.

12 Q   I want to follow-up on some of those.  I want you to focus on

13 the training that you give officers when you're talking to them

14 about the use of force.  Now, first of all, is there a basic rule

15 that you teach about when an officer is and is not allowed to use

16 force?

17 A   Yes, ma'am.

18 Q   What's that basic rule?

19 A   Basically, an officer's able to use reasonable force when

20 it's apparently necessary to achieve a legitimate result.

21 Q   All right.  What does that mean, that an officer allowed to

22 use reasonable force?

23 A   It's going to be the amount of force that, in the same

24 circumstances, a reasonable officer would have used that would

25 have been in similar or like circumstances.

1  Q   What's the perspective of that reasonable officer you're

2  talking about?

3  A   It's got to be objectively reasonable based on the totality

4  of all the circumstances that that officer perceives.

5  Q   The first part of that was you said an officer is allowed to

6  use reasonable force.  The second part of the rule was what?

7  A   When it was apparently necessary.

8  Q   Apparently necessary to achieve a legitimate law enforcement

9  purpose, you said; right?

10 A   Yes, ma'am.

11 Q   What if the purpose you're trying to achieve is not a

12 legitimate law enforcement purpose?

13 A   Then it would be unauthorized.

14 Q   And what does it mean for reasonable force to be apparently

15 necessary?

16 A   It's going to be at the moment in time that officer perceives

17 whatever that action is, he has to make a decision based on that

18 perception and either control or to stop that particular threat.

19 Q   What is deadly force?

20 A   Deadly force is force that is likely to cause death or

21 serious bodily injury.

22 Q   When an officer fires a gun, is that deadly force?

23 A   Yes, ma'am.

24 Q   Is that true whether or not the officer hits anybody?

25 A   Yes, ma'am.

1  Q    Is there a particular rule that you teach officers about when

2  they are and are not allowed to use deadly force?

3  A    Yes, ma'am.

4  Q    What's that rule?

5  A    Officers are trained to use deadly force to defend life or to

6  prevent serious bodily injury.

7  Q    Are they ever allowed to use deadly force other than in those

8  circumstances?

9  A    No, ma'am.

10 Q    Now, the rules that you were just talking about for using

11 force and specifically for using deadly force, are those rules

12 that only apply when an officer is arresting somebody?

13 A    No, ma'am.

14 Q    When do those rules apply?

15 A    All situations where an officer is using force in any

16 contact.

17 Q    Are you familiar with something called a use of force

18 continuum?

19 A    Yes, ma'am.

20 Q    Is that something that you use when you teach officers?

21 A    Yes, ma'am.

22 Q    Is it in this POST manual here?

23 A    Yes, ma'am.

24 Q    Can you describe for us, can you tell me what that is, a use

25 of force continuum?

1  A   A use of force continuum basically is an illustration that

2  allows us, the instructors, to teach the recruits and inservice

3  personnel basically the rules of engagement.

4  Q   What's a continuum?  What does that word mean?

5  A   Continuum is there's going to be certain force options that

6  police officers are trained in, and they're able to go up or down

7  on those force options based on the officer's perception of

8  danger.

9  Q   And you talk about up and down, so this use of force

10  continuum has different levels of force that an officer can use?

11  A   That's correct.

12  Q   What is the very lowest level of force an officer can use?

13  A   Officer presence.

14  Q   That's just being there?

15  A   Yes, ma'am.  Being there either in uniform, getting out of a

16  marked police car.  Or, if you're in plain cloths, identifying

17  yourself with a badge, ID, that you are a police officer.

18  Q   Let me jump all the way to the other end.  What's the highest

19  use of force on that continuum?

20  A   Lethal force.

21  Q   Between that lowest level and highest level, what is it that

22  dictates how much force you're allowed to use?

23  A   Officer's perception of danger.

24  Q   All right.  And you said this continuum is a training tool

25  that you use?

1  A   Yes, ma'am.

2  Q   What's the purpose of it?  What are you trying to teach

3  officers when you talk to them about the continuum?

4  A   Just to make sure that the officer understands exactly, once

5  he perceives the aggressor's actions, then it gives him some

6  illustration written that he can actually see that will allow him

7  to have a general knowledge of how much force he can use to

8  overcome that level of aggression or resistance.

9          MS. BERNSTEIN:  May I approach the witness, Your Honor?

10          THE COURT:  Yes.

11          MR. FLEMING:  Ms. Bernstein.

12          (Discussion held off the record.)

13  BY MS. BERNSTEIN:

14  Q   For the record, I'm showing the witness page M-3 of the POST

15  manual.

16          MS. BERNSTEIN:  And, actually, at this point I'd like to

17  offer the POST manual, which has been marked Exhibit 101, into

18  evidence.

19          THE COURT:  Any objection, counsel.

20          MR. DeSALVO:  No, Your Honor, not from Mr. Bowen.

21          MR. LONDON:  One moment, Judge.

22          (Discussion held off the record.)

23          MR. LONDON:  What was that number again?

24          THE COURT:  101.

25          MS. BERNSTEIN:  Your Honor, we have agreed, for right

1    now, we're going to offer certain sections of this manual.

2    Procedurally, I don't know how to do that right now, except other

3    than to indicate the page numbers.

4            THE COURT:  Let's do this.  Exhibit 101 will consist of

5    page numbers --

6            MS. BERNSTEIN:  Right now, M-3.

7            THE COURT:  M-3, okay.  Subject to being supplemented as

8    we go either with this witness or others.

9            MS. BERNSTEIN:  Thank you, Your Honor.

10   BY MS. BERNSTEIN:

11   Q    Do you recognize page M-3 as the force continuum we were just

12   talking about?

13   A    Yes, ma'am.

14           MS. BERNSTEIN:  I'd like to offer page M-3 of 101 into

15   evidence.

16           MR. HESSLER:  No objections.

17           THE COURT:  Subject to what I just said, so ordered,

18   that page is admitted as 101.

19           (Exhibit admitted.)

20           MS. BERNSTEIN:  May I have on the screen, please.

21   BY MS. BERNSTEIN:

22   Q    For starters, Major Najolia, can you tell us what we're

23   looking at?

24   A    Basically, this is the illustration that I was referring to

25   earlier.  The horizontal axis is actually going to define the

 1    aggressor's actions, the perpetrator's actions.  There's four

 2    categories.

 3              And then, the vertical axis would actually, starting at

 4    the bottom, actually illustrates the lowest level of force, open

 5    stance, all the way up to including deadly force, shooting.

 6              MS. BERNSTEIN:  Steven, can you zoom in on this part at

 7    the bottom, please?

 8    BY MS. BERNSTEIN:

 9    Q    You mentioned that the horizontal axis dealt with the

10    aggressor's actions.  Now, first of all, what does that mean, the

11    aggressor?

12    A    That's the person that the officer is in contact with.

13    Q    All right.  Now I'd like you to define for us some of these

14    terms going across the horizontal axis.  The first one says

15    cooperative.  What does that mean?

16    A    That basically means that the officer is giving the aggressor

17    certain verbal commands, the aggressor is following those

18    commands.

19    Q    What's the next level of resistance that a person can give

20    against a police officer?

21    A    It's referred to as passive resistance.

22    Q    What does that mean?

23    A    Basically, the officer is giving commands but the

24    perpetrator, the aggressor, is not responding to those commands.

25    The officer may be telling the aggressor let me see you hands,

1    and the aggressor is not showing him his hands.  Not necessarily

2    doing anything violently and aggressively toward the officer, but

3    he's still not cooperating with what the officer is saying.

4    Q   The next level of aggression there is actually called

5    aggression.  What does that mean?

6    A   Aggression would be when the officer makes contact.  This is

7    going to be the perpetrator would then become physically

8    aggressive, violent, combative, against the officer.

9    Q   All right.  Thank you.

10            So now you just defined the terms going along the

11   horizontal axis.  Let's go back to the one that you just talked

12   about there, the first one, cooperative.  When a police officer

13   is dealing with somebody who is cooperative, what level of force

14   is authorized according to the force continuum?

15   A   Dialog.  Communications.

16   Q   This might be obvious, but what does that mean?

17   A   If the perpetrator is following the officer's verbal

18   directions, then it's incumbent upon the officer to give those

19   communications, those verbally -- what you're attempting to do is

20   place him into a position of safety, and he's cooperating.

21   Q   Can you explain what you mean what you use the term position

22   of safety.

23   A   Position of safety would be placing the individual aggressor,

24   perpetrator, suspect, in a position that would give the officer

25   some type of an advantage in the event that the aggressor changes

1    his mind and wants to become aggressive.

2    Q   And I drew a box around the part of the continuum that

3    responds to the cooperative section here, and that includes

4    presence and dialog.  That's what you just talked about?

5    A   Yes, ma'am.

6    Q   How about the next level of resistance, how about somebody

7    who is passively resistant, what kind of a force is an officer

8    allowed to use?

9    A   It goes up to physical control techniques.  We're not saying

10   that we're only going to use physical control.  It may be

11   appropriate to use both, both voice.  But what you're attempting

12   to do then, if the individual is not complying to the verbal

13   directions by the officer, then it's legally -- is legally able

14   to physically place that individual into that position of safety.

15   Q   And you mentioned that, when you're in the area that I'm

16   outlining right now, which is the area that corresponds to

17   passive resistance, you said that you don't necessarily just use

18   physical control but you can also use anything lower than that;

19   correct?

20   A   That's correct.

21   Q   If somebody is passively resistant, are you ever allowed to

22   use a level of force that's higher than what you've just talked

23   about?

24   A   No, ma'am.

25   Q   The next level we talked about was aggression.  If somebody

1   is being aggressive toward a police officer, what kind of force

2   is the police officer allowed to use?

3   A   That's referred to now as intermediate weaponry.  Which would

4   include certain police tools such as the baton, OC pepper spray,

5   the taser, bean bag rounds.  Also canine would fit into that

6   level.

7   Q   You called them intermediate weapons?

8   A   Yes, ma'am.

9   Q   What are they intermediate between?

10   A   Hands and deadly force.

11   Q   Now, if somebody is being aggressive towards a police

12   officer, is the police officer ever allowed to use more than the

13   force you've just described, the intermediate level?

14   A   No, ma'am.

15   Q   All right.  And, before, when I went across the bottom, I

16   didn't ask you yet about aggravated aggression.  What is

17   aggravated aggression?

18   A   That's going to be when the perpetrator is actually getting

19   combative, violent, physically aggressive with a weapon.  And

20   that could be any type of weapon that could be used in a manner

21   of killing the officer or seriously injuring him.

22   Q   So a weapon that can cause serious bodily injury or death to

23   the officer?

24   A   Yes, ma'am.

25   Q   All right.  And is it just, for aggravated aggression, is it

1    just that the person has a weapon?  Or does the person have to be

2    doing something with the weapon to fit in the aggravated

3    aggression category?

4    A    As a rule -- and this is why we use this -- we always attempt

5    to tell the recruits and the inservice personnel and remind them

6    that, when an officer uses deadly force, it's important at the

7    moment in time that he makes that decision to use deadly force,

8    that he is firing in defense of life or to prevent serious bodily

9    injury.

10   Q    So, if somebody is in that aggravated aggression stage,

11   somebody is pointing a gun at a police officer, now what level of

12   force is allowed?

13          MR. HESSLER:  Your Honor, I would object to the

14   characterization.  He never said he has to be pointing a gun at a

15   police officer.  That's a complete mischaracterization.

16          THE COURT:  Go ahead and rephrase it.  He's been

17   qualified as an expert, so I think he can be asked about it.  But

18   go head and rephrase the question.

19   BY MS. BERNSTEIN:

20   Q    If for example somebody is pointing a gun at a police

21   officer, what level of aggression would that qualify as?

22   A    Aggravated aggression.

23   Q    In that situation, where the officer is facing a suspect who

24   is engaged in aggravated aggression, what level of force is

25   authorized?

1    A    If an officer believes that he is going to be killed or an

2    innocent third party is going to be killed, it would be

3    appropriate to respond with deadly force.

4    Q    Now, you've just walked us through how an officer might move

5    up this continuum.  Does an officer ever move down the continuum?

6    A    Yes, ma'am.  De-escalation side of that, yes.

7    Q    Can you explain that.

8    A    What happens is, if I approach an individual as a street

9    officer in uniform, and I perceive that an individual -- if I see

10   a bulge in his waistband, if I perceive that is a weapon, which

11   is a commonplace that criminals carry weapons, then it may be

12   appropriate for me to have my hand on my gun, to have my gun

13   drawn, to actually have my gun pointed at that particular

14   individual.

15              At that point, if it's a situation where it's

16   feasible, I would attempt to use verbal directions in order to

17   get that person to a position that I feel safe.  And that would

18   be getting his hands as far away from that bulge as possible.

19   So, if I'm in a situation where I'm directing that individual to

20   raise his hands, extend those hands, lock those elbows and spread

21   his fingers, and he complies, then I would put him into maybe a

22   prone position, wall position, where I could then either stand by

23   and wait for backup or approach and restrain him temporarily with

24   the aid of handcuffs, conduct a search and determine if it is in

25   fact a weapon.

1    Q    So, if a suspect's level of aggression goes down on this

2    continuum, what happens to the level of force that's authorized?

3    A    The level of force actually goes down.

4    Q    So I used the example before of a suspect who is pointing a

5    gun at a police officer.  What level of force is justified at

6    that moment?

7    A    Actually, deadly force.

8    Q    What if the person drops the gun?

9    A    Then it would be -- I still may have my weapon out, but it

10   would be verbally directing that individual as far away from that

11   weapon as possible.

12   Q    And if I do and what you tell me to do and if I comply, you

13   tell me to get away from the gun and turn around, now what level

14   of force is authorized?

15   A    I'm still using verbal direction to put you in a position of

16   safety where I can get you under control.

17   Q    Now, that principle you were just talking about, you called

18   it de-escalation, is that a principle you teach to officers?

19   A    Yes, ma'am.  And corresponds with the illustrations when we

20   do the use of force continuum.

21   Q    So what is that basic rule, if you can put it into a sentence

22   or two, what is that basic rule you teach the officers?

23   A    Basically, you're using deadly force when the officer

24   perceives that he has to fire to save life, in defense of life,

25   to prevent serious bodily injury.  An officer is trained to use

1  nondeadly force to control resistant or aggressive behavior.

2  But, in all situations, the force that the officer uses needs to

3  be reason.

4  Q   And can you describe, just very succinctly like that, the

5  principle of de-escalation.

6  A   De-escalation corresponds to the officer's perception that

7  the aggressor's danger is reduced.  As the aggressor's actions

8  become less threatening to the officer, then it would be

9  appropriate for the officer's response to be less, lessened.

10  Q   What is punitive force?

11  A   Punitive force we teach to the recruits and to inservice

12  personnel as a reminder that it's forced as used strictly to

13  punish an individual and not for control purposes or to stop a

14  deadly threat.

15  Q   Is punitive force allowed?

16  A   No, ma'am.

17  Q   Ever?

18  A   No, ma'am.

19  Q   Is that a rule that you teach people?

20  A   Yes, ma'am.

21  Q   Now, with respect to that rule, does it matter whether the

22  person you're arresting or dealing with might have committed a

23  terrible crime?

24  A   No, ma'am.  It's never authorized.

25  Q   What if the police officer personally witnessed the suspect

1  commit a terrible crime --

2  A   Yes, ma'am.

3  Q   -- is punitive force allowed in that circumstance?

4  A   No, ma'am.

5  Q   Let me give a scenario.  Police officer walks around the

6  corner of a building and sees a suspect pointing at gun at an old

7  lady's head.

8  A   Yes, ma'am.

9  Q   At that moment, at this moment right now, what level of force

10 is justified?

11 A   Deadly force.

12 Q   Why is that?

13 A   In fear that that individual will kill that victim.

14 Q   Let's say as you, the officer we're talking about, as you

15 come around that corner, the suspect pulls the trigger and kills

16 that old lady right in front of you.

17 A   Yes, ma'am.

18 Q   And then drops the gun.  What level of force is allowed right

19 then?

20 A   It would not be deadly force.  If the officer does not

21 perceive that his life or another life is in danger, then deadly

22 force would not be authorized.

23 Q   It doesn't matter that you just watched him commit a horrible

24 crime?

25 A   No, ma'am.

1   Q    Let's say in that same scenario you suspect that the suspect

2   might have another weapon in his pocket.

3   A    Yes, ma'am.

4   Q    How does that effect what's going on and how much force is

5   justified?

6   A    It may be appropriate to keep your gun pointed at the

7   individual in an attempt to get you in a position of safety.  But

8   it would not be authorized.  Unless the officer, at the moment in

9   time he makes a decision to use deadly force, he is using it

10  based on the fact he is defending life or prevent serious bodily

11  injury.

12  Q    You said that the officer in that case might want to keep his

13  or her gun focused on the suspect; right?

14  A    Yes, ma'am.

15  Q    Is there any rule about whether or not an officer has to give

16  a warning before firing?

17  A    Where feasible, yes.

18  Q    What is the rule?

19  A    It's when feasible.

20  Q    So, if feasible to do so, the officer has to give a warning?

21  A    Yes, ma'am.

22  Q    What does that mean, if it's feasible to do so?

23  A    If the officer in the scenario that you used comes around the

24  corner and the perpetrator has his weapon drilled in to an

25  innocent victim's head, if I'm the officer and I believe that

1    giving any verbal warning would in fact cause more danger to the

2    victim and/or to myself, then it would be strictly appropriate

3    according to training to actually fire without saying anything.

4            If I'm in a situation where I'm able to give a warning

5    without increasing the danger to that victim, innocent third

6    parties or myself, then it would be acceptable.

7    Q   So let's go back to the last example that I left you with,

8    where you come around the corner, you see the suspect shoot and

9    kill the old lady and then drop the gun and put his hands up, but

10   you suspect that he has another weapon in his pocket.  In that

11   situation, are you required to give a warning?

12   A   His hands are up?

13   Q   Yep.

14   A   Yes.

15   Q   Why?

16   A   Because I think I can -- based on the information, I think I

17   could successfully challenge that individual without increasing

18   the danger to myself or innocent third parties.

19   Q   How tough is police work?

20   A   Extremely.  It has its moments.

21   Q   How emotional is police work?

22   A   Very emotional.

23   Q   Can you explain what you mean?

24   A   There's a lot of factors that's occurring in a split second.

25   The events that police officers face are tense, they are

1  uncertain, rapidly involving.  And an officer has to make a

2  decision.

3  Q   How about the kinds of situations we're talking about where

4  an officer has to decide whether or not to use force, how tense

5  and emotional are those situations?

6  A   Extremely stressful.

7  Q   Do you teach officers anything about the role that emotion

8  plays in their decision how much force they can use in a

9  particular situation?

10  A   Yes, ma'am.

11  Q   What's the rule that you teach them?

12  A   What we teach to the police officers is that force is based

13  on reasonable and necessity, never based on emotion.

14  Q   So, even though they are making these decisions while doing a

15  job that is fraught with emotion and stress, the rule that you

16  teach them is that they are not allowed to make a decision based

17  on emotion; is that right?

18  A   That's correct.

19  Q   Now, it's one thing just to tell an officer that.  Officers

20  are human.  How do you try to make sure that that rule actually

21  sticks?

22  A   Exactly that.  We want, in a classroom setting, to let the

23  recruit examine and understand that it's going to be a very

24  stressful event.  We want that officer to know he is human and

25  there's going to be emotions that's going to occur.  But we still

1    want that officer to address that situation, and we do it based

2    on discussing scenarios.  And also, as the training progresses,

3    we will put these officers into specific events, some real life

4    events that have occurred in the past, in order to stress,

5    confuse, create that type of emotion.  Now, we're never going to

6    be able to replicate, reproduce the stress that an officer feels

7    in a real life situation.  But, in training, we do the very best

8    that we can.

9    Q    Do you tell the officers that the real life stress is going

10   to be even greater than what you have in the classroom here?

11   A    Yes, ma'am.

12   Q    How important is that rule that you teach officers?

13   A    It's a very important part of being successful.

14   Q    So let's go back to the example that we've been using where

15   the officer watches a suspect shoot somebody in the head, and

16   let's make it even worse, let's make it somebody the officer

17   knows.  How high are emotions running at that point?

18   A    Extremely.

19   Q    Is that officer allowed to use force based on that emotion?

20   A    No, ma'am.

21   Q    What if the officer is tired?

22   A    Not authorized based on being tired.

23   Q    What if he's hungry?

24   A    No, ma'am.

25   Q    What if he's angry?

1    A    No, ma'am.

2    Q    Are you familiar with something called the PEDA principle?

3    A    Yes, ma'am.

4    Q    What is that?

5    A    Basically it's a principle again that we illustrate to

6    officers to give them a basic guideline of when they're able to

7    use force and how to go through the assessment evaluation phase

8    to choose the right force option.

9    Q    Is this a principle that you teach?

10   A    Yes, ma'am.

11   Q    Do you know whether this principle is taught at the NOPD

12   academy?

13   A    It's a mandated principle throughout the state.

14   Q    Now, do you know whether PEDA is actually in this manual that

15   we've been talking about?

16   A    Not -- I don't think in that particular manual.  It came

17   about after, I believe.  The principles were being taught.  I

18   don't know if it's in that manual.  I don't remember.

19   Q    So whether or not it's in there, you know that the PEDA

20   principles have been taught at the NOPD academy?

21   A    Yes.

22   Q    Explain it.  PEDA, now do you spell that, that acronym?

23   A    Yes.

24   Q    What is it?

25   A    P-E-D-A.

1        MR. HESSLER:  Your Honor, if I may.  If it's not in

2    that, I think it would be more appropriate that the government

3    refer to what is taught as opposed to the principles that are

4    taught now.

5        MS. BERNSTEIN:  He is testifying as to what he teaches

6    and from what he knows through his personal knowledge through his

7    involvement is taught at NOPD.

8        MR. HESSLER:  Your Honor, I think he clearly indicated

9    that the PEDA principle, which he is about to explain, was not

10   taught for years that are issue for these officers.

11       MS. BERNSTEIN:  I don't think that's what he said.

12       THE COURT:  Let's lay a foundation for that, determine

13   how that applies and during what time period it applies.

14   BY MS. BERNSTEIN:

15   Q   Do you know, during the years that we've been talking about,

16   do you know whether NOPD academy taught the PEDA principle.

17   A   I reviewed documents that would indicate that, yes.

18   Q   So you said that PEDA stands for -- the PEDA is P-E-D-A;

19   correct?

20   A   Yes, ma'am.

21   Q   What do the P-E-D-A stand for?

22   A   The P stands for perception.  The E stands for evaluation.

23   The D stands for decision.  And the A stands for action.

24   Q   Before I take you through each one of those, what is the

25   purpose of the PEDA principle that we're talking about?

1    A    It basically gives an officer the opportunity to make -- have

2    an understanding of what process he needs to go through in order

3    to, once he perceives some type of action, to go through a threat

4    assessment and to choose the appropriate force option to overcome

5    that level of resistance.

6    Q    You just used the word threat assessment.  What do you mean

7    by that?

8    A    Basically, it's the officer's assessment evaluation as to

9    what he is observing at that moment in time.

10   Q    Is an officer required to do a threat assessment before he or

11   she uses force?

12   A    Yes, ma'am.

13   Q    Every time he or she uses force?

14   A    Yes, ma'am.

15   Q    Is there ever a time that you are allowed to use force

16   without doing a threat assessment first?

17   A    No, ma'am.

18   Q    All right.  So let's talk about -- P-E-D-A teaches them how

19   to do a threat assessment?

20   A    Yes, ma'am.

21   Q    Let's walk through each one of those.  You say P stands for

22   perception?

23   A    Yes, ma'am.

24   Q    What does that mean.

25   A    Basically, it's the officer's observation of the actions and

1    everything as far as the total circumstances that's going on at

2    that moment in time.

3    Q    So the officer has to take all that information in first?

4    A    Yes, ma'am.

5    Q    Then what's the second step?

6    A    That's when he does the evaluation.  And he's evaluating all

7    this data, makes a threat assessment.  The first thing that the

8    officers are trained to do is to branch, to determine is the

9    threat that I'm perceiving at this time a deadly threat or a

10   nondeadly threat.

11         If it's a deadly threat, then it would be appropriate

12   for the officer to go to deadly force.  And it might not mean an

13   immediate shot; it may be going through the process of putting

14   your hand on the gun, drawing your weapon, each pointing your

15   weapon at the perpetrator.

16         If the officer perceives at that time that it's a

17   nondeadly threat, then based on a lot of factors, he has to make

18   a determination what force option would be appropriate for him to

19   control that resistant or aggressive behavior.

20         And there's a lot of factors that come in to, and the

21   officers are trained in those factors.

22   Q    So it sounds like you just moved at the end of that to D; is

23   that right?

24   A    Right.

25   Q    What does the D stand for?

1  A    Once the officer makes a determination, the D stands for

2  decision, and it would be that officer then deciding, based on

3  all of his observations, the threat assessment he made, as to

4  what would be the appropriate level of force, force option to use

5  to overcome that level of resistance.

6  Q    What's the A in PEDA?

7  A    The action.

8  Q    So that's actually carrying out what you just decided to do?

9  A    Yes, ma'am.

10  Q    Now, it just took you awhile to explain these four steps that

11  an officer has to go through.  How quickly does the officer go

12  through those steps?

13  A    It could be a nano of a second.

14  Q    And is that something an officer is trained in?

15  A    Yes, ma'am.

16  Q    Explain that.

17  A    Basically what we are attempting to do is put the officers in

18  situations, not only in a classroom setting, but actually doing

19  real live scenarios.  And sometimes it's done by videos where

20  they're watching scenarios.  Other times, it's an interactive

21  computer that we have at the training academy where we're making

22  decisions to shoot or don't shoot, to use what level of force and

23  how to successfully resolve whatever that event is unfolding.

24  And then we will also use situations where we'll bring live

25  aggressors and put them into safety gear, and they'll actually be

```
 1   using paint ball, simunitions basically, force-on-force drills.

 2   Q   Going back to that example we've been using where you come

 3   around the corner -- let's go back to the first one.  You are

 4   come around the corner and you see a suspect pointing a gun at

 5   the head of an old lady.  Now, you've already said that that is a

 6   situation where lethal force is justified; right?

 7   A   Yes, ma'am.

 8   Q   And you have to act very quickly in that case; correct?

 9   A   Yes, ma'am.

10   Q   Even though you have to react immediately to what you see, do

11   you still have to go through the P?

12   A   Yes, ma'am.

13   Q   The E?

14   A   Yes, ma'am.  The threat assessment.

15   Q   The D?

16   A   Yes, ma'am.

17   Q   And then you get to the A?

18   A   Yes, ma'am.

19   Q   Is an officer ever allowed to skip the P, the E or the D?

20   A   No, ma'am.

21   Q   Going back to the P, you said it's perception.  You said

22   that's when the officer is taking all of his or her surroundings

23   in; right?

24   A   Yes.

25   Q   Whose perception are we talking in that situation?
```

A    That specific officer.

Q    Is the officer who is about to use force allowed to rely on somebody else's perception?

A    No, ma'am.

Q    Why not?

A    Officers are trained that they're going to use force based on their perception of danger.

Q    Now, we're talking about perception, but perception can sometimes be wrong; can't it?

A    Yes, ma'am.

Q    What if an officer's perception is wrong?  What if it turns out that the gun the suspect was holding to the woman's head was unloaded, how does that factor in?

A    It would still be an authorized shooting based on the fact that the officer perceived that it was a real gun.  It was reasonable for a thousand officers to look at that situation, who would be objective, and conclude the same thing, and perception actually becomes reality to that officer at the moment in time he makes that decision.

Q    What if it turns out it's actually a toy gun, same thing?

A    Yes, ma'am.

Q    Even though that gun couldn't possibly have actually hurt the woman?

A    That's correct.

Q    Now, what if the officer knows that it's a toy gun?  What if

1   the officer gave that guy the gun and knows it a toy gun?

2   A    Then it would be an unauthorized use of deadly force.

3   Q    And explain that, why.

4   A    Because the officer is firing for whatever reason other than

5   to defend life or to prevent serious bodily injury.

6   Q    What if an officer sees a suspect going for a gun, yells a

7   warning, and the person is going for what the officer believes to

8   be a gun, whether or not it is, at that moment is the officer

9   justified in using deadly force?

10  A    Once that officer perceives that he is about to receive death

11  or serious bodily injury, then he would be firing in defense of

12  life, that would be an appropriate use of deadly force.

13  Q    And let's say if the officer thinks somebody might be going

14  for a gun but then sees that the person doesn't have a gun, what

15  level of force is justified?

16  A    It would not be deadly force.  Deadly force would not be

17  justified.  It would have to be something lesser.

18  Q    Let's talk about the E, which was evaluation; right?

19  A    Yes, ma'am.

20  Q    Who needs to do that evaluating?

21  A    The officer that's involved in the event.

22  Q    What if there are multiple officers involved in an event.  If

23  you are involved in an event with other officers, who has to do

24  the evaluating for whether or not you use force?

25  A    I do the evaluating -- evaluation/threat assessment for me.

```
 1   The other officers are doing the evaluation/threat assessment for
 2   their selves.
 3   Q   Are you ever allowed to rely on somebody else's threat
 4   assessment?
 5   A   No, ma'am.
 6   Q   What if that other person is an officer, a partner you've
 7   worked with for years, whom you know has absolutely perfect
 8   judgment and whom you trust with your life, are you allowed to
 9   use his threat assessment instead of your own?
10   A   No, ma'am.
11   Q   You said the D stands for decision.
12   A   Yes, ma'am.
13   Q   Does that mean that every use of force has to be a conscious
14   decision?
15   A   Yes, ma'am.
16   Q   And you already said you're never allowed to skip any of
17   those P, E, D or A; is that correct?
18   A   That's correct, ma'am.
19   Q   Ever heard of a concept called sympathetic fire?
20   A   Yes, ma'am.
21   Q   What is that?
22   A   Basically, sympathetic fire happens when one officer is
23   firing and almost as a startled reaction an officer in close
24   proximity pulls the trigger.
25   Q   So if somebody fires sympathetic fire, is that officer going
```

1    through the P, the E, the D and the A?

2    A    No, ma'am.

3    Q    Is sympathetic fire ever permitted?

4    A    No, ma'am.

5    Q    But it's also not intentional; right?

6    A    That's correct.

7    Q    It's basically an accident?

8    A    Yes, ma'am.

9    Q    Now, do you do anything in your training to try to prevent

10   the phenomena of sympathetic fire?

11   A    Well, we'll talk about the phenomena in the classroom.  But

12   we also get them on the range and we will do certain drills to

13   try to encourage that phenomenon.  And ultimately, during in a

14   recruit class that's attending a firearms training, at some point

15   in time, we're going to be able to elicit that response, as a

16   warning, that sympathetic fire, it's a human thing, but they have

17   to be aware of that phenomenon.

18   Q    So, if officer 1 fires a gun and officer 2 fires

19   sympathetically, without going through the P-E-D-A, how close in

20   time are those two shots going to be?

21   A    It's going to be immediate.

22   Q    Immediate?

23   A    Yes, ma'am.

24   Q    If officer 1 fires several times and on the eighth time

25   officer 2 fires, is that sympathetic fire?

1    A    No, ma'am.  Not in my opinion.

2    Q    Why not?

3    A    Because sympathetic fire is going to be based on that

4    immediate startled affect.  And, if the officer was able to hear

5    the rounds one through seven and didn't do anything, then it

6    would not appear to me to be sympathetic fire.

7    Q    If officer 1 is in one room and officer 2 is in a room next

8    door, but they can hear what's going on between the rooms, if

9    officer 1 fires and causes a sympathetic fire from officer 2,

10   where will officer 2 be when his gun goes off?

11   A    He would be in the opposite room.

12   Q    If officer 2 -- if officer 1 fires and officer 2 runs in to

13   the first room and fires, is that sympathetic fire?

14   A    No, ma'am, not in my opinion.

15   Q    You familiar with a pump action shotgun?

16   A    Yes, ma'am.

17   Q    If somebody with a pump action shotgun sympathetically fires,

18   can that person sympathetically fire the pump action shotgun

19   twice?

20   A    No, ma'am.  And I believe that, just so the jury would

21   understand, a pump action shotgun, you're required to actually

22   take the forearm and pull it all the way back and then go forward

23   again.  So it would seem to me that, if it's going to be a

24   sympathetic shot, it would be one shot.  But then you're going

25   through a process.  And it would seem unusual.

1    Q    Now I want to talk about a situation in which officers fire

2    multiple shots.  Let's assume that an officer sees an immediate

3    threat and is justified in using deadly force.  When is that

4    officer supposed to stop firing?

5    A    When he perceives that the threat is no longer.

6    Q    So that's that de-escalation principle; once the threat goes

7    down -- once the threat goes down, the level of force has to go

8    down?

9    A    Yes, ma'am.

10   Q    So an officer who is justified in using deadly force might

11   very well be justified in shooting multiple sometimes, usual more

12   than once?

13   A    Yes, ma'am.

14   Q    Now, these rules that you're talking about that govern when

15   an officer can and can't use force, which of those shots do those

16   rules apply to?

17   A    All of the shots that you perceive that you need to protect

18   life.  Once the threat is no longer, then it would be appropriate

19   to go through the mechanical process of stopping firing, which

20   may not be immediate, but you would go through that process.

21   Q    So every single pull of the trigger has to be justified

22   independently; is that right?

23   A    Yes.

24   Q    And what has to be present for each pull of the trigger?

25   A    You're firing in defense of life.

1    Q    If an officer is firing -- if an officer is justified in

2    using deadly force and is firing his or her weapon, where is that

3    officer looking?

4    A    At the threat.

5    Q    And what is that officer doing as he's looking at the threat?

6    A    He's assessing/evaluating, to determine what is going on.

7    Target acquisition, the dangers.  There's a lot of things going

8    on there.

9    Q    So he's assessing the whole time?

10   A    That's correct.

11   Q    Is he ever allowed to fire without knowing what he's firing

12   at?

13   A    No, ma'am.

14   Q    Is an officer ever allowed to shoot without a particular

15   target?

16   A    No, ma'am.

17   Q    Never allowed to shoot willy nilly?

18   A    No, ma'am.

19   Q    Just in general?

20   A    No, ma'am.

21   Q    Is an officer ever allowed to shoot first and ask questions

22   later?

23   A    No, ma'am.

24   Q    Ever allowed to do the assessment, the E, the threat

25   assessment or the evaluation, after the fact rather than before?

1   A    No, ma'am.

2   Q    Now, all of these rules that you've been talking about, are

3   those rules that every POST-certified officer would have in his

4   or her head?

5   A    Yes, ma'am.  They've been trained in those rules.

6   Q    I want to shift gears a little bit and talk about

7   documentation.  How important is it to document a use of force

8   incident?

9   A    Very important.

10  Q    And that documentation can be either written or verbal or

11  both; right?

12  A    Yes, ma'am.

13  Q    Now, you said documentation is very important.  Why is that?

14  A    It basically memorializes what the events were, how you came

15  about to be there, your perceptions of danger, the processes that

16  you went through.  And basically justifies your using a force and

17  the legitimacy of your stop.

18  Q    Let's focus on a verbal statement about a use of force

19  incident.  Although, tell me, I guess the rules we're going to

20  talk about would be the same in a written or verbal statement as

21  far as what needs to be included?

22  A    Yes, ma'am.

23  Q    What absolutely must be included in a statement about a use

24  of force incident?

25  A    Well, you're going to talk about your perceptions of danger,

1    the fact that you used force and justify that force based on the

2    PEDA principle.

3    Q    You started by saying the fact that you used force, and then

4    you said and the justification for the force.  How important is

5    it to include in your statement about the use of force the fact

6    that you used force?

7    A    It's very important.

8    Q    So, if an officer fires a weapon, how important is it that

9    the statement about the incident include the fact that he fired a

10   weapon?

11   A    Extremely important.

12   Q    How important is it for the officer to say exactly what he

13   did and why?

14   A    It's very important.

15   Q    What are officers taught about the completeness and the

16   accuracy of these statements that they give?

17   A    They have to be truthful, complete and accurate.

18   Q    Are officers taught anything about whether or not their uses

19   of force will be judged afterward?

20   A    Absolutely.

21   Q    What are they taught?

22   A    Any use of force is going to be evaluated within a police

23   agency, and that use of force is going to be based on -- is going

24   to be evaluated based upon that reasonable standard.

25   Q    So that's not be some unfair thing that is sprung on an

1    officer later.  Every officer knows that a use of force is going

2    to be evaluated?

3    A    Multiple times generally.

4    Q    I think you just included this in your last answer, but what

5    standard is it going to be evaluated by?

6    A    The fact that it's objectively reasonable.

7    Q    And is the officer also trained that that statement that he

8    or she gives is going to be used in that evaluation?

9              MR. HESSLER:  Your Honor, may we approach?

10             THE COURT:  Yes.

11             (Sidebar conference.  Jury not present.)

12             MR. HESSLER:  I would object to this line of

13   questioning.  We're getting far afield from the use of force.

14   Now we're in to administrative procedures and statements and

15   reports and things like that, which is not what I anticipated to

16   be in the realm of the use of force.

17             MS. BERNSTEIN:  I think the fact that a use of force --

18   it's not in there, Your Honor.  I don't think I specifically said

19   the reports.  But that's part and parcel of a use of force, is

20   that you need to document the use of force.

21             MR. HESSLER:  And you know what, there was never a use

22   of force report that you had him refer to or anything else in

23   this matter, because none was ever done.  And it's not these guys

24   fault.  And it's not part of the use of force.  Use of force is a

25   practical application of force on a suspect or person.  It's not

 1    the documentation that occurs afterwards.

 2         MS. BERNSTEIN:  I actually think I was at the end of

 3    that section anyway, so I can moot it by moving on.

 4         THE COURT:  Here's my concern -- and I appreciate that.

 5    My concern is that this is, at the most basic level, is a two

 6    part case.  When you read the indictment, it is two fundamental

 7    parts.  One is the use of force to violate civil rights, and the

 8    other is the obstruction of justice in all of its statutory

 9    forms.  The documentation of use of force, I think the last few

10    questions are pertinent to the second of those allegations.

11         When I read the summary, the summary fairly

12    characterized this testimony as relating to the first category of

13    counts; that is, when the use of force is appropriate.  Arguably,

14    the subsequent documentation of it might fall within that.  I

15    think you've touched on that prior to the objection.

16         But I don't think we can go much further based on what

17    the summary has, as well as -- well, based on what the summary

18    has in it.  I don't know that we can go much further into this.

19         Plus, I don't know that, other than in the most general

20    way, I don't know that you've laid a foundation for his testimony

21    relative to NOPD use of force.

22         Now, he's talked about general concepts, and I think no

23    one would dispute that there has to be some documentation

24    following an incident where use of force is involved.  But I

25    don't think that we can go too much further with this without

1    running afield of what we have on the subject.

2         MS. BERNSTEIN:  It's fine with me to move on.  That was

3    a very small section of what I wanted to cover.  I will actually

4    go back and lay the foundation retroactively, which is everything

5    that we're talking about with documentation is in that POST

6    manual.

7         And, to defend my expert notice there, I don't think

8    it's possible to separate use of force from documentation of use

9    of force.  I'm quite sure that, if ask a few more questions, this

10   witness is going to say that he talks to his people, in the

11   context of use of force, he talks about the importance of

12   documenting.  That's different than the separate class in the

13   academy that's on report writing which focuses on grammar and

14   structure.

15        The last thing -- this is sort of for the record at this

16   point -- but we do have two parts of our case but they are not

17   separate.  They are two, you know, very much interwoven parts.

18        MR. HESSLER:  Again -- that was going to be my second

19   part -- there's no foundation for this.

20        And thirdly is, there is a complete use of force

21   investigation done not by this man but by a completely separate

22   section of police department that does not apply to his

23   knowledge.

24        MS. BERNSTEIN:  But I'm not asking him about that.

25        MR. HESSLER:  You are.  You are asking about the use of

```
 1   force.
 2          THE COURT:  I'll let you get in to that on cross.
 3          MR. HESSLER:  I don't want to.
 4          THE COURT:  I've ruled on the objection.
 5          And, if I use the word separate, obviously just the
 6   factual scenario set forth in the indictment is one that begins
 7   with the first paragraph and ends with the grand juror's
 8   signatures.  So if I use the word separate, I don't mean that
 9   they're severable necessarily.  They're together.  But in terms
10   of the types of counts, there's the physical activity of what
11   happened on the morning of September 4th, just to be clear for
12   the record, and the act that occurred after that are, as I say,
13   are fairly described in the language in the statutes, some of the
14   statutes such as obstruction of justice, such as falsification of
15   forms, et cetera, et cetera.
16          MS. BERNSTEIN:  So let me go back, Your Honor, and
17   establish my retroactive foundation and then move on.
18          THE COURT:  Okay.
19          MS. BERNSTEIN:  I'll establish the fact that these rules
20   are in the manual.
21          THE COURT:  So I'm sustaining the objection beyond that.
22          (Sidebar conference concluded.  Jury now present.)
23   BY MS. BERNSTEIN:
24   Q   Major Najolia, before that break, we were talking about the
25   rules regarding documentation of a use of force.  Those rules
```

1    that you were talking about, are they contained in this book?

2    A    Yes, ma'am.

3    Q    So they're contained in Exhibit 101, the POST manual?

4    A    Yes, ma'am.

5    Q    So those are rules that every officer in the state of

6    Louisiana is trained on?

7    A    Yes, ma'am.

8    Q    I want to ask you a series of hypothetical situations,

9    hypothetical questions that might help you illustrate the

10   principles that you've just taught us.  Let's start with this

11   first situation.  You're an officer and you respond to a call of

12   a bank robbery in progress.  You arrive out to the bank and you

13   see somebody running out of the bank.  Can you shoot that person?

14   A    No, ma'am.

15   Q    Why not?

16   A    There's no perception of a deadly threat.

17   Q    All right.  Let me change it a little bit.  When you hear

18   about the bank robbery in progress, you also hear that that bank

19   robber has shot and killed a teller.  You go to the bank, you see

20   somebody running out of the bank.  Can you shoot them?

21   A    No, ma'am.

22   Q    Why not?

23   A    No perception of a deadly threat.

24   Q    Let's say you -- same situation -- you hear that a teller has

25   been killed in the bank, and you hear that the perpetrator is

1    wearing a yellow shirt.  You see somebody in a yellow shirt

2    running out of the bank.  Can you shoot them?

3    A    No, ma'am.

4    Q    Why not?

5    A    No perceptions of a deadly threat.

6    Q    So let me change it; and, instead of the person wearing a

7    yellow shirt, you hear that the perpetrator is wearing a yellow

8    shirt, and you see somebody coming out in a green shirt.  Can you

9    shoot him?

10   A    No, ma'am.

11   Q    All right.  Let me give a situation where you have a very

12   distinctive description.  Let me make a crazy description.  You

13   hear that this bank robbery is in progress, that the teller has

14   been killed, and that the perpetrator is seven foot two, wearing

15   a yellow and purple suit.  You get to the bank and you see

16   someone who is seven foot two wearing a yellow and purple suit

17   come out of bank.  Can you shoot them?

18   A    No, ma'am.

19   Q    Why not?

20   A    No perception of a deadly threat.

21   Q    You have every reason to believe that this person coming out

22   of the bank is armed.

23   A    Yes.

24   Q    You can't shoot them?

25   A    (Witness shakes head.)

1  Q    Let's say this person had a gun in his hand when he runs out.

2  Can you shoot him?

3  A    Not unless you perceive that you're firing in defense of

4  life.  What is he doing with that gun, is he pointing it toward

5  you, is he pointing it toward --

6  Q    Let's say he's turning toward you with it?

7  A    If he's turning toward me and I'm perceiving that I'm going

8  to be killed, then it would be appropriate to use deadly force.

9  Q    Let's say you see the seven foot two guy in the green and

10  purple suit, instead of you seeing him running out of the bank,

11  you see him backing out of the bank so his back is to you, and

12  you believe that he's armed, can you shoot him?

13  A    No, ma'am.

14  Q    What do you do?

15  A    You cannot use deadly force at that point in time.  I would

16  challenge him.

17  Q    What do you mean, challenge?

18  A    Verbally challenge.  If I could get behind cover.

19  Q    What your verbal challenge sound like?

20  A    Stop, police.  And it would be much louder and commanding, a

21  command voice.

22  Q    Same scenario, you get called to a bank robbery, a teller has

23  been shot and killed; and, when you get there, you see other

24  officers shooting into a bush.  Can you fire into the bush?

25  A    No, ma'am.

1    Q    Why not?

2    A    No perception of a deadly threat.

3    Q    Let me go back to a question I asked you earlier.  What if

4    those three officers are the three greatest officers you have

5    ever known and you would very easily trust any one of them with

6    your life, can you fire into that bush?

7    A    No, ma'am.

8    Q    What if somebody standing there says the bad guy is in the

9    bush?

10   A    Not unless you perceive a deadly threat.

11   Q    How about you get there and the bad guy is walking away down

12   the street, can you shoot him?

13   A    No, ma'am.

14   Q    Even if somebody identifies him as the bad guy?

15   A    Yes, ma'am.

16   Q    Why not?

17   A    No perception of a deadly threat.

18   Q    I want to switch gears just a tiny bit.  As far of your use

19   of force training, do you all talk about certain tactics related

20   to the use of force?

21   A    Yes, ma'am.

22   Q    If an officer believes he's under fire, what is he trained to

23   do?

24   A    He believes he's under fire?

25   Q    Uh-huh.

1  A   He believes he's going to be killed, he's trained to return

2  fire.

3  Q   And how about in terms of tactics, in terms of protecting

4  himself, is he trained anything along those lines?

5  A   First thing the officers would be trained that they would be

6  looking for cover.

7  Q   What does that mean, to look for cover?

8  A   Cover, cover basically -- there's two types of terms we use.

9  Concealment.  If I jump behind this bench, you would not see me;

10  but, if you had a gun, you could probably shoot through this wood

11  and still hurt me, injure me, kill me.

12        If this was bulletproof, and I got behind it, then it

13  would be considered cover.

14        Basically, cover stops bullets.  Concealment only hides

15  the officer.

16  Q   What are some places -- well, and so an officer who is under

17  fire, talk to me about the tactics, what's his first option, what

18  he's looking for?

19  A   He's looking for cover.

20  Q   What are some things that might offer cover?

21  A   Telephone poles, engine block of a car, a fire hydrant if

22  it's not -- you're not so big.  Ultimately, it could be a large

23  tree.  Any --

24  Q   What's the next option if an officer can't find cover?

25  A   Well, then they're going to be trained one of two ways.  If

1    they're under fire, either they're going to try make themselves a

2    smaller target and actually follow their shots as they're

3    advancing to the perpetrator to stop them from killing them.  Or,

4    depending on what the circumstances are, they may also be taught

5    and have an option to go laterally and move -- it is harder to

6    hit a moving target than it is a stationary target.  And what

7    you're hoping for is that the police officer -- what I'm hoping

8    for -- is that the police officer is more accurate while moving

9    and shooting than the perpetrator who is trying to kill him.

10   Q    So there are two concepts you just a talked about.  One, you

11   said try to make himself smaller.  What does that mean?

12   A    Basically, he's just trying to drop your stature.  It's

13   referred to commonly as the Groucho walk.  So, if you knew how

14   Groucho Marx walked, your gun is up, you are trying to bend those

15   legs, get as much as a stable platform.  And what the police

16   officers are trained to do is to move as quickly as they possibly

17   can but still maintain accurate fire.

18   Q    How important is it for that officer to be moving if he

19   thinks he's under fire?

20   A    It could be the difference between life and death.

21   Q    Now, the rules we've been talking about, the rules we've been

22   talking about regarding the use of force, are they just in one

23   place in this book, in this manual?

24   A    No, ma'am.

25   Q    Are they throughout the manual?

1    A    Yes, ma'am.

2    Q    Can you explain that.

3    A    Well, basically what's going to happen, the POST council

4    arranges that POST manual by blocks of instruction.  The academy

5    director would have the ability to take any one of those blocks

6    of instruction and put it in any particular order.

7    Q    What are some of the blocks of instruction where you're going

8    to get these rules repeated?

9    A    Obviously, firearms is going to be -- they're going to be

10   addressing the legal and moral responsibility of using force.

11           In defensive tactics, in the officer survival section in

12   the defensive tactics section, they're going to be addressing the

13   legally, departmentally, when it's appropriate to use personal

14   weapons, when it's appropriate to use, to escalate to

15   intermediary weapons, nondeadly force.

16   Q    I think you just used a term that you hadn't used before.

17   You used the term personal weapons.  What does that mean?

18   A    Personal weapons is right above communications/verbal dialog

19   and right below intermediate weapons.  And it's exactly what it

20   means.  It's using your hands, your elbows, knees, feet as a

21   means to control resistant or aggressive behavior.  And it could

22   be tripping and pulling and wrestling, but it also could be doing

23   defensive counter strikes as well.

24   Q    So, for a lay person, a personal weapon might mean my

25   personal weapon or my personal knife.  That's not what you mean?

1    A    No, ma'am.  It's nothing to do with weaponry.  What you're

2    sitting here in court, what I'm sitting here in court with, that

3    would be considered my personal weapons.  And it would be my

4    forehead, my elbows, my knees.  And moving in manners that's as

5    they're trained to do in order to control resistant aggressive

6    behavior.

7    Q    You mentioned that officers are taught the use of force

8    during something called legal and moral responsibility.

9    A    Yes.

10   Q    That was a part of firearms training?

11   A    Yes, ma'am.

12   Q    Are you familiar with that section in the POST manual?

13   A    Yes, ma'am.

14   Q    Is that something you teach?

15   A    Yes, ma'am.

16        MS. BERNSTEIN:  I'd like to offer again, as part of POST

17   manual, I'd like to offer pages Firearms 15, 16, and 17 of the

18   POST manual.

19        THE COURT:  Any objection, counsel?

20        MR. HESSLER:  No objection, Your Honor.

21        THE COURT:  All right.  So this is part of Exhibit 101;

22   is that not correct?

23        MS. BERNSTEIN:  Yes, Your Honor.

24        THE COURT:  All right.  So ordered.

25        (Exhibit admitted.)

1           MS. BERNSTEIN:   May I have page 15?

2    BY MS. BERNSTEIN:

3    Q    So what we have on the screen now is part of this POST manual

4    that you gave me; right?

5    A    Yes, ma'am.

6    Q    And this is the outline for this section, this class called

7    Legal and Moral Responsibility; right?

8    A    Yes, ma'am.

9    Q    At the bottom of the page, it says F-Arms 15.  What does that

10   tell us, what does that mean?

11   A    That tells us it's in the Firearms section and it's page 15

12   of that outline.

13   Q    Can you read the goal of that section, of this training?

14   A    Each officer should be aware of the legal restraints

15   regarding the use of deadly force.  The moral responsibility

16   associated with firearms should be explored and thoroughly

17   understood.

18           MS. BERNSTEIN:   May I have page 16, please.

19   BY MS. BERNSTEIN:

20   Q    Says, General Guidelines:   The decision to use force must be

21   based on reasonableness and necessity, not one.

22           Is that what you teach?

23   A    Yes, ma'am.

24   Q    The use of force in any degree must be based on a reasonable

25   judgment that force is necessary under the circumstances.

1              Is that what you've been telling us?

2    A    Yes, ma'am.

3    Q    For example, an officer must always prevent anger from

4    affecting his decision to use force.

5              Is that what you teach?

6    A    Yes, ma'am.

7              MS. BERNSTEIN:  Can I have page 17, please?  Again,

8    zoomed in on the highlighted section.

9    BY MS. BERNSTEIN:

10   Q    I'll read the whole paragraph and then ask you a question

11   about it.

12             Force should be used only when it is reasonable to

13   believe that it is immediately necessary.  There must be an

14   immediate and reasonable need for the force used.  When force in

15   any degree, but particularly deadly force, is used against a

16   suspect, the officer's action will be judged in large part by

17   whether the force was reasonably necessary at the moment of its

18   use.

19             Let me stop there.  Is that all what you've been telling

20   us?

21   A    Yes, ma'am.

22   Q    Now, this last line, we haven't talked about yet.  Force,

23   particularly deadly force, should not be used except as a last

24   resort.

25             Is that something that you teach?

1    A    Yes, ma'am.

2    Q    And that's in this POST manual?

3    A    Yes, ma'am.

4         May I make one comment about that?

5    Q    Yes.

6    A    We talked about using deadly force as a last resort, but that

7    does not mean that you have to start from officer presence and

8    work your way up that a continuum.   In other words, it may be

9    appropriate for the officer, once he perceives that he's in a

10   position where he could be killed or an innocent third party

11   could be killed or seriously injured, that it would be

12   appropriate to go directly to deadly force.

13   Q    And that's an important distinction.   What does it mean then

14   only as a last resort?

15   A    Is that you're evaluating, you did your threat assessment,

16   and there's absolutely nothing else, it has reached that threat

17   to the point where, unless you use deadly force, you or an

18   innocent third party will be killed or seriously injured.

19        MS. BERNSTEIN:   May I approach, Your Honor?

20        THE COURT:   Yes.

21        MS. BERNSTEIN:   For the record, I'm showing the witness

22   Exhibit Q1 of Exhibit 101.

23   BY MS. BERNSTEIN:

24   Q    Do you recognize that?

25   A    Yes, ma'am.

1    Q    What is it?

2    A    It's the Law Enforcement Code of Ethics that's in the

3    appendix inside the POST manual.

4    Q    And is this something that is given to every law enforcement

5    officer?

6    A    Yes, ma'am.

7              MS. BERNSTEIN:  I'd like to offer Q1 into evidence.

8              THE COURT:  Any objection?

9              MR. HESSLER:  No objections, Your Honor.

10             THE COURT:  All right.  Q1 is also a part of Exhibit

11   101; is that correct?

12             MS. BERNSTEIN:  Yes, Your Honor.

13             THE COURT:  So ordered.

14             (Exhibit admitted.)

15             MS. BERNSTEIN:  May I have Q1 up, please.

16   BY MS. BERNSTEIN:

17   Q    You said this is the Law Enforcement Code of Ethics?

18   A    Yes, ma'am.

19   Q    Can you read that for us?  And Steven can zoom in on it, if

20   you'd like.

21   A    As a law enforcement officer, my fundamental duty is to serve

22   mankind; to safeguard lives and property; to prospect the

23   innocent against deception, the weak against the oppression or

24   intimidation, and the peaceful against violence or disorder; and

25   to respect the constitutional rights of all men to liberty,

1   equality and justice.  I will keep my private life unsullied as

2   an example to all; maintain courageous calm in the face of

3   danger, scorn or ridicule; develop self-restraint and be

4   constantly mindful of the welfare of others.  Honest in thought

5   and deed in both my personal and official life.  I will be

6   exemplary in obeying the laws of the land and regulations of my

7   department.  Whenever I see or hear a confidential nature or that

8   is confided to me in my official capacity will be kept ever

9   secret unless revelation is necessary in performance of my duty.

10  I will never act officiously or permit personal feelings,

11  prejudices, animosities or friendships to influence my decisions.

12  With no compromise for crime and with relentless persecution of

13  criminals, I will enforce the law courteously and appropriately

14  without fear or favor, malice or ill will, never employing

15  unnecessary force or violence and never accepting gratuities.  I

16  recognize the badge of my office as a symbol of public faith, and

17  I accept it as a public trust to be held so long as I am true to

18  the ethics of the police service.  I will constantly strive to

19  achieve these objectives and ideals, dedicating myself before God

20  to my chosen profession, law enforcement.

21  Q   Agent Najolia, I asked you when we first got started whether

22  you had ever -- I think I asked you whether you'd ever testified

23  before.  And you've testified as a use of force expert; right?

24  A   Yes, ma'am.

25  Q   Approximately, how many times?

1    A    In excess of 60 times.

2    Q    State court, or federal court?

3    A    In both.

4    Q    You said that you've testified in cases involving officers

5    accused of using excessive force; right?

6    A    Yes, ma'am.

7    Q    In those cases, who have you testified for?

8    A    For the police officer.

9    Q    What percentage of those times that you've testified have you

10   been testifying in defense of a police officer?

11   A    100 percent.

12         MR. DeSALVO:  Your Honor, I object.  It makes no

13   difference that's testifying for the government.  He's here as an

14   expert of general knowledge and teachings.

15         THE COURT:  I think we probably need to rephrase the

16   question, or define the types of cases he's testified in in order

17   for him to give a more clear answer.

18         MS. BERNSTEIN:  I can move on, Your Honor.

19         THE COURT:  Well, I'm sustaining the objection.  I think

20   we need to -- I'll go ahead and strike the question and answer,

21   if you'd like to move on.

22         MS. BERNSTEIN:  Okay.

23         THE COURT:  Okay.  I'll instruct the jury to disregard

24   the last question and the last answer for the reasons that I

25   stated.  I think that it needs to be defined further in order for

1   the answer to have a particular meaning.

2   BY MS. BERNSTEIN:

3   Q   I want to switch gears from the training.  I want to talk to

4   you about Hurricane Katrina.

5        Where were you when the storm hit?

6   A   In Jefferson Parish.  When Katrina made landfall, we were

7   assigned for security in the Jefferson Parish Correctional

8   Center.

9   Q   You said the Jefferson Parish is just over the bridge from

10  New Orleans?

11  A   Yes, ma'am.

12  Q   Did you come in to New Orleans at all to help out?

13  A   On one incident I was involved in.

14  Q   What did you come to New Orleans for?

15  A   On it was I think the Thursday -- Katrina hit on a Monday.

16  Thursday afternoon, I received a telephone call from Sheriff

17  Harry Lee, who was the sheriff at the time.  And he asked that we

18  -- that we provide as many guns and ammo and magazines that we

19  could to the New Orleans Police Department because they were

20  requesting assistance for equipment.

21  Q   What kind of guns -- did you all bring some guns in for NOPD?

22  A   Yes, ma'am, we did.

23  Q   When I say you all, who were you with, what group?

24  A   I was the commander of the SWAT team at that time.

25  Q   So this was, you'd come in with your some of your SWAT guys?

1    A    Yes, ma'am.

2    Q    What kind of guns did you bring in for NOPD?

3    A    It was handguns, a Beretta 92F 9 millimeter.  That was our

4    duty weapons at the time.

5    Q    He you all brought in 9 millimeters to be handed out to NOPD

6    officers?

7    A    Yes, ma'am.

8    Q    Did you see anybody handing out long guns to NOPD officers?

9    A    No, ma'am.

10   Q    You said you came in to New Orleans on this one occasion.

11   For most of that time after the storm, where were you?

12   A    Within Jefferson Parish.

13   Q    Did Jefferson Parish flood?

14   A    Yes.  In parts.

15   Q    What were the conditions like?

16   A    It was terrible.

17   Q    Tell us about it.

18          MR. MECHE:  Your Honor, I'd object to the relevancy of

19   this.

20          THE COURT:  I think we had some pretrial motion practice

21   with regard to this, and the Court ruled on general Katrina

22   anecdotal type evidence.  So I'm going sustain.

23          MS. BERNSTEIN:  May we approach on this?

24          THE COURT:  If it's to talk about what I said what I

25   ruled on a few months before trial, then I'd rather not.

1          MS. BERNSTEIN:  Your Honor, I believe there's been a ton

2  of testimony in this trial -- and, first of all, I think the

3  ruling --

4          THE COURT:  Ms. Bernstein, are you arguing a motion that

5  I ruled on three weeks ago?

6          MS. BERNSTEIN:  No, Your Honor.  I wanted to tell you my

7  understanding of the motion with respect to a particular witness

8  with regard to what he personally experienced.

9          THE COURT:  But you're asking him about the entirety of

10  the parish, though.  That's what the question was.  And, if we

11  sat here and admitted evidence about the entirety of the Orleans

12  Parish -- which, by the way, was the subject of an objection by

13  the government -- we would be here a mightily long time.  So I

14  don't think that, even though the witness may have a lot of

15  knowledge about the state of Jefferson Parish, we've not even

16  allowed evidence of the entirety of the state of Orleans Parish,

17  so I'd rather not expand the relation of my ruling to other

18  parishes.  Let's stick on the straight and narrow.

19          And you're correct, that I did rule about personal

20  experiences of witnesses in so far as where they were at the

21  time.  And that's why the questions you asked a few minutes ago

22  were appropriate, about when he came into the parish, what he was

23  doing at the time, where he was stationed.  Those were

24  appropriate.  But I think the last question related to,

25  parish-wide, what the state of affairs were.

1        MS. BERNSTEIN:  Yes, Your Honor.  Let me clarify my

2   question.

3   BY MS. BERNSTEIN:

4   Q   Let me focus on your personal experience during Hurricane

5   Katrina.  Did you work law enforcement during the weeks after the

6   storm?

7   A   Yes, ma'am.

8   Q   Is that with your SWAT team?

9   A   Yes, ma'am.

10  Q   What was that like for you?

11  A   It was the most horrific thing I've experienced in my life.

12  And, I have no military experience, just the police experience.

13  Q   So that's in 35 years of law enforcement?

14  A   Yes, ma'am.  Approximately.

15  Q   Had you been trained for a situation like Katrina?

16  A   No, ma'am.

17  Q   What did you have to rely on in that -- I think you said

18  horrific -- in that horrific situation?

19  A   Basically, common sense and the training that we had received

20  up to that point.  And just the reasonableness of your action.

21  You had to do what you thought was the best at that moment in

22  time.

23  Q   And you say you had to rely on reasonableness and logic and

24  training.  How important was your training?

25  A   Extremely important.

1  Q    How many times during that post-Katrina period were you

2  personally terrified?

3  A    Many times.

4  Q    All right.  So let me ask you to think of, whatever harrowing

5  experiences you had during Katrina, focus on the one that was

6  most harrowing for you.  Do you have one in mind?

7  A    Yes, ma'am.

8  Q    Tell us about that.

9  A    It was a Thursday afternoon.  I receive a phone call from

10  Sheriff Lee, who basically informed me that the Oakwood Shopping

11  Center, which was on the west bank of Jefferson Parish near the

12  Orleans Parish line, that there was a group of individuals that

13  had came across the CCC and had actually began going into the

14  stores, looting.  And what troubled him was we had the Second

15  District police station, which was in Oakwood Shopping Center.

16  And there was a group of individuals -- it was staffed, and

17  individuals was trying to make entry into the police station.

18  Q    You said there were some people there in the mall, in the

19  shopping center.  Are we just talking about a couple of civilians

20  who were storming that mall?

21  A    It was probably a couple hundred.

22  Q    Were you in the mall at the time?

23  A    No, ma'am.  I was actually at our location where the SWAT was

24  running out, which was the training academy building.

25           I received a telephone call from the sheriff.

1   Communications was completely gone.  We had one radio frequency

2   among all of the sheriff and police agencies within the

3   metropolitan area.  And phones were working intermittently.

4   Q   So you said you got a call from the sheriff, and what was

5   that for -- let me ask you first, how many -- you were commanding

6   SWAT after the storm; correct?

7   A   Yes, ma'am.

8   Q   How many SWAT officers were you in charge of?

9   A   We had 30, 30 SWAT operators at that moment in time.  As we

10  got more help, ultimately, I had 80 SWAT officers under my

11  command.

12  Q   So you get this call from the sheriff.  There are -- you said

13  hundreds of civilians storming the mall?

14  A   Yes, ma'am.

15  Q   And what happened?

16  A   Ultimately, what the sheriff wanted me to know was that he

17  was sending over a helicopter, and wanted me to dispatch SWAT

18  operators to that location.  There were many other policemen that

19  were heading in that direction.

20          Within seconds after the phone call, we actually got a

21  helicopter -- it wasn't our helicopter.  Our helicopter was small

22  at the time.  So we were able to put a couple of SWAT operators,

23  marksmen, in the helicopter for aerial protection.

24  Q   Did you send some of your guys?

25          MR. MECHE:  Excuse me.  I object to relevance.  I don't

1     know that what at the Oakwood mall in Gretna has any relevance to

2     the subject matter.

3             MS. BERNSTEIN:  I'm going to ask him just his personal

4     experience in a minute.  That's just right now.

5             THE COURT:  I'm going to go ahead and let him answer

6     this.

7     BY MS. BERNSTEIN:

8     Q   Did you did put your guys in that helicopter?

9     A   Yes, ma'am.

10    Q   Were you scared for them?

11    A   Yes, ma'am.

12    Q   How concerned were you?

13    A   Well, certainly, there was a few things that went through my

14    mind.

15            MR. LONDON:  Objection, Your Honor.  May we approach for

16    a minute?

17            THE COURT:  Yes, I think it's time.

18            (Sidebar conference.  Jury not present.)

19            MS. BERNSTEIN:  I have one more question for him.  And I

20    think it's highly relevant.

21            THE COURT:  You're going to have to explain how it's

22    relevant, because it's apples and oranges.

23            MR. LONDON:  May I voice my objection?

24            THE COURT:  Go ahead.

25            MR. LONDON:  We know where she's going.  She's going to

1    ask and how many people did you kill.  Yeah, you are.  And, by

2    extrapolation, you're going to say we're acting in bad faith.

3          MS. BERNSTEIN:  That's not where I'm going.  And I'm

4    about to ask him something extraordinarily relevant.  He's about

5    to testify, when he put his guy in the helicopter, he grabbed

6    them and he looked at them, and he said:  You remember you fire

7    in defense of life.

8          And he's going to talk about -- and the last question is

9    he's going to talk about how important the training is in that

10   kind of situation.  It's extremely relevant.

11         Your Honor, during all of this, we listened to literally

12   hours of Katrina stuff.  About old women floating by on

13   mattresses.  And, you're right, that at some point I did object

14   to some Katrina stuff, and it was overruled.

15         THE COURT:  No.  There was a footnote, there was a

16   footnote in an order that said anecdotal Katrina stories, no

17   matter how interesting, will not be permitted.  The idea being

18   that we could listen for days of what was going on elsewhere in

19   the city; but, if it didn't pertain to what the five defendants

20   or a witness such as Mr. Madison this morning or somebody of the

21   other witnesses, particularly the police officer witnesses, if it

22   didn't pertain to them, then, if it was a meeting that the police

23   officers had at the casino that nobody knew about, then it wasn't

24   relevant.

25         MS. BERNSTEIN:  And I totally agree with that.

1     Let me explain, this witness is -- not only is he

2 explaining about his personal experience, this is an expert

3 witness who can use hypotheticals to illustrate his teaching.

4 What he's doing right now -- and I've got just a couple questions

5 left --

6          THE COURT:  But I think it's transcended hypotheticals.

7          MS. BERNSTEIN:  Which is even more --

8          MR. LONDON:  We're in his life, real life.

9          MS. BERNSTEIN:  I'm going to have him talk about what he

10 said to that officer and ask him why that was so important.  And

11 then move on.  And I think that's -- it's such a fair question.

12 And it has nothing to do with what the question I was going to

13 ask.

14          MR. LONDON:  He's testifying as a fact witness, not an

15 expert.  He's here to give an opinion as to what he taught and

16 not what he did in this situation.

17          MS. BERNSTEIN:  Your Honor, this is noticed as an -- a

18 fact witness can always testify as a fact witness.  Because

19 somebody noticed as an expert does not mean he's not allowed to

20 talk about the facts.

21          THE COURT:  I agree with that.

22          And I think the only fair question out of what you've

23 told me is to simply ask him -- and this is one question -- to

24 simply ask him did he instruct officers to follow their -- to

25 employ their training.

```
 1              MS. BERNSTEIN:  Yes.

 2              THE COURT:  Something about that.

 3              MS. BERNSTEIN:  My question is going to be:  What did

 4    you say to that officer before you put him on the helicopter,

 5    which is exactly that.

 6              MR. HESSLER:  That just has nothing to do --

 7              MR. FLEMING:  We can call a bunch of officers in to talk

 8    about their experience that has nothing to do with that.  We'd

 9    like that opportunity.

10              MS. BERNSTEIN:  That is such an unfair characterization.

11    Because he is a -- he is the use of force trainer.  He is giving

12    his expert opinion about the importance of the rules in this kind

13    of situation.  This whole case, the whole defense case has been

14    about Katrina and what -- you know, the chaos of Katrina.  All

15    he's doing is he's saying he was there and this is the rule.  And

16    this is what he said to his guys.

17              MR. HESSLER:  And that's been hammered through what the

18    rule is, and now you want to use his personal experience and his

19    little coaching, his hurrah-here-we-go speech.

20              MS. BERNSTEIN:  It's not a speech.

21              MR. HESSLER:  Well, sure it is.

22              MS. BERNSTEIN:  It's just to illustrate the rules that

23    he's talking about.

24              MR. HESSLER:  We know what the rule is, he's told what

25    they are trained.
```

1          MR. MECHE:  Judge, I'm afraid what this might do is open

2     the door for us.  There's five or six justifiable shootings a

3     year, and I think this would open the door for us to call those

4     witnesses and say what did you experience, what were the

5     circumstances like, was your shooting found to be justified.  And

6     we can go on for weeks doing that if she opens the door to this

7     kind of stuff.

8          MS. BERNSTEIN:  This absolutely does not open the door

9     to all that.  Although, I would put on the record that I would be

10    fine talking about other NOPD shootings after the storm.  But I

11    realize that is not the issue.

12         With him -- I mean, as Your Honor, you said -- I

13    understand their objection, and I don't plan to go there.  I'm

14    going to ask this man what he said to his guy and about whether

15    the rules are the same.

16         THE COURT:  Here's the question I'm going to allow you

17    to ask, this and only this:  Did you expect them to follow the

18    training that they were given when they were sent on that

19    particular incident.

20         MS. BERNSTEIN:  So I can't ask the question you said a

21    minute ago, which is:  What did you tell them?

22         THE COURT:  No.  I think it's going to open the door --

23    I'm really not -- I'm somewhat regretful that we got into this

24    whole incident of the Oakwood Shopping Center because I think it

25    borderline falls into the category of my footnote in the pretrial

1    ruling.  We're into it now.

2           I think you can ask him:  When you sent the officers to

3    the Oakwood Shopping Center, did you expect them to follow the

4    training principles that we've talked about here today.

5           MS. BERNSTEIN:  May I ask if he instructed them to?  I'm

6    just asking.  Just trying to understand the ruling.  I'm not

7    arguing.

8           THE COURT:  I think you can ask if he expected that.  I

9    mean, we don't have -- you're trying to draw an analogy.

10          And, in this case, we don't have -- the person that you

11   have in charge is a person that you've reached a Plea Agreement

12   with.  Who the defendants can't call to say that Officer Bowen

13   instructed them to follow police procedures.

14          So let's just ask him the question as I said.

15          Is that going to be it on direct, or do we have further

16   to go?

17          MS. BERNSTEIN:  I have a couple to go, like three

18   questions.

19          MR. HESSLER:  Are we going to break after that?

20          THE COURT:  Yes.

21          (Sidebar conference concluded.  Jury now present.)

22   BY MS. BERNSTEIN:

23   Q   Major Najolia, before we broke, you were talking about

24   putting two of your SWAT guys on that helicopter.  When you put

25   your guys on that helicopter, did you expect them to follow these

```
 1   use of force rules that we've just been talking about?

 2   A    Absolutely.

 3   Q    Did the use of force rules that we've been talking about

 4   change during Hurricane Katrina?

 5   A    No, ma'am.

 6   Q    Do they ever change?

 7   A    No, ma'am.

 8   Q    How important are they in a time of crisis?

 9   A    Extremely important.

10          MS. BERNSTEIN:  Nothing further, Your Honor.

11          THE COURT:  We'll take a very short restroom break, I

12   would say 10 minutes.  If you're ready to go sooner, we'll be

13   ready to go sooner.  But we do want to try to knock off a little

14   bit early, and we have the cross examinations to go, so let's do

15   the best we can.

16          Sir, if you could be up here in ten minutes, we'd

17   appreciate it.

18          (Proceedings in recess.)

19          THE COURT:  You may be seated.

20          Mr. Najolia, you are still under oath.  We're going to

21   go ahead and start with cross examination.

22          Mr. Meche, you're at the podium, so I assume you are

23   going to start.

24                      CROSS EXAMINATION

25   BY MR. MECHE:
```

1    Q   Good afternoon, Mr. Najolia.  Good see you again.  For the

2    record, my name is Timothy Meche, I represent Officer Anthony

3    Villavaso.

4         I don't know if you recall, but I had occasion to

5    consultant with you a few years ago in a case involving two

6    sheriff deputies from Terrebonne Parish who shot and killed an

7    unarmed drug dealing suspect who was trying to flee in a car.  Do

8    you remember that?

9    A   Briefly, yes.

10   Q   And I think you were hired by the sheriff's department to

11   evaluate that incident and render an opinion and assist the

12   sheriff's department in defending the civil lawsuit.

13   A   Yes, sir.

14   Q   I think you actually gave a deposition in that case.

15   A   I don't recall but --

16   Q   The attorney was Bill Dodd in Houma?

17   A   Yes, sir.

18   Q   And, in that case, two sheriff deputies in Houma were doing

19   an undercover drug operation at a gas station, and some suspect

20   allegedly sold drugs; and, when the sheriff's deputies tried to

21   arrest him, he got in his car and started speeding away.  And the

22   sheriff's deputies perceived that he would be a threat to

23   somebody, not just themselves but the general public, and they

24   shot and killed the suspect.  And you may recall that the suspect

25   was not armed with a gun, nor did the sheriff deputies perceive

1  that he had a gun.  And I believe your agreement that it was a

2  justifiable shooting, was that you found that the car was a 3,000

3  pound weapon, and the suspect could have used it to cause a

4  traffic accident which would have caused somebody in the public

5  to die or receive great bodily harm.  Do you remember that?

6  A   As I recall, I think it was one of the undercover agents from

7  Terrebonne Sheriff's Office that was in front of the vehicle.

8  Q   Right.

9  A   And you had a couple of agents as they approached -- I think

10  it was a buy/bust hand-to-hand situation.  And, as the

11  perpetrator accelerated forward, it was my understanding that the

12  officers fired based on the fact that they feared for the safety

13  of the officer who was standing in front.

14  Q   Exactly.

15      And another one of your concerns -- and you educated me

16  on this -- was the situation could have evolved into a high speed

17  chase.  And you indicated that there was an evolving concern

18  amongst law enforcement to prevent high speed chases.

19      MS. BERNSTEIN:  I'm going to object to the form of this

20  interaction.  I don't know if we're just sort of reminiscing

21  about the prior case.  I have no objection to ask a question

22  based on facts that might be drawn from that case.  But this

23  sounds like just sort reminding each other about what happened in

24  another case.

25      THE COURT:  Well, I think -- I understand the objection,

1    and I want to get to the question.  So, if you want to cite him

2    to prior work that he's done or couch it in terms of a

3    hypothetical, I think that would be fair enough.  But I think

4    we're kind of getting into the particulars of a prior case.  Now,

5    he has been qualified as an expert, and it does relate to some

6    work that he has previously done as an expert in that field.  So

7    see if we can kind of tailor the questions to be a little shorter

8    and let's get some answers from him.

9    BY MR. MECHE:

10   Q    The high speed chase was a concern of yours; do you recall

11   that?

12   A    As I recall, the officers fired in defense of the agent who

13   was standing in front of the vehicle because they feared for her

14   safety that the perpetrator would run into her.  They fired, and

15   I think they struck the perpetrator, and the vehicle came to

16   rest.

17   Q    Now, Ms. Bernstein asked you a number of questions about when

18   it is justified in use force and when it is not.  And many of her

19   questions suggested that it's when someone points a gun at an

20   officer.  Is that correct?

21   A    Yes.

22   Q    But, in this case, there was not even a perception that the

23   suspect had a gun.  Do you remember?

24   A    That's correct.

25   Q    So it's not only when someone points a gun at you; there are

1  many other incidents which could cause a threat of death or great

2  bodily arm?

3  A   Sure.

4  Q   And, in those circumstances, the officer's justified in using

5  deadly force?

6  A   The officer would be justified in using deadly force when he

7  perceives, when he makes his mind up that deadly force has to be

8  used to protect life or to prevent serious bodily injury.

9  Q   And Ms. Bernstein asked you about shooting first and asking

10  questions later.  You're not suggesting to me and the jury that,

11  if an officer perceives someone is pointing a gun at them and

12  about to shoot, he's supposed to say:  Excuse me, sir, are you

13  going shoot me, before he shoots?

14  A   No, sir, I'm not suggesting that.

15  Q   In fact, under that circumstance, not only is the officer

16  allowed to shoot first but ask questions later, but he's required

17  to?

18  A   He's required to use that level of force in defense of life,

19  yes, sir.

20  Q   And in another situation you testified about, if a criminal

21  was pointing a gun at a lady's head and the officer perceives

22  that he's about to shoot her, the officer's not required to say:

23  Excuse me, sir, are you going to shoot this lady, before he uses

24  deadly force?

25  A   Yes, sir, that's correct.

1   Q   So that's another situation where an officer is not only

2   allowed but required to shoot first and ask questions later?

3   A   But, according to training, the officer would still be going

4   through the PEDA principle, perceiving that particular action,

5   making an evaluation/threat assessment, determining that it's a

6   lethal force encounter and acting.  Although it's immediate, it's

7   a quick, quick response, I still stand on fact that he should go

8   through that perception-evaluation- decision-action principle.

9   Q   In a perfect world, it would be great if the criminal would

10  wait until the officer asked him a question and he would answer;

11  wouldn't it?

12  A   Yes, sir.

13  Q   But, in the real world, does it always work that way?

14  A   No, sir, not always.

15  Q   So, in fact, there are many situations where an officer can

16  shoot first and ask questions later?

17  A   As long as the officer's going through the PEDA principle,

18  based on the fact that he is firing, at the moment in time he

19  makes that decision to use deadly force then to stop that

20  individual from killing someone, yes, it would be appropriate.

21  Q   So the answer is yes?

22  A   Yes.

23  Q   Okay.  Now, you spoke a lot in terms of what the officer

24  perceives the threat to be.  And I thought that was very

25  interesting.  When you educated me on this many years ago, you

1    didn't talk about what the threat actually is or was.  Why did

2    you make that distinction?

3    A    Based on the guidelines that the courts have provided for

4    police officers, it's been very clear to us the training and

5    policies that say that the officer makes his decision and it can

6    be reasonable based on his perception of danger at that moment in

7    time.  So we don't expect the officer, unless the officer had a

8    crystal ball where he could see into the future, where he would

9    know that this was a toy gun, then he could be held accountable

10   for firing at the individual who held a toy gun.  Unfortunately,

11   police officers don't have that crystal ball.  So what they have

12   to reply upon is, when they go through that perception, they

13   actually are identifying, recognizing, whatever actions the

14   perpetrator is doing, they make that threat assessment, and

15   either it's going to be a deadly force decision or nondeadly

16   force decision, and then they're going to decide to act.  They're

17   taught to fire, to use deadly force to defend life or prevent

18   serious bodily injury.

19   Q    So it's not exactly what the officer -- what the threat is;

20   it's what the officer perceives the threat to be?

21   A    Yes, sir.

22   Q    And that's based on, I think you said, the totality of the

23   circumstances?

24   A    Yes, sir.

25   Q    So can I sum up this whole area -- and I don't know if you'd

1    call it a science or an art or a subject -- but, just to sum it

2    up, can I just say it in two words, it depends?

3    A    I would have to include some words on it depends.

4    Q    It depends on the totality of the circumstances?

5    A    The officer's perception of the circumstances, yes.

6    Q    And you take everything into account.  No one thing controls

7    but no one thing is excluded.

8    A    That's correct.

9    Q    Ms. Bernstein asked you if an officer can rely on another

10   officer's perception.

11   A    Yes.

12   Q    And you said no.  But isn't that a relevant factor that he

13   should consider?

14   A    He can't fire, in my opinion, unless he identifies the fact

15   that he is perceiving whatever danger.  So that officer has to,

16   in my opinion, identify, do that threat assessment.  Once that

17   threat assessment reaches that he's firing in defense of life,

18   then it would be appropriate.

19   Q    But in his mind -- and you said this happens in a split

20   second.  I mean, he's under a lot of stress.  There's probably

21   nothing else in the life experience that's compared to this kind

22   of circumstance; okay?

23            In his mind, when he's forming that perception in the

24   split second, is he allowed to at least consider as one of the

25   relevant totality factors the perception of another officer who

1   communicates to him what his perception is?

2   A   I think -- we're looking at totality of circumstances?

3   Q   Yeah.

4   A   And certainly it would be an option.  But I still don't

5   believe that the officer has the right unless he perceives.

6   Unless he perceives.

7   Q   But that's not my question, though.  I mean, should he

8   exclude the other officer's perception from wherever he's forming

9   his perception?

10   A   I don't think we're excluding, I think we're looking at all

11   the circumstance.  But the officer still has to come up with a

12   threat assessment which equals deadly force or nondeadly force.

13   Q   But that is a relevant factor?

14   A   It is a factor.

15   Q   It's relevant.  It's a relevant factor.  It either is or

16   isn't.

17   A   I think the officer is looking at the totality of

18   circumstances, absolutely.  But the officer still has to make

19   that decision based on his own perception.

20   Q   Sure.

21        All right.  Now, once an officer perceives there to be a

22   threat to life or great bodily harm, does it just have to be a

23   threat to his life, or in fact does he also consider the threat

24   to the citizenry at large?

25        Isn't an officer's obligation to the citizenry more of

 1    his responsibility than his own?

 2    A    Yes; but I think when he uses deadly force, he is basing it

 3    on at the moment in time he makes the decision, is he firing to

 4    protect life or prevent serious bodily injury.  So if he's doing

 5    it for whatever those reasons are then it would be appropriate.

 6    Q    And it's not just his life.  In fact, the thing Ms. Bernstein

 7    showed you on the board said his duty is to protect the public?

 8    You don't deny that an officer's duty is to protect not just

 9    himself but the public also?

10    A    Sure.

11    Q    Yeah, obviously.

12         All right.  Now, once an officer perceives there to be a

13    threat, and I recall discussing with you an old western movie

14    where the sheriff shot the gun out of the bad guy's hand.  And is

15    that proper?

16    A    No, sir.

17    Q    In fact, once you perceive there's a threat, what are you

18    supposed to do?

19    A    You fire until the threat stops.

20    Q    Are you supposed to try to shoot the guy in the leg to wound

21    him?

22    A    No, sir.

23    Q    In fact, at the academy, you teach them to shoot where?

24    A    Center mass.

25    Q    Why?

1  A   Because it's the quickest way to incapacitate an individual

2  so you're protecting life.

3  Q   So you're really shooting to kill them or disable them?

4  A   To stop them.

5  Q   So you're not shooting to wound them?

6  A   (Witness shakes head.)

7  Q   So you're not shooting to scare him, over his head.

8        In fact, are officers allowed to shoot warning shots?

9  A   Depending on departmental policy, some policies change.

10  Generally, it's not authorized to fire warning shots.

11  Q   You either are shooting to stop the threat or you're not.

12  And, if you're shooting to stop the threat you're shooting to

13  kill?

14  A   You're shooting to stop.

15  Q   And are you limited in the amount of number of times you're

16  supposed to shoot?

17  A   Officers are trained to fire until they perceive the threat

18  has stopped.

19        MR. MECHE:  Thank you, sir.

20                    CROSS EXAMINATION

21  BY MR. HESSLER:

22  Q   Good afternoon, Major.  We know each other?

23  A   Yes, sir.

24  Q   I'm representing Sergeant Robert Gisevius.

25        Major, is it safe to say that you literally wrote the

1    book on the POST's use of force?

2    A    Yes, sir.

3    Q    And I know it's very comprehensive and well written.

4         Is it feasible or possible for us to cover every

5    scenario that a police officer could ever envision himself in?

6    A    No, sir.

7    Q    It's just guidelines.  And guidelines I guess coupled with

8    the law and the experience and the practical applications of

9    police work; would you agree with that?

10   A    Yes, sir.

11   Q    And even that can't cover every situation a police officer

12   may encounter; would you agree with that?

13   A    Yes, sir.

14   Q    Now, you talked about training.  And training essentially is

15   -- and please correct me if I'm wrong, if I got your words wrong

16   -- that the basic rule is the police officer must use reasonable

17   force when apparently necessary to achieve a legitimate goal?

18   A    Yes, sir.

19   Q    And reasonable force can be and is dictated by the

20   circumstances and facts that that police officer is facing at

21   that time?

22   A    Yes, sir.

23   Q    And those change.  You can walk into one room and face a

24   deadly threat, walk into the next room and face something

25   similar, and it might not be a deadly threat?

1    A    Yes, sir.

2    Q    It just depends on how things change over the period, at the

3    time he perceives; right?

4    A    The officer's perception to danger, yes.

5    Q    And the perception is based on the objective reasonableness

6    of that individual police officer?

7    A    That's correct.  And his perception is the totality of all of

8    the circumstances.

9    Q    Right.  And the deadly force, of course, can only be used to

10   protect the life of a police officer and that of other officers

11   or citizens that may be in the area?

12   A    Yes, sir.

13   Q    Now, this use of force continuum is, from the low end, the

14   appearance of a police officer.  He might come on the scene and a

15   fight might end just because, oh, God, the cops are here, cut it

16   out; right?

17   A    Yes.

18   Q    Sometimes that works?

19   A    Yes, sir.

20   Q    If it doesn't work, cop might say:  Stop fighting.  That

21   might work?

22   A    Yes, sir.

23   Q    Might not.

24   A    Yes, sir.

25   Q    And it might be, he can go to stop fighting, go to an

 1    intermediate level, use a baton, mace, that might not work?

 2    A    Yes, sir.

 3    Q    It might that be that police officer finds himself in the

 4    fight for his life and ends up shooting somebody; right?

 5    A    Yes, sir.

 6    Q    Have you ever testified in defense of a police officer who

 7    shot and killed a person who was unarmed?

 8    A    Yes, sir.

 9    Q    In defense of a person who shot and killed an unarmed person?

10    A    Yes, sir.

11    Q    So Ms. Bernstein been up here saying you might have to point

12    the gun, drop the gun, do all this stuff.  It can be justified

13    when a police officer shoots an unarmed person?

14    A    As long as he perceives that that individual was placing him

15    in danger of being killed, or an innocent third party.

16    Q    Or someone else.

17    A    (Witness nods head.)

18    Q    And that perception is based on a whole lot of the different

19    things, as we say.

20                    Ms. Bernstein went through -- I don't know if

21    there's enough bank robbers or banks in this city to go through

22    all the scenarios that she went through when he can and can't

23    shoot, but there was a couple I want to hit on.

24         If a bank robber comes out and he's running, you have

25    information he's armed, and he's reaching into his pocket,

1    looking at you, running toward you, reaching into his pocket, do

2    you have to wait for him to draw a gun and fire at you?  Or draw

3    a gun and even point it at all?

4    A    No.  Based on what the officers perceives, what we're trying

5    to train the officers to recognize is the fact that, if they

6    believe an individual is reaching into their waistband, that

7    pocket, and is going to produce a weapon, if you wait until the

8    weapon is pointed at you and the individual is firing at you,

9    you're dead, based on the action versus reaction principle.  It's

10   always quicker to act than it is to react to a threat.

11   Q    And, Major -- and, again, correct me if I'm wrong -- not only

12   have you testified in cases, you've also studied cases in your

13   art, your science, your subject?

14   A    Yes, sir.

15   Q    And would it be fairly accurate or even most accurate to say

16   that most police officers who shoot unarmed people perceive that

17   person to be armed?

18   A    Yes.

19   Q    And later learned that, oops, he wasn't armed.  Is that

20   accurate?

21   A    Yes.

22   Q    And those types of incidences can be justified if that

23   officer can lay the foundation and the groundwork of why his

24   perception was objectively reasonable?

25   A    Right.  And what you're basing it on is that officer's

1   description of the actions and the movements and everything that

2   was going on that led him to believe that -- made him think that,

3   you know, caused him to believe that that individual was reaching

4   for a gun.

5   Q   Let's say, Major, you respond to a bank robbery; and, as

6   you're approaching, the bank robber's coming out with that little

7   old lady that had the gun to her head earlier, and her head's

8   here, and you can't see his hands, and he's walking up to you,

9   and he's got his head poked out where you can take a shot at him,

10  and he says" I'm walk by you or I'm going to shoot her in the

11  head and kill her, about what time are you going to pull your

12  weapon out and shoot me?

13  A   As soon as I believe that he's going to kill anyone.

14  Q   Without seeing -- without seeing what's in my hand; right?

15  A   Yes.  I would think that would be an appropriate time to use

16  deadly force.

17  Q   And if you're doing it, and then you say this is close

18  enough, he's going to kill this lady, and you shoot me, and I

19  fall to the ground and a pen comes out of my hand, that's just

20  unfortunately for me?

21  A   Based on your actions, I think it would be objectively

22  reasonable for me to believe that that would be a deathly threat

23  to the hostage.

24  Q   And part of your perception would be the information you got

25  on the radio call; right?

1   A    You want every part.  What leads you, what brings you there,

2   what you observe once you get there, all of the factors.

3   Q    If you see people running out of the bank, you're going to

4   believe, oh, well, this call is possibly legitimate, probably

5   legitimate?

6   A    Sure.

7   Q    And you said you can base your perception based on the

8   actions of other police officers; right?

9   A    Yes.  You can't use force based on the fact that you're using

10  another police officer's perception.  You have to use your own.

11  Q    But, if you came on the scene as a police officer, and you

12  saw 15 cops taking cover and hiding behind barriers and looking

13  like this, you're not going to just walk out there until you get

14  a different perception; right?

15  A    That's correct.

16  Q    If you hear gunfire, as a police officer, and you see a

17  policeman on his hands and knees with his hands over his head

18  cowering on the ground, are you going to -- is your perception

19  going to be that that police officer believes his life is in

20  danger?

21  A    That's possible.

22  Q    It's going to be a whole bunch of other things?

23  A    It could be a lot of factors.

24  Q    I want to add some things to it.  You know you're going to a

25  scene where your perception is, you're knowledge or your belief

```
 1   is that two police officers have already been shot, armed
 2   perpetrator is on the scene.  Would that convince you that maybe
 3   this police officer is in fear for his life?
 4   A   Sure.
 5   Q   Would that cause you to be, since you're on the scene and
 6   you're a police officer, to be in fear for your life?
 7   A   It would certainly elevate my -- the danger levels.
 8   Q   Now, we talked about warnings and verbal warnings or oral
 9   warnings or commands.  And you say when it's feasible; correct?
10   A   Yes, sir.
11   Q   And usually, a lot of times, a warning, a verbal command or a
12   warning, is to announce your presence?
13   A   (Witness nods head.)
14   Q   Even if it's a fight:  Police?
15   A   (Witness nods head.)
16   Q   That might stop the fight?
17   A   Yes.
18   Q   If you're somehow injected into the midst of what you believe
19   to be a gun battle, is it feasible to announce your presence?
20   A   No.
21   Q   And, actually, that's probably more dangerous; wouldn't it
22   be?
23   A   If you announced yourself?
24   Q   Yes.
25   A   Yes.  It could be, Yes.
```

1  Q    Now, you said -- Ms. Bernstein asked you a question:  How

2  tough is police work.  And I've got exactly what you just said,

3  how tough it was.  But it's -- how tough did you say it was?

4  A    Extremely tough.

5  Q    Extremely tough.

6        That's on a good day; right?

7  A    Yes.

8  Q    And then you add to that the situation that develops the need

9  for a use of force, that makes a good bad day even worse; doesn't

10 it?

11 A    Yes, sir.

12 Q    Now, in your study of the use of force, have you studied the

13 stressors that effect police officers' use of force decisions?

14 A    Sure.

15 Q    And we can't allow police officers to use anger and emotion

16 to base the use of force, we'd all agree on that; right?

17 A    Yes, sir.

18 Q    Does the physical condition, does that tend to impact their

19 decision of use of force?

20 A    You're talking about the physical conditions of the officer?

21 Q    Of the police officer himself.

22 A    Sure.

23 Q    Mental condition?

24 A    Sure.

25 Q    But it's always got to be reasonable and necessary?

1   A   Yes, sir.

2   Q   But that physical and mental condition certainly can affect a

3   person's judgment on what is reasonable and necessary; would you

4   agree with that?

5   A   It's absolutely human factors.

6   Q   Now, do you know what the NOPD's regulation is on firing

7   warning shots?

8   A   Yes, sir.

9   Q   What is that?

10  A   It is not authorized to fire warning shots.

11  Q   Does Jefferson Parish allow it?

12  A   Yes.  The rule is, generally, we do not fire warning shots.

13  Q   Okay.  But your officers know that there might be an

14  exception to that rule?

15  A   Absolutely.

16  Q   And you know the rule in New Orleans is no warning shots, no

17  exceptions?

18  A   That's correct.

19  Q   And we talked about this PEDA principle.  That's perception,

20  evaluations, decision and action; right?

21  A   Yes, sir.

22  Q   And, you know, I mean, you can sit here, it takes oftentimes

23  to say it longer than it does to do it; right?

24  A   Yes.

25  Q   You might having to go through the entire PEDA principle, if

1    I stand here and pick up this lady's keys and poke you in the eye

2    with it, you've got to make that decision before I can do so;

3    right?

4    A    Yes.

5    Q    So it's not this nice little thing that you can sit in your

6    car and drive to a scene and start writing it out and saying I'm

7    going to perceive it and I'm going to have to evaluate it and

8    make a decision and I'm going to have to take some action.  You

9    might not even know that you're going to have to do that save

10   your life or somebody else's life.  It might even be a nano

11   second, as you said before, before you figure that one out;

12   right?

13   A    That's correct.  Although, it's fast, but officers are

14   trained to do it.

15   Q    How do you train them to do all that, when they don't even

16   know what's coming up and don't even know what the facts and

17   circumstances might be?  How do you do that?

18   A    Well, we put them into classroom scenarios, discussions.

19   Actually put them into a classroom environment where they're

20   using videos to watch the exchange of various actions that

21   resemble, you know, deadly force and nondeadly force situations.

22        Ultimately, we have a shooting computer that we use.

23   It's an integrated force thing where they can either use, you

24   know, deadly or nondeadly, they have to make decisions.

25        And, ultimately, the final phase is when we put live

1    aggressors in safety gear.  And we actually put those aggressors,

2    they're scripted into doing specific things to the police officer

3    or police recruit or inservice officer, and physically put them

4    into situations where they're going through that decision

5    process.

6    Q    Okay.  And, certainly, for obvious reasons, these officers

7    are not subjected to real life or death situations; right?

8    A    No.  There's no way in training that you're going to

9    duplicate a life and death situation on the street.

10   Q    So, if their perception is wrong, then that leads to a wrong

11   evaluation, which leads to a wrong decision, which leads to a

12   wrong action; right?

13   A    Yes.

14   Q    And they might get a low grade on a test, but they're not

15   going to get killed and buried?

16   A    That's correct.

17   Q    And, actually, this perception, that's where it all began,

18   what you perceive; right?

19   A    Yes, sir.

20   Q    And, again, if your perception is wrong, even though if you

21   might have the best intentions in your heart, and you've gone

22   through the PEDA principle from A to Z, if it's later determined

23   that your perception is wrong, then the action's going to

24   ultimately be wrong.

25   A    The action may be tragic, but the action of the officer still

1    may be reasonable.

2    Q    Of course.

3         Since we know we've got to have our perception right,

4    let's talk about what an officer uses to build perception.  And I

5    would think, from a police officer's standpoint, sight would be

6    one of the best things.

7    A    Yes, sir.

8    Q    Let's start even earlier than that.  Information.  If you get

9    intelligence information and things like that, that helps build

10   your information.

11   A    Yes, sir.  And there's going to be two ways of obtaining

12   that.  Either it's going to be done over a radio call, or getting

13   information from a third party, or actually if you're driving and

14   doing routine patrol and you actually observe actions.

15   Q    If you get information en route to a scene that there's an

16   armed perpetrator wearing a grey jogging suit, and you pull up

17   and there's a guy with wearing a grey jogging suit, you're going

18   to treat that individual a little bit different than you would if

19   you pulled up and there was guy in a blue business suit?

20   A    Yes, sir.

21   Q    If you're wrong, that's to your detriment.  But that's how

22   you're going to act.

23   A    You couldn't shoot the guy.  But you could actually -- yeah,

24   I think it would be appropriate to have your hand on the gun,

25   have your gun out, the gun pointed directly at an individual if

1  he fit the description of someone armed.

2  Q   And, if the information was somehow backwards, that the

3  threat was actually the guy in the business suit, then that could

4  be a bad situation for all involved?

5  A   Yes, sir.

6  Q   So initial intelligence or information begins the perception,

7  If you're lucky enough to have it?

8  A   Yes, sir.

9  Q   So -- and typically in police officer fashion, oftentimes,

10 you'll get information over the radio, either from a dispatcher

11 or another police officer, Maybe even a civilian?

12 A   Yes, sir.

13 Q   And so then you can proceed to that area to see what -- check

14 out what you're going to find and see what that civilian, that

15 dispatcher or that radio call gave; right?

16 A   Yes, sir.

17 Q   Now, if -- and you said radio communications were real poor

18 back then?

19 A   Oh, yes, sir.  There was one frequency for all of the

20 agencies in the metro area.

21 Q   And mis-information can also be tragic; correct?

22 A   Yes, sir.

23 Q   So, if a police officer has some -- has part of some

24 information and not the other, his perception can be damaged;

25 would you agree with that?

1    A    Yes, sir.

2    Q    If a police officer is en route to a scene and he can't see

3    where he's going, literally can't see where he's going, can only

4    see where he's been, does that damage his ability to accurately

5    perceive a situation?

6    A    I'm not sure in the context that you're talking.

7    Q    Well, let's put it this way.  Let's go back to Ms.

8    Bernstein's bank robbery.  If you're responding to a bank robbery

9    in progress, you wouldn't walk through the doors of the bank

10   backwards; would you?

11   A    No, sir.

12   Q    And if you had to do that, for whatever reason, that would be

13   putting you at a distinct disadvantage; wouldn't you agree?

14   A    Absolutely.

15   Q    In that same situation, walking in backwards, and not being

16   able to hear what's going on, would that concern you, too?  Would

17   that limit your ability to correctly perceive?

18   A    Sure.  It would have an impact.

19   Q    And, if you're in that bank robbery situation with your back,

20   entering in with your back, and gunfire erupts, would you be

21   concerned for your life?

22   A    Absolutely.

23   Q    Ms. Bernstein said something about sympathetic fire.  Which

24   I'm not going to talk about because I'm not going to talk about

25   it.  You've heard of it?

1   A   Yes, sir.

2   Q   And that's when somebody fires one shot because somebody else

3   fired?

4   A   Yes, sir.

5   Q   Police officers are certainly not trained to fire just

6   because somebody else fired; is that correct?

7   A   Yes, sir, that's correct.

8   Q   They're trained to fire if they perceive a threat?

9   A   In defense of their life.

10  Q   And they're trained to fire, and I know you all hate saying

11  it, to stop the threat; right?

12  A   That's correct.

13  Q   I mean, I know that is what is said.  But, literally, the

14  only way to ensure that you stop the threat is, normally, to

15  decapitate or kill somebody by shooting them in the chest?

16  A   Um-hum.

17  Q   Right?

18  A   Yes.

19  Q   Or else, otherwise, we would shoot people in the arms and

20  shoulders and legs, if we could hit them?

21  A   That's correct.

22  Q   But this is also the biggest -- center mass is also the

23  biggest body part; correct?

24  A   Yes, sir.

25  Q   So there are a lot of reasons you're trained to shoot center

1    mass?

2    A    Shooting center mass is the best way to incapacitate an

3    individual as quickly as possible.

4    Q    And she put a little schedule, a little thing up there on the

5    thing about I think it was aggressive --

6            MR. HESSLER:   Could you put that thing up there?   The

7    use of force continuum?   Yeah.

8    BY MR. HESSLER:

9    Q    We're back to this use of force.   Aggravated aggression, and

10   that's when you can use a firearm; right?

11   A    A weapon.   A deadly weapon.

12   Q    And somebody can be, when you say aggravated, typically, law

13   enforcement means he's armed with a dangerous weapon?

14   A    Yes, sir.

15   Q    An aggravated aggression means an aggression of a deadly type

16   situation?

17   A    Yes, sir.

18   Q    Now, a person can be committing aggravated aggression on a

19   police officer even if he's fleeing that police officer; would

20   you agree?

21   A    If he's shooting when he's running, sure, that would be --

22   certainly, absolutely.

23   Q    If the police officer perceives him to be armed with a

24   weapon, pointed back at him as he's fleeing, would you consider

25   that aggravated aggression?

1    A    Yes, sir.

2    Q    Would you consider that, if that was the perception, that

3    that person could be fired upon?

4    A    Yes, sir.

5    Q    Deadly force could be used on that person?

6    A    Yes, sir, would be appropriate.

7              MR. HESSLER:  You can take it down.

8    BY MR. HESSLER:

9    Q    Now, you talked about the legal and moral considerations, and

10   you talked about that with Ms. Bernstein; right?  Correct?

11   A    Yes, sir.

12   Q    And, obviously, all police officers have to operate under the

13   law; correct?

14   A    Yes, sir.

15   Q    And that's not listed under Hurricane Katrina or any other

16   reason?

17   A    (Witness nods head.)

18   Q    And there's moral considerations?

19   A    Yes, sir.

20   Q    And a police officer has to live with what he's perceived was

21   his duty to do; correct?

22   A    Yes, sir.

23   Q    Now let's say, for instance, a police officer is not supposed

24   to -- it's against rules and regulations to strike an individual

25   in the head with his police radio; right?

1   A    Yes, sir.

2   Q    If that police officer was in a fight for his life, and he

3   grabbed his police radio and struck somebody in the head with it,

4   might be against departmental rules and regulations, but it would

5   be acceptable under those circumstances; wouldn't it?

6   A    I think it could be considered reasonable, yes, sir.

7   Q    And that could be done to protect somebody else's life?

8   A    Yes, sir.

9   Q    As long as it's reasonable under his perceptions?

10  A    Yes, sir.

11  Q    And Ms. Bernstein brought up Hurricane Katrina.  Now, you

12  were asked at some point by Harry Lee to deliver weapons and

13  ammunition and extra magazines into the city of New Orleans;

14  correct?

15  A    Yes, sir.

16  Q    And these were weapons that the Jefferson Parish didn't feel

17  the need for, or could certainly part with?

18  A    Yes, sir.  We didn't give them all.  I told him what we had,

19  and he made the decision as to how many we would share with NOPD,

20  New Orleans Police Department.

21          MR. HESSLER:  One second, Your Honor.

22          (Pause in proceedings.)

23  BY MR. HESSLER:

24  Q    Major, you stated that you did not bring any long guns in to

25  the city, meaning AR-15s, M-16s, shotguns?

1   A   All of the long guns, the shoulder weapons that we had, was

2   disseminated to Jefferson Parish Sheriff's Office personnel.

3   Q   So Jefferson Parish also felt the need to arm their officers

4   with additional firepower during that time?

5   A   Yes, sir.

6   Q   Now, when you brought these weapons over, do you remember --

7   did you deliver them personally?

8   A   Yeah.  There was about a six-man team.  And I was there,

9   yeah.

10   Q   And you didn't -- where did you deliver them to?

11   A   Harrah's Casino was the headquarters.

12   Q   Right.

13   A   And it was my instructions to deliver them to Chief Compass.

14   Q   Okay.  So you didn't just pull you up on a corner; and,

15   anybody that came by, you handed them a Beretta 9 millimeter?

16   A   No, sir.  What had happened was we had actually a list of the

17   serial numbers and we had JPS numbers on the guns.  So we

18   provided that -- Superintendent Compass was not on premises at

19   the time, and I believe it was the deputy superintendent Steve

20   Nichols who actually signed for the equipment.

21   Q   Are you familiar with Police Officer Patrick O'Hern, SOD

22   Armory?

23   A   Yes, sir, I do know who he is.

24           MR. HESSLER:  Thank you, sir.

25           THE COURT:  Other cross?

```
 1            MR. FLEMING:  Believe it or not, I have no questions.
 2   Mr. Hessler and Mr. Meche covered all mine.
 3            THE COURT:  Mr. DeSALVO.
 4            MR. DeSALVO:  Believe it or not, I do, Judge.  But not
 5   many.
 6                        CROSS EXAMINATION
 7   BY MR. DeSALVO:
 8   Q    Frank DeSALVO.  Major Najolia, you how are you?
 9   A    Fine, sir.
10   Q    We appreciate you coming.
11   A    Yes, sir.
12   Q    You've answered about everything I can imagine, other than
13   the government talked to you about use of force and reports on
14   use of force.  Do you remember that?
15   A    Yes, sir.
16   Q    I'm not sure what the Jefferson Parish Sheriff's Office
17   policy is.  I'm not even sure what's in the manual.
18            But are you aware that, in New Orleans, the New Orleans
19   manuals say that the officer involved --
20            MS. BERNSTEIN:  I'm going to object to Mr. DeSALVO
21   testifying.  He can ask whether he is familiar with whatever he's
22   going to ask about in the manual.
23            MR. DeSALVO:  I'll do it that way.
24            THE COURT:  Let's be careful.  He hasn't finished the
25   question, but just be careful in light of the objection.
```

```
 1   BY MR. DeSALVO:
 2   Q   Do you know whether or not New Orleans policy is that the
 3   person involved in the use of force is not the person who
 4   prepares the use of force report?
 5   A   I don't know that.
 6   Q   Then I don't get to ask any more questions about that.
 7           Ms. Bernstein gave you an example of a person who you
 8   said dropped the gun, you dropped the gun.  And you said the
 9   first thing you do is get him to move as far way from that gun as
10   possible.  Is that correct?
11   A   Yes, sir.
12   Q   And that's so he can't pick up the gun again?
13   A   Yes, sir.
14   Q   Now, if that person is on the ground, and you believe he may
15   be incapacitated or not, and the gun is near him, and it's not
16   feasible to move him, do you then move the gun?
17   A   That would be an option, sure.
18   Q   And do you move it by any means necessary?
19   A   Sure.
20   Q   You can pick it up; right?
21   A   Yes.
22   Q   You can kick it away?
23   A   Sure.
24   Q   And any of those things are reasonable, because you're
25   supposed to get that gun away from that individual so that you
```

```
 1    can eliminate the threat?

 2    A    Yes, sir.

 3    Q    Now, one more question for you -- well, one more area.

 4         The most horrific thing that happened -- I think you

 5    used the word horrific -- during the storm with you was that

 6    incident at the Oakwood mall.  And the incident at the Oakwood

 7    mall consisted of looters and fire and everything inside the

 8    Oakwood mall, and Harry Lee called and said:  You've got to get

 9    over there.  And, when you went over there, you went with a SWAT

10    team; right?

11    A    Yes, sir.

12    Q    You had SWAT vehicles?

13    A    They were in their personal units.

14    Q    You had helicopters?

15    A    Yes, sir.

16    Q    There were snipers?

17    A    Yes, sir.

18    Q    And there were already police there?

19    A    Yes, sir.

20    Q    And you set up some type of perimeter for your safety?

21    A    Sure.

22    Q    And the safety of your officers.

23         And you had -- you set up a game plan on how you were

24    going to deal with it.

25    A    Yes, sir.
```

1    Q    You didn't ride up in a Budget truck; did you?

2    A    No, sir.

3              MR. DeSALVO:  I have no further questions.

4              THE COURT:  Redirect?

5              MS. BERNSTEIN:  Yes, Your Honor.

6                        REDIRECT EXAMINATION

7    BY MS. BERNSTEIN:

8    Q    Major Najolia, let me start where we just left off.  Mr.

9    DeSALVO asked you a question about whether you were familiar with

10   NOD policy on who does an investigation.  Does an officer's

11   obligation to tell the truth in his statement depend on whether

12   or not who writes a use of force-- depend on who writes the use

13   of force report?

14   A    No, ma'am.

15   Q    What is that obligation that the officer has when he gives a

16   statement?

17   A    Always tell the truth.

18   Q    Even if he didn't use the use of force report?

19   A    Yes, ma'am.

20   Q    Mr. DeSALVO just asked you whether it's reasonable for an

21   officer to remove a gun by any means necessary.  Do you remember

22   that?

23   A    Yes, ma'am.

24   Q    Would it be reasonable to kick a gun to an area where you

25   just saw a suspect flee?

1    A    You're taking the gun away from that threat; but, if you move

2    the gun closer to a potential perpetrator, then I'm not sure that

3    that's going to be what you're trying to accomplish.

4    Q    Now I want to talk to you about some of Mr. Hessler's

5    examples.  He gave you that example, he said if you hear that

6    there's an armed suspect in a grey jogging suit and you drive up

7    and you see somebody in a grey jogging suit, and you said but you

8    can't shoot him.  Why can't you shoot him, even if you have

9    reason to believe he's armed?

10   A    No perception of a deadly threat, no need to fire at that

11   point in time in defense of life.

12   Q    Now, Mr. Hessler said something else, he asked you something

13   about -- and I wrote down the quote -- if an officer can lay the

14   foundation and groundwork to show that he saw a threat, does that

15   make it reasonable.  And that might make it sound like you can

16   justify it afterwards.  So I want to ask you a question.  At what

17   moment must the officer perceive that deadly threat?

18   A    At the moment in time he makes a decision to use deadly

19   force.

20   Q    Now, if an officer fires ten times, at what moment must he

21   perceive that deadly threat?

22   A    That entire volley of rounds.  That moment in time.

23   Q    Every single shot; is that right?

24   A    That's right.

25   Q    If an officer sees a threat for the first shot and then no

1   longer sees a threat and fires nine more shots, is that

2   justified?

3   A   No, ma'am.

4   Q   I want to go to another one of Mr. Hessler's examples.

5   Remember that example he gave you where somebody is walking

6   toward you, and you can't see the gun, but he has that poor old

7   woman who has a very bad day, he has her in front of him, and he

8   asked you whether you wait to see the gun to shoot.  Do you

9   remember that?

10  A   Yes, ma'am.

11  Q   Do you shoot through her to shoot him?

12  A   No, ma'am.

13  Q   Why not?

14  A   Because the ability to justify that use of force is to

15  protect her.  And yourself.

16  Q   And, if you're standing there with a shotgun with buckshot in

17  it, do you shoot him?

18  A   To make a surgical shot with a buckshot, you'd have to be an

19  excellent shot.

20  Q   So you don't shoot him because you're going to shoot that

21  poor old woman instead; right?

22  A   That's possible with a buckshot.

23  Q   Mr. Hessler asked you, if you got to a scene and you saw a

24  bunch of cops taking cover, if you would believe there was a

25  threat.  And you might believe there's a threat under those

 1    circumstances; right?

 2    A    It's possible, sure.

 3    Q    Would that justify you getting out and just firing in the

 4    direction they're looking?

 5    A    No, ma'am.

 6    Q    Why not?

 7    A    Because each individual officer has to perceive that deadly

 8    threat at the moment in time he makes the decision to use deadly

 9    force.

10    Q    Mr. Hessler asked you another example.  He talked about, if

11    an officer can't see in front of him, does that diminish his

12    ability to perceive.  Obviously, if you can't see, that

13    diminishes your ability to perceive; right?

14    A    Yes.

15    Q    He gave that you an example of somebody having to walk into

16    that bank backwards.  Do you remember that?

17    A    Yes, ma'am.

18    Q    Does that justify you turning around and shooting?

19    A    No, ma'am.

20    Q    Why not?

21    A    You still have to identify the threat and you're firing based

22    on the fact that you're firing in defense of life.

23    Q    Do you still have to do the P?

24    A    Yes, ma'am.

25    Q    You still have to do the E?

```
 1    A    Yes, ma'am.

 2    Q    You still have to do the D?

 3    A    Yes, ma'am.

 4    Q    And you have to do all that before you get to the A?

 5    A    Yes.

 6    Q    A similar example based on that.  If you're in one room and

 7    gunfire erupts in a room next to you, asking Mr. Hessler's

 8    question, might you fear for your life?

 9    A    Sure.

10    Q    Something could come through the walls; right?

11    A    Absolutely.

12    Q    Does that fear for your life justify you running into the

13    room next door and just shooting it up?

14    A    No, ma'am.

15    Q    Why not?

16    A    You have to identify the deadly threat and deliver accurate

17    fire to stop it.

18    Q    Do you still have to do the P?

19    A    Yes.

20    Q    Do you still have to do the E?

21    A    Yes, ma'am.

22    Q    Do you still have to do D?

23    A    Yes, ma'am.

24    Q    Before you get to the A?

25    A    Yes, ma'am.
```

1  Q   So Mr. Meche asked you about the bottom line, and I'm going

2  to ask you about the bottom line.

3        If the truth is that an officer perceived his life was

4  in imminent danger when he fired, is his shoot justified?

5  A   Yes, ma'am.

6  Q   If the truth is that the officer did not perceive that his

7  life was in imminent danger when he fired, is that shoot

8  justified?

9  A   No, ma'am.

10 Q   And Mr. Meche also asked you a question about whether an

11 officer has an obligation to the citizenry.  And that's true;

12 isn't it?

13 A   Yes.

14 Q   That a police officer has an obligation to protect innocent

15 civilians?

16 A   Yes, ma'am.

17        MS. BERNSTEIN:  No further questions.  Thank you, Major.

18        THE COURT:  Thank you.  This witness is released,

19 counsel?

20        MR. FLEMING:  Yes, Judge.

21        THE COURT:  Thank you.

22        Okay.  It is right at 4 o'clock, so I think we can go

23 ahead and adjourn for the day.

24        I had given you some instructions at the end of the day,

25 and you know to try to emphasize the importance of following

1    those instructions.  I try to add a little bit on each time about

2    not viewing or reading about this case, and in particular about

3    not discussing it with anyone.  You all are familiar with the

4    concept.

5            And I think I told you as part of the jury selection

6    process that the jury in this case would not be sequestered, and

7    I think all of you know what that means.  It's an experience that

8    I can only describe as unpleasant.  It does not mean you get to

9    live in a hotel and get meals brought up to you and look at the

10   pay-per-view and all of that that you normally do when you're on

11   vacation.  It's a very miserable experience.  And, fortunately,

12   we don't have to do it very often, either in state or federal

13   court.

14           The reason we don't do that is because we give you the

15   instructions that I give you every day.  All right?  That's why I

16   keep stressing it, and I keep repeating it, is because you're not

17   a sequestered jury.  We depend on you all, you have taken the

18   oath as jurors, and so we depend on you all to follow those

19   instructions.

20           Because the only alternative, if we could not depend on

21   jurors to follow them, is to sequester jurors.  And, in addition

22   to that being a very miserable experience for you all and for

23   your families, it could also be a very a expensive proposition

24   for the court and for the government.  All of your phone calls

25   would be monitored, your cellphones would be taken away.  TV

 1   programs and reading material would all be screened.  And I don't

 2   think any of you would like to be in that circumstance for the

 3   duration of the trial.

 4        So, in lieu of all of that, I will remind you again, do

 5   not discuss the case with anyone, including spouse, friends,

 6   neighbors, family, anyone else who would like to discuss it with

 7   you.  You can tell them that you're under a court order not

 8   discuss it, and also not to listen to them discuss it.

 9        And, second of all, do not read or view any discussion

10   about this case in any type of media outlet or online or any

11   other source.  And I think I've emphasized to you the importance

12   of following those instructions.

13        So, with that, we're going let you go for the day.  I

14   hope you have a nice weekend.

15        Next week, we will have court Monday through Thursday,

16   but not on Friday.  But that is not to say that Friday is the off

17   day every week.  The following week, there may be some

18   variations.  But we'll try to build in some time for you the

19   following week, and I'll announce that to you some time next week

20   so that you can plan accordingly.

21        Okay.  Have a good weekend, and we will see you Monday

22   morning at 8:30.

23           (Jury exits.)

24           THE COURT:  Counsel, if you all would be seated.

25           As usual, I would ask if there's anything we need to

 1    cover on the record here in open court first.

 2            MS. BERNSTEIN:  Yes, Your Honor.  May we approach?

 3            THE COURT:  In open court first.

 4            MS. BERNSTEIN:  I'm sorry.

 5            Nothing from the government in open court.

 6            MR. FLEMING:  One thing in open court, Judge.

 7            At the end of yesterday, the Court had ordered the

 8    government to provide Agent Bezak's handwritten notes.  We have

 9    not yet received that.

10            THE COURT:  I think I said by the end of today.

11            MR. FLEMING:  You did.

12            THE COURT:  And I was going to remind you all of that.

13            Also remind that I think Mr. Larson -- I'm singling you

14    out, although I'm not quite sure you had the responsibility, but

15    you did give a letter with regard to another witness that the

16    defendants intended to call, and I think you had an assignment

17    for that as well on Monday morning.

18            MR. LARSON:  Yes, Your Honor.

19            THE COURT:  So if you could take care of that.  The

20    sooner, the better.  But, Monday morning, at the latest.

21            My law clerk sent you an email relative to a jury

22    instruction issue.  Did anybody not get that?

23            MR. FLEMING:  We got that.  I believe there's something

24    due also Monday morning that is being worked on as we speak,

25    Judge.

```
 1              THE COURT:  Correct.  I just wanted to make sure
 2   everybody got it; so, when the deadline comes, I won't hear:  We
 3   were in trial, I didn't get that and now I need more time.  It's
 4   a very important issue, and you all have known that for a long,
 5   long time.  It's a point of law, and I trust you all have already
 6   researched it, and you can go ahead and submit something to the
 7   Court that's appropriate in response to the email request.  But
 8   we do need that.
 9              Again, we don't wave a magic wand and come up with jury
10   instructions.  We depend on counsel to have input on that, and I
11   think you all desire to have input on that.  Okay.
12              MS. BERNSTEIN:  Your Honor, for the record, we have
13   those notes for defense counsel, and we will provide them today.
14              THE COURT:  Great.  Okay.
15              Anything else in open court to cover?  On the record?
16              MR. FLEMING:  Just very briefly.  At the lunch break,
17   the government was ordered to provide us a CV of a certain
18   witness.  We've not yet received that either.
19              MR. CARTER:  It is forthcoming, yes.
20              THE COURT:  That witness wasn't called today so it
21   wasn't as critical to get it to you at lunchtime.  But certainly
22   we want to provide that as soon as possible.  If that witness is
23   going to testify on Monday, then maybe some time today or first
24   thing in the morning we can get that.
25              Anything else on the record in open court?
```

```
 1            MR. FLEMING:  No.

 2            THE COURT:  Okay.  Then why don't you all approach.

 3    We'll cover what we need to cover on the record here at the

 4    bench, and then we'll go off the record and talk about other

 5    issues.

 6            (Sidebar conference.)

 7            THE COURT:  By my count -- we'll get to your issue in a

 8    minute -- by my count, we've called 26 witnesses, which I think

 9    is pretty good.  I was going to say --

10            MS. BERNSTEIN:  That is a gold star?

11            THE COURT:  Gold star territory.  I counted them today.

12            MR. LONDON:  They were all today?

13            MS. BERNSTEIN:  All 26.

14            MR. LONDON:  I missed it.

15            THE COURT:  Including some lengthy witnesses, such as

16    the -- those that have entered guilty pleas and the victims, all

17    of whom I think were lengthier than usual.  So I think we've

18    covered a lot of ground.

19            MS. BERNSTEIN:  The thing I wanted to get on the record

20    up here, I don't know if you heard this comment that I am not

21    happy about, but when you asked whether they wanted to hold over

22    Mr. Najolia, Mr. Fleming said:  No, we can't pay.  Which was

23    clearly, clearly intended to insinuate to the jury that we paid

24    him.  They obviously all know that we didn't, or somebody would

25    have crossed them on that.
```

1        MR. FLEMING:  Judge, I made a comment similar to that,

2  that was in a joking vein, though.  That was not to insinuate

3  anything to the jury.

4        THE COURT:  I didn't hear him say that.

5        MS. BERNSTEIN:  He just admitted he said it.

6        THE COURT:  I understand.  We're this far from the jury.

7        Let me back up a little bit because I'm glad you raised

8  that.

9        I don't -- while I understand cross examination is

10  pretty much -- and I love good cross examination, don't get me

11  wrong.  All of you have done a great job -- I do find that at a

12  few junctures, there were some what I would call editorial type

13  comments.  And I understand that's part of a style.  And, people

14  need to be asked questions, and the jury wants to hear answers.

15  And to the extent that there's closing argument that can be made

16  -- and frankly, I'm going to sending you out because I think a

17  couple times you did it, and I understand the type.  So I'm not

18  saying it's improper.  But I think we need to minimize that and

19  let's just ask a question.  And, if Paul said that, I agree that

20  it should not have been said.  I didn't hear --

21        We need quiet.  If you need to discuss something, please

22  go outside the room.

23        MS. BERNSTEIN:  I very much appreciate the Court's

24  comment about the editorializing.  We've objected to that.  But I

25  can tell you, that's no where as bit a deal, because we can get

1  up and do redirect.  A comment with that's made when these's no

2  witness on the stand, and it's before the jury, and it put me in

3  the position of either standing up and bringing attention to

4  asking -- and I'm still thinking about whether or not I want you

5  to instruct the jury that he was not paid.  But, you know, puts

6  us in a position, do we stand up a draw nor attention to it by

7  objecting, or do we let the jury go and the let jury think we

8  paid a witness, who everybody knows we did not pay.

9           MR. FLEMING:  Actually, I did not know that.  My comment

10 was not intentional.  It was more just in joking.

11          THE COURT:  The problem is, once we ring the bell, it's

12 hard it unring the bell.

13          MS. BERNSTEIN:  So, as a remedy, and since you didn't

14 intend that comment to insinuate things, can we just have the

15 Judge instruct them that that last witness did not receive any

16 money for his testimony?

17          MR. DeSALVO:  From either side.

18          MS. BERNSTEIN:  Yeah.  That nobody paid that witness for

19 his testimony.  That he was -- although he's an expert, he was

20 not a paid expert, how about that?

21          MR. FLEMING:  Not paid by you.

22          MS. BERNSTEIN:  He's not paid by anybody.

23          THE COURT:  I'm willing to do that.  I think the more

24 appropriate thing to do, although it would be a real pain in the

25 rear, is to bring him back and ask him that question.  I hope we

1   don't have to do that.  I would prefer that -- look, I didn't

2   hear the comment, so I'm not sure they heard it.

3          MS. BERNSTEIN:  How about we stipulate to what his

4   testimony would be if we brought him back for that one question.

5          MR. DeSALVO:  I have no objection to that instruction.

6   You may want to think about it over the weekend.

7          MR. HESSLER:  Do you really think the jury heard it?

8          MS. BERNSTEIN:  Everybody at our table.  So we don't

9   waste the Court's time, let's come up with a stipulation that he

10  would testify to if brought back.

11         THE COURT:  I would suggest at if Major Najolia were

12  brought back and testified, the parties stipulate that he did not

13  receive compensation directly from the government or any defense

14  counsel.

15         MR. DeSALVO:  That's fine.

16         THE COURT:  Maybe something along the lines of he

17  testified in the course and scope of his job as being a major for

18  the Jefferson Parish Sheriff's Office.

19         MS. BERNSTEIN:  We will work something out.

20         THE COURT:  I would be willing to do that.  I didn't

21  hear the comment.

22         MR. FLEMING:  I won't do it again.  I apologize.

23         THE COURT:  The jury wants to know what people think.

24  They want to know that.  Once the person is finished, get them

25  off the stand and let's move on to somebody else.  They get it

```
 1   now and they understand that there's certain factual nuances that
 2   are very important in this case, such as what each witness saw.
 3   But I don't think we need to ask any more setting-the-stage type
 4   questions, unless they relate to a particular witness.  I think
 5   they understand September 4th now, they understand the Budget
 6   truck, they understand there was lot of gunfire.  Let's cut to
 7   the chase on these witnesses.
 8           And, again, I think we have a done a pretty good job,
 9   particularly with regard to the instructions.  I kind of thought
10   you all would unwind -- like, for instance, Mr. Madison.  I
11   thought maybe you all would go through a little bit more, and I'm
12   glad you didn't -- but, you know, the history of the world with
13   Mr. Madison.  I don't know why, I guess maybe I've been hanging
14   around civil lawyers.
15           MS. BERNSTEIN:  We've been cutting right to the chase,
16   Your Honor.  I want to get home, too.
17           THE COURT:  I shouldn't say that on the record because
18   somebody at Gateway Technical is going to get it.  Off the
19   record.
20           (Discussion held off the record.)
21           MS. BERNSTEIN:  Our one other issue is the juror.  And
22   my understanding from talking to these guys, I can't remember
23   which one, is that you all are remaining silent on what we have
24   decided to do.  We've talked about it, and we need to let her go.
25           THE COURT:  Okay.
```

1          MR. LONDON:  You need to do what?

2          MS. BERNSTEIN:  My understanding is we need to let her

3     go, with no objection from the defense.

4          MR. MICHE:  No.  Objection.  Villavaso objects.

5          MS. BERNSTEIN:  That's different than what we were just

6     told.

7          THE COURT:  Somebody has to file something in the

8     record.  I'll be happy to visit with her to tell her.  I think,

9     under the circumstances -- and you can certainly make your

10    objection.

11         MR. MECHE:  Right.

12         THE COURT:  -- I'm really inclined -- it's going to be a

13    problem in this case that the case was tried with the relative,

14    even though by marriage, a relative say sitting on a jury.  I

15    mean, I've never heard of a case, particularly one of this

16    magnitude, with this much at risk.

17         MS. BERNSTEIN:  Going forward.

18         THE COURT:  Going forward with that kind of

19    circumstance.  It's extraordinary.

20         My perception, again, in light of the Batson challenge,

21    is that we would be not only excusing the juror but a black

22    female juror, and I think the record needs to be very, very clear

23    on the two points that I made.

24         Number one, it's through no misconduct of hers.  And I

25    think that's for her protection, so that no one can indicate that

1    she's done anything improper.  Quite to the contrary.

2            Number two, that she's not being excused by the Court

3    for any reason that the information was brought to the attention

4    of counsel and that either I would say it's not going to be by a

5    joint motion now but that --

6            MR. CARTER:  Could I interject something, Your Honor?

7            THE COURT:  You're going to have figure a way to word

8    this.  But the problem is that this is something that can't be

9    said, because it is apparent in the courtroom, and I assure you

10   it will be noticed quickly.

11           MR. DeSALVO:  Why can't that --

12           MS. BERNSTEIN:  Let's go off for a second.

13           MR. DeSALVO:  Why don't we just basically tell the

14   truth, that she realized that she was related to one of the

15   defendants?

16           THE COURT:  I'm going to make my comment on the record;

17   and then, if you want to go off, that's fine.

18           I'm all in favor of that.  The issue is that there was a

19   Batson challenge, and she happens to be not just any juror but

20   one who was the subject of a successful Batson challenge and is

21   on the jury because the Court put her back on the jury in

22   response to a Batson challenge.  That's why I'm sensitive as to

23   what the public understands from a confidence point of view.  The

24   truth of the matter is -- and I don't care if it's put in the

25   record -- I think ultimately it's going to be known that she is

 1    related to Mr. Faulcon; and, in fact, she may have some

 2    connection, although it's unknown precisely what it is, to Mr.

 3    Villavaso, which she put in her questionnaire and was questioned

 4    about it and was questioned about it during the jury voir dire

 5    process.  So, if you want to put that in the record, that's fine.

 6             What I don't want to have is her just to not show up --

 7    she's going to be here Monday.  She's going to sit there, she's

 8    going to be dismissed on Tuesday, and we're all going to --

 9             MR. CARTER:  Should she even sit on Monday?

10             MR. LONDON:  He's saying if we don't say anything and

11    she's kind of disappointed.

12             THE COURT:  Let's go off the record.

13             Wait.  Back on the record for Tim.

14             MR. MECHE:  Judge, unless the judge wants to hear

15    argument, which I don't feel like making, I just want to make

16    sure that Defendant Villavaso's objection is noted to remove her.

17             THE COURT:  Here's my issue with that.  Is that Ms.

18    Weber, Juror No. 9, was the subject of a peremptory challenge by

19    defendants.  So, you see, we catch ourselves coming and going on

20    this in a very strange way.  And I think that's why it's a

21    delicate circumstance and that's why it needs to be dealt with

22    appropriately on the record, for the truthful reason that the

23    situation with Mr. Faulcon is one that was brought to our

24    attention after we started the trial.

25             MS. BERNSTEIN:  And brought to her attention after we

1   started the trial.

2          THE COURT:  Exactly.

3          Does anybody want to put anything else on the record

4   about this?

5          MR. FLEMING:  I can't help myself.  Because of Your

6   Honor's comment about the subject of the Batson challenge,

7   Because the defendant's -- I'll use the term forced -- to share

8   12 challenges, that there was a divide amongst the defendants on

9   whether or not to exercise a peremptory challenge against that

10  particular juror.  And the majority prevailed.

11         THE COURT:  But that's the way the challenges were

12  designed, and that's the way they were exercised.  So, now,

13  that's very much in the rearview mirror.

14         Anything else on the record?  We can -- if you would

15  stay, Susan, just for a minute, because I have a feeling we'll be

16  back on the record about something soon.

17         (Discussion held off the record.)

18         THE COURT:  We've just further discussed all of the

19  how-to's and where-for's and implications with regard to the

20  Juror No. 9 issue; and, after that discussion, we've decided that

21  we will take the weekend -- all of us will take the weekend to

22  give it further thought, and it will be discussed further early

23  next week.  Not a particular time, but some time early next week.

24         With that, we'll close out the record.

25         (4:30 p.m., proceedings concluded.)

1

2

CERTIFICATE

3

4

     I, Susan A. Zielie, Official Court Reporter, do hereby

5 certify that the foregoing transcript is correct.

6

7

              /S/ SUSAN A. ZIELIE, RPR, FCRR

8                _____

9                  Susan A. Zielie, RPR, FCRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25