```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2    ************************************************************
      UNITED STATES OF AMERICA
 3
                                    Docket No. 10-CR-204
 4    v.                            New Orleans, Louisiana
                                    Tuesday, July 19, 2011
 5
      KENNETH BOWEN, ROBERT GISEVIUS,
 6    ROBERT FAULCON, ANTHONY VILLAVASO
      and ARTHUR KAUFMAN
 7    ************************************************************

 8
                      TRANSCRIPT OF TRIAL PROCEEDINGS
 9          HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
                     UNITED STATES DISTRICT JUDGE
10                           VOLUME XVI

11

12    APPEARANCES:

13    FOR THE PLAINTIFF:           UNITED STATES DEPARTMENT OF JUSTICE
                                   BY:  BARBARA BERNSTEIN, ESQ.
14                                 Civil Rights Division-D Street
                                   601 D Street N.W.
15                                 Office PHB 5123
                                   Washington, D.C. 20004
16
17                                 UNITED STATES DEPARTMENT OF JUSTICE
                                   BY:  CINDY K. CHUNG, ESQ.
18                                 CIVIL RIGHTS, CRIMINAL SECTION
                                   950 Pennsylvania Avenue N.W.
19                                 Washington, D.C. 20530

20
                                   UNITED STATES ATTORNEY'S OFFICE
21                                 BY:  THEODORE R. CARTER, III, ESQ.
                                   650 Poydras Street, Suite 1600
22                                 New Orleans, LA 70130

23
      FOR DEFENDANT KENNETH BOWEN:  FRANK G. DeSALVO, APLC
24                                 BY:  FRANK G. DeSALVO, ESQ.
                                   829 Baronne Street
25                                 New Orleans, LA 70113
```

```
 1   FOR DEFENDANT ROBERT
     GISEVIUS:                    ERIC J. HESSLER, ESQ.
 2                                700 Camp Street, Suite 104
                                  New Orleans, LA 70130
 3

 4   FOR DEFENDANT ROBERT
     FAULCON:                     PAUL C. FLEMING, JR., ESQ.
 5                                2821 Kingman Street, Suite C
                                  Metairie, LA 70006
 6

 7                                KING, KREBS & JURGENS
                                  BY:  LINDSAY A. LARSON, III, ESQ.
 8                                201 St. Charles Avenue, 45th Floor
                                  New Orleans, LA 70170
 9

10   FOR DEFENDANT ANTHONY
     VILLAVASO:                   TIMOTHY A. MECHE, ESQ.
11                                700 Camp Street
                                  New Orleans, LA 70130
12

13                                DeSALVO, BLACKBURN & KITCHENS
                                  BY:  ROGER W. KITCHENS, ESQ.
14                                2802 Tulane Avenue
                                  New Orleans, LA 70119
15

16   FOR DEFENDANT ARTHUR
     KAUFMAN:                     STEPHEN D. LONDON, ESQ.
17                                1100 Poydras Street, Suite 2950
                                  Energy Centre
18                                New Orleans, LA 70163-2950

19

20   Official Court Reporter:     Karen A. Ibos, CCR, RPR, CRR
                                  500 Poydras Street, Room HB-406
21                                New Orleans, Louisiana 70130
                                  (504) 589-7776
22

23

24     Proceedings recorded by mechanical stenography, transcript
     produced by computer.
25
```

3

1                          <u>I N D E X</u>

2

3      <u>WITNESSES FOR THE GOVERNMENT:</u>                    <u>PAGE/LINE:</u>

4      <u>WILLIAM BEZAK</u>

5         Continued Cross-Examination by Mr. Hessler        4/18

6         Cross-Examination by Mr. London                   129/15

7         Cross-Examination by Mr. Fleming                  181/10

8         Cross-Examination by Mr. DeSalvo                  211/10

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                 (TUESDAY, JULY 19, 2011)

 3                     (MORNING SESSION)

 4

 5      (OPEN COURT.)

 6           THE COURT:  All right.  You may be seated.  Thank you all

 7  again for being on time this morning.  We're going to pick up where

 8  we left off.

 9           Mr. Bezak, you're still under oath.  Have you discussed

10  your testimony with anyone over the evening hours?

11           THE WITNESS:  No, I have not.

12           THE COURT:  Mr. Hessler, I think when we broke we had

13  discussed an objection here at the bench, and having resolved that,

14  it was the five o'clock hour so we adjourned.  So if you would like

15  to pick up where you left off, you may do so.

16           MR. HESSLER:  Thank you, your Honor.

17                 CONTINUED CROSS-EXAMINATION

18  BY MR. HESSLER:

19  Q.  Good morning, Agent Bezak.

20  A.  Good morning.

21  Q.  I believe yesterday when we talked we had talked about your

22  training, some of the general information you had gathered leading

23  up to your beginning this investigation, correct?

24  A.  Correct.

25  Q.  We talked about your understanding of the use of force policy
```

```
 1   implemented by NOPD?

 2   A.  Yes.

 3   Q.  And isn't it true that you felt the need to learn about that in

 4   order to more fully understand the actions that the officers took,

 5   the reasons that they took them, and whether or not they were in

 6   conformance with policy?

 7   A.  I definitely looked into the policy, but it wasn't a necessary

 8   part of the investigation because the officers will be judged on

 9   the Constitution and the federal law, not whether they violated

10   policy or not.

11   Q.  And while they'll be judged on the Constitution and federal

12   law, but they'll actually be judged on their actions as applied to

13   the Constitution and the federal law, correct?

14   A.  Correct.  But not -- whether they violated NOPD policy or not

15   is not a matter that's a part of this investigation or this trial.

16   Q.  And would you agree -- the use of force policy doesn't

17   necessarily require that they're right in their decision to use

18   deadly force, right -- force of any type, it just requires that it

19   be, that it be their perception that is reasonable and necessary at

20   that time, would you agree with that?

21   A.  I am a little confused by what you mean by right.  The

22   policy -- by the policy -- if they violate the policy by default,

23   they're going to violate the law because the policy has to be more

24   restrictive than the law.  NOPD's policy cannot permit them to use

25   force when by the Constitution they're not allowed to use force.
```

1   So by default if they violate policy, they're also going to violate

2   the Constitution of the federal law.

3   Q.  All right.  Let's explore that a little bit.  NOPD policy and

4   the law does not allow you to shoot an unarmed person, correct?

5   A.  No, you can absolutely shoot an unarmed person in certain

6   circumstances.

7   Q.  Exactly.  And when are those circumstances?  When is it that

8   you can -- I know it sounds odd -- but when is it that a law

9   enforcement officer can shoot an unarmed person?

10  A.  If they reasonably believe that the subject of such force poses

11  a threat of eminent danger of death or serious bodily injury.

12  Q.  And that reasonable belief can ultimately be proven to be

13  completely wrong, huh?

14  A.  Yes.

15  Q.  But if it's believed at the time, the time that the officer

16  pulls a trigger, whether he pulls it once or five times, if he

17  believes his life was in danger, and we don't agree that an unarmed

18  person cannot -- well, in most circumstances an unarmed person

19  wouldn't be perceived as a danger to the point where an officer

20  would shoot that person?

21  A.  Their actions must be judged reasonable -- their action must be

22  judge objectively as if a reasonable officer in that same

23  circumstance would take the same action.

24  Q.  Right.  And you would have to look at all of the circumstances,

25  wouldn't you?

1    A.  All of the information that they had at that time, yes.

2    Q.  Right.  Including the circumstances that they were working

3    under?  Not necessarily just what happened right then, but maybe

4    some of the things that happened in days prior?

5    A.  I wouldn't agree with that.  The subject -- when you use deadly

6    force the threat has to be at that point when you pull the trigger.

7    Q.  Okay.

8    A.  Because something happened a day before, I don't think that can

9    affect whether you perceive somebody in that instant as a threat.

10   Q.  All right.  Let's talk about that.  The FBI has the ten most

11   wanted criminals in America, right?

12   A.  Yes.

13   Q.  Do you think it's more likely that an FBI agent who knew a guy

14   was on a ten most wanted list for a year would -- knew him to be

15   armed and dangerous, when approaching that individual would be at a

16   different mind-set when he was approaching a guy he had no idea

17   about?

18   A.  Certainly.  If you know somebody who is an armed and dangerous

19   individual you're going to approach them differently than a

20   grandmother you're going to talk to her at her house.

21   Q.  And that information is prior information, it's not at the time

22   you confronted him, you're acting on information you had prior to

23   your actual confrontation?

24   A.  Sure.

25   Q.  So it is logical and reasonable to assume that an officer's

1   prior experience or prior knowledge would impact his decision on

2   taking a certain course of action, as well as the encounter itself?

3   A.  I agree.  But just because you know somebody has a history of

4   being armed and dangerous doesn't mean you can shoot them when you

5   first see them.

6   Q.  Of course not.  Of course not.  You ever been in a deadly force

7   situation where you had to fire your weapon?

8   A.  No, I have not.

9   Q.  You've taken classes in it and stuff like that?

10  A.  Yes.

11  Q.  You understand the psychological impacts that this has on a law

12  enforcement officer, to a certain degree?

13  A.  To a certain degree, I certainly wouldn't claim to be an expert

14  in the psychological effects.

15  Q.  You certainly know the legal ramifications?

16  A.  Yes.

17  Q.  You've had classes in that, right?

18  A.  Yes.

19  Q.  In fact, y'all, correct me if I'm wrong, FBI policy is you

20  don't give a statement until like 48 hours afterwards or 48 hours

21  to three days?

22  A.  I am not aware of that policy if it is, if that is a policy.

23  FBI policy is after you discharge your weapon you immediately

24  notify the supervisor, chain of command.

25  Q.  And then when you do that the responsibility for the

1   investigation, the competency of the investigation, the
2   thoroughness of the investigation relies essentially on that
3   supervisor and what he does or does not do; wouldn't you agree with
4   that?
5   A.  Certainly starts with that supervisor, but there is a shoot
6   review team that is from out of division -- this is my
7   understanding of the way it works, I've never obviously been
8   involved -- but my understanding is there's a shoot and review team
9   that comes from out of the division to review the shooting
10  incident.
11  Q.  Let's go back to more general parameters and general things
12  like the NOPD or law enforcement officers.  Once a law enforcement
13  officer shoots their gun, hits somebody or doesn't hit somebody,
14  and notifies a supervisor, then essentially that officer becomes a
15  piece of evidence in that investigation, right?
16  A.  Yes.
17  Q.  To be used by the investigator to determine, so the
18  investigator can make a determination of what happened?
19  A.  Yes.
20  Q.  And that piece of evidence, like any piece of evidence, can be
21  misused or mischaracterized?
22  A.  Certainly a possibility.
23  Q.  Intentionally or unintentionally?
24  A.  Certainly.
25  Q.  Based on several things, the level of expertise by the

1   investigator?

2   A.  Well, yeah, I guess if an -- it is a hypothetical, but

3   ordinarily I would expect a very experienced investigator to handle

4   a shooting incident.  But if it was an inexperienced investigator,

5   certainly they could make a mistake by accident and mischaracterize

6   something that the shooter did or said or some type of evidence.

7   Q.  Right.  Right.  And a police shooting is certainly more

8   problematic and requires a certain expertise as opposed to other

9   investigations, would you agree?

10  A.  I don't think it's anymore complicated than a homicide

11  investigation.

12  Q.  But the FBI has a special investigation team for FBI-related

13  shootings, don't you?

14  A.  Yes.  Like my understanding is the shoot review team comes in,

15  and that's merely so the division itself doesn't investigate the

16  incident.  And again, this is my understanding.  So there isn't an

17  appearance of impropriety.  It's a neutral investigative team, not

18  that they have -- well, actually, I mean, they have experience

19  doing it, but it's primarily for, it's that a neutral team is doing

20  the investigation.

21  Q.  Right.  But it's an experienced team also, wouldn't you agree?

22  A.  Certainly.

23  Q.  Now, let's move along with your investigation.  And I am going

24  to particularize Sergeant Gisevius here.  You investigated and

25  obtained certain records about Sergeant Gisevius, correct?

1    A.  Yes.

2    Q.  And you know as you sit here today that in the 13 years that

3    Sergeant Gisevius spent as a New Orleans police officer never once

4    did he have the occasion to fire his weapon in the line of duty,

5    would you agree with that?

6    A.  I believe it was only during this incident.

7    Q.  Right.  And you knew that he had been assigned to the tactical

8    unit at some point, which is a high crime street patrol unit?

9    A.  Yes.

10   Q.  You knew he was assigned to the 7th District narcotics section,

11   which certainly involves incidents of oftentimes violent narcotics

12   offenders?

13           MS. BERNSTEIN:  Your Honor, may we approach a moment?

14           THE COURT:  Yes.

15       (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

16           MS. BERNSTEIN:  I have no objection to this line of

17   questioning, but it's opening doors that I want to make sure

18   everybody knows it's opening.  This is basically character evidence

19   that, this is also 404(b), it is evidence of his good conduct, his

20   history of being a good police officer.  It's opening a door and I

21   am happy to dance through, but I don't think you intend to be doing

22   that and if you don't, I object.

23           MR. HESSLER:  I don't think it is.  In fact, I am going

24   to leave it alone at this point; but at this point I asked about

25   one point and one point only, discharges.

1          THE COURT:  I think that's correct.  That's all he's

2    asked about is discharging a weapon and the stations that he's had

3    in his career.  Look, this is the investigating agent, wide berth,

4    wide berth; investigating agent, he sat here all day yesterday, all

5    day.  We are going to get into this witness.

6          MS. BERNSTEIN:  I'm fine, I'm fine.

7          THE COURT:  He is a big boy.

8          MR. HESSLER:  I did not open that door and I

9    intentionally phrased my questions like that to avoid opening that

10   door.

11         THE COURT:  I am going to overrule.  Let's go.

12     (OPEN COURT.)

13         THE WITNESS:  Actually I would like to correct an answer.

14   BY MR. HESSLER:

15   Q.  Okay.

16   A.  I have reason to believe Sergeant Gisevius was involved in

17   another shooting after the storm.

18   Q.  Okay.  And you have reason to believe, but you have no evidence

19   whatsoever to corroborate that, right?

20   A.  Two separate witnesses have told me that.

21   Q.  Since you brought us there, I was going to get there, but you

22   brought us there.  You've got two witnesses, right?

23   A.  Yes.

24   Q.  And you've already told this jury that when you have

25   information that doesn't corroborate one witness or another, you

1   got a problem with it, right?

2   A.  I don't know if I would characterize it as a problem, but it's

3   an issue that you have to deal with.

4   Q.  Well, how do you deal with that?

5   A.  Again, you look at the totality of the evidence that you've

6   collected during the investigation and you weigh it against that.

7   If it's, you know, if you have a mountain of evidence that's

8   pointing you in one direction and you have these one or two

9   outliers that for whatsoever reason either misperceived something

10  or saw a different incident or just flat out lying -- I mean, you

11  really can't explain it, but you have to go where the bulk of your

12  evidence is taking you.

13         And in an investigation as huge and as large as this

14  investigation where you've, I think I've interviewed close to 400

15  people, 350 people, I mean, you're always going to have those

16  outliers and it's just something that you have to deal with.

17  Q.  What is an outlier?

18  A.  People that their statements or their observations don't fit

19  with the bulk of the evidence, the physical evidence, the other

20  statements from other witnesses that were on the scene, the

21  statements from the officers involved in the incident.

22  Q.  So in regards to this other incident that you believe Sergeant

23  Gisevius may be involved in, let's make it clear to the jury, not

24  one shred of physical evidence, would you agree with that?

25  A.  I agree with that.

1   Q.  And you said you would look at the circumstances and look at

2   the corroboration or lack of corroboration, you have Hills who is

3   telling you it happened in front of countless people -- well, he

4   said that Gisevius just randomly said this in front of numerous

5   people?

6   A.  It was a discussion out in the open, yeah, Hills overheard a

7   discussion out in the open.

8   Q.  Right.  And out of these 400 people you've talked to, I'm sure

9   you've talked to everybody that was at the Crystal Palace or ever

10  even drove by or looked at the place or the thought that passed

11  their head?

12  A.  No, I can't definitely say I talked to everybody who was at the

13  Crystal Palace.

14  Q.  You didn't pull a 7th District manpower sheet as a part of the

15  investigation to make sure you talked to everybody that was in the

16  7th District during that time?

17  A.  Talked to everybody that I could identify on the scene, but

18  not -- I can't say that I talked to everybody who was assigned to

19  the Crystal Palace during that time.

20  Q.  Did you try to?

21  A.  No.

22  Q.  Why not?

23  A.  They weren't on the scene --

24  Q.  At the Crystal Palace, to try and corroborate this information?

25  A.  Oh, of the Sergeant Gisevius shooting?

```
 1    Q.  Sure.

 2    A.  No, no, I did not.

 3    Q.  Why wouldn't you try to do that?

 4    A.  I wasn't -- I was investigating the Danziger Bridge shooting

 5    incident, I wasn't investigating this separate incident.

 6    Q.  So it's not important enough to investigate but it's important

 7    enough to tell this jury about?

 8    A.  It wasn't important enough to conduct -- there wasn't enough

 9    information, I couldn't find enough information to justify a

10    separate investigation of that incident.

11    Q.  So you don't have enough information to even investigate, to

12    begin an investigation?

13    A.  Any further than the two witness statements.

14    Q.  Any further than just telling these people, Hills said that he

15    said that he shot a guy?

16    A.  And Mike Hunter was on the scene after the shooting.

17    Q.  Did you surmise that?

18    A.  Mike Hunter told us that.

19    Q.  What did Mike Hunter tell us exactly?

20         MS. BERNSTEIN:  Objection, hearsay.  Mike Hunter already

21    testified and the jury can remember what he testified to.

22         THE COURT:  Well, no.  He's just cited Michael Hunter as

23    the source for information, so I think it's a fair follow-up

24    question.  I'll overrule.

25    BY MR. HESSLER:
```

1   Q.  What exactly did Michael Hunter tell you?

2   A.  That he was on the Crescent -- I think the Crescent City

3   Connection, saw Sergeant Gisevius come up one of the on-ramps or

4   off ramps of the bridge.  He noticed that it was him in the truck,

5   Mr. Gisevius in the truck.  That he stopped, had a conversation,

6   Mr. Gisevius looked shaken, nervous, disheveled I guess, I forget

7   exactly how he described it, but nervous, shaken; and Mr. Gisevius

8   told him that he had to shoot at individuals who were trying to

9   take his truck.

10  Q.  Well, actually, he said he fired his weapon, and I think Hunter

11  said that he didn't know, certainly didn't say he hit anybody, that

12  he might have had to fire his weapon to get away is what he said,

13  right?

14  A.  Yeah, that might be more correct.

15  Q.  He didn't allegedly say he had to fire at somebody, shot

16  somebody, killed somebody, did he?

17  A.  No.

18  Q.  And there's also witnesses there that never come forward to

19  corroborate that?

20  A.  One was Defendant Ken Bowen, so obviously he has not come

21  forward.

22  Q.  Who is the other one?

23  A.  I am not aware of another one.

24  Q.  But you know Hunter said there was somebody next to him, he

25  just doesn't know who it was?

1   A.  He thought it was Ken Bowen.

2   Q.  Well, Hunter thought he was with Ken Bowen?

3   A.  Correct.

4   Q.  And Gisevius he thought was with somebody else, he doesn't know

5   who that person was?

6   A.  I don't remember if Mike said that or not.

7   Q.  Let me ask you:  As an investigator when someone tells you

8   something and tells you there's other witnesses but he can't

9   identify those witnesses, guys he's worked with for some number of

10  years, does that cause your suspicions to rise?

11  A.  It certainly makes his statement weaker, but I don't think it

12  means he's lying.  I think, you know, it's reasonable that after a

13  certain amount of time you forget facts like that.

14  Q.  And that applies to everybody in this room, as time passes you

15  forget certain things?

16  A.  Sure, you can forget minor details, absolutely.

17  Q.  And that's just a minor detail, a witness to something like

18  that?

19  A.  (NO RESPONSE.)

20  Q.  All right.  So anyway, I think however we got on that one was

21  we were talking about credibility of witnesses and how you

22  interview witnesses and things like that, and then we were talking

23  about Sergeant Gisevius and the fact that he hadn't fired his

24  weapon in 13 years.

25          Now, investigators were called to the scene, right?  They

1  were notified, I mean, his rank was notified of the shooting,

2  Sergeant Gisevius's rank was notified of the shooting incident?

3  A.  Yes.

4  Q.  And they responded to the scene?

5  A.  Yes.

6  Q.  Maybe not all of them, but some of them, Captain Bardy we don't

7  know if he responded or not I guess?

8  A.  I have no information that Captain Bardy responded.

9  Q.  And there's a chain of command, Lieutenant Lohmann would be the

10  top of the chain as far as we can tell of the investigative body

11  out there?

12  A.  Of the investigative body, yes.  I believe at some point

13  Captain Jeff Winn also showed up.  But I think it's fair to say

14  that Mike Lohmann was the ranking 7th District officer on the

15  scene.

16  Q.  Captain Winn would be a tactical officer, he would have nothing

17  to do with an investigation?

18  A.  Correct.

19  Q.  Any investigators we talked about, they're responsible for

20  protecting the crime scene, right?

21  A.  Absolutely.

22  Q.  Not Sergeant Gisevius?

23  A.  No.

24  Q.  And they're responsible for preserving and collecting evidence?

25  A.  Yes.

```
 1   Q.  Not Sergeant Gisevius?
 2   A.  In this instance, no, because he was a participant in the
 3   incident.
 4   Q.  Believe me, I am just talking about this incident.
 5   A.  Yes.
 6   Q.  Sergeant Gisevius isn't responsible for locating and
 7   interviewing witnesses, that would be the responsibility of the
 8   investigator?
 9   A.  Yes.
10   Q.  Sergeant Gisevius is not responsible for doing any follow-up
11   investigation into this matter?
12   A.  Yes.
13   Q.  And he's not responsible for documenting any of the essential
14   aspects of this investigation?
15   A.  His only responsibility would be a full -- would be to give a
16   full and truthful statement.
17   Q.  Okay.  We'll get to that.  And you actually just brought me
18   right to it.
19           He's responsible for giving a full and accurate
20   statement, right?
21   A.  Yes.
22   Q.  That statement is taken by an investigator?
23   A.  Correct.
24   Q.  And the investigator is responsible for conducting a thorough
25   and accurate interview?
```

A.   Yes.

Q.   And are you responsible for giving accurate and thorough testimony?

A.   Yes.

Q.   But you testified yesterday that the FBI trained you, and law enforcement in general, are trained not to volunteer information?

A.   Not to provide anymore information than is required to answer your question.

Q.   Right.  Nothing more than what's asked?

A.   Correct.

Q.   If I fail to ask something that's pretty important, are you going to remind me?

A.   If you would like me to.

Q.   Please do.  Now, that would be in violation of your policy though, wouldn't it, or your training?

A.   I mean, it's not a policy --

Q.   But it's training?

A.   -- so I don't think it's anything that you could violate.

Q.   And we talked again, and I hate to beat a dead horse until it's more dead, but these accurate and thorough statements, we talked about Michael Hunter's 302 versus what he said on the stand.

A.   Yes.

Q.   And I don't know if we ever really figured out who was responsible for that mishap, was it the investigator or was it Michael Hunter?

1    A.  I guess in the end it would be my responsibility, but it

2    clearly was a misunderstanding on two very minor points in 75 pages

3    of notes.  Two points that have little to nothing to do with the

4    incident that was investigated.  And I think every portion of Mike

5    Hunter's testimony that was pertinent to this case was reflected in

6    the 302 accurately.

7    Q.  Okay.  And that's if you made a mistake, and I understand that.

8    But if Michael Hunter lied, then I've got a big problem with that.

9    And -- let me finish.

10   A.  Sure.

11   Q.  You said you do a read back, and I guess my question is, when

12   you read back to him, Michael Hunter spent two days working for

13   Louis Gaydosh, Sergeant Louis Gaydosh on the West Bank, he either

14   agreed with you and you're right or he disagreed with you and

15   remained silent and he lied.  And I am trying to figure out which

16   one it is?

17   A.  Neither of those things happened.

18   Q.  None of those happened, you didn't do a read back?

19   A.  The thing you're referring to is a brief back.  And in that

20   interview, it was a six or seven-hour interview, I had 75 pages of

21   notes, the brief back consisted of the facts that were pertinent to

22   the incident and Mike Hunter's involvement in the coverup.  I

23   imagine that I did not brief back the two, first two or three pages

24   of background information that you're referring to.

25   Q.  Now, let's go on to, or we started talking about the interview,

interviews, and we talked yesterday a little bit more about the
policy or lack thereof of recording interviews.  Did you ever --
isn't it a fact that you've denied taking interviews from some
witnesses who wanted to tape record their own interview?

A.  Yes.

Q.  They didn't want you to interview it, they said I'll talk to
you, I'll tell you everything I know, but I want to record it for
myself?

A.  Yes.

Q.  And you're telling me that the FBI's policy is you would rather
not interview a witness if he is going to record his statement?

A.  That's exactly our policy.  The witnesses that you are
referring to were then given grand jury subpoenas so that they
could testify in front of the federal grand jury where their
statements were recorded in a transcript, and that's the way we
handled that.

Q.  I understand, sir.  One way or the other it's going to be
recorded, so why not just get their information and propel your
investigation forward?

A.  FBI policy does not allow me to do that.

Q.  When they asked, did you ever go and ask your superior -- how
many times did you go ask your supervisor to allow a tape-recorded
statement to be given in this investigation?

A.  When that started to occur, I definitely did ask the supervisor
how I should handle it, and was told that we would discontinue the

1    interview.

2    Q.  Okay.  My question was, did you ever ask can I record this

3    interview?

4    A.  Oh, can the FBI --

5    Q.  You or this person, yes.

6    A.  I just answered the question for that person, we were not

7    allowed to do that, I was told not to do that.  And for myself, no,

8    I've never asked -- I never tried to get permission to record

9    interviews, for myself recording interviews.

10   Q.  You kind of talked about something I want to get to.  You said

11   at one point, I don't know if you described it, came to one point

12   where police officers in your opinion began not wanting to talk to

13   the FBI?

14   A.  Um, yes.

15   Q.  How many police officers -- how many police officers did you

16   call after their grand jury testimony and tell them they better get

17   an attorney?

18   A.  I didn't call any police officers and told them that.

19   Q.  Never told them that?

20   A.  No.  I mean, somebody from the prosecution team may have done

21   that but --

22   Q.  You in particular, left a voicemail on an officer's cell phone

23   telling them it's best after his testimony that he gets an

24   attorney?

25   A.  I don't remember that.  Do you know a particular officer?

1    Q.  Yes.  And you said that's never happened, you don't remember

2    that not to just one but maybe more than one?

3    A.  No.

4    Q.  Do you recall interviewing Lieutenant Tollefson?

5    A.  Yes.

6    Q.  He testified before the grand jury?

7    A.  Yes, he did.

8    Q.  In regards to your investigation, you also are responsible for

9    doing a crime scene investigation, or at least attempting to do one

10   because I understand your time period, you didn't believe there was

11   evidence that might be out there, but you did one anyway, right?

12   A.  Yes.

13   Q.  And, in fact, you knew there was evidence out there because of

14   strike marks, you had seen the strike marks on the concrete?

15   A.  I knew they had impact points and the strike marks, I didn't

16   expect to find any physical evidence.

17   Q.  Well, the impact points and the strike marks are, in fact,

18   physical evidence, aren't they?

19   A.  I guess you could characterize them as that.  I was speaking of

20   physical evidence like the shell casing, stuff that you collect and

21   take from the scene.

22   Q.  Now, metal takes, like a metal casing, a brass casing

23   especially, takes more than four years to decompose, wouldn't you

24   agree with that?

25   A.  Decompose, yes.

1   Q.  And the casings might be blown off the side of the roadway by

2   traffic, may be washed down the gutter pipes by the water, it's not

3   going to decompose?

4   A.  I mean it's going to deteriorate, it's not going to completely

5   disappear.

6   Q.  And you actually knew from talking to Taj Magee he told you

7   that he saw 9mm casings up on the scene that day?

8   A.  That's what he told me when I interviewed him at his home, yes.

9   Q.  Right.  And he testified, you were here when he testified, he

10  didn't testify on direct to any of the 9mm casings, we had to ask

11  that question, right, do you recall that?

12  A.  I don't remember when it came out, but I know it did come out

13  in court.

14  Q.  And, in fact, did you find 9mm casings out there on the scene

15  searched some number of years later?

16  A.  There was one casing that the search team identified as

17  possibly a 9mm casing.  I don't know whether it really was or not.

18  Q.  Right.  And the reason we don't whether it really was or not

19  was because you didn't send to it get tested, right?

20  A.  Correct.

21  Q.  Why wouldn't you do that?

22  A.  I felt there was no reason to send it to the lab because we

23  had -- didn't have a gun to compare it to.  So it could tell us

24  what type, possibly tell us what type of casing it was, but there's

25  no way to tie it to the incident either one way or the other.

1    Q.  But it was preserved?

2    A.  Yes.

3    Q.  And a .380 was also found?

4    A.  Yes.  That was found on the left side of the road on the deck

5    of the bridge, and you could tell just by looking at it that it was

6    much too new to be related to the incident.

7    Q.  Could you tell by looking at it if it had been somehow maybe

8    protected from the elements by debris or something else?

9    A.  It was literally on the deck of the road, so there's no way it

10   was protected by anything.

11   Q.  You got a picture of how it was recovered?

12   A.  Yes.

13   Q.  Do you have a picture of that shell casing?

14   A.  Yes.

15   Q.  And that's what you normally do, you photograph things that you

16   find whether or not you believe they have anything to do with it or

17   not because that's what you're trained to do?

18   A.  Yes.  That was the only, my recollection anyway, is that was

19   the only piece of evidence that was photographed in place where it

20   was found because the other pieces of evidence were located in the

21   sewer drains when we were sifting through the sediment.  So there

22   was no way to photograph them in place.

23   Q.  Now, I think you told the jury yesterday that there was no way

24   that anybody from the Brissette party or Bartholomew party could

25   have fired those weapons up on top of the bridge because they never

1  made it to the top of the bridge, right?

2  A.  Yeah.  I didn't say the top of the bridge, but it was further

3  west from their position.

4  Q.  Further west to a higher position?

5  A.  Yes.

6  Q.  You didn't tell them that it couldn't have been any members of

7  the group that fired the weapon that the police officers chased

8  which were wearing the same type of clothing as the Madison

9  brothers?

10  A.  The police officers only chased the Madison brothers and

11  Morrell Johnson.

12  Q.  We're going to get to that.  You didn't tell the jury that it

13  couldn't have been the persons that Jennifer Dupree said I tracked

14  them from them firing at the bridge to the Danziger, directed the

15  cops to the Danziger Bridge, and they ran over, the guy with the

16  red T-shirt, I believe red T-shirt, a white T-shirt, and a black

17  T-shirt; right?

18  A.  I don't recall if Jennifer Dupree said she tracked them the

19  whole way from her position to the Danziger Bridge.  But, no, I did

20  not say that.

21  Q.  Do you recall her saying, "I'm sure it was the same people that

22  ran up on top of the Danziger Bridge that were shooting at us."?

23  A.  I believe she told me that when I interviewed her.

24  Q.  Do you recall her testifying to that in court?

25  A.  I don't remember her saying that in court.

 1    Q.  So even though it may not have been the Bartholomews,

 2    Brissettes, or Jose Holmes, certainly can't rule out that it was

 3    whoever the parties may have been, whether this was Lance Madison,

 4    Ronald Madison, or unknown persons, you can't rule out those

 5    persons shooting --

 6    A.  I can rule them out because Mike Hunter who was a witness on

 7    the scene stated those individuals were not shooting.

 8    Q.  Okay.  Right.  Then Mike Hunter also said he was not shooting

 9    back at the ones that weren't shooting at him, he was shooting over

10    their heads?

11    A.  That's what he claimed.

12    Q.  You say he claimed that, you didn't say -- never mind.  So

13    we're on the same page.

14            Now, one of the things I am wondering about is you when

15    we had experts and we debated all of this until the end of the day,

16    strike marks on the north side of the barrier.

17            MR. HESSLER:  Your Honor, may I borrow your bookcase

18    again?

19            THE COURT:  Yes.

20            THE WITNESS:  On the walkway side of the barrier?

21            MR. HESSLER:  Correct.

22    BY MR. HESSLER:

23    Q.  Now, let's pretend that this is concrete barrier -- and when I

24    say this, I am using a bookcase -- it's parallel to the bar in

25    front of the jury box.  And this is the concrete barrier, this is

1    the north side, south side, and this is the metal railing

2    (INDICATING).  So we're oriented, do you understand what I'm

3    saying?

4    A.  Yes, sir.

5    Q.  And we don't have the little red rubber gun, but Ms. Bernstein

6    stated, and she did this numerous times, and you sat right where

7    she is sitting and kept talking about that ricochet that hit James

8    Brissette.  Do you recall that?

9    A.  Yes.

10   Q.  From a high-powered weapon?

11   A.  Yes.

12   Q.  And we talked about troughs and direct strike marks, right?

13   A.  Yes.

14   Q.  And a ricochet from a high-powered weapon would leave a

15   definitive trough, do you agree?

16   A.  I do not agree.

17   Q.  Would it leave a strike mark?

18   A.  It depends on the angle that it -- and again, I am not a

19   ballistics expert, but it would depend on the angle that it hit the

20   concrete.  For example, the strike marks that you can see in the

21   picture of James Brissette laying on the ground, they just look

22   like skid marks which would be consistent with the bullet from Ken

23   Bowen's, the AK-47 that Ken Bowen fired that was found in James

24   Brissette which was consistent with a bullet that struck at a very

25   shallow angle on a concrete or hard surface.

1    Q.  Well, let's not talk about that yet, let's talk about the one I

2    was talking about, and I'm talking about the one that Ms. Bernstein

3    kept referring to, the AK-47 round or high-powered round,

4    ricochetted off of the north side of the barrier --

5    A.  Sure.

6    Q.  -- entered James Brissette's body?

7    A.  Yes.

8    Q.  Now, I would agree with you that if it was a rubber gun that

9    shot rubber bullets it probably wouldn't leave a mark.  But you're

10   going to tell me and you're going to tell this jury that an AK-47

11   or high powered, high velocity assault rifle, wouldn't so much as

12   leave a nick in the concrete?

13   A.  I didn't say that.  I think you -- I referred to it like a skid

14   mark, like the ones that are shown on the walkway in that

15   photograph, not a strike mark where the concrete has exploded like

16   on the south side of the barrier where clearly it was an impact

17   that was straight on, not a shallow impact, shallow and ricochet.

18   Q.  Sir, could bring up 146 and 153.  Where in that picture do you

19   see any indications on the north side concrete barrier of a strike

20   mark, trough, furrow, whatever you want to call it?

21   A.  (WITNESS MARKS EXHIBIT.)

22   Q.  Okay.  That's blood, right?

23   A.  Below the blood.

24   Q.  Right.  And it's also above his head?

25   A.  It's hard to tell in this photograph.

Q.  All right.  But assuming that the jury can see that, but
assuming that it's above his head, that bullet, especially at a
shallow ricochet, would have gone on and certainly not have entered
James Brissette's body as he lays there on the ground?
A.  I mean, it depends.  Maybe he was slightly elevated when he got
struck with that round, I don't think you can say one way or the
other.
Q.  Can you enlarge this area, sir (INDICATING)?  You're talking
about that right there (INDICATING)?
A.  Yes, yeah.  And for the picture it appears it could be a strike
mark.
Q.  This one (INDICATING)?
A.  Yes, that one.  This would be blood (INDICATING).
Q.  And that would be ejected blood?
A.  I mean, yeah, obviously it got there somehow, I am not an
expert on blood splatter analysis.
Q.  But you're an engineer, right?
A.  Yes.
Q.  And I am certainly not.  But blood is like liquid, and if
you're walking and you're dripping blood, if you ever cut your
finger, on the kitchen floor and you swing your arm, the velocity
of blood that's dropped and then the splatter narrows into the
little tail in the direction that the blood carried, would you
agree with that?
A.  I can't agree with that.  I don't know.

1    Q.  You don't -- okay.  But you looked at that picture and, in

2    fact, the expert and Ms. Bernstein had Mr. Harrell lying on the

3    ground and went to great lengths explaining to the jury how it

4    ricochetted off and into his arm at that position, right?

5    A.  Yes.

6    Q.  So we're back to what -- so maybe it didn't happen the way the

7    expert and Ms. Bernstein said it happened, maybe the bullet did

8    strike up here and maybe everybody's wrong about what happened?

9    A.  You just asked if there was a strike mark on the north side of

10   the concrete barrier, I pointed out what I thought was a strike

11   mark.  I didn't indicate that that was the strike mark that was the

12   ricochet that Ms. Bernstein and Dr. DiMaio were referring to.

13   Q.  Sure.  And that's what I am asking you, where is that strike

14   mark that the government keeps referring to?

15   A.  I don't know.  It could have been that one or it could have

16   been just not caught in that photograph.

17   Q.  Could be that it's not there?  I'm mean, it's not like -- I

18   mean, it's not caught in a photograph.  In a photograph it's not

19   like Big Foot, it's either there or it's not there?

20   A.  It's not a crisp, perfectly clear photograph.  And again it

21   would be -- you keep referring to an impact like it was going to be

22   an exploded section of concrete like you see on the south side of

23   the barrier, but this was clearly from the medical testimony and

24   from the ballistics testimony a bullet that struck a very shallow

25   angle.  And what type of mark that would make, I can't say.

1    Q.   Okay.

2              MR. HESSLER:  Your Honor, may I approach?

3              THE COURT:  Yes.

4              MR. HESSLER:  May I approach, your Honor?

5              THE COURT:  Yes.

6    BY MR. HESSLER:

7    Q.   I am going to show you a picture that's marked -- with FBI

8    markings.  Do you recognize that photograph?

9    A.   Yes.

10   Q.   Is that impact mark 11?

11   A.   Yes, it is.

12   Q.   Is that, in fact, the impact mark that is referred to, that

13   we've been referring to above Mr. Brissette's body?

14   A.   I can't say that for sure, it's certainly in the general area.

15   Q.   Now, in your experience, does that appear to be more of a

16   direct impact?  It's almost perfectly round.

17   A.   I can't say either way what kind of impact would have caused

18   that.

19   Q.   Now, I think Dr. DiMaio stated something about that was not a

20   jacketed pellet, that was a core or something and it struck

21   something, and it's indicative of striking something before it

22   entered Mr. Brissette's body?

23   A.   I don't think Dr. DiMaio talked about the ballistics in that

24   detail at all.

25   Q.   There was a .223, what he believed might be a .223 core, right?

 1  A.  There was a piece of core that Patrick Lane thought was

 2  consistent with the core from a .223 found in the abdomen of James

 3  Brissette.

 4  Q.  And that he says, couldn't be sure, but based on things he told

 5  the jury, very well may be a .223, the bending of the cantelur --

 6  A.  No, no, no.  That was Dr. DiMaio who said that.  Patrick Lane

 7  said the core was most consistent with the core from a .223 based

 8  on the diameters.  Dr. DiMaio said that the piece of jacket that he

 9  saw in the abdomen, the X-ray of James Brissette's abdomen was a

10  .223 jacket because in his experience a .223 round bends at the

11  cantelur and he saw that in the X-ray.

12             MR. HESSLER:  Your Honor, may I approach?

13             THE COURT:  Yes.

14  BY MR. HESSLER:

15  Q.  Agent Bezak, you testified -- I believe I may be correct, I

16  don't want to mislead -- that you did look at the strike mark and

17  it kind of peaked your interest a little bit because of some

18  corroborating evidence that, hey, it may have come from the grassy

19  area?

20  A.  No.  That peaked my interest the first week or two after I was

21  assigned the case.  When I was just doing a survey of the scene, I

22  noticed if I stood in a certain, stood in a certain position I

23  could lineup what I believe is this impact point 11 with one of the

24  impact points on the railing.  So that's how it peaked my interest

25  just because visually I could see that, you could line it up.

1    Q.  Right.  And so I guess it was important enough for you to take

2    a picture of?

3    A.  Certainly.

4    Q.  And so you recognized that that was, in fact, an impact point

5    on the wall?

6    A.  Yeah, something chipped the concrete, I can't say what but

7    something chipped the concrete.

8    Q.  But just by coincidence not only did it chip the concrete but

9    they had a strike mark which perfectly fit the trajectory of a

10   bullet of one which could be fired from the grassy area?

11   A.  It appeared to line up.  Later when we shut the bridge down and

12   the real ballistics expert came to look at it, that was no longer a

13   concern of mine.

14   Q.  Okay.  Why is that?

15   A.  Based on his analysis he felt all of the strike marks on the

16   railing came from either the east or the southeast, which is not in

17   the grass.  So clearly I was wrong when I had that feeling.

18   Q.  Okay.  He could be wrong?

19   A.  I guess he could be wrong, but he's the expert and I would

20   expect that he wouldn't be wrong.

21   Q.  And he hasn't testified here today or in this trial, has he?

22   A.  Not yet.

23   Q.  How is it that you took a picture, where was it from, were you

24   hanging from the side of the bridge or did you walk back a little

25   bit?

1   A.  I was standing in the grass.

2   Q.  You must have had like a zoom lens obviously?

3   A.  Just had the point and shoot that I keep in my car.

4   Q.  Pretty good photograph.  About, whereabouts were you standing?

5   I wish I had a picture so you could orient yourself.

6           When we talk about this grassy area, we're talking about

7   the area where we saw a police car drive, the trooper Baron kind of

8   referred to it as the low road?

9   A.  Correct.  And he stated that, I think he sent one or two

10  troopers down that way.

11  Q.  Right.  And we know from testimony that a 108 call like this

12  draws every police officer that can get there?

13  A.  Yes.

14  Q.  Not only in budget trucks, there were police officers getting

15  there in commandeered cars such as Bethea, police cars that still

16  survived the storm, National Guard's people probably responded,

17  anybody that was in the area?

18  A.  Certainly I know LSP, NOPD.  I don't have any information that

19  the National Guard responded.

20  Q.  All right.  I am going to show you a photograph which you

21  took --

22           MR. HESSLER:  Your Honor, may I approach?

23           THE COURT:  Yes.

24  BY MR. HESSLER:

25  Q.  Is that a depiction of the photograph from the evidence that

1   you observed that day?

2   A.  Yes.

3           THE COURT:  Which one is this, Mr. Hessler?

4           MR. HESSLER:  Your Honor, we can't seem to locate it but

5   it has been introduced.

6           THE COURT:  Is this in already?

7           MR. HESSLER:  It should be, your Honor.  Could we see

8   296.

9           THE COURT:  296 is in.

10  BY MR. HESSLER:

11  Q.  296, please.  We're looking at Exhibit 296, correct?

12  A.  Correct.

13  Q.  And that appears to be a photograph taken from that grassy area

14  at some point, depending on, I guess, the magnification of your

15  lens, and almost in the middle of the picture we see the strike

16  mark I guess right there, correct (INDICATING)?

17  A.  Correct.

18  Q.  And if we look at the railing, we see a corresponding furrow

19  into the metal?

20  A.  Correct.

21  Q.  And I want to show you what I'm going to mark as 296-A, your

22  Honor, and I think that's the picture that's in front of you, it

23  looks like it's a blowup of that same photo.

24  A.  Yes.

25          MR. HESSLER:  And we'll mark this as 296-A.

1    BY MR. HESSLER:

2    Q.  And that's that same photograph, right, blowed up?

3    A.  It appears to be.

4    Q.  Blowed up, I feel like I'm Larry the Cable Guy.  That's that

5    photograph all blowed up now, right?

6    A.  That's right.

7    Q.  And coincidentally, and I must say amazingly so, it fits like a

8    glove?

9    A.  That's why I took the photograph.

10   Q.  Now, you reviewed Eric Smith's report of examination?

11   A.  Yes.

12   Q.  And you're aware that he talks about impact marks in that

13   report, correct?

14   A.  Yes.

15   Q.  And are you aware that he opines in his report that the

16   approximate direction for the origin of these projectiles cannot be

17   determined?

18   A.  I don't.  I think he's referring to the impact points on the

19   concrete barrier, not the metal railing.

20   Q.  Okay.  Well, let me ask you this.  And I wish I would have

21   asked you this before because I wouldn't have to go through all of

22   this leaning over and stuff.  Where did he determine that bullet

23   came from, that impact point?

24   A.  Which one are you referring to?

25   Q.  The one we've been talking about for the last 20 minutes, that

1    one right there (INDICATING).

2    A.   The metal rain railing or the concrete?

3    Q.   The concrete.

4    A.   Could not determine where the one on the concrete came from.

5    The metal railing was from the south or southeast.  So clearly if

6    that shot caused the impact point on the metal railing came from

7    the south or southeast, the fact that it lines up with this other

8    nick on the concrete is purely coincidental.

9    Q.   Can you go to 307, please.  And this is a diagram conducted or

10   compiled by FBI crime scene people?

11   A.   Yes.

12   Q.   And it's actually an aerial photo I suppose, right?

13   A.   Yes.

14   Q.   And the two trucks I'm assuming are actually superimposed,

15   makeups, they're not actually trucks that y'all parked there that

16   day, or am I wrong?

17   A.   No.  These are --

18   Q.   Models?

19   A.   Yeah, models, a graphic.

20   Q.   Let me ask you a question.  Can you blow up that area right

21   there (INDICATING).  Where is Agent (SIC) Lehrmann's car?

22   A.   We didn't --

23   Q.   Officer Lehrmann's car.

24   A.   We didn't attempt to position Officer Lehrmann's car.

25   Q.   Why not?

1    A.  It wasn't pictured, depicted in the video.  These positions

2    were based on the positions of the truck that you could see in the

3    video, and you can't see Officer Lehrmann's vehicle in the video.

4    Q.  So if you could explain to the jury, and to me, how is it that

5    these positions were determined?

6    A.  Again, the specialist from Quantico came to the scene, and then

7    based on the video they used -- we'll start with truck position 1,

8    which was the first clear picture of the budget truck that had

9    enough detail in the foreground and background of the picture that

10   they could use those details to position it based on landmarks in

11   real life while they were there on the scene.

12           So if there was a pole -- and I don't know what the first

13   image they used was, but if, for instance, if this pole was one of

14   the landmarks in the image that they used, they would lineup the

15   truck so that in real life on the scene its positioned in the same

16   position relative to that pole.

17   Q.  Okay.  And this was done by GPS?

18   A.  No.  It was done -- I am not sure exactly how they did it, but

19   once they determined they had it in the correct location, the

20   position of the truck was surveyed in and I believe they did use

21   GPA to survey that in.

22   Q.  I know GPS can sometimes, depending on what version you use,

23   military's precise down to a matter of three feet I think, but

24   civilian versions and so on, it could be of 50, 100 feet of margin

25   of error.  What's your margin of error here?

1    A.  I have no idea, the lab handled all of this.

2    Q.  So we don't even know if this is correct, it could be 3 feet,

3    14 feet, 20 feet, 80 feet different?

4    A.  No.  Because we had discussions about that and I told them as

5    long as they could get it accurate within a few feet that I think

6    that would be satisfactory.

7           And those are for the positions of the truck and the

8    people.  Obviously the positions of the evidence that was located,

9    the positions of the impact points that were located, those are all

10   dead on because they could look at it and point to it.

11   Q.  So the position of the persons that were shot could be off?

12   A.  Sure.

13   Q.  And that could mean a heck of a lot of difference, right?

14   A.  If you're referring to these positions, I think those are,

15   again I can't opine about exactly how precise, but I think those

16   are actually going be very, very close because they were comparing

17   it over a very short distance.  The things that I was referring to

18   that I told them if they could get it within a few feet would be

19   the positions of the people, the positions of the truck, which was

20   again gauged over a very long distance.  So a very short, very

21   small angle would create a large difference.  I told them to try to

22   get it within a few feet of their actual position, and they were

23   able to do that.

24   Q.  But again, you don't know how accurate this is, at all, it's a

25   general description?

1    A.  I mean, if you can define accurate.  If within a few feet over

2    a scene that's a half mile to a quarter mile long, I think that's

3    very accurate.  If you want it down to the inches, no, it's

4    definitely not down to the inches.

5    Q.  I'm talking about how accurate is it when you're on trial for

6    shooting persons and they might not be in a position that you're

7    trying to tell the jury that they were in, I'm talking about that

8    accurate.

9    A.  I think it's definitely accurate enough for this.

10   Q.  Even though you don't know the margin of error?

11   A.  Like I said, it's within a few feet.  Whether Robert Gisevius

12   fired at Lance Madison in this position or two feet up the bridge

13   or two feet back on the bridge, I really don't think that matters.

14   Q.  Okay.  What about these people over here, does that matter to

15   you (INDICATING)?

16   A.  Yes.  And those individuals, like I said, I think those are

17   very precise because it was a close-up image that was used, it

18   wasn't over such a great distance.

19   Q.  Did you factor in positions that Hunter put them in when he put

20   them right adjacent to the truck, the live eye witness that's

21   cooperating with the government?

22   A.  I don't believe Mike Hunter said they were adjacent to the

23   truck.  I know he said he had to walk up to the victims.

24   Q.  We're talking about Mike Hunter and witnesses and things like

25   that.  When you do these 302s and do interviews, do you ask for a

1   narrative version of events, do you ask that person tell me what

2   happened and then you ask questions, or do you ask questions while

3   the narrative is going on or what?

4   A.  It varies --

5   Q.  Or do you ask questions at all?

6   A.  It varies.  I think generally I try to get a broad statement,

7   kind of a tell me what happened and then narrow in; but sometimes

8   that's not the case, sometimes I'll ask more pointed questions

9   right away.  But generally I would try and get a broad overview.

10  During that overview I try not to interrupt them, but certainly I

11  can't say that I never interrupt them.  And then, of course,

12  there's follow-up questions after that broad overview.

13  Q.  Now, but you do ask questions, would you agree with that, in

14  almost every interview of a witness you would ask questions?

15  A.  Certainly, definitely.

16          THE COURT:  Mr. Hessler, you did not offer 296-A,

17  although you gave it to the courtroom deputy.

18          MR. HESSLER:  I thought I marked it, your Honor, I would

19  offer it then.

20          THE COURT:  You marked it, you didn't offer it.  Is there

21  an objection?

22          MS. BERNSTEIN:  No objection, your Honor.

23          THE COURT:  Okay, thank you.  We'll admit 296-A.

24          MR. HESSLER:  Thank you, your Honor.

25  BY MR. HESSLER:

1  Q.  As an investigator asking those witnesses, you're trying to get

2  to the truth of the matter, whether it's contrary to your theory or

3  supports it or ends up having nothing to do with it, right?

4  A.  That's correct.

5  Q.  Wouldn't you agree that that's the matter in this case with all

6  witnesses?

7  A.  Yes.

8  Q.  And you wouldn't ignore or otherwise marginalize any evidence

9  without reason, of course, of further investigation, would you?

10  A.  I mean, the only way I would -- I don't know if I like the word

11  marginalize.  But if somebody is telling me something that's not

12  consistent with the rest of the evidence, of course I'm not going

13  to veer my investigation off based on just that person's statement.

14  Q.  No, until you could figure out if he was mistaken or lying or

15  just otherwise crazy?

16  A.  (WITNESS NODS HEAD IN THE AFFIRMATIVE.)

17  Q.  And you make credibility calls?

18  A.  Yes.

19  Q.  And you did, a fella you mentioned yesterday, Shawn Hunter on

20  direct -- not Hunter, Shawn Gasaway?

21  A.  Yes.

22  Q.  Gasaway gave you indications that he observed and heard gun

23  fire coming from --

24       MS. BERNSTEIN:  Objection to the hearsay, your Honor, we

25  talked about this yesterday.

 1            MR. HESSLER:  Your Honor, he testified to this yesterday.

 2            THE COURT:  Well, he testified I think as to Mr. Gasaway.

 3  I don't recall that he testified into anything that specifically

 4  that Mr. Gasaway said.

 5            MR. HESSLER:  I'll rephrase my question.

 6            THE COURT:  So I sustain the objection and ask that you

 7  rephrase.

 8            MR. HESSLER:  I will, your Honor.

 9  BY MR. HESSLER:

10  Q.  You spoke to an EMT officer from I think Arkansas by the name

11  of Shawn Gasaway?

12  A.  I did not speak with him, other agents were assigned leads to

13  speak with him.  I don't remember if he was from northern Louisiana

14  or Arkansas, but he was spoken to.

15  Q.  And this was leads that the FBI developed?

16  A.  Yes.

17  Q.  And based on information you obtained from Gasaway, you

18  considered the possibility of shots being fired from the north

19  side?

20  A.  No.  I considered that possibility before that when I took that

21  photograph within the first few weeks of being assigned the case.

22  Mr. Gasaway provided information that was consistent with that.

23  Q.  Consistent with what you believe could have happened that's

24  possible?

25  A.  Consistent with the strike mark and impact point on the rail

1    that I lined up, yes.

2    Q.  And for reasons you found, for reasons I guess lack of

3    corroboration, you chose to discount this?

4    A.  Yes.  Because of the results of Eric Smith's ballistics

5    analysis, and also the other EMTs with Mr. Gasaway did not

6    corroborate his account.

7    Q.  You're not suggesting to his jury that every bullet that would

8    have passed through that, that was shot from the grassy area that

9    passed through that iron railing would have struck that iron

10   railing, are you?

11   A.  No.  I have no reason to believe that any bullets were fired

12   from that grassy area.

13   Q.  Could have been fired and struck an individual and not hit

14   anything other than that individual?

15   A.  If that did happen, yes.

16   Q.  Right.  Do you remember talking to Michael Lawrence?

17   A.  The name sounds familiar, I don't remember the details.

18   Q.  Did you ever have occasion to be informed that a civilian was

19   in possession --

20            MS. BERNSTEIN:  Objection, hearsay.

21            THE COURT:  I think we're going to have to be careful on

22   how we phrase the question so as to avoid a hearsay problem.

23   Although he didn't finish the question, I'll give an instruction to

24   rephrase the question in light of the objection.

25   BY MR. HESSLER:

1   Q.  Did you ever have the occasion to learn of evidence that was

2   collected and remained in the possession of a civilian that was

3   collected from that area, from that shooting scene?

4   A.  A civilian told me that they did that.

5   Q.  Right.  And that civilian told you that he had that?

6   A.  He thought he had that.

7   Q.  He told you where he had them at?

8   A.  Where he thought he had them at, yes.

9   Q.  Did you ever go back and ask him to check that location and

10  confirm whether or not they were there or not?

11  A.  Multiple times.

12  Q.  What occurred on these multiple times?

13  A.  Asked him to search and then I believe two agents also went

14  there and attempted to search the area where he claimed he had

15  these items.  But it was -- the area was so full of junk that

16  nothing was located.

17  Q.  Just couldn't find it?

18  A.  Correct.

19  Q.  Let me go on.  So I guess what you're saying is if there's not

20  corroboration to an individual's story you might begin to doubt

21  that story or discount that story?

22  A.  Yes.

23  Q.  They give you multiple stories, different stories, varying

24  stories, would you have a concern about that, too?

25  A.  If their story changed, for instance, like Ken Bowen's stories

1    changed from running down into the grass to not running down in the

2    grass --

3         MR. DeSALVO:  I object, your Honor, there's only one

4    statement in this record from Ken Bowen.  Saying the statement was

5    changed is misleading this jury.

6         THE COURT:  Well, we have the one -- why don't y'all

7    approach.

8         (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

9         MR. DeSALVO:  He wants to say it's different from what's

10   in the report, I have no problem with that; but to say that his

11   story has changed, that's misleading this jury.

12        MS. BERNSTEIN:  Your Honor, if I can respond.  There

13   certainly is tons of evidence that's been elicited in this trial

14   that that was, in fact, his statement.  There was evidence that he

15   wrote it, there was evidence that he sat at the computer with

16   Kaufman.  I actually don't disagree with Mr. DeSalvo though because

17   this is my concern exactly which is, although I am not objecting

18   because I think Agent Bezak has nearly perfect memory, but having

19   Agent Bezak go through the entire trial and tell this jury what

20   every witness has said seems, you know, redundant and potentially

21   misleading if he happens to have imperfect memory on something.  So

22   I stopped objecting because I didn't want to jump up here.

23        THE COURT:  I think we ought to rephrase the question.

24   I'll strike the answer and we'll rephrase the question.

25        MR. HESSLER:  Well, the question --

```
 1              MR. DeSALVO:  I think the answer was non-responsive.

 2              THE COURT:  Well --

 3              MS. BERNSTEIN:  I don't remember what the question was.

 4              THE COURT:  I think he's trying to respond to the

 5    question, the problem is that he's adding something that the

 6    question doesn't necessarily call for.  Okay.  So I'll strike the

 7    answer, I'll tell him to answer the questions directly and

 8    concisely as he can.

 9              MS. BERNSTEIN:  And on the other issue.

10              THE COURT:  What's the question?

11              MR. HESSLER:  The question is, if he received multiple

12    versions of an event from a witness, would he question the

13    veracity, credibility of that witness, something along those lines.

14              THE COURT:  Okay.

15              MR. HESSLER:  And his answer could be yes or no.

16              MS. BERNSTEIN:  He answered that fairly.

17              THE COURT:  He did.  That's the problem is that he did

18    and then he went on to launch an attack on Bowen's statements in

19    particular, which he wasn't asked about.

20              MS. BERNSTEIN:  And, your Honor, just so I know whether

21    or not to jump up in the future, do you agree that asking him to

22    repeat other people's testimony is improper?  You haven't done it

23    right now, but I have --

24              THE COURT:  If it's on a point that's fairly, it's fairly

25    subject of cross on a specific point, I don't have a problem with
```

1    it.  If the point is to simply get him to plow through testimony

2    that's already been given so as to remind the jury of it, then we

3    can do that for days on end, you all can do it and he can do that.

4    I don't think anybody wants to do that.

5         MS. BERNSTEIN:  But, for example, if the purpose is to

6    argue with a conclusion that Dr. DiMaio testified about, that seems

7    improper to argue with him about that DiMaio's conclusions.  I am

8    just trying that as an example.  I didn't object because I didn't

9    want to jump up here, but as long as we're up here I wanted to

10   share this concern.

11        MR. DeSALVO:  Since he's offered an expert opinion as to

12   strike marks and we have one from Dr. DiMaio, certainly going to

13   talk about the difference in training and expertise.

14        MS. BERNSTEIN:  Bezak hasn't offered any expert opinions

15   on strike marks, he's offered opinions in response to --

16        THE COURT:  But the thing about it is is that he is the

17   chief investigator, under Kelly Bryson he is the person assigned to

18   do the investigation, to talk to the witnesses, to examine the

19   physical evidence, and indeed examine and accept or reject any

20   expert analysis.  So there's a connexity between his investigation

21   and all of the things that were done as part of it.

22        MS. BERNSTEIN:  And I guess what I would ask is that they

23   be held to the same careful rules that I was held to, which is no

24   problem with saying did you review an expert opinion, what did you

25   do based on that.  I yesterday worked very carefully not to elicit

1  the hearsay.  What we have now is anything anybody said to him and

2  anything anybody has said in court we'll get his opinion on it,

3  including his opinion on whether people told the truth or not in

4  court.

5          MR. HESSLER:  He just testified he does that as part of

6  his investigation.

7          THE COURT:  He did that with regard to Hunter in

8  particular and maybe a couple of others that he said he rejected

9  and there were people with whom he spoke to that he rejected their

10  version.

11          MS. BERNSTEIN:  And I have no objection to that.

12          THE COURT:  In particular Gasaway just now.

13          MS. BERNSTEIN:  I have no objection to did you speak to

14  Michael Lawrence, did you reject his opinion and why, and I am just

15  using Michael Lawrence as an example.  But what I object to is

16  rather than having a trial, having him talk about what everybody

17  told him and what everybody has told us in court --

18          THE COURT:  I sustained the objection insofar as a

19  question that either characterizes someone else's testimony that he

20  could have rejected or getting him to recite a person's testimony

21  and then saying but I reject it.  I think you need to call those

22  witnesses, if, in fact, we're going to do that.  And I think after

23  I sustained the objection I thought Mr. Hessler appropriately asked

24  about Gasaway in particular, I think was the line of questioning

25  that you objected to, and I thought that we successfully asked him

1    about it without eliciting the hearsay of what, in fact, Gasaway

2    told him.  So I think we're going to have to be careful about that.

3    He is not the witness who recites the testimony of all of the other

4    witnesses.

5           MR. HESSLER:  But, your Honor, he made certain

6    conclusions based on his investigation.

7           THE COURT:  Correct.

8           MR. HESSLER:  His investigation was based on witness

9    statements.

10          THE COURT:  That's correct.  And in that regard if you

11   want to probe a point of his investigation and how he came to

12   conclusions based on particular pieces of testimony, such as

13   Mr. Hunter, I think it's appropriate to do it.

14          I think it's inappropriate to simply ask him, well, did

15   you talk to so and so and did you find them credible or did so and

16   so tell you this.  I think you can -- let me back up a little bit.

17   I think you can ask him if he interviewed or if he directed a

18   certain person to be interviewed and whether he chose to accept or

19   reject that testimony as helpful.

20          MR. HESSLER:  And why he did that.

21          MS. BERNSTEIN:  Yes.

22          THE COURT:  And why because it was either uncredible or

23   uncorroborated or whatever.

24          MR. HESSLER:  That's fine.  That's the only thing I was

25   talking about.  I just think the big problem is his answer was

 1   non-responsive.

 2              THE COURT:  Correct.  We are going to go back to that and

 3   I am going to strike the answer.

 4              MR. HESSLER:  Can you strike partially the answer,

 5   because I like part of the answer.

 6              MS. BERNSTEIN:  The answer was absolutely responsive to

 7   the question.

 8              THE COURT:  No, but he went on after that, and he's not

 9   going to be able to just tear off and go into an attack on a

10   particular defendant when the question clearly doesn't call for it.

11              MR. HESSLER:  If I may, I think the non-responsive part

12   ought to be stricken, the part that he says that multiple versions

13   of events do concern him and then he gave a for instance, I think

14   the for instance wasn't part of the question.  I'll just have to

15   ask it again in a different way.

16              THE COURT:  Just ask it again.  I am going to strike the

17   answer.  Go ahead and ask the question again.

18       (OPEN COURT.)

19   BY MR. HESSLER:

20   Q.  Agent Bezak --

21              THE COURT:  Wait one second.  The court is going to

22   strike the previous answer from the record and ask counsel to

23   propound the question again.  Sir, I would ask you to please listen

24   carefully to the question and answer the question and only the

25   question as concisely as you can.

1          THE WITNESS:  Yes, sir.

2    BY MR. HESSLER:

3    Q.  Agent Bezak, as an investigator, you sometimes have to make

4    certain credibility calls of a witness or person interviewed,

5    correct?

6    A.  Correct.

7    Q.  If a person interviewed gives you multiple versions of an event

8    that differ in the telling and the facts of that event, does that

9    concern you?

10   A.  It depends on the significance of the differences.

11   Q.  Is that depending on the significance of the variation, does

12   that cause you to question the credibility sometimes?

13   A.  Yes.

14   Q.  And depending on the number of times you hear that story and

15   the number of times that story changes, especially if it's a

16   significant fact, would that cause you to possibly doubt the

17   credibility of that witness?

18   A.  If it was a significant fact that would be unlikely that

19   somebody could mix it up or be mistaken about it, absolutely.

20   Q.  Okay.  Jose Holmes told you he did not have a gun.

21   A.  Yes.

22   Q.  Right?  And you were in here when Jose Holmes testified?

23   A.  Yes.

24   Q.  And you know Jose Holmes testified under oath in a grand jury

25   that someone jumped over the barrier --

1          MS. BERNSTEIN:  Objection, your Honor, the same objection

2    we just talked about.

3          THE COURT:  I think we need -- well, look, we need to get

4    to a particular question about what he knows.  If you want to

5    direct him to something in particular, but rather than recount

6    testimony, let's get to a specific point and then we can ask him

7    about it in light of his investigation.

8    BY MR. HESSLER:

9    Q.  You know Jose Holmes described how he was shot to you?

10   A.  Yes.

11   Q.  And you know from your investigation he described it to others

12   how he was shot?

13   A.  Yes.

14   Q.  And you know those stories have changed, depending on who he

15   was talking to and when over how he was shot?

16   A.  Well, I think they've been fairly consistent, he was shot while

17   he was laying on the ground next to the barrier.

18   Q.  Okay.  Fairly consistent that he was shot by a high-powered

19   rifle twice in the abdomen, right?

20   A.  Yes, yes.

21   Q.  Your expert testified he was never shot in the stomach with a

22   high-powered rifle, correct?

23         MS. BERNSTEIN:  Objection, misstates the testimony, this

24   is my concern.

25         THE COURT:  Well, he's the investigating agent, the case

1    has been assigned to him to investigate.  I think that we have to

2    be careful about asking him to wander into the field of an expert

3    and agree or disagree, and we haven't gotten to the question yet,

4    but he's not going to be able to agree or disagree with an expert

5    but he is going to be able to answer questions of how he used that

6    expert's opinion as part of his overall investigation.  So I think

7    we're going to have to be careful on how we phrase the question.

8    BY MR. HESSLER:

9    Q.  Agent Bezak, was there any evidence to corroborate two close

10   range high-powered rifle rounds to Mr. Jose Holmes' stomach?

11   A.  Well, I don't think anybody suggested that it was close range

12   like a contact wound if that's what you mean.  But certainly he had

13   two wounds to the stomach.

14   Q.  You say you don't think anybody suggested it.  When Jose Holmes

15   stated, "he stuck the rifle barrel in my stomach and pulled the

16   trigger twice," that doesn't suggest to you close range?

17   A.  I don't remember him saying that.

18   Q.  Now, you do recall that he described the person that shot him?

19   A.  Yes.

20   Q.  Describing him to you?

21   A.  Yes.

22   Q.  You're the investigator?

23   A.  Yes.

24   Q.  And you asked questions?

25   A.  Yes.

1    Q.   And he said a light skinned male?

2    A.   In my interview, yes, he did.

3    Q.   With a rifle?

4    A.   Yes.

5    Q.   I'm assuming you asked him black or white?

6            MS. BERNSTEIN:  Your Honor, I'm sorry, objection.  May we

7    approach very briefly?

8            THE COURT:  Yes.

9      (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

10           MS. BERNSTEIN:  Jose Holmes took the stand, Jose Holmes

11   was cross-examined.  Time to impeach Jose Holmes was when Jose

12   Holmes was on the stand.  If there is some other impeachment that I

13   don't remember where you asked Jose did you tell Agent Bezak

14   something and he denied having told it, then it's proper to impeach

15   on that one point.

16           MR. HESSLER:  I am not asking the story, I'm asking him

17   what did he ask.

18           MS. BERNSTEIN:  What we're doing here is reliving the

19   entire investigation and the entire trial.  What I thought your

20   Honor just ruled is that what's proper, and what I did yesterday

21   and I would have absolutely no objection to is you talked about how

22   you make credibility determinations.  You talked to Jose Holmes,

23   did you make credibility determinations about Jose Holmes without

24   eliciting, without basically impeaching Jose Holmes.

25           MR. HESSLER:  His credibility is at issue, too.

1          THE COURT:  Wait.  But I don't think that the question

2     that was asked was an unfair question.  He's talking about specific

3     points on what Jose Holmes said based on his interview.

4          MS. BERNSTEIN:  Right.

5          THE COURT:  And based on what he said here in court.

6     He's talking about his ability to make credibility calls and his

7     ability to put evidence together as part of an investigation.

8          MS. BERNSTEIN:  But this is exactly what we just talked

9     about where it is going through the entire substance of the

10    investigation.  And I think we will again -- and I hesitate to

11    object because he has nearly perfect memory.

12         THE COURT:  Well, the jury's going to decide that.

13         MS. BERNSTEIN:  But my concern is that we will, in fact,

14    be here forever -- I mean, if this is the defense -- let me use the

15    argument that they made.  This is the defense made basically making

16    their closing argument through the case agent by reminding here is

17    what Jose Holmes said, here is what we impeached him on, do you

18    remember us impeaching him on this?  Here is what somebody else

19    said, here is what we impeached them on, do you remember us

20    impeaching him on it?  What I think is totally appropriate with

21    this witness is, again, what I did very carefully yesterday and

22    what they objected strenuously to if I stepped out of line, I think

23    what's appropriate is did you talk to Jose Holmes.  Now the jury

24    has heard Jose Holmes's testimony.  Let me ask you, did you have

25    any concerns about his credibility, without rehashing --

```
 1              THE COURT:  He has -- in cross-examination he's got to be
 2   asked about how he came to the conclusion that Jose Holmes was
 3   credible and he's already testified.  In fact, he willingly
 4   volunteered testimony about Mr. Bowen which I just struck from the
 5   record as an example.  He wanted to give an example.  So, if he
 6   found Jose Holmes to be credible then he is subject to being
 7   cross-examined on that.  What I don't want to have happen is just
 8   go through testimony throughout the trial and just bring to his
 9   attention certain testimony, I think that's improper.
10              MR. HESSLER:  I am not trying to do that, your Honor.
11   But his integrity, the integrity of the investigation, his
12   competency and his credibility are at issue.  If he is going to get
13   a guy to identify somebody and you don't ask questions, I think
14   that's, all of that is something the jury needs to consider.
15              THE COURT:  I think you need to be specific though on the
16   point, like Jose Holmes's specific testimony about that relates to
17   credibility; we are not going to go through and plow through other
18   testimony just because we want to remind the jury that someone so
19   testified to something.
20              MR. HESSLER:  Yes, sir.
21              THE COURT:  You need to start out by asking him if he
22   spoke to the witness, if he found the witness to be credible, why
23   he found the witness to be credible, and if then if you want to
24   cross-examine him on a few things based on a 302.  I really don't
25   think -- the jury has heard the testimony here in court, so we
```

1    really don't need to go back to that.

2              MR. HESSLER:  And, your Honor, but again though, I think

3    he is the lead investigator, I think I have a right to question his

4    tactics, his ability to handle such a case, the questions he

5    asked --

6              THE COURT:  I am not disagreeing with any of that, and I

7    think you've asked him that about what questions he asked Jose

8    Holmes about a particular point.

9              MR. HESSLER:  And I am going to continue on.  Thank you.

10      (OPEN COURT.)

11   BY MR. HESSLER:

12   Q.  Agent Bezak, did you ask Jose Holmes whether this light skinned

13   male was black or white?

14   A.  Yes.  That's why I characterized it as light skinned because he

15   didn't know, he couldn't provide me information one way or the

16   other whether it was a light skinned black male or a white male.

17   Q.  Did you ask him height, the height of the individual?

18   A.  He couldn't provide any other further details.  He said it

19   was -- you know, those were the only details he could provide.

20             MR. HESSLER:  One second, your Honor.

21   BY MR. HESSLER:

22   Q.  Now, during the course of your investigation you stated

23   eventually certain individual officers involved, or allegedly

24   involved, decided to cooperate with the investigators?

25   A.  Yes.

1   Q.  And one of those officers was Michael Lohmann?

2   A.  Yes.

3   Q.  Did you find Michael Lohmann to be a credible witness when you

4   interviewed him?

5   A.  Once he started cooperating, yes.

6   Q.  Did anything -- now, we've been through your assessment of

7   individuals.  Did anything in your investigation cause you to

8   question his credibility?

9   A.  Not that I can think of right now.

10  Q.  Well, let me ask you right off the bat.  The fact that he lied

11  to you previously, did that cause you to question his credibility?

12  A.  No, because now he was admitting things that were against his

13  self-interest.  Why would you lie to get yourself in trouble?

14  Q.  To keep yourself out of more trouble.

15  A.  Certainly a possibility.

16  Q.  Did you attempt to corroborate certain things that he told you?

17  A.  Yes.

18  Q.  He told you he had over 100 meetings or 100 contacts with

19  individual officers, did he tell you that?

20  A.  I don't remember that.  But I wouldn't doubt that, he was their

21  supervisor.

22  Q.  Couldn't give you any dates or times?

23  A.  No.

24  Q.  He told you specifically that he talked to each individual

25  officer about statements and reports, correct?

1    A.  Yes.  Sometimes just passing conversation, with other officers

2    it was more detailed.

3    Q.  And you heard Hills deny that happened?

4    A.  Yes.

5    Q.  You heard Hunter deny that happened?  Government witnesses.

6    A.  Yes.

7    Q.  Does that cause you to question at least some government

8    witness credibility?

9    A.  No, because again, Mike said some of those conversations were

10   just passing conversations.  So it's perfectly logical to forget

11   that you've had a two-sentence conversation with somebody.  I think

12   Mike said a lot of conversations were, "hey, you all right with

13   what happened?"  And certainly somebody could forget that.

14   Q.  And Mike also said he said he was careful to use language which

15   would -- careful to use language to show that he was conducting a

16   legitimate investigation?

17   A.  Yes, he said that.

18   Q.  Did Barrios ever tell you -- Barrios pled, correct?

19           MS. BERNSTEIN:  Objection, hearsay.

20           THE COURT:  Why don't you all approach here because I

21   think this is part of the continuing.

22       (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

23           THE COURT:  Although Ms. Bernstein didn't object two

24   questions before, I think I accepted as a continuing objection.  We

25   have to ask him about his investigation and credibility findings

1    that he made as part of the investigation.  I think when we ask

2    him, well, you heard so and so testify here in court, the jury has

3    already heard that testimony.  So if we're asking about his

4    evaluation based on credibility, his evaluation of credibility at

5    the time he was investigating, that's the first sign of

6    cross-examination and that goes back to the objection that was

7    originally made.

8            MR. HESSLER:  Your Honor, these are corroborating

9    witnesses that he investigated.  If Lohmann told him I've had

10   numerous conversations with him, I would assume that they're all

11   investigated, they would go to the government witnesses and they

12   either told him, and if he didn't he's certainly incompetent; and

13   if they didn't and the denied it, somebody is certainly lying.

14           THE COURT:  I think we need to be clear of when this is

15   happening.  This is part of his investigation.  I think a couple of

16   times you asked him it was unclear to me that you were asking about

17   testimony given in court which goes back to the objection, so

18   hopefully you can get through it.  So I think you need to be

19   clearer.

20           MR. HESSLER:  I have to specify during the investigation

21   as opposed to during court.

22           THE COURT:  And even more particular I think when you

23   first or secondly spoke to Lohmann or whenever the occasion was

24   that Mr. Lohmann finally told him what he accepted as truthful that

25   then he put, he went and talked to someone else.  There's a

1    difference there as part of the investigation.  We're focussing on

2    his investigation.

3            MR. HESSLER:  I agree with you.

4            THE COURT:  And the more -- it becomes clearer to me in

5    the last few questions that the problem is recounting testimony in

6    court I think was the original objection.

7            MS. BERNSTEIN:  That is.  And one of the problems is

8    taking the testimony in court and applying it backwards.  Like, for

9    example, the testimony about 100 conversations.  That was testimony

10   that came out in court when on redirect I asked him to estimate how

11   many total conversations he had.  You're taking what he says in

12   court and coming back and asking questions about whether it

13   affected his credibility determination.

14           THE COURT:  But that doesn't mean it wasn't something

15   that was told to him back when he was first interviewed.  So I

16   think we need to be careful, and I think that really is the problem

17   with the questioning and the problem with the objection.

18           MR. HESSLER:  I see your point, your Honor.

19           THE COURT:  Is to somehow hold him responsible in his

20   investigation for testimony which has now been presented to the

21   jury.

22           MR. HESSLER:  I'll refine my question to show that it

23   happened during the investigative phase prior.

24           THE COURT:  At some point in time.  I think we're clear.

25        (OPEN COURT.)

1   BY MR. HESSLER:

2   Q.  Agent Bezak.

3   A.  Yes, sir.

4   Q.  Ignatius Hills, another officer that pled guilty and alleged

5   that he was involved in a coverup, correct?

6   A.  Correct.

7   Q.  You spoke with him during the course of your investigation?

8   A.  Yes.

9   Q.  And at some point he expressed concern to --

10          MS. BERNSTEIN:  Objection, hearsay.  There's no way to

11   finish the question without it being hearsay.

12          MR. HESSLER:  I'll rephrase the question.

13          THE COURT:  Rephrase the question.

14   BY MR. HESSLER:

15   Q.  Did you ever interview Ignatius Hills in regards to problems he

16   believed that --

17          MS. BERNSTEIN:  Objection, hearsay.

18          MR. HESSLER:  I'm asking if he interviewed.

19          THE COURT:  No, no, now this one isn't.  He is a big boy,

20   he can answer these questions.  This is serious business here.  He

21   is the lead investigator, so we're going to ask him these questions

22   and he is going to answer this one.

23   BY MR. HESSLER:

24   Q.  Did you ever interview Ignatius Hills in regards to certain

25   pressures he perceived to be occurring during his cooperation?

1    A.   Yes.

2    Q.   And he did not express these pressures to you directly, did he?

3    At first?

4    A.   At first, no.

5    Q.   How is it that you learned that he was telling people he felt

6    pressured to do certain things that he didn't think was right?

7    A.   From another source, definitely not from him.  I think it may

8    have been Robert Barrios, I think.

9    Q.   And Barrios brought it to you?

10   A.   I think that's what happened.  But I can't exactly recall.  I

11   definitely learned from, not from Ignatius Hills, from another

12   source.  To the best of my recollection it was Barrios.

13   Q.   And his complaint was that he was feeling pressure from the

14   federal government, Ms. Bernstein, to say things that he had no

15   knowledge of or that didn't occur?

16   A.   That was the way it was related to me.  After I spoke to

17   Ignatius Hills he clarified that he felt pressured by Ms. Bernstein

18   because in his opinion he thought that she believed he knew more

19   information than he was providing.  Not that he felt pressured to

20   say things that didn't occur or to lie, he just felt pressured that

21   she thought he wasn't providing all of the information he had.

22   Q.   But you were there and you took the notes on the interview,

23   right?

24   A.   Not for the initial interviews with Ignatius Hills I did not.

25   Q.   The 302.

1    A.   For the one where we spoke about his concerns?

2    Q.   Yes.

3    A.   Yes.

4    Q.   And in your 302 you write that Ms. Bernstein informs him that,

5    no problem, if you've told us a lie in the past, tell me now and we

6    can charge you with lying to a federal agent.  And then he said --

7    A.   You would have to refresh my memory with the 302.

8    Q.   Let me ask you this.  A person who is complaining of pressure,

9    complaining of potential or perceived, correctly or incorrectly --

10   I don't know what term to use -- but is feeling pressured to do

11   something, do you think it's the best course of action to interview

12   that person in front of the person that not only he's feeling

13   pressured by but also has the ability to charge him with a variety

14   of crimes if they so chose to do so?  Don't you think you would

15   have gotten a more freer conversation from him if you passed it on

16   to somebody not involved in the investigation where he could speak

17   freely?

18   A.   I have no reason to believe that he didn't speak freely.

19   Q.   Well, what about the fact that he didn't come to you, that he

20   went to somebody else, does that kind of tell you he didn't trust

21   you or didn't feel like coming to you?

22   A.   No.  He expressed to Ms. Bernstein that -- to Ms. Bernstein

23   that he had those concerns.

24   Q.   I'm sorry?

25   A.   He had expressed those concerns.

1    Q.  Yeah.  But you called him in, he didn't come to you and say I

2    have these concerns, he went to somebody else, he confided in

3    somebody else and that person came to you?

4    A.  Yes.

5    Q.  That didn't cause you any concern that maybe he couldn't

6    confide in you because he didn't?

7    A.  I don't think he had the opportunity to yet.  Certainly all of

8    those meetings his attorney was present, and if it was a genuine

9    concern he would have, I would imagine he would have expressed

10   those concerns to his attorney.

11   Q.  Wait, what was that?  That he would express those concerns to

12   his attorney?

13   A.  Yes.

14   Q.  That's what you think he probably should have done?

15   A.  If they were genuine concerns I think that's what he would have

16   done.  His attorney has his best interest at hand, in hand.  If he

17   wasn't comfortable with me, certainly he would go to his attorney,

18   his attorney never approached us.  We did get information from this

19   other source, so we approached him and his attorney.

20   Q.  But it's pure speculation on your part?

21   A.  Yes.  I mean, it's logical that that's what would have occurred

22   if it was a genuine concern.

23   Q.  He was also called in the very next day after the interview,

24   you don't even know if he had time to consult with his attorney, do

25   you?

1  A.  He was called in -- I don't know -- are you referring to the

2  day when I got the information?

3  Q.  I'll withdraw the question.  Now, some four and a half years

4  later after the incident Lehrmann also starts to, Lehrmann decides

5  that he's part of some coverup and he is going to cooperate with

6  the government?

7  A.  Yes.

8  Q.  Did you have any concerns about his credibility?

9  A.  No.  I mean, all of the cooperators that provided information

10  either corroborated themselves, each other, or were corroborated

11  with the physical evidence on the scene.

12  Q.  Did you have any problems with Robert Barrios' credibility?

13  A.  I don't know if I have problems with his credibility.  His

14  story is odd to me, yes.

15  Q.  Let's go back to Lehrmann.  Lehrmann lied to you many times

16  prior to him deciding that he's going to cut a deal?

17  A.  Yes.

18  Q.  He lied in front of the grand jury according to you all before

19  he decided he was going to save his skin and cut a deal?

20  A.  Yes, he did.

21  Q.  And did he ever inform you that he was demoted and transferred

22  as a result of a drug scandal in Jefferson Parish Sheriff's Office?

23  A.  I was aware of that and I don't know if we asked him detailed

24  questions about it, but we were aware of that.

25  Q.  That didn't cause you to question his integrity?

1    A.   Certainly.   But again, the information that Jeff provided to me

2    was later corroborated by Lieutenant Lohmann, two independent

3    sources.   Jeff told me about an evolving coverup story, Jeff told

4    me about an altercation -- not an altercation, a disagreement over

5    the reports between Sergeant Kaufman and Lieutenant Lohmann.   All

6    of those things were later corroborated by Lieutenant Lohmann, an

7    independent source.

8              Lieutenant Lohmann actually provided me with the three

9    reports that explicitly show an evolving coverup.   He confirmed

10   that there was a confrontation between him and Sergeant Kaufman

11   over the reports, and that that confrontation led him to author his

12   own 17-page report.   So I think they corroborated each other very,

13   very well actually.

14   Q.   In regards to Gisevius -- well --

15   A.   I don't understand the question.

16   Q.   I'll move on.

17             So eventually you decide that Jeff Lehrmann is going to

18   try and surreptitiously -- I can't even say that word, pick an

19   easier one -- secretly try and tape record Rob Gisevius and get him

20   in incriminating statements --

21   A.   Yes.

22   Q.   -- in regards to his alleged involvement in this criminal

23   activity?

24   A.   Yes, sir.

25   Q.   I can't believe you think much of Immigration and Customs

1   Enforcement Agent Lehrmann as a law enforcement officer, a federal

2   agent?

3   A.  I have no idea what type of agent he was.  Certainly the type

4   of activity that he admitted to be involved in is deplorable.  So I

5   don't think much of him as a result of that.

6   Q.  And he had to find a way out and part of it was agreeing to

7   tape record an individual whom you believe was involved in a crime

8   and get confessions, incriminating information?

9   A.  He wanted to do whatever he could to help this situation,

10  absolutely.

11  Q.  Right.  And you were fully prepared to give him every

12  opportunity to do so?

13  A.  Yes.

14  Q.  Obviously you wanted it to be a successful operation, too?

15  A.  Yes.

16  Q.  And there were four recordings that were made, right?

17  A.  I can't remember the exact number, but there were multiple

18  recordings, yes.

19  Q.  And in the first one that was prayed where he said, I think he

20  said, hey dude, did he give me up in the grand jury?

21  A.  Yes, the first one that was played.

22  Q.  That was the only thing played out of one of those tapes?

23  A.  Yes.

24  Q.  Clearly doesn't sound to you as anything more than a joke,

25  would you agree with that?

1   A.  To me, no.  That sounds like him asking Jeff how the grand jury

2   went.  I mean, it's said in a joking manner, I could agree with

3   that.

4   Q.  And you heard the subsequent tape?  I mean, we all heard it for

5   awhile.

6   A.  The Lucy's tape, yes.

7   Q.  It wasn't like Gisevius saying, hey, blanketity blank, if you

8   did this I'm going to blah, blah, blah, it was a joke, didn't

9   threaten him, didn't --

10  A.  I don't understand the question.

11  Q.  It wasn't a threat, you didn't take it as a threat?

12  A.  What threat?

13  Q.  Hey, dude, did you give me up in the grand jury?

14  A.  Oh, no, no.

15  Q.  It was more or less a preamble to what happened?

16  A.  Yes.

17  Q.  Nothing wrong with that, is there?

18  A.  He was asking him what happened in the grand jury, you know,

19  certainly not.

20  Q.  If you're the subject of that grand jury and you're the accused

21  or you're the person being investigated, human nature would cause

22  you to want to know what's going on?

23  A.  To me it sounded like he was, Mr. Gisevius was worried that he

24  hadn't heard from Lehrmann since that initial -- since his grand

25  jury appearance and his -- the way the statement that he made was,

```
 1   you know, I thought, this is me just characterizing it, basically I
 2   thought I haven't heard from you in so long because you gave me up
 3   in the grand jury.
 4   Q.  But again, you wouldn't find anything odd or unusual about a
 5   human being wondering what's going on with an investigation that's
 6   revolving around his actions?
 7   A.  No.
 8   Q.  In fact, somebody that was wrongfully accused would probably
 9   have a bigger level of interest in what was going on and how was it
10   occurring and why was it occurring?
11            MS. BERNSTEIN:  Objection, speculation.
12            MR. HESSLER:  Would you agree with that?
13            THE COURT:  I'll sustain the objection.
14   BY MR. HESSLER:
15   Q.  All right.  So by the time you gave -- by the time this
16   recording was done it was in November of 2009 or 2010?
17   A.  2009.
18   Q.  2010?
19   A.  2009.
20   Q.  2009.  So we're talking about four and a half years after
21   the -- essentially some four and a half years after the shooting?
22   A.  Four and some change, yes.
23   Q.  And there was extensive media coverage on almost over aspect of
24   this investigation?
25   A.  The federal investigation?
```

1    Q.  The state, federal.

2    A.  There was definitely media coverage, yes.

3    Q.  And there was information that was and allegations that were

4    made at the state level, right?

5    A.  The officers were charged with crimes, yes.

6    Q.  And as a result of those crimes the state would have to give

7    the defense attorneys with certain discovery, which is the police

8    reports that were involved, the allegations, the evidence so the

9    accused could defend against the state charges, right?

10   A.  Yes.

11   Q.  And it's logical to assume that Sergeant Gisevius gained a

12   whole lot of information at that time that he had no idea occurred;

13   is that right?

14            MS. BERNSTEIN:  Same objection, objection speculation.

15            THE COURT:  I am going to let him answer if he knows.

16   Don't speculate, if you know.

17            THE WITNESS:  I don't know.

18   BY MR. HESSLER:

19   Q.  Do you know that attorneys often do their own investigations in

20   order to obtain information for the defendants, for the accused

21   defense?

22            MS. BERNSTEIN:  Same objection, your Honor.

23            MR. HESSLER:  If he knows, your Honor.

24            THE COURT:  I am going to let him answer.

25            THE WITNESS:  Yes.

BY MR. HESSLER:

Q.  And, in fact, a search warrant at the homicide unit had already been served by that time, right?

A.  Yes, it had.

Q.  And I think you stated on direct that that was a big plus for the -- that kind of put pressure, you thought it was going to put pressure on a whole bunch of people?

A.  Yes.  I think it made it obvious that the federal investigation was advancing, that we weren't at a standstill.

Q.  And you thought that that information being out there was going to cause, could cause some things if anybody had done anything wrong, concerns?

A.  Yeah.  I thought it would apply pressure to individuals who were culpable.

Q.  And that tactic sometimes works?

A.  Yes.

Q.  Who leaked that information about the search warrant to the media and what was recovered?

A.  It was never leaked what was recovered.  I don't think it was ever leaked, as far as I know, to the media at all.  And certainly not what was recovered, that wasn't known until probably the indictment.

Q.  Let me get on to what -- what exactly did you -- you said you instructed Agent Lehrmann on topics that you wanted covered.

A.  Yes.

1   Q.  I guess you really wanted a confession or something overt, we

2   did this and that was done?

3   A.  Of course.  I mean, if he could get that, that would be great.

4   But that's not the way people involved in a conspiracy discuss

5   things.  Nobody is going to come out and say, yeah, I helped you

6   cover up this crime, those words aren't going to be used.  So I

7   didn't expect that.

8   Q.  How do you know that?

9   A.  It's just human nature.

10  Q.  You have people that come in and confess to murders to police?

11  A.  Yes.

12  Q.  It shouldn't be hard for a guy that did something to confess to

13  a guy that he thinks did something with him?

14  A.  Somebody coming in to the confess to the police is much

15  different than two conspirators trying to cover up a crime.

16  Q.  Did you tell Lehrmann maybe challenge him on certain things if

17  he denied it or bring out certain things, or what kind of

18  instructions did you give him?

19  A.  Certainly not to challenge him on anything.  We just gave him

20  the topics that I wanted him to try and talk about and let the

21  conversation, you know, run its course.  Sometimes you get there

22  and sometimes you don't.  But if you push too hard it's going to be

23  obvious that something is amiss.  Obviously -- it could become

24  obvious that the guy is recording and trying to get information out

25  of you.

1          So you try and keep it as natural as you can.  One

2   instruction that he was given, which I think he did a good job

3   actually was if Defendant Gisevius began to outright deny something

4   to somehow cut off an answer, not to agree with Defendant Gisevius.

5   If he was denying something that he knows to be true, not to go

6   along with that.

7   Q.  I don't understand.  So he was instructed that if Gisevius

8   denied something that was thought to be true not to say anything

9   about it?

10  A.  Yeah.  I think this -- I want to say it occurred when they were

11  talking about Lakeisha Smith and James Youngman, the fabricated

12  witnesses; and I forget the specifics actually of the conversation,

13  but basically Gisevius denied that he didn't know that or that

14  nothing illegal was done.  And Jeff's response to that was, "dude."

15  Q.  My response to what you just said is, do you know that

16  Lakeisha Youngman and James -- Lakeisha Smith and James Youngman's

17  name does not ever appear in this transcript?

18  A.  They talk about the witnesses, fabricated witnesses, they're

19  referring to Lakeisha Smith and James Youngman.

20  Q.  Well, we're going to get to that.  But it doesn't appear there,

21  does it?

22  A.  No, they don't use those specific names, no.

23  Q.  And that allegation had been out in the media for months, if

24  not years, that it was allegedly created, that witnesses were

25  allegedly created?

```
 1    A.  I am not aware of that.

 2            THE COURT:  Mr. Hessler, when you get to a good spot,

 3    we'll take our morning break.

 4            MR. HESSLER:  I should be at a good spot in just a

 5    second, your Honor.

 6            THE COURT:  Sure.

 7            MR. HESSLER:  I am in a good spot right now.

 8            THE COURT:  Okay.

 9            MR. HESSLER:  I told you a minute and I only waited 30

10    seconds.

11            THE COURT:  Okay.  We will take about a 15-minute break,

12    10:40, unless the jury is ready earlier in which case we'll begin

13    earlier.

14            THE MARSHAL:  All rise.

15            THE DEPUTY CLERK:  All rise.

16        (WHEREUPON, THE JURY EXITED THE COURTROOM.)

17            THE COURT:  Counsel, anything that we need to discuss at

18    this point?

19            MS. BERNSTEIN:  Not for us, your Honor.

20            MR. HESSLER:  No, your Honor.

21            THE COURT:  Okay.  Good.  Come back as soon as you can.

22    As soon as the jury is ready we'll start.

23        (WHEREUPON, A RECESS WAS TAKEN.)

24        (OPEN COURT.)

25        (WHEREUPON, THE JURY ENTERED THE COURTROOM.)
```

1        THE COURT:  You may be seated.  Mr. Bezak, you are still

2   under oath.  Have you discussed your testimony with anyone during

3   the break?

4        THE WITNESS:  I have not.

5        THE COURT:  Okay.  Good.  Thank you.  Mr. Hessler, if you

6   want to pick up where you left off, we will go ahead and proceed.

7        MR. HESSLER:  Okay, your Honor.  Thank you.

8   BY MR. HESSLER:

9   Q.  Agent Bezak, you said something earlier, you said that he was

10  instructed if there's a denial as an assertion made by or a topic

11  brought up by Lehrmann to cut him off?

12  A.  Correct.

13  Q.  And there's a reason for that?

14  A.  Yes.  It was a point that we knew was true such as Mr. Gisevius

15  firing his weapon on the bridge.  If he was going to deny that, he

16  was instructed not to keep pushing him on that topic so the tape

17  wasn't an entire tape of Mr. Gisevius denying that he fired a gun

18  on the bridge.

19  Q.  Any particular reason why a barroom was chosen?

20  A.  No.  Just seemed -- I think Jeff and Rob actually decided on

21  the place.  Just it's a logical place where two 30-something year

22  old men would meet after they haven't seen each other for awhile.

23  They're certainly not going to go play bingo or something.

24  Q.  That's because the people calling out the bingo numbers and

25  letters would disturb the audio, right?  So you picked a barroom

1   where there's music, crowds, and everything else, and alcohol?

2   A.  I didn't pick the location, Jeff and Rob did that.

3   Q.  But you had control over the location, you certainly could have

4   told Lehrmann you're not going into a barroom to do this, we need

5   to make sure the audio is clear, crisp?

6   A.  Yes, yes.

7   Q.  Did you tell him don't get him drunk or make sure he hadn't

8   been drinking or any of that?

9   A.  No.

10  Q.  Did you tell him to get him drunk, make sure he talks as much

11  as he can talk?

12  A.  No.

13  Q.  Did you know of his physical condition or mental condition at

14  the time?

15  A.  No.

16  Q.  Were you aware that -- well, you weren't aware that he had

17  suffered two or three strokes prior to that time, right?

18  A.  I don't know if I had that information at that time.  During

19  the investigation at some point I had learned that.

20  Q.  And he actually refers to them or at least one of those in the

21  statement?

22  A.  In the Lucy's -- yes, yes, he does.

23  Q.  He also refers to the loss of a sister two months earlier?

24  A.  I don't remember if he refers to that, but I know that he did

25  lose his sister.

Q.  Now I want to go through certain, I am not going to play the
whole tape and I am not going to go through the whole thing, but I
want to go through a couple of different things.  This is, in fact,
an audio recording, right?

A.  Yes.

Q.  And sometimes the audio is very difficult if not impossible to
hear, the audio of the voices?

A.  Yes.

Q.  And the transcript is -- certain words may or may not have been
transcribed?

A.  I'd agree.

Q.  Completely?

A.  Correct.

Q.  And a word such as we, she, or he can mean a whole world of a
difference in a case like this, would you agree?

A.  I guess it depends on the context.  If you can refer me to a
specific sentence or passage.

Q.  Well, in the context of doing something illegal, if I say we
did something illegal, we're in trouble.  If I say he did something
illegal, he's in trouble, right?

A.  Oh, definitely.

Q.  So a simple word as we or he or she, if there would be a
female, if that word is incorrectly transcribed then he could have
a problem that's not his or we could have a problem that's not ours
or she could have a problem that's not hers?

1    A.  Yes.  If that was your only piece of evidence.

2    Q.  Okay.  I want to go to, can you put up page 9 of the

3    transcript, sir.  Page 9, line 6.  "Robert Gisevius:  We cut

4    everything out of it."  Correct?

5    A.  Yes.

6    Q.  If that "we" is a "he", that's other than we, that's singular?

7    Sounds like a Dr. Seuss rhyme.

8    A.  Yes.

9    Q.  The government has it as "we", that's what y'all heard?

10   A.  Yes.

11           MR. HESSLER:  Can you play that line, please.

12        (WHEREUPON, THE AUDIO WAS PLAYED.)

13   BY MR. HESSLER:

14   Q.  Is that clear and concise without a doubt to figure out what

15   was said?

16   A.  Clear enough for my ear to hear we.

17   Q.  There was a big concern, in fact, there's charges here that

18   Robert Gisevius never admitted to firing his weapon, right?

19   A.  Yes.

20   Q.  Could you put page No. 9 up again.  And we know that's not true

21   though, right?  We know beyond -- we know that he admitted firing

22   his weapon, right?

23   A.  We know that he says that he admitted firing his weapon.  This

24   tape, nowhere in his NOPD taped statement or the 54 page

25   supplemental report does it indicate that he fired any weapon.

1   Q.  Okay.  And we know that he has -- we know that he has, he

2   didn't write the 54-page report?

3   A.  No.  It's Sergeant Kaufman's name and Sergeant Dugue's name are

4   on the report.

5   Q.  So it don't matter who wrote the report, it's not his doing?

6   A.  It's supposed to be a summary of his statement.

7   Q.  But as you sit here as the investigator, it's your

8   understanding that the Danziger 7, those seven officers are seven

9   because that's who raised their hand and said I fired my weapon?

10  A.  Yes.

11  Q.  And lines 15, 16, and 17 it says, "My original statement is I

12  engaged and fired a weapon."

13  A.  Yes, that's what it says.

14  Q.  Correct?  Okay.  Now, can you go to page 10.  And I am going to

15  refer you to line 10 on down.  Says:  Archie submitted a bullshit

16  report.  Now, if he was F'ing dumb enough to put the report you and

17  him, you and him wrote on that F'ing computer a year or so

18  afterwards, and Lehrmann said I don't think he would do that, would

19  he?  I would hope he wouldn't.  Right?

20  A.  Yes.

21  Q.  Doesn't seem like he knows -- he's speculating on what's going

22  on, who did what, the report you and him wrote, not saying we

23  wrote -- going back to we, he, she -- you and him, you and Archie?

24  A.  No, he's definitely not, he's made it specific the report that

25  Lehrmann and Archie worked on.

1  Q.  Right.  And he actually says I don't even know if it's on a

2  computer or not?

3  A.  He says he hopes he wasn't dumb enough to put it on the

4  computer.

5  Q.  Right.  And then Robert says I hope he wouldn't.  And this is

6  all stuff that's been out in the media for four and a half years,

7  reports and things of that nature?  Well, not four and a half

8  years.

9  A.  No, I don't think there is -- as far as I know there is no

10  mention of draft reports until probably when Jeff Lehrmann pled

11  guilty.

12  Q.  Go to page 11, please.  Jeff Lehrmann talks about some

13  30-something page report, right?  Gisevius again says, line 5:

14  "Are you sure that's not Dugue's?"  Right?

15  A.  Correct.

16  Q.  Does that not show that he's confused about who did reports

17  other than Kaufman and Dugue?

18  A.  No.  There's portions of the conversation that you've cut out

19  where they specifically talk about whether it's the report that he,

20  Jeff and Archie handed in; and if it wasn't, how could we have

21  gotten our hands on it and why do we have our hands on it.

22        And again, I am just paraphrasing, obviously it's not

23  word for word.

24  Q.  Right.  Now, there was a comment, you can go to page 19.  There

25  is this phrase that came up a couple of times, sink the ship, who

1   could sink the ship, right?

2   A.  Yes.

3   Q.  And that phrase was brought up from the first time, I believe

4   line 11; page 19, line 11, by Lehrmann, right?

5   A.  He refers to a boat.

6   Q.  Yeah.  He refers to essentially, you know, who could be talking

7   and what's being said and all of that?

8   A.  Yes.

9   Q.  Robert Gisevius's response, page 18:  Who the "F" could be

10  saying stuff?  He's asking questions about what's going on in the

11  investigation, right?  Who could be saying stuff?  That's a

12  question?

13  A.  Yeah, he's wondering who the leak could be.

14  Q.  Could he be saying who is saying, could it be just what it

15  says, who could be saying stuff, it doesn't say who could be

16  leaking stuff, but who is saying stuff?

17  A.  If you take it in context, Jeff is talking about somebody, you

18  know, whether the boat stays afloat or sinks remains to be seen.

19  They're talking about a leak that could -- is it going to sink

20  everybody and get everybody indicted or not.  And Rob asks who

21  could be saying stuff, who could be leaking stuff is the way I read

22  it, interpret it.

23  Q.  They're talking about what you instructed Lehrmann to talk

24  about and in the context that you instructed Lehrmann to put it out

25  there, right?

A.  Yes.

Q.  And he's asking questions about what Lehrmann has told him and what's going on?

A.  Yeah, he wants to know who the leak is.

Q.  Well, if he said, hey, there's something going on, somebody's saying stuff, if it's untrue or true, especially if it's untrue, wouldn't you want to know who is saying what especially if they're saying something that's not true that you know didn't happen, wouldn't you have a question in your mind as to who, what, when, where and why?

A.  Yes.

Q.  And he has a bunch of questions, don't he?

A.  Yes.

Q.  You talked to some 400 witnesses?

A.  Again, it's approximate.  I know there's over 350 302s related to the case.

Q.  And many of them are police officers?

A.  I can't estimate the number, we talked to a number of civilians and a number of police officers.  Many is probably a fair characterization.

Q.  Did you give -- you said you gave him some false information, well, maybe not some false information -- yeah, gave false information to give to Gisevius to bait him into saying things?

A.  Yeah, we told him to -- that we had video that clearly showed Gisevius shooting, video that was not made public.

1   Q.  Wait, what's that?

2   A.  Video that hadn't been public, video that Rob hadn't seen

3   before because it was never made public.

4   Q.  And he disputed that, too, he said, I seen it, it's been on

5   CNN, been on CNN for years?

6   A.  They debated -- my recollection is they debated whether it was

7   the CNN video or not, and Jeff indicated that he didn't think it

8   was.

9   Q.  Now, you know from your experience, in fact, you said you know

10  from your experience that police officers are oftentimes reluctant

11  to get involved and talk in front of grand juries, federal agents?

12  A.  Yes.

13  Q.  Or whatever.

14  A.  Yes.

15  Q.  Right?

16  A.  (WITNESS NODS HEAD IN THE AFFIRMATIVE.)

17  Q.  And in this case this was one of a number of investigations

18  going on at that time?

19  A.  Yes, it was.

20  Q.  And some of those persons have been called before multiple

21  grand juries?

22  A.  Yeah, for the different cases, if they had some type of

23  involvement in the other cases, absolutely.

24  Q.  And you're only aware of one particular person who complained

25  of feeling pressured by the government, and that would be?

1   A.   Ignatius Hills.

2   Q.   Hills.  You wouldn't be surprised if there was a number of them

3   that complained of their treatment by the government who didn't

4   come back and tell you about it, would you agree, would you believe

5   that?

6   A.   I would be very surprised if there was a number of people who

7   have complained about my treatment because I know the way that I

8   treated them.  If they had other complaints about other members of

9   the government, I am not aware.

10  Q.   But the general, I guess, atmosphere was don't talk to them

11  unless you have to, and that's why you had to start issuing grand

12  jury subpoenas?

13  A.   I don't know what the general atmosphere was, but at some point

14  officers stopped giving voluntary interviews and they were issued

15  grand jury subpoenas.

16  Q.   Page 36, please.  Line five to line 12, and there's Gisevius

17  saying, or basically saying, you know, complaining that Archie was

18  stupid enough to go talk to the grand jury or talk to the feds and

19  talk to y'all and said certain things or whatever?

20  A.   Yes.

21  Q.   Don't know what he said but he just says talking to y'all was

22  stupid?

23  A.   No, there's no specific mention of what he said.

24  Q.   And then Lehrmann says, he says, Lehrmann says:  "And he went

25  with it."  And Gisevius says:  "Huh?  He went with it, right?  So

1  he's done, right?"

2        And there's no response from Gisevius.  Is that Lehrmann

3  trying to lead him into something?

4  A.  I would have to see more of the conversation.  Can you --

5  (WITNESS READS DOCUMENT.)

6        I think that's in response to Rob saying that he sunk his

7  own ship and Jeff saying, yeah, he went with it, he went to the

8  interview with us.

9  Q.  Right.  His opinion is don't talk to them, just like their

10  opinion of many people that went before, that were called to talk

11  to you that didn't want to talk to you?

12  A.  Yeah, Jeff, is indicating that -- my interpretation and Archie

13  went to talk to with them voluntarily.

14  Q.  And his opinion is that's stupid, it's an opinion, it's not an

15  admission of a criminal act?

16  A.  Yep, his opinion.

17  Q.  Now, and again -- we go to page 40.  Can you play, like, line 7

18  to 15.  Put it up there.  It says -- Jeffrey Lehrmann talking, I

19  want to direct you to line 11, 10 and 11.  They're talking about

20  Jim Letten, correct?

21  A.  Line 4 I see Letten's name, so I believe you're correct.

22  Q.  And I think Gisevius, not Gisevius, but Lehrmann said, "What do

23  you want me to do, he's got my -- in my view he's got fucking good

24  control right now over what's going on."  Right?

25  A.  Yes, that's what's in the transcript.

1          MR. HESSLER:  Can you play that portion.

2       (WHEREUPON, THE AUDIO RECORDING WAS PLAYED.)

3          MR. HESSLER:  Stop it.

4    BY MR. HESSLER:

5    Q.  The government says that they want that audio to be heard as

6    good control, says got good control.  Fucking good control.

7    A.  That's what he -- that's what the transcript says.

8    Q.  Right.  Did you hear what the audio said, did it say he has no

9    control?

10   A.  I'm not sure.

11         MR. HESSLER:  Can you play it again.

12      (WHEREUPON, THE AUDIO CLIP WAS PLAYED.)

13   BY MR. HESSLER:

14   Q.  Do you still hear the word good?

15   A.  No, it sounds like "no" to me.  I didn't make this transcript.

16   Q.  I am not saying you did.  I just want to make sure because of

17   the obvious implications that it's right, because if not we, he or

18   she has problems and I don't want to be we.

19         And you can also look around and I guess in that

20   particular one in particular because he says, what do you want me

21   to do, you know, because he's got -- what do you want me to do?

22   He's got good control, you have to look at all of them, he's got

23   good control, and he can say I can tell you what I can do.

24   A.  Correct, good control doesn't fit into the context of the

25   conversation.

1    Q.  Yes.  And there's another one, I hate to go here, but let's go

2    to page 39.

3                MR. HESSLER:  One second, your Honor.

4    BY MR. HESSLER:

5    Q.  They just blanked -- I'm tired of cursing -- "they just blanked

6    in a bathroom stall, dude.  Jeffrey Lehrmann:  Here?  In there."

7    And they laugh, right?

8    A.  Yes.

9    Q.  "Anybody you knew?"  Do you know who he is referring to "they"?

10   A.  I think the transcript is wrong, that's why it's striked out.

11   Q.  What do you think it is?

12   A.  I think it says we.

13   Q.  Him and Lehrmann?

14   A.  Him and whoever the person was.

15   Q.  All right.  But we know that that didn't happen because he's

16   been sitting there talking to Lehrmann for awhile, right?

17   A.  I mean, he said -- I wasn't there.

18   Q.  Thank God.  But there was no time this tape was turned off and

19   Gisevius disappeared into the bathroom with or without Lehrmann,

20   did he?

21   A.  No, no.  Once the recorder was on Jeff didn't turn it off until

22   the recording was done.

23   Q.  Now, all of this time they're drinking, right, and I think

24   there's four times that --

25   A.  I think on that page is when Mr. Gisevius starts drinking coke.

1  Q.  Well, can you go to that same page, line 39 I think -- page 39,

2  please.  And, yeah, he says you quit drinking already.  He says can

3  I get a coke, please, right, line four?

4  A.  Yes.

5  Q.  And Lehrmann says you quit drinking already, man?  Right?

6  A.  Yes.

7  Q.  Do you know if another coke is ordered subsequent to that or

8  after that or another beer?

9  A.  I have no idea.

10  Q.  Thank you.  Now, and I am a little concerned but they're going

11  to talk for three hours.  Why if he denies something why not

12  instruct him, say, instead of just saying dude, say dude, come on,

13  you know.  You know you did this and you know you have to answer

14  for this or something more than just cut it off and move on?

15  A.  Because if you keep pushing that topic the subject of the

16  consensual would most likely get suspicious.

17  Q.  I understand that.  But to keep pushing something you have to

18  begin.  He never once challenged him, he never once tries to get

19  anything other than he says something, Gisevius questions what he

20  is saying, and he speculates on who might be saying something, you

21  never addressed how to answer that -- how to address that?

22  A.  Again, I mean, I think you're referring to why he didn't try to

23  get specific names or things like that.  And it's just the way the

24  conversation flowed.  Again, if he tried to pin him down on names

25  or specific acts, I think it would have been suspicious.  This is

1    just the way that the conversation flowed.  If Gisevius would have

2    started naming specific instances in the coverup and things like

3    that, then Jeff would have rolled with the conversation like that.

4         And at points they did do that where they speculated

5    whether Raymond Young could have been leaking information or Edward

6    Colmenero.  So in instances where they were using specifics, Jeff

7    also used specific.  In instances where they were being vague, Jeff

8    was also vague.  It's just the way the conversation flows.

9    Q.  In this pretend video clip that you told Lehrmann to tell

10   Gisevius that you had, Lehrmann actually describes the video clip

11   to Gisevius and Gisevius asks questions about it, right?

12   A.  Yes.

13   Q.  Go to page 45, please.  Lines 8 -- go all the way down to the

14   bottom of the page.  And they talk about what the clip shows and

15   what it may show and Rob's asking about where am I shooting, what

16   am I doing, right?

17   A.  Yes.

18   Q.  And he asks, he says, "I'm shooting straight ahead, huh?  Yeah.

19   Shooting it straight up ahead to the top?  He says, yeah, I want to

20   say it looked more like towards people than towards the top --" go

21   to the next page -- "like Madison running on top.  I remember from

22   what it looked like more toward the people than over the bridge."

23   He said, "you mean over that way?"  Okay?

24   A.  Yes.

25   Q.  And then there's, Lehrmann goes through a discussion on how he

1  sees it and Gisevius says, asks the question, "I mean, does it look

2  like I was shooting at people laying on the ground?"  Right?

3  A.  Yes.

4  Q.  And that's from the description that Lehrmann gives to him of

5  the video, he actually questions him, prompts a question?

6  A.  Yeah.  I mean, Lehrmann describes a video where it looks like

7  he's shooting more towards at people than at, than up the bridge.

8  He doesn't make any mention about people play laying on the ground,

9  and then Mr. Gisevius on his own wonders if that video shows him

10  shooting people laying on the ground.

11  Q.  And he asks a question, is that what it shows, that was a

12  question that I would want to ask if I was accused of something

13  like that?

14  A.  I mean, I can only answer for myself, but I wouldn't have asked

15  that question unless I had -- unless I knew that I did that.  Why

16  ask about something that nobody has any -- nobody made any

17  indication of a video showing him shooting people on the ground, he

18  brought that up on his own.

19  Q.  Well, let me ask you this.  You just said, you just brought out

20  a good point.  You wouldn't have asked it if you knew you did it?

21  A.  I wouldn't have asked if it I didn't do it.  If I did not do

22  it.

23  Q.  I wouldn't have asked if I didn't do it.

24  A.  Why ask -- in the conversation that he put up, nowhere in that

25  conversation does it mention a video of Mr. Gisevius shooting

1    individuals laying on the ground.  If you know you didn't shoot

2    individuals laying on the ground, why ask the question.

3    Q.  Well, because if it shows a video of somebody shooting somebody

4    on the ground and I know I didn't do it, I know the video isn't of

5    me.

6    A.  There's no mention in the conversation of a video showing him

7    shooting people at the ground.

8    Q.  You do know for some four and a half years these officers were

9    accused of doing essentially just that, somebody had to do it,

10   that's what the accusations were?

11   A.  I don't know what the accusations were in the state.

12   Q.  You really don't?

13   A.  I mean, I know, I know what the accusations are generally but I

14   don't know the specifics that they allege that Sergeant Gisevius

15   shot people while they were laying on the ground, I don't know

16   that.

17   Q.  Now, they talked about, you said they talked about witnesses,

18   right?

19   A.  Yes.

20   Q.  And you would agree that Lakeisha Smith and James Youngman's

21   name never came up, right?

22   A.  No.

23   Q.  But on page 55, please.  David Ryder's name comes up at the

24   bottom?

25   A.  Yes, it does.

1   Q.  And there's something -- Lehrmann brings up David Ryder, and

2   Gisevius asks did he talk to him; and Lehrmann says, no, I don't

3   blanking know blank at all, does he blanking exist?  Gisevius said

4   yeah.  Right?

5   A.  Yes.

6   Q.  Lehrmann says, did Archie create him?  He said no.

7   A.  Yes.

8   Q.  And then page 55, I'm sorry, the bottom, the reason I ask is

9   because the way she's saying is, is like, he just blanking created

10  it, right?

11  A.  Yes.

12  Q.  And Gisevius says, I seen him on the news, right?

13  A.  Yes.

14  Q.  Nothing about Youngman, I mean, he's not saying we created

15  anybody, he's saying I know this guy exists, I saw him on the news,

16  he's not denying the existence of anybody else?

17  A.  No.

18  Q.  And on page 63, please.  Lines 8 through 17.  This is a portion

19  that reflects another conversation in regards to the statement

20  being screwed up, right, and not having anything in there about

21  Robert shooting a gun?

22  A.  I don't think they refer to the statement, I think they're just

23  talking about Archie being lazy, if I read it correctly.

24  Q.  Okay.  He says, the worst I could say, I said the only thing I

25  could ever say about Archie, the worst I could say is that he's

1    lazy, right?

2    A.  Yes.

3    Q.  And Lehrmann says, but, dude, they're not going to shape it

4    that way.  He says, no, no, they're not.  Right?

5    A.  Yes.

6    Q.  Now, you know that when you're in a conversation with somebody

7    and you give somebody information and that person believes that

8    you're correct, the information is correct, people start taking

9    that on as if it is correct and talking about it.  Do agree with

10   that?  If I tell you I know something and you believe me, you're

11   going to assume that fact is correct that I know it?

12   A.  Yes, if -- yes.

13   Q.  Go to line 18, please, page 67 line 18, 67 and 68.  Talking

14   about the Gist, right?

15   A.  Where are you?

16   Q.  Gist?

17   A.  Can you point out where you're referring?

18   Q.  Hills wrote the report, line 16, Hills wrote the report, right?

19   A.  Yes.

20   Q.  Talking about the Gist, right, no allegations, Hill filled out

21   the report?

22   A.  Right, talking about the probable cause statement.

23   Q.  And Gisevius says, "and Archie went around and scratched words

24   in the report."  Right?

25   A.  Yes.

1   Q.  And Lehrmann says, "What do you mean?"  He said, "Archie went

2   around and scratched words out."  Right?

3   A.  Yes.

4   Q.  Go to page 68.  Lehrmann corrects him, he added words to the

5   Gist, right?

6   A.  Yes.

7   Q.  He don't know if he scratched words or added out, he's just

8   talking in general terms about allegations and things of that

9   nature, he can't even get the specifics right?

10  A.  I think in that instance everybody knew that Archie Kaufman

11  added words to the Gist, I think that was public knowledge.

12  Q.  So now Gisevius is trying to throw Lehrmann off the scent by

13  saying he scratched words out as opposed to everybody knows

14  except --

15  A.  No.  If you put it back up, I think there's just maybe -- and

16  again, this is speculation, he initially says that he scratched

17  words into the Gist, then he says he scratched words out, Jeff says

18  he put words in the Gist.  So Mr. Gisevius said both.

19  Q.  The jury will see the transcript.

20       Now, let's go to page 74, lines 10 through 16.  Robert

21  Gisevius informs Lehrmann, "they were thinking that

22  Heather Koutz, until Bobbi Bernstein apparently became friendly

23  with Heather, Heather thinks they made friends.  Heather is not

24  that -- they actually called to recommend that she be fired for

25  holding reports.  They showed Anthony Monico who also works in the

1    records room a report and said this could have been altered in your

2    office."  Correct?

3    A.  Yes.

4    Q.  Nobody ever recommended Heather Koutz be fired?

5    A.  No.

6    Q.  So his information is wrong?

7    A.  Yes.

8    Q.  He's speculating on what could have happened or he is repeating

9    rumors of what he heard?

10   A.  Rumors.

11   Q.  Correct or incorrect?

12   A.  Definitely incorrect.

13   Q.  Right.

14   A.  The rumor is incorrect.

15   Q.  What I am saying is, he is repeating rumors whether those

16   rumors were correct and factual in basis or not?

17   A.  Correct.

18   Q.  And that's just one example of that?

19   A.  Yes, sir.

20   Q.  And this went on for three hours back and forth, question and

21   answers?

22   A.  The entire meeting was probably three hours long.  I think

23   they've only had -- the substantive parts or the parts that were

24   played in court, so maybe a little over an hour.

25   Q.  But he was in a barroom for three hours drinking with Lehrmann?

```
 1   A.  Some of the conversation I think occurred at Mr. Gisevius's

 2   apartment.

 3   Q.  Let's go to page 85, please.  Are you aware that --

 4           MS. BERNSTEIN:  Hang on one second, may I approach

 5   Mr. Hessler?

 6           THE COURT:  Yes.

 7           MS. BERNSTEIN:  Thanks, your Honor.

 8   BY MR. HESSLER:

 9   Q.  So Lehrmann was instructed to if there were any denials to cut

10   him off, right?

11   A.  Yes, as we talked about.

12   Q.  Because you didn't want to hear them because you knew they just

13   weren't true?

14   A.  Knew they weren't true and, like I said, if you keep pushing

15   him on a subject that he clearly isn't going to admit to he'll

16   become suspicious.

17   Q.  How do you know he is not going to admit to them if you don't

18   push him?

19   A.  Because he admitted to other things in the conversation.

20   Q.  He questioned a lot of things that Lehrmann brought up, right,

21   asked questions about?

22   A.  Yeah.  They bantered back and forth, yes.

23   Q.  Do you know if he was drunk at the end of this conversation or

24   prior to entering the conversation?

25   A.  No idea.
```

1    Q.  Do you know what his mind-set was in regards to the

2    investigation after being subjected to this after some four and a

3    half years?

4    A.  No, I don't.

5    Q.  Now let me go to page 44 now, please.  Line 1, Gisevius:

6    "Between you and me, was there anything done that was legally

7    wrong?"

8    A.  Yes.

9    Q.  Sounds to me like an invitation for Lehrmann to kick down the

10   door and give him an answer.

11   A.  This is the instance that I was talking to where Jeff did what

12   I told him to do, was if he was denying, specifically denying

13   anything legally wrong to say, dude or however he chose, whatever

14   flowed naturally to end that line of questioning.

15   Q.  But not, I mean, good God, not anything like that, you know,

16   just dude?

17   A.  That's the way Jeff chose to handle it.

18   Q.  And then the answer is -- all right.  Let me move on.

19          At some point on January 25th, was it, the statement,

20   homicide?

21   A.  Homicide, yeah, 25th or 26th of '06.

22   Q.  In that statement --

23   A.  I'm sorry, you're referring to Robert Gisevius's statement?

24   Q.  Yes.

25   A.  Yes, sir.

1   Q.  Have you ever investigated a police shooting or a similar

2   violation involving a police shooting before?

3   A.  No.

4   Q.  Ever investigated a shoot policing?

5   A.  No.

6   Q.  Ever reviewed statements taken in regard to a police shooting?

7   A.  No.

8   Q.  Are you familiar with how detailed an original statement should

9   be as opposed to a supplemental statement?

10  A.  I am not sure what you're referring to.

11  Q.  All right.  You agree that there's original statements, initial

12  statements?

13  A.  My understanding of the way the process should work is

14  initially an officer gives a statement just basically to determine

15  if there are any safety concerns, are there still subjects out in

16  the area, those types of statements.  And then at a later time they

17  would give a detailed statement about their involvement in the

18  incident.

19  Q.  And you've stated it that you've taken initial statements and

20  then later on taken a more thorough and detailed statement in this

21  case?

22  A.  Yes.

23  Q.  And there's times where you might come back and ask a question

24  or a series of questions related to something you left out or

25  whatever?

1    A.  Yes.  Or clarification, yes.

2    Q.  And you as an investigator have a high responsibility to make

3    sure that your interview is conducted in a manner to display

4    whether or not it's an initial or supplemental -- you can make that

5    interview as detailed or as general as you wish?

6    A.  Yes.

7    Q.  If you plan on doing a follow-up statement?

8    A.  Yes.

9    Q.  And in this -- one second.  One second, please.

10          You're familiar with the content of the statement

11   generally?

12   A.  Generally.  You're referring to the homicide?

13   Q.  Uh-huh, the homicide statement.

14   A.  Yes.

15   Q.  Does Rob Gisevius, does he ever ask to address or does he ever

16   address anything in regards to seeing any individuals on the east

17   side of the bridge?

18   A.  I know he's asked a catchall question, basically tell me

19   everything you know about the incident.

20   Q.  That could take a long time, right?

21   A.  Yes.

22   Q.  This thing took about 15 minutes?

23   A.  Yes.

24   Q.  And the investigator, could he have chosen to, could have asked

25   100 more questions?

1  A.  Absolutely.

2  Q.  My question was, is there anything in there that describes,

3  say, the actions of Jose Holmes?

4  A.  I don't believe so.  I think his statement is that he hears gun

5  fire on that side of the truck and then pursues individuals fleeing

6  west.

7  Q.  You're right.  And pursues individuals up the bridge, two

8  individuals, who we later learned or believed to be Lance and

9  Ronald Madison?

10  A.  Yes.

11  Q.  Never comes back to that side and does anything over there?

12  A.  It's not mentioned in this statement, no.

13  Q.  Doesn't say Jose Holmes had a gun?

14  A.  No.

15  Q.  Pointed a gun at him?

16  A.  No.

17  Q.  Never said he even saw Jose Holmes?

18  A.  No.

19  Q.  Never said Jose Holmes did anything illegal?

20  A.  No.

21  Q.  And the physical evidence doesn't support the contention that

22  he shot him in the stomach with a high-powered rifle?

23  A.  Shot Jose Holmes?

24  Q.  Yes.

25  A.  No.

1    Q.  And Jose Holmes hasn't identified Robert Gisevius as doing a

2    single thing?

3    A.  No.

4    Q.  And yet Robert Gisevius is charged with violation of Jose

5    Holmes' civil rights?

6    A.  Yes.

7    Q.  By?

8    A.  By the government?  By --

9    Q.  For doing what?

10   A.  For being involved in an unjustified shooting, for

11   essentially -- well, for using excessive force on the Bartholomew

12   family.

13   Q.  No, I am talking about Jose Holmes.

14   A.  And Jose Holmes.

15   Q.  But specifically, what did he do, what did he do to violate

16   Jose Holmes' civil rights?

17   A.  This is a legal question and I am not an attorney, but my

18   understanding is that all of the officers are charged with aiding

19   and abetting each other, meaning, you know, they all aided and

20   abetted each other in violating all of those individuals' civil

21   rights.

22   Q.  Okay.  Robert Gisevius somehow used unreasonable force against

23   Jose Holmes?

24   A.  Aided and abetted.

25   Q.  Even though he's never seen him, didn't describe any actions?

1   A.   Yes.

2   Q.   Didn't ever refer to him in any way, shape, or form?

3   A.   Yes.

4   Q.   Didn't say he did anything?

5   A.   That's correct.

6   Q.   And didn't shoot him?

7   A.   There is no -- I don't recall any evidence that Gisevius shot

8   Jose Holmes.

9   Q.   In Count 12 Robert Gisevius is charged with conspiracy to

10   violate civil rights by the false prosecution of Jose Holmes?

11   A.   Yes.

12   Q.   How did he -- prosecute Jose Holmes for what?

13          MS. BERNSTEIN:  Your Honor, I guess I'll object at this

14   point to all of the continuing questions asking him to interpret

15   the indictment, legal questions, and he has already said he's not

16   qualified to talk about these things.

17          THE COURT:  I don't think he is asking -- and you're

18   right, he's qualified his answers by saying he is not an attorney,

19   but these are specific factual allegations.  He is the case agent,

20   he investigated this, he should be able to answer these as a matter

21   of fact, not as a legal opinion.

22   BY MR. HESSLER:

23   Q.   He said you can answer the question.

24   A.   Can you repeat the question?  I'm sorry.

25   Q.   I thought you were going to ask me that.  What is it in

1   Count 12, Robert Gisevius is charged with conspiracy -- hang on one

2   second -- to falsely, to violate civil rights by the false

3   prosecution of Jose Holmes.  My question to you was, what did he do

4   to do that?

5   A.  Again, I am not a legal expert, but I suppose it was his

6   involvement in a coverup that alleged Jose Holmes had a weapon and

7   was firing at the officers on the bridge.

8   Q.  And he's never said that he saw Jose Holmes have a weapon, fire

9   a weapon, possess a weapon, point a weapon?

10  A.  No.

11  Q.  Never gave any statements in any reports suggesting that Jose

12  Holmes should be prosecuted?

13  A.  No.

14  Q.  Now, we've talked about, we were talking about the interview,

15  and Gisevius was asked -- and if you could, sir, just for

16  efficiency purposes -- anyway, he's asked, did you fire your weapon

17  I think?

18  A.  Yes, he is asked, "Did you fire your weapon?"

19  Q.  What page is that on?

20  A.  Page five of my transcript.

21  Q.  Page 5?

22  A.  Yes.

23  Q.  And his answer is?

24  A.  "No, I did not fire my, uh, my uh, my department service

25  weapon."

1    Q.   The follow-up question is, did you fire your other weapon, the

2    M4?

3    A.   There is no follow-up question.

4              MR. HESSLER:  Can you play that?

5              MS. BERNSTEIN:  May I approach Mr. Hessler?  Technical

6    difficulty.

7              THE COURT:  Yes.

8              MR. HESSLER:  Page 10, line like 5 through 7.

9              THE COURT:  We're playing this?

10             MR. HESSLER:  Yes, sir.

11       (WHEREUPON, THE AUDIO CLIP WAS PLAYED.)

12   BY MR. HESSLER:

13   Q.   That was Sergeant Kaufman asking that question?

14   A.   Yes.

15   Q.   And the transcript says, "Did you fire your weapon?"  Right?

16   A.   Yes.

17   Q.   Does it appear that the question actually is, did you fire your

18   weapons?

19   A.   No.

20             MR. HESSLER:  Can you play that again.

21       (WHEREUPON, THE AUDIO CLIP WAS PLAYED.)

22             THE WITNESS:  It could be weapons.

23             MR. HESSLER:  You can turn it off.  I didn't hear.

24             THE WITNESS:  It could be weapons.

25   BY MR. HESSLER:

1  Q.  Which would indicate that the officer knew that, the

2  interviewer knew that there was more than one weapon, weapons

3  plural?

4  A.  I would agree and I totally expect that Sergeant Kaufman did

5  know that he had multiple weapons on the bridge.

6  Q.  Okay.

7  A.  The suspicious part about this is Sergeant Kaufman being a very

8  experienced detective allowing an evasive answer to go like that

9  without a follow-up question.  In my opinion, clear indication that

10  both officers are involved in covering up the fact that that weapon

11  was on the bridge.

12  Q.  Are you being evasive in your testimony?

13  A.  No.

14  Q.  So when you don't volunteer information to me that I don't ask,

15  is that evasiveness or is that just the way that you're trained and

16  you expect there will be another question coming?

17  A.  I think I've answered all of your questions.  What I was

18  referring to is the evasive nature.  Any parent could tell that

19  that answer was not responsive to Sergeant Kaufman's question.

20  It's a child trying to be very specific so they're lying but not

21  lying.  They're being evasive.

22  Q.  Could it be a cop answering questions the way he's answered

23  them for the last eight years, you ask the question that's

24  answered, and then the cop or another person will ask you more

25  questions and then you go on in that procession?

1    A.  No.  I mean, it's a very specific question.  As you point out,

2    it's probably weapons, did you fire your weapons that day.  So very

3    specific, did you fire your weapons.  His answer is evasive to the

4    question, no, I did not fire my department service weapon.  If he

5    was being truthful, he would have said, no, I did not fire my

6    department service weapon but I did fire an M4.

7    Q.  Now, in that he also was asked, "Did you identify Lance Madison

8    as a person that was firing a weapon back at you?"

9    A.  You would have to refer to me to the transcript.  I think

10   you're right, I think he does.

11   Q.  Page 8.  I don't know if we have the same one, Agent.

12   A.  No, we do not.

13            MR. HESSLER:  Can I approach, your Honor?

14            THE COURT:  Yes.

15            THE WITNESS:  It's page 4 of my transcript.

16   BY MR. HESSLER:

17   Q.  Are you at the point where it says, "Sergeant, but the person

18   that they apprehended was the person that you chased?"

19   A.  Yes.

20   Q.  And that's Sergeant Gisevius responds, "Yes, it was."

21   A.  Yes.

22   Q.  Sergeant asks, "And was that the person that was also was

23   firing a weapon?  Yes, he was."?

24   A.  Yes.

25   Q.  And that's the identification of it, correct?

1   A.  Yeah, because the question before the ones that you just

2   referred to, they're talking about Lance Madison and who identified

3   him, so.

4   Q.  And there's a few more questions about what he may or may not

5   have done and the person shooting the weapon, what hand, he says, I

6   don't recall, I don't even want to speculate, stuff like that?

7   A.  Yes.

8   Q.  So there's follow-up questions to all of that?

9   A.  Yes.

10  Q.  Now, you're familiar with identification processes, procedures,

11  and things like that?  I mean, you know how an identification

12  should be done, like in person, a physical identification, a

13  lineup, a show off, lineup, or --

14  A.  Or photo six pack?

15  Q.  Right.

16  A.  Sure.

17  Q.  And there are certain processes and procedures that you want to

18  follow so somebody isn't inadvertently, I don't know, compelled to

19  maybe possibly wrongfully identify somebody?

20  A.  Yes, that's why you do that.

21  Q.  And that's human nature, that happens sometimes?

22  A.  If you put one person in front of somebody and say is this the

23  guy, it's very suggestive and they may say, yes, that's the guy.

24  Like for instance, when you do a photo lineup you have six in a six

25  pack.

1  Q.  And that person might not be lying, the person might actually

2  believe it's the guy because of circumstances, etc.?

3  A.  Yes.

4  Q.  Could even happen to a couple, wouldn't you agree?

5  A.  Yes.

6  Q.  And there are no questions in regards to how positive he is of

7  the ID or are you sure that's him, what percentage, et cetera,

8  would you agree?

9  A.  Yes.

10  Q.  And you've heard of tentative ID's, that I think it's him, I

11  can't be sure because of lighting and this and that, right?

12  A.  Yes.

13  Q.  And when Sergeant Gisevius observed him we know that he was

14  already in custody by then, by the National Guard I think or some

15  state troopers?

16  A.  When the ID was made?

17  Q.  Yes, sir.

18  A.  Yes.

19  Q.  Handcuffed?

20  A.  Yes.

21  Q.  Dressed in similar dark colored clothing, black males, dark

22  colored clothing?

23  A.  Yes.

24  Q.  And there was some debate amongst some other officers that it

25  might not be the same guy?

1    A.   Yes.   I think Mike Hunter testified to that.

2    Q.   And Mike even said it looks like him?

3    A.   Yes.

4    Q.   Now, as you said before, there was an actual videotape in this

5    matter that was conducted, correct, or that was made?

6    A.   A video that was made?

7    Q.   Yeah, the video from the bridge.

8    A.   Yeah, it was -- there were things that were done to it to add

9    the slugs and the time and that type of stuff, yes.  It wasn't like

10   a Hollywood production, it was the video.

11   Q.   Right.  And there was some things that caused you to believe

12   that Sergeant Gisevius wasn't in fear for his life because he

13   didn't take cover, when he exits the vehicle and runs out front?

14   A.   No.  I think I said that it didn't appear that he was taking

15   fire because he wasn't taking cover, it didn't look like he was

16   attempting to make himself small, he was just standing straight up

17   in the road.

18   Q.   Now, he moved forward, firing while he was moving forward,

19   right?

20   A.   My recollection of the video is he stops, fires, advances,

21   stops and fires -- fires while he is stationary.

22   Q.   Correct.  He advances?

23   A.   Stops and fires.

24   Q.   Stops and fires.

25             MS. BERNSTEIN:  Just ask for a clarification whether

 1   we're talking about initially in front of the truck or later when

 2   we walks up the bridge.

 3              MR. HESSLER:  As a matter of fact, can we bring up 90,

 4   the video.

 5        (WHEREUPON, THE VIDEO WAS PLAYED.)

 6              MR. HESSLER:  Can you stop it right there.

 7   BY MR. HESSLER:

 8   Q.  That black spot now, but the person clad in black is believed

 9   to be Sergeant Gisevius, right?

10   A.  Correct.

11   Q.  And he was moving forward, right?

12   A.  From the back of the truck to the front, that's correct.

13   Q.  And when he comes out of that truck he is bailing out in the

14   blind, right?  He doesn't know what he's going to face, what he's

15   going to see, if there's a guy two feet from that truck, 20 feet

16   from that truck, or if there's ten guys two feet from that truck,

17   right?

18   A.  I agree.

19   Q.  And he's moving forward the entire time, right?

20   A.  Yes.

21   Q.  He has no cover once he gets out of that truck, right?

22   A.  I mean, he could have taken cover beside the truck, but.

23   Q.  Well, if you're linear and there's people ahead of you, the

24   side of the truck is not going to do you any good, do you agree

25   with that?

1    A.  If the people are in front of you, no.

2    Q.  Yes.

3    A.  No.

4    Q.  And he doesn't know where they are when he bails out?

5    A.  No.

6    Q.  As he cuts the corner he can see, his viewpoint opens up,

7    right, or he can see instead of just looking out the back of the

8    truck as he starts to make the curve his field of vision starts to

9    open up?

10   A.  Yes.

11   Q.  And eventually he can see all this way except for the portion

12   because he's being blocked from the right by the truck

13   (INDICATING)?

14   A.  Correct.

15   Q.  So he's got to -- to get a real good field of vision, he has to

16   pass the front of the truck, which he does, right?

17   A.  To get a 360 view, yes, sir, he has to get past that truck.

18   Q.  Well, not even 360 but a full 180?

19   A.  About 180, sure, 180.

20   Q.  And he does that, move forward?

21   A.  Yes.

22          MR. HESSLER:  Can you start the video again.

23       (WHEREUPON, THE VIDEO WAS PLAYED.)

24   BY MR. HUNTER:

25   Q.  He's firing up, as is Hunter, right?

1    A.   Yes.

2    Q.   Stop the video.  And Hunter is firing, has his arms out front,

3    extended level with the ground firing multiple shots?

4    A.   Yeah.  I mean, multiple shots and level to the ground.  You

5    can't tell from the video, but his arms are definitely extended out

6    in front of him.

7    Q.   Who appears taller right now?

8    A.   I can't tell.

9    Q.   Does it appear that Gisevius has somehow amazingly made himself

10   smaller than Michael Hunter?

11   A.   Look like they're the same size to me.

12           MR. HESSLER:  Go on.

13       (WHEREUPON, THE VIDEO WAS RESUMED.)

14   BY MR. HESSLER:

15   Q.   You can't tell if he's firing during that time or not?

16   A.   Sergeant Gisevius?

17   Q.   Yes.

18   A.   No.  I mean, he a looks like he has the weapon --

19   Q.   You can't tell if he's firing, right?

20   A.   No.

21   Q.   You can stop the tape.

22           So he moved forward while firing, moved laterally, and

23   then moved forward again?

24   A.   You can't tell when he's firing here, you definitely -- he

25   definitely moves from the back of the truck to the front of the

1  truck and then he is stationary in front of the truck and then he

2  walks towards the barrier.

3  Q.  He doesn't just walk, he moves laterally?

4  A.  I can't tell if he's moving laterally or if he's turned and

5  faced -- he walks that direction.  Whether he was side stepping or

6  not, I can't tell.

7  Q.  And then he moves forward, again because he's off the tape and

8  he's later seen right at the top of the bridge, he had to go

9  further?

10  A.  Yes.

11  Q.  You heard the expert --

12      MS. BERNSTEIN:  I am going to object and just raise the

13  same objection from yesterday that the video speaks for itself.  I

14  don't know that Agent Bezak needs to interpret what's on it, that

15  might move it along.

16      THE COURT:  Yes, I agree.

17      MR. HESSLER:  Okay.

18  BY MR. HESSLER:

19  Q.  When you don't have cover as a law enforcement officer, are you

20  supposed to move forward toward your target?

21  A.  I've never heard of that tactic.

22  Q.  Were you here in court the other day when the government's

23  expert testified to that?

24  A.  That you advance towards somebody who is shooting at you?

25  Q.  Absolutely.

1    A.  I don't remember that.

2              MR. HESSLER:  Can you go to 90-A, please.

3              MS. BERNSTEIN:  That's the Blu-ray.

4              MR. HESSLER:  I am going to need the Blu-ray set up, I

5    can ask questions while they're doing it.

6              THE COURT:  Well, we're close to the lunch hour here, why

7    don't we set it up during the lunch hour if we're going to go to

8    back to the Blu-ray.  It's about ten minutes to 12.  If you all can

9    be back at let's just say 1:05, that gives you about an hour and 15

10   or an hour and ten minutes.  If you can be back at 1:05 we will

11   begin with the Blu-ray.

12             THE MARSHAL:  All rise.

13        (WHEREUPON, THE JURY EXITED THE COURTROOM.)

14             THE COURT:  You can step down, please don't discuss your

15   testimony during the lunch break.  If y'all could be seated.

16   Counsel, anything we need to cover on the record at this time?

17             MS. BERNSTEIN:  Nothing for us, your Honor.

18             MR. FLEMING:  Nothing from the defense on the record,

19   your Honor.

20             THE COURT:  If y'all would approach then not on the

21   record.

22        (WHEREUPON, A BENCH CONFERENCE WAS HELD OFF THE RECORD.)

23        (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

24

25

```
 1                    P R O C E E D I N G S

 2                     (AFTERNOON SESSION)

 3

 4        (OPEN COURT.)

 5             THE COURT:  You may be seated.  Mr. Bezak, you've not

 6   talked to anyone during the lunch break about your testimony?

 7             THE WITNESS:  No, I have not.

 8             THE COURT:  And you're still under oath.  Mr. Hessler was

 9   about to show you and show the jury I think another part of the

10   Blu-ray video.  So we're ready to go ahead and do that,

11   Mr. Hessler, we can proceed.

12             MR. HESSLER:  All right, your Honor.

13             THE COURT:  See if we can turn that.  Do you need the

14   witness to step down?

15             MR. HESSLER:  It's probably going to need to be done,

16   your Honor.

17             THE COURT:  Sure, okay.  If you would step down there by

18   your chair.  Okay.

19   BY MR. HESSLER:

20   Q.  Agent Bezak, you've seen Exhibit 90-A?

21   A.  Yes.

22   Q.  And 90-A is, in fact, a clip from the video of Exhibit 300 I

23   believe -- 90, okay.

24             MR. HESSLER:  And if you could play, start the Exhibit

25   90-A.
```

```
 1            (WHEREUPON, THE VIDEO WAS PLAYED.)

 2                 MR. HESSLER:  Can you play it one more time, Exhibit

 3    90-A.

 4            (WHEREUPON, THE VIDEO WAS PLAYED.)

 5    BY MR. HESSLER:

 6    Q.  Now you've seen Exhibit 90-A twice, correct?

 7    A.  Yes.

 8    Q.  And what does that portray?

 9    A.  Robert Gisevius approaching the concrete barrier pointing his

10    weapon in the direction of the barrier walkway and firing his

11    weapon.

12    Q.  What makes you think he is firing his weapon?

13    A.  You can see muzzle blast, smoke.

14                 MR. HESSLER:  Can you play it again.

15            (WHEREUPON, THE VIDEO WAS PLAYED.)

16    BY MR. HESSLER:

17    Q.  Where do you see muzzle blast?

18    A.  Smoke, not muzzle flash, smoke.

19                 MR. HESSLER:  Can you play it again.

20            (WHEREUPON, THE VIDEO WAS PLAYED.)

21    BY MR. HESSLER:

22    Q.  Something well forward of the rifle barrel, wouldn't you agree,

23    an M4 doesn't have a long --

24    A.  Yeah, definitely in front of it.

25    Q.  And when concrete is struck it pulverizes, correct, sometimes?
```

1    A.  Sometimes.

2    Q.  And it can cause concrete dust, remnants of the concrete?

3    A.  Yes.

4           MR. HESSLER:  Play it again, please.

5      (WHEREUPON, THE VIDEO WAS PLAYED.)

6  BY MR. HESSLER:

7    Q.  Do you ever see Sergeant Gisevius lean over a barricade?

8    A.  Lean over, no.  Definitely appears that he's pointing down in

9  that direction.

10          MR. HESSLER:  Okay.  Play it again.

11     (WHEREUPON, THE VIDEO WAS PLAYED.)

12  BY MR. HESSLER:

13   Q.  His left forearm is up -- or his right forearm?

14   A.  Looks like he's like this to me (DEMONSTRATING).

15   Q.  Shoulder and gun on his right-hand side?

16   A.  Left.

17   Q.  Left-hand side?

18   A.  Yes.

19   Q.  So it would be right forearm pointed in a forward direction?

20   A.  If you're holding the weapon traditionally.  I think -- it

21  appears to me what you see is him holding the rifle like this and

22  see his left arm (DEMONSTRATING).

23   Q.  And it's nine o'clock in the morning or approximately thereof?

24   A.  Approximately.

25   Q.  Sun's coming up from the east?

1    A.  Yes.

2    Q.  And it's -- sun's still low at nine o'clock?

3    A.  Yes.

4    Q.  And the shadow is going to be longer?  The higher the sun goes

5    the shorter; and the shorter, you are the shorter the shadow you

6    have?

7    A.  Yes.

8    Q.  Feel like Peter Pan here.  So if I am walking up here, I have

9    to get relatively close with a short shadow when I'm walking up to

10   this podium here before my head's going to reach the top, I have to

11   be close, huh?

12   A.  Correct.

13   Q.  Because you have overhead lighting the further back it goes,

14   the longer my shadow is going to be.  Such as this, if my hand is

15   here and I go up, I only have to go to there before my shadow

16   reaches the top (DEMONSTRATING)?

17   A.  Correct.

18          MR. HESSLER:  Play the video again.  Pay attention to the

19   shadow, please.

20       (WHEREUPON, THE VIDEO WAS PLAYED.)

21   BY MR. HESSLER:

22   Q.  Would you agree that his shadow barely, if at all, crests the

23   top of that barrier, the top of his head?

24   A.  I can't tell.  You can tell that the shadow makes its way up

25   the barrier, but I can't tell at what --

1   Q.  And would you agree that there's gun fire going on as he's

2   approaching that barrier?

3   A.  It appears that way.  Again, I can't be sure.

4       (WHEREUPON, THE VIDEO WAS PLAYED.)

5   BY MR. HESSLER:

6   Q.  And he approaches, peaks, and comes back (DEMONSTRATING)?

7   A.  Yes.

8   Q.  About that quick?

9   A.  Yes.

10  Q.  And as he's backing up he lowers the rifle barrel?

11  A.  I can't see that.

12          MR. HESSLER:  Play it again.

13      (WHEREUPON, THE VIDEO WAS PLAYED.)

14          THE WITNESS:  He brings it down off his shoulder.

15  BY MR. HESSLER:

16  Q.  He brings it down off his shoulder?

17  A.  Yeah.

18  Q.  And he is backing away and there is still gun fire going off?

19  A.  Yes.

20  Q.  Okay.  So you're saying you see smoke or powder or whatever and

21  that leads you to believe that he fired the weapon?

22  A.  Yes.

23  Q.  Does it appear that he reached over with the barricade, over

24  the barricade in order to shoot somebody that's laying down like

25  this straight on down in a straight trajectory (DEMONSTRATING)?

```
1    A.  No.  The individual would have to be laying directly at the
2    side for him -- for that to be the case.  But it appears as if he's
3    shooting forward from his position, not directly down.
4    Q.  If he's lying next to the barricade, the angle, there's only
5    one way to do it, he has to lean over that barricade?
6    A.  He has to get close enough to that barricade that the weapon
7    leans over, he doesn't have to lean over.
8                MR. HESSLER:  Okay.  All right.  You can sit down, thank
9    you.
10               THE COURT:  Are we finished with the Blu-ray for now?
11               MR. HESSLER:  Yes.
12               THE COURT:  Thank you, gentlemen.
13   BY MR. HESSLER:
14   Q.  You're familiar with Exhibit 300, which is the CNN video,
15   you're familiar with that?
16   A.  Yes.
17   Q.  I am going to ask you to watch this snip it and listen to the
18   audio that accompanies it.
19   A.  Okay.
20      (WHEREUPON, THE VIDEO WAS PLAYED.)
21   BY MR. HESSLER:
22   Q.  You have seen this tape before, correct, many times?
23   A.  Yes, sir.
24   Q.  You've listened to the audio?
25   A.  Yes.
```

1    Q.   Many times?

2    A.   Yes.

3    Q.   You've spoken to the individuals who have taken these videos?

4    A.   Yes.

5           MR. HESSLER:   Whenever you're ready.

6        (WHEREUPON, THE VIDEO WAS PLAYED.)

7    BY MR. HESSLER:

8    Q.   Do you know why the cameramen are focused on this individual?

9    A.   No.

10          MR. HESSLER:   Okay.  Go ahead.

11       (WHEREUPON, THE VIDEO WAS RESUMED.)

12   BY MR. HESSLER:

13   Q.   Now, they're talking about the same individual sitting down or

14   is it a different individual?

15   A.   I don't know.

16   Q.   Well, when you talked to them, did you ask them?

17   A.   They couldn't remember any details that were pertaining to

18   this.

19   Q.   About that, okay.

20       (WHEREUPON, THE VIDEO WAS RESUMED.)

21   BY MR. HESSLER:

22   Q.   They're talking about a kid in the red shorts, you heard that?

23   A.   Yes.

24   Q.   And then did you hear, "I'm sure if he still has it, it's in

25   his pack."?

1          MR. HESSLER:  Play the video back.

2      (WHEREUPON, THE VIDEO WAS PLAYED.)

3   BY MR. HESSLER:

4   Q.  Does it sound like he says something like, the kid in the red

5   shorts, I'm sure if he has it it's packed or it's in his pack?

6   A.  No.

7   Q.  You don't hear that?

8   A.  No.  It sounds like he says I'm not sure if he has his pack.

9   That's what it sounds to me anyway.

10  Q.  Okay.  Did you ever see him carrying a pack?

11  A.  Did I?

12  Q.  Yeah.  When he was running on the video, did you see him

13  carrying a pack?

14  A.  No.

15          MR. HESSLER:  Okay.  Go ahead.

16      (WHEREUPON, THE VIDEO WAS RESUMED.)

17  BY MR. HESSLER:

18  Q.  So what do you think it says, sound like to you?

19  A.  Sounds to me something like, I don't see if he has his pack or

20  has a pack.  But I mean, it's obviously not a great recording.

21  Q.  No, but you can tell that they have an interest about a pack or

22  if he has it it's in his pack or he left his pack.  Do you know

23  what item of interest they might have that would be put in a pack

24  that they're so interested in to make that comment?

25  A.  I think they're interested in a pack because -- this is all

1  speculation now --

2  Q.  I don't want you to speculate.

3  A.  I have no idea then.  Obviously they say something about a

4  pack.  I don't hear anything about it's in his pack or an object in

5  his pack.  It sounds, it's clear to me that they say pack.  Other

6  than that.

7          MR. HESSLER:  Can you play it one more time.

8      (WHEREUPON, THE VIDEO WAS PLAYED.)

9  BY MR. HESSLER:

10  Q.  I'm sure if he has it, I'm sure you can hear that part?

11  A.  To me it sounds like I'm not sure if he has his pack or a pack.

12  Q.  And again, you don't know what item he is referring to that

13  he's sure he has it or not sure he has it.  But he has an item of

14  interest that they're talking about?

15  A.  They're talking about the pack.

16  Q.  How do you know that?

17  A.  He says and you can clearly hear the word pack.

18  Q.  Okay.  And you clearly have, "I'm sure if he has it" --

19          MS. BERNSTEIN:  At this point I'll object, your Honor.  I

20  think the jury will decide what they hear.

21          MR. HESSLER:  That's fine, your Honor, that's perfectly

22  fine.

23          THE COURT:  Let's go ahead.

24          MR. HESSLER:  I will, I'll go to this next clip.  And I

25  am going to ask you to listen to the audio and tell me what you may

1    or may not hear there.

2         (WHEREUPON, THE VIDEO WAS PLAYED.)

3              MR. HESSLER:  Actually go back to the beginning.

4    BY MR. HESSLER:

5    Q.  Did you see this fella that was running around here?  Somebody

6    dressed in all black, right about there, did you ever notice that

7    in this tape (INDICATING)?

8    A.  Yes.

9    Q.  Do you know who that is?

10   A.  No.

11             MR. HESSLER:  All right.

12        (WHEREUPON, THE VIDEO WAS RESUMED.)

13   BY MR. HESSLER:

14   Q.  You heard the two gunshots?

15   A.  Yes.

16   Q.  Did you hear somebody yell drop the gun after that?

17   A.  No.

18             MR. HESSLER:  Play it back again.

19        (WHEREUPON, THE VIDEO WAS PLAYED.)

20   BY MR. HESSLER:

21   Q.  Did you ever listen to this with earphones?  Did you hear some

22   yelling?

23   A.  Yeah, yelling.

24   Q.  Did you hear the cadence of that yelling?

25   A.  No.

1    Q.  And did you ever listen to this thing with headphones?

2    A.  Yes.

3    Q.  Did you ever hear something same cadence, same tone, same sound

4    as drop the gun being yelled right then and there?

5    A.  No.

6            MR. HESSLER:  No further questions, your Honor -- wait

7    one second.

8            Thank you, your Honor.

9            THE COURT:  All right.

10           THE WITNESS:  Thank you.

11           THE COURT:  Mr. London.

12           MR. LONDON:  May I begin, your Honor?

13           THE COURT:  Yes, please do.

14                        CROSS-EXAMINATION

15   BY MR. LONDON:

16   Q.  Good afternoon, Agent.  My name is Steve London, I represent

17   Archie Kaufman.  We've met before and we've talked, haven't we?

18   A.  Yes, we have.  Good afternoon.

19   Q.  Good afternoon to you.  I believe we talked probably several

20   times, and I think this is the only case we've done together; is

21   that correct?

22   A.  Yes, yes.

23   Q.  I am going to be very brief with you this afternoon, I am just

24   going to get right to the point of some items that I would like to

25   talk to you which you testified on direct.

1          Mr. Stephen, could you put up numbered Exhibit 301,

2     please.

3          Do you see this individual here in Exhibit 301?

4     A.  Yeah, there's two individuals.

5     Q.  That's true, the shorter one.

6     A.  Yes, David Ryder.

7     Q.  That's David Ryder.  Now that is the individual that Archie

8     Kaufman has been criticized so much about believing was a police

9     officer at the time of this incident; is that not right?

10    A.  I wouldn't characterize it as criticized at the time of the

11    incident.  It was suspicious to me that over the length of his

12    investigation he didn't determine that David Ryder was a sheriff's

13    deputy.  I have no reason to disbelieve that Mr. Kaufman thought

14    David Ryder was a sheriff's deputy that day at all.

15    Q.  You were suspicious over the length of time of his

16    investigation, is that what you just testified to?

17    A.  Yes.

18    Q.  He assumed the investigation September 4th; is that correct?

19    A.  Yes.

20    Q.  And the investigation was assumed by Sergeant Dugue when?

21    A.  Sometime in October.

22    Q.  October 14th, would you disagree with that?

23    A.  No.

24    Q.  October 14th.  That is about five weeks?

25    A.  Yes.

1   Q.  This is four days after Katrina?

2   A.  Yes.

3   Q.  What were these individuals involved in prior to this incident

4   immediately after Katrina, if you know, the police officers?

5   A.  I don't know.

6   Q.  Would search and rescue be appropriate?

7   A.  Yes.

8   Q.  And would search and rescue from whatever you know -- if you

9   don't know, please say so -- have extended way past September 4th

10  in the city of New Orleans and in surrounding areas?

11  A.  I can't say for sure.  By this time most -- I know there was

12  definitely still searchs going on, I think most of the people were

13  close to being evacuated by this point.

14  Q.  It's certainly not your testimony that the city was anywhere

15  even remotely close to back to normal five weeks later?

16  A.  Absolutely not.

17  Q.  We're not even talking about within Third World status within

18  five weeks, are we?

19  A.  I would agree with that.

20  Q.  You would agree with that.  And you would also agree that

21  Sergeant Kaufman had something more to do other than simply work on

22  this case every single day, would you not?

23  A.  I don't know what you're referring to.

24  Q.  Well, what I'm referring to is you said he had a large period

25  of time to work on this case, and what I am discussing with you is

1   what he may have been doing other than working on this case at this

2   particular time.

3   A.  I don't know what he may have been doing other than working on

4   this case.

5   Q.  Would it have seemed unreasonable to you to believe that he may

6   have been still operating search and rescue immediately after this

7   case?

8   A.  Yes, that would seem unreasonable.

9   Q.  That would seem unreasonable.  You think he would drop all of

10  that just to work on this case?

11  A.  Absolutely.

12  Q.  Absolutely.  That's -- working on this case is more important

13  than search and rescue in your opinion?

14  A.  Yes.  It was a very serious incident that needed to be

15  investigated, he was assigned as the lead investigator.  There were

16  other officers that could have handled search and rescue at that

17  time.

18  Q.  Do you know how many police officers fled the city of New

19  Orleans after the storm?

20  A.  No.

21  Q.  Do you know if I were to tell you it was several hundred, would

22  you believe that, would you have any reason to take issue with

23  that?

24  A.  No.

25  Q.  If I were to tell you that there were only 50 or 60 in this

1  district after the storm, would you have reason to take issue with

2  that?

3  A.  No.

4  Q.  And you think that's more than enough sufficient to help with

5  the search and rescue after Katrina where he could devote his

6  entire time once his initial interviews are over in this case that

7  he would have nothing to do but work on this case; is that your

8  testimony?

9  A.  Yes.  After the initial days --

10  Q.  Please, if you would answer the question first.

11  A.  Yes.

12  Q.  You may explain if you want.

13  A.  After those initial days there were other agencies that came to

14  assist in search and rescue, so it wasn't just the 50 or so

15  officers that you referenced that were in the 7th District, there

16  were also civilians who came to assist in the search and rescue.

17  There were a number of individuals beyond the 50 or so officers

18  that may have been in the 7th District.

19  Q.  So he should have just let that go, that's your testimony?

20  That aspect to work on the case only?

21  A.  His supervisor should have ordered him to let that go and tell

22  him that this was his main focus and to be his only focus, yes.

23  Q.  Did his supervisor tell him that?

24  A.  I am not sure.

25  Q.  You're not sure.  Well, I mean, you investigated the chief

1   investigator, did his supervisor tell him that?

2   A.  I know Mike Lohmann assigned the case to him.  I can't say that

3   he told him do nothing but this investigation.

4   Q.  That was the question.  You said that his supervisor told him

5   he should do nothing but work on that case, and I am asking you,

6   did, to your knowledge, as a result of your investigation, his

7   supervisor tell him to do that?

8   A.  Supervisor told him to work on the investigation.  I did not

9   say that the supervisor told him to work on nothing but the

10  investigation.

11  Q.  Did you speak to Captain Curole of Public Integrity Bureau

12  during your investigation?

13  A.  I don't even know the name, so no.

14  Q.  You did not speak to anybody in PIB?

15  A.  Not that I can say was in PIB at that time.  Captain

16  Waguespack, but I am not sure when he was in PIB.

17  Q.  We surely know what PIB is?

18  A.  Public Integrity Bureau.

19  Q.  And you know the procedure for handling police shootings, don't

20  you, at the New Orleans Police Department during that period of

21  time?

22  A.  Before the storm?

23  Q.  Well, the storm, before the storm, during the storm.

24  A.  Sure.  PIB --

25  Q.  I'm not talking about in 2011, I'm talking about let's say

1  2005.

2  A.  PIB would handle an administrative investigation and cold case

3  homicide would handle the investigation, a criminal investigation,

4  to determine whether it was a criminal shooting.

5  Q.  And did you speak to anybody in PIB concerning their input into

6  this investigation?

7  A.  As far as I know they had no input in this investigation.

8  Q.  Did you speak to anybody at PIB about their input in this

9  investigation?

10  A.  I can't remember a specific name --

11  Q.  Did you speak with anyone in PIB concerning this investigation?

12  A.  Yes.

13  Q.  Yes.  Do you remember who that person is?

14  A.  Chief Adams.

15  Q.  Do you remember who the commander of PIB was at the time?

16  A.  No.  I think it may have been Waguespack or maybe he was a

17  lieutenant at that time.

18  Q.  If I were to tell you Captain Curole you wouldn't know that

19  name I believe you testified?

20  A.  No, I wouldn't know that name.

21       MS. BERNSTEIN:  Just clarification, you said at the time,

22  as for clarification which time you're asking?

23       MR. LONDON:  Obviously I am talking about the time of

24  this incident, we're not talking about today.

25       MS. BERNSTEIN:  No, no, followed up the question about

1   whether he had spoken to somebody at PIB and you asked who was the

2   captain at the time.  I wasn't sure whether it meant at the time --

3          MR. LONDON:  I'm sorry, I thought anybody would figure at

4   the time --

5          THE COURT:  We're questioning him about events in the

6   weeks after Katrina and then we were talking -- maybe you should

7   clarify about the time period when he was investigating, which I

8   think he testified started somewhere a few years later.  So

9   obviously we're talking about somebody who served in PIB at some

10   point in time that he may have spoken to.  So clarify that and be

11   careful that we don't have two people talking at one time.  But

12   good ahead and clarify.

13          MR. LONDON:  Yes, I apologize for that, Agent.

14   BY MR. LONDON:

15   Q.  I am talking about from the time the storm hit until your

16   investigation, did you speak to the person that was in charge of

17   PIB immediately after the storm?

18   A.  No.

19   Q.  You have never spoken to that person in your investigation?

20   A.  No.

21   Q.  You don't think it would be important to talk to somebody who

22   plays an integral role in investigating police shootings?

23   A.  In this case, no, because PIB was not involved in the

24   investigation of the incident.

25   Q.  If you didn't speak to them, how do you know that?

1   A.  We subpoenaed documents looking for all documents related to

2   the incident, and Chief Adams also provided that information.

3   Q.  And told you, Chief Adams told you PIB had nothing to do with

4   this case?

5   A.  There were no reports generated as far as I know.

6           THE COURT:  The question is, did Chief Adams tell you

7   that PIB had nothing to do with this case?  So he didn't ask about

8   reports, he asked you about Chief Adams, so let's answer that.

9   Either he did or he didn't.

10          THE WITNESS:  No.  At least he indicated that there were,

11  there was no investigation conducted by PIB.

12  BY MR. LONDON:

13  Q.  Indicate?  Did he tell you that?

14  A.  Yes.

15  Q.  He told you that?

16  A.  Yes.

17  Q.  You personally spoke to him?

18  A.  Yes.

19  Q.  Did you personally speak to Captain Curole who was in charge of

20  PIB at that time?

21  A.  No.

22  Q.  Did anyone tell you that the superintendent of police in

23  response to Danziger said no investigation 105, get back on the

24  street?

25  A.  I did hear that.

1  Q.  You did hear that?

2  A.  Yes.

3  Q.  I want to get right back to this picture here real quick and

4  then we'll get off of this.  It's obviously police all the way

5  across it, correct?

6  A.  Yes.

7  Q.  And that looks like a holster that he is wearing on his right

8  side?

9  A.  Yes.

10  Q.  And that's a policeman over here that I believe testified

11  during this trial (INDICATING)?

12  A.  Yes.

13  Q.  And there is not, and would not be according to your testimony,

14  unreasonable to think where somebody would believe that this was an

15  actual policeman at this time; is that correct?

16  A.  At that time, absolutely not.

17  Q.  And as a matter of fact, they did find out later that he wasn't

18  a policeman, didn't they?

19  A.  Yes.

20  Q.  Now, I want to ask you about, I am just going to get right to

21  these reports.  First thing I want to ask you is --

22          MR. LONDON:  And I am not sure, Ms. Bernstein, is 184 in

23  evidence?

24          THE COURT:  I don't think we have 184 in.

25          MR. LONDON:  I'll proceed then, I'll submit it to be

1    introduced.

2    BY MR. LONDON:

3    Q.  Agent Bezak, there's been an awful lot of talk ad nauseam about

4    the different reports that are involved in this.  I am going to try

5    to lay this out to you and ask you if I am correct or not, but I am

6    going to go through a little bit of the chronology with it first.

7    It's the 17 page report.  I am just saying there is a 17-page --

8    A.  Okay.

9    Q.  -- document.  I'll just use the term generically report.  I do

10   not mean by using the term report that that necessarily is a report

11   in our traditional sense of the word, but for purposes of our

12   communication; is that all right?

13   A.  Yes.

14   Q.  There's a 17-page report?

15   A.  Yes.

16   Q.  There's a 7-page report?

17   A.  Yes.

18   Q.  There's a 32-page report?

19   A.  Yes.

20   Q.  That came off -- that was given to you by Lohmann?

21   A.  Yes.

22   Q.  There's the 32-page report that was -- I'll get right back.

23   There's another 32-page report?

24   A.  Yes.

25   Q.  There's a 46-page report?

1  A.  Yes.

2  Q.  And there's a 54-page report?

3  A.  Yes.

4  Q.  The 54-page report we have been referring to, I believe you've

5  been referring to as the supplemental report; is that correct?

6  A.  Yes, the official.

7  Q.  Well, okay.  That's my next question.  That's the official

8  report and that is the only one of those five that had been turned

9  in; is that correct?

10  A.  The --

11  Q.  That's correct, the seven page.  I stand corrected, the seven

12  page has.  We'll they get back to that, let me put that on the side

13  for a second.

14          The 54 page is the official report of the incident; is

15  that correct?

16  A.  Yes.

17  Q.  And I believe that there may have been another supplemental

18  Sergeant Dugue did down the road, but nobody's talked about that,

19  so I'll leave it alone.

20  A.  There might have been more than one actually.

21  Q.  But that 54 page is the one and only report submitted by

22  anybody on the entire New Orleans Police Department, to your

23  knowledge, that purports to be the official results of the

24  investigation of Danziger; is that correct?

25  A.  Correct.

1    Q.   None -- the 17 page was not?

2    A.   Correct.

3    Q.   The 32 page that Lohmann gave you was not?  I'll call it the

4    annotated.

5    A.   Correct.

6    Q.   The 32 page that you received, got off of Sergeant Kaufman's

7    computer was not?

8    A.   Correct.

9    Q.   The 46 page that we don't know -- I know you have a position

10   and I have one too, but we technically don't know who authored was

11   never turned in either, was it?

12   A.   Correct.

13   Q.   You did, it's your testimony, serve a warrant on Sergeant

14   Kaufman's computer at homicide, did you not?

15   A.   Yes.

16   Q.   At first -- that was at central homicide downtown, wasn't it?

17   A.   Correct.

18   Q.   And in the beginning Sergeant Kaufman worked in the 7th

19   District homicide which was not central; is that correct?

20   A.   That's correct.

21   Q.   You came to find out he was transferred when to central

22   homicide?

23   A.   It was my understanding that he went at the time -- shortly

24   around the time that the case was transferred, the Danziger case

25   was transferred to central homicide.

1   Q.  In October?

2   A.  That was my understanding, yes.

3   Q.  You didn't find the results of that in your investigation?

4   A.  That's what Mike Lohmann, his supervisor, indicated to me.

5   Q.  What did you find out?  It's your case, it's not Lohmann's.

6   A.  That's what I found out.

7   Q.  Well, if I tell you it was February 6, what would you say about

8   that?

9   A.  I'd have -- the only reason to dispute that would be what Mike

10   Lohmann has told me and other witnesses.

11   Q.  When you're conducting your investigation you didn't think it

12   was important to find out when this man transferred to central

13   homicide where this investigation was supposed to be in the first

14   place?

15   A.  I did.  Witnesses told me that he went with the case.

16   Q.  Did you ask the department of police, they might have transfer

17   documents?

18   A.  I think we did ask for transfer documents.  I know we asked for

19   their personnel files, so if those documents would have been

20   contained in his personnel files then we did ask for them.

21   Q.  So you don't know that?

22   A.  No.

23   Q.  If I were to tell you, I believe it's sometime in February of

24   '06, would you have a reason to dispute that?

25   A.  Yes.

1   Q.  You would have reason to dispute that?

2   A.  Yes.

3   Q.  Then I'll have to supplement with those documents then.  If it

4   was February as I say, that would have been significantly after

5   October obviously?

6   A.  Obviously.

7   Q.  So you don't know that.  Now, you served a warrant when?

8   A.  August 5th, 2009.

9   Q.  August 5th, 2009.  And you searched Sergeant Kaufman's

10  computer?

11  A.  We searched the offices of Sergeant Kaufman and Sergeant Dugue

12  and their computers.

13  Q.  The only report or portion of report that you found on Sergeant

14  Kaufman's thumb drive or computer was the 32-page report, which I

15  have as Exhibit 184; is that correct?

16          MR. LONDON:  Can I approach and show this?

17          THE COURT:  Yes.

18          THE WITNESS:  That is correct.

19  BY MR. LONDON:

20  Q.  Let me just show it to you.  Is that correct?

21  A.  (WITNESS REVIEWS DOCUMENT.)  It's hard to tell if this is "the

22  one".

23  Q.  It's an exhibit the government put in, it's Exhibit 184.

24  Assuming they tell me that that's the one you got, that's the only

25  way I would have to get it is for the government to give it to me,

1   you guys served a warrant on it, I can't get it, right?

2   A.  Right.

3   Q.  And that's purported to be -- and they'll correct me if I'm

4   wrong -- that's the document that was obtained from Sergeant

5   Kaufman's computer, correct?

6   A.  Correct.

7   Q.  You did not find a 17-page report on his computer?

8   A.  No.

9   Q.  You didn't find pieces of a 17-page report on his computer?

10  A.  No.

11  Q.  You didn't find anything of a 46-page report on his computer?

12  A.  No.

13  Q.  You did not find pieces on his computer?

14  A.  No.

15  Q.  You have not found a 17-page report, a 46-page report anywhere

16  remotely associated with Sergeant Kaufman's person or property,

17  correct?

18  A.  Correct.  Just one small correction.  This report was found on

19  his thumb drive, but the same answer for all.

20  Q.  Okay.  Same answer for all, thumb drive?

21  A.  Yes.

22  Q.  There wasn't anything found on the computer, this is the only

23  piece of material we're involved with today?

24  A.  Correct.  Nothing was found on the computer, this report was

25  located on his thumb drive.

1   Q.  That report and the report that Lohmann gave you that looks

2   similar to that, great deal similar to that, but has annotations on

3   it was not found with Kaufman, was it?

4   A.  No, it was not.

5   Q.  That and only that?

6   A.  Correct.

7   Q.  So we've had all of this discussion earlier in this case about

8   17-page reports, 46-page reports, 54-page reports, that's really

9   nothing having to do insofar as him having possession of it with

10  Kaufman's computer or thumb drive?

11  A.  Insofar as him having possession, correct.

12  Q.  Just 184?

13  A.  That's correct.

14          MR. LONDON:  Your Honor, at this time I move to put in

15  this, I am not sure what number we're up to.

16          THE COURT:  Is it premarked 184?

17          MR. LONDON:  It's Exhibit 184.

18          THE COURT:  Correct.  Is there any objection?

19          MS. BERNSTEIN:  No objection, your Honor.

20          THE COURT:  Okay.  We'll admit Exhibit 184.

21  BY MR. LONDON:

22  Q.  Now, you have testified -- now I am going to back you up.

23  We've talked about grand juries.  A grand jury in the federal

24  system, please correct me if I'm wrong, is used as an investigatory

25  tool as opposed to what most states use, as a general rule; would

1    you agree with that?

2    A.  I am not familiar with the way states utilize grand juries, but

3    it's definitely an investigative tool in the federal symptom.

4    Q.  And a grand jury is much like our petit jury, except it has

5    about 24 people, 25 people, and they serve for a certain term,

6    correct?

7    A.  Correct.

8    Q.  And they're picked just like our petit jury is except they're

9    picked for a different person, they're called grand jury as opposed

10   to a petit jury; is that correct?

11   A.  That's correct.

12   Q.  And that is used by prosecutors to present evidence that of

13   course defense counsel are not entitled to appear, correct?

14   A.  Correct.  It's just the government's evidence.

15   Q.  Correct.  And that's how you will go in as an investigator, not

16   just yourself, any member of a federal investigator arm, whoever

17   they choose to have as witnesses will go in and they'll testify in

18   front of the grand jury.  And they will do this until they think

19   they've provided enough evidence and then they seek an indictment;

20   is that correct?

21   A.  That's correct.

22   Q.  Do you consider a grand jury a rubber stamp?

23   A.  I'm not sure what you mean.

24   Q.  You know what a rubber stamp is.  We all say that, as a joke,

25   grand jury would indict --

1          MS. BERNSTEIN:  Your Honor, can we approach?

2          THE COURT:  Yes.

3          MR. LONDON:  I can drop it, it's not a big part, unless

4    you want to continue.

5          THE COURT:  Approach about this question?

6          MS. BERNSTEIN:  I don't know if it's this question or a

7    series of questions.

8          MR. LONDON:  No, I am finished with that.  I just want

9    the jury to understand what the role of the grand jury is, and

10   there's a reason why I asked it but I'll move on, that's not

11   important.

12   BY MR. LONDON:

13   Q.  But you testified in front of this grand jury on many

14   occasions, didn't you?

15   A.  Several occasions.

16   Q.  And they asked you questions and you, of course, always

17   testified to the truth?

18   A.  As best as I could, yes.

19   Q.  You never tried to mislead them?

20   A.  No.

21   Q.  Did you -- and you testified earlier that the 54-page report is

22   the one and only official report.

23   A.  The one and only that was submitted.

24   Q.  Submitted.  Well, official report?

25   A.  Yes.

1  Q.  So the one and only official report?

2  A.  Yes.

3  Q.  And you've also testified that you found Exhibit 184 on

4  Sergeant Kaufman's computer?

5  A.  Yes.

6  Q.  Now, you must have compared this report with the 54-page

7  report, correct?  Were this series of this document, which y'all

8  have been referring to as the draft report No. 184, you have

9  compared that with the 54-page report, haven't you?

10  A.  Yes.

11  Q.  Have you found any significant differences between this report

12  and the 54-page report?

13  A.  I know there were differences --

14  Q.  Significant, not is and at or something, I am talking about a

15  difference in the account of the incident, for instance?

16  A.  I can't say for sure for the 54-page report.  I know like there

17  were details like Leonard Bartholomew's name which is not contained

18  in the 54-page report --

19  Q.  We're going to go there.  I tell you what.  Let me stop you, if

20  you give me one, if I may just address it as you go, I may not

21  remember.

22       Leonard Bartholomew's name is in this report, and I'm

23  glad you brought that up because I almost forgot that.  This is in

24  Sergeant Kaufman's draft that was contained on his computer,

25  correct?

1    A.   Correct.

2    Q.   Now, that name is in here, isn't it, Leonard Bartholomew, Jr.?

3    A.   Yes.

4    Q.   But everybody says and I believe you say somewhere in the grand

5    jury that Sergeant Kaufman, when he did the 54-page report, which

6    we've now found out he didn't do, he took Leonard Bartholomew's

7    name out of that report?

8    A.   Yes.

9    Q.   It's your testimony -- is it your testimony Sergeant Kaufman

10   did the 54-page report?

11   A.   It's my testimony that he and Sergeant Dugue worked on that

12   report together.

13   Q.   Is it your testimony or did you ever write in one of your 302s

14   that Sergeant Dugue took full responsibility for that report, did

15   you write that in your 302?

16   A.   He did take full responsibility for the report.

17   Q.   Did you write in your 302 that he took full responsibility for

18   conclusions?

19   A.   He did take full responsibility for the conclusions.

20   Q.   And did you write in your 302 that he put Arthur Kaufman's name

21   on that report because he was kind of like a co-investigator?

22   A.   Yes, they worked on the report -- investigation together.

23   Q.   So the extent of Sergeant Kaufman just providing him these

24   details that he has, basically thumb drive, here is the notes that

25   I've done, correct?

A.  Correct.

Q.  But nothing past this, correct?

A.  No, he was there -- yes, something past that.

Q.  What?

A.  He was present for the interviews of Ken Bowen --

Q.  We're talking about writing the report, not participating --

A.  I thought you said involved in the investigation.

Q.  No, no, talking about writing the report, physically writing the report.

A.  No, I would agree.  As far as my knowledge on that, he provided the results of his initial investigation to Sergeant Dugue.

Q.  Which is 184?

A.  I am not sure if it was 184.

Q.  That's the 32, I just had you identify it, this is what you got off his computer?

A.  That's what I got off his computer.  I can't say that's what he provided Sergeant Dugue.

Q.  Well, what are you saying he provided Sergeant Dugue?

A.  I don't know.

Q.  Well, you don't know what he provided Sergeant Dugue, is that your testimony?

A.  No, he provided Sergeant Dugue the results of his initial investigation.  Whether it was that particular report, I don't know.

Q.  Well, then which portion of the 54-page report did he provide

1    him with?

2    A.  The portions of that report that document Sergeant Kaufman's

3    initial investigation of the incident.

4    Q.  Well, I don't know, maybe I am missing something.  Isn't that

5    what this is, 184 is supposed to be, the 32 page that you --

6    A.  Yes, I guess I'm saying -- I don't know if he literally gave

7    him that report, he provided that information from his initial

8    investigation.

9    Q.  This came off of Sergeant Kaufman's thumb drive, correct?

10   A.  Yes.

11   Q.  This 184 photocopy came off of Sergeant Dugue's (SIC) thumb

12   drive, correct?

13   A.  Yes.

14   Q.  And it's your testimony you compared this to the 54-page

15   report.  Is this contained in some variance in the 54-page report?

16   A.  Yes.

17   Q.  Well, then it would not be illogical to think that these may

18   have been his notes, correct?

19   A.  No.

20   Q.  No, that's not correct?

21   A.  No, it would not be illogical.

22   Q.  It would not be illogical?

23   A.  Yes.

24   Q.  So you didn't find anything that differs from this 32 page

25   initial -- or not initial, I don't want to use that term, that's a

1   term argued today -- of these notes' draft, if you will, that was

2   put in that 54-page report, correct?

3   A.  Leonard Bartholomew's name --

4   Q.  This is in Archie's, isn't it?  You're trying to tag Archie

5   with omitting Leonard Bartholomew, that's what's in his

6   indictment --

7             MS. BERNSTEIN:  Objection, your Honor, argumentative and

8   the witness has answered the question.

9             THE COURT:  No, I am going to let him answer this.  Go

10  ahead.

11  BY MR. LONDON:

12  Q.  You are trying to tag Sergeant Kaufman with taking Leonard

13  Bartholomew's name out, he has it in here, doesn't he?

14  A.  I thought you asked me what the differences are between that

15  report and the 54-page report.

16  Q.  Agent --

17            MS. BERNSTEIN:  Your Honor, that is what he asked, that

18  is exactly the question he asked.

19            MR. LONDON:  May I just rephrase it then.

20            THE COURT:  Let's go ahead and rephrase it.  Let's

21  establish this and move on.

22            MR. LONDON:  It's an important point, I'm sorry, your

23  Honor.

24            THE COURT:  I know it's an important point, but to the

25  extent that there may be some disconnect, let's go ahead and

1    clarify.

2    BY MR. LONDON:

3    Q.  I'm sorry, Agent, I'll start this over.  These again -- and

4    I'll say it because it's important to me -- 184 is what you got off

5    of Sergeant Kaufman's thumb drive, correct?

6    A.  Correct.

7    Q.  This document does have the name Leonard Bartholomew, Jr.,

8    doesn't it?

9    A.  That is correct.

10   Q.  D-O-E-S, it does have?

11   A.  Correct.

12   Q.  The 54-page report which you've said Kaufman did not physically

13   type or submit does not have Leonard Bartholomew, Jr., correct?

14   A.  It does not --

15   Q.  Does not?

16   A.  -- but I don't believe I ever said -- I have no knowledge one

17   way or the other whether he physically typed or not.

18   Q.  You have somebody to say that he didn't, right, you have in

19   your 302 that Sergeant Dugue is totally responsible for that,

20   correct?

21   A.  He took responsibility for the report and for the conclusions

22   in the report, but he also said that he incorporated Sergeant

23   Kaufman's initial investigation.

24   Q.  But it didn't incorporate Leonard Bartholomew, Jr., did it?

25   A.  No, it did not.

1    Q.  But you found this on Kaufman's computer?

2    A.  Yes.

3    Q.  And it has Leonard Bartholomew, Jr. in it?

4    A.  Correct.

5    Q.  So Kaufman didn't eliminate Leonard Bartholomew, Jr. from his

6    report, did he?  It's right here.

7    A.  It's in that report, yes.

8    Q.  Yes.

9           MR. LONDON:  Excuse me, your Honor, I got a little out of

10   order here.

11   BY MR. LONDON:

12   Q.  Now, I want to talk to you a little bit about --

13           THE COURT:  One second.  All right, Mr. London, go ahead.

14           MR. LONDON:  I'm sorry, you said go ahead?

15           THE COURT:  Go ahead.

16   BY MR. LONDON:

17   Q.  I want to talk to you a little bit about these witnesses that

18   you claim are made up.  Lakeisha Smith first.

19   A.  Okay.

20   Q.  Now, I believe that it was Mr. Lehrmann's testimony that he

21   provided Sergeant Kaufman with the name Lakeisha?

22   A.  That was his testimony.

23   Q.  Not Lakeisha Smith?

24   A.  Correct.

25   Q.  Just Lakeisha?

1   A.  Just Lakeisha.

2   Q.  And that it's your contention that Lakeisha Smith doesn't even

3   exist, correct?

4   A.  Yes.

5   Q.  Doesn't -- total figment of Kaufman and Lehrmann's imagination?

6   A.  There was -- of course there are Lakeisha Smiths that exist --

7   Q.  Of course there are.

8   A.  -- but no Lakeisha Smith that witnessed what they claim she

9   witnessed.

10  Q.  Well now, no Lakeisha Smith that claimed she witnessed is

11  entirely different than no Lakeisha Smith that exists, a Lakeisha

12  Smith who Kaufman claims to have spoken to.  I understand that

13  there are Lakeisha Smiths in this world; is that correct?

14  A.  Yes.

15  Q.  Not just that she claims not to have witnessed it, a human by

16  that name that Kaufman talked to does not exist?

17  A.  I can't say one way or the other whether he actually spoke to a

18  Lakeisha Smith if that's what you're asking.

19  Q.  But your indictment says not only did he not speak to Lakeisha

20  Smith that she doesn't even exist, that's in your indictment.

21  A.   I think what -- I am not sure exactly what's in the indictment.

22  The intent was that there is no Lakeisha Smith who witnessed what

23  Sergeant Kaufman claimed she witnessed or provided a statement that

24  he claimed she provided.

25  Q.  So if I were to tell you that the indictment says Lakeisha

1   Smith does not exist, would you agree with that?

2   A.  Yes.

3   Q.  You would agree that does not exist.  Okay.

4          Now, Lakeisha was supposedly provided to Kaufman by

5   Lehrmann, correct?

6   A.  Correct.

7   Q.  And he has the name Lakeisha Smith in his report, correct?

8   A.  Yes.

9   Q.  So that would mean that he or some other third party that we

10  don't know about gave him the last name of Smith, doesn't it?

11  A.  Gave --

12  Q.  Yeah.  If Lakeisha comes from one person, where did the Smith

13  come from?  Either him or another third party, correct?

14  A.  Yes.

15  Q.  But it wasn't given to him by Lehrmann, not according to

16  Lehrmann?

17  A.  Not according to Lehrmann.

18  Q.  So either Kaufman would have made up Smith or some other

19  unknown third party would have given him that name Smith to

20  complete the name of Lakeisha Smith?

21  A.  Yes.

22  Q.  And you looked for Lakeisha Smith, didn't you?

23  A.  Yes.

24  Q.  And how many Lakeisha Smiths did you look for?

25  A.  I looked for all of the Lakeisha Smiths that were in the age

1    range of the Lakeisha Smith in the report that were located in New

2    Orleans at that time.  I think we located 10 or 11, I don't

3    remember the specific number.

4    Q.  Now, did you conduct this search before or after Mr. Kaufman

5    was indicted and charged with this particular offense?

6    A.  Before.

7    Q.  Before?

8    A.  Yes.

9    Q.  When was the indictment, do you remember?

10   A.  July of 2010 maybe.

11   Q.  I have here, and this is a 302 dated 8/3/10, which I believe

12   would be after the indictment, and I would just like to show you

13   this.

14   A.  Yes.

15   Q.  And ask if you would look at this, please.  And if you would

16   tell me what that is?

17   A.  This is a 302 documenting the interview of Lakeisha Smith in

18   Carrollton, Texas.

19   Q.  Carrollton, Texas.

20   A.  Yes.

21   Q.  Now, what, if you can remember, is in Sergeant Kaufman's notes

22   about a description of this individual that he puts for Lakeisha

23   Smith?

24   A.  That she was going to Dallas, Texas.

25   Q.  And is Carrollton, Texas close to Dallas?

1    A.  I am not sure.

2    Q.  If I were to tell you it's like Metairie to New Orleans would

3    you have any reason to dispute that?

4    A.  No.

5    Q.  Now, but you spoke, not you, an agent spoke -- and I guess you

6    can say what an agent said if you look at your own 302 -- that that

7    claims not to have witnessed anything in New Orleans, correct?

8    A.  Yes.

9    Q.  And that particular Lakeisha Smith, do you have access -- and I

10   don't want it and I don't want to publicize it -- but do you have

11   access to the descriptors on there so that what I ask you next you

12   can say yes or no?  In other words, do you have an uncensored 302

13   available to you?  Like I said, I don't want it in the record or

14   anything, I just want you to be able to look at it.

15          I'm sorry, Agent, what do you want, the date?

16   A.  August 3rd, 2010.

17   Q.  While we're waiting on that, you also told the grand jury that

18   Sergeant Kaufman signed the 54-page report, didn't you?

19   A.  I don't know if I used those terms.

20   Q.  If I asked you -- I didn't think she would be that quick, so

21   I'll finish with this first.

22          MR. LONDON:  May I go back?

23          THE COURT:  Yes.  Is it the same one?

24          THE WITNESS:  Yes, it is.

25   BY MR. LONDON:

```
1    Q.   Okay.  That Lakeisha Smith lived, just give me the street.

2    A.   Old Dentin -- at the time of the interview?

3    Q.   No, in New Orleans.  What was her address in New Orleans?

4    A.   I don't believe it's in here.  (WITNESS READS DOCUMENT.)  I

5    don't think it's in here.

6    Q.   That's not in there, you wouldn't put that?  I mean, the FBI

7    does that, they wouldn't put that information on there?  I mean,

8    how did they know she lives in New Orleans if they talked to her?

9    Do you have a date of birth?

10   A.   The way they knew that she was in New Orleans because I located

11   her using database searchs, the agent who, I don't know why -- I

12   didn't conduct the interview.

13   Q.   I know that.  All right.  Do you know from your database search

14   what address she had?

15   A.   No, not off the top of my head.

16   Q.   Is there a way to find that?

17   A.   Yes.

18   Q.   Can we do that now or do you have to go through some process of

19   looking that up?  I don't want to go through all of that.

20   A.   It depends if they have the results of that search.

21   Q.   Do you have a date of birth on there?

22   A.   March 24th, 1979.

23   Q.   You don't have it, so you don't where she lived or where she

24   claimed to have lived in New Orleans?

25   A.   At this time, no.
```

```
 1   Q.  But her date of birth is 3/24/79, her name is Lakeisha Smith?

 2   A.  Yes.

 3   Q.  And Sergeant Kaufman said he spoke to a Lakeisha Smith?

 4   A.  Yes.

 5   Q.  At the Friendly Inn?

 6   A.  Yes.

 7   Q.  Who was going to leave town and go to relatives in Texas?

 8   A.  Yes.

 9   Q.  In Dallas, Texas?

10   A.  Yes.

11   Q.  That's Carrollton, Texas?

12   A.  Yes.

13   Q.  Suburb of Dallas, Texas?

14   A.  Yes.

15   Q.  Did she ever tell you that she lived on the Debore Circle at

16   the time of Hurricane Katrina?

17   A.  I never spoke to Ms. Smith.

18   Q.  Do you know where Debore Circle is?

19   A.  No.

20   Q.  If I were to tell you it was two blocks from the Friendly Inn,

21   what would you say about that?

22   A.  I have no reason to doubt that that's true.

23   Q.  So we have a Lakeisha Smith, Smith, Lakeisha first name

24   supposedly given to him by somebody, Smith --

25               MS. BERNSTEIN:  Objection, your Honor, may we approach?
```

```
1         (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

2         MS. BERNSTEIN:  Once he starts asking Agent Bezak

3   questions to which Agent Bezak does not know the answer, it's no

4   longer asking about the investigation.  What he's doing now and

5   trying to testify without calling Lakeisha Smith.  I have no

6   problem with him calling this Lakeisha Smith.

7         MR. LONDON:  I am going to call a private investigator.

8         MS. BERNSTEIN:  Whatever he says would be hearsay.

9         THE COURT:  The question that triggered the objection, I

10  think, correct me if I'm wrong --

11        MS. BERNSTEIN:  It was actually two questions before.

12        THE COURT:  I think I know the two, one of them is, do

13  you know where Carrollton, Texas is; and the other one is, do you

14  know where Debore is.  In answer to either one of those the witness

15  said he didn't or he wasn't sure.

16        MS. BERNSTEIN:  And now what we're about to get into is

17  closing argument.

18        MR. LONDON:  No, no.

19        THE COURT:  I think that we can't, unless you have a map

20  or something that you want to show him, I agree with the objection

21  that says that if he doesn't know he can't testify and put words in

22  his mouth.

23        MR. LONDON:  Can I say if I were to tell you Debore was

24  two blocks, I thought I did --

25        MS. BERNSTEIN:  That's objectionable.
```

1          THE COURT:  But then you are offering a factual

2   statement.  So I think we need to be careful.  I know it's

3   cross-examination, but that's a factual statement that he's already

4   said he doesn't know.

5          MS. BERNSTEIN:  And what's more offensive than do you

6   know where Debore Circle is, is do you know that she lived on

7   Debore Circle, and he says no; and now what he's testifying to,

8   there is a Lakeisha Smith who lived on Debore Circle two blocks

9   away from the Friendly Inn.

10          MR. LONDON:  May I respond?

11          THE COURT:  Go ahead.

12          MR. LONDON:  He said that there were made up witnesses

13   and opened the door to Lakeisha Smith, and all I'm doing is driving

14   a truck through it.

15          THE COURT:  I think you need to do it with fact testimony

16   from a witness.

17          MR. LONDON:  We have a witness that is going to testify

18   to that.

19          THE COURT:  I understand that.  But unless you have a map

20   and can show him or some way that you can refresh his memory, he,

21   like any other witness, can only testify as to facts that they

22   know, facts that they know or something that you can show him, such

23   as a map, or something he can take notice of that's undisputed.

24          So I think the objection is well founded.  I think that

25   we can go ahead and let's move on.  I understand the point you're

 1    making, but I think that it's a follow-up with another witness who

 2    can testify.

 3                MR. LONDON:  I have a witness coming.

 4                THE COURT:  He established he didn't know things, and the

 5    jury can determine how significant that is.

 6                MR. LONDON:  I'll have a witness for that.  I'll

 7    follow-up, Judge.

 8                THE COURT:  Sure.  Okay.  Thank you.

 9       (OPEN COURT.)

10    BY MR. LONDON:

11    Q.  We'll move on, I'll address this later with another witness.

12    Thank you, Agent.  And we're going to move on to another topic, I

13    am just about finished, at least I think I am.

14                On the trace report, which I think is Exhibit 244, this

15    form, would you highlight the possession, please, portion of it --

16    I tell you what, first let's do it in order.  If you would go up to

17    where it says Officer Kaufman, and if you would just highlight

18    that, just bring that out, please.

19                Now, this, I believe you testified to earlier, Agent; is

20    that correct?

21    A.  Yes.

22    Q.  And this is how I believe that Ms. Bernstein said that Kaufman

23    put this gun or claimed that this gun that was found out there or

24    that he says was found out there and tried to tie this in to

25    Mr. Madison, correct?

1   A.  Yes.

2   Q.  And you looked at this form and you said, yes, because it has

3   Officer Kaufman's name up here at the top.  And if you can go down

4   and show possessor, please.  And the possessor would be Lance

5   Madison?

6   A.  Yes.

7   Q.  Well, it's going to come up, but I think -- correct?

8   A.  Correct.

9   Q.  Wherever -- and we're going to get into the location of the gun

10  in a second.  But even just taking what you just said, which I

11  dispute and we'll go into that in a second, that would be a little

12  over a half a mile from where Lance Madison was arrested, correct?

13  A.  Yes.

14  Q.  Would be over the bridge to the end of the bridge?

15  A.  Yes.

16  Q.  To the west side of the bridge?

17  A.  Yes.

18  Q.  Over the Industrial Canal?

19  A.  Yes.

20  Q.  About a half mile away?

21  A.  Yes.

22  Q.  Now, when you go back up on this report, if we can take that

23  down and if we can put -- remember this says Officer Kaufman on

24  here, right, it doesn't say Sergeant Kaufman, does it?

25  A.  That's correct.

1    Q.  If we could put up, and I think you can do this side by side,

2    105.  You can take down the trace, there are two portions to 105,

3    one is handwritten and the other is typed, or printed or whatever,

4    it comes off of a computer.

5           There we go.  If I could direct your attention to these

6    two.  There was testimony, I believe it was when Lehrmann

7    testified, that he hand wrote, that the one on my right -- I guess

8    it's everybody's right -- on my right that that's his handwriting;

9    is that correct?

10   A.  Yes.

11   Q.  And that he circled accused; is that correct?

12   A.  Yes.

13   Q.  And then the one on the left is the one that Sergeant Kaufman

14   supposedly submitted, and I say typed, I understand it's a

15   computer, it's not typed, but that was put in because that came off

16   the tag and I believe Mr. Lehrmann said that that portion was from

17   Kaufman, correct?

18   A.  Yes, I think that's correct.

19   Q.  And this one says confiscated, if you would circle the center

20   portion where it says "from the scene" -- I'm sorry, on the left in

21   the center where it says comments.  This one says confiscated from

22   the scene that Sergeant Kaufman filled out, not from Madison,

23   correct?

24   A.  Correct.

25   Q.  Nor does it say anything about possessor, does it?

1  A.  No.

2  Q.  This one, if you take that down, please.  And then if you go up

3  here to the very top right, right there (INDICATING), that says

4  Officer Kaufman, doesn't it?

5  A.  Yes.

6  Q.  And then on the right form it says, if you can phrase that,

7  Sergeant Kaufman, doesn't it?

8  A.  Yes.  I think the one on the left though is a generated form.

9  I mean, it looks to me it's always going to say officer just like

10 it's always going to say receipt number and assignment.

11 Q.  My point exactly, you just made my point.  Because the trace

12 report also says officer, doesn't it?

13 A.  Yes.

14 Q.  And that's the only place you ever see Kaufman refer to himself

15 as Officer, isn't it?

16 A.  Yes.

17 Q.  So that would seem that that was generated off of this evidence

18 and property receipt, correct?

19 A.  I have no reason to think that.

20 Q.  Where would you think the information would come from that

21 trace report then?  Can you put the trace report back up, please?

22 Where do you believe that information would have come from?

23 A.  Sergeant Kaufman.

24 Q.  Generated from that evidence tag you just saw on your left,

25 wouldn't you?

1    A.  No.  I mean, I would think he submitted a request to Lionel

2    Parker to have this trace report done.  I don't think it has

3    anything to do with the CE&P.

4    Q.  You don't think it does, but you have no way of knowing that,

5    do you?

6    A.  No.

7    Q.  You just don't because it doesn't conform to your theory of the

8    case?

9    A.  No, I just don't see how a CE&P record would cause an ATF trace

10   report to happen.

11   Q.  Maybe on a gun when you type in one thing computers can be

12   trained where that data also if it pertains to a certain item could

13   be transferred to another sheet, wouldn't it?

14   A.  Sure.

15   Q.  You do know that that happens?

16   A.  Sure, I guess that could happen.

17   Q.  And you do know that the New Orleans Police Department, as well

18   as any other police department on the planet, submits a trace

19   report on every weapon they find unless they have proof of

20   ownership for it, correct?

21   A.  Yes.

22   Q.  And Sergeant Kaufman's name does not appear signed anywhere on

23   this form, does it?

24   A.  No.

25   Q.  Which brings me back to the signature.  Thank you, you can take

1     that down.

2            Did you -- do you recall testifying in the federal grand

3     jury that Sergeant Kaufman's name was signed to that 54-page

4     report?

5     A.  I don't recall that, but I wouldn't dispute it if you've got

6     the transcript.

7     Q.  Well, I am going to show it to you.

8            MR. LONDON:  I'm sorry about that, Judge.

9     BY MR. LONDON:

10    Q.  Do you recall testifying in front of the federal grand jury on

11    July 12th, one of the many times that you may have testified?  I am

12    just going to bring you this and show this to you.

13           MR. LONDON:  If I may approach.

14           THE COURT:  Yes.

15    BY MR. LONDON:

16    Q.  This is discussing the 54-page report, the official report

17    submitted.  Does it say on there when asked, they both signed it

18    and your response was yes?

19    A.  Yes.

20    Q.  But they didn't sign it, did they?

21    A.  No.

22    Q.  Sergeant -- now, there is a big difference when you say

23    somebody signed something, isn't there?

24    A.  I mean, I think -- I mean, it's happened in this trial, it's

25    happened obviously when I was speaking in the grand jury.  People

1    just say signed but their names are printed, typed on the report.

2    And then later it's clarified by another question that says:  "This

3    copy doesn't have any signatures, it has typed names for the

4    reporting officers of whom?  Sergeant Dugue Sergeant Kaufman."

5    Q.  But when you say this copy doesn't have a signature would tend

6    to lead someone to believe that there was one with a signature,

7    especially when you say they're signed, correct?

8    A.  Yes.  I didn't ask the question.

9    Q.  But it's not signed?

10   A.  The 54-page report is only signed by Lieutenant Waguespack.

11   Q.  It's not signed by Kaufman?

12   A.  No.

13   Q.  You don't have any document involving this case that's signed

14   by Kaufman, do you?

15   A.  I don't believe so.

16   Q.  Now I want to ask you about that gun.  You testified that the

17   gun was found -- can you put that, I'm not sure which exhibit that

18   was.  It's the bridge, the long view of the bridge.  58.

19          You, I believe, testified -- Kaufman took you guys out

20   there in January of 2009 I believe, or was it eight?

21   A.  2009.

22   Q.  2009, correct?

23   A.  That's correct.

24   Q.  He took you out there and he responded to questions that you

25   asked him?

1   A.  Yes.

2   Q.  Didn't have an attorney with him?

3   A.  No, he did not.

4   Q.  And he said, it's your testimony that he said he found the gun

5   somewhere around in here (INDICATING)?  Somewhere around -- I am

6   trying to draw a circle.

7   A.  Yeah, yeah, in that general area.

8   Q.  And you heard my cross-examination of Agent Bryson, didn't you?

9   A.  Yes.

10  Q.  You got to sit here and you got to listen to all of that --

11  A.  Yes.

12  Q.  -- before you had to testify.  You get to listen to all of the

13  witnesses, don't you?

14  A.  Yes.

15  Q.  Now, you recall a 302 -- well, you recall Sergeant Kaufman's

16  302?

17  A.  Yes.

18  Q.  Agent Bryson went through the whole 302?

19  A.  Correct.

20  Q.  And you recall where in the 302, and I am going to read it, you

21  tell me if you don't and I'll bring it to you, "Kaufman showed the

22  agents and the attorneys where he found the revolver, which was

23  located in the grass near the beginning of the westbound side of

24  the bridge."  Correct?

25  A.  That's what's in the 302.

1   Q.  That's what's in the 302.  Is that incorrect?

2   A.  No.

3   Q.  That's where he showed you at the beginning of the bridge.  My

4   beginning of the bridge would be over here, that's not your

5   beginning of the bridge (INDICATING)?

6   A.  No.  In my mind the beginning of the bridge is where it begins

7   to elevate.  I think this would all be considered to be the

8   approach to the bridge.

9   Q.  Do you remember testifying in that same grand jury on July

10  12th?

11  A.  Yeah, yes.

12  Q.  Do you remember when you were asked a question, "And the rail

13  goes all the way to the bottom?"  Do you recall what your answer

14  is?

15  A.  Um --

16  Q.  If you don't I can show it to you.

17  A.  I don't recall.

18  Q.  What is your answer to that?  Or you read it first and tell me

19  if you recall.

20  A.  (WITNESS READS DOCUMENT.)  Yes.

21  Q.  And what's your bottom of the bridge there?

22  A.  I refer to the base of the bridge and it's where the railing

23  begins.

24  Q.  Which is -- who drew this line -- which would be --

25          MR. LONDON:  How do you get rid of this?

1          MS. BERNSTEIN:  Tap it in the corner.

2   BY MR. LONDON:

3   Q.  Which would be, actually a little bit more to the left

4   according to What you're talking about here (INDICATING)?

5   A.  Yes.

6   Q.  Do you recall testifying on 10/14/2009 to the federal grand

7   jury about this gun?

8   A.  No.

9   Q.  I am going to ask you, if you would, to start -- well, just the

10  end if you would and what occurred, read it to yourself obviously,

11  you know how it works, and if you remember it, fine; if you don't,

12  then you can read it.  You just tell me.

13  A.  (WITNESS READS DOCUMENT.)

14  Q.  Do you recall that?

15  A.  Yes.

16  Q.  When you were asked, I believe it showed you the answer

17  correct, talking about where the gun was when Sergeant Kaufman took

18  you out there?

19  A.  That's correct.

20  Q.  You say it's a handgun found by Detective Kaufman, correct?

21  A.  Correct.

22  Q.  "Have you had a chance to talk to Kaufman?"  Your answer was

23  yes.

24  A.  Yes.

25  Q.  "What did he tell you about the gun?  He told me that he

1    returned the morning after the incident, went onto the bridge and

2    found the gun in the grassy area just north of the bridge and

3    relatively close to the area where the shooting occurred."  Is that

4    correct?

5    A.  Yes.

6    Q.  Do you recall testifying in front of the federal grand jury on

7    November 18th, 2009?

8    A.  No.

9    Q.  Just read from there to there (INDICATING).

10   A.  (WITNESS READS DOCUMENT.)

11   Q.  Do you recall that?

12   A.  Yes.

13   Q.  Do you recall being asked, "Did he show you where he found this

14   gun on September 5th?"

15   A.  Yes.

16   Q.  "Yes, the general location."?

17   A.  Yes.

18   Q.  "And based on your investigation, where was that in relation to

19   where the Bartholomews were shot?"

20   A.  Yes.

21   Q.  "Directly below the area where they were?"

22   A.  Yes.

23   Q.  So it goes from relatively close -- it goes from the 302 at the

24   beginning of the bridge to relatively close to directly below, and

25   then yesterday or today it goes to out here where that starts right

 1  there (INDICATING); is that correct?

 2  A.  Yes, I think that's all consistent.

 3  Q.  You think that's consistent.  You think directly below is

 4  consistent with relatively close?

 5  A.  It's not inconsistent.

 6  Q.  It's not?

 7  A.  No.

 8  Q.  Directly below to you does not mean directly below?

 9  A.  Directly below in the grass, I think it's --

10  Q.  Directly below where they were shot, not directly below in the

11  grass, Agent, that's not what it says.

12  A.  I would have to see it again to see exactly what it says.

13  Q.  I'd be happy to.

14            MR. LONDON:  Judge?

15            THE COURT:  Yes, go ahead.

16            THE WITNESS:  (WITNESS READS DOCUMENT.)  The next

17  question is, "So in the grass below where they were shot?  A. Yes."

18  BY MR. LONDON:

19  Q.  "In the grass below where they were shot?"

20  A.  Yes.

21  Q.  Directly below, correct?

22  A.  Correct.

23  Q.  Directly below.  And that's the same to you as relatively

24  close?

25  A.  It's not the same, but it's not inconsistent, it's in that

1   general area.

2   Q.   What about near the beginning of the bridge?

3   A.   Well, also in that 302 it says Kaufman showed -- let me just

4   find it.

5   Q.   No.   It says you asked Kaufman when you were in the, when you

6   were at the FBI headquarters, not when he took you out there.   I'm

7   asking you when he took you out there.   Talking -- a picture is

8   worth a thousand words.

9   A.   When he took us out there he showed us this area; when we

10   talked to him at the FBI office, he told us it was in the area

11   located where the victims were shot.

12   Q.   But this says at the beginning of the bridge, which is I think

13   here, but you disagree with that (INDICATING)?

14   A.   Yes.

15   Q.   The gun was empty, wasn't it?

16   A.   I think that's correct.

17   Q.   You think, I mean was it or wasn't it?

18          MS. BERNSTEIN:   According to what and when?   Please

19   clarify.

20          MR. LONDON:   Okay.   That's correct, I stand corrected.   I

21   stand corrected.

22   BY MR. LONDON:

23   Q.   The evidence that you have from the Central Evidence and

24   Property tag has the revolver being empty, does it not?

25   A.   Yes.

```
 1  Q.  No shell casings in it, correct?

 2  A.  No.

 3  Q.  No indication it had been fired?

 4  A.  No.

 5  Q.  Did you take that weapon?

 6  A.  Yes.

 7  Q.  Did you send it to the FBI lab?

 8  A.  I don't remember if I sent that weapon to the FBI crime lab.

 9  Q.  Did you check it for prints?

10  A.  No.

11          MR. LONDON:  Judge, if you would give me one second.

12          THE COURT:  Sure.

13          THE WITNESS:  Actually, I'm sorry, I do remember I did

14  send it to the lab, they did test fires to see if it could be --

15  see if it came up as a match in whatever the, the database of

16  bullets, I think it's called NIBIS or NIBIS.

17  BY MR. LONDON:

18  Q.  Did it?

19  A.  No.

20  Q.  Did you send it and have it processed for fingerprints?

21  A.  I did not.

22  Q.  You know sometimes when weapons are cleaned there are

23  fingerprints, not like we see on TV necessarily when they're just

24  on the outside, there are fingerprints on the mechanisms of the

25  weapon if they're ever cleaned, aren't there?
```

1    A.   Yes.

2    Q.   There can be, not always, it doesn't mean there has to be, but

3    there can be, correct?

4    A.   Correct.

5    Q.   Real quick and I have just one more series of about three more

6    questions and I'm going to ask you two.  We talked about that

7    46-page report which was not found in any of Kaufman's possessions,

8    correct?

9    A.   Correct.

10   Q.   And we talked about the 17-page report which was not found in

11   any of Kaufman's possessions, correct?

12   A.   Correct.

13   Q.   And we talked about that 17-page report.  Lohmann testified

14   that he created that 17-page report, correct?

15   A.   That's correct.

16   Q.   Where to your knowledge and as a result of your investigation

17   was the revolver turned into?  It may be easier if I say, would you

18   disagree it was the Greyhound bus station at the Central Evidence

19   and Property?

20   A.   No, that sounds correct.

21   Q.   Would you disagree if I were to tell you that the Greyhound bus

22   station Central Evidence and Property was the only property

23   repository that was in effect immediately following the storm and

24   for a few weeks, would you agree with that?

25   A.   I have no reason to disagree with that.

```
 1    Q.  Do you see where I am going to direct your attention to the
 2    yellow spot?
 3    A.  Yes.
 4    Q.  It says that the gun was turned in to the property room at the
 5    Governor Nicholls wharf?
 6    A.  Yes.
 7    Q.  That comes from the 46-page report, doesn't it?
 8    A.  Yes, it does.
 9    Q.  I am going to take that out of here.
10    A.  Okay.
11    Q.  And I think we did this once before, but we're going to do it
12    again.  Wharf is W-A-R-F?
13    A.  Spelled --
14    Q.  What's the correct spelling of wharf?
15    A.  W-H.
16    Q.  A-R-F?
17    A.  Correct.
18    Q.  And I'll remove this.  This is from the 17-page report,
19    Lohmann's, and ask you, where was the property turned in?
20    A.  Governor Nicholls Street wharf.
21    Q.  And how is wharf spelled?
22    A.  Incorrectly without the H.
23    Q.  Just exactly like the one in the 46?
24    A.  Yes.
25    Q.  You don't find that in the 54?
```

1    A.  I think -- no.  In the 7-page report it says CE&P at Greyhound

2    I believe, but, no.

3    Q.  You don't find that in the 54?

4    A.  That went to the wharf, no, I don't believe so.

5    Q.  No, yes or no?  If I were to tell you no, would you have any

6    reason to disbelieve that?

7    A.  No.  I'm fairly confident in the 54 and the seven page initial

8    report that says the Greyhound bus station, I think that's correct.

9    Q.  And what does Archie's 32 page that you took off his thumb

10   drive say?

11   A.  You would have to show it to me.

12   Q.  That's if I can find it.  Can I take this down now?

13   A.  Just to be sure, is that the one that you just had up there,

14   was that the 17 page and the first one was the 46?

15   Q.  Yes.

16   A.  Okay.

17   Q.  Do you want to see them again?

18   A.  No, I just wanted to be sure I didn't mislead.

19   Q.  Ron just corrected me.  This is actually 33 pages, but we all

20   refer to it as the 32 that was taken off of Archie's thumb drive.

21        MS. BERNSTEIN:  Actually, what has been referred to in

22   court as the 32 page, is the 32 pager that Mike Lohmann gave to

23   Agent Bezak.  Then perhaps you should have a new make name for

24   this.

25        MR. LONDON:  The computer, off of Archie's thumb drive,

```
 1   okay?
 2               THE WITNESS:  That sounds fine.
 3               THE COURT:  That's fine, go ahead.
 4   BY MR. LONDON:
 5   Q.  Tell me where Archie says that gun was taken.
 6   A.  (WITNESS REVIEWS DOCUMENT.)  Do you know what -- unless you can
 7   direct me to a different page, the page that I am looking at just
 8   says that the Colt Trooper was the only weapon logged into
 9   evidence.  I'm not sure.
10   Q.  It's not there that you can see?
11   A.  It doesn't specify where it was turned in.
12   Q.  When as a result of your investigation was the Nicholls Street
13   wharf opened up to receive property and evidence?
14   A.  I am not sure when it was opened up.  Sometime after the bus
15   station.
16   Q.  Sometime after, you didn't check?
17   A.  I don't know specific dates.
18   Q.  You don't know the date?
19   A.  No.
20   Q.  Now, you testified that you served a warrant on Sergeant
21   Kaufman's computer.  You did not serve a warrant on Lehrmann's
22   computer or thumb drive, did you?
23   A.  No.
24   Q.  Because he destroyed them, correct?
25   A.  That's what he told me.
```

1  Q.  That's what he told you, he destroyed his computer and

2  destroyed his thumb drive?

3  A.  Threw them away.

4  Q.  I think you have destroyed in your 302.

5  A.  If that's -- I have no reason to doubt that.

6          MR. LONDON:  That's all I have, sir.

7          THE COURT:  Okay.  Mr. Fleming.

8          MR. FLEMING:  Yes, Judge.

9                      CROSS-EXAMINATION

10  BY MR. FLEMING:

11  Q.  Good afternoon, Mr. Bezak.

12  A.  Good afternoon.

13  Q.  Mr. Hessler asked you a good number of questions, so I am not

14  going to be quite that long.  I just want to clear up some points

15  that you testified to on direct and cross-examination.  I am going

16  to start with something you indicated to Mr. London.

17          You testified to Mr. London that you would feel it

18  appropriate that Sergeant Kaufman would stop all of his search and

19  rescue efforts and devote his full-time and attention towards

20  investigating the investigation of this incident.

21  A.  Yes.

22  Q.  Would you tell the ladies and gentlemen of the jury how many

23  people you would be willing to allow to die so that the search and

24  rescue efforts would terminate and --

25          MS. BERNSTEIN:  I object.

1        THE COURT:  I didn't hear the back half of the question.

2        MR. FLEMING:  -- so that the search and rescue efforts

3  would stop and that full time and attention would be devoted

4  towards the investigation?

5        MS. BERNSTEIN:  Objection.

6        THE COURT:  I am going to sustain and ask you to

7  rephrase.

8  BY MR. FLEMING:

9  Q.  How many people do you feel it would have been appropriate to

10  allow to die so that the search and rescue efforts would stop?

11        MS. BERNSTEIN:  Objection.

12        THE COURT:  It's a rhetorical question.  Let's focus on

13  what he knows, factual information.  I'll sustain the objection.

14  BY MR. FLEMING:

15  Q.  There were still people at that time trapped at their houses,

16  in their attics, on their roofs?

17  A.  I can't --

18  Q.  You don't know?

19  A.  I don't know.

20  Q.  You weren't here?

21  A.  No.

22  Q.  You were off at the office in Bowing at the time?

23  A.  Yes.

24  Q.  Let me ask you some follow-up as to the questions Ms. Bernstein

25  asked you regarding taping of interviews, or the non-taping of

1   interviews I guess is a better way to phrase that.

2   A.  Okay.

3   Q.  Do you remember those questions that she asked you that

4   yesterday?

5   A.  I remember the topic, yes.

6   Q.  And why is it that the FBI frowns upon taping interviews?

7   A.  I just know it's the policy that we do not tape interviews.  I

8   didn't make the policy, I can't tell you why that is the policy,

9   but that's the policy that I must follow.

10  Q.  And you testified yesterday that in your 302s and your notes,

11  those are essentially bullet points of your interviews with people?

12  A.  Yeah, they're not intended to be a word-for-word transcription

13  of an interview.

14  Q.  Not intended to be a word for word, okay.  Lying to a federal

15  agent is a federal crime, right?

16  A.  Yes.

17  Q.  And people get prosecuted for lying to a federal agent, don't

18  they?

19  A.  Yes.

20  Q.  And oftentimes what's presented in court is the agent's

21  recollection of what that person told them, right?

22  A.  Along with other evidence, yes.

23  Q.  Well, sometimes it's that agent's recollection, right?

24  A.  Yes.

25  Q.  And that recollection is based on his notes, or her notes, in

1  the 302s, right?

2  A.  That's correct.

3  Q.  People are convicted based on those notes given by the agents

4  sometimes?

5  A.  Sometimes, yes.

6  Q.  Have you ever heard of Jim Brown?

7  A.  No.

8  Q.  Former Secretary of State here in Louisiana?

9  A.  No.

10  Q.  You testified yesterday that people that, some people were

11  willing to talk to you but wanted to tape record those

12  conversations.

13  A.  That's correct.

14  Q.  And you would not talk to them --

15  A.  No.

16  Q.  -- conditioned on that premise, right?

17  A.  That's correct.

18  Q.  And the people that wanted to either tape record the

19  conversations or chose not to talk to you -- and it's their right

20  not to talk to you, correct?

21  A.  That's correct, yes.

22  Q.  They were given a subpoena and dragged before the grand jury,

23  right?

24  A.  They were given a subpoena and they had to testify in front of

25  the grand jury, yes.

1    Q.  They were given a grand jury, had to come down here to Camp

2    Street and testify before the grand jury?

3    A.  That's correct.

4    Q.  Because they wouldn't -- either chose not to talk to you or

5    wanted to tape record those conversations?

6    A.  Yes.

7    Q.  We talked yesterday regarding some interviews that were

8    conducted by Sergeant Dugue, and I believe at least some of the FBI

9    agents were present, FBI agents that were assigned to some type of

10   task force helping out the state authorities, right?

11   A.  Yes.

12   Q.  They didn't cease to be FBI agents, did they?

13   A.  No.

14   Q.  They were there in their capacity as FBI agents, right?

15   A.  Yes.

16   Q.  There was talk of you issuing subpoenas for lots of different

17   things yesterday, right, got subpoenas, grand jury subpoenas, got

18   returns on personnel records with NOPD?

19   A.  Yes, I remember that, yes.

20   Q.  With transcripts of different things, of the court proceedings

21   in the state matter, right?

22   A.  Yes.

23   Q.  There are other things you didn't mention, you also got copies

24   of Louisiana State Police records, correct?

25   A.  Yes.

1    Q.   And those included the radio transmissions?

2    A.   Correct.

3    Q.   At the time of Katrina the New Orleans Police Department lost

4    their ability to record radio transmissions, right?

5    A.   That's my understanding, yes.

6    Q.   Louisiana State Police did not lose that ability, right?

7    A.   No.

8    Q.   So you have in your possession copies of Louisiana State Police

9    transmissions, right?

10   A.   The ones that were related to this incident, yes.

11   Q.   You have the transmissions Trooper Baron referred to, correct?

12   A.   Yes.

13   Q.   And you have Trooper Baron's transmissions, don't you?

14   A.   Yes.

15   Q.   There was testimony yesterday regarding your search of the

16   Danziger Bridge, and that occurred September, I believe September

17   11th, 2009, right?

18   A.   Um, I don't remember the exact date.   It was September of 2009.

19   I want to say the 26th.

20   Q.   We can go September 2009, you're not sure on the precise date.

21   A.   No.

22   Q.   Can we pull up 307, please.   And this is your chart of where

23   certain items were found on that day, right?

24   A.   Yes.

25   Q.   Let me ask you.   You mentioned yesterday that you don't know,

1   do not know how many shootings would have occurred -- have occurred

2   on or near the Danziger Bridge after September 4th, 2005?

3   A.   That's correct.

4   Q.   You were able to run records or able to retrieve records of all

5   matters reported, at least through the police department, right?

6   A.   I did not do that.

7   Q.   But you were able to?

8   A.   I was able to do that, yes.

9   Q.   What we've called, there's been testimony regarding incident

10  reports.  Those incident reports would reflect any and all calls

11  made in a specific area, right?  It could?

12  A.   You know, calls for service.

13  Q.   You can narrow that down, sort that out through location,

14  correct?

15  A.   Yes.

16  Q.   And you didn't do that?

17  A.   No.

18  Q.   There was talk yesterday of retrieving something you referred

19  to a mark as EV-1, it was a metal fragment, right?

20  A.   Yes.

21  Q.   You're referring to your notes there?

22  A.   Yes.

23  Q.   And that was an item you did not bother to send to the FBI lab,

24  correct?

25  A.   Correct.

1   Q.  Why was that?

2   A.  Again, it just appeared to be a piece of debris, nothing that

3   was in my opinion evidentiary at all.

4   Q.  Let me back up, I meant to ask you this before.  When you

5   searched this bridge, when you searched the Danziger Bridge in your

6   mind anyway you had a theory of this case, a theory of the

7   investigation, right?

8   A.  Yes.

9   Q.  So when you made that decision that that item had no

10  evidentiary value to this investigation, that didn't pertain to

11  your theory of the investigation?

12  A.  One way or the other I didn't think it was a piece of ballistic

13  material that could be tested for anything.  So whether it was my

14  theory or not, I just didn't think it had value one way or the

15  other, not relative to my theory.

16  Q.  Let me ask you a similar question as to what you've marked or

17  designated as EV-2, a brown pellet.

18  A.  Yes.

19  Q.  You did not bother submitting that to the FBI lab for testing;

20  is that correct?

21  A.  That is correct.  That piece of evidence that was collected to

22  me looked like a small ball bearing.  Again, nothing that would

23  have been related to the incident.

24  Q.  You don't feel it pertained to this matter?

25  A.  No.

1    Q.  So you didn't bother testing it, having it to sent to the lab

2    for testing?

3    A.  That's correct.

4    Q.  EV what's marked as 14 but apparently should have been marked

5    as three --

6    A.  That's correct.

7    Q.  -- was a casing from a .380?

8    A.  According to the search team, they designated it as a .380,

9    yes.

10   Q.  Same question, you did not bother sending that to the FBI lab

11   for testing, right?

12   A.  No.

13   Q.  Is that the same reasoning for that?

14   A.  No, different answer.  This particular item was obviously too

15   new to have been related to the incident.  I didn't have a .380 gun

16   to compare it to.  But again, you could tell it was recently fired

17   or dropped on the bridge, it wasn't there for four years.

18   Q.  Let me ask you, which is it though, you've given two answers

19   now as to why you didn't test it.  It looked too new or you didn't

20   have a gun to compare it to?

21   A.  Both, both.

22   Q.  If you had a gun to compare it to, even though it looked new,

23   would you have sent it to the lab?

24   A.  Yes.  If I had a .380, sure.

25   Q.  So the fact that it looked new wasn't the factor, it was the

1   fact that you didn't have a gun?

2   A.  I think they were both factors.

3   Q.  If you had had a gun you would have sent it to the lab anyway

4   to compare it to, right?

5   A.  Yes.

6   Q.  You've testified yesterday you're not a ballistics expert?

7   A.  No.

8   Q.  But you took it upon yourself to determine that it was too new

9   to have any evidentiary value?

10  A.  Yeah.  I mean, you can tell just by looking at it that it was

11  absolutely not on the bridge for four years.

12  Q.  In your opinion?

13  A.  In my opinion.

14  Q.  EV-4 was a casing, another casing I believe that was mangled,

15  found that in a sewer drain?

16  A.  Yes.

17  Q.  Likewise, you did not submit that to the FBI lab for testing,

18  right?

19  A.  No, sir.

20  Q.  Why is that?  Is that too new looking also?

21  A.  No gun to compare that one to.

22  Q.  What type of casing was that?

23  A.  Not sure.  Not a caliber consistent with the weapons that were

24  used, that I had in my possession in the investigation, definitely

25  not a .40 caliber, definitely not a shotgun, definitely not a 762.

1    Q.  So it didn't fit your theory of the case?

2    A.  It didn't fit the weapons that I had that I could test them up

3    against.

4    Q.  But likewise, did not fit your theory of the case?

5    A.  I don't think that's true.  It could have been around --

6    obviously this is up further west up the bridge from where the

7    Bartholomews were, but it could have been from around Sergeant

8    Gisevius' .223, the M4 that he was firing.

9    Q.  EV-5, and for whatever reason I didn't write that down, what

10   was that?

11   A.  That was also an unknown caliber casing.

12   Q.  Did you send that to the FBI lab?

13   A.  No.

14   Q.  What's the rationale there?

15   A.  Same rationale, didn't have a gun to compare it to, definitely

16   not a .40 caliber or the 762 shotgun.

17   Q.  Do you know what type of casing that was?

18   A.  No.

19   Q.  Ballistics expert might have been able to tell you --

20   A.  Yes.

21   Q.  -- with precision?

22   A.  Might have been able to.

23   Q.  EV-6 I believe was a -- is what?

24   A.  That was labeled possible -- a 9mm bullet casing.

25   Q.  9mm bullet casing.  And where was that found?  Point to the map

1    where that was found for us.

2    A.  Over here, that last drain where EV-6 and 7 were found.  So 630

3    feet west of the Bartholomews' position.

4    Q.  And this is still on the east side of the bridge?

5    A.  Yes.

6    Q.  And I believe, I don't remember if it was yesterday or today,

7    you had discussed this with Mr. Hessler, the 9mm casing.

8    A.  Yes.

9    Q.  Remember your response as to his question as to why you did not

10   think that 9mm casing was related to this case?

11   A.  Probably the same answer that I didn't have a gun, a 9mm that

12   was involved in the incident.

13   Q.  And do you remember your response to his question as to whether

14   there could have been a gun carried by Lance Madison?

15   A.  I don't remember my response to that.

16   Q.  Do you remember saying something to the effect that Mr. Hunter

17   informed you that Mr. Madison was not carrying a gun?

18   A.  Yes.

19   Q.  Is that your -- is that what you responded to Mr. Hessler?

20   A.  Yeah, I remember.

21   Q.  You remember now.  When did Mr. Hunter start cooperating?

22   A.  Spring of 2010.

23   Q.  And you searched this bridge in September of 2009?

24   A.  Yes.

25   Q.  So Mr. Hunter's statement to you really could have no bearing

1    on your decision that that was not related?

2    A.  No.

3    Q.  He didn't talk to you yet?

4    A.  No, yeah, I agree.

5    Q.  So when you testified before that Mr. Hunter's statement to you

6    had bearing on whether you perceived this as being --

7            MS. BERNSTEIN:  Objection, that wasn't the question

8    yesterday.  The question yesterday was whether he believes now that

9    it could have been Lance Madison's gun and he gave that answer.

10           THE COURT:  Let's clarify the question.

11   BY MR. FLEMING:

12   Q.  Mr. Hunter's statement to you did not have any bearing for you

13   on September 2009 as to whether --

14   A.  No, he had not given me that statement.

15   Q.  He had not given you that statement.  There's lots of

16   different, a few other items, too, I won't repeat those over and

17   over.

18           You said on several occasions you didn't submit certain

19   items for testing because you had no gun to compare it to.

20   A.  These items, yes.

21   Q.  And you have some familiarity with -- in fact, you testified a

22   moment ago about the, I believe, the IBIS system?

23   A.  Yes.

24   Q.  And when guns are fired, test fired, that information is put

25   into a computer, some type of computer database, right?

1   A.  Correct.

2   Q.  Those casings that were retrieved but you didn't bother

3   submitting to the lab, could have been sent to the FBI lab and

4   compared to what's in the IBIS database?

5   A.  They could have been, yes.

6              MR. FLEMING:  One moment, please.

7   BY MR. FLEMING:

8   Q.  Likewise, there was a casing found at the top of the bridge

9   that was not submitted for testing in response to Mr. Hessler's

10  question?

11  A.  I am not aware --

12  Q.  I know he was questioning for quite awhile.

13  A.  I am not aware of a casing at the top of the bridge.

14  Q.  I'm sorry, I misspoke.  You found casings on the top of the

15  bridge, you didn't submit; you found casings on the bridge in the

16  drains that you did not submit for testing?

17  A.  Yes.

18  Q.  And you indicated you did not have a gun to compare that to?

19  A.  Yes.

20  Q.  But certainly those casings could have been compared to other

21  casings that were --

22  A.  They could have been, but just based on their condition I

23  didn't think it was likely to get anything.

24  Q.  So I guess the answer to my question, the answer would be, yes,

25  they could have been submitted and compared to the other casings?

1    A.  Yes.

2    Q.  You were asked questions yesterday regarding Mr. Lehrmann and

3    what was said and not said to Mr. Lehrmann.  I believe you

4    testified, I don't remember if it was on direct or somebody's

5    cross-examination, as to what was promised or not promised to

6    Mr. Lehrmann?

7    A.  Yes.

8    Q.  I believe you had indicated at some point you were involved in

9    a conversation with Mr. Lehrmann and his attorney?

10   A.  Yes.

11   Q.  He was represented at the time by a gentleman by the name of

12   David Ehle?

13   A.  Yes.

14   Q.  That was the poor unfortunate fella that was asked to leave the

15   courtroom last week.

16            MS. BERNSTEIN:  Objection.

17            THE COURT:  Sustained.

18   BY MR. FLEMING:

19   Q.  David Ehle represented Mr. Lehrmann?

20   A.  Yes.

21   Q.  You were present for a conversation with Ms. Bernstein,

22   yourself, Mr. Ehle and Mr. Lehrmann?

23   A.  I was present for many conversations.

24   Q.  Present for many conversations.  Were you present for every

25   conversation Ms. Bernstein had with Mr. Ehle either in person or

1    over the phone?

2    A.  No, I can't say that I was.

3    Q.  There was some testimony yesterday on direct examination

4    regarding the state investigation and the lawyers, individuals

5    through the police association and Fraternal Order of Police.  That

6    was not either -- that was not me, right?

7    A.  No, it was not.

8    Q.  It was not Mr. Larson?

9    A.  No.

10   Q.  You were asked yesterday or yesterday we watched that CNN tape,

11   and I'll mispronounce the name, it was a reporter on that tape by

12   the name of Carlos Quintanilla?

13   A.  I think it's Quintanilla.

14   Q.  Quintanilla, thank you.  And you had a follow-up conversation

15   with that reporter -- I am not going to ask for the gentleman's

16   name again -- right?

17   A.  Yes, I did.  I had one conversation with him.

18   Q.  One conversation.  And in that conversation in response to your

19   questioning he indicated that he had merely assumed that people had

20   been firing at the police officers, he didn't actually see that?

21   A.  I think he said that he assumed police officer -- there was a

22   lot of assumptions.  He assumed that the people he assumed were

23   police officers were responding to a threat, but he didn't see a

24   threat.

25   Q.  He did not see a threat?

1    A.   Correct.

2    Q.   And that's a little inconsistent with the entirety of that CNN

3    tape?

4              MS. BERNSTEIN:  Objection.

5              MR. FLEMING:  May we approach?

6        (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

7              MS. BERNSTEIN:  Obviously I'm objecting to him getting

8    into the part that's been kept out.

9              MR. FLEMING:  I think she opened the door with that,

10   Judge.  She asked questions relating to Mr. Bezak's questioning of

11   that witness that related to things that that witness -- that that

12   non-witness saw that is reflected.

13             THE COURT:  I think you have gone into this business with

14   the reporter way more than it needs to go into, including him, the

15   witness calling the reporter and doing a 302.  But you know what,

16   that's for you all to litigate.  If you all think it's important,

17   maybe the jury does too.  I recall the 302 and the testimony to be

18   that he didn't see, he didn't see anything.

19             MR. FLEMING:  May I respond?

20             THE COURT:  Go ahead.

21             MR. FLEMING:  Judge, if you remember I objected to that

22   line of questioning yesterday.

23             THE COURT:  You did.

24             MR. FLEMING:  And your Honor ruled that I would be

25   allowed to cross-examine on portions that were muted out would

1    suggest something differently than I didn't see anything.

2          MS. BERNSTEIN:  They don't --

3          THE COURT:  The portions that were muted out though, as I

4    set forth in my multipage order though, are not factual assertions,

5    one of them is a rhetorical question.  The other one I think says

6    something about this is no longer an American city, it's the Wild

7    West or something like that.  So I don't know that those contradict

8    anything that pertains to what he's just said or what the reporter

9    said.

10          MR. FLEMING:  Judge --

11          THE COURT:  I had a feeling we were going to get into

12    this, that's why I chose instead of to handle it at a bench

13    conference to write a report on something that at the time seemed

14    insignificant, but I kind of had a feeling it would become a

15    revisited issue.

16          MR. FLEMING:  And, Judge, I was happy not to get into

17    that, but she over my objection has asked questions along those

18    lines.  I would ask either or both be allowed to ask the questions

19    or play the whole tape, play that portion of the tape, play the

20    portion of the muted tape.

21          MS. BERNSTEIN:  The part that was kept out was kept out

22    for a reason.  There was one sentence that was left.  The

23    information from the reporter that he testified about is explaining

24    that sentence that they heard played, it's explaining that he did

25    not, in fact, see what happened at the Danziger Bridge, the court

1    has already recognized that the other comments aren't factual, they

2    didn't pretend to be factual assertions.

3         What he said, what the reporter said to Agent Bezak is

4    fully consistent with -- I mean, there is nothing inconsistent

5    about what he said with what's on the tape.  What he has explained

6    to Bezak is that he made assumptions.  What you hear on the part of

7    the tape that's been redacted are those assumptions.  We did deal

8    with this beforehand and the judge said you could cross-examine him

9    about his conversation with Carlos Quintanilla, you can ask him

10   whether he made assumptions and what he made those assumptions

11   based on, but beyond that I think this has all been dealt with.

12        MR. FLEMING:  That's for the judge to decide.

13        THE COURT:  What is it that you want to do other than

14   play the rest of the comments?  Which I think I have covered in my

15   order that that would be inappropriate.

16        MR. FLEMING:  Judge, I agree that that is covered in the

17   order, and I was not going to ask a question until Ms. Bernstein

18   brought that up.  I think in the full context of his interview and

19   the impressions asked of that person, the direct questions asked by

20   this agent of that report is misleading in the full context.  The

21   reporter says, how are these first responders supposed to do their

22   job --

23        THE COURT:  That was the question that was not played for

24   the jury.  The statement was that was played for the jury, if I

25   remember --

1          MS. BERNSTEIN:  "This kind of urban warfare that hampers

2    rescue operations -- "

3          THE COURT:  And the delivery of supplies, something to

4    that effect.  Both of which he stated as a factual statement, and

5    as I pointed out in the order, he shows on the videotape that there

6    are caravans, there's shooting.

7          MR. FLEMING:  Judge, I am not disputing that this was

8    resolved, I think it was resolved pretrial, I agree with that.  But

9    Ms. Bernstein went somewhere yesterday and I think that -- I think

10   I have to be allowed to play that tape now.

11         THE COURT:  You want to play the entirety of the tape?

12         MR. FLEMING:  I want to play the entirety of the

13   reporter's comments, she's opened that door.

14         THE COURT:  I don't think that has --

15         MS. BERNSTEIN:  I have not opened any door --

16         THE COURT:  Her questions on direct have not changed my

17   mind about that order.  Now, what is it -- if you want to question

18   him about the 302, if you want to play back that statement.  I

19   don't think that it's opened the door to playing the entirety of

20   those comments because the reasons I gave for not playing them I

21   think are still pertinent.

22         MS. BERNSTEIN:  And let me point out that Mr. --

23         THE COURT:  Wait, let me hear from Mr. Fleming since he

24   is arguing the point.

25         MR. FLEMING:  In terms of the 302, I can cross-examine.

```
 1    But this is a very, that's a very well thought out phone call

 2    placed to that reporter so they can't open that door and it doesn't

 3    open.  They don't get into a lot of stuff that's helpful to me,

 4    they leave that stuff out, Judge.

 5              MS. BERNSTEIN:  Mr. Fleming can call him as a witness.

 6              MR. FLEMING:  Judge --

 7              THE COURT:  You can cross him on what he did not cover in

 8    the 302, you can cross him on what is seen on the tape, you can

 9    play that tape segment again.  Go ahead and cross him on that.

10              MR. FLEMING:  Judge --

11              THE COURT:  I am not to the point where and I don't think

12    you can convince me with this witness's testimony to play the

13    remainder of the comments.  Nothing has happened that has changed

14    my mind about that.  You all argued that you wanted to play the

15    entirety, I gave a written opinion, believe me I parsed the thing

16    word for word because it's an important issue.

17              MR. FLEMING:  And you did.  I am not denying that.  But

18    the prosecution was allowed to elicit hearsay testimony and what

19    that reporter would have testified and I think, Judge, on behalf of

20    my client and all of the clients we're being denied our right,

21    constitutional right to confront this non-witness reporter.

22              THE COURT:  No, you can subpoena him directly if you

23    wish, that's one thing.  The other thing is that you can

24    cross-examine this witness as to the 302 and what was asked, as

25    well as what was not asked.
```

1          MR. FLEMING:  And remember, Judge, there was some point

2    the defense considered a substantial case law that would not favor

3    issuing subpoenas to reporters based on the court's order.  We did

4    not realize this was coming up.  That 302 was given to us yesterday

5    morning, yesterday morning, Judge, that 302 was given to us

6    yesterday morning.

7          THE COURT:  It's a paragraph or two long.

8          MR. FLEMING:  Had we had that 302, been given to us

9    before, we could have issued a subpoena to that out of state

10   witness, we could have litigated, it's going to take probably two,

11   three days, a week long to litigate with those media attorneys.

12         THE COURT:  Look, we started this thing with where the

13   government did not want any of the statements played.  That's where

14   this whole dispute started, the government didn't want any of the

15   statements played, and so now we're in trouble because I agreed

16   with you on playing some of the statement and now --

17         MR. FLEMING:  No, Judge.  The problem came in when they

18   made a very pointed effort to ask a few questions of this witness

19   and try to just narrowly focus that in --

20         MS. BERNSTEIN:  Ask him about what he asked the witness.

21         THE COURT:  I think you can cross him on what he did ask

22   and what he didn't ask.

23         MR. FLEMING:  We are -- the problem is --

24         MR. HESSLER:  Your Honor, he stated on direct that this

25   guy made assumptions that he didn't see anything and he made

```
1    assumptions and characterized his hearsay testimony.  But his
2    testimony I think can be impeached or contrasted by his actual
3    statements that he now claims he didn't see anything and the
4    government has put on a witness saying that he assumed certain
5    things but he did see certain things.
6              THE COURT:  The jury sees the tape itself, they see what
7    he is seeing.
8              MS. BERNSTEIN:  May I respond to that, your Honor?
9              THE COURT:  This is a tempest in a teapot.
10             MS. BERNSTEIN:  Neither of these men have stated any
11   statement that's on that tape, either what was played or what was
12   redacted, that is inconsistent in any way with what's in this 302.
13   If he had said on the tape, look at that, I am witnessing people
14   shoot at police, then we would be talking about something different
15   here.
16             MR. HESSLER:  He said they had to travel through gun
17   fire, police officers had to travel through gun fire.  Through gun
18   fire.
19             MR. FLEMING:  They've essentially --
20             THE COURT:  Isn't that what the tape shows, when we see
21   the guy come out, the St. Landry Parish guy?
22             MS. BERNSTEIN:  The --
23             THE COURT:  Wait, they show the caravan, they show them
24   stopping it, we see the St. Landry Parish police, we hear the audio
25   of the shooting.  I don't think what this guy says on the tape
```

1   amounts to a little hill of beans to be honest with you.  That's my

2   opinion, I am not on the jury, but I think it's a tempest in a

3   teapot.  When this fella, whoever he is says you wanted to play it,

4   I went through it and parsed it out and said agree with this part

5   and I don't agree with this part.

6          I don't think when you look at the tape what he says in

7   the grand scheme of things, I have to tell you, it's neither here

8   nor there.  But again, I know you have to represent your client.

9          MR. FLEMING:  Judge, two things:  First of all, there's a

10  portion played, they were allowed essentially to impeach that

11  witness through the hearsay testimony of Agent Bezak.  I think

12  likewise we should be able to get into that whole statement to

13  rehabilitate that witness and impeach that report.

14         THE COURT:  Their statements don't rehabilitate him.

15         MR. FLEMING:  And the second thing that's the part of my

16  comment, I don't mean this with any disrespect, but you touched on

17  that.  You in your opinion assumed that that's not important but,

18  again with all due respect, it's what the jury determines is

19  important and the jury might determine that that full statement is

20  important, Judge.

21         THE COURT:  But I don't see how those statements -- this

22  is no longer an American city, it is the Wild West, or something to

23  that effect -- that doesn't rehabilitate if that's your point, it

24  doesn't rehabilitate.

25         MS. BERNSTEIN:  Exactly.

1          MR. FLEMING:  I think Mr. Hessler's point is more

2     appropriate, it's a "shoot their way through," it's that statement.

3     I'd ask that we be allowed to publish that portion of the

4     statement.

5          THE COURT:  I just don't see it, Paul, I just don't see

6     it.  I think you can cross-examine him on the 302, you can

7     cross-examine him on what he did and did not ask this fella.

8          MR. FLEMING:  Respectfully note my objection and my

9     objection to the United States Constitution.

10         THE COURT:  So noted.

11      (OPEN COURT.)

12   BY MR. FLEMING:

13   Q.  You spoke to Mr. Quintanilla -- I'll never get the name

14   right -- you spoke to the CNN reporter?

15   A.  Yes, I did.

16   Q.  And you asked him certain questions, right?

17   A.  Yes.

18   Q.  302 is about a half a page long?

19   A.  Yes.

20   Q.  You had other ones, other 302s in this case, I believe one was

21   over ten pages?

22   A.  That's correct.

23   Q.  You had several, in fact, that long, right?

24   A.  Yes.

25   Q.  So you asked this reporter a few questions?

1    A.  Yes.

2    Q.  A lot of questions you didn't ask him?

3    A.  Yes.

4    Q.  You asked him questions regarding his comments that were not

5    muted on the tape and published to the jury, right?

6    A.  His comments in general.

7    Q.  Okay.  You did not delve deeply into his comments that were

8    made and were muted out?

9    A.  No.  At the time I didn't know which comments would be muted

10   out, I was just speaking to him in general terms about his

11   comments.

12   Q.  Well, this occurred July 12th of this year, this just occurred,

13   right?

14   A.  Yes.

15   Q.  We got this 302 yesterday morning, right?

16   A.  Yes.

17   Q.  You also sat in on interviews, sat in on interviews with a lot

18   of people, sat in on interviews with Mr. Hunter?

19   A.  Yes.

20   Q.  Mr. Lehrmann?

21   A.  Yes.

22   Q.  Mr. Lohmann?

23   A.  Yes.

24   Q.  Mr. Hills?

25   A.  Yes.

1   Q.   Who am I leaving out?  Mr. Barrios?

2   A.   Mr. Barrios, yes.

3   Q.   Sat in on interviews with Robert Barrios, right?

4   A.   Yes.

5   Q.   In those interviews Robert Barrios gave you his version of

6   events that occurred on the bridge?

7   A.   Yes.

8   Q.   I am not asking you what he said, Mr. Barrios gave you his

9   version of his actions --

10  A.   Yes, yes, he did.

11  Q.   -- that day on the bridge, right?

12  A.   Yes, he did.

13  Q.   And the other people you spoke to, Mr. Hunter, again I am not

14  asking you what he said, Mr. Hunter gave you his version of the

15  events?

16  A.   Yes.

17  Q.   Mr. Hunter gave you his version of Mr. Barrios' actions?

18  A.   Um, yes.

19  Q.   And Mr. Hunter gave you his versions, again I am not asking you

20  what was said, Mr. Hunter gave you his versions of statements

21  Mr. Barrios made?

22  A.   Yes.

23  Q.   Mr. Hunter's versions of Mr. Barrios's actions and words were

24  not consistent with Mr. Barrios' version, were they?

25  A.   No.

1    Q.  As the case investigator you retrieved a lot of records in this

2    matter, right?

3    A.  Yes.

4    Q.  You had discussions with Ms. Madison's attorney, Mr. Fisher,

5    you retrieved records from Mr. Fisher?

6    A.  I don't believe I had discussions with him though.  I don't

7    remember having discussions, I think maybe Ms. Bernstein contacted

8    him to get those records.

9    Q.  Okay.  Those records, records were retrieved from Mr. Fisher?

10   A.  Yes.

11   Q.  And included in those records provided by Mr. Fisher were

12   reports generated by a private investigator retained by Mr. Fisher,

13   right?

14   A.  Yes.

15   Q.  I am not asking you the context of those reports, and I believe

16   it was a young lady by the name of Jennifer Vitry?

17   A.  Jennifer sounds right, I don't remember the last name.

18   Q.  And in those reports, the conversation Ms. Vitry had with a

19   gentleman by the name of Jerome Green related to the Bartholomews?

20   A.  I am not familiar with that report.

21   Q.  You're not familiar with that report?

22   A.  No.

23   Q.  That was turned over in connection with this case?

24   A.  If you're saying it was turned over, I have no reason to

25   dispute that.  I know they have -- I know there is a Jerome Green

1    who is related, I just don't remember the specifics of that

2    statement.

3    Q.  But you remember that, when you say that statement --

4    A.  I don't remember even getting the statement.

5    Q.  And you know that -- you don't remember.  Okay.

6          You know that Ms. Vitry spoke to the father of Jose

7    Holmes?

8    A.  I don't know that either.

9    Q.  You don't know, you didn't bother reading that?

10   A.  No.

11   Q.  You didn't bother talking to the father of Jose Holmes?

12   A.  No.  He was --

13   Q.  No?

14   A.  No.

15   Q.  How many years were you involved in this investigation, five

16   years now starting in '06?

17   A.  '09.

18   Q.  I'm sorry, in '09?

19   A.  Three years.

20   Q.  Three years.  You've reviewed easily thousands of pages, tens

21   of thousands of pages, maybe hundreds of thousands of pages, close

22   to 100,000 --

23   A.  Tens of thousands, I'll agree with that.

24   Q.  -- worth of material?

25   A.  Yes.

```
 1    Q.  And you didn't bother to review the report, to review a report
 2    turned over by Mr. Madison's attorney?
 3    A.  I have no recollection of reviewing it or of the report.
 4    Q.  Did you speak to Ms. Vitry?
 5    A.  No.
 6    Q.  Did anybody from the FBI speak to Ms. Vitry?
 7    A.  Not that I am aware of.
 8              MR. FLEMING:  Thank you.
 9              THE WITNESS:  Thank you.
10              MR. FLEMING:  No further questions.
11              THE COURT:  Okay.  Let's take a short break.  It's about
12    3:15, we'll start up at 3:30.  If you all are ready earlier, we'll
13    start earlier.  And, Mr. Bezak, be back up here at that time.
14              THE WITNESS:  Yes, sir.
15              THE DEPUTY CLERK:  All rise.
16      (WHEREUPON, THE JURY EXITED THE COURTROOM.)
17              THE COURT:  Counsel, 3:30.  Let's see if -- we're going
18    to try to cover as much ground as we can.  We still have another
19    witness we would like to get on today.  So who do we have left,
20    Mr. DeSalvo and Mr. Meche?
21              MR. DeSALVO:  I'm coming up next, your Honor.
22              THE COURT:  And then we have redirect.
23              MS. BERNSTEIN:  I was just asking Frank, he said less
24    than an hour.
25              MR. DeSALVO:  I'll go as fast -- I talk fast, Judge.
```

```
 1             (WHEREUPON, A RECESS WAS TAKEN.)

 2             (OPEN COURT.)

 3             (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

 4             THE COURT:  You may be seated.  Go ahead and finish up

 5     for the day here.  Agent Bezak, you're still under oath.  Have you

 6     discussed your testimony with anyone during the break?

 7             THE WITNESS:  I have not.

 8             THE COURT:  Okay.  Thank you.  Mr. DeSalvo.

 9                         CROSS-EXAMINATION

10     BY MR. DeSALVO:

11     Q.  Mr. Bezak, Special Agent Bezak, Frank DeSalvo.

12     A.  Afternoon.

13     Q.  We've been spending a lot of time together lately, I feel like

14     maybe we should get married or something, I don't know.

15             But at any rate, you opened a fair and impartial

16     investigation in the year 2009 as to this incident?

17     A.  Yes.

18     Q.  And --

19     A.  Well, I mean, technically the investigation was opened well

20     before that.  I started -- I was assigned to the case in 2009.

21     Q.  But you started with no preconceived notions?

22     A.  Yes.

23     Q.  You went by the blank slate?

24     A.  Yes.

25     Q.  To see what you could learn?
```

1    A.   Yes.

2    Q.   And your curiosity was peaked when, I think you said for two

3    reasons, because there was no gun found, right?  Did you say that

4    peaked your curiosity?

5    A.   No gun found the day of the incident, yes.

6    Q.   Yes.

7    A.   Yes.

8    Q.   And that the investigator was also a witness?

9    A.   Yes.

10   Q.   That peaked your curiosity.  And that's, of course, because an

11   investigator is not supposed to be a witness?

12   A.   Yes.

13   Q.   And as quickly as possible, an investigator is the person who

14   asks questions?

15   A.   Yes.

16   Q.   Of witnesses or possible witnesses, kind of like you did?

17   A.   Yes.

18   Q.   Preserve the scene?

19   A.   Yes, the investigator, yes.

20   Q.   Diagram the scene?

21   A.   Yes.

22   Q.   Document where the different pieces of evidence are taken from?

23   A.   All of these things should have been done.  I mean, not

24   necessarily the investigator, but he should've --

25   Q.   Well, at his direction.

1    A.  Correct.

2    Q.  But your curiosity turned into suspicion when -- let's see when

3    you said that was.  When you saw the transcript of Sergeant

4    Kaufman's preliminary hearing testimony, the preliminary hearing

5    for Lance Madison?

6    A.  That was one of the things that made it more suspicious, yes.

7    Q.  And at that point you felt like maybe no gun was really --

8    really existed or really had been associated with the incident?

9    A.  Yes.

10   Q.  And so that peaked your suspicion?

11   A.  Yes.

12   Q.  And that's when you read that portion of the preliminary

13   hearing?

14   A.  Certainly that was part of the thought process.  I...

15   Q.  Okay.  Did you read the whole preliminary hearing?

16   A.  Yes.

17   Q.  So you also knew that Lance Madison had said that those boys

18   that were -- that they thought were chasing them and shooting at

19   them had guns, right?

20   A.  Yes.

21   Q.  Now, did that give you any cause to think that maybe they did

22   have guns?

23   A.  It was certainly a possibility, yes.

24   Q.  And at that point had you read the memo that was written by

25   Tris Lear?

1   A.  I can't say at what point I had read that memo, but I am

2   familiar with the memo.

3   Q.  But you are familiar with it?

4   A.  Yes.

5   Q.  You would certainly think that it was a significant factor that

6   a person who was arrested by the police and charged with a crime

7   would say that individuals other than the police were shooting at

8   him first?

9   A.  Yes.

10  Q.  That's significant?

11  A.  Yes.

12  Q.  And that would certainly give you pause to think about whether

13  or not it was true?

14  A.  Yes.

15  Q.  Fair?

16  A.  Yes.

17  Q.  And you had that in your consideration?

18  A.  It was certainly a part of the thought process.

19  Q.  Sure.  Now, you wouldn't have expected anybody from the

20  Bartholomew family or Jose Holmes to tell you or to tell anyone,

21  well, we were shooting at Mr. Madison and then we were shooting at

22  the police; you didn't expect them to say that, would you?

23  A.  (NO RESPONSE.)

24  Q.  Let me change it.  Did you find it significant that they didn't

25  say that?

1  A.  Yes.

2  Q.  Would you have found it more significant if they said they did?

3  A.  Yes, that it would corroborate the police officers' account of

4  the events.

5  Q.  But if they said they did, they would have been incriminating

6  themselves; is that fair?

7  A.  Yes.

8  Q.  And you don't always expect people to be incriminating

9  themselves?

10  A.  Certainly not.

11  Q.  So soon after, or actually it was a while, you eventually went

12  to the scene with your crime lab people?

13  A.  Yes.

14  Q.  And these are specialists?

15  A.  Yes.

16  Q.  These are experts within the FBI?

17  A.  Yes.

18  Q.  And they are who a special agent -- would you call them a field

19  agent or somebody that works -- what's the right term?

20  A.  Special agent.

21  Q.  Well, y'all are all special agents, huh?

22  A.  Yes.  I think I was referring to, there was testimony about

23  crime scene investigations and I was trying to make the point that,

24  at the academy, you just learn basic crime scene stuff, crime scene

25  processing, you know, the --

1    Q.   Is that where the experts live?

2    A.   At Quantico?

3    Q.   Or work out of, Quantico?

4    A.   We had a team from Quantico, and we also had our local evidence

5    response team, who are more specialized at crime scene processing.

6    Q.   These are people who specialize in this?

7    A.   Yes.

8    Q.   Have specialized training?

9    A.   Yes.

10   Q.   Who know what to look for?

11   A.   Yes.

12   Q.   Who, would you say, do a very, very good job?

13   A.   Yes.

14   Q.   An excellent job?

15   A.   Yes.

16   Q.   And they certainly know more about it than a regular special

17   agent?

18   A.   Yes.

19   Q.   But you make the decisions?

20   A.   What decisions are you referring to?

21   Q.   Well, it said you seized -- or they seized a .380 casing, a 9mm

22   casing.  How many 9mm casings?

23   A.   One.

24   Q.   One?  A small caliber casing?

25   A.   Yes.

1   Q.  Maybe a .22.  And you make the decision as to what to do with

2   those things?

3   A.  That's correct.

4   Q.  And you kind of referred to -- actually, I did a combination of

5   IBIS and NIBIN and came up with NIBIS.

6   A.  Right.

7   Q.  But you know what NIBIN does?

8   A.  Yes.

9   Q.  It's the National Integrated Ballistics Identification Network.

10  A.  That sounds right.

11  Q.  Right.  And that actually replaced IBIS.

12        If you send a casing -- let's go backwards.  If you sent

13  a pistol to NIBIN, they could take that pistol, and somehow or

14  another put it in their computer system, and they could associate

15  it with a crime, if it was involved in a crime?

16  A.  Not the pistol, I think they take test fires from the pistol.

17  Q.  They would have to test fire it to --

18  A.  Yes.

19  Q.  -- so they could -- but they have the wherewithal to do that?

20  A.  They have the capability to do that, yes.

21  Q.  And they can associate it with a crime?

22  A.  If there's --

23  Q.  If they have a good one?

24  A.  And evidence from that crime is entered in the database.

25  Q.  Right.  Who maintains or operates NIBIN?

1  A.  I am not sure.  I would assume it's the FBI, but I can't tell

2  you that for sure.

3  Q.  I would too.  All right.  So if it's in the database, they can

4  associate it with -- and a crime was committed with that pistol,

5  they can associate the crime with that pistol?

6  A.  Yes.

7  Q.  And they may even be able to associate that pistol with a

8  person?

9  A.  Yes.

10  Q.  You can also send bullets to NIBIN?

11  A.  (NO RESPONSE.)

12  Q.  Come on now, remember --

13  A.  I think --

14  Q.  -- we said you had to test fire that gun, you had to fire a

15  bullet in order to be able to associate it with something, so you

16  can send a bullet?

17  A.  Yeah, I think, I think you can do that, yes.

18  Q.  So you can send the bullet to NIBIN, right?

19  A.  Yeah, I think you can do that, yes.

20  Q.  And the bullet could be associated with a gun?

21  A.  Yes.

22  Q.  I mean, they got more than two or three guns in the system,

23  huh?

24  A.  I would imagine so, yes.

25  Q.  And they could maybe associate that with a gun?

1    A.  Yes.

2    Q.  A crime?

3    A.  Yes.

4    Q.  Or a person?

5    A.  Yes.

6    Q.  You didn't do that?

7    A.  No.

8    Q.  When you went to the scene of the Danziger Bridge, who made the

9    determination of where the experts would do their search?

10   A.  I did.

11   Q.  You had information that perhaps this incident had begun with

12   firing underneath the high-rise of the I-10.  Yeah, I mean, you had

13   to have looked at this video by then.

14   A.  I mean, there's -- yes, I mean, the incident was kicked off by

15   Jennifer Dupree at the I-10, that's correct.

16   Q.  And she said there was somebody below the I-10 shooting?

17   A.  Yes.

18   Q.  Did you go below the I-10 with your expert crime scene people

19   to look for any evidence there?

20   A.  No.

21   Q.  So you can't tell this jury whether or not there would have

22   been anything underneath that bridge that would have connected to

23   evidence Exhibits 4, 5, 6 and 7 that you refer to on your chart

24   which were casings, right?

25   A.  No.  No, I cannot tell them that.

```
 1   Q.  And actually, what you said was you didn't consider the casings
 2   on the bridge to be related to Madison, right, because Hunter had
 3   already told you that Madison hadn't fired a weapon?  That's not a
 4   quote, I mean, that's --
 5   A.  I think that was in response to how do you know Madison didn't
 6   fire that -- didn't fire those rounds, and the response was
 7   because --
 8   Q.  Because Hunter told you --
 9   A.  Because Hunter said he wasn't firing.
10   Q.  -- said he didn't have a gun.
11   A.  Right.
12   Q.  And that's when Hunter pled guilty?
13   A.  Yes.
14   Q.  Would you be surprised to learn that Hunter had not yet pled
15   guilty when you went to the scene?
16   A.  No.
17   Q.  Well, let's see if we can agree on something.
18   A.  Okay.
19   Q.  The report that was prepared and submitted in this case --
20   A.  Which report?
21   Q.  Well, I only know of one, y'all have all of these other ones.
22   The one that was submitted.  Like, how many pages is that?
23   A.  The 54 -- the 54-page report?
24   Q.  54-page report.  And that was not a very good report, was it?
25   A.  No.
```

1   Q.  And there was far less investigation than should have been

2   done?

3   A.  Much more investigation should have been done, yes.

4   Q.  Sure.  And they only interviewed the people who raised their

5   hand when they said who fired their gun, right?

6   A.  Correct.

7   Q.  And then they only tested the gun that the person raised his

8   hand and said he fired, right?

9   A.  Yes.

10  Q.  And they only seized the guns that people said they fired for

11  testing?

12  A.  That's correct.

13  Q.  That wasn't the best thing in the world to do, was it?

14  A.  No.

15  Q.  Kind of a, look, we're investigating something, so why don't we

16  go on the honor system here; who shot and who didn't?

17  A.  I agree.

18  Q.  The guys who got in trouble are the ones that raised their

19  hands, right?

20  A.  Yes.

21  Q.  And the people who didn't raise their hands, nobody ever said,

22  well, give me your guns, let's go test them?

23  A.  No.

24  Q.  And you think that was a critical mistake by the NOPD, or

25  Mr. Kaufman -- or Sergeant Kaufman?

1   A.   Something that should have been done, yes.

2   Q.   And if they had, if during this investigation -- you say

3   Sergeant Kaufman, let me say Lieutenant Lohmann, I'm more

4   comfortable with that.

5        If Lieutenant Lohmann or anyone had bothered to diagram

6   the scene, pick up the casings after so they could show them where

7   they came from, these could have been sent off to any number of

8   places to be able to determine what guns fired what?

9   A.   Yes.

10  Q.   And you would have had an accurate counting or more reliable

11  counting?

12  A.   Yes.

13  Q.   Not that yours may not be accurate, we just don't know.

14  A.   Mine -- what are you referring to mine?

15  Q.   Yeah.  Now, when you did your extensive investigation where you

16  were looking into all possibilities with no preconceived notion,

17  you determined to the best of your ability everyone who was in the

18  back of that Budget truck?

19  A.   Yes.

20  Q.   I was going to call it a Ryder truck for a second.  That Budget

21  truck.

22  A.   Yes, I did.

23  Q.   Everybody.  And you pretty much were able to establish most of

24  the people you think were at the scene?

25  A.   I identified everybody that I could.

1   Q.  Right.  Now, every one of those people, to the best of your

2   knowledge, members of the NOPD, would have been carrying a .40

3   caliber Glock?

4   A.  Um, yes.

5   Q.  Let's say more likely than not.

6   A.  More likely to be carrying a .40 caliber Glock, yes.

7   Q.  Because that's the issued weapon of the NOPD?

8   A.  Yes.

9   Q.  We had a bullet, or you had a bullet, that had been taken out

10  of the elbow of James Brissette.

11  A.  Jose Holmes.

12  Q.  Jose Holmes, right.  .40 caliber?

13  A.  Yes, that's correct.

14  Q.  Under the circumstances, more likely than not, from a Glock?

15  A.  Consistent with being fired from a handgun with a polygonal

16  barrel, which Glocks are.

17  Q.  But you made the same basic error that Sergeant Kaufman,

18  Lieutenant Lohmann, or the NOPD made in your investigation, didn't

19  you?

20  A.  I don't believe so, no.

21  Q.  You didn't test fire all of the Glocks that belonged to

22  everybody that was in the back of that truck to see if any of them

23  had just not lived up to the honor system?

24  A.  No, I didn't do that.

25  Q.  Now, that would have been better, don't you think?

1   A.  Sure.

2   Q.  In fact, what you did is you compared that one bullet that was

3   in Jose Holmes's elbow to three Glock pistols?

4   A.  Yes.

5   Q.  They couldn't get a match?

6   A.  I forget.  I mean, it definitely didn't match.  But I forget

7   what the expert's opinion as to why it didn't match.  But, yeah, it

8   definitely did not match those three handguns.

9   Q.  And we'll never know if it would have matched anyone else's

10  Glock, do we?

11  A.  No.

12  Q.  Or anyone else's pistol that fires a .40 caliber --

13  A.  No, and -- no.

14  Q.  Now, the FBI, I believe, has probably the finest criminal

15  investigatory lab or laboratory in the country; is that correct?

16  A.  I wouldn't argue against that.

17  Q.  And maybe the world, huh?

18  A.  I wouldn't argue.

19  Q.  You wouldn't argue with that, either, huh?

20  A.  No.

21  Q.  So you had lots of capabilities, not just with your lab, with

22  access to other disciplines that you could use at your disposal in

23  an investigation?

24  A.  Yes.

25  Q.  Now, you sent that videotape that's been played ad nauseam in

1    this courtroom -- and I promise I'm not going to play it again --

2    you sent that off to get it enhanced?

3    A.  You say enhanced, I say stabilized.

4    Q.  Stabilized, okay.  That's good.

5         I think what -- I have this report here.  It appears to

6    be from the FBI related to this case, and it talks about this

7    photogrammetry and it talks about enhancement.  But you're

8    satisfied that that's just stabilizing and putting in maybe the

9    black box, the slugs?

10   A.  Depends what report you're talking about.

11   Q.  Do you want to look at it?

12   A.  Yes.

13   Q.  Because I am not sure what it is.  I'm not sure I need to

14   introduce it yet.

15   A.  Yes.  (WITNESS REVIEWS DOCUMENT.)  This is something entirely

16   different than what you're referring to.  This is the --

17   Q.  It is?

18   A.  Yes.  I had --

19   Q.  What was that that you sent off?

20   A.  This was to the FBI lab, and they were trying to enhance still

21   images, I believe, from the videos, so they captured some stills

22   and were trying to enhance the stills.

23   Q.  Okay.

24   A.  Yeah, two sets of prepared, of prepared photographs.

25   Q.  And they were trying to enhance the audio also, right?

1   A.  I am not sure if they did that.  I don't remember.

2   Q.  All right.  Well, let's go away from that for a second.

3   A.  I don't remember if we requested that.

4   Q.  While we're agreeing on things, we do agree that the videotape

5   was contemporaneous and was going on in realtime with what was

6   happening on the Danziger Bridge?

7   A.  Yes.

8   Q.  We can agree that there was a microphone that was also hearing

9   things at the same time in realtime of what was going on on the

10  Danziger Bridge and on the high-rise?

11  A.  Yes.

12  Q.  And that microphone picked up a lot of information?

13  A.  Yes.

14  Q.  Most of which this jury has heard, you know, about the calls

15  and this is where they are and that kind of stuff?

16  A.  Yes.

17  Q.  Right.  And you could hear the transmissions of the people who

18  were on the high-rise to the people who were down, I guess on the

19  Danziger, whoever was hearing it, right?

20  A.  Yes.

21  Q.  Listening or communicating with the radio?

22  A.  Yes.

23  Q.  And at times you could hear on that microphone what was being

24  said down on the Danziger?

25  A.  You would have to assume --

1  Q.  How about one quick example:  "Shut up, stupid, I got him."

2  Something like that.  Do you remember that?

3  A.  Yes.

4  Q.  That was a transmission from down at the foot of the Danziger?

5  A.  Based -- from the recording you can't tell, but based on the

6  context I would agree with you.

7  Q.  Where the microphone was and who was saying what?

8  A.  Yes.

9  Q.  And actually, you do have to have context, don't you, for a

10  conversation, you just can't hear one side?

11  A.  Yes.

12  Q.  Now, you sent that audio off -- well, I thought you sent that

13  audio off for enhancement, but you don't think you did.

14  A.  I don't have a specific recollection of doing that.

15  Q.  Now, if that audio, I mean, we certainly have evidence that

16  people were believing they were being shot at.  We have that from

17  state trooper?

18  A.  Yes.

19  Q.  And people who were saying, you know, hold back, you know,

20  we're being shot at, don't bring that Budget truck over the top,

21  right?

22  A.  Yes.

23  Q.  And you wouldn't think that people were going to be planning

24  the coverup while they were in the middle of this incident, would

25  you?

1  A.  No.

2  Q.  And if you had the ability to hear more of what was being

3  transmitted from down by the Danziger Bridge to what was coming

4  over the radios of the people who were on the high-rise, that could

5  have certainly lent some -- could have been significant evidence?

6  A.  Certainly could have been significant.

7  Q.  It could be more evidence of, gee whiz, they can't possibly be

8  planning a coverup in the middle of this incident; but we don't

9  know that, do we?

10  A.  We don't know that.

11  Q.  And that would have been nice?

12  A.  Yes, it would have been nice if we had a complete recording of

13  the entire incident, yes.

14  Q.  Sure.  And it certainly would have been something significant

15  for a jury to hear?

16  A.  Yes.

17  Q.  Yet on June 22nd, 2010, you requested that the audio

18  examinations be discontinued.  I'll show you that report?

19  A.  Sure.

20  Q.  Right by my thumb.

21  A.  (WITNESS READS DOCUMENT.)  Yes, that's correct.

22  Q.  Now, we've seen that portion of the video, which I am not going

23  to play, that was from 9:09 and 20 seconds to 9:09 and 33 seconds,

24  where it appeared that someone was moving around in the cab of that

25  Budget truck.  Do you remember when I was trying to point that out?

1   A.  Yes.

2   Q.  Did you try to get that portion, from 9:09 and 20 seconds to

3   that 9:09 and 33 seconds, enhanced or still photos or in any way

4   try to corroborate what a police officer said happened by looking

5   at that video?

6   A.  The entire video was stabilized, so that portion was

7   stabilized.  And that portion of the video does not corroborate

8   Kenny Bowen's statement.  Kenny Bowen says he exited the driver

9   side of the truck, and clearly in that portion of the video, nobody

10  exits that side of the truck except for Mike Hunter.

11  Q.  Certainly he didn't exit it while he was in it, that's fair?

12  A.  No.

13  Q.  But when he did exit it, it was on the driver's side, is what

14  he said.

15  A.  No.  That's what "he" said.  The video clearly shows that it

16  never happened.

17  Q.  Oh.  Does the video show him getting out on the passenger side?

18  A.  No, the -- no.

19  Q.  Does the video show him getting out at all?

20  A.  No.

21  Q.  But we know he got out because on the video we see him running

22  up on the left-hand side of the Budget truck from the rear, heading

23  towards the driver's seat?

24  A.  And we know he didn't come out the driver's side like he

25  claimed in his statement.

```
 1    Q.  Can you answer my question?

 2            THE COURT:  You have to answer the question he's asking,

 3    you can't just say what you want to say.  You have to answer the

 4    question.

 5    BY MR. DeSALVO:

 6    Q.  Is the first time that you see Kenny Bowen on that videotape,

 7    other than that affects him moving around, from 9:09 and 20 seconds

 8    to 9:09 and 33 seconds, is that the first time you see him on that

 9    videotape?

10    A.  Yes.

11    Q.  All right.  Let's talk about strike marks, all right.

12            MR. DeSALVO:  Your Honor, in connection with this, I

13    would like to introduce and then show them to the government,

14    Exhibits 320, 321, 321-A, 322, 323, 323-A, 324, and 324-A.

15            THE COURT:  Show them to counsel.  It's 320 --

16            MS. BERNSTEIN:  I think I've already seen them, your

17    Honor.  We're good.  No objection.

18            THE COURT:  It's 320, 321 --

19            MR. DeSALVO:  320 -- I have a couple here, 321, 321-A,

20    322, 323, 323-A --

21            THE COURT:  And 24 and 24-A.

22            MR. DeSALVO:  Yes.

23            THE COURT:  Okay.  Do you want to show those to the

24    witness?

25            MR. DeSALVO:  And we have them on the screen, your Honor.
```

1    I think you will be able to see them on the screen.

2              THE COURT:  These have not yet been admitted; is that

3    correct?

4              MR. DeSALVO:  I am offering them now, and I think the

5    government has no objection.

6              MS. BERNSTEIN:  No objection, your Honor.

7              THE COURT:  All right.  So ordered.  We'll go ahead and

8    admit those.

9              MR. DeSALVO:  With that in mind, can we pull up 320.

10   BY MR. DeSALVO:

11   Q.  Now, when your crime scene technicians went to the scene, they

12   identified marks that they call impact point, in this case on 320

13   impact point 8 and 9.

14   A.  Correct.

15   Q.  And that's where the impact point numbers begin for the impact

16   points on the barrier?

17   A.  Yes.  One through seven were impact points on the metal

18   railing, eight and above were the concrete barrier.

19   Q.  So that's two, and that was in the area where you had parked

20   the truck and you, your photogrammetry, whatever they call that

21   thing, right?

22   A.  Yes.

23   Q.  It's right there.  And someone, you know, went to the scene and

24   wanted to see if those things are there for God and the whole world

25   to see?

1    A.  I think they've been repaired now.

2    Q.  They have not.

3    A.  They have not been repaired?

4    Q.  They were still out there the other day, I went out and

5    checked.

6    A.  Then they're still there, yes.

7    Q.  321, please, sir.

8             Is what was marked as IP, would it be safe for me to say

9    10?

10   A.  I can't tell in the photo.

11   Q.  We can zoom in.  Does it look like a 10?

12   A.  Yes.

13   Q.  Now, 321-A, I gave you 321 so you could orient it with the rail

14   behind it.

15   A.  Okay.

16   Q.  And this certainly is a picture that you took?

17   A.  The FBI took.

18   Q.  At your direction?

19   A.  Yes.

20   Q.  And 321-A is a closer-up picture of impact point 10?

21   A.  Yes.

22   Q.  Now, impact point 11 is on the other side of that barrier?

23   A.  Yes.

24   Q.  And you would call that the, that would be south?

25   A.  North.

1   Q.  North.  But it would be on the -- I don't know -- on the

2   walkway side?

3   A.  Walkway side.

4   Q.  Let's do it that way.  And this one is on the area, the street

5   side?

6   A.  Yes.

7   Q.  As well as 8 and 9?

8   A.  Yes.

9   Q.  Could you pull up Exhibit 322, please.  Now, this appears to be

10  impact points 12 and 14.

11  A.  Yes.

12  Q.  Why they numbered them differently, I don't know.  So, so far,

13  how many do we have?

14  A.  I wasn't counting.  There's, I believe, eight total on the

15  concrete.

16  Q.  And eight total on the concrete, right?

17  A.  I believe that's correct.

18  Q.  I was going to bring us up-to-date, but we'll just say eight

19  total.

20          So those impact points are 12 and 14.  And those two are

21  on the street side of that barrier that I think the FBI called a

22  jersey wall?

23  A.  Yes.

24  Q.  I've been calling it barrier so long I'll keep doing that.

25          And then 323, please, sir.  Could you maybe go up close

1    so we can see the number on that.  That's impact point 13?

2    A.  Yes.

3    Q.  Right?  323-A, which is a closer-up of the same impact point?

4    A.  Yes.

5    Q.  And 324, please, sir.  Is impact point what?

6    A.  It should be 15 but I can't tell.

7    Q.  I think it is, I think it's marked right in that top corner.

8    Could you pull that up.  I know it's 15, but we need to let the

9    jury see.  15.

10          Now, and 324-A is a closer-up, 324-A is a closer-up view

11   of the same thing?

12   A.  Yes.

13   Q.  Now, that's eight impact spots, right?

14   A.  Yes.

15   Q.  Your ballistics experts --

16   A.  I'm sorry, I didn't hear you.

17   Q.  Your ballistics expert -- I'm sorry, I'm losing my -- I can do

18   it.

19          Your ballistics expert associated eight casings with the

20   AK-47 that Sergeant Bowen fired that day?

21   A.  Patrick Lane, the LSP expert.

22   Q.  Oh, well, the one that was called as a witness in this case?

23   A.  Yes.  Eight or nine.

24   Q.  Well, let's talk about it.  Didn't he say it was eight and

25   there's one he couldn't tell, that was a maybe?

1    A.  I know there's -- I know there's one, I know there's one that

2    he couldn't tell.  I don't remember the exact number that would

3    match.

4    Q.  That's okay, I'm sure the jury wrote it down.

5             So if it was eight and Ken Bowen said he fired eight,

6    does that create any curiosity for you?

7    A.  No.

8    Q.  And you don't see any significance to that?

9    A.  (NO RESPONSE.)

10   Q.  Come on, Agent.  There's got to be some significance, huh?

11   A.  I mean, there's some significance.  I don't think I see the

12   same significance that you see.

13   Q.  Well, let's hope the jury does.

14            I have another one here for you, though.  This one might

15   even be better for you.  Could you pull up Exhibit 153 for me,

16   please, sir.

17            Now, this white mark right there, that's what you said

18   was a, what did you call it, a strike mark (INDICATING)?

19   A.  Skid maybe, could be.

20   Q.  Skid mark.  You think that was caused by a round, a bullet?

21   A.  Could have been.

22   Q.  Could have been, okay.  Now, you had your experts there looking

23   for evidence, right?

24   A.  Yes.

25   Q.  Of course, they know more about this than you?

1    A.  Yes.

2    Q.  And they didn't find that, did they?

3    A.  No.

4    Q.  They didn't say that there was a strike mark on the ground, did

5    they?

6    A.  No.

7    Q.  And you don't know if it's a strike mark; you're saying, well,

8    maybe it was one?

9    A.  It's consistent with the evidence that we've heard.

10   Q.  Now, I guess consistent is if this guy didn't have any bullet

11   wound to the groin, huh?

12   A.  I think he had one somewhere behind his knee (WITNESS MARKS

13   EXHIBIT).

14   Q.  Can we blow up this, this little white mark as much as

15   possible, sir.

16          Now, you can see the ridges in the cement of that

17   walkway, can't you?

18   A.  Yes.

19   Q.  And interestingly enough, that white mark has the same ridges,

20   doesn't it?

21   A.  Um.

22   Q.  Let me help you out.

23   A.  Yeah, it appears --

24   Q.  Right there, huh (INDICATING)?  It doesn't look like a trough

25   that would be caused by an AK-47 round that was moving at 24,000

```
1   was it, feet per second?

2   A.  I mean, I can't -- I don't know what an AK-47 round would do to

3   a piece of concrete, if it was skipping across the concrete.

4   Q.  Of course, you haven't written any books on this?

5   A.  No.

6   Q.  You haven't written any treatises?

7   A.  No.

8   Q.  You haven't lectured at any seminars?

9   A.  No.

10  Q.  You haven't been a college professor?

11  A.  No.

12  Q.  You certainly wouldn't even think this jury should believe that

13  you would know more than Dr. DiMaio?

14  A.  I didn't suggest that, no.

15  Q.  Does that still look like a strike mark to you, blown up?

16  A.  It's a mark on the concrete.

17  Q.  No?

18  A.  Whether it was -- certainly not a strike mark.  A skid mark.

19  Q.  A skid of what?

20  A.  Whatever caused it.

21  Q.  Okay.  You think a bullet may have caused it?

22  A.  It's possible.

23  Q.  Okay.  So what you're saying is that somebody could've,

24  consistent with what Hunter said, leaned over and fired a round, an

25  AK-47, right?
```

1    A.   Yes.

2    Q.   And it just skidded along the ground for a while?

3    A.   Yes.

4    Q.   It didn't hit the ground and go up?

5    A.   Yes.

6              THE COURT:   I'm sorry, what did you say?

7              THE WITNESS:   Yes.

8    BY MR. DeSALVO:

9    Q.   And it didn't make a groove in these grooves that go

10   perpendicular across it?

11   A.   I mean, this is a 2-D photograph.   There's no way to tell that,

12   in my opinion.

13   Q.   And you don't think it could be paint, huh?

14   A.   Could have been.

15   Q.   Could have been, right.   Looks like it even fades a little bit

16   up in here, huh (INDICATING)?

17   A.   It narrows, yes.

18   Q.   Yes.   So you realize once this trial started that not having

19   the strike mark in that pathway was going to be critical in

20   determining whether or not Officer Hunter told the truth or not

21   when he said he saw, he saw it strike the thing but he didn't see

22   the bullet, he saw the cement pop up and powder up, right?

23   A.   No, I didn't think that.

24   Q.   He didn't say that?

25   A.   I didn't think that, no.

1    Q.   Oh, okay.  And you understood that the credibility of his

2    testimony was related to that strike mark?

3    A.   No.

4    Q.   Well, let's move on, then.

5    A.   I would like to explain a little bit more.  Because not only

6    are these things that could be strike marks strike marks, but all

7    of the strike marks, impact points on the railings are all low,

8    consistent with somebody leaning over the barrier and firing or

9    consistent with somebody firing down, to actually hit the barrier

10   that low, all consistent with Mike Hunter's account.

11   Q.   Are you saying that those came from the southeast is what I

12   think your expert said, right?

13   A.   South -- in the south and east quadrant, so that quadrant.

14   Q.   So what you're saying is, now, Sergeant Bowen could have fired

15   those things that hit the rails too, huh?

16   A.   I think that's certainly possible.

17   Q.   And that would have been by leaning over that barrier and doing

18   this, right (DEMONSTRATING)?

19   A.   Or while he was standing.  It was -- I mean, it was in a

20   downward direction to get that low.

21   Q.   That's what Officer Hunter told you.

22   A.   That's what Officer Hunter said, yes.

23   Q.   And you indicated that -- I forget the word you used, outliners

24   or people that told you things that nobody else said?

25   A.   Yes.

1   Q.  What was the word you used?

2   A.  I think outliers, maybe.

3   Q.  Outliers, outliners?

4   A.  Outliners.  Outliners?

5   Q.  I never heard that phrase before, we'll use it.  The outliners,

6   they were outliners because nobody else said that, right?  I think

7   you did that referring to like Mr. Gasaway?

8   A.  Sure.  Nobody in that situation, nobody else that he was with

9   gave a statement that corroborated his statement.  And also there

10  was other evidence that was inconsistent.

11  Q.  And there was no physical evidence to support it, too, is what

12  you said?

13  A.  Right.  Correct.

14  Q.  So we have the outliers who can't be believed if nobody else

15  saw it, what they saw, and if there was no physical evidence to

16  support what they said, right?

17  A.  Yes.

18  Q.  Would you pull up, please, sir, Exhibit 153.  Oops, that's not

19  the one I wanted.  Maybe it was 46.  I am looking for the

20  photograph of Ronald Madison -- oh, Exhibit 250.  I looked on the

21  wrong page of my notes, okay.

22          So now we have this outliner testimony from Officer

23  Hunter, because no one else saw it, and we're looking for some

24  physical corroboration, right?

25  A.  Yes.

1  Q.  So we had him say that this spot right here was a footprint, or

2  he said could have been a footprint?

3  A.  Yes.

4  Q.  But he said, and I mean, not for the first time in this

5  courtroom today, I assume, that Sergeant Bowen stomped him at least

6  three times on the back?

7  A.  I don't remember a specific number but more than once.

8  Q.  And when you look at Exhibit 250, you don't see any footprints

9  or foot marks of any kind on his back, do you?

10 A.  You see the mark that you referred to on his shirt.

11 Q.  Okay.  And we also -- could you blow that spot up there

12 (INDICATING).  You know what I'm talking about.  No, that's the

13 wrong one, I'm looking for the fender.  That's it.

14       That looks like a pretty filthy vehicle, huh?

15 A.  Yes.

16 Q.  And it's just got one little clean mark, right?

17 A.  One area that's clean, and there's also, it looks like marks up

18 there (INDICATING).

19 Q.  Looks like what might even be a little blood stain, huh?

20 A.  Yes.  Could possibly be a blood stain.

21 Q.  Maybe that spot on the back of Ronald Madison's shirt was

22 caused by falling against that truck after he was shot?

23 A.  It's possible.

24 Q.  Do you have any physical evidence that corroborates the

25 outliner testimony of Officer Hunter?

1   A.   The strike marks low on the barrier.

2   Q.   The strike marks where?

3   A.   On the barrier, the metal barrier.

4   Q.   Well, no, Officer Hunter said that he fired -- oh, the strike

5   marks on the metal barrier?

6   A.   Yes.

7   Q.   Okay.  So you think Sergeant Bowen caused those?

8   A.   It's possible, yes.

9   Q.   It's possible.  Do we deal with possibility in this justice

10   system we have?  You don't arrest people on possibilities, do you?

11   A.   Yes, probable cause.

12   Q.   Oh, on possibilities?

13   A.   We arrest people based on probable cause, yes.

14   Q.   Okay.  On probable cause, okay.  So, now you're going to say

15   that those marks on the railings were probably caused by Sergeant

16   Bowen?

17            MS. BERNSTEIN:  Objection to the legal discussion here.

18            MR. DeSALVO:  He's answering the questions.

19            THE COURT:  I am going to overrule.  He is the

20   investigator of the case, he is investigating a crime.  He knows

21   the elements of the crime that he is investigating, he can

22   certainly answer questions about his investigation and where they

23   led him.

24            THE WITNESS:  Can you repeat the question?

25   BY MR. DeSALVO:

1  Q.  Are you saying now that that those strike marks on that rail

2  were probably caused by Sergeant Bowen?

3  A.  It's consistent with Mike Hunter's testimony.

4  Q.  That's consistent with Mike Hunter's testimony?

5  A.  Yes.

6  Q.  Wow.  And you think that when they hit that rail like that, it

7  caused cement to pop up?

8  A.  No.  When he hit that rail, there's -- no cement would have

9  popped up if he hit the metal railing.

10  Q.  We kind of alluded to it before when we talked about these

11  radio transmissions, about only hearing half of what was said,

12  right?

13  A.  Yes.

14  Q.  And if you don't hear the other half, you really don't have any

15  contact, do you?

16  A.  No.

17  Q.  Well, I hate to belabor the point, but let's talk about 302s.

18  Your 302s are what -- your bullet points that you write down and

19  summarize and put on a piece of paper?

20  A.  Correct.

21  Q.  But your 302s never, ever contain the question you ask?

22  A.  No.

23  Q.  How you ask it?

24  A.  No.

25  Q.  The tone of voice?

1  A.  No.

2  Q.  Any coercion you may have made?

3  A.  No.

4  Q.  Any well-I-don't-believe-a-word-you're-saying kind of stuff,

5  right?

6  A.  No.

7  Q.  You're not telling me you never did that, huh?

8  A.  I've definitely done that.  Maybe not in those words, but I

9  definitely have challenged, challenged people.

10  Q.  Well, yeah, you've definitely done that.  Where you walk away

11  disgusted, like, I know you're lying?

12  A.  I've definitely would have told people that I know they're

13  lying or I believe you're lying.  But I wouldn't just end an

14  interview and walk out in disgust like that, no.

15  Q.  And then you never got the interview restarted again?  Look,

16  I've been in these interviews for 40 years.

17  A.  I've never conducted an interview in that manner.

18  Q.  But fair enough to say is we don't know what was said by you,

19  by anyone from the Department of Justice when these interviews were

20  going on?

21  A.  Correct.

22  Q.  Now, Special Agent -- what was her name, the lady, your boss in

23  this case?

24  A.  Bryson?

25  Q.  Bryson.  She indicated that Heather Gore had made a complaint

1    that she was a little uncomfortable about what happened and how it

2    happened, right?

3    A.  Yes.

4    Q.  And that was referred to you?

5    A.  Yes.

6    Q.  Is there a public integrity division of the United States of

7    America, Department of Justice?

8    A.  There isn't -- there is the Office of Professional

9    Responsibility?

10   Q.  Yes.

11   A.  I think that's what it's -- OPR, I think that's what it stands

12   for.

13   Q.  That's when people make complaints about federal agents?

14   A.  Yes.

15   Q.  That's who makes the investigation, right?

16   A.  Yes.

17   Q.  If they make a complaint about a member of the Department of

18   Justice attorney team, that's who does the investigation, right?

19   A.  That's my understanding, yes.

20   Q.  And certainly if they made a complaint against your team you

21   wouldn't do the investigation?

22   A.  No.

23   Q.  You would refer it to public integrity?

24   A.  Yes.

25   Q.  Who is Rakisha Barrios?

1    A.   Robert Barrios's wife.

2    Q.   And Rakisha Barrios made a direct complaint to Mr. Letten, did

3    she not?

4    A.   I overheard portions of the conversation between Ms. Barrios

5    and Mr. Letten, yes.

6    Q.   And actually, you became a witness to the complaint, didn't

7    you?

8    A.   Yes.

9    Q.   And what she said was, my husband pled guilty because he was

10   pressured, he didn't do those things.  Something to that effect.

11   He didn't do what he pled guilty to, or something like that?

12   A.   Yes.  He -- something to that effect.

13   Q.   Yeah.  And you didn't refer that to public integrity, did you?

14   A.   No.

15   Q.   In fact, you investigated it yourself, didn't you?

16   A.   I spoke to Mr. Barrios and his attorney about it, yes.

17   Q.   You called Mr. Barrios's attorney, told him what happened, and

18   he told you, everything's all right, she is just a loose cannon?

19   A.   I think that fairly summarizes it, yes.

20   Q.   And that was your whole investigation into you and into what

21   the government did?

22   A.   Yes.

23   Q.   Let's talk about Heather Gore.  Did you go try to visit

24   Heather Gore at her house on one of those surprise visits?

25   A.   Yes.

1    Q.   And when you got there she wasn't there?

2    A.   Yes.

3    Q.   And you found out where she was?

4    A.   Yes.

5    Q.   And you went to where she was?

6    A.   I don't know if it was the same day, but I did interview her at

7    the 2nd District station.

8    Q.   You knew by then where she lived?

9    A.   Yes.

10   Q.   And you mentioned to her that she had a nice house?

11   A.   Yes.

12   Q.   And you knew that she had triplets?

13   A.   Yes.

14   Q.   And did you or did you not tell her some words to the effect

15   of, it would be terrible if you lost your house and never saw your

16   children again?

17   A.   Um, something to that effect but not those words.  I think it

18   would be more closely characterized by, you know, think about your

19   kids, and you have a nice house, don't throw it away lying for Rob

20   Gisevius.

21   Q.   And when you -- you were aware, of course, that Lance Madison

22   had given several different stories?

23   A.   Yes.

24   Q.   You were aware that when he talked to Tris Lear he said, those

25   boys shot at the police first?

1    A.  Yes.

2    Q.  You were aware that when he went to his preliminary hearing, he

3    said that those boys were shooting at he and his brother, they were

4    running away?

5    A.  Did you say preliminary hearing?  I'm sorry, I didn't hear the

6    first part.

7    Q.  Yeah, that preliminary bail hearing.

8    A.  Yes.

9    Q.  You were aware that when he was investigated by the district --

10   or interviewed by the district attorney's office, that he said he

11   was sure they had guns?

12   A.  Yes.

13   Q.  You saw the questioning by the attorney from the United States

14   Department of Justice?

15   A.  Yes.

16   Q.  Where he suggested that he really didn't see it, that he maybe

17   just thought he saw it?

18   A.  I don't remember questioning where he suggested that, I think

19   he asked him for details about the gun.

20   Q.  Did you really see it or did you just think you saw it?

21   A.  I don't remember, yeah --

22   Q.  Do you want to read it?

23   A.  -- I mean, I'll take your word for it, if you're saying that's

24   what was said.

25   Q.  And then you also became aware that he went to the state grand

1  jury the very next day, or was it the same day?

2  A.  I am not sure.

3  Q.  And when he went to that state grand jury, he was no longer

4  sure; it was like, I thought they had guns but they may not have,

5  right?

6  A.  That's correct.

7  Q.  And, in fact, he didn't testify before the federal grand jury,

8  did he?

9  A.  No.  No, he didn't.

10  Q.  You testified for him, didn't you?

11  A.  I am not sure what you mean.

12  Q.  Basically what you told that grand jury was, well, what

13  Mr. Madison said was, he thought some guys were shooting at him, he

14  turned around and everybody scattered?

15  A.  I don't remember saying that.

16  Q.  Do you want me to pull it up for you?

17  A.  Sure.

18  Q.  Let's put it this way, let's go backwards, then.  Did you tell

19  the grand jury that Lance Madison on the day of his arrest said

20  that those boys were shooting at the police?

21  A.  I don't remember telling the grand jury that.

22  Q.  Did you tell the grand jury that Lance Madison, when he was at

23  a bail preliminary/preliminary hearing, under oath before a judge,

24  said that those boys, that those boys were shooting at him and his

25  brother and they were just trying to run away?

1    A.  I don't remember telling them that.

2    Q.  You didn't, did you?

3    A.  I don't remember.

4    Q.  You don't remember?

5    A.  No.

6    Q.  Wow.  Don't y'all tell people when they go in the grand jury,

7    if you keep saying you don't remember we're going to interpret that

8    as perjury, don't y'all say that?

9    A.  I mean, I testified in front of the grand jury a number of

10   times, I don't remember every word that I spoke.  If you could show

11   me a transcript, and if it's not in there I would agree with you.

12   But I don't remember everything that I said.

13          MR. DeSALVO:  Anybody have a transcript from the grand

14   jury?

15   BY MR. DeSALVO:

16   Q.  I want you to look at what purports to be your grand jury

17   testimony of --

18          THE COURT:  Page?

19          MR. DeSALVO:  It would be pages 73 and 74.

20   BY MR. DeSALVO:

21   Q.  I am going to show you, just read this section here

22   (INDICATING).

23   A.  Which section?

24   Q.  Right up in here, all of that, and I have a question or two to

25   ask you (INDICATING).

1   A.   (WITNESS READS DOCUMENT.)

2            MS. BERNSTEIN:  What's the date of that one, Frank?

3            MR. DeSALVO:  That's the 2010.

4            THE WITNESS:  Yes.

5   BY MR. DeSALVO:

6   Q.   Okay.  Do you know the date of that document, or the very back

7   of it and see what's the date on it?

8   A.   July 12th.

9   Q.   July 12th of 2010.  Did you tell that grand jury that Lance

10  Madison was sure he had a gun?

11  A.   I told -- the question was, "Who did he think was shooting at

12  them?"  Referring to him and his brother, and my response was,

13  "Those teenagers."

14  Q.   And that was who did he think was shooting at him?

15  A.   Correct.

16  Q.   Did you say that he saw guns?

17  A.   No.

18  Q.   Did you say that he was sure he saw guns?

19  A.   No.

20  Q.   Now, I don't want you to have to read that whole thing.  You

21  say you don't remember telling them about what he said to Tris

22  Lear, that those boys shot at the police first?

23  A.   Correct.

24  Q.   Do you really think that's in there?

25  A.   I am not sure.  If you tell me it's not in there, I will

1    believe you, I have no reason --

2    Q.  Do you believe me?

3    A.  -- no reason to doubt that.  But, I mean, I don't know word for

4    word what's in here.

5    Q.  You find me that believable?

6    A.  Yes.

7    Q.  Good.  Now, what about that, that statement at the DA's office

8    that he made where he was sure they had guns, do you think you told

9    them about that statement he gave at the DA's office?

10   A.  I don't know.  If you're telling me it's not in here, I have no

11   reason to doubt you, but...

12   Q.  You trust me on that one, too?

13   A.  What's that?

14   Q.  You trust me on that one, too?

15   A.  Yes.

16   Q.  I appreciate that.

17        Wow.  Now, one of the things you said earlier in your

18   testimony was that you would have thought or you would expect that

19   they would put a serious, an experienced investigator on this

20   Danziger case when it happened by the NOPD, right?

21   A.  Yes.

22   Q.  And that -- because of the magnitude of the case?

23   A.  Yes.

24   Q.  You need that kind of experience?

25   A.  Yes.

1    Q.  Now, you replaced a Special Agent Henley in this case, right?

2    A.  Yes.

3    Q.  And how long had Special Agent Henley been on the case?

4    A.  On the case, I am not sure.

5    Q.  How long was he on the job?

6    A.  At that time, maybe ten years, approximately.

7    Q.  Ten years.  And you handled this investigation in less than one

8    year on the job?

9    A.  I think I had two years, a little more than two years.

10   Q.  Less than two?

11   A.  I think more than two.

12   Q.  When did you --

13   A.  I came on duty in '06, I was assigned to the investigation in

14   '09, so close to three years.

15   Q.  You certainly didn't have the experience that Special Agent

16   Henley had?

17   A.  I didn't have the time in that Special Agent Henley had, no.

18             MR. DeSALVO:  Thank you very much.  I'm tired of talking.

19             THE WITNESS:  Thank you.

20             THE COURT:  All right.  Let's go ahead and get this book

21   back up here.

22             Counsel, are we going to finish with this witness today?

23   That would be my goal.  Certainly we should have finished with him

24   yesterday, but we are where we are.  Are we going to be able to

25   finish with this witness today?  Mr. Meche, how long have you got?

1            MR. MECHE:  No, sir, I wouldn't be able to finish today.

2            THE COURT:  That puts us behind.  All right.  We won't

3    have court tomorrow, we will resume at 8:30 on Thursday.  In the

4    meantime, please do not discuss the case amongst yourselves or view

5    anything or read anything about the case.  As I indicated, you may

6    return to your workplaces, subject to those restrictions as always.

7    And we will see you then at 8:30 on Thursday and this gentleman

8    will still be on the stand.

9            MS. BERNSTEIN:  Your Honor, before you release them, may

10   we approach?

11           THE COURT:  Yeah.

12      (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

13           MS. BERNSTEIN:  I have no idea whether they would be

14   willing to stay late, but if staying an extra hour would do it, is

15   that worth it?  I mean, I don't know whether --

16           THE COURT:  It's really up to --

17           MS. BERNSTEIN:  How long are you going to be?

18           MR. MECHE:  I'm going to be awhile and I don't want to

19   have to break, I don't think that's fair.  I wouldn't ask you to do

20   that.

21           THE COURT:  The idea, and I thought of that, I thought of

22   asking them to say until 5:30 or quarter to six.  If it's possible

23   to finish.

24           MS. BERNSTEIN:  I was thinking if he were short.

25           THE COURT:  I think originally you said you were going to

```
 1    be short, of course I understand that that changes depending on
 2    what he says, but.
 3              MS. BERNSTEIN:  Is there --
 4              MR. FLEMING:  Not going to do both is what it sounds
 5    like.
 6              MS. BERNSTEIN:  Can't come in tomorrow, huh?
 7              THE COURT:  I've already told them they could be off
 8    tomorrow.
 9              MR. FLEMING:  That's all, I mean, I don't think we get to
10    cross and redirect.
11              MS. BERNSTEIN:  If he were going to be short we could do
12    both.
13              THE COURT:  Just pick it up Thursday.  Looks like
14    tomorrow canceled but I've already told them.
15              MS. BERNSTEIN:  Can we ask if they're willing to come in
16    tomorrow?
17              MR. LARSON:  I have something I have to do at two
18    o'clock.
19              MS. BERNSTEIN:  Judges don't care about our schedules.
20              THE COURT:  Look, I'm all in favor, I'll stay here to
21    midnight to get this witness done.  Looks like we start again at
22    8:30, I'd rather not, believe me, I would rather not.
23         (OPEN COURT.)
24              THE COURT:  Okay.  8:30 on Thursday and we'll pick up
25    where we left off.  If you could be mindful of the rules and
```

1    restrictions that I've given you in the meantime, I would

2    appreciate it.  We will see you at 8:30 on Thursday.

3              THE MARSHAL:  All rise.

4              THE COURTROOM DEPUTY:  All rise.

5         (WHEREUPON, THE JURY EXITED THE COURTROOM.)

6              THE COURT:  Sir, please don't discuss your testimony with

7    anyone between now and 8:30 Thursday morning.

8              THE WITNESS:  Yes, sir.

9              THE COURT:  If y'all could be seated.  Anything that we

10   need to cover on the record here before we adjourn for the day

11   until Thursday?

12             MS. BERNSTEIN:  Nothing for the government, your Honor.

13             MR. FLEMING:  No, Judge.

14             THE COURT:  All right.  I think we know, I ask at the end

15   of the day when you all come up here about the game plan, but I

16   think we know the game plan because it's been delayed now by two

17   days.

18             MS. BERNSTEIN:  I don't think we know the whole day for

19   Thursday though.

20             THE COURT:  At the rate we're going, I think we know the

21   game plan for Thursday, Friday, and probably the next week at the

22   rate we're going.  You know what, y'all talk about it because every

23   time I ask you all questions about how long things are going to

24   take and how many questions do you have and who do we have lined up

25   for tomorrow, the last, since Wednesday I have gotten information

1    that's been incorrect, incorrect, inaccurate.

2            And look, you got to do what you have to do in terms of

3    these witnesses, ask the questions you have to ask.  I certainly

4    haven't tried to limit that, nor will I because I think you all

5    have been very thorough.  So if it sounds like I am angry with you,

6    I am not angry with you for doing your jobs; but when I ask you for

7    an estimate and we try to plan the next day, it ain't happening.

8    It ain't happening because your estimates of time and how long

9    things take are just fantasy land.

10           So I am not going to ask anymore until we get past the

11   witnesses that you've already told me last week we were going to

12   see on Monday, it's now Tuesday afternoon and we haven't seen any

13   of those people.  So when we get through those people, we'll visit

14   again about how long things are going to take.  See you Thursday.

15           THE DEPUTY CLERK:  All rise.

16       (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

17

18                       *  *  *  *  *  *

19                    REPORTER'S CERTIFICATE

20

21       I, Karen A. Ibos, CCR, Official Court Reporter, United
     States District Court, Eastern District of Louisiana, do hereby
22   certify that the foregoing is a true and correct transcript, to the
     best of my ability and understanding, from the record of the
23   proceedings in the above-entitled and numbered matter.

24   _____
     Karen A. Ibos, CCR, RPR, CRR
25   Official Court Reporter