```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2   *********************************************************************
     UNITED STATES OF AMERICA
 3
                                       Docket No. 10-CR-204
 4   v.                                New Orleans, Louisiana
                                       Thursday, July 21, 2011
 5
     KENNETH BOWEN, ROBERT GISEVIUS,
 6   ROBERT FAULCON, ANTHONY VILLAVASO
     and ARTHUR KAUFMAN
 7   *********************************************************************

 8
                       TRANSCRIPT OF TRIAL PROCEEDINGS
 9          HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
                      UNITED STATES DISTRICT JUDGE
10                             VOLUME XVII

11

12   APPEARANCES:

13   FOR THE PLAINTIFF:            UNITED STATES DEPARTMENT OF JUSTICE
                                   BY:  BARBARA BERNSTEIN, ESQ.
14                                 Civil Rights Division-D Street
                                   601 D Street N.W.
15                                 Office PHB 5123
                                   Washington, D.C. 20004
16

17                                 UNITED STATES DEPARTMENT OF JUSTICE
                                   BY:  CINDY K. CHUNG, ESQ.
18                                 CIVIL RIGHTS, CRIMINAL SECTION
                                   950 Pennsylvania Avenue N.W.
19                                 Washington, D.C. 20530

20                                 UNITED STATES ATTORNEY'S OFFICE
21                                 BY:  THEODORE R. CARTER, III, ESQ.
                                   650 Poydras Street, Suite 1600
22                                 New Orleans, LA 70130

23
     FOR DEFENDANT KENNETH BOWEN:  FRANK G. DeSALVO, APLC
24                                 BY:  FRANK G. DeSALVO, ESQ.
                                   829 Baronne Street
25                                 New Orleans, LA 70113
```

```
 1   FOR DEFENDANT ROBERT
     GISEVIUS:                      ERIC J. HESSLER, ESQ.
 2                                  700 Camp Street, Suite 104
                                    New Orleans, LA 70130
 3

 4   FOR DEFENDANT ROBERT
     FAULCON:                       PAUL C. FLEMING, JR., ESQ.
 5                                  2821 Kingman Street, Suite C
                                    Metairie, LA 70006
 6

 7                                  KING, KREBS & JURGENS
                                    BY:  LINDSAY A. LARSON, III, ESQ.
 8                                  201 St. Charles Avenue, 45th Floor
                                    New Orleans, LA 70170
 9

10   FOR DEFENDANT ANTHONY
     VILLAVASO:                     TIMOTHY A. MECHE, ESQ.
11                                  700 Camp Street
                                    New Orleans, LA 70130
12

13                                  DeSALVO, BLACKBURN & KITCHENS
                                    BY:  ROGER W. KITCHENS, ESQ.
14                                  2802 Tulane Avenue
                                    New Orleans, LA 70119
15

16   FOR DEFENDANT ARTHUR
     KAUFMAN:                       STEPHEN D. LONDON, ESQ.
17                                  1100 Poydras Street, Suite 2950
                                    Energy Centre
18                                  New Orleans, LA 70163-2950

19

20   Official Court Reporter:       Karen A. Ibos, CCR, RPR, CRR
                                    500 Poydras Street, Room HB-406
21                                  New Orleans, Louisiana 70130
                                    (504) 589-7776
22

23

24      Proceedings recorded by mechanical stenography, transcript
     produced by computer.
25
```

1                              I N D E X

2

WITNESSES FOR THE GOVERNMENT:                    PAGE/LINE:

3

WILLIAM BEZAK

4

   Cross-Examination by Mr. Meche                    4/21
5  Redirect Examination by Mr. Bernstein            76/17

6

LESHA BARTHOLOMEW

7

   Direct Examination by Mr. Carter                193/25
8  Cross-Examination by Mr. Larson                 206/21
   Cross-Examination by Mr. Meche                  210/10
9  Cross-Examination by Mr. Hessler                212/23
   Redirect Examination by Mr. Carter             220/23
10

SHAWN F. GASAWAY

11

   Direct Examination by Mr. Hessler              230/10
12 Direct Examination by Mr. DeSalvo              252/23
   Direct Examination by Mr. Larson               253/18
13 Direct Examination by Mr. Meche                256/23
   Cross-Examination by Ms. Chung                 261/20
14 Redirect Examination by Mr. Hessler            281/22
   Redirect Examination by Mr. Larson             287/5
15 Redirect Examination by Mr. DeSalvo            288/4

16 TRIS LEAR

17 Direct Examination by Mr. DeSalvo              293/12
   Direct Examination by Mr. Hessler              309/10
18 Direct Examination by Mr. Meche                311/12
   Cross-Examination by Ms. Chung                 318/24
19 Redirect Examination by Mr. Meche              323/10

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S

 2                (THURSDAY, JULY 21, 2011)

 3                     (MORNING SESSION)

 4

 5     (OPEN COURT.)

 6     (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

 7          THE COURT:  Y'all may be seated.  Thank you all again for

 8   being on time.  I'm sorry about the few minute delay here.  We

 9   would like to pick up where we left off, I think which was with

10   Mr. Bezak still on the stand, and Mr. Meche about to cross-examine

11   him.  We're going to finish with this witness today, this morning,

12   we certainly hope.

13          Mr. Bezak, you're still under oath.  Have you had any

14   discussions with anyone since we adjourned on Tuesday about your

15   testimony?

16          THE WITNESS:  No, sir.

17          THE COURT:  All right.  Mr. Meche, if you would like to

18   begin.

19          MR. MECHE:  Thank you, your Honor.

20                     CROSS-EXAMINATION

21   BY MR. MECHE:

22   Q.  Good morning, Agent Bezak.  I am the last lawyer on this side

23   that will question you.

24   A.  Good morning.  Thank you.

25   Q.  I want to start off where Ms. Bernstein started off with you
```

1   when she asked you questions about your experience and background.

2   I appreciate you sharing all of that with us.

3   A.  Okay.

4   Q.  I think you made it clear that at the time of Katrina you were

5   not even an agent yet with the FBI?

6   A.  No, sir, still in Philadelphia going through the application

7   process to become an agent.

8   Q.  And you were working, you said, for the Bowing Corporation?

9   A.  Yes.

10  Q.  Do you remember, like, watching it on TV and seeing the images

11  and all of that?

12  A.  Yes, of course I watched it.

13  Q.  And the reason I asked that is because I think in response to

14  someone's question, maybe it was Mr. London, you said it was your

15  understanding that a week after the storm, like when the bridge

16  incident happened, the search and rescue operation had been pretty

17  much completed, I think that's what you said.

18  A.  Yeah, it was my understanding that it was wrapping up at that

19  point.  Obviously there were still individuals in the city, but my

20  understanding was that at that point the city was in not as much

21  disarray as it was in the first few days.

22  Q.  And where did you get that information from?

23  A.  Talking to people that were here, the media.  I can't say

24  exactly where, just my understanding.

25  Q.  You would have gotten it when you were watching it on TV in

1   Philadelphia or after you came here?

2   A.  Could have been both.  Like I said, I've interviewed a number,

3   a number of officers who were here for the storm, a number of

4   civilians who were here for the storm.  Of course I've watched it

5   on the news, it could have come from any of those sources.  It was

6   just my understanding.

7   Q.  But in speaking to the people who were here -- we heard from

8   Ms. Bryson that most of the FBI people had evacuated and didn't

9   come back until mid-October.  So speaking to the people who were

10  here, the NOPD people who were here, did they give you that

11  understanding, that they were pretty much finished with search and

12  rescue at that time?

13  A.  I mean, there was continued search and rescue.  I mean, there

14  were houses -- every house had to be searched and that type of

15  stuff.  We are not talking about search and rescue, I'm talking

16  about people that were still on their rooftops and that type of

17  thing.  The entire city, probably for weeks, they had agencies from

18  all over the country that were searching house to house for, I

19  guess at that point probably be a recovery operation, not a search

20  and rescue operation.

21  Q.  Now, you also shared with us that you were only about two years

22  on the job when you got involved in this case, correct?

23  A.  Closer to three years than two.

24  Q.  And you have had some experience investigating cases where you

25  were the case agent?

```
 1    A.   Yes.
 2    Q.   But you had never done a civil rights violation case?
 3    A.   No.
 4    Q.   You had never done a homicide investigation?
 5    A.   I did do civil rights cases, I've never done -- well, no,
 6    actually, I was the case agent who reopened the Raymond Robair
 7    case, and I investigated that case until I was assigned to
 8    Danziger.  So I guess you could consider that a homicide also.
 9    Q.   So maybe one homicide before this one?
10    A.   Yes.
11    Q.   But your job, as I understand it, and it began when you first
12    met at that meeting with Sergeant Kaufman that day?
13    A.   Yes.
14    Q.   Was to essentially investigate a homicide investigator's case?
15    A.   Like I said, the attack that I took and the strategy that was
16    developed was two pronged:  Initially to investigate the coverup,
17    which I guess you could consider an investigation of an
18    investigation; and the second prong would be the actual shooting
19    investigation.
20    Q.   But now, the day you got thrown into this, my understanding was
21    you went to that meeting with Sergeant Kaufman, had you decided at
22    that point in time there was a coverup?
23    A.   No.  I had very little knowledge about the case at that point,
24    so no, definitely not.
25    Q.   So all you knew was there was a homicide?
```

```
 1    A.  I knew there was -- I knew there was an incident where
 2    individuals were killed.  That's about the extent of my knowledge.
 3    Q.  And that's a homicide?
 4    A.  Yes.
 5    Q.  That's not a trick question.  Okay.
 6              So what you were investigating was a homicide
 7    investigation?
 8    A.  Yes.
 9    Q.  And so the person you first were investigating was Sergeant
10    Kaufman?
11    A.  He was certainly one of the targets.
12    Q.  That's the first person you met with?
13    A.  First person that I met with, yes.
14    Q.  And you knew he was an experienced homicide investigator?
15    A.  At that time I didn't know Sergeant Kaufman at all.  I mean,
16    I've learned that he was a very experienced homicide detective, but
17    at that time I didn't know Sergeant Kaufman at all.
18    Q.  He had probably, you know, done homicide in New Orleans for,
19    what, 20 years?
20    A.  Probably more than that.
21    Q.  Yeah.  And unfortunately, if you're a homicide detective in New
22    Orleans, you get to investigate a lot of homicides?
23    A.  Yes.
24    Q.  And probably done hundreds in his career?
25    A.  I'm sure he's done a number.  I couldn't swear on 100, but I'm
```

1    sure he's done a number of homicides in his 20- or 25-year career.

2    Q.  And then the next person you met with was also another

3    homicide -- experienced homicide detective, right?

4    A.  Yes, Sergeant Dugue.

5    Q.  And that was the next day?

6    A.  Yes.

7    Q.  And incidentally, I think Sergeant Dugue's here.  Do you see

8    him in courtroom?

9    A.  Yes, I do.

10   Q.  Could I ask him to stand up, please, sir.  Is that Sergeant

11   Dugue (INDICATING)?

12   A.  Yes, it is.

13   Q.  Okay.  Thank you, sir.

14           And that's the individual that you met with the next day?

15   A.  Yes.

16   Q.  And I think -- well, just to be clear, like Sergeant Kaufman,

17   you've learned he also was a very experienced homicide detective in

18   New Orleans?

19   A.  That's true.

20   Q.  For even longer than Sergeant Kaufman?

21   A.  Yes.

22   Q.  He's probably done maybe a thousand homicide investigations in

23   his career?

24   A.  Again, he's done a number.  I'm confident -- I would not swear

25   that he's done a thousand, but he's been a homicide detective for a

1  very long time.

2  Q.  And he's done what you're doing, has sat on the witness stand

3  hundreds of times and been questioned by any number of defense

4  attorneys?

5  A.  Yes, I think that's probably fair.

6  Q.  And the reason I ask you this is because I found it curious

7  something you said.  You said when you first met with him, when you

8  just mentioned the name David Ryder, Sergeant Dugue started

9  sweating profusely, you said?

10 A.  Yes.

11 Q.  Now, when you say sweating profusely, just describe that.  I

12 mean, was his shirt dripping wet and his face, how did that look?

13 A.  Exactly.  His shirt was dripping; sweat on his face, yes.

14 Q.  Did he have to like get a handkerchief or something to wipe it

15 off?

16 A.  I don't recall that, but he had huge sweat stains on his shirt.

17 Q.  And it was like all of a sudden, you mentioned David Ryder and

18 he just broke out in a sweat?

19 A.  It was in the course of that questioning, yes.

20 Q.  Somebody who had been a homicide detective in New Orleans for

21 over 30 years?

22 A.  Yes.

23 Q.  Testified hundreds of times?

24 A.  Yes.

25 Q.  Just the mere mention of David Ryder's name caused him to break

```
 1   out in a profuse sweat?
 2           MS. BERNSTEIN:  Objection, your Honor.  The witness has
 3   said several times it was during the discussion about David Ryder,
 4   not at the first mention of his name.
 5           MR. MECHE:  You see, she is doing it again.
 6           THE COURT:  Well, I am going to let him clarify, I think
 7   it's a fair question.  Let's do this.
 8   BY MR. MECHE:
 9   Q.  I mean, just the mere mention he just started sweating
10   profusely?
11   A.  No.  Like I said, it was under the questioning about David
12   Ryder.  Specifically, when did he learn David Ryder was not, in
13   fact, a sheriff's deputy and why he went out to lunch with David
14   Ryder before the state grand jury, all of which was very curious
15   because in the official report, David Ryder is still listed as a
16   sheriff's deputy, which would be at least six months after the
17   incident.
18           Also in those six months, there was no follow-up
19   investigation of David Ryder, he wasn't contacted, there was no
20   follow-up interview, and very suspicious to not interview one of
21   the lead victims in your case, an important witness in your case,
22   but then meet with him and have a friendly lunch with him before he
23   testified in the state grand jury.  All very suspicious, and, yes,
24   he began to sweat and stammer when we questioned him about those
25   topics.
```

1    Q.  Now, didn't Sergeant Dugue then provide you with an explanation

2    as to why they didn't interview David Ryder?

3    A.  Because he knew how to get in touch with him?

4    Q.  No, sir.  Didn't he tell you that the district attorney's

5    office had taken over the investigation from the New Orleans Police

6    Department after a period of time?

7    A.  He may have also said that, but if I can refer to my 302 I can

8    tell you the page.  (WITNESS REVIEWS DOCUMENT.)  It might be in the

9    second interview of Dugue.

10   Q.  What exactly are you looking for, I may be able to help you?

11   A.  In the 302 specifically, my recollection anyway, specifically

12   says that Dugue told me he did not follow up with David Ryder

13   because he knew how to get in touch with him.

14   Q.  Okay.  Well, I'll accept that.  Okay.

15         But now, you acknowledge there was also a discussion

16   about the fact that the district attorney's office had taken over

17   the investigation from the New Orleans Police Department?

18   A.  Yes.

19   Q.  And do you acknowledge that he described some tension between

20   the district attorney's office and the New Orleans Police

21   Department's investigation?

22   A.  Yes.

23   Q.  And he, in fact, told you that the district attorney's office

24   told the New Orleans Police Department not to do their

25   investigation anymore, that they were going to do it?

```
 1   A.  No, I don't think he told me that.  I don't remember him saying
 2   that.  And they -- Sergeant Dugue continued to do interviews while
 3   the DA's investigation was going on because I believe they --
 4   Sergeant Dugue spoke to Chris Baron --
 5   Q.  That's a good point, he did.
 6   A.  -- I believe he spoke to Chris Baron after the DA's office did.
 7   Q.  And did a report on that, didn't he?
 8   A.  Yes.
 9   Q.  And sent that over to the district attorney's office?
10   A.  I'm not sure if they sent that to the DA, I don't know.
11   Q.  Well, I mean, the district attorney's office would have had
12   access to it, wouldn't they?
13   A.  Yes, yes, but I'm not -- I can't say that he provided it to
14   them, but they certainly would have had access to it if...
15   Q.  Right, yeah.  So after meeting with Kaufman and Dugue, it's my
16   understanding, then, you began your own independent investigation?
17   A.  Yes.
18   Q.  And what you were trying to do, the words you used in your
19   response to Ms. Bernstein, was to determine whether or not what you
20   found in your investigation was consistent or inconsistent with
21   Kaufman and Dugue's understanding?
22   A.  Yeah, that's fair.
23   Q.  And you did an extensive investigation, you said you
24   interviewed over 400 witnesses?
25   A.  I don't know if I said 400, but probably close to 400.
```

1    Q.  I think that's what you said, yeah.

2    A.  Okay.

3    Q.  You don't deny it, about that many?

4    A.  No, there was a number of interviews, and close to 400 is a

5    good approximate number.

6    Q.  And your investigation lasted well over a year?

7    A.  Yes.

8    Q.  And in doing that, at some point you formed a belief as to what

9    you thought occurred on the bridge that day?

10   A.  Yes.

11   Q.  And as to what you believed occurred in the post shooting

12   investigation?

13   A.  Yes.

14   Q.  And what you believed at some point in time was that these

15   defendants and others unjustifiably shot unarmed innocent people on

16   the bridge?

17   A.  Yes.

18   Q.  That's what you believed?

19   A.  Yes.

20   Q.  And you also believed at some point, that you came to believe,

21   that there was an organized coverup of what happened, actually

22   happened on the bridge?

23   A.  Yes.

24   Q.  And at what point in time did you form that belief, do you

25   remember?

1    A.  I can't give you a specific time frame of when.  Through the

2    course of the investigation, it became obvious that those were

3    the -- that that's what was occurred -- what had occurred.

4    Q.  Now, in interviewing all 400 people, did they all give you a

5    version that was consistent or inconsistent with your belief?

6    A.  No.  There were people that provided information that was

7    inconsistent with my belief, yes.

8    Q.  And that's normal in an investigation, not everybody is going

9    to support your theory?

10   A.  Yes.

11   Q.  And it's your job as a good investigator to sort through what's

12   believable and what's not?

13   A.  Yes.

14   Q.  And if somebody gives you information that's inconsistent with

15   your theory, you can't just dismiss it out of hand?

16   A.  No.

17   Q.  You have to investigate it and see if it matches up with all of

18   your other evidence?

19   A.  Yes.

20   Q.  Now, at some point in your investigation, you testified that

21   you were able to get people to plead guilty and cooperate with the

22   government?

23   A.  Yes.

24          MR. MECHE:  And there's been extensive testimony about

25   that and who pled and not pled.  And what I would like to do is

1    nail it down for the jury on the white board, if I can, your Honor.

2              THE COURT:  Yes.

3    BY MR. MECHE:

4    Q.  And what I want to do is get nailed down who exactly pled

5    guilty in the order in which they pled, okay?  And I am going to

6    put number one here, and correct me if I'm wrong, but I think the

7    first one was Lohmann; is that correct?

8    A.  To plead or cooperate?

9    Q.  Well, you raise a good point, so let's talk about that.  Who

10   was the first to start cooperating?

11   A.  Jeff Lehrmann.

12   Q.  I'll put him first.  And he, in fact, started cooperating when;

13   like around the summer of '09, I think is what I understood?

14   A.  I think it was --

15   Q.  That July meeting that's reflected in your 302?

16   A.  No.  I wouldn't consider that him cooperating.  I think it

17   might've been the second meeting with him, in October I think it

18   was, October maybe.

19   Q.  And at that time -- and you talked about how, you know, you and

20   he had come to the understanding that he had committed a crime?

21   A.  Yes.

22   Q.  But yet you guys allowed him to keep his federal law

23   enforcement job for over a year, even though y'all knew he was a

24   criminal?

25   A.  Yes.  I mean, it was not my decision to do that, but that is

1   what occurred.

2   Q.  That was a decision by the prosecutorial team?

3   A.  That is what occurred, yes.

4   Q.  He got to wear a federal badge?

5   A.  Yes.

6   Q.  Engage in federal law enforcement activity?

7   A.  Yes.

8   Q.  Even though y'all knew he was a criminal?

9   A.  Yes.

10  Q.  And so that's why he didn't plead guilty first, because y'all

11  had an agreement with him, we'll leave you out there so you can

12  keep your paycheck?

13  A.  No.

14  Q.  So the next one was Lohmann, am I correct?

15  A.  Yes.

16  Q.  Now, Lohmann was the actual first one to plead guilty?

17  A.  First publicly, yes.

18  Q.  And when was that about?  My understanding was it was February

19  of 2010.

20  A.  That sounds correct.

21  Q.  Let me just write that.  And I'll put him, you said -- what

22  month did you say?

23  A.  He started to cooperate in, I would say October of 2009, I

24  think that sounds right.  He pled shortly after Lohmann.

25  Q.  Okay, yeah, and then they reverse, you know, Lohmann pled first

1    and then Lehrmann pled first, after he had been cooperating for a

2    long time?

3    A.  Yes.

4    Q.  When people plead guilty in the federal system, there are at

5    least two documents that are executed in connection with their

6    plea.  Specifically, there's a plea agreement.

7              Roger, can you pull up 41, please, Exhibit 41.  We

8    stipulated to that, it's in evidence.

9              MS. BERNSTEIN:  No, it's not in evidence.

10             MR. MECHE:  We stipulated to it.

11             THE DEPUTY CLERK:  It's never been offered.

12             MR. MECHE:  We stipulated pretrial and I am going to

13   offer it.

14             THE COURT:  Let him identify it first.

15             MR. MECHE:  Can you put up 41.

16             THE COURT:  It should be on the screen up here.  All

17   right.  Go ahead and put it up now.  All right.  Go ahead.

18   BY MR. MECHE:

19   Q.  Take a look at it, sir.

20   A.  (WITNESS REVIEWS DOCUMENT.)

21   Q.  Have you seen a document like this before?

22   A.  I know I had this document in my possession.  I don't -- I

23   mean, I've seen it before, but I've never read --

24   Q.  You know the type of document?

25   A.  Yes.

1    Q.  It's a plea agreement?

2    A.  Yes.

3    Q.  And it's a standard plea agreement that's executed when someone

4    agrees to plead guilty, the federal government and the person

5    pleading guilty.  And this sets forth what their agreement is?

6    A.  Yes.

7    Q.  Can we put it back on the big screen, please.

8              THE COURT:  This is No. 41?

9              MR. MECHE:  Exhibit No. 41.

10             THE COURT:  It has not been admitted yet.  So are you

11   offering it at this time?

12             MR. MECHE:  I'm offering it as something we stipulated

13   to.

14             THE COURT:  Any objection?  Any objection?

15             MS. BERNSTEIN:  Despite the fact that there is no

16   stipulation, we have no objection.

17             THE COURT:  All right.  Admit 41.

18   BY MR. MECHE:

19   Q.  And this sets forth -- and the language in here, correct me if

20   I'm wrong, is just standard language of what the parties are

21   committing to each other to do; it's like a contract?

22   A.  It is like a contract.  I can't say that it's standard language

23   because I am just not that familiar with it.

24   Q.  You haven't done that many in your career?

25   A.  Yes.

1    Q.  But you have done some and you've seen this type of language?

2    A.  Yes.

3    Q.  Can we go to page 2, please, bottom of page 2.

4         And we don't have to go through the whole document, but I

5    just want to point something out and see if this is standard

6    language that's contained.  That last paragraph, where it says:

7    "This plea agreement is predicated upon the fact that the defendant

8    agrees to submit to interviews whenever and wherever requested by

9    federal law enforcement authorities.  The defendant understands

10   that he must be completely truthful during all of the interviews.

11   The defendant also agrees to appear before any grand jury or trial

12   jury, if he is requested to do so, and he agrees that he will

13   testify truthfully.  The defendant understands that if he is not

14   truthful, this agreement will be null and void and the defendant

15   may be prosecuted for perjury or making false statements."

16        Now, that's standard language in every plea agreement.

17   A.  I would expect that that would be standard language.  I can't

18   say that it is, but it makes sense that that would be in every plea

19   agreement because, otherwise, the plea agreement is useless.

20   Q.  So what the defendant is committing to the government to do is,

21   I'll be there for you, I'll go to court, I'll testify, and I'll say

22   what we believe is the truth; and if I don't tell the truth, you

23   can tear this up and I no longer have an agreement?

24   A.  I agree with everything except what we believe to be the truth.

25   He is required to testify to what he knows to be the truth.

```
 1    Q.  Exactly.  Now, does everybody always agree on what the truth
 2    is?  It's what he thinks the truth is and what the government
 3    thinks the truth is, it's not what --
 4    A.  It's his --
 5    Q.  It's not what the defendants think the truth is, obviously?
 6    A.  Right, exactly.
 7    Q.  So there's no one big truth, it's what he and the government
 8    believe to be the truth?
 9    A.  Yes.
10    Q.  Thank you, sir, you can take it down.
11            Now, there's also a second document that's confected when
12    someone pleads guilty, and it's called a factual basis.
13    A.  Yes.
14    Q.  And in that factual basis, the government -- and we've had a
15    lot of testimony about factual basis, the government sets forth in
16    writing exactly what they believe to be the truth?
17    A.  The -- it's the person who is pleading guilty, it's their
18    statement, their -- the facts that would have been used to prove
19    their guilt.
20    Q.  Exactly.  Everything but, you know, what they say this is what
21    happened?
22    A.  Yes.
23    Q.  And once you execute that document, it's filed in the court
24    record?
25    A.  Yes.
```

1   Q.   The media gets it?

2   A.   If it's not sealed, yes.

3   Q.   Yes, it's filed in court?

4   A.   Yes.

5   Q.   Everybody gets it.  So at that point that witness and the

6   government is pretty locked in on a factual scenario?

7   A.   Yes, that is his -- that is his sworn statement.  Well, the

8   person whose factual basis, that is their sworn statement.

9   Q.   Can we bring up No. 42.  Make sure you look at it first before

10  we show it to the jury.

11          Do you recognize this document?

12  A.   Yes.

13  Q.   And what is that?

14  A.   Michael Lohmann's factual basis.

15          MR. MECHE:  Your Honor, that's Exhibit 42, I offer that

16  in evidence.

17          THE COURT:  Any objection?  Any objection?

18          MS. BERNSTEIN:  No.

19          THE COURT:  So ordered, 42 is admitted.

20          MR. MECHE:  Can you go to page 10, please.

21  BY MR. MECHE:

22  Q.   I want you to focus on that middle paragraph, where it says:

23  "After drafting the 17-page false report, Defendant Lohmann

24  directed the investigator --" who are you speaking of right there,

25  who are they speaking of when they say investigator, do you know?

A.  Sergeant Kaufman.

Q.  Sergeant Kaufman or Detective Lehrmann?

A.  I believe that's Sergeant Kaufman.

Q.  Okay.  "To speak with each of the shooters to make sure they were "okay" with the 17-page report, and were willing to give statements consistent with that report."  Okay?

A.  Yes.

Q.  That's what he told you happened?

A.  Yes.

Q.  So you filed this, and at this point everybody's pretty much locked in to this having occurred?

A.  I don't understand if everybody's --

Q.  This is a public document, the witness has sworn under oath, he's agreed to be a government witness, he's agreed to tell the truth, all the way through, and he is sworn under oath that this is what happened?

A.  Yes.

Q.  But once this occurred, you only had two people who pled guilty, Lehrmann and Lohmann?

A.  Yes.

Q.  And you continued to investigate the case?

A.  Yes.

Q.  Continued to try to get additional witnesses?

A.  Yes.

Q.  Additional cooperators and defendants who would plead guilty?

A.  Yes.

Q.  And you wanted to make sure that these other people, if you were to give them a plea agreement, that their version of what happened would be consistent with this version?

A.  No, their version is their version.

Q.  Well, wait a minute.  This is the truth, isn't it?

A.  It's Mike Lohmann's truth.

Q.  You don't believe Mike Lohmann told the truth?

A.  I didn't say that.  But I wouldn't shade my investigation to try to get other cooperators to tell me information just so it matches what Mike Lohmann told me.  The other cooperators provided their truth, their information to me.  And there was no attempt to shade it, as you -- your characterization, to try to make it match Mike Lohmann's factual basis, no.

Q.  How many different truths can there be?

A.  Every person has their own memory, recollection, interpretation of events.  So if one person provided information that doesn't exactly match Mike Lohmann's, is that -- does that make it false, no.  Does it mean that Mike Lohmann was lying, no.  Does it mean that this individual was lying, no.  That's just the way it is.

Q.  Does it mean that these individuals are lying if their memory is different?

A.  Depends what -- if you could give me an example.  You know, if they're -- if the defendant would claim that I don't remember shooting a family laying on the walkway, obviously that is false

```
 1   and untruthful.  If somebody was going to say, I don't remember
 2   talking to Mike Lohmann, maybe they really don't remember talking
 3   to Mike Lohmann.
 4   Q.  Maybe they really didn't talk to Mike Lohmann?
 5   A.  Maybe.
 6   Q.  You don't deny that's possible?
 7   A.  It's inconsistent with my investigation, but...
 8   Q.  Right, you had to lock in on the theory.  And if you found
 9   something inconsistent you had to dismiss it, didn't you?
10   A.  No.
11   Q.  Well, let's talk about that.  You can take that down, sir.
12            There was a third person who agreed to cooperate and
13   plead guilty, who was that?
14   A.  Michael Hunter.
15   Q.  Now, concerning looking at that 17-page report, speaking with
16   Lohmann, or any of them, about whether or not he was okay with the
17   investigation, did Hunter's version of the truth, was that
18   consistent with that?
19   A.  I don't believe Mike Hunter recalled a conversation with Mike
20   Lohmann, if that's...
21   Q.  In fact, he said he had no conversations with him?
22   A.  Yes.
23   Q.  Never talked about it?
24   A.  Yes.
25   Q.  In fact, thought they were trying to leave him out of the
```

```
 1   investigation?

 2   A.  Was happy that they were, yes.

 3   Q.  But, Mr. Hunter signed a plea agreement.  Let's go to No. 80.

 4   Exhibit A.  80.

 5            THE COURT:  Go ahead.

 6   BY MR. MECHE:

 7   Q.  Can you take a look at that before we show it to the jury,

 8   sir -- no, that's not 80 -- that is it, yeah.

 9            Does that look familiar to you?

10   A.  (WITNESS REVIEWS DOCUMENT.)  Is this Michael Hunter's plea

11   agreement?

12   Q.  Yes.

13   A.  Yes.

14   Q.  And go again to page 2 of that agreement.

15            THE COURT:  We've not -- do you want to offer this before

16   I broadcast it?

17            MR. MECHE:  Yes, sir, please.  Yes, sir.

18            THE COURT:  Any objection to Exhibit 80?

19            MS. BERNSTEIN:  No objection, your Honor.

20            THE COURT:  So ordered.  Exhibit 80 will be admitted.

21   BY MR. MECHE:

22   Q.  That last paragraph, that's once again that same language, that

23   if he is not truthful, the agreement may be voided by the

24   government and he may be prosecuted.

25            So here we have Mr. Hunter and Mr. Lohmann giving
```

1  different versions of what the truth is?

2  A.  They disagreed on this one point, yes.

3  Q.  But you didn't decide to tear up either one of them's plea

4  agreement?

5  A.  No.

6  Q.  Let's go to No. 4, who was the fourth person to plead guilty?

7  A.  I don't recall the exact order for the four and five.  It would

8  have been Hills or Barrios.

9  Q.  I think it would have been Barrios.

10 A.  Barrios.

11 Q.  You don't deny that?

12 A.  No.

13 Q.  Now, Barrios also signed a similar agreement?

14 A.  Yes.

15 Q.  Agreed to be truthful?

16 A.  Yes.

17 Q.  Agreed to come talk to the government whenever you wanted them

18 to?

19 A.  Yes, he did.

20 Q.  Agreed to come testify in court if you wanted him to?

21 A.  Yes.

22 Q.  About the truth?

23 A.  Yes.

24 Q.  Was his version of what Mr. Lohmann said about showing the

25 17-page report consistent or inconsistent?

1          MS. BERNSTEIN:  Objection.  May we approach, your Honor?

2          THE COURT:  Yes.

3     (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

4          MS. BERNSTEIN:  I am going to object to any questions

5     about the substance of any statement made by Barrios since he has

6     not testified.  If they want to call Barrios, they can call

7     Barrios, get his testimony in through him and then he can be

8     impeached.

9          MR. MECHE:  I have no intention to ask substantive

10    questions.  I am just asking if it's consistent or inconsistent,

11    which is what she did through out her whole direct.

12         THE COURT:  Barrios is part of the investigation, it's

13    part of what formulates his conclusions.  So I don't think --

14         MS. BERNSTEIN:  True, although that would be true with

15    any interview he did with anybody, that information was part of his

16    investigation.

17         THE COURT:  Including the reporter, which you all said he

18    could testify about.

19         MS. BERNSTEIN:  The reporter, the issue there was that a

20    statement had been introduced.  I am saying, for example, and the

21    court has recognized this, that in his testimony he should not be

22    able to rehash the statement of every witness because that defies

23    the purpose of a trial.  On cross there's been tons of leeway

24    given, which I understand, but it's been mostly in relation to

25    people who have testified.  Barrios is a very different situation,

1    he has not testified.

2          The defense has said that they plan to call him, and if

3    they do, that's fine.  At that point his statement will come in, he

4    can then be crossed about whether this is consistent or

5    inconsistent with Lohmann's accounts and Hills' accounts and

6    everybody else.

7          THE COURT:  What is your tenure for establishing --

8          MR. MECHE:  I am going to ask the same thing she asked

9    about on direct, is it consistent or inconsistent.  I am not going

10   to ask a substantive.

11         MS. BERNSTEIN:  Let me make one qualification on that.

12   When he says on this particular point, consistent or inconsistent,

13   on this particular point, consistent or inconsistent, that's the

14   same as eliciting the testimony.

15         MR. MECHE:  But you were the one who started that on

16   direct, you asked is this consistent or inconsistent.  You did that

17   with a lot of the witnesses.

18         MS. BERNSTEIN:  I didn't go through on each point in

19   order to elicit the entire testimony.

20         THE COURT:  Only on information that the jury has already

21   heard will I let you ask him those types of questions.  No other

22   type of testimony from Barrios.

23         MR. MECHE:  No, I am not going to do that.

24         THE COURT:  All right.

25       (OPEN COURT.)

BY MR. MECHE:

Q.  I think I asked you if Barrios's version concerning being shown the 17-page report, saying he was okay with it, was consistent or inconsistent with Lohmann's version?

A.  I don't remember Barrios's factual basis well enough to say one way or the other.  But also I think you're mischaracterizing Michael Lohmann's factual basis.  The line that you showed me I think said he instructed Sergeant Kaufman to talk to the officers and show them the report.  I think you've been characterizing it that Mike Lohmann specifically showed them the report.  But if I remember the factual basis that you showed, it was he instructed Sergeant Kaufman to do it.

Q.  Well, there was also Mike Lohmann's testimony.

A.  He testified that he spoke to the officers, but not specifically showed them the report like you've been saying.

Q.  Was Barrios's version consistent or inconsistent with that?

A.  I don't remember his factual basis well enough to tell you.

Q.  Now, Barrios was a cooperator, pled guilty?

A.  Yes.

Q.  Has agreed to come in whenever the government wants and testify?

A.  Yes.

Q.  But he hasn't testified in this trial?

A.  No, he hasn't.

Q.  And the government has decided, you're part of the government

1    team, not to call him as a witness?

2              MS. BERNSTEIN:  Objection to questions about government

3    strategy.

4              MR. MECHE:  No, he's stated it.

5              THE COURT:  Well, I am going to sustain to the extent for

6    asking about -- and the government hasn't rested yet, so I am going

7    to sustain the objection.

8    BY MR. MECHE:

9    Q.  If you wanted the jury to hear from Officer Barrios, you would

10   call him as a witness, wouldn't you?

11   A.  I don't make the decisions how to present the case to the jury,

12   that's the prosecutors.

13   Q.  Well, they would?

14   A.  Yes.

15   Q.  It's not like he died or he's out of town or something?

16   A.  No.

17   Q.  Y'all have the ability to put him right where you are and let

18   the jury hear from him?

19   A.  Yes.

20   Q.  Now, the fifth person who pled guilty and agreed to cooperate

21   was who?

22   A.  Ignatius Hills.  And like I said, I don't remember the order,

23   but if you say that this is the order I have no reason to disagree.

24   Q.  Yes.  Now, without going through all of the documents again, he

25   reached the same type of plea agreement?

1  A.  Yes.

2  Q.  Agreed to be a witness for the government?

3  A.  Yes.

4  Q.  If asked.

5  A.  Yes.

6  Q.  Agreed to go see and speak to the government?

7  A.  Yes.

8  Q.  Was his version about being shown the report and saying he was

9  okay with it consistent or inconsistent with Lohmann?

10  A.  Consistent.

11  Q.  And he testified, you know?

12  A.  He testified that he got a 17-page report at some point, he

13  didn't remember how he got it, and that he was happy about the way

14  it was written in his statement; the way his account of the events,

15  he was happy about it.

16  Q.  Didn't he also tell you, though, he also thought they were

17  trying to leave him out of the coverup?

18  A.  Yes, and that's what he was happy about.

19  Q.  And that's not consistent with Lohmann's version?

20  A.  Somehow he got a 17-page report.  He couldn't remember how he

21  got it.

22  Q.  Now, there was a sixth person who pled guilty also, right?

23  A.  David Ryder.

24  Q.  Yeah, let's put him up there.  Now, David Ryder -- put up 301,

25  please.

1          MR. MECHE:  Why do we have two different versions of 301?

2    Is this going to be the official one that goes to the jury?  Let's

3    agree on that, though.  We have two different versions.  Can this

4    be the official one?

5          MS. BERNSTEIN:  I think the reason is because you all put

6    in one with a blue sticker off of a different computer.

7          MR. MECHE:  Well, I don't care, but let's just --

8          THE COURT:  We'll straighten that out.

9          MS. BERNSTEIN:  I think it's the same picture.

10         THE COURT:  We'll straighten that out.  If you want the

11   picture that was up, let's just use that and go ahead.

12         MR. MECHE:  Yes, I do.

13   BY MR. MECHE:

14   Q.  This is David Ryder, the guy pulling up his pants, right?

15   A.  Yes, sir.

16   Q.  And your investigation uncovered the fact that he was the guy

17   impersonating a police officer, who initially claimed to see people

18   shooting basically?

19   A.  Yeah, basically.

20   Q.  He was the guy that started it all?

21   A.  I don't know if he started it all, he was certainly on the I-10

22   bridge when the initial 108 went out.

23   Q.  He was an eyewitness?

24   A.  Yes.

25   Q.  And he was interviewed by not just you guys, but he actually

1    testified in the state grand jury proceeding?

2    A.  Yes.

3    Q.  Gave testimony under oath as to what he saw and did out there?

4    A.  I know he was called to the state grand jury.  I don't remember

5    if he actually testified, actually, but I know he -- I don't recall

6    if he actually testified.  I know he was called to the state grand

7    jury.

8    Q.  He was interviewed?

9    A.  Yes.

10   Q.  Given several statements?

11   A.  Yes.

12   Q.  About what he saw and heard and did?

13   A.  Yes.

14   Q.  You guys interviewed him?

15   A.  Yes, several times.

16   Q.  He signed the same type of agreement, agreeing to come to court

17   and give testimony to this jury?

18   A.  Yes.

19   Q.  And he's not dead?

20   A.  No.

21   Q.  He's agreed to come in any time the government wants him?

22   A.  Yes.

23   Q.  But he has not testified in this case?

24   A.  No.

25   Q.  Do you know if he will?

1          MS. BERNSTEIN:  Objection.

2          MR. MECHE:  Yes or no?

3          THE COURT:  I think you've asked him about the other

4   witness.  But he's already said that that's not his decision so,

5   and the government hasn't rested, so I'll sustain the objection.

6   BY MR. MECHE:

7   Q.  But if the government wanted to -- I mean, you have the ability

8   to do it?

9   A.  Yes.

10  Q.  Now, we've been focussing on whether or not these witnesses'

11  version of what happened in the coverup was consistent or

12  inconsistent with Lohmann.  But let's focus on whether or not their

13  versions of what happened on the bridge were consistent or

14  inconsistent.

15          Now, Lehrmann and Lohmann weren't witnesses to the actual

16  shooting.

17  A.  Lehrmann arrived --

18  Q.  I guess Lehrmann was, yes.

19  A.  Very briefly, yes.

20  Q.  I'm glad you brought that up because there was something

21  curious.  You heard, Lehrmann had told you, I think told us, that

22  he pulled his car up right behind the truck?

23  A.  I don't think he -- behind the truck, I don't remember him

24  being able to give you an exact distance behind the truck.

25  Q.  Well, he did?

1   A.   Yeah, behind the truck.

2   Q.   We don't have to go there but he did.  But when we watched the

3   video, I mean, his car's nowhere around, right?

4   A.   It's not in the video, yes.

5   Q.   How did your investigation explain that or resolve that?

6   A.   Well, the camera is very, very zoomed in at that point.  It

7   only really shows the Budget truck.

8   Q.   Well, I mean, I think -- well, since you brought that up, let's

9   look at 300.  Let's look at 300, at about, I would say 530 maybe.

10          MS. BERNSTEIN:  While they're looking, your Honor, may I

11   approach Mr. Meche?

12          THE COURT:  Yes.

13          MS. BERNSTEIN:  And I would ask that you please when you

14   play it, put on the record, I don't know what the number 530 means,

15   but I would put on the record the time stamp from the video, which

16   is the relevant time.

17          MR. MECHE:  Yes, I don't know that because it's not on

18   300.  Do we have it?  There we go.  Back up a little.  I think you

19   said it was a close shot and they don't show behind the truck.

20   Let's take a look.

21          THE COURT:  Let's identify on the record where it is.  I

22   think that we need to state what the counter is on it.

23          MR. MECHE:  It says 447 on Exhibit 300.

24   BY MR. MECHE:

25   Q.   At that point it is a tight shot, but you're going to see, it's

1    going to show, as I understood, see, that's a, that's a pretty wide

2    berth?

3    A.  I disagree.  You have to remember that this video is taken from

4    a quarter mile to a half mile away.  So to get that close to the

5    Budget truck it's a very tight shot.

6    Q.  You don't think Detective Lehrmann's memory may be a little

7    faulty?

8    A.  I don't think the video gives you the information to say one

9    way or the other.

10   Q.  I am going to show you what's been previously marked as Exhibit

11   302 and introduced.  Now, you may recall, that's a chart that

12   Officer Hunter and I confected when he testified.

13   A.  Yes.

14          MS. BERNSTEIN:  Objection, your Honor.  This is an

15   objection from yesterday about having the witness comment on

16   testimony that's been given here in court.

17          MR. MECHE:  That's not what I am doing.

18          THE COURT:  Just remember the instructions that we

19   discussed, and I think there was one or two bench conferences where

20   we discussed the procedure, so let's see where we go.  Go ahead,

21   Mr. Meche.

22   BY MR. MECHE:

23   Q.  And in your interviews with Officer Hunter, he described the

24   same scene too, basically?

25   A.  I would say exactly.

1    Q.  Yeah, because you have notes and you showed them to me, and the

2    chart you drew was almost exactly like this one?

3    A.  Yes.

4    Q.  And he placed -- when he interviewed you and the chart y'all

5    drew together in your interview, he pointed out where he believed

6    he was, Ken Bowen, and these three individuals with the X?

7    A.  Yes.

8    Q.  And his version was exactly the same that he gave you in your

9    interview?

10   A.  Yes.

11   Q.  And these three people with the Xs were Faulcon, Villavaso, and

12   Barrios, although he couldn't say --

13   A.  Which order.

14   Q.  -- which order?

15   A.  Correct.

16   Q.  And he told you during the interview that he believed all three

17   of them would have been in a position to see the exact same thing

18   he saw?

19   A.  Yes.

20   Q.  In your interviews with -- out of those three Xs, you were able

21   to interview at least one of them?

22   A.  Yes.

23   Q.  He cooperated with the government?

24   A.  Yes.

25   Q.  Signed a plea agreement?

```
 1    A.  Yes.

 2    Q.  Agreed to come testify?

 3    A.  Yes.

 4    Q.  Truthfully, about what he saw or didn't see?

 5    A.  Yes.

 6    Q.  Was his version consistent or inconsistent with Officer Hunter?

 7    A.  Inconsistent.

 8    Q.  But yet they both agreed to tell the government the exact

 9    truth?

10    A.  Yes.

11    Q.  About what they saw out there?

12    A.  Yes.

13    Q.  So you have two possibilities.  One of them is lying, or maybe

14    things were happening so fast and it was so chaotic that it's

15    difficult for people to remember exactly what they saw out there?

16    A.  Yes, that's -- that's possible.

17    Q.  Which one is it?

18              MS. BERNSTEIN:  Objection.

19              THE COURT:  I am going to let him answer, if he knows, if

20    he's made that kind of evaluation based on his investigation.

21              THE WITNESS:  Can you repeat your question again?

22    BY MR. MECHE:

23    Q.  Well, it's either one of two possibilities, either one of them

24    is lying, or maybe, in their minds, it was happening so fast and so

25    chaotic out there they both saw the same event, but in their minds
```

1    under the circumstances, they saw entirely different things?

2    A.  No.  I think -- no, I guess I can agree with you.  I think

3    Michael Hunter believes that his version of where and what Officer

4    Barrios did is -- he believes that.  And that's inconsistent with

5    what Officer Barrios says he did.  And I believe the video is more

6    consistent with Officer Barrios's account.

7    Q.  Okay.  About what actually happened out there?

8    A.  About Officer Barrios's actions, yes.

9    Q.  You said something in your testimony, I think it was in

10   response to, I forget whose questions, that you found Officer

11   Barrios's account kind of odd, that's the word you used.

12   A.  Yes, odd.

13   Q.  What did you mean by that?

14   A.  His account of his conduct is odd, it's not something that is

15   usual, it's not something that I think a person would normally do.

16   Q.  Can you be more specific?

17           MS. BERNSTEIN:  Objection.  I don't think he can, your

18   Honor, without getting into hearsay.

19           MR. MECHE:  He brought it up, your Honor.

20           THE COURT:  If there's a way to answer it without telling

21   you what -- specifically what Officer Barrios said, if you can

22   define what you mean by odd based on your evaluation of his

23   testimony -- of his -- what he told you without stating what he

24   told you, you can answer.

25           THE WITNESS:  It's tough to do that without talking about

1    the specifics.

2    BY MR. MECHE:

3    Q.  Okay.  But if the government wanted to, they could put Barrios

4    and sit him right where you're sitting and have him tell the jury?

5    A.  Yes.

6    Q.  Let's move on.  The tapes.  A couple of days ago we heard a

7    long taped conversation of Mr. Lehrmann and Mr. Gisevius that you

8    played for the jury.  Do you remember that?

9    A.  Yes.

10   Q.  And that was one tape.  And you made that tape during the

11   course of your investigation -- I'll wait for you.

12   A.  Thank you.  Yes, I did.

13   Q.  And that's a proper sort of investigative technique that not

14   just the FBI does, but law enforcement agencies all around the

15   world do?

16   A.  Yes, they do.

17   Q.  They secretly tape somebody?

18   A.  Yes.

19   Q.  And you do that because you believe that people who are

20   secretly taped will more likely reveal truthful information than

21   they might at a formal interview or something?

22   A.  Yes.  And ordinarily, it's -- like in this case, a

23   coconspirator, so they're more comfortable.  They're more likely to

24   talk truthfully with a coconspirator than they are to an FBI agent.

25   Q.  It's somebody they would trust?

A.  Correct.

Q.  And you even said that, you know, whenever you sat down with Lehrmann, you wanted to make sure that the people y'all sent him in to tape were the type of people he had a relationship with that they would talk freely and honestly?

A.  Yes.

Q.  And that's kind of what you look for?

A.  Yes.

Q.  In addition to that one tape, it's my understanding that during the course of your investigation you made a total of nine tapes?

A.  That sounds right.  I don't know the specific number, but that sounds right.

Q.  But you only played one for the jury?

A.  Two.

Q.  Two, okay.

A.  Yes.

Q.  Out of the other seven tapes, did they contain information that was consistent or inconsistent with what you believed to be the truth in the case?

A.  I mean, I don't remember the exact.  There were a couple that were just phone calls setting up meetings and then some contained information that was -- I don't want to say inconsistent, but there were no admissions on those tapes.

Q.  Let's talk a little bit about them without telling what anybody said.  One of the people you sent in to tape was Officer Hunter,

1    and I think he testified a little bit about it, the jury will

2    remember his testimony, but you sent Hunter in to tape Barrios?

3    A.   Yes.

4    Q.   I think -- by telephone?

5    A.   Yes, it was telephonic.

6    Q.   There were two telephone calls that he taped?

7    A.   I don't remember if there were two, but there was definitely a

8    telephone call between Hunter and Barrios that I remember.

9    Q.   Yes.  And the jury will remember what Hunter said he was trying

10   to get Barrios to do?

11   A.   Yes.

12   Q.   But before Hunter did that, you sat down with Hunter and y'all

13   went over kind of the information you were looking for?

14   A.   Yes.

15   Q.   And did you get that information?

16   A.   No.

17   Q.   And you decided not to play that tape to the jury?

18   A.   Yes.

19   Q.   In addition to that, after Barrios started cooperating, you

20   decided to send him in to tape my client, Officer Villavaso?

21   A.   Yes.

22   Q.   And you believed there was a good chance that Barrios would get

23   Villavaso to give him truthful information because they were

24   partners?

25   A.   I believed there was a chance that would happen.  I didn't

1    think it was likely that it would happen.

2    Q.  Oh, really?  Well, now, you said that you wanted to make sure

3    people, before you sent them in to tape, had to kind of trust them.

4    They rode around in the same car together for over a year?

5    A.  Yeah.  At that point, our investigation was very, very public.

6    I expected that the officers who were not charged --

7    Q.  Excuse me, you're not answering my question, you're expounding.

8           THE COURT:  Just answer his question as directly as you

9    can.

10          MR. MECHE:  Yes.

11   BY MR. MECHE:

12   Q.  You knew they were partners?

13   A.  Yes.

14   Q.  Had a close relationship?

15   A.  Yes.

16   Q.  They were friends?

17   A.  Yes.

18   Q.  And what you did was, you sat down with Barrios before you sent

19   him in and talked about some of the areas you wanted him to talk

20   about?

21   A.  Yes.

22   Q.  Some of the specific questions you wanted him to ask Villavaso?

23   A.  Specific topics, I wouldn't give him specific questions.  You

24   work your way to the topics the way the conversation flows, if it

25   flows.  I wouldn't say, ask him specifically these words, but

1   specific topics.

2   Q.  The conversation that was captured on tape lasts an hour and

3   ten minutes, didn't it?

4   A.  That sounds about right.

5   Q.  And he did ask him all of those questions you wanted him to

6   ask?

7   A.  He attempted to talk about the topics that I wanted him to talk

8   about.

9   Q.  He didn't just attempt, he did talk about the topics?

10  A.  Yes, he did.  Yes.

11  Q.  But he didn't get the answers you wanted?

12  A.  It wasn't clear enough to me to -- no, I mean, not clear enough

13  where I would present it here in court.

14  Q.  Now, but since you brought that up, if you wanted to, you could

15  play that tape for this jury and let them listen to it and they

16  could determine whether or not it's clear, couldn't they?

17  A.  Yes, as could you.

18          MR. MECHE:  Oh.  Well, I would like to, then, Judge,

19  since he said that, he opened the door.

20          THE COURT:  Counsel, would you all approach?

21      (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

22          THE COURT:  Oops.

23          MS. BERNSTEIN:  It's not an oops, your Honor.  This is

24  exactly the problem with asking an agent about the law, he is not a

25  lawyer.

```
 1              THE COURT:  No.  I am not going to let you play the tape
 2      because I think it's getting him to testify, if he wants to assert
 3      the Fifth, I am not going to let you play the tape.  But the
 4      testimony stands, the testimony stands that you asked him if he
 5      could be called up.
 6              MR. MECHE:  But, Judge, he said something incorrect with
 7      the law, that if I could play it, and if I can't, you need to
 8      instruct this jury that I don't have the ability to play it because
 9      they think I am holding back and they think I'm being disingenuous
10      and I am not, I would love to play that tape.
11              MS. BERNSTEIN:  You said we could have a standing
12      objection, I have objected to these questions about asking him the
13      state of the law.  He is not a lawyer.  That question was
14      specifically elicited in the hopes that Bill would misunderstand --
15      he doesn't know the law, he doesn't know the rules of evidence.  He
16      is not supposed to.  He is the case agent, not a prosecutor.
17              So, I mean, I have not been objecting because, your
18      Honor, you have made it clear that you're going to allow broad
19      cross-examination.
20              THE COURT:  I will tell them it's not a legal opinion
21      that he is giving and that, in fact, the defendant cannot play a
22      tape of the defendant.
23              MR. MECHE:  But the prosecution can, that's the law.
24              THE COURT:  That is the law.
25              MR. MECHE:  That's the law, I just want an accurate
```

```
1    instruction of the law.
2         MS. BERNSTEIN:  That the defense can offer -- the
3    defendants cannot offer his own statement.  I wouldn't say can't
4    play the tape because the tape also has other people's statements.
5    For example, when Mike Hunter taped, Mike Hunter's part of the tape
6    can come in through Mike Hunter.  But, your Honor, I mean, I will
7    jump up on my feet with every legal question from now on because I
8    don't think it's fair to let him --
9         THE COURT:  This question here I agree with you was
10   somewhat of a legal question, although he answered it and that's
11   why I said oops.
12        MS. BERNSTEIN:  Your Honor, he answered it because I had
13   stopped objecting to them -- I've got my standing objection here,
14   but I've made it clear --
15        MR. MECHE:  But he's overruled it.
16        THE COURT:  No, look, I am going to instruct --
17        MR. FLEMING:  He is trying to be cute.
18        MS. BERNSTEIN:  Mr. Meche is trying to be cute.
19        THE COURT:  No, let's be clear.  Ms. Bernstein, I am
20   going to be careful what I am going to say here.  This witness's
21   testimony has caused me a great deal of concern since a point --
22   well, a point Tuesday afternoon; but I'll go back to a point
23   pretrial when we were here on this very issue of this tape and the
24   time I have been concerned about this witness's testimony of the
25   inaccuracy of the time line and his willingness to testify that he
```

1   met the day before -- incorrectly, he met the day before with

2   counsel -- this is just history.  He met the day before and then

3   taped the following day.  We established that that didn't happen.

4   But he testified at that hearing that that is, in fact, what

5   happened.  I have the transcript in my office, and it concerns me

6   greatly, it concerns me greatly.

7        I have not had an FBI agent -- I don't know what you're

8   going to do on redirect.  I have never had an FBI agent that needed

9   rehabilitation on redirect.  So I don't know what you're planning

10  on doing, but there are some problems.  I am going to be careful

11  how I say it, but there are some problems.

12       I will instruct the jury that he is not offering legal

13  opinion as to who can admit evidence with regard to tape recordings

14  that have been made, but that, as a matter of law, a defendant

15  cannot introduce the defendant's own tape-recorded statement; his

16  testimony that the government can, however, stands.

17       MR. MECHE:  Thank you, your Honor.

18       THE COURT:  That's what I'll tell them.

19     (OPEN COURT.)

20       THE COURT:  To be clear, this witness -- and this came up

21  earlier in his testimony, not today, but earlier this week.  This

22  witness is not qualified to give a legal opinion as to the

23  admissibility of evidence during a trial, including the

24  admissibility or the ability of either side or the other to admit

25  evidence, including a tape recording.

1           As a matter of law, a defendant cannot, contrary to what

2    the witness said, a defendant cannot admit his own tape-recorded

3    statement, except under some very limited circumstances, but even

4    then, that would be extremely rare.  The defendant cannot introduce

5    the defendant's own tape-recorded statement.  In this case -- and

6    the witness did testify that the government could call a witness

7    and introduce a defendant's tape-recorded statement with that

8    witness.

9           Go ahead, Mr. Meche.

10          MR. MECHE:  Thank you, your Honor.

11   BY MR. MECHE:

12   Q.  Are you okay?

13   A.  Yes.

14   Q.  To be clear, you, as an FBI agent, have the authority and power

15   to investigate, but you don't have the unilateral authority to

16   decide whether or not someone is guilty of a crime?

17   A.  No.

18   Q.  And Ms. Bernstein, Mr. Carter, Ms. Chung, they have the power

19   and authority to prosecute, but they don't have the unilateral

20   power to determine whether or not somebody is guilty of a crime?

21   A.  Correct.

22   Q.  The people we place that awesome burden and responsibility on

23   is the jury, laypeople who sit and listen, and they're the ones who

24   have to go home on their conscious and decide whether or not

25   somebody is guilty?

1              MS. BERNSTEIN:  Your Honor, object; closing argument.

2              THE COURT:  Let's ask him a question.  Let's ask him a

3    question.

4    BY MR. MECHE:

5    Q.  We place that burden on the jury?

6    A.  Yes, we do.

7    Q.  Now, wouldn't it be proper and right to give the jury all of

8    the evidence that you gather in your investigation and not just the

9    part that supports your theory?

10   A.  Again, it's not my decision what evidence to present to the

11   jury, that's the prosecutor's decision.

12   Q.  Well, now, isn't it -- and you spoke about how you learned at

13   FBI school how to testify and only to testify as to the question,

14   not to elaborate, not to give additional information.  Did they

15   also teach at FBI school -- they taught you how to be a case agent?

16   A.  Yes.

17   Q.  That's -- you put a case together for the prosecution, you work

18   closely with prosecutors?

19   A.  Yes.

20   Q.  Is it the policy of the FBI or the Department of Justice to

21   only present the portions of your case which are in your favor and

22   to withhold evidence that's favorable for the defendant?

23              MS. BERNSTEIN:  Objection, your Honor.

24              THE COURT:  I'll sustain.  You're going to have to --

25   you're going to have to --

1            MS. BERNSTEIN:  And move to strike.

2            THE COURT:  I'll grant -- we'll strike it.  Go ahead and

3    rephrase the question, Mr. Meche.

4    BY MR. MECHE:

5    Q.  Well, does the FBI have some kind of policy as to what type of

6    evidence should or shouldn't be presented to the jury?

7    A.  The FBI has no policy because it's not the FBI's job to decide

8    which evidence should be presented to the jury, that's the

9    prosecution team's job --

10   Q.  Then neither of --

11   A.  -- and their responsibility.

12   Q.  You're correct, there is no policy.  They leave it up to the

13   individual prosecutorial team?

14   A.  Yes.

15   Q.  And in this case, y'all have decided to withhold certain

16   evidence from the jury?

17            MS. BERNSTEIN:  Objection.

18            THE COURT:  Look, yeah, I am going to sustain the

19   objection.

20   BY MR. MECHE:

21   Q.  Let's talk about some other evidence, which we may or may not

22   hear about.  You, in response to Mr. DeSalvo's questions, talked

23   about someone named Heather Gore.

24   A.  Yes.

25   Q.  And I don't think it was made clear exactly who she was or what

1    her involvement in this case was.  Can you tell us?

2    A.  Heather Gore was a female officer.  At the time she was

3    assigned to the 2nd District of NOPD, NOPD 2nd District.  After the

4    storm, she was stranded in New Orleans East, so she worked in the

5    7th District.

6            She was in the back of the Budget truck during the

7    incident.  Was not identified in the state's investigation.  I

8    identified that she was in the back during my investigation.  She

9    was interviewed, she lied to me during that interview.

10   Q.  So she told you something that you believe was not the truth?

11   A.  Yes.

12   Q.  Glad you brought that up.  Could it have been like the way

13   Officer Hunter and Barrios saw things differently but did not lie,

14   could it have been that she honestly believes she saw something

15   differently?

16   A.  No.

17   Q.  No, of course not, because she didn't agree to cooperate with

18   the government?

19   A.  Her statement was inconsistent with the facts; also, she

20   attempted to get other witnesses to lie and back up her story.

21   Q.  And so did Hunter and Barrios?

22   A.  I don't know what you're talking about.

23   Q.  During your investigation, did you determine all of the people

24   who were actually in the back of the truck?

25   A.  I can't say that I did.

1    Q.  How many did you determine were in the back of the truck?

2    A.  In the back?

3    Q.  Yes.  Well, in the front.  Let's do this, let's nail it down

4    for the jury.  I'm going to draw.  Assume this is the truck.  Who

5    was in the front?

6    A.  Mike Hunter and Ken Bowen.

7    Q.  This would have been Hunter and this would have been Bowen

8    (INDICATING)?

9    A.  Yes.

10   Q.  Who all that you are aware of was in the back?

11   A.  Anthony Villavaso, Robert Faulcon, Robert Gisevius, Ignatius

12   Hills, Robert Barrios, Kevin Brian, Marchant Paxton, Raymond Young,

13   Heather Gore.

14   Q.  That is one, two, three, four, five, six, seven, eight, nine

15   people in the back?

16   A.  Yes.

17   Q.  Out of those nine, we know this one is on trial, this one's on

18   trial, this one's on trial, okay (INDICATING)?

19   A.  Yes.

20   Q.  And these two, this one is on trial (INDICATING)?

21   A.  Yes.

22   Q.  This one has pled guilty (INDICATING)?

23   A.  Yes.

24   Q.  This one has pled guilty (INDICATING).  And both of them have

25   given us their versions of what they thought they saw out there --

```
 1   A.  Yes.
 2   Q.  -- which weren't consistent.  We testified about that already.
 3   A.  Ignatius Hills was not in a position to see anything that
 4   Michael Hunter saw.
 5   Q.  We heard from this guy, but he did not plead guilty, but he
 6   testified?
 7   A.  Kevin Brian, yes.
 8   Q.  But we have not heard from this person (INDICATING)?
 9   A.  Marchant Paxton, no.
10   Q.  Who was there.  This person (INDICATING)?
11   A.  No.
12   Q.  Who was there.  And this person (INDICATING)?
13   A.  Correct.
14   Q.  Now, and who is this again (INDICATING)?
15   A.  Barrios.
16   Q.  Right, he is on trial --
17            THE COURT:  He pled.
18            MR. MECHE:  Pled guilty, sorry.
19   BY MR. MECHE:
20   Q.  We have not heard him from, either?
21   A.  No.
22   Q.  So we have one, two, three, four people who were there on the
23   scene.  You've interviewed all of them, right?
24   A.  Yes.
25   Q.  Taken statements from all of them?
```

1   A.  The four that -- the four on the bottom that you're referring

2   to?

3   Q.  Yes.

4   A.  Yes, yes.

5   Q.  They've testified in front of the grand jury?

6   A.  Yes.

7   Q.  Taken an oath to tell the truth?

8   A.  Yes.

9   Q.  Told you exactly what they remember seeing out there on that

10  scene?

11  A.  Yes.

12  Q.  Have they testified in this trial?

13  A.  No.

14  Q.  Going back to Heather Gore.  You said you didn't believe her

15  testimony, and unlike the others, you don't want to credit her with

16  maybe seeing something she thought she saw, you just say she's a

17  liar?

18  A.  Yes.

19  Q.  Because she gives testimony that is favorable for these guys?

20          MS. BERNSTEIN:  Objection.

21          THE COURT:  I am going to sustain.  You have to rephrase

22  the question rather than...

23  BY MR. MECHE:

24  Q.  Now, when you spoke to her and she told you what she said she

25  saw, you decided to threaten her, didn't you?

1   A.  Absolutely not.

2   Q.  Well, now, there was some testimony about that.  You told her

3   she could lose her house, right?

4   A.  I would not characterize that as a threat.  What I told her

5   was -- I confronted her, I told her that she was lying, I knew she

6   was lying, I told her that she didn't have to lie for Robert

7   Gisevius, that she should think about her kids, that type of stuff.

8   Q.  How many kids does she have, since you brought that up?

9   A.  Triplets.

10  Q.  Three girls?

11  A.  I believe so.

12  Q.  And when you told her she should think about her kids, you're

13  insinuating that she could lose custody of her children?

14  A.  I was insinuating that if she goes to jail, she wouldn't have

15  her kids with her.

16  Q.  Did that cause her to change her story?

17  A.  No.

18  Q.  Who is Donald Haynes?

19  A.  Donald Haynes was -- I forget what district he worked in, but

20  he was on the I-10 high-rise during the incident.

21  Q.  Was he interviewed by law enforcement?

22  A.  Yes.

23  Q.  Did he claim to have seen things happen on that bridge?

24  A.  In the state investigation, he claimed to have seen things on

25  the bridge.  When I interviewed him -- when I interviewed him, he

1  admitted that he lied and did not see the things he claimed to see

2  that he claimed he saw during the state investigation.

3  Q.  Since you brought that up, he claimed to see people shooting at

4  the officers --

5          MS. BERNSTEIN:  Objection, your Honor.

6          MR. MECHE:  Well, he brought it up.

7          MS. BERNSTEIN:  Objection, your Honor.  May we approach?

8          THE COURT:  Come on up.

9      (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

10         MR. MECHE:  If I may be heard first.  Your Honor, the

11  problem with this witness is, he keeps embellishing and he opens

12  the door.  If he would just answer the question, but he decides he

13  wants to embellish and say what he wants to say.

14         MS. BERNSTEIN:  He is not embellishing.  Again, he

15  doesn't know the rules of evidence in terms of what is and is not.

16  And you are asking him about these witnesses, you are attempting to

17  elicit what the witnesses said, you're asking him whether witnesses

18  support the defense theory of the case.  There's no way to answer

19  questions like that without offering a little more information.

20         THE COURT:  The problem is he is not following my

21  instruction to answer concisely the question that is asked.  That's

22  been the problem all along.

23         MS. BERNSTEIN:  What was the question and answer?

24         THE COURT:  Because he wants to say more, and when he

25  does, he steps in it and tracks it all around the house, that's the

1   problem.

2          MS. BERNSTEIN:  What was the question and answer on this

3   one?

4          MR. MECHE:  Well, I specifically asked him, did you get a

5   statement from Donald Haynes, who was Donald Haynes.  He said,

6   yeah, he gave a statement in the state grand jury; but then later I

7   found that he lied, and he is just totally unresponsive to what I

8   asked.  And since he opened that door, I get to ask him.  All he

9   had to say was, yes, I saw the statement.

10          THE COURT:  I am going to ask him to answer the questions

11   concisely.

12          MS. BERNSTEIN:  I think that's fair.

13          THE COURT:  But he's got to do it.  He's got to do it.

14   He is all too willing to say things that are hurtful to one side or

15   the other, or helpful to one side or the other.

16          MS. BERNSTEIN:  Your Honor, to be fair, the questions are

17   asked in such a way that an honest answer cannot be given without a

18   clarification, and he's giving a clarification.  When the question

19   is, did he say -- did she say stuff that helps the defense.  He

20   also said --

21          MR. MECHE:  That was a long time ago, he sustained that.

22   That's not what I just asked.

23          MS. BERNSTEIN:  I am giving you an example.

24          MR. MECHE:  But that was sustained, we moved on.

25          THE COURT:  I did sustain that.

1          MR. HESSLER:  Your Honor, his testimony has been in the

2     past the same type of testimony.  He will throw things out there,

3     little quips and quibbles that we can't attack, or else it hurts

4     us, and now he is doing it and we can't use it to benefit us, and

5     it's still -- and the door is open.

6          MS. BERNSTEIN:  Mr. Meche asked the question.

7          MR. HESSLER:  If the door is open because of his lack of

8     rules of evidence or testimony, that doesn't mean the door shuts on

9     us.

10          MS. BERNSTEIN:  Mr. Meche is asking this question about

11     Donald Haynes, there's pretrial litigation about Donald Haynes.

12     Mr. Meche asking this question knows full well that Donald Haynes

13     said that he lied and he admitted that he lied in order to help

14     these defendants.

15          MR. MECHE:  No, he said he lied because he didn't want to

16     get prosecuted.  Y'all went to go him as you did with Heather Gore,

17     we're going to put you in jail if you don't change your story,

18     that's what happened.

19          MS. BERNSTEIN:  He admitted in the grand jury that he

20     lied in order to help these officers.

21          MR. FLEMING:  No, he admitted because y'all were --

22          MS. BERNSTEIN:  And Mr. Meche knows that.

23          THE COURT:  I am going to instruct the witness to answer

24     the questions as concisely and directly as possible.  If he wants

25     to explain, he can explain.  But the problem is that he keeps

1    adding on, and he did it on direct, too.  Well, like I said, I have

2    to be careful what I say.  I'll take all of this up later in the

3    appropriate venue, but -- it's problematic.  It's very problematic.

4            MR. HESSLER:  He said Heather Gore without any evidence

5    being entered in this trial contacted other witnesses to have them

6    lie for these guys; that could be any evidence from any witness we

7    may call in the future.

8            THE COURT:  That's exactly the problem.  And I have,

9    look, I have already written, and I think you covered it, but this

10   Heather Gore thing, it concerns me.  It concerns me.  Now, he's

11   already asked about it, but I am going to instruct him to -- I have

12   to be careful what I say here.  I will take care of what I think

13   needs to be taken care of at an appropriate date and time, but this

14   witness is causing problems that you're objecting to,

15   Ms. Bernstein.  He is the cause of those problems and he has been

16   doing, and he's been doing it now for two days.

17           Look, when we started this on Thursday, I wanted you to

18   put him on the stand on Thursday, and at that time I was told, oh,

19   no, we can get him done on Monday, we'll be done by Monday

20   afternoon.  The reason why it's taken so long is not because you

21   are not prepared, because God knows you're very prepared, they're

22   prepared; the problem is him.  He is the problem.  And I am going

23   to tell him to answer the questions directly and I am going to deal

24   with this at a later date because it concerns me greatly, and I am

25   going to leave it at that.

1          MS. BERNSTEIN:  Let me just put on the record, your

2    Honor, and I know your position and I don't mean to argue with you.

3    I want to put on the record I disagree with that.  I think he has

4    given very careful answers to try to make sure that his answers are

5    not misleading, but I just wanted to put that on the record, and I

6    understand your position.

7          THE COURT:  Let's go.

8          MR. MECHE:  Since he opened the door, go ahead and ask.

9      (OPEN COURT.)

10         THE COURT:  Mr. Bezak, you have to listen to the

11   questions carefully and answer them as directly and as concisely as

12   you can.  Okay.  Listen to the question carefully.  If you would

13   like to explain an answer, you can.  But make sure that your

14   explanation is pertinent to the question that's asked and is

15   limited to the question that is asked.

16         THE WITNESS:  Yes, sir.

17         THE COURT:  That's the procedure that we've employed and

18   that's how we're going to go.

19         THE WITNESS:  Sorry, your Honor.

20         THE COURT:  Mr. Meche.

21         MR. MECHE:  Thank you, sir.

22   BY MR. MECHE:

23   Q.  Appreciate you bringing up the story about Donald Haynes, and

24   since you did, I want to ask you a few questions about that, just

25   to be clear.  He was one of the officers on the high-rise bridge?

1    A.  Yes.

2    Q.  And he was one of the officers we saw scurrying around in the

3    video on the I-10 high-rise bridge?

4    A.  Yes.

5    Q.  And he was watching the events unfold on the Danziger Bridge?

6          MS. BERNSTEIN:  Objection, your Honor, to the extent that

7    it calls for hearsay.  I have no objection to the questions about

8    where Donald Haynes was; questions about what he said are hearsay

9    and I object.

10         MR. MECHE:  He's already volunteered hearsay.

11         THE COURT:  Yes, I am going to overrule.  Go ahead and

12   answer.

13   BY MR. MECHE:

14   Q.  And he saw the events unfold on the Danziger Bridge?

15   A.  Yes.

16   Q.  And he was eventually interviewed by law enforcement people

17   investigating the event?

18   A.  Yes.

19   Q.  And he actually gave a statement to I think Sergeant Dugue, at

20   some point?

21   A.  Yes.

22   Q.  And he actually was called to the state grand jury, raised his

23   hand, took an oath to tell the truth and testified?

24   A.  I don't recall if he testified in the state grand jury.

25   Q.  Well, wouldn't that -- I think you just said earlier in

1    response to my question that he originally testified and then later

2    gave a different statement; you didn't say it?

3    A.  I was referring to Sergeant Dugue's interview.

4    Q.  Okay.  You wouldn't have made it your business to find out if

5    he testified in the state grand jury?

6    A.  I just don't recall if he did.  If he did, I would have had

7    that transcript and reviewed it.  I just don't recall.

8    Q.  I mean, you're going to do a thorough investigation.  That

9    would have been something, if he testified under oath that would

10   have been important to you, wouldn't it?

11   A.  Yes.  I just don't recall if he did or not.

12   Q.  But you do recall that what he said was, I saw people shooting

13   at those officers?

14             MS. BERNSTEIN:  My objection is the same, your Honor.

15             THE COURT:  I am going to overrule it because I think

16   we've already -- again, we've already gotten there based on the

17   witness's testimony.

18   BY MR. MECHE:

19   Q.  That is what he said he saw?

20   A.  Yes.

21   Q.  Okay.  Now, at some point during your investigation you had

22   formed a belief of what happened, and this was inconsistent with

23   what you believed happened?

24   A.  Yes.

25   Q.  And it was just like the other information that's inconsistent.

1    At some point once you formed a belief about what happened and put

2    it on paper and gotten guilty pleas and released it to the media,

3    it's problematic when witnesses come forward and tell you something

4    different, isn't it?

5    A.  No.

6    Q.  No?  You can't have them being in disagreement with your theory

7    because maybe your theory's not right?

8    A.  I don't know how to answer that question.  Can you rephrase it?

9    Q.  What you did in response was you called Donald Haynes in to the

10   federal grand jury?

11   A.  He was interviewed before the grand jury and then he came to

12   the grand jury.

13   Q.  Good point, I'm glad you brought that up.  Yeah, you

14   interviewed him before the federal grand jury?

15   A.  Yes.

16   Q.  And you told him y'all thought he was lying?

17   A.  No.

18   Q.  You told him you didn't believe he was telling the truth?

19   A.  No.

20   Q.  You told him you agreed with what he was saying?

21   A.  I can't explain what happened without getting into the details

22   in the conversation.  He was not confronted.  The information he

23   provided initially in the interview was inconsistent with the

24   information he provided in the state case; without any

25   confrontation, he volunteered it.

1  Q.  In fact, you did to him what you did to Heather Gore, you told

2  him if he persisted with that version of events he would be

3  prosecuted and would go to jail?

4  A.  That never happened.

5  Q.  You didn't tell him he could be in a lot of trouble if he --

6  A.  No.

7  Q.  Did you hear somebody else tell him that?

8  A.  It never happened.

9  Q.  Do you think he was intentionally lying before when he gave

10 that version of events, or that's really what he thought he saw,

11 like Officer Hunter and Barrios?

12 A.  I don't know what his intentions were.

13 Q.  Mr. DeSalvo also asked you about someone named Rakisha Barrios.

14 Do you remember who that is?

15 A.  Robert Barrios's wife.

16 Q.  And you testified pretty extensively about that subject.

17        After Barrios pled guilty, I think you said Mr. Letten,

18 the U.S. Attorney was having a media briefing, right?

19 A.  I don't believe I said that.

20 Q.  Well, you were there you said?

21 A.  Yes.

22 Q.  First of all, I think Mr. Letten is in the courtroom.  Just to

23 identify him.  Can you stand up, Mr. Letten?  Is that the person

24 you're talking about, Mr. Letten?

25 A.  Yes, it is.

1  Q.  And he is, I think you said, the United States Attorney, the

2  big boss?

3  A.  Yes.

4  Q.  And after the Barrios guilty plea, you said you were there, but

5  if it wasn't a media briefing, what was it?

6  A.  I don't think I said one way or the other, I don't think that

7  came up in court.

8  Q.  Well, why don't you tell us what it was.

9  A.  I think it was the press conference for Robert Barrios's guilty

10  plea.

11  Q.  And so you said, in response to Mr. DeSalvo's question, this

12  lady, Rakisha, his wife, came up to Mr. Letten at that press

13  conference and said, look, you got it all wrong, they're lying, he

14  is just doing that to help himself, that's not what happened, or

15  something to that effect?

16  A.  Something to that effect.

17  Q.  Yeah.  And obviously, Mr. Letten, who I know would probably be

18  concerned about something like that, right?

19  A.  Yes.

20  Q.  And because if she's right, then maybe we have some injustice

21  going on, right?

22  A.  Yes.

23  Q.  So he would have said, look, guys, go investigate this, this is

24  troubling, wouldn't he have said that?

25  A.  Yes.

 1   Q.  And did he, in fact, say that?

 2   A.  I don't know if Mr. Letten said that, I can't say that.

 3   Q.  Well, somebody instructed you, man, you all better go and

 4   investigate that, this could be a problem, right?

 5   A.  We did -- yes.

 6   Q.  Y'all didn't just ignore it?

 7   A.  No.

 8   Q.  Mr. Letten would not have ignored something like that?

 9   A.  No.

10   Q.  No.  Y'all would have wanted to investigate what this was all

11   about?

12   A.  Yes.

13   Q.  You didn't want -- at this point, you weren't closing your eyes

14   and ears to information that was inconsistent with your theory,

15   were you?

16   A.  No.

17   Q.  Because you always want to hear additional evidence to make

18   sure you're not making a mistake?

19   A.  Yes.

20   Q.  Did you go interview Rakisha Barrios?

21   A.  No.

22   Q.  Did anybody go interview Rakisha Barrios?

23   A.  No.

24   Q.  So at that point, y'all didn't want to hear what she had to

25   say, right?

1    A.  She wasn't interviewed.

2    Q.  Going back to the conversation you said you had with my client,

3    Mr. Villavaso.  I think you indicated that was back in March of

4    2010, right?

5    A.  That sounds correct, yes.

6    Q.  And Ms. Bernstein asked you a litany of questions as to, did he

7    deny that, did he deny that, and you responded no, no, no, to all

8    of them, right?

9    A.  Yes.

10   Q.  I'm a little confused because I read your grand jury testimony

11   of July 2010, and I think you said you did not interview Villavaso,

12   do you remember saying that?

13   A.  No.

14   Q.  I'll show it to you.

15           MR. MECHE:  I am going to approach the witness.

16           MS. BERNSTEIN:  What page is that, Tim?

17           MR. MECHE:  It's 162 and 163.  Look at the last line of

18   62 (SIC) and the first line of 163.

19   BY MR. MECHE:

20   Q.  Can you read that question at the top of page 163, please?

21   A.  I'm sorry, where did you say to refer to again?

22   Q.  The first question on page 163.

23   A.  So nothing on 162?

24   Q.  No.  Can you read that -- first of all, who is asking you that

25   question?  If you look at the bottom of 162.

1  A.  Ms. Bernstein.

2  Q.  Ms. Bernstein is asking you.  What is she asking you?  And this

3  is in front of the grand jury in July of 2010.

4  A.  Read it?

5  Q.  Yes, please.

6  A.  "Agent Bezak, we have a follow-up question for you, but I want

7  to remind you that you're still under oath.  One of the grand

8  jurors had a question about what the shooters allege now, what

9  their version now is of what happened.  Let me ask you first, with

10 the four in the indictment, have you interviewed Bowen, Gisevius,

11 Villavaso, or Faulcon?"

12 Q.  And what was your response?

13 A.  "No."

14 Q.  Well, that's why I am confused.  That was July, you said you

15 didn't ever interview Villavaso?

16 A.  Yes.

17 Q.  Well, then, why did you tell the jury in response to

18 Ms. Bernstein's questions that you did talk to him and he denied

19 this, denied that, denied that?

20 A.  I must have misspoken in the grand jury, and I did have a very

21 brief conversation with Villavaso on the March 4th.

22 Q.  Was it an interview?

23 A.  It wasn't a sit-down interview, no.

24 Q.  No.  In fact, it was just a very brief conversation.  There was

25 a reason for that, wasn't there?

1   A.  It was very brief, yes.

2   Q.  And what was the reason that it was very brief?  He told you he

3   didn't want to talk to you without his lawyer being present?

4   A.  Yes, yes.

5   Q.  And when you went over there you knew he had a lawyer?

6   A.  No.

7   Q.  You didn't know he had a lawyer from the state court case?

8   A.  I knew he was represented in the state case, I had never had

9   any contact with him in the federal case.

10  Q.  Now, you know as an FBI agent if someone tells you they don't

11  want to be interviewed without their lawyer, that's their right?

12  A.  Absolutely.

13  Q.  And we can't hold it against them, we can't prejudice them?

14  A.  No.

15  Q.  In fact, in the grand jury, Ms. Bernstein cautioned the grand

16  jury, as a good, ethical prosecutor should, and said you can't hold

17  that against them, didn't she?

18  A.  Yes.

19  Q.  Yeah, and you should.  So he basically said, I don't want to

20  talk to you without a lawyer?

21  A.  Yes.

22  Q.  And being a good FBI agent, you would've shut down the

23  interview right there?

24  A.  No.

25  Q.  Really.  Why?

A.  The Constitution allows -- requires me to stop questioning

individuals in two instances, two primary, there may be some

other -- again, I am not a law expert.  But in this situation, if

he asked for an attorney while he was in custody, I would have to

stop questioning him.  If he asked for an attorney while he was

charged with a crime, I would have to stop questioning him.  In

this case, neither of those things were the case, so I was not

required to stop questioning him.

Q.  So you didn't honor his request that you not question him

without an attorney?

A.  No.

Q.  And it's your understanding that that was okay?

A.  Yes.

          MR. MECHE:  Okay, sir.  Do you know what, Agent Bezak,

that's all I have.  Thank you very much.

          THE WITNESS:  Thank you, sir.

          THE COURT:  Why don't we take a short break and we'll

come back with redirect.  If you all can be ready at 10:20, we will

start with redirect.  And, sir, if you can be up here we'll begin

promptly.

          THE WITNESS:  Yes, sir.

          THE DEPUTY CLERK:  All rise.

    (WHEREUPON, THE JURY EXITED THE COURTROOM.)

          THE COURT:  Counsel, for the record, 301 I think is the

one that was put on the screen.  I don't know, there was some

```
 1    discussion about there being two, but check with Ms. Radosta to

 2    verify, but I think it was the one that was on the screen and I

 3    think that's the correct one.  But while we're thinking about it,

 4    let's make sure.  3:20 unless the jury is ready earlier.

 5              (WHEREUPON, A RECESS WAS TAKEN.)

 6              (OPEN COURT.)

 7              THE COURT:  Counsel, do you all need to approach?

 8              MR. FLEMING:  Yes, Judge.

 9    (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

10              MR. HESSLER:  Your Honor, based on Agent Bezak's

11    testimony during direct and during cross, and now we're coming up

12    on redirect, there's propensity to interject objectionable material

13    or materials that aren't relevant to the answers during

14    questioning.  We are going to ask that Ms. Bernstein be limited in

15    her redirect to not address those areas or those comments which we

16    are not allowed to expound on because of the nature of his

17    testimony.

18              THE COURT:  If it was asked on cross, she can cover it on

19    redirect.

20              MR. HESSLER:  I am talking about the things that he

21    brought up which were objected to.

22              THE COURT:  If I sustained the objection, then she can't

23    cover it on redirect; if I overruled the objection and he testified

24    to it, then I think she can ask him on redirect.

25              MS. BERNSTEIN:  Your Honor, I don't know which questions
```

 1    particularly they are talking about, but there are some things that

 2    they objected to him adding additional stuff on cross.  The things

 3    he was explaining are exactly the things that I would ask on

 4    redirect anyway, and it would be totally proper on redirect because

 5    they were things they put in context the answers on cross.

 6         MR. DESALVO:  I think the objection is, I don't mean to

 7    reiterate, is that he brought up things that are not admissible and

 8    he was shut down and we were not able to go into, the example, of

 9    course, is the tape or tapes.

10         MS. BERNSTEIN:  No, what example?

11         MR. DeSALVO:  Am I correct?

12         THE COURT:  I don't understand the example.

13         MR. HESSLER:  Certain things he interjected.

14    Heather Gore, her testimony wasn't believable because she tried to

15    get other witnesses to lie.  There is no evidence of that in this

16    trial.  There's been no testimony of that in this trial.

17         MS. BERNSTEIN:  Your Honor, I planned to ask that on

18    redirect anyway, and I did not ask it on direct, but on redirect --

19    I mean on cross they asked him about why he thought she was lying

20    rather than just mistaken like Mike Hunter.

21         MR. MECHE:  After he volunteered --

22         MS. BERNSTEIN:  No, no, no.  And Heather Gore was asked

23    about yesterday as well before Meche even got up, and I've already

24    written that on redirect.  They asked him why he thought she was

25    lying, and his answer is because she tried to get other people to

1    lie.

2              THE COURT:  And he's already said that.  But the rule

3    regarding getting him to state what other people state, which is

4    what was objected to and which I sustained the objection, is going

5    to apply.  If it was objected to and I sustained the objection,

6    you're not going to be able to ask on redirect; if I've allowed it,

7    she is able to cover it on redirect.  It's going to be the same

8    thing.

9              The problem has been, the problem has been that he has

10   said things that are not within the scope of the question that was

11   asked, and it goes back to something that, I forget who was the

12   very first person that crossed him.

13             MR. FLEMING:  Eric.

14             THE COURT:  Eric.  He said something about when he was

15   asked about inconsistencies or something, at some point, and he

16   started taking off on Mr. Bowen when he was never asked a question

17   about Mr. Bowen.

18             MS. BERNSTEIN:  But, your Honor, if I may, the questions

19   on cross were questions about why he made certain conclusions.  The

20   question I think that elicited that answer was a question about

21   whether he assumes that somebody -- I think the exact -- I think

22   the question was a question about whether, basically whether Lance

23   Madison must be lying because he changed his testimony.  And then a

24   follow-up question about, well, why -- basically, why do you

25   believe him and not believe other people who changed their

1    testimony.

2           And these kinds of -- these kinds of questions, they

3    invite that answer.  You have to give that answer.  The question

4    is, why is it okay for one person to change his mind and not okay

5    for another, and his answer was, you know, whatever answer he gave,

6    but it's because it's different in this situation then, for

7    example, when you lie about not shooting people, that's something

8    you can't just forget.

9           THE COURT:  Let's do this.  Let's get the jury in and

10   let's go ahead and redirect.  He's not going to be able to state

11   what other people told him unless it came up as part of the

12   redirect -- I mean, cross --

13          MS. BERNSTEIN:  Sure, on cross.

14          THE COURT:  -- or was permissible on direct and has

15   already been presented to the jury.  Which brings us to, let's not

16   plow ground that we've already plowed.  But if you want to touch

17   upon and direct him to certain lines of questioning and get him to

18   ask him questions about that.

19          MS. BERNSTEIN:  Your Honor, with 10 or 11 hours of cross

20   or whatever, I have a lot of redirect.  I will try, and it's going

21   to be extra hard with so much cross, I will try to direct him

22   exactly to whose question and what it is I am following up on and

23   then zoom through.

24          THE COURT:  Wait.  Bobbi, I almost hesitate to ask this,

25   but do we -- can you do this before --

```
 1              MS. BERNSTEIN:  I think about an hour and a half.  What

 2   time is it?

 3              THE COURT:  It's about 10:24, that's about an hour and a

 4   half before lunch.

 5              MS. BERNSTEIN:  So 15 minutes before or after lunch,

 6   whatever, but that's my guesstimate.  Depending on how many bench

 7   conferences I get, that's my time-outs.

 8              THE COURT:  Suspending the period, the time limitations.

 9      (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

10              THE COURT:  You may be seated.  We're going to begin

11   redirect.  Mr. Bezak, you're still under oath, and have you

12   discussed your testimony with anyone during the break?

13              THE WITNESS:  No, I have not.

14              THE COURT:  Okay.  Good.  Let's go ahead, Ms. Bernstein,

15   and redirect.

16                        REDIRECT EXAMINATION

17   BY MS. BERNSTEIN:

18   Q.  Agent Bezak, you've been on cross-examination for 10 or 11

19   hours, and I am going to ask you follow-up questions on very

20   specific things that you were asked during cross.  Because cross

21   has been so long, I am going to try to be very specific to take you

22   back to exactly what it is I am asking you about.

23   A.  Okay.

24   Q.  Let me start, though, with some questions that Mr. Meche just

25   asked you.  He was talking to you about whether or not you have
```

1  presented every fact, or whether every fact that you came up with

2  has been presented to this jury.  How big is your case file in this

3  case?

4  A.  Four book shelves.

5  Q.  If you presented to this jury every fact that you learned

6  during your investigation, can you estimate how long this trial

7  would take?

8  A.  Significantly longer than it is now.  Months.

9  Q.  If you played every tape that Mr. Meche asked you about, in

10  full, how long do you think that would take?

11  A.  A very long time.

12  Q.  Now, is the fact that a tape has not been played in this

13  courtroom, does that mean that the tape is inconsistent with your

14  case?

15  A.  No.

16  Q.  Is there any reason, as part of the prosecution team, that you

17  would play a tape, for example, that does not have anything

18  relevant on it?

19           MR. HESSLER:  Objection, your Honor.

20           MR. FLEMING:  Objection.

21           MR. DeSALVO:  Objection.  He already said he doesn't make

22  that decision.

23           THE COURT:  He did state that, that was the objection

24  that I sustained.

25  BY MS. BERNSTEIN:

1    Q.  Let me talk to you about Donald Haynes, he's one of the

2    witnesses Mr. Meche just asked you about.  And Mr. Meche asked you

3    about statements that Donald Haynes made during the state case, and

4    you said you would have reviewed those in your investigation,

5    right?

6    A.  Yes.

7    Q.  And Mr. Meche asked you about a statement where Donald Haynes

8    claimed to have seen civilians shoot at police on the Danziger

9    Bridge, do you remember that?

10   A.  Yes.

11   Q.  Now, when you met with Donald Haynes during the course of your

12   federal investigation, did he tell you whether or not those

13   statements he gave during the state case were true?

14   A.  Yes, he did tell me.

15   Q.  What did he tell you?

16   A.  They were not true.

17   Q.  Does it sound right that it was about November 3rd, 2009, when

18   you interviewed Donald Haynes?

19   A.  Yes.

20   Q.  Do you remember every detail of that interview you conducted

21   with Donald Haynes?

22   A.  No.

23   Q.  I am going to ask you some specific questions about it.  Will

24   it help you remember if you can look at the 302 or the report you

25   wrote of that interview?

```
 1    A.  Yes, it would.

 2            MS. BERNSTEIN:  It's the November 3rd, 2009, 302.  I am

 3    showing him page 2.

 4            Your Honor, this is an interview that he was just

 5    questioned about.  May I approach and show him his 302?

 6            THE COURT:  Why don't we ask him a question first.  If

 7    we're going to use that to try to refresh his memory, let's ask him

 8    a question first.

 9    BY MS. BERNSTEIN:

10    Q.  You said that you remember he told you during that interview

11    that the statement he gave to the state was false; is that correct?

12    A.  Correct.

13    Q.  Do you remember what he told you about why it was false?

14    A.  No.

15            MS. BERNSTEIN:  May I approach?

16            THE COURT:  Yes.

17    BY MS. BERNSTEIN:

18    Q.  I would like you to read the highlighted sections to yourself,

19    and just let me know when you're done.

20    A.  (WITNESS READS DOCUMENT.)  Yes.

21    Q.  Does that help you remember?

22    A.  Yes.

23    Q.  Based on your conversation with Mr. Haynes, was his statement

24    in the state case false because he --

25            MR. FLEMING:  Objection.
```

1          THE COURT:  Wait, let's not suggest to him why or what,

2     it's what he knows.  This is redirect.  This is no leading

3     questions.

4     BY MS. BERNSTEIN:

5     Q.  Why was his statement in the state case false?

6     A.  He lied because he wanted to protect the officers and help

7     them, keep them out of trouble.

8     Q.  And when Mr. Meche was asking you about David Ryder, he asked

9     you if at some point the DA's office took over the investigation

10    from NOPD, do you remember that?

11    A.  Yes.  Yes, I remember that question.

12    Q.  When was the official 54-page report that we've seen in court

13    here, when was that turned over to the DA's office?

14    A.  Sometime around late May of 2006.

15    Q.  Who turned it over?

16    A.  Sergeant Dugue and Sergeant Kaufman.

17    Q.  Did they just mail it or did they deliver it in person?

18    A.  Delivered it in person.

19    Q.  So the end of May 2006, you said?

20    A.  Yes.

21    Q.  So that's approximately nine months after the shooting; is that

22    right?

23    A.  Yes.

24    Q.  Now, you've already testified that -- well, let me ask you

25    this:  According to that report, how many victims were there of the

1    alleged attempted murder of a police officer?

2    A.  Eight.

3    Q.  And that's the Danziger seven plus David Ryder?

4    A.  Yes.

5    Q.  Now, you've already testified that six of the seven NOPD

6    officers gave statements on January 25th, 2006, right?

7    A.  Yes.

8    Q.  Who is the one who did not give a statement on January 25th?

9    A.  Robert Faulcon.

10   Q.  I think you've already testified that's because he lived in

11   Texas at the time, right?

12   A.  Yes.

13   Q.  Did NOPD eventually interview Robert Faulcon?

14   A.  Yes.

15   Q.  When was that?

16   A.  June 9th, 2006.

17   Q.  So by June 2006, seven of the eight alleged victims had been

18   interviewed, correct?

19   A.  Yes.

20   Q.  Had David Ryder been interviewed?

21   A.  No.

22   Q.  Did he live closer to New Orleans than Texas or further away

23   than Texas?

24   A.  Closer than Texas.

25   Q.  Did you find that suspicious?

1    A.  Yes.

2    Q.  Mr. Meche asked you about those plea agreements that the

3    cooperators entered into, and he put up Exhibit 41.  Can I have

4    Exhibit 41, please.  And I think he put up page 2, if we could go

5    there first.

6         Mr. Meche read this part to you at the bottom of page 2.

7    You don't have to read the whole thing again, but basically

8    requiring the cooperator to tell the truth, correct?

9    A.  Correct.

10   Q.  And I just wanted to put up one more part on page 3.  Can you

11   blow up the very first paragraph, please, Stephen.

12         Can you read the first full sentence on that page.

13   A.  "The defendant agrees neither to implicate anyone falsely nor

14   to excul --"

15   Q.  Exculpate?

16   A.  "Exculpate or protect anyone falsely."

17   Q.  So that's just another part of that same, same paragraph that

18   Mr. Meche put up, right?

19   A.  Yes, ma'am.

20   Q.  Mr. Meche also asked you about these factual bases that the

21   cooperators signed as part of their plea agreements?

22   A.  Yes, he did.

23   Q.  Where did the information in those factual bases come from?

24   A.  Those individuals.

25   Q.  How did it come from those individuals, did they write the

```
 1   factual bases?

 2   A.  My interviews with them.

 3   Q.  So the government didn't just make up the facts in the factual

 4   basis?

 5   A.  No.

 6              MR. FLEMING:  Objection.

 7              THE COURT:  I am going to sustain.  Let's not lead the

 8   witness.  It's redirect.

 9   BY MS. BERNSTEIN:

10   Q.  Now, Mr. Meche came over here and he asked you about the

11   factual bases of these cooperators and then whether they were

12   consistent and inconsistent with one another.  Let me start at the

13   top there with Lehrmann.  Did he say anything about whether or not

14   he was part of a coverup?

15   A.  Yes.

16   Q.  Did he say who else was part of the coverup?

17   A.  Yes.

18   Q.  Was that information consistent or inconsistent with what Mike

19   Lohmann said?

20   A.  Consistent.

21   Q.  Consistent or inconsistent with what Mike Hunter said?

22   A.  Consistent.

23   Q.  I am going to jump down to Hills.  Consistent or inconsistent

24   with what Ignatius Hills said?

25   A.  Consistent.
```

```
1   Q.  Now, David Ryder, did he know what happened on the Danziger

2   Bridge?

3   A.  No.

4   Q.  Was he part of whatever coverup afterwards?

5   A.  No.

6   Q.  So let me set him aside.  I want to talk about Mr. Barrios, who

7   has not testified yet in this trial.  Was what he said consistent

8   or inconsistent with that?

9   A.  Consistent.

10  Q.  Now, Mike Hunter, in his factual basis, did he tell you whether

11  the civilians had any guns on the bridge?

12  A.  Yes.

13  Q.  Was that consistent or inconsistent with what Ignatius Hills

14  said?

15  A.  Consistent.

16          MR. DeSALVO:  Objection, your Honor.

17          MS. BERNSTEIN:  Was that consistent or inconsistent with

18  what Robert Barrios said?

19          MR. DeSALVO:  That's misleading.  The witnesses said he

20  didn't see any guns.

21          THE COURT:  I'll sustain.  Let's rephrase.

22  BY MS. BERNSTEIN:

23  Q.  All right.  We've established that Mike Hunter said -- what did

24  Mike Hunter say about guns?

25  A.  There were no guns.
```

```
1   Q.  And is that consistent or inconsistent with what Ignatius Hills
2   said?
3   A.  Consistent.
4   Q.  Consistent or inconsistent with what Robert Barrios said?
5   A.  Consistent.
6   Q.  Mr. Meche asked you about whether the government had the power
7   to bring certain witnesses here to testify at trial.  Do you
8   remember those questions?
9   A.  Yes.
10  Q.  Do you know whether or not every attorney in this room has the
11  same power to issue a subpoena to bring --
12          MR. FLEMING:  Objection.
13          MR. MECHE:  Objection, we don't have plea agreements.
14          THE COURT:  Yes, y'all have to approach.
15      (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)
16          THE COURT:  If we're going to put a parade of people on
17  the stand to take the Fifth, that's one thing.  But the other day
18  we're talking about people taking the Fifth, Ms. Gore taking the
19  Fifth outside of the presence of the jury.
20          MS. BERNSTEIN:  She's the only one that I know of.
21          THE COURT:  Then give her immunity and let's get her in
22  here.  They don't have the power to force her to not take the
23  Fifth.  I'll grant that motion.  If you want to give her immunity
24  to come in here, or anybody else that they want to subpoena to come
25  in here.  But they can't call her.  Same thing with Mr. Dugue.
```

 1   Mr. Dugue's, he is not here to testify.  They don't have the

 2   ability to call Mr. Dugue to the stand.  Unless they do, then they

 3   take the Fifth in front of the jury, which, as you pointed out,

 4   would be improper.

 5            MS. BERNSTEIN:  So --

 6            THE COURT:  That's an improper question.

 7            MS. BERNSTEIN:  They have implied, your Honor, they have

 8   implied that Marchant Paxton, Robert Barrios, Ignatius Hills --

 9            THE COURT:  You need to be specific on those people,

10   then.  It's misleading to tell the jury that they can call Dugue,

11   that they can call Heather Gore --

12            MS. BERNSTEIN:  They said they planned to call

13   Heather Gore, your Honor.

14            THE COURT:  No, you said that she was going to take the

15   Fifth.

16            MS. BERNSTEIN:  And they argued with me.

17            THE COURT:  I don't blame her after what this fella just

18   said.

19            MS. BERNSTEIN:  So I ask whether he understands what both

20   sides have subpoena power and whether, if a witness does not have a

21   Fifth Amendment right, whether both sides can bring that person in.

22   I don't want to get --

23            THE COURT:  The only problem is the jury -- it's

24   misleading to tell the jury that everybody is fair game for every

25   party.  That's not true.

```
 1            MS. BERNSTEIN:  What's misleading is to suggest that we

 2   own these witnesses, Marchant Paxton --

 3            THE COURT:  The government can give immunity to get

 4   testimony in the state case and who knows if they've done it in

 5   this case.  The government has the power to call whoever they want

 6   and compel the testimony with the grant of immunity.  The

 7   defendants don't have the same right to do that.  And this fella

 8   sitting in the courtroom, Mr. Dugue, and he is an untouchable at

 9   this point.

10            MS. BERNSTEIN:  Let me tell you --

11            THE COURT:  That's the problem.

12            MS. BERNSTEIN:  Yes.  So I should not talk about Dugue,

13   let me talk about everybody but Heather Gore.  With Robert Barrios

14   this is an issue.

15            THE COURT:  He is another one.

16            MR. FLEMING:  He's threatened Donald Haynes with perjury.

17            THE COURT:  Haynes is another one.

18            MR. FLEMING:  You have threatened him if he changed his

19   testimony, if you changed, you would prosecute him for perjury if

20   he told --

21            MS. BERNSTEIN:  Your Honor, this came up beforehand with

22   Donald Haynes, and they said they planned to call him.  Nobody has

23   threatened anybody with perjury other than if you lie you can be

24   charged with perjury.

25            MR. FLEMING:  If you testify differently than the story
```

1    you told us today.

2             MS. BERNSTEIN:  Nobody has ever said that.

3             MR. FLEMING:  That's in the grand jury testimony.

4             THE COURT:  Look, I am going to sustain the objection.

5    And I am going to strike the last question.  I think you need to be

6    careful how you ask about it.  Haynes, I have Gore here, I've got

7    Dugue.

8             MS. BERNSTEIN:  And, your Honor, he knows --

9             THE COURT:  The government can grant immunity to the

10   defendants' witnesses if they choose, if the government chooses to

11   do so.  And then it would be a fair statement that they could call

12   whoever they want.

13            MR. DeSALVO:  Your Honor, we would ask for a

14   precautionary instruction to the jury to disregard so they're not

15   misled by that.

16            MS. BERNSTEIN:  Your Honor, what's misleading is that the

17   defense can't call Marchant Paxton, Donald Haynes, Robert --

18   Raymond Young; of course the defense can call these people.

19            THE COURT:  Well, you're going to have to figure out a

20   way to ask that without --

21            MR. MECHE:  They all would take the Fifth, your Honor.

22            MR. FLEMING:  We would ask for a chance to recross on

23   whether they would have the right to assert the Fifth Amendment

24   privilege and whether they've been threatened --

25            MR. MECHE:  Every single one would take the Fifth.

1          MR. FLEMING:  -- because they absolutely have, all of

2     those people that were mentioned.

3          MS. BERNSTEIN:  If they lied to the prosecutor.  That is

4     true, sir, for every witness who comes in here.

5          THE COURT:  That's not the issue, the issue is them

6     asserting the Fifth Amendment.

7          MS. BERNSTEIN:  I think Heather Gore is a very different

8     situation, and I am not willing to give her immunity.  Robert

9     Barrios, if he takes the Fifth on this case, I -- there's no --

10         THE COURT:  I don't think he can, I think he's waived it.

11         MS. BERNSTEIN:  This is something that I wanted -- this

12    is going to be along the discussion that I needed to flag regarding

13    Robert Barrios.

14         THE COURT:  If you want to ask them if they wanted to

15    call Robert Barrios, they could call Robert Barrios.  He has no

16    Fifth Amendment privilege at this time.  That would be a fair

17    question.

18         MR. MECHE:  That's the only one.  Everyone else would

19    take the Fifth, Judge, they've refused to talk to us.  We don't

20    have the ability to get any plea agreements.

21         THE COURT:  I have witnesses that have been told that

22    their house and kids are at stake.

23         MR. DeSALVO:  We would ask for a precautionary statement.

24         MR. FLEMING:  The defense came out, the FBI is knocking

25    on everybody's door.

1              MS. BERNSTEIN:  Of course.

2              MR. FLEMING:  Of course.

3              MS. BERNSTEIN:  To see if they're willing to speak to us.

4              THE COURT:  Not based on what he said.  This is what

5      concerns me about him.

6              MR. DeSALVO:  A precautionary statement.

7              MS. BERNSTEIN:  He contacted the people at their house,

8      your Honor, because I instructed him to see if they were willing to

9      talk to us.

10             THE COURT:  It's not him contacting them.

11             MS. BERNSTEIN:  His conversation with Heather Gore was

12     two years ago.  That was not in preparation for this trial.

13             THE COURT:  Let's not go there right now.  Let's not go

14     there right now because that's a whole other inquiry of what he

15     told people who were going to be witnesses at this trial.  But to

16     suggest to the jury that everybody is fair game as a witness is

17     incorrect.

18             MR. HESSLER:  Donald Haynes is one who was told he called

19     me the night before his grand jury and asked that he be provided

20     with an attorney because he was threatened before his grand jury

21     testimony with being charged with perjury.

22             MS. BERNSTEIN:  If he lied, he could be charged with

23     perjury.  He admitted to it in the pre-grand jury interview that he

24     had lied to the state grand jury, and he was told, do not lie to

25     us.

1          MR. FLEMING:  And the government is the one that decides

2    whether he is lying and whether they're going to prosecute him for

3    perjury.

4          MS. BERNSTEIN:  Do you know whether Marchant Paxton is on

5    the defense witness list?  Do you have a clue?

6          MR. FLEMING:  You have told them many times --

7          THE COURT:  Paxton is on the list that I read, I'm sure

8    he is.  This is a list of people of interest that they needed to

9    know about.

10         MR. FLEMING:  The FBI has been to him three or four

11   times, and now he is dodging us because they keep going over there

12   and looking to getting indicted.

13         MS. BERNSTEIN:  That is not true.  We went over there to

14   decide whether or not we were going to call him as a witness.

15         THE COURT:  I wish I could believe you.  I believe you --

16         MS. BERNSTEIN:  I am telling you, your Honor, I met with

17   him pretrial to determine --

18         THE COURT:  I wish I could believe (INDICATING).

19         MS. BERNSTEIN:  I met with him pretrial to determine

20   whether or not I was going to call him as a witness.  Same thing

21   with Raymond Young.  I decided not to call them, these guys can

22   call them.  And it's misleading to suggest to the jury that they

23   can't.

24         MR. FLEMING:  And the FBI was told both of those men

25   we're looking to get indicted.

```
 1              MS. BERNSTEIN:  That is not true.

 2              MR. FLEMING:  That is true.

 3              MR. HESSLER:  This is exactly what happened.  It's all

 4   part of the way this thing has operated since the investigation

 5   began.  That officers that were called to the stand by the defense

 6   have all either been here or fired by the NOPD, but rest assured,

 7   it was because of, I'm sure, if the one of the witness that

 8   testified was stopped in the middle of the testimony and told he

 9   was likely to get indicted.  That has yet to have happened, but the

10   threat is there and it's a realistic threat to every officer that's

11   involved.

12              THE COURT:  I am going to strike the last question.

13              MR. DeSALVO:  Can we get a precautionary instruction so

14   the jury is not misled by the questioning?

15              MS. BERNSTEIN:  No, because --

16              THE COURT:  Insofar as what would that be?

17              MR. DeSALVO:  The defense does not have the same power to

18   call these witnesses as the government does.

19              MS. BERNSTEIN:  That is totally misleading, your Honor.

20              MR. DeSALVO:  The question was misleading.

21              MS. BERNSTEIN:  To suggest that they don't, to suggest

22   that they don't have the power to call Marchant Paxton --

23              MR. HESSLER:  You said any witness.

24              MR. FLEMING:  Don't have the power to call any witness.

25              THE COURT:  I don't like telling them that.  The problem
```

1    is that if you were to call these people they would assert their

2    Fifth Amendment right in front of the jury, which we all think

3    would be improper.

4            MR. LONDON:  We can't do that.

5            THE COURT:  Exactly.  Exactly, we can't do that.

6            MS. BERNSTEIN:  We call them they would assert their

7    Fifth, I don't understand that.  Every witness that --

8            THE COURT:  The government, if their testimony was

9    helpful to the government, the government would grant them immunity

10   to testify, and that's a difference, that's the difference.

11           MS. BERNSTEIN:  They're not granting anybody immunity.

12           THE COURT:  I know that, but you're suggesting that,

13   you're suggesting that the defendants could get them in here, get

14   their testimony, and the only reason they can't is because they're

15   asserting their Fifth Amendment because they're subject to criminal

16   prosecution by the other side in the case.

17           MS. BERNSTEIN:  All attorneys on either side can subpoena

18   a witness to come here and testify, and unless that -- and unless

19   that witness asserts the Fifth, the witness has to testify.  That's

20   the --

21           MR. HESSLER:  You can give anybody --

22           MR. LONDON:  You can get anybody you want.

23           THE COURT:  I am going to sustain the objection.  I don't

24   think there's any other way to proceed.  I understand your point,

25   and I think it's a fair point to make if you can make it with

```
 1    another worded question.  But I can't --

 2              MR. HESSLER:  I would ask for a precautionary instruction

 3    also.

 4              MS. BERNSTEIN:  Do you know whether the defense can

 5    subpoena Marchant Paxton?

 6              THE COURT:  That's not the question.

 7              MS. BERNSTEIN:  But can I ask that?  Is there any way the

 8    defendants can subpoena Ray Young?

 9              THE COURT:  Any objection to that?

10              MR. FLEMING:  They both have been threatened with perjury

11    and prosecution.

12              MS. BERNSTEIN:  Your Honor, in this investigation, people

13    do not come call us up and say, let me tell you about the shady

14    business we were involved in.  We had to do our investigation.

15    You've heard that everybody lied to NOPD, everybody lied during the

16    state investigation, we have to do our investigation.  Of course

17    when we do our investigation we say, if you lie to us, you're going

18    to be prosecuted.  For God's sake, some of them do get prosecuted.

19              THE COURT:  Right.

20              MS. BERNSTEIN:  There's nothing wrong with that, and the

21    implication that that is somehow a threat that keeps them from

22    being able to issue subpoenas.  They told us in their pretrial

23    litigation that they planned to call Donald Haynes.  Call him, by

24    all means.  Let me cross this guy who says he lied to help protect

25    the police.
```

1              MR. DeSALVO:  What he says is that he won't be indicted

2    as long as he says the same thing that he told y'all after.

3              MS. BERNSTEIN:  That might be what Donald Haynes says, do

4    you believe that's what we told him?

5              MR. FLEMING:  It's in the transcript.

6              MR. HESSLER:  The eye witnesses, and there were several

7    beholdened to you for what he's already told.

8              MS. BERNSTEIN:  Your witness, meaning the guy who lied to

9    protect y'all?

10             THE COURT:  Unless you can figure out a way to reword it,

11   and I don't think it's fair to suggest to the jury that each

12   witness is equally available to each side in this case.  I think if

13   you can ask specifically about people, that we run into the same

14   problem, we run into the same problem.  It's not true that each

15   witness is equally available, it's just not true.

16             MR. FLEMING:  Grant the people immunity.

17             THE COURT:  Maybe you can ask them with a grant of

18   immunity, wouldn't the defendants be able to call -- I don't know

19   how you're going to word that.

20             MS. BERNSTEIN:  Thank you.

21             THE COURT:  I'll give you a few minutes.

22        (OPEN COURT.)

23             THE COURT:  I am going to strike from the record the last

24   question and answer.  So to the extent that it's part of your

25   recollection, we'll strike it as -- be careful on how I say this.

```
 1   I am going to ask counsel to go back a question or two and strike
 2   everything since then.
 3   BY MS. BERNSTEIN:
 4   Q.  I want to ask you about David Ryder.  Mr. Meche asked you about
 5   David Ryder.  When you met with David Ryder, did he tell you
 6   whether or not he had told the truth in the state case?
 7   A.  Yes.
 8   Q.  And Mr. Meche asked you about his plea agreement that says he
 9   could be prosecuted for lying to federal authorities, do you
10   remember that?
11   A.  Yes.
12   Q.  Was he prosecuted for lying to the FBI?
13   A.  Yes.
14   Q.  Did he plead guilty?
15   A.  Yes.
16   Q.  Did Mr. Meche ask you --
17            MR. LONDON:  Your Honor, I would object to that and ask
18   to approach on that.  That's very misleading.  May we approach on
19   that?
20            THE COURT:  Come on up.
21            MS. BERNSTEIN:  Is it the timing that you're --
22            MR. LONDON:  No.
23     (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)
24            MS. BERNSTEIN:  My estimate of time did not account for
25   this.
```

```
 1              THE COURT:  I agree.

 2              MR. LONDON:  I'm sorry, Judge, he pled guilty to be a

 3   convicted felon in possession of a firearm.

 4              MS. BERNSTEIN:  And a --

 5              MR. LONDON:  Can I finish?  You're making it sound like

 6   he pled guilty to lying about this offense.  He pled guilty to

 7   being a convicted felon in possession --

 8              MS. BERNSTEIN:  He pled guilty to two counts, 1001, lying

 9   the FBI.

10              MR. LONDON:  But you're making it seem like he pled

11   guilty to lying about this case, he lied because he said he didn't

12   have a gun.

13              MS. BERNSTEIN:  He didn't say he didn't have a gun,

14   that's not what he lied about.  Mr. London is just wrong.

15              MR. HESSLER:  Wait a minute.

16              THE COURT:  Do you have his papers, his plea agreement

17   and his --

18              MS. BERNSTEIN:  Judge, he pled guilty to lying about what

19   happened when he was chasing people over to the Danziger Bridge.

20              MR. HESSLER:  He was told that he lied to the FBI and he

21   was told to lie to the FBI.  Part of that was a dismissal of

22   federal felony in possession of a firearm.  There's federal law.

23              MS. BERNSTEIN:  He's guilty.

24              MR. HESSLER:  He pled guilty.

25              THE COURT:  Do you have Ryder's indictment and his plea?
```

1          MS. BERNSTEIN:  I'm sure we have his information.

2          THE COURT:  Can we get that?  And I will tell the jury

3   what he was charged with and what he pled to.

4          MS. BERNSTEIN:  You guys are mistaken.

5          MR. LONDON:  It wouldn't be the first time in my life

6   that I am mistaken, but that's what I remember.

7          THE COURT:  Let's clear it up.

8          MR. LONDON:  I'm sorry to come here with that.

9          THE COURT:  That's all right.  While you're here, let's

10  get it and take a look at it and that way we can straighten it all

11  out.  What does it say he pled guilty to?  Let's get to his factual

12  basis or something from the record.

13         MS. BERNSTEIN:  He pled guilty to 1001 and felon in

14  possession.  He knowingly made false statements, claimed that a

15  person running from the I-10 shot at him.

16         THE COURT:  It's in the factual basis.  Why don't you

17  also ask him to say he pled guilty to the firearm as well, but it's

18  in the factual basis.  I'll overrule.

19     (OPEN COURT.)

20  BY MS. BERNSTEIN:

21  Q.  Agent Bezak, we were talking about David Ryder's guilty plea.

22  What did David Ryder plead guilty to?

23  A.  Lying to the FBI and being a felon in possession of a weapon.

24  Q.  That's two different felonies?

25  A.  Yes, ma'am.

1   Q.  Now, Mr. Meche asked you about a series of surreptitious

2   recordings that you had cooperators make during the course of your

3   investigation.  And the jury heard the other day the tape between

4   Jeff Lehrmann and Rob Gisevius.  We've been referring to that, I

5   think, the Lucy's tape; is that right?

6   A.  Yes.

7   Q.  Now, at the time the Lucy's tape was made, was it public or not

8   that you had people cooperating with your investigation?

9   A.  It was not public.

10   Q.  Now, at the time of the tapes that Mr. Villavaso asked about,

11   the ones that you had Mike Hunter and Rob Barrios make once they

12   started cooperating, at that time was it public or not that there

13   were people cooperating?

14   A.  It was public.

15   Q.  I want to come back in a minute and ask you another follow-up

16   question about that tape between Robert Barrios and Anthony

17   Villavaso.  Let me switch gears now, though.  I want to ask you

18   some follow-up questions to the things that Mr. DeSalvo asked you

19   yesterday.

20        Now, Mr. DeSalvo asked you yesterday, talking about those

21   impact marks on the concrete barrier.  Do you remember him asking

22   you whether you thought it was significant that there were eight

23   impact marks?

24   A.  Yes.

25   Q.  And he asked you whether there were also eight casings that

1    matched to Defendant Bowen's gun.  Stephen, may I have 227, please.

2           This is the exhibit created based on the ballistics

3    report that was part of your investigation, right?

4    A.  Yes.

5    Q.  Can you count the number of casings that were matched

6    definitively to Defendant Bowen's rifle?

7    A.  Nine.

8    Q.  Nine.  Do you know from your investigation how many rounds that

9    AK-47 holds?

10   A.  Approximately 30.

11   Q.  According to Mike Hunter's testimony, how many rounds were in

12   that gun when Defendant Bowen took it?

13          MR. FLEMING:  Objection to rehashing Mr. Hunter's

14   testimony, Judge.

15          MS. BERNSTEIN:  It's directly on point, your Honor, to

16   this question that Mr. DeSalvo asked.

17          THE COURT:  But we're talking again about, and this came

18   up on both direct and on cross, that we're talking about his

19   investigation, not -- the jury's already heard the testimony here

20   in court.  It's about what he was told as part of his investigation

21   that we're interested in.

22          MS. BERNSTEIN:  You're right, your Honor, and I misspoke

23   in my question.

24   BY MS. BERNSTEIN:

25   Q.  According to your investigation, how many times did Defendant

1    Bowen actually fire that rifle?

2    A.  He emptied the magazine.

3    Q.  Which is how many times?

4    A.  Approximately 30.

5    Q.  So that's 30.  And how many casings were definitively linked to

6    the rifle used by Defendant Villavaso?

7    A.  Eight -- nine.

8    Q.  So that's 30 plus 9 is 39.  How many casings were definitively

9    linked to the rifle used by defendant -- I'm sorry, how many were

10   definitively linked to this unknown .223 rifle?

11   A.  Five.

12        MR. FLEMING:  Judge, at this point I am going to lodge an

13   objection.  She is just having the witness recant the item that's

14   already in evidence.

15        MS. BERNSTEIN:  We can put this down.

16        MR. FLEMING:  And he is doing it incorrectly.  The jury

17   can count for themselves.

18   BY MS. BERNSTEIN:

19   Q.  I am going to ask you based on your investigation.  We have 30

20   from Defendant Bowen, we had nine linked definitively to Defendant

21   Villavaso, that's 39, and you just said there were five linked to

22   the unknown .223.  That's 44 so far.  Right?

23        How many casings were definitively linked to Defendant

24   Faulcon's Mossberg shotgun?

25   A.  Four.

```
 1    Q.  And in each one of those shots, how many pellets or projectiles
 2    are there?
 3    A.  Nine.
 4              MR. FLEMING:  Objection, your Honor.
 5              MS. BERNSTEIN:  Four times nine --
 6              MR. FLEMING:  Your Honor --
 7              THE COURT:  I'm sorry, wait, wait.
 8              MR. FLEMING:  I'll withdraw the objection, Judge.
 9    BY MS. BERNSTEIN:
10    Q.  Four times nine is 36.
11              MR. HESSLER:  Leading, your Honor.  Maybe it's not.
12              THE COURT:  It depends on how well you did in math in
13    school whether it's leading or not.
14              MS. BERNSTEIN:  It's not leading because he was --
15              MR. FLEMING:  It's a little misleading as to the precise
16    testimony of the ballistics expert instead of approximately.
17              THE COURT:  I don't think I can ask her to rephrase a
18    math question.  I think the jury can recall the testimony.  I am
19    going to overrule.  Go ahead.
20    BY MS. BERNSTEIN:
21    Q.  So nine times four is 36.
22              MR. FLEMING:  Objection; beyond the scope of cross.
23              MS. BERNSTEIN:  It's absolutely within the scope.
24              THE COURT:  No, I'm going to let him answer this.  I'll
25    overrule it.
```

1   BY MS. BERNSTEIN:

2   Q.  So 36 from the shotgun.  I am not going to try to do the math.

3   Thirty-six from the shotgun, 30 from Defendant Bowen, five from the

4   unknown .223, nine definitely linked to Defendant Villavaso's

5   rifle.  Somewhere in the realm of 80 we're talking about now; is

6   that right?

7   A.  That sounds right.

8   Q.  So let me ask you Mr. DeSalvo's question.  Was it significant

9   to your investigation that there were eight marks on the barrier?

10  A.  No.

11  Q.  Now, Mr. DeSalvo also asked you about those strike marks on the

12  walkway, and he asked you whether you've written books or given

13  lectures on ballistics?

14  A.  Yes.

15  Q.  Has Dr. DiMaio written books on ballistics?

16  A.  Yes.

17  Q.  Has he given lectures on the topics?

18          THE COURT:  Wait, he testified -- you see, and you all

19  sometimes wonder why I am conscious of time.  He testified, he was

20  here, if I recall, less than a week ago, I think on a Thursday of

21  last week, a week ago today, and we talked about all that he did

22  and how great he was, so let's not get him to just repeat DiMaio's

23  testimony.

24          MS. BERNSTEIN:  I'm not, your Honor.  But it was brought

25  up on cross.

1        THE COURT:  This is a consumption of time that the -- the

2   jury's already heard.  They saw DiMaio, he was here a long time.

3        MS. BERNSTEIN:  I am not going to ask him to repeat it,

4   your Honor, but it was brought up on cross.

5        THE COURT:  But you just did.

6   BY MS. BERNSTEIN:

7   Q.  All right.  Let me ask you about Dr. DiMaio.  During your

8   investigation, did Dr. DiMaio give you an opinion on whether those

9   strike marks were consistent or inconsistent?

10        MR. DeSALVO:  Your Honor, Dr. DiMaio has given his

11   opinion in this courtroom, and that's the only opinion that this

12   jury should know about.

13        MS. BERNSTEIN:  And, your Honor, directly responsive to

14   the questions on cross about whose opinion it was, the insinuation

15   was made that it was Agent Bezak's opinion regarding these strike

16   marks, it's direct follow-up to a question on cross.

17        THE COURT:  I am going to overrule.  But Dr. DiMaio

18   testified and we are not going to have Agent Bezak, who sat in the

19   courtroom during that testimony, recant that testimony.

20        MS. BERNSTEIN:  I am going to ask him what he learned

21   during his investigation.

22        THE COURT:  One question and let's move on.

23   BY MS. BERNSTEIN:

24   Q.  Did Dr. DiMaio give you an opinion about whether those strike

25   marks were consistent or inconsistent with somebody leaning over

```
 1    the barrier and firing?
 2            MR. DeSALVO:  That's just a repetition of Dr. DiMaio's
 3    testimony.
 4            THE COURT:  No, it's a yes or no, and he is going to say
 5    yes or no and then we are going to move on to another topic.
 6            THE WITNESS:  Yes.
 7    BY MS. BERNSTEIN:
 8    Q.  Mr. Hessler also asked you about -- can I have 153 up, please.
 9    Mr. Hessler asked you yesterday about the theory that a bullet
10    ricochetted off the concrete barrier and went into James
11    Brissette's left arm.  Whose theory was that?
12    A.  Dr. DiMaio's.
13    Q.  Now, one of them asked you, I think it was Mr. DeSalvo, but I
14    wouldn't swear to it, asked you, where is the strike mark made by
15    that shot that went into James Brissette; do you remember that
16    question?
17    A.  Yes.
18    Q.  My question to you is, can you see the concrete right there
19    (INDICATING)?
20    A.  No.
21    Q.  Why not?
22    A.  Shirt's in the way.
23    Q.  Mr. DeSalvo asked you whether you were surprised that Jose
24    Holmes didn't admit that he shot at the Madisons and then at the
25    police, do you remember that question?
```

1    A.  Yes.

2    Q.  And he followed it up with, he asked you if you were surprised

3    that a suspect would lie to avoid incriminating himself, do you

4    remember that?

5    A.  Yes.

6    Q.  Is that a phenomenon that you're familiar with, lying to avoid

7    incriminating yourself?

8    A.  Yes.

9    Q.  Did Defendants Bowen, Gisevius, Faulcon, and Villavaso all give

10   statements about what happened on the bridge?

11        MR. DeSALVO:  None of those people ever talked to this

12   man, he is not qualified to give the answer in this investigation

13   as to what was said.

14        MS. BERNSTEIN:  He reviewed their statements during the

15   course of the investigation, there's been about eight hours of

16   cross-examination.

17        MR. DeSALVO:  In this courtroom for the jury to hear.

18        THE COURT:  All of which were not only covered on direct,

19   but played on direct, and not inquired about on cross.  Those

20   statements were not inquired about on cross.

21        MS. BERNSTEIN:  The question that was asked on cross was

22   whether he's surprised that a suspect would lie to avoid

23   incriminating himself.

24        THE COURT:  And he just answered that.

25        MS. BERNSTEIN:  And I have my follow-up question to that.

 1   That was the question on cross, I have my follow-up question.

 2              MR. DeSALVO:  I objected to the follow-up, not the first

 3   one.

 4              MS. BERNSTEIN:  Redirect --

 5              THE COURT:  No -- but we didn't -- I am going to sustain.

 6   Let's move on.  Let's move on.

 7   BY MS. BERNSTEIN:

 8   Q.  Mr. DeSalvo asked you yesterday about a portion of the video

 9   where, "it appears that someone is moving inside the Budget truck."

10   Do you remember that question?

11   A.  Yes.

12   Q.  Do you agree with that characterization?

13   A.  No.

14   Q.  Why not?

15   A.  You can't tell what's going on inside the Budget truck.

16   Q.  Now, at that point in the video, do you remember, at that point

17   in the video where is Mike Hunter?

18   A.  I believe he is on the other side of the truck.

19   Q.  On the passenger side of the truck?

20   A.  Yes, ma'am.

21   Q.  Now, according to Defendant Bowen's statement, what did he do

22   after firing in the truck?

23              MR. FLEMING:  Judge, objection.  She is rehashing every

24   witness, rehashing the video and the statements.

25              MS. BERNSTEIN:  May we approach, your Honor?

1          THE COURT:  Yes.

2        (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

3          THE COURT:  The statements were played.  Nobody replayed

4    a statement, nobody asked -- you made your point with the first

5    question, and then you go on and you say, well, that's an entrée

6    into, now I'm going to get back and drill back into the statement.

7          MS. BERNSTEIN:  No, but, your Honor, they did ask about

8    the statements in the sense about when they asked questions about

9    why did you find him credible and not find the defendants credible.

10   You can't answer those questions without talking about their

11   statements.

12          This particular line of questioning, the implication was

13   made, more than an implication was said, that Defendant Bowen was

14   in that, was in the cab of the truck at the time.

15          THE COURT:  And you asked him.

16          MS. BERNSTEIN:  In order to answer why that doesn't, why

17   that implication is wrong, in order to correct it on redirect --

18          MR. DeSALVO:  That's argument, the evidence is in, that's

19   argument.

20          MS. BERNSTEIN:  He has been cross-examined on everything

21   that was in his investigation, everything that he knew, including

22   all of these statements, including the statements of the people who

23   have testified in court, including the statements given by the

24   defendants.

25          Now, according to Defendant Bowen's testimony, I mean

1    Defendant Bowen's statement, which is in evidence and which was

2    part of his investigation, when he's doing his investigation and

3    deciding, which way am I going to go with this, who do I believe

4    and who I don't, which there were tons of questions about on cross,

5    he looks at these statements, he compares them to the video.  There

6    were lots of questions about the video.

7            THE COURT:  He just said that you can't see what's going

8    on inside the truck.

9            MS. BERNSTEIN:  I know, your Honor, but according to the

10   statement, Defendant Bowen backs out of the driver's side, backs --

11           THE COURT:  He --

12           MS. BERNSTEIN:  Hang on, hang on.  And then he goes up

13   front to shoot while he is standing next to Mike Hunter.  By that

14   time in the video that we're talking about, Mike Hunter is gone.

15   So I should be able to ask whether it's consistent or inconsistent

16   with Defendant Bowen's statement.

17           MR. DeSALVO:  The thing is in evidence, that becomes part

18   of the record.  And trust me --

19           MS. BERNSTEIN:  They asked questions --

20           MR. DeSALVO:  -- there's more on the tape that's going to

21   prove him wrong and you wrong, so don't go too far with it because

22   I am holding back on you.

23           MS. BERNSTEIN:  They asked questions for ten hours about

24   whether things were consistent or inconsistent with what he learned

25   in his investigation.  And I'll move quick on these, but I've got a

1    lot of questions about whether they're inconsistent or consistent.

2         THE COURT:  First of all, listen, nobody replayed the

3    taped statements.  There were questions about consistent or

4    inconsistent --

5         MS. BERNSTEIN:  Yes.

6         THE COURT:  -- and the ability to evaluate the

7    credibility of people he interviewed, there were a lot of questions

8    about that.  So I think you have some leeway on that.

9         Insofar as this particular point is concerned, I think

10   you need to -- he's already said he can't tell from the tape who

11   was in the truck.  He said you really can't see it.  In fact, he

12   should have said, I really can't see it, but he volunteered that

13   you can't see it, meaning everybody, he said you can't see it.  So

14   you need to direct him to another part.

15        Get off of what's going on in the truck because he just

16   said he can't see it, he doesn't know what's going on in the truck.

17   If you want to direct him to after that when Bowen is in front of

18   the truck on the tape, then let's ask him that.

19        MS. BERNSTEIN:  I'm asking about what Bowen said in his

20   statement.

21        THE COURT:  I think we're taking four questions to get to

22   one.  But the jury can evaluate that.  The thing is, we didn't play

23   the statements back on cross and we're not going to play them back

24   here.

25        MR. HESSLER:  Your Honor, I didn't ask any questions

1    about the credibility of my client's statement, only questions

2    about what might have been asked or not asked.

3         THE COURT:  A lot of that was covered on cross regardless

4    of who asked it, a lot of it was covered on cross.  But again, we

5    can sit here, and we already have sat here for days recounting

6    testimony when we should be talking about his investigation.  He is

7    not a juror and he is not going to get up there and say, now I see

8    this and that's what this means.

9         MS. BERNSTEIN:  I think that's exactly my point.  We have

10   sat here for days, while on cross he was able to testify about

11   everything he knew during his investigation.  My job on redirect is

12   to come back and take those specific points and have him answer

13   additional questions in order to clarify what was misleading.

14        THE COURT:  And that's what we're going to allow you to

15   do.  The thing about it is, though, that is limited to cross, no

16   one played the statements on cross.  If you want to refer him to

17   something --

18        MS. BERNSTEIN:  They asked about -- I'm sorry.

19        THE COURT:  Ms. Bernstein, you know what, and you're not

20   the only one, you have to let me finish and you have to let each

21   other finish.

22        The jury has seen the tape many times, you need to direct

23   him to something -- he's already said he couldn't see what was

24   going on inside the truck.  Let's be specific on the question.

25   Talk to him about what when he does see Bowen on the tape and then

```
 1   you can direct him, without playing it, with regard to his

 2   statement.

 3        (OPEN COURT.)

 4   BY MS. BERNSTEIN:

 5   Q.  You were asked some questions yesterday about judging the

 6   credibility of witnesses during your investigation.  When you were

 7   judging the credibility of witnesses, would you compare what they

 8   said to what you saw on that tape?

 9   A.  Yes.

10   Q.  Did you do that with the statements that the defendants gave as

11   well?

12   A.  Yes.

13   Q.  On the point of where Defendant Bowen, when he got out of the

14   front of that cab of that truck, was it consistent or inconsistent

15   with the tape?

16            MR. HESSLER:  Object, your Honor.  The tape is not a

17   complete and accurate assessment of the incident from beginning to

18   end.

19            THE COURT:  But it has been shown to the jury, so based

20   upon what the jury has seen of the tape, I am going to allow him to

21   answer.

22            THE WITNESS:  It is inconsistent with his statement.

23   BY MS. BERNSTEIN:

24   Q.  I want to ask you, Mr. DeSalvo asked you yesterday some

25   questions about whether you searched under the I-10 bridge that day
```

```
 1   that you closed down Danziger, do you remember that?
 2   A.  Yes.
 3   Q.  You've already testified about the main purpose of the Danziger
 4   Bridge closing; what was the main purpose?
 5   A.  The photogrammetry analysis.
 6   Q.  And you testified Monday that you didn't particularly expect to
 7   find relevant evidence, right?
 8            MR. DeSALVO:  Objection -- I'll withdraw the objection.
 9            MS. BERNSTEIN:  I'm just trying to move it along.
10            THE WITNESS:  Yes.
11   BY MS. BERNSTEIN:
12   Q.  Can I have Exhibit 47, please.  For the record, this is the
13   aerial photograph that's been introduced into testimony.  Stephen,
14   can you zoom in on this area, please (INDICATING).
15            What's the terrain like in that area under the I-10
16   bridge?
17   A.  Filled with debris and brush trees.
18   Q.  Did you know, based on your investigation, a precise location
19   where the shooters from under the I-10 were at any particular time?
20   A.  No.
21   Q.  Now, if you were to have searched the I-10 -- so you didn't
22   have a precise location, so it would have been this entire area you
23   would have had to search?
24            MR. FLEMING:  Objection; leading.
25            THE COURT:  Yes.
```

1              MS. BERNSTEIN:  If you were to --

2              THE COURT:  You can't lead the witness and then ask him a

3    leading question and they object and then I sustain the objection,

4    when he's already heard the suggested answer.  That's improper.

5              MS. BERNSTEIN:  And, your Honor, I was leading on a

6    question that I thought, just to get where we're going, but I won't

7    lead.

8              THE COURT:  I know sometimes -- if he's already given an

9    answer without suggestion, that's one thing.  If he hasn't, then

10   you can't suggest an answer, have the objection and now he's

11   already heard the suggested answer and then you turn around and

12   rephrase the question and now he answers.  So we can't do it that

13   way.

14   BY MS. BERNSTEIN:

15   Q.  Agent Bezak, if you were to have searched the I-10, as

16   Mr. DeSalvo suggested, what area would you have had to search?

17   A.  (WITNESS MARKS DOCUMENT.)

18             MR. HESSLER:  Your Honor, I am going to object to the

19   form of the question.  I think it suggests, I guess it suggests

20   that he talked to the officers that witnessed the event, and they

21   didn't give him the area or he -- or he talked to the witnesses and

22   they couldn't give him an area, and there's been no evidence to

23   either one of those theories.

24             THE COURT:  Well, he's testified at length about his

25   investigation, plus he's already answered the question by

 1    illustrating it, so I'll overrule the objection.

 2    BY MS. BERNSTEIN:

 3    Q.  So let me ask a different question, and my next question is --

 4    and just a reminder for the jury what we're looking at since it's

 5    been awhile, this is the Danziger Bridge; is that correct

 6    (INDICATING)?

 7    A.  Yes, ma'am.

 8    Q.  And this is the I-10 at the bottom of the picture; is that

 9    correct (INDICATING)?

10    A.  Yes, ma'am.

11    Q.  Do you have any idea how many resources it would have taken to

12    search, and I am going to ask in my question, to search the area

13    between the I-10 and the Danziger Bridge?

14    A.  A lot of resources.

15    Q.  And your search was, you've already testified it was September

16    of 2009, so that's about four years after the incident, correct?

17    A.  Yes, ma'am.

18    Q.  Do you know how many hurricanes had passed through New Orleans

19    in that time?

20    A.  A number, several.

21    Q.  Do you know how many rainstorms had passed through New Orleans

22    in that time?

23    A.  Many.

24    Q.  Did you expect to find any relevant evidence in that area over

25    by the I-10?

```
 1            MR. DeSALVO:  That's been asked and answered.

 2            MS. BERNSTEIN:  No, that one has not.

 3            MR. DeSALVO:  On redirect already.

 4            MS. BERNSTEIN:  No, I asked about the Danziger Bridge

 5  before.  Now I am asking about the I-10 bridge.

 6            THE COURT:  I'll overrule, he can answer.

 7            THE WITNESS:  No.

 8  BY MS. BERNSTEIN:

 9  Q.  No, you did not?

10  A.  No.

11  Q.  And if you had found casings over by the I-10, would you have

12  had -- or any physical evidence, would you have had anything to do

13  with it?

14            MR. FLEMING:  Objection.

15            THE COURT:  I am going to sustain.  It's speculative

16  about something he didn't -- what would he have done with something

17  he didn't find and he didn't search for.

18  BY MS. BERNSTEIN:

19  Q.  Now, several attorneys asked you yesterday about those items

20  that you did find during the search of the Danziger Bridge.  And

21  they asked you whether you had -- or why you hadn't submitted the

22  evidence to NIBIS, is that how you pronounce it?

23            MR. DeSALVO:  NIBIN.

24            THE WITNESS:  Mr. DeSalvo knows.

25  BY MS. BERNSTEIN:
```

1   Q.  Okay, NIBIN.

2   A.  NIBIN, is that...

3   Q.  Which was the ballistics database that you talked about, right?

4   A.  Yes.

5   Q.  The information in that ballistics database, where does it come

6   from?

7   A.  From items of evidence that are submitted to that database.

8   Q.  Do you know where the items submitted to that database come

9   from?

10  A.  Other investigations.

11  Q.  So do you know whether NIBIN would have any information in it

12  relating to the Madisons, the Bartholomews, Jose Holmes, or James

13  Brissette?

14          MR. DeSALVO:  Objection, your Honor.  He couldn't know

15  unless he checked.

16          THE COURT:  Yes, I will sustain.

17          MR. HESSLER:  Objection, your Honor.

18          MS. BERNSTEIN:  I think he can know that, your Honor.

19          THE COURT:  No, I just ruled that I've sustained an

20  objection, so...

21          MS. BERNSTEIN:  May I have 250, please.

22  BY MS. BERNSTEIN:

23  Q.  Mr. DeSalvo asked you about this photograph of Ronald Madison,

24  and he asked you about the mark on Mr. Madison's shoulder.

25  A.  Yes, I remember that.

1    Q.  And he asked you specifically why there was only one mark, do

2    you remember that?

3    A.  Yes.

4           MR. DeSALVO:  Your Honor, I never asked why, we've been

5    through that before.

6           THE COURT:  I'll overrule.  He can answer this.

7    BY MS. BERNSTEIN:

8    Q.  Can you see Ronald Madison's whole shirt?

9    A.  No.

10   Q.  Why not?

11   A.  It's scrunched up, for lack of a better word, because the

12   officer's pulling on it.

13   Q.  Stephen, can we blow up this part right here with the mark on

14   the fender (INDICATING).

15           You were asked whether you thought that mark could be

16   blood.  Do you see any scratches on the fender in that photograph?

17   A.  Yes.

18   Q.  Do you have any experience with what happens to scratches on

19   fenders out in the weather?

20   A.  Um -- can you rephrase the question, I don't understand

21   scratches in the weather.

22   Q.  Have you ever scratched your car?

23   A.  Yes.

24   Q.  And what happens in that scratch when your car is left out in

25   the weather?

1    A.  It rusts.

2            MR. FLEMING:  Judge, I am going to object.  She is asking

3    about common, every day experiences.

4            MR. HESSLER:  Certainly been no --

5            THE COURT:  A lot of these questions are better suited

6    for argument to the jury.  They see the picture, the question

7    you're asking is hypothetical based on common experience that

8    everyone has.  It doesn't -- we need to ask him questions about

9    what he knows about his investigation.  That's what he's called

10   for.

11   BY MS. BERNSTEIN:

12   Q.  Let me ask a follow-up question on a specific part of this

13   photograph that was blown up on cross.  Stephen, can you blow up

14   this part up here (INDICATING).

15           You were asked specifically about these marks on the

16   truck.

17   A.  Yes.

18   Q.  Right?  What do these marks look like to you?

19   A.  Somebody's fingers dragging down the fender.

20   Q.  Mr. DeSalvo asked you a bunch of questions about your reaction

21   in your investigation when you read a memo written by Tris Lear.

22   Do you remember those questions?

23   A.  Yes.

24   Q.  And I'll ask I think an unobjectionable leading question.  Tris

25   Lear is the guy who interviewed Lance Madison at lockup and wrote a

1    report, correct?

2    A.  Correct.

3    Q.  Now, do you remember exactly what that memo says that

4    Mr. DeSalvo asked you about?

5    A.  No, I do not.

6    Q.  You just took his word for it --

7    A.  Yes.

8    Q.  -- I think you said, the words that you guys used in court?

9    A.  Yes, ma'am.

10              MS. BERNSTEIN:  May I approach, your Honor, and show him

11   the memo?

12              THE COURT:  Yes.

13              MR. FLEMING:  Well, is there a question that's being used

14   to refresh his memory?

15              MR. DeSALVO:  Tris Lear is on our witness list and we

16   expect to call him today.

17              THE COURT:  Let's get a question before we show him

18   anything.  If he says he didn't look at it and he took their word

19   for it, than I don't know how much further we can go without a

20   question.

21   BY MS. BERNSTEIN:

22   Q.  Well, Mr. DeSalvo asked you about what Lance Madison said in

23   this interview, and he specifically asked you about whether it

24   affected your investigation when you read Tris Lear's memo that

25   Lance Madison said he was sure somebody was shooting at him on the

```
 1    bridge.
 2                THE COURT:  Wait, wait, wait.
 3                MS. BERNSTEIN:  That's the only way to give him the
 4    specific follow-up.
 5                THE COURT:  But you have to --
 6                MR. DeSALVO:  That's not my question anyway, Judge.  I
 7    know what Tris Lear's memo is and I never asked that question.
 8                MS. BERNSTEIN:  May we approach, your Honor?
 9                THE COURT:  Well, here is what I want to do, I want to
10    get a question to him that would call for him to view the document.
11    Right now we're showing him a document and then we're -- now we're
12    reading it.  It's sort of disembodied voice.  So let's ask the
13    question, let's see -- proceed.
14    BY MS. BERNSTEIN:
15    Q.  You were asked on cross questions about what Lance Madison said
16    to Tris Lear about who was or was not shooting on the bridge.  Do
17    you remember those questions?
18    A.  Yes.
19    Q.  Do you remember what Lance Madison said to Tris Lear about who
20    was or was not shooting on the bridge?
21    A.  No.
22                MS. BERNSTEIN:  May I approach?
23                THE COURT:  Go ahead.
24                MS. BERNSTEIN:  I would like you to read the highlighted
25    part and just let me know when you're done.
```

```
 1            THE WITNESS:  (WITNESS READS DOCUMENT.)

 2            MR. DeSALVO:  Your Honor, I think the best evidence for

 3    that is Tris Lear.  The memo is not in evidence, but it will be.

 4            THE COURT:  All right, then, let's let him take a look at

 5    it.  We don't know if he has seen this before, that's the question

 6    that we have yet to ask him when we're showing him stuff.  I hope

 7    we're not going to ask him to now state something that's in a

 8    document that he's never seen before.

 9            MS. BERNSTEIN:  No, your Honor, I think that was

10    established on cross, but I can ask again.

11    BY MS. BERNSTEIN:

12    Q.  Is this a memo that was part of your investigation?

13    A.  Yes.

14    Q.  Have you seen it before?

15    A.  Yes.

16            THE COURT:  All right.

17            THE WITNESS:  May I read it one more time, I'm sorry.

18    (WITNESS REVIEWS DOCUMENT.)

19    BY MS. BERNSTEIN:

20    Q.  According to that memo by Tris Lear, what did Tris Lear write

21    in that memo about what Lance Madison said about who was shooting

22    on the bridge?

23            MR. FLEMING:  Judge, that's really not used to refresh

24    his memory.

25            THE COURT:  No, but it's a document that he's now
```

1    testified that he had as part of his investigation; in fact, that

2    he reviewed as part of his investigation.

3             MR. DeSALVO:  Your Honor, we have no objection if the

4    government wants to mark it and introduce it into evidence.

5             MS. BERNSTEIN:  I'm not going to introduce it, I am just

6    following up on the questions that Mr. DeSalvo asked.

7             THE COURT:  All right.

8    BY MS. BERNSTEIN:

9    Q.  Mr. DeSalvo asked about what was in this memo and whether this

10   memo affected your investigation.  Now that you've --

11            I didn't ask the proper follow-up question, which is, now

12   that you've looked at it, does that refresh your memory as to

13   what's in the memo?

14   A.  Yes.

15   Q.  What's in the memo about who shot on the bridge that day?

16   A.  Unknown -- members of an unknown law enforcement agency.

17   Q.  And what's in the memo about whether or not anybody fired at

18   the truck that the officers were in?

19   A.  He says he is not sure if that happened.

20   Q.  Now, along those same lines, Mr. DeSalvo asked you about Lance

21   Madison's preliminary hearing testimony.  And he specifically asked

22   you whether that testimony made you think during your investigation

23   that the people behind Lance Madison had guns.  Do you remember

24   that question?

25   A.  Yes.

1   Q.  Based on your investigation, who were the people behind the

2   Madisons?

3   A.  The Bartholomews.

4   Q.  What happened to them that day?

5   A.  They were shot by the police.

6   Q.  Were there any officers right there when they were shot?

7   A.  Yes.

8   Q.  Did the officers collect any guns?

9   A.  No.

10  Q.  Do you know from your investigation whether Lance Madison knew

11  on the day of the preliminary hearing that officers were firing

12  from a Budget truck a block behind the Bartholomews?

13  A.  Yes.

14  Q.  What do you know from your investigation about that?

15  A.  He did not know.

16  Q.  Now, Mr. DeSalvo asked you about allegations that the federal

17  prosecution team had pressured people, and I want to follow up on

18  each set of those questions that he asked.

19          You were asked about an interview that you did with

20  Heather Gore at the 2nd District station.

21  A.  Yes, ma'am.

22  Q.  Who suggested that you all meet at the 2nd District statement

23  (SIC)?

24  A.  Station?

25  Q.  Yeah, station, sorry.

1   A.   Heather Gore.

2   Q.   And approximately when was this interview, do you know?

3   A.   Time that day or --

4   Q.   During the year, do you remember what year?

5   A.   2009.

6   Q.   So sometime in 2009?

7   A.   Yes, ma'am.

8   Q.   And she suggested that you all meet at the 2nd District

9   statement -- I mean station, I'm sorry.

10   A.   Yes, ma'am.

11   Q.   Was that interview voluntary?

12   A.   Yes.

13   Q.   Did you know from your investigation, do you know what her

14   relationship was with Defendant Gisevius?

15   A.   Yes.

16   Q.   What was their relationship?

17   A.   They were friends, at one time they were intimate friends.

18   Q.   Now, during that interview with Heather Gore, did you think

19   that she was telling you the truth?

20   A.   No.

21        MR. DeSALVO:  Your Honor, we need to approach the bench.

22        (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

23        MR. HESSLER:  I am going to ask for recross based on what

24   she just said, this is going on, it's gone too far and I will be

25   asking to recross Agent Bezak.

```
 1              MS. BERNSTEIN:  I've asked two questions.

 2              MR. DeSALVO:  You know that was misleading.

 3              MS. BERNSTEIN:  What was misleading?

 4              MR. DeSALVO:  That question.

 5              MS. BERNSTEIN:  What question?

 6              MR. DeSALVO:  I am going to tell you, Ms. Gore said that

 7    one time when they were 16 years old they had sex.

 8              MR. HESSLER:  They've been knowing each other since grade

 9    school, or high school at least, and that's the reason I want --

10              MS. BERNSTEIN:  On their sexual relationship?

11              MR. HESSLER:  On the question that didn't come up on

12    direct, didn't come up on direct or didn't come up on cross.

13              MS. BERNSTEIN:  The sexual relationship?

14              MR. FLEMING:  The implication is that was something

15    recent, it was something that happened when they were children.

16              MS. BERNSTEIN:  You never asked about what his

17    investigation showed.

18              MR. DeSALVO:  We asked about threats on Heather Gore,

19    that was it.

20              MS. BERNSTEIN:  This whole discussion about Heather Gore,

21    I objected to the line of questioning about Heather Gore and I was

22    overruled yesterday, and they got into all of this about Heather

23    Gore and all of this about her complaints, now who she is and what

24    her relationship is to the defendants, and they asked about

25    whether -- they --
```

```
 1              MR. DeSALVO:  That's not true.

 2              THE COURT:  First of all, nobody asked about her

 3    relationship to a defendant in this case.

 4              MS. BERNSTEIN:  Of course, your Honor, that's not

 5    redirect.  That's important.  That's responsive to what they were

 6    saying about her allegations.  Her bias is, of course --

 7              MR. HESSLER:  It was important if it came up on direct,

 8    and it didn't come up on direct and it didn't come up on cross.

 9              MS. BERNSTEIN:  It didn't come on direct --

10              MR. HESSLER:  And it's misleading.

11              THE COURT:  Let's see how far we go.  I may allow

12    Mr. Hessler redirect on this.

13              MS. BERNSTEIN:  On the question of their sexual

14    relationship?

15              THE COURT:  I hope not, but on the length of time or ago

16    that it was they had -- it's important if they were involved and

17    involved intimately at a time relevant to this investigation,

18    that's important.  If they were not, if they were just co-workers

19    and that they were -- this happened 20 or 30 years ago, then --

20              MS. BERNSTEIN:  On that, your Honor --

21              THE COURT:  -- that's an important distinction.

22              MS. BERNSTEIN:  -- there is no hard and fast answer to

23    that.  Ms. Gore said they had sex when they were teenagers, other

24    people said that they were romantically involved right at the time

25    of the incident.
```

```
 1              MR. HESSLER:  That's no good.

 2              MR. DeSALVO:  They also said Bowen was having sex with

 3    her, Villavaso was having sex with her.

 4              THE COURT:  I really -- first of all, I really don't want

 5    to go down this road.

 6              MS. BERNSTEIN:  I don't either.

 7              THE COURT:  But the impression is left with the jury that

 8    at times during his investigation they had not only a friendship

 9    and were co-workers, but that they had an intimate relationship,

10    which would go all the more to a motivation to lie.

11              MS. BERNSTEIN:  And this is consistent with his

12    investigation.  Obviously, nobody was in the bed with them.  So

13    what I can do, if you will allow this, is I can ask two questions:

14    Did Heather Gore tell you when she was romantically involved with

15    Gisevius, and did other people during your investigation --

16              MR. DeSALVO:  No, no, no.

17              MS. BERNSTEIN:  -- also know they were -- either one is

18    misleading without the other.

19              MR. DeSALVO:  That's gross hearsay.

20              MS. BERNSTEIN:  And that's -- of course, this is lots of

21    hearsay here.  But the objections that were overruled yesterday is

22    that it's based on his investigation and the information he learns.

23    The information he learned, whether it's correct or not, the

24    information he learned --

25              THE COURT:  First of all, we are on redirect, so we are
```

1  now beyond the scope of his investigation.  We are now limited to

2  the scope of the cross.

3         MS. BERNSTEIN:  Of course.  But the bias would be

4  relevant to what was on cross was, whether she was -- whether she

5  was mistreated; on redirect it's whether she was mistreated,

6  whether she has a motive to lie about that.  So I think it's

7  absolutely fair within redirect --

8         THE COURT:  Go ahead and ask him, I may give him recross.

9         MS. BERNSTEIN:  Ask both questions?

10         MR. DeSALVO:  May I just interject one thing, Judge?

11  This is a character assassination on Heather Gore, and we don't

12  have the right to call her, with respect to the fact that she would

13  take the Fifth.

14         MS. BERNSTEIN:  Well, how is it a character assassination

15  when she was romantically involved with Defendant Gisevius, I don't

16  know.

17         MR. FLEMING:  I am going to object.  I think, your Honor,

18  Ms. Bernstein's last comment as to what his investigation shows,

19  whether it's correct or incorrect.

20         MS. BERNSTEIN:  On the issue of whether or not --

21         MR. FLEMING:  You're putting information that they don't

22  know it's true don't even know it.

23         MS. BERNSTEIN:  What he learns --

24         THE COURT:  The objection is that it's not limited in

25  times when they had an intimate relationship, something other than

 1   being co-workers and friends.  That's the objection.

 2            MS. BERNSTEIN:  If I can navigate around this with a

 3   somewhat leading question, I'll ask him -- I'll ask him

 4   specifically whether Heather Gore said when they were romantically

 5   involved, and then I will ask, during your investigation, did other

 6   people tell you whether or not she had a very close relationship --

 7            THE COURT:  No, this was not covered at all.

 8            MR. HESSLER:  Absolutely not.

 9            MS. BERNSTEIN:  Her bias is what's relevant.

10            MR. DeSALVO:  I don't think she SAID romantically

11   involved, I think she said they had sex one time when they were 16.

12            MS. BERNSTEIN:  I don't think that's what she said,

13   but --

14            MR. FLEMING:  And you don't know whether that other

15   information is even true.

16            MR. HESSLER:  And you know what -- well, I'll get to that

17   if I get to recross on how that came up.

18            THE COURT:  We are going down a road that I really don't

19   want to go down for several reasons.

20            MS. BERNSTEIN:  I know.  And my point, your Honor, what I

21   have to do and what I have the right to do is to bring out this

22   woman's bias.  They have brought out that she claims that she was

23   mistreated by the government.  We have a right to bring out her

24   bias.  And if nobody objects, I can just say, did you learn whether

25   or not she had a very close relationship to Gisevius; did she --

```
 1    you mentioned that she had a romantic relationship at some point,

 2    did she tell you when that romantic relationship was.

 3              MR. HESSLER:  You can't do both.  There is no evidence.

 4    What is the evidence that their sexual intercourse in 1983 had

 5    anything to do with the close connection to them now, if there is

 6    one?

 7              MS. BERNSTEIN:  There isn't.  They had a very close,

 8    everybody said they were very close.

 9              MR. HESSLER:  What everybody said?

10              MS. BERNSTEIN:  In his investigation, that they were very

11    close, and somebody did, people have testified here.

12              THE COURT:  I think you need to establish the time frame.

13    The jury has already heard that they had a relationship that was

14    other than just friends.  Establish the time frame on it.

15              MR. FLEMING:  Close does not mean intimate.  Frank and

16    Eric are very close.

17              MR. DeSALVO:  That's a matter of fact, Judge.

18              THE COURT:  But I think the jury has already heard that

19    word.

20              MR. FLEMING:  Yes.

21              THE COURT:  That's the problem.

22              MS. BERNSTEIN:  And it's true, your Honor.  It is not

23    misleading.  I will ask whether he knows when -- according to

24    Heather Gore when they were intimate, but then I will follow up

25    with, did you learn whether they continued to be very close.
```

```
 1              THE COURT:  I already can't wait to see the 2255 on this
 2    baby.
 3              MS. BERNSTEIN:  Is that okay, your Honor?  Is everybody
 4    okay with those two questions?
 5              MR. FLEMING:  No.
 6              MR. HESSLER:  I'm not.  I think I need to do it on
 7    redirect.
 8              MR. FLEMING:  Recross.
 9              MR. HESSLER:  Recross.  This is just stuff coming up.
10              THE COURT:  I am going to let you ask those two
11    questions.
12              MS. BERNSTEIN:  Those two questions.
13              THE COURT:  No, the question about if he knows at what
14    point in time, how old they were when they had a relationship.  You
15    need to establish that there's no evidence that they had a
16    relationship thereafter.
17              MS. BERNSTEIN:  That's not true that there's no evidence
18    that they had a relationship thereafter, and that's the problem.
19              THE COURT:  Then I am going to let him recross on it.  On
20    that point alone.
21              MS. BERNSTEIN:  Okay.  Just so we're not back-dooring
22    here, I don't care whether they were actually having sex at the
23    time of the Danziger, to show the intimacy that is relevant --
24              THE COURT:  It's not relevant if it was so many years
25    ago.  The relevant question is what she was told about and whether
```

1   she lied, that's the relevant question.

2            MS. BERNSTEIN:  And what is relevant is her relationship

3   with Gisevius at the time of the incident and at the time of the

4   investigation.  Now, with that --

5            THE COURT:  Then why did you ask about a relationship

6   that occurred in 1983?

7            MS. BERNSTEIN:  Because the relationship at the time was

8   very, very close.  Many people told us that they were romantically

9   involved at the time.

10            MR. FLEMING:  Call them in here.

11            MS. BERNSTEIN:  It's not worth calling them in here for

12   that.  But what people told us was, yes, they were at one point

13   sexually intimate; and the reason that's important is because of

14   the fact that they were involved and they had stayed very, very

15   close forever does say something about their closeness at the time

16   of the incident.

17            MR. FLEMING:  She wants to get in a statement made by

18   Heather Gore who is not here and then impeach her from what other

19   people told him about her.

20            THE COURT:  Right.  Just ask what I just asked, and we'll

21   see where we go; and I may allow recross only very limited to this,

22   and only Eric since that's Eric's client.

23         (OPEN COURT.)

24   BY MS. BERNSTEIN:

25   Q.  Agent Bezak, before that break we were talking about what you

 1   learned during your investigation about the relationship between

 2   Heather Gore and Defendant Gisevius.  Did you learn how long they

 3   had known each other?

 4   A.  Since they were kids.

 5   Q.  And you mentioned that at some point they had an intimate

 6   relationship, did Heather Gore tell you when that was?

 7   A.  I believe when they were teenagers.

 8   Q.  And did you learn during your investigation whether they had

 9   continued to remain very close friends?

10            MR. DeSALVO:  Objection.  That's got to be hearsay, your

11   Honor.

12            THE COURT:  I am going to sustain.  I think we've covered

13   this enough.  I am going to sustain.

14   BY MS. BERNSTEIN:

15   Q.  Okay.  We're back on your interview with Heather Gore at the

16   2nd District station.  During that interview, did you feel she was

17   telling you the truth?

18   A.  I did not feel she was telling me the truth.

19   Q.  And I think you were asked yesterday whether lying to the FBI

20   is a crime.  Is lying to the FBI on a material matter a crime?

21   A.  Yes.

22   Q.  Did you think she was lying to you about a material matter?

23   A.  Yes.

24   Q.  And if someone is convicted of perjury, are they allowed to

25   take their children with them to jail?

1  A.  No, they're not.

2  Q.  Did you confront Heather Gore in that interview with the fact

3  that you thought she was lying?

4  A.  Yes.

5  Q.  Do you still think she was lying to you?

6  A.  Yes.

7  Q.  Now, why did you confront Heather Gore in that interview, when

8  you testified on Monday and I think again yesterday, that you did

9  not confront Defendant Kaufman in that very first interview you did

10  in the case?

11  A.  Because now I had a lot more information about the incident.

12  Q.  And once you had more information about the incident, did you

13  regularly confront people if you thought that they were lying?

14        MR. FLEMING:  Objection; leading.

15  BY MS. BERNSTEIN:

16  Q.  Did you or did you not regularly confront people if you thought

17  they were lying?

18  A.  I did confront them if I thought they were lying.

19  Q.  In your experience, do people generally incriminate themselves

20  right off the bat?

21  A.  No, they do not.

22  Q.  In your experience, what does it take to get people to admit

23  that they did something wrong?

24        MR. FLEMING:  Objection; asked and answered.

25        THE COURT:  Yes, I think we've covered this.  Let's move

```
 1   on.
 2   BY MS. BERNSTEIN:
 3   Q.  Did you confront Kevin Brian in the course of your
 4   investigation?
 5   A.  Yes, I did.
 6   Q.  Did he tell you whether or not he had been lying?
 7   A.  Yes, he did.
 8   Q.  Had he?
 9   A.  Yes, he was lying.
10   Q.  Did you confront Mike Lohmann during the course of your
11   investigation?
12   A.  Yes, I did.
13   Q.  Did he tell you whether or not he had been lying?
14   A.  Yes, he did.
15   Q.  Had he?
16   A.  Yes, he was lying.
17   Q.  Did you confront Jeff Lehrmann?
18   A.  Yes, I did.
19   Q.  Did he tell you whether or not he had been lying?
20   A.  Yes.
21   Q.  Did he tell you whether or not he ever would have ever told you
22   the truth if you hadn't confronted him?
23   A.  Yes.
24   Q.  What did he tell you?
25               MR. FLEMING:  Objection.  That was testified to by
```

1    Mr. Lehrmann, Judge.

2         THE COURT:  Yes.  I'll sustain it.  We've heard these

3    witnesses.  Let's get on to some stuff that needs to be covered on

4    redirect without plowing through stuff that the jury has already

5    heard and that he's already testified to.

6    BY MS. BERNSTEIN:

7    Q.  Mr. Hessler asked you on a similar vein, he asked you about a

8    conversation with Ignatius Hills, about whether or not Ignatius

9    Hills was pressured, do you remember those questions?

10   A.  Yes.

11   Q.  And when Ignatius Hills finally cooperated in 2010, did he tell

12   you whether he had been lying before that?

13   A.  He did.

14   Q.  When he finally said, okay, I'll tell you the truth now, did

15   you take him at face value?

16   A.  No.

17   Q.  Why not?

18   A.  His statement had to be backed up by something else, so I

19   wouldn't just take what he said at face value.

20   Q.  And did you tell him whether or not you thought he might be

21   holding back?

22   A.  Yes.

23   Q.  And Mr. DeSalvo asked you about something he referred to as a

24   complaint by Rakisha Barrios, and Mr. Meche just asked you about

25   that as well.  Did she ever file any sort of formal complaint?

```
1    A.  No.

2    Q.  Now, did Rakisha Barrios complain --

3            MR. HESSLER:  Objection, your Honor, to the form of the

4    question.  It assumes there is a formal complaint, and a complaint

5    is a complaint.

6            THE COURT:  I think it was a fair question.

7            MR. HESSLER:  I think it's up to the authorities to lodge

8    a complaint once a complaint was made to them.

9            THE COURT:  I think it was a fair question and he's

10   answered it.

11   BY MS. BERNSTEIN:

12   Q.  Did Rakisha Barrios complain about the way she was treated?

13   A.  No.

14   Q.  Who was she complaining about?

15   A.  Her husband.

16   Q.  So it was a secondhand complaint?

17   A.  Yes.

18   Q.  And just for the record, who is her husband?

19   A.  Robert Barrios.

20   Q.  So then did you talk to Robert Barrios to see if he had a

21   complaint?

22   A.  Yes.

23   Q.  Did he have any complaint?

24   A.  No.

25   Q.  Who was the actual witness in the case, Rakisha or Robert?
```

1    A.   Robert.

2    Q.   Let me go back to Heather Gore for a minute.   Did she ever tell

3    you why she complained?

4    A.   Yes.

5    Q.   What did she tell you?

6    A.   Her supervisor made her.

7    Q.   Who is that supervisor?

8    A.   I believe she was referring to Bruce Little.

9    Q.   Now, if you had taken everything at face value and not

10   confronted people when they gave you stories that didn't add up,

11   where would your investigation have gone?

12   A.   Nowhere.

13   Q.   In your experience, is confrontation unusual during an

14   investigation?

15   A.   No.

16   Q.   In your interviews with Robert Barrios, Ignatius Hills, and

17   Heather Gore, the people you've been asked about, what did you tell

18   them you wanted from them?

19   A.   The truth.

20   Q.   You were asked some questions about interviews we did together.

21   When we talked to people together, what did we tell them they

22   wanted -- we wanted?

23   A.   The truth.

24   Q.   And how about your interviews with other officers, what did you

25   tell them you wanted from them?

1    A.  The truth.

2    Q.  Did anybody from the government ever say otherwise?

3    A.  No.

4         MR. FLEMING:  I am going to object as to that form.  He

5    can only testify as to what he knows firsthand, not to what other

6    agents or prosecutors may have said.

7         THE COURT:  I'll sustain, and the witness's answer is

8    limited only to what he participated in.

9    BY MS. BERNSTEIN:

10   Q.  Are Barrios, Hills, and Gore the only officers you talked to

11   during your investigation?

12   A.  No.

13   Q.  Did any other officers ever compliment your investigation?

14        MR. DeSALVO:  Objection, your Honor.

15        MR. HESSLER:  Objection, your Honor.

16        MS. BERNSTEIN:  Well within the scope, your Honor.

17        MR. HESSLER:  A bit self-serving.

18        THE COURT:  Yes, I am going to sustain the objection.

19   BY MS. BERNSTEIN:

20   Q.  In your experience, is it more unusual, more remarkable to have

21   a suspect complain that you pressed him for more information or to

22   have someone compliment your investigation on a police misconduct?

23        MR. FLEMING:  Object.

24        MR. DeSALVO:  Objection.

25        THE COURT:  I am going to sustain.  We are not giving out

1   gold stars here.  We want to know facts that he knows.  Let's ask

2   him for factual testimony.  Whether he did a great good or a good

3   job or a substandard job is something the jury will have to decide.

4   That's the province of the jury.

5           MS. BERNSTEIN:  Let me switch to Mr. Fleming's questions

6   from yesterday.

7   BY MS. BERNSTEIN:

8   Q.  Mr. Fleming asked you whether during the course of your

9   investigation you gained access to Louisiana State Police radio

10  runs, do you remember that question?

11  A.  Yes.

12  Q.  Do you know whether those records were also turned over to

13  defense attorneys as part of this case?

14  A.  Yes, they were turned over.

15  Q.  Mr. Fleming asked you if you were present for every

16  conversation that prosecutors on this case had with Mr. Lehrmann's

17  lawyer, do you remember that question?

18  A.  Yes.

19  Q.  Now, are you generally present for every conversation that

20  attorneys have with one another?

21  A.  No.

22  Q.  Were you or was some agent present for every conversation the

23  prosecutors had with Mr. Lehrmann?

24          MR. DeSALVO:  He can't say that unless he was present,

25  Judge.

1   BY MS. BERNSTEIN:

2   Q.  Do you know whether you were?

3           MR. DeSALVO:  He can't answer that either.

4           THE COURT:  He can't because if he doesn't know all of

5   the conferences that were held, he doesn't know whether there were

6   any at all or three or six.  So I don't know how he can --

7           MS. BERNSTEIN:  Well, I think he does know the answer to

8   that question.  May I ask the do you know question?

9           MR. DeSALVO:  It's hearsay.

10          THE COURT:  You're going to have to go back a question or

11  two and lay a foundation on how he would know something like this.

12  This is now -- you're talking about interviews -- communications

13  between attorneys.

14          MS. BERNSTEIN:  No, no, he said the communications

15  between attorneys he was not always present.

16          THE COURT:  Right.

17          MS. BERNSTEIN:  My question for him is whether he knows

18  whether he was always present when prosecutors met with Lehrmann,

19  not with Lehrmann's attorney.

20          MR. DeSALVO:  Same objection.

21          THE COURT:  I think you're going to have to rephrase the

22  question.

23          MS. BERNSTEIN:  Rephrase it from do you know?

24          THE COURT:  I think I know what you're trying to ask, but

25  I don't want to substitute what I would think would be a good

1  question for what you would think would be a good question.  So

2  I'll give you -- go ahead and rephrase it and let's see if there's

3  an objection.

4  BY MS. BERNSTEIN:

5  Q.  Do you know whether you or another FBI agent was present

6  whenever prosecutors met with Mr. Lehrmann?

7  A.  Yes, an FBI agent was always present if Mr. Lehrmann was

8  present.

9  Q.  I want to talk to you about some of the questions that

10  Mr. London asked you yesterday.  You were asked whether you wrote

11  in your 302 that Sergeant Dugue took full responsibility for the

12  official 54-page report.  Do you remember that question?

13  A.  Yes.

14  Q.  And those were the words that you wrote in your 302, right?

15  A.  Yes.

16  Q.  When you write -- when one person takes full responsibility,

17  does that mean that nobody else can also be responsible?

18  A.  No.

19         MR. LONDON:  Object to that, your Honor, that's not the

20  question.  The question I asked him was precisely as she recited

21  it, and I don't believe she is allowed to elicit more information

22  from that other than what I asked in redirect.

23         MS. BERNSTEIN:  Exactly the purpose of redirect.

24         THE COURT:  Number one, I think that he's already

25  answered the question, but I'll overrule it anyway because I don't

1    think that it was an unfair question.

2    BY MS. BERNSTEIN:

3    Q.   So what was your answer?   The question was whether that means

4    that nobody else can also be responsible.   What was your answer?

5    A.   No, that -- it does not mean that.

6    Q.   Who else's name is on that official 54-page report?

7    A.   Sergeant Kaufman and Lieutenant Waguespack.

8    Q.   And who turned that 54-page report in to the DA's office?

9    A.   Sergeant Kaufman --

10            MR. LONDON:  Objection to that, your Honor.  That was not

11   addressed at all during my examination of this witness.

12            THE COURT:  No, I think it's within the scope of cross,

13   I'll overrule it.

14            THE WITNESS:  Sergeant Kaufman and Sergeant Dugue.

15   BY MS. BERNSTEIN:

16   Q.   And you mentioned it earlier that that was in person, correct,

17   in-person delivery?

18   A.   Yes, ma'am.

19   Q.   Now, Mr. London asked you some questions about when Sergeant

20   Dugue assumed the investigation.  Now, according to your

21   investigation, did anybody work with Dugue on the investigation of

22   the Danziger Bridge case?

23   A.   Yes.

24   Q.   Who was that?

25   A.   Sergeant Kaufman.

1   Q.  Did Sergeant Kaufman tell you that?

2   A.  Yes.

3   Q.  Did Dugue tell you that?

4   A.  Yes.

5   Q.  Mr. London asked you about the date of Sergeant Kaufman's

6   transfer to central homicide, and I think you said you don't know

7   what date that officially happened, right?

8   A.  Correct.

9   Q.  So do you know when the paperwork was done for that transfer?

10  A.  No.

11  Q.  Mr. London suggested it was February.  Do you know on your own

12  whether that date is right?

13  A.  No.

14  Q.  Do you know whether Sergeant Kaufman went to homicide the same

15  date his paperwork was done?

16          MR. LONDON:  Objection, your Honor.  He's already

17  answered he doesn't know when Sergeant Kaufman --

18          MS. BERNSTEIN:  That's a different question.

19          MR. LONDON:  -- went to homicide, and my questions to him

20  were totally confined to whether he was transferred in February or

21  not, not when the paperwork went.  She's going way afield from

22  that, Judge.

23          THE COURT:  Let's clarify the question because it is

24  limited to what was asked on cross, so clarify the question.

25          MS. BERNSTEIN:  On cross he asked about paperwork showing

1    that that transfer was in February.

2             THE COURT:  Let's go ahead and clarify and ask him a

3    question.

4    BY MS. BERNSTEIN:

5    Q.  You've already said you don't know when paperwork was done,

6    correct?

7    A.  Correct.

8    Q.  Whenever paperwork was done, do you know if that means he went

9    on that same day?

10   A.  No.

11   Q.  So let's talk about what we do know -- what you do know about

12   dates.  What division conducted the NOPD interviews, that there's

13   already been testimony about, that happened on January 25th, 2006,

14   at the 7th District station?

15   A.  Cold case or major case homicide, whatever it was referred to

16   at the time.

17   Q.  And that's the unit that Sergeant Dugue worked in; is that

18   right?

19   A.  Yes.

20   Q.  On that day when cold case unit was conducting those

21   interviews, who interviewed Defendant Bowen?

22   A.  Sergeant Kaufman and Sergeant Dugue.

23   Q.  And on that day when cold case was doing the interviews, who

24   interviewed Defendant Gisevius?

25   A.  Sergeant Kaufman and Sergeant Dugue.

1   Q.  So on that day, on January 25th, 2006, what unit was Defendant

2   Kaufman working in?

3   A.  Cold case homicide.

4           MR. LONDON:  Objection to that, your Honor.  That is

5   absolutely misleading.  Again, he knows that is not a correct

6   answer and she knows it, too.  He was still in the 7th District,

7   that was the testimony he gave.  He was assisting cold case, he was

8   not in cold case.

9           THE COURT:  Well, he's already answered the question.  I

10  am going to overrule the objection.  Argument can be made later.

11  BY MS. BERNSTEIN:

12  Q.  Now, Mr. London asked you yesterday whether Defendant Kaufman

13  should have dropped search and rescue to work on the investigation

14  of Danziger Bridge.  Do you remember those questions?

15  A.  Yes.

16  Q.  I want to focus you on January 25th, 2006, when those

17  statements were taken.  Do you know whether search and rescue was

18  going on at that point?

19  A.  Yes.  There -- yes.

20  Q.  And what do you know?

21  A.  No search and rescue going on at that point.

22  Q.  How about in May of 2006 when you said that Kaufman and Dugue

23  delivered that report to the DA's office, was there search and

24  rescue going on in May 2006?

25  A.  No.

1    Q.  Mr. London asked you about David Ryder, and he asked, "They did

2    find out later that he wasn't a police officer, didn't they?"  Do

3    you remember that question?

4    A.  Yes.

5    Q.  Now, is the fact that David Ryder was not an officer reflected

6    anywhere in that official 54-page report?

7    A.  No, it is not.

8    Q.  And you said that report was turned in at the end of May 2006?

9    A.  Yes.

10   Q.  In the end of May 2006, how is David Ryder referred to in that

11   report?

12   A.  Deputy Sheriff David Ryder.

13   Q.  Mr. London asked you about a Lakeisha Smith from Carrollton,

14   Texas.  Now, when you talked to Defendant Kaufman, did he tell you

15   whether or not he thought Lakeisha Smith was a real name?

16   A.  Yes.

17   Q.  What did he tell you?

18   A.  He thought it was made up.

19   Q.  According to your investigation, where did the name Lakeisha

20   come up -- come from in the report?

21   A.  Jeff Lehrmann.

22   Q.  Mr. London talked to you about differences between the report

23   you got from Defendant Kaufman's computer, or I think you actually

24   corrected him, you said it was, what, a thumb drive?

25   A.  Yes, ma'am.

 1  Q.  So the report you got from Defendant Kaufman's thumb drive

 2  during the search warrant and the official 54-page report, do you

 3  remember him asking those questions?

 4  A.  Yes.

 5  Q.  But he didn't show you the report from Kaufman's computer when

 6  he was asking those questions, did he?

 7  A.  No.

 8  Q.  Now, first of all, based on your investigation, is either one

 9  of those reports accurate?

10  A.  Neither one is accurate.

11  Q.  Did any witnesses you talked to explain the evolution of the

12  reports?

13  A.  Yes.

14  Q.  I am not going to ask you what they said, but who were those

15  witness?

16  A.  Jeff Lehrmann, Mike Lohmann.

17          MS. BERNSTEIN:  May I have Exhibit 184, please, which is

18  that report taken off of Defendant Kaufman's thumb drive.

19          And if I may, may I refer to it shorthand as the report

20  off of his computer, with the understanding that it's actually off

21  of his thumb drive?

22          THE COURT:  All right.

23  BY MS. BERNSTEIN:

24  Q.  This is that report from the computer.  May I have page 8,

25  please.

1            So according to this report from Defendant Kaufman's

2    computer, what gun did Sergeant Bowen use in the incident?

3    A.  His NOPD-issued Glock 22, .40 caliber, with the serial number

4    NO1164PD.

5    Q.  Is that the same as what's listed in the 54-page official

6    report?

7    A.  No.

8    Q.  How is it different?

9    A.  In the 54-page report, it also has an AK-47.

10   Q.  I'll ask you Mr. London's question, is that difference

11   significant to you?

12   A.  Yes.

13   Q.  May I have page 32, please.

14            This highlighted section on page 32, there's a word that

15   you've been using to describe that paragraph, what is it?

16   A.  The blame section.

17   Q.  Is that blame section in the 54-page report?

18   A.  No.

19   Q.  Do you consider that difference significant?

20   A.  Yes.

21   Q.  May I have page 19, please.

22            The highlighted section there says:  "At this time,

23   Officers Faulcon, Barrios, Hills, and Villavaso tactically moved to

24   the concrete barrier as Sergeant Bowen laid down suppression fire,

25   and engaged Holmes and an unidentified black male who also

1    brandished a handgun.  The officers fired several rounds, as the

2    two perpetrators returned fire, striking all five subjects,

3    mortally wounding," and it ends in the middle of a sentence.  But

4    my question to you is, according to this report taken off of

5    Defendant Kaufman's computer, what was Officer Hills doing?

6    A.  Tactically moving to the concrete barrier and then engaged

7    Holmes and the unidentified male.

8    Q.  Is that consistent or inconsistent with the official 54-page

9    report?

10   A.  Inconsistent.

11   Q.  Is that difference significant to you?

12   A.  Yes.

13   Q.  Now, may I have this up side by side next to Exhibit 27, which

14   is the 54-page official report already in evidence.  May I have

15   page 20, please.

16          The highlighted section there starts off similarly:

17   "Officer Faulcon, Villavaso, and Barrios engaged the armed subjects

18   behind the cement barrier and then ceased firing.  Sergeant Bowen

19   also observed two males running west over the bridge, while

20   gunshots could be heard coming from those two subjects, who were

21   shooting back at the officers on the bridge."

22          In the official 54-page report in that section, does it

23   specify who was shooting at the officers at that point?

24   A.  No.

25   Q.  Does it name people in the report off of the computer?

1    A.   Yes.

2    Q.   Who does it say was shooting?

3    A.   Jose Holmes.

4    Q.   And who else?

5    A.   And an unidentified black male.

6    Q.   Is that difference significant to you?

7    A.   Yes.

8    Q.   Let's go back just to Exhibit 184, please.  May I have page 20.

9          "Sergeant Bowen moved in, grabbed two handguns, and threw

10   them over the side railing of the bridge."  That's off of the

11   report taken from Defendant Kaufman's computer.  Is that in the

12   official 54-page report?

13   A.   No, it is not.

14   Q.   Is that significant?

15   A.   Yes.

16   Q.   Why?

17   A.   Two different versions of what Sergeant Bowen did.

18   Q.   May I have page 21, please.

19          Leonard Bartholomew, Jr., his name is in that report that

20   was on Defendant Kaufman's computer.  Is that name in the official

21   54-page report?

22   A.   No, it is not.

23   Q.   Now, it's in this report that Defendant Kaufman wrote.  Did

24   Defendant Kaufman ever submit this 32-page report to NOPD?

25   A.   No.

1  Q.  Did he ever submit it to the DA's office?

2  A.  No.

3  Q.  Who did submit the official 54-page report to the DA's office?

4  A.  Sergeant Kaufman and Sergeant Dugue.

5  Q.  Now, when you asked Defendant Kaufman why Leonard Bartholomew

6  Jr.'s name wasn't in the official report, did he say, gosh, I put

7  it in there, I don't know what happened?

8  A.  No.

9  Q.  What did he say?

10  A.  He said that he did not know the name, but he had recently

11  heard a rumor that the juvenile was related to the Bartholomews.

12  Q.  But it's in the 32-page report?

13  A.  Yes, ma'am.

14  Q.  Mr. London asked about a gun that Defendant Kaufman claimed to

15  have found alongside the Danziger Bridge, and he asked you about

16  the fact that you sent that gun to be compared to the NIBIN's

17  database, right?

18  A.  Yes.

19  Q.  What was the result?

20  A.  Negative, it wasn't matched to anything.

21  Q.  Is that what's referred to as a clean gun?

22  A.  Yes.

23  Q.  Now, I want to talk now about the questions that Mr. Hessler

24  asked.

25          MS. BERNSTEIN:  Your Honor, this might be a good time to

```
 1    break.
 2              THE COURT:  Let's see if we can finish up with this
 3    witness.  I think we can -- if you don't mind working past it.  We
 4    need to get done with this witness.
 5              MS. BERNSTEIN:  I think I'm on to the last attorney.
 6    BY MS. BERNSTEIN:
 7    Q.  Mr. Hessler asked whether you knew -- focussing in the time
 8    after Hurricane Katrina, Mr. Hessler asked whether you knew if
 9    violent crimes were being investigated, and you mentioned the
10    Officer Thomas shooting.  Who is Officer Thomas?
11    A.  He was an NOPD officer who was shot, I believe, in the 4th
12    District.
13    Q.  Was he shot before or after Hurricane Katrina?
14    A.  After.
15    Q.  Was he shot before or after the incident on the Danziger
16    Bridge?
17    A.  Before.
18    Q.  So in-between those two things?
19    A.  Yes, ma'am.
20    Q.  Did NOPD respond to that shooting?
21    A.  Yes.
22    Q.  What unit in particular responded?
23    A.  Homicide.
24    Q.  That's centralized homicide?
25    A.  Yes, ma'am.
```

1   Q.  According to your investigation, how did they get there?

2   A.  I believe -- they drove.  National Guard, I think, drove them.

3   Q.  And that was after the storm?

4   A.  Yes, ma'am.

5   Q.  Now, Mr. Hessler asked you about arresting someone on the ten

6   most wanted list, do you remember that question?

7   A.  Yes, ma'am.

8   Q.  And he asked whether you would use extra caution, I don't

9   remember his exact words, but you remember that question?

10  A.  Yes, I do.

11  Q.  Was Susan Bartholomew on the ten most wanted list?

12  A.  No, she wasn't.

13  Q.  Was Leonard Bartholomew on the ten most wanted list?

14  A.  No, he wasn't.

15  Q.  Lesha Bartholomew?

16  A.  No, she wasn't.

17          MR. HESSLER:  Your Honor, I will save time and stipulate

18  that none of these people were on the ten most wanted list.

19  BY MS. BERNSTEIN:

20  Q.  Mr. Hessler also asked you about the other shooting that there

21  was evidence about Defendant Gisevius being involved in, do you

22  remember that?

23  A.  Yes, ma'am.

24  Q.  And he asked you whether you had any physical evidence to back

25  up the statements that Hills and Hunter gave about that, do you

1   remember that question?

2   A.  Yes.

3   Q.  Now, according to your investigation, did Defendant Gisevius or

4   anyone else write a report about that other incident?

5   A.  No, they did not.

6   Q.  Was any investigation done?

7   A.  No.

8   Q.  If Defendant Gisevius shot someone who tried to take his truck,

9   whose responsibility would it be to report that incident so that

10  evidence could be collected?

11  A.  Mr. Gisevius's.

12        THE COURT:  Wait, and to be sure, I think it's important

13  to instruct the jury that Mr. Gisevius is not on trial in this case

14  for any other incident than that which is -- I read the indictment

15  at the outset of the trial, or the failure to report any other

16  incident other than what I read in the indictment.  So let's go

17  ahead and proceed.

18        MS. BERNSTEIN:  Your Honor, can you give a 404(b)

19  instruction at this point?

20        MR. HESSLER:  Your Honor, may we approach on that?

21        THE COURT:  No, I think I've said what I have to say to

22  the jury about that.  Let's go ahead and proceed.

23  BY MS. BERNSTEIN:

24  Q.  Mr. Hessler also asked you some questions about how the FBI

25  would investigate if you were involved in a shooting, do you

1    remember that?

2    A.  Yes.

3    Q.  And you agreed with him that an experienced supervisor would

4    handle the investigation; is that right?

5    A.  Yes.

6    Q.  Was an experienced supervisor assigned to the Danziger Bridge

7    case?

8    A.  Yes.

9    Q.  Who was that?

10   A.  Sergeant Kaufman.

11   Q.  Who was responsible for preserving the scene?

12   A.  Sergeant Kaufman.

13   Q.  Who was responsible for collecting evidence?

14   A.  Sergeant Kaufman.

15   Q.  Who was responsible for locating witnesses?

16   A.  Sergeant Kaufman.

17   Q.  Had Sergeant Kaufman worked homicides before?

18   A.  Yes.

19   Q.  And I think you testified earlier today 20 to 25 years,

20   correct?

21   A.  Yes.

22   Q.  Now, Mr. Hessler asked you again with that question about if

23   you were involved in a shooting, he asked whether the investigation

24   would be left to that experienced investigator.  Does that mean

25   that you could hide the gun that you used?

1  A.  No.

2  Q.  Does it mean that you could lie about what happened?

3  A.  No.

4  Q.  Now, in response to a question from Mr. Hessler, you said

5  yesterday that -- or maybe it was Monday, that the FBI SWAT was

6  assigned -- was stationed at your office after the storm; is that

7  right?

8  A.  Yes, ma'am.

9  Q.  How far is your office from the Danziger Bridge?

10  A.  A mile or two.  Close.

11  Q.  Was your SWAT team called out to help?

12  A.  No.

13  Q.  Do you know whether the FBI was available if they had been

14  called out?

15         THE COURT:  Wait, the FBI or the SWAT team, let's be

16  specific?

17         MS. BERNSTEIN:  Well, the FBI SWAT folks who were at the

18  FBI office.

19         MR. DeSALVO:  Judge, how could he know?

20         MR. FLEMING:  I object to the question.  He wasn't

21  even --

22         THE COURT:  Yes, I am going to sustain.  He's not here,

23  he doesn't -- he has no firsthand knowledge of that and that's not

24  part of his investigation.  Sustained.

25         MS. BERNSTEIN:  May I have 296, please.

```
 1    BY MS. BERNSTEIN:

 2    Q.  Well, I think you can see it here.  296, I am going to ask you

 3    about that impact mark on the concrete barrier.

 4    A.  Yes.

 5    Q.  Do you know what made that mark?

 6    A.  On the concrete barrier?

 7    Q.  Yes.

 8    A.  No.

 9    Q.  Do you know what day it was made?

10    A.  No.

11    Q.  Do you know whether or not it's related to this case?

12    A.  No.

13    Q.  Let me have 296-A, please, which is just a close-up version of

14    the same thing.

15              Now, Mr. Hessler asked you about these marks lining up;

16    and to be clear, I'm talking about the mark in the railing, the

17    impact mark in the railing, and the mark on the concrete barrier.

18    A.  Yes.

19    Q.  You said that you took this picture, right?

20    A.  Yes, I did.

21    Q.  How did you decide where to stand when you were taking this

22    picture?

23    A.  I kept moving until it lined up.

24    Q.  So if you had taken a step to the left and taken it, would they

25    have lined up?
```

1  A.  No.

2  Q.  Or a step to the right?

3  A.  No.

4  Q.  So you purposely positioned yourself in order to line these up?

5  A.  Yes.

6  Q.  Now, based on your investigation, had any of the officers said

7  anything about anybody in the grass shooting?

8  A.  No, they had not.

9  Q.  So you were just positioned in order to line those up?

10  A.  Yes.

11  Q.  Now, at that point when you took this picture, what possibility

12  were you checking out?

13  A.  Whether there could have been somebody in the grass.

14  Q.  And did that possibility that you were checking out fit with

15  your theory that all of the shots were fired by officers on the

16  bridge?

17  A.  No, it didn't.

18  Q.  But you checked it out anyway?

19  A.  Yes, I did.

20  Q.  Now, according to your ballistics expert, this mark in the

21  rail, what direction was that shot fired from?

22         MR. HESSLER:  Objection to hearsay, your Honor.

23         MS. BERNSTEIN:  Hearsay that was gone over in great depth

24  on cross.

25         THE COURT:  I'm going to allow it, so go ahead and

```
 1    answer.
 2              THE WITNESS:  All of the impact points on the railings
 3    were from the -- can I draw, because I just want to make sure that
 4    I am doing it correctly.
 5    BY MS. BERNSTEIN:
 6    Q.  Let me give another picture that might help to draw.  Can I
 7    have 46 up, please, and then I am going to ask for 290.
 8              Forty-six, for the record, this is the picture of James
 9    Brissette lying in the walkway.  You talked earlier about the
10    impact marks on the rail (INDICATING)?
11    A.  Yes.
12    Q.  Can you draw on this picture what you wanted to draw?
13    A.  Yes.
14    Q.  So explain where those shots came from.
15    A.  Within this quadrant, so an east to southeast direction.  So
16    this way (INDICATING).
17    Q.  And for the record, you've drawn a line straight from the
18    railway over to the road and straight back along the railway.  And
19    you said that the shots, according to your investigation, came from
20    that quadrant?
21    A.  Yes, from that quadrant, correct.
22              MR. DeSALVO:  I think the report on this, your Honor, is
23    not consistent with what he is saying, the quadrant of the
24    direction from which it came.
25              THE COURT:  I think the jury can consider that as part of
```

1    the evidence, and the fact that it may or may not be consistent is

2    something the jury is going to have to resolve.

3    BY MS. BERNSTEIN:

4    Q.  Now, you were asked on cross about whether things were

5    consistent or inconsistent with your theory of the case.  The

6    directions that you just talked about, was that consistent or

7    inconsistent with your theory that the shots came from the officers

8    on the roadway or the barrier?

9    A.  Consistent.

10        MS. BERNSTEIN:  You can take that down, Stephen, thank

11   you.

12        THE WITNESS:  Again, can I explain a little bit more

13   about this?

14   BY MS. BERNSTEIN:

15   Q.  Yes.

16   A.  The reason I was being careful is because that particular

17   impact point that you pointed out that I lined up, I don't know

18   which one that is referred to in the report.  Some of them he was

19   able to specify they came from an easterly direction, some of them

20   he was able to specify they came from a southeasterly direction.

21   That's why I was being -- that's why I gave the quadrant because I

22   didn't know which impact point specifically that one is.  If I

23   knew, I could tell you he said that was easterly.  If I knew which

24   impact point I could say precisely what he said.

25   Q.  So when you gave that quadrant, all of them were within that

1   quadrant; is that right?

2   A.  Yes.

3   Q.  Now, Mr. Hessler specifically asked you your opinion of Mike

4   Lohmann's credibility.  Did you find Mike Lohmann credible?

5   A.  Initially, no.

6   Q.  How about -- well, you qualified.  Why do you qualify

7   initially?

8   A.  Because I didn't believe what he was saying.

9   Q.  How about later?

10  A.  Yes.

11  Q.  You found him credible later?

12  A.  Yes.

13  Q.  What was the difference?  What's the before and what's the

14  after for you?

15  A.  He admitted that he lied, he provided me a truthful statement,

16  and that statement was corroborated by Jeff Lehrmann's statement,

17  account of the investigation.

18  Q.  So once he started cooperating, did he provide you anything to

19  corroborate what he said?

20  A.  Yes.

21  Q.  What were those things he provided?

22  A.  The 32-page report with his handwritten notes, the 46-page

23  report with his handwritten notes, and the 17-page report.

24  Q.  Mr. Hessler specifically asked you -- and I'm switching gears

25  now to that tape between Jeff Lehrmann and Defendant Gisevius.  And

Mr. Hessler specifically asked you about Defendant Gisevius's

mental state during that conversation.  Does Defendant Gisevius

slur on the tape?

A.  No.

Q.  Does he seem distraught on the tape?

      MR. HESSLER:  Your Honor, I am going to object, I think

the tape itself --

      THE COURT:  We heard the tape at length.  These are

questions that the jury can appreciate.

      MS. BERNSTEIN:  And then we heard cross-examination --

      THE COURT:  No, no, Ms. Bernstein, don't argue with me.

      MS. BERNSTEIN:  I'm not.

      THE COURT:  I am not an attorney in the case, do you

understand that?

      MS. BERNSTEIN:  I'm not arguing.  Yes, your Honor.

      THE COURT:  Every time I say something isn't an

invitation for you to argue to the contrary.  Now, I made a ruling

and this is not the first time this has happened, and I am not

going to let you do it.

      MS. BERNSTEIN:  I'll move on, your Honor.

      THE COURT:  Please do.  And please don't respond when I

rule on something as though my ruling is a suggestion that can be

revisited immediately after I make it.

      MS. BERNSTEIN:  I'm sorry, your Honor.

      THE COURT:  Let's go.

1   BY MS. BERNSTEIN:

2   Q.  Mr. Hessler asked you about a statement on that tape, going

3   back to that tape between Lehrmann and Defendant Gisevius.  He

4   asked you about a statement on the tape about Jim Letten.  And that

5   statement particularly was about whether Jim Letten had any idea

6   what was going on in the investigation, and I am paraphrasing.  Do

7   you know whether Jim Letten was involved in this investigation from

8   the start?

9   A.  Yes.

10  Q.  Was he?

11  A.  Yes.

12  Q.  Have you participated in meetings with him during the course of

13  your investigation?

14  A.  Yes.

15  Q.  During what time frame?

16  A.  The entire investigation, from the beginning.

17  Q.  Now, Mr. Hessler, during cross-examination, put up a bunch of

18  pages from the Lucy's tape.  And I want to ask you about some of

19  those.  Now, he asked you about the part of the conversation where

20  Lehrmann and Defendant Gisevius are talking about the videotape

21  that Jeff Lehrmann told Gisevius the government had played for him.

22       That was sort of a long question, did you follow that?

23  A.  No.

24  Q.  Again, I am going to lead on something that I think will be

25  unobjectionable, tell me if there's an objection.

1          You testified before about the fact that when Jeff

2     Lehrmann went in for this conversation with Defendant Gisevius,

3     Jeff Lehrmann told Gisevius that you had shown him a videotape of

4     Gisevius on the bridge; is that right?

5     A.  Yes, ma'am.

6     Q.  Mr. Hessler asked you about the conversation that they had on

7     that topic?

8     A.  Yes.

9     Q.  When they were talking about that topic, what question did

10    Defendant Gisevius ask?

11          MR. HESSLER:  Objection, your Honor.

12          MR. FLEMING:  Judge --

13          MS. BERNSTEIN:  This was -- I'm following up on part of

14    what Mr. Hessler put up.

15          THE COURT:  Yes, we did talk about passages on the tape

16    that were played and we did put the transcript up.  If it's

17    pertinent to that passage, he can go ahead and answer.

18          MR. HESSLER:  I think to that question, the tape and the

19    transcript is the best evidence, as opposed to his recollection of

20    what was said.

21          THE COURT:  It is and the jury has seen that.  But it was

22    asked about on cross, so I think it's a fair question.

23    BY MS. BERNSTEIN:

24    Q.  So what was the question that Defendant Gisevius asked Jeff

25    Lehrmann about that video that Jeff Lehrmann was supposedly shown?

1   A.  He asked if the video showed him shooting people laying on the

2   ground.

3   Q.  Had Jeff Lehrmann -- well, let me ask you, who brought up the

4   topic of shooting at people laying on the ground?

5   A.  Mr. Gisevius.

6   Q.  Had Lehrmann said anything about that?

7   A.  No, he didn't.

8   Q.  And Mr. Hessler asked you a series of questions about whether

9   Defendant Gisevius was, "just asking questions during that

10  conversation."  May I have Exhibit 314, which is the transcript of

11  the conversation, page 74, line 19 through 75 line 24.

12       Gisevius says:  "I don't think they could have got

13  anything.  Archie -- unless Archie was f'ing dumb enough to leave

14  that shit on there."  Lehrmann says:  "I'm just afraid that he

15  plugged in shit in one day and that other f'ing report was on that

16  computer, you know?  And those computers are funny about what they

17  have as far as, like --"  and Gisevius says:  "He did that on --

18  he's been all right, though?"  "No, he's nervous, he's always been

19  like that."  And then Jeff Lehrmann said:  "He ain't going to be

20  willing to take the fall, though."

21       What does that mean, to take the fall?

22       MR. FLEMING:  Objection.

23       THE COURT:  Yes, the jury -- I don't think he can testify

24  as to what somebody else meant when the jury can see -- can hear it

25  and can read it, certainly when they hear it.  I don't think these

1      are terms of art.

2                MS. BERNSTEIN:  Your Honor, may I -- the ruling I don't

3      want to argue with, but may I respond to that?

4                THE COURT:  No, I -- look, the jury -- let's trust the

5      jury.  These are common, every day words, these are not terms of

6      art that an expert uses.  They've heard them, they heard the voice

7      inflection that was used at the time.  So getting him to say what

8      somebody else meant I think is improper.  I am going to sustain the

9      objection.

10     BY MS. BERNSTEIN:

11     Q.  Okay.  And the next statement on there from Robert Gisevius is:

12     "I don't think he's gonna call -- I don't think he's going to fall.

13     He ain't got nothing to say, except sink his own ship."

14               May I have that same exhibit, please, page 78.  First

15     line there, Robert Gisevius:  "But he would sink his own ship first

16     and foremost.  But it depends on what they offer him, dude.  That's

17     what you don't understand."  Gisevius --  and this is talking --

18     who are they talking about?

19               MR. LONDON:  Judge, this is just another direct

20     examination about the possibility of cross-examination.

21               THE COURT:  Yes, let's get to a question, let's get to a

22     question.  Let's get to a question.  We don't want to read pages

23     and pages, we've already spent a lot of time on that.  Let's get to

24     a question.

25     BY MS. BERNSTEIN:

1    Q.  Is this another section where they're talking about sinking his

2    own ship, whatever that means?

3    A.  Yes.

4    Q.  May I have 79, please.

5            The question here from Jeff Lehrmann is:  "Could there be

6    a weak link --"

7            MR. LONDON:  Your Honor, this is not redirect.  This is a

8    whole new area.

9            THE COURT:  Wait, wait.  We can't just keep reading it

10   and say, so now are they talking about and then -- we read a

11   passage and we say, so they're talking about sinking the ship.

12   They've heard all of this.

13           MS. BERNSTEIN:  Your Honor, this --

14           THE COURT:  Ask him a question about something that he

15   knows, not something that they've heard or that they can read that

16   they've already read.

17           MS. BERNSTEIN:  This one I have a specific question.

18           THE COURT:  Well, ask him a specific question.  We just

19   can't sit here and read through transcripts.

20           MR. LONDON:  May I make this one -- this is supposed to

21   be redirect, Judge.  This is areas nobody --

22           THE COURT:  I understand.  I understand, I understand.

23   It's going to be limited.  If this was not covered on cross, then

24   it has already been covered on redirect and there is no reason to

25   go into it again.  If this passage was not covered, we are moving

```
 1    on.  When was this covered?
 2          MS. BERNSTEIN:  The question was not about a particular
 3    passage, the question was, during that entire tape, wasn't Gisevius
 4    just asking questions trying to get more information.  So I have a
 5    couple very specific passages that respond to that line of
 6    questioning.
 7          THE COURT:  Let's ask him that.  The jury has heard the
 8    tape, they've seen the transcript while the tape was being played.
 9    They know that.  So let's --
10          MS. BERNSTEIN:  I'll ask a very specific question in
11    response to that particular question on cross.
12    BY MS. BERNSTEIN:
13    Q.  My question to you, Agent Bezak, is, when Robert Gisevius was
14    asked, could there be a weak -- could there be a weak link in
15    homicide, did Robert Gisevius say, "What do you mean by that?"
16          MR. HESSLER:  Objection, your Honor.  The answer to the
17    question is right there in front of him, and now he wants to know
18    what he meant by that or why he asked another question.
19          THE COURT:  I wish we could rely on the fact that the
20    jury heard the tapes, they followed the transcripts.  We don't need
21    to go back into stuff.  Getting him to -- reading stuff to the jury
22    at this point is improper.  Ask him a question about something he
23    knows.  The jury knows what's on the tapes, they know what's on the
24    transcript.  So all of that is good for argument, you can remind
25    the jury about all of that when we get to closing arguments; but
```

1    sitting here and plowing through ground again is, quite frankly,

2    not a wise expenditure of time.

3            Let's ask him a question, ask him the question; if you

4    want to ask a follow-up to what Mr. Hessler asked, then let's do

5    that.  But let's not just read transcripts.  It gets mind numbing.

6            MS. BERNSTEIN:  I had just one more section and I have a

7    question about a word that I want to ask.  May I approach and ask

8    whether --

9            THE COURT:  Go ahead and ask and let's get a question to

10   him, to this person.

11           MS. BERNSTEIN:  I would like page 54, please, line 6

12   through 15.  Can we zoom in on that.

13   BY MS. BERNSTEIN:

14   Q.  The first part there, it says:  "If they indict people, people

15   are going to start f'ing singing."  My question to you is, do you

16   know what that means to sing, in the context --

17           MR. HESSLER:  Your Honor.

18           MS. BERNSTEIN:  Singing could mean different things.

19           MR. HESSLER:  That's right.

20           THE COURT:  I don't think anybody in this case is an

21   opera singer or a rock star.  So let's -- the portions of this

22   conversation, in fact the entirety of the conversation, I don't

23   think there was any term of art that was used, either a police term

24   or an expert term.  Trust the jury to understand what they have

25   heard and what they have read.

1          MS. BERNSTEIN:  Let me ask, then, a direct follow-up on

2     Mr. Hessler's question, which was, did you think that Defendant

3     Gisevius was just asking questions?

4     BY MS. BERNSTEIN:

5     Q.  Based on what you heard on the tape, did you think that?

6     A.  No.

7     Q.  I want to switch gears a little bit.  Mr. Hessler asked you

8     about whether law enforcement officers were trained to answer only

9     the question asked.  Do you remember that?

10    A.  Yes.

11    Q.  They're also trained to answer truthfully and accurately?

12    A.  Yes.

13    Q.  Are they trained whether or not they can give misleading

14    answers?

15    A.  Yes.

16    Q.  What's the training?

17    A.  You can't give misleading answers.

18    Q.  Mr. Hessler, when he was talking about the interview that

19    Defendant Gisevius gave to NOPD, he asked you a series of questions

20    about your familiarity with an initial versus a detailed interview

21    regarding a police shooting.  Do you remember those questions?

22    A.  Yes.

23    Q.  Now, which of those interviews has to be truthful?

24    A.  Both of them.

25    Q.  If a police officer, again, based on your familiarity which he

1   was asking you about, if a police officer is involved in a

2   shooting, what is the most important -- and I should say police

3   officer or agent -- what are the most important things to go in the

4   statement about that shooting?

5   A.   That you fired your weapon and what weapon you fired, whether

6   you hit somebody.

7   Q.   In which statement or statements is it important to give that

8   information?

9   A.   Both.

10  Q.   Now, when did Defendant Gisevius give his taped statement in

11  this case?

12  A.   January of 2006.

13  Q.   So we've talked about the fact that that's almost five months

14  after the shooting, right?

15  A.   Yes.

16  Q.   That statement that he gave, was it an in-passing statement or

17  was it a formal taped statement?

18  A.   A formal taped statement.

19  Q.   May I have 205, page 2, please.

20        Does the question:  "To the best of your recollection,

21  reflect back to that date, and, uh, tell me of your involvement in

22  the, uh, police-involved shooting, which occurred on the Danziger

23  Bridge."  Does that indicate whether or not he is supposed to

24  include his own actions?

25  A.   Yes, it does.

1   Q.  Let's jump to page 5 -- well, first of all, you said yes, it

2   does indicate, what does it indicate?

3            MR. HESSLER:  Your Honor, the question indicates what the

4   question indicates, and for him to tell the jury what it indicates

5   I think is improper.

6            MS. BERNSTEIN:  It's a direct follow-up to cross, your

7   Honor.

8            THE COURT:  It's not the follow-up to cross that's the

9   problem.  It's getting him to translate common, every day language

10  that you're attempting to get him to construe when all of that can

11  be construed by the jury.  It's written there in black and white.

12  BY MS. BERNSTEIN:

13  Q.  Let's jump to page 5, a page that Mr. Hessler put up during

14  cross.  And he talked to you about this question, did you fire your

15  weapon?  And I think Mr. Hessler actually corrected the transcript

16  and said, did you fire your weapons.  Do you remember that?

17  A.  Yes, ma'am; yes, ma'am.

18  Q.  And after this answer that Defendant Gisevius gave, "I did not

19  fire my department service weapon," Mr. Hessler asked you whether

20  there was a follow-up question, did you fire that M4.  Do you

21  remember that question?

22  A.  Yes.

23  Q.  Had Defendant Gisevius admitted in this statement that he had

24  an M4?

25  A.  No.

1    Q.  Mr. Hessler asked about a follow-up question, what was the very

2    next follow-up question he was asked?

3    A.  "And these are your observations and that's all you observed as

4    far as yourself and the others anybody around.  You only observed

5    what you just told me?"

6    Q.  Now, Mr. Hessler also asked you about the fact that Defendant

7    Gisevius had admitted on the day of the shooting that he fired his

8    rifle, do you remember that?

9    A.  Yes.

10   Q.  To whom did Defendant Gisevius admit that on the day of the

11   shooting?

12   A.  Sergeant Kaufman.

13   Q.  Who was present for that meeting?

14   A.  The seven officers, Sergeant Kaufman, Lieutenant Lohmann.

15   Q.  According to your investigation, were all of those people part

16   of the coverup?

17   A.  Yes.

18   Q.  Now, according to your investigation, was that taped statement

19   that he gave in January going to be read only by members of the

20   coverup?

21           MR. HESSLER:  Your Honor --

22           THE WITNESS:  No, no.

23           MR. HESSLER:  Okay.  All right.

24           THE COURT:  He's already answered and if there's an

25   objection I'll hear it, but he's already answered.

```
 1            MR. HESSLER:  He's already answered.

 2            MR. FLEMING:  I am going to object, your Honor, I am

 3   going to object to the form of the question.  She is presupposing

 4   facts that are up to the jury to determine, whether, in fact, there

 5   was a coverup, that these people --

 6            THE COURT:  As to the form of the question he's already

 7   answered, so let's go.

 8   BY MS. BERNSTEIN:

 9   Q.  And I think you -- I don't know if the jury heard the answer to

10   that --

11            THE COURT:  Well, let's not --

12            MR. HESSLER:  Now I am going to object.

13            THE COURT:  You're giving him another chance to object

14   and this time I might sustain it.

15            MS. BERNSTEIN:  I'm trying to remember what the last

16   question was.

17            MR. HESSLER:  It was objected to.

18            MS. BERNSTEIN:  But the objection was overruled.  The

19   last question was --

20            THE COURT:  The objection, to be clear, the objection was

21   overruled because it was made as to form, but it was to a question

22   that he had already answered.  If you ask it again, it then might

23   be timely, in which case I might have to revisit whether or not it

24   was a proper question or not.

25   BY MS. BERNSTEIN:
```

1  Q.  I just want to remember the last question so I can go to the

2  next one.  So don't answer this, Agent Bezak, but the last question

3  was about whether that statement on January 25th was only going to

4  be heard or read by members of the coverup.  And don't answer that

5  because you already have.

6      But the next question is, in that official statement, did he

7  admit that he fired an M4?

8  A.  No.

9  Q.  And according to your investigation, what happened right before

10  the officers gave their statements on January 25th?

11      MR. HESSLER:  Objection to the form of the question, your

12  Honor.  We've had different versions, and I don't think it's right

13  that he chooses one of those versions to reinforce to the jury.

14      THE COURT:  Yes, I think you're going to have to

15  rephrase.  According to whom?

16  BY MS. BERNSTEIN:

17  Q.  According to Mike Hunter, what happened directly before the

18  officers gave their taped statements?

19      MR. DeSALVO:  Hunter has already testified as to that,

20  your Honor, it's not a matter to be directed to this witness.

21      THE COURT:  If he is talking about his -- he's talking

22  about his investigation, so I am going to let him go ahead and

23  answer.  The jury's heard his testimony as far as what it was at

24  the time he gave it here; as far as what he said during the

25  investigation, he can go ahead and answer.

```
 1              THE WITNESS:  The officers met before they gave their
 2    formal taped statements and discussed what their statements would
 3    be.
 4    BY MS. BERNSTEIN:
 5    Q.  Is that consistent or inconsistent with what Lehrmann told you?
 6    A.  Consistent.
 7    Q.  Consistent or inconsistent with what Hills told you?
 8    A.  Consistent.
 9    Q.  Consistent or inconsistent with what Robert Barrios told you?
10    A.  Consistent.
11    Q.  Now, Mr. Hessler asked you a few questions about Defendant
12    Gisevius's involvement in -- I can't remember the word he used, but
13    he asked you about the charges against Defendant Gisevius for using
14    false information to see Jose Holmes prosecuted.  Do you remember
15    that series of questions?
16    A.  Yes.
17    Q.  And he asked you what Defendant Gisevius's involvement was in
18    that.  Do you remember that?
19    A.  Yes.
20    Q.  Now, did Mike Lohmann tell you whether anybody worked on that
21    first report with Defendant Kaufman?
22    A.  Yes.
23    Q.  Who worked on that report?
24    A.  Jeff Lehrmann, Sergeant Bowen, Sergeant Gisevius.
25    Q.  May I have Exhibit 184, please.
```

1          And that's the 32-page report -- is this the one off the

2    computer?  184, which is the 32-page report off of Defendant

3    Kaufman's computer.  May I have page 4, please.

4          Who are the first two perpetrators listed in that report?

5    A.  Jose Holmes and Lance Madison.

6    Q.  May I have page 19, please.

7          In that report, what does it say Jose Holmes did?

8    A.  Fired in direction of the officers.

9    Q.  Now, Mr. Hessler showed you Exhibit 90-A, which was that

10   Blu-ray video, the very short video of Defendant Gisevius walking

11   to the barrier.

12   A.  Yes.

13   Q.  And he asked you whether concrete can sometimes pulverize when

14   hit by a bullet, do you remember that?

15   A.  Yes.

16   Q.  And just to orient, this was after you said that you saw smoke,

17   correct?

18   A.  Yes, ma'am.

19   Q.  Was there concrete where you saw the smoke?

20   A.  No.

21   Q.  And he asked you specifically about Defendant Gisevius walking

22   over to that barrier.  Does Defendant Gisevius take cover behind

23   the barrier?

24          MR. FLEMING:  Judge, that video speaks for itself.  The

25   jury has seen that video, multiple versions, numerous times, will

1   be allowed I assume to see the video as many times during

2   deliberations as they would like to.  She is just commenting on

3   what everyone is doing.

4           MS. BERNSTEIN:  I can move on, your Honor, although he

5   did play --

6           THE COURT:  He played it and it's proper subject to

7   cross.  But, again, they have seen it.  I agree with what

8   Mr. Fleming said, but it was covered on cross.  If you want him to

9   answer it, answer it, but they've seen it.  And, again, we're

10  spending time.

11          MS. BERNSTEIN:  I am going to move on to my next

12  question, your Honor, which responds directly to a question

13  Mr. Hessler asked.

14  BY MS. BERNSTEIN:

15  Q.  Mr. Hessler pointed out on that video that when Defendant

16  Gisevius brings his gun down, there is still gunfire going off.  My

17  question to you as the investigator is, what did that tell you

18  about whether or not Defendant Gisevius saw a threat?

19          MR. HESSLER:  Your Honor, I object to the form of the

20  question, and for speculation, and I am not even sure what the

21  question asks for.

22          THE COURT:  Yes, I have to say I am not quite sure I

23  understand the question, either.  If you're asking him to speculate

24  on what Mr. Gisevius saw, then I sustain the objection.

25          MS. BERNSTEIN:  Let me ask my next question on that.

```
 1   BY MS. BERNSTEIN:
 2   Q.  In direct response to that question that Mr. Hessler asked,
 3   according to -- asked about Defendant Gisevius pulling the gun back
 4   while gunshots are still going off.  According to your
 5   investigation, who is firing those other shots you hear on the
 6   tape?
 7   A.  Ken Bowen, the other officers on the other side of the truck.
 8   Q.  Now, Mr. Hessler asked you about Defendant Gisevius shooting
 9   Jose Holmes in the stomach.
10   A.  Yes.
11   Q.  Have you ever suggested that Defendant Gisevius shot Jose
12   Holmes in the stomach?
13   A.  No.
14   Q.  Do you think that he did?
15   A.  No.
16              MR. HESSLER:  Objection, your Honor.
17              THE COURT:  I am going to overrule based on his
18   investigation, plus he's already answered.
19              MR. DeSALVO:  Your Honor, I think we're getting afield on
20   what his investigation revealed and what he thinks happened are two
21   different things.  And I think what -- the conclusions have to be
22   reached by this jury.
23              THE COURT:  I agree, I agree.  But I've ruled on the
24   objection that was before me.
25              MR. DeSALVO:  I'm sorry.  I guess I made another one.
```

```
 1              THE COURT:  Go ahead.

 2              MR. DeSALVO:  Sorry, Judge.

 3   BY MS. BERNSTEIN:

 4   Q.  And, again, to be clear, these are in response to questions

 5   about what you thought during your investigation.  I think the last

 6   question was whether you thought that Defendant Gisevius, shot Jose

 7   Holmes in the stomach.

 8              THE COURT:  Okay, but he's answered that one, so we

 9   really need to get another one.

10   BY MS. BERNSTEIN:

11   Q.  Is Defendant Gisevius specifically charged with shooting Jose

12   Holmes in the stomach?

13   A.  No.

14   Q.  According to your investigation, who is Defendant Gisevius

15   shooting at in 90-A?

16   A.  James Brissette.

17   Q.  Now, Mr. Hessler asked you whether you concluded, in your own

18   mind during your investigation, whether you concluded that Lance

19   Madison was lying because his account changed.  Do you remember

20   that question?

21   A.  Yes.

22   Q.  Now, when somebody tells you something different on different

23   occasions, do you always conclude that they're lying?

24   A.  No.

25   Q.  Why not?
```

1   A.  When people speak, sometimes they use different language.  Your

2   memory isn't perfect.

3   Q.  Before you talked to Mike Hunter in this investigation, who did

4   you think fired the first shot?

5   A.  Ken Bowen.

6   Q.  After you talked to Mike Hunter, who did you think fired the

7   first shot?

8   A.  Mike Hunter.

9   Q.  Why did you change your mind?

10  A.  Because Mike Hunter told me he fired the first shot.

11  Q.  So you got new information in-between those two?

12          MR. DeSALVO:  Misleading.

13          THE COURT:  Rephrase the question.

14  BY MS. BERNSTEIN:

15  Q.  Did you get any new information between those two thoughts that

16  you had?

17  A.  Yes.

18  Q.  And were you lying when you said that you thought Bowen fired

19  first?

20  A.  No.

21  Q.  Now, sometimes when people give different stories, do you

22  conclude that they're lying?

23  A.  Yes.

24  Q.  Did the account attributed to these defendants stay the same or

25  change over time?

1              MR. FLEMING:  Objection.

2              MR. DeSALVO:  I have to object, what's before this jury

3    are what's before the jury.

4              THE COURT:  Yes, I am going to sustain.

5              MS. BERNSTEIN:  And will you sustain, your Honor, even if

6    I don't go into the specifics of the account but just in general

7    based on his review of it?

8              THE COURT:  I think we have covered this on direct plenty

9    enough, I think we need to move on.  I think the jury

10   understands -- we've been at this quite a while now.  Let's move

11   on.

12   BY MS. BERNSTEIN:

13   Q.  Agent Bezak, you were asked a number of questions about whether

14   certain people had been called by the government to testify in this

15   trial.  Do you remember those questions?

16   A.  Yes.

17   Q.  Now, do you understand that the -- do you understand that the

18   government has the power to give immunity to people if they're

19   called to testify?

20   A.  Yes.

21   Q.  And immunity might be given in a case where somebody had a

22   Fifth Amendment right and decides not to answer questions, right?

23   A.  Correct.

24   Q.  Now, outside of that, do you know whether both sides, the

25   prosecution and the defense, do you know whether both sides have

1   subpoena power?

2   A.   Yes, both sides have subpoena power.

3          MR. DeSALVO:  This is back to that misleading thing that

4   we were dealing with before, Judge, that you gave an instruction to

5   this jury on.

6          THE COURT:  Well, the problem is that we've already had

7   objections that he's not an expert in the law and cannot give a

8   legal opinion, and now we're asking him about immunity and who can

9   grant it and who can subpoena.  So I fear we're going to get into

10  another area, another question where he is going to give another

11  wrong answer on the law, such as he gave on cross.  On this very

12  topic he gave a wrong answer, which I instructed the jury was

13  incorrect.  So I really don't think we need to be asking him about

14  things that he's proven to not be knowledgeable about.

15         MS. BERNSTEIN:  And I'm sorry, your Honor, I thought -- I

16  was trying to ask the question as we discussed them up at the

17  bench.

18         THE COURT:  We discussed --

19         MS. BERNSTEIN:  I am not sure where we left that.  But

20  it's 12:30, time for lunch, and I can stop on that.

21         THE COURT:  You're finished with him?

22         MS. BERNSTEIN:  Yes, thank you, your Honor.

23         THE COURT:  Before we go to lunch, and I rarely ask

24  questions of a witness, but I think -- at times, I feel like I have

25  to.  With regard to Ms. Gore, Mr. Bezak.

1              THE WITNESS:  Yes, sir.

2              THE COURT:  You indicated that you thought that she had

3    lied to you; is that not correct?

4              THE WITNESS:  That is correct.

5              THE COURT:  And has she been charged, to the best of your

6    knowledge, has she been charged with a crime, either lying to the

7    FBI or perjuring herself?

8              THE WITNESS:  No.

9              THE COURT:  Has she been advised that she's been absolved

10   of any criminal liability?

11             THE WITNESS:  No.

12             THE COURT:  And with regard to Mr. Haynes, the same

13   questions.  You believe Mr. Haynes has lied to you, I think you

14   testified?

15             THE WITNESS:  Yes.

16             THE COURT:  And has he been charged with either lying to

17   an FBI agent or committing perjury?

18             THE WITNESS:  No.

19             THE COURT:  And has he been absolved of any such criminal

20   responsibility, to the best of your knowledge?

21             THE WITNESS:  To the best of my knowledge, no.  I know

22   there were discussions between his attorney and the prosecution

23   team, I don't remember where they wound up on that point.

24             THE COURT:  All right.  We are going to go ahead and

25   adjourn for lunch.  Please don't discuss anything about the case

 1    with anyone, including amongst yourselves.  And I ask you to be

 2    careful, even a casual conversation about what you might think

 3    about certain things about the courtroom or about the case or about

 4    anybody, you have to be very careful.  And even though you think

 5    something is very innocent or innocuous, you might come close to

 6    running afoul of that.  So we ask you to be very careful about

 7    that.

 8           It is about 12:35.  Why don't we start, we'll give you an

 9    hour and ten minutes, at 1:45 we'll begin again.  Thank you.

10           THE MARSHAL:  All rise.

11       (WHEREUPON, THE JURY EXITED THE COURTROOM.)

12           THE COURT:  You can step down, sir.  Thank you.

13           THE WITNESS:  Thank you.

14           THE COURT:  Counsel, is there anything we need to cover

15    on the record at this point?

16           MS. BERNSTEIN:  Nothing for the government.

17           MR. FLEMING:  I don't believe so, no, Judge.

18           THE COURT:  Why don't you all approach, then, not on the

19    record, so we can talk about the afternoon.

20       (WHEREUPON, A BENCH CONFERENCE WAS HELD OFF THE RECORD.)

21       (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD WITH

22       COUNSEL FOR THE GOVERNMENT ONLY.)

23           MS. BERNSTEIN:  Because nothing is ever easy,

24    particularly in this case, we learned this past weekend that Robert

25    Barrios -- I hesitate on this because I haven't actually spoken to

1    the prosecutor in the U.S. Attorney's Office, but, apparently,

2    Robert Barrios, his name has come up in an investigation into BP

3    fraud, and we have determined that it is the same Robert Barrios.

4              THE COURT:  This is as a possible perpetrator?

5              MS. BERNSTEIN:  Yes.  That he -- again, allegedly, I

6    don't know the status of this, but we believe -- everything I'm

7    saying I believe to be the truth is to the best of my knowledge,

8    but that Robert Barrios submitted some claims for losses he

9    suffered as a fisherman or something like that.

10             MS. CHUNG:  As a fisherman or a server at the Marriott.

11             MS. BERNSTEIN:  So he submitted a BP claim.  He is now

12   under investigation.  My understanding is that he will be

13   prosecuted based on that.  We are not -- we have made the decision

14   we are not calling him as a witness, so we have not disclosed this

15   information.

16             THE COURT:  Have they indicated whether they are going to

17   call him?

18             MS. BERNSTEIN:  Well, I think they indicated today, my

19   reading -- they have not given an official indication, my reading

20   is that they do not plan to call him, I do not know.

21             THE COURT:  I wouldn't think so.  I believe it's a

22   double-edged sword, I wouldn't expect that they would, but who

23   knows.

24             MS. BERNSTEIN:  We're certainly ready if they -- I mean,

25   this obviously is related to the Fifth Amendment question we just

1    had and -- because I was going to raise it but because I was not

2    allowed to ask questions, it was -- you know, it was okay to leave

3    it off until now.

4              But, I mean, that puts us in a situation.  Obviously, if

5    it turns out he did commit this crime, he is in violation of his

6    plea agreement, which then leaves the decision up to us whether we

7    make him go -- or whether we honor the plea agreement and just ask

8    for the max at sentencing, or whether we revoke the plea agreement

9    and go back to scratch.

10             Without making any formal representation, my expectation

11   right now, since he will be prosecuted for the fraud, is that what

12   we will do is just tell the judge at his sentencing what he did and

13   the judge will give him the max.  So I fully expect that we will

14   honor the plea agreement even though he is in breach of it and we

15   will hold him to the plea agreement, and then let him be sentenced

16   for the additional fraud and let him get slammed for that.

17             THE COURT:  Right.

18             MS. BERNSTEIN:  So that's where we are.  I just wanted to

19   advise you of it, we just learned of it this weekend.

20             THE COURT:  Well, from what you're telling me, it's not a

21   problem unless he is called to testify.  I mean, otherwise, he is

22   sort of the guy outside of the room who they've heard about and

23   there's no need for anyone else to know that at this time.  The

24   question is whether he testifies is the dilemma?

25             MS. BERNSTEIN:  Yeah.  And if he's called to testify -- I

1   mean, here is the thing.  If we decide to hold him to his plea

2   agreement, he has no Fifth Amendment right to assert in this case.

3         THE COURT:  Right, exactly.

4         MS. BERNSTEIN:  I have talked to his attorney, and I

5   didn't ask -- it's Robert Glass, I didn't ask him specifically --

6         THE COURT:  Good lawyer.

7         MS. BERNSTEIN:  -- about whether or not -- I'm sorry, he

8   has been served a subpoena, Robert Glass told me last night that

9   Barrios was served a subpoena.  Robert Glass said he doesn't know

10  whether it's for real or not.  I did not specifically ask him

11  whether Barrios intends to invoke, but -- and I can find out more

12  information from Glass and tell him if we decide for sure that what

13  we're going to do is make him stick to the plea agreement and just

14  tell the judge at sentencing what happened, then I can talk to

15  Glass about what, if anything, he plans to advise Barrios.

16        I mean, I think the way to do that would be, I'm sort of

17  thinking as I'm speaking here, but I think the way to do that would

18  be to have all counsel -- I don't know, I am just thinking out

19  loud, I was thinking having all counsel instructed that the

20  separate matter is separate.

21        MS. CHUNG:  But it does bear on his truthfulness.

22        MS. BERNSTEIN:  That's what I said, I'm thinking out

23  loud.

24        THE COURT:  I don't know if they called him -- I doubt

25  that they would call him, defense counsel.

```
 1          MS. BERNSTEIN:  They might.

 2          THE COURT:  Who knows what they're thinking, but I doubt

 3     that they would.   In the meantime, let's see if we can find out

 4     from Bob what his intentions are if he is called.  I think he's

 5     waived his Fifth Amendment on this case, but if it's a question of

 6     credibility, which of course has been, you know, the age-old song

 7     in this case of who are you going to believe amongst all of these

 8     people, including these people, these defendants, then it gets

 9     into --

10          MS. BERNSTEIN:  I thought you were pointing to Cindy.

11          THE COURT:  No, I believe her, she is the least of my

12     problems.

13          Then it becomes a real problem.  And I know if I ask them

14     at the end of the day whether they're going to call Barrios, as is

15     their right, they're going to say, well, we don't know.

16          MS. BERNSTEIN:  I mean, the other thing we can do --

17          THE COURT:  They might be able to tell you.  I don't want

18     to be too obvious, too, you know, why would I ask about him as

19     opposed to other people.

20          MS. BERNSTEIN:  Because he would be a very long witness.

21          THE COURT:  That's true, he is a cooperating witness and

22     one who could possibly be lengthy.

23          MS. CHUNG:  You can pair him with Lehrmann because they

24     have said they're going to call Lehrmann, too, so you could ask

25     about both of them.
```

1           THE COURT:  Okay.

2           MS. BERNSTEIN:  And I'll try to find out.  I don't know

3    the status of the fraud investigation, but I can find out

4    whether -- and I don't know whether that's going to end in charges

5    or a plea or what.

6           THE COURT:  Right.

7           MS. BERNSTEIN:  Or whether it's going to go away.

8           THE COURT:  Check with Bob and tell him I need to know

9    for trial management purposes what his presentation here, if he

10   honors the subpoena or he has to honor it, but what his intentions

11   will be if his client were to take the stand in this case after

12   being called as a witness by defense counsel, we'll know that, and

13   then I will ask either at the afternoon break or maybe better at

14   the end of the day, what their intentions are.  Not only with

15   regard to Lehrmann and Barrios, but the other people they've held

16   on over.  I think we were going to get back to them once the

17   government's case was complete, which would be this afternoon.  So

18   they really need to cut some of these people loose anyway, I would

19   expect them to.  So let me make a note of it, and I will be sure to

20   ask about it.

21          He went back to Arizona, is that where he is?

22          MS. BERNSTEIN:  Yes.

23          THE COURT:  I'll check on both of those with defense

24   counsel.

25       (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

1

2                          P R O C E E D I N G S

3                         (AFTERNOON SESSION)

4

5      (OPEN COURT.)

6      (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

7           THE COURT:  Okay.  You may be seated.  Thank you all for

8  being back on time and ready to go.

9           This is our next witness, Mr. Carter, I assume?

10          MR. CARTER:  Yes.

11          THE COURT:  And she is?

12          MR. CARTER:  Lesha Bartholomew.

13          THE COURT:  Lesha Bartholomew.  Ma'am, would you please

14  stand up until you take the oath.

15          THE DEPUTY CLERK:  Please raise your right hand.

16     (WHEREUPON, LESHA BARTHOLOMEW, WAS SWORN IN AND TESTIFIED AS

17     FOLLOWS:)

18          THE DEPUTY CLERK:  Thank you, you may be seated.  Please

19  state and spell your full name for the record.

20          THE WITNESS:  Lesha Bartholomew, L-E-S-H-A

21  B-A-R-T-H-O-L-O-M-E-W.

22          MR. CARTER:  May I begin?

23          THE COURT:  Yes, please.

24                         DIRECT EXAMINATION

25  BY MR. CARTER:

1  Q.  Good afternoon, Lesha.

2  A.  Hi.

3  Q.  Good afternoon, Lesha.

4  A.  Hello.

5  Q.  Lesha, where do you live now?

6  A.  I live in Georgia.

7  Q.  Where did you live before moving to Georgia?

8  A.  New Orleans.

9  Q.  Were you in New Orleans during Hurricane Katrina?

10 A.  Yes.

11 Q.  Let me direct your attention to the Sunday after Hurricane

12 Katrina, the morning of September 4th, Sunday, September 4, 2005.

13 Where were you staying then?

14 A.  We were staying at the Family Inn.

15 Q.  Who were you staying with?

16 A.  It was a lot of people.

17 Q.  Let me ask you to pull that microphone a little closer to your

18 mouth, please.

19         You said a lot of people?

20 A.  Yes.

21 Q.  Tell me some of them, as many as you can remember.

22 A.  It was me, my mom, my dad, my brothers, my grandma, my cousin,

23 her baby, Jose, another cousin.  I think that's about it.

24 Q.  Was there a James Brissette there?

25 A.  James came later.

Q.  He came later?

A.  Yeah.

Q.  That Sunday morning had he spent the previous night there at the hotel?

A.  Yes.

Q.  With you and your family?

A.  Yes.

Q.  Tell me about that morning.  Did you leave the hotel that morning?

A.  Yes.

Q.  Why did you leave the hotel?

A.  We were going to get -- my grandma was supposed to have a surgery before Katrina and she got sick during -- because she wasn't able to get it, so she couldn't keep anything down, so we went to the store to try to get something.

Q.  What store were you going to?

A.  Winn-Dixie.

Q.  And who was going?

A.  It was me, my mom, my dad, my brother, Jose and James.

Q.  And where was the Winn-Dixie in relation to the Family Inn?

A.  It was down Chef, over the bridge.

Q.  Over the Danziger Bridge?

A.  Yes.

Q.  And did you all walk to the bridge?

A.  Yes.

1   Q.   What happened as you walked to the bridge?

2   A.   As we walked to the bridge, we started hearing gunshots.

3   Q.   Now, was this as you walked to the bridge or was it on the

4   bridge?

5   A.   It was pretty much on the bridge.

6   Q.   On the bridge?

7   A.   Uh-huh.

8   Q.   What happened next?

9   A.   After we heard shots, my family -- well, I saw my mom and dad

10  run to the barrier and jump over, and I ran out towards the other

11  way.

12  Q.   They ran toward the barrier and you ran out the other way?

13  A.   Yes.

14  Q.   Just to orient ourselves, did they run right or left?

15  A.   They ran right.

16  Q.   And you ran left?

17  A.   And I ran left.

18  Q.   When you heard the gunshots, were you able to tell where the

19  gunshots were coming from?

20  A.   No.   I mean, it sounded like it was close, but I didn't know

21  where exactly.

22  Q.   Did it sound loud or did it sound like it was far off?

23  A.   No, it was loud.

24  Q.   I'm sorry?

25  A.   It was loud.

1    Q.   It was loud?

2    A.   Yeah.

3    Q.   You ran to the left?

4    A.   Uh-huh.

5    Q.   And what happened as you ran to the left?

6    A.   I ran to the left and thought, okay, the rest of my family just

7    ran in the opposite way, so maybe I should go by them, and then I

8    turned in and ran to the right.

9    Q.   So you turned and went back to go right where the rest of your

10   family was?

11   A.   Yes.

12   Q.   What happened next?

13   A.   Then I felt a shot in my side.

14   Q.   Then what did you do?

15   A.   I kept running, and I got over the barrier and laid next to my

16   mom.

17   Q.   How high was the barrier?

18   A.   I'm kind of short, so it was hard for me to kind of get over

19   it.  So I don't know.

20   Q.   How tall are you?

21   A.   I'm five-two.

22   Q.   How tall were you then?

23   A.   Around that, maybe five feet.

24   Q.   Was the barrier two feet, three feet, or four feet, if you can

25   approximate?

1   A.   Maybe three.

2   Q.   Three, so you got over the barrier?

3   A.   Yes.

4   Q.   And what happened as you -- after you got over the barrier?

5   A.   I laid next to my mom.

6   Q.   I'm sorry?

7   A.   I laid next to my mom.

8   Q.   Can you pull that microphone a little bit closer.  It's not

9   your fault, somebody coughed just now and I couldn't hear your

10  answer.

11       You laid next to your mom?

12  A.   Yes.

13  Q.   What was happening while you laid there on the ground?

14  A.   We kept hearing gunshots.

15  Q.   What were you thinking?

16  A.   Just that I hope we didn't die.

17  Q.   You said you laid next to your mom?

18  A.   Yes.

19  Q.   Could you hear your mom?

20  A.   Uh-huh.

21  Q.   What did you hear?

22  A.   She was just saying, Lord, help us.

23  Q.   Did you talk to her?

24  A.   Yes.

25  Q.   And could you hear her?

1   A.   Yes.

2   Q.   With the gunfire going off you could hear her?

3   A.   Yes.

4   Q.   What did you say?

5   A.   I just was asking why is this happening.

6   Q.   Did you have any knowledge of why that was happening?

7   A.   No.

8   Q.   Any understanding of why that was happening?

9   A.   No.

10   Q.   And what was happening?

11   A.   We were getting shot.

12   Q.   Were you close to your mother or far away?

13   A.   I was close.

14   Q.   You were close?

15   A.   Yes.

16   Q.   Did you ever attempt to get closer or move away?

17   A.   Yeah, I got closer.

18   Q.   Why did you get closer?

19   A.   So she wouldn't get shot again.

20   Q.   Did you see her get shot?

21   A.   I didn't see her get shot.

22   Q.   You could tell she was shot?

23   A.   Yes.

24   Q.   Where was she shot?

25   A.   In her right arm.

```
 1   Q.  Can you describe her right arm for the jury?

 2   A.  It was on by some skin.

 3   Q.  And you moved closer to protect her?

 4   A.  Yes.

 5   Q.  With your body?

 6   A.  Yes.

 7   Q.  To prevent her from being shot again?

 8   A.  Yes.

 9   Q.  What happened as you laid there trying to protect your mother?

10   A.  I kept hearing shots, I felt a shot in my butt.

11   Q.  You felt a shot in your butt?

12   A.  Yes.

13   Q.  Did you feel any other shots after that?

14   A.  No.

15   Q.  Did you learn later that you were shot somewhere else?

16   A.  Yes.

17   Q.  Where else were you shot?

18   A.  In my legs.

19   Q.  Did you feel those shots to your legs?

20   A.  No.

21   Q.  At some point the shooting stopped?

22   A.  Yes.

23   Q.  You were taken to the hospital?

24   A.  Yes.

25   Q.  Were you asked any questions at the hospital?
```

1    A.   Yes.

2    Q.   What were you asked at the hospital?

3    A.   Did we know who shot us.

4    Q.   And what did you say?

5    A.   The man came in when they were cutting my clothes off, and I

6    just wanted to just be out of pain.  So I don't even think I

7    responded.

8    Q.   Do you know who that man was?

9    A.   No.

10   Q.   Do you know whether he was a police officer?

11   A.   No.

12   Q.   Did police ever come to talk to you, have they come back to

13   talk to you while you were at the hospital?

14   A.   Yes.

15   Q.   Was that the next day or sometime later?

16   A.   That was sometime later.

17   Q.   Were you alone when they came back to talk to you or were you

18   with someone else?

19   A.   No, I was with my mom and dad.

20   Q.   And who came to talk to you?

21   A.   It was two police officers.

22   Q.   What did they ask you?

23   A.   Did we know who shot us.

24   Q.   Did they ask you if you shot at the police?

25   A.   No.

1    Q.  Did they ask you anything about Jose?

2    A.  No.

3    Q.  When these officers came in, did you say there were two

4    officers?

5    A.  Yes.

6    Q.  Who did most of the talking for your family?

7    A.  My mom and dad.

8    Q.  Were you present for the whole time during this conversation

9    with the police officers?

10   A.  Yes.

11           MR. CARTER:  Your Honor, we ask for Exhibit 27, which is

12   already in evidence, to be put on the screen.  And I want pages 25

13   and 26 side by side, please.  Can we blow up the highlighted

14   portions, please.

15           And, Lesha, that says:  "Sergeant Kaufman and Detective

16   Lehrmann proceeded to the eighth floor of the hospital and met with

17   Susan Bartholomew and Lesha Bartholomew.  Mrs. Susan Bartholomew

18   stated that she and her daughter expected to be released from the

19   hospital on this date.  Mrs. Bartholomew stated that she recalls

20   her nephew was shooting at the police officers as they approached

21   on the Danziger Bridge.  Mrs. Bartholomew stated she doesn't

22   remember what happened after that and later woke up in the

23   hospital."

24   BY MR. CARTER:

25   Q.  Did your mother say that?

1    A.  No.

2    Q.  "Sergeant Kaufman and Detective Lehrmann spoke to Lesha

3    Bartholomew, who advised she doesn't recall what occurred on the

4    morning she was shot."

5            Did you say that?

6    A.  No.

7    Q.  "Also, Sergeant Kaufman related that he and Detective Lehrmann

8    interviewed Leonard Bartholomew, Sr., who was in the hospital room

9    visiting his family.  Mr. Bartholomew, Sr. stated he recalls a

10   military truck pulling up on the bridge and opening fire on his

11   family, while his nephew was shooting at police officers.

12   Mr. Leonard Bartholomew, Sr. mentioned he was unsure why his nephew

13   was shooting at the military."

14           Did your dad say that?

15   A.  No.

16   Q.  Did anyone say that?

17   A.  No.

18   Q.  Did your mom say that?

19   A.  No.

20   Q.  Did you say that?

21   A.  No.

22   Q.  After this conversation with the police officers, did your mom

23   ever say anything to you that was consistent with these statements?

24   A.  No.

25   Q.  Did your dad?

1    A.  No.

2    Q.  You were out there that day, weren't you?

3    A.  Yes.

4    Q.  Did you see Jose do anything like what's referenced here?

5    A.  No.

6    Q.  Did you see Jose fire at police officers?

7    A.  No.

8    Q.  Let me have Exhibit 206, please.  Again, this is already in

9    evidence, your Honor.  Go to page 3 of 8.  And this is from the

10   statement of Officer Villavaso, a defendant in this case.  And I'll

11   just read what's on the screen.

12           "At that time, I could hear from the back of the cab what

13   was saying up front was, police, police, show me your hands, show

14   me your hands.  At that time, I heard numerous gunfire.  At that

15   time, I exited the rear, the rear of the Budget truck to the right

16   side.  At that time I observed several subjects, males and females,

17   um, holding black handguns.  Um, at that time, we announced our

18   presence.  They turned toward us, fired several shots.  At that

19   time, I exchanged fire with the subjects, um, roughly around four,

20   four shots."

21           Lesha, were there any other females in your group other

22   than you and your mother?

23   A.  No.

24   Q.  Did anyone, any officer announce his presence to you?

25   A.  No.

```
 1   Q.  Did anyone say, "police"?

 2   A.  No.

 3   Q.  Did anyone say, "show me your hands"?

 4   A.  No.

 5   Q.  Did you ever see, let alone turn toward any police officer?

 6   A.  No.

 7   Q.  Did you fire at any officers?

 8   A.  No.

 9   Q.  Were you holding a gun?

10   A.  No.

11   Q.  Did anybody in your group fire at police officers?

12   A.  No.

13   Q.  Was anybody in your group holding a gun?

14   A.  No.

15   Q.  Did your mom have a gun?

16   A.  No.

17   Q.  Did your dad have a gun?

18   A.  No.

19   Q.  Jose?

20   A.  No.

21   Q.  James?

22   A.  No.

23   Q.  What's your little brother's name, what do you call him?

24   A.  NiNi (PHONETIC).

25   Q.  NiNi?  How old was he at the time?
```

1    A.  I think he was 14.

2    Q.  Did he have a gun?

3    A.  No.

4    Q.  Did you ever do anything threatening to these officers?

5    A.  No.

6    Q.  Anybody in your group do anything that you saw to be

7    threatening to these officers?

8    A.  No.

9    Q.  Did anybody in your group ever do anything that caused these

10   officers to shoot at them?

11   A.  No.

12   Q.  Did you ever do anything to cause these officers to shoot at

13   you?

14   A.  No.

15   Q.  Is this statement the truth or a lie?

16   A.  It's a lie.

17          MR. CARTER:  It's a lie.  Thank you.  I have nothing

18   further, your Honor.

19          THE COURT:  All right.  Cross.  Mr. Larson.

20                    CROSS-EXAMINATION

21   BY MR. LARSON:

22   Q.  Good afternoon, Ms. Bartholomew.  My name is Lindsay Larson,

23   I'm representing one of the accused today.  I have just a few

24   questions for you.

25          When you and your family and James Brissette were going

1    up the bridge before you heard the gunfire, as I understand it you,

2    your mother and your father were sort of together?

3    A.  Yes.

4    Q.  And your little brother, Leonard, IV, was behind you all?

5    A.  Yes.

6    Q.  And then James and Jose were farther up the bridge than you all

7    were, correct?

8    A.  Yes.

9    Q.  And I believe that you also indicated, if I am correct, that

10   after the -- when the firing started, in fact, your father was the

11   one who was closest to the base of the bridge?

12   A.  I don't remember.

13   Q.  Do you remember talking to Agent Bezak on March the 9th of

14   2010?

15   A.  Yes.

16   Q.  Do you remember telling Agent Bezak that after the emergency

17   medical technicians arrived, that you noticed your father was

18   closer to the base of the bridge than you?

19   A.  Yes, he was behind us, behind me and my mom.

20   Q.  Was he the one who was closest to the base of the bridge?

21   A.  He was behind us that I can see.

22   Q.  He was behind you?

23   A.  Yes.

24   Q.  Was he behind your mother?

25   A.  Yes.

1    Q.  We know Jose and James were in front of you, so he must have

2    been the closest one to the bottom of the bridge then, correct?

3    A.  I don't know where James and Jose were.  That's what I saw was

4    my dad was behind me.

5    Q.  But you know they were in front of you before the shooting

6    started?

7    A.  Yes.

8    Q.  Now, you said that when you initially heard the gunshots you

9    ran to your left, correct?

10   A.  Yes.

11   Q.  Did you run like this, parallel to the base of the bridge?

12   A.  I ran on an angle.

13   Q.  On an angle up or on an angle down?  If you remember.

14   A.  Maybe it was a little bit up.

15   Q.  Up, okay.  And then you decided, I'm going the wrong way

16   because all of my family is going the other way, and then you

17   turned around?

18   A.  Uh-huh.

19   Q.  If you're going up like this to the left, would you turn around

20   like this to get back to the right (DEMONSTRATING)?

21   A.  Yeah, I turned and ran back.

22   Q.  You turned right as opposed to turning all the way around like

23   this (DEMONSTRATING)?

24   A.  Yeah.

25   Q.  So you were doing this, meaning moving to the left and upward a

1   little bit, and then you turned around to go back and jump over the

2   divider (DEMONSTRATING)?

3   A.  Yes.

4   Q.  Is that fair?  Okay.  How did you get over the divider?  Did

5   you, like you see people that, I forget what they call it, where

6   they run and jump over those little markers that run down the road,

7   did you jump like that or did you have to put your hand over and

8   get over like that (DEMONSTRATING)?

9   A.  Yeah, I had to put my hand on it to get over it.

10  Q.  Okay.  So hop over and one leg over and the other leg over like

11  that (DEMONSTRATING)?

12  A.  Yes.

13  Q.  Now, when you got to the hospital, were you able to give any

14  information to the admitting people, such as your name, your age,

15  whether you were on any medications or not, do you remember that?

16  A.  When I was in the ambulance, yes.

17  Q.  And do you remember telling anybody, either in the ambulance or

18  when you got to the emergency room, that people were shooting at

19  the police and the police returned their gunfire and that you got

20  caught in the gunfire?

21  A.  No.

22  Q.  Do you know why those words would be put on your chart?

23  A.  No.

24  Q.  Have you ever seen that -- have you ever seen your chart?

25  A.  No.

```
1    Q.  And you don't know who put those words on your chart?

2    A.  No.

3    Q.  And you don't know why they got there?

4    A.  No.

5             MR. LARSON:  Thank you, ma'am.

6             THE COURT:  All right.  Other cross?

7             MR. MECHE:  I'll be brief.

8             THE COURT:  Okay, Mr. Meche.

9                        CROSS-EXAMINATION

10   BY MR. MECHE:

11   Q.  Good afternoon, Ms. Bartholomew.  I'm Tim Meche, I just have a

12   few questions for you.

13            Have you ever watched a videotape of that day?

14   A.  I've seen it, yes.

15   Q.  And you got to watch it when you were meeting with

16   Ms. Bernstein to prepare for your testimony at some point?

17   A.  Yes.

18   Q.  And y'all were able to -- were you able to recognize things in

19   the video that you remember?

20   A.  I mean, it's not clear to me, so I can't --

21   Q.  Let me show you something and see if you remember.  Right

22   there, stop it, please.

23            Well, I guess I'll ask you, is that you in that video?

24   A.  It's not clear to me, so, I mean, I couldn't say for sure.

25   Q.  Do you remember walking with your mom and dad that morning with
```

1   a shopping cart?

2   A.  Yes -- well, not with a cart.

3   Q.  You don't remember having a cart?

4   A.  Um, I didn't remember whether we had one or not.

5   Q.  Could this be somebody else maybe?

6   A.  I am not sure.

7   Q.  Now, what you remember is that in addition to your mom and your

8   dad walking to the store that morning were also other people,

9   right?

10  A.  Other people...

11  Q.  Well, you mentioned Jose Holmes?

12  A.  I -- yes.

13  Q.  James Brissette?

14  A.  Yes.

15  Q.  And your brother Leonard?

16  A.  Yes.

17  Q.  Were they all walking with y'all or would they have been

18  separated?

19  A.  They were separated.

20  Q.  Okay.  So it doesn't look like they would be clear, you said

21  this may be you, but it may not, you don't know, but clearly you

22  don't see James Brissette, Jose Holmes, or your little brother?

23  A.  No.

24  Q.  And your dad, he's still alive right now, right?

25  A.  Yes.

```
1    Q.  And he lives with y'all in Georgia?

2    A.  No.

3    Q.  Where does he live?

4    A.  He lives in New Orleans.

5    Q.  In New Orleans?

6    A.  Yes.

7    Q.  So he's here in town now, right?

8    A.  Yes.

9    Q.  Do you know if he'll be in court to testify?

10   A.  I am not sure.

11   Q.  And your brother Leonard, at the time, you might recall, he had

12   kind of long hair, didn't he?

13   A.  Yes.

14   Q.  And he was frequently mistaken for a girl?

15   A.  Yes.

16              MR. MECHE:  Thank you.  That's all I have.

17              THE COURT:  Okay.  Any other cross?

18              MR. DeSALVO:  Mr. Bowen has none, your Honor.

19              MR. LONDON:  None, your Honor.

20              THE COURT:  All right.  Mr. Hessler.

21              MR. HESSLER:  Yes, sir.

22                          CROSS-EXAMINATION

23   BY MR. HESSLER:

24   Q.  Good afternoon, Ms. Bartholomew, my name is Eric Hessler, how

25   are you?
```

1          Ma'am, I'm sure that this was a very scary event for you.

2     A.  Yes.

3     Q.  And I take it that you really didn't quite have any reason to

4     anticipate anything that was going on or anything such as this

5     would occur when you were walking up that bridge, would that be

6     fair?

7     A.  Yes.

8     Q.  Your knowledge was, you were just going to obtain some supplies

9     in an attempt to bring back to your grandmother who was ill?

10    A.  Yes.

11    Q.  When this happened, I guess your perception that this was just

12    going to be a normal day certainly changed?

13    A.  Yes.

14    Q.  You were confused about what was going on, I take it?

15    A.  Yes.

16    Q.  And you -- actually, you ran to the left, which would be,

17    again, it's in New Orleans, we use a lot of river, lakesides and

18    things like that.  You ran away from the lake, toward the river,

19    correct?

20    A.  Yes.

21    Q.  You ran to the left, like toward the I-10 bridge, right?

22    A.  In that direction, yes.

23    Q.  That was your first instinct?

24    A.  Yes.

25    Q.  Did you hear gunshots coming from the left-hand side and that's

1    what caused you to run right, or do you know why you did that?

2    A.  Just thinking I just -- I thought I could just -- I don't know,

3    just get away from it, yeah.

4    Q.  Your first instinct was to run that way?

5    A.  Yes.

6    Q.  But then something, I guess, caught your eye, your family

7    moving, running in an opposite direction, so you mimicked them for

8    whatever reason; under the circumstances, you did what you saw them

9    do?

10   A.  Yes.

11   Q.  And, I guess, you still don't know why you did that other than

12   the explanation we just agreed on, or that sounded kind of like the

13   thing to do at the time?

14   A.  To follow them when I'm running thinking?

15   Q.  Yes, ma'am.

16   A.  That's where my family went, so, yeah, I followed them.

17   Q.  And I understand that.

18           Now, when you jumped over the wall, had you been struck

19   by any gunfire then?

20   A.  Yes.

21   Q.  And then you were struck by more gunshots, your belief, as you

22   were laying on the ground next to your mother?

23   A.  Yes.

24   Q.  During this time, you actually saw police officers below you in

25   that grassy area by the bridge, didn't you?

1    A.   Yes.

2    Q.   Those police officers were armed, weren't they?

3    A.   Yes.

4    Q.   They were pointing guns at you, weren't they?

5    A.   Yes.

6    Q.   Did you see any of them fire at you?

7    A.   No.

8    Q.   Did you hear one of them yell something to you?

9    A.   After the shooting stopped, after I stopped hearing gunshots,

10   he said for us to raise our hands up.

11   Q.   Your feet were to the -- what side were your feet pointing?

12   A.   My feet were pointing towards the bottom of the bridge and my

13   head was towards the top.

14   Q.   And at some point -- so your feet were at the bottom, facing

15   the bottom of the bridge, your head was facing to the top of the

16   bridge.  And at some point you were on your right-hand side, right?

17   A.   Yes, I was laying on my right side.

18   Q.   So your back would have been toward the grassy area?

19   A.   Yes.

20   Q.   But you did look at some point and saw the police officers

21   pointing weapons at you?

22   A.   Yes.

23   Q.   And you actually got struck in the buttocks one time, correct?

24   A.   Yeah, at some point I did.

25   Q.   Which would have been from that direction, the north side, the

1    lake, right?

2    A.  I mean, I don't know where it came from.  The shot in my butt

3    came before --

4    Q.  All right.  I'm sorry.  And one of those police officers from

5    the bottom -- how many police officers did you actually see down

6    there, more than one?

7    A.  Yes.

8    Q.  Several police officers you've testified to, correct, earlier

9    in other testimony?

10   A.  I remember seeing two.

11   Q.  Do you remember possibly saying that you saw three, including

12   possibly a female?

13   A.  It could have been a female, yes.

14   Q.  So you saw at least three officers down there?

15   A.  I saw at least two.

16   Q.  At least two?

17   A.  Yes.

18   Q.  And, again, at some point, you obviously turned back and saw

19   your mother.  Your mother was where at?

20   A.  My mom was laying on the left of me.

21   Q.  And after the gunfire subsided, did you look back down into the

22   grassy area again?

23   A.  They were there -- I saw them after the gunshots, after the

24   shots stopped, so...

25   Q.  They were still there?

1   A.  I didn't see them while the shots were going.

2   Q.  But right afterwards you said you did?

3   A.  Yeah, when the shots stopped, yeah, I saw them.

4   Q.  And one of them actually told you something basically ugly?

5   A.  Yeah.

6   Q.  At least it sounds ugly, when he said turn your head or else

7   I'll essentially blow your --

8   A.  Yes, he said he was going to blow my head off.

9   Q.  Did he sound concerned or did he sound like he meant it?

10  A.  Yeah, he sounded like he meant it.

11  Q.  Like he was scared or something?

12  A.  I was scared.

13  Q.  I understand, ma'am, I don't doubt that.  I'm sorry for that.

14          Now, prior to the storm -- I want to take you back and

15  get away from that a little bit.  Prior to the storm, you had known

16  about Hurricane Katrina coming?

17  A.  Uh-huh.

18  Q.  And it was described to be a storm that was going -- that had

19  potentially terrible effects on people, if it came this way, came

20  towards New Orleans?

21  A.  Yes.

22  Q.  And your family knew that?

23  A.  (WITNESS NODS HEAD IN THE AFFIRMATIVE.)

24  Q.  And y'all debated, I guess, about leaving town and stuff like

25  that?

```
1    A.  (WITNESS NODS HEAD IN THE AFFIRMATIVE.)

2    Q.  And obviously thought that, based on the information y'all had,

3    that you made a decision based on the information you had to stay?

4    A.  Yes.

5    Q.  And obviously things didn't turn out, it turned out a lot worse

6    than you thought?

7    A.  Yes.

8    Q.  The information you had wasn't correct or -- and after the

9    storm, like in the first couple of days after the storm or the

10   first couple of days prior to this incident, did you hear rumors of

11   things that were going on, acts of violence, gangs, and things like

12   that, looting and shooting and rapes at the Superdome, had you

13   heard any of those type of rumors?

14   A.  Yes.

15   Q.  That certainly had to concern you, didn't it?

16   A.  Yes.

17   Q.  Y'all didn't go out at night because of that, right?

18   A.  No.

19   Q.  And that information caused you and your family and your party

20   to react certainly in a different way than you would if you didn't

21   know that information, or if you didn't believe that information to

22   be true.  Do you agree with that?

23   A.  Well, I mean --

24   Q.  If you didn't have reason to believe that there weren't these

25   acts of violence going on, and gangs and people with guns driving
```

1   around -- did you ever see anybody in New Orleans East, guys in

2   stolen postal trucks with guns and stuff?

3   A.  I saw people that had stolen mail trucks.

4   Q.  Did you ever see any of them armed or driving with guns or

5   anything like that?

6   A.  No.

7   Q.  Did you ever hear of that stuff happening?

8   A.  No.

9   Q.  But nevertheless, the information you had, whether it was

10  correct or incorrect, caused you to react in certain ways during

11  that time; wouldn't you agree with that?

12  A.  Certain ways meaning?

13  Q.  You didn't go out at night --

14  A.  No.

15  Q.  -- because of the possibility of violence and danger and

16  everything else?

17  A.  Yes.

18  Q.  And you were actually rescued, I think, by police officers,

19  correct?

20  A.  Yes.

21  Q.  In that situation, that rescue situation, did they treat you

22  the way you would expect to be treated?

23  A.  Yeah, they were -- they were fine.

24  Q.  And were you aware that as these officers -- are you now aware

25  that these officers believed they were responding to a call of

1    police officers shot underneath the bridge, the I-10 bridge, are

2    you aware of that?

3    A.  Um --

4    Q.  The police officers that responded, were you aware that they

5    were responding to the calls of two police officers shot under the

6    I-10 bridge?

7    A.  The day of the shooting?

8    Q.  Huh?

9    A.  The day of the shooting?

10   Q.  Yes, ma'am.  Were you aware of that?

11   A.  (WITNESS SHAKES HEAD IN THE NEGATIVE.)  No.

12   Q.  Were you aware that when this truck pulled up behind your

13   party, a police officer actually told them, that's them, that's the

14   people that shot at the police?

15   A.  I don't know anything.

16   Q.  I understand.

17              MR. HESSLER:  Thank you, ma'am.  Thank you, sir.

18              THE COURT:  All right.  Thank you.  Anybody else?  All

19   right.  Mr. Carter, any redirect?

20              MR. CARTER:  Briefly, your Honor.

21              THE COURT:  Sure.

22                        REDIRECT EXAMINATION

23   BY MR. CARTER:

24   Q.  Lesha, you were asked about an officer in the grass, I want to

25   follow up on that.  When you were walking up the bridge to go to

1  the Winn-Dixie, did you see any other people around?

2  A.  No.

3  Q.  Did you see any police officers off to the right or the left?

4  A.  No.

5  Q.  When that gunfire broke out and you heard the shooting, did you

6  see any people, any police officers to your right or to your left?

7  A.  No.

8  Q.  Did you see anyone?

9  A.  No.

10  Q.  When you ran to the left, did you see anyone?

11  A.  No.

12  Q.  When you ran back to the right to go to that barrier, when you

13  ran toward that barrier, what side were you shot in?

14  A.  On my right side.

15  Q.  Your right side.  So as you ran to that barrier, looking at

16  that barrier, looking over that way, did you see anyone in the

17  grass?

18  A.  No.

19  Q.  Did you see any police officers?

20  A.  No.

21  Q.  You didn't see anyone?

22  A.  No.

23  Q.  Now, eventually after you were shot, as you laid there on the

24  ground being shot, did you see anyone off to the right in the

25  grass?

1   A.   No.

2   Q.   Eventually after you were shot, sometime later you did see

3   somebody?

4   A.   Yes.

5   Q.   And who did you see?

6   A.   I saw a police officer below the bridge.

7   Q.   How far away was this officer?

8   A.   I was laying down, so I guess kind of on an angle a little bit,

9   at the bottom of the bridge.

10  Q.   A little bit at the bottom of the bridge.  And what did he say

11  to you?

12  A.   For me to put -- for us to put our hands up.

13  Q.   What did you say in response?

14  A.   I put my hands up, and I was screaming to him that my mom

15  couldn't raise her other arm.

16  Q.   Why did you tell him that your mom couldn't raise her arm?

17  A.   Because her arm had been shot off.

18  Q.   But you hadn't seen that officer before?

19  A.   No.

20  Q.   Or any officers before?

21  A.   No.

22  Q.   Until well after you had been shot?

23  A.   Yes.

24            MR. CARTER:  Thank you.

25            THE COURT:  Thank you, ma'am.  You can step down.

1          MR. CARTER:  May we approach, your Honor?

2          THE COURT:  Yes.

3      (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

4          MS. BERNSTEIN:  Before we rested, your Honor, we just

5   wanted to make sure, subject to the qualification before about

6   checking with the exhibits, I understand there's some dispute about

7   a couple of exhibits that we thought that we believe them offered

8   that aren't on the official record, and I just wanted to make sure

9   that after we rest, if we need to, we can offer into evidence

10  exhibits that have already been talked about at trial.

11         THE COURT:  Yes, I think that's appropriate.  Anybody

12  have any objection to that?

13         MR. LARSON:  No.

14         MR. FLEMING:  Assuming we'll have the same courtesy,

15  sure.

16         THE COURT:  Sure, as long as it's been covered, and we

17  have a pretty good record here between Pam and me, and I'm sure you

18  all, too.

19         I do have a question about Exhibit 300, which is the

20  video version with the black slugs in it.

21         MS. BERNSTEIN:  That's the defense version of the video,

22  and that one, my understanding is that that version still has the

23  part on it that needs to be excised per your order; and I think

24  that the defense team didn't have the capability of doing that and

25  so they've asked us to try to help.  It has not yet been done, so

 1    that would be another exhibit that needs to be introduced.

 2              THE COURT:  We will need to add that.

 3              MR. KITCHENS:  We've agreed we can cut it off at the

 4    helicopter.

 5              MS. BERNSTEIN:  That's just a matter of time for our guy

 6    Tim to do that.

 7              THE COURT:  Right, okay.

 8              MR. LARSON:  I don't know if this is the proper time for

 9    this or not, but I wanted to offer the intake sheet that I was

10    talking to her about because, interestingly enough, her medical

11    records are in the record as an exhibit, but this page is not part

12    of the record.

13              THE COURT:  You're saying it should be part of the record

14    that was already introduced?

15              MR. LARSON:  A total record.

16              MS. BERNSTEIN:  I disagree with that.  I don't think her

17    total record is in, I think it's a part of the record that's in.

18              MS. CHUNG:  I just put in the part that Dr. Thompson said

19    would be helpful for him to testify.

20              MS. BERNSTEIN:  And I would object to him offering that

21    report in, since all we've established so far is that the statement

22    he is interested in is hearsay.  We don't have anybody telling us

23    who provided that information that's in there.  So we definitely

24    oppose that.

25              MR. CARTER:  I'll tell you that it looks similar to a

```
 1    sheet that we talked about one of the nurses, that was filled in by
 2    an intake nurse, so it's no indication that it came from her, she
 3    knows nothing about it.  I know nothing about the sheet of paper.
 4          MR. LARSON:  This is a medical record and it is written
 5    on the medical record.
 6          MS. BERNSTEIN:  But the medical records in full have not
 7    been offered and we haven't offered them, and don't plan to offer
 8    them.
 9          THE COURT:  You will have to get it in with a witness on
10    the defense's presentation.
11          MR. CARTER:  And I'm sure there is something you can do.
12          THE COURT:  I wouldn't help -- we'll cross that bridge
13    when we get to it.  I agree, it needs to be introduced through the
14    appropriate witness, and I don't think that it's been offered
15    otherwise and would not be part of the records that have been
16    introduced, if they were only the particular doctor's records.  So
17    it's a record from somewhere, but it's not part of a record that's
18    been introduced.
19          MR. LARSON:  It's an emergency nursing record for
20    multiple trauma at West Jefferson Hospital.
21          THE COURT:  Right.
22          MS. CHUNG:  And, your Honor, the last two stipulations I
23    had put into letter form, I brought them, I didn't know when you
24    wanted to do them, so I have them here.
25          THE COURT:  Should we read those to the jury now, is that
```

```
 1   the intent?

 2            MS. CHUNG:  Well, I mean, both of the exhibits are in

 3   evidence, that's why I don't know if you want them.

 4            MS. BERNSTEIN:  I am not sure the stipulation needs to be

 5   read to the jury since the stipulations are the foundation for the

 6   pieces of evidence that have been offered.

 7            MR. FLEMING:  I don't remember, I don't know what you're

 8   talking about.

 9            MS. CHUNG:  It was the ATF report and then the

10   stipulation to the video with the slugs and the statement.

11            MR. FLEMING:  I don't think, I think that the stuff is in

12   there.

13            MS. CHUNG:  It's in there.

14            THE COURT:  We can add them, if need be, we can add them

15   to the stipulations that I read to the jury as part of the jury

16   charge.  If the documents are in evidence already, then they're in

17   evidence.

18            MS. CHUNG:  They're in evidence.

19            THE COURT:  Whether or not we need to actually add a

20   written stipulation to accompany that, we can always read that,

21   too -- you can decide that and I can read that when I read the

22   stipulations.

23            MR. FLEMING:  That's easy enough.

24            MS. CHUNG:  I just brought them in case.

25            THE COURT:  Is the government resting at this point?
```

1           MS. BERNSTEIN:  Yes.

2           THE COURT:  I am going to ask you to do that in open

3      court; but in the meantime, since the government rests, do we want

4      to make our -- reserve our rights as was previously discussed?

5           MR. MECHE:  Yes, your Honor.  On behalf of Defendant

6      Villavaso, pursuant to Rule 29, Villavaso moves for judgment of

7      acquittal as to all counts he is charged with, specifically Counts

8      1, 2, 3, 4, 5, 6, 7, 11, 12 and 23.  It's my understanding that the

9      court may wish us to argue that later and not now.

10          THE COURT:  We will just be making a record right now

11     while you all are up here.

12          MR. LARSON:  We will so move on behalf of Defendant

13     Robert Faulcon, Rule 29 motion for judgment of acquittal on all

14     counts.

15          MR. HESSLER:  Move on behalf of Gisevius.

16          MR. DeSALVO:  Mr. Bowen joins in.

17          MR. LONDON:  Along with Mr. Kaufman.

18          MR. HESSLER:  I'm assuming mine is granted, can I go now?

19          THE COURT:  Subject to further argument/discussion on the

20     record, the record will reflect that those were timely moved for at

21     the conclusion of the government's case.

22          Now, let's go ahead and hear that the government has

23     rested, and you all have a witness who is Gasaway?  Okay, we'll

24     take Gasaway.

25          (OPEN COURT.)

```
 1              THE COURT:  Okay.  Anything further from the government?
 2              MS. BERNSTEIN:  Your Honor, at this point the government
 3    rests.
 4              THE COURT:  Okay.  Thank you, Ms. Bernstein.
 5              Okay.  Subject to the record that we made up here, I
 6    would ask defense counsel at this time, who is calling the first
 7    witness, first of all?
 8              MR. HESSLER:  Your Honor, Eric Hessler for Robert
 9    Gisevius, would call Shawn Gasaway.
10              THE COURT:  Let's get Mr. Gasaway in.  If you'd come up,
11    sir, please remain standing until you take the oath.
12              And let me ask also, is this a witness that is being
13    called collectively by the defense or only by Mr. Hessler's client?
14              MR. DeSALVO:  Mr. Hessler calling on behalf of Mr. Bowen
15    also.
16              MR. FLEMING:  I believe Mr. Hessler is calling
17    Mr. Gasaway on behalf of all defendants.
18              THE COURT:  All the defendants, is that correct?  Okay.
19    So the way we're going to proceed at this point is that each
20    defense counsel will have the opportunity to direct exam the
21    witness, Mr. Hessler will be first, and then the witness will be
22    subject to cross, and then subject to redirect by each of defense
23    counsel.  Okay.
24              MR. HESSLER:  Your Honor, may we approach very briefly?
25              THE COURT:  Sure.  While we're up here, if you want to go
```

1    ahead and administer the oath to this witness, please.

2         (WHEREUPON, SHAWN GASAWAY, WAS SWORN IN AND TESTIFIED AS

3         FOLLOWS:)

4         (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

5              MR. HESSLER:  I believe he has some documents in his

6    hand, like his running sheets and all of that, that I just want to

7    take from him because if he has to refresh his recollection.

8              MS. BERNSTEIN:  Do you mind if I excuse myself from court

9    for two minutes?

10             THE COURT:  Sure.

11             MR. HESSLER:  I just saw him walk in with a folder.

12             THE COURT:  You want to take them from him?

13             MR. HESSLER:  I assume -- well, it's up to the court.

14             MS. CHUNG:  I mean, if he is going to refer to them I

15   would like to see them.

16             MR. HESSLER:  I don't know what's in there.

17             THE COURT:  Why don't we go ahead and -- sir, you brought

18   a folder with you?

19             THE WITNESS:  Yes, sir.

20             THE COURT:  Can I take that?  Take a look at them here,

21   at least get an eyeball.

22             It looks like run sheets, the 302, and the subpoena.  Any

23   issue?

24             MR. HESSLER:  I don't believe so, but I didn't want him

25   to refer to them at the time.

1          (OPEN COURT.)

2               THE DEPUTY CLERK:  Please state and spell your full name

3     for the record.

4               THE WITNESS:  Shawn Franklin Gasaway.

5               THE DEPUTY CLERK:  Can you spell it, please.

6               THE WITNESS:  Shawn, S-H-A-W-N, Gasaway, G-A-S-A-W-A-Y.

7               THE COURT:  All right, Mr. Hessler.

8               MR. HESSLER:  Thank you, your Honor.

9                         DIRECT EXAMINATION

10    BY MR. HESSLER:

11    Q.  Mr. Gasaway, what is your present occupation?

12    A.  Present occupation is an emergency room RN, registered nurse.

13    Q.  A registered nurse?

14    A.  Yes, sir.

15    Q.  Where are you employed?

16    A.  Employed in several different places, Little Rock, Arkansas,

17    Baptist Health.  I also work part-time on an ambulance for

18    Emergency Ambulance Service and Saline Memorial Hospital.

19    Q.  How long have you been employed as a registered nurse?

20    A.  I graduated school in December of 2010.

21    Q.  Where did you go to school?

22    A.  Sir?

23    Q.  Where did you go to school?

24    A.  Ouachita Tech in Arkansas.

25    Q.  Prior to becoming a registered nurse, what was your occupation?

1    A.  I was a paramedic.

2    Q.  And when you say a paramedic, is that an EMT?

3    A.  EMT, paramedic, yes, sir.

4    Q.  Is there a difference between EMT and paramedic?

5    A.  Absolutely.  Along with a year and a half more school, we have

6    more diverse skills that we can perform.

7    Q.  When you say -- how long were you a paramedic?

8    A.  I've been a paramedic, counting Army and civilian, since '95.

9    Q.  And I guess prior to '95 were you an EMT first?

10   A.  Yes, sir, I went through EMT training, yes, sir.

11   Q.  And then how long were you an EMT before you became a

12   paramedic?

13   A.  It's kind of the same thing in the Army, it's all reading into

14   one.

15   Q.  I guess your training as a paramedic came from the armed

16   forces?

17   A.  Yes, sir.

18   Q.  And what did you experience there?

19   A.  We went through two and a half years of training in San

20   Antonio.  Was only deployed to El Salvador for three weeks.  Other

21   than that, I was Army Reserve, spent the last three years of my

22   enlistment on a Black Hawk as a flight mate.

23   Q.  And for what units or have you been assigned to in your course?

24   A.  Initially, it was the 810 Field Hospital and then I transferred

25   to the reserves for the 172nd air evac.

1    Q.  Do you have any law enforcement training?

2    A.  I was a SWAT medic for ten years in Pine Bluff, Arkansas.

3    Q.  And a SWAT medic, would you tell the jury what a SWAT medic

4    typically does?

5    A.  Basically, we are part of the SWAT team, there for medical

6    training, whether it be for the officers itself or the civilians.

7    We go in with the team, we are trained as a team.  I currently am

8    SWAT level 2 certified with explosives.  We train with the weapons,

9    we train with the devices, and we're virtually a part of the team.

10   Q.  And you say you train to render medical aid if an officer is

11   shot, wounded, or somehow injured?

12   A.  Absolutely.  I've treated -- actually, the only thing I treated

13   at home was an entry device explosion, minor injury.  Other than

14   that, we're just there for backup in case something happens.

15   Q.  And that's -- certainly could happen in a situation like that?

16   A.  Yes, sir.

17   Q.  You're also trained to render aid to a civilian if a civilian

18   should be inadvertently wounded or injured?

19   A.  Absolutely, yes, sir.

20   Q.  Would you also be trained to render aid to a perpetrator or a

21   hostage if they were to be injured?

22   A.  Absolutely, yes, sir.

23   Q.  You wouldn't withhold aid from an injured perpetrator, would

24   you?

25   A.  No, sir.

1    Q.   Would you withhold medical aid from anybody?

2    A.   No, no, sir.

3    Q.   Now, at some point you end up in New Orleans from Arkansas?

4    A.   Yes, sir.

5    Q.   And I guess that point would be when?

6    A.   We came down, that was me and four other Emergency Ambulance

7    Service employees, came down the day after Katrina.  We arrived in

8    Baton Rouge that night.  Spent the next two days back and forth

9    between Baton Rouge and the Causeway, and then a group of Arkansas

10   ambulances gathered up and went and came downtown New Orleans.

11   Q.   Was this a volunteer mission or a paid mission?

12   A.   We were paid, but they asked for volunteers.

13   Q.   Did your paid time ever run out?

14   A.   Yes, sir.  We -- actually, I was supposed to go back after

15   three days, they had an agreement that they would swap crews every

16   72 hours.  And I called my boss and told him that I was staying for

17   another three days, whether it was paid or not.

18   Q.   And why did you make that decision?

19   A.   Because of everything that was going on down here, the chaos, I

20   mean, it was -- once you crossed the Causeway, and the best words I

21   can describe it, it was, it was a land forgotten, it was a

22   disaster.

23   Q.   When you were supposed to go back, did you keep your employer's

24   ambulance?

25   A.   Yes, sir.  Actually, another crew came down, which I escorted

1    to the West Bank that night on my third night.

2    Q.  You say another crew, was that crew also from Arkansas?

3    A.  Yes, sir.

4    Q.  Part of your team that you usually work with?

5    A.  Emergency Ambulance Service, yes, sir.

6    Q.  Up in Arkansas?

7    A.  Yes, sir.

8    Q.  How is it that you became assigned to the, I guess New Orleans

9    East area of the 7th police district area?

10   A.  On that third day after we had spent the night at a local

11   school, we went over to what was established as a headquarters,

12   which was Harrah's, and we were assigned to an evac/rescue mission

13   that was over in that area by one of the New Orleans, I guess a

14   lieutenant or a commanding officer.

15   Q.  And how long had you worked in that 7th District area prior to

16   the shooting incident?

17   A.  That was my first morning.

18   Q.  That was your first morning?

19   A.  Yes, sir.

20   Q.  On that morning that we're speaking of, what time did you

21   arrive?

22   A.  Probably six, seven o'clock in the morning, if not earlier.

23   Q.  Did you have any set working hours, or how long during the day

24   did you work?

25   A.  No set working hours.  The three previous days I had been up

1    for 72 hours.

2    Q.  Tell me about the morning that -- the activities you were

3    engaged in prior to learning of a call for service.

4    A.  We were at a makeshift headquarters there, what I believe to be

5    an old Mexican restaurant, they set up, that had bandages, water

6    and stuff on the tables.  We were parked outside and there was an

7    officer that was -- has a history of high blood pressure, and he

8    asked us if we would check his blood pressure because he hadn't had

9    his medicine in a few days.

10   Q.  Let me stop you there.  You said he had a history of high blood

11   pressure?

12   A.  Yes, sir.

13   Q.  Did you know this guy or that's just the way --

14   A.  No, sir, he just approached us and said, hey, can y'all check

15   my pressure, you know, I've been out of my medicine since the storm

16   hit, I want to make sure nothing is outrageously bad.

17   Q.  But, I mean, I guess as part of your duties, were you able to

18   determine he had this history?

19   A.  No, he told us he did.

20   Q.  So you didn't know him --

21   A.  Correct.

22   Q.  A personal history of him, you just learned that through the

23   course of treatment?

24   A.  Exactly.  Yeah, he approached us and said, hey, I have high

25   blood pressure, I haven't had my blood pressure medicine in three

1    days, can you check it for me.

2    Q.  So what happened next?

3    A.  We were checking his blood pressure and then we heard a radio

4    dispatcher, a male voice, officer down, need help, shots fired.

5    Q.  You heard that via -- you overheard somebody else's radio or...

6    A.  Yes, sir.

7    Q.  What happened next?

8    A.  He told us, he said, follow me, I need y'all to follow me; we

9    did, all five of us hopped in the ambulance.

10   Q.  You say all five of us.

11   A.  Yes, sir.

12   Q.  Did the police officer hop in the ambulance with you?

13   A.  No, sir.  It was five of us that was assigned to that

14   ambulance, from Emergency Ambulance Service.

15   Q.  And what happened next?

16   A.  We followed him down the street, and I don't know what the

17   streets' names were.  As we arrived to the scene, I guess probably

18   within a minute, or less than two minutes, it wasn't very far.  I

19   noticed and heard gunfire at the base of the bridge.  When I pulled

20   up, I noticed people standing on the left side and on the right.  I

21   parked my ambulance in a defensive position to where we could

22   actually get out the back and cover ourselves.  We didn't have a

23   clue what was going on, and we didn't know if we were that close to

24   what was going on.

25   Q.  And you said you -- let me ask you this:  When you arrived,

1  what happened to the unmarked police car that you were following?

2  A.  There was one that went ahead of us, the gentleman that we were

3  taking his blood pressure, he went straight, parked on the bridge a

4  little ways up, and there was another unmarked car behind us that

5  came around us and followed him up to the -- where he was parked at

6  on the bridge.

7  Q.  Would it be fair to say that there were police officers on the

8  scene prior to you arriving?

9  A.  Yes, sir.

10  Q.  Are you familiar with that area at all?

11  A.  No, sir.

12  Q.  Did you ever drive -- upon your initial arrival, you said you

13  didn't drive up on the bridge?

14  A.  No, sir; no, sir.  We parked -- we parked at the intersection

15  prior to the bridge or in-between the base of the bridge and that

16  intersection.

17  Q.  And when you say you just parked, did you actually just park

18  the vehicle?

19  A.  I cut it to the right, kind of give us some shelter so we could

20  hop out and actually get behind the ambulance.

21  Q.  What caused you to cut it to the right as to just parking it

22  somewhere?

23  A.  Training.

24  Q.  Was there gunfire going on?

25  A.  Yes, sir, there was a gunfire when we arrived.

1   Q.  Did you see anything off to the right side of the bridge?

2   A.  Yes, sir.

3   Q.  When you're looking up, if you described it in military terms,

4   which I think you did at one point to the FBI?

5   A.  Yes, sir.

6   Q.  Would -- if you refer to the 12 o'clock position, where would

7   that be?

8   A.  Twelve o'clock position would be the piers of the bridge.

9   Q.  The piers of the bridge?

10  A.  Yes, sir, the straight-up angle.

11  Q.  We've been describing it as everything but piers, it's not

12  something that we used, but it sounds correct.

13          If you're looking at the bridge, the peer's straight

14  ahead of you at --

15  A.  Yes, sir.

16  Q.  -- three o'clock?

17  A.  No, I'm sorry.

18  Q.  I mean one o'clock?

19  A.  Twelve o'clock.

20          THE COURT:  You're asking him about --

21          MR. HESSLER:  I'm not in the military, there's a reason

22  why, I guess, I would be going the wrong way all the time.

23  BY MR. HESSLER:

24  Q.  So 12 o'clock?

25  A.  Yes, sir.

```
1   Q.  And you stated you heard gunfire from the right.  What o'clock
2   would that be?
3   A.  That would be three o'clock.
4   Q.  And did you see -- you heard gunfire from the three o'clock?
5   A.  Yes, sir.
6   Q.  Where else did you hear gunfire?
7   A.  When I was behind the ambulance taking cover, I heard gunfire
8   from which would be the nine to 12 o'clock position, which would be
9   my left, and the three to 12 o'clock position both.
10  Q.  So fair to say almost ahead of you in almost a 180 --
11  A.  Correct, yes, sir.
12  Q.  -- arch?
13  A.  180-degree, yes.
14  Q.  Did that cause you to look to the right, to the three o'clock
15  position?
16          MS. CHUNG:  Your Honor, I just object.  There have been
17  several leading questions.
18          THE COURT:  Let's not lead the witness.
19  BY MR. HESSLER:
20  Q.  When you heard the gunfire from the three o'clock position,
21  what did you do?
22  A.  I was at that time behind the ambulance taking cover with the
23  rest of my crew.
24  Q.  When you say taking cover, were you armed?
25  A.  Yes, sir.
```

1    Q.   You had weapons training?

2    A.   Yes, sir.

3    Q.   In the military?

4    A.   Yes, sir.

5    Q.   Through law enforcement?

6    A.   The SWAT medic, yes, sir.

7    Q.   Were you ever able to see toward the 12 or three o'clock

8    location?

9    A.   Negative.  When I was behind the ambulance, mostly covering

10   what was behind us, because my thoughts were, I didn't know what

11   was going on, didn't know what was coming or what could come.

12   There was gunfire ahead of us, so I was basically covering my six

13   o'clock, so to speak, my tail.

14   Q.   And my question, though, was, did you ever have the occasion to

15   look ahead and see where the gunfire was coming from?

16   A.   No, sir, not until after it was over.

17   Q.   When the gunfire stopped, how long did it take until you looked

18   ahead?

19   A.   Maybe 30 seconds.

20   Q.   What did you see, if anything?

21   A.   I saw people to the right side, long guns, officers.  There was

22   a blonde female, she was at the highest point of the bridge; the

23   two officers, the one that followed us and the one that led us.

24   There was -- I remember seeing a red and white jersey in the middle

25   on the walkway.

1   Q.  And you said that to the right of the bridge you saw people

2   with long guns?

3   A.  Yes, sir.

4   Q.  Could you identify those persons?  Were they civilians or were

5   they law enforcement?

6   A.  They were wearing BDUs with tactical vests, and like I told

7   Officer Lovell with the FBI, they were long guns, possibly AR-15s

8   is what the silhouette looked like.

9   Q.  Do you know what caliber the AR-15s fire?

10  A.  .223.

11  Q.  Were they pointing these weapons at the bridge?

12  A.  Yes, sir.

13  Q.  Now, could you pull up Exhibit 58, please -- actually, can you

14  pull up 71 first.

15          Can you recognize from this exhibit the area where you

16  would have turned your ambulance?

17  A.  Yes, sir.

18  Q.  Could you press this dot?  You can do that.  Can you press that

19  screen where you think you were, in the area where you parked the

20  truck?

21  A.  (WITNESS COMPLIES.)  And that --

22  Q.  What?

23  A.  That would be at the top left corner was where -- I mean, it's

24  kind of wide, but, yeah, that's ...

25  Q.  Let's try it again.  If you just poke at it it will make a

1   smaller mark.  Is that kind of where your truck was?

2   A.  Yes.  Yes.

3   Q.  Or your ambulance.  Now, you see this grassy area that runs

4   along that way (INDICATING)?

5   A.  Yes, sir.

6   Q.  If you can, can you put dots where you saw individuals that you

7   described as, with the long rifles.  If you can see it in there,

8   can you see it in that picture?

9   A.  It's actually going to be more just to the outside of the

10  picture, to the left.

11  Q.  Can you put that exhibit -- you're talking about closer to the

12  roadway (INDICATING)?

13  A.  Closer and back this way, out of the picture frame right now.

14  It's just outside of the picture frame to the left.

15  Q.  Can you go to 71, please.

16          MR. DeSALVO:  That is 71.

17          MR. HESSLER:  All right, then.  58.

18          THE WITNESS:  It's going to be over there (INDICATING).

19  BY MR. HESSLER:

20  Q.  And could you point or draw a line in the direction that these

21  individuals were pointing their weapons?

22  A.  (WITNESS COMPLIES.)

23  Q.  And how many did you see?

24  A.  Roughly, 10 or 15.  There was also boats and trucks and other

25  civilians that I could see as we were going up the bridge to treat

1   the victims.

2   Q.  And we're going to get to that in a little bit.

3        MR. HESSLER:  And, your Honor, for the record, I would

4   just like to indicate that on Exhibit 58 there was a line that was

5   coming from the grassy area toward the bridge.

6   BY MR. HESSLER:

7   Q.  Mr. Gasaway, so now you're looking out -- the gunfire has

8   stopped.  You look out because the gunfire had stopped, and that's

9   what you just described to the jury you saw.  What did you do next?

10  A.  Next we heard the officers that was actually on the bridge

11  yell, medic, medic, scene's clear, and that's when we moved in.

12  Q.  Your crew got back in the car, got back in the ambulance, I

13  would suppose?

14  A.  Yes, sir.

15  Q.  So you drive up on the bridge?

16  A.  Yes, sir.

17  Q.  Are the police officers still milling around or standing

18  around?

19  A.  Yes, sir.  They had, they had secured the scene and were

20  pointing over toward the walkway on the bridge.

21  Q.  What did you see when you pulled up?

22  A.  When I pulled up, officers were to my left.  I couldn't really

23  see anything because of the concrete wall that was in-between

24  there.  And that's when the officers were pointing over behind the

25  wall and saying, they're over there, they're over there.

```
1    Q.   Did you go to the area they were pointing to?
2    A.   Yes, sir.
3    Q.   What did you find?
4    A.   I found one gentleman, and as I'm describing, I'm going from
5    the base to the top of the bridge, which would be from my right to
6    left.   There was a gentleman, multiple gunshot wounds, to my right.
7    He was pulseless and apneic.
8    Q.   Can you explain what that means to the jury and to me?
9    A.   No pulse and no respirations.
10   Q.   That would be the person that was at the lowest end of the
11   bridge?
12   A.   Yes, sir.   Yes, sir.
13   Q.   All right.   Going up from that person -- and when you say
14   pulseless and apneic?
15   A.   Apneic, A-P-N-E-I-C.
16   Q.   Showed no signs of life?
17   A.   Exactly, yes, sir.
18   Q.   So now you're doing what you call triage phase?
19   A.   Yes, sir.
20   Q.   And would you tell the jury what triage phase means to you?
21   A.   Triage is to where you have a limited number of resources,
22   which at that time was our truck, our ambulance and stuff we had
23   stocked in it.   With the number of patients, you find out the ones
24   that you can treat and save the quickest with the least resources.
25   And at that time, the gentleman at the base of the bridge there, he
```

```
 1    was basically unsavable at that time.
 2    Q.  So you moved on to the next patient?
 3    A.  The next patient would be, and it was either the gentleman with
 4    the gunshot wound to the head or the multiple gunshot wounds to the
 5    chest and abdomen.  And I don't know which was first.  Then the two
 6    females were ahead of them.
 7    Q.  Out of the -- and was there another male?
 8    A.  There was three males and two females.
 9    Q.  The second male would actually have been the second person
10    going up the bridge?
11    A.  Correct.
12    Q.  And he had a gunshot wound to the abdomen and to the face I
13    think, to the head?
14    A.  No, sir.  One was a gunshot wound to the chest and abdomen.
15    No. 3 person would have had a gunshot wound to the head, which was
16    actually a conscious and alert, talking to me.  Also an injury to
17    one of his legs was the third person.
18              Second one was a female, right arm was hanging by a
19    tissue of fascia, or fat material, no bone.  She also had multiple
20    abrasions, maybe had some injuries to her lower extremities.  And
21    I'm unsure of exactly what the fifth person had as far as the
22    injuries.
23    Q.  And the fifth person was also a female?
24    A.  Yes, sir.
25    Q.  The male that was second -- can you go to Exhibit No. 46,
```

 1   please.

 2            No. 46, do you see the gentleman that's obviously or

 3   apparently expired?

 4   A.  Yes, sir.

 5   Q.  Is that the first person that we discussed that you said was --

 6   A.  Yes, sir.

 7   Q.  -- no pulseless and apneic?

 8   A.  Pulseless and apneic, yes, sir.

 9   Q.  The second gentleman, can you describe his condition?

10   A.  Guarded, multiple gunshot wounds.  We gauge them by holes, how

11   many holes they had that may be an entrance, may be an exit, that's

12   not that time to judge.  Basically count the holes, plug them, and

13   keep the blood in the body.

14            He had gunshot wounds to the chest and abdomen, and

15   that's what I was mostly worried about with him.

16   Q.  You say you gauge them by gunshots, holes in them.

17   A.  Yes, sir.

18   Q.  In your experience, a person could be shot here and have a hole

19   here, a hole here, and a hole here, all caused by one single

20   gunshot?

21   A.  Absolutely, yes, sir.

22            MS. CHUNG:  Object to the leading, your Honor.

23            THE COURT:  Yes, let's just ask him.  I realize that he's

24   testified already about certain entrance wounds, but let's not lead

25   the witness, same thing as we had before, so let's not lead the

1    witness.

2              MR. HESSLER:  Yes, sir.

3    BY MR. HESSLER:

4    Q.  Was that somebody in your triage experience and your decision

5    was, in fact, to treat?

6    A.  Yes, absolutely.

7    Q.  Do you recall his name?

8    A.  No, sir, I don't.  Only by the run sheet.

9    Q.  Was he in a position to talk?

10   A.  Very little.

11   Q.  And did you, in fact, put him in your ambulance?

12   A.  Yes, sir.

13   Q.  Was there anybody else you transported?

14   A.  Yes, sir, I transported the gentleman with the gunshot wound to

15   the head.

16   Q.  Was he able to talk?

17   A.  Yes, sir, he was.

18   Q.  Of the two, who did you feel that was most grave?

19   A.  The gentleman with the gunshot wound to the abdomen and chest.

20   Q.  You transported the two males from the scene?

21   A.  Yes, sir.

22   Q.  And that would have left the two females behind, as well as the

23   deceased?

24   A.  Yes, sir.

25   Q.  Was there anyone else there to treat the two females?

```
 1    A.  Yes, sir.  At that time that I did my triage, we only had one
 2    ambulance.  There was five people, one ambulance.  There's only
 3    places for two patients that are actually supine or laying.  There
 4    was another ambulance that showed up on scene from northeast
 5    Louisiana EMS.  I ran, waved them in.  They were only EMT basics,
 6    which is the basic level, the lowest level that you can get as an
 7    EMT.
 8    Q.  And where were they from?
 9    A.  Northeast Louisiana, it's NELAMS.
10    Q.  Had you encountered them earlier in the day?
11    A.  Yes, sir, they were -- they were with the group that moved down
12    into the downtown area.
13    Q.  Were you the highest -- in your opinion or your knowledge, were
14    you the highest trained personnel on the scene, medical personnel
15    on the scene?
16    A.  Yes, sir.
17    Q.  Did you ever tell anybody don't treat that guy, he can't be --
18    anybody other than maybe Brissette?
19    A.  When I waved them in, told them to come on, we need some help,
20    I waved them in, we were continuing to treat the other four
21    patients that were on scene.  They started at the base where the
22    gentleman was that I had already pronounced, I said, he is
23    ten-seven, let's focus on these.
24    Q.  Ten-seven is EMT or police parlance for what?
25    A.  Deceased or out of operation.
```

1   Q.  Go on, I'm sorry.

2   A.  Once I told him, I said move toward what we can help or what we

3   can fix.

4   Q.  The fellow, the second fellow that you encountered, did you

5   ever tell an EMT, don't mess with him, just leave him, we can't

6   help him?

7   A.  Absolutely not.  No, sir.

8   Q.  Did you request any other aid that was denied or did you try to

9   get any other assistance, medical assistance, in order to expedite

10  transporting or anything else?

11  A.  Yes, sir.  There were multiple helicopters in the area that

12  day, and I requested -- I hollered out, in general, I need a

13  helicopter, I need a helicopter.  Because the quickest way to get

14  these people to the hospital was by air.

15  Q.  Was that request ever --

16  A.  They said we can't get one, there's no way.

17  Q.  And you make a decision, the only way to transport them is by

18  your van?

19  A.  Yes, sir.

20  Q.  Did you actually take your van?

21  A.  Not personally.  I took over the EMT ambulance, there was four

22  basics on that ambulance.  Being a paramedic, I took charge of that

23  ambulance and the personnel on it.

24  Q.  Did you also take charge of who you determined to be the most

25  critically wounded?

1    A.  Yes, sir.

2    Q.  In route to the hospital and in route during the

3    transportation, did you drive or did you treat?

4    A.  No, sir, I was in the back, I was treating in the back.

5    Q.  Did you do that for any specific reason?

6    A.  That's usually where a paramedic goes to treat.  I mean, the

7    EMT usually on scene, it's two people, it's an EMT or a medic with

8    another medic.  If it's an EMT and a medic, the EMT usually helps

9    the paramedic on scene, get the patient in the truck, and then they

10   drive.

11   Q.  Approximately how long did it take to get to the hospital, if

12   you recall?

13   A.  Honestly, it felt like forever.  But with no times or anything,

14   I would say probably, ballpark, ten minutes.

15   Q.  Were you treating the most critically wounded individual, the

16   abdomen?

17   A.  I was treating both the gunshot wound to the head and the

18   gentleman with the gunshot wounds to the abdomen and chest, yes,

19   simultaneously.

20   Q.  Going back and forth?

21   A.  Yes.

22   Q.  Were you the only medic on board at that point?

23   A.  Yes, sir.

24   Q.  Do you know the condition of the two when you dropped them off?

25   A.  They had said that the gentleman with the gunshot wound to the

1    abdomen and chest were going -- he was going into surgery, and they

2    had taken the other gentleman with the gunshot wound to the head

3    into another room, and I never -- never heard anything on that one.

4    Q.  Did you return back to your duties after that or did you hang

5    around at the hospital?

6    A.  The officer that escorted us into the hospital, because we

7    didn't know where we were going, he actually escorted us back to

8    Harrah's, which was our, kind of our meeting place or our base.

9    Q.  Do you know if the officer that escorted you to the -- did you

10   get an escort to the hospital?

11   A.  Yes, sir.

12   Q.  Do you know if that was actually the officer you followed to

13   the scene?

14   A.  No, sir, that was an officer that followed us.

15   Q.  And that's the car that passed behind you?

16   A.  Yes, sir.

17   Q.  A white man?

18   A.  Yes, sir.

19   Q.  And you say this car passed behind you and went up on the

20   bridge?

21   A.  Yes, sir.  When I pulled to the right, the car passed on the

22   left.

23   Q.  Do you recall what color the car was?

24   A.  A grayish bluish dark color.

25   Q.  After this event, did you ever have the occasion to speak with

1   the FBI?

2   A.  Back in '09, Officer Mike Lovell contacted me.

3   Q.  Mike who?

4   A.  Mike Lovell.

5   Q.  That's an FBI agent?

6   A.  Yes, sir.

7   Q.  Was that the first time you had ever been contacted by any

8   person in regards to this incident?

9   A.  Yes, sir.

10  Q.  Did you tell them what you told us today?

11  A.  Yes, sir.

12  Q.  And you and I have talked, right?

13  A.  Yes, sir.

14  Q.  When was the first time you ever heard from me, or of me?

15  A.  I guess it was the first of July when I got my subpoena is the

16  first time I had actually talked to you.

17  Q.  And you told me what you told the FBI?

18  A.  Yes, sir.

19            MR. HESSLER:  No further questions.  Thank you.

20            THE COURT:  All right.  Counsel.

21            MR. DeSALVO:  Briefly, your Honor.

22                      DIRECT EXAMINATION

23  BY MR. DeSALVO:

24  Q.  I'm Frank DeSalvo.

25            Do you know any of these people here that have been

1    charged with crimes?

2    A.  No, sir.

3    Q.  And you have no reason to lie for them?

4    A.  No, sir.

5    Q.  To help them or to hurt them?

6    A.  No, sir.

7              THE COURT:  Let's not lead the witness.

8              MR. DeSALVO:  I'm sorry.  Just one more question.

9    BY MR. DeSALVO:

10   Q.  Did you know you were an outliner?

11   A.  An outliner?

12   Q.  Do you know what an outliner is?

13   A.  No, sir.

14             MS. CHUNG:  Objection.

15             MR. DeSALVO:  No further questions.

16             THE COURT:  All right.  Anybody else?  Mr. Larson?

17                      DIRECT EXAMINATION

18   BY MR. LARSON:

19   Q.  I just wanted to clarify something.  My name is Lindsay Larson.

20             Did I understand your testimony correctly when you

21   initially talked to Mr. Hessler just a few minutes ago, you said

22   you were unsure -- or did you say you were unsure as to whether the

23   fella with the gunshot wound or the fella with the multiple chest

24   wounds was either closer to the --

25   A.  No. 2 or No. 3?

1   Q.  -- to the side?  Yes.

2   A.  Correct.  I remember being the worst No. 2, and then the third

3   one, which would be the gunshot to the head, three.  The best I

4   can -- I can remember.

5   Q.  And in the three days prior to this particular incident, what

6   were you doing?

7   A.  Day No. 1, we got down to Baton Rouge, we were the newest crew

8   on scene.  They told us we were first up, we were the freshest.

9   About three o'clock that morning we got -- got somebody woke us up

10  at the dispatch center in Baton Rouge, said we need you to head to

11  the Causeway, and my first question was, what was that.  They said,

12  you'll know it when you get there.  And we spent that day

13  transporting patients from the triage point at the Causeway to the

14  airport.

15        Day No. 2, same thing.  That night we actually made -- we

16  got cleaned up a little bit, went back out to the Causeway, hauled

17  patients.  The last patients I hauled that day was a family of five

18  from down here, we hauled them actually into Baton Rouge.

19        Then there was a gentleman that was at Baton Rouge that I

20  suspect was a medical director of some kind, requested for

21  volunteers to go into New Orleans the back way through St. Bernard.

22  And there was -- as a matter of fact, I believe all of us from

23  Arkansas volunteered.  There was approximately five, six

24  ambulances.

25  Q.  What did you do when you got there?

```
 1   A.  That night we got into St. Bernard Parish, told them what we
 2   were going to do, set up a triage point and that stuff.  They said
 3   they didn't want that at the hospital.  So the medical director
 4   said that morning we were going out, we actually made our way into
 5   New Orleans from St. Bernard's Parish.
 6   Q.  You were treating people all that time?
 7   A.  We were looking for people that were actually -- if they needed
 8   to be treated, yes.  We were -- we were trying to find places where
 9   we could set up and use our materials and our skills to help
10   people, yeah.
11   Q.  Those three days prior to this incident, how much sleep did you
12   get?
13   A.  Catnap here and there.  The third day we swapped out crews.  We
14   went into Baton Rouge, swapped out crews.  That was the day that I
15   told my boss that I wasn't going back home, I was going to stay
16   another round.
17        We drove back into New Orleans, stayed on the West Bank
18   at a school that was, it was a building with chain link fence,
19   pretty high chain link fence.  We pulled inside there.  I slept
20   about four or five hours in the back of a pickup truck, which was
21   the first steady sleep I had got in about three days.
22        MR. LARSON:  Thank you, sir.
23   BY MR. LARSON:
24   Q.  I believe you said you were armed?
25   A.  Yes, sir.
```

1    Q.  Why were you armed?

2    A.  Because we had heard stories that martial law was in effect

3    down here, knew that there was looting, there was robberies,

4    shootings going on before we got down here.  And I figured it was

5    in my best interest to bring my side arm and my tactical gear.

6    Q.  And what kind of side arm did you have?

7    A.  It was a Beretta 92FS.

8    Q.  What caliber pistol?

9    A.  9mm.

10   Q.  And you actually -- did you actually hear the call for

11   assistance that Sunday morning?

12   A.  Yes, sir.  We had -- like I said earlier, we were taking the

13   gentleman's blood pressure and it came over his radio.

14   Q.  Can you tell me what came over the radio, exactly what you

15   heard, to the best you can recall?

16   A.  Officer down, need help, shots fired.  I mean, that's -- that's

17   what I heard.

18   Q.  And that's when you jumped in your ambulance and followed?

19   A.  That's when he said follow me.

20          MR. LARSON:  Thank you, sir.

21          THE COURT:  All right.  Mr. Meche.

22                      DIRECT EXAMINATION

23   BY MR. MECHE:

24   Q.  Good afternoon, Mr. Gasaway.  I am Timothy Meche.

25          You said you gave a statement, where did you give that

```
1    statement?
2    A.  The gentleman, Officer Mike Lovell or Lovell, came to Pine
3    Bluff to Emergency Ambulance Service.
4    Q.  And he was an FBI agent?
5    A.  Yes, sir.
6    Q.  And he came actually to interview you in Arkansas?
7    A.  Yes, sir.
8    Q.  And did you know where he had come from?
9    A.  He said he was out of New Orleans, out of the office of New
10   Orleans.
11   Q.  And when he -- do you remember approximately when that was that
12   you gave that interview?
13   A.  March of 2009.
14   Q.  And when he was interviewing you, was he by himself?
15   A.  No, sir.  It was an FBI attorney or lawyer that he had brought
16   with him.
17   Q.  Yes, it was a lawyer?
18   A.  Yes, sir, that's my understanding.
19              MS. CHUNG:  Object to the leading again, your Honor.
20              THE COURT:  Let's not lead the witness.  The witness used
21   the word lawyer.  Although he was not specific, he has mentioned
22   several possibilities.  So let's see if we can ask him what he
23   knows and what he recalls.
24   BY MR. MECHE:
25   Q.  Why did you think he was a lawyer?
```

1    A.   I was informed that he was.

2    Q.   And did he tell you which agency he was with?

3    A.   No, sir, I just assumed he was with the FBI since he was with

4    Mike.

5    Q.   Some kind of government lawyer?

6    A.   Yes, sir.

7    Q.   And when the agent was interviewing you, were they taking

8    notes?

9    A.   I believe there was a recorder, I think.  I mean, I don't

10   remember any note pads or anything like that.  It was more of a

11   casual meeting in my director of operations office.

12   Q.   Did they let you know what specifically they were

13   investigating?

14   A.   Just the Danziger Bridge incident, and they wanted to know what

15   happened that day.

16   Q.   And they let you know the investigation was out of New Orleans?

17   A.   Yes, sir.

18              MS. CHUNG:  Objection again, your Honor.

19              THE COURT:  Let's not lead.

20   BY MR. MECHE:

21   Q.   Did you believe -- did they let you know whether or not you

22   would have to come to New Orleans to testify?

23   A.   Not at the time, no, sir.

24   Q.   Did they indicate whether or not you would be contacted again?

25   A.   If they needed me, they would contact me, yes.

```
1    Q.  Did anybody ever contact you?

2    A.  Yes, sir.  There was an FBI agent that contacted me, I believe

3    it was maybe end of May, first of June.

4    Q.  Of this year, 2010?

5    A.  Yes, sir.  Yes, sir.

6    Q.  And what did he want?

7    A.  He said that I may need to come testify.

8    Q.  Okay.  And who was it, did he say his name?

9    A.  Special Agent Brown, I believe, is who I've been talking to on

10   that side.  Yes, sir.

11   Q.  And did he indicate whether or not they would give you a

12   subpoena?

13   A.  I told them that's what it would take because my boss wasn't

14   going to let me off work.

15   Q.  Sure.  Did you ever get a subpoena?

16   A.  Not from them, no, sir.

17   Q.  Did you see any of these people sitting at this table right

18   here?

19   A.  No, sir.

20   Q.  How about from this table (INDICATING)?

21   A.  Yeah.  I mean ... no, (WITNESS SHAKES HEAD IN THE NEGATIVE.)

22   Q.  Have you ever talked to any of them?

23   A.  What's their names?  I mean, I've talked to -- not in person,

24   no.

25   Q.  You don't recognize them?
```

1   A.  No.

2   Q.  And were you ever invited to come to New Orleans to give

3   testimony at a grand jury?

4   A.  No, sir.

5   Q.  When you gave your statement, did you tell them pretty much

6   exactly what you testified to about today?

7   A.  Absolutely.

8   Q.  How long did you stay in New Orleans after the shooting

9   incident?

10   A.  We left, I guess it would be three days.

11   Q.  Three days afterwards?

12   A.  I was going to say that was Day No. 1 and we left on Day

13   No. 3 -- morning of No. 4, excuse me, morning of No. 4.

14   Q.  Four days after the shooting.  Now, during that period of time,

15   were they still -- did you still notice whether or not they were

16   still doing rescue operations?

17   A.  Absolutely, yes, sir.

18   Q.  Did it look like that situation was anywhere near complete at

19   the time?

20   A.  The rescue operations?

21   Q.  Yes.

22   A.  Oh, no, sir, no, sir.  I was actually assigned to the New

23   Orleans and ATF SWAT teams as medical help to go into the

24   convention center on I believe it was my second or third day after

25   the shooting, to go in and help them clear out, and if there was

```
 1   anybody that needed medical assistance, or if they did, then we

 2   were there.

 3   Q.  There was still a lot to be done?

 4   A.  Absolutely.  Yes, sir.

 5           MS. CHUNG:  Objection again to the leading.

 6           MR. MECHE:  Thank you, sir.

 7           THE COURT:  Counsel, we have to be careful since we've

 8   shifted gears here that we not ask leading questions.  You've been

 9   on cross before and now you're on direct, so you cannot ask leading

10   questions.  We've been through this -- we've been at this a while,

11   so just because we changed hats we need to be cognizant of that.

12           Anybody else, Mr. London?

13           MR. LONDON:  No, sir.

14           THE COURT:  Ms. Chung, you're handling this witness?

15           MS. CHUNG:  Yes, your Honor.

16           THE COURT:  All right.  You may begin.  Now you're on

17   cross.

18           MS. CHUNG:  Yes, your Honor.

19                       CROSS-EXAMINATION

20   BY MS. CHUNG:

21   Q.  Good afternoon.  You usually can't hear me.  Good afternoon.

22           Mr. Gasaway, the guy who followed you to the bridge,

23   that's the same guy who brought you to the hospital, correct?

24   A.  That escorted us, yes, sir -- I mean, yes, ma'am, I'm sorry.

25   Q.  And that was a white male in an unmarked dark police vehicle?
```

1    A.  Yes.

2    Q.  And he left you for a short period of time on the side of the

3    bridge and then came back; isn't that right?

4    A.  No.

5    Q.  I'm sorry, once you were attending to the victims on the

6    walkway of the bridge, he left for a short time and came back and

7    then brought you to the hospital?

8    A.  No.  He was actually -- when I hollered I need someone to take

9    us to the hospital, we don't know the way, that's when he got in

10   his car and escorted us.

11   Q.  And that's the same person who came to you -- came with you

12   directly behind you to the bridge, correct?

13   A.  Yes.

14   Q.  And he cut in front of you a little bit once you parked, and

15   went in front of you, correct?

16   A.  When I swerved -- yes, when I swerved right, he was on my left

17   coming around.

18   Q.  So he got there at the end of all the shooting, so did you,

19   correct?

20   A.  No, there was shooting going on when I was behind my ambulance.

21   Q.  But you agree that you arrived there at the same time, correct?

22   A.  Correct.

23   Q.  And you mentioned there were five of you all in your ambulance,

24   correct?

25   A.  Yes, ma'am.

1  Q.  That's Jerilyn Ramsey, I think her name might be Penson now,

2  Melinda Haskett, that's right?

3  A.  Yes.

4  Q.  Ricky Gorman, all of those people were with you?

5  A.  Yes.

6  Q.  And if I told you all of them said they didn't hear any

7  gunshots or no gunshots, would that surprise you?

8          MR. HESSLER:  Objection, I know --

9          MR. LARSON:  Objection, your Honor.  Those people haven't

10  even testified.

11          THE COURT:  I'm going to sustain.

12  BY MS. CHUNG:

13  Q.  And certainly if they arrived with you, they should have heard

14  and seen the same thing you said, right?

15  A.  Absolutely.

16  Q.  And whatever shooting you saw was from approximately a half

17  mile away; isn't that right?

18  A.  Negative.

19  Q.  Okay.  Well, you were keeping a log of everything that you were

20  doing day, weren't you?

21          MR. HESSLER:  Your Honor, he's trying to explain his

22  answer.

23          THE COURT:  Go ahead.

24          THE WITNESS:  The water was actually closer than it is

25  now.  I am guessing from the pictures, it would be approximately a

```
 1    quarter to half a mile away now.  But at the time, the water was
 2    closer than that.
 3    BY MS. CHUNG:
 4    Q.  You were observing everything from a half mile; isn't that
 5    right?
 6    A.  From that intersection.  I don't know how much of a distance
 7    that is.
 8    Q.  Well, you were keeping a log at the time, right?
 9    A.  Roughly a general log, yeah.  We were told to keep a general
10    log of what we did.
11    Q.  And you were making accurate notes at the time as soon as
12    afterwards you could, correct?
13    A.  As soon as we could, yeah.
14    Q.  And in that log, you said you were a half mile away; isn't that
15    right?
16    A.  What log is that?
17    Q.  Would you like to see it?
18    A.  Absolutely.
19              THE COURT:  Let's go ahead and see it.
20              THE WITNESS:  If that's the one I turned in, I haven't
21    seen that thing in six years.
22    BY MS. CHUNG:
23    Q.  Right.  And certainly your memory when you made the log was
24    fresh, correct?
25    A.  I guess, yes.
```

1   Q.  You made it at the time, correct?

2   A.  That was after I got back.

3   Q.  And that was -- you made it six years ago when you got back

4   from there, correct?

5   A.  Yes, yes.

6   Q.  And your memory was fresher six years ago, correct?

7   A.  Yes.

8           MR. HESSLER:  Your Honor, may we approach?

9           THE COURT:  Yes.

10     (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

11          MR. HESSLER:  Your Honor, it says that they followed him

12   from about a mile and a half to the scene and it's a mile and a

13   half, I don't know where she is coming out of that.

14          MS. CHUNG:  I think he's proved it's a half mile to the

15   foot of the bridge and that's where they were held, a half mile

16   from the scene.

17          MR. HESSLER:  It says one and one half miles followed

18   them to the scene, I think you mislead them.

19          MS. CHUNG:  I don't think so, I think he's crossed it out

20   and put SG where he's crossed out the one.  If you look

21   carefully --

22          MR. HESSLER:  Well, maybe he added the one.

23          THE COURT:  Why don't you show it to him and ask him.

24   Let's go ahead and do that.

25      (OPEN COURT.)

1            THE WITNESS:  (WITNESS READS DOCUMENT.)  Are you

2    referencing this about a -- whatever half to the foot of the

3    bridge?

4    BY MS. CHUNG:

5    Q.  Right.

6    A.  We followed him and another car --

7            THE COURT:  Let's go ahead and get a question.  She is

8    going to ask you a question.

9            THE WITNESS:  Okay, okay, that's fine.

10           THE COURT:  As long as you've seen it and know what she's

11   asking about.

12           THE WITNESS:  Yes, sir.

13   BY MS. CHUNG:

14   Q.  So you've now had a chance to review your log?

15   A.  Uh-huh.

16   Q.  Now, after reviewing your log, does that refresh your memory

17   that you were about a half mile away?

18   A.  Negative.

19   Q.  So that's not what you indicated in your log?

20   A.  We followed him approximately a mile and a half or a half mile

21   down the road to the foot of the bridge.

22   Q.  And just now you were stating when you arrived, you saw some --

23   before you stopped your vehicle and bailed out and went behind your

24   tire, you observed some people to the right of the bridge; is that

25   right?

1   A.  Yes, ma'am.

2   Q.  Could I have -- wait a minute, I'm sorry.  And there were also

3   boats and trucks with those people?

4   A.  Yes, ma'am.  There was vehicles and boats and trailers parked

5   on the right side.

6   Q.  And those are people you believe are putting boats into the

7   water, correct?

8   A.  I would assume, yes.

9   Q.  And those people were -- you said now the water is closer -- or

10  farther than it was at the time, but at the time they were right by

11  the water; is that right?

12  A.  They were closer to the water, yeah.  The water was, I would

13  probably say the foot of the water was maybe half mile or quarter

14  mile.

15  Q.  Could I have 58, please.

16          Okay.  So in this picture, could you show where the water

17  was?

18  A.  Approximately at the top of that mark (INDICATING).

19  Q.  Okay.  So for the record, the witness has put a blue line I

20  guess about equal with the France Road sign in the picture.  Is

21  that about right?

22  A.  No, it's further than that.

23  Q.  Okay.  Could you draw it again.  You tell me where on the

24  picture it is.

25  A.  Right down in there (WITNESS MARKS EXHIBIT.)

```
1   Q.  So even with this mark (INDICATING)?
2   A.  That pillar right there where you made that mark at, probably
3   just the other side of that, yes.
4   Q.  Pillar, you mean this (INDICATING)?
5   A.  Yes.
6   Q.  And so for the record, I believe that's a staircase that we're
7   talking about.  And when you say on the other side, you mean the
8   far side of that; is that correct?
9   A.  Yes.  Looking at it, the far side, the other side of it, yes.
10  Q.  So the people you saw were in that vicinity over here
11  (INDICATING)?
12  A.  Scattered over in there, yeah, it wasn't grouped up.
13  Q.  And those are the people you're referencing that you saw on the
14  right side of the bridge, correct?
15  A.  There was people down there, yes.
16  Q.  And they had boats?
17  A.  I could see boats down there, yes.
18  Q.  So multiple boats in this area?
19  A.  There was multiple boats everywhere.
20  Q.  But specifically in this area there were multiple boats?
21  A.  Yes, there was multiple.
22  Q.  And there were multiple trucks in this area that you saw?
23  A.  Multiple vehicles, yes.
24  Q.  And this whole area, then, was actually water at that time; is
25  that right?
```

```
 1    A.  I believe so, yes, ma'am.

 2    Q.  And do you remember when you went with Agent Lovell that you

 3    had drawn him a diagram to assist him in understanding what your

 4    perspective was that day?

 5    A.  Yes.

 6              MS. CHUNG:  Your Honor, I would like to approach.

 7              THE COURT:  Yes.  Go ahead and show it to counsel.

 8              MS. CHUNG:  For the record, that's Exhibit 317.

 9              THE COURT:  317.

10    BY MS. CHUNG:

11    Q.  Mr. Gasaway, do you recognize 317?

12    A.  Yeah, I do; it's my handwriting, yeah.

13    Q.  Is that the diagram you drew to assist in explaining what you

14    meant when you were talking to Agent Lovell?

15    A.  Yes.

16              MS. CHUNG:  Your Honor, I would offer that.

17              THE COURT:  Any objection?

18              MR. HESSLER:  No objection, your Honor.

19              THE COURT:  All right.  So ordered, 317 is admitted.

20    BY MS. CHUNG:

21    Q.  So when you were at the restaurant, the radio run came over and

22    you heard a male voice; is that correct?

23    A.  Yes.

24    Q.  And you responded to the bridge, correct?

25    A.  Yes, ma'am.
```

```
 1   Q.  And you said immediately upon arrival you saw the people in the
 2   area we just showed on Exhibit 58?
 3   A.  Among other things, yes.
 4   Q.  With their boats and their trucks?
 5   A.  I don't know if it was theirs or not, but there was boats and
 6   trucks there, yes.
 7   Q.  Right by that water area where it had, I guess, was closer at
 8   that time, correct?
 9   A.  Correct.
10   Q.  And from that distance, you could see -- you said that the
11   people were in camo or BDU garb?
12   A.  Yes.
13   Q.  And you could see their weapons silhouetted against the water,
14   correct?
15   A.  Yes, I could.
16   Q.  And you're absolutely sure of that?
17   A.  Yes, I am.
18   Q.  As sure as you heard a male voice on the radio?
19   A.  Yes.
20   Q.  And once you arrived, you never saw people walking up with a
21   shopping cart, correct?
22   A.  No.
23   Q.  You never saw a big rental truck parked on the bridge, correct?
24   A.  I don't recall one, no.
25   Q.  You never saw a juvenile running down the bridge, correct?
```

```
1    A.  No.
2    Q.  And you never saw a minibus or shuttle; isn't that right?
3    A.  That is correct.
4    Q.  And you never saw police chasing a juvenile, correct?
5    A.  That is correct.
6    Q.  And you never saw a marked police car arrive with someone
7    riding on the hood; isn't that right?
8    A.  Never seen that, no.
9    Q.  You never saw a big rental truck at all; isn't that right?
10   A.  That's correct.
11   Q.  So if there was a big rental truck on the bridge, it was gone
12   by the time you got there, correct?
13   A.  I would assume that, but there's nothing to say that I didn't
14   not see it or overlook it.
15   Q.  Your testimony today, though, is you don't recall ever seeing
16   the --
17   A.  No, I don't recall them being there, no.
18   Q.  -- rental truck anywhere on the scene?
19   A.  Not that I can recall, no.
20   Q.  Could we put up 317, please.
21            So this is the diagram you drew for Agent Lovell; is that
22   right?
23   A.  Yes, it is.
24   Q.  Here it looks like you put the three o'clock?
25   A.  Correct.
```

1    Q.  Twelve o'clock, and then the nine o'clock.

2    A.  And the six o'clock.

3    Q.  Oh, and the six o'clock.

4         Now, it looks like you wrote pop here (INDICATING).

5    A.  Uh-huh.

6    Q.  And that's indicating gunfire, correct?

7    A.  Correct.

8    Q.  So if someone was shooting a handgun down the bridge at a

9    juvenile, that would be consistent with what you heard, correct?

10   A.  Negative.  I mean, if they were shooting towards me, I would

11   hear a whiz or a whip, with that pop.

12   Q.  If someone were shooting from this area a handgun, that would

13   be consistent with what you heard, correct?

14   A.  From that area, yes.

15   Q.  You also mentioned large caliber shots over here (INDICATING)?

16   A.  To my nine o'clock, correct.

17   Q.  Right.  And for the record, I am pointing near the nine o'clock

18   where there is some handwriting.

19        If someone were firing a long gun from that direction

20   this way (INDICATING), that would be consistent with what you heard

21   and what's on your diagram, correct?

22   A.  That would, yes.

23   Q.  You also noted up here there was a figure, and I am now near

24   the 12 o'clock?

25   A.  Correct.

1    Q.  You saw that figure when you first arrived, correct?

2    A.  Correct.

3    Q.  And if that figure were firing a rifle, that would be

4    consistent with what you heard, correct?

5    A.  Okay, yeah.

6    Q.  Correct?

7    A.  Yes.

8    Q.  And we had earlier talked about your log, the log you had --

9    were keeping of the events that occurred.

10   A.  Yes.

11   Q.  And in that log, you were detailing everything you did day by

12   day, and even different segments of the day, correct?

13   A.  Correct.  I was told when I got back to make a, kind of a log

14   of the stuff that we did so I could turn it in to the ambulance

15   service, which would turn it in to the state, I guess to prove that

16   we actually did something while we were down there.

17   Q.  And so you recorded each event that you recalled over the

18   course of how many days you had been here?

19   A.  Correct.

20   Q.  And in that log, you do not record that you heard gunfire;

21   isn't that right?

22   A.  Correct.

23   Q.  You did put in there how far away you were and how long it took

24   you to get to the bridge, but you didn't put anything about hearing

25   gunfire or gunfire coming from multiple sides; Isn't that right?

1   A.  That is correct.  I was more focused on the treatment that I

2   provided to the injuries.

3   Q.  Well, I understand that, but you also included details about

4   how far you drove; isn't that right?

5   A.  Yeah.

6   Q.  And you also put details in there about how you were held back?

7   A.  Because the scene was not secure.  That's one of our first

8   things as an EMT, don't go in until the scene is safe.

9   Q.  Sure.  Definitely.  But you didn't put anything about gunfire

10  in that, correct?

11  A.  No.

12  Q.  But you said you did go to the walkway and you saw multiple

13  victims, correct?

14  A.  Correct.

15  Q.  The older male was suffering a gunshot wound to the head?

16  A.  Correct.

17  Q.  One of the female's arm was almost blown off?

18  A.  Correct.

19  Q.  She also had a serious gunshot wound to the left leg?

20  A.  I believe so.

21  Q.  The young female had gunshot wounds, multiple gunshot wounds;

22  is that correct?

23  A.  I believe so, yes.  Like I said, I never got to the actual

24  fifth victim because there was another two medics on the scene.

25  Q.  So you never really saw the younger female?

1   A.  I got an overall visual of who looked worse, yes.

2   Q.  And the younger male was in very serious condition; isn't that

3   right?

4   A.  Yes.

5   Q.  And that's why you stayed with him?

6   A.  Correct.

7   Q.  He barely had any pulse?

8   A.  His pressure was really low.  As I recall from the run sheet,

9   it was, I believe, 80.

10  Q.  He was in a life-threatening condition when you saw him?

11  A.  Absolutely.

12  Q.  And the last young male you had described was deceased,

13  correct?

14  A.  The first one from the foot of the bridge, yes.

15  Q.  First from the foot, last from the top?

16  A.  Right.

17  Q.  He was deceased?

18  A.  Correct.

19  Q.  But you never treated any police officers, correct?

20  A.  That's correct.

21  Q.  You never saw any police officers with gunshot wounds; isn't

22  that right?

23  A.  That is correct.

24  Q.  You were not directed to any police officers with gunshot

25  wounds?

1    A.  Well, we had our hands full.

2    Q.  Right.  You were pretty busy with those four people who were

3    alive?

4    A.  Correct.

5    Q.  Did you ever get notice that there was a seriously injured

6    person all the way on the other side of the canal?

7    A.  Never made it to the tip of the bridge.

8    Q.  And did anyone ever tell you, of all those officers you saw on

9    scene, that someone on the other side also needed medical

10   assistance?

11   A.  No.

12   Q.  Would you have been able to render medical assistance to that

13   person?

14   A.  We would have found a way, yes.

15   Q.  You had said the older male with the gunshot wound was able to

16   talk; isn't that right?

17   A.  The older one with the gunshot wound to the head, yes.

18   Q.  It's important as a medic for you to know what's happened to

19   your patients?

20   A.  Not as much as what's going on with them currently.

21   Q.  But he told you that people had just started shooting at them,

22   just started shooting at them, correct?

23            MR. HESSLER:  Objection; leading, your Honor.

24            THE COURT:  Yes, overruled.

25            THE WITNESS:  I'm sorry?

BY MS. CHUNG:

Q.  That older male just told you that people just started shooting at him, correct?

A.  He said, they just started shooting.  Where's my son?  And then that's when I was -- I told him, I am not sure who your son is, he may be in the other ambulance.  At that time I didn't want to tell him if I knew anything, I didn't want to say, if that was your son back there on the bridge, you know, he's dead.  He had more things to worry about at that time than his son.

Q.  Because of his --

A.  He had a gunshot wound to the head, yes.

Q.  And you had mentioned that there were multiple police officers on scene; isn't that right?

A.  Yes.

Q.  And they were helping direct you all and guide you to the hospital; isn't that right?

A.  There was one that did, yes.

Q.  And the EMS reports, your all -- your crews' reports from that day indicate that they were helping you at the scene, correct?

A.  Correct, they pointed us to them.

Q.  And the EMS reports also indicate that the police were giving you information that day; isn't that right?

A.  Did mine say that?  That's what I brought in my folder was my run sheets, and that's -- I mean, if we can reference that, I'll tell you that, I can answer that part honestly and openly.

1          THE COURT:  Do we have those?

2          THE WITNESS:  These are just mine.

3          MS. CHUNG:  Well, I am giving you a stack of reports for

4    all four people that day, and I'll ask you if you have knowledge of

5    any of those.

6          THE WITNESS:  Okay.  (WITNESS REVIEWS DOCUMENTS.)

7    BY MS. CHUNG:

8    Q.  Okay.  I've handed you four EMS reports from that day, one for

9    each of those individuals you described who were not deceased.  Do

10   you have familiarity with those reports?

11   A.  I have a report here for Jose Bartholomew and then Leonard

12   Bartholomew, yes.  And the other two were by another medic, Melina

13   (PHONETIC), that she treated the other two -- or treated this

14   patient.

15   Q.  And she is a member of your crew?

16   A.  She was, yes.

17   Q.  Are you familiar with any of those, Melina's patients or her

18   reports?

19   A.  Just the fact that triage them, that's it.  I mean, as far as

20   what happened -- we were in separate ambulances on the way to the

21   hospital, I don't know what happened in the ambulance that she was

22   in.

23   Q.  And if those refresh your memory at all, were police also

24   giving information at the scene?

25   A.  She's got it on hers that -- something about according to PD.

1    Like I said, that's not my run sheet, so that's...

2    Q.   So that's not your recollection?

3    A.   No.

4    Q.   That was just if it refreshed your recollection.

5    A.   No.   (WITNESS SHAKES HEAD IN THE NEGATIVE.)

6    Q.   But in the end, you don't actually know what was happening on

7    the bridge, that's fair to say, correct?

8    A.   That is correct.

9    Q.   You don't know where -- who was shooting or where the gunfire

10   was coming from, correct?

11   A.   I can tell you that when I was behind the ambulance, that there

12   was gunshots coming both from, which would be my nine to 12 and

13   also my three to 12.

14   Q.   And other than that, you can't say anything as far as who is

15   shooting or what?

16   A.   Correct.

17   Q.   But you did check the walkway for weapons; isn't that right?

18   A.   As a habit, yes.

19   Q.   For your safety, for you and your crew; is that right?

20   A.   Absolutely.   And I also trust my officers that I'm working with

21   on scene, if they say the scene is secure.   That's just one thing I

22   do, going behind them, because I've had weapons fall out of

23   patients' pockets before.

24   Q.   So you checked to make sure there were no weapons on the

25   walkway?

1   A.  A once over, yes.

2   Q.  And you didn't see any weapons on the walkway --

3   A.  No.

4   Q.  -- correct?  Could I have 46, please.

5           I think you testified earlier that this person here is

6   the deceased individual you observed that day?

7   A.  Yes, it is.

8   Q.  Can you agree that the water was actually farther away than you

9   recall earlier today, that you can't see any water in this

10  photograph in that area?

11  A.  I can't see any in that photograph, no.

12  Q.  And in the area that you indicated earlier today, there's no

13  water there; isn't that right?

14  A.  It looks to be no water there, no.

15  Q.  So do you think you were mistaken that the water was actually

16  farther out?

17  A.  Could have been.

18  Q.  So farther out --

19  A.  From this picture it could have been further.

20  Q.  But before you were confident that the water was closer at that

21  time?

22  A.  Absolutely, yeah.

23  Q.  But looking at this photo you see you were mistaken?

24  A.  Uh-huh.

25          MS. CHUNG:  I have no further questions, your Honor --

1          MS. BERNSTEIN:  May we confer for one moment, your Honor?

2          THE COURT:  Sure.

3     BY MS. CHUNG:

4     Q.  Mr. Gasaway, we had just talked about the scene being secure

5     before you went up to the walkway; is that correct?

6     A.  Correct.

7     Q.  So you were informed that the scene was now safe for you to

8     proceed; is that right?

9     A.  Yes.

10    Q.  Were you informed that any guns had been kicked off the walkway

11    at that time?

12    A.  No.

13    Q.  So you were not informed that there were any unsecured weapons

14    out there which could possibly be used against you?

15    A.  I put my trust in the police that when they say the scene is

16    cleared, it's secure.

17    Q.  So you were not told of any unsecured guns that had been kicked

18    off the walkway and were directly below you?

19    A.  No.

20         THE COURT:  Okay.  Redirect, Mr. Hessler.

21                    REDIRECT EXAMINATION

22    BY MR. HESSLER:

23    Q.  Mr. Gasaway.

24    A.  Yes, sir.

25    Q.  The area where you saw boats and trucks parked, were they

1   trucks with boats on trailers or were they -- could you tell?

2   A.   The ones closer to me, I could tell that they were hauling

3   trailers with boats on them, yes.

4   Q.   And where the trucks and the trailers and the boats were

5   parked, was that the area where the police officers were seen

6   pointing their guns from?

7   A.   That's correct.

8            MS. CHUNG:   Objection to leading, your Honor.

9            THE COURT:   Yes, let's not -- we have to remember now

10   we've changed -- we're on redirect now, not on cross, so let's not

11   lead the witness.

12   BY MR. HESSLER:

13   Q.   Did you see the area where the guns -- the direction that the

14   guns were pointed?

15   A.   I could see where the guns were pointed, yes.

16   Q.   Did it appear that it was the same area where you treated the

17   patients?

18   A.   Yes.

19   Q.   Now, you heard a radio call, correct?

20            MS. CHUNG:   Objection.

21            MR. HESSLER:   All right.

22   BY MR. HESSLER:

23   Q.   When you heard the call come over the radio, was it your radio

24   that you were carrying, handheld?

25   A.   No, sir, it was the gentleman that we were taking the blood

1    pressure.

2    Q.  Do you know who made the call?

3    A.  No, I don't.

4    Q.  It sounded like a male?

5    A.  It did sound like a male, yes.

6    Q.  Could it have been a female with a deep voice?

7    A.  Could have been.  It was a deep or an excited -- a, I would

8    say, moderately deep voice.

9    Q.  Was it -- you said it sounded excited.

10   A.  Yes.

11   Q.  Is that what you would expect to hear when you hear a call such

12   as that?

13   A.  Absolutely.

14   Q.  Did it sound -- I'll withdraw that.

15          Now, you stated that you didn't see a Budget truck on the

16   bridge.

17          MS. CHUNG:  Objection again, your Honor.

18          THE COURT:  Well, this is something, again, technically

19   it's a leading question, but it's something that he's already said,

20   so it's not an answer that's being suggested.  But let's not lead

21   the witness.  We've been leading witnesses because we've been on

22   cross for the last however long, few weeks -- how long have we been

23   doing it -- for the last few weeks we've been on cross, so we need

24   to change hats here and be mindful -- and I know we just started

25   here with the defense case, but let's be mindful that we're not to

1    ask leading questions.

2          Now, that question itself relates to something that he

3    has already said; but nonetheless, the rule is not to lead the

4    witness.

5    BY MR. HESSLER:

6    Q.  When you heard the gunfire, did you see a Budget truck on the

7    bridge?

8    A.  No, sir.

9    Q.  When you heard the gunfire, did you exit your ambulance out of

10   the rear?

11   A.  No, sir, I exited out of my driver's side.

12   Q.  Where did you go?

13   A.  To the rear of my ambulance.

14   Q.  And you said you watched through six?

15   A.  Yes, sir.

16   Q.  I've got where 12 o'clock is, it's ahead of you.

17   A.  Turn exactly around and that's your six.

18   Q.  I know that now.  So that's where you were looking?

19   A.  Yes, sir.

20   Q.  Now, this log book, you wrote it when you got back?

21         MS. CHUNG:  Objection again.

22         MR. HESSLER:  Did you write in the log book when you got

23   back?

24         MS. CHUNG:  I'm sorry, but every question has been

25   leading, even since you've reminded Mr. Hessler.  I mean, I

1    understand --

2              THE COURT:  Yes.  Again, this is one that falls in the

3    category of an answer that he has already given; however, it is a

4    leading question.  So let's not lead the witness.

5    BY MR. HESSLER:

6    Q.  When did you write your log book?

7    A.  A few days after I got back.

8    Q.  What was the purpose of writing the log book?

9    A.  My ambulance director said that we needed something to

10   basically account our actions, our participation down here, and I

11   just sat out on the porch one night with a beer and went at it with

12   the laptop.  I mean, that's how I wrote it.

13             MR. HESSLER:  Thank you very much.

14             THE COURT:  All right.  Other redirect?  Mr. Larson.

15             MS. BERNSTEIN:  Your Honor, may we approach one second on

16   this?

17             THE COURT:  Sure.

18        (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

19             MS. BERNSTEIN:  I thought before we started the defense

20   case you said that if a witness belonged to everybody, only the

21   first person would redirect.

22             THE COURT:  No, the other way around.  Because each

23   witness -- and that's why I clarified when they started.  This

24   witness is being called by each defendant for each defendant's

25   case, so they will be allowed to direct, each defendant may direct

this witness and redirect.  If a witness is called by one defendant

for one defendant's case, although the other defendants can cross

that witness, only the party calling the witness will be allowed to

redirect.

            MS. BERNSTEIN:  Okay.  So the additional redirects --

            THE COURT:  Relate --

            MS. BERNSTEIN:  Are there any limitations on the

follow-up redirects?

            THE COURT:  It has to be limited to cross, it's got to be

limited to cross.  It's not follow-up to something that Mr. Hessler

just asked.  Of course by definition, however, Mr. Hessler is

limited to what was covered on cross as well.

            MR. LARSON:  I want to talk about what Ms. Chung talked

about.

            THE COURT:  By definition, Mr. Hessler would have been

limited to Ms. Chung's exam.  So any redirect, therefore, also has

to be limited to Ms. Chung's exam.

            You all need to be ready to tell me, when each defense

witness is called, whether he is being called for a particular

defendant.  Because I can imagine certain witnesses, for instance,

might relate to certain accounts in which your client may not be a

defendant, in which case you could cross-examine another

defendant's witness.  I would expect that won't be many witnesses,

but if you do cross-examine another defendant's witness, you are

not permitted to redirect.

1              MR. LARSON:  That's what I understood.

2              MR. FLEMING:  We're prepared to let the court know.

3         (OPEN COURT.)

4                         REDIRECT EXAMINATION

5    BY MR. LARSON:

6    Q.  Mr. Gasaway, I would like to take a look at the exhibit.  Do

7    you have it up there on your screen?

8    A.  Yes, sir.

9    Q.  Ms. Chung asked you some questions about gunfire coming from

10   this area, coming from this area, but she didn't ask you about

11   gunfire coming from this area (INDICATING), so I am going to ask

12   you about that, okay?

13              Now, on that map, the area that I have the arrow on, what

14   is that in terms of degrees or clockwise positions?

15   A.  I would say probably a two o'clock.

16   Q.  And at that two o'clock position, you have P-O-P drawn there

17   with a circle around it.

18   A.  Yes, sir, pop.

19   Q.  What does pop mean?

20   A.  Referencing gunfire.

21   Q.  Did you hear gunfire coming from that area, as well as the

22   other two areas?

23   A.  Yes, sir, and that would be within my 12 and my three o'clock.

24              MR. LARSON:  Thank you very much.

25              THE WITNESS:  Yes, sir.

```
 1              THE COURT:  Okay.  Anybody else on redirect?

 2              MR. DeSALVO:  I do, your Honor.

 3                        REDIRECT EXAMINATION

 4   BY MR. DeSALVO:

 5   Q.  Could you pull up 317 for me, please.

 6              Mr. Gasaway, did you say something about that figure

 7   that's up near 12 o'clock on the bridge during your

 8   cross-examination?  That would be this thing right here

 9   (INDICATING).

10   A.  Yes, sir.

11   Q.  That would be right here?

12   A.  From the best I could tell, that would be the blonde that was

13   the highest portion.  She was the furthest one on the bridge as far

14   as going up, yes.

15   Q.  So you think this was on, excuse me -- do you think this was on

16   the bridge that you were on or on the other bridge?

17   A.  No, sir, this is my lane is what I drew.

18   Q.  Now, was this figure firing a weapon?

19   A.  Not that I seen, no.

20   Q.  If you look to the right of your -- that would be the little,

21   maybe around 2:30, you have above the words that you have written

22   pop, P-O-P, you have a diagram?

23   A.  Yes, sir.

24   Q.  And what is that?

25   A.  That is a truck and a boat.
```

1    Q.  Is that on some type of a road?

2    A.  I believe there is a road that is under, that goes under the

3    bridge.

4    Q.  Would the water that you described have been on the other side

5    of that road?

6    A.  Yes, sir.

7    Q.  I am going to show you what I've marked as Exhibits 341 and

8    342, and ask you to take a moment to look at them and see if you

9    can identify them.

10             MS. CHUNG:  Your Honor, do you mind if I approach and

11   grab my papers?

12             THE COURT:  Sure.

13             THE WITNESS:  (WITNESS REVIEWS DOCUMENTS.)  Yes, they're

14   my run sheets.

15             MR. DeSALVO:  They're your run sheets?

16             THE WITNESS:  Yes, sir.

17             MR. DeSALVO:  At this time, your Honor, I would offer to

18   introduce Exhibits 341 and 342 into evidence.

19             MS. CHUNG:  Your Honor, my only objection is Mr. DeSalvo

20   just has the front page of those two reports, so I would ask that

21   the entire three pages be admitted.

22             THE COURT:  Yes, three pages each?

23             MS. CHUNG:  Yes, but I don't have copies right now that I

24   can give the court.

25             THE COURT:  Sure.  Well, we can make those during the

1    break.

2              MR. DeSALVO:  I have no objection to her clipping them to

3    the back of these, your Honor.

4              THE COURT:  Okay.  So 341 will be a three-page exhibit,

5    and 342 will also be a three-page exhibit, as I understand it; and

6    if that's the only objection then, those would be admitted.  Is

7    that correct, Ms. Chung?

8              MS. CHUNG:  Yes, your Honor.

9              THE COURT:  We will admit 341 and 342 as each three

10   pages.  Mr. DeSalvo, if you want to go ahead and proceed.

11   BY MR. DeSALVO:

12   Q.  Did you write on 341 and 342 a description of the scene?

13   A.  Yes, sir.

14   Q.  I am going to hand you these two exhibits -- well, let me do

15   this.  Let's just do it that way, we don't have to put them on the

16   ELMO.

17   A.  You want me to read the scene?

18   Q.  What was your description of the scene in Exhibit 341?

19   A.  341 says:  "Officers responding to PD down, scene secured,

20   units waved in, gunshot wounds times four, bystanders possible

21   caught in cross fire."

22   Q.  Where did you get that information from?

23   A.  When we sat down at the hospital, and it's typical we don't

24   have time with critical patients like this in the back of our truck

25   to write our run form out.  We sit down, and that's what we

1   gathered, there were shots coming from both sides, like I said

2   earlier, from my nine and my three.  I assumed since they were in

3   the middle, cross fire.

4   Q.  Was this based on something someone told you or your

5   observations?

6   A.  Just my observations.

7   Q.  And did you record these observations within a couple of hours

8   after you saw the scene?

9   A.  This was actually at the hospital after we dropped the patients

10  off.

11  Q.  And how long would that be after you witnessed what you

12  witnessed?

13  A.  Minutes.

14  Q.  Does 342 reflect the same thing?

15  A.  Yes, sir, it also says the same thing.

16  Q.  Was that also based upon what you believed you observed only

17  minutes before?

18  A.  Yes, sir.

19           MR. DeSALVO:  I have no further questions, your Honor.

20           THE COURT:  All right.  Mr. Meche, are you going to

21  also --

22           MR. MECHE:  No, sir, I'm finished, thank you.

23           MR. LONDON:  No, sir.

24           THE COURT:  Okay.  Is this witness excused?

25           MR. FLEMING:  He is by the defense, your Honor.

 1             MR. DeSALVO:  Yes, your Honor.

 2             MS. CHUNG:  Yes.

 3             THE COURT:  All right.  Thank you, sir.  You can step

 4    down.  We need to give him his folder.  Make sure everything is in

 5    it that was in it when he got here.  If we need copies of anything,

 6    we can do that, so long as he can take the material that he had

 7    when he arrived.  And we also need to get those pages also

 8    attached, if you could give that to the courtroom deputy.

 9             Why don't we go ahead and take a very short break.  It's

10    3:45, we'll start at four unless you're ready earlier.

11             THE DEPUTY CLERK:  All rise.

12             THE MARSHAL:  All rise.

13        (WHEREUPON, THE JURY EXITED THE COURTROOM.)

14             THE COURT:  When it's four o'clock, we can get,

15    hopefully, in with the game plan we suggested.

16             MR. FLEMING:  Judge, can we approach, just procedure

17    stuff, any one of the prosecutors.

18             THE COURT:  Yes, very quickly.

19             MR. FLEMING:  Just 30 seconds.

20        (WHEREUPON, A RECESS WAS TAKEN.)

21        (OPEN COURT.)

22        (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

23             THE COURT:  You all may be seated.  Counsel, our next

24    witness is?

25             MR. DeSALVO:  Tris Lear, your Honor.

```
 1              THE COURT:  Tris Lear, if you would come up here to this
 2   chair, sir.
 3              THE DEPUTY CLERK:  Please raise your right hand.
 4          (WHEREUPON, TRIS LEAR, WAS SWORN IN AND TESTIFIED AS FOLLOWS:)
 5              THE DEPUTY CLERK:  Thank you, you may be seated.
 6              THE WITNESS:  Thank you.
 7              THE DEPUTY CLERK:  Please state and spell your full name
 8   for the record.
 9              THE WITNESS:  My first name is Tris, T-R-I-S; my last
10   name is Lear, L-E-A-R.
11                          DIRECT EXAMINATION
12   BY MR. DeSALVO:
13   Q.  Mr. Lear, we know each other very well, I am Frank DeSalvo.  I
14   think you call me Frankie?
15   A.  How are you doing, Mr. Frankie?
16   Q.  You also know the Madison family very well -- excuse me, do you
17   know the Madison family very well?
18   A.  Yes, I am personal friends with Romell Madison, Grace Madison,
19   Leslie, and I call him Little Romell, his son.  Real good friends,
20   family type friends.
21   Q.  And have you been friends with -- at least know most of his
22   family?
23   A.  Only the people that I named that I am really familiar with,
24   but I am very close to them.
25   Q.  Did you visit Lance Madison at the temporary prison they had at
```

1    the Amtrak station?

2    A.  Yes, I did.

3    Q.  And did you make a report in connection with that visit?

4    A.  Yes, sir.

5    Q.  I am going to show you what I've marked for identification, and

6    not for publication to the jury at this time --

7    A.  Yes, sir.

8    Q.  -- as Exhibit 343.

9    A.  Yes, sir.

10          MS. CHUNG:  And, your Honor, we would object to the

11   publication of that.

12          MR. DeSALVO:  I just said we weren't going to do that.

13          MS. CHUNG:  Oh, I thought you said you were offering it

14   for publication.

15          THE COURT:  Right, right.  No, no, he said he was not.

16          MS. CHUNG:  I'm sorry, I misheard.

17          MR. DeSALVO:  That's all right.

18   BY MR. DeSALVO:

19   Q.  Is Exhibit 343 the report that you filed in this case?

20   A.  Yes, sir.

21   Q.  Is everything in that report correct?

22   A.  No, sir.  I think the date may be, may be wrong.

23   Q.  What is the date that you have on that report?

24   A.  Saturday, September the 10th, 2005, at 11 o'clock A.M.

25   Q.  Have you since learned, since the time that you prepared this

```
1   report, that Lance Madison wasn't at the Amtrak station on
2   September 10th, 2005?
3   A.  Yes, sir.
4   Q.  When you went to -- did you receive a call from Dr. -- or
5   Romell Madison, your good friend, prior to the time that you went
6   to the bus station?
7   A.  Yes, sir.
8   Q.  Did he ask you to go look for his brother?
9              MS. CHUNG:  Objection to the leading, your Honor.
10             MR. DeSALVO:  That's did he.  He can say yes or he can
11  say no.
12             MS. CHUNG:  It's suggesting the answer, your Honor.
13             THE COURT:  Yes, we need to just ask him a non-leading
14  question that doesn't suggest an answer at all, one way or the
15  other.
16             MR. DeSALVO:  Okay.
17  BY MR. DeSALVO:
18  Q.  What did he ask you to do?
19  A.  Romell called me and asked me to try to locate his two brothers
20  that were in New Orleans that did not evacuate for Katrina.
21  Q.  Where did you go?
22  A.  It was my intentions to visit several places to look for his
23  brother, but the first place that I visited was the Amtrak station
24  because visiting that place would serve two purposes.
25  Q.  Did you see Lance Madison there?
```

1   A.  Yes, I did.

2   Q.  Does your report contain what Lance Madison was wearing?

3   A.  Yes, sir.

4   Q.  Is that correct?

5   A.  I don't recall.

6   Q.  But whatever is written in this report is what you wrote at

7   that time?

8   A.  Yes, sir -- well, I wrote the report about a week or so after

9   the incident.  So I wrote the report from memory and I could have

10  been mistaken.

11  Q.  Did you indicate that his attire appeared to be unclean and

12  worn?

13          MS. CHUNG:  Objection, your Honor.  Your Honor, may we

14  approach?

15          THE COURT:  Yes.

16     (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

17          THE COURT:  We can't just read from the report.

18          MS. CHUNG:  Mr. DeSalvo can ask him what he saw at the

19  station.

20          MR. DeSALVO:  He says he doesn't remember, which is what

21  he said.

22          THE COURT:  My understanding is that he can review the

23  report and then you ask him the question rather than you read the

24  report.

25          MR. DeSALVO:  I don't mind doing that, Judge, but -- I'll

1  ask him if he says he doesn't remember, which he's already said.

2          THE COURT:  Is it your intent to introduce the report

3  into evidence?

4          MR. DeSALVO:  Not yet.  If I lay the proper foundation I

5  will.

6          THE COURT:  I think it's improper for him to -- for you

7  to read the report to him.  If he wants to look at it to refresh

8  his memory after answering a question that he doesn't recall or,

9  then that's one thing.

10          MS. BERNSTEIN:  Your Honor, this is not my witness, but

11  may I say something sort of more fundamental about the process

12  here?

13          THE COURT:  I hate to start, as much as I am anxious to

14  hear what you have to say, I hate to go down this road where we

15  have multiple people talking.  He needs to testify based on his

16  memory, and if he doesn't recall, then he can look at the report.

17          MR. DeSALVO:  And if he still doesn't recall, I can

18  introduce his past recollection recorded.

19          THE COURT:  If he doesn't recall after looking at the --

20          MS. CHUNG:  I would object to that, your Honor.  He's

21  already just testified it was written weeks later and it's

22  inaccurate.

23          MR. DeSALVO:  He said about a week later.

24          THE COURT:  That doesn't mean he can't use it to refresh

25  his recollection.

1        MS. CHUNG:  That I'd agree.

2        MR. DeSALVO:  Past recollection or recording.

3        MS. CHUNG:  What's in the report, that's very important.

4        MR. DeSALVO:  I know what y'all want, you don't want the

5    hearsay from Lance Madison in, I am not going to ask that.  I am

6    going to show the things in this report that he said he wrote on

7    September 10th were false and that he knew they were false.  It's

8    only establishing he went there because of Romell Madison, not

9    because he just happened to be there.

10        MS. CHUNG:  Your Honor, what is in the report is

11   completely irrelevant.  The witness is here to testify to what he

12   saw and what he remembers.  To ask a witness if he made the report

13   that Mr. DeSalvo thinks is false is --

14        MR. DeSALVO:  I am calling him to show that this

15   investigation began with the lie and this is the lie.  You just

16   don't want to hear it.

17        MS. CHUNG:  Ask the witness what he heard, saw, or knew,

18   which is what the witnesses are here for.

19        MR. DeSALVO:  Or what he wrote that's not correct.

20        THE COURT:  Go ahead and ask him what he remembers,

21   direct him to portions of it, and that either refreshes his memory

22   or it doesn't.  What you're saying is that what he is looking at to

23   refresh his memory isn't going to be correct.

24        MR. DeSALVO:  That's correct, your Honor.

25        MS. CHUNG:  But even if that's the case, it's

```
 1    irrelevant --
 2              THE COURT:  Wait, wait.  I am going to let you go ahead
 3    and ask him the questions and ask him to look at the document, if
 4    you want to direct him to portions.  But beyond that, I think we're
 5    going to have to be careful.  Let's see what the questions are and
 6    see what the objection will be.
 7              MR. DeSALVO:  I have no intention of introducing this,
 8    other than he doesn't recall, that it's admissible as a past
 9    recollection of the report.
10         (OPEN COURT.)
11    BY MR. DeSALVO:
12    Q.  Mr. Lear -- actually, it's Detective Lear, right?
13    A.  Yes, sir.
14    Q.  You're presently employed by --
15    A.  The City of Gretna, yes, sir.
16    Q.  And before I go much further, why don't you tell the jury your
17    history in law enforcement.
18    A.  From 1987 to 2003, I worked at the sheriff's office in New
19    Orleans.  When I left the sheriff's office, I was a captain,
20    assigned as commander of internal affairs.  I was invited by the
21    criminal sheriff -- by the criminal sheriff at that time, Charles
22    Foti, to come to Baton Rouge with him at the Louisiana State
23    Attorney General's office, and I did.  He appointed me as deputy
24    director of investigations.
25    Q.  And at the time of, when Hurricane Katrina hit --
```

```
 1    A.  Yes, sir.

 2    Q.  -- and immediately following, were you employed at the Attorney

 3    General's office?

 4    A.  Yes, sir, I was.

 5    Q.  I would like for you to take a moment, if you would --

 6    A.  Yes, sir.

 7    Q.  -- to review that document in front of you, and I am going to

 8    ask --

 9          MS. CHUNG:  I object, your Honor.  There is no question

10    showing that the witness needs to look at the document.

11          THE COURT:  He can go ahead and review it, and we'll hear

12    the question and if there's an objection to the question.  He's

13    already identified it, so he can go ahead and review it.

14          THE WITNESS:  (WITNESS REVIEWS DOCUMENT.)  Okay,

15    Mr. Frankie.

16    BY MR. DeSALVO:

17    Q.  You got it?

18    A.  Yes, sir.

19    Q.  Do you recall what Lance Madison was wearing when you saw him

20    at the Amtrak station?

21    A.  To the best of my recollection, he was wearing a white like

22    undershirt, and I have listed some tan shorts and a pair of tennis,

23    white tennis.

24    Q.  Are you -- do you know how long after his arrest it was that

25    you saw him?
```

1    A.  No, sir.

2    Q.  Do you know for a fact that you did see him at the Amtrak

3    station?

4    A.  Yes, sir.

5    Q.  And do you believe that this was after he was arrested?

6           MS. CHUNG:  Objection to leading, your Honor.

7           THE COURT:  No, I am going to let him go ahead and answer

8    this one, I don't think it's leading.

9           THE WITNESS:  Yes, sir.

10   BY MR. DeSALVO:

11   Q.  Are you aware that when he was arrested he was dressed in all

12   black?

13          MS. CHUNG:  Objection, your Honor.

14          THE COURT:  Look, you can't ask -- there's got to be a

15   foundation laid for how he would know that and I don't think that

16   foundation is there, other than to lead him to ask a leading

17   question.  So you've asked him about when he got there and the fact

18   that the man had already been arrested, but we don't have any

19   testimony from him that he would have a way to know that.

20   BY MR. DeSALVO:

21   Q.  Do you know what he was wearing when he was arrested?

22   A.  No, sir.

23   Q.  Could you tell by looking at him whether or not it appeared he

24   had been wearing that clothing for a while?

25   A.  No, sir.

1    Q.  Would you look at your memorandum again.

2    A.  Yes, sir.

3    Q.  And in that area where you read about his clothes, see if

4    there's anything there that would refresh your recollection.

5    A.  I have a statement, well, a sentence after, that his attire

6    appeared to be --

7             MS. CHUNG:  Your Honor, I just ask that the witness not

8    read and answer; does it refresh his recollection.

9             THE WITNESS:  I'm sorry.

10            THE COURT:  That's all right.  That's all right.  Go

11   ahead, just answer, if it does -- it's a yes or no if there is such

12   a statement.

13            THE WITNESS:  Yes, sir.

14            THE COURT:  He is going to ask you a question.

15            THE WITNESS:  Yes, sir.

16            MR. DeSALVO:  It does?

17            THE WITNESS:  Yes, sir.

18   BY MR. DeSALVO:

19   Q.  How did he appear?

20   A.  He appeared to be unclean and worn for an extended period of

21   time.

22   Q.  His clothes?

23   A.  Yes, sir, I think I'm relating to that.

24   Q.  Was there a reason why -- other than what you observed, would

25   there have been a reason why you would have described his clothing

```
 1   as having been worn for an extended period of time?

 2   A.  I don't understand.  Could you say that again, sir.

 3   Q.  Other than what you observed --

 4   A.  Yes, sir.

 5   Q.  -- would there be a reason why you would have put in your

 6   report that the clothing he was wearing appeared to have been worn

 7   for an extended period of time?

 8            MS. CHUNG:  Objection.  Objection to what's put in the

 9   report.

10            THE COURT:  I am going to overrule.

11            THE WITNESS:  No, sir.

12   BY MR. DeSALVO:

13   Q.  There's no reason why, other than what you observed?

14   A.  No, sir.

15   Q.  Was there a reason why you put the date down as September 10th

16   instead of September 5th?

17   A.  No, sir.

18   Q.  Did you know that Lance Madison was going to be at that Amtrak

19   station?

20   A.  No, sir.

21   Q.  Did you have any suspicion that he may have been arrested?

22   A.  No, sir.  But I figured that that would be a good place to

23   start to look for someone.

24   Q.  Were you aware where Dr. Madison's office was?

25   A.  I know where both of his offices are, sir.
```

1   Q.  Did you think it would have been reasonable to go look at that

2   location?

3   A.  Yes, sir.

4   Q.  Did you go look at that location?

5   A.  No, sir, I had problems getting out to that New Orleans East

6   location.  And I did pass -- I don't know if it was before I

7   visited the Amtrak station or the day before, but his office on

8   Terry Parkway was passable.  I don't know about the office on Chef

9   Highway.

10  Q.  Where were you located when Dr. Romell called you?

11  A.  I believe I was in Baton Rouge, sir.

12  Q.  Did you leave immediately to come to the city?

13  A.  I don't believe so, sir; no, sir.

14  Q.  Well, how long did it take you to drive from Baton Rouge to the

15  Amtrak station?

16  A.  I don't know if he called me the day that I saw Lance or the

17  day before.  I don't remember, sir.  But I know that after he had

18  called me, the next available time that I could drive to New

19  Orleans I did.

20  Q.  Does Romell Madison's name appear anywhere in the report that

21  you filed?

22  A.  Yes, sir.

23          MS. CHUNG:  Objection to what is contained in the report,

24  your Honor.

25          THE WITNESS:  I'm sorry.

```
 1              THE COURT:  I am going to overrule, I'm going to
 2   overrule.
 3              THE WITNESS:  Yes, sir, it does.
 4   BY MR. DeSALVO:
 5   Q.  Romell Madison's name appears in your report?
 6   A.  Yes, sir, it does.
 7   Q.  And could you tell me where?
 8   A.  Contact info, Dr. Romell Madison, and I have his home and his
 9   cellular number.
10   Q.  And you had that information prior to the time you went to see
11   Lance Madison?
12   A.  Yes, sir.
13   Q.  And then -- but in the body of that report, is there any place
14   where you refer to Romell Madison?
15   A.  No, sir, I don't think so.
16   Q.  Would anybody reading this report have any reason to believe
17   that you had gone to that train station at the request of Romell
18   Madison?
19              MS. CHUNG:  Your Honor, I am going to object, and may we
20   approach?
21              MR. DeSALVO:  It's a pretty simple question.
22              THE COURT:  Yes, I'm going to -- I think we've already
23   talked about this.  Come on up.
24       (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)
25              THE COURT:  Look, the government had a chance, the
```

```
 1    government had a chance to put witnesses on on direct, and we're

 2    not going to object every time the defendant starts asking

 3    questions on direct.  This is getting ridiculous.

 4            MS. CHUNG:  The reason I am objecting, your Honor, is all

 5    of these questions about the contents of the report --

 6            THE COURT:  And the government asked -- how many times

 7    did the government ask about the content of exhibits that they put

 8    in front of people?

 9            MS. CHUNG:  That were in evidence and were alleged to be

10    part of the coverup.

11            THE COURT:  Do you want to introduce that into evidence?

12            MR. DeSALVO:  I will, I will offer it right now.

13            THE COURT:  Is there any objection?  He already

14    identified it as his report.

15            MS. CHUNG:  His report is full of hearsay.  It's largely

16    Lance Madison's statement.  He's already been impeached with that

17    statement.  He's already --

18            MR. DeSALVO:  I would offer it as Exhibit 343.

19            MS. CHUNG:  And I would object to all the hearsay.

20            THE COURT:  There has been hearsay in many government

21    documents.

22            MR. DeSALVO:  And actually the hearsay is what

23    Mr. Madison said, which is already in evidence from Mr. Madison,

24    and from Agent Bezak for that matter.

25            MS. CHUNG:  This is -- I would ask that all of the Lance
```

1    Madison statements be redacted.  He's already --

2         THE COURT:  No, no, let's get -- the problem is it's not

3    in evidence, introducing it into evidence and he can testify about

4    it.  That's why we're getting hung up.

5         (OPEN COURT.)

6         THE COURT:  We are going to admit Exhibit 343 into

7    evidence, and let's go ahead and proceed.

8         THE WITNESS:  Yes, sir.

9         MR. DeSALVO:  Can we go ahead and put it up on the --

10   343.

11   BY MR. DeSALVO:

12   Q.  Detective Lear, is that the first page of the report we've been

13   talking about?

14   A.  Yes, sir.

15   Q.  And is that date in the upper left-hand corner the incorrect

16   date that we've been talking about?

17   A.  No, sir, that's an incorrect date.

18   Q.  Right.  Okay.  Now, in that first page of that report, is

19   reading that report -- let me bring you back.  Would a person

20   reading that report have any reason to believe that Dr. Madison had

21   requested you go to the Amtrak station?

22   A.  No, sir.

23   Q.  Can we go to page 2, please.

24        Is that the second page of your report?

25   A.  Yes, sir.

1   Q.  In reading the second page of that report, would there be any

2   reason why someone reading that report would believe that

3   Dr. Romell Madison had requested you go there?

4   A.  No, sir.

5           MR. DeSALVO:  I had stuff that wasn't supposed to be

6   there.

7   BY MR. DeSALVO:

8   Q.  You went there with -- excuse me, who did you go there with,

9   make it easier?

10  A.  Mr. Clyde McCoy.

11  Q.  And how well do you know Mr. Clyde McCoy?

12  A.  He is my brother-in-law, and he's also the chief investigator

13  for the DA's office.

14  Q.  At the time?

15  A.  At the time.

16  Q.  Not today?

17  A.  Not today.

18  Q.  When you prepared this report, did you give it to -- a copy of

19  it to Clyde McCoy?

20  A.  No, sir, I think I gave it to Eddie Jordan himself.

21  Q.  You gave it to Eddie Jordan?

22  A.  Yes, sir.

23  Q.  Do you recall when you gave that to Eddie Jordan?

24  A.  No, sir.  It was, it was probably a month or so after the

25  visit.

```
 1                MR. DeSALVO:  I have no more questions.  Thank you, Tris.

 2                THE WITNESS:  Thank you, Mr. Frankie.

 3                THE COURT:  Is this witness for all defendants --

 4                MR. FLEMING:  He is a witness for all defendants, your

 5     Honor.  On behalf of Mr. Faulcon, we would have no questions.

 6                THE COURT:  Any other direct of this witness?

 7                MR. HESSLER:  Briefly, your Honor.

 8                THE COURT:  All right, Mr. Hessler.

 9                          DIRECT EXAMINATION

10     BY MR. HESSLER:

11     Q.  Mr. Lear.

12     A.  How you doing, sir?

13     Q.  My name is Eric Hessler, how are you?

14     A.  All right, sir.

15     Q.  You stated that you went there looking for Romell Madison's

16     brother -- brothers.

17                MS. CHUNG:  Objection to leading.

18                THE COURT:  Again, it's a leading question, but this is

19     something that he's already said, so it's hard to suggest to him an

20     answer he's already given.  Let's not lead the witness.

21     BY MR. HESSLER:

22     Q.  When you got to the Amtrak station, were -- it was being used

23     as a temporary detention facility, correct?

24     A.  Yes, sir.

25                THE COURT:  That's also leading, but let's not lead the
```

1    witness.

2    BY MR. HESSLER:

3    Q.  And you were lucky enough -- you didn't know -- did you know

4    Lance Madison at the time?

5    A.  No, sir.

6    Q.  Would you consider it extremely lucky that he actually

7    summoned -- did he know you?

8    A.  I don't know, sir.

9    Q.  But it was just -- was it just by pure luck that of all of the

10   people that were being detained and arrested, he summoned you?

11   A.  There wasn't too many people in the -- actually, I don't think

12   there was anybody in that holding area but him.

13   Q.  But he called -- he summons you to talk --

14           THE COURT:  Yes, let's not lead the witness, Mr. Hessler.

15   Let's not lead the witness.  You cannot suggest to him something

16   that happened until he testifies to it.  And even then, we

17   shouldn't ask leading questions.  Ask him what happened, what did

18   he see.

19   BY MR. HESSLER:

20   Q.  Did you review your memo?

21   A.  Yes, sir.

22   Q.  Doesn't, in fact, your memo say that you were summoned by an

23   arrested subject?

24   A.  Yes, sir.

25   Q.  Was that arrested subject that summoned you, in fact, Lance

```
 1  Madison?
 2              THE COURT:  Let's -- look, you have to --
 3              MR. HESSLER:  I have no further questions, your Honor.
 4  That will make it easy.
 5              THE COURT:  All right.  Mr. Meche, do you want to try
 6  this?
 7              MR. MECHE:  I am going to see if I can maybe make things
 8  a little more clear without asking leading questions.
 9              THE COURT:  You need to turn the switch off from
10  cross-examination and on to direct.
11                           DIRECT EXAMINATION
12  BY MR. MECHE:
13  Q.  Good afternoon, Mr. Lear.
14  A.  How you doing, sir?
15  Q.  I'm Timothy Meche and I represent Anthony Villavaso.
16  A.  How you doing, sir?
17  Q.  Do you know Anthony Villavaso?
18  A.  I think I've seen him before, sir.
19  Q.  How?
20  A.  I worked at the sheriff's office, he was with the police
21  department, so we probably crossed paths.
22  Q.  Are you friends with him or anything like that?
23  A.  No, sir.
24  Q.  Do you remember where you were when Katrina came in?
25  A.  Yes, sir.
```

```
 1   Q.  Where were you?

 2   A.  Dallas, Texas.

 3   Q.  And at some point did you come back to the Louisiana area?

 4   A.  Yes, sir.

 5   Q.  When was that?

 6   A.  I can't recall the exact date, but it was a few days after

 7   Katrina.

 8   Q.  What was the purpose that you came back for?

 9   A.  To work, sir.

10   Q.  For who?

11   A.  The Louisiana Department of Justice, the Attorney General's

12   office.

13   Q.  And where were you working?  I mean, you were working in New

14   Orleans or somewhere else?

15   A.  New Orleans, sir, and Baton Rouge actually.

16   Q.  And what specifically were you doing during this time?

17   A.  Oh, God.  We were conducting investigations pursuant to

18   complaints that we had received in Baton Rouge from New Orleans.

19   We also were summoned to assistant the clerk of court in New

20   Orleans with some issues of concern, and other things like that.  I

21   can't think of everything.  But we, we had a tough job to do at

22   that time.

23   Q.  Right.  And can you describe the conditions you were

24   encountering when you were coming into New Orleans?

25   A.  Oh, well, it was difficult.  The devastation was, of course,
```

1    traumatic.  It took a lot of effort to get to New Orleans, it

2    wasn't as simple as going through I-10 and coming in.  We had to, I

3    think, go to I-10 to 310, 310 to Highway 90, and then on to New

4    Orleans.

5    Q.  Are you encountering any lawlessness and things like that?

6    A.  No, sir, not personally.

7    Q.  Do you recall hearing any gunfire?

8    A.  No, sir.

9    Q.  Was part of your duties -- were you also looking for missing

10   people?

11   A.  No, sir.

12   Q.  How did you come to go to the Greyhound station in the first

13   place?

14   A.  Dr. Romell Madison had contacted me, I don't know if it was the

15   same morning or the morning before, or the day before, and told me

16   that if I am in New Orleans to look for his two brothers.

17         We had personnel assigned to the Amtrak station, so to

18   kill two birds with one stone, I wanted to go to the Amtrak station

19   to see what logistical resources they needed, and also to look for

20   his brother as well, as a starting point.

21   Q.  Now, was this a personal mission for a friend or was this part

22   of your official duties?

23   A.  Yes, sir.  I was acting as a friend.

24   Q.  So after you got to the station, can you describe to the jury

25   what that atmosphere was like, what did it look like?

1    A.  I can't recall if they had power or not.  I know they were

2    trying to get locomotive power hooked up to the train station.

3    They had some tables set up with law enforcement personnel, and I

4    think some people from the U.S. Attorney's office might have been

5    there, maybe the FBI.  And the Department of Corrections, along

6    with the sheriff's office in New Orleans, had constructed some

7    kennel-type cages in the back, where they use it as a confinement

8    area.

9    Q.  And how did you go about finding one particular individual?

10   A.  They didn't have that many people in custody from what I

11   remember.  And to my recollection, Mr. Lance Madison was the only

12   person in this kennel.

13   Q.  So it wasn't difficult to find him?

14   A.  No, sir.

15   Q.  Was he happy to see you?

16   A.  Well, I don't think he knew who I was in the beginning.

17   Q.  Right.

18   A.  And I believe he asked me if I was in charge, I told him I was

19   a supervisor.  And then I also asked him his name, and he told me

20   his name was Lance Madison.  And I told him that his brother had

21   sent me to look for him, and that's when he started to cry and tell

22   me his rendition of what he witnessed.

23   Q.  Did you conduct a formal law enforcement type interview?

24   A.  No, sir.  I wasn't -- I didn't have any equipment such as video

25   cameras and tape recorders, or even so much as a notebook, to

1   conduct a full-scale interview with this person.  I think that

2   would warrant, at the very least, a video, but I didn't.

3   Q.  How long did you stay there doing this?

4   A.  Not long, sir.

5   Q.  Did you take notes and stuff like that?

6   A.  I don't recall.  I don't think I had even a note pad.  I wasn't

7   there to conduct an interview, I was there to see if they needed

8   water and how many personnel were needed for that particular

9   assignment.

10  Q.  And do you recall how long you actually stayed at the station?

11  A.  No, sir.

12  Q.  Do you know if anyone else attempted to interview him, either

13  while you were there or subsequent to that?

14  A.  No, sir.

15  Q.  What did you do after you completed meeting with Mr. Madison?

16  A.  I am not clear on what I did in New Orleans, I don't remember.

17  But I know Mr. McCoy and I, since he was present with me at the

18  time I talked with Lance, he discussed that he was going to contact

19  the district attorney and inform him of this --

20  Q.  I'm sorry, of what?

21  A.  Of the information that Lance had provided.

22  Q.  Mr. McCoy?

23  A.  Yes, sir.

24  Q.  Okay.  Let me ask you this, and I don't want you to lose your

25  thought.

1    A.  I'm sorry.

2    Q.  But why was the decision made to contact the district attorney?

3    A.  Well, the district attorney has jurisdiction over that type of

4    incident in New Orleans.  The Attorney General's office, of course,

5    can investigate things, but Eddie Jordan retains that jurisdiction.

6    That and the police department.

7    Q.  And you mentioned that term Eddie Jordan in response to

8    Mr. DeSalvo, and you mentioned the term district attorney.

9    A.  Yes, sir.

10   Q.  A lot of people in the jury are not from New Orleans, so can

11   you just tell us --

12   A.  Oh, I'm sorry.  Eddie Jordan was the former district attorney

13   in New Orleans at the time of Katrina.

14   Q.  So when you say district attorney and Eddie Jordan, you're

15   referring to the same person?

16   A.  Yes, sir.

17   Q.  And I apologize for interrupting you when I asked you, you

18   know, why the decision was made to contact the district attorney, I

19   think you were about to say something.

20   A.  Well, Mr. McCoy made that decision.  Of course, my intentions

21   were to contact, and I did notify the Attorney General.  I advised

22   the Attorney General that his brother is a personal friend of mine

23   and of the information that I received, and that particular night

24   when I got back to Baton Rouge, I couldn't call Romell from New

25   Orleans, we had no cellular service, so when I got close to Baton

1    Rouge, I called Romell and I met with him and his daughter at a

2    Starbucks Coffee on Corporate Boulevard, and I informed him that

3    his brother was incarcerated and that his other brother was killed.

4    Q.  And did you take any other steps after meeting with Mr. Madison

5    when you told him that?

6    A.  No, sir.  I reported it to the Attorney General, he told me to

7    prepare a draft, a report, which I've done.  And I forwarded it to

8    the assistant SAC at FBI.

9    Q.  Now, you had earlier said the district attorney had

10   jurisdiction.  Why did you at that time forward it to the FBI?

11   A.  I forwarded a lot of things to the FBI at that time, a lot of

12   investigations that we conducted.  That was the instructions of the

13   Attorney General.

14   Q.  And did you have communications with the FBI thereafter?

15   A.  No, sir.  I met with special agent or assistant special agent

16   in charge, Mark Gant, in Covington, Louisiana, where they had set

17   up headquarters; and I provided him copies, not of just this

18   incident, but other investigations that the Department of Justice

19   was conducting.

20   Q.  You had given him that report y'all have been talking about?

21   A.  Yes, sir.

22   Q.  How long after the meeting would that have occurred?

23   A.  Maybe a few -- I don't know, maybe a few weeks.  I don't -- I

24   don't remember the exact date, sir.

25   Q.  And did you have any more contact with Lance Madison after

```
1   that?
2   A.  No, sir.
3   Q.  Did you have any contact thereafter with any law enforcement
4   people, federal or state, investigating this incident?
5   A.  Mr. McCoy, the district attorney's office didn't have any
6   resources, intelligence resources.  I made certain that our
7   intelligence officer at the Attorney General's office would conduct
8   whatever type of intelligence work that Mr. McCoy or the DA's
9   office would need.
10  Q.  And what type of work was that?
11  A.  Mr. McCoy would provide names of individuals, whom I don't
12  know, to our intelligence officer, and I authorized him to conduct
13  data researches on those -- that information.
14  Q.  And did you keep a file or record on that?
15  A.  No, sir.
16  Q.  Did anybody?
17  A.  The district attorney in New Orleans did.
18  Q.  Would Mr. McCoy have been --
19  A.  Yes, sir.
20       MR. MECHE:  All right, sir, I completed my questions
21  without asking one leading question.
22       THE COURT:  All right.  Cross.
23                      CROSS-EXAMINATION
24  BY MS. CHUNG:
25  Q.  Good afternoon.
```

1  A.  Hello.

2  Q.  Mr. Lear, are you sure you talked to Lance Madison at the

3  Amtrak station?

4  A.  Yes, ma'am.

5  Q.  And he was very distraught, correct?

6  A.  Yes, ma'am.

7  Q.  One of the most stressed you had ever seen; is that right?

8  A.  It was very stressed, ma'am.

9  Q.  And you have a lot of law enforcement experience?

10  A.  Yes, ma'am.

11  Q.  You've seen a lot of individuals in post -- after some kind of

12  trauma?

13  A.  Yes, ma'am.

14  Q.  And Lance Madison was one of the worst cases you've seen, as

15  far as how stressed out he was?

16  A.  He was, ma'am.

17  Q.  He was crying?

18  A.  Yes, ma'am.

19  Q.  He wasn't completely coherent?

20  A.  I don't know his state of coherentness, but he definitely was

21  very emotional, apparently emotional.

22  Q.  And after talking to him, you felt you had some information but

23  not a complete picture; is that right?

24  A.  That's correct, ma'am.

25  Q.  And you wrote this memo, Exhibit 342?

```
 1              THE COURT:  Three.
 2   BY MS. CHUNG:
 3   Q.  343, a week or more later?
 4   A.  Yes, ma'am.
 5   Q.  Do you have any idea how much later?
 6   A.  No, ma'am.  It was -- it was at least a week or so after.
 7   Q.  At least a week, possibly more?
 8   A.  Yes, ma'am.
 9   Q.  And you documented that report because it was important to have
10   a record of your conversation with Mr. Madison?
11   A.  In my opinion, yes, ma'am.
12   Q.  And it was important to discuss how upset Mr. Madison was?
13   A.  Yes, ma'am.
14   Q.  What Lance Madison was wearing wasn't particularly important to
15   you, was it?
16   A.  No, ma'am.
17   Q.  You remembered that his clothes were worn and dirty; is that
18   right?
19   A.  Yes, ma'am.
20   Q.  And you put in your memo what you could recollect at that time?
21   A.  Yes, ma'am.
22   Q.  But what was most important was his state of mind and what he
23   had told you had happened; is that fair to say?
24   A.  Yes, ma'am.
25   Q.  And you might have been mistaken about what he was wearing; is
```

1    that fair to say?

2    A.  Yes, ma'am, that's fair to say.

3    Q.  You were mistaken about the date that this happened?

4    A.  Yes, ma'am.

5    Q.  And as far as all of the things that you interacted with him

6    that day, it would be fair to say what exactly he was wearing was

7    not one of the most important?

8    A.  No, ma'am.

9    Q.  What mattered was what he told you and your reaction to that;

10   is that right?

11   A.  Yes, ma'am.

12   Q.  And your reaction to that was that you needed to tell the

13   Attorney General of Louisiana about what Lance Madison had told

14   you?

15   A.  Yes, yes, ma'am.  Yes, ma'am.

16   Q.  And Clyde McCoy also felt it was important that the district

17   attorney know immediately; is that correct?

18              MR. FLEMING:  Objection as to what another witness --

19              THE COURT:  Yes, I'll sustain that.

20   BY MS. CHUNG:

21   Q.  You observed Clyde McCoy immediately contact the district

22   attorney; is that correct?

23   A.  I don't know if he called him in my presence, but he did tell

24   me that he was going to contact the DA.

25   Q.  So he also had an extreme reaction; is that correct?

1    A.  Yes, ma'am.

2              MR. FLEMING:  Objection.

3              THE WITNESS:  I'm sorry.

4              THE COURT:  We can't get him to testify unless it's

5    something that he personally, physically firsthand observed.  You

6    can't testify as to what another person thought or what motivated

7    another person, unless he has some knowledge of that firsthand.

8              MS. CHUNG:  Yes, your Honor.

9    BY MS. CHUNG:

10   Q.  From what you observed of Mr. McCoy, is it fair to say he also

11   had a reaction that he should immediately let Mr. Jordan know?

12             MR. FLEMING:  Objection.

13             THE COURT:  It's the same question, I'll sustain it.

14   BY MS. CHUNG:

15   Q.  Did you observe Mr. McCoy that same day say he needed to call

16   Mr. Jordan about this?

17             MR. FLEMING:  Objection.  Objection, twofold:  One, first

18   part is asked and answered; second, it calls for hearsay.

19             THE COURT:  I am going to sustain it.

20   BY MS. CHUNG:

21   Q.  And even though Lance Madison was in that stressed state, you

22   did attempt to talk to him?

23   A.  I did.

24   Q.  And you got what information you could, given that crying,

25   distressed state; is that correct?

1    A.  Yes, ma'am.

2            MS. CHUNG:  I have no further questions, your Honor.

3            THE COURT:  Any redirect, Counsel?

4            MR. DeSALVO:  No, your Honor.

5            MR. FLEMING:  No, Judge.

6            THE COURT:  Anyone?

7            MR. MECHE:  Sure.

8            THE COURT:  All right.

9                         REDIRECT EXAMINATION

10   BY MR. MECHE:

11   Q.  Briefly, Mr. Lear.  Ms. Chung asked you if you thought it

12   important to get whatever information you could from Mr. Madison in

13   his distressed state.  Do you remember that?

14   A.  Yes, sir.

15   Q.  And why did you think that was important?

16   A.  Why did I think it was important.  Well, because -- I don't

17   understand the question.

18   Q.  You said -- she asked you if you thought that was important,

19   and you said, yeah, I did think it was important.

20   A.  Sure.

21   Q.  It certainly meant something, what did you mean?

22   A.  Because he was a witness to a shooting that occurred.

23   Q.  And did he give you that important information?

24   A.  Sir, the only thing he expressed to me is what's documented in

25   the memo.

1    Q.  He told you what he thought he saw?

2    A.  Yes, sir.

3    Q.  Did you think he was being truthful with you?

4    A.  I had no question otherwise.

5    Q.  And one of the things he thought he saw that he told you about

6    was that people, other than police, were shooting at him and his

7    brother on the bridge?

8            MS. CHUNG:  Objection to leading.

9            THE COURT:  Yes.  If you want to -- I am going to sustain

10   the objection.

11   BY MR. MECHE:

12   Q.  What did he tell you he saw?

13           MS. CHUNG:  Also, your Honor, I would object to outside

14   of the scope.  Cross doesn't ask any of the content of

15   Mr. Madison's statement.

16           MR. MECHE:  No, she asked whether it was important that

17   he be given accurate information.

18           THE COURT:  Yes, I think this is within the scope of what

19   was asked on cross and why he recorded certain things and did not

20   record other things that he deemed to be less important.

21   BY MR. MECHE:

22   Q.  What did he tell you he saw?

23   A.  He indicated to me that he believed, wasn't sure but believed,

24   that someone on the bridge fired a weapon at a mail truck, and the

25   individuals in the mail truck returned fire, striking people on the

1    bridge and killing his brother.

2    Q.  And did he indicate to you whether or not he thought these

3    people who first fired were police officers or somebody else?

4    A.  No, sir.

5    Q.  Did you ask him?

6    A.  I don't recall, sir.

7    Q.  Wouldn't that have been important to you?

8    A.  Yes, sir.

9    Q.  And Mr. McCoy?

10   A.  Oh, absolutely.  And --

11          THE COURT:  Wait, this goes back to the same objection

12   about what Mr. McCoy --

13          MR. MECHE:  Sure, and I apologize.

14          THE COURT:  -- so let's not ask him about what Mr. McCoy

15   thought was important.

16   BY MR. MECHE:

17   Q.  Wouldn't that have been important to you?

18   A.  Oh, absolutely.

19   Q.  What else did he tell you?

20   A.  He indicated that the people that were in the mail truck

21   identified themselves as police officers, and he was placed under

22   arrest for attempted murder of police despite him not having a

23   firearm.

24   Q.  Did he also tell you what the men in the mail truck --

25          THE COURT:  Wait, wait, wait, wait.  I'm sorry, go ahead.

BY MR. MECHE:

Q.  Did he also tell you what the men in the mail truck did?

A.  He indicated that the people in the mail truck returned fire with an automatic weapon.

Q.  The people in the mail truck --

A.  Yes, sir.

Q.  -- returned fire, returned fire?

A.  Yes, sir.

Q.  That's what he told you?

A.  Yes, sir.

Q.  At people who were firing at them?

A.  Yes, sir.

Q.  Did you later learn what he was referring to as a mail truck?

A.  No, sir.

Q.  Did you later learn who the people in the -- what he said was a mail truck were?

A.  That was a year later, sir.

Q.  And who were they?

A.  Police officers.

Q.  And those were the ones who returned fire?

A.  Yes, sir.

Q.  That someone fired at them?

A.  Yes, sir.

          MR. MECHE:  Thank you, sir.

          THE COURT:  All right.  Anybody else?  This witness is

```
 1   released?

 2            MR. DeSALVO:  Yes, your Honor.

 3            THE COURT:  Thank you, sir.  You can step down.

 4            MR. DeSALVO:  Thank you, your Honor.  Thank you,

 5   Mr. Tris.

 6            THE COURT:  Counsel, how long is the next witness to

 7   take?  Is this a very brief witness that we can fit in?

 8            MR. DeSALVO:  I am not sure, your Honor.

 9            MR. FLEMING:  Probably not, Judge, given that it's

10   quarter to five.

11            THE COURT:  Okay.  All right.  Let's go ahead and adjourn

12   for the day, then.  We will pick up with that next witness tomorrow

13   at 8:30.  Again, please don't discuss anything about the case

14   amongst yourselves or with anyone else.  And again, I remind you

15   that even, even a description of things in the courtroom or

16   impressions of certain things that have happened at trial, you

17   should try to refrain from any type of indication, just to be safe,

18   from any type of indication one way or the other of what your

19   thoughts are about any of the presentation here in court.

20            Also, please be aware not to read or view anything about

21   the case between now and 8:30 tomorrow.  If you're here, as I'm

22   sure you will be, you have a good track record, if you're here

23   ready to start at 8:30, then we'll try to do the same.

24            We'll also try to, depending on where we are, I mentioned

25   to the jury earlier that I think we'll try to break an hour or so
```

```
 1    early tomorrow, it being a Friday.  So I'll tell counsel, I again
 2    offered the jury the opportunity to lunch in my conference room
 3    tomorrow, as I had offered them previously.  So keep that in mind
 4    as well, you're free to take me up on it or to go elsewhere if you
 5    choose.  All right.  Thank you all.
 6              THE MARSHAL:  All rise.
 7         (WHEREUPON, THE JURY EXITED THE COURTROOM.)
 8              THE COURT:  Counsel, if you all would be seated.  We had
 9    reserved the right on the motion practice, and let me ask you all
10    in terms of how you wish to present that.  Is there oral argument
11    you wish to make with regard to the Rule 29, and if so, how long do
12    we anticipate we will need for that?  Anybody.
13              MR. MECHE:  Five minutes, maybe.  Three minutes.
14              THE COURT:  Okay.  All right.  Anybody, any other defense
15    counsel wish to respond?
16              MR. DeSALVO:  Probably in less than that, your Honor.  I
17    just want to make enough to protect the record.
18              MR. HESSLER:  Same here on Gisevius, your Honor.
19              MR. LONDON:  Did we do that, your Honor, when we were up
20    there?
21              THE COURT:  We just made note and reserved the right with
22    regard to those motions.
23              MR. LONDON:  Then I just want to make a record, that's
24    it, however long that takes.
25              MR. FLEMING:  It's probably a fair estimate, a few
```

```
 1   minutes.  Probably do it faster with a little more preparation, we
 2   would be able to do.
 3           THE COURT:  The reason I am asking is simply because we
 4   can either do that now, I'm assuming we're not going to be here for
 5   another two hours, it sounds like we're not, or we can try to do it
 6   tomorrow morning prior to 8:30.
 7           MR. FLEMING:  I think tomorrow morning may be a better
 8   time to do it.  I think given a little more prep time, we can
 9   actually make it shorter and make it more concise.
10           MR. MECHE:  I can do mine now, Judge.
11           THE COURT:  Why don't we go ahead and do what we can now.
12           It's up to you all as to how you wish to present it.  If
13   you've made your motion on the record, I understand the motion and
14   I'll certainly give the government the opportunity to address it on
15   the record as well.  I just don't want to foreclose anything that
16   you had planned in terms of what you want to say on the record to
17   preserve the record.  So if you want to do that now, we can do it
18   now.
19           Go ahead, Mr. Meche.
20           MR. MECHE:  I know you understand the issue, I don't want
21   to say anything more than necessary on the issue, Judge.  I
22   represent Anthony Villavaso and he is charged with ten counts, and
23   obviously, pursuant to Rule 29, I move for motion for judgment of
24   acquittal as to all counts because we contend that the evidence is
25   not sufficient to convict.
```

 1            However, I want to specifically address two specific

 2    counts in the indictment that I think merit serious consideration.

 3    The first one I want to address is Count 11, that's the conspiracy

 4    to obstruct justice count, Section 371 count.   In that count the

 5    government alleges that there was a conspiracy to obstruct justice,

 6    and they allege 35 overt acts in their indictment.   Specifically,

 7    that's paragraph D.   Out of those 35 overt acts, Defendant

 8    Villavaso's name is mentioned in two of the overt acts.   And

 9    specifically, they relate to the same incident, and that was that

10    January 25th, 2006, day where all of the officers involved in the

11    shooting gave the statements to members of the New Orleans homicide

12    squad.

13            In a separate substantive count in the indictment, I

14    think it's Count 23, the government alleges that that was a false

15    statement, therefore it's a violation of 1512, which is a separate

16    count, which has a separate -- which has separate elements of

17    proof.   But for the conspiracy count, not only do they have to

18    prove that this was a knowingly-made false statement, which we

19    contend they didn't do, but we understand there may be some

20    evidence to that.   But what we can -- but what they haven't done is

21    proved that there was a conscious, knowing, intentional decision to

22    join a conspiracy.

23            In fact, the evidence that we've heard throughout the

24    trial, from even the government's own witnesses, specifically

25    Officer Hunter, specifically I think Officer Hills, was that they

 1    kept others out of the conspiracy, that Villavaso was kept out of

 2    it, Barrios was kept out of it.  And there's no evidence that at

 3    any point in time Defendant Villavaso knowingly made a conscious,

 4    intentional decision to join a conspiracy.  Irregardless of the

 5    fact whether or not he knowingly gave a false statement, which we

 6    contend he didn't do.  That's the substance of my argument on that.

 7         The second count that I think merits serious

 8    consideration is Count 12 of the indictment, which is the false

 9    prosecution of Jose Holmes.  In there, the government alleges that

10    five people -- specifically, Kenneth Bowen, Robert Gisevius, Robert

11    Faulcon, Anthony Villavaso and Archie Kaufman -- conspired and

12    agreed with each other to essentially threaten, intimidate Jose

13    Holmes in the free exercise enjoying a right secured by the

14    Constitution; that is, not to be falsely prosecuted.

15         The big, glaring hole in that count, Judge, is there was

16    never a prosecution of Jose Holmes.  No one ever contemplated a

17    prosecution of Jose Holmes.  The police officers not only didn't do

18    it, but they didn't have the ability or the statutory authority to

19    prosecute Jose Holmes.  The only people who could do that is the

20    district attorney of New Orleans or perhaps some other body.  But

21    certainly, these officers didn't have the authority or the

22    statutory ability to do that.  That's the big, glaring hole.

23         Secondly, there's no evidence that certainly my client

24    didn't even know who Jose Holmes was.  He never had, you know -- if

25    you asked him up until he was indicted who is Jose Holmes, he

1   couldn't say.  He never gave a statement about a Jose Holmes, he

2   never described a Jose Holmes.  He never consciously decided to

3   falsely prosecute some individual who he didn't know and didn't

4   hear of.

5          I believe those two counts merit serious consideration

6   for a Rule 29 motion.  That's essentially my argument

7          THE COURT:  All right.  Thank you, Mr. Meche.

8          Anyone else like to address any particulars, Counsel, at

9   this time?

10          MR. DeSALVO:  Yes, your Honor.

11          THE COURT:  Mr. DeSalvo.

12          MR. DeSALVO:  I can make it very short.  We have a

13   similar objection with respect to Count 13 and the violation of

14   civil rights of Lance Madison.  The testimony was clear, and no one

15   ever said anything differently, that Sergeant Bowen never

16   identified Lance Madison as a perpetrator of anything.

17          THE COURT:  Okay.

18          MR. HESSLER:  Your Honor, Eric Hessler on behalf of

19   Robert Gisevius.  I would also join in the arguments of the two

20   prior counsel in regards to Count 12, the false prosecution of Jose

21   Holmes.  There's been no evidence whatsoever presented by the

22   government that Gisevius identified Jose Holmes as the perpetrator

23   of any crime, that he gave any statements alleging Jose Holmes was

24   the perpetrator of any crime or committed any crime, that he aided

25   and abetted or abetted in giving such statements, formulating such

1    statements, coming up with such statements, or entering any

2    statements into any reports which would be forwarded to a

3    prosecutorial body.

4         And I would put forth those same arguments in regards to

5    Count 13.  There was a tentative identification, I think the

6    identification was tentative based upon the government's witness,

7    that Hunter said that Barrios was the one that identified him, and

8    they began to believe that and gave a tentative identification.

9    It's the decision and the responsibility of the investigators and

10   the district attorney's office to determine if that identification

11   is sufficient to go forward with prosecution, it has nothing to do

12   with Mr. Gisevius.

13        And in Count 6 in regards to unreasonable use of force,

14   the 242 violation against Robert Gisevius, on Jose Holmes, I again

15   would suggest that Gisevius, there's no evidence sufficient that

16   was proposed that would show Gisevius used any force against

17   Holmes, aided and abetted anyone in using any force against Jose

18   Holmes, and simply, I think all three counts bears insufficient

19   evidence to convict.  Thank you, your Honor.

20        THE COURT:  All right.  Mr. Larson.

21        MR. LARSON:  Yes, your Honor.  As to Robert Faulcon, we

22   agree with Mr. Meche's arguments concerning Jose Holmes.

23   Mr. Faulcon was not present at the January meeting, alleged

24   meeting, when other officers gave their statements.  He wasn't

25   available until June of 2006.  During this alleged conspiracy he

1    was gone, he was gone to Texas, and that's where he was.  Since the

2    end of October -- the end of September, beginning of October, he

3    was no longer -- no longer a New Orleans police officer, and they

4    have presented no evidence that he did anything in Texas to further

5    any conspiracy.

6            In addition, we join in the arguments that Mr. Meche made

7    about the prosecution of Jose Holmes.  Mr. Faulcon has given one

8    statement in this, one recorded statement in June, he doesn't

9    mention Jose Holmes, doesn't know who Jose Holmes was.  He was a

10   police officer, he was not in charge with -- he was not empowered

11   with arresting Jose Holmes.  Jose Holmes was never arrested, he was

12   never prosecuted.  Mr. Faulcon would not make those types of

13   decisions as a police officer.  We again ask you to look closely at

14   those particular counts.

15           THE COURT:  Okay.  Thank you, Mr. Larson.

16           MR. LONDON:  Your Honor, I would just adopt Mr. Meche's

17   motion as far as Jose Holmes and just maintain what I had said up

18   at the bench.

19           THE COURT:  Okay.  One second.  Okay.  Ms. Bernstein.

20           MS. BERNSTEIN:  The question, of course, at this point is

21   whether the government has presented sufficient evidence from which

22   a reasonable jury could find these defendants guilty.  Let me

23   respond to each one of those arguments in turn.

24           First, the question about Count 11, the conspiracy.  The

25   government has presented far more than sufficient evidence to find

 1   each of these defendants guilty of a conspiracy to obstruct

 2   justice.  This jury heard from Mike Lohmann, Jeff Lehrmann, Mike

 3   Hunter, Ignatius Hills about a conspiracy among all of these

 4   officers to cover up what happened on the Danziger Bridge.  Their

 5   testimony was corroborated by a series of reports, all of which are

 6   demonstrably false and which have been proven false during this

 7   trial.

 8        We also heard testimony from all of -- well, from

 9   Lehrmann, Hunter and Hills about the conspiratorial conversation

10   that happened in that abandoned building right before six of the

11   seven officers gave their false statements.

12        Let me jump ahead, then, to Defendant Faulcon, whose

13   attorneys just argued that he was not part of that conspiracy

14   because he was gone during the time of the conspiracy.  That is not

15   what the evidence showed.  What the evidence showed was that this

16   conspiracy started within seconds of that shooting and that every

17   one of these officers involved in the shooting was involved in that

18   conspiracy right from the start.

19        We heard ample evidence about supervisors meeting with

20   Defendant Faulcon, Robert Faulcon, who shot an innocent man,

21   meeting with him to try to come up with the story that he was going

22   to give.  He then left and went to Texas and was out of touch for a

23   while.  When he came back from Texas to give that statement in June

24   2006, he gave a statement in keeping with the conspiracy.  And in

25   keeping with that conspiracy, he in that statement claimed that

1    Jose Holmes and James Brissette had guns. Now, granted, he didn't

2    use their names because he didn't know their names. The fact that

3    these defendants didn't know the names of the people they were

4    clearly trying to frame for something they didn't do does not

5    absolve them of guilt.

6         And, your Honor, we did have -- it's not just me

7    speculating that they're talking about James Brissette and Jose

8    Holmes, we presented evidence of that through the cooperators. And

9    I can't remember if it was all of them or some of them, Lohmann,

10   Lehrmann and Hunter, I believe all of them were asked when they

11   were shown these reports, who is that unidentified male, that's

12   Jose Holmes; who is that unidentified male, that's James Brissette;

13   who is that unidentified male in black running up the bridge,

14   that's Lance Madison.

15        There was ample evidence from which this jury can

16   conclude that every one of these defendants was a knowing, willing,

17   voluntary participant in the conspiracy to cover up what happened

18   on the Danziger Bridge.

19        Let me move to Count 12, and I guess I can talk about

20   Count 12 and Count 13 at the same time. Those are the counts that

21   charge these defendants with conspiring to see Jose Holmes and

22   Lance Madison, respectively, prosecuted on the basis of false

23   evidence.

24        I said conspiring the way I did because that is very

25   different than what the defense attorneys just argued, which is

1    that there's a gaping hole there because Jose Holmes and Lance

2    Madison were not actually prosecuted for the attempted murder of

3    police officers.  It's a key distinction because the charge here is

4    conspiracy.  The law is absolutely clear that the object of the

5    conspiracy need not be obtained.  The charge that's charged here is

6    that they conspired to do something that they knew would have the

7    effect or that they expected would have the effect of seeing these

8    two innocent people prosecuted for falsely -- prosecuted for

9    attempted murder on police officers.

10           Again, the fact that some of these individuals, some of

11   the defendants didn't know Jose Holmes's name or didn't know Lance

12   Madison's name is irrelevant when they decided to give statements

13   that they knew backed up the conspiracy aimed at framing innocent

14   people.  And again, it's clear from the evidence that they knew the

15   people they -- that the people they were framing were, in fact,

16   Jose Holmes and Lance Madison.

17           And again, this sort of -- the three conspiracies all

18   relate together in the sense that all of those conspiracies, the

19   over arching conspiracy to obstruct justice and the two separate

20   conspiracies to frame innocent people, or to see innocent people

21   prosecuted on the basis of false evidence, those three conspiracies

22   all started right away.  As soon as these officers decided, we're

23   going to get together and we're going to cover up what we did out

24   there on the bridge, part of that from day one was, we're going to

25   say those innocent people had guns, and there's been plenty of

1    testimony that these people as experienced officers, these

2    defendants knew what happened.  Knew what would happen when you put

3    in a police report that a civilian had a gun and turned and fired

4    at police.  They knew that that was the first step in a prosecution

5    of that civilian for attempted murder on a police officer.

6          Again, each one of them when they gave their statements,

7    whether those statements were in the official reports or whether

8    those were their statements that they gave on tape, those

9    statements were all intentional statements, intentionally false

10   statements that put guns in the hands of innocent people, and those

11   statements were given knowing the effect of a statement when a

12   police officer says, an innocent person fired a gun at me.

13         The 242, the counts involving 242, I think Mr. Hessler

14   talked about those, all of those counts these defendants are

15   charged -- except for the one 242 count where Defendant Faulcon is

16   charged alone for shooting and killing Ronald Madison.  The other

17   242 charges, these defendants are all charged with aiding and

18   abetting one another in violation of civil rights.  In this case,

19   the use of unreasonable force, the willful use of unreasonable

20   force.

21         And the question here is whether based on the evidence we

22   presented, this jury could reasonably conclude when four defendants

23   lined up along a barrier and fired at unarmed people lying

24   defenseless on a walkway, for what that video shows is, don't hold

25   me to the exact amount of time, but somewhere 40 seconds to a

 1  minute, that while they were doing that, all joining one another,

 2  they knew that they were acting in concert, doing something that

 3  they are not allowed to do, which is shoot at people because they

 4  assume that those people might have committed a crime earlier.

 5         And I don't know if anybody mentioned, I don't know if

 6  Mr. DeSalvo mentioned the other 242 that does not involve a

 7  shooting, which is the civil rights violation charged against

 8  Defendant Bowen for stomping on Ronald Madison as he lay dying on

 9  the ground.  Again, more than sufficient evidence from which a jury

10  can conclude that he is guilty on that based on the testimony of

11  Mike Hunter.

12         I think that's all of the ones they raised, your Honor.

13  If there's anything else you would like to hear, let me know.

14         THE COURT:  I think that was it.  Anybody wish to respond

15  very briefly?

16         MR. MECHE:  Fifteen seconds or so.

17         Judge, the whole problem with this false prosecution of

18  Jose Holmes is, our clients never identified Jose Holmes.  They

19  were never shown a picture of him and said is this the guy.  The

20  only thing they did was, they said, somebody, some unknown,

21  unnamed, undescribed person on that bridge had guns.  They were not

22  shown a picture of Jose Holmes and said is this the guy.  So you

23  can't fault -- the prosecution, false prosecution of someone if

24  they -- we don't even know if they're talking about the same

25  person.  It's an unidentified person, that's what the weak link in

 1    their case is.

 2            MR. HESSLER:  And, your Honor, I would piggyback on what

 3    Mr. Meche just said, and I would point out that, again, from the

 4    government's own witness, Gisevius was not -- never returned to

 5    that side, didn't encounter Jose Holmes to his knowledge, never so

 6    much as spoke a word about Jose Holmes.

 7            THE COURT:  All right.  Look, Rule 29(b) affords the

 8    court, and I'll quote it here, "affords the court the opportunity

 9    to reserve decision."  The court may reserve decision on the

10    motion, proceed with the trial where the motion is made before the

11    close of all of the evidence, submit the case to the jury and

12    decide the motion, either before the jury returns a verdict or

13    after it returns a verdict of guilty, or is discharged without

14    having returned a verdict.

15            If the court reserves decision, it must decide the motion

16    on the basis of the evidence at the time the ruling was reserved,

17    which is now.  So I am going to avail myself of 29(b) and reserve

18    ruling on the motion.  Okay.

19            All right.  Anything else we need to cover on the record

20    here in open court?

21            MR. DeSALVO:  I don't think, your Honor.

22            MS. BERNSTEIN:  Nothing for the government, your Honor.

23            THE COURT:  Anything else we need to cover on the record

24    up here?  I do want to visit with you about witness issues here.

25    Anything else on the record up here before we close out?

1          MR. FLEMING:  I don't believe so, your Honor.

2          THE COURT:  Okay.

3       (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE DAY.)

4

5                        * * * * * *

6

7                     REPORTER'S CERTIFICATE

8

9       I, Karen A. Ibos, CCR, Official Court Reporter, United

10   States District Court, Eastern District of Louisiana, do hereby

11   certify that the foregoing is a true and correct transcript, to the

12   best of my ability and understanding, from the record of the

13   proceedings in the above-entitled and numbered matter.

14

15

16   _____

17                     Karen A. Ibos, CCR, RPR, CRR

18                     Official Court Reporter

19

20

21

22

23

24

25