1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

5   UNITED STATES OF AMERICA      *   Docket 10-CR-204
                                  *
6   versus                        *   Section N
                                  *
7   KENNETH BOWEN                 *   New Orleans, Louisiana
    ROBERT GISEVIUS               *
8   ROBERT FAULCON                *   July 27, 2011
    ANTHONY VILLAVASO             *
9   ARTHUR KAUFMAN                *   8:30 a.m.
    * * * * * * * * * * * * * * * *

10

11                  VOLUME XXI of XXVII
                 JURY TRIAL BEFORE THE
12            HONORABLE KURT D. ENGELHARDT
               UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15   For the United States:      U.S. Attorney's Office
                                 BY:  THEODORE CARTER, ESQ.
16                               500 Poydras Street
                                 New Orleans, Louisiana 70130

17

18
     For the United States:      U.S. Department of Justice
19                               Civil Rights Division
                                 BY:  BARBARA BERNSTEIN, ESQ.
20                               601 D Street NW
                                 Office PHB 5123
21                               Washington, D.C. 20004

22

23   For the United States:      U.S. Department of Justice
                                 Civil Rights Division
24                               BY:  CINDY K. CHUNG, ESQ.
                                 950 Pennsylvania Avenue NW
25                               Washington, DC 20530

```
 1   APPEARANCES:

 2   For Kenneth Bowen:          FRANK G. DESALVO, APLC
                                 829 Baronne Street
 3                               New Orleans, Louisiana 70113

 4

 5   For Robert Gisevius:        ERIC J. HESSLER, ESQ.
                                 700 Camp Street
 6                               New Orleans, Louisiana 70130

 7

 8   For Robert Faulcon:         PAUL C. FLEMING JR., ESQ.
                                 2821 Kingman Street
 9                               Suite C
                                 Metairie, Louisiana 70006
10

11

12   For Robert Faulcon:         King Krebs & Jurgens, PLLC
                                 BY:  LINDSAY A. LARSON III, ESQ.
13                               201 St. Charles Avenue
                                 45th Floor
14                               New Orleans, Louisiana 70170

15
     For Anthony Villavaso:      DeSalvo Blackburn & Kitchens, LLC
16                               BY:  ROGER W. KITCHENS, ESQ.
                                 2802 Tulane Avenue
17                               New Orleans, Louisiana 70119

18

19   For Anthony Villavaso:      TIMOTHY A. MECHE, ESQ.
                                 700 Camp Street
20                               New Orleans, Louisiana 70130

21

22   For Arthur Kaufman:         STEVEN D. LONDON, ESQ.
                                 1100 Poydras Street
23                               Suite 2950
                                 New Orleans, Louisiana 70163
24

25
```

1   APPEARANCES:

2

3   Official Court Reporter:        Jodi Simcox, RMR, FCRR
                                    500 Poydras Street
                                    Room HB-406
4                                   New Orleans, Louisiana 70130
                                    (504) 589-7780
5

6

7

8   Proceedings recorded by mechanical stenography; transcript

9   produced by computer.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2                                                          Page

3

ROBERT BARRIOS
4        Redirect Examination By Mr. Fleming:          10
         Redirect Examination By Mr. Meche:            31
5        Redirect Examination By Mr. Hessler:          47

6   MICHAEL HUNTER
         Direct Examination By Mr. Fleming:            66
7        Cross-Examination By Mr. Carter:              69
         Cross-Examination By Mr. Fleming:             71
8        Redirect Examination By Mr. Meche:            72

9   ROBERT FAULCON
         Direct Examination By Mr. Larson:             78
10       Direct Examination By Mr. London:            137
         Cross-Examination By Ms. Bernstein:          148
11       Redirect Examination By Mr. London:          296
         Redirect Examination By Mr. Hessler:         302
12       Redirect Examination By Mr. Desalvo:         304
         Redirect Examination By Mr. Larson:          305
13
DONALD C. HAYNES, III
14       Deposition Read                              317
         Examination By Mr. Christian:                318
15

16

17

18

19

20

21

22

23

24

25

1    <u>**PROCEEDINGS**</u>

2    **(July 27, 2011)**

3    **(MORNING SESSION)**

4    ******

5    **(COURT CALLED TO ORDER)**

6    **THE DEPUTY CLERK:**  All rise.

7    **THE COURT:**  All right.  If you all would be seated.

8          Counsel, I understand there's something to put

9    on the record.  Just the government at this point.

10    ******

11          (WHEREUPON, the bench conference with only the

12    government lawyers present was placed under seal.)

13    ******

14          **THE DEPUTY CLERK:**  Mr. DeSalvo wants to see you for a

15    minute.

16          **THE COURT:**  Okay.

17          (WHEREUPON, the following proceedings were held at

18    the bench.)

19          **MR. DESALVO:**  Judge, at the time that we allowed that

20    *Bruton* issue to be cleared by saying "an officer," the

21    government said they would ask for a limiting instruction that

22    would only be usable against --

23          **THE COURT:**  The tape recording?

24          **MR. DESALVO:**  Yes.  Yes, sir.

25          **MS. BERNSTEIN:**  Well, actually this is not the tape

```
 1   recording.  This is the specific claim where he said -- where
 2   he testified that Villavaso told him that another officer
 3   pointed a gun down.
 4            THE COURT:  So Villavaso's statement regarding the
 5   actions of the other officer cannot be considered against any
 6   defendant other than Villavaso?
 7            MR. DESALVO:  That's correct.
 8            THE COURT:  Okay.  Let me make sure --
 9            MR. LONDON:  Well, there is no statement in evidence.
10   There is no such statement in evidence.  So if you say
11   Villavaso's statement, you're presupposing that there is one,
12   and there's not one.  There's zero.
13            MR. DESALVO:  The problem is, of course, what this
14   witness said, what this witness said Villavaso said.
15            THE COURT:  That sounds like that's really between
16   you guys.
17            MR. MECHE:  Well, I think leave it alone.  There is
18   no statement that Villavaso made in evidence.
19            MR. DESALVO:  Let me ask this, as a fall-back
20   position, that the government not argue this against any of the
21   defendants other than --
22            THE COURT:  Villavaso.
23            MR. MECHE:  I'm okay with that.
24            MR. CARTER:  I'm not.
25            MR. DESALVO:  Because the jury can't use it.  I had
```

1  nightmares that all of a sudden the government's going to say

2  Mr. Bowen did that.

3           **MR. MECHE:**  They wouldn't do that ethically.

4           **MR. DESALVO:**  Sure they would.

5           **MS. BERNSTEIN:**  What's in evidence is that Villavaso

6  said that *an* officer pointed his gun down.  What cannot be

7  argued is that Villavaso said that a particular officer did it.

8  My understanding -- and if there's a question, I have to go

9  look at this again -- my understanding is that that evidence,

10 once it comes in, can be matched up with other evidence.  It

11 just can't be on its own represented.

12          **MR. DESALVO:**  This was in your own brief, what you

13 said the government was --

14          **THE COURT:**  Look, let's do this -- I've got a jury

15 waiting here.  We need to talk about this during the break.  In

16 fact, I wish you all would talk about it first and then we'll

17 cover it either during the break or at lunch.

18          (WHEREUPON, the following proceedings were held in

19 open court.)

20          **THE DEPUTY CLERK:**  All rise.

21          (WHEREUPON, the jury entered the courtroom.)

22          **THE COURT:**  All right.  You may be seated.

23          Thank you all for being on time both today as

24 well as yesterday.  I want to mention one thing about yesterday

25 first.

1          The question came up with regard to any

2     photographs.  And I know I spoke to some of you, and I think I

3     spoke to all of you out there.  But I need to put on the record

4     now that with regard to any photographs that you may have taken

5     on your personal phone or cellular device, that should be

6     treated like any other note that you take in one of your

7     notebooks and be subject to the same instructions.

8          To be fair, you all were not instructed not to

9     take photographs of your own.  But the rules governing notes

10    are that you are not to share your notes with anyone at any

11    point in time.  They are simply an aid to your own memory, not

12    to anyone else's.

13         And if another juror's memory differs from what

14    one person has written, then you should follow your own memory

15    as to the evidence.  And, likewise, that will pertain to

16    photographs that you may have taken yesterday.  You should not

17    show those to any other juror if you did take any.

18         Likewise, the photographs that you are allowed

19    to consider in this case are only the photographs that have

20    been introduced into evidence.  And you've seen, if not all of

21    them, then you've seen most of the photographs here on the

22    screens during the course of the trial.  Those are the only

23    photographs that are in evidence, and those are the only ones

24    that you, as a jury collectively, may consider during the

25    course of your deliberations.

```
 1                 As a practical matter, I think I mentioned to
 2      you this -- this to you earlier, and I'll remind you again.
 3      That when you do begin your deliberations, you will not be
 4      permitted to have any kind of cellular device or iPhone or any
 5      other type of device with you in the jury room during the
 6      deliberations themselves.  So we would ask you to abide by
 7      those instructions with regard to photographs.
 8                 And I appreciate -- a couple of you asked at the
 9      time when we got out there if that was okay, and I appreciate
10      your sensitivity to it, that it was an issue that we did not
11      instruct you on.
12                 But those are the rules governing that.
13                 With that instruction, Mr. Barrios was still on
14      the stand.  We are going to redirect him briefly.
15                 Mr. Barrios, you are still under oath, sir.
16                 Have you discussed your testimony with anyone
17      from the time we adjourned on Monday until this moment?
18            THE WITNESS:  No, sir.
19            THE COURT:  All right.
20                 Mr. Fleming -- we're going let Mr. Fleming
21      redirect, and then I think Mr. Meche and then Mr. Hessler,
22      which was the order in which direct was conducted.
23                 And, gentlemen, I sure hope you all have
24      conferred such that we can do this efficiently and without any
25      repetition.  I would like to go ahead and get more witnesses
```

ROBERT BARRIOS - Redirect

1  on, so let's do this very efficiently.

2              Mr. Fleming, you can begin.

3          **MR. FLEMING:**  Thank you, Your Honor.

4          (WHEREUPON, **ROBERT BARRIOS**, having been duly sworn,

5  testified as follows.)

6          **THE DEPUTY CLERK:**  Please state your full name and

7  correct spelling for the record.

8                    **REDIRECT EXAMINATION**

9  **BY MR. FLEMING:**

10 **Q.**   Good morning, Mr. Barrios.

11 **A.**   Good morning, sir.

12 **Q.**   I have a few questions for you.

13 **A.**   Yes, sir.

14 **Q.**   Not yesterday, the day before, Monday, you were asked some

15 questions on cross-examination by the prosecutor regarding you

16 having heard about people shooting at officers on the bridge,

17 hearing rumors about people shooting at officers; right?

18 **A.**   Yes, sir.

19 **Q.**   Do you remember those questions?

20 **A.**   Yes, sir.

21 **Q.**   That was one particular rumor that you were asked about.

22          What other rumors were you hearing about during that

23 time, Mr. Barrios?

24 **A.**   As far as?

25 **Q.**   People shooting, people shooting --

ROBERT BARRIOS - Redirect

1  **A.**   At police?

2  **Q.**   -- at police and so forth, yes, sir.

3  **A.**   Throughout the storm or just that particular day?

4  **Q.**   Throughout the storm.

5  **A.**   Looters shooting at policemen, rescue workers.

6          I heard a rumor that the looters were shooting at the

7  Coast Guard helicopter, the helio.  They also shot a Black Hawk

8  helicopter during rescues.  Those were the rumors.

9  **Q.**   Did you hear anything about anybody on the West Bank,

10  policemen?

11  **A.**   Yes.  I heard about a policeman, I don't know if it was

12  before or after.

13          **MS. BERNSTEIN:**  Objection, Your Honor.  There was

14  nothing on cross about this other shooting.

15          **THE COURT:**  I don't believe that there was,

16  Mr. Fleming.

17          **MR. FLEMING:**  Well, she was asking -- Ms. Bernstein

18  asked about other things that this officer heard during this

19  time about violence towards police officers.

20          **THE COURT:**  All right.  Well, I'll fairly consider it

21  within the scope of that question, but let's not go too far

22  afield of that.

23          **MR. FLEMING:**  Certainly, Judge.

24  **BY MR. FLEMING:**

25  **Q.**   What did you hear about that incident, Mr. Barrios?

ROBERT BARRIOS - Redirect

1   **A.**   I heard a policeman was shot.

2   **Q.**   Now, hearing all these things, how did that make you feel?

3   **A.**   Nervous.

4   **Q.**   I'm sorry?

5   **A.**   Nervous, scared.

6   **Q.**   Mr. Barrios, you were also asked several questions about

7   the incidents that occurred on the bridge that day.  And you

8   were asked a question about once the truck stopped, people

9   getting out of the truck.

10           Do you remember that series of questions?

11   **A.**   Yes, sir.

12   **Q.**   Do you remember who you said -- or who got out of the

13   truck first, if you remember?

14   **A.**   I remember Mr. Faulcon got out of the truck first.

15   **Q.**   And when Mr. Faulcon got out of the truck -- and this is

16   going to seem like a silly question -- were you still inside

17   the truck or outside the truck?

18   **A.**   I was inside.

19   **Q.**   Who got out of the truck after Mr. Faulcon?

20   **A.**   Mr. Villavaso.

21   **Q.**   When Mr. Villavaso -- the same silly question.

22           When Mr. Villavaso got out of the truck, were you

23   still inside the truck or were you outside of the truck?

24   **A.**   I was inside the truck.

25   **Q.**   And you were asked some questions regarding what you saw

ROBERT BARRIOS - Redirect

1   Mr. Faulcon do once he got outside the truck.

2           Do you remember that series of questions?

3   A.   Yes, sir.

4   Q.   I'll just ask you a couple of follow-ups on that.

5           You were asked some questions about having seen

6   Mr. Faulcon shoot.

7           When you saw Mr. Faulcon fire his weapon, was he

8   still inside the truck or was he on the ground?

9   A.   He was on the ground.

10  Q.   You were asked some questions regarding the direction

11  Mr. Faulcon was pointing his shotgun in.

12          Could you see Mr. Fal- -- what Mr. Faulcon was

13  pointing his shotgun in?

14  A.   The direction?

15  Q.   What Mr. Faulcon was pointing his shotgun at?

16  A.   No, I didn't see what he was pointing it at.

17  Q.   Again, kind of a silly question.

18          But since you could not see what or who Mr. Faulcon

19  was pointing his weapon at, could you see what other people

20  were doing?

21  A.   No, sir.

22  Q.   And you were asked questions about having seen Mr. Faulcon

23  fire his weapon.  What did you think Mr. Faulcon was firing at?

24          **MS. BERNSTEIN:**  Objection.  It's irrelevant what he

25  thought.

ROBERT BARRIOS - Redirect

 1          **THE COURT:**  Well, we had some questions on cross --
 2     leading questions about what he thought at various times, so
 3     I'm going to let him go ahead and answer those.
 4          **THE WITNESS:**  I thought he was shooting at the
 5     perpetrators.
 6     **BY MR. FLEMING:**
 7     **Q.**   At a threat?
 8     **A.**   Possibly.
 9     **Q.**   You were asked a series of questions about Mr. Faulcon
10     walking away, walking out of your view.  Is that an accurate --
11     **A.**   Yes, that's accurate.
12     **Q.**   Could you see what was going on?
13     **A.**   After.
14     **Q.**   You're still inside the truck at this time; is that right?
15     **A.**   Yes.
16     **Q.**   Could you see what was going on after Mr. Faulcon walked
17     out of your view?
18     **A.**   No, sir.
19     **Q.**   Likewise, you were asked a series of questions about
20     Mr. Villavaso getting out of the truck and moving out of your
21     view.  Likewise, same silly question.
22          Could you see what was going on when Mr. Villavaso
23     got out of your view?
24     **A.**   No, sir.
25     **Q.**   You were asked a series of questions about Mr. Hills

ROBERT BARRIOS - Redirect

```
 1   firing his weapon.  When Mr. Hills fired his weapon, are you
 2   still inside or outside of the truck?
 3   A.   Still inside the truck.
 4   Q.   I think we've covered this.  But real quickly, while
 5   you're still inside the truck, can you see what's going on on
 6   the side of the truck?
 7   A.   No, sir.
 8   Q.   You were asked also a series of questions of what happened
 9   before Mr. Faulcon fired his shotgun after he got out of the
10   truck.  Did he say anything?
11   A.   Ask me that question again.
12   Q.   I'm sorry.  After Mr. Faulcon got out of the truck, did
13   you hear him say anything?
14   A.   I heard him say "Police," after.
15   Q.   I'm sorry?
16   A.   I heard him say "Police," after he fired the first shot.
17   Afterwards, I didn't hear what he said.
18   Q.   Okay.
19        Now, you were asked a very specific question on
20   cross-examination about that time.
21        Do you remember that question?
22   A.   (WITNESS NODS HEAD.)
23   Q.   Do you remember being asked if Mr. Faulcon was saying
24   "Police" while he fired his weapon?
25   A.   Yes.
```

ROBERT BARRIOS - Redirect

1   **Q.**   Is that accurate?

2   **A.**   Yes.

3   **Q.**   Okay.  Prior to this day, had you ever seen Robert Faulcon

4   fire his weapon at anyone?

5   **A.**   No, sir.

6   **Q.**   And on the statement you gave to the New Orleans Police

7   Department, I believe that was Decynda Barnes and Anthony

8   Small, did you tell them that Mr. Faulcon had yelled "Police"?

9   **A.**   I don't recall if I said it was Mr. Faulcon.

10          Can you show me?

11  **Q.**   Yes, sir.

12          **MR. FLEMING:**  May I approach the witness, Your Honor.

13          **THE COURT:**  Yes, sir.

14          **MR. FLEMING:**  I'm showing Ms. Bernstein what I'm

15  going to show Mr. Barrios.

16  **BY MR. FLEMING:**

17  **Q.**   Sir, I'm going to ask you just to identify that real

18  briefly.  Does that appear to be a statement -- a transcription

19  of the statement you gave to Decynda Barnes and Anthony Small?

20  **A.**   Yes, sir.

21  **Q.**   I'm going to direct your attention to page 2.  I will ask

22  you to read this to yourself and see if that refreshes your

23  memory as to what you told them on that date.

24          And I'm just going mark that.

25  **A.**   Can I read the whole thing?

ROBERT BARRIOS - Redirect

```
 1   Q.   You can read the whole thing, yes, sir.  Certainly.
 2   A.   (WITNESS COMPLIES.)
 3            Yes, sir.
 4   Q.   Does that refresh your memory as to what you told Decynda
 5   Barnes and Anthony Small?
 6   A.   Yes, sir.
 7   Q.   Did you tell them that Mr. Faulcon had yelled "Police"?
 8   A.   Yes, sir.
 9   Q.   I'll get that from you when we finish up.
10            A couple of questions.  Let me back up.
11            You were asked a couple of questions Monday on
12   cross-examination about events that transpired back at the
13   Crystal Palace.
14            Do you remember those questions?
15   A.   Yes, sir.
16   Q.   And you were asked -- specifically asked questions about
17   how the people divided up into shooters and non-shooters.
18            Do you remember that series of questions?
19   A.   Yes, sir.
20   Q.   And somebody asked a question -- well, let me ask you.
21            Did someone ask whether -- who had shot their
22   weapons?
23            Let me rephrase that.
24            Did someone at the Crystal Palace ask which officers
25   had fired their weapons?
```

ROBERT BARRIOS - Redirect

1  **A.**   Yes, sir.

2  **Q.**   And did you say you did or -- you, personally -- did or

3  did not fire your weapon?

4  **A.**   Did I say it or did I?

5  **Q.**   Did you say it?

6  **A.**   Yes, I did.

7  **Q.**   Did Robert Faulcon say he did or did not fire his weapon?

8         **MS. BERNSTEIN:**  Objection, Your Honor.  I think all

9  these questions were asked and answered on direct and cross.

10        **THE COURT:**  Well, but they were covered on cross as

11 well.  But I want to stay away from -- let's just focus on

12 particular things that were asked on cross.

13             I'm going to allow him to answer this.  But to

14 be clear, we're not just going to re-conduct direct.  We're

15 going to focus on what was covered on cross, something that was

16 specifically inquired about on cross, although we did cover a

17 lot of ground on cross.  So...

18        **MR. FLEMING:**  I'm not going to re-cover every point,

19 Judge.  I have some very specific notes on the transcript.

20        **THE COURT:**  Okay.  Well, let's do that.

21             I'll overrule.

22        **THE WITNESS:**  Yes.  I believe he did state he fired

23 his weapon.

24 BY MR. FLEMING:

25 **Q.**   Did Mr. Faulcon go to the group of people that said they

ROBERT BARRIOS - Redirect

1   had shot their weapons?

2   A.   Yes, sir.

3   Q.   Did you ever hear him deny that he fired his weapon?

4   A.   No, sir, at no time.

5   Q.   Now, you were asked a few questions on cross-examination

6   about a conversation that transpired between Mr. Faulcon and

7   Mr. Villavaso.

8            Do you remember that con- -- do you remember those

9   questions?

10  A.   Yes, sir.

11  Q.   And do you remember that conversation specifically?

12  A.   I remember parts of it, but I can't -- specifics, but

13  parts of it.

14  Q.   I think that the question was phrased on cross-examination

15  of who may have been bragging.

16           Were Mr. Faulcon and Mr. Villavaso bragging or were

17  they merely having a discussion?

18  A.   It was a dis- -- it was -- it could be taken either way.

19  I guess they were trying to ascertain which people they struck

20  or who they struck.

21  Q.   And, I'm sorry.  Again, that microphone is --

22  A.   My voice is not here.

23           They were discussing what people they struck or

24  possibly who had they struck.

25  Q.   Okay.

ROBERT BARRIOS - Redirect

1          So from the conversation, were they trying to figure
2  out who they may have shot?
3  A.   Yes, sir.
4  Q.   And you were asked a few questions about you firing or not
5  firing your weapon on cross-examination, and whether you were
6  concerned on the pellets being traceable to Mr. Faulcon's
7  weapon.
8          Do you remember those series of questions --
9  A.   Yes, sir.
10 Q.   -- on cross-examination?
11          I'll ask you a couple follow-ups on that.
12          Do you know who Glenn Madison is?
13 A.   Yes, sir.
14 Q.   Glenn Madison is whom?
15 A.   Pardon me?
16 Q.   Who is Glenn Madison, for the ladies and gentlemen of the
17 jury.
18 A.   He was --
19 Q.   Is he a policeman?
20 A.   Yeah, he's a policeman.
21 Q.   Where does he work?
22 A.   Currently or back then?
23 Q.   Back then.
24 A.   Back then I think he was a part of the crime lab.
25 Q.   Was he ever -- I'm sorry.

ROBERT BARRIOS - Redirect

1              Was he ever at the training academy?

2   A.   Yes, sir.

3   Q.   Do you remember what he taught at the training academy?

4   A.   Firearms.

5   Q.   Is Mr. Madison a friend of yours?

6   A.   We know each other.

7   Q.   Do you know whether he's related to Lance Madison?

8   A.   At the time, I didn't know it.

9   Q.   At this time, do you know?

10  A.   At this -- yes, I do.

11  Q.   Okay.  And is he?

12  A.   Yeah, supposedly.  I hear he is, yes.

13  Q.   Did you have a conversation with Mr. Glenn Madison about

14  tracing pellets to a particular shotgun?

15  A.   I had a conversation with him about shotguns, not pellets.

16  Q.   Okay.  After this incident on the bridge?

17  A.   Yes, sir.

18  Q.   And what did you ask Mr. Madison?  I'm not asking what

19  Mr. Madison may have said to you.  But what did you ask

20  Mr. Madison?

21  A.   I asked him about how -- how could shotguns be tested, how

22  were they tested.  And I had asked him a series of questions as

23  to how weapons were tested in general.

24  Q.   And let's talk about the shotguns for a second.

25              What were you asking him about how shotguns could be

ROBERT BARRIOS - Redirect

1  tested?
2          Do you remember those questions?
3  A.   I don't remember the questions.  I mean, it was just,
4  like, a general conversation.  Like I said, it was shotguns and
5  firearms.
6  Q.   Okay.  And did you ask him specifically whether pellets
7  that were retrieved could be traceable to a particular shotgun?
8  A.   I may have asked him about pellets, but not to a specific
9  shotgun.  I mean, it was a conversation about ballistics and
10 weapons, I mean, with handguns, with rifles, with the shotguns.
11 It wasn't nothing specific.
12 Q.   Okay.  So it's your testimony you did not specifically ask
13 him about pellets being traceable to a particular shotgun?
14 A.   I don't recall "specific shotgun."  I can't remember if it
15 was a specific question, "Can this be traced to this?"  I
16 don't -- I can't remember that.
17 Q.   And aside from the pistols and the other firearms, what
18 did you ask him about pellets?  If you did not ask him -- or do
19 not recall asking him that question, what did you ask him about
20 the pellets?
21 A.   I may have asked him how -- how can a shotgun be traced, I
22 mean, period.  As far as in shooting, how did they determine
23 how -- what was hit, who hit, stuff like that.
24 Q.   Okay.
25         Let me jump forward, Mr. Barrios.  I think we're

ROBERT BARRIOS - Redirect

```
1   fairly close to being done.  I'm going to have to ask you some
2   questions.
3           You were asked a series of questions on Monday about
4   your plea of guilty and conversations you had with your wife
5   surrounding that plea of guilty.
6           Do you remember those series of questions?
7   A.  Yes, sir.
8   Q.  And for the record, your wife has the last name Barrios?
9   A.  Yes, sir.
10  Q.  And her first name is what?
11  A.  Rakesha.
12  Q.  We'll call her Mrs. Barrios.
13          You were asked a series of questions about whether
14  you told Mrs. Barrios that you were guilty.
15          Do you remember those questions?
16  A.  Yes, sir.
17  Q.  And did you tell her --
18          MS. BERNSTEIN:  Objection, Your Honor.  I think my
19  questions about Mrs. Barrios were objected to, and I think the
20  objection was sustained.  So I don't think I actually got into
21  these questions on cross.
22          MR. FLEMING:  She did.
23          THE COURT:  Well, let me see it.  Why don't you all
24  approach?
25          (WHEREUPON, the following proceedings were held at
```

ROBERT BARRIOS - Redirect

1    the bench.)

2              **THE COURT:**  May I see it?

3              **MR. FLEMING:**  Yes, Your Honor.

4              **MS. BERNSTEIN:**  May I see as well, Your Honor?  And

5    if I misremembered, I apologize.

6              **MR. FLEMING:**  That issue was brought up.

7              **THE COURT:**  First of all, this is the transcript of

8    the cross from Monday?

9              **MR. FLEMING:**  Yes, sir.

10             **THE COURT:**  That's the first thing.

11                  The second thing, I do recall a discussion at

12   the bench where we discussed the marital or the spousal

13   privilege when Mr. Glass was here, and I know his partner's

14   here today.

15                  This is in open court transcript, and there do

16   seem to be questions on here directly about his communications

17   with his wife.

18             **MR. FLEMING:**  And he answered.

19             **THE COURT:**  Uh-huh.

20             **MS. BERNSTEIN:**  Okay.

21             **MR. FLEMING:**  That's not even highlighted, Judge.

22             **MS. BERNSTEIN:**  Okay.  This is what I was thinking

23   of, Your Honor.  So the only questions I asked were these.

24             **THE COURT:**  Well, it opens the door to redirect on

25   this subject about these communications.  So let's go ahead and

ROBERT BARRIOS - Redirect

1  proceed.  I'm going to overrule the objection.  The objection

2  that I think you're thinking about relates to the BP -- the

3  communications with the government regarding BP --

4          **MS. BERNSTEIN:**  Okay.

5          **THE COURT:**  -- which immediately followed.  I think

6  it's on page 244 and 245 -- actually, 245 where --

7          **MS. BERNSTEIN:**  I apologize for misremembering

8  exactly where that objection came.

9          **THE COURT:**  All right.

10          (WHEREUPON, the following proceedings were held in

11  open court.)

12  **BY MR. FLEMING:**

13  **Q.**  I'm sorry, Mr. Barrios.

14          Do you remember those questions on Monday regarding

15  that?

16  **A.**  Yes, sir.

17  **Q.**  When you pled guilty, what did you tell your wife as to

18  why you were pleading guilty?

19  **A.**  I explained to her I pled guilty to a specific charge that

20  I had given a false statement and I had lied, basically.

21  **Q.**  Did you ever tell your wife that you didn't do anything

22  wrong?

23  **A.**  I didn't tell her that.  I mean, if -- I elaborated on

24  certain parts of the cover-up that I did not take part of or

25  didn't know.  But I never told her that I did anything

ROBERT BARRIOS - Redirect

1  specific, I didn't do nothing wrong.  I never told her that.
2  **Q.**  At any time since the shooting until today, did you tell
3  your wife that you didn't do anything wrong?
4  **A.**  No.
5  **Q.**  You never told your wife you didn't do anything wrong from
6  the time of the shooting until today?
7  **A.**  From the time of the shooting?
8  **Q.**  From the time September 4, 2005, until today, did you ever
9  tell your wife that you did not do anything wrong?
10  **A.**  No.
11  **Q.**  Do you remember testifying to that on Monday, that you
12  told your wife you didn't do anything wrong?
13  **A.**  I don't recall, sir.
14       **MR. FLEMING:**  If I may approach the witness.
15  **BY MR. FLEMING:**
16  **Q.**  This is a transcript of your testimony from the other day.
17  Just read that to yourself.
18  **A.**  (WITNESS COMPLIES.)
19  **Q.**  Does that refresh --
20  **A.**  Yes, I did.
21  **Q.**  I'm sorry.  Does that refresh your memory, sir?
22  **A.**  Yes, sir, it does.
23  **Q.**  So I guess let me ask the question again.
24       From the time of September 4, 2005, until today, have
25  you ever told your wife that you did not do anything wrong?

ROBERT BARRIOS - Redirect

1    **A.**    Yes, sir, I did.

2    **Q.**    Is this why she complained to Mr. Letten?

3            **MS. BERNSTEIN:**  Objection.

4            **THE COURT:**  Yes.  I'm going to sustain that.

5    BY MR. FLEMING:

6    **Q.**    Do you know whether your wife complained -- made a

7    complaint with Mr. Letten?

8    **A.**    I found out later.

9    **Q.**    Who did you find out from?  And I'm not asking you the

10   substance of the conversation.  But who did you find out from?

11   **A.**    I was advised by my attorney, Mr. Glass, first.

12   **Q.**    And after being advised of your wife's complaint, what did

13   you tell your wife?

14   **A.**    I spoke to her later that evening.  And I -- I asked what

15   happened because I was -- I wasn't around when that happened,

16   when she gave her statement or whatever she did.

17           And then I found out what she said and why she said

18   it.

19   **Q.**    Okay.  And what did you tell your wife?

20   **A.**    "Why did you do that?"

21   **Q.**    And why did -- and you kind of said -- made an inflection,

22   "Why did you do that?"

23   **A.**    Yeah.  It -- I didn't -- I'm not going to disrespect the

24   Court --

25   **Q.**    Oh, no.

ROBERT BARRIOS - Redirect

1    **A.**   -- or the jury by saying what I told her.  But...

2    **Q.**   Why was your reaction such as that?

3    **A.**   Why was my reaction such as that?

4    **Q.**   Why was it, yes, sir.

5    **A.**   It was unnecessary.  It was unnecessary.  It was uncalled

6    for.

7    **Q.**   Were you concerned that her actions might impact your plea

8    deal?

9    **A.**   No.  No, not at the time.

10   **Q.**   Were you concerned that her actions might impact your

11   sentence?

12   **A.**   No.  I was more concerned about her at the time because it

13   was -- it was uncalled for.

14   **Q.**   Now, you testified the other day as to your factual basis,

15   and that those allegations in the factual basis were true.

16   That's what you signed and said they were true when you signed

17   that factual basis; right?

18   **A.**   Yes, sir.

19   **Q.**   And your wife had made a complaint to Mr. Letten that

20   those allegation that you had claimed were true were not true;

21   is that right?

22   **A.**   Yes, sir.

23   **Q.**   And so let me ask you again.

24        If those allegations were not true, could that impact

25   your plea deal?

ROBERT BARRIOS - Redirect

1  **A.**   If the allegations were not true?

2  **Q.**   If the government suspected -- well, let me ask this in a

3  couple of questions.

4  **A.**   Yeah.

5          **MS. BERNSTEIN:**  I'm going to object on several

6  grounds, but particularly that it's beyond the scope of cross.

7  I didn't ask him about the factual basis on cross.

8          **THE COURT:**  I don't recall the factual basis coming

9  up on cross.  If you want to ask a rephrased question that

10 relates to what you've already asked him about the issue of his

11 conversation with his wife and the incident that he's already

12 described, I don't know how much further you can go with that.

13 But I don't think we got into the factual basis on cross.

14          So I'll sustain.

15 BY MR. FLEMING:

16 **Q.**   And, Mr. Barrios, for your plea deal, part of the

17 requirement was for you to be truthful or not truthful?

18 **A.**   Truthful.

19 **Q.**   What would happen if you were not truthful?

20 **A.**   I guess -- my plea wouldn't go forward, I guess.

21 **Q.**   So now let me ask this question again.

22          When your wife complained to Jim Letten that the

23 allegations were not true, were you worried that that could

24 impact your plea deal?

25          **MS. BERNSTEIN:**  Objection, asked and answered a few

 1   minutes ago.
 2          THE COURT:  I'm going to let him go ahead and answer
 3   it, then let's move on.
 4          THE WITNESS:  No, I wasn't worried.
 5   BY MR. FLEMING:
 6   Q.   You weren't worried, even though you could face more time?
 7   A.   I wasn't worried.
 8   Q.   You weren't worried?
 9   A.   I figured I could explain her actions due to the emotions
10   at the time, her visually observing me pleading guilty in open
11   court, and everything hitting her at one time.
12          And that's one thing that -- to hear it, but to see
13   it actually going down, I basically stated that it was her
14   emotions.
15          And then when I got home, it was basically confirmed
16   what I had been thinking.
17   Q.   So you were facing -- you have not been sentenced; is that
18   right?
19   A.   No, sir.
20   Q.   What's your maximum sentence?
21   A.   Five years.
22   Q.   What were you looking at before the plea deal?
23   A.   I think eight.
24   Q.   Before the plea deal?
25   A.   Yes.  Eight.  That's what I was told.

ROBERT BARRIOS - Redirect

1  **Q.**   Not 20 --

2  **A.**   I --

3  **Q.**   -- 25?

4  **A.**   I don't recall.

5          **MR. FLEMING:**  Thank you.  I have no further questions

6  of this witness.

7          **THE COURT:**  All right.

8              Mr. Meche?

9                    **REDIRECT EXAMINATION**

10 BY MR. MECHE:

11 **Q.**   Good morning, Mr. Barrios.

12          I want to ask you just a few questions about some of

13 the things that you testified about yesterday in response to

14 Ms. Bernstein -- I think the day before yesterday.

15 **A.**   The day before.

16 **Q.**   I apologize.

17          Ms. Bernstein asked you a series of questions about

18 the tape conversation that we played, that you listened to.

19 And one of the things she asked you about was when Vil, I think

20 in response to your question, said, quote, Them bitches had

21 guns.

22          Do you remember that?

23 **A.**   Yes.

24 **Q.**   And he said that multiple times, "Them bitches had guns."

25          Do you know specifically who he was talking about?

32

ROBERT BARRIOS - Redirect

1  A.   Not specifically, no.
2  Q.   And his term "them bitches," it's a term you've used
3  before when you had conversations with people.
4        Do you remember that?
5  A.   Yes, sir.
6  Q.   In fact, that taped telephone conversation you had with
7  Hunter, the one I showed you the transcript on, you remember
8  you used the term "Them bitches were smart.  Them bitches were
9  smart because they said we ain't getting involved because we
10 don't know, if we come to him with it, he may not go for it."
11       Do you remember saying that?
12 A.   Yes, sir.
13 Q.   And when you were using the term, "them bitches," who were
14 you talking about?
15 A.   I was referring to the rank, the sergeants.
16 Q.   Okay.  So you weren't referring to females?
17 A.   No.
18 Q.   You were referring to males?
19 A.   Yes, sir.
20 Q.   So when you and Vil use the term "them bitches," you're
21 not exclusively referring to women or females?
22 A.   No.
23 Q.   No.  That's just a term you use to refer to people?
24 A.   Yes, sir.
25 Q.   Okay.

ROBERT BARRIOS - Redirect

1            Ms. Bernstein, I think, established in her testimony
2   with you that you and Vil, at the time of the tape, at the time
3   you agreed to go tape Vil, at that time, you all were aware
4   that Lehrmann and Lohman had already pled guilty?
5   A.   Yes, sir.
6   Q.   And, in fact, documents had been published in the
7   newspaper concerning those guilty pleas?
8   A.   Yes, sir.
9   Q.   And, in fact, both of them signed a factual basis which
10  the media reported on.  And you and Vil actually read those
11  documents to see what was in them?
12  A.   I remember reading -- I don't remember reading it with
13  Villavaso, but we were informed and were basically -- having
14  been informed and knowledgeable of what he pled guilty to and
15  the statements he made.  We were pretty knowledgeable to what
16  they pled guilty to.
17  Q.   So on the tape, when you're referring to, like, planting a
18  gun or secret meetings, you got those terms from looking at
19  those documents?
20  A.   Yes, sir.
21  Q.   Okay.  And, in fact, in the Lohman factual basis, they
22  used the term "secret meeting"?
23  A.   Yes, sir.
24  Q.   Okay.  Now, at one point during the tape with Villavaso he
25  said, "Man, I had nothing to do with no secret meeting.  I

ROBERT BARRIOS - Redirect

1  didn't go to a secret meeting."
2          Do you remember he said that?
3  **A.**   Yes.
4  **Q.**   Did you challenge him when he said that?
5  **A.**   I don't recall challenging him on that, no.
6  **Q.**   No.  I mean did you say, "Well, wait a minute, Vil.  We
7  had that meeting that Lehrmann referred to."
8          Why didn't you do that?
9  **A.**   I didn't do that.  I don't remember challenging him on any
10  of the -- on the secret meeting.  I didn't.
11  **Q.**   Did you consider that to be a secret meeting at that point
12  in time?
13  **A.**   No.
14  **Q.**   Do you know of any other secret meetings at all?  Any
15  other secret meetings?
16  **A.**   The only meeting that I recall that was secret was the one
17  we had at the 7th District gutted station.  That was it.
18  **Q.**   Well, but that's -- but that's what you're talking about.
19  And he said, "Man, I didn't go to no secret meeting."
20          Why didn't you challenge him?  You're taping him for
21  the government, you're trying to get evidence for the
22  government.  Why didn't you challenge him and say, "Well, wait
23  a minute, Vil"?
24  **A.**   I didn't challenge him.  No, I didn't.
25  **Q.**   Ms. Bernstein also asked you a series of questions about

ROBERT BARRIOS - Redirect

1    when you met with the government a few days ago to prepare for

2    your testimony.  And she indicated that they had some

3    discussion with you about this BP fraud investigation.

4           Do you remember that?

5    A.   Yes, sir.

6           **MS. BERNSTEIN:**  Objection, Your Honor.  I think we're

7    at the objection we were at the bench for a minute ago.

8           **MR. MECHE:**  She brought it up.

9           **THE COURT:**  It was covered, and I ruled on it with

10   some specific guidelines at a bench conference.  So subject to

11   those -- that previous ruling with regard to what can and

12   cannot be asked, I'll allow you to question him.

13          But, again, it's strictly within those

14   guidelines.

15          **MR. MECHE:**  And I'm very aware of that.  And I'll be

16   very careful, Your Honor.

17          **THE COURT:**  Okay.  Sure.  Let's hear it.  And then if

18   there's another reason to object, we'll hear it.

19   BY MR. MECHE:

20   Q.   What specifically did they tell you about the BP

21   investigation?

22   A.   That I was being investigated for fraud.  That was it.

23   Q.   Okay.  Did they tell you that they were interested in

24   finding out information about that investigation?

25   A.   No, they didn't.

ROBERT BARRIOS - Redirect

1   **Q.**   Did they tell you that they didn't want to know anything
2   about that, that someone else was going to handle it?
3   **A.**   I recall them saying, yes, that they didn't want to hear
4   anything about it.
5   **Q.**   They didn't want you to talk about it at all?
6   **A.**   At all.
7   **Q.**   They didn't want you to tell them anything about it?
8   **A.**   Nothing.
9   **Q.**   And they didn't ask you any questions about what your role
10  may or may not --
11          **MS. BERNSTEIN:**  Objection, Your Honor.  These are
12  misleading interview questions.  May we approach?
13          (WHEREUPON, the following proceedings were held at
14  the bench.)
15          **MS. BERNSTEIN:**  Your Honor, I would ask that you
16  advise the jury that he had -- has a valid Fifth Amendment
17  right that he invoked with respect to that and that we all know
18  that.  I think that has to be -- that has to be said.  And if
19  we can ask his lawyer if his lawyer's okay with that.  I think
20  that has to be said in order for this not to be blatantly
21  misleading.
22          **MR. MECHE:**  This is not misleading though.  He has a
23  plea agreement.  He's agreed to be truthful concerning any
24  investigation, to implicate anyone in any crime, and they
25  haven't withdrawn that plea agreement.  And it's not limited to

1  just the Danziger Bridge.  He has to be truthful about
2  everything.
3        **THE COURT:**  Why don't you do this:  Why don't you
4  establish with him that he understands that he's not under an
5  obligation -- well, then we've run into the plea agreement.
6        **MS. BERNSTEIN:**  Your Honor, I think it has to be very
7  specific that he has a Fifth Amendment right that he invoked
8  and that that's why we didn't ask him.  We had -- and, of
9  course, if we had asked him --
10        **MR. MECHE:**  Then why didn't you tear up his plea
11  agreement?
12        **MS. BERNSTEIN:**  Of course, if we had asked him, we'd
13  be accused of misconduct, because it would have been misconduct
14  had we asked him details about something that he invoked the
15  Fifth Amendment privilege on.
16        **MR. MECHE:**  If they reach a plea agreement with the
17  witness -- and I'm going to read the specific language -- it
18  says you have to be truthful about everything.  It's not
19  limited to a specific investigation.  It says you have to tell
20  us if anyone else is committing any crimes.  It's not limited
21  to just this specific investigation.  And if they chose not to
22  ask him questions about that, clearly, if he had asserted his
23  Fifth, the plea agreement's got to be torn up.  It wasn't torn
24  up, and it's still not torn up.
25        **MS. BERNSTEIN:**  This is all argument.  It's

ROBERT BARRIOS - Redirect

1    inappropriate for this witness.  And the line of questioning is

2    very clearly intended to suggest that we did something wrong in

3    not asking him these questions, which we were told by his

4    lawyer that he was invoking the Fifth, and they know this, and

5    we've discussed it at the bench.

6         **MR. MECHE:**  Then why didn't they tear up his plea

7    agreement, Your Honor?

8         **MS. BERNSTEIN:**  So I really think this jury needs to

9    be instructed that he invoked his Fifth Amendment privilege.

10   Mr. Meche can argue that we should have torn up his plea

11   agreement, which is a separate issue.

12        **THE COURT:**  Why don't you ask him if he invoked his

13   Fifth Amendment privilege?  If that's what the government is --

14        **MR. MECHE:**  Okay.  I'm happy too.

15        **THE COURT:**  Hang on.  That's on.

16        **MR. MECHE:**  That's a good point.  I should.

17        **MS. BERNSTEIN:**  "Did you invoke your Fifth Amendment

18   privilege with respect to the BP matter?"

19        **MR. MECHE:**  Sure.

20        **MS. BERNSTEIN:**  And I still maintain that this should

21   come from the Court and that the jury should know that this is

22   something that we have already discussed.  It's intentionally

23   misleading, and I don't have a chance to fix it now because

24   this is redirect.

25        **THE COURT:**  But I don't have discretion to interpret

ROBERT BARRIOS - Redirect

1    his plea agreement vis-à-vis a subsequently committed crime.

2    For me to suggest that that would be permissible is really

3    within the realm of the U.S. Attorney's Office to determine

4    whether or not he's under an obligation and whether he's

5    complied with that obligation.

6              That's not for me to instruct the jury that

7    somehow he is nonetheless being cooperative even though he has

8    asserted his Fifth Amendment privilege.  I'm not going to bless

9    that.

10             **MS. BERNSTEIN:**  I do think that's two separate issues

11   though.  One is whether he has a valid Fifth Amendment right,

12   which he clearly does because it's a Constitutional right.

13             The second question is whether he's in violation

14   of his plea agreement, which is the issue that I think is fair

15   game for argument.

16             But I think that first question of whether has a

17   valid Fifth Amendment right, regardless of that plea agreement,

18   we can't tell him, "No, you don't have a Fifth Amendment right,

19   you can't invoke it."

20             **THE COURT:**  Well, that's right, and that's why he's

21   going to ask about whether he asserted his Fifth Amendment

22   privilege.  If he says "Yes," then I think that's about as far

23   as you can go.  I think the jury knows that he's got a plea

24   agreement.  You've already covered that with him.

25             **MS. BERNSTEIN:**  And I would also ask, Your Honor,

ROBERT BARRIOS - Redirect

1  since this is redirect, I understand that Mr. Meche was allowed
2  to lead on matters involving the cooperation, and I understood
3  that ruling.  I think because this is redirect, I would ask
4  that he be required to direct rather than lead.
5          **MR. MECHE:**  Well, at this point we're talking about
6  his cooperation and his preparation for testimony, and it's a
7  government witness.  It would go a lot quicker --
8          **THE COURT:**  This would relate to his cooperation with
9  the government.  So I think he can lead -- lets go ahead and
10  ask him the question, but I going to overrule the objection
11  subject to what I've said up here.
12          **MR. CARTER:**  One quick matter, Your Honor.  It may be
13  silly, but he's not a lawyer.  If he says he did not invoke, he
14  should be asked, "Did your lawyer instruct you not to answer
15  questions about the BP fraud?"
16          **THE COURT:**  The problem with that is that Mr. Reed is
17  going to be up here saying that that requires disclosure of
18  attorney/client communication, and I will agree with him on
19  that.
20          **MR. MECHE:**  Your Honor, he's a police officer.  He
21  knows his rights.
22          **THE COURT:**  Let's go ahead and ask him.
23          (WHEREUPON, the following proceedings were held in
24  open court.)
25

ROBERT BARRIOS - Redirect

1   BY MR. MECHE:

2   Q.   All right.  Mr. Barrios, now, there's been some

3   discussion, and I just want to summarize it and make it clear.

4           You have a plea agreement with the government.

5   A.   Yes, sir.

6   Q.   And in your plea agreement you agree to submit to

7   interviews with them whenever and wherever they request?

8   A.   Yes, sir.

9   Q.   To any federal law enforcement authorities, not just these

10  guys.

11  A.   Yes, sir.

12  Q.   And you understand that if you're not truthful to any of

13  these law enforcement people this agreement may be voided by

14  the government?

15  A.   Yes, sir.

16  Q.   Yes.  And you understand you agreed neither to implicate

17  anyone falsely nor to exculpate or protect anyone falsely.

18          And you understand that includes yourself?

19  A.   Yes.

20  Q.   And you understand that you further agreed to advise the

21  government immediately as to any person you believe to be

22  violating the law, not just the law covering the Danziger

23  Bridge, but the law in general?

24  A.   Yes, sir.

25  Q.   And you would have done that?

ROBERT BARRIOS - Redirect

1  **A.**   Yes, sir.

2  **Q.**   And you would still do that?

3  **A.**   Yes, sir.

4  **Q.**   Okay.  Now, had they chosen to ask you questions about the

5  BP fraud investigation would you have answered them?

6  **A.**   I would have.

7            **MS. BERNSTEIN:**  Objection, Your Honor.

8            **MR. MECHE:**  She asked.  She asked that, Judge.

9            **MS. BERNSTEIN:**  May we approach again?

10           **THE COURT:**  Let's -- I'd rather go and do as I

11 previously ruled at the bench conference.

12                I think you need to rephrase the question.

13 BY MR. MECHE:

14 **Q.**   What if they would have asked you questions about the BP

15 fraud investigation?  What would you have said?

16           **MS. BERNSTEIN:**  Objection, Your Honor.

17           **THE COURT:**  Let's do as I said at the bench

18 conference which was held a few minutes ago.

19                Let's ask the question.

20 BY MR. MECHE:

21 **Q.**   What would you have done?

22 **A.**   I would have advised --

23           **MS. BERNSTEIN:**  Objection.

24           **THE COURT:**  Well --

25           **MS. BERNSTEIN:**  May we approach, Your Honor?  I'm

ROBERT BARRIOS - Redirect

1   sorry.  It will be very brief.

2            THE COURT:  You all are beating a path in the carpet

3   here over something I already said.

4                 Come on up.

5            (WHEREUPON, the following proceedings were held at

6   the bench.)

7            THE COURT:  He was about to ask it.  The specific

8   question was:  "Would you have invoked your Fifth Amendment

9   privilege?"

10           MR. MECHE:  Then let him say it.

11           MS. BERNSTEIN:  "Did you invoke your Fifth Amendment

12   privilege?"  And the only concern I have with this -- and

13   that's fine, I didn't know what he was going to say, Your

14   Honor, but you very specifically told Mr. Meche what to ask.

15   My other concern is that this line of questioning is

16   presupposing that there was criminal activity, which is exactly

17   the problem with this line of questioning.

18           MR. MECHE:  She asked me to ask it.

19           MS. BERNSTEIN:  No, no, no, not that.  I'm sorry.

20   Not the question that you were supposed to ask, questions that

21   you went back and did and ask.

22           THE COURT:  He's going to ask the question as we

23   discussed, which is:  "Did you invoke your Fifth Amendment

24   privilege with regard to any questions about the BP

25   investigation?"

ROBERT BARRIOS - Redirect

1          **MR. MECHE:**  Okay.

2          **MS. BERNSTEIN:**  And, Your Honor, I think that --

3          **THE COURT:**  That's what the instruction -- what the

4   government asked me to instruct the jury.

5          **MR. MECHE:**  That's true.  Yes, they did.

6          **MS. BERNSTEIN:**  And that's -- Tim, don't leave.

7          **MR. MECHE:**  He's ruled Bobbi.

8          **MS. BERNSTEIN:**  I know.  I have a follow-up question.

9   My understanding is that that question, then we're done with

10  this line of questioning, because anything additional I would

11  object to because I was not allowed to get into it on cross.  I

12  was stopped.

13         **THE COURT:**  I don't think we can go much further with

14  this, Tim.

15         **MR. MECHE:**  I understand.

16         **THE COURT:**  First of all, regardless of whether it

17  was covered on cross or not, if he says he invoked Fifth

18  Amendment right --

19         **MR. MECHE:**  I understand.

20         **MS. BERNSTEIN:**  And I expect follow-up questions

21  about the plea agreement and whether we should have revoked the

22  plea agreement, and that's the line I'm objecting to on the

23  grounds that it presupposes criminal activity, which, of

24  course --

25         **THE COURT:**  I think that falls within argument later.

ROBERT BARRIOS - Redirect

1            **MS. BERNSTEIN:**  Thank you.

2            **THE COURT:**  The jury can -- you've made the point

3    about his cooperation.  You will now have made the point that

4    he has chosen not to answer questions about suspected criminal

5    activity.  I think the rest of that is argument for later.

6            **MS. BERNSTEIN:**  And I don't want to have to jump on

7    my feet again.

8            (WHEREUPON, the following proceedings were held in

9    open court.)

10   BY MR. MECHE:

11   Q.   Thank you, Mr. Barrios.  I think we understand each other.

12           I think what you were about to say is, had they asked

13   you questions about the BP investigation, you wouldn't have

14   answered them.  You would have said, "I'm invoking my Fifth

15   Amendment right, and I'm declining to answer any questions

16   about that"; right?

17   A.   I wasn't going to say that.  I was --

18   Q.   Well, what would you have said, then?

19   A.   I would have consulted with my attorney first.

20   Q.   Uh-huh.

21   A.   And whatever he told me to do I would have done,

22   basically.

23   Q.   Okay.  Well, since you said that, what did you want to do?

24   A.   I -- at the time we didn't really discuss that topic.  It

25   wasn't discussed, so it wasn't what I wanted to do or not.  It

ROBERT BARRIOS - Redirect

1    was never asked.

2    Q.   They just kind of stayed away from it?

3    A.   No.  They just advised me, and that's it.

4    Q.   Well, what did they advise you, now?

5    A.   That I was being investigated for fraud, and they left it

6    alone.

7    Q.   So they didn't ask you any questions about it?

8    A.   No, sir, they didn't.

9    Q.   And you don't know what -- you don't know if you would

10   have taken your Fifth Amendment.  You might have answered their

11   questions?

12   A.   I don't know what I would have done.  They didn't ask me.

13   They left it alone.

14   Q.   And what if they came to you now and asked you questions

15   about that?  What would you do?

16   A.   I would consult with my attorney.

17   Q.   Is your attorney here in the courtroom?

18   A.   His law partner is.  My attorney is in another trial, but

19   his law partner, yes.

20   Q.   And without telling me what was said, have you had this

21   discussion with your attorney about how you would answer

22   questions about the BP fraud investigation if asked?

23   A.   No, sir.

24   Q.   And has anyone from any government agency asked you any

25   questions about the BP fraud investigation as we sit here

ROBERT BARRIOS - Redirect

1  today?

2  A.   No, sir.  All they have done was advise me I was being

3  investigated.  That was it.

4  Q.   Okay.

5  A.   I was never asked any questions.

6  Q.   Do you anticipate, at some point, being called in and

7  asked questions about that?

8  A.   I mean, I don't know.  I can't tell you yes, I can't tell

9  you no.

10 Q.   And how would you respond if you were?

11          MS. BERNSTEIN:  Objection.

12          THE COURT:  We've covered this.  Let's move on.

13          MR. MECHE:  All right.  Okay.  Thank you, sir.

14          THE COURT:  All right.  Mr. Hessler.

15                  **REDIRECT EXAMINATION**

16 BY MR. HESSLER:

17 Q.   Good morning, Mr. Barrios.

18 A.   Good morning, sir.

19 Q.   Mr. Barrios, you're here today and the other day as a

20 result your cooperation with the federal government; correct?

21 A.   Yes, sir.

22 Q.   And isn't it true, as a result of your cooperation with

23 the federal government, you met with them pretrial and prior to

24 your testimony; correct?

25 A.   Yes, sir.

ROBERT BARRIOS - Redirect

1   **Q.**   To talk about your statements and to talk about your
2   testimony?
3   **A.**   Yes, sir.
4   **Q.**   To get your story straight to tell to this jury; correct?
5   **A.**   No, not to get my story straight.
6   **Q.**   Well, what was the point of them meeting with you and have
7   you repeat to them --
8            **MS. BERNSTEIN:**  Objection.
9            **THE COURT:**  I assume the grounds is that it was
10   outside the scope.  Is that --
11            **MS. BERNSTEIN:**  That's one of the grounds.  But, yes,
12   we didn't talk about this at all on cross.
13            **THE COURT:**  I'll sustain.  Let's get to something
14   that was covered on cross that needs to be covered on redirect.
15            **MR. HESSLER:**  All right.
16   **BY MR. HESSLER:**
17   **Q.**   Your wife, Rakesha.
18   **A.**   Yes.
19   **Q.**   You said what she did was uncalled for?
20   **A.**   Yes.
21   **Q.**   Was it untrue?
22   **A.**   Yes.
23   **Q.**   Now, Ms. Bernstein said -- and I think this was covered on
24   cross because -- well, anyways, you -- she said you were
25   itching to tell somebody -- to tell them something; right?

ROBERT BARRIOS - Redirect

1  **A.**   Yes, sir.

2  **Q.**   Do you recall that?

3  **A.**   Yes.

4  **Q.**   And you didn't have this itch for five years.  It wasn't

5  something you had been dying to scratch for some five years,

6  was it?

7  **A.**   No, it wasn't, sir.

8  **Q.**   You actually began to get the itch to tell the government

9  that you didn't fire your weapon after you found out that there

10 was an investigation brought forth, no physical proof that you

11 fired your weapon.

12        Isn't that when you began itching?

13 **A.**   No.

14 **Q.**   But somehow, you didn't satisfy that itch until you met

15 with the government; right?

16 **A.**   No.

17 **Q.**   Now, do you recall talking with Ms. Bernstein about when

18 you got out and you saw the civilians on the walkway?

19 **A.**   Yes.

20 **Q.**   Do you recall seeing the civilians on the walkway, as we

21 sit here today?

22 **A.**   Yes.  When they were down I saw them.

23 **Q.**   Okay.

24        **MR. HESSLER:**  Your Honor, may I approach?

25        **THE COURT:**  Yes.

ROBERT BARRIOS - Redirect

1          **MR. HESSLER:**  This might be a challenge for me.
2          **THE WITNESS:**  Can I get up?
3          **MR. HESSLER:**  You're going to have to unless you've
4   got some balloons with you.
5               Go to exhibit --
6          **THE COURT:**  Would you give him a microphone, too,
7   there, Mr. Hessler, so that we can all hear?
8          **MR. HESSLER:**  Thank you, sir.
9          **THE COURT:**  Can everybody see that or do we need to
10  tilt it further?
11              Everybody in the jury can see?
12  **BY MR. HESSLER:**
13  **Q.**  I think Exhibit 307.  You can turn the page.
14  **A.**  Is it --
15  **Q.**  Wait a minute.  That's it.
16              Did you place these Xs where the victims -- where you
17  recall the victims being?
18  **A.**  Yes, I did.
19  **Q.**  Okay.  And that was essentially from the foot -- or the
20  front of truck to the rear tire of the truck.  Do you recall
21  telling the FBI that?
22  **A.**  I don't recall that.  I recall saying I couldn't -- I
23  couldn't remember where the bodies were laying and where the
24  truck was positioned, if it was -- if some were in front of the
25  truck, some in the rear of the truck, I don't remember

ROBERT BARRIOS - Redirect

1   specifically where the truck was positioned.

2            **MR. HESSLER:**  Your Honor, may I approach?

3            **THE COURT:**  Yes.

4   **BY MR. HESSLER:**

5   **Q.**   Do you recall speaking to the federal government

6   March 26th, 2010?

7   **A.**   Yes, sir.

8   **Q.**   You can sit back down, Mr. Barrios.

9   **A.**   (WITNESS COMPLIES.)

10  **Q.**   I'm going to ask you to read that last paragraph to

11  yourself.

12  **A.**   (WITNESS COMPLIES.)

13            Yes.

14  **Q.**   Does that refresh your recollection of the locations where

15  you recalled these persons being in March of 2010?

16  **A.**   Yes, sir.

17  **Q.**   And where would that be?

18  **A.**   The deceased was in the front of the truck -- the first

19  civilian that was deceased was in the front of the truck.

20  **Q.**   Well, it says more than that; right?

21  **A.**   They were lying -- the perpetrators were lying on the

22  pedestrian walkway.

23  **Q.**   Okay.  And I asked you not to do it, but now I'm going to

24  ask you to do it.  Read that entire paragraph.  It's very

25  short.

ROBERT BARRIOS - Redirect

1   A.   The paragraph says that "The truck, after Hills fired, he

2   saw several injured civilians lying on the pedestrian walkway.

3   A deceased male civilian was located near the front of the

4   truck, and the first civilian was located near the truck's rear

5   tire.  All the civilians were severely injured."

6   Q.   You said "near the front of the truck"; right?

7   A.   Yes.

8   Q.   You don't even say it was past the front of the truck.

9   But it was from near the front of the truck to the rear tire of

10  the truck?

11  A.   Yes, sir.

12  Q.   All, I guess, parallel -- directly parallel to the truck?

13  A.   Yes, sir.

14  Q.   You told the government this; right?

15  A.   Yes.

16          MR. HESSLER:  Could we pull up 307, please.

17          Blow up this area here.

18  BY MR. HESSLER:

19  Q.   Assuming the green area -- the green area would be the

20  location of the bodies -- do you see a green area on the

21  walkway that is parallel to the truck where you identified to

22  the government where you saw the bodies?

23  A.   No, sir.

24  Q.   Do you know why the government's exhibit --

25          MS. BERNSTEIN:  Objection.

ROBERT BARRIOS - Redirect

1           **THE COURT:**  No, I think this was covered.  I'm going
2   to let him go ahead and ask this.
3   **BY MR. HESSLER:**
4   **Q.**    Do you know why the government's exhibit is contrary to
5   your information -- your eyewitness information?
6   **A.**    No, sir.
7   **Q.**    Thank you.
8           **MR. HESSLER:**  You can take it down.
9   **BY MR. HESSLER:**
10  **Q.**    Now, when you -- when you responded to this call, do you
11  recall responding?
12  **A.**    Yes, sir.
13  **Q.**    And would you agree that on a 108 call everybody responds,
14  everybody possible?
15  **A.**    Yes.
16  **Q.**    And do you now know for a fact that other people responded
17  that weren't in that truck?
18  **A.**    Yes.
19  **Q.**    Would you expect that to happen?
20  **A.**    Yes.
21  **Q.**    I mean, if -- and that was early in the morning; correct?
22  **A.**    Yes.
23  **Q.**    That's when people were gearing up to put their boats in
24  the water and go rescue people?
25  **A.**    Yes.

ROBERT BARRIOS - Redirect

1   Q.   Do you think it's possible that people responded, police

2   officers, law enforcement officers, and persons that heard the

3   call, responded towing their boats to the launch location?

4   A.   Possibly, yes.

5   Q.   And Ms. Bernstein asked you yesterday about when you got

6   out of that truck, and what did you see; right?

7   A.   Yes.

8   Q.   Could you see off of the bridge and then below the bridge

9   when you got off that truck?

10  A.   No.  Not directly below the bridge, no, I couldn't.

11  Q.   Isn't it true you have to actually walk almost directly to

12  the edge of bridge to look down, or even get over the angle of

13  that barricade to look?

14  A.   You would have to get over the barrier, yes.

15  Q.   To even look beyond the bridge?

16  A.   Yes.

17  Q.   So you said you didn't see anybody in that grassy area;

18  right?

19  A.   Yes.

20  Q.   But you couldn't see that grassy area, could you?

21  A.   No, I couldn't.

22  Q.   And you did hear -- you did hear shots come from the

23  passenger side of the vehicle; right?

24  A.   Yes, I did.

25  Q.   And does the passenger side include the walkway where the

ROBERT BARRIOS - Redirect

1  persons were found shot?

2  **A.**   Yes, sir.

3  **Q.**   Would the passenger side also contain the grassy area and

4  beyond?

5  **A.**   It would be a little lower, but, yes.

6  **Q.**   And you, in fact, said it sounded like rifle fire, didn't

7  you?

8  **A.**   Yes.

9  **Q.**   Did you hear anybody yelling any commands at all at any

10  point?  "Put your hands up.  Don't move.  Turn over.  Turn your

11  head or I'll blow your fucking head off."

12  **A.**   No, I didn't hear that.

13  **Q.**   Would you be surprised if you heard somebody might have

14  said that if they were in that situation?

15  **A.**   No, I wouldn't have been surprised.

16  **Q.**   Now, you were in court Monday when Ms. Bernstein testified

17  that the rank were going to take care of this; right?

18          **MS. BERNSTEIN:**  Objection, Your Honor.

19          **THE COURT:**  I'll sustain.  I'll sustain.  Let's

20  rephrase.

21          Come on.  Let's go.

22  **BY MR. HESSLER:**

23  **Q.**   You heard the phrase, "The rank was going to take care of

24  this"; right?

25  **A.**   Yes, sir.

ROBERT BARRIOS - Redirect

1   **Q.**   Did you say that phrase?

2   **A.**   No.

3   **Q.**   Ms. Bernstein said that phrase; right?

4   **A.**   Possibly, yes.

5   **Q.**   And you agreed with that; right?

6   **A.**   I agreed to her terminology.

7   **Q.**   Okay.

8   **A.**   I knew what she meant.

9   **Q.**   Well, yeah, you knew what she meant because you all talked

10  about it; right?

11  **A.**   No.

12  **Q.**   All right.  When you talked about it -- I'm going to give

13  you -- I mean, I'm just going to make it easy on you.

14          Did you ever say that in your NOPD statement?

15  **A.**   No, sir.

16  **Q.**   Did you ever say that in your 302 dated 3/26/2010?

17  **A.**   No, sir.

18  **Q.**   Did you ever say that in your 302 dated 4/28/2010?

19          **MS. BERNSTEIN:**  I would ask for clarification as to

20  the question, if it's whether said those words or was it the

21  concept.

22          **MR. HESSLER:**  I'll go with the big picture.

23  BY MR. HESSLER:

24  **Q.**   Did you ever -- I'll give you the whole thing.

25          In any of your 302s, your grand jury, your factual

ROBERT BARRIOS - Redirect

1  basis, your proffer agreement, show me whether you say the rank
2  is going to take care of it generally, in conceptual terms, and
3  specifically where Robert Gisevius is going to do anything.
4  **A.**   I don't remember using that terminology.  I don't remember
5  using the term, Mr. Hessler.
6  **Q.**   Look through it.  See if you find it in there.
7  **A.**   I looked through it.
8            **THE COURT:**  He's looked through it.
9            **THE WITNESS:**  I've looked through it.
10           **THE COURT:**  Unless he wants to look further, I think
11  he has.
12           **MR. HESSLER:**  That's about all I have, Your Honor.
13  **BY MR. HESSLER:**
14  **Q.**   When you talked with Robert Gisevius for an hour and a
15  half on 3/30/2010, you were instructed to ask questions
16  regarding certain --
17           **MS. BERNSTEIN:**  Objection.  There were no questions
18  on the cross about the conversation with Mr. Gisevius.
19           **THE COURT:**  Mr. Hessler?
20           **MR. HESSLER:**  Your Honor, I think this goes into
21  what -- the question on cross about Ms. Bernstein's comment
22  that the rank was going to take care of it.  And I think it's
23  addressed on this tape.
24           **THE COURT:**  Why don't you all approach.  I have some
25  questions about that.

ROBERT BARRIOS - Redirect

1          (WHEREUPON, the following proceedings were held at
2    the bench.)
3          **THE COURT:**  I would agree that I don't think this
4    specific tape was inquired about on cross.  Explain to me how
5    this falls within the scope.
6          **MR. HESSLER:**  Well, obviously, when they sent him in
7    they were trying to -- he was directed -- obviously when the
8    government sent him in to tape Gisevius, they wanted to get --
9    ascertain and gain proof and corroboration of his involvement
10   in taking care of this, the reports, the statements and
11   everything else, and Robert Gisevius every time he's questioned
12   or asked about that, he denies it.
13         **MS. BERNSTEIN:**  And, Your Honor, we were held very
14   strictly on redirect.  Even when cross-examination asked
15   specific questions about specific conversations, we were not
16   allowed to redirect on other parts of that very same
17   conversation.  This conversation was not touched upon at all.
18         **MR. HESSLER:**  This conversation impacts directly
19   on --
20         **THE COURT:**  I think I've let you all redirect pretty
21   generously on government witness, including over the objection
22   of the defendants.
23          I think you can ask him about whether or not
24   that was discussed with Mr. Gisevius.  I don't know how much
25   detail you can get into other than -- because we did talk about

ROBERT BARRIOS - Redirect

1   the rank, whether the rank would take care of it, and that's

2   kind of a general statement.  But I hope it's not your

3   intention to go into playing the tape.

4           **MR. HESSLER:**  Not unless he lies.

5           **MS. BERNSTEIN:**  Your Honor, going into the specific

6   tape is just so far more detailed than a very general

7   conversation about -- about rank.

8           **THE COURT:**  I think so.  I think that's probably

9   correct.  Let's get him to talk about whether or not

10  Mr. Gisevius ever made such a representation and let's see what

11  he says.

12          **MR. HESSLER:**  That's fine with me.

13          **THE COURT:**  I think it's -- to sit and play a tape

14  that could have been played on direct --

15          **MR. HESSLER:**  I know, Your Honor.  It was ruled out.

16          **THE COURT:**  I know.  I know.

17          **MR. HESSLER:**  So I couldn't --

18          **MS. BERNSTEIN:**  I didn't touch it on cross.

19          **THE COURT:**  That's true.  But we didn't get into the

20  tape on cross.  We did get into the issue of the rank, and you

21  also got him to define the rank as including Bowen and

22  Gisevius, so I think it's --

23          **MS. BERNSTEIN:**  Your Honor, I was talking very

24  specifically about the meeting at the Crystal Palace where the

25  rank was involved; the meeting at the gutted-out 7th District

ROBERT BARRIOS - Redirect

1    that was involved --
2                **THE COURT:**  But you've alleged a conspiracy that
3    extends all the way through today among these defendants.
4                **MS. BERNSTEIN:**  Well, no, not through today,
5    Your Honor.  I'm sorry, just for the record, just through
6    January 23rd, 2010 -- or 2009.  But so I understand, so I
7    don't -- I don't want to object on something that's been ruled
8    on, but my understanding is that the question will be a general
9    question rather than one specifically about the tape; is that
10   right?
11               **THE COURT:**  Well, I think he can ask him about the
12   conversation, the conversation on that particular day since
13   he's already agreed that he has wired up.
14               **MS. BERNSTEIN:**  Okay.
15               **THE COURT:**  And I hope he's going to give a truthful
16   answer as to what's on the tape.  By this time he knows that
17   the tapes are available.
18               **MS. BERNSTEIN:**  But he's never listened to the tape.
19               **THE COURT:**  No, but he was a participant in the
20   conversation.  I don't think he can sit there and say something
21   that's false.
22               **MS. BERNSTEIN:**  But the question will be a very
23   general question, not specific questions about the
24   conversation; is that right?
25               **THE COURT:**  No, no.  It's about the conversation.

ROBERT BARRIOS - Redirect

1    The questions are about whether the rank is going to take care

2    of it.  This is a communication between him and a member of the

3    rank, so we're here now.  We're here now.  Gisevius -- you have

4    established that Gisevius was in the rank.  He and Mr. Bowen,

5    among others above them, were the rank who was to take care of

6    this.  This goes to the very heart of the alleged conspiracy.

7              He can ask him specifically on that day whether

8    or not it came up that Mr. Gisevius did or didn't do certain

9    things.  This was covered.

10             **MR. HESSLER:**  Okay.

11             **THE COURT:**  And it's an important point too.  I think

12   it's an important -- it's a critical issue in the case as far

13   as what Gisevius and Bowen did as sergeants insofar as the

14   alleged cover-up.  So let's go ahead and ask him.

15             **MR. CARTER:**  I suppose my concern, Your Honor, is

16   that --

17             **THE COURT:**  Well, first of all, though --

18             **MR. CARTER:**  Shut up Ted.

19             **THE COURT:**  Ted, as much as I appreciate your

20   comments.

21             **MR. CARTER:**  Got it.

22             **THE COURT:**  -- and I always look forward to hearing

23   from you, I need to stick to the rules.  So let's go ahead and

24   do that.

25             (WHEREUPON, the following proceedings were held in

ROBERT BARRIOS - Redirect

1  open court.)

2  **BY MR. HESSLER:**

3  **Q.**   Mr. Barrios, on March 30th of 2010, you wore a wire and

4  went and spoke with Robert Gisevius; correct?

5  **A.**   Yes.

6  **Q.**   You spoke to him for about an hour and a half, didn't you?

7  **A.**   Yes, sir.

8  **Q.**   On that tape, did you talk about his -- the parameters or

9  the levels of his involvement or possible involvement in report

10  writing?

11  **A.**   I don't remember discussing with him report writing.

12  **Q.**   Do you remember him -- do you remember discussing with him

13  any concerns about the way the investigation was handled?

14  **A.**   I don't recall that either.  We might have, but I don't --

15  I can't specifically remember.

16  **Q.**   Well, what in the world did you all talk about?

17  **A.**   We talked about the way the case was going.

18        We talked about certain evidence that did not show

19  up.  I questioned him on it.

20        I questioned the fact that the specific rifle he was

21  using did not show up, specific statements that he said he

22  didn't fire when he did fire.

23        That's what we talked about.

24  **Q.**   Did you ask him about information that you -- that was

25  attributed to you in a report that you didn't give?

ROBERT BARRIOS - Redirect

1  A.   Yes, I did.

2  Q.   Did he express to you the same concerns back, about his

3  alleged involvement?

4        MS. BERNSTEIN:  Your Honor, objection.  I think the

5  questions that we talked about at the bench have been

6  established, and I'm objecting to going into more detail about

7  the conversation that were not covered on the cross, and

8  objection to eliciting the defendant's own statements.

9        MR. HESSLER:  And, Your Honor, just --

10        THE COURT:  I'm going to let him answer this, but I

11  think it's -- we're getting close to that point where that

12  objection's going to be valid.  I'm going to let him answer

13  this one.

14        But...

15        MS. BERNSTEIN:  Thank you, Your Honor.

16  BY MR. HESSLER:

17  Q.   Did he express the exact same concerns that you had

18  about -- regarding his alleged involvement?

19  A.   Yes, he -- yes, he did.

20  Q.   When you -- going back to the scene, approximately how

21  many people did you see at that scene at the end, or after the

22  shooting?  Did you see a lot of people gathered around police

23  officers?

24  A.   Yes.

25  Q.   Did you know them all?

ROBERT BARRIOS - Redirect

1   A.   No, sir.

2   Q.   Isn't it true that a lot of law enforcement officers from

3   numerous places came into town?

4            To help?

5   A.   Oh, yeah.

6   Q.   Some civilians, too, huh?

7   A.   Yes.

8   Q.   It wasn't uncommon to find everybody armed?

9   A.   Yes, sir.

10  Q.   And you're SWAT trained; correct?

11  A.   Yes.

12  Q.   You have some knowledge of weapons?

13  A.   Yes.

14            MR. HESSLER:  Could you put up 300, please, Exhibit

15  300.  300-A?

16            THE COURT:  Which is it, 300-A?  Is that --

17            MS. BERNSTEIN:  Well, it's going to be 300.  It's

18  part of 300, and I think I'm going to have to identify --

19            May I approach Mr. Hessler?

20            THE COURT:  Yes.

21            MR. HESSLER:  One second, Your Honor.

22            Your Honor, I'm going to -- I think --

23            Ms. Pam, I'm going to have to have you just put

24  this only on his screen, if possible.  Can you do that?

25            THE WITNESS:  I've got it.

ROBERT BARRIOS - Redirect

1              THE COURT:  It's 300-B?

2              MR. HESSLER:  This would be 300-B.

3  BY MR. HESSLER:

4  Q.   Do you recall seeing a video of this matter several times

5  during the course of these proceedings?

6  A.   No, I've never seen the video.

7  Q.   Do you recall seeing -- you've never seen this still

8  photograph?

9  A.   No, sir.

10             MR. HESSLER:  You can take it down.

11                  No further questions, Your Honor.

12                  Thank you, sir.

13             THE COURT:  Thank you.  This witness is released, I

14  take it?

15

16             MR. FLEMING:  Yes, Judge, by the defense.

17             THE COURT:  Is that correct?

18             MS. BERNSTEIN:  Yes, Your Honor.

19             THE COURT:  Thank you, sir.  You can step down.

20                  Okay.  Next?

21             MR. FLEMING:  Defense calls Michael Hunter.

22             THE COURT:  Michael Hunter is being recalled?

23             MR. FLEMING:  Yes, he is, Your Honor.

24             THE COURT:  Mr. Hunter, if you would come forward,

25  sir.  You can have a seat up here.

ROBERT BARRIOS - Redirect

1          Mr. Hunter, you appeared earlier in this trial,

2   at which time you were administered the oath to tell the truth,

3   the whole truth, and nothing but the truth.  You're still under

4   oath, sir.

5          Mr. Fleming, if you'd like to begin, you may do

6   so.

7          **MR. FLEMING:**  I will, Your Honor.  And given that

8   Mr. Hunter is identifiable with the prosecution, I would ask

9   that I be allowed to treat him as such.

10          **THE COURT:**  Well, he's already been called by the

11   prosecution; so I will, therefore -- since he's being recalled,

12   I will treat him -- I think you can treat him as a hostile

13   witness and commence what would, in effect, be a

14   cross-examination, i.e., ask leading questions of the witness.

15          **MR. FLEMING:**  Thank you, Your Honor.  I only have a

16   few questions of Mr. Hunter.

17          (WHEREUPON, **MICHAEL HUNTER**, having been previously

18   duly sworn, testified as follows.)

19                    **DIRECT EXAMINATION**

20   BY MR. FLEMING:

21   **Q.**   Good morning, Mr. Hunter.

22   **A.**   Good morning, sir.

23   **Q.**   I have just a few questions for you.

24          I guess to lay the framework, the jury's heard from

25   you about a lot of -- probably more than you cared to before.

MICHAEL HUNTER - Direct

1    There was a lot of discussion regard your conversations with

2    the FBI.

3    A.    Yes, sir.

4    Q.    And you did, in fact, have a lot of conversations with the

5    FBI; right?

6    A.    Yes, sir.

7    Q.    Do you remember at any point -- or at some point you did,

8    in fact, tell Mr. Bezak here about a conversation you overheard

9    Mr. Barrios having after the shooting incident; right?

10   A.    Yes.

11   Q.    And do you remember -- I guess not that you told

12   Mr. Bezak -- do you remember Mr. Barrios sort of bragging about

13   the shooting incident on the bridge?

14   A.    Yes.

15   Q.    Do you remember Mr. Barrios saying he hit somebody and

16   made that bitch spin around, or spin around like a bitch, or

17   something to that effect?

18   A.    Something to that effect, yes.

19   Q.    Hit somebody, hit somebody with the shotgun?

20   A.    Yes, he -- he --

21   Q.    Shot somebody with a shotgun --

22   A.    Yes.

23   Q.    -- just to be clear.

24          Spun that person around?

25   A.    That's what he was saying.

MICHAEL HUNTER - Direct

1  **Q.**  And referred to that person as a bitch?

2  **A.**  Yes.

3  **Q.**  And you took that --

4  **A.**  An expletive.  I'm -- I -- I'm trying to remember the

5  exact expletive.  But it was something to that effect.

6  **Q.**  Okay.  And was it your understanding he was talking about

7  a man or a woman?

8  **A.**  It was my understanding he was talking about a male.

9  **Q.**  Okay.

10          **MR. FLEMING:**  Thank you.  I have no further questions

11  at this time, Judge.

12          **THE COURT:**  Any other counsel?

13          **MR. DESALVO:**  No, Your Honor.

14          **MR. HESSLER:**  No, Your Honor.

15          **MR. LONDON:**  No, Your Honor.

16          **MR. MECHE:**  No, Your Honor.

17          **THE COURT:**  All right.  Any examination on this

18  point?

19          **MS. BERNSTEIN:**  Just one moment, Your Honor.

20              Come on.  Let's ask him something, because they

21  only asked about three or four questions.  So...

22          **MR. CARTER:**  And that's why we were conferring,

23  Your Honor.  We were trying make this as brief as possible.

24          **THE COURT:**  Okay.  All right.

25

MICHAEL HUNTER - Direct

1                         **CROSS-EXAMINATION**

2    **BY MR. CARTER:**

3    **Q.**   Mr. Hunter?

4    **A.**   Yes, sir.

5    **Q.**   You know what a slug is, don't you?

6    **A.**   Yes, sir.

7    **Q.**   It's different from buckshot that's shot from a shotgun,

8    isn't it?

9    **A.**   Correct.

10   **Q.**   It's much more devastating, isn't it?

11            **MR. FLEMING:**  Judge, I'm going to object.  This is

12   their witness.

13            **THE COURT:**  Yeah, this is -- we've covered this.

14   He's testified at length, and he was brought back for a

15   specific purpose.  So let's get to examining him about the

16   very -- I said if someone's recalled to the stand it's going to

17   be for a very limited purpose about something they had not

18   already testified to or was not a part of the scope of the

19   examination prior.

20            So let's get to the point here.  This is very

21   narrow.

22   **BY MR. CARTER:**

23   **Q.**   It is a very narrow point, and the very narrow point is

24   that other people were present when Mr. Barrios said this;

25   isn't that correct?

MICHAEL HUNTER - Cross

1   **A.**   Yes, sir.

2   **Q.**   Who else was present when he said this?

3   **A.**   I recall Officer Faulcon being there and

4   Officer Villavaso.

5   **Q.**   And the worry that the -- the term that Mr. Barrios used

6   was "slug"; isn't that correct?

7   **A.**   Correct.

8   **Q.**   And that's different from buckshot, isn't it?

9   **A.**   Correct.

10          **MR. CARTER:**  Thank you.  I have nothing further.

11          **THE COURT:**  All right.  Mr. Fleming?

12          **MR. CARTER:**  Just one second, Your Honor.

13   BY MR. CARTER:

14   **Q.**   Just to make sure we're clear and there is no confusion.

15   He said he fired a slug; is that correct?

16          **MR. FLEMING:**  Judge, leading.

17          **MR. CARTER:**  I am leading.  It's cross.

18          **MR. FLEMING:**  It's their witness.

19          **THE COURT:**  No, it's -- he's a government witness.

20   He was put on the stand, but we're not going to -- the

21   government can't lead him at this point.  The government

22   offered him as a witness in their case in chief.  He's being

23   called under the rule -- he's a hostile witness.

24   BY MR. CARTER:

25   **Q.**   What did Mr. Barrios say he fired?

MICHAEL HUNTER - Cross

1  **A.**   He said he fired -- he hit him with a slug and made him
2  spin around.
3          **MR. CARTER:**  Nothing further.
4          **MR. FLEMING:**  Some follow-up?
5          **THE COURT:**  Mr. Fleming, sure.
6                          **CROSS-EXAMINATION**
7  BY MR. FLEMING:
8  **Q.**   Do you know for a fact whether Robert Faulcon heard what
9  Mr. Barrios said?
10  **A.**   I'm assuming he did.  He was standing right there.
11  **Q.**   Okay.  So I guess to answer my question, do you know?  Do
12  you know for a fact?
13  **A.**   Oh, no.  I don't know for a fact.
14  **Q.**   Do you know for a fact whether Mr. Villavaso heard what
15  Mr. Barrios said?
16  **A.**   No.  I do not know for a fact.
17  **Q.**   And Mr. Barrios was talking about shooting someone?
18  **A.**   Yes.
19  **Q.**   With a shotgun?
20  **A.**   Yes.
21  **Q.**   Referring to a male?
22  **A.**   Yes.
23  **Q.**   Called him a bitch?
24  **A.**   Yes.
25  **Q.**   Spun him around?

MICHAEL HUNTER - Cross

1   **A.**   Yes.

2         **MR. FLEMING:**  Thank you.  I have no further

3   questions.

4         **THE COURT:**  All right.

5            Mr. Meche?

6         **MR. MECHE:**  Yes.

7         **THE COURT:**  Keep in mind this is very, very narrow.

8         **MR. MECHE:**  Oh, absolutely.  Yes.

9                    **REDIRECT EXAMINATION**

10  BY MR. MECHE:

11  **Q.**   Officer Hunter, I think you said that you thought Barrios

12  was speaking to Faulcon and Villavaso.

13  **A.**   Correct.

14  **Q.**   But didn't you in fact, when you were interviewed by the

15  FBI, say that he was speaking to Faulcon and Ignatius Hills?

16         I can show you this document.  Maybe it will refresh

17  your memory.

18  **A.**   I recall Villavaso being there.  Hills could have possibly

19  been there too.

20         **MR. MECHE:**  Let me see if I can help refresh his

21  memory.

22         **THE COURT:**  Right.  Show it to him.

23  BY MR. MECHE:

24  **Q.**   I think they showed you this document earlier in the case.

25  And they showed you a lot of documents, and I know it's hard to

MICHAEL HUNTER - Redirect

1    remember.
2            But does that help refresh your memory at all?
3    **A.**   I remember the conversation we had.  I don't -- my
4    recollection is Villavaso was there, and I guess Hills could
5    have possibly been there too.
6    **Q.**   Yeah.  Because I guess what you told Agent Bezak was it
7    was -- the three people there who you remembered then was
8    Barrios, Faulcon, and Hills.  But you didn't mention Villavaso
9    when you initially told that to Agent Bezak.
10   **A.**   I thought I did.
11   **Q.**   Okay.
12   **A.**   That was a long time ago we had that conversation.
13   **Q.**   Sure.  But it's not in Agent Bezak's report?
14   **A.**   No, it's not there.
15   **Q.**   Agent Bezak's report says that you told him it was Barrios
16   talking to only Faulcon and Hills.
17   **A.**   That's what it says.
18   **Q.**   And not Villavaso.
19   **A.**   I -- I recall Villavaso being there, but I -- but I don't
20   remember exactly what Agent Bezak and I discussed specifically.
21   **Q.**   Okay.  That's fair.
22           **MR. MECHE:**  Thank you, sir.
23               That's all I have, Your Honor.
24           **THE COURT:**  All right.  Anybody else on this?
25           **MR. MECHE:**  One second, please.

MICHAEL HUNTER - Redirect

1          **MR. FLEMING:**  Not for Mr. Hunter, Judge.

2          **THE COURT:**  Anybody else with regard to this witness?

3          **MR. LONDON:**  No, sir.

4          **THE COURT:**  All right.

5               Thank you, sir.  You can step down.

6          **THE WITNESS:**  Thank you.

7          **THE COURT:**  Is there any reason for this witness to

8    be held over at all at this point?

9          **MR. FLEMING:**  He can be released by the defense,

10   Judge.

11         **THE COURT:**  He's been here twice.

12         **MR. FLEMING:**  I would ask that the Court ask Mr.

13   Hunter not to discuss his testimony with any other potential

14   witnesses during the course of this trial.

15         **THE COURT:**  Yes.  Until the trial is completed,

16   Mr. Hunter, you're not to discuss your testimony or anyone

17   else's, for that matter, with anyone who might be a witness at

18   this trial.

19         **THE WITNESS:**  Yes, sir.

20         **THE COURT:**  Okay.  Do we have a brief witness we can

21   hear from before the break at this point, or at least get a

22   direct examination completed?

23         **MR. FLEMING:**  Not prior to the break, Judge.

24         **THE COURT:**  Why don't we go ahead and take it now,

25   then.  It's a little bit earlier than usual.  But if you-all

MICHAEL HUNTER - Redirect

1  can be ready at 10 minutes after 10:00, which is 15 minutes
2  from now, we'll pick up then with the next witness.
3          **THE DEPUTY CLERK:**  All rise.
4          (WHEREUPON, the jury exited the courtroom.)
5          **THE COURT:**  Counsel, if you could have your next
6  witness up here ready to take the oath at 10:10, we'll start
7  right in.
8          **MR. FLEMING:**  Judge, if I can approach, not on the
9  record, and if we can do it at the side ex parte.
10                         **(OFF THE RECORD)**
11         (WHEREUPON, the Court took a recess.)
12         **THE DEPUTY CLERK:**  All rise.
13         (WHEREUPON, the jury entered the courtroom.)
14         **MR. CARTER:**  Your Honor, permission to approach.
15  Come on up.
16         (WHEREUPON, the following proceedings were held at
17  the bench.)
18         **MR. CARTER:**  During the break I was informed that
19  Mr. Faulcon was taking the stand.  I understand that he was not
20  on the list for today.  And I understand he is a defendant and
21  he may testify at any time.  I understand that --
22         **THE COURT:**  Defendants are always on the list, and
23  we've discussed witnesses.  Defendants are always on the list,
24  and we're in the defendants' case in chief.  I don't know when
25  else they could possibly testify.

MICHAEL HUNTER - Redirect

1          **MR. CARTER:**  I was wondering, are we going to read
2   the transcripts?  Are the transcript transcripts going to be
3   read in?
4          **THE COURT:**  That's defense counsel -- my
5   understanding is --
6          **MR. CARTER:**  He says yes.
7          **MR. FLEMING:**  Well, we still have to get together.
8   You and I -- well, not -- somebody from both sides have to get
9   together and agree to the redactions per the Judge's order.
10         **MS. BERNSTEIN:**  Well, I think we can do that right
11  now.  We believe if those transcripts come in, they need to
12  come in in full.  Some of the --
13         **THE COURT:**  We can discuss transcripts later.  Unless
14  we're discussing this witness, let's go.
15         **MS. BERNSTEIN:**  We're going to get something.
16         **THE COURT:**  Okay.  Let's go.  Faulcon was disclosed
17  on opening statement that he was going to testify and we are on
18  their case in chief.  He's not a witness, he's a party.  He's a
19  party.
20         **MR. CARTER:**  So daily notice doesn't apply to
21  parties.
22         **THE COURT:**  They've been sitting in the courtroom.
23  That has always been the option that they would testify at
24  whatever time defense counsel chose to put them on the stand.
25  We've talked about witnesses.

MICHAEL HUNTER - Redirect

1          MR. CARTER:  My misunderstanding.

2          THE COURT:  In particular, Mr. Faulcon said in

3    opening statement by Mr. Fleming that he would testify.  So

4    we're in defendants' case in chief.

5          MS. BERNSTEIN:  We just thought the daily notice rule

6    applied, not that they had to commit, but put them on the

7    possible witness list.

8          THE COURT:  They make that decision -- I specifically

9    said, on more than one occasion, that's a split-second

10   decision.  That's defense counsel's prerogative, after

11   conferring with his client.  That's a split-second decision.

12   They're parties.  I mean, you should always -- from the day of

13   indictment, you should be aware that they may testify, and be

14   prepared to cross-examine them.

15         MR. CARTER:  We just wanted to have our materials

16   with us if --

17         THE COURT:  You've got more people in here that

18   somebody can be go retrieve that material.  I'm not asking you

19   to cross-examine him right now.  Somebody can go get the

20   material now.  They can be back in five or ten minutes.

21         MR. CARTER:  All right.

22         (WHEREUPON, the following proceedings were held in

23   open court.)

24         THE COURT:  This gentleman, obviously, Mr. Larson,

25   is?

MICHAEL HUNTER - Redirect

1          **MR. LARSON:**  Robert Faulcon.

2          **THE COURT:**  Let's go ahead and administer the oath.

3          (WHEREUPON, **ROBERT FAULCON**, having been duly sworn,

4    testified as follows.)

5          **THE DEPUTY CLERK:**  Please state your full name and

6    correct spelling for the record.

7          **THE WITNESS:**  First name Robert, last name Faulcon.

8          **THE COURT:**  All right.

9               Mr. Larson?

10                        **DIRECT EXAMINATION**

11   BY MR. LARSON:

12   Q.   Mr. Faulcon, let's talk a little bit about yourself, if we

13   can.

14               Where did you grow up?

15   A.   I was born and raised in Brooklyn, New York.

16   Q.   And did you go to --

17          **THE COURT:**  You're going to have to pull that

18   microphone up a little bit.

19          **THE WITNESS:**  I was born and raised in Brooklyn,

20   New York.

21   BY MR. LARSON:

22   Q.   And where did you go to high school?

23   A.   I went to high school in Littleton, North Carolina.

24   That's when I finished my schooling.

25   Q.   Are you presently married?

ROBERT FAULCON - Direct

1  **A.**   Yes, I am.
2  **Q.**   Do you have any children?
3  **A.**   Yes, I do.
4  **Q.**   How many children do you have?
5  **A.**   I have two older girls and I have my son, who was born two
6  days after the hurricane.
7  **Q.**   Okay.  Now, your son is your natural child with your wife?
8  **A.**   Yes, sir.
9  **Q.**   And the two girls, how are they your children?
10 **A.**   Brittany, now, is 22.  And Tiffany is 18.
11 **Q.**   Are they your children, your natural children?
12 **A.**   No.  No, sir.
13 **Q.**   They're your stepchildren?
14 **A.**   Yes, sir.
15 **Q.**   Now, after you graduated from high school, did you go to
16 college?
17 **A.**   No, sir, I didn't.
18 **Q.**   All right.  What did you do?
19 **A.**   I enlisted in the military.
20 **Q.**   And what branch of the military did you enlist in?
21 **A.**   I enlisted in the U.S. Army.
22 **Q.**   Where did you serve in the Army?  What did you do in the
23 Army?
24 **A.**   I served with the 101st Airborne, Fort Campbell, Kentucky,
25 and I was in the infantry.  I was a rifleman.

ROBERT FAULCON - Direct

1   **Q.**   And you said you were with the airborne?

2   **A.**   Yes, sir, the 101st Airborne.

3   **Q.**   You jumped out of perfectly functioning airplanes?

4   **A.**   Yes, sir.

5   **Q.**   You're a better man than I am.

6           How long were you in the Army?

7   **A.**   I was in the Army, for that period, for four years, for

8   that enlistment.

9   **Q.**   And after you left the Army, what did you do?

10  **A.**   After I left the Army, I moved to Detroit.  We had a

11  family business, and I assisted with that for approximately ten

12  months, and then I reenlisted in the United States Navy.

13  **Q.**   What did you do in the Navy?

14  **A.**   In the Navy I enlisted as a yeoman/legalman.  So I had the

15  opportunity to go to legalman school, which is pretty much like

16  a paralegal in the military.  And I graduated from legalman

17  school in Newport, Rhode Island.

18  **Q.**   How long did you stay in the Navy?

19  **A.**   I stayed in the Navy four years.

20  **Q.**   Now, after you left the Navy, did you join any other

21  branch of the service at any other time?

22  **A.**   Yes, sir.  In 2009 I reenlisted in the United States -- in

23  the Army reserve, and I was under a six-year enlistment.

24  **Q.**   Now, after you left the Navy, what did you do for a

25  living?

ROBERT FAULCON - Direct

1   **A.**   After I left the Navy?

2   **Q.**   Yes, sir.

3   **A.**   Oh, that's when I -- I relocated to New Orleans, and I was

4   employed by the Orleans Parish Sheriff's Department.

5   **Q.**   How long were you employed by the sheriff's department?

6   **A.**   I was there approximately five years.

7   **Q.**   What did you do for the sheriff?

8   **A.**   Well, actually, I was a correctional officer at that time.

9   **Q.**   And how long were you a correctional officer?

10  **A.**   For those five years.

11  **Q.**   Did you ever leave the sheriff's office?

12  **A.**   Yes, I did.

13  **Q.**   What did you do when you left the sheriff's office?

14  **A.**   When I left of the sheriff's office, I was offered a job

15  with Brink's Security as an ATM tech.

16  **Q.**   How long did you hold that job?

17  **A.**   I stayed there -- I was employed there for approximately

18  two years.

19  **Q.**   When you left Brink's Security, where did you go next?

20  **A.**   I went back to the sheriff's department, and I worked for

21  the courts as a bailiff.  And also, I worked with the subpoena

22  and capias division.

23  **Q.**   How long did you do that job?

24  **A.**   Until I was hired by the New Orleans Police Department.

25  **Q.**   When did you enter the New Orleans Police Department

ROBERT FAULCON - Direct

1   academy?

2   **A.**   When I entered the academy?

3   **Q.**   Yes, sir.

4   **A.**   2000- -- well, actually, my hiring date was December 2000.

5   And I entered the academy in 2001.  And I graduated in

6   May 2001.

7   **Q.**   In May of 2001?

8   **A.**   That's when I graduated; correct.

9   **Q.**   Now, where were you assigned when you graduated from the

10  academy?

11  **A.**   I was assigned to the 7th District.

12  **Q.**   And what job did you do in the 7th District?  Were you --

13  **A.**   Well --

14  **Q.**   I know there's patrol personnel --

15  **A.**   Correct.

16  **Q.**   -- and there's task force personnel.  Where were you

17  assigned initially?

18  **A.**   Well, initially, grad- -- completing the FTO program, I

19  want to basic patrolman.  And then from that point I went to

20  the task force.

21  **Q.**   And what year was that?

22  **A.**   I believe I was a patrolman maybe -- just about -- just a

23  year, a year and a half somewhere.

24  **Q.**   And then you went to the task force.

25  **A.**   And then I went to the task force.

ROBERT FAULCON - Direct

1   Q.   Did you ever wind up on any other type of NOPD operation?
2   A.   Yes, sir.  From the task force, I served with the special
3   operations division, which is SOD, commonly known as SWAT.  So
4   I had the opportunity to go to SWAT school as well.
5   Q.   When you went to SWAT school, where did you go to SWAT
6   school?
7   A.   SWAT school was actually held in New Orleans.
8   Q.   Were you trained on any -- well, when you became a police
9   officer --
10  A.   Yes.
11  Q.   -- first, at the academy, were you trained on any weapons?
12  A.   At the academy, we were just trained on our .40-caliber,
13  which is our service weapon.
14  Q.   Were you trained on any other weapons when you went to
15  SWAT?
16  A.   Yes.
17  Q.   What weapon were you trained on, or weapons, were you
18  trained on?
19  A.   Well, shotguns, M-4s.
20  Q.   What type of shotgun?
21  A.   I believe it's 12-gauge.
22  Q.   What kind of action?
23  A.   Pump action.
24  Q.   And then how long were you with SWAT?
25  A.   I believe I was with SWAT for maybe a year.

ROBERT FAULCON - Direct

1   **Q.**   And then what did you do after that?

2   **A.**   And then after I left SWAT I went back to the task force

3   in the 7th District.

4   **Q.**   Okay.  And the night before Hurricane Katrina, where were

5   you stationed?

6   **A.**   7th District.

7   **Q.**   You were on the task force then?

8   **A.**   Yes.  I was still assigned to the task force.

9   **Q.**   Who was on the task force with you, if you can recall?

10  **A.**   It was myself, my partner --

11  **Q.**   Who was your partner?

12  **A.**   Officer Paxton -- Officer Barre, Officer Hills,

13  Officer Hunter, Officer Murret.  There was a lot -- I can't

14  remember everybody.

15  **Q.**   Okay.  Who were your commanding officers?

16  **A.**   My commanding officer at that time was Captain Barty.

17  **Q.**   And --

18  **A.**   And Lieutenant Lohman --

19  **Q.**   And --

20  **A.**   -- second in command.

21  **Q.**   -- who was the sergeant level?  Do you remember who your

22  sergeant was?

23  **A.**   I had Sergeant Bowen.  I also had Sergeant Keller at one

24  point, and Sergeant Santos.

25  **Q.**   Who was your sergeant at the time of Hurricane Katrina, if

ROBERT FAULCON - Direct

1   you can recall?

2   **A.**   I believe it was Sergeant Keller, if I can recall.

3   **Q.**   Were you on duty the night before Hurricane Katrina?

4   **A.**   Yes.

5   **Q.**   And before you went on duty, can you explain to the jury

6   what you did?

7   **A.**   The night before we went on duty?

8   **Q.**   Yes.

9   **A.**   Basically, we just showed up at the 7th District station.

10  **Q.**   Well, before you showed up at the 7th District station,

11  did you have any conversations with your wife?

12  **A.**   Oh, yes.  Okay.  Yes.  What happened, on Sunday, the night

13  before the hurricane where we had to report to duty, we got a

14  call from the hospital.  Because my wife was nine months'

15  pregnant, and they informed us that she had to evacuate, and

16  that she couldn't -- they wouldn't be able to induce the labor.

17          So I had to meet her at NOPD headquarters, and we had

18  to switch out cars, because my vehicle was larger for she and

19  the girls.  And so we met at NOPD headquarters, and I pretty

20  much kissed her good-bye and told her that I would see her

21  after the storm, not thinking that I wouldn't see her for three

22  and a half weeks later.

23  **Q.**   Okay.  Now, you said that she was nine months' pregnant?

24  **A.**   She was nine months' pregnant, and they were going to

25  induce labor, I believe that Tuesday or that Monday.

ROBERT FAULCON - Direct

1   Q.   Do you know where she was going?

2   A.   To the nearest hospital.  And I believe that would have

3   been Baton Rouge at the time.

4   Q.   Well, why didn't you go to Captain Barty and say,

5   "Captain, I've got a nine-month pregnant wife.  They want to

6   induce labor.  They just told her to evacuate.  May I be

7   excused to go with my wife, who needs me?"

8   A.   Well, it was my duty to report.  And not thinking that the

9   storm was going to be as severe as it was, so my assumption was

10  that I would report for duty, and then once the storm passed, I

11  assumed that we were just going to have a little flooding, and

12  then I was going it meet her the next day at the hospital so I

13  could be there for the birth of my son.

14  Q.   And that didn't happen?

15  A.   No.  That didn't happen at all.

16  Q.   How long was it before you saw your wife?

17  A.   It was maybe about three and a half weeks later.

18  Q.   How long was it before you knew what had happened to her,

19  she had given birth or not?

20  A.   About three and a half weeks later.

21  Q.   So you relocated from the police headquarters to the

22  7th District?

23  A.   Yes.

24  Q.   All right.  What time did you get to the 7th District that

25  Sunday night?

ROBERT FAULCON - Direct

1   A.   It was still daybreak.  It was, I believe, later on in the

2   day, in the evening, I believe.  Because it was actually our

3   regular shift, and we worked that night.  The task force worked

4   at night.  So I believe it was that evening when I reported.

5   Q.   What do you all do on the task force?  Explain to the jury

6   what the task force does.

7   A.   Basically what the task force does -- they have a task

8   force in each district throughout the city, and we go -- we go

9   to different areas, which we call trouble spots, that the

10  average patrol officers don't go to.  And we address issues

11  like criminal activity as drug dealing, narcotics activity, a

12  lot of areas where you have gun crimes.  We address those

13  issues.

14        So we don't, per se, answer calls for service

15  from dispatch.  Everything we do is self-initiated.  So what we

16  try and do -- we try to deter -- we try and prevent the crime

17  from happening instead of coming after the fact.

18  Q.   Now, prior to September 4, 2005, had you ever fired a

19  weapon while you were in the line of duty for NOPD?

20  A.   No, sir, other than just at the academy.

21  Q.   At the academy, you mean practice --

22  A.   Doing -- during --

23  Q.   -- qualifying and such?

24  A.   Right.  Correct.

25  Q.   So you were on this proactive patrol the night before

ROBERT FAULCON - Direct

1    Hurricane Katrina?

2    **A.**    Correct.  Everything was normal, just our normal duties.

3    **Q.**    Okay.  And explain to the jury what happened that night.

4    **A.**    That night, actually as it got later, we got a call on the

5    radio, on the police radio, and they told us to seek higher

6    ground.

7              And at that point, my partner and I were at Bullard

8    and the I-10 service road.  And we saw the hotel, the Comfort

9    Suites.  So when they said -- when they -- when we were

10   instructed to seek higher ground, we went to the hotel and we

11   inquired about a room.

12             So they had one room left.  And at that time, we

13   actually had to pay for the room, and we got the last room just

14   before --

15   **Q.**    Where was the room?

16   **A.**    It was at the Comfort Suites at Bullard and I-10 service

17   road.

18   **Q.**    Where was it located in the hotel?

19   **A.**    I believe we were on the third floor, if I can recall.

20   **Q.**    Who was your partner that night?

21   **A.**    Marchant Paxton.

22   **Q.**    Do you know why you were told to seek higher ground?

23   **A.**    It had gotten bad in the flooding.  We had -- the water

24   started coming in the city, and the east had started flooding.

25   **Q.**    Now, when you got to the hotel, what did you have with you

ROBERT FAULCON - Direct

1   physically?

2   A.   Nothing but what we -- what I came to work with, which was

3   basically my uniform and maybe a little snack.

4   Q.   You had your gun with you?

5   A.   Yes, sir.

6   Q.   Okay.  All right.

7        Now, did you notice when the water started coming up?

8   A.   Yes, sir.  Actually --

9   Q.   What did you notice?

10  A.   Actually, I was looking out the window, you know, just

11  seeing how the storm was progressing.  And once I saw the water

12  get up to the -- halfway up the wheel of the car, our police

13  car, and then after I saw the police car being submerged in

14  water, at that point, I knew we were in trouble.

15  Q.   Did you continue to watch the water go up?

16  A.   I sure did.

17  Q.   Were you able to notify anybody on the radio of your

18  whereabouts?

19  A.   No, because we wanted to kind of conserve our batteries to

20  the radio.  But it got to the point where we didn't have any

21  radio communication.  And I believe, before we lost radio

22  communications, we were able to make contact -- well, my

23  partner was able to make contact with someone to give our

24  location to where we were.

25  Q.   Okay.  All right.  So you watched the water go above the

ROBERT FAULCON - Direct

1  roof of your vehicle?

2  A.   I watched the water -- I actually watched the police car

3  go underwater, and then the water continued to rise until it

4  got to the roof of the houses.

5  Q.   Okay.  And you all were stuck in the hotel at that point

6  in time?

7  A.   At that point we were -- we were stuck.

8  Q.   Did you have any power?

9  A.   No, sir.  The power went out in the hotel.  We didn't have

10  any ventilation.  We didn't have any food.  We didn't have any

11  plumbing.  And basically at nighttime it was just hot,

12  stifling, and just dark, black, pitch-black dark.

13  Q.   Were you able to open any windows or anything to get some

14  air?

15  A.   No.  The Comfort Suites is designed where they just had

16  one big window.  They don't have windows where you can actually

17  open them.  So what we had -- my partner and I, what we had to

18  do, we had to take the air conditioner from out of the wall so

19  we could have some ventilation to come in the room.

20  Q.   How long were you stuck at that hotel?

21  A.   We were there for two days.

22  Q.   How did you manage to escape from the hotel?

23  A.   Somehow they found us.  I don't know how they found us,

24  but the officers appeared on the boat.  And we had to get in

25  the water, because the water had come up to the second floor.

ROBERT FAULCON - Direct

1    So we actually had to get in the water to get to the boat.

2    **Q.**    Okay.  And then where did the boat take you?

3    **A.**    From that point the boat took a beeline straight to Chef

4    and Read.  That's where they were letting us off at.

5    **Q.**    What did you have with you when you got to Chef and Read?

6    **A.**    Nothing.  Just the clothes on my back.

7    **Q.**    Were you wet?

8    **A.**    I was soaking wet.  Yes, sir.

9    **Q.**    Were you able it get new clothes?

10   **A.**    Not until later on, when we were afford the opportunity to

11   actually go to Walmart, where we could get a change of clothes,

12   which consisted of maybe underclothes, like undershirts or

13   socks or whatever.

14   **Q.**    When was that?

15   **A.**    That was much later, maybe a week or so later.

16   **Q.**    And then during that week you wore the same clothes?

17   **A.**    I kept the same clothes on; correct.

18   **Q.**    Now, what were your duties after you got rescued from the

19   hotel?  What did you do in the days up to that Sunday,

20   September 4th?

21   **A.**    We immediately went into rescue mode.

22   **Q.**    And when you say "rescue mode," specifically, what did you

23   do?

24   **A.**    We actually -- they had people that were actually on Chef

25   Highway, I mean old women, families, children.  They had

1    families on the I-10 service road.  I mean, they were just
2    there.  They had nowhere to go.
3          So what we did at that time, we utilized the Budget
4    truck.  And what we were doing, we were transporting them from
5    that point trying to go get them to shelter, which was at the
6    Superdome Convention Center area.  So we did that around the
7    clock.
8    Q.    When you say "around the clock," what do you mean?
9    A.    Around the clock, 24 hours.
10   Q.    Now, did you -- during this period of time, did you
11   actually go in a boat to rescue people or were you just driving
12   people back and forth from New Orleans East to the Convention
13   Center.
14   A.    At that point in time -- we were just utilizing the Budget
15   truck at that time.  But later on we utilized the boats, where
16   they had boat crews come in the city, and we had to assist them
17   on the boats.  But that was -- that was much later.
18   Q.    Well, let's talk about that.  When you assisted the people
19   on the boat, what were you doing at that point in time?
20   A.    Rescuing people.  We were going throughout the district
21   and just had certain zones and just trying to find whoever we
22   could find and -- you know, whoever was still trapped or needed
23   to be rescued that were on roofs and trying to get to a safe
24   haven.
25   Q.    Was the water still high at that point in time?

ROBERT FAULCON - Direct

1   A.   Exactly.  The water was very high.

2   Q.   Did you ever do any body retrieval?

3   A.   I didn't, per se.  But I did see -- I did happen to have

4   the occasion to come across bodies where we had to just stand

5   there until they were recovered, basically.

6   Q.   Now, during the time between when you were rescued and

7   September 4, 2005, what was your experience in terms of the

8   atmosphere in the city, your personal experience?

9   A.   It was -- it was chaotic.  And to give you an idea, it

10  was -- it was just like a third-world country.  It was just --

11  just like Iraq.  It was just a third-world country.  It was

12  pretty much like nothing existed.  There was no life, I mean

13  just -- it was just nothing.  It was just devastation.

14  Q.   Was there any electricity on at that point?

15  A.   There was nothing.

16  Q.   What was it like at night?

17  A.   Dark.  Pitch-black dark.

18  Q.   Where did you sleep?

19  A.   I slept on the ground.

20  Q.   What about any criminal element?  Did you come in contact

21  with or were you aware of any criminal element during that

22  particular time?

23  A.   Definitely.  That was throughout the city.

24  Q.   And what are you talking about specifically?

25  A.   Gunshots at nighttime.  Looting.  What -- I mean just --

1   it was just chaotic.
2   **Q.**   Did there ever come a time when you were made aware that a
3   police officer had been shot?
4   **A.**   Yes, sir.
5   **Q.**   Tell me about that.  Tell the jury about that.
6   **A.**   I was aware of -- actually, he was a friend of mine.  I
7   was aware, when it came over the radio, that a police officer
8   had been shot across the river.  And he was actually shot in
9   the head by looters.
10  **Q.**   And when was this, if you can recall?
11  **A.**   It was a -- maybe a couple of days after -- after the
12  hurricane.
13  **Q.**   Before September 4th?
14  **A.**   I believe it was -- I can't recall now whether it was
15  before -- it might have been before.  It might have been before
16  or after.  I can't recall.  I believe it was before.
17  **Q.**   Now, who was at the Crystal Palace at Chef and Read during
18  the time between when you were rescued and the morning of
19  September 4th?
20  **A.**   They had -- they had numerous officers, and we also had
21  officers that were from other districts.
22  **Q.**   Were they all NOPD?
23  **A.**   Yes.
24  **Q.**   Did you have any help from the federal government?
25  **A.**   None whatsoever.

ROBERT FAULCON - Direct

1  **Q.**   Any help from the state government at that point in time?
2  **A.**   None whatsoever.  We actually didn't get any help until --
3  actually, we didn't get any help, period, the first week.  We
4  were basically on our own.
5  **Q.**   How did you feel about that?
6  **A.**   With the resources that the government has, I felt as
7  though they could have sent troops in earlier than what they
8  did.  So I pretty much felt abandoned or betrayed, so to speak.
9  **Q.**   How did you get food and water during that period of time?
10 **A.**   At some point -- at some point -- they had a Winn-Dixie
11 which is further down Chef Highway, and I guess some officers
12 went there and they were able to ascertain canned goods or
13 something for us to drink and basically pretty much like Vienna
14 sausages so we could have something to eat.
15 **Q.**   That's what you were eating before you finally got some
16 help from the outside?
17 **A.**   That's all we had.
18 **Q.**   All right.  I want to take you back now to the morning of
19 September the 4th.  What were you doing that morning?
20 **A.**   That morning we had -- we were standing at the Crystal
21 Palace waiting to start the day.
22 **Q.**   And did anything unusual happen that day that didn't
23 happen the days preceding?
24 **A.**   At that point, that's when we received a 108.  I heard it
25 on the radio and also I was informed, I want to say by Sergeant

1  Bowen, that a 108 had occurred.

2  **Q.**   All right.  Now, explain to the jury.  We've heard about a

3  108.  Explain to the jury what a 108 is, what it means to you.

4  **A.**   A 108 means something really -- something bad has

5  happened.  And during normal conditions on a 108, every

6  available officer in the surrounding districts and throughout

7  the city would respond to that call.

8  **Q.**   Why would every officer within earshot respond to a 108?

9  **A.**   Because of the fact that that means that that officer's

10  life is in danger -- he or she is fighting for their life.

11  Either they have been shot or they have been shot at.

12  Basically, that's what it boils down to.

13  **Q.**   It wouldn't be unusual, then, for every officer who heard

14  that 108 call to go to that particular scene?

15  **A.**   That's what you're supposed to do.  And it's a call that

16  you never want to hear.

17  **Q.**   What happened after you heard the 108 signal?

18  **A.**   After the 108, that's when we -- the task force, that's

19  when we went to the back of the truck and everybody jumped on

20  the back of the truck.

21  **Q.**   Okay.  Now, what kind of a weapon did you have -- or

22  weapons did you have that particular day?

23  **A.**   At that time I had a shotgun.

24  **Q.**   What kind of shotgun?

25  **A.**   Actually, I didn't know at the time because it wasn't

ROBERT FAULCON - Direct

1   mine, but I later learned it to be a 12-gauge.
2   **Q.**   How did you -- how did you come to get that shotgun?
3   **A.**   I borrowed it from Officer Villavaso.
4   **Q.**   Okay.  Why did you borrow the shotgun?
5   **A.**   Because at the time there were reports of looters.  We
6   knew that all the gun shops in the district, all the pawn shops
7   that held all the weapons that you would go and purchase a
8   weapon from those places had been looted.  So we knew that all
9   those weapons were on the streets, besides the fact that AK-47
10  is the norm for New Orleans, actually, for criminals to carry.
11  **Q.**   When you left the hotel, you had to wade out, you said,
12  through the water, did your service revolver get wet?
13  **A.**   Yes, it did.
14  **Q.**   Were you able to clean it or anything or do anything with
15  it?
16  **A.**   I couldn't do anything with it.
17  **Q.**   Do you know if it was working or not?
18  **A.**   I didn't have any idea.  Once it was submerged, I didn't
19  know.
20  **Q.**   You still carried it with you, though?
21  **A.**   Yes, sir.
22  **Q.**   Do you recall who jumped in the back of the Budget truck
23  with you?
24  **A.**   It was the task force -- do you want me to go name
25  everyone?

ROBERT FAULCON - Direct

1  **Q.**   Whoever you can remember, yes.  When I say the "Budget

2  truck," that's the truck we've been seeing on the video that

3  we've been watching?

4  **A.**   Right.  It was myself, it was Officer Villavaso, it was

5  Sergeant Gisevius, it was Ignatius Hills.  It was Marchant

6  Paxton.  And at the time I didn't know -- I didn't know it was

7  Officer Brian or -- I believe there was a female.  I later

8  learned that, but I didn't know -- I couldn't remember at the

9  time.

10 **Q.**   Okay.  Now, on the ride from the Crystal Palace -- I'll

11 direct your attention to the ride from the Crystal Palace --

12 where were you going?  Did you know where you were going?

13 **A.**   We were going to the location that was given by the

14 officer who initiated the 108, which was the Danziger Bridge.

15 **Q.**   And besides hearing the term 108, did you hear anything

16 else over the radio or did anybody tell you anything else about

17 why you were going to the Danziger Bridge?

18 **A.**   Actually, it came out as an officer down, shots fired,

19 108, officer needs assistance, multiple armed subjects.

20 **Q.**   All right.  So on that ride from the Crystal Palace to the

21 Danziger Bridge, what was going on in your mind as to what you

22 were going to encounter when you finally got to the bridge?

23 **A.**   What was going through my mind at that time, I knew we

24 were going into a bad situation because of the fact that it was

25 a 108.  And once we arrived, I just expected to be shot at

ROBERT FAULCON - Direct

1   because of the fact that the description that the officer gave
2   when she said multiple armed subjects.  So at that time I
3   expected the worst.
4   **Q.**   Were you scared?
5   **A.**   That's an understatement.
6   **Q.**   Now, I want you to take the jury through, if you would,
7   step by step of what happened beginning with your approach to
8   the Danziger Bridge.
9   **A.**   Okay.  As we approached the Danziger Bridge, before the
10  truck came to a complete stop, there was gunfire.  At that
11  point, the truck came to an abrupt stop, which kind of threw us
12  in the truck.
13  **Q.**   Let me stop you for a second.  Where did you hear the
14  gunfire?  Did you hear a direction or could you tell where it
15  was coming from?
16  **A.**   I couldn't tell where it was coming from because I was
17  located at the end of the truck.
18  **Q.**   How many shots did you hear?
19  **A.**   It was multiple.
20  **Q.**   What were you thinking at that point in time?
21  **A.**   We're getting shot at, it's bad.
22  **Q.**   Go ahead and continue.  You said you all had tumbled down
23  because the truck stopped abruptly?
24  **A.**   Exactly.
25  **Q.**   And who was the first person out?

ROBERT FAULCON - Direct

1   A.   I can't recall, but as I exited the truck, the gunfire

2   continued.  It was continuous.  And then at that point, that's

3   when I announced my presence, and I observed -- the subjects

4   that were reported to be armed, I observed them in the walkway.

5   Q.   You said you announced your presence.  What do you mean?

6   A.   Yes, sir.

7   Q.   What did you say?

8   A.   I yelled, "Police."  As I exited the rear of the truck, I

9   yelled, "Police."

10  Q.   What did you observe as you exited the rear of the truck?

11  A.   I observed the subjects that were in the walkway that were

12  reported to be armed.  At that point I noticed two other

13  individuals, and that's when I saw guns, in that split second.

14          So after I saw the guns in that split second out my

15  peripheral vision, I could see an officer in the front of the

16  truck.  He was in defensive posture, and he was discharging his

17  firearm as if he was under duress.

18          So after I observed that, that's when I feared for my

19  life and his life.  At that point, that's when I discharged my

20  firearm.

21  Q.   What were you thinking when you saw the police officer

22  shooting in the direction of those individuals that you saw?

23  A.   That they were getting shot at prior to us getting out of

24  the truck.

25  Q.   That who was getting shot at?

ROBERT FAULCON - Direct

1   A.   The officers that were located in the front of the truck.
2   Q.   And how many guns do you recall seeing at that point in
3   time?
4   A.   At that split second, I saw two.  I was concentrating on
5   the other individuals that were up further in the walkway.
6   Q.   Now, you said "in that split second."  What do you mean by
7   "split second"?
8   A.   It was a split second, just a split second.
9   Q.   When you say "a split second," what did you have to do in
10  that split second, if anything?
11  A.   In that split second I had to ascertain where the threat
12  was, who was the threat, and at that time I had to concentrate
13  on protecting the officers who were in the front.  I had to
14  assist them.
15          So all of this was going on at the same time, and my
16  mind was trying to, you know, take all of that into
17  consideration.
18  Q.   Did you fire your weapon?
19  A.   At that time when I perceived a threat, when I saw the
20  handguns, yes, I did.
21  Q.   Now, if you had seen that these people were totally
22  unarmed, would you have fired your weapon?
23  A.   If they were what?
24  Q.   Totally unarmed.
25  A.   No, sir, because they wouldn't be a threat to me.  So if I

ROBERT FAULCON - Direct

1   had known that they were unarmed, I would have never fired my

2   weapon at unarmed civilians.

3   **Q.**   Why did you fire your weapon?

4   **A.**   Because I saw handguns and that was a threat, and the

5   officers in the front of the truck had been fired upon.  So at

6   that point, that's when I discharged my firearm.

7   **Q.**   And you thought you were shooting at people who were

8   shooting at police?

9   **A.**   Yes, sir, I did.

10  **Q.**   How many times did you fire your weapon, if you can

11  recall?

12  **A.**   At that time?

13  **Q.**   Yes, sir.

14  **A.**   I can't remember.  I had no idea.

15  **Q.**   You said you heard gunfire that continued as you got out

16  of the truck.

17  **A.**   Yes, sir.

18  **Q.**   Could you tell where the gunfire was coming from?

19  **A.**   When I got out the rear of that truck, gunfire, it was --

20  it was everywhere.  I mean, gunfire was everywhere, and it was

21  continuous.  So I couldn't tell where the gunfire was coming

22  from other than it had to have been coming from the walkway.

23  That's why the officers were returning fire that was in front

24  of the truck?

25  **Q.**   That's what you thought.

ROBERT FAULCON - Direct

1  A.   Yes, sir.

2  Q.   Now, after you discharged your weapon, what did you do at

3  that point in time?

4  A.   At that point I relocated on the other side of the Budget

5  truck, which would have been the passenger -- I'm sorry, the

6  driver's side.

7  Q.   All right.

8        MR. LARSON:  May I approach, Your Honor?

9        THE COURT:  Yes.

10  BY MR. LARSON:

11  Q.   If we look at this particular exhibit here -- if it's up

12  here.  This is the Budget truck.  This is exhibit 377.

13        THE COURT:  You can step down, if you have to, sir.

14        Why don't you give him -- if you're going to ask

15  him anything, Mr. Larson, give him a microphone so we can hear.

16        MR. LARSON:  Sure.

17  BY MR. LARSON:

18  Q.   If you could, would you show the jury where you were --

19  don't mark on it; just point, if you would.  I don't want to

20  ruin the exhibit.  But show the jury where you were when you

21  perceived the threat and you started to fire your weapon

22  initially.

23  A.   Right here.

24  Q.   And then after you fired your weapon, where did you go?

25  A.   Back around the truck because -- I went back around the

1   truck on the driver's side because I didn't want to approach
2   the barrier because that's where the threat was.
3   **Q.**   Okay.  Have a seat.
4          The shotgun that you had, do you know how many shells
5   it held, its capacity?
6   **A.**   I didn't know because, again, it wasn't my shotgun.  So I
7   wasn't that familiar with it.
8   **Q.**   Did you manage to reload it?
9   **A.**   Yes.  When I was going up the bridge, out of instinct, I
10  tried to manage and reload it.
11  **Q.**   Did you have to shoot all of your shells to reload it?
12  **A.**   No, no.  You don't have to discharge all your shells to
13  reload it.  You can shoot one time and add another shell.
14  **Q.**   Now, when you went around the truck -- you said you
15  started going up the bridge?
16  **A.**   Yes, sir.
17  **Q.**   What was the purpose of you going up the bridge?
18  **A.**   Well, at that time, that's when the radio transmission was
19  coming across radio again from another officer, probably from
20  the same officers, that two individuals that I presumed -- or
21  they presumed to be part of the -- the individuals that were
22  shooting at them, they were fleeing to the west side of the
23  bridge.  So at that point they gave a description, and that's
24  what directed my attention to them going up the bridge.
25  **Q.**   Did they give you any instructions as to what to do?

ROBERT FAULCON - Direct

1   A.   No.  Basically, they were just saying, "There's two more,
2   they're getting away.  They're running on the west side of the
3   bridge," and they gave a description.  I believe it was -- the
4   first male had on all black, and the second male -- I think
5   they just said light clothing.
6   Q.   And what did you think when you heard this next
7   transmittal?
8   A.   What I thought at that time, these were the same
9   individuals that had fired upon them on the I-10 service -- I'm
10  sorry, on the I-10 overpass.
11  Q.   So you head on up the bridge after those guys.
12  A.   Yes, sir.
13  Q.   All right.  Now, why don't you explain to the jury, then,
14  your trip up the bridge and what happened.
15  A.   As I got up to the top of the bridge, I could see the two
16  individuals, but they were at such a distance that I wasn't
17  going to be able to catch them on foot.  So about that time a
18  state trooper arrived when I got to the top of the bridge.  And
19  when the state trooper arrived, I heard more gunshots in that
20  area.  And as I heard the gunshots, that's when I got into the
21  state trooper's car.
22  Q.   Before we talk about that, as you were going up the
23  bridge, did you see the two subjects turn and fire at you?
24  A.   No, I never saw that.
25  Q.   Did you shoot your weapon at the two subjects?

ROBERT FAULCON - Direct

1   **A.**   No, sir, I didn't.

2   **Q.**   When the trooper got there and you heard shots ring out,

3   what did the trooper do?

4   **A.**   At that time the trooper ducked down in his unit.

5   **Q.**   And then you got in the vehicle?

6   **A.**   And then I got in the vehicle on the passenger side.

7   **Q.**   Did anybody else get in the vehicle with you?

8   **A.**   At that time I didn't remember.

9   **Q.**   All right.  Now, you heard the trooper testify, didn't

10  you?

11  **A.**   Yes, sir.

12  **Q.**   And you heard the trooper testify that two other people

13  got in the vehicle?

14  **A.**   Yes, sir.

15  **Q.**   All right.  And you were unaware of that?  You just

16  didn't --

17  **A.**   I was unaware of that.  I later learned that later on, but

18  at that time when I heard the gunshots, I was -- I was just

19  trying to get in the unit with the state trooper.

20  **Q.**   And once you got in the unit with the state trooper, what

21  happened at that point in time?

22  **A.**   At that time, once I got in the unit with the state

23  trooper, I could see the two individuals that were running on

24  the west side of the bridge.  At the same time I'm listening to

25  the radio transmission from the officers on the I-10 high rise,

ROBERT FAULCON - Direct

 1  and they were saying, "That's them.  They're getting away,
 2  they're getting away.  Hurry, hurry."
 3  **Q.**   The two individuals that you're talking about, that you
 4  were looking at, how were they dressed?
 5  **A.**   The first subject had all black and the second subject had
 6  light clothing on.
 7  **Q.**   Did that match the description you heard when you were
 8  going up the bridge?
 9  **A.**   Yes, sir.
10  **Q.**   What happened?  Did you ever catch up to those subjects?
11  **A.**   At one point -- we didn't catch up to them until we
12  actually got to the hotel.  But by that time the first
13  individual, that had all black on, had disappeared around the
14  corner of the hotel.
15  **Q.**   Did you believe him to be armed?
16  **A.**   Yes, sir.
17  **Q.**   Did you know where he was around the corner?
18  **A.**   I had no idea.
19  **Q.**   Now, the individual who was wearing, you said, a T-shirt?
20  **A.**   Um.
21  **Q.**   Were you focused on him?
22  **A.**   I didn't say -- well, he had light-colored clothing,
23  correct.
24  **Q.**   I'm sorry.
25  **A.**   After the first individual disappeared around the corner,

ROBERT FAULCON - Direct

1  that's when I focused my attention on the second subject.

2  Q.   All right.  Now, describe for me, if you will, what the

3  second subject was doing.

4  A.   Well, the second subject, when I observed him, on two

5  previous occasions he actually slowed down and he sort of

6  turned and he looked over his left shoulder at me and the state

7  trooper, trying to see where we were.

8  Q.   Could you see his hands?

9  A.   No, sir.  His hands were in front of his body, tucked in

10  front of his body.

11  Q.   Did you believe him to be armed?

12  A.   Yes, sir, I did.  With the information that I was getting

13  from the officers off the I-10 high rise, yes, I did.

14  Q.   You indicated that he kept on running?

15  A.   Yes, sir.

16  Q.   What happened at that point in time?

17  A.   At that point he got to the corner of the hotel with the

18  other individual who disappeared and he turned again, looking

19  over his left shoulder, and he was sort of bent at the waist.

20  At that time, that's when I thought that me and the state

21  trooper were going to be shot at, perhaps ambushed from around

22  the corner along with the other individual.

23       So then that's when I became paralyzed with fear,

24  really, that we were going to be shot at.  And at that point,

25  that's when I discharged my firearm for the safety of myself

ROBERT FAULCON - Direct

1   and the state trooper.

2   **Q.**   What were you thinking at the time that you fired your

3   shotgun this time?

4   **A.**   That actually I was going to be dead or we were going to

5   be ambushed.

6   **Q.**   We know that individual now to be Ronald Madison; correct?

7   **A.**   Yes, sir.

8   **Q.**   You didn't know him at the time?

9   **A.**   No, sir, I didn't.

10   **Q.**   Did you have any idea that he was mentally challenged?

11   **A.**   I had no idea.

12   **Q.**   Did you believe him to be an armed subject who put your

13   life in danger?

14   **A.**   Yes, sir.

15   **Q.**   Now, after you fired your weapon, did you go over to where

16   Mr. Madison was to see if you could check for handguns or

17   weapons or anything?

18   **A.**   No, sir, I didn't.  I never approached because I knew that

19   the other individual was still around the corner, and I wasn't

20   going to approach that corner by no means at all.

21   **Q.**   And what happened immediately after that?

22   **A.**   About that time what diverted my attention was the state

23   police SWAT team arrived, and they were on a water amphibious

24   vehicle.

25   **Q.**   What did they do?

ROBERT FAULCON - Direct

1   **A.**   After they arrived, they immediately went into the
2   driveway of the hotel; and immediately after that, the
3   New Orleans police SWAT team arrived as well.
4   **Q.**   Okay.  Now, during this time did you see anybody go over
5   to Ronald Madison and kick him and stomp him?
6   **A.**   No, sir, I didn't see that because I never approached.  My
7   attention was on the SWAT teams responding.
8   **Q.**   What did you do after that?
9   **A.**   At that point I was instructed to take a position on the
10  perimeter.
11  **Q.**   When you say "take a position on the perimeter," what do
12  you mean?
13  **A.**   I was instructed -- I don't know by who, but assume a
14  position on the perimeter.  Because we had to set up a
15  perimeter when they were searching for the second subject.
16  **Q.**   And that was the reason for the perimeter?
17  **A.**   Yes, sir.
18  **Q.**   Do you know if they ever apprehended the second subject?
19  **A.**   Later on, yes, sir.
20  **Q.**   Now, once the other subject was apprehended, what did you
21  do?
22  **A.**   After that I just pretty much stayed on the scene, and
23  somehow I made it back to the Crystal Palace.  I don't know how
24  I got back, but I left from that point and returned to the
25  Crystal Palace.

ROBERT FAULCON - Direct

1  **Q.**   What happened then, when you got back to the Crystal
2  Palace?
3  **A.**   When we got back to the Crystal Palace, they wanted to
4  know who shot -- who fired their weapons, and everyone who
5  fired their weapons, they raised their hand.  We sat at the
6  table, and at that point we just gave a brief gist our actions.
7  **Q.**   Who did you speak to?
8  **A.**   At that time it was Sergeant Kaufman.
9  **Q.**   What did you tell him?
10  **A.**   Briefly what happened in regards to the incident, maybe
11  just really brief, that I had fired my weapon and I saw the
12  guns on the perpetrators that were on the east side of the
13  bridge.
14  **Q.**   Okay.  I want to go back -- I forgot to ask you this.  At
15  the top of the bridge, when the trooper came and you heard
16  gunfire --
17  **A.**   Yes, sir.
18  **Q.**   -- how many shots did you hear, if you can recall?
19  **A.**   Multiple.
20  **Q.**   Do you know where they were coming from?
21  **A.**   No, I had no idea.  The only thing I know, they were in
22  the general area where I saw the subjects fleeing.
23  **Q.**   Now, after you spoke briefly with Archie Kaufman, did you
24  ever speak to Lieutenant Lohman?
25  **A.**   No, sir, I did not.

ROBERT FAULCON - Direct

1  Q.  Did you ever speak to Lieutenant Lohman on the scene?
2  A.  I didn't even see Lieutenant Lohman out there.
3  Q.  Did Lieutenant Lohman ever come up to you and say, "Come
4  here.  Let me tell you what you're going to say about this"?
5  A.  No, sir.  That didn't happen.
6  Q.  Did you ever talk to Officer Lehrmann?
7  A.  No, sir.  I didn't even know who Officer Lehrmann was at
8  the time.
9  Q.  And how was that?  He was a member of the 7th District,
10  wasn't he?
11  A.  Yes, sir.  But the fact was, he was new to the district.
12  And the task force, we worked in a separate building.  So I
13  never knew who he was.  The only thing I knew of him is that he
14  was new to the district, and that was it.  And, plus, we worked
15  at nighttime, so we didn't cross paths.
16  Q.  Now, after you spoke to Sergeant Kaufman, did you ever
17  talk to anybody else about the shooting?
18  A.  No, I never talked about it.  The only time --
19  Q.  Well, you shot somebody.
20  A.  Well, I mean, it was a traumatic event.  It's something
21  that you try and get over.  It's something that you don't want
22  to be reminded of.
23        So the next time I actually talked about it was when
24  I actually gave a statement, which was in June of 2006.
25  Q.  Well, you heard Officer Hunter testify just before you

ROBERT FAULCON - Direct

1  took the stand --
2  A.    Yes, sir.
3  Q.    -- that Mr. Barrios said what he said about shooting
4  someone on the bridge with a shotgun.  Did you hear Barrios say
5  that?
6  A.    I didn't hear that.  I did not hear that.
7  Q.    And did you talk to Villavaso about the shooting at all?
8  A.    No, I did not.
9  Q.    Did you talk to Sergeant Gisevius about maybe you struck
10  somebody or whatever?
11  A.    No, sir, I did not.
12  Q.    Did you know if you had struck anybody other than Ronald
13  Madison at that time?
14  A.    I had no idea.  I really didn't.  I had no idea if I had
15  struck anyone.
16  Q.    All right.  Were you even aware that there were women on
17  the Danziger Bridge on the east side?
18  A.    I had no idea.
19  Q.    When you first saw the individuals, were you able to
20  distinguish whether they were male or female?
21  A.    No, sir.  Because, again, this -- everything happened in a
22  split second or two.  So there was no time to distinguish who
23  was male and who was female.  It just wasn't possible.
24  Q.    How did you feel when you found out the woman had been
25  shot?

ROBERT FAULCON - Direct

1    **A.**    I felt sick.  I felt horrible.

2    **Q.**    You left the police department not long after the

3    shooting, some weeks after the shooting?

4    **A.**    Yes, sir, I did.

5    **Q.**    What went on during those weeks, from the day of the

6    shooting to when you finally left the police department?

7    **A.**    Rescue operations.

8    **Q.**    Was it rescue operations all the time?

9    **A.**    All the time.

10   **Q.**    Now, during those weeks when you were still on the police

11   force, were you aware that anyone was trying to cover up this

12   particular shooting?

13   **A.**    I had no idea.

14   **Q.**    Had you ever spoken to anyone about anybody writing a

15   report?

16   **A.**    No, sir.  I hadn't spoken to anyone, and I didn't -- I

17   didn't even see a report.

18   **Q.**    Did you know a report was going to be written about the

19   event?

20   **A.**    Well, I assumed it would, because it was my expectation

21   that, you know, a shooting, it would be investigated.  So

22   naturally a report would have to be generated, you know.

23   **Q.**    Now, when did you resign from the NOPD?

24   **A.**    Again, maybe about three and a half weeks later, after the

25   incident.

ROBERT FAULCON - Direct

1    Q.   And during that time, you never discussed with anyone the
2    fact that you had shot and killed somebody?
3    A.   No, sir.  Again, it was traumatic.  It's something that
4    you have to live with, and you just don't want to be reminded
5    of it.
6    Q.   Was anything else going on at that time that occupied your
7    thoughts?
8    A.   Well, at the time, I had to deal with the fact that we
9    just went through a major storm.  I had nothing but the clothes
10   on my back.  I didn't know where my family was.  My wife was
11   nine months pregnant.  My friend, Officer Thomas, was shot in
12   the head across the river by looters.  And then at the same
13   time, we were dealing with Officer Celestine, who is a friend
14   of mine also.  He was also on that task force, and he had
15   committed suicide.
16          So with all of that going on, I was just trying to
17   keep myself together mentally.
18   Q.   Now, did you ever learn about what happened to your wife?
19   A.   Later on, yes.
20   Q.   And what did you learn?
21   A.   I learned that she had the baby in Baton Rouge, at the
22   hospital.
23   Q.   And what did you do when you learned that she had the baby
24   and she was -- was she in Baton Rouge at the time you learned
25   of it, or was she someplace else?

ROBERT FAULCON - Direct

1   **A.**   From what I understand, she had the baby in Baton Rouge,

2   and somehow they took pictures of her -- she was actually

3   interviewed by a reporter because she was one of the first

4   evacuees at the hospital.  So they actually did a story on her.

5   And once my wife told her story and she informed them that I

6   was a police officer, at that time they took pictures of she

7   and the baby.  And I don't know how they found me, but they

8   were able to bring the pictures to me in the 7th District.

9                   And after I saw the pictures of she and the

10  baby, that's when I was able to determine where she was.

11  **Q.**   Okay.  And what did you decide to do at that point in

12  time?

13  **A.**   It was about my family.  I had to go.

14  **Q.**   Is that why you resigned from NOPD?

15  **A.**   My family?

16  **Q.**   Yes.

17  **A.**   Yes, sir.

18  **Q.**   And after you resigned, where did you go?

19  **A.**   I had to go get them from the shelter, which they were in

20  Shreveport.  And from that point, that's when we relocated to

21  Houston, Texas.

22  **Q.**   What did you do when you got to Houston, Texas?

23  **A.**   After we got settled, we found housing.  We had a

24  government voucher.  So we found a house so we could live in.

25  And then at that time, that's when I attended truck driving

ROBERT FAULCON - Direct

1  school.

2  **Q.**   And did you become a truck driver?

3  **A.**   Yes, I did.

4  **Q.**   When did you graduate from truck driving school?

5  **A.**   I graduated early part of December.

6  **Q.**   How long was truck driving school?

7  **A.**   It was for 60 dyes.

8  **Q.**   How long did it take you to get relocated from

9  Shreveport -- how many days to get relocated from Shreveport,

10  to Houston, find a house?

11  **A.**   It took a few days because of the fact we had to relocate

12  from Shreveport to Houston.  And then at that point, things

13  were kind of chaotic in Houston also because there was so much

14  red tape you had to go through to get a voucher to even have

15  somewhere to live.

16          So we had to go through all of that, and then we had

17  to find a house to actually live in.  So it took some time

18  before we actually had a roof over our head.

19  **Q.**   Now, at some point in time, did you get contacted by NOPD

20  to give a statement?

21  **A.**   Yes, sir.  I received a call from Sergeant Dugue.

22  **Q.**   Now, you heard about the meeting that took place -- or the

23  officers gave their statements, I believe, in January 2006 at

24  the 7th District station.  Were you present during that time?

25  **A.**   No, sir, I was not.

ROBERT FAULCON - Direct

1    Q.   Where were you?

2    A.   I was in Houston, Texas.

3    Q.   When was the first time that you came back to New Orleans

4    after having been in Houston, Texas?

5    A.   The first time I came back to New Orleans?

6    Q.   Yes, sir.

7    A.   The day I gave my statement in June of 2006.

8    Q.   Tell the jury how that came about.

9    A.   I received a phone call from Sergeant Dugue in regards to

10   me giving a statement, a taped statement.  And he asked me when

11   would I be available to come back to New Orleans.  And I told

12   him I would be available in June.

13          So in June, I want to say the 9th, June the 9th, I

14   came into New Orleans.  I gave my statement to Sergeant Dugue,

15   and then I went straight back to Texas.

16   Q.   Did you meet with anybody before that?

17   A.   No, sir.

18   Q.   Did anybody tell you what to say to Sergeant Dugue?

19   A.   No, sir.  I didn't have any communications with anyone

20   once I left.

21   Q.   Where did you give your statement?

22   A.   Actually, I gave it -- I believe it was a trailer in City

23   Park.  I believe that's where they were located.  So it was

24   inside the trailer there.

25   Q.   And I believe you said you just drove in for the day and

ROBERT FAULCON - Direct

1  gave your statement and drove back?

2  **A.**   I drove in, gave my statement and went back.

3  **Q.**   Now, we heard your taped statement a few days ago.

4  **A.**   Yes, sir.

5  **Q.**   And that's what you told Sergeant Dugue; correct?

6  **A.**   Yes, sir.

7  **Q.**   Now, we have heard about four separate reports that were

8  written in this particular case --

9  **A.**   Yes, sir.

10 **Q.**   -- or prepared or whatever.  I'm going show you these

11 reports, Mr. Faulcon.

12 **A.**   Okay.

13 **Q.**   I want you to take a look at them.

14        **MR. LARSON:**  May I approach, Your Honor?

15        **THE COURT:**  Yes.

16 BY MR. LARSON:

17 **Q.**   Just briefly, if you would take a look at that.

18 **A.**   (WITNESS COMPLIES.)

19        **MR. LARSON:**  For the record -- what I've handed

20 Officer Faulcon is what we've been referring to as the 17-page

21 report, which is Exhibit No. 39; the 32-page report, which is

22 Exhibit No. 38; the 46-page report, which is Exhibit 37; and

23 the 54-page report, which is Exhibit 27.

24        **THE COURT:**  Counsel, while he's looking at that,

25 would you all approach bench.

ROBERT FAULCON - Direct

1           (WHEREUPON, the following proceedings were held at
2      the bench.)
3           **THE COURT:**  I think we've forgot to establish when he
4      took the stand, is he testifying on behalf of all defendants or
5      only as to Mr. Faulcon's case in chief?
6           **MR. HESSLER:**  Yes, sir.
7           **THE COURT:**  Yes, he's for everybody?
8           **MR. LARSON:**  Yes.  I'm sorry, Your Honor.
9           **THE COURT:**  All right.  Do you know, as we sit here
10     now -- and, of course, we're not finished with Mr. Larson --
11     will any of you have any questions on direct for him?
12          **MR. HESSLER:**  I can't imagine that I will on direct.
13          **MR. DESALVO:**  No.
14          **MS. BERNSTEIN:**  While we're up here, may I ask
15     something off the record?
16          **THE COURT:**  Off the record.
17                         **(OFF THE RECORD)**
18          (WHEREUPON, the following proceedings were held in
19     open court.)
20          **THE COURT:**  Okay.  Mr. Larson.  I think he's finished
21     looking at those.
22     **BY MR. LARSON:**
23     **Q.**   Are you finished?
24          Mr. Faulcon, when was the first time that you saw
25     these four reports that I've just shown you?

ROBERT FAULCON - Direct

1  A.   The first time that I actually saw any of the reports was
2  after we got indicted and just prior to this trial.  I received
3  them from my attorney, Mr. Larson.
4  Q.   And this is after you were indicted in the federal case?
5  A.   In the federal case, correct.
6  Q.   Now, Lieutenant Lohman never showed you any reports?
7  A.   No, sir.
8  Q.   Sergeant Gisevius never showed you any reports?
9  A.   No, sir, he didn't.
10  Q.   Anyone show you any reports?
11  A.   No, sir, they did not.
12  Q.   Now, there are some things in the reports that are
13  attributable to you.  I want to discuss that with you now, if I
14  can.  Okay?
15  A.   Sure.
16  Q.   And, basically, what I'm going to -- you've read the
17  reports, haven't you?
18  A.   Yes, sir.
19  Q.   And you know what's in them?
20  A.   Yes, sir.
21  Q.   And I'm going to briefly go through some of the things
22  that are attributed to you.  I want you to tell me if, in fact,
23  that actually happened, okay?
24  A.   Okay.
25  Q.   On page 10 of Exhibit No. 39, the 17-page report, it says

ROBERT FAULCON - Direct

1   that "Officers Faulcon, Villavaso and Barrios immediately

2   exited the rear of the truck after it stopped, and they heard

3   gunfire outside."

4           Is that accurate?

5   A.   No, sir.

6   Q.   Why is it not accurate?

7   A.   Because we received -- we heard gunfire prior to the truck

8   even coming to a complete stop, and it continued as we exited

9   the truck.

10  Q.   It says:  "Upon exiting the truck, Officer Faulcon

11  immediately observed that Doe No. 1 and Holmes were in

12  possession of dark-colored handguns."   .

13          Is that accurate?

14  A.   No, sir.

15  Q.   Why is it not accurate?

16  A.   Because I observed the two subjects that were further up

17  in the walkway with handguns.

18  Q.   It says:  "At that point Doe No. 1 and Holmes pointed

19  their weapons and fired at Officers Faulcon, Villavaso and

20  Barrios."

21          Is that accurate?

22  A.   I never said that.

23  Q.   Did you ever actually see anybody fire at you?

24  A.   No, sir.

25  Q.   Let me go to page 11, the second paragraph.  This is now

ROBERT FAULCON - Direct

1   shifting to going up the bridge part of the report.

2   **A.**   Okay.

3   **Q.**   "Officers Faulcon and Villavaso, along with

4   Officer Gisevius and Officer Hunter, also observed Madison and

5   Doe No. 2 firing at them from the top of the bridge."

6          Did that happen?

7   **A.**   That's inaccurate.  I never saw Madison fire at anyone.

8   **Q.**   It says:  "The officers returned fire and began to pursue

9   the subjects over the bridge."

10          Did you ever shoot at anybody?

11  **A.**   No, sir, I did not.

12  **Q.**   "As Madison was running over the top of the bridge, he

13  discarded his handgun off the north side of bridge and into the

14  waters of the Industrial Canal."

15          Is that accurate or inaccurate?

16  **A.**   That's inaccurate.

17  **Q.**   Why is that inaccurate?

18  **A.**   Because I never saw Mr. Madison in possession of a handgun

19  nor throw anything over the bridge.

20  **Q.**   And that's not something you told Sergeant Dugue, is it?

21  **A.**   I never said that.

22  **Q.**   It said:  "Officer Faulcon continued to pursue Madison and

23  Doe No. 2 over the bridge.  As Officer Faulcon traveled over

24  the crest of the bridge, he gained a visual contact on both

25  Madison and Doe No. 2."

ROBERT FAULCON - Direct

1              Again, is that accurate or inaccurate?

2    **A.**    That's inaccurate because I didn't run over the crest of

3    the bridge.  By that time I was in the unit with the state

4    trooper.

5    **Q.**    Well, I'm sorry.  I should have read the next --

6    **A.**    Oh, okay.

7    **Q.**    It says:  "Officer Faulcon entered the vehicle of an

8    unidentified police officer."

9    **A.**    Yes, sir.

10   **Q.**    And then it says:  "As Doe No. 2 turned into the driveway,

11   he looked back over his shoulder and noticed Officer Faulcon

12   approaching.  At that point Doe No. 2 quickly reached into his

13   right front waistband with his right hand and abruptly turned

14   right towards the officer."

15             Is that accurate?

16   **A.**    That's inaccurate.

17   **Q.**    And why is it inaccurate?

18   **A.**    Because of the fact I never said that Mr. Madison turned

19   to the right; neither did I say he reached into his waistband

20   for an object.

21   **Q.**    And you never told Sergeant Dugue that when you gave your

22   recorded statement, did you?

23   **A.**    I never said that.

24   **Q.**    Let's look at the 32-page report which is Exhibit 38.  Go

25   to page 14, paragraphs 3 and 4.

ROBERT FAULCON - Direct

1           This says:  "Upon exiting the truck, Officer Faulcon
2   observed several subjects, both male and female, walking
3   westbound up the Danziger Bridge."
4           Is that accurate or inaccurate?
5   A.   That's inaccurate.
6   Q.   All right.  You never told Sergeant Dugue that, did you?
7   A.   No, sir, I did not.
8   Q.   It says:  "Several of the subjects then jumped over the
9   concrete pedestrian barrier while opening fire on the
10  officers."
11          Is that accurate or inaccurate?
12  A.   That's inaccurate.
13  Q.   Why is that inaccurate?
14  A.   Because of the fact when I exited the rear of the truck,
15  they were already in the walkway.
16  Q.   And then it said:  "Officer Faulcon arrived at the bottom
17  of the Danziger Bridge and engaged another perpetrator at the
18  entrance to the Friendly Inn.  This male noticed the police
19  presence and quickly turned toward the officer, reaching for an
20  object from his right waistband."
21          Is that accurate or inaccurate?
22  A.   That is inaccurate.
23  Q.   Did you tell Sergeant Dugue that?
24  A.   No, sir, I did not.
25  Q.   All right.  Now, we're at page 25, last paragraph.  I'm

ROBERT FAULCON - Direct

1    sorry, page 26.
2          Again, it says -- second paragraph:  "Upon exiting
3    the truck, Officer Faulcon observed several subjects, both male
4    and female, walking westbound up the Danziger Bridge."
5          Accurate or inaccurate?
6    A.   Inaccurate.
7    Q.   Why is it inaccurate?
8    A.   I never distinguished the fact that there were females out
9    there.
10   Q.   And that's what you told Sergeant Dugue, wasn't it?
11   A.   Correct.
12   Q.   It said:  "Several of the subjects then jumped over the
13   concrete pedestrian barrier while opening fire on the
14   officers."
15         Accurate or inaccurate?
16         MS. BERNSTEIN:  I'm sorry, what page are you on?
17         MR. LARSON:  Page 26, second paragraph.
18   BY MR. LARSON:
19   Q.   It says "Several of the subjects then jumped over the
20   concrete pedestrian barrier while opening fire on the
21   officers."
22         Is that accurate or inaccurate?
23   A.   Inaccurate.  Again, when I exited the rear of the truck,
24   they were already in the walkway.
25   Q.   Okay.  And then third paragraph:  "Officer Faulcon arrived

ROBERT FAULCON - Direct

1    at the bottom of the Danziger Bridge and engaged another

2    perpetrator at the entrance to the Friendly Inn.  This male

3    noticed the police presence and quickly turned toward the

4    officer, reaching for an object from his waistband."

5              Accurate or inaccurate?

6    A.   Inaccurate.

7    Q.   You never told -- did you ever tell Sergeant Dugue you saw

8    the subject reaching into his waistband for an object?

9    A.   I never said that he reached in his waistband for an

10   object.

11   Q.   I believe you told Sergeant Dugue he had his hand where

12   you couldn't see it, by his waist.  Correct?

13   A.   What I told Sergeant Dugue, my perception was he was bent

14   slightly at the waist, he had turned and looked over his left

15   shoulder; his hands were in front of his body by his waist, and

16   his hands were tucked into his body.

17   Q.   We're now looking Exhibit No. 37, the 46-page report.

18             Second paragraph.  I'm sorry, this is the third

19   paragraph.

20   A.   Okay.

21   Q.   "As the Budget truck began to drive up the Danziger

22   Bridge, the truck came to a sudden stop, and about four seconds

23   later, Officer Faulcon heard gunfire come from the right side

24   of the truck."

25             Is that accurate or inaccurate?

ROBERT FAULCON - Direct

1    **A.**    That's inaccurate.

2    **Q.**    Why is it inaccurate?

3    **A.**    Because of the fact gunfire erupted prior to the truck

4    coming to a complete stop and also continued as I was exiting

5    the rear of the vehicle.

6    **Q.**    All right.  Then on page 12, the first paragraph, it says:

7    "Officer Faulcon announced his police presence by shouting

8    'police.'  Two of the subjects, later identified as perpetrator

9    John Doe No. 1 and Jose Holmes, pointed their weapons in the

10   direction of Officer Faulcon."

11             Is that accurate or inaccurate?

12   **A.**    That's inaccurate.

13   **Q.**    Why is that inaccurate?

14   **A.**    Because of the fact when I exited the rear of the truck, I

15   said that I observed two subjects that were in possession of

16   handguns.  I never said that they pointed it at me.

17   **Q.**    You wouldn't have let them point it at you?

18   **A.**    No, sir, or I wouldn't sitting here right now.

19   **Q.**    The second paragraph says:  "Officer Faulcon then heard

20   additional gunfire coming from two armed subjects near the top

21   of the Danziger Bridge who were later identified as Lance

22   Madison and perpetrator John Doe No. 2."

23             Accurate or inaccurate?

24   **A.**    Inaccurate.

25   **Q.**    Why is it inaccurate?

ROBERT FAULCON - Direct

1  A.   Because of the fact I never saw the individuals at the top
2  of the bridge shooting.
3  Q.   And you never told Sergeant Dugue that?
4  A.   I never said that.
5  Q.   And now back on the third paragraph, as Madison -- we're
6  talking about Lance Madison?
7  A.   Yes, sir.
8  Q.   "As Madison was running over the top of the Danziger
9  Bridge, he turned sharply to his right towards the north edge
10  of the bridge and discarded his handgun off the north side of
11  the bridge and into the waters of Industrial Canal."
12             Accurate or inaccurate?
13  A.   Inaccurate.
14  Q.   Why is it inaccurate?
15  A.   I never saw Lance Madison with a weapon, nor did I see him
16  discard a weapon over the side of the bridge.
17  Q.   In your recorded statement to Sergeant Dugue, did you ever
18  tell Sergeant Dugue you saw Lance Madison with a weapon?
19  A.   Never said it.
20  Q.   Now, the last paragraph on page 12, talking about
21  Mr. Ronald Madison.
22  A.   Okay.
23  Q.   "Immediately after Doe No. 2 noticed the police presence,
24  he quickly reached for his waistband underneath his shirt with
25  his right hand while beginning to turn his body clockwise to

ROBERT FAULCON - Direct

1   the right, towards Officer Faulcon."
2            Accurate or inaccurate?
3   A.   Inaccurate.
4   Q.   Why is it inaccurate?
5   A.   Because I never said that he reached underneath his shirt
6   much less reaching for an object, nor did I say he turned to
7   the right.  I said he turned to the left, looking over his left
8   shoulder.
9   Q.   And you never told Sergeant Dugue he turned to the right,
10  did you?
11  A.   No, sir, I did not.
12  Q.   I believe, without going through the rest of the report,
13  there's another section that's exactly the same as what we just
14  talked about.
15  A.   Okay.
16  Q.   And that would be inaccurate like the other sections were
17  that you just told me about?
18  A.   Yes, sir, it would.
19  Q.   Save a little time here.
20           I'm page 37 now of the 46-page report, and we're
21  talking about "As Officer Faulcon ran behind Doe No. 2, as both
22  Madison and Doe No. 2 ran under the front overhang of the
23  Friendly Inn."
24           Accurate or inaccurate?
25  A.   Inaccurate.

ROBERT FAULCON - Direct

1    Q.   Why is that?

2    A.   Because I never went underneath the overhang to the

3    Friendly Inn.

4    Q.   It says that "Doe No. 2 then looked back and observed

5    Officer Faulcon behind him.  Immediately after Doe No. 2

6    noticed the police presence, he quickly reached for his

7    waistband underneath his shirt with his right hand while

8    beginning to turn his body clockwise to the right, towards

9    Officer Faulcon."

10            Accurate or inaccurate?

11   A.   Inaccurate.

12   Q.   Why is it inaccurate?

13   A.   Again, I never said that Mr. Madison reached under his

14   shirt, reaching for an object and turning clockwise.  I said he

15   turned and looked over his left shoulder.

16   Q.   Did you tell Sergeant Dugue he turned right, clockwise?

17   A.   No, sir, I did not.

18   Q.   We're now on Exhibit No. 27.  I'm looking at Exhibit

19   No. 27, the 54-page report.

20            On page 22, the first paragraph, it says:  "Upon

21   exiting the truck, Officer Faulcon observed several subjects,

22   both male and female, walking westbound up the Danziger

23   Bridge."

24            Accurate or inaccurate?

25   A.   Inaccurate.

ROBERT FAULCON - Direct

1  Q.   And why is it inaccurate?

2  A.   Because, once again, it was just a spilt second that I

3  had, and there was no time to distinguish between male and

4  female.  It was impossible in one or two seconds.

5  Q.   Okay.  It says "he," meaning you, Officer Faulcon,

6  "mentioned several of the subjects then jumped over the

7  concrete pedestrian barrier while opening fire on the

8  officers."

9          Accurate or inaccurate?

10 A.   Inaccurate.

11 Q.   Why is it inaccurate?

12 A.   Because of the fact, again, once I observed the subjects,

13 they were already in the walkway.

14 Q.   In the second paragraph it says:  "Officer Faulcon arrived

15 at the bottom of the Danziger Bridge and engaged another

16 perpetrator at the entrance of the Friendly Inn.

17 Officer Faulcon stated that a male subject noticed the police

18 presence and quickly turned towards the officer, reaching for

19 an object from his right waistband."

20          Accurate or inaccurate?

21 A.   Inaccurate.

22 Q.   Why is it inaccurate?

23 A.   Because I never said that he reached in his waistband,

24 reaching for an object.

25 Q.   You didn't -- did you tell Sergeant Dugue that?

ROBERT FAULCON - Direct

1   **A.**   No, sir, I did not.
2   **Q.**   Okay.  Now, after the particular incident, were you ever
3   asked to write a report?
4   **A.**   No, sir.
5   **Q.**   Did you ever make an arrest of anybody?
6   **A.**   No, sir, I did not.
7   **Q.**   Were you ever involved in any decisions to prosecute
8   anyone in this particular case?
9   **A.**   No, sir, I was not, not at all.
10  **Q.**   Were you aware -- well, were you aware of any prosecutions
11  in this case?
12  **A.**   I didn't even know the facts surrounding the case.
13  **Q.**   Did you have any authority to prosecute someone in this
14  particular case?
15  **A.**   No, I don't have that authority.
16  **Q.**   As I understand it, after you left three weeks later, you
17  had no contact with anybody until you talked to Sergeant Dugue
18  and gave your recorded statement.
19  **A.**   Yes, sir.  That's the next time I actually gave a
20  statement.
21  **Q.**   Now, Officer Faulcon, we've had some testimony from
22  experts and from other people, police officers, about training.
23  **A.**   Correct.
24  **Q.**   You've heard that testimony?
25  **A.**   Yes, sir.  Yes.

ROBERT FAULCON - Direct

1  Q.   Have you had police training in how to confront subjects
2  that you may believe to be armed?
3  A.   Yes, sir.  During the academy you go through scenarios
4  where you use paint guns -- paint ball guns, and you're put
5  through different scenarios that may pertain to dealing with
6  armed individuals, suspicious persons, felony traffic stops.
7  So there were various scenarios that we were put through.
8  Q.   And in that training that you had in dealing with
9  suspicious persons or even persons whom you were told were
10 armed, did you have any training at all to handle a situation
11 like you were confronted with in Hurricane Katrina or after
12 Hurricane Katrina?
13 A.   No, sir.  We just didn't -- that kind of training wasn't
14 available.
15 Q.   What's the difference between training and real
16 life-threatening experiences?
17 A.   With the scenarios that we went through in the academy
18 using paint ball guns, even if you get shot, if you make a
19 mistake, you get -- you know, you're still in a safe
20 environment, you know that you are -- everything is going to be
21 all right, you're going to go home at the end of the day.
22        But a paint ball scenario in the academy does not
23 compare to a real-life situation where at that fraction of a
24 second you have to decide whether you going to live or die.  I
25 mean, the fear that you have in that split second, there's just

ROBERT FAULCON - Direct

1   no words to describe it.  It's just indescribable.

2   **Q.**   Officer Faulcon, what you just described, was that how you

3   felt that morning on the east side and then on the west side of

4   the Danziger Bridge?

5   **A.**   Yes, sir.  Yes, sir.

6   **Q.**   Did you fear for your life?

7   **A.**   Yes, sir, I did.  And just to take it a little further,

8   during my tour of duty with the New Orleans Police Department,

9   I went to three funerals of friends of mine that were police

10  officers.  And they too had gone through the paint ball

11  scenario.  But the tragic part about it is their paint ball

12  scenario became a reality, and when it became a reality, they

13  didn't come home.

14  **Q.**   You were aware of that on the morning of September 4,

15  2005, weren't you?

16  **A.**   Yes, sir.  I'm always aware of that.

17  **Q.**   Now, Officer Faulcon, here we are some years later.

18  **A.**   Yes.

19  **Q.**   We know now that Ronald Madison was not armed, that you

20  shot an unarmed man.

21  **A.**   Yes.

22  **Q.**   And that possibly -- well, I don't want to comment on

23  that.  But you shot at and perhaps hit some of the

24  Bartholomews?

25  **A.**   Yes.

ROBERT FAULCON - Direct

1   **Q.**   Bartholomew and James Brissette?

2   **A.**   Yes, sir.

3   **Q.**   And there is a difference of opinion --

4   **A.**   Yes, sir.

5   **Q.**   -- or difference of evidence as to whether they were armed

6   or not?

7   **A.**   Uh-huh.

8   **Q.**   -- as we sit here today.

9          **MS. BERNSTEIN:**  Objection to the leading, Your Honor.

10         **MR. LARSON:**  I'm just prefacing my question.

11         **THE COURT:**  That's what the objection's geared to.

12   Go ahead and ask him a question.  I'll sustain.

13   BY MR. LARSON:

14   **Q.**   What do you personally feel about what you did on the

15   Danziger Bridge on September 4, 2005?

16   **A.**   I feel -- I feel horrible because of the fact, you know,

17   in that split second when I saw guns, I might have been right

18   or I might have been wrong; but if I had known that those

19   civilians were unarmed, I would have never fired my weapon at

20   unarmed civilians.

21         I'm human, I have feelings too.  So my heart goes out

22   to the people that were hurt.  My heart goes out to the

23   families of the victims.

24         But at that time when I saw guns, I just thought my

25   actions were justified based on what I saw in that split

ROBERT FAULCON - Direct

1    second.

2          **MR. LARSON:**  Just one second, Your Honor.

3             I have no further questions.  I'll tender the

4    witness.

5          **THE COURT:**  Let's check and see if there are any

6    questions from defense counsel.

7          **MR. LONDON:**  Your Honor, just a couple.

8          **THE COURT:**  Mr. London, okay.

9                        **DIRECT EXAMINATION**

10   BY MR. LONDON:

11   **Q.**   Good morning, Mr. Faulcon.

12   **A.**   Good morning, sir.

13   **Q.**   Steve London.  I represent Mr. Kaufman.  We obviously know

14   each other.

15   **A.**   Yes, sir.

16   **Q.**   I just wanted to ask you, on September 4th, the evening,

17   you testified that you returned to the Crystal Palace and you

18   rendered a brief gist concerning the incident that day;

19   correct?

20   **A.**   Yes, sir.

21   **Q.**   Can you describe your mental condition at that time on the

22   same day?  Were you still scared?

23   **A.**   Yes.  Because I had never been in an officer-involved

24   shooting.  It was still traumatic at that time.  So it was a

25   lot.  I was stressed, kind of, you know, emotional.  I mean,

ROBERT FAULCON - Direct

1    I've never been involved in anything like that.
2    **Q.**   And the only statement --
3           **MS. BERNSTEIN:**  Objection to leading, Your Honor.
4           **MR. LONDON:**  I didn't get it out yet.
5           **THE COURT:**  Go ahead and ask the question.  But my
6    understanding is that he's been called on behalf of all
7    defendants.  You can't lead him.
8           **MR. LONDON:**  I didn't mean to.
9    **BY MR. LONDON:**
10   **Q.**   You later gave a formal statement; correct?
11   **A.**   Yes, sir, I did.
12   **Q.**   When was that?
13   **A.**   That was in June -- I want to say either June 6th or
14   June 9th of 2006.
15   **Q.**   And that was to whom?
16   **A.**   That was to Sergeant Dugue.
17          **MR. LONDON:**  Thank you.  That's all I have.
18          **THE COURT:**  Any other defense counsel?
19          **MR. HESSLER:**  No, Your Honor.
20          **THE COURT:**  Okay.  We'll go ahead and take our lunch
21   break.  It's a little early, but now would be a good time to
22   take a break.  If you all could be prepared at 12:45, we'll
23   pick up with cross-examination of Mr. Falcon.  Okay.
24          **THE DEPUTY CLERK:**  All rise.
25          (WHEREUPON, the jury exited the courtroom.)

ROBERT FAULCON - Direct

1      **THE COURT:**  Counsel, anything that needs to be
2  covered on the record at this point?
3      **MS. BERNSTEIN:**  Not from the government, Your Honor.
4      **MR. FLEMING:**  No, Judge.
5      **THE COURT:**  At 12:45 we'll begin, sir.  If you could
6  be up here promptly, we'll go ahead and start right then.
7  Thank you.
8      (WHEREUPON, the following proceedings were held at
9  the bench.)
10     **MR. LARSON:**  It's my understanding, and correct me if
11  I'm wrong, but the rulings talking to witnesses does not apply
12  to attorneys and their clients?
13     **THE COURT:**  Well, there's actually two opinions on
14  that, one Supreme Court opinion and one Fifth Circuit opinion,
15  and the names and the citations escape me, but the issue has
16  come up in connection with some CLE programs that I've been
17  involved in.
18          It's a little unclear, but my understanding of
19  the opinions when read together is that if it's a fortuitous
20  break during the course of the day, such as a lunch break or a
21  recess in court, that the witness should not be -- the
22  testimony should not be discussed as opposed to a break in the
23  evening where his right to counsel would be involved to discuss
24  overall strategy in the case.
25     **MR. LARSON:**  I just wanted to make sure I didn't go

ROBERT FAULCON - Direct

1  afoul of the law.

2          **THE COURT:**  I can give you the citations.

3          **MR. LARSON:**  No, no.  I'll issue -- I trust

4  Your Honor's up on the law.

5          **THE COURT:**  The fact that we're taking a break --

6  it's kind of an interesting point of law, I found.

7          **MR. LARSON:**  And I really don't have any reason to

8  talk to him, but I just wanted to clarify that.  I'll let him

9  know I'm not going to talk to him.

10          **THE COURT:**  Well, if -- and I hope he's not -- but if

11  he's still on the stand at the end of the day, you can consult

12  with him.

13          **MS. BERNSTEIN:**  He won't be due to me, Your Honor.

14          **THE COURT:**  You can consult with him overnight.  That

15  will be the distinction.

16          **MS. BERNSTEIN:**  One more thing.  Because we did have

17  a misunderstanding of the rule about the notice, Mr. Faulcon

18  has a PIB history.  We are trying get certified copies from

19  Civil Service.  I don't know that we'll have them here by the

20  time I'm finished crossing.  If not, I was wondering if I could

21  reserve the right to cross on that part once those records come

22  in.

23          **MR. LARSON:**  PIB, Public Integrity?  It's 404(b).  I

24  thought we ruled on that.

25          **THE COURT:**  We ruled on 404(b).  So is this new

ROBERT FAULCON - Direct

1    material of some short?

2            MS. BERNSTEIN:  Well, this not -- it's not 404(b)

3    now.  There was the one -- and, again, I'm talking off the top

4    of my head now, Your Honor -- but there was one finding that

5    very definitely goes to honesty.  There was the finding

6    regarding him -- well, you know what, I don't want to speak off

7    the top of my head, Your Honor, because I want to see them.

8            But they wouldn't be offered at this point as

9    404(b).  Any sustained discipline would be offered to impeach,

10   not as 404(b).  And anything that was sustained and not

11   reserved by Civil Service, which is what we need to find out.

12           MR. LARSON:  That's sort a distinction without a

13   difference.

14           THE COURT:  I'm trying to imagine how that differs

15   from the 404(b) issue that was briefed and that I ruled on.  If

16   it was one of those instances, then I've ruled on it.

17           MS. BERNSTEIN:  Okay.

18           MR. LARSON:  Impeachment is dealt with by a specific

19   code of evidence article.  And as I understand it, crimes that

20   fall beyond that if they involve dishonesty can be used to

21   impeach persons, but not acts.

22           MS. BERNSTEIN:  I think the first part of Lindsay's

23   argument was actually my argument as well, which is that the

24   404(b) is a question of whether this evidence comes in on the

25   issue of intent, motive, absence of mistake, which I think is

 1    separate from whether it come in as impeachment if the person

 2    testifies.

 3                And the rule that we were following for the

 4    other officers was that if other officers testified and they

 5    had sustained discipline that was not overturned by Civil

 6    Service, then they could be impeached with that.

 7                And if you recall, Your Honor, with the

 8    government witnesses who were so impeached, I made an objection

 9    to impeaching them with things that did not go directly to

10    dishonesty, and I was overruled on that and was told that

11    anything that was sustained, they could be impeached with.

12          MR. LARSON:  I don't know that that's the law,

13    though, if you look at the Federal Code of Evidence.

14          THE COURT:  What's the difference between -- I'm

15    trying to see how who this would play out if you ask him if he

16    has ever --

17          MS. BERNSTEIN:  What I had anticipated is --

18          MR. LARSON:  A finding of dishonesty.

19          MS. BERNSTEIN:  -- were you disciplined by

20    New Orleans Police Department in 2002, 2004, such and such, did

21    you receive a three-day suspension, the same types of questions

22    that were asked of the other witnesses.

23          THE COURT:  So if he says, "No," and then you

24    introduce it; and if he says, "Yes," and you get your 404(b)

25    in.

ROBERT FAULCON - Direct

1          **MS. BERNSTEIN:**  Well, if he said no to something -- I
2    mean, if he lied, then it would be directly admissible to show
3    his --
4          **THE COURT:**  But the question -- I'm going back one
5    step further to the question --
6          **MR. LARSON:**  I mean, that was what you ruled, the
7    404(b) was out.
8          **THE COURT:**  Yes.  Why did we brief the whole 404(b)
9    thing?
10         **MS. BERNSTEIN:**  Because 404(b) would come in whether
11   or not he testified.  The 404(b) is a very -- it's a whole
12   separate legal entity.  I mean, that's why -- that's why we
13   would submit it beforehand is, "Can we put this in in our case
14   in chief," which I think is different.
15              I mean, Your Honor, I think you recognized when
16   we were talking up here before that, for example, if Ken Bowen
17   took the stand, he could very easily say something that would
18   open the door to the admissibility of something that was kept
19   out under 404(b).  So I think they are two very distinct legal
20   questions.
21         **MR. LARSON:**  Well, I still don't think the Federal
22   Rules of Evidence allow you to ask somebody about a job
23   infraction.  I mean, it's a crime --
24         **MS. BERNSTEIN:**  I think it depends.
25         **THE COURT:**  But he's damned if do, and he's damned if

ROBERT FAULCON - Direct

1    he doesn't, you know.  You've introduced evidence that the

2    Court has already ruled inadmissible, if he were to answer the

3    question honestly.  I go back to the appropriateness of the

4    question.  Because he's not on trial for those things and

5    that's what the whole issue was about, whether it's 404(b) or

6    otherwise.

7            MS. BERNSTEIN:  And with the other officers who

8    testified, my understanding was that that information was --

9            THE COURT:  But they're not on trial.  They're not

10   trial here.  They're not on trial.

11           MS. BERNSTEIN:  But the impeachment rules aren't any

12   different for a defendant.

13           THE COURT:  No, they're not.  They're not.  But

14   that's not -- you want to impeach him on the something that the

15   Court has already ruled inadmissible, that he's on trial and

16   the prejudicial value -- I'll go back to what I wrote on

17   Mr. Faulcon's.  He's damned if he does and he's damned if he

18   doesn't.

19               I go back to the objection to the question

20   itself.  You're going to introduce -- one way or the other,

21   you're going to introduce something about him that he's not on

22   trial for that the jury can associate with him that I've

23   already ruled on.  I'll think about it, but I -- I've already

24   given specific written reasons.

25           MS. BERNSTEIN:  I'm in an unusual position.

ROBERT FAULCON - Direct

1          **MR. LARSON:**  Note my objection for the record.

2          **MS. BERNSTEIN:**  I'm in an unusual position because I

3    actually objected to this impeachment for the other officers.

4    But what I understood was that there was a determination that

5    this impeachment was relevant to credibility, which would be

6    the only reason it would come in.

7          **THE COURT:**  But their names are not on the jury

8    verdict form --

9          **MS. BERNSTEIN:**  Then I guess --

10         **THE COURT:**  -- and that's a problem.

11              The point of the briefing was whether or not the

12   jury could hear this evidence and whether it was prejudicial

13   against this defendant in whom they are sitting in judgment.

14   That's the problem, as I see it.

15         **MS. BERNSTEIN:**  Okay.  So I know you're going to

16   think about it.  I've got to go change clothes.

17         **THE COURT:**  I'll think about it.  We can talk about.

18         **MS. BERNSTEIN:**  All right.

19              (WHEREUPON, the following proceedings were held in

20   open court.)

21                        **(LUNCHEON RECESS)**

22

23

24

25

ROBERT FAULCON - Direct

1              **AFTERNOON SESSION**

2                **(JULY 27, 2011)**

3                   * * * * *

4      **THE DEPUTY CLERK:**  All rise.

5      **THE COURT:**  Mr. Larson, or any defense counsel,

6  Ms. Bernstein, I need the government and also in particular

7  Mr.~Faulcon's counsel.

8          (WHEREUPON, the following proceedings were held at

9  the bench.)

10     **THE COURT:**  I took another look at my ruling, which

11 is sealed document 441, which discussed not only 404(b) but

12 403.  I also took a look at 404(a)(1), which relates to

13 character evidence of the accused, and notably the only

14 evidence of his career post-academy up until September 4th was

15 the question about had he ever fired his firearm, to which he

16 said, "No."

17          And I don't think -- correct me if I'm wrong,

18 but I don't think any of the instances that the government

19 would contemplate asking him about relates to the discharge of

20 a firearm inappropriately or any appropriate action with a

21 firearm

22     **MS. BERNSTEIN:**  That's correct, Your Honor.

23     **THE COURT:**  The other instances relate to matters

24 that were the subject of my ruling.  Having -- and because of

25 that, there is an exception in 404(a)(1) that if the defense

ROBERT FAULCON - Direct

1  were to have asked or tried to establish that he had a spotless

2  career or in any way had a career that was worthy of some

3  praise, whether he had received awards or any sort of positive

4  citations, I think the door would be open.

5          But there were no questions about that.  So I go

6  back to 403.  And the Court's ruling based on -- and I have the

7  ruling here 403 and 404(b), I think it's -- I'll give you a

8  chance to respond, but I think it's inappropriate to ask him

9  about prior PIB actions, complaints, discipline issues of the

10 sort that were brought to my attention on the 404 issue.

11         **MS. BERNSTEIN:**  That's fine, Your Honor.

12         **THE COURT:**  Okay.

13         (WHEREUPON, the following proceedings were held in

14 open court.)

15         **THE COURT:**  Whenever the jury's ready, we can begin.

16         **THE DEPUTY CLERK:**  All rise.

17         (WHEREUPON, the jury entered the courtroom.)

18         **THE COURT:**  Okay.  You may be seated.

19         Mr. Faulcon, you're under oath, sir.  You may be

20 seated.

21         Have you discussed your testimony at all with

22 anyone over the break?

23         **THE WITNESS:**  No, sir.

24         **THE COURT:**  We left off where we were about to begin

25 cross-examination.

1          Ms. Bernstein, you may begin.

2          **MS. BERNSTEIN:**  Thank you, Your Honor.

3              **CROSS-EXAMINATION**

4  BY MS. BERNSTEIN:

5  **Q.**   Mr. Faulcon, you agree that Ronald Madison was an innocent

6  man?

7  **A.**   Yes.

8  **Q.**   So you agree that he did not fire at police and then

9  change his shirt to allude capture by police?

10  **A.**   Yes.

11  **Q.**   You also agree that you shot and killed that innocent man?

12  **A.**   Yes.  At the point when I felt that I was threatened for

13  my life, when I felt he was a threat.

14  **Q.**   You agree that you shot him in the back?

15  **A.**   Yes.  Again, when I felt, at that point, where my life was

16  in danger, and I presumed him to be a threat.

17  **Q.**   You agree that you never saw Ronald Madison with a gun?

18  **A.**   Yes.

19  **Q.**   You agree that you never saw Lance Madison with a gun?

20  **A.**   Yes.

21  **Q.**   I want to see if there are some other things that we can

22  agree on.

23          You heard Major Najolia here.  Do you agree that you

24  can only use deadly force if you perceive that your life or the

25  life of another person is in imminent danger?

ROBERT FAULCON - Cross

1  A.   Yes.
2  Q.   You agree that firing a gun is deadly force whether or not
3  you actually hit someone?
4  A.   Yes.
5  Q.   Do you also agree with what Major Najolia told us, which
6  is that if you fire your gun multiple times each individual
7  shot has to be justified?
8  A.   I believe, once you fire your weapon, it has to be
9  justified.
10  Q.   I want to make sure I understand.
11  A.   Yes, uh-huh.
12  Q.   Every time you fire your weapon you have to have a reason
13  to fire; correct?
14  A.   Yeah.  I mean, your life would have to be in danger;
15  correct.
16  Q.   So if you shoot four times, say, your life -- you have to
17  perceive a threat to your life or the life of another person
18  every single time you pull the trigger; correct?
19  A.   No, ma'am.  When you perceive the threat, you can actually
20  discharge the firearm until that threat is neutralized, whether
21  it might be discharging a firearm once or twice or three times.
22  It's just whenever the threat is neutralized.
23  Q.   That's a good point.  And I'm not sure we're saying
24  something different.  But when you see a threat --
25  A.   Correct.

ROBERT FAULCON - Cross

1    Q.   -- you can fire your weapon; correct?

2    A.   If you presume that that is a threat and it's a danger to

3    your life or others; correct.  You can -- that would determine

4    your use of deadly force.

5    Q.   Interesting.  You just used the word "presume."  Can you

6    fire your weapon because you presume there is a threat, or must

7    you perceive a threat?

8    A.   Oh.  Well, when you perceive; correct.  When you perceive

9    that individual to be a threat.

10   Q.   So you agree that you cannot fire your weapon simply

11   because you presume there is a threat?

12   A.   Well, no, not presume.  But if I believe that that is a

13   threat and it's imminent, you know, my life is in danger or

14   others, and given the totality of the circumstances, also, has

15   a lot to take into consideration.

16   Q.   So I want to make sure that you're answering my question.

17   So I'd ask you to answer with a yes or no, and then explain if

18   you have to.

19   A.   Okay.

20   Q.   Do you agree that you may not fire your weapon simply

21   because you presume there is a threat?

22   A.   Correct.  You have to believe.

23   Q.   All right.  Now, my question that started us down this

24   road was:  Do you agree that every time you fire your weapon

25   you must perceive a threat that you're firing at?

ROBERT FAULCON - Cross

1  A.   I disagree with that.

2  Q.   So you think that if you perceive a threat in the

3  beginning you can continue to fire even when the threat is

4  gone?

5  A.   If you believe -- if you perceive that to be a threat at

6  that time, at that second.  It's nowhere saying that you have

7  to just fire one time.  You fire until that threat is

8  neutralized, whether it might be once or whether it might be

9  twice or whether it might be three times.

10  Q.   And, Mr. Faulcon, I'd like to ask you to focus on my

11  question, because I didn't ask you whether you may only fire

12  once.

13  A.   Okay.

14  Q.   You can fire once if you perceive a threat; correct?

15  A.   Correct.  I'm with you there.

16  Q.   You may fire a second time if you still perceive a threat;

17  correct?

18  A.   Okay.  I -- yeah.

19  Q.   Is that correct?

20  A.   Yes.

21  Q.   You may fire a third time if you still perceive a threat;

22  correct?

23  A.   Okay.

24  Q.   Do you agree that once you no longer perceive a threat you

25  may not continue to fire?

ROBERT FAULCON - Cross

1  A.   Yes.  Well, if there's no longer a threat, correct, then
2  there's no need to fire.
3  Q.   So now let me go back to a concept that you just
4  mentioned.
5  A.   Okay.
6  Q.   Which is that once you perceive a threat --
7  A.   Correct.
8  Q.   -- you look at that threat; correct?
9  A.   Correct.
10  Q.   Because that's the threat that might kill you; right?
11  A.   Correct.
12  Q.   So you focus on that threat and you continue to fire as
13  long as you perceive a threat; correct?
14  A.   Correct.
15  Q.   So the flip side of what I just asked you:  Would you
16  agree that you do not stop firing until you're sure that threat
17  is neutralized?
18  A.   Correct.
19  Q.   Now, we talked about perceiving a threat and that
20  justifying a shooting.
21  A.   Yes.
22  Q.   Do you agree that an assumption that someone is armed is
23  not a reason to shoot them?
24  A.   I would agree with you on that.  But, again, the totality
25  of the circumstances you also have to consider, too, in your

ROBERT FAULCON - Cross

1    decision.

2    **Q.**   Let me bring you back to my question.

3    **A.**   Okay.

4    **Q.**   If I understand you correctly, the totality of the

5    circumstance relates to whether or not you perceive an imminent

6    threat to your life or the life of someone else; is that

7    correct?

8    **A.**   Correct.

9    **Q.**   So let me focus you on my question.

10            Do you agree that you may not shoot someone simply

11   because you suspect that they are armed?

12   **A.**   Uh --

13   **Q.**   I would ask for a yes or no before you expand.

14   **A.**   I don't agree with you on that.  I don't.

15   **Q.**   So you believe that you may shoot someone simply because

16   you suspect that they are armed?

17   **A.**   No.  I'm not saying that either.

18   **Q.**   Let me go back to my question, then.

19            Do you agree that you may not shoot someone simply

20   because you suspect that they are armed?

21   **A.**   It's hard to say yes and it's hard to say no.

22            Again, given the situation that you're in, given the

23   perception of what you perceive, and given the totality of the

24   circumstances.  There could be information that you receive.

25   There could be information that that individual has already

ROBERT FAULCON - Cross

1  fired a weapon at others.

2  **Q.**   And let me stop there and focus on my question.

3  **A.**   Okay.

4  **Q.**   If the information you have received is that that person

5  over there might be armed --

6  **A.**   Correct.

7  **Q.**   -- is that enough to justify shooting that person over

8  there?

9  **A.**   It would raise my beliefs that that person is armed.

10 **Q.**   Again, I would ask -- I would ask for a yes-or-no answer

11 to my question, not to another question.

12         My question is not whether you would believe that

13 person was armed.  So I want you to focus on my question.

14         Do you agree that you may not shoot someone simply

15 because you suspect that that person is armed?

16 **A.**   It's -- it's hard to -- I can't say yes and I can't say

17 no.  I just can't.

18 **Q.**   So the follow-up to that is you believe, then, that there

19 are some times when it is okay just to shoot someone simply

20 because you suspect that they are armed?

21 **A.**   No, ma'am.  No, ma'am.

22 **Q.**   So do you agree, then, that you may not shoot someone

23 simply because you suspect that they are armed?

24 **A.**   Again, I -- I'm not trying to be difficult.  But, again,

25 there's just so many scenarios and so many other circumstances

ROBERT FAULCON - Cross

1   that you have to take into account to make that decision.  I
2   mean you can't --
3   Q.   And just so you understand, I want to make sure.
4   A.   Okay.
5   Q.   You said a lot of things you have to take into account
6   when you make that decision.
7   A.   Correct.
8   Q.   The decision you're talking about right now is the
9   decision whether or not to shoot somebody simply because you
10  suspect that they're armed.  You have to take a lot into
11  account to make that decision.
12          Is that what you're saying?
13  A.   Yes, you do.
14  Q.   Now, I think I know what my answer will be to the next
15  question, then, which is may -- do you agree that you may not
16  shoot someone simply because you know that they're armed?
17  A.   If I know that they're armed?
18  Q.   Uh-huh.
19  A.   Well, even if I knew that they were armed, still, you have
20  to take into consideration their actions or their demeanor.
21  Q.   So, for example, if somebody is standing in front of you
22  and you know that they have a gun in their pocket --
23  A.   Correct.
24  Q.   -- but they're standing like this, with their hands to
25  their side, do you agree that you may not shoot that person

1  even though you know that person is armed?
2  **A.**   No.  If this -- if I know he's armed and his hands and
3  arms are extended to his side, no I wouldn't -- I wouldn't
4  discharge my firearm.
5  **Q.**   And the question isn't whether you would or you wouldn't.
6  **A.**   I wouldn't.
7  **Q.**   Do you understand that you are not allowed to discharge
8  your firearm in that situation?
9  **A.**   That's up to that individual.  But me, personally, if I
10  knew that that individual was armed and his arms and hands were
11  extended from his body, even though I knew he was armed, I
12  would not fire my weapon.
13  **Q.**   The first part of your answer was, "That's up to the
14  individual."  I want to make sure I understand that.
15  **A.**   Well, each --
16  **Q.**   Is it your testimony that you believe that you would be
17  within your rights to shoot me if I am standing in front of you
18  the way I am right now and you know I have a gun in my pocket?
19  **A.**   I wouldn't think that would be right.
20  **Q.**   Do you know that that is not allowed?
21  **A.**   My belief, it wouldn't be allowed.  I mean it's just not
22  the right thing to do, if I see his hands extended from his
23  body.  That wouldn't be the right thing to do.
24  **Q.**   And I hate to interrupt you, sir, but I'm not asking you
25  whether you think it would be the right thing to do.

ROBERT FAULCON - Cross

1    A.   Right.
2    Q.   My question is:  Do you know, based on your training as a
3    police officer, based on your experience as a police officer,
4    based on your experience in the military, based on all of the
5    experience that you bring here to court today, do you know that
6    you may not shoot me if I am standing in front of you like I am
7    right now, simply because you know I have a gun in my pocket?
8    A.   I would tend to agree with you to some extent.
9    Q.   To some extent?
10   A.   Correct.
11   Q.   But you're not entirely sure that you couldn't shoot me in
12   this situation?
13   A.   I wouldn't.  I can only speak for me.  I wouldn't do it.
14   Q.   Do you agree you may not shoot somebody simply because you
15   suspect that they committed another crime?
16   A.   No.  Again, we're going back to the totality of the
17   circumstances.  But if I knew that that individual had
18   committed a crime, it could be that he might not be a threat to
19   me, even though he did commit a crime.  So in that instance, I
20   would say no.
21   Q.   Let's start with defining some terms.
22   A.   Okay.
23   Q.   Do you understand what I mean when I say "simply"?
24   A.   Yes.
25   Q.   You realize that means "only"?

1  A.   Yes.  Uh-huh.

2  Q.   You realize that means, when I'm giving you these

3  questions and I say simply because you know something, what I'm

4  asking is, if that's what you know and you don't know anything

5  else.  You understand that; right?

6  A.   Right.

7  Q.   So let me ask this question again.

8          Do you agree that you may not shoot somebody simply

9  because you believe that person previously committed a crime?

10  A.   Okay.  I would agree with you on that -- on those -- on

11  those terms, yes.

12  Q.   Do you agree that that is true even if you believe the

13  person committed a very serious crime?

14  A.   I would have to agree, yes.

15  Q.   Do you agree that that's true even if you believed that

16  the person committed a crime that made you very angry?

17  A.   Well, I wouldn't be angry.  I mean I'm just not that type

18  of person to take anything out on someone because I'm angry.

19  Q.   That leads me to another question.

20          Do you agree -- again, you heard Major Najolia.  Do

21  you agree that a decision to fire your weapon must be based on

22  reason and necessity and not on emotion?

23  A.   Correct.

24  Q.   Do you agree that it is never appropriate to fire your

25  weapon because of anger?

ROBERT FAULCON - Cross

1  **A.**   Yeah.  I would never do that.
2  **Q.**   Do you agree that you may never fire your weapon to punish
3  someone?
4  **A.**   I would never do that.
5  **Q.**   Do you agree that you may never use force to send a
6  message?
7  **A.**   I would never do that.  That's just --
8  **Q.**   And, again, I want to make sure that you are answering my
9  question.  Because my question is not whether you would ever
10 choose to do it.
11 **A.**   Correct.
12 **Q.**   My question is:  Do you understand that you may not use
13 force to send a message?
14 **A.**   Yes.
15 **Q.**   For example, to send a message, "Don't mess with police."
16 **A.**   Yes.
17 **Q.**   Now, do you agree that, as a police officer, you know from
18 day one that any time you do use force your decision to use
19 force will be judged?
20 **A.**   Eventually, yes.
21 **Q.**   So that's not something that was unfairly sprung upon you,
22 that your decision to use force would be judged?
23 **A.**   Yes -- well, no.
24 **Q.**   I asked it --
25 **A.**   Yeah.

ROBERT FAULCON - Cross

1  **Q.**  Would you agree that that was not unfairly sprung upon
2  you?
3  **A.**  Yes, I would agree with you.
4  **Q.**  And you know that every time you pull the trigger one of
5  the standards by which your decision to pull the trigger will
6  be judged is whether a reasonable officer standing in your
7  shoes would make that same decision to pull the trigger.
8          Do you understand that?
9  **A.**  Kind of/sort of.  But you're going on what someone else
10 might do in the same situation.
11 **Q.**  Well -- and, again, I'm asking you about your training.
12 **A.**  Okay.
13 **Q.**  Do you understand, based on your training, that whether --
14 that your decision to shoot will be judged on whether or not it
15 was reasonable?  Do you understand that?
16 **A.**  Yes.  Textbook definition, yes.
17 **Q.**  Do you understand that the definition of "reasonable," by
18 which you will be judged, is whether another officer standing
19 in your position, knowing what you knew, would make that same
20 decision to shoot?
21 **A.**  Again, I would have to kind of disagree, because of the
22 fact you're going on the assumption of what another officer
23 might perceive other than what I might perceive.
24 **Q.**  Were you trained that that is the definition of
25 reasonableness?

ROBERT FAULCON - Cross

1   A.   That's why I stated earlier that's the textbook
2   definition, yes.
3   Q.   Okay.  So let me go back --
4        MR. HESSLER:  Your Honor, I would object, because
5   it's not what another officer would do, it's what a reasonable
6   officer would do.  It's not what anybody else would do, it's
7   what that person perceives is reasonable, the person that's
8   perceiving it at that time.
9        THE COURT:  Well, let's go ahead and maybe rephrase
10  the question.  I don't know that it's being asked differently.
11  But just to make sure the witness understands, I want you to go
12  ahead and rephrase the question.  I didn't detect that he
13  misunderstood, but to be fair, go ahead and rephrase.
14  BY MS. BERNSTEIN:
15  Q.   You understand my question is about your training?
16  A.   Yes, ma'am.
17  Q.   And you already said that you understand from your
18  training that any time you decide to pull the trigger that
19  decision to pull the trigger will be judged based on whether or
20  not it is reasonable; correct?
21  A.   Yes, ma'am.
22  Q.   So my question was:  Based on your training, do you
23  understand that the test of whether or not it's reasonable is
24  whether a reasonable officer standing in your position would
25  have made the same decision?

ROBERT FAULCON - Cross

1  **A.**   Again, I'm going to disagree.
2  **Q.**   So that training that Major Najolia told us about is
3  incorrect; is that --
4  **A.**   To a certain extent.  Again, if you put two officers in
5  the same situation, each officer might react differently.  So I
6  can't go on what's reasonable for everyone in entirety, based
7  on the definition -- you know, the textbook definition.
8  **Q.**   And you keep saying "the textbook definition."  I'm going
9  to come back do that.
10 **A.**   Okay.
11 **Q.**   Do you understand that the textbook definition -- let me
12 ask you another question first.
13          You were taught the textbook definition; correct?
14 **A.**   Yes, ma'am.
15 **Q.**   So you understand that the textbook definition of
16 reasonableness is whether a reasonable officer standing in your
17 position, knowing what you knew, would have made the same
18 decision?
19 **A.**   According to the textbook definition; correct.
20 **Q.**   So you agree that that's what you were trained?
21 **A.**   Yes.
22 **Q.**   Now, so far all of these rules that we've been talking
23 about are rules that you knew on September 4, 2005; correct?
24 **A.**   Based on what we learned in the academy; correct.
25 **Q.**   You also understand that even though Hurricane Katrina had

ROBERT FAULCON - Cross

1   hit, those rules still governed your decision to use force?

2   A.   Yes.  Yes, I would agree.

3   Q.   Do you also agree that you knew on September 4th that any

4   decision to fire your gun had to be a conscious decision?

5   A.   I would agree.

6   Q.   And that goes back to what we were talking about.  It has

7   to be a conscious decision based on your perception of an

8   imminent threat to your life or the life of someone else;

9   correct?

10  A.   Correct.  Along with the totality of the circumstances;

11  correct.

12  Q.   Did you also know on September 4 that you cannot fire your

13  weapon simply because another officer is firing?

14  A.   I would agree.  But, you know, it's your percep- -- it's

15  that officer's perception.

16  Q.   Just to be clear about what we're perceiving --

17  A.   Uh-huh.

18  Q.   -- what matters is your perception of whether or not there

19  is an imminent threat to your life or the life of somebody

20  else; correct?

21  A.   Right.  The life of myself and someone else; correct.

22  Q.   But your perception that another officer is shooting is

23  not sufficient to justify you shooting; correct?

24  A.   Well, I disagree with you on that.  Because at that time,

25  what would be -- what would be -- my point at that time is, why

ROBERT FAULCON - Cross

1  is that officer shooting?  You know, evidently he has perceived

2  a threat and his life is in danger, for him to be discharging

3  his firearm at that point.

4        So my perception is, he is under duress, or whatever

5  specific reason it is he is in fear for his life.

6  **Q.**  That's actually --

7  **A.**  So my perception is based on that right there.

8  **Q.**  Okay.  So that's very helpful.  If I'm understanding you

9  correctly, you are saying that if you see another officer

10  shoot, then you can just start shooting whether or not you

11  perceive a threat yourself; is that --

12  **A.**  No.

13  **Q.**  All right.  So let me go back to my question.

14  **A.**  Okay.

15  **Q.**  If you see another officer shooting, may you fire simply

16  because you presume that that officer perceives a threat?

17  **A.**  Okay.  Now, we are going back to the definition of use of

18  force.  It's when that officer --

19        **MS. BERNSTEIN:**  I'm sorry.  May I ask for a yes/no

20  answer to my yes/no question before an explanation?

21        **THE COURT:**  You can answer yes or no, and then you

22  can explain.

23        **THE WITNESS:**  Okay.  Well, I disagree.  Because then

24  it goes back to the definition, again, if that officer

25  perceives his life is in danger or others.  So that would be my

ROBERT FAULCON - Cross

1   perception at that time, thinking that that officer's life is
2   in danger.  So at that time I can use deadly force because
3   that's part of the definition, whether my life is in danger or
4   that officer's life.  So that would be my perception.
5   **BY MS. BERNSTEIN:**
6   **Q.**   So you disagree with Major Najolia.  You flatout disagree
7   with him on that; is that correct?
8   **A.**   Yes, I would disagree --
9   **Q.**   All right.  So let me go back to the example --
10  **A.**   -- because I -- I'm sorry.
11  **Q.**   Let me go back to the example we talked about with Major
12  Najolia.
13  **A.**   Okay.
14  **Q.**   You respond to a bank robbery and you see an officer just
15  shooting into a bush.
16  **A.**   Okay.
17  **Q.**   Do you understand that you cannot just shoot into that
18  bush?
19  **A.**   I mean, if he was just shooting into a bush, no.  You
20  know, I wouldn't discharge my firearm.
21  **Q.**   And, again, I didn't ask you if you would or you wouldn't.
22  But do you agree that you may not, under those circumstances,
23  shoot into that bush?
24  **A.**   I would agree.
25  **Q.**   And that's true even if you think the officer shooting

ROBERT FAULCON - Cross

1   into the bush is a guy who probably has a good reason to shoot

2   into the bush; correct?

3   A.   Yes.  Yes, I agree.

4   Q.   And the reason you can't just shoot into that bush is

5   because you need to perceive an imminent threat to your life or

6   to that officer's life before you can fire; correct?

7   A.   Correct, to a certain extent.  Again, that would be my

8   perception already, that that officer's life was in imminent

9   danger.  That's why he would be discharging his firearm.

10  Q.   Okay.  So going back to Major Najolia's example, are you

11  changing your answer?  Do you believe you may fire into the

12  bush simply because another officer fired into that bush?

13  A.   Um...  Given the circumstances, I don't know.  I mean it

14  could be -- it could be, I mean, different circumstances.  I

15  can't say yes and I can't say no.

16  Q.   So you disagree with Major Najolia on that?

17  A.   Yes, I do.

18  Q.   Do you agree with Major Najolia that before you fire your

19  weapon you have to go through the PEDA?

20  A.   Uh-huh.

21  Q.   You agree with that?

22  A.   Correct.

23  Q.   The P is perception; correct?

24  A.   Correct.

25  Q.   Before you decide to fire your weapon you have to perceive

ROBERT FAULCON - Cross

1   a threat?

2   A.   Correct.

3   Q.   Correct?

4   A.   Correct.

5   Q.   You agree that that perception has to be your own

6   individual perception and not somebody else's perception?

7   A.   Correct.

8   Q.   So if somebody tells you, "Hey, that guy over there is a

9   threat," you're not allowed to shoot that guy over there?

10  A.   Okay.

11  Q.   You agree with that?

12  A.   Correct.

13  Q.   The E is evaluate; correct?

14  A.   Correct.

15  Q.   You have to evaluate the surroundings; correct?

16  A.   Correct.

17  Q.   And part that is evaluating whether the person you're

18  dealing with has a weapon; correct?

19  A.   Correct.

20  Q.   One thing might be whether that person is on the ground or

21  not; correct?

22  A.   Correct.

23  Q.   One factor might be whether that person is facedown on the

24  ground or not; correct?

25  A.   Correct.

ROBERT FAULCON - Cross

1   **Q.**   All of these are things that you perceive and then you
2   evaluate; right?
3   **A.**   Correct.
4   **Q.**   And then the D is decide.  You decide to fire; correct?
5   **A.**   Correct.
6   **Q.**   And you agree -- and then the A is act.  And that's
7   actually firing; correct?
8   **A.**   Yes.
9   **Q.**   And you agree that every time you pull the trigger you
10   have to be pulling the trigger because you have perceived,
11   evaluated, decided and you are now acting; correct?
12   **A.**   Correct.
13   **Q.**   So you agree with Major Najolia that you may not shoot
14   first and ask questions later; is that correct?
15   **A.**   I disagree.
16   **Q.**   You think it is okay to shoot first and ask questions
17   later?
18   **A.**   From what I understand -- now, I might be wrong.  But from
19   what I understand from his testimony, when they had the chart
20   where you can go from the -- each of the levels, you can -- in
21   certain situations you can go straight to deadly force.
22   **Q.**   And what is that situation when you can go straight to
23   deadly force?
24   **A.**   It could be a subject with a weapon.  I mean, an
25   individual could actually be discharging his firearm against

ROBERT FAULCON - Cross

1    you.  Or he could be pointing a firearm, not discharging the
2    weapon.  That individual could actually be pointing a firearm
3    at you.  So you would escalate, at that point, to direct deadly
4    force.
5    Q.   Would you agree that the only time you can escalate
6    directly to deadly force is when you perceive an imminent
7    threat to your life or the life of another person?
8    A.   Correct.
9    Q.   So you can never shoot before you have done that
10   perception and evaluation.
11   A.   Correct.
12   Q.   Right?
13   A.   Can I make a comment?
14           THE COURT:  Do you want to explain on the prior
15   question?
16           THE WITNESS:  Yes.  Yes, sir.
17           THE COURT:  Go ahead.
18           THE WITNESS:  I understand the concept of PEDA --
19   that's what it's known as, PEDA.
20             But in actuality, in a real-life situation, you
21   only have a fraction of a second.  So it's kind of difficult to
22   say you would perceive -- I would perceive, I would evaluate, I
23   would determine, I would act.  You have a fraction of a second
24   to make a decision whether you are going to live or die.
25

1  BY MS. BERNSTEIN:

2  Q.   And you understand that the rules require you to do that

3  analysis in that fraction of a second; is that correct?

4  A.   Yes, ma'am.  According -- again, according to the

5  textbook, yes.  In reality, I'm sorry to say, I mean, you only

6  have a fraction of a second.

7  Q.   I want to follow up on that.  Does that mean that you are

8  saying, in reality, sometimes it's okay to shoot when you don't

9  really have a reason?

10  A.   I'm not saying that.

11  Q.   So you still believe, in order to shoot, you need to

12  perceive an imminent threat to your life or the life of

13  somebody else; correct?

14  A.   Yeah.  You do need to perceive it; correct.  Yes, ma'am.

15  Q.   Now, let me define this term that I've asked you about,

16  shoot first and ask questions later.

17  A.   Okay.

18  Q.   Do you agree that you may never shoot before you perceive

19  a threat and evaluate it?

20  A.   I would agree with you on that.

21  Q.   Even if it's just a fraction of a second?

22  A.   I would agree.  You have to perceive it to be a threat,

23  correct, whether it's a fraction of a second.

24  Q.   So do we agree, then, that whether your shootings that

25  we're going to talk about that today --

ROBERT FAULCON - Cross

1   A.   Okay.

2   Q.   -- were justified depends on whether you honestly

3   perceived an imminent threat to your life or the life of

4   someone else every time you pulled that trigger?

5   A.   Yes, ma'am.

6   Q.   We also agree, then, that if you did not honestly perceive

7   that threat every time you pulled the trigger, your shooting

8   was not justified?

9   A.   I -- wait a minute.  I disagree with you on that because

10  of the fact, again, when you're perceived with a threat, your

11  life is in danger or someone else's, again, you discharge your

12  firearm until the threat is neutralized.

13          Because you can fire one time and there's still a

14  threat, so you might have to discharge your weapon two or three

15  times until there's no longer a threat.  So I can't say that

16  you would shoot -- fire just one time and the threat would be

17  gone.  It just --

18  Q.   And, again, I think you have answered a question that I

19  didn't ask, so I'll try again.

20  A.   Okay.

21  Q.   You agree that before you shoot the first time you must

22  perceive and evaluate a threat; correct?

23  A.   Correct.

24  Q.   You also agree that once you perceive that threat you will

25  continue shooting until the threat is gone; correct?

ROBERT FAULCON - Cross

1   A.   Correct.

2   Q.   That might be only one time if the threat is then gone;

3   correct?

4   A.   Correct.

5   Q.   It might be twice; correct?

6   A.   Correct.

7   Q.   It might be three times; correct?

8   A.   Yes, correct.

9   Q.   Do you agree that as soon as you no longer perceive a

10  threat you may not fire your weapon again?

11  A.   Correct.

12  Q.   So let me go back to my question, then.

13        Do you agree that if you did not honestly perceive an

14  imminent threat to your life or the life of someone else every

15  time you pulled the trigger, then your shooting was not

16  justified?

17  A.   Well, I can agree with you on that, if you didn't honestly

18  believe or perceive there to be a threat; correct.

19  Q.   Okay.  And if I understand your testimony on direct

20  correctly, when you pulled that trigger the first time it was

21  because you honestly perceived a threat; correct?  That's your

22  testimony?

23  A.   Yes.

24  Q.   And then you pumped that shotgun; correct?

25  A.   Yes.

ROBERT FAULCON - Cross

1   Q.   And you fired again?

2   A.   Yes.

3   Q.   Correct?

4   A.   Yes.

5   Q.   And you pumped it?

6   A.   Yes, sir.

7   Q.   And you fired again?

8   A.   Yes.

9   Q.   And you pumped it?

10  A.   Uh-huh.

11  Q.   And you fired again?

12  A.   Yes.  Now, I don't know how many times I fired.  I'm

13  just -- I didn't know at that time.

14  Q.   Well, let's talk about that because it's not that time I'm

15  asking about.  You're on the stand right now.  You know that

16  you fired that shotgun at least four times at the people on the

17  walkway; correct?

18  A.   That's what later was revealed, correct.

19  Q.   And you don't dispute the ballistics, do you?

20  A.   No.

21  Q.   You don't believe anybody planted your shells at the

22  scene?

23  A.   No.

24  Q.   So you fired your weapon at the people on the walkway at

25  least four times?

ROBERT FAULCON - Cross

1    A.    That's what was later revealed; correct.

2    Q.    So I want to talk to you now about each one of those

3    trigger pulls that you engaged in on September 4th.

4    A.    Okay.

5    Q.    I want to start first at the Crystal Palace.

6          At the Crystal Palace you learned that somebody was

7    shooting at police; right?

8    A.    Correct.

9    Q.    And as we've heard over and over in this trial, that's the

10   last thing an officer wants to hear; right?

11   A.    Yes.

12   Q.    And you talked today about some of the things you had been

13   hearing in the week up to that day.  You had been hearing

14   rumors about violence in the city; correct?

15   A.    Yes.

16   Q.    You had heard about people taking shots at police; right?

17   A.    Yes.

18   Q.    I think you used the term on direct examination

19   "lawlessness in the city"; correct?

20   A.    I didn't say lawlessness.  I said it was chaotic.

21   Q.    And you used the terms -- you said that you felt

22   abandoned; correct?

23   A.    Yes.

24   Q.    You felt betrayed; correct?

25   A.    Yes.

ROBERT FAULCON - Cross

1  Q.   You felt like -- I can't remember the term you used -- but
2  like the world was falling apart around you; is that fair?
3  A.   Yes.
4  Q.   And you all were relying on one another, you and your
5  fellow officers; correct?
6  A.   Yes, ma'am.  At that time, yes.
7  Q.   You all were relying on one another in a city that you
8  thought was full of violence?
9  A.   Yes.
10 Q.   And now you heard that somebody was shooting at police;
11 correct?
12 A.   That's how the call originated, yes.
13 Q.   And you were frustrated; correct?
14 A.   No, I wasn't frustrated.
15 Q.   You were angry?
16 A.   I didn't say I was angry.  I was never angry.
17 Q.   When you heard that somebody out there was shooting at
18 police you weren't angry that somebody was shooting at police?
19 A.   No, ma'am.  I was afraid.
20 Q.   Do you agree with me that you can have more than one
21 emotion at a time?
22 A.   I would assume so.  But, you know, I can tell you right
23 now, as I testified today, I was not angry.  I was more afraid
24 than anything.
25 Q.   Were you angry when someone shot your friend, Officer

ROBERT FAULCON - Cross

1   Kevin Thomas?
2   A.    No.  I was concerned for his life.  I mean, I'm not the
3   type of person to be angry, because I understood the chaos and
4   what was going on in the city.  So...
5   Q.    So you heard that somebody was shooting at police?
6   A.    Yes.
7   Q.    You all grabbed your weapons and you got on the Budget
8   truck; right?
9   A.    Yes, ma'am.
10  Q.    And you had a pump-action shotgun; right?
11  A.    Yes, ma'am.
12  Q.    As you testified earlier, you had been trained on a
13  pump-action shotgun; right?
14  A.    Yes, ma'am.
15  Q.    So you were comfortable with this gun?
16  A.    I wasn't comfortable with that particular weapon because
17  it wasn't mine.  But -- I had trained with a shotgun, but that
18  particular weapon wasn't my weapon.  So I wouldn't say, per se,
19  I was comfortable with it.
20  Q.    You knew how to use a pump-action shotgun?
21  A.    Yes, ma'am.
22  Q.    All right.  So you headed out there to the bridge, and you
23  were in the back of the truck; correct?
24  A.    Yes.
25  Q.    When you got to the bridge, right before the truck stopped

ROBERT FAULCON - Cross

1  you heard firing; is that right?
2  A.   Correct.
3  Q.   Rapid-fire firing; correct?
4  A.   Correct.  It was continuous, yes.
5  Q.   That's the first thing you heard when you got to the
6  bridge?
7  A.   Before the truck stopped.
8  Q.   Yes.
9  A.   Correct.
10  Q.   So you did not hear, "Stop.  Police.  Show us your hands."
11  A.   No, ma'am.  Not in the midst of all that gunfire, no.
12  Q.   And not before all that gunfire?
13  A.   No.
14  Q.   You didn't hear it at all?
15  A.   No.  Not -- not from the back of the truck, no.  Not with
16  all the gunfire that was erupting.
17  Q.   And I hear you saying "not with all the gunfire."
18        I want to make sure, again, that you understand my
19  question.
20        Before you heard all that gunfire erupting, you did
21  not hear anybody yell, "Stop.  Police.  Show us your hands."
22  A.   No, ma'am, I didn't.
23  Q.   So you heard gunfire erupting, and it sounded like it was
24  coming from the front passenger side of the truck; is that
25  right?

ROBERT FAULCON - Cross

1  A.   I didn't say that.  I didn't know where the gunfire was
2  coming from.  I was assuming that we were getting shot at as we
3  arrived on the scene.  So I couldn't -- I couldn't say, "Yes,
4  it's coming from the front of the truck."
5  Q.   You recognized it as assault rifle fire, didn't you?
6  A.   I didn't say that either.  I said "gunfire."
7        The only thing I said, I heard gunfire prior to the
8  truck stopping.  I couldn't distinguish whether it was rifle
9  fire, pistol fire or whatever.  All I know, there were shots
10 being fired.
11 Q.   Again, sir, I need to ask you to pay attention to my
12 question.
13 A.   Okay.
14 Q.   Because I'm not asking you about what you said earlier
15 when your lawyer was questioning you.
16 A.   Okay.
17 Q.   I am asking you new questions.
18 A.   Okay.
19 Q.   So I want to make sure when you answer the questions you
20 are not just telling us what you said before --
21 A.   Yes.
22 Q.   -- but you're actually answering my question.  Okay?
23 A.   Okay.
24 Q.   So my question is:  When you heard the rapid-fire shots,
25 you recognized those shots as assault rifle fire; correct?

ROBERT FAULCON - Cross

1   **A.**   No, I -- no; incorrect.

2   **Q.**   And then the truck stopped?

3   **A.**   Yes.

4   **Q.**   And as soon as that truck stopped you jumped out of the

5   back of the truck; correct?

6   **A.**   After identifying myself; correct.

7           **MS. BERNSTEIN:**  May I approach the board, Your Honor?

8           **THE COURT:**  Yes.

9   BY MS. BERNSTEIN:

10  **Q.**   And I want to follow up on an answer you just gave.  You

11  said you jumped out of the truck after you identified yourself.

12          That's what you just said; right?

13  **A.**   Yes.

14  **Q.**   So while you were in the truck, you identified yourself?

15  **A.**   No.  I mean it occurred simultaneously.  I didn't -- I

16  didn't identify myself while I was in the truck.  As I was

17  exiting the truck, at that point, that's when I identified

18  myself.

19  **Q.**   How did you identify yourself?

20  **A.**   "Police."

21  **Q.**   You said "Police"?

22  **A.**   Yes.

23  **Q.**   As you jumped out of the truck?

24  **A.**   Simultaneously; correct.

25  **Q.**   And as you jumped out of the truck, you had your shotgun

1  in your hand; correct?
2  A.   Correct.
3  Q.   And as you jump out of the truck, you heard firing from
4  the front of the truck; right?
5  A.   Well, actually, I heard firing from all over.
6  Q.   Did you hear firing from the front of the truck?
7  A.   I couldn't distinguish whether it was from in the front of
8  the truck or the side.  It was just gunfire that was erupting
9  in that area.
10  Q.   So you're not sure whether you -- whether you heard any
11  gunfire from the front of the truck; correct?  Is that what
12  you're saying?
13  A.   I couldn't be specific.  I just heard gunfire.
14  Q.   So then when you came around the side of the truck, you
15  looked to see what was happening; correct?
16  A.   Correct.
17  Q.   And when you looked to see what was happening, you
18  testified on direct that you saw an officer standing there
19  firing into the walkway?
20  A.   Can I make a correction?
21  Q.   I want you to answer yes or no first.
22  A.   I'm sorry.  What's the question again?
23  Q.   When you got out of the truck and you came around to the
24  side, you saw an officer standing there firing in the direction
25  of the walkway?

ROBERT FAULCON - Cross

1   A.    I seen the officer standing in the front of the truck by

2   the front bumper.  That's what I testified to.  He was standing

3   in front of the truck.

4   Q.    And nobody asked you who that officer was.  Who was that

5   officer you saw firing?

6   A.    I couldn't identify him.  Out of my peripheral vision, the

7   only thing I can testify to is I saw an officer standing at the

8   front of the truck by the front bumper with a long gun.  That's

9   the only thing I can testify.  I couldn't be specific who he

10  was.  Because, again, we're in the middle of gunfire, and I'm

11  located at the rear of the truck; I'm not on the side of the

12  truck.

13  Q.    Well, let's talk about when you -- where you went when you

14  got out of the rear of the truck.  And I'm going to approach

15  over here.

16          I'm looking at Exhibit 302.

17          You got out of the --

18  A.    Yes.

19  Q.    As you're looking out back of the truck, you got out back

20  left corner; correct?

21  A.    Yes.

22  Q.    And you came around to the passenger side of the truck;

23  correct?

24  A.    And I stopped right there at the rear bumper.  Right

25  there.

ROBERT FAULCON - Cross

1   **Q.**   You came around to the side of the truck; correct?

2   **A.**   Right there.  Okay.

3   **Q.**   You've seen a video of this incident; right?

4   **A.**   Yes, but it didn't show the right side of the truck.

5   **Q.**   Would you agree you were not standing behind the truck?

6   **A.**   Yes.  I would agree I wasn't standing behind.  I was

7   standing right at the rear on the side.

8   **Q.**   So you went around.  So you do agree you want around to

9   the side of the truck?

10  **A.**   Okay.

11  **Q.**   And when you went around to the side of the truck you were

12  firing your gun into the walkway; correct?

13  **A.**   No.  It was further up where the pedestrians were.  They

14  were -- they were further up in front of the truck by the front

15  bumper.  They were further up.  There were not parallel to the

16  side of the truck.  They were further up the walkway.

17  **Q.**   Thank you for correcting that.

18           So you came around the side --

19           **MR. FLEMING:**  Judge, I hate to interrupt.  May we

20  approach momentarily?

21           **THE COURT:**  Yes.

22           **MR. FLEMING:**  Off the record.

23                    **(OFF THE RECORD)**

24  BY MS. BERNSTEIN:

25  **Q.**   Before we broke, you had just corrected me and explained

ROBERT FAULCON - Cross

1  that when you were standing near the back of the truck on the
2  side firing your shotgun, you were firing at people who were up
3  in front of the truck; correct?
4  A.   Correct.
5  Q.   And would you agree -- and you said that there was an
6  officer near the front of the truck also firing that direction;
7  correct?
8  A.   He was standing -- see where that "H" is?
9  Q.   Yes.
10 A.   That's where I observed, out of my peripheral vision, the
11 officer -- where the officer was positioned at.
12 Q.   And that was Defendant Bowen standing there firing his
13 long gun, wasn't it?
14 A.   I couldn't be specific.  I couldn't identify the officer.
15 I just testified that I observed the officer standing by the
16 front bumper of the vehicle and he had a long gun.
17         That's the only thing I could see at that split
18 second out of my peripheral vision while I'm looking at the
19 individuals on the walkway.  So I couldn't -- I couldn't be
20 100 percent sure.  I just couldn't.
21 Q.   Now, you said you can't be 100 percent sure.  Are you
22 pretty sure that was Defendant Bowen?
23 A.   No, I couldn't identify who it was.
24 Q.   Not sure at all who that officer was who was firing into
25 the walkway?

ROBERT FAULCON - Cross

1   A.   No, ma'am.
2   Q.   You would agree that when you got out of the truck in this
3   very dangerous situation the most important thing in your mind
4   was to figure out where there was a threat; correct?
5   A.   I actually had already figured that out.  Because why else
6   would the officers be returning fire prior to the truck
7   stopping?  So I had already determined that there was a threat.
8   Q.   So you had already decided that the officers were
9   returning fire before the truck stopped?
10  A.   Yes, ma'am.  Well --
11  Q.   That's what you just said.
12  A.   -- they were returning fire because they been fired upon.
13  That was my -- my belief at that time.
14  Q.   So following up on what you just said --
15  A.   Uh-huh.
16  Q.   -- while the truck was still moving --
17  A.   Yes.
18  Q.   -- you recognized police officer fire, outgoing fire; is
19  that correct?
20  A.   I'm not saying that.
21  Q.   I don't want to argue with you, sir.  But did you just
22  say --
23  A.   Right.
24  Q.   -- that you had decided before the truck stopped that
25  police officers were returning fire?

ROBERT FAULCON - Cross

1   A.   I didn't say police officers were returning fire.  I said
2   before the truck stopped there was gunfire that was erupting.
3   I couldn't tell whether it was coming from the front of the
4   truck or from where it was coming.
5          But at that time, my belief was they were in imminent
6   danger and they were fearing for their life.  That's why they
7   were discharging, you know, their firearms.
8   Q.   They --
9   A.   Uh-huh.
10  Q.   -- who are discharging their firearms are police officers;
11  correct?
12  A.   Right.
13  Q.   All right.  So let me move along.
14  A.   Okay.
15  Q.   You said when you got out --
16  A.   Correct.
17  Q.   -- you had already decided that there was a threat;
18  correct?
19  A.   Yes, ma'am.
20  Q.   So you hit ground and fired?
21  A.   No.
22  Q.   You still recognized that you had to assess the threat for
23  yourself; is that right?
24  A.   Exactly.  I still had to get out of the truck, and I had
25  to determine what the threat was.

ROBERT FAULCON - Cross

1  Q.   So let me go back to my question.
2        When you jumped out of the back of the truck --
3  A.   Yes.
4  Q.   -- the most important thing at that moment was to assess
5  that threat; correct?
6  A.   Right.  In that time I had when I got out of the back of
7  the truck, yes, for that couple of seconds, yes.
8  Q.   A couple of seconds to figure out whether or not to fire?
9  A.   That's all the time I had.
10 Q.   All right.  And in that couple of seconds what you took in
11 was that there was gunfire?
12 A.   Yes.
13 Q.   And you knew that there was an officer standing right
14 there shooting into the walkway at civilians; correct?
15 A.   I didn't see where he was shooting.  I can't say he was
16 shooting into the walkway.  I know he was discharging his
17 firearm in that direction.
18 Q.   In the direction of the walkway?
19 A.   Yes.  Yes, I would say that.
20 Q.   Well, if I understood you correctly, by seeing him
21 firing --
22 A.   Uh-huh.
23 Q.   -- you concluded that there was an immediate threat;
24 correct?
25 A.   I concluded there was an immediate threat when I saw

ROBERT FAULCON - Cross

1   handguns on two of the individuals that were further up in the
2   walkway in front of the truck.
3   Q.   Okay.  So you did not fire simply because you saw that
4   officer firing.  You fired because, in the two seconds, you saw
5   handguns; correct?
6   A.   Yes, ma'am.
7   Q.   Let's talk about the people in the walkway.
8   A.   Okay.
9   Q.   There were more than two people in the walkway; correct?
10  A.   I later learned.  When I first arrived on the scene, I did
11  observe multiple subjects in the walkway, yes.  So I would
12  agree it was more than two.  I just...
13  Q.   I'm going to have to ask that question again.
14  A.   Okay.
15  Q.   Because in the answer you stuck in the words "I later
16  learned."  So let me ask the question again.
17  A.   Okay.
18  Q.   When you got out of the back of the truck --
19  A.   Yes.
20  Q.   -- and you looked at the walkway --
21  A.   Yes.
22  Q.   -- you saw more than two civilians on the walkway;
23  correct?
24  A.   Yes.
25  Q.   And you saw this officer, whom you have no idea who it

ROBERT FAULCON - Cross

1  was --
2  A.   Yes.
3  Q.   -- firing in the direction of those people on the walkway;
4  correct?
5  A.   Firing in that direction, yes.
6  Q.   And you assumed that he was firing at those people with
7  guns; correct?
8  A.   That was my presumption at that time; correct.
9  Q.   And you looked at where he was firing; correct?
10 A.   No, I can't say I had time to see where he was firing.
11 Because again, within those couple of seconds when I exited the
12 truck, I was concentrating on the two individuals that were
13 further ahead that I saw had handguns.  So I can't say what he
14 saw.
15 Q.   All right.  So you were concentrating on two particular
16 people?
17 A.   Yes.
18 Q.   And those are the people you saw with handguns?
19 A.   Yes.
20 Q.   Now, you said they were further ahead.  Were there people
21 between them and you on the walkway?
22 A.   I couldn't say.  Because I'm telling you -- I mean just a
23 couple of seconds, that's all there was.  It wasn't as if I had
24 time to stand there and ascertain who was where, who was male,
25 who was female.

ROBERT FAULCON - Cross

1  Q.   And I haven't asked those questions, sir.  So I'm trying
2  to follow up on an answer that you gave.
3  A.   Yes.
4  Q.   You have specified several times now that the two people
5  you were focused on were further ahead.
6  A.   Yes.
7  Q.   So let me ask you this.
8        They were further ahead than what?
9  A.   They were further ahead in the front of the truck.
10 Q.   Further ahead than what?
11 A.   Than where the officer was that was discharging his
12 firearm, because he was in the front of the truck.  So that
13 made me concentrate my efforts past the front of the truck,
14 because that's where he was positioned.
15 Q.   When I asked whether there were more than two people, you
16 said yes; correct?
17 A.   Correct.
18 Q.   Were all of the people that you saw further ahead than the
19 officer who was firing in that direction?
20 A.   They were -- they were further ahead.  But, again, the
21 other two individuals were, again, in front of that group.  So
22 they weren't -- they weren't together in a group, per se.
23 Q.   Which brings us back to my question --
24 A.   Okay.
25 Q.   -- if I'm understanding you correctly.

ROBERT FAULCON - Cross

1  A.   Yes.

2  Q.   I'll come over here and just use the walkway --

3  A.   There was some separation between the two.

4  Q.   Am I putting an RF in approximately the right place to

5  represent where you were when you were firing?

6  A.   Yes.

7  Q.   If I'm understanding, there was an officer up at this

8  corner the truck; correct?

9  A.   Yes.

10 Q.   Who was firing in the direction of the walkway; correct?

11 A.   Correct.

12 Q.   And you said there were more than two people in the

13 walkway.  So I want to make sure I understand the people you

14 saw with guns.

15 A.   Okay.

16 Q.   Is this about right?

17 A.   No, a little closer.  Maybe a little closer.  Maybe right

18 there.

19 Q.   Okay.  And I'm going to put two Gs.

20 A.   Okay.

21 Q.   That's where you saw guns; right?

22 A.   Correct.

23 Q.   And you said there were other people in the walkway.

24 A.   Correct.

25 Q.   Am I right that they were between where you were and where

ROBERT FAULCON - Cross

1    the people with the guns were?
2    A.   Yeah.  They were between myself and where the people with
3    the guns were, but they were further back from the first two
4    individuals that were further up.
5    Q.   All right.  Am I in about the right spot?
6    A.   No.  You would have to come down some more.
7             From what I -- from what I can remember, maybe in
8    that direction right there, in that position.
9    Q.   How many?  How many more people am I talking about?
10   A.   I can't say.  I don't know.
11   Q.   At least two?
12   A.   I don't know.  It was just -- it happened so quick, I -- I
13   don't know.  I don't know.
14   Q.   But you've been using a plural word.  So does that mean at
15   least two people?
16   A.   Could be, possibly.
17   Q.   I'm going to put "C" there for two civilians.
18   A.   Okay.
19   Q.   So if I'm understanding you correctly, the reason you
20   claim that you fired into the walkway was because you saw guns
21   in the hands of these people who were up in front of the truck;
22   correct?
23   A.   Correct.
24   Q.   And you fired in that direction; correct?
25   A.   Correct.

ROBERT FAULCON - Cross

1  Q.   Even though there were other people in the way who did not
2  have guns; correct?
3  A.   I don't know if they didn't have weapons or not.  I don't
4  know.
5  Q.   When you were assessing the danger to yourself, didn't you
6  check out the people who were closest to you, to see if they
7  were going to shoot you?
8  A.   Again, this happened in a matter of seconds, one or two
9  seconds.
10  Q.   And in a matter of one or two seconds, you did not see any
11  threat from those people closest to you?
12  A.   In the one or two seconds I couldn't ascertain that, not
13  at that time.
14  Q.   Let's talk about a shotgun, since you had been trained on
15  a shotgun.
16  A.   I have.
17  Q.   A handgun fires one projectile; right?
18  A.   Yes.
19  Q.   A shotgun fires a bunch of projectiles at once; right?
20  A.   Yes.
21  Q.   And sometimes people use the term "spray" to describe what
22  happens to shotgun pellets; right?
23  A.   Correct.
24  Q.   You would agree that a shotgun is not a precision
25  instrument?

ROBERT FAULCON - Cross

1  A.   Correct.

2  Q.   In fact, that's why a lot of people like it for

3  self-defense; right?

4  A.   For different reasons.

5  Q.   Because it sprays?

6  A.   Well, I've never owned a shotgun, so I -- that's just what

7  I heard.

8  Q.   All right.  So I want to ask you a few questions, before

9  we go further, about these shots that you fired.

10  A.   Okay.

11  Q.   You agree that you did not fire your gun accidently?

12  A.   No.

13  Q.   Yes, you agree with that?

14  A.   Yes, I agree.

15  Q.   You agree that you did not fire your gun because you had a

16  finger twitch, because your thought from your brain had not yet

17  reached your finger.  You agree with that?

18  A.   Yeah.

19  Q.   And you know what I'm referring to.  You heard the

20  testimony of the expert the other day; right?

21  A.   Yes.

22  Q.   He talked about how sometimes it takes a while for a

23  message to get from your brain to your finger and you might

24  pull the trigger; right?

25  A.   It might have, and what I -- I mean I can't speak on those

ROBERT FAULCON - Cross

1   medical terms like that, no.
2   **Q.**   But when you fired your weapon, each time it was because
3   you decided to fire it; correct?
4   **A.**   Yes.  Uh-huh.
5   **Q.**   And you fired because you saw those two people with guns;
6   right?
7   **A.**   Yes, ma'am.  That was the only reason.
8   **Q.**   And you said earlier that when you see a threat you focus
9   on that threat; right?
10  **A.**   Yes.
11  **Q.**   So you were focused on those guns; correct?
12  **A.**   For that split second, yes.
13  **Q.**   Well, we've gone from split second to a couple of seconds
14  back to split second.  So let's talk about that.
15  **A.**   Well, that's seconds.
16  **Q.**   I want to talk about the amount of time.
17  **A.**   Okay.
18  **Q.**   You were looking at those people and you saw guns; right?
19  **A.**   Yes.
20  **Q.**   You didn't think you saw guns, you saw guns?
21  **A.**   Yes.
22  **Q.**   And you fired?
23  **A.**   Yes.
24  **Q.**   You heard Major Najolia talk about how you move toward a
25  threat as you fire; correct?

ROBERT FAULCON - Cross

1  A.   I wouldn't move towards no threat -- that's -- me
2  personally?  No, I wouldn't do that.
3  Q.   So you stood in one place?
4  A.   Yes.
5  Q.   And you fired?
6  A.   Yes.
7  Q.   And then you pumped?
8  A.   Yes.
9  Q.   And you still saw that threat; correct?
10  A.   Yes.
11  Q.   And you fired again?
12  A.   Yes.
13  Q.   And you pumped and you fired because you still saw the
14  threat.
15  A.   Yes.
16  Q.   And you pumped and you fired because you still saw the
17  threat.
18  A.   Yes.
19  Q.   So that entire time that you were shooting at least four
20  times -- and you don't know, it could have been more; right?
21  A.   No, it wasn't more.
22  Q.   You don't know that it couldn't have been five?
23  A.   No.  I know it wasn't five because shotguns don't hold
24  that many shells.
25  Q.   Really.  Your Mossberg shotgun didn't hold five shells?

ROBERT FAULCON - Cross

1  A.   I said shotguns don't hold that many shells.  I don't know
2  how many the Mossberg held.  That wasn't my weapon.
3  Q.   When you talked to Sergeant Dugue, with NOPD, did you tell
4  him that that gun held five shells?
5  A.   Yes, I did say that.  And I assumed it was -- I was
6  guessing.  I didn't know.
7  Q.   All right.  So let me go back to my question.
8        We have agreed that you fired at least four times
9  while you were there between the truck and the walkway;
10 correct?
11 A.   That's what was later revealed; correct.
12 Q.   And you don't dispute that.  So we can agree on that
13 point; correct?
14 A.   Yes.
15 Q.   Might you have fired five, since your shotgun carried five
16 shells?
17 A.   I doubt it.
18 Q.   Did you actually reload a few minutes later?
19 A.   A few minutes later?
20 Q.   Uh-huh.
21 A.   No, I didn't actually attempt to reload until we were
22 actually going up the bridge.  And that was just out of
23 instinct.
24 Q.   So you reloaded your shotgun a few minutes later as you
25 were going up the bridge?

ROBERT FAULCON - Cross

1   A.   Yes, ma'am.  I might have put one or two.  I don't know.
2   It was just out of instinct.
3   Q.   All right.  So let's go back.
4        You fired at least four times, pumping each time in
5   between; correct?
6   A.   Yes.
7   Q.   And you agree, then -- and you're sure you did not fire a
8   fifth time?
9   A.   I don't think I did.  I didn't know I fired four times.
10  Q.   So you agree, then, going back to what we talked about
11  earlier, that when you stopped firing, it was because there was
12  no more threat.
13  A.   Yes, ma'am.
14  Q.   Had there been a threat you would have continued to fire;
15  correct?
16  A.   That would be speculation.  I don't know what I would have
17  done.
18  Q.   Well, didn't we just agree earlier that when you see a
19  threat you continue to fire until that threat is neutralized?
20  A.   Yes.  Naturally, you would do that.
21  Q.   All right.  So you stopped firing after four shots because
22  the threat was neutralized; correct?
23  A.   Yes.
24  Q.   Now, when the threat is a gun, which it was in this
25  case -- it was two guns; correct?

ROBERT FAULCON - Cross

1  **A.**   Yes.

2  **Q.**   And you saw those guns and they were handguns; right?

3  **A.**   Yes.

4  **Q.**   When the threat is a gun, there are a couple different

5  ways that threat can be neutralized.

6           Would you agree that that threat can be neutralized

7  when the gun is safely taken into custody?

8  **A.**   Yes.  If it's taken into custody, yes.

9  **Q.**   Now, if the gun is right there on the walkway, that

10 threat's not neutralized yet; right?

11 **A.**   If it's in the walkway?

12 **Q.**   Yeah.

13 **A.**   It wouldn't be secure until it's actually retrieved --

14 **Q.**   Of course.  So there's still a threat.

15 **A.**   -- and unloaded.

16 **Q.**   There's still a threat; right?

17 **A.**   It depends on how you look at it.  I mean -- well, it

18 could be.  It could be.

19 **Q.**   Okay.  And you were looking at this threat until the

20 threat was neutralized; correct?

21 **A.**   Yes.

22 **Q.**   Now, one way to neutralize a threat is if you know for

23 sure the person with the gun is dead and can't do anything with

24 the gun; correct?

25 **A.**   Yes.

ROBERT FAULCON - Cross

1    Q.    But you didn't know whether these people were dead;
2    correct?
3    A.    No.  I had no idea.
4    Q.    You saw that they were on the ground; correct?
5    A.    No, I didn't see that they were on the ground.  I no
6    longer saw them, but I never approached the barrier because
7    I -- you know, I guessed they were on the ground, but I
8    didn't -- I never approached the barrier.
9    Q.    Now, you just testified that you stopped shooting --
10   A.    Right.
11   Q.    -- because that threat was neutralized; right?
12   A.    Right.
13   Q.    And you agree that while the threat is still there, you're
14   not going to turn our back on that threat; correct?
15   A.    No, I'm not.
16   Q.    And you're not going to stop firing until you're sure that
17   threat is neutralized?
18   A.    Correct.  Yes.
19   Q.    So when you stopped firing --
20   A.    Yes.
21   Q.    It was because you knew that that threat was neutralized?
22   A.    Yes.  Uh-huh.
23   Q.    All right.  So I want to explore with you how you knew
24   that threat was neutralized.
25              And one way that a threat can be neutralized is that

ROBERT FAULCON - Cross

1    you know the person with the gun is dead; right?

2    A.   Well, I'm not going to say necessarily dead.  I mean, once

3    the threat is neutralized and that individual is laying on the

4    ground and may be wounded or whatever, to me, he's not a threat

5    at that point.

6    Q.   Well, let me follow up on that.  If the person is lying

7    wounded on the ground, but he still has his gun, he's still a

8    threat; right?

9    A.   If he still has possession of his weapon, yes, he would be

10   considered a threat.

11   Q.   Sure.  And you're not going to turn your back on that;

12   right?

13   A.   No, ma'am.

14   Q.   And likewise, if he drops the gun but it's lying right

15   next to him, that's still a threat?

16   A.   That could be perceived a threat, yes.  If it's within

17   reach, yes.

18   Q.   Let's talk about another way, though, that a threat can be

19   neutralized.

20   A.   Okay.

21   Q.   If you think somebody has a gun and then you realize they

22   don't have a gun --

23   A.   Okay.

24   Q.   -- that also neutralizes the threat; correct?

25   A.   Depending on the circumstances.

ROBERT FAULCON - Cross

1   Q.   So if you're firing at these people because you think you
2   see guns, and then you realize that they are not guns, is the
3   threat neutralized?
4   A.   I was firing at the individuals because I did see guns,
5   not because I thought.
6   Q.   I understand that.
7   A.   Okay.
8   Q.   I'm asking you -- I'm asking you about different ways --
9   A.   Okay.
10  Q.   -- that a threat might be neutralized.
11  A.   Okay.
12  Q.   And I'm asking if you agree with me that one way this
13  threat might be neutralized is if you realize the person has no
14  gun.
15  A.   Yeah.  They wouldn't be a threat if I knew 100 percent
16  that they were unarmed; correct.
17  Q.   All right.  But you did actually correct me, and you said
18  that there was no mistake here.  These people did have guns.
19  A.   Yes.
20  Q.   So we've already agreed that the way to neutralize a
21  threat when somebody does have a gun --
22  A.   Yes.
23  Q.   -- is to take that gun into custody.
24  A.   Yes.
25  Q.   You didn't see anybody take that a gun into custody, did

ROBERT FAULCON - Cross

1   you?

2   A.   No, I didn't.  I never even approached the barrier, so I

3   didn't see that.

4   Q.   Okay.  But you knew that there was no threat --

5   A.   I knew there was no threat --

6   Q.   -- when you stopped firing.

7   A.   -- after the subjects were down.  After I didn't see the

8   subjects and they were down, at that point I considered him not

9   to be a threat to me.

10  Q.   If I'm understanding correctly, you use force if there is

11  an imminent threat to you or to another officer; correct?

12  A.   Correct.

13  Q.   And you agreed that when you stopped firing after that

14  fourth shot it was because you knew that the threat had been

15  neutralized?

16  A.   Correct.

17  Q.   Now, we've talked about whether this was a fraction of a

18  second or a couple of seconds.  And I want to talk about that a

19  little bit.

20  A.   Okay.

21  Q.   Because we've agreed that you fired, pumped; fired,

22  pumped; fired, pumped; fired; correct?

23  A.   Well, it's not like that.  But it's just -- it's quick.  I

24  mean a pump is quick.  It takes, what, a half a second to

25  rerack it?

ROBERT FAULCON - Cross

1  **Q.**   Okay.  So we're talking about --
2  **A.**   If that.
3  **Q.**   -- at least a couple seconds that you're firing; right?
4  **A.**   Yes.
5  **Q.**   What's the longest time you think you might have been
6  firing?
7  **A.**   A couple of seconds.  I mean -- a couple seconds.
8  **Q.**   A couple seconds?
9  **A.**   Yes.
10  **Q.**   All right.  And during that time you're looking at the
11  threat?
12  **A.**   Yes.
13  **Q.**   And after a couple seconds there is no threat?
14  **A.**   There is no threat.
15          **MS. BERNSTEIN:**  Can you play 89, please?
16              There might be a correction on the exhibit
17  number, Your Honor.
18              89-C, Your Honor, is what I'm going to play.
19          **THE COURT:**  All right.  89-C?  That's already in, I
20  believe.
21              Do we have that in?
22          **MS. BERNSTEIN:**  I'm sorry, Ms. Pam.  Which ones are
23  in?
24          **THE DEPUTY CLERK:**  Well, the whole 89 is in, but then
25  we have H and I and J also in.

ROBERT FAULCON - Cross

1           **THE COURT:**  That's what I have, H, I, and also we
2   have a J.  So this is C?
3           **MS. BERNSTEIN:**  Well, we'll try H.  We'll use one
4   that's already in, Your Honor.
5           **THE COURT:**  Okay.
6   BY MS. BERNSTEIN:
7   **Q.**  Actually, before we play this, you agree that you got out
8   as soon as that truck stopped?
9   **A.**  As soon as it stopped; correct, yes.
10  **Q.**  So you were the first one out of that corner; correct?
11  **A.**  I don't know if I was the first one.  I know I was at the
12  corner of the truck when I got out.  I don't know if I was the
13  first one.
14  **Q.**  Well, somebody might have gone out somewhere else in the
15  back of the truck; correct?
16  **A.**  Yeah, I mean...
17  **Q.**  You don't know about that?
18  **A.**  I don't know.  I don't know where the other officers --
19  **Q.**  Would you agree that you didn't see anybody jump down in
20  that particular corner where you jumped down before you did?
21  **A.**  I didn't see anyone.
22  **Q.**  And let me talk about what the other people did.  Because
23  once you came down, Defendant Villavaso jumped out behind you,
24  didn't he?
25  **A.**  I don't know.  I don't know.  When I exited the truck I

ROBERT FAULCON - Cross

1   was at the rear bumper, and I can't -- I can't tell you where
2   no one else was other than that officer in the front of the
3   truck.
4   Q.   Well, did anybody pass by you to come onto the walkway
5   there?
6   A.   I can't -- I can't say.  Because you have to understand,
7   when I exited the rear of that truck, gunfire was -- you know,
8   it was chaotic.  There was gunfire everywhere, you know, and it
9   was continuous.  So I can't tell you where this person was,
10  where that person was.  I can't tell you that.
11  Q.   I understand.  And I'm not asking you to tell us where
12  everybody was.  I want to make sure I explore what you can and
13  cannot tell us.
14  A.   Okay.
15  Q.   You said you came out of the corner of this truck and you
16  stopped right at the back of the truck on the side; correct.
17  A.   Correct.
18  Q.   And do you remember Defendant Villavaso getting out the
19  back of the truck?
20  A.   I can't answer that because I don't know.
21  Q.   So might he have come around to the side of the truck?
22  A.   I don't know.  I mean we -- anything could have happened.
23  He could have gone anywhere, but I can't testify to that
24  because I don't know.
25  Q.   And you're positive you didn't move up along the truck?

ROBERT FAULCON - Cross

1  A.   I'm positive I didn't move up along the truck.

2  Q.   Would you agree, then, if anybody else came out the back

3  of the truck and disappeared on this side, you would have seen

4  them?

5  A.   Yeah, right.  Correct.  Right, because they would have had

6  to pass me up.

7  Q.   Did you see Defendant Villavaso?

8  A.   I did not see Vil.  I can't say I saw Vil.  I can't say I

9  saw Hills.  I can't say Barrios.  I can't attest to that.  I

10  just can't -- I can't say that.

11        MS. BERNSTEIN:  All right.  Let's play the tape,

12  please.

13  BY MS. BERNSTEIN:

14  Q.   And actually, I'm sorry, one more time, because I got off

15  on a sidenote there.

16  A.   Okay.

17  Q.   But I think what we just established was that you looked

18  at the people with guns every single time you fired and pumped;

19  correct?

20  A.   Okay.

21  Q.   And you believe that your four shots took approximately

22  two seconds; correct?

23  A.   I'm guessing, yeah.

24  Q.   Give or take a second?

25  A.   Probably so, yes.

ROBERT FAULCON - Cross

1  **Q.**  And you also agreed that when you stopped firing it's
2  because there was no threat on the walkway.
3  **A.**  Correct.  When I stopped firing; correct.
4                          **(TAPE PLAYED)**
5          **MS. BERNSTEIN:**  I'd like to offer 89C.  It's another
6  snippet of this same.
7          **THE COURT:**  Any objection, Counsel?
8          **MR. HESSLER:**  I don't think we've seen 89C.
9          **MR. LARSON:**  I don't know what the snippet is.
10         **THE COURT:**  How long is 89C?
11         **MS. BERNSTEIN:**  I'm only going to play about a minute
12  of it.  I'm not sure how long it is.
13         **THE COURT:**  All right.  And it's a portion of 89?
14         **MS. BERNSTEIN:**  Correct.
15         **THE COURT:**  Which we have seen.  Why don't we -- I
16  guess if you want to see it first we're going to have to go
17  ahead and play it at Counsels' table first.
18         **MR. LARSON:**  Judge, we won't object if it's a part of
19  89.
20         **MR. HESSLER:**  I understand it's probably a portion of
21  that, Your Honor.  I just want to make sure that it's a portion
22  that's depicted in the format we've seen before.
23         **MS. BERNSTEIN:**  If I can take a minute, Your Honor, I
24  think 89 might be the one I need.
25         **THE COURT:**  All right.

ROBERT FAULCON - Cross

1              MS. BERNSTEIN:  All right, Your Honor.  89 will work.
2   BY MS. BERNSTEIN:
3   Q.   And you've seen this videotape of the shooting numerous
4   times in court and also numerous times before this trial;
5   correct?
6   A.   I only saw this video by being in court.  I've never seen
7   it before -- before the trial started.
8                        **(TAPE PLAYED)**
9   BY MS. BERNSTEIN:
10  Q.   When we play it again, I want you to focus on the back of
11  the truck and tell me if you see legs of somebody who has just
12  gotten out of the back of the truck and is stepping behind the
13  truck.
14                       **(TAPE PLAYED)**
15  BY MS. BERNSTEIN:
16  Q.   Watch the back of the truck.
17          Right there.  Did you see that?
18  A.   I saw an individual at the right rear corner.
19  Q.   Uh-huh.
20  A.   Yes, I saw that.
21  Q.   And you have watched that part of this tape in preparation
22  for trial; correct?
23  A.   No, I never saw the tape until the trial started.  I never
24  saw it previously.
25  Q.   Would you agree that that is you walking behind the back

ROBERT FAULCON - Cross

1  of the truck there?

2  A.   Oh, I can't attest to that.  I just see a dark shadow, a

3  figure.  I can't say if it was me 100 percent.  But I did see

4  an individual step to the right rear.

5  Q.   And when you came around to the right rear of the truck

6  there were no other officers between you and that mysterious

7  officer who was shooting into the walkway; correct?

8  A.   Not that I can recall.

9  Q.   You would probably recall, if there was another officer

10  standing there, you had to be careful not to hit him with your

11  shotgun, wouldn't you?

12  A.   Probably so.  I mean I would see him out of my peripheral

13  vision, at least.

14  Q.   So that's certainly consistent, then, with what you

15  remember of what you did:  Getting out of the back of the truck

16  and going to the passenger side, like we just saw those legs

17  do; correct?

18  A.   If that was me; correct.

19          MS. BERNSTEIN:  All right.  I want you to play it for

20  two more seconds.

21                    (TAPE PLAYED)

22          MS. BERNSTEIN:  Keep going.

23                    (TAPE PLAYED)

24          MS. BERNSTEIN:  All right.  Let's stop.

25

ROBERT FAULCON - Cross

1    BY MS. BERNSTEIN:

2    Q.   We played it for, what, four or five seconds?  And you

3    said that was the outside amount of time that you were

4    shooting; correct?

5    A.   I'm guessing, yes.

6    Q.   Well, you said two seconds, and then we gave you -- we

7    spotted you a second or two; correct?

8    A.   Okay.  Safe to say.

9    Q.   So by this time the threat is done?

10   A.   Yes.

11        MS. BERNSTEIN:  Play it.

12                  (TAPE PLAYED)

13        MS. BERNSTEIN:  Stop it there.

14   BY MS. BERNSTEIN:

15   Q.   And you agree that you are not visible anywhere behind the

16   truck at this point; correct?

17   A.   Correct.

18   Q.   And you didn't get back in the truck; correct?

19   A.   No, I didn't.

20   Q.   And you're not visible on the passenger side of the truck;

21   correct?

22   A.   No.

23   Q.   So you're still over there between the truck and the

24   walkway?

25   A.   Obviously, yes.

ROBERT FAULCON - Cross

1                         **(TAPE PLAYED)**

2   **BY MS. BERNSTEIN:**

3   **Q.**   So you agree with me that while you're standing between

4   the truck and the walkway, there are at least 20 shots once the

5   threat is neutralized?

6   **A.**   According to the film, yes; the video, yes.

7   **Q.**   And that might be 30 shots; correct?

8   **A.**   Could have been.

9   **Q.**   Would you agree with me that it's a whole lot of shots?

10  **A.**   It was multiple, yes.

11  **Q.**   And the people you remember being on the walkway during

12  that time -- not on the walkway, I'm sorry -- during that space

13  between the truck and the walkway, are -- you and that

14  mysterious officer are firing in the direction of the walkway;

15  correct?

16  **A.**   Yes.

17  **Q.**   You don't remember any other officers being there?

18  **A.**   Not from my recollection.  There might have been, but I

19  don't remember.  I don't recall.

20  **Q.**   Did you fire those 20 or 30 shots once the threat was

21  neutralized?

22  **A.**   No, ma'am.  Not at all.

23  **Q.**   Did that mysterious officer at the front of the truck fire

24  those 20 to 30 shots while the threat was neutralized?

25  **A.**   I have no -- I don't know.  I have no idea.

ROBERT FAULCON - Cross

1    **Q.**   Now, while you were standing there between the truck and
2    the walkway, you didn't turn your back to the action, did you?
3    **A.**   No, ma'am, I didn't.
4    **Q.**   And you also didn't duck down behind walkway, did you?
5    **A.**   No.  No, I didn't.  The walkway?  I never approached the
6    walkway.
7    **Q.**   So you were facing the walkway and the officer in front of
8    you; correct?
9    **A.**   Correct.
10   **Q.**   During all of those shots we just heard?
11   **A.**   Correct.
12           **THE WITNESS:**  And can I bring up something, Judge?
13           **THE COURT:**  Is it in connection with something that
14   Counsel has asked you?
15           **THE WITNESS:**  Yes.  It's in regards to the film.
16           **THE COURT:**  Well, she's asked to you identify --
17   she's asked you a specific question about it.
18           Ms. Bernstein, is that...
19           **MS. BERNSTEIN:**  I have my answer.  I have the answer
20   to the question that I asked.
21           **THE COURT:**  It can be covered on redirect.
22           Go ahead.
23           Let me back up.
24           Is it -- do you need to explain an answer to a
25   question that she has already asked you, or do you want to

ROBERT FAULCON - Cross

1  point out something else on the film?  You're allowed to

2  explain if it relates to a question that she's asked.

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Otherwise, save it and it will be covered

5  on redirect.

6          THE WITNESS:  I observed something while she was

7  playing the tape.  There was movement at the rear of the truck,

8  while the other shots were going on, that might have been

9  showing me coming back around.  If but if you could look

10  closely, they had movement, and you could see legs coming back

11  towards the rear of the truck.

12  BY MS. BERNSTEIN:

13  Q.   All right.  I'm going to keep playing it.  And when I keep

14  playing it, it's going to come back to the Danziger Bridge and

15  the truck.

16  A.   Okay.

17  Q.   And I'm going to ask to you listen for a "pow-pow."

18  A.   Okay.

19          MS. BERNSTEIN:  And then after that, I'm going to ask

20  you some questions.  And I want you to stop it after the

21  pow-pow.

22          And can we have the volume, please, so we can

23  hear.

24                    **(TAPE PLAYED)**

25

ROBERT FAULCON - Cross

1   BY MS. BERNSTEIN:

2   Q.   Would you agree that that pow-pow sounded like a handgun?

3   A.   It didn't sound like a large-caliber weapon.

4   Q.   It didn't sound like a rifle?

5   A.   No, not by what I just heard.

6   Q.   It didn't sound like a shotgun?

7   A.   No.

8   Q.   It sounded liked a handgun?

9   A.   That's pretty much what's left.

10  Q.   So you agree with me it sounded like a handgun?

11  A.   Yes.

12  Q.   A pow-pow?

13  A.   Yes.

14  Q.   Did you see who fired that pow-pow?

15  A.   Did I see?

16  Q.   Uh-huh.

17  A.   No, ma'am.

18  Q.   Now, you're one of these guys running up the bridge now;

19  right?

20  A.   I know I was running up the bridge.  I don't know if

21  that's -- because it's blurry.  But I would assume that was me.

22  Q.   Now, sir, you have seen this video before; correct?

23  A.   Well, I've seen it during trial; correct.

24  Q.   And you've seen two guys run up the bridge, and you've

25  seen them stop?

ROBERT FAULCON - Cross

1   **A.**   Yes.

2   **Q.**   And one of those is you; correct?

3   **A.**   Yeah, that's what I'm saying.  I assume that it's me right

4   there now, but it's blurry.  But I did run up the bridge.

5           **MS. BERNSTEIN:**  We'll keep playing.

6                          **(TAPE PLAYED)**

7   BY MS. BERNSTEIN:

8   **Q.**   Now, you can tell that one of those officers is you;

9   correct?

10  **A.**   Yes.

11  **Q.**   And the one with you is Defendant Gisevius?

12  **A.**   Yes.

13  **Q.**   Would you agree that you just came from the passenger side

14  of the truck before you started running up the bridge?

15  **A.**   I didn't see that.

16  **Q.**   Would you agree that you did not see you running along the

17  driver's side of the truck?

18  **A.**   I didn't see that either.  But I didn't see me coming the

19  passenger side either.

20          **MS. BERNSTEIN:**  Can we reverse it?  Can we go back?

21                  Let's go back to the beginning, since it's

22  short.

23                          **(TAPE PLAYED)**

24  BY MS. BERNSTEIN:

25  **Q.**   There goes somebody around the back of the truck.  Did you

ROBERT FAULCON - Cross

1  see that?
2  A.   Yes.
3  Q.   Now, you don't see anybody running along the passenger
4  side of the truck there; right?
5  A.   No.  That right -- at that moment, there's someone there
6  at the rear of the truck.  That's what I was trying to point
7  out, coming back around.
8  Q.   Okay.
9  A.   At that split second.
10 Q.   All right.
11 A.   See, now, the video jumps.  See, the video jumped, so I --
12 it doesn't show it.
13 Q.   And now you and Defendant Gisevius are running up the
14 bridge; correct?
15 A.   Yes.
16        MS. BERNSTEIN:  And we can take it down, but if you
17 can leave it in that same spot.
18 BY MS. BERNSTEIN:
19 Q.   So we established that you stopped firing only once you
20 were sure that the threat was neutralized; correct?
21 A.   Yes.
22 Q.   And after two seconds.  We gave you an extra second either
23 side; right?
24 A.   Yes.
25 Q.   You never saw guns lying in the walkway, did you?

ROBERT FAULCON - Cross

1   A.   I didn't approach the walkway, so my answer would be no.

2   Q.   You never saw any officer jump over into the walkway?

3   A.   No, ma'am, I didn't.

4   Q.   You never saw anybody kick guns off the walkway?

5   A.   No, ma'am, I didn't.

6   Q.   Another thing I want to make sure I understand clearly is

7   that the threat that you were focused on most definitely came

8   from that walkway; correct?

9   A.   Yes.

10   Q.   It came from those two people whom you claim had guns;

11   right?

12   A.   Yes.

13   Q.   So you're clear that the threat didn't come from the

14   grass; it came from the walkway?

15   A.   Yes.  That's what I was focused on, the walkway.

16   Q.   And you also agree that those people you were focused on

17   who had guns didn't fire their guns when you saw them; correct?

18   A.   When I saw them?

19   Q.   Yes.

20   A.   No.  No.

21   Q.   Never saw them fire their guns?

22   A.   No.  Huh-uh.

23   Q.   You fired when you saw that they had guns?

24   A.   I fired when I saw that they had handguns, believing that

25   they had fired upon the officers that was in front of the

ROBERT FAULCON - Cross

1   truck.

2   **Q.**   I'm sorry.  You said you fired believing that they had

3   fired on the officers in the front of the truck; correct?

4   **A.**   Yes.  Yes, because they had handguns.

5   **Q.**   And you didn't see that yourself?

6   **A.**   No.

7   **Q.**   And you also never saw any damage at all to the truck;

8   correct?

9   **A.**   At that time?  I'm not trying to be funny, but I wasn't

10  looking for damage.

11  **Q.**   And I want to be clear with my question, because I didn't

12  ask you if you looked for it at that time.  So let me ask my

13  question more clearly.

14  **A.**   Okay.

15  **Q.**   At any time after this incident did you see any damage to

16  that truck from any shots?

17  **A.**   I didn't -- I didn't look for damage, no.

18  **Q.**   And you also know that that officer, that mysterious

19  officer at the front of the truck, was not hit; correct?

20  **A.**   Yes.

21  **Q.**   You know that you were not hit?

22  **A.**   Yes.

23  **Q.**   You know that no other officer was hit?

24  **A.**   Yes.  I later learned than everybody was safe.

25  **Q.**   So while you're firing at these people, keeping your eyes

ROBERT FAULCON - Cross

1  focused on the threat, you're firing a shotgun at them;
2  correct?
3  A.   Yes.
4  Q.   Did you hit them?
5  A.   I didn't know.
6  Q.   Did they fall to the ground when you fired your shotgun?
7  A.   Eventually, they were no longer visible.
8  Q.   And let me try to keep you focused on my question.
9  A.   Okay.
10  Q.   Because you're looking at them, and you're looking at
11  their guns, and you're pointing your shotgun at them; correct?
12  A.   Yes.  Yes.
13  Q.   And you fire?
14  A.   Yes.
15  Q.   When you fire, does anybody fall to the ground?
16  A.   I would say so, yes.  Uh-huh.
17  Q.   And when you pump and fire again, does anybody fall to the
18  ground?
19  A.   Oh, I see where you're going with it.  You're trying to
20  say that after I fired the first time did they fall?
21       No, they didn't.  If that's what you're insinuating,
22  no.
23  Q.   So when you fired the first time, nobody fell?
24  A.   No.
25  Q.   You had at least four people in the walkway, and you're

ROBERT FAULCON - Cross

1   shooting a shotgun that sprays, and you think you missed
2   everybody?
3   A.   Again, when I stopped firing, that's when the threat was
4   neutralized.
5   Q.   And that was two to three seconds after you got to the
6   passenger side of the truck?
7   A.   Yes.
8   Q.   I want you to estimate how far away you were from the
9   people with guns whom you fired at.
10          Were you about as far away as I am from you right
11  now?
12  A.   Oh, no.  That's -- it was further.
13  Q.   They were further?
14  A.   That's just -- not the length of the -- that's not even
15  the be length of the truck, from me to you -- from the rear
16  bumper to the front bumper.
17  Q.   And those people were in the front of the truck?
18  A.   Yes.
19  Q.   All right.  I want to talk to you about what happened
20  next --
21  A.   Okay.
22  Q.   -- when you and Defendant Gisevius started running up over
23  the bridge.
24  A.   Yes.
25  Q.   As you started running up over the bridge, you saw two

ROBERT FAULCON - Cross

1  people running away right near the top of the bridge; correct?
2  **A.**   Yes.
3  **Q.**   You now know those people to be Lance and Ronald Madison;
4  correct?
5  **A.**   Now I know, yes.
6  **Q.**   And as they ran up and over the bridge, you never saw
7  Lance with a gun; correct?
8  **A.**   No, ma'am.
9  **Q.**   You never saw Ronald with a gun; correct?
10 **A.**   No.
11 **Q.**   You never saw either one of them turn around and point at
12 any of the officers; correct?
13 **A.**   No, ma'am.
14 **Q.**   You never saw Lance Madison aim a shovel at you; correct?
15 **A.**   No, ma'am.
16 **Q.**   They were just running away?
17 **A.**   Yes.  They were -- they were well ahead of me.
18 **Q.**   So you agree with Mike Hunter on that?
19 **A.**   With --
20 **Q.**   You agree with Mike Hunter, that Lance and Ronald
21 Madison --
22        **MR. DESALVO:**  This is improper cross, Your Honor.
23        **THE COURT:**  Yeah.  Let's just ask him what he knows.
24 Let's ask him what he remembers.
25             I'll sustain.  Rephrase the question.

ROBERT FAULCON - Cross

1   BY MS. BERNSTEIN:
2   Q.   Now, as you were running up the bridge on the east side,
3   still --
4   A.   Yes.
5   Q.   -- with Defendant Gisevius --
6   A.   Yes.
7   Q.   -- you didn't perceive an immediate threat; correct?
8   A.   No, I didn't, because of the distance between myself and
9   the individuals that went on top of the bridge.
10  Q.   And as you ran up the bridge, you also didn't perceive a
11  threat from the people in the walkway, because you knew that
12  threat was already neutralized; correct?
13  A.   Yes.  They were behind me at that point.
14  Q.   And as you ran up the bridge, there were concrete barriers
15  on either side; correct?
16  A.   Yes.
17  Q.   You didn't feel the need to take cover behind either of
18  those concrete barriers; right?
19  A.   No, not at that point.
20  Q.   Because there was no threat; right?
21  A.   Yes.
22  Q.   And you were running with Defendant Gisevius; correct?
23  A.   Yes.
24  Q.   And Defendant Gisevius, as you ran, never took cover
25  behind one of those concrete barriers?

ROBERT FAULCON - Cross

1   A.   Not that I can recall.

2   Q.   And you would recall that because he was right with you;

3   correct?

4   A.   Yes.

5   Q.   And then you get a little ways up the bridge, and you both

6   stop; correct?

7   A.   Yes.  I saw that in the video, yes.

8   Q.   And when you stopped you were reloading your shotgun;

9   correct?

10  A.   I'm attempting to.

11  Q.   You were attempting to?

12  A.   Yes.

13  Q.   Did you actually reload your shotgun?

14  A.   I can't even remember, to be honest with you.  I know I

15  was fumbling with it, so I can't say that, yes, I did.

16  Q.   You know you had at least one shot left; right?

17  A.   I wasn't counting.  So...

18  Q.   Well, you know now.

19  A.   I would just assume.

20  Q.   Let me ask you.  You know now that, at that point, you had

21  at least one shot left because you fired it a few minutes

22  later; right?

23  A.   Yes.

24  Q.   All right.  So when you stopped and tried to reload,

25  Defendant Gisevius was, what, about an arm's length away from

ROBERT FAULCON - Cross

1  you?

2  A.   According to the video, that's what it appeared.  I

3  mean...

4  Q.   Now, let me ask you.

5          As you're going up the bridge after these two

6  people --

7  A.   Yes.

8  Q.   -- Lance and Ronald Madison --

9  A.   Yes.

10 Q.   -- you believed in your mind, at the time, that Lance and

11 Ronald Madison might have been involved in shooting at police;

12 right?

13 A.   Yes.

14 Q.   So you believed that they were potentially dangerous

15 people; correct?

16 A.   Yes.  Because we were -- at that point, we were still

17 getting radio transmissions from the officers that were on the

18 I-10 saying that that's -- giving descriptions saying, "That's

19 them.  They're getting away.  They're running on the west

20 side."

21         So at that point, yes, I -- you know.

22 Q.   And I'm glad you just said that, because I meant to ask

23 you a follow-up on that.

24         But as you were running after Lance and Ronald

25 Madison, you heard -- or you heard people on the radio say,

ROBERT FAULCON - Cross

1   "That's them.  That's them"; right?

2   A.   Yes.

3   Q.   And that's the first time you heard anybody on the radio

4   say, "That's them.  That's them"; correct?

5   A.   Yes.  That was my first time, when we got to the top of

6   the bridge.

7   Q.   All right.  So as you were running up the bridge after

8   Lance and Ronald Madison, you believed that they might be

9   armed; correct?

10  A.   Yes.  Based with information that I had, by them fleeing,

11  and the radio transmissions that we were getting, the

12  descriptions, yes, at that time.  Yes.

13  Q.   And so they are a potential threat; is that fair?

14  A.   Yeah, that's fair.

15  Q.   So you're keeping your eye on that potential threat as you

16  go up the bridge?

17  A.   Yes.

18  Q.   And when you stop on that bridge, Defendant Gisevius fires

19  at them; correct?

20  A.   According to the video.

21  Q.   Well, you were there, sir; right?

22  A.   Well, I can't -- I mean at that time, I was focused on the

23  two that was running.  So according to the video, I can attest

24  to that, yes.

25  Q.   And I don't want to ask you to attest to the video.

ROBERT FAULCON - Cross

1   A.   Okay.
2   Q.   So I want to explore what you can tell us about what
3   happened that day when you were on the bridge watching this
4   potential threat with Defendant Gisevius next to you.
5   A.   Well, actually, I -- to be honest with you, I really
6   didn't remember him firing.  I knew he was with me, but I
7   just -- I didn't -- I just couldn't recall it.
8   Q.   All right.  So what you can say for sure is you did not
9   see any threat coming at you and Defendant Gisevius as you went
10  up that bridge?
11  A.   No, ma'am.
12  Q.   I'm sorry.  Is what I said correct?
13  A.   Yeah.  Yes, you're correct.
14  Q.   All right.  I want to talk you to about what happened.
15  A.   Okay.
16  Q.   You all ran to the top of the bridge.
17  A.   Yes.
18  Q.   And you said, when you got to the top of the bridge, you
19  saw Lance and Ronald running down the other side; correct?
20  A.   Correct.
21  Q.   Still, you were focused them because they were a potential
22  threat; right?
23  A.   Correct.
24  Q.   Still, you never saw either one them with a gun; correct?
25  A.   Not at that point, no.  No.

ROBERT FAULCON - Cross

1  **Q.**   Let me ask --
2  **A.**   No.
3  **Q.**   Let me ask it again, to make sure we're clear.
4  **A.**   All right.
5  **Q.**   You never saw Lance Madison with a gun, did you?
6  **A.**   No, I didn't.
7  **Q.**   And you never saw Ronald Madison with a gun, did you?
8  **A.**   No.  No.
9  **Q.**   All right.  So when you're at the top of the bridge
10 watching them run away, you're focused on them still; right?
11 **A.**   Yes.
12 **Q.**   And you said you heard some gunshots when you were at the
13 top of the bridge?
14 **A.**   Yes.
15 **Q.**   Those gunshots did not come from Lance and Ronald Madison,
16 because you were watching them; correct?
17 **A.**   Well, I said the gunshots were in the general area.
18 **Q.**   Well -- and I haven't asked you who fired them yet.  I'm
19 asking who didn't.
20 **A.**   Right.
21 **Q.**   You know that Lance and Ronald Madison did not fire them;
22 correct?
23 **A.**   I didn't see them.  No.
24 **Q.**   And you were looking at them?
25 **A.**   Yes.

ROBERT FAULCON - Cross

1   **Q.**   So you know that they did not fire those shots?

2   **A.**   Yes.

3   **Q.**   And there were other officers there at the top of the

4   bridge with you; right?

5   **A.**   The only one that I can recall is Sergeant Gisevius, when

6   he was running up the bridge with me.

7   **Q.**   And when you got to the top of the bridge,

8   Defendant Gisevius fired down at those people; isn't that

9   right?

10  **A.**   I can't attest to that.  I don't -- I can't recall that.

11  **Q.**   So you can't say he didn't?

12  **A.**   I can't say he did and I can't say he didn't.

13  **Q.**   So is it possible that those shots you heard at the top of

14  the bridge were him firing down?

15  **A.**   No, because they was off in the distance.  So if -- if

16  that was the case, it would have been right in my ear, so I

17  would have known 100 percent that he was firing his weapon.

18  But this was in the general area, so I can't say it was

19  specifically him.

20  **Q.**   I'm confused.  Was it in the general area or was it off in

21  the distance?

22  **A.**   It was -- well, it was off in the distance, but in the

23  area, should I say, to kind of sum it up.

24  **Q.**   Well, you're looking down the bridge at Lance and Ronald

25  Madison; right?

ROBERT FAULCON - Cross

1    A.    I'm looking down the bridge, but I'm still at the top of
2    the bridge.
3    Q.    Right.
4    A.    Correct.
5    Q.    Did you see other civilians on the bridge as you were
6    looking down?
7    A.    No, ma'am.
8    Q.    Did you see other civilians at the top, or was it just
9    officers at the top?
10   A.    The only one that I can recall at that time was myself and
11   Sergeant Gisevius.
12   Q.    At about that point, a Louisiana state trooper pulled up;
13   right?
14   A.    Yes.
15   Q.    And you jumped into the passenger seat with that trooper;
16   right?
17   A.    Yes.
18   Q.    Defendant Gisevius and Mike Hunter jumped in the backseat;
19   correct?
20   A.    I later learned that.  But at the time, I didn't know.  I
21   just later learned that at another time.
22   Q.    Now, when you talked to Sergeant Dugue in your NOPD
23   statement, you were asked specifically whether anybody else got
24   in the trooper's car with you; right?
25   A.    Yes.

ROBERT FAULCON - Cross

1  Q.   He asked you, "Okay.  And you were picked up by the state

2  trooper, just yourself"; right?

3  A.   Correct.

4  Q.   And you said, "Yeah, just myself"; right?

5  A.   Correct.  That's what I just said.  I don't recall them

6  getting in there.

7  Q.   And you have to say that, because that's what you said in

8  your NOPD statement; correct?

9           MR. LARSON:  Objection, argumentative.

10          THE COURT:  I'm going to overrule.  It's cross.

11          THE WITNESS:  I'm saying that because that's the

12  truth.  Because, at that time, I didn't remember.

13  BY MS. BERNSTEIN:

14  Q.   All right.  So let me get in your mind, then, at the time.

15  You're pursuing this potential threat; correct?

16  A.   Yes.

17  Q.   You're in a very tense situation; right?

18  A.   Yes.

19  Q.   You've just run up the bridge with Defendant Gisevius,

20  your fellow officer; right?

21  A.   Yes.

22  Q.   You are pursuing this threat together; right?

23  A.   Yes.

24  Q.   And if I'm understanding your testimony correctly, it's

25  that you jumped in this trooper car, and you didn't know where

ROBERT FAULCON - Cross

1    the guy who was with you went?

2    A.    No, I did not.  Speaking of Sergeant Gisevius?

3    Q.    Uh-huh.

4    A.    No, I didn't.  As I was getting in the state trooper car,

5    at the same time that's when gunfire was erupting.  So I was

6    concentrating on getting in the state trooper car with the

7    trooper.

8             So at that point, I can't say -- I didn't know where

9    Sergeant Gisevius was.  But I later learned that he was also in

10   the vehicle.

11   Q.    So now you know that Sergeant Gisevius was in the rear

12   driver's side; correct?

13   A.    I later learned that.

14   Q.    And you don't dispute that?

15   A.    No.  If that's what the trooper testified to, then, yes.

16   Q.    And Mike Hunter was in the rear passenger side?

17   A.    That was learned later by me.

18   Q.    You don't dispute that?

19   A.    No.

20   Q.    And as you drive down the bridge, you're focused still on

21   Lance and Ronald Madison; correct?

22   A.    Yes.

23   Q.    The entire way down the bridge, you are focused on them;

24   correct?

25   A.    Yes.

ROBERT FAULCON - Cross

1  Q.   And as you're going down the bridge, you never lost sight
2  of them; correct.
3  A.   No, I -- I was focused on them.
4  Q.   So you agree that you never lost sight of them?
5  A.   Yes.  Uh-huh.
6  Q.   And during that entire time, as they're running down the
7  bridge --
8  A.   Okay.
9  Q.   -- they never turned around and threatened you?
10 A.   I'm not saying he didn't turn around, but he didn't turn
11 around and threaten me.
12 Q.   Neither one of them had a gun?
13 A.   Not that I could see at that point.
14 Q.   Neither one of them fired at you?
15 A.   No, ma'am.
16 Q.   And as you saw them running, you were assuming that they
17 had fired at the I-10?
18 A.   Based on the information that I was getting from the
19 officers on the I-10 across the radio, yes.
20 Q.   As you went down the bridge in that trooper car you gained
21 on them; correct?
22 A.   Somewhat, yes.
23 Q.   Well, you got closer and closer until you pulled up
24 alongside of them; correct?
25 A.   No, we never pulled up alongside of them.  We were always

ROBERT FAULCON - Cross

1    at a distance.  But we were in the middle lane, so we were

2    pretty much at a 45-degree angle, but still behind them.  We

3    were never parallel to them.

4    Q.   All right.  So you said a 45-degree angle, but still

5    behind them.  So that means you pulled up pretty close;

6    correct?

7    A.   I wouldn't say "close."  Again, we were in the middle

8    lane.  They were on the sidewalk all the way adjacent to the

9    building.  So they were a ways to my right.

10   Q.   And let me come back to the distance off to your right.

11   Let me focus on the distance straight ahead for right now.

12   A.   Okay.

13   Q.   Would you agree that you pulled up within about 10 to

14   15 feet of them lengthwise?

15   A.   No, ma'am.  It was further than that.

16   Q.   But it was close enough that you were on a 45-degree angle

17   from them?

18   A.   We were at a 45-degree angle, but there was still a great

19   amount of distance between us and the two that were running.

20   Q.   Because you were in the middle lane and they were off to

21   the side?

22   A.   Correct.

23   Q.   And would you agree that as you pulled closer to them, to

24   a 45-degree angle, neither one of them shot at you?

25   A.   No.

ROBERT FAULCON - Cross

1  **Q.**  Neither one of them pointed anything at you?
2  **A.**  No.
3  **Q.**  They just ran straight ahead?
4  **A.**  Yes.
5  **Q.**  And then you saw the man you know to be Lance Madison --
6  **A.**  Yes.
7  **Q.**  Turn the corner and run into the Friendly Inn Motel;
8  right?
9  **A.**  I didn't know where he ran.  Once he disappeared around
10  the corner, I lost sight of him at that point.  So I don't know
11  what happened to him after that.
12  **Q.**  Just to be clear, the corner we're talking about is the
13  entrance to that motel; correct?
14  **A.**  Correct.
15  **Q.**  And at that point, Ronald Madison was running in the same
16  direction; correct?
17  **A.**  Correct.
18  **Q.**  And Ronald Madison turned to look at you; correct?
19  **A.**  Correct.
20  **Q.**  You were chasing him?
21  **A.**  I wouldn't say "chasing."  We were pursuing.
22  **Q.**  You were pursuing him --
23  **A.**  Yes.
24  **Q.**  -- and he turned to look at who was pursuing him; correct?
25  **A.**  Correct.  That was the third time that he actually turned

ROBERT FAULCON - Cross

1   and -- to locate where myself and the state trooper was.
2   **Q.**   All right.  Let's talk about that.  You claim he turned a
3   first time to locate you and the trooper; correct?
4   **A.**   I'm not saying I'm claiming that.  That's what he did.
5   **Q.**   And I want to make sure I understand, because I want to go
6   bit-by-bit here.
7   **A.**   Right.  That's what he did.
8   **Q.**   So according to you, he turned a first time to look at you
9   and the trooper; right?
10  **A.**   Two previous occasions; correct.
11  **Q.**   I'm going to go one at a time.
12  **A.**   Okay.  Yes.
13  **Q.**   So I'm going to ask you to listen to my question.
14  **A.**   Yes.
15  **Q.**   He turned a first time to look at you and the trooper?
16  **A.**   Yes.
17  **Q.**   He did not shoot at you?
18  **A.**   No.
19  **Q.**   He did not pull a gun on you?
20  **A.**   No.
21  **Q.**   And you did not shoot him?
22  **A.**   No.
23  **Q.**   And then according to you, he ran a little further?
24  **A.**   Yes.
25  **Q.**   Still without threatening you; correct?

ROBERT FAULCON - Cross

1   A.   Yes.
2   Q.   And then he turned a second time; right?
3   A.   Yes.
4   Q.   He did not pull a gun on you?
5   A.   No.
6   Q.   He did not shoot at you?
7   A.   No.
8   Q.   He just looked, according to you?
9   A.   Yes.  And when he looked, he was trying to see where we
10  were -- where we were.  He was trying to locate our location.
11  Q.   He was trying to locate your location?
12  A.   Yes.  By looking over his left shoulder, he was actually
13  trying see where we were.
14  Q.   So meaning he was looking at you?
15  A.   Yes.
16  Q.   All right.  And you didn't shoot?
17  A.   No.
18  Q.   Now, that first time when he turned and looked at you, you
19  didn't yell, "Stop.  Police," did you?
20  A.   No, ma'am.
21  Q.   And then he turned to look at you again, according to you;
22  right?
23  A.   Yes.
24  Q.   And you didn't yell, "Stop.  Police," did you?
25  A.   No, ma'am.

ROBERT FAULCON - Cross

1  Q.   And then he simply continued to run in that direction
2  where his brother had gone; correct?
3  A.   Yes.
4  Q.   And then he turned around the third time; right?
5  A.   Yes.
6  Q.   And you shot him in the back?
7  A.   No.  I didn't.  It didn't go down like that.
8        What happened was, when he got to the corner of the
9  building, he was slumped over a little bit.  His arms were in
10 front of his body and his hands were tucked in front of his
11 body.
12       So when he looked at me over the left shoulder, by
13 that time the other individual had disappeared.  So I was under
14 the assumption that we were going to -- you know, that's when I
15 feared for my life, that myself and the state trooper were
16 going to be shot at or perhaps ambushed.
17       So at that point --
18 Q.   Let me --
19 A.   I'm sorry.
20 Q.   I think you've gotten a little astray from my question.
21 A.   Uh-huh.
22 Q.   But I want to go back to something you just said.
23 A.   Yes.
24 Q.   You said the guy we know to be Lance turned the corner;
25 correct?

ROBERT FAULCON - Cross

1  A.   Yes.

2  Q.   And the guy we know to be Ronald --

3  A.   Yes.

4  Q.   -- was slumped over and was going in that same direction;

5  correct?

6  A.   Yes.

7  Q.   And you said, "And I assumed we were going to be

8  ambushed."

9  A.   Well, I shouldn't have used the term "assumed."

10        At that point, that's when I feared for our life, and

11  the state trooper, that we were going to be shot at from around

12  the corner of the building by he and the other individual that

13  had disappeared, because his hands were tucked in his body, and

14  I couldn't see his hands.

15        So at that point, that's when I knew we were going to

16  be shot at or ambushed from around the corner of the building,

17  to prevent us form pursuing any further.

18  Q.   Let's go bit-by-bit there.

19  A.   Okay.

20  Q.   He turned to look at you -- this is, according to you, a

21  third time, now; right?

22  A.   Yes.

23  Q.   And you shot him in the back?  Yes or no on that.

24  A.   I shot in that direction.

25  Q.   And you hit him in the back?

ROBERT FAULCON - Cross

1  A.   I believe it was the right upper shoulder, if I'm not --
2  I'm trying to recall.
3  Q.   Would you agree it was the back of the right shoulder?
4  A.   Yes.
5  Q.   All right.  And I want to follow up on what you just said.
6  A.   Yes.
7  Q.   Which is that you were shooting him because you didn't
8  want him to turn the corner and then ambush you?
9  A.   No.  I was -- no.  I'm not saying I didn't want him to
10  turn the corner.  I'm saying at that time that's when I feared
11  for my life and the state trooper, that we were going to be
12  shot at from around the corner by he and the other individual
13  that had disappeared, or perhaps ambushed.  That's when I
14  discharged my firearm.
15  Q.   So you shot this man in the back proactively to keep him
16  from shooting you after he went around the corner; is that
17  correct?
18  A.   No.  At that point, that's when -- at that point, that's
19  when I feared for my life and knowing that we were going to be
20  shot -- shot at.  That's when I discharged my firearm, not
21  presuming, not to be keeping him from going around the corner.
22  Q.   And before you shot him --
23  A.   Yes.
24  Q.   -- in the back --
25  A.   Yes.

ROBERT FAULCON - Cross

1   **Q.**   -- you didn't yell, "Stop.  Police."

2   **A.**   No, ma'am.

3   **Q.**   Would you agree that you were the only person who shot

4   Ronald Mad- -- shot at Ronald Madison at that point as he was

5   running toward the motel?

6   **A.**   Yes.

7   **Q.**   Mike Hunter, sitting behind you, didn't shoot at him?

8   **A.**   No.

9   **Q.**   And Defendant Gisevius, in the rear passenger seat, before

10  you shot that man in the back, said "Don't shoot," didn't he?

11  **A.**   I didn't hear that.

12  **Q.**   You didn't hear him say, "Don't shoot"?

13  **A.**   No, ma'am.

14          **THE WITNESS:**  Can I add something to that, if I may?

15          **THE COURT:**  Is it in connection with your answer to

16  her question?

17          **THE WITNESS:**  Yes.

18          **THE COURT:**  Okay.  Go ahead.

19          **THE WITNESS:**  The reason I didn't yell "Police" was

20  the fact, if you heard from the earlier testimony from the

21  expert, a lot of times you don't yell "Police," only when it's

22  feasible.  Because when you yell "Police" in a situation like

23  that, you know, when you feel that you're about to be shot, it

24  gives away your location.

25                    So what happens, you put yourself in more of a

ROBERT FAULCON - Cross

```
 1    dangerous situation.  So at that time, I didn't feel as though
 2    it was feasible because of the point that -- the fact that I
 3    was about to be shot.
 4    BY MS. BERNSTEIN:
 5    Q.   And I'm glad you clarified.  I want to follow up on that.
 6             You understand that if it's feasible you need to yell
 7    "Police" --
 8    A.   Yes.
 9    Q.   -- if you can do that without enhancing the danger;
10    correct?
11    A.   Exactly.
12    Q.   And if I'm understanding you correctly, you are saying
13    that as you were driving down behind Lance and Ronald Madison,
14    you made a conscious decision not to yell "Police"; correct?
15    A.   You have to realize that --
16    Q.   I'm sorry.  Just a yes or no, please, before you explain.
17    A.   No.  Look.  So can I explain?
18    Q.   Yes.
19    A.   We were still at a great distance from the two subjects
20    that were running.  Again, we were coming down the bridge, but
21    they were at a distance where it wasn't feasible to yell
22    "Police," because we were in the middle lane, and they were to
23    the far right on the sidewalk.  So it was a great distance
24    between us.
25             We weren't, you know, within 10 or 15 feet.  So at
```

ROBERT FAULCON - Cross

1    that point it wasn't feasible, because we were still coming
2    down the bridge.
3    Q.    And I want to make sure we're talking about at the same
4    point.  So let me fast-forward you to the first time, according
5    to you, Ronald Madison turned to get a fix on you and the G98
6    14trooper; right?
7    A.    Yes.
8    Q.    And he sees you and the trooper; right?
9    A.    I would assume so, yes.
10   Q.    And then, according to you, he runs a little further
11   without threatening you.  And then he turns again; correct?
12   A.    Yes.
13   Q.    And he looks at you again?
14   A.    Yes.
15   Q.    And then he runs a little further.  And according to you,
16   he turned a third time and you shoot him in the back?
17   A.    By that time he was at the corner of the building.  Yes.
18   Q.    My question to you was about whether or not you yelled
19   "Stop.  Police," before you shot the man in the back.
20          And your answer, if I understood it, was you didn't
21   yell, "Stop.  Police," because you made an assessment that that
22   would give away your location; is that correct?
23   A.    Yes.  It would further endanger me.
24   Q.    All right.  I want to shift gears a little bit and see if
25   we can agree on some more rules.

ROBERT FAULCON - Cross

1  A.   Okay.

2  Q.   Do you agree that when -- actually, you know what?  I

3  don't want to do that quite yet.  I want to talk to you about

4  something you didn't testify about on direct.

5          I want to talk to you about what happened after you

6  shot Ronald Madison.

7  A.   Okay.

8  Q.   When you testified on direct, you jumped right from that

9  minute until when the Louisiana State Police SWAT team was

10 there; correct?

11 A.   Yes.

12 Q.   You agree that the Louisiana State Police SWAT team was

13 not there when you shot and killed Ronald Madison?

14 A.   No, ma'am.

15 Q.   You agree they were not there?

16 A.   No, they weren't there.

17 Q.   And you agree that when they got there, they eventually

18 came down the bridge in one of those big armored vehicles;

19 right?

20 A.   Yes.

21 Q.   All right.  So I want to talk about that span of time that

22 you skipped over before.

23 A.   Uh-huh.

24 Q.   When you shot Ronald Madison, according to you, it was

25 because you perceived a threat from him; correct?

ROBERT FAULCON - Cross

1   A.   Yes.  I felt we were -- myself and that trooper were going
2   to be shot at; correct.
3   Q.   All right.  And we've already established that when you
4   perceive a threat you keep your focus on that threat; correct?
5   A.   Correct.
6   Q.   So you kept your focus on Ronald Madison; right?
7   A.   Up to what point?
8   Q.   Right after you shot him.  You kept your focus on him;
9   right?
10  A.   Well, after he -- after he fell on the ground, then,
11  again, my attention was directed at the state police that were
12  responding.
13  Q.   Well, now, we already talked about the fact that if
14  somebody has a gun, the fact that the person is on the
15  ground --
16  A.   Right.
17  Q.   -- doesn't render the threat neutralized; right?
18  A.   Right.
19  Q.   That's still a threat until you know absolutely that the
20  person doesn't have a gun; right?
21  A.   Yes.
22  Q.   Or until you know absolutely that the person is dead;
23  right?
24  A.   Yes.
25  Q.   Or until you know absolutely that that gun has been taken

ROBERT FAULCON - Cross

1   into custody; right?

2   A.   Yes.

3   Q.   So let me go back to -- you claim that you shot Ronald

4   Madison because you perceived a threat; right?

5   A.   Yes.

6   Q.   So you must, then, have kept your focus on Ronald Madison

7   until you were 100 percent sure that that threat was

8   neutralized.

9   A.   No, I didn't.  I didn't keep focus on him.  Again, my

10  attention was diverted to the state police that were

11  responding.

12  Q.   Well, would you agree with me that they weren't there yet?

13  A.   They were there maybe right afterwards.

14  Q.   Seconds?

15  A.   I'm not going to say seconds, but they were there

16  promptly.

17  Q.   Two minutes?

18  A.   I don't -- I can't give you one minute, two minutes.  But

19  they were there promptly.

20  Q.   Would you agree it wasn't seconds?

21  A.   I wouldn't say it was seconds.  But, again, they were

22  there promptly.

23  Q.   Did they see you shoot Ronald Madison?

24  A.   I don't know.

25  Q.   All right.  So I want to make sure I understand your

ROBERT FAULCON - Cross

1  testimony --
2  A.    Uh-huh.
3  Q.    -- which is that you shoot Ronald Madison, and within
4  seconds you turn around and start paying attention to something
5  else; is that right?
6  A.    Yes.  I stood by the rear of the police vehicle.  I never
7  approached Mr. Madison, nor did I approach that driveway.
8  Q.    So you didn't see whether Mike Hunter went over and stood
9  over him?
10  A.    I did not approach that -- the reason I didn't approach
11  Mr. Madison, because he was in the driveway.  I still knew
12  there was a threat around that corner, so I was not approaching
13  the corner of that building.  So I never made an effort to
14  approach the body.
15  Q.    So now we have two threats, if I'm understanding you.
16  There's -- Ronald Madison is the threat, which is why you shot
17  him; correct?
18  A.    Correct.
19  Q.    And now you're saying that Lance Madison is also still a
20  threat to you; correct?
21  A.    Correct.  And the reason I say Lance Madison was a threat
22  to me, because I didn't know where he was.  He could have been
23  still around corner waiting for me to come around the corner.
24  So, to me, that was ascertained as a threat.  That's why I
25  didn't approach.

ROBERT FAULCON - Cross

1   **Q.**   So that makes sense.  That if you are scared of a threat
2   over here, you're going to keep your eyes focused to make sure
3   that threat doesn't get you; right?
4   **A.**   Correct.
5   **Q.**   All right.
6   **A.**   Somewhat.
7   **Q.**   So you did that; right?
8   **A.**   Somewhat, yes.
9   **Q.**   So you kept your focus on Ronald Madison and where you had
10  seen Lance Madison go; correct?
11  **A.**   Yes.
12  **Q.**   Did you see Mike Hunter go over and stand over Ronald
13  Madison?
14  **A.**   I did not see that.
15  **Q.**   Did you go over to make sure that he didn't have a gun
16  that he was going to use to shoot you with?
17  **A.**   I didn't approach the body.  I didn't approach the
18  driveway.  I didn't approach the corner of the building.
19  **Q.**   You called him a "body."  You didn't know he was dead at
20  that point, did you?
21  **A.**   Well, I didn't know he was dead at the time.  But when I
22  say "body," because he was lying on the ground.
23  **Q.**   Still a threat?
24  **A.**   He was still a threat.  That's why I didn't approach.
25  **Q.**   So you never did check out Ronald Madison?

ROBERT FAULCON - Cross

1  A.   I never approached.

2  Q.   While you were standing there looking in the direction of
3  these perceived threats --

4  A.   Yes.

5  Q.   -- isn't it true that Defendant Gisevius went to the left
6  corner of the motel and fired at Lance Madison running away?

7  A.   I didn't see Sergeant Gisevius.  I don't know where he was
8  at that point.

9  Q.   Did you hear officers firing at Lance Madison as he ran
10  away?

11  A.   I didn't hear any gunshots after that, after everything
12  was over.

13  Q.   Because you switched your focus to the Louisiana State
14  Police?

15  A.   Yes.  That's where my attention was.  But if there had
16  been gunshots, obviously, I would have heard that.

17  Q.   So I want to make sure I understand, and I just want to
18  make sure I understand you correctly, which was that within a
19  couple of seconds after you shot Ronald Madison, you turned
20  your attention elsewhere?

21  A.   Yes.

22  Q.   And you didn't look back at Ronald Madison?

23  A.   No, I didn't.

24  Q.   So you can't tell us whether or not Defendant Bowen
25  stomped on Ronald Madison?

ROBERT FAULCON - Cross

1    A.   No, I can't.  I can't testify to that.

2    Q.   All right.  Now, I want to do what I said I was going to

3    do a minute ago and talk you to about some more rules --

4    A.   Okay.

5    Q.   -- to see if we can agree on some rules.

6         Do you agree that when a police officer shoots

7    somebody that's a very serious matter?

8    A.   Yes.

9    Q.   When a police officer shoots and kills somebody, that's a

10   very serious matter?

11   A.   Yes.

12   Q.   When a civilian fires at a police officer, that's a very

13   serious matter?

14   A.   Yes.

15   Q.   So would you agree that involved in this Danziger incident

16   we have a lot of very serious things going on; correct?

17   A.   Yes.

18   Q.   And you agree that when a civilian threatens a police

19   officer with a gun, that's a very serious crime; right?

20   A.   Yes.

21   Q.   And if a civilian fires a gun at police, that's an even

22   more serious crime; right?

23   A.   Yes.

24   Q.   And you know that when there is a serious incident like

25   this there has to be a report; correct?

ROBERT FAULCON - Cross

1   A.   Yes.

2   Q.   Do you agree that a report in an incident like this has to

3   be accurate?

4   A.   I would hope it would be accurate, yes, if it's being

5   investigated.

6   Q.   A report has to be complete; correct?

7   A.   Yes.

8   Q.   It has to be accurate?

9   A.   Yes.

10  Q.   It has to be truthful?

11  A.   Yes.

12  Q.   Now, you know that an investigator investigating a very

13  serious crime gets statements from witnesses; correct?

14  A.   Yes.

15  Q.   And you understand that witnesses have to provide accurate

16  statements to the investigator in order for that report to be

17  truthful; correct?

18  A.   Yes.

19  Q.   You also understand that reports are legal documents;

20  right?

21  A.   Yes.

22  Q.   You know, as a police officer, that reports are used by

23  prosecutors; right?

24  A.   Yes.

25  Q.   They're used by prosecutors to make decisions about

ROBERT FAULCON - Cross

1   whether or not people get charged with crimes; correct?
2   A.   Yes.
3   Q.   In a case like this, reports might be used by prosecutors
4   to decide whether, for example, police officers get charged;
5   right?
6   A.   Yes.
7   Q.   And they will also use these reports to determine whether
8   civilians get charged with these very serious crimes of
9   assaulting or attempting to kill police officers; right?
10  A.   Yes.
11  Q.   And you knew all those things back on September 4th;
12  right?
13  A.   Sure.  Uh-huh.
14  Q.   You also know that when you give a statement in a case it
15  has to be complete?
16  A.   Yeah.  Sure.
17  Q.   It has to be accurate?
18  A.   Yes.
19  Q.   Has to be truthful?
20  A.   Yes.
21  Q.   You know that a statement you that give, just like a
22  report, is a legal document; right?
23  A.   Yes.
24  Q.   That's going to be relied on by prosecutors?
25  A.   Yes.

ROBERT FAULCON - Cross

1   **Q.**   Decisions are going to be made on the basis of it?
2   **A.**   Correct.
3   **Q.**   And you know that when you give a statement saying that
4   two people in the walkway had guns --
5   **A.**   Uh-huh.
6   **Q.**   -- you know that that statement is going to be used to
7   decide whether those two people get charged with a very serious
8   crime; correct?
9   **A.**   Correct.  Uh-huh.
10  **Q.**   Now, those two people with guns, the ones that you were
11  looking at --
12  **A.**   Correct.
13  **Q.**   -- they weren't Susan Bartholomew; right?
14  **A.**   No.  No.
15  **Q.**   They weren't Lesha Bartholomew?
16  **A.**   No.
17  **Q.**   They weren't an older guy, were they?
18  **A.**   No.
19  **Q.**   So that leaves Jose Holmes and James Brissette; right?
20  **A.**   That's what I later learned.  I didn't know who they were
21  at the time.
22  **Q.**   So at the time you gave your statement saying that those
23  two people had guns, you didn't know their names were Jose
24  Holmes and James Brissette; right?
25  **A.**   No, I didn't know them.  Huh-uh.

ROBERT FAULCON - Cross

1   Q.   But still, you knew that your statement was going to go to
2   a prosecutor who would use that statement in evaluating whether
3   these people would get charged?
4   A.   Yes.
5   Q.   And you agree that when a civilian gets charged with
6   attempting to kill a police officer, that civilian is facing
7   very serious legal ramifications; correct?
8   A.   Yes.
9   Q.   That civilian --
10  A.   I would assume so.  Yes.
11  Q.   That civilian might be deprived of liberty; correct?
12  A.   Sure.  Uh-huh.
13  Q.   Would you agree that the United States is one of the
14  greatest countries in the world?
15  A.   Yes.  I served eight years active duty.  Of course.
16  Q.   Would you agree that one of the things that makes this
17  country great is our U.S. Constitution?
18  A.   Sure.
19  Q.   And you understand that one of the fundamental rights in
20  our U.S. Constitution is the right to due process; right?
21  A.   Correct.
22  Q.   And let's talk about due process.  Because that due
23  process right in the Constitution, as you understand it, means
24  that everybody has the right to be tried fairly before being
25  convicted of something; correct?

ROBERT FAULCON - Cross

1   A.   Yes.

2   Q.   It means that a police officer on the street can't be

3   judge, jury, and executioner; right?

4   A.   Correct.

5   Q.   It means that if somebody is accused of a crime, they have

6   the right to know that they're accused of a crime?

7   A.   Correct.  Sure.

8   Q.   And they have the right to answer that charge?

9   A.   Sure.

10  Q.   They have the right to have a lawyer?

11  A.   Yes.

12  Q.   They have the right to have their fate decided by a jury

13  of their peers?

14  A.   Yes.

15  Q.   They have a right to have the trial presided over by an

16  impartial judge?

17  A.   Sure.

18  Q.   They have the right to call witnesses?

19  A.   Yes.

20  Q.   They have the right to cross-examine or have their lawyers

21  cross-examine people who accuse them; correct?

22  A.   Yes, uh-huh.

23       MR. LARSON:  Your Honor, let me object to this line

24  questioning.  She's asking him legal questions.

25       THE COURT:  Well, I think he's giving -- he can

ROBERT FAULCON - Cross

1   answer based on his knowledge of the process, even as a

2   layperson and as a former law officer.

3                  So I think the jury understands that he's not

4   being asked as an expert in the law; but, rather, based on his

5   appreciation of things that are a fairly common process, so I'm

6   going to let him answer.

7   **BY MS. BERNSTEIN:**

8   **Q.**   And you know, as a police officer, that every person in

9   this country has the right not to be prosecuted on the basis of

10  false evidence; correct?

11  **A.**   Correct.

12  **Q.**   Would you agree with me that if a police officer provides

13  false evidence to be used against a person that that police

14  officer commits a crime?

15  **A.**   Correct.

16  **Q.**   You knew that on September 4th; correct?

17  **A.**   Correct.  Uh-huh.

18  **Q.**   And you knew that on June 9th, 2006; correct?

19  **A.**   Correct.

20  **Q.**   And we talked about the fact that every single person in

21  this country has the right not to be prosecuted on the basis of

22  false evidence.

23                  You agreed with that; right?

24  **A.**   Yes.

25  **Q.**   And you agree that when we say every single person has

ROBERT FAULCON - Cross

1  that right, that includes a person who you think might be
2  guilty?
3  A.    Sure.  Yes.
4  Q.    Even guilty people have that right?
5  A.    Yes.
6  Q.    All right.  And all those things we just talked about,
7  that's one of the reasons that it's so important that a report
8  be completely accurate and truthful; right?
9  A.    Yes.
10 Q.    And one of the reasons why a statement has to be
11 completely accurate and truthful?
12 A.    Yes.
13 Q.    Let's talk specifically about a statement in a
14 police-involved shooting.
15        When an officer gives a statement in a
16 police-involved shooting, would you agree that the most
17 important thing to go in that statement is the fact that you
18 shot and why you shot?
19 A.    Yes.
20 Q.    You agree that that is fundamental?
21 A.    Yes.
22 Q.    That that is the most important thing?
23 A.    Yes.
24        MS. BERNSTEIN:  May I have Exhibit 208, please, page
25 2.

ROBERT FAULCON - Cross

1              For the record, this is already in evidence.

2    It's the statement of Robert Barrios.

3    **BY MS. BERNSTEIN:**

4    **Q.**   Now, do you agree that you did not ever hear Sergeant

5    Bowen on the bridge yell, "Police.  Stop.  Stop, police.  Show

6    me your hands."

7    **A.**   Yes.

8    **Q.**   Do you agree that you never, on the bridge, yelled "Stop.

9    Police.  Hold your -- show me your hands."

10   **A.**   No.  I never said that on the bridge.

11              **MR. LARSON:**  Your Honor, she's questioning him about

12   somebody else's statement.

13              **THE COURT:**  Yeah, I'm kind of confused as to -- we

14   were asking him about something that Mr. Barrios said?

15              I don't think he's going to be responsible for

16   something that Mr. Barrios said that he wasn't present for.

17              **MR. LARSON:**  She can ask him questions about whether

18   anybody did something, but not whether somebody said something

19   like that.

20              **THE COURT:**  Yes.  Let's move off of Barrios'

21   statement.  You can ask him what he did as a matter of fact, or

22   since he's given a statement and we've played it, you can ask

23   him about that, or about something in a report that's

24   attributable to him.

25              But just asking him about Mr. Barrios is not

ROBERT FAULCON - Cross

1  particularly helpful.
2  **BY MS. BERNSTEIN:**
3  **Q.**   When you got out of the back of the truck and saw the
4  civilians on the walkway, those civilians never ran down the
5  walkway toward you, did they?
6  **A.**   No, ma'am.
7  **Q.**   Those civilians never ran east down the walkway toward
8  Downman Road?
9  **A.**   Not that I saw.
10 **Q.**   You never saw women on the walkway with guns?
11 **A.**   No.
12 **Q.**   The officer, the mysterious officer who was shooting into
13 the walkway, from what you could tell, that person was shooting
14 at the threat that you saw; correct?
15 **A.**   Yes, ma'am.
16 **Q.**   As far as you could tell, that person was not shooting
17 down into the concrete?
18 **A.**   Not that I can recall.  Again, I wasn't actually
19 concentrating on what he was shooting at or what he was
20 pointing.  But he was pointing in that direction.
21 **Q.**   If I understood you correctly, part of what made you fear
22 for your life was that this officer was shooting at people;
23 correct?
24 **A.**   Yes.  Because at that time, I believed that they had been
25 fired upon.

ROBERT FAULCON - Cross

1  **Q.**   When you started running up the road --
2  **A.**   Okay.
3  **Q.**   -- up the bridge --
4  **A.**   Yes.
5  **Q.**   -- you never saw Defendant Bowen standing in the road
6  shooting up the bridge, did you?
7  **A.**   No, I didn't.
8  **Q.**   According to you, you never saw Defendant Bowen at all;
9  correct?
10 **A.**   I don't remember where he was.
11 **Q.**   Unless maybe he was that guy shooting into the walkway;
12 right?
13 **A.**   Could have been, but I'm not 100 percent sure.
14 **Q.**   But that certainly could have been Bowen?
15 **A.**   Yeah.  Anything could have been possible, yes.
16 **Q.**   Where did you first see Gisevius?
17 **A.**   Actually, when we were going up the bridge.  And that's
18 basically what I remember from the time of getting out of the
19 back of the truck to going up the bridge.  And that's when I
20 recall him -- being beside him.
21 **Q.**   Did you see Gisevius, before that, walk over to the
22 barrier and fire down into the walkway?
23 **A.**   Did I see him do that?
24 **Q.**   Uh-huh.
25 **A.**   No, ma'am.

ROBERT FAULCON - Cross

1  Q.   Now, you've seen on the videotape when he walks over to
2  the walkway; correct?
3  A.   I'd have to look at it again.
4           MS. BERNSTEIN:  Let's go to 89, please.
5           MR. HESSLER:  Again, I can see this coming.
6           MS. BERNSTEIN:  I'm not asking the question you think
7  I'm going to ask.
8           MR. HESSLER:  Well, just in case you do -- you don't
9  know what question I think you're going to ask.  I can't -- I
10 guess what I'm thinking she's going to ask is --
11           (WHEREUPON, the following proceedings were held at
12 the bench.)
13           MR. HESSLER:  She just made a statement of what
14 Gisevius did, which I think is improper.
15           MS. BERNSTEIN:  It's a leading question.
16           MR. HESSLER:  No, it was a statement of what he did.
17 He denied it and now you're going to show him a question -- I
18 mean, now you're going to show him a video and ask him, "Is
19 that Gisevius stepping toward --
20           THE COURT:  The question was:  "Did you see him walk
21 over to the barrier?"
22           MS. BERNSTEIN:  And fire down into the walkway,
23 that's a leading question.
24           THE COURT:  And he said, "No."  He said, "No."
25           MS. BERNSTEIN:  Correct.  And I am not going to ask

ROBERT FAULCON - Cross

 1 | him the question that you think I'm going to ask him now.  I'm
 2 | not going to ask him to describe --
 3 |         THE COURT:  Let's just make sure we all know what it
 4 | is.
 5 |         MS. BERNSTEIN:  I'm not going to ask him to describe
 6 | what he sees on the video.  I'm going to ask him a question
 7 | about timing and whether saw Defendant Gisevius at that point
 8 | walk to the barrier.  I'm not going to ask about his
 9 | interpretation of whether or not Gisevius is firing.
10 |         MR. HESSLER:  Okay.  Can I ask one question?  My
11 | client has to use the restroom really, really badly and I've
12 | kind of got to go --
13 |         MS. BERNSTEIN:  I kind of have to also.
14 |         THE COURT:  How close are you.
15 |         MR. HESSLER:  Do you want to do it now?
16 |         MS. BERNSTEIN:  I don't know, but I have a little
17 | ways left.  I wouldn't mind taking a break.
18 |         THE COURT:  It's kind of early in the day to go up to
19 | 5:00.
20 |         MS. BERNSTEIN:  It's a quarter to 3:00.
21 |         THE COURT:  Yes, I know.
22 |         MS. BERNSTEIN:  So there would two hours left at the
23 | end if we took it now.  I can a little longer.  I was just
24 | trying to accommodate them.
25 |         MR. HESSLER:  Are you going to go two more hours?

ROBERT FAULCON - Cross

1          **THE COURT:**  How long do you think you have?

2          **MS. BERNSTEIN:**  I don't have my notes in front of me,

3   but definitely more than 15, 20 minutes.

4          **MR. HESSLER:**  Then we got redirect after that.

5          **THE COURT:**  All right.  Let's go ahead and take it

6   now then.

7          **MR. HESSLER:**  Thank you, Your Honor.

8          (WHEREUPON, the following proceedings were held in

9   open court.)

10         **THE COURT:**  We're going to go ahead and take our

11  afternoon pit stop here.  It's about -- almost 10 minutes to

12  3:00.  So, again, it's a little bit earlier than we had

13  planned.  Let's plan on starting at 3:05, again, 15 minutes.

14  We can take a short restroom break.

15              And, sir, if you could be up here -- you can

16  step down if you want during the break, but just be up here at

17  five after 3:00.

18         **THE DEPUTY CLERK:**  All rise.

19         (WHEREUPON, the jury exited the courtroom.)

20         **THE COURT:**  Counsel, if you all will approach.   In

21  the meantime, if anyone needs to use the restroom, now is a

22  good time to do it.

23         (WHEREUPON, the following proceedings were held at

24  the bench.)

25         **THE COURT:**  So are we going to finish with him today,

1  do we anticipate?
2          MR. LARSON:  Oh, yes.
3          MR. HESSLER:  I think so.
4          MR. FLEMING:  I anticipated Bobbi going until 5:00.
5          MS. BERNSTEIN:  I'm not going to go until 5:00, Your
6  Honor.
7          THE COURT:  All right.  A couple times I thought you
8  were winding up, but that's your prerogative.
9          MS. BERNSTEIN:  I've got some left to cover.  I
10 really don't know how much because I haven't looked, and you
11 see me with my notes, I'm jumping back and forth.
12         THE COURT:  All right.  That's fine.  Not no pin you
13 down, 20 minutes, 25 minutes?
14         MS. BERNSTEIN:  Please don't pin me down, Your Honor,
15 I just don't know.  I'm not looking at my notes.
16         MR. FLEMING:  Pin her down and say ten minutes,
17 Judge.
18         THE COURT:  No, we're making progress.
19         MS. BERNSTEIN:  I'm pinned to I will not go the whole
20 day.
21         THE COURT:  I think it's fair a question.
22         MR. CARTER:  Who else do we have?
23         MR. LONDON:  We're not going to finish him today.
24         MR. DESALVO:  I've got an hour of redirect.
25         THE COURT:  Are your kidding?  I couldn't see his

ROBERT FAULCON - Cross

1    face.

2            THE COURT:  What about is Hills off the board now

3    since we've heard Hunter and Barrios?

4            MR. FLEMING:  I'm sorry, Hills is off the board.

5            THE COURT:  Hills if off.  All right.

6            MR. FLEMING:  I think we'd like to do a transcript do

7    a transcript.

8            MR. HESSLER:  Depends on how much time we have.

9            THE COURT:  Well, we can fill up and if we have to

10   take a break overnight.

11           MS. BERNSTEIN:  May I leave this in my colleague's

12   hands and run to the restroom?

13           THE COURT:  Yes.  I'm almost done too.  All right.

14   That's all I need to know.  So we would finish up with him and

15   then you would like to start a transcript.

16           (WHEREUPON, the following proceedings were held in

17   open court.)

18           (WHEREUPON, the Court took a recess.)

19           THE DEPUTY CLERK:  All rise.

20           (WHEREUPON, the jury entered the courtroom.)

21           THE COURT:  All right.  You may be seated.  We'll go

22   ahead and have our last session of the day here.

23              Mr. Faulcon, you're still under oath.  Have you

24   discussed your testimony with anyone during the break?

25           THE WITNESS:  No, sir.

ROBERT FAULCON - Cross

1          **THE COURT:**  Okay.  Ms. Bernstein, let's go ahead and
2    finish up with our cross-exam.
3          **MS. BERNSTEIN:**  Thank you, Your Honor.
4    **BY MS. BERNSTEIN:**
5    **Q.**   I think when we left we were talking about reports, but I
6    want to go back and hit a couple things that I forgot to ask
7    earlier.
8          I want to take you back to the east side of the
9    bridge where you shot at the people in the walkway.  From the
10   time you got out of the back of the truck, you never saw any of
11   those civilians jump off the bridge into the grass, did you?
12   **A.**   No, ma'am.
13   **Q.**   And from the time you got out of the truck until the time
14   you shot Ronald Madison on the other side of the bridge, you
15   never saw Lance Madison throw a gun; is that right?
16   **A.**   No, ma'am.
17   **Q.**   All right.  Now, I want to come back to the guns you saw
18   in the hands of two civilians.  You're positive that those are
19   guns, correct, that you saw?
20   **A.**   Yes, yes.
21   **Q.**   That was not a misperception?
22   **A.**   No, no.
23   **Q.**   So you agree that if that were a misperception and you
24   then realized that they didn't have guns, that would be a very
25   important thing to put in your statement; correct?

ROBERT FAULCON - Cross

1  A.   Yes.
2  Q.   And you agree that there's a very big difference between
3  "they had guns" and "I thought they had guns."
4  A.   Yes.
5  Q.   Would you agree that if they did not in fact have guns,
6  your statement would be untruthful?
7  A.   If I -- if they didn't?
8  Q.   Correct.
9          MR. DESALVO:  Your Honor, that's a nonsense question.
10         THE COURT:  I think we need to stick with what he
11  knows, what he saw, his factual testimony.  The jury can
12  consider the evidence, but I think you need to stick with his
13  factual testimony.
14            You can ask him about a lot of hypothetical
15  things, but he's testifying as to what he saw, his perception,
16  like any other witness in the case.
17  BY MS. BERNSTEIN:
18  Q.   So I want to ask you about the audiotaped statement you
19  gave to Sergeant Dugue.
20  A.   Yes.
21  Q.   You already agreed that it needs to be completely accurate
22  and truthful; correct?
23  A.   Yes.
24  Q.   Do you agree that that completely accurate and truthful
25  statement needs to include not only what you did and why, but

ROBERT FAULCON - Cross

1  also anything you saw other officers do?  Correct?
2  A.   Yes.
3  Q.   And you agree that if you purposely lied in this
4  statement, that would be a crime?
5  A.   Yes.
6  Q.   Now, you agreed earlier that after you stopped shooting,
7  once the threat was neutralized --
8  A.   Yes.
9  Q.   -- there were a whole lot more shots fired; correct?
10 A.   After I finished firing?
11 Q.   Well, we watched the video.
12 A.   Yes.
13 Q.   And you agree that within about four seconds, being
14 generous, after you got out of the back of the truck --
15 A.   Right.
16 Q.   -- there was no more threat; correct?
17 A.   Right.  That was my perception, correct.
18 Q.   We didn't count the shots, but you agree there was
19 somewhere, 20, 30, maybe more shots fired after that; correct?
20 A.   Yes.
21 Q.   Is the fact that there were 20, 30 or more shots fired
22 after the threat was neutralized contained anywhere in your
23 statement?
24 A.   No.  I don't think I even was asked that.
25 Q.   Do you agree that if an officer covers for another

ROBERT FAULCON - Cross

1  officer's use of force, that's a crime?

2  A.   Sure, uh-huh.

3  Q.   Do you agree, for example, if you know who fired into the

4  walkway and lied about that, that would be a crime?

5  A.   Yes, uh-huh.

6  Q.   Going back to that time after the first four seconds or so

7  when you got out, you agree that if you fired after that time,

8  that would be unjustified; correct?

9  A.   If I fired after -- repeat that again.

10  Q.   Once you got out of the back of the truck --

11  A.   Right.

12  Q.   -- within four seconds, being generous, the threat was

13  over; correct?

14  A.   Right.

15  Q.   Do you agree that if you fired after that time, that would

16  be unjustified?

17  A.   Yes, after the threat was neutralized.  Yes, I mean it

18  would be because there's no longer a threat.

19  Q.   And you agree, then, because you knew that rule, if you

20  fired after the first four seconds or so, that would also be a

21  crime; correct?

22  A.   If I fired after the four seconds and there was no longer

23  a threat?

24  Q.   Correct.

25  A.   And I fired again?

ROBERT FAULCON - Cross

1    Q.   Correct.

2    A.   Yes.  That wouldn't be necessary.

3    Q.   And it would be a crime; correct?

4    A.   Yeah.  I would assume it would be, yes.

5    Q.   Would you agree that a police-involved shooting is a very

6    stressful thing?

7    A.   Yes.

8    Q.   Would you agree that if an officer is involved in a

9    justified shooting, that officer is lucky to have witnesses to

10   the shooting?

11   A.   It's always good to have witness, yes.

12   Q.   If the shooting is good, it's always good to have

13   witnesses; yes?

14   A.   Either/or, really.

15   Q.   Would you agree that if an officer is involved in a bad

16   shooting, it's unlucky to have witnesses if those witnesses are

17   going to tell the truth?

18   A.   I was about to say that.  If they're going to tell the

19   truth, it's good to have witnesses either/or, in either

20   situation.

21   Q.   So if you have a bad shooting, it's lucky to have a

22   witness who will say it's a bad shooting?

23   A.   If there was a bad shooting, I would rather have a witness

24   to tell the truth.

25   Q.   To say that you were involved in a bad shooting?

ROBERT FAULCON - Cross

1          **MR. HESSLER:**  Your Honor, I'm going to object to the
2     term "bad shooting."
3          **THE COURT:**  I think we need to define that term.
4     BY MS. BERNSTEIN:
5     Q.   We already talked about your shooting of Ronald Madison.
6     You learned that day that Ronald Madison was not, in fact,
7     armed; correct?
8     A.   I didn't learn it that day.
9     Q.   Didn't you ask anybody whether they found a gun on Ronald
10    Madison?
11    A.   No, ma'am.  The only thing I did after the incident, we
12    went back to the Crystal Palace, and I gave a brief gist.  And
13    at that point, we just went back into rescue operations again.
14    But I knew the incident was going to be investigated, so when
15    it was time for me to give a statement, then that's when I
16    would give a statement.
17    Q.   Did you know that day that Ronald Madison was dead?
18    A.   I later learned.
19    Q.   So you knew -- well, let me ask you:  That day, did you
20    learn that day that Ronald Madison was dead?
21    A.   I later learned, I think it was that day.  I think it was
22    that day, later on, late in the day, later on, correct.
23    Q.   So you knew that you had killed a man?
24    A.   Yes.
25    Q.   If I'm understanding you correctly, your testimony is that

ROBERT FAULCON - Cross

 1  when you learned that you killed a man, you never asked whether

 2  he was armed?

 3  **A.**   No, I didn't.  I didn't even inquire about it because I

 4  knew that it was going to be investigated.

 5  **Q.**   You also knew that there were some witnesses around when

 6  you shot Ronald Madison; correct?

 7  **A.**   No, I did not know.

 8  **Q.**   For example, you knew that there was a trooper who was in

 9  the car with you; correct?

10  **A.**   Yes, I was aware of the trooper.  Correct.

11  **Q.**   And given the importance -- you've just told us how good

12  it is to have a witness to a shooting -- certainly you went and

13  got that trooper's name; right?

14  **A.**   I didn't.

15  **Q.**   Didn't you want to get the name of the person who would be

16  able to say whether or not -- or who would be able to say what

17  happened in your shooting?

18  **A.**   Once I exited the vehicle with the trooper, I didn't see

19  that trooper anymore.  So it was incumbent upon the

20  investigator, which that was my assumption, that they would get

21  statements.  So it wasn't my duty to go and run behind the

22  trooper and get a statement.

23  **Q.**   Again, that wasn't my question, whether it was your duty.

24  My question was simply:  Did you make sure to get that

25  trooper's name so that you would have the name of a witness?

ROBERT FAULCON - Cross

1  A.   Once I exited the passenger side of that vehicle, I didn't
2  even see the trooper from that point.
3  Q.   And according to your testimony, you also didn't notice
4  that Defendant Gisevius was a witness; right?
5  A.   I didn't know who were witnesses on the west side.
6  Q.   And according to your testimony, you didn't notice that
7  Mike Hunter was in the car and was a witness?
8  A.   From the time that we got in the vehicle, no, I didn't.
9  Q.   And you never learned that afterwards because you all
10 never had any discussion about what happened on the bridge;
11 correct?
12 A.   Correct.
13 Q.   I want to talk about one thing between when you left the
14 bridge and when you got back to the Crystal Palace.  You
15 actually rode back to the Crystal Palace in the truck with
16 Lance Madison and two other people, didn't you?
17 A.   I couldn't -- I can't remember.  I know that I was in the
18 back of the truck when we transported them from the Crystal
19 Palace to the bus station.
20 Q.   Okay.  And now I'm asking about the first leg of that
21 journey, which was from the bridge to the Crystal Palace.
22 A.   I can't recall how I got back.  Honestly, I can't.
23 Q.   So you're not sure.  You might have been in the truck with
24 Lance Madison and two other people who were in custody; you're
25 just not sure?

ROBERT FAULCON - Cross

1   A.   Yeah, I'm not sure.  I could have been.  I'm not sure.
2   Q.   Do you remember Lance Madison asking you why you shot at
3   him?
4   A.   No, ma'am.
5   Q.   Or why the police shot at him?
6   A.   No, ma'am.  I don't remember any conversation.
7   Q.   Did you say to Lance Madison, "If I had killed you, I
8   wouldn't have to go through this"?
9   A.   No, ma'am.  I would never say anything like that.
10   Q.   I want to talk you to about what happened back at the
11   Crystal Palace.
12   A.   Okay.
13   Q.   Back at the Crystal Palace, you saw Defendant Kaufman;
14   correct?
15   A.   Briefly, yes, at the -- yes.
16   Q.   He was the sergeant in charge of the DIU?
17   A.   He was a charge in DIU, yes.
18   Q.   Well, and that's a good clarification.  Mike Lohman, as
19   the lieutenant, was in charge of the whole DIU; correct?
20   A.   Yes.
21   Q.   You also saw Mike Lohman back at the Crystal Palace;
22   right?
23   A.   I saw him, but I didn't speak to him.
24   Q.   Isn't it true that Defendant Kaufman and Mike Lohman
25   called together the people who had been at the Danziger Bridge?

ROBERT FAULCON - Cross

1   A.   I don't know if it was Lieutenant Lohman per se, but I
2   believe it was Sergeant Kaufman who gathered us around the
3   table at that time, yes.
4   Q.   Once Defendant Kaufman gathered you all around the table,
5   he said he only wanted to talk to the shooters; correct?
6   A.   Yes.
7   Q.   He sent everybody else away; correct?
8   A.   I don't know who he sent away.  He just wanted to speak to
9   the shooters.
10  Q.   He told the shooters to stay; correct?
11  A.   Yes, uh-huh.
12  Q.   And he told the non-shooters to go; correct?
13  A.   I would assume so.  I didn't actually hear him say "go."
14  I mean, he just wanted to speak to the shooters.  So he might
15  have.  I don't know.
16  Q.   Did the non-shooters then go away?
17  A.   I would assume so.  I don't know.  I mean, I just recall
18  he asking for the shooters, and we sat at the round table.  I
19  mean, as far as who was there and who he told to go away or
20  what, I don't know.
21  Q.   Do you remember that the only people who sat at the table
22  are the people who said, "Yes, I shot"?
23  A.   Yes, I remember that.
24  Q.   Would you agree that in an investigation people who didn't
25  shoot would be important witnesses about what happened?

ROBERT FAULCON - Cross

1   **A.**   If they were on scene, yes, they would be witnesses.

2   **Q.**   And to be clear, when we're talking about gathering

3   together people who were there and saying, "I only want to talk

4   to the shooters," that group that we're talking about are the

5   people who were on scene; correct?

6   **A.**   Yes, uh-huh.

7   **Q.**   And you all sat at that round table; correct?

8   **A.**   Uh-huh.

9   **Q.**   And at that round table Defendant Kaufman asked you all

10  who shot and how many times; correct?

11  **A.**   Something to that effect, yes.

12  **Q.**   Sergeant Kaufman did not ask you whether civilians fired

13  at you, did he?

14  **A.**   Not that I recall.  It was brief.

15  **Q.**   Would you agree that that's strange?

16  **A.**   Not at the time.  I wasn't thinking in that aspect

17  because --

18          **MR. LARSON:**  Objection.  He's no an expert.

19          **THE COURT:**  You're asking him to evaluate --

20          **MS. BERNSTEIN:**  Based on his experience.

21          **MR. LARSON:**  He's not an investigator.

22          **THE COURT:**  He said he hadn't been involved in a

23  shooting before.  So I don't know that he has any experience to

24  answer whether it's unusual for Sergeant Kaufman or any other

25  investigator of a shooting -- as I recall his testimony on

ROBERT FAULCON - Cross

1   direct, he had not fired his weapon.
2            MS. BERNSTEIN:  I'll move to the next question.
3            THE COURT:  Okay.  I'll sustain the objection.
4   BY MS. BERNSTEIN:
5   Q.   So you're at the round table.  Sergeant Kaufman asks you
6   all how many times you fired, and he does not ask you whether
7   any civilians fired at you.  That's where we just left off;
8   right?
9   A.   Yes.
10  Q.   At that the meeting, you understood that Sergeant Kaufman
11  at that point was in charge of the investigation; correct?
12  A.   That was my assumption, yes.
13  Q.   And you understood that he was going to have write a
14  report, an investigative report about the incident; correct?
15  A.   Of course.
16  Q.   Sergeant Kaufman told you at that meeting that it was
17  being taken care of; correct?
18  A.   I didn't hear him say that.  I later learned that that was
19  said, but I didn't hear him say it per se.
20  Q.   I want to talk to you about the next stage in the
21  investigation, but first I want to follow up on something you
22  said earlier, that you never talked to anybody about the
23  shooting.  Right?
24  A.   No, ma'am.
25  Q.   So even though, when you got out of the back of the truck,

ROBERT FAULCON - Cross

1  already lots of fire had gone off, you never asked any
2  questions to find out who was shooting or why; is that right?
3  **A.**   Did I ask those questions?
4  **Q.**   Sure.
5  **A.**   No.  I didn't ask who was shooting and why, no.
6  **Q.**   And even though you can't remember who that mystery
7  officer was who was firing into the walkway, you never asked
8  these other guys you worked with whether it was them?
9          **MR. DESALVO:**  Your Honor, she's putting words in his
10 mouth.  He said he was firing in that direction; now she's got
11 him firing into the walkway.
12         **THE COURT:**  I'm going to sustain.  Rephrase the
13 question.
14 **BY MS. BERNSTEIN:**
15 **Q.**   Even though you're telling us that you didn't know who
16 that mystery officer was who was firing in the direction of the
17 walkway --
18 **A.**   Right.
19 **Q.**   -- did you ever ask the people you worked with to try
20 figure out who that officer was?
21 **A.**   No, ma'am.  I just didn't inquire about it.  There was so
22 much -- so many other thing that was going on, it just wasn't
23 on my mind to say, "Who was that firing in the front of the
24 truck?"  I mean --
25 **Q.**   Were there other things going on that were as big a deal

ROBERT FAULCON - Cross

1   as this incident?

2   **A.**   At the time -- at the Crystal Palace -- well, immediately

3   we went back into our rescue operations.  So, you know, all of

4   that was still taking place.

5   **Q.**   When you went back to rescue operations, you continued to

6   work with this same group of guys; correct?

7   **A.**   No.  Actually we were split up because we were assigned to

8   boat crews, and each boat crew had a police officer.  So by

9   that time we got split up and we were working all over the

10  place throughout the district.

11  **Q.**   Your partner at the time was Marchant Paxton; right?

12  **A.**   Yes.

13  **Q.**   Did you continue to work with Marchant Paxton?

14  **A.**   No.  We got split up.  Again, when the boat crews came in,

15  we were assigned to each boat crew, so actually we were split

16  up.

17  **Q.**   I think I understood from your testimony on direct that

18  you said not only did you not talk to anybody back at the

19  Crystal Palace about what happened, you also never talked to

20  anybody before you gave your statement to Sergeant Dugue.

21  Right?

22  **A.**   Yes.

23  **Q.**   Did I understand you to say that when you left NOPD and

24  moved away, you didn't stay in touch with these guys?

25  **A.**   No.

ROBERT FAULCON - Cross

1  Q.   Yes, that's correct?
2  A.   Oh, I'm sorry.  No, I didn't stay in touch.
3  Q.   When did you leave NOPD?  The end of September 2005?
4  A.   That would be safe to say, yes.
5  Q.   You gave your statement in June 2006; right?
6  A.   Correct.
7  Q.   So from the end of September 2005 to June 2006, did you
8  ever talk to Defendant Bowen?
9  A.   No, I don't think I did.  To 2006?  No, I didn't.  No, I
10 didn't.
11 Q.   Did you ever talk to Defendant Villavaso during that time?
12 A.   No, I didn't.
13 Q.   Did you ever talk to Defendant Gisevius during that time?
14 A.   No.  I didn't even have their telephone numbers.
15 Q.   Let me ask some specific questions.
16 A.   Okay.
17 Q.   Did you have eight short telephone calls back and forth
18 between you and Defendant Bowen on October 19th, 2005?
19 A.   I can't recall, but -- in October?
20 Q.   Uh-huh, after you left.
21 A.   I can't recall.
22 Q.   Did you talk to Defendant Bowen for 32 minutes on
23 November 13th, 2005, after you left?
24 A.   I can't recall.  If I did, then I did, but it wasn't
25 particular to the case.

ROBERT FAULCON - Cross

1   Q.   Did you talk to Defendant Villavaso for eight minutes on
2   November 15th, 2005?
3   A.   I can't recall.  I might have -- I mean, I don't know.
4   Q.   Did you talk to Defendant Bowen again on December 4th and
5   January 25th?
6   A.   I can't recall.  If I did, I mean, I did.  But it wasn't
7   any particulars to the case.
8   Q.   Did you talk to Defendant Gisevius on December 4th, after
9   left for Texas?
10  A.   September 4th, the same --
11  Q.   I'm sorry, December 4th, after you left for Texas.
12  A.   I can't really recall.
13  Q.   All right.  Let me focus on January 25th, which you
14  understand is the day that everybody else gave their statements
15  to NOPD; correct?
16  A.   Yes.
17  Q.   Did you talk to Ken Bowen that day?
18  A.   I can't recall.
19  Q.   Do you remember whether you had a seven-minute
20  conversation with him that day?
21  A.   I can't recall.  You're talking about January of 2006, so
22  I really can't recall.
23  Q.   But if you did talk to Defendant Bowen on that same day
24  that they all gave their statements, it's your testimony that
25  there was no discussion about this case or about the

ROBERT FAULCON - Cross

1  statements?

2  **A.**   There was no discussion about the case and no particulars.

3  **Q.**   Did you also talk to Defendant Villavaso that same day?

4  **A.**   I can't recall.  I don't think I did.

5  **Q.**   Did you talk to Defendant Villavaso the very next day

6  after they gave their statements?

7  **A.**   I can't recall.

8  **Q.**   Did you talk to Defendant Kaufman on June 5th, 2006,

9  before you came back to give your statement?

10  **A.**   I can't recall.

11  **Q.**   But you might have?

12  **A.**   I doubt it because I never had his telephone number.

13  **Q.**   Can you sometimes talk to people on the phone even if you

14  don't have their telephone number?

15  **A.**   I mean, it's possible, but I never even talked to Sergeant

16  Kaufman even when I was here working.

17  **Q.**   So you did not talk to Defendant Kaufman on June 5th,

18  2006; is that right?

19  **A.**   Right.  Not that I can recall, no.

20  **Q.**   Now, going back to your claim that you never talked to

21  anybody about what happened on the Danziger Bridge --

22  **A.**   Right.

23  **Q.**   -- you heard some testimony here about conversations where

24  people were congratulating the people involved in the shooting.

25  Did you ever hear that?

ROBERT FAULCON - Cross

1   A.   They were congratulating them?  I know the day we turned

2   ourselves in -- well, I don't know.

3   Q.   So let me focus back September 4th and the days and weeks

4   after the shooting.

5   A.   Uh-huh.

6   Q.   Would you agree that there were some officers in NOPD who

7   were congratulating you all for getting the bad guys?

8   A.   On September the 4th back at the Crystal Palace?

9   Q.   September 4th and the days and weeks after.

10   A.   I don't recall anybody congratulating us, no.

11   Q.   So you never heard any of that?

12   A.   No.  I never seen, I never heard anybody patting us on

13   back, good job, or anything.

14   Q.   And you never heard any officers standing around bragging

15   about what happened?

16   A.   No.  I never heard that, huh-uh.

17   Q.   You never heard any officers standing around talking about

18   what happened?

19   A.   No, I never heard that.

20   Q.   Nobody ever talked to you about the fact that you shot a

21   man in the back?

22   A.   No, ma'am.  We just didn't talk about it.

23   Q.   Did you ever hear anybody say, "Faulcon shot an innocent

24   man"?

25   A.   I never heard anyone say that, no.

ROBERT FAULCON - Cross

1          MR. FLEMING:  Judge, I'm going to object.  Can we
2    approach?
3          THE COURT:  Yes.
4          (WHEREUPON, the following proceedings were held at
5    the bench.)
6          MR. FLEMING:  I'm going to move for a mistrial at
7    this point.  That is misconduct on the part of Ms. Bernstein.
8    That is a statement that in discovery is made between two other
9    people that he was not a part of, and for her to present that
10   to the jury is nothing short of misconduct, Judge.  He was not
11   a part of that alleged conversation.  It's not even alleged
12   that he's a part of that conversation if it, in fact, took
13   place.
14          I forget who that supposedly took place between,
15   but not him, and for her to ask that question in front of the
16   jury is improper.
17         MS. BERNSTEIN:  May I respond?
18         THE COURT:  No.  I'm going to deny the motion for a
19   mistrial.  I overrule the objection.  I do think we need to
20   focus on what he knows, okay?  Incorporating other evidence
21   that we know he's not a part of and asking him if he's ever
22   heard of before is improper.
23         MS. BERNSTEIN:  I agree, Your Honor.  If I may
24   respond, the reason I asked that question, that statement is
25   already in evidence and the reason I was asking is --

ROBERT FAULCON - Cross

1          **THE COURT:**  But there's no evidence that he was
2    present for it.
3          **MS. BERNSTEIN:**  And that's what I wanted to find out
4    whether anybody relayed that to him.
5          **THE COURT:**  We're not going to rehash other people's
6    statements by asking him, "Have you heard this," and, "Do you
7    know that."  He's here to testify as to the facts, that's his
8    knowledge.  Okay.  Let's move on.
9
10
11
12
13
14          (WHEREUPON, the following proceedings were held in
15    open court.)
16    **BY MS. BERNSTEIN:**
17    **Q.**  All right.  You said you understood as of that
18    conversation at the Crystal Palace that Defendant Kaufman was
19    writing a report; correct?
20    **A.**  Correct.
21    **Q.**  And you knew that Defendant Kaufman was not present for
22    the shooting on the east side of the bridge; right?
23    **A.**  Correct.
24    **Q.**  So in order for Defendant Kaufman to write a report, he
25    would have to get witness statements from the people who were

ROBERT FAULCON - Cross

1    there; correct?

2    A.    Correct.

3    Q.    Is it your testimony that you never gave a witness

4    statement to Defendant Kaufman?

5    A.    I gave a brief statement the day of at the Crystal Palace,

6    around the round table.  That's when I gave a brief

7    statement -- a brief gist, I should say.

8    Q.    And that's the statement that you've already told us did

9    not involve any questions about whether civilians fired at you?

10   A.    Correct.

11   Q.    And your testimony is that that's the only statement you

12   ever gave to Defendant Kaufman?

13   A.    That's the only one, yes.

14   Q.    Mr. Larson asked you about some questions in a report, and

15   he asked you whether you ever made these statements to Sergeant

16   Dugue.  I want to ask you about statements in the 32-page

17   report found on Defendant Kaufman's computer.

18            MS. BERNSTEIN:  May I have exhibit 184 please.  May I

19   have page 10 first, please, which I think is actually going to

20   be the ninth page of the exhibit.

21   BY MS. BERNSTEIN:

22   Q.    I just wanted to flag this part right here that's the

23   lead-in to a section that says:  "The following persons were

24   interviewed by Sergeant Arthur Kaufman relevant to this

25   incident."  Okay.

ROBERT FAULCON - Cross

1          And you said you've seen these reports at this point;
2   right?
3   A.   Yes.  Prior to the trial, correct.
4   Q.   So you understand that this report claims to have a
5   statement made by you; correct?
6   A.   Yes.  All of them do.
7          MS. BERNSTEIN:  All right.  Let's go to page 15,
8   please.
9   BY MS. BERNSTEIN:
10  Q.   So on page 15 we have a gist of a statement that
11  Defendant Kaufman says you gave to him; correct?
12  A.   Correct.
13  Q.   Let me ask you some questions about that similar to the
14  questions your attorney asked you.  It says there:  "Upon
15  exiting the truck, Officer Faulcon observed several subjects,
16  both male and female, walking westbound up toward the center of
17  the Danziger Bridge."
18         That statement is false; correct?
19  A.   Correct.
20  Q.   You never said that to Defendant Kaufman?
21  A.   No, I didn't.
22  Q.   "Several of the subjects then jumped over the concrete
23  pedestrian barrier while opening fire on the officers."
24         That's also false; correct?
25  A.   Correct.

ROBERT FAULCON - Cross

1  Q.   Because you said, by the time you got out, they were
2  already on the pedestrian barrier; right?
3  A.   Yes.
4  Q.   You never said that to Defendant Kaufman?
5  A.   No, huh-uh.
6  Q.   It says there:  "Fearing for his safety and the safety of
7  his fellow officers on the scene, Officer Faulcon returned
8  gunfire in an attempt to neutralize the threats."
9       Did you ever tell anybody that you returned gunfire?
10  A.   No.  I said I discharged my firearm when I saw the two
11  handguns.
12  Q.   Would you agree that it would be false to say that you
13  returned gunfire?
14  A.   In that sense, I mean, by reading it the way it's written,
15  that would be incorrect.
16  Q.   And that would be incorrect because you never saw anybody
17  fire; is that right?
18  A.   Correct.
19  Q.   I'm going to jump to your NOPD statement.  Didn't you say
20  to Sergeant Dugue, "I observed a -- a group of subjects on the
21  bridge, two of which were -- were armed.  And at that point a
22  fire fight ensued, after receiving fire, after which the threat
23  was neutralized"?
24  A.   Uh-huh.
25  Q.   You agree that you did not, in fact, receive fire?

ROBERT FAULCON - Cross

1   A.   No.   My statement was, when I observed the subjects in the
2   walkway, that's when I observed the subjects with the handguns
3   and that the officers in the front of the truck had been fired
4   upon; and at that point, that's when I discharged my firearm.
5   Q.   So you did not receive fire?
6   A.   At that point, no.
7   Q.   You did not see --
8   A.   I didn't see it, right.
9   Q.   You did not see anybody else receive fire?
10  A.   Right, I didn't see it.  Right.
11  Q.   In fact, you never saw a civilian fire a gun on the bridge
12  that day; correct?
13  A.   No, huh-uh.
14  Q.   Yes, that is correct?
15  A.   Yes, correct.
16  Q.   "Officer Faulcon and Sergeant Gisevius pursued another
17  threat, two male subjects who broke from the crowd of people
18  and were fleeing westbound over the Danziger Bridge toward the
19  3rd District."
20        The two male subjects are Lance and Ronald Madison;
21  correct?
22  A.   Yes.
23  Q.   Lance and Ronald Madison were already way up near the top
24  of the bridge by the time the shooting ended on the east side;
25  correct?

ROBERT FAULCON - Cross

1  A.   Yes.  When I observed them, they were at the top of the
2  bridge, correct.
3  Q.   And that's a long bridge; correct?
4  A.   Yes.
5  Q.   You agree that those two people did not break away from
6  this crowd on the walkway and run up the bridge?
7  A.   Correct.
8  Q.   I want to jump down to what it says about the shooting of
9  Ronald Madison.  "This male" being Ronald Madison; right?
10 A.   Okay.
11 Q.   "This male noticed the police presence and quickly turned
12 towards the officer, reaching for an object from his right
13 waistband."
14       Did you tell Defendant Kaufman that Ronald Madison
15 reached for an object in his right waistband?
16 A.   No.
17 Q.   Do you agree that that is patently false?
18 A.   Yes, it's false.
19 Q.   Not only did you not say it, it did not happen; correct?
20 A.   I didn't happen.  I didn't see that.
21 Q.   So you have no hesitation saying that that is a false
22 statement in that report?
23 A.   Correct.
24 Q.   And you have also now seen the official 54-page report
25 that was turned in to the DA's office in this case; correct?

ROBERT FAULCON - Cross

1  **A.**   Yes.
2  **Q.**   And you know that that same statement is in that report;
3  correct?
4  **A.**   Yes.
5  **Q.**   So you agree, then, that that report that was submitted to
6  the DA's office was false?
7  **A.**   Now -- now I know.
8  **Q.**   And you agree that it's false in a very specific way,
9  which is that it's false in a way to give justification for
10 your shooting?
11 **A.**   After reading it, yes.
12 **Q.**   In fact, you said earlier that you have now read all of
13 those reports; correct?
14 **A.**   Yes.
15 **Q.**   Do you agree that all of these reports are false?
16 **A.**   Based on what I read pertaining to my actions, yes.
17 **Q.**   Do you agree that there was a cover-up in this case?
18 **A.**   Based on what I learned now, yes.
19 **Q.**   And do you agree that if you did know about that cover-up,
20 then you would be responsible?
21 **A.**   If I did know.
22 **Q.**   I want to go back to something you said earlier.  You said
23 that you had no idea whether or not you struck anyone when you
24 fired on the bridge; right?
25 **A.**   Yes.

ROBERT FAULCON - Cross

1  Q.   The officer you saw, the mystery officer, was shooting a
2  rifle; correct?
3  A.   From what I remember, yes.
4  Q.   You were shooting a rifle --
5  A.   I didn't say rifle, a long gun -- well, a long gun.
6  Q.   You were shooting a shotgun?
7  A.   Yes, that's what I had.
8  Q.   You never saw Robert Barrios shoot at anybody?
9  A.   I didn't know where anyone was when I got out of the
10  truck.
11  Q.   So you never saw Robert Barrios shoot at anyone?
12  A.   No, I didn't.
13  Q.   When you fired your gun, you were pointing the shotgun
14  right at the people in the walkway; correct?
15  A.   That were further ahead, yes, in that direction.
16  Q.   Well, I want to clarify that.  You weren't just pointing
17  in the direction --
18  A.   Uh-huh.
19  Q.   -- you were pointing at them, weren't you?
20  A.   Yes.  The ones who had handguns, yes.
21  Q.   Because you were trying to shoot them?
22  A.   Yes, neutralize the threat.
23  Q.   Neutralize the threat by shooting them; correct?
24  A.   Yes, yes.
25  Q.   You were shooting at them at center mass?

ROBERT FAULCON - Cross

1  **A.**   I wouldn't -- I wouldn't say center mass.  I was just
2  discharging my firearm in the direction of the threat.  So I
3  wasn't per se just taking my time, saying, "Okay, I'm going to
4  shoot center mass."  It didn't happen like that.
5  **Q.**   But you were trying to shoot the people in the walkway?
6  **A.**   Yes.  To neutralize the threat, correct.
7  **Q.**   Did you shoot Jose Holmes as he held his hand up in front
8  of his face?
9  **A.**   No, ma'am.
10  **Q.**   But you didn't see anybody else shoot a shotgun?
11  **A.**   No, I didn't.  At that time I didn't see anyone hold any
12  hand in front of their face.
13  **Q.**   Did you shoot James Brissette in the back of the head as
14  he was going to the ground?
15  **A.**   The only thing I did was discharge my firearm at the
16  subjects that had the handguns.  I don't know whether he was
17  going to the ground.  I don't know whether he was laying -- as
18  a matter of fact, I know he wasn't laying on the ground.  So
19  that was my course of action right there.
20  **Q.**   Did you shoot James Brissette in the bottom of the feet as
21  he was laying on the ground face down?
22  **A.**   I didn't shoot anyone that was laying on ground.  And at
23  that time I didn't even know if I had struck anyone.
24  **Q.**   But you didn't see anybody else shooting a shotgun?
25  **A.**   No, I didn't.  I know who had the shotgun.

ROBERT FAULCON - Cross

1   Q.   Did you shoot an older guy in the back of the head?
2   A.   I have no idea.
3   Q.   And you said earlier that you felt horrible about the
4   women being shot; is that right?
5   A.   Yes.  I felt horrible about everybody being shot, and the
6   women also after I later learned that there were women.
7   Q.   And you learned that relatively quickly; correct --
8   A.   No.
9   Q.   -- that there were women who were shot?
10  A.   Later -- it was later on.  I didn't learn that until much
11  later.
12  Q.   Days later?
13  A.   Possibly.  I just -- I didn't know the facts.  I just know
14  people were shot.  I didn't know who was -- if it was females
15  that were involved.  I didn't know where they were shot, I
16  didn't know.
17  Q.   But so sometime, days -- let me even give you two weeks
18  later -- you learned that women had been shot?
19  A.   Yes.  Days, weeks, yes.
20  Q.   And you said you felt terrible about them being shot?
21  A.   Yes.  Still do.
22  Q.   And you assumed that they were innocent victims; correct?
23  A.   Not at that time when I got out of the back of the truck
24  and I saw the handguns.  I didn't know who was innocent and who
25  was armed.  I mean --

ROBERT FAULCON - Cross

1  Q.   So let me focus you on that time, whether it was days or

2  weeks later, when you learned that women had been shot and you

3  felt terrible about it.

4  A.   Yes.

5  Q.   At that time, days or weeks later, when you learned that

6  women had been shot --

7  A.   Yes.

8  Q.   -- you assumed that they were innocent victims; correct?

9  A.   Once I got more facts of the case, yes -- of the incident,

10 not the case, but the incident.

11 Q.   So within days or weeks?

12 A.   Within days or weeks.

13 Q.   And when you gave your statement eight or nine months

14 later, in June 2006, you didn't tell Sergeant Dugue that you

15 thought innocent people were shot on the bridge, did you?

16 A.   No.  I just gave a statement according to the questions

17 that he asked me.

18 Q.   You didn't tell Sergeant Dugue that you thought Ronald

19 Madison was an innocent man?

20 A.   No, I didn't.

21 Q.   You didn't tell Sergeant Dugue that you thought those

22 women were innocent people?

23 A.   No, I didn't.  Again, I hadn't seen the report, so I still

24 didn't know the facts.

25 Q.   You got your facts from the report?  I thought you --

ROBERT FAULCON - Cross

1   **A.**   I said I didn't see the reports, so I didn't know the
2   facts.
3   **Q.**   But we've already agreed that every one of those reports
4   is false; correct?
5   **A.**   Yes, now we agree.  But at that time I didn't know
6   anything about the reports.  I hadn't read them.
7   **Q.**   And you said earlier that you had been to the funerals of
8   three other police officers; is that right?
9   **A.**   Uh-huh.
10  **Q.**   Did you go to the funeral of Ronald Madison?
11  **A.**   No.  I was in Texas.
12  **Q.**   Did you go to the funeral of James Brissette?
13  **A.**   No, I didn't.
14          **MS. BERNSTEIN:**  Your Honor, I'm finished.  I've been
15  reminded to offer this exhibit up there.  I'm not sure what
16  number we're on.  383.
17          **THE COURT:**  383, that's what I have.  Any objection
18  to 383?
19          **MR. LARSON:**  No, Your Honor.
20          **THE COURT:**  So ordered.  We'll admit 383.
21          Redirect?
22          **MS. BERNSTEIN:**  May I write his name in the corner,
23  Your Honor?
24          **THE COURT:**  Yes.  I don't see any objection to that.
25  Go ahead and label it.

ROBERT FAULCON - Cross

1          In the meantime, on redirect, Mr. Larson, did
2    you want to go last since this is your client?
3          **MR. LARSON:**  Yes, I would prefer to, if that's okay
4    with everybody else.
5          **THE COURT:**  Let's go ahead and start redirect.  He's
6    being called on behalf of all defense counsel.  Who wants to go
7    first?  We'll let Mr. Larson do the final redirect.
8          **MR. LONDON:**  Let me go, Your Honor.  I'll be brief.
9          **THE COURT:**  That's fine.  Redirect examination.
10                    **REDIRECT EXAMINATION**
11   BY MR. LONDON:
12   **Q.**   Hello, Mr. Faulcon.
13   **A.**   How are you doing?
14   **Q.**   We've met each other?
15   **A.**   Yes.
16   **Q.**   I want to be brief with you -- let me first ask you, how
17   long have you been a policeman?
18   **A.**   At that time it was about four and a half years.
19   **Q.**   Had you ever written reports?
20   **A.**   Yes.
21   **Q.**   Had you ever had a report kicked back?
22   **A.**   Yes.
23   **Q.**   Have you ever written a report that you considered to be
24   just notes as you were going along in an investigation?
25          **MS. BERNSTEIN:**  Objection, Your Honor.  I think this

ROBERT FAULCON - Redirect

1   is supposed to be direct.
2           MR. MECHE:  Redirect.
3           MR. LONDON:  Did I lead that?
4           THE COURT:  It wasn't a leading question, but it is
5   redirect.  I will overrule the objection.
6           MR. LONDON:  So I'm okay.
7           THE COURT:  Right.
8           MR. LONDON:  I'm not chewing gum.
9           THE COURT:  Don't ask leading questions.
10          MR. LONDON:  I didn't think that was.
11          THE COURT:  And I agree.  Let's proceed.
12  BY MR. LONDON:
13  Q.   Have you ever written a report that was partially
14  completed?
15  A.   Yes.
16  Q.   Have you ever written a report that was partially
17  completed and continued along as the investigation continued?
18  A.   Yes, as you get more facts to incorporate in your report.
19  Q.   Have you ever written a partial report that you didn't
20  turn in?
21  A.   Yes.  You never turn in a report until it's completed.
22  Q.   And those reports that you never turned in, did you ever
23  destroy any because you either rewrote it or for whatever
24  reason?
25  A.   You have to keep your notes and your partial reports to

ROBERT FAULCON - Redirect

1  complete a report.

2  **Q.**   Once the report is completed, have you ever disposed of

3  your notes and your partial reports?

4  **A.**   No.  We're always trained -- well, we are trained to keep

5  your notes, always keep your notes.

6  **Q.**   So when you make a mistake, you just keep that note in

7  your file?

8  **A.**   Yes, you always keep the notes.

9  **Q.**   Do you submit that note as your official report?

10 **A.**   No, you don't submit notes.

11 **Q.**   Do you attach the notes to an official report when you

12 submit it?

13 **A.**   No.

14 **Q.**   Now, did Ms. Bernstein tell you that Exhibit 184 --

15       **MR. LONDON:**  If you could put that back up, please.

16 **BY MR. LONDON:**

17 **Q.**   Did she tell you this exhibit, which you testified to, was

18 a rough draft?

19 **A.**   No.

20       **MS. BERNSTEIN:**  Objection.

21       **THE WITNESS:**  No, she didn't.

22       **MS. BERNSTEIN:**  Objection.  That's not a fair

23 question about what this witness knows.

24       **MR. LONDON:**  I asked if she told him that.

25       **THE COURT:**  I understand that, but the jury was here

ROBERT FAULCON - Redirect

1   to hear the questioning.

2              I'll overrule, but I don't think we need to ask

3   questions that are already apparent to the jury.  The jury

4   heard the question and the answers.

5              MR. LONDON:  Yes, sir, but just to comment, I believe

6   that she was making it look as if this was the official report

7   turned in.  I can ask that?

8              THE COURT:  He can answer the question you asked

9   previously.

10  BY MR. LONDON:

11  Q.   Did she tell that?

12  A.   No.

13  Q.   Did she tell that you this was not the --

14             MS. BERNSTEIN:  Same objection, Your Honor.

15             THE COURT:  Then we get into argument, though, as

16  opposed to factual information.

17             MR. LONDON:  Then I'll drop that.

18             You can take that down for me.  Thank you.

19  BY MR. LONDON:

20  Q.   When you gave your statement on -- I believe it was

21  January -- June 26th.  Is that correct?

22  A.   June, I want to say the 6th or June the 9th of 2006.

23  Q.   Who took that statement?

24  A.   Sergeant Dugue.

25  Q.   Was Sergeant Kaufman anywhere around?

ROBERT FAULCON - Redirect

1   A.   No, he wasn't.

2   Q.   Did you speak to Sergeant Kaufman any time months before

3   that?

4   A.   I don't recall even speaking to Sergeant Kaufman.

5   Q.   Did someone call you and tell you to come back to the city

6   of New Orleans so that your statement may be obtained?

7   A.   The only person that called me to see when I could return

8   to New Orleans was Sergeant Dugue, and that's when we set up a

9   date for me to return and give my statement.

10  Q.   That evening on September 4th, when you went to the

11  Crystal Palace, did Sergeant Dugue tell you what to say in your

12  statement?

13  A.   At the Crystal Palace?

14  Q.   Yes.

15  A.   No.  No one told me what to say in my statement.

16  Q.   Did he tell you he was going to cover this case up?

17          MS. BERNSTEIN:  Objection, leading.

18          MR. LARSON:  Excuse me, Your Honor.

19          THE COURT:  We asked him about a cover-up on cross.

20          MS. BERNSTEIN:  No, it's just the leading.

21          MR. LONDON:  I don't know how else to ask that.

22          THE COURT:  I understand that.  I'm going let him --

23  in light of previous answer, I'm going to let him answer.  But

24  just to be clear, you're asking him about Sergeant Dugue on

25  September 4?

ROBERT FAULCON - Redirect

1            **MR. LONDON:**  No.  Sergeant Kaufman.

2            **THE COURT:**  Because I think you said Dugue.

3            **MR. LONDON:**  Did I say that?  If I did, I misspoke.

4  I meant Sergeant Kaufman.

5            **THE WITNESS:**  No.

6  BY MR. LONDON:

7  **Q.**   No.  When Ms. Bernstein told you, "Did you know that these

8  reports" -- and I believe she listed the ones that you had

9  previously testified to -- "Did you know that these reports

10  were false?"  Do you recall her asking you that?

11  **A.**   Yes, sir, I do.

12  **Q.**   Do you know that the reports are false?

13  **A.**   I have no idea because, again, I hadn't seen the reports

14  until after we were indicted and the prior to this trial.

15  **Q.**   The portions of the report that she pointed to you, you

16  say are not attributed to you, snippets of what is in your

17  statement; correct?

18  **A.**   Correct.

19  **Q.**   Correct.

20            Do you know that the official -- do you know who

21  turned in the official report?

22  **A.**   I have no idea.

23            **MR. LONDON:**  I believe that's all I have, sir.  Thank

24  you.  Thanks.

25            **THE WITNESS:**  Yes, sir.

ROBERT FAULCON - Redirect

1           THE COURT:  All right.  Anybody else prior to --
2    Mr. Hessler?
3           MR. HESSLER:  Yes, Your Honor.
4                    REDIRECT EXAMINATION
5    BY MR. HESSLER:
6    Q.   Good afternoon, Mr. Faulcon.
7    A.   Good afternoon.
8    Q.   Mr. Faulcon, you stated that the gunfire broke out before
9    the truck actually stopped; correct?
10   A.   Yes.
11   Q.   Could you tell where the gunfire was coming from or which
12   direction it was coming from?
13   A.   I had no idea.  I was still in the back of the truck.
14   Q.   Could you tell if it was incoming or outgoing?
15   A.   I had no idea.  I couldn't distinguish.
16   Q.   Did you perceive it as incoming because of the
17   circumstances?
18           MS. BERNSTEIN:  Objection.  Leading.
19           THE COURT:  No, I'm going to let him go ahead and
20   answer.
21           THE WITNESS:  Of course.  I mean, there was no reason
22   why they would be discharging their firearms if they weren't
23   fired upon and in imminent danger.
24   BY MR. HESSLER:
25   Q.   I believe you said that part of your perception is based

ROBERT FAULCON - Redirect

1  on other people's reactions.  Right?
2  A.   Yes, uh-huh.
3  Q.   That's not the entirety of it, though, is it?
4  A.   No, it's not.
5  Q.   Did you see Officer Kevin Bryan in the back of the truck,
6  on his hands and knees, curled up on the floor with his hands
7  over his head?
8          MS. BERNSTEIN:  Objection, leading.
9          MR. HESSLER:  I asked did he see that.
10         THE COURT:  I'm going on overrule because he hasn't
11 testified.  There's been no testimony from him about that.  So
12 I'm going to overrule.
13 BY MR. HESSLER:
14 Q.   Were you in the truck to see that?
15 A.   No.
16 Q.   Now, when you were outside of the truck, I believe your
17 testimony was that you never approached the barrier, the
18 concrete barrier.  Correct?
19 A.   Correct.  I never did.
20 Q.   Do you have any idea of what the persons on the north
21 side, below the bridge, thought when they heard gunfire and saw
22 people jump over that barrier?
23 A.   I have no idea.
24 Q.   And would it be fair to state that you couldn't even see
25 down there?

ROBERT FAULCON - Redirect

1  **A.**   You can't see.  The only way you can see on that side of
2  bridge is if you're actually at the railing.

3          **THE COURT:**  Mr. Hessler, that was a leading question.
4  So let's not lead the witness.

5          **MR. HESSLER:**  I'll withdraw that question.

6          **THE COURT:**  He's already answered it.  Let's not lead
7  the witness.

8  **BY MR. HESSLER:**

9  **Q.**   Now, did Sergeant Gisevius ever tell you what to say on
10 that bridge to anybody?  Did you talk to anybody on that
11 bridge?

12 **A.**   No, I didn't.

13 **Q.**   Did Sergeant Gisevius ever tell you what to say at any
14 time?

15 **A.**   Sergeant Gisevius never told me to say anything.

16 **Q.**   Did Sergeant Gisevius ever ask you to lie about anything?

17 **A.**   No one has asked me to lie.

18 **Q.**   Did Sergeant Gisevius ever tell you, "Don't worry about,
19 it, Robert.  I'm going to take care of it"?

20 **A.**   No, sir.

21         **MR. HESSLER:**  No further questions.  Thank you.  All
22 right.

23                     **REDIRECT EXAMINATION**

24 **BY MR. DESALVO:**

25 **Q.**   Hello, Robert.

ROBERT FAULCON - Redirect

1   A.   How are you doing, sir?
2   Q.   Did Sergeant Bowen ever talk to you about this case?
3   A.   No, sir.
4   Q.   Did he ever tell you what he said he saw or what he did?
5   A.   No, sir, he didn't.
6   Q.   Did he tell you what to say?
7   A.   No, sir, he didn't.
8           MR. DESALVO:  Thank you.
9           THE COURT:  All right, Mr. Meche.
10          MR. MECHE:  I don't have any questions for this
11   witness.
12          THE COURT:  Mr. Larson.
13          MR. LARSON:  Yes, Your Honor, briefly.
14                    REDIRECT EXAMINATION
15   BY MR. LARSON:
16   Q.   Mr. Barrios [sic], do you have any direct evidence of
17   anyone directly participating in any alleged cover-up?
18   A.   No, I don't.
19   Q.   Now, do you know who investigated this particular case?
20   A.   It was my assumption it was -- now I know it was Sergeant
21   Dugue, Sergeant Kaufman.
22   Q.   Well, whoever investigated the case --
23   A.   Yes.
24   Q.   -- would it be appropriate for you, a police officer, to
25   interfere with that investigation?

ROBERT FAULCON - Redirect

1   A.   No, it wouldn't be appropriate at all.

2   Q.   You described the shooting on the east side of the bridge?

3   A.   Yes.

4   Q.   Did you have a really good sense of time while all this

5   was going on?

6   A.   Not at all.  Everything was a matter of seconds.

7   Q.   You didn't have a stopwatch?

8   A.   No, sir, I didn't.

9   Q.   Ms. Bernstein asked you a bunch of questions about if an

10  officer simply knew this, like simply had a gun -- simply knew

11  the person had a gun in his pocket and hands were out like

12  this, would you shoot that person.

13  A.   Correct.

14  Q.   She asked you, if you simply saw a police officer shooting

15  at another person --

16  A.   Right.

17  Q.   -- would you then shoot at that person?

18  A.   Right.

19  Q.   I have another question I want to ask you.

20  A.   Okay.

21  Q.   If you had information that officers had been shot at by

22  multiple subjects --

23  A.   Uh-huh.

24  Q.   -- if you had information that officers had been shot at

25  by multiple subjects at a particular location --

ROBERT FAULCON - Redirect

1   A.   -- right.

2   Q.   -- and when you arrived at that location, you couldn't see

3   but you could hear gunshots --

4   A.   Right.

5   Q.   -- and then finally when you could see, you saw people --

6   or you saw officers firing at people who you saw had guns --

7   A.   Right.

8   Q.   -- that's a different scenario, isn't it?

9   A.   Completely different.

10  Q.   That was your scenario, wasn't it?

11  A.   That was my scenario.

12  Q.   And you perceived that you were being shot at, didn't you?

13  A.   Yes, I did.

14  Q.   And you perceived that your life was in danger?

15  A.   Yes, I did.

16  Q.   And when you shot on the east side of the bridge, you

17  perceived you and your officers' lives were in danger, didn't

18  you?

19  A.   Yes, I did.

20       MS. BERNSTEIN:  Objection to the leading, Your Honor.

21       THE COURT:  He's asking questions about something

22  that the witness has already testified to, so although

23  technically it's leading, he's not suggesting the answers.

24            But let's not lead the witness.

25

ROBERT FAULCON - Redirect

1  BY MR. LARSON:

2  Q.   Officer Faulcon, did you honestly perceive when you shot

3  Ronald Madison that he was about ready to shoot you?

4  A.   Yes, I did, myself and the state trooper.

5  Q.   I want to ask you about this -- the PEDA, I guess,

6  analysis, you would call it.

7  A.   Correct.

8  Q.   Tell me again what PEDA stands for.

9  A.   Perception, evaluate, decision and action.

10  Q.   And are you supposed to go through those phases when

11  you're trying to evaluate whether to shoot or not to shoot?

12  A.   If it was in a perfect world, yes.

13  Q.   And I want to ask you about those three officers who you

14  knew were killed in the line of duty.

15  A.   Yes.

16  Q.   Do you know what phase of the PEDA analysis they were in

17  when they were shot and killed?

18  A.   They didn't have time to go through the phase because -- I

19  was going to say one of the officers was killed before even

20  getting out of his patrol unit.

21          MR. LARSON:  No further questions, Your Honor.

22          THE COURT:  Thank you, sir.  You may step down.

23              Okay.  Counsel, who's next?

24          MR. FLEMING:  As discussed before, Judge, we have the

25  issue for one of the transcripts.

ROBERT FAULCON - Redirect

1          THE COURT:  And who is that?

2          MR. FLEMING:  I believe Mr. Haynes.

3          THE COURT:  Haynes.  All right.

4               Counsel, would you all approach?

5               (WHEREUPON, the following proceedings were held at

6     the bench.)

7          THE COURT:  Number one, have you all looked at that

8     transcript with regard to any hearsay of non-testifying

9     witnesses?  Do we know that we're clear on that?

10          MR. FLEMING:  I think both parties have read it, but

11     to be honest, the parties, we've not talked to each other about

12     that.

13          THE COURT:  Well, if nobody has seen an issue, then

14     it's not necessary that you communicate about it.  I just don't

15     want to get in the middle of it and then have somebody read

16     something and then say, "Oh, well, that's not supposed to be

17     read."

18               Because the defendants don't get the right to

19     introduce hearsay that would be appropriate at the grand jury

20     simply because you're reading the transcript.

21          MS. BERNSTEIN:  I have not had a chance to read it

22     for that purpose.  I've read it --

23          MR. FLEMING:  Oh, I'm sorry.  I thought you had.  I

24     apologize.  I didn't mean to speak for you.

25          MS. BERNSTEIN:  May I confer for a minute?

ROBERT FAULCON - Redirect

1           Sure.

2           (WHEREUPON, the government lawyers had private

3    discussion off the record.)

4           **MS. BERNSTEIN:**  We have not had a chance to read it

5    for that purpose.  But my general feeling is that when these

6    transcripts come in, they should come in in full.

7           **THE COURT:**  Okay.

8           **MS. BERNSTEIN:**  And if I -- since we'll have a break

9    after this one, I will look at the other two tonight and see if

10   there's any objection to that and discuss it with defense

11   counsel.

12          **THE COURT:**  If there's no objection, that's fine with

13   me if they're brought in in their entirety.  I was sensitive,

14   when I read them, to the person being here live in which case a

15   valid objection would have been raised, such as the one I think

16   I cited about the people on the balcony and what they said they

17   saw, clearly would be excluded if there was an objection.

18          **MS. BERNSTEIN:**  Let me put on that one, particularly

19   your Honor, there is no objection.  Because that particular

20   statement is one of the statements that we believed was a lie.

21   So we would actually want that to come in.  So there's no

22   objection to that particular hearsay coming in.  It's not being

23   offered for the truth of the matter asserted.

24          **MR. FLEMING:**  What the judge cited, that's on the

25   Gore transcript.

1          MS. BERNSTEIN:  Yes, that's correct.  And we can look

2     at the other two tonight for that particular purpose.

3          THE COURT:  Okay.  All right.  I think that it would

4     be appropriate for me to explain the history about what I put

5     in the order, that witnesses aren't available, the witnesses'

6     testimony is being introduced by way of a grand jury

7     transcript.

8          MS. BERNSTEIN:  Your Honor, I think we should

9     actually explain why, that these witnesses have asserted the

10    Fifth, and so their transcripts are coming in.

11         THE COURT:  No, no, no.  We could have done that with

12    the lawyers here to put that on the record.  We did that up

13    here at the bench.

14         MS. BERNSTEIN:  Well, at that point we didn't know

15    that the transcripts were coming in.

16         MR. FLEMING:  Well, you would ask for sanctions if I

17    were to call somebody to assert their Fifth Amendment right.

18         THE COURT:  Yeah.  I mean, I would grant a mistrial

19    on that.  I can't --

20         MS. BERNSTEIN:  Of course, I know --

21         THE COURT:  That has 2255 written all over it.

22         MS. BERNSTEIN:  Your Honor, I agree with that --

23         THE COURT:  The circuit's going to trample me for

24    that.

25         MS. BERNSTEIN:  I agree with that, if you call a

ROBERT FAULCON - Redirect

1   witness just to take the Fifth.  I think it's a very -- this

2   is, obviously, a highly unusual situation where, even though

3   the witness is unavailable, the grand jury is being read, and I

4   understand the Court's reason for that and I, you know,

5   understand the Court's appreciation of this very unusual

6   situation.

7                I think in that particular situation, where the

8   jury is getting this unusual testimony, I think they should

9   know.  And the reason the jury doesn't normally know is because

10  if the person takes the Fifth, the jury then doesn't hear the

11  testimony.  So I think --

12           MR. FLEMING:  There's not an explanation offered for

13  other reasons.  When the person's deceased, you don't -- you

14  just read transcript.  The person's unavailable, you read the

15  transcript.

16           THE COURT:  Here's what I'm going to tell them:  The

17  witnesses are unavailable.  Their grand jury testimony are

18  being used.  And you can argue about the weight and credibility

19  of it.  I think it's evident on the transcript those factors

20  that would tend to make it arguable as to credibility.  I don't

21  think -- otherwise, we'd have the attorneys in here to assert

22  that they've taken the Fifth, in which case we may not have

23  used the transcripts.

24                So we've already rung that bell.

25           MS. BERNSTEIN:  And, Your Honor, I've never had this

1    situation come up either.

2              THE COURT:  I haven't either.  That's why I got memos

3    from you.

4              MS. BERNSTEIN:  May I have permission to look for

5    authority -- I have no idea if there is any -- but look for

6    authority on this particular issue about informing the jury of

7    why it's being done that way?

8              THE COURT:  Well, we had the cases that I -- and I've

9    got them sitting right over here.  I don't think that any of

10   them instruct that the jury should be told that.

11             MS. BERNSTEIN:  I wasn't looking for that particular

12   issue, so I don't know.  I was just -- and there very well

13   might not be any authority.  I would just like permission to

14   see if there is any authority out there on that.

15             MR. MECHE:  Essentially, it gives an adverse

16   inference.

17             MR. FLEMING:  My thought is it's likely to be

18   discretionary at best anyway.

19             MS. BERNSTEIN:  I just don't want to upset the Court

20   if I find some.

21             MR. FLEMING:  It's either improper or discretionary.

22             THE COURT:  I'll say this:  I'd be curious to see the

23   answer, just from a personal and professional point of view.  I

24   think it's very keenly interesting.  I'm not sure what it would

25   change, unless there's some -- obviously, if there's some

ROBERT FAULCON - Redirect

```
 1   mandatory requirement, then I'll be more than happy to
 2   instruct.  If it's discretionary...
 3          MS. BERNSTEIN:  I don't know if there's any authority
 4   at all, Your Honor.  I'll take a look and let you know.
 5          THE COURT:  I think it's highly unusual, I agree, and
 6   I think I used the word "rare" --
 7          MR. FLEMING:  Judge, the defense has no problem if
 8   Ms. Bernstein wants to spend her time tonight doing that
 9   research.
10          THE COURT:  I would like the edification, if there's
11   something out there.
12          MS. BERNSTEIN:  I'll see what I can find.
13          THE COURT:  All right.  Let's go ahead and do that
14   transcript real quick.
15          MR. MECHE:  Judge, the way we want to do this, we
16   have -- Mr. Kitchens has it on his computer, the actual
17   transcript, and we'll have one of the law clerks sit up here
18   and read the testimony, and let the jury view it on their
19   monitors.
20          THE COURT:  Well no, no, no.  I don't think they get
21   to view other people's testimony.  I get to see it up here.  I
22   think they just hear it.  And I don't want them to go back and
23   deliberate and say, "No, no, we want the transcript from
24   Ms. Gore."  They don't get that.
25          MS. BERNSTEIN:  There are actually two things that I
```

ROBERT FAULCON - Redirect

 1   mean ask for, Your Honor, with the transcripts.  There was a
 2   misrepresentation, whether it was intentional -- I'm not
 3   suggesting an intentional misrepresentation, but the main
 4   questioner on all three of these transcripts was actually
 5   Forrest Christian.
 6                Donald Haynes' transcript, I wasn't even
 7   present.  And because there has been testimony about me and my
 8   involvement with these witnesses, I would ask that it be made
 9   clear who's asking the questions.
10           **THE COURT:**  Okay.
11           **MR. DESALVO:**  I think that's fair.
12           **MR. MECHE:**  It's in the transcript.
13           **THE COURT:**  I think we should read that and designate
14   that.  Now, he's not here to read his part, in fact, I think we
15   can do it with a single attorney and a single person on the
16   stand, as long as the attorney says, "Now, this is
17   Mr. Christian doing the questioning," and then we hear his
18   questions.
19           **MS. BERNSTEIN:**  And the other thing I'd ask, it
20   probably goes without saying, but just the tone of the reading
21   needs to be neutral as opposed to trying to read in tone one
22   way or the other.
23           **MR. DESALVO:**  Well, we know how you would have done
24   it.
25           **THE COURT:**  It would be unfair to have a dramatic

ROBERT FAULCON - Redirect

1    interpretation of all this.

2            **MS. BERNSTEIN:**  That's all.  Like I said, it goes

3    without saying.

4            **THE COURT:**  No one's going to get nominated for an

5    Oscar.

6                    Who wants to do it?

7            **MR. LONDON:**  They can do it if they want.

8            **MR. FLEMING:**  No, no.  It's our case.

9            **THE COURT:**  Let's go.  It's up to you all.  If you

10   agree that -- look, I just need a warm body that knows how to

11   read up here, and I need a warm body that knows how to read at

12   the podium, and let's do this.  Let's do this.

13                   I agree, this should not have any dramatic spin

14   to it whatsoever.

15           **MR. MECHE:**  So we had prepared to do this

16   electronically.  Could she read from the monitor?

17           **THE COURT:**  Just put the monitor up here, that's not

18   a problem.

19                   (WHEREUPON, the following proceedings were held in

20   open court.)

21           **THE COURT:**  All right.  The next witness to be called

22   by the defendant is?

23           **MR. MECHE:**  Donald Haynes, Your Honor.

24           **THE COURT:**  Donald Haynes.

25                   Donald Haynes is a witness who is unavailable.

ROBERT FAULCON - Redirect

1  The Court is going to permit the reading of his grand jury
2  testimony to the jury.  To do that, we will have one person
3  read, and Mr. Meche is going to read who the questions,
4  indicating who the questioner is, and we're going stick to
5  exactly what's on the written page.
6           This young lady is -- what's your name?
7           **THE WITNESS:**  Lea Cotton.
8           **THE COURT:**  Ms. Cotton is going to read the parts
9  that would be Mr. Haynes' testimony.
10          Mr. Haynes was sworn in.  He was administered
11  the oath before the grand jury and this is his testimony.  Go
12  ahead, Mr. Meche.
13          (WHEREUPON, the deposition of **DONALD C. HAYNES, III**
14  was read.)
15          **MR. MECHE:**  I'll read the caption.  In re:  Danziger
16  Bridge.  This is testimony of Donald C. Haynes, III, taken
17  before the special federal grand jury on Wednesday the 4th day
18  of November, 2009.
19          (Whereupon the witness, Donald Haynes, III, entered
20  the grand jury room.)
21          **THE FOREPERSON:**  Could you, please, state and spell
22  your name?
23          **THE WITNESS:**  Donald C., D-O-N-A-L-D, C., Haynes,
24  H-A-Y-N-E-S, III.
25          **THE FOREPERSON:**  Could you, please, raise your right

1    hand?

2              Do you solemnly swear to tell the truth, the

3    whole truth, and nothing but the truth in this and related

4    cases, so help you God?

5              **THE WITNESS:**  Yes.

6              **THE FOREPERSON:**  Thank you.

7              Donald C. Haynes, having been first duly sworn, was

8    examined and testified as follows:

9                              **EXAMINATION**

10   **BY MR. CHRISTIAN:**

11   **Q.**    Good morning, Mr. Haynes.

12   **A.**    Good morning.

13   **Q.**    Do you understand this grand jury is investigating a

14   September 4, 2005 incident at the Danziger Bridge?

15   **A.**    Yes.

16   **Q.**    You understand you're a witness in this case and not a

17   target of the investigation?

18   **A.**    Yes.

19   **Q.**    You understand you're here pursuant a grand jury subpoena?

20   **A.**    Yes.

21   **Q.**    As a witness, you have certain rights and

22   responsibilities.  I want to run through them now.

23   **A.**    Okay.

24   **Q.**    Do you understand that you've sworn an oath to tell the

25   truth completely and fully?

DONALD C. HAYNES - Direct

1   A.   Yes.

2   Q.   Do you understand if you don't testify complete and full

3   truth that you could be prosecuted for perjury?

4   A.   Yes.

5   Q.   You understand that answering "I don't know" when, in

6   fact, you do know the answer to a question is the same as

7   testifying untruthfully?

8   A.   I know now.

9   Q.   Okay.  Do you understand you have a right to take a break,

10  if you wanted to take a break, at some point and speak with an

11  attorney?

12  A.   I know that now.

13  Q.   Do you have an attorney here today?

14  A.   Yes, I do.

15  Q.   What's his name?

16  A.   Donald Hyatt.

17  Q.   Have you spoken to him this morning?

18  A.   Yes, I have.

19  Q.   Okay.  Is he outside this room?

20  A.   Yes, he is.

21  Q.   Are you aware that you have the right to refuse to answer

22  a question that would intend to incriminate you?

23  A.   Yes.

24  Q.   Do you understand that right is personal to you; that is,

25  you can't refuse to answer a question that might get somebody

DONALD C. HAYNES - Direct

1   else in trouble?

2   A.   I can't answer?

3   Q.   You can't refuse to answer a question that might get

4   somebody else in trouble.

5   A.   Okay.

6   Q.   Do you understand that?

7   A.   Yes.

8   Q.   Okay.  If at any point I ask you a question you don't

9   understand, will you let me know and I'll rephrase?

10  A.   Yes.

11  Q.   Where do you work right now?

12  A.   The Westin Galleria Dallas, in Dallas, Texas.

13  Q.   How long have you been working there?

14  A.   Probably a year and a couple of weeks or so.

15  Q.   Where were you working before the Westin?

16  A.   I was a member of the New Orleans Police Department.

17  Q.   Where were you working right before Katrina struck New

18  Orleans?

19  A.   The 3rd District, Homicide Division.

20  Q.   I want to take you back to September 4, 2005.

21  A.   Okay.

22  Q.   The date of the incident under investigation here.

23  A.   Okay.

24  Q.   On that date, that morning, did you find yourself on the

25  I-10 bridge?

DONALD C. HAYNES - Direct

1  A.   Yes.

2  Q.   Who were you with?

3  A.   I was with Detective Pat Conaghan, Jennifer Dupree,

4  Jennifer Goodenough, and Tony Mayfield, along with two airboat

5  drivers.  I don't remember their names.

6  Q.   The folks that you do remember the names of, where did

7  they work?

8  A.   They were all 3rd District officers also.

9  Q.   What were you doing on the I-10 that day?

10  A.   I was actually headed to my house out in New Orleans

11  East -- well, we were.

12  Q.   You testified on previous occasions about what you saw and

13  heard from the I-10 that day; correct?

14  A.   Yes.

15  Q.   And you spoke with us yesterday, with the FBI and with the

16  Department of Justice?

17  A.   Yes.

18  Q.   I wanted to ask you a series of questions now about what

19  you saw and what you hear, and I want it to be based entirely

20  on the best of your recollection of what you saw and heard that

21  day.

22  A.   Yes.

23  Q.   Is that clear?

24  A.   Yes.

25  Q.   And will that information be completely truthful and

DONALD C. HAYNES - Direct

1  accurate, the information you're prepared to provide today?
2  A.   Yes.
3  Q.   What's the first thing that caught your attention on the
4  I-10 that day?
5  A.   We observed, it was several trucks with flat boats
6  attached to them kind of pulled off to the side.  And as we
7  made our way closer to the group of people, we asked, you know,
8  "What was going on?"  And the guys advised us, "You might not
9  want to go any further.  There's somebody down there shooting
10 up the bridge."
11 Q.   Did you look to see if could you find anybody who was
12 shooting at the bridge?
13 A.   We did look.  We looked around.  And I would say within a
14 minute we heard three -- two to three gunshots.
15 Q.   Did you see who was shooting?
16 A.   Not initially, no.
17 Q.   Did you ever see anybody under the bridge?
18 A.   No.
19 Q.   What's the -- what's the next thing noticed?
20 A.   The next thing, we kind of ran over to the end of the
21 bridge to the -- I guess that's north end, and we did observe
22 two gentlemen running, coming from that way under the bridge in
23 the -- like a trailer park area.
24 Q.   How far were those two people who were running from you
25 when you first saw them?

DONALD C. HAYNES - Direct

1    **A.**   Running from me?
2    **Q.**   How far were they from you when you first saw them?
3    **A.**   They were -- I guess, we were -- I don't know exactly how
4    far.  We were up on the bridge and they were down on the ground
5    at an angle.
6    **Q.**   How far were they from the base of the bridge?
7    **A.**   The base...
8    **Q.**   Just a rough, ballpark estimate.  Close to the base of the
9    bridge, far from the base of the bridge?
10   **A.**   A little further away, not as close, but further away from
11   the base.
12   **Q.**   Were you close enough that you could see their faces?
13   **A.**   Faces, no.
14   **Q.**   Could you see their clothings?
15   **A.**   Yeah.
16   **Q.**   What kind of clothing did they have on?
17   **A.**   Like I said before, I remember one person with a red
18   shirt.
19   **Q.**   Did these men appear to have guns?
20   **A.**   Yeah.
21   **Q.**   What kind of guns did they look like they had?
22   **A.**   I have no idea.  I don't know.
23   **Q.**   Why do you say then that it looked like they had guns?
24   **A.**   Just based on the situation and the shooting that we heard
25   from under the bridge and them running.  We believed they had

guns.

**Q.** And I just want to be clear. I don't want to put any words in your mouth, but I just want to make sure that I understand you. What you're saying is, you heard gunshots, and then the first people you saw under the bridge were running?

**A.** Yes.

**Q.** And so you assumed that they had guns?

**A.** Yes.

**Q.** Because they were running and you heard gunshots; is that fair?

**A.** Yes.

**Q.** Did you actually physically see them with guns?

**A.** I can't recall.

**Q.** Okay. To the best your recollection now, did you see those two men running under the bridge with guns? Did you ever see them fire a gun under the bridge or while they were running under the bridge?

**A.** Can I step out for a second?

**MR. CHRISTIAN:** Sure.

And I would advise the grand jurors not to read anything into him taking a break here.

Okay. You want to take break?

**THE WITNESS:** Thank you.

(WHEREUPON, the witness was excused and left the grand jury room.)

DONALD C. HAYNES - Direct

1          (WHEREUPON, the witness returned to the grand jury
2    room.)
3    **BY MR. CHRISTIAN:**
4    **Q.**   Mr. Haynes, I want to remind you you're still under oath.
5    **A.**   Okay.
6    **Q.**   The question we had is:  When you first saw these two
7    gentlemen, one with the red shirt running, did you see them in
8    possession of guns?
9    **A.**   I believed they had guns based on the situation.  So I did
10   assume that they guns, yes.
11   **Q.**   Did you assume they had guns because you saw them running
12   and you heard gunshots before that?
13   **A.**   Yes.
14   **Q.**   Do you have any independent recollection today of actually
15   seeing them with guns?
16   **A.**   I don't.
17   **Q.**   Where were these guys running towards?
18   **A.**   They were running north towards the Danziger Bridge.
19   **Q.**   What did they have to run through on the way to the
20   Danziger Bridge?
21   **A.**   There was, like, a small trailer park area down that way,
22   and there was, like, a neighborhood with various streets and
23   all.
24   **Q.**   Did you ever lose sight of them while they were running?
25   **A.**   Yes.

DONALD C. HAYNES - Direct

1   **Q.**   How long did you lose sight of them?

2   **A.**   I don't know exactly.  I know it was no longer than five

3   minutes.

4   **Q.**   Where did you lose sight of them exactly?

5   **A.**   Within that area.

6   **Q.**   The area of the trailer park?  Is that what you're

7   referring to?

8   **A.**   Yeah.

9   **Q.**   As you were watching them run and before you lost sight of

10  them, what else were you able to tell about them besides that

11  one had a red shirt on?

12  **A.**   I just remember black males.

13  **Q.**   When's the next time that you remember seeing them, seeing

14  someone and a red item of clothing?

15  **A.**   I remember seeing them kind of make their way up to, I

16  guess that's Chef, on -- up onto the Danziger Bridge and, you

17  know, turning left towards going up the bridge.

18  **Q.**   Since you had lost sight of them for five minutes or so,

19  how do you know that the two people who were on the bridge were

20  the same people that you had seen running under the I-10?

21  **A.**   Just based off the description and the red shirt.  I mean,

22  that's still strong in my memory, remembering a red shirt.

23  **Q.**   You remember seeing that red item of clothing on some

24  figure going up the bridge?

25  **A.**   Yes.

DONALD C. HAYNES - Direct

1   Q.   Okay.  Anything besides that red item of clothing that
2   made you think that the people you had seen under the I-10 were
3   the same people now on the Danziger Bridge?
4   A.   No, not that I can recall now.
5   Q.   Any idea how long it took, roughly, for these two guys to
6   run from the I-10 to Danziger?
7   A.   It would have to be roughly, but it would have to be
8   within five or ten minutes.
9   Q.   Okay.  So if it was five to ten minutes and you lost sight
10  of them for roughly five minutes, you first saw them under the
11  bridge, and then the next time you saw somebody was on
12  Danziger?
13  A.   Yes.
14  Q.   Okay.
15  A.   Maybe it's ten minutes altogether.
16  Q.   When these two black males reach the Danziger Bridge, was
17  there anybody else on the bridge at that time?
18  A.   No, I didn't see anybody.
19  Q.   Did you see any civilians whatsoever on the bridge?
20  A.   No.
21  Q.   Those two guys were the only two guys on the bridge at all
22  that you could see?
23  A.   Yes, sir.
24  Q.   Did you see any women on the bridge?
25  A.   No.

DONALD C. HAYNES - Direct

1  **Q.**   Any children on the bridge?

2  **A.**   No.

3  **Q.**   Grocery carts?

4  **A.**   No.

5  **Q.**   Vehicles of any kind?

6  **A.**   No.

7  **Q.**   Okay.  Do you know if anybody was chasing after these two

8  black males?

9  **A.**   You mean within the distance chasing after them?

10 **Q.**   From the I-10?

11 **A.**   I know Detective Conaghan went down the bridge.  I don't

12 know how close he was to them because I was screaming down

13 there, "They're headed to the Danziger."  It was a great

14 distance, but I would say, yeah, he was going behind them.

15 Yeah.

16 **Q.**   You said it was a great distance.  What were you using to

17 watch these two guys from the great distance from the I-10 to

18 the Danziger?

19 **A.**   My eyes.

20 **Q.**   And for the court reporter, can you tell her, do you have

21 any problems with your vision?

22 **A.**   No.

23 **Q.**   Glasses, contacts?

24 **A.**   I was wearing contacts, yeah.

25 **Q.**   Okay.

DONALD C. HAYNES - Direct

1  A.   I've always worn contacts, and I just recently started

2  wearing glasses.

3  Q.   Okay.  Any binoculars with you?

4  A.   No.

5  Q.   Telescopes, cameras?

6  A.   No.

7  Q.   Anybody in your group have anything like that to watch?

8  A.   (WITNESS NODS HEAD NEGATIVELY.)

9  Q.   Fair to say, you and the other officers on the I-10 were

10 just watching were your naked eyes?

11 A.   Yes.

12 Q.   Okay.  What's the first vehicle that you saw reach the

13 bridge?

14 A.   I observed a Budget rental truck.

15 Q.   What did the Budget rental truck do?

16 A.   It stopped.  Kind of pulled up and stopped, like, right at

17 the -- maybe the base of the bridge.

18 Q.   What side is that?  East or west?

19 A.   Um --

20 Q.   The Danziger is north; right?

21 A.   You mean the traffic traveling east?

22 Q.   Oh, no, no, not the trafficking.  Just there's east side

23 and west side of the bridge.

24 A.   Oh, okay.

25 Q.   Do you know if it's the east side or the west side?

DONALD C. HAYNES - Direct

1   A.   Okay.  That's east side.
2   Q.   Okay.  So the Budget truck stopped at the east side of the
3   Danziger Bridge at roughly at the base?
4   A.   Uh-huh.  (Affirmative response.)
5   Q.   Well, where were the two black males you saw at that
6   point?  Where were they?
7   A.   They were making their way up the bridge and I would say
8   midway between the top and the bottom, like midway up.
9   Q.   What were they doing when the Budget truck first pulled up
10  before it stopped?
11  A.   They were still kind of making their way up and kind of
12  looking back.
13  Q.   What happened when the Budget truck stopped?
14  A.   The guys got out of the vehicle, and it happened really
15  fast, a shootout ensued.
16  Q.   When you say "guys got out of the vehicle," what do you
17  mean?
18  A.   I mean --
19  Q.   Out of the Budget truck?
20  A.   Yeah, out of the back of the vehicle.  Yes.
21  Q.   Did you know at that moment who those guys were?
22  A.   At that moment, no.
23  Q.   What did they appear to be wearing?
24  A.   All dark color, like a dark blue pants type and shirts.
25  Q.   Did they appear to have weapons?

DONALD C. HAYNES - Direct

1  **A.**   Yes.

2  **Q.**   What kind of weapons did it look like they had?

3  **A.**   Like I say, all I could remember, I maybe saw a couple of

4  long guns.  And until the shootout occurred, I guess the rest

5  was handguns.

6  **Q.**   And you say you guess the rest was handguns.  Why do you

7  guess that the rest would have been handguns?

8  **A.**   Because I noticed the difference between the long gun and

9  the handgun.

10  **Q.**   What was the difference from the I-10?  Could you see a

11  handgun from the I-10?

12  **A.**   No.  Like I said, I could see the arms extended and I

13  could later numerous gunfire real loud.

14  **Q.**   Can you describe for the court reporter what do you mean

15  by "arms extended"?

16  **A.**   Armed extended like a handgun in your hand.  I mean,

17  reaching out, the movement of your arm.

18  **Q.**   Could you actually see whether there was a handgun in the

19  person's hand when they had their arms extended?

20  **A.**   No.

21  **Q.**   Was it possible for you to tell from the I-10 whether

22  those guys in the Budget truck, who didn't have long guns, were

23  simply pointing or were actually firing handguns?

24  **A.**   Well, based on the whole situation, I believed it was --

25  they were firing.

DONALD C. HAYNES - Direct

1   Q.   Right.
2   A.   And just because I heard the guns.
3   Q.   Well, we'll get to that in a minute.  But my first
4   question is:  Could you tell from the I-10, could you say with
5   certainty whether somebody was pointing or actually was
6   pointing a handgun?  Pointing with their finger or pointing a
7   handgun?  Could you tell that from the Friendly Inn.
8   A.   I can't say with certainty.
9   Q.   Okay.  And why is that?
10  A.   Just the distance and with everything going on.
11  Q.   Okay.  The two black males, what were they doing when you
12  saw the officers getting out of the Budget truck?
13  A.   The same thing.  They were facing the officers and arms
14  extended.  The same type of motion as a handgun, which I
15  believed to be a handgun, and firing, pointing in that
16  direction.
17  Q.   Could you -- is there any information that you had that
18  would tell you that they were definitely firing a handgun
19  versus pointing?
20  A.   No.
21  Q.   Could you see muzzle flashes?
22  A.   No.
23  Q.   Could you see smoke from that dance?
24  A.   No.
25  Q.   Could you see the bodies recoiling from the fire of a gun?

DONALD C. HAYNES - Direct

1  A.   Bodies recoiling, like the hand movements?

2  Q.   Sure.  Yes.

3  A.   That's what I -- that's what I observed, yeah.

4  Q.   Did you observe that with the two black males who were on

5  the bridge?

6  A.   Yes.

7  Q.   What about the guys in the Budget truck?

8  A.   Yes.

9  Q.   Could you tell who opened fire first from the I-10?

10 A.   No, I couldn't.

11 Q.   When did the gunfire start?

12 A.   Like I said, it was really fast.

13 Q.   Did the gunfire start relative to when the Budget truck

14 arrived?  What was the event that immediately preceded the

15 gunfire starting?

16 A.   I would say the Budget truck pulled up, stopped, the

17 person in the back exited, and gunfire began.

18 Q.   Almost immediately?

19 A.   Just like that:  Stop, exit, and gunfire.

20 Q.   Could you tell how many shots were fired?

21 A.   A lot.  Numerous.  I can't give a number, but it was a

22 lot, and it was loud.

23 Q.   More than 20?

24 A.   Probably so, yes.

25 Q.   Could you tell what kind of weapons were being fired?

DONALD C. HAYNES - Direct

1  A.   No.

2  Q.   Could you tell whether semi-automatic weapons were being

3  used?

4  A.   I can -- yeah.  I could hear that sound of the

5  semi-automatic, that type of blast.  I've heard it before.  And

6  I have experience with those, so, yeah, there was some

7  semi-automatics involved.

8  Q.   As this gunfire was going on, how far were the two black

9  males from the Budget truck?

10  A.   It was a good distance.  I mean, 40, 50 feet back and a

11  continuous -- and continuous of moving backwards.

12  Q.   As this gunfire erupted, did you see anybody on the bridge

13  besides the two black males and the guys in the Budget truck?

14  A.   I didn't.

15  Q.   And could you tell who was firing the shots?  Could you

16  tell whether it was the guys in the back of the truck, the guys

17  in the front of the truck, the black males?  Could you

18  differentiate any firing whatsoever?

19  A.   I guess I couldn't just point and say, "This person was

20  firing," but it was so much and so loud and it was a lot of

21  firing.

22  Q.   But don't know the source of that firing?  You can't say

23  with any certainty who the source of that firing was?

24  A.   With certainty, no, I can't.

25  Q.   Okay.  The guys you saw getting out of the Budget truck,

DONALD C. HAYNES - Direct

1   did you ever see them taking cover of any kind on the bridge?
2   A.   No.
3   Q.   Did you ever see the guys in the Budget truck sort of
4   ducking behind the Budget truck to, you know, look up at the
5   bridge?
6   A.   Not that I remember.
7   Q.   Did you ever see any of the officers hiding behind a
8   concrete barrier or anything?
9   A.   No.
10  Q.   What did the officers look like they were doing when you
11  saw them?
12  A.   Just -- I mean, like I said, there was a gunfight.
13  Q.   I mean, were these officers just standing out in the
14  middle of the street when you saw them firing weapons?
15  A.   Yeah.  I mean, it's like they got out and they just kind
16  of went around out onto the bridge and they were firing.
17  Q.   No defensive positions whatsoever that you saw?
18  A.   I really can't, you know, recall if kneeling or ducking
19  behind.  I don't remember.
20  Q.   You don't remember seeing that?
21  A.   No.
22  Q.   Okay.  What about the two black males on the bridge, what
23  were they doing as this gunfire erupted?
24  A.   They -- I was really alerted to the guy in the red shirt
25  and I remember him, and I even remember thinking at the time,

DONALD C. HAYNES - Direct

1    "Wow.  This is bold."  I remember standing up, that person's
2    arm extended, I mean.
3    **Q.**    Which one was that?
4    **A.**    The red shirt.
5    **Q.**    The red shirt?
6    **A.**    Yes.
7    **Q.**    Do you know whether that person was pointing and saying,
8    "Those guys are shooting at us down there"?
9    **A.**    No.
10   **Q.**    Do you know what that guy was doing?
11   **A.**    No.  I just believed he was shooting.
12   **Q.**    Okay.  And that was based on the arm gesture?
13   **A.**    Yes.
14   **Q.**    Any other information that you had at that time?  You just
15   have to give the court reporter a yes or no answer.
16   **A.**    Oh, I'm sorry.  Any information?
17   **Q.**    To indicate that he was shooting beside the arm gesture?
18   **A.**    Just based on the arm gesture and the situation.  I mean,
19   standing toe to toe with the officers like that, I believed he
20   was shooting.
21   **Q.**    What about the other guy, the guy who didn't have the red
22   shirt, what happened to him?  What did you see?
23   **A.**    I don't -- I'm not certain if he was the guy that was shot
24   and went down or if it was the other guy with the red shirt
25   that was shot, but one of them was shot, went down, and the

DONALD C. HAYNES - Direct

 1   other one made his way over the bridge.

 2   **Q.**   So you saw one guy get shot down?

 3   **A.**   Yes.  And I'm sorry, I can't remember which one exactly

 4   went down.

 5   **Q.**   Sure.  What was the guy who was shot down?  What was he

 6   doing when he was shot down?

 7   **A.**   He was standing on the bridge, like I said, arm extended,

 8   which I believed he was firing a weapon.

 9   **Q.**   The two black males you saw on the bridge, were they

10   standing still the entire time just facing the guys in the

11   Budget truck?

12   **A.**   No.  They were -- I mean, kind of gradually moving their

13   way up the bridge, like kind of moving back, but just with the

14   arm extended and backing up the bridge.

15   **Q.**   Could you tell whether they were walking or running?

16   **A.**   They were not in a full out stride, but they weren't

17   walking.

18   **Q.**   So could you tell what direction they were facing in the

19   whole time?  If they didn't have their arm extended, could you

20   tell what directions they were facing?

21   **A.**   No.

22   **Q.**   Do you know how far the I-10 is from the Danziger Bridge?

23   **A.**   Exactly?

24   **Q.**   No.  Your estimate?  Your opinion?

25   **A.**   No.

DONALD C. HAYNES - Direct

1  Q.   While you were on the I-10 watching what was happening on
2  the Danziger, what were you doing on the I-10?
3  A.   Watching it.  Also, I was watching and kind of moving up
4  over the I-10 headed to the westbound side.
5  Q.   Is that headed uphill, up the I-10?
6  A.   Yes.
7  Q.   Up the crest?
8  A.   Yeah.
9  Q.   What kind of shoes were you wearing?
10 A.   I was wearing like thigh-high rubber boots.
11 Q.   What's it like to run in those thigh-high rubber boots?
12 A.   Hard.
13 Q.   Hard uphill?
14 A.   Uphill, downhill, straight.  It's hard either way.
15 Q.   So I assume you got to kind of watch where you're going as
16 you're running uphill in thigh-high rubber boots?
17 A.   Yes.
18 Q.   Yeah.
19       So your attention wasn't focused on the Danziger
20 Bridge the entire time; right?
21 A.   Yes.
22 Q.   So there's stuff that you might have missed.  You can't
23 say for certain what might have happened on the Danziger
24 Bridge; correct?
25 A.   Yes, sir.

DONALD C. HAYNES - Direct

1   Q.   You said one suspect, one of black males was shot.  Now,
2   what happened to the other one?
3   A.   He continued over the Danziger Bridge and ran across, and
4   I believe after that I think -- I don't know if I heard it on
5   the radio or if I heard it from another officer -- there was a
6   SWAT roll that ensued at the motel right there at the end, and
7   that was a standoff.  And I really don't know what happened
8   after that, once the SWAT team got there.
9   Q.   The information you've testified, is that truthful and
10  accurate information to the best of your recollection of what
11  you saw and heard that day on the Danziger Bridge?
12  A.   Yes, what I remember now.
13  Q.   This isn't the first time you've been asked, though, about
14  what happened on the Danziger Bridge; correct?
15  A.   Correct.
16  Q.   Previously you were asked by NOPD and by the state grand
17  jury what you had seen and heard that day; correct?
18  A.   Correct.
19  Q.   We discussed, you and I and the FBI agents, we discussed
20  your previous statements; correct?
21  A.   Yes.
22  Q.   Is it your understanding today that if you provide
23  truthful and accurate information regarding what happened that
24  day, and if you provide truthful and accurate information
25  regarding the veracity of your prior statements, that neither

DONALD C. HAYNES - Direct

1   the Department of Justice, nor the United States Attorney's

2   Office will in any way pursue criminal charges?

3   A.   Yes.

4   Q.   Did your attorney explain that to you as sort of pocket

5   immunity today?

6   A.   Yeah.

7   Q.   Is that a fair assessment of your understanding?

8   A.   Yes.

9   Q.   Of our previous discussions?

10  A.   Yes.

11  Q.   And have you provided truthful and accurate information

12  then in conjunction with that?

13  A.   Yes, I have.

14  Q.   I want to talk now about the previous statements you made.

15       Did you have a chance to review those today?

16  A.   Yes, I did.

17  Q.   Did we discuss some of the statements you made in those

18  prior statements, did we discuss those yesterday?

19  A.   Yeah.

20  Q.   When you reviewed those two transcripts, was the first one

21  a May 2006 interview with Sergeant Gerald Dugue with NOPD?

22  A.   Yes.

23  Q.   What is your understanding of what Dugue was interviewing

24  you for?

25  A.   A shooting incident that happened on the Danziger Bridge.

DONALD C. HAYNES - Direct

1    **Q.**   Did you know who Dugue was investigating when you spoke to
2    him in May of '06?
3    **A.**   No.
4    **Q.**   What was your understanding of what the District
5    Attorney's Office was doing at that time?
6    **A.**    Investigating the shooting case between officers and
7    people on the bridge.
8    **Q.**   Was it your understanding the District Attorney's Office
9    was looking at the officers as potential suspects in the
10   shooting?
11   **A.**   Yes.
12   **Q.**   So that was your background understanding when you went
13   and met with Dugue; correct?
14   **A.**   Yes.
15   **Q.**   Did you talk to Dugue about what you had seen that day?
16   **A.**   Yes.
17   **Q.**   At some point did he tape record that interview?
18   **A.**   Yes, did he.
19   **Q.**   Have you reviewed a transcript of that tape recorded
20   interview?
21   **A.**   Yes, I did.
22   **Q.**   Does it accurately reflect your memory of what you told
23   Dugue at that time?
24   **A.**   Yes.
25   **Q.**   How long did you talk to Dugue best he started the tape

DONALD C. HAYNES - Direct

1   recorder?

2   A.   Briefly.  I don't know the exact time line, but it wasn't

3   long.  It was brief.  And then we started the interview.

4   Q.   Did Dugue ever tell you what to say?

5   A.   No, he didn't.

6   Q.   Did he ever make any suggestions about what you should

7   say?

8   A.   No, he didn't.

9   Q.   Did you talk to any other NOPD officers about what you

10   should say?

11   A.   No.

12   Q.   Did you know going into that interview with Dugue whether

13   anybody else at NOPD was investigating this incident besides

14   Dugue?

15   A.   No.

16   Q.   Had you compared stories with anybody else from NOPD?

17   A.   No.

18   Q.   Prior to going in and seeing Dugue?

19   A.   No.

20   Q.   What I'd like to do now is read some of the questions and

21   your answers and ask you if that reflects your recollection of

22   your previous statements.  I'm going to ask you whether that

23   was truthful and accurate information.  Okay?

24   A.   Okay.

25   Q.   This is from the May 2006 transcript of your tape recorded

DONALD C. HAYNES - Direct

1    interview with Sergeant Dugue.

2           Sergeant Dugue asked:  "Okay.  For the record, in

3    your own words, Detective Haynes, could you explain what

4    happened on September, on September [sic] morning, that day of

5    September 4, 2005, at approximately 9:00 a.m. in the morning in

6    the vicinity of the Danziger Bridge, Chef and I-10 high-rise

7    bridge?"

8           I'm going to read you just a portion of your answer.

9    This is not your entire answer because you basically summarized

10   what you had seen.  But the portion of your answer I want to

11   refer you to now, you said:

12          "I observed the subjects make their way onto the

13   Danziger Bridge and turn left headed towards westbound, headed

14   westbound over the Danziger Bridge, at which time a Ryder or a

15   Budget truck pulled up and I don't remember how many, but a

16   good bit of police officers exited the truck.  And as they

17   exited the truck, the two guys running over the bridge began

18   firing at the officers that exited the truck.  The officers

19   returned fire."

20          I want to direct your attention particularly to, "The

21   two guys running over the bridge began firing and that the

22   officers returned fire."

23          Was that an accurate, completely accurate, completely

24   truthful statement of what you had seen and heard that day?

25   Did you acknowledge yesterday that that was not a completely

DONALD C. HAYNES - Direct

1   accurate and truthful statement?

2   A.   Yes.

3   Q.   Did you acknowledge yesterday that you had provided

4   that -- provided Sergeant Dugue with inaccurate and untruthful

5   information regarding who opened fire first?

6   A.   Yes.

7   Q.   Did you tell Sergeant Dugue that the two civilians opened

8   fire first?

9   A.   Yes.

10  Q.   From the I-10 could you see whether the two civilians had

11  opened fire?

12  A.   No.

13  Q.   Before the guys in the rental truck?

14  A.   No.

15  Q.   Next, I want to direct your attention to Sergeant Dugue

16  asked:  "As you recall there were two individuals you mentioned

17  opened fire by shooting at the police officers that were in the

18  truck as they got out of the truck?"  And you said:  "Yes."

19          Is that a completely truthful and accurate statement?

20  A.   No.

21  Q.   You couldn't, in fact, tell who opened fire?

22  A.   Correct.

23  Q.   Correct.  From where you were on the I-10.

24          You also said, "The subjects I saw on the bridge were

25  shooting and they were running away and they were shooting back

DONALD C. HAYNES - Direct

1  at the officers."
2          Sergeant Dugue said, "Okay.  But the subject that did
3  make it, you observed made it to the top of the bridge, you say
4  he was also firing at officers?"
5          And you said, "Yes.  The subject who did actually
6  make it over and continue running, he was actually firing,
7  also, as the officers approached the bridge."
8          Was that completely accurate and truthful?
9  A.   It's not completely accurate.
10 Q.   Could you say with certainty that the civilians were
11 firing guns?
12 A.   Not with certainty.  It's what I believed based on the
13 situation.
14 Q.   Could you see a handgun from the I-10?
15 A.   No.
16 Q.   Did you at any point tell Sergeant Dugue that you weren't
17 certain that the civilians had handguns?
18 A.   No.
19 Q.   Did you ever tell Sergeant Dugue you can't see a handgun
20 from the I-10?
21 A.   No.
22 Q.   Did you ever tell Sergeant Dugue that the only reason you
23 concluded that black males were firing guns was because you saw
24 their arms extended?
25 A.   No.

DONALD C. HAYNES - Direct

1  **Q.**   I want to direct you now to your appearance before the
2  state grand jury.
3  **A.**   Okay.
4  **Q.**   You had a chance to review that October 2006 transcript?
5  **A.**   Yes.
6  **Q.**   Before you went into the state grand jury you had the
7  opportunity to go in May, after your initial interview with
8  Dugue, go out to the I-10 with another NOPD officer; correct?
9  **A.**   Yes.
10 **Q.**   Why did you go out to the I-10 with that NOPD officer?
11 **A.**   They wanted to take photos of my vantage point to the
12 actual incident.
13 **Q.**   Did you have a chance to view the Danziger Bridge from the
14 I-10 at that time?
15 **A.**   Yes.
16 **Q.**   Do you recall if any of the roads were blocked off?
17 **A.**   Yeah, they were blocked off.
18 **Q.**   So you could look onto the other bridge and see --
19 **A.**   Yes.
20 **Q.**   -- what your vantage point would have been?
21 **A.**   Yes.
22 **Q.**   Were photographs taken?
23 **A.**   Yes.
24 **Q.**   When you went to the I-10 with that NOPD officer, you
25 understood, you just made a statement to Dugue, that you could

DONALD C. HAYNES - Direct

1    see the two black males firing; correct?

2    A.    Yes.

3    Q.    You realized when you were on the I-10 that day taking the

4    photographs, you couldn't, in fact, see handguns from the I-10;

5    correct?

6    A.    Yes.

7    Q.    Did you go back to Dugue and explain to him that you had

8    provided inaccurate information to him?

9    A.    No.

10   Q.    After you went to the I-10 and the photographs were taken,

11   you appeared in the state grand jury in October.  Before you

12   went in to the state grand jury, did you meet with anybody from

13   the State Attorney General's [sic] Office, the District

14   Attorney's Office?

15   A.    Yes.

16   Q.    Can you tell us what new information you learned while you

17   were in there?

18   A.    I just remembered him telling me that, and like we talked

19   about it.  He was kind of yelling and all, that innocent --

20   that two innocent people -- two innocent -- I don't know if it

21   was two -- but bystanders were shot and one person was a

22   mentally challenged person who was also on the bridge.

23   Q.    Had you seen any other people on the bridge besides the

24   two guys that you remembered?

25   A.    I didn't.

DONALD C. HAYNES - Direct

1   Q.   Did you tell the District Attorney's Office that you could
2   see a handgun from I-10?
3   A.   Then, yes, I did.
4   Q.   Did you tell the District Attorney's Office that you had
5   seen a guy in a red shirt with a handgun and that you had seen
6   him firing at the police officers?
7   A.   Yes.
8   Q.   I showed you some photographs yesterday; correct?
9   A.   Yes.
10  Q.   And these were photographs that were taken by the FBI I
11  told you?
12  A.   Yes.
13  Q.   They're not actually photographs from the day of the
14  incident, but they are taken from -- see if you can identify
15  the vantage point that these photographs were taken from and
16  tell us if they reflect your memory of what you could see from
17  the I-10 onto the Danziger Bridge?
18  A.   Yeah.
19  Q.   Do those photographs appear to have been taken from the
20  same point that you were standing on the I-10 looking at
21  Danziger?
22  A.   Yeah, pretty much.  Yeah.
23  Q.   As you look at those photographs, which have been marked
24  as Grand Jury Exhibits 3 and 4, can you tell how many people
25  are on the bridge?

DONALD C. HAYNES - Direct

1  **A.**   On which one?  This one?

2          **MS. BERNSTEIN:**  Your Honor, objection -- I guess

3  objection.  I'd like to put up the grand jury exhibits that the

4  witness was looking at.

5          **THE COURT:**  I think that's fair.

6          **MR. MECHE:**  Yeah, I agree.

7          **THE COURT:**  If he's looking at exhibits, then it's

8  fair for us to look at --

9          **MR. MECHE:**  That's a good idea.  I agree.  I'm glad

10 you brought it up.

11         **THE COURT:**  Are these already in evidence in this

12 case -- in this trial?

13         **MS. BERNSTEIN:**  They are not.

14             All right.  Well, let's go ahead -- have they

15 been labeled, Ms. Bernstein?

16         **MS. BERNSTEIN:**  No.

17         **THE COURT:**  Okay.  We can go ahead and label them.

18 Let's go ahead and put them up.  We'll give them a consecutive

19 number for our case, if it's a number that's already been taken

20 that's on there.  I believe you said 384; is that right?

21         **MS. BERNSTEIN:**  So Grand Jury Exhibit 3 will be 384.

22         **THE COURT:**  Right.  And that's -- so the jury knows,

23 this is what the witness is looking at.

24         **MS. BERNSTEIN:**  And Grand Jury Exhibit 4 will be 385.

25         **THE COURT:**  All right.  So ordered.  384 and 385 are

1   admitted.
2   **BY MR. CHRISTIAN:**
3   **Q.**   Do those photographs appear to have been taken from the
4   same point that you were stand on the I-10 looking at Danziger?
5   **A.**   Yes, pretty much.  Yes.
6   **Q.**   As you look at those photographs, which have been marked
7   as Grand Jury Exhibits 3 and 4, can you tell how many people
8   are on the bridge?
9   **A.**   On which one?  This one?
10  **Q.**   You start with the first one.  We'll start with -- that's
11  Grand Jury Exhibit 3.
12  **A.**   Okay.  Yeah.  Like I say, I can see -- one, two, three,
13  and then behind that it was two more in, like, bright colored
14  green shirts -- five -- five people.
15  **Q.**   Five people.
16          Can you tell whether anyone in that picture has a
17  handgun?
18  **A.**   No, I can't.
19  **Q.**   Can you say with certainty what direction they're moving,
20  if they're moving, what they're doing?
21  **A.**   With certainty, no.  I can say this guy's pointing this
22  way.  This guy's facing -- these three are facing the bridge.
23  **Q.**   How do you know that the guy that's pointing doesn't have
24  a handgun in his hand?
25  **A.**   I don't know.

DONALD C. HAYNES - Direct

 1  Q.   Okay.  Grand Jury Exhibit 4, can you tell us what you see
 2  in that picture?
 3  A.   I see another vantage point.
 4  Q.   Can you see any people on the bridge -- on the Danziger
 5  Bridge in that picture?
 6  A.   Oh, what do I see on the bridge?  I see one, and then it's
 7  kind of blocked by this fence, but two more right there [sic].
 8  Q.   Okay.  What are they doing in that picture?
 9  A.   Standing.
10  Q.   Are these men?  Women?  Black?  White?
11  A.   I don't know.
12  Q.   You can't tell from the I-10; right?
13  A.   I can't tell from this picture, no.
14  Q.   Okay.  And do these pictures reflect what you saw back on
15  September 4, 2005, from the I-10?
16  A.   Pretty much.
17  Q.   I want to go over now some of the statements you made
18  during your appearance before the state grand jury, ask you
19  whether those statements were completely truthful and accurate.
20  Okay?
21  A.   Okay.
22  Q.   The first question was:  "How many individuals did you see
23  run from under the bridge?"
24        You said:  "I saw two individuals."
25        The question was.  "Okay.  At that time how were they

DONALD C. HAYNES - Direct

1    attired?  What were they wearing?"

2         You answered:  "I don't really remember both guys.  I

3    just remember one of the guys possibly wearing a red shirt."

4         The next [sic] question was:  "At that point did you

5    see any, either of the two individuals with a firearm in their

6    hands?"

7         Your answer is:  "Yes."

8         You were asked to describe the type of weapon.  You

9    said:  "Definitely a handgun."

10        "Okay."

11        And your answer was:  "It was no bigger than a

12   handgun."

13        The question was:  "Did one of them have a handgun or

14   did both?"

15        And your answer was:  "At the time I initially saw

16   them, I saw one of them in possession of a handgun."

17        Is that completely accurate and truthful that you

18   definitely saw a handgun?

19   A.   No, I believed they had handguns.

20   Q.   But you can't say with any certainty that they had a

21   handgun; right?

22   A.   No, I can't.

23   Q.   Is that because the distance from the I-10 is too great to

24   determine whether someone had a handgun?

25   A.   Yes.  Yep.

DONALD C. HAYNES - Direct

1   Q.   Can you say with any certainty that it wasn't a cell phone
2   or a walkie talkie or anything in their hand?
3   A.   No.
4   Q.   Next in the grand jury you were asked:  "What did the two
5   individuals do as the truck pulled up?"
6           Your answer was:  "As the truck pulled up, the police
7   officers exited.  These guys both began firing in the direction
8   of the Budget truck."
9           The question was:  "So both the gentlemen?  The
10  gentleman with the red shirt that you remember?"
11          You said:  "Yes."
12          The question was:  "Fired in the direction of the
13  rental truck?"
14          You said:  "Yes."
15          Is that completely truthful and accurate that the two
16  black males opened fire on the Budget -- or on the rental truck
17  and that the officers simply returned fire?
18  A.   No.  I believed they opened fire.  Not certain.
19  Q.   But you don't know who fired first; correct?
20  A.   No.
21  Q.   And when you told the grand jury that you knew that the
22  two black males had fired first, that was not truthful and
23  accurate; correct?
24  A.   It wasn't accurate, no.
25  Q.   Okay.  Isn't it a fact you don't know who fired first;

DONALD C. HAYNES - Direct

1  correct?

2  A.   No.

3  Q.   You don't even know whether the two black males fired at

4  all; right?

5  A.   Not with certainty, no.

6  Q.   Did you offer the grand jury any caveats?  Did you ever

7  say, "I'm not entirely certain whether the two black males had

8  guns"?

9  A.   Based on the statement, no.

10  Q.   Do you recall ever telling the grand jury you don't know

11  for certain who fired first?

12  A.   No.

13  Q.   Direct you next to this question:  "How many, if you had

14  to guess, how many shots did the two perpetrators or the

15  suspects fire upon the police that you can recall?"

16        Your answer was:  "They both fired numerous shots.  I

17  mean, they were" --

18        The question was:  "So did the police officers who

19  were situated in the rear of the Ryder truck, or the rental

20  truck, exit the truck and return fire?"

21        Your answer was:  "Yes."

22        Is that completely truthful and accurate?

23  A.   No.

24  Q.   Because, in fact, you don't know whether the two black

25  males fired at all; correct?

DONALD C. HAYNES - Direct

1   **A.**   Correct.

2   **Q.**   You certainly don't know whether they fired numerous

3   shots; correct?

4   **A.**   It's what I believed and I thought, yeah.

5   **Q.**   But you testified that they both fired numerous shots in

6   the state grand jury; correct?

7   **A.**   Yes.

8   **Q.**   And that's not true; correct?

9   **A.**   Yes.

10   **Q.**   Because you don't know whether they fired numerous shots;

11   correct?

12   **A.**   Yes.

13   **Q.**   And you don't know whether the officers returned fire or

14   fired first; correct?

15   **A.**   Correct.

16   **Q.**   But you told the state grand jury that the officers simply

17   returned fire; right?

18   **A.**   Correct.

19   **Q.**   The next question I want to direct you to is:  "Okay.

20   Now, the officers from the rear of the truck opened fire.  Do

21   you recall the type of weapons used by the officers?"

22          You said:  "It was -- I remember handguns, you know,

23   definitely and possibly a few long guns."

24          Were you able to definitely see handguns from the

25   I-10?

DONALD C. HAYNES - Direct

1   A.   No.

2   Q.   Do you know whether, in fact, the officers were using

3   handguns on the I-10?

4   A.   No.

5   Q.   Could you see long guns from the I-10?

6   A.   I believed they had long guns.

7   Q.   Could you see long guns?

8   A.   Like I say, I could just see the motion of the carrying of

9   the gun.

10  Q.   But you couldn't actually see the gun itself from the

11  I-10?

12  A.   No.

13  Q.   So when you answered:  "I remember handguns, you know,

14  definitely and possibly a few long guns," that's not completely

15  true?

16  A.   It's not.

17  Q.   The next question was:  "As a result of the police

18  officers shooting at the two suspects that were shooting at

19  them, what happened?"

20        Your answer was:  "I noticed one of them actually

21  went down, I guess was shot, went down to the ground.  And the

22  other subjects [sic] I remember continued shooting and actually

23  ran all the way over the bridge and made it all the way

24  across."

25        Is it -- would it be truthful and accurate for you to

DONALD C. HAYNES - Direct

1  say that you know that the suspect who made it over the bridge
2  was continuing to fire as he ran across the bridge?
3  A.   No.
4  Q.   So that testimony to the state grand jury wouldn't be
5  truthful and accurate, would it?
6  A.   No.
7  Q.   The next question is in relation to that, the subject that
8  made it across.  The question was:  "Did the guy continue to
9  fire?"
10         You said:  "He continued to fire after the officers
11  returned fire."
12         The answer was:  "The second subject that actually
13  made it across."
14         The question was:  "Yes."
15         And you said:  "Yes.  He continued firing as he ran
16  all the way across the bridge.  He was actually running and
17  reaching his arm back and letting off shots."  And you
18  demonstrated motion.
19         In fact, you know that was not truthful and correct;
20  correct?
21  A.   Could you say that again?
22  Q.   Sure.
23  A.   Because that -- that sounds right.
24  Q.   "Did the guy continue to fire?"
25         You said:  "He continued to fire after the officers

DONALD C. HAYNES - Direct

1  returned fire."

2          You said:  "The second subject that actually made it

3  across?"

4          "Yes."

5          Your answer was:  "Yes.  He continued firing as he

6  ran all the way across the bridge.  I mean, he was actually

7  running and reaching his arm back and letting off shots."

8  **A.**  Right.

9  **Q.**  Did you see him actually firing as he ran across the

10  bridge?

11  **A.**  No.

12  **Q.**  You simply saw the arm motion; correct?

13  **A.**  Yes.

14  **Q.**  Did you clarify that to the grand jury that you weren't

15  certain he was firing?

16  **A.**  No.

17  **Q.**  Again, you were asked:  "Would you explain again what you

18  saw when the truck and the other two black males met?"

19          Your answer was:  "When the truck actually pulled up,

20  like I said, the police officers exited the truck."

21          The question was:  "And you could see them and you

22  knew they were police officers?"

23          And you said:  "Yes."

24          Was that true?

25  **A.**  No.

DONALD C. HAYNES - Direct

1   Q.   Could you tell whether the guys in the rental truck were
2   police officers or not?
3   A.   Not initially.
4   Q.   When did you figure out that they were police officers?
5   A.   I don't know exactly when, but they were -- when they
6   first got out I didn't know.  But after everything transpired,
7   I did realize that they were officers.
8   Q.   So when you told the state grand jury that when you saw
9   them you could see they were police officers, that's not true;
10  correct?
11  A.   Yes.
12  Q.   The next question was a follow-up to that one, simply an
13  okay.  And your answer was:  "Yes.  And when they exited, those
14  guys that were on the bridge began firing shots toward the
15  truck."
16          Question was:  "You saw them firing at the truck?"
17          And you said:  "Yes."
18          The question was:  "You didn't just hear gunfire and
19  interpret it as them firing at each other?"
20          Your answer was:  "No, not at all."
21          That's not truthful and correct?
22  A.   Could you say that one again?
23  Q.   Sure.  Your answer was:  "And when they exited, those guys
24  that were on the bridge began firing shots toward the truck."
25          The question was:  "You saw them firing at the

DONALD C. HAYNES - Direct

1    truck?"
2              And you said:  "Yes."
3    **A.**   Okay.
4    **Q.**   That's not true, is it?
5    **A.**   Right.
6    **Q.**   You didn't actually see them firing at the truck?
7    **A.**   I believed they were firing, right.  Correct.
8    **Q.**   The next question was:  "You didn't just hear gunfire and
9    interpret it as them firing at each other?"
10             And your question [sic] was:  "No, not at all."
11             That's not true, is it?
12   **A.**   I didn't hear them or interpret it as them firing --
13             I sorry.
14             I didn't hear them or interpret it as them firing at
15   each other.
16   **Q.**   The question was:  "You didn't just hear gunfire and
17   interpret it as them firing at each other?"
18   **A.**   Okay.
19   **Q.**   And you said:  "No, not at all."
20   **A.**   Okay.
21   **Q.**   That's not true, is it?
22   **A.**   Right.
23   **Q.**   Your truthful testimony today is that you heard gunfire.
24   You couldn't tell who was firing; right?
25   **A.**   Right.

DONALD C. HAYNES - Direct

1   Q.   So you actually asked in the state grand jury whether you
2   heard gunfire and you interpreted it as those guys exchanging
3   gunshots; right?
4   A.   Yeah.
5   Q.   And you said:  "No, not at all."
6        That's not true, is it?
7   A.   Yes.
8   Q.   That information you provided that was untruthful and
9   accurate, did that help or hurt the officers on the Danziger
10  Bridge?
11  A.   I don't know.
12  Q.   What did you think it was going to do?  Did you think it
13  was going to hurt them or help them?
14  A.   I definitely didn't think it was going to hurt them.
15  Q.   And you said yesterday you thought it was going to help
16  them; correct?
17  A.   Yes.
18  Q.   Because, obviously, if you said you were certain that you
19  had seen two black males firing at the officers and they opened
20  fire first, that would, in fact, have helped the officers;
21  right?
22  A.   Right.
23  Q.   With any state investigation of any kind?
24  A.   Yes.
25  Q.   Or any federal investigation of any kind; correct?

DONALD C. HAYNES - Direct

1   A.   You mean at the time it was stated?
2   Q.   Sure.
3   A.   Yes.
4   Q.   But anybody investigating the officers, you would help
5   them significantly if you said, "I saw these two black males
6   open fire on the officers first"; correct?
7   A.   Yes.
8   Q.   And if you, in fact, identified the type of weapons these
9   guys were using when they fired at officers, that would help
10  the officers too, wouldn't it?
11  A.   Yes.
12  Q.   And the untruthful and inaccurate information you provided
13  was intended by you to help the officers; right?
14  A.   It was bad judgment, and I did think it would help them.
15  Q.   You did think it would help them?
16  A.   Yeah.
17  Q.   And you understood that it would help them; right?
18  A.   Yeah.
19  Q.   And you intentionally provided information?  You were
20  given an opportunity to back off it; right?
21  A.   Yes, I was.  Yes.
22  Q.   And you stuck with it.  You continued to maintain that you
23  had definitely seen handguns on the bridge with the two
24  civilians?
25  A.   Yeah.

DONALD C. HAYNES - Direct

1  **Q.**   Can you tell the grand jury why you did that?

2  **A.**   Exactly why, using the word "definitely" and what I just

3  believed, that was the variance of it.  Exactly why, of course,

4  I thought it might help by definitely seeing something and

5  believing I saw something.

6  **Q.**   Because you don't know what happened on the bridge that

7  day, do you?

8  **A.**   I know what I believed happened and what I saw.

9  **Q.**   Do you know what happened on the bridge?

10 **A.**   I know exactly?  No.

11 **Q.**   Are you even certain what you saw?

12 **A.**   Am I certain what I saw?

13 **Q.**   Do you know whether the two black males were pointing or

14 actually had guns?

15 **A.**   No, I don't.

16 **Q.**   Do you know whether the NOPD officers had guns?

17 **A.**   Somebody had guns.

18 **Q.**   Somebody had guns?

19 **A.**   There was a lot of shooting.

20 **Q.**   That's all you know; right?

21 **A.**   Yeah.

22 **Q.**   Somebody had guns?  You don't know who fired first?

23 **A.**   No.

24 **Q.**   You don't know if both groups were firing at each other,

25 do you?

DONALD C. HAYNES - Direct

1   A.   No.

2   Q.   Did you express any of that uncertainty to the state grand

3   jury?

4   A.   I didn't.

5   Q.   Did you express any of that uncertainty to Sergeant Dugue?

6   A.   I didn't.

7   Q.   So why did you tell Sergeant Dugue and the state grand

8   jury you were certain that the two suspects, black males,

9   opened fire on the police officers first with handguns?

10  A.   Because at the time and based on what I saw, that's what I

11  believed they did, but I wasn't certain.

12  Q.   We talked about this yesterday; right?

13  A.   Yes.

14  Q.   Did you acknowledge yesterday that you provided that

15  information to help the officers?  That you did it

16  intentionally and that you recognized at the time that it

17  wasn't truthful?

18          THE COURT:  Mr. Meche, one second.

19          (WHEREUPON, the following proceedings were held at

20  the bench.)

21          THE COURT:  Just read the question.  I think we're

22  getting into the field of dramatic interpretation that I

23  commented on earlier.  It's happened a couple of other times,

24  but just -- on one hand, we need to make it interesting, so it

25  doesn't need to be monotone; but on the other hand, I think

DONALD C. HAYNES - Direct

1  you're emphasizing certain things in a way that is not going to
2  be reflected on the record.  So try to not --
3            MS. BERNSTEIN:  I would say, Your Honor --
4            THE COURT:  -- to use voice inflections.
5            MS. BERNSTEIN:  -- it has been throughout, right down
6  to reading double at your speed.
7            MR. MECHE:  Judge, nothing would make me happier if
8  somebody else did this.  I'm not enjoying this.  My throat's
9  kind of hurting.
10           MS. BERNSTEIN:  I actually would ask that if we do go
11 to the other ones, I would ask that somebody a little less
12 dramatic read them.
13           THE COURT:  All right.  I agree.  We'll do that, and
14 Mr. Meche doesn't have a problem with it either.
15           MR. MECHE:  I don't.
16           THE COURT:  From hereon try to --
17           MR. MECHE:  I'm just trying to speed it up.
18           THE COURT:  On the one hand, we don't want to be
19 monotone; but on the other hand, I think you're stressing
20 certain things that arguably could be contextually inaccurate.
21           Okay.  Let's go ahead and proceed.
22           (WHEREUPON, the following proceedings were held in
23 open court.)
24           MR. MECHE:  Let me know when you are ready.
25           THE COURT:  What page are you on, Mr. Meche?

DONALD C. HAYNES - Direct

1          MR. MECHE:  We are on page 53.

2          THE COURT:  Okay.

3          MR. MECHE:  And I think we left off -- oh, okay --

4    line 11.

5    BY MR. CHRISTIAN:

6    Q.   Did you acknowledge yesterday that you provided the

7    information to help the officers?  That you did it

8    intentionally and that you recognized at the time that it

9    wasn't truthful?

10   A.   Yes.

11   Q.   That this wasn't simply a question of you choosing your

12   words with less than precision or, you know, being less than

13   careful how you phrase things?

14   A.   Yes.

15   Q.   Does that reflect your opinion today?

16   A.   Yes.

17   Q.   That you intentionally provided inaccurate and untruthful

18   information to help the officers during the course of the state

19   investigation?

20   A.   Yes.

21   Q.   And did you say whether anybody put you up to that

22   yesterday?

23   A.   No, nobody put me up to it.

24   Q.   Did anybody ever tell you, "This is what you need to say

25   to help these officers out"?

DONALD C. HAYNES - Direct

1   A.   No, they didn't.

2   Q.   Did you know any of the officers on the bridge?

3   A.   Like I say, I knew two of them.

4   Q.   Who did you know?

5   A.   I knew Gisevius and Iggy.  I don't know his last name.

6   Q.   Did you ever talk to Gisevius and Iggy about your

7   statement to Dugue or your testimony before the state grand

8   jury?

9   A.   No.

10  Q.   I want to refer you back to one other thing in your state

11  grand jury?

12  A.   Okay.

13  Q.   You were asked where you were presently employed.

14          Your answer was:  "I'm assigned to NOPD Homicide

15  Division."

16          You were asked:  "And is that a recent assignment?"

17          You said:  "Yes, it is."

18          The question was:  "When were you assigned there?"

19          Your answer was:  "Approximately two weeks ago."

20  A.   When was that?

21  Q.   That was October 11th, 2006, your state grand jury

22  transcript.

23  A.   Okay.

24  Q.   Is it true that shortly before your appearance not

25  state grand jury, and this is after your taped statement with

DONALD C. HAYNES - Direct

1   Dugue, that you were promoted to the Major Case Homicide with

2   NOPD?

3   A.   Yes.  I was transferred, yes.

4   Q.   Was that a promotion or a demotion?

5   A.   It's not a promotion or a demotion.  I mean, I didn't make

6   any more money.  Just that I had --

7   Q.   More serious cases?

8   A.   Yes, definitely.

9   Q.   Better for your career or worse for your career?

10  A.   At the time I thought it was better.

11  Q.   Okay.  So I want to run through the chronology here and

12  ask you to explain what's going on.  May of 2006, you met with

13  Dugue and you gave a statement that you now admit was

14  inaccurate and untruthful; right?

15  A.   Yeah.

16  Q.   Is that fair?

17  A.   Yeah.

18  Q.   You intentionally provided that inaccurate and untruthful

19  statement to the Dugue to help the officers on the Danziger

20  Bridge; right?

21  A.   Right.

22  Q.   And that's in May of 2006?

23  A.   Okay.

24  Q.   You were getting ready to go into the state grand jury and

25  you get a promotion; correct?

DONALD C. HAYNES - Direct

1   **A.**   Okay.

2   **Q.**   You testified in the state grand jury consistently with

3   your previous statement to Dugue; right?

4   **A.**   Yes.

5   **Q.**   And your statement to the state grand jury, again, is

6   untruthful and inaccurate and you intended to help your fellow

7   officers; right?

8   **A.**   Okay.

9   **Q.**   Were any promises made to you about your move to Major

10  Case Homicide?

11  **A.**   None.

12  **Q.**   No *quid pro quo*?  No exchange?  You testify this way,

13  we'll give you this job?

14  **A.**   None.  I was asked to join the Homicide Division by

15  Sergeant Troy Williams.

16  **Q.**   Was he your supervisor in homicide?

17  **A.**   Yes.

18  **Q.**   Did he remain your supervisor in homicide?

19  **A.**   He remained until probably a month prior to me leaving

20  homicide.

21  **Q.**   Who became your supervisor at that point?

22  **A.**   Briefly, like maybe a week, it was Sergeant Jimmy

23  Catalanotto (phonetic).  And then after that week, it became

24  Sergeant Dugue.

25  **Q.**   And that's the same person you gave the taped interview

DONALD C. HAYNES - Direct

1   to; correct?

2   A.   Yes.

3   Q.   Any explanation for that?  Just a coincidence?

4   A.   I really think so, yeah.

5   Q.   Okay.

6   A.   No explanation to it.

7           MR. MECHE:  By Mr. Christian:  Can I ask you to step

8   out for just a second to see if the grand jurors have any

9   questions for you?

10          THE WITNESS:  Step out?

11          MR. MECHE:  Yeah, just for a second, so we can see if

12  the grand jurors have any questions.

13              (WHEREUPON, the witness was excused and left the

14  Grand Jury Room.)

15              (WHEREUPON, the witness returned to the Grand

16  Jury Room.)

17  BY MR. CHRISTIAN:

18  Q.   Mr. Haynes, let me remind you, you're still under oath.

19          Anybody from the NOPD you're still in touch with now?

20  A.   Yeah.

21  Q.   Who are you still in touch with?

22  A.   Good friends with Officer Conaghan.  I probably talk to my

23  old sergeant, Troy Williams, every now and then.  I mean, I was

24  there a while.  I'm friends with a lot of guys.

25  Q.   Lots of guys you still stay in touch with?

DONALD C. HAYNES - Direct

1   A.   Yeah, a few of them.

2   Q.   Anybody connected to the Danziger incident or the ensuing

3   investigation?

4   A.   I would say only Officer Conaghan.

5   Q.   Do you ever speak to Jeff Lehrmann?

6   A.   No.

7   Q.   Do you ever speak to Archie Kaufman?

8   A.   No.

9   Q.   Do you know either of those two individuals?

10  A.   I knew who Archie Kaufman was.

11  Q.   Okay.  Do you know whether Archie Kaufman had any

12  connection to this matter?

13  A.   What I can recall is he's the one that wrote the report.

14  Q.   Did you ever talk to him about his report?

15  A.   No.

16  Q.   Did he ever interview you?

17  A.   No.

18  Q.   Did you ever give him a statement of any kind about what

19  you had seen or heard?

20  A.   No.

21  Q.   Who was the first NOPD officer who came to speak to you

22  about this incident?

23  A.   Sergeant Dugue.

24  Q.   Anybody after that?

25  A.   Not that I could recall.  No.

DONALD C. HAYNES - Direct

1   Q.   The grand jurors have a couple of questions for you.  The
2   two black males you saw running under the bridge --
3   A.   Uh-huh.
4   Q.   -- could you tell how old those people were?
5   A.   No.  I can guess.  I mean, they were younger gentlemen.
6   Q.   Okay.
7   A.   I mean, you could tell they weren't old guys or anything.
8   Q.   When you saw them, what were they doing when you first saw
9   this?
10  A.   I first saw them under the bridge.
11  Q.   What were they doing when you first saw them?
12  A.   Running.  Running, like say, north.
13  Q.   Why did you think they were running?
14  A.   Because they were firing the shots under the bridge.
15  Q.   Did it ever occur to you they might be running because
16  someone else was firing shots?
17  A.   I didn't think about that.  I just, based on the situation
18  at that time, that's what I believed.
19  Q.   Is there anything you had to support that belief at the
20  time?
21  A.   Not other than what transpired, no.
22  Q.   What you saw?
23  A.   Yeah.
24  Q.   Did you see anything before you lost sight of them that
25  made you think that he they had been firing shots?

DONALD C. HAYNES - Direct

1   A.   No.
2   Q.   Or that they had guns before you lost sight of them?
3   A.   No.  I just, like I said, I believed they did have guns.
4   Q.   Can you say with certainty that the two people you saw
5   running were the same two ended up on the bridge?
6   A.   With certainty, no.  I just remember the clothing
7   description and the red shirt.
8   Q.   The red clothe?
9   A.   And it was the same, you know, person that I saw actually
10  on the bridge.  And there was another gentleman with him.
11  Q.   And this was based entirely on the red item of clothing
12  and the fact that it was a black male?
13  A.   Yes.
14  Q.   You've acknowledged giving untrue inaccurate testimony
15  under oath in the state grand jury; right?
16  A.   Acknowledge it, yes.
17  Q.   The grand jurors want to know what assurances you can give
18  them that you're providing truthful and accurate information
19  today?
20  A.   I'm telling everything that I remember and based on the
21  distance and what I saw -- I mean, that's what I can recall.
22  And prior to sitting down with you guys yesterday, I hadn't
23  thought about it, and I just said what I remembered.  And like
24  you say, you believe that's what actually happened based on
25  everything, and that's what I remember.

DONALD C. HAYNES - Direct

1   Q.   Who are you employed with now again?

2   A.   The Westin Galleria, Dallas.

3   Q.   Has your employment affected your testimony in this or

4   prior proceedings?  The fact that you were employ by NOPD, did

5   that affect your testimony for the state grand jury or your

6   statement to Sergeant Dugue?

7   A.   I don't think so.

8   Q.   Okay.  The fact that you're no longer employed with NOPD

9   now, does that in any way affect your testimony here today?

10  A.   I don't think it does because I never even thought about

11  that until you just said it.

12  Q.   Okay.  All right.  Can you tell the state [sic] -- can you

13  tell the grand jurors why you left NOPD?

14  A.   Yes.  My wife was pregnant in early 2000- -- not early,

15  September 2007.  And we decided we didn't want to live in the

16  area anymore.  And she got a job opportunity to take a better

17  job, a promotion in the Dallas area, and I really like that

18  area.  My sister lives there.  Some of my family moved.  So I

19  made the decision, "If I'm going to leave, I better leave now,"

20  and it was just time for us to leave.

21  Q.   Is there anything I haven't asked you that's at all

22  relevant to this grand jury's investigation?

23  A.   You asked me a lot.

24  Q.   Anything else you can think of?

25  A.   No.

DONALD C. HAYNES - Direct

1  **Q.**   If you do think of additional information that would be
2  relevant to this grand jury's investigation, will you contact
3  FBI special Agent Bill Bezak?
4  **A.**   Yeah.
5  **Q.**   Okay.  During the course of this investigation you've
6  spoken with prosecutors and with FBI agents; correct?
7  **A.**   Yeah.
8  **Q.**   Have you been treated fairly?
9  **A.**   Yes.
10 **Q.**   Anybody told you what so say?
11 **A.**   No.
12 **Q.**   Any threats or promises made in connection with your
13 testimony?
14 **A.**   No.
15 **Q.**   Is it your understanding that our -- the government's --
16 the federal government's sole request was that you come in
17 today and provide truthful and accurate testimony about what
18 you saw and heard on the I-10 bridge on September 4, 2005?
19 **A.**   Yes.
20         **MR. MECHE:**  If there are no other questions, may the
21 witness be excused?
22             By the foreperson:  Yes.
23             By Mr. Christian:  Thank you, Mr. Haynes.
24         **THE WITNESS:**  Thank you.
25             (WHEREUPON, the witness was excused and left the

1  Grand Jury Room.)

2          **MS. BERNSTEIN:**  Your Honor, may we approach for a

3  minute before the fake witness leaves the stand?

4          **THE COURT:**  Yes.

5          (WHEREUPON, the following proceedings were held at

6  the bench.)

7          **MS. BERNSTEIN:**  It's just Rule 806 and Fifth Circuit

8  case law says that if a witness comes in in this manner, the

9  hearsay statement comes in, the witness can be impeached as if

10 the witness is on the stand.

11          I have just, at this point, just one question

12 that's in the state grand jury transcript that I'd like to ask

13 the question and the answer.  This is something I would ask on

14 cross if the witness were on the stand.

15          **THE COURT:**  Where is this from?  I thought we had a

16 transcript from the federal --

17          **MS. BERNSTEIN:**  This is the transcript from the

18 federal grand jury is what was just read.

19          **THE COURT:**  All right.

20          **MS. BERNSTEIN:**  And now -- and much of the stuff from

21 the state grand jury was asked in here, so I don't need to ask

22 that.

23          **THE COURT:**  Sure.  Correct.

24          **MS. BERNSTEIN:**  There's one question that was not

25 that I would like to have asked and answered now.

 1              MR. FLEMING:  Then we want redirect.

 2              THE COURT:  Did you all not --

 3              MR. HESSLER:  That would have been available to the

 4     prosecution.

 5              THE COURT:  You've confused me.

 6              MS. BERNSTEIN:  I'm sorry.  Let me start from

 7     scratch.

 8              THE COURT:  Did you all not have that when you?  I

 9     mean, you asked him tons of questions about the state grand

10     jury in this transcript.

11              MS. BERNSTEIN:  Well, I didn't.  But, yeah --

12              THE COURT:  Well, I know, but, I mean, the government

13     has.

14              MR. FLEMING:  Your office.

15              MS. BERNSTEIN:  But my point is Rule 806 and the

16     Fifth Circuit case law says that once Donald Haynes takes the

17     stand in absentia now, so now Donald Hayne has testified as a

18     witness.  And the case law says that we should then be able to

19     impeach him as if his presence is irrelevant.

20              I don't have the direct quote, although Steven

21     is grabbing it.  But in this case, it's a very tiny little

22     thing that we're talking about now, which is just rather than

23     calling the witness later to say, "Here's the state grand jury

24     and let's go through this, I just wanted to do this one

25     question from the state grand jury.

1              And I also wanted to make sure -- I'm not sure

2    it was already made sure, that the date of that federal grand

3    jury was put into the record.

4              **MR. MECHE:**  Yes, I read it.  I read it when we

5    started it.

6              **THE COURT:**  How does this impeach -- maybe I missed

7    it, but how does this impeach what was just read?  This has to

8    do with his position with regard to Officer Dupree.

9              **MS. BERNSTEIN:**  Well, it impeaches his testimony

10   simply because the grand jury has heard -- I mean, the jury has

11   heard from Officer Dupree.  So if Donald Haynes were here on

12   cross that is one question that I would ask him, "didn't he

13   tell the state grand jury that you were with Dupree the entire

14   time?"

15             And since he's not here to ask, I would just ask

16   to put this one question and answer -- have the witness read

17   it.

18             **THE COURT:**  I'm going to have to see the case law on

19   it.  Since we're not talking about holding a witness over, we

20   can do it tomorrow if necessary.

21             **MS. BERNSTEIN:**  Okay.

22             **THE COURT:**  Show it to counsel and see.

23             **MS. BERNSTEIN:**  I've got a motion I'll file as soon

24   as we're done with court.

25             **MR. FLEMING:**  Judge, our position, I think, would be

1  two-fold, and it is, one, they had -- "they," the government --

2  had the availability to ask Mr. Haynes all these questions

3  while he was in the grand jury room.

4         THE COURT:  We'll talk about it in a minute.  I'm

5  going to let the jury go.

6         (WHEREUPON, the following proceedings were held in

7  open court.)

8         THE COURT:  Okay.  We're going to go ahead and break

9  for the day.  It's a couple of minutes after 5:00.  We're going

10  to go ahead and break for the day.  Keep in mind my

11  instructions with regard to not discussing the case with

12  anyone, and not viewing or reading anything about the case

13  between now and 8:30 tomorrow.  We'd like to start at 8:30

14  tomorrow.  If you can be here then, we'll start promptly.

15         THE DEPUTY CLERK:  All rise.

16         (WHEREUPON, the jury exited the courtroom.)

17         THE COURT:  All right.  Counsel, is there anything we

18  need to cover here in open court on the record before we resume

19  our discussion up here?

20         MS. BERNSTEIN:  Nothing for the government, Your

21  Honor.

22         MR. FLEMING:  No, Judge.

23         THE COURT:  Okay.  Then why don't you all approach.

24  You can step down.  Thank you.

25         (WHEREUPON, the following proceedings were held at

1    the bench.)

2            **THE COURT:**  Let's do this rather than -- since we

3    have time on this and we can do it tomorrow, make sure Tim and

4    the defendants have a copy.  I don't know if you want to just

5    e-mail it to everybody.

6            **MS. BERNSTEIN:**  Yeah.  We've actually got copies for

7    everybody.

8            **THE COURT:**  Oh, okay.

9            **MS. BERNSTEIN:**  We've got copies for everybody.

10           **THE COURT:**  Then we'll talk about it in the morning.

11           **MS. BERNSTEIN:**  Okay.  The one thing, if I might,

12   before we break, Your Honor, just to respond to something that

13   I think Mr. Meche or Mr. Fleming or somebody just said before

14   we went back to our seats.

15           The government did, as we explained in our memo,

16   we certainly did not have the same opportunity and motive at

17   this point early in our grand jury investigation to develop the

18   testimony the way we would at trial.

19           I think the rest of the motion -- the rest of

20   motion there speaks for itself -- or the memo.

21           **THE COURT:**  I think I commented on that in my ruling,

22   that I felt like you did, especially since these people have

23   been through the mill, at least Mr. Haynes had been through the

24   mill, on the state court grand jury, and that you all had the

25   benefit of his testimony in that transcript, and had a great

1    deal of knowledge of the subject matter of what the grand jury
2    was considering.
3              But be that as it may, we'll go ahead and take a
4    look at this memo.  But, counsel, if you all would, please,
5    respond.  I'm not going to give you a time frame on it, but if
6    we're going to do this -- and you may agree -- I'll have to
7    review the jurisprudence.  If we're going to do it, I'd like to
8    do it first thing in the morning since there's some continuity
9    to it.
10              You don't have an extra copy?
11         MS. BERNSTEIN:  We do.  We do.
12         THE COURT:  Oh, okay.  I was going to give one to
13    Jennifer here.
14              All right.  Let's move on here to -- is there
15    anything else we need to do on the record right now?
16         MS. BERNSTEIN:  No.
17         MR. LARSON:  No.
18         MR. LONDON:  No.
19         THE COURT:  All right.  Thank you, Jodi.
20              (OFF THE RECORD)
21
22
23
24
25

1                          *****

2                     CERTIFICATE

3          I, Jodi Simcox, RMR, FCRR, Official Court Reporter

4    for the United States District Court, Eastern District of

5    Louisiana, do hereby certify that the foregoing is a true and

6    correct transcript, to the best of my ability and

7    understanding, from the record of the proceedings in the

8    above-entitled and numbered matter.

9

10

11                            S/ Jodi Simcox, RMR, FCRR
                              Jodi Simcox, RMR, FCRR
12                            Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25