UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | |
| KENNETH BOWEN | NO.  10-204 |
| ROBERT GISEVIUS | |
| ROBERT FAULCON | |
| ANTHONY VILLAVASO | |
| ARTHUR KAUFMAN | |
| GERARD DUGUE | SECTION  "N"  (1) |

## <u>ORDER AND REASONS</u>

Before the Court is the Motion for New Trial (Rec. Doc. 963) originally urged by defendant

Arthur Kaufman, and joined in by the other defendants in this matter who were tried and convicted

in 2011 (hereinafter referred to as "Defendants" or "the defendants").[1]  The government opposes this

motion.  (Rec. Doc. 1007.)  The Court heard oral argument on the defendants' motion on June 13,

2012 (Rec. Doc. 1020).  A detailed recounting of subsequent events is set forth in this Court's Order

and Reasons dated November 26, 2012 (Rec. Doc. 1070).  As an expected result of that Order, the

---

[1]  Kenneth Bowen, Robert Gisevius, Robert Faulcon and Anthony Villavaso, all former officers
with the New Orleans Police Department ("NOPD"), along with Kaufman.  (Defendant Gerard Dugue filed
a similarly-based Motion to Dismiss (Rec. Doc. 1079), arguing many of the same grounds for the dismissal
of the pending charges against him.  The Court does not rule on Dugue's motion herein.)

Court is in receipt of additional information[2] to which it was not privy at the time of its last Order.

With such information and for the reasons stated herein, **IT IS ORDERED** that Defendants' motion

is **GRANTED**.

For ease of reference, the following sets forth a "Table of Contents" for review of this Order:

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 3 |
| II. | BACKGROUND: PART ONE - MAY 18, 2012 To NOVEMBER 26, 2012 | 7 |
| III. | BACKGROUND: PART TWO - NOVEMBER 26, 2012 TO PRESENT | 12 |
| | A. Special Attorney to the Attorney General - John Horn's Assignment | 12 |
| | B. Departures from the USAO | 13 |
| | C. The Horn Report of January 25, 2013 | 13 |
| | D. The March 29, 2013 Supplement to the Horn Report | 17 |
| | E. Further Inquiry of the Court, and the May 15, 2013 Meeting | 22 |
| | F. Second Supplemental Report of May 20, 2013 | 27 |
| | G. Third Supplemental Report Dated June 17, 2013 | 30 |
| | H. Fourth Supplemental Report Dated June 25, 2013 | 30 |
| IV. | STATEMENT OF ISSUES | 31 |
| | A. The Government's Opposition to Defendants' Motion | 31 |
| | B. Questions Raised | 32 |
| V. | GOVERNING LAW | 33 |
| | A. Fundamental Guiding Principles | 33 |
| | B. Laws Governing Conduct of Prosecutors | 34 |
| | C. Law Governing Motions For New Trial | 42 |

---

[2]     Also before the Court is a "Motion to Intervene to Address Access Issues" (Rec. Doc. 1126) and a "Motion for Access to Future Proceedings and to Sealed and Un-Docketed Information" (Rec. Doc. 1126-2) both filed by The Times-Picayune, L.L.C. ("Times-Picayune") on August 6, 2013. On August 19, 2013, the Associated Press ("AP") joined in the Times-Picayune's motions (Rec. Doc. 1129 and Rec. Doc. 1129-2). These motions are opposed by the government and the defendants, and will be disposed of separately.

VI.    THE MISCONDUCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    49

    A.    Former USAO Senior Litigation Counsel Sal Perricone . . . . . . . . . . . .    50
    B.    "Dipsos" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    56
        a.    The "Taint Team" Leader . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    56
        b.    The *Kastigar* Rulings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    61
        c.    "Dipsos" on Nola.com . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    62
    C.    An On-Line 21ˢᵗ Century "Carnival Atmosphere" . . . . . . . . . . . . . . . . . .    65
    D.    Sworn Testimony of Former First AUSA Jan Mann . . . . . . . . . . . . . . . .    87
    E.    Pre-Trial and Trial Concerns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    95
        1.    The Government's Pre-Trial Timeline . . . . . . . . . . . . . . . . . . . .    95
        2.    FBI Agent Bezak's Explanation of the Credibility
            of NOPD Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    98
        3.    Perricone's View of the FBI and the Potential Source
            of Rule 6(e) Leaks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    99
        4.    Testimony of Cooperating Government Witnesses,
            and the Refusal of Defense Witnesses to Testify . . . . . . . . . . . . .    101
            (a)    Hunter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    102
            (b)    Hills . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    103
            (c)    Barrios . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    104
            (d)    Lehrmann . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    105
            (e)    Haynes, Tollefson, and Gore . . . . . . . . . . . . . . . . . . . . . . .    106

VII.    ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    107

    A.    Timeliness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    107
    B.    Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    111
    C.    Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    115
        a.    Government Pressure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    115
        b.    Influence on Jurors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    117
        c.    Potential Influence on Witnesses . . . . . . . . . . . . . . . . . . . . . . .    119
    D.    Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    120
    E.    Disposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    122

VIII.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    127

## I. **INTRODUCTION**

With a history of unprecedented events and acts, consideration of the defendants' motion has taken the Court on a legal odyssey unlike any other.  With the relatively recent advent of the age of cyberspace and social media/networking, courts have anticipated a myriad of issues and potential

controversies. This Court is unaware of any case, however, wherein prosecutors acting with anonymity used social media to circumvent ethical obligations, professional responsibilities, and even to commit violations of the Code of Federal Regulations. Hence, to the Court's knowledge, there is no case similar, in nature or scope, to this bizarre and appalling turn of events.

From the landfall of Hurricane Katrina on August 29, 2005, the subsequent failure of the levees surrounding the City of New Orleans resulting in massive and severe flooding of the metropolitan area, the exodus/evacuation of hundreds of thousands of people from southeast Louisiana both before and after August 29, 2005; the outbreak of intense and wide-spread civil unrest and the response of the New Orleans Police Department ("NOPD"), including the tragic events on the morning of September 4, 2005, in which two civilians were killed and others injured, some severely, by NOPD gunfire; the aborted prosecution in state court,[3] the United States

---

[3]     Four of the defendants in this case (Bowen, Gisevius, Faulcon and Villavaso), were charged in Criminal District Court for the Parish of Orleans, State of Louisiana, with first degree murder, in Case No. 468-037. Along with these four defendants, NOPD officers Ignatius Hills and Michael Hunter (both of whom pled guilty to reduced charges in federal court and testified for the government in defendants' trial) were charged in Criminal District Court for the Parish of Orleans, State of Louisiana, with either attempted first degree murder or attempted second degree murder, in Case No. 468-038. Officer Robert Barrios was also charged in the latter state court indictment, and also later entered a plea of guilty to reduced federal charges; he testified at trial after being called as a witness not by the government, but by the defense. Barrios is the *only* cooperating defendant that the government chose not to present to the jury at trial, despite his plea deal.

These state court indictments were dismissed, on August 13, 2008, under *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653 (1972), *State v. Edmundson*, 97-2456 (La. 7/8/98) 714 So.2d 1233; and *State v. Lehrmann*, 532 So.2d 802 (La. App. 4th Cir.), *writ denied*, 533 So.2d 364 (La. 1988). The primary basis for the dismissal of the indictment was the order of defendant Kenneth Bowen to give testimony, over his assertion of his Constitutional rights, before the state grand jury on October 30, 2006, in exchange for immunity under La. C.Cr.P. Art. 439.1( C ). Defendant Bowen timely raised this issue before this Court under *Kastigar* by way of pretrial motion and hearing, which will be discussed later in this Order; and by post-trial motion.

4

Department of Justice's ("DOJ") active take-over[4] of this case in 2008, followed by this federal indictment on July 12, 2010; the multi-week trial during the summer of 2011, followed by the separate mistrial of severed defendant Dugue in January 2012; the noteworthy sentencing of the defendants to mandatory consecutive minimums;[5] and the later discovery of disturbing online misconduct of the government throughout, the Court has dutifully attempted to negotiate all the twists and turns in order to apply fundamental bedrock principles in achieving the result here. In particular, the Court notes that the issue of prosecutorial misconduct involving at least two high-ranking members of the United States Attorney's Office for the Eastern District of Louisiana (USAO) has not been dispositively addressed by this Court, or any other, in a case where the defendants went to trial. Although other sections of this Court have encountered the misconduct of improper online posting by these two federal prosecutors in other cases,[6] such issues have heretofore been raised only by defendants who had already entered guilty pleas, admittedly establishing all of the essential elements of the crimes for which they pled guilty and were sentenced. This case, however, involves at least one more posting prosecutor, and postings both significantly higher in quantity, and more egregious and inflammatory in quality, given the tone, timing, and identities of persons posting, than has been seen in prior cases.

---

[4]    The DOJ began monitoring the state proceedings no later than November 2006. See Declaration of Karla Dobinski, Rec. Doc. 277-1, ¶ 21.

[5]    See Rec. Doc. 792. Based largely on the statutory consecutive mandatory minimums set forth in 18 U.S.C. § 924(c), these defendants were sentenced to the following cumulative prison terms: Bowen - 40 years; Gisevius - 40 years; Faulcon - 65 years; and Villavaso - 38 years. *Id.* Defendants Bowen, Gisevius and Villavaso have been incarcerated without bond since their initial appearances on July 14, 2010; Defendant Faulcon has been incarcerated since July 27, 2010. Defendant Kaufman was sentenced to 6 years, reported to the designated Bureau of Prisons institution on June 21, 2012, and has been incarcerated since then.

[6]    See, e.g., *United States v. Broussard*, No. 11-299; *United States v. Mouton*, No. 11-48.

In considering the present motion, which was filed on May 18, 2012, the Court has continued to receive more and more information albeit in the fashion of slowly peeling layers of an onion. During this time, the Court has remained ever cognizant of multiple factors, including: the sanctity of this jury's verdict and the undesirability of upsetting it; the consumption of resources by the government and the defendants in preparing to try this matter in 2011; the cost in financial and other resources in staging this trial; the efficient use of judicial resources; the substantial interest in achieving finality; and last, but certainly not least, the heavy emotional toll that the trial, and subsequent proceedings, have taken on the victims and their families, as well as the defendants and their families. Further, the undersigned has spent countless hours considering these factors against the backdrop of the longstanding integrity and respect afforded the United States criminal justice system and courts, and the special role of prosecutors, especially federal prosecutors from the Department of Justice acting in the name of the people of the United States of America. Try as it might to reconcile all of these interests, in light of the facts set forth, the Court is unable to achieve a disposition contrary to the one reached here, and most assuredly does not take such action lightly. Quite simply, in the most general sense, traditional notions and concepts of criminal justice cannot be served by minimizing such misconduct and preserving a verdict under these peculiar circumstances.

The Court is, of course, also very cognizant that, on September 4, 2005, two men died, while three others were seriously injured, under tragic circumstances at the hands of some of the defendants herein, and that the state court criminal justice system was corrupted to the prejudice of at least one victim, Lance Madison. Mr. Madison's riveting testimony – both at trial and at sentencing – is surely not soon forgotten. Indeed, it echoes in this case, making the abuses set forth

6

herein all the more astonishing.  This case started as one featuring allegations of brazen abuse of authority, violation of the law, and corruption of the criminal justice system; unfortunately, though the focus has switched from the accused to the accusors, it has continued to be about those very issues.  After much reflection, the Court cannot journey as far as it has in this case only to ironically accept grotesque prosecutorial misconduct in the end.

For the most part, the Court will attempt herein to simply continue the chronology set forth in its Order and Reasons dated November 26, 2012 (which the Court considers and refers to as **"PART ONE"** of this saga), although some of the events described herein must necessarily be placed on the existing overall timeline in order to reflect the important context as it relates to this case.  Additionally, as an exordium, the Court believes it prudent, for the sake of clarity, to first provide a brief summary of Part One.

At this juncture, the most precious commodities are candor and credibility, both of which seem to be in short supply, despite the best efforts of this Court and a couple of federal prosecutors from Georgia.  But for the Court's disposition today, a detailed evidentiary hearing would be certain, and would be the only way to ascertain the entirety of facts surrounding these exploits and uncover the further extent of misdeeds herein.  As will be explained, however, the Court does not find taking that likely arduous route to be necessary.  In short, despite the many remaining questions that would have great bearing on the subject motion, the Court believes more than sufficient grounds exist warranting the disposition set forth herein.

## II.  <u>BACKGROUND:  PART ONE – MAY 18, 2012 TO NOVEMBER 26, 2012</u>

Following their convictions and sentencings on multiple counts, Defendants, on May 18, 2012, filed the instant motion under Rule 33 of the Federal Rules of Criminal Procedure, arguing

essentially two grounds.  The first ground is that the government allegedly "engaged in a secret public relations campaign" designed to make the NOPD "the household name for corruption," inflame public opinion against the defendants and others involved with NOPD, establish community acceptance of the government's version of the facts "before anyone set foot in a courtroom," urge defendants and others to plead "guilty" as a result, and prejudice the defendants during trial through online activities designed to secure their convictions.  The second ground for new trial is that the government, or someone associated with the government, allegedly improperly disclosed, to The Times-Picayune, L.L.C. ("Times-Picayune") and the Associated Press ("AP"), the government's theories regarding the defendants' alleged guilt, the status of plea negotiations, and the upcoming guilty plea of cooperating defendant and former NOPD lieutenant Michael Lohman, all in violation of Rule 6(e) of the Federal Rules of Criminal Procedure.[7]  At the time the instant motion was filed, the defendants based the first argument in large part on persistent online posting of "comments" by former USAO Senior Litigation Counsel Sal Perricone, who was exposed, on March 12, 2012, as

---

[7]    Rule 6(e) provides, in pertinent part:
(2)  Secrecy.
           (B)  Unless these rules provide otherwise, the following persons must not disclose a matter occurring before the grand jury:
                      (i)  a grand juror;
                      (vi)  an attorney for the government; or
                      (vii) a person to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii).
(3)  Exceptions.
           (A)  Disclosure of a grand-jury matter–other than the grand jury's deliberations or any grand juror's vote–may be made to:
                      (ii)  any government personnel–including those of a state, state subdivision, Indian tribe, or foreign government–that an attorney for the government considers necessary to assist in performing that attorney's duty to enforce federal criminal law; or
                      (iii)  a person authorized by 18 U.S.C. § 3322.

the Nola.com[8] poster "Henry L. Mencken1951."  Defendants suspected, but had no proof, that Perricone had posted under other pseudonyms in the past, and had been doing so for a long time. Defendants further alleged that others in the USAO became aware of and accepted Perricone's activities.

Oral argument on Defendants' motion was held on June 13, 2012.  At that time, based upon the government's representations, including that of Jim Letten, then United States Attorney ("USA") for the Eastern District of Louisiana, the Court expressed considerable doubt about the merits of the motion.  Nonetheless, in the interest of completeness, full disclosure, and seeking satisfaction that what obviously might be a very grave transgression by the government did not occur, the Court ordered the government to pursue an investigation of the leak of the Lohman plea.  (Minute Entry, Rec. Doc. 1020; and June 13, 2012 Transcript, p. 44, l. 2 - p. 45, l. 24.)  The Court further ordered Defendants to set forth what they intended to cover at the evidentiary hearing requested of the Court. (Minute Entry, Rec. Doc. 1020; June 13, 2012 Transcript, pp. 46-47.)

Based upon Defendants' submission, the Court, on July 9, 2012, ordered the government to produce documents relating to any posting activity on the website Nola.com between the dates of February 17, 2010 (one week before the Lohman plea) and March 24, 2012 (approximately ten days after Perricone's activities were admitted).  (Rec. Doc. 1034.)  Both the investigation into the Lohman plea leak, and the gathering and production of documents in response to the July 9, 2012 Order, were handled by former First Assistant United States Attorney ("AUSA") Jan Mann, who also

---

[8]     "Nola.com" is the online version of the Times-Picayune newspaper, featuring news stories and other information traditionally found in the print edition.  After certain articles, there exists a "Comments" section, where readers may register under a self-created "user ID" or "alias" to publicly post an opinion or comment which would then accompany the article.

responded to the Court's inquiries regarding the investigation of Perricone that had been undertaken by the DOJ's Office of Professional Responsibility ("OPR").

Later, on October 10, 2012, because Perricone had not yet been questioned under oath about his online activities, but during an interview with a local magazine had asserted that in posting he had acted alone with no one else's knowledge, the Court undertook further questioning of Perricone under oath at a status conference.  At the October 10th interview, Perricone admitted that he had used several other online user IDs, including "dramatis personae," "legacyusa," and "campstblue," but denied using or knowing the real life personas of several other commenters, including "eweman." He also reiterated that he had acted solo (referring to his postings as "my little secret"), and without the knowledge of anyone else at the USAO or DOJ.  Perricone was also asked about various posts he made, including some relative to potential non-public grand jury information.  Then First AUSA Jan Mann attended the conference on behalf of the government, and occasionally lodged objections on the record to questions posed of Perricone by defense counsel.  Additionally, at the conclusion of the meeting, Mann, to the Court's surprise, professed suspicions that other court personnel might also be posting.

Thereafter, in a follow-up letter exchange with the undersigned, Mann stated that, in speaking at the October 10th conference, she "did not intend to suggest that anyone else in particular was posting," and that "[p]rior to the Perricone incident, [she] was not a follower of Nola.com postings and had no real sense of what was happening there."  (Letter dated October 19, 2012 from former First AUSA Jan Mann to U.S. District Judge Kurt D. Engelhardt.)  On Friday, November 2, 2012, however, a lawsuit was filed in Louisiana state court, alleging that Mann, as "eweman," had in fact posted inappropriate comments on Nola.com from November 2011 to March 2012.  Days later, the Court was advised that the allegations were true.

At a status conference held on November 7, 2012, attended by all counsel and USA Letten, DOJ lead prosecutor Barbara "Bobbi" Bernstein advised the Court that neither she nor her "trial team" co-counsel[9] were aware of the Perricone or Mann postings until they became public. Nevertheless, considering the gravity of the Perricone postings, and the unfortunate assignment by the government of then First AUSA Jan Mann to submit responsive investigatory information and other materials to the Court, in connection with both the alleged Rule 6(e) violation and the Perricone issue,[10] the Court, expressing its dismay over the already-known troubling government hijinks, ordered the government, on November 26, 2012, to recommence compliance with its prior Orders, including an investigation of the leak of the Lohman plea pursuant to Rule 6(e), and a full and complete report regarding government internet posting activity relative to this case. (Rec. Doc. 1070.)

At that time, the Court indicated that defendants were surely correct in their suspicions of prosecutorial misconduct, but concluded that the facts, as of November 2012, still did not yet warrant an evidentiary hearing or the relief requested by the defendants. On the other hand, the Court clearly had sufficient grounds to continue seeking full and candid disclosure by the government of all

---

[9]     The "trial team" or "prosecution team" consisted of Barbara Bernstein, Deputy Chief of the Criminal Section of the Civil Rights Division of DOJ; Trial Attorney Cindy Chung, also of the Civil Rights Division of DOJ; and AUSA Ted Carter of the USAO. This team initially also included EDLA AUSA Julia Evans, who was a signatory on the original Indictment filed on July 12, 2010, but who withdrew as counsel of record on May 5, 2011. (Rec. Doc. 337.)

[10]     In addition to handling the government's investigation into the Lohman plea leak and the government's response to this Court's Order for production of documents related to online posting, Jan Mann was connected to this prosecution throughout as First AUSA for the USAO. She was frequently included on email exchanges during the investigation and prosecution of this matter (See Part One, Rec. Doc. 1070, p. 7, fn. 9), and as First AUSA, supervised the work of EDLA AUSA's Ted Carter and Julia Evans, members of the prosecution team.

relevant facts bearing on the defendants' motion.  That being said, recognizing that the drastic action of overturning a jury verdict is not favored, and fully considering such action a last resort, the undersigned sincerely hoped that, with a clear, unequivocal and all-inclusive reliable report, the government could represent with confidence the breadth and ends of any unethical and unprofessional conduct directed towards the prosecution and trial of these defendants.

### III.  BACKGROUND:  PART TWO – NOVEMBER 26, 2012 TO PRESENT

**A.**    **Special Attorney to the Attorney General - John Horn's Assignment**

On December 3, 2012, following the Court's issuance of the November 26, 2012 Order and Reasons (Rec. Doc. 1070), John Horn,[11] the DOJ's First Assistant United States Attorney for the Northern District of Georgia, was assigned as "Special Attorney to the Attorney General," pursuant to 28 U.S.C. § 1515,[12] to accomplish the tasks set forth in this Court's previous Orders of June 13, 2012 (Rec. Doc. 1020), July 9, 2012 (Rec. Doc. 1034) and November 26, 2012 (Rec. Doc. 1070, p. 49).  Although the Court previously had afforded the government thirty days to properly compile those reports, an extension of an additional thirty days was requested and granted on December 21, 2012 (Rec. Doc. 1076).  Mr. Horn's request for additional time also contained a "Status Report in Partial Compliance," dated December 19, 2012, which described the commencement of his investigatory efforts.

---

[11]    Throughout his endeavors in this case, Mr. Horn has been ably assisted by Special Attorney Charysse L. Alexander, also of the United States Attorney's Office for the Northern District of Georgia.

[12]    On page 33 of the November 26, 2012 Order and Reasons (Rec. Doc. 1070), the Court suggested that DOJ "seriously consider appointment of an independent counsel to review the activities of Perricone and AUSA Mann, both with regard to the online postings, as well as subsequent matters before this Court as described herein."  DOJ apparently chose to disregard this suggestion.

**B.     Departures from the USAO**

Shortly after Mr. Horn's appointment, Jim Letten, United States Attorney for this district, resigned his office on December 11, 2012.[13] Then, on or about December 14, 2012, First AUSA Jan Mann retired from the United States Attorney's Office; her husband, AUSA Jim Mann,[14] retired the same day.

**C.     The Horn Report of January 25, 2013**

On January 25, 2013, Mr. Horn submitted ex parte[15] a "Report in Compliance with Order and Reasons Dated November 26, 2012" (hereinafter referred to as "the Horn Report" or "First Horn Report").  The Horn Report summarizes the government's compliance with the guidance set forth in *In Re: Grand Jury Investigation (Lance)*, 620 F.2d 202 (5th Cir. 1980), including the completion

---

[13]     First Assistant United States Attorney Dana J. Boente of the Eastern District of Virginia was appointed to serve as Interim United States Attorney for the Eastern District of Louisiana on December 6, 2012.

[14]     At the time of his retirement, AUSA Jim Mann held the position of Supervisor of the Financial Crimes and Computer Crimes Unit.  See Transcript of Jim Mann, August 8, 2012, p. 5.

[15]     All of the reports and related materials provided by Mr. Horn were submitted ex parte and under seal, and have remained so, except where provided herein.  Additionally, the Horn Report and those that followed contain a "Reservation of Applicable Privileges":

> This Report and its attachments contain information protected by the attorney-client privilege, work-product privilege, and deliberative process privilege.  At this time, the government waives these privileges only for the limited purpose of complying with the instructions in the Court's Order and enabling the Court to conduct an ex parte, in camera review of the government's submissions in response to the Order.  The government does not waive, and expressly asserts, these privileges with respect to any further disclosure of this Report or the materials submitted in connection with the Report.

On Friday, August 2, 2013, the Court requested that the DOJ provide the basis and authoritative support for each privilege asserted, which was received on August 21, 2013.  The Court has been and is sensitive to the narrow assertion of applicable privileges, and has given due consideration to each in releasing this Order.  Indeed, the Court has purposefully included only those aspects of Mr. Horn's reports it thought essential at this time, and omitted various aspects of the Horn Reports and documents produced that have additional bearing on the disposition of the defendants' Motion for New Trial, but might be subject to such privileges.

of nearly 200 interviews of various DOJ, FBI, and USAO personnel, as well as the submission of sworn affidavits of certain federal law enforcement personnel,[16] regarding the grand jury proceedings and subsequent guilty plea of cooperating defendant/witness Michael Lohman.  The Horn Report also further examines the conduct of Perricone and Jan Mann.

Regarding the premature media reports of Lohman's guilty plea agreement, the First Horn Report indicates that the media sources ("two people familiar with the investigation" and "a source close to the probe") responsible for the Lohman plea leak have never been identified, and that the publishers (the Times-Picayune and AP) of the information "formally rejected" DOJ's request for their identities (even in a general exclusionary sense, i.e., by group or category of potential persons).  See First Horn Report, Attachment 10 (Letter from AP's counsel dated December 17, 2012; and letter dated December 17, 2012 from counsel for the Times-Picayune).  Nonetheless, the body of evidence set forth in the Horn Report purports to rebut any assumptions under *Lance* that federal law enforcement personnel were the sources of the information reported.  The Horn Report also indicates that, although attempts to negotiate with the Times-Picayune and AP for the disclosure of the identity of the sources (or even the general group from which they might come) failed, the DOJ believes it has sufficiently pursued the information through other sources (the aforementioned DOJ affidavits), and "has concluded that the factors required for the issuance of a subpoena to the reporters have not

---

[16]     In addition to submitting to questioning by an Inspector General Assistant Special Agent in Charge, the involved law enforcement personnel were asked to sign a pre-printed standard form affidavit. The form affidavit used for employees of the U.S. Attorney's Office for the Eastern District of Louisiana records the sworn answers to ten questions.  The form affidavit used for employees of DOJ's Civil Rights Division asks nine questions.  The one used for employees of other agencies propounds eight questions.  See Attachment 1 to Horn Report, Exhibit 1, pp. 08-21.  None of the executed affidavits has been provided to the Court, nor have they been requested at this time.

been met."[17] Perhaps significantly, however, though it had been reported in the Times-Picayune that a subpoena had issued to discover the identities of at least eleven Nola.com user IDs of interest to Mr. Horn, the First Horn Report does not reference the other user IDs of persons obviously posting curiously similar information and/or opinions about DOJ/USAO business.

With regard to the internet postings of comments by Perricone and Jan Mann, the First Horn Report not unexpectedly concludes "that Mr. Perricone's and Ms. Mann's conduct reflects no broader effort/campaign within the USAO to provide non-public information about this or other cases through Nola.com or other websites." (Horn Report, p. 16.) However, Horn did learn that Perricone used (but could not recall) yet another user ID on the Nola.com website, but could not confirm the specific name. Likewise, Mann admitted that she too may have posted a few comments under a different user ID than "eweman" approximately one year before her first post as "eweman" (which would also be about six months before the start of this trial in June 2011). Nevertheless, although she reportedly could not recall that particular user ID, she assured the government investigators that those comments did not relate to DOJ matters. Both Jan Mann and Jim Mann declined to provide affidavits, although both agreed to be and were interviewed in December 2012.

_____

[17]     The Court disagrees with this conclusion; but, in light of the disposition of the pending motion, it is moot. It is not without irony, however, that the Court notes the Times-Picayune's and AP's recent noble assertion of the "right of access to information regarding the alleged misconduct of federal prosecutors", "the right of access [to] ensure[s] that the public has the information it needs to intelligently assess the activities of its government", and a "right of access to information regarding not only the events that led to the convictions . . . but also the facts surrounding Defendants' allegations of prosecutorial misconduct in connection with that case." (See Rec. Doc. 1126-1, pp. 2, 4 and 5.) Specifically, as to alleged prosecutorial misconduct regarding Rule 6(e), the critical piece of information – the gravamen of defendants' motion – is the identity of the source of the AP's and Times-Picayune's premature publication of information regarding the unannounced Michael Lohman plea deal – a fact known, even today, only by the movants Times-Picayune and the AP. By formally rejecting the DOJ's request for this information, and choosing to keep it "confidential" and thus hidden from the public, these two media outlets perpetuate the viability of defendants' Rule 6(e) motion, and support its merit by implication, while relying on an inapplicable claim of journalistic "privilege." See *United States v. Sterling*, 2013 WL 3770692 (4th Cir. July 19, 2013) (citing *Branzburg v. Hayes*, 408 U.S. 665 (1972)); and *United States v. Smith*, 135 F.3d 963 (5th Cir. 1998).

Aside from those who used the internet to post comments concerning only non-DOJ matters, Horn also uncovered two other law enforcement personnel who posted about this case: (1) "the first employee, from the Civil Rights Division and who had first-hand knowledge of the Danziger Bridge case but was not a member of the prosecution team, . . ." posted six comments under the pseudonym "Dipsos" over the course of four days of the Danziger Bridge trial in 2011; and (2) [DOJ agency employee "A"][18] in New Orleans who was not involved in the Danziger Bridge or Glover investigations . . ."[19] Neither law enforcement employee was named or further identified in the First Horn Report.  Though the first was described as only an "employee" in the Civil Rights Division of the DOJ in Washington, D.C., the First Horn Report excused the posted comments by characterizing them as not "inflammatory, critical or prejudicial," and not containing grand jury or non-public information.  As to the unnamed DOJ agency employee "A," the First Horn Report identifies only two (out of over 100) comments relating to this matter, both of which were made in connection with the mistrial declared in the separate Dugue trial in January 2012.  Again, the First Horn Report concludes that these comments were not "inflammatory, critical, or prejudicial, or otherwise contained grand jury non-public information."

Finally, the First Horn Report also identified and produced several other previously undisclosed email communications that the Court ordered produced back on July 9, 2012 (Rec. Doc. 1034).

---

[18]      The Court has deleted the actual descriptive reference and replaced it with more general terminology.

[19]      On August 21, 2013, Mr. Horn advised the Court of a significant correction:  DOJ agency employee "A" had, in fact, served in a supervisory capacity over the Danziger Bridge investigation, at times directly supervising the matter.  This activity included reviewing and approving related documents, sometimes attending interviews of relevant persons, and assisting in the conduct of searches.

**D.      The March 29, 2013 Supplement to the Horn Report**

After carefully reviewing the January 25, 2013 Horn Report and determining additional information was needed, the Court, on February 22, 2013, propounded thirteen questions/requests in response.  These include the following:

(1) The absence of sworn affidavits from Jan Mann (hereinafter "Mann") and Jim Mann is problematic.  Both need to submit sworn affidavits regarding all pertinent matters (including those several in your report, as well as those outlined here), or be questioned under oath in the presence of a court reporter, in the same manner as Sal Perricone (hereinafter "Perricone").

(2) How did the employee from the Civil Rights Division who posted under the pseudonym "Dipsos" during the Danziger Bridge trial obtain "first-hand knowledge of the case" without being a member of the prosecution team?  What position within the division did this person hold at the pertinent time?  What duties and job responsibilities did he/she have?  Who are his/her superiors and underlings? Has he or she been asked why information was sought from "bloggers" rather than a member of the trial team or their support staff? (See January 15, 2013 Report by John Horn ("Report"), p. 20.)

(3) When interviewed, why were FBI personnel not questioned about posting comments on websites, [omitted by the Court].  (See Report, pp. 7-8 and 20-21.) Were any FBI personnel asked whether he or she had knowledge of other federal employees (Assistant U.S. Attorneys, other FBI personnel, etc.) posting on public websites?

(4) The Report indicates that Perricone used another user-id on nola.com similar to "fed up" and that a DOJ review of those comments for non-public information was ongoing at the time of the Report's submission. (See Report, p.17, n. 3.) What information has been obtained since then?  If any DOJ/USAO matters are referenced in any of the posts, please provide the Court with a complete copy of them.

(5) The Report indicates that Mann may have posted under another user-id prior to posting as "eweman" but, at the time of her intereview, she could not recall the user-id in question.  Has an additional inquiry regarding that user-id been made since the submission of your report?  If the user-id and the content of the posts has been determined, what was the nature of the posts, if they did not concern DOJ/USAO matters?  If any DOJ/USAO matters are referenced in any additional posts by Mann, please provide the Court with a complete copy of them. (See Report, p.17, n. 4.)

\*      \*      \*

(7) A February 1, 2013 article by Gordon Russell, a reporter for Nola.com/The Times-Picayune, states that "authorities sent the NOLA Media Group a subpoena asking for information about commenters on NOLA.com." (The article presently can be found at http://www.nola.com/crime/index.ssf/2013/02/deadline_passes_quietly_for_in.html.) Is Mr. Russell correct? Is this subpoena (or its results) referenced in the Report? The article additionally indicates that "a catalog of comments and the associated IP addresses" of about 11 other commenters[20] was sought by "the feds" from (but not provided by) the NOLA Media Group. Is this correct? Are those efforts reflected in the report? What was the intended purpose of the request(s)? Why these 11 commenters?

(8) Footnote 30 of the Court's November 26, 2012 Order and Reasons states:

It would seem obvious that, upon news of Perricone's activities, among the first questions to be answered were: (1) Is anyone else in the U.S. Attorney's Office posting inappropriate and/or compromising online comments? and (2) Did anyone in the U.S. Attorney's Office know or suspect that Perricone was posting prior to his admission in March 2012? (Even if OPR asked the first question in March, one shudders to imagine what answer was given by First AUSA Mann. Either she confessed to such activity, or falsely denied it.) Regardless, had the DOJ proactively and independently investigated and carefully analyzed the online comments in March 2012 as did the expert who uncovered Perricone and Mann, the answer to the first question would have been known months ago.

Regarding this, why were Mann's postings as "eweman" not discovered prior to late October/early November 2012? And what have you been able to ascertain regarding previous efforts, if any, by OPR (or the EDLA US Attorney's office (hereinafter referred to as "USAO")) to determine whether anyone in the USAO in addition to Perricone was improperly posting online?

(9) What efforts, if any, have been made as to whether Mann, Perricone, or anyone else in the USAO, has made improper public comments regarding DOJ/USAO matters via any website, blogs, newspapers, etc., *other* than nola.com,? If such an inquiry has made, what information has been gathered?

---

[20]     The eleven user IDs/aliases sought are: **"FormerNOPDman," "mardigraswizard," "lawdawg1963," "nolacat60," "FSU1982," "alafbi," "thewizard," "copperhead504," "isthisthingon?," "Andjusticeforall,"** and **"uckzerto."** As of this date, the Court knows the identity of only one with certainty, though the Court suspects the likely general identity of some of the others.

(10) The Report addresses the question of whether anyone else within the U.S. Attorney's office was posting online, but does not address the question of who within the office knew about Perricone's and/or Mann's postings, as indicated in Footnote 30 of the Court's November 26, 2012 Order and Reasons.  What inquiry, if any, has been made relative to this question?  For instance, on November 7, 2012, Michael Magner ("Magner") testified that he previously had told at least three supervisory personnel, and others, within the USAO that he suspected Perricone was posting online about DOJ/USAO matters.  Have the referenced persons, including Greg Kennedy, Maurice Landrieu, and Matt Coman, as well as Carter Guice and the others identified, been interviewed under oath, or otherwise, regarding Magner's assertions?  If so, what information was obtained?  Please provide a complete copy of any pertinent findings resulting from any such inquiries.

*   *   *

On March 29, 2013, Mr. Horn and Ms. Alexander responded to these questions.  The

Supplemental March 29, 2013 Report (herein after, the "First Supplemental Report") disclosed that

both former First AUSA Jan Mann and former AUSA Jim Mann had been interviewed under oath

in the presence of a court reporter on November 15, 2012, by OPR attorneys.[21]  Thereafter, in

December 2012, both were interviewed by Mr. Horn and Ms. Alexander, who were accompanied

by a special agent with the DOJ Office of Inspector General (OIG).  On that occasion, neither were

placed under oath, and both, according to the First Supplemental Report, declined to sign an affidavit

containing the answers given.[22]  Both reiterated their denial of being the source of any unauthorized

release of information in connection with the Rule 6(e) issue.

---

[21]     OPR counsel had also previously conducted unsworn interviews of Jan and Jim Mann on August 8, 2012 (prior to the discovery that she had posted comments online as "eweman").

[22]     The First Supplemental Horn Report indicates that, in December 2012, both Jan Mann and Jim Mann were questioned "in the presence of two federal prosecutors and a federal agent, placing themselves at the same risk of consequence for a false statement under 18 U.S.C. § 1001 as if they had signed affidavits with those responses."  (March 29, 2013 Supplement, p. 2.)  While the Court appreciates this representation, if one or both witnesses were required to testify under oath and be cross-examined at an evidentiary hearing, the assessment and enforcement of penalties for false testimony, if found by the Court, would be the independent responsibility of the Court, not simply the discretionary decision of DOJ, their former employer and a party to this prosecution with an obviously strong interest in its dispositive result.

19

The March 29, 2013 First Supplemental Report still conspicuously did not name the Civil Rights Division employee who posted as "Dipsos," an omission the Court found truly odd, and which further peaked its curiosity, especially given that the First Supplemental Report *did* further disclose that this "employee" actually is an attorney, who had gained first-hand knowledge of this case "pursuant only to her review of investigative materials and not by participating in the investigation or on the prosecution team."   (First Supplemental Report, p. 3.)   The First Supplemental Report then explained that:

> the attorney was walled off from the prosecution team and was prohibited from having any substantive discussion about the investigation with any member of the prosecution team or any supervisor over the prosecution team.  The attorney thus discussed the Garrity review with the team and passed along evidence that had been reviewed and cleared for use by the prosecution team.  The attorney is not a supervisor, and the attorney's direct supervisor had no involvement in the case except to oversee the Garrity work.  The attorney does not supervise others.  The attorney said under oath that the attorney was in Washington [D.C.] during the trial and followed the progress of the trial in the Times-Picayune because the prosecution team was busy and there was not a good flow of information back about the trial events.

*Id.*

In further response to the Court's February 22, 2013 queries, Mr. Horn reported that, in December 2012, counsel for the New Orleans FBI office "asked all employees in that office if they had engaged in any online posting activity relating to any federal or state criminal investigations." (First Supplemental Report, p. 4.) In addition, the First Supplement Report reiterated that Perricone did not recall the specific user ID he used that was similar to "fed up," though a search indicated six comments posted under this particular user ID ("fed up") occurring from October 12, 2009 to October 20, 2009, did bear some semblance to Perricone's writing style and content. But according to the First Supplemental Report, none of the comments relate to legal matters or cases. The First

Supplemental Report also states that, although former First AUSA Jan Mann could not recall her prior user ID, she thought it possible that, approximately one year prior to registering as "eweman," she posted one or two comments in a single day about Louisiana Attorney General Buddy Caldwell in response to an article. Again, however, she had assured investigators that she did not post about DOJ matters using her unknown prior user ID.

In response to the Court's Question No. 7, the First Supplemental Report further explains that the government deferred its request [to media outlets] for information associated with the other eleven referenced user IDs "until such time that more specific evidence of misconduct was developed." The First Supplemental Report additionally states that, given other investigatory work, including obtaining affidavits from all USAO personnel, "we believe that the results [of the subpoena] yield little probative evidence when compared with the other evidence summarized in the Report." (First Supplemental Report, p. 8.)

Of significance, with regard to the Court's Question No. 8, the First Supplemental Horn Report admits that OPR did **not** initially inquire as to whether any other USAO employees had posted online comments,[23] but asserts OPR did ask EDLA attorneys "to provide all information they possessed relevant to its inquiry regarding Perricone's postings." According to the First Supplemental Report, at that time "no USAO employee, including Jan Mann, volunteered that he or she had posted online comments in response to that question." (First Supplemental Report, p. 9.) The First Supplemental Report indicates that only later in November 2012, when it initiated its investigation into former First AUSA Mann's postings, did OPR specifically inquire as to whether any other employee had posted comments about DOJ matters on Nola.com or any other internet website.

---

[23]     This omission did not escape the notice of First AUSA Jan Mann, as discussed *infra*.

In responding to the Court's Question No. 10, the First Supplemental Report deferred to the OPR's continuing investigation, relative to whether anyone in the USAO knew about Perricone's and/or Jan Mann's postings. Nonetheless, it reiterated the government's belief that neither Perricone nor Mann posted confidential information about this case; that no USAO personnel other than Perricone and Mann posted comments online about DOJ matters; and yet again denied that the comments posted by Perricone and Mann were part of a broader or collusive effort within the USAO, or federal law enforcement, to provide non-public information about this case, or any other cases, through Nola.com or any other websites.

On April 16, 2013, the Court held a status conference at the request of defense counsel, wherein an oral update of a general nature was provided.[24] Defense counsel were not provided any of the Horn Reports or documents, or any substantive information based on such material.[25]

**E.     Further Inquiry of the Court, and the May 15, 2013 Meeting**

On Monday, April 22, 2013, the undersigned contacted Mr. Horn via telephone[26] to thank him for his prior efforts, but to also advise that a further request for specific documentation and materials would be forthcoming from the Court. During that conversation, the Court expressed a concern that the two previous Horn Reports seemed to not only contain appropriate factual information, but also further verbiage that either was anodyne in nature, or expressed advocacy in

---

[24]     The government's prosecution team (lead counsel Bernstein by phone, AUSA Carter in person) also attended and participated in this status conference. They, however, were aware of and had previously reviewed the then-existing Horn Reports and submitted materials, and thus were already fully informed.

[25]     To this day, defense counsel have not been provided any of the Horn Reports or other documentary materials submitted by Mr. Horn.

[26]     This was the first direct person-to-person contact, verbal or otherwise, between the undersigned and Mr. Horn.

the form of arguably debatable mitigating commentary.[27]  The undersigned further noted that some provisions of the Horn Reports seemed to incite obvious further inquiry or investigation, and thus follow up by the Court with Mr. Horn.

That same day, the Court requested, via email, eight additional items for in-camera review, including:

> 1.  Full and complete transcripts, including any exhibits, of the interviews of former AUSA's Jan Mann and Jim Mann taken before a court reporter on November 15, 2012.
>
> 2.  All notes (handwritten or otherwise) no matter how recorded, electronic recordings, transcripts, or other materials memorializing (a) the "unsworn interview" of former AUSA Jan Mann on August 8, 2012; and (b) the "supplemental interview(s)" of former AUSA's Jim Mann and Jan Mann that occurred in December 2012.
>
> 3.  The full name and title of (a) the Civil Rights Division employee referenced on Page 3 of the March 29, 2013 Supplemental Report; and (b) the direct supervisor  referenced in the first full paragraph of Page 3 of the March 29, 2013 Supplemental Report.
>
> 4.  The full name and title of [DOJ agency employee "A"] who is under administrative investigation and referenced on Pages 20-21 of the January 25, 2013 Report and Page 4 of the March 29, 2013 Supplemental Report.
>
> *   *   *
>
> 6.  The full name and title of the ..... FBI agent referenced on Page 4 of the March 29, 2013 Supplemental Report regarding former AUSA Mike Magner's statement to him.
>
> 7.  The full name and title of the .... FBI agent referenced on Page 6 of the March 29 Supplemental Report (regarding Question No. 6).

---

[27]     On April 22, 2013, the Court specifically inquired: "My concern, when I ask you about who all might have reviewed the report before you submit it to me, is whether anyone is adding to the report after you do your fact-finding; is anyone adding to the report, before it comes to me, in the nature of advocacy?"

\*   \*   \*

At that same time, the undersigned propounded ten more questions, including these:

1.  Before the Court rules on the pending motion for new trial and motion to dismiss filed by Defendant Dugue (Rec. Docs. 963 and 1079 (sealed)), the Court might require former AUSA Jan Mann to answer questions under oath, or sign a sworn statement or affidavit that provides clear, comprehensive and unequivocal information regarding the entirety of the Court's inquiry in this matter, as well as her own conduct relative to it. This will, to some extent, depend on what was covered on November 15, 2012, as set forth in that transcript. Please state the legal basis given for her decision to decline to sign an affidavit, as described on Page 2 of the March 29, 2013 Supplemental Report.

2.  With regard to Question No. 4, and the response thereto on Page 5 of the March 29, 2013 Supplemental Report, has former AUSA Perricone been asked about the user name "martyfed" and/or "camp?" Has the DOJ reviewed any comments from either of these user ids?

3.  Has former AUSA Jan Mann been questioned about the user id "bowatch?" Has the DOJ attempted to review and analyze comments posted by the user id "bowatch?"

4.  Is the Court to understand, with certainty, that the DOJ does not intend to further pursue the subpoena referenced in Question No. 7 (Page 7 of the March 29, 2013 Supplemental Report)?

5.  Page 8 of the March 29, 2013 Supplemental Report states that "DOJ's own forensic evidence identified any USAO personnel who posted comments on Nola.com using the USAO's internet portals during 2012." The last paragraph of Page 21 of the January 25, 2013 Report appears to indicate that such evidence was not obtained for 2010 and 2011 (prior to December 19, 2011) because it was impossible to do so. Is that correct? If not, please explain why the same evidence was not obtained for pertinent time periods prior to December 19, 2011.[28]

6.  Page 9 of the March 29, 2013 Supplemental Report, in response to Question No. 8, provides information regarding OPR's previous efforts, following former AUSA Perricone's March 2012 admission, to determine whether anyone else in the USAO was posting anonymous comments about DOJ matters, but not any

---

[28]     The trial in this matter commenced on June 22, 2011, and the verdict was returned on August 5, 2011. At no time was the jury sequestered. This period, and the time before it, are obviously highly relevant to the issues facing the Court in the motion *sub judice*.

independent efforts by the USAO.  What have you been able to ascertain regarding the USAO's own past efforts, if any, to determine whether anyone in the USAO was posting anonymous comments about DOJ matters?

*   *   *

8.  On Pages 11-12 of the March 29, 2013 Supplemental Report, you state that you did not understand the Court's Order and Reasons to encompass Question No. 10 of the Court's February 22, 2013 email inquiry.  The Court believes the question to be well within the scope of issues raised in both the motion for new trial (and the subsequent *Dugue* motion to dismiss).fn.  In any event, the Court understands that this question will be answered fully, completely, and comprehensively in the OPR report.  Please advise if this is inaccurate.

> [fn. Of course, the Court's Order of June 13, 2012, rendered at the conclusion of the hearing conducted on that date, was based on what was then known.  Since that time, many intervening events have warranted a logical extension of the inquiry.]

9.  Although Page 16 of the March 29, 2013 Supplemental Report indicates that the process of investigating and generating the OPR report "may be lengthy", is there any estimate as to when that report will be completed, including the time delays for any challenges to OPR's findings?  Additionally, please identify and provide contact information for the persons, including any supervisory personnel, who are conducting the OPR investigation and/or are responsible for the report.

10.  Please provide the names and title of all persons, as well a short description of their respective roles, participating in the preparation, including drafting, editing, approving, and/or supervising, of your reports and submissions to the Court.

On Wednesday, May 1, 2013, Mr. Horn and Ms. Alexander contacted the Court to request

an in-chambers meeting, attended by a court reporter, to discuss their response to the April 22, 2013

queries.  At the meeting on May 15, 2013, Mr. Horn and Ms. Alexander delivered some of the

requested materials to the Court, with an explanation/clarification of the content and their attempts

to gather information in response to the Court's request.

During the meeting, Mr. Horn also again raised the issue of the review of his reports by

others in the DOJ.  Mr. Horn assured the Court that, although drafts of each report were shown to

25

various other DOJ/government personnel (including the prosecution trial team) to confirm accuracy, "Charysse and I hold the drafting authority for the documents that we submitted to the Court. We are the drafters of the language in it, of the factual findings, and the information that is summarized is what we have concluded and what our observations are." (May 15, 2013 Transcript, p. 20.)  Mr. Horn additionally confirmed that "drafts were shared with our supervisors in the D[eputy] A[ttorney] G[eneral]'s office," but that, "[A]s far as any suggestions that were given by anyone other than anyone in the DAG's office, Charysse and I had the final authority over what content and what suggestions were made." *Id.*

While accepting Mr. Horn's assertion, the Court nonetheless again expressed its concern and objection to anyone editing his reports to either change or delete facts that have been found, or changing accurate information that was originally included, or adding verbiage in the nature of advocacy to mitigate what findings had been made. *Id.* at 26-27.   In response, Mr. Horn stated forthrightly: "There's not been anything that anybody within the department [DOJ] has asked us to change in terms of correcting a fact or a representation that we've made in our report that has not been based on the intent to make it more accurate, . . ." *Id.* at 28.  Mr. Horn continued:

> I think I can address what your concern is by saying that what Charysse and I have put into our submissions is our work product, it's our assessments.  There may have been – there may have been suggestions, and there may have been clarifications offered; but in terms of the trial team, in terms of the U.S. Attorney's Office here, suggestions that they made were subject to our final approval and authority and drafting.

*   *   *

> So all of that contribution would be filtered through Charysse and me and our assessment of the record, the evidence, the materials that we reviewed, the interviews that we've conducted, and subject to the oversight and the final authority of the DAG's office, and that would be people who had no, I think, involvement in the

26

Danziger Bridge matter. We're talking about, we were reporting to, at one point, the chief of staff to the Deputy Attorney General, and then now to, who I mentioned on the phone, Stuart Goldberg, who is the Principal Associate Deputy Attorney General.

*   *   *

So there were certainly suggestions and comments made along the lines that I think a supervisor has an appropriate role to make in saying, "Are you looking at this? Are you looking at that?" But there has never been anything that was changed factually, or an assessment that we've made that did not reflect Charysse and my judgment and assessment and determination about what happened or whether that representation is appropriate and accurate to be in the report.

*Id.* at 34-35.

During the May 15, 2013 meeting, the undersigned was told orally the identity of "Dipsos" by name for the first time. As will be discussed, it was a rather familiar one.

**F.      Second Supplemental Report of May 20, 2013**

In further response to the Court's April 22, 2013 written inquiry, and as discussed at the May 15, 2013 conference, Mr. Horn and Ms. Alexander provided to the undersigned much of the materials requested, including transcripts of the interviews conducted by OPR, and related documents. Then, on May 20, 2013, Mr. Horn delivered his Second Supplemental Report responding to the questions posed, and the rest of the materials sought.

In that report, Mr. Horn indicated that Jan Mann was advised, in December 2012, that "she could answer all the [10] questions in the affidavit [previously utilizied by OPR] or complete another form of the affidavit [containing only 8 questions] that omitted [the 2] questions about the OPR survey." After consulting with counsel, she agreed to answer the questions in the ten-question affidavit relating to the alleged disclosures. In so doing, however, Jan Mann again declined to submit an affidavit, but agreed to an interview "in the telephonic presence of an OIG Special Agent."

Mr. Horn reported that Jan Mann's attorney "provided no legal basis for her decision not to sign the affidavit." (Second Supplemental Report, p. 2.) Mr. Horn also indicated his belief that the questions in the affidavit had been orally covered during the sworn November 15, 2012 interview of Jan Mann by OPR attorneys. To the contrary, however, in the DOJ's "Memorandum Of Investigation," reflecting the results of the Horn and Alexander interview of Jan Mann on December 21, 2012, Jan Mann was again asked only questions one through eight from the original ten-question affidavit presented by OPR during the summer of 2012. According to the Memorandum Of Investigation: "Mann was not asked questions nine or ten,[29] because her attorney had previously advised Horn that Mann would not answer those questions. Mann declined to swear to the statement."

The Second Supplemental Report also revealed that, through his counsel, Perricone denied ever posting comments under the user IDs "martyfed" or "camp;" whereas through her counsel, Jan Mann similarly denied posting comments under the user ID "bowatch."

The Second Supplemental Report additionally confirmed that DOJ does not intend to pursue the subpoena it issued in January 2013 (relating to the eleven user IDs) to the NOLA Media Group, in light of its collection of affidavits. The DOJ concluded that pursuing the subpoena "would yield little additional probative evidence."[30] (Second Supplemental Report, p. 5.)

---

[29]      Questions nine and ten were:

> 9. For AUSAs only: do you affirm that your answers to OPR's July 2012 survey remain the same, or do you have changes, clarifications, or additional information to provide?

> 10. If you completed OPR's November 2012 survey asking whether you had posted any comments online and about your knowledge of others posting comments online, do you affirm that your answers to this survey remain the same, or do you have changes, clarifications, or additional information to provide?

In fact, as Mr. Horn stated, Jan Mann gave sworn testimony on November 15, 2012, that related to the answers to these two questions.

[30]      The Court disagrees with this conclusion too, but again finds the issue moot in light of its disposition of the subject motion.

In a truly disappointing and unsettling crucial development, the Second Supplemental Report also indicates that DOJ could not forensically recover computer data evidence from the USAO's internet portals for years 2010 and 2011 (prior to December 19, 2011) because it "did not retain data for the period before that." *Id.* Thus, critical information regarding further prosecutorial misconduct in the months before and during this trial seems forever unavailable.[31]

The Second Supplemental Report then indicates that, with one important exception (discussed *infra* at pp. 88-95), no evidence was found that USAO management had information about any other posters (besides Perricone) before November 2012, when the state court civil lawsuit against First AUSA Jan Mann was filed. Furthermore, the USAO reportedly held two staff meetings, led by former USA Jim Letten, in March 2012, shortly after the Perricone activity became known, wherein he urged all in attendance to advise him promptly if they had any information of like nature that should be disclosed before he addressed Perricone's conduct with the media. No one volunteered during either meeting that they had posted online comments.

The Second Supplemental Report further states that OPR will make its final report available for the Court's review when it is completed, but adds: ".... it is difficult to predict with certainty the time at which OPR's final report will be available for disclosure to the court." (Second Supplemental Report, p. 7.) An expected time line of legal delays was provided, but suffice it to say, the Court does not anticipate the OPR final report to be forthcoming for many months after the date of this Order.

---

[31]     The inability of DOJ to forensically recover computer data evidence at material times to this inquiry, particularly when coupled with both Perricone's and Jan Mann's reported inability to recall prior user IDs, indeed troubles the Court, and supports the Court's ruling.

Finally, in further response to the Court's inquiry regarding DOJ persons participating in the preparation, including drafting, editing, approving, and/or supervising the Horn Reports to the Court, the Second Supplemental Report states:

> ". . . we have acted under the supervision of Deputy Attorney General James Cole, initially through former Associate Deputy Attorney General Scott Schools[32] and presently through Principal Associate Deputy Attorney General Stuart M. Goldberg. As described more fully below, at all times the undersigned have held the responsibility for conducting our investigation and preparing all submissions to the Court in response to the November Order, subject to the editing and final approval of the above supervisors. We have been given the authority to independently conduct this investigation and have not been restricted in pursuing leads or information. Similarly, we have not been restricted in reporting information in our submissions that we concluded to be appropriate."

(Second Supplemental Report, pp. 8-9.)

## G.    Third Supplemental Report Dated June 17, 2013

The Court reviewed the material delivered by Mr. Horn and Ms. Alexander on May 15 and 20, 2013, and thereafter asked seven more questions in the nature of clarification, none of which was of a substantive nature.  A Third Supplemental Report was filed by Mr. Horn, on June 17, 2013, in response to the Court's inquiries.

## H.    Fourth Supplemental Report Dated June 25, 2013

As a matter of even further follow-up, the Court made two additional requests of Mr. Horn on June 18, 2013, to which Mr. Horn responded via a Fourth Supplemental Report dated June 25, 2013.  The first of those questions related to the interview of Jan Mann; the second related to the DOJ agency employee "A."  Then, on Friday, July 26, 2013, the Court requested the transcript or

---

[32]     See p. 89, fn. 100.

30

recording of the December 20, 2012, OIG interview of "Dipsos,"[33] which recording was received on July 31, 2013.

As of that date, July 31, 2013, with the body of information gathered by Mr. Horn and Ms. Alexander, along with other information received and confirmed during this time period, the Court was strongly inclined to hold an in-depth evidentiary hearing, as originally requested by defendants, given that their allegations, based then on very few known facts, deductive reasoning, and supposition, had clearly blossomed into a series of newly-discovered facts and admissions, unanswered questions, additional apostasies, and a fetor extending far beyond the simple disconcerting notion of a single rogue prosecutor known to counsel and the Court at the hearing on June 13, 2012. But, with these admissions, and confirmed facts reported and verified sufficient to tip this matter toward disposition, the Court is able and instead finds it more appropriate to simply rule on defendants' motion now, for the reasons stated.

## IV. STATEMENT OF ISSUES

A.    **The Government's Opposition to Defendants' Motion**

In its original opposition memorandum (Rec. Doc. 1007), filed on June 5, 2012, the government staked out two general arguments: (1) the defendants' motion is untimely and must be dismissed without consideration of its merits; and (2) the defendants' motion should be denied because the defendants have failed to demonstrate a violation of their rights to due process. (Rec. Doc. 1007, p. 3.)

---

[33]    Though not otherwise referenced by quote in this Order, the Court finds certain other particular information on this recording tends to support its decision.

**B.      Questions Raised**

Generally speaking, as reflected in the government's opposition memorandum, the Court is faced with a motion for new trial under Rule 33. This particular new trial request, however, unlike most, poses many interesting questions, some groundbreaking: (1) Initially, as raised by DOJ, was the defendants' motion timely filed when some of the government's conduct was not discovered until months later, and much of it is being disclosed to defense counsel for the first time in this Order? (2) Did the government violate the Code of Federal Regulations? (3) Did the government attorneys violate the other Rules of Professional Responsibility and Local Court Rules set forth herein? (4) Can the government do indirectly that which it is strictly prohibited from doing directly? (5) Can the government do in cyberspace, with anonymity, that which it is strictly prohibited from doing otherwise? (6) Because these posts by government attorneys were made anonymously (or under a fake name), should the Court overlook and excuse the fact that they were made by government prosecutors and employees of DOJ? (7) Was Rule 6(e) violated? (8) If Rule 6(e) was violated, by whom? (9) Are the defendants entitled to an evidentiary hearing on any or all of these issues? (10) Under these extraordinary circumstances, are the defendants required to show prejudice? (11) If so, have the defendants shown sufficient prejudice?

The Court again points out that a search of existing case law does not reveal that factually similar circumstances have occurred elsewhere in this nation (which is a relief, in a way) for prior court treatment. This is not entirely surprising, given that social media and internet posting are relatively new phenomena, and the minatory nature of the conduct occurring both before and during this high stakes trial. Any precedential discussion of them in the jurisprudence, however, would have been helpful. Nonetheless, with certain irrefragable facts before it juxtaposed against a number

of unanswered material questions, the Court believes this matter can be disposed of at this time based upon longstanding fundamental principles of due process.

## V. GOVERNING LAW

**A.      Fundamental Guiding Principles**

"[F]air play . . . is the essence of due process." *Galvan v. Press*, 347 U.S. 522, 530 (1954). Such fair play includes "the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." *Spano v. New York*, 360 U.S. 315, 320-21 (1959). This deep-rooted feeling extends even deeper where prosecutors are concerned, given their status as officers of the court bound to special rules of professional conduct. *See, e.g.*, La. Rules of Professional Conduct, Rule 3.8 (Special Responsibilities of a Prosecutor).

Addressing the special obligations owed by federal prosecutors, in *United States v. Lopez-Avila,* 678 F.3d 955 (9th Cir. 2012), the Ninth Circuit Court of Appeals recently explained:

> The Department of Justice has an obligation to its lawyers and to the public to prevent prosecutorial misconduct. Prosecutors, as servants of the law, are subject to constraints and responsibilities that do not apply to other lawyers; they must serve truth and justice first. *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993). Their job is not just to win, but to win fairly, staying within the rules. *Berger,* 295 U.S. at 88, 55 S.Ct. 629.
>
> \*      \*      \*
>
> When a prosecutor steps over the boundaries of proper conduct and into unethical territory, the government has a duty to own up to it and to give assurances that it will not happen again.

*Id.* at 964-65. Having found prosecutorial misconduct committed by one AUSA, the Court of Appeals remanded the case to the district court to consider "two different courses of action that

would deter future misconduct like this since 'quite as important as assuring a fair trial . . . is assuring

that the circumstances that gave rise to the misconduct won't be repeated in other cases.' *Kojayan,*

8 F.3d at 1324." *Lopez-Avila,* 678 F.3d at 965-66.  The two remedial options set forth by the Ninth

Circuit are (1) retrial, or dismissal with prejudice, pursuant to the district court's supervisory powers

over the attorneys who practice before it, and (2) discipline of the prosecutor(s) directly pursuant to

a show cause order.  *Lopez-Avila,* 678 F.3d at 966.  The Ninth Circuit finally noted, as is the case

herein, that the DOJ Office of Professional Responsibility (OPR) is required to review the conduct

of the DOJ attorney involved.[34]

**B.      Laws Governing Conduct of Prosecutors**

The conduct of prosecutors and other personnel of the DOJ is governed in several respects,

the most significant here being 28 C.F.R. § 50.2.  That provision of the Code of Federal Regulations

states, in pertinent part:

> **§ 50.2   Release of information by personnel of the Department of Justice**
> **relating to criminal and civil proceedings.**
>
> (a)      *General.*
>
>                            *      *      *
>
> (2)   While the release of information for the purpose of influencing a trial is,
> of course, always improper, there are valid reasons for making available to the public
> information about the administration of the law.  The task of striking a fair balance
> between the protection of individuals accused of crime or involved in civil

---

[34]      In *Lopez-Avila,* upon the initial release of the original opinion, the government filed a motion
requesting that the Circuit remove the prosecutor's name (AUSA Jerry Albert) from the opinion and replace
it with references to simply "the prosecutor", arguing that naming Albert publicly was inappropriate.  The
Circuit rejected the government's request, stating: "If federal prosecutors receive public credit for their good
works - as they should - they should not be able to hide behind the shield of anonymity when they make
serious mistakes." 678 F.3d at 965.  To the extent DOJ and AUSA attorneys have objected to being publicly
named herein, this maxim applies here as well.

proceedings with the Government and public understandings of the problems of controlling crime and administering government depends largely on the exercise of sound judgment by those responsible for administering the law and by representatives of the press and other media.

\* \* \*

(b)    *Guidelines to criminal actions.*

(1) These guidelines shall apply to the release of information to news media from the time a person is the subject of a criminal investigation until any proceeding resulting from such an investigation has been terminated by trial or otherwise.

**(2) At no time shall personnel of the Department of Justice furnish any statement or information for the purpose of influencing the outcome of a defendant's trial, nor shall personnel of the Department furnish any statement or information, which could reasonably be expected to be disseminated by means of public communication,** *if such a statement or information may reasonably be expected to influence the outcome of a pending or future trial.[35]*

(3) Personnel of the Department of Justice, subject to specific limitations imposed by law or court rule or order, may make public the following information:

(i) The defendant's name, age, residence, employment, marital status, and similar background information.

(ii) The substance or text of the charge, such as a complaint, indictment, or information.

(iii) The identity of the investigating and/or arresting agency and the length or scope of an investigation.

(iv) The circumstances immediately surrounding an arrest, including the time and place of arrest, resistance, pursuit, possession and use of weapons, and a description of physical items seized at the time of arrest.

---

[35]    Significantly, this regulation sets forth an objective standard: ". . . could reasonably be expected . . ." and ". . . may reasonably be expected to influence the outcome of a pending or future trial." Thus, a violation is **not** measured subjectively, i.e., whether it *actually* influenced a pending or future trial. In other words, actual "influence" is not required for a violation of this regulation.

Disclosures should include only incontrovertible, factual matters, and should not include subjective observations. In addition, where background information or information relating to the circumstances of an arrest or investigation would be highly prejudicial or where the release thereof would serve no law enforcement function, such information should not be made public.

(4)   Personnel of the Department shall not disseminate any information concerning a defendant's prior criminal record.

**(5)   Because of the particular danger of prejudice resulting from statements in the period approaching and during trial, they ought strenuously to be avoided during that period.  Any such statement or release shall be made only on the infrequent occasion when circumstances absolutely demand a disclosure of information and shall include *only information which is clearly not prejudicial.***

(6)   The release of certain types of information generally tends to create dangers of prejudice without serving a significant law enforcement function. Therefore, personnel of the Department should refrain from making available the following:

**(i)   Observations about a defendant's character.**

**(ii)   Statements, admissions, confessions, or alibis attributable to a defendant, or the refusal or failure of the accused to make a statement.**

(iii)   Reference to investigative procedures such as fingerprints, polygraph examinations, ballistic tests, or laboratory tests, or to the refusal by the defendant to submit to such tests or examinations.

**(iv)   Statements concerning the identity, testimony, or credibility of prospective witnesses.**

**(v)   Statements concerning evidence or argument in the case, whether or not it is anticipated that such evidence or argument will be used at trial.**

**(vi)   Any opinion as to the accused's guilt, or the possibility of a plea of guilty to the offense charged, or the possibility of a plea to a lesser offense.**

*         *         *

(9)  Since the purpose of this statement is to set forth generally applicable guidelines, there will, of course, be situations in which it will limit the release of information which would not be prejudicial under the particular circumstances.  **If a representative of the Department believes that in the interest of the fair administration of justice and the law enforcement process information beyond these guidelines should be released, in a particular case, he shall request the permission of the Attorney General or the Deputy Attorney General to do so.**

*   *   *

[italic and bold face emphasis added.][36]  Moreover, as if this provision in the Code of Federal

Regulations is not sufficient and clear, much the same legal directive is contained in the DOJ's

United States Attorneys Manual, Chapter 1-7.000, entitled "Media Relations."  Those provisions

state, in pertinent part [italics and bold face emphasis added]:

---

[36]        See also 28 C.F.R. § 16.26, which governs production or disclosure of information pursuant to a demand:

  (a) In deciding whether to make disclosures pursuant to a demand, Department officials and attorneys should consider:

    (1)     Whether such disclosure is appropriate under the rules of procedure governing the case or matter in which the demand arose, and

    (2)     Whether disclosure is appropriate under the relevant substantive law concerning privilege.

  (b)  Among the demands in response to which disclosure will **not** be made by any Department official are those demands with respect to which any of the following factors exist:

    (1)     Disclosure would violate a statute, . . . or a rule of procedure, such as the grand jury secrecy rule, F.R.Cr.P., Rule 6(e),

    (2)     **Disclosure would violate a specific regulation;**

*   *   *

**1-7.110  Interests Must Be Balanced**

These guidelines recognize three principal interests that must be balanced: the right of the public to know; an individual's right to a fair trial; and, the government's ability to effectively enforce the administration of justice.

\*   \*   \*

**1-7.112  Need for Free Press and Public Trial**

Likewise, careful weight must be given in each case to the constitutional requirements of a free press and public trials as well as the right of the people in a constitutional democracy to have access to information about the conduct of law enforcement officers, prosecutors and courts, consistent with the individual rights of the accused.

\*   \*   \*

**1-7.401  Guidance for Press Conferences and Other Media Contacts**

The following guidance should be followed when Department of Justice components or investigative agencies consider conducting a press conference or other media contact:

\*   \*   \*

D.      There are also circumstances involving substantial public interest when it may be appropriate to have media contact about matters after indictment or other formal charge but before conviction. In such cases, any communications with press or media representatives should be limited to the information contained in an indictment or other charging instrument, other public pleadings or proceedings, and any other related non-criminal information, within the limits of USAM [United States Attorneys Manual] 1-7.520, .540, .550, .500 and 28 C.F.R. 50.2.

E.      **Any public communication by any Department component or investigative agency or their employees about pending matters or investigations that may result in a case, or about pending cases or final dispositions, must be approved by the appropriate Assistant Attorney General, the United States Attorney, or other designate responsible for the case.**

\*   \*   \*

G.      **All Department personnel must avoid any public oral or written statements or presentations that may violate any Department guideline or regulation, or any legal requirement or prohibitions, including case law and local court rules.**

H.   Particular care must be taken to avoid any statement or presentation that would prejudice the fairness of any subsequent legal proceeding. See also 28 C.F.R. 16.26(b).

\* \* \*

### 1-7.500  Release of Information in Criminal and Civil Matters—Non-Disclosure

*At no time shall any component or personnel of the Department of Justice furnish any statement or information that he or she knows or reasonably should know will have a substantial likelihood of materially prejudicing an adjudicative proceeding.*[37]

\* \* \*

### 1-7.550  Concerns of Prejudice

Because the release of certain types of information could tend to prejudice an adjudicative proceeding, Department personnel should refrain from making available the following:

A.   **Observations about a defendant's character;**

B.   **Statements, admissions, confessions, or alibis attributable to a defendant, or the refusal or failure of the accused to make a statement;**

C.   Reference to investigative procedures, such as fingerprints, polygraph examinations, ballistic tests, or forensic services, including DNA testing, or to the refusal by the defendant to submit to such tests or examinations;

D.   **Statements concerning the identity, testimony, or credibility of prospective witnesses;**

E.   **Statements concerning evidence or argument in the case, whether or not it is anticipated that such evidence or argument will be used at trial;**

F.   **Any opinion as to the defendant's guilt, or the possibility of a plea of guilty to the offense charged, or the possibility of a plea of a lesser offense.**

\* \* \*

[italics and bold face emphasis added.]

---

[37]   Importantly, this express prohibition also carries an objective standard ("knows or reasonably should know" and "substantial likelihood"), rather than requiring actual "material prejudice" for a violation to occur.

In addition, and just in case the aforementioned federal regulation and the DOJ's U.S. Attorneys Manual were not quite enough, the United States District Court for the Eastern District of Louisiana has also enacted Local Criminal Rules, which state the following [italics and bold face emphasis added]:

**LCrR53.1 Dissemination of Information Concerning Pending or Imminent Criminal Litigation by Lawyer Prohibited**

**It is the duty of the lawyer not to release or authorize the release of information or opinion for dissemination by any means of public communication, in connection with pending or imminent criminal litigation with which he or she is associated, if there is a *reasonable likelihood* that such dissemination will interfere with a fair trial *or otherwise prejudice the due administration of justice.***

\* \* \*

**LCrR53.3 Extrajudicial Statements Concerning Specific Matters**

From the time of arrest, issuance of an arrest warrant or the filing of a complaint, information, or indictment in any criminal matter until the commencement of trial or disposition without trial, **a lawyer associated with the prosecution or defense shall not release or authorize the release of any extrajudicial statement for dissemination by means of public communication relating to that matter and concerning:**

\* \* \*

(B)     The existence or contents of any confession, admission, or statement given by the accused, or the refusal or failure of the accused to make any statement;

\* \* \*

(D)     **The identity, testimony, or credibility of prospective witnesses, except that the lawyer may announce the identity of the victim if the announcement is not otherwise prohibited by law;**

(E)     **The possibility of a plea of guilty to the offense charged or a lesser offense;**

**(F)** *Any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case.*

\*    \*    \*

## LCrR53.5 Extrajudicial Statements During Trial

During the trial of any criminal matter, including the period of selection of the jury, no lawyer associated with the prosecution or defense shall give or authorize any extrajudicial statement or interview, relating to the trial or the parties or issues in the trial, for dissemination by any means of public communication, except that the lawyer may quote from or refer without comment to public records of the court in the case.

## LCrR53.6 Extrajudicial Statements After Trial and Prior to Sentence

After the completion of a trial or disposition without trial of any criminal matter, and prior to the imposition of sentence, a lawyer associated with the prosecution or defense shall refrain from making or authorizing any extrajudicial statement for dissemination by any means of public communication if there is a reasonable likelihood that such dissemination will affect the imposition of sentence.

\*    \*    \*

[italics and bold face emphasis added.]

Finally, at all times, of course, the conduct of attorneys licensed to practice in the State of Louisiana also were and are governed by the Louisiana Rules of Professional Conduct. Rule 3.8 singles out those serving as prosecutors in the State of Louisiana with a clear and direct special obligation [italics and bold face emphasis added]:

## RULE 3.8   SPECIAL RESPONSIBILITIES OF A PROSECUTOR

**The prosecutor in a criminal case shall:**

\*    \*    \*

(f) except for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose, **refrain from making extrajudicial comments that have a substantial**

41

**likelihood of heightening public condemnation of the accused and exercise reasonable care to prevent investigators, law enforcement personnel, employees or other persons assisting or associated with the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under Rule 3.6 or this Rule.**

[bold face emphasis added.]  As for "Dipsos," the DOJ attorney identified in the Horn Reports, the

Rules of Professional Conduct for lawyers practicing in Washington, D.C., are governed by the

District of Columbia Rules of Professional Conduct.  In particular, Rule 8.4 provides, in pertinent

part:

**Rule 8.4 – Misconduct**

**It is professional misconduct for a lawyer to:**

**(a)  Violate or attempt to violate the Rules of Professional Conduct,** knowingly assist or induce another to do so, **or do so through the acts of another;**

\*   \*   \*

[bold face emphasis added.]

The government might argue that violations of these regulations and directives are simply

*malum prohibitum* and not *malum in se*.  As discussed below, case law indicates otherwise.

**C.      Law Governing Motions For New Trial**

Rule 33 of the Federal Rules of Criminal Procedure states:

(a)  Defendant's Motion.  Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.

\*   \*   \*

(b)      Time to File.

(1)      Newly Discovered Evidence.  Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty.  If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.[38]

---

[38]      The Court treats this motion for new trial under both subsections (b)(1) and (b)(2). To the extent the motion is based on "newly discovered evidence," the Court proceeds under the Fifth Circuit case of *United States v. Redd*, 355 F.3d 866, 880-81 (5th Cir. 2003), in which the Court is, for jurisdictional purposes, indicating its intent to rule as set forth herein.

(2)     Other Grounds. Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.

Ordinarily, Rule 33 recognizes that if a trial court concludes for any reason that the trial has resulted in a miscarriage of justice, the court has broad powers to grant a new trial. *United States v. Scroggins,* 379 F.3d 233 (5th Cir. 2004), *vacated on other grounds,* 543 U.S. 1112 (2005). Nevertheless, motions for a new trial are to be granted with caution, *United States v. Wall,* 389 F.3d 457, 467 (5th Cir. 2004), *cert. denied,* 544 U.S. 978 (2005), and are generally subject to the harmless and plain error provisions of Rule 52 of the Federal Rules of Criminal Procedure. *United States v. Valencia,* 600 F.3d 389 (5th Cir.), *cert. denied,* 131 S.Ct. 285 (2010). In determining whether the substantial rights of the defendant were affected, courts may aggregate all alleged errors, under the cumulative effect doctrine, to determine if together any harmless errors are no longer harmless, making it necessary for a new trial to be granted. *United States v. Barrett,* 496 F.3d 1079, 1121 (10th Cir. 2007).

In this instance, the Court again states the obvious: this motion for new trial has evolved and is not analogous to other motions for new trial featured in the jurisprudence. In fact, it is *sui generis,* difficult to categorize as either one based on newly discovered evidence;[39] one based upon prosecutorial misconduct so significant and repugnant as to undermine these proceedings; or, most likely, a combination of both. Generally, however, a district court may grant a new trial, "if the

---

[39]     To obtain a new trial based solely on newly-discovered evidence, a defendant must show: (1) that the evidence is newly discovered and was unknown to him at the time of trial; (2) that the failure to discover the evidence was not due to his lack of diligence; (3) that the evidence is not merely cumulative, but is material; and (4) that the evidence would probably produce an acquittal. *United States v. Blackthorne,* 378 F.3d 449, 452 (5th Cir. 2004) (quoting *United States v. Gresham,* 118 F.3d 258, 267 (5th Cir. 1997)); *United States v. McRae,* 702 F.3d 806, 841 (5th Cir. 2012).

interest of justice so requires," including, in some circumstances, because of newly-discovered evidence. Fed. R. Crim. P. 33.

Of course, in this motion, other grounds for a new trial resting on fundamental due process are urged. Thus, the matter is not as simple as a motion for new trial based on "newly-discovered evidence" in the traditional sense. Significantly, in *Brecht v. Abrahamson,* 507 U.S. 619, 638, n. 9, (1993), the Supreme Court, albeit on application for habeas relief, recognized and identified additional grounds for relief based upon prosecutorial misconduct:

> Our holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict.

One need only review the facts set forth herein, and in the Court's November 26, 2012 Order and Reasons (Rec. Doc. 1070), to discern that this is a most unusual case, involving "error" (or, more alarmingly, intentional conduct) that surely consists of a "deliberate and especially egregious" pattern of prosecutorial misconduct.

Further, the Court has found only three pertinent cases involving actual violations of 28 C.F.R. § 50.2.[40] In two of them, convictions were vacated – one on motion for new trial and the

---

[40]    In a fourth case, *United States v. Stanford,* 589 F.2d 285 (7th Cir. 1978), *cert. denied,* 440 U.S. 983 (1979), the Court found a violation of 28 C.F.R. § 50.2; however, because the defendants elected a bench trial with no jury, failed to seek a change of venue or continuance of the trial (unlike the defendants here, who moved for both and were denied) despite knowledge of the purported adverse publicity, and thus failed to show prejudice dismissal of the indictments was denied. A few other cases relating to 28 C.F.R. § 50.2 involve defendants seeking prospective relief (*In re Grand Jury Investigation,* No. 87-163, 1987 WL 8073, *1 (E.D.N.Y. February 23, 1987), or involve an allegation but no finding that § 50.2 was violated. See *United States v. Civella,* 648 F.2d 1167, 1174 (8th Cir.), *cert. denied,* 454 U.S. 867 (1981); *United States v. Rosado,* 728 F.2d 89 (2nd Cir. 1984)(wherein defendants were fully aware of pre-trial publicity and participated in voir dire); and *United States v. Flemmi,* 233 F.Supp.2d 75 (D. Mass. 2000)(wherein the court ordered the government to show cause why certain sanctions should not be imposed based upon a *prima facie* showing of misconduct).

other on habeas application.  And, even in the third, although relief to the defendants was denied, the Court strongly condemned the government's actions.

The first of these cases is *Sheppard v. Maxwell,* 384 U.S. 333 (1966), in which the Supreme Court reversed the denial of the defendant's habeas petition, and remanded the case to the district court with instructions to issue the writ and order that Sheppard be released from custody, subject to further charges.   Of particular importance, the Supreme Court found "the totality of the circumstances" approach should be taken when a defendant may have been deprived of due process because of ongoing prejudicial publicity saturating the community. *Sheppard,* 384 U.S. at 352-53. Citing 28 C.F.R. § 50.2, the Court further stated:

> Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures.

*Sheppard,* 384 U.S. at 363.

The second case, *United States v. Capra,* 372 F.Supp. 609 (S.D.N.Y. 1974), decided long before the creation of "blogs," "chat rooms," "tweets," and various other internet posting/social media, was based upon publicity afforded by the government before and during trial.  In *Capra,* the court denied the requested relief,[41] but stated: "At the same time, it seems fitting to underscore that the mere gnashing of judicial teeth should not remain the sole response to such law enforcement

---

[41]        In *Capra,* defendants' complaint related to "massive and lurid publicity" by law enforcement officers, describing their activities in conducting a "round-up" resulting in numerous arrests, including that of the defendants.  The sensational detailed "publicity extravaganza" (*Capra,* 372 F.Supp. at 615) occurred months earlier, and obviously was known to defendants and the court prior to trial; thus it was, most crucially, subject to voir dire.  Though the court set forth a scathing criticism of the government, and particularly the response of the U.S. Attorney to questions propounded by the court, the district judge found the relief (outright dismissal of the charges) sought by the defendants to be "excessive and unjustifiable", in light of the clear guilt of the defendants.

behavior." 372 F. Supp. at 615.  In the next paragraph, the court continued:  "The United States

Attorney scarcely embraces the whole of the matter when he concludes in this case that this

particular trial has not been demonstrated to have been vitiated by sordid publicity."  *Id.,* at 616.

Most importantly, the *Capra* court addressed 28 C.F.R. § 50.2:

> The question of the integrity of the Department's [DOJ's] own functioning might have
> been supposed to cause concern in that quarter, quite apart from **the now familiar**
> **principle that an agency may deny due process if it fails to obey its own**
> **regulations.**  *E.g., United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 266-
> 268, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *Service v. Dulles,* 354 U.S. 363, 388-389, 77
> S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Yellin v. United States,* 374 U.S. 109, 120-121,
> 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963).  As for the court itself, our 'supervisory
> power,' if it means something, must entail an alert sensitivity to indications that the
> federal prosecutor and/or federal law enforcement officers have participated in, or
> quietly condoned, transgressions against court rules, executive rules, and commands
> of the Constitution.

*Capra,* at 611-612.  [emphasis added].[42]

---

[42]     This Court's review of the cited cases, *Accardi, Service,* and *Yellin,* reveals that each
involved a governmental agency's violation of regulations set forth in the Code of Federal Regulations,
United States Code, or House Committee Rule, the violation of which yielded deprivations of due process
resulting in grants of relief to the aggrieved persons.

        In *Accardi,* the Supreme Court (Justice Clark) stated:  "We think the petition for habeas
corpus charges the Attorney General with precisely what the regulations forbid him to do:  dictating the
Board's decision." 347 U.S. at 267.

        In *Service,* the Supreme Court (Justice Harlan) stated:  "It being clear that § 393.1 was not
complied with by the Secretary in this instance, it follows that under the Accardi doctrine petitioner's
dismissal [from his position] cannot stand, regardless of whether the 1951, rather than the 1949, Regulations
are deemed applicable in his case." 354 U.S. at 388.

        In granting relief in *Yellin,* the Supreme Court (Chief Justice Warren) stated:  ". . . the
witness' reasonable expectation is that the Committee actually does what it purports to do, adhere to its own
rules.

                                    *   *   *

        The Committee prepared the groundwork for prosecution in Yellin's case meticulously.  It
is not too exacting to require that the Committee be equally meticulous in obeying its own rules." 374 U.S.
at 123-24.

In the third case relating to 28 C.F.R. § 50.2, *United States v. Narciso,* 446 F.Supp. 252 (E.D.

Mich. 1977), the court also exercised its inherent supervisory authority to consider the "cumulative

impact" of governmental misconduct in granting a new trial. *Narciso,* 446 F.Supp. at 301. The court

explained:

> The standard to turn to in determining whether the court should exercise its supervisory powers is not so clear. Numerous rationales have been advanced to explain the nature and scope of the somewhat sparingly used supervisory authority, but it is generally conceded (as defendants' brief argues) that the courts are primarily concerned with protecting "the judicial process from the stigma of illegal or unfair" government conduct. Note, <u>The Supervisory Power of the Federal Courts</u>, 76 Harv. L.Rev. 1656, 1663 (1963). *See McNabb v. U.S.*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943).FN8 The Supreme Court has not announced a general rule requiring the application of the Court's supervisory authority to a wide variety of cases, preferring instead to treat each case on its particular facts. *Marshall v. U.S.*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); *Grunewald v. U.S.*, 353 U.S. 391, 424, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).

>> FN8. The Court said: "We are not concerned with law enforcement practices except in so far as courts themselves become instruments of law enforcement." 318 U.S. at 347, 63 S.Ct. at 616. It is significant that *McNabb's* narrow holding was that an improperly obtained confession cannot be used at trial. The Supreme Court did not dismiss the indictment.

> While it is true that an indictment may be dismissed without regard to considerations of prejudice, prejudice to the defendants is one factor which the Court should take into account in its determination. *U.S. v. McCord*, 166 U.S.App.D.C. 1, 509 F.2d 334, 350 (1974) (en banc), *cert. denied,* 421 U.S. 930, 95 St.Ct. 1656, 44 L.Ed.2d 87 (1975). *U.S. v. Crow Dog*, 399 F. Supp. 228, 238 (N.D. Iowa 1975), aff'd, 532 F.2d 1182 (8th Cir. 1976). The Court has an obligation to tailor any remedy to the nature of the misconduct in the particular case. The more serious the violation, the more severe the remedy must be.

*Narciso,* 446 F.Supp. at 302. The court continued:

> Federal trial judges are not, however, limited in deciding motions under Rule 33, to weighing the evidence. On the contrary, the very words of the rule "interest of justice" mandate the broadest inquiry into the nature of the challenged proceeding.

> As the Supreme Court said in *U.S. v. Gainey*, 380 U.S. 63, 68, 85 S.Ct. 754, 758, 13 L.Ed.2d 658 (1965), "Our Constitution places in the hands of the trial judge

the responsibility for safeguarding the integrity of the jury trial . . ." In the context of motions for new trial the courts have discharged this obligation by determining whether there has been a "miscarriage of justice."

\* \* \*

The fact that in ruling upon a motion for new trial the Court has broad powers as to the type of errors it may consider as well as the manner in which it may weigh the evidence testifies to the great significance the law attaches to fairness in our criminal justice system.

*Narciso,* 446 F.Supp. at 304.  Before reviewing the cumulative effect of a plethora of government

misdeeds, including improper remarks by the prosecution and purported misconduct by the FBI, the

court added:

Faith in the courts and in the jury system must be maintained and it is proper that on questions such as we have here the rule should be such as to support the faith of all litigants in our judicial system and, as part thereof, trial by jury.  That faith can be sustained only by keeping our judicial proceedings free from the suspicion of wrong. The question is, not whether any actual wrong resulted . . . but whether (there was) created a condition from which prejudice might arise or from which the general public would suspect that the jury might be influenced to reach a verdict on the ground of bias or prejudice." *Stone v. U.S.,* 113 F.2d 70, 77 (6th Cir. 1940).

*Narciso,* 446 F.Supp. at 306.  The *Narciso* court concluded:

In assessing whether the conduct of the prosecution requires the Court to set aside the convictions here and grant a new trial, it must be kept in mind that the government is held to a high standard in the conduct of its criminal cases.

\* \* \*

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.  He may prosecute with earnestness and vigor indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

*Narciso,* 446 F. Supp. at 325 (citing and quoting *Berger v. United States*, 295 U.S. 78, (1935)). The court found that the prosecution's comments violated 28 C.F.R. § 50.2 and the Rules of the Department of Justice, as well as the Code of Professional Responsibility. *Narciso,* 446 F.Supp. at 319. The motion for a new trial was granted.

## VI. THE MISCONDUCT

With these standards firmly in hand, the Court must, regretfully, recount and then analyze identified instances of government misconduct that are brought to bear in considering the defendants' motion. This evidence consists of: (a) the long-time online postings of then USAO Senior Litigation Counsel Sal Perricone; (b) the actions of "Dipsos;" (c) the online carnival type atmosphere fostered by at least two government attorneys; (d) the assertions of then First AUSA Jan Mann and the possible knowledge/complicity of others in the USAO and/or DOJ; and (e) other trial and pretrial concerns that emerged earlier in the case, but which must be considered anew, as part of the totality of the circumstances, and to evaluate the cumulative effect on the proceedings. As will be further discussed in the upcoming "Analysis" portion of this Order and Reasons, although any of these pieces of evidence, considered alone, might be of arguable legal import, the contrary is true when all of it, along with what remains unknown, is considered together. It is axiomatic that candor, credibility and transparency are the "coin of the realm" in circumstances such as these, and are foremost in the Court's consideration of the government's submissions.

49

A.      **Former USAO Senior Litigation Counsel Sal Perricone**

As a familiar refrain starting in 2008 (and perhaps even earlier),[43] Perricone, under his several

monikers, habitually posted comments[44] portraying the NOPD, its superintendent Warren Riley, and

its officers and personnel in the most negative and vitriolic way. Specifically, during the long period

of time in which this matter was being investigated by federal law enforcement, Perricone

anonymously asserted online that the NOPD is "corrupt" and "ineffectual,"[45] "totally disfunctional,"[46]

"an indolent agency,"[47] "a joke for a long time,"[48] and suffers from "cultural" problems.[49]   Indeed,

---

[43]     The earliest known and confirmed public posting on Nola.com by Perricone is on November 22, 2007, under the user ID "campstblue." As "campstblue," Perricone's earliest attacks on the NOPD, in particular, appear to be in June 2008. During that time (and since at least November 2006), the DOJ, through federal prosecutors Mark Blumberg and Bobbi Bernstein, and with the frequent consultation of DOJ attorney Karla Dobinski, monitored the state investigation of the events of September 4, 2005, that are the subject of this proceeding. "Active federal involvement" in the investigation of the September 4, 2005 shootings began in September 2008. (See Dobinski Declaration, Rec. Doc. 277-1, ¶¶ 21-31.) Following the commencement of DOJ's active investigation, Perricone's anonymous posting of public comments and criticisms increased in frequency and malice, as described herein. Perricone has stated that he does not recall at least one other of his user IDs, when it may have been used, and what he may have posted using it.

[44]     All Nola.com comments in this Order and Reasons are set forth precisely as they were posted, without corrections of typographical errors, spelling, grammar, punctuation, etc. Bold face and italicized additions are by the Court for emphasis, and omitted portions are so indicated.

[45]     campstblue, March 4, 2009, 8:57 a.m.; Kaufman Memorandum in Support (Rec. Doc. 963-20), Exh. 19, p. 64.

[46]     campstblue, July 17, 2008, 12:23 p.m.; Kaufman Memorandum in Support (Rec. Doc. 963-20), Exh. 19, p. 31.

[47]     campstblue, November 28, 2008, 9:12 a.m.; Kaufman Memorandum in Support (Rec. Doc. 963-20), Exh. 19, p. 44: "The NOPD is an indolent agency -- plain and simple. It's entire command structure in only concerned with their own aggrandizement and enrichment." [sic]

[48]     legacyusa, February 27, 2011, 9:20 a.m.; Kaufman Memorandum in Support (Rec. Doc. 963-21), Exh. 20, p. 129. Perricone assumed this other persona, "legacyusa," in or around April 2009.

[49]     campstblue, July 18, 2008, 8:34 a.m.; Kaufman Memorandum in Support (Rec. Doc. 963-20), Exh. 19, p. 32; campstblue, January 18, 2009, 10:21 a.m.; Kaufman Memorandum in Support (Rec. Doc. 963-20), Exh. 19, p. 50.

not many NOPD news stories on Nola.com went unscathed by Perricone's anonymously-administered invectives. For example, on June 7, 2008, Perricone/campstblue posted:

> At no time did anyone EVER take an inventory of the NOPD's assests??? Riley has to GO and GO now!! Is it any wonder why they are having recruiting problems? Who in their right mind wants to work for [then-mayor] Nagin and Riley? WHO?? And look at the rest of the Command (hahah) structure. All the deputies are idiots or have their own "issues". THis department is dead. Put the sheet over it....[50]

The very next day, under an article about the suspension of an NOPD officer who engaged in an altercation with a Mississippi River bridge officer, he commented: "The sad thing is that the NOPD is full of officers like this."[51]  And under the same article, Perricone published a very memorable phrase:  ***"There is an old Italian proverb:  the fish rots from the head down."***[52]

Perricone also labeled (future defense witness) NOPD Superintendent Warren Riley a "racist,"[53] "inept,"[54] and "delusional"[55] and proclaimed generally that NOPD officers are "crap." Perricone/campstblue continued to rail:  "[Riley] and his ENTIRE commad staff needs to GO and NOW.  Our lives and safety hang in the balance and he and his 'men' are just out for their own

---

[50]     campstblue, June 7, 2008, 8:05 a.m.; Kaufman Memorandum in Support (Rec. Doc. 963-20), Exh. 19, pp. 18-19.

[51]     campstblue, July 8, 2008, 7:42 a.m.; Kaufman Memorandum in Support (Rec. Doc. 963-20), Exh. 19, p. 27.

[52]     campstblue, July 8, 2008, 8:26 a.m.; Kaufman Memorandum in Support (Rec. Doc. 963-20), Exh. 19, p. 27.

[53]     campstblue, July 11, 2008, 10:01 a.m.; Kaufman Memorandum in Support (Rec. Doc. 963-20), Exh. 19, p. 28; legacyusa, June 11, 2009, 8:47 p.m.; Kaufman Memorandum in Support (Rec. Doc. 963-21), Exh. 20, p. 9.

[54]     campstblue, November 28, 2008, 9:12 a.m.; Kaufman Memorandum in Support (Rec. Doc. 963-20), Exh. 19, p. 44.

[55]     legacyusa, January 10, 2010, 10:50 a.m.; Kaufman Memorandum in Support (Rec. Doc. 963-21), Exh. 20, p. 31.

enrichment."[56]  In July 2009, Perricone again called for Riley's resignation:  "If this newspaper [Times-Picayune] genuinely had the city's interest at heart, they would immediately call for Riley's resignation, as well as the top brass of the police department.  None of them have the people's interest at heart.  NONE."[57]  In that regard, Perricone posted that "the Feds [DOJ] have zero confidence in Riley or the NOPD,"[58] and further that "The Government [DOJ] needs to take over the police department..NOW!!!!!"[59]  As for NOPD leadership, Perricone twice on the same day offered a suggestion to the new mayor, Mitch Landrieu:  "GET LETTEN OR ONE OF HIS BOYS[60] OR GIRLS TO BE THE NEXT CHIEF!!!!!"  That would scare the beeejeeeezuuuus out of the corrupt cops and excite the honest ones."[61]  Similarly, on July 10, 2009, 9:27 a.m., as legacyusa:

---

[56]    campstblue, May 16, 2009, 12:45 p.m.; Kaufman Memorandum in Support (Rec. Doc. 963-20), Exh. 19, p. 117.

[57]    campstblue, July 15, 2009, 8:29 a.m., Kaufman Memorandum in Support (Rec. Doc. 963-20), Exh. 19, p. 142.

[58]    legacyusa, February 25, 2010 (day after the Lohman plea), 5:53 p.m.; Kaufman Memorandum In Support (Rec. Doc. 963-21), Exh. 20, p. 43.

[59]    legacyusa, February 25, 2010 (day after the Lohman plea), 5:47 p.m.; Kaufman Memorandum in Support (Rec. Doc. 963-21), Exh. 20, p. 43 and Kaufman Memorandum in Support, Rec. Doc. 963-1, p. 15.

[60]    Notwithstanding his (then) unknown public criticisms of the NOPD, Perricone played a significant role on behalf of the DOJ in negotiating a Consent Decree between DOJ and the City of New Orleans, which was eventually filed on July 24, 2012, in proceedings entitled *United States of America v. City of New Orleans*, No. 12-1924, to govern/reform the NOPD. Additionally, in May 2013, the City of New Orleans disclosed, in pleadings filed in the Consent Decree litigation, that in 2010, Perricone himself had applied unsuccessfully for the NOPD Superintendent position that went to Ronal Serpas. See 12-1924, Rec. Doc. 175-1, pp. 2, 17; *United States of America v. City of New Orleans,* 13-30161 (5th Cir.), Docket No. 512288882, filed June 26, 2013, pp. 14-15.  For Perricone's online discussion of other candidates for the NOPD superintendent's job, see Part One, Rec. Doc. 1070, pp. 28-29.

[61]    legacyusa, March 9, 2010, 4:13 p.m. and 4:17 p.m.; Kaufman Memorandum in Support (Rec. Doc. 963-21), Exh. 20, pp. 48-49.

> Hey, can we get Letten or one of his people to take over the NOPD???  Darn, this is our safety, afterall and the current management of the NOPD doesn't care...[62]

As "legacyusa," former AUSA Perricone continued his campaign against the NOPD into 2010 and up into July 2011, as this case was being tried.  On January 10, 2010 (six weeks before former NOPD lieutenant and cooperating defendant Lohman entered his guilty plea), at 10:50 a.m., he posted:

> Riley is delusional.

*   *   *

> Riley, you are the racist and the sooner you and the other idiots ont he 5th floor [of NOPD headquarters] go, the better the Police Department will be.  I can only hope, as others here, that the new mayor [Landrieu] will clean house and fumigate 715 South Broad [NOPD headquarters] the day he is elected.  Perhaps we can get Letten to take a hard look at the position or one of his assistants.  We need change there and the quicker the better.[63]

Then, on December 3, 2010 (six months before this trial), at 6:53 a.m., Perricone offered a comment about the ongoing trial in *United States v. Warren*,[64] No. 10-154, also concerning post-Katrina police activity:

> This case, no matter how it turns out, has revealed the NOPD to be a collection of self-centered, self-interested, self-promoting, insular, arrogant, overweening, prevaricating, libidinous fools and that the entire agency should be re-engineered from the bottom up.  This case has ripped the veil of respectibilty away from the police department.  The facts, as reported here--and if they are correct--shows a group of people who, when not having sex with each other, or beating, burning and abusing the citizens.  Thank God for the Feds [DOJ]---can you imagine New Orleans without a Federal presence?[65]

---

[62]   Kaufman Memorandum in Support (Rec. Doc. 963-21), Exh. 20, p. 10.

[63]   Kaufman Memorandum in Support (Rec. Doc. 963-21), Exh. 20, pp. 31-32.

[64]   In *Warren* (also commonly referred to sometimes as "the *Glover* case"), No. 10-154, five NOPD officers and personnel were charged with various civil rights violations and obstruction of justice counts. Two officers were acquitted by the jury; U.S. District Judge Lance Africk granted a third (defendant McCabe) a new trial; the U.S. Fifth Circuit vacated defendant Warren's conviction and remanded for a new trial; and the conviction of the fifth was maintained. See *United States v. McRae, et al.,* 702 F.3d 806 (5th Cir. 2012), *cert. denied,* 133 S.Ct. 2037 (2013).

[65]   Kaufman Memorandum in Support (Rec. Doc. 963-21), Exh. 20, p. 113.

He added on February 27, 2011 (four months before this trial, and only three days after the Lohman plea), at 9:20 a.m.:

> The NOPD has been a joke for a long time.[66]

And on May 15, 2011 (only five weeks before the start of this trial), at 10:22 a.m.:

> Both [former mayors Ernest and Marc] Morials, Barthelemy and Nagin are to blame **for allowing criminals on the police force today.** Now, it seems, **we are weeding them out one by one,** but until they wrought ineffiable damage on our citizenry. [bold face added.][67]

Nor are the Court's concerns regarding Perricone's conduct limited to his posts about the NOPD. In its November 26, 2012 Order, the Court discussed in detail the testimony Perricone gave on October 10, 2012, following his 2012 resignation precipitated by his online postings, and the USAO's awareness, if any, of that activity prior to March 2012. At that time, the Court expressed its considerable doubt as to the truth of certain material assertions made by Perricone on October 10, 2012. (See Part One, Rec. Doc. 1070, pp. 27-32.) That sentiment has not changed. For example, because a critical feature of that inquiry related to the treatment of confidential and protected grand jury information, in accordance with Federal Rule of Criminal Procedure Rule 6(e), the Court allowed questions to be propounded to Perricone about his posting activity concerning former New Orleans District C City Councilman James Carter. (See Part One, Rec. Doc. 1070, pp. 29-31.) In particular, Perricone's explanation of his posts regarding a DOJ grand jury investigation of "the failed Algiers Landing project" garnered the Court's interest, as his explanation did not appear to make sense at the time.

---

[66]   Kaufman Memorandum in Support (Rec. Doc. 963-21), Exh. 20, p. 129.

[67]   Kaufman Memorandum in Support (Rec. Doc. 963-21), Exh. 20, pp. 157-158.

Further demonstrating the infirmity of Perricone's proffered explanation of the posts is its factual falsity. That is, Perricone testified that, "before Katrina," he spoke to two NOPD officers in a coffee shop about the "downgrading" of criminal activity at the Algiers Point ferry landing. According to him, he recommended the officers "talk to the city councilman, [James] Carter," to which one NOPD officer purportedly responded, "are you kidding me? He's involved in it." Thus, with that explanation, Perricone purported to put to rest the Court's concern about a leak of the grand jury investigation into "the failed Algiers Landing project." Unfortunately, however, Perricone's explanation cannot possibly be true, as James Carter was not elected to the New Orleans City Council until the spring of 2006 (obviously *after* Hurricane Katrina, which occurred on August 29, 2005), and did not take office until June 2006. Along with the other passages the Court previously cited, in its November 2012 Order, this discrepancy cannot be considered minor, as it relates to a grand jury proceeding that was subsequently confirmed to be under way at the time of Perricone's posts.

Furthermore, even today the Court is left to wonder what other user IDs Perricone might have employed to post additional critical information, personal criticisms, and vituperative comments, about the NOPD and possibly other DOJ-related matters. Although Perricone denies use of specific user IDs[68] about which he was asked, he admits, as previously stated, that he does not remember at least one other name he used to post online in the past.[69] Thus, were the Court to hold an evidentiary

---

[68]    Perhaps foreshadowing the future, "campstblue" asked on March 20, 2008, 8:21 a.m.: "ps: Where is H.L Mencken when we sorely need him?" (Kaufman Memorandum in Support, Rec. Doc. 963-20), Exh. 19, p. 14.

[69]    Sometimes utilizing his user IDs simultaneously, Perricone occasionally responded to his own posts.  See campstblue, May 16, 2009, 12:45 p.m. and legacyusa, May 16, 2009, 12:48 p.m., commenting negatively on NOPD Superintendent Riley (Kaufman Memorandum in Support, Rec. Doc. 963-

hearing, Perricone undoubtedly would be summoned to provide supplemental testimony regarding various areas/matters not previously even considered on October 10, 2012, as they were not then known.

**B.     "Dipsos"**

As previously explained, the Horn Reports revealed, for the first time, that a DOJ attorney, working in Washington D.C., had posted on Nola.com during the trial using the name "Dipsos." See, *supra,* pp. 16-17, 20, 23, and 27.   To the Court's shock and dismay, "Dipsos" eventually was identified, on May 15, 2013, as Karla Dobinski, a trial attorney in the Criminal Section of DOJ's Civil Rights Division.[70]   To fully understand the significance of this revelation, additional information regarding certain pre-trial proceedings in this matter is necessary.

**a.     The "Taint Team" Leader**

On occasion, during the course of certain investigations, particularly in police misconduct cases, officers are compelled to testify over the assertion of their Constitutional right not to do so. See *Garrity v. New Jersey,* 385 U.S. 493 (1967), and *Kastigar v. United States,* 406 U.S. 441 (1972).

---

21), Exh. 20, p. 5; see legacyusa, May 17, 2009, 9:15 p.m. agreeing with campstblue, May 17, 2009, 8:43 p.m. ("Campst is correct.")(Kaufman Memorandum in Support, Rec. Doc. 963-21), Exh. 20, p. 5; see legacyusa, May 22, 2009, 9:16 p.m. and campstblue, May 22, 2009, 9:40 p.m. (Kaufman Memorandum in Support, Rec. Doc. 963-21), Exh. 20, pp. 5-6; see legacyusa, May 23, 2009, 12:07 p.m. agreeing with campstblue, May 23, 2009, 11:13 a.m. ("Harvey, I agree with Campst, you are an idiot!!!!")(Kaufman Memorandum in Support, Rec. Doc. 963-21), Exh. 20, p. 6; see campstblue, May 28, 2009, 8:29 a.m. agreeing with legacyusa, May 28, 2009, 9:28 a.m. (Kaufman Memorandum in Support, Rec. Doc. 963-21), Exh. 20, p. 7; see campstblue, May 31, 2009, 2:18 p.m. agreeing with legacyusa, multiple posts under the same article ("Well, I must admit I am with Legacy and if that makes me a wingnut, so be it. * * * Keep the fight alive, Legacy. I'm your wingman. Semper fi.")(Kaufman Memorandum in Support, Rec. Doc. 963-20), Exh. 19, p. 123.

[70]      In response to the Court's direct inquiry, the Second Supplemental Horn Report states: "The full name and title of the Civil Rights Division employee referenced ... is Trial Attorney Karla Dobinski." On information and belief, however, Dobinski has, in the past, held the title and position of "Senior Deputy Chief" of the Criminal Section of the DOJ's Civil Rights Division. It is not known whether she held that position at the time of the 'Dipsos' posts in the last week of July 2011.

In those situations, a critical function of the government is to engage in a long established standard practice to insure that no immunized statement of a subject officer is used against that officer in a federal criminal prosecution. In fact, the Criminal Section of the DOJ's Civil Rights Division is charged with insuring the protection of those officers' rights under *Garrity* and *Kastigar*. (See Dobinski Declaration, Rec. Doc. 277-1, ¶¶ 4 and 10.)

This critical responsibility is assigned to a "taint team," which is charged with reviewing all of the evidence (including the immunized statements previously compelled) and then segregating and purging materials reflecting, or which might disclose, the immunized statements, in order to provide an untainted and sanitized body of evidence to DOJ prosecutors for their consideration. This standard practice might also warrant interviewing and screening witnesses by the taint team in order to verify and insure that no contents from an immunized statement reaches prosecutors in violation of the officer defendant's Constitutional rights. Thus, the function of the taint team, and its leader, is of obvious grave importance, and must be discharged with the utmost of care and prudence, to ensure that evidence turned over to DOJ prosecutors is filtered and pristine relative to the omission of immunized testimony and materials reflecting such testimony.

In this instance, the responsibility for this task was placed with Karla Dobinski, a Washington, D.C. trial attorney, working in the Criminal Section of the Civil Rights Division, U.S. Department of Justice, who was chosen to serve as the leader of the "taint team." (Dobinski Declaration, Rec. Doc. 277-1, ¶¶ 11-13; Dobinski Transcript, p. 82, l. 23.) With regard to this case, this crucial responsibility was Dobinski's professed single mission: to protect a defendant from use of his compelled testimony by the government. Indeed, her duties expressly *excluded* assisting the prosecution's investigation or trial strategy. (Dobinski Declaration, Rec. Doc. 277-1, ¶ 14.)

57

The Court first became acquainted with Dobinski at an April 18, 2011 pre-trial hearing held, pursuant to *Kastigar,* in response to a motion filed by Defendant Bowen concerning his prior compelled immunized testimony. At the hearing, the government relied almost exclusively on the testimony of Dobinski. (Dobinski Declaration, Rec. Doc. 277-1, ¶ 1; Dobinski Transcript, p. 82, l. 23.) Dobinski testified that she "headed the 'taint team'" that was formed at the beginning of the active federal investigation, which she believed was in September of 2008. (Dobinski Declaration, Rec. Doc. 277-1, ¶ 1; Dobinski Transcript, p. 15.) Dobinski assured the Court that she, assisted only by a paralegal, did all of the screening herself. (Dobinski Transcript, p. 16, l. 1-2.)[71]  She further testified that she was entrusted with "boxes of documents" that were carefully Bates numbered and scanned into a database by litigation support personnel in the DOJ Civil Rights Division. (Dobinski Transcript, p. 17.) According to Dobinski, the taint team's purpose and mission was to "***ensure the officers' rights*** under *Garrity* and *Kastigar,* i.e., to prevent the use of a compelled or immunized statement of such officer in a prosecution against him." (emphasis added) (Dobinski Transcript, p. 18.) In short, Dobinski was charged with using her considerable experience, judgment, and prudence as a meticulous "gate keeper" to prevent federal prosecutors' exposure to and use of immunized testimony previously compelled over a defendant's assertion of his Constitutional rights. As she

---

[71]     The title "Taint Team" might be a bit of a confusing misnomer:  According to the Supplemental Horn Report (p. 3), Dobinski "is not a supervisor, and the attorney's [her] direct supervisor had no involvement in the case except to oversee the *Garrity* work.  The attorney [Dobinski] does not supervise others."  One might now query whom the term "team" might include, other than a single paralegal, to accomplish such a meticulous, sensitive task involving compelled testimony.  In any event, the Supplemental Horn Report's portrayal of Dobinski as being isolated, with no supervisory duties, appears at odds with ¶ 33 of her Declaration (Rec. Doc. 277-1), filed with this Court on April 8, 2011:

> ". . . I was assigned to lead the taint team, which was also staffed by Dorothy Manning Taylor, an Assistant United States Attorney from the United States Attorney's Office [for the Eastern District of Louisiana], and John Wood and Jose Guillen, agents from the Federal Bureau of Investigation.  Taint-team paralegals also participated in the screening process."

herself testified, her admitted obligation was to protect the defendant (in this case, Bowen) from a

violation of his Constitutional rights.

Significantly, Dobinski was no novice to her position as taint team leader in this matter, or

lacking knowledge or expertise.  To the contrary, Dobinski has been employed in the Criminal

Section of the DOJ Civil Rights Division since April 1985[72] and has investigated and prosecuted

police misconduct, racial violence and human trafficking cases since then.  (Dobinski Declaration,

---

[72]       During her questioning of Dobinski, lead federal prosecutor Bobbi Bernstein brought out
the fact that Dobinski and Bernstein have long known each other since even before Bernstein attended law
school, when she [Bernstein] was hired as a paralegal in the Criminal Section of the Civil Rights Division
in 1989.  Bernstein further elicited testimony from Dobinski regarding her awareness of Bernstein's
knowledge and careful approach to the issue and required exercise at hand.  See Dobinski Transcript of April
18, 2011, pp. 78-79:

> Q.  [Bernstein]  You were asked some questions about our relationship,
> how long we have known each other.  I've been a prosecutor in the criminal
> section since 1996, correct?
> A.  [Dobinski]  Yes.
> Q.  When I was first hired into the criminal section, I actually worked for
> you; is that right?
> A.  That's right.
> Q.  That was with the National Church Arson Task Force?
> A.  Yes.
> Q.  We have actually known each other longer than that, haven't we?
> A.  Yes.
> Q.  You knew me before I even went to law school?
> A.  Yes.
> Q.  How did you know me before I went to law school?
> A.  You were a paralegal in the section.
> Q.  I was a paralegal in the criminal section of the Civil Rights Division?
> A.  Yes.
>                              *    *    *
> Q.  How confident are you that I understand *Kastigar*?
> A.  I'm very confident.
> Q.  How confident are you that I understand *Garrity*?
> A.  Very confident.
> Q.  How confident are you that I know and understand the procedures that
> we use in our office?
> A.  Very confident.

Rec. Doc. 277-1, ¶ 3.)  She also has participated on several "taint teams" in the past, including the one formed for *United States v. Koon,* 34 F.2d 1416 (9th Cir. 1994), "provided advice and consultation to numerous federal and state law enforcement authorities, and provided training on the *Garrity/Kastigar* best practices." (Dobinski Declaration, Rec. Doc. 277-1, ¶¶ 5, 6 and 28.)  She has been involved in this case since February 2007 (Dobinski Declaration, Rec. Doc. 277-1, ¶ 28), interacting as a "consultant" for both state and federal prosecutors.  For reasons that should be obvious, the Court considers her role essential to the proper functioning to the dual federal and state criminal systems, and one which the Court could, without question, look to for complete trustworthiness, confidence and reliability.

Unfortunately, during the April 18, 2011 hearing, it was established that, despite Dobinski's expertise and described efforts, former NOPD officers and cooperating defendants Ignatius Hills, Michael Lohman and Michael Hunter had each viewed at least some portions of the transcript of compelled immunized testimony of defendant Bowen. (See Transcript, pp. 57-58; 64-65; 95-98 - Hills; 98-100 - Lohman; and 100-101 - Hunter; Rec. Doc. 277-1, ¶ 49.) (See also Attachment G to Dobinski Declaration, Rec. Doc. 277-1, p. 25 of 26.)[73] Dobinski also admitted on cross-examination that, on at least one occasion, a "mistake" was made when a duplicate copy of a document (Hearing Exhibit AA, Bates numbered MAD008414, etc.) somehow was turned over to the DOJ trial team unredacted, when it should not have been. (Sealed Transcript, Rec. Doc. 713, p. 118, l. 21-24.) (See Dobinski Declaration, Rec. Doc. 277-1, ¶ 47, which is contra.)  Given these disclosures, Dobinski

---

[73]     It also was established that two other NOPD officers, Marchant Paxton and Raymond Young, were also compelled to give testimony in spite of the invocation of their constitutional right not to do so, in exchange for a grant of immunity. (Dobinski Transcript, pp. 76-77, pp. 84-85; Sealed Transcript, Rec. Doc. 713, p. 22)  The testimony of Paxton and Young was provided to federal prosecutors; neither has been the subject of a prosecution.

further testified that she had prepared a chart purporting to demonstrate that Bowen's compelled immunized testimony before the state grand jury could be sourced elsewhere in legally permissible ways. (Sealed Rec. Doc. 379, Exhibit 12.)  Although Dobinski's chart cites the 54-page Kaufman report (Trial Exhibit 27) for certain pieces of information provided by Bowen's immunized testimony, there are discrepancies. (Sealed Transcript, Rec. Doc. 713, pp. 123-126.)

### b.    The *Kastigar* Rulings

As previously stated, Dobinski's assigned role is an important one. Indeed, on June 17, 2011, the Court, in ruling on defendant Bowen's first Motion to Quash the indictment against him (Rec. Doc. 262),[74] relied exclusively on the testimony of Karla Dobinski, the only witness called, setting forth, both in her Declaration and April 18th live testimony, the careful "laborious process employed by the government's 'taint team' . . ." (See Rec. Doc. 500, pp. 4-6.)  Specifically, the Court denied Bowen's motion "on the showings made, and considering the information available at this stage of the proceeding." (Rec. Doc 500, p. 4, 7.)  The Court also denied defendant Bowen's post-trial motion, seeking relief pursuant to *Kastigar* (Rec. Doc. 693), "on the showing made," (Rec. Doc. 840, p. 2), and referred back to its June 21, 2011 denial. (Rec. Doc. 500.)  In so ruling, the Court again relied heavily on the Declaration and testimony of Dobinski wherein she claimed she assiduously

---

[74]    In particular, Bowen's motion points to:  (1) various meetings held by state and federal prosecutors;  (2) the Government's failure to disclose the federal grand jury witness and exhibit lists to Bowen and/or the Court;  (3) the provision of a copy of the immunized testimony to counsel for several of Bowen's state co-defendants;  (4) the reading of Bowen's immunized testimony by Michael Lohman and Ignatius Hills;  (5) the taint team's screening of only four of the more than one hundred grand jury witnesses;  (6) the taint team's failure to question federal grand jurors, as well as all grand jury witnesses, to ascertain any exposure to unredacted public documents, including any news accounts of Bowen's immunized testimony, and/or to provide them with special "*Kastigar*" instructions; and  (7) the taint team's failure to redact one of the copies of the state court's dismissal ruling that was provided to the federal prosecution team, as well as Bowen's state court indictment. Additionally asserting various differences between Bowen's immunized testimony and other evidence, Bowen maintains that any taint of the case would not be harmless. (Rec. Doc. 500, pp. 3-4.)

went through each scintilla of evidence supplied to federal prosecutors. (Rec. Doc. 840, p. 2, fn. 3 & 4.)

### c.   "Dipsos" on Nola.com:   "Taint Team" Leader Dobinski

As previously explained, the January 25, 2013 Horn Report, in discussing the posts of "Dipsos," initially characterized the person as "an employee" of DOJ; the March 29, 2013 First Supplemental Horn Report adds only that the employee is an attorney. Ultimately, on May 15, 2013, much to the shock and dismay of the Court, Mr. Horn and Ms. Alexander disclosed that Dipsos actually was not just any "employee," or just any "attorney," but instead was Dobinski, the person charged with defending the Constitutional rights of defendant Bowen by filtering his compelled testimony from the prosecution team.

Regarding Dobinski's posts and the proffered rationale for them, the First Supplemental Horn Report provides:

> The attorney [Dobinski/Dipsos] said under oath that the attorney was in Washington during the trial and followed the progress of the trial in the Times-Picayune because the prosecution team was busy and there was not a good flow of information back about the trial events.

(Supplemental Horn Report, p. 3.) The Court finds this explanation tenuous and unconvincing, for several reasons.

First, Dobinski obviously followed the progress of this matter through trial. Putting aside the question of whether reports in the Times-Picayune newspaper were "not a good flow of information back about the trial events," Dobinski surely had access to various other media reports, as this trial was well-publicized each day in a number of electronic and print media venues. In fact, the Court even arranged for daily media access to a separate courtroom across the hall from the trial,

wherein credentialed members of the media could monitor the trial, see the evidence on screen as it was displayed to the jury, and contemporaneously "tweet" or "blog," in real time, on their free news websites, which several of them did. (See Standing Order, Rec. Doc. 499, ¶ 4; and p. 76, fn. 87.) In addition, Dobinski knew at least one EDLA AUSA (Taylor),[75] whom she led on the "taint team," and whom she could have contacted for updates. Furthermore, Dobinski and lead DOJ prosecutor Bernstein shared a longstanding relationship as co-workers in the DOJ Civil Rights Division, extending over two decades before this trial, suggesting that updates from Bernstein, or someone else on the trial team,[76] would be easily accessible with a mere phone call or simple email.

Moreover, even had Dobinski been truly dissatisfied with the "flow of information back" about the trial, an internet blog of anonymous cyber-characters on Nola.com hardly seems the best place to obtain a "good flow" of accurate unbiased reporting. Indeed, the "comments" section on Nola.com is merely a vehicle for the expression of anonymous opinions, well-founded or not, about the particular story published by the journalist. Surely upon reviewing the "comments" under articles about this trial, Dobinski, ever the meticulous analyst of evidence and data, realized that the Nola.com "comments" hardly substituted for reliable reporting, or provided "a good flow of information."

Finally, and most critically, the nature and content of Dobinski's posts belie her claim that she posted on Nola.com merely to gain information about the trial. Assuming the name "Dipsos,"

---

[75]    See Dobinski Declaration, Rec. Doc. 277-1, ¶ 33.  It is not known if FBI Agents Wood or Guillen were also in New Orleans during the trial, and whether they too could have been a source for Dobinski to obtain further information about the trial.

[76]    In addition to trial attorneys Bernstein, Chung and Carter, see fn. 9, the trial team also included paralegal DOJ Steven Harrell, who usually was in the courtroom and, in any event, obviously was in close contact with the trial team attorneys.

Dobinski posted *six* times during the last week of the trial, repeatedly urging others to keep posting. She also specifically identified two of her fellow posters, "123ac" (whom she addressed five times) and "crawdaddy" (whom she addressed twice), for special approbation and encouragement, when those two commenters repeatedly posted vigorous pro-prosecution statements strongly condemning the defendants, their witnesses, and their entire defense. Expressing her appreciation for their posts, she proclaimed:   "You are performing a valuable public service!"  As "Dipsos," Dobinski additionally asked "123ac" if he/she would "cover the closings [closing arguments] as well;" and even answered a factual question from a third poster regarding where on the Danziger Bridge the Bartholomew family was shot.  Thus, when the totality of known dialogue between Dobinski as "Dipsos," "123ac" and "crawdaddy"[77] (among others), along with Perricone's posts regarding this case, is considered,[78] Dobinski's defensive assertion that, for her own edification, she was merely seeking information otherwise unavailable from the prosecution team, the EDLA USAO, or even all regular media outlets,[79] simply does not stand up to scrutiny.

In short, it is difficult to accept the story that an experienced trial attorney in the Criminal Section of the DOJ's Civil Rights Division, sitting in Washington, D.C. during this trial, with privity of knowledge of Bowen's compelled testimony, and charged with ensuring "that the officers'

---

[77]    The identities of "123ac" and "crawdaddy" are not known to the Court, and except for providing the "Dipsos" posts, neither is mentioned at all (nor are their relevant posted comments reproduced) in any of the Horn Reports.  Nonetheless, their identities are not material to the Court's disposition in this Order.  Their selection by Dobinski for approbation and encouragement **is** of significance, given what they posted before and in response to Dobinski's expressions of support.  Not all of their posts are included here; only those material to this issue, both in time and content, are provided.

[78]    The totality of these posts, are set forth chronologically in section VI. C., *infra*.

[79]    Also inconsistent with her stated purpose is her consistent use of plural/collective terms: "keep letting **us** know . . .", "give **us** more real information . . .", "let **the rest of us** know . . ."

[constitutional] rights under *Garrity* and *Kastigar* are protected," would embark upon such a wanton reckless course of action, involving herself with two highly-opinionated trial observers, simply to obtain "a good flow of information back about the trial events." Less than 65 days before the start of this trial, Dobinski took the stand to explain in detail all of her extensive efforts to protect defendant Bowen's constitutional rights; yet before the jury even got the case for decision, she *personally* fanned the flames of those burning to see him convicted. Such gravely poor judgment surely calls into question the careful and meticulous effort she claims she exerted in protecting Bowen's rights. Moreover, such conduct significantly undercuts the government's original position that Perricone was a solitary government rogue[80] in his posting activity about DOJ prosecutions, and substantially supports defendants' argument to the contrary.

## C.   An On-Line 21st Century "Carnival Atmosphere"[81]

With the additional activity of "Dipsos," and her two selected posters "covering" the trial, the chronological relevant anonymous posting activity by or related to the government,[82] at least currently known to the Court, is as follows:[83]

---

[80]     In its original June 2012 Memorandum in Opposition to this motion, the government states, "the defendants attempt to cloak the entire Department of Justice with any alleged misconduct attributed to former-AUSA Perricone." (Rec. Doc. 1007, p. 27.)

[81]     *See Sheppard,* 384 U.S. at 358.

[82]     At the current time, the posts of First AUSA Mann as "eweman" appear to have begun in November 2011, after the completion of trial herein. As stated previously, however, the Court is now aware that First AUSA Mann did indeed have a prior user name, which she used on Nola.com, approximately one year before her first "eweman" post, and six months before this trial commenced. Although she now cannot recall that user ID, she assures that those posts "did not relate to DOJ matters"; she admitted under oath on November 15, 2012 that some of those posts may have been directed toward Louisiana Attorney General Buddy Caldwell.

[83]     The following posts are quoted as they appeared online, with the same spelling, punctuation, spacing, etc. The boldface and italic type, however, are emphasis added.

On February 20, 2010 (only four days before the Lohman plea), at 8:23 a.m., under an article concerning the grand jury's investigation of this matter, Senior Litigation Counsel Perricone, as "legacyusa," posted:

> [Kaufman defense attorney Steve] **London just hung his client.** Dumbutt statements. My God, anyone who knows anything about Federal investigations know that invitations to the Grand Jury are perfunctory. They must invite targets,London, lest your client take the stand at trial and cry. " they didn't give me a chance to explain." Dumb London, very Dumb.

(Kaufman Memorandum in Support, Rec. Doc. 963-21, Exh. 20, p. 40.) On February 23, 2010, the article prematurely announcing NOPD Lieutenant Michael Lohman's plea in possible violation of Rule 6(e) was first posted on the Nola.com webpage. Only nine and a half minutes after the original story was posted, at 6:17:30 p.m., Perricone provided advice and warning to those under investigation, including the defendants herein:

> **Despite defense attorneys protestations to the contrary, It would be prudent for those involve to consider the track record of the US Attorney's Office.** Letten's people are not to be trifled with.

(legacyusa, Kaufman Memorandum in Support, Rec. Doc. 963-21, Exh. 20, p. 42.) Later that very evening (February 23, 2010), at 10:44 p.m. (on the eve of Lohman's guilty plea, and over four months before the grand jury returned the indictment in this case), Perricone addressed then-Sergeant Kaufman by name:

> The cover up is always worse than the crime.  **Archie** [Kaufman, London's client]**, your time is up.**

(legacyusa, Kaufman Memorandum in Support, Rec. Doc. 963-21, Exh. 20, p. 41.) Two days later, on February 26, 2010 at 7:04 a.m., Perricone added:

> I am afraid that the NOPD has inoperable cancer. It must be completely and comprehensively rebuilt, including a culturing change which will kill the current patient. But that is good. For too long, way too long, the NOPD has enjoyed an insular existence, separated from reality and control. The current events are revelatory, but not curative. The government MUST step in and take over this agency now. We can not allow this police department to exist in the world it now exist. It must be stopped and stopped now. Too many officers' loyalty and devotion to duty is not to the citizens but to themselves and their own self-interest. **Indeed, the fish has rotten from the head down.**

(legacyusa, Kaufman Memorandum in Support, Rec. Doc. 963-21, Exh. 20, p. 43.)

On May 20, 2010, at 9:27 p.m. (updated at 10:16 p.m.), almost two months before the grand jury returned its indictment, an article entitled "New Orleans Police Officer Resigns, May Enter Plea In Danziger Bridge Case," concerning cooperating defendant/government witness Ignatius Hills, was posted on the Nola.com website. At 10:41 p.m., only 75 minutes later, Perricone/legacyusa encouraged defendants to plead guilty, posting:

> The Feds never forget.....**this officer is doing the right thing....wish the others would**, then IT would be over.

(Kaufman Memorandum in Support, Rec. Doc. 963-21, Exh. 20, p. 86.)

On August 13, 2010, under an article concerning the attorneys representing the defendants in the case of *United States v. Warren,* No. 10-154 (commonly referred to as "the *Glover* case," also involving post-Katrina police misconduct), Perricone/legacyusa commented negatively on the attorneys representing those five NOPD officers:

> These cops are being led down the road to perdition by their attorney. They need to get competent INDEPENDENT representation and stop dining on a diet of cop-cooked soup of self-justification served to them on paper plates by attorney who just wants to mug for the cameras. I hope the judge can keep this under control. Something's not right here---can't put my finger on it---but somethings not right.

67

(Kaufman Memorandum in Support, Rec. Doc. 963-21, Exh. 20, p. 98.)  Then, on November 19,

2010, at 7:49 a.m., during the *Glover* trial, legacyusa/Perricone offered:

> Let me see if I understand this: The cops, throught their attorneys,
> admitted that they shot Glover and then burned the body in a car that
> belonged to another man, who was not arrested for
> anything...RIGHT??? **Guilty!!  Now, let's get on to Danzinger.**

(Kaufman Memorandum in Support, Rec. Doc. 963-21, Exh. 20, p. 110.)  As the *Glover* trial

progressed, Perricone/legacyusa, on December 3, 2010, at 6:53 a.m., attacked NOPD yet again:

> This case, no matter how it turns out, has revealed the NOPD to be a collection of
> self-centered, self-interested, self-promoting, insular, arrogant, overweening,
> prevaricating, libidinous fools and that the entire agency should be re-engineered
> from the bottom up.  This case has ripped the veil of respectibilty away from the
> police department. The facts, as reported here--and if they are correct--shows a group
> of people who, when not having sex with each other, or beating, burning and abusing
> the citizens.  Thank God for the Feds---can you imagine New Orleans without a
> Federal presence?

(Kaufman Memorandum in Support, Rec. Doc. 963-21, Exh. 20, p. 113.)  On December 12, 2010,

at 10:34 a.m. (six months before this trial), after the split verdict in the *Glover* trial,

Perricone/legacyusa previewed, criticized and debunked the defense he expected from Bowen,

Gisevius, Villavaso, Faulcon, Kaufman and Dugue:

> **There is no Katrina defense.**  The jury responded in the Warren
> [*Glover*] matter, not by the stress of Katrina, but by split-second
> decision of Warren to what he percieved was a threat. The writers of
> this article don't understand that; I thought the lawyers quoted herein
> would, but they don't. **Danzinger is totally different. I am sure the
> attorneys will proffer this defense, but it will fail.**  The facts and
> circumstances are totally different.  What was in Mr. Warren's sight
> picture and mind, was totally different in what was in the minds of the
> **gang of thugs (NOPD) on the bridge** that day.  They bailed out the
> rental truck, guns ablazing. Officer Hunter, recently sentence, shot in
> the air. (??????)  WTF!! The others should have done the same, but
> they, like their brothers in Algiers, thought they were the law and no
> one would ever question them.  WRONG!!

(Kaufman Memorandum in Support, Rec. Doc. 963-21, Exh. 20, pp. 115-116.) On June 22, 2011, promptly at 8:30 a.m., this Court and counsel began jury selection herein. Only ten minutes before Court was called to order, at 8:19 a.m., Perricone/legacyusa posted criticism of the defendants:

> **NONE of these guys should had have ever been given a badge.** We should research how they got on the police department, who trained them, who supervised them and why were they ever been promoted. **You put crap in--you get crap out!!!**

(Kaufman Memorandum in Support, Rec. Doc. 963-21, Exh. 20, p. 169.) On Wednesday, July 13, 2011, 11:45 a.m., as the prosecution put on its case, "crawdaddy" wrote:

> **These cops are murders, throw them all in angola w/ the prison population the max time allowed by law and then some. These cops are guity( even Ray Charles can see this)** but the defense keep trying to poke giant holes in their testimonies. I have sit in on 50% of the trial and the **testimonies for the feds are very very convincing. Defense attorneys are so confused that they have the whole court room shaking their heads in this belief with their stupid cross examination.** I know their job is to create reasonable doubt but they are not during it from my stand point. **It is very dishearthing to listen to this BS. Stop the trial, Guity! Guity! Guity!.** I pray for the victims and their families. May God bless them!

On Thursday, July 14, 2011, 12:15 p.m., "crawdaddy" added:

> agnes powell, spot on. I was there and u are exactly correct. The expert did his job base on what was given to him to give an opinion. **These thugs should get the death penalty. They all should die.**

On Saturday, July 23, 2011, 2:10 p.m., "123ac" weighed in with a strangely familiar critical analysis

of NOPD, and a haunting echo of an old expression:[84]

---

[84]     See Perricone's "legacyusa" and "dramatis personae" posts of February 26, 2010 (pp. 66-67) and later on August 5, 2011 (p. 84), set forth herein. Perricone also used the "Italian proverb" euphemism on several other occasions before and during the investigation of this matter, in addition to during the weeks of trial. (a) campstblue, July 8, 2008, 8:26 a.m., under an article about the suspension of an NOPD officer: **"There is an old Italian proverb: the fish rots from the head down."** (Kaufman Memorandum in Support, Rec. Doc. 963-20), Exh. 19, p. 27; (b) July 17, 2008, 11:47 a.m., in a post describing the NOPD as "crap": **"Fish rot from the head down."** (Kaufman Memorandum in Support, Rec. Doc. 963-20), Exh. 19, p. 31; (c) September 6, 2009, 10:18 a.m., under an article entitled "Federal Probe Digs Deeper Into NOPD's Actions After Hurricane Katrina": "Can you imagine New Orleans without a Federal presence? Corruption would reign! **There is an old Italian expression which applies here...the fish rots from the head down...."** (Kaufman Memorandum in Support, Rec. Doc. 963-20), Exh. 19, p. 146; and (d) Perricone as "legacyusa" posted the following, on February 26, 2010, at 7:04 a.m., under an article concerning the Lohman plea: "We can not allow this police department to exist in the world it now exist. It must be stopped and stopped now. Too many officers' loyalty and devotion to duty is not to the citizens but to themselves and their own self-interest. **Indeed, the fish has rotten from the head down.**" (Kaufman Memorandum in Support, Rec. Doc. 963-21), Exh. 20, p. 43. This phrase is not mentioned in any information provided to the Court by the government, either in the Horn Reports or otherwise.

A search of all posts on Nola.com revealed only four other uses of the euphemism "the fish rots from the head down." Two of particular interest:

(1)  Under an article entitled "DA Eddie Jordan Resigns" published on Tuesday, October 30, 2007, discussing Orleans Parish District Attorney Eddie Jordan's resignation and subsequent attempts to replace him, along with his relationship with the U.S. Attorney's Office and the troubling crime rate in the City of New Orleans at the time, **"swordoftruth"** posted the following on Wednesday, October 31, 2007, at 11:31:57 p.m., attacking NOPD Superintendents Eddie Compass and Warren Riley, along with Mayor Ray Nagin:

> The crime rate with its attendant murders will continue to increase until a real police superintendent is found to run the department. You can keep giving pay raises and overtime, but the murder rate will continue because the police department does not have a true leader at the helm. The reforms of the Pennington years were trashed by Compass and Riley, and the murder rates will continue to rise. Impeach C Ra(z)y Nagin and save the soul of New Orleans. **As the saying goes "The fish stinks from the head"**, and the fish has continued to rot under fence sitting Nagin who can only decide on what suit to wear, and what area of Dallas to buy his retirement home.

(2)  On Saturday, August 8, 2009, an opinion column entitled "New Orleans Police Monitor Choice Looks Like A Set-Up", a person donning the user ID **"uptownman123"** posted:

A good article about a bad problem. Whatever shred of creditability this office had when

> **Someone once told me that "when the fish rots, it rots from the head."** The involvement of supervisors in the cover-ups of the Glover and Danziger Bridge travesties says to me that 1) the corruption is deeply-rooted and goes up the chain. 2) The fact that higher-ups helped cover-up says that's the way they came up in the department and so they train new members to lie, cover-up, look the other way, and if you get caught, retire as soon as possible sit back and collect a big pension.

> It also says to me 3) that the NOPD has gotten away with these cover-ups before, which is why they kept doing it. The same names keep popping up - Kaufman, Dugue, DeFillo in case after case. I shudder to think of what other citizens have been murdered, falsely charged, or battered--only to have truth crushed to the ground. It's beyond the NOPD, however, since neither the PIB nor the local DA's office brought these crimes to light. It took the Justice Dep't to step in and uncover this filth.

On July 25, 2011, at 11:32 a.m., as the defense case was underway, Perricone/dramatis personae took

a critical shot at the trial testimony of defense witness Warren Riley, former NOPD Superintendent:

> **He can't remember which deputy chief he instructed to conduct investigations of police shootings????** Thank God he's not chief anymore. Looks like he's reached his capacity for competence at Southern [University].

(Kaufman Memorandum in Support, Rec. Doc. 963-22, Exh. 21, p. 3.)

**– WEDNESDAY, JULY 27, 2011:**

Defendant Robert Faulcon was the only defendant to testify at trial, and he did so on Wednesday,

July 27, 2011. That evening, at 7:43 p.m., "123ac" continued with what "Dipsos"/Dobinski would

later call "real information from the trial", by attacking the media coverage in addition to the defense:

---

Cerasoli left is now gone. It is a shame that the leadership of this office cannot see the damage that has been done with the purchase of brand new and expensive cars and now this hiring setup. **There is an old expression that a fish rots from the head,** and this situation with the police monitor smells badly. Clearly, a lack of good judgment is lacking with this hiring process.

I also find it troubling that the ethics review board's representative decided to vote for Mr. Nealy while at the same time admitting that the process was not right. It is ashame this person did not have the courage to stand up for what is right. Isn't that what the ethics review board is suppose to do?

this is my first opportunity to actually sit in on a trial and it's amazing to me how the news coverage is reported. TV news reporters said this p.m. that Faulcon's testimony helped both sides -- I didn't see that at all. He insisted that he saw 2 civilians with guns, but 1) no such guns were recovered and 2) the only gun that was recovered was planted by the police. He also testified that he never saw either Madison brother with a gun, fire a gun, or aim a gun. He testified that he shot Ronald Madison in the back, but never id'd himself as police or warned him to stop, raise his hands, etc. He said he knew police rules for shooting, but called them "textbook" rules -- in the field, they didn't follow these rules. Some other courtroom attendees defined this as a "rogue cop." He said he fired at the Bartholemews and the others because when he jumped out of the truck, another officer was firing in their direction and he "assumed"

that he was returning fire. He didn't get out of the truck and assess the situation -- he jumped out and started firing in the direction other cops were firing in. He said he shot Mr. Madison in the back b/c he "knew his brother was waiting around the corner to ambush him". Wonder how he "knew" this? Ronald was running, turned around and looked at him, ran some more, turned around again to look at him, ran some more and turned around a 3rd time. Faulcon had all this time to identify himself and warn Madison, but he did neither. Ronald was not warned, Faulcon didn't see any weapon, and Ronald was running away -- no perceived threat at all. Yet, Faulcon shot him ... in the back. I don't see how the defense was helped by any of his testimony as the media reported.

In a separate post, at 7:59 p.m., "123ac" provided some legal analysis, and again turned his/her

attention to news reports that were not pro-prosecution, and criticized more zealously:

WWL news just did it again -- they half-reported the news. News anchor said NOPD Officer Haynes told the federal grand jury he saw civilians shooting at the police. What Haynes actually told the federal grand jury was that 1) he did not see civilians with guns, 2) he did not see civilians firing at police and that 3) he lied when he told the local grand jury that he saw civilians with guns shooting at police. He told the federal GJ that he lied to the local GJ to cover for the cops. The media inaccurately reported news during the storm and continue to do so. They're a big part of the problem. The question is why? I thought journalists had an ethical duty to verify and fact-check before reporting. Sloppy, pitiful reporting!

At 8:24 p.m., "123ac" responded to other comments:

He [Faulcon] admitted on the stand today that he killed Ronald Masison.

In a separate post, at 8:36 p.m., "123ac" reported and explained his/her interpretation of the evidence:

72

Madison had no gun; the police were HEAVILY armed. Madison shot no one; the police killed 2 and shot 5 others -- all unarmed. Madison had no training on when to shoot; the police had weeks of police academy. Madison didn't lie on the police; they lied on him. Madison didn't invent "fake" witnesses or plant guns; the police did. The police panicked when they THOUGHT they had guns pointed at them; Madison panicked because he KNEW he had guns pointed at him.

Shortly thereafter, at 9:21 p.m., "123ac" again attacked the defense:

If Youngman existed, the defense would call him b/c police reports said he witnessed the shooting and saw people shooting at the police. He supports their story -- which is why the police invented him. If this "fake" witness existed, he would have been the defense's first witness.

Later that evening at 9:31:54 p.m. (approximately four hours later), "Dipsos"/Dobinski chummed

the Nola.com waters by encouraging "123ac," with approval:

> 123ac, please keep letting us know what you observe
> in the courtroom. **Many people appreciate it!**

And again, twenty minutes later at 9:51:34 p.m., "Dipsos" reiterated:

> 123ac, please keep letting us know what you observe
> in the courtroom. Many people appreciate it!

Soon (at 10:23 p.m.), "crawdaddy" seconded the criticism leveled at WWL by 123ac and bashed the

defense:

123ac is exactly right, the news media is not accurate at all. I was in the courtroom today and we must not be watching the same trial. 123ac put it where the goats can get it, per the black eagle (Joe Madison of satellite radio). I am going to be brief because he's done. He said that"s textbook rules if you use deadly force when you not suppose to. He is a rogue cop. How can you shoot a human being in the back and say you perceive that your life is in danger? Textbook says that you suppose to holler "Police, Stop, Show Me Your Hands"! I can go on and on about this cop but I do not understand how the news media can report these half-truth. The defense was not help at all. There is rumors that the other four defendants got to testify now to plug up the holes that Mr Faulcon created. **Stick a fork in him, he's done! ! 123ac, keep up the good work.**

**– THURSDAY, JULY 28, 2011:**

The next morning, at 8:16 a.m., Perricone/dramatis personae could not resist posting another of his

opinions publicly, taunted defendant Faulcon, and urged the jury to reject his testimony:

> **Where is Madison's gun?  Come on officer, tell us.** You shot
> because you wanted be part of something, you thought, was bigger
> than you.  You let your ego control your emotions.  You wanted to be
> viewed as a big man among the other officers.  **That's the creed of
> the NOPD and I hope the jury ignores your lame explanation and
> renders justice for Mr. Madison.  To do less, is to sanction any
> cop who decides it is in his best interest to put a load of buckshot
> in the back of a disabled american in broad daylight.**

(Kaufman Memorandum in Support, Rec. Doc. 963-22, Exh. 21, pp. 5-6.)   That afternoon,

"crawdaddy" continued:

> I would run too if no one holler police stop show me your hands.  No one ever found
> a gun the civilians had.  The only gun found was a "ham sandwich".  These cops
> came out of the truck firing their weapons to kill anyone in sight.

At 5:48 p.m., Perricone/dramatis personae persisted in his long-enduring campaign against defense

counsel:

> **Always a loser.** [*commenting on Kaufman's attorney, Stephen
> London*].

(Kaufman Memorandum in Support, Rec. Doc. 963-22, Exh. 21, p. 6.)   That afternoon at 6:38 p.m.,

"crawdaddy" took on an important defense witness:

> It doesn't matter what [defense witness] Nurse Issemann heard Jose Holmes say in
> his hospital bed after being severely wounded by police or what she thinks she heard
> him say; bottom line, THERE WERE NO GUNS FOUND IN AREA OF THE
> DEAD OR WOUNDED CITIZENS!!!  If there had been guns in the vicinity, this
> trial would not be happening.  Sgt. Kaufmann would not have had to pull out his
> "ham sandwich", no falsifying police reports, no guilty pleas, etc.  I believe a nurse's
> duty is to care for the sick and injured.  This nurse/modern day Sherlock Holmes
> should stick to her job.  Seems like she was working with these crooked cops.

And at the same time, as the evidentiary portion of the trial was nearing its conclusion, "123ac," at

7:13 p.m., continued his/her keen pro-prosecution analysis of the evidence:

> The transcript[85] of the 1st cop's grand jury testimony didn't help the defense at all --
> his story just didn't add up.  He said Lance Madison confessed that a group of people
> below him on the bridge was shooting up at him and his brother and that they fired
> back at them.  Then the police pulled up at the very bottom of the bridge and were
> fired upon.  If this were true, the group firing at the Madisons would have been
> nearest the police and directly in the line of fire -- surely, anyone shooting at the
> police would have been

> killed.  The Bartholomews were nearly all killed.  His story made no sense - first,
> where were the guns?  Then, there's no evidence that the police were fired upon.
> Third, if that's what Lance Madison said, why were charges against him dropped?
> Plus he said he never told anyone about Lance Madison's supposed confession.  Even
> after his buddies were indicted, he still never told any supervisors about the supposed
> confession.  He said he told "lots and lots" of other people, but when asked to name
> one -- just one, he couldn't.  Just another version of the NOPD's untrue story.  This
> transcript didn't help the defense at all -- it more likely helped the prosecution.  Many
> of us who heard the entire transcript wondered why the defense presented it.

That evening, at 8:44:47 p.m., "Dipsos" again further encouraged "123ac" and "crawdaddy", among

others, to continue their vituperative posts, to help not just her, but "the public," and even provided

a factual answer to the question of another poster ("willyouplease"):

> *123ac, thanks so much - you and crawdaddy and*
> *anyone else able to attend do help the public[86] to get*
> *a better understanding of what happened in court.*
> *willyouplease, to answer your question - the portion*
> *of the bridge where the family was shot is over land.*

---

[85]     The transcript referenced is one read at the trial, in light of the witness' refusal to appear live.
See pp. 106-07, 119-20.

[86]     This phrase -- "help the public" -- again belies Dobinski's later explanation in the
Supplemental Horn Report that she was merely personally attempting to find out more about the trial.

**– FRIDAY, JULY 29, 2011:**

At 10:50:14 a.m. (during work day hours), "Dipsos"/Dobinski urged even more posts from "123ac,"

"crawdaddy" and others:

> *hey 123ac, crawdaddy, speaking truthfully[87] --*
> *whoever else is attending - please post what you see*
> *in court!*

Demonstrating some insight into criminal law (particularly the Fifth Amendment), a peculiarly

specific and esoteric recollection of a recent prosecution in EDLA, and a persistent attempt to

discredit the defense, 123ac responded, on July 29, 2011, at 10:57 a.m.

> Catfish2 asks why the 3 unindicted NOPD officers' transcripts were
> read into evidence vs their being present to testify personally. The
> only reason a person's sworn testimony at a previous hearing is read
> vs their being present is that, for some reason, they CAN'T be present
> -- serious illness (like a Jefferson niece in the 2nd Gill Pratt trial),
> they're dead, etc., or they've pled the 5th Amendment to avoid
> incriminating themselves. Since these 3 officers don't fit into the first
> 2 categories and since 1 of the 3 actually admitted in his transcript at
> the fed'l grand jury that he lied at the 1st GJ, the most likely reason is
> that Heather Gore and the other officer knew if they gave the same
> testimony, they'd be opening themselves up to a possible perjury
> charge. Their GJ transcripts were FULL of lies -- many of which
> were obvious, and they wisely took the Fifth, rather than repeat or try
> to defend their earlier lives.

Soon thereafter, at 11:36 a.m., 123ac provided a lawyer-like outline of rebuttal witness Lakeisha

Smith's testimony, and proclaimed defendant Kaufman's guilt:

> Will the REAL Lakeisha Smith please stand up? Today she did --in
> the flesh, and said 1) she never lived 3 blocks of the Friendly Inn, 2)
> she wasn't in NO the day of the shooting because she evacuated to
> Miss days before the storm and never returned to NO, 3) she was in

---

[87]     That day, "SpeakingTruthfully" responded, suggesting where Dobinski could find "a good
flow of information": "Hey Dipsos, I'm sorry...I haven't been attending, I was following a couple of reporters
from WWL & WVUE on Twitter. They were much more detailed than what we were getting here."

Miss the day of the shooting, 4) she never gave NOPD a statement, 5) no NOPD officer ever asked her for a statement, 5) she didn't move to Texas to live with a sister because she doesn't have a sister, and 6) none of the defense attorneys tried to find her to ask her to testify at the trial. Kaufmann's attorney didn't cross-examine her, or any other defense attorney. You could call her the nail in Kaufmann's coffin.

Less than an hour later, at 12:26 p.m., 123ac provided further insightful legal analysis of defense witness Heather Gore's testimony by transcript, another lesson on witness unavailability and praise for the government's rebuttal case. Interestingly, 123ac also took the opportunity to make a full-throated attack on the NOPD generally, and again referenced the two specific occasions (during the trial of *U.S. v. Gill Pratt*) where witnesses were not available:

Rebuttal witnesses! Wow! All of us should find some time to exercise our civic right to sit in on trials, whether we're retired, unemployed, off on stay-cation, or what. 8th grade civics classes should sit in -- it's real life civics. The last rebuttal witness was a La State trooper who showed up on the bridge to assist the NOPD. He arrived after all the shooting and said they were only asked to help locate one fleeing suspect armed with a handgun-- not 2, like Heather Gore told the local grand jury; not armed with long guns, like the 2 men Heather Gore said she saw. Officer Gore also swore to the grand jury that the 2 men got aware and that a couple at the Friendly Inn told her where they fled -- she never told anyone else this, but that's what she said she saw. So when the state trooper said NOPD asked them to look for only 1 suspect who was actually captured (Lance Madison), he just blew Officer Gore's sworn testimony to bits.

We were never told why Officer Gore and the other officers whose GJ transcripts were read into evidence didn't appear at trial, but I think now we know. Sworn testimonhy is only read into evidence when the person in unavailable to appear personally -- due to illness (like the Jefferson niece in the Gill Pratt trial),

death (Mose Jefferson[88]), or some other similar reason.  if it's one of these reasons, their absence is explained, like it was in the Gill Pratt trial.   None of these reasons apply to these 3 officers and their absence wasn't explained.  One officer admitted tom the fed'l GJ that he lied under oath to the local GJ -- the other 2 didn't.  Based on the state trooper's testimony today, we know Gore lied under oath about seeing 2 black males pointing long guns at the police, that they got away, and that 2 witnesses saw them fleeing.  It's not rocket science to conclude that these 3 NOPD officers didn't testify because they'd be committing perjury if they did.  Also explains why the Feds didn't subpoena them -- no one can be made to testify if it would incriminate them.  They took "the Fifth."

NOPD lying under oath -- not one, but more than we can count. Falsely charging innocent people.  Planting guns.  Putting lies in victims' mouths.   Inventing witnesses -- all with the help of supervisors. And to cover up killing innocent, unarmed victims who posed no threat.  The tentacles of corruption go very deep in the NOPD.  They know the law and are sworn to uphold the law and then this!  Wow!

That afternoon, at 2:25:46 p.m.(again, during normal work day hours), begging for even more posts,

"Dipsos" encouraged "123ac" to "cover the closings" after requesting that "123ac" post "more real

information":

> *123ac - thanks so much for the details in courtroom -- reach back in your memory and give **us** more real information from the trial... much appreciated!! will you cover the closings as well???? **we hope so!**[89]*

At 9:08 p.m., "crawdaddy" commented:

---

[88]    Perricone was a signatory for the government on the indictment of Mose Jefferson, and served on the prosecution team at Jefferson's trial. *See United States v. Mose Jefferson*, No. 08-85.  Mose Jefferson was also a co-defendant in the matter of *United States v. Renee Gill Pratt*, No. 08-140, however, Perricone was not on the trial team in the *Gill Pratt* matter.

[89]    It is significant that the plural "us" and "we" are used, and that perhaps others in addition to Karla Dobinski were "hoping" for further "coverage" from 123ac.

31eeeth, I agree, [defense witness/NOPD officer] Gore should be fire or made to resign & charged with perjury.[90]

## – SATURDAY, JULY 30, 2011 and SUNDAY, JULY 31, 2011:

In the wee hours of the morning, at 1:02:12 a.m., "Dipsos" returned to Nola.com to aid and abet

further posting by her two favorite posters, in addition to all others (which obviously would include

Perricone masking as "dramatis personae") as "a valuable public service":

> *crawdaddy, 123ac, all of you - get to court early on Wednesday and then let **the rest of us**[91] know as much as you can remember about the closing arguments - what was said, what your impressions are..... and if you have any more recollections of events during the trial please add them to the comments.   **You are performing a valuable public service!**[92]*

---

[90]      Through her attorney, NOPD Officer Heather Gore declined to testify.  Her grand jury transcript was read.

[91]      Again, the use of the term "the rest of us" is significant.

[92]      It is clear that the "valuable public service" of posting opinions on Nola.com to sway public opinion was fully appreciated by Perricone too.  Just over three years prior, Perricone/campstblue, on July 18, 2008, 1:19 p.m., also praised online Nola.com "citizen involvement" in his attacks on the NOPD:

Hey folks, **we on this blog accomplish something** which I haven't seen in my 57 years of life in this state---**citizen involvement in government-extra-electorally.**  By that I mean when the greedy legislators attempt to give themselves a 300% raise, we stopped it.  **That's right WE did it.  Everyone on this blog should be proud of themselves and their fellow bloggers.**

But now we face a different challenge.  **The NOPD has historically been corrupt, at worst, and mismanaged at best.  It does not respond (double entendre) to the needs of its citizens on a daily basis.  Worst yet, we have rogue cops who are just on the job for their own benefit--financial and power.**

The city is horribly mismanaged and has been for years because we have tolerated it for so long.  We expect it therefore we tolerate it.  **It's a vicious circle we must stop.**  We can't rely on the politicians anymore.  They are useless.

Therefore, we must DEMAND the resignation of Riley NOW!  We must march if he doesn't.  Then demand the city (mayor and council) to search for someone who will LEAD the Department out of the morass it is in now, and has been for years.  **We can do it.  Only we can do it.**

Later that morning, on July 30, 2011, at 8:44 a.m., Perricone/dramatis personae obliged the request

of "Dipsos" by predicting Kaufman's conviction with another taunt:

> **Bye- Bye Archie** [Kaufman]....

(Kaufman Memorandum in Support, Rec. Doc. 963-22, Exh. 21, p. 9.)  At 11:19 a.m., "crawdaddy"

responded:

> sit in on the trial daily. Lehrmann testified that Kaufmann said he needed a witness.
> Lehrmann said, "How about Lakeisha." Kaufmann included Lakeisha in his report.
> My theory is that Lehrmann pulled "Lakeisha" from their database and looked for any
> Lakeisha living near the Friendly Inn motel.  Well, they located a Lakeisha Smith
> whose address was less than a half mile from the motel; never contacted nor
> interviewed her.  Kaufmann described Lakeisha as a well-dressed, good looking
> black woman who possibly coulld have been a stripper.  Said Lakeisha witnessed
> Ronald Madison reach into his waistband, turn toward police when Faulcon shot him.
> She waded in waist-deep water over to Kaufman at the foot of the bridge to report
> what she had witnessed to Kaufman. Really?  First of all:  Who was well-dressed
> after being stuck in the city w/o food and water 3 to 4 days after Katrina?  Well,
> according to Kaufman, Lakeisha was.  I guess he threw in the stripper part for good
> measure.  Well, the Government located Lakeisha Smith who lived near the Friendly
> Inn as a rebuttal witness and called her to the stand today.  She testified that she
> evacuated to Mississippi a couple of days before Katrina hit and was NOT in No.O.
> 9/4/05 when this massacre occurred.  Her mother also testified and supported her
> daughter's testimony.  Lakeisha testified she was never interviewed by Kaufman as
> indicated in the report he wrote. The Gov. also called a state trooper on rebuttal who
> arrived on the scene after the shooting.  NOPD told him to help look for a lone
> gunman who ran into the Friendly Inn Motel.  He said a helicopter was called to
> circle the motel with a sharp shooter (allegedly Lance Madison).   This is
> unbelievable.  Did this really happen in America?  How do these people sleep at
> night?  What these two families have gone through is unconscionable.

"Crawdaddy" revised, at 11:31 a.m.:

> typo, s/b "I sit in on the trial daily"; Also the sentence that says "NOPD told him to
> help look for a lone gunman who ran into the Friendly Inn Motel", should say,
> "NOPD told him to help look for a lone gunman who ran into the Friendly Inn Motel
> (allegedly Lance Madison)".

---

Kaufman Memorandum in Support, Rec. Doc. 963-20), Exh. 19, p. 32.

In a separate post, at 6:29 p.m., "crawdaddy" focused on defendant Villavaso, proactively proclaiming his guilt over any notion of reasonable doubt:

> Lets clear up this notion that several of you bloggers said that officer Anthony Villavaso maybe the only one acquitted. Lets look at the facts. The forensic pathologists testified that Mr James Brissett was struck by six projectiles that killed him. Some of the casing & bullets(taken from Brissett's body) was fired by a AK-47 said the experts.[93]
>
> Villavaso carried a AK-47 & he was seen spraying the victims with bullets with a sweeping motion who were trying to hide behide the concrete barrier on the walk-way.
>
> Villavaso called the two black females "them b-----es had guns" on tape which was played at the trial several days ago.
>
> Putting it where the goats can get it, he is as guilty as anyone of the dependants of this terrible massacre. Even Ray Charles can see this.
>
> So those who said that he could be found not guilty, explain to me & the public how did you came to this assumption?

Upon a discussion of the strange coincidence that a person with the same name ("Lakeisha Smith") as that fabricated by Lehrmann and Kaufman actually did reside only a few blocks from the Danziger Bridge, 123ac, at 11:38 p.m., sought to remove any doubt as to the guilt of defendant Kaufman:

> Her looking like a stripper, her wading thru waist-deep water, her being an eye-witness to the shooting, her giving NOPD a statement --all of this is 100% made up. Fabricated. A lie. Ms Smith didn't look like a stripper to me, she didn't wade in the water, she didn't witness the shooting, didn't give a statement, etc.

## – TUESDAY, AUGUST 2, 2011:

At 2:53 a.m., "crawdaddy" demanded guilty verdicts:

---

[93]     At the sentencing hearing on April 4, 2012, the government (prosecutor Bernstein) admitted, in response to the Court's question, that despite extensive expert forensic firearm/ballistic examination and testimony, no bullet or fragment fired on the bridge was traced to defendant Villavaso's weapon. Sentencing Hearing Transcript, Rec. Doc. 885, pp. 116-117.

**These rogue cops should never see the light of day again, never!** These cops see their love ones daily, the victims will never see theirs. **GUILTY AS CHARGED!** GO TO JAIL, GO DIRECTLY TO JAIL!  DO NOT COLLECT ANOTHER PAY CHECK, NEVER!

At 10:27 a.m., as closing arguments began in this matter, Perricone/dramatis personae again focused on NOPD corruption:

> This is a well-reasoned opinion, but it's to facile to leave unremaked. [NOPD Captain] **DeFillo, as someone opined, is and of the corrupt culture of the NOPD.  It's been there for years and will be until the DOJ leashes it to a Consent Decree.**  That being said, DeFillo should not slip away without some penalty or sanction.  His purposeful, dilatory and yes, corrupt silence only embolded those actually involved in Glover case to pursue a pattern of concealment and lies. A federal jury had to untie the conspiratorial knot.  But how did it get to this.  As the DOJ acutely noticed in their letter to the mayor last March, the detail system at the NOPD is at the heart of the corrupt pratices of the police department. Seems to simple, huh? But consider this. DeFillo, by all indications, ran and coordinated a bunch of lucrative details at the NOPD.  These details created alliances and allegiances which don't appear on any orgainizational chart on Broad Street.   These alliances and allegiances, over the years, have made subordinates superiors off-duty, while superiors became subornidates all for the sake of securing details.  Many knew what DeFillo was doing and he knew they knew.  So, when Mr. Glover appeared at the Habans school bleeding his guts out in the back of Mr. Tanner's car, who was the superior?  Who was the subordinate?  Why would DeFillo go after his subordinates,like Wynn for example,  if he,DeFillo, knew that his little game at NOPD HQ would be exposed. Remember the alliances and allegiances -- they survived Katrina-- Mr. Glover didn't.  ps: isn't it curious that the first major scandal to hit Serpas had to do with a paid detail?

(Kaufman Memorandum in Support, Rec. Doc. 963-22, Exh. 21, p. 13.)  At the end of the closing arguments, 3:17 p.m., "crawdaddy" again demanded a guilty verdict:

> Right-no RB, **guilty as charged!**

**– WEDNESDAY, AUGUST 3, 2011:**

At 11:54 a.m., apparently febrile with anticipation, "crawdaddy" repeated:

**Guilty, Guilty, Guilty!** Right on @ xilla 02,keep up the excellant.

On the morning of the first day of the jury's deliberations, Perricone/dramatis personae weighed in,

at 7:06 a.m., and also demanded a guilty verdict:

> I agree with [nola.com poster] Cauane.  The same hurricane that hit Orleans Parish,
> hit Jefferson, St. Bernard, Plaquemine,and St Tammany.  Yet, the only police force
> to use deadly force throughout the city was the venerable NOPD.  Perhpas we would
> be safer if the NOPD would leave next hurricans and let the National Guard assume
> all law enforcement duties.  **GUILTY AS CHARGED.** [caps as published; bold
> added].

(Kaufman Memorandum in Support, Rec. Doc. 963-22, Exh. 21, p. 13.)   At 8:57 a.m., he

(Perricone/dramatis personae) further "explained":

> Agree.  **With all the shots fired on the bridge that day, how many hit an
> ARMED subject?  Listen to the video.**

(Kaufman Memorandum in Support, Rec. Doc. 963-22, Exh. 21, p. 13.)

**– THURSDAY, AUGUST 4, 2011:**

On the next day, the jury's deliberations continued.  At 5:53 p.m., as the second day of deliberations

concluded, Perricone/dramatis personae expressed his expectations of the jury:

> **I don't think the jury will leave the dead and wounded on the bridge.**

(Kaufman Memorandum in Support, Rec. Doc. 963-22, Exh. 21, p. 31.)

**– FRIDAY, AUGUST 5, 2011:**

The jury returned its verdict.  Only hours after the guilty verdicts in this case were rendered,

Perricone/dramatis personae, concerned that praise for the verdicts did not extend to the Eastern

District U.S. Attorney's Office, posted:

> RED, for your edification, if that's possible, [prosecution team member] Theodore
> Carter is an Assistant U.S. Attorney and works for Letten.  DOJ and US Attorney
> staff particpated in the prosecution.  Thought you should know, as you go about
> merrily running your mouth and convincing us you are a fool.

(Kaufman Memorandum in Support, Rec. Doc. 963-22, Exh. 21, pp. 19-20.) A couple of hours later, at 3:09 p.m. that very day, Perricone/dramatis personae directed a threatening post to the subject of another grand jury investigation and indictment, Dominick Fazzio,[94] who happened to then be represented by Kaufman defense attorney Steve London:

> Well, Mr. Fazzio, I hope you have room in your scrap book for your conviction and mug shot.  London didn't too well with Archie Kaufman.  You're next.

(Kaufman Memorandum in Support, Rec. Doc. 963-22, Exh. 21, p. 19.)  At 11 p.m. that evening, Perricone/dramatis personae yet again opined about NOPD with a now familiar refrain:

> **There's an old Italian proverb that goes something like this: the fish rots from the head down.**[95]  And the proverb applies to the New Orleans Police Department. Of all the law enforcement agencies in the metropolitan area the NOPD was the ONLY one to kill people after Katrina--on BOTH sides of the river.  Now, we, as a society, must ask why.
>
> Abiding by the proverb, the only unassailable answer is the paucity of leadership at the NOPD before,during and after Katrina slammed New Orleans.  In fact, I submit there was no leadership and that which existed, was woefully unqualified to occupy those positions.  And as events unfolded, we now see that that was the case.
>
> What a failure [former NOPD Superintendent and predecessor of Warren Riley] Eddie Compass prove to be!  And his underlings were/are no better.
>
> Where was the leadership before Katrina?  Where the officers prepared for adverse conditions?  Where they trained to handle a society shattered by the storm?  Where they reminded and lead to serve a public unders stress?  Where the commanders reminded to watch their men to see if they're were about to bust?  What paradigm did they operate under?  It appears to be Lord of the Flies.

---

[94]     River Birch, Inc. executive Dominick Fazzio was indicted by an EDLA grand jury in June 2011 (around the start of this trial).  On March 12, 2013, all charges against him were suddenly dismissed with prejudice.  The government's motion to dismiss cited only "evidentiary concerns and in the interests of justice."  See *United States v. Fazzio*, No. 11-157, Rec. Doc. 293.

[95]     See 123ac post of July 23, 2011, at 2:10 p.m., and footnote to it, on pp. 70-71.

The NOPD is a failed organization. No one can dispute that. We all can only hope that the ONLY police department in this city has enough bits and pieces left to put a reliable, trustworthy, ethical, and legally efficient agency together--one with the right leadership, even when the weather is bad.

The DOJ can not get here fast enough. Without their help and supervision the NOPD will not be remediated or redeemed.

(Kaufman Memorandum in Support, Rec. Doc. 963-22, Exh. 21, p. 19.) The next morning (August

6, 2011), at 7:32 a.m., Perricone/dramatis personae continued his analysis:

You've made my point--partly. No one was shot at Oakwood. Why only the NOPD? Why? Dig deep for the answers and they will appear. Then again, perhaps the answers are very apparent. The NOPD will not change until the present command structure of that department is either 1) Replaced by qualified personnel, 2) has an ephany that the way they were taught and trained is no longer the way to operate, 3) cease being so damn arrogant and remember the oath of office you took the day you graduated from the police academy, 4) prepare your staff for storms and remind them that they are there to protect the city, while all others abandon their homes and buisniness. Some one has to stand strong and restore law and order, not create chaos.

I am not encouraged by what I see at the higher levels of that department. And as I wrote last night, it will never change if the NOPD is allowed to change itself. It needs outside intervention and NOW.

(Kaufman Memorandum in Support, Rec. Doc. 963-22, Exh. 21, pp. 18-19. And on August 9, 2011,

at 7:59 a.m., Perricone/dramatis personae added:

"Correction: Sunday's column described convicted officer Kenneth Bowen as stomping on the lifeless body of Ronald Madison. In fact, testimony indicated Madison was alive at the time."

..

A distinction devoid of a difference. While I'm sure Mr. Bowen–now inmate Bowen–appreciates the correction, I'm sure Mr. Madison is insentient of the good will of the sentiment.

**The entire weft of the NOPD's culture was on trial in this horrid episode. The DOJ assembled a great team which had institutional support beyond the TP's comprehension. We can only imagine what this city would be like without the DOJ. Some NOPD officers, I would assert, are musing the same thing.**

(Kaufman Memorandum in Support, Rec. Doc. 963-22, Exh. 21, p. 24.)  And less than four hours

later, on August 9, 2011, at 11:43 a.m.:

> **Danzinger is a result of a failed command structure at the NOPD.**  Indeed, not
> long after this event, Chief Compass was ingnomaniously relieved of his command.
> But closer to the point, there was no command structure at the bridge--only rage and
> errant undisciplined fire.  If one cool head had been there, perhaps the police would
> not have fired, people would be alive, and the population of the Federal prison
> system would not be increasing by a factor of five.
>
> Yes, poor or ineffectual police control contributed to Danzinger.   Rage and
> contagious fire caused these officers to abandon their training and resort to base
> instincts.  Something they will regret for the rest of their lives.  Sadly, those who
> could have stopped it, are free to allow it again--God Forbid.

(Kaufman Memorandum in Support, Rec. Doc. 963-22, Exh. 21, pp. 24-25.)  Not yet finished with

Kaufman's defense counsel Steve London, Perricone (now as "Henry L. Mencken1951") posted on

September 21, 2011, at 6:26 a.m.:

> **..and** [London] **does a very poor job of pretending to be an attorney....ask
> Kaufmann.**

(Kaufman Memorandum in Support, Rec. Doc. 963-23, Exh. 22, p. 35.)  And on November 5, 2011,

three whole months after this trial ended, at 8:23 a.m., Perricone/"Henry L. Mencken1951")[96]

persisted:

> **London doesn't know what day it is...ask Archie Kaufman.**  You must be with
> the NOPD.

(Kaufman Memorandum in Support, Rec. Doc. 963-23, Exh. 22, p. 49.)

---

[96]     In assuming various user IDs on Nola.com, Perricone registered them with characteristics
far different than reality in an effort, presumably, to further preserve anonymity. For instance, "campstblue"
was registered on Nola.com as "female attorney who lives in warehouse district who is fedup [sic] with
corruption in this city", and shows a zip code of 70130, which includes the French Quarter, Lower Garden
District, and the Central Business District in downtown New Orleans. Perricone did and does not reside in
the Warehouse District, nor in the 70130 zip code (which happens to be the zip code of the USAO as well
as this Court). Henry L. Mencken1951 described himself, in one of his many posts, as an old retired lawyer
who graduated from law school in 1951, which in reality is the year of Perricone's birth.

**D.    Sworn Testimony of Former First AUSA Jan Mann**

As set forth in the Court's prior Orders, former First AUSA Jan Mann's direct in-court involvement on behalf of the USAO in this matter began with her appearance on June 13, 2012 at the hearing of this motion. Her role ended on November 5, 2012, when the undersigned was advised by former USA Letten that she too had posted on Nola.com.[97] Additional information obtained during the course of Mr. Horn's investigation, such as Jan Mann's testimony discussed herein, substantially increases the Court's concerns that Nola.com posting activity about this case, and others, by government attorneys and personnel, was far more extensive than previously suggested, and even presently known.

Attorneys from OPR took the sworn testimony of former First AUSA Jan Mann on November 15, 2012, less than two weeks after her exposure as "eweman." Her November 15th testimony, particularly in the context of the transcript of her August 8, 2012 interview,[98] also is critical to the Court's ruling today. Jan Mann had "supervisory responsibilities" on a number of cases[99] about which she posted (See Jan Mann November 15, 2012 Transcript, pp. 26, 69, 71 and

---

[97]    Jan Mann testified that, as of March 2012, when Perricone was exposed as "Henry L. Mencken1951," she had posted perhaps ten times in a month, describing it as "no big deal" and "my little downtime thing." (Jan Mann November 15, 2012 Transcript, p. 110.)

[98]    Jan Mann also submitted to an unsworn interview by OPR personnel, which is reflected in the transcript of August 8, 2012, and submitted to an unsworn interview with Mr. Horn and Ms. Alexander, in the telephonic presence of an OIG special agent, on December 21, 2012.

[99]    Perricone, as legacyusa, on August 22, 2009, at 8:43 a.m., described Mann's role:

The lady speaking is Jan Mann, and she is the one who really runs the US Attorneys office. She is a great person and the guys who work for her, love her. You are right the guys should be applauded but they work for a great lady and they respect her. All ouf us in New Orleans should be proud of that office and the men and women who work there.

Similarly, on September 4, 2011, at 10:45 a.m. (one month after this trial ended), Perricone, as

75), and as First Assistant U.S. Attorney, supervised the work of AUSA Ted Carter (and AUSA Julia

Evans, during her involvement), members of the prosecution team in this case. In her November 15,

2012 testimony, Jan Mann related the events surrounding the March 2012 exposure of Perricone as

"Henry L. Mencken1951." She further asserted, quite definitively, that in the days between the filing

of the *Heebe* lawsuit against Perricone, and USA Letten's March 15, 2012 press conference

acknowledging Perricone as "Henry L. Mencken1951," she advised Letten that she, too, had posted

on Nola.com. See Jan Mann November 15, 2012 Transcript, pp. 114, 117, 120-121, 124, 168, 205,

210, 211-213, 216, 229, 235, 239-241, 243-244. She stated, "He didn't have a big reaction" (p. 117,

l. 13), and admitted that, on the occasion she told him, "I was definitely trying to downplay it," and

"I didn't want him to get too upset yet." (*Id.*, pp. 122-123.) She added that the fact of her posting

came up only obliquely on a few occasions between March and November 2012:

> A.      He [Letten] asked me no more questions, but we did discuss it a couple of
> times. He'd say, you know, "These cowardly commenters." And I'd say, "Well, I'm
> not a coward," you know, things like that. "I'm not" -- "you know, I'm not a coward.
> That's not why people do it anonymously," you know.
>
> So I would make references to it, maybe, you know, less than a handful of
> times.
> Q.      When did those occur?
>
> A.      Between March and November, you know.   He'd say, "God, those
> commenters, they're just nothing but graffiti."
>
> And I'd say, "I have nothing against graffiti." You know, things like that like
> -- meaning, obviously, I'm a commenter, you know.

---

HenryL.Mencken1951, commented:

> You are correct about one thing --- the brains of that operation of Poydras [USAO] is Jan
> Mann.  Don't ever underestimate her.  Even Letten listens to her.....

Q.      Well, were they specific statements to Mr. Letten reminding --

A.      Yeah.

Q.      - - him that you had been a poster?

A.      I never said, like, "Let me remind you, I'm one of those posters."  But when he would say, "I just think they're cowards, people who use anonymity are cowards"; and I'd say, "So you think I'm a coward?"  things like that.  I didn't say, "Remember, I told you I'm a commentator."  But I just accepted that he remembered.

(Jan Mann November 15, 2012 Transcript, p. 143, l. 3 - p. 144, l. 9.  See also pp. 207-208, 285-286.)

As to whether others at DOJ were advised of her "eweman" posting activity, Jan Mann responded:

Q.      Did you consider at all your obligation to tell department [DOJ] officials, given the decisions that they needed to make about the removal -- the civil removal or any other recusal issue?

A.      I left that up to Jim [Letten].  And I kind of thought he did.  I kind of thought he did.

Q.      In what way?

A.      Because, first of all, he was talking to them [DOJ personnel] without me, which was a little unusual.  Normally I would be in there.

Q.      Had he told you to leave the office?

A.      No, he never said leave, but like I'd come back in or something, and he'd be on the phone with somebody, I don't know, like a Scott Schools[100] or something.  I don't know who, but different people.  He talked to a bunch of different people.

        So I kind of thought he did.

---

[100]    See p. 30.  Associate Deputy Attorney General Scott N. Schools retired on February 22, 2013.  It is the Court's understanding that, prior to his retirement, he had supervisory responsibilities for the Executive Office for United States Attorneys, the Office of Professional Responsibility, the Office of Attorney Recruitment and Management and the Criminal Section of the Civil Rights Division.  See "Scott Schools, a Power in DOJ Bureaucracy, Is Leaving After Two Decades", by David Stout, *Main Justice*, February 11, 2013.

Q.      Did you ever ask him?

A.      No.

(Jan Mann November 15, 2012 Transcript, p. 140, l. 7 - p. 141, l. 5.)  Even more telling regarding

the possibility of then USA Letten's knowledge, and regarding the possible knowledge of others "up

the chain" at DOJ, is this passage:

Q.      On -- back just a little bit, on March 13th, you had a couple of conversations
        that you said about -- to Mr. Letten concerning your postings?
A.      Yes.  Yes.

Q.      Did you and Mr. Letten have any discussion about whether they should be --
        your postings should be reported up the chain?

A.      No.

Q.      Did you ask him that question?

A.      No.

Q.      Did you ask him whether he thought, like, it should be reported to OPR?

A.      No.

Q.      Did he make any comments to you?

A.      No.  We didn't discuss that.  I probably thought in my mind he probably did
say something, but he didn't tell me any -- again, I know how he is.  He didn't want
to -- he wasn't -- he didn't want to -- me to have done anything wrong, you know.
Not that I think he'd cover for me, because I don't think he'd cover for anybody.

        But I just thought, you know, he's not going to put it back up in my face.  I
thought that was him being nice; he's not going to put it back up in my face.  I
thought he probably said it to somebody, one of the people he was talking to,
probably said, you know, "Jan said she" -- and they all know me.  "Jan said she's
commented a few times, but just on innocuous subjects and things."

        And they probably said, "Well, let's deal with this, and then we'll worry about
that."  That's kind of –

        And then the worrying about that never came.  You know, it was like we were
still -- I kept thinking, if we finally -- and we were almost at the end of it.  We had
a positive ruling from every judge.  You know, it was like they filed four or five

90

different things.  We won, we won, we won, we won.

I thought, when we get to the end, then maybe they're going to deal with anything else, other repercussions, but we never got to that point.

(Jan Mann November 15, 2012 Transcript, p. 168, l. 5 - p. 170, l. 5.)

Former First AUSA Jan Mann drew support for this belief from the fact that DOJ, and specifically OPR, initially did not ask seemingly the obvious question[101] of whether any other USAO personnel commented online [emphasis added]:

Q.      Well, wasn't there a concern that other people in the office were doing the same type of -- **whether there was a concerted activity or not, the damage is very much the same if there's a bunch of independent activity --**

A.      **We weren't going to investigate that.  If somebody thought -- I -- I thought people in Washington decided not to ask that.  When your survey came out and you didn't say, have you ever commented, I thought, they decided they're not going to cross that line.**

I don't know why you didn't ask that.  I thought you were going to ask it in the survey.  I really did.  I said, my jig is going to be up.  I'm going to have to tell her [OPR counsel].

Q.      There was a long time between March 13th and the survey.

A.      And the survey, yeah, August.

Q.      During any of that time, did you consider that you should be telling people, besides Mr. Letten?

A.      No.  No.  I -- I thought DOJ had made a concerted decision, decided, that we can't ask all our employees about this because they have a right to do this.

So then what are you going to say?  Well, only thing we can ask you, if you did it in your personal capacity, but did you ever comment about cases?  What, are they going to get on everybody's computer and search?  I mean, at what point are they going to stop?  I said, they mustn't want to do that.  They must realize that may be just going too far.

---

[101]      See First Supplemental Horn Report, p. 9 (in responding to the Court's question No. 8), discussed *supra* at p. 21; and Part One, Rec. Doc. 1070, p. 34, fn. 30.

(Jan Mann November 15, 2012 Transcript, p. 163, l. 20 - p. 165, l. 6.)[102]  During the course of her

November 2012 testimony, Mann specifically recalled the careful wording of the press release

regarding Perricone's activities in light of her belief that USAO personnel other than Perricone and

herself were similarly posting online:

> A.     -- I kept telling him [USA Letten], "You know there's going to be other
> bloggers probably.  There's going to be other commenters in the office."  I mean, I
> would not ever say there's none.  I don't know.
>
> I don't know to this day if there are, I couldn't tell you who they are, but I
> believe in my heart that there are, you know.  Now that I realize that I did it, Sal did
> it, are we the only two?  Probably not.  Probably in every U.S. Attorney's Office
> there's a handful of people commenting.  I just believe that now, in retrospect.
>
> So I said, "Jim, we can't ever say he's the only one."  So that's why everything
> was crafted the way it was.  That he was -- we stuck to the issue, the lawsuit against
> Sal.  The -- the allegations not in the lawsuit, as you pointed out, but the allegations
> that were coming to us.  Nobody cares whether Sal was commenting.  They --
> everybody is saying that you-all were all doing this as a team, like making it an
> official strategy.
>
> That's what we were defending against.  That's what we were saying to
> Washington.  This is not part of any official work of the office to have a propaganda
> campaign or something like that.  That's what we were saying.  It wasn't that there's
> nobody else blogging.

---

[102]     Regarding the occasion of her August 8, 2012 interview by the same OPR attorneys, Jan
Mann recalled, on November 15, 2012:

> A.     I thought about telling you, but I kept saying, they're going to ask
> me if any -- if I ever blogged, and you never did so. . .
>
> Q.     Well, we asked you about the events of March 13th, right?
>
> A.     I know you did.  Look, I'm not -- I'm not disputing your questions.
> I'm just saying, I had made up my mind that if you asked me if I blogged,
> I was going to tell you, and if you didn't, I wasn't.  That's why I didn't tell
> you.

(Jan Mann November 15, 2012 Transcript, p. 133, l. 1-12.)

When we -- if we said that, it was in terms of together, knowledge of Sal, doing it as a team.  That's what we were trying to say.  That didn't happen.  I was completely comfortable with that, because that was the truth.

(Jan Mann November 15, 2012 Transcript, p. 136, l. 21 - p. 138, l. 9.)

Jan Mann further described two meetings USA Letten held regarding the Perricone situation: one with supervisory personnel, and the other with the all the USAO's staff.  On both occasions, Jan Mann recalls Letten stating:  "if anybody has anything they want to tell me, you know, come see me right after this, because I'm going to, you know, let the public know that this is not some widespread thing, that this was Sal, and we believe it's just Sal."  (Jan Mann November 15, 2012 Transcript, p. 154, l. 18-24.)  Letten advised the staff that he did not want to be "blindsided" and "embarrassed" in having a press conference making such representations, only to find that they were not true.[103] Mann recalled:  "He wasn't ever asking has anybody ever blogged, because we had discussed that. He didn't want to ask people that.  Washington didn't want us to ask that.  It was all about sitting with

---

[103]    On March 21, 2012, about a week after Perricone was unmasked, an unknown Nola.com poster, using the alias "alafbi" – one of the user IDs that was the subject of the DOJ's subpoena (see p. 18 posted the following:

> The only positive is that someone may examine how this USAs office has operated over that past 10 years. It's doubtful that any real investigation will occur. There is no doubt that Sal, Jim Mann and Jim Letten sat round Letten's office laughing at Sal's posts.  If ever interviewed, I would suspect that numerous employees would confirm that not only Sal, but others in that office, routinely post to the TP [Times-Picayune].
> * * *
> There are and have been over the years career prosecutors in that office.  Most have represented the taxpayers well.  Letten and his thugs have abused the office.  The majority of the federal criminal defense attoreys have experience with dealing with the Perricone/Mann/Letten group.  This would bbe a good time to document the abuses of authority they have experienced with Letten's group.
> So far, few have chosen to complain due to retaliation against future clients.  There has been corruption in New Orleans at every level and this is the best opportunity to examine it at the federal level.

The following day, March 22, 2012, one EDLA AUSA emailed the copied comment to another, stating:  "This was posted yesterday by 'alafbi.'  Seems to know a bit, yes?"

Sal and commenting or putting our stamp of approval on Sal's comment." (Jan Mann November 15, 2012 Transcript, p. 157, l. 15-21.) Jan Mann further recalled:

> A.    He was never trying to say to the press, and he never said to the press, and he was careful not to say to the press in the press release, that nobody else was blogging. Because I kept saying, "You can't say that, Jim." And he was like, "Yeah, I can't say that."
>
> We knew we couldn't say that, because we hadn't even asked anybody else if they blogging, and never have to this day unless he's done it since, you know, November 2nd. We couldn't say that. It was what he wanted to be able to say, which is exactly what he said, which is Sal was the blogger, and nobody else was working with him or knew what he was doing. That was it. Because we knew that we couldn't go broader than that. We couldn't.

(Jan Mann November 15, 2012 Transcript, p. 158, l. 12 - p. 159, l. 4.) Jan Mann further stated, "I've never lied to him. I have never lied to him about anything and I never would. And I tell him everything. I tell him everything." (Jan Mann November 15, 2012 Transcript, p. 126, l. 8-11.)

The Court does not have former USA Letten's description of the events of March 13, 2012 and thereafter. Suffice it to say, if it coincides with his First Assistant's recollection, and concealed knowledge of internet posting extending beyond those who have, at least up to this point, admitted their activities, the defendants' suspicions would seem to have been borne out as truth, regardless of whether the posting activity was purposefully orchestrated or not. In the event that former USA Letten were to dispute Jan Mann's testimony, an evidentiary hearing would certainly be in order, at which credibility could be measured in a pitched internecine battle between various prosecutors, both from EDLA and DOJ, as well as other agency personnel. At present, however, the Court does not believe such an exercise necessary or, for that matter, productive. Rather, the Court leaves to the various bar associations and other attorney regulatory bodies the question of who knew what, when they knew it, and whether they discharged ethical and professional responsibilities to report/disclose

it. For purposes of disposing of the defendants' present motion, it is sufficient for the Court to glean from Jan Mann's sworn testimony: (1) USA Letten was, according to his First Assistant, aware of her posting activity in March 2012; (2) the First Assistant USA suspected and believed the USA reported this up to other supervisors at DOJ; (3) the First Assistant USA "believe(d) in her heart" that other AUSA's were likewise posting comments on Nola.com; and (4) the First Assistant USA believes the USA and DOJ purposefully avoided such a portentous inquisition, instead maintaining the denial of an organized "propaganda campaign."

## E.    Pre-Trial and Trial Concerns

The Court's record for this matter reflects that concerns about misconduct, and disregard of legal and ethical obligations, surfaced early in the proceeding. Indeed, on more than one occasion, the Court has expressed that it was "disappointed and troubled" by the government's handling of particular matters herein. Now considered together with the aforementioned government misconduct discussed herein, discovered only after the defendants were convicted, these matters form part of the totality of circumstances convincing the Court that the defendants' motion should be granted.

### 1.    The Government's Pre-Trial Timeline

For instance, on April 18, 2011, the Court held an evidentiary hearing on a motion filed by defendants Gisevius and Villavaso seeking to suppress statements purportedly obtained in violation of the Sixth Amendment. (Rec. Doc. 255.) That motion involved, in part, allegedly improper contact between the FBI and defendant Villavaso the very day after Villavaso and his counsel met with DOJ prosecutor Bobbi Bernstein and FBI Special Agent Bill Bezak wherein all agreed that any further contact with Villavaso would be done through counsel. The Court considered this allegation to be a serious one, and *ex proprio motu* ordered the pre-hearing submission of a detailed timeline

from the government reflecting the chronology of material events relative to this issue. Prior to the hearing, in response to the Court's Order, the government submitted a timeline clearly showing that, in fact, on March 25, 2010, Bernstein and Bezak met with Villavaso's counsel (Mr. Kitchens and Mr. Kearney), and that on the very next day, March 26, 2010, Bezak, with Bernstein's approval,[104] "wired" and sent cooperating defendant Robert Barrios (Villavaso's former NOPD partner) to engage in a taped (unbeknownst to Villavaso) conversation. Further, at the April 18, 2011 hearing, Bezak gave sworn testimony confirming that these events indeed did occur as represented on the government's timeline submitted pre-hearing. (See Transcript of April 18, 2011, Testimony of FBI Agent Bezak, pp. 195, l. 21 – p. 198, l. 10.) Under questioning from prosecutor Bernstein, Bezak testified [emphasis added]:

> Q.   Did someone on the government team then reach out to Robert Kitchens, whose number was on whatever piece of paper he gave you?
>
> A.   Yes.
>
> Q.   One of the next steps was somebody from the government team reached out to them, and **we set up an interview that happened later in March**, correct, at the U.S. Attorney's Office?
>
> A.   That's correct.
>
> Q.   During that conversation, they told us that -- "they" being Mr. Kearney and Mr. Kitchens – they were representing Villavaso, correct?
>
> A.   Correct.
>
> Q.   We already knew that because that's why they were there meeting with us, right?
>
> A.   That's correct.

---

[104]   Transcript of April 18, 2011, Testimony of FBI Agent Bezak, p. 193, l. 10-15 – p. 198, l. 4-10.

Q.     They told us that if we wanted to interview their client, that we should go
       through them, correct?

A.     Correct.

**Q.     We agreed to that?**

**A.     Correct.**

Q.     Have you honored that?

A.     Yes.

Q.     Have you ever reached out to their client since then without -- have you or as
       far as you know has anybody from the government team reached out to their
       client without going through them?

A.     No.

(See Transcript of April 18, 2011, Testimony of FBI agent Bezak, pp. 202, l. 8 – p. 203, l. 10.)

However, to the contrary, Bezak admitted that defendant Barrios was in fact a cooperating defendant

on March 26, 2010, and the FBI had "wired" Barrios before directing him to covertly get a statement

from defendant Villavaso not 24 hours later.  (Transcript of April 18, 2011, Testimony of FBI agent

Bezak, p. 197, l. 8-25.)  Bezak expressed no reservations or hesitation about this chronology.

      The Court, however, was quite concerned about this turn of events, and, as a result, the Court

ordered post-hearing supplemental briefs.  Several days later, prosecutor Bernstein advised the Court

that, in fact, the timeline (as well as her questioning and Bezak's testimony) was in error, and the

taped Barrios-Villavaso conversation actually had occurred approximately ten days *before* the

meeting between Villavaso's counsel, Bernstein, and Bezak, which was held on April 6, 2010, rather

than March 25, 2010, as originally reported.  In its May 20, 2011 Order denying the defendant's

motion (Rec. Doc. 396), the Court strongly expressed its dissatisfaction over such an important error:

Given that the timeline was created only upon the Court's instruction, given well before the April 18th hearing date, counsel knew or should have known that the Court sought confirmation of the timing of relevant events and believed such information to be important. Indeed, the Court devoted a significant amount of preparation time and resources relative to this motion prior to the April 18th hearing, as did the Court and counsel during the course of the hearing, based on the March 25th meeting date reflected in the Government's timeline. Accordingly, given that the actual date of the meeting between the Government and Villavaso's counsel apparently was discernable simply by checking the FBI case agent's and Mr. Kearney's calendars, as well as Ms. Bernstein's archived emails, and the Justice Department's substantial investigatory skill and resources, the Court is disappointed and troubled by the Government's initial sloppiness in preparing a document that the Court ordered in an attempt to facilitate the proper and efficient disposition of the parties' motions.

See Order of May 20, 2011, p. 2, fn. 2. It was then hoped that Bezak's lack of precision and inattention to detail would not foreshadow other difficulties in such a high-stakes prosecution.

## 2.    **FBI Agent Bezak's Explanation of the Credibility of NOPD Witnesses**

Unfortunately, the Court's concerns regarding FBI Special Agent Bezak continued. Specifically, at trial, when pressed on the witness stand to explain material differences between the testimonies of cooperating defendants (and others who were not charged), particularly the divergence of Michael Lohman's testimony from that of other government witnesses, Bezak paused and offered only a very disconcerting characterization of Lieutenant Lohman's testimony: "It's Mike Lohman's truth." (July 21, 2011 Transcript, p. 21, lines 2-14; see also p. 17, line 20 through p. 18, line 9; p. 23, line 22 through p. 24, line 5; and p. 36, line 13 through p. 37, line 6.) Agent Bezak tried to further explain away the materially inconsistent testimony of his cooperating defendants: When then asked, "How many different truths can there be?", Bezak delicately responded, "Every person has their own memory, recollection, interpretation of events." (p. 21, lines 16-17.) As this Court has previously stated, there cannot be individualized "truths", excused as "interpretations" when the witness' testimony is favorable to the prosecution, but threatened with perjury when the

98

"interpretation" is not.

### 3.    Perricone's View of the FBI and the Potential Source of Rule 6(e) Leaks

At this juncture it is worth noting that Perricone himself, who spent a career in law enforcement as a NOPD detective, FBI Special Agent, and then Assistant U.S. Attorney, frequently expressed prior critical opinions of the local FBI generally and the shortcomings he perceived. In addition to his remarks referring to FBI Supervisor Charles McGinty as one who may have leaked information (See Part One, Rec. Doc. 1070, p. 16, fn. 20), Perricone occasionally blasted former Special Agent-in-Charge James Bernazzani.[105]  He also explained, generally:

> As a former FBI agent let me say one thing that should put this debate to sleep. SAC's [special agents in charge] have nothing to do with the investigation or development of cases. Bernazzani was an agent with very little criminal background, if any. . . .

(campstblue, May 4, 2008, 6:29 p.m.)(Kaufman Memorandum in Support, Rec. Doc. 963-20, Exh. 19, p. 15.)

> As someone who has some acquaintance with this process, I can confident inform you mentally encumbered posters herein that Letten's office is in control of all Federal investigations,as is all US Attorneys in the this country. The "investigative" agencies, which the FBI is part of, must go to the the US Attorney's office for authority to act, especiallly if in impacts ANYTHING which will affect the proscution of an individual.  [Reprinted as posted.]

(campstblue, April 25, 2009, 9:50 a.m.)(Kaufman Memorandum in Support, Rec. Doc. 963-20, Exh. 19, p. 101.)

With further regard to the FBI, in his October 10, 2012 testimony, Perricone indicated that he suspected "multiple leakers" of sensitive DOJ information, including grand jury information,

---

[105]    campstblue, May 4, 2008, 6:29 p.m. and 6:32 p.m. (Kaufman Memorandum in Support, Rec. Doc. 963-20), Exh. 19, pp. 15-15; April 18, 2009, 10:46 p.m. (Kaufman Memorandum in Support, Rec. Doc. 963-20), Exh. 19, p. 90; July 18, 2009, 10:59 a.m. and 1:03 p.m. (Kaufman Memorandum in Support, Rec. Doc. 963-20), Exh. 19, p. 142.

sourced at the FBI.  (See October 10, 2012 Testimony of Perricone, p. 89, l. 22 – p. 90, l. 1; p. 93,

l. 15-20), confirming that he "always suspected that the FBI had loose lips . . ." (See October 10,

2012 Testimony of Perricone, p. 94, l. 7-9.)  At times material to the investigation and prosecution

of this case, David W. Welker was Special Agent-in-Charge (SAC) of the FBI's New Orleans

Division, having been named as such, upon Bernazzani's departure, on June 9, 2008.  On April 18,

2009, under an article about Welker, while the government's investigation into this matter was well

under way, campstblue/Perricone posted:

> Here's some facts.  Folks in the Federal law enforcement community are glad
> Bernazzani is gone.  No more puffing, No more embellishments.  No more self-
> serving BS.
>
> Welker is a breath of fresh air.  I only hope he can get his agents to do the work and
> not just think they are FBI agents.
>
> Some folks thing the FBI is responsible for all the corruption cases. Not exactly. Jim
> Letten's folks are some of the best in the country.  They compliment the agents, but
> the prosecutors have a firm grip on the laboring oar.
>
> *   *   *
>
> Contratualations to Mr. Welker.  Welcome to New Orleans.  But you have your work
> cut out for you.  This is a pit of vipers.  The people you think are your friends will
> bite you on your butt.

(campstblue, April 18, 2009, 10:46 p.m.)(Kaufman Memorandum in Support, Rec. Doc. 963-20,

Exh. 19, p. 90.)  A few months later, on September 27, 2009, at 10:53 a.m., Perricone/legacyusa

further opined:

> IF anyone cares about the truth here and how things really work, here's the inside
> scoop. The FBI of legend and lore is DEAD.  Today, cases are made by the Assistant
> US Attorneys, who I have met around this country.  The ones in VA [Virginia] are
> an incredible group of men and women dedicated to bring [Congressman William]

100

Jefferson to justice.

Here in New Orleans, and I know a few of them here, they are equally dedicated. They take cases from the FBI (chicken poop and make chicken salad) and do remarkable things--within the law. We are lucky we have attorneys who are willing to do this work, especially in New Orleans. I've always say, can you imagine New Orleans without the US Attorney's Office? It would be shocking to have to rely on the NOPD and the Orleans DA's office to bing corruption to justice.

We, the citizens should applaud our local Assistant US Attorneys and understand what they have to do to make a case, especially when their partners [the FBI] may be off doing things which can undermine their hard work.

I am very proud to know some of these men and women...we all should be too. We can only hope the FBI -- nationwide--gets it act together because we need them more now than ever.

(Kaufman Memorandum in Support, Rec. Doc. 963-21, Exh. 20, pp. 13-14.)

### 4.   Testimony of Cooperating Government Witnesses, and the Refusal of Defense Witnesses to Testify

Insofar as the trial itself is concerned, the Court has also, in the past, commented on the highly questionable credibility of certain witnesses who appeared at trial, and why a few did not, as well as seemingly coercive[106] tactics by the government. (See, *e.g.,* Rec. Doc. 593, pp. 6-8 and Rec. Doc. 794, p.17, n.23, pp. 39-52). A cavalier attitude toward the truth cannot be indulged at any juncture or level.

---

[106]   The Court also has already commented extensively expressing serious concerns, on the government's use of drastically reduced statutory maximums for cooperating witnesses, versus the use of lengthy 18 U.S.C. § 924(c) mandatory statutory minimum sentences for those who chose to go to trial, as set forth in this Court's Order and Reasons dated April 11, 2012 ( Rec. Doc. 794, pp. 38-52). See also United States Sentencing Commission's Report to Congress entitled "Mandatory Minimum Penalties in the Federal Criminal Justice System," dated October 2011, which can be accessed at the Sentencing Commission's website at www.ussc.gov.

### (a) Hunter

Officer Michael Hunter pled guilty to conspiracy to obstruct justice and misprision of a felony, exposing him to a maximum sentence of eight years.  Disregarding the calculated sentencing guidelines, U.S. District Judge Sarah Vance sentenced Hunter to the full eight years in prison.  At the time he was sentenced, Chief Judge Vance stated that she found that Hunter's cooperation "was the product of cold calculation", and that his trial testimony was "inconsistent" and "self-serving", particularly when compared to the Factual Basis he signed in connection with his guilty plea and the video shown at trial.  Judge Vance expressly questioned how much Hunter truly accepted responsibility for his actions, and pointed out that Hunter got the benefit of his bargain up front under what she described as "a highly generous plea agreement." (See *United States v. Hunter,* No. 10-86.)

This Court also evaluated Hunter's testimony when considering earlier motions for judgment of aquittal and for new trial (Rec. Doc. 575, 576, 577, 578, and 579.)  Those motions were directed, in part, to Count X, in which the government alleged that defendant Bowen "kicked and stomped Ronald Madison while Madison was on the ground, alive but mortally wounded . . ."  The charge set forth in Count X was directed only at defendant Bowen, and was supported only by Hunter's uncorroborated testimony. (See Rec. Doc. 593, "Order and Reasons" wherein the Court discusses Hunter's testimony.)  In opposing the earlier defense post trial motions, the government abandoned Count X, failing to even mention it in its 28-page memorandum.  In granting Bowen's motion directed to Count X, the Court noted that Hunter's credibility was so grievously called into question at trial that the Court had taken the unprecedented (for the undersigned) step of ordering the production of FBI Agent Bezak's handwritten notes of interviews he conducted with Hunter.  Hunter's trial testimony was significantly and quite materially at odds with Agent Bezak's, and

directly contradicted many of the written Form 302 notes expressly (and contemporaneously) made by Agent Bezak while interviewing Hunter.   Indeed, Hunter's repeated departures from these previous statements given by him to the FBI made his testimony practically useless in the government's efforts to meet its burden of proof, as more extensively explained in the Court's October 20, 2011 ruling (Rec. Doc. 593).

### (b) Hills

Questions and uncertainty likewise surround the testimony of another cooperating witness who entered a plea, Officer Ignatius Hills.  Hills rode in the back of the Budget rental truck from the Crystal Palace to the Danziger Bridge, but he did not exit the truck with the other officers.  From the back of the truck, Hills saw 14-year-old Leonard Bartholomew, III, running down the bridge, away from Hills.  Hills' response was to fire his side arm twice at the fleeing teenager, albeit missing both times.  As part of his plea agreement with the government, Hills pled guilty to obstruction of justice and misprision of a felony, for a statutory maximum exposure of eight years in prison, but received a sentence of only six and a half years imprisonment, which was the top of the sentencing guideline range applicable to the charged offenses.  (See *United States v. Hills,* No. 10-142.)  He had allegedly disavowed his guilt when speaking to his supervisor (NOPD Lieutenant Troy Savage) at the time of his resignation:

> Q.  [Bernstein, cross-examining]:  You said during this conversation with Officer Hills [when Hills advised of his resignation], he rattled off a litany of charges that he was pleading guilty to?
>
> A.  Yeah.  It was -- I don't remember that exact charges.  I want to say misprision of a felony was one.  This is all -- I'm recalling from memory, ma'am.
>
> Q.  And you asked him whether he was, in fact, guilty; is that right?

A.  Yes.  I believe the exact quote I used was, "Did you do it?"  And his response was, "No, I did not.  It was the best deal I could get.  I have to take it."

(See July 28, 2011 Testimony of NOPD Lieutenant Troy Savage, Rec. Doc. 691, at

p. 242, l. 22 – p. 243, l. 6.)

### (c)  Barrios

Officer Barrios was charged with and pled guilty to obstruction of justice, exposing him to a maximum five year sentence in exchange for his cooperation.  (See *United States v. Barrios,* No. 10-103.)  With the other officers, Barrios exited the Budget truck and was present and armed during the shooting.   Yet the government did not call him as a witness at trial in its case-in-chief. According to Agent Bezak, Barrios initially volunteered that he had fired his weapon (a shotgun) which apparently struck victim James Brissette, who (according to Barrios) spun around when hit. Upon learning of the federal investigation, Barrios conferred with Mr. Glen Madison, an NOPD ballistics officer, to learn that ammunition from a shotgun blast could not be traced to a particular shotgun, whereupon he then denied he fired his weapon at all.  At trial, testimony was elicited that Rakesha Barrios, the spouse of cooperating defendant Robert Barrios, initially claimed that her husband had been forced to admit guilt and to cooperate despite the fact that he was innocent.[107] (See July 25, 2011 testimony of Robert Barrios, Rec. Doc. 676, at pp.157-165).  Before the jury, Robert Barrios denied such was the case, however, he was the only cooperating defendant with a plea agreement who, conspicuously, was not called as a witness by the government. (*Id.* at pp. 164-65, 270-71, 275-76; July 27, 2011 testimony of Robert Barrios, Rec. Doc. 683, at pp.25-30, 48-49).

---

[107]     Rakesha Barrios complained to USA Letten, which was overheard by Agent Bezak, who neither investigated further nor referred the complaint to "public integrity." (July 21, 2011 Testimony of William Bezak, p. 246, l. 1-22.)

(d)    **Lehrmann**

Just as disturbing was the DOJ's treatment of cooperating witness Jeffrey Lehrmann, who

pled guilty to misprision of a felony, and received the maximum three year sentence. (See *United*

*States v. Lehrmann*, No. 10-51.) On July 29, 2009, Lehrmann provided false testimony to the federal

grand jury. (See *id.,* "Factual Basis," Rec. Doc. 22, p. 12.) At that time or shortly thereafter, the

government determined that Lehrmann lied, and he was brought back before the grand jury on

February 3, 2010, this time as a cooperating witness/defendant, plea deal in hand.

At trial in this matter, Lehrmann testified that he participated in the creation of fictitious

names (suggesting the name "Lakeisha Smith" out of thin air, when in need of a witness), falsified

evidence, and other criminal acts while working side-by-side with defendant Kaufman, in an effort

to justify the events occurring on the Danziger Bridge, on September 4, 2005, and participated in the

filing of false charges thereafter against Lance Madison. For Lehrmann's cooperation, the

government charged, and Lehrmann pled guilty, only to the grossly lesser crime of misprision of a

felony, as opposed to the multiple charges defendant Kaufman faced. Further, in September 2006

(a full year after the shootings), Lehrmann was hired by DOJ with employment in *federal* law

enforcement, as an agent with Immigrations and Customs Enforcement ("ICE"), where he worked

from approximately September 2006 until June 2010,[108] although he pled guilty on March 11, 2010,

and had reached an agreement to cooperate and enter the plea some time before. However, within

only two months of Lehrmann becoming employed by the federal government in federal law

enforcement, the DOJ, in November 2006, began monitoring the State of Louisiana's Danziger

---

[108]    At the time of his cooperation and guilty plea, Lehrmann was paid a salary of $2,275.00
every two weeks. (See *United States v. Lehrmann,* No. 10-51, Pre-Sentence Report, p. 18.)

Bridge prosecution. ((See Declaration of Karla Dobinski, Rec. Doc. 277-1, p. 5, ¶ 21, *et seq.*) "Active federal involvement in the investigation" began in September 2008 (*Id.,* at p. 6, ¶ 31)). It was with some astonishment that the Court learned at trial that Lehrmann, having falsified official police records and attempted to frame an innocent man, matriculated into federal law enforcement, seemingly the worst place to put a man guilty of such transgressions so offensive to the administration of justice. Moreover, he stayed there on the payroll for years until three months *after* his guilty plea, and at least several months after the government knew of his admitted criminal acts.....and likely a much longer period since the time he was deemed a serious target of this federal investigation beginning in 2008.

### (e) Haynes, Tollefson, and Gore

In addition, the Court notes at least one instance of shockingly coercive tactics employed against one potential witness (NOPD Officer Heather Gore) by FBI Special Agent William Bezak.[109] (See, *e.g.,* July 21, 2011 testimony of William Bezak, Rec. Doc. 674, at pp. 52-57.) Further, at least three persons called by Defendants as witnesses at trial refused to appear under threats from DOJ that they would be prosecuted for perjury as a result of their earlier grand jury testimony, and thus asserted their Fifth Amendment privilege so as to deprive Defendants of live witnesses. On July 27, 2011, as the defense commenced presenting its witnesses and evidence, the DOJ, through trial attorney Bernstein, advised the Court that two of the three witnesses "have both been informed that they are targets." (Sealed July 27, 2011 Transcript, p. 5, l. 24-25.) With regard to one of these witnesses, Bernstein advised that the indictment was ready to be presented to the grand jury, but was

---

[109]    On cross, Bezak stated that he did not believe Officer Gore's testimony. He first sought to visit her at her home, but later found her at the NOPD 2nd District station. He mentioned to her that she had "a nice house," inquired about her kids (triplet girls), and advised she would be deprived of them as a result of her lying. (See July 21, 2011 Testimony of William Bezak, Rec. Doc. 673, p. 246, l. 23 – p. 247, l. 20.) Nonetheless, as of today, she has never been charged at all, to the best of the undersigned's knowledge.

held back so as to avoid pretrial publicity. As to the third, he stood orally accused of lying to a state grand jury, and thus declined to testify for the defendants at this trial. Because of this, the Court allowed Defendants to present such testimony via reading a transcript; nonetheless, as is well-established, live testimony before a jury is always preferable and more convincing than reading from a cold transcript, as was done at this trial for these three witnesses. Still, to the best of the Court's information, as of the date of this Order some twenty-six months later, not one of these three defense witnesses has been charged with any crime whatsoever.

## VII. ANALYSIS

### A.    Timeliness

As previously stated, the government, in its initial opposition to Defendants' motion for new trial, contends the motion is untimely because the posts of Perricone "are not newly discovered." (Rec. Doc. 1007, p. 6.) In particular, the government argues that because the articles were published well before the Rule 33 deadline for any motion not based on newly discovered evidence,[110] and the comments under such articles were also posted long ago, defendants' motion is not timely. The government asserts that only the source of the posts recently became known, which, according to it, does not constitute "newly discovered evidence" for purposes of Rule 33. (Rec. Doc. 1007, p. 8.)

The Court rejects this contention, for seemingly obvious reasons. First, some of the evidence supporting the defendants' argument is clearly new, was submitted ex parte by Mr. Horn under the Court's Order, and is being made known to defense counsel for the first time in this Order. See, for example, the entire discussion regarding "Dipsos" herein. Secondly, the material fact about the Perricone posts (and any others by DOJ employees) is *who* made the posts, which was not revealed

---

[110]    See Rule 33(b)(2) (within 14 days after verdict).

until many months post trial.[111]   Furthermore, to argue that serious violations of the Code of Federal Regulations, the DOJ's U.S. Attorneys Manual, and various other ethical rules designed to ensure the fundamental fairness and integrity of liberty depriving criminal proceedings, can be committed in anonymity and thus concealed, without consequences, based upon timeliness, merely invites more of such conduct.  Similarly, the government's position[112] that because the "anonymous" posts were available to defendants should have alerted them to the government's improper activities, is nonsensical, particularly since those DOJ employees who posted did so under pseudonyms chosen specifically for the very purpose of avoiding detection.

Additionally, *United States v. Ugalde,* 861 F.2d 802 (5th Cir. 1988), a case cited by the government, is easily distinguishable.  In *Ugalde,* the defendant observed all the grounds for his motion during the trial itself, unlike in this case, wherein the prosecutorial misconduct occurred surreptitiously and covertly, and with every intent for it to remain so, as the poster's "little secret" or "little downtime thing."  Thus, the Court finds that the identity of the commentators, revealed to be DOJ attorneys, constitutes "newly discovered evidence" for purposes of Rule 33(b)(1).

Moreover, even were the Court willing to consider this evidence as not "newly discovered", the government's timeliness argument would still fail, because the government employees involved have taken great pains to conceal their activities to prevent its discovery.  In assuming the sobriquets

---

[111]   On March 15, 2012, it was first publicly admitted that Perricone was, in fact, posting as "Henry L. Mencken1951."  Some of the other user IDs he used in the past were not admitted until the October 10, 2012 status conference at which time Perricone was questioned about them.  As previously discussed, moreover, even today other user IDs of both Perricone and Jan Mann cannot be recalled.

[112]   Government's Response to Defendants' Motion for New Trial, Rec. Doc. 1007, pp. 10 & 15.

they did as user IDs, Perricone,[113] Mann,[114] and Dobinski,[115] all realized the impropriety of posting online under their real names. None thought they would ever be discovered, and all knew they otherwise should not be conducting such prejudicial activity. Further, even after Perricone's activities had been discovered, former First AUSA Jan Mann became personally involved in purportedly protecting the government's interests by responding to the Court's inquiries on June 13, 2012, and thereafter, some of which conduct is recounted in Part One (Order and Reasons dated November 26, 2012, Rec. Doc. 1070). Significantly, despite her awareness of the Court's concerns about Perricone's postings, she did not publicly admit to her own postings until November 2012.

---

[113]    Perricone Transcript, October 10, 2012, p. 18, l. 21-25:

> The Court:    Did you think when you joined NOLA.com, under whatever name you initially used, that it was okay if people knew that an Assistant U.S. Attorney, particularly senior litigation counsel, was a poster?

> The Witness:   No, no, negative.

[114]    Jan Mann Transcript, November 15, 2012, p. 93:  "I couldn't say that [regarding her Nola.com posts] with my name and my title.  But, again, I thought I had anonymity."; p. 136:  "I never thought it was going to get out.  I never thought about it getting out in public."; and p. 284:

> Q.    Sitting at the computer and starting to type, why did you decide not to use your own name?

> A.    Because I happen to have a cloak of authority.  If I used my own name, I mean, my name is not that well-known, but it's known well enough that people might know that it was an assistant U.S. attorney saying it.  So I couldn't -- I couldn't go there.  I knew that.

> *    *    *

> Q.    Is it fair to say that you chose to post anonymously because you thought you could say things anonymously that you couldn't say using your own name?

> A.    Definitely.

[115]    Dobinski's posting activity was disclosed in December 2012, at which time she described herself as being "chagrined" over the revelation.

Likewise, it was not until May 15, 2013 – more than a year after Perricone admitted to at least some of his postings and OPR began its apparently ongoing investigation – that the Court was advised that it was Civil Rights Division trial attorney and "taint team" leader, Karla Dobinski, who posted about this case, during the course of Defendants' trial, as "Dipsos," not just any DOJ "employee." Surprisingly, the first two Horn Reports, dated January 25, 2013 and March 29, 2013, essentially gloss over the unidentified "employee from the Civil Rights Division," minimizing her involvement as posting a mere six comments, described as not being "inflammatory, critical or prejudicial," and as such "of a different category than those posted by Mr. Perricone and Ms. Mann." Thus, according to the government, Dobinski's postings "do not constitute a basis to support Defendants' Motion for New Trial." (See Horn Report dated January 25, 2013, pp. 20-21.) Though it may have been the government's hope that the Court would accept this assertion and simply "move on," such advocacy surely warranted further scrutiny.[116] Indeed, having become suspicious that the Horn Reports might have been edited by a supervisor so as to coyly provide less information, rather than more, it took the undersigned two rounds of response questioning to finally obtain the important true identity of "Dipsos."[117]

In short, the government's argument (Rec. Doc. 1007) that "the defendants find themselves in a Catch-22 created by the Rule 33 deadlines" is but an expedient attempt to exploit and benefit

---

[116]     To be sure, Mr. Horn and Ms. Alexander might well have been unaware of Karla Dobinski's pre-trial role in this case, but other DOJ personnel who viewed the drafts of the Horn Reports prior to submission, including the prosecution team, knew exactly who she is and her importance in this case. Lest there be any doubt whatsoever, the Court gives the benefit of that doubt to Mr. Horn and Ms. Alexander, in their attempt to be accurate and complete, based on their specific limited assignment and what they knew (and didn't know) of the pre-trial history of this case.

[117]     It also took a second round of response questioning for the Court to obtain the specific identity of DOJ agency employee "A", who is not discussed further in this Order.

from certain government counsel's own lack of transparency and deception. Thus, the Court cannot deprive, on grounds of untimeliness, the defendants an opportunity to argue this grievance simply because Perricone, Jan Mann, Dobinski, and possibly others "kept mum" long enough for the defendants to lose their right to bring before the Court such a gravely serious matter impacting their convictions. Accordingly, the Court finds the defendants' motion to be timely.

**B.      Due Process**

In every criminal trial, a defendant is entitled to a fair trial before an impartial jury, at which time the government must prove his or her guilt, for each count charged, with admissible evidence, and beyond a reasonable doubt. This sacrosanct principle ensures that no defendant is deprived of his or her liberty as a result of an unfair, biased, or slanted proceeding skewed to achieve a conviction, as opposed to finding the truth with requisite certainty. In this instance, it is difficult to conceive, much less accept, that this time-honored constitutional procedure successfully withstood an attack of the ferocity seen here, a campaign extending back to the commencement of the DOJ's active investigation of this case in 2008, and continuing through the acceptance of related plea agreements, the indictment, and the trial itself. To conclude that such misconduct was only a little unfair, but not enough to be harmful, turns the fundamental principle of due process on its head.

The government attempts to minimize the early disclosure of the Lohman plea by stating that "the public's exposure to this information was less than one day before the information was properly to be publicized." The internal emails[118] of the prosecution, however, clearly recognize its undeniable impropriety. Although the Court still does not know with certainty the identity of the source of the leak to the AP and the Times-Picayune (and both news agencies steadfastly refuse to

---

[118]      See Part One, Rec. Doc. 1070, p. 7, particularly Footnote 9.

disclose this information), Perricone's testimony sheds some light on who it may be.  Further, the affidavits gathered by Mr. Horn under *Lance* are, of course, wholly contingent on the credibility of those who signed them.

With respect to Perricone's postings, which are the only ones discussed in the government's June 5, 2012 memorandum, the government endeavors to safely isolate the "prosecution team" (much like the attempts to contain and limit Karla Dobinski's role in the Horn Reports), stating: "Perhaps recognizing that they have no evidence to support their allegations of misconduct by members of the prosecution team, the defendants attempt to cloak the entire Department of Justice with any alleged misconduct attributed to former-AUSA Perricone." (Rec. Doc. 1007, p. 27.) The fallacy of this argument should be obvious. Of course, the "prosecution team" IS the DOJ – it IS "the government" – in this case, as it repeatedly referenced during this trial. The "prosecution team" is not some distant independent satellite of DOJ.  The government further describes Perricone's postings (as Henry L. Mencken1951, or any other pseudonym) as

> not known or suspected by anyone associated with the case (including the prosecution team, the Court, the jurors, or the defense attorneys) to be a government employee, let alone a supervisor of the trial team.  Additionally, Perricone's comments were neither front-page headlines nor breaking news stories; rather, they were remarkably low-profile musings of an unrecognizable citizen not known to be associated with the government, commenting beneath articles that related directly to the ongoing trial and were therefore expressly off limits to the jurors.

(Rec. Doc. 1007, pp. 28-29.)  Thus, the government sought to minimize Perricone's activities, without commenting whatsoever[119] on his and First AUSA Jan Mann's, and Karla Dobinski's, and perhaps others' earlier pre-trial posts, or violations of 28 C.F.R. § 50.2, Chapter 1-7.000 of the

---

[119]     The government might contend it was unaware of other posting activity when it filed its opposition memorandum.  The sworn testimony of former First AUSA Jan Mann suggests the contrary. Regardless, the Court's decision today would remain unchanged.

United States Attorney's Manual, Local Criminal Rule 53 of this Court, the Louisiana Rules of

Professional Conduct, and Rule 8.4 of the District of Columbia Rules of Professional Conduct.[120]

---

[120]     The government will likely posit that the appropriate remedy for the conduct reflected in Part One and this Order is attorney discipline, both via the relevant bar associations and the DOJ's internal disciplinary arm, OPR.  While this might be a logical place to start, having a division of the DOJ, such as OPR, investigate members of the DOJ wherein the validity of a DOJ conviction may be at risk clearly demonstrates an obvious conflict of interest.  In other words, because the DOJ has argued vigorously for the conviction of the defendants, has zealously prosecuted them, and seeks to maintain their convictions, it is unlikely to view *any* transgression by government counsel as impacting, in even any small way, the validity of these convictions.  Relegating prosecutorial misconduct to attorney disciplinary bodies is also insufficient in this case for some very specific reasons: (1) as late as April 10, 2013, in an email letter attributed to Perricone, he still reiterates, "I did nothing wrong.  Yes I commented on a myriad of things, including the corrupt state of affairs of this metropolitan region."  Despite his sensitive former position as AUSA Senior Litigation Counsel, Perricone maintained: "The right to comment anonymously and the right to allow people to comment anonymously are consubstantial constitutional rights, which are enshrined in our basic law."  See email communication from Salvador Perricone, Wednesday, April 10, 2013, at 10:37 a.m., to Sandy Rosenthal, published on May 21, 2013, by reporter Lee Zurik, WVUE TV, New Orleans, Louisiana.  This is consistent with Perricone's statement in the article "Sal Perricone's Next Chapter", which the Court discussed in Part One.  (2) Former First AUSA Jan Mann adopted a similar pertinacious position, further developing a theory that she had dual capacities, a "personal" capacity which permitted her to comment online at will, and an "official" capacity which did not.  (See Jan Mann Transcript, November 15, 2012, pp. 37, 41, 42, 60-61, 107.)  Even after Perricone's "little secret" became public in March 2012, Jan Mann did not flinch or become uncomfortable when considering the consequences of her "downtime" postings:

> Q.     [question propounded by one of two OPR attorneys] Were you concerned that there was an investigation going on of you?
>
> A.     No.  Because I really didn't think it was even something I had to report to you.  I hadn't been alleged to have done anything wrong.  I didn't think I was under any obligation to -- to of- -- to volunteer it.  But that's not who I am.  I should have told you.
>
>       But I wasn't really too worried about adverse consequences, 'cause I sort of feel like I can retire.  That -- that's like a load.  You know, I don't know if either of y'all can retire, but when you get there, it's like there's really kind of not anything they can do to you, 'cause I can at least retire.  I don't want to retire with a bad record or anything because I never had did anything wrong.
>
>       But -- so it's not like I'm flaunting it, but I wasn't worried about the ad- -- I really wasn't.  I really wasn't.  Because I said, I'll retire.

(Jan Mann Transcript, November 15, 2012, p. 134, l. 17 – p. 135, l. 12.)  And that is exactly what she did. With such recusant attitudes, Perricone and Jan Mann both undercut the notion that disciplinary actions, reprimands, or even loss of their important positions at EDLA DOJ are any incentive for others to conform future conduct to the Code of Federal Regulations, Local Rules, and other guidelines set forth herein.  In any event, for purposes of the instant motion, the Court's focus is on ensuring the defendants receive a fair trial, as required by the United States Constitution, not merely that proper attorney discipline is rendered.

As should be clear by now, these arguments quickly fade and wither in light of the facts learned by this Court since the government's opposition memorandum was filed over a year ago.

The government additionally asserts that the defendants' motion "lacks any substantive merit" (Rec. Doc. 1007, p. 10), claiming that no juror or potential juror was actually prejudiced by any pretrial publicity, while at the same time recognizing, as it must that the law provides exceptions to the requirement of such a showing of prejudice.[121] (Rec. Doc. 1007, p. 12.) As previously discussed (See pp. 43-44), one such exception is where the integrity of the proceeding is so infected with a pattern of deliberate and especially egregious prosecutorial misconduct, such that due process may be denied by the government's failure to obey its own regulations, and/or where a miscarriage of justice occurs.

Under circumstances as extraordinary and offensive as these, jurisprudence indicates that a showing of prejudice is not necessary. *Narciso,* 446 F.Supp. at 306; *Stone v. United States,* 113 F.2d 70, 77 (6th Cir. 1940). The Court finds that this case fits squarely within Footnote 9 of the U.S. Supreme Court's opinion in *Brecht v. Abrahamson, supra.* Moreover, as was the case in *Narciso, supra,* at 320, even an inquiry of the jury[122] and witnesses (both those who testified and those who might have but did not) can hardly cure such a grave appearance of unfairness nor insure complete candor, even if these comments were "not actually conveyed to the jury." See also *Narciso, supra,* at 306, and 320; *Stone,* 113 F.2d at 77.

---

[121]    In its opposition (Rec. Doc. 1007, p. 11), the government recognized (and argued distinguishment of) the Fifth Circuit cases of *United States v. Capo,* 595 F.2d 1086 (5th Cir. 1979), and *United States v. Chagra,* 669 F.2d 241 (5th Cir. 1982), *cert. denied,* 459 U.S. 846 (1982), <u>overruled on other grounds</u>, *Garnett v. United States,* 471 U.S. 773 (1985). Considering the revelations learned since the June 13, 2012 hearing, the Court finds that both cases provide useful guidance for the disposition of this motion.

[122]    See discussion of the jury, pp. 117 through 119.

## C.   Prejudice

Even were a showing of actual prejudice required here, this record is sufficient in that regard as well.

### a.   **Government Pressure**

First of all, both Perricone and Dobinski viewed posting of highly-opinionated comments as a "public service." That is, the comments Perricone provided,[123] and those Dobinski encouraged and praised, were viewed, at least by them, as accomplishing a larger public goal. Moreover, though the Court initially was unimpressed with the defendants' citation of FBI Agent Bezak's frank trial testimony regarding DOJ's use of the media, it now seems, at a minimum, rather unfortunate and coincidental:

Q.    All right. So I want to focus you back. Now all of a sudden you have a splash of media when you do this search. How did you try to deal with that media for purposes of your investigation, or how did you try to deal with that fact?

A.    Well, I hoped that it would create more pressure on the subjects of the investigation, that they would know that we're still investigating the case and that we're making progress in the case.

Q.    And what do you mean by pressure? Why is pressure a good thing?

A.    Pressure is a good thing because, in my experience, to flip a subject, to get a subject to admit that they've committed a crime, it's not like the movies where you go into a room and three hours later you come out with a confession. In my experience, the only time I've been able to get somebody to admit what they've done is to back them into a corner; to have, you know, a case that

---

[123]      In particular, the Court recalls Perricone's posts directed to NOPD officers on February 23, 2010, calling on them to seek "guilty" pleas and forego their right to trial: ("Despite defense attorney protestations to the contrary, It would be prudent for those involve to consider the track record of the US Attorney's Office. Letten's people are not to be trifled with." and "Archie, your time is up."); May 20, 2010 ("The Feds never forget.....this officer [Hills] is doing the right thing....wish the others would, then IT would be over."); and August 13, 2010 ("These cops are being led down the road to perdition by their attorney. They need to get competent INDEPENDENT representation and stop dining on a diet of cop-cooked soup of self-justification served to them on paper plates by attorney who just wants to mug for the cameras. I hope the judge can keep this under control. Something's not right here—can't put my finger on it --- but somethings not right.").

is so strong that they have nowhere to go except to admit the truth. And that usually occurs, and in this case it did occur, when their attorney is present with them.

(See Transcript of April 18, 2011, Testimony of FBI Agent Bezak, p. 75, l. 5-16; see also Rec. Doc. 1019-1, p. 6.) While this testimony regarding the "pressure" the government brought to bear through intentional and purposeful use of the media might not have extended, in Bezak's mind, to anonymous online commenting, it surely depicts the government's purposeful cultivation of media as a tool to ultimately obtain favorable testimony and cooperation in exchange for convictions on far lesser charges.

Everyone should recognize, as did First AUSA Jan Mann (Jan Mann November 15, 2012 Transcript, p. 138, l. 1), that a "propaganda campaign" by the USAO or the DOJ would be improper, and the USAO/DOJ proceeded to deny (and continues to deny) that such an effort existed. Prejudice, however, can occur in many forms, and can now undermine judicial proceedings without being as overt as that described in existing case law. Whether coordinated as a "propaganda campaign," or simply the culmination of independent, but nonetheless quite improper, posting activities by government employees, a prejudicial, poisonous atmosphere can be created sufficient to impair the fundamental constitutional right to a fair trial by an impartial jury. In this case, the Court has already learned of more online posters employed, or encouraged by, USAO and DOJ attorneys, all of whom rain vociferous condemnation on the defendants, their employer NOPD, their attorneys, their defenses, their witnesses, their evidence, and the testimony of the one defendant who took the stand. Through the cited provision of the Code of Federal Regulations, as well as the U.S. Attorneys Manual, the government clearly recognizes that the use of the media, in ways that might very well prejudice defendants, and create an overriding tenor of guilt in the community long before trial, must

116

be avoided.  The known postings of Perricone, in particular, clearly establish this general criteria of creating such prejudice.

> ### b.   Influence on Jurors

Though the Court has found that, under these egregious circumstances, prejudice need not be shown, the undersigned reviewed the pre-trial questionnaires filled out by the twelve jurors who deliberated in this case.[124]  In the months before trial in 2011, recognizing that Nola.com was a rather popular source of local news and information, the Court, by agreement of all counsel, expressly and separately included a written question regarding it (Question 87c) on the questionnaire.  Specifically, when asked whether they visited the Nola.com website, seven of the twelve responded in the affirmative; three of those seven also indicated that they did not receive a hard copy of a newspaper. The Court then not knowing and never suspecting posting activity by DOJ attorneys and employees, AUSA's, or any other counsel, no further questions were asked of those who answered "Yes."  Had counsel and the Court been aware of such improper activity, jurors surely would have been subject to further inquisitive voir dire, particularly about Perricone's long-time campaign of negative NOPD posts, including those discussing the defendants and the defense of this case.  But, because the posting of prejudicial comments was kept a "secret," neither trial counsel nor the Court had the inclination or need to explore it further, and thus, in hindsight, the voir dire process, given these unique circumstances, was flawed and insufficient.

Also pertinent are Questions 49, 54, 77(f) and 77(h), which specifically relate to impressions

---

[124]   The questionnaires were completed by all prospective jurors a few weeks prior to jury selection in this matter.

of NOPD.[125]  Although the Court did not discern a material difference between the responses of the

seven jurors who looked at the Nola.com website, versus those who did not, on these particularly

relevant questions, there was one noticeable disparity of arguable significance.    That is, in

responding to Question 77(h) ("NOPD officers tend to be honest."), the seven Nola.com readers

responded [on a scale of 1 ("disagree strongly") to 7 ("agree strongly")] with four 4's, one 2, and one

6, for an average of 4.[126]  The jurors who indicated that they do not look at Nola.com responded with

two 6's, one 2, one 5, and one 7, for an average of 5.2.    Though the many answers to the

questionnaires could be interpreted in different ways, these responses to this particular question seem

to demonstrate that those jurors who **did not** view the Nola.com website tended to view NOPD

officers as being more honest than the seven who **did** view the website; to state it conversely, those

who read Nola.com were more likely to view NOPD officers as dishonest.

Of course, there are undoubtedly many reasons why each juror thought the way he/she did,

and on which he/she based each opinion.  More importantly, were an evidentiary hearing held on this

issue, it is highly unlikely that any juror, questioned years later, could recall, with any reliability or

certainty, which news articles he/she viewed on Nola.com, and which comments he/she read, since

Perricone started posting in late 2007/early 2008.  Moreover, even today, neither the Court, the

government, nor defense counsel know the full extent of posts by AUSA's, other DOJ employees,

and/or other government employees to this day, since the previous Perricone and Jan Mann user IDs

---

[125]      With regard to answers provided to questions about the NOPD on the questionnaire, there
are a few inconsistencies.  For instance, on a scale of 1 to 7 (1 is "disagree strongly" and 7 is "agree
strongly"), one juror answered with a numeric "2" ranking to both statements 77(f) ("NOPD officers tend
to be corrupt.") and 77(h) ("NOPD officers tend to be honest.").

[126]      One juror answered "don't know," and circled "4."

118

cannot be recalled or recovered, the DOJ has decided not to pursue a subpoena for the ten other user IDs sought earlier this year, and there may well be others still unknown who posted comments. (See Jan Mann November 15, 2012 Transcript, p. 138, l. 23-24: "There's going to be other commenters in the office.")

Finally, it might not be discernable whether a juror's opinion about NOPD officers' honesty is a result of conversation/influence of other family members, friends, and/or coworkers who were unknowingly impacted by the surreptitious "public service" of Nola.com posting by government personnel. Thus, the contamination of the illicit prejudicial comments over the preceding years is ineradicable, like a bell which cannot be unrung. Suffice it to say, however, the only dependable answer in the questionnaire, not subject to interpretation and argument based upon analysis of trends, or later vague recollections, is that seven jurors indicated before trial that they visited and viewed the Nola.com website with varying frequencies. And, of course, none of those jurors were immune to the extensive pre-trial posting activity of Perricone (and perhaps others) in the years leading up to trial. Rather, during this multi-week trial, the jury was not sequestered, and jurors resumed normal activities on the days they were not in trial. Even if they followed the Court's instructions precisely, they still would have been exposed to the general zeitgeist of the community, which was being purposefully influenced by Perricone and, later during trial, Dobinski. Under these circumstances, the Court cannot afford the government a presumption of innocuous benignity.

### c.   **Potential Influence on Witnesses**

In addition, as the Court has already pointed out, Officer Hills (and perhaps others, like Officer Barrios) denied his guilt, but took "the best deal I could get. I have to take it." On the flipside, attorneys for three defense-subpoenaed witnesses reported to the Court during the trial that

their respective clients declined to testify, on Constitutional grounds, because they had been threatened with federal or state prosecution based upon prior conduct. (See Part One, Rec. Doc. 1070, p. 45, fn. 35.) Prosecutor Bernstein herself advised the Court that two of these three witnesses "have been informed that they are targets", and that DOJ was "ready to present the indictment and the reason we held back was specifically in deference to this Court's Order and to be sure not to generate publicity." (Sealed Transcript of Bench Conference, July 27, 2011, p. 6.) Then USA Letten similarly stated: "There are legitimate pending matters against them that we could, in fact, press." (Sealed Transcript of Bench Conference, July 27, 2011, p. 6.) With regard to the third witness who had faced state charges, moreover, USA Letten reportedly advised Orleans Parish District Attorney Leon Cannizaro that, "we have no intention of immunizing these individuals . . ." (Sealed Transcript of Bench Conference, July 27, 2011, p. 5.) Though transcripts of these witnesses' grand jury testimony were read to the jury by a paralegal or law clerk, the defendants were deprived of live testimony subject to cross examination, which is always significantly better from the jury's perspective, though the Court makes no evaluation (and simply cannot make such an evaluation) of whether such testimony would have ultimately impacted the verdict herein.

## D.    Evidentiary Hearing

The defendants originally requested an evidentiary hearing. (Rec. Doc. 963-1, pp. 18-20.) In cases alleging prosecutorial misconduct, courts should hold an evidentiary hearing when the motion, as is this one, is based on evidence outside the trial record. *Richardson v. United States,* 360 F.2d 366, 369 (5th Cir. 1966) (remanding for the district court to conduct a hearing on potential witness misconduct); *United States v. Chagra,* 735 F.2d 870, 874 (5th Cir. 1984) ("the alleged governmental misconduct could not be shown except by an evidentiary hearing, because it was (as

alleged) extraneous to and outside of the trial record.")  In this case, however, the Court believes it has obtained sufficient information from the government via the Horn Reports to meet the threshold for deciding the defendants' motion, without the need to pursue an evidentiary hearing.

Initially skeptical about the need for such a hearing, the Court ordered further investigation and information from the government, and also ordered the defendants to submit ex parte a specific description and plan for the evidentiary hearing they sought.  (Rec. Doc. 1070, pp. 6-7.)  In the intervening 15 months between that Order (June 13, 2012) and today, the Court has seen the initial suspicions of government misconduct mushroom into more than it could possibly have imagined in June 2012.  Indeed, developments in the interim seem to show this misconduct has metastasized.

The undisputed facts as set forth in Part One and in this Order are sufficient for the Court to rule as it does today, although they may just scratch the surface.  In fact, a reader of both Orders will note quite conspicuously that pivotal questions abound and remain unanswered.[127]  In addition, one can only wonder what other unanticipated revelations might be in store along the lines of those

---

[127]      As Henry L. Mencken1951, Perricone made two very correct statements: "There are NO secrets in New Orleans......." (October 12, 2011, 7:24 a.m.)(Kaufman Memorandum in Support, Rec. Doc. 963-23), Exh. 22, p. 38, and "Perhaps the truth will surface. God knows, we need more truth in this city." (August 27, 2011, 10:16 a.m.)(Kaufman Memorandum in Support, Rec. Doc. 963-23), Exh. 22, p. 10.  Yet the Court, even with the capable assistance of Mr. Horn and Ms. Alexander, remains unaware of: the identity of the source of the "leak" of the Lohman plea, in possible violation of Rule 6(e); the earlier user IDs of Perricone and Jan Mann, and how many other user IDs might be involved; the identities of ten of the eleven user IDs that were the subject of the DOJ administrative subpoena (see p. 17); the information which could have been obtained from a forensic recovery of computer data for years 2010 and 2011 (prior to December 19, 2011) by the DOJ; whether USA Letten agrees with his former First Assistant that she disclosed her online posting activity in March 2012, and whether that information was conveyed to others in DOJ over six months prior to its public disclosure in early November 2012; whether Karla Dobinski's posting was known to others at DOJ; whether "123ac" is an AUSA; whether other government agency employees posted comments on this case, as did government agency employee "A;" and whether any of the three defense witnesses who refused to testify at trial will ever be charged with the crimes for which they were threatened prior to this trial.  These are but a few of the outstanding issues which would be the subject of an evidentiary hearing.  It is anticipated that surely others would surface upon learning further information at such a hearing.

suggested herein. Secrets such as these are not given up easily, and have not been. For instance, the shock of learning of "taint team" leader Dobinski's posting activities leads the undersigned think that nothing would surprise the Court at this point. In Part One, the Court said it would follow the evidence, and it has done so sufficiently to arrive at its ruling.

Moreover, the only practical way an evidentiary hearing can be held in this case, given the prior lack of complete transparency and slow drip of information, would be to schedule it in sessions, much the way a grand jury operates. In other words, each day of testimony and document return and review would lead to further inquiry, resulting in another evidentiary session as follow up to that which was learned in the one before. Proceeding seriatim, the Court would likely ferret out much more information regarding the government's activities, both anonymous and not, at great cost to all involved, with no small amount of collateral damage. Based on the record as it exists today, the Court believes this motion can be disposed of without the need to further test the veracity and reliability of many more prosecutors and federal law enforcement personnel. Furthermore, given additional information within the Court's knowledge from the Horn Reports but not reported herein, it is highly unlikely an evidentiary hearing would improve the government's position, or absolve it of its admitted transgressions. Considering the already-known and established facts, the Court has already been led to a dark benthic place of prosecutorial misconduct.

**E.   Disposition**

The Court expects that all criminal proceedings will be conducted by all counsel properly, professionally, ethically, and with dignity. In that regard, the Court is charged with "safeguarding the integrity of the jury trial." (See *Narciso,* 446 F.Supp. at 304 (quoting *United States v. Gainey,* 380 U.S. 63, 68 (1965)). Thus, the Court's primary concern, in light of all of the government's

activities set forth herein, is whether this verdict can be honored as a fair product of our criminal justice system. The Court finds that it cannot. The Court determines that, in this instance, prejudice need not be shown; and even so, sufficient prejudice exists. The critical mass - the "totality of the circumstances" or "cumulative effect" - of these actions is more than this Court can bear, and warrants the relief granted herein. At the conclusion of Part One (Rec. Doc. 1070), the Court indicated that the possibility of prosecutorial misconduct "ripening into grounds for relief remains somewhat distant." (Rec. Doc. 1070, p. 48.) As set forth herein, that distance has closed, and the government's misconduct has surpassed the Court's tolerance under the relevant law and jurisprudence. While it may be difficult to pinpoint exactly which government act is the proverbial "straw that broke the camel's back," the undersigned is certain that it is indeed surely broken with the revelation of Dobinski's posting activity, given the "public service" encouraged of specific posters thirsting for convictions.

The Court initially posed the question of whether the government could do indirectly, with anonymity, that which it is strictly prohibited from doing under all other circumstances. One need only review the clear unequivocal provisions of 28 C.F.R. § 50.2, 28 C.F.R. § 1626, the DOJ U.S. Attorneys Manual, Local Criminal Rule 53 of this Court, and the various Rules of Professional Responsibility, to realize that the government's conduct in this case cannot be considered merely "my little secret" "to relieve stress,"[128] or "my little downtime thing," "no big deal."[129] A review of the entire body of information provided to the Court since the subject motion has been filed leaves one

---

[128]    Perricone October 10, 2012 Transcript, pp. 23-24.

[129]    Jan Mann November 15, 2012 Transcript, p. 110.

with the distinct impression that an online "carnival atmosphere"[130] existed, wherein justice was distorted and perverted in ways that are directly and strictly prohibited, without exception.  Nor was such misconduct confined to a single low-level government employee who committed such acts infrequently and over a short period of time; to the contrary, they were committed by those with significant authority who act in the name of "the United States of America" when they enter court and at all other times, and who have now left a fractured public trust.

The government, through DOJ, is instilled by the United States Constitution and statutory authority with great investigatory and prosecutorial powers:  the power to initiate investigations, empanel grand juries, call and subpoena witnesses and the production of documents before grand juries.  The government likewise is equipped with a vast network of law enforcement officers, including federal agencies such as the FBI, ATF, DEA and other various arms of agency law enforcement, as well as cooperating state and local law enforcement authorities.  Importantly, the DOJ is empowered to determine who gets prosecuted, and for what crimes, and has discretion in crafting an indictment to be presented before a grand jury, including the various counts featured in such indictment, so as to establish mandatory statutory minimum and maximum sentences for each defendant, and to select the strategic timing for handing down such an indictment.  The same is true relative to bills of information issued by the government.  Much to the Court's consternation, however, this apparently is not enough to some, as evidenced here.  Try as it might, the Court cannot fathom why at least three (four, counting government agency employee "A") highly intelligent, experienced and respected officials of DOJ thought posting comments publicly online was a good idea, other than to have their corrosive opinions on public display for all to see, read, and accept as correct.

---

[130]     See *Sheppard*, 384 U.S. at 358 (1966).

The publication by DOJ employees of inflammatory invectives, accusatory screeds, and vitriolic condemnations, both directly and by the express encouragement of others to do the same, should confound and alarm any reasonable observer of the criminal justice process. Indeed, the very purpose of 28 C.F.R. § 50.2 is to avoid "the particular danger of prejudice resulting from statements in the period approaching and during trial . . .", and DOJ personnel are ordered to "strenuously avoid furnishing any statement or information during that period which could reasonably be expected to be disseminated by means of public communication, if such a statement or information may reasonably be expected to influence the outcome of a pending or future trial." (See 28 C.F.R. § 50.2(b)(2)(5); U.S. Attorney Manual, § 1-7.500.) Clearly, the campaign of Senior Litigation Counsel AUSA Perricone, along with the online aiding and abetting of Washington, D.C. DOJ attorney Dobinski, violates this regulation and the other rules set forth herein.

In its opposition memorandum, the government seems to take solace in the fact that this conduct was conducted anonymously such that these "remarkably low profile musings of an unrecognizable citizen (Perricone)" were "not known or suspected by anyone associated with the case (including the prosecution team, the Court, the jurors, or the defense attorneys) to be a government employee let alone a supervisor of the trial team." (Government Memorandum in Opposition, Rec. Doc. 1007, p. 28.) In the Court's view, however, the fact that the government's actions were conducted in anonymity makes it all the *more* egregious, and forces the Court, the defendants, and the public into an indecent game of "catch-me-if-you-can." This warps the very meaning of 28 C.F.R. § 50.2 and the other rules and regulations cited herein, and casts them and the protections of the criminal justice system to the side of the road to securing convictions. This Court

is unwilling to rummage through debris and "graffiti"[131] in search of unexpected unethical conduct. The government's argument, when reduced to its most fundamental sentiment, is that it can "pull a fast one" on the Court, the defendants, defense counsel, the jury, and the public, and relief from such transgressions is now barred as untimely under Rule 33. Nowhere in the law is the Court condemned to suffer a "fool me once" fate, deprived of the ability of granting relief, and taking no action other than "gnashing of judicial teeth."[132]

The Court remains troubled that, despite the best efforts of Mr. Horn and Ms. Alexander, much is still not known about the nature and extent of government activities similar to those reflected herein.  Although a battery of preprinted affidavits were signed, the Court has, unfortunately, already seen the government omit pertinent facts, conceal material information, threaten but not charge at least three witnesses the defense identified (resulting in their failure to appear at trial), present cooperating witnesses testifying to their own separate but dissonant "truths," or "interpretations," and attempt to mitigate internet conduct that any reasonably responsible prosecutor would know is forbidden.

On July 12, 2010, the indictment in this case was announced with much fanfare, a major press conference presided over by U.S. Attorney General Eric Holder, and widespread media attention.  On that occasion, a DOJ representative said that the indictments "are a reminder that the Constitution and the rule of law do not take a holiday -- even after a hurricane." While quite true in every respect, the Court must remind the DOJ that the Code of Federal Regulations, and various Rules of Professional Responsibility, and ethics likewise do not take a holiday -- even in a high-

---

[131]    Jan Mann November 15, 2012 Transcript, p. 143, l. 15-21.

[132]    See *Capra, supra,* at 615.

126

stakes criminal prosecution, and even in the anonymity of cyberspace. While fully appreciating the horrific events of September 4, 2005, and those who tragically suffered as a result, the Court simply cannot allow the integrity of the justice system to become a casualty in a mere prosecutorial game of *qualsiasi mezzo.*

Some may consider the undersigned's view of the cited rules and regulations as atavistic; but courts can ignore this online "secret" social media misconduct at their own peril. Indeed the time may soon come when, some day, some court may overlook, minimize, accept, or deem such prosecutorial misconduct harmless "fun."[133] Today is not that day, and Section N of the United States District Court for the Eastern District of Louisiana is not that court.

The public must have absolute trust and confidence in this process. Re-trying this case is a very small price to pay in order to protect the validity of the verdict in this case, the institutional integrity of this Court, and the criminal justice system as a whole. In an abundance of caution, the motion must be granted.

## VIII.  CONCLUSION

In this Order and in Part One (Rec. Doc. 1070), the Court has cited only some of the testimony upon which it relies in ruling on the defendants' motion. This testimony and other recited information illustrates the diseased root that unfortunately casts an ineradicable taint on these convictions. The government's actions, and initial lack of candor and credibility thereafter, is like scar tissue that will long evidence infidelity to the principles of ethics, professionalism, and basic fairness and common sense necessary to every criminal prosecution, wherever it should occur in this country. In fact, many of the charges included by the DOJ in the indictment filed against these

---

[133]    Jan Mann November 15, 2012 Transcript, p. 264, l. 1.

defendants are designed to serve the purpose of maintaining honesty, integrity, professionalism, and the protection of the public from those who abuse their authority in the criminal justice system. Those purposes likewise must be served in the prosecution of those accused of violating them.

Though the Court would otherwise be inclined to have an evidentiary hearing of the type described herein, the already-established facts, in the opinion of the undersigned, establish sufficient grounds to grant the defendants' instant motion for new trial. Given the time, effort and energy invested by the Court in this matter from the beginning, this is indeed a bitter pill to swallow. With full realization of the implications and gravity of granting the defendants' motion, the Court does not take such action lightly, but only after deep and intense consideration of the admitted facts, applicable law, and the consequences of doing otherwise. For the reasons extensively stated in Part One (Rec. Doc. 1070) and in this Order, there can be no doubt that the highly unusual, extensive, and truly bizarre actions of government counsel have placed the Court and all counsel, as well as their clients and the victims, in the unacceptably awkward position of maintaining multiple convictions and de facto life sentences in the face of such actions. No comfort level for this can be reached. Accordingly, for these reasons,

**IT IS ORDERED, ADJUDGED AND DECREED** that the Motion for New Trial filed herein on behalf of defendant Arthur Kaufman (Rec. Doc. 963), and joined in by defendants Kenneth Bowen, Robert Gisevius, Robert Faulcon and Anthony Villavaso, be and is hereby **GRANTED**.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that counsel are to confer within the next thirty (30) days to determine scheduling needs, and then request the Court to set a

128

status conference once this has been accomplished.  The Court will promptly schedule such a status

conference, and will post haste select a trial date to be docketed on the calendar of this Court.

     New Orleans, Louisiana, this <u>17th</u> day of <u>September</u>, 2013.


**KURT D. ENGELHARDT**
**United States District Judge**